## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL ACTION NO.: 3:12-CV-327-RLV

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> **vs.** <br><br> **AQUILIA MARCIVICCI BARNETTE** | **DEATH PENALTY § 2255** |

### PETITIONER AQUILIA MARCIVICCI BARNETTE'S
### INITIAL MOTION FOR RELIEF PURSUANT TO 28 U.S.C. § 2255

Aquilia Marcivicci Barnette, through undersigned counsel, pursuant to 28 U.S.C. § 2255 and the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution, respectfully moves this Court to vacate the judgment entered against him and/or set aside or correct the sentence of death.

### RELEVANT PROCEDURAL HISTORY

On February 4, 1997, Aquilia Marcivicci Barnette (hereinafter "Petitioner" or "Mr. Barnette"), was indicted by a federal grand jury in the Western District of North Carolina on eleven criminal charges arising out of the firebombing of the residence of Robin Williams in Roanoke, Virginia, the carjacking and murder of Donald Lee Allen in Charlotte, North Carolina, and the subsequent murder of Ms. Williams in Roanoke. The charges included: interstate domestic violence, in violation of 18 U.S.C. §§ 2261(a)(1) & (b) (Count 1); use of a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1) (Count 2); using and carrying fire and explosive materials during commission of a felony, in violation of 18 U.S.C. § 844(h)(1) (Count 3); making a false statement in connection with the purchase of a

1

firearm, in violation of 18 U.S.C. §§ 922(a)(6) & 924 (Count 4); making a firearm by sawing off the barrel of a shotgun without complying with the provisions of the National Firearms Act, in violation of 26 U.S.C. §§ 5821, 5822, 5861(f) & 5871 (Count 5); possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) & 924 (Count 6); carjacking resulting in death, in violation of 18 U.S.C. § 2119(3) (Count 7); first-degree murder by use of a firearm, in violation of 18 U.S.C. §§ 924(c)(1) & (i)2(1) (Count 8); transporting a stolen vehicle in interstate commerce, in violation of 18 U.S.C. § 2312 (Count 9); interstate domestic violence, in violation of 18 U.S.C. §§ 2261(a)(1) & (b) (Count 10); and first-degree murder by use of a firearm, in violation of 18 U.S.C. §§ 924(c)(1) & (i)2(1) (Count 11).

On January 27, 1998, a jury found Mr. Barnette guilty on all counts of the Indictment. At sentencing, the jury recommended that Mr. Barnette be sentenced to death on Counts Seven, Eight, and Eleven. On February 10, 1998, this Court entered a judgment sentencing Mr. Barnette to death. The Court also imposed sentences on the other eight counts, which resulted in a total sentence of life imprisonment, plus 540 months to be served consecutively.

Mr. Barnette's direct appeal to the United States Court of Appeals for the Fourth Circuit resulted in the reversal of the sentences of death on Counts Seven, Eight, and Eleven, and his case was remanded for resentencing. *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000). Following a new penalty phase trial in 2002, a jury again imposed the death penalty. On direct appeal, Mr. Barnette's new death sentences were affirmed. *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004).

On May 15, 2005, Mr. Barnette filed a Petition for a Writ of Certiorari with the United States Supreme Court. Soon thereafter, the Supreme Court decided *Miller-El v. Dretke*, 545

U.S. 231 (2005). A supplemental petition for a writ of certiorari was filed on Mr. Barnette's behalf in light of *Miller-El*. The Supreme Court thereafter granted the supplemental petition, vacated the judgment of the Fourth Circuit, and remanded the case in light of *Miller-El*. *Barnette v. United States*, 546 U.S. 803 (2005). Following remand to the Fourth Circuit, Mr. Barnette sought to remand the case to the District Court. After supplemental briefing on the issue, the Fourth Circuit entered an order granting his motion to remand the case to the District Court.

After additional briefing, an in camera review of jury questionnaires, and an additional hearing on the matter, the District Court refused to provide copies of the jury questionnaires to defense counsel. The Court then issued an Order on May 20, 2010, finding no *Batson* violation by the government, and further ruling that Mr. Barnette was not entitled to discovery under the Jencks Act. *United States v. Barnette*, Case No. 3:97CR23, 2010 WL 2085312 (W.D.N.C. May 20, 2010).

Mr. Barnette appealed this Court's Order to the Fourth Circuit Court of Appeals. Following oral argument on January 27, 2011, the Fourth Circuit issued a published opinion affirming the District Court's ruling. *United States v. Barnette*, 644 F.3d 192 (4th Cir. 2011). On March 19, 2012, the United States Supreme Court denied Mr. Barnette's Petition for a Writ of Certiorari. *Barnette v. United States*, 132 S.Ct. 1740 (Mar. 19, 2012).

On April 3, 2012, a sealed motion to appoint counsel for Defendant was filed. [Case No. 3:97CR23, Doc. 682]. On May 23, 2012, the Court appointed the undersigned, *nunc pro tunc* to April 3, 2012, as counsel in this capital § 2255 proceeding. [Doc. 1]

On September 18, 2012, post-conviction counsel Henderson Hill and Jake Sussman

appeared before the Court, along with former trial counsel Harold Bender, in connection with the status of Mr. Barnette's trial files. Mr. Bender acknowledged on the record that he was the last attorney (among all of Mr. Barnette's prior counsel) to have trial files pertaining to Mr. Barnette and that he had not located or produced them to post-conviction counsel.[1]

On March 13, 2013, Mr. Barnette, through undersigned counsel, filed a *Notice of Stipulation to Extend Deadline for Filing Motion Under 28 U.S.C. § 2255 and Government Waiver of Statute of Limitations Defense and Motion for Order Confirming Agreed-Upon Extension of Time*. [Doc. 31] In this pleading, Mr. Barnette stated:

> Following extended discussions between undersigned counsel and the government, the government has made a considered, intentional, affirmative decision to waive, forfeit and/or relinquish any statute of limitations defense and consent to the extension of Mr. Barnette's § 2255 filing deadline from March 19, 2013 to June 19, 2013 in this case. *See Wood v. Milyard*, 132 S. Ct. 1826, 1835 (2012); *see also Day v. McDonough*, 547 U.S. 198, 202 (2006). The government has made clear to post-conviction counsel that this waiver is strictly limited to a three (3) month extension of the limitations period from March 19, 2013 to June 19, 2013.

*Id.* at 1.

On March 15, 2013, the government filed its Notice of Government Stipulation to Extend Deadline for Filing Motion Under 28 U.S.C. § 2255 [Doc. 32], and stated as follows:

> NOW COMES the United States, through the U.S. Attorney's Office for the Western District of North Carolina and undersigned counsel, and hereby files this notice of its consent and considered, intentional, affirmative decision to waive, forfeit and/or relinquish any statute of limitations defense regarding the extension of Defendant Aquilia Marcivicci Barnette's § 2255 filing deadline from March 19, 2013 to June 19, 2013. *See Wood v. Milyard*, 132 S. Ct. 1826, 1835 (2012); *see also Day v. McDonough*, 547 U.S. 198, 202 (2006). The government's consent and waiver is strictly limited to a three (3) month extension of the limitations

---

[1] As of this filing, Mr. Barnette, through post-conviction counsel, remains without his trial files. Prior to his death on March 24, 2013, Mr. Bender had produced approximately 300 pages consisting of miscellaneous electronic documents that largely concerned post-trial matters. The approximately 40 to 50 boxes of trial files that Mr. Bender and co-counsel Jean Lawson reportedly possessed at the time of Mr. Barnett's 2002 trial, inclusive of handwritten notes, memoranda, correspondence with the government and experts, etc., have not yet been located or produced.

period from March 19, 2013 to June 19, 2013 for Mr. Barnette to file a § 2255 motion.

*Id.* at 1.

In this motion, Mr. Barnette, through undersigned counsel, moves to set vacate his judgment and/or set aside his death sentences as having been obtained in violation of the U.S. Constitution.

## STATEMENT REGARDING BRIEFING AND LEGAL ARGUMENT

In accordance with Rule 2 of the RULES ON MOTION ATTACKING SENTENCE UNDER SECTION 2255, this motion sets forth only the facts and grounds entitling Mr. Barnette to relief. It does not contain legal argument or citation.[2]

References to sequentially numbered pages of the transcript of the trial proceedings before this Court are cited as "2002 Tr." followed by the page citation. Transcripts of the first trial before the Honorable Robert D. Potter are cited as "1998 Tr." followed by the page citation. Transcripts of other proceedings are cited as "Tr." and are followed by the date.

---

[2] The parties have conferred and propose the following scheduling after the filing of this Motion, subject to this Court's consideration.  Petitioner will file motions for discovery (if any) by July 19, 2013.  Respondent will respond to discovery requests by August 19, 2013.  After discovery issues are resolved, Petitioner will be allowed thirty (30) days to file a motion for evidentiary hearing and brief in support of his positions.  Respondent will then have sixty (60) days to file any motion, brief, answer, or other responsive pleading.  Petitioner will have forty-five (45) days to reply.

5

<u>**STATEMENT REGARDING SCOPE OF THIS PETITION**</u>
<u>**AND ANTICIPATED AMENDMENT OF CLAIMS**</u>

Although the U.S. Supreme Court's denied certiorari in Petitioner's direct appeal on March 19, 2012, thereby triggering Petitioner's one year limitations period, Petitioner was not appointed counsel for post-conviction purposes until May 23, 2012. Under any set of circumstances, ten (10) months within which to investigate and file a § 2255 petition would be quite difficult. In a capital case that involves crimes from 1996 spanning two states, aggravating factors dating back to the early 1990s, a federal capital trial in 1998, a second federal trial in 2002, three direct appeals and two remands, and an unquestionably massive record, the challenge is extraordinary.

As the Supreme Court has made clear, in addition to "the seriousness of the possible penalty," capital habeas corpus proceedings are by their nature "unique and complex." *McFarland v. Scott*, 512 U.S. 849, 855-56 (1994). Habeas litigation involves extra-record investigation and the need for expert resources; post-conviction counsel "cannot rely on the previously compiled record but must conduct a thorough, independent investigation." AMERICAN BAR ASSOCIATION, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (2003) (hereinafter "2003 ABA Guidelines"), Guideline 10.15.1 commentary. The preparation of a comprehensive and thorough post-conviction pleading is a labor intensive endeavor that requires "enormous amounts of time, energy, and knowledge. *Id.* This is particularly true in a federal post-conviction case where the 2255 litigation represents the defendant's only opportunity to present any extra-record facts challenging his conviction or sentence, and there is no state court record on which to rely. Petitioner will have no other forum in which to raise constitutional objections for judicial review.

6

As the post-conviction record in this matter makes clear, an unexpected and profound obstacle has stood in the way of undersigned counsel's diligent efforts to undertake these significant obligations, and made this undertaking vastly more "unique and complex": the failure of prior trial counsel to produce Petitioner's files from his underlying capital trials. As confirmed during a status conference on September 17, 2012, although Harold Bender was the last attorney for Petitioner to possess all trial counsel files for all prior counsel from all prior proceedings—including attorneys Susan Weigand of the Mecklenburg County Public Defender's Office, Paul Williams, George Laughrun, James Cooney, Jean Lawson, Claire Rauscher, and Mr. Bender himself—he could not locate or otherwise produce the files. As of this filing, Petitioner, through post-conviction counsel, still does not have his trial files. Prior to his death on March 24, 2013, Mr. Bender had produced approximately 300 pages on a diskette consisting of miscellaneous electronic documents that largely concerned post-trial matters. The approximately 40 to 50 boxes of trial files that Mr. Bender and co-counsel Jean Lawson reportedly possessed at the time of Mr. Barnette's 2002 trial, inclusive of handwritten notes, memoranda, reports, correspondence with the government and experts, etc., have not yet been located or produced.

As post-conviction counsel have established in previously filed *ex parte* submissions and hearings, the absence of trial files—understood to be scores of missing boxes constituting prior trial counsel's work in two federal death penalty trials which are missing through no fault of Petitioner—has created an impediment and obstacle of the first magnitude. Despite the fact that Petitioner has "been pursuing his rights diligently," the absence of trial files and complete discovery has created an "extraordinary circumstance" that threatens to "[stand] in his way" as he endeavors, through counsel, to competently explore and, ultimately, litigate matters of

7

constitutional importance relating to his death sentences. *Holland v. Florida*, 130 S.Ct. 2549, 2562 (2010) (internal quotes and citations omitted).

As made clear by Supreme Court jurisprudence arising out of capital post-conviction litigation (*see, e.g., Sears v. Upton*, 130 S. Ct. 3259 (2010); *Jefferson v. Upton*, 130 S. Ct. 2217 (2010); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 130 S.Ct. 447 (2009); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000)), and in light of the Guidelines for the Administration of the Criminal Justice Act and Related Statutes, CJA Guidelines on Case Budgeting and the 2003 ABA Guidelines, the well-established "phases" of capital post-conviction litigation include: record collection (including, and usually starting with, trial counsel files); record review; investigation (including interviewing prior defense team members, trial witnesses, client, etc.); researching and writing the 2255 petition; conducting discovery; responding to the government's answer; preparing for and conducting an evidentiary hearing; and post-hearing briefing. Section 2255 litigation is the appropriate time for a federal litigant to raise violations pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984) or *Brady v. Maryland*, 373 U.S. 83 (1963) as they depend upon ascertainment of facts outside the record. *See, e.g., Massaro v. United States*, 538 U.S. 500 (2003). The records of trial counsel are critical to this endeavor. Because of the extraordinary circumstance here, post-conviction counsel, despite diligent efforts, have been severely stymied in conducting the necessary record review and investigation that must take place.

In the face of this extraordinary obstacle, post-conviction counsel have nonetheless worked diligently to investigate Petitioner's case. During the aforementioned September 17, 2012 hearing, in an effort to continue to diligently investigate Petitioner's case, post-conviction counsel made an oral motion seeking a court order directing the government to produce

8

discovery and related material (to the extent the same would have been provided to trial counsel during Defendant's underlying capital trials). On October 5, 2012, the Court entered such an order. [Doc. 17]

On November 29, 2012, the U.S. Attorney's Office for the Western District of North Carolina provided a diskette to undersigned counsel containing 3428 pages of material. On March 5, 2013, the government produced an additional sixteen (16) separate diskettes (along with duplicate copies of (13) thirteen of the diskettes) of audio/video recordings from discovery. On March 12, 2013, the government informed post-conviction counsel that an additional three (3) audio files of interviews had been duplicated and were available to post-conviction counsel. The government also asserted that all *Jencks* material had been produced to post-conviction counsel pursuant to the Court's order and that it did not have any raw data from any expert, other than what had been previously turned over to post-conviction counsel.

In addition, post-conviction counsel have employed all manner of available process and investigative avenues to seek out and obtain information and records that pertain to Petitioner and his case. The unfortunate and unhelpful combination of the age of this case and the absence of trial files, however, has rendered this process exceedingly challenging. For example, some institutions have destroyed records pertaining to Petitioner that trial counsel had in 2002. Some defense experts no longer have their files pertaining to Petitioner because they assumed that trial counsel would have maintained their copies. To the extent that post-conviction counsel have been able to successfully identify and locate records that pertain to Petitioner by way of tireless investigation and/or extrapolation from what does exist in the court file, post-conviction counsel has not yet received all of the records that were requested.

For the above-stated reasons, despite post-conviction counsel's diligent work in this case,

and despite the government's considered, affirmative decision to waive and/or forfeit any statute of limitations argument or defense it could otherwise raise in connection with the timeliness of a 2255 motion filed after March 19, 2013 and by or on June 19, 2013, it remains apparent, due to a variety of factors over which neither Petitioner nor post-conviction counsel has any control, that Petitioner's post-conviction investigation remains incomplete.

Accordingly, post-conviction counsel have made factual allegations that they know to be true, or reasonably believe to be true. Counsel have also made allegations in good faith in order to preserve the right to amend this Motion. As counsel continue their investigation, they will seek to amend, supplement and/or correct inaccuracies (if any) in the facts and claims pled herein, and of course will provide support for each of the grounds for relief asserted, pursuant to the applicable Rules and this Court's discretion.

### STATEMENT REGARDING A CAPITAL HABEAS PROCEEDING

The Supreme Court has repeatedly emphasized that the "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Kyles v.* Whitley, 514 U.S. 419, 422 (1995) (quoting *Burger v. Kemp*, 483 U.S. 776, 785 (1987)), which is in accord with the "awesome responsibility entrusted to the federal judiciary in its habeas jurisdiction." *Stouffer v. Reynolds*, 168 F.3d 1155, 1173 (10th Cir. 1999). *See also Strickland v. Washington*, 466 U.S. 668, 704 (1984) (Brennan, J., concurring in part and dissenting in part) (observing, in habeas proceedings pursuant to § 2254, that "we have consistently required that capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding"); *Smith v. Mullin,* 379 F.3d 919, 939 (10th Cir. 2004) (noting the court's "heightened attention parallels the heightened demands on counsel in a capital case") (citing ABA STANDARDS FOR CRIMINAL JUSTICE 4–1.2(c) (3d ed. 1993)).

10

<h2 style="text-align:center"><u>GROUNDS FOR RELIEF</u></h2>

Petitioner herein alleges that his death sentences were obtained in violation of his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution. These violations include deprivations of Petitioner's rights to effective assistance of counsel, due process of law, and to be free of cruel and unusual punishment.

<h2 style="text-align:center"><u>JURISDICTION AND AUTHORITY TO GRANT RELIEF</u></h2>

This Court has jurisdiction to entertain this motion and to provide the relief requested herein pursuant to 28 U.S.C. § 2255 and the RULES ON MOTION ATTACKING SENTENCE UNDER SECTION 2255.

<h2 style="text-align:center"><u>CLAIMS FOR RELIEF</u></h2>

**I.** **<u>Petitioner Marc Barnette was Denied Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution and 18 U.S.C. § 3006A</u>**

**A.** **<u>Introduction</u>**

Aquilia Marcivicci "Marc" Barnette was convicted and sentenced to death in 1998 by a jury that did not have the benefit of a full and accurate account of his severe mental illness, tragic family dysfunction, trauma he experienced as an adolescent and young man, and the effect that his mental illness and background experiences had on his behavior and functioning. When Mr. Barnette received the promise of re-sentencing, the past repeated itself: he was again sentenced to death by a jury that did not have accurate and complete information about his mental health and his background, and the impact both had on him.

Having failed to conduct an adequate and complete investigation by the start of trial, trial counsel called Mr. Barnette as his own first defense witness at resentencing. Mr. Barnette is mentally ill and his testimony was more aggravating than mitigating. The most charitable thing

11

the prosecutor called it was "spin." It is unsurprising that after nearly two days on the witness stand, only one juror found that Mr. Barnette "has accepted full responsibility for his actions," and that only one juror found that Mr. Barnette "has remorse." A mentally ill defendant ought not to be justifying behavior through self-proclaimed mitigation, yet that is precisely what trial counsel attempted to do. Trial counsel's failure to have mental health experts explain or contextualize Mr. Barnette's testimony merely compounded *sub silento* what was already highly aggravating.

Given the unreasonably inadequate investigation that was undertaken, it is unsurprising that the other mitigating background information that was presented to Mr. Barnette's sentencing jury in 2002 was done in a truncated, contradictory, and incomplete manner. For example, after presenting Mr. Barnette's testimony about suffering severe physical abuse at the hands of Derrick Barnette, trial counsel presented the testimony of Derrick Barnette himself, which quickly and severely undermined, indeed flatly contradicted, Mr. Barnette's testimony. Reasonable trial counsel would have anticipated this concern and relied on the treasure trove of available information to establish that, unquestionably, Mr. Barnette suffered significant abuse at the hands of Derrick Barnette. Unfortunately, trial counsel unreasonably failed to take those steps and the jury was presented with two versions of the past in stark contradiction to one another. As a result, only one juror found that Mr. Barnette "was abused by his father."[3]

Mr. Barnette's chaotic, abusive, and neglectful upbringing culminated in Derrick Barnette revealing to Marc that he was not his father, when Marc was around fourteen years old, and then leaving Charlotte. These circumstances cemented Marc Barnette's mental illness that

---

[3] Defense mental health experts also relied upon the fact that Derrick "Rick" Barnette was abusive. But Rick testified that he was not abusive, that Marc's mother left him alone only once to his knowledge, and that even after he told Marc he was not his father he said he would always be there for him and he was. The government capitalized on this inaccurate and contradictory evidence defense counsel introduced.

12

would prove to be a blight on many of Marc Barnette's relationships for the next few, short, years. Defense mental health experts unreasonably were not provided available background materials that were necessary for reliable mental illness diagnoses that could withstand cross-examination. Indeed, a thorough investigation of Marc Barnette's history provides powerful insights into his actions and relationships, and makes clear that he suffers both from borderline personality disorder and a major mood disorder, neither of which he had control over, and which, in combination are doubly disabling.

Trial counsel's deficient efforts prejudiced Mr. Barnette. If any of this evidence had been properly developed, it is reasonably probable that a unanimous verdict for death would not have been returned.

### B. Standard

When a jury is asked to determine whether a defendant will live or die for his crimes, "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. 262, 276 (1976). The Sixth Amendment to the U.S. Constitution guarantees every criminal defendant the right to assistance of counsel, which in turn "protect[s] the fundamental right to a fair trial." *Strickland*, 466 U.S. at 684. Moreover, "[t]he right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). Accordingly, a capital defendant is entitled to have his death sentence reversed where counsel renders constitutionally deficient assistance of counsel. *See Strickland*, 466 U.S. at 688.

There is a two-prong test governing ineffective assistance of counsel claims. First, the defendant must show that counsel's performance was deficient in that it fell below "an objective standard of reasonableness" such that "counsel was not functioning as the 'counsel' guaranteed

13

by the Sixth Amendment." *Strickland*, 466 U.S. at 687-89. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id*. at 687. Petitioner's allegations satisfy these requirements.[4]

### C.  Information that was Reasonably Available for the Jury's Consideration

#### 1.  Major Mental Illnesses and Statutory Mitigation

Dr. Richard Dudley, M.D., a physician, with a specialty in clinical and forensic psychiatry, evaluated Mr. Barnette in person, and relying upon his evaluations and extensive background materials, reached the following expert opinions:

> Mental status examinations of Marc Barnette, performed during this psychiatrist's various visits with/examinations of Marc Barnette were quite revealing. More specifically, each time that this psychiatrist met with Marc Barnette he was oriented to person, place and time, and his memory for both short and long-term events appeared to be good. However, Marc Barnette's mood was markedly different each time that he met with this psychiatrist for reasons that he/ Marc Barnette was unable to identify/explain. At times his mood was severely depressed; at other times his mood was inappropriately elated, and at other times his mood was more mixed (i.e., depressed and manic), with an associated irritability and extreme suspiciousness that at times reached the level of paranoia (i.e., the feelings that he was being harmed were fixed/he wouldn't let them go despite being confronted about them). His affect (i.e., the external representations or expressions of his mood) also changed consistent with the above noted changes in his mood.
>
> Marc Barnette's family reported observing similar changes in Marc Barnette's mood over the course of his life, starting at least back when he was an adolescent. Unprompted, Marc Barnette's mother noted that these changes in Marc Barnette's mood were often so extreme and would occur so rapidly that she felt that she should take him for some type of mental health evaluation and treatment; she cried as she noted that she just never did that; and she noted that maybe if she had done what she had thought she should do for Marc Barnette, maybe none of this would have ever happened. More detailed exploration with family members and others about Marc Barnette's mood during May and June 1996 revealed rapid changes in his mood during that time period as well.
>
> Marc Barnette did evidence at least some developing insight, in that he noted that although in the past he didn't really know anything about depression, he now realizes that

---

[4] Petitioner will not present a lengthy discourse in this Motion on the requirements of *Strickland* and why they are satisfied. As noted above, the parties assume that the Court will schedule such arguments for an appropriate time. Petitioner does contend that his allegations make a showing of unreasonable and prejudicial attorney conduct.

the depression and suicidal feelings and attempts that he made were indicative of depression or at least some type of mental health problem. He also noted that some of the things he was feeling back then seem foreign and maybe even crazy now, largely because he has come to understand more about why/how he developed such major issues with trust, starting back with his early childhood experiences. He noted, for example, that his frenzied 'need to know' whether or not Robin was really with Greene now seems strange to him, as does the sense that he could love her so strongly that he would want to take her with him or do a murder/suicide thing.

Otherwise, Marc Barnette's mental status was unremarkable, in that his speech was clear, coherent and goal-directed, his intellectual capacity appeared to be within the average range, and there was no clear evidence of an organic brain syndrome.

Given the above noted, it is the opinion of this psychiatrist, to within a reasonable degree of medical certainty, that Marc Barnette has suffered quite severely as a result of his extremely difficult childhood. More specifically, Marc Barnette's extremely difficult childhood significantly impaired his development, resulting in broad-based instability in all major areas of functioning. There is difficulty with attachment/instability in interpersonal relationships, characterized by frantic efforts to avoid real or imagined abandonment, and intense relationships with alternating feelings of extreme idealization and extreme devaluation of the other person; there is instability of self-image, characterized by an unstable sense of self and periods feeling empty and valueless; there is instability of mood, with affective instability due to marked reactivity of mood often accompanied by anxiety and irritability and/or suicidal behavior; and there is impulsivity generally associated with self-damaging behavior.

Although this psychiatrist believes that identifying Marc Barnette's symptoms of mental illness and appreciating their impact on his ability to function is more important than labeling him with a specific diagnosis, it is the opinion of this psychiatrist that the above described cluster of symptoms meet the diagnostic criteria for Borderline Personality Disorder. A childhood history of abuse, neglect, hostile conflict, and early parental loss or separation is not at all uncommon in individuals who suffer from this disorder; this is clearly the case with Marc Barnette; and therefore it is not surprising that there is an exacerbation of the difficulties associated with this disorder when a caregiver or lover is seen as neglectful, withholding, uncaring, or abandoning. It is also important to note that persons who suffer from this disorder are vulnerable to the development of transient, stress-related paranoid ideation or severe dissociative symptoms, and based on the information currently available to this psychiatrist, this also seems to be the case with Marc Barnette.

In addition, it is the opinion of this psychiatrist, to within a reasonable degree of medical certainty, that Marc Barnette also suffers from a major mood disorder, characterized by rapidly changing, extreme mood states, including mania, depression, and mixed states of mania and depression associated with extreme irritability and paranoid ideation. It at least appears that the onset of this major mood disorder was during Marc Barnette's adolescent years.

Such rapidly changing mood states are quite destabilizing for an individual in and of themselves, and are particularly destabilizing during the period of adolescent development when such emotional turmoil is so difficult to understand and manage. Then in addition, the fact that Marc Barnette's major mood disorder is superimposed on his above described broad-based instability in major areas of functioning has resulted in even much more severe impairment in his ability to function, in that each of these major psychiatric disorders potentiate the other.

A full appreciation of how these two psychiatric disorders interact with and can potentiate each other requires additional understanding of the nature and course of each disorder. More specifically, Borderline Personality Disorder is best understood as an underlying disorder, in that its characteristics are enduring/persistent and therefore always impact on the individual and his/her ability to function. However, as noted above, certain types of stressors can exacerbate the difficulties associated with Borderline Personality Disorder, thereby causing a further deterioration in the person's ability to function. In contrast, the rapid swings in mood that are a part of Marc Barnette's major mood disorder cycle on their own schedule, virtually unrelated to whatever is going on around him. However, the mood that he is experiencing at any given time will impact on how he responds to any stressors that he might be vulnerable to as a result of his underlying Borderline Personality Disorder.

More specifically, for example, when an individual who suffers from Borderline Personality Disorder perceives that he/she is being abandoned by a significant other, the symptoms associated with this disorder will be exacerbated. However, if that same person is simultaneously in a manic/hyper-elated state due to a separate major mood disorder, the overall response/mental state will be quite different than it will be if he/she were in a depressed state due to that major mood disorder.

Based on this psychiatrist's review of the information noted above in paragraph 6 and my consultation with Ann Wolbert Burgess, RN, DNSc, the information currently available to this psychiatrist is considerably and significantly more than the information that was made available to Dr. Burgess. In addition, because of the wealth of information currently available to this psychiatrist, my psychiatric opinions about Marc Barnette are not only better supported but also much more complex than the opinions rendered at the time of his trial. More specifically, although there had been various difficulties including violence in some (although not all) of Marc Barnette's relationships with women, additional important information about those relationships, especially his life-changing relationship with Sheila Sullivan, and additional important information that helped establish that he also suffered from other major psychiatric disorders resulted in that much more complex picture of Marc Barnette's mental health difficulties. Additional important information also indicates that he was suffering from these major psychiatric difficulties at the time of the killings, and that therefore his mental state was even more severely impaired than had been previously recognized.

16

Based on my experience in capital litigation, if the information made available to this psychiatrist had been available at the time of his trial, Marc Barnette's extremely difficult childhood, including the effect that his mother's own trauma and family secrets had on her availability/capacity to parent Marc Barnette; the impact of his extremely difficult childhood on his development, the resultant broad-based instability in major areas of functioning, and the associated impairments in his ability to function; his severe major mood disorder and the impact of this disorder on his ability to function; and the ways in which the two psychiatric disorders potentiate each other would have been mental health findings that could have been recognized and presented to Marc Barnette's legal team for consideration as mitigation at the time of his trial. Instead, the mental health opinions presented, which apparently lacked many of the critically important factual bases upon which my opinions are based, were either incomplete, not sufficiently supported, and/or inaccurate.

Of particular importance, with regard to potential mitigation, is the fact that the information currently available to this psychiatrist makes Marc Barnette's mental state at the time of the crimes for which he has been convicted and sentenced to death much clearer, and indicates that at the time of the crimes, Marc Barnette's capacity to conform his conduct to the requirements of the law was significantly impaired.

More specifically, the symptoms of Marc Barnette's Borderline Personality Disorder were clearly exacerbated by his perception of the impending loss of his relationship with Robin Williams, his perception that she had been unworthy of his trust, and his perception that she had viewed him as a fool who could be easily used/taken advantage of. Based on the information currently available to this psychiatrist, Marc Barnette evidenced frantic efforts to avoid abandonment by Robin, a reversal of his extreme idealization of Robin to extreme devaluation of her, a deterioration of his sense of self to the point of feeling empty and valueless, mood reactivity with irritability and suicidal behavior, impulsivity, and stress-related paranoid ideation. Then, over the next couple months, superimposed on these exacerbated symptoms, were the profound and rapid swings in his mood that were symptomatic of his major mood disorder that determined how he ultimately experienced the underlying crisis and its resultant symptoms. In other words, based on the information currently available to this psychiatrist, when Marc Barnette was experiencing an elevated mood he was out with friends, despite the underlying crisis; when he was experiencing a depressed mood he was isolative/stayed in his room, he was crying a lot, and he was suicidal; and when he was experiencing a more mixed state of mania and depression he was agitated, irritable, more paranoid and otherwise even more irrational.

Dr. Dudley's expert opinions, grounded in a thorough post-conviction investigation, more accurately reflect Marc Barnette's relevant mental states, and their mitigating qualities, than the defense evidence that was presented at resentencing. The reason for the significant differences

17

lies with trial counsel's unreasonable failures to conduct an adequate investigation and provide relevant information to their experts.[5]

### 2. A Background of Abuse, Deprivation, Abandonment, and Neglect Leading to Long-Standing Mental Illness and, Ultimately, Tragedy

#### i. Family Overview[6]

Aquilia Marcivicci "Marc" Barnette was born on July 7, 1973 in Charlotte, North Carolina. Marc is 39 years old and the father of two young adult children, Angelica and Marc. Marc Barnette spent the first 14 years of his life in Charlotte before moving to Georgia with his mother Sonia Cooper Barnette and brother Mario Barnette. He returned to Charlotte in 1993. He later met Robin Williams, who was living in Roanoke, Virginia, and moved in with Robin in 1995. He returned to Charlotte in April 1996 after their relationship ended. The crimes for which Marc is incarcerated occurred in June 1996.

Marc's mother, Sonia, was born to Jesse and Pearl Cooper on August 17, 1958. She gave birth to Marc when she was 14 years old. Less than a year later, Sonia's mother Pearl was shot and killed by her new husband, Loyd Brown, while Sonia and Marc were sleeping nearby. Pearl's murder and its aftermath severely traumatized Sonia, as well as her younger sister Sheila Cooper, who was also in the house when the murder took place. Many family members report that this event had lasting negative effects on the entire family for decades.

During high school, Sonia dated Derrick "Rick" Barnette. Rick later attended North Carolina A&T for one semester before enlisting with the U.S. Air Force in late 1974. Sonia and Rick were married February 8, 1976, and they lived together until approximately 1984.

---

[5] This failure by counsel infected all expert opinions, including the government's expert. Complete and reliable, information would significantly bolster or change prior defense experts' opinions, and undermine those presented by the government.

[6] This background and social history is taken from records and interviews compiled by post-conviction counsel and post-conviction counsel's mitigation specialist.

18

For the first 14 years of his life, Marc knew Rick Barnette as his biological father, as well as the biological father of his younger brother, Mario, who was born in 1977. But in 1987, nearly two years after Rick and Sonia's divorce was finalized, Rick moved to have paternity testing done. The results, which Rick revealed to Marc and Mario, showed that Rick was not their biological father. This information had immediate and long lasting negative effects on Marc.[7] Shortly after breaking the news to Marc and Mario, Rick moved to Philadelphia and thereafter maintained minimal contact with Marc and Mario.

### ii. Cooper Family Legacies: Trauma, Abandonment, and Murder

Sonia grew up on the Cooper Family's West Boulevard property in Charlotte. Originally there were several houses on the property and there were generations of Coopers living there. Jesse Cooper, Sonia's father, had served in Korea after entering the Army in 1951. On February 4, 1952, he was severely wounded. According to military records, Jesse was an ammunitions bearer in a rifle platoon and was wounded by enemy shell fire while counterattacking an outpost. He received wounds to his face, right eye, right thigh, and right hand. A letter dated February 11, 1952, from Major General Wm. E. Bergin to Jesse's wife Pearl Cooper reads, in part:

> I deeply regret that it is necessary to inform you that your husband, Private First Class Jesse Cooper, was seriously wounded in action in Korea…. My heartfelt sympathy is with you during this period of anxiety.

According to family members, they understood that after Jesse was injured, enemy soldiers kicked and poked their bayonets at him and kept walking, assuming he had died. Family members recall that notice was sent informing them that Jesse had been missing and that

---

[7] Derrick Barnette testified that when he told his "children" about the paternity test results, Marc "asked more questions at that point because when I told him I wasn't his biological father, he reacted and it was subtle, but I got questions from him more than I got from Mario." [2002 Tr. 3335]

he had, in fact, died. Robert Cooper, Sonia's cousin and Jesse's nephew, recalls that Jesse "could squeeze shrapnel out of his skin in different parts of his body." Jesse would tell Sonia and others that he had "already met Jesus." It was not until 2002, however, with Jesse ailing and in the hospital, that he was awarded a Purple Heart, which apparently had not been previoulsy awarded to him due to an oversight.

Jesse's war experience had long lasting effect on him and the family. Sonia's younger sister, Sheila, says, "He had PTSD. He'd relive that scene. One time I tripped and fell and busted my head. He regressed and just wrapped my head in a bandage." Then Sheila's oldest sister, Tessie, came home and said that Sheila looked pale. Sheila had lost a lot of blood. It was Tessie that made sure Sheila got to the hospital where she received stitches. Sheila still has a scar on her head from that accident.

Jesse loved Pearl unreservedly, even after he discovered that she had cheated on him and later left him. Robert Cooper knew that Pearl was cheating on Jesse because she would sometimes take him with her to a liquor house where she would meet a man. Robert also recalls that Jesse gave Pearl a Cadillac with fins, and that after Jesse found out that she was cheating on him, he took the car back and parked it on the property. He never drove nor moved the car again. Even after Pearl moved out and remarried, Jesse never took off his wedding band.

Pearl worked as a nurse and she initially left Jesse for a man named Herman Mazyck, whom she met through work, although Pearl had started a relationship with Herman well before leaving Jesse. Herman, however, ended up marrying another woman from work. This marriage announcement was a surprise and shock to Pearl. Sheila says this news "broke her heart" and she remembers her mother crying about it. Pearl's good friend, Delores Hart,

20

believes that Pearl was deeply hurt by this turn of events and it was the reason that Pearl later married Loyd Brown, someone Delores did not think offered much for Pearl. Neither Sonia nor her younger sister Sheila liked Loyd Brown. Loyd had been a patient of Pearl's at the hospital where she worked. They later ran into each other at a store and Loyd started calling Pearl. They were married only six months later. They lived at 716 Peaceful Glen Road in Charlotte. Loyd reportedly came to the house—and the marriage—with only a bag of clothes and a stereo.

Jean Barber Nduly, Sonia's cousin, remembers Sonia was never comfortable around Loyd. Although they initially went to live with their mother at Loyd's house, Sheila and Sonia returned to Jesse's house at one point. Delores Hart recalls that Loyd was happy about that and wanted the girls to stay with Jesse. Given how they felt about Loyd and their father, Sonia and Sheila felt the same way. Sheila told her mother that she was tired and "want[ed] to go live with daddy. Tell him to come pick me up." Then Pearl dropped her and Sonia off at Jesse's. While there, Pearl asked Sheila, "Don't you love me?" Sheila never answered her.

Sheila and Sonia (and, at this point, Marc, who was an infant) stayed with Jesse on West Boulevard for only about a month before returning to Loyd and Pearl's house on Peaceful Glen Road. Tessie, Sonia and Sheila's eldest sister, was living in Alaska at the time with her husband Jeff Nero (who was in the service). Tessie recalls that Sonia, Marc, and Sheila only stayed with Jesse briefly because he was not providing for them. Jesse was intoxicated most days after Pearl left, drinking Pabst Blue Ribbon beers (which he called his "tea"). Medical records from 1994 indicate that Jesse drank alcohol from "11:00 p.m. to 6:00 a.m., early a.m., six packs of beer a day" and was a malnourished heavy drinker.

According to Tessie and others, Jesse "was not always the most stable" due to his combat experience: "As long as I can remember he told the same war stories. He re-lived it. He

21

rehashed it.  He would shout out at night: 'No! Stop!'" Sonia recalls that Jesse had one flashback episode in which he thought his daughters were nurses.  Jesse was taken to Broughton Hospital in Morganton, North Carolina for treatment.  Family members recall having to be very quiet around Jesse after he came home from the hospital.  Even decades later Mario remembers that Jesse would have night terrors where he would "yell out at the top of his lungs" from the couch in the living room where he slept.

In the spring of 1974, Delores Hart was told by either Sonia or Sheila that Loyd had pulled a gun on Pearl.  Delores remembers calling Pearl and telling her to make Loyd leave the house, but Pearl refused.

The week after Mother's Day in 1974, in the early Sunday morning hours following Sonia's high school school prom, Loyd shot Pearl shot and killed Pearl while she was in her bedroom.  Unbeknownst to Sonia and her family, Brown had previously been convicted of shooting someone else.  After the shooting occurred, Loyd fled; he later turned himself in to the magistrate.  A police report states that law enforcement heard a female scream after police knocked on the door of the residence.  Sheila, age 12, came running to the door.  Police found Pearl's body in bed with blood around her head.  There were no signs of life but her body was still warm.

In Loyd's confession, he reported that on the day before, around 5:30 p.m., he came home to find that someone had hit a tree next to the driveway.  He said he asked Pearl and kids what happened and "they would not give him an answer."  Loyd also confessed that he and Pearl were having "trouble" and "he was running up charge cards which he could not pay."

Sonia, who was 15 years old at the time, says 10-month-old Marc was in a crib in the room that she shared with Sheila when the shooting happened.  Sonia had gone to the prom that

night; when she got home Loyd was gone and her mother told her that they had argued and he had left the house. Sheila says they had argued because Loyd had not gotten Sonia roses for her prom. Sonia later went to bed and was awakened when the police arrived. She remembers seeing blood on the wall of her mother's room.

After hearing the police banging at the door, Sheila went to find her mother. When she turned on the light to her mother's room, Sheila saw her mother covered in something red. Sheila's first thought was that her mother's red rubber heating pad had somehow exploded; she then realized that her mother was covered in blood. Sheila says she blacked out at some point and later woke up across the street in her friend's bedroom. Confused, Sheila recalls looking out the window and seeing police and emergency personnel still at the house. For the first few nights following Pearl's murder, Sheila recalls her father standing outside all night holding a shotgun to protect the girls and Marc. Sonia remained acutely scared that Loyd would get out of jail and harm them.

Sonia called Tessie to tell her about their mother's murder. Tessie, the older sister, broke down on the telephone. Tessie came back to Charlotte shortly after the murder to help out. Her husband Jeff requested and received a compassionate reassignment by the military from Alaska to Columbia, South Carolina.

Sonia, Sheila, and Marc initially went to stay with Jesse Cooper after Pearl's death. They lived with Jesse for a few months, until fall of 1974, when they moved to South Carolina and lived with Tessie and Jeff.

Sonia was very depressed and withdrawn following Pearl's death, crying a lot. Years later, Sonia was struck with terror when she saw Loyd out on work release. She remained fearful of Loyd until finding out later that he died in prison. Sonia never received any mental

23

health counseling about her mother's murder but assumes she could have benefitted from it. Indeed, Sonia never talked about Pearl's murder with anyone in her family. As Sonia states, "Since I was young I always felt I needed to be the glue. I could see my sisters losing it." Sonia also lived with the fear that history would repeat itself: "I had an inner fear that I would only live to the same age as [Pearl], that the same thing that happened to her would happen to me. I always have this wall up. An emotional wall -- with relationships." As a result, Sonia has fears of "letting someone in" and trusting others.

Sonia says her father, Jesse, also never dealt with Pearl's murder. He never talked to Sonia or Sheila about it. Sonia says, "He'd go into his room and read his bible. He didn't know what to do."

The effects of Pearl's murder have also deeply affected Sheila throughout her entire life. When she was in her 20s, Sheila reports having a "breakdown" that she largely attributes to the psychological trauma she has carried since her mother's murder. Sonia remembers that Sheila's boss in Georgia called her (Sonia) and told her that Sheila was having a breakdown and that they were going to get her some help. Sonia says that Sheila used to have episodes of "uncontrollable crying." Sheila says about her mother's death, "I felt like it was my fault. I felt like it for years. I never told her I loved her. She said it and I didn't say it back." Sheila says that, over the years, if anyone ever talked about what happened to her mother she would "sob like it just happened."

### iii. Sonia's Dating and Marc's Paternity

### a. Who is Marc's Father?

Until a paternity test in 1987 indicated otherwise, it was generally accepted in the family that Rick was Marc's father. Rick, however, always doubted that Marc was his biological son.

24

Sonia and Rick first met at Smith Junior High School. He does not think that he and Sonia were dating at the time she got pregnant. After they found out that Sonia was pregnant, Rick's mother and Sonia's mother (Pearl) talked to each other. Following that conversation, Rick reports, his mother told him that the coming baby was not his. Rick, however, further reports that he was attracted to Sonia and allowed himself to believe the baby was his when Sonia began saying to others that he was the father.

Rick recalls that Sonia dated Larry Wright around the time she became pregnant with Marc. Larry was a classmate of Sonia's and he confirms that he and Sonia did date. Larry recalls Sonia as a beautiful and intelligent girl. Larry knew Pearl, went to their house frequently, and he and Pearl would talk.

Shortly before Sonia found out that she was pregnant, a friend of Sonia's told Larry that Sonia was also dating Rick. Larry says that after Pearl learned of Sonia's pregnancy, Pearl talked with Larry and Sonia and asked them what they were going to do about the coming baby. At this point, Larry said he did not believe the baby was his. Larry says Pearl was surprised by this; she had not known about the relationship between Sonia and Rick. Larry remembers that Pearl and Sonia then decided the baby was Rick's. Larry's parents knew and liked Sonia and they were disappointed that Larry would not be considered the father.

Larry remembers Pearl's murder, and how Sonia's behavior changed dramatically after her mother died, which he attributed to the trauma of the event. Sonia started to dress in a provocative style, use marijuana and cocaine, and, according to Larry, spent time with people that were known to be drug dealers, hired killers, and thugs.

Larry did not see Sonia as often after she and Rick married, yet he has reported that his sexual relationship with Sonia continued sporadically through Sonia's relationship with Rick, as

25

well as after their eventual separation. When visiting one of her best friends, Starr Reape, who was a neighbor of Larry's, Sonia would sometimes stop by with Marc and Mario. Larry kept in touch with Sonia enough that when she and Rick split up, he went and helped her, Marc, and Mario move out of the house.

**b. <u>Sonia: A Mother at 14 Years Old and in a Violent Home</u>**

Marc was born when Sonia was 14 years old and Rick was 16 years old. In the fall of 1974, when Marc was about 15 months old, and approximately five months after Pearl Cooper's death, Sonia and Marc (and Marc's young aunt, Sheila) moved to South Carolina to live with Tessie and Jeff Nero.

Rick and Sonia were married in February 1976, and lived together (with Marc) for a short period of time in Omaha, Nebraska, where Rick was stationed with the U.S. Air Force. Rick was then transferred to Okinawa, Japan for approximately one year; Sonia and Marc stayed behind. By July 1977, when Marc's younger brother, Mario, was born, Rick had returned from Japan and they were all living together at Rick's mother's home at 1137 Comstock Drive, Charlotte in the Clanton Park neighborhood. Rick, Sonia, Marc, and Mario then moved to Minot, North Dakota for a year while Rick was stationed there. They returned to Clanton Park in Charlotte in early 1979. They remained together in Clanton Park until approximately 1984, when Rick and Sonia separated.

Starting upon their return to Charlotte in 1979, Sonia and Rick's relationship became one marked by intense jealousy, mistrust, and violence. Both Rick and Sonia dated other people while still living together. Rick recalls that Tessie, Marc's aunt, was terrified by Rick and Sonia's fighting. Rick confirms that he kicked a hole through the door, and once hit Sonia in the head with a hammer. Sonia would also be violent towards Rick. Rick once woke up and

26

saw Sonia standing over him with a frying pan or pot, about to hit him with it. After one beating by Rick, Sonia recalls that Marc called somebody—the police or DSS—and that someone came out to the house to investigate. Rick also confirms that a social worker came to the house to investigate allegations of child abuse. According to Sonia, Rick would beat Marc with a belt. Sonia would often lock herself in the bathroom because she could not stand to hear the beating.

Mario remembers well his parents' violence, although Marc shielded him from much of it. When Sonia and Rick began to fight, Marc would take Mario into his room and let him play with one of his toys. Marc would not let Mario come out until the fighting was over.

While they lived together, Rick says Sonia would spend a lot of time going out with her friend Tina Davis. Sonia and Tina would drink, smoke marijuana, and use cocaine together. Rick and Sonia both say that much of their fighting was about infidelity. Sonia says she found out that Rick was seeing someone he had known from school. This also turned out to be the woman that Rick later married.

Wendy Sharpe, a relative who lived nearby in Clanton Park, recalls babysitting for Marc and Mario when she was about 12 years old and Marc was about 9 or 10 years old. She says about Marc, "He wasn't a loud rambunctious kid." Wendy recalls that Marc was scared of Rick. Wendy further recalls that Marc would knock on their front door in the middle of the night; Marc would be in bare feet and pajamas. Wendy says Marc was always upset but never said what was causing him to come to their house in the middle of the night, although Wendy believed something was going on between Rick and Sonia. Wendy's family would take Marc in and give him a blanket and a place on the couch to sleep. The next morning Wendy's family would give Marc breakfast and then he would go home. Wendy recalls this occurring over a

27

number of months when Marc was probably around 9 or 10 years old.

c. **Rapid Disintegration of the Family: Violence, Separation, Divorce, Partying, Paternity Tests, and Continued Chaos**

Records show that although Rick and Sonia did not officially separate until June 29, 1984, the date they executed a separation agreement, their separation was planned at least 18 months prior to that. In fact, Rick had hired an attorney to draft a separation agreement that included a provision that he pay $250 per month in child support starting December 30, 1982. The initial plan was for Sonia, Marc, and Mario to remain at the Clanton Park home until both reached 18 years old. Rather than Sonia and the boys remaining in the house—which, under the circumstances, might have provided a semblance of stability—that plan was scrapped and Sonia, Marc, and Mario moved into an apartment on North Wendover Road in Charlotte. They remained there for a couple of years until they moved in with Tessie, Jeff, Regena and Shonda Nero on Farm Pond Lane in Charlotte.

Following the separation, Rick did not have a visitation schedule for Marc and Mario. While he previously claimed to have "left the door open," he rarely took steps to initiate contact with Marc and Mario after the first year of the separation. Sonia did occasionally call upon Rick to "discipline" Marc after the separation, although Rick moved to Philadelphia in 1987, further reducing any contact he had with Marc and Mario.

Marc's cousin Regena Nero was upset and surprised by Sonia and Rick's separation. She believes that Rick and Sonia fought a lot. She knew Rick had injured Sonia's ears when he yanked out her pierced earrings (resulting in a lifelong scar). Shonda Nero, Regena's younger sister, says that when she was a teenager she learned that Rick was beating Sonia and cocaine was involved. Shonda recalls that her mom (Tessie) and dad (Jeff) were quite similar—always

28

arguing—and that there was physical violence in her home as well. Further, Regena and Shonda did not get along at all. Shonda would have her first child when she was 15 years old. Marc, of course, was exposed to this chaos and violence while living with the Neros on Farm Pond Lane.

After Sonia's separation from Rick, Regena spent more time with Sonia, who she described as the "party aunt." They would go to clubs, where Sonia would meet other men. Regena confirms that Sonia was using both cocaine and marijuana, and that Sonia would often leave Marc and Mario home alone when she went out, sometimes overnight.

Sonia was with a number of men after Rick. The first was Ollie "Al" McArthur, who Sonia dated around 1985 when she was 27 years old. Sonia describes him as a "hustler" who sold fake jewelry. Al persuaded Sonia to give him a couple thousand dollars, which Sonia later learned he used to pay child support for his kids in Virginia. Al also suggested that Sonia buy a red Corvette with some money she got back from her tax returns one year. Sonia then dated Sam Walton, who was then-County Commissioner Bob Walton's brother. Sam was about 15 years older than Sonia and had a drinking and gambling problem. The next relationship was with a man named Tyrone. Sonia and Tyrone dated for a few months. Tyrone drove a taxi that Sonia helped him purchase.

Sonia was later with a man named Mark Ragin, who owned a nightclub on Wilkinson Boulevard. This was when Sonia, Marc, and Mario were living with the Neros on Farm Pond Road. Regena recalls that she and Sonia shared a room when they were at Farm Pond. She confirms that it was a chaotic household with lots of violent arguments and physical fights. Sonia's relationship with Mark Ragin ended on June 20, 1987, when he was shot to death. Regena and Shonda remember well that Sonia was very upset. Recalls Shonda: "I know Sonia

29

loved him to death. That's who she partied with." Sonia herself recalls being "devastated."

On March 9, 1987, approximately 18 months after the divorce was finalized, Rick formally sought paternity testing to determine whether he was, in fact, Marc and Mario's biological father. Rick says this was sought after Sonia, in early 1987, told him that he was neither Marc nor Mario's biological father. Rick also recalls that Sonia would pester him for child support payments but then spend her money on herself (like when she bought a red Corvette that did not have a backseat). Notably, the initial attempt to serve Sonia with the paternity testing complaint was unsuccessful because Rick was apparently unaware that Sonia, Marc, and Mario had moved from their Wendover apartment to Farm Pond Lane. To be sure, this lack of awareness is consistent with reports that Rick was not present for Marc and Mario following his separation from Sonia.

On June 15, 1987, as directed by a court order, Sonia, Marc, and Mario had blood drawn for paternity tests. On June 24, 1987, only four days after Mark Ragin was shot and killed, blood tests established that Rick was the not the biological father of either Marc or Mario.

Sonia claims she did not discuss the paternity issue with Marc because she "thought it was a ploy." Yet as a result of the test results, Rick stopped paying child support. He also told Marc and Mario about the results, a decision he made without first discussing it with Sonia. Unsurprisingly, the news that Rick was not their "real" father shocked Marc and Mario.

Soon thereafter, Rick moved from Charlotte to Philadelphia. He later moved to Maryland in 1990. Other than Robin Williams, whom he once met while passing through Virginia, Rick never met any of Marc's girlfriends. He was unaware of Marc's experiences in Georgia other than Marc's arrest for child abuse charges in 1993 (which he learned about after Marc called him from jail). Rick never met Marc's children prior to 1996. He never met

30

Alesha Chambers or knew about Marc's legal troubles related to her. He apparently never learned about the firebombing of Robin Williams' home in April 1996 until after the murders in June 1996.

In 1987, around the time of the paternity testing and Mark Ragin's death, Sonia experienced difficulties at her job. She was repeatedly warned and counseled about tardiness, absenteeism, and telephone abuse (making personal calls). She was fired in November 1987. Her employment records indicate that she "cannot be relied upon," "shows no interest in attendance obligations, even with constant reminders from supervisor," and "can never be relied upon to be at work." When she lost her job, Sonia, Marc and Mario were living at 8816 Softwind Drive in Charlotte in a residence that they rented from Delores Hart, Pearl Cooper's old friend. Delores reports that she ultimately had to evict Sonia and the kids from the residence because Sonia was not paying the rent. The house was also "a mess" with broken windows and terrible upkeep.

In the fall of 1987, Marc began the ninth grade at Smith Junior High School. Despite the turbulence and chaos of the preceding years, he recalled that ninth grade started well. Soon, however, his life was again disrupted when, by the following summer, Sonia told him and Marc that they were moving to Georgia. Marc initially protested; in response, Sonia told Marc that he could stay in North Carolina, a highly impractical option for a ninth grader in Marc's situation to consider.

Despite the physical abuse and abandonment that Marc suffered at Rick's hands, Mario suggests that perhaps Marc should have lived with Rick after the separation. Even though Rick essentially abandoned the family, Mario observed that Rick was more stable than Sonia, and that Sonia's behavior "tended to bother Marc much more" than it did Mario, who described himself

31

as less "fragile" than Marc.

### iv. Relocation to Georgia: Chaos and Drug Use Continue, and Marc's First Relationship Leaves Permanent Scars

Following the move to Georgia, chaos continued to reign in whatever home Marc lived in Initially, Sonia, Marc, and Mario stayed with Sonia's younger sister, Sheila Cooper, in an apartment in Norcross, Georgia. Sheila was then living with her boyfriend, Michael O'Neal (who was married to another woman at the time), and her son, Armaud. Robert Cooper, Sonia and Sheila's cousin, remembers that Sheila was unstable. Like Sonia, she used drugs and partied. Longtime Charlotte neighbor Ann Austin recalls that Sheila was a "wild child" who once left her kids and followed a man to Florida.

Marc, Mario, and Armaud had little supervision or parenting by the adults in the family while they were all living together in Georgia. Sheila and Sonia went out regularly, often not returning until it was time to get the children to school the following morning. Michael O'Neal drank, as did Sonia, and they would argue constantly. Michael, Sheila, and Sonia all also used cocaine. Armaud recalls that his mother had a $1300 white mink coat and that he once found a large box of cocaine in the closet. Mario remembers coming across Armaud playing with a big bag of cocaine that was like a pillow the size of a magazine.

Armaud recalls that Michael dated a "crazy white chick" who once came to the house and Sheila pulled a gun on her. Marc pushed Mario and Armaud into a closet to shield them and the police came. Sonia, Marc, and Mario eventually moved out of the house after Michael aggressively accused Marc of stealing $500.

Armaud recalls Marc being anxious about starting school in Georgia. Shortly after starting school, Marc began a relationship with Sheila Sullivan. Sheila recalls that their

32

relationship was fun and that Marc was very nice. She said that Marc would hang out at a club for kids, where he would dance. Sheila describes herself as being a "thug" back in high school who was always fighting—in contrast to Marc, who Sheila confirms was not a fighter. Sheila also recalls that both her mom and her dad liked Marc a lot.

Marc and Sheila became intimate and sexual at some point during the relationship. Towards the end of 1988, Marc was assaulted by a group of teenage boys, including David Walker, who was a boxer and football player. Walker had been harassing Marc and was interested in Sheila Sullivan. As one of the co-assailants, Melvin Bryant, describes, "After school we went up to him and punched [Marc]." After hitting Marc in the face, the teenagers continued to punch and kick Marc. Both Walker and Bryant were criminally charged. Sheila Sullivan recalls that Marc was "beat up so bad. His eye was black, his face swollen, and his lip cut." Marc was taken to the hospital for x-rays and treatment for his injuries.

After the assault, Sheila cheated on Marc with David Walker, the same boy that had assaulted Marc. According to Sheila, she cheated on him "real bad." Prior to cheating on Marc, Sheila had written another friend to say that she was attracted to David Walker. After Sheila had sex with Walker, Marc was given the letter that Sheila had written. Sheila remembers Marc being very upset.

Marc and Sheila broke up after he learned that she cheated on him. After the breakup, Marc attempted suicide by ingesting pills. According to Sonia, emergency responders were able to get Marc to throw up and he was not taken to the hospital. At a later point in the school year, Marc and Sheila started seeing each other again. Soon thereafter, Sheila learned that she was pregnant. Sheila says that Marc was supportive of her and wanted to help. Sheila's mother, however, found out and Sheila got an abortion. Marc and Sheila's relationship ended

33

more permanently towards the end of the school year (Marc's tenth grade year).   Sheila recounts that she was later raped by David Walker, who then committed suicide two or three weeks after they went to court on the rape charge.

**v.   Relationship with Tasha, Bouts of Sadness and Crying, and A Home with No Food and No Bed**

Family members confirm that Marc's relationship with Sheila Sullivan was a turning point, and that Marc began acting differently afterward.   Around the spring of 1989, near the end of Marc's tenth grade year, Sonia, Marc, and Mario moved into their own apartment at The Crossings in Lithonia.   Regena Mack, Marc's cousin from Charlotte, visited the apartment and was surprised that it did not have beds for Marc and Mario, and that the fridge only contained nail polish.   Sonia was still using both cocaine and marijuana during this period of time.

Marc began dating Natasha "Tasha" Heard during the summer between 10th and 11th grades.   Kesha Heard, Tasha's sister, was surprised when Marc and Tasha started dating.   She recalls Marc being quiet and mellow, whereas her sister was "not a people person," nor someone who "had a filter" for what she said.

Tasha recalls that Marc missed Charlotte a lot, but also that "something was wrong" with Marc, and that at times he was "very unhappy."   According to Tasha, Marc would "sway from being appropriate to being clingy, needy, anxious, and demanding of her total attention." She also says he was "up and down." His mood would change over the course of hours or a day. Tasha recalls that Marc would sometimes cry; she would sometimes find Marc naked and crying in the closet.   Marc would have "acute bouts of sadness and crying uncontrollably," which seemed to come out of nowhere.

When they first started dating, Marc spent a lot of time at Tasha's house. Tasha's sister,

34

Kesha, recalls that Marc's mom was not very concerned about him. She was neglectful and seemingly uncaring. Tasha says that Marc and his mom were not close. "We were always together and she was never there. One time [Marc] asked me over to meet his mom. We eyed each other but that's about it." Tasha recalls, "As a teen [Marc and Mario] didn't have adequate stuff." Tasha remembers there wasn't enough food in the house: "There was one bottle of wine in the fridge. No food. No butter. No condiments. No ketchup." Tasha used to give Marc food from her mother; she recalls that Marc would take it, but he would also save some for Mario. She also recalls that Marc and Mario just slept on the carpet and had a blanket. This stood in stark contrast to Sonia's room, where "[t]here were silk sheets on the bed, heels, lots of clothes and jewelry. It was totally different from the rest of the house. There was a plush bed and all that." A few months into the relationship with Tasha, Kesha noticed that Marc stopped dressing well. She remembers one time when Tasha took their mother's credit card and bought Marc clothes and shoes.

Kesha recalls one time when her then-boyfriend, Keith Furlow, got into an argument with her, Tasha, and Marc. They were all at Kesha and Tasha's apartment at The Crossings. Kesha explained that neither she nor her sister was allowed to date and nobody was supposed to be there at the apartment. Keith, who was three times the size of Marc, went to hit Tasha before Marc stepped in, resulting in Keith hitting Marc in the face. There was blood everywhere. Tasha was also punched in the eye; her eye was swollen and her mom ended up taking her to a specialist. Marc called the police, who came and charged Keith with assault. Other than Marc and Tasha, others were unaware that Tasha was pregnant at the time.

### vi. Becoming a Teenage Parent, Twice

Tasha's mother learned about Tasha's pregnancy following the Keith Furlow assault

35

when a nurse called the house.   Kesha recalls, "Mom thought she was calling about Tasha's eye but the nurse told her [Tasha] was pregnant."   Although Marc had been going with Tasha to every doctor's appointment, Kesha recalls that her mother began excluding Marc from the prenatal visits.   At one point Tasha asked if Marc could go with her to an appointment and her mother said no.

Marc started working after Tasha became pregnant, first at a restaurant and then, later, at a temp agency where his mother also worked.   Baby Angelica was born in September of 1990. Tasha's mother would not let Angelica have Marc's last name, which upset Marc, although he did not challenge her about it.   Kesha remembers well the day that Angelica was born. She says of Marc, "He sat there looking at [Angelica] as though he couldn't believe she was there -- like he'd gotten a million dollars. He just wanted to hold her. I didn't think he was going to let me hold her."

After Angelica was born, Tasha's mother sent her to live with her grandmother.   Tasha then became pregnant again and gave birth to Aquilia Marcivicci Heard on New Year's Eve of 1991.   A few months after the birth of their son, Marc and Tasha moved in together in Newnan. Their apartment was at 86 East Berry Avenue.   Marc, then 18 years old, signed the lease because Tasha was not old enough to do so.   Soon after moving to Newnan, Marc got a job working at Arby's.

Kesha recalls that Marc changed after he and Tasha had children and started living together.   There was a lot of strain as a result of the pressure to pay the rent, work, and raise their children. Family members recall that Tasha and Marc were too young and not ready for parenting and living together.   Neither was in school, Marc was working at a fast food restaurant, and they were having a hard time paying for food, the lights, and clothing for the kids.

36

There were times when Tasha and Marc fought. Tasha recalls that after Marc and she would fight, Marc would forget things he had done or said. Tasha says, "It was like he was in a trance. He's just ill." Mario recalls that Marc and Tasha fought a lot, but Tasha "would give it back to Marc. She was not passive." Regarding the incident referenced at trial—when Marc pushed Tasha down while she was pregnant—Tasha explains that they were coming from the mall and Marc was talking to another girl on the bus. When they got off the bus, Tasha slapped him. In response, Marc pushed her to the ground. Tasha makes clear that Marc never hit or used force on their children.

### vii. 18 Years Old and Overwhelmed by Relationships and Emotions

Crystal Dennis recalls meeting Marc through Anthony Britt. She recalls that Anthony was trying to get together with Tasha, so Anthony tried to get Marc and Crystal together. When Marc found out, it resulted in a confrontation between Marc and Anthony in May 1992.

Marc reported to police that he acted in self-defense, an assertion corroborated by others, most notably Anthony's good friend, Victor Montgomery. Victor was present that evening and says that Anthony gathered a bunch of friends to go after Marc. Victor tried to talk Anthony out of it but was unsuccessful. Victor says that if Marc had not had a gun that evening he would have been badly beaten, as Marc was small and was being challenged by a group of guys. Victor says that Anthony was the one in the wrong that night and that if he had been in Marc's shoes, he would have done the same thing—or perhaps would have even taken it further. Victor also states that it was true that Anthony was the one that had introduced Marc to Crystal, and that Anthony had started to "mess with" Tasha. Victor says that Anthony started to see Tasha even more while Marc was locked up.

Tasha believes that when Marc went to jail following the Anthony Britt incident, it was a

37

damaging turning point for him: "After he went to jail that time our lives spiraled out of control." Tasha says about Marc, "He came down here [to Newnan] and his whole spirit changed." Even after she had moved out of Marc's apartment in Newnan, Tasha recalls being very stressed and depressed, and that Marc frequently seemed suicidal.

During Marc's 30 days in jail, his only real contact was with Crystal Dennis. Following his release, at the urging of Crystal's mother, she and her two children (by two different fathers) moved into Marc's apartment at 86 East Berry Avenue in Newnan. Crystal says she first became intimate with Marc after she moved in with him.

Crystal described the first three to six months of the relationship as being good. She says Marc would cook for them and even bring Crystal breakfast in bed. In the fall of 1992, both she and Marc re-enrolled in high school. While also working two jobs, Marc was unable to continue going to school once his car broke down a few weeks into the fall semester.

It was around this time, according to Crystal, when things changed: "He became controlling and possessive. He went completely mad. Crazy." For example, Marc would demand that Crystal keep the door open when she was using the bathroom. Once, when Crystal had the door closed, Marc kicked open the door so he could see her using the bathroom. Marc also demanded that Crystal not work, apparently because he did not want her to be around other men. As a result of his demand, Marc took a second job—working at both Arby's and Blockbuster—in order for them to make enough money. After Marc's behavior changed, Crystal stopped wanting to have sex with him. Marc did not thereafter try to force or coerce Crystal into having sex.

While working at Arby's, Marc began a relationship with his co-worker/supervisor, a woman named Kowana Dozier. Kowana recalls that "Marc used to talk about death all the

38

time," leading her to believe that he was suicidal. Marc would ask, "Why am I here? What is my purpose?" Marc would also cry in front of Kowana, which was the first time she had seen a grown man cry. Marc would sometimes cry at work in the back office and sometimes when they were other places. When Marc would cry, which was often, he would sob. Kowana was worried about him: "He was out of control. He was unstable emotionally." Kowana was aware of Marc's situation with both Tasha and Crystal, and the enormous stress he felt. She did not understand why Marc's mother did not come get him and try to help him out.

Kowana and Marc used to talk about their lives and what they wanted. Kowana says, "He wanted someone to love him." According to Kowana, Marc wanted a family, kids, and a white picket fence; he was intense and "he loved hard." When Marc moved back to North Carolina in 1993, he and Kowana lost touch.

### viii. Return to Charlotte: Further Deterioration and the Tragedies of 1996

Marc returned to Charlotte in March 1993 and soon began a relationship with Alesha Chambers that was marked by jealousy, possessiveness, and violence. As the result of Marc's behavior, he found himself facing criminal charges in Mecklenburg County. His court-appointed attorney, Joseph VonKallist, had Marc evaluated by a psychologist to explore Marc's mental status. In June 1994, Dr. Tyson wrote:

> My examination does reveal the existence of psychological and behavioral problems that might be of use as mitigating factors in sentencing. There are a variety of deficiencies in his psychological functioning that might shed light on his behavior. However, he is relatively unwilling to accept psychological interpretations of his behavior and motives. He is not likely to accept assistance that is based on such assessment, particularly as these apply to deficiencies that he believes do not exist. … He may insist on following a course of action that will appear self-defeating to others. He rigidly adheres to thinking patterns that center around justification of his actions. This does not allow him to accept that his actions will be seen as problematic.

39

At the very same time that Dr. Tyson made his findings, Marc was in the beginning stages of his relationship with Robin Williams.

In March 1995, Marc moved to Virginia to live with Robin. As evidenced in the trial and sentencing records here, Marc and Robin had a volatile relationship prior to their break up in June 1996. After the break up, Marc returned to his grandfather's home on West Boulevard, where he started spending much of his time alone in a loft in the house. Mario says that Marc put up a sign that said that he wanted privacy and for others to stay out. Mario also says he saw Marc smoking cigarettes, which was unusual. Marc's aunt Sheila remembers that Marc was on the phone a lot, begging and pleading and crying with Robin.

Marc's cousin, Shonda Nero, could also tell that something was wrong with Marc after he and Robin broke up. Marc spent a few nights at her apartment, where Shonda says that he stayed in his room almost the entire time, keeping the door and blinds closed and neither talking nor eating. Shonda remembers that Marc would have the blankets over his head when she would go into the room where he was staying. If he did come out of the room, he would sit on the floor in the living room and stare at the floor.

Marc has testified that he called and spoke with Robin several times the night after hearing that he did not get a job he wanted with Saturn, and learned that she was with another man. Marc also testified that he drank vodka and took sleeping pills that evening. Later that evening, Marc asked to borrow Mario's car, which he drove to Robin's apartment in Roanoke. As Marc and others have testified, he set fire to her apartment.

Marc returned to Charlotte and in the subsequent days and weeks spent much time sitting on an overturned bucket in the driveway waiting to be picked up by authorities. He sold a number of his possessions at a nearby flea market. Sonia says Marc had put on a lot of

40

weight—she estimates that he might have gained 30 pounds—and that he shaved his head at some point after the fire in Virginia. Sonia says she asked Marc about this and he told her that his hair was bothering him, hurting him, and that he could not think straight.

### 3. <u>Marc Barnette's Exemplary Years in Prison</u>

From the time Marc Barnette was arrested in 1996 through to the time of his resentencing in 2002—and, indeed, continuing to the present—he has been engaged with his family, engaged in the prison community, and supportive of those around him and with whom he comes into contact. While he was a model inmate in county jails—as testified to at his 2002 resentencing—he has also been a trustee or orderly at every prison or institution that has such trusted positions (including at USP-Terre Haute). He has maintained positive and supportive relationships with his family and friends through letters, telephone calls, visits, and presents, offering advice over the years about staying out of trouble, getting an education, staying away from drugs and alcohol, and generally getting ahead in life. This type of engagement with his family and community was occurring before his resentencing in 2002.

### D. <u>Trial Counsel Promised Much but Presented Little: A Bleak and Disjointed Case for the Jury</u>

As the prosecution repeatedly and effectively emphasized during closing arguments, trial counsel presented a weak and disjointed mitigation case during Mr. Barnette's 2002 resentencing. Trial counsel presented uncorroborated and scattershot evidence concerning Mr. Barnette's violence-marred and turbulent upbringing, incomplete and misleading evidence concerning Mr. Barnette's prior relationships, and expert testimony that was undermined by the failure to provide mental health experts with all of the readily available information about Mr. Barnette's background.

41

The defense presentation was riddled with false or empty promises. Trial counsel announced during its opening statement the defense would provide the jury with information about Marc Barnette in order to assist them in "decide[ing] what to do about Marc Barnette." [2002 Tr. 2386] Mentioning "abuse," "violence," and "neglect" (yet not mental illness), trial counsel promised the jury that it would hear "the story of Marc Barnette and his family and what shaped him into a young man with terrible emotional problems, behavioral problems that are the product of how he was raised." [2002 Tr. 2387] Regrettably, while trial counsel forecast a number of events and subjects that suggested a comprehensive and compelling mitigation presentation, very little was ultimately presented. Indeed, as the government would later stress in its closing argument, "The defense didn't give [the jury] the tools to find their mitigating factors." [2002 Tr. 3938][8]

Resentencing counsel claimed the story of Marc Barnette and his family would include evidence about his maternal grandfather, Jesse Cooper, who trial counsel explained had been "horribly injured" and "came home shell shocked" from the Korean War. Jesse Cooper, the jury was told during opening statement, drank "a lot" and "didn't take care of his family terribly well. He did all sorts of odd thing that you'll hear about." [2002 Tr. 2387-8] Other than Marc Barnette's personal recollections of his grandfather and Derrick "Rick" Barnette's testimony that Jesse Cooper was "unique" and "eccentric," the jury was provided with no direct evidence about this significant person in Marc Barnette's life history. Nothing about the combat injuries he suffered, the fear within his family that he had died in Korea, the Bronze Star and Purple Heart

---

[8] The only family members to testify were Derrick "Rick" Barnette, Mario Barnette, and Ahmad Cooper. Derrick Barnette utterly gutted the "abuse, violence, and neglect" promised by trial counsel. Mario—in a case involving the murder of an ex-girlfriend and evidence of violence in other intimate relationships—testified that "**it happened from his first girlfriend to his last girlfriend, he gave everything that he could, and only in retrospect can I say maybe he gave too much, you know, but I'm not going to judge that.**" [2002 Tr. 3386] Mario also testified that times with Sonia and Rick were "**happy times**." [2002 Tr. 3392]

42

he earned, the disabilities he suffered, and the role that this damaged war hero played in trying to raise Marc's mother, Sonia, and his aunt, Sheila.

Trial counsel also promised the jury that it would hear about the violent murder of Marc's grandmother, Pearl Cooper, which occurred when he was 10 months old and his mother, Sonia, was 15 years old. [2000 Tr. 2388] Not only was no evidence presented about the murder itself-other than stray references to its occurrence that provided little or no detail and context-the defense failed to present evidence about why the murder of Pearl Cooper was even relevant to Marc Barnette's life history. As a result, the jury never learned about Pearl and Jesse Cooper's divorce, Pearl's subsequent marriage to Loyd Brown (who later murdered her), and Sonia, her sister Sheila, and baby Marc's subsequent move back to Jesse Cooper's house-and the profound impact that these events had on Sonia and Sheila, both arguably Marc's biggest caretakers during his childhood.

Additional examples abound. Trial counsel promised the jury that it would hear about Sonia's "running around" and "acting the way a damaged young woman would act" in the wake of her mother's murder. [2002 Tr. 2389] Yet trial counsel failed to produce a single witness or elicit any pertinent testimony concerning the trauma that Sonia experienced and how it later manifested.

Trial counsel promised the jury that it would hear about Marc's "disordered" thinking after his break-up with Robin, and how "family members will tell you that he would weep on the phone begging her to take him back." [2002 Tr. 2393] Yet the only evidence the jury received about Marc's behavior prior to the fire and subsequent murders was through Marc Barnette's own testimony (and that which experts reported he had told them).

Even when trial counsel actually introduced evidence concerning a promise it made

43

during opening statement, what was ultimately presented to the jury was wholly underwhelming, a result of ineffective and incomplete investigation and trial preparation. For example, trial counsel told the jury in its opening statement that Sonia and Rick Barnette's marriage was "characterized by reciprocal domestic violence." Highlighting one incident, trial counsel asserted in opening statement: "He hit her in the head with a hammer. She stood over him with a frying pan in her hand. There was crying; there was infidelity; there were accusations of infidelity, all in the presence of Marc." [2002 Tr. 2389] Yet what the jury later learned about this incident from Rick Barnette lacked the markings of a significant example of domestic violence:

> I woke up one time, she had a frying pan over my head. Turned into sort of **a joke**. You know, I was just laying on the sofa. Hadn't done anything that time. And I just asked her what - I woke up and she's standing there with the frying pan. I says, What you going to do? She said, I'm going to hit you with it. Why? I mean, you know, so ....

[2002 Tr. 3329 (emphasis added)][9]

In another instance, trial counsel told the jury that it would hear, as a telling example of Sonia's neglectful parenting, about how Sonia used insurance proceeds to buy a red Corvette that "[s]he couldn't have driven her sons to school if she wanted to," [2002 Tr. 2390] Other than

---

[9] Rick Barnette testified right after Marc. The prosecution used Rick's testimony repeatedly against Marc:

> Q. Would you agree -- well, were you here for Derrick Barnette's testimony?
> A. Yes.
> Q. Okay. And do you recall that Mr. Barnette testified on cross examination that the spankings that he had given the defendant as a child were always directly related to transgressions of family rules?
> A. Yes.

[2002 Tr. 3546 (cross-examination of defense expert Dr. Ann Burgess)]

> Q. And are you aware that Derrick Barnette has not corroborated that he ever beat the defendant with a coat hanger?
> A. Yes. I remember he said he didn't remember ever doing that, so that's correct, yes.

[2002 Tr. 3553 (same)]

44

Marc Barnette mentioning Sonia's Corvette purchase during his testimony, the only evidence concerning Sonia's Corvette came through her youngest son, Mario:

Q: Do you remember your mom getting a red Corvette?

A: Oh, yeah. I loved that car. I think it was an '84 or '86 red Corvette, nice. I got to ride in it one time. Since it was only a two seater I had to sit in the hatch part, but she was definitely the talk of the town with that vehicle. It was nice.

[2002 Tr. 3373] The relevance of Sonia's decision to buy a sports car-done at a time when money was scarce, she was dating various men, and she was often leaving Marc and Mario home along-was never properly presented to the jury.[10]

Furthermore, trial counsel promised the jury in 2002 that it would hear how Marc Barnette has "changed over the last six years. And you'll hear evidence about why that happened." [2002 Tr. 2395] Yet while the jury learned that Marc Barnette had a spotless institutional record during his incarceration since his arrest in 1996, the jury was never provided with evidence about why Marc Barnette had apparently adjusted so well to prison. This gaping omission-the failure to explain to the jury that Marc Barnette's mental health makeup and severe mood disorders were better controlled and managed in the prison setting-left the jury with little reason to spare his life.

E. **Trial Counsel Unreasonably and Prejudicially Failed to Conduct an Adequate Investigation and Utilize the Information it Possessed**

By trial counsel's own assessment, the social history investigation conducted for Marc Barnette's 1998 trial was "superficial and not-sufficiently in depth." Trial counsel believed that

---

[10] As noted elsewhere in this motion, trial counsel's reliance on Marc Barnette as his own mitigation specialist who essentially told the jury "the story of Marc Barnette and his family," [2002 Tr. 2387] was highly problematic and, ultimately, incredibly prejudicial. Thus, while Marc Barnette testified that his mother bought herself "a bright red, lipstick red 1984 Corvette" that held only two seats, and that this came in the wake of her divorce from Rick, when his mother's "behavior just got real weird," it came through the testimony of a mentally ill defendant who, in the absence of any explanation or context from trial counsel, lacked credibility.

45

Marc's prior defense team had failed to "include some critical things" while investigating and developing his mitigation evidence, and "some potential mitigation witnesses may not have been candid with [the mitigation investigator] in the past." Thus, a serious re-investigation into Marc Barnette's background was required. Despite this candid assessment about the work that had been undertaken previously, trial counsel repeated the past when it unreasonably failed to adequately investigate and pursue readily available and critically important information about Marc's background.

### 1. Trial Counsel's Unreasonable and Prejudicial Misuse of its Investigative Resources

In August 2001, Mr. Barnette's trial counsel submitted an *ex parte* pleading that asserted a need to replace the defense mitigation specialist from the earlier trial due to her failure to develop adequate rapport with Mr. Barnette's family and friends, as well as critical omissions in the background investigation she had previously conducted. The prior investigator's omissions, trial counsel asserted, cast doubt on the reliability of expert witnesses who relied on her work during their testimony.

In related *ex parte* pleadings filed at the same time, trial counsel also noted that they intended to affirmatively address Mr. Barnette's prior relationships with women. Whereas "[p]rior defense counsel sought to minimize the severity of these incidents, or place blame for them on the women involved," Ms. Lawson and Ms. Rauscher were of the belief that the defense "must lay out for the jury the extent of Marc Barnette's history with women in order for them to understand his psychosis. Defense presentation of this evidence to the jury could result in a sentence of life without parole, rather than death." In seeking funds for a private investigator, trial counsel also asserted that some trial witnesses "were hostile to the defense at the

46

defendant's first trial and sentencing and counsel reasonably believe they will not make themselves available to the defense unless they are located and approached."

To this end, trial counsel sought and received funding to retain an experienced mitigation specialist (Cessie Alfonso) and private investigator (Jan Barefoot). Despite a seemingly well intended approach that was appropriately skeptical of the integrity of the prior defense team's work, and cognizant of the need to affirmatively address the government's evidence in aggravation, trial counsel unreasonably failed to follow its own game plan.

For starters, trial counsel failed to reasonably supervise and utilized its mitigation specialist, Ms. Alfonso. Based in New York, Ms. Alfonso interviewed a total of 12 witnesses (including Petitioner). Other than brief contact with Natasha Heard, the mother of Petitioner's two children, Ms. Alfonso was never asked to seek out and speak with women whom Petitioner previously dated. Her suggestions to trial counsel about powerful areas of mitigation were ignored. And her psycho-social report that marshaled what work she had completed was not submitted to trial counsel until July 8, 2002-one week before the start of jury selection. None of the testifying experts were provided with Ms. Alfonso's reports. As a result, a significant amount of mitigating evidence that was in trial counsel's possession was not shared with defense experts or presented to the jury.

**2. Trial Counsel's Unreasonable and Prejudicial Failure to Re-interview Multiple Witnesses from the 1998 Trial**

Despite having the services of two experienced investigators, trial counsel did not seek to interview a number of witnesses who either were interviewed by Petitioner's prior defense team and/or testified at Petitioner's 1998 trial. As a result, trial counsel relied on "superficial and not-sufficiently in depth" interview summaries done by Sindy Maxwell (the mitigation

47

specialist from the 1998 trial) to make determinations about what witnesses to call and how to cross-examine certain government witnesses. This unreasonable trial preparation resulted in a failure to uncover and develop powerful mitigation. For example:

### i. Steve Austin (Best Friend/Prosecution Witness): Family History, Remorse, and a Future in Prison

Steve Austin was, by various accounts, Petitioner's best friend while they were growing up together in Charlotte. Steve and his family lived in the Clanton Park neighborhood, across the street from where Petitioner, Sonia Barnette, Derrick Barnette, and Mario lived before Sonia and Derrick separated. Steve Austin not only knew Petitioner growing up, but he had also gone on double dates with Petitioner and was with Petitioner when he met Robin Williams in Roanoke, Virginia. Mr. Austin also visited Petitioner at the Mecklenburg County Jail prior to the 2002 trial.

Mr. Austin was subpoenaed to testify as a government witness at both the 1998 and 2002 trials. The focus of the government's examinations in both trials concerned Mr. Austin's contacts with Petitioner after Petitioner and Ms. Williams broke up.

Despite the obvious role that Mr. Austin could play as a mitigation witness for Petitioner-and one who would be able to provide such information on cross-examination during the prosecution's case-in-chief-trial counsel failed to re-interview Mr. Austin prior to the 2002 trial. Instead, relying only on Sindy Maxwell's brief (and "superficial and not-sufficiently in depth") interview from 1997, and Mr. Austin's government-directed testimony at trial, trial counsel failed to elicit readily available mitigating evidence from Steve Austin.[11] Worse yet, trial counsel's lack of investigation and prior contact with Mr. Austin resulted in a

_____

[11] In preparation for the 2002 trial, the defense first reached out to Steve Austin on July 11, 2002. Jury selection began on July 15, 2002. There is no indication that any interview of Mr. Austin ever occurred.

48

cross-examination that elicited inaccurate and incomplete information.

Trial counsel failed to elicit any information from Mr. Austin about the fact that Petitioner would sometimes retreat to the Austin home to sleep in order to avoid the chaos and violence in his own home. Trial counsel failed to elicit any information from Mr. Austin about how Petitioner would support and look after Mr. Austin, who suffered from sickle-cell anemia and missed quite a bit a school as a result of his illness. Trial counsel failed to elicit any information from Mr. Austin about the circumstances leading up to Petitioner's sudden move to Georgia (which came after Petitioner's parents split up and Petitioner had to move out of the house with his mother and brother) and how it impacted Petitioner. Moreover, trial counsel failed to elicit any information from Mr. Austin about his visits with Petitioner at the Mecklenburg County Jail prior to the 2002 trial, and the depth and quality of their continuing friendship and the support provided by Petitioner even during Petitioner's incarceration. None of this information was provided to Petitioner's experts or the jury.

### ii. Multiple Family Members: Family History and Mental Health Information

Jean Barber Nduly (first cousins once removed), Jeff Nero (uncle), Shonda Nero (cousin), and John West (step-father) were all family members who had either been interviewed by Sindy Maxwell prior to the 1998 trial and/or testified at the 1998 trial. None of these family members were re-interviewed prior to the 2002 trial, despite their availability and the trove of information they could have provided.

For example, Jean Barber Nduly, who grew up on the same West Boulevard property as Petitioner's mother, could have described the impact that Jesse and Pearl Cooper's divorce had on Sonia; how "uncomfortable" Sonia always was around Pearl's second husband, Loyd Brown;

49

how devastating Loyd Brown's murder of Pearl Cooper was to Sonia, Jesse, and others; how she (Jean) would care for Petitioner when he was an infant because Sonia was still in high school; how she witnessed the aftermath of fights between Sonia and Derrick; how, after Sonia, Petitioner, and Mario returned to West Boulevard from Georgia, the house was always in "chaos" with fighting and drinking. Moreover, Ms. Nduly could have described her interactions with Petitioner prior to the murders, information that supports Petitioner's significant mental health impairments described herein. Yet this information was never provided to Petitioner's experts or the jury.

Jeff Nero, who was married to Petitioner's maternal aunt Tessie, could have described seeking leave from the military so that he and Petitioner's Aunt Tessie could transfer from Alaska, where he had been stationed, closer to Charlotte, North Carolina following Pearl Cooper's murder. Mr. Nero could have described moving to Ft. Jackson, South Carolina, and having Sonia and Petitioner (still an infant) move in with him, Tessie, and their two daughters, Regena and Shonda. Mr. Nero could have described Sonia's behavior in the wake of her mother's murder, which would have corroborated the significant trauma she had experienced. Mr. Nero could have described the drinking, drug use, and neglect of children that persisted in his household, as well as in Sonia and Derrick Barnette's home when they moved to Clanton Park. Moreover, Mr. Nero could have described his interactions with Petitioner prior to the murders, information which supports Petitioner's significant mental health impairments described herein. Yet this information was never provided to Petitioner's experts or the jury.

Shonda Nero, who lived in the same house as Petitioner, could have described the chaos, violence, and stress the she and Petitioner experienced growing up. She could have also described some of Petitioner's relationships with women other than those referenced during the

50

2002 trial; this information would have undercut the prosecution's theory about Petitioner's relationships with women. Yet this information was never provided to Petitioner's experts or the jury.

### iii. Brian Ard (Government Witness): Rebuttal to Aggravation and Independent Mitigation

Brian Ard, Petitioner's former boss at Camelot Records in Roanoke, Virginia, fired Petitioner after allegations of sexual harassment were raised against Petitioner in January 1996. Mr. Ard testified as a government rebuttal witness at trial in 1998, describing the allegations that were raised, and Mr. Ard's subsequent investigation and termination of Petitioner.

Sindy Maxwell interviewed Mr. Ard prior to the 1998 trial. Both Ms. Maxwell's interview, as well as Mr. Ard's later trial testimony, made clear that Mr. Ard could provide mitigating information about Petitioner, despite the fact that he had been called as a government witness. In preparation for the 2002 trial, however, trial counsel unreasonably failed to re-interview Mr. Ard. At the 2002 trial, neither the government nor defense called Mr. Ard as a witness. As a result, the jury did not learn about Mr. Ard's observations of Petitioner and Robin Williams together (which included attending Mr. Ard's wife's baby shower); how, as a favor to Petitioner, Mr. Ard kept a picture of Petitioner's children on Mr. Ard's office wall; how Petitioner was promoted to Assistant Manager, which came with a number of important responsibilities; how Petitioner responded to his termination by crying but also by maintaining a good relationship with Mr. Ard; how Mr. Ard wrote Petitioner positive recommendations for future jobs; and how Mr. Ard wanted to send Petitioner a Bible after his arrest. This information was never provided to Petitioner's experts or the jury.

51

### iv. Crystal Dennis (Government Witness): Rebuttal to Aggravation and Mental Health Information

Crystal Dennis, Petitioner's former girlfriend, testified as a prosecution witness in both the 1998 and 2002 trial. Despite trial counsel's stated objective, made months prior to the 2002 trial, that it was necessary to affirmatively address Petitioner's prior relationships with women, they inexplicably failed to interview Ms. Dennis.[12] As a result, trial counsel failed to learn--and, as a result, failed to share with their experts or the jury--important information about the relationship between Petitioner and Ms. Crystal.

For example, the jury was informed through Ms. Dennis that her half brother, Anthony Britt, introduced her to Petitioner in hopes that they would spend more time together, thereby enabling Britt to begin dating Natasha Heard (the mother of Petitioner's children). [2002 Tr. at 2815-16] The jury was then told that Petitioner "got … together" with Ms. Dennis and Mr. Britt started dating Ms. Heard, and that subsequently there were "some words" between Petitioner and Mr. Britt at the railroad tracks in May 1992. [2002 Tr. 2816-17] The jury was then told that both Petitioner and Britt were criminally charged, and that "sometime after that [Ms. Dennis] and Marc began dating and moved in together." [2002 Tr. 2817]

This version of events was grossly incomplete and misleading. Had trial counsel interviewed readily available witnesses—including Ms. Dennis and Anthony Britt's good friend, Victor Montgomery—they would have grasped not only the limited nature of what the government sought to present about this incident, but also the significant role it played in Petitioner's life. Indeed, at the time when Mr. Britt began scheming to date Tasha Heard, Ms. Heard and Petitioner were continuing to struggle as teenaged parents of two young children.

---

[12] Ms. Dennis had been interviewed by Ms. Maxwell prior to the 1998 trial.

52

Their daughter, Angelica, was less than two years old and their son, Marc, Jr., was still an infant. Although Mr. Britt was urging Petitioner to spend more time with Ms. Dennis, there had not yet been any sexual activity between them.

On the night of the altercation, Mr. Britt recruited some friends to beat up Petitioner (who had discovered Mr. Britt's plot and discussed it with Ms. Dennis, who was also upset). Accompanied by at least two other men, Mr. Britt confronted Petitioner and threatened to kill him. Knowing that Mr. Britt had been looking for him, Petitioner was carrying a small gun that he used to protect himself that night. According to Mr. Britt's cohort that night, Mr. Britt was in the wrong that night and left Petitioner with no choice but to defend himself. (As was revealed in court, Anthony Britt he was shot and killed by someone in an unrelated dispute over a woman at some point before the 2002 retrial.)

As a consequence of the shooting, Petitioner was charged with battery, reckless conduct, pointing a gun at another, and discharging a firearm near a public highway. Petitioner was arrested and held at the Coweta County Jail. After waiving his right to counsel, Petitioner provided a statement to law enforcement, in which he explained that "[m]y fiance, Natasha Heard and I have been having some trouble lately. Anthony Britt has been talking to her, and that has been making things worse."

After being held in jail for approximately 30 days, Petitioner pleaded guilty to misdemeanor charges and was sentenced to time served. During Petitioner's incarceration, Mr. Britt and Ms. Heard intensified their relationship. Following his release, Petitioner began living with Crystal Dennis. Only at that point did their relationship become intimate.

Due to trial counsel's unreasonable failure to interview Ms. Dennis and others concerning this period of time, the jury never learned that the relationship between Petitioner and Ms.

53

Dennis began as a purely platonic one; that Petitioner believed that Tasha Heard, his children's mother, had intensified a romantic relationship with Anthony Britt during the approximately 30 days that Petitioner spent in jail following his altercation with Mr. Britt in May 1992; that Petitioner's mood swings during their relationship seemed inexplicable to Ms. Dennis; that after his release from jail, Petitioner, despite working two jobs, made a serious effort to go back to high school after Ms. Dennis and his children moved in with him (which was soon derailed when Petitioner's car broke down); and that the fathers of Ms. Dennis' two children had threatened to do bodily harm to Petitioner (before the allegations of abuse were brought against Petitioner in January 1993). As was the case with Steve Austin, despite being a prosecution witness, Ms. Dennis was a witness who could have provided important mitigation evidence. Yet the information she could have shared was never provided to Petitioner's experts or the jury

Moreover, not only did trial counsel fail to learn about (and, as a result, use) any of the aforementioned information, trial counsel's cross-examination of Ms. Dennis, which was uninformed due to the lack of investigation, produced far more aggravating than mitigating evidence. For example, rather than elicit available information that supported Petitioner's serious mental health issues, including a serious mood disorder, trial counsel instead had Ms. Dennis confirm that Petitioner was "controlling," "possessive," and "insanely jealous." [2002 Tr. 2817-18] Reasonably informed trial counsel would have known that the truth was not so simple.

### 3. Trial Counsel's Unreasonable and Prejudicial Failure to Use Information Developed by its Mitigation Specialist

Although trial counsel unreasonably failed to re-interview a number of key witnesses, as noted above, trial counsel did receive important mitigation information from the interviews

conducted by Ms. Alfonso.   Inexplicably, however, trial counsel failed to reasonably follow up on Ms. Alfonso's work; as a result, the helpful information that was developed prior to the 2002 trial was not shared with Petitioner's experts or the jury.

Trial counsel learned from Ms. Alfonso that Petitioner's former girlfriend and mother of his two children, Natasha Heard, possessed important mitigation evidence.   This information, however, was never provided to defense experts, nor was it elicited from Ms. Heard when she testified.

For example, during cross-examination at trial, trial counsel elicited from Ms. Heard that, when she met Petitioner, there was not much food in the apartment he was living in with his mother; there was "some wine" in the apartment; and Petitioner and his brother Mario did not have beds.   [2002 Tr. 2852]   Inexcusably, trial counsel failed to elicit far more mitigating information concerning Ms. Heard's recollections of first meeting Petitioner-information she had previously shared with Ms. Alfonso.

Trial counsel could have elicited from Ms. Heard how she believed that Petitioner was a very troubled young man who had been raised by a mother who appeared to be "all about herself."   Ms. Heard could have testified about how Petitioner's mother "would not feed the children because there was no food in the house.   There was no clothing, no sheets on the beds, no shoes ... just a bed frame with no mattress."   Ms. Heard could have further recalled that one time at Petitioner's house the only thing in the refrigerator was a bottle of wine.   Yet despite this apparent privation, Petitioner's mother's room was well appointed with a bed, nice quilts, and dressers.   Ms. Heard also could have recounted that Sonia was hardly ever around.

Mr. Heard could have further testified that as problems increased in their relationship, she tried to tell Sonia that something was wrong with Marc, only to have Sonia dismiss her concerns

55

by saying there was nothing wrong or to blame her for not understanding Petitioner. Ms. Heard could have informed the jury and any mental health expert that Petitioner's mood swings were quite turbulent, moving from appropriate to clingy, needy, anxious, and overly demanding. There were also several times when Ms. Heard would find Marc in her closet, crying-a fact, while told to the jury, was not placed into any context concerning Marc's behavior and Tasha's larger concerns about him.

Trial counsel were also advised by Ms. Alfonso that Sonia Barnette's background was critically important to explaining Petitioner's background and needed to be communicated to the jury and to experts. This history included Ms. Barnette becoming a mother at age 14; her feelings of loss following her parents' divorce; growing up with a father, Jesse Cooper, who was damaged by combat trauma during the Korean War; the guilt, fear, and trauma she experienced at age 15 with her mother's murder; how she changed in the wake of her mother's violent death; the circumstances surrounding her marriage to Derrick Barnette and issues related to the paternity of Petitioner and his brother, Mario; the nature and extent of abuse that she experienced during her marriage to Rick; her emotional unavailability while Petitioner was an adolescent; and her battles with drugs and alcohol. Ms. Alfonso, a highly experienced mitigation specialist, firmly believed-and communicated as much to trial counsel-that Sonia Barnette's background story was an integral piece of Petitioner's mitigation presentation and needed to be communicated to the jury. Yet Ms. Alfonso's information was never provided to the jury, either directly through Ms. Barnette's testimony or through Petitioner's experts.

Similarly, trial counsel unreasonably failed to inform the jury that Sonia's younger sister, Sheila Cooper, was also traumatized by their mother's murder. Both Sonia and Sheila carried intense feelings of loss, grief, rage, and guilt following their mother's murder. This

56

information, as well, was never provided to the jury.

The issues concerning Petitioner's biological father are important to his psycho-social development. Learning that Rick Barnette was not, in fact, his biological father was profoundly confusing and destabilizing for Petitioner. Nevertheless, trial counsel unreasonably failed to introduce any evidence concerning this fundamental element of Mr. Barnette's characterological and personality development. Compounding the confusion and destabilization was the fact that since adolescence, and in the face of a laboratory test result and court order, Petitioner's mother had unrealistically denied the fact that Derrick Barnette is not the biological father of Petitioner and Mario Barnette.

As Rick Barnette testified, "I took [Petitioner] and Mario out to dinner and I kind of explained to them before what had happened about the blood test and maybe some possibilities of what it could be and what it would mean. And during -- well, after dinner I told them that I was not their biological father, but I would always be their father because they didn't have any choice in this and this was not between me and them, it was between me and their mother." [2002 Tr. 3334] Yet despite these words that were allegedly spoken, Rick Barnette very soon thereafter moved away from Charlotte and, in fact, spent very little time with Petitioner ever again.

The significance of the paternity issue goes beyond simply whether Rick Barnette, the man who meted out exceedingly harsh punishment on Petitioner while growing up, was (or was not) Petitioner's biological father and his abandonment of Marc. Information concerning Petitioner's biological father reveals powerful insights about the family into which he was born and raised. As Cessie Alfonso uncovered—but as trial counsel failed to further develop and inform their experts about—it was well known to Sonia Barnette and at least her mother, Pearl

57

Cooper, that Larry Wright was likely to be Petitioner's biological father.

As a young teenager, Sonia dated both Larry Wright and Rick Barnette. She was sexually active with both teenagers, and when Larry Wright was approximately 15 years old, he was informed by Sonia that she was pregnant. (Sonia was 14 years old at the time.) Larry Wright's parents spoke with Pearl Cooper about the situation, and it was agreed that if Larry was, in fact, the father, his family would acknowledge paternity and provide support. Sonia, however, sought to continue dating Rick Barnette, who was a few years old and was about to start a career in the military which perhaps made him a more appropriate individual to take on parental responsibilities.

Notwithstanding Sonia's relationship with Rick, her claiming him as Marc's father, and their eventual marriage when Petitioner was two years old, Sonia and Larry Wright maintained an active yet sporadic sexual relationship during the ensuing years. Their sporadic sexual relationship continued even after Sonia and Derrick eventually separated. Notably, at the time of the 2002 trial, Larry Wright was a high school and college graudate with a stable job and family of his own. He could have also testified about the significant possibility that he might, in fact, be Marc's father, and the ways he could have done something to help Marc or otherwise played a positive role in his life.

Despite the likelihood that Larry Wright is Petitioner's biological father, and in the face of evidence making clear that Derrick Barnette is not Petitioner's biological father, Sonia Barnette has long publicly maintained that Derrick is Petitioner's father. The impact of Sonia's allegations that Derrick "fixed" the paternity test, and that he is the only one who could be Petitioner's father, is significant. Unfortunately, neither Petitioner's defense experts nor his sentencing jury knew anything about it.

58

Information concerning Larry Wright's relationship with Sonia, conversations between the Cooper, Barnette, and Wright families around the time of Sonia's pregnancy with Petitioner, and the steadfast yet conspicuously false assertion that Sonia has maintained throughout Petitioner's life that Rick is Petitioner's biological father (despite this history and a court-approved blood test) profoundly demonstrates the family dysfunction and confusion that Petitioner grew up in. Yet this information was never provided to the jury, either directly through the testimony of Mr. Wright, Ms. Cooper, Mr. Barnette or Petitioner's experts.

Trial counsel's failure to use the information provided by Ms. Alfonso—and, in turn, use Ms. Alfonso and rely on her expertise—was unreasonable. As the ABA Guidelines make clear, the role of a mitigation specialist is a critically important one:

> The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

2003 ABA Guidelines, Guideline 4.1 (footnotes omitted). There is little question that trial counsel unreasonably failed to use and rely on Ms. Alfonso's expertise and assistance when preparing and presenting Petitioner's case for life.

### 4. Trial Counsel's Unreasonable and Prejudicial Failure to Interview Witnesses who Possessed Important Mitigation Information

Trial counsel also failed to ever interview a number of witnesses who they were well aware of and knew, or should have known, likely possessed important mitigating evidence.

For example, despite trial counsel's early declaration that they would seek to deal head-on with Petitioner's prior relationships with women, they conspicuously failed to interview

59

the women with whom Petitioner had been in relationships. The one exception to this failure to interview-trial counsel spoke with Tasha Heard prior to the 2002 trial-was nevertheless problematic, as well, since trial counsel failed to use the information Ms. Alfonso had collected. As a result, an incomplete and inaccurate telling of Petitioner's prior relationships was shared with the jury. Had trial counsel conducted the investigation that they themselves suggested was critically important, significant information would have been learned that would have painted a very different picture of Petitioner and changed defense experts' opinions.

Sheila Sullivan was Petitioner's first girlfriend when he moved from Charlotte, North Carolina to outside of Atlanta, Georgia when he was approximately 15 years old. Although Sheila Sullivan was identified as a potential witness well in advance of the 2002 trial, trial counsel made no effort to locate or interview her. Had trial counsel made reasonable efforts to interview Ms. Sullivan, they would have learned that during Petitioner's relationship with Ms. Sullivan, he was faithful (she was not); he was supportive at different times of crisis or stress (for example, when Ms. Sullivan became pregnant); he was not abusive toward Ms. Sullivan; and he was not suspicious or controlling of her. In addition, Petitioner was the undisputed victim of a brutal assault perpetrated by the very teenager with whom Ms. Sullivan later cheated on Petitioner. Finally, after Petitioner's relationship with Ms. Sullivan went astray, he attempted to commit suicide. Ms. Sullivan and others could have informed defense experts and the jury that Petitioner was profoundly affected by their relationship, and that he had changed as a result.

Although trial counsel were aware of Ms. Sullivan and the likelihood that she would possess such important information, they made no effort to speak with her. As a result, neither Petitioner's defense experts[13] nor the jury were informed about the details of this relationship.

---

[13] Although defense expert Dr. Ann Wolbert Burgess, who testified as an expert in "domestic violence," referenced

Trial counsel also failed to explore other key relationships in Petitioner's life, including his relationships with Temeka Hunter and Kowana Dozier.[14]  Petitioner had relationships with both women while he was living in Georgia in 1992 and early 1993.   As was the case with Ms. Sullivan, these relationships did not include violence or jealousy or the other elements of domestic violence that the government and, to a large extent, trial counsel suggested to the jury were consistent features of all of Petitioner's relationships with women.[15]

Trial counsel also failed to interview neighbors of Petitioner from his childhood who could have powerfully detailed the destabilizing and chaotic world that Petitioner grew up in. As noted above, Wendy Sharpe could have testified that Petitioner would sometimes appear at her home late a night, wearing only his pajamas, and spend the night.   Regena Nero could have testified about Rick and Sonia's fighting, and how Rick had injured Sonia's ears when he pulled out her earrings—and how, following the separation, she would party with Sonia while Marc and Mario were home alone.   Evidence of Petitioner seeking refuge at neighbors' homes, violence in his home, and Sonia's unavailability to parent was consistent with Petitioner's claims-largely undeveloped by trial counsel-that his household was often an unpleasant and violent place to be when he was an adolescent, and that he received very little guidance and parenting.

Delores Hart would have been able to testify about the background to Jesse and Pearl

---

Petitioner's relationship with Sheila Sullivan in her report, the information reported about the relationship is incomplete and inaccurate.  Had Dr. Burgess been informed by trial counsel about the full details of this relationship, her analysis and ultimate opinion would have changed.

[14] Petitioner's relationship with Temeka Hunter began in late 1992, after meeting her on a trip back to Charlotte. Temeka was a good friend of Petitioner's cousin, Shonda Nero, which is how they were introduced.   Temeka would have testified that Petiitoner was "a sweet, timid, respectful young man." There were no arguments, much less violence, during the relationship.

[15] Trial counsel could have also called Beth Durant and Ayanna Brewer-Beasley to testify about their relationships with Petitioner before he moved from Charlotte to Georgia, which would have further undermined the assertion that Petitioner's interpersonal relationships with women were consistently marked by violence.

61

Cooper's divorce, as well as the devastating aftermath of Pearl's murder.  Moreover, Delores Hart could have explain that, even as a caring family friend, she was compelled to evict Sonia (along with Marc and Mario) after Sonia continually proved unable to pay rent.

The failure to interview these and other witnesses left the jury with a wholly incomplete, and at times incorrect, understanding of Mr. Barnette and his background.

**F.      Trial Counsel's Unreasonable and Prejudicial Failure to Adequately Investigate and Present Evidence Which Resulted in the Jury Receiving Incomplete and, at times, Materially Inaccurate Testimony from Defense and Prosecution Experts**

Trial counsel failed to provide the defense experts who testified during Petitioner's resentencing in 2002 with readily available information that would have not only corroborated and substantiated significant aspects of their testimony, but would have also  materially changed the nature and scope of their opinions.  Because trial counsel failed to conduct an adequate investigation, and failed to provide the defense experts with what evidence they had collected, the jury was presented with incomplete and, at times, inaccurate information about Petitioner's mental health.

**1.   Identification and Use of Experts for the 2002 Trial**

After Petitioner's sentences were vacated, he was appointed new trial counsel.  On February 13, 2001, Jean Lawson and Claire Rauscher were appointed to represent Petitioner. Nine months after their appointment, trial counsel had yet not consulted with either Dr. Seymour Halleck or Dr. Mark Cunningham about their work from Petitioner's first trial, much less decided what mental health experts to utilize for Petitioner's retrial.  On November 15, 2001, trial counsel filed its first motion for funding to consult with the experts from the 1998 trial.  On November 28, 2001, with a trial date scheduled for March 12, 2002, trial counsel filed its first set

62

of motions for funding to retain mental health experts (including Dr. Halleck).

On February 26, 2002, with the trial having been continued to July 2002 following the replacement of Ms. Rauscher with Harold Bender, the Court authorized funding for Dr. Halleck, Dr. Cunningham (or a similarly qualified expert on future dangerousness), Dr. Ann Burgess (a forensic nurse who had no involvement in the 1998 trial), and an as-yet-unidentified psychologist. A few weeks later, in March 2002, Dr. Cunningham formally re-opened his Barnette file after trial counsel and he met to discuss him being an expert witness at the 2002 trial.

Dr. Halleck, Dr. Burgess, and Dr. Cunningham all later testified on behalf of Petitioner in the 2002 trial; however their respective opinions and testimony were significantly undermined by trial counsel's failure to conduct an adequate investigation and provide these experts with readily available evidence concerning Petitioner. As a result, trial counsel's presentation of expert testimony was wholly incomplete and, at times, materially inaccurate

### 2. Trial Counsel's Own Assessment that the Prior Defense Team's Investigation was "Superficial and Not-Sufficiently in Depth"

In August 2001, by way of an *ex parte* filing with the Court, Petitioner's counsel asserted that there were manifold problems with the manner in which the earlier trial team investigated and presented mitigation evidence at the 1998 trial:

> Current counsel have reviewed the testimony and cross-examination at Marc Barnette's first sentencing hearing. It is apparent that the defense presentation was disjointed. The psychological, psychiatric and family history was not presented to the jury in an effective manner. The witnesses were unprepared for cross-examination. The investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation. Our objective is to assure that he information presented to the jury at this sentencing hearing is the result of thorough investigation, top notch assessment by appropriate experts and is credible and logical enough for the jury to understand the genesis of these crimes and to impose a sentence of life imprisonment, rather than death.

63

[Sealed Doc. 364]

Trial counsel's assessment of the earlier investigation was reiterated to the Court during an *ex parte* hearing on February 26, 2002 concerning defense funding. Trial counsel noted that, during the 1998 trial, "[t]he government pretty well ridiculed this mitigation investigator and pointed out some - she had a timeline and they pointed out some areas where she didn't include some critical things." Moreover, trial counsel noted that "some potential mitigation witnesses may not have been candid with [the mitigation investigator] in the past and then that misinformation or information that we're going to try to present doesn't show up in her report."

Despite trial counsel's view that the first defense team's "investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation," trial counsel repeated the past when it unreasonably failed to adequately re-investigate and pursue readily available information to provide to its experts, as well effectively utilize the new information it had gathered.

### 3. Trial Counsel Unreasonably and Prejudicially Failed to Provide Defense Experts with Important and Readily Available Mitigation and Mental Health Information

Both Dr. Seymour Halleck and Dr. Mark Cunningham testified at Petitioner's first trial in 1998. At that time, these experts were provided with and relied upon the investigative work of the first trial team and its mitigation specialist, Sindy Maxwell-the same work that Petitioner's new lawyers believed was "superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation." [Sealed Doc. 364] Despite the shoddiness of the earlier work done on Petitioner's background, however, trial counsel inexplicably had its experts rely on precisely the same information for purposes of their testimony in 2002. As a result, the same deficiencies that plagued Petitioner's first trial-a superficial and incomplete picture of

64

Petitioner's background, available mitigation, and mental health condition-were again presented to the jury. Consequently, critically important information-including the diagnosis of a major mood disorder-was not shared with the jury.

### i. Dr. Halleck

In Dr. Halleck's report from 1997, he suggested that "the diagnosis of Bipolar Disorder II might also be considered," in light of Petitioner's reported different mood presentations throughout his life ("periodic short depressions throughout his life alternating with periods of hyperactivity and possible hypomanic behavior"). Due to trial counsel's failure to conduct an adequate investigation and provide their experts with readily available information, Dr. Halleck later abandoned this view that Petitioner might, in addition to a serious Borderline Personality Disorder, also suffer from a genetically-grounded mood disorder. [2002 Tr. 3405]. Readily available information that was never provided to Dr. Halleck would have supported his original suspicions.

As post-conviction counsel's investigation reveals, and as expert testimony would show at an evidentiary hearing, Mr. Barnette not only suffered from a Borderline Personality Disorder-a disorder born largely out of Petitioner's turbulent childhood history-but he also suffered from a serious and independent mood disorder. The significance of the mood disorder cannot be understated. As Dr. Richard Dudley explains, Petitioner suffers from a major mood disorder that is "characterized by rapidly changing, extreme mood states, including mania, depression and mixed states of mania and depression that are associated with extreme irritability and paranoid ideation." While such rapidly changing mood disorder states are "quite destabilizing for an individual in and of themselves, and are particularly destabilizing during the period of adolescent development when such emotional turmoil is so difficult to manage,"

65

Petitioner's major mood disorder is "superimposed" on Borderline Personality Disorder, "result[ing] in even much more severe impairment in his ability to function, in that each of these major psychiatric disorders potentiate the other."

As expert testimony at an evidentiary hearing would further show, the existence of Petitioner's major mood disorder effectively explains why his symptomatic behavior of Borderline Personality Disorder was, at times, so outsized and severe. Moreover, and perhaps most critically, it would show that that Petitioner's behavior was not simply "reactive" to things going on around him-such as his relationships with women or other external psycho-social stressors-but was also powerfully and uncontrollably driven by a genetic etiology.

Evidence to support this finding was readily available to trial counsel. Indeed, while trial counsel's investigation was inadequate and incomplete, it nonetheless identified "red flags" that, had the information been further explored and shared with defense experts, would have supported the diagnosis of Petitioner's mood disorder. Yet that reasonable pursuit of information and sharing with experts never occurred.

For example, trial counsel's mitigation specialist, Cessie Alfonso, received information from Petitioner's former girlfriend and mother of his two children, Natasha Heard. Ms. Heard reported to Ms. Alfonso that she (Ms. Heard) tried to tell Petitioner's mother that "something was wrong with [Petitioner]" and that Petitioner "was very unhappy." Ms. Heard reported that Petitioner would "sway from being appropriate to being clingy, needy, anxious, and demanding of her total attention." At some point, Ms. Heard reported, Petitioner's mood swings were so dramatic that she did not feel that she could leave his side. Ms. Alfonso's work product was not provided to the defense trial experts.

66

### ii. Dr. Ann Burgess

Trial counsel's inadequate investigation and failure to provide defense experts with readily available information resulted in a highly aggravating and inaccurate diagnosis by Petitioner's own expert. Dr. Ann Burgess, a psychiatric nurse who was tendered as an expert in domestic violence, opined at trial that Petitioner was involved in a "crime spree" that extended from the firebombing of Robin Williams' residence to the murders of Ms. Williams and Donald Allen. Based on her review of information provided by trial counsel, Dr. Burgess testified that the violence during that time period reflected "a clear pattern of this kind of -- not certainly to the degree, but this kind of obsessional need to reunite the relationship with prior girlfriends and [Petitioner's] thinking…. It just goes from young woman to young woman, from girlfriend to girlfriend." [2002 Tr. 3505] Having described "the cycle of violence," wherein, with respect to domestic violence, "a cycle … seems to carry on from generation to generation," Dr. Burgess proceeded to explain that Petitioner's behavior "has its roots very much in the way he was raised and developed." [2002 Tr. 3506]

While Petitioner indisputably witnessed and experienced violence in his home and amongst and between his relatives, trial counsel's failure to conduct an adequate investigation and provide Dr. Burgess with access to readily available information resulted in a limited, incomplete opinion. As a result, Dr. Burgess' testimony framed Mr. Barnette's prior behavior in the context of dysfunction rather than psychiatric illness. Rather than simply "a hereditary predisposition for violence," as the government summarized Dr. Burgess' opinion during closing argument [2002 Tr. Tr. 3923-24], any explanation for Petitioner's past conduct was, in fact, far more complex.

As a preliminary matter, while Dr. Burgess suspected that Petitioner had features of a

67

Borderline Personality Disorder, she was not provided with the full set of information to make an informed diagnosis one way or another.   Indeed, trial counsel only provided Dr. Burgess with the work conducted by the first trial team, work that trial counsel themselves had deemed "superficial and not-sufficiently in depth."   Dr. Burgess was not provided with Cessie Alfonso's mitigation report or interview summaries.   As a result, Dr. Burgess did not have an accurate or complete picture about Petitioner's family history.   For example, Dr. Burgess was not made aware of the extent to which Sonia Barnette, Petitioner's mother, was traumatized and affected by her parents' divorce and her mother's subsequent murder.   Nor was Dr. Burgess apprised about the extent to which Jesse Cooper, Petitioner's father and an important figure in his upbringing (and his mother's), was damaged by combat trauma and alcoholism.   These factors were highly significant, especially in light of the fact that Sonia Barnette was only 14 years old when she gave birth to Petitioner.

Dr. Burgess was further unaware about the truth behind Petitioner's paternity, and the manner in which that issue was handled from the very start.   Dr. Burgess was also uninformed about the fact that Petitioner would literally run away to neighbors' homes in the middle of the night during the nadir of Sonia and Derrick Barnette's marriage.

Dr. Burgess was also not provided with accurate and complete information about Petitioner's relationships with women, which is particularly unreasonable given the fact that her expert opinion was focused on that very subject.   Indeed, contrary to Dr. Burgess' opinion that Petitioner's relationships with women followed a consistent "theme,"   [2002 Tr. 3507] the truth was far less simple.   Dr. Burgess had no way of knowing this since trial counsel failed to undertake an adequate investigation.   This is again particularly notable given trial counsel's earlier suggestion that addressing Petitioner's relationships with women was critically important

68

and their criticism of Petitioner's earlier lawyers who attempted to "hid[e]" or "minimize" those relationships.

The significance of these other relationships which trial counsel unreasonably failed to learn about, in combination with the information about Petitioner's mental health which trial counsel failed to develop and use, is profound. As post-conviction would show at an evidentiary hearing, although there had been various difficulties including violence in some (although not all) of Petitioner's relationships with women, his life-changing relationship with Sheila Sullivan, his relationships with other women that did not fit the same "pattern" of violence described by Dr. Burgess, and the additional important information that helped establish that he also suffered from other major psychiatric disorders, would have resulted in a much more complex picture of Petitioner's mental health difficulties. Had Dr. Burgess been supplied with the accurate and more complete information gathered by post-conviction counsel, it would have materially affected her expert opinion.

### iii. **Dr. Mark Cunningham**

Trial counsel's inadequate investigation and failure to provide each defense expert with readily available information also rendered the defense experts' credibility and opinions acutely vulnerable to impeachment and ridicule by the government. Indeed, the defense expert testimony was severely undermined by the shortcomings of trial counsel's investigation, a point the government repeatedly made through cross-examination and in closing argument. During closing, the prosecution rightly pointed out that the jury was presented with "quick snapshots … uncorroborated information," which begged the question: "[W]hat do I know about the quality of information that [the defense experts] used to form their opinions?" [Tr. 2002 at 3936]

For example, Ms. Alfonso had urged trial counsel to consider the impact of Petitioner's

69

grandfather's wartime experience and mental health concerns. Jesse Cooper, who was nearly killed in combat during the Korean War, was responsible for Petitioner (then an infant), Petitioner's mother, Sonia, and Petitioner's aunt, Sheila, immediately following the murder of Pearl Cooper. From that point in time until Petitioner's arrest for murder in 1996, Jesse Cooper was a central figure in Petitioner's life. Yet while some mention was made about Jesse Cooper and how he was "unique" and a "[l]ittle eccentric," [2002 Tr. 3318] the jury was never informed, either by credible testimony or through Mr. Cooper's own military records, about the severity of his wartime injuries and the profound affect they took on him. Indeed, Mr. Cooper's military and medical records alone would have laid bare not only his heroism on behalf of the United States during combat—he was awarded a Bronze Star and Purple Heart among other commendations—but also the trauma he experienced, his resulting disabilities, and his subsequent alcoholism. Trial counsel's failure to pursue and present this information was unreasonable, and left the defense presentation vulnerable to attacks by the prosecution. For example, during Dr. Mark Cunningham's testimony, the prosecution hammered on the credibility of Dr. Cunningham's assessment that Jesse Cooper was "psychiatrically disabled":

> Q:   Okay. Now, what psychiatric tests did you perform on Jesse Cooper to make that determination?
>
> A:   I was advised of that by Sheila, his daughter.
>
> Q:   My question is what psychiatric tests did you perform on Jesse Cooper to make that determination?
>
> A:   I did not test Jesse Cooper.

[2002 Tr. 3718-3719]

Dr. Cunningham's testimony was undermined by trial counsel's failures in myriad other ways, as well. For example, when discussing Petitioner's experience with abandonment-a core

70

feature of his Borderline Personality Disorder-Dr. Cunningham attempted to mention the fact

that Petitioner's mother, Sonia, never publicly accepted the paternity test results establishing that

Derrick Barnette was not the biological father of either Marc or Mario.

> A: The only thing I might add is that as Sonia insists that the paternity tests were rigged, she leaves Marc and Mario to deal with this issue by themselves and then there is no shared reality of, okay, this is what happened, let me help you understand this. By denying it, Marc -
>
> MS. TOMPKINS: Objection. There is no evidence of this.
>
> THE COURT: Sustained. Members of the jury, don't consider that last comment.

[2002 Tr. 3637]

### 4. Trial Counsel's Unreasonableness Concerning Government Experts

### i. Dr. Park Deitz

Following the defense case-in-chief, the prosecution presented the rebuttal testimony of

Dr. Park Dietz, a well-known forensic psychiatrist from California. Dr. Dietz played a critical

role in the government's case. Indeed, his testimony was the fulcrum of the government's

attack on Petitioner's mitigation and mental health presentation. The government highlighted

Dr. Dietz's testimony in its closing repeatedly: "I contend to you, ladies and gentlemen, that the

clearest explanation of Marc came from Dr. Dietz, Marc Barnette is narcissistic, he sees himself

as the center of the universe and all things revolve around him and his needs; if anything gets out

of whack, he reacts violently." [2002 Tr. 3935] Later, the government contrasted Dr. Dietz's

testimony against the evidence supplied by the defense experts:

> Contrast that, ladies and gentlemen, with the Government's expert, Dr. Park Dietz. Dr. Dietz looked you in the eye and said, Marc Barnette was not psychotic at the time of these crimes, Marc Barnette's choices were not predetermined by he [sic] childhood, childhood risk factors do not cause adult behavior, Marc Barnette's behavior was not programmed. He told you this was two crimes with two distinct motives, this was not a domestic homicide, and he told you that Marc Barnette has

71

told so many stories in the past that it's not possible to know what happened. Plain language, plain opinions.

[2002 Tr. 3939] Given the near-celebrity status that Dr. Dietz maintained at the time and his central role as a forensic expert, and given the reasonable likelihood that Dr. Dietz would play a key role in the government's case for the death penalty, trial counsel was well aware that Dr. Dietz's credibility was crucial. Despite this fact, trial counsel failed to impeach Dr. Dietz on a critical issue that cut to the heart of his credibility as an expert witness.

During the government's qualifying of Dr. Dietz as an expert, the prosecution noted a number of high profile cases in which Dr. Dietz had previously testified, including "the case of Andrea Yates, the woman who drowned her children in the bathtub[.]" [2002 Tr. 3793-94] The Yates case, out of Harris County, Texas, had recently concluded in March 2002. By all accounts, Dr. Dietz's testimony for the prosecution had undermined Yates' claim that she was insane at the time of the crimes. At trial, Yates claimed that Satan was inside her and that she had killed her children to save them from "hellfire and damnation." During his testimony, Dr. Dietz claimed that Yates got the idea to drown her children from an episode of "Law & Order" in which a mother was acquitted on an insanity defense after drowning her children in a bathtub. Dr. Dietz testified that he was a consultant for the television program and that the show in question had been broadcast shortly before the Yates provided her reasoning for the murders.

Following the jury's rejection of Yates' insanity defense, it was revealed that Dr. Dietz had provided materially false testimony. Contrary to his forceful and convincing testimony, no such episode of "Law & Order" was ever taped. As a result of Dr. Dietz's materially false testimony, the prosecution abandoned its request for the death penalty and Yates was sentenced to life in prison with the possibility of parole after 40 years. On January 6, 2005, Yates' murder

72

convictions were overturned as a direct result of Dr. Dietz's false testimony given that it more than likely prejudiced the jury.   Yates was subsequently retried.   On July 26, 2006, a Texas jury found that Yates was not guilty by reason of insanity.   Needless to say, Dr. Dietz did not testify at Yates' retrial.

Based on this information, trial counsel was in a position to establish that Dr. Dietz was an unreliable expert witness whose explanations and rationalizations for behavior were suspect and fallible.   Yet Petitioner's trial counsel unreasonably failed to impeach Dr. Dietz on the materially false testimony he had provided just a few months prior in the Yates case.[16]

Furthermore, had counsel conducted the type of investigation that was required, and had counsel provided defense experts with the results of that investigation, counsel would have been able effectively to rebut Dr. Dietz, cross-examine him, and perhaps affect his expert opinion.

ii.  **Dr. Sally Johnson**

Trial counsel unreasonably failed to consult with and call to testify Dr. Sally Johnson, a forensic psychiatrist employed by the Bureau of Prisons at the time of Petitioner's two trials.   In 1997, pursuant to a court order, Dr. Johnson evaluated Petitioner with respect to his competency and insanity evaluation.   She later testified during Petitioner's 1998 trial as a defense witness. Despite being able to testify to a number of mitigating issues—including, but not limited to, positive institutional adjustment, remorse, and mental illness—Dr. Johnson was not called to testify on Petitioner's behalf in 2002, much less even consulted by trial counsel.

When Dr. Johnson testified on Petitioner's behalf in 1998, she was Chief Psychiatrist and

---

[16] Based on the timing of the disclosure in Texas that Dr. Dietz had provided materially false information in the Yates case—March 2002—it would appear that trial counsel should have been in a position to gather and use this information without government disclosure.   Based on the current record, however, it is not entirely clear. Accordingly, post-conviction counsel, in the alternative, asserts this as a *Brady/Giglio* claim given the government's apparent failure to provide this information to trial counsel.

73

Associate Warden for Health Services at Butner. Accordingly, Dr. Johnson was administratively responsible for the running of the psychiatric hospital and for the general medical care that was given to the prison's population (which, at the time, consisted of approximately 1,000 inmates). Petitioner was held at Butner from November 17, 1997 through December 19, 1997 for purposes of Dr. Johnson's evaluation. As Dr. Johnson testified in 1998, Petitioner described "coming to grips with what he had done shortly after the crime was committed"; Petitioner "fully intended to kill himself because he believed his life was over"; and Petitioner "describe[d] feeling overwhelmed with the magnitude of his behavior." [1998 Tr. 609] Moreover, according to Dr. Johnson, Petitioner "was able to express remorse for his behavior and to express sympathy for the victim's family." [1998 Tr. 610]. The evidence that Dr. Johnson, a psychiatrist employed by the Bureau of Prisons, provided in 1998 was, to be certain, mitigating. Inexplicably, however, trial counsel failed to present this powerful evidence to Petitioner's 2002 jury.

In addition, trial counsel failed to explore with Dr. Johnson the significance of Petitioner's prison adjustment, and the prospects for his long-term adjustment should he have received a life sentence. By the time of trial in 2002, Petitioner had demonstrated over six years of discipline-free behavior. Such behavior was also absolutely consistent with Dr. Johnson's initial observations of Petitioner in 1997. As reflected in her letter to the Honorable Robert Potter on January 8, 1998, Dr. Johnson found that a review Petitioner's prison record at that time "revealed that he did not receive any incident reports for rule infractions. He reported promptly to all appointments and was cooperative with the evaluation process. He was noted to interact appropriately with other patients." Trial counsel unreasonably failed to interview Dr. Johnson, have her review Petitioner's prison records from the date of his conviction in 1998

74

through to 2002, and comment or opine about Petitioner's adjustment.

**G.** **Trial Counsel Unreasonably and Prejudicially Failed to Advise Petitioner That He Should Not Testify, Failed to Realize That He Should Not Testify, Failed to Properly Prepare Him for Testifying, and Failed to Frame Petitioner's Testimony in the Context of His Severe Mental Health Issues**

As the first defense witness called to the stand, Petitioner, over the course of two days, testified about his role in the charged crimes, his prior conduct in other relationships, his upbringing, and various other aspects of his background. For all intents and purposes, Petitioner was his own mitigation specialist providing testimony about his own psycho-social history. While a qualified mitigation specialist is undoubtedly a core component of any capital defense team, and plays "an integral part of the defense team [to] insure[] that the [mitigation] presentation to be made at the penalty phase is integrated into the overall preparation of the case," ABA Guidelines, Guideline 4.1, Commentary, it is highly unusual—indeed, unprecedented—for that role to be played by a capital defendant, particularly one who is as damaged as Petitioner.

Because of Petitioner's distorted and warped interpretation of events and relationships-a direct consequence of his severe psychological impairments-portions of his testimony were inaccurate and, to the sentencing jury, highly aggravating. Trial counsel's performance in this regard was thus both objectively unreasonable and remarkably prejudicial.[17]

---

[17] Dr. Dudley explains:

Subsequent to the initial referral of Marc Barnette to this psychiatrist, this psychiatrist was also asked to comment on the testimony that Marc Barnette gave at his trial. Given Marc Barnette's above described psychiatric impairments, his lack of insight into the causes of these impairments, and his lack of insight into how these impairments impact on his perceptions and his behavior, the following can be said. Marc Barnette's psychiatric impairments manifest (both to this psychiatrist and others) in statements, explanations, and rationalizations by Marc Barnette that would appear to be distorted, self-serving, and simply off-base, and therefore, it is unsurprising to this psychiatrist that Marc Barnette's testimony at trial appeared unsympathetic. While Marc Barnette's testimony was, in many ways, consistent with his mental health make-up – and thus clouded by distorted and warped interpretations of events and relationships – to an untrained listener, it likely appeared quite offensive. That being said, if Marc Barnette was going to be

75

Trial counsel could have, and should have, kept Mr. Barnette off the witness stand and presented his life history and mental impairments in a mitigating manner. At the very least counsel should have contextualized Petitioner's testimony as, in large measure, his inability to comprehend or explain his own actions, despite still feeling genuine remorse. The total failure to do so permitted the prosecution to assert, essentially unchallenged, that "[Mr. Barnette's] testimony [was] so filled with misinformation that you simply can't believe it. I contend to you, ladies and gentlemen, that those hours that Marc Barnette was on the witness stand is just where he likes to be, the center of attention." [2002 Tr. 3928-29] He was nothing more than a "spin artist." [2002 Tr. 3929]

Trial counsel's failure to explain their client's testimony in the context of his impairments was critically prejudicial. Trial counsel did not offer the jury an understanding of Petitioner's own words. Trial counsel unreasonably failed to explain and argue to the jury that many aspects of Petitioner's testimony in fact revealed signs and symptoms of his multiple impairments, and was consistent with his mental health diagnoses. Left unexplained, Petitioner's testimony sounded, at various turns, damning, callous, and unmitigated.

To be sure, there is little question that trial counsel was on notice that Petitioner's mental health impairments would deleteriously affect his testimony. Trial counsel were aware from Dr. Tyson's 1994 report that Petitioner "may insist on following a course of action that will appear self-defeating to others," and that "[h]e rigidly adheres to thinking patterns that center around justification of his actions," which consequently "does not allow him to accept that his actions will be seen as problematic." They were also aware from Dr. Faye Sultan's 1998 report

---

allowed to testify, it would have also been possible for a mental health expert to then explain to a jury why Marc Barnette, even after his arrest and conviction for murder, would persist in describing things in ways that no one else could see or agree with.

76

that Petitioner had "developed significant perceptual and cognitive distortions," and that "[t]hese perceptual inaccuracies … bred behavior grossly inappropriate to social situations."

**H.** **Trial Counsel Unreasonably and Prejudicially Failed to Investigate and Present Readily Available *Lockett/Skipper* Evidence Concerning Petitioner's Institutional Adjustment and Meaningful Relationships**

Marc Barnette maintained loving and supportive relationships after he was imprisoned, contributed to the efficient and safe functioning of prisons and jails as a trustee/orderly, conveyed appropriate and healthy empathy and sympathy toward others, and provided advice and insights to those he was in contact with. Trial counsel showed that Petitioner was a good inmate (although unreasonably failed to show he was a good employee-inmate (trustee)). Yet counsel unreasonably failed to show that Marc Barnette became a contributing member of a family and community. And Mr. Barnette's contributions had nothing to do with preparing for a resentencing. Dr. Dudley explains:

> Finally, the mental health impairments suffered by Marc Barnette, while dramatic and severe, can be managed and/or controlled. For example, I am aware that Marc Barnette had not committed any infractions or received any disciplinary write-ups from the time of his arrest in June 1996 through the time of his retrial in 2002. This is particularly noteworthy given how disruptive his behavior and distorted his thinking had been prior to his arrest. Yet it is quite understandable/explainable given the structure that MB had while incarcerated and the forced reduction (as a result of his incarceration) of the particular stressors that make MB acutely vulnerable to an exacerbation of his symptoms and the associated erratic and irrational behavior. This explanation as to why Marc Barnette had shown positive and constructive adjustment to prison could have also been presented for consideration as mitigation at the time of trial.

In opening statements, trial counsel promised the jury that the defense would put forward evidence to show how and why Petitioner had "changed over the last six years." [2002 Tr. 2395] Yet while the jury learned that Petitioner had a spotless institutional record during his incarceration since his arrest in 1996, the jury was never provided with evidence about why Petitioner had adjusted so well to prison. This gaping omission—the failure to explain to the

77

jury that Petitioner's mental health makeup and severe mood disorders were better controlled and managed in the prison setting, and that Petitioner had maintained and continued to develop important relationships with friends and family—left the jury with little reason to spare his life.

Trial counsel presented evidence that Petitioner had no infractions from the time of his arrest in 1996 through the time of trial in 2002. Trial counsel presented evidence from three county detention officers that when Petitioner was at the Mecklenburg County Jail, he had been a "good model inmate," [2002 Tr. 2459] that he "followed all orders and directives," [2002 Tr. 3460] and that he had been "[r]espectful, intelligent, and quiet." [2002 Tr. 3458] Trial counsel also presented evidence from two employees of the Bureau of Prisons to discuss Petitioner's infraction-free incarceration, as well as the conditions of Petitioner's confinement—for example, the type of housing units he had been housed in and type of segregation that he was regularly kept in. Trial counsel also presented an expert witness, Walter Buer, to describe Petitioner's classification within the Bureau of Prison.[18]

Although trial counsel presented data about Petitioner's good behavior and highly restricted confinement in prison, they conspicuously failed to provide the jury with any evidence about *why* Petitioner had seemingly adjusted so well. For example, given Petitioner's psychiatric impairments, trial counsel unreasonably failed to present testimony from any one of Petitioner's mental health experts concerning Petitioner's understandably positive response to structure, and about how the forced reduction of the particular stressors that previously made Petitioner acutely vulnerable to an exacerbation of his symptoms, and the associated erratic and irrational behavior, resulted in Petitioner being a genuinely constructive and productive

---

[18] On cross-examination, the government discussed the import of Buer's testiony: "[G]iven this classification, this arithmetic, the defendant is seen as a dangerous person." [2002 Tr. at 3487] In prison, however, Petitioner is not.

78

individual while imprisoned.

Moreover, trial counsel failed to investigate, prepare, and present readily available evidence that Petitioner had ongoing and significant interpersonal relationships with various family members and friends at the time of his 2002 trial. From the time of his arrest in 1996 until the 2002 trial, Petitioner had been in contact with a significant number of people, including, but not limited to, Sonia Barnette, Tessie Nero, Jesse Cooper, Rick Barnette, Armaud Cooper, and Steve Austin. Petitioner's contacts with these individuals were in person, by letter, or by telephone. Trial counsel failed to inform Petitioner's jury about these contacts and the many ways they were important and meaningful, not only to Petitioner but also to his family and friends. These witnesses could have testified about, *inter alia*, Petitioner's connectedness with his half-siblings (Sonia Barnette's two younger children), as well as Derrick Barnette's biological children; how Petitioner would send family members his art work, which is something they cherished; his sincere interest in maintaining and developing his relationships with Natasha Heard and their two children[19]; as well as his genuine acceptance of responsibility and remorse.[20] Such aspects of Petitioner's character are, by their very nature, relevant to the sentencing determination.

Instead of this powerful and temporally proximate information about Petitioner's relationships, the jury was provided with evidence that suggested Petitioner had perhaps no

---

[19] Based on the evidence presented, it is unsurprising that no juror found beyond a reasonable doubt that Petitioner's children would be harmed by his execution. Left unexplored and not presented by trial counsel, however, was evidence that would have suggested otherwise, and would have shown that Petitioner genuinely wished to have a relationship with his children. In point of fact, today, Petitioner has a durable and meaningful relationship with Ms. Heard and their two children.

[20] Other than from Petitioner himself, the only other evidence presented by trial counsel concerning remorse came from Bobby West, a cemetery manager and pastor who had been involved in the prison ministry since 1971. Mr. West testified about some prison visits with Petitioner that occurred at some point(s) between 1998 and 2002. (No information was provided about the dates and lengths of such visits, or when they occurred.) Mr. West testified that he believed Petitioner to be remorseful for what he had done. [2002 Tr. 3396] Mr. West was not asked to elaborate or explain why he believed this to be the case.

ongoing contact with anyone who knew him prior to his arrest in 1996. For example, Armaud Cooper, Petitioner's cousin, testified that "[Petitioner] was definitely the person that I always looked up to, and he always gave my advice and helped me out, and he even does so to this day, because we write each other very frequently. And it just really hurts to see him in this position, and I love him dearly. It's just hard to express in words how much I love him. It's just a very hard time." [2002 Tr. 3438-39] Mario Barnette, Petitioner's brother, testified that he "infrequently" visited Petitioner in the jail. [2002 Tr. 3387] Rick Barnette, who had visited Petitioner during his incarcerations in both Terre Haute, Indiana and Charlotte, North Carolina, was not asked about his contacts with Petitioner. following his 1996 arrests.[21] No other family member or friend testified on behalf of Petitioner at his 2002 trial. There is little question that trial counsel's failure to present this readily available evidence was prejudicial. Indeed, the jury's findings in mitigation laid this bare, as only two jurors believed beyond a reasonable doubt that Petitioner did well in a structured environment; only one juror believed beyond a reasonable doubt that Petitioner had accepted responsibility for his action; only one juror believed beyond a reasonable doubt that Petitioner had remorse; and no jurors believed beyond a reasonable doubt that Petitioner's brother and children would be harmed by his execution.

I. **Trial Counsel Unreasonably and Prejudicially Failed to Request a Continuance Despite Being Unprepared**

As noted above, the absence of trial counsel files has severely hampered post-conviction counsel's investigation-and, as asserted below, stands as an independent ground for relief. While contemporaneous notes of counsel and communications are not available to provide insight about trial counsel's decision making, it is markedly clear that trial counsel's "strategy"

---

[21] Perversely, while trial counsel permitted the jury to receive the false notion that Rick Barnette had "been there" for Petitioner prior to the crimes in question (which he had not), they failed to convey the fact that Rick Barnette and Petitioner had, in fact, developed a genuine relationship only after the murders.

80

was un-informed and based on incomplete investigation. What is also clear is that trial counsel was also madly scrambling on the eve of and during trial to uncover information that should have been investigated and developed well in advance of trial. Despite the clear need for additional time, however, the trial team of Ms. Lawson and Mr. Bender never moved to continue trial.

By way of background, on May 4, 2000, the Fourth Circuit remanded Petitioner's case for a new penalty phase trial. On February 9, 2001, Petitioner was brought back from Terre Haute, Indiana and placed in the Mecklenburg County Jail. On February 13, 2001, Jean Lawson and Claire Rauscher were appointed to represent Petitioner.

For the next six-and-one-half-months, it appears from visitation records at the Mecklenburg County Jail that Ms. Lawson met with Petitioner on three (3) separate occasions (February 22, 2001, May 2, 2001, June 20, 2001) for an approximate total of five (5) hours and forty-five (45) minutes. Jail records do not reflect any visits between Petitioner and Ms. Rauscher, nor do they reflect any visits between Petitioner and any investigator or expert during those six-and-a-half months.[22] Moreover, as of August 28, 2001, trial counsel had not conferred or consulted with either of Petitioner's prior trial counsel (Paul Williams and George Laughrun) or any of the experts previously consulted and/or used during the 1998 trial (Dr. Seymour Halleck, Dr. Faye Sultan, Dr. Ruth Kappius, Sindy Maxwell, Dr. William Tyson, Dr. John Warren, and Dr. Mark Cunningham).

On August 31, 2001, three days after trial counsel submitted their initial request for funding of an investigator, the Court directed that trial would begin on March 19, 2002. With a trial date approximately seven (7) months away, trial counsel had yet to initiate any independent

---

[22] Trial counsel did not submit their first request for expert or investigative funding until August 28, 2001. With respect to Ms. Rauscher's work in this case during those months, she later confirmed that due to other cases, she "was not working on this case" during the months of July and August in 2001. [Tr. 11/29/01 at 4]

investigation into Petitioner's case, his background, or his mental health.

On October 31, 2001, two months after the Court ordered that trial would begin on March 19, 2002, and with their investigation barely underway, Ms. Rauscher and Ms. Lawson filed a *Motion to Continue Date for Sentencing Hearing*. In their motion, trial counsel detailed their respective commitments in other cases, including Ms. Lawson's capital trial that was scheduled to start in January 2002, two other capital cases for which Ms. Lawson had responsibility, and other significant cases pending trial. The Court granted trial counsel's motion, although the relief granted was a rescheduling of the trial for one week earlier: March 12, 2002.

On November 29, 2001, during a hearing about trial counsel's motion for reconsideration of the March 12, 2002 start date of trial, Ms. Rauscher withdrew as counsel for Petitioner due to concerns about conflicts with other client's cases.

On January 14, 2002, Harold Bender was appointed to represent Petitioner with Ms. Lawson. At the time of Mr. Bender's appointment, he was already counsel in at least one other capital case that would be tried in Rowan County between May 6, 2002 and May 23, 2002.

Ms. Lawson also had a very active law practice that included representation in a number of other capital cases. Indeed, on January 16, 2002, two days after Mr. Bender was appointed as her co-counsel in Petitioner's case, Ms. Lawson was appointed to represent Jeffery Neal Duke for a capital retrial of a double murder in Gaston County. And one week after Mr. Bender's appointment, Ms. Lawson would begin a capital murder trial that would last until February 7, 2002.

On February 26, 2002, Mr. Bender and Ms. Lawson met *ex parte* with the Court regarding the defense team's budgetary needs. At the time of the hearing, Mr. Bender had been involved in Petitioner's case approximately six weeks, and Ms. Lawson had only recently

82

completed a capital trial in Mecklenburg County. During the hearing, Mr. Bender explained: "The trial date is scheduled for July 15, 2002. And in order for us to get ready for that, we have literally been burning the midnight oil. We don't want this case continued. We're not going to ask for this case continued." While perhaps an understandable position to assert given the context of the *ex parte* hearing-seeking defense funding-Mr. Bender curiously promised something that he had no basis for promising: that trial counsel would not ask for a continuance.

At the point in time when trial counsel promised not to seek a continuance, their mitigation investigation was barely underway, if it had started at all. Various experts had not yet been engaged, and it was already readily apparent that trial counsel was failing to adequately supervise its mitigation specialist, who was based near Albany, New York. As a result, the defense preparation suffered immeasurably. The disorganization and absence of an informed and coherent strategy would later be laid bare by the trial team's presentation at trial.

An "insistence upon expeditiousness in the face of a justifiable request for a delay can render the right to defense with counsel an empty formality." *Unger v. Sarafite*, 376 U.S. 575, 589 (1964). Although a motion to continue is vested in the discretion of the district court, its denial will be reversed if it is "unreasoning and arbitrary." *Morris v. Slappy*, 461 U.S. 1, 11 (1983).

Under the facts and circumstances as they existed here, it was unreasonable for trial counsel not to seek a continuance so they would be adequately prepared to defend Mr. Barnette.

**J. Trial Counsel Unreasonably and Prejudicially Failed to Maintain and Preserve Petitioner's Files**

Under RPC 209 of North Carolina's Revised Rules of Professional Conduct, a client's file "belongs to the client"; as such, counsel is commanded to "store a client's file in a secure

location where client confidentiality can be maintained." Here, where Mr. Bender appeared on Petitioner's behalf before the Court as recently as 2009, his obligation to retain and maintain Petitioner's file is indisputable. Indeed, Mr. Bender was well aware from his years as a criminal defense attorney, and his familiarity with capital post-conviction proceedings that Petitioner's case was-and is-still quite active. The absence of trial files creates an extraordinary impediment for Petitioner that rises to the level of a constitutional violation.

At a minimum, trial counsel's failure to maintain and preserve Petitioner's files strongly supports the need for an evidentiary hearing in order to resolve any factual disputes which might have otherwise been resolved by reference to trial files. *See, e.g., Turner v. Wong*, 641 F. Supp. 2d 1010, 1036, 2009 WL 2394152 (E.D. Cal. 2009) (capital case where trial files were lost; district court's findings with respect to trial counsel's performance and prejudice made following federal evidentiary hearing; post-conviction relief granted and petitioner's death sentence vacated due to trial counsel's ineffective assistance of counsel); *Poindexter v. Booker*, 05-CV-71607, 2007 WL 1556671 (E.D. Mich. May 30, 2007) *aff'd*, 301 F. App'x 522, 2008 WL 4997500 (6th Cir. 2008) (non-capital criminal case where trial files were lost; district court's findings with respect to trial counsel's performance and prejudice made following state evidentiary hearing; post-conviction relief granted and petitioner's conviction vacated due to trial counsel's ineffective assistance of counsel).

### K. Trial Counsel Unreasonably and Prejudicially Failed to Protect Petitioner's Constitutional Rights

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

84

Petitioner was denied his right to the effective assistance of counsel at his capital trials in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Counsel's ineffectiveness includes, but is not limited to the following:

1. counsel failed to conduct adequate negotiations for a plea agreement resulting in a sentence less than death;

2. counsel failed to conduct an adequate pretrial investigation into the defenses available to Petitioner, including but not limited to the psychological, medical and psychiatric factors affecting Petitioner's mental state during, before and after his participation in the murders for which he was charged;

3. counsel failed to conduct an adequate pretrial investigation into the voluntariness of Petitioner's statements to law enforcement personnel, and specifically failed to investigate the effect of Petitioner's mental capacity, and his medical and psychological history on Petitioner's mental state at the time he provided the incriminating statements;

4. counsel failed to adequately present information and evidence in pretrial motions and at trial relating to Petitioner's allegedly voluntary waiver of constitutional rights during interrogation by the police;

5. counsel failed to file several pretrial motions to protect his client's right to a fair trial, including discovery motions which would have produced highly relevant and critical information regarding the circumstances surrounding the crimes charged against Petitioner and which would have assisted his lawyers to effectively represent their client;

6. counsel failed to obtain those records, including educational, medical, and mental health records of Petitioner and his family which would have assisted in formulating and supporting defenses in the guilt/innocence and sentencing phases of the case;

7. counsel failed to investigate, develop and present evidence which would have supported defenses in the guilt/innocence phase of the case;

8. counsel failed to adequately prepare for and conduct voir dire;

9. counsel failed to adequately examine potential jurors during voir dire by failing to follow up on responses by potential jurors, including but not limited to failing to discover the verdicts handed down by those jurors with prior jury service; failing to question those who showed a complete lack of

85

understanding regarding mental health issues, alcohol use and other conditions; failing to adequately question those venirepersons whose families and friends had been murdered; failing to adequately question potential jurors whose family members had backgrounds in law enforcement;

10. counsel failed to move to strike unqualified and biased jurors from the venire;

11. counsel failed to object to the prosecution's use of its peremptory strikes in a racial- and gender-based fashion;

12. counsel failed to present evidence and to raise defenses at the guilt/innocence phase of the case, including but not limited to evidence and defenses based upon Petitioner's mental state at the time of the alleged offenses;

13. counsel failed to object to improper remarks made by the proecutor during his guilt/innocence phase closing;

14. counsel failed to raise the proper objections to improper charges given by the trial court to the jury at the conclusion of the guilt phase of trial;

15. counsel failed to properly object to items of improper evidence offered in aggravation at both the guilt/innocence and the penalty phases of trial;

16. counsel failed to conduct an adequate pretrial investigation into Petitioner's life and familial background to uncover and present to the jury evidence in mitigation during the penalty phase of the trial;

17. counsel failed to investigate fully Petitioner's childhood and early life history including interviewing maternal family members, neighbors, friends, and teachers;

18. counsel failed to investigate the obvious signs of abuse and neglect in Petitioner's early life by interviewing witnesses who were acquainted with Petitioner and his care givers when he was a child;

19. counsel failed to retrieve records which would have provided evidence in support of mitigation;

20. counsel failed to follow up on leads from those records counsel did obtain;

21. counsel failed to investigate, develop and prepare evidence in support of mitigation, including information available from Petitioner's family members, friends, neighbors, and teachers;

22. counsel failed to develop mitigating evidence of Petitioner's childhood trauma and provide such evidence to their mental health expert;

86

23.  counsel failed to present records that were reasonably available to counsel during the penalty phase of Petitioner's trial;

24.  counsel failed to adequately prepare Petitioner's penalty phase witnesses;

25.  counsel failed adequately to prepare Petitioner's mental health expert before testifying and failed to provide him with evidence of Petitioner's childhood trauma and other relevant background information;

26.  counsel failed to adequately consult with and advise Petitioner regarding whether he should testify;

27.  counsel failed to adequately prepare Petitioner to testify;

28.  counsel failed to challenge the constitutionality of Petitioner's prior convictions;

29.  counsel failed to adequately cross-examine the prosecution's sentencing phase witnesses; these inadequacies included the failure to impeach with prior inconsistent statements, the failure to impeach with criminal records, the failure to impeach with inconsistent statements of other witnesses, the failure to explore questions of bias and motive on the part of the witnesses;

30.  counsel failed to object to inappropriate arguments made by the prosecution in its sentencing phase closing;

31.  counsel failed to object to those portions of the trial court's charge which failed to adequately define mitigating circumstances and misled the jury in other ways.

But for counsel's ineffective representation, there is a reasonable probability that the result of each phase of trial, and the appeal, would have been different.

**L.    Trial Counsel's Unreasonable Performance was Prejudicial to Petitioner**

The evidentiary picture that was presented to Petitioner's jury would have materially changed if trial counsel had conducted a proper mitigation investigation and presentation. A determination of whether counsel's deficiencies with respect to the provision of effective assistance of counsel caused prejudice is a mixed question of law and fact. For now, Petitioner

87

alleges that counsel's performance caused prejudice and that prejudice is established in the penalty phase because "the totality of the available mitigating evidence" from trial and post-conviction creates "a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 534, 537 (2003). Defendant will fully brief this issue at the direction of the Court.

**II.** **Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution with Respect to Raising and Supporting a Claim of Racial Discrimination in Jury Selection, and the *Batson* Proceedings were Unconstitutionally Conducted**

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

At resentencing, Petitioner was entitled to jurors who were not selected in a racially discriminatory way. *Batson v. Kentucky*, 476 U.S. 79 (1986). A *Batson* challenge sparks a three step inquiry. *Rice v. Collins*, 546 U.S. 333, 338 (2006). "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. If so, then[,] [second,] the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question." *Id*. (citations omitted). Third, the trial court must "assess the plausibility of that reason in light of all of the evidence with a bearing on it." *Miller El II,* 545 U.S. at 252. This final step involves the court evaluating the "'persuasiveness of the justification' proffered by the prosecutor ...." *Rice,* 546 U.S. at 339 (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam)).

In *Miller-El v. Dretke*, 545 U.S. 231 (2005), the Supreme Court held that comparative juror analysis could demonstrate that a prosecutor's stated, race-neutral, reasons for striking a juror were pretextual. "[S]ide-by-side comparisons of some black venire panelists who were

88

struck and white panelists [who were] allowed to serve" are "[m]ore powerful than...bare statistics." *Miller-El*, 545 U.S. at 241. When "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination. *Id.* Additionally, disparate questioning—"contrasting voir dire questions posed respectively to black and non-black panel members"—provides "evidence that prosecutors more often wanted blacks off the jury." *Id* at 255. Petitioner's case was remanded for this type of *Batson*, step three, comparative juror analysis. *Barnette*, 644 F.3d at 213.

At Petitioner's resentencing voir dire, the parties and the Court possessed juror questionnaires filled out by every juror. Questions were asked of jurors based upon these questionnaires. The prosecution also noted the race and gender of the jurors on the face of their copies of the questionnaires. Afterward, the defense relinquished all copies of their questionnaires to the Court and/or the Clerk. Consequently, appellate counsel did not have access to all of the actual filled out juror questionnaires. After the Supreme Court and the Fourth Circuit remanded this case for a *Batson* hearing, counsel for Barnette still did not have the juror questionnaires or the government's annotated copies and this Court denied Petitioner's requests to obtain copies. This was affirmed on appeal, but in a splintered decision. *See United States v. Barnette*, 644 F. 3d 192, 218 (4th Circuit 2011) (Judge Keenan, concurring in part and concurring in the judgment) ("Barnette thus was unable to question any of the explanations provided by the government relating to the presence of the race notations.").

Thus, at Petitioner's first genuine opportunity to present comparative juror analysis in support of his *Batson* claim he was denied one of the most important sources of evidence: the pre-trial questionnaires filled out by prospective jurors. The government and the Court had and

89

used the questionnaires, but they were withheld from Petitioner. This was a fundamentally unconstitutional manner of resolving an allegation of a constitutional violation.

The panel's majority noted this court's refusal to provide Petitioner's counsel with the original juror questionnaires for his use during his *Batson* hearing "exclud[ed] the defendant from this important stage" of the proceedings. *Barnette*, 644 F.3d at 212-13.

> [T]he district court's stated reason for refusing to do so, i.e., because Barnette might have pointed to "disparate questioning," which was "something that he could have raised at his [original] *Batson* hearing," does not withstand close scrutiny. *This is because "disparate questioning" is part and parcel of a comparative juror analysis, which the district court correctly identified as the gravamen of the Supreme Court's holding in Miller–El and the focus of our further remand of the case to the district court after the Supreme Court vacated our judgment in Barnette II.* Moreover, owing to the rejection of comparative juror analysis in this circuit before *Miller–El, see supra* p. 204, it was incumbent on the district court to ensure that Barnette enjoyed the full panoply of tools available with which to fortify any showing he could arising out of that approach to *Batson* challenges, an approach that was not genuinely available to him before *Miller–El* under the law of the circuit.

*Id.* (emphasis added) But the Court then held that being excluded from one's own *Batson* hearing, and being denied the most essential tool to litigate *Batson* the first time it is "genuinely available" for litigation, "does not affect [Petitioner's] substantial rights" and "must be disregarded" under Federal Rule of Criminal Procedure 52(a). *Id.*, at 213.

The panel suggested several reasons why harmless error analysis applied. First, counsel had the clean questionnaires in July of 2002—at the resentencing—so it was unimportant to have them in September of 2009 at the *Miller-El II* hearing. *Barnette*, 644 F.3d at 213 ("this is not a case where Barnette has been denied the opportunity to review and examine these documents thoroughly.).[23]

---

[23] However, as this Court illustrated, seven years is a long time to rely upon memory (Court "could not recall [juror's] demeanor" [*Barnette*, 644 F.3d. at 215]) and, more importantly, the 2002 voir dire was insufficient preparation for a 2009 *Miller-El II* remand: comparative juror analysis was "an approach that was not genuinely available to him before *Miller-El* under the law of this circuit." *Id*. at 213.

90

Second, the panel wrote that "Barnette's prior examination of these documents led him to raise the very issue on which the Supreme Court's remand was based." *Id.* In fact the *Batson* argument in Petitioner's appeal from resentencing was based solely on what was said on the record during voir dire—appellate counsel did not have the actual questionnaires to work from. Resentencing counsel should have insisted that the questionnaires be included in the record on appeal.

Third, the lower court assured Barnette that "*we* have reviewed the questionnaires in this case, and we are not persuaded that there is any reasonable likelihood that the outcome of the proceedings below would have been different if Barnette received clean copies of the questionnaire." *Id.* (emphasis added).

Petitioner was entitled to an advocate at his *Batson* hearing. "*Defense counsel could say some things that might persuade the district judge or, failing that, he could say things that might persuade us.* Both functions are crucial to our adversary system and to the principles of due process it serves." *United States v. Thompson,* 827 F.2d 1254, 1261 (9th Cir.1987) (emphasis added); *see also id.* ("with all appropriate respect for our able district judges, there might be arguments they would overlook if unassisted by an advocate. That, at least, is one of the theories behind our adversary system.").

Petitioner continues to contend that the Court should have been provided copies of the completed questionnaires and copies of the government's annotated ones on remand from the Fourth Circuit. [24] Petitioner also contends that resentencing counsel were prejudicially

---

[24] This *Batson* proceeding was not conducted in such a way as to "ferret[] out" (*Miller-El* 545 U.S. at 238) racial discrimination in jury selection. Elements of fairness are well-known and common sense, *see Gardner v. Florida*, 430 U.S. 349 (1977) (right of rebuttal and confrontation in capital proceedings) (right of rebuttal and confrontation in capital proceedings; courts may not consider secret and confidential information); *Lankford v. Idaho*, 500 U.S. 110 (1991) ("a procedure for selecting people for the death penalty that permits consideration of secret information about the defendant is unacceptable"); *Simmons v. South Carolina*, 512 U.S. 154 (1994) (defense must be able to

ineffective for unreasonably failing to: effectively present comparative juror analysis based upon the questionnaires they did possess; effectively insist that juror questionnaires be included in the record on appeal; and effectively act for the prosecutor's notes which reflected race and gender annotations.

Furthermore, the *Batson* proceeding that was conducted upon remand was a critical stage of this capital trial at which Petitioner was entitled of the effective assistance of counsel. There are "some occasions when although counsel is available to assist the accused ... the likelihood that any lawyer, *even a fully competent one*, could provide effective assistance is so small that" prejudice from such a "representation" is presumed. *United States v. Cronic*, 659 U.S. 648, 659-60 (1984) (emphasis added). Inasmuch as counsel at the remand *Batson* proceeding could not possibly have provided effective assistance, prejudice is presumed and a new resentencing is required.[25]

### III. Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution as a Result of Misconduct Related to the Jury

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

Petitioner has a constitutional right to a fair trial and impartial jury. *See Parker v. Gladden*, 385 U.S. 363, 365 (1966); *Turner v. Louisiana*, 379 U.S. 466 (1965); *Irvin v. Dowd*, 366 U.S. 717, 729 (1961); *Remmer v. United* States, 347 U.S. 227, 229 (1954).

---

rebut government's argument); *Amadeo v. Zant*, 486 U.S. 214 (1988) (secret discrimination in selection of jurors forbidden); *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (due process demands an opportunity to be heard "at a meaningful time and in a meaningful manner."), and these constitutional guarantees were violated here.

[25] This Court is fully aware of the record in this case and the jurors Petitioner has heretofore argued were excused in a racially discriminatory manner. Petitioner incorporates these arguments herein (*see*, *e.g*., Doc. 658), but will more fully discuss them if the opportunity for briefing arises.

92

Given the posture of this 2255 litigation, as well as the need to seek leave of the Court to contact trial jurors, the facts to support this claim require further development by way of additional investigation, discovery, use of process, and an evidentiary hearing. Nonetheless, Petitioner raises this claim here, lest he be deemed to have waived any such challenge.

Misconduct on the part of the jurors at Petitioner's underlying capital trials included, but was not limited to, improper consideration of matters extraneous to the trial, improper racial attitudes which infected the deliberations of the jury, false or misleading responses of jurors on voir dire, improper biases of jurors which infected their deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, improper communication with jury bailiffs and/or U.S. Marshals, improper *ex parte* communications with the Court, and improperly prejudging the guilt/innocence and penalty phases of Petitioner's trial. *See*, *e.g.*, *Parker v. Gladden*, 385 U.S. 363, 363-364 (1966) (granting post-conviction relief where bailiff's prejudicial comments about petitioner directed at one juror were overheard by other jurors on public sidewalk outside courtroom); *United States v. Sampson*, 820 F. Supp.2d 151, 158-160 (D. Mass. 2011) (death sentence vacated in capital § 2255 proceedings where juror failed to disclose personal experience with abusive relationship and daughter's incarceration, details of which were similar to trial evidence); *Bauberger v. Haynes,* 2009 U.S. Dist. LEXIS 100216 (M.D.N.C. Oct. 29, 2009) (habeas relief from murder conviction granted where jury foreman borrowed dictionary from public library during recess in deliberations, brought it back to jury room, and read to other jurors definition of "malice"); *Novelo v. Yates*, 2009 U.S. Dist. LEXIS 73376 (C.D. Cal. June 18, 2009) (*adopted by* 2009 U.S. Dist. LEXIS 73384 (C.D. Cal. Aug. 13, 2009)) (hearing ordered in habeas case where juror told defendant's acquaintance about reading news accounts to arrive at verdict); *Roman v. Hedgepeth,* 2008 WL 4553091 (C.D. Cal.

93

Oct. 8, 2008) (habeas relief from non-capital murder conviction granted where jurors held transcript of defendant's police interrogation up to light, revealing two prior convictions and prior incarceration); *Wisehart v. Davis*, 408 F.3d 321 (7th Cir. 2005) (conviction and sentence vacated in capital habeas proceedings where juror told petitioner she learned during trial that petitioner submitted to a polygraph test); *Fullwood v. Lee*, 290 F.3d 663 (4th Cir. 2002) (hearing required in capital habeas case to determine, in part, extent to which juror was strongly influenced by pro-death penalty husband); *Doan v. Brigano*, 237 F.3d 722 (6th Cir. 2001) (habeas relief granted in murder case where juror approximated bruise with lipstick and concluded defendant must be lying about bruises at issue in case); *Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001) (death sentence reversed in habeas proceedings based in part on jurors' use of Bible in deliberations); *Anderson v. Miller*, 2001 WL 1182832 (E.D.N.Y. Oct. 2, 2001) (habeas case remanded for evidentiary hearing to investigate allegations that jurors were intimidated); *Nevers v. Killinger*, 169 F.3d 352 (6th Cir. 1999) (*overruled on other grounds*) (second degree murder conviction vacated in habeas proceedings where jurors watched movie containing footage of police brutality incident similar to instant offense, and heard news reports about case); *Church v. Sullivan*, 942 F.2d 1501 (10th Cir. 1991) (robbery conviction reversed in habeas case where head jailer's wife was heard asking jurors how defendants could have tied up and robbed an elderly couple); *Jones v. Kemp*, 706 F.Supp. 1534 (N.D. Ga. 1989) (jury consideration of extraneous religious information); *United States v. Scott*, 854 F.2d 697, 700 (5th Cir. 1988) (failure to respond truthfully on voir dire).

As a matter of record in this case, Juror Evans raised a concern during the 2002 trial that other jurors were forming, or had formed, opinions about whether Petitioner should receive the death or penalty *prior* to the Court's final instructions [2002 Tr. 3667-3682].

By separate motion, Petitioner seeks leave to interview the jurors who served in Petitioner's trials.

IV. **Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution Because the Decision to Prosecute Petitioner in Federal Court Rather than State Court Resulted in a Well-Known Significant Reduction in the Number of African-Americans in the Jury Pool in 1998 and 2002**

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

Petitioner could have been prosecuted—indeed he initially was prosecuted—in state court. Why was it decided, ultimately, to prosecute him capitally instead in federal court? The government's determinations to federally and capitally prosecute Petitioner were improper and violated the Fifth Sixth, and Eighth Amendments because of apparent discriminatory purpose.[26]

Having elected to establish certain procedures for determining whether or not to federally and capitally prosecute an accused, the government is required to apply those procedures in conformance with due process. *See Evitts v. Lucey*, 469 U.S. 387, 393 (1985) (due process interest in state created right to direct appeal); *see also Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (liberty interest in state-created capital sentencing procedures). Both Due Process and Equal Protection preclude the government from reaching determinations on the basis of race or bias. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 142 n.13 (1994); *Snyder v. Louisiana*, 128 S. Ct. 1203, 1208 (2008). Petitioner alleges that the government's determinations to federally and capitally charge Petitioner violated each of these fundamental principles.

---

[26] As noted in Claim II, *supra*, the government in the 2002 trial wrote the race and gender of prospective jurors on the face of the juror questionnaires. Race was, thus, a factor in the jury selection process. It is as yet unknown whether the same held true for the 1998 trial.

95

Though prosecutors have discretion in choosing which cases to charge federally versus at the state level, that discretion is not unchecked. *Powers v. Ohio*, 499 U.S. 400, 415 (1991) (prosecutor's discretion bound by Equal Protection clause prohibition on racial discrimination "from all acts and proceedings of the State."). Facially nondiscriminatory procedures that are applied in a discriminatory manner violate Equal Protection. *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886). A defendant may establish a prima facie case of purposeful discrimination by showing the totality of the relevant fact gives rise to an inference of discriminatory purpose. Perpetrators do not often publicly announce discriminatory intent and those responsible for key decisions may have "[m]ore subtle, less consciously held racial attitudes." *Turner v. Murray*, 476 U.S. 28, 31 (1986). These considerations are especially problematic when those responsible for the decision have broad discretion, as in the decision to federally and capitally prosecute. *Id*. at 35.

If Petitioner had been prosecuted in state court in North Carolina, the racial composition of the juror pool would have been significantly different than before this Court. The government's federal charging determination had the unconstitutional effect of significantly altering the race of the potential and actual jury pool.

> Most federally prosecuted capital crimes occur in minority-concentrated areas. Thus, expansion of the venire to the federal district level (which often includes white flight suburbs) has a dramatic effect on the circumstance of the prosecution. Moving the relevant "community" from the county to the district dilutes the voice of the population impacted by most of the violent crime. Moreover, as the jury pool gets whiter, the opportunity for implicit race bias increases (and minority group defendants suffer the consequences.

G. Ben Cohen and Robert J. Smith, *The Racial Geography of the Federal Death Penalty*, 85 WASH. L. REV. 425, 435 (2010). White juries are more prone to levy death sentences than juries with minorities. *Id.* at 469-71. In fact, all-white juries give the death penalty 71.9% of

96

the time.  *Id*.  One African-American on the jury drops the likelihood of a death penalty to 42.9%.  *Id*. Prosecutors are aware of these statistics. *Id*.

As is illustrated by the following chart, the racial demographics of the counties from which the federal district court summoned jurors in this case in 2002 and 1998 were different from the state court demographics:

**2000 Census Data**

| County | Total Population | Total Population that identified as one race | White | | Black/Afr.Am. | | Am. Indian | | Asian | | Native Haw.and Other Pac Isl. | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | No. | % | No. | % | No. | % | No. | % | No. | % |
| **Anson** | 25,275 | 25,158 | 12,519 | 49.5% | 12,295 | 48.6% | 113 | .4% | 143 | .6% | 6 | 0% |
| **Gaston** | 190,365 | 188,717 | 157,965 | 83% | 26,405 | 13.9% | 525 | .3% | 1814 | 1% | 50 | 0% |
| **Mecklenburg** | 695,454 | 684,709 | 445,250 | 64% | 193,838 | 27.9% | 2439 | .4% | 21,889 | 3.1% | 339 | 0% |
| **Union** | 123,677 | 122,410 | 102,441 | 82.8% | 15,480 | 12.5% | 475 | .4% | 720 | .6% | 30 | 0% |

In absolute census numbers, the decision to prosecute in federal rather than state court resulted in 4% fewer African-Americans in the jury pool.    But the effect was significantly larger than that.    The federal court draws jurors only from voter registration lists, while the state combines voter and driver's license lists.    N.C. Gen. State § 9-2.    It is well known that the combination of voter and drivers license lists provide a truer reflection of the racial demographics of a county.  *See United States v. Rogers*, 73 F.3d 774, 775-777 (8th Cir. Iowa 1996); Ramseur v. Beyer, 983 F.2d 1215, 1233 (3d Cir. 1992) ("Moreover, an examination of the source lists reveals that the mechanism used to create the source lists was facially neutral with respect to race. Essex County, New Jersey utilized voter registration and Department of Motor

Vehicle lists to create its jury venire. These lists are constituted using facially neutral criteria and allow no opportunity for subjective or racially motivated judgments."); *Mason v. United States*, 2011 U.S. Dist. LEXIS 150062 at \*14-15 (N.D.W.Va. Dec. 5, 2011) ("It should be noted the jury venire in this district is taken from merged voter registration rolls and motor vehicle operators or chauffeur licenses—a much wider list than the voter registration rolls approved in Cecil. *See* Amended Jury Plan, Northern District of West Virginia, 1:05-mc-8.")

Petitioner has demonstrated in Claim VI, *infra*, that death sentences for African Americans are disproportionately high under the Federal Death Penalty Act. He has also demonstrated in Claim II, *supra*, that jurors the prosecution discriminated against African Americans during jury selection. Why did the federal government target this case for capital prosecution? The federal interest in and connection to the case was no greater than the state's. The state expended significant resources in investigating and prosecuting the case. Petitioner avers that it would have been very unlikely that a state court prosecution would have resulted in a death sentence.

### V. Petitioner Marc Barnette was Deprived of His Constitutional Rights to Due Process and a Fair Trial under *Brady*, *Giglio*, *Kyles*, and *Napue* in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

Given the posture of this 2255 litigation, as well as failure of trial counsel to produce Petitioner's trial files, the facts to support this claim require further development by way of additional investigation, discovery, use of process, and an evidentiary hearing. Nonetheless, Petitioner raises this claim here, lest he be deemed to have waived any such challenge.

98

The government suppressed information favorable to the defense at both phases of the trial, and the materiality of the suppressed evidence undermines confidence in the outcome of the guilt/innocence and penalty phases of Petitioner's trial, and Petitioner's direct appeal, in violation of *Brady v. Maryland*, 373 U.S. 667 (1965), and *Kyles v. Whitley*, 514 U.S. 419 (1995). The government took advantage of Petitioner's ignorance of the undisclosed favorable information by arguing to the jury that which it knew or should have known to be false and/or misleading. *United States v. Sanfilippo*, 564 F.2d 176, 179 (5th Cir. 1977).

The government failed to disclose benefits or promises extended to witnesses in exchange for their testimony and allowed its witnesses to convey a false impression to the jury; and there is a reasonable likelihood that the false impression could have affected the jury's deliberations. *Giglio v. United States*, 405 U.S. 150 (1972).

The government elicited false and/or misleading testimony from witnesses at trial, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). The government's knowing presentation of false and/or misleading testimony violated Petitioner's rights under *Mooney v. Holohan*, 294 U.S. 103 (1935). The government knowingly or negligently presented false testimony in pretrial and trial proceedings, and there is a reasonable likelihood that the false testimony could have affected the judgment of the trial court and/or the jury at both phases of the trial. *United States v. Agurs,* 427 U.S. 97, 103 (1976).

Regardless of whether the government knew or should have known that it was presenting false and/or misleading evidence, the mere presentation of such evidence and the jury's reliance upon such evidence at both phases of the trial deprived Petitioner of due process. *Sanders v. Sullivan*, 863 F.2d 218 (2d Cir. 1988). This pervasive government misconduct violated Petitioner's rights under the Fifth, Sixth, and Eighth Amendments.

99

**VI.     The Death Penalty is Unconstitutional Because it is Sought on the Invidious Basis of Race and Irrational Basis of Geography**

On September 12, 2000, prior to Mr. Barnette's retrial, the Department of Justice released a comprehensive study concerning the administration of the federal death penalty from 1988 to 2000.  A supplemental report  was issued on June 6, 2001.[27]  The essence of the studies' findings was that the federal death penalty had been disproportionately sought against persons of color and irrationally sought on a regional basis.   As reported in the studies, after 12 years of discriminatory and irrational charging decisions, federal death row consisted of 19 men, of whom four (4) were White, thirteen (13) were Black, one (1) was Hispanic, and one (1) was "other."

### Federal Death Row Population by Race



As of May 1, 2011          Source: Federal Capital Habeas Project

---

[27]  *See* U.S. Dep't of Justice, The Federal Death Penalty System: A Statistical Survey (1998-2000) (Sept. 12, 2000), available at http://www.justice.gov/dag/pubdoc/dpsurvey.html; U.S. Dep't of Justice, The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review 10 (Jun. 6, 2001), available at http://www.justice.gov/dag/pubdoc/deathpenaltystudy.htm.

Consistent with the historical roots of the death penalty, 12 of the 19 defendants on federal death row at the time had been sentenced to death in the South. Moreover, the government's authorization rates were much higher in cases involving white victims that in cases involving victims of color.

Over-representation of minorities on Federal death row has continued:

Race-based arbitrariness threatens the fair administration of the death penalty. Blacks and other minority group members are over-represented on death rows across the country. Statistics suggest that defendants are more likely to be sentenced to death for killing a white victim than a black victim. Blacks are also executed disproportionately—and have been since 1976. Again, the federal death penalty is illustrative. Black inmates constitute twenty-eight of the fifty-seven (49%) inmates on federal death row. As then-Assistant Attorney General Eric Holder emphasized in reaction to a September 2000 Department of Justice study of the federal death penalty, these disparities are alarming in a country where blacks constitute less than 13% of the population. These same disparities persist even now that Eric Holder has been appointed the current Attorney General in the Obama Administration. In fact, early reports indicated that he has authorized the death penalty at the same rate, in the same places, and for the same race as did his predecessors in the Bush Administration.

G. Ben Cohen and Robert J. Smith, *The Racial Geography of the Federal Death Penalty*, 85 WASH. L. REV. 425, 428 (2010) (internal citations omitted).

Based on the government's own irrefutable data, Petitioner's death sentence should be set aside.

VII.    **The Manner in Which the Bureau of Prisons Would Carry Out Mr. Barnette's Execution Would Violate the Eighth Amendment**

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

Petitioner alleges that the manner of carrying out his execution would violate the Eighth Amendment to the United States Constitution. This constitutional violation would arise because of the combination of drugs to be used, the manner in which said drugs would be procured by the

101

government, the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the execution would be carried out, would all result in the infliction of unnecessary pain and suffering in violation of the Eighth Amendment.

Petitioner's challenge to execution protocols and procedures need not be litigation at this time, in this pleading, as the question is not yet ripe. Moreover, a challenge to lethal injection is properly brought in a separate civil rights action under 42 U.S.C. § 1983. *See Hill v. McDonough*, 547 U.S. 573 (2006) (holding that challenge to lethal injection as cruel and unusual punishment in violation of the Eighth Amendment was cognizable under 42 U.S.C. § 1983, and was not barred as a second or successive habeas petition).

Petitioner will be prepared to litigate this Eighth Amendment challenge in whatever forum is deemed appropriate. However, litigation of this claim at this time would appear to be an inefficient use of resources, inasmuch as Petitioner believes he is entitled to relief on the other claims alleged herein. Nonetheless, he raises it here, lest he be deemed to have waived any such challenge.

### VIII. <u>Cumulative Effect of Errors References in this § 2255 Motion Demand Relief</u>

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

Courts have long recognized that constitutional claims of error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief regardless of whether the effect of individual errors warrants relief. *See United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009) ("Pursuant to the cumulative error doctrine, '[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a

defendant to the same extent as a single reversible error.'") (citations omitted).   Accordingly, Petitioner asserts that relief is justified due to the cumulative effect of errors raised herein.

### IX.     Petitioner Marc Barnette is Entitled to an Evidentiary Hearing

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

Section 2255 provides that "[u]nless the motion and the files and records of the case *conclusively* show that the prisoner is entitled to no relief, the court shall … grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."   28 U.S.C. § 2255 (emphasis added); *accord United States v. Magini,* 973 F.2d 261, 264 (4th Cir.1992) (stating that a federal court "must hold an evidentiary hearing when the petitioner alleges facts which, if true, would entitle [him] to relief").   Moreover, as the Fourth Circuit has stressed, "[w]hen … the factual allegations 'relate[] primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light,' and where the ultimate resolution rests on a credibility determination, an evidentiary hearing is especially warranted."   *United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004) (citing *Machibroda v. United States,* 368 U.S. 487, 494-95 (1962) and *Raines v. United States,* 423 F.2d 526, 530 (4th Cir.1970)).

Here, Petitioner's 2255 petition alleges colorable Fifth, Sixth, and Eighth Amendment claims, including numerous facts outside of the record which if proved, would entitled Mr. Barnette to relief.   Pursuant to Rule 8 of the Rules Governing § 2255 Proceedings and Fourth Circuit precedent, Mr. Barnette is entitled to an evidentiary hearing on all of his claims. Although analysis of the scope of such a hearing will have to await the government's responsive filings, at this juncture and to avoid any claim of waiver, Mr. Barnette requests that he be

103

afforded a hearing on any disputed fact which, if proven individually or in combination with other facts, would entitle him to relief.

## REQUEST FOR RELIEF

Based upon all of the above allegations and the entire record of this case, Petitioner respectfully requests that the Court provide the following interim and final relief:

1. To require the Government to respond to the allegations made herein;

2. To permit Mr. Barnette to utilized the processes of discovery as set forth in Rule 6 of the Rules Governing § 2255 Proceedings;

3. To permit Mr. Barnette to file appropriate memoranda in support of the relief requested herein;

4. To permit Mr. Barnette to amend this § 2255 motion to include any additional claims or allegations not presently know to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this motion, and to find that the amendment relates back to the date of the filing of this petition;

5. To conduct an evidentiary hearing to establish the facts he alleges herein and to resolve any factual disputes raised by the government's response to this motion;

6. To permit oral argument as appropriate and required;

7. To vacate Mr. Barnette's convictions and sentences and to order new proceedings to cure any constitutional defects in the prior proceedings; and

8. To grant such further and additional relief as this Court deems in the interests of justice.

104

Dated: June 19, 2013

/s/ Mark E. Olive
N.C. State Bar No. 10615
LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com

/s/ Jacob H. Sussman
N.C. Bar No. 31821
TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, NC 28203
704-338-1220 (tel)
704-338-1312 (fax)
jsussman@tinfulton.com

/s/ Henderson Hill
N.C. Bar No. 18563
FEDERAL DEFENDERS OF WESTERN
    NORTH CAROLINA, INC.
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720 (tel)
704-374-0722 (fax)
henderson_hill@fd.org

105

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has served the foregoing motion with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Amy Ray
Amy.Ray@usdoj.gov

William M. Miller
William.Miller@usdoj.gov

Dated: June 19, 2013

/s/ Jacob H. Sussman

106

## VERIFICATION UNDER PENALTY OF PERJURY

Undersigned counsel is authorized by Aquilia Marcivicci Barnette to file the foregoing motion pursuant to 28 U.S.C. § 2255. Undersigned counsel further declares that the contents of the foregoing are true to the best of his knowledge, information, and belief.

Dated: June 19, 2013

/s/ Jacob H. Sussman

107