| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>**vs.**<br><br>AQUILIA MARCIVICCI BARNETTE | **DEATH PENALTY § 2255** |

## PETITIONER AQUILIA MARCIVICCI BARNETTE'S
## MOTION FOR PERMISSION TO INTERVIEW TRIAL JURORS

Aquilia Marcivicci Barnette, through undersigned counsel, respectfully moves this Court to permit counsel or their representative to interview the jurors in his case. Juror interviews, as explained in further detail below, are essential in these capital 28 U.S.C. § 2255 proceedings to securing rights guaranteed to Mr. Barnette by the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution.

### INTRODUCTION

The relief requested in this motion is permission to interview jurors in Mr. Barnette's 1998 and 2002 trials. As the Court is aware, these § 2255 proceedings are the last opportunity to examine the constitutionality and legality of Mr. Barnette's conviction and death sentence and this Court is the forum in which Mr. Barnette must present all relevant facts. The purpose of the juror interviews sought is to aid Mr. Barnette in the factual development of § 2255 claims relating to juror misconduct and ensure that Mr. Barnette's death sentence was not the product of juror bias or outside influence; the scope of the interviews is strictly limited to development of extra-record evidence.

Juror misconduct of virtually every kind is unearthed in post-conviction proceedings, and

has formed the basis for post-conviction relief and further factual inquiry in both state and federal courts, including in capital § 2255 proceedings. *See, e.g., United States v. Sampson*, 820 F. Supp.2d 151, 158-160 (D. Mass. 2011) (death sentence vacated in capital § 2255 proceedings where juror failed to disclose personal experience with abusive relationship and daughter's incarceration, details of which were similar to trial evidence). Jurors have been found to bring newspapers and dictionaries into the jury room[1]; consult religious and other sources not in evidence and conduct experiments related to evidence[2]; share extraneous information, including information learned from exposure to news media coverage, amongst each other[3]; have inadvertent but prejudicial *ex parte* contacts with third parties and have been subjected to intimidation during proceedings[4]; and fail to answer questions truthfully during *voir dire*.[5]

---

[1]*See, e.g., Bauberger v. Haynes,* 2009 U.S. Dist. LEXIS 100216 (M.D.N.C. Oct. 29, 2009) (habeas relief from murder conviction granted where jury foreman borrowed dictionary from public library during recess in deliberations, brought it back to jury room, and read to other jurors definition of "malice"); *Novelo v. Yates*, 2009 U.S. Dist. LEXIS 73376 (C.D. Cal. June 18, 2009) (*adopted*, 2009 U.S. Dist. LEXIS 73384 (C.D. Cal. Aug. 13, 2009)) (hearing ordered in habeas case where juror told defendant's acquaintance about reading news accounts to arrive at verdict).

[2]*See, e.g., Fullwood v. Lee*, 290 F.3d 663 (4th Cir. 2002) (hearing required in capital habeas case to determine, in part, extent to which juror was strongly influenced by pro-death penalty husband); *Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001) (death sentence reversed in habeas proceedings based in part on jurors' use of Bible in deliberations); *Nevers v. Killinger*, 169 F.3d 352 (6th Cir. 1999) (*overruled on other grounds*) (second degree murder conviction vacated in habeas proceedings where jurors watched movie containing footage of police brutality incident similar to instant offense, and heard news reports about case); *Doan v. Brigano*, 237 F.3d 722 (6th Cir. 2001) (habeas relief granted in murder case where juror approximated bruise with lipstick and concluded defendant must be lying about bruises at issue in case).

[3]*See, e.g., Wisehart v. Davis*, 408 F.3d 321 (7th Cir. 2005) (conviction and sentence vacated in capital habeas proceedings where juror told petitioner she learned during trial that petitioner submitted to a polygraph test); *Fullwood*, 290 F.3d 663 (hearing required in capital habeas case to determine, in part, whether jury considered extraneous evidence that defendant had been previously sentenced to death for same offense by different jury); *Roman v. Hedgepeth,* 2008 WL 4553091 (C.D. Cal. Oct. 8, 2008) (habeas relief from non-capital murder conviction granted where jurors held transcript of defendant's police interrogation up to light, revealing two prior convictions and prior incarceration).

[4]*See, e.g., Church v. Sullivan*, 942 F.2d 1501 (10th Cir. 1991) (robbery conviction reversed in habeas case where head jailer's wife was heard asking jurors how defendants could have tied up and robbed an elderly couple); *Anderson v. Miller*, 2001 WL 1182832 (E.D. NY Oct. 2, 2001) (habeas case remanded for evidentiary hearing to investigate allegations that jurors were intimidated); *Crawford v. State*, 191 P.3d 1136 (Kan. Ct. App. Sept. 12, 2008) (unpublished opinion) (murder case remanded in habeas proceedings for hearing where members of victim's family threatened to harm her and her son if she did not vote to convict).

Capital trials, moreover, are invariably high-profile events in the communities where they take place, giving rise to a greater probability of improper extraneous influence or misconduct and a heightened need for scrutiny of jurors. *See Sheppard v. Maxwell*, 384 U.S. 333, 349-363 (1966); *see also Estes v. Texas*, 381 U.S. 532 (1965); *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Patterson v. Colorado*, 205 U.S. 454, 462 (1907) ("The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print") (Holmes, J.).

Thus, despite *voir dire*, jury instructions, and other aspects of the trial process designed to protect an individual's right to a fair and impartial jury, juror misconduct, which need not be deliberate or malicious, inevitably occurs outside the record and often goes undetected in trial and appellate proceedings. *See, e.g.*, *Parker v. Gladden*, 385 U.S. 363, 363-364 (1966) (granting post-conviction relief where bailiff's prejudicial comments about petitioner directed at one juror were overheard by other jurors on public sidewalk outside courtroom). As such, juror misconduct has been recognized as among those extra-record claims properly raised for the first time in post-conviction proceedings because the facts surrounding the misconduct often only

---

[5]*See, e.g., Conaway v. Polk,* 453 F.3d 567 (4th Cir. 2006) (hearing ordered in capital habeas case where juror concealed familial relationship with co-defendant who cooperated with prosecution and testified against petitioner); *Williams v. True*, 39 Fed. Appx. 830 (4th Cir. June 21, 2002) (unpublished) (affirming district court determination in habeas proceedings that juror's failure to disclose she had been married to investigator for several years, along with non-disclosure of other information, deprived petitioner of fair trial); *Green v. White*, 232 F.3d 671 (9th Cir. 2001) (habeas relief granted in murder case where juror concealed fact of previous felony conviction and other information); *Burton v. Johnson*, 948 F.2d 1150 (10th Cir. 1991) (murder conviction in which battering and abuse issues were prominent reversed in habeas case where juror in *voir dire* failed to disclose her own sexual abuse experience); *United States v. Sampson*, No. 01-10384-MLW, 2011 WL 5022335 (D. Mass. Oct. 20, 2011) (death sentence vacated in capital § 2255 proceedings where juror failed to disclose personal experience with abusive relationship and daughter's incarceration, details of which were similar to trial evidence); *McCurtis v. Michaels*, 2006 WL 3240762 (W.D. La. Oct. 3, 2006) (habeas petitioner granted new trial in sexual battery case where juror failed to disclose his wife was cousin of victim's boyfriend); *Beckworth v. State*, 2009 WL 1164994 (Ala. Crim. App. May 1, 2009) (post-conviction relief granted in capital case where juror failed to disclose he knew state's witness, had been previously employed by FBI, and had read and seen news reports about case); *McQuary v. State*, 241 S.W.3d 446 (Mo. Ct. App. 2007) (hearing ordered in post-conviction proceedings in drug distribution case where juror failed to disclose he knew key state witness); *State v. Dye*, 784 N.E.2d 469 (Ind. 2003) (post-conviction relief granted in capital case where juror failed to disclose her brother had been sentenced to death, two other brothers had been arrested, and she herself had been raped).

come to light as a result of investigation in the course of those proceedings. *See*, *e.g.*, *Williams v. Taylor*, 529 U.S. 420, 442-444 (2000) (evidentiary hearing required in capital habeas proceedings where trial record contained no evidence that would have put trial counsel on notice that juror concealed material information, uncovered in post-conviction proceedings, about prior relationships with prosecutor and prosecution witness). Especially when there is something in the trial record to indicate the need for further inquiry—for example, the Court may recall that Juror Evans raised a concern during the 2002 trial that other jurors were forming, or had formed, opinions about whether Petitioner should receive the death or penalty *prior* to the Court's final instructions [2002 Tr. 3667-3682]—good cause exists to conduct juror interviews and permission should be granted.

Congress "has recognized that federal habeas corpus has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty." *McFarland v. Scott*, 512 U.S. 849, 859 (1994). Mr. Barnette's instant § 2255 proceedings, likewise, serve the crucial function of ensuring that his capital conviction and death sentence are reliable and not the product of outside influence or bias on the part of jurors. Consistent with that crucial function, as well as with the equal protection principles that inform application of the death penalty across federal jurisdictions, and with counsel's professional and ethical obligations, and for the additional reasons set forth in detail below, Mr. Barnette seeks permission to utilize the vital investigatory tool of juror interviews to vindicate his guaranteed right to a fair and impartial jury and ensure misconduct on the part of jurors did not taint his capital trial.

**ARGUMENT**

**I.   THE FIFTH AND SIXTH AMENDMENTS PROTECT A CAPITAL § 2255 PETITIONER'S RIGHT TO A FAIR AND IMPARTIAL JURY.**

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . ." U.S. Const. amend. VI. The Supreme Court has also recognized that the right to an impartial jury inheres in the Fifth Amendment: "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal citations omitted).

The primacy of juror impartiality has been affirmed time and time again.  In *Remmer v. United States*, the Court underscored the gravity of fair jury violations:  "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed *presumptively prejudicial*." 347 U.S. 227, 229 (1954) (emphasis added). The Court emphasized that the right to juror impartiality must be scrupulously guarded: "The integrity of jury proceedings must not be jeopardized by unauthorized invasions. The trial court should not decide and take final action ex parte on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id.* at 229-30.

In *Parker v. Gladden*, 385 U.S. 363, 365 (1966), a little more than a decade after the *Remmer* decision, the Court again weighed in to protect fair jury trial rights of an aggrieved defendant.  In light of evidence that the court bailiff had told jurors that the defendant in their case was "wicked" and "guilty," the Court found numerous trial violations of constitutional

magnitude:

> the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel . . . [the bailiff's] expressions were private talk, tending to reach the jury by outside influence . . . we believe that the unauthorized conduct of the bailiff involves such a probability that prejudice will result that it is deemed inherently lacking in due process, . . . it would be blinking reality not to recognize the extreme prejudice inherent in such statements . . . petitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors."

*Id.* at 364-66 (internal quotations omitted). As a result of these violations in *Remmer*, the Court reversed the decision of the state high court below and granted petitioner post-conviction relief. In sum, the Court's careful protection of the individual's right to an impartial jury and its willingness to order new trials when that right is breached speaks to its fundamental importance. *See Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966); *Irvin v. Dowd*, 366 U.S. 717, 729 (1961); *Mattox v. United States*, 146 U.S. 140, 153 (1892) (granting relief and ordering new trials where juries were not impartial).

## II. FOR AN INDIVIDUAL FACING A DEATH SENTENCE, THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT ALSO REQUIRES THAT THE JURY BE FAIR AND UNBIASED.

The capital defendant's right to an impartial jury is further protected by the Eighth Amendment's prohibition against cruel and unusual punishment. U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted"). For nearly half a century, the Supreme Court has recognized that arbitrary and capricious infliction of the ultimate penalty contravenes this prohibition. *See Furman v. Georgia*, 408 U.S. 238, 295-96, (1972) (Brennan, J., concurring); *Id.* at 310 (Stewart, J., concurring); *Id.* at 313 (White, J., concurring); *Gregg v. Georgia*, 428 U.S. 153, 189 (1976); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) ("if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the

arbitrary and capricious infliction of the death penalty"); *see also Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985) (emphasizing "the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case'") (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)); *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("the sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's background, character, and crime") (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

Trial by a jury tainted by improper extraneous influences or misconduct necessarily manifests such arbitrary decision-making. A jury's decision to impose death based on information not properly presented or admissible at trial circumvents any legislative or judicial attempt to guide their discretion, inviting wanton and capricious infliction of the death penalty. *Jones v. Kemp*, 706 F. Supp. 1534, 1559 (N.D. Ga. 1989) ("The use by deliberating jurors of [a Bible] . . . cannot be reconciled with the Eighth Amendment's requirement that any decision to impose death must be the result of discretion which is carefully and narrowly channeled"); *see also California v. Brown*, 479 U.S. 538, 543 (1987) ("to the extent that the instruction helps to limit the jury's consideration to matters introduced in evidence before it, it fosters the Eighth Amendment's need for reliability in the determination that death is the appropriate punishment in a specific case" (internal quotation omitted)).

### III. ACCESS TO JURORS IN THESE CAPITAL § 2255 PROCEEDINGS IS APPROPRIATE AND NECESSARY FOR SAFEGUARDING AN INDIVIDUAL'S RIGHT TO A FAIR AND IMPARTIAL JURY.

Juror interviews are among the essential means for investigation and factual development of juror misconduct. They take on a uniquely important role in rooting out juror bias and extraneous evidence in capital § 2255 proceedings like Mr. Barnette's: where judicial processes

such as *voir dire* fall short, juror interviews may prove invaluable in protecting an individual's right to a fair and impartial jury. That interest—in juror contact as a means for investigating and raising cognizable § 2255 claims of juror misconduct in this death penalty case—on balance outweighs generalized concerns related to jurors' privacy interests, especially when the juror contact sought would take place several years removed from deliberations.

**A. These Section 2255 Proceedings Play A Vital Role In Protecting Mr. Barnette From Juror Misconduct.**

The singular importance of habeas proceedings bolsters Mr. Barnette's position that juror interviews should be allowed. The most essential, weighty rights are at stake in habeas proceedings, because habeas corpus safeguards the fundamental liberty interest of the individual. *Slack v. McDaniel*, 529 U.S. 473, 483 (2000) ("The writ of habeas corpus plays a vital role in protecting constitutional rights"). The remedy contemplated in these § 2255 proceedings is coextensive with habeas, and § 2255 proceedings provide a vehicle for the vindication of core rights and liberties equivalent to petitions for the writ of habeas corpus. *Sanders v. United States*, 373 U.S. 1, 14 (1963) ("it conclusively appears from the historic context in which § 2255 was enacted that the legislation was intended simply to provide in the sentencing court a remedy *exactly commensurate* with that which had previously been available by habeas corpus" (quoting *Hill v. United States*, 368 U.S. 424, 427 (1962)) (emphasis added)).

It follows that § 2255 provides the proper vehicle for Mr. Barnette to develop and present evidence of fair jury trial violations. *See Wellons v. Hall*, 130 S.Ct. 727, 728-29, 732 (2010) (vacating Eleventh Circuit's denial of an evidentiary hearing to capital habeas petitioner on claims of juror bias and remanding for further consideration in light of post-trial revelations of *ex parte* contacts between jurors and judge); *Williams v. Taylor*, 529 U.S. 420, 440-44 (2000) (granting § 2254 petitioner evidentiary hearing on juror bias claim); *see also, e.g., United States*

*v. Smith*, 62 F.3d 641, 650 n.5 (4th Cir. 1995) ("we have often recognized that a claim of jury tampering implicates the Sixth Amendment right to an impartial jury and therefore *is* cognizable on habeas corpus").

Cognizable § 2255 claims such as juror misconduct claims will not be apparent from the face of the trial record, and can be established only by virtue of the discovery of extra-record facts; the facts supporting such claims often do not arise without a post-conviction petitioner's counsel or other agents unearthing them well after trial and appellate proceedings have concluded. *See, e.g., Williams v. Taylor*, 529 U.S. 420, 442-444 (2000) (trial record contained no evidence that juror concealed material information on *voir dire*); *United States v. Sampson*, 820 F.Supp.2d 141 (D. Mass. 2011) (trial record contained no evidence that juror failed to disclose information that, under *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), called her ability to decide the case solely on the evidence into question and that the concealed information would have resulted in her excusal for cause).

Notably, unlike capital habeas petitioners seeking relief pursuant to § 2254, § 2255 petitioners have not had an earlier opportunity for factual development of juror misconduct claims in state post-conviction proceedings. *See, e.g., Wellons*, 130 S.Ct. at 729 (noting Wellons attempted to ascertain facts surrounding alleged improper contacts between judge and jury in both state and federal courts). Thus, these § 2255 proceedings represent Mr. Barnette's first real opportunity for extensive investigation to root out instances of juror misconduct not apparent from the trial record and his last realistic opportunity to have such claims considered.

**B. The Heightened Standards For Reliability In Capital Cases Enhance Mr. Barnette's Interest In Access to Jurors**

The Supreme Court has long recognized that "it would not be safe to lay down any inflexible rule [of juror contact] because there might be instances in which such testimony of the

juror could not be excluded without violating the plainest principles of justice." *McDonald v. Pless*, 238 U.S. 264, 269-70 (1915) (internal quotation marks omitted). The Court emphasized that such an instance would arise in "the gravest and most important cases." *Ibid.* Mr. Barnette's is such a case.

As early as 1892, the Supreme Court declared that "[i]t is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated." *Mattox v. United States*, 146 U.S. 140, 159 (1892). The *Mattox* imperative has been reaffirmed repeatedly. *See, e.g.*, *Lowenfield v. Phelps*, 484 U.S. 231, 238-39 (1988) ("we are naturally mindful in such cases that the qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed" (internal quotation omitted)); *California v. Ramos*, 463 U.S. 992, 998-99 (1983) ("the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination"); *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring) ("Because sentences of death are qualitatively different from prison sentences . . . this Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake" (internal citations omitted)). The severity of the death penalty imposes the strictest possible requirements of reliability upon capital proceedings – both the defendant and the public have an overriding interest in ensuring that the jury has legitimately and fairly decided on death. Allowing juror interviews in these § 2255 proceedings would fit squarely with the strict reliability requirements imposed in capital cases. The flip side—that is, denying Mr. Barnette

this crucial tool for developing the factual basis of juror misconduct claims—would mean valid claims for relief may go undiscovered despite Mr. Barnette's diligence in seeking to investigate relevant facts, risking a manifestly unjust result.

**C. Other Procedural Safeguards And Means Of Factual Development Are Inadequate To Protect Mr. Barnette's Right To A Fair And Impartial Jury.**

A § 2255 proceeding is the only available mechanism through which to air juror bias or misconduct that may not be apparent or discoverable by any other means. The essential quality of post-conviction interviews of jurors can only be understood in light of the inadequacies of other processes that the judicial system relies on to root out constitutional defects relating to jurors.

It is well-recognized that *voir dire* is not a sufficient process for ensuring the impartiality of the jury. First, the corrupting influence can take place after jury selection. *See, e.g., Wellons*, 130 S.Ct. at 729; *Remmer*, 347 U.S. at 228; *Turner*, 379 U.S. at 467-68. Second, the effectiveness of *voir dire* is predicated on venire members' forthrightness: "the necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984). *See also Williams v. Taylor*, 529 U.S. 420, 440-44 (2000) (ordering evidentiary hearing where empanelled juror concealed her previous marriage to and divorce from the state's lead-off witness; moreover, juror failed to disclose that one prosecutor had represented her in these divorce proceedings); *United States v. Sampson*, 820 F. Supp.2d 151, 158-160 (D. Mass. 2011) (death sentence vacated in capital § 2255 proceedings where juror failed to disclose personal experience with abusive relationship and daughter's incarceration, details of which were similar to trial evidence); *Conaway v. Polk*, 453 F.3d 567 (4th Cir. 2006) (granting evidentiary hearing on juror bias claim by capital habeas petitioner where juror concealed familial relation to codefendant who

cooperated with the prosecution and testified against petitioner); *Jackson v. Alabama State Tenure Comm'n*, 405 F.3d 1276, 1288-89 (11th Cir. 2005) (affirming district court's order of new trial in a civil discrimination suit where one juror never disclosed her prior conviction for murdering her child, despite being asked if she had any prior felony convictions); *Fields v. Woodford*, 309 F.3d 1095, 1101-06 (9th Cir. 2002) (granting evidentiary hearing to habeas petitioner in kidnapping/rape case where juror stated on *voir dire* that his wife had been victim of robbery but neglected to mention that she had been kidnapped and raped and the perpetrator never found).

### D. Counsel Has A Professional And Ethical Obligation To Contact Jurors Recognized By The U.S. Supreme Court And Pursuant To American Bar Association Guidelines For The Appointment And Performance Of Defense Counsel In Death Penalty Cases.

Implicit in Supreme Court precedent is the recognition that, in order to provide competent representation, counsel has a duty to contact members of the jury to investigate possible misconduct or bias. *See Williams v. Taylor*, 529 U.S. 420, 440-43 (2000) (federal habeas claim of juror bias preserved only because state post-conviction counsel, who undertook juror interviews, "was diligent in efforts to develop the facts supporting [it]"); *McCleskey v. Zant*, 499 U.S. 467, 498 (1991) ("petitioner must conduct a reasonable and diligent investigation aimed at including *all* relevant claims and grounds for relief in the first federal habeas petition") (emphasis added).

The Court's recognition is further supported by cases acknowledging the importance of the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"), which impose on counsel a professional ethical obligation to interview jurors. The ABA Guidelines have been validated by the Supreme Court as guidelines for assessing the reasonableness of capital counsel's performance. *See, e.g.,*

*Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) ("the standards for capital defense work articulated by the American Bar Association (ABA) [are] standards to which we long have referred as 'guides to determining what is reasonable'") (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)); *see also Williams v. Taylor*, 529 U.S. 362, 396 (2000) (relying on ABA Standards for Criminal Justice).

These Guidelines oblige counsel to contact jurors in post-conviction proceedings. *See* 10.15.1(E)(4) ("Post-conviction counsel should fully discharge the ongoing obligations imposed by these Guidelines, including the obligations to: . . . continue an aggressive investigation of all aspects of the case"); 10.15.1, Commentary ("As demonstrated by the high percentage of reversals and disturbingly large number of innocent persons sentenced to death, the trial record is unlikely to provide either a complete or accurate picture of the facts and issues in the case. This may be . . . because of juror misconduct"); 10.10.2, Commentary n. 260 ("counsel investigating a capital case should be particularly alert to the possibility that, notwithstanding surface appearances, one or more jurors were unqualified to sit at either phase of the trial and make every effort to develop the relevant facts, whether by interviewing jurors or otherwise. Such inquiries can be 'critical in discovering constitutional errors'") (quoting HERTZ & LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE at 489 n.40); 10.7, Commentary n.197 ("counsel must investigate the possibility that the defendant was judged at either the guilt or penalty phases by one or more jurors who were not impartial").

Rather than being some sort of extraordinary measure, juror interviews, as reflected in the controlling case law and professional norms of practice, are part and parcel of standard

investigations required by undersigned in capital post-conviction proceedings.[6]

## IV. THE LOCAL RULE CIVIL RULE GOVERNING JUROR CONTACT SHOULD NOT TRUMP MR. BARNETTE'S RIGHT TO A FAIR OPPORTUNITY TO DEVELOP AND PRESENT COGNIZABLE CLAIMS FOR RELIEF CONCERNING HIS DEATH SENTENCES.

The local civil rule in this district requires that counsel receive permission of the court upon a showing of good cause before contacting any trial jurors. *See Local Civil Rule 47.1 (D).* It should be noted that this district's juror contact rule is an outlier compared with those of other districts. A strong majority of federal districts in which there is currently a federal death sentence either have no rule governing juror contact (thus presumptively allowing counsel to contact jury members) or have rules that do not impose a good cause requirement. *See* Local Rule 47.1 (E.D. Ark.); Local Rule 47.1 (W.D. Ark.); LR 47.3 and LCrR 47.3 (N.D. Ga.); LR 83.8 (S.D. Ga.); LCrR31.1 (N.D. Ill.); LR 47-2 (N.D. Ind.); LR 47 and LCrR 24.1 (N.D. Iowa); LR 107.16 (D. Md.); LR 47 - 7.01 (E.D. Mo.); S.D. Ohio Civ. R. 47.1 (S.D. Ohio); LCvR 47.1 (E.D. Okla.); LR 48.1 (E.D. Tenn.); LR CV-47 and Rule LR CR-24 (E.D. Tex.); LR 47.1 and LCrR 24.1 (N.D. Tex.); LR 47 and CrLR24.1 (S.D. Tex.); LR 83.5 (D. Vt.) (no requirement of good cause); *see also* Local Rules for D. Idaho, D. Mass, W.D. Mich., W.D. Mo., D. N.D., and W.D. Tex. (no rule barring juror contact).

Given this divergence in local rules, a limitation or prohibition on Mr. Barnette's access to jurors implicates equal protection principles, irrationally restricting the means by which he can safeguard his constitutional rights based solely on geography and running afoul of its responsibility to "tailor and apply its law in a manner that avoids arbitrary and capricious infliction of the death penalty" consistent with Eighth Amendment requirements. *See Godfrey v.*

---

[6] Upon information and belief, Mr. Barnette's defense counsel at his 2002 trial conducted interviews with jurors from his 1998 trial. Due to the absence of trial files, however, post-conviction counsel has no information about the fruits of those interviews.

*Georgia*, 446 U.S. 420, 428 (1980). Whereas the local rule in this district potentially thwarts his ability to adequately investigate and develop claims of juror misconduct, § 2255 petitioners in the above-mentioned districts can proceed unfettered. In other words, should the Court deny access to jurors based on the local rule's good cause requirements, the only reason Mr. Barnette would not be able to fully litigate and raise cognizable habeas claims of juror misconduct would be because his case happens to be in such an outlier district. To avoid this sort of arbitrary treatment and place Mr. Barnette in a position equal to similarly situated individuals under death sentence who have access to the full range of investigatory tools for identifying juror misconduct, the Court should allow Mr. Barnette the ability to contact jurors.

### CONCLUSION

For the foregoing reasons, the § 2255 Mr. Barnette respectfully asks this Court for permission to interview the jurors in his case.

Dated: June 19, 2013

/s/ Mark E. Olive
N.C. State Bar No. 10615

LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com

/s/ Jacob H. Sussman
N.C. Bar No. 31821

TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, NC 28203
704-338-1220 (tel)
704-338-1312 (fax)
jsussman@tinfulton.com

/s/ Henderson Hill
N.C. Bar No. 18563

FEDERAL DEFENDERS OF WESTERN
 NORTH CAROLINA, INC.
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720 (tel)
704-374-0722 (fax)
henderson_hill@fd.org

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that he has served the foregoing motion with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

        Amy Ray
        Amy.Ray@usdoj.gov

        William M. Miller
        William.Miller@usdoj.gov


Dated: June 19, 2013

                        /s/ Jacob H. Sussman