| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**vs.**<br><br>**AQUILIA MARCIVICCI BARNETTE** | **DEATH PENALTY § 2255** |

### PETITIONER AQUILIA MARCIVICCI BARNETTE'S
### BRIEF IN SUPPORT OF MOTION FOR EVIDENTIARY HEARING

Aquilia Marcivicci "Marc" Barnette is on federal death row in Terre Haute, Indiana for the 1996 murders of Donald Lee Allen in Charlotte, North Carolina and Robin Williams in Roanoke, Virginia. Mr. Barnette was originally tried and sentenced to death in 1998. After his death sentences were vacated by the Fourth Circuit Court of Appeals, he was resentenced to death by a federal jury in the Western District of North Carolina in 2002.

As detailed in Mr. Barnette's *Initial Motion for Relief Pursuant to 28 U.S.C. § 2255*, filed June 19, 2013, Mr. Barnette is not on death row because of the nonexistence of evidence to support a life sentence. [ECF Doc. 48] Rather, Mr. Barnette is under a sentence of death because of multiple violations of the U.S. Constitution. When a jury is asked to determine whether a defendant will live or die for his crimes, "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. 262, 276 (1976). The jury that determined Mr. Barnette's fate in 2002, like the jury that imposed death in 1998, did not have before it all possible relevant information about Mr. Barnette, in violation of his federal constitutional rights.

1

Mr. Barnette requested an evidentiary hearing in his *Initial Motion for Relief Pursuant to 28 U.S.C. § 2255* (hereinafter "§ 2255 motion"). The Court subsequently entered a scheduling order on its own motion on August 9, 2013, finding that, upon an initial review of the Motion as required by Rule 4 of the Rules Governing § 2255 Proceedings, it did not "plainly appear" that Mr. Barnette was not entitled to relief. The Court then adopted the parties' agreed upon preliminary litigation schedule. [ECF Doc. 53] Following two unopposed extensions of time, Mr. Barnette, through undersigned counsel, now files this brief in support of his motion for an evidentiary hearing.

## I. Assuming the Government Contests His Claims for Relief, Mr. Barnette is Entitled to an Evidentiary Hearing

Section 2255(b) of the Judicial Code provides (with emphasis added):

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court *shall* cause notice thereof to be served upon the United States attorney, *grant a prompt hearing thereon*, determine the issues and make findings of fact and conclusions of law with respect thereto.

Rule 8(a) of the Rules Governing § 2255 Proceedings provides:

> If the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted.

The use of mandatory language indicates this Court is required, on its own motion, to order an evidentiary hearing unless there is conclusive evidence Mr. Barnette is entitled to no relief. For the reasons stated in Mr. Barnette's *Initial Motion for Relief Pursuant to 28 U.S.C. § 2255*, this brief and its exhibits,[1] and all prior pleadings and documents filed in this matter, "the motion the files and records of the case" do not conclusively refute Mr. Barnette's claims and an evidentiary hearing is therefore required.

---

[1] All of the exhibits filed are incorporated herewith.

2

When a petitioner files a motion to vacate or set aside under 28 U.S.C. § 2255, an evidentiary hearing must be granted "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. §2255. Citing to the statutory standard, the Fourth Circuit held in *United States v. Magini*, 973 F.2d 261 (4th Cir. 1992) that "[a] federal court in a habeas proceeding *must* hold an evidentiary hearing when the petitioner alleges facts which, if true, would entitle her to get relief." *Id.* at 264 (emphasis added). *See also United States v. Witherspoon,* 231 F.3d 923, 925-26 (4th Cir. 2000) ("Generally, an evidentiary hearing is required under 28 U.S.C. § 2255 unless it is clear from the pleadings, files, and records that a movant is not entitled to relief."); *Raines v. United States,* 423 F.2d 526, 529 (4th Cir. 1970). Indeed, when a movant presents a colorable Sixth Amendment claim showing disputed facts involving inconsistencies beyond the record, a hearing is mandated. *Magini*, 973 F.2d at 264 (internal citations omitted). *See also United States v. White,* 366 F.3d 291, 302 (4th Cir. 2004) (citing *Raines,* 423 F.2d at 530) ("[W]here the ultimate resolution rests on a credibility determination, an evidentiary hearing is especially warranted."); *Raines,* 423 F.2d at 530 ("There will remain … a category of petitions, usually involving credibility, that will require an evidentiary hearing in open court."). The Fourth Circuit has reversed and remanded where district courts have not held evidentiary hearings in order to resolve factual disputes. *See*, *e.g.*, *United States v. Diaz*, No. 13-6952, 547 F. App'x 303, 304, 2013 WL 6246774 (4th Cir. Dec. 4, 2013) (holding that district court "abused its discretion in concluding, without an evidentiary hearing, that Diaz did not direct counsel to file a notice of appeal"); *United States v. Mitchell*, No. 11-6711, 484 F. App'x 744, 745, 2012 WL 2365895 (4th Cir. June 22, 2012) (holding that district abused its

discretion by failing to hold an evidentiary hearing because one was required in order to make the factual findings necessary to rule on petitioner's § 2255 motion); *United States v. O'Quinn*, No. 05-6412,166 F. App'x 697, 698, 2006 WL 372430 (4th Cir. Feb. 16, 2006) (vacating and remanding because factual dispute existed that required evidentiary hearing on claim of ineffective assistance of counsel).

Although "the burden is on the petitioner in a habeas case" to establish his right to a hearing, that burden is "relatively light … and is significantly lower than his burden to show he is entitled to § 2255 relief." *Valentine v. United States*, 488 F.3d 325, 333-34 (6th Cir. 2007). Mr. Barnette has satisfied this standard. Moreover, the government has not yet filed a responsive pleading in this post-conviction litigation that addresses the facts alleged by Mr. Barnette.[2] As with the facts alleged in Mr. Barnette's § 2255 motion, the government may not dispute the facts contained in this brief and its exhibits. If that is the case, then this Court may grant summary judgment with respect to some or all of the claims for relief.

Mr. Barnette's § 2255 motion raises eight separate claims for relief. Under the standards articulated above, Mr. Barnette is entitled to an evidentiary hearing on all claims, which include:

Claim I: Petitioner Marc Barnette was Denied Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution and 18 U.S.C. § 3006

Claim II: Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution with Respect to Raising and Supporting a Claim of Racial Discrimination in Jury Selection, and the *Batson* Proceedings were Unconstitutionally Conducted

---

[2] An answer "must address the allegations in the motion." Rule 5(b) of the Rules Governing § 2255 Proceedings.

4

Claim III: Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution as a Result of Misconduct Related to the Jury

Claim IV: Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution Because the Decision to Prosecute Petitioner in Federal Court Rather than State Court Resulted in a Well-Known Significant Reduction in the Number of African-Americans in the Jury Pool in 1998 and 2002

Claim V: Petitioner Marc Barnette was Deprived of His Constitutional Rights to Due Process and a Fair Trial under *Brady*, *Giglio*, *Kyles*, and *Napue* in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution

Claim VI: The Death Penalty is Unconstitutional Because it is Sought on the Invidious Basis of Race and Irrational Basis of Geography

Claim VII: The Manner in Which the Bureau of Prisons Would Carry Out Mr. Barnette's Execution Would Violate the Eighth Amendment

Claim VIII: Cumulative Effect of Errors References in this § 2255 Motion Demand Relief

## II. Argument

**Claim I: Petitioner Marc Barnette was Denied Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution and 18 U.S.C. § 3006A**

Mr. Barnette's § 2255 motion details the myriad ways in which he was denied his constitutional right to the effective assistance of counsel at his 2002 resentencing trial. The information referred to within Mr. Barnette's § 2255 motion, this brief, and the exhibits hereto lay bare the failures by resentencing counsel to reasonably investigate, develop, and present powerful information to the jury. Mr. Barnette's resentencing counsel were confronted repeatedly with "red flags" about Mr. Barnette's mental health

5

issues and the availability—and need to explore—mitigating evidence and information about Mr. Barnette's mental health. Nevertheless, without making reasoned strategic decisions, resentencing counsel ignored these "red flags" and failed to thoroughly investigate available mental health and mitigation. As a result, Mr. Barnette's sentencing jury was provided an inaccurate and incomplete picture. Had resentencing counsel conducted a reasonably thorough investigation, there is a "reasonable probability that at least one juror would have struck a different balance" and Mr. Barnette would not be on death row. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

A. <u>**Law Governing Claims of Ineffective Assistance of Counsel**</u>

Because of the enormity of the decision to formally and judicially take a human life, the differences between defending a typical criminal case and defending a capital client are many. A primary difference is that a capital case decision maker must be allowed to consider any aspect of a defendant's background and character, and respond by imposing a life sentence. *See Lockett v. Ohio*, 438 U.S. 586, 602-03 (1977). Chief Justice Burger explained that the requirement of individualized consideration for each capital defendant

> ... rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina*, 428 U.S. 304, 305 (1976). *See also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 1.1, Comm. (2003) ("Due to the extraordinary and irrevocable nature of the penalty, at every stage of the proceedings counsel must make 'extraordinary efforts on behalf of the accused.'")

(internal citation omitted).

The Supreme Court deems the unrestricted scope of mitigating evidence necessary to "be sure that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *Woodson*, 428 U.S. at 305). Further, "[t]he need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases." *Lockett*, 438 U.S. at 605. In ordinary criminal cases, the law defines crimes and defenses in objective elements that can be perceived in concrete terms. The life and death decision, in contrast, is driven by abstract but powerful concepts, such as retribution, remorse, redemption, and human dignity. "The basic concept underlying the [Eighth Amendment] is nothing less than the dignity of man." *Furman v. Georgia*, 408 U.S. 238, 270 (1972) (Brennan, J., concurring) (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958)). In the wake of *Furman v. Georgia*, 408 U.S. 238 (1972), the humanity of the accused is the focal point of capital litigation.

With respect to trial counsel's duties and obligations in these matters, capital counsel have "a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Ineffective assistance of counsel under the Sixth Amendment occurs when counsel acts contrary to professional norms, with prejudice resulting. Prejudice is established when attorney conduct undermines confidence in the result or creates a reasonable probability that the result in the case would have been different absent the conduct. *Id.*

In the context of failing to investigate and present mitigation evidence, as was the

7

case in Mr. Barnette's 2002 resentencing trial, the Supreme Court has recently found trial counsel ineffective in five cases: *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); and *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam). Each of these cases was tried years before Mr. Barnette's 2002 resentencing trial.

To comply with professional norms defense counsel must conduct a thorough and complete investigation into the client's background and social history. *See Williams,* 529 U.S. at 396 ("[t]rial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background"); *id.* at 415 (trial counsel's duty is to conduct the "requisite, diligent" investigation into client's background) (O'Connor, J., concurring). Counsel may not abandon their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.*

In *Rompilla v. Beard*, the Court found trial counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite the fact that trial counsel consulted with three mental health experts. 545 U.S. at 377, 379. The Court held in *Rompilla* that trial counsel were ineffective because they knew the prosecution intended to use a prior conviction against the defendant yet failed to examine the file prior to trial. *Id.* at 387 ("The notion that defense counsel must obtain information that the [prosecution] has and will use against the defendant is not simply a matter of common sense … [L]ooking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to

8

tell defense counsel something about what the prosecution can produce.").

In *Porter v. McCollum*, the Supreme Court found trial counsel to have been ineffective despite a "fatalistic and uncooperative" client because "that does not obviate the need for defense counsel" to conduct mitigation investigation. 558 U.S. at 40. In *Sears v. Upton*, the Court found trial counsel ineffective in a 1993 trial even though they had presented seven witnesses in the penalty proceedings. As the Court stressed, "We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented to the decisionmaker[.]" 561 U.S. at 954 (quoting *Strickland*, 466 U.S. at 700).

Courts reviewing capital cases must determine whether trial counsel satisfied his or her "duty to conduct the 'requisite, diligent' investigation into his client's background." *Wiggins*, 539 U.S. at 524-25 (citing *Williams v. Taylor*, 529 U.S. 362 (2000)). This assessment "includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 522 (quoting *Strickland*, 466 U.S. at 689). As the Supreme Court explained in *Wiggins*:

> In assessing the reasonableness of an attorney's investigation … a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.

*Wiggins*, 539 U.S. at 527. Where facts known to counsel suggest further investigation would be fruitful, the failure to investigate results from "inattention, not reasoned strategic judgment." *Id.* at 526. Where, as here, counsel fails to explore and present substantial mitigation evidence, "we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable." *Id.* at 523.

9

The fact that the United States was seeking the death penalty against Mr. Barnette is an essential part of the "context-dependent consideration" that *Wiggins* requires of Mr. Barnette's claim of ineffective assistance of counsel. The unfettered constitutional right, found under the Eighth Amendment, to offer mitigating evidence "does nothing to fulfill its purpose unless it is understood to presuppose the defense lawyer will unearth, develop, present and insist on consideration of those 'compassionate or mitigating factors stemming from the diverse frailties of humankind.'" ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (2003), Guideline 1.1, Comm. (quoting Louis D. Bilionis & Richard A. Rosen, Lawyers, *Arbitrariness and the Eighth Amendment,* 75 TEX. L. REV. 1301, 1316-17 (1997) (citation omitted)). The Fourth Circuit recognizes this obligation, as well. In reversing a death sentence due to trial counsel's ineffective assistance of counsel with regard to sentencing, the Fourth Circuit emphasized:

> [W]e simply adhere to Supreme Court precedent and require that counsel, before settling on a sentencing strategy, make "efforts to discover *all reasonably available* mitigating evidence." *Wiggins,* 539 U.S. at 524 (internal quotation marks omitted); *see Strickland,* 466 U.S. at 690–91. Because [trial] counsel ignored numerous red flags and failed to investigate reasonably available mitigating evidence about [the defendant's] mental impairment, we conclude that their performance was constitutionally deficient …

*Gray v. Branker*, 529 F.3d 220, 234 (4th Cir. 2008) (emphasis in original).

As this precedent makes indisputably clear, the questions for any reviewing court are not whether trial counsel conducted a mitigation investigation or consulted with experts or presented mitigation evidence at trial. Rather, the questions include, but are not limited to, whether trial counsel conducted a thorough investigation of sentencing issues, whether trial counsel conducted a thorough investigation of all reasonably available

10

mitigating evidence, whether trial counsel conducted a thorough investigation of all reasonably available evidence to rebut any aggravating evidence that may be introduced by the government, whether any of trial counsel's strategic decisions were based on information learned from a thorough investigation, and whether counsel reasonably implemented a chosen "strategy."

In Mr. Barnette's case, resentencing counsel's individual actions and omissions, and their cumulative effect, require vacating Mr. Barnette's death sentences.[3]

### B. Resentencing Counsel Failed to Investigate and Present Powerful Evidence of Major Mental Illnesses and Mitigation

As detailed in the § 2255 motion, and supported further herein and through the attached exhibits, there was compelling mitigation evidence that resentencing counsel failed to develop and present at Mr. Barnette's 2002 resentencing. The information that trial counsel unreasonably failed to develop and present would have recast the entire defense presentation, told a materially different and mitigating story about Marc Barnette, his mental health, and his social history, and rebutted much of the prosecution's evidence in aggravation. As one defense expert who testified at resentencing explains:

> The new information that I have reviewed [in post-conviction] significantly changes my earlier findings and opinions. Had I been provided with this information during my trial work on behalf of Mr. Barnette, I would have rendered a different expert report and testified in markedly and materially different ways. Indeed, now that I have been provided with additional information from post-conviction counsel, it is my belief that my earlier findings, opinions, and testimony were badly marred by inaccurate and incomplete information with which trial counsel provided me.

[Burgess Affidavit ¶ 9, Bates Nos. 51-55] Resentencing counsel's failures were not due to reasonable strategic decisions following a thorough investigation.

---

[3] To avoid any confusion with Mr. Barnette's counsel during his 1998 trial, references to Mr. Barnette's counsel for his 2002 resentencing will be referred to herein as "resentencing counsel." The legal standards for assessing their performance are the same.

11

**1. Trial Counsel for the Resentencing Hearing Recognized They Could Not Rely on the Work Generated by the First Trial Team—But Unreasonably Did So Anyway**

In February 2001, Jean Lawson and Claire Rauscher were appointed to represent Mr. Barnette for his resentencing hearing. Nearly seven months into their representation of Mr. Barnette, no mitigation investigation had occurred. On August 28, 2001, Ms. Lawson and Ms. Rauscher filed an *ex parte* document called "Statement of Defense Contentions," in which they identified certain "red flags" from the first trial and concerns they had about the prior defense team's work on Mr. Barnette's behalf. As Ms. Lawson explains:

> Based on our work in the case up to that point, which constituted a review of the first trial transcript, Mr. Barnette's criminal record, and discovery, we wrote that "an approach different from that used in his first sentencing hearing [was] warranted." We believed that the first defense team tried to minimize the features of Marc Barnette's relationships with other women, and, in some instances, sought to blame the women for any difficulties that existed. It was our belief that we would need to address those prior relationships head on, and have a far better understanding of them than what the first defense team had or presented to the Jury.

> Based on our review of the case materials as of August 28, 2001, it was also apparent that the first defense team presented a "disjointed" sentencing case. As we explained in the *ex parte* Statement of Defense Contentions: "[W]itnesses were unprepared for cross-examination. The investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation."

[Lawson Affidavit ¶¶ 7-8, Bates Nos. 94-101]

Ms. Lawson and Ms. Rauscher believed they "needed to reevaluate everything that the first trial team did." [Lawson Affidavit ¶ 9, Bates Nos. 94-101] Resentencing counsel for Mr. Barnette's resentencing recognized the need to further develop and explore a number of "red flags"—issues and questions that were apparent yet undeveloped—that were readily apparent from a simple review of the transcript of Mr.

12

Barnette's 1998 sentencing hearing. One particularly significant "red flag" concerned Mr. Barnette's relationships with women. The government had introduced a significant amount of evidence at the first trial about Mr. Barnette's relationships in an effort to secure a death sentence. Ms. Lawson and Ms. Rauscher both saw the pressing need to re-investigate those relationships.

> We believed that the first defense team had done a poor job trying to address Marc's relationships with other women, and had, in some instances, appeared to blame the women for any difficulties that existed. It was our belief that we would need to directly address Marc's prior relationships and develop a far better understanding of them than what the first defense team had or presented to the jury.

[Rauscher Affidavit ¶ 6, Bates Nos. 129-131]

In addition to Mr. Barnette's relationships with other women, other "red flags" included such things as:

> [T]he trauma experienced by Mr. Barnette's teenager mother when her mother was shot and killed by her step-father; the combat trauma experienced by Mr. Barnette's maternal grandfather, Jessie Cooper, in the Korean War and its impact on his civilian life; the beatings Derrick inflicted on young Marc for bad grades in school; the impact of the divorce of Derrick and Sonia; Mr. Barnette's hospitalization in Georgia after a brutal beating; the track coach who recognized Mr. Barnette's potential and may have had an outsider's insights into his situation at home; the shooting of Mr. Barnette by his cousin when he returned to North Carolina; Mr. Barnette's suicide attempt as a teenager; and his chronic crying spells, from the time he was with Natasha Heard (sobbing in the closet) until the period after the break-up with Robin Williams (when his mother and Aunt Sheila observed him crying on the telephone).…

> What was the impact of her mother's murder on Sonia? How did her mother's death affect Sonia's ability to care for her son? After the grandmother died, who looked after ten-month-old Marc while Sonia attended school? What did the military and Veterans Administration records document about Jessie Cooper's wounds and post-war functioning? How did Mr. Barnette do in school? What did teachers and coaches know about his home situation? Did he come to school hungry or with visible bruises? Who could confirm the physical maltreatment by his father? What did police reports and medical records say about the incidents when Mr. Barnette was victimized as a teenager?

[Stetler Declaration ¶ 54, Bates Nos. 137-199]

The existence of these "red flags" was not lost on Mr. Barnette's resentencing trial counsel, and they made clear to the Court in August 2001 that additional investigation—and, to be clear, re-investigation of ground previously covered—was absolutely necessary. As a starting point, trial counsel explained to the Court in its *ex parte* filing that it needed to replace the original mitigation specialist, Sindy Maxwell, with Cessie Alfonso. As Ms. Lawson explains:

> With respect to hiring Cessie Alfonso, it was evident to defense counsel that we needed to replace Sindy Maxwell, who had handled the mitigation investigation for the first trial team. As we wrote in the *ex parte* Statement of Defense Contentions, "[Maxwell] failed to develop adequate rapport with the defendant's family and friends that would have enabled her to unearth critical biographical information. She prepared a 'time line' purporting to represent the defendant's life history and omitted critical information. These omissions cast doubt on the reliability of other expert witnesses called by the defense. As a result, the honesty of the defense presentations was compromised." Inasmuch as this was a resentencing trial and the primary focus would be on mitigation, and in light of the significant deficits in Ms. Maxwell's earlier work, there was little question in my mind that we needed to replace her with someone new.

[Lawson Affidavit ¶ 12, Bates Nos. 94-101]  As Ms. Rauscher notes:

> The deficits in [Ms. Maxwell's] earlier work were particularly problematic because this was a resentencing trial and the primary focus would be on mitigation.

[Rauscher Affidavit ¶ 11, Bates Nos. 129-131] Because the work previously done "omitted critical information," "cast doubt on the reliability" of experts who relied on that information, and called into question "the honest of the defense presentations," *id.*, it was quite evident to Mr. Barnette's new trial counsel that a different mitigation specialist and reinvestigation was required.

Despite resentencing counsel's recognition that it could not rely on the mitigation investigation done previously, and despite the readily apparent "red flags" from the first

14

trial, resentencing counsel simply failed to follow through. The above-referenced "red flags"—which provided at least a starting "roadmap for follow-up investigation"—were ignored. [Stetler Declaration ¶ 54, Bates Nos. 137-199] Critical witnesses were never interviewed; powerful mitigation was undeveloped; and the evidence provided to Mr. Barnette's jury in 2002 was, as before, incomplete, inaccurate, and misleading. As just one glaring example, the mental health experts called to testify at Mr. Barnette's resentencing hearing in 2002 were provided with Ms. Maxwell's mitigation work from the first trial—the very work deemed incredible and unreliable by resentencing counsel. Inexplicably, the defense experts were not provided with the mitigation investigation developed by Ms. Alfonso. [Lawson Affidavit ¶ 36, Bates Nos. 94-101; Burgess Affidavit ¶¶ 7, 12, Bates Nos. 51-55]

Even in the absence of glaring "red flags," resentencing counsel had a duty to reassess, reevaluate, and reinvestigate the earlier work done on Mr. Barnette's behalf. As Russell Stetler, the National Mitigation Coordinator for the Federal Death Penalty Projects and investigator with over 34 years of death penalty experience, explains:

> In a capital resentencing proceeding, one cannot assume that all relevant mitigating evidence was developed by prior counsel – particularly since the original jury returned a death sentence. It is incumbent upon successor counsel to conduct the same penalty-phase preparation, including thorough social history investigation and reliable mental health assessments, as counsel would be expected to conduct at an initial trial.

[Stetler Declaration ¶ 4, Bates Nos. 137-199] Indeed, Mr. Stetler opines, "[R]eliance on the existing mitigating evidence and overall penalty-phase preparation in lieu of conducting a thorough and independent investigation of both mitigating and alleged aggravating evidence would constitute a dereliction of counsel's duty under the Sixth and

Eighth Amendments and the prevailing professional norms[.]" [Stetler Declaration ¶ 4, Bates Nos. 137-199]

As a direct consequence of resentencing counsel's unreasonable failure to do precisely what it had previously deemed necessary – and what prevailing professional norms requited – Mr. Barnette's resentencing hearing unfolded much like this first one. The jury was not provided with critical information about Mr. Barnette; the information that was provided by resentencing counsel was not reliable; and the experts who testified for the defense were forced to rely on incomplete, inaccurate, and misleading information.

2. <u>**Resentencing Counsel's Delayed and Interrupted Preparation for the Resentencing Hearing**</u>

Although Ms. Lawson and Ms. Rauscher were appointed to represent Mr. Barnette for resentencing on February 13, 2001, no investigation or mitigation development had occurred nearly eight months into their representation. Requests for mitigation and investigative services were not filed until August 28, 2001. Authorizations for mitigation specialist Cessie Alfonso and investigator Jan Barefoot were not granted until October 2001. [Bates Nos. 382-389] By October 31, 2001, over eight months into their representation of Mr. Barnette, resentencing counsel's mitigation specialist, Ms. Alfonso, was "just getting started," and resentencing counsel "had not yet spoken with any other experts—both experts from Marc's first trial (who we needed to assess and decide whether to use again) as well as potential new experts." [Rauscher Affidavit ¶ 14, Bates Nos. 129-131]

Then on November 20, 2001, just as resentencing counsel's work appeared to be beginning, the unexpected removal of Ms. Rauscher as resentencing counsel caused a

16

disruption for Mr. Barnette's defense. As a hearing in November 2011, the Court removed Ms. Rauscher as one of Mr. Barnette's attorneys after she asserted the existence of a conflict due to the resentencing hearing being scheduled for March 12, 2002. [Rauscher Affidavit ¶ 15, Bates Nos. 129-131; Lawson Affidavit ¶ 16, Bates Nos. 94-101] As Ms. Lawson explains:

> The loss of 50% of the defense team was a huge shock to all of us. As a result of her removal, the case then had to be continued from the March 12, 2002 trial date.
>
> From [November 2001] until January 14, 2002, I was Marc Barnette's only attorney. The process of finding a substitute for Claire Rauscher was difficult.

[Lawson Affidavit ¶¶ 16-17, Bates Nos. 94-101]

By January 2002, with Mr. Barnette's resentencing scheduled to begin on July 15, 2002, resentencing counsel's investigation had not gone very far at all. Cessie Alfonso, the new mitigation specialist, had only had her first meeting with Mr. Barnette and his mother, Sonia Cooper, in January 2002. [Alfonso Affidavit ¶ 8, Bates Nos. 1-5] Ms. Lawson's new co-counsel, Harold Bender, was appointed on January 14, 2002 and Ms. Lawson knew that he would not take much responsibility for developing the mitigation for resentencing. As Ms. Lawson explains:

> I had previously worked with Mr. Bender as co-counsel and as counsel for co-defendants. In terms of working up a case, I knew from first-hand experience that Harold Bender's major strength and interest was in the courtroom and that he had a busy private practice. As a result, I knew that the responsibility and burden of developing the mitigation and case for sentencing would be mostly mine.

[Lawson Affidavit ¶ 18, Bates Nos. 94-101] Two days after Mr. Bender joined her as co-counsel for Mr. Barnette, Ms. Lawson was appointed counsel in another capital case in Gaston County. Only days later, she began a capital resentencing in Mecklenburg County that would occupy her into February 2002. [Lawson Affidavit ¶ 20, Bates Nos. 94-101]

17

**3. Resentencing Counsel Unreasonably Failed to Develop Mr. Barnette's Background of Abuse, Deprivation, Abandonment, and Neglect Leading to Long-Standing Mental Illness and, Ultimately, Tragedy**

**a. The Dysfunctional "Investigation"**

In keeping with its *ex parte* filing in October 2001, resentencing counsel hired a new mitigation specialist, Cessie Alfonso, for Mr. Barnette's resentencing hearing. Although resentencing counsel may have understood why Ms. Alfonso was needed to replace Sindy Maxwell and what areas in particular required investigation, they failed to communicate any of that information to her. As Ms. Alfonso explains:

> Sindy Maxwell was the mitigation investigator for Marc's first trial. Jean Lawson had little confidence in Sindy's work because the mitigation investigation had been incomplete and resulted in inaccuracies and superficial conclusions. Neither she nor Harold Bender (nor anyone else on the defense team) discussed with me what particular aspects of Sindy's mitigation investigation they had serious concerns or reservations about.
>
> It was never made clear to me whether defense counsel wanted me to do a wholesale re-investigation of Marc's background, or instead just focus on specific aspects. …

[Alfonso Affidavit ¶¶ 6-7, Bates Nos. 1-5]

Investigator Jan Barefoot, who describes her "primary role in Barnette retrial was to assist Cessie Alfonso … with locating witnesses," similarly notes the absence of communication or direction from resentencing counsel.

> I did not have full-scale involvement in the retrial. Neither Jean Lawson nor Harold Bender sought my input about defense strategy. I do not recall either Jean or Harold describing their trial strategy to me. They would usually just call or fax me with a task or "to do." My biggest responsibility for the Barnette retrial was serving subpoenas. I was not involved with and was unaware of any team meetings or organized means of communicating new information or thoughts about strategy.

[Barefoot Affidavit ¶¶ 6-7, Bates Nos. 15-16]

18

This lack of clarity and failure to communicate by resentencing counsel resulted in an inadequate, unreasonable, and wholly underdeveloped mitigation investigation. By the start of Mr. Barnette's resentencing hearing in July 2002, his defense team had not even interviewed all of the witnesses who had testified for the defense at his first trial, much less the many other witnesses who had never been spoken with in the first place.[4] As Ms. Lawson describes:

> I have reviewed Cessie Alfonso's mitigation report that identifies the persons she interviewed. According to her report, she interviewed Marc, Sonia Barnette, Derrick Barnette, Sheila Cooper, Mario Barnette, Mable Johnson, Jesse Cooper, Armaud Cooper, Larry Wright, Tasha Tolbert, Tessie Nero, and Dorothy Harper. It does not appear that she re-interviewed a number of witnesses who Sindy Maxwell had interviewed prior to the first trial. There were also a number of witnesses who had been identified on a list of "potential mitigation witnesses" in early March 2002 (like Sheila Sullivan, Tameka Hunter [sic], and Kowana Dozier) whom Ms. Alfonso did not interview.

[Lawson Affidavit ¶ 37, Bates Nos. 94-101]  Only three of the witnesses interviewed by Ms. Alfonso were called as defense witnesses at the 2002 resentencing hearing. [Alfonso Affidavit ¶ 7, Bates Nos. 1-5]

As post-conviction counsel's investigation lays bare, there was a treasure trove of mitigation information available from a number of readily available witnesses whom resentencing counsel simply and unreasonably failed to pursue. These witnesses were either known to resentencing counsel before the 2002 resentencing or, with little effort, would have been known. Indeed, Ms. Lawson had a list of "potential mitigation witnesses" as early as March 2002 that contained the names of a number of witnesses who could have provided important information about Mr. Barnette but were never asked. [Lawson Affidavit ¶ 29, Bates Nos. 94-101]

---

[4] During Mr. Barnette's 1998 penalty phase, the defense called twenty-two (22) witnesses, half of whom were family members.

### b. Proper Investigation: Major Mental Illness

The extent to which these un-interviewed witnesses, or witnesses who were spoken with briefly but not pursued, could have provided important information and insights about Mr. Barnette—and the many "red flags" that had been readily apparent from the first trial—cannot be overstated. Indeed, with access to this information gathered in post-conviction, Dr. Richard Dudley, M.D., a physician, with a specialty in clinical and forensic psychiatry, reached the following expert opinions:

> Mental status examinations of MB, performed during this psychiatrist's various visits with/examinations of MB were quite revealing. More specifically, each time that this psychiatrist met with MB he was oriented to person, place and time, and his memory for both short and long-term events appeared to be good. However, MB's mood was markedly different each time that he met with this psychiatrist for reasons that he/MB was unable to identify/explain. At times his mood was severely depressed; at other times his mood was inappropriately elated, and at other times his mood was more mixed (i.e., depressed and manic), with an associated irritability and extreme suspiciousness that at times reached the level of paranoia (i.e., the feelings that he was being harmed were fixed/he wouldn't let them go despite being confronted about them). His affect (i.e., the external representations or expressions of his mood) also changed consistent with the above noted changes in his mood.

> MB's family reported observing similar changes in MB's mood over the course of his life, starting at least back when he was an adolescent. Unprompted, MB's mother noted that these changes in MB's mood were often so extreme and would occur so rapidly that she felt that she should take him for some type of mental health evaluation and treatment; she cried as she noted that she just never did that; and she noted that maybe if she had done what she had thought she should do for MB, maybe none of this would have ever happened. More detailed exploration with family members and others about MB's mood during May and June 1996 revealed rapid changes in his mood during that time period as well.

> MB did evidence at least some developing insight, in that he noted that although in the past he didn't really know anything about depression, he now realizes that the depression and suicidal feelings and attempts that he made were indicative of depression or at least some type of mental health problem. He also noted that some of the things he was feeling back then seem foreign and maybe even crazy now, largely because he has come to understand more about why/how he developed such major issues with trust, starting back with his early childhood experiences. He noted, for example, that his frenzied 'need to know' whether or

20

not Robin was really with Greene now seems strange to him, as does the sense that he could love her so strongly that he would want to take her with him or do a murder/suicide thing.

Otherwise, MB's mental status was unremarkable, in that his speech was clear, coherent and goal-directed, his intellectual capacity appeared to be within the average range, and there was no clear evidence of an organic brain syndrome.

Given the above noted, it is the opinion of this psychiatrist, to within a reasonable degree of medical certainty, that MB has suffered quite severely as a result of his extremely difficult childhood. More specifically, MB's extremely difficult childhood significantly impaired his development, resulting in broad-based instability in all major areas of functioning. There is difficulty with attachment/instability in interpersonal relationships, characterized by frantic efforts to avoid real or imagined abandonment, and intense relationships with alternating feelings of extreme idealization and extreme devaluation of the other person; there is instability of self-image, characterized by an unstable sense of self and periods feeling empty and valueless; there is instability of mood, with affective instability due to marked reactivity of mood often accompanied by anxiety and irritability and/or suicidal behavior; and there is impulsivity generally associated with self-damaging behavior.

Although this psychiatrist believes that identifying MB's symptoms of mental illness and appreciating their impact on his ability to function is more important than labeling him with a specific diagnosis, it is the opinion of this psychiatrist that the above described cluster of symptoms meet the diagnostic criteria for Borderline Personality Disorder. A childhood history of abuse, neglect, hostile conflict, and early parental loss or separation is not at all uncommon in individuals who suffer from this disorder; this is clearly the case with MB; and therefore it is not surprising that there is an exacerbation of the difficulties associated with this disorder when a caregiver or lover is seen as neglectful, withholding, uncaring, or abandoning. It is also important to note that persons who suffer from this disorder are vulnerable to the development of transient, stress-related paranoid ideation or severe dissociative symptoms, and based on the information currently available to this psychiatrist, this also seems to be the case with MB.

In addition, it is the opinion of this psychiatrist, to within a reasonable degree of medical certainty, that MB also suffers from a major mood disorder, characterized by rapidly changing, extreme mood states, including mania, depression, and mixed states of mania and depression associated with extreme irritability and paranoid ideation. It at least appears that the onset of this major mood disorder was during MB's adolescent years.

Such rapidly changing mood states are quite destabilizing for an individual in and of themselves, and are particularly destabilizing during the period of adolescent

development when such emotional turmoil is so difficult to understand and manage. Then in addition, the fact that MB's major mood disorder is superimposed on his above described broad-based instability in major areas of functioning has resulted in even much more severe impairment in his ability to function, in that each of these major psychiatric disorders potentiate the other.

A full appreciation of how these two psychiatric disorders interact with and can potentiate each other requires additional understanding of the nature and course of each disorder. More specifically, Borderline Personality Disorder is best understood as an underlying disorder, in that its characteristics are enduring/persistent and therefore always impact on the individual and his/her ability to function. However, as noted above, certain types of stressors can exacerbate the difficulties associated with Borderline Personality Disorder, thereby causing a further deterioration in the person's ability to function. In contrast, the rapid swings in mood that are a part of MB's major mood disorder cycle on their own schedule, virtually unrelated to whatever is going on around him. However, the mood that he is experiencing at any given time will impact on how he responds to any stressors that he might be vulnerable to as a result of his underlying Borderline Personality Disorder.

More specifically, for example, when an individual who suffers from Borderline Personality Disorder perceives that he/she is being abandoned by a significant other, the symptoms associated with this disorder will be exacerbated. However, if that same person is simultaneously in a manic/hyper-elated state due to a separate major mood disorder, the overall response/mental state will be quite different than it will be if he/she were in a depressed state due to that major mood disorder.

Based on this psychiatrist's review of the information noted above in paragraph 6 and my consultation with Ann Wolbert Burgess, RN, DNSc, the information currently available to this psychiatrist is considerably and significantly more than the information that was made available to Dr. Burgess. In addition, because of the wealth of information currently available to this psychiatrist, my psychiatric opinions about MB are not only better supported but also much more complex than the opinions rendered at the time of his trial. More specifically, although there had been various difficulties including violence in some (although not all) of MB's relationships with women, additional important information about those relationships, especially his life-changing relationship with Sheila Sullivan, and additional important information that helped establish that he also suffered from other major psychiatric disorders resulted in that much more complex picture of MB's mental health difficulties. Additional important information also indicates that he was suffering from these major psychiatric difficulties at the time of the killings, and that therefore his mental state was even more severely impaired than had been previously recognized.

22

Based on my experience in capital litigation, if the information made available to this psychiatrist had been available at the time of his trial, MB's extremely difficult childhood, including the effect that his mother's own trauma and family secrets had on her availability/capacity to parent MB; the impact of his extremely difficult childhood on his development, the resultant broad-based instability in major areas of functioning, and the associated impairments in his ability to function; his severe major mood disorder and the impact of this disorder on his ability to function; and the ways in which the two psychiatric disorders potentiate each other would have been mental health findings that could have been recognized and presented to MB's legal team for consideration as mitigation at the time of his trial. Instead, the mental health opinions presented, which apparently lacked many of the critically important factual bases upon which my opinions are based, were either incomplete, not sufficiently supported, and/or inaccurate.

Of particular importance, with regard to potential mitigation, is the fact that the information currently available to this psychiatrist makes MB's mental state at the time of the crimes for which he has been convicted and sentenced to death much clearer, and indicates that at the time of the crimes, MB's capacity to conform his conduct to the requirements of the law was significantly impaired.

More specifically, the symptoms of MB's Borderline Personality Disorder were clearly exacerbated by his perception of the impending loss of his relationship with Robin Williams, his perception that she had been unworthy of his trust, and his perception that she had viewed him as a fool who could be easily used/taken advantage of. Based on the information currently available to this psychiatrist, MB evidenced frantic efforts to avoid abandonment by Robin, a reversal of his extreme idealization of Robin to extreme devaluation of her, a deterioration of his sense of self to the point of feeling empty and valueless, mood reactivity with irritability and suicidal behavior, impulsivity, and stress-related paranoid ideation. Then, over the next couple months, superimposed on these exacerbated symptoms, were the profound and rapid swings in his mood that were symptomatic of his major mood disorder that determined how he ultimately experienced the underlying crisis and its resultant symptoms. In other words, based on the information currently available to this psychiatrist, when MB was experiencing an elevated mood he was out with friends, despite the underlying crisis; when he was experiencing a depressed mood he was isolative/stayed in his room, he was crying a lot, and he was suicidal; and when he was experiencing a more mixed state of mania and depression he was agitated, irritable, more paranoid and otherwise even more irrational.

[Dudley Report ¶¶ 63-76, Bates Nos. 209-231]

Ann Wolbert Burgess, a forensic nurse who testified as a defense witness in 2002,

agrees that the information gathered in post-conviction and not previously made available

23

to her in 2002 is critically important and markedly different than what was provided by

resentencing counsel—so much so that it "significantly changes [her] earlier findings and

opinions." [Burgess Affidavit ¶ 8, Bates Nos. 51-55] As Dr. Burgess explains:

> The new information that I have reviewed significantly changes my earlier findings and opinions. Had I been provided with this information during my trial work on behalf of Mr. Barnette, I would have rendered a different expert report and testified in markedly and materially different ways. Indeed, now that I have been provided with additional information from post-conviction counsel, it is my belief that my earlier findings, opinions, and testimony were badly marred by inaccurate and incomplete information with which trial counsel provided me.
>
> For example, a prominent focus of my report and trial testimony was the notion that Mr. Barnette had witnessed and experienced domestic violence during his youth, and that his criminal conduct in April through June 1996 "may be understood, in part, as a symbolic reenactment of family and childhood patterns" (which is how I wrote about it in my report). I also testified that the "roots" of his behavior could be found in the way he was "raised and developed." The information now made available to me makes clear that this emphasis on "multi-generational violence" as an explanation for Mr. Barnette's criminal behavior in question was misplaced and due to incomplete and inaccurate information provided to me by trial counsel. While it is true that Mr. Barnette witnessed and experience domestic violence, it is clear from the new information provided that his criminal conduct could not simply be explained by that upbringing. Rather than any "symbolic reenactment of family and childhood patterns," Mr. Barnette's criminal conduct was attributable to a psychotic episode and mental health crisis that he was experiencing. The incomplete and inaccurate information provided by trial counsel led me to erroneously conclude that Mr. Barnette "ha[d] devoted his adolescent life to a continuous pattern of reenacting and trying to resolve the way he was programmed in childhood." Rather than simply acting out as a result of familial dysfunction, as I reported and testified about in 2002, Mr. Barnette suffered from debilitating mental health issues that profoundly affected his behavior throughout his life.
>
> In my report and trial testimony, I opined that Mr. Barnette may have been suffering from major depression and a personality disorder "not otherwise specified," with paranoid, antisocial, and borderline features. These diagnoses were incomplete and lacking because the information provided to me at the time was also incomplete and lacking. The new information provided by post-conviction counsel makes far clearer the most prominent and important aspects of Mr. Barnette's mental health status during the relevant period of time. Based on this new information, it is my opinion that Mr. Barnette was experiencing a psychotic episode and mental health crisis, and that he also suffered from a mood disorder that was significantly affecting his thinking and behavior.

24

[Burgess Affidavit ¶¶ 9-11, Bates Nos. 51-55]

Dr. Sally C. Johnson, who evaluated Mr. Barnette prior to his 1998 trial in her capacity as the Associate Warden of Health Services/Chief Psychiatrist at FCI Butner, but who was not contacted by resentencing counsel prior to his 2002 resentencing (at which time Dr. Johnson was the Director of Forensic Fellowship Program for Federal Bureau of Prisons/Duke University of Psychiatry and a Psychiatric Consultant to the Medical Director of the Federal Medical Center (FMC) at FCI Butner), also agrees that the information gathered in post-conviction is significant. Had she been contacted by resentencing counsel and provided with readily available information, Dr. Johnson could have testified about Mr. Barnette's health issues and nonviolent relationships with other women. She could have testified about the significance of the murder of Mr. Barnette's maternal grandmother, Pearl Cooper; his maternal grandfather, Jesse Cooper's, post-traumatic stress disorder; how the confusion concerning Mr. Barnette's paternity was handled within the family; his mother Sonia's limitations as a young parent; and the absence of any stable or helpful guidance given to him from others (including his family) for coping with stress, dealing with problems, and navigating his adolescent and teenaged years. [Johnson Affidavit ¶¶ 16-22, Bates Nos. 89-93] Dr. Johnson could have also testified that by 2002, Mr. Barnette had clearly demonstrated "very positive institutional adjustment."

> He presented no problems for correctional officers and had no problems with other inmates. He demonstrated an ability and willingness to abide rules, remained non-violent, and maintained constructive and positive relationships with others.

[Johnson Affidavit ¶ 16, Bates Nos. 89-93]

25

As post-conviction counsel's thorough investigation demonstrates, resentencing counsel failed to conduct a reasonable investigation that would have produced a complete and accurate understanding of Marc Barnette's relevant mental states, and their mitigating qualities. As a result, Mr. Barnette's resentencing jury in 2002 was not informed of this highly relevant and strongly mitigation information.

### c. Family Overview

Aquilia Marcivicci "Marc" Barnette, called "Vicci" by some relatives, was born on July 7, 1973 in Charlotte, North Carolina. Marc is 41 years old and the father of two young adult children, Angelica and Marc. Marc Barnette spent the first 14 years of his life in Charlotte before moving to Georgia with his mother Sonia Cooper Barnette and brother Mario Barnette. He returned to Charlotte in 1993. He later met Robin Williams, who was living in Roanoke, Virginia, and moved in with Robin in 1995. He returned to Charlotte in April 1996 after their relationship ended. The crimes for which Marc is incarcerated occurred in June 1996.

Marc's mother, Sonia, was born to Jesse and Pearl Cooper on August 17, 1958. She gave birth to Marc when she was 14 years old. Less than a year later, Sonia's mother Pearl was shot and killed by her new husband, Loyd Brown, while Sonia and Marc were sleeping nearby. Pearl's murder and its aftermath severely traumatized Sonia, as well as her younger sister Sheila Cooper, who was also in the house when the murder took place. Many family members report that this event had lasting negative effects on the entire family for decades. During high school, Sonia dated Derrick "Rick" Barnette. Rick later attended North Carolina A&T for one semester before enlisting with the U.S. Air Force

in late 1974. Sonia and Rick were married February 8, 1976, and they lived together until approximately 1984. [Rowles Mitigation Report, Bates Nos. 232-259]

For the first 14 years of his life, Marc knew Rick Barnette as his biological father, as well as the biological father of his younger brother, Mario, who was born in 1977. But in 1987, nearly two years after Rick and Sonia's divorce was finalized, Rick moved to have paternity testing done. The results, which Rick revealed to Marc and Mario, showed that Rick was not their biological father. This information had immediate and long lasting negative effects on Marc. Shortly after breaking the news to Marc and Mario, Rick moved to Philadelphia and thereafter maintained minimal contact with Marc and Mario. [Rowles Mitigation Report, Bates Nos. 232-259]

### d. Cooper Family Legacies: Trauma, Abandonment, and Murder

For example, with respect to the Cooper Family and its legacies of trauma, abandonment, and murder, the jury never learned about Jesse Cooper, his military service, his trauma, and his condition as a caretaker for Sonia, Marc, and others. Resentencing counsel's failure to gather Mr. Cooper's military and medical records—a basic task in capital defense—meant they were unable to explain to the jury that Jesse Cooper, Sonia's father, had served in Korea after entering the Army in 1951. On February 4, 1952, he was severely wounded. According to military records, Jesse was an ammunitions bearer in a rifle platoon and was wounded by enemy shell fire while counterattacking an outpost. He received wounds to his face, right eye, right thigh, and right hand. [Rowles Mitigation Report, Bates Nos. 232-259; Jesse Cooper: Military Records, Bates Nos. 5156-5253]

A letter dated February 11, 1952, from Major General Wm. E. Bergin to Jesse's wife Pearl Cooper reads, in part:

> I deeply regret that it is necessary to inform you that your husband, Private First Class Jesse Cooper, was seriously wounded in action in Korea…. My heartfelt sympathy is with you during this period of anxiety.

[Jesse Cooper: Military Records, Bates Nos. 5156-5253]

According to family members, after Jesse was injured, enemy soldiers kicked and poked their bayonets at him and kept walking, assuming he had died. Notice was sent informing family members that Jesse had been missing and that he had, in fact, died. Robert Cooper, Sonia's cousin and Jesse's nephew, recalls that Jesse "could squeeze shrapnel out of his skin in different parts of his body." Mr. Cooper, who was never contacted by any of Mr. Barnette's resentencing attorneys or investigators, could have described how the family "thought he was dead" after receiving a letter and a flag from the Army; how "[s]ometimes Jesse would act crazy after he got back from the war," and how "[e]ven in the summertime Jesse would wear a big coat and waterproof boots," and "sit under a tree from sunup to sunset." [Robert Cooper Affidavit ¶¶ 8-10, Bates Nos. 64-66]

Jesse would tell Sonia, who was not called as a witness in 2002, that he had "already met Jesus." [Sonia Barnette Affidavit ¶ 10, Bates Nos. 34-48] It was not until 2002, however, with Jesse ailing and in the hospital, that he was awarded a Purple Heart, which had not been previously awarded to him due to an oversight.

Jesse's war experience had long lasting effects on him and the family. As Sonia explains:

> The war affected him mentally. After he came back from Korea he would have nightmares and call out in the night. Once he had a flashback episode where he

28

thought me and my sisters were nurses. After this he was taken to Broughton Hospital, a state psychiatric hospital in Morganton, NC. After he came home from Broughton we had to be really quiet. We were not supposed to make loud noises around him.

He often ate Vienna Sausages and a pack of saltines for a meal. He basically lived on rations. This was like it was when he was in Korea – eating meat out of a can. He really didn't eat fully cooked meals until I came back to Charlotte from Atlanta in 1993 and started cooking for him.

[Sonia Barnette Affidavit ¶¶ 13-14, Bates Nos. 34-48]

Sonia's younger sister, Sheila Cooper, recalls:

Jesse was really shaken up by his experience serving with the Army in Korea. Jesse would normally sleep outside on our screened in porch. He was sleeping outside like he was still in the war. He had Post Traumatic Stress Disorder and he would sometimes relive his combat experience. He would crouch down with his rifle behind the sofa that was on the porch and peer out. After an episode of doing this, Jesse would end up crying. Then he'd just walk off. I would just watch Jesse when he was doing these things. I didn't know what he was doing and I didn't know what to do. All I knew was that I was not to bother him.

One time I tripped and fell and busted my head. Jesse picked me up as if I was a piece of wood and took me in the house. He lay me on the sofa in the living room and just wrapped my head in a bandage. He treated me like I was a soldier and the best he could do was wrap me in a bandage. He didn't take me to the hospital because he thought we were in the middle of a war. Tessie later came home and saw that I was very pale and had lost a lot of blood. She then made sure I was taken to the hospital. I went in an ambulance to Mercy Hospital and got stitches. I still have a mark on my head from this incident.

[Sheila Cooper Affidavit ¶¶ 9-10, Bates Nos. 67-75]

Jean Nduly, Sonia Barnette's cousin, testified at Mr. Barnette's 1998 trial but was never contacted by resentencing counsel prior to the 2002 resentencing. Ms. Nduly could have testified that:

Jesse Cooper served in the military and he often told stories about the war. He was badly injured in the war and there was a period of time when the family thought he'd been killed. My grandmother always said that Jesse was in the hospital for a long time after he was wounded. Jesse had a glass eye as a result of his injuries. He drank Pabst Blue Ribbon beer and called it his tea. He drank it every day. When he got tipsy he would go lie down and go to sleep, but you still

29

couldn't sneak up on him. In our family the men walked the property to keep people off, and this is something Jesse would do.

[Nduly Affidavit ¶ 6, Bates Nos. 113-116]

Resentencing counsel's failure to investigate and develop this information—through readily available witnesses and records—was highlighted to Mr. Barnette's detriment during resentencing. For example, during Dr. Mark Cunningham's testimony, the prosecution hammered on the credibility of Dr. Cunningham's assessment that Jesse Cooper was "psychiatrically disabled":

> Q: Okay. Now, what psychiatric tests did you perform on Jesse Cooper to make that determination?
>
> A: I was advised of that by Sheila, his daughter.
>
> Q: My question is what psychiatric tests did you perform on Jesse Cooper to make that determination?
>
> A: I did not test Jesse Cooper.

[2002 Tr. 3718-3719] Not only were there a number of readily available witnesses who could have graphically described Jesse Cooper's obvious mental health issues, but there were also records from the U.S. Army, Department of Veterans Affairs, and medical facilities that would have left no question for the jury. [Bates Nos. 5156-3474]

Jesse's condition also factored into the end of his marriage to Pearl, although her own behavior—described as promiscuous by relative Robert Cooper—certainly played a role. Whatever the driving reason behind the end of their marriage, Jesse and Pearl's divorce was a portent for tragedy.

Robert Cooper could have described how Pearl Cooper was promiscuous and left Jesse for another man; how Jesse took the car in which he caught Pearl and another man

in and parked it on Cooper Hill, "and never moved it again"; and yet how "Jesse kept his wedding band on until he died." [Robert Cooper Affidavit ¶¶ 12-13, Bates Nos. 64-66]

Do'Lores Guy,[5] who was never contacted by resentencing counsel, could have described how she was very close friends with Pearl, and how Pearl's second husband, Loyd Brown, had been a patient of Pearl's and how when he moved in with Pearl "he only had a stereo, a chair, and clothes. He had nothing." Ms. Guy was aware that Loyd Brown did not want Sonia (Marc's mother) and Sheila (Marc's aunt), who were both young teenagers, to live with him and Pearl, and how he would "rage." [Guy Affidavit ¶¶ 4, 12-13, 16, Bates Nos. 81-84]

Jean Nduly, Sonia's cousin, remembers Sonia was never comfortable around Loyd:

> There was a period of time when Sonia, Sheila, and Vicci came back and stayed with Uncle Jesse. This was while Pearl was with Loyd and after Tessie had moved away. They stayed with Jesse for about a month. Sonia wasn't comfortable around Loyd. I thought he had made a pass at Sonia. Sonia and I laughed and giggled a lot but not after Loyd came into the picture.

[Nduly Affidavit ¶ 9, Bates Nos. 113-116]

> As Sonia herself could have testified in 2002:

> I didn't like Loyd from the start. He wasn't genuine. He was stalking my mom. He was trying to take out a life insurance policy on my grandmother. Loyd also ran up credit cards. He was crooked. He took advantage and she was a perfect target. We had moved into a house at that time and my mother had two kids that were girls. Loyd didn't have anything to offer my mom. He came with only a gym bag and a console stereo. That was a red flag to me and I was young and didn't know much about these things. Six months after my mother and Loyd reconnected she said she was marrying him. That was the end of any relationship between my mom and me.

> Loyd treated my mom bad. He wasn't nice to her. I remember seeing him twist my mom's arm behind her back one time during an argument they were having. I had never seen anything like that before.

---

[5] Do'Lores Guy is referred to as "Dolores Hart" in the § 2255 motion.

31

> Loyd and I didn't get along and I was unhappy. I said a couple of things about Loyd to my mom. This led us to have arguments which led to us going to live at my father's for a while. However, that arrangement didn't last long. I think we went to live with my father for about a month before going back to live with our mom and Loyd.

[Sonia Barnette Affidavit ¶¶ 23-25, Bates Nos. 34-48]

After the divorce, Sheila and Sonia (and, at this point, Marc, who was an infant) stayed with Jesse on West Boulevard for only about a month before returning to Loyd and Pearl's house on Peaceful Glen Road. Tessie, Sonia and Sheila's eldest sister, was living in Alaska at the time with her husband Jeff Nero (who was in the service). Sonia, Marc, and Sheila only stayed with Jesse briefly because he was not providing for them. Jesse was intoxicated most days after Pearl left, drinking Pabst Blue Ribbon beer.[6] [Tessie Nero Affidavit ¶ 15, Bates Nos. 124-128]

The week after Mother's Day in 1974, in the early Sunday morning hours following Sonia's high school prom, Loyd shot and killed Pearl while she was in her bedroom. Unbeknownst to Sonia and her family, Brown had previously been convicted of shooting someone else. After the shooting occurred, Loyd fled; he later turned himself in to the magistrate. A police report states that law enforcement heard a female scream after police knocked on the door of the residence. Sheila, age 12, came running to the door. Police found Pearl's body in bed with blood around her head. There were no signs of life but her body was still warm. [Rowles Mitigation Report, Bates Nos. 232-259]

In Loyd's confession, he reported that on the day before, around 5:30 p.m., he came home to find that someone had hit a tree next to the driveway. He said he asked

---

[6] Had resentencing counsel obtained Jesse Cooper's medical records, they would have learned that as late as 1994, Jesse drank alcohol from "11:00 p.m. to 6:00 a.m., early a.m., six packs of beer a day" and was a determined to be a "malnourished heavy drinker." [Bates No. 5453]

32

Pearl and kids what happened and "they would not give him an answer." Loyd also confessed that he and Pearl were having "trouble" and "he was running up charge cards which he could not pay." [Rowles Mitigation Report, Bates Nos. 232-259]

Sonia, who was 15 years old at the time, says 10-month-old Marc was in a crib in the room that she shared with Sheila when the shooting happened. Sonia could have vividly described for the jury the night that Loyd murdered her mother in the next room to where she and Marc were sleeping:

> Vicci, Sheila, and I were all at home when it happened. Vicci was in his crib. I had gone to the prom that night with a friend's brother. When I got back to the house, Loyd was gone. Mom told me she and Loyd had argued and then he had left. I was eating a sandwich when he got back. I later went to bed. Neither Sheila nor I heard any gunshots when it happened. Loyd shot her five times. He must have had a silencer. I was woken up when the police arrived. Loyd had gone out to turn himself in and after he did so they came to the house. Sheila heard the police cars and checked on our mom. She was the first one to find her. I remember seeing blood on the wall. I blacked out after that.

[Sonia Barnette Affidavit ¶ 28, Bates Nos. 34-48]

Sheila Cooper, Sonia's sister, was 11 years old at the time and could have also testified about what happened:

> I was asleep when Loyd shot Pearl; I didn't hear the gun shots. Afterwards, he went and turned himself. Then the police came to the house. I woke up when they banged on the door. When I awoke I was back in my room and Vicci was in his crib. I had on my blue pajamas with frill at the ankles. I knew not to answer the door after 6pm so I went to my mom's room to get her. I saw her and I saw redness. I thought, "Oh mama, your hot water bottle exploded." Then I turned on the light and saw blood all over her front. I started screaming. My mouth tasted weird. I remember the police saying, "He's killed her." Sonia was also screaming. She went and got Vicci.
>
> Then I passed out. I just remember screaming and falling. I ended up waking up across the street at my friend Cynthia Williams' house. I was in bed with her. The second time I awoke, I got up and could see through the window that the police were still at our house. I also saw my dad.

[Sheila Cooper Affidavit ¶¶ 20-21, Bates Nos. 67-75]

Do'Lores Guy could have further testified about how a police officer called her in the middle of the night and asked if she knew Sonia. When Ms. Guy confirmed that she did, the officer asked her, "Can you stay with them? The mama's dead. The husband killed her." Ms. Guy went to stay with Sonia, Sheila, and Marc, who was only a baby. Ms. Guy could have described how scared and upset Sonia and Sheila were, and how "Sonia went into a withdrawal state and depression" afterward. "She would cry easily. She would have crying moods. These were deep-seated feelings. Sonia was depressed and would cry ever since her mother died. That was a change from how she had been before. Sonia was withdrawn and would go through periods of depression." [Guy Affidavit ¶¶ 17-21, Bates Nos. 81-84]

Jean Nduly could have similarly described the impact of Pearl's murder on Sonia and the family:

> I remember the night Pearl was shot. I had talked to Sonia before it happened because it was her prom night. Jesse said, "Jean, we have to get the girls." Pearl had been shot. We went immediately to get them. It was so sad when they came down the steps. They were in a fog. Sonia was in shock and Sheila was really upset. Sonia was trying to console Sheila. The police were at the house and Jesse talked to them. We weren't there very long before we took them back to Jesse's. It was very confusing and scary. Sonia and Sheila were both still so young, and Sonia had Vicci, who was just a baby.

> Sonia never talked about her mom's death and we don't pry in our family. She was clearly very sad. It wasn't very long before they moved to Columbia, South Carolina to live with Tessie. After they moved to Columbia I didn't see them as much.

[Nduly Affidavit ¶¶ 11-12, Bates Nos. 113-116]

Sandra Smith, a neighbor who was never contacted by resentencing counsel, recalls:

34

I heard about it when Loyd killed Pearl. Sonia and her younger sister, Sheila, were the ones that found their mother after she'd been killed.

It would be awful for anybody to lose their mom like Sonia and Tessie did. Sonia never talked very much about her feelings or what she thinking about; she was more of an introvert when we were teenagers. She didn't really share what she was going through after her mother was murdered.

[Smith Affidavit ¶ 6-7, Bates Nos. 135-136]

Tessie Nero, Marc's aunt and Sonia's older sister, was not called to testify at Marc's 2002 resentencing, but could have provided important insights about the family in the wake of Pearl's murder:

Pearl married Loyd Brown after I'd left Charlotte and he murdered her within a year of their marriage. I saw him for the first time when I came home for some of his court dates. It was a horrible shock to hear of my mom's death. It happened shortly after mother's day. Sonia, Sheila and Vicci were in the house when he killed her. I came back to Charlotte shortly after it happened. After that, Jeff requested and received a compassionate reassignment to Columbia, South Carolina so we could be closer to home. I drove to Charlotte almost every day in those days after it happened.

Pearl's death was traumatizing. Sheila is the one that found her after she had been shot. After that Sheila got involved with friends that weren't friends. I had to tell her more than once that she wasn't the only one that lost a mother. Sheila stayed out a lot with her friends.

[Tessie Nero Affidavit ¶¶ 12-13, Bates Nos. 124-128] As Sheila Cooper could have testified:

My mother's murder had a profound effect on our family. I was in turmoil on the inside for a long time. Not having a mother to help with stuff going on at school, or with kids, or with work, was difficult. There always felt like a big hole in my life and the lives of my sisters.

[Sheila Cooper Affidavit ¶ 32, Bates Nos. 67-75]

Through Sonia's own testimony, or an expert who had discussed the murder of Pearl with her, the jury could have heard more about the deleterious affect the trauma had on Sonia:

35

For a long time I was frightened that Loyd would get out of jail and harm us. We sent letters to not release him. One time I was in the car on South Boulevard and I saw Loyd out on work release. I was terrified. That stuck with me a long time, up until we found out Loyd had died in prison.

I just had to keep going after my mom's death. Ever since I was young I always needed to be the glue because I could see my sisters losing it. I particularly felt I had to be strong for Sheila. She had a lot of difficulty handling what happened. Once when Sheila's supervisor from work called and told me that Sheila was having a breakdown. She told me they were going to get Sheila some help. At that time Sheila would go into uncontrollable crying. I saw her crying often. Sheila did end up getting some counseling and I think it helped. She's the only one of the three of us that got that. We all needed it.

I have had this inner fear that I would only live to the same age as my mom, and that the same thing would happen to me that happened to her. I always have this emotional wall up. I never allow anyone to hurt me. I have had a fear of letting someone in because I don't know if I can trust them. All of the things that happened in my relationship with Rick (my ex-husband) were triggers for my fears about what happened with my mom.

[Sonia Barnette Affidavit ¶¶ 31-33, Bates Nos. 34-48]

Tessie could have further testified about how Jesse Cooper's condition made matters even more difficult for Sonia after her mother was murdered:

Sonia, Vicci, and Sheila ended up moving to Columbia to live with us. They didn't stay with our dad after Pearl was killed because Jesse was not providing for them. He was drinking Pabst Blue Ribbon beer. He drank a lot. After the war he was not stable. The effects on him contributed to the split between him and Pearl. As long as I can remember he told the same war stories. He re-lived it and he rehashed it. It was kind of hard to be around him. I didn't realize it back then, but now I see some of the signs that he had been traumatized in the war. I can remember hearing him shout out at night, "No! Stop!" I don't think he drank as much before the war, although I think he really increased his drinking after he and mama split. Then it became every day. Most days after the split and after Pearl's death he was intoxicated. He was never physically or verbally abusive when he was intoxicated. He just talked about the war.

[Tessie Nero Affidavit ¶ 15, Bates Nos. 124-128] Looking back on how Pearl's murder impacted Sonia and Sheila, Tessie could have testified in 2002 as follows:

I would have explained how both Sheila and Sonia changed a lot after the fact. They were both so young; Sheila was only 11 years old, and Sonia was 15 years

36

old and had Vicci, who was only 10 months. They both started partying more, running around, and being less responsible about things. As I mentioned during my testimony [in 1998], it wasn't something we talked about. Everyone was going through very intense feelings and emotions, but no one knew what to do with those feelings.

[Tessie Nero Affidavit ¶ 31, Bates Nos. 124-128]

Sheila Cooper recounts how the effects of Pearl's murder have also deeply affected her:

I had three visions of my mother's death before it happened and I told my mom about each one. I was just a little girl and she ignored me. After she was killed I felt it was my fault because I'd had the visions of what was going to happen but didn't do more to stop it. I believed that for years.

I cried about my mom all the time. My boyfriend, Michael, saw that. We had a miscarriage and I had to have a DNC. I started going ballistic. They put me under. Michael was there. He was trying to reassure me. He said I was talking to my mother.

I wanted to kill myself. I was working at Georgia Power and Michael and I had a plan to meet for dinner. I was driving to the restaurant. I was racing along and thinking: I'm just going to kill myself. I'm going to run into this pole head on so I can see my mother.

One time while I was working at Georgia Power I went to call Michael and started crying and could not stop. I had a breakdown behind so much stress and I went blind in one eye. Michael suggested I get help. I was crying all the time. I did end up getting help through my job. I saw a therapist and I was prescribed medication. I believe I was prescribed Seroquel.

I never talked to Sonia about what happened to our mother and I've never been to my mom's grave. We never talked about it because I had my own pain to get past. If anyone talked about it I would sob like it had just happened.

[Sheila Cooper Affidavit ¶¶ 25-29, Bates Nos. 67-75]

### e. Sonia's Dating and Marc's Paternity

Until a paternity test in 1987 indicated otherwise, it was generally accepted in the family that Rick was Marc's father. Rick, however, always doubted that Marc was his biological son. Sonia and Rick first met at Smith Junior High School. He does not think

37

that he and Sonia were dating at the time she got pregnant. After they found out that Sonia was pregnant, Rick's mother and Sonia's mother (Pearl) talked to each other. Following that conversation, Rick reports, his mother told him that the coming baby was not his. Rick, however, further reports that he was attracted to Sonia and allowed himself to believe the baby was his when Sonia began saying to others that he was the father. [Derrick Barnette Affidavit ¶¶ 3, 6, Bates Nos. 17-21]

Sonia dated Larry Wright around the time she became pregnant with Marc. [Derrick Barnette Affidavit ¶ 6, Bates Nos. 17-21] Larry was a classmate of Sonia's and he confirms that he and Sonia did date. Larry knew Pearl, went to their house frequently, and he and Pearl would talk. [Rowles Mitigation Report, Bates Nos. 232-259]

Shortly before Sonia found out that she was pregnant, a friend of Sonia's told Larry that Sonia was also dating Rick. After Pearl learned of Sonia's pregnancy, Pearl talked with Larry and Sonia and asked them what they were going to do about the coming baby. At this point, Larry did not believe the baby was his. Pearl was surprised by this; she had not known about the relationship between Sonia and Rick. Pearl and Sonia then decided the baby was Rick's. Larry's parents knew and liked Sonia and they were disappointed that Larry would not be considered the father. [Rowles Mitigation Report, Bates Nos. 232-259]

Sonia's behavior changed dramatically after her mother was murdered. She started to dress in a provocative style, use marijuana and cocaine, and spent time with people that were known to be drug dealers, hired killers, and thugs. [Rowles Mitigation Report, Bates Nos. 232-259]

Larry did not see Sonia as often after she and Rick married, yet his sexual

38

relationship with Sonia continued sporadically through Sonia's relationship with Rick, as well as after their eventual separation. When visiting one of her best friends, Starr Reape, who was a neighbor of Larry's, Sonia would sometimes stop by with Marc and Mario. Larry kept in touch with Sonia enough that when she and Rick split up, he went and helped her, Marc, and Mario move out of the house. [Rowles Mitigation Report, Bates Nos. 232-259]

Marc was born when Sonia was 14 years old and Rick was 16 years old. In the fall of 1974, when Marc was about 15 months old, and approximately five months after Pearl Cooper's death, Sonia and Marc (and Marc's young aunt, Sheila) moved to South Carolina to live with Tessie and Jeff Nero. [Rowles Mitigation Report, Bates Nos. 232-259]

Rick and Sonia were married in February 1976, and lived together (with Marc) for a short period of time in Omaha, Nebraska, where Rick was stationed with the U.S. Air Force. Rick was then transferred to Okinawa, Japan for approximately one year; Sonia and Marc stayed behind. By July 1977, when Marc's younger brother, Mario, was born, Rick had returned from Japan and they were all living together at Rick's mother's home at 1137 Comstock Drive, Charlotte in the Clanton Park neighborhood. Rick, Sonia, Marc, and Mario then moved to Minot, North Dakota for a year while Rick was stationed there. They returned to Clanton Park in Charlotte in early 1979. They remained together in Clanton Park until approximately 1984, when Rick and Sonia separated. [Rowles Mitigation Report, Bates Nos. 232-259]

Starting upon their return to Charlotte in 1979, Sonia and Rick's relationship became one marked by intense jealousy, mistrust, and violence. As Rick explains:

Sonia and I had fights when we were together. We fought all the time after we moved back to Charlotte and lived in Clanton Park. We had bad fights, physical fights. I hit Sonia in the head with a hammer one time. She had her hand on her head at the time and was peeking through her hand. I hit her on the forehead just above her eyebrow. She ended up calling her sister about it. The police came because of that incident.

[Derrick Barnette Affidavit ¶ 10, Bates Nos. 17-21]

Sonia confirms the domestic unrest: "We were extremely jealous of each other and this led to arguments and physical fights." [Sonia Barnette Affidavit ¶ 40, Bates Nos. 34-48] Sonia elaborates:

It got bad with me and Rick. He would throw my things outside. He once hit me with a hammer. There was also a frying pan incident where I was planning to hit him with a frying pan while he was sleeping.

Rick also beat Vicci. After one particular beating Vicci called somebody and they came out to our house to check on the situation. Rick admitted he had beaten Vicci. It was probably a social worker that came out, someone from DSS. Rick and I were young then. We didn't know as much about the effect that fighting would have on Vicci.

After our separation, Rick still disciplined the kids if they'd done something wrong. He would come over and discipline them when I asked him to. He would usually use his hands or belt. This lasted for about a year while we were separated, but before our divorce.

[Sonia Barnette Affidavit ¶¶ 43-45, Bates Nos. 34-48]

Robert Cooper describes how Derrick Barnette "was a jerk," "put Sonia, Marc, and Mario out," and "acted crazy towards Sonia." [Robert Cooper Affidavit ¶ 16, Bates Nos. 64-66]

Shonda Nero, Marc's first cousin, testified at the 1998 trial but was not contacted by resentencing counsel prior to the 2002 resentencing. Ms. Nero could have testified how she "learned in [her] teenage years that Rick was beating Sonia and that cocaine was involved." [Shonda Nero Affidavit ¶ 7, Bates Nos. 117-123] Ms. Nero could have

explained how there was also domestic violence between her parents—Tessie and Jeff Nero—and "[t]hey acted the same was as Sonia and Rick and that made me resent my father." [Shonda Nero Affidavit ¶ 8, Bates Nos. 117-123] Tessie Nero could have testified about the fighting, as well:

> I remember once that Sonia's ear lobe was torn through. Sonia told me this happened when she and Ricky were in an argument and he tore her earring out. I think we were cooking out at the time she told me, but then Ricky walked into the kitchen while we were talking and Sonia changed the subject. Sonia has now had her ear lobe repaired. She had it stitched up. She did this more recently at the medical office where she works.

[Tessie Nero Affidavit ¶ 19, Bates Nos. 124-128] Jean Nduly could have also testified about Sonia and Rick's fighting. [Nduly Affidavit ¶ 15, Bates Nos. 113-116]

The impact of Sonia and Derrick's troubled relationship was clearly felt by Marc. Weona Sharpe,[7] a relative and neighbor of Marc's when they were young, was never contacted by resentencing counsel. Ms. Sharpe could have testified:

> Vicci would knock on our front door in the middle of the night sometimes. This could be midnight or two in the morning. We'd give Vicci a blanket and a place on the couch to sleep. He never said anything about it but there was something wrong for him to show up at our house in the night like that. Vicci would look upset. He would be in pajamas, and barefoot. Mario was never with him. It was always just Vicci.

> Vicci always slept on the couch in our living room. We had two couches and one of them let out into a bed. We would feed Vicci breakfast in the morning and he'd hang out a little. We would also call Sonia in the morning and let her know that he was there at our house. It got to a point where we knew who it was when we heard a knock on the door in the middle of the night. Vicci came to our house in the middle of the night numerous times over a period of months. I don't know why he eventually stopped.

[Sharpe Affidavit ¶¶ 12-13, Bates Nos. 132-134]

---

[7] Weona Sharpe is referred to as "Wendy Sharpe" in the § 2255 motion.

Perniciously, although it was far from a secret, the domestic violence in the family—whether between Sonia and Derrick, or the murder of Pearl—was not openly discussed. As Ms. Nero explains:

> There have been a lot of secrets and things that aren't discussed in our family. Marc never once talked about Sonia and Ricky, just like I didn't tell about my parents. Also, my mother never talked about her mom, Pearl, and how she was murdered by her husband after she remarried. My sister knew because she was born and was around when it happened, but I didn't know about Pearl's death until I was 13 or 14 years old. Even after learning about it, no one in the family would speak about it.

[Shonda Nero Affidavit ¶ 9, Bates Nos. 117-123] Ms. Nero could have further explained how this environment—which Marc was part of—affected her:

> I got in trouble growing up. I fought all the time. I used to fight the girls that my boyfriend was cheating with; I didn't realize I should be upset with my boyfriend. I went to jail for fighting one time when I gave a girl two black eyes. I was 14 or 15 years old and the fight was over a guy. I was in jail for a couple of hours and then my dad picked me up. I thought he was going to be furious but he busted out laughing. I learned that when my dad was 16 he once broke a guy's nose.
>
> I also got two DWI's in my 20s. The second one was when I was 22 and I ended up having to serve 30 days in jail for it.
>
> I first got pregnant when I was 15. My mom took me to have an abortion at a medical facility in Charlotte. My mom wanted it to be a secret. This was on my 16th birthday. However, they told me they couldn't do it because I was too far along. Now I am thankful I had my daughter Alex and didn't get the abortion.
>
> After I had Alex, my boyfriend Silky and I had another baby named Shauna. We ended up putting her up for adoption. I met Shauna last year for the first time. It was great to meet her. She looks like Alex and she is about to get a tennis scholarship. I also have a third child.
>
> I was never faithful in my relationships but I have always been up front about that. I told the guys I was with when I cheated on them. In the same way that Silky cheated on me, I cheated with other guys. However, I have now been married eight years and I've been faithful.

[Shonda Nero Affidavit ¶¶ 15-19, Bates Nos. 117-123]

### f. Rapid Disintegration of the Family: Violence, Separation, Divorce, Partying, Paternity Tests, and Continued Chaos

Records show that although Rick and Sonia did not officially separate until June 29, 1984, the date they executed a separation agreement, their separation was planned at least 18 months prior to that. In fact, unbeknownst to resentencing counsel because they never sought the records in question, Rick had hired an attorney to draft a separation agreement that included a provision that he pay $250 per month in child support starting December 30, 1982. The initial plan was for Sonia, Marc, and Mario to remain at the Clanton Park home until both reached 18 years old. Rather than Sonia and the boys remaining in the house—which, under the circumstances, might have provided a semblance of stability—that plan was scrapped and Sonia, Marc, and Mario moved into an apartment on North Wendover Road in Charlotte. They remained there for a couple of years until they moved in with Tessie, Jeff, Regena and Shonda Nero on Farm Pond Lane in Charlotte.

Following the separation, Rick did not have a visitation schedule for Marc and Mario. While he testified in 2002 to have "left the door open," he rarely took steps to initiate contact with Marc and Mario after the first year of the separation. Indeed, Rick admits:

> I tried to make clear that although I offered to "keep the door open" for both boys, I had not personally done anything to foster a true relationship with either boy after leaving Charlotte.

[Derrick Barnette Affidavit ¶ 21, Bates Nos. 17-21]

With Rick gone, Sonia used cocaine and marijuana and would often leave Marc and Mario home alone when she went out, sometimes overnight. [Rowles Mitigation Report, Bates Nos. 232-259; Sonia Barnette Affidavit ¶ 52, Bates Nos. 34-48] Sonia was

43

also with a number of men after Rick. The first was Ollie "Al" McArthur, who Sonia dated around 1985 when she was 27 years old. Sonia describes him as a "hustler" who sold fake jewelry. Al persuaded Sonia to give him a couple thousand dollars, and he also got her to give him $600 to help him pay his child support. Al also convinced Sonia to buy a red Corvette. [Sonia Barnette Affidavit ¶ 48, Bates Nos. 34-48]

Sonia then dated Sam Walton, who was then-County Commissioner Bob Walton's brother. Sam was about 15 years older than Sonia and had a drinking and gambling problem. The next relationship was with a man named Tyrone. Sonia and Tyrone dated for a few months. Tyrone drove a taxi that Sonia helped him purchase. Sonia was later with a man named Mark Ragin, who owned a nightclub on Wilkinson Boulevard. This was when Sonia, Marc, and Mario were living with the Neros on Farm Pond Road.  [Sonia Barnette Affidavit ¶¶ 49-51, Bates Nos. 34-48]

Sonia's relationship with Mark Ragin ended on June 20, 1987, when he was shot to death.  Tessie Nero could have explained as follows:

> Another guy in Sonia's life was Mark Ragin. He had drug connections and was living the fast life. I was afraid for Sonia while she was with him. He was running a club called St. Mark's. I went there a couple times but I didn't know what was going on behind the scenes. Mark didn't have a 9-5 job but he had money. He had a black Corvette and also a Lexus. He was eventually shot and killed. Sonia was upset when he was killed. She had been spending a good deal of time with him.

[Tessie Nero Affidavit ¶ 24, Bates Nos. 124-128] Sonia confirms the impact of Ragin's death: "I was devastated when that happened. I think I was secretly in love with Mark." [Sonia Barnette Affidavit ¶ 51, Bates Nos. 34-48]

On March 9, 1987, approximately 18 months after the divorce was finalized, Rick formally sought paternity testing to determine whether he was, in fact, Marc and Mario's biological father. Rick says this was sought after Sonia, in early 1987, told him that he

was neither Marc nor Mario's biological father. Rick also recalls that Sonia would pester him for child support payments but then spend her money on herself (like when she bought a red Corvette that did not have a backseat). As Rick explains:

> I was paying child support to Sonia after we separated. Sonia would call me and demand the money. It would only be two days late but I wouldn't pay it on the right day. When I learned that she went out and bought a red Corvette, I was upset.
>
> When the money became an issue between me and Sonia, I decided to seek a blood test to find out if I was really Vicci's and Mario's father. This was in 1987. I was already suspicious that I wasn't the boys' biological father. When I was with the Air Force, I left for Okinawa, Japan on August 26, 1976. I remember the date because I missed my birthday -- August 27 -- by flying over the International Date Line. I was gone for six months before I came back for a visit. Mario was born the following July 1977, which means Sonia got pregnant while I was away in Okinawa. I brought it up a couple of times with Sonia and she always said, "No, he's yours." I came home from Japan and was present for Mario's birth. I took Sonia to the hospital for it. I had to call and get an extension on my leave from the Air Force. As for Vicci, I always thought Larry Wright was his biological father. Sonia was dating him around the time she became pregnant with Vicci. I believe Sonia told her mother that Larry was Vicci's father. Then Sonia's mother told my mother.

[Derrick Barnette Affidavit ¶¶ 14-15, Bates Nos. 17-21]

On June 15, 1987, as directed by a court order, Sonia, Marc, and Mario had blood drawn for paternity tests. On June 24, 1987, only four days after Mark Ragin was shot and killed, blood tests established that Rick was the not the biological father of either Marc or Mario.

Given the truth—that Larry Wright was Marc's biological father—and what others knew about Sonia's relationship with Rick, the paternity tests results perhaps should not have come as a surprise to other adults. As Shonda Nero explains: "Sonia could have gotten together with someone else besides Rick. She partied and she was a clubber." [Shonda Nero Affidavit ¶ 20, Bates Nos. 117-123]

Sandra Smith, who was never contacted by resentencing counsel, further explains:

> While still in high school school, Sonia started dating a guy named Larry. Everybody knew she was dating him. Then she got pregnant with Vicci. After Vicci was born, the family said that Vicci's dad was Ricky Barnette. There was something on the down low about the situation and it was never clear to me what the truth was – although Sonia always made it clear that Ricky was the biological father.
>
> After Vicci was born, I looked after him sometimes when he was a baby. I am a couple years older than Sonia and it was during my first year out of high school when I babysat Vicci. This was when Sonia was still in school. She was so young, which made raising a child difficult enough. But then when Pearl was killed, it brought all sorts of craziness and stress into the equation.
>
> I never knew until last year that a paternity test showed that Ricky was not Vicci's biological father. It surprised me to hear this since Sonia and the family were always adamant that Ricky was the father, even though other people had questions.

[Smith Affidavit ¶¶ 8-10, Bates Nos. 135-136]

Ms. Smith's point—that "Sonia and the family were always adamant that Ricky was the father, even though other people had questions"—was highly significant and yet totally missed by resentencing counsel. As Dr. Dudley notes, "the blood test results [came] out of nowhere, which made [Marc] feel like he was 'thrown overboard.'" [Dudley Report ¶ 22, Bates Nos. 209-231] Adding to the shock that Rick was not his "real" father was how Sonia responded in the face of a blood test: denial. Indeed, Sonia, then and now, says she does not believe the results:

> As part of the divorce, Rick had us do a paternity test for Vicci and Mario. At first he just wanted to question whether he was Mario's father, but then the test results came back and indicated that neither Vicci nor Mario were his. However, I still don't believe the test results. At the time of the test Rick was involved with his current wife, Marcela, and I always thought he should question Marcella about the results; I feel she had something to do with rigging the test.

[Sonia Barnette Affidavit ¶ 46, Bates Nos. 34-48]

Dr. Burgess, who was not made aware of this issue prior to the 2002 resentencing, confirms its significance:

> Information concerning Mr. Barnette biological father that was not previously shared with me is also quite significant. While I was previously made aware of the fact that Derrick Barnette denied paternity of both Marc and Mario, I was never provided information concerning Sonia Barnette's troubled and troubling response to that fact – which was complete denial. In the face of a paternity test and actual knowledge that another man was Marc's father, Sonia Barnette continued to tell her sons and others that Derrick Barnette was, in fact, the father. Sonia Barnette's handling of the situation – perpetuating known lies to her children and thereby creating an irreconcilable conflict with what Derrick Barnette was saying – caused deep confusion and distrust on multiple levels. The lies concerning Marc's biological father's identity played an important role in the family dynamic. Far more potent than simply breeding "suspicion" and "grief," it fostered incompatible set of "truths" that were dangerously destabilizing for Mr. Barnette. Indeed, it forced Mr. Barnette to navigate an almost unnavigable path between the two people he believed to be his parents and caretakers.

[Burgess Affidavit ¶ 19, Bates Nos. 51-55]

As Mario Barnette could have testified, debilitating family secrets were not unusual:

> The identity of our father has been a family secret. However, there have been a number of other family secrets too. Aunt Sheila informed her son Armaud who his father was but she told him that his father had run off and didn't want anything to do with him. But the truth was that Armaud's biological father and Armaud's father's brothers were trying to find him. Sonia and Aunt Sheila have been very secretive. They won't tell you anything. All of these secrets have been harmful.

[Mario Barnette Affidavit ¶ 32, Bates Nos. 22-33]

In the wake of the divorce and paternity testing, Sonia's difficulties increased significantly. As Mario could have explained:

> After our parents separated, we moved a lot. We went from Clanton Park to Windsong Drive to Wendover Road to Farm Pond Lane to Atlanta, Georgia. We lived several places in Atlanta before moving back to Charlotte. The worst times were when we lived at Windsong and Wendover. Financially and mentally they were the worst for mom. This was when she had her crazy period and she lost her way. She was depressed.

> Our house at Windsong was terrible. There was never any food in the kitchen and there was always a lot of trash.
>
> My mom's friends, Tina and Harlene and Jackie, would go out with her. No babysitters looked after us when mom was out. Vicci was around 13 years old then. He would come home and ask if there was anything to eat. He would make TV dinners for us if we had any and then he would stay around until mom came home. Then he'd be back out that door. He was out drinking with friends. He was trying to find a family with the girls he was with.
>
> One of Sonia's boyfriends was a guy who drove a nice car and was sleazy. He was in and out. He would pop up and then disappear again. He once came back from somewhere and showed us his black case of fake gold. When he disappeared, I assumed he was out on his next hustle.
>
> These were bad times because Sonia was recently divorced and she was out all the time. We also did not see Derrick very much. When we would see him, which wasn't often, Derrick was usually there to beat Vicci with a belt. Because this was the only time we were seeing Derrick it made our relationship with him even more strained than it had been after we learned he was not our biological father. This was especially true for Vicci.

[Mario Barnette Affidavit ¶¶ 33-37, Bates Nos. 22-33]

Soon thereafter, Rick moved from Charlotte to Philadelphia. He later moved to Maryland in 1990. While the government presented a picture to the jury in 2002 that Rick had "remained a central part of Vicci's and Mario's lives," the reality was that once Rick left Charlotte, he "essentially dropped out of Marc's world." [Derrick Barnette Affidavit ¶ 22, Bates Nos. 17-21]

In 1987, around the time of the paternity testing and Mark Ragin's death, Sonia experienced difficulties at her job. She was repeatedly warned and counseled about tardiness, absenteeism, and telephone abuse (making personal calls). She was fired in November 1987. Her employment records indicate that she "cannot be relied upon," "shows no interest in attendance obligations, even with constant reminders from supervisor," and "can never be relied upon to be at work." [Sonia Barnette: Employment

Records, Bates Nos. 4246-4333] Mr. Barnette's resentencing jury heard none of this information.

When Sonia lost her job, she, Marc and Mario were living at 8816 Softwind Drive in Charlotte in a residence that they rented from Do'Lores Guy, an old friend. Ms. Guy could have testified in 2002 about the difficulties that Sonia was experiencing. "Sonia was getting depressed at that time. She was crying then too. I suggested she go see a counselor. However, when I asked her about it, she didn't answer. … I remember talking to Sonia on the phone and she would have crying spells. She was depressed." [Guy Affidavit ¶ 23, Bates Nos. 81-84] Despite being a lifelong friend of the family's, Ms. Guy evicted them from the Softwind Drive residence because Sonia was not paying rent. "The house was a mess. Sonia was always crying. I would try to tell her to get things straight and she'd start that crying. I really hate that I had to put them out but the house was taking a beating and Sonia wasn't paying rent." [Guy Affidavit ¶¶ 24-25, Bates Nos. 81-84] Mr. Barnette's resentencing jury heard none of this information.

As Sonia admits:

> I have used drugs before. I used them most heavily in the period of time before we moved to Atlanta. The most was probably with my friend Tina when we were living off Wendover Road. Tina was an avid weed smoker. Then when we lived at the place on Soft Wind my friends would come over and we would use drugs together then too. Vicci would bring up my drug use when he and I would argue. It upset him.

[Sonia Barnette Affidavit ¶ 52, Bates Nos. 34-48]

In the fall of 1987, Marc began the ninth grade at Smith Junior High School. Soon his life was again disrupted when Sonia told him that they were moving to Georgia. Marc initially protested; in response, Sonia told Marc that he could stay in North Carolina, a highly impractical option for a ninth grader. [Dudley Report ¶ 25, Bates Nos. 209-231]

49

**g. Relocation to Georgia: Chaos and Drug Use Continue, and Marc's First Relationship Leaves Permanent Scars**

Following the move to Georgia, chaos continued to reign in Marc's home life. Initially, Sonia, Marc, and Mario stayed with Sonia's younger sister, Sheila Cooper, in an apartment in Norcross, Georgia. Sheila was then living with her boyfriend, Michael O'Neal (who was married to another woman at the time), and her son, Armaud. Sheila was unstable and, like and with Sonia, used drugs and partied. [Tolbert Affidavit ¶ 19, Bates Nos. 200-206; Ann Austin Affidavit ¶ 10-11, Bates Nos. 6-8; Robert Cooper ¶ 16, Bates Nos. 64-66] Marc, Mario, and Armaud had little supervision or parenting by the adults in the family while they were all living together in Georgia. Sheila and Sonia went out regularly, often not returning until the morning. Michael O'Neal drank, as did Sonia, and they would argue constantly. Michael, Sheila, and Sonia all also used cocaine. As Mario could have explained in 2002:

> My mom, Vicci, and I moved to Georgia before my 6th grade year in school. We moved in with my Aunt Sheila, Uncle Michael, and my cousin, Armaud. At first we lived with them in an apartment, but we soon moved with them into their house in Lithonia, Georgia. Things were chaotic there. The adults would party and use drugs. Uncle Michael drove a canary yellow Corvette with a T-top roof, but he was never home. All of the adults in the family were always going out, leaving us alone at the house. If I overslept in the morning there was very little chance that any adult would wake me up and make sure I made it to school.

> At some point while we were living there Aunt Sheila gave birth to her daughter, Michaela. Sheila barely took care of Michaela. There were many nights when Armaud and Vicci and I would hear Michaela crying and crying in her crib. The crying would get so bad that we would go check on Michaela. We would find that all of the adults were gone and would have to take care of Michaela and soothe her. Sheila and the others would often come home at 3:00 a.m. or close to dawn and we would hear them come in because we were just getting back to bed ourselves from taking care of Michaela.

> Armaud once found drugs under the master bathroom cabinet. He is four years younger than me and he was only around seven years old at that time. The drugs

50

were in plastic bags about the size of a magazine and Armaud thought they were pillows. Vicci and I told Armaud to get away from the drugs.

There were lots of signs that the adults were involved in drug dealing. Sometimes rundown, suspicious looking guys would show up at our house and not stay very long. Another time a U-Haul truck came to our house but nobody was moving anywhere. Our household also seemed to go from extreme highs to extreme lows. At times the adults would be in party and celebration mode, and at other times I understood that we were dead broke, despite the fact that Michael still had his job at General Motors.

A white woman once showed up at our house and it caused a commotion between her and Aunt Sheila. I believe Aunt Sheila got out a gun while the lady was there. I think it was early on a Saturday or Sunday morning when the lady showed up and I woke up to hear her and Sheila yelling at each other. Armaud and I were told to stay in our room. I later learned in bits and pieces that this was Michael's wife and that he had a whole other life with a house and family.

[Mario Barnette Affidavit ¶¶ 39-43, Bates Nos. 22-33]

Armaud Cooper describes similar scenes of chaos, drug use, and violence. Resentencing counsel's failure to conduct a thorough investigation, however, prevented them from eliciting this readily available information from Mr. Cooper when he testified in 2002.

Vicci's lawyer asked me [during the 2002 resentencing] if I noticed "any alcohol or drug consumption." While my answer was true – that I noticed alcohol consumption and was suspicious about drug consumption – it was not complete or very descriptive. I wasn't sure whether it was okay to say more about what had been going on in the house at the time. I did not know whether the lawyers had told other people in the family that we would be getting into some of this family history, which was pretty raw and painful.

For example, my mom was with Michael O'Neal when we all lived together in Lithonia. Michael was a drug dealer. He also had a job at General Motors. Since I was only about 6 or 7 years old when Vicci and his family moved in, it shouldn't be surprising that I didn't notice much "drug consumption." But I certainly could have testified [during the 2002 resentencing] about the fact that drug dealing with was going on in the house and that cocaine was stored in the closet of my room.

As another example, Vicci's lawyer asked me [during the 2002 resentencing] whether Vicci, Mario and I ever talked about "what was going on with the adults" in the household. I responded by saying that Vicci basically tried to make sure

51

"that a lot of stuff went unseen in terms of what [Mario and I] saw." Vicci's lawyers never asked, and I didn't know to offer information, about what that "stuff" was that Vicci was trying to shield us from. One time Michael's ex-wife, Joyce, came to our door with a gun. This woman was acting crazy and I remember Marc pushing me and Mario into a closet. I heard the adults shouting at each other and I heard my mom yell that Joyce had a gun. The police came to the house and there was a lot of commotion. I later learned that Joyce was threatening to kill either Michael, my mother, or both of them.

[Armaud Cooper Affidavit ¶¶ 9-11, Bates Nos. 56-61]

Marc's cousin Shonda Nero could have testified:

When we were little Sheila was the first one to go live in Atlanta. We all thought she was doing well. However, Sheila's boyfriend, Michael O'Neal, was a coke addict and a dealer. He got Sheila turned on to drugs. I remember that Sheila had a yellow Corvette. It was duck yellow with a white rag top. She also had a Nissan Maxima and an SUV. Sonia and Sheila were doing cocaine together and partying to the point where the kids were left to fend for themselves. When I found out that Sheila and Sonia did cocaine I lost all respect for them and disassociated from them. I felt they had been fakes.

[Shonda Nero Affidavit ¶ 30, Bates Nos. 117-123]

Previously abandoned by the man he had believed to be his father, Marc was now

abandoned by his mother, too.

Marc's mama was some kind of drunk or partier because he stayed overnight at our house a lot and nobody came looking for him. Marc's mom was not very concerned about him. She was a bad mother. His mother wasn't providing for him.

[Heard Affidavit ¶ 10, Bates Nos. 85-88]

Throughout this period of time, much responsibility was placed on young Marc's

shoulders. His aunt Sheila Cooper recalls:

We put a lot of trust in Vicci. We often left him to take care of the younger kids. He was very responsible. I never knew him to break the house rules. If you asked him to pick up a list of things at the grocery store he'd do it and get everything you asked for. Vicci was not a typical teen. He wasn't flippant. He could be trusted. Vicci would apologize if he thought he had hurt your feelings. One time he and Sonia got into a bad argument and he apologized to her. He would

52

apologize and cry so hard. It would hurt him to the core if he knew he'd hurt someone.

[Sheila Cooper Affidavit ¶ 42, Bates Nos. 67-75]

It was during this confusion and chaotic time following Marc's move to Georgia when he started dating a fellow student named Sheila Sullivan. As Mario Barnette could have explained:

> We first moved to Georgia over the summer and in the fall Vicci and I started school. I was in the 6th grade and he was in the 10th. Then Vicci started seeing Sheila Sullivan. Prior to moving to Georgia, he'd had a crush on Ayana. He really liked her. I think the relationship with Ayana ended because of our move to Georgia.
>
> Vicci was excited about Sheila Sullivan. I remember him talking to his buddies about it. We rode by her house one time. I saw a photo of her and I thought she was cute. Aunt Sheila thought she was cute too.

[Mario Barnette Affidavit ¶¶ 44-45, Bates Nos. 22-33]

This budding and positive relationship subsequently turned ugly, however, when Marc was assaulted. His excitement turned to depression and serious injury—physically and psychologically. As Mario Barnette could have explained:

> Vicci got jumped and beaten up bad one time when we were living in Lithonia, Georgia. It had something to do with Sheila Sullivan. The guy who did it was a little older than Vicci. Vicci was hurt and upset about it. After this Vicci said that nobody was going to catch him off guard again.

[Mario Barnette Affidavit ¶ 46, Bates Nos. 22-33] Melvin Bryant could have described how he and David Walker assaulted Mr. Barnette when they were teenagers attending Lithonia High School. Mr. Bryant could have described how he and Mr. Walker punched and kicked Mr. Barnette without warning; how Mr. Walker was a boxer and "very tough"; how Mr. Barnette suffered physical injuries as a result of the assault; how both Mr. Bryan and Mr. Walker were charged as juveniles; and how the incident was about Sheila Sullivan. [Bryant Affidavit ¶¶ 5-8, Bates Nos. 49-50]

53

Sheila Sullivan could have described that Marc was "beat up so bad. His eye was black, his face swollen, and his lip cut." Marc was taken to the hospital for x-rays and treatment for his injuries. [Rowles Mitigation Report, Bates Nos. 232-259]

After the assault, Sheila cheated on Marc with David Walker, the same boy that had assaulted Marc. According to Sheila, she cheated on him "real bad." Prior to cheating on Marc, Sheila had written another friend to say that she was attracted to David Walker. After Sheila had sex with Walker, Marc was given the letter that Sheila had written. Sheila remembers Marc being very upset. [Rowles Mitigation Report, Bates Nos. 232-259]

Marc and Sheila broke up after he learned that she cheated on him. After the breakup, Marc attempted suicide by ingesting pills. Emergency responders were able to get Marc to throw up and he was not taken to the hospital. At a later point in the school year, Marc and Sheila started seeing each other again. Soon thereafter, Sheila learned that she was pregnant. Sheila says that Marc was supportive of her and wanted to help. Sheila's mother, however, found out and Sheila had an abortion. Marc and Sheila's relationship ended towards the end of the school year (Marc's tenth grade year). Sheila was later raped by David Walker, who then committed suicide two or three weeks after they went to court on the rape charge. [Rowles Mitigation Report, Bates Nos. 232-259]

The relationship with Sheila Sullivan—which the resentencing jury knew nothing about—was significant on multiple levels. As Dr. Burgess explains:

> … Mr. Barnette's relationship with Sheila Sullivan and Mr. Barnette's move to Georgia during high school were both far more complicated and significant than what trial counsel's information had suggested. In stark contrast to information I was previously given, Mr. Barnette had been faithful during the relationship with Ms. Sullivan (while she was not); Mr. Barnette had been a supportive companion during times of stress and crises (including when Ms. Sullivan became pregnant

54

and later terminated the pregnancy); and Mr. Barnette had not been abusive toward Ms. Sullivan or controlling. Moreover, Mr. Barnette was the victim of a brutal assault carried out by another teenager with whom Ms. Sullivan later cheated on Mr. Barnette. This led Mr. Barnette into a serious depression and an attempted suicide. Witnesses describe Mr. Barnette as being profoundly affected by this relationship with Ms. Sullivan.

This information belies the information that had been previously provided to me by trial counsel on many important fronts. For example, it was previously suggested to me that Mr. Barnette's suicide attempt around this time had been minor or insignificant; in reliance on this information from trial counsel, I wrote in my report that Mr. Barnette made "suicidal gesture" (rather than a clear attempt to kill himself). The new information makes clear that Mr. Barnette was, in fact, deeply depressed and affected by the developments in his relationship with Ms. Sullivan, and that those developments, along with his mood disorder, led him to attempt suicide.

[Burgess Affidavit ¶¶ 13-14, Bates Nos. 51-55]

According to Mario Barnette:

The Sheila Sullivan breakup affected Vicci real bad. It was a real heartbreak. He took it hard. It was the first of a pattern where he would have a breakup and then spiral downwards. After the relationship with Sheila ended, his buddies tried to pull him out of it and pick him up, but he said no. He wanted to be by himself in the bedroom. Since we shared a bedroom with him, Armaud and I had to go to the living room so he could sit in there with the lights off. Vicci's buddies eventually were able to get him out. But when he came back in he'd fall back into that hole. That pattern lasted for months.

[Mario Barnette Affidavit ¶ 49, Bates Nos. 22-33] As Mario emphasizes: "Vicci's relationship with Sheila was a turning point. His actions became over the top after that. Vicci had some girlfriends before Sheila but they were not a big deal. It never got to a point of dejection for Vicci." [Mario Barnette Affidavit ¶ 69, Bates Nos. 22-33] Again, resentencing counsel learned none of this evidence.

55

### h. Relationship with Tasha, Bouts of Sadness and Crying, and A Home with No Food and No Bed

Family members confirm that Marc's relationship with Sheila Sullivan was a turning point, and that Marc began acting differently afterward. Around the spring of 1989, near the end of Marc's tenth grade year, Sonia, Marc, and Mario moved into an apartment at The Crossings in Lithonia. The apartment did not have beds for Marc and Mario, and the refrigerator only contained nail polish. Sonia was still using both cocaine and marijuana. [Rowles Mitigation Report, Bates Nos. 232-259]

Marc began dating Natasha "Tasha" Heard during the summer between tenth and eleventh grades. Kesha Heard could have described how she was surprised when she learned that Marc and her sister were dating, since "Marc was quiet and relatively popular. Tasha was loud – she does not have a filter for the things she says – and wasn't really popular at all." [Heard Affidavit ¶ 5, Bates Nos. 85-88] Ms. Heard could have described how unassuming and mellow Marc was when he and Tasha began dating:

> Marc was artistic and liked different music. He was not popular. Even in school he was by himself. He never had an entourage. He was not very smart. He was not a reader and not an academic. He did not write well. His sentences were not as they should have been.
>
> Marc is low energy. He is real mellow, kicked back, and unassuming. You'd expect to see him in a park drawing. He was often in his own world.
>
> I've never seen him show any emotion except when holding my niece, which he loved to do.

[Heard Affidavit ¶¶ 6-8, Bates Nos. 85-88]

Tasha, who was far more intimate with Marc, describes how Marc's moods would fluctuate.

> At times Marc would get teary-eyed and other times he would outright bawl. He was up and down. His mood would change over the course of hours or a day.

[Tolbert Affidavit ¶ 32, Bates Nos. 200-206]

Tasha elaborates:

> There were times when I found Marc naked and crying in the closet. When my mom was home and active around the apartment, the safest place for Marc to hide out was in the closet. When I'd open the closet door he'd be crying. It was a walk-in closet. Marc would be sitting on the floor with his knees up to his chest. I don't remember what would lead Marc into those situations and I don't know why he was naked because I never asked him. Sometimes I would go in there and sit with him. Sometimes I cried with him. I would try to get his mind on something else. I might suggest things for us to do. It would be a few hours before he felt better. Marc did this a lot of times. It happened every now and then. I once tried to tell Sonia that something was terribly wrong with Marc but she responded that something was terribly wrong with me.

[Tolbert Affidavit ¶ 22, Bates Nos. 200-206]

> The neglect and abandonment by Sonia was clear to Tasha:

> As a teen, Marc and his brother, Mario, didn't have adequate stuff. I used to go over to Marc's apartment at The Crossings every day. I would just walk in. There was a couch in the living room and a TV, but Marc and Mario didn't have adequate clothes and there wasn't enough food in the house. There was one bottle of wine in the fridge. There was no food, no butter, no condiments, and no ketchup. Marc and Mario shared a bedroom but they didn't have beds. They just slept on the carpet and had a blanket. Sonia's room, however, was totally different from the rest of the house. I couldn't believe it when I first went into her room. There were silk sheets on a plush bed, heels, lots of clothes, and jewelry.

> I used to give Marc food from my mom. I would sneak him this food. He would take it but he would also save some for Mario. Sonia was always working or gone. Even though my mama didn't protect me the way she should have, I still had clothes, a bed, and food. One time I stole my parents' credit card and used it to buy clothes for Marc.

[Tolbert Affidavit ¶¶ 20-21, Bates Nos. 200-206]

Kesha Heard could have described how Marc was assaulted by her boyfriend, Keith Furlow, after Marc tried to prevent Mr. Furlow from hurting Tasha, who was pregnant.

> We got into an argument and Keith ended up assaulting Tasha and Marc. Keith was three times the size of Marc. Keith had an extremely violent nature. Keith initially made a move to hit Tasha. Then Marc stepped in and Keith hit him in the nose. There was blood everywhere. Keith also punched Tasha in the eye. She was pregnant at the time but only Marc and Tasha knew that. Her eye was badly injured. It was swollen. Marc ended up calling the police and they came. Keith left the apartment before the police got there but I think they went to arrest him. They brought an ambulance to treat both Marc and Tasha. After mom got home they transferred Tasha to the hospital. Mom ended up taking Tasha to be seen by a specialist.

[Heard Affidavit ¶ 12, Bates Nos. 85-88] The Furlow assault was a particularly significant event because after Tasha received medical attention, her mother learned that she was pregnant. [Heard Affidavit ¶ 14, Bates Nos. 85-88]

### i. Becoming a Teenage Parent, Twice

Marc's excitement over becoming a parent—albeit a very young one—was pronounced. As Tasha explains:

> When I was pregnant Marc and I bought baby books and talked about baby names. Also, Marc found a job after I got pregnant with Angelica. Then, from his earnings, he got enough money to buy a crib. Marc took the bus with me to my prenatal doctor visits until my mom stopped letting him. Marc was excited about the baby. He was there at the hospital with me when I gave birth to Angelica.

> Marc talked all the time about getting married. One time he bent down on one knee and proposed to me. I said yes. I was sitting on the edge of the bed and Angelica was born and her crib was there. But we were too young. My mom would never go for that. We often talked about plans and our future. He meant it when we talked about these things.

[Tolbert Affidavit ¶¶ 24-25, Bates Nos. 200-206]

58

Tasha's best friend, Anitra Lyles, could have described a similar picture:

After Marc and Tasha had been dating for a while, Tasha became pregnant with her daughter, Angelica. Marc was excited about being a father. He did well to prepare for Angelica. He was at the hospital when she was born and he was very excited about being a father. I remember Marc holding, hugging, and kissing Angelica when she was little.

[Anitra Lyles Affidavit ¶ 8, Bates Nos. 104-105]

Kesha Heard confirms Marc's excitement about and love for his daughter:

Marc went with Tasha to every doctor's visit; every single one. A lot of boys run off in that situation, but not Marc. However, at the end of Tasha's pregnancy, our mother started excluding Marc from the prenatal visits. Tasha even asked if Marc could go and mom said no. Marc was always respectful of my mother even though she didn't treat him well. Our mom would not let Angelica's last name be Barnette. Marc was upset by this but he didn't challenge her or disrespect her about it.

The best light I've ever seen Marc in was when Angelica was born. He wouldn't leave my sister's side the entire time they were at the hospital. He slept in a chair by her side. When the chair got uncomfortable he slept on the floor. Tasha was in the hospital for about three days. After she was born Marc sat there looking at Angelica as though he couldn't believe she was there - like he'd won a million dollars. He just wanted to hold her. I didn't think he was going to give her up and let me hold her.

[Heard Affidavit ¶¶ 15-16, Bates Nos. 85-88]

After Angelica was born, Tasha's mother sent her to live with her grandmother. Tasha then became pregnant again and gave birth to Aquilia Marcivicci Heard on New Year's Eve of 1991. A few months after the birth of their son, Marc and Tasha moved in together in Newnan. Their apartment was at 86 East Berry Avenue. Marc, then 18 years old, signed the lease because Tasha was not old enough to do so. Soon after moving to Newnan, Marc got a job working at Arby's. [Rowles Mitigation Report, Bates Nos. 232-259]

Kesha recalls that Marc changed after he and Tasha had children and started living together:

> I went to college in Carrollton, Georgia. During college I moved to Newnan, Georgia and got a full time job. Then my sister and Marc moved there, too. That's when I really noticed changes in Marc. He and my sister began to fight a lot. There was a lot of strain taking care of the place and the kids. I would go over to their place in Newnan a lot, especially to see their second child, Marc Jr.
>
> Tasha and Marc were under a lot of pressure taking care of the kids. I know they were having a hard time paying for food, the lights, and clothing for the kids. I know Tasha wasn't working. We got a disability check from our father's veteran status, which Tasha and Marc were relying heavily on.
>
> I never saw any bruises or marks on Tasha. If I had I would have confronted Marc. Tasha told me that Marc was jealous and controlling. She said he didn't want her to go anywhere or do anything. She complained about it but I never saw anything. I didn't get into it. I didn't hear about this until a while after Marc and Tasha had moved to Newnan.

[Heard Affidavit ¶¶ 17-19, Bates Nos. 85-88]

Neither Marc nor Tasha was in school at the time, Marc was working at a fast food restaurant, and they were having a hard time paying for food, the lights, and clothing for the kids. As Tasha recalls:

> After our second child was born, Marc and I ended up moving to Newnan, Georgia with our two kids. Marc actually signed the lease for our apartment because I wasn't old enough. I was 17 at the time and Marc was 18. Our apartment was on Berry Avenue. I lived there until Marc made me leave. When he came down here to Newnan his whole spirit changed. He acted bizarre.
>
> Marc had two personalities. One personality was cool and sweet. The other personality would want to fight me and would do stupid stuff. I was always strung out around Marc. My heart rate was always up because I was both excited and on edge. Marc was very impulsive. He could make a decision and it wouldn't make any sense. He was very high strung.  He acted psychotic.
>
> There were times when I would instigate things with him but this would not lead him to be psychotic angry. When Marc was psychotic he would not reason. You don't even know if he's hearing what you have to say. It's like he's not even there. He will look at you but he's not there.

When Marc was the other personality he would forget things he'd done or said. It was like he was in a trance. He didn't talk he just acted. Usually when people are fighting it's all talking and arguing, but not with Marc. When he got in this state it was fighting without talking.

With the crazy Marc it felt like there was witchcraft on him and there was some kind of psychosis. I really didn't know what was wrong with him. He was just ill.

[Tolbert Affidavit ¶¶ 26-30, Bates Nos. 200-206]

While the evidence at resentencing incorrectly suggested that the stress and tension between Marc and Tasha, from her pregnancy onward, was driven solely by Marc's behavior, Ms. Lyles could have provided significant context:

Tasha's mother was very strict and she didn't like Marc. Marc would try to catch the bus to go to the doctor's office with Tasha for her prenatal visits, but Tasha's mom stepped in and did not allow him to go to the appointments with her. And after Angelica was born, Tasha's mother didn't want Marc to see his baby daughter. Tasha's mother interfered a lot and that's part of the reason Tasha and Marc and their kids moved down to Newnan, Georgia. I have seen Marc sad and upset over what Tasha's mother was doing. There was a lot of stress to being a young parent. If Marc and Tasha had gotten more support from her mother, things might have gone better for them.

Tasha became pregnant before I did, but I was only 9 months behind her. She and I both became teenage mothers. I became a mother at age 16. After they had Angelica, Marc and Tasha had second child named Marc Jr. Tasha's mother showed favoritism towards Angelica because Marc Jr. looked just like Marc.

[Lyles Affidavit ¶¶ 9-10, Bates Nos. 104-105]  Ms. Lyles could have also described how, when arguments and fights occurred, both parties were responsible.

Marc and Tasha started arguing and fighting a lot in their relationship. They were like gasoline and fire together. They were both physical with each other. Tasha was not passive in these fights. She would hit, punch, and slap Marc when they were fighting.

[Lyles Affidavit ¶ 6, Bates Nos. 104-105] Tasha would confirm: "I fought too. It was normal to me. All of our fighting was always around trust, jealousy, and who I was talking to." [Tolbert Affidavit ¶ 11, Bates Nos. 200-206]  As Tasha further explains:

Marc once pushed me down when I was pregnant. We were coming from the mall and Marc was talking to another girl on the bus. When we got off the bus I slapped him. Then he shoved me to the ground. Then we fought and walked.

Marc and I once got into a fight where I scratched him. This happened in the living room at Marc's mom's place. He hit me and I was so mad I scratched him leaving bright red marks on him. These scratch marks stayed on him for several months. It seemed like they stayed there forever but they eventually faded and turned darker. We had sex after the fight. I was in pity mode, trying to makeup. It was like that a lot.

Another time I bit Marc in the chest. This also left a mark. He and I would rumble. I would slap him, hit him with my fist, kick him, and shove him.

[Tolbert Affidavit ¶¶ 13-15, Bates Nos. 200-206]

### j. 18 Years Old and Overwhelmed by Relationships and Emotions

Crystal Dennis, who testified as a government witness in both the 1998 penalty phase and 2002 resentencing, was never approached by resentencing counsel prior to the second trial. Although Ms. Dennis testified about a number of seemingly aggravating facts concerning Mr. Barnette, competent counsel could have elicited, developed, and presented meaningful mitigation evidence, as well as evidence to rebut the prosecution's contentions.

Ms. Dennis recalls meeting Marc through Anthony Britt. Ms. Dennis could have described how her brother, Anthony Britt, introduced them in an effort to "distract" Marc from Tasha, and how when she and Marc "started spending time together … we weren't physical or intimate; we were just hanging out." [Dennis Affidavit ¶ 3, Bates Nos. 76-80] Victor Montgomery, who was never contacted by resentencing counsel, could have testified about how Britt was his best friend, and how Britt, who also went by "Ant" (for Anthony), "wanted to get together with Tasha, so he set Marc up to be with his sister, Crystal Dennis." [Montgomery Affidavit ¶ 6, Bates Nos. 111-112]

The dynamic that Britt created led to a serious altercation between him and Marc. Ms. Dennis could have described how Britt was "threatening to beat up Marc and tried to jump him one night." [Dennis Affidavit ¶ 4, Bates Nos. 76-80] Victor Montgomery, Britt's best friend, could have testified about what happened:

> We saw Marc walking home to Tasha's apartment. Ant saw him and said he was going to go and straighten Marc out. Ant also said, "I'm going to get his ass." I tried to talk him out of it. I encouraged him to leave Marc alone but Ant and some other guys took off after Marc. I stayed behind at first but then I walked up towards them.
>
> Marc was a little guy, not a big dude, and he was still new in town. Ant had five or six guys with him. They surrounded him. I saw all of this from a distance as I walked towards them. Marc and Ant had words. Ant was threatening to beat up Marc. Marc pulled out a gun and fired two to three shots. Ant was shot one time in his arm.
>
> To me, Marc was in the right. Ant and the other guys would have beaten Marc up, and Marc was going to get hurt. I would have done the same thing as Marc in that situation.

[Montgomery Affidavit ¶¶ 7-9, Bates Nos. 111-112]

Ms. Dennis could have explained how when Marc was locked up for the shooting, Mr. Britt "was spending nights over there with Tasha," and how "[b]y the time Marc got out of jail, things were basically over between them." [Dennis Affidavit ¶ 7, Bates Nos. 76-80] Ms. Dennis then moved in with Marc.

Ms. Dennis could have described how the "first three to six months with Marc were great," how he would cook for her, had lots of energy, played with her children, and "was always helping people." Indeed, Ms. Dennis described, she felt that she "was in dreamland." She could have also described how Marc did not have close friends in Newnan, where they lived, and did not talk much about his childhood or his father (who,

63

as far as Ms. Dennis knew, "was out of the picture"). [Dennis Affidavit ¶¶ 8-9, 11-12, 17, Bates Nos. 76-80]

Ms. Dennis could have described how Mr. Barnette's mood and behavior shifted significantly about three to six months into their relationship, how "[a]ll of a sudden he just changed…. He went completely mad. He was crazy." For example, Marc would demand that Crystal keep the door open when she was using the bathroom. Once, when Crystal had the door closed, Marc kicked open the door so he could see her using the bathroom. Marc also demanded that Crystal not work, apparently because he did not want her to be around other men. As a result of his demand, Marc took a second job—working at both Arby's and Blockbuster—in order for them to make enough money. After Marc's behavior changed, Crystal stopped wanting to have sex with him. Marc did not try to force or coerce Crystal into having sex. [Dennis Affidavit ¶¶ 16, 18, 20, 23, Bates Nos. 76-80]

While working at Arby's, Marc began a relationship with his co-worker/supervisor, a woman named Kowana Dozier. Kowana recalls that "Marc used to talk about death all the time," leading her to believe that he was suicidal. Marc would ask, "Why am I here? What is my purpose?" Marc would also cry in front of Kowana, which was the first time she had seen a grown man cry. Marc would sometimes cry at work in the back office and sometimes when they were other places. When Marc would cry, which was often, he would sob. Kowana was worried about him: "He was out of control. He was unstable emotionally." Kowana was aware of Marc's situation with both Tasha and Crystal, and the enormous stress he felt. She did not understand why Marc's

mother did not come get him and try to help him out. [Rowles Mitigation Report, Bates Nos. 232-259]

Kowana and Marc used to talk about their lives and what they wanted. Kowana says, "He wanted someone to love him." According to Kowana, Marc wanted a family, kids, and a white picket fence; he was intense and "he loved hard." When Marc moved back to North Carolina in 1993, he and Kowana lost touch. [Rowles Mitigation Report, Bates Nos. 232-259]

A profound consequence of this undeveloped are of resentencing counsel's investigation was that the jury had a wholly inaccurate and misleading understanding of Mr. Barnette's intimate relationships. Disturbingly, resentencing counsel themselves drove much of this misinformation to jury. For example, during the direct examination of Dr. Burgess, resentencing counsel ask the defense expert whether she had "an opinion … as to what Marc's purpose has been consistently in terms of going after his girlfriends?" Dr. Burgess' response, based on inaccurate and incomplete information provided by resentencing counsel, endorsed the premise of the question—that Mr. Barnette would "go after" all of his girlfriends—and testified that is occurred "with each successive girlfriend." [Tr. 2002 3512] Dr. Park Dietz, who testified for the government in rebuttal in 2002, opined that Mr. Barnette's psychological makeup included "a tendency to exploit other people in his relationships with them." [Tr. 2002 at 3800] The truth, however, is far different.

Kowana Dozier, whose relationship with Mr. Barnette is described above, could have explained that "Marc was never violent, possessive, jealous, or aggressive with her." [Rowles Mitigation Report, Bates Nos. 232-259] Temeka Lee (formerly Temeka Hunter)

65

could have described an intimate relationship with Mr. Barnette where "[t]here was never any fighting or jealousy … and he never acted possessively towards me." Ms. Lee could have explained that she and Mr. Barnette "never argued. He was always respectful. We never got into fights and he never put his hands on me." [Lee Affidavit ¶ 7, Bates Nos. 102-103] Danielle Mathis, who was never contacted by resentencing counsel, could have testified about her relationship with Mr. Barnette, which although platonic, demonstrated his ability to engage in healthy relationships with women. [Mathis Affidavit ¶ 6, Bates Nos. 109-110] Eric Cooper, who was spoken to briefly Jan Barefoot prior to the 2002 resentencing but never followed up with or asked to testify, could have described how Mr. Barnette had a girlfriend named Ayana Brewer, and how he "never saw any problems between Marc and Ayana." [Eric Cooper Affidavit ¶ 9, Bates Nos. 62-63]

Dr. Burgess makes clear how resentencing counsel's failures to develop and provide this readily available information was prejudicial:

> This information, along with information concerning relationships with Tameka Hunter [sic] and Kowana Dozier, also dramatically undercuts the notion that Mr. Barnette was somehow a "classic batterer" whose relationships always followed the same pattern, including "obsessive pursuit." As was the case with [Sheila] Sullivan, Mr. Barnette's relationships with Ms. Hunter and Ms. Dozier did not include violence or misplaced jealousy or the other elements of domestic violence or obsessive pursuit.

> The new information provided by post-conviction counsel concerning Mr. Barnette's relationships with Crystal Dennis and Netoshia Tolbert – both of which concededly involved violence by Mr. Barnette – confirms for me that my earlier conclusions, based on information provided by trial counsel, were misplaced. The additional information from Ms. Dennis, Ms. Tolbert, and witnesses to their relationships with Mr. Barnette makes clear that Mr. Barnette was not a "classic batterer," as my report and testimony suggested. Instead, this new information strongly supports the finding that Mr. Barnette suffered from psychiatric issues that were both affected by a mood disorder as well as certain psycho-social "triggers." In my opinion, this is a critically important difference from what was reported previously at trial.

During my trial testimony, I was asked by the prosecutor whether I had interviewed Ms. Dennis, Ms. Heard, or another ex-girlfriend. I had not. Trial counsel never suggested to me that speaking with Mr. Barnette's ex-girlfriends or witnesses to those relationships was a possibility.

[Burgess Affidavit ¶¶ 16-18, Bates Nos. 51-55]

### k.  Return to Charlotte: Further Deterioration and the Tragedies of 1996

Marc returned to Charlotte in March 1993 and soon began a relationship with Alesha Chambers that was marked by jealousy, possessiveness, and violence. As the result of Marc's behavior, he found himself facing criminal charges in Mecklenburg County. His court-appointed attorney, Joseph VonKallist, had Marc evaluated by a psychologist to explore Marc's mental status. In June 1994, Dr. Tyson wrote:

> My examination does reveal the existence of psychological and behavioral problems that might be of use as mitigating factors in sentencing. There are a variety of deficiencies in his psychological functioning that might shed light on his behavior. However, he is relatively unwilling to accept psychological interpretations of his behavior and motives. He is not likely to accept assistance that is based on such assessment, particularly as these apply to deficiencies that he believes do not exist. … He may insist on following a course of action that will appear self-defeating to others. He rigidly adheres to thinking patterns that center around justification of his actions. This does not allow him to accept that his actions will be seen as problematic.

[Tyson Report, Bates Nos. 14773-14774] At the very same time that Dr. Tyson made his findings, Marc was in the beginning stages of his relationship with Robin Williams. He was also still living in and surrounded by dysfunction. As Jean Nduly could have described:

> I saw the family more after they came back from living in Georgia. Sheila and her kids also moved back to Charlotte around that time. They all lived in the same house on West Boulevard and it was a house of chaos. Sheila's kids were badly behaved whereas Vicci and Mario were quieter.
>
> Sonia's friend, Tina, also lived with the family at the house on West Boulevard for a while. I didn't care for Tina. She always had wine and she was trying to make passes at Uncle Jesse. If she was there at the house I didn't stay long. Tina

drank a lot. Sonia liked her wine, too. Sonia and I only had one incident where we drank together. I didn't drink much because I was driving. We both loved to dance and we went out downtown. Sonia drank enough where she was ready to go to bed when she got home.

[Nduly Affidavit ¶¶ 17-18, Bates Nos. 113-116]

In March 1995, Marc moved to Virginia to live with Robin. As evidenced in the trial and sentencing records here, Marc and Robin had a volatile relationship prior to their break up in June 1996. After the break up, Marc returned to his grandfather's home on West Boulevard, where he started spending much of his time alone in a loft in the house. Mario remembers that Marc "shut down emotionally." [Mario Barnette Affidavit ¶ 81, Bates Nos. 22-33]  Tessie Nero recalls that, after the breakup with Robin, "Vicci was despondent. He wasn't himself.  It was like he had given up all hope." [Tessie Nero Affidavit ¶ 28, Bates Nos. 124-128]

Sheila Cooper recalls:

Vicci really fell apart after he and Robin broke up.  They would still talk on the phone.  He would always be sobbing. It was horrible. My dad would say to go get him off the phone so I'd tell Vicci to get off.

When he came back to Charlotte from Virginia, Vicci was reclusive. He was slow. I remember us encouraging him to come with us to go places. He would sigh and say okay, but then he'd say, "Maybe later. You guys go."

There were a number of things that changed about Vicci in that time period. I remember coming into the house one time and seeing that Vicci's head was bald. I asked him about it but I don't recall how he responded. Vicci also gained a lot of weight. He had started drinking a lot. He also started calling me "Sheila" instead of "Aunt Sheila." One time after he called me "Sheila," I asked him who he was talking to; he didn't say anything back to me.

[Sheila Cooper Affidavit ¶¶ 51-53, Bates Nos. 67-75] Numerous other witnesses were available to testify about visible changes to Marc's demeanor and personality upon his

68

return to Charlotte after breaking up with Robin. For example, Jean Nduly could have

testified as follows:

> A couple of days before the crime Sonia called me about Vicci. She said that he wouldn't work or get a job. He just sits out on a white bucket. He won't go anywhere. She told me that if he keeps this up she would have to take him somewhere. I agreed, telling Sonia she might have to take him to see a psychiatrist or counselor. Sonia asked me to come over and talk to Vicci, so my daughter and I went over to West Boulevard for a visit. When I got there I asked Sonia where Vicci was because he didn't come out to greet me. I called to him, "Vicci, you're not going to come out to talk to me?" He responded that he wasn't. I asked, "What's wrong with you?" and he responded, "I don't know." Vicci was lying on Sonia's bed. I went in there and saw him. I remember taking his arm and moving it. His arm was floppy and limp. He never did get up off the bed while I was there. That was not how he usually reacted when I came over.

> A couple days later Sonia called and told me about Robin's death. She told me, "I wish I'd taken him somewhere." I went over to the West Boulevard house before Vicci was caught. I remember there were news people there trying to come up to the house.

[Nduly Affidavit ¶¶ 22-23, Bates Nos. 113-116]

Sonia, who resentencing counsel failed to call as a witness, could have provided

additional insights to the jury in 2002:

> Vicci moved into the upstairs loft in the house after he moved back from Virginia. He would generally be quiet and not come down from the loft but I knew he was up there. Up until the fire incident he was on the phone with Robin a lot, usually late at night. I could hear him on the phone crying. He was calling from the land line in our house and the bill got extremely expensive. The phone calls were bad. Sometimes I would just make him get off the phone. He would be on calls for over an hour. He would be crying. I could hear him crying out loud.

> When Vicci first got back from Virginia he talked about getting a job and said he would be okay. Vicci applied for a job at Saturn. He was excited about it but he didn't end up getting the job. After that he was very down; he was disappointed. Things went downhill for him after he didn't get that job. He stayed upstairs in the loft more after that. He put up a curtain in front of the door. He put up a sign for people to keep out.

> When people came over to the house we would call up to him. We would call for him to come down and say hello. He would say, "I'll come down in a bit." But then he wouldn't come down to visit with people.

69

When I learned about the fire at Robin's apartment, I asked Vicci what he had been thinking. He just retreated upstairs. He also started sitting out at the fork in the driveway on an overturned paint bucket after that. He was waiting for the authorities to come and arrest him. Eventually he gave up on that when nobody came for him. Vicci wanted the authorities to get him and take him away.

After some time passed and Vicci was not arrested I started to second guess that he had set the fire at all. I can't recall if the news reports actually said his name. I thought it was strange that nobody contacted me about it or seemed to be looking for him.

Vicci was eating a lot during that time period and he gained a lot of weight. I think he gained about 30 pounds. He also shaved his head. This was about three weeks before the shootings. I asked Vicci why he had shaved his head and he told me his hair was bothering him and he couldn't think straight. He also said his hair was hurting him.

I offered for him to talk to someone like a counselor. He responded, "You can't afford that." I told him it was true that I didn't have the money but I said we could work something out. The subject was dropped after that. I wish I had pushed it more.

A day or two before the shootings, Vicci was still just emotionally flat and non-responsive. Then on the eve of the shootings there was a sports game on the television. Tessie's husband, Jeff, was over at the house and John was there too. They were watching the game and Vicci watched it with them. They were all having some beers together.

I was getting ready for work in my bedroom while they were watching the game. I remember coming out and seeing the three of them. I was wearing a navy blue dress coat. It was double breasted and had lapels. I had a silk scarf around my neck that was tied and I was wearing flats. I remember that Vicci was straddling a chair, sitting on it backwards when I came out. He came over and hugged me. He said, "You make that uniform look good." He kissed me on the cheek and told me he loved me. He said, "Have a good night. I'll see you in the morning." During this time period, Vicci had usually been upstairs in the loft when I left for work, not downstairs socializing. In that short time period before the shootings he was not the Vicci that we raised and know. His feelings were crushed after his breakup with Robin. She broke his heart and he was caught up in that. It was the idea that she cheated on him. He had desperation to show that he was a man.

Vicci needed counseling after his relationship with Robin ended. A neutral person with whom he could have opened up and vented. Someone who could have understood his feelings would have been helpful to him.

70

[Sonia Barnette Affidavit ¶¶ 69-78, Bates Nos. 34-48]

Dr. Burgess explains how this accurate background information would have fundamentally changed her testimony:

> For example, a prominent focus of my report and trial testimony was the notion that Mr. Barnette had witnessed and experienced domestic violence during his youth, and that his criminal conduct in April through June 1996 "may be understood, in part, as a symbolic reenactment of family and childhood patterns" (which is how I wrote about it in my report). I also testified that the "roots" of his behavior could be found in the way he was "raised and developed." The information now made available to me makes clear that this emphasis on "multi-generational violence" as an explanation for Mr. Barnette's criminal behavior in question was misplaced and due to incomplete and inaccurate information provided to me by trial counsel. While it is true that Mr. Barnette witnessed and experience domestic violence, it is clear from the new information provided that his criminal conduct could not simply be explained by that upbringing. Rather than any "symbolic reenactment of family and childhood patterns," Mr. Barnette's criminal conduct was attributable to a psychotic episode and mental health crisis that he was experiencing. The incomplete and inaccurate information provided by trial counsel led me to erroneously conclude that Mr. Barnette "ha[d] devoted his adolescent life to a continuous pattern of reenacting and trying to resolve the way he was programmed in childhood." Rather than simply acting out as a result of familial dysfunction, as I reported and testified about in 2002, Mr. Barnette suffered from debilitating mental health issues that profoundly affected his behavior throughout his life.
>
> In my report and trial testimony, I opined that Mr. Barnette may have been suffering from major depression and a personality disorder "not otherwise specified," with paranoid, antisocial, and borderline features. These diagnoses were incomplete and lacking because the information provided to me at the time was also incomplete and lacking. The new information provided by post-conviction counsel makes far clearer the most prominent and important aspects of Mr. Barnette's mental health status during the relevant period of time. Based on this new information, it is my opinion that Mr. Barnette was experiencing a psychotic episode and mental health crisis, and that he also suffered from a mood disorder that was significantly affecting his thinking and behavior.

[Burgess Affidavit ¶¶ 10-11, Bates Nos. 51-55]

71

**C. Resentencing Counsel Unreasonably and Prejudicially Failed to Conduct an Adequate Investigation and Utilize the Information it Possessed**

By resentencing counsel's own assessment, the social history investigation conducted for Marc Barnette's 1998 trial was "superficial and not-sufficiently in depth." Resentencing counsel believed that Marc's prior defense team had failed to "include some critical things" while investigating and developing his mitigation evidence, and "some potential mitigation witnesses may not have been candid with [the mitigation investigator] in the past." Thus, a serious re-investigation into Marc Barnette's background was required. Despite this candid assessment about the work that had been undertaken previously, resentencing counsel repeated the past when it unreasonably failed to adequately investigate and pursue readily available and critically important information about Marc's background.

**1. Resentencing Counsel's Unreasonable and Prejudicial Misuse of its Investigative Resources**

Cessie Alfonso was hired by resentencing counsel to undertake the thorough mitigation investigation that resentencing counsel knew had not been conducted prior to Mr. Barnette's 1998 trial. Yet resentencing counsel provided no guidance to Ms. Alfonso, failed to direct her investigation, and ignored the powerful information she gathered despite the ineffectiveness of resentencing counsel. Ms. Alfonso explains:

> Following my initial interviews with Marc and his mother, Sonia, in January 2002, I wrote Jean Lawson a detailed letter. Based on my initial meetings, as well as what case materials I had reviewed to that point, I believed Sonia's personal history of trauma, abuse, and loss would be an important feature of the mitigation case to explain Marc's development. For example, Sonia's family had rarely, if ever, spoken about the murder of her mother, Pearl, which occurred when Sonia was a very, very young mother. During my interviews with Sonia and her sisters, it was clear that they had never discussed their respective experiences and emotions – of loss, pain, grief, and guilt – as a result of their mother's murder, and had never healed from the traumatic loss.

72

Despite my urgings to the defense team that Sonia's own history was critically important, the defense team did not present evidence about it. I was neither consulted about this decision nor told why the defense team did not present this evidence.

[Alfonso Affidavit ¶¶ 8-9, Bates Nos. 1-5] As Dr. Dudley, Dr. Burgess, Dr. Johnson and various lay witnesses explain, Sonia Barnette's own history and trauma are significant factors in understanding Marc Barnette's mitigating background. Despite Ms. Alfonso drawing attention to this important line of mitigation, resentencing counsel unreasonably ignored it.

The same thing happened with respect to information about Jesse Cooper. As Ms. Alfonso explains:

I met with Jesse Cooper, Marc's maternal grandfather, during the course of my investigation. Jesse had been in the Korean War, been injured in combat, and suffered from trauma-related symptoms ever since. I spoke with Jan Barefoot and suggested locating Jesse's military and medical records, but we never got any of them. Due to Jesse's bad health at the time of Marc's retrial, he could not testify. Neither Jean Lawson nor Harold Bender ever talked with me about ways in which the defense might be able to present information about Jesse and his background, such as through records, video, or other witnesses' testimony. Jesse's background in the service, the affects that combat had on him, his drinking, his relationship with Pearl, his reaction to Pearl's leaving the family and subsequent murder, and his efforts to raise Sonia, Sheila, and Marc in the wake of Pearl's death, were all significant pieces of information that I felt were important to the mitigation case. Moreover, Jesse had gone with Marc to Roanoke, Virginia at one point to help Marc get his belongings from Robin Williams' house, and saw some of their break up in the process. Jesse also lived in the same house as Marc after he returned from Virginia, and witnessed Marc's worsening mental health. I was never told why the defense team did not present this evidence.

[Alfonso Affidavit ¶ 11, Bates Nos. 1-5]

With respect to the information about paternity—an issue Dr. Burgess deems "quite significant" and something that was "dangerously destabilizing for Mr. Barnette," [Burgess Affidavit ¶19, Bates Nos. 51-55]—resentencing counsel did *nothing* with the information gathered by Ms. Alfonso.

The issue of paternity—namely, the identity of Marc's true biological father—was also significant in Marc's case. In addition to the importance that it would make on a biological level, the lies, rumors, and misunderstandings concerning Marc's biological father's identity played an important and debilitating role in the family dynamic. Sonia had always maintained that Rick Barnette was Marc's father, despite a blood test that established otherwise. Sonia would tell others—including Marc—that Rick had "faked" the test. Notwithstanding Sonia's protests to the contrary, it was evident that Rick was not Marc's biological father and Sonia was well-aware of that fact.

Family secrets can be corrosive and damaging, especially to someone like Marc, who was in the middle of the paternity controversy. Compounding the harm in Marc's situation was the fact that his mother was very vocal in her claim that Rick was lying about the blood test. Thus, I thought it was important to fully explore the paternity issue.

In late March 2002, I spoke with Larry Wright, whom I believed to be Marc's biological father. I regularly updated Jean Lawson about developments in the mitigation investigation, and did so with respect to Wright. Lawson did not suggest any ways in which to develop the evidence concerning Wright. He would not have been the first, or last, witness who was hesitant to get involved as a witness in a capital murder case. There were many ways that the defense could have developed this information. Ultimately, the defense did not present any evidence, or otherwise suggest to the jury, that Sonia was lying to Marc (and others) about the paternity issue. I was neither consulted about this decision nor told why the defense team did not present this evidence.

[Alfonso Affidavit ¶¶ 12-14, Bates Nos. 1-5]

Approximately five months before jury selection was scheduled to begin, Ms. Lawson "faxed a list of 'potential mitigation witnesses' to [Jan Barefoot] in early March 2002. This list was based on names that Marc had provided to [Ms. Lawson] during [her] visits with him." [Lawson Affidavit ¶ 29, Bates Nos. 94-101] As Ms. Lawson explains:

I indicated on this list which witnesses I wanted Jan to locate so Cessie Alfonso could interview them. A number of former girlfriends were on the list — including Sheila Sullivan, Tameka Hunter [sic], and Kowana Dozier — but I don't recall if I specifically asked Ms. Barefoot to locate them at that time. Her notes indicate that, right on the eve of trial, I asked Ms. Barefoot to locate Kowana Dozier and Tameka Hunter [sic], but she did not have enough time to track them down.

[Lawson Affidavit ¶ 29, Bates Nos. 94-101] Ms. Barefoot recalls that she was never

asked to locate Ms. Sullivan, and that she was only asked to locate Ms. Dozier on or about July 5, 2002, and Ms. Hunter on or about July 23, 2002—in both instances, too late to locate them for use at trial. [Barefoot Affidavit ¶¶ 9, 15, Bates Nos. 15-16]

Resentencing counsel's unreasonable failure to utilize its investigative resources was further evidenced by its inexplicable management of Ms. Alfonso's "biopsychosocial" report—a standard and necessary tool in capital defense in 2002. Although Ms. Alfonso's report was incomplete (due to resentencing counsel's failure to competently direct Ms. Alfonso), it was certainly more substantive and accurate than what Sindy Maxwell had compiled for the 1998 trial. Indeed, according to Ms. Lawson and Ms. Rauscher, nothing Ms. Maxwell produced was reliable. According to Ms. Alfonso:

> I created a "biopsychosocial" report for the defense team. This type of report, which details the witnesses I interviewed, the documents I received, the psychosocial factors present in the defendant's life, and a chronology of life events [were] standard in capital mitigation work in 2002.
>
> It was never made clear to me by the defense attorneys how, if at all, they intended to use my report. Indeed, it was never made clear to me until the trial itself that defense counsel did not intend to call me as a testifying witness.
>
> I submitted my report to defense counsel on July 8, 2002. I did not have further discussions with either Jean Lawson or Harold Bender about the report.

[Alfonso Affidavit ¶¶ 18-20, Bates Nos. 1-5] Having received the report one week before jury selection started, resentencing counsel failed to take any steps to follow up on the various leads and issues uncovered by Ms. Alfonso, as well as failed to share the report or its contents with its experts. As a result, a significant amount of mitigating evidence that was in resentencing counsel's possession was not shared with defense experts or presented to the jury. Other than Mr. Barnette himself, only three of the witnesses interviewed by Ms. Alfonso were called as defense witnesses in the 2002 sentencing

75

proceeding: Derrick Barnette, Mario Bamette, and Armaud Cooper. [Alfonso Affidavit ¶ 7, Bates Nos. 1-5]

Thus, despite having the resources of an experienced mitigation specialist (Ms. Alfonso) and experienced investigator (Ms. Barefoot), resentencing counsel unreasonably failed to put either to use. Ms. Alfonso comments: "I later met with Harold Bender but had no substantive conversations with him about my work. Initially, I was in somewhat regular contact with Jean Lawson, but things changed a few months into the case and I started hearing less and less often from her." [Alfonso Affidavit ¶ 4, Bates Nos. 1-5] Ms. Barefoot notes: "I had worked on a number of cases with Harold Bender prior to the Barnette retrial. Harold's manner with me in the Barnette case was similar to his manner in other cases we worked on together: he would give me a set of tasks to accomplish—for example, locate a witness or find a record—but not provide context or explanation." [Barefoot Affidavit ¶ 5, Bates Nos. 15-16] As Russell Stetler, the National Mitigation Coordinator for the Federal Death Penalty Projects and investigator with over 34 years of death penalty experience, opines, "[T]he defense team existed on paper but not in reality." [Stetler Declaration ¶ 61, Bates Nos. 137-199]

## 2. **Resentencing Counsel's Unreasonable and Prejudicial Failure to Re-interview Multiple Witnesses from the 1998 Trial**

Resentencing counsel understood its obligation to re-interview witnesses from the 1998 trial. Referring to the earlier investigation, resentencing counsel explained to the Court: "The investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation." [Lawson Affidavit ¶ 8, Bates Nos. 94-101] Yet resentencing counsel failed to follow through. As evidenced by the affidavits of witnesses who had been contacted or testified during the 1998 trial but who were not re-

interviewed by resentencing counsel for the 2002 resentencing, valuable information was left undiscovered.

### 3. Resentencing Counsel's Unreasonable and Prejudicial Failure to Interview Witnesses who Possessed Important Mitigation Information

Resentencing counsel failed to interview many witnesses who they were well aware of and knew, or should have known, possessed important mitigating evidence. The attached affidavits and mitigation report lays bare this significant information that was never developed by trial.

The failure to interview these witnesses—including, but not limited to, Brian Ard, Kenny Bailey, Melvin Bryant, Eric Cooper, Robert Cooper, Crystal Dennis, Kowana Dozier, Do'Lores Guy, Temeka Hunter,[8] Kesha Heard, Anitra Lyles, Danielle Mathis, Victor Montgomery, Jean Nduly, Shonda Nero, Weona Sharpe, Sandra Smith, Sheila Sullivan, John West—meant that resentencing counsel had an incomplete and inaccurate understanding of their client's background. As a direct consequence of this information deficit, the jury was misled.

For example, and perhaps most glaringly, despite resentencing counsel's early declaration that they would seek to deal head-on with Mr. Barnette's prior relationships with women, they conspicuously failed to interview the women with whom Petitioner had been in relationships. The one exception to this failure to interview—resentencing counsel spoke with Netoshia Tolbert (then Netoshia "Tasha" Heard) prior to the 2002 trial—was nevertheless problematic, since resentencing counsel failed to use the information Ms. Alfonso had collected. As a result, an incomplete and inaccurate telling of Mr. Barnette's prior relationships was shared with the jury. Had resentencing counsel

---

[8] Temeka Hunter now goes by Temeka Lee.

77

conducted the investigation that they themselves knew was critically important, significant information would have been learned that would have painted a very different picture of Mr. Barnette and changed experts' opinions.

When, as here, the un-interviewed witnesses who possess mitigating information come in the form of prosecution witnesses, the prejudice is compounded. Resentencing counsel's failure to investigate in these circumstances means that mitigation evidence is undiscovered and aggravating evidence is introduced without an ability to rebut or neutralize. The example of Crystal Dennis, described above, most clearly proves this point.

The Supreme Court is clear that the duty to investigate in a specific case may well include consideration of the aggravating factors on which the prosecution may rely. In *Rompilla v.* Beard, 545 U.S. 374 (2005), the issue before the Court was resentencing counsel's failure to look at information related to the defendant's prior convictions.

> There is an obvious reason that the failure to examine Rompilla's prior conviction file fell below the level of reasonable performance. Counsel knew that the Commonwealth intended to seek the death penalty by proving Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law. Counsel further knew that the Commonwealth would attempt to establish this history by proving Rompilla's prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim's testimony given in that earlier trial… There is no question that defense counsel were on notice, since they acknowledge that a "plea letter," written by one of them four days prior to trial, mentioned the prosecutor's plans.... It is also undisputed that the prior conviction file was a public document, readily available for the asking at the very courthouse where Rompilla was to be tried.

*Rompilla v. Beard,* 545 U.S. 374, 383–384 (2005) (internal citations omitted). Here, the government, through its evidence and argument at Mr. Barnette's first trial, gave notice it would focus on Mr. Barnette's prior relationships in aggravation. Mr. Barnette's

resentencing counsel were well aware of this approach; indeed they highlighted it in their *ex parte* "Statement of Defense Contentions" filed in August 2001. By failing to investigate this information—failing to interview the government witnesses in question as well as others with whom Mr. Barnette had been intimate—resentencing counsel committed the same error as Rompilla's counsel. There is no reasonable strategic reason for failing to interview a witness whom the prosecution has made clear it will present at trial. As the Supreme Court observed in *Rompilla*, "[L]ooking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell defense counsel something about what the prosecution can produce." 545 U.S. at 389. Such an investigation here would have resulted in important mitigating evidence, as well as powerful evidence to rebut the government's evidence in aggravation. [Burgess Affidavit ¶¶ 12-17, Bates Nos. 51-55]

> But once counsel had an obligation to examine the file, counsel had to make reasonable efforts to learn its contents; and once having done so, they could not reasonably have ignored mitigation evidence or red flags simply because they were unexpected.

*Rompilla,* 545 U.S. at 391 n. 8.

**D. <u>Resentencing Counsel's Unreasonable and Prejudicial Failure to Adequately Investigate and Present Evidence Which Resulted in the Jury Receiving Incomplete and, at times, Materially Inaccurate Testimony from Defense and Prosecution Experts</u>**

Resentencing counsel failed to provide the defense experts who testified during Mr. Barnette's resentencing in 2002 with readily available information that would have not only corroborated and substantiated significant aspects of their testimony, but would have also materially changed the nature and scope of their opinions. Because resentencing counsel failed to conduct an adequate investigation, and failed to provide

79

the defense experts with what evidence they had collected, the jury was presented with incomplete and, at times, inaccurate information about Mr. Barnette's mental health.

Resentencing counsel recognized as early as August 2001 that there were manifold problems with the manner in which the earlier trial team investigated and presented mitigation evidence at the 1998 trial:

> Current counsel have reviewed the testimony and cross-examination at Marc Barnette's first sentencing hearing. It is apparent that the defense presentation was disjointed. The psychological, psychiatric and family history was not presented to the jury in an effective manner. The witnesses were unprepared for cross-examination. The investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation. Our objective is to assure that he information presented to the jury at this sentencing hearing is the result of thorough investigation, top notch assessment by appropriate experts and is credible and logical enough for the jury to understand the genesis of these crimes and to impose a sentence of life imprisonment, rather than death.

[Bates No. 366]

Resentencing counsel's assessment of the earlier investigation was reiterated to the Court during an *ex parte* hearing on February 26, 2002 concerning defense funding. Resentencing counsel noted that, during the 1998 trial, "[t]he government pretty well ridiculed this mitigation investigator and pointed out some - she had a timeline and they pointed out some areas where she didn't include some critical things." Moreover, resentencing counsel noted that "some potential mitigation witnesses may not have been candid with [the mitigation investigator] in the past and then that misinformation or information that we're going to try to present doesn't show up in her report."

Despite resentencing counsel's view that the first defense team's "investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation," resentencing counsel repeated the past when it unreasonably failed to adequately re-investigate and pursue readily available information to provide to its

80

experts, as well effectively to utilize the new information it had gathered.

In the case of Dr. Burgess, mitigation specialist Cessie Alfonso was never asked to develop information or interview witnesses to assist Dr. Burgess in her evaluation.

> Defense counsel never asked me to work with Ann Burgess, the "domestic violence" expert they used, in an effort to explore Marc's relationships with other women. Burgess and I spoke one time on the telephone. There was no request by Burgess for me to contact or interview or explore any particular aspect of Marc's background. Although I interviewed Tasha Tolbert, who had two children with Marc, my interviews with Tolbert were necessarily limited because I did not have any direction from defense counsel regarding what was needed for resentencing.

[Alfonso Affidavit ¶ 17, Bates Nos. 1-5]

Not only did the experts in 2002 not receive the benefit of the work performed by Ms. Alfonso, but there were also asked to rely on the "superficial and not-sufficiently in depth" investigation performed by Ms. Maxwell for the 1998 trial. [Lawson Affidavit ¶¶ 26, 32, 33, Bates Nos. 94-101] Indeed, Dr. Seymour Halleck and Dr. Mark Cunningham both testified at Mr. Barnette's first trial in 1998. At that time, these experts were provided with and relied upon the investigative work of the first trial team and its mitigation specialist. [Bates Nos. 362-367] Despite the shoddiness of the earlier work done on Mr. Barnette's background, however, resentencing counsel inexplicably had these experts rely on *precisely the same information* for purposes of their testimony in 2002. This undermined the accuracy and credibility of the experts' opinions and testimony. It was also grist for the prosecution's mill on cross-examination and in closing argument, when the prosecution rightly pointed out that the jury was presented with "quick snapshots … uncorroborated information," which begged the question: "[W]hat do I know about the quality of information that [the defense experts] used to form their

opinions?" [Tr. 2002 at 3936][9]

Resentencing counsel's deficiencies did not exist only with defense experts. As alleged in the § 2255 motion, resentencing counsel unreasonably failed to impeach the government's expert, Dr. Park Dietz, on an issue that cut to the core of his credibility.

Following the defense case-in-chief, the prosecution presented the rebuttal testimony of Dr. Dietz, a well-known forensic psychiatrist from California. Dr. Dietz played a critical role in the government's case. Indeed, his testimony was the fulcrum of the government's attack on Mr. Barnette's mitigation and mental health presentation. The government highlighted Dr. Dietz's testimony in its closing repeatedly: "I contend to you, ladies and gentlemen, that the clearest explanation of Marc came from Dr. Dietz, Marc Barnette is narcissistic, he sees himself as the center of the universe and all things revolve around him and his needs; if anything gets out of whack, he reacts violently." [2002 Tr. 3935] Later, the government contrasted Dr. Dietz's testimony against the evidence supplied by the defense experts:

> Contrast that, ladies and gentlemen, with the Government's expert, Dr. Park Dietz. Dr. Dietz looked you in the eye and said, Marc Barnette was not psychotic at the time of these crimes, Marc Barnette's choices were not predetermined by he [sic] childhood, childhood risk factors do not cause adult behavior, Marc Barnette's behavior was not programmed. He told you this was two crimes with two distinct motives, this was not a domestic homicide, and he told you that Marc Barnette has told so many stories in the past that it's not possible to know what happened. Plain language, plain opinions.

[2002 Tr. 3939] Given the near-celebrity status that Dr. Dietz maintained at the time and his central role as a forensic expert, and given the reasonable likelihood that Dr. Dietz would play a key role in the government's case for the death penalty, resentencing

---

[9] During Dr. Halleck's direct examination, when asked by Mr. Bender about what he had been able to review prior to rendering his opinion and testifying, Dr. Halleck testified: "I think I have reviewed most of the available documentation on this case." [2002 Tr. 3403] Through no fault of his own, it is clear that Dr. Halleck's statement was untrue.

82

counsel was well aware that Dr. Dietz's credibility was crucial. Despite this fact, resentencing counsel failed to impeach Dr. Dietz about his grossly misleading testimony in the high-profile trial of Andrea Yates in Texas, an issue that cut to the heart of his credibility as an expert witness.

During the government's qualifying of Dr. Dietz as an expert, the prosecution noted a number of high profile cases in which Dr. Dietz had previously testified, including "the case of Andrea Yates, the woman who drowned her children in the bathtub[.]" [2002 Tr. 3793-94] The Yates case, out of Harris County, Texas, had recently concluded in March 2002. By all accounts, Dr. Dietz's testimony for the prosecution had undermined Yates' claim that she was insane at the time of the crimes. At trial, Yates claimed that Satan was inside her and that she had killed her children to save them from "hellfire and damnation." During his testimony, Dr. Dietz claimed that Yates got the idea to drown her children from an episode of "Law & Order" in which a mother was acquitted on an insanity defense after drowning her children in a bathtub. Dr. Dietz testified that he was a consultant for the television program and that the show in question had been broadcast shortly before the Yates provided her reasoning for the murders.

Following the jury's rejection of Yates' insanity defense, it was revealed that Dr. Dietz had provided materially false testimony. Contrary to his forceful and convincing testimony, no such episode of "Law & Order" was ever taped. As a result of Dr. Dietz's materially false testimony, the prosecution abandoned its request for the death penalty and Yates was sentenced to life in prison with the possibility of parole after 40 years. On January 6, 2005, Yates' murder convictions were overturned as a direct result of Dr. Dietz's false testimony given that it more than likely prejudiced the jury. Yates was

83

subsequently retried. On July 26, 2006, a Texas jury found that Yates was not guilty by reason of insanity. Needless to say, Dr. Dietz did not testify at Yates' retrial.

Based on this information, resentencing counsel was in a position to establish that Dr. Dietz was an unreliable expert witness whose explanations and rationalizations for behavior were suspect and fallible. Yet Mr. Barnette's resentencing counsel unreasonably failed to impeach Dr. Dietz on the materially false testimony he had provided just a few months prior in the Yates case.

There is no way in which the failure to confront Dr. Dietz with his testimony in Yates can be justified as sound trial strategy or a reasonable strategic choice. Indeed, it is inconceivable that a trial attorney would fail to inform a jury of Dr. Dietz's very recent and significant "misstep" in the Andrea Yates case. The reliability of the government's one and only mental health expert, called to testify in rebuttal, cut directly to the heart of resentencing counsel's defense at resentencing. Inexplicably, resentencing counsel failed to use the available information. That failure simply cannot be condoned as reasonable trial strategy. *See Berryman v. Morton*, 100 F.3d 1089, 1098-99 (3d Cir. 1996) (granting relief, in part, on trial counsel's failure to impeach a prosecution witness).

Although, generally, the decision whether to cross-examine a witness, and "to what extent and in what manner," is "strategic in nature," *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.1987), courts can "second-guess such decisions" if there is "no strategic or tactical justification for the course taken[.]" *United States v. Luciano,* 158 F.3d 655, 660 (2d Cir.1998). *See also Moore v. Marr,* 254 F.3d 1235, 1241 (10th Cir.2001) (noting that "counsel's failure to impeach a key prosecution witness is potentially the kind of representation that falls outside the wide range of professionally

84

competent assistance") (internal quotation and citation omitted); *Driscoll v. Delo,* 71 F.3d 701, 710 (8th Cir.1996) (failure to question witness with prior inconsistent statement made to investigators constituted deficient performance since there was "no objectively reasonable basis on which competent defense counsel could justify a decision not to impeach a state's eyewitness whose testimony ... took on such remarkable detail and clarity over time"); *Tomlin v. Myers,* 30 F.3d 1235, 1238 (9th Cir.1994) (defense counsel's performance deficient when counsel failed to challenge an in-court identification made by an eyewitness where the case "hinge[d] on an eyewitness's testimony"); *Harris v. Reed,* 894 F.2d 871, 878 (7th Cir.1990) (failure to call witnesses to contradict eyewitness identification of defendant was deficient performance); *Nixon v. Newsome,* 888 F.2d 112, 115-16 (11th Cir.1989) (failure to impeach with prior inconsistent testimony "sacrificed an opportunity to weaken the star witness' inculpatory testimony"); *Blackburn v. Foltz,* 828 F.2d 1177, 1183-84 (6th Cir.1987) (counsel deficient where he failed to impeach an eyewitness with previous inconsistent identification testimony when "weakening [the witness'] testimony was the only plausible hope [the defendant] had for acquittal").

**E.** **Resentencing Counsel Unreasonably and Prejudicially Failed to Advise Mr. Barnette That He Should Not Testify, Failed to Realize That He Should Not Testify, Failed to Properly Prepare Him for Testifying, and Failed to Frame Mr. Barnette's Testimony in the Context of His Severe Mental Health Issues**

As the first defense witness called to the stand, Mr. Barnette, over the course of two days, testified about his role in the charged crimes, his prior conduct in other relationships, his upbringing, and various other aspects of his background. For all intents and purposes, Mr. Barnette was his own mitigation specialist providing testimony about

85

his own psycho-social history. While a qualified mitigation specialist is undoubtedly a core component of any capital defense team, and plays "an integral part of the defense team [to] insure[] that the [mitigation] presentation to be made at the penalty phase is integrated into the overall preparation of the case," ABA Guidelines, Guideline 4.1, Commentary, it is highly unusual—indeed, unprecedented—for that role to be played by a capital defendant, particularly one who is as damaged as Mr. Barnette.

Because of Mr. Barnette's distorted and warped interpretation of events and relationships—a direct consequence of his severe psychological impairments-portions of his testimony were inaccurate and, to the sentencing jury, highly aggravating. Resentencing counsel's performance was thus both objectively unreasonable and remarkably prejudicial.

It is evident that resentencing counsel's decision-making process was superficial. As Ms. Lawson recalls:

> At some point after I was appointed to him, Mr. Barnette and I discussed the issue of whether he would testify at his sentencing hearing and, as I recall, Harold Bender was involved in those discussions occasionally. Mr. Barnette was always very amenable to the advice of counsel. Mr. Bender and I recommended that he testify, and he decided to testify.

> I was primarily responsible for preparing Marc Barnette to testify. I never considered, and I don't recall ever discussing with Harold Bender, having any mental health expert weigh in on Mr. Barnette's testimony. At this point in time-2002-I was familiar with the notion of having an expert opine to the jury about a defendant's confession or demeanor. Indeed, often times a defendant's state of mind, psychological make-up, or even his appearance can affect how the defendant's words might come across to a jury.

[Lawson Affidavit ¶¶ 22-23, Bates Nos. 94-101] Despite an awareness of having an expert play a role, resentencing counsel unreasonably failed to do anything to contextualize or explain Mr. Barnette's testimony.

Cessie Alfonso was shocked by Mr. Barnette's role as a testifying witness:

I was definitely surprised—actually, shocked would be the right word—when Marc testified on his own behalf at trial. I was neither consulted about this decision nor told why the defense team decided to call him as the first defense witness. During my various meetings with Marc, I was never told by Marc—directly or indirectly—that he wanted to testify. I could count on one hand the number of times a defendant testified on his own behalf before the jury in cases I've worked on. Had defense counsel sought my advice or insights about Marc as a potential witness, I would have strongly cautioned them that Marc, despite genuine remorse for what he had done, would likely offend the jury by his testimony. I would have been concerned that Marc's mental health makeup and experiences, and his general lack of insight, would result in explanations and rationales for his behavior that would alienate jurors, rather than communicate remorse and sorrow. I believe his testimony did just that.

[Alfonso Affidavit ¶ 23, Bates Nos. 1-5] Dr. Burgess was also not asked by resentencing counsel to offer her insights or expertise.

Trial counsel never consulted with me about the decision to have Mr. Barnette testify on his own behalf at trial. Had trial counsel sought my advice or insights about Mr. Barnette as a potential witness, I would have strongly cautioned them that Mr. Barnette, despite genuine remorse for what he had done, would likely offend the jury by his testimony. I would have expressed my strong reservations that given his mental health makeup and experiences, and his general lack of insight, Mr. Barnette would explain and rationalize his behavior in ways that would likely anger jurors.

[Burgess Affidavit ¶ 22, Bates Nos. 51-55]

Dr. Sally Johnson, who evaluated Mr. Barnette in 1997 and was an employee of the Bureau of Prisons in 2002, adds:

I have been made aware that Mr. Barnette testified on his own behalf at his resentencing trial. Had trial counsel sought my advice or insights in 2002 about putting Mr. Barnette on as a witness, I would have discussed that although Mr. Barnette expressed genuine remorse for what he had done, he had limited insight into his behaviors and may not be able to display his remorse when confronted with the stress of examination and cross examination. His attempts to deal with his anxiety and his personality functioning would likely limit his ability to relate to the Jury or others in the court room.

[Sally Johnson Affidavit ¶ 24, Bates Nos. 89-93]

Dr. Dudley provides further insights about the highly problematic nature of having Mr. Barnette testify on his own behalf:

> Given MB's above described psychiatric impairments, his lack of insight into the causes of these impairments, and his lack of insight into how these impairments impact on his perceptions and his behavior, the following can be said. MB's psychiatric impairments manifest (both to this psychiatrist and others) in statements, explanations, and rationalizations by MB that would appear to be distorted, self-serving, and simply off-base, and therefore, it is unsurprising to this psychiatrist that MB's testimony at trial appeared unsympathetic. While MB's testimony was, in many ways, consistent with his mental health make-up – and thus clouded by distorted and warped interpretations of events and relationships – to an untrained listener, it likely appeared quite offensive. That being said, if MB was going to be allowed to testify, it would have also been possible for a mental health expert to then explain to a jury why MB, even after his arrest and conviction for murder, would persist in describing things in ways that no one else could see or agree with.

[Dudley Report ¶ 77, Bates Nos. 209-231]

Resentencing counsel could have, and should have, kept Mr. Barnette off the witness stand and presented his life history and mental impairments in a mitigating manner. At the very least counsel should have contextualized Mr. Barnette's testimony as, in large measure, his inability to comprehend or explain his own actions, despite still feeling genuine remorse. The total failure to do so permitted the prosecution to assert, without challenge or rebuttal, that "[Mr. Barnette's] testimony [was] so filled with misinformation that you simply can't believe it. I contend to you, ladies and gentlemen, that those hours that Marc Barnette was on the witness stand is just where he likes to be, the center of attention." [2002 Tr. 3928-29] He was nothing more than a "spin artist." [2002 Tr. 3929]

Resentencing counsel's failure to explain their client's testimony in the context of his impairments was critically prejudicial. Resentencing counsel did not offer the jury an understanding of Mr. Barnette's own words. Resentencing counsel unreasonably failed to

88

explain and argue to the jury that many aspects of Mr. Barnette's testimony in fact revealed signs and symptoms of his multiple impairments, and was consistent with his mental health diagnoses. Left unexplained, Mr. Barnette's testimony sounded, at various turns, damning, callous, and unmitigated.

There is no question that resentencing counsel was on notice that Mr. Barnette's mental health impairments would deleteriously affect his testimony. Resentencing counsel were aware from Dr. Tyson's 1994 report that Mr. Barnette "may insist on following a course of action that will appear self-defeating to others," and that "[h]e rigidly adheres to thinking patterns that center around justification of his actions," which consequently "does not allow him to accept that his actions will be seen as problematic." [Tyson Report, Bates Nos. 14773-14774] They were also aware from Dr. Faye Sultan's 1998 report that Mr. Barnette had "developed significant perceptual and cognitive distortions," and that "[t]hese perceptual inaccuracies … bred behavior grossly inappropriate to social situations." [Sultan Report, Bates Nos. 14770-14772]

### F. <u>Resentencing Counsel Unreasonably and Prejudicially Failed to Investigate and Present Readily Available *Lockett/Skipper* Evidence Concerning Mr. Barnette's Institutional Adjustment and Meaningful Relationships</u>

In opening statements, resentencing counsel promised the jury that the defense would put forward evidence to show how and why Mr. Barnette had "changed over the last six years." [2002 Tr. 2395] Yet while the jury learned that Mr. Barnette had a spotless institutional record during his incarceration since his arrest in 1996, the jury was never provided with evidence about why Mr. Barnette had adjusted so well to prison. This gaping omission—the failure to explain to the jury that Mr. Barnette's mental health makeup and severe mood disorders were better controlled and managed in the prison

89

setting, and that he had maintained and continued to develop important relationships with friends and family—left the jury with little reason to spare his life.

Resentencing counsel presented evidence that Mr. Barnette had no infractions from the time of his arrest in 1996 through the time of trial in 2002. Resentencing counsel presented evidence from three county detention officers that when Mr. Barnette was at the Mecklenburg County Jail, he had been a "good model inmate," [2002 Tr. 2459] that he "followed all orders and directives," [2002 Tr. 3460] and that he had been "[r]espectful, intelligent, and quiet." [2002 Tr. 3458] Resentencing counsel also presented evidence from two employees of the Bureau of Prisons to discuss Mr. Barnette's infraction-free incarceration, as well as the conditions of Mr. Barnette's confinement—for example, the type of housing units he had been housed in and type of segregation that he was regularly kept in. Resentencing counsel also presented an expert witness, Walter Buer, to describe Mr. Barnette's classification within the Bureau of Prison.

Although resentencing counsel presented data about Mr. Barnette's good behavior and highly restricted confinement in prison, they conspicuously failed to provide the jury with any evidence about why Mr. Barnette had seemingly adjusted so well. For example, given Mr. Barnette's psychiatric impairments, resentencing counsel unreasonably failed to present testimony from any one of Mr. Barnette's mental health experts concerning Mr. Barnette's understandably positive response to structure, and about how the forced reduction of the particular stressors that previously made Mr. Barnette acutely vulnerable to an exacerbation of his symptoms, and the associated erratic and irrational behavior, resulted in Mr. Barnette being a genuinely constructive and productive individual while imprisoned.

As Dr. Dudley explains:

Finally, the mental health impairments suffered by Marc Barnette, while dramatic and severe, can be managed and/or controlled. For example, I am aware that Marc Barnette had not committed any infractions or received any disciplinary write-ups from the time of his arrest in June 1996 through the time of his retrial in 2002. This is particularly noteworthy given how disruptive his behavior and distorted his thinking had been prior to his arrest. Yet it is quite understandable/explainable given the structure that MB had while incarcerated and the forced reduction (as a result of his incarceration) of the particular stressors that make MB acutely vulnerable to an exacerbation of his symptoms and the associated erratic and irrational behavior. This explanation as to why Marc Barnette had shown positive and constructive adjustment to prison could have also been presented for consideration as mitigation at the time of trial.

[Dudley Report ¶ 78, Bates Nos. 209-231] None of the defendant's mental health experts—Dr. Halleck, Dr. Cunningham, Dr. Burgess—were asked to opine about this issue.

Resentencing counsel's failure here is all the more inexplicable given the availability of a compelling expert witness who had previously evaluated Mr. Barnette and, for good measure, maintained a high-level position within the Bureanu of Prison. As detailed in the § 2255 motion, Dr. Sally Johnson had evaluated Mr. Barnette in 1997 with respect to his competency and insanity. She later testified during the 1998 trial as a defense witness. Yet despite being able and available to testify to a number of mitigating issues—including, but not limited to, positive institutional adjustment, remorse, and mental illness—Dr. Johnson was not called to testify on Mr. Barnette's behalf in 2002 or even consulted by resentencing counsel.

As Dr. Johnson now explains:

I testified briefly at Mr. Barnette's trial in Charlotte on February 3, 1998. In court I confirmed that during his stay at the FMC, Mr. Barnette told me he had come to grips with what he had done shortly after the crime was committed, that prior to his arrest he had intended to kill himself because he believed his life was over, and he described feeling overwhelmed with the magnitude of his behavior. I

91

confirmed my assessment that Mr. Barnette expressed remorse for his behavior and expressed sympathy for the victim's family.

[Sally Johnson Affidavit ¶ 14, Bates Nos. 89-93] Following her testimony in 1998, Dr. Johnson had no further involvement with Mr. Barnette or his case until being contacted by post-conviction counsel. [Sally Johnson Affidavit ¶ 15, Bates Nos. 89-93] Had Dr. Johnson been contacted by resentencing counsel before the 2002 resentencing, she would have been able to testify about Mr. Barnette's institutional adjustment to that point, as well as a number of other relevant matters that the jury never heard. Had she testified as a defense witness, Dr. Johnson would have explained to the jury that, at the time, she was the Director of Forensic Fellowship Program for Federal Bureau of Prisons/Duke University of Psychiatry, as well as a Psychiatric Consultant to the Medical Director of the Federal Medical Center (FMC) at FCI Butner. In that position she conducted forensic evaluations for the federal court system on high profile and complex cases, and served as an expert witness. [Sally Johnson Affidavit ¶ 4, Bates Nos. 89-93]

> Dr. Johnson could have opined as follows:
>
> According to my December 29, 1997 report, Mr. Barnette was taken into custody in connection with his crimes on or around June 25, 1996. Thus, by the time of Mr. Barnette's resentencing trial in 2002, he had been in custody for approximately six years – the majority of which time he had spent in the custody of the Bureau of Prisons. Having reviewed Mr. Barnette's prison records from his incarceration during that period of time, it is clear that Mr. Barnette had very positive institutional adjustment. He presented no problems for correctional officers and had no problems with other inmates. He demonstrated an ability and willingness to abide rules, remained non-violent, and maintained constructive and positive relationships with others. Had I been asked, I would have been willing and able to testify at Mr. Barnette's resentencing trial about his positive adjustment to prison and his lack of disciplinary issues, and how it was consistent with his behavior and adjustment during his evaluation period in 1997 and consistent with my expectations for his future adjustment.

[Sally Johnson Affidavit ¶ 16, Bates Nos. 89-93]

Dr. Johnson could have also testified about aspects of Mr. Barnette mental and social history, including the following:

The information provided by post-conviction counsel also clarifies that Mr. Barnette's intimate relationships did not always involve abuse or negative behavior. During his relationship with Sheila Sullivan, Mr. Barnette appeared to have been supportive during times of stress, including when Ms. Sullivan became pregnant and later terminated the pregnancy. There is no evidence Mr. Barnette was abusive toward Ms. Sullivan. Mr. Barnette was the victim of an assault, perpetrated by other young males, during the time of his relationship with Ms. Sullivan. When that relationship fell apart, Mr. Barnette became depressed and attempted suicide. I did not have this information in 1997. Had I had this information, I could have testified then and in 2002 that Mr. Barnette was engaged in a significant, nonviolent relationship with Ms. Sullivan.

Mr. Barnette's relationships with Ms. Tameka Hunter [sic] and Ms. Kowana Dozier also did not include violence or extreme jealousy or elements of domestic violence or obsessive pursuit. I could have so testified to that in 1998 and in 2002.

During my 1997 evaluation, I was unaware of the paternity issues concerning Mr. Barnette's father and how his mother, Sonia Barnette, handled the controversy. In the face of a paternity test, confirming Derrick Barnette was not the father, Sonia Barnette continued to claim he was. This was upsetting and confusing for Mr. Barnette. I could have testified to this in 1998 and 2002.

I was also unaware in 1997 of the details concerning the circumstances of Sonia Barnette's mother's murder (death of Pearl Cooper), and the impact of this trauma on her parenting abilities. Again, I could have testified to this in 1998 and 2002.

The murder of his maternal grandmother, Pearl Cooper; his maternal grandfather, Jesse Cooper's, post-traumatic stress disorder, how the confusion concerning Marc's paternity was handled within the family; his mother Sonia's limitations as a young parent; and the absence of any stable or helpful guidance given to Marc from others (including his family) for coping with stress, dealing with problems, and navigating his adolescent and teenaged years, are all important facts that I would have been willing and able to discuss at Marc's resentencing trial in 2002.

[Sally Johnson Affidavit ¶¶ 18-22, Bates Nos. 89-93]

Ann Burgess was also available to opine about Mr. Barnette's institutional adjustment:

Trial counsel never asked me to explore and opine about Mr. Barnette's institutional adjustment, including the status of his relationships with various

93

family members and friends.  At the point in time when I was involved in his retrial, Mr. Barnette had been incarcerated in both county jail and federal prison for approximately six years. Based on the information I have now been provided with to review, it is clear that Mr. Barnette's adjustment to incarceration – his ability to abide rules, be non-violent, maintain constructive and positive relationships with others – was unsurprisingly strong. This is because Mr. Barnette's mental health issues are strongly ameliorated by structure and the absence of psychiatric triggers. Had trial counsel asked me to discuss these issues in my report and during my testimony, I would have certainly been willing to do so.

[Burgess Affidavit ¶ 22, Bates Nos. 51-55]

In addition to failing to have an expert witness provide critically important testimony about Mr. Barnette's institutional adjustment, resentencing counsel also failed to investigate, prepare, and present readily available evidence that Mr. Barnette had ongoing and significant interpersonal relationships with various family members and friends at the time of his 2002 trial. From the time of his arrest in 1996 until the 2002 trial, Mr. Barnette had been in contact with a significant number of people, including, but not limited to, Sonia Barnette, Jesse Cooper, Rick Barnette, Armaud Cooper, and Steve Austin. Mr. Barnette's contacts with these individuals were in person, by letter, or by telephone. As Sonia Barnette explains:

> Vicci and I stay in touch. He's my oldest son and he keeps a check on my health. He asks to make sure I am taking my medication. Vicci usually reminds us about family birthdays and things like that.
>
> Vicci stays in close touch with the family. He calls often. He calls when there is a family function. He asks when family will be together and calls at that time. Then people pass the phone around to talk to him. He will do this on any major holiday or family event. I remember talking to Vicci on the phone at a cousin's wedding and passing the phone around so everyone could speak with him.
>
> Vicci has been staying in touch with his kids. He'll say to me, "Remember to call Angelica. It's her birthday." When his son is acting up Vicci will ask me to call him. He lets me know when to call them and then I do. One time Tasha was feeling down and he asked me to call her, so I did. His kids love him. Vicci and Tasha had their difficulties but she doesn't hate him. She went to visit him at the

94

jail. It is hard with him being locked up and far away, but we try to make his presence felt. Vicci did a painting for Angelica for her to hang up in her house.

Vicci writes and sends cards. He'll send Valentine's Day cards, Mother's Day cards, and birthday cards. He drew cards and pictures for John Mack when he was younger. He did this before Vicci's second trial in 2002.

Vicci has always been in touch with Armaud while he's been locked up. They have a close bond. Vicci was also in close touch with Steve up until Steve died. He's also been in touch with my sisters, Tessie and Sheila.

Vicci will try to take care of me, even from jail. He will ask, "Are you taking your medicine?" One time I had to have a gallstone removed and he was always calling and monitoring how I was doing. He would call to check on me. He also sent me a get well card. It's as much like him being here as he could possibly be, given that he's locked up far away.

We had a landline at the house on West Boulevard. Vicci talked to Jesse on the phone and Jesse prayed for Vicci all the time. My dad would tell Vicci to trust in God and keep praying. Vicci was upset when Jesse started getting ill in 2002.

Vicci was in touch around the time my daughter McKenzie was born. She was born in September 2000. He checked on me when I was pregnant with her. He was concerned that I was being healthy during my pregnancy.

[Sonia Barnette Affidavit ¶¶ 92-99, Bates Nos. 34-48]

Resentencing counsel failed to inform Mr. Barnette's jury about these contacts and the many ways they were important and meaningful, not only to Mr. Barnette but also to his family and friends. These witnesses could have testified about, *inter alia*, Mr. Barnette's connectedness with his half-siblings (Sonia Barnette's two younger children); how Mr. Barnette would send family members his art work, which is something they cherished; his sincere interest in maintaining and developing his relationships with Natasha Heard and their two children; as well as his genuine acceptance of responsibility and remorse.

95

Such aspects of Mr. Barnette's character are, by their very nature, relevant to the sentencing determination. As Netoshia Tolbert, the mother of Marc's two children and a government witness at resentencing, explains:

> I was asked on the stand about Marc re-establishing contact with me after being out of touch for a long time. It was true that this had happened, but I didn't believe then – and I don't believe now – that it was something Marc did in an effort to look good for his trial. It was genuine on his part. Marc and I were so young when we got together and started a family. Despite our difficulties, Marc and I shared a deep bond and connection – and our relationship was not some stereotypical one where Marc was the terrible batterer and a monster. Marc had an incredibly sensitive and tender side to him, but it would compete with other aspects of his personality that made our relationship very turbulent. None of Marc's lawyers ever really understood that.

> Even to this day, Marc and I – and our kids – have a relationship that is real and meaningful. Our daughter Angelica recently went to visit him and it went really well.

[Tolbert Affidavit ¶¶ 53-54, Bates Nos. 200-206]

Unfortunately, because resentencing counsel failed to conduct a reasonably thorough investigation, this powerful evidence was never provided to the jury. Instead of this powerful and temporally proximate information about Mr. Barnette's relationships, the jury was provided with evidence that suggested Mr. Barnette had perhaps no ongoing contact with anyone who knew him prior to his arrest in 1996. For example, Rick Barnette, who had visited Mr. Barnette during his incarcerations at both Terre Haute, Indiana and Charlotte, North Carolina, was not asked about his contacts with Mr. Barnette following his 1996 arrests. No other family member or friend testified on behalf of Mr. Barnette at his 2002 trial.

There is little question that resentencing counsel's failure to present this readily available evidence was prejudicial. Indeed, the jury's findings in mitigation laid this bare, as only two jurors believed beyond a reasonable doubt that Mr. Barnette did well in a

96

structured environment; only one juror believed beyond a reasonable doubt that Mr. Barnette had accepted responsibility for his action; only one juror believed beyond a reasonable doubt that Mr. Barnette had remorse; and no jurors believed beyond a reasonable doubt that Mr. Barnette's brother and children would be harmed by his execution.

### G. Resentencing Counsel Unreasonably and Prejudicially Failed to Request a Continuance Despite Being Unprepared

While it is markedly clear that resentencing counsel's "strategy" was uninformed and based on incomplete investigation, it is also clear that resentencing counsel was also madly scrambling on the eve of and during resentencing to uncover information that should have been investigated and developed well in advance of resentencing. Despite the clear need for additional time, however, Ms. Lawson and Mr. Bender never moved to continue resentencing.

By way of background, on May 4, 2000, the Fourth Circuit remanded Mr. Barnette's case for a new penalty phase trial. On February 9, 2001, Mr. Barnette was brought back from Terre Haute, Indiana and placed in the Mecklenburg County Jail. On February 13, 2001, Jean Lawson and Claire Rauscher were appointed to represent Mr. Barnette.

For the next six-and-one-half-months, Ms. Lawson met with Mr. Barnette on three (3) separate occasions (February 22, 2001, May 2, 2001, June 20, 2001) for an approximate total of five (5) hours and forty-five (45) minutes. Jail records do not reflect any visits between Mr. Barnette and Ms. Rauscher, nor do they reflect any visits between Mr. Barnette and any investigator or expert during those six-and-a-half months. **[Bates Nos. 2309-2343]** Moreover, as of August 28, 2001, trial counsel had not conferred or

97

consulted with either of Mr. Barnette's prior trial counsel (Paul Williams and George Laughrun) or any of the experts previously consulted and/or used during the 1998 trial (Dr. Seymour Halleck, Dr. Faye Sultan, Dr. Ruth Kappius, Sindy Maxwell, Dr. William Tyson, Dr. John Warren, and Dr. Mark Cunningham).

On August 31, 2001, three days after resentencing counsel submitted their initial request for funding of an investigator, the Court directed that trial would begin on March 19, 2002. With a trial date approximately seven (7) months away, resentencing counsel had yet to initiate any independent investigation into Mr. Barnette's case, his background, or his mental health.

On October 31, 2001, two months after the Court ordered that resentencing would begin on March 19, 2002, and with their investigation barely underway, Ms. Rauscher and Ms. Lawson filed a Motion to Continue Date for Sentencing Hearing. In their motion, resentencing counsel detailed their respective commitments in other cases, including Ms. Lawson's capital trial that was scheduled to start in January 2002, two other capital cases for which Ms. Lawson had responsibility, and other significant cases pending trial. The Court granted resentencing counsel's motion, although the relief granted was a rescheduling of the trial for one week earlier: March 12, 2002.

On November 29, 2001, during a hearing about resentencing counsel's motion for reconsideration of the March 12, 2002 start date of resentencing, Ms. Rauscher was removed as counsel for Mr. Barnette.

On January 14, 2002, Harold Bender was appointed to represent Mr. Barnette with Ms. Lawson. At the time, he was already counsel in at least one other capital case that would be tried in Rowan County between May 6, 2002 and May 23, 2002.

Ms. Lawson also had a very active law practice that included representation in a number of other capital cases. On January 16, 2002, two days after Mr. Bender was appointed as her co-counsel in Mr. Barnette's case, Ms. Lawson was appointed to represent Jeffery Neal Duke for a capital retrial of a double murder in Gaston County. [Lawson Affidavit ¶ 20, Bates Nos. 94-101] And one week after Mr. Bender's appointment, Ms. Lawson would begin a capital murder trial that would last until February 7, 2002.

On February 26, 2002, Mr. Bender and Ms. Lawson met *ex parte* with the Court regarding the defense team's budgetary needs. At the time of the hearing, Mr. Bender had been involved in Mr. Barnette's case approximately six weeks, and Ms. Lawson had only recently completed a capital trial in Mecklenburg County. During the hearing, Mr. Bender explained:

> The trial date is scheduled for July 15, 2002. And in order for us to get ready for that, we have literally been burning the midnight oil. We don't want this case continued. We're not going to ask for this case continued.

[ECF Doc. 688 at 2] Based on the limited amount of that that Mr. Bender had been in the case, and the lack of ground covered overall by resentencing counsel, there was simply no basis for promising that resentencing counsel would not ask for a continuance.

At the point in time when resentencing counsel promised not to seek a continuance, their mitigation investigation was barely underway, if it had started at all. Various experts had not yet been engaged, and it was already readily apparent that resentencing counsel was failing to adequately supervise its mitigation specialist, who was based near Albany, New York. As a result, the defense preparation suffered immeasurably. The disorganization and absence of an informed and coherent strategy

99

would later be laid bare by counsel's presentation at resentencing.

An "insistence upon expeditiousness in the face of a justifiable request for a delay can render the right to defense with counsel an empty formality." *Unger v. Sarafite*, 376 U.S. 575, 589 (1964). Although a motion to continue is vested in the discretion of the district court, its denial will be reversed if it is "unreasoning and arbitrary." *Morris v. Slappy*, 461 U.S. 1, 11 (1983). Under the facts and circumstances as they existed here, it was unreasonable for resentencing counsel not to seek a continuance so they would be adequately prepared to defend Mr. Barnette.

**H. Resentencing Counsel Unreasonably and Prejudicially Failed to Maintain and Preserve Mr. Barnette's Files**

As the Court is well aware, Mr. Barnette's case files, going back to his 1998 trial, have not been located despite post-conviction counsel's continuing efforts to locate them. Indeed, on September 17, 2012, "it was confirmed that all of the attorneys who had represented [Mr. Barnette] in his underlying capital trial and [2002] sentencing proceedings … had transferred their case files to Mr. Bender," and that Mr. Bender had been unable to locate any of those files, or his own files for the 2002 resentencing. [ECF Doc. 17][10]

Resentencing counsel's failure to maintain and preserve Mr. Barnette's files is unreasonable and prejudicial. The absence of Mr. Barnette's files—understood to be scores of missing boxes constituting prior counsel's work in two federal death penalty trials which are missing through no fault of Mr. Barnette—has created an impediment

---

[10] Prior to his death on March 24, 2013, Mr. Bender had produced approximately 300 pages consisting of miscellaneous electronic documents that largely concerned post-trial matters. [Bates Nos. 4634-4903] The approximately 40 to 50 boxes of trial files that Mr. Bender and co-counsel Jean Lawson reportedly possessed at the time of Mr. Barnett's 2002 trial, inclusive of handwritten notes, memoranda, correspondence with the government and experts, etc., have not yet been located or produced.

and obstacle of the first magnitude. Despite the fact that Mr. Barnette has "been pursuing his rights diligently," the absence of his files has created an "extraordinary circumstance" that threatens to "[stand] in his way" as he endeavors, through counsel, to vindicate his constitutional rights in connection with his death sentences. *Holland v. Florida*, 130 S.Ct. 2549, 2562 (2010) (internal quotes and citations omitted).[11]

Here, where Mr. Bender appeared on Mr. Barnette's behalf before the Court as recently as 2009, his obligation to retain and maintain Mr. Barnette's file is indisputable. Indeed, Mr. Bender was well aware from his years as a criminal defense attorney, and his familiarity with capital post-conviction proceedings, that Mr. Barnette's case was—and is—still quite active. The absence of these files creates an extraordinary impediment for Mr. Barnette that rises to the level of a constitutional violation. At a minimum, trial counsel's failure to maintain and preserve Mr. Barnette's files strongly supports the need for an evidentiary hearing in order to resolve any factual disputes which might have otherwise been resolved by reference to trial files. *See*, *e.g*., *Turner v. Wong*, 641 F. Supp. 2d 1010, 1036, 2009 WL 2394152 (E.D. Cal. 2009) (capital case where trial files were lost; district court's findings with respect to trial counsel's performance and prejudice made following federal evidentiary hearing; post-conviction relief granted and petitioner's death sentence vacated due to trial counsel's ineffective assistance of counsel); *Poindexter v. Booker*, 05-CV-71607, 2007 WL 1556671 (E.D. Mich. May 30, 2007), *aff'd*, 301 F. App'x 522, 2008 WL 4997500 (6th Cir. 2008) (non-capital criminal case where trial files were lost; district court's findings with respect to trial counsel's performance and prejudice made following state evidentiary hearing; post-conviction

---

[11] Under RPC 209 of North Carolina's Revised Rules of Professional Conduct, a client's file "belongs to the client"; as such, counsel is commanded to "store a client's file in a secure location where client confidentiality can be maintained."

relief granted and petitioner's conviction vacated due to trial counsel's ineffective assistance of counsel).

### I. Resentencing Counsel Unreasonably and Prejudicially Failed to Protect Mr. Barnette's Constitutional Rights

As alleged throughout his § 2255 motion, Mr. Barnette was denied his right to the effective assistance of counsel at his capital resentencing in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Specifically, Mr. Barnette's references Claim I, Subpart K of his § 2255 motion, and asserts that an evidentiary hearing and relief is justified on these allegations.

### J. Resentencing Counsel's Unreasonable Performance was Prejudicial to Mr. Barnette

Based on Mr. Barnette's *Initial Motion for Relief Pursuant to 28 U.S.C. § 2255*, the merits brief filed in support hereto, and all prior pleadings and documents filed in this matter, there is a reasonable probability that this accurate and thorough description of Mr. Barnette's background and mental illness "might well have influenced the jury's appraisal of his moral culpability." *Williams*, 529 U.S. at 398. *See also Wiggins*, 539 U.S. at 536 ("had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence").

**Claim II: Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution with Respect to Raising and Supporting a Claim of Racial Discrimination in Jury Selection, and the *Batson* Proceedings were Unconstitutionally Conducted**

Mr. Barnette respectfully refers to and incorporates herein Claim II of his § 2255 motion. Based on the factual allegations raised in this claim, an evidentiary hearing is required.

**Claim III:** **Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution as a Result of Misconduct Related to the Jury**

Mr. Barnette respectfully refers to and incorporates herein Claim III of his § 2255 motion.

As asserted previously, "[j]uror misconduct of virtually every kind is unearthed in post-conviction proceedings, and has formed the basis for post-conviction relief and further factual inquiry in both state and federal courts, including capital § 2255 proceedings." [ECF Doc. 49 at 1-2] (citing *United States v. Sampson*, 820 F.Supp.2d 151, 158-160 (D. Mass. 2011) (death sentence vacated in capital § 2255 proceedings where juror failed to disclose personal experience with abusive relationship and daughter's incarceration, details of which were similar to trial evidence). As the Fourth Circuit recently explained when reversing and remanded a capital case due to juror misconduct:

> It is clearly established under Supreme Court precedent that an external influence affecting a jury's deliberations violates a criminal defendant's right to an impartial jury. *See, e.g., Parker v. Gladden,* 385 U.S. 363, 364–66 (1966) (per curiam); *Turner,* 379 U.S. at 472–73; *Remmer* [*v. United States,* 347 U.S. 227, 229 (1954)]. Especially troubling are private communications between a juror and a third party. *See Fullwood v. Lee,* 290 F.3d 663, 677 (4th Cir.2002) ("The Supreme Court has clearly stated that private communications between an outside party and a juror raise Sixth Amendment concerns." (citing *Parker,* 385 U.S. at 364)). Indeed, it is well established that "'private talk, tending to reach the jury by outside influence' is constitutionally suspect." *Id.* (quoting *Parker,* 385 U.S. at 364). The Supreme Court recognized this as early as 1892 when it declared that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox v. United States,* 146 U.S. 140, 150 (1892).

*Barnes v. Joyner*, 751 F.3d 229, 240-41 (4th Cir. 2014).

This Court previously denied Mr. Barnette's *Motion for Leave to Conduct Juror Interviews* [ECF Doc. 49] (prior to the government filing a response). Mr. Barnette,

through undersigned counsel, respectfully preserves this claim and his arguments in support thereof.

**Claim IV:** **Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution Because the Decision to Prosecute Petitioner in Federal Court Rather than State Court Resulted in a Well-Known Significant Reduction in the Number of African-Americans in the Jury Pool in 1998 and 2002**

Mr. Barnette respectfully refers to and incorporates herein Claim IV of his § 2255 motion. Based on the factual allegations raised in this claim, an evidentiary hearing is required.

**Claim V:** **Petitioner Marc Barnette was Deprived of His Constitutional Rights to Due Process and a Fair Trial under *Brady*, *Giglio*, *Kyles*, and *Napue* in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution**

Mr. Barnette respectfully refers to and incorporates herein Claim V of his § 2255 motion. Based on the factual allegations raised in this claim, an evidentiary hearing is required.

Mr. Barnette further notes, as he has asserted in other pleadings, that the government has not fully complied with the Court's order to produce a complete copy of all material previously provided by the government to Mr. Barnette's counsel for the 1998 trial and 2002 resentencing. [ECF Doc. 17, 64]

**Claim VI:** **The Death Penalty is Unconstitutional Because it is Sought on the Invidious Basis of Race and Irrational Basis of Geography**

Mr. Barnette respectfully refers to and incorporates herein Claim VI of his § 2255 motion. Based on the factual allegations raised in this claim, an evidentiary hearing is required.

**Claim VII:** **The Manner in Which the Bureau of Prisons Would Carry Out Mr. Barnette's Execution Would Violate the Eighth Amendment**

Mr. Barnette respectfully refers to and incorporates herein Claim VII of his § 2255 motion.

The Federal Bureau of Prisons maintains an execution protocol that carries out death sentences by an intravenous injection of a lethal substance or substances in quantity sufficient to cause death. Recent reports concerning the execution of Clayton D. Lockett in Oklahoma on April 29, 2014 highlight the constitutional infirmities of executing a condemned person by lethal injection. *See* Cary Aspinwall & Ziva Branstetter, "Botched execution described as 'a bloody mess,' court filing shows," *Tulsa World*, Dec. 14, 2014[12]; Oklahoma Department of Public Safety, *The Execution of Clayton D. Lockett, Case Number 14-0189SI*.[13] Only months after Mr. Lockett's execution, Joseph Wood was executed in Arizona after being injected 15 times with an experimental lethal drug cocktail during the nearly two hours that it took him to die. *See* Mark Berman, "Arizona execution lasts nearly two hours; lawyer says Joseph Wood was 'gasping and struggling to breath,'" *Washington Post*, July 23, 2014.[14]

Based on the factual allegations raised in this claim, an evidentiary hearing is required.

---

[12] Available at: http://www.tulsaworld.com/news/investigations/botched-execution-described-as-a-bloody-mess-court-filing-shows/article_a4b70b76-84f7-5ebd-a5f3-044c205d474a.html.

[13] Available at: http://www.dps.state.ok.us/Investigation/14-0189SI%20Summary.pdf.

[14] Available at: http://www.washingtonpost.com/news/post-nation/wp/2014/07/23/arizona-supreme-court-stays-planned-execution/. A transcript of Mr. Wood's attorney's *Motion for Emergency Stay of Execution*, filed and heard (telephonically) during the course of Mr. Wood's execution, chillingly describes the challenges facing the U.S. District Court as it grappled with whether to halt the execution. Mr. Wood was pronounced dead during the hearing. Transcript available at: http://www.scribd.com/doc/234993495/Transcript-related-to-Joseph-Wood-execution.

**Claim VIII:** **Cumulative Effect of Errors References in this § 2255 Motion Demand Relief**

Mr. Barnette respectfully refers to and incorporates herein Claim VIII of his § 2255 motion. Based on the factual allegations raised in this claim, an evidentiary hearing is required.

## CONCLUSION

Mr. Barnette's § 2255 petition alleges colorable Fifth, Sixth, and Eighth Amendment claims, including numerous facts outside of the record, which if proved, would entitle Mr. Barnette to relief. Pursuant to Rule 8 of the Rules Governing § 2255 Proceedings and Fourth Circuit precedent, Mr. Barnette is entitled to an evidentiary hearing on all of his claims. As with the facts alleged in Mr. Barnette's § 2255 motion, the government may not dispute the facts contained in this brief and its exhibits. If that is the case, then this Court may grant summary judgment with respect to some or all of the claims for relief.

106

Dated: December 22, 2014

/s/ Mark E. Olive
N.C. State Bar No. 10615
LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com


/s/ Jacob H. Sussman
N.C. Bar No. 31821
TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, NC 28203
704-338-1220 (tel)
704-338-1312 (fax)
jsussman@tinfulton.com

/s/ Ross Richardson
Ross Richardson
FEDERAL DEFENDERS OF WESTERN
   NORTH CAROLINA, INC.
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720 (tel)
704-374-0722 (fax)
ross_richardson@fd.org

107

<h1 style="text-align:center"><u>CERTIFICATE OF SERVICE</u></h1>

The undersigned hereby certifies that he has served the foregoing pleading with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

William M. Miller
William.Miller@usdoj.gov

Dated: December 22, 2014

/s/ Jacob H. Sussman
Counsel for Mr. Barnette