<u>**Affidavit of Ann Wolbert Burgess**</u>

I, Ann Wolbert Burgess, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am presently a faculty member of the William F. Connell School of Nursing at Boston College. I have a Bachelor of Science degree in nursing from Boston University, a Master of Science degree in psychiatric nursing from the University of Maryland, and a Doctor of Nursing Science degree in psychiatric nursing from Boston University. I have held various administrative positions, including the chair of the departments in which I have worked. I have also been the interim dean of the School of Nursing at Boston University and the director of nursing research at Boston University.

3. Throughout my career, I have maintained a clinical and forensic practice, in addition to teaching and researching. I have been certified by the American Nurses Association as a clinical specialist in psychiatric mental health nursing in 1980. In Massachusetts, where I live and work, I have prescriptive authority, meaning I can prescribe medication for patients I am treating. I have testified as an expert witness in numerous legal proceedings. In criminal cases, I have primarily testified for the government.

4. I was contacted by Jean Lawson to work on Aquilia Marcivicci ("Marc") Barnette's case in 2001. I had never before worked with Ms. Lawson or the other lawyers involved in Mr. Barnette's case.

5. I had previously worked on a capital case from Charlotte, North Carolina with attorneys Jim Cooney and Isabel Scott Day. The client was Henry Louis Wallace. I testified as an expert in that case.

6. I no longer have any of my files from my work in the Barnette case.

7. Post-conviction have provided me with my report, dated July 1, 2002, as well as my trial testimony from 2002. According to my 2002 report and trial testimony, I reviewed the following information prior to submitting a report and testifying at trial: a copy of the direct appeal brief from Mr. Barnette's initial trial; Mr. Barnette's school, employment, medical, and other records prepared by Paul Williams and Cindy Maxwell; mental health reports and testimony by mental health experts who testified at Mr. Barnette's initial trial; Mr. Barnette's prison medical records; transcribed interviews of Robin Williams (from 5/30/96), Benjamin Spencer Greene (from 5/1/96), Aquilia "Marc" Barnette (from 6/25/96 and 6/28/96); video and audio-taped copies of Mr. Barnette's police interview; discovery materials from the underlying crimes; trial transcripts from Mr. Barnette's original trial; police reports and statements regarding an incident at Bojangles from 11/12/93; and police reports from the 1974 homicide of Pearl

1

Bates No. 51

Brown. I viewed the home of Mr. Barnette's mother and the path Mr. Barnette took prior to the murder of Donald Allen. I also interviewed Mr. Barnette on June 14 and June 26, 2002; and interviewed Sonia Barnette, Derrick Barnette, and Mario Barnette.

8. For purposes of preparing this affidavit, in addition to my 2002 report and trial testimony, I have reviewed information provided to me by Mr. Barnette's post-conviction counsel that was not previously made available to me. This information includes numerous affidavits gathered by post-conviction counsel, Dr. Richard Dudley's post-conviction mental health report, Zachary Rowles' post-conviction mitigation report, and Cessie Alfonso's mitigation report that she prepared for trial counsel in 2002 (a copy of which I never received or was made aware of).

9. The new information that I have reviewed significantly changes my earlier findings and opinions. Had I been provided with this information during my trial work on behalf of Mr. Barnette, I would have rendered a different expert report and testified in markedly and materially different ways. Indeed, now that I have been provided with additional information from post-conviction counsel, it is my belief that my earlier findings, opinions, and testimony were badly marred by inaccurate and incomplete information with which trial counsel provided me.

10. For example, a prominent focus of my report and trial testimony was the notion that Mr. Barnette had witnessed and experienced domestic violence during his youth, and that his criminal conduct in April through June 1996 "may be understood, in part, as a symbolic reenactment of family and childhood patterns" (which is how I wrote about it in my report). I also testified that the "roots" of his behavior could be found in the way he was "raised and developed." The information now made available to me makes clear that this emphasis on "multi-generational violence" as an explanation for Mr. Barnette's criminal behavior in question was misplaced and due to incomplete and inaccurate information provided to me by trial counsel. While it is true that Mr. Barnette witnessed and experience domestic violence, it is clear from the new information provided that his criminal conduct could not simply be explained by that upbringing. Rather than any "symbolic reenactment of family and childhood patterns," Mr. Barnette's criminal conduct was attributable to a psychotic episode and mental health crisis that he was experiencing. The incomplete and inaccurate information provided by trial counsel led me to erroneously conclude that Mr. Barnette "ha[d] devoted his adolescent life to a continuous pattern of reenacting and trying to resolve the way he was programmed in childhood." Rather than simply acting out as a result of familial dysfunction, as I reported and testified about in 2002, Mr. Barnette suffered from debilitating mental health issues that profoundly affected his behavior throughout his life.

11. In my report and trial testimony, I opined that Mr. Barnette may have been suffering from major depression and a personality disorder "not otherwise

2

specified," with paranoid, antisocial, and borderline features. These diagnoses were incomplete and lacking because the information provided to me at the time was also incomplete and lacking. The new information provided by post-conviction counsel makes far clearer the most prominent and important aspects of Mr. Barnette's mental health status during the relevant period of time. Based on this new information, it is my opinion that Mr. Barnette was experiencing a psychotic episode and mental health crisis, and that he also suffered from a mood disorder that was significantly affecting his thinking and behavior.

12. A significant focus of my report concerned Mr. Barnette's relationships with women. My bases for learning about these relationships were reports written by Cindy Maxwell, testimony from the first trial, and meetings with Mr. Barnette. Based on the information that was provided to me, I testified at trial that there was a consistent pattern to all of Mr. Barnette's intimate relationships, namely, that he was programmed to become suspicious, paranoid, and a batterer in each case. Now that I have been provided with new information from post-conviction counsel, it is clear to me that I was previously given incomplete and inaccurate information about Mr. Barnette's relationships. Rather than being "programmed" or engaging in "repetition compulsion" in each and every one of his intimate relationships, Mr. Barnette had very different types of relationships with different women – and that he did not, in fact, fit the profile of a "classis batterer."

13. For example, information provided by post-conviction counsel makes clear that Mr. Barnette's relationship with Sheila Sullivan and Mr. Barnette's move to Georgia during high school were both far more complicated and significant than what trial counsel's information had suggested. In stark contrast to information I was previously given, Mr. Barnette had been faithful during the relationship with Ms. Sullivan (while she was not); Mr. Barnette had been a supportive companion during times of stress and crises (including when Ms. Sullivan became pregnant and later terminated the pregnancy); and Mr. Barnette had not been abusive toward Ms. Sullivan or controlling. Moreover, Mr. Barnette was the victim of a brutal assault carried out by another teenager with whom Ms. Sullivan later cheated on Mr. Barnette. This led Mr. Barnette into a serious depression and an attempted suicide. Witnesses describe Mr. Barnette as being profoundly affected by this relationship with Ms. Sullivan.

14. This information belies the information that had been previously provided to me by trial counsel on many important fronts. For example, it was previously suggested to me that Mr. Barnette's suicide attempt around this time had been minor or insignificant; in reliance on this information from trial counsel, I wrote in my report that Mr. Barnette made "suicidal gesture" (rather than a clear attempt to kill himself). The new information makes clear that Mr. Barnette was, in fact, deeply depressed and affected by the developments in his relationship with Ms. Sullivan, and that those developments, along with his mood disorder, led him to attempt suicide.

3

15. This information also significantly changes the aspects of my report that suggested that Mr. Barnette "sought out peer male companionship who negatively influenced him," and that Mr. Barnette would always fight when challenged. Instead, the truth is that Mr. Barnette was engaged in a solid, nonviolent relationship with Ms. Sullivan in which he ended up getting very badly hurt, both physically and psychologically.

16. This information, along with information concerning relationships with Tameka Hunter and Kowana Dozier, also dramatically undercuts the notion that Mr. Barnette was somehow a "classic batterer" whose relationships always followed the same pattern, including "obsessive pursuit." As was the case with Ms. Sullivan, Mr. Barnette's relationships with Ms. Hunter and Ms. Dozier did not include violence or misplaced jealousy or the other elements of domestic violence or obsessive pursuit.

17. The new information provided by post-conviction counsel concerning Mr. Barnette's relationships with Crystal Dennis and Netoshia Tolbert – both of which concededly involved violence by Mr. Barnette – confirms for me that my earlier conclusions, based on information provided by trial counsel, were misplaced. The additional information from Ms. Dennis, Ms. Tolbert, and witnesses to their relationships with Mr. Barnette makes clear that Mr. Barnette was not a "classic batterer," as my report and testimony suggested. Instead, this new information strongly supports the finding that Mr. Barnette suffered from psychiatric issues that were both affected by a mood disorder as well as certain psycho-social "triggers." In my opinion, this is a critically important difference from what was reported previously at trial.

18. During my trial testimony, I was asked by the prosecutor whether I had interviewed Ms. Dennis, Ms. Heard, or another ex-girlfriend. I had not. Trial counsel never suggested to me that speaking with Mr. Barnette's ex-girlfriends or witnesses to those relationships was a possibility.

19. Information concerning Mr. Barnette biological father that was not previously shared with me is also quite significant. While I was previously made aware of the fact that Derrick Barnette denied paternity of both Marc and Mario, I was never provided information concerning Sonia Barnette's troubled and troubling response to that fact – which was complete denial. In the face of a paternity test and actual knowledge that another man was Marc's father, Sonia Barnette continued to tell her sons and others that Derrick Barnette was, in fact, the father. Sonia Barnette's handling of the situation – perpetuating known lies to her children and thereby creating an irreconcilable conflict with what Derrick Barnette was saying – caused deep confusion and distrust on multiple levels. The lies concerning Marc's biological father's identity played an important role in the family dynamic. Far more potent than simply breeding "suspicion" and "grief," it fostered incompatible set of "truths" that were dangerously destabilizing for Mr.

4

Bates No. 54

Barnette. Indeed, it forced Mr. Barnette to navigate an almost unnavigable path between the two people he believed to be his parents and caretakers.

20. Information concerning the depth of Sonia Barnette's trauma that was not previously shared with me is also quite significant. Trial counsel provided little accurate information about Sonia Barnette's upbringing and adolescence other than perhaps the fact that her mother was murdered when Sonia was a young mother. The information now being shared with me about Sonia's trauma in the wake of her mother's murder shines important and new light on the family structure and dynamic in which Mr. Barnette was raised. The murder of Pearl Cooper; Jesse Cooper's own post-traumatic stress and how that manifested; the issues concerning Marc's paternity and how that was handled within the family; and Sonia's difficulties as a young mother who ultimately could not hold onto her job, are all facts that would have affected my report and testimony.

21. Trial counsel never asked me to explore and opine about Mr. Barnette's institutional adjustment, including the status of his relationships with various family members and friends. At the point in time when I was involved in his retrial, Mr. Barnette had been incarcerated in both county jail and federal prison for approximately six years. Based on the information I have now been provided with to review, it is clear that Mr. Barnette's adjustment to incarceration – his ability to abide rules, be non-violent, maintain constructive and positive relationships with others – was unsurprisingly strong. This is because Mr. Barnette's mental health issues are strongly ameliorated by structure and the absence of psychiatric triggers. Had trial counsel asked me to discuss these issues in my report and during my testimony, I would have certainly been willing to do so.

22. Trial counsel never consulted with me about the decision to have Mr. Barnette testify on his own behalf at trial. Had trial counsel sought my advice or insights about Mr. Barnette as a potential witness, I would have strongly cautioned them that Mr. Barnette, despite genuine remorse for what he had done, would likely offend the jury by his testimony. I would have expressed my strong reservations that given his mental health makeup and experiences, and his general lack of insight, Mr. Barnette would explain and rationalize his behavior in ways that would likely anger jurors.

Date 11/3/2014

*Ann Wolbert Burgess*
ANN WOLBERT BURGESS

Affirmed and subscribed before me on this the 3re day of Nov., 2014 in MIDDLESEX County, Massachusetts.

Notary Public
My commission expires: _____

DONALD M LOVELESS
Notary Public, Commonwealth of Massachusetts
My Commission Expires Dec. 31, 2016

## Affidavit of Armaud Cooper

I, Armaud Cooper, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Marietta, Georgia. I am a student in the business school at Kennesaw State University.

3. Aquilia Marcivicci Barnette and I are first cousins and I have known him my whole life. I call him Vicci. He is about eight years older than me. His mother, Sonia Barnette is my mother's older sister. Their other sister, Tessie, is the oldest of the three of them.

4. I didn't have any contact with Vicci's first team of lawyers before his first trial. I was in Charlotte in 1998 when his first trial happened. I went to Vicci's trial for a day. Seeing the trial made me angry and I didn't go back.

5. Between his first trial and his second trial I moved back to Georgia. Before Vicci's second trial I met with his lawyers a couple times. I met with Jean Lawson in late 2001 or early 2002. She and I had lunch at Chili's in Austell, Georgia. It was just the two of us.

6. I also met with the lawyers a day or two before Vicci's trial. Vicci's two attorneys were there. This meeting included me, Mario Barnette, Vicci's brother, and Rick Barnette, Vicci's dad. It was only the attorneys and us. I don't recall ever meeting a person named Cessie Alfonso, or someone who was called a mitigation specialist or investigator.

7. I have had a chance to review my testimony from Vicci's second trial. I was not well-prepared to testify and was unsure about how in-depth or real to get about certain things. As a result, my testimony was really incomplete. Not only was I not prepared about how to testify, the attorneys also didn't ask me a lot of important questions about Vicci and our family.

8. For example, during my testimony, I was asked questions about the time period when Vicci was living with us in Georgia. I mentioned that things started to "deteriorate" in the family around that time. When Vicci's attorney asked me to explain, I wasn't sure what to say because I assumed they wanted me to talk about the more positive aspects of Vicci. So instead of talking about how crazy and unstable things were when Vicci and I were living together, I said that there was a "lack of communication between the adults and children in the house." Although that was true – the adults never clued us into what they were doing, where they were going, or when they would be back – that did not begin to describe what it was like back then.

1

Bates No. 56

9. Vicci's lawyer asked me if I noticed "any alcohol or drug consumption." While my answer was true – that I noticed alcohol consumption and was suspicious about drug consumption – it was not complete or very descriptive. I wasn't sure whether it was okay to say more about what had been going on in the house at the time. I did not know whether the lawyers had told other people in the family that we would be getting into some of this family history, which was pretty raw and painful.

10. For example, my mom was with Michael O'Neal when we all lived together in Lithonia. Michael was a drug dealer. He also had a job at General Motors. Since I was only about 6 or 7 years old when Vicci and his family moved in, it shouldn't be surprising that I didn't notice much "drug consumption." But I certainly could have testified about the fact that drug dealing with was going on in the house and that cocaine was stored in the closet of my room.

11. As another example, Vicci's lawyer asked me whether Vicci, Mario and I ever talked about "what was going on with the adults" in the household. I responded by saying that Vicci basically tried to make sure "that a lot of stuff went unseen in terms of what [Mario and I] saw." Vicci's lawyers never asked, and I didn't know to offer information, about what that "stuff" was that Vicci was trying to shield us from. One time Michael's ex-wife, Joyce, came to our door with a gun. This woman was acting crazy and I remember Marc pushing me and Mario into a closet. I heard the adults shouting at each other and I heard my mom yell that Joyce had a gun. The police came to the house and there was a lot of commotion. I later learned that Joyce was threatening to kill either Michael, my mother, or both of them.

12. I was seven or eight years old when our family moved to a house on Stone Mill Manor in Lithonia, Georgia. By the time I was going on 12 we'd moved to an apartment complex on Powers Ferry Road and we were staying with a junkie named Tracy. This was a friend that my mom met through the Atlanta nightlife.

13. During my testimony, Vicci's lawyer asked me to talk about how Vicci and I would ask our mothers to get us a snack or candy from the store when they were going out. I had told the lawyer this story before the trial. As a young kid, I thought of this as a game. In reality, this was an example of how our parents would lie to our faces about what they were doing. Maybe Vicci understood that our mothers were not, in fact, going to the store, but were instead going out to a club or somewhere else. Reading my testimony about it, I don't think it was clear from what I said or what was asked just how messed up it was that this happened so often.

14. Although there was a little bit of discussion during my testimony about my grandfather, Jesse Cooper, there was no discussion about my grandmother, Pearl. This is because no one asked me about her. My mom was in the house when Pearl was shot and killed by her husband Loyd Brown. My mother was the first one to see her body. She was only a child when this happened. My Aunt Sonia was a young teenager. Vicci was just a baby.

2

Bates No. 57

15. Had I been asked about Pearl's murder during my testimony, I would have talked about how Pearl's murder debilitated the family and we never recovered. It didn't just affect my mom. Our family has a history of sweeping stuff under the rug. For a long time, my mother and Aunt Sonia wouldn't talk about the family's issues – what happened to Pearl, what it was like living with my grandfather, Jesse, even stuff that Vicci was going through before the murders.

16. Pearl's murder affected Sonia, Sheila and Tessie. I know my mother's been depressed. She also had a nervous breakdown. When Tessie gets emotional she stays away. Sonia would try to act like nothing was the matter, but she was never engaged with what was really going on. She would try to float above it.

17. Because their mother was taken from them, neither my mother nor Aunt Sonia had parenting skills. My mom had me when she was 19. My Aunt Sonia was even younger when she had Vicci. I grew up in a household where the adults were always thinking about themselves, drinking, and getting high. Based on what they went through, I understand what they were doing, but they were doing it in excess and not realizing what it did to me and my cousins.

18. Vicci's lawyer never asked me about the fact that after Sonia and Rick Barnette divorced, Rick had a paternity test done that indicated he was not Vicci's father. I knew about this before my testimony in Vicci's second trial. When I learned about it, I figured it was just another secret or issue that was swept under the rug.

19. During my testimony I described Marc as someone I always looked up to, and that he had been like a father figure to me since I never knew my own father until around 2000. Because I did not know what the lawyers wanted me to talk about, and because they never directly asked me, I didn't talk about how Marc was very stressed about life back then. For example, while Vicci and his family were in Atlanta they made four or five moves. They lived two places with me and my mom, and then they lived two more places after Sonia moved the kids out on their own. Then Vicci also went and lived in Newnan. They were always bouncing from place to place.

20. Vicci was anxious about moving from Charlotte to Georgia in the first place. I was younger and I was always watching him. Before his first day at Lithonia High School he spent an hour in the closet.

21. When we lived together in Lithonia, Vicci started dating Sheila Sullivan. She came over to our place sometimes. She came for a family dinner one time, and also one time when the family was watching a movie together. She said virtually nothing. My memory is of her sitting on the couch and doing nothing. However, Vicci liked her a lot. I remember Sheila threatening to kill herself if Vicci didn't get back together with her. She tried to throw herself in front of a car or a bus one time. She called Marc about this.

3

Bates No. 53

22. Vicci was beaten up while we were living in Lithonia. He was hurt badly and had to go to the hospital for it.

23. After Sheila, Vicci dated Tasha. She got close to our family. She was always with us, even more than her own family. She would sneak out of her mother's place and come over. At first, Vicci and Tasha were happy. But they were both too young and weren't ready for everything that happened. They had two children together while they were still teenagers. Even now I'm still in contact with Tasha and their kids. They came to my wedding a few years ago and I see their son, Marc Jr. often.

24. Vicci and Tasha moved to Newnan, Georgia with their two kids. I visited Vicci in Newnan. That was where his relationship with Tasha ended. Things were rough for them. They were out of school and Vicci was working two jobs. He was a teenager trying to handle adult situations.

25. During my cross-examination, the prosecutor asked me whether I was proud of Marc when he spent some time in jail in Georgia. I responded by saying that I wasn't proud of him, but that I was worried about him. And in response to other questions, I testified that I was worried about Tasha, as well. Neither the prosecutor nor Vicci's lawyer asked me any follow up questions about my worries and what I meant. I would have talked about the obvious stress that Vicci and Tasha were under, and how Vicci was losing his ability to keep his life together. I would have explained that I was worried about how Vicci didn't have real support from his mother or my aunt – or anyone, really.

26. After Vicci moved back to Charlotte from Newnan, there was a time when we all lived together there, too. Charlotte was just like Atlanta in that our family was all physically there together, but we were not cohesive. Everybody was doing their own thing.

27. There is a lot of denial in our family and there has been for years. We are a family with a background of emotionally unstable relationships. Not just Vicci, but me too. When things don't go well there can be a tipping point. It was not stable to be in the type of relationships Vicci was in.

28. During my testimony, I was never asked about Vicci's relationship with Robin, even though I had been present when Vicci was moving his stuff out of their apartment in Virginia. After Vicci and Robin broke up, I went with him and my grandfather to Roanoke to get the rest of Vicci's stuff. Things got heated while we were moving Vicci's things out of Robin's apartment and into the moving truck. That was the first time I saw a woman, Robin, outside of the family that showed the other side of her character. Vicci and Robin started arguing when Vicci went to break down the bed. He and Robin had been in the back and they came out arguing. Robin was very boisterous. She had a high voice and was animated. She was taunting Vicci. She was also saying that there had already been another man in her bed. That was when emotions ratcheted up.

4

Bates No. 53

29. After he moved back from Virginia, Vicci was depressed and down. He slept in John Mack's room but spent most of his days upstairs in the loft. He'd spend time in his room, in the dark. No one was too surprised to see him like that. He'd been like that before. He was like that after things didn't work with Tasha, too.

30. At some point Vicci shaved his head with Mario's clippers. I asked him about doing this and he responded that he needed a change. He said he just needed to do something different. I know Vicci also sold some things at a flea market in that time period as well.

31. I remember Vicci often sitting on the bucket at the split in the driveway around that time.

32. Vicci never seemed to be able to control his moods and thoughts very well. When Vicci is feeling up he will talk faster. He was up when he was fixing cars. Things that he liked were cars, art, and music. Vicci could have a lot of energy. He has "bouncing off the walls" type energy. He can go a mile a minute. He would literally run into a room. He could be the most energetic person I know. He always has new ideas and thoughts. However, they are not always the most well thought out ideas.

33. A lot of people in the family have pretty severe emotional highs and lows. My brother, Michael Jr., and my sister, Michaela, have both been diagnosed with Bipolar Disorder and ADHD. They have seen psychiatrists and therapists, and they have been prescribed a number of medications, including Lithium and Ritalin. Their illnesses have caused Michael and Michaela to have erratic behaviors and heavy mood swings. When they are in a good mood they are great, but their mood can turn in a matter of seconds. Both of them are extremely volatile. They get upset easily and fly off the handle. Michael and Michaela are both very impulsive.

34. My mom, Sheila, has always been very impulsive as well. For as long as I can remember, she would do things without really thinking about it. Sheila was always quick to react to things, and she used to be very hot-headed. My grandfather Jesse always said that Sheila had a terrible temper.

35. One of my favorite memories with Vicci was a time we walked together to the store. This was around 1993 and I was 13 or 14 years old. Vicci said to me, "Armaud, come walk with me to the store." So we went walking from the house on West Boulevard. Then we sat and talked. He told me, "You were brought here for a reason. Go to college. Don't stay here. Go to California. Go see the world." Vicci was also always encouraging me to join the Navy. I did end up going to college and I did live in California for a while too.

36. I visited Vicci a number of times when he was locked up in Charlotte before each of his trials. Before his first trial I had to go with an adult because I was still a minor. I've been to see him with Mario, Aunt Sonia, and my mom.

5

Bates No. 60

37. After he got locked up, Vicci would write me lots of letters. I would write him back as well. In his letters, he's always been very supportive of me and I rely on that. To me, that support is proof that Vicci has and can contribute to society in a positive manner.

38. I would have talked with a mental health expert if I'd been asked. I would have testified to any of the above information if I'd been asked about it on the stand.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____      _9/17/14_____
Armaud Cooper           Date

Affirmed and subscribed before me on this the _17th_ day of _September_, 2014 in

_Fulton_____ County, Georgia.

_____
Notary Public

My commission expires: _12/12/17_____

KATRINA CONRAD
MY COMMISSION EXPIRES
DECEMBER 12, 2017
NOTARY PUBLIC
FULTON COUNTY, GEORGIA

6

# Affidavit of Eric Cooper

I, Eric Cooper, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Charlotte, North Carolina. I work as a cook at a Buffalo Wild Wings.

3. Aquilia Marcivicci and I are second cousins. I call him Marc. Marc's grandfather was Jesse Cooper. Jesse's older brother was Henry Cooper, and Henry was my grandfather. Jesse and Henry are now both deceased.

4. Marc and I spent a fair amount of time together when we were in junior high school. At that time Marc was living on Windsong Drive and was going to Smith Junior High School.

5. I lived about 10 houses down the street from Marc, and I went over to his house sometimes. We often went to Marc's house because he was looking after his little brother, Mario. He would make sure Mario was fed, preparing him cereal or other simple things like that.

6. I never met Marc's dad and I don't remember Marc ever talking about his father.

7. Marc and I both liked music and we both liked to dance. He was a good dancer. We would practice, sometimes in the yard or on a piece of cardboard in the street. Sometimes we'd also dance at a school dance or at the skating rink.

8. We lived in a nice neighborhood. Marc and I used to ride bikes and play in the woods. We also went to the movies. We would often go play at the lake which is now part of Central Piedmont Community College. Sometimes a bunch of us would go to the skating rink too. Marc wasn't drinking or using any drugs. We were too busy playing in the creek and riding dirt bikes for that

9. Marc was interested in girls. Marc had a girlfriend named Ayana Brewer. She was beautiful and nice. I was just upset that Marc got together with Ayana before I could. We knew Ayana from school and she also lived in our neighborhood on Gaywood Drive. I never saw any problems between Marc and Ayana. Their relationship ended when Sonia moved Marc and his family to Atlanta.

Bates No. 62

1

10. I was very surprised and upset when I heard what Marc had done. It was not like him at all. I never saw Marc have a temper, get into a fight, or get in trouble.

11. Before his 1998 trial I was never contacted by anyone on behalf of Marc's legal team, and I did not testify then. Before Marc's 2002 resentencing I briefly spoke with an investigator who was working for Marc's attorneys. However, I was not asked to testify then either.

12. I would have willingly testified for Marc at the sentencing hearing of his capital trial. Marc and I were good friends when we were younger and I would have wanted to share my memories of him with the jury.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Eric Cooper_         _6/8/14_
Eric Cooper                  Date

Affirmed and subscribed before me on this the __8th__ day of __June__, 2014 in __Mecklenburg__ County, North Carolina.

Notary Public

My commission expires: __1/20/16__

Zachary Rowles
Notary Public
Durham County, NC

Bates No. 63

2

# Affidavit of Robert Cooper

I, Robert Cooper, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.  I am over the age of 18 and competent to testify to the following facts.

2.  I am a resident of Charlotte, North Carolina. I was a truck driver for 37 years but now I am retired.

3.  Sonia Cooper Barnette and I are first cousins. My uncle, Jesse Cooper, was her father. Sonia is Aquilia Marcivicci Barnette's mother. We call him Vicci.

4.  Jesse lived with my mother in St. Pauls, North Carolina for a long time to help my mother. She was pregnant and my father was in the Navy at the time. That was before Jesse married Pearl and before Jesse went to the war. My mother became a nurse at Mercy Hospital. My father was later killed when a car fell on him.

5.  I grew up on the family property on West Boulevard in Charlotte. Sometimes we called it Cooper Hill. We had cows and chickens. We churned milk and took care of animals. My Grandma Lilly used to make butter. After churning the butter we would mold it. We sold butter and milk. We also sold clothes. There was a guy living behind us who used to have a cow farm back there but Billy Graham Parkway changed all that.

6.  There were five family houses on Cooper Hill and they were basic. When I was little there was no running water in the houses. We had an outhouse and we had to get our water from either the well or the spring. We would get the water with buckets and bring it back to the house. We poured the water into a number 10 bathtub to bathe. In the winter we boiled the water on the stove before putting the hot water in the tub. In the summer we let the sun heat the water during the day and then bathed at the end of the day. For heat we had stoves that either used wood, or wood and coal. My dad and grandfather would go to the coal yard and buy 50 or 100 pound bags of coal for the stove. We also used wood stoves for cooking. The stove had a side compartment where we could pour in water to heat it up. Later, when I got older, the houses started becoming more modern with running water and things like that.

7.  I knew Jesse Cooper well. Jesse worked at the schools as a custodian until he retired. Jesse would sometimes shoot guns out back. There was a bank down there and we'd go and shoot target practice. We would also go squirrel hunting and coon hunting.

8.  Jesse served in the Army and fought in Korea. Grandma got a letter and a flag from the Army and we thought he was dead. I remember when the soldiers

Bates No. 64

brought the flag to the house. My understanding has always been that some monks ended up finding Jesse after he was injured and they kept him in a Buddhist temple.

9. Jesse was badly injured in the war. I think they had to take a graft off of his leg and put it on his face. Jesse also needed an artificial eye. He could squeeze shrapnel out of his skin in different parts of his body. I saw him do this.

10. Sometimes Jesse would act crazy after he got back from the war. He could be irritable. After he came home Jesse just sat around. Jesse didn't drink before the war. Afterwards, however, he drank a lot of Pabst Blue Ribbon beers and called it his tea. Even in the summertime Jesse would wear a big coat and waterproof boots that you could pump air into to make them tight. He would sit under a tree from sunup to sunset.

11. I remember Jesse's wife, Pearl. She was a good nurse. Jesse loved her a lot but Pearl was promiscuous. Pearl would go meet a big tall guy. They would meet at a hooch house and sometimes she would take me with her.

12. Jesse had a 1959 or 1960 Cadillac that had fins. He gave it to Pearl. She used it to fool around in and he found out. He caught Pearl and another man together in the car. After that Jesse took the car back, parked it on Cooper Hill, and never moved it again.

13. Jesse did not kick Pearl out when he found out she was cheating on him. She ended up moving out because she was going to marry someone else. Even after Pearl left him, Jesse went down to her house sometimes on Arrowood. Jesse kept his wedding band on until he died.

14. After Pearl left Jesse, she married a man named Loyd Brown. Loyd killed her. I was living at Arrowood when that happened. Pearl had a house down there.

15. Sonia's sister Sheila is completely crazy. She was using drugs. Sheila would always ask Jesse for money. She was often messed up. I don't know what drugs she was using. Sheila didn't stay around here too much.

16. I knew of Sonia's husband, Derrick Barnette. He was a jerk. He put Sonia, Marc, and Mario out. I knew that Derrick acted crazy towards Sonia. After a while she had to leave the house.

17. I always stayed in touch with Uncle Jesse. I was never contacted by any of Vicci's trial attorneys or investigators working for them. Had I been contacted, I would readily have shared with them the contents of this affidavit.

Bates No. 65

18. I would have willingly testified for Vicci at the sentencing hearing of his capital trial. I would have wanted to share with the jury my memories of him and his family.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Robert Cooper_
Robert Cooper

Date 6/8/14

Affirmed and subscribed before me on this the 8th day of June , 2014 in Mecklenburg County, North Carolina.

Notary Public

My commission expires: 1/20/16

Bates No. 66

# Affidavit of Sheila Cooper

I, Sheila Cooper, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Smyrna, Georgia. I volunteer at a place called Seven Bridges to Recovery. This is a ministry where we go out and feed the homeless. I volunteer there almost every day.

3. Aquilia Marcivicci Barnette is my nephew. I call him Vicci and I have known him his whole life. His mother, Sonia Barnette, is my older sister. She is about four years older than me. Our oldest sister is Tessie Nero and she is approximately nine years older than me.

4. When I was growing up, my family lived on West Boulevard in Charlotte. My grandparents lived in a small house nearby, and so did some aunts and uncles. My parents, sisters, and I lived in a small two-bedroom house. None of the house had regular plumbing. We used outhouses. We used washboards for washing clothes. When I was very young I bathed in a basin. In the winter we had to keep the doors in the house open so the heat from the furnace would come in.

5. My parents were Jesse Cooper and Pearl Cooper. My parents had very different temperaments and styles, and this was part of the reason their relationship didn't last. Pearl would yell and was action-packed whereas Jesse was quiet and calm.

6. Pearl once yelled and threw dishes towards Jesse. I was behind the door peeking in on what was going on. She just opened the cabinet and started throwing dishes at him. They were hitting the floor and breaking. I remember my father calmly saying, "Okay Pearl." My dad and I later took the bus to Belk's. We went to the China Department and bought replacement dishes. I remember taking the new dishes out of their tissue paper wrapping at home.

7. My dad never spanked me or Sonia. He only spanked Tessie. He spanked her after she was caught with a boy. As he was spanking her, Pearl was beating him and saying, "Don't beat my children!"

8. Tessie was 16 years old when she got pregnant with her first child, Regena. After becoming pregnant, she married her husband, Jeff Nero. I don't think Jeff was the father. This is not something that was discussed in the family. Sonia told me that Tessie got in trouble and she married so Jeff would be the father. This was not kept a secret from Jeff.

1

Bates No. 87

9. Jesse was really shaken up by his experience serving with the Army in Korea. Jesse would normally sleep outside on our screened in porch. He was sleeping outside like he was still in the war. He had Post Traumatic Stress Disorder and he would sometimes relive his combat experience. He would crouch down with his rifle behind the sofa that was on the porch and peer out. After an episode of doing this, Jesse would end up crying. Then he'd just walk off. I would just watch Jesse when he was doing these things. I didn't know what he was doing and I didn't know what to do. All I knew was that I was not to bother him.

10. One time I tripped and fell and busted my head. Jesse picked me up as if I was a piece of wood and took me in the house. He lay me on the sofa in the living room and just wrapped my head in a bandage. He treated me like I was a soldier and the best he could do was wrap me in a bandage. He didn't take me to the hospital because he thought we were in the middle of a war. Tessie later came home and saw that I was very pale and had lost a lot of blood. She then made sure I was taken to the hospital. I went in an ambulance to Mercy Hospital and got stitches. I still have a mark on my head from this incident.

11. My mother was a nurse. One time I saw that her uniform had a lot of blood on it. I started having visions and hallucinations of what was going to happen to her. I told my mom about the visions but she responded, "You're crazy just like your daddy."

12. Pearl and Jesse eventually split up and we moved away from West Boulevard with our mom. Jesse would still come see us. My mother was always asking him for money. She worked but it was never enough. I listened in on the phone and heard Jesse said to Pearl, "I pay you every week. What are you doing with the money?"

13. Pearl had a boyfriend immediately after my parents' separation. His name was Herman Mazyck. He was an orderly. Pearl might have been seeing him even before my parents split up. I didn't like him. He made my parents split up. I remember Herman coming over to our house. He had a lot of children. He used to try to buy me things. Herman ended up marrying another woman he was seeing at the same time. By the time Pearl found out about the other woman, Herman had already married. He had been lying to my mom. This broke her heart. I remember hearing my mother crying about it.

14. Pearl went for the first person that paid her any attention after it was over with Herman. That turned out to be Loyd Brown and they eventually married. Loyd had been a patient of Pearl's. Loyd eventually murdered Pearl, shooting her in our house.

2

Bates No. 68

15. My mother said to me, "I want you to meet someone." She wanted me to meet Loyd. However, when I saw him I told my mother he was the devil. His house was in the Rosewood Apartments. I remember walking up to his door. He opened the door and I felt I was looking at Satan.

16. Loyd was jealous of Pearl about everything. He didn't want us to do certain things. I played first clarinet in the band at school and one time Loyd didn't want my mom to take me to my concert. I was on the front steps waiting and they were in the house arguing about it. We didn't go to family functions after Loyd came into the picture. One time one of the NAACP people came to our house and Loyd accused Pearl of being with him.

17. Eventually I told my mother I was tired and wanted to go live with my father. I told her, "Tell him to come pick me up." Then Sonia chimed in and said she wanted that too. Pearl took us over to Jesse's house and dropped us off. My mom was upset about it and she asked, "Don't you love me?" I never answered her.

18. After a while Pearl's friend, Delores, came to the house on West Boulevard and said Loyd was beating our mother. Delores had found two rifles in the house. The police had also been out to the house. After that, Sonia and I went back to live with Pearl so she would not be alone. Then I found two rifles that had barrels that looked different.

19. Sonia had her prom on the night Pearl was killed. Pearl and Loyd argued because he had not given Sonia roses for her prom. We were all sick that evening. Pearl had a red rubber hot water bottle on her stomach. My mom, Vicci, and I were all in Pearl's bed and that's where I fell asleep that night. Vicci was less than a year old at the time and I was 11.

20. I was asleep when Loyd shot Pearl; I didn't hear the gun shots. Afterwards, he went and turned himself. Then the police came to the house. I woke up when they banged on the door. When I awoke I was back in my room and Vicci was in his crib. I had on my blue pajamas with frill at the ankles. I knew not to answer the door after 6pm so I went to my mom's room to get her. I saw her and I saw redness. I thought, "Oh mama, your hot water bottle exploded." Then I turned on the light and saw blood all over her front. I started screaming. My mouth tasted weird. I remember the police saying, "He's killed her." Sonia was also screaming. She went and got Vicci.

21. Then I passed out. I just remember screaming and falling. I ended up waking up across the street at my friend Cynthia Williams' house. I was in bed with her. The second time I awoke, I got up and could see through the window that the police were still at our house. I also saw my dad.

3

Bates No. 69

22. After that we stayed at our dad's a while and he stood outside all night with a shotgun to protect us. Nobody thought he could care for us because of his mental condition so then we went to live with Tessie in South Carolina. Even though our mother had walked out on him, Pearl's death was devastating for Jesse. I think when Sonia, Vicci, and I moved away to live with Tessie, it hurt him even more.

23. Tessie took on the role of mother for me and Sonia when we moved to South Carolina. However, I was the built in babysitter. I would babysit Vicci and also Tessie's children. I was only about 12 years old.

24. I have lived with the regret and sadness that I never told my mother that I loved her before she was killed. She said it to me when she dropped us off at Jesse's and I didn't say it back. Instead I just went inside Jesse's house and didn't answer her. That regret will always be with me.

25. I had three visions of my mother's death before it happened and I told my mom about each one. I was just a little girl and she ignored me. After she was killed I felt it was my fault because I'd had the visions of what was going to happen but didn't do more to stop it. I believed that for years.

26. I cried about my mom all the time. My boyfriend, Michael, saw that. We had a miscarriage and I had to have a DNC. I started going ballistic. They put me under. Michael was there. He was trying to reassure me. He said I was talking to my mother.

27. I wanted to kill myself. I was working at Georgia Power and Michael and I had a plan to meet for dinner. I was driving to the restaurant. I was racing along and thinking: I'm just going to kill myself. I'm going to run into this pole head on so I can see my mother.

28. One time while I was working at Georgia Power I went to call Michael and started crying and could not stop. I had a breakdown behind so much stress and I went blind in one eye. Michael suggested I get help. I was crying all the time. I did end up getting help through my job. I saw a therapist and I was prescribed medication. I believe I was prescribed Seroquel.

29. I never talked to Sonia about what happened to our mother and I've never been to my mom's grave. We never talked about it because I had my own pain to get past. If anyone talked about it I would sob like it had just happened.

4

Bates No. 30

30. Pearl's death affected Sonia and me differently. I always wanted to pour out love to people even if it was not reciprocated. I didn't want to miss that opportunity like I had with my mother. I had boyfriends but I never married any of them because marriage didn't turn out well for my parents. I would date a married man because I knew I couldn't marry him. Michael O'Neal was married and my son Armaud's father was too. When I got tired of a relationship I would just leave.

31. Sonia was also affected by our mother's murder. She became very emotional. I remember Sonia sometimes just sitting with tears streaming down her face. Sonia has been the paper keeper and had the records related to our mother's death. She wouldn't let me read the transcript of Loyd's trial until I was about 20 years old.

32. My mother's murder had a profound effect on our family. I was in turmoil on the inside for a long time. Not having a mother to help with stuff going on at school, or with kids, or with work, was difficult. There always felt like a big hole in my life and the lives of my sisters.

33. Sonia married Derrick Barnette. I call him Rick or Ricky. They first met when Sonia was still in school and I met him then too. I never knew about the physical abuse that Sonia and Vicci suffered at the hands of Rick until Vicci's first trial. The other witnesses and I were sequestered at Vicci's first trial, but some of the case files were there in the room with us. I read it and found out that Ricky had been beating on Sonia. I read that he hit Sonia with a hammer while she was holding Vicci. Vicci couldn't protect his mother. I think Vicci called the police one time. However, Vicci did protect his little brother, Mario. Sonia kept all of this information on the inside. She never told anyone what was going on. Just like with our mother's death, Sonia didn't talk about the painful things.

34. I saw Ricky yelling and being mean. I recall times when Tessie and I had to go pick up Sonia's things off the front yard of her house on Comstock Road after Ricky had thrown her clothes out in the yard. It would be a mess. There was one time when either Vicci or Sonia called for help and Rick snatched the phone away and hung up. Tessie and I went over to the house anyway to check on them.

35. Sonia used to have torn ear. She had that for many years and she told me it came from wearing earrings. I later found out that it was because Ricky tore her earrings from her ears.

36. Rick was manipulative. He had some money. I have always believed he rigged the paternity tests concerning Vicci and Mario.

5

Bates No. 31

37. Sonia, Vicci, and Mario moved to Georgia and lived with us when Vicci was in high school. At that time, Vicci was sometimes driving before he had a license. In fact, he drove me to the hospital in 1991 when I was in labor and Sonia was in Marietta with a friend.

38. We were all using drugs when we lived together in Lithonia, Georgia. I first started using drugs when Michael said to me, "I want you to try." Michael and Sonia drank, and we were all using cocaine together. Michael was using cocaine a lot and it became a problem for him. He would only want me to use around him but I found out he was getting high other places because he would get too high to drive home. Michael ended up going to drug rehab several times.

39. There was a time when we were living in Lithonia when Vicci was beaten up. We took him to the hospital after that.

40. There were times when Vicci would be in his room acting strangely. He would just sit and stare. I also saw Vicci crying sometimes, both in Lithonia and later when we were living together on West Boulevard in Charlotte,

41. Vicci dated a girl named Sheila Sullivan soon after he, Mario, and Sonia moved to Georgia. Vicci tried to kill himself at the end of his relationship with Sheila. He was only 15 or 16 years old at the time.

42. We put a lot of trust in Vicci. We often left him to take care of the younger kids. He was very responsible. I never knew him to break the house rules. If you asked him to pick up a list of things at the grocery store he'd do it and get everything you asked for. Vicci was not a typical teen. He wasn't flippant. He could be trusted. Vicci would apologize if he thought he had hurt your feelings. One time he and Sonia got into a bad argument and he apologized to her. He would apologize and cry so hard. It would hurt him to the core if he knew he'd hurt someone.

43. Later, after he got into trouble related to some of his relationships, he didn't seem to be the same. After he moved away from Lithonia he seemed to change a lot.

44. Vicci started dating Tasha when he was living in Lithonia and I liked her a lot. I was happy that he had found somebody nice but then they started having a lot of drama in their relationship. Tasha's mother didn't like Vicci. Vicci was sneaking in Tasha's window.

6

Bates No. 32

45. Tasha and Vicci ended up having two children together and they moved to Newnan, Georgia and got their own place. But they were still teenagers. They were too young to have children or their own apartment. Having your own place creates pressure. You need a job. You need a car to get to the job. You need things in your house. I remember going down to Newnan to visit and they were sleeping on palettes on the floor.

46. Vicci and Tasha ended up splitting up and he got together with Crystal. After that everything was a big mess. His attitude was that he was going to do it on his own. Things would have been better if he'd gotten help from Sonia.

47. I met Alesha, who Vicci later dated when we were all living back in Charlotte. Vicci was excited about Alesha. I remember she and Vicci would be in the room he shared with Mario. I never knew about Vicci getting in legal trouble over Alesha until well after it occurred.

48. Vicci was agitated when he was living back in Charlotte, after he'd moved back from Georgia. For example, I remember him being overly impatient for Sonia to iron his work shirt. This was when he worked at a restaurant. Vicci was different from when he'd been a teenager after moving to Georgia. He was more agitated and stressed at different points in time, and less able to keep himself in check.

49. Vicci was really excited when he and Robin started dating. He wanted us to meet her when she came down to Charlotte to visit. Then Vicci moved to Virginia to live with her.

50. After he and Robin were living together in Virginia, Vicci called and asked me a spiritual question. He said he felt like Robin was putting something in his food. He said it felt evil. I told him it sounded like someone was sleeping with the enemy. I counseled Vicci not to eat Robin's food unless they were eating out of the same pot. I told him to be careful.

51. Vicci really fell apart after he and Robin broke up. They would still talk on the phone. He would always be sobbing. It was horrible. My dad would say to go get him off the phone so I'd tell Vicci to get off.

52. When he came back to Charlotte from Virginia, Vicci was reclusive. He was slow. I remember us encouraging him to come with us to go places. He would sigh and say okay, but then he'd say, "Maybe later. You guys go."

53. There were a number of things that changed about Vicci in that time period. I remember coming into the house one time and seeing that Vicci's head was bald. I asked him about it but I don't recall how he responded. Vicci also gained a lot of weight. He had started drinking a lot. He also started calling me "Sheila" instead of "Aunt Sheila." One time after he called me "Sheila," I asked him who he was talking to; he didn't say anything back to me.

7

Bates No. 33

54. Shortly before the shootings occurred we had a family cookout. Everybody was outside. I realized Vicci was not outside. I found him inside rocking in the rocking chair. The TV was on but he was not watching. I asked him what was wrong and he said he was okay. I had never seen Vicci rocking like that before.

55. They let Vicci call me from Jesse's house to say goodbye before he was arrested and locked up. I didn't know what had happened. He told me, "I'm at Pop Pop's house calling to say goodbye because I've done something and I'm going away for a long time. The officers are here."

56. Vicci later said that when the crime happened he saw himself standing here in one place while his spirit was over there pulling the trigger. Then he started walking away and his spirit merged back into his body.

57. Something was not right with Vicci. I have wondered if he's had Bipolar Disorder or some other mental illness where his mood fluctuates so dramatically. I have two children, Michael Jr. and Michaela, who were each diagnosed with Bipolar and ADHD. Both were diagnosed when they were in elementary school. Both children have had periods where they've been very depressed, both have cut themselves on their arms to try to make themselves feel better, and both have taken many medications, including Depakote, Adderall, and Lithium.

58. My son Michael was diagnosed with Bipolar Disorder when he was in the first grade. This came about after something he said to his teachers. While Michael was in school I was always getting calls about things he'd said or difficulties he was having. He's had evaluations and home visits. We've dealt with school personnel, psychiatrists, therapists, and all sorts of people involved with Michael and our family.

59. Michael has had three suicide attempts. The first time he tried to jump out a window but I was able to catch him by his t-shirt. The next time he had climbed out on the roof and was preparing to jump. He was sitting on the roof crying. The third time we were driving down the street and he got upset. He opened the car door and tried to throw himself out of the car. I then drove Michael to the emergency room at the hospital and told them he was trying to kill himself. He ended up staying at Georgia Regional Hospital for three days.

60. When Michael was about 10 years old he was sent to a psychiatric facility called Inner Harbor. He stayed there for one and a half years. Michael went to school, had therapy sessions, and saw a psychiatrist while he was there.

8

Bates No. 74

61. Michael is often too high or too low. He has difficulty reacting to things and he gets upset easily. Experts have told me that Michael has too much activity in the frontal lobe of his brain. It makes him think too much. Michael can stay up for days at a time. When he tries to get rest his brain won't settle down. After days of staying up, Michael will crash out and sleep for a long time.

62. I remember talking with an investigator named Sindy before Vicci's first trial. I ended up testifying at the trial.

63. After Vicci got a new sentencing hearing, I remember speaking with a woman named Cessie. She came to Atlanta and met me at my job. She seemed discombobulated and all over the place. I didn't even know when the second trial was going to take place until my son Armaud informed me.

64. I don't recall ever talking with Vicci's new lawyers and they never called me to testify. I was living in Georgia at the time but certainly would have been willing to testify for Vicci or talk with anyone they wanted me to talk with.

65. I would have willingly testified for Vicci at the sentencing hearing of his second trial. I care about Vicci and I've known him his whole life. I could have share with the jury my memories of our time together, including the contents of this affidavit.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____
Sheila Cooper

Date 9-17-14

Affirmed and subscribed before me on this the 17 day of September 2014 in Cobb County, Georgia.

_____
Notary Public

My commission expires: April 17, 2017

9

# Affidavit of Crystal Dennis

I, Crystal Dennis, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.  I am over the age of 18 and competent to testify to the following facts.

2.  I am a resident of Fairburn, Georgia. I used to live in Newnan, Georgia. This is where I grew up and this is where I met Aquilia Marcivicci Barnette. I call him Marc.

3.  Marc and I first met in 1992. I met him through my brother, Anthony Britt. Anthony is now deceased. Anthony was trying to get together with Marc's girlfriend, Tasha. Anthony brought Marc over to my house one time to introduce us and distract Marc from his girlfriend. Then Marc started calling and coming over to see me on his own. When Marc and I started spending time together, however, we weren't physical or intimate; we were just hanging out.

4.  A week or two later, after Anthony introduced Marc and me, Marc found out that Anthony was messing with Tasha. Marc knew that Anthony and Tasha were messing with each other because I told him. I told him because Anthony had told me. This led to a confrontation between Marc and Anthony. Anthony was threatening to beat up Marc and tried to jump him one night after Marc left my apartment. Marc ended up shooting Anthony Britt in self-defense. Afterwards, Marc came back to my apartment and told me what happened.

5.  The only time I ever saw Marc with a gun was on the night he shot Anthony Britt. It was in his jacket pocket. I knew it was in his jacket pocket that night because I put his coat up and it felt heavy. Then I saw the handle of the gun in the pocket.

6.  Marc was locked up for a little while after the shooting. I visited Marc at the jail while he was locked up. There was one time when Tasha and I both went to visit Marc at the same time. She didn't know about me yet. When she came in for her visit I was already there. We feuded. Then the officer got us quieted down and we both left.

7.  Anthony and I had a falling out because of what he had done. It was wrong how Anthony did it. When Marc got locked up Anthony was spending nights over there with Tasha. By the time Marc got out of jail, things were basically over between them and he wanted to get her out of their apartment.

8.  Marc and I started out as friends. At first we were not intimate. Then it developed into more of a relationship. After Marc got out of jail, Tasha left and I moved into Marc's apartment with him. The first three to six months with Marc were great.

Bates No: 36

9. Marc knew how to cook. He would cook and bring me breakfast in bed. I thought I was in dreamland. He was an energetic person. He liked doing things. He would fix his car. Also, there were times when we went out bowling. He could be fun. He played with my kids. My kids liked Marc and got along with him. At that time my daughter was about two or three years old and my son was about a year old. Marc was real good with them. He would sometimes have his kids too. Tasha let their kids come over. His daughter was the same age as my son. His son, Marc Jr., was just a baby.

10. The only time I saw Marc have a drink was on my birthday. That was just a sip. He never used other drugs, including pot.

11. Marc didn't really have close friends in Newnan. The only people around were Anthony Britt and Victor Montgomery. Marc and I never had other friends over to our apartment except Tasha's sister and Anthony Ball who was dating my sister.

12. Marc didn't talk with me about his childhood. It didn't seem like he had a close family. Marc and his mom would bump heads sometimes. We went up to Atlanta to visit her a couple times. Marc's mom and family dressed nice. I knew they weren't broke. Sonia carried herself in an uppity style. Marc was crazy about his brother. He would talk to his brother if his mom said his brother had done something he shouldn't have. Marc never talked about his dad and I never met his dad. As far as I know his dad was out of the picture.

13. Marc never talked about any girlfriends he'd had before Tasha. He would only talk to me about his problems with Tasha. He said her parents were always in her business. Marc and Tasha kept in touch even after they broke up because of their kids, but she was kind of done with him.

14. At some point Tasha and I started talking. This was while Marc and I were still together. I told Tasha that as long as I'm with Marc and her kids are around, I will treat them like my own kids. After that Tasha let Marc start having the kids. And Tasha started to tell me everything she had gone through with Marc.

15. Tasha ended up marrying one of my best friend's brothers. Also, my kids and Marc's kids kept in touch with each other over the years. My son, Mario, committed suicide about two years ago and Marc Jr. was shook up about it.

16. Marc and I started having sex right after I moved into the apartment with him. It started out frequent and it was okay. We were having sex everyday at the beginning. There wasn't anything unusual about Marc sexually. He never had any sexual problems that I saw. Once our relationship went downhill I didn't want to anymore. This didn't lead to fights or arguments between us. He never tried to make me have sex.

Bates No. 37

17. Marc was always helping people. If someone asked him for something, he would do it. One time he helped a person get their car together.

18. At some point about three to six months into our relationship Marc started to get mad. All of a sudden he just changed. He became controlling and possessive. He went completely mad. He was crazy. I don't know why he changed like this.

19. There were many things that Marc did that were controlling and possessive. For instance, he didn't want me to take a bath if he wasn't there.

20. If Marc was in the house and I went to the bathroom and closed the door he would get mad. One time we were in our apartment and I went to the bathroom and closed the door. Marc kicked the door in and said, "Why are you closing the door?" I responded that I was using the bathroom. Marc told me not to do that so after that I left the bathroom door open when I was in there. My kids were in the other room when Marc kicked the door in. He didn't hit me, he just fussed at me.

21. One time Marc and I were at the grocery store and we saw two guys that I had gone to high school with. They came up and spoke to me, and they spoke to Marc too. Marc seemed cool about it but when we got outside the store he started yelling at me. He yelled, "As long as you ever live don't you ever speak to any other guy as long as you are with me." Then we got in Marc's VW Bug and he drove out of the parking lot so crazy he was up on two wheels.

22. Marc would take my clothes. Some of my clothes would disappear out of the house and I knew he had taken them. He had even bought me some of those clothes. Marc and I never talked about this and I never understood why he would do it.

23. Marc didn't want me to work because he didn't want me to be around other guys. I was working at Burger King at the time and Marc took two jobs so I didn't have to work one. Marc worked at both Arby's and Blockbuster.

24. My cousin Victor stayed next door and Marc didn't want me talking to him. He thought Victor was hitting on me. The only person Marc was okay with me talking to was my cousin Anthony Jones. James. CO

25. Marc sometimes took the keys to my house. I would be at home but I couldn't leave because I didn't have any keys and couldn't lock the apartment.

26. I later found out that Marc had started checking on me. If I left home he'd get off work and come looking for me.

Bates No. 38

27. I ended up finding out that Marc was cheating on me. I used to do the laundry and one time I found the laundry basket was missing. I learned that Kowana Dozier had done the laundry. He told me she was just a friend who had agreed to wash his clothes. She was his manager at Arby's and I had met her there before. Most of the time he spent with her was probably at work. Marc and I argued about that. I wanted to end things with him when I found out about Kowana.

28. Marc went back to North Carolina to visit a couple times. The second time he went up there he brought his grandfather back with him to visit Newnan.

29. One time when Marc went to visit North Carolina I went to the rent lady and got myself an apartment behind the one we had. I had my cousin and sister help me move out and I didn't tell Marc where I was living. In my mind I was ending our relationship when I moved out. However, after he got back, Marc was calling me. He also watched me to find out where I'd moved to. One night when I got off work and came home, I found him at the top of the stairs. So I let him in and he stayed. Marc came and lived with me for a week or two before the incident occurred where he hit my kids.

30. On the night that Marc hit my kids I came home and Marc was already in bed and the kids were as well. Later, my son Mario said to me, "Mom, look what Marc did." I saw the cut on his arm and back. I asked him why Marc did that and he said it was because they didn't eat. Marc was out when I learned what happened. When he got home he and I went at it. I told my sister what had happened and I left my kids with my mom. My sister stayed over at my apartment that night. The next morning I got up before Marc and went downstairs with my sister. Then Marc woke up and called to me. I went back upstairs and sat on the bed. He hit me in the back of the head with his fist so I grabbed whatever I could find to hit him back. Then my sister called Tavarus Brown and he came over. Tavarus was our friend and my coworker at Burger King.

31. That same morning Marc and I were outside the apartment in the yard arguing when Marc bit me on the shoulder and hit me in the back of the leg. My sister and Tavarus were inside the apartment and they called the police. Marc took off in my car before the police arrived. The police then took photos of me and the kids. I think Marc went to Atlanta, but he called me and I talked him into coming back. He was arrested as soon as he came back. Everybody was shocked at what Marc had done. They had all liked him before that.

32. Marc had never been mean or cruel to my kids before this incident. Marc had been good to the kids and they liked him.

33. Marc called my mom's phone a lot while he was in jail. The phone would be constantly ringing. Marc would also send letters. Marc wanted me to visit him but I never did. He kept telling me he missed me, he loved me, and he was sorry. For the most part I didn't believe him, but maybe he loved me in his messed up way.

Bates No. 79

34. At some point Marc stopped calling for me. We moved to another location and he didn't have the number. After he got out of jail, I didn't know that he had moved back to Charlotte. I never heard from Marc after he moved.

35. I never talked about Marc with my kids. I do not believe there was any lasting effect on the kids from what Marc did. If Marc had been around longer and it had happened many times it probably would have affected them.

36. I recall talking with someone named Sindy who was working on Marc's case before his first trial.

37. I do not recall anyone from Marc's defense team contacting me before his second trial. I would have been willing to talk with Marc's attorneys or investigators. There was a lot of information that they had not asked me about before and I would have been willing to share it with them. I would have also been willing to talk with any of their experts about Marc. I also would have been willing to testify about Marc, our relationship together, and anything else that would have been asked of me.

38. I rode up to the second trial with Officers Yarbrough and Riggs because I was pregnant. We didn't talk about Marc much in the car on the way up. I was probably asleep most of the way. They were the officers that took the photos of my shoulder and of my son after the incidents with Marc. I remember that Tasha and I were staying at the same hotel and one time after court we went out to eat and we also went shopping. I think I was in Charlotte for one or two days for that second trial. Then, after my testimony, I flew back home. Except when I was on the witness stand in court, no one from Marc's defense team spoke with me.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Crystal Dennis_ (signature)  
Crystal Dennis

_9-15-14_  
Date

Affirmed and subscribed before me on this the 15TH day of September, 2014 in

_Fulton_ County, Georgia.

_Kettin Conrad_ (signature)  
Notary Public

My commission expires: 12/12/17

[Notary seal: KATRINA CONRAD, NOTARY PUBLIC, FULTON COUNTY, GEORGIA, MY COMMISSION EXPIRES DECEMBER 12, 2017]

Bates No. 30

5

## Affidavit of Do'Lores Guy

I, Do'Lores Guy, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.  I am over the age of 18 and competent to testify to the following facts.

2.  I am a resident of Charlotte, North Carolina. I am married and have two daughters. My maiden name was Do'Lores McClure and my name after my first marriage was Do'Lores Hart.

3.  I am retired now but I used to work as a paralegal. In 1972 I was recognized as the first official paralegal in the state of North Carolina. I formerly worked at Legal Services in Charlotte. Then I moved to Florida in 1986 and worked for Janet Reno in the state attorney's office in Miami.

4.  Before she was murdered by her second husband, I was very close friends with Pearl Brown. Pearl's maiden name was Pearl Anderson. After her first marriage to Jesse Cooper, her name changed to Pearl Cooper. Pearl's second husband was Loyd Brown.

5.  Pearl had three daughters. Tessie was the oldest, Sonia was the middle child, and Sheila was the youngest. Sonia Cooper Barnette is the mother of Aquilia Marcivicci Barnette. The family calls him Vicci, and others call him Marc.

6.  Pearl worked as a nurse at Mercy Hospital in Charlotte. I knew her since the early 60's. I met Pearl at work. She knew how to meet people.

7.  When I first met her, Pearl's husband was Jesse Cooper. Jesse had been in the war. He had a prosthetic eye and I believe he had a plate in the back of his head. Jesse was very slow in speech. He wasn't talkative and he didn't communicate back when people talked to him. By contrast, Pearl was very outgoing.

8.  Jesse and Pearl lived off of West Boulevard in Charlotte. I visited them there. They had no indoor plumbing. There were three or four houses there where various family members lived.

9.  Pearl and Jesse later divorced. After their separation, Pearl had an apartment in Belvedere Homes off Rozzelles Ferry Road.

1

Bates No. 31

10. Pearl dated Herman Maczyck after she and Jesse split up, and before she got together with Loyd Brown. Pearl and Herman had known each other for quite a while. They met at the hospital where he was an orderly. Herman's wife had been killed and he had a lot of kids. Herman and Pearl were close. They were together even before Pearl left Jesse. Herman could be the father of Sonia, Sheila, or both. Pearl's relationship with Herman affected her decision to leave Jesse.

11. Herman and I grew up in the same church. Herman ended up marrying a nurse who worked at Presbyterian. He stayed with that woman until he died. It was a surprise to Pearl when Herman married the other lady. That's why Pearl jumped and married someone else a short time afterwards.

12. I didn't really know Pearl's second husband, Loyd Brown, but I had met him. She first met him as a patient but then lost contact. Then she met him again. When Loyd moved in with Pearl he only had a stereo, a chair, and clothes. He had nothing. Loyd was driving Pearl's car. I saw less of Pearl after she got together with Loyd. Pearl and I both attended the United House of Prayer on Beatties Ford Road, but Pearl stopped going to church after she got together with Loyd. We were devastated when Pearl married Loyd.

13. Pearl told me once that Loyd had suggested that the kids go stay with Jesse. Tessie was already living on her own, but Sonia and Sheila did go back and live with Jesse.

14. When Sonia was pregnant with Marc, I understood Derrick Barnette to be the father. He would come by to see her. I never knew that Derrick later had a paternity test done, and I never knew the results indicated he was not Marc's father.

15. After Marc was born, Pearl was the one that was mostly taking care of him. However, Pearl worked from 3pm to 11pm each day. Sonia needed help because she was still in high school.

16. Loyd didn't like for you to come over to the house unannounced. I was at the house one time when Loyd stomped through. Pearl had issues with Loyd. Loyd had been raging. One of the kids – Sonia or Sheila – once called me and said that Loyd had drawn a gun on Pearl. I then talked to Pearl and told her to put Loyd out. Pearl didn't do it, saying there wasn't anything in the gun. Loyd murdered Pearl only a week or two later. Pearl didn't deserve to be killed like that.

2

Bates No. 32

17. I remember the night of Pearl's murder. It was Sonia's prom night. I was in my house that night. I dreamt that the police were at my door and telling me to lock up. They were telling me this because someone dangerous was in the neighborhood. Then my phone rang and I woke up. It was Sergeant Smith. He asked me if I knew Sonia. I told him I did. He asked me, "Can you stay with them? The mama's dead. The husband killed her." Then I called my sister and we went down to Pearl's house to stay with Sonia, Sheila, and Marc.

18. The kids were asleep and never heard the gunshots. Sheila heard the police at the door and went to tell her mom. That's when she found her mom dead. Marc was also present in the house. He was only a baby but it had an effect on him. His mother was only a child herself. After Pearl died those kids were clinging to me. When I picked them up they were crying and scared. They sat on the front step.

19. I took Sonia and Sheila and Marc with me. There was a girl whose last name was Williams that lived across the street from Pearl. We were over at her house for a long time that night.

20. I called Jesse to come get them. When I told him what had happened he got real silent. I asked him to come get the kids. He did.

21. After her mom's death, Sonia clung to her older sister, Tessie. Sonia went into a withdrawal state and depression. She would cry easily. She would have crying moods. These were deep-seated feelings. Sonia was depressed and would cry ever since her mother died. That was a change from how she had been before. Sonia was withdrawn and would go through periods of depression.

22. Sonia later married Derrick Barnette. People called him Rick or Ricky. Rick's mom died shortly after their marriage. I went over to their house in Clanton Park when his mother died. Sonia never talked much about her relationship with Rick.

23. I moved to Miami in 1986. While I was living in Florida, Sonia rented my house for a while. This house was on Softwind Drive. This was after Sonia and Rick split up. At that time, Marc was playing the little man part. He was trying to take care of his mother and his brother. Marc was in his teens at that time and I would see him when I came back to visit. Sonia was getting depressed at that time. She was crying then too. I suggested she go see a counselor. However, when I asked her about it, she didn't answer. Things went bad when Sonia and Derrick split up. It had an effect on her. Sonia cried a lot. I remember talking to Sonia on the phone and she would have crying spells. She was depressed.

3

Bates No. 33

24. I came back to the house on Softwind one time and either Marc or Mario had broken the window in the bedroom. There was also a lot of rough wear and tear on the house. It was tough for Sonia after the separation. She had to raise two boys on her own.

25. In the end, I told them they had to leave the house. Sonia wasn't paying rent. I told them I was coming up to collect. The house was a mess. Sonia was always crying. I would try to tell her to get things straight and she'd start that crying. I really hate that I had to put them out but the house was taking a beating and Sonia wasn't paying rent. Tessie came and got them at that point. Sonia and I lost touch with each other after she moved out of the house. This was about 20 years ago.

26. I was never contacted by any of Marc's trial attorneys or investigators working for them. Had I been contacted, I would readily have shared with them the contents of this affidavit. I did not learn about the crimes, Marc's trial, or that Marc is on death row until I was contacted last year.

27. I would have willingly testified for Marc at the sentencing hearing of his capital trial. I have known and cared about Marc's family for a long time. I feel terrible about this situation and I would have wanted to share with the jury my memories of Pearl, Sonia, and Marc.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Do'Lores Guy_                _6/8/14_
Do'Lores Guy                                   Date

Affirmed and subscribed before me on this the 8th day of June, 2014 in Mecklenburg County, North Carolina.

_____
Notary Public

My commission expires: 1/20/16

*[Notary seal: Zachary Rowles, Notary Public, Durham County, NC]*

4

# Affidavit of Kesha Heard

I, Kesha Heard, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am resident of Union City, Georgia. I am the mother of two teenagers. I work for Cox Communications. My job involves extracting data from Oracle, a software program we use.

3. I met Aquilia Marcivicci Barnette, whom I call Marc, many years ago when he and my younger sister started dating. They were both in high school. My younger sister is Netoshia Tolbert but everyone calls her Tasha. Tolbert is her married name. When she and Marc were dating her last name was Heard. Tasha and Marc have two children: Angelica and Marc Jr.

4. I first met Marc in high school. He was meticulous about his clothing and the way he looked. He was preppy.

5. I was surprised when I learned that Marc and Tasha were dating. Marc was quiet and relatively popular. Tasha was loud – she does not have a filter for the things she says – and wasn't really popular at all.

6. Marc was artistic and liked different music. He was not popular. Even in school he was by himself. He never had an entourage. He was not very smart. He was not a reader and not an academic. He did not write well. His sentences were not as they should have been.

7. Marc is low energy. He is real mellow, kicked back, and unassuming. You'd expect to see him in a park drawing. He was often in his own world.

8. I've never seen him show any emotion except when holding my niece, which he loved to do.

9. When we lived in Lithonia, Marc was at our house a lot. He would usually eat when he was over at our house. He even stayed the night sometimes when he was not supposed to. Marc would hide under the bed to avoid being found out by my mom. I knew about Marc staying over because Tasha and I were very close and we told each other what was going on. If mom was in her room, Tasha could let Marc in the front door of our apartment without our mother knowing. Or sometimes he'd come through the window. My mother wouldn't really check our rooms. I knew Tasha and Marc were having sex before Angelica was born. I think Marc was the second person Tasha had been with.

Case 3:12-cv-00327-MOC    Document 74-35    Filed 12/22/14    Page 35 of 50

Bates No. 35

1

10. Marc's mama was some kind of drunk or partier because he stayed overnight at our house a lot and nobody came looking for him. Marc's mom was not very concerned about him. She was a bad mother. His mother wasn't providing for him. When I first met Marc, he kept up a nice appearance by the way he dressed. But after a while, Marc stopped dressing very well. One time my sister stole my mother's credit card and bought Marc some clothes and shoes. This was just prior to our mother finding out Tasha was pregnant. Tasha charged a couple hundred dollars on the credit card. Mom didn't want to press charges on Marc because it was Tasha's idea.

11. I remember one incident involving Marc, Tasha, and my boyfriend Keith Furlow. I was about 17 years old when this happened and Keith was a year older than me. We were all at The Crossings apartment where Tasha, my mom, and I lived. Neither my sister nor I were allowed to date and nobody was supposed to be there with us at our apartment.

12. We got into an argument and Keith ended up assaulting Tasha and Marc. Keith was three times the size of Marc. Keith had an extremely violent nature. Keith initially made a move to hit Tasha. Then Marc stepped in and Keith hit him in the nose. There was blood everywhere. Keith also punched Tasha in the eye. She was pregnant at the time but only Marc and Tasha knew that. Her eye was badly injured. It was swollen. Marc ended up calling the police and they came. Keith left the apartment before the police got there but I think they went to arrest him. They brought an ambulance to treat both Marc and Tasha. After mom got home they transferred Tasha to the hospital. Mom ended up taking Tasha to be seen by a specialist.

13. We ended up going to court in DeKalb County over this. This wasn't Keith's first time in trouble. I testified against Keith and that's what convicted him. This was the spring or summer of 1990.

14. Our mom found out about Tasha being pregnant with Angelica when a nurse called the house. Mom thought the nurse was calling about Tasha's eye but the nurse told her Tasha was pregnant. Our mother was very upset to learn that Tasha was pregnant.

15. Marc went with Tasha to every doctor's visit; every single one. A lot of boys run off in that situation, but not Marc. However, at the end of Tasha's pregnancy, our mother started excluding Marc from the prenatal visits. Tasha even asked if Marc could go and mom said no. Marc was always respectful of my mother even though she didn't treat him well. Our mom would not let Angelica's last name be Barnette. Marc was upset by this but he didn't challenge her or disrespect her about it.

Bates No. 36

2

16. The best light I've ever seen Marc in was when Angelica was born. He wouldn't leave my sister's side the entire time they were at the hospital. He slept in a chair by her side. When the chair got uncomfortable he slept on the floor. Tasha was in the hospital for about three days. After she was born Marc sat there looking at Angelica as though he couldn't believe she was there - like he'd won a million dollars. He just wanted to hold her. I didn't think he was going to give her up and let me hold her.

17. I went to college in Carrollton, Georgia. During college I moved to Newnan, Georgia and got a full time job. Then my sister and Marc moved there, too. That's when I really noticed changes in Marc. He and my sister began to fight a lot. There was a lot of strain taking care of the place and the kids. I would go over to their place in Newnan a lot, especially to see their second child, Marc Jr.

18. Tasha and Marc were under a lot of pressure taking care of the kids. I know they were having a hard time paying for food, the lights, and clothing for the kids. I know Tasha wasn't working. We got a disability check from our father's veteran status, which Tasha and Marc were relying heavily on.

19. I never saw any bruises or marks on Tasha. If I had I would have confronted Marc. Tasha told me that Marc was jealous and controlling. She said he didn't want her to go anywhere or do anything. She complained about it but I never saw anything. I didn't get into it. I didn't hear about this until a while after Marc and Tasha had moved to Newnan.

20. Tasha learned about another girl that Marc was seeing when he was locked up in jail after a shooting incident. She found out when they both went to visit him at the same time. The other girl was Crystal. Tasha was upset after she found out about Crystal. After Marc got out of jail he made Tasha leave and she lived with me. She was depressed about the situation but not angry with him.

21. I was very surprised to find out about Marc's crimes. It didn't seem like him at all. I was never contacted by any of Marc's trial attorneys or investigators working for them. Had I been contacted, I would readily have shared with them the contents of this affidavit.

22. I would have willingly testified for Marc at the sentencing hearing of his capital trial. I would have wanted to tell the jury that one reason I'd ask anybody to spare his life would be for his children. It would be hard on them if he were executed.

Bates No. 37

3

23. Under the circumstances, Marc has a good relationship with his children. His daughter Angelica even took the Barnette name when she got married. Now her name is Angelica Barnette Sharpe.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Kesha Heard_              _9/17/2014_
Kesha Heard                   Date

Affirmed and subscribed before me on this the _17_ day of _September_ , 2014 in

_Gwinnett_ County, Georgia.

_Sandra Jones_
Notary Public

SANDRA K JONES
NOTARY PUBLIC, GWINNETT COUNTY, GA
MY COMMISSION EXPIRES 2/16/2016

My commission expires: _____

Bates No: 38

## Affidavit of Sally Ann Cunningham Johnson, M.D.

I, Sally C. Johnson, M.D., appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I have a Bachelor of Science degree from Penn State University. I received my M.D. from Jefferson Medical College and completed my residency in psychiatry at Duke University Medical Center. I am board certified in psychiatry and neurology and have a subspecialty board certification in forensic psychiatry.

3. I am presently a faculty member of the University of North Carolina School of Medicine in the Department of Psychiatry. I joined the Psychiatry faculty at UNC to help establish the Forensic Psychiatry Program and Clinic, an outpatient clinic that provides criminal and civil forensic services, including evaluations and consultations on a broad range of forensic issues to attorneys, the courts, and other agencies. I currently hold faculty appointments at both UNC and Duke Law Schools.

4. From 1979 until 1983, I served as a staff psychiatrist at Federal Bureau of Prisons Federal Medical Center, Federal Complex in Butner, North Carolina (FCI Butner). From 1983 until 1989 I served as the Director of Forensic Services and Clinical Research at FCI Butner. I became the Associate Warden of Health Services/Chief Psychiatrist at FCI Butner in 1989, and the Associate Warden Medical/Chief Psychiatrist in 1999. From 1990 to 2004, I was the Director of Forensic Fellowship Program for Federal Bureau of Prisons/Duke University of Psychiatry. From 2001 to June 30, 2004, I served as a Psychiatric Consultant to the Medical Director of the Federal Medical Center (FMC) at FCI Butner. In this position I conducted forensic evaluations for the federal court system on high profile and complex cases, and served as an expert witness. My curriculum vitae is attached to this affidavit.

5. On November 17, 1997, Aquilia Marcivicci "Marc" Barnette was committed to the FMC at FCI Butner for purposes of a psychiatric or psychological examination pursuant to 18 U.S.C. §§ 4241(b) and 4242(a). He was initially housed in the prison's Admission/Seclusion Unit pending medical, psychiatric, and case management clearances.

6. I evaluated Mr. Barnette during his time at the FMC. Under my supervision, Charles Vance, M.D., a forensic fellow, conducted several interviews with Mr. Barnette. Dr. Michael Schaefer conducted psychological testing of Mr. Barnette.

7. The evaluation of Mr. Barnette resulted in a report dated December 29, 1997 that was sent under seal to the Honorable Robert D. Potter in the Western District of North Carolina.

8. Post-conviction counsel have asked me to discuss and elaborate on my earlier findings and testimony and my interactions with Mr. Barnette's trial counsel; review information that was not previously made available to me; and answer whether I was available to Mr. Barnette's defense counsel during his resentencing trial in 2002.

9. For purposes of preparing this affidavit, I have reviewed the report of December 29, 1997, as well as my testimony given during Mr. Barnette's sentencing in 1998. I have also reviewed additional information provided by post-conviction counsel that was not previously made available to me, including: Mr. Barnette's prison records from his incarceration in the Bureau of Prisons; evaluations and testimony provided by other experts in Mr. Barnette's 1998 trial, as well as his resentencing trial in 2002; a federal petition for habeas corpus filed on Mr. Barnette's behalf; Dr. Richard Dudley's post-conviction mental health report; Zachary Rowles' post-conviction mitigation report; Cessie Alfonso's mitigation report that she prepared for trial counsel in 2002; and affidavits executed by various witnesses (both lay and expert) in the post-conviction litigation.

10. As the December 29, 1997 report indicates, in addition to meeting with Mr. Barnette, I reviewed information provided by both the prosecutors and defense counsel. The government provided me with a cover letter dated November 6, 1997 from Assistant U.S. Attorney Robert Conrad and a packet of materials consisting of pleadings filed in the criminal cases and four volumes of the government's discovery. The defense provided me with a cover letter dated December 9, 1997, and a copy of the Complaint, Indictment, and description of possible punishment facing Mr. Barnette. The defense also provided a letter confirming that Dr. Seymour Halleck had been retained as a psychiatrist; a copy of a 1994 report written by William M. Tyson, M.D. and some records from Blue Ridge Behavior Systems. I also spoke by telephone with defense attorney Paul Williams, prosecutor Robert Conrad, and Sonia Barnette, Mr. Barnette's mother.

11. Given that this was a capital case and, thus, the evaluation was particularly important, the information provided by Mr. Barnette's attorneys in 1997 would be considered sparse and less comprehensive than seen in many capital cases. I understood what "mitigation" was in 1997. The defense provided little in the way of mitigation information or detailed psycho-social information that could have assisted my evaluation. Although I did receive a report and some limited records from Dr. William Tyson, those records were, as my report noted, "brief." They were limited in scope and detail.

12. According to my report, "[Mr. Barnette] was generally cooperative with the evaluation, although he indicated that his attorneys had instructed him not to discuss detailed information about the offense. Nonetheless, he spoke quite openly and freely about his behavior around the time in question."

2

13. My records also indicate that on December 5, 1997, Mr. Barnette was released to the open population of the Health Services Division, where he remained until he was returned to Charlotte, North Carolina to stand trial. This is because, as stated in the report, Mr. Barnette was not seen as presenting a danger to staff or other inmates. He did not present any management problems. He was not difficult to interact with and he was cooperative with the evaluation process. He did not attempt to feign or malinger signs of symptoms of mental illness during the evaluation period.

14. I testified briefly at Mr. Barnette's trial in Charlotte on February 3, 1998. In court I confirmed that during his stay at the FMC, Mr. Barnette told me he had come to grips with what he had done shortly after the crime was committed, that prior to his arrest he had intended to kill himself because he believed his life was over, and he described feeling overwhelmed with the magnitude of his behavior. I confirmed my assessment that Mr. Barnette expressed remorse for his behavior and expressed sympathy for the victim's family.

15. Until I was contacted by his post-conviction counsel, I had no further contact with Mr. Barnette or anyone involved in his case following my testimony on February 3, 1998. I was not contacted by his defense counsel or anyone involved in his resentencing trial in 2002.

16. According to my December 29, 1997 report, Mr. Barnette was taken into custody in connection with his crimes on or around June 25, 1996. Thus, by the time of Mr. Barnette's resentencing trial in 2002, he had been in custody for approximately six years – the majority of which time he had spent in the custody of the Bureau of Prisons. Having reviewed Mr. Barnette's prison records from his incarceration during that period of time, it is clear that Mr. Barnette had very positive institutional adjustment. He presented no problems for correctional officers and had no problems with other inmates. He demonstrated an ability and willingness to abide rules, remained non-violent, and maintained constructive and positive relationships with others. Had I been asked, I would have been willing and able to testify at Mr. Barnette's resentencing trial about his positive adjustment to prison and his lack of disciplinary issues, and how it was consistent with his behavior and adjustment during his evaluation period in 1997 and consistent with my expectations for his future adjustment.

17. Information has been provided to me by post-conviction that I did not have available to me in 1997. Much of the new information I have provides significant additional detail about Mr. Barnette's upbringing, family situation, and relationships prior to the time of the crimes for which he was convicted.

18. The information provided by post-conviction counsel also clarifies that Mr. Barnette's intimate relationships did not always involve abuse or negative behavior. During his relationship with Sheila Sullivan, Mr. Barnette appeared to have been supportive during times of stress, including when Ms. Sullivan became

3

Bates No. 91

pregnant and later terminated the pregnancy. There is no evidence Mr. Barnette was abusive toward Ms. Sullivan. Mr. Barnette was the victim of an assault, perpetrated by other young males, during the time of his relationship with Ms. Sullivan. When that relationship fell apart, Mr. Barnette became depressed and attempted suicide. I did not have this information in 1997. Had I had this information, I could have testified then and in 2002 that Mr. Barnette was engaged in a significant, nonviolent relationship with Ms. Sullivan.

19. Mr. Barnette's relationships with Ms. Tameka Hunter and Ms. Kowana Dozier also did not include violence or extreme jealousy or elements of domestic violence or obsessive pursuit. I could have so testified to that in 1998 and in 2002.

20. During my 1997 evaluation, I was unaware of the paternity issues concerning Mr. Barnette's father and how his mother, Sonia Barnette, handled the controversy. In the face of a paternity test, confirming Derrick Barnette was not the father, Sonia Barnette continued to claim he was. This was upsetting and confusing for Mr. Barnette. I could have testified to this in 1998 and 2002.

21. I was also unaware in 1997 of the details concerning the circumstances of Sonia Barnette's mother's murder (death of Pearl Cooper), and the impact of this trauma on her parenting abilities. Again, I could have testified to this in 1998 and 2002.

22. The murder of his maternal grandmother, Pearl Cooper; his maternal grandfather, Jesse Cooper's, post-traumatic stress disorder; how the confusion concerning Marc's paternity was handled within the family; his mother Sonia's limitations as a young parent; and the absence of any stable or helpful guidance given to Marc from others, (including his family). for coping with stress, dealing with problems, and navigating his adolescent and teenaged years, are all important facts that I would have been willing and able to discuss at Marc's resentencing trial in 2002.

23. I have not seen Mr. Barnette since 1997. While I am aware that others have since opined that Mr. Barnette, among other things, suffers from an affective mood disorder, I would need to re-evaluate him before rendering an opinion on that issue.

24. I have been made aware that Mr. Barnette testified on his own behalf at his resentencing trial. Had trial counsel sought my advice or insights in 2002 about putting Mr. Barnette on as a witness, I would have discussed that although Mr. Barnette expressed genuine remorse for what he had done, he had limited insight into his behaviors and may not be able to display his remorse when confronted with the stress of examination and cross examination. His attempts to deal with his anxiety and his personality functioning would likely limit his ability to relate to the Jury or others in the court room.

4

Bates No. 32

25. In 2001 and 2002, during the years leading up to Mr. Barnette's resentencing trial, I was a consultant to the Medical Director of the FMC at FCI Butner. I was available during that period of time and would have been willing, if asked, to review information, reevaluate Mr. Barnette, and testify at his re-sentencing. As noted above, however, no one ever approached or asked to me to do so.


_____  Date __11__/__24__/__14__

Sally C. Johnson M.D.

Affirmed and subscribed before me on this the 24th day of November, 2014 in Orange County, North Carolina


_____
Notary Public

My commission expires: 10/19/2014

BRENT A KAPPLER
My Commission Expires
NOTARY PUBLIC
WAKE COUNTY, NC
10-19-19

## Affidavit of Jean B. Lawson

I, Jean B. Lawson, appearing before the undersigned Notary Public and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I became licensed to practice law in Virginia and North Carolina in 1979. As of the time of Marc Barnette's second sentencing hearing, I had been in the private practice of law for all but two years that I served in the Public Defender's Office in the early 1980's. I am currently an Assistant Public Defender with the Mecklenburg County Public Defender's Office in Charlotte

3. I was in solo private practice in 2001 when I was appointed to represent Aquilia Marcivicci "Marc" Barnette for his resentencing. Following Mr. Barnette's sentencing in 2002, I joined the Mecklenburg County Public Defender's Office and gave all of my files to Harold Bender. I no longer possess any documents from my representation of Marc Barnette.

4. Prior to signing this affidavit, I met with Mr. Barnette's post-conviction counsel and reviewed various documents, including pleadings from the underlying case, as well as information that some of the trial experts retained.

5. I handled several murder cases in Federal Court before I was assigned to represent Marc Barnette. One was in the WDNC in which the government finally agreed not to seek the death penalty. The other was in Rhode Island and we actually met with the Department of Justice Death Penalty Committee in Washington, DC. It took a long time, but the government eventually decided not to seek the death penalty. At that point, Learned Counsel was no longer necessary and I withdrew from representing the defendant.

6. I was appointed to represent Mr. Barnette along with Claire Rauscher. Neither Ms. Rauscher nor I had any involvement in the original trial, in which he was represented by George Laughrun and Paul Williams. When Ms. Rauscher and I were appointed in 2001, Mr. Barnette was awaiting a new sentencing hearing.

7. Claire Rauscher and I were appointed in February 2001. On August 28, 2001, we filed an *ex parte* document called "Statement of Defense Contentions," in which we identified a handful of issues about which we wanted the court to be aware. Based on our work in the case up to that point, which constituted a review of the first trial transcript, Mr. Barnette's criminal record, and discovery, we wrote that "an approach different from that used in his first sentencing hearing [was] warranted." We believed that the first defense

1.

Case 3:12-cv-00327-MOC    Document 74-3    Filed 12/22/14    Page 44 of 50

team tried to minimize the features of Marc Barnette's relationships with other women, and, in some instances, sought to blame the women for any difficulties that existed. It was our belief that we would need to address those prior relationships head on, and have a far better understanding of them than what the first defense team had or presented to the jury.

8. Based on our review of the case materials as of August 28, 2001, it was also apparent that the first defense team presented a "disjointed" sentencing case. As we explained in the *ex parte* Statement of Defense Contentions: "[W]itnesses were unprepared for cross-examination. The investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation."

9. Thus, as of August 28, 2001, it was clear to me and Claire Rauscher that we needed to re-evaluate everything that the first trial team did, meet with their experts and review all of their data and evaluations, identify additional experts who might be needed, and identify and interview numerous family members, co-workers, and other potential witnesses.

10. In addition to filing our *ex parte* Statement of Defense Contentions, Ms. Rauscher and I also filed *ex parte* motions for funds to hire a private investigator (Jan Barefoot) and mitigation specialist (Cessie Alfonso). I had previously worked with Jan Barefoot on other cases; I had never previously worked with Cessie Alfonso, although I was aware of her professional reputation.

11. Our need for both Jan Barefoot and Cessie Alfonso was very clear. I had handled a number of capital cases by the time I was appointed in Marc Barnette's case, and it was common practice at that time to use both an investigator and mitigation specialist. It was clear from the outset that Jan Barefoot would need to locate various witnesses for Ms. Alfonso to interview. It was also evident to the defense team that there were potentially hostile witnesses with whom we needed to speak. As we explained in our *ex parte* Statement of Defense Contentions, we were aware that some of the witnesses we needed to talk with "were hostile to the defense at the defendant's first trial and sentencing." As a result, we believed that we needed to have an investigator locate and approach these witnesses; they were not necessarily going to come to us. These witnesses included some of Marc Barnette's former girlfriends.

12. With respect to hiring Cessie Alfonso, it was evident to defense counsel that we needed to replace Sindy Maxwell, who had handled the mitigation investigation for the first trial team. As we wrote in the *ex parte* Statement of Defense Contentions, "[Maxwell] failed to develop adequate rapport with the defendant's family and friends that would have enabled her to unearth critical biographical information. She prepared a 'time line'

2

purporting to represent the defendant's life history and omitted critical information. These omissions cast doubt on the reliability of other expert witnesses called by the defense. As a result, the honesty of the defense presentations was compromised." Inasmuch as this was a resentencing trial and the primary focus would be on mitigation, and in light of the significant deficits in Ms. Maxwell's earlier work, there was little question in my mind that we needed to replace her with someone new.

13. On August 31, 2001, just a few days after we filed our initial requests for expert funding, the resentencing trial was scheduled for March 19, 2002.

14. The requests for funding to hire Jan Barefoot and Cessie Alfonso were not granted until October 10, 2001. The actual CJA Authorization forms for their work were not issued until October 25, 2001. This delayed our first consultation with Ms. Alfonso until mid-October, 2001.

15. On October 31, 2001, two months after the Court scheduled resentencing for March 19, 2002, Ms. Rauscher and I filed a motion to continue the trial. As we wrote in our motion to continue, both of us had significant commitments in other cases that caused great concern about our ability to be ready by March, 2002. Among my other commitments was a death penalty trial that was scheduled for January, 2002 in Mecklenburg County. In addition, we were also very concerned about having only four-and-a-half months to investigate and prepare a penalty phase presentation for Mr. Barnette. Our mitigation specialist was just getting started and we had a great deal more work to do in a case in which the defendant had already been sentenced to death once.

16. The Court granted our motion to change the March 19, 2002 trial date but, instead of moving the case to a later date, the Court moved the start of trial up to March 12, 2002. Claire Rauscher and I filed a motion asking the Court to reconsider the trial date of March 12, 2002. At a hearing on November 20, 2001, the Court removed Ms. Rauscher from the defense team after she asserted the existence of a conflict due to the scheduling of the resentencing. The loss of 50% of the defense team was a huge shock to all of us. As a result of her removal, the case then had to be continued from the March 12, 2002 trial date.

17. From November 20, 2002 until January 14, 2002, I was Marc Barnette's only attorney. The process of finding a substitute for Claire Rauscher was difficult. David Bruck, the federal death penalty resource counsel, and I had various communications about identifying the right replacement. Some of my initial recommendations, including Calvin Murphy and Reita Pendry, did not work out for one reason or another.

Bates No. 96

18. It was ultimately decided that Harold Bender would be Mr. Barnette's second attorney. I had previously worked with Mr. Bender as co-counsel and as counsel for co-defendants. In terms of working up a case, I knew from first-hand experience that Harold Bender's major strength and interest was in the courtroom and that he had a busy private practice. As a result, I knew that the responsibility and burden of developing the mitigation and case for sentencing would be mostly mine.

19. Harold Bender was appointed as co-counsel on January 14, 2002. The sentencing hearing was rescheduled to July 15, 2002.

20. On January 16, 2002, two days after Mr. Bender was appointed in Marc Barnette's case, I was appointed as trial counsel for Jeffery Neal Duke in a death penalty case in Gaston County. On January 21, 2002, I began a death penalty trial on behalf of Frank Robinson in Mecklenburg County. My co-counsel in that case was Calvin Murphy, who had only been appointed to the case on November 30, 2001, less than two months earlier. As a result, I was working especially hard and particularly focused on the Robinson case during the period of time after Ms. Rauscher was removed from Mr. Barnette's case. Frank Robinson's trial started on January 21, 2002, and ended with a hung-jury in the penalty phase on February 7, 2002.

21. In a January 22, 2002 letter from Cessie Alfonso to me, she advised that she believed that a key part of Marc Barnette's mitigation presentation concerned his mother, Sonia. In her letter, Ms. Alfonso suggested that we consider presenting Sonia's testimony at sentencing, with a focus on her own history of grief, trauma and abuse. Reviewing what Ms. Alfonso wrote to me in January 2002, it certainly appears that focusing on Sonia's own grief, trauma, and abuse, and how that impacted her, could have been powerful mitigating evidence.

22. At some point after I was appointed to him, Mr. Barnette and I discussed the issue of whether he would testify at his sentencing hearing and, as I recall, Harold Bender was involved in those discussions occasionally. Mr. Barnette was always very amenable to the advice of counsel. Mr. Bender and I recommended that he testify, and he decided to testify.

23. I was primarily responsible for preparing Marc Barnette to testify. I never considered, and I don't recall ever discussing with Harold Bender, having any mental health expert weigh in on Mr. Barnette's testimony. At this point in time—2002—I was familiar with the notion of having an expert opine to the jury about a defendant's confession or demeanor. Indeed, often times a defendant's state of mind, psychological make-up, or even his appearance can affect how the defendant's words might come across to a jury.

4

24. Marc Barnette's relationships with Tasha Tolbert, the mother of his two children, his ex-girlfriend Crystal Dennis, and his ex-girlfriend Alesha Chambers were used as aggravating evidence during his first trial. As reflected in the *ex parte* Statement of Defense Contentions that Claire Rauscher and I filed in August 2001, it was clear that we needed to have a better understanding of those relationships prior to the start of the resentencing trial.

25. In late November 2001, the defense filed a motion for funds to hire Ann Wolbert Burgess. Dr. Burgess was an expert in the field of violence, in particular domestic violence, and had worked with the FBI. When we sought funding for Dr. Burgess, the defense team believed that she could help us better understand—and explain to a jury—the dynamics of Marc Barnette's relationships with other women, as well as the impact that Sonia and Derrick Barnette's volatile relationship had on him. As we wrote in the motion, the defense intended to "hinge its presentation on the expert testimony of a qualified expert in the field." In the motion, we further wrote that "[d]efense counsel contend that it is absolutely essential, and mitigating, to explain the criminal conduct of the defendant in light of how his relationship with women was formed. These crimes, the defense contends, are a direct product of the impact of domestic violence and murders of women in the defendant's family upon the defendant. It is critical to the defense to make the jury understand the way the defendant was raised and the way his psyche was formed and acted out in the conduct for which he will be sentenced."

26. We intended to have Dr. Burgess focus on Marc Barnette's prior relationships with other women. Ideally, Dr. Burgess would need to have access to all of Mr. Barnette's social history and mitigation information as well as women with whom he had been in relationships. We had Dr. Burgess meet with Mr. Barnette and speak with his mother and father, and his brother, Mario. I do not recall coordinating or suggesting conversations or meetings between Dr. Burgess and any other social history witnesses. Some of the social history information we provided to Dr. Burgess, including information about Mr. Barnette's prior relationships, came from Sindy Maxwell's work on the first trial – the same work we had previously concluded and told the court was poorly done and deficient.

27. With respect to the people with whom Cessie Alfonso ended up speaking, I do not recall coordinating any conversations or information sharing between Dr. Burgess and Ms. Alfonso. Ms. Alfonso did not provide her mitigation report to defense counsel until July 8, 2002, which was one week after Dr. Burgess submitted her report.

5

Bates No. 98

28. Based on my review of Jan Barefoot's notes, it appears that in early March, 2002, Harold Bender and I spoke with her about Mr. Barnette's ex-girlfriends Tasha Tolbert and Crystal Dennis. Both women had testified against him during his first capital trial. We did end up speaking with Tasha Tolbert prior to the second sentencing hearing, but I do not recall having Ms. Tolbert talk to Dr. Burgess.

29. According to a document from Jan Barefoot's files, I faxed a list of "potential mitigation witnesses" to her in early March 2002. This list was based on names that Mr. Barnette had provided to me during my visits with him. I indicated on this list which witnesses I wanted Ms. Barefoot to locate so Cessie Alfonso could interview them. A number of former girlfriends were on the list—including Sheila Sullivan, Tameka Hunter, and Kowana Dozier— but I don't recall if I specifically asked Ms. Barefoot to locate them at that time. Her notes indicate that, right on the eve of trial, I asked Ms. Barefoot to try to locate Kowana Dozier and Tameka Hunter, but she did not have enough time to track them down.

30. The government engaged Dr. Park Dietz to testify against Marc Barnette at resentencing. Although I had never before personally dealt with Dr. Dietz, I was aware of him by reputation. I spent a significant amount of time tracking down prior cases in which Dr. Dietz testified and reviewing that testimony.

31. Around March 2002, Harold Bender and I met with Dr. Mark Cunningham at a death penalty conference. I had previously spoken with Dr. Cunningham about his role in the first trial, when he testified as an expert about "future dangerousness." After Mr. Bender and I met with Dr. Cunningham, we decided to have him testify more broadly about Marc Barnette's psychological make-up and mental health issues.

32. In order for an expert like Dr. Cunningham to testify competently about Mr. Barnette's psychological make-up and mental health issues, he would need to have access to all of his social history and mitigation information. Because of his participation in the first trial, Dr. Cunningham had already been provided with the social history and mitigation information compiled by Sindy Maxwell (which Claire Rauscher and I had previously determined to be deficient). Other than having Dr. Cunningham meet with Mr. Barnette prior to the second sentencing hearing, I do not recall coordinating or suggesting any conversations or meetings between Dr. Cunningham and any other social history witnesses—including anyone who Ms. Maxwell had not spoken with prior to the first trial. Moreover, Cessie Alfonso's mitigation report was not provided to defense counsel until July 8, 2002, and I don't recall whether we gave that report to Dr. Cunningham.

6

33. Dr. Seymour Halleck testified for the defense at Mr. Barnette's first trial. Harold Bender and I decided to use Dr. Halleck again for this second sentencing hearing. I knew that in order for an expert like Dr. Halleck to testify competently about our client's psychiatric make-up and mental health issues, he would need to have access to all of his social history and mitigation information. Because of his participation in the first trial, Dr. Halleck had already been provided with the social history and mitigation information compiled by Sindy Maxwell (which Claire Rauscher and I had previously determined to be deficient). In addition to having Dr. Halleck meet with Marc Barnette prior to the second sentencing proceedings, we made Sonia Barnette and Tasha Tolbert available for him to interview. I do not recall coordinating or suggesting any other conversations or meetings between Dr. Halleck and any other social history witnesses. Cessie Alfonso's mitigation report was not provided to defense counsel until July 8, 2002 and I do not recall when or whether we provided Dr. Halleck with a copy of the mitigation report.

34. Cessie Alfonso's report referred to Mr. Barnette's grandfather, Jesse Cooper, and described the damaging effects of his combat experience. Mr. Bender and I did not gather Mr. Cooper's medical or military records or other information about combat injuries or commendations. We elicited whatever information we provided to the jury about Jesse Cooper from Marc Barnette, Derrick Barnett, and Armaud Cooper.

35. Harold Bender and I were aware of the murder of Pearl Cooper who was Sonia Barnette's mother and Marc Barnette's grandmother. Based on Cessie Alfonso's report and interviews with Sonia, it was evident that Pearl Cooper's murder had a devastating and debilitating effect on the family and impaired Sonia's ability to parent her son, Marc. I do not recall asking any of our experts to focus on Pearl Cooper's death and what effect it might have had on Marc Barnette and the family.

36. It was evident to trial counsel that we would have to explain Marc Barnette's actions at the time of the April 1996 firebombing of Robin Williams' home, and how he spent the ensuing six weeks before the murders. With respect to witnesses to that important time frame, I understand that defense expert witnesses—Dr. Cunningham, Dr. Halleck, and Dr. Burgess—were only provided access to Mr. Barnette, his parents Sonia and Derrick Barnette, and his brother, Mario. Those experts had Sindy Maxwell's investigative reports but not a report from Cessie Alphonso.

37. I have reviewed Cessie Alfonso's mitigation report that identifies the persons she interviewed. According to her report, she interviewed Marc, Sonia Barnette, Derrick Barnette, Sheila Cooper, Mario Barnette, Mable Johnson, Jesse Cooper, Armaud Cooper, Larry Wright, Tasha Tolbert, Tessie Nero, and Dorothy Harper. It does not appear that she re-interviewed a number of witnesses who Sindy Maxwell had interviewed prior to

7

Bates No. 100