the first trial. There were also a number of witnesses who had been identified on a list of "potential mitigation witnesses" in early March 2002 (like Sheila Sullivan, Tameka Hunter, and Kowana Dozier) whom Ms. Alfonso did not interview.

38. Prior to Marc Barnette's first trial, he was evaluated by Dr. Sally Johnson, a mental health expert who worked for the United States Bureau of Prisons. The defense called Dr. Johnson as a witness during the first trial. We did not call upon Dr. Johnson to testify at the second sentencing hearing and did not ask her to review any new information about our client, including his Bureau of Prisons records.

_____  
Jean B. Lawson

12/8/14  
Date

Sworn to and subscribed before me on this the _8th_ day of December, 2014 in Mecklenburg County, North Carolina

_____  
Notary Public

My commission expires: _4-1-2015_



8

Bates No. 101

## Affidavit of Temeka Lee

I, Temeka Lee, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Jacksonville, Florida. I used to live in Charlotte, North Carolina. At that time my name was Temeka Hunter.

3. I first met Aquilia Marcivicci Barnette in 1992 or 1993. I call him Marc. I met him through his cousin, Shonda Nero. Shonda and I worked together and we became good friends, spending time together outside of work.

4. When I met Marc he was living in Georgia. However, he would make trips to Charlotte to visit family and friends, including Shonda. Marc and I spent time together with Shonda, and Marc and I dated for about three or four months.

5. Our relationship was long distance because Marc was living in Georgia. I saw him when he came to Charlotte to visit his cousin. We also talked on the phone.

6. When we spent time together we didn't go out. We would sit around Shonda's house and talk. We spent all our time together at Shonda's. We were together sexually but we didn't spend an extended amount of time together because I was still living with my now-ex-husband.

7. I didn't know a lot about Marc's life. We never had deep talks. There was never any fighting or jealousy in our relationship, and he never acted possessively towards me. There was nothing like that in our relationship. We never argued. He was always respectful. We never got into fights and he never put his hands on me.

8. I was very surprised to learn about Marc's crimes. I could never see him doing that. I visited Marc at the jail in Charlotte before he went to trial in the late 1990s. He was the same person that I'd known but he was obviously quite disturbed and upset. He was very ashamed. He couldn't look me in the eyes.

9. I have not been in contact with Marc since I visited him that time at the jail. I later got divorced from my husband and moved away from Charlotte.

10. I was never contacted by any of Marc's trial attorneys or investigators working for them. Had I been contacted, I would have shared with them the contents of this affidavit.

11. I would have willingly testified for Marc at the sentencing hearing of his capital trial. Marc was always sweet and kind to me and I would have shared my memories of him with the jury.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Temeka R. Lee_
Temeka Lee

_12-22-14_
Date

Affirmed and subscribed before me on this the 22nd day of December, 2014 in _Duval_ County, Florida.

_____
Notary Public

My commission expires: _____

URSULA Y. CORBITT
Commission # EE 224827
Expires September 6, 2016
Bonded Thru Troy Fain Insurance 800-385-7019

Bates No. 103

## Affidavit of Anitra Lyles

I, Anitra Lyles, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Riverdale, Georgia. My best friend is Netoshia Tolbert. Everyone calls her Tasha. We have been best friends since we were little kids. Also, our mothers are best friends with each other, and our daughters are too.

3. When Tasha and I were little we both lived in Ellenwood, Georgia. Then Tasha and her family moved to Lithonia, Georgia. This is where Tasha met and started dating Aquilia Marcivicci Barnette. I call him Marc.

4. I was 13 or 14 years old when I first heard about Marc. Tasha told me she had met a guy and she wanted me to meet him.

5. Tasha used to sneak Marc into her bedroom window. Tasha's bedroom was on the second story so she tied up sheets and dropped them out the window so Marc could climb in and out. Tasha's mom would be on the other side of their apartment and Marc would be in Tasha's room. I first met Marc one time when she had snuck him in. The three of us sat around and laughed together.

6. Marc and Tasha started arguing and fighting a lot in their relationship. They were like gasoline and fire together. They were both physical with each other. Tasha was not passive in these fights. She would hit, punch, and slap Marc when they were fighting.

7. Tasha's sister's boyfriend, Keith Furlow, once hit Tasha.

8. After Marc and Tasha had been dating for a while, Tasha became pregnant with her daughter, Angelica. Marc was excited about being a father. He did well to prepare for Angelica. He was at the hospital when she was born and he was very excited about being a father. I remember Marc holding, hugging, and kissing Angelica when she was little.

9. Tasha's mother was very strict and she didn't like Marc. Marc would try to catch the bus to go to the doctor's office with Tasha for her prenatal visits, but Tasha's mom stepped in and did not allow him to go to the appointments with her. And after Angelica was born, Tasha's mother didn't want Marc to see his baby daughter. Tasha's mother interfered a lot and that's part of the reason Tasha and Marc and their kids moved down to Newnan, Georgia. I have seen Marc sad and upset over what Tasha's mother was doing. There was a lot of stress to being a young parent. If Marc and Tasha had gotten more support from her mother, things might have gone better for them.

1

Bates No. 104

10. Tasha became pregnant before I did, but I was only 9 months behind her. She and I both became teenage mothers. I became a mother at age 16. After they had Angelica, Marc and Tasha had second child named Marc Jr. Tasha's mother showed favoritism towards Angelica because Marc Jr. looked just like Marc.

11. Marc Jr. is an emotional person. He's very sensitive. I have seen him post on Facebook that his father would not be around much longer. I know he must have been suffering to have written that. He had nothing to do with the situation his father is in, so it's not fair that he's had to live with the thought that his father could be executed soon. I believe all children deserve to have their parents.

12. I know that both Angelica and Marc Jr. have been in touch with their father while he's been locked up. He has reached out to them and they have written each other. · Angelica once showed me a card that Marc drew for her. It would be extremely hard on Tasha and on both of the kids if Marc were executed.

13. I was never contacted by anyone working on behalf of Marc's legal team before 2013. If I had been contacted, I would have been willing to talk with them. I would also have willingly testified for Marc at the sentencing hearing of his capital trial if I'd been asked. I first met Marc many years ago and he is an important person to Tasha, Angelica, and Marc Jr. I would have shared this with the jury.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____       _10/6/14_
Anitra Lyles                          Date

Affirmed and subscribed before me on this the 6th day of October, 2014 in

_Fulton_ County, Georgia.

_____
Notary Public

My commission expires: _12/12/17_

2

## Affidavit of Regena Mack

I, Regena Mack, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Charlotte, North Carolina. My maiden name was Regena Nero.

3. Aquilia Marcivicci Barnette and I are first cousins and I have known him since we were both little kids. I call him Vicci. He is about five or six years younger than me. My mother's name is Tessie Nero. Vicci's mother, Sonia Barnette, is my mother's younger sister. Their other sister, Sheila, is the youngest of the three of them.

4. I am the oldest of my siblings and cousins in our family. I was born in Charlotte but we moved to Columbia, South Carolina when I was little.

5. Vicci and Sonia lived with me and my family in Columbia for a while when I was little. I was in the 1st and 2nd grade then and Vicci was a baby.

6. Sonia and Vicci and their family later moved back to Charlotte. My family still lived in Columbia but we came to Charlotte frequently. We would go visit Vicci and his family – his mother, Sonia, his father, Ricky, and his brother, Mario – at their house in Clanton Park. When we were kids it would generally be Shonda, Vicci, Mario, and me. I remember digging up worms in their back yard.

7. I knew the Austins who lived across the street from Vicci and his family. I had a crush on Greg Austin but nothing happened. I was young.

8. My family moved back to Charlotte when I was in the 6th grade. I hated the move. I wanted to stay in Columbia and be a cheerleader, go to high school, and then go to Clemson.

9. I was surprised when Sonia and Ricky split up. I had no idea that was going to happen. I was totally shocked. I was devastated. I understood that they were fighting and also that Ricky had an affair. I heard that Ricky hit Sonia while they were together. I remember seeing Sonia's ear messed up a many years ago as well as more recently. She only just got it fixed more recently. I didn't know until I was an adult that her ear had been damaged when Ricky tore her earrings out.

10. I saw Vicci and Sonia and Mario quite a bit after Sonia's separation. I saw them when they were living on Windsong Trails and Wendover Avenue. I even went to Atlanta to visit them after they moved down there.

11. I was 16, had a car, and wanted to be just like Sonia. She was the fun party aunt. Sonia had a Corvette at one point and would let me drive it.

1

Bates No. 106

12. I would go see Sonia and we would hang out. We would go to clubs together.

13. I knew Sonia's friend, Tina. Tina and Sonia would party together. Sonia and Tina fell out at some point before Tina died.

14. When I was partying with Sonia, Vicci and Mario were at home, with Vicci being the caretaker of Mario. I remember one time that Mario was hit by a car when Sonia and I were out, but I don't remember the details of how it happened. He hurt his collarbone.

15. Sonia and I would meet guys sometimes when we went out. Sonia dated a guy named Al and another named Mark Ragin. Mark owned a club. I heard about it when Mark was shot and killed. Sonia was very upset about that.

16. Sonia, Vicci, and Mario ended up moving down to Georgia to be with Sheila and her family. I visited them there. Sheila's house in Georgia was set up more like a normal house with food and such. Sonia's apartment in Lithonia, however, was definitely different. There were no beds like one would normally have. Sonia used to have a basket of nail polish in the fridge and that's all she had.

17. Sonia and others in the family were using cocaine in both Charlotte and Georgia. They were also using marijuana in both places. I saw more drinking but I knew Sonia did coke, as well.

18. It was always chaotic in my family's house. There were arguments more frequently than not. There were also physical fights. I stayed in my room a lot.

19. I was treated differently by my family. I always looked different than my sister. Shonda has light skin and was thin. My dad said I should go into the Army but said Shonda should go to modeling classes. My mom didn't like me. I wanted to get out of the house. I later got some counseling to learn to be a better parent. As a mom I try to do the opposite of what my mom did.

20. I met two of Vicci's girlfriends: Tasha and Robin. Robin seemed good for Vicci. I saw her at the hospital after Vicci had been shot by our cousin, LeDon. Vicci was in the hospital because of his leg. LeDon was a junkie and crazy.

21. I saw Vicci after he'd moved back to Charlotte from Virginia following his breakup with Robin. This was at the house on West Boulevard. He was very depressed.

22. Never in a million years could I have imagined Vicci doing what he did. It just wasn't my cousin. He was a good kid. I never could believe this about him. I've never even really seen him mad. I would trust him with my child.

Case 3:12-cv-00327-MOC   Document 74-7   Filed 12/22/14   Page 7 of 50

Bates No. 107

23. I remember talking to a man before Vicci went to trial the first time. He asked me some basic questions about Vicci, including about when he and I worked together at a hamburger place. I think he was a detective with the police, not someone from Vicci's legal team.

24. I had to go to court for Vicci's first trial. We all went. Then we were sequestered in a room. They were all getting called to testify but I never did. I wanted to help and be called. Nobody said anything to me about not being called to testify, but then I was allowed to go into the courtroom. Then the sentence came so fast I didn't even know what had happened.

25. I never met anyone from Vicci's legal team before his second trial, and I didn't testify then either. I don't think I went to court for any of Vicci's second trial. I was not subpoenaed and I was not sequestered that time. I remember seeing Tasha and their kids while they were in town for the trial. I went to Tasha's hotel to say hello to her.

26. I would have willingly testified for Vicci at the capital sentencing hearing of either of his trials. I care about Vicci a lot and I would have wanted to share with the jury my memories of him and his family.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Regena Mack_
Regena Mack

12/22/2014
Date

Affirmed and subscribed before me on this the 22nd day of December, 2014 in

Mecklenburg County, North Carolina.

_____
Notary Public

My commission expires: _____

LISA A. OTTENS
Notary Public
Mecklenburg County
My Commission Expires
01-11-2016
NORTH CAROLINA

Bates No. 108

3

<u>**Affidavit of Danielle Mathis**</u>

I, Danielle Mathis, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Charlotte, North Carolina.

3. I knew Aquilia Marcivicci Barnette when we were in middle school together. I call him Marc.

4. Marc and I went to eighth and ninth grade together at Randolph Middle School in Charlotte. In high school we still kept in touch some because we had some mutual friends.

5. Marc and I may have first met through friends. We either met in school or in our neighborhood. We were living in the same neighborhood at that time. We didn't live far from where I live now.

6. Marc and I liked each other. We were boyfriend and girlfriend for a short time but it was just kiddy dating. We used to talk on the phone. We didn't have a physical relationship. The most he might have done was give me a hug. Marc used to walk me to all of my classes. He would be at my classroom when my class got out. He left his own class a little early to come to my classroom. Then he would walk me to my next class.

7. Another person Marc dated was a girl named Melanie. She was a year or two older. After they broke up Marc was able to bounce back emotionally. He didn't seem to get depressed about it.

8. Marc got along very well with other kids. He was good looking and dressed nice. He would wear polo shirts and handle himself respectfully. Teachers loved him. He was a good person to be around.

9. Marc was a happy person and he was energetic. Anyone that was around him was going to be upbeat too. Marc was also gentle and honest. He and I used to have some deep conversations and he would make me feel better when I was down. He was very caring and compassionate.

10. I knew that Marc was really close to his mom and also his younger brother. He was concerned about looking out for them when we were young.

11. I never knew Marc to get into any trouble or conflict. The only problem he had that I knew about was that other guys were jealous of him because all the girls liked him.

Bates No. 109

1

12. I last saw Marc when I was about 20 years old. We had not seen each other for several years. He was working at Taco Bell on South Boulevard. We spoke to each other. We said hello and asked each other how the other was doing. Marc looked a little sad at that time. He wasn't his same upbeat self that I remembered.

13. When I heard about Marc being involved in this crime I was shocked. The Marc that I knew wasn't at all violent. I would never have thought this could happen. I'm crushed about his situation. I can't properly describe the feeling that I have. I have lain in bed and cried about it. Something happened to Marc because the person I knew wasn't like that. The people on the news don't know the full picture of who he is.

14. I was never contacted by any of Marc's trial attorneys or investigators working for them. Had I been contacted, I would have shared with them the contents of this affidavit.

15. I would have willingly testified for Marc at the sentencing hearing of his capital trial. I remember Marc as a kind and caring person when I was around him and I would have shared my memories of him with the jury.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Danielle Mathis_       _6/9/14_
Danielle Mathis           Date

Affirmed and subscribed before me on this the ___9th___ day of ___June___, 2014 in ___Mecklenburg___ County, North Carolina.

_____
Notary Public

My commission expires: ___1/20/16___

Zachary Rowles
Notary Public
Durham County, NC

Bates No. 110

## Affidavit of Victor Montgomery

I, Victor Montgomery, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Decatur, Georgia.

3. I used to live in Newnan, Georgia and this is where I first met Aquilia Marcivicci Barnette. We met in 1992 after he moved to Newnan. I called him Marc.

4. Marc stayed next door to my mother's apartment and that's how I first got to know him. I spent a lot of time at my mom's place. When I first met Marc, he was living with his girlfriend, Tasha Heard. Marc and Tasha argued sometimes and I noticed one time that they were physically fighting.

5. Marc didn't bother anybody. Marc used to work on his car all the time, a red Volkswagen. In general, Marc pretty much stayed to himself.

6. Anthony Britt was my best friend and his nickname was Ant. We used to hang out together every day. Ant wasn't a rough character but he didn't take any shit. Ant wanted to get together with Tasha, so he set Marc up to be with his sister, Crystal Dennis. We went over to Crystal's house and Marc started talking to her. After that, Ant started fooling with Tasha. He was fooling with Tasha on a regular basis. He would go over whenever Marc wasn't around. I used to talk to Tasha's friend, Anitra, and I started fooling with her.

7. I remember the night that Marc ended up shooting Ant. At that time, Marc was fooling with Crystal, but going out with Tasha. Anthony was fooling around with Tasha on the low, meaning that Marc wasn't supposed to know. That night that it happened something was said between Marc and Anthony. Marc was supposed to have said something that got Ant mad. Ant and I were standing outside my brother's house. My brother was also Ant's uncle. We could see clear up the street. We saw Marc walking home to Tasha's apartment. Ant saw him and said he was going to go and straighten Marc out. Ant also said, "I'm going to get his ass." I tried to talk him out of it. I encouraged him to leave Marc alone but Ant and some other guys took off after Marc. I stayed behind at first but then I walked up towards them.

8. Marc was a little guy, not a big dude, and he was still new in town. Ant had five or six guys with him. They surrounded him. I saw all of this from a distance as I walked towards them. Marc and Ant had words. Ant was threatening to beat up Marc. Marc pulled out a gun and fired two to three shots. Ant was shot one time in his arm.

1

Bates No. 111

9.  To me, Marc was in the right. Ant and the other guys would have beaten Marc up, and Marc was going to get hurt. I would have done the same thing as Marc in that situation.

10. I was never contacted by any of Marc's trial attorneys or investigators working for them. Had I been contacted, I would readily have shared with them the contents of this affidavit. I did not learn about Marc's crimes, his trial, or that Marc is on death row until I was contacted last year.

11. I would have willingly testified for Marc at the sentencing hearing of his capital trial.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____
Victor Montgomery

_____9/18/14_____
Date

Affirmed and subscribed before me on this the 18th day of September, 2014 in

____Fulton____ County, Georgia.

_____
Notary Public

My commission expires: __12/12/17__

KATRINA CONRAD
NOTARY PUBLIC
FULTON COUNTY, GEORGIA

2

# Affidavit of Jean Nduly

I, Jean Nduly, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.	I am over the age of 18 and competent to testify to the following facts.

2.	I am resident of Charlotte, North Carolina. Before I married, my name was Jean Barber.

3.	Sonia Cooper Barnette and I are first cousins. My uncle, Jesse Cooper, was her father. Sonia is Aquilia Marcivicci Barnette's mother. We call him Vicci.

4.	Sonia is the middle child of three sisters. Her older sister is Tessie and her younger sister is Sheila. Tessie is a number of years older than Sonia. She was a teenager when she got pregnant with her first daughter, Regena. Not long afterwards, she married Jeff Nero and they eventually moved away because Jeff was in the service. My family and I never believed that Jeff is Regena's biological father.

5.	I grew up on the Cooper family property on West Boulevard in Charlotte. Sonia and I both lived there when we were little. I am about three years older than Sonia. We used to play together as kids. I often asked if Sonia could come out to play. ~~However,~~ Sonia's mother, Pearl, ~~didn't~~ always let her and her sisters out. Sonia and I also went to elementary school together. She rode the bus with me.

6.	Jesse Cooper served in the military and he often told stories about the war. He was badly injured in the war and there was a period of time when the family thought he'd been killed. My grandmother always said that Jesse was in the hospital for a long time after he was wounded. Jesse had a glass eye as a result of his injuries. He drank Pabst Blue Ribbon beer and called it his tea. He drank it every day. When he got tipsy he would go lie down and go to sleep, but you still couldn't sneak up on him. In our family the men walked the property to keep people off, and this is something Jesse would do.

7.	Pearl and Jesse eventually split up and Pearl and her kids moved away. I was about 10 years old when Pearl and the family moved out. I remember them driving off. I was sad when they moved. Jesse continued to wear his wedding band his whole life.

8.	The first place they moved to was an apartment. Then they moved to South Side. Then they moved to Windsong Trails. Windsong is where Pearl was shot and killed by her second husband, Loyd Brown. After they moved, I would occasionally talk to Sonia over the phone or go over and see her in person. I went over to the place on Windsong one time with Uncle Jesse. I think we went to drop off some money for Pearl.

Bates No. 113

1

9. There was a period of time when Sonia, Sheila, and Vicci came back and stayed with Uncle Jesse. This was while Pearl was with Loyd and after Tessie had moved away. They stayed with Jesse for about a month. Sonia wasn't comfortable around Loyd. I thought he had made a pass at Sonia. Sonia and I laughed and giggled a lot but not after Loyd came into the picture.

10. It was cold out during the time the kids came back and stayed with Jesse. ~~Jesse's~~ My grandfather's car had no heat and he would put hot coals in the car to heat it up. I had just gotten out of school at that time and I looked after Vicci some. I think I was going to Central Piedmont Community College then. I just felt like something wasn't right. I remember Sonia saying she was going to go to a dance at school and it was not long afterwards that Pearl was killed.

11. I remember the night Pearl was shot. I had talked to Sonia before it happened because it was her prom night. Jesse said, "Jean, we have to get the girls." Pearl had been shot. We went immediately to get them. It was so sad when they came down the steps. They were in a fog. Sonia was in shock and Sheila was really upset. Sonia was trying to console Sheila. The police were at the house and Jesse talked to them. We weren't there very long before we took them back to Jesse's. It was very confusing and scary. Sonia and Sheila were both still so young, and Sonia had Vicci, who was just a baby.

12. Sonia never talked about her mom's death and we don't pry in our family. She was clearly very sad. It wasn't very long before they moved to Columbia, South Carolina to live with Tessie. After they moved to Columbia I didn't see them as much.

13. As a kid, Vicci was sweet and kind. He was always wanting a hug. My favorite memory involving him was that he would run up and hug me when he saw me coming. I remember when Vicci was first toddling around. All of a sudden he let go of the table and just took off and started walking. Someone exclaimed, "He's walking!" I hadn't seen him crawl or anything yet. He was still tiny. When he stopped he didn't fall, he just sat down.

14. I stayed in the Barnette house in Clanton Park for a while when Sonia and the family were living in North Dakota. This was when Ricky was in the service. I was there about a year. Sometimes I would talk to Sonia on the phone during that time.

15. One time when I went over to Sonia and Ricky's house in Clanton Park they were both very quiet. All the clothes were out of the drawers and out of the closet. There was a pile of his clothes up to the ceiling and another pile of her clothes that was the same. They had been fighting.

16. After Sonia and Ricky split up, Sonia moved to a place off Wendover Road in Charlotte. I didn't talk to them for a while after that.

Bates No. 114

17. I saw the family more after they came back from living in Georgia. Sheila and her kids also moved back to Charlotte around that time. They all lived in the same house on West Boulevard and it was a house of chaos. Sheila's kids were badly behaved whereas Vicci and Mario were quieter.

18. Sonia's friend, Tina, also lived with the family at the house on West Boulevard for a while. I didn't care for Tina. She always had wine and she was trying to make passes at Uncle Jesse. If she was there at the house I didn't stay long. Tina drank a lot. Sonia liked her wine, too. Sonia and I only had one incident where we drank together. I didn't drink much because I was driving. We both loved to dance and we went out downtown. Sonia drank enough where she was ready to go to bed when she got home.

19. I saw Vicci's kids one time at Vicci and Sonia's house. I remember learning that their mother, Tasha, had just shown up at the house one day with both kids and asked Sonia and Vicci to keep them for a while. The kids ended up staying in Charlotte for about three or four months before Tasha took them back.

20. I knew Vicci and his cousin Don, who is my nephew, had a confrontation and the next thing I knew Don had shot Vicci. Don was living in his great grandmother's house on the Cooper property. Vicci was still on the floor in his house when I arrived. The police were also there. Vicci ended up in the hospital.

21. I met Vicci's girlfriend, Robin, when they started dating. I met her at the house when Robin was visiting. I remember Vicci smiling and giggling. He acted like they had just started seeing each other. However, Vicci never really talked about Robin with me. He never talked about any of his girlfriends.

22. A couple of days before the crime Sonia called me about Vicci. She said that he wouldn't work or get a job. He just sits out on a white bucket. He won't go anywhere. She told me that if he keeps this up she would have to take him somewhere. I agreed, telling Sonia she might have to take him to see a psychiatrist or counselor. Sonia asked me to come over and talk to Vicci, so my daughter and I went over to West Boulevard for a visit. When I got there I asked Sonia where Vicci was because he didn't come out to greet me. I called to him, "Vicci, you're not going to come out to talk to me?" He responded that he wasn't. I asked, "What's wrong with you?" and he responded, "I don't know." Vicci was lying on Sonia's bed. I went in there and saw him. I remember taking his arm and moving it. His arm was floppy and limp. He never did get up off the bed while I was there. That was not how he usually reacted when I came over.

23. A couple days later Sonia called and told me about Robin's death. She told me, "I wish I'd taken him somewhere." I went over to the West Boulevard house before Vicci was caught. I remember there were news people there trying to come up to the house.

Bates No. 115

24. I visited Vicci in jail before his first trial. I believe I went there by myself, but I know that Sonia and other family members were going to see him as well.

25. I talked with Sindy Maxwell before Vicci's first trial. We talked in person at an office. I only met with anyone from Vicci's legal team that one time. Then I was told I would be called to court. I ended up testifying at Vicci's trial. I remember that I cried. I can't remember what they asked me. They only asked me a couple of things and that was it. I was not up there long. I didn't know what they were going to ask me before I took the stand. No one asked me about Pearl's murder or what Sonia was like afterward.

26. I was not contacted by anyone concerning Vicci's second trial. I wasn't interviewed by anyone, I didn't testify, and I didn't attend the trial. I didn't even know when it was happening. I only knew Vicci was in town because Sonia told me.

27. I was living in Charlotte in 2002 and I was talking to Sonia during that time so I could have been reached. I would have talked to someone if they'd asked, and I would have testified if someone thought it might help Vicci because I care about him very much.


I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.


_Jean B. Nduly_  
Jean Nduly

_11/15/2014_  
Date

Affirmed and subscribed before me on this the _15th_ day of _November_ , 2014 in _Mecklenburg_ County, North Carolina.

_[signature]_  
Notary Public

My commission expires: _1/20/16_

Zachary Rowles  
Notary Public  
Durham County, NC

Bates No. 116

4

# Affidavit of Shonda Nero

I, Shonda Nero, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Charlotte, North Carolina. I was working doing pet grooming but then I had some health issues and I had to stop.

3. Aquilia Marcivicci Barnette is my first cousin. I call him Marc or Vicci. I am about two years older than him.

4. My mother is Tessie Nero and my dad is Jeff Nero. My mom and Marc's mom are sisters. His mother's name is Sonia Barnette. Tessie is the oldest sister, Sonia is the middle sister, and Sheila Cooper is their youngest sister.

5. Vicci and I didn't really grow up together. My family and I lived in Columbia, South Carolina when I was little and Vicci and his family mostly lived in Charlotte. However, we would always get together on holidays. In our teenage years we only spent time together once in a while.

6. Sonia was married to Derrick Barnette when Marc was younger. We called him Rick or Ricky. Their family lived in the Clanton Park neighborhood.

7. I learned in my teenage years that Rick was beating Sonia and that cocaine was involved.

8. There was also domestic violence between my mom and dad. They acted the same way as Sonia and Rick and that made me resent my father. There was violence in my home all the time and it was physical. Even though I had an older sister, Regena, my mother would call for me to help. I had to step in the middle of their fights several times when I was a teenager. At the time I just wanted to protect my mother. My mom and I once moved to another apartment for a while. Mom lived away from Jeff for a whole year and a half but then Jeff found the Lord and quit drinking. However, his change was temporary. I still resent my father for all he put us through.

9. There have been a lot of secrets and things that aren't discussed in our family. Marc never once talked about Sonia and Ricky, just like I didn't tell about my parents. Also, my mother never talked about her mom, Pearl, and how she was murdered by her husband after she remarried. My sister knew because she was born and was around when it happened, but I didn't know about Pearl's death until I was 13 or 14 years old. Even after learning about it, no one in the family would speak about it.

Bates No. 117

1

10. My sister, Regena, and I have not had much of a relationship since I was 10 years old. She would live in her bedroom and not come out. Regena would only come out to eat when she wanted to, not when everyone else was eating.

11. When I was in my early 20s, Regena called me one time when her lights were about to get cut off and asked me for $300. I lent it to her and then Regena never paid me back. This damaged our relationship for a very long time.

12. My mom and dad married out of high school. Mom was already pregnant before they got married but dad said he would raise the child like his own. My dad told me about this when I was 17 years old. Then I told Regena that Jeff was not her biological father one time. This was within a year of when I was told that we didn't have the same biological father. Regena knows who her father is. She always suspected that Jeff might not be her father. She never called him dad. She and I look nothing alike. She is dark skinned and I am light skinned and she always said she was the black sheep of the family.

13. When we were kids, my dad would have us up at 5am doing calisthenics. We had to lie on the ground with our feet off the ground. It was brutal. We got spanked all the time. We used to have to pull our pants down and get spanked. This went on until I was 12 or 13 years old. At that time I had pubic hair and I did not want him to see it, so I took the belt away.

14. My father's side of the family was about drugs, thugs, and slums.

15. I got in trouble growing up. I fought all the time. I used to fight the girls that my boyfriend was cheating with; I didn't realize I should be upset with my boyfriend. I went to jail for fighting one time when I gave a girl two black eyes. I was 14 or 15 years old and the fight was over a guy. I was in jail for a couple of hours and then my dad picked me up. I thought he was going to be furious but he busted out laughing. I learned that when my dad was 16 he once broke a guy's nose.

16. I also got two DWI's in my 20s. The second one was when I was 22 and I ended up having to serve 30 days in jail for it.

17. I first got pregnant when I was 15. My mom took me to have an abortion at a medical facility in Charlotte. My mom wanted it to be a secret. This was on my 16th birthday. However, they told me they couldn't do it because I was too far along. Now I am thankful I had my daughter Alex and didn't get the abortion.

18. After I had Alex, my boyfriend Silky and I had another baby named Shauna. We ended up putting her up for adoption. I met Shauna last year for the first time. It was great to meet her. She looks like Alex and she is about to get a tennis scholarship. I also have a third child.

Bates No. 118

19. I was never faithful in my relationships but I have always been up front about that. I told the guys I was with when I cheated on them. In the same way that Silky cheated on me, I cheated with other guys. However, I have now been married eight years and I've been faithful.

20. There came a time when Rick had a paternity test done that indicated he was not Marc's biological father. Sonia could have gotten together with someone else besides Rick. She partied and she was a clubber.

21. Just like Marc, I was finding out stuff about my family as I grew up. I was 17 when I found out my sister, Regena, was not my dad's daughter. Regena didn't know this either. My family really isn't who they say they are. My father did drugs and I didn't know this until I was 16 or 17 years old.

22. My family and I moved to North Carolina from Columbia, SC when I was 10 years old. We have been in Charlotte since then. At first we lived off Ottawa Road in the Ottawa Apartments. Then we moved to Farm Pond Road where we lived for 8-10 years. While we were on Farm Pond Lane, there was a time when Marc came and lived with our family.

23. Marc lived with me and my family for a couple of months. He was just a tag-along. He was goofy. He tried to fit in. If you met Marc on the street you would not have the perception that he was a thug.

24. Marc and I really didn't have a close relationship but he and I had fun together. It was not like he had to answer to me. I was like his big sister. Sometimes we would go clubbing. Marc would hang out with my boyfriend. He was happy. He'd dance. I was in a dance group and the guys had another dance group. This was in the 80s and we would get letters put on our t-shirts and sweatshirts. My group was called the GBs - the Gray Babes. We were a group of friends. It was kind of like break dancing movies. One club we went to was called Glory Days. When certain songs came on each group would dance. We used to go and dance all night long. It was fun.

25. Silky was my boyfriend then and he was around a lot. His real name is Antoine McKenzie but he goes by Silky Jones. He is about four years older than me. He and I were together on and off for eight years. He would always be at my house. Silky always looked young, and he was friendly and outgoing. He and Marc became friends. Silky would stay over at our house with me sometimes. Sometimes I would sneak out and sometimes I would sneak him in. I would also steal my mom's car sometimes.

26. I never had any consequences to getting in trouble. I'd come home whenever I wanted. I didn't have to answer to anybody. I never got restricted by my parents.

Bates No. 119

27. When Marc was around us he was always shy towards girls. He would always close up around girls. He dressed in the MC Hammer style with the huge baggy pants and big shirts. He had no definition in his arms. He never had facial hair. It took him longer to reach puberty. He looked so young and his demeanor was so juvenile. He had more of a feminine body type. Marc never told me about girlfriends so I assumed he was gay. I think I even asked him but he just said no and started laughing

28. Marc would sometimes ask me girl advice but not about specific girlfriends. He had a one night stand type of relationship with my friend Lori Osborn one time. Lori lived four doors down from us and was promiscuous. She and Marc had sex. That's all it was. It was never holding hands. .I only found out about Marc and Lori afterwards when each of them told me about it. Lori had a boyfriend at the time so it had to be kept quiet.

29. My mom and dad used to have house parties. They drank and I was the bartender. Mom drank Dewar's and water. They were all partiers. I know Sonia and them used to do drugs. They would snort cocaine and smoke weed. Later I found out my sister did drugs too. She told me she used to do cocaine. She started doing that when she was in her mid-20s.

30. When we were little Sheila was the first one to go live in Atlanta. We all thought she was doing well. However, Sheila's boyfriend, Michael O'Neal, was a coke addict and a dealer. He got Sheila turned on to drugs. I remember that Sheila had a yellow Corvette. It was duck yellow with a white rag top. She also had a Nissan Maxima and an SUV. Sonia and Sheila were doing cocaine together and partying to the point where the kids were left to fend for themselves. When I found out that Sheila and Sonia did cocaine I lost all respect for them and disassociated from them. I felt they had been fakes.

31. Marc didn't have any real problems until he started dating. He always seemed scrawny so nobody took him seriously.

32. I only met Marc's girlfriend, Tasha, one time. I remember that Marc was excited about having his kids, Marc Jr. and Angelica, with Tasha. Marc thought Tasha was someone he would stay with forever.

33. Marc dated my friend Temeka Hunter for a while. Temeka and I worked together at a club called The Party Zone when I was between the ages of 17 and 20. She was married at the time and having marital problems. Temeka and Marc first met when Temeka once came with me to see Marc. After that, Temeka and Marc developed a relationship and started seeing each other. Marc was still living in Georgia at the time.

Bates No. 120

34. Marc later dated Robin. He brought ~~me~~ her to meet me one time when I was living at the Castlewood Apartments. It was just Marc, Robin, me, and possibly my ~~husband~~ boyfriend Gerald. We hung out for a little while. Marc and Robin seemed to be happy and in love but something about her rubbed me the wrong way. I remember Robin dictating to Marc like a parent. He was like her little puppet. However, Marc seemed like he was with the person he wanted to be with. I saw them holding hands.

35. Either Marc or Sonia said they thought Robin was putting stuff in his food. They said Marc was always feeling sick to his stomach while he was with her. Robin and her mother were into voodoo stuff. After Marc was locked up I went into his room and found a Seagram's gin bottle that had some milky white stuff in it. It was something Robin made and whenever they got married they were supposed to drink it together.

36. Marc would call me from time to time from Virginia after he'd moved up there to live with Robin. When they broke up I thought it was a temporary thing.

37. I could tell that something was wrong with Marc after he and Robin broke up, and he moved back to Charlotte. He called me and asked if he could stay with me for a little bit. I told him that was fine. At the time I was a single parent and worked nights. When Marc stayed with me he slept in my daughter Alex's bedroom. She was staying at my mom's place at the time. He stayed in the bedroom almost the whole time. He didn't open the blinds, didn't open the door, and didn't eat. When I asked him if he was okay he said he was fine. I asked Marc to go eat, take a walk, and do things like that but he wouldn't do it. This was a change in him because he was normally a happy person. All he would say was that he would get through it and he would be fine. He never discussed his inner feelings. I remember he would have the blankets over his head when I would go in Alex's room. When he did come out of the room he would sit on the floor instead of on the furniture with his head down and his legs stretched out. He never talked. He just acted depressed. He didn't want to discuss it. If he had tried to talk to someone maybe all this wouldn't have had to happen. I told Marc he needed to talk to someone. He stayed with me for about three days.

38. Marc was at my house in Alex's room when I found out about the fire. Marc had come to my house the day after the fire. I first heard about it on the radio, but they didn't say who had done it. When I found out they thought it was Marc, I didn't believe it because Sonia told me that Marc was there at the house the next morning when they woke up. I thought there was no way that was possible.

39. I was working at TJ Maxx when I first saw the news that Robin had been shot. The next day I was off of work. The phone would ring but nobody would be on the other end. I didn't know what was going on. I know I talked to Marc once but I don't know how or when. I have blocked a lot of my memory out. He told me he wanted to get back to his mother. I know I asked Marc what had happened but he wouldn't talk. I told him to get back to me and I'd try to get him in safely.

Bates No. 121

40. When the crimes happened I was blown out of the water. Marc just wanted someone to be with. He wanted to belong to somebody. He wanted to feel needed but he kept getting broken. He just went numb.

41. All of Marc's troubles have been related to girls. It would have been better if he had spoken to someone like a counselor a long time ago. Marc has always been a person who didn't express his feelings. He considers me one of his closest people but I never talked to him. Marc kind of reminds me of my daughter. She listens but she shuts down. You can tell when something is wrong but she doesn't want to talk about it.

42. You can tell when Marc is not doing well because he just closes in on himself. I could see it. He looks very different from when he's feeling confident. His chest was in and he was looking downward. When he was having problems with Robin it totally affected him. I would try to talk to him but he would brush it off and not elaborate. He would tell me that he would be fine.

43. I would ask Marc how he was doing but he wouldn't tell me. He wouldn't say he was hurting. Instead he would say, "I'm going to think about it." I would ask him what he was going to think about. I always wanted him to tell me the story from beginning to end. He didn't trust anybody enough to do that. He could have said he needed me to hold him or he needed me to be there for him. Marc would never give me a real explanation.

44. Marc was never conceited and he didn't have a big ego. He didn't think he was sliced bread. He had dreams and always wanted to take it to a higher level. However, relationships made him feel small. He didn't feel like his mom was there for him. He never had a sense of security in his relationships. My daughter was raised without a father and that is why she loves so hard and has always needed a guy.

45. Marc could have been a very successful person if all this had not happened. He could be energetic, happy, and full of life.

46. After his conviction at the first trial, but when he was still in Charlotte, Marc would call me and write me sometimes. He said he knew he had to pay for what he'd done. He couldn't sleep because all he saw was Robin's face. Marc would see her standing there looking at him. He thought he was going crazy because he was always seeing Robin.

47. Marc wrote me a letter at some point after his first trial. It was an apology. However, he was losing his words because he was in jail. He sounded like he was babbling in the letter. Almost every other sentence would leave out words.

48. I remember going to Sonia's for a 4th of July cookout one year and Marc was on the phone. We passed the phone around and I talked to him for a few minutes.

Bates No. 122

49. I don't see Marc as a stone-blooded killer. I would never feel threatened by having him in society. Marc could be rehabilitated. From day one I know he was remorseful. He's paying for it on the inside even more than being physically locked up.

50. The only people that talked to me before Marc's trial were two guys that came to my house. I was living at Castlewood Apartments at the time. I think they were detectives. I stood outside and talked to them.

51. I don't remember anyone on Marc's team named Sindy. I never met a Sindy in person but I could have talked to her on the phone. I only got contacted by Marc's legal team right before his first trial. I did testify at Marc's first trial. I was subpoenaed to appear and testify. I never had a briefing about what my testimony would be about. I got no testimony preparation.

52. I was called to the stand and asked how I knew Marc. I thought I was a character witness. I testified that Marc was a happy person. I was never told what kinds of questions I would get asked. This is why my testimony was so short. My testimony could have been better if it had been more planned out. Afterwards, I was so upset I left the courthouse. Part of my testimony was quoted in the paper. They quoted me saying, "This is not the Marc we all know and love."

53. I did not testify at Marc's the second trial. I was never contacted by anyone from Marc's legal team before his trial. I hadn't moved since Marc's first trial. I had the same exact address. I still lived in the Castlewood Apartments in Charlotte.

54. I would have willingly testified for Marc at his second trial. I would have wanted to share with the jury my memories of him and his family.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Shonda Nero_                                    8/24/14
Shonda Nero                                       Date

Affirmed and subscribed before me on this the 24th day of August , 2014 in
Mecklenburg County, North Carolina.

Notary Public

My commission expires: 1/20/16

Zachary Rowles
Notary Public
Durham County, NC

Bates No. 123

## Affidavit of Tessie Nero

I, Tessie Nero, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Charlotte, North Carolina. Before I married my husband, Jeff Nero, my maiden name was Tessie Cooper.

3. I work for Tolt Solutions and I have been with them for over four years. I work in accounting administering accounts payable. Before that I worked for 25 years at Wellman Inc.

4. Aquilia Marcivicci Barnette is my nephew and I have known him since he was a baby. People in our family call him Vicci. I am one of three sisters. Sheila Cooper is my youngest sister and Sonia Barnette is the middle sister. Vicci is Sonia's son.

5. My parents were Jesse and Pearl Cooper. Pearl later remarried and her name became Pearl Brown. Mom was a nurse. She worked each day from 3pm to 11pm. She used to fix dinner before going to work and leave it for me and my sisters. She would be gone by the time I got home from school so I saw more of my dad. He didn't work at that time. He was disabled from fighting in the Korean War and had a glass eye. Later, he worked as a school custodian.

6. I tell everyone I was a daddy's girl. I can't ever remember a time where my dad disciplined us. Mom was always the one to discipline us and she was a strict disciplinarian. She was a believer in spanking. We would get it on the backside and on the legs with a switch or a belt. I ended up inheriting my mom's discipline style.

7. I was surprised when my parents broke up. There had been no physical fighting between them before they split up but there were arguments. I remember some of the arguing but I didn't understand it.

8. I am nine years older than Sonia and I was out of the house sooner. I got married as a senior in high school. My husband, Jeff, was going off to Vietnam. His unit was replacing a unit where a friend had been killed. He was in Vietnam for a year. My mom was getting divorced when I was getting married and I lived in her apartment while Jeff was in Vietnam.

9. When I was living with my mom after the separation it was Pearl, Sonia, Sheila, Regena, and me in the house. I think we first lived on Justin Avenue and then we lived in the Southside neighborhood. I graduated from high school in May and my first daughter, Regena, was born in November. When I had Regena I wasn't ready to be a mother. I cried about it. My mom helped me take care of her.

Bates No. 124

1

10. My younger daughter is Shonda. When Jeff came back from Vietnam he had orders for Germany, but those orders got changed and they gave us Alaska instead. Shonda had her first birthday in Alaska. Before that we were stationed at Fort Benning in Georgia where Shonda was born. We lived in Fort Benning for about a year.

11. I remember my mom dating a man named Herman Mazyck. He is the only person I remember in my mom's life other than my dad. Then Jeff and I moved to Georgia and I never met Loyd Brown, the man she later married.

12. Pearl married Loyd Brown after I'd left Charlotte and he murdered her within a year of their marriage. I saw him for the first time when I came home for some of his court dates. It was a horrible shock to hear of my mom's death. It happened shortly after mother's day. Sonia, Sheila and Vicci were in the house when he killed her. I came back to Charlotte shortly after it happened. After that, Jeff requested and received a compassionate reassignment to Columbia, South Carolina so we could be closer to home. I drove to Charlotte almost every day in those days after it happened.

13. Pearl's death was traumatizing. Sheila is the one that found her after she had been shot. After that Sheila got involved with friends that weren't friends. I had to tell her more than once that she wasn't the only one that lost a mother. Sheila stayed out a lot with her friends.

14. There was a time when Sonia and Sheila moved back in with their dad ~~before~~ after JK Pearl was killed.

15. Sonia, Vicci, and Sheila ended up moving to Columbia to live with us. They didn't stay with our dad after Pearl was killed because Jesse was not providing for them. He was drinking Pabst Blue Ribbon beer. He drank a lot. After the war he was not stable. The effects on him contributed to the split between him and Pearl. As long as I can remember he told the same war stories. He re-lived it and he rehashed it. It was kind of hard to be around him. I didn't realize it back then, but now I see some of the signs that he had been traumatized in the war. I can remember hearing him shout out at night, "No! Stop!" I don't think he drank as much before the war, although I think he really increased his drinking after he and mama split. Then it became every day. Most days after the split and after Pearl's death he was intoxicated. He was never physically or verbally abusive when he was intoxicated. He just talked about the war.

16. I remember trying to figure out what to do with Sonia and Sheila after Pearl was killed. Then Jeff said they could live with us in Columbia, so that's what happened. This put me in more of a motherly role with them. I remember giving them interrogations. I was a stay-at-home mom when we were living in South Carolina. I took care of my kids and Vicci.

Bates No. 125

17. Sonia ended up marrying Derrick Barnette, who I call Rick or Ricky. I first met him as a teenager when we were living at Jesse's. This was before our parents split up. I thought he was a spoiled brat as an only child. He was used to having his own way. He wasn't really rude but he just had an attitude.

18. I know that Ricky had a paternity test done after he and Sonia split up, and that the test indicated that he is neither Vicci's nor Mario's biological father. I was taken aback that a test was even needed. I never understood the question of why it was needed.

19. I remember once that Sonia's ear lobe was torn through. Sonia told me this happened when she and Ricky were in an argument and he tore her earring out. I think we were cooking out at the time she told me, but then Ricky walked into the kitchen while we were talking and Sonia changed the subject. Sonia has now had her ear lobe repaired. She had it stitched up. She did this more recently at the medical office where she works.

20. After Sonia and Ricky split up, Sonia left her kids home alone a lot. Vicci was about 13 or 14 years old at that time. *SM*

21. When my family and I moved back to Charlotte from South Carolina, Sheila was living in Atlanta and Sonia was in Charlotte working for All State. Sonia moved in with me for a little while before she, Vicci, and Mario moved to Atlanta.

22. I remember one of Sonia's boyfriends she had after her relationship with Ricky ended. His name was Sam Walton and he is now deceased.

23. Another person Sonia dated was a guy named Al. I didn't like him.

24. Another guy in Sonia's life was Mark Ragin. He had drug connections and was living the fast life. I was afraid for Sonia while she was with him. He was running a club called St. Mark's. I went there a couple times but I didn't know what was going on behind the scenes. Mark didn't have a 9-5 job but he had money. He had a black Corvette and also a Lexus. He was eventually shot and killed. Sonia was upset when he was killed. She had been spending a good deal of time with him.

25. Sonia also spent time with her friends Tina and Jackie. Sonia and Jackie went to school together in Columbia. She would visit Sonia in Charlotte sometimes.

26. We were all drinking at that time.

27. Vicci was a typical teenager. I didn't see excessive behavioral problems. He was always well-mannered. He was talented in art. After they moved to Atlanta he had trouble. Things got tough for Vicci during his relationship with a girl named Sheila. He then dated Tasha and they had a volatile relationship.

Bates No. 126

28. After the breakup with Robin, Vicci was despondent. He wasn't himself. It was like he had given up all hope

29. After Vicci was locked up I visited him several times at the jail in Charlotte. At first he was very depressed. Sometimes I visited Vicci with Sonia and other times I visited him with my granddaughter. I have also talked to Marc on the phone a number of times over the years when he's called my house from prison. When he calls he will ask me how I'm doing and how others in the family are doing. Family is important to Vicci.

30. Before Vicci's first trial, I met and talked to Sindy Maxwell, although I don't remember her well. Sindy was working with Vicci's attorneys. I testified at Vicci's first trial and I gave my account.

31. During my testimony, I was asked by Vicci's lawyer about the effect of our mother's murder on me and my sisters. I responded that it had a very profound effect. I was never asked to describe or explain what that meant. Had I been asked that question, I would have explained how both Sheila and Sonia changed a lot after the fact. They were both so young; Sheila was only 11 years old, and Sonia was 15 years old and had Vicci, who was only 10 months. They both started partying more, running around, and being less responsible about things. As I mentioned during my testimony, it wasn't something we talked about. Everyone was going through very intense feelings and emotions, but no one knew what to do with those feelings.

32. Before Vicci's second trial I remember Sonia saying there was a person named Cessie on Vicci's legal team. However, I don't' remember if I ever talked to Cessie.

33. I don't know either of Vicci's attorneys from his second trial: Harold Bender or Jean Lawson. I was living in Charlotte in 2002 but nobody ever came and talked to me at my house before the trial. I think I was living on Wendover Avenue at that time. Sonia has always been in touch with me so anyone could have gotten in tough with me through her. Most of what I heard about Vicci's situation came from Sonia, or from a call from Vicci.

34. I remember that Vicci's second trial was held in the old courthouse instead of in the Federal courthouse. I think I may have attended a little bit of the trial. I don't know why Vicci's legal team didn't have many of our family members testify like they had in his first trial.

35. I never read my testimony from the first trial until someone from Vicci's legal team showed it to me last year.

Bates No. 127

36.    I would have willingly testified for Vicci at his second trial. I love my nephew and I would have wanted to share with the jury my memories of him and his family.


I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Tessie Nero_ (signature)
Tessie Nero

_11-15-14_
Date


Affirmed and subscribed before me on this the _15th_ day of _November_, 2014 in

Mecklenburg County, North Carolina.

_(signature)_
Notary Public

My commission expires: _1/20/16_

(notary seal: Zachary Rowles, Notary Public, Durham County, NC)

## <u>Affidavit of Claire J. Rauscher</u>

I, Claire J. Rauscher, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a member of the North Carolina and Pennsylvania bars. I was a public defender with the Defender Association of Philadelphia before moving to Charlotte, North Carolina and opening up my own private criminal defense practice. From 2005 until 2011, I was the Executive Director of the Federal Defenders of Western North Carolina, Inc. I am currently a partner at Womble Carlyle Sandridge & Rice, LLP.

3. I have handled all types of criminal cases throughout my career, including capital cases and federal cases. All of my capital matters resolved themselves (to life sentences or less) prior to trial.

4. I was appointed to represent Aquilia Marcivicci "Marc" Barnette, along with Jean Lawson, in February 2001. Neither Jean nor I had any involvement in Marc's original trial, which was handled by George Laughrun and Paul Williams. When Jean and I were appointed in 2001, Marc was awaiting a new sentencing hearing.

5. In April 2001, I wrote then-U.S. Attorney Robert Conrad about the Barnette case. I explained that Jean and I were working through 18 boxes of files from prior counsel, 15 volumes of transcripts from the first trial, and one box of discovery that we had received from the government in March 2001.

6. On August 28, 2001, Jean and I filed an *ex parte* document called "Statement of Defense Contentions," in which we identified a handful of issues about which we wanted the court to be aware. Based on our work in the case up to that point, we wrote that "an approach different from that used in his first sentencing hearing [was] warranted." We believed that the first defense team had done a poor job trying to address Marc's relationships with other women, and had, in some instances, appeared to blame the women for any difficulties that existed. It was our belief that we would need to directly address Marc's prior relationships and develop a far better understanding of them than what the first defense team had or presented to the jury.

7. Based on our review of the case materials as of August 28, 2001, it was also apparent that the first defense team presented a "disjointed" sentencing case. As we explained in the motion, "[W]itnesses were unprepared for cross-examination. The investigation was

1

Bates No. 129

superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation."

8. Thus, as of August 28, 2001, it was clear to me and Jean Lawson that we needed to re-evaluate everything that the first trial team did, meet with their experts and review all of their data and evaluations, identify additional experts who might be needed, and identify and interview numerous family members, co-workers, and other potential witnesses.

9. In addition to filing our *ex parte* Statement of Defense Contentions, Jean and I also filed *ex parte* motions for funds to hire a private investigator (Jan Barefoot) and mitigation specialist (Cessie Alfonso).

10. Our need for having both a mitigation specialist and investigator was clear to me. We needed Jan to locate various witnesses for Cessie to interview. As we explained in our *ex parte* motion, it was also evident to us that some of the witnesses we needed to talk with "were hostile to the defense at the defendant's first trial and sentencing." As a result, we believed that we needed to have an investigator locate and approach these witnesses; they were not necessarily going to come to us. These witnesses included some of Marc's former girlfriends.

11. With respect to hiring Cessie Alfonso, it was evident to me and Jean that we needed to replace Sindy Maxwell, who had handled the mitigation investigation for the first trial team. As we wrote in the *ex parte* Statement of Defense Contentions, "[Maxwell] failed to develop adequate rapport with the defendant's family and friends that would have enabled her to unearth critical biographical information. She prepared a "time line" purporting to represent the defendant's life history and omitted critical information. These omissions cast doubt on the reliability of other expert witnesses called by the defense. As a result, the honesty of the defense presentations was compromised." The deficits in Sindy's earlier work were particularly problematic because this was a resentencing trial and the primary focus would be on mitigation. Thus, there was little question that we needed to replace Sindy with someone new.

12. On August 31, 2001, just a few days after we filed our initial requests for expert funding, the resentencing trial was scheduled for March 19, 2002.

13. Our requests for funding to hire Jan Barefoot and Cessie Alfonso were not granted until October 10, 2001. The actual CJA Authorization forms for both Jan and Cessie were not issued until October 25, 2001.

2

Bates No. 130

14. On October 31, 2001, two months after the Court scheduled resentencing for March 19, 2002, Jean and I filed a motion to continue the trial. As we wrote in our motion to continue, both Jean and I had major commitments in other cases that gave us significant concern about our ability to be ready by March 2002. I had a number of major federal cases on the trial calendar. Jean had other capital cases, including a trial scheduled for January 2002. We were also very concerned about having only four-and-a-half months to investigate and prepare a penalty phase presentation for Marc. Our mitigation specialist was just getting started, and we had not yet spoken with any other experts—both experts from Marc's first trial (who we needed to assess and decide whether to use again) as well as potential new experts.

15. The Court granted our motion to change the March 19, 2002 trial date, but instead of moving the case to a later date, the Court moved the start of trial up to March 12, 2002. Jean and I filed a motion asking the Court to reconsider the trial date of March 12, 2002. At a hearing on November 29, 2001, much to my surprise and dismay, the Court removed me as Marc's lawyer after I asserted what I believed was a conflict due to the scheduling of Marc's resentencing and my other cases.

16. I had no further involvement in Marc's case until 2009, when Marc's case was remanded to the U.S. District Court for a hearing on a *Batson* claim.


_____          11/19/2014
Claire J. Rauscher                                     Date


Affirmed and subscribed before me on this the 19th day of November , 2014 in Mecklenburg County, North Carolina

_____
Notary Public

My commission expires: 9/11/2018



Bates No. 131

## Affidavit of Weona Sharpe

I, Weona Sharpe, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.    I am over the age of 18 and competent to testify to the following facts.

2.    My name is Weona Sharpe, but people call me Wendy. I am a resident of Charlotte, North Carolina.

3.    I have known Aquilia Marcivicci Barnette since we were both kids. I call him Vicci. I am about two years older than Vicci. We are related through our mothers. My mother, Bessie Sharpe, and his maternal grandmother, Pearl Brown, were first cousins. This makes me second cousins with his mother, Sonia Cooper Barnette.

4.    Our families were close when I was growing up. Sonia and her family would often stop by our house and visit. We would also see each other at family reunions. I had heard about Pearl and how she was killed. I was born in 1971 so I was just a child at the time. However, my family did talk about it because I asked. I was told that Pearl was murdered by a man. Pearl had been close to my mom, who told me that Pearl was really outgoing. My aunt said they used to like to go over to Pearl's house.

5.    I have also known of Sonia's father, Jesse Cooper. He was like a recluse. He didn't socialize much.

6.    My mom died when I was 10. After that we moved to the Clanton Park neighborhood of Charlotte and I lived there until I was 16. My mom's name was Bessie. Mom's death was a suicide. We were at the house when it happened. I saw my mom after she'd died and that had a big impact on me. We've had our share of tragedies in my family.

7.    In addition to my mom, there is some history of depression and suicide in our family. I've had one niece and two nephews who've each attempted suicide. None of them have died. I also have an aunt on my mom's side who acts crazy.

8.    When we were kids, Vicci and I used to live in the same neighborhood. My family and I lived at 1000 Comstock Drive in Clanton Park. Vicci and his family lived on the same street, a couple blocks down.

9.    Vicci and I went to some of the same primary schools. I attended Beverly Woods Elementary and Barringer Elementary. I was two grades ahead of Vicci. I would see him at school and we rode the bus together. Vicci wasn't a loud rambunctious kid. He hung out with his friend Steve Austin. They were really close. They would sit together on the bus.

Bates No. 132

10. I used to babysit Vicci sometimes when I was growing up. I would go down to Vicci's house and babysit. This was when I was about 12 years old. I would babysit both Vicci and his younger brother, Mario. They used to just run around the house. It would be just a couple of hours of babysitting at a time. I would babysit if Sonia and her husband Ricky were going out.

11. Our neighborhood was a place where we could spend time in the street and ride bikes. If we got in trouble we might get a whupping from a neighbor and then get another one back home. People knew I was a Sharpe. They might not remember my name but they knew which family I belonged to.

12. Vicci would knock on our front door in the middle of the night sometimes. This could be midnight or two in the morning. We'd give Vicci a blanket and a place on the couch to sleep. He never said anything about it but there was something wrong for him to show up at our house in the night like that. Vicci would look upset. He would be in pajamas, and barefoot. Mario was never with him. It was always just Vicci.

13. Vicci always slept on the couch in our living room. We had two couches and one of them let out into a bed. We would feed Vicci breakfast in the morning and he'd hang out a little. We would also call Sonia in the morning and let her know that he was there at our house. It got to a point where we knew who it was when we heard a knock on the door in the middle of the night. Vicci came to our house in the middle of the night numerous times over a period of months. I don't know why he eventually stopped.

14. As a truck driver, my dad was gone a lot for work and it was usually just me and my sisters at our house. Our dad would usually be gone for the whole week and then come back for a couple of days. He'd try to be here on the weekends.

15. Vicci's dad would try to talk to my older sister Nita in an inappropriate way. He'd come to the door and ask for her. Nita was a teenager at the time – maybe between 18 and 20 years old. She would talk to Ricky for a bit. They would just talk in the living room. She'd sit on one side of the living room and he'd sit on the other. I questioned why he was there, especially when his wife, Sonia, was back at his house. Nita thought it was weird and inappropriate too. We never told Sonia about these visits.

16. After Ricky and Sonia broke up, Ricky dated someone I knew. She was the aunt of a friend of mine. Her name was Blondie Fleming and she was a school teacher. She lived in Clanton Park. I was over at Blondie's house one time when Ricky showed up. I was in high school when this happened.

Bates No. 133

17.     I saw Vicci only a couple of times at family reunions after we grew up a bit. I saw Vicci at a reunion not too long before everything happened. We would usually have our reunion at a park where we would have a limited amount of time to be together. Then we would generally move to someone's house. This particular year we went to my grandmother's house and Vicci stopped by. We were sitting and talking. Vicci was trying to reconnect. He said to me that we needed to get together more. I remember Vicci told me he had been shot by his cousin. I remember that Vicci was planning to move up to Virginia to be with his girlfriend.

18.     The next thing I heard about Vicci was the news about the shootings. Hearing about the crimes was a total shock. It was totally out of his character. It's just not him.

19.     After Vicci was locked up I wanted to go see him. However, I was told by his aunt Tessie that I shouldn't because Vicci was unstable and on suicide watch.

20.     My father has passed away since I became an adult. His name was Willie and he was a truck driver. He wasn't there at home that much when I was a kid. Our father was cold to us. He loved to play with and be around other kids but he never showed any affection toward his own kids. My dad disowned me and my sisters when I was 16. This was when he got remarried and we didn't like his new wife.

21.     I was never contacted by any of Marc's trial attorneys or investigators working for them. Had I been contacted, I would readily have shared with them the contents of this affidavit.

22.     I would have willingly testified for Marc at the sentencing hearing of his capital trial. When I saw him last he was still Vicci. He was still the little kid I grew up with. I would have wanted to share with the jury my memories of him.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____        _11. 21. 2014_
Weona Sharpe                              Date

Affirmed and subscribed before me on this the _21st_ day of _November_, 2014 in

_Mecklenburg_ County, North Carolina.

_____
Notary Public

My commission expires: _January 11th, 2016_

LISA A. OTTENS
Notary Public
Mecklenburg County
My Commission Expires
01-11-2016
NORTH CAROLINA

# Affidavit of Sandra Smith

I, Sandra Smith, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.  I am over the age of 18 and competent to testify to the following facts.

2.  I am a resident of Charlotte, North Carolina. My maiden name is Sandra Mason.

3.  When I was growing up, my family lived in the same neighborhood as Pearl Cooper. Pearl was a nurse who worked at the hospital. I remember her as nice, sweet, and kind.

    Sonia Cooper was one of Pearl's daughters. Sonia later had a son named Aquilia Marcivicci Barnette, whom I have always called Vicci.

4.  I was close in age to Sonia's older sister, Tessie. Tessie went to York Road High School. Tessie ended up getting together with a guy named Luther Shankle, who also went to the school.

5.  Pearl was with a man named Loyd. I heard that Loyd had mental problems and that he had been one of Pearl's patients. Sonia used to refer to him as her "mama's husband." Sonia didn't like Loyd. Before Loyd and Pearl married, I used to go over to the Cooper home. After they married, however, I didn't go over to their house.

6.  I heard about it when Loyd killed Pearl. Sonia and her younger sister, Sheila, were the ones that found their mother after she'd been killed.

7.  It would be awful for anybody to lose their mom like Sonia and Tessie did. Sonia never talked very much about her feelings or what she thinking about; she was more of an introvert when we were teenagers. She didn't really share what she was going through after her mother was murdered.

8.  While still in high school school, Sonia started dating a guy named Larry. Everybody knew she was dating him. Then she got pregnant with Vicci. After Vicci was born, the family said that Vicci's dad was Ricky Barnette. There was something on the down low about the situation and it was never clear to me what the truth was – although Sonia always made it clear that Ricky was the biological father.

9.  After Vicci was born, I looked after him sometimes when he was a baby. I am a couple years older than Sonia and it was during my first year out of high school when I babysat Vicci. This was when Sonia was still in school. She was so young, which made raising a child difficult enough. But then when Pearl was killed, it brought all sorts of craziness and stress into the equation.

Bates No. 135

10.     I never knew until last year that a paternity test showed that Ricky was not Vicci's biological father. It surprised me to hear this since Sonia and the family were always adamant that Ricky was the father, even though other people had questions.

11.     When Vicci was a teenager, he and Sonia moved back into our neighborhood for a year or two. Vicci is close in age to my daughter, Lekeishea, and the two of them became friends. After they moved away again, we lost touch with him and Sonia.

12.     I heard about the crime and Marc's trials when they were on the news. My sister, Carrie, works as the Deputy Clerk for the Bankruptcy Court at the courthouse and she once saw Vicci when he was there for his trial. Carrie also knew Vicci and Sonia.

13.     I was never contacted by any of Marc's trial attorneys or investigators working for them. I was married and living in Charlotte in 1998 and also in 2002. Had I been contacted, I would readily have shared with them the contents of this affidavit.

14.     I would have willingly testified for Vicci at his resentencing. I would have wanted to share with the jury my memories of Vicci and his family.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Sandra Smith_           _8-24-2014_
Sandra Smith           Date

Affirmed and subscribed before me on this the _24th_ day of _August_ , 2014 in _Mecklenburg_ County, North Carolina.

_[signature]_
Notary Public

My commission expires: _1/20/16_

Zachary Rowles
Notary Public
Durham County, NC

I, RUSSELL STETLER, declare as follows:

***Summary of Opinions***

1.   I was asked by federal habeas corpus counsel for Aquilia Marcivicci Barnette to summarize the prevailing professional norms in the investigation of mitigation evidence at the time of Mr. Barnette's sentencing proceeding in 2002, and to address in particular what mitigation investigation is required in the context of a resentencing.   I was also asked to address the relationship between the mitigation (or social history) investigation and capital mental health assessments.   Finally, I was asked to review the investigation and presentation of mitigation in the 2002 resentencing proceeding in light of the then prevailing norms.

2.   The prevailing norms in mitigation investigation are addressed in detail in this declaration, but the critical points can be summarized succinctly.   Counsel's duty to conduct a thorough mitigation investigation was well established in 2002.   *See Williams v. Taylor*, 529 U.S. 362, 396 (2000) (ineffective assistance where capital counsel in a 1986 trial "did not fulfill their obligation to conduct a thorough investigation of the defendant's background").   Writing for the Court's majority, Justice Stevens cited the American Bar Association's STANDARDS FOR CRIMINAL JUSTICE (2nd edition 1980) concerning the need to investigate sentencing issues thoroughly.   *Id.* at 396.   Standard 4.4-1 of the Defense Function described the duty to investigate as follows: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of conviction.*" (Emphasis added.) *Id.* at 4:53.   In discussing mitigation, the Commentary continued, "Information concerning the defendant's background, education, employment record, mental and

1

emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id.* at 4:55. The need to investigate mental illness in the context of mitigating evidence was also well established in 2002. *See Ake v. Oklahoma*, 470 U.S. 68, 80 (1985) (due process right to psychiatric assistance when mental condition is relevant to culpability *or punishment*).[1] The Eighth Amendment jurisprudence of the United States Supreme Court has mandated individualized sentencing in death penalty cases since 1976. *See Gregg v. Georgia*, 428 U.S. 153, 156 (1976) (finding Georgia's death penalty statute Constitutional in part because it allowed for mercy based on individualized consideration) and *Woodson v. North Carolina*, 428 U.S. 280, 301 (1976) (finding mandatory statute unconstitutional because it would allow the blind infliction of the death penalty on members of a faceless undifferentiated mass).

3. Effective capital defense throughout the post-*Furman* era has required counsel to conduct a thorough investigation of the client's life. This investigation generally involves a multigenerational inquiry into the biological, psychological, and social influences on the development and adult functioning of the accused. Mitigation investigation involves parallel tracks of collecting and analyzing life-history records, and conducting multiple, in-person, face-to-face interviews. The purpose of this thorough investigation is to develop evidence that will humanize the defendant, help jurors to understand why he may have committed the capital offense, and to evoke compassion and empathy by identifying the client's individual frailties that at once establish human kinship and expose vulnerabilities and disadvantage. A thorough social

---

[1] The High Court noted that "[m]any states, as well as the Federal Government currently make psychiatric assistance available to indigent defendants," citing, among other statutes, N.C. GEN. STAT., § 7A-454 (1981). 470 U.S. at 78 & n.4.

2

Bates No. 138

history investigation also provides the foundation for reliable mental health evidence and enables counsel to make informed decisions about what kind of mental health experts to consult and what questions they should address. The fruits of a thorough mitigation investigation not only provide capital defendants with the effective representation to which they are entitled under the Sixth Amendment, but assure jurors of the opportunity to consider all the evidence relevant to the reasoned moral judgment they are asked to render, thereby also assuring the courts of an outcome that is reliable and just. Penalty-phase preparation involves more than just investigating mitigating evidence. Although I mainly focus on the need for thorough mitigation investigation in this declaration, penalty-phase preparation involves an equal obligation to conduct thorough investigation of the offenses underlying the capital charges and any other aggravating evidence that the Government may seek to introduce either in its case in chief or in rebuttal of mitigating evidence. The investigation of aggravating and rebuttal evidence is just as important as the mitigation investigation.

4. Habeas counsel have asked me specifically to opine on whether this thorough penalty-phase investigation was required in Mr. Barnette's case even though mitigating evidence had been developed for his original sentencing proceeding in 1998. The answer is a resounding "yes." In a capital resentencing proceeding, one cannot assume that all relevant mitigating evidence was developed by prior counsel – particularly since the original jury returned a death sentence. It is incumbent upon successor counsel to conduct the same penalty-phase preparation, including thorough social history investigation and reliable mental health assessments, as counsel would be expected to conduct at an initial trial. Based on my own experience in over three decades of capital defense work, I am confident in opining that reliance on the existing mitigating

3

Bates No. 139

evidence and overall penalty-phase preparation in lieu of conducting a thorough and independent investigation of both mitigating and alleged aggravating evidence would constitute a dereliction of counsel's duty under the Sixth and Eighth Amendments and the prevailing professional norms, discussed *infra* ¶¶ 15 to 41.

### Background and Qualifications

5. I am the National Mitigation Coordinator for the federal death penalty projects, which are described more fully at their web site, capdefnet.org. This national position was created in 2005 in response to the increased demand for effective mitigation preparation in death penalty cases following the U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), and the February 2003 revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.[2] In this capacity, I consult with lawyers, investigators, mitigation specialists, and experts in connection with death penalty cases that are pending in the federal courts at trial or on habeas corpus (under 28 U.S.C. §§ 2254 and 2255).

6. From 1995 to 2005, I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases received effective assistance of counsel. The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering

---

[2] *See* JON B. GOULD & LISA GREENMAN, REPORT TO THE COMMITTEE ON DEFENDER SERVICES, JUDICIAL CONFERENCE OF THE UNITED STATES, UPDATE ON THE COST AND QUALITY OF DEFENSE REPRESENTATION IN FEDERAL DEATH PENALTY CASES, 111-112, September 2010 (Commentary describes authorization of the position "to assist in expanding the availability and quality of mitigation work in death penalty cases in the federal courts" and the role of the National Mitigation Coordinator in case consultations and training).

assistance to private counsel assigned by the courts to represent indigent capital defendants. I supervised a statewide staff of investigators and mitigation specialists, and I consulted with lawyers, investigators, mitigation specialists, and experts who were retained or employed by the Capital Defender Office or the private bar in connection with death penalty cases.

7. From 1990 to 1995, I served as Chief Investigator at the California Appellate Project, a nonprofit law office in San Francisco that coordinated appellate and post-conviction representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with staff attorneys and court-appointed counsel, as well as investigators, mitigation specialists, and experts outside the office who were retained to assist counsel representing death-sentenced prisoners.amb

8. I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices. All my work on death penalty cases has been on behalf of indigent clients, either through funding authorized by courts or public defender offices, or as an employee of an indigent defense agency. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial, on appeal, and in post-conviction proceedings. Most of these conferences were organized and attended by attorneys specializing in capital work. I investigated mitigation evidence in over two dozen death penalty cases in California in the 1980s.

9. Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have lectured on these subjects not only in New York and California, but in many other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky,

5

Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming, as well as in Puerto Rico, a jurisdiction where only federal death penalty cases are prosecuted. I have lectured at six CLE programs in North Carolina, beginning in 1996. I have also lectured on numerous occasions under the auspices of the Administrative Office of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service. Over the past two and a half decades, I have lectured at over three hundred fifty continuing legal education programs around the country, as well as dozens of additional programs at law schools and related professional conferences in the United States, Europe, and Asia.

10. Since the 1990s, I have lectured on mitigation investigation in death penalty cases at multiple national training conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual Airlie conference), the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the Case for Life"). At various times over the past twenty-five years, I have served on the planning committees for these national conferences, as well as the annual Capital Case Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA), which is attended by over a thousand practitioners. I was a co-chair of the planning committee for this seminar in 2009 and from 2011 to 2014, and I am returning as a co-chair for the 2015 seminar. I have also taught at the death penalty colleges at the Santa Clara University School of Law in California and the DePaul University College of Law in Illinois. I have taught at a dozen capital defense seminars throughout the country under the

6

Bates No. 142

auspices of the National Institute of Trial Advocacy and over a dozen "bring-your-own-case" capital brainstorming seminars under the auspices of the National Consortium for Capital Defense Training and its regional counterparts. I also designed and organized the annual Capital Mitigation Skills Workshop under the auspices of the federal Habeas Assistance and Training Counsel Project.

11. Since 1993, I have contributed extensively to the California Death Penalty Defense Manual published by the California defense bar (CACJ and CPDA). This multi-volume reference has a volume devoted to the investigation and presentation of mitigation evidence which I helped to shape in the 1990s. In 1999, I published articles on *Mitigation Evidence in Death Penalty Cases* and *Mental Disabilities and Mitigation* in THE CHAMPION, the monthly magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled *Why Capital Cases Require Mitigation Specialists* in INDIGENT DEFENSE, published by the National Legal Aid and Defender Association. These and other articles of mine were cited in the Commentary to the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, rev. 2003, 31 HOFSTRA L. REV. 913 (2003), available at ambar.org/2003guidelines. At the request of HOFSTRA LAW REVIEW, I wrote an article for their symposium issue on the revised ABA Guidelines, entitled *Commentary on Counsel's Duty to Seek and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1)*, 31 HOFSTRA LAW REVIEW 1157 (2003). At the request of HOFSTRA LAW REVIEW, I also wrote an article for their symposium issue on the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 HOFSTRA L. REV. 1067 (2008). At the request of UMKC LAW REVIEW, I contributed an article to their symposium issue devoted to "Death Penalty Stories," *The Unknown Story of a Motherless Child,*

7

77 UMKC L. Rev. 947 (2009). I have recently written three additional articles on prevailing norms in the development of mitigation and mental health evidence. One was written in collaboration with Professor W. Bradley Wendel, *The ABA Guidelines and the Norms of Capital Defense Representation*, 41 Hofstra L. Rev. 635 (2013). The second, *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, appeared in 82 UMKC Law Review 407 (2014). The third (written with Aurélie Tabuteau), *The ABA Guidelines: A Historical Perspective*, has been accepted for publication in Hofstra Law Review 43:3.

12. I am the coauthor of chapters on psychiatric issues in death penalty cases in two books: *Dead Men Talking: Mental Illness and Capital Punishment*, in Forensic Mental Health: Working with Offenders with Mental Illness (Gerald Landsberg, D.S.W., & Amy Smiley, Ph.D., eds.; Kingston, New Jersey: Civic Research Institute, Inc., 2001) and *Punishment*, in Principles and Practice of Forensic Psychiatry, 2nd ed. (Richard Rosner, M.D., ed.; London: Arnold Medical Publishing, 2003; U.S. distribution by Oxford University Press). I am also a coauthor of A Practitioner's Guide to Representing Capital Clients with Mental Disorders and Impairments (Bishop Auckland, U.K.: International Justice Project, 2008).

13. I have qualified as an expert witness in multiple state and federal courts and have provided opinion evidence on standard of care issues in capital cases (especially in the investigation and presentation of mitigation evidence) by live testimony or affidavit over one hundred fifty times in numerous jurisdictions, including Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nevada, New York, North Carolina, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming. I have testified as an expert

8

Bates No. 144

witness twenty-three times, including testimony in capital habeas corpus cases in the District of Arizona, the Eastern District of California, the Northern District of Iowa, the Western District of Missouri, and the District of Wyoming, as well as in state capital post-conviction proceedings in Alabama, Arkansas, California, Colorado, Louisiana, Nevada, and Wyoming. I have also testified as an expert witness on mitigation standards in the state and federal trial courts of various states, including pretrial testimony in the United States District Court for the Middle District of Tennessee in 2001.

14. Over the years, I have been directly involved in hundreds of capital cases, including scores of trials and post-conviction hearings. I have also been consulted in various capacities on capital cases in numerous jurisdictions around the country, including many federal death penalty cases.

### *Prevailing Norms in the Development of Mitigating Evidence in Capital Cases in 2002*

15. Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case, and has been for as long as I have done this work. In every seminar in which I have participated since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases. When I began working on capital cases, investigation was already firmly established as an integral part of the criminal defense function generally. When the American Bar Association published the second edition of its STANDARDS FOR CRIMINAL JUSTICE (2nd edition 1980), Standard 4.4-1 of the Defense Function described the duty to investigate as follows: "It is the duty of the lawyer to

Bates No. 145

conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of conviction.*" (Emphasis added.) *Id*. at 4:53. The Commentary to this Standard noted concisely, "Facts form the basis of effective representation." *Id*. at 4:54. In discussing mitigation, the Commentary continued, "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id*. at 4:55.[3] These ABA Standards were cited by Justice Stevens in reference to counsel's obligation to conduct a thorough investigation of a capital defendant's background. *Williams v. Taylor*, 529 U.S. at 396 (2000).

16. These standards covered criminal defense generally. Discussions of *capital* defense provided more specific detail about counsel's duties in investigating mitigating evidence. As early as 1979, Dennis Balske (an effective capital litigator then practicing in the South) emphasized, "Importantly, the life story must be complete." Dennis N. Balske, *New Strategies for the Defense of Capital Cases,* 13 AKRON L. REV. 331, 358 (1979). In 1983, Professor Gary Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases. He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The

---

[3] *See also* Joseph B. Cheshire V, *Ethics and the Criminal Lawyer: The Perils of Obstruction of Justice,* CHAMPION (Jan./Feb. 1989) at 12 ("Defense counsel have a right and a duty to approach and interview every witness that might have any information regarding the particular issue involved in their client's case.").

10

Case 3:12-cv-00327-MOC   Document 74-1   Filed 12/22/14   Page 46 of 50
Bates No. 146

importance of this investigation, and the care with which it is conducted, cannot be overemphasized." Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 323-324 (1983). Writing again in 1984, Mr. Balske advised capital defense counsel that they "must conduct the most extensive background investigation imaginable. You should look at every aspect of your client's life from birth to present. Talk to everyone that you can find who has ever had any contact with the defendant." Dennis Balske, *The Penalty Phase Trial: A Practical Guide*, THE CHAMPION (March 1984), at 40, 42. *See also* David C. Stebbins and Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, the Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, THE CHAMPION, (August 1986) at 14, 18 ("capital defense attorneys must recognize that the profession demands a higher standard of practice in capital cases"); and Robert R. Bryan, *Death Penalty Trials: Lawyers Need Help*, THE CHAMPION (August 1988) at 32 ("There is a requirement in every case for a comprehensive investigation not only of the facts but also the entire life history of the client.").

17. At the beginning of the 1980s, a capital defense lawyer in California hired a former *New York Times* reporter to investigate the life history of his client. The reporter, the late Lacey Fosburgh, had previously written a best-selling book about a murder case she had covered for the newspaper, CLOSING TIME: THE TRUE STORY OF THE "GOODBAR" MURDER (1977). After her successful work in developing the capital client's mitigation evidence, Ms. Fosburgh wrote about the critical role she had played:

> A significant legal blind spot existed between the roles played by the private investigator and the psychiatrist, the two standard information-getters in the trial process. Neither one was suited to the task at hand here – namely discovering and then communicating the complex human reality of the defendant's personality in a sympathetic way.
> Significantly, the defendant's personal history and family life, his obsessions, aspirations, hopes, and flaws, are rarely a matter of physical evidence. Instead they are

11

both discovered and portrayed through narrative, incident, scene, memory, language, style, and even a whole array of intangibles like eye contact, body movement, patterns of speech – things that to a jury convey as much information, if not more, as any set of facts. But all of this is hard to recognize or develop, understand or systematize without someone on the defense team having it as his specific function. *This person should have nothing else to do* but work with the defendant, his family, friends, enemies, business associates and casual acquaintances, perhaps even duplicating some of what the private detective does, but going beyond that and looking for more. This takes a lot of time and patience. (Emphasis added.)[4]

Capital defense lawyers across the country soon recognized the value of nonlawyers with expertise in the development of sentencing evidence – ultimately referred to as "mitigation specialists." The California defense bar prominently featured one such nonlawyer on the cover of its monthly magazine FORUM in 1987.[5] The national defense bar magazine, THE CHAMPION, discussed the use of social workers in developing mitigating evidence in 1986.[6] The following year, another article in the same magazine commented tersely, "The mitigation specialist is a professional who, as attorneys across the nation are now recognizing, should be included and will be primary to the defense team."[7]

18. Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client suffers from organic brain injury, psychiatric disorders, or trauma outside the realm of ordinary human experience. Whenever brain-behavior

---

[4] Lacey Fosburgh, *The Nelson Case: A Model for a New Approach to Capital Trials*, in CALIFORNIA STATE PUBLIC DEFENDER, CALIFORNIA DEATH PENALTY MANUAL, 1982 supplement, N6-N10, N7 (July 1982). This article also appeared in the magazine of the California defense bar, FORUM (Sept.-Oct. 1982). *See also* Report by the Team Defense Project, *Team Defense in Capital Cases*, FORUM (May-June 1978), and Michael G. Millman, *Interview: Millard Farmer*, FORUM (Nov.-Dec. 1984) at 31-33.

[5] Anne E. Fragasso, *Interview: Casey Cohen*, FORUM (Jan.-Feb. 1987) at 22, 26.

[6] Cessie Alfonso & Katharine Bauer, *Enhancing Capital Defense: The Role of the Forensic Social Worker*, CHAMPION (June 1986) at 26, 26-29.

[7] James Hudson et al., *Using the Mitigation Specialist and the Team Approach*, CHAMPION (June 1987) at 33, 36.

12

Bates No. 148

relationships are at issue, a thorough investigation of the etiology of brain damage is needed to determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposures, head injuries, etc. In a capital case, such investigation is particularly important because of the additional mitigating factors that may be disclosed beyond the fact of psychiatric disorder or organicity. *See*, for example, John Hill and Mike Healy, *The Death Penalty and the Handicapped*, FORUM (May-June 1986) at 18-20 (discussing implications of childhood disorders affecting the brain and other disabilities for penalty phases in capital cases); and David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (April 1988) at 34, 36 (discussing need for adequate time to overcome clients' distrust and the value of a neuropsychologist or neurologist in cases with head trauma).

19. Over the past fourteen years, the U.S. Supreme Court has found trial counsel ineffective in five cases for failing to investigate potential mitigation evidence: *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); and *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam). Every case but *Sears* was tried in the 1980s, and *Sears* was tried over twenty years ago, in 1993, nearly a decade before Mr. Barnette's resentencing. In *Williams,* the Court reaffirmed an all-encompassing view of mitigation and found trial counsel ineffective for failing to prepare the mitigation case until a week before trial in 1986 and failing to conduct an investigation of the readily available mitigating evidence (nightmarish childhood, borderline retardation, model prisoner status, etc.). In *Wiggins*, a case tried in 1989, trial counsel were found deficient in their performance, even though they had had their client examined by one mental health expert, because they failed to conduct a complete social history investigation in accordance with the ABA

13

Guidelines. "Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. In *Rompilla*, tried in 1988, counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting three mental health experts. 545 U.S. at 377, 379. Similarly, in *Porter*, also tried in 1988, counsel were found deficient despite a "fatalistic and uncooperative" client because "that does not obviate the need for defense counsel" to conduct mitigation investigation. 558 U.S. at 40. Quoting *Williams*, the Court in *Porter* reaffirmed this duty: "It is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" (Citation omitted.) *Id.* at 39. Among the mitigation that Porter's counsel failed to present was "brain damage that could manifest in impulsive, violent behavior." *Id.* at 36. In *Sears*, the Court found trial counsel ineffective in a 1993 trial even though they had presented seven witnesses in the penalty proceedings. The Court noted, "We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented . . ." 561 U.S. at 954. Post-conviction evidence emphasized significant frontal lobe brain damage causing deficiencies in cognitive functioning and reasoning. *Id.* at 946. Four of these five individuals have subsequently received sentences of less than death, and the fifth case is pending as of this writing. Terry Williams received a life sentence by negotiated disposition in Danville, Virginia, in 2000.[8] On October 15, 2004, the State of Maryland agreed to

---

[8]*See* Frank Green, *Death Penalty Cases Scrutinized: More Hearings Are Being Ordered in Virginia*, RICHMOND TIMES-DISPATCH (Apr. 9, 2001) at A1, *available at* truthinjustice.org/va-dpreview.htm.

14

Bates No. 150