a disposition sending Kevin Wiggins to a state facility for mental health treatment and rehabilitation services, but making him eligible for parole immediately based on time already served.[9]  On August 13, 2007, the Lehigh County (Pennsylvania) District Attorney's Office stipulated to a life sentence for Ronald Rompilla.[10]  On July 21, 2010, the Brevard-Seminole (Florida) State Attorney's Office announced that it would allow George Porter, Jr., to be resentenced to life."[11]  All five cases involved mental health evidence that was not discovered and presented at trial.

### *The Need for a Qualified Mitigation Specialist*

20.  In a capital case, competent defense counsel have a duty to conduct life-history investigations, but generally lack the skill to conduct the investigations themselves.  *See, generally,* Russell Stetler, *Mitigation Investigation: A Duty That Demands Expert Help but Can't Be Delegated*, THE CHAMPION (March 2007) at 61.  Moreover, even if lawyers had the skills, it is more cost-effective to employ those with recognized expertise in developing mitigation evidence.  Competent capital counsel have long retained a "mitigation specialist" to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes.  The Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, for example, noted in 1998 that mitigation specialists "have extensive training and experience in the defense of

---

[9] *See* Jenner & Block, *12 Year Battle for Kevin Wiggins Comes to an End* (Oct. 15, 2004), jenner.com/news/news_item.asp?id=12759624

[10] *See* Associated Press, *Death Row Inmate Gets New Life Term*, USA Today, usatoday.com/news/topstories/2007-08-13-477084247_x.htm (last visited Apr. 8, 2008).

[11] Kaustuv Basu, *Aging Killer May Get Reprieve from Death Row*, FLA. TODAY (July 21, 2010).

15

Bates No. 151

capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review." The subcommittee report also bluntly commented, "The work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal." The Commentary also stated that, as of 1998, the work of mitigation specialists "is part of the existing 'standard of care' in a federal death penalty case." *Id.*, Commentary to 7. Experts, Sec. II, Recommendations and Commentary. FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION, Federal Judicial Conference (May 1998) (commonly known as "the Spencer Report"), *available at* americanbar.org/content/dam/aba/uncategorized/Death_Penalty_Representation/Standards/Natio nal/federal_judicial_conference_recommendations.authcheckdam.pdf. As noted *supra*, ¶ 17, even before the term "mitigation specialist" was coined, penalty phase biographical investigation was widely accepted in the 1980s as a critical part of the capital defense function.

21. As revised in 2003, the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (*hereinafter*, ABA Guidelines (rev. 2003), *available at* ambar.org/2003guidelines) state unequivocally that lead counsel at any stage of capital representation (trial or post-conviction) should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation

16

Bates No. 152

relating to penalty (Guideline 10.7 and Guideline 10.11). The original edition of the ABA Guidelines, adopted in 1989 (*available at* ambar.org/1989guidelines), similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence." (1989 Guideline 11.4.1.C.) The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation" (1989 Guideline 11.4.1.D.(7).) Notably, the 1989 Guidelines specifically stated that "the investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." (1989 Guideline 11.4.1.C.)

22. The ABA Guidelines and the Supplementary Guidelines have received particular recognition in federal court. The Defender Services Program has four goals in its strategic plan: timely provision of assigned counsel, delivery of counsel services consistent with the best practices of the legal profession, cost-effective services, and protection of the independence of the defense function. Among its strategies for achieving the "best practices" goal, the Defender Services Program has adopted a specific strategy for capital representation that states that appointed counsel should comply with the February 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and the 2008 Supplementary Guidelines for the Mitigation Function.

*Evolution of Prevailing Norms*

23. The 1989 edition of the ABA Guidelines reflected a national consensus among capital defense practitioners based on their practices in the 1980s. These Guidelines were the result of years of work by the National Legal Aid and Defender Association (NLADA) to develop

17

Bates No. 153

standards to reflect the prevailing norms in indigent capital defense. NLADA published its

Standards for the Appointment of Defense Counsel in Death Penalty Cases (available at

americanbar.org/content/dam/aba/migrated/DeathPenalty/RepresentationProject/PublicDocumen

ts/NLADA_Counsel_Standards_1985.authcheckdam.pdf) in 1985. With initial support from the

ABA's Standing Committee on Legal Aid and Indigent Defendants (SCLAID), NLADA

developed its expanded Standards for the Appointment *and Performance* of Defense Counsel in

Death Penalty Cases (emphasis added) over the course of several years. In February 1988,

NLADA referred the Standards to SCLAID, which reviewed them and circulated them to

appropriate ABA sections and committees. SCLAID incorporated the only substantive concerns

expressed (by the Criminal Justice Section) and changed the nomenclature to "Guidelines" as more

appropriate than "Standards." Each black-letter guideline is explained by a commentary, with

references to supporting authorities. *See* Introduction to ABA Guidelines, 1989 ed.

24. Courts have found the various editions of the ABA Criminal Justice Standards and

Death Penalty Guidelines useful in assessing the reasonableness of counsel performance. As

Justice Stevens noted in writing for the Court's majority in *Padilla v. Kentucky*, 559 U.S. 356, 366

(2010): "We long have recognized that 'prevailing norms of practice as reflected in American Bar

Association standards and the like . . . are guides to determining what is reasonable . . .'" Justice

Stevens cited *Strickland*, 466 U.S. 668, 688 (1984), *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per

curiam); *Florida v. Nixon*, 543 U.S. 175, 191, and n.6 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524

(2003); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000). Justice Stevens concluded: "Although

they are 'only guides,' *Strickland*, 466 U.S., at 688, and not 'inexorable commands,' *Bobby*, 558

U.S. at 8, these standards may be valuable measures of the prevailing norms of effective

18

Bates No. 154

representation . . ." Justice Stevens also cited law review articles and the publications of criminal defense and public defender organizations (the National Association of Criminal Defense Lawyers and the National Legal Aid and Defender Association) as guides to prevailing professional norms. *Id.* at 367. *Accord Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (per curiam) (capital reversal finding trial counsel ineffective and citing *Padilla*'s analysis of "prevailing professional norms," 559 U.S. at 366, and quoting verbatim the first two sentences of Justice Stevens's analysis of prevailing norms).

25. SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, published in 36 HOFSTRA L. REV. 677 (2008), discuss in detail the skills that mitigation specialists provide to the defense team – skills that most lawyers simply do not possess. Supplementary Guideline 5.1.B, for example, specifies the need for someone with "the training and ability to obtain, understand and analyze all documentary and anecdotal information relevant to the client's life history. Life history includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors." *Id.* at 682.

26. Supplementary Guideline 5.1.C continues: "Mitigation specialists must be able to identify, locate and interview relevant persons in a culturally competent manner that produces

Bates No. 155

confidential, relevant and reliable information. They must be skilled interviewers who can recognize and elicit information about mental health signs and symptoms, both prodromal and acute, that may manifest over the client's lifetime. They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures. They must have the ability to advise counsel on appropriate mental health and other expert assistance." *Id.* A core team member, usually the mitigation specialist, must also have the specialized training, as described in Supplementary Guideline 5.1.E, to identify, document and interpret "symptoms of mental and behavioral impairment, including cognitive deficits, mental illness, developmental disability, neurological deficits; long-term consequences of deprivation, neglect and maltreatment during developmental years; social, cultural, historical, political, religious, racial, environmental and ethnic influences on behavior; effects of substance abuse and the presence, severity and consequences of exposure to trauma." *Id.* at 683.

27. Without the thorough social history investigation that a skilled mitigation specialist can provide, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for the jury to vote for a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation. *See* Richard G. Dudley, Jr., and Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a*

Bates No. 156

*Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008); and Douglas Liebert and

David Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J.

FORENSIC PSYCHIATRY 43 (1994). *See also* George W. Woods, David Freedman, and Stephen

Greenspan, *Neurobehavioral assessment in forensic practice*, 35 INT'L J. OF L. & PSYCHIATRY 432

(2012).

28. The social history investigation should include a thorough collection of objective,

reliable documentation about the client and his family, typically including medical, educational,

employment, social service, and court records. Such contemporaneous records are intrinsically

credible and may document events which the client and other family members were too young to

remember, too impaired to understand and record in memory, or too traumatized, ashamed, or

biased to articulate. The collection of records and analysis of this documentation involve a slow

and time-intensive process. Many government record repositories routinely take months to

comply with appropriately authorized requests. Records are sometimes mistakenly presumed

destroyed when they are in fact simply stored offsite in dusty warehouses that no one is eager to

visit. Great diligence is required to ensure compliance with appropriate requests. Careful

review of records often discloses the existence of collateral documentation which, in turn, needs to

be pursued.

29. The Commentary to ABA Guideline 10.7 (Investigation) notes, "Records should be

requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and

children. . . . The collection of corroborating information from multiple sources – a

time-consuming task – is important wherever possible to ensure the reliability and thus the

persuasiveness of the evidence. Counsel should use all appropriate avenues including signed

21

Bates No. 157

releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes . . ." 31 HOFSTRA L. REV. at 1024-25.

30. Records invariably provide valuable background information on clients and their families. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (court file – a readily available public document – contained "a range of mitigation leads that no other source had opened up"). In an earlier ineffectiveness case, *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court found the life-history records such powerful mitigating evidence that the High Court added a footnote to quote a caseworker report verbatim:

> The home was a complete wreck. . . . There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms. There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash. . . . The children were all dirty and none of them had on under-pants. Noah and Lula were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them. . . . The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey. 529 U.S. at 395, n.19.

This excerpt provides a lucid example of a vivid illustration of family dysfunction – and a story which even the most skilled interviewer could never have elicited simply by talking with family members. The records documented an event that Terry Williams and his siblings were too young to remember, and his parents were too intoxicated to register in memory. Records have no inherent bias, and contemporaneous records are in any event more credible than witnesses who share previously undisclosed memories.

31. Life-history records enable capital defense teams to interview all witnesses more effectively – not only the witnesses who created the records in the first place (like the teachers who produced report cards) but also family members and friends who can organize their memories more accurately if there is hard documentation of dates and places. The frailty of human memory

22

Bates No. 158

obliges us all to rely on records, and they provide the essential skeletal framework for the social history investigation. They are helpful in preparing witnesses to testify.

32. A social history cannot be completed in a matter of hours or days. In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history. It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socioeconomic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.

33. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. One nationally recognized authority in mitigation investigation, Lee Norton, writing in 1992, stressed the cyclical nature of the work and estimated that hundreds of hours will typically be required. *See* Lee Norton, *Capital Cases: Mitigation Investigation*, THE CHAMPION (May 1992) at 43-45. *See also* Pamela Blume Leonard, *A New Profession for an Old Need: Why a Mitigation Specialist Must Be Included on the Capital Defense Team*, 31 HOFSTRA L. REV. 1143, 1154 (2003) (reiterating a decade later that "it takes hundreds of hours to conduct a thorough social history investigation")

23

Bates No. 159

and David DeMatteo, Daniel C. Murrie, Natalie M. Anumba, and Michael E. Keesler, FORENSIC MENTAL HEALTH ASSESSMENTS IN DEATH PENALTY CASES 244 (2011) ("Typically, mitigation specialists invest hundreds of hours in a detailed mitigation investigation.").

34. Mitigation investigation is particularly complex when the client does not share the attorney's cultural background.[12] Attorneys may too readily overlook symptoms of impairment, attributing them to language difficulties or cultural differences. Cultural issues may involve not only race and ethnicity, but sexual orientation, gender, socioeconomic status, or any other characteristics that define social identity.

35. Mitigation evidence is not developed to provide a defense to the crime. Instead, it provides evidence of a disability, condition, or set of life experiences that can inspire compassion, empathy, mercy and understanding. Unlike insanity and competency, both of which are strictly defined by statute and temporal limitations, mitigation need not involve a mental disease or defect, and it may encompass the entire trajectory of the client's life. In many cases, defendants suffer mental impairments that do not meet the legal definition of insanity or incompetency, but are powerfully mitigating disabilities that are given great weight when juries are charged with assessing individualized culpability.

36. For clients who are psychiatrically disordered, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions. Psychiatric evidence can provide a context to explain the capital crime and past behaviors as more than simply bad choices made by the client.

---

[12] *See* Scharlette Holdman & Christopher Seeds, *Cultural Competency in Capital Mitigation*, 36 HOFSTRA L. REV. 883 (2008).

Bates No. 150

37.   Over the years, I have been involved in hundreds of capital cases, including scores of trials and post-conviction hearings, throughout the country.   I have provided evidence as an expert on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in over one hundred fifty cases around the country. *See supra* ¶ 13.   My personal experience of the effectiveness of mitigation evidence accords with the empirical research of social scientists who have studied the decision-making processes of actual jurors in death-penalty cases.   *See*, for example, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998) and *The Emotional Economy of Capital Sentencing,* 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially mental impairment and mental illness).   *See also* John H. Blume, Sheri Lynn Johnson & Scott E. Sundby, *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 HOFSTRA L. REV. 1035, at 1038 (2008) ("The [Capital Jury Project] studies reveal that many different types of mitigation resonate with jurors.   Low intelligence, mental illness, child abuse, extreme poverty, remorse, lack of a significant prior record, and lesser culpability are just some of the categories of mitigation that, in a particular case, can lead jurors to choose life over death."); *id.* at 1051 ("[E]vidence that the defendant was under the influence of extreme emotional disturbance or mentally ill at the time of the crime is also mitigating to almost half of all jurors.   Almost a third of jurors found exposure to serious child abuse mitigating, and a like number found childhood poverty mitigating.").

*Standard of Care in Capital Mental Health Evaluations*

25

Bates No. 151

38. Both anecdotal reports from capital defense practitioners and social science research indicate that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses and historical experts (i.e., the professionals who encountered the capital client long before the alleged offense).[13] *See*, for example, Scott Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109 (1997), finding that two-thirds of the witnesses jurors thought "backfired" were defense experts. Thus, if only for pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without the corroborative lay witnesses whose identity and potential evidence can only be discovered through life-history investigation. However, it is equally important to offer well-prepared expert testimony to explain the effects of life experiences on an individual's functioning and behavior. Lay witnesses on their own are unlikely to understand the significance of the symptoms and behaviors they describe, and only an expert is likely to be able to provide an overview of the

---

[13] During the operative years of the New York death penalty statute (1995 to 2004), for example, the Capital Defender Office offered the testimony of historical experts in several cases. A school psychologist who had tested a client routinely as part of mandated triennial review for Special Education explained the significance of his borderline intellectual functioning (FS IQ 76-81). People v. George Davis Bell (Ind. 128-97, Judge Cooperman, Queens County, N.Y., 1999). In another case, a different school psychologist explained the impact of learning disabilities (at age 11, reading just above a second grade level; at 14, just above fourth grade; and at 17, just above fifth grade). People v. José J. Santiago (Ind. 1210/99, Judge Bristol, Monroe County, N.Y., 2000). In a third case, a psychiatrist had treated the client's mother after her suicide attempt when the client was nine – thirty years before the capital trial. From the records, the psychiatrist testified to the history of mood disorders and suicidality in the maternal lineage, as well as family dysfunction, including fights over promiscuity, gambling, and drinking. From her current perspective, the psychiatrist opined about the devastating impact on the children of the mother's mood disorder, suicidality, and psychiatric removal from the family. People v. John F. Owen (Ind. 547-99 cons. with 414-99, Judge Egan, Monroe County, N.Y., 2001). *See* Russell Stetler, *The Mystery of Mitigation: What Jurors Need to Make a Reasoned Moral Response in Capital Sentencing*, 11 U. PA. J. L. & SOC. CHANGE 237, 258 (n.92) (2007-08).

26

Bates No. 152

factors that shaped the client over the course of her life and to be able to offer an empathic framework for understanding the resultant disorders and disabilities.[14] Expert testimony is essential for placing the factual details elicited from lay witnesses into an interpretive context that explains how various life events shaped the capital client's brain and behavior.

39. The proper standard of care for a competent mental health evaluation also requires an accurate medical and social history as its foundation. Because psychiatrically disordered or cognitively impaired individuals are by definition likely to be poor historians, a reliable evaluation requires historical data from sources independent of the client (for clinical, not simply forensic, reasons).

40. Except when clients exhibit such florid symptomatology that immediate clinical intervention is patently warranted, capital defense counsel are well advised to conduct a thorough social history investigation before retaining mental health experts. Only after the social history data have been meticulously digested and the multiple risk factors in the client's biography have been identified will counsel be in a position to determine what kind of culturally competent expert is appropriate to the needs of the case, what role that expert will play, and what referral questions

---

[14] It has long been recognized that lay and expert testimony must be harmonized to be credible to the trier of fact. As one capital defense lawyer pointed out in 1988, "[T]estimony about the psycho-social development of the defendant explains the psychological diagnosis in human terms that the jury can understand." He continued, "Typical psychological testimony on sanity, competency, or diminished capacity sounds like it comes out of a textbook. Despite the best efforts of the mental health professional and the attorneys, most of this type of testimony is incomprehensible to a lay juror. There is also an unfortunate tendency to get caught up in technical terms that bore the jurors and do nothing to humanize the client. It makes little sense to spend several days putting on the testimony of relatives and friends of the defendant about the human characteristics of the defendant, and then put on a psychologist or psychiatrist who immediately turns this around by making the person sound like a casebook study out of some obscure and arcane psychology textbook." David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, CHAMPION (Apr. 1988), at 34, 38.

27

Bates No. 153

will be asked of the expert. Psychiatrists and psychologists have different training and expertise, and within each profession are numerous subspecialties including the disciplines that study the effects of trauma on human development. The potential roles of experts include consultants; fact gatherers needed to measure cognitive capacities or to elicit client disclosures (and/or to assess their credibility); and testifying witnesses, to name but a few. To make informed decisions about the kind of experts that may be needed and the referral questions they will address, counsel first needs a reliable social history investigation.

41. The importance of independently corroborated social history data was also well recognized among mental health practitioners as early as the 1980s. A leading psychiatric text in that period described an accurate and complete medical and social history as the "single most valuable element to help the clinician reach an accurate diagnosis." H. KAPLAN & B. SADOCK, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 837 (4th ed. 1985). The same text noted that the individuals being evaluated are often poor historians: "The past personal history is somewhat distorted by the patient's memory of events and by knowledge that the patient obtained from family members." *Id.* at 488. Thus, "retrospective falsification, in which the patient changes the reporting of past events or is selective in what is able to be remembered, is a constant hazard of which the psychiatrist must be aware." *Id.* This problem is particularly acute in the forensic context, as two other leading authorities pointed out in 1980:

> The thorough forensic clinician seeks out additional information on the alleged offense and data on the subject's previous antisocial behavior, together with general "historical" information on the defendant, relevant medical and psychiatric history, and pertinent information in the clinical and criminological literature. To verify what the defendant tells him about these subjects and to obtain information unknown to the defendant, the clinician must consult, and rely upon, sources other than the defendant.

28

Bates No. 154

Richard J. Bonnie & Christopher Slobogin, *The Role of Mental Health Professionals in the Criminal Process: The Case for Informed Speculation*, 66 VA. L. REV. 427, 508-509 (1980). Capital defense lawyers also appreciated this need: "A psychologist armed with all of the records of the client's history is much better equipped to present a sympathetic and truthful explanation of the client's psychological make-up and of how the crime occurred." David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (April 1988) at 34, 37.

***Investigation and Development of the Defense Case in Capital Resentencing Trials***

42. For appellate relief to be meaningful, a capital defendant should be afforded every opportunity to return to his position at the time of his original prosecution. "If a prisoner is successful in persuading a federal court to grant the writ, the court should aim to restore him to the position he would have occupied, had the first trial been constitutionally error-free." *Bittaker v. Woodford*, 331 F.3d 715, 722 (9th Cir. 2003).[15] Resentencing counsel should try to develop whatever mitigating evidence might persuade a single juror to strike a different balance and spare his life. Moreover, resentencing counsel should conduct a thorough investigation of the offenses underlying the capital charges and any other aggravating evidence that the Government might introduce in the penalty phase, whether in its case in chief or in rebuttal. Under the Federal Death Penalty Act, jurors are never required to impose a death sentence. The presumption favoring life is borne out empirically. According to the update to the Spencer Report issued in September

---

[15] *See also United States v. Barnes*, 948 F.2d 325, 330 (7th Cir. 1991) (Effect of motion to vacate is to "nullify [defendant's] sentence" such that he appears before the Court "with a clean slate as far as sentencing [is] concerned; his previous sentence [is] not to be rubber stamped, but instead a new sentencing determination [is] to be made.").

29

Bates No. 155

2010,[16] there were 2,975 "death eligible" federal capital defendants from 1989 through 2009, of which 463 were authorized by the Attorney General to proceed capitally.[17] By the end of 2009, 262 authorized defendants had been tried, and sixty-eight of those who proceeded to trial were sentenced to death.[18] Roughly three out of four cases avoided death at trial. Others avoided the death penalty earlier through plea bargains.[19] A scant 2 percent of the "death-eligible" federal defendants received the death penalty.[20]

43. The need to conduct a fresh, new, and independent investigation in resentencing is analogous in the first instance to the duty of post-conviction counsel not to rely on the facts developed at trial. *See* ABA Guideline 10.15.1.E.3 (duty to "keep under continuing review the desirability of modifying prior counsel's theory of the case") and 10.15.1.E.4 (duty to "continue an aggressive investigation of all aspects of the case") and Commentary, 31 HOFSTRA L. REV. at 1085-1086.

44. Mitigation investigation is an arduous process. Gathering life-history records is slow and time-consuming, as noted *supra* ¶ 28. Establishing trust and rapport with clients, their family members, and other witnesses also takes time, as noted *supra* ¶¶ 32-33. In the context of resentencing, both these processes are typically more difficult. Records that were not gathered

---

[16] For original Spencer Report, see *supra* ¶ 20; for update, *see* GOULD & GREENMAN, UPDATE ON THE COST AND QUALITY OF DEFENSE REPRESENTATION IN DEATH PENALTY CASES (2010), *supra* n.2.

[17] *Id.* at 5 fig. 1 ("'Death-Eligible' Federal Capital Defendants, 1989-2009, by Calendar Year of Indictment") and 8 fig. 2 ("U.S. Department of Justice Capital Authorizations, 1989-2009, by Year of Authorization").

[18] *Id.* at 8-10. *See also* Stetler & Wendel, *The ABA Guidelines and the Norms of Capital Defense Representation,* 41 Hofstra L. Rev. 635, 684-695 (2013) (VIII. The Majority of Capital Cases Avoid the Death Penalty, also citing data from New York, California, Georgia, North Carolina, South Carolina, Kentucky, Indiana, Missouri, Nebraska, Colorado, New Mexico, Maryland, Delaware, and the U.S. military).

[19] Gould & Greenman, *supra* n. 12, at 9, n. 14.

[20] *Id.* at 5 fig. 1, 10.

30

Bates No. 156

either at trial or on habeas may have been destroyed. At very least, they are often more difficult to locate and obtain simply because of the passage of time. They may now be available only on microfilm or in offsite storage facilities. Records of now-deceased witnesses will be harder to obtain. The process will be more complicated and time-consuming, and may vary from one institution to another. There may be "witness fatigue," the phenomenon that occurs when witnesses are weary of telling what they know to one more interviewer. Witnesses may have had negative experiences with prior legal teams or court proceedings. Their personal circumstances may have changed in ways that make them more reluctant than ever to become involved in the case. They may also be geographically more scattered. Their memories may have faded or become confused. They may have died or become infirm.[21] Or they may be distrustful of the new legal team because of positive relationships with predecessor counsel. My point is simply that relationships with witnesses are not transferable, and the attitudes and availability of witnesses change over time. Each new team starts the process of building trust and rapport anew. The loss of known witnesses may require resentencing counsel to cast a wider net to identify completely new witnesses with relevant insights. It may seem counterintuitive, but resentencing preparation may require more time than typical pretrial preparation because of the obstacles stemming from the passage of time as well as the need for counsel to familiarize themselves with the voluminous documentary record of all members of the original trial team.

---

[21] I have testified in some cases where the loss of records and witnesses has been so extreme as to prevent counsel from providing effective assistance in the domain of mitigation investigation. After a hearing in which I testified, in *State v. Jonathan Bruce Reed*, Cause No. F81-01988-FK, In the Criminal District Court #4 of Dallas County, Texas, Judge John Creuzot granted defendant's motion to preclude the prosecution from seeking the death penalty because of such losses. The Texas Court of Criminal Appeals overruled the trial court, finding that the issue was not ripe because Mr. Reed had not yet been convicted on retrial. After conviction on retrial, the prosecution elected not to seek the death penalty.

31

Bates No. 157

45. In resentencing cases, what has happened *since* trial is also important. Whether there are formal allegations of future dangerousness or not, jurors are invariably concerned about whether capital defendants will pose a danger to staff and other inmates. *See* John H. Blume, Stephen P. Garvey, & Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 CORNELL L. REV. 397 (2000-2001). By the time of resentencing, a client's adjustment to prison, the effects of incarceration on his mental health, and his personal capacity for change need to be thoroughly investigated. Potential witnesses include correctional staff, chaplains, visitors, pen pals, and other inmates.

46. The "clean slate" which is appropriate for a defendant appearing in a capital resentencing is easy to imagine, but hard to achieve. With a truly "clean slate," the Government would know nothing of a capital defendant's potential mitigation themes and the signs and symptoms of his mental disorders and impairments. The Government would have had no preview of the defendant's biography beyond what it knew from criminal records and presentence reports. In order to attain the cleanest slate possible, counsel need to conduct a more thorough mitigation investigation than any of those whose fruits the Government has already seen in the prior trial proceedings. Counsel are bound by no prior strategies or limitations, and their investigation should be afforded the time that is reasonably necessary in the daunting circumstances where they may face lost leads, faded memories, perished documentary evidence, and witnesses who have passed away.

### *Review of the Case of Aquilia Marcivicci Barnette*

47. At the request of Mr. Barnette's federal habeas corpus counsel, I have reviewed the opinion affirming his conviction but vacating his 1998 death sentence, *United States v. Barnette*,

32

211 F.3d 803 (4th Cir. 2000); the opinion affirming his 2002 death sentence, *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004); the United States Supreme Court opinion remanding the case to the Fourth Circuit for further consideration in light of *Miller-El v. Dretke*, 546 U.S. 803 (2005); the District Court's opinion finding no purposeful discrimination in the Government's peremptory strikes, *United States v. Barnette*, 2010 WL 2085312 (2010); the Fourth Circuit's affirmance of the District Court, *United States v. Barnette*, 644 F.3d 192 (2011); a digest of the transcripts of the 1998 trial and sentencing proceeding; the Special Verdict Form from the 1998 sentencing proceeding, filed in the District Court February 10, 1998; the transcript of the 2002 sentencing proceedings from July 29 through August 13, 2002; the Special Verdict Form from the 2002 sentencing proceeding, filed in the District Court August 15, 2002; and the affidavits of the surviving members of the 2002 trial team, attorney Jean B. Lawson, investigator Jan Barefoot, and mitigation specialist Cessie Alfonso, as well as the affidavits of attorney Claire Rauscher (Ms. Lawson's original co-counsel), Ann Wolbert Burgess, Ph.D. (a psychiatric nurse who testified in the 2002 resentencing) and Sally Ann Cunningham Johnson, M.D. (a psychiatrist who testified at Mr. Barnette's original sentencing proceeding but who was not contacted by the resentencing team).   I understand that the other lawyer representing Mr. Barnette in the 2002 resentencing, Harold J. Bender, died in 2013, but he had been unable to locate any files of the trial team beyond about 300 pages of electronic material on a diskette provided to habeas counsel.

*The 1998 Sentencing Proceeding*

48.    After a three-week jury trial in January 1998, Mr. Barnette was convicted and sentenced to death for the carjacking murder of Donald Lee Allen and the shotgun murder of Mr. Barnette's ex-girlfriend, Robin Williams.   211 F.3d at 808.   Mr. Barnette and Ms. Williams

33

began dating in 1994 and moved in together in Roanoke, Virginia, in 1995, until they broke up in April 1996. *Id.* On April 30, 1996, Mr. Barnette kicked open the front door of Ms. Williams's apartment and set it on fire. *Id.* at 809. Ms. Williams escaped by jumping out a rear window, but was hospitalized with second and third degree burns to her hands and arms. *Id.* A warrant was issued for Mr. Barnette's arrest and the Charlotte Police Department was notified, but the police did not arrest him. On June 21, Mr. Barnette carjacked Mr. Allen's Honda Prelude, killed Mr. Allen, and drove to Roanoke, where he killed Ms. Williams in front of her mother. *Id.*

49. At sentencing, in their case in chief the Government called nineteen witnesses who testified about Mr. Barnette's past violence (both domestic violence and the shooting of an ex-girlfriend's half-brother), including multiple law enforcement personnel from North Carolina and Georgia and three former girlfriends, as well as seven victim-impact witnesses – four from Mr. Allen's family and three from Ms. Williams's.

50. The defense called twenty-two witnesses. Half were family members who testified about Mr. Barnette's childhood hardships, but the narrative was incoherent and the witnesses contradicted one another. The defense attempted to call mitigation specialist Cynthia Neagle ("Sindy") Maxwell as a summary witness, based on her interviews with 50 to 75 mitigation witnesses, but the Government objected, saying that the defense had provided no notice that she would be called as an expert. The Court did not allow Ms. Maxwell to testify as an expert, but she was permitted to testify briefly about a "life line" summary she had prepared. Ms. Maxwell, now deceased, indicated that she had spent 200 to 300 hours investigating mitigation, beginning May 25, 1997. The penalty phase began eight months later on January 29, 1998. Mr. Barnette had been in custody since June 25, 1996 – that is, eleven months before Ms. Maxwell began her work.

34

51.    The defense called several corrections staff to testify about Mr. Barnette's positive adjustment and lack of infractions in custody.   Four mental health experts also testified.   The first was Sally Johnson, M.D., the chief psychiatrist at Federal Correctional Institution Butner, where Mr. Barnette had been sent for a one-month evaluation of his competency to stand trial.   Dr. Johnson interposed ethical objections to discussing her diagnoses at sentencing, since her referral questions in the competency evaluation had been narrowly framed.   She did testify about what Mr. Barnette had told her about his drinking prior to the murders, and she said he was able to express sympathy and remorse.   Psychologist Faye Sultan testified that she had diagnosed Mr. Barnette with a mood disorder (clinical depression) and borderline personality disorder, both of which impaired his capacity at the time of the murders.   She also offered the opinion that Mr. Barnette would behave well in prison.   Dr. Sultan was effectively impeached on cross-examination for her anti-death penalty bias as reflected in her book, OVER THE LINE, whose autobiographical character is a psychologist who is passionately anti-death penalty.   She also had a pending ethical grievance from testimony in a civil case.   She had once been reprimanded for "exploitation of client" for discontinuing therapy in order to hire a patient as a receptionist.   That morning, NPR had broadcast an interview with Dr. Sultan in which she had said, "If I do my job when I'm testifying in front of a jury, by the time I'm finished, the jury is crying."

52.    Forensic psychiatrist Seymour Halleck, M.D., diagnosed Mr. Barnette with substance abuse disorder, major depressive disorder, and bipolar two disorder.   He found that intermittent explosive disorder should not be diagnosed because borderline personality disorder appeared to be more appropriate.   Some antisocial and narcissistic factors were also present.   Mark Cunningham, Ph.D., testified as an expert on violence risk assessment and concluded that there

35

Bates No. 171

was little likelihood that Mr. Barnette would commit future violent acts in prison. The Fourth

Circuit described the remainder of the evidence thus:

> In rebuttal, the government called five more witnesses, including Dr. Scott Duncan. Dr. Duncan contested Dr. Cunningham's conclusion that Barnette would not be a future danger in prison based on three factors, the Psychopathy Checklist Revised [citation omitted], research on predicting future dangerousness, and an actuarial analysis comparing Barnette to groups of people with characteristics similar to him. Dr. Duncan found that Barnette was likely to be violent in the future. He testified that, in his opinion, Barnette was a psychopath. Barnette then asked to recall his risk assessment expert, Dr. Cunningham, to rebut Dr. Duncan's opinion that Barnette was a psychopath, and related testimony based on the Psychopathy Checklist revised, but the district court denied that motion.

211 F.3d at 811. The Fourth Circuit later found that "simple fairness required that Barnette have

the ability to rebut the new evidence the Government's expert introduced in rebuttal" and therefore

remanded for a new sentencing proceeding. *Id.* at 824.

53. The jury sentenced Mr. Barnette to death on all three death-eligible counts, after

finding all the statutory and non-statutory aggravating factors established beyond a reasonable

doubt. The Special Verdict Form offered three groups of mitigating factors. The first group

contained three statutory mitigation factors, impaired capacity, unusual and substantial duress, and

"other factors in the defendant's childhood, background or character mitigate against imposition of

the death sentence." A single juror found the third factor established by a preponderance of the

evidence as to each death-eligible count. No juror found impaired capacity or duress. The

second group listed sixteen "non-statutory factor(s) in the defendant's background or character,

the circumstances of the crime(s), or other relevant fact or circumstances as mitigation." The

number of jurors who found these factors varied according to the death-eligible count. In other

words, the jurors apparently decided whether the factor mitigated each count, rather than simply

whether it was factually established. For example, the first item (that "defendant assisted police

36

in locating Donald Allen's body") was found by 12 jurors as to Count Seven (carjacking murder committed in expectation of receipt of something of pecuniary value) and Count Eight (intentional killing of Donald Allen), but by only one juror as to Count Eleven (grave risk to one or more persons in addition to the intended victim). This chart summarizes the number of jurors who found each factor in the second group:

| Mitigating factor | Count 7 | Count 8 | Count 11 |
|---|---|---|---|
| Helped police locate Allen's body | 12 | 12 | 1 |
| Voluntarily turned himself in | 9 | 6 | 6 |
| No positive family role model as teen | 6 | 5 | 3 |
| Home condoned domestic violence | 5 | 5 | 6 |
| Physically/emotionally abused by father | 7 | 7 | 7 |
| Neglected by mother when she was drunk | 9 | 8 | 8 |
| Thrust into caretaker role after divorce | 3 | 3 | 3 |
| Worked consistently since age 15 | 5 | 6 | 3 |
| Grew up in home with drugs, alcohol | 12 | 12 | 11 |
| Grew up in home with violence | 11 | 10 | 8 |
| After beating, lost interest in school | 6 | 5 | 5 |
| Went to church with grandfather Jessie | 11 | 12 | 11 |
| Pled to 2 priors, accepted responsibility | 3 | 4 | 3 |
| Confessed to friend and friend's mother | 11 | 11 | 11 |
| Confessed to police | 12 | 12 | 12 |
| Model inmate | 12 | 12 | 12 |

The third group listed twelve "[o]ther non-statutory factors which the defendant contends are" mitigating. This chart summarizes the number of jurors who found each factor in the third group:

37

| Mitigating factor | Count 7 | Count 8 | Count 11 |
|---|---|---|---|
| Unstable home life, frequent moves | 2 | 3 | 3 |
| Showed remorse by trying to kill himself | 1 | 1 | 1 |
| Prayed for the souls of his victims | 4 | 3 | 3 |
| Exhibited psych problems as minor | 6 | 5 | 5 |
| Cooperated with police | 11 | 12 | 12 |
| Will do well in structured prison setting | 6 | 5 | 5 |
| Abandoned by father at age 10 | 1 | 3 | 4 |
| Rejected by father at 13 after blood tests | 2 | 4 | 4 |
| Attemped suicide prior to crimes | 2 | 6 | 2 |
| Age at time of the offense | 2 | 2 | 3 |
| If sentenced to LWOR, will not be danger | 3 | 2 | 1 |
| Execution impact on MB's family | 8 | 9 | 9 |

Prior to sentencing, Mr. Barnette made a statement to the court, which then formally imposed a sentence of death.

54. It is appropriate to pause here to review some of the evident investigative failings in the 1998 penalty proceeding and to identify the "red flags" that should have prompted more thorough investigation. The Supreme Court has consistently stressed the importance of pursuing leads. In *Wiggins*, nothing that trial counsel had uncovered suggested that mitigation would be fruitless: "To the contrary, the many red flags . . . would have prompted a reasonable attorney to conduct additional investigation." 539 U.S. at 525. Similarly, in *Rompilla*, the Court noted that counsel "could not have reasonably ignored mitigation evidence or red flags because they were unexpected." 545 U.S. at 391. In fact, post-conviction experts "found plenty of 'red flags' pointing up the need" for further investigation. In *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009), the Court distinguished the weak claim of ineffectiveness in that case from the compelling claims in *Wiggins* and *Rompilla*, because it was "not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face [citation omitted], or would have been apparent from documents any reasonable attorney would have obtained [citation

38

Bates No. 174

omitted]." The 1998 sentencing proceeding in Mr. Barnette's case was itself full of "red flags": the trauma experienced by Mr. Barnette's teenager mother when her mother was shot and killed by her step-father; the combat trauma experienced by Mr. Barnette's maternal grandfather, Jessie Cooper, in the Korean War and its impact on his civilian life; the beatings Derrick inflicted on young Marc for bad grades in school; the impact of the divorce of Derrick and Sonia; Mr. Barnette's hospitalization in Georgia after a brutal beating; the track coach who recognized Mr. Barnette's potential and may have had an outsider's insights into his situation at home; the shooting of Mr. Barnette by his cousin when he returned to North Carolina; Mr. Barnette's suicide attempt as a teenager; and his chronic crying spells, from the time he was with Natasha Heard (sobbing in the closet) until the period after the break-up with Robin Williams (when his mother and Aunt Sheila observed him crying on the telephone). Events that were superficially described needed to be explored in depth. What was the impact of her mother's murder on Sonia? How did her mother's death affect Sonia's ability to care for her son? After the grandmother died, who looked after ten-month-old Marc while Sonia attended school? What did the military and Veterans Administration records document about Jessie Cooper's wounds and post-war functioning? How did Mr. Barnette do in school? What did teachers and coaches know about his home situation? Did he come to school hungry or with visible bruises? Who could confirm the physical maltreatment by his father? What did police reports and medical records say about the incidents when Mr. Barnette was victimized as a teenager? The 1998 procedings provided a roadmap for follow-up investigation.

Bates No. 175

55. The Fourth Circuit issued its decision granting a new sentencing proceeding on May 2, 2000. 211 F.3d 803. When the case was remanded to the trial court, two new lawyers were appointed to represent Mr. Barnette on February 13, 2001. Claire Rauscher had extensive experience as a federal criminal defense lawyer. Jean Lawson had handled capital cases in state court and several murder cases in federal court, but none in which the Government had ultimately elected to seek the death penalty. Lawson Aff. at ¶¶ 5, 11. Executions resumed under the Federal Death Penalty Act that summer: Timothy McVeigh was executed on June 11, and Juan Garza on June 19, 2001. On August 28, 2001, new trial counsel filed an *ex parte* "Statement of Defense Contentions," explaining that "an approach different from that used in his first sentencing hearing [was] warranted." *Id.* at ¶ 7. They had determined that the original defense team in 1998 had presented a "disjointed" sentencing case: "[W]itnesses were unprepared for cross-examination. The investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation." *Id.* at ¶ 8. Mr. Barnette's new trial counsel explained to the Court why they needed to replace the previous mitigation specialist, "[Sindy Maxwell] failed to develop adequate rapport with the defendant's family and friends that would have enabled her to unearth critical biographical information. She prepared a 'time line' purporting to represent the defendant's life history and omitted critical information. These omissions cast doubt on the reliability of other expert witnesses called by the defense. As a result, the honesty of the defense presentations was compromised." *Id.* at ¶ 12. They filed *ex parte* motions to hire private investigator Jan Barefoot (with whom Jean Lawson had worked previously on other cases) and mitigation specialist Cessie Alfonso (with whom Ms. Lawson had never previously worked). *Id.* at ¶ 10. *See also* Rauscher Aff. at ¶¶ 6-11. From the time of their

40

appointment until these *ex parte* filings in late August 2001, neither new attorney had spent much time with Mr. Barnette. Mecklenburg County Jail records reflect no visits by Ms. Rauscher in this time frame. Ms. Lawson made three visits on February 22, May 2, and June 20, 2001, for less than six hours altogether.

56. On August 31, 2001, the resentencing proceeding was set for March 19, 2002. Lawson Aff. at ¶ 13. The Court did not grant the *ex parte* funding requests for the investigator and mitigation specialist until October 10, 2001, nearly eight months after the appointment of Mr. Barnette's new lawyers. *Id.* at ¶ 14. On October 31, trial counsel filed a motion to continue the trial. Ms. Lawson has summarized the reasons thus:

> . . . both of us had significant commitments in other cases that caused great concern about our ability to be ready by March, 2002. Among my other commitments was a death penalty trial that was scheduled for January, 2002 in Mecklenburg County. In addition, we were also very concerned about having only four-and-a-half months to investigate and prepare a penalty phase presentation for Mr. Barnette. Our mitigation specialist was just getting started and we had a great deal more work to do in a case in which the defendant had already been sentenced to death once.

*Id.* at ¶ 15. Instead of continuing the trial, the Court moved it up a week to March 12, 2002. Trial counsel sought reconsideration. They ultimately obtained a continuance, but lost one of the two attorneys. According to Ms. Lawson, at a hearing on November 20, "the Court removed Ms. Rauscher from the defense team after she asserted the existence of a conflict due to the scheduling of the resentencing. The loss of 50% of the defense team was a huge shock to all of us. As a result of her removal, the case then had to be continued from the March 12, 2002 trial date." *Id.* at ¶ 16. *See also* Rauscher Aff. at ¶ 15 (". . . much to my surprise and dismay, the Court removed me as Marc's lawyer after I asserted what I believed was a conflict due to the scheduling of Marc's resentencing and my other cases.") It took two months before a second attorney was appointed to

41

Bates No. 177

replace Ms. Rauscher.   On January 14, 2002, Harold Bender was appointed, and the case was continued until July 15, 2002.   Lawson Aff. at ¶¶ 17-19.

57.   Ms. Lawson knew that she would have to develop the mitigation case without much assistance from Mr. Bender.   According to her affidavit, "I had previously worked with Mr. Bender as co-counsel and as counsel for co-defendants.   In terms of working up a case, I knew from first-hand experience that Harold Bender's major strength and interest was in the courtroom and that he had a busy private practice.   As a result, I knew that the responsibility and burden of developing the mitigation and case for sentencing would be mostly mine." *Id.* at ¶ 18.   However, she did nothing to lighten her caseload; in fact, she increased it.   Two days after Mr. Bender's appointment, she accepted appointment in a death penalty case from Gaston County. *Id.* at 20. Seven days after Mr. Bender's appointment, she began another death penalty trial in state court in Mecklenburg County.   Her co-counsel on that case had only been appointed on November 30, so she "was working especially hard and particularly focused on the [Mecklenburg County] case during the period of time after Ms. Rauscher was removed from Mr. Barnette's case." *Id.*

58.   The new mitigation specialist, Cessie Alfonso, has indicated that she did not begin interviewing anyone on Mr. Barnette's case until January 2002, three months after the Court authorized her funding.   Alfonso Aff. at ¶ 7.   According to her affidavit, "[i]t was never made clear to me by defense counsel whether they wanted me to do a wholesale re-investigation of Marc's background, or instead just focus on specific aspects.   As a result, I started my investigation where I normally do: reviewing documents and then meeting with the client.   My first meeting with Marc occurred in January 2002." *Id.*   She subsequently interviewed only eleven people, in addition to the client. *Id.* *See also* Lawson Aff. at ¶ 37: "I have reviewed Cessie Alfonso's mitigation report that identifies the persons she interviewed. . . . It does not

42

Bates No. 178

appear that she re-interviewed a number of witnesses who Sindy Maxwell had interviewed prior to the first trial. There were also a number of witnesses who had been identified on a list of 'potential mitigation witnesses' in early March 2002 (like Sheila Sullivan, Tameka Hunter, and Kowana Dozier) whom Ms. Alfonso did not interview." Only three of the witnesses interviewed by Ms. Alfonso were called as defense witnesses in the 2002 sentencing proceeding (Derrick Barnette, Mario Barnette, and Ahmad Cooper). *See* Alfonso Aff. at ¶ 7.

59. Ms. Lawson "faxed a list of 'potential mitigation witnesses' to [Jan Barefoot] in early March 2002. This list was based on names that Marc had provided to me during my visits with him. I indicated on this list which witnesses I wanted Jan to locate so Cessie Alfonso could interview them. A number of former girlfriends were on the list – including Sheila Sullivan, Tameka Hunter, and Kowana Dozier – but I don't recall if I specifically asked Ms. Barefoot to locate them at that time. Her notes indicate that, right on the eve of trial, I asked Ms. Barefoot to locate Kowana Dozier and Tameka Hunter, but she did not have enough time to track them down." Lawson Aff. at ¶ 29. Ms. Alfonso only spoke to one of Mr. Barnette's ex-girlfriends, Natasha Heard. Alfonso Aff. at ¶ 7.

60. Mitigation specialist Cessie Alfonso wrote Ms. Lawson a detailed letter in January 2002 following her initial interviews with the client and his mother indicating that the mother's history of trauma, abuse, and loss "would be an important feature of the mitigation case to explain Marc's development." Alfonso Aff. at ¶ 8. Ms. Alfonso said that the team never told her why it did not present this evidence. She was not consulted about the decision not to present it. *Id.* at ¶ 9. Ms. Alfonso wrote a "biopsychosocial" report and submitted it to the team on July 8, 2002. *Id.* at ¶¶ 18, 20. She did not have further discussions with either trial counsel about the report. *Id.* at ¶ 20. Such reports were "standard in capital mitigation work in 2002." *Id.* at ¶ 18. In Mr.

43

Bates No. 179

Barnette's case, "[i]t was never made clear to me by the defense attorneys how, if at all, they intended to use my report.   Indeed, it was never made clear to me until the trial itself that defense counsel did not intend to call me as a testifying witness."   *Id.* at ¶ 19.

61.   Investigator Jan Barefoot has also confirmed that the defense team existed on paper, but not in reality.   She had worked with the first trial team in 1998, but her role was "primarily to compile criminal histories for potential defense witnesses, subpoena witnesses, and locate witnesses for Sindy Maxwell, the mitigation specialist."   Barefoot Aff. at ¶ 3.   She had worked on a number of cases with Harold Bender before Mr. Barnette's case: "Harold's manner with me in the Barnette case was similar to his manner in other cases we worked on together; he would give me a set of tasks to accomplish – for example, locate a witness or find a record – but not provide context or explanation."   *Id.* at ¶ 5.   Once again, she understood that her "primary" role was to assist the mitigation specialist.   *Id.* at ¶ 6.   According to Ms. Barefoot, "I did not have full-scale involvement in the retrial.   Neither Jean Lawson nor Harold Bender sought my input about defense strategy.   I do not recall either Jean or Harold describing their trial strategy to me.   They would usually just call or fax me with a task or 'to do.'   My biggest responsibility for the Barnette retrial was serving subpoenas."   *Id.* at ¶ 7.   She met with Mr. Barnette very belatedly on June 13, 2002, when he "provided me with names of former girlfriends."   *Id.* at ¶ 13.   Ms. Barefoot was given a number of last-minute assignments "prior to, during, and following jury selection" – a flurry of interviews between July 10 and 31, 2002, "in anticipation of having them testify on behalf of Marc."   *Id.* at ¶ 14.

62.   Trial counsel's consultation with experts was equally haphazard.   They decided in late November 2001 – before there had been any new mitigation investigation – to involve an expert in domestic violence, psychiatric nurse and FBI consultant Ann Wolbert Burgess.   Lawson

44

Aff. at ¶ 25. "We intended to have Dr. Burgess focus on Marc Barnette's prior relationships with other women. Ideally, Dr. Burgess would need to have access to all of Mr. Barnette's social history and mitigation information as well as women with whom he had been in relationships. We had Dr. Burgess meet with Mr. Barnette and speak with his mother and father, and his brother Mario. I do not recall coordinating or suggesting conversations or meetings between Dr. Burgess and any other social history witnesses." *Id.* at ¶ 26. Most importantly, there was no attempt to integrate the findings of the mitigation investigation into Dr. Burgess's analysis. *Id.* at ¶ 36. According to Ms. Lawson, "With respect to the people with whom Cessie Alfonso ended up speaking with, I do not recall coordinating any conversations or information sharing between Dr. Burgess and Ms. Alfonso. Ms. Alfonso did not provide her mitigation report to defense counsel until July 8, 2002, which was one week after Dr. Burgess submitted her report." *Id.* at ¶ 27. "Some of the social history information we provided to Dr. Burgess, including information about Mr. Barnette's prior relationships, came from Sindy Maxwell's work on the first trial – the same work we had previously concluded and told the court was poorly done and deficient." *Id.* at 26.

63. Inexplicably, trial counsel did not consult the one neutral expert who had testified favorably to Mr. Barnette at the first trial, Dr. Sally Johnson, the Bureau of Prisons psychiatrist. *See supra* ¶ 51. According to Ms. Lawson, "We did not call upon Dr. Johnson to testify at the second sentencing hearing and did not ask her to review any new information about our client, including his Bureau of Prison records." Lawson Aff. at ¶ 38. Dr. Johnson has confirmed that she "was not contacted by [Mr. Barnette's] defense counsel or anyone involved in his resentencing trial in 2002." Johnson Aff. at ¶ 15. She has also confirmed her availability in 2002:

> . . . by the time of Mr. Barnette's resentencing trial in 2002, he had been in custody for approximately six years – the majority of which time he had spent in the custody of the Bureau of Prisons. Having reviewed Mr. Barnette's prison records from his incarceration

45

Bates No. 131

during that period of time, it is clear that Mr. Barnette had very positive institutional adjustment. He presented no problems for correctional officers and had no problems with other inmates. He demonstrated an ability and willingness to abide [by] rules, remained non-violent, and maintained constructive and positive relationships with others. Had I been asked, I would have been willing and able to testify at Mr. Barnette's resentencing about his positive adjustment to prison and his lack of disciplinary issues, and how it was consistent with his behavior and adjustment during his evaluation period in 1997 and consistent with my expectations for his future adjustment.

*Id.* at ¶ 16.

64. Mr. Bender and Ms. Lawson decided to use two of the prior experts at the 2002 resentencing, Dr. Halleck and Dr. Cunningham. Ms. Lawson has indicated that she "knew that in order for an expert like Dr. Halleck to competently testify about our client's psychiatric make-up and mental health issues, he would need to have access to all of his social history and mitigation information." *Id.* at ¶ 33. Dr. Halleck had the information compiled by the previous mitigation specialist, but Ms. Lawson and Ms. Rauscher "had previously determined" that it was deficient. *Id.* However, the only additional information they provided to Dr. Halleck was another meeting with Mr. Barnette and access to his mother and one former girlfriend, Tasha Tolbert. *Id.* Once again, according to Ms. Lawson, "I do not recall coordinating or suggesting any other conversations or meetings between Dr. Halleck and any other social history witnesses. Cessie Alfonso's mitigation report was not provided to defense counsel until July 8, 2002, and I do not recall when or whether we provided Dr. Halleck with a copy of the mitigation report." *Id.* *See also* ¶ 36.

65. Mr. Bender and Ms. Lawson met with Dr. Cunningham at a capital defense training program around March 2002 and decided to expand his role beyond the issue of "future dangerousness" that he covered in the first sentencing proceeding. *Id.* at ¶ 31. He, too, had been provided with the previous "deficient" mitigation information, but Ms. Lawson does not recall

46

Bates No. 132

whether she provided Dr. Cunningham with a copy of Cessie Alfonso's report. *Id.* at ¶¶ 32, 36. This time, Dr. Cunningham was expected to testify "more broadly about Marc Barnette's psychological make-up and mental health issues." *Id.* at ¶ 31. Dr. Cunningham met with Mr. Barnette before the second sentencing proceeding, but did not have access to other new information or witnesses. *Id.* at ¶¶ 32, 36.

*The 2002 Resentencing Proceeding*

66. The resentencing proceeding began on Monday, July 29, 2002. The Government called multiple witnesses to establish the factual predicates for three separate crimes: the firebombing of Ms. Williams's apartment in Roanoke, Virginia, in April 1996; the carjacking and murder of Donnie Allen in Charlotte, North Carolina, in June 1996; and the murder of Ms. Williams in front of her mother in Roanoke in June 1996. The testimony began with the dramatic story of how Mr. Barnette had firebombed the apartment of Robin Williams in April 1996. Benjamin Greene, who was staying with Ms. Williams at the time of the firebombing, described the attack in vivid detail. Tr., July 29, 2002, at 2397-2417. Roanoke police investigator K. O. Hubbard described the scene of the firebombing and also discussed his previous responses to the address when Mr. Barnette and Ms. Williams lived there. *Id.* at 2418-2431. Firefighter Kent McInhaney described the burns suffered by Ms. Williams. *Id.* at 2435. Two neighbors, John Grubb and Maude Hubbard, described how phone lines had been cut and the prior fights between Ms. Williams and Mr. Barnette. *Id.* at 2450, 2455. Roanoke Sgt. Rick Kahl investigated the fire at the apartment. *Id.* at 2470-89. UVA staff nurse Sarah Aldridge discussed Ms. Williams's burns, as well as her fears. *Id.* at 2497, 2499. Ms. Williams's brother Sydney testified about letters from Mr. Barnette and Ms. Williams that had been left on her car a week after the fire with

Bates No. 133

messages accusing her of lying.  *Id.* at 2519-21.  Mr. Barnette's friend Steve Austin described how Mr. Barnette had told him what happened on the night of the firebombing.  *Id.* at 2532.

67.  Moving on to the carjacking homicide, the Government called Jacob Freshour, who testified that he had sold a shotgun to someone using the name "Mario Barnette."  *Id..* at 2543. Elaine Edwards testified about playing pool with Donnie Allen the night he was killed.  She subsequently noticed fliers about his disappearance and contacted police.  *Id.* at 2556-59. Mecklenburg Officer Robert Holl testified about the discovery of Mr. Allen's abandoned car and how a shotgun was found in a nearby dumpster.  *Id.* at 2561-64.  He identified photos of multiple items of evidence relating to the Allen homicide.  *Id.* at 2572-82.

68.  On the second day of testimony, the Government presented firearms and tool mark examiner Todd Nordhoff, who testified about test firing the shotgun and concluded that Mr. Allen was shot at a distance not greater than five feet.  Tr., July 30, 2002, at 2606.  Forensic pathologist James Michael Sullivan, M.D., described the fatal wounds and opined that the shots were fired at close range, three feet or less.  *Id.* at 2614.  Mr. Allen could have been conscious up to five minutes; these shots could have caused substantial pain.  *Id.* at 2624.

69.  The Government set the stage for the murder of Robin Williams with the testimony of her mother's neighbor, Earlene Thompson, who saw a gunman as Ms. Williams ran out of her mother's apartment.  *Id.* at 2628-29.  Her mother was holding a child.  *Id.* at 2628.  The gunman pointed his gun at Ms. Thompson.  *Id.* at 2631.  She went inside and called the police. *Id.*  Later she saw the gunman dragging Ms. Williams down the street by her hair.  *Id.* at 2633. He then shot Ms. Williams twice and returned to his car and "normally . . . drove off."  *Id.* at 2636, 2638.  Another neighbor, Sonji Hill, was talking on the phone when she heard a loud boom.  *Id.* at 2647.  The gunman pointed his gun at her and told her to "hang the motherfucking phone up."

48

*Id.* at 2653.   Ms. Hill saw the gunman shoot Ms. Williams.   *Id.* at 2655-56.   Roanoke Officer Daniel Dean was the first officer to respond to the scene.   *Id.* at 2662.   He saw Ms. Williams as she lay dying and prayed with her mother as paramedics attended Ms. Williams.   *Id.* at 2665. Crime scene technician C. R. Sacra described where the shotgun shells were found.   *Id.* at 2669. He noted that the telephone lines had been cut.   *Id.* at 2676.   Dr. Gregory Wagner testified about the autopsy performed by a pathologist who had now retired.   *Id.* at 2691.   Autopsy photographs showed skin grafts from the prior burn injuries.   *Id.* at 2694-96.   Prior testimony of Officer J. L. Krall was read to the jury, documenting the discovery of Mr. Allen's stolen Honda.   *Id.* at 2704. Ben Kennedy, a friend of Mr. Allen's brother-in-law, testified that he had actually found the shotgun and other items in the dumpster.   *Id.* at 2718-21.   Charlotte-Mecklenburg Officer James Michael Sanders arrested Mr. Barnette, who was nicely dressed and holding a Bible when he was arrested.   *Id.* at 2726.   Mr. Barnette was cooperative and assisted the police in finding Mr. Allen's body.   *Id.* at 2730-34.   Officer Sanders recounted Mr. Barnette's confession at length. *Id.* at 2737-49.   Charlotte-Mecklenburg Officer Tony Rice interviewed Mr. Barnette following the interview by Officer Sanders.   *Id.* at 2771-72.

70.   On the third day of the resentencing proceedings, Charlotte-Mecklenburg Officer Robert A. Holl covered another interview of Mr. Barnette.   Tr., July 31, 2002, at 2793-94.   The Government then called numerous witnesses to explore Mr. Barnette's history of violent relationships.   Former girlfriend Crystal Dennis was called to testify about how Mr. Barnette was abusive and jealous during their relationship.   *Id.* at 2807.   He was also prosecuted for cruelty to her children, including whipping them with a clothes hanger.   *Id.* at 2809.   Mr. Barnette shot at her half-brother Anthony [Britt] in a conflict over another girlfriend, Tasha, with whom Mr. Barnette was involved prior to Ms. Dennis.   *Id.* at 2817.   Detective James Yarbrough testified

about his investigation of the cruelty to Ms. Dennis's children in Noonan, Georgia. *Id.* at 2821-28. Detective Rodney Riggs testified about his investigation of the shooting involving Anthony Britt. *Id.* at 2832. (Britt was later killed in another gun fight over a woman. *Id.* at 2838.) Natasha (Heard) Tolbert, the mother of two of Mr. Barnette's children, testified about their relationship, which began when she was fourteen and Mr. Barnette was sixteen. *Id.* at 2842-43. He once threw Natasha to the concrete when she was pregnant. *Id.* at 2847. He had written the children only once in five or six years after splitting up with Natasha. *Id.* at 2848. On cross-examination, Ms. Tolbert said that the children are excited to see Mr. Barnette, but on redirect she conceded that they love him because he is their daddy, not because they know him. *Id.* at 2859, 2860. Another ex-girlfriend, Alesha Chambers Houston testified to Mr. Barnette's jealousy and possessiveness. *Id.* at 2870. They fought once over a knife. *Id.* at 2877. He picked Alesha up and threatened to throw her from the balcony. *Id.* at 2878-79. Another time he put a knife to her throat when she refused to go with him. *Id.* at 2891-92. He raped her in the back of a car. *Id.* at 2900. She later called the police, but the case was not pursued because of her prior consensual sexual relationship with Mr. Barnette. *Id.* at 2902-04. Charlotte-Mecklenburg Officer W. T. Brandon of the sexual assault unit testified about the rape investigation, but noted that the charges were dropped. *Id.* at 2915-25. Brent McQuickered Burgess testified about witnessing the incident where Mr. Barnette held Ms. Houston at knifepoint. *Id.* at 2931. Co-workers subdued Mr. Barnette. *Id.* at 2934. Donna Burgess confirmed the incident. *Id.* at 2939-41. Charlotte-Mecklenburg Officer Donna Adamo investigated a kidnaping case involving Ms. Tolbert. *Id.* at 2947. Mr. Barnette's mother denied that Ms. Tolbert was at the Barnette home, but the police found her there. *Id.* Mr. Barnette's probation officer Thad Johnson testified

50

Bates No. 136

that he had a heavy caseload (230-240 people to supervise) and never knew that Mr. Barnette had moved out of North Carolina. *Id.* at 2969, 2973.

71. On August 1, 2002, the Government concluded its case in chief with victim-impact witnesses: Ms. Williams's brother, Kenneth, and her mother, Bertha, Tr., August 1, 2002, at 2984-88, 2989-3012; and Mr. Allen's parents, Bobby and Shirley, and his only sister Denise, *id.* at 3013-3026, 3028-3033, 3034. Nearly all of the Government witnesses had testified in the 1998 sentencing proceeding. There were no surprises.

72. On Monday, August 5, 2002, the defense began its presentation of mitigation evidence. Fourteen witnesses were called. Six were so-called *Skipper* witnesses (*see Skipper v. South Carolina*, 476 U.S. 1 (1986)), rebutting future dangerousness allegations by demonstrating that Mr. Barnette had adjusted well to incarceration. A seventh was a jail minister, Bobby H. West, who found Mr. Barnette remorseful and wondering if God will forgive him for what he did. Tr., August 6, 3394-96. Three correctional officers from Mecklenburg County Jail – Terry Michael Dorsey, Olandas Truesdale, and Tony Harrison – testified that Mr. Barnette was a model inmate. Tr., August 7, 2002, 3457-58, 3459, 3460. A correctional officer from the Bureau of Prisoners, Bruce Ryherd, said that Mr. Barnette was a good prisoner who had progressed from Phase 1 to Phase 2 because of his positive adjustment. *Id.* at 3460-63. Case manager Donna Boyer from United States Penitentiary Terre Haute confirmed that Mr. Barnette was not a disciplinary problem. *Id.* at 3470. Corrections consultant Walter W. Buer, Jr., said that Mr. Barnette would be eligible for a medium security prison based on the normal BOP classification system, but he would remain in a high security penitentiary because of the nature of his sentence.

51

Bates No. 137

*Id.* at 3486.   What was glaringly missing from this testimony, however, was an explanation of *why* Mr. Barnette functions so well in the structured environment of prison.[22]

73.   The remaining seven witnesses included three experts, three family members, and Mr. Barnette himself.   As I have explained *supra* ¶ 38, defense experts tend to be viewed as "hired guns" unless their opinions are supported by abundant, credible evidence from lay witnesses and professionals, such as teachers and caseworkers, who encountered the capital client long before the alleged offense.   Mr. Barnette's 2002 resentencing represents a textbook example of how *not* to present penalty phase expert evidence.   The absence of corroborative evidence from objective witnesses outside the family was a direct result of trial counsel's failure to conduct a thorough mitigation investigation.   Even more catastrophic was the decision to make Mr. Barnette himself the centerpiece of the resentencing case.   He was the first defense witness, and he was on the stand for more than a day.

74.   Mr. Barnette did not testify in the 1998 sentencing proceeding.   I have seen nothing in the record to suggest that he was insistent about taking the witness stand.   On the contrary, Ms. Lawson has stated in her affidavit, ". . . Mr. Barnette and I discussed the issue of whether he would testify at the sentencing hearing and, as I recall, Harold Bender was involved in those discussions occasionally.   Mr. Barnette was always very amenable to the advice of counsel.   Mr. Bender and I recommended that he testify, and he decided to testify."   Lawson Aff. at ¶ 22.   She continued, "I never considered, and I don't recall ever discussing with Harold Bender, having any mental health

---

[22] As discussed *infra* ¶ 86, all twelve jurors agreed that Mr. Barnette can serve a useful purpose in prison, but only two thought that he does well in a structured environment.   They had been given no means to connect his well-adjusted prison behavior to the beneficial impact of structure on his underlying disorders.

expert weigh in on Mr. Barnette's testimony." *Id.* at ¶ 23. Mitigation specialist Cessie Alfonso

has summed up her reaction thus:

> I was definitely surprised – actually, shocked would be the right word – when Marc testified on his own behalf at trial. I was neither consulted about this decision nor told why the defense team decided to call him as the first defense witness. During my various meetings with Marc, I was never told by Marc – directly or indirectly – that he wanted to testify. I could count on one hand the number of times a defendant testified on his own behalf before the jury in cases I've worked on. Had defense counsel sought my advice or insights about Marc as a potential witness, I would have strongly cautioned them that Marc, despite genuine remorse for what he had done, would likely offend the jury by his testimony. I would have been concerned that Marc's mental health makeup and experiences, and his general lack of insight, would result in explanations and rationales for his behavior that would alienate jurors, rather than communicate remorse and sorrow. I believe his testimony did just that.

Alfonso Aff. at ¶ 23. Trial expert Ann Burgess has also confirmed that she was not consulted

about the decision to have Mr. Barnette testify. According to her declaration, "Had counsel

sought my advice or insights about Mr. Barnette as a potential witness, I would have strongly

cautioned them that Mr. Barnette, despite genuine remorse for what he had done, would likely

offend the jury by his testimony. I would have expressed my strong reservation that given his

mental health makeup and experiences, and his general lack of insight, Mr. Barnette would explain

and rationalize his behavior in ways that would likely anger jurors." Burgess Aff. at ¶ 22. Dr.

Johnson concurs:

> I have been made aware that Mr. Barnette testified on his own behalf at his resentencing trial. Had trial counsel sought my advice or insights in 2002 about putting Mr. Barnette on as a witness, I would have discussed that although Mr. Barnette expressed genuine remorse for what he had done, he had limited insight into his behaviors and may not be able to display his remorse when confronted with the stress of examination and cross examination. His attempts to deal with his anxiety and his personality functioning would likely limit his ability to relate to the Jury or others in the court room.

Johnson Aff. at ¶ 24.

53

Bates No. 139

75. Experienced capital practitioners have long recognized that the decision to have a capital client testify in his own penalty phase is perilous and extremely difficult. *See*, for example, Edward C. Monahan, *Testifying and Allocution*, KENTUCKY DEPARTMENT OF PUBLIC ADVOCACY, DEATH PENALTY MANUAL 99 (1989) (noting "most difficult" decision; preparing client to testify may take hundreds of hours). Most importantly, if the client does testify, counsel should "surround the defendant's testimony with unbiased or less interested witnesses"; otherwise, his testimony "can ring hollow, as purely self-serving and manipulative." *Id.* at 100.[23] In my own thirty-four years of involvement in capital defense teams, I cannot think of a single example where the defense team encouraged a client to testify in the penalty phase, although there were several cases in which the issue was carefully discussed and clients were counseled thoughtfully about the extreme risks and downsides of testifying.

76. In Mr. Barnette's case only three family members were called as mitigation witnesses, and there were no witnesses outside the family to testify about anything in Mr. Barnette's childhood, developmental years, or early adulthood. There was no attempt to "surround" his testimony with unbiased witnesses. Derrick Barnette testified that he became involved with Mr. Barnette's mother, Sonia, when she was in the eighth or ninth grade. Tr., August 6, 2002, at 3320. She became pregnant with Marc, and he assumed that the child was his. *Id.* at 3321. She and the baby lived with her mother and step-father until her step-father shot and

---

[23] In a capital case, the only widely accepted reason for a client to testify in a penalty phase is to accept responsibility and express remorse. However, a brief allocution is generally preferred since it avoids cross-examination and factual disputation. *See* J. Thomas Sullivan, *The Capital Defendant's Right to Make a Personal Plea for Mercy: Common Law Allocution and Constitutional Mitigation*, 15 N.M. L. Rev. 41 (1985). *See also State v. Zola*, 548 A.2d 1022, 1046 (N.J. 1988) (citing Sullivan article on appropriateness of allocution in capital sentencing) and J. Thomas Sullivan, *Use of the "Zola Plea" in New Jersey Capital Prosecutions*, 21 SETON HALL L. REV. 3 (1990) (tracing history of "mercy pleas" by allocution).

54

killed Sonia's mother. *Id.* Derrick enlisted in the air force and later married Sonia. *Id.* at 3323-24. Derrick and Sonia accused one another of infidelity and sometimes fought. *Id.* at 3327, 3330. They split up when Marc was about ten. *Id.* at 3330. Derrick spanked Marc with a belt. *Id.* He denied hitting him with a coat hanger. *Id.* at 3346. Although he confirmed that the worst thing" he ever did to Sonia was to hit her with a hammer (*id.* at 3328), he made light of an incident where she had brandished a frying pan over him when he was sleeping: "Turned into sort of a joke. . . . I woke up and she's standing there with a frying pan." *Id.* at 3329. After the break-up, Derrick arranged paternity testing and learned that he was not the father of either of Sonia's sons. *Id.* at 3334. On cross-examination, Derrick indicated that "spanking" and "beating" could be used interchangeably. *Id.* at 3351. He spanked Marc only when he transgressed the family rules, such as "don't lie" and "do well in school." *Id.* at 3352-53.

77. Mr. Barnette's younger brother Mario testified that Mr. Barnette protected him when their parents were fighting. *Id.* at 3363. After the divorce, Sonia sometimes left the boys on their own, sometimes for days at a time. *Id.* at 3373. She bought herself a two-seater Corvette rather than a family car, but Mario fondly recalled how he loved getting a ride in it once. *Id.* Mario was asked how Mr. Barnette felt about victim Robin Williams, and the following exchange occurred:

A. From looking at him in other relationships, he definitely had a thing about devoting everything –

Q. I'm sorry, I'm having difficulty hearing you.

A. I'm sorry. I was saying from looking at him in other relationships, the outside view, he definitely had a thing about giving it all. And with Robin it seemed a lot easier for both of them. There was never, as far as what I saw when she visited, there were never any fights between them. . . . he was proud of the relationship with her. It had been a long time since I had seen him happy, and he seemed to be making her happy as well.

Q. When you say he gave his relationship his all, what do you mean by that?

55

Bates No. 191

A.     Ever since Tosha, my brother would basically fall off the face of the earth when it came to a girlfriend.   I mean, it was just like this is where my focus is, and I could see how he would do that.   But it happened from his first girlfriend to his last girlfriend, he gave everything that he could, and only in retrospect can I say maybe he gave too much, you know, but I'm not going to judge that.

*Id.* at 3385-86.

78.     Mr. Barnette's twenty-year-old cousin, Ahmad Cooper, testified very briefly.   *Id.* at 3440.   He is eight years younger than Mr. Barnette.   *Id.* at   3436.   Sonia and her boys moved in with Ahmad and his mother (Sonia's younger sister, Sheila Cooper) in Atlanta when Ahmad was about six.   *Id.* at 3440.   The adults often went out in their "best outfits" and left the children unsupervised.   *Id.* at 3435.   Ahmad Cooper looked up to Marc Barnette as a father figure.   *Id.* at 3438.

79.     Forensic psychiatrist Seymour Halleck, M.D., testified that he had interviewed Mr. Barnette four times in 1998 and four more times in 2002.   *Id.* at 3402.   He had also interviewed Mr. Barnette's mother in person for about an hour and talked on the telephone to Derrick Barnette and ex-girlfriend Natasha Heard.   *Id.* at 3403.   Dr. Halleck opined that Mr. Barnette was suffering from major depressive disorder and substance abuse disorder at the time of the capital crimes, as well as borderline personality disorder.   *Id.* at 3403-06.   Mr. Barnette was also "demonstrating a great deal of anger and rage."   *Id.* at 3407.   He had qualities of antisocial and narcissistic personality disorders.   *Id.*   Mr. Barnette "acted out a plan rationally based on irrational motivations."   *Id.* at 3413.   Dr. Halleck is opposed to the death penalty.   *Id.* at 3430-31.   No lay witnesses corroborated any of the bases of his opinions.

80.     Psychiatric nurse Ann Wolbert Burgess was qualified as an expert in domestic violence.   Tr., August 7, 2002, at 3494.   She had taught FBI agents about rape victimology at the Behavioral Science Unit at Quantico, Virginia, where she also studied serial offenders (serial

56

killers, child molesters, child abductors, etc.). *Id.* at 3495. She recommended Park Dietz, M.D., Ph.D., to the FBI based on her knowledge of his work. *Id.* at 3496. There are multigenerational patterns of violence. *Id.* at 3499-3500. Neglect is a risk factor for domestic violence. *Id.* at 3501. Dr. Burgess had interviewed Mr. Barnette twice and she heard some of his testimony in court. *Id.* at 3502. She talked with his mother and by telephone with Derrick and Mario Barnette. *Id.* at 3503. The whole crime spree from April to June was part of Mr. Barnette's "attempt to reengage with his ex-girlfriend Robin Williams." *Id.* at 3504-05. Mr. Barnette's violence with his domestic partners escalated over time; there was no intervention to curtail it. *Id.* at 3510. Dr. Burgess noted Mr. Barnette's symptoms of depression and suicidality in his childhood and teenage years. *Id.* at 3514-15. At one point, according to Sonia, Mr. Barnette shaved his head because "he couldn't think as clearly with the hair on his head." *Id.* at 3518-19. Abusers do not enjoy the abuse, but perpetrate it to keep control of the individual. *Id.* at 3519. Mr. Barnette's cruel treatment of Crystal Dennis's children and the shooting of Anthony Britt should also be seen in the context of his domestic relationship at the time. *Id.* at 3520-21. His problems with women in unstructured settings would not be replicated in prison. *Id.* at 3522-23.

81. In the Government's lengthy cross-examination, Dr. Burgess was closely questioned about the crimes, Mr. Barnette's efforts to evade arrest in Tennessee, whether the crime scenes were "organized" or "disorganized," and the traumatic impact of domestic violence on the victims of intimate-partner rape and assault. *Id.* at 3523-3565.

82. Forensic psychologist Mark Cunningham was the final defense witness. He had interviewed Mr. Barnette four times for a total of eighteen hours. *Id.* at 3576. He also interviewed Sonia, Derrick, and Mario; Mr. Barnette's aunt Sheila; his friend Steve Austin; his cousin Chanda [sic] Nero; a work supervisor; a correctional officer; and BOP psychiatrist Sally

Bates No. 193

Johnson, M.D.  *Id.* at 3576-77.  He also listened to the earlier penalty phase testimony beginning August 5, 2002.  *Id.* at 3578.  His conclusion was that Mr. Barnette was damaged by "a number of fundamental factors," and "that damage placed him at substantially greater risk for disturbed romantic relationships, for criminal activity, and for criminal violence in the community."  *Id.*  In some cases, Dr. Cunningham relied on information that was either not in evidence or conflicted with lay witness testimony.  For example, he opined about Mr. Barnette's mother that "it's tough when your father is psychiatrically and physically disabled, as Jessie was, and your mom has been murdered . . ."  *Id* at 3594.  Derrick Barnette had testified that Jesse Cooper had been the janitor at his high school who was a "nice guy," "unique," and a "[l]ittle eccentric."  Tr., August 6, 2002, at 3318.  According to Derrick, Jessie Cooper was "a very educated man" who had earned a degree from North Carolina A & T State University and drank beer – Pabst Blue Ribbon – daily.  *Id.* at 3319.  Mario testified that Jessie "had a strange way of talking at first" – he called Sonia "Sonar" – and he wore an army coat.  *Id.* at 3361.  There was no hint of psychiatric or physical disability from either Derrick or Mario.  Dr. Cunningham explained that he based his opinion on information from Mr. Barnette's aunt, Sheila Cooper, who had not testified.  Tr., August 8, 2002, at 3718.  Elsewhere, in referring to Derrick's father as an "alcoholic playboy," Dr. Cunningham said he relied on the "psychosocial history investigation that was done four or five years ago," apparently referring to the Maxwell report that 2002 trial counsel had found erroneous and deficient.  *Id.* at 3720; *see supra* ¶ 55.

83.  Outside the presence of the jury, Dr. Cunningham was questioned by the Court and the Government about when he was retained by the defense and when he completed the slides that he used in his testimony.  He said he "was kind of informally retained I think in about March" of 2002.  Tr. August 7, 2002, at 3626.  He was not informed that the Court had ordered experts to

Bates No. 154

produce their report by June 25.  *Id.*  Some of his slides were prepared prior to June 25, but others were prepared as late as the preceding weekend.  *Id.* at 3626-3627.  He had originally been expecting just to testify about risk assessment, but he remembered "when I came out in July, July 8th, that there was a discussion about going ahead and working up mitigation for sure at that time."  *Id.* at 3627.  His report had summarized "multiple mitigating issues," including "primary attachment instability, multigenerational domestic violence scripts, observed domestic jealousy and violence, paternal abandonment, corruptive modeling, vulnerability to alcohol abuse, depressing and posttraumatic symptoms, poor parental supervision and instruction, and other developmental factors" – all of which "form a nexus to the instant offense."  *Id.* at 3629.

84.  Dr. Cunningham discussed at length how Mr. Barnette's crimes fit the category of "catathymic homicide," where there is an emotional bond between perpetrator and victim, and violence is driven by emotional turmoil.  *Id.* at 3647-51.

85.  The Government offered several witnesses in rebuttal.  Joanna Baldwin Coleman had worked with Mr. Barnette at Camelot Music Store.  She testified to his vulgar sexual and lewd comments, like "I needed his big dick in me."  Tr., August 8, 2002, at 3737-38.  Another co-worker at the music store, Shirley Williams Parker, testified that she had had sex with Mr. Barnette a couple of times in 1995 (during the time when he was involved with Ms. Williams).  *Id.* at 3746.  Ms. Williams's friend Angela Rosser testified to Mr. Barnette's bizarre behavior when Ms. Williams attended a funeral with Ms. Rosser.  *Id.* 3747-53.  Dr. Peter Carlson had retired on December 31, 1999, after spending thirty years with the Bureau of Prisons.  *Id.* at 3769.  Dr. Carlson testified that life-sentenced prisoners are placed in the general population of high-security prisons, but there are exceptions where those prisoners can sometimes be transferred to less secure prisons.  *Id.* at 3772.

59

Bates No. 195

86.   Forensic psychiatrist Park Dietz, M.D., disagreed with all of the defense experts on various points.   He said that Dr. Halleck should not have diagnosed Mr. Barnette with depression in the period between the firebombing and the murders because Mr. Barnette was drinking heavily during that time and "the effects of alcohol can't be distinguished from the effects of the illness that we call depression." *Id.* at 3797.   Dr. Dietz disagreed with Dr. Burgess about Mr. Barnette's purpose on the trip to Roanoke: he did not merely want to talk with her.   "It's the most common thing that domestic offenders, including ones that kill their victims, say when they are arrested, they say, I just wanted to talk to her.   But that's not true. . . .   In that case, what he wanted to do and what he acknowledged having thought about doing was to kidnap her and make her take him to Benjamin Green, and he had already thought of killing Robin, he had thought of killing Benjamin." *Id.* at 3802.   Dr. Dietz disagreed with Dr. Cunningham about categorizing the Donnie Allen homicide under catathymic homicide because Mr. Barnette had no relationship with Mr. Allen and there was no brooding.   *Id.* at 3805.   Mr. Allen's murder was not a domestic homicide.   *Id.* at 3809.

87.   Once again, the jury sentenced Mr. Barnette to death on all three death-eligible counts, after finding both the statutory aggravating factors (pecuniary gain and substantial planning and premeditation) established beyond a reasonable doubt.   The jury agreed that two non-statutory aggravating factors had been proved beyond a reasonable doubt (harm to Mr. Allen's family and intentional killing of two people), but it rejected the contention that Mr. Allen would be likely to commit criminal acts of violence in the future.   The Special Verdict Form again offered three groups of mitigating factors.   No juror found that the statutory mitigating factor of impaired capacity had been established, but eleven found that "other factors in the defendant's childhood, background or character mitigate against imposition of the death sentence."   The

60

Bates No. 196

Court found that three non-statutory mitigating factors had been established, and the jury followed the Court's instruction and indicated that all twelve jurors had found that Mr. Barnette was neglected by his mother, turned himself in to police, and has been a model prisoner. The jury was deeply divided about the other thirteen non-statutory mitigating factors that were proposed. None of the jurors connected his difficult childhood to his mental health at the time of the offenses. This chart summarizes the number of jurors who found each factor in the third group:

| Mitigating factor | Count 7 | Count 8 | Count 11 |
|---|---|---|---|
| Accepted full responsibility for his actions | 1 | 1 | 1 |
| Has remorse | 1 | 1 | 1 |
| Was abused by his father | 1 | 1 | 1 |
| Family environment of violence, drugs, etc. | 12 | 12 | 12 |
| Repeated exposure to violence in home | 12 | 12 | 12 |
| Attempted to protect Mario | 12 | 12 | 12 |
| History of untreated emotional problems | 9 | 9 | 9 |
| Experiencing depression at time of crimes | 0 | 0 | 0 |
| Does well in structured environment | 2 | 2 | 2 |
| Cooperated with police | 12 | 12 | 12 |
| Can serve useful purpose in prison | 12 | 12 | 12 |
| Irrational/obsessive thoughts during crimes | 6 | 6 | 6 |
| Execution impact on brother and children | 0 | 0 | 0 |

### Conclusions

88. In summary, trial counsel in 2002 failed to conduct a thorough and expansive investigation of Mr. Barnette's potential mitigating evidence. They belatedly engaged the services of an experienced mitigation specialist, but gave her little guidance, ignored her own advice about potentially important areas to develop, and made no effort to extend her investigation when she had completed fewer than a dozen interviews. Among those who were interviewed, there was no attempt to build rapport and trust through multiple, in-person, one-on-one, face-to-face interviews. The mitigation specialist's biopsychosocial report was not shared with any of the experts who testified.

89. It is my considered professional opinion that trial counsel's duty to conduct a thorough mitigation investigation was well-established at the time of Mr. Barnette's resentencing proceeding in 2002. Trial counsel in this case conducted no such investigation, but instead, as in the *Wiggins* case cited *supra* ¶ 19, "abandoned [their] investigation" of Mr. Barnette's background "after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. They chose the least credible witness – Mr. Barnette himself – to recount his life history with no regard for his lack of insight and judgment. A mere three family members testified, and they contradicted Mr. Barnette's testimony in critical areas while failing to corroborate the three mental health experts who attempted to provide a framework for understanding Mr. Barnette's behavior. No juror believed that Mr. Barnette was experiencing depression at the time of his crimes. Only one found evidence of remorse after observing Mr. Barnette on the witness stand for more than a day.

90. In conclusion, it is my considered professional opinion that trial counsel's

62

Bates No. 198

performance in Mr. Barnette's resentencing case fell far below the prevailing norms of 2002 in the investigation and presentation of mitigation evidence. It is also my considered professional opinion that the mental health evidence presented in 2002 lacked the foundational social history that is essential to both reliability and credibility.

I declare under penalty of perjury pursuant to 28 U.S.C. §1746, and under the laws of the States of California and North Carolina, that the foregoing is true and correct and was executed this 9th day of December 2014 at Oakland, California.

RUSSELL STETLER

63

Bates No. 199

# Affidavit of Netoshia Tolbert

I, Netoshia Tolbert, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.  I am over the age of 18 and competent to testify to the following facts.

2.  I am a resident of Newnan, Georgia. My given first name is Netoshia but most people call me Tasha. Before I married, my last name was Heard.

3.  I went to school through the 8th grade but I later passed a GED exam.

4.  I was diagnosed with bipolar disorder three years ago. I have been prescribed Busperone for this.

5.  I have known Aquilia Marcivicci Barnette for decades. I call him Marc. We dated for several years, starting when we were both in high school, and we are still in contact today. Marc and I have two children together. Angelica Barnette Sharpe is our older daughter and Aquilia Marcivicci Heard is our younger son. We call our son Marc Jr. or Little Marc. Marc Jr. looks just like his dad.

6.  I know the type of person Marc can be. He can be sweet and smart. But he's also unstable and always has been.

7.  I first met Marc when I was 13 years old. We met at my apartment complex, The Crossings. Marc had just moved there and we met at the pool one day. My cousin who is two years younger than me had just run into Marc and they started talking. Then he started talking to me. It was love at first sight. When we were together we used to go to Dogwood Fest and museums and things like that.

8.  Marc lived a couple of buildings up from me. Our relationship was pretty intense right from the start. We would spend more of our time at my house because I wasn't allowed to be out. I was living with my mom and my sister at that time. We lived in a second floor apartment. Marc would sometimes climb up sheets that I threw down to him that I'd tied to the bed.

9.  Marc and I met over the summer and in the fall we went back to school. We would see each other at school. We would hold hands and Marc would put his arm around me. I was in 8th grade that year and Marc was a grade or two above me.

10. Marc and I started having sex and it eventually led to two babies. I was 14 when I gave birth to Angelica. She was born in September and I turned 15 in November. Sex with Marc was normal and good. Marc and I never used protection except after Angelica was born. I really didn't know much about sex or protection then. Nobody taught me that unprotected sex leads to pregnancy. I got a birth control prescription at some time before Angelica was born but my mom ripped it up.

11. Mark and I started fighting. I fought too. It was normal to me. All of our fighting was always around trust, jealousy, and who I was talking to.

12. Marc broke up with me for a brief time and I went out with a boy named Tommy. Tommy was someone I knew from school. He was dark skinned. Tommy was a little older than me but he went to Lithonia High School. We had sex in my sister's bed. Marc found out about it. When Marc found out he went crazy. Marc would bring it up in future fights.

13. Marc once pushed me down when I was pregnant. We were coming from the mall and Marc was talking to another girl on the bus. When we got off the bus I slapped him. Then he shoved me to the ground. Then we fought and walked.

14. Marc and I once got into a fight where I scratched him. This happened in the living room at Marc's mom's place. He hit me and I was so mad I scratched him leaving bright red marks on him. These scratch marks stayed on him for several months. It seemed like they stayed there forever but they eventually faded and turned darker. We had sex after the fight. I was in pity mode, trying to makeup. It was like that a lot.

15. Another time I bit Marc in the chest. This also left a mark. He and I would rumble. I would slap him, hit him with my fist, kick him, and shove him.

16. If I talked to certain people he would get mad. I had to watch how I dressed and where I went. Marc spied on me. He would call and say he was outside the house, sitting in the woods watching me. He told me he was looking at the balcony of my apartment and in the window. He frequently accused me of being with other guys.

17. Marc didn't tell me much about his home life or childhood. He did tell me that his father, Rick, took him and Mario out to dinner and told them he was not their father. That devastated him.

18. I never knew about Rick beating on Marc when he was younger. I think this has affected him by making it so he doesn't trust people. Marc doesn't trust anybody. Whatever anyone said to him, he didn't believe it was the truth.

19. Marc and his mom were not close. Marc and I were always together and his mom was never there. One time Marc asked me over to meet his mom. We eyed each other but that's about it. I also met Aunt Sheila. She was using cocaine, drinking, and partying. Her husband Michael was selling drugs. He wore a big chain and looked like a dealer.

20. As a teen, Marc and his brother, Mario, didn't have adequate stuff. I used to go over to Marc's apartment at The Crossings every day. I would just walk in. There was a couch in the living room and a TV, but Marc and Mario didn't have adequate clothes and there wasn't enough food in the house. There was one bottle of wine in the fridge. There was no food, no butter, no condiments, and no ketchup. Marc and Mario shared a bedroom but they didn't have beds. They just slept on the carpet and had a blanket. Sonia's room, however, was totally different from the rest of the house. I couldn't believe it when I first went into her room. There were silk sheets on a plush bed, heels, lots of clothes, and jewelry.

21. I used to give Marc food from my mom. I would sneak him this food. He would take it but he would also save some for Mario. Sonia was always working or gone. Even though my mama didn't protect me the way she should have, I still had clothes, a bed, and food. One time I stole my parents' credit card and used it to buy clothes for Marc.

22. There were times when I found Marc naked and crying in the closet. When my mom was home and active around the apartment, the safest place for Marc to hide out was in the closet. When I'd open the closet door he'd be crying. It was a walk-in closet. Marc would be sitting on the floor with his knees up to his chest. I don't remember what would lead Marc into those situations and I don't know why he was naked because I never asked him. Sometimes I would go in there and sit with him. Sometimes I cried with him. I would try to get his mind on something else. I might suggest things for us to do. It would be a few hours before he felt better. Marc did this a lot of times. It happened every now and then. I once tried to tell Sonia that something was terribly wrong with Marc but she responded that something was terribly wrong with me.

23. My older sister's boyfriend, Keith Furlow, once tried to beat me up. He pushed me, I pushed him back, and he punched me in the face. My entire left eye turned bright red. I had to go to the hospital. Marc was there when this happened.

24. When I was pregnant Marc and I bought baby books and talked about baby names. Also, Marc found a job after I got pregnant with Angelica. Then, from his earnings, he got enough money to buy a crib. Marc took the bus with me to my prenatal doctor visits until my mom stopped letting him. Marc was excited about the baby. He was there at the hospital with me when I gave birth to Angelica.

25. Marc talked all the time about getting married. One time he bent down on one knee and proposed to me. I said yes. I was sitting on the edge of the bed and Angelica was born and her crib was there. But we were too young. My mom would never go for that. We often talked about plans and our future. He meant it when we talked about these things.

Bates No. 252

26. After our second child was born, Marc and I ended up moving to Newnan, Georgia with our two kids. Marc actually signed the lease for our apartment because I wasn't old enough. I was 17 at the time and Marc was 18. Our apartment was on Berry Avenue. I lived there until Marc made me leave. When he came down here to Newnan his whole spirit changed. He acted bizarre.

27. Marc had two personalities. One personality was cool and sweet. The other personality would want to fight me and would do stupid stuff. I was always strung out around Marc. My heart rate was always up because I was both excited and on edge. Marc was very impulsive. He could make a decision and it wouldn't make any sense. He was very high strung. He acted psychotic.

28. There were times when I would instigate things with him but this would not lead him to be psychotic angry. When Marc was psychotic he would not reason. You don't even know if he's hearing what you have to say. It's like he's not even there. He will look at you but he's not there.

29. When Marc was the other personality he would forget things he'd done or said. It was like he was in a trance. He didn't talk he just acted. Usually when people are fighting it's all talking and arguing, but not with Marc. When he got in this state it was fighting without talking.

30. With the crazy Marc it felt like there was witchcraft on him and there was some kind of psychosis. I really didn't know what was wrong with him. He was just ill.

31. I've never even seen Marc smoke a cigarette. He didn't use weed, he never used cocaine, and he never drank. When we were younger and back in Lithonia we would sneak out of the house but we never used weed or drank.

32. At times Marc would get teary-eyed and other times he would outright bawl. He was up and down. His mood would change over the course of hours or a day.

33. When we lived in Newnan the same thing happened every night. Marc would come home from work, bathe, and go see Crystal, a girl he'd started spending time with. Then at midnight Marc would come home and we would fight in the living room and throw dishes and such. This happened so many times that one night our neighbors Anthony Britt and Victor were fed up and they broke down the door, held Marc down, and forced me to hit him. They made me kick Marc, hit him, and slap him. That really angered him.

34. When Marc was in this other state, he just acted. It seemed surprising to him if I had a bruise the next day. We never discussed these incidents. He would not say sorry. It was like it never happened. It was a Jekyll and Hyde situation.

Bates No. 253

35. One time Marc came to me and told me he'd found a gun on the railroad tracks but it wasn't functioning. This was the gun that Marc used when he shot Anthony. Marc went to jail following that incident. After he went to jail that time our lives spiraled out of control.

36. After Marc and I broke up, and Marc was living with Crystal, he would call me and say he wanted to take the kids. When Marc had the kids, Crystal would do their hair and things like that.

37. Marc never troubled our kids. He never hit Angelica and he didn't want me to either. I once dropped a comb on Angelica and Marc was more upset about it than anyone.

38. Marc was very hyper. Sometimes he talks so fast I have to tell him to slow down. Marc's regular self goes at things a million miles an hour.

39. Marc Jr. has anxiety problems and he's been diagnosed with ADHD. He was diagnosed when he was three years old. He was a terror in preschool. He would never sit down. I had him on medication but it zombied him. A lot of the reason that Marc Jr. didn't finish school is because I took him off his medications. He was prescribed Ritalin and then Adderol. Marc Jr. acts in a similar way to his dad.

40. However, there were times when Marc seemed depressed. These were times when he didn't have his normal energy. He would be real quiet and he would draw. He would be more introverted. These episodes of depression would last a day or more.

41. I liked it when Marc would draw. His work was beautiful. He wanted to move to Charlotte and become an architect.

42. I was often an instigator in our relationship and it would lead to fights. However, I understood Marc because he didn't feel the love from his parents, and I didn't have a good childhood family situation either. I remember my dad kicking us down the stairs.

43. Overall, the good in our relationship outweighed the bad. That's why I stayed with him. If Crystal hadn't come into the picture we'd still be together. It would have been rough but we'd have gotten better.

44. After Marc had left Newnan and was living in Charlotte, his mom let me know that Marc wanted to spend time with the kids. So I brought them up there for a visit. Marc and Sonia took care of them while they were up there. This was at their house on West Boulevard. During their visit Sonia called and let me know they both had chicken pox. I didn't have any concerns about the kids being properly cared for. I wouldn't have known what to do with chicken pox. They only came back with one or two little scars from the chicken pox. Sonia did a good job caring for them when they were sick.

Bates No. 254

45. Marc once called and gave me his girlfriend's number in case I wanted to reach him. This was Robin's number. I later called him at that number and he said to me, "What are you doing calling me at this number?" He was acting crazy. He asked, "How did you get this number?" I told him he'd given it to me. Marc did not remember this. This occurred right before Angelica started kindergarten because the reason I called Marc was to ask if he could help me pay for some of Angelica's school things.

46. Even though I have now been married for 14 years, if Marc was out tomorrow I'd be with him tomorrow. If all this had never happened Marc and I would be sitting on top of the world. I think we would be very successful and very loving of each other. We just needed to get past that stage of being young. He would have gotten less crazy as he got older. Marc did leave me and I got mad at him but this situation hurts more than anything. Marc now calls me and we cry together.

47. I testified at both of Marc's trials. Both times I was called to testify by the prosecutors. I prayed about it. I wanted to tell the truth but I also didn't want to hurt Marc with my testimony.

48. After the crime and after Marc was locked up, I remember talking to someone named Sindy. I don't remember talking to any mental health experts that were going to testify in either of Marc's trials.

49. I remember meeting a man and a woman at Applebee's in Newnan before the first trial. I was throwing newspapers at that time. I got a call and a man said he was a federal prosecuting attorney. I handed the phone to my husband but he gave it back to me when he learned it was about Marc's case. It was during this call that the attorney set up a meeting with me. We met at Applebee's and talked for a long time. Then we later had a meeting where they questioned me some more. I remember telling folks that all I found in the fridge at Marc's apartment in Lithonia was a wine bottle. There was no food in the house, only liquor bottles.

50. The kids and I visited Marc one time at the jail in Charlotte before his second trial. The kids were excited to see him. This was the first time they had interacted with Marc since they'd visited Charlotte that one time after he had left Georgia. We had to show I.D. when we got to the jail. Then they brought us to a visiting booth. We sat and talked to Marc. It was not long enough. We had some laughs but it was emotional. I was distraught and cried during the visit. Our kids were worried about me because I was crying and being emotional.

51. During the second trial, the prosecutor pulled me into a witness room to talk to me. The prosecutor asked me some questions and said, "Oh good," in response to some of my answers. I talked to the prosecutor for about 5-10 minutes. This was right before they called me to the stand. Then, when I was answering the prosecutor's questions on the stand in court, the prosecutor switched up and got upset at me.

Bates No. 205

52. I don't remember talking to the defense team at all before the second trial.

53. I was asked on the stand about Marc re-establishing contact with me after being out of touch for a long time. It was true that this had happened, but I didn't believe then – and I don't believe now – that it was something Marc did in an effort to look good for his trial. It was genuine on his part. Marc and I were so young when we got together and started a family. Despite our difficulties, Marc and I shared a deep bond and connection – and our relationship was not some stereotypical one where Marc was the terrible batterer and a monster. Marc had an incredibly sensitive and tender side to him, but it would compete with other aspects of his personality that made our relationship very turbulent. None of Marc's lawyers ever really understood that.

54. Even to this day, Marc and I – and our kids – have a relationship that is real and meaningful. Our daughter Angelica recently went to visit him and it went really ~~went~~ NT *well.*

55. I would have talked with any of Marc's attorneys or investigators or experts before the second trial if they had asked. I would have told them about all of the above information and would have testified about it in court, as well.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Netoshia M Tolbert_       _Sept 16, 2014_
Netoshia Tolbert             Date

Affirmed and subscribed before me on this the _16_ day of _Sept_ , ~~2013~~ 2014 in

_Coweta_ County, Georgia.

_Charles E Browne_
Notary Public

CHARLES E. BROWNE
NOTARY PUBLIC
Coweta County
State of Georgia
My Comm. Exp. April 5, 2018

My commission expires: _____

Bates No. 206

## Affidavit of John West

I, John West, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Charlotte, North Carolina.

3. I started dating Sonia Barnette in 1992 in Atlanta, Georgia, and we have been ~~dating~~ *in a permanent relationship* ever since. We currently live together in Charlotte.

4. Sonia's oldest child is Aquilia Marcivicci Barnette. People either call him Marc or Vicci.

5. Sonia and I first met in October or November of 1992. Somebody introduced me to her. Then I got stood up for a company party by someone else so I asked Sonia to go to the party with me and she came. After that we started dating.

6. Around January of 1993 Sonia informed me that she was pregnant. Around this same time my father passed away and I got separated from my second wife. I had a lot going on. In the spring of 1993 Sonia moved up to Charlotte, but I was still living down in Atlanta. Sonia and I were in a long distance commuting relationships for 2-3 years. We would see each other most weekends. I eventually moved to Charlotte to live with Sonia in May of 1996.

7. Our son, John McAllister West was born in late 1993. We call him John Mack.

8. When Marc and I first were getting to know each other, he asked me about my intentions with his mom. Marc told me he thought I was just going to be a temporary person in the family, but I told Marc I intended to stay together with Sonia.

9. Marc was also living there. However, I didn't see him too much because he spent most of his time upstairs in the loft area of the house. We often tried to get him out instead of just moping around the house. I also attempted to get Marc involved with the projects I was doing around the house. However, Marc didn't respond.

10. Sonia's father, Jesse Cooper, was also living in the house with us. He was not talkative. We called Jesse "The Sentry" because he was always up at night. It was like he was a guard on duty. He would sit on the patio and keep watch. Jesse slept on the sofa. He would take cat naps. He never went into a deep sleep. He would nap during the day because he was always up at night.

11. Jesse had been in the Korean War and he had shrapnel all over his body. We used to bring Jesse to the VA Hospital in Salisbury for his appointments and his medications.

12. Jesse was quiet and would often sit on the porch. Every Sunday he went to church. He would also go once or twice during the week. I can remember Jesse sitting on the sofa reading his bible. He was very religious. He would also read other books and watch TV. Jesse liked to watch the History Channel and the National Geographic Channel.

13. Jesse would go outside and investigate the property on a regular basis. While outside, he would often sit in one spot and crouch on his heels. He could sit in a crouch for at least a half hour. Jesse often wore a big overcoat. He wore this in the winter, but he sometimes wore it in the summer too.

14. Jesse was about 5'10" or 5'11" tall. He had about a 28 inch waist and weighed approximately 120-130 pounds. Jesse had an appetite but he wouldn't eat one big meal. Instead he would ration his food over the course of the day.

15. Jesse smoked cigars and drank beer. He called his beer his "tea." He drank every day. I remember picking up beer bottles in the woods that were Jesse's.

16. After Marc was locked up, I visited him at least once at the county jail in Charlotte. I believe I visited him right before his trial. Even since being locked up, Marc has been an important part of Sonia's life as well as our kids, John Mack and McKenzie.

17. Sonia's mother was murdered when Sonia was a teenager, and that's another extremely difficult thing she's had live with. Her mother, Pearl, is buried in Charlotte but Sonia has never gone to see her mom's grave site. She says she doesn't even know where it is.

18. If I had been asked to, I would have testified for Marc in the sentencing hearing of either of his capital trials. I would have been willing to share with the jury my knowledge of Marc, of Sonia, and of their family.


I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____
John West

8/23/14
Date

Affirmed and subscribed before me on this the 23rd day of August, 2014 in Mecklenburg County, North Carolina.

_____
Notary Public

My commission expires: _____1/20/16_____

Zachary Rowles
Notary Public
Durham County, NC

2