the defense and possibly a jury with relevant information about the defendant.

**FCI TERRE HAUTE**

V. Boyer

TC Henry (or TR Henry)

N. Thompson

Kathy Pierce

Mike Nally

Harley Lappin, Warden

F. Quintana

Mil Pill (?)

S. Vielle (or, Viello)

ET White      (telephone access record)

J. DeVore (Property Control)

RT Starbuck (Property Control)

Lt. RJ Troutman

R. Hines (or, D. Hines)

DR Neff

N. Wood

A.Genen (?)

E. Gonzalez

T. Miller

SD Stewart (Stine?)

K. Walker

O. Hoffman

T. Schaller (or, L. Schaller)

___ Phelps

E. Blut (?)

___ Goodin

___ Gregerson

T. Coleman (or, Colema)

D. Leht (?)

M. Smith

___ Russ

___ Macak

F. Hart

___ Franklin

___ Blubaun (Blubaum?)

___ Thompson

T. Carr

4

HB 000204

Bates No. 4796

___ Witucke

J. Hackett

Menzie Maura

D. Moore

R. Paris (or, D. Paris)

D. Holfhill

JW Butler

J. McCrack

___ Boland

___ Vaillencourt


SA Swaby, RN


Bill Elliott, Chief Psychologist


**FCI BUTNER**


Mitchell Sprinkle

J. Balm

K. McKeithan (or, K. McKeitten)

CM Hicks

Dr. Vance


**MECKLENBURG (VA)(state prison housing federal inmates)**


AM Gayles (Counselor)




Respectfully submitted on this the ____ day of April, 2002.




_____                    _____

Jean B. Lawson                                   Harold J. Bender

PO Box 472106                                    200 N. McDowell Street        Charlotte, NC 28247

Charlotte, NC 28204

(704) 341-1865                                    (704) 333-2169

ATTORNEYS FOR AQUILIA MARCIVICCI BARNETTE

5


HB 000205

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **Docket No. 3:97CR-23** |
| v. | ) | |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE | ) | |
| | ) | |

### DEFENDANT?S *EX PARTE* PROPOSED INITIAL CASE BUDGET AND MEMORANDUM IN SUPPORT

NOW COMES Aquilia Marcivicci (?Marc?) Barnette, by and through his undersigned counsel, and respectfully submit this Proposed Initial Case Budget and Motion to Certify Proposed Expenditures incorporating the defense Memorandum.   This submission is made pursuant to the Guidelines for Administration of the Criminal Justice Act.   Counsel respectfully request that this Court certify the budget as setting forth  ?reasonably necessary? expenses for this complex capital case.   In support of the proposed initial case budget and motion for certification, defendant respectfully shows as follows:

### REQUEST FOR *EX PARTE* PROCEEDING

1.      This motion discusses defense strategy and relates, in part, to communications to and from defense experts, investigators and specialists, requiring absolute confidentiality. Permission is therefore sought to submit this application *ex parte* and under seal of the Court.[1] It is noted further that this document is being submitted pursuant to the CJA Guidelines.   Those guidelines suggest that budget proposals be submitted *ex parte* and under seal.   *See* CJA Guidelines at  ?6.02 F, stating:  ?Courts are encouraged to require appointed counsel to submit

---

[1]   *See,* 21 U.S.C.  ?848(q)(9).

HB 000206

(*ex parte*) a proposed initial litigation budget ...?.   In the report submitted by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States[2] [hereinafter Spencer Subcommittee Report], the recommendations of which were adopted by the Judicial Conference of the United States on September 15, 1998,   it is specifically recommended that   ?Case budgets should be submitted *ex parte* and should be filed and maintained under seal.?[3]   If this Court does not accept this application on an *ex parte* basis, under seal, it is requested that all moving papers be returned to defense counsel for further consideration of appropriate action.

## BACKGROUND

2.       This application is brought pursuant to the Fifth, Sixth and Eighth Amendments to the United States Constitution.[4]   The CJA Guidelines also provide, at   ?6.03(B), as follows:

> If it can be anticipated that the payments for investigative,
> expert, and other services will exceed the statutory maximum,
> advance approval should be obtained from the Court and the
> Chief Judge of the Circuit (or an active Circuit Judge to whom
> the Chief Judge has delegated this authority).

3.       Marc Barnette has been convicted in this case of Carjacking Resulting in Death in violation of 18 USC 2119(3); Use of a Firearm in Carjacking resulting in Death in violation of 18 USC 924(c ) and (j); and Use of a Firearm in Commission of an Act of Domestic Violence resulting in Death, in violation of 18 USC 924(c) and (i).   At his sentencing hearing, the jury recommended that Marc Barnette be sentenced to death on each of the three convictions.   The Fourth Circuit Court of Appeals has remanded the case to this Court for re-sentencing.   On July 30, 2001, the US Attorney filed Notice of Reaffirmation of Intention to Seek the Death Penalty.

---

[2]   FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF REPRESENTATION, (May 1998).
[3]   *Id.,* pg. 53, para. 9e.
[4]   *See* 21 U.S.C.   ?848(q)(10)(B).

2

HB 000207

Bates No. 4799

As part of the justification for this Initial Proposed Case Budget, the undersigned incorporate the Defendant?s *Ex Parte* Statement of Defense Contentions, filed herein on August 30, 2001.

## MEMORANDUM IN SUPPORT

Effective April 24, 1996, 21 U.S.C. ?848(q)(4)-(10) was amended as one part of the larger legislative package known as the Anti-terrorism and Effective Death Penalty Act. The statute, as amended, provides procedures for assuring adequate representation and furnishing other services related to the defense of complex capital cases. The statute provides, in relevant part, as follows:

(9)    Upon a finding that investigative, expert, or other
services are reasonably necessary for the representation
of the defendant, whether in relation to issues relating
to guilt or the sentence, the court may authorize the
defendant?s attorneys to obtain such services on behalf
of the defendant and, if so authorized, shall order the
payment of fees and expenses therefor...
21 U.S.C. ?848(q)(9).

The statute further sets a threshold of $7,500 ? *apparently* meant to encompass all investigative, expert and other assistance, including expenses ? beyond which compensation and expenses (excluding counsel fees) must be certified as ?reasonably necessary? by the trial judge and approved at the Circuit level by the Chief Judge of that body. In this particular regard, the statute provides:

(10)(B)    Fees and expenses paid for investigative, expert, and
other reasonably necessary services authorized under
paragraph (9) shall not exceed $7,500 in any case,
unless payment in excess of that limit is certified by
the court ... as necessary to provide fair compensation
for services of an unusual character or duration, and the
amount of the excess payment is approved by the chief
judge of the circuit. The chief judge of the circuit may
delegate such approval authority to an active circuit

3

HB 000208

Bates No. 4500

judge.[5]   21 U.S.C.   ?848(q)(10)(B).

5.      For the following reasons, it is vital that this proposed budget for investigative, expert and other services, be approved by this Court.   The Spencer Subcommittee Report recognized the importance of experts and investigators in preparation for both the guilt and penalty phases of a capital case.[6]   According to the Coopers & Lybrand study cited by the Spencer Subcommittee, payments to experts are a substantial component of defense costs in federal death penalty cases, amounting to about 19% of payments for representation in federal capital cases for FY 1997.[7]   In further support of the necessity of mitigation investigation, counsel note that in 1983 Professor Gary Goodpaster published an article entitled:   ?The Trial For Life: Effective Assistance of Counsel in Death Penalty Cases,? 58 N.Y.U.L. Rev. 299 (1983).   In the article, Professor Goodpaster discussed the role of the advocate in a death penalty case in the following terms:

> As an advocate, ...defense counsel has the related but
> distinct function of attempting to persuade the jury to
> exercise mercy.   Defense counsel therefore has both
> the opportunity and the duty to present potentially
> beneficial mitigating evidence and to attempt to convince
> the sentencer that, notwithstanding the defendant?s guilt,
> he or she is a person who should not die.   Once the defendant
> has been found guilty of a capital crime, a life sentence is
> counsel?s only remaining advocacy goal.   As an advocate
> for life, counsel must attempt to demonstrate that
> mitigating factors outweigh aggravating factors and must

---

[5]   Prior to the April 1996 amendment, district court judges were permitted to approve expert, investigative and other services in death penalty cases at any level the court believed was ?reasonably necessary? to the defense.   There was no provision for circuit review or oversight of such approvals.

[6]   *Spencer Subcommittee Report*, at page 21.

[7]   The Spencer Subcommittee Report notes that the 19% figure may understate the total spending on expert and investigative services because some of these costs are included as reimbursable expenses on attorney vouchers, rather than in separate vouchers submitted by the expert or investigator.   *See*, *Spencer Subcommittee Report*, at page 22.

4

HB 000209

Bates No. 4501

> present the sentencer with the most persuasive possible
> case for mercy.

58 N.Y.U.L. Rev. at 318.   In his article, the author also outlined the steps an attorney handling a case should follow, including the absolute duty of trial counsel  ?to investigate the client?s life history, and emotional and psychological make-up, as well as the substantive case and defenses?, noting further that  ?  ?The importance of this investigation, and the thoroughness and care with which it must be conducted, cannot be overemphasized.?   *Id.* at 324.    In describing the nature of such an investigation, Professor Goodpaster emphasized that it is both difficult and time-consuming:

> Such investigations present more obstacles than those
> conducted in furtherance of an ordinary criminal defense,
> primarily because of the difficulty in locating relevant
> witnesses.   Over the years, the witnesses who are
> acquainted with the defendant are likely to have become
> geographically dispersed and more difficult to trace than
> guilt-phase witnesses. Indeed, constructing a mitigating
> case on the basis of the life-history investigation is perhaps
> best viewed as a successive winnowing process: the attorney?s
> investigator tracks down all mitigating leads; the attorney
> next interviews the most promising contacts and then chooses
> to call some of them at the penalty phase of the trial in
> accordance with a coherently developed strategy.   *Id.*

In 1989, the American Bar Association promulgated guidelines for counsel in death penalty cases.   In doing so, the ABA set forth the following about penalty-phase preparation:

<u>GUIDELINE 11.8.6 THE DEFENSE CASE
AT THE SENTENCING HEARING</u>

Counsel should present to the sentencing entity or entities
> all reasonable available evidence in mitigation unless there
> are strong strategic reasons to forgo some portion of such
> evidence.

Among the topics counsel should consider presenting are:

5

HB 000210

Bates No. 4502

Medical history (including mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays);

Educational history (including achievement, performance and behavior), special education needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof;

Military service (including length and type of service, conduct, and special training);

1. Employment and training history (including skills and performance, and barriers to employability);

2. Family and social history (including physical, sexual and emotional abuse, neighborhood surroundings and peer influence); and other cultural and religion influences, professional intervention (by medical personnel, social workers, law enforcement personnel, clergy or others) or lack thereof; prior correctional experience (including conduct on supervision and in institutions, education or training, and clinical services);

3. Rehabilitative potential of the client;

4. Record of prior offenses (adult and juvenile), especially where there is no record, a short record, or a record of non-violent offenses.

5. Expert testimony concerning any of the above and the resulting impact on the client?s potential at the time of sentencing.

6. Counsel should consider all potential methods for offering mitigation evidence to the sentencing entity or entities, including witnesses, affidavits, reports (including, if appropriate, a defense pre-sentence report which could include challenges to inaccurate, misleading or incomplete information contained in the official pre-sentence report and/or offered by the prosecution, as well as information favorable to the client),

6

HB 000211

Bates No. 4503

letters and public records.

7.        Counsel may consider having the client testify or speak during
the closing argument of the sentencing phase.

*ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (ABA 1989).* In the present case, the assistance of qualified mitigation specialists who can address the unique issues in this case, including the prior convictions and the death sentences previously imposed is, at the very least, ?reasonably necessary? to the preparation of this case. It is counsels? view that without the resources requested, it is likely that Mr. Barnette will be sentenced to death again.

6.        Death is fundamentally different from all other forms of punishment. The principle that death is different pervades death penalty jurisprudence.[8] As the Supreme Court emphasized in Gardner v. Florida, 430 U.S. 349 (1977):

> [D]eath is a different punishment from any other which may be imposed in this country. ...From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens differs dramatically from any other state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

*Id.* at 357-58. Because is uniquely different in its finality and severity, increased scrutiny is required at every step of the capital process to ensure that death is the appropriate penalty. ?[T]he qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.? Caldwell v. Mississippi,

---

[8] Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (?Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.?); ?The ?unique? nature of modern capital sentencing proceedings ...derives from the fundamental principle that death is ?different?.? Schiro v. Farley, 114 S.Ct. 783 (1994).

7

HB 000212

472 U.S. 320, 329 (1985).[9]   As the Third Circuit has observed,  ?The sentencing phase of a death penalty trial is one of the most critical proceedings in our criminal justice system.   It is *clearly* the most critical proceeding from the standpoint of the defendant whose life is at stake.?  Lesko v. Lehman, 925 F.2d 1527 (3rd Cir. 1991).   As counsel for Mr. Barnette, it is our goal and obligation to present on his behalf a forceful, well-conceived, and adequately supported argument in opposition to government?s pursuit of the death penalty.   See   Zettlemoyer v. Fulcomer, 923 F.2d 284, 316 (3rd Cir. 1991) (Sloviter, Cir. J., dissenting).   Having accepted the responsibility of attempting to save the life of another human being, defense counsel require the tools needed to build the case for life.   Defense counsel never want to find themselves in the position of having a court ponder whether a more thorough or effective job on counsel?s part might have saved the client?s life.   *See, e.g.,* Chief Judge Sloviter?s observation in   *In re Zettlemoyer*, 53 F.3d 24, 26 n.2 (3rd Cir. 1995) (?[I]n other counsel?s hands, such as those who have sought to pursue this petition for *habeas corpus*, the sentence may well have been different.?

## INITIAL PROPOSED LITIGATION BUDGET

1.      Mindful of the above principles, counsel propose the following budget covering the period from the date of appointment of counsel and including the sentencing portion of this case. The budget is a good faith estimate based on available information.   This excludes payments made, or to be made, to Claire Rauscher, former attorney for the defendant, and any interim payment to Jean Lawson for work done prior to December 11, 2001.

### ATTORNEY HOURS

---

[9]   The principle that death is different requires a   ?heightened standard of reliability? in the entire process of the decision to impose death in an individual case.   Ford v. Wainwright, 477 U.S. 399, 411 (1986).   This heightened standard of reliability is   ?[t]he natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties: that death is different.?   *Id.*

8

HB 000213

Bates No. 4905

The estimate covers the detailed review of discovery materials; reading and preparing summaries of the transcript of the defendant?s first trial and sentencing hearing; contacting and hiring (as necessary) a fact investigator, mitigation specialist, mental health experts, neuropsychologist, neurologist, psychiatrist and other specialists.   Also covered is consultation time with the client, as well as consultation with co-counsel, investigators, witnesses, and experts. Counsel will have to prepare as if for a full guilt-innocence trial in order to meet the government?s case on aggravation.   Travel time related to the case is included in this estimate. It is also contemplated that during this time frame counsel will research and prepare pretrial motions that will require extensive research.   Time will also be consumed in consultation with Federal Death Penalty Resource Counsel.

The government predicts that trial will last six weeks.   This budget item includes time expended in a six-week trial.

4,136 hours @ $125.00 per hour                                                      $ 517,000

## FACT INVESTIGATOR

Extensive investigative services will be necessary.     In addition to the Defendant?s *Ex Parte* STATEMENT OF DEFENSE CONTENTIONS, counsel incorporate the Defendant?s *Ex Parte* MOTION FOR AUTHORIZATION TO RETAIN A PRIVATE INVESTIGATOR, filed herein on August 31, 2001 in support of this budget item.

100 hours at $75.00 per hour, plus expenses                                   $ 10,000

## MITIGATION SPECIALIST

The mitigation specialist is a critically important member of the defense team who will work closely with counsel throughout all phases of the case, including the actual sentencing proceeding.    The *EX PARTE* STATEMENT OF DEFENSE CONTENTIONS and the *EX PARTE* MOTION FOR APPOINTMENT OF, AND FUNDS FOR, A MITIGATION SPECIALIST, filed herein on August 30, 2001, are incorporated herein as detailed background in support of this budget item.

300 hours at $100.00 per hour                                                        $30,000

## EXPERT IN DOMESTIC VIOLENCE

9

HB 000214

Bates No. 4906

At this time, counsel have formulated an approach to sentencing that incorporates a significant body of research and expertise in the nature of domestic violence, including the causes, manifestations and mitigation issues relating to that subject.   The services of the expert in domestic violence are the focal point of the defense case and all other experts will develop their evaluations starting from the domestic violence context of these crimes.

75 hours at $200 per hour                                                                              $15,000

## PSYCHIATRIC EVALUATION WITH PSYCHOLOGICAL AND NEUROPSYCHOLOGICAL TESTING

In every capital case it is absolutely necessary to begin with a psychological evaluation and testing. Using a neuropsychologist to do the testing can be cost efficient because the neuropsychologist will conduct a battery of tests that would include tests designed to test the possibility of any organic brain damage. Only if the neuropsychological battery suggests such a possibility would counsel come back with a request for funding of a full neurological examination.   The neuro-psychologist can also conduct the routine psychological work-up that is normally completed prior to the psychiatric evaluation that must be conducted on issues of competency, criminal responsibility, impaired capacity[10], disturbance[11], and other mental health related factors[12].

Psychiatric Evaluation:                    $15,000
Psychological Evaluation:                     8,000

---

[10]   18 U.S.C.  ?3592 (a)(1).   This is a statutory mitigating factor that must be explored. The standard is  ?significant impairment?, which is a substantially lower level of impairment than would be required to constitute a defense to the charges.

[11]   18 U.S.C.  ?3592(a)(6).   If the defendant committed the offense under severe mental or emotional disturbance, counsel is required to present that evidence as a statutory mitigating factor.

[12]   18 U.S.C.  ?3592(a)(8) requires counsel to explore all other factors in the defendant?s background, record, or character or any other circumstance of the offense that mitigate against the imposition of the death sentence.

10

HB 000215

Bates No. 4907

| Neuropsychological Evaluation | 8,000 | $31,000 |
|---|---|---|

## CONSULTATION WITH EXPERTS AND PERSONNEL WHO HAD CONTACT WITH THE DEFENDANT PRIOR TO THIS SENTENCING PROCEEDING

Many professionals, primarily mental health professionals, have had contact with the defendant, including prior to the commission of these crimes, as well as during preparation for the first sentencing hearing.   Counsel must interview each and every one of these individuals at length, regardless of whether they are used as witnesses or not.   To that end, these individuals must gather all the materials relating to their first contact with this case, prepare to meet with

defense counsel (and, possibly, new experts involved in the case), review their findings and discuss the case.   All of these individuals will require payment for their time, and will likely incur, and bill, costs for duplicating extensive records.

*NOTE:   Some of these experts? fees are covered in other items in this budget.   To the extent a former expert is interviewed and selected to assist in the defense in this re-sentencing, the charges for this initial consultation will reduce the amount allocated for that expert in the overall budget.   Thus, there will be no duplicate billing.*

Consultations:                                                                              $24,000

## CONSULTATIONS WITH PRIOR COUNSEL FOR THE DEFENDANT

The defendant has been represented by five attorneys prior to this resentencing. In exercising due diligence, counsel must interview these attorneys to determine whether they have relevant information about the defendant.   In order to prepare for meaningful meetings with defense counsel, these attorneys will have to, at a minimum,   review their files and pertinent trial transcripts.   All these attorneys will require payment for their time.

Consultations with prior counsel:                                          $ 5,000

## MEDICAL TESTING AND EVALUATION

Based upon review of the case and defense preparation records contained in former defense counsels? files, the undersigned reasonably believe that several significant medical (as opposed to psychological, neuropsychological and psychiatric tests) will be necessary and,

11

HB 000216

Bates No. 4908

therefore, include them in this budget.   Among those tests will be a MRI, an EEG and a PET scan, which must be performed in a hospital or clinic.   Accordingly, this budget includes allocations for transport and security for the defendant, as well as interpretations of the results of the tests by appropriate experts, such as radiologists and neurologists.   In addition, some DNA testing will likely be necessary.   This budget item includes the cost of the testing and interpretation of the results.

Medical Testing and Evaluation                                          $15,000

## JURY CONSULTANT

The assistance of a trained and experienced Jury Consultant is an acknowledged benefit to a person of means in both civil and criminal litigation.   The consultant can help formulate jury questionnaires, develop juror profiles, and assist in the actual selection of a jury.   The *EX PARTE*   STATEMENT OF DEFENSE CONTENTIONS and the *EX PARTE* MOTION FOR APPOINTMENT OF, AND FUNDS FOR, A JURY SELECTION EXPERT, are incorporated herein as detailed background in support of this budget item.

Flat rate:                                          $40,000

## BUREAU OF PRISONS EXPERT

At Marc Barnette?s first sentencing hearing, the government successfully prevented the defense from introducing evidence of US Bureau of Prisons facilities as being sufficient to contain the defendant .   The government contended that the only appropriate witness for that purpose would be a person directly connected to the Bureau of Prisons, who could be qualified as an expert on those facilities as well as an expert in placement of convicts in those prisons.   In anticipation of making such a presentation, counsel believe it is reasonably necessary to confer with and, possibly, retain such an expert.

BOP expert:                                          $ 2,000

## PHOTOCOPYING & POSTAGE

Copies will be made at the lowest possible rate considering time constraints.

Counsel may very well have need to duplicate additional sets of discovery as well as significant portions of the transcript of testimony from the defendant?s first trial and sentencing hearing.   In addition, counsel must provide experts with sufficient data obtained from other

12

HB 000217

Bates No. 1909

sources, such as from the mitigation specialist and professionals who have performed testing and/or evaluation of the defendant in the past.   In addition, from the transcript of the first trial, there was significant testimony and cross-examination about studies (such as the Hare Psychopathy Index) for which current counsel must prepare.   Counsel will have to be thoroughly familiar with the studies and literature in several disciplines and prepared for examination or cross-examination with copies of these treatises and studies.

To the extent the defense in the defendant?s previous sentencing proceeding did not obtain certain medical and school records, defense counsel will also have to pay for those records.   We will have to obtain and copy records and distribute additional copies to experts. Mailing of documents and records certain to be required.   We will also need to obtain photocopies directly from courts regarding past criminal conduct and/or convictions of various potential government witnesses.

In addition to the costs normally associated with gathering records to prepare for defense mitigation presentation, counsel will also need to obtain documents from the federal Bureau of  Prisons concerning the defendant?s course in Prison including on Death Row in Terra Haute, IN.

Copying and Postage                                                                $ 6,000

## TRIAL AIDS

It may be necessary for counsel to generate charts, audio and video tapes, have documents enlarged or make evidentiary presentations that require equipment or the assistance of a professional to make.   Certainly the government has access to this assistance and the interests of justice may well require that the defense have this capacity.

Trial Aids                                                                $ 2,000

## COLLECT TELEPHONE, LONG DISTANCE CHARGES AND FAX EXPENSE

The only telephone to which the defendant has access is that at the Mecklenburg County Jail.   All his calls to counsel must be collect, and counsel should be in a position to accept collect calls of reasonable duration and frequency.   Counsel must consult with witnesses, investigators and experts by fax and telephone.   Counsel will also be in long distance telephone contact with Resource Counsel in South Carolina, Kentucky and Texas.

Telephone Costs:                                                                $1,500

13

HB 000218

Bates No. 4810

**TRAVEL**

*NOTE:   Travel costs for experts are included in their budget line items.*

The undersigned anticipate that they will have to travel at least once to each of Virginia, Pennsylvania, Georgia, Florida, South Carolina, Butner, North Carolina and Terra Haute, Indiana to prepare for this sentencing hearing.   This budget estimate is very tentative and subject to variables such as the actual cost of airline tickets at the time of travel and any additional trips that the mitigation investigation should disclose are necessary.   However, counsel believe that the trips to South Carolina and Butner, North Carolina can be made by car, so estimate $300 for mileage costs.   Assuming the average round-trip airfare at government rates for the remaining five travel destinations is $500 per ticket, counsel estimate those travel costs to be $5,000 plus $500 for car rental and $600 for per diem.   Under these circumstances, counsel estimate up to $8,500 for this line item.

Travel Costs:                                          $8,500


## BUDGET RECAP


| | |
|---|---|
| **Appointed Counsel** | **$517,000** |
| **Fact Investigator** | **10,000** |
| **Mitigation Specialist** | **30,000** |
| **Expert in Domestic Violence** | **15,000** |
| **Psychiatric Evaluation with Psychological and Neuropsychological Testing** | **31,000** |
| **Consultation with experts and professionals who were involved with the Defendant prior to this sentencing** | **24,000** |
| **Consultation with prior counsel for the Defendant** | **5,000** |
| **Medical Testing and Evaluation** | **15,000** |
| **Jury Consultant** | **40,000** |
| **Bureau of Prisons Expert** | **2,000** |

HB 000219

Bates No. 4911

| | |
|---|---|
| **Photocopying and Postage** | **6,000** |
| **Trial Aids** | **2,000** |
| **Collect, Long Distance Charges and Fax Expense** | **1,500** |
| **Travel** | **5,400** |
| **TOTAL:** | **$ 703,900** |

### CONCLUSION

Wherefore, for all of the reasons listed above, counsel request that this Court promptly enter an order that Defendant?s Proposed Case Budget is reasonably necessary for the representation of Marc Barnette.

Respectfully submitted on this the _____ day of January, 2002.


_____                              _____
Jean B. Lawson                                            Harold J. Bender
PO Box 472106                                             200 N. McDowell Street
Charlotte, NC 28247                                       Charlotte, NC 28204
(704) 341-1865                                            (704) 333-2169

ATTORNEYS FOR AQUILIA MARCIVICCI BARNETTE

15

HB 000220

Bates No. 4912

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Docket No.    3:97CR-23 |
| v. | ) | |
| | ) | *EX PARTE* ORDER AUTHORIZING |
| AQUILIA MARCIVICCI BARNETTE, ) | EXPERT IN    DOMESTIC VIOLENCE | |
| | Defendant.    ) | |
| _____ ) | | (UNDER SEAL) |

THIS MATTER is before the Court on defendant's *EX PARTE* Motion for Authorization to hire an expert in Domestic Violence.

Based upon the information before the Court, the undersigned finds:

1.    That the defendant is indigent.

2.    That the defendant received three death sentences in this case in 1998.    The Fourth Circuit Court of Appeals has remanded his cases to this Court for resentencing.    New counsel have been appointed for the defendant.

3.    That the defense has established to the satisfaction of this Court that the defendant is entitled to the services of an expert in Domestic Violence to assist in this case.    Defense counsel have requested the authority to hire Dr. Ann Burgess to serve in this capacity.    Her fee is $200 per hour and counsel reasonably believe that she will have to spend approximately 50 hours in order to do the work necessary in this case and that an allocation of $15,000 for her fees and expenses is appropriate.

4.    The fees requested by the defense are reasonable and appropriate in this case and the defendant's request for relief should be granted, pursuant to 18 U.S.C. 3006(a), 21 U.S.C. 848(q)(10)(B) and

HB 000221

Bates No. 4913

the Fifth, Sixth and Eighth Amendments to the Constitution of the United States.

IT IS, THEREFORE, ORDERED that the defendant's *EX PARTE* Motion for Authorization to Hire an

Expert in Domestic Violence is GRANTED. The defendant's counsel are authorized to retain the services of

Dr. Ann Burgess, at government expense, at the rate of $200 per hour with a cap of $15,000, pending any

further order of the Court.

This the _____ day of February, 2002.

_____

**Richard L. Voorhees**
**US District Court Judge**

Bates No. 4914

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Docket No.    3:97CR-23 |
| v. | ) | |
| | ) | **UNDER SEAL** |
| AQUILIA MARCIVICCI BARNETTE, | ) | |
| Defendant | ) | (*EX PARTE*) |
| _____ | ) | |

## DEFENDANT'S EX PARTE REQUEST FOR TRAVEL AUTHORIZATION FOR COURT-APPROVED DEFENSE EXPERT

**NOW COMES** the defendant, by and through counsel, and respectfully requests that the Court issue a travel authorization for unlimited travel for defense expert DR. ANN BURGESS who must travel from Boston, MA and Charlotte, NC at least twice between this date and the start of trial on July 15, 2002.    Her trips are reasonably necessary to the defense of this case in which the defendant is indigent and faces capital re-sentencing.    The Court has previously authorized the defense to retain Dr. Burgess' services as an expert in domestic violence.

**WHEREFORE**, counsel respectfully requests that the Court direct the Clerk to authorize DR. ANN BURGESS to travel at government rates between Boston, MA and Charlotte, NC from the date of the Order through and including August, 2002, when she is providing services in this case.

Respectfully submitted on this the _____ day of June, 2002.

_____          _____

HB 000223

Bates No. 4915

Harold J. Bender                                     Jean B. Lawson
200 N. McDowell Street                               PO Box 472106
Charlotte, NC 28204                                       Charlotte, NC 28247
(703) 333-2169                                          (704) 341-1865

ATTORNEYS FOR AQUILIA MARCIVICCI BARNETTE

HB 000224

Bates No. 4916

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Docket No.   3:97CR-23 |
| v. | ) | |
| | ) | **UNDER SEAL** |
| AQUILIA MARCIVICCI BARNETTE, | ) | |
| Defendant | ) | (*EX PARTE*) |
| _____ | ) | |

### ORDER AUTHORIZING TRAVEL AT GOVERNMENT RATED FOR COURT-APPROVED DEFENSE EXPERT

**THIS MATTER** came on before the undersigned United States District Court Judge on the written, *ex parte*

application of the defendant for an order authorizing Dr. Ann Burgess, the defense domestic violence expert, to have

unlimited travel between Boston, MA and Charlotte, NC between now and the end of August, 2002 when she is

performing work in this case.

It appears to the Court that it is reasonably necessary for Dr. Burgess to undertake this travel and it is

therefore ORDERED that the Clerk will issue a travel authorization for Dr. Burgess for travel between Boston, MA and

Charlotte, NC, as Dr. Burgess requests it, between now and the end of August, 2002.

This the _____ day of June, 2002.

_____
Richard L. Voorhees
United States District Court Judge

HB 000225

Bates No. 4317

UNITED STATES OF AMERICA )
) Docket No. 3:97CR-23
v. )
)
AQUILIA MARCIVICCI BARNETTE, )
Defendant )
_____)

**MOTION TO SUPPRESS PRIOR CONVICTION**

**NOW COMES** the defendant, by and through counsel, and hereby moves this Court to suppress the

following convictions for the reason set forth below:

Docket No. 92-0957, Discharging a Firearm in the City of Newnan, Coweta County, Georgia;

Docket No. 92-0958, Battery, City of Newnan, Coweta County, Georgia; and

Docket No. 92-0960, Pointing a Gun at Another, City of Newnan, Coweta County, Georgia.

In support of this Motion, the undersigned direct the Court's attention to, and adopt and incorporate by

reference, the defendant's Motion to Suppress Prior Convictions, filed on September 24, 1997, and further direct the

Court's attention to the issue in light of the United States Supreme Court opinion in Alabama v. Shelton, ____ U.S. ____,

122 S.Ct. 1764 (decided May 20, 2002).

Respectfully submitted on this the _____ day of June, 2002.

_____          _____

Jean B. Lawson                              Harold J. Bender
PO Box 472106                               200 N. McDowell Street        Charlotte, NC 28247
                          Charlotte, NC 28204
(704) 341-1865                              (704) 333-2169

ATTORNEYS FOR AQUILIA MARCIVICCI BARNETTE

HB 000226

Bates No. 4918

UNITED STATES OF AMERICA        )

                           )        Docket No.    3:97CR-23

         v.              )

                           )        **UNDER SEAL**

AQUILIA MARCIVICCI BARNETTE,  )

        Defendant          )

_____)

NOW COMES the defendant Aquilia Marcivicci Barnette (hereinafter, "Marc" Barnette) and respectfully requests leave of the Court to retain the services of a second Mitigation Consultant to assist in the preparation and presentation of the defense case at the re-sentencing proceeding scheduled for July, 2002. Counsel do not contemplate exceeding the budget amount for mitigation investigation of $30,000, but the work is so complex that a second person is needed to complete the work by trial time.

Accordingly, counsel respectfully request that the Court authorize them to retain the services of Pamela Laughon as a mitigation consultant, to be paid at the rate of _____ per hour, plus her reasonable expenses.

The Court has already allocated $15,000 of the budgeted $30,000 for the services of Cessie Alfonso. The undersigned request that the court authorize the balance of the $30,000 and allow the defense to bill both mitigation consultants inside that total budget.

Respectfully submitted on this the _____ day of April, 2002.

_____          _____

Case 3:12-cv-00327-MOC    Document 76-19    Filed 12/22/14    Page 24 of 122

Bates No. 4919

Harold J. Bender  
200 N. McDowell Street  
Charlotte, NC 28204  
(704) 333-2169

Jean B. Lawson  
PO Box 472106  
Charlotte, NC 28247  
(704) 341-1865

ATTORNEYS FOR AQUILIA MARCIVICCI BARNETTE

HB 000228

Bates No. 4920

| | |
|---|---|
| 286 | Qualifications and credentials |
| 287 | My work has been limited to forensic psychiatry, and a small private practice for a few years |
| 289 | So, I spend half my time on prevention and half my time dealing with cases where that event has already happened |
| 290 | I have focused on several areas, including sex offenses and unusual sexual conduct and I have done a series of studies looking at individuals whose sexual behavior causes them to harm other people. I have quite a bit of experience working on sexual homicides and sexual torture |
| 290 | To a very limited degree, my experience in working on sexual homicides comes from treating the offenders, which I did earlier in my career |
| 291 | Knows DSM and had involvement in authoring three sections: delusional disorder, impulse control and paraphilias, which is sexual deviations |
| 292 | DSM is not designed for forensic use. It's designed for clinicians and for insurance companies |
| 293 | Explains subdural and epidural hemorrhage |
| 296 | Spent the better part of a day with defendant; did routine examination |
| 297 | It is my standard practice to become familiar with the facts of a case before I meet the defendant so I will be in a position to ask sensible questions and to be able to judge whether or not I am being told the truth. |
| 300 | Describes PTSD; amnesia is not part of PTSD although people who have been through serious trauma have times they don't recall. That's from a "separate co-incidental" problem. |
| 303 | The next thing that happens in evaluation is that I take a life history, personal, family, work experience, school. I have them tell me everything in a spontaneous account analog [sic?monologue]; then I go back, ask questions and confront them with inconsistencies |
| 304 | Sometimes I do a formal mental status evaluation |
| 305 | Distinguishes hallucination from illusion |
| 307 | Seeing things is rare (discussing hallucinations). There can be hallucinations of every sense: taste, smell, touch, hearing and sight. I've just never heard of a case that had all five. |
| 308 | Dietz says his opinions fall into two categories: Diagnosis (which, in this case are Anti-social Personality Disorder, Sexual Sadism and Fetishism (meaning "he's sexually stimulated by inanimate objects and mens' socks and probably ace bandages, too). And that he was malingering. |
| 309 | Explains how defendant meets criteria of ASPD, gives examples |
| 312 | If a person believes he is hearing something but can't make out the words, or he thinks a person is over there and he isn't, this can happen from Marijuana smoking |
| 315 | ASPD, like any personality disorder, does not rise to the level of being a |

| | |
|---|---|
| | mental disease or illness.  It's a pattern of bad behavior, a maladaptive way of relating to the world. |
| 315 | The only possible relationship between head injury and this conduct is that the head injury can, in fact, make people more irritable, aggressive |
| 317 | I teach residents in psychiatry that ASPD used to be called sociopaths and, before that, psychopaths.  Hollywood had people using the term psychopath to mean really crazy;  it's not crazy, "it's bad, and even before this it was called evil". |
| 318 | Psychiatrists are trying to come to grips with the behavior and to understand why people are – some people are bad again and again.  We do have some understanding of how people get this way. |
| 319 | Discusses sexual sadism |
| 321 | Discusses serial sexual sadistic offender |
| 324 | I have been an expert witness in cases that include serial sexual homicide cases including Joel Rifkin in New York; Art Shawcross in New York; Jeffrey Dahmer in Milwaukee |
| 325 | I have studied 50 sadistic offenders |
| 325-6 | It is a common practice to understand prior similar behavior |
| 326 | "If one wishes to understand the sexual deviation, one wants to know its course over the life history of the subject, rather than a merely a single point in time and, in fact, in order to make the diagnosis one wishes to see a continuing proclivity for the same behavior so that it isn't just a whim or experiment, but rather a continuing, on-going desire". |
| 329 | Fetishism defined |
| 333 | Fetishism, like sexual sadism, is a perversion |
| 334 | Malingering is our medically polite way of saying faking |
| 334 | We are taught to suspect malingering in particular circumstances including anti-social personality disorder—we know that people with that pattern very often pretend to be mentally ill |
| 337 | When defendant makes statements against his self-interest, that carries greater weight than statements that can be self-serving |
| 337 | Begins recitation of facts to show defendant responsible and knew the difference between right and wrong:  told victim to be quiet, so he knew it was wrong to kidnap him, etc. |
| 345 | People said defendant looked normal or a little anxious at the time the crime was going on--  "So, what we have here is episodes of torture interspersed with episodes of normal behavior, precisely as we expect to see in people with the diagnosis that I've rendered"…An individual with a personality disorder and perverted is capable of behaving completely normal because there is nothing influencing their ability to do this… |
| 346 | CROSS |
| 346 | Dietz worked for the prosecution in Hinckley, who has been in an institution for 15 years. |
| 347 | Does not specialize in brain trauma |
| 353 | Q.  Doctors aren't perfect in their diagnoses? A.  That is true. |
| 355 | Since the DSM-3, the level of reliability has vastly improved.  It's an |

HB 000230

Bates No. 1922

|  | |
| --- | --- |
|  | effort to further refine the diagnosis and bring new technological advances to bear. |
| 357 | Real amnesia doesn't come and go quickly |
| 358-9 | Attorney trying to get Dietz to agree that man who says he's trying to bend broken legs to repair them is having "illogical thoughts"; Dietz responds that, "I knew it was a lie because he knows well enough that he's not going to fix them"—so, it seems that illogical thoughts are lies in Dietz parlance. |
| 362 | REDIRECT |
| 366 | Dietz has seen lists of "appealing possible victims" in cases all over the country. |

HB 000231

Bates No. 4923

# *MARC BARNETTE*

# <u>CORRECTIONS OFFICERS</u>

FCI TERRE HAUTE

V. Boyer
TC Henry (or TR Henry)
N. Thompson
Kathy Pierce
Mike Nally
Harley Lappin, Warden
F. Quintana
Mil Pill (?)
S. Vielle (or, Viello)
ET White  (telephone access record)
J. DeVore (Property Control)
RT Starbuck (Property Control)
Lt. RJ Troutman
R. Hines (or, D. Hines)
DR Neff
N. Wood
A.Genen (?)
E. Gonzalez
T. Miller
SD Stewart (Stine?)
K. Walker
O. Hoffman
T. Schaller (or, L. Schaller)
___ Phelps
E. Blut (?)
___ Goodin
___ Gregerson
T. Coleman (or, Colema)
D. Leht (?)
M. Smith
___ Russ
___ Macak
F. Hart
___ Franklin
___ Blubaun (Blubaum?)
___ Thompson
T. Carr
___ Witucke
J. Hackett

HB 000232

Bates No. 1324

Menzie Maura
D. Moore
R. Paris (or, D. Paris)
D. Holfhill
JW Butler
J. McCrack
___ Boland
___ Vaillencourt

SA Swaby, RN

Bill Elliott, Chief Psychologist

## BUTNER

Mitchell Sprinkle
J. Balm
K. McKeithan (or, K. McKeitten)
CM Hicks
Dr. Vance

## MECKLENBURG (VA)

AM Gayles (Counselor)

HB 000233

Bates No. 4925

| 2 | Defendant not cooperating with evaluation because doesn't want to talk about offense history (case has potential insanity claim); also refused to complete the MMPI |
|---|---|
| 3 | Because for the defendant to refuse to cooperate with government evaluation could result in the court excluding all defense psychiatric testimony ("which would be the emasculation of our defense completely") defense counsel and government move to have the defendant undergo psychiatric evaluation at Springfield to determine competency. |
| 4 | Joint Motion for Psychiatric Evaluation granted. |

Trial – Park Dietz Testimony

| 575 | Dietz is a physician specializing in psychiatry; credentials recited |
|---|---|
| 581 | Testified or consulted in criminal cases: "I stopped counting at a thousand, and that was in the 1970's" |
| 582 | Testified for the defense in a case of a man who killed his cousin and mother. He was schizophrenic and insane at the time of the crime. |
| 585 | Records (of the defendant): "That body of materials forms one of the major bases of my findings in this case" The other set of information comes from "my own observations of the defendant" |
| 586 | I do not find that the defendant suffers from what I would characterize as a serious mental disease or defect, but that he does suffer from two non-severe conditions: anti-social personality disorder and the second does not have a formal label, but I think it might be fair to characterize is as some mild brain dysfunction that causes him to have difficulty with attention. |
| 587 | Evidence of anti-social personality disorder is the man's history |
| 587 | ASPD refers to a condition that has its onset by age 18 and that forms a pervasive pattern of behavior in the way the person relates to the world. Individuals with personality disorders can't be said to be mentally ill or to be mentally diseased, but they do have a maladaptive way of relating to the world that reflects their personality.. |
| 587 | ASPD used to be called "sociopath" and before that it was known as being a psychopath. Hollywood corrupted that term to make psychopaths appear to be really sick in some more serious way, so psychiatry dropped that term. Before they were called psychopaths, they used to be called a variety of names implying that they were evil and immoral, because that's how the behavior's been seen through most of human history. |
| 587 | Invokes DSM |
| 588 | Defense objects to Dietz reading off a list of Gallant's "atrocities" to show he meets diagnostic criteria. |
| 598 | Judge's tentative ruling is that the government should consider using an approach (because of Rule 403 problems) that does not require Dietz to address each criminal act in the defendant's background—approach should |

| | |
|---|---|
| | be more global.  Arguments on issue ensue. |
| 631 | Case law on 403/404 and insanity issues discussed |
| 636 | Limiting instruction on 403 |
| 639 | Sometimes the defendant acts impulsively; he also behaves out of design and planning and organization for other crimes.  We tend to see that only in the best criminals, who will use ruses.  It's actually a very successful technique |
| 641 | Lack of remorse: even if the defendant said he felt bad for his current crime, Dietz saw no remorse for most of his crimes |
| 642 | Conduct disorder, DSM criteria related to defendant's history |
| 643 | The last thing one needs to do to diagnose ASPD is to find that the behavior we're relying on to give this label is not really due to one of the serious mental illnesses like schizophrenia or mania. |
| 643 | ASPD occurs among more than 50% of prison inmates; among 50% or more of jail inmates, according to studies |
| 644 | For brain defect issues, Dietz defers to his colleague, Dr. Martell.  "He and I work together and we worked together on this case." |
| 646 | While acknowledging probable brain dysfunction, "it certainly doesn't make him a brain-damaged person in any way that matters." |
| 646 | To find brain damage, have to use lots of sophisticated tests; can't tell brain damage by talking to him |
| 646 | Dr. Martell found the defendant to be faking most of the brain damage anyway |
| 647 | CROSS STARTS |
| 648 | Dietz doesn't know how to read PET scan:  "I'm an expert on crime, not on PET scans"…. I don't need the benefit of PET scans because I analyzed this crime, and this crime couldn't have been committed by a person with brain damage of any significant kind. |
| 648 | Mentions hypometabolism of the temporal lobes—they're burning less sugar. That tells us about functioning, not about damage.  The functioning is slower. |
| 649 | PET Scans:  "It's very well established that they're not reliable for use in criminal cases, generally not admissible and that there is no one who knows anything of the relationship between PET scans and criminal behavior." |
| 650 | Everything I do is in forensic psychiatry and criminology.  No patients |
| 651 | I've testified in every state but Mississippi and one of the Dakotas; acknowledging testifying for the government about 25 times and being "increasingly expensive" with a government rate of $400 an hour |
| 653 | Bulk of Dietz' time was coming for evaluation and to testify.  Balance was 10 hours for record review. |
| 655 | Testified that Jeffrey Dahmer was responsible under Wisconsin law; testified for prosecution in Menendez case, but that wasn't an insanity case |
| 656 | Was a defense expert in the Gerald and Charlene Gallegos case:  "Did you testify?" "No, they didn't like what I found"; Was a prosecution witness in Rifkin (serial killer of prostitutes prosecution) and found he was |

HB 000235

| | |
|---|---|
| | responsible; same for Shawcross (strangled and killed prostitutes) |
| 657 | Worked for government on federal habeas case of Bonan – he killed a series of victims, but "I don't know much about his crimes". I testified on the issue of allegations of brain damage. |
| 657 | Tager, who killed somebody in front of the Today show, "pled guilty after I submitted my report". |
| 658 | Testified for the defense in Bardow |
| 658 | Testified for the government in Betty Broderick case |
| 658 | Consulted for the government in Unibomber case |
| 659 | Wishy-washy on how much money gets from federal government |
| 660 | 50% of my time is prevention. Of the other half, 60 per cent is civil, leaving 40 percent of 50 percent, which is criminal. Of that 20 percent of my time, 80 per cent of clients are government as opposed to defense "because generally defense attorneys won't meet my office's criteria for accepting a case." |
| 661 | Office Criteria: "We won't accept a case unless the client is willing to share all information with us and, in our experience, many defense attorneys won't allow us to see information that makes their client look bad." |
| 661 | I know most of the 1,800 members of the academy (that I was president of) and if I don't know the defense expert psychiatrist it has to do with whether he's contributed to the growth of the field, whether he's contributed in research, whether he's a person of stature in the professional community |
| 663 | The reason [I] publish is to share knowledge, advance the field… |
| 664 | Agrees that it is possible he's the highest paid forensic psychiatrist in the country; it could be through my company, Threat Assessment Group |
| 665 | Dr. Dan Martell one of 7 people in Dietz group; work in the same office and worked together on this case |
| 666 | Dr. Martell is a forensic neuropsychologist |
| 666 | Neither Martell nor Dietz prepared reports in this case |
| 667 | Dietz says he was on DSM Committees for paraphilias (sex offenders) and for impulse control disorders. "I also worked on a section called Delusional Disorders, though I wasn't on that committee." |
| 667 | Dietz trivializes defense report—didn't even look at it. |
| 668 | Temporal lobe damage does not cause organized criminal conduct (uses example of temporal lobe damage leading to seizure during which person may injure another by 'flailing around'). |
| 670 | This defendant committed this crime on purpose, knowing it was wrong; he may have been impulsive on other occasions but this wasn't one of them |
| 671 | Someone who plans certainly knows what they're doing… Planning and sanity are not mutually exclusive…… You can have a crazy motive while still planning. (In this case, per Dietz, the defendant did not have a crazy motive to break his buddy out of prison—that's a typical criminal motive) |
| 673 | Dietz participated in the revision of the federal insanity test to eliminate the prong about conforming behavior to the standard of law. Dietz says that at the time of the revision, he had never seen any case in which an individual |

Bates No. 4928

| | |
|---|---|
| | lacked volitional responsibility while having preserved cognitive responsibility; in other words, never at that point heard of or seen a case in which a person knew what they were doing, knew what was wrong but couldn't control themselves. |
| 676 | Dismisses numbers on PET scan because his determination is "based on his functioning, not based on his numbers". |
| 676 | Response to you didn't see how messed up defendant was then: "Not through my own eyes. I saw it through the eyes of the witnesses, through his account, through Vic's account, through his behavior." |
| 679 | Behavior of defendant as "wise guy" defined as what one expects of a career criminal who's very full of himself. Dahmer, on the other hand, was a perfectly ordinary fellow in his personality, but for his shyness. His sexual proclivities were..bizarre and very perverted. |
| 680 | No one should be considered just a bad man. The defendant has been a very bad man, as a matter of fact. There are other [good, recites some] things about him. "So he's many things besides being a bad person, and yes, he is a bad person." |
| 681 | Everyone does some bad things. The defendant has made a career out of it. His specialty has been behaving recklessly and violently and harming everything in his path except his friends. |
| 681 | ASPD thought to have two causal factors: genetic predisposition to fearlessness and an environment that allows that to show itself. |
| 682 | On fearlessness- they often have been born into families with a history of criminality and get abused. There is a huge body of literature showing heritability of criminality and heritability of galvanic skin response patterns that measure fear. |
| 683 | People who test out physiologically as fearless also score high on the Hare Psychopathy test. |
| 683 | The autonomic nervous system controls fear. It's related to anxiety and it's a different processing of anxiety and fear than normal people have. |
| 683 | The earliest demonstration of objective physiological measures of fearlessness has been in six-year-olds and correlated perfectly with their later criminality. You could screen first-graders and see whose reactions, physiologically, were fearless and that predicted which of them became criminals in adulthood. |
| 684 | I don't this the "fearlessness gene" gene testimony ought to be considered because, even if Dietz believes this is the best current understanding of how one gets to be ASPD, "because I don't think that this is a generally accepted body of scientific knowledge about fearlessness and crime. I feel that the body of information about brain damage and crime is about 10 years behind that on fearlessness and crime, and deserving admissibility in a court of law. |
| 686 | There are crimes in which it is not impulsive and yet the person did not appreciate wrongfulness. I've seen a few over my career that involved extreme planning and yet the person did not appreciate wrongfulness. |
| 686 | This arises from a very elaborate delusional system- The US Attorney's |

HB 000237

Bates No. 4929

|  | office had him evaluate a man who believed the voice of Malcolm X was compelling him to kill strangers randomly or else his brain would explode. Drove from NY to DC to do these crimes; there was elaborate planning, like putting a fake license tag on the car. Dietz thought this guy was insane. |
|---|---|
| 687 | Three psychotic symptoms necessary to find a serious mental illness: hallucinations, delusions and markedly illogical thinking, which is what we know as a formal thought disorder. |
| 689 | REDIRECT |
| 690 | One of the reasons I like to work for the government is, with the government there's a requirement that you play fair. |

Trial – Dr. Daniel Martell Testimony

| 691 | Forensic Neuropsychologist – subset of clinical psychology that has to do with the study of brain damage and its effects on human behavior |
|---|---|
| 692 | Credentials |
| 694 | Done almost a thousand cases |
| 696 | When doing an evaluation, I ask whoever has retained me for all the information they may have in the case.  After reviewing the material, I will conduct an examination and testing.  Reviewed discovery, records, Scott Duncan report |
| 697 | Also looked at MRI, BEAM "fancy computerized EEG, PET scan, video-taped interview of defendant |
| 699 | Notes that defense neuropsychologist did not administer tests designed to detect malingering—this is very important in any criminal case. |
| 703 | PET scan automobile analogy-  sugar is gas for the brain.  Some cars get better gas mileage than others.  Just because a PET is abnormal, it raises your eyebrows but doesn't tell us anything about behavior |
| 712 | Discusses test scale called "psychopathic deviate", which measures anti-social personality characteristics |
| 713 | Because of the psychopathic deviate test, gave HARE PSYCHOPATHY CHECKLIST.  Psychopaths are people who have no feelings for others; no empathy, no remorse for the bad things they do and, at the same time have an inflated sense of their own self-worth.  Grandiose, charming and ingratiating.  Some psychopaths are used car salesmen or work at Circuit City—they'll do anything to get the sale.  They'll manipulate you and con you any way they need to, to get what they want. |
| 713 | Psychopathy characteristic of a large number of people in prison and predictor of recidivism |
| 717 | Pre-planning shows no insanity.  "The behavior of changing the license plates indicates, number one, that he knew what he was doing was wrong, because he wanted to avoid detection.  He wanted to reduce his own risk of getting caught.  You only do that if you know what you are doing is wrong. |
| 725 | CROSS |
| 726 | Defense counsel asks for raw test data.  Martell has it in suitcase in courtroom; says defense has to ask US attorney if he wants copy of raw |

| | |
|---|---|
| | data. |
| 733 | (Martell Testimony actually starts)  Making $250 per hour on this case |
| 739 | I wouldn't go so far as to say the defendant has a fear gene—that's theoretical and unproven (although has strong empirical support) |
| 741 | Works with Dietz on 5-10 percent of his cases |
| 742 | Martell worked on Kaczynski case prosecution but hasn't worked with Dietz on other cases. |
| 742 | Current fee is $300 per hour |
| 747 | To the extent defendant exhibits poor judgment, it's because he's psychopathic and antisocial, not because he's brain-damaged |
| 750 | REDIRECT |
| 751 | The largest cause of poor judgment would be mental disorder such as schizophrenia, psychosis, emotional disorders like manic depression, that impair your judgment to the point where you might want to hurt yourself or other people or you may misperceive the world and do things based on faulty judgment.  Poor judgment is a hallmark of many personality disorders, particularly anti-social personality disorders. |
| 753 | RE-CROSS |
| 753 | Cannot malinger on a PET scan |
| 755 | FURTHER RE-DIRECT |
| 757 | FURTHER RE-CROSS |
| 758 | Martell says he had never heard of the fear gene until Dietz mentioned it in his testimony the preceding day, |

Bates No. 1931

Judge:  Hon. H. James Ellis
Rptr:    Kathryn Lezchuk, CSR No. 2302

Prosecutor:  Deputy DA John L. Grandsaert
Defense:      Philip S. Barnett

Defense Evidence by Blum, MD

| | |
|---|---|
| 2560 | It's impossible to tell conclusively or beyond a shadow of a doubt that someone hallucinates |
| 2561 | You would have to see what happened before and after |
| 2561 | Defendant saw glowing eyes, tongues like snakes, people converting into snakes; fears of harm, devils |
| 2563 | Antipsychotic medication helps reduce the symptoms of psychosis |
| 2563 | Antipsychotic medication more effective for people who have experienced delusions for less than a year or so.  They're much less effective than in people who have experienced delusions for decades… |
| 2563 | No current hallucinations isn't inconsistent with diagnosis of being schizophrenic |
| 2563 | One isn't cured of schizophrenia |
| 2568 | Taking a hallucinogen can certainly cause the symptoms of schizophrenia; it doesn't cause schizophrenia itself |
| | |
| RECROSS 2570 | |
| 2574 | Do you think a psychiatrist can influence the answer of his subject by the way he asks the question?  Answer: Absolutely. |
| 2577 | Based upon studies I have reviewed, daily use of marijuana does not cause a gradual build-up of paranoia |
| | |
| REDIRECT 2580 | |
| | |

For the Defense, Witness Park Dietz

| | |
|---|---|
| 2582 | CV Marked |
| 2584 | The [forensic] psychiatrist's role is to seek the truth, and this is not necessarily helpful to the person who is sick or may be sick. |
| 2584 | Worked at Bridgewater State Hospital (trying to make it a Harvard |

| | |
|---|---|
| | Teaching Hospital.  We did not succeed well in that effort).  I spent two years running the forensic effort there.  We did about a thousand evaluations a year of **mentally disordered defendants** there |
| 2584 | [In my third year as an Assistant Professor of Psychiatry at Harvard Medical School, I was] the government's chief expert's trial in John Hinckley's trial. |
| 2584 | Then I spent my third year at Harvard as a researcher and doing research on mentally disordered offenders based in the alcohol and drug abuse research center at McLean Hospital, which is Harvard's private psychiatric facility. |
| 2585 | At UVA, I began to do research on mentally ill offenders who were pursuing public figures.  We did a study of people who were threatening and trying to pursue, stalk, members of Congress.  We did a similar study of people doing the same to Hollywood figures, *and that work brought me to the west coast a great deal, and I decided to move out to California and then moved to Newport Beach in, I think, 1987; and since 1987 I have been based in Orange Counts...  That's a part time role, teaching at UCLA.* |
| 2586 | I spend half my time doing forensic consultation (on cases where there's some issue about a defendant's mental state, or an issue in a civil suit about whether someone has been harmed mentally, or whether behavior at the time of crime that people are suing each other about might have been prevented in various ways, and I spend the other half of my time on crime prevention on behalf of major employers.<br><br>I have a firm that does the work-place violence prevention for more than 160 of the Fortune 500 companies, and we also do that for a handful of celebrities and for certain government agencies that have retained us over the years… |
| 2588 | Famous cases:  Jeffrey Dahmer; the trial of Richard Allen Davis, the man who killed Polly Klaas;  Erik Menendez (second trial) and "quite a few serial killers".  "Some people tend to know those names:  a man named Arthur Shawcross in New York, another named Joel Rifkin in New York, another named James Swann in Washington, DC."<br><br>"There have been a number of mass murder trials.  They tend not to be too recognizable by name.  I'm currently retained in some cases people know that haven't come to trial yet.  I testified in a deposition on behalf fo the Goldman family against OJ Simpson.  I am retained on the Unabomber case in – for the Justice Department, which won't come to trial until next year.  The Attorney General of California hired me on the Ng case, and I think those are some that people might know about."<br><br>In each of the aforementioned cases, the government/prosecution hired me. |

| | |
|---|---|
| | … I'm more often called by the prosecution.  I'm very well known among the law-enforcement community and among prosecutors, so they more often call our offices, and consequently we more often work for the government. |
| 2589 | Professional Activities:  … American Academy of Psychiatry and the Law –"I've been active in that for more than 20 years and have held, I think, every office except secretary….  That's a group of about 1800 psychiatrists |
| 2590 | Q. How did you become involved in this case?  A.  You called me and asked me if I'd be willing to consult to you on this case. |
| 2590 | Relationship between Dr. Blum, Dr. Dietz and Dr. Martel-  Martel is an independent contractor to me; we share office space.  Blum is an independent contractor. |
| 2591 | After the video-taped evaluation of the defendant, which (videotaping) is our routine practice, … Dr. Blum had identified a number of family members and people who knew the defendant who he thought would have relevant information about his mental condition, his mental state, and I suggested that he (Martel) be the one to travel to Northern California and interview those witnesses, which he did.  (All of the foregoing is explanation for involvement of Dr. Martel and, of course, shows the importance Dr. Dietz places on collateral interviews when he is working for the defendant). |
| 2595 | Is the person faking?  Everybody in the middle of some legal dispute, whether they're the defendant or they're the plaintiff in a civil case, has something to gain by seeming to be sicker than they really are or better than they really are, and so we're always on the lookout for people trying to fool us, and there's some techniques for trying to see who is faking. |
| 2596 | "It's always been my view that the clearest way to think about mental illness is that those three features, hallucinations, delusions and disorganized thinking, are the hallmarks of mental illness."…"Normal people never have any of those three things happen to them." |
| 2596- | Six kinds of mental illness. One, that normal people can get is DELERIUM – from diabetes. intoxication, too much prescribed medication, dementia from aging or brain disease.

NOTE:  THIS GETS CONFUSING, BUT MAY BE HELPFUL= The mental illnesses that cause it—that can cause these three symptoms are schizophrenia, delusional disorder, which we used to call paranoia, and two disorders of mood, major depression with psychotic features, or mania; and those are the only conditions in which people get delusions, hallucinations and disorganized thinking.

There's a sub-category really where people have such symptoms for a short period of time.  We may give it the name of brief psychotic episode because they haven't had it long enough to call it schizophrenia. |

HB 000242

Bates No. 1934

| | |
|---|---|
| | … and we had evidence from family members, who had observed the defendant prior to the crimes, that he had complained of such symptoms and exhibited such symptoms before the crime… |
| 2598 | … the evidence added up to his having, at the time of the killings, had a very unusual view of the world that was out of touch with reality, an interpretation of the world that made it off the charts in its difference from the way anyone else in that situation would have seen the same facts. |
| 2599 | I'm skeptical of every defendant, because it's my experience that they usually lie to me, and I've been lied to for many, many years by defendants, so I'm quite skeptical; and when defendants say why they committed crimes, very often that's part of the lie they want to tell, because they don't want to be responsible for the lie they want to tell, because they don't want to be responsible for what they do, and I've heard every story in the book explaining to me why it wasn't their fault. It was somebody else's fault. Why they couldn't help themselves.<br><br>But this defendant, Mr. Anguiano, had various ideas of why he did this, but he was as inconsistent in his understanding of why he did this as he was in many of the things that he tried to describe about his own experiences. His thoughts were not well enough organized for him to maintain consistency, and he would contradict himself frequently on many, many topics, including that topic.<br><br>So among the many explanations that he offered when we would ask him, "Why did you do this?" he thought maybe he did it because of the drugs he was taking, and that's the one that was his favorite. He wanted to be able to blame drugs for this, because that's easier to accept than to think that he's mentally ill. It's shameful for him to be mentally ill, but if it was the drugs, maybe he could live with that…. He also mentioned the possibility that he had been possessed, maybe that had made him do it, and he mentioned being out of his mind. He said he didn't know why he had done it. He said many times that he did it because he wanted to live. He didn't want to die there with these evil forces. But I don't think he really understood why he did it. Today I think he's begun to have some recognition. |
| 2601 | Question: How do you know he's not faking?<br>Answer: Well, psychiatrists aren't lie detectors. That is, if all we have is the ability to hear someone speak briefly, we have no greater ability to know if they're lying than other people. In fact, one of my favorite colleagues likes to say that, if you wanted somebody who is really good at detecting lies, you wouldn't ask psychiatrists. You would ask hotel |

HB 000243

Bates No. 1935

| | clerks on the night shift, because they're used to being lied to all the time.

There's a lot of sense to that, that we're not really lie detectors, but what we're especially trained at and try to get skilled at is recognizing the patterns of symptoms of mental illness and recognizing whether what looks like mental illness is or isn't, because it's difficult for people to fake certain aspects of mental illness.

It's very easy for people to say they hear voices telling them what to do. Anyone can fake that. It's extremely hard to fake symptoms of illogical thinking… there's some silly ways that fakes use. One very famous pattern is called giving approximate answers. If you ask the person what's two plus two, they say five… the person is faking it because they think a crazy person would answer it that way… Another way is to see if there is outside support for the answers –is their past behavior consistent with their behavior at the time they contend they were sick? Did they have signs of mental illness at a time when they didn't have a motive to fake it? |
|---|---|
| 2603 | Defendant suggested the reason he had these symptoms was drugs. We considered that, but government toxicology results were negative. |
| 2604 | One to two percent of the population has paranoid schizophrenia… almost nobody gets psychotic from marijuana, despite the very heavy use of marijuana in our society. |
| 2604 | There are some people who get very sick after smoking marijuana. I think these are people who are schizophrenics who had their first schizophrenic break after smoking marijuana. |
| 2605 | Schizophrenia is the touchstone of psychiatry, as been for a hundred years, because it is the classic important mental illness. Important because it is so severe and debilitating to the patient and because it is common… with one to two percent of the population afflicted. |
| 2606 | It's been a very great challenge—even today is not curable—is quite treatable with modern medications. For that tiny, tiny fraction of criminal defendants who are insane for their crimes, that is, not responsible, schizophrenia is usually the explanation. Occasionally, there are other illnesses that could make one responsible… |
| 2606 | I see lots of people who are schizophrenics. It is unusual for me to find someone who is not responsible for his crime. Last time was James Swann, (Washington, DC), the "Shotgun Stalker". He was a security guard who was patrolling backwards so nobody could sneak up on him. "It never fails to amaze me how people tolerate mental illness in their presence." |
| 2607 | Swann killed a series of strangers in eight shotgun attacks from his car, believes he was responding to the voice of Malcolm X that would burst his brain and heart if he didn't follow the command. I saw him for the government     but found him insane, as did six or seven other doctors. |

HB 000244

Bates No. 4936

| | |
|---|---|
| 2608 | There was research done back in the 50s showing that better educated families with high incomes tended to recognize family members who became mentally ill and take them to a doctor within a matter of weeks. People without much income might wait years. |
| 2608 | But for [the defendant's] illness, the crime would not have occurred. His illness has everything to do with the crimes. |
| 2609 | Defines "ambivalence": "His mental illness allows him to believe two things simultaneously that are impossible logically to believe at the same time." [The defendant's] mental illness prevents him from having the logic that allows him to see this as impossible. |
| 2611 | It is possible to know something is wrong (like killing the victim) and simultaneously know it is right. He could simultaneously hold the view that he had to [kill the victim] to get rid of evil, yet he knew, as soon as it was over, that he had done something wrong. |
| 2612 | Penetration delusions are that people are trying to get inside [a person], to penetrate him. |
| 2614 | Sleep probably makes a difference in how schizophrenics act NOTE: P. 2615 is missing. |
| | |
| CROSS | By Prosecution starts at 2616 |
| 2618 | Dietz says he is unaware of literature that indicates an association between LSD and violent crimes, but there has been speculation about it. |
| 2618 | It's possible for someone to stay psychotic for a week. |
| 2624 | [the defendant] shows some awareness of having done something wrong … by going to a priest and seeking forgiveness…. The defendant knew what he did was wrong, yet simultaneously knew it was right… simultaneously holding inconsistent ideas such as he has to kill the victims, knowing that is wrong, but also knowing that they harbor evil spirits and he must kill them to save his life. |
| 2626 | Dietz agrees he has said that one has to look at the surrounding circumstances in order to determine whether or not you should believe someone when they tell you things that could be construed as an attempt to make an excuse for their wrongful conduct. |
| 2630 | One way to measure a defendant's credibility is to see if his actions are in accord with what he tells us he believed—that lends credence to his having so believed at the time. |
| 2633 | People cannot give you a detailed, logical accounting of their mental experiences during a psychotic break. They're incapable if it. |
| 2643 | Probably a fifth or a fourth of my work has been on sex crimes and related things. |
| 2648 | About one percent of child molesters are schizophrenic |
| 2658 | Malingering: One important element is whether the person behaved differently when they think no one is looking, |
| 2659 | Standard government rate (government agencies, prosecutors) is $400 |
| 2660 | I charge by the day for 10 hour days when I have to leave town, so |

HB 000245

| | |
|---|---|
| | $4,000 per day. |
| 2661 | Regarding the efforts of Dr. Blum, whose information was incorporated in the report:  "He spent a great deal more time with the records than I did.  And his summaries of the records came to be incorporated, in part, in the report.  And he spent much more time interviewing collateral witnesses, because I didn't interview any of them. |
| 2667 | The average time they bring schizophrenics who are threatening to kill their supervisors is seven years after the onset of the illness.  (sic) |
| 2698 | Dietz agrees that marijuana exacerbates a mood—if you're frightened, it makes you more so, angry, it makes you more so, etc.  He says that might be true, but I'm not aware of that as a fact.  It makes sense [to Dietz]. |
| 2704-5 | Q.  Isn't it true that a psychiatrist should be very careful about leading a subject into certain conclusions, because the psychiatrist can have an inordinate effect on the answers?<br>A.  Yes.  And that's why we video tape and request transcripts.<br>There is a lot of danger when people don't record their examinations, that they won't even be able to be challenged when they do such things. |
| 2705 | Dietz did three days of interviews in the *Barto* case. |
| 2707 | The proper use for Navane is to treat psychotic mental illness |
| 2711 | Hypnagogic hallucination is kindred to hallucination—it's a sensory phenomenon that can happen to normal people as they are falling asleep and begin to think they have seen or heard something.  Because it can happen in the absence of mental illness, it is not a true hallucination. |
| 2717 | On DSM development:  [The diagnostic criteria] "depends on the state of all scientific knowledge and also what we can get people to agree on.  So there is a political process involved.  There's some great examples of lousy diagnosis because of it." |
| 2717 | There is a genetic component to schizophrenia.  In the absence of family history of schizophrenia, "we have no way, of course, to look at the DNA and find the genetic material."  ../ at 2718:  "In half or more cases [of schizophrenia] there will be a relative who's been hospitalized or received shock treatment or was diagnosed with a serious mental illness." |
| 2726 | LSD can cause a psychotic response; an individual can, through consumption of LSD can become psychotic and even violent.  We expect that psychosis to last less than 24 hours after ingestion. |
| 2728-9 | Affective illness is a mood disorder.  You are not necessarily insane if you have a mood disorder.<br>Q.  And how many of the psychotic symptoms that he allegedly showed be accounted for by a mood disorder?<br>A.  …Someone could behave as he did the week of the 28th from either mania or depression. (Note: that was the week of the crimes when the defendant murdered a three year old relative, mutilated his body by cutting out the heart, then murdered his mother, then apparently, set a fire) |
| 2729 | It is not an act of madness to wish to kill oneself after having killed |

HB 000246

Bates No. 1938

| | |
|---|---|
| | others. Most of the time, the wish to kill oneself when true is a reflection of some mental disorder. |
| 2733 | Repetitive exposure to Marijuana contaminated with PCP would be "an alternative explanation" (apparently, for the defendant's conduct) |
| 2737-8 | Stands by his article, "Why the Experts Disagree", published in the Annals of the American Academy of Political and Social Science about 10 years prior to this testimony in which he asserts: *Challenging defendant's assertions, confronting contradictions, and checking the objective evidence are police investigative techniques. The police investigative techniques are precisely what psychiatrists should learn before they undertake to evaluate a defendant's criminal responsibility.* |
| | |
| REDIRECT | Starts on page 2741 |
| 2745-6 | "And if you believe yourself to be killing a vampire, even though you may also know that's a human, you don't truly know the nature and quality of your act. And if you believe that it is necessary to kill that vampire or that demon or that spirit or that evil in order to survive the night, because you are going to die otherwise, then no matter what you may know about it being wrong, you also know it's right, because self-preservation is such a human instinct. |
| 2749 | Most of the time when you see candles and bibles and bodies with hearts cut out it's because it's a psychotic with religious preoccupations and delusions and hearing voices, not because it's some kind of cult ritual. |
| | |
| RE-CROSS | Prior to date of testimony, the bill was $35,000: $10,000 for Blum; $7,000 for Dr. Martel; 17,000 for Dietz. |

HB 000247

Bates No. 4939

| 426 | Credentials |
|------|-------------|
| 428 | I moved to Southern California in 1988 or 1989, initially on sabbatical. I'm clinical professor of psychiatry and behavioral sciences at UCLA, which is a volunteer position. |
| 429 | Work on the DSM: I was on two of the committees responsible for the book. (1) Impulse Disorders, not otherwise specified (which is that cluster of disorders in which thought that inability to control impulses or failure to control impulses is related to behavioral aberrations)(sic). (2) Paraphilia, which refers to sexual deviations. |
| 430 | Admits to being an expert in sexual sadism |
| 431 | Recites notable testimony, cases. Note: Testified for the defense in the case of Robert Barbarrow who killed the actress Rebecca Shaffer in LA (state court). |
| 432 | Dietz HAS NOT PERSONALLY EXAMINED BONIN |
| 433 | Dietz said he requested the opportunity to examine Bonin, but was denied. "In the absence of an examination, my testimony must be limited to the information available to me in these documents." |
| 436 | On impulse control issues in instant case: "…the manner in which Mr. Bonin's crimes were committed which are reflective of planning and deliberate actions rather than impulsive behavior". |
| 439 | Behavioral signs Dietz expects to find with frontal lobe syndrome are slowness and lack of spontaneity in speech (called bdulia), slowness and lack of spontaneity in thought, emotion, inappropriate laughter, unrestrained behavior, slow gait. |
| 444-5 | The diagnosis of Bi-polar mood disorder must rest on a finding that the individual has had at least one episode of mania. Although, the term is the current term for what used to be called manic depression (this court reporter isn't very good) illness. It dies not necessarily imply that one has been both manic and depressed…. A manic episode is diagnosed when an individual had simultaneously a pronounced change in mood that leads to either euphoria or irritability, accompanied by at least three on a list of I believe seven symptoms specified in the diagnostic manual such as decreased need for sleep, grandiose, inflated sense of self and other "dramatic and striking" findings. And these must lead to either occupational difficulties or difficulties in one's social relationship. Also, there cannot be an organic cause. |
| 445 | An individual with bi-polar disorder will likely have impulse control most of the time, though a person while manic in the throes of a manic episode may have impairment in impulse control. |
| 446 | Current thinking on the origin of bi-polar disorder is in childhood, though |

HB 000248

| | |
|---|---|
| | the symptoms by which it could be diagnosed may be manifest at any point in life. |
| 448 | Diagnoses the defendant as a sexual sadist |
| 450 | Discusses anti-social personality disorder. Desrcibes the MMPI elevated scale as PD (psychopathic deviation). |
| 451 | RE: exclusion criteria and ASPD- one does not apply ASPD diagnosis if the behaviors occur only during manic episodes or because of schizophrenia. |
| 451 | "There is some controversy and certainly between psychiatry and other fields as to whether this (ASPD) ought to be seen as a diagnosis at all or simply a modern way of labeling evil people, but the convention in psychiatry is to treat it as a personality disorder and to give that diagnosis where the facts support it.<br><br>And there are also those who would say that there is a biological basis for that disorder. And that one can measure it biologically. So it's an area where there continues to be research where there is some controversy. |
| 451 | Sexual Sadism has no effect on the individual's free choice or other aspect of mental functioning |
| 452 | People with ASPD have no impairment in their choice or free will. |
| | |
| CROSS | Starts at 452 |
| 453 | Not an expert in neurology, except insofar as a physician and psychiatrist is; passed board certification tests that includes neurology. Treated people for neurological disorders while a medical student (graduated from medical school in 1975). |
| 456 | A blow to the head of "sufficient severity" could cause organic brain damage. One would not expect brain damage from a head injury in which one neither loses consciousness not had any neurological symptoms in the immediate aftermath or had any fracture of the skull. |
| 457 | Dietz does not treat patients |
| 457 | A personal interview is not a necessary component to an evaluation<br><br>"For an evaluation in forensic psychiatry there are quite a few forums where a personal examination is neither possible nor necessary. These sorts of questions that I'm often asked to determine are such things as who committed these series of crimes from which there is not a suspect and how do we locate him? Who is writing these anonymous letters and is he dangerous to the person who they are written? (sic) Was the decedent competent to make a will at the time it was written? What was the individual's mental state at the time of what seems to be a self-inflicted death?<br><br>And all of those situations it's impossible to do an interview as part of an evaluation. |

HB 000249

Bates No. 4941

| | |
|---|---|
| | And in addition to those, there are other forensic contexts where an evaluation is not possible because of a lawful refusal to be examined. That results in a limitation of what one is able to say and conclude from the basis of the evaluation; but it doesn't preclude an evaluation being done." |
| 459 | How many times have you testified as an expert for the defense in a capital case?<br><br>A. I have no way to know. When I was in Virginia most of the referrals to my clinic were from the defense. And I know there was some volume of capital cases there. |
| 459 | I more often accept cases from the prosecution; I consult with several law enforcement agencies that call for behind the scenes work—some of that contact results in my participating more fully as a consulting expert. And there is one public defender's office that I routinely do work with. |
| 461-2 | There is no doubt that people with serious frontal lobe damage are behaving impulsively all the time, can't even sit still without showing evidence of it. |
| 467 | Agrees that learning disabilities can be the result of either organic … or something psychiatric … |
| 468 | If a child is unsupervised at him, neglected, emotionally abused, these contribute to poor school performance. |
| 470 | Acknowledges he's not a child psychiatrist and never qualified as an expert in determining the psychiatric impacts of growing up in a dysfunctional family, "although I've been permitted to testify to that on many occasions." |
| 472 | While debating seizures, Dietz says, "If Mr. Bonin ever had a seizure like my son had this morning before I came up here, I'd say that, in fact, there was evidence he had seizures.' |
| 478 | Dietz says he's not a psychologist and not qualified to interpret testing he doesn't routinely use. MMPI is a test Dietz routinely uses. |

HB 000250

Bates No. 4842

TIMESHEET
CLIENT NAME

| DATE | Brief Description of Services | Out of Court | In Court | Expenses |
|---|---|---|---|---|
| | | | | |
| 9/8/2003 | draft letter to M.Olive | 0.30 | | |
| 9/9/2003 | mail M. Olive Motion hearing trans. | | | 6.55 |
| 9/22/2003 | draft motion to excuse | 0.40 | | |
| 9/22/2003 | tc with 4th circuit | | | |
| | tc with fed. Travel | | | |
| 9/22/2003 | travel to Richmond | 1.00 | | |
| 9/22/2003 | review briefs | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

HB 000251

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | 1.70 | 0.00 | $6.55 |

HB 000252

Bates No. 4844

TIMESHEET
CLIENT NAME   Barnette

| DATE | Brief Description of Services | Out of Court | In Court | Expenses |
|---|---|---|---|---|
| 7/13/2002 | Lodging-Hampton Inn | | | 70.08 |
| 7/21/2002 | Lodging-Four Point | | | 96.05 |
| 8/8/2002 | Lodging Four Points | | | 467.13 |
| 8/8/2002 | Lodging Four Points | | | 924.13 |
| 8/8/2002 | Lodging Four Points | | | 1,219.77 |
| 8/9/2002 | WestLaw fees for research | | | 41.60 |
| 8/16/2002 | Postage/fed ex to client's family | | | 18.18 |
| 8/26/2002 | Postage fed ex 4 boxes to attorney | | | 307.72 |
| 9/16/2002 | conference with Lawson | 1.20 | | |
| 9/17/2002 | TC with Expert | 0.30 | | |
| 9/17/2002 | TC with Expert | 0.30 | | |
| 9/18/2002 | TC wtih Clerk | 0.30 | | |
| 9/24/2002 | tc w/4th circuit | 0.60 | | |
| 9/26/2002 | TC with client's family | 0.55 | | |
| 9/30/2002 | TC with clerk | 0.30 | | |
| 10/2/2002 | tc with 4th circuit | 0.20 | | |
| 10/4/2002 | Mail docketing statements to 4 parties | | | 15.50 |
| 10/7/2002 | preparation of docketing Statement | 1.40 | | |
| 10/7/2002 | tc with lawson | 0.55 | | |
| 10/8/2002 | tc with client's family | 0.45 | | |
| 10/11/2002 | tc with client | 0.70 | | |
| 10/28/2002 | tc with Lawson | 0.80 | | |
| 10/28/2002 | tc with Federal Death Penalty Ctr | 0.50 | | |
| 10/28/2002 | Prep motion to extend | 1.60 | | |
| 10/29/2002 | TC with Federal Death Penalty Ctr | 0.65 | | |
| 10/30/2002 | Conference with Lawson | 1.15 | | |
| 11/4/2002 | TC with expert | 0.30 | | |
| 11/5/2002 | review transcripts | 1.90 | | |
| 11/6/2002 | tc w/federal capital defender | 0.55 | | |
| 11/7/2002 | Review Transcripts | 2.05 | | |
| 11/8/2002 | TC with M. Olive | 0.45 | | |
| 11/12/2002 | conference with/former attorney | 0.85 | | |
| 11/13/2002 | review trancripts | 2.30 | | |
| 11/13/2002 | tc with co-counsel | 0.55 | | |
| 11/14/2002 | tc w/Federal Capital Defender | 0.45 | | |
| 11/26/2002 | review transcripts | 3.40 | | |
| 12/3/2002 | Letter to M. Olive | 0.45 | | |
| 12/6/2002 | review transcripts | 4.20 | | |
| 12/10/2002 | review transcripts | 2.30 | | |
| 12/12/2002 | tc w/M. Olive | 0.40 | | |
| 12/16/2002 | review transcripts | 1.85 | | |
| 12/17/2002 | legal research | 2.35 | | |
| 12/19/2002 | tc with M. Olive | 0.70 | | |
| 12/19/2002 | obtain documents | 2.35 | | |
| 12/20/2002 | sent documents via mail | 0.65 | | |
| 12/27/2002 | letter to client | 0.35 | | |
| 1/6/2003 | tc with M. Olive | 0.55 | | |

Bates No. 4945

| | | | | |
|---|---|---|---|---|
| 1/13/2003 | tc with M. Olive's office | 0.40 | | |
| 1/13/2003 | tc with M. Olive | 0.55 | | |
| 1/15/2003 | tc with M. Olive | 0.45 | | |
| 4/9/2003 | TC with client | 0.40 | | |
| 5/8/2003 | TC with AUSA Rose | 0.40 | | |
| 5/8/2003 | TC with Mark Olive | 0.55 | | |
| 5/9/2003 | tc with client | 0.60 | | |
| 5/9/2003 | tc with Mark Olive | 0.40 | | |
| 5/9/2003 | TC with AUSA Rose | 0.35 | | |
| 5/12/2003 | tc with Mark Olive | 0.40 | | |
| 5/15/2003 | tc with Mark Olive | 0.45 | | |
| 6/6/2003 | review records | 2.70 | | |
| 6/9/2003 | TC with mark Olive | 0.60 | | |
| 6/9/2003 | obtain records | 1.70 | | |
| 6/10/2003 | review draft brief | 1.65 | | |
| 6/12/2003 | tc with Mark Olive | 0.35 | | |
| 9/30/2003 | conference with Lawson | 0.85 | | |

HB 000254

Bates No. 4846

1.  The Government respectfully requests that both the Court and the parties look for guidance to the previously approved Jury Questionnaire used in this case, especially in circumstances in which the Defendant requests changes in the language of questions previously approved by the Court.

Response:  None Necessary.

2.  The Government requests that the "Instructions to Jurors" at the beginning of the Juror Questionnaire previously approved be used.  Defendant's proposal includes only the last three paragraphs of those instructions.

Response:  The "Instructions to Jurors" portion of the old juror questionnaire in the possession of the defense only has three paragraphs.   The general information conveyed in these prefatory comments is the same in both the old questionnaire and that proposed by the defense.  The defense made only minor changes to those paragraphs which, in the opinion of defense counsel, make the information in the paragraphs easier to read and understand.

3.  The Government requests that all references to :family: be amended to read "immediate family" and that the previously approved definition of "immediate family" be included in the Juror Questionnaire.  This definition stated:  (NOTE:  For the purposes of this Juror Questionnaire, the term "immediate family" shall be defined as a husband, wife, father, mother, sister, brother, daughter or son.  The above definition shall apply to any use of the term "immediate family" in this Questionnaire.)

Response:  The defense seeks to assure that the jurors have as much opportunity to respond to the questions asked of them as possible.  The government's proposal to limit the definition of family ignores the reality of our society in which aunts and uncles, grandparents and cousins are often considered by people to be family within the context contemplated by the questions.  Because each juror knows whom he or she considers "family" as it relates to their answers to the questions, he or she should not be confined in the answers by an artificial, and possibly inapplicable, limitation.

4.  The Government does not oppose Defendant's addition of "significant other" into relevant questions.

5.  The government requests that all references to "friends" be amended to say "close friends" in order to streamline the answers to questions without jeopardizing the process of gathering information.

Response:  The definition of close friend is a subjective one.  In a capital case, the objective should not be to "streamline the answers" to questions as the government suggests, but to learn enough about potential jurors to assure a fair trial and preservation of the defendant's Sixth Amendment rights.  Jurors' answers should not be limited by artificial constraints.  If a question suggests an answer that the Juror thinks is helpful or responsive, the juror should not be limited in providing an answer.

HB 000255

6.  The government requests that all references that ask a question about a juror themselves, or "anyone they know" be amended to "any immediate family or close friend."  The Government contends that phrasing questions in this manner will be sufficient to gather important information, and focus questioning to close relationships and influences.

Response:  The defendant incorporates by reference his responses to Items 3 and 5 herein.  The object of the questionnaire should not be to narrow the scope of jurors' answers to questions artificially.  If a question suggests an issue the juror feels calls for an answer, he or she should not be limited by the terms used in the questionnaire.

7.  The government requests if the following questions remain in the final Questionnaire, Questions 34, 35, 36, 38, 39, 44, 45, 59, 66. 67, 71, 72, 73, 75, and 105 be amended to include room for a written explanation for their answer.  Allowing for a written explanation will streamline and focus the in-court questioning process.

Response:  The defendant does not object to providing room for expanded or detailed answers to any question in the Questionnaire that might provide additional insight into the juror's response, so agrees that the suggestion of the government should be implemented as to all questions that may call for elaboration or explanation.

8.  The Government objects to Defendant's Question 27, which asks, "What type of work did your parent(s) do while you were growing up?"

Response:  This is not a difficult or time-consuming question.  Parents' employment may be significant in development of a potential jurors' biases, interests and experiences.  To the extent the answer to this question provides any insight that might contribute to the parties' understanding of a particular juror, it is meaningful and relevant.

9.  The Government objects to a subpart of Defendant's Question 31, which asks for the purpose of the organization to which the juror belongs.  This question is more properly asked during voir dire.

Response:  Defendant and the Government agree that the answer to the question is relevant and material.  The defense seeks only to have the juror answer this question so counsel may determine if it merits using time during voir dire.

10.  The Government objects to Defendant Question 37, which asks, "Have you or anyone you know ever been sued?  The government contends that this question is over broad, and will not assist counsel in selecting qualified jurors.

Response:  This general line of questions was on the prior questionnaire:

>   Prior Questionnaire question #68 is:  "Have you, a close friend, or anyone in your immediate family, ever filed a lawsuit?"

HB 000256

Bates No. 4948

Current Questionnaire question #37 is:  "Have you or anyone you know ever been sued?"

 The government did not object to current Questionnaire question #36, which is, "Have you or anyone you know ever sued anyone?"  Indeed, that question is addressed in prior Questionnaire, question #69:  "Have you, any immediate family member or anyone close to you, ever had a lawsuit filed against them?"

Defense counsel maintain that these questions are relevant and may yield information that will assist both parties in selecting a jury.

**11. Government asks for substitution of defendant's questions:** 41-47 be replaced by questions from the Questionnaire used at the last trial, those being questions 32-45.

Response:  The defendant's proposed questions are almost the same as those in the prior questionnaire, with different numbers.  They are compared below:

Arrest:
     *Prior Questionnaire #32*:  Have you or any family member ever been arrested?
     *Defendant's Question #35*:  Have you or anyone you know ever been arrested?

Sued:   Note that at Government's response question #10, the government wants lawsuit question eliminated.  However, this issue was addressed in the old Questionnaire:

     *Defendant's Questions 36*:  Have you or anyone you know ever sued anyone?
              *Question 37.*  Have you or anyone you know ever sued anyone?
     *Prior Questionnaire Question 68.*  Have you, a close friend, or anyone in your immediate family ever filed a lawsuit?
-Have you, any immediate family member or anyone close to you ever had a lawsuit filed against them?
-Are you presently involved either as a plaintiff or a defendant in any court?
-Have you ever been involved in a lawsuit? (asking for details in subparagraphs)

*Defendant's Question 38*;have you or anyone you know ever been charged with a crime or been the subject of a criminal investigation
*Prior Questionnaire: #34* Have you or any family member or close friend, ever been charged with a crime or been the subject of a criminal investigation?

     *Defendant's Question 35*:Have you or anyone you know ever been arrested?
     *Prior Questionnaire  32*:Have you or any family member ever been arrested?

     *Defendant's Question 40*;  Have you, or any family or fiend, ever been questioned in any matter by and local, state or federal law enforcement agency?

HB 000257

Bates No. 4949

*Prior Questionnaire 36*:  Have you, or any family member or close friend, ever been questioned in any matter by any local, state or federal law enforcement agency.

*Defendant's Question 41*.  Have you or anyone you know ever worked in public or private law enforcement?
*Prior Questionnaire:37:*  Have you ever worked in public or private law enforcement?

*Defendant's Question 42*:  Have you or anyone you know ever had a dispute with any local, state or federal office or agency or any of its employees?
*Prior Questionnaire 73*:  Have you or any member of your immediate family ever been audited, investigated by or had a dispute with any agency or department of the United States (including the IRS, Social Security Administration, Veterans Administration, Equal Employment Opportunity Commission (EEOC), Health and Rehabilitation Service (HRS), etc.?

*Defendant's Question 43*:  Have you, or any family member or friend ever been the victim of a crime (whether or not reported to the police)
*Prior Questionnaire 74*:Have you, any members of your family, or close friends ever been the victim of, or witnessed, any crime (Whether or not the crime was reported)

*Defendant's Question 44*:  Have you ever known anyone who was the victim of an accidental killing?
*Defendant's Question 45*:  Have you ever known anyone who was murdered?

Prior Questionnaire


11.     *Defendant's Question 46* re military service
Have you ever been in any branch of the armed forces of the United States (including the military reserves, Nation Guard or ROTC)
            With sub questions
*Prior Questionnaire 43*
Have you ever been in any branch of the armed forces of the United States, including the military reserves, National Guard or ROTC)?

*Defendant's Question  47*  SAME AS ABOVE, EXCEPT ABOUT SPOUSE

12.  The Government requests that Defendant's Question 44 be stricken, as irrelevant to the facts of this case, and any issue bearing on juror qualification.

Response:  Proposed Question 44 is:  Have you ever known anyone who was a victim of and accidental killing?  The defense concedes that accidental killing is not an issue in this case.  However, such a life experience could affect the juror's ability to be fair and impartial when he/she hears victim impact evidence, which is why the defense included the question.

HB 000258

Bates No. 4950

13.  The Government requests that Defendant's Question 55 be amended to add subsection (h) "Any health related field" as was included in the previously approved Juror Questionnaire.

Response:  This question deals with education in various disciplines such as psychology, criminology, and education.  Defense agrees that the suggested addition will be helpful and joins in the Government request to add that language.

14.  The Government requests that Defendant's Question 57, regarding prior jury service be amended to take the question of what the actual jury verdict was in any case in which they served on a jury.  The proper issue is not the disclou=sure of the actual verdict in the case, but whether the jury was able to reach a unanimous verdict.  The amended question should specifically tell the juror NOT to reveal the actual verdict rendered.

Response:

15.  The Government requests that the Defendant's Question 58 be substituted with Question 49(c) in the previously approved Questionnaire, calling for a written response about the quality of any prior jury experience, rather than only allowing for "Good", "Mixed" or "Bad" as answers to this question.

Response:  The defense agrees with the Government that asking for a written response to the question about the juror's prior jury experience is a good idea.  The defense proposed the three options of "Good", "Mixed", or "Bad" for jurors who might not provide meaningful answers.  Accordingly, the defense suggests including both the three written options, and a request for further explanation.

16.  The Government requests thatDefendant's Question 59 be amended to add the names of the victims in this case, Donald Lee Allen and Robin Antionette Williams to the question, as well as adding a line asking for an explanation to any "Yes" answer, as was done in the previously approved Questionnaire.

Response:  The defense agrees that this modification is appropriate and therefore requests that Question 59  be changed to, "Do you know, or think you have ever heard of, Donald Lee Allen, Robin Antoinette Williams or Aquilia Marcivicci Barnette?   Yes___   No ___ . If yes, please explain."


17.  The Government requests that Defendant's Question 61 be stricken as irrelevant to the jury selection process in this case.  The Government notes that this question was requested by the Defendant in the previous trial, and was disallowed by the Court.

Response:  Defendant's Question 61 is:  In your opinion, what are the two most important things you can teach your children?  This question is material and relevant in light of the amount and quality of the victim impact testimony presented at the last trial.  The

HB 000259

Bates No. 1951

defendant is entitled to have some idea of a juror's concept of the importance of family, both from the defense and government perspectives.

18. The Government requests that Defendant's Question 62 be stricken as irrelevant to the jury selection process in this case. The Government notes that this question was requested by the Defendant in the previous trial, and was disallowed by the Court.

Response: Defendant's Question 62 is: What are the two most important things you learned from your parents? See our response to #17.

19. The Government requests that Defendant's Question 65 be amended to add further instructions to have the juror indicate who sought employment, the length of employment, the location of the employment, and the position. For clarification, please refer to question 58 in the previously approved Questionnaire. Additionally, the Government would ask that the United States Secret Service be added to the list of employers.

Response: The Governments observations are well taken. The defense concurs with the propositions that more detail concerning employment would be helpful and that any other government agency, including the United States Secret Service, should be included in the question. Formatting the question is a challenge, but defense counsel propose something similar to the formulation in Attachment 1 to this document.

20. The Government requests that Defendant's Question 66 be amended to read: "Have you ever been approached by the United States Government or any of its agencies to assist or gather information on its behalf? For clarification, please refer to question 59 in the previously approved Questionnaire."

Response: The defendant's proposed question is, "Have you ever been approached by any agency to assist or gather information on its behalf?" Given the Government's request that the United States government be specified in the question (to which the defendant has no objection) the defense suggests the following to replace the current question 66: "Have you ever been approached by the federal government or a state government or any government agency to assist or gather information on its behalf?"

21. The government requests that Defendant's Question 74 be substituted with Question 69 in the previously approved Questionnaire. The government's proposed substitution allows for a more detailed written answer to the question, and will streamline in-court questioning of jurors.

Response: This issue concerns whether the juror, family members or friends (in whatever formulation the court chooses) have been the victim of a crime or a witness to a crime. The defense has no objection to the government's proposal to bundle victimization and witnessing into one question, with provision for explanations of the answers.

Bates No. 4952

22. The Government requests that Defendant's Question 75 be amended to include the line, "If yes, what were your/their duties?"

Response: The defendant's question 75 is: "Have you or your spouse of significant other worked for a lawyer or in a law office?" The defendant agrees with the government that detail to an affirmative answer would be helpful and joins in the government's request. In addition, because this question is so general, defendant proposes to delete his proposed question #33: "Have you, or any family member or friend, ever worked for a criminal defense lawyer or private investigator?"

23. The Government requests that Defendant's Questions 78 and 79 be stricken, as redundant to question 57.

Response: Question 57 concerns prior jury experience and requests detail about that experience which, if answered completely, makes Questions 78 and 79 redundant. Accordingly, the defendant has no objection to the Government's request to omit questions 78 and 79.

24. The Government requests that Defendant's Questions 80 and 81 be stricken, as not relevant to the jury selection process in this case.

Response: Defendant's questions 80 and 81 deal with the use and credibility of a witness who is given benefits (e.g., reduced sentence, dismissal of charges, immunity) for testimony against a criminal defendant. These questions are highly relevant if the government plans, as it did at the defendant's first trial, to call a "jail house" informant to testify. If the Government advises the Court that it will not call any witness who will make these questions relevant, the Defendant will withdraw his request for these questions.

25. The Government requests that Defendant's Question 82 be substituted with Question 80 in the previously approved Questionnaire, regarding the juror's beliefs about law enforcement testimony. The government's proposed substitution contains less extreme language, and will call for a more informative answer.

Response: The Defendant believes that the defense formulation of the question is better designed to elicit meaningful answers. In any event, the two options are as follows:

Defense Proposal:

Would you agree or disagree with the following statement?
In general, law enforcement officers are very much more likely than other people to tell the truch when testifying in trial if they are called as a witness in a trial. (Please check your answer)
_____ I AGREE
_____ I SOMEWHAT AGREE
_____ I HAVE NO OPINION

HB 000261

Bates No. 4953

_____ I SOMEWHAT DISAGREE
_____ I DISAGREE

Last Questionnaire:

Would you agree or disagree with the following statement?
Law enforcement officers are more likely than other people to tell the truth if they are called as a witness in a trial. (Circle the response that most accurately reflects your feelings)
AGREE   DISAGREE   AGREE SOMEWHAT   DISAGREE SOMEWHAT  NO SURE

26.  The Government requests that Defendant's Question 89 be substituted for the question, "Have you seen, read or heard anything about this case?"  The Government proposes that in the Jury Orientation, the Court will give the jury a brief synopsis of the facts of the case, rather than try and summarize the facts in one sentence on the Questionnaire.

Response:  The defense agrees that the Court should give the jurors a brief synopsis of the facts of the case during initial orientation, but contends that Question 89 accurately and succinctly states the facts and procedural posture of the case.  Defense counsel believe that answers to some of the remaining questions on the questionnaire require that the jurors be reminded about the nature of the case.

27.  The Government proposes that Defendant's Questions 89, 90, 104,. 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, regarding the juror's views of the law and the death penalty be substituted for the questions previously approved in the prior Jury Questionnaire.  Specifically, Question 89 is inflammatory and calls for speculation.  In general, the questions regarding the law and the death penalty in the previous Questionnaire have been approved, and are more detailed and will allow for a more streamlined questioning process by both the Court and counsel.  Those questions can be found at Questions 90, 92 and 122-135 in Exhibit 1.

Response:  There is no Exhibit 1 attached to any documents served on the defendant contemporaneously with the Government's Response to the Defendant's proposed questionnaire.

The vast majority of the questions posed by the Defendant's Questionnaire are, in fact, the same as in the prior questionnaire, as follows:

1.  Proposed #89 deals with the question discussed in response 26 and is almost identical to  old questionnaire question 92.
2.  Proposed 90:  Prosecutors must prove their cases beyond a reasonable doubt. Do you think that proof beyond a reasonable doubt makes it too hard on the prosecution?
    Old 100.  The government bears the burden of proof in a criminal case.  In order for the jury to reach a verdict of guilty, the Government must prove beyond a

HB 000262

reasonable doubt each and every element of the crime charged. A person charged with a crime has absolutely no burden to prove anything. Will you accept and apply this rule of law?

Commentary: Old 100 deals with guilt/innocence issue, so needed to be modified to deal with sentencing only. The defense also simplified the language.

3. Proposed 104: What is your personal view of the death penalty?
   Old 135: What is your personal view of the death penalty?
4. Proposed 105: Do you have any religious, moral, social, or political beliefs about the death penalty?
   Old 136: Do you have any strong religious, moral social or political beliefs regarding the death penalty?
4. Proposed 106: In this case, Aquilia Marcivicci Barnette is guilty of the murders of Robin Williams and Donald Allen. Under these circumstances, would you ever impose any punishment other than the Death Penalty?
   Old 137: Would you never vite to impose the death penalty under any circumstances?
5. Proposed 107: Would you always vote to impose the Death Penalty in a case where a person has been convicted of first degree murder and there is no self-defense?
   Old 138: Would you always vote to impose the death penalty in a case where a person has been convicted of first degree murder?
6. Proposed 108: Would you never vote to impose the penalty of Life Imprisonment without the Possibility of Release, under any circumstances, in a case where an accused has been found guilty of first degree murder and there was no self defense?
   Old 139: Would you never vote to impose the penalty of life without the possibility of parole, under any circumstances, in a case where an accused has been found guilty of first degree murder?
7. Proposed 109: Would you always vote to impose the penalty of Life Imprisonment Without the possibility of Release in a case where an accused has been found guilty of first degree murder?
8. Old 140: Would you always vote to impose the penalty of life without the possibility of parole in a case where an accused has been found guilty of first degree murder?
9. Proposed 110: What do you see as the problems with the law allowing the death penalty?
10. This question was not on the old questionnaire.
11. Proposed 111: What do you see as the values of the law allowing the death penalty?
12. This question was not on the old questionnaire.
13. Proposed 112: If you favor the death penalty, would you say you favor it: Very Strongly, Somewhat Strongly, Not Very Strongly
14. Old 142: This question is not on the old questionnaire.
15. Proposed 113: If you oppose the death penalty, would you say that you
    i. __ could not support the death penalty in any case;

Bates No. 4955

ii. __ might support the death penalty in the most horrible cases

This question is not on the old questionnaire, but counterbalances Proposed Question 112.

Proposed 114:  Which of the following describes your attitude towar dhe death penalty?…

Old  142 is identical except for the insertion of the word "usually" in the old phrase, "the death penalty typically is imposed in appropriate cases" and deletion fo the phrase because it is wrong in the old sentece "the death penalty should be abolished because it is wrong."

Proposed 115.  Does your spouse or significant other have a different opinion of the death penalty from yours?

Old 143:  Does your spouse have a different opinion of the death penalty from yours?

In addition, the government wants old questions as follows:

Old #90          What are your news sources?
                 Same question asked at proposed question 86

Old

Our 90: Burden of proof on prosecutors =
Our 89:Your personal view of the death penalty  is old 135
Our 104:religious, moral qualms  is old 136
104.  would you ever impose sentence other than death for person guilty of 2  new
        -137
105.  always vote for death-138
106.  never vote for LWOP-139
107.  always vote for LWOP-140
108.  problems with DP - new
109.  values of DP -new
110.  how strongly favor
111.  If you oppose dp, in every case?
112.  Check what describes your view of dp. -142
113.
114.  spouse feel differently  -143

Govt wants old:
90.  what are your news sources  86
91.  How may days do you read paper  87
92.  Have you seen/heard anything about this case  89

23.  Gov't wants to add qualifier, "If you are affiliated with a church…"

HB 000264

24. Wants to add "No overall classification fits my case to our question 96, which now reads: How would you describe yourself politically? Followed by a scale of extremely liberal to extremely conservative, running from 1-6
25. Our question 98 is: Have you ever been in a dating relationship or a marital relationship that involved physical and/or mental abuse or violence or the threat of anything like that?
    Government wants to replace with 114 a-d   (We don't have this; the only question we have is 128, which is essentially what we have written at 98)
26. Government wants our 100 (Has anyone you know been the victim of a homicide or an attempted homicide?) deleted because of the question about being a victim of a crime (Our question 43)
27. They want to replace our 101-103 with (misnumbered) 131-133

Our 101:  Do you believe psychologists and psychiatrists can identify and explain reasons for human behavior (Circle answer  Yes   no  Not Sure)
Our 102:  Have you ever received any training or engaged in the study of psychology or psychiatry:
Our 103:Have you or anyone you know ever had treatment for mental illness or emotional problems

Their 131:  In the course of this trial, you may hear testimony from psychologists or psychiatrists.  What is your opinion about the ability of psychologists or psychiatrists to identify and explain the reasons for human behavior?

Their 132.  Have you or any member of your immediate family ever worked for a psychiatrist, psychologist, therapist, mental health counselor, at a mental health clinic or in a psychiatric hospital or similar setting

Their 133.  Have you ever received any training or engaged in the study of psychology or psychiatrist.

HB 000265

Bates No. 4957

# MARC BARNETTE
## List of Contacts to Consider for Mitigation

| NAME | LOCATION | TIME | NOTES |
|---|---|---|---|
| SONIA BARNETTE<br>*Mother* | 704-391-8966 | | |
| MARIO BARNETTE<br>*Brother* | 704-391-8966 | | |
| JESSE COOPER<br>*Grandfather (mat)* | 704-391-8966 | | |
| SHEILA COOPER<br>*Aunt (maternal)* | 770-745-7761 | | |
| TESSIE NERO<br>*Aunt (maternal)* | 704-366-2302 | | |
| DERRICK BARNETTE<br>*Father* | 301-868-0139 | | |
| MARCELLA BARNETTE<br>*Step-mother* | | | |
| ARMAUD COOPER<br>*cousin* | 770-745-7761 | | |
| REGINA NERO<br>*cousin* | 704-366-2302 | | |
| SHONDA NERO<br>*cousin* | | | |

HB 000266

Bates No. 4958

JEFF NERO          704-366-2302
*cousin*


MABLE JOHNSON      704-547-0374
*Great-aunt*


JEAN COOPER
*Mother?s cousin*


ROBERT COOPER
*Mother?s cousin*


CARL COOPER*
*Mother?s cousin*


CANDICE
HOLLAND
*Jean Cooper?s
daughter*
 FRED COOPER
*cousin*


ERIC COOPER*
*Cousin, one-time
friend*

LARRY COOPER
*Mother?s cousin*


LARISSA BROWN
*cousin*


ALLEN SIFFORD
*Step-brother*

HB 000267

Bates No. 4959

MARCUS SIFFORD
*Step-brother*


LISA SHARP
*Mother?s cousin*


WENDY SHARP
*cousin*


LYNN SHARP
*cousin*


JT BARNETTE
*Father?s cousin*


# FRIENDS

STEVE AUSTIN          704-947-1938
*Best friend*


DARYL AUSTIN          FLYNWOOD DRIVE
*Steve Austin?s
brother*

GREG AUSTIN           COLUMBUS, OH
*Steve Austin?s
brother*

ANN AUSTIN            COMSTOCK DRIVE
*Steve?s mother*


RICK AUSTIN     *
*Steve?s father*


HB 000268

Bates No. 4960

| | |
|---|---|
| ANDREW McCLAIN<br>*Childhood neighbor* | COMSTOCK DRIVE |
| KEVIN BOLDEN<br>*Childhood friend* | |
| ANTHONY HAMILTON<br>*Childhood friend* | |
| BARRY ALSBROOKS*<br>*Childhood friend* | NC DOC #0005943<br>BOX 608, SPRUCE PINE,NC<br>28777 |
| SHONDA FRAZIER<br>*Childhood friend* | SEAMAN DR. |
| PHILOMENA<br>*Childhood friend* | (DERRICK BARNETTE CAN FIND) |
| ALVIN BOND<br>*5th grade best buddy* | OLC-1983 |
| ERICA BOND<br>*Alvin?s older sister* | OLC-1983 |
| TERRA<br>*5th grade friend* | SUN RAY CT. |
| THANOS SEQOROUS<br>*6th grade best buddy* | MCALWAY RD    ?85 |
| THANOS? PARENTS<br>*Thanos? parents* | |

HB 000269

Bates No. 4961

| | |
|---|---|
| SUSAN FISHER<br>*6th grade friend* | RIDGE CREST AVE. 1984 |
| MAJOR THOMAS<br>*6th grade friend* | GRIER HEIGHTS |
| SHAWN MOORE*<br>*7th grade friend* | FCI BUTNER |
| MELANIE MARTIN<br>*7th grade girlfriend* | FONTANA STREET   ? 1985 |
| TONYA RATLIFF<br>*Melanie?s best friend* | GRIER HEIGHTS |
| DARYL HAMILTON<br>*8th grade buddy* | LIVINGSTONE COLLEGE 1993 |
| ALBERT ALEXANDER*<br>*Best Buddy in  ?86-87* | FCI BUTNER   ?   ?02 |
| BETH DURANT*<br>*8th grade sweetie,<br>Hawthorne Jr. High* | BARCLIFF DR.   1998 |
| DANIELE MATHIS<br>*8th grade girlfriend,<br>Randolph Jr. High* | GRIER HEIGHTS   1986 |
| JUANNA MOONEY<br>*8th grade girlfriend,<br>S. Adams? sister* | POLK ST., 1985 |
| LORI OSBORNE<br>*1985 lover, Shonda?s<br>best buddy* | FARM POND LANE 1987 |

HB 000270

Bates No. 4962

| | |
|---|---|
| ANTOINE MCKINZIE<br>*Alex Nero?s father, buddies in 1985* | ASK S. NERO |
| LESLIE OSBORNE<br>*Lori?s sister, almost dated* | FARM POND LANE 1987 |
| AYANNA BREWER*<br>*9th grade friend* | TRIAL, 1998 |
| STEPHANIE<br>*Ayanna?s best friend* | AYANNA?S BEST FRIEND<br>ASK AYANNA |
| KIESHA MASON<br>*Play sister from childhood ? ask Ayanna* | PLAY SISTER FROM CHILDHOOD ? ASK AYANNA |
| RODRICK<br>*9th grade friend* | ERIC COOPER CAN FIND |
| ALICIA STITT*<br>*9th grade girlfriend* | ROSELAND APTS. 1987 |
| NICOLE HAMILTON<br>*9th grade lover/girlfriend* | SMITH JR. HIGH, 1987 |
| NATASHA ANDERSON*<br>*9th grade girlfriend* | SMITH JR. HIGH, 1987 |
| SHEILA SULLIVAN*<br>*10th grade girlfriend (ATL)* | LITHONIA HIGH 1988-91<br>NEED YEARBOOK |

HB 000271

Bates No. 4963

KENNY BAILEY*  LITHONIA HIGH 1988-91
*10th grade best buddy*

NETOISHA HEARD
*My childrens mother*

 TAMEKA  MOVED TO ORLANDO, FL
HUNTER*  IN 1996
*Lover, 92-93*

TONYA CURBEAM  JONQUIL ST. 1985
*Friend in Jr. High*

TAMMY DENNIS*  NEWNAN HIGH 1992
*Crystal Dennis?*
*sister*

STEVE
*Best buddy in*
*Newnan    ?92-93*

KAWANA  ARBYS IN NEWNAN
DOZIER*
*Lover/Friend   1992*

CANDY EPPS*  REID AVE, 1993
*Long-time friend -*
*church*

BARBRA EPPS  REID AVE, 1993
*Long-time friend -*
*church*

RICKY
*Courtyard Marriott*
*Securitym 1994-5*

SHAVONDA DAVIS  MYERS PARK HIGH 93-4
*Girlfriend &*
*co-worker, 1994*

HB 000272

Bates No. 4964

| | |
|---|---|
| RENEE CARSON<br>*Girlfriend/lover<br>1994* | UNCC  ?1994 HAS POLICE<br>RECORD |
| CYNTHIA<br>*Friend, co-worker* | COURTYARD MARRIOTT<br>ON ARROWWOOD RD |

# WORK CONTACTS

DANA (MALE)
*Boss at Arby?s in Newnan, 93-4; fired by company in 1994 for alleged theft*
DELORES GRISSOM
*Boss at Arby?s in Newnan in 1993-4*
KAROLYN McCORD
*Boss, Blockbuster in Newnan*
ANTHONY BALL
*Friend- family owns tire shop in Newnan. Possible name is Ball Tire and Repair*
KATHY BLACK
*Boss- Best Western in Roanoke in 1995*

SHIRLEY WILLIAMS*          .
*Lover, co-worker at Camelot Music, Roanoke; attended Patrick Henry HS 1995-7; Trial in 1998*
TOM HODGES
*Boss, Electrolux in Roanoke, VA,*

HB 000273

Bates No. 4965

# TEACHERS

MS. McDONALD
*Our Lady of Consolation (OLC) 5th grade teacher*
MS. MC---
*Cotswold Elem. 6th grade*
MR. AIKEN
*Lithonia HS Art Teacher ? 10th-11th grade*
SENSEI JOHNSON
*Magic Johnson & Roberts Karate School ? 1983-4*
SENSEI WILLIAMS
*Instructor at Karate School 1983-93. He is a former Capt. At Meck. Co. Jail and was a Bail Bondsman in 1996*
LISA SHARP
*Mother?s cousin*
WENDY SHARP
*cousin*
LYNN SHARP
*cousin*
JT BARNETTE
*Father?s cousin*

HB 000274

NAME:        AQUILIA M. BARNETTE

CASE #        CR-97-23-V

HB 000275

Bates No. 4967

Pg. 1 – 2nd para., should read "condoms alleged to have been…"

Pg. 2 – 1st para. Should read "contending that the government has the right to "elect" . .."

Last sentence in 1st paragraph should read "gave notice of its initiation of an administrative forfeiture"

2nd paragraph, right before arguments and authority – add " … by Barnett, which converted the administrative forfeiture proceeding into a judicial forfeiture proceeding."

Page 3.  Add a footnote at the end of the paragraph in #1 after the last parentheses which says "There are no allegations that the seized condoms fall within either of the remaining categories."

Page 4.  End of 1st paragraph should read:  " …. proceedings); *Matthews, supra* at 1099, *Linarez v. U.S. Dept. of Justice,* 2 F.3d 208, 212 (7th Cir. 1993)(The filing of a claim of ownership and cost bond would force the seizing agency to institute a judicial forfeiture proceeding).

Page 5, 2nd paragraph should read… "Barnett filed a claim and cost bond."
….. "claim and cost bond were…"

Then add before the last paragraph:

3.  The Court has jurisdiction to hear a Fed.R. Crim. P. 41 Motion.

The government contends that Fed.R.Crim.P. 54(b)(5) precludes the application of Rule 41 to a civil forfeiture action.  Recognizing that the Fourth Circuit had not addressed this issue, the district court in *Matthews, supra*, 917 F.Supp. 1090 (E.D.Va. 1996) conducted a thorough analysis of the application of Rule 41 to Rule 54(b)(5) and ruled that the Court will allow Rule 41(e) motions to overlap civil forfeitures to permit the Court to determine whether ancillary or equitable jurisdiction should be applied under the circumstances.  *Id.*, at 1102. The Court stated that the evocation of equitable principles has been demonstrated in cases involving the suppression of evidence prior to an indictment; the deterrence of unlawful conduct in law enforcement officials via the exclusion of illegally obtained evidence, the correction of a procedurally deficient administrative forfeiture and the award of equitable relief for exceptional circumstances.  *Id.*, 1101 – 02 (other citations omitted).  Accordingly, to determine if equitable relief may be evoked in exceptional circumstances, the Court held that it may examine whether a claimant has suffered irreparable harm and whether he had an adequate remedy at law in the administrative procedures

HB 000276

Bates No. 4968

afforded him. *Id.* (other citations omitted). Barnett is prepared to and will readily demonstrate to the Court to the irreparable harm it faces in the loss of nearly one million dollars of inventory and to the consequences which would inevitably follow a forfeiture of the condoms. The claimant will further demonstrate that it has taken immediate remedial action to bring the labeling deficiencies into full compliance with Customs regulations. Barnett will seek the equitable jurisdiction of the court to deny forfeiture and return its property.

HB 000277

Bates No. 4969

# UNITED STATES DISTRICT COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,    )
        Appellee,  )
                          )     **Docket No. 02-20 (CR-97-23-V)**
   v.                 )
                          )     **MOTION TO BE EXCUSED FROM**
AQUILIA MARCIVICCI BARNETTE,   )          **ORAL ARGUMENT**
        Appellant     )
_____)

**NOW COMES,** Harold J. Bender, counsel for the Appellant, and respectfully requests that the Court excuse Harold J. Bender from Oral Argument in this matter. In support of this Motion, the undersigned shows unto the Court:

1. Harold J. Bender was one of the trial counsel for the Appellant and has been appointed as Appellant Counsel in this matter.

2. Currently, Harold J. Bender is involved in the Penalty Phase of the capital murder case entitled *State v Jeffrey Neal Duke* in Gaston County, North Carolina..

3. The penalty phase is expected to last through the end of this week.

4. Mark Olive is the primary Appellant Attorney handling this matter and will be doing the entire argument for the Appellant.

5. Mark Olive consents to excusing Harold J. Bender from Oral Arguments in this matter.

**WHEREFORE,** counsel requests to be excused from Oral Arguments in this matter.

Respectfully submitted, this the _____ day of September, 2003..


_____
HAROLD J. BENDER
Attorney at Law
200 N. McDowell Street
Charlotte, North Carolina  28204

HB 000279

Bates No. 4571

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that she has served a copy of the foregoing Motion to be Excused from Oral Arguments upon the United States Court of Appeals, on this _____ day of September 2003, by faxing to:

Ms. Beth Walton
Case Manager
804-916-2796


_____
Patty Fantetti
Paralegal
Law Office of Harold Bender
200 N. McDowell Street
Charlotte, NC 28204
704-333-2169

HB 000280

Bates No. 4372

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
Lewis F. Powell, Jr. United States Courthouse Annex
1100 E. Main Street, Suite 501
Richmond, Virginia 23219-3517

Patricia S. Connor
Clerk

www.ca4.uscourts.gov

Telephone
(804) 916-2700

October 31, 2005

Matthew Theodore Martens, Esq.
OFFICE OF THE U. S. ATTORNEY
Suite 170C
Carillon Building
227 West Trade Street
Charlotte, NC 28202

Anne Magee Tompkins, Esq.
Assistant U. S. Attorney
OFFICE OF THE U. S. ATTORNEY
Suite 170C
Carillon Building
227 West Trade Street
Charlotte, NC 28202

Jill Westmoreland Rose, Esq.
OFFICE OF THE U. S. ATTORNEY
Suite 233
U. S. Courthouse
100 Otis Street
Asheville, NC 28801

        Re: 02-20 US v. Aquilia M. Barnette
            CR-97-23-V

Dear Counsel:

     The appellant's motion to remand or, in the alternative, to allow
supplemental briefing and argument was filed in this office on
10/31/05.  The appellee must file four copies of a response to the
motion in the clerk's office on or before 11/10/05, even if there is
no objection.


                              Yours truly,

                              PATRICIA S. CONNOR
                                   Clerk


                                  /s/ Taline Akseraylian
                              By: _____
                                   Deputy Clerk


cc:  Mark Evan Olive
  .  Harold Johnson Bender

HB 000281

September 14, 2007


Aquilla Marcivicci Barnette
# 12599-058
P.O. Box 12015
Terre Haute  IN  47801


Dear Marc,

It appears that we are making progress toward resolving your case favorably.

It has been a long time since I even communicated with you. For that, I apologize.

Mark Olive and I have spoken several times recently about the best way to handle your case, now that it has been remanded to Judge Voorhees to determine the effect of the jury selection in your case. Since Mark has not made an appearance in the case in District Court, only in the Appellate Court, and Jean Lawson has gone back to the State Public Defenders Office, a second attorney needs to be involved. I have spoken to Claire Rauscher, who is now the Federal Public Defender for the Western District of North Carolina, she is agreeable to assisting me in your case. However, she wants to make sure that you do not object to her or her office being involved at this time. Her office has sufficient resources to assist me in making sure that we get the best result possible.

Please let me hear from you as soon as possible. I look forward to hearing from you.


Very truly yours,


Harold J. Bender


HJB/mc

HB 000282

Bates No. 4374

# Motions

3:97-cr-00023-RLV USA, et al v. Barnette **CASE CLOSED on 02/20/1998**

CLOSED, PSLC5

## U.S. District Court

## Western District of North Carolina

## Notice of Electronic Filing

The following transaction was entered by Bender, Harold on 11/29/2007 at 5:30 PM EST and filed on 11/29/2007

**Case Name:** USA, et al v. Barnette
**Case Number:** 3:97-cr-23
**Filer:** Dft No. 1 - Aquilia Marcivicci Barnette
**Document Number:** 633

**Docket Text:**
First MOTION Return to North Carolina by Aquilia Marcivicci Barnette. (Bender, Harold)

**3:97-cr-23-1 Notice has been electronically mailed to:**

Harold J. Bender    hjblaw@bellsouth.net

James P Cooney , III    jcooney@wcsr.com, basmith@wcsr.com

Jill Westmoreland Rose    jill.rose@usdoj.gov, shelly.flynn@usdoj.gov

Anne M. Tompkins AUSA    mike.savage2@usdoj.gov

**3:97-cr-23-1 Notice will not be electronically mailed to:**

Robert Erickson
U.S. Dept. of Justice
Criminal Division, Appellate Section
P.O. Box 899
Washington, DC 20044

Jean B. Lawson
P. O. Box 472106
Charlotte, NC 28226

HB 000283

Bates No. 1375

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1095689202 [Date=11/29/2007] [FileNumber=881836-0
] [8d27f4886fa75a5a4333034c7109df42a1d1e459bb5ddabba4632f7351d9d9a8647
53598069fb7d24798cecad67d55335fac963e1050603915312952d4e6cf36]]

HB 000284

Bates No. 4976

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

FILED
September 11, 2006

No. 02-20
CR-97-23-V

UNITED STATES OF AMERICA

            Plaintiff - Appellee

  v.

AQUILIA MARCIVICCI BARNETTE

            Defendant - Appellant

------------------
O R D E R
------------------

     The government has filed an unopposed motion for an extension of time within which to file its supplemental brief.

     The Court extends the time for filing the government's supplemental brief until September 21, 2006, and extends the time for filing the appellant's supplemental reply brief until October 6, 2006.

For the Court,

/s/ Patricia S. Connor
_____
CLERK

HB 000285

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 02-20
CR-97-23-V

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

AQUILIA MARCIVICCI BARNETTE

Defendant - Appellant

------------
O R D E R
------------

Appellant has filed an unopposed motion for an extension of time within which to file his supplemental brief.

The Court grants the motion. Appellant's supplemental brief shall be served and filed on or before August 10, 2006, appellee's supplemental brief shall be served and filed on or before September 11, 2006, and appellant's supplemental reply brief, if any, shall be served and filed on or before September 26, 2006.

For the Court,

/s/ Patricia S. Connor
———————————————
CLERK

HB 000286

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:00M132

UNITED STATES OF AMERICA   )
   )
   vs.   )   **DEFENDANT'S RESPONSE TO**
   )   **GOVERNMENT'S MOTION FOR**
   )   **RECONSIDERATION AND**
   )   **MEMORANDUM IN SUPPORT**
BARNETT INTERNATIONAL   )   **OF MOTION FOR RETURN OF**
CORPORATION,   )   **PROPERTY**
   )
   Defendant.   )
_____)

NOW COMES the Defendant, Barnett International Corporation ("Barnett"), by and through its attorney, and in response to the government's Motion for Reconsideration and the Court's Order of August 23, 2000. In support of Barnett's Motion for Return of Property, the Defendant states as follows:

On or about June 8, 2000, a search warrant was executed on the premises of Barnett by the United States Customs Service, resulting in the seizure of 730 boxes of packaged condoms alleged to have been incorrectly labeled, in violation of United States Customs regulations. The appraised value of the condoms is $975,300.00. As stated in its Motion for Return of Property, Barnett has rectified the labeling defect, is now in complete compliance with Customs Regulations, and seeks to have its property returned, pursuant to Fed.R.Crim.P. 41.

Apparently in opposition to the return of the property, the government claimed that it initiated administrative forfeiture of the property under 19 U.S.C. §§ 1602 – 1621, thereby depriving this Court of subject matter jurisdiction over the

HB 000287

Bates No. 4379

proceedings.  This Court rejected the government's contention regarding its lack of jurisdiction and has begun to proceed with Barnett's Rule 41 Motion.   The government now moves the Court to reconsider its Order, contending that the government has the right to "elect" to proceed with a forfeiture administratively or judicially under 19 U.S.C. §§ 1602 – 1621, and that it has initiated the administrative process.  The government suggests that "most federal forfeitures in this country proceed 'administratively' without any filing in federal court," and that it "gave notice of its initiation an administrative forfeiture" on or about June 28, 2000" which thereby divested the Court of jurisdiction.

<u>Argument and Authorities</u>

The clear mandate of the statutory scheme, however, provides that the <u>only</u> forfeiture option available to the government is through the judicial process, and that this Court has original jurisdiction over this matter because it involves property exceeding $500,000.00 in value, and because the administrative forfeiture process was halted by the filing of a claim and cost bond by Barnett, which converted the administrative forfeiture proceeding into a judicial forfeiture proceeding.   19 U.S.C. § 1607.

Administrative forfeitures are authorized by the procedural provisions of the customs laws, 19 U.S.C. §§ 1602 – 1621.  Pursuant to 19 U.S.C. § 1607 (a), if seized property falls within any of four enumerated categories, it may be forfeited by the seizing agency if proper notice of the seizure and intent to forfeit is given, provided no person files a claim to the property, accompanied by a cost bond, within the allotted time period.  Id. § 1609.  The four categories of property subject

2

HB 000288

Bates No. 4980

to administrative forfeiture are (1) property of a value that does not exceed $500,000; (2) property whose importation is prohibited; (3) property used to transport illegal drugs; or (4) currency or other monetary instruments. *Id*. §1607(a). Claims to the property, accompanied by a cost bond, must be filed within 20 days of the date of the first publication of the notice of seizure and intent to forfeit. Id. § 1608. Once the claim and cost bond is filed, the administrative forfeiture process is halted and the seizing agency must refer the matter to the United States Attorney for the institution of judicial forfeiture proceedings. *Id*. §§ 1603(b) and 1608.

As Courts in the Fourth Circuit have stated, "in sum, administrative forfeitures are appropriate only where the property remains unclaimed: administrative forfeiture is, in reality, a non-proceeding – it is merely the consequence of no one having come forward to claim the property seized or contest its forfeitability." *Matthews v. U.S.,* 917 F.Supp. 1090, 1098 (E.D. Va. 1996). See also *U.S. v. Idowu,* 74 F.3d 387, 394 (2nd Cir. 1996).

    1. <u>The seized property is not subject to administrative forfeiture</u>

Contrary to the assertions of the government, administrative forfeiture is not an option in this matter. The value of the seized condoms, $975,300.00, is well in excess of the statutory amount of $500,000.00. 19 U.S.C. § 1607 (a); *Matthews*, supra. ("[Administrative forfeitures] are available only if the value of the property seized is less than the jurisdictional amount of $500,000.00").[1]

---

[1]There are no allegations that the seized condoms fall within either of the remaining categories.

3

HB 000289

Bates No. 4981

2. <u>Administrative proceedings are halted by the filing of a claim and cost bond</u>

It is well settled that an administrative forfeiture is commenced when the seizing agency publishes notice of the seizure and its intent to forfeit the property once a week for at least three consecutive weeks in a newspaper in general circulation in the district in which the forfeiture proceeding is initiated. *Ibarra v. U.S.,* 120 F.3d 472, 474 (4th Cir. 1997), citing 19 U.S.C. § 1607(a); 21 C.F.R. § 1316.75. The seizing agency must also give personal written notice of the seizure and information on the applicable procedures to any person who appears to have an interest in the property. *Id.* Claimants then have twenty days from the date of the first publication of the notice of seizure to file a claim and cost bond. *Id.* Once the seizing agency commences forfeiture proceedings pursuant to 19 U.S.C. § 1607, the seizing agency does in fact divest the district court of jurisdiction of the forfeiture proceedings and the court remains without jurisdiction, **unless** an interested party timely files a claim and cost bond pursuant to 19 U.S.C. § 1608. By timely filing a claim and cost bond, a claimant effectively halts the administrative proceedings by compelling the seizing agency to refer the matter to the U.S. Attorney for institution of judicial forfeiture proceedings. *Id.*, citing 19 U.S.C. § 1608; 21 C.F.R. 1316.76. See also, *U.S. v. All Right, etc.*, 772 F.Supp. 1433, 1438 (S.D.N.Y. 1991)(The filing of a claim and cost bond converts the administrative proceedings into judicial forfeiture proceedings); *Matthews*, *supra* at 1099, *Linarez v. U.S. Dept. of Justice*, 2 F.3d 208, 212 (7th Cir. 1993)(The filing

4

HB 000290

Bates No. 4982

of a claim of ownership and cost bond would force the seizing agency to institute a judicial forfeiture proceeding).

By its letter dated June 28, 2000, the Department of Treasury notified Barnett of its seizure of the subject property, that it intended to initiate forfeiture by publishing a notice of seizure and intent to forfeit in *The Charlotte Observer*, beginning July 28, 2000. The notice further stated that by filing a claim and cost bond in the amount of $5,000.00, the matter would immediately be referred for judicial forfeiture proceedings in Federal court. See Exhibit A attached. [2]

On July 27, 2000, prior to the publication of the notice, and before the twenty-day period had even begun to run, Barnett filed a claim and cost bond. See Exhibit B attached. Accordingly, because the claim and cost bond were timely filed, well before administrative proceedings were commenced, the U.S. Code demands that the matter now be referred to the district court.

The government likens the instant case to the issue in *Ibarra, id.,* in which the court ruled that a district court lacked jurisdiction to hear a party's Fed.R.Crim.P 41(e) claim for return of seized property. However, the facts in *Ibarra* are altogether different than in the instant case. Ibarra elected to participate in an administrative forfeiture proceeding, during the pendency of which she sought return of the property by her Rule 41 motion. In that case, the court clearly did not have jurisdiction, and repeated the mandatory language of the statutory scheme:

---

[2] Providing written notice of the seizure and information on the applicable procedures to Barnett did not commence the administrative proceedings. The law is clear that the proceedings are commenced by the publication of the notice and intent to forfeit in the newspaper for three weeks. It is upon the first publication that the twenty-day period begins to run.

5

HB 000291

Bates No. 4983

"[O]nce the government initiates forfeiture proceedings, the district court is divested of jurisdiction. The court remains without jurisdiction during the pendency of the proceeding **UNLESS** during the pendency of the proceeding the claimant timely files a claim and cost bond." *Id.* at 475 (emphasis added).

3. The Court has jurisdiction to hear a Fed.R.Crim.P. 41 Motion.

The government contends that Fed.R.Crim.P. 54(b)(5) precludes the application of Rule 41 to a civil forfeiture action. Recognizing that the Fourth Circuit had not addressed this issue, the district court in *Matthews, supra*, 917 F.Supp. 1090 (E.D.Va. 1996) conducted a thorough analysis of the application of Rule 41 to Rule 54(b)(5) and ruled that the Court will allow Rule 41(e) motions to overlap civil forfeitures to permit the Court to determine whether ancillary or equitable jurisdiction should be applied under the circumstances. *Id.*, at 1102. The Court stated that the evocation of equitable principles has been demonstrated in cases involving the suppression of evidence prior to an indictment; the deterrence of unlawful conduct in law enforcement officials via the exclusion of illegally obtained evidence, the correction of a procedurally deficient administrative forfeiture and the award of equitable relief for exceptional circumstances. *Id.*, 1101 – 02 (other citations omitted). Accordingly, to determine if equitable relief may be evoked in exceptional circumstances, the Court held that it may examine whether a claimant has suffered irreparable harm and whether he had an adequate remedy at law in the administrative procedures afforded him. *Id.* (other citations omitted). Barnett is prepared to and will readily demonstrate to the Court to the irreparable harm it faces in the loss of nearly one million dollars of inventory and to

6

the consequences which would inevitably follow a forfeiture of the condoms. The claimant will further demonstrate that it has taken immediate remedial action to bring the labeling deficiencies into full compliance with Customs regulations. Barnett will seek the equitable jurisdiction of the court to deny forfeiture and return its property.

The clear mandate of the U.S. Code provides that this Court indeed has subject matter of the seized condoms. Accordingly, Barnett asks this Court to deny the government's Motion for Reconsideration and to proceed with Barnett's Rule 41 motion.

Respectfully submitted, this the ____ day of September, 2000.

_____  
HAROLD J. BENDER  
Bender & Barnett  
200 North McDowell Street  
Charlotte, North Carolina 28204  
704/333-2169  
Attorney for BARNETT

7

HB 000293

Bates No. 4985

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|---|---|---|---|---|---|
| **2002** | | | | | |
| 09/12/02 | prepared and filed notice of appea | 1.05 | | | |
| 09/24/02 | tc with 4th circuit | 0.60 | | | |
| 09/26/02 | tc clients family | 0.55 | | | |
| 09/30/02 | conference with Lawson | 0.85 | | | |
| 10/07/02 | prepare docketing statement | 1.40 | | | |
| 10/07/02 | tc with Lawson | 0.55 | | | |
| 10/08/02 | tc with clients family | 0.45 | | | |
| 10/11/02 | tc with client | 0.70 | | | |
| | | | | | |
| | | | | | |
| 10/28/02 | tc Lawson | 0.80 | | | |
| 10/28/02 | tc with Federal Death Penalty Ctr | 0.45 | | | |
| 10/28/02 | prepare motion to extend | 1.60 | | | |
| 10/29/02 | tc with Federal Death Penalty Ctr | 0.65 | | | |
| 10/29/02 | prepare motion to extend | 1.30 | | | |
| 10/30/02 | conference with Lawson | 1.15 | | | |
| | | | | | |
| 11/05/02 | review transcripts | 1.90 | | | |
| 11/06/02 | tc with Federal Capital Defender | 0.55 | | | |
| 11/07/02 | review transcripts | 2.05 | | | |
| 11/08/02 | tc with M.Olive | 0.45 | | | |
| 11/12/02 | conference with former attny | 0.85 | | | |
| 11/13/02 | review transcripts | 2.30 | | | |
| 11/13/02 | tc with co-counsel | 0.55 | | | |
| 11/14/02 | tc with Federal Capital Defender | 0.45 | | | |
| 11/26/02 | review transcripts | 3.40 | | | |
| | | | | | |
| 12/03/02 | ltr M.Olive | 0.45 | | | |
| 12/06/02 | review transcripts | 4.20 | | | |
| 12/10/02 | review transcripts | 2.30 | | | |
| 12/12/02 | tc with M.Olive | 0.45 | | | |
| 12/16/02 | review transcript | 1.85 | | | |
| 12/17/02 | LR | 2.35 | | | |
| 12/19/02 | tc with M.Olive | 0.70 | | | |
| 12/19/02 | obtain documents | 2.35 | | | |
| 12/20/02 | mailed documents | 0.65 | | | |
| 12/27/02 | ltr to client | 0.35 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | COLUMN TOTALS | 40.25 | 0.00 | 0.00 | 0 |
| | PAGE TOTAL | 40.25 | | | |
| | | | | | |
| | TIME GRAND TOTAL | | | | |
| | EXPENSE GRAND TOTAL | | | | |
| | | | | | |
| | | | | | |

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|---|---|---|---|---|---|
| **2003** | | | | | |
| 01/06/03 | tc with M.Olive | 0.55 | | | |
| 01/13/03 | tc with M.Olive | 0.55 | | | |
| 01/15/03 | tc with M.Olive | 0.45 | | | |
| | | | | | |
| 03/11/03 | review order | 0.30 | | | |
| | | | | | |
| 04/09/03 | tc with client | 0.40 | | | |
| | | | | | |
| 05/08/03 | tc with AUSA Rose | 0.40 | | | |
| 05/08/03 | tc with M.Olive | 0.55 | | | |
| 05/09/03 | tc with client | 0.60 | | | |
| 05/09/03 | tc with M.Olive | 0.40 | | | |
| 05/09/03 | tc with AUSA Rose | 0.35 | | | |
| 05/12/03 | tc with M.Olive | 0.40 | | | |
| 05/15/03 | tc with M.Olive | 0.45 | | | |
| | | | | | |
| 06/04/03 | preparing motions | | | 3.00 | |
| 06/04/03 | preparing motions | | | 2.25 | |
| 06/06/03 | review and gather records | 2.70 | | | |
| 06/09/03 | tc M.Olive | 0.60 | | | |
| 06/09/03 | obtained records | 1.70 | | | |
| 06/10/03 | review draft brief | 1.65 | | | |
| 06/12/03 | tc M.Olive | 0.35 | | | |
| | | | | | |
| 09/08/03 | ltr to M. Olive | | | 0.50 | |
| 09/09/03 | draft motions | | | | 6.55 |
| 09/22/03 | mailmotion | 0.40 | | | |
| 09/22/03 | tc with 4th circuit | 0.45 | | | |
| | tc with Fed. Travel | 0.50 | | | |
| 09/22/03 | travel to richmond | 1.60 | | | |
| 09/22/03 | review briefs | 1.85 | | | |
| 09/22/03 | expense-taxi service | | | | 17.50 |
| 09/23/03 | ct argument | | 0.80 | | |
| 09/23/03 | conference with M.Olive | 1.30 | | | |
| 09/23/03 | expense-taxi service | | | | 17.50 |
| 09/23/03 | travel to Charlotte | 1.55 | | | |
| | | | | | |
| | COLUMN TOTALS | 20.05 | 0.80 | 5.75 | $41.55 |
| | PAGE TOTAL | 26.60 | | | |
| | | | | | |
| | TIME GRAND TOTAL | | | | |
| | EXPENSE GRAND TOTAL | | | | |

HB 000295

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|------|------------------------------|--------------|----------|-----------|----------|
| **2004** | | | | | |
| 01/02/04 | review transcripts | 3.05 | | | |
| 01/02/04 | conference with client | 1.40 | | | |
| 01/03/04 | tc Lawson | 0.70 | | | |
| 01/03/04 | review transcripts | 3.40 | | | |
| 01/04/04 | review transcripts | 4.05 | | | |
| 01/04/04 | tc Lawson | 0.35 | | | |
| 01/04/04 | tc with clerk | 0.30 | | | |
| 01/05/04 | conference with client | 2.05 | | | |
| 01/05/04 | conference with Lawson | 1.55 | | | |
| 01/06/04 | review transcripts | 2.80 | | | |
| 01/07/04 | review transcripts | 3.85 | | | |
| 01/07/04 | conference with Voorhees | 0.90 | | | |
| 01/07/04 | conference with Lawson | 1.70 | | | |
| 01/08/04 | tc with Lawson | 0.65 | | | |
| 01/09/04 | tc with Lawson | 0.70 | | | |
| 01/09/04 | review transcripts | 3.10 | | | |
| 01/10/04 | conference with Lawson | 1.85 | | | |
| 01/10/04 | review transcripts | 1.70 | | | |
| 01/10/04 | tc with experts | 1.60 | | | |
| 01/10/04 | conference with AUSA Tompkins | 0.70 | | | |
| 01/11/04 | conference with Lawson | 1.30 | | | |
| 01/11/04 | tc with experts | 0.90 | | | |
| 01/11/04 | review transcripts | 2.80 | | | |
| 01/12/04 | review transcripts | 2.30 | | | |
| 01/13/04 | review transcripts | 3.05 | | | |
| 01/14/04 | conference with expert | 2.20 | | | |
| 01/14/04 | conference with Lawson | 1.15 | | | |
| 01/14/04 | review transcripts | 2.80 | | | |
| 01/15/04 | review transcripts | 2.15 | | | |
| 01/15/04 | conference with S.Maxwell | 2.80 | | | |
| 01/15/04 | tc with expert | 0.70 | | | |
| 01/15/04 | tc Lawson | 0.25 | | | |
| 01/16/04 | conference with J.Warren | 1.70 | | | |
| 01/16/04 | conference with Lawson | 1.35 | | | |
| 01/16/04 | tc with experts | 0.60 | | | |
| 01/17/04 | conference with Alphonso | 3.65 | | | |
| 01/17/04 | tc with expert | 0.40 | | | |
| 01/17/04 | review transcripts | 1.70 | | | |
| | | | | | |
| | COLUMN TOTALS | 68.20 | 0.00 | 0.00 | $0.00 |
| | PAGE TOTAL | 68.20 | | | |
| | | | | | |
| | TIME GRAND TOTAL | | | | |
| | EXPENSE GRAND TOTAL | | | | |

HB 000296

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|---|---|---|---|---|---|
| **2004** | | | | | |
| 01/18/04 | review transcripts | 2.70 | | | |
| 01/18/04 | conference with expert | 1.80 | | | |
| 01/18/04 | tc with expert | 0.65 | | | |
| 01/18/04 | conference with family | 0.80 | | | |
| 01/19/04 | review transcripts | 1.95 | | | |
| 01/20/04 | review transcripts | 2.80 | | | |
| 01/21/04 | review transcripts | 3.05 | | | |
| 01/22/04 | conference with Lawson | 0.65 | | | |
| 01/22/04 | conference with clerk | 0.45 | | | |
| 01/22/04 | review transcripts | 3.20 | | | |
| 01/23/04 | visit crime scene-Roanoke | 4.50 | | | |
| 01/23/04 | visit witnesses | 2.70 | | | |
| 01/23/04 | review transcripts | 1.15 | | | |
| 01/24/04 | review transcripts | 4.05 | | | |
| 01/25/04 | tc with experts | 0.85 | | | |
| 01/25/04 | review report Resource Center | 0.60 | | | |
| 01/25/04 | review transcripts | 1.30 | | | |
| 01/25/04 | conference with client | 1.70 | | | |
| 01/26/04 | review transcripts | 3.05 | | | |
| 01/27/04 | review transcripts | 2.95 | | | |
| 01/28/04 | review discovery | 2.80 | | | |
| 01/28/04 | tc with expert | 0.45 | | | |
| 01/29/04 | conference with expert | 1.40 | | | |
| 01/29/04 | conference with client | 1.35 | | | |
| 01/29/04 | conference with Lawson | 0.90 | | | |
| 01/30/04 | review discovery | 2.85 | | | |
| 01/30/04 | filed motions | 0.65 | | | |
| 01/30/04 | tc with co-counsel | 0.70 | | | |
| 01/31/04 | review discovery | 3.05 | | | |
| 01/31/04 | tc with expert | 0.70 | | | |
| | | | | | |
| 02/01/04 | review discovery | 3.10 | | | |
| 02/01/04 | tc with expert | 0.60 | | | |
| 02/02/04 | review transcripts | 2.85 | | | |
| 02/04/04 | review transcripts | 4.10 | | | |
| 02/04/04 | conference with client | 0.85 | | | |
| 02/04/04 | tc with co-counsel | 0.60 | | | |
| | | | | | |
| | | | | | |
| | COLUMN TOTALS | 67.85 | 0.00 | 0.00 | $0.00 |
| | PAGE TOTAL | 67.85 | | | |
| | | | | | |
| | TIME GRAND TOTAL | | | | |
| | EXPENSE GRAND TOTAL | | | | |

HB 000297

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|---|---|---|---|---|---|
| **2004** | | | | | |
| 02/04/04 | tc with expert | 1.15 | | | |
| 02/05/04 | conference with | 2.70 | | | |
| 02/05/04 | conference with jury expert | 2.55 | | | |
| 02/05/04 | review discovery | 1.80 | | | |
| 02/06/04 | review transcripts | 3.90 | | | |
| 02/07/04 | conference with Lawson | 0.90 | | | |
| 02/07/04 | review transcripts | 3.45 | | | |
| 02/07/04 | conference with client | 1.55 | | | |
| 02/08/04 | review transcripts | 2.90 | | | |
| 02/08/04 | review clerk file | 1.35 | | | |
| 02/09/04 | review discovery | 2.80 | | | |
| 02/10/04 | review discovery | 1.95 | | | |
| 02/11/04 | conference with clerk | 1.05 | | | |
| 02/11/04 | tc | 0.70 | | | |
| 02/11/04 | conference with Lawson | 4.65 | | | |
| 02/12/04 | conference with Lawson | 1.75 | | | |
| 02/12/04 | tc with Lawson | 0.80 | | | |
| 02/12/04 | revised expert motion | 2.60 | | | |
| 02/12/04 | tc expert | 0.90 | | | |
| 02/13/04 | conference with clerk | 1.05 | | | |
| 02/13/04 | filed motion | 0.90 | | | |
| 02/13/04 | conference with Lawson | 2.35 | | | |
| 02/13/04 | review discovery | 2.70 | | | |
| 02/14/04 | tc with investigator | 0.60 | | | |
| 02/14/04 | tc with Lawson | 0.55 | | | |
| 02/14/04 | review discovery | 2.30 | | | |
| 02/15/04 | conference with former psycholog | 2.05 | | | |
| 02/15/04 | conference with Lawson | 1.45 | | | |
| 02/15/04 | filed exoerts motion | 0.90 | | | |
| 02/15/04 | review discovery | 3.10 | | | |
| 02/17/04 | review discovery | 2.95 | | | |
| 02/18/04 | review discovery | 3.45 | | | |
| 02/19/04 | conference with client | 2.05 | | | |
| 02/19/04 | conference with Lawson | 3.70 | | | |
| 02/19/04 | conference with former attny | 1.10 | | | |
| 02/19/04 | tc with witness | 0.95 | | | |
| 02/19/04 | tc with former attny | 0.70 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | COLUMN TOTALS | 72.30 | 0.00 | 0.00 | $0.00 |
| | PAGE TOTAL | 72.30 | | | |
| | | | | | |
| | TIME GRAND TOTAL | | | | |
| | EXPENSE GRAND TOTAL | | | | |
| | | | | | |

HB 000298

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|---|---|---|---|---|---|
| **2004** | | | | | |
| 02/19/04 | tc with Bof P | 0.75 | | | |
| 02/19/04 | LR | 1.15 | | | |
| 02/20/04 | review discovery | 3.60 | | | |
| 02/20/04 | conference with Lawson | 1.35 | | | |
| 02/20/04 | conference with witness | 1.60 | | | |
| 02/21/04 | review discovery | 3.35 | | | |
| 02/21/04 | tc Lawson | 0.85 | | | |
| 02/21/04 | tc with w expert | 1.10 | | | |
| 02/22/04 | tc with Lawson | 0.70 | | | |
| 02/22/04 | review discovery | 3.20 | | | |
| 02/24/04 | review discovery | 2.85 | | | |
| 02/25/04 | tc with Lawson | 0.70 | | | |
| 02/25/04 | review Lawson memos | 0.85 | | | |
| 02/25/04 | review motion hearings | 3.15 | | | |
| 02/25/04 | conference with AUSA Tompkins | 0.70 | | | |
| 02/26/04 | conference with Lawson | 3.85 | | | |
| 02/26/04 | ct expert hearing | | 1.05 | | |
| 02/26/04 | tc with D.Bell | 0.85 | | | |
| 02/26/04 | review discovery | 3.20 | | | |
| 02/26/04 | LR | 1.45 | | | |
| 02/27/04 | tc with Lawson | 0.85 | | | |
| 02/27/04 | tc with Resource Center | 0.90 | | | |
| 02/27/04 | tc with expert | 0.75 | | | |
| 02/27/04 | review discovery | 4.55 | | | |
| 02/28/04 | review discovery | 4.30 | | | |
| | | | | | |
| 03/01/04 | conference with Lawson | 1.70 | | | |
| 03/01/04 | tc with Lawson | 0.60 | | | |
| 03/01/04 | review transcripts | 4.05 | | | |
| 03/02/04 | review discovery | 2.85 | | | |
| 03/03/04 | review discovery | 3.40 | | | |
| 03/04/04 | filed motions | 0.85 | | | |
| 03/04/04 | conference with Lawson | 3.70 | | | |
| 03/04/04 | review transcripts | 2.95 | | | |
| 03/05/04 | conference with former attny | 4.80 | | | |
| | | | | | |
| | COLUMN TOTALS | 71.50 | 1.05 | 0.00 | $0.00 |
| | PAGE TOTAL | 72.55 | | | |
| | | | | | |
| | TIME GRAND TOTAL | | | | |
| | EXPENSE GRAND TOTAL | | | | |
| | | | | | |

HB 000299

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|---|---|---|---|---|---|
| **2004** | | | | | |
| 03/05/04 | conference with Lawson | 2.65 | | | |
| 03/05/04 | review transcripts | 3.55 | | | |
| 03/06/04 | review discovery | 4.80 | | | |
| 03/06/04 | prepare response | 1.85 | | | |
| 03/06/04 | tc with Lawson | 1.70 | | | |
| 03/06/04 | tc with expert | 0.70 | | | |
| 03/07/04 | conference with Lawson | 6.70 | | | |
| 03/08/04 | conference with Lawson | 4.35 | | | |
| 03/08/04 | conference with experts | 3.55 | | | |
| 03/08/04 | review transcripts | 1.90 | | | |
| 03/09/04 | conference with Lawson | 3.80 | | | |
| 03/09/04 | conference with experts | 4.05 | | | |
| 03/10/04 | review transcripts | 4.90 | | | |
| 03/10/04 | conference with experts | 2.15 | | | |
| 03/10/04 | conference with Lawson | 3.60 | | | |
| 03/11/04 | review transcripts | 3.95 | | | |
| 03/11/04 | review court file | 4.80 | | | |
| 03/11/04 | review transcripts | 2.30 | | | |
| 03/12/04 | tc with Lawson | 0.90 | | | |
| 03/12/04 | review prison records | 3.85 | | | |
| 03/12/04 | review discovery | 3.40 | | | |
| 03/13/04 | tc with expert | 0.95 | | | |
| 03/13/04 | conference with Lawson | 2.30 | | | |
| 03/13/04 | review records | 3.45 | | | |
| 03/14/04 | conference with client | 1.55 | | | |
| 03/14/04 | tc with Lawson | 0.65 | | | |
| 03/14/04 | review transcripts | 2.70 | | | |
| 03/15/04 | review transcripts | 1.95 | | | |
| 03/16/04 | review transcripts | 2.20 | | | |
| 03/17/04 | review Death Penalty Resource D | 3.15 | | | |
| 03/18/04 | review DP Resource Doc | 3.80 | | | |
| 03/18/04 | conference with AUSA Shuppert | 0.60 | | | |
| 03/18/04 | tc with Lawson | 1.20 | | | |
| 03/18/04 | review jury selection transcripts | 2.40 | | | |
| 03/19/04 | review transcripts | 4.05 | | | |
| 03/19/04 | tc with expert | 0.70 | | | |
| 03/19/04 | tc with Lawson | 0.85 | | | |
| 03/20/04 | tc with expert | 0.45 | | | |
| 03/20/04 | review transcripts | 3.70 | | | |
| 03/20/04 | tc with lawson | 0.40 | | | |
| 03/21/04 | conference with Lawson | 4.05 | | | |
| 03/21/04 | review jury transcripts | 1.55 | | | |
| 03/22/04 | review transcripts | 1.95 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | COLUMN TOTALS | 114.05 | 0.00 | 0.00 | $0.00 |
| | PAGE TOTAL | 114.05 | | | |
| | | | | | |
| | TIME GRAND TOTAL | | | | |
| | EXPENSE GRAND TOTAL | | | | |
| | | | | | |

HB 000300

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|---|---|---|---|---|---|
| **2004** | | | | | |
| 03/22/04 | review attny w       files | 3.20 | | | |
| 03/23/04 | review attny w       files | 2.70 | | | |
| 03/24/04 | review discovery | 3.85 | | | |
| 03/25/04 | conference with Lawson | 4.20 | | | |
| 03/25/04 | review DP doc | 2.95 | | | |
| 03/25/04 | review court order | 0.55 | | | |
| 03/26/04 | review DP doc | 3.20 | | | |
| 03/26/04 | conference with Lawson | 2.15 | | | |
| 03/27/04 | conference with Lawson | 2.40 | | | |
| 03/27/04 | conference with mitigation expert | 3.20 | | | |
| 03/27/04 | tc with resource center | 0.85 | | | |
| 03/27/04 | review selection transcripts | 1.70 | | | |
| 03/28/04 | tc with Lawson | 0.55 | | | |
| 03/28/04 | review resource center doc | 2.90 | | | |
| 03/28/04 | tc expert | 0.85 | | | |
| 03/01/04 | review discovery | 3.20 | | | |
| 03/29/04 | review discovery | 2.20 | | | |
| 03/30/04 | review discovery | 2.70 | | | |
| | | | | | |
| 04/01/04 | review prison record | 3.05 | | | |
| 04/01/04 | review transcripts | 2.80 | | | |
| 04/02/04 | filed expert motions | 0.85 | | | |
| 04/02/04 | review transcripts | 3.60 | | | |
| 04/30/04 | tc with expert | 2.30 | | | |
| 04/03/04 | conference with Lawson | 3.15 | | | |
| 04/03/04 | review | 2.25 | | | |
| 04/04/04 | tc with experts | 1.90 | | | |
| 04/04/04 | conference with Lawson | 3.60 | | | |
| 04/04/04 | prepare motions | 1.45 | | | |
| 04/04/04 | review prison records | 2.55 | | | |
| 04/05/04 | conference with Lawson | 2.55 | | | |
| 04/05/04 | review Dietz transcripts | 3.40 | | | |
| 04/05/04 | tc with expert | 0.85 | | | |
| 04/06/04 | review Dietz transcripts | 3.60 | | | |
| 04/07/04 | review Dietz transcripts | 4.05 | | | |
| 04/08/04 | tc with Lawson | 0.85 | | | |
| 04/08/04 | tc with experts | 1.10 | | | |
| 04/08/04 | review Dietz transcripts | 3.60 | | | |
| 04/09/04 | review Dietz transcripts | 2.60 | | | |
| 04/10/04 | conference with expert | 3.30 | | | |
| 04/10/04 | review Dietz transcripts | 3.45 | | | |
| 04/11/04 | conference with client | 1.60 | | | |
| 04/11/04 | conference with Lawson | 2.85 | | | |
| 04/11/04 | review transcripts | 3.05 | | | |
| | | | | | |
| | | | | | |
| | COLUMN TOTALS | 107.70 | 0.00 | 0.00 | 0 |
| | PAGE TOTAL | 107.70 | | | |
| | | | | | |
| | TIME GRAND TOTAL | | | | |
| | EXPENSE GRAND TOTAL | | | | |
| | | | | | |

HB 000301

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|---|---|---|---|---|---|
| **2004** | | | | | |
| 04/12/04 | prepare doc for experts | 3.40 | | | |
| 04/12/04 | tc with Lawson | 0.65 | | | |
| 04/12/04 | review Dietz transcripts | 2.70 | | | |
| 04/14/04 | review Dietz transcripts | 4.05 | | | |
| 04/15/04 | prepare response | 1.55 | | | |
| 04/15/04 | conference with Lawson | 3.70 | | | |
| 04/15/04 | review discovery | 2.95 | | | |
| 04/16/04 | conference with Lawson | 3.55 | | | |
| 04/16/04 | review discovery | 1.70 | | | |
| 04/16/04 | filed expert motions | 0.90 | | | |
| 04/16/04 | prepare doc for experts | 2.35 | | | |
| 04/17/04 | review discovery | 3.20 | | | |
| 04/17/04 | prepare draft motions | 2.55 | | | |
| 04/17/04 | tc with Lawson | 0.80 | | | |
| 04/17/04 | tc expert | 0.65 | | | |
| 04/18/04 | conference with client | 1.40 | | | |
| 04/18/04 | review Dietz transcripts | 2.85 | | | |
| 04/18/04 | review discovery | 2.40 | | | |
| 04/19/04 | conference with Lawson | 2.85 | | | |
| 04/19/04 | review Dietz transcripts | 1.95 | | | |
| 04/19/04 | prepare jurer motion | 1.40 | | | |
| 04/19/04 | filed motions | 0.85 | | | |
| 04/20/04 | review discovery | 1.60 | | | |
| 04/21/04 | review discovery | 1.45 | | | |
| 04/22/04 | tc with expert | 0.90 | | | |
| 04/22/04 | review transcripts | 3.15 | | | |
| 04/22/04 | conference with Lawson | 4.05 | | | |
| 04/23/04 | review Dietz transcripts | 2.95 | | | |
| 04/23/04 | conference with client | 1.60 | | | |
| 04/23/04 | prepare motion hearing | 2.25 | | | |
| 04/23/04 | conference with Lawson | 1.90 | | | |
| 04/23/04 | tc with clerk | 0.45 | | | |
| 04/24/04 | conference with Lawson | 1.80 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | COLUMN TOTALS | 70.50 | 0.00 | 0.00 | $0.00 |
| | PAGE TOTAL | 70.50 | | | |
| | | | | | |
| | TIME GRAND TOTAL | | | | |
| | EXPENSE GRAND TOTAL | | | | |
| | | | | | |

HB 000302

Bates No. 4894

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|------|------------------------------|--------------|----------|-----------|----------|
| **2004** | | | | | |
| 04/24/04 | conference with client | 0.75 | | | |
| 04/24/04 | ct motion hearing | | 1.05 | | |
| 04/24/04 | review discovery | 3.10 | | | |
| 04/25/04 | conference with Lawson | 1.90 | | | |
| 04/25/04 | conference with expert | 3.65 | | | |
| 04/26/04 | review discovery | 3.15 | | | |
| 04/26/04 | tc with expert | 0.70 | | | |
| 04/26/04 | tc with Lawson | 1.10 | | | |
| 04/26/04 | review Dietz transcripts | 2.70 | | | |
| 04/27/04 | review Dietz transcripts | 3.20 | | | |
| 04/28/04 | review discovery | 2.95 | | | |
| 04/30/04 | review transcripts | 2.95 | | | |
| 05/01/04 | tc with Lawson | 0.85 | | | |
| 05/01/04 | prepare response: jury questionair | 2.70 | | | |
| 05/01/04 | conference with client | 0.85 | | | |
| 05/01/04 | review Dietz transcripts | 3.05 | | | |
| 05/02/04 | conference with Lawson | 2.90 | | | |
| 05/02/04 | ct jury motion | 1.85 | | | |
| 05/02/04 | conference with client | 0.90 | | | |
| 05/02/04 | review Dietz transcripts | 2.55 | | | |
| 05/03/04 | review discovery | 3.35 | | | |
| 05/03/04 | prepare jury response | 1.75 | | | |
| 05/04/04 | review discovery | 3.70 | | | |
| 05/05/04 | review discovery | 2.90 | | | |
| 05/05/04 | review discovery | 2.85 | | | |
| 05/06/04 | review faxes | 1.35 | | | |
| 05/06/04 | tc with Lawson | 1.05 | | | |
| 05/07/04 | review proposed motions | 1.70 | | | |
| 05/07/04 | conference with Lawson | 1.65 | | | |
| 05/08/04 | review faxes | 0.90 | | | |
| 05/08/04 | review motions | 2.05 | | | |
| 05/09/04 | tc with Lawson | 0.90 | | | |
| 05/09/04 | review faxes & respond | 1.75 | | | |
| 05/10/04 | review transcripts | 3.20 | | | |
| 05/11/04 | review Dietz transcripts | 3.40 | | | |
| 05/12/04 | review discovery | 4.05 | | | |
| 05/13/04 | tc with Lawson | | | 0.90 | |
| 05/13/04 | tc with expert | | | 0.60 | |
| 05/13/04 | review resource center docs | | | 0.75 | |
| 05/14/04 | tc with Lawson | 0.80 | | | |
| 05/14/04 | review proposed motions | | | 0.65 | |
| 05/15/04 | tc with Lawson | | | 0.85 | |
| 05/15/04 | review proposed jury response | | | 0.65 | |
| 05/16/04 | tc with Lawson | 0.70 | | | |
| 05/16/04 | review proposed responses | 1.40 | | | |
| 05/17/04 | review discovery | 2.80 | | | |
| | | | | | |
| | COLUMN TOTALS | 84.05 | 1.05 | 4.40 | $0.00 |
| | PAGE TOTAL | 89.50 | | | |
| | | | | | |
| | TIME GRAND TOTAL | | | | |
| | EXPENSE GRAND TOTAL | | | | |

HB 000303

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|---|---|---|---|---|---|
| **2004** | | | | | |
| 05/17/04 | tc with Lawson | 0.65 | | | |
| 05/18/04 | tc with Lawson | 0.90 | | | |
| 05/18/04 | review discovery | 3.05 | | | |
| 05/19/04 | review jury questionaire | 1.40 | | | |
| 05/19/04 | tc with Lawson | 0.70 | | | |
| 05/19/04 | LR | 2.15 | | | |
| 05/20/04 | review jury questionaire | 2.30 | | | |
| 05/20/04 | tc with expert | 0.65 | | | |
| 05/21/04 | tc with Lawson | 0.90 | | | |
| 05/21/04 | review proposed motions | 1.25 | | | |
| 05/22/04 | conference with expert | 1.55 | | | |
| 05/22/04 | tc with Lawson | 1.05 | | | |
| 05/23/04 | review gov. proposal | 0.85 | | | |
| 05/23/04 | conference with expert | 0.90 | | | |
| 05/23/04 | tc with client | 0.55 | | | |
| 05/24/04 | conference with Lawson | 1.30 | | | |
| 05/24/04 | review questionaire | 1.85 | | | |
| 05/25/04 | trial prep | 3.65 | | | |
| 05/26/04 | trial prep | 4.10 | | | |
| 05/27/04 | trial prep | 2.85 | | | |
| 05/27/04 | tc with Lawson | 0.65 | | | |
| 05/28/04 | review doc | 1.05 | | | |
| 05/28/04 | conference with mitigation expert | 0.85 | | | |
| 05/28/04 | tc with Lawson | 0.40 | | | |
| 05/29/04 | review doc | 1.30 | | | |
| 05/29/04 | review order | 0.40 | | | |
| 05/29/04 | tc with Lawson | 0.55 | | | |
| | | | | | |
| 06/01/04 | review transcripts | 4.10 | | | |
| 06/02/04 | prepare motions | 3.95 | | | |
| 06/03/04 | prepare motions | 4.70 | | | |
| 06/03/04 | conference with expert | 2.55 | | | |
| 06/03/04 | conference with Lawson | 3.10 | | | |
| 06/04/04 | preared and filed motions | 6.70 | | | |
| 06/04/04 | tc with expert | 0.95 | | | |
| 06/04/04 | trial prep | 3.80 | | | |
| 06/05/04 | review transcripts | 4.20 | | | |
| 06/05/04 | conference with Lawson | 2.85 | | | |
| 06/05/04 | tc with expert | 0.90 | | | |
| 06/05/04 | trial prep | 2.45 | | | |
| 06/06/04 | conference with Lawson | 3.20 | | | |
| 06/06/04 | trial prep | 5.90 | | | |
| 06/06/04 | tc with expert | 0.65 | | | |
| 06/07/04 | conference with Lawson | 3.35 | | | |
| 06/07/04 | trial prep | 5.55 | | | |
| | | | | | |
| | COLUMN TOTALS | 96.70 | 0.00 | 0.00 | $0.00 |
| | PAGE TOTAL | 96.70 | | | |
| | | | | | |
| | TIME GRAND TOTAL | | | | |
| | EXPENSE GRAND TOTAL | | | | |
| | | | | | |

HB 000304

Bates No. 4896

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|---|---|---|---|---|---|
| **2004** | | | | | |
| 06/08/04 | review discovery | 3.85 | | | |
| 06/09/04 | review Dietz transcript | 4.80 | | | |
| 06/10/04 | review Dietz transcript | 3.45 | | | |
| 06/10/04 | trial prep | 3.70 | | | |
| 06/10/04 | tc with Lawson | 0.85 | | | |
| 06/11/04 | review Dietz transcript | 4.05 | | | |
| 06/11/04 | conference with Lawson | 2.20 | | | |
| 06/11/04 | trial prep | 1.35 | | | |
| 06/12/04 | conference with Voorhees | 0.80 | | | |
| 06/12/04 | prepare addendum | 2.20 | | | |
| 06/12/04 | conference with Lawson | 3.15 | | | |
| 06/12/04 | conference with expert | 1.95 | | | |
| 06/12/04 | review Dietz transcript | 3.40 | | | |
| 06/13/04 | conference with expert | 2.15 | | | |
| 06/13/04 | filed motions | 0.95 | | | |
| 06/13/04 | conference with Lawson | 3.70 | | | |
| 06/13/04 | trial prep | 3.90 | | | |
| 06/14/04 | tc with AUSA Thompkins | 0.90 | | | |
| 06/14/04 | review jury questionaire | 1.60 | | | |
| 06/14/04 | conference with Lawson | 3.48 | | | |
| 06/14/04 | conference with expert | 2.35 | | | |
| 06/14/04 | trial prep | 3.15 | | | |
| 06/15/04 | trial prep | 4.15 | | | |
| 06/15/04 | review Dietz transcripts | 1.70 | | | |
| 06/16/04 | trail prep | 3.95 | | | |
| 06/16/04 | review jury questionaire | 1.20 | | | |
| 06/17/04 | ct jury questionaire | | 1.65 | | |
| 06/17/04 | conference with former attny | 2.05 | | | |
| 06/17/04 | conference with AUSA Tompkins | 0.95 | | | |
| 06/17/04 | trial prep | 4.70 | | | |
| 06/18/04 | ct jury orientation | | 1.70 | | |
| 06/18/04 | review juror questionaire | 3.95 | | | |
| 06/18/04 | tc with expert | 0.85 | | | |
| 06/18/04 | conference with Lawson | 3.25 | | | |
| 06/19/04 | ct jury orientation | | 1.65 | | |
| 06/19/04 | review juror questionaire | 5.30 | | | |
| 06/19/04 | conference with Lawson | 3.15 | | | |
| 06/20/04 | conference with Lawson | 4.20 | | | |
| 06/20/04 | conference with witnesses | 5.65 | | | |
| 06/20/04 | LR | 1.70 | | | |
| 06/20/04 | tc with expert | 0.80 | | | |
| 06/21/04 | conference with Lawson | 3.20 | | | |
| 06/21/04 | review juror questionaire | 5.15 | | | |
| 06/22/04 | review juror questionaire | 5.40 | | | |
| | | | | | |
| | | | | | |
| | COLUMN TOTALS | 119.23 | 5.00 | 0.00 | $0.00 |
| | PAGE TOTAL | 124.23 | | | |
| | | | | | |
| | TIME GRAND TOTAL | | | | |
| | EXPENSE GRAND TOTAL | | | | |
| | | | | | |

HB 000305

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|------|------------------------------|--------------|----------|-----------|----------|
| **2004** | | | | | |
| 06/23/04 | review juror questionaire | 4.90 | | | |
| 06/24/04 | travel | 3.10 | | | |
| 06/24/04 | conference with Lawson | 3.25 | | | |
| 06/24/04 | conference with AUSA Tompkins | 2.55 | | | |
| 06/24/04 | conference with witnesses | 1.95 | | | |
| 06/24/04 | review discovery | 2.05 | | | |
| 06/25/04 | review juror questionaire | 5.70 | | | |
| 06/25/04 | ct motions hearing | | 1.55 | | |
| 06/25/04 | conference with Lawson | 2.80 | | | |
| 06/26/04 | conference with expert | 2.30 | | | |
| 06/26/04 | conference with Lawson | 2.55 | | | |
| 06/26/04 | review juror questionaire | 3.95 | | | |
| 06/27/04 | review juror questionaire | 4.55 | | | |
| 06/27/04 | conference with Lawson | 2.35 | | | |
| 06/27/04 | tc with expert | 0.70 | | | |
| 06/27/04 | prepare draft motions | 2.80 | | | |
| 06/28/04 | review juror questionaire | 3.70 | | | |
| 06/28/04 | conference with Lawson | 4.15 | | | |
| 06/28/04 | review Dietz interviews | 1.90 | | | |
| 06/29/04 | review discovery | 3.65 | | | |
| 06/13/04 | review juror questionaire | 3.80 | | | |
| | | | | | |
| 07/01/04 | conference with Lawson | 4.20 | | | |
| 07/01/04 | LR re: Ring | 2.90 | | | |
| 07/01/04 | prepare draft motion | 1.70 | | | |
| 07/01/04 | review juror questionaire | 1.65 | | | |
| 07/02/04 | review juror questionaire | 3.25 | | | |
| 07/02/04 | conference with Lawson | 4.80 | | | |
| 07/02/04 | prepared and filed motion | 3.40 | | | |
| 07/03/04 | conference with expert | 5.60 | | | |
| 07/03/04 | conference with Lawson | 2.70 | | | |
| 07/03/04 | filed motion | 0.65 | | | |
| 07/04/04 | review juror questionaire | 4.05 | | | |
| 07/05/04 | review juror questionaire | 3.70 | | | |
| 07/05/04 | LR ring issue | 1.55 | | | |
| 07/06/04 | review expert report | 0.90 | | | |
| 07/06/04 | review juror questionaire | 3.15 | | | |
| 07/07/04 | review discovery | 3.95 | | | |
| 07/08/04 | conference with expert | 4.85 | | | |
| 07/08/04 | review discovery | 4.55 | | | |
| 07/08/04 | conference with Lawson | 1.90 | | | |
| 07/09/04 | conference with Lawson | 3.70 | | | |
| 07/09/04 | conference with client | 1.45 | | | |
| 07/09/04 | trial prep | 5.75 | | | |
| 07/10/04 | tc with expert | 0.90 | | | |
| 07/10/04 | trial prep | 6.45 | | | |
| | | | | | |
| | COLUMN TOTALS | 140.40 | 1.55 | 0.00 | $0.00 |
| | PAGE TOTAL | 141.95 | | | |
| | | | | | |
| | TIME GRAND TOTAL | | | | |
| | EXPENSE GRAND TOTAL | | | | |

HB 000306

Bates No. 4858

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|---|---|---|---|---|---|
| **2004** | | | | | |
| 07/10/04 | conference with client | 1.90 | | | |
| 07/10/04 | tc with Lawson | 1.20 | | | |
| 07/10/04 | LR ring issue | 3.05 | | | |
| 07/11/04 | conference with client | 1.80 | | | |
| 07/11/04 | conference with Lawson | 3.80 | | | |
| 07/11/04 | trial prep | 5.65 | | | |
| 07/12/04 | conference with client | 3.30 | | | |
| 07/12/04 | conference with Lawson | 4.15 | | | |
| 07/12/04 | LR | 2.90 | | | |
| 07/13/04 | trial prep | 7.15 | | | |
| 07/14/04 | conference with | 2.20 | | | |
| 07/14/04 | conference with expert | 3.15 | | | |
| 07/14/04 | trial prep | 6.25 | | | |
| 07/15/04 | ct jury selection | | 7.40 | | |
| 07/15/04 | conference with | 3.55 | | | |
| 07/16/04 | ct jury selection | | 8.10 | | |
| 07/16/04 | conference with experts ET AL | 2.80 | | | |
| 07/17/04 | trial prep | 3.15 | | | |
| 07/18/04 | ct jury selection | | 8.25 | | |
| 07/18/04 | conference with experts ET AL | 1.90 | | | |
| 07/18/04 | review jury questionaire | 2.20 | | | |
| 07/19/04 | ct jury selection | | 8.20 | | |
| 07/19/04 | trial prep | 3.05 | | | |
| 07/20/04 | ct jury selection | 3.40 | | | |
| 07/20/04 | trial prep | 3.75 | | | |
| 07/21/04 | conference with witnesses | 2.30 | | | |
| 07/21/04 | conference with Lawson | 1.35 | | | |
| 07/21/04 | trial prep | 4.80 | | | |
| 07/22/04 | ct jury selection | | 7.40 | | |
| 07/22/04 | review jury selection transcripts | 2.80 | | | |
| 07/22/04 | conference with expert ET AL | 1.70 | | | |
| 07/23/04 | ct jury selection | 6.85 | | | |
| 07/23/04 | conference with expert ET AL | 2.30 | | | |
| | | | | | |
| | COLUMN TOTALS | 92.40 | 39.35 | 0.00 | $0.00 |
| | PAGE TOTAL | 131.75 | | | |
| | | | | | |
| | TIME GRAND TOTAL | | | | |
| | EXPENSE GRAND TOTAL | | | | |
| | | | | | |

HB 000307

Bates No. 4859

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|---|---|---|---|---|---|
| **2004** | | | | | |
| 07/23/04 | review juror questionaire | 3.15 | | | |
| 07/24/04 | ct jury selection | | 7.35 | | |
| 07/24/04 | trial prep | 3.40 | | | |
| 07/24/04 | conference with Lawson | 1.70 | | | |
| 07/25/04 | ct jury selection | 8.20 | | | |
| 07/25/04 | review jury selection transcripts | 3.65 | | | |
| 07/25/04 | conference with expert ET AL | 1.45 | | | |
| 07/26/04 | ct jury selection | | 8.05 | | |
| 07/26/04 | review jury selection transcripts | 3.20 | | | |
| 07/26/04 | conference with expert ET AL | 1.55 | | | |
| 07/27/04 | ct jury selection | | 5.30 | | |
| 07/28/04 | trial prep | 6.85 | | | |
| 07/29/04 | ct trial | | 6.65 | | |
| 07/29/04 | conference with experts | 2.70 | | | |
| 07/29/04 | trial prep | 2.95 | | | |
| 07/30/04 | ct trial | | 6.30 | | |
| 07/30/04 | conference with experts | 3.15 | | | |
| 07/30/04 | trial prep | 3.40 | | | |
| 07/31/04 | ct trial | | 6.20 | | |
| 07/31/04 | trial prep | 4.35 | | | |
| 07/31/04 | conference with witnesses | 2.60 | | | |
| | | | | | |
| 08/01/04 | ct jury trial | | 2.50 | | |
| 08/01/04 | review transcripts | 4.35 | | | |
| 08/01/04 | conference with Lawson | 3.70 | | | |
| 08/02/04 | conference with client | 1.55 | | | |
| 08/02/04 | review transcripts | 3.90 | | | |
| 08/02/04 | conference with witnesses | 2.85 | | | |
| | | | | | |
| 08/03/04 | review transcripts | 6.80 | | | |
| 08/04/04 | conference with witnesses | 4.30 | | | |
| 08/04/04 | trial prep | 3.15 | | | |
| 08/05/04 | ct Trial | | 6.15 | | |
| 08/05/04 | conference with witnesses | 3.05 | | | |
| 08/05/04 | trial prep | 2.30 | | | |
| 08/06/04 | ct Trial | | 5.30 | | |
| 08/06/04 | conference with witnesses | 2.20 | | | |
| 08/06/04 | trial prep | 3.45 | | | |
| 08/07/04 | ct Trial | | 5.90 | | |
| 08/07/04 | conference with Lawson | 1.35 | | | |
| 08/07/04 | conference with witnesses | 1.65 | | | |
| 08/07/04 | review examine gov't witness | 3.15 | | | |
| 08/08/04 | ct Trial | | 5.10 | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | COLUMN TOTALS | 100.05 | 64.80 | 0.00 | $0.00 |
| | PAGE TOTAL | 164.85 | | | |
| | | | | | |
| | TIME GRAND TOTAL | | | | |
| | EXPENSE GRAND TOTAL | | | | |
| | | | | | |

HB 000308

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|---|---|---|---|---|---|
| **2004** | | | | | |
| 08/08/04 | prepare jury instructions | 3.05 | | | |
| 08/08/04 | conference with Lawson | 3.40 | | | |
| 08/09/04 | ct | | | 3.70 | |
| 08/09/04 | trial prep | | | 3.85 | |
| 08/10/04 | prep | | | 5.25 | |
| 08/11/04 | prep | | | 5.50 | |
| 08/12/04 | ct | | | 6.25 | |
| 08/13/04 | ct | | | 7.00 | |
| 08/16/04 | tc with Lawson | 0.90 | | | |
| 08/19/04 | tc with Lawson | 0.70 | | | |
| 08/21/04 | review motion | 1.20 | | | |
| 08/22/04 | tc with Lawson | 0.65 | | | |
| 08/27/04 | tc with expert | 0.60 | | | |
| 08/29/04 | conference with client | 1.55 | | | |
| 08/30/04 | tc with clients family | 0.55 | | | |
| | | | | | |
| 09/05/04 | tc with expert | 0.55 | | | |
| 09/09/04 | tc with Lawson | 0.55 | | | |
| 09/11/04 | tc with Lawson | 0.60 | | | |
| 09/11/04 | review Order | 0.95 | | | |
| 12/06/04 | review opinion | 1.20 | | | |
| 12/08/04 | tc with client | 0.40 | | | |
| 12/13/04 | tc with M.Olive | 0.45 | | | |
| 12/20/04 | Review Order | 0.25 | | | |
| | COLUMN TOTALS | 17.55 | 0.00 | 31.55 | $0.00 |
| | PAGE TOTAL | 49.10 | | | |
| | 2004 TIME GRAND TOTAL | 1,438.08 | | | |
| | 2004 EXPENSE TOTAL | 41.55 | | | |

HB 000309

Bates No. 4901

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|---|---|---|---|---|---|
| **2005** | | | | | |
| 01/31/05 | Review Order | 0.30 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | TOTAL FIFTEENTH PAGE | | | | |
| | | | | | |

HB 000310

Bates No. 4902

| DATE | Brief Description of Services | Out of Court | In Court | Paralegal | Expenses |
|---|---|---|---|---|---|
| **2004** | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |



# STATE COURT OF DEKALB COUNTY
DeKalb County Courthouse
Decatur, Georgia 30030-3356
(404) 371-2261

Wayne M. Purdom., Chief Judge
Alvin T. Wong, Judge
Johnny Panos, Judge
Janis C. Gordon, Judge
Dax E. Lopez, Judge
Stacey K. Hydrick, Judge
Eleanor L. Ross, Judge

Melanie F. Wilson, Clerk
R.S. Mann, Marshal
Willie Hopkins, Chief Probation Officer

January 24, 2013

Re: Melvin G. Bryant
88C51113-2
Charge for Simple Battery

Dear Sir or Madam:

Under current Georgia law, we are only required to keep our criminal records for twenty (20) years from the date of sentencing. After that time has expired, the records are destroyed. Currently, most of our records only go back twenty years. Most records older than that have been destroyed. Therefore, we are unable to provide you with any copies of the cases you have requested. We do keep the docket books for older records, and can make certified copies of the docket pages. They provide an official court record of when a case was filed and disposed of, and the disposition of the case. Please accept this in lieu of a copy of a case.

If you need any further assistance in this patter, please do not hesitate to contact me at the address above, or by phone at (404) 371-2261 press 5.

Sincerely,

*(signature)*

Deputy Clerk

PC - 005112

Bates No. 1904

| THE STATE vs. | ATTORNEYS | OFFENSE | ☐ BONDSMAN ☐ PRETRIAL RELEASE | |
|---|---|---|---|---|
| *Melvin G. Bryant* | | | *Warrant Simp Batt* | —2 |

| DATE FILED / / | ARRAIGNMENT / / | TRIAL / / | ☐ WITH JURY ☐ WITHOUT JURY | *2-13-89* | JUDGE |

| DATE | STATE PROCEEDINGS | DATE | DEFENDANT PROCEEDINGS | DATE | PLEA | SENTENCE |
|---|---|---|---|---|---|---|
| | | | | | GUILTY | |
| | | | | | NOT GUILTY | |
| | | | | | NOLO | |
| | | | | *2-13-89* | DISMISSED   *HK* | |
| | | | | | NOL PROSSED | |
| | | | | | VERDICT | |
| | | | | | GUILTY | |
| | | | | | NOT GUILTY | |
| | TRANSCRIPT FILED | | NOTICE OF APPEAL FILED | | | |

| THE STATE vs. | ATTORNEYS | OFFENSE | ☐ BONDSMAN ☐ PRETRIAL RELEASE | |
|---|---|---|---|---|
| *Angela Thomas* | | | *Warrant TXT* | —2 |

| DATE FILED / / | ARRAIGNMENT / / | TRIAL / / | ☐ WITH JURY ☐ WITHOUT JURY | *2-13-89* | JUDGE |

| DATE | STATE PROCEEDINGS | DATE | DEFENDANT PROCEEDINGS | DATE | PLEA | SENTENCE |
|---|---|---|---|---|---|---|
| | | | | | GUILTY | |
| | | | | | NOT GUILTY | |
| | | | | | NOLO | |
| | | | | *2-13-89* | DISMISSED *DWOP HK* | |
| | | | | | NOL PROSSED | |
| | | | | | VERDICT | |
| | | | | | GUILTY | |
| | | | | | NOT GUILTY | |
| | TRANSCRIPT FILED | | NOTICE OF APPEAL FILED | | | |

JBR—12/87

PC - 005113

**Ann Wolbert Burgess, RN, DNSc.**
**228 Highland Avenue**
**West Newton, MA 02465**
**617-965-6261**
**Fax: 617-244-2323**
**bureges@bc.edu**

July 1, 2002

Jean B. Lawson
PO Box 472106
Charlotte, NC 28247-2106

Harold J. Bender
200 N. McDowell Street
Charlotte, NC 28204

### Re: United States of America v. Aquilia M. Barnette

Dear Ms. Lawson and Mr. Bender:

⸰This is a summary of my findings concerning the resentencing trial of Aquilia Marcivicci Barnette in the United States District Court in Charlotte, North Carolina. My report is based on four visits with Mr. Barnette over two days: June 14 and June 26, 2002. My total interview time with Mr. Barnette was approximately 12 hours. In addition, I interviewed Sonia Barnette and talked by telephone with his father, Derrick Barnette, and his brother, Mario Barnette.

I have reviewed the following documents:

1. Copy of James P. Cooney III and George V. Laughrun II corrected brief of appellant;
2. Mr. Barnette's school records, employment records, medical records, and material prepared by Paul William's and Cindy Maxwell;
3. Volumes I and II of Mental Health Expert reports and trial testimony;
4. Prison Medical Records;
5. Transcribed interview of Robin Williams, dated 5/30/96;
6. Transcribed interview of Benjamin Spencer Greene, dated 5/1/96;
7. Transcribed interviews by Mecklenburg Police Department with Acquila Barnette, dated 6/25/96 and 6/28/96;
8. Videotaped and audio taped copy of police interview.
9. Discovery materials;
10. Trial transcripts
11. Police reports and statements re 11/12/93 incident at Bojangles
12. Police report on 1974 homicide of Pearl Henderson Brown

I also viewed the home of Mark Barnette's mother and the path he took to the corner of Billy Graham Parkway and Morris Field and the left side drainage ditch.

MC-0003270    1

**Aquilia Marcivicci Barnette**

## Background

On January 27, 1998, Aquilia Marcivicci Barnette (Marc Barnette) was convicted on all counts relating to the deaths of Robin Williams and Donald Allen including First Degree Murder by Use of a Firearm (2 counts), Interstate Domestic Violence (2 counts), Arson in the Commission of a Felony, Use and Carry a Firearm During a Crime of Violence, Providing False Information to Acquire a Firearm, Making a Firearm, Possession of a Firearm by a Felon, Carjacking Using a Firearm Resulting in Death and Interstate Transportation of a Stolen Vehicle.

## Statement of Facts

On June 25, 1996, Marc Barnette voluntarily surrendered to Charlotte- Mecklenburg police investigators and FBI agents. He had been identified as the person who shot and killed Robin Williams in Roanoke, Virginia on June 22, 1996. During the three days prior to his surrender, Barnette traveled from Roanoke to Knoxville, Tennessee, visited a church and twice attempted to take his own life. After his surrender, Marc Barnette told police that he had killed Robin Williams and that he had killed Donald Allen, from whom he stole the blue Honda automobile he used to travel to Robin Williams' mother's home. Items recovered from the Honda included a June 23 church bulletin, duct tape taken from the tailpipe, a garden hose consistent with a failed attempt at carbon monoxide poisoning, and love letters between Barnette and Williams.

The video and audio tapes of the law enforcement interviews provide the bulk of the facts surrounding these crimes. These tapes were stopped and started several times to allow Barnette to gain control of his emotions and grief.

## Killings of Robin Williams and Donald Allen

This is a domestic homicide. Domestic violence research indicates about 30% of female homicide victims are killed by former intimates who stalked or harassed them prior to death. The Williams crime scene is disorganized in that Marc Barnette made no attempt to hide his identity. His discarded clothing and weapon were found in a dumpster. The gun was easily traced to his brother.

Robin Williams' family testified at trial that Robin met Marc Barnette and fell in love with him in the spring of 1994. Barnette moved to Roanoke, found a job, and began living with Williams. They were both in their early 20's. Within a year, largely as a consequence of Barnette's irrational and obsessive jealousy about Williams and an old boy friend, he moved back with his mother in Charlotte April 10, 1996. According to government testimony, his obsession with Williams did not end as she was "always on his mind". On the one hand, he begged her to reestablish their relationship but he also threatened and accused her of being unfaithful. In response, Williams changed the locks on her apartment and moved in with her mother.

By April 30, 1996, Williams had moved back into her apartment, accompanied by a male friend, Benjamin Greene. In the early morning of April 30, Greene was awakened by Williams saying, "he is here." Greene saw Barnette striking at the windows with a baseball bat, screaming obscenities and threatening to kill Williams. The telephone lines to the house had been cut. Two small containers of gasoline had been poured on the window frames and door and the front part of the living room was in flames. Greene shot at Barnette who fled. Greene and Williams escaped the burning apartment by jumping out a rear window. Greene was uninjured but Williams suffered second and third degree burns on her hands and arms.

Roanoke police issued warrants for Barnette's arrest. Barnette, after confessing to his mother and best friend, waited at his mother's home for the police to arrest him for the firebombing. However Charlotte-Merklenburg police failed to arrest Barnette and later contended they could not find his home despite the fact that the police had previously answered a number of calls at that address.

In June, Barnette purchased a semi-automatic shot gun, using his brother's identification and name. He told police he sawed off the barrel of the gun, taped a flashlight to it, and packed it in a bag. He then consumed at least six beers, walked to an intersection and waited for a car to stop at the light. Donald Allen stopped at that intersection after midnight on June 22, 1996.

Barnette, holding the shotgun, told Allen to get out, and throw down his wallet. He then (according to what he told police) walked Allen to a drainage ditch, told him to turn around, and shot at him, firing 3 times. Barnette then drove 3 1/2 hours to Roanoke, confronted Robin Williams, said you are coming with me, she refused, and he subsequently shot her. When asked by the police why he did it, Barnette (crying) said he did not know.

**Opinions**

Based on my evaluation, counseling, and research of over several hundreds of women and men entangled in domestic violence situations, it is my opinion within a degree of scientific certainty that

1. Over an 8-week period (April 30-June 22, 1996) Marc Barnette embarked on a domestic crime spree based on his belief that Robin Williams, his ex-girl friend of two years, was being unfaithful, a thinking pattern noted with prior girl friends. The killing of Robin Williams was part of Barnette's obsessional belief that Williams would resume their relationship. The criminal acts may be understood, in part, as a symbolic reenactment of family and childhood patterns. The fatal contact with Donald Allen was a result of Barnette's flawed logic that Allen was both an opportunity and an obstacle to his reunion with Williams.

2. During the 8-weeks prior to the shootings, Marc Barnette may be diagnosed as suffering from an Axis I Major Depressive Episode and Axis II Personality Disorder Not Otherwise Specified (NOS) with paranoid features, antisocial features and borderline features.

MC-0003272

3

**Basis for Opinion**

### 1. Family and Childhood Patterns

Marc Barnette's family history is significant for the consistency of relationships clouded by suspicions of infidelity, paranoia, and domestic violence. This witnessed and experienced history resulted in a learned programming that Marc Barnette incorporated into his personality and repeated as a teenager and young adult.

Sonia Cooper was born to Jessie and Pearl Cooper on 8/17/58. Jessie was a severely injured Korean War veteran who, after returning to the states, withdrew, became depressed and began to drink heavily. On 3/21/71, when Sonia was 13, Pearl and Jessie divorced. Sonia then began dating Derrick Barnette, 2 years her senior.

Marc Barnette was born 7/7/73 to 14-year-old Sonia Cooper. Pearl and Sonia Cooper reported that Derrick Barnette was Marc's father. Pearl Cooper was a primary caretaker for Marc and also worked as an LPN. She married Lloyd Brown on 8/21/73, four days after Sonia's 15th birthday. Brown had a domestic violence history, having been convicted of Assault with a Deadly Weapon for shooting a woman in her right lower stomach with a .22 handgun on 9/10/71 and was given a 6 month suspended sentence.

According to police reports, on 5/19/74 around 2:30am, Lloyd Brown shot Pearl in her lower right temple during a domestic dispute. After their mother's murder, Sonia and her younger sister, Sheila, were moved to Jessie Cooper's home.

Sonia married Derrick Barnette on 2/8/75 when Marc was 2.5 years old. On 2/7/77, Carrie Barnette, Derrick's mother, died. Although her death certificate reports cerebral hemorrhage as the cause of her death, some adults in the family believed, and told the children, that her boyfriend poisoned her because he was upset that she had begun seeing her ex-husband, John Barnette.

On 7/12/77 Mario Barnette was born into the marriage of Derrick and Sonia Barnette. Derrick had joined the Air Force and had been on a tour of duty in Japan with sporadic visits back to his young family. He was discharged from the Air Force in February 1979 and the family moved back to Charlotte.

Derrick Barnette handled the discipline of Marc, who he slapped, spanked or beat for any infraction, e.g., poor grades or not filling the dog's water bowl . From age 3-10, Marc had strict boundaries, enforced by Derrick. Derrick emphasized that lying was not tolerated and prefaced his interrogation of Marc's behavior by saying, "Don't lie to me."

Marc was witness to parental verbal and physical fights that were both private in the home as well as public. For example, one time the parents fought in front of his school mates as Marc was boarding a bus. Marc believed he was singled out for beatings rather than his younger brother. He was beaten primarily by a belt (and, he believes, a coat hanger). Marc became very fearful of his father and angry at his mother (who reported hiding in the bathroom during the beatings) for not having intervened in the excessive punishment.

MC-0003273

4

During his elementary school years, Marc maintained average grades depending on how stressful it was at home. He worried about bringing home bad report cards; he even tried unsuccessfully to sign a report card. He reported two times (for very brief periods) of running away.

In 1983, Marc attended Our Lady of Consolation Catholic school for 5th grade. At that time, Derrick began accusing Sonia of infidelity after he found a letter to Sonia from an incarcerated man stating he could not wait to see Sonia when he was released. Derrick became increasingly violent and abusive toward Sonia. For instance, he kicked the door in at their Comstock Road apartment and, during another argument, he hit Sonia in the head with a hammer. The fights were loud and physical; the police responded at least once to domestic disputes. Marc tried to intervene in the fights, attempting to protect his mother and to shelter his younger brother from the violence.

On July 12, 1994, Derrick and Sonia separated. Derrick was to pay Sonia $400 each month for child support. That fall, Marc attended 6th grade and began to drink alcohol. Sonia and Derrick's divorce was granted on 8/19/85.

Derrick continued to accuse Sonia of infidelity during their marriage and obtained a court order requiring a paternity test. On June 15, 1987, blood was drawn from Derrick, Sonia and her two sons. The result of the paternity test established that Derrick was the father of neither son. Derrick took the two boys to a restaurant and told them about the test results and said, "How would you feel if one of your girlfriends was having babies by another man." Sonia did not accept the results of the blood test, but the Court found that Derrick was not the boys' father and declined to require Derrick to pay support for the children. Derrick stopped paying child support.

**Family Stresses**

A series of family stresses developed following the paternity issue. Sonia lost her job, neglected her sons in favor of dating numerous men, used alcohol and drugs and mourned her boyfriend, a nightclub owner/drug dealer, who was murdered by gunshot the spring of 1988. She moved the family to Atlanta to be near her sister, started her sons in new schools, and became employed as a hospital billing clerk.

The home life was unstable; often the children were left without supervision or food. Marc moved into the big brother role of supervising Mario because he did not trust his mother to care properly for him. As a student, Marc was bright and could earn good grades but his study habits and school and work attendance were not a priority; women consumed his energy. The move to Atlanta meant leaving his support system of family and friends. He sought out peer male companionship who negatively influenced him. When challenged, he would fight and that would result in suspension from school. He started 11th grade in Atlanta but dropped out and never completed his studies.

MC-0003274    5

Bates No. 4910

## Marc Barnette's Relationships

Marc Barnette's teenage relationships were fraught with conflict, especially over infidelity. His first sexual contact was with a cousin when he was 7 and she two years older. He began having sexual relations with girls around age 13. His wish to have a monogamous long-term relationship with a girl never materialized; rather, he became involved with women who, in his mind, were unfaithful and usually with prior boyfriends. While Mark admitted to his own infidelity, he qualified it as a response to the girlfriend's infidelity. Mark admitted elements of violence in the relationships he held with the five women for whom he cared the most.

*Sheila Sullivan.* Marc Barnette's first serious girlfriend was Sheila Sullivan whom he dated in Atlanta. They broke up two times when Marc believed Sheila had cheated on him. One time, Sheila told Marc she was pregnant and that her mother arranged for an abortion, a decision that upset Marc. After the breakup, Marc became depressed and took pills in a suicidal gesture; the EMT were called.

*Tasha Heard.* At age 16, Marc was in the 11th grade. He began to date Tasha, age 14. He began to secretly stay at her house. His mother lectured him for not coming home or coming home late. Sometimes she would lock the door and not let him in. His daughter, Angelica, was born 9/29/90.

Marc and Tasha began fighting. In the spring of 1991, Marc returned to Charlotte for his grandmother Hattie's funeral. On his return, he was told by Tasha that she had an affair with an ex-boyfriend. Marc got into a fight with the boy and both were suspended from school. Marc dropped out of school.

During the summer of 1991, Barnette moved to Newman, GA to be with Tasha. They patched up their differences and their son, little Marc, was born.

Marc and Tasha continued to have difficulty with the relationship. Marc believed Tasha was being unfaithful and began spying on her.

Marc was befriended by Anthony whose half-sister was Crystal Dennis. Crystal learned Anthony was having relations with Tasha. Marc got into a fight with Anthony, whom he shot. On 6/1/92 he was convicted of Pointing a Gun at Another and punished by time served.

*Crystal Dennis.* Crystal Dennis moved into Marc's apartment with her two children the week after Tasha moved out. Marc would sometimes watch the children. Marc stated he found the children "playing doctor" and spanked them with a clothes hanger ("like my father did me"). Crystal's mother and aunt reported the bruising to police and Marc was arrested for cruelty to children. A plea agreement was reached and he was sentenced to 6 years probation and fined $480.

MC-0003275

6

Bates No. 1911

*Alisha Chambers.* Marc returned to live in Charlotte. While visiting friends, he met Alisha Chambers. The relationship was stormy and several times Marc was arrested. The incidents occurred in the context of Marc trying to repair his relationship with Alisha by going to her home, confronting her at work, and demanding that she come with him to talk. On November 12, 1993, Marc was charged with second degree Kidnapping and 3 counts of Assault With a Deadly Weapon when he attempted to take Alisha from her workplace at Bojangles.

In a 11/9/93 police report, the officer wrote that Marc cried and said he could not live without the victim (Alisha) and that everyone and everything was always interfering with their relationship. The officer noted that it sounded like Marc was in a dream world and he thought he could make everything OK if he could just talk with the victim. The officer found Marc to be sincere, intelligent, and sensitive and that he was very upset over his mother's personal lifestyle of drinking, doing drugs and that she had quit her job to take care of her alcoholic father. Marc, according to the officer, seemed to be in emotional turmoil.

On 3/23/94 Alisha accused Marc of assaulting her with a baseball bat. On 3/25/94 Marc was charged with Rape and Kidnapping of Alisha Chambers. Police learned that Marc and Alisha had consensual sex and dropped the rape charge.

*Robin Williams.* Marc met Robin and they start dating 5/7/94. He moved to Roanoke with Robin and worked at Camelot Music. In September 1995, Marc found a condom in Robin's pocket and Benjamin Greene's telephone number. Greene was an old boyfriend; Robin said she was not having an affair but Marc did not believe her.

On 1/25/96 Marc resigned from Camelot Music because of reports he was sexually harassing another employee. He took a job at Electrolux, did well but resigned when he moved back to Charlotte. (He was later told he could have asked for a transfer to the Charlotte area).

In early April 1996, Robin ended the relationship. Marc took Robin's car and drove home to Charlotte. Marc's grandfather Cooper went with Marc back to the apartment the couple shared in Roanoke to pack his belongings. The grandfather reported to others that Robin started cussing Marc the minute he entered the apartment.

In Charlotte, Marc interviewed for a car sales job but lost out on it to someone with more experience. He was continually calling Robin and she would not return calls. He was depressed, crying, taking sleeping pills and drinking Vodka.

On April 28th, Marc Barnette called Robin at her mothers and was told she was having guests. He called back and got a male voice that he suspected was Benny Greene. Marc thought about Robin and Benny Greene being together, drank some beer and vodka and took Mario's car, saying he was going to Revco. Instead, he drove to Roanoke. He banged on Robin's apartment door, heard a gun cocked, knocked out the living room window and poured gasoline on the door and window sills and set it afire.

MC-0003276    7

Bates No. 1912

On 5/7/96, Marc learned it was Benny Greene in Williams' apartment. He obsessed over the newspaper report that named Greene, started drinking, sat on a paint can, and waited for the police to pick him up for the firebombing. He became driven to talk to Robin; he could not understand "why she was doing this to him". Marc said he jeopardized everything for nothing. He had abandoned his kids, skipped on probation, used his brother's identification, but he had to talk to Robin. No one, not even family, could stop him. He believed that Donald Allen would have stopped him or told someone. "It was like jumping off a cliff." (He has since corrected his belief, at the time, that "people would understand".)

Marc confronted Robin and said he wanted her to come with him, give him answers, and to tell him the truth. He threatened to kill her if she did not come with him. Marc remembered Robin looked in his eyes, said he was not going to kill her, and grabbed at the gun. Marc thought to himself, "There she goes again; I'm a weakling. She knows me too well." That angered him and "that's when it happened."

## 2. Psychiatric Diagnosis of Major Depressive Episode

Marc Barnette's had symptoms of depression that were preceeded by an upsetting family conflict (age 8) or a rejection (ages 14, 20). A Major Depressive Episode developed following his breakup with Robin Williams when he was age 22. The symptoms of depression date to his move out of their Roanoke apartment. Mario noted Marc to be severely depressed ("the most I've ever seen"), that he was reclusive, did not interact with the family, began smoking as a new habit, was drinking, not sleeping, only came downstairs occasionally to watch television, blocked off an area upstairs for himself that no one else was to trespass, would call Robin on the phone, and cried alot.

The DSM-IV sets the criteria for Major Depressive Episode as needing 5 or more symptoms present during the same 2-week period and represent a change from previous functioning: at least one of the symptoms is either (1) depressed mood or (2) loss of interest or pleasure. Marc Barnette had both depressed mood and loss of interest over a 3-week period as noted by mother and brother and self-report. He had 6 symptoms needed for diagnosis as follow.

- marked diminished interest or pleasure;
- sleep disturbance;
- fatigue and loss of energy;
- feelings of worthlessness;
- diminished ability to think or concentrate or indecisiveness nearly every day;
- recurrent thoughts of death

## Psychiatric Diagnosis of Personality Disorder Not Otherwise Specified

Marc Barnette also suffers from an Axis II Personality Disorder Not Otherwise Specified. The DSM-IV describes this as a category provided for a situations where the individual's personality pattern meets the general criteria for a Personality Disorder and traits of several Personality Disorders are present. The essential feature of a Personality Disorder is an enduring pattern of inner experience and behavior that deviates markedly from the

MC-0003277

8

expectations of the individual's culture and is manifested in at least two of the following areas: cognition, affectivity, interpersonal functioning, or impulse control.

Mark Barnette has features of Paranoid Personality Disorder which is a pattern of distrust and suspiciousness such that others' motives are interpreted as malevolent. He has elements of Antisocial Personality Disorder which is a pattern of disregard for, and violation of, the rights of others. He has elements of Borderline Personality Disorder which is a pattern of instability in interpersonal relationships, self-image, and affects, and marked impulsivity.

Interviews and testimony of ex-girlfriends describe these patterns. Alisha Chambers said that as the relationship developed, "jealousy set in. He didn't like what I wore and wanted to have a complete say over the entire relationship." Crystal Dennis described Marc Barnette as "very possessive, that she was not allowed to take a bath by herself, that he believed she had been unfaithful and was trying to wash away the evidence." Tasha Heard described Mark's jealousy and an incident when he pulled a gun on people because he thought she had other men in the apartment. Tasha denied to Mark that she was seeing other men or that she had even met Anthony, a man he accused her of seeing, but he did not believe her

*Pattern of Obsession and Obsessional Following*

Marc Barnette's faulty logic and disturbed judgment was noted over and over with his female relationships: Sheila, Tasha, Crystal, Alisha, and Robin. Obsessive pursuit of a person has both romantic and historical tradition. Studies have evolved from celebrity victimization, to a women's issue, to a broad spectrum of interpersonal violence. In fact, the research has grown from a handful of studies by the mid-1990s to over 100 studies as of 2000.

Marc Barnette was unable to detach from certain female relationships despite the woman's rejection; rather the obsession and pursuit continued. The highly respected forensic psychologist J. Reid Meloy has studied and written about patterns of obsession and obsessional following for over 15 years. He uses the term as the repetitive and persistent nature of a thought and that the preoccupation and stability of the individual may vary according to personality and mood of the person. An obsessional follower, according to Meloy, is a person who engages in an abnormal or long-term pattern of threat or harassment directed at a specific individual.

Meloy's analysis of 10 studies (n=180) describes pattern as more than one overt act of unwanted pursuit, rather, it is a pattern of behavior with inferred motivation. His study revealed 85% of obsessional followers had both an Axis I (substance abuse, dependence or mood disorder) and Axis II diagnosis (cluster B disorders not antisocial). An obsessional follower was more likely to have an intense and pathological attachment to his object of pursuit than chronic emotional detachment as noted in antisocial personality. His findings support psychologist Donald Dutton's research on batterers, linking borderline psychopathology, attachment theory and domestic violence.

MC-0003278

9

The obsessional follower's reality testing, according to Meloy, is likely to be seriously impaired. What appears to differentiate these individuals from others appears to be their aggression and pathological narcissism. A real event, such as rejection, challenges the compensatory narcissistic fantasy that he is special, loved, idealized, admired and linked to (or destined to be with) the pursued object. When the fantasy is disturbed, feelings of shame and humiliation are defended by rage. The intense anger fends off any feelings of sadness. Borderline defenses are used: denial, splitting, idealization. Overt paranoia is likely to be directed to third parties perceived as standing in the way of the object. The pattern to use threats, intimidation, or even violence as a mechanism for maintaining the relationship and avoiding abandonment raises the potential for dangerous behavior especially when inhibitions are lowered.

**Marc Barnette**

Marc Barnette is a complex personality. He has many strengths and positive personality traits. Up until the 11th grade and the move to Atlanta, he did well in school, had no major infractions with the law, was involved with his family, had male friends, and had a work ethic. Sonia Cooper described Marc growing up as mild tempered and outgoing who was neat in his appearance and loving as a son. Derrick Barnette described his son as nice looking, smart, pretty happy, got along well with the neighbors, artistic, and good at sports, especially track. He said if he had been told Marc could have done this (crime), he would have said, "no way." He was shocked that this could have "happened over a girl". Mario Barnette described his brother as outgoing, interested in music, attentive, caring, but always having some boy-girl conflict.

It is clear that Marc Barnette has severe problems managing his relationships and emotions, perceiving female relationships, and coping with disappointment and rejection. He was rejection sensitive and when depressed, he moved into a biophysiological depression where nothing made him feel better. In his younger, teenage years, when rejected by Sheila, Tasha, Crystal and Alisha, he continued to pursue them and alternated between crying and pulling himself together, saying he just wanted to be with them, that all they had to do was open the door, listen to him, or talk to him. With Robin Williams's rejection, he treated his depression with alcohol which lowered his inhibitions. He threatened her with a weapon (as he had other women) and told her to come with him and give him answers. But she refused, and said he was not going to kill her.

From a clinical perspective, this young man has devoted his adolescent life to a continuous pattern of reenacting and trying to resolve the way he was programmed in childhood. This programming is revealed in the fingerprints of his repetitive, abusive relationships with women starting at age 14. His behavior was not understood by authorties as acting out; rather it was viewed as delinquent behavior and there was no counseling mandated even though one officer noted his emotional turmoil.

The depression, passive suicide attempts and acting out was rooted in the pattern of rejection, suspicion, and accusation. This combined with a deep-seated paranoia that escalated to violent acts that seemed justified from his position. Only when he saw the consequences of his act was he remorseful and realized it did not make sense. He was horrified at the damage he ultimately brought to someone he loved. He was helpless to

MC-0003279 10

Bates No. 1915

understand how he could move into an emotional state for the acts that horrified him. It was a repetition compulsion that was totally out of his control. Once he was emotionally close and dependent on someone, the confusion of his upbringing was triggered and with it came the programmed paranoia. He became suspicious of the very person he wanted to love. As he became more and more suspicious, ultimately the tension and pain behind it was released by a decision that he emotionally felt justified in acting and he abused or hurt her.

At that point, persons who interfered with him were an obstacle to the release of the tension and they were in a dangerous position. They would not know it. He interpreted everything from his position that he had to get to his desired object of pursuit, Robin Williams.

Retrospectively, he thought he was reacting to an external situation in which he was being provoked. But he was depressed and trying to maintain control over his identity confusion (whether or not he belonged, was he legitimate, was he meant to be). His whole existence was challenged. Understanding the mental state he entered when he became close to someone explained the reenactment (repetition compulsion).

His father became suspicious of his wife. Marc became programmed by the father's behavior. His father proved he was justified in his suspiciousness. It is important how a child interprets such information and how it becomes utilized in his own character and makeup. Marc was now programmed to be suspicious of women; they were not to be trusted. In fact, the more one loved the person, the more one could not trust her. This young man had not had a chance to understand his own integration, his own background and how influential was his family and childhood. Instead of understanding these relationships, he acted out aggressively to the women because he believed they were harming him. He felt threatened and needed to be vindicated. His adolescent acting out was the vindication of a small child. He had the emotional and thinking capacity he had when he was 11.

He also had a complex delayed grief reaction. He was told Derrick Barnette was not his biological father and his parents divorce. From his standpoint, he lost his parents on many different levels. He lost his sense of himself. His narcissism was his only coping mechanism. That is, there was only one person to take care of him and that was himself. He had the grandiose ideas of a child, for example, that he could be the big man in sales without prior experience or knowing the business.

Marc Barnette was programmed not to control his emotions. Men (stepgrandfather) kill when offended by a partner. Father spied on mother; men fight with women. Those are narcissistic defenses. A narcissistic individual cannot tolerate any reflection from another person that is not his own. Marc was not antisocial and unable to form attachments; rather, his attachments to people were fraught with ambivalence and he could not detach without anger. His character defenses covered a deep depression that surfaced when he was rejected. His identity was not formed; his attachments had been undermined by the paternity rejection and the betrayal of trust of mother and father. His only way to cope was through his programmed suspiciousness. No one challenged his irrational thinking; it was considered legitimate thinking. But it was also learned paranoia.

MC-0003280  11

Case 3:12-cv-00327-MOC    Document 76-19   Filed 12/22/14    Page 121 of 122
Bates No. 1916

The minute Marc Barnette became close to someone, he could not handle the emotion. He could not tolerate separation from a woman; when the woman tried to pull away, the rage and everything came forward. The minute he could not have control over the relationship he became anxious and depressed and sought to soothe himself with alcohol. It was not the affair but that he could not control the woman and have her total focus; it was infantile rage.

When asked about beating Crystal's children, he stated that his father did it. He identified with physical discipline for any infraction. He was so vulnerable to repetition. Any time he was confronted with something that resurrected information from his past as a child, he began to repeat in the form of the aggressor. That was the pattern. After it was over, he thought maybe he went too far, but "that's what my father would do".

Marc sought out Robin Williams; his behavior had a level of organization to it. He believed she had another boyfriend; he wanted answers but most of all he wanted her to declare her love to him and return. The anger intensified when that did not happen.

Please let me know if there are any questions on my report.

Sincerely,

*Ann Wolbert Burgess*

Ann Wolbert Burgess, RN, DNSc.
Clinical Specialist in Psychiatric Nursing

MC-0003281    12