# CERTIFICATE

THIS IS TO CERTIFY, That we Bessie W. Quinn

did this day perform the marriage ceremony for the within-named persons at York

South Carolina, this 6th day of February , A. D. 19 51

Bessie W. Quinn

, Clerk, Probate Court.

Officiating Title.

Signatures of Contracting Parties:     Witnesses:

Jesse Cooper

Pearlee Anderson

NOTICE: The failure of the person who performs the marriage ceremony to return this license within fifteen days after the marriage subjects him to a fine.

I, E. Gettys Nunn, Judge of Probate for York County, South Carolina, do hereby certify that the foregoing is a true and exact copy of the Affidavit to Obtain License, Marriage License, and Certificate of Performance of Ceremony, issued to the within-named persons, and which are now on file in this office.

Witness my Hand and Seal of the Probate Court of York County, South Carolina, this 21st

day of September , 19 54

E. Gettys Nunn
Judge of Probate.

---

No. 121964

State of South Carolina
COUNTY OF YORK

IN THE PROBATE COURT

MARRIAGE LICENSE

TO

Jesse Cooper

AND

Pearl Lee Anderson,

---

STATE OF SOUTH CAROLINA,
County of York.

IN THE PROBATE COURT

Personally appeared before me_____who being duly sworn

deposes and says that _____ is the_____of_____

that said_____is_____years of age and that_____gives

_____consent for_____marriage to_____

Sworn to and subscribed before me this_____day of_____, 19_____.

_____
Judge of Probate

_____
Father, Mother or Guardian.

PC - 009217

Case 3:12-cv-00327-MOC    Document 77-6    Filed 12/22/14    Page 1 of 100

Bates No. 13475

# MARRIAGE LICENSE

## AFFIDAVITS TO OBTAIN LICENSE

STATE OF SOUTH CAROLINA, }
    County of York.

I do solemnly swear that I am legally capacitated to marry; and that I am not under the influence of intoxicating liquor or narcotic drugs; and that my full name is_____Jesse Cooper_____; that my age is_____21_____years and_____months; my place of residence is_____Charlotte, NC_____; that my race is_____colored_____; my nationality is American.

SWORN to before me in open court this_____6th_____

day of_____February_____, A. D. 19 51 }     Jesse Cooper

_____E.Gettys Nunn_____(L. S.)
    Judge of Probate.

---

STATE OF SOUTH CAROLINA, }
    County of York.

I do solemnly swear that I am legally capacitated to marry; and that I am not under the influence of intoxicating liquor or narcotic drugs; and that my full name is_____Pearl Lee Anderson_____; that my age is_____16_____years and_____months; my place of residence is_____Charlotte, NC_____; that my race is_____colored_____; my nationality is American.

SWORN to before me in open court this_____6th_____

day of_____February_____, A. D. 19 51 }     Pearlee Anderson
                Consent of Mother

_____E.Gettys Nunn_____(L. S.)
    Judge of Probate.

---

# Marriage License

## State of South Carolina, }
### COUNTY OF YORK.

Whereas, It has been made to appear to me, E. GETTYS NUNN, Probate Judge for York County, upon oath, that_____Jesse Cooper_____

of_____Charlotte, NC_____and_____Pearl Lee Anderson_____

of_____Charlotte, NC_____are legally capacitated to contract matrimony, and that their ages are respectively_____21_____years and_____months and_____16_____years and_____months, and their race is_____colored_____and their nationality is_____American_____, and that application for a license was filed with this Court at_____1:45 P M., on the_____5th_____day of_____February_____, 19 51

These are, therefore, to authorize any person qualified to perform marriage ceremonies to perform the marriage ceremony for the persons above named, and for the so doing this shall be sufficient warrant.

Given under my Hand and Seal at_____3:10 P M., this the_____5th_____day of_____February_____, A. D. 19 51

                E.Gettys Nunn
                Probate Judge

PC - 009218

Bates No. 13476

C - 16-767-739,

PC - 009214

STATE OF NORTH CAROLINA

COUNTY OF ___MECKLENBURG___

IN THE GENERAL COURT OF JUSTICE

DISTRICT COURT DIVISION

___70___ Cv. D. ___7564___

PEARL ANDERSON COOPER
Plaintiff

vs.

JESSE COOPER
Defendant

FILED

MAR 29 1971

ROBERT M. BLACKBURN
CLERK OF SUPERIOR COURT
MECKLENBURG COUNTY, N. C.

JUDGMENT OF DIVORCE

THIS CAUSE COMING ON TO BE HEARD AND BEING HEARD before the undersigned Judge presiding over the General Court of Justice, District Court Division, ___Mecklenburg___ County, North Carolina, on the_29__day of__March_____, 19_71_, and from the record in this cause and the testimony presented in open court, the Court makes the following finding of facts:

1. That this is an action for absolute divorce based on the separation of the Plaintiff and Defendant for one year.

2. The Defendant has been personally served with summons and a copy of the Complaint herein.

3. That the Defendant has not filed a request for jury trial with the Clerk of this Court.

4. That this action is at issue and properly called for trial.

5. That the Plaintiff has been a resident of the State of North Carolina for more than six months next preceding the institution of this action.

6. That the Plaintiff and Defendant were married as alleged in the Complaint.

7. That the Plaintiff and Defendant have lived separate and apart each from the other for more than one year next preceding the institution of this action.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED that the bonds of matrimony heretofore existing between the Plaintiff and Defendant be, and the same are hereby dissolved, and that the Plaintiff and Defendant are granted an absolute divorce one from the other.

This the_29th_day of___March_____, 19_71_.

_____
District Court Judge

## STATE OF NORTH CAROLINA

Mecklenburg _____ COUNTY

☑ DISTRICT COURT DIVISION  ☐ SUPERIOR COURT DIVISION

CASES CONSOLIDATED

JURY TRIAL? ☐ YES

FILING DATE **6-15-93**

FILING CODE **4**

NAME OF PLAINTIFF(S)

Chrysler Credit Corp

NAME AND ADDRESS OF PLAINTIFF'S ATTORNEYS (OR PRO SE PLAINTIFF)

S. Dean Hamrick

FILE NO. **93 CVD 7340**

FILM NO. **93-234-198**

## CIVIL DOCKET

DISPOSITION DATE **12/6/93**

DISPOSITION CODE **2**

NAME OF DEFENDANT(S)

Jesse Cooper

NAME AND ADDRESS OF DEFENDANT'S ATTORNEYS (OR PRO SE DEFENDANT)

DATE COMPLAINT FILED

DATE 3RD PARTY COMPLAINT FILED

| DFD # | DATE/HOUR SUMMONS ISS. | DATE SUMMONS RETURNED | SVD? | DATE ANSWER FILED | COUNTER-CLAIMS | | DISPOSITIONS | |
|---|---|---|---|---|---|---|---|---|
| | | | | | FILE DATE | REPLY DATE | DATE | DESCRIPTION |
| 1 | | | | | | | | |
| 2 | | | | | | | | |
| 3 | | | | | | | | |
| 4 | | | | | | | | |
| 5 | | | | | | | | |
| 6 | | | | | | | | |

CROSS-CLAIM FILED BY DEFENDANT

CROSS-CLAIM ANSWERED

DATE AMENDED COMPLAINT FILED

DATE SUMMONS SERVED

DATE ANSWER FILED

| MOTIONS | | | OTHER ACTIVITY | |
|---|---|---|---|---|
| FILED BY | DATE | TYPE | DATE | DESCRIPTION |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

AOC-CV-700
Rev. 3/91

(See Post Disposition Activity on reverse)

PC - 003919

Case 3:12-cv-00327-MOC    Document 77-6    Filed 12/22/14    Page 4 of 100    Bates No. 13478

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
93-CVD-7340 MLB

CHRYSLER CREDIT CORPORATION,
                    Plaintiff
                                          )
                                          )
vs.                                       )
                                          )
JESSE COOPER,                             )
                    Defendant             )

FILED

DEC 6 1993

JUDGMENT
CLERK OF SUPERIOR COURT
MECKLENBURG COUNTY, N.C.

This cause coming on to be heard before the undersigned District Court Judge upon Motion of the plaintiff for entry of judgment against the defendant; and

It having been made to appear to the Court that the defendant was duly served with a verified Complaint and that defendant, through his attorney, secured an extension of time to file responsive pleadings;

And it further appearing to the Court that the time to file a responsive pleading has expired and that the defendant has failed to file an Answer or otherwise plead as by law required;

And it further appearing to the Court that the defendant is in default and that plaintiff is entitled to a default judgment for the amount sought in the Complaint;

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that the plaintiff have and recover from the defendant the sum of $5,444.69 with interest thereon from April 22, 1993, together with a reasonable attorney's fee in the amount of $816.70 and the costs of this action.

This _____ day of December, 1993.

_____
DISTRICT COURT JUDGE

PC - 003920

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
93 CVD 7340

BY _____

CHRYSLER CREDIT CORPORATION, )
                              )
            PLAINTIFF,        )
                              )
        -vs-                  )        MOTION FOR EXTENSION OF TIME
                              )        TO FILE RESPONSIVE PLEADING
JESSE COOPER,                 )
            DEFENDANT         )

Now comes the Defendant, by & through his counsel, & he respectfully moves unto the Court that it grant him an additional period of time wherein to respond or answer the Plaintiff's complaint for relief upon the grounds that counsel needs an additional time to investigate the merits & allegations of the Plaintiff against the Defendant.

This the 15th day of July, 1993.

Barry M. Storick
Attorney for Plaintiff
301 South Tryon Street
Suite 2460-7
Charlotte, North Carolina
                    28282
704-333-2310

PC - 003921

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
                                 DISTRICT COURT DIVISION
COUNTY OF MECKLENBURG            93 CVD 7340

CHRYSLER CREDIT CORPORATION,  )
                              )
                 PLAINTIFF,   )
                              )
         -vs-                 )   ORDER
                              )
JESSE COOPER,                 )
                 DEFENDANT    )

        This matter coming on to be heard, & being heard, before
the under-signed Assistant Clerk of the Superior Court of
Mecklenburg County, North Carolina, upon the motion of the
Defendant, seeking an extension of time in which to file a
response pleading or answer to the Plaintiff's Complaint, upon
the grounds that counsel for the Defendant needs additional
time to investigate the merits of the Plaintiff's claim against
the Defendant. And the Court, after considering the Defendant's
motion, enters the following findings of fact:

1.      That the time for filing a responsive pleading or other
answer to the Plaintiff's Complaint has not expired.

2.      That the Defendant's request for an extension of time
is reasonable.

3.      That the Defendant should be allowed an additionalperiod
of time in which to respond to the allegations raised in the
Plaintiff's Complaint.

        Based upon the foregoing findings o fact the Court enters
the following Conclusions of Law:

1.      That the Defendant is entitled to an extension of time in
which to file a responsive pleading or answer to the Plaintiff's
Complaint.

        IT IS, THEREFORE, ORDERED that the Defendant be granted an
additional period of thirty days, or until the ____ day of August,
1993, in which to file a responsive pleading or answer to the
Plaintiff's Complaint.

        This the 15th day of July, 1993.

                                    _____
                                    Assistant Clerk of Superior Court

PC - 003912

7340

# STATE OF NORTH CAROLINA
## MECKLENBURG _____ County

File No. 93-CVD-

Firm No.

in the General Court of Justice
[X] District Court Division  [ ] Superior Court Division

**Plaintiff Name** Chrysler Credit Corporation
c/o S. Dean Hamrick
**Address** Waggoner, Hamrick, Hasty, Monteith & Kratt
2500 Two First Union Center
**City, State** Charlotte, NC 28282

## CIVIL SUMMONS

GS 1A-1 Rules 3, 4

**VERSUS**

A-495

**Defendant**

Jesse Cooper

* [ ] Alias and Pluries Summons
The summons originally issued against you was returned not served

| Date Last Summons Issued | *Disregard this section unless the block is checked |
|---|---|

TO: Jesse Cooper

TO:

**Name & Address of First Defendant**

Jesse Cooper
3413 West Boulevard, Charlotte, NC 28208

**Name & Address of Second Defendant**

## A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or his attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to him or by mailing it to him at his last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint the plaintiff will apply to the Court for the relief demanded in the complaint.

**Name and Address of Plaintiff's Attorney**
If none, Address of Plaintiff

S. Dean Hamrick
Waggoner, Hamrick, Hasty, Monteith and Kratt
2500 Two First Union Center
Charlotte, NC 28282

| Date Issued 6-15-93 | Time Issued 3:37 [ ] AM [ ] PM |
|---|---|
| Signature | |
| [ ] Deputy CSC  [X] Assistant CSC  [ ] Clerk of Superior Court | |

[ ] **ENDORSEMENT**
This summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this summons must be served is extended thirty (30) days.

| Date of Endorsement | Time [ ] AM [ ] PM |
|---|---|
| Signature | |
| [ ] Deputy CSC  [ ] Assistant CSC  [ ] Clerk of Superior Court | |

AOC-CV-100
Rev. 3/83

PC-003923

1607269

## RETURN OF SERVICE

I certify that this summons and a copy of the complaint were received and served as follows:

### Defendant 1.

Date served: 6-18-93     Name of defendant: Jesse Cooper

☑ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name and address of person with whom or was left (if corporation give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason

### Defendant 2.

Date served:     Name of defendant:

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name and address of person with whom copies left (if corporation give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason

| Service Fee Paid | Date Received 6-18-93 | Name of Sheriff |
| --- | --- | --- |
| By | Date of Return 6-18-93 | County Mecklenburg |
| | | Deputy Sheriff Making Return |

AOC-CV-100, side two
Rev. 9/83

PC - 003924

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
DISTRICT COURT DIVISION
93-CVD-

CHRYSLER CREDIT CORPORATION,
               Plaintiff

vs.

JESSE COOPER,
               Defendant

)
)
)
)
)
)
)
)
)

COMPLAINT

Plaintiff, complaining of defendant, alleges:

1. Plaintiff is a corporation duly organized pursuant to law with an office and place of business located in Charlotte, Mecklenburg County, North Carolina.

2. Defendant is a citizen and resident of Mecklenburg County, North Carolina.

3. On or about July 8, 1991, defendant secured a loan from plaintiff as evidenced by a Retail Instalment Contract, a copy of which is attached hereto as Exhibit 1 and by the terms of said Retail Instalment Contract defendants gave plaintiff a security interest in a 1991 Dodge automobile.

4. Defendant failed to pay the amount due plaintiff and plaintiff repossessed the 1991 Dodge automobile and sold it as required by law.

5. After giving defendant credit for the amount received from the sale of the vehicle, there is still a balance due plaintiff in the amount of $5,444.69 all as shown on a Notice of Deficiency forwarded to defendant on April 22, 1993, copy of which is attached hereto as Exhibit 2.

PC - 003925

Bates No. 19484

6.  Defendant is indebted to the plaintiff in the amount of $5,444.69 with interest thereon from April 22, 1993, and the costs of this action.

WHEREFORE, plaintiff prays that it have and recover from the defendant the sum of $5,444.69 with interest thereon from April 22, 1993, until paid together with a reasonable attorney's fee in the amount of 15% of the amount of any judgment obtained against defendant and the costs of this action.

S. DEAN HAMRICK
WAGGONER, HAMRICK, HASTY, MONTEITH
      & KRATT
2500 Two First Union Center
Charlotte, NC  28282
Phone:  704/375-1431

PC - 003926

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

_Gail Pillars_, being first duly sworn, deposes and says: that he is an agent of the plaintiff and as such is authorized to make this affidavit; that he has read the foregoing Complaint and knows the contents thereof and that the same is true to the best of his knowledge except as to those matters and things as may be stated therein on information and belief and as to those matters and things, he believes them to be true.

_Paul Piller_

Sworn to and subscribed before me

this _8_ day of June, 1993.

_Susan C Ballard_

Notary Public

My Commission Expires: _5 28 97_

OFFICIAL SEAL
NOTARY PUBLIC NORTH CAROLINA
COUNTY OF MECKLENBURG
SUSAN C BALLARD
My Commission Expires 5-28-97

PC - 003927

84-251 5298 (9-86) NORTH CAROLINA

# RETAIL INSTALMENT CONTRACT

| DATE | ACCOUNT NO |
|------|-----------|
| 07/08/91 | |

BUYER'S (AND CO-BUYER'S) NAME AND ADDRESS
JESSE COOPER
3413 WEST BLVD
CHARLOTTE NC 28208

CREDITOR (ITS NAME AND ADDRESS)
METROLINA DODGE, INC.
8525 SOUTH BLVD.
CHARLOTTE NC 28217

The undersigned Creditor (hereinafter called "Creditor") hereby sells and the undersigned Buyer (which means Buyer or Buyers and Co-Buyer, jointly and severally and respectively) ... Buyer ... or now ... having been quoted both a time price and a lower ... hereby purchases from Creditor on a time price basis ... herein **including the reverse hereof,** the following property ...

## USE OF PROPERTY
☒ PERSONAL  ☐ AGRICULTURAL
☐ BUSINESS

## PROPERTY DESCRIPTION

| | YEAR | MAKE | C.C. | MODEL | BODY TYPE | VEHICLE IDENTIFICATION NO. |
|--|------|------|------|-------|-----------|----------------------------|
| ☐ NEW ☐ USED | 91 | DODGE | | SHADOW | 5 DR | 1B3XP28D4MN614265 |

Describe Trade-in

CHECK ALL SPECIAL EQUIPMENT: ☐ AUTO TRANS ☐ POWER BRAKES ☐ POWER STEERING ☐ POWER BRAKES ☐ POWER WINDOWS ☐ POWER SEATS ☐ AIR CONDITION ☐ AM/FM RADIO OTHER

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you | Amount Financed The amount of credit provided to you or on your behalf | Total of Payments The amount you will have paid after you have made all payments as scheduled | Total Sale Price The total price of your purchase on credit, including your downpayment of $1500.00 |
|---|---|---|---|---|
| 14.40 % | $ 4267.11 | $ 10232.49 | $ 14499.60 | $ 15999.60 |

**Payment Schedule:** Your payment schedule will be:

| NO. OF PAYMENTS | AMOUNT OF EACH PAYMENT | WHEN PAYMENTS ARE DUE (MONTHLY BEGINNING) | NO. OF PAYMENTS | AMOUNT OF EACH PAYMENT | WHEN PAYMENTS ARE DUE (MONTHLY BEGINNING) |
|---|---|---|---|---|---|
| 60 | $ 241.66 | 08/22/91 | | $ N/A | 07/22/96 |
| | | | | | |

**Prepayment.** If you pay off early, you may be entitled to a refund of part of the Finance Charge

**Late Charge.** If a payment or part thereof is more than 10 days late you will be charged $6.00 or 5% of the unpaid amount, whichever is less.

**Security Interest.** You are giving a security interest in the goods being purchased.

**Filing Fees $** _____ N/A _____

See this Retail Instalment Contract for any additional information about security interests, nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds.

**\* PHYSICAL DAMAGE INSURANCE** is required under this contract. You may obtain physical damage insurance from anyone who sells that is acceptable to Creditor. If a premium is shown in detail it means that you choose to get the insurance through Creditor and that you will pay the premium shown, for the coverages checked for a term of _____ months ☐ $ _____ N/A _____ Comprehensive ☐ Fire Theft and Combined Additional Coverage ☐ $ _____ N/A _____ Deductible Collision ☐ Towing and Labor at each _____ cost of $ _____ N/A _____ is included in the premium ☐ Rental Reimbursement ... Insurance ...

**\* MECHANICAL BREAKDOWN INSURANCE** is not required under this contract. If a premium is shown in detail, it means that you choose to get the insurance through Creditor and that you will pay the premium shown for coverage for a term of _____ months and/or _____ miles, and with a $ _____ N/A _____ Deductible.

### YOU MAY CHOOSE THE PERSON THROUGH WHICH THE INSURANCE IS TO BE OBTAINED.

### LIABILITY INSURANCE COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGE CAUSED TO OTHERS IS NOT INCLUDED.

**\*\* CREDIT LIFE AND/OR ACCIDENT AND HEALTH INSURANCE** for a term of _____ 60 _____ months according to the terms and conditions in the policy or certificate of insurance issued by (check):
☐ Chrysler Life Insurance Company, Troy, Michigan

NAME OF OTHER INSURER
☒ HERITAGE LIFE

HOME OFFICE ADDRESS
WESTLAKE VILLAGE CA 91359

**CREDIT LIFE INSURANCE AND ACCIDENT AND HEALTH INSURANCE ARE NOT REQUIRED TO OBTAIN CREDIT, AND WILL NOT BE PROVIDED UNLESS YOU SIGN AND AGREE TO PAY THE ADDITIONAL COST.**

| TYPE | PREMIUM | PERSON(S) INSURED | TYPE | PREMIUM | PERSON(S) INSURED |
|---|---|---|---|---|---|
| ☒ CREDIT LIFE | $ 507.49 | JESSE COOPER | ☐ ACCIDENT AND HEALTH | $ N/A | |

I want the credit insurance coverage(s) checked above
SIGNATURE: Jesse Cooper   DATE 07/08/91
SIGNATURE: _____   DATE _____

## ITEMIZATION OF THE AMOUNT FINANCED

| 1 Cash Price | | |
|---|---|---|
| a. Cash sale price - Personal Property | | |
| Smaller of Cost or Market | $ 10145.31 |
| b. | N/A |
| c. | N/A |
| d. Cash Price (1a + 1b + 1c) | $ 1014 |
| **2 Downpayment** | | |
| a. Cash Downpayment | 1500.00 |
| b. Gross Allowance on Trade-in | | |
| $ | N/A |
| Less: | N/A |
| Net Trade-in (2b - 2c) | N/A |
| c. | N/A |
| d. | N/A |
| Total Downpayment (2a + 2d) | 1500 |
| **3 Unpaid Balance of Cash Price** | 864 |
| **4 Amounts Paid to Others on Your Behalf** | | |
| a. Paid to Public Officials - Filing Fees | N/A |
| Physical Damage Insurance | N/A |
| Mechanical Breakdown Insurance | N/A |
| Credit Life Insurance | 507.49 |
| Accident and Health Insurance | N/A |
| Paid to Public Officials for: | |
| License and Other Taxes | 298.69 |
| Filing Fees | N/A |
| Title Fee | 56.00 |
| Registration | N/A |
| | N/A |
| Paid to: | N/A |
| Paid to: | N/A |
| CHRYSLER SERVICE CONTRACTS | |
| for EXTENDED WARRANTY | 725.00 |
| Subtotal (4a + 4b + 4c + 4d) | 158 |
| **5 Amount Financed** (3 + 4e) | $ 1023 |

**Assignment**

SEE BACK OF THIS CONTRACT FOR ADDITIONAL TERMS AND CONDITIONS.

## CONSUMER CREDIT DOCUMENT

**NOTICE TO THE BUYER: Do not sign this contract before you read it or if it contains any blank spaces. You are entitled to an exact copy of the contract.**

**BUYER ACKNOWLEDGES receipt of a completely filled-in copy of this contract.**

| A BUYER SIGNS | B CO-BUYER SIGNS |
|---|---|
| Jesse Cooper (Seal) | (Seal) |

**THIS CONTRACT is accepted by the Creditor (Seller) and assigned to Chrysler Credit Corporation in accordance with the terms of the Assignment set forth on the reverse hereof.**

CREDITOR (SELLER): METROLINA DODGE, INC.

BY _____   TITLE _____

Exhibit 1

ORIGINAL

PC - 003928

Buyer agrees that except where the property is of a type normally used for personal, family or household purposes, manufactured after July 3, 1975 and is subject to Creditor's written warranty or service contract entered into at the date of this contract or within 90 days thereafter, that there are no implied warranties of merchantability or fitness for a particular purpose or which extend beyond the description of the property on the face hereof and that no express warranties and no representations, promises or statements have been made by Creditor unless endorsed hereon in writing.

NOTICE: THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THIS CONTRACT. INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE.

The preceding NOTICE applies if the vehicle is a used vehicle as shown on the front of this contract and if this contract is a contract of sale under the Used Motor Vehicle Trade Regulation Rule.

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

The preceding NOTICE applies to goods or services obtained primarily for personal, family or household use.

## ASSIGNMENT

### INITIAL APPLICABLE PROVISIONS

WITHOUT RECOURSE. The assignment of this contract is without recourse to the Seller except in the circumstances set forth in the FULL RECOURSE. Seller unconditionally guarantees payment to Chrysler of the full amount remaining unpaid under this contract and agrees to purchase this contract and/or the Property from Chrysler upon demand for the full amount of the unpaid balance then due...

FULL REPURCHASE. In the event of default by Buyer under this contract and provided that Chrysler shall take possession of the Property and tender delivery of same to Seller within thirty days after maturity...

LIMITED REPURCHASE. Seller agrees to continue...

OPTIONAL REPURCHASE. If Chrysler takes possession of the Property, Seller shall, upon demand from Chrysler...

TRUCK REPURCHASE...

LEASE LOSS PROTECTION...

Case 3:12-cv-00327-MOC   Document 77-6   Filed 12/22/14   Page 14 of 100
Bates No. 13488

 **CHRYSLER**
CREDIT CORPORATION

DATE  4-22-93

Jesse Cooper
3413 West Blvd
Charlotte NC 28208

Account No.  267?96ʰ

Make of Vehicle  91 Dodge

Dear  Mr Cooper

The following is a complete breakdown of the balance of your account with Chrysler Credit
Corporation:

| | | |
|---|---|---|
| (1) Balance at time of repo session | $ | 10642.76 |
| (2) Repossession expenses | $ | 375.00 |
| (3) Gross balance owed | $ | 11017.76 |
| (4) Refund or unearned charges | $ | 1995.87 |
| warranty rebate | $ | 483.20 |
| (5) Sale proceeds | | 3094.00 |
| (6) Balance due | $ | 5444.69 |

We are sure you are most anxious to settle your account, and we are prepared to work with you
in establishing payment terms on either a cash or monthly payment basis.

To arrange this, it is most important that you contact this office in person or by telephone
without delay.

Yours truly,

CHRYSLER CREDIT CORPORATION

By _____
Customer Services Supervisor

Exhibit 2

PC - 003930

DQRY

```
--------CASE--------
```
CASE NO: 93B28477  CIV/CRI: CRI FILING DATE: 02/12/93
    BRANCH: DK MAGISTRATE COURT CIV CASE TYPE:
    CRIM CAPTION: COOPER, SHEILA DIANE
    CRIM CAUSE ACTN: BAD CHECK CITATION        DATE RECD: 02/12/93
   **SUMMARY DATA** STATUS: CLOSED     JUDGE: PURDOM, WAYNE M
    NO LIT/DEF: 001 DISP DATE: 06/15/93 DEF LST NAME: COOPER
    SCHD DATE: 06/15/93 TIME: 1400 PREV SCHD DATE: 05/18/93 ORG CASE:
    CRI SCH EV: ARRAIGNMENT
    STAGE: SOLICITOR                  DOCKET DATE: 02/12/93 JUDGE: M01
    STAFF: LOHNA                      ASSIGNED: 05/03/93


```
------CASE DISP-----
```
CASE NO: 93B28477  BRANCH: DK MAGISTRATE COURT IMMEDIATE/VERIFY: IMMEDIATE
    DISP DATE: 06/15/93
    DISP TYPE: CASE CLOSED
    DISP REASON: PLEA ON MISDEMEANOR CASE (NON TRAFFIC)
    RESTITUTION AMT:        .00+ DAMAGE AMOUNT:          .00+
    COURT COST:       .00+
  ** PRESS ENTER FOR NEXT PAGE **

Date: 1/31/2013 Time: 10:27:27 AM

PC - 005105

Bates No. 13490

DQRY

---SCHEDULED EVENT--

CASE NO: 93B28477  SCHD DATE: 05/18/93
    SCHD EVENT: ARRAIGNMENT                                      TIME: 0900
    BRANCH: DK MAGISTRATE COURT RE-SCHEDULED:   PRIORITY ON CALN:
    JUDGE: BETHEL, WINSTON
CASE NO: 93B28477  SCHD DATE: 06/15/93
    SCHD EVENT: ARRAIGNMENT                                      TIME: 1400
    BRANCH: DK MAGISTRATE COURT RE-SCHEDULED: Y PRIORITY ON CALN:
    JUDGE: BETHEL, WINSTON


---DOCKET ENTRIES---

CASE NO: 93B28477  DOCKET SEQ: 001 BRANCH: DK MAGISTRATE COURT DATE: 02/12/93
    ACTION: BAD CHECK CITATION FILING COST
    NOTE: 10 CA
CASE NO: 93B28477  DOCKET SEQ: 002 BRANCH: DK MAGISTRATE COURT DATE: 03/05/93
    ACTION: CITATION PENDING CONVERSION TO WARRANT
CASE NO: 93B28477  DOCKET SEQ: 003 BRANCH: DK MAGISTRATE COURT DATE: 05/03/93
    ACTION: INCIDENT REPORT OF ARREST
CASE NO: 93B28477  DOCKET SEQ: 004 BRANCH: DK MAGISTRATE COURT DATE: 05/03/93
    ACTION: ORDER CONSOLIDATING CASES
    NOTE: 93B28179
  ** PRESS ENTER FOR NEXT PAGE **

DQRY

---DOCKET ENTRIES---
CASE NO: 93B28477  DOCKET SEQ: 005 BRANCH: DK MAGISTRATE COURT DATE: 05/17/93
    ACTION: ACCUSATION FILED
    STAGE: SOLICITOR                        L/D NO:
CASE NO: 93B28477  DOCKET SEQ: 006 BRANCH: DK MAGISTRATE COURT DATE: 05/18/93
    ACTION: NOTICE BAD CHECK RESET TO PAY
    NOTE: 061593 AT 0200
    STAGE: SOLICITOR                        L/D NO:
CASE NO: 93B28477  DOCKET SEQ: 007 BRANCH: DK MAGISTRATE COURT DATE: 06/15/93
    ACTION: ARRAIGNMENT
    STAGE: SOLICITOR                        L/D NO:


------DEFENDANT-----
CASE NO: 93B28477  L/D NO: 001 BRANCH: DK MAGISTRATE COURT
    NAME: COOPER, SHEILA DIANE           SPN: X0097769 CLASS: INDIVIDUAL
    INIT DATE: 02/12/93 ADDR: 2030 CHARTER MANOR        APT #:
    CITY: LITHONIA              STATE: GA ZIP: 30058 PHONE: 0002028283
   **SUMMARY DATA** DISP DATE:
    SENT LENGTH: FT           PROB TIME:
   ** PRESS ENTER FOR NEXT PAGE **

DQRY

---CHARGE(S) FILED--
CASE NO: 93B28477  L/D NO: 001 CHG SEQ: 001 CHG TYPE: CI BOOKIN NO:
    AGENCY: DEKALB MAGISTRATE COURT
    CHARGE: BAD CHECK
    CHG DESCRIPTION:                              MISD/FEL: MISDEMEANR
    LEAD CHG (Y/N):   COUNTS: 01 DATE OF OFFENSE: 11/03/92

                       ---STATE CHG DISP---
CASE NO: 93B28477  L/D NO: 001 CHG SEQ: 001 SEQ NO: 001 DATE: 06/15/93
    CHARGE: BAD CHECK
    PLEA: NOLO CONTENDRE                    NEGOTIATED:
    DISP TYPE: PLEA OF NOLO CONTENDRE
    DISP REASON: SENTENCED
  ** PRESS ENTER FOR NEXT PAGE **

Date: 1/31/2013 Time: 10:27:57 AM                         PC - 005108

Bates No. 13493

DQRY

```
                         ------SENTENCE------
CASE NO: 93B28477  L/D NO: 001 SEQ NO: 001
    SENTENCE: FINE AND TIME TO SERVE                    DATE: 06/15/93
    VERDICT DATE:          TIME TO SERVE: 10D        PROB TIME:
    HRS TO SERVE:    COMMUNITY HRS:     FINE AMOUNT:              50.00+
    COURT COST:     5.00+ JAIL COST:       5.00+
    RESTITUTION AMT:       .00+ JDGMT STAYED:
    PLEA: NOLO CONTENDRE                      COURT/JURY:
    NOTE: $20SSF & FINE PAID/REC #22822
    NOTE: JAIL SUSPENDED


                         --------ALIAS-------
 CASE NO    L/D NO   SEQ NO              ALIAS
93B28477     001       001    ONEAL, SHEILA D
  ** PRESS ENTER FOR NEXT PAGE **
```

Date: 1/31/2013 Time: 10:28:03 AM                              PC - 005109

DQRY

```
                         --WITNESS/SOLICITO--
CASE NO: 93B28477  L/D NO: 001 WITN NO: 001
    NAME: WESTBROOK, ROBERT           WITN TYPE: VI BADGE NO:
    TITLE: BIG STAR
    ADDR: 4145 LAVISTA RD             APT #:
    CITY: TUCKER           STATE: GA ZIP: 30084 PHONE:
    BUS PHONE: 0002700447 NOTIFY:    PROP DMG/PER INJ:
    PROP DAMAGE AMT:        .00+ RESTITUTION AMT:     24.42+
CASE NO: 93B28477  L/D NO: 001 WITN NO: 002
    NAME: WESTBROOK, SHEILA           WITN TYPE: VI BADGE NO:
    TITLE: BIG STAR (CASE #93B28179)
    ADDR: 4145 LAVISTA RD             APT #:
    CITY: TUCKER           STATE: GA ZIP: 30084 PHONE:
    PROP DAMAGE AMT:       .00+ RESTITUTION AMT:     84.87+


                       ---WARRANT ISSUED---
CASE NO: 93B28477  L/D NO: 001 SEQ NO: 001 DT ISSUED: 03/05/93
    JUDGE: BETHEL, WINSTON
    AGENCY: DEKALB MAGISTRATE COURT               WARRANT TYPE: OR
    WARR NO:        BOND AMOUNT:      FORFEITURE AMT:        .00+
    NOTE: CONVERSION
  ** PRESS ENTER FOR NEXT PAGE **
```

Bates No. 15495

DQRY

---ASSIGNED JUDGE---
CASE NO: 93B28477  SEQ NO: 001 JUDGE: BETHEL, WINSTON
    START DATE: 02/12/93 END DATE:


---ASSIGNED STAFF---
CASE NO: 93B28477  SEQ NO: 001 ASSIGNED: 05/03/93
    STAGE: SOLICITOR                    STAFF: LOHNA
  ** END OF INQUIRY **

Case 3:12-cv-00327-MOC   Document 77-6   Filed 12/22/14   Page 22 of 100

Bates No. 13496

Mar 1, 2013    3:08:34 PM

  NC AOC CIS                CR/IF CASE PROCESSING        ****  CAUTION  ****
  590 MECKLENBURG           STATEWIDE NAME INQUIRY     INDEXED SOLELY BY NAME
                                                       NO GUARANTEE TO IDENTITY
  COOPER,SHEILA,DIANE           BF02181962 SSN#: 245137879   590 97CR 047357
  3107 SOUTHWEST BV #4                  DL#: NC 21918955
  CHARLOTTE       NC 28216 0000        CIT#:            VRA:    DV CH:
  TRIAL DT: 022698    SERVED:  120297     SID#: NC0750579A          STATUS: N
 DISTRICT  PROCESS: W  DV CV: N       CK DIG#: CJ2607X  LID#: 225084
 CHG: M SIMPLE WORTHLESS CHECK            C&F:      FTA:      OFA:
 CONV:                              CLASS:    P:   V:   M:VD DISP:022698

 COMP: BILO INC                       AGY:      ORI: NC060013Y
  F3=EXIT 7=BKWD 8=FWD 10=PREV 11=NEXT                03/01/13  15:07:49

Bates No. 13497

Mar 1, 2013     3:18:04 PM

NC AOC CIS              CR/IF CASE PROCESSING        ****  CAUTION  ****
590 MECKLENBURG        STATEWIDE NAME INQUIRY    INDEXED SOLELY BY NAME
                                                 NO GUARANTEE TO IDENTITY
COOPER,SHEILA,DIANE        BF02181962 SSN#: 245137879   590 97CR 047358
3107 SOUTHWEST BV #4                  DL#: NC 21918955
CHARLOTTE        NC 28216 0000        CIT#:            VRA:    DV CH:
TRIAL DT: 022698    SERVED:  120297    SID#: NC0750579A        STATUS: N
DISTRICT  PROCESS: W  DV CV: N       CK DIG#: CJ2607X  LID#: 225084
CHG: M SIMPLE WORTHLESS CHECK           C&F:      FTA:      OFA:
CONV:                           CLASS:    P:   V:  M:VD DISP:022698


COMP: BILO INC                       AGY:     ORI: NC060013Y
F3=EXIT 7=BKWD 8=FWD 10=PREV 11=NEXT               03/01/13  15:17:13

Bates No. 13498

Mar 1, 2013    3:18:47 PM

  NC AOC CIS              CR/IF CASE PROCESSING        ****  CAUTION  ****
  590 MECKLENBURG        STATEWIDE NAME INQUIRY    INDEXED SOLELY BY NAME
                                                    NO GUARANTEE TO IDENTITY
  COOPER,SHEILA,DIANE          BF02181962 SSN#: 245137879   590 97CR 047359
  3107 SOUTHWEST BV #4                  DL#: NC 21918955
  CHARLOTTE        NC 28216 0000        CIT#:              VRA:    DV CH:
  TRIAL DT: 022698    SERVED:  120297    SID#: NC0750579A          STATUS: N
 DISTRICT  PROCESS: W  DV CV: N       CK DIG#: CJ2607X  LID#: 225084
 CHG: M SIMPLE WORTHLESS CHECK          C&F:      FTA:       OFA:
 CONV:                              CLASS:    P:   V:   M:VD DISP:022698


 COMP: BILO INC                      AGY:      ORI: NC060013Y
   F3=EXIT 7=BKWD 8=FWD 10=PREV 11=NEXT                 03/01/13  15:18:15

Bates No. 13499

```
Mar 1, 2013    3:19:36 PM

  NC AOC CIS              CR/IF CASE PROCESSING      ****  CAUTION  ****
  590 MECKLENBURG          STATEWIDE NAME INQUIRY    INDEXED SOLELY BY NAME
                                                     NO GUARANTEE TO IDENTITY
  COOPER,SHEILA,DIANE           BF02181962 SSN#: 245137879   590 97CR 047360
  3107 SOUTHWEST BV #4                    DL#: NC 21918955
  CHARLOTTE      NC 28216 0000            CIT#:             VRA:    DV CH:
  TRIAL DT: 022698    SERVED: 120297      SID#: NC0750579A          STATUS: N
 DISTRICT  PROCESS: W  DV CV: N         CK DIG#: CJ2607X  LID#: 225084
 CHG: M SIMPLE WORTHLESS CHECK            C&F:      FTA:      OFA:
 CONV:                                  CLASS:    P:   V:   M:VD DISP:022698




 COMP: BILO INC                        AGY:      ORI: NC060013Y
   F3=EXIT 7=BKWD 8=FWD 10=PREV 11=NEXT                 03/01/13  15:19:01
```

Bates No. 19500

Mar 1, 2013    3:21:25 PM

NC AOC CIS                  CR/IF CASE PROCESSING          ****  CAUTION  ****
590 MECKLENBURG             STATEWIDE NAME INQUIRY     INDEXED SOLELY BY NAME
                                                        NO GUARANTEE TO IDENTITY
COOPER,SHEILA,DIANE              BF02181962 SSN#: 245137879   590 97CR 047361
3107 SOUTHWEST BV #4                     DL#: NC 21918955
CHARLOTTE        NC 28216 0000          CIT#:              VRA:    DV CH:
TRIAL DT: 022698    SERVED:  120297     SID#: NC0750579A          STATUS: N
DISTRICT  PROCESS: W  DV CV: N        CK DIG#: CJ2607X  LID#: 225084
CHG: M SIMPLE WORTHLESS CHECK           C&F:      FTA:      OFA:
CONV:                                CLASS:    P:   V:   M:VD DISP:022698

COMP: BILO INC                      AGY:      ORI: NC060013Y
F3=EXIT 7=BKWD 8=FWD 10=PREV 11=NEXT                   03/01/13  15:19:50

Bates No. 19501

```
Mar 1, 2013    3:22:56 PM
   NC AOC CIS              CR/IF CASE PROCESSING      ****  CAUTION  ****
   590 MECKLENBURG         STATEWIDE NAME INQUIRY     INDEXED SOLELY BY NAME
                                                      NO GUARANTEE TO IDENTITY
   COOPER,SHEILA,DIANE          BF02181962 SSN#: 245137879   590 97CR 047362
   3107 SOUTHWEST BV #4                    DL#: NC 21918955
   CHARLOTTE       NC 28216 0000           CIT#:              VRA:    DV CH:
   TRIAL DT: 022698    SERVED:  121097     SID#:                      STATUS: N
  DISTRICT  PROCESS: W  DV CV: N       CK DIG#:          LID#: 225084
  CHG: M SIMPLE WORTHLESS CHECK            C&F:      FTA:       OFA:
 CONV:                                 CLASS:     P:   V:   M:VD DISP:022698




  COMP: BILO INC                        AGY:      ORI:
   F3=EXIT 7=BKWD 8=FWD 10=PREV 11=NEXT                  03/01/13  15:22:17
```

Bates No. 19502

Mar 1, 2013    3:23:55 PM

NC AOC CIS                CR/IF CASE PROCESSING        ****  CAUTION  ****
590 MECKLENBURG          STATEWIDE NAME INQUIRY     INDEXED SOLELY BY NAME
                                                     NO GUARANTEE TO IDENTITY
COOPER,SHEILA,DIANE           BF02181962 SSN#: 245137879   590 97CR 047363
3107 SOUTHWEST BV #4                    DL#: NC 21918955
CHARLOTTE        NC 28216 0000        CIT#:              VRA:    DV CH:
TRIAL DT: 022698    SERVED:  121097     SID#:                     STATUS: N
DISTRICT  PROCESS: W  DV CV: N       CK DIG#:        LID#: 225084
CHG: M SIMPLE WORTHLESS CHECK          C&F:      FTA:      OFA:
CONV:                                CLASS:    P:   V:   M:VD DISP:022698


COMP: BILO INC                        AGY:      ORI:
  F3=EXIT 7=BKWD 8=FWD 10=PREV 11=NEXT                    03/01/13  15:23:26

Bates No. 13503



**SOUTHERN COMPANY**

*Energy to Serve Your World*™

AFFIDAVIT FOR RECORDS

**RE: Sheila Diane Cooper**

Before me, the undersigned officer, duly authorized to administer oaths, appeared **Tiffany Sims** of Southern Company Services, Inc., who upon being duly sworn, states that Southern Company Services, Inc. is licensed to do business in the State of Georgia, and that the attached copies of records related to **Sheila Diane Cooper** are true and correct copies and are kept in the normal course of business at Southern Company Services, Inc.

Southern Company Services, Inc.

By: _____

Sworn to and subscribed
before me, this **6TH** day
of **August**, 2013.

_____
Notary Public



20475829v3

PC - 009003

Bates No. 19504

EIS 750 History

Name: Sheila Cooper                                    Empl ID   862644

EIS 750 History Data                          Find | View 1      First ▓ 1-10 of 10 ▓ Last

**Effdt:**   11/09/1992   **Seq#:**   1   **Status:**  23   **Hist. Co. Code:** 03   **Type Change Code:** 72

**Job Code:** 4345   CUSTOMER SERVICE REP A(CSC-A)   **Location:**   CSC - GEN OFFICE '

**Dept Code:** 503   CUST SVC CENTER-GO

**Payroll Number:**   91   **PP End Date:** 11/27/1992

**Salary Code:**   2   **Salary:**   2448.00

**KARDEX Remarks:**

---

**Effdt:**   06/13/1992   **Seq#:**   1   **Status:**   1   **Hist. Co. Code:** 03   **Type Change Code:** 00

**Job Code:** 4345   CUSTOMER SERVICE REP A(CSC-A)   **Location:**   CSC - GEN OFFICE '

**Dept Code:** 503   CUST SVC CENTER-GO

**Payroll Number:**   91   **PP End Date:** 06/26/1992

**Salary Code:**   2   **Salary:**   2448.00

**KARDEX Remarks:**

---

**Effdt:**   04/04/1992   **Seq#:**   1   **Status:**   1   **Hist. Co. Code:** 03   **Type Change Code:** 00

**Job Code:** 4345   CUSTOMER SERVICE REP A(CSC-A)   **Location:**   CSC - GEN OFFICE '

**Dept Code:** 503   CUST SVC CENTER-GO

**Payroll Number:**   91   **PP End Date:** 04/17/1992

**Salary Code:**   2   **Salary:**   2448.00

**KARDEX Remarks:**

---

**Effdt:**   03/01/1992   **Seq#:**   2   **Status:**   1   **Hist. Co. Code:** 03   **Type Change Code:** 23

**Job Code:** 4345   CUSTOMER SERVICE REP A(CSC-A)   **Location:**   CSC - GEN OFFICE '

**Dept Code:** 503   CUST SVC CENTER-GO

**Payroll Number:**   91   **PP End Date:** 03/06/1992

**Salary Code:**   2   **Salary:**   2448.00

**KARDEX Remarks:**

---

**Effdt:**   03/01/1991   **Seq#:**   2   **Status:**   1   **Hist. Co. Code:** 03   **Type Change Code:** 23

**Job Code:** 4345   CUSTOMER SERVICE REP A(CSC-A)   **Location:**   CSC - GEN OFFICE '

**Dept Code:** 503   CUST SVC CENTER-GO

**Payroll Number:**   91   **PP End Date:** 03/08/1991

**Salary Code:**   2   **Salary:**   2358.00

**KARDEX Remarks:**

---

**Effdt:**   03/01/1990   **Seq#:**   1   **Status:**   1   **Hist. Co. Code:** 03   **Type Change Code:** 23

**Job Code:** 4345   CUSTOMER SERVICE REP A(CSC-A)   **Location:**   CSC - GEN OFFICE '

**Dept Code:** 503   CUST SVC CENTER-GO

**Payroll Number:**   91   **PP End Date:** 03/09/1990

**Salary Code:**   2   **Salary:**   2268.00

**KARDEX Remarks:**

PC - 009004

Bates No. 13505

| Effdt: | 10/07/1989 | Seq#: | 1 | Status: | 1 | Hist. Co. Code: | 03 | Type Change Code: | 07 |

**Effdt:** 10/07/1989  **Seq#:** 1  **Status:** 1  **Hist. Co. Code:** 03  **Type Change Code:** 07

**Job Code:** 4345  CUSTOMER SERVICE REP  **Location:** CSC - GEN OFFICE '

**Dept Code:** 503  CUST SVC CENTER-GO

**Payroll Number:** 91  **PP End Date:** 10/20/1989

**Salary Code:** 2  **Salary:** 2161.00

**KARDEX Remarks:**

---

**Effdt:** 05/01/1989  **Seq#:** 2  **Status:** 1  **Hist. Co. Code:** 03  **Type Change Code:** 03

**Job Code:** 3525  CUST SVC REP (CSC)  **Location:** CSC - GEN OFFICE '

**Dept Code:** 503  CUST SVC CENTER-GO

**Payroll Number:** 91  **PP End Date:** 06/30/1989

**Salary Code:** 2  **Salary:** 1941.00

**KARDEX Remarks:**

---

**Effdt:** 01/01/1989  **Seq#:** 1  **Status:** 1  **Hist. Co. Code:** 03  **Type Change Code:** 23

**Job Code:** 3525  CUST SVC REP (CSC)  **Location:** 43 EXECUTIVE PARK '

**Dept Code:** 621  CSTSV CENTER

**Payroll Number:** 10  **PP End Date:** 01/13/1989

**Salary Code:** 2  **Salary:** 1941.00

**KARDEX Remarks:**

---

**Effdt:** 01/01/1988  **Seq#:** 1  **Status:** 1  **Hist. Co. Code:** 03  **Type Change Code:** 23

**Job Code:** 3525  CUST SVC REP (CSC)  **Location:** 43 EXECUTIVE PARK '

**Dept Code:** 621  CSTSV CENTER

**Payroll Number:** 10  **PP End Date:** 01/01/1988

**Salary Code:** 2  **Salary:** 1875.00

**KARDEX Remarks:**

---

**Effdt:** 08/17/1987  **Seq#:** 1  **Status:** 1  **Hist. Co. Code:** 03  **Type Change Code:** 01

**Job Code:** 3525  CUST SVC REP (CSC)  **Location:** 43 EXECUTIVE PARK '

**Dept Code:** 621  CSTSV CENTER

**Payroll Number:** 10  **PP End Date:** 09/11/1987

**Salary Code:** 2  **Salary:** 1718.00

**KARDEX Remarks:**

---

**Effdt:** 01/03/1987  **Seq#:** 2  **Status:** 1  **Hist. Co. Code:** 03  **Type Change Code:** 07

**Job Code:** 3527  JRCUST SVC REP (CSC)  **Location:** 43 EXECUTIVE PARK '

**Dept Code:** 621  CSTSV CENTER

**Payroll Number:** 10  **PP End Date:** 03/27/1987

**Salary Code:** 2  **Salary:** 1583.00

**KARDEX Remarks:**

---

**Effdt:** 01/03/1987  **Seq#:** 1  **Status:** 1  **Hist. Co. Code:** 03  **Type Change Code:** 00

**Job Code:** 3163  JR CUST SVC REP  **Location:** 43 EXECUTIVE PARK '

**Dept Code:** 621  CSTSV CENTER

**Payroll Number:** 10  **PP End Date:** 02/27/1987

PC - 009005

**Salary Code:** 2    **Salary:** 1583.00

**KARDEX Remarks:**

---

**Effdt:** 01/01/1987    **Seq#:** 1    **Status:** 1    **Hist. Co. Code:** 03    **Type Change Code:** 23

**Job Code:** 3163    JR CUST SVC REP     **Location:** 43 EXECUTIVE PARK '

**Dept Code:** 621    CSTSV CENTER

**Payroll Number:** 10    **PP End Date:** 01/02/1987

**Salary Code:** 2    **Salary:** 1583.00

**KARDEX Remarks:**

---

**Effdt:** 02/01/1986    **Seq#:** 1    **Status:** 1    **Hist. Co. Code:** 03    **Type Change Code:** 00

**Job Code:** 3163    JR CUST SVC REP     **Location:** 43 EXECUTIVE PARK '

**Dept Code:** 621    CSTSV CENTER

**Payroll Number:** 10    **PP End Date:** 04/25/1986

**Salary Code:** 2    **Salary:** 1489.00

**KARDEX Remarks:**

---

**Effdt:** 01/01/1986    **Seq#:** 1    **Status:** 1    **Hist. Co. Code:** 03    **Type Change Code:** 23

**Job Code:** 3163    JR CUST SVC REP     **Location:** 43 EXECUTIVE PARK-CSC

**Dept Code:** 621    CSTSV CENTER

**Payroll Number:** 10    **PP End Date:** 01/03/1986

**Salary Code:** 2    **Salary:** 1489.00

**KARDEX Remarks:**

---

**Effdt:** 08/17/1985    **Seq#:** 1    **Status:** 1    **Hist. Co. Code:** 03    **Type Change Code:** 01

**Job Code:** 3163    JR CUST SVC REP     **Location:** 43 EXECUTIVE PARK-CSC

**Dept Code:** 621    CSTSV CENTER

**Payroll Number:** 10    **PP End Date:** 09/27/1985

**Salary Code:** 2    **Salary:** 1394.00

**KARDEX Remarks:**

---

**Effdt:** 05/11/1985    **Seq#:**    **Status:** 1 1    **Hist. Co. Code:** 03    **Type Change Code:** 00

**Job Code:** 3162    CORR REP C     **Location:** 43 EXECUTIVE PARK-CSC

**Dept Code:** 621    CSTSV CENTER

**Payroll Number:** 10    **PP End Date:** 05/10/1985

**Salary Code:** 2    **Salary:** 1054.00

**KARDEX Remarks:**

---

**Effdt:** 04/15/1985    **Seq#:**    **Status:** 1 1    **Hist. Co. Code:** 03    **Type Change Code:** 32

**Job Code:** 3162    CORR REP C     **Location:** EXECUTIVE PARK (CSC)

**Dept Code:** 621    CSTSV CENTER

**Payroll Number:** 10    **PP End Date:** 04/26/1985

**Salary Code:** 2    **Salary:** 1054.00

**KARDEX Remarks:**

PC - 009006

Bates No. 19507

Return to Search | Notify

PC - 009007

Bates No. 19508

Mar 15, 2013     11:53:06 AM

 590 MECKLENBURG            ARCHIVAL ICA INQUIRY   85CR 036511          CRARC1P
                            R  S  DOB/AGE      CR      FILM:
NERO,TESSIE,COOPER          U  F  05281951
4811 FARM POND LN.                               DL#:
CHARLOTTE        NC                              CITA. #: 6202795


OFFN #: 01
CHRG OFFN: U D W I                                      U


 AGENCY:                      ISSUED:                    DISP DATE:  062785


PLEA  VER  MOD      FINE          COSTS          REST        MONIES PAID
              $              $              $


CONV OFFN:


SENT. LENGTH:                                    FTA COMP:
PROB. LENGTH:                                    FTC COMP:


LID:              COMPLAINT:              ARREST NUMBER:


 NEXT#:            PF2-NAME INQ   P4-ADDITIONAL EVENTS    ADDL CHARGES: Y

Case 3:12-cv-00327-MOC   Document 77-6   Filed 12/22/14   Page 35 of 100
Bates No. 13509

Mar 15, 2013     11:53:07 AM

 590 MECKLENBURG                ADDITIONAL EVENTS      85CR 036511           CRARC2P

          GUILTY/GUILTY
          FINE                  AMOUNT $100.00
          NOT LESS THAN 60DAYS     NOR MORE THAN 60DAYS
          COST, SUSP.2YRS.,UNSUP.PROB.2YRS.,ADET SCH.,
          24HRS.COMM.SER.W/IN 30DAYS, SPEC. COND. SEE CASE

Bates No. 13510

Mar 15, 2013     11:53:07 AM

 590 MECKLENBURG                ARCHIVAL ICA INQUIRY    87CR 030645          CRARC1P
                               R   S   DOB/AGE       CR        FILM:
NERO,TESSIE,COOPER             B   F   05281951
4811 FARM POND LN                                    DL#:
CHARLOTTE         NC                                 CITA. #:

OFFN #: 01
CHRG OFFN: M WORTHLESS CHECK                         U

 AGENCY:                        ISSUED: 052187              DISP DATE:   053087

 PLEA   VER   MOD      FINE            COSTS          REST        MONIES PAID
                  $              $              $

 CONV OFFN:

 SENT. LENGTH:                                       FTA COMP:
 PROB. LENGTH:                                       FTC COMP:

 LID:               COMPLAINT:                ARREST NUMBER:

  NEXT#:            PF2-NAME INQ   P4-ADDITIONAL EVENTS    ADDL CHARGES:

Bates No. 13511

Mar 15, 2013    11:53:07 AM

 590 MECKLENBURG                ADDITIONAL EVENTS       87CR 030645          CRARC2P

          WAIVER
          COSTS                 AMOUNT $040.00
          RESTITUTION           AMOUNT $055.88
          REST TO WINN DIXIE/P.O. BOX 31397/CITY

Bates No. 13512

Mar 15, 2013    11:53:08 AM

 590 MECKLENBURG                 ADDITIONAL EVENTS       87CR 030645          CRARC2P


        WAIVER
        COSTS                 AMOUNT $040.00
        RESTITUTION           AMOUNT $055.88
        REST TO WINN DIXIE/P.O. BOX 31397/CITY

Bates No. 13513

Mar 15, 2013      11:53:08 AM

590 MECKLENBURG              ARCHIVAL ICA INQUIRY   90CR 017277        CRARC1P
                                   R  S  DOB/AGE       CR       FILM:
NERO,TESSIE,COOPER                 B  F  05281951
651-H ARCHDALE RD                                  DL#:
CHARLOTTE        NC                                CITA. #: C2136498

OFFN #: 01
CHRG OFFN: M C/S-SCH  VI- POSSESS                     U

AGENCY:                         ISSUED: 022890           DISP DATE:  043090

PLEA  VER  MOD      FINE            COSTS          REST        MONIES PAID
              $              $            $

CONV OFFN:

SENT. LENGTH:                                      FTA COMP:
PROB. LENGTH:                                      FTC COMP:

LID:                 COMPLAINT:                 ARREST NUMBER:


 NEXT#:              PF2-NAME INQ  P4-ADDITIONAL EVENTS    ADDL CHARGES:

Bates No. 13514

Mar 15, 2013      11:53:08 AM

 590 MECKLENBURG                ADDITIONAL EVENTS      90CR 017277            CRARC2P


              VOL DISMISSAL        ADA ENTERING DISMISSAL MLG

Bates No. 13515

# MARK D. CUNNINGHAM, PH.D.

## CLINICAL & FORENSIC PSYCHOLOGY

*Diplomate in Forensic Psychology • American Board of Professional Psychology*

## Capital Sentencing Evaluation

Re:    United States of America v Aquilia Marcivicci Barnette,
       Criminal Docket 3:97CR23-P in the District Court of the United
       States of the Western District of North Carolina, Charlotte
       Division

Defendant:   Aquilia Marcivicci Barnette

Date of Birth:   7-7-73

Date of Report:      1-9-98

Dates of Evaluation:   1-3-98, 1-4-98

Evaluation Techniques to date:   Clinical interview and history,
limited third party interview, records review, literature review,
inspection of Morris Field Drive crime scene.

Evaluation Techniques still pending:   Additional third party
interview, additional records review, consultation with other
experts, additional literature review.

Findings:   The evaluation findings which follow are provisional to
the extent that additional evaluation techniques remain pending.

Mental status exam revealed an alert, fully oriented male with good
hygiene and appearing his stated age.   He was cooperative with the
extended interview and evaluation.   Speech was clear and coherent
without noticeable defect.   Thoughts were logical and goal directed
though with some circumstantiality, tangentiality, and excessive
detail.   There was no loosened associations.   Recent and remote
memory were intact.   Concentration was adequate though the
defendant became restless as the evaluation progressed.   Insight
was quite limited and judgement, particularly for heterosexual
conflict behaviors and relationship expectations, was poor.
Depressive symptoms are not currently pronounced.   Current suicidal
ideation was denied though this has been problematic in the past.
There was no evidence of a thought disorder.

Multiple mitigating issues are present which are likely to be
relevant to a jury in sentencing.   These include primary attachment
instability and insecurity, childhood geographic instability,
multi-generational domestic violence scripts, observed domestic
jealousy and violence, paternal abandonment, corruptive modeling,
vulnerability to alcohol abuse, depressive and post traumatic
symptoms, poor parental supervision and instruction, and other
developmental factors.   These mitigating factors form a nexus to
the instant offenses.

MC-0000331

There is conceptual and research literature regarding risk assessment of violence potential. Research literature describes actuarial and anamnestic approaches as being most reliable in assessing likelihood of violent behavior. Multiple actuarial studies indicate that the majority of individuals convicted of capital murder will not represent a disproportionate risk of violence while confined in prison. These studies are believed to be applicable to the defendant in forming a base rate estimate of likelihood of violence while incarcerated. This base rate can be individualized to the defendant utilizing anamnestic approaches regarding the nature, pattern, and context of the defendant's past violent acts as well as above listed developmental influences. Also relevant to this individualization is the defendant's past response to incarceration as well as other individualized variables. Individualizing the defendant's likelihood of violence confined for life to federal prison utilizing the above data indicates that his likelihood of violence in prison is below the capital group base rate. The Federal Bureau of Prisons has the capability to confine an inmate in a super maximum security setting which represents a context where the likelihood of violence toward staff or other inmates is even further reduced below the above individualized low probability.

Respectfully,

Mark D. Cunningham, Ph.D.
Clinical and Forensic Psychologist
Diplomate in Forensic Psychology
American Board of Professional Psychology

MC-0000332

July 6, 2002

Anne M. Tompkins, Esq.
Jill Rose, Esq.
United States Attorney's Office
Western District of North Carolina
Carillon Building, Suite 1700
227 West Trade Street
Charlotte, NC  28202

Re:  United States v. Aquilia Marcivicci Barnette

Dear Ms. Tompkins and Ms. Rose:

At the request of your office, I have evaluated Mr. Barnette's mental
condition and his mental state at the time of the offenses for which he
has been convicted.  This summary report sets forth my sources of
information, describes my examination of Mr. Barnette, and briefly
states my opinions and the basis for each.  I do not review here all of
the facts of the crimes (except insofar as they establish mental state
and motives) or the life history of the defendant, as both are well
documented by prior testimony and the various reports listed below.

## SOURCES OF INFORMATION

(1) Mr. Barnette's statement re. shooting incident with Anthony Britt,
May 7, 1992

MC-0003282

(2) Report of Interview of Mr. Barnette re. the child abuse case, January 23, 1993

(3) Alesha Chambers' statement re. kidnapping and rape, November 9, 1993

(4) Jeffrey Jordan's statement re. kidnapping and assault with a deadly weapon against Alesha Chambers, November 12, 1993

(5) Alesha Chambers' statement re. kidnapping and rape, March 25, 1994

(6) Scene photographs of the fires at Keswick Apartments

(7) Transcript of interview of Robin Williams, May 30, 1996

(8) 7 greeting cards with handwritten messages from the defendant that were placed on Robin Williams' car while she was hospitalized with burn injuries

(9) Scene photographs of the Donnie Allen homicide

(10) Autopsy photographs of Robin Williams

(11) Scene photographs of the Robin Williams homicide

(12) Inspection of the murder weapon (Winchester Model 140 12 gauge shotgun with sawed off stock and barrel and flashlight affixed)

(13) Videotaped interview of Mr. Barnette by Det. J. M. Sanders, June 25, 1996

(14) Transcript of Mr. Barnette's statement to Homicide Investigator T. Rice, June 25, 1998

(15) Report by Det. J. M. Sanders, June 26, 1996 [Bates 001077-001086]

(16) Transcript of Mr. Barnette's statement to Homicide Investigator Bob Holl, June 28, 1998

(17) Criminal History chart prepared by U.S. Attorney's Office

(18) Report of William Tyson, Ph.D., June 19, 1994, and raw data

2

MC-0003283

Bates No. 13519

(19) Report of Sally Johnson, M.D., December 29, 1997

(20) Letter of Sally Johnson, M.D., January 8, 1998

(21) Testimony of Sally Johnson, M.D., February 3, 1998, pp. 601-613

(22) Report of Seymour Halleck, M.D., December 30, 1997

(23) Testimony of Seymour Halleck, M.D., February 3, 1998, pp. 690-730

(24) Testimony of Mark Cunningham, Ph.D., February 4, 1998, pp. 785-873

(25) Report of Faye Sultan, Ph.D., January 2, 1998

(26) Report re. MMPI administered by Faye Sultan, Ph.D., December 31, 1997

(27) Testimony of Faye Sultan, Ph.D., February 3, 1998, pp. 630-689

(28) Report of Scott Duncan, Psy.D., and William H. Grant, M.D., January 29, 1998

(29) Testimony of Scott Duncan, Psy.D., February 5, 1998, pp. 954-1026

(30) Transcript of the Sentencing Phase, U.S. v. Barnette, January 30, 1998, pp. 72-316

(31) Transcript of the Sentencing Phase, U.S. v. Barnette, February 2, 1998, pp. 317-549

(32) Testimony of Sydney Williams, undated, pp. 193-201

(33) Examination of Mr. Barnette, May 28-29, 2002 (see below)

**EXAMINATION**

I personally examined Mr. Barnette on May 28 and May 29, 2002, while he was in custody in jail, awaiting resentencing. It has been my custom to attempt to videotape all examinations of defendants since 1982 in order to permit all parties to have a full and complete record

3

MC-0003284

of everything that transpired, but the defense refused to permit videotaping of this examination. A digital audiotape was produced, with the knowledge of the defendant.

At the outset of the examination, I introduced myself and informed Mr. Barnette that the examination results would not be confidential and would become known to both the prosecution and the defense, and that they could become public should I be called to testify. I explained that I had been retained by the Office of the U.S. Attorney and that I was not entering a treatment relationship with him. I periodically reminded him of these warnings during the two days of the examination.

A complete transcript of the examination should already have been provided to the parties and is incorporated in this report by reference. Two observations that are not apparent from the transcript are that Mr. Barnette rarely made any eye contact and that Mr. Barnette often displayed an arrogant, haughty attitude. I observed no evidence of agitation or hypomania.

## OPINIONS

Although there is evidence indicating that Mr. Barnette witnessed parental violence as a child, was excessively disciplined by his father for getting into fights and for bad grades, was psychological abused and neglected by his mother, was exposed to alcohol and drug abuse among family members, and has himself been the victim of violence, Mr. Barnett was inconsistent in claiming more severe beatings by his father, and such claims were uncorroborated.

I do not explore this issue in any detail here because there is room for reasonable people to disagree about whether parental spankings are abusive and because these issues are not relevant to Mr. Barnette's responsibility for his violence toward others.

Having reviewed all of the information listed above, I have reached the following opinions with reasonable medical certainty:

(1) <u>Mr. Barnette was not psychotic at the time of the two homicides.</u>

Mr. Barnette had no history of mental health care or psychiatric diagnosis prior to the murders. Mental health counseling was advised in connection with probation, but he did not go because it was not mandatory. He was first treated with any psychoactive medication

4

MC-0003285

Bates No. 13521

after the murders, when he briefly received anti-anxiety and antidepressant medication that he thought did him no good [Dietz exam, pp. 247-248, 315-317].

His history is consistent with several mental disorders, most notably substance abuse, depression, and personality disorder. In each of these categories, contradictory reports by Mr. Barnette leave room for reasonable clinicians to disagree about the exact classification of the disorder. For example, he could be given any of several diagnoses for his alcohol and marijuana abuse, any of several diagnoses for his depression, and any of several personality diagnoses.

Among the reasonable formulations for Mr. Barnette's substance abuse is to diagnosis him with alcohol dependence (based on the report of tremor and blackouts to Dr. Halleck [Report of Seymour Halleck, M.D., p. 4], but contradicted by Mr. Barnette's denial to Dr. Johnson that he had ever had any withdrawal symptoms [Report of Sally Johnson, M.D.).

Mr. Barnette has certainly had periods of depression observed by family members. Until the spring of 1996, his notable periods of depressed mood were of less than two weeks duration and an obvious response to stressful life events, such as having women break up with him after he beat them [Dietz exam, pp. 178-182]. These would be diagnosed as adjustment reactions with depressed mood.

Only the period from April – July 1996 warrants consideration as an episode of major depression. For at least portions of this time, he was sad, socially withdrawn, lost interest in pleasurable activities, thought of suicide, cried, had impaired sleep and appetite, and, according to him, attempted suicide. These symptoms were in response to his breakup with Robin, being turned down for the job at the Saturn dealership, being sought in connection with the arson fire that burned Robin, being sought in connection with two homicides, and being arrested for two homicides. Although family members confirm the presence of some depressive symptoms some of the time, diagnosis of a major depressive episode in this period relies on acceptance of Mr. Barnette's account of the duration and severity of his symptoms. As late as the January 19, 1998, interview by Drs. Duncan and Grant, Mr. Barnette "was unable to describe the symptoms of depression in any depth at all," and he described having good days among the bad [Report of Drs. Duncan and Grant, p. 32], which is not expected in major depression. Because Mr. Barnette reports drinking heavily during this period, it is not possible to determine whether his

5

MC-0003286

Bates No. 13522

depressive symptoms resulted from alcohol abuse, though the fact that his symptoms cleared relatively soon after his arrest with minimal therapeutic intervention lends support to that interpretation. Mr. Barnette dated the onset of his depressed mood to the day he began drinking heavily upon learning he had been turned down for the job at the Saturn dealership, and he acknowledged that drinking made him feel more depressed and distraught [Dietz exam, pp. 223-224, 251]. If one gives Mr. Barnette the benefit of the doubt, he would be diagnosed with a major depressive episode; if one sticks only to the provable facts, he would be diagnosed with an adjustment reaction with depressed mood, exacerbated by alcohol. In either case, it is clear that he was not psychotically depressed.

The clearest personality features warranting a personality diagnosis fall into three categories:

Antisocial personality features: Truancy from school, running away from home, underage drinking, fighting, deceitfulness (including lying, forgery, concealing criminal conduct, and feigning suicide attempts), failure to conform to social norms with respect to lawful behavior (taking women's cars, breaking and entering, and other crimes), consistent irresponsibility (failure to pay child support and erratic work history, including termination for sexual harassment), infidelity to serial sexual partners, impulsivity and failure to plan ahead, reckless disregard for the safety of others (such as driving under the influence, burning an occupied apartment building, and firing shots in residential areas), and irritability and aggressiveness (see lengthy history of repetitive violence below).

Borderline personality features: Dramatic and unstable interpersonal relationships; frantic efforts to avoid abandonment (crying, pleading, threatening suicide, threatening homicide); recurrent suicidal threats, gestures, and attempts; impulsive, self-damaging behavior (substance abuse, sex); affective instability; persistent anger; and transient paranoia (limited to unwarranted suspicions of infidelity).

Narcissistic personality features: grandiose sense of self-importance; lack of empathy; fantasies of unlimited success and ideal love; a sense of entitlement; arrogant and haughty demeanor; and interpersonal exploitation.

Based on these features, Mr. Barnette would meet criteria for borderline personality disorder, narcissistic personality disorder, and antisocial personality traits. He amply meets the adult criteria for a

6

MC-0003287

diagnosis of antisocial personality disorder, but the only features documented prior to age 15 are truancy, underage drinking, running away from home, and fighting.

Dr. Halleck testified that in his opinion, Mr. Barnette suffered from borderline personality disorder, that this is a major mental illness, and that people with that disorder can become transiently psychotic. While this testimony permits the inference that Mr. Barnette may have been psychotic, I note that Dr. Halleck did not testify that Mr. Barnette was psychotic at the time of the homicides [Testimony of Seymour Halleck, M.D., pp. 712-713].

None of the examiners whose reports or testimony I have reviewed has reported observing or eliciting any evidence of psychosis (delusions, hallucinations, or formal thought disorder). Two MMPI-2 tests (11/26/97 and 12/31/97, which is too close in time for re-administration) were interpreted as showing evidence of symptom exaggeration [Report of Sally Johnson, M.D., and Report of MMPI administered by Faye Sultan, Ph.D.]. When I asked Mr. Barnette clarifying questions about a few MMPI-2 items that suggested psychosis, he denied having the symptoms.

The best evidence of Mr. Barnette's mental state at the time of the two homicides is his behavior in committing the crimes, which is well established. The significant facts are these:

- Forged his brother's signature on a fraudulent driver's license [Testimony of Mario Barnette].
- Forged his brother's signature on a Firearms Transaction Record in buying a pump shotgun on May 20, 1996 [Testimony of Mario Barnette]
- Lied about his fugitive status and whether he was a convicted felon on the Firearms Transaction Record May 20, 1996
- Forged his brother's signature on a Firearms Transaction Record in buying the murder weapon, a semiautomatic shotgun, on May 21, 1996 [Testimony of Mario Barnette]
- Lied about his fugitive status and whether he was a convicted felon on the Firearms Transaction Record May 21, 1996
- Cut down the stock of the shotgun and wrapped it with tape
- Cut down the barrel of the shotgun and mounted a flashlight with a red-tinted lens
- Took with him a kidnapping and murder kit containing handcuffs, screwdrivers, bolt cutters, a crowbar, a sawed off shotgun with forward-mounted tinted-lens flashlight, ammunition, and a

7

MC-0003288

second flashlight with a red-tinted lens [Physical evidence; Transcript of Mr. Barnette's statement to Homicide Investigator Bob Holl, June 28, 1998]

- On June 21, 1996, dressed in dark clothing
- Walked to an intersection where he knew it would be dark and drivers would need to stop at a traffic light
- Crouched behind foliage and waited half an hour for a suitable carjacking scenario
- Approached Donnie Allen at a red light when no other cars were apparent
- Robbed Donnie Allen of his wallet at gunpoint
- After starting to leave, turned and killed Donnie Allen by shooting him three times in the back, despite his pleas
- Picked up and took Mr. Allen's wallet and the bag containing his kit
- Drove three and a half hours to Roanoke, VA
- Removed and kept the cash from Donnie Allen's wallet, but discarded the remainder
- Lay in wait for Robin Williams from about 5:30 a.m. until about 7:00 a.m. [Transcript of Mr. Barnette's statement to Homicide Investigator T. Rice, June 25, 1998]
- Moved the car behind the Williams residence
- Cut the phone lines to the Williams residence
- Forced entry to the Williams residence by shooting and kicking the door or pushing it with his body
- Reloaded the shotgun with shells from his pocket
- Chased Robin Williams
- Threatened to shoot witness Sonji Hill, who was dialing the police, if she did not put down the phone
- Grabbed Robin Williams by the hair and dragged her back toward her mother's house
- Attempted to kidnap Robin Williams at gunpoint to force her to direct him to Benjamin Green
- Threatened Robin Williams at gunpoint, saying he would kill her if she didn't come with him
- Killed Robin Williams with two shotgun blasts as she ran to her mother
- Fled to Tennessee
- Stole new license tags
- Scraped the North Carolina inspection sticker off the windshield of the stolen car so that Tennessee law enforcement would not become suspicious
- Hid for a time in North Carolina upon his return, eventually surrendering on June 25, 1996

8

MC-0003289

Another source of relevant information about Mr. Barnette's mental state is his own account of his subjective experience, the most important points of which are these:

- He thought about killing Robin Williams in the weeks before the murders [Report of Sally Johnson, M.D.].
- He thought about killing Benjamin Green, killing himself, or getting into a shootout with the police in the weeks before the murders [Dietz exam, p. 253-258].
- He stated, "I became more angry and more angry and more angry as the day went by. Then I thought about why should I go after Benny Green when Robin was the one who caused me all this pain? She lied to me. She betrayed me. She stabbed me in the back. So I said, 'Well, if I've got to die, maybe she should, too. Maybe we can be miserable together.' . . . That's when I started to think about killing her and killing me at the same time. And it was just one of the many thoughts I had. I said, 'No, I can't do that.' I said, 'I can't do that. I've just got to wait for the police. No, I've just got to kill myself. No, I'm going after Benny. No, I'm going to get Robin. No, I'm just going to – I'm going to shoot at the police and make them kill me'" [Dietz exam, p. 261].
- Mr. Barnette stated, "I just kept drinking heavier and heavier. Usually it was just every night. And it started to be some in the afternoon, and then around the end of June, I just -- I just got so built up, so built up with anger and hatred, hurt feelings, and I just didn't care what happened to me. I didn't care what happened to anybody around me. . . . And now, I look at this article and I see this guy's name and I think about 'Was I right in those arguments? Had she played me for a complete idiot?' And I come to the conclusion that she had. So now I wanted revenge, and that's what I set out to do" [Dietz exam, pp. 262-263].
- He drank 5-6 beers the evening of June 21st, but did not perceive himself as "drunk" [Report of Sally Johnson, M.D.].
- He told Dr. Johnson that on the evening of June 21st, "I felt evil come over me. I had never been that angry . . ." and he "wanted to get back for 'everything that had ever hurt me'" [Report of Sally Johnson, M.D.].
- He told Det. Holl that when he first confronted Donnie Allen, "I knew what I was about to do and I didn't want to be there. I didn't want to be there but it was like I couldn't control myself. It was like I had to get to see Robin, I had to get to Robin. And

9

MC-0003290

that's like the only thing that was driving me. . . . and my anger took over" [Transcript of Mr. Barnette's statement to Homicide Investigator Bob Holl, June 28, 1998, p. 32].

- He told Dr. Duncan his motivation for killing Donnie Allen: "If I don't stop this guy, he's going to stop me from getting to Virginia. . . . Just this feeling of anger. The actual part is that I felt all this anger" [Report of Drs. Duncan and Grant, p. 31].
- Mr. Barnette described feeling "scared" while he was at the intersection waiting to carjack a vehicle, and he described a feeling of unreality during the crimes against Donnie Allen [Dietz exam, pp. 266-267, p. 270].
- He told Det. Sanders that as he waited outside the Williams residence, at times he wanted to talk to her and at times he wanted to kill her, and around 7:00 a.m., when he saw Robin come out to walk the dog, something told him to kill her and kill himself [Report by Det. J. M. Sanders, June 26, 1996].
- He told Dr. Dunan that as he tried to kidnap Robin Williams, she said she was not going to go anywhere with him, leading him to say, "If you don't, I am going to have to kill you." Robin said, "No," and Mr. Barnette told her, "I've got one for you and one for me." She asked, "What?" He responded, "One bullet." He said he wanted Robin to take him to Benjamin Green. He stated he wanted revenge against Mr. Green. He told her, "Robin, if you don't go with me I am going to kill you." He claimed she said, "You are not going to kill me" and grabbed the gun. He admitted lifting the weapon and shooting her, then lifting it and shooting her again as she ran to her mother [Report of Drs. Duncan and Grant, pp. 31-32, 39].
- Mr. Barnette told me that he waited for a time outside the Williams residence: "After I sat there and, you know, I moved to the point where I decided, 'Well, I'm going in this house,' at first I attempted to try to shoot my way in the house, you know. From then on, I couldn't get in that way. I forced my way in the house through the back way, you know. And that's when I first saw Robin because she was standing in front of the house, and I could see her. She ran. I ran out and chased her; chased her across the street. Got a hold of her, grabbed her, tried to force her to go with me. She wouldn't go. I told her she was coming with me and she said she wasn't going anywhere with me. And we struggled a little bit. I punched her. That's the first time I had ever punched her. . . . And I grabbed her and I tried to make her come with me. She snatched away from me again. She's tough. She's -- she -- that's what I loved about her. She wouldn't put up with the shit. I loved that about her. I told her,

MC-0003291

"I'm going to kill you, and I'm going to kill me." She said, "You're not going to kill me." Then she tried to grab the gun. That's when I shot her the first time. Then she tried to run away, and I shot her again. I'll never forget. I actually saw myself shoot her. It was almost -- everything was in slow motion. I absolutely panicked. I took off running. . . . And before all that, I said, "I'm going to get revenge for everybody that's ever screwed me." But after I shot her, all that went away. I was -- I was terrified then [Dietz exam, pp. 274-276].

- Asked to describe the experience of seeing things in slow motion, Mr. Barnette said: "When she tried to grab the gun the first time -- well, actually the one time, and I snatched it away from her and I pulled the trigger. And I -- I didn't see her get hit right then. I just saw her pull her arm up and hold her arm up and kind of look at herself. And she started to turn and run, and that instant when she turned and ran and when I shot her the second time, all of that was just happening so slow. I saw -- this is what spooked me and made me -- it just -- it shook me when I saw her hit the second time, I saw her bleed through her shirt. I saw it kind of come out, and it was in just, like, slow motion. And it only happened for a brief second that that -- that stage of events happened because I turned and I ran. And it just seemed like I was running in slow motion, but everything else was -- like I was running in quicksand. But it wasn't -- and all I could hear was my heart. It's like I was trapped inside my heart, you know. I -- and everything was shaky. My head was hurting. My head was banging. But that instant between when I shot her, when she turned and I shot her the second time, that happened in slow -- real slow motion" [Dietz exam, pp. 332-333].

In various interviews, Mr. Barnette described a variety of feelings and thoughts, including suicidal and homicidal thoughts, in the weeks leading up to the homicides. He was drinking heavily during those weeks, and his mood was predominantly depressed and distraught. As is often the case with men who feel they have nothing to lose, he contemplated a variety of dramatic acts, including suicide, homicide, murder-suicide, and suicide by cop. He described having experienced both anxiety and mild dissociative symptoms (a sense of unreality during the crimes against Donnie Allen and the sensation of events being in slow motion after firing the first shot at Robin Williams) during both crimes, as is common among people facing life-and-death emergencies (such as car crashes and police shootings). He experienced no psychotic symptoms.

11

MC-0003292

Bates No. 13528

In my opinion, his primary motive in killing Donnie Allen was to prevent a call to the police that might lead to his arrest before he killed Benjamin Green and Robin Williams. In my opinion, his primary motive in killing Robin Williams was anger.

(2) Mr. Barnette has a long history of violence with a variety of motivations, including jealousy, anger, fear, intimidation of witnesses, rape, revenge, and, in the case of the homicide of Donnie Allen, simple expediency to carjack a vehicle so as to carry out his planned crimes against Robin Williams and Benjamin Green. His violence has been both expressive and instrumental. I disagree with the claim that his violence is always domestic or related to fear of abandonment. It would be more accurate to say that violence is his habitual method of solving interpersonal problems.

Although not an exhaustive inventory of supportive evidence, among the facts on which I base these opinions are these, listed in roughly chronological order:

Dates unknown: Mr. Barnette has pushed and shoved his mother and his maternal grandfather, and reportedly strangled his mother [Testimony of Sonia Barnette]. He acknowledged a fistfight with his mother shortly before the homicides [Report of Seymour Halleck, M.D., p. 3]

1989—1992: Natasha Heard testified that Mr. Barnette beat her with his fists. On one occasion when she was pregnant, he became jealous of her talking to another man and "slammed" her on the concrete [Testimony of Natasha Heard]. Ms. Heard told Drs. Grant and Duncan that Mr. Barnette pulled a gun on her sister and her (confirmed by her sister) [Report of Drs. Duncan and Grant]. Mr. Barnette told me that Ms. Heard was the first girl he ever beat, and he described three occasions on which he beat her [Dietz exam, pp. 86-92].

May 2, 1992: Mr. Barnette shot Anthony Britt. According to Mr. Barnett, he fired three shots after Britt threatened him and pushed him twice. He was ultimately convicted of battery, reckless conduct, pointing a gun at another, and discharging a firearm in the city limits [Testimony of Rodney Freeman Riggs; Mr. Barnette's statement re. shooting incident with Anthony Britt, May 7, 1992].

MC-0003293

July 28, 1992:  Mr. Barnette entered Natasha Heard's residence by force after being told not to do so [Criminal History chart prepared by U.S. Attorney's Office].

1992—1993:  Crystal Dennis testified that Mr. Barnette repeatedly sexually assaulted her, beat her, and kicked her, sometimes as often as twice a week.  These attacks were often motivated by jealousy and his suspicions of infidelity [Testimony of Crystal Dennis].  Mr. Barnette told police that on some occasions he struck Crystal, "but not often" [Report of interview of Mr. Barnette re. the child abuse case, January 23, 1993; Testimony of James Yarbrough].  When I asked Mr. Barnette if he beat Crystal Dennis, he replied, "There was one time I did" [Dietz exam, p. 119].

January 23, 1993:  Crystal Dennis reported to the Newnan, Georgia, Police Department that Mr. Barnette had beaten her two children, ages 3 and 5, with a metal coat hanger, leaving welts and scars on the children.  Mr. Barnette admitted to police that he had done so, though he said he was just punishing them for misconduct.  He was ultimately convicted of two counts of felonious cruelty to children  [Testimony of James Yarbrough].  Mr. Barnette gave various parties conflicting accounts of why he had beaten the children, including "playing doctor," not eating their dinner, and untying shoelaces [Report of interview of Mr. Barnette re. the child abuse case, January 23, 1993; Report of Drs. Duncan and Grant; Testimony of Crystal Dennis].

January 25, 1993:  Crystal Dennis reported that Mr. Barnette struck and "choked" her after she confronted him about beating her children [Testimony of James Yarbrough].  Mr. Barnette acknowledged having beat and kicked Ms. Dennis on that occasion because he was angry that she hadn't defended him when her mother threatened to call the police and report him for child abuse [Dietz exam, pp. 119-122].

June 1993—March 1994:  Alesha Chambers Houston testified that Mr. Barnette was repeatedly violent toward her, often in connection with his jealousy and efforts to control her.  On one occasion he almost ran into her with his car, then punched her because he didn't approve of what she wearing.  On another occasion he strangled her and threw her in an empty bathtub.  On several occasions he struck her in the face.  In various incidents, she testified, "he busted my lip, he cracked my front tooth . . . he pulled a big clump of my hair out in the back" [Testimony of Alesha Chambers Houston; Report of Drs. Duncan and Grant].  Alesha Chambers told investigating police officers that Mr. Barnette punched her in the face and sometimes kicked her during

13

MC-0003294

arguments [Alesha Chambers' statement re. kidnapping and rape, November 9, 1993].

November 8, 1993:  Alesha Chambers Houston testified that when she was 16 years old and trying to end the relationship with Mr. Barnette because of his physical abuse, he kicked in the door of her uncle's house, pulled the phone from the wall as she tried to call 911, and cut several of her fingers in the process of wresting a knife from her that she had grabbed to protect herself.  When she screamed, he gagged her with a towel.  He carried her over his shoulder to the balcony and threatened to throw her off.  He forced her to a vehicle, threatening to kill her if she tried to escape, and drove to his mother's house, picking up his brother along the way.  When the police arrived at his mother's home, he fled.  He was ultimately convicted of breaking and entering and felonious restraint [Testimony of Alesha Chambers Houston; Alesha Chambers' statement re. kidnapping and rape, November 9, 1993].  Her uncle, Jasper Chambers, testified that he came home to find his door kicked in, the phone pulled out of the wall, and his niece missing, causing him to call 911 [Testimony of Jasper Chambers].  FBI Special Agent Debra Adamo testified that when she was an officer with the Charlotte Police Department she located Alesha Chambers at the Barnette residence.  When Alesha was escorted out of the residence, she reported that Mr. Barnette had taken her there against her will.  At Jasper Chambers' residence, SA Adamo had observed damage to the door and a phone cord pulled out of the wall [Testimony of SA Debra Adamo].  Officer Elizabeth Joye of the Charlotte Police Department testified that she, too, observed the evidence of the door being kicked in and phone pulled out of the wall, but Mr. Barnette had told her that he didn't kick in the door and that he had taken her out of the home without giving her a chance to get her shoes on [Testimony of Elizabeth A. Joye].  Mr. Barnette confirmed the central facts of Alesha Chambers' account of this incident [Dietz exam, pp. 146-150].

November 12, 1993:  Alesha Chambers Houston testified that Mr. Barnette confronted her in the parking lot of Bojangles', where she worked, pulled a long knife on her, held the knife to her back to force her to go behind the restaurant, threatened suicide, and threatened that he was going to kill her.  When witnesses came to her aid, Mr. Barnette threatened to kill them, too.  He also held the knife to her throat, telling her to have one of the men back off.  Witnesses intervened, disarmed Mr. Barnette, and held him for police [Testimony of Alesha Chambers Houston].  Donna Burgess was among the Charlotte Police Department officers who responded to this scene.  Ms. Chambers had given her a statement of these events, which had been

14

MC-0003295

confirmed by witness Kevin Daley, who reported seeing a black male holding a knife to the throat of a black female and later saw the black male lunge at another man with the knife [Testimony of Donna Burgess]. Casey McCrickard testified that he observed the knife held to the woman's throat and also observed the man swing and jab the knife at Kevin Daley [Testimony of Casey McCrickard]. Jeffrey Jordan also reported hearing the man threaten to kill the woman and seeing the man hold the knife to the woman's throat and trying to stab Mr. Jordan [Jeffrey Jordan's statement re. kidnapping and assault with a deadly weapon against Alesha Chambers, November 12, 1993]. Mr. Barnette told me that there was a warrant for his arrest when he went to Bojangles' with a knife and confronted Alesha. He expected to talk to her and finish an argument they were having. Asked why he had taken a knife, he gave a vague answer. He denied having at any point put the knife near her throat, contradicting the victim and three other witnesses [Dietz exam, pp. 153-160].

December 15, 1993: Mr. Barnette entered Alesha Chambers' residence after being ordered not to do so [Criminal History chart prepared by U.S. Attorney's Office].

March 1994: Alesha Chambers Houston testified that she opened the door expecting someone else and was confronted by Mr. Barnette, who picked up a bat that is kept behind the door and beat her with the bat when she told him to leave. He lacerated her hand, which required approximately 12 sutures, and bruised her thighs, back, torso, legs, and elsewhere [Testimony of Alesha Chambers Houston].

March 25, 1994: Alesha Chambers Houston testified that the day before Mr. Barnette was to stand trial for the November 8, 1993, incident, he laid in wait for her at her mother's house, told her not to yell because he had a gun, forced her to get in a car, and drove her to his mother's house. When she refused to have sex, he ripped her shirt and strangled her with the fabric until she said he could do whatever he wanted. After having sex with her twice, he let her leave [Testimony of Alesha Chambers Houston; Alesha Chambers' statement re. kidnapping and rape, March 25, 1994]. The investigating officer found the victim's torn fingernail on the passenger seat of the vehicle, found her shirt in the vehicle, and found her bra in Mr. Barnette's bedroom. When questioned, Mr. Barnette told police that he hadn't had sex with the victim that day and that she had planted the evidence in his car. Semen was present on the victim's clothing and vaginal swabs [Testimony of W.T. Brandon]. Mr. Barnette gave a totally different account of this event, claiming that he drove Alesha to

15

MC-0003296

his home, where they had sex several times with her consent, but that she filed a false rape report because he called her a cab rather than driving her home [Dietz exam, pp. 167-175].

January 1995: Mr. Barnette fired a shot in the house where LaDon Barbour lived [Testimony of Sonia Barnette].

April 1996: Mr. Barnette reported that he and Robin argued frequently, including name-calling, cursing, and accusations of infidelity, but that the first time he was physically violent toward he, was on the last day of their relationship, when he "grabbed her, and threw her down, and held her down," then tried to prevent her from leaving the apartment, whereupon she bit him. He took her car and drove to Charlotte. [Dietz exam, pp. 200, 204, 219-221].

April 30, 1996: Mr. Barnette drove to the home of Robin Williams in Roanoke, VA, stopping en route to fill an oilcan with gasoline. About 3:30 a.m., Ms. Williams was awakened by the sound of Mr. Barnette shouting obscenities. When she looked out the window, he broke it with a bat. She tried to call 911 but found the phone dead (he had cut the phone line). Mr. Barnette was striking the windows of the car belonging to her friend Benjamin Green. Mr. Barnett used gasoline to set the apartment on fire, and as the flames spread, Ms. Williams heard Mr. Barnette yelling, "Die, bitch, die." She escaped through a second story window, having suffered serious burns. Mr. Barnette also burned Mr. Green's car, but fled as Mr. Green fired shots at him [Transcript of interview of Robin Williams, May 30, 1996].

Mr. Barnette initially denied any involvement in this crime, but later admitted to Dr. Johnson that he had done it. His drivers license, the wire cutters that he used to cut the phone lines, and a lighter were all found at the scene [Report of Sally Johnson, M.D.], indicating that he had come prepared with a complete arson kit.

Mr. Barnette told Dr. Duncan that he had been hurt by Robin Williams' seeming to put higher importance on what he believed was a date with Benjamin Green than on his suicide threats, so he drank alcohol and took over-the-counter sleeping pills, but went from being hurt to being angry. He vomited before departing in his brother's car, which he borrowed on the pretext of going to the store. Although he denied having a plan to burn the apartment, he could not explain why he had an oilcan filled with gasoline. He said he tore out Robin's phone lines and denied using wire cutters as the police had reported. He banged loudly on the door with a baseball bat he had in his car, and he

16

MC-0003297

Bates No. 13533

admitted swinging it at a window at which he saw Robin Williams. He claimed that it was after shots were fired at him that he broke the kitchen window and poured gasoline on the window, door frame, and living room window frame, and set it alight. He poured the remaining gasoline on Benjamin Green's car and set it alight. He denied yelling, "Die, bitch, die." He said he then smashed the windows of Mr. Green's car with the baseball bat and fled when Mr. Green resumed shooting. After reading about the incident in the newspaper and seeing confirmation of the identity of Benjamin Green, he blamed him for Robin's injuries. He claimed he wanted to apologize to Robin Williams but denied going to Virginia between the fires and the murders [Report of Dr. Duncan and Dr. Grant; Testimony of Dr. Duncan]. His claim of wanting to apologize and his denial of traveling to Virginia are contradicted by the notes he left on her car while she was hospitalized, accusing her of lying to him about her love for him [Testimony of Sydney Williams, undated, pp. 193-201; 7 greeting cards with handwritten messages].

The version Mr. Barnette told me is consistent with Ms. Williams' account that Mr. Green started shooting only after the fires were set. Mr. Barnette acknowledged that he wanted to beat up the man he believed was with Robin that night, and he said "I was very, very, very, very livid." He acknowledged that afterwards, he had conflicting feelings of wanting to apologize, yet hating Ms. Williams for "lying" to him about what he believed was confirmation of her having an affair with Mr. Green [Dietz exam, pp. 240-245, 315].

June 22, 1996: Armed robbery, carjacking, and murder of Donnie Allen (see above).

June 22, 1996: Threat to kill Robin Williams, attempt to kidnap Robin Williams, and murder of Robin Williams (see above).

In summary, the evidence indicates that Mr. Barnette has committed at least 20 violent crimes against more than a dozen men, women, and children. While he may have committed hundreds of additional domestic assaults, as indicated by the testimony of two of his surviving victims, the crimes detailed above reflect multiple motives.

Thank you for providing me the opportunity to evaluate this case. My credentials and recent experience in testifying are set forth in the attached c.v. Please do not hesitate to call with any questions you may have. If called to testify, I expect to generate Microsoft®

MC-0003298

Bates No. 13534

PowerPoint® slides to use as demonstrative exhibits to summarize some of the information contained in this report.

Yours sincerely,


Park Dietz, M.D., M.P.H., Ph.D.
Clinical Professor of Psychiatry and Biobehavioral Sciences
UCLA School of Medicine


18

MC-0003299

Bates No. 13535

Best Copy Available.



EW-C;VAFBIRH00/BARNETT,AQUILIA MARC1B1CC1.M.B,.070773,.506,141,BRO,BLK,
950082PA5.MED..16D1P1PM172011P1H113..243571534,...0903,062246,se-45652,
A&D,MURDER,NO BOND,LAST SEEN DRIVING BLUE HONDA CIVIC W/GOLD TRIM
PARTIAL NC PLATE ENDING WITH 465

0622 01985 1742
   NCIC REPLY

VAFBIRH00
NAM/BARNETT, AQUILIA MARC1B1CC1  N1C/WARB574X014

#101990.

0622 01985 1743
VCIN-REPLY

WANTED PERSON ENTERED 062246
NAM/BARNETT,AQUILIA MARC1B1CC1 SEX/M RAC/B DOB/070773
/C07200978527 OCA/BB-45652
#101997

Supv. Burch advised
O.K. to enter. 6·22·96
                        BJB

BBA-RH-45652-1

SEARCHED _____ INDEXED _____
SERIALIZED BJB    FILED fbi

JUN 2 2 1996

FBI — RICHMOND

PC - 005530

DOJ-FOIA 000001

1A Envelope

Case ID: 88A-RH-45652

| RH | 1 | ARREST PHOTOS OF AQUILIA BARNETTE |

PC - 005531

(Title) _____

(File No.) _____

| Item | Date Filed | To be returned Yes | To be returned No | | Disposition |
|------|-----------|------|------|---|-------------|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

$\delta p$-$R$ $11$-$45652$-$1$

PC - 005

DOJ-FOIA 000003

FD-340 (Rev. 7-29-92)

**Universal Case File Number** _88A - RN - 45652_

**Field Office Acquiring Evidence** _____

**Serial # of Originating Document** _____

**Date Received** _8-5-96_

**From** _SAN FRANCISCO — COLOR LAB_
(Name of Contributor)

_____
(Address of Contributor)

**By** _____  b6
(Name of Special Agent)                  b7C

To Be Returned ☐ Yes ☐ No
Receipt Given ☐ Yes ☐ No
Grand Jury Material - Disseminate Only Pursuant to Rule 6 (e)
Federal Rules of Criminal Procedure
☐ Yes ☐ No

Title:

Reference: _____
(Communication Enclosing Material)

_____

**Description:** ☐ Original notes re interview of

_ARREST PHOTOS OF AQUILIA M._

_BARNETTE_

PC - 005533

DOJ-FOIA 000004



005534

DOJ-FOIA 000005



000 145 16:07 062596 5.500

DOJ-FOIA 000006



008 145  16:0 7  062596  5.5 00

05536

DOJ-FOIA 000007



05537

DOJ-FOIA 000008



P 05538

DOJ-FOIA 000009



000 145  16:06  062596  5.500

05539

DOJ-FOIA 000010

y

DOJ-FOIA 000010

SEQ (FBIHQ ONLY)___ ___ ___ ___          PHOTOGRAPHIC WORK          Cost Code ____

## NEGATIVES PRODUCED (In frames)

| | | | COLOR | B&W | Intl. Date |
|---|---|---|---|---|---|
| C O P Y | 101 | 35mm | | | |
| | 102 | 120 or 70mm | | | |
| | 103 | 4 × 5 | | | |
| | 104 | 8 × 10 | | | |
| S L I D E S | 105 | Dupe | | | |
| | 106 | Orig/Title | | | |
| S T U D I O | 107 | ●ed | | | |
| | 108 | Mugs | | | |
| | 109 | Portrait | | | |
| | 110 | Object | | | |
| | 111 | D.O. (FBIHQ only) | | | |
| | 112 | G&G | | | |
| L O C A T I O N | 113 | Executive (GS-16 & above) | | | |
| | 114 | Crime Scene | | | |
| | 115 | Surveillance | | | |
| | 116 | Aerial | | | |
| | 117 | Other (Specify) | | | |
| P O L A R | 118 | Copy | | | |
| | 119 | ●ig. | | | |
| | 120 | Slide | | | |
| | | TOTAL | | | |

## ROLL FILM PROCESSED (In rolls)

| | | COLOR | B&W | TRANS | Intl. Date |
|---|---|---|---|---|---|
| 201 | 110 | | | | |
| 202 | 135 - 12 | / | | ✓ | |
| 203 | 135 - 20 | | | | |
| 204 | 135 - 24 | | | | |
| 205 | 135 - 36 | | | | |
| 206 | 120 | | | | |
| 207 | 220 | | | | |
| 208 | 4 × 5 | | | | |
| 209 | 8 × 10 | | | | |

## BULK FILM PROCESSED (In feet)

| | | COLOR | B&W | TRANS | MICRO | DUPE | Intl. Date |
|---|---|---|---|---|---|---|---|
| 301 | 16mm | | | | | | |
| 302 | 35mm | | | | | | |
| 303 | 70mm | | | | | | |
| 304 | 105mm | | | | | | |

## PRINTS PRODUCED (In final prints)

| | | COLOR | Intl. Date | B&W | Intl. Date |
|---|---|---|---|---|---|
| 401 | Contact | | | | |
| 402 | 2 × 3 C | | | | |
| 403 | Cred M | | | | |
| 404 | Cred C | | | | |
| 405 | 3½ × 5 M | | | | |
| 406 | 3½ × 5 C | | | | |
| 407 | 4 × 5 M | | | | |
| 408 | 4 × 5 C | | | | |
| 409 | 5 × 7 M | | | | |
| 410 | 5 × 7 C | | | | |
| 411 | 8 × 10 M | | | | |
| 412 | 8 × 10 C | | | | |
| 413 | 11 × 14 M | | | | |
| 414 | 11 × 14 C | | | | |
| 415 | 16 × 20 C | | | | |
| 416 | 20 × 24 C | | | | |
| 417 | 30 × 40 C | | | | |
| 418 | 40 × 60 C | | | | |
| 419 | DOC | | | | |
| 420 | Trans | | | | |

## WORK REQUESTS

| Priority | In-House | In | Out | Total |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| Total | | | | |
| | | Year to Date | | |

### BPA

| | TIMES USED | AMT SPENT |
|---|---|---|
| BR | | |
| Supplies | | |
| Emerg. Color | | |

### Silver Recovery Turn Ins

| | |
|---|---|
| Gallons | |
| Troy Ounces | |

### Training Provided

| | Prep Hrs | Class Hrs |
|---|---|---|
| FBI | | |
| Other | | |

### Video Work (Hrs.)

| | |
|---|---|
| Training | |
| Case work | |
| Other (Specify) | |

5364

PC - 005540

DOJ-FOIA 000011

DOC LAB NOTE

# ITEM (S)

# CAN NOT

# BE SCANNED

DESCRIPTION

Negatives

PC - 005541

DOJ-FOIA 000012

FD-36 (Rev. 8-29-85)

# FBI

| TRANSMIT VIA: | PRECEDENCE: | CLASSIFICATION: |
|---|---|---|
| ☒ Teletype | ☒ Immediate | ☐ TOP SECRET |
| ☐ Facsimile | ☐ Priority | ☐ SECRET |
| ☐ AIRTEL | ☐ Routine | ☐ CONFIDENTIAL |
| | | ☐ UNCLAS E F T O |
| | | ☒ UNCLAS |

Date  6/22/96

FM FBI RICHMOND (88A-RH-45652) (P)

TO  FBI CHARLOTTE ()/IMMEDIATE/

BT

UNCLAS

CITE: //3540//


SUBJECT:  AQUILIA MARCIBICCI BARNETT, AKA MARK BARNETT;

FUGITIVE (A); UFAP - MURDER; OO:RH.

    ARMED AND DANGEROUS.

    RE RH TELCALL FROM SSRA [          ] 6/22/96.

    BEING FORWARDED TO CHARLOTTE VIA FACSIMILE ARE COPIES OF

BOTH FEDERAL AND LOCAL WARRANTS REGARDING CAPTIONED SUBJECT.

CURRENT PHOTOGRAPHS OF SUBJECT ARE UNAVAILABLE AT THIS TIME

BUT WILL BE FURNISHED IF AND WHEN OBTAINED.

    FOR INFORMATION OF CHARLOTTE, ON 6/22/96, FEDERAL UFAP

WARRANT WAS OBTAINED IN THE WESTERN DISTRICT OF VIRGINIA

CHARGING CAPTIONED SUBJECT WITH VIOLATION OF TITLE 18, SECTION

b6
b7C

88A·RH·45652·2

CEARCHED _____
SERIALIZED __BJG__
INDEXED _____
FILED __BJG__

①- Richmond
/rbb
(1) BJG

Approved: Supv [      ] approved  Original filename: RRBOOTW.174
BJG 6-22-96

Time Received: _____  Telprep filename: RBB00150.174

MRI/JULIAN DATE: ____454  \174__  ISN: DOJ

FOX DATE & TIME OF ACCEPTANCE: ____2229 1BJG____  PC - 005542

BARNETT TEL

b6
b7C

DOJ-FOIA 000013

^PAGE 2 RH, 88A-RH-NEW (P)

1073, UFAP - MURDER.   AQUILIA MARCIBICCI BARNETT IS CURRENTLY

WANTED FOR THE MURDER OF ROBIN ANTOINETTE WILLIAMS WHICH

OCCURRED IN ROANOKE, VA. AT APPROXIMATELY 7:00 A.M. ON

6/22/96.   SUBJECT BARNETT WAS POSITIVELY IDENTIFIED BY

b6
b7C

BY WAY OF BACKGROUND, ROBIN WILLIAMS IS A FORMER

GIRLFRIEND OF BARNETT'S.   WILLIAMS BROKE OFF HER RELATIONSHIP

WITH BARNETT IN APRIL OF 1996, FOLLOWING WHICH BARNETT BECAME

EXTREMELY VIOLENT TOWARD HER.   ON 4/30/96, BARNETT TRAVELLED

FROM CHARLOTTE TO WILLIAMS' RESIDENCE IN ROANOKE WHERE HE

BROKE OUT SEVERAL WINDOWS OF WILLIAMS' APARTMENT PRIOR TO

IGNITING TWO MOLOTOV COCKTAILS INSIDE THE APARTMENT WHERE

WILLIAMS AND HER FAMILY WERE SLEEPING.   WILLIAMS AND HER

FAMILY WERE ABLE TO ESCAPE WITH ONLY MINOR INJURIES BUT THE

APARTMENT WAS DESTROYED.

ARREST WARRANTS WERE OBTAINED BY THE ROANOKE POLICE

DEPARTMENT (RPD) CHARGING BARNETT WITH TWO COUNTS OF ATTEMPTED

CAPITAL MURDER AS WELL AS NUMEROUS ADDITIONAL FELONIOUS

PROPERTY CRIMES AS A RESULT OF THE FIRE.   BY REVIEWING

TELEPHONE RECORDS OF WILLIAMS AND DISCUSSING HER PREVIOUS

PC - 005543

DOJ-FOIA 000014

^PAGE 3 RH, 88A-RH-NEW (P)

RELATIONSHIP WITH BARNETT, BARNETT WAS BELIEVED TO BE RESIDING

IN CHARLOTTE WITH HIS MOTHER, [                    ]

BETWEEN 4/30/96 AND 6/22/96, SEVERAL LEADS WERE GENERATED

REGARDING BARNETT'S LOCATION.  THESE LEADS WERE SET BY RPD TO

THE CHARLOTTE POLICE DEPARTMENT (CPD) VIA TELEX BUT FOR

UNKNOWN REASONS CPD PERFORMED LITTLE OR NO WORK ON THEM.

ON 6/22/96, AT APPROXIMATELY 6:50 A.M. BARNETT APPROACHED

THE REAR DOOR OF WILLIAMS RESIDENCE AT 911 LOUDOUN AVENUE, NW,

ROANOKE, VA. AND FIRED THREE SHOTGUN ROUNDS THROUGH THE LOCK

TO GAIN ENTRY. [                    ] WHILE CARRYING A YOUNG CHILD

MET BARNETT, WHO DEMANDED TO SEE ROBIN WILLIAMS.  ROBIN

WILLIAMS RAN FROM THE RESIDENCE AND WAS PURSUED BY BARNETT TO

A LOCATION ACROSS THE STREET WHERE BARNETT RESTRAINED HER AT

GUNPOINT.  AFTER SEVERAL MINUTES OF DISCUSSION AND PLEADING BY

ROBIN AND [                ] TO RELEASE ROBIN, ROBIN WAS LET GO.

AS SHE BEGAN TO WALK AWAY, BARNETT SHOT HER IN THE SIDE WITH

THE SHOTGUN CAUSING HER TO FALL TO THE GROUND.  BARNETT THEN

STOOD OVER ROBIN WILLIAMS AND FIRED A FATAL WOUND INTO HER

BACK, KILLING HER ALMOST IMMEDIATELY.  BARNETT DEPARTED THE

b6
b7C

b6
b7C

b6
b7C

PC - 005544

DOJ-FOIA 000015

^PAGE 4 RH, 88A-RH-NEW (P)

AREA DRIVING A BLUE WITH GOLD TRIM HONDA CIVIC WITH PARTIAL
NORTH CAROLINA LICENSE ENDING IN 465.

IN ADDITION TO THE ABOVE ROANOKE, VA. CHARGES, BARNETT IS
WANTED FOR PAROLE VIOLATION IN NEWNAN, GA.  BARNETT IS
DESCRIBED AS FOLLOWS:

| | |
|---|---|
| NAME | AQUILIA MARCIBICCI BARNETT |
| ALIAS | MARK BARNETT |
| SEX | MALE |
| RACE | AFRICAN AMERICAN |
| DATE OF BIRTH | 7/7/73 |
| SSAN | 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 |
| HEIGHT | 5'6" |
| WEIGHT | 145 LBS. |
| EYES | BROWN |
| HAIR | BLACK, CLOSE CROPPED |
| FBI NUMBER | 950082PA5 |
| LAST KNOWN ADDRESS | 3413 WEST BOULEVARD, CHARLOTTE, NC |

RICHMOND DIVISION, ROANOKE RA POINT OF CONTACT IS SA

b6
b7C

PC - 005545

DOJ-FOIA 000016

^PAGE 5 RH, 88A-RH-NEW (P)

LEADS:

CHARLOTTE AT CHARLOTTE, NC:

CONDUCT LOGICAL FUGITIVE INVESTIGATION AT 3413 WEST
BOULEVARD, CHARLOTTE, WHERE BARNETT IS BELIEVED TO BE RESIDING
WITH HIS MOTHER, _____ ACCORDING
TO CPD THE ABOVE IS A BAD ADDRESS.  IT SHOULD BE NOTED THAT OF
SEVERAL LEADS SENT TO CPD, THE ABOVE ADDRESS LEAD WAS THE ONLY
LEAD RESPONDED TO.  THE PHONE NUMBER FOR THIS ADDRESS AS OF
APPROXIMATELY APRIL, 1996 WAS (704) 399-5479. _____ IS
BELIEVED TO BE EMPLOYED AT _____ IN CHARLOTTE, NO
FURTHER INFORMATION.

b6
b7C

TELEPHONE RECORDS OF VICTIM DETERMINED THE FOLLOWING:
_____ IS BELIEVED TO BE THE PROBATION OFFICER OF
BARNETT IN CHARLOTTE.

b6
b7C

_____ ARE UNKNOWN LOCATIONS
CALLED BY BARNETT FROM WILLIAMS' RESIDENCE PRIOR TO APRIL 30,
1996.

ATTEMPT TO IDENTIFY THE SUBSCRIBERS OF THE ABOVE NUMBERS
AND CONDUCT APPROPRIATE INVESTIGATION THERE.

PC - 005546

DOJ-FOIA 000017

^PAGE 6 RH, 88A-RH-NEW (P)

ARMED AND DANGEROUS.  SUBJECT IS BELIEVED TO BE ARMED

WITH A SHOTGUN.

BT

PC - 005547

DOJ-FOIA 000018

FD-515 (Rev. 10-1-94)

Squad Supervisor approval (please initial)

**Accomplishment Report**
(Accomplishment must be reported and loaded into ISRAA within 30 days from date of accomplishment)

Date Prepared 6/27/96
Date Loaded 6/27/96
Data Loader's Initials

**Does Accomplishment Involve:**
(check all that apply)

| | |
|---|---|
| Drugs | ☐ |
| A Fugitive | ☒ |
| Bankruptcy Fraud | ☐ |
| Computer Fraud/Abuse | ☐ |
| Corruption of Public Officials | ☐ |
| Forfeiture Assets | ☐ |
| Sub Invest Asst by FO (s) | ☐ |

**File Number**
88A-RH-45652

Stat Agent Soc. Sec. No.

Stat Agent Name

| RA | Squad |
|---|---|
| ROANOKE | 5 |

Assist. FO(s) ☐ ___ ___ ___ ___
A, B, C, D, E

Assisting Agents Soc. Sec. No.
1. ___ ___ ___
Name:
2. ___ ___ ___
Name:

Task Force

Assisting Joint Agencies ×●
1.
2.

**Investigative Assistance or Technique Used**
1-Used, but did not help
2-Helped, minimally
3-Helped, substantially
4-Absolutely essential
For Sub. Invest. Assist. by other FO (s) indicate A,B,C,D,E for corresponding FO

b6
b7C

| Rate FO(s) | IAT | Rate FO(s) | IAT | Rate FO(s) | IAT |
|---|---|---|---|---|---|
| | Financ. Analyst | | Lab. Div. Exams | | UCO - Group I |
| | Aircraft Asst. | | Lab. Div. Field Sup. | | UCO - Group II |
| | Computer Asst. | | Pen Registers | | UCO - Other |
| | Consensual Mon. | | Photo Coverage | | NCAVC/VI - CAP |
| | ELSUR / FISC | | Polygraph Asst. | | Visual Invest. Anal. |
| | ELSUR / Title III | | Search Warrants | | Crisis Neg. - Fed. |
| | Eng. Sect. Field Supt. | | Show Money Usage | | Crisis Neg. - Local |
| | Eng. Sect. Tap Exams | | SOG Asst | | ERT Assistance |
| | Hypnosis Asst. | | Swat Team Action | | Butte-ITC |
| | Evidence Purchase | | Tech. Agnt or Equip. | | Savannah-ITC |
| | Informant /CW Info. | | Telephone Toll Recs. | | |

**A. Complaint / Information / Indictment**
Also Complete Section H
Complaint Date 6/22/96
Check if Civil Rico Complaint ☐
Information Date ___
Indictment Date ___

**B. Arrest / Locate / Summons**
Arrest Date ___
☐ Federal ☐ Local ●
Subject Priority: ☐ A ☐ B ☐ C
☐ Subject Resisted
☐ Subject was armed
Locate Date ___
Subject Priority: ☐ A ☐ B ☐ C
Summons Date ___
☐ Federal ☐ Local ●

**C. Hostage(s) Released** Date ___
Released by: ☐ Terrorist ☐ Other
Number of Hostages: ___
Child Located Date ___

**D. Recovery / Restitution / PELP ×●**
Recovery Date ___
☐ Federal ☐ Local
Code ● Amount
$
$
Restitution Date ___
☐ Court Ordered
☐ Pretrial Diversion
Code ● Amount
$
PELP Date ___
Code ● Amount
$

**E. Civil Rico Matters** Date ___
Also Complete Section H

or

Other Civil Matters Date ___
Judgment ___ ●
Judicial Outcome ___ ___ ×●
Amount: $ ___
Suspension: | Years | Months |

**F. Administrative Sanctions** Date ___
Type: Length:
☐ Suspension ☐ Permanent
☐ Debarment ☐ | Years | Months |
☐ Injunction
Subject Description Code ___ ___ ●

**G. Final Judicial Process Conviction**
Also Complete Section H
Date of Conviction: ___
Date of Sentence: ___
Subject Description Code: ___ ●
Judicial State: ___ District: ___
Sentence type: ___ ___ ●
Sentence Term:

| In-Jail Years Months | Suspended Years Months | Probation Years Months |
|---|---|---|
| | | |

☐ Federal
☐ Local ●
☐ Felony
☐ Misdemeanor
☐ Plea
☐ Trial

Fines: $ ___

**H. U.S. Code Violations**

| Title | Section | Counts | Title | Section | Counts |
|---|---|---|---|---|---|
| 18 | 1073 | i | | | |
| | | | | | |

Required for Sections A, E, and G (Conviction)
Optional for Section B (arrest) 88A-RH-45652-3
SEARCHED
Acquittal / Dismissal Information SERIAL DIVISION
Acquittal Date ___
Dismissal Date ___ INDEXED
Pretrial Diversion Date ___ FILED

**I. Subject Information** (Required for Sections A, B, D (Restitution), E, F, and G)

| Name | Date of Birth | Race ● | Sex | Place of Birth (if available) | Social Security No. (if available) |
|---|---|---|---|---|---|
| AQUILIA M. BARNETTE | 7/7/73 | B | M | | 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 |

☐ Subject Related to an LCN, Asian Organized Crime (AOC), or Italian Organized Crime (IOC) Group. (Submit form FD-515a for indictments and convictions only)

× Additional information may be added by attaching another form or a plain sheet of paper for additional entries.
● Requires that a written explanation on plain paper be attached. (Court Ordered Restitution does not require a written explanation)
* See codes on reverse side.

Serial No. of FD-515
3

TOTAL P.02

PC - 005548

DOJ-FOIA 000019

06/27/96            *************** COMPLAINT ***************
                     SENSITIVE / UNCLASSIFIED

b6
b7C

Case Number: 88A-RH-45652     Stat Agent Name: [         ]     Report Date: 06/27/1996
Serial No.: 3              Stat Agent SOC.: [       ]     Accom Date.: 06/22/1996

| Does Accomplishment Involve | Assisting Joint Agencies | Assisting Agents SOC | Subject Name |
|---|---|---|---|
| Drugs . . . . . . . . . . . . : N | | | BARNETT, AQUILIA, MARCIBI |
| A Fugitive. . . . . . . . . : Y | | | |
| Bankruptcy Fraud. . . . . . : N | | | |
| Computer Fraud/Abuse. . . . : N | | | RA     Squad    Task Force |
| Corruption of Public Officials: N | | | ----    -----    ---------- |
| Forfeiture Assets . . . . . : N | | | ROAN    5 |

Sub. Invest. Asst by Other FOs:

```
          Investigative Assistance or Technique Used
          --------------------------------------------
   FINAN ANALYST        LAB DIV EXAMS       UCO-GROUP I
   AIRCRAFT ASST        LAB FIELD SUP       UCO-GROUP II        1 = Used, but did not help
   COMPUTER ASST        PEN REGISTERS       UCO-OTHER           2 = Helped, Minimally
   CONSEN MONITR        PHOTO COVERGE       NCAVC/VI-CAP        3 = Helped, Substantially
   ELSUR/FISC           POLYGRAPH           VISUAL INVEST       4 = Absolutely Essential
   ELSUR/III            SRCH WAR EXEC       CRIS NEG-FED
   ENG FIELD SUP        SHOW MONEY          CRIS NEG-LOC
   ENG TAPE EXAM        SOG ASST            ERT ASST
   HYPNOSIS ASST        SWAT TEAM           BUTTE-ITC
   EVIDNCE PURCH        TECH AG/EQUIP       SAVANNAH-ITC
   INFORMANT/CW         TEL TOLL RECS
```

Is this a Civil Rico Complaint (Y/N): N

```
                United States Code Violation
                ==============================
                Title      Section     Counts
                -----      -------     ------
                 18         1073          1
```

```
                    Accomplishment Narrative
                    ------------------------
```

                        SENSITIVE / UNCLASSIFIED

PC - 005549

DOJ-FOIA 000020

Routing Slip



Date: 7/3/96

To: SAC, RICHMOND

From: SAC, CHARLOTTE

Title: AQUILIA MARCIVICCI BARNETTE, AKA MARC
BARNETTE - FUGITIVE (A);
UFAP _ MURDER

File#: 88A-RH-45652

Re: RH TELETYPE TO CE, 6/22/96

Attached is/are ____2____ original documents being forwarded
to OO case file from the Charlotte Division.

SAC JOHN E. MORLEY
CHARLOTTE DIVISION

PC - 005550

DOJ-FOIA 000021

FD-36 (Rev. 8-29-85)

FBI

TRANSMIT VIA:
[X] Teletype
[ ] Facsimile
[ ] AIRTEL

PRECEDENCE:
[ ] Immediate
[ ] Priority
[X] Routine

CLASSIFICATION:
[ ] TOP SECRET
[ ] SECRET
[ ] CONFIDENTIAL
[ ] UNCLAS E F T O
[X] UNCLAS

Date 6/28/96

FM FBI CHARLOTTE (88A-RH-NEW)

TO DIRECTOR FBI/ROUTINE/

FBI RICHMOND (88A-RH-NEW)/ROUTINE/

BT

UNCLAS

CITE: //3140//

PASS: FOR FBI RICHMOND, ATTN ROANOKE RA.

SUBJECT: AQUILIA MARCIVICCI BARNETTE, AKA MARC BARNETTE;

FUGITIVE (A); UFAP - MURDER; OO:RH.

RE RICHMOND TELETYPE TO CHARLOTTE, 6/22/96 AND CHARLOTTE

TELCALL TO SA [         ] 6/25/96.

AQUILIA MARCIVICCI BARNETTE WAS ARRESTED ON 5/22/96 AT

CHARLOTTE, NORTH CAROLINA, WITHOUT INCIDENT BY BU AGENTS AND

FUGITIVE TASK FORCE MEMBERS.

b6
b7C

SENT VIA
ENCIPHERED TELETYPE

Approved: _____  Original filename: _____

Time Received: _____  Telprep filename: _____

MRI/JULIAN DATE: _____  ISN: 003

FOX DATE & TIME OF ACCEPTANCE: _____

PC - 005551

DOJ-FOIA 000022

^PAGE 2 88A-RH-NEW UNCLAS

BARNETTE ADMITTED TO THE ROANOKE, VIRGINIA MURDER AND ALSO ADMITTED TO A MURDER IN CHARLOTTE, NORTH CAROLINA DURING THE EARLY AM HOURS ON SATURDAY, 6/22/96.

SUBJECT LODGED AT MECKLENBURG COUNTY JAIL, CHARLOTTE, NORTH CAROLINA.

ON 6/28/96, MURDER CHARGES FROM ROANOKE, VIRGINIA AND CHARLOTTE, NORTH CAROLINA, WERE LODGED WITH THE MECKLENBURG COUNTY SHERIFF'S OFFICE.

LEAD:  RICHMOND DIVISION AT ROANOKE VIRGINIA:

WILL CLEAR SUBJECT FROM NCIC AND HAVE THE FEDERAL UFAP PROCESS DISMISSED.

CHARLOTTE WILL PLACE LOCATE ON SUBJECT.

BT

PC - 005552

LW                           Locate Wanted Person

ORI  NCFBICE01  NAM  BARNETTE,AQUILIA_MARCIVICCI____  NIC  W822271542
OCA  _____  DOL  062296  LCA  RH-45652_  XTR  EXTR  HLP  _

FBJ-4012  JUL 2,1996  17:49:13  ( 48JH8H1PYKWW )  ACK
                                                    PAGE  1 OF  1
 FBJ-3868 - NC2      07/02/96 17:49:16 - 07/02/96 17:49:16 48JH8H1PYKWW
1L0148JH8H1PYKWW111
NCFBICE01
LOCATED NAM/BARNETTE,AQUILIA MARCIVICCI  NIC/W822271542

*Located Coweta CO SO Entry.*
*FBI RH Entry was not on file.*

88A-RH-45652-5
SEARCHED
SERIALIZED
JUL 2 1996
FBI - CHARLOTTE

PC - 005553

DOJ-FOIA 000024

QW                  Query Wanted Person And Missing Person

ORI   NCFBICE01   NIC  _____   NAM   BARNETTE,AQUILIA_MARCIBICCI___
SEX   _   RAC   _   DOB   070773   FBI   950082PA5   MNU  _____
SOC   243571534   OLN  _____   OCA  _____   HLP   _

FBJ-4010   JUL 2,1996   17:14:32   ( 441H8H1PXL4K )   ACK
 FBJ-3864 - DCI209       07/02/96 17:14:32 - 07/02/96 17:14:32 441H8H1PXL4K
NO DCI STATE WANTED PERSON RECORD
BASED ON NAM/BARNETTE,AQUILIA MARCIBICCI   DOB/070773   FBI/950082PA5
SOC/243571534
                                                          PAGE   1 OF   2
 FBJ-3865 - NC1        07/02/96 17:14:36 - 07/02/96 17:14:33 441H8H1PXL4K
1L01441H8H1PXL4K108
 NCFBICE01

MKE/WANTED PERSON
ORI/GA0380000 NAM/BARNETTE,AQUILIA MARCIVICCI SEX/M RAC/B POB/NC
 DOB/070773 HGT/505 WGT/120 EYE/BRO HAI/BLK FBI/950082PA5
FPC/18DIPIPM172011PIPI13 SOC/243571534
 OLN/243571534 OLS/GA OLY/95 OFF/PROB VIOLATION - SEE MIS DOW/082294
OCA/93R107
MIS/COWETA CO SO 404 253 1502 CRUELTY TO CHILD
 ORI IS COWETA CO SO NEWNAN GA
NIC/W822271542
IMMED CONFIRM WARRANT AND EXTRADITION WITH ORI

b6
b7C

PC - 005554

DOJ-FOIA 000025

FD-350 (Rev. 5-8-81)

(Mount Clipping in Space Below)

(Indicate page, name of newspaper, city and state.)

P. A1 + A2, Roanoke Times & World News, Roanoke VA

Date: 6-23-96
Edition:

Title: Aquilia M. Barnett

Character:
or
Classification: 88A-RH-45652
Submitting Office:

Indexing:

# Woman slain; ex is suspect

**A MAN** *already wanted on charges that he firebombed his ex-girlfriend's apartment is now being sought on new charges — that he killed her Saturday at her mother's house.*

By MIKE HUDSON
STAFF WRITER

Eight weeks ago, Robin Williams survived a firebombing at her apartment in Northeast Roanoke. But neighbors say she still feared for her life, because the ex-boyfriend who was charged with the attack, Aquilia Marcibicci Barnette, was still at large.

An hour after sunup Saturday, police say, he came to her mother's house with a shotgun to finish the job. Police say Barnette chased Williams outside and then shot her in the chest. Williams, 23, died at Roanoke Memorial Hospital.

Police were still looking for Barnette, also 23, as of late Saturday.

Barnette, who is from Charlotte, N.C., has been wanted since April 30 on five charges in the firebombing of Williams' Keswick Street apartment. Police said Barnette had tried to kill her because she had broken up with him and then rebuffed him when he tried to talk her into getting back together.

"He thought he owned her," said Doris Coleman, one of Williams' neighbors. "He just didn't want to let go."

Williams had been out of the hospital a few weeks and living with her mother, but she was still returning to get therapy for her burns.

Police say that around 7 a.m. Saturday, Barnette showed up at Williams' mother's house on Loudon Avenue Northwest. Police say witnesses told them Barnette fired a shotgun several times into the back door, then forced his way in and confronted her mother, Bertha Williams.

Robin Williams fled the house, police say, but he chased her down and caught her near Ninth Street and Loudon Avenue. Police say Barnette was trying to force her back into the house when he shot her in the chest.

Then, they say, he sped away in a dark blue Honda Civic.

Williams' killing left two of her neighbors complaining that police don't do enough to protect victims of domestic violence.

"They didn't take it serious enough," Coleman said. She said she saw Barnette riding around

88A-RH-45652-69



b6
b7C

PC - 005555
FBI/DOJ

Roanoke a couple of days after the firebombing and called police, but he was already gone.

"I know there's some things you can't do," Maude Hubbard, 75, said. "But there's a whole lot more they could do. They can do more about domestic troubles."

Roanoke Police Lt. William J. Beason said the department takes domestic violence cases "very seriously. We encourage victims to place charges and prosecute them."

In Barnette's case, Beason said, "everything we had indicated he had gone back to Charlotte. We were in constant contact with the Charlotte police. We passed on any leads we had to them."

Charlotte police say Barnette is also wanted in North Carolina on an unrelated burglary charge. They said he was charged in North Carolina in 1992 with assault with a deadly weapon, burglary and two counts of kidnapping. Two years later he was charged again with kidnapping and with two counts of rape. It couldn't



Aquilia Marcibicci Barnette, 23, is wanted in the slaying of his ex-girlfriend. Police describe him as 5-foot-6, 140 pounds with brown eyes and black hair.

be determined Saturday what had happened in the courts with those charges.

Coleman said Williams and Barnette had moved into the Keswick Apartments together about a year ago.

Hubbard said Williams was a "hard-working girl, a good girl" who sang in her church choir. Williams had a good job working in the insurance claims office at Community Hospital of Roanoke Valley, Hubbard said.

"She was a wonderful person," Williams' brother, Kenny, said. "She loved everybody. She was the sweetest person you ever wanted to meet."

Hubbard said Williams "got tied up with the wrong people" and starting seeing Barnette.

Another neighbor, Tony St. Clair, said he had often heard Barnette and Williams arguing, and that he had called police three times.

Police say that after she rejected Barnette, he told her to "watch out."

About 4 a.m. April 30, Williams and Benjamin Greene, 23, who was staying at her apartment, were awakened by smoke. When they looked outside, they saw that Greene's car windows had been smashed and the car was on fire.

They later told police that they saw a man — whom they identified as Barnette — throw an object through the apartment window. It was a firebomb, and it ignited the couch.

Greene pulled a handgun from his duffle bag and fired three shots at the man. The man fled in a car.

Williams and Greene escaped the flames through a second-story window. Greene was not hurt, but fire scorched Williams' right arm and she suffered bad cuts to her chest, stomach, legs and knees.

After Williams got out of the hospital, Hubbard said, "she came back and dedicated her life to Jesus Christ."

But many nights she couldn't sleep because of her fears that Barnette would return, Hubbard said. "She was looking to see him any time."

Hubbard said "some men think that they can take possession of a young girl." She said people need to get angry about domestic violence — and do more to stop it.

"I think this ought to wake Roanoke up," Hubbard said. "Young women are losing their lives. It's so sad to let this child die like this."

PC - 005556

DOJ-FOIA 000027

FD-350 (Rev. 5-8-81)

(Indicate page, name of
newspaper, city and state.)

P. A1 & A6  Roanoke Times And
World News, Roanoke, VA.

Date: 6-26-96
Edition:

Title: Aquila M. Barnette

Character:
or
Classification: 88A-RH-45652
Submitting Office:

Indexing:

# Slaying suspect arrested

**A 23-YEAR-OLD** *fugitive wanted in the killing Saturday of his ex-girlfriend was found at his mother's house in Charlotte, N.C.*

By DIANE STRUZZI
STAFF WRITER

A fugitive wanted on charges of gunning down his ex-girlfriend in the middle of a Northwest Roanoke street was captured Tuesday afternoon at his mother's house in Charlotte, N.C.

Aquilia Marcibicci Barnette, 23, remained in FBI custody late Tuesday in the Charlotte-Mecklenburg Jail, charged with murder in the shooting death of Robin Williams. Maj. J.L. Viar of the Roanoke Police Department said Barnette admitted to authorities that he killed his ex-girlfriend.

Barnette also was charged with murder and robbery in connection with the death of a 22-year-old South Carolina man missing since Friday. According to Charlotte-Mecklenburg police Capt. Dixon Skipper, the body of Donald Allen of McConnells was found Tuesday in a wooded area near a west Charlotte intersection.

Police believe Barnette murdered Allen, stole his car and drove it to Roanoke to find Williams.

At 7:10 a.m. Saturday, Williams was at her mother's house on Loudon Avenue Northwest. Police say her killer shot his way into the house, then chased her into the street. As he caught up to her, police say, he fired his shotgun. Williams suffered gunshot wounds to the chest and back, according to the medical examiner.

"I am relieved that he is captured," said Robin Williams' mother, Bertha Williams. "I know my baby is lost from me forever. But at least he's not walking free, and he can't hurt anyone else."

Roanoke police, FBI, Charlotte police and Virginia State Police were involved in the hunt for Barnette. Two major breaks this week resulted in his arrest.

Monday night, Charlotte police recovered the car witnesses said they saw Barnette driving in Roanoke on Saturday. The dark blue Honda Prelude was found in an east Charlotte parking lot. A shotgun was in a nearby trash bin. Authorities are testing the weapon to see if it was the one used to kill Williams.

Tuesday afternoon, a member of Barnette's family alerted the FBI that Barnette was at his mother's house.

Williams broke off her relationship with Barnette shortly before her Northeast Roanoke apartment was firebombed April 30. Williams escaped, but she suffered burns to her hand and arm.

Barnette was charged with attempted murder and arson in connection with the incident, but he eluded police.

Williams moved to her mother's home and was recuperating from skin grafts. She lived in fear of her ex-boyfriend, neighbors said.

Three weeks ago, Barnette again made his presence known. Love letters Williams had written to Barnette appeared taped to her car, Bertha Williams said. The car was parked at Williams' brother's house on Leon Street Northwest.

Barnette had scrawled messages to Williams on the letters and cards, phrases such as "I love you" and "It didn't have to be this way," her mother said.

Williams' funeral is today. Barnette is expected to go before a federal magistrate for arraignment this morning in Charlotte.

88A-RH-45652-7
1d    1d

b6
b7C

PC - 005557
FBI/DOJ

DOJ-FOIA 000028

(Mount Clipping in Space Below)

(Indicate page, name of newspaper, city and state.)

B-4, RICHMOND TIMES-DISPATCH, Richmond, Va.

Date: 6/27/96
Edition: Morning

Title: AQUILIA M. BARNETTE

Character:
or
Classification: RH
Submitting Office: RICHMOND

Indexing:

## Suspect in Roanoke death arrested in N. Carolina

ROANOKE — North Carolina authorities have arrested a man wanted on a Roanoke murder warrant in the shotgun slaying of his former girlfriend.

Aquilia Marcibicci Barnette, 23, remained in FBI custody Tuesday in the Charlotte-Mecklenburg Jail, wanted in the shooting death of Robin Williams. Roanoke police Maj. J.L. Viar said Barnette admitted that he killed the woman.

Barnette also was charged with murder and robbery in the death of a 22-year-old South Carolina man missing since Friday. According to Charlotte-Mecklenburg police Capt. Dixon Skipper, the body of Donald Allen of McConnells was found Tuesday in a wooded area in Charlotte.

Police believe Barnette killed Allen, stole his car and drove it to Roanoke, found Williams and shot her.

b6
b7C

88A-RH-45652-8

SEARCHED_____ INDEXED_____
SERIALIZED_____ FILED_____

JUN 27 1996

FBI — RICHMOND

FBI/DOJ

DOJ-FOIA 000029

# Police ponder suspect search foul-up

**THE ROANOKE AND CHARLOTTE** *departments both want to know how a man wanted for attacking his ex-girlfriend failed to be arrested in North Carolina for more than month before she was killed in Roanoke.*

By DIANE STRUZZI
STAFF WRITER

Police communication foul-ups plagued the search for Aquilia Marcibicci Barnette, the 23-year-old charged with murdering his ex-girlfriend in Roanoke and another man in Charlotte, N.C.

A week after Barnette's arrest, Charlotte police say they are continuing to investigate any "deficiencies" in their system.

"We very much use situations like this to correct problems," said Charlotte-Mecklenburg Deputy Chief Larry Snider.

Roanoke police say their methods of searching for violent felons will not change. As in the past, the Teletype will be the primary source of communication, and each case will be reviewed to see if a telephone call is necessary, said Roanoke Lt. William Beason Jr.

In the Barnette case, "At some point we should have said, 'Why are Charlotte police not responding to our Teletypes? Let's find out what's going on down there,'" Beason acknowledged.

Barnette eluded police for nearly two months. They began looking for him after he was charged with trying to kill his ex-girlfriend, Robin Williams, in an April 30 firebombing.

This week, Roanoke police released the six Teletypes dispatched from their offices regarding the investigation. Charlotte police explained how the messages were handled by their department (see accompanying graphic).

Wednesday, Charlotte police released a timetable of what they know went wrong within their department. The records show that, on several occasions, officers could have taken an extra step that might have expedited the arrest of Barnette, but they failed to do so.

They say they received three of the five Teletypes that Roanoke relayed to North Carolina. A sixth Teletype, which was sent a half-hour after the April 30 firebombing, went to jurisdictions in Virginia and possibly North Carolina. Roanoke police had earlier said the Teletype was sent to all Southeastern states.

The records released this week

PLEASE SEE **POLICE**/C4

PC - 005559

DOJ-FOIA 000030

# Police

FROM PAGE C1

also show that Roanoke sent three Teletypes on May 2, two days after the firebombing. The first two stated that Barnette was wanted on numerous felony charges. Charlotte police have not been able to locate those Teletypes.

The third Teletype issued that day referred to the two earlier Teletypes and said Barnette was an "arson subject" and was believed to be at an address in Charlotte. When Charlotte police checked the address, they were unable to find it and mistakenly told Roanoke it was invalid.

Charlotte police admit that one of their investigators forgot to follow up on a Teletype received May

> **Charlotte police admit that one of their investigators forgot to follow up on a Teletype received May 31.**

31. They contend that it was not clear Barnette was wanted until a June 20 Teletype. And that one was lost and not found until after Barnette was captured June 25.

"The person actually making the arrest has to be satisfied that the warrants exist," Snider said.

But Snider said he has no information that his investigators ever checked Barnette in the National Crime Information Center, a nationwide criminal database that lists all wanted suspects.

Snider said that while an internal investigation dissecting what went wrong in their department continues, it does not appear anyone will be disciplined.

In Roanoke, the procedures regarding Teletypes are expected to be reviewed by Chief M. David Hooper and his administrative staff.

---

## THE SEARCH FOR A SUSPECT

A chronology of events leading to the arrest of Aquilia Marcibicci Barnette

**APRIL 30**
**4 a.m.** Robin Williams' Northeast Roanoke apartment is firebombed.

**4:30 a.m.** Roanoke police send a Teletype to Franklin County, Roanoke County and Virginia State Police, asking them to be on the lookout for Aquilia Marcibicci Barnette. It says Barnette has "numerous felony charges pending" and is expected to be en route to Charlotte, N.C. The Teletype apparently is received by the North Carolina State Bureau of Investigation in Raleigh, which routes Teletypes to North Carolina police agencies. Charlotte police are trying to verify if they ever got the message.

Barnette is listed as a wanted suspect in the National Crime Information Center, a national database accessible to police departments.

**MAY 2** Roanoke police send three Teletypes regarding Barnette to police in North Carolina. The first two say Barnette is wanted on numerous felony charges. Police in Charlotte say they received only the last one, which refers to an earlier Teletype, gives an address in Charlotte where Barnette might be and asks police to find him.

A Charlotte patrol officer looks for the address but is unable to find it. Charlotte police mistakenly tell Roanoke the address is invalid.

**MAY 23** Love letters that Robin Williams and Barnette wrote to each other are found pasted on Williams' car, which is parked at her brother's house on Leon Street Northwest. Police say they weren't notified until May 31, and that they stepped up patrols around her house then. But Williams' family says police were told about the letters right away.

**MAY 31** Williams gives police a list of telephone numbers that Barnette has been calling from in N.C. Roanoke police send another Teletype to Charlotte police. It says Barnette is charged with "two counts of attempted capital murder, one count of arson and additional charges" and that he has been calling from telephones in Charlotte.

Charlotte police say the Teletype was forwarded to an investigator.

**JUNE 3** A Charlotte investigator tries to call a Roanoke investigator twice but does not get an answer. The Charlotte investigator goes on vacation and does not follow up on the request when he returns.

**JUNE 20** Roanoke police send another Teletype. Charlotte police refer it to their fugitives division. An officer there is en route to another city and asks for the message to be left in a mailbox. The officer checks the mailbox later but doesn't find the Teletype. It is found on June 26, one day after Barnette is arrested.

**JUNE 22** Police believe Barnette killed Donald Allen, of South Carolina, during the early morning hours. They say Barnette took Allen's car, drove it to Roanoke and killed Williams outside her mother's house in Northwest Roanoke. Roanoke police alert the FBI.

**JUNE 25** The FBI picks up Barnette at his mother's house in Charlotte. It is the same address Roanoke police sent Charlotte on May 2. After Barnette's arrest, Charlotte police charge Barnette with murder and robbery in connection with Allen's death.

*SOURCES: Roanoke Police Department, Charlotte-Mecklenburg Police Department*     Staff

---

RG - 005560

DOJ-FOIA 000031

FD-350 (Rev. 5-8-81)

(Mount Clipping in Space Below)

(Indicate page, name of
newspaper, city and state.)

ROANOKE TIMES & WORLD NEWS

Date: 7/4/96
Edition: Final

Title:

Character: 88A-RH-45652
or
Classification:
Submitting Office: RH - ROANOKE

Indexing:

88 RH-45652-9

SEARCHED
SERIALIZED
INDEXED

PC - 005561

FBI/DOJ

DOJ-FOIA 000032



88A-RH-45652-10

b6
b7C

PC - 005562

DOJ-FOIA 000033

CLERK'S OFFICE, U.S. DIST CT
AT ROANOKE, VA.
FILED

JUL - 3 1996

MORGAN E. SCOTT, JR., CLERK
By _____
Deputy Clerk

IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

UNITED STATES OF AMERICA )
                                      )
v.                                    )          Criminal No. 96-0195C
                                      )
AQUILIA M. BARNETT,                   )
 a/k/a "Mark Barnett"                 )

ORDER

And now, this 3rd day of July, 1996, pursuant to Rule 48.(a)
the within motion is granted and it is hereby ORDERED and DECREED
that the Complaint against **AQUILIA M. BARNETT**, a/k/a "Mark Barnett"
be and the same is hereby DISMISSED without prejudice.

Suspect arrested in Charlotte, N.C. June 24, 1996, by the
Charlotte Police Department.

The Clerk of this Court at Roanoke, VA shall certify a copy of
this Order to each of the following: Honorable Larry R. Mattox,
United States Marshal, P.O. Box 2280, Roanoke, VA 24009; Ron
Buckley, Special Agent, Federal Bureau of Investigation, P.O. Box
1562, Roanoke, VA 24007; Betty Jo Anthony, Chief Assistant
Commonwealths Attorney, City of Roanoke, 315 W. Church Ave.,
Roanoke, VA 24016; and the Honorable Robert P. Crouch, Jr., United
States Attorney, P.O. Box 1709, Roanoke, VA 24008-1709.

ENTERED this 3rd day of June, 1996.

_____
UNITED STATES DISTRICT JUDGE
Magistrate

A TRUE COPY, TESTE:
MORGAN E. SCOTT, JR., CLERK
BY: _____
DEPUTY CLERK

PC - 005563

DOJ-FOIA 000034

FD-65 (Rev. 3-22-94)         Federal Bureau of Investigation                        **AIRTEL**

To:     Director, FBI
        Att: Criminal Investigative Division          Date: 7/1/96
              Violent Crime/Fugitive Unit        **INSTRUCTIONS - Reverse Side**
                                                 NOTE: Priority "A" and "B" Fugitives - With initial
From:   SAC, RICHMOND (88A RH-45652) (P)               submission, set forth a synopsis of crime on reverse side.

Subject: AQUILIA MARCIBICCI BARNETT, aka          [X] III Inquiry
         Mark Barnett;                            [X] Initial Submission
         FUGITIVE (A)                             [ ] Initial Submission - Parental Kidnaping
         UFAP - MURDER                            [ ] Supplements FD-65 dated _____
         OO: RH
                                                  Indicate Fugitive Priority
                                                  [X] A
                                                  [ ] B
                                                  [ ] C
                                                  [ ] D (Parental Kidnaping)

                    **CHECK APPLICABLE WARNINGS**

| Caution | | | |
|---|---|---|---|
| [X] Armed and Dangerous | [ ] Suicidal Tendencies | [ ] Known to Abuse Alcohol | **MKE** |
| [ ] Escape Risk | [ ] Known to Use Narcotics | [ ] Other | |

| Name | **NAM** | Sex **SEX** | Race **RAC** |
|---|---|---|---|
| Aquilia Marcibicci Barnett | | Male | Black |

| Place of Birth | **POB** | Birth Date **DOB** | Date of Emancipation **DOE** | Height **HGT** | Weight **WGT** |
|---|---|---|---|---|---|
| | | 7/7/73 | 7/7/94 | 5'6" | 145 |

| Eye Color **EYE** | Hair Color **HAI** | FBI No. **FBI** | Skin Tone **SKN** |
|---|---|---|---|
| Brown | Black | 950082PA5 | Medium |

| Scars, Marks, Tattoos, and Other Characteristics | **SMT** |
|---|---|
| | |

| NCIC Fingerprint Classification **FPC** | Other Identifying Number **MNU** | Social Security # **SOC** |
|---|---|---|
| 18DIPIPM172011PIPI13 | | 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 |

| Operator's License Number **OLN** | Operator's License State **OLS** | Year Expires **OLY** |
|---|---|---|
| | | OFF |

Offense Charged  Unlawful Flight to Avoid Prosecution - Murder

U. S. Code, Title and Section   USC, 18, Section 1073

| Warrant Issued By  USDJ James Turk       on   6/22/96 | **DOW** | F.O. File# **OCA** |
|---|---|---|
| | | 88A-RH-45652 |

Miscellaneous Including Bond Recommended                                    **(MIS)**
No bond; last observed driving blue Honda Civic, gold trim, partial North Carolina
license ending with 465

| LICENSE PLATE AND VEHICLE INFORMATION | | | | |
|---|---|---|---|---|
| License Plate Number **LIC** | State | **LIS** | Year Expires | **LIT** |
| Vehicle Identification # **VIN** | Year **VYR** | Make **VMA** | Model | **VCO** |

| Aliases | Additional Identifiers |
|---|---|
| | |

| NCIC #   W938747014   **NIC** |
|---|

2 - FBIHQ ( 1 - VC/FU)
1 - Savannah ITC
2 - Richmond
RRB/srg (5)

SEARCHED _____
SERIALIZED _____
INDEXED _____
FILED _____

Armed and Dangerous

PC - 005564

DOJ-FOIA 000035

**PRIORITY "A" and "B" Fugitives - Synopsis of Crime.**

Unlawful Flight to Avoid Prosecution warrant issued 6/22/96 in connection with the 6/22/96 murder of Robin A. Williams in Roanoke, Va. Subject Barnett positively identified and witnessed in the murder by _____ Local Roanoke, Va., warrants for First Degree Murder, Breaking and Entering with a Firearm and two counts of Attempted Captial Murder are outstanding.

b6
b7C

## INSTRUCTIONS

1. **Caution (MKE)** - Check applicable caution type block(s) indicated. The caution statement must also appear in Miscellaneous block, e.g., "armed and dangerous".
2. **Name (NAM)** - Place name in this block. Aliases are not to be entered in this block but are to be placed in Aliases block.
3. **Sex (SEX)** - Sex will be designated by one letter, M (male) or F (female).
4. **Race (RAC)** - Race will be described by one letter, A (Asian or Pacific Islander), I (American-Indian or Alaskan Native), B (Black), W (White), U (Unknown).
5. **Place of Birth (POB)** - Indicate city and state or, if foreign born, city and country. Where multiple birthplaces are reported, list verified birthplace or that which appears most logical in this block.
6. **Birth Date (DOB)** - Enter as month, day and year. Where multiple birth dates are reported, enter verified birth date or that which appears most logical in this block. Place other dates of birth in Additional Identifiers block.
7. **Date of Emancipation (DOE)** - Must be filled in if individual is a juvenile. Otherwise leave blank.
8. **Height (HGT)** - Express in feet and inches, e.g., 6'0". Round off fractions to nearest inch.
9. **Weight (WGT)** - Express in pounds. Omit fractions.
10. **Eye Color (EYE)** - Use appropriate three-character symbol.
11. **Hair Color (HAI)** - Use appropriate three-character symbol.
12. **Skin Tone (SKN)** - Use appropriate three-character symbol.
13. **Scars, Marks, Tattoos, (SMT), and Other Characteristics** - Place in this block only appropriate NCIC coding for scars, marks, tattoos, birthmarks, deformities, missing body parts and artificial body parts as defined in NCIC Code Manual. If more than one SMT is to be entered, use Additional Identifiers block for additional appropriately coded items. Use Miscellaneous block to describe all scars, marks, tattoos, and other characteristics, which are not defined in the NCIC Code Manual and to more fully describe SMT's which have been entered in SMT block. For example, an appendectomy scar, not being readily visible, would be described in the Miscellaneous block. A tattoo on right arm, shown as TAT R ARM in block, might be further described in Miscellaneous block as a rose tattoo on inside of lower right arm.
14. **NCIC Fingerprint Classification (FPC)** - Enter NCIC fingerprint classification.
15. **Other Identifying Number (MNU)** - Miscellaneous numbers may be entered with appropriate identifiers (prefixes). For first miscellaneous identifying number, use MNU block. When military service number is in fact Social Security Account Number, the number should be entered in both MNU and SOC blocks. Additional Identifying numbers are placed in Additional Identifiers block. The identifier (prefix) should precede the number and be separated from the number by use of a hyphen.
16. **Social Security Number (SOC)** - Place subject's Social Security Account Number in this block.
17. **Operator's License Number** - Place subject's operator's license number in OLN block. Also show licensing state (OLS) and year license expires (OLY).
18. **Warrant Issued By-On-(DOW)** - Enter date warrant issued in DOW block. For juvenile offenders, enter the date of violation.
19. **Miscellaneous (MIS)** - Enter additional pertinent information in this block. If caution statement used, basis for statement must be set forth as first item in this block.
20. **License Plate and Vehicle Information** - Place information concerning license plate and/or vehicle known to be in the possession of subject in appropriate blocks under License Plate and Vehicle Information heading.
21. **Additional Identifiers** - Enter information concerning additional license plates (number, state, year expires, and where applicable, type); Social Security Numbers; operator's license number, state and year expires; vehicle information (VIN, VYR, VMA, VMO, VST, VCO); MNU's (see list in item 14 above); visible scars, marks, tattoos, and other characteristics; and dates of birth. Clearly identify what data is being set forth; e.g., Social Security # 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; Michigan operator's license 234567, expires 1999; DOB's 4/5/32, 5/3/32; etc.
22. By making an III inquiry, the entering agency may become knowledgeable of additional DOBs, AKAs, and other significant information which may aid in the location and/or apprehension of wanted persons.
23. Changes and deletions should be so indicated in the appropriate blocks.

PC - 005565

DOJ-FOIA 000036

MKE/WANTED PERSON - CAUTION NAM/BARNETT, AQUILIA MARCIBICCI SEX/M RAC/B DOB/070773
ORI/VAFBIRH00 NAM/BARNETT, AQUILIA MARCIBICCI SEX/M RAC/B DOB/070773
HGT/506 WGT/145 EYE/BRO HAI/BLK FBI/950082PA5 SKN/MED
FPC/18DIPIPM1/2011PIPI13 SOC/243571534
OFF/HOMICIDE - WILLFUL KILL-GUN DOW/062296 OCA/88-45652
MIS/A&D,MURDER,NO BOND,LAST SEEN DRIVING BLUE HONDA CIVIC W/GOLD TRIM
   PARTIAL NC PLATE ENDING WITH 465
ORI IS FBI RICHMOND VA
NIC/W938747014

#140233


0628 40226 1652
  NCIC REPLY


VAFBIRH00

MKE/WANTED PERSON
ORI/GA0380000 NAM/BARNETTE,AQUILIA MARCIVICCI SEX/M RAC/B FOB/NC
DOB/070773 HGT/505 WGT/120 EYE/BRO HAI/BLK FBI/950082PA5
FPC/18DIPIPM1/2011PIPI13 SOC/243571534
OLN/243571534 OLS/GA OLY/95 OFF/PROB VIOLATION - SEE MIS DOW/082294
OCA/93R107
MIS/COWETA CO SO 404 253 1502 CRUELTY TO CHILD
ORI IS COWETA CO SO NEWNAN GA
NIC/W822271542
IMMED CONFIRM WARRANT AND EXTRADITION WITH ORI


0628 40225 1652
VCIN REPLY



VAFBIRH00




RESPONSE NUMBER 01
WANTED PERSON
   *** USE CAUTION ***
   OFFENSE - 0911-HOMICIDE-GUN
   NAM/BARNETT,AQUILIA MARCIBICCI SEX/M RAC/B DOB/070773
   HGT/506 WGT/145 EYE/BRO HAI/BLK SKN/MED FPC/18DIPIPM1/2011PIPI13
   FBI/950082PA5
   SOC/243571534
   MIS/A&D,MURDER,NO BOND,LAST SEEN DRIVING BLUE HONDA CIVIC W/GOLD TRIM PARTIAL
      L NC PLATE ENDING WITH 465

   ** CONFIRM WITH ORI/VAFBIRH00 VIC/200578327 OCA/88-45652
   DOW/062296 DRE/062296
   VERIFY DATA



NO CONCEALED WEAPON PERMIT ON THE VCIN FILE
#140237

78 RH45652-12

SEARCHED ____ INDEXED ____
SERIALIZED _##_ FILED ____

JUN 28 1996

FBI-RICHMOND
PC - 005566

DOJ-FOIA 000037

CW,VAFBIRHOO.NAM/BARNETT,AQUILIA MARCIBICCI.VIC/2005/8527,OCA/88-45652.
062896
REJ - INVALID FIELD OF
0628 40624 1654
NCIC REPLY

VAFBIRHOO
CLEAR NAM/BARNETT,AQUILIA MARCIBICCI OCA/ 88-45652

#140629

0628 40623 1655
VCIN REPLY

WANTED PERSON CLEARED 062896
VIC/2005/8527 OCA/88-45652
NAM/BARNETT,AQUILIA MARCIBICCI
ORI/VAFBIRHOO TERM/FBIR
#140647

PC - 005567

DOJ-FOIA 000038

(rev. 8-23-84)

To: Director, FBI
(Attn: Photographic Processing Unit, Rm. TB903 JEH)
SAC, SAN FRANCISCO (Attn: SACB)

From: SAC, CHARLOTTE (GL:A-FU-45652)(P)

**AIRTEL**

Cost Code: 3140          Date: 7/25/96

Subject: GUILLAR MAXSIVICCI DAINSTRA;
FUGITIVE(A) - UFAP - MURDER
CO; NICKLOW

☒ Unclassified  ☐ Confidential  ☐ Secret

## ENCLOSURES:

|  | Size | Type | Quantity |
|---|---|---|---|
| Film | 35mm | C | 1 |
| Negatives |  |  |  |
| Prints |  |  |  |
| Other (specify) |  |  |  |

(color and black & white work will not be accepted on same request)

## WORK REQUESTED:
☒ Develop and print 3 ea. 3½ × 5
Other:

CONTACT FOR INFORMATION:

FTS
SA

b6
b7C

JUSTIFICATION: Ongoing Fugitive Investigation

PHOTO TECHNICIAN (Intl.) _____

88A-TCH - 45652-73

DOJ-FOIA 000039

Enclosure