FD-350 (Rev. 5-8-81)

(Mount Clipping in Space Below)

(Indicate page, name of newspaper, city and state.)

Charlotte Observer

Date:
Edition: July 15, 2002

Title: Facing death penalty - again

Character:
or
Classification: 26A-CE-77261
Submitting Office: Charlotte

Indexing:

# Facing death penalty - again

## The resentencing process begins in Charlotte for a man pulled back from death row

### Victim's father wants an execution, the killer said he was ready – but decision is up to a jury

By Gary L. Wright
*Staff Writer*

Bob Allen has waited six years for his son's killer to be brought to justice.

For the second time during those years, a federal jury in Charlotte will be asked to decide whether Aquilia Barnette should be sentenced to life in prison or death for the 1996 murders of his former girlfriend and Allen's son.

"It's been a horror for us ever since this happened," said Bob Allen, 70. "My son's killer is being given a second chance at life. He didn't give his victims a second chance at life. Why should he get a second chance?"

Barnette, 29, was convicted in 1998 of murdering Donald Allen and Robin Williams and sentenced to death. He became the first killer sentenced to death in



**Barnette**

North Carolina's federal courts since the U.S. government reinstated its death penalty in 1988.

But in 2000, the 4th U.S. Circuit Court of Appeals overturned the death sentences and ordered a new sentencing hearing.

Jury selection is scheduled to begin today at the federal courthouse in Charlotte. Picking the jurors could take up to two weeks, and testimony could last a month.

Bob Allen and his wife, Shirley, sat through each day of Barnette's capital murder trial four years ago. They plan to attend each day of the resentencing hearing.

"It's the least I can do for my son," Allen said. "It's a shame we have to go through this again. It's terrible to have to sit there and listen to how he planned these killings."

More than 400 potential jurors have been summoned. They have already filled out lengthy questionnaires, answering questions about everything from their beliefs on capital punishment and

views on domestic violence to details about their work and family backgrounds.

Barnette's resentencing hearing comes at a time when the debate over the federal death penalty is intensifying.

A federal judge in New York earlier this month declared the death penalty in federal cases unconstitutional, saying evidence has revealed an "undue risk" that a meaningful number of innocent people have been executed. Federal prosecutors are expected to appeal the ruling.

Assistant U.S. Attorneys Anne Tompkins and Jill Rose, who are now prosecuting Barnette, declined comment.

U.S. Attorney Bob Conrad recently described the murders committed by Barnette as "the most heinous of crimes" and said prosecutors are intent on seeking the death penalty.

Defense attorney Harold Bender says he knows he has a difficult job saving Barnette's life.

"Our goal is to convince the jury that he should not be sentenced to death but should be sen-

26A-Ce-77261

006169
FBI/DOJ

DOJ-FOIA 000640
DOJ-FOIA 000640

tenced to life in prison without the possibility of release," Bender said. "It's not going to be easy."

Bender then described Barnette's state of mind as the resentencing hearing approaches: "He's nervous. He's anxious. He's scared."

Barnette was accused of waiting for someone to carjack during the dark early morning hours of June 22, 1996. He ordered Donald Allen, 22, of McConnells, S.C., from his car at the intersection of Billy Graham Parkway and Morris Field Drive and shot him three times in the back.

Barnette then took Allen's car and drove to Roanoke, Va., where he blasted his way into the home of his 23-year-old former girlfriend, Robin Williams. He chased her down and then shot her to death in front of her mother.

The 4th U.S. Circuit Court of Appeals in 2000 upheld the convictions.

But the federal appeals court judges overturned the death sentences and ordered a new sentencing hearing. They ruled Barnette was wrongfully prohibited from putting an expert witness on the stand to challenge a government witness's description of him as a remorseless psychopath.

The appeals court judges concluded the prosecution testimony portraying Barnette as a psychopath, unchallenged by testimony from the defense expert, might have helped produce the jury's death verdicts.

Barnette didn't object to the death sentences at the trial. After being condemned to die, he apologized for the killing spree and said he preferred death to living with his deeds.

"They sentenced me to death. That's fine," Barnette said. "The worst thing they could have done is sentence me to life because I live every day in a little block and think about what I did. And that is painful."

PC - 006170

DOJ-FOIA 000641
DOJ-FOIA 000641

FD-350 (Rev. 5-8-81)

(Indicate page, name of newspaper, city and state.)

Charlotte Observer
Charlotte, North Carolina

Date:
Edition: August 14, 2002

Title: 29-year-old again given death in double murder

Character:
or 26A-CE-77261
Classification:
Submitting Office: Charlotte

Indexing:

(Mount Clipping in Space Below)

## SECOND SENTENCE IN 1996 KILLINGS

# 29-year-old again given death in double murder

*Shooter killed Charlotte man in carjacking, then killed ex-girlfriend*

**BY GARY L. WRIGHT**
*Staff Writer*

For the second time in four years, Aquilia "Marc" Barnette has been sentenced to death for the 1996 murders of his former girlfriend and a Charlotte motorist.

A federal jury in Charlotte on Tuesday deliberated about six hours before recommending that Barnette be executed for the murders of Robin Williams and Donald Allen.

"It's been tough. But justice has finally been served," Bob Allen, holding a photograph of his son, said outside the courthouse. "It's finally over. I've counted every day. It's been 2,243 days since my son was killed. I say good morning to him every morning and good night to him every night."

U.S. Attorney Bob Conrad told reporters: "There's no joy in this verdict. But there is an overwhelming sense of relief – a sense

that although justice was delayed, it was delivered."

Barnette, 29, was first sentenced to death in 1998 for the June 1996 murders of Allen and Williams. The 4th U.S. Circuit Court of Appeals in 2000 upheld the convictions but overturned the death sentences and ordered a new sentencing hearing.

On Tuesday, Barnette hung his head and did not look at jurors as the death sentences were announced.


Barnette

Before being sentenced to death, Barnette thanked his lawyers. "They did a terrific job," he said. "Things didn't go as planned."

Before being escorted from the courtroom, Barnette smiled and shook hands with defense lawyer Harold Bender.

Outside the courthouse, Bender told reporters he was "greatly disappointed" at the death sentences. "We were hoping the results would be different," he said.

In closing arguments Monday, defense lawyers Bender and Jean

Lawson pleaded with jurors for a life in prison sentence.

The defense lawyers told jurors how Barnette was devastated over the breakup with Williams and was suffering from depression at the time of the killings.

"He loved Robin," Lawson said. "He couldn't understand why she didn't want to be with him. He was lost."

The defense lawyers described Barnette's abusive childhood and said their client had long suffered from a psychological disorder and a fear of abandonment.

"Marc Barnette is not an evil person," Bender told jurors. "He's a very troubled young man."

Bender said sending Barnette to prison for the rest of his life would be harsh punishment.

"Some people think it is more severe than the death penalty," Bender said. "Every morning for the rest of his life his first thought will be what he did to Robin and Donny and their families."

Assistant U.S. Attorneys Anne Tompkins and Jill Westmoreland Rose told jurors how Barnette carjacked Allen, 22, in Charlotte and shot him in the back three times.

They described how Barnette

then drove to Roanoke, Va., where he blasted his way into the home of Robin Williams and then gunned down his 23-year-old ex-girlfriend in front of her mother.

Rose told jurors how Williams, in her last moments, looked into the eyes of her terror-stricken and helpless mother.

"Do you think Robin heard the wail of her mother who had just witnessed her child murdered?" Rose asked jurors. "How much do the teardrops of a grieving parent weigh?"

Rose asked jurors why Barnette should live.

"Donny and Robin are in dark and silent graves," Rose said. "Why does he deserve more than Donny and Robin? Why is his life more valuable than the two precious lives that he took? Ask yourself if that is justice."

Tompkins held up photographs of Allen and Williams for jurors.

"You are now their voice. Speak for Donny. Speak for Robin," Tompkins said. "Speak to Marc Barnette. Tell him he is ultimately responsible. With 12 voices together, speak the words of justice and sentence the defendant to death."

DOJ-FOIA 000642
DOJ-FOIA 000642

10/07/2002

b6
b7C

Case Number: 26A-CE-77261          Stat Agent Name:                    Report Date: 04/09/1998
Serial No.:                         Stat Agent SOC.:                    Accom Date.: 02/20/1998

Does Accomplishment Involve    Assisting Joint Agencies    Assisting Agents SOC         Subject Name
---------------------------    ------------------------    --------------------         ------------
Drugs . . . . . . . . . . . . : N                                                 BARNETTE, AQUILIA, MARCIV
A Fugitive. . . . . . . . . : N
Bankruptcy Fraud. . . . . . : N
Computer Fraud/Abuse. . . . : N                                             RA     Squad   Task Force
Corruption of Public Officials: N                                           ----   -----   ----------
Forfeiture Assets . . . . . : N                                             HQ     6

Sub. Invest. Asst by Other FOs:                                          1 = Used, but did not help
                                                                         2 = Helped, Minimally
    Investigative Assistance or Technique Used                          3 = Helped, Substantially
    ------------------------------------------                          4 = Absolutely Essential

    FINAN ANALYST    LAB DIV EXAMS    UCO-GROUP I      FT. MON-NRCSC
    AIRCRAFT ASST    LAB FIELD SUP    UCO-GROUP II     FOR LANG ASST
    COMPUTER ASST    PEN REGISTERS    UCO-OTHER        NON FBI LAB EX
    CONSEN MONITR    PHOTO COVERGE    NCAVC/VI-CAP     VICT-WITN COOR
    ELSUR/FISC       POLYGRAPH        CRIM/NS INTEL    IO WANTED FLYR
    ELSUR/III        SRCH WAR EXEC    CRIS NEG-FED     SARS
    ENG FIELD SUP    SHOW MONEY       CRIS NEG-LOC     CART
    ENG TAPE EXAM    SOG ASST         ERT ASST         ASSET FORF PRO
    LEGATS ASST.     SWAT TEAM        BUTTE-ITC        FORF SUPPORT P
    EVIDNCE PURCH    TECH AG/EQUIP    SAVANNAH-ITC
    INFORMANT/CW     TEL TOLL RECS    POC-WRCSC
------------------------------------------------------------------------------------------------------
Type of Sentence . . . :   CP
Date of Sentencing . ..:   02/20/1998
Federal, Local, or International (F/L/I):  F

                    Year    Month
                    ----    -----
Time in Jail. .:
Time Suspended.:
Probation Time.:
Total Fines. . :$
------------------------------------------------------------------------------------------------------

                              Accomplishment Narrative
                              ------------------------
SUBJECT ORIGINALLY RECEIVED A DEATH PENALTY SENTENCE ON 2/20/1998.  HE
APPEALED AND WAS RE-SENTENCED ON 08/13/2002, AGAIN RECEIVING THE DEATH
PENALTY

                              SENSITIVE / UNCLASSIFIED

26A-Ce-77261-48

file

PC - 00612

DOJ-FOIA 000643
DOJ-FOIA 000643

FD-515 (Rev. 8-4-99)

Squad supervisor approval (please initial)

**Accomplishment Report**
(Accomplishment must be reported and loaded into ISRAA within 30 days from date of accomplishment)

Date Prepared 10/4/02
Date Loaded 10/7/02
Data Loader's Initials DCC

**Accomplishment involves:** (check all that apply)

| | |
|---|---|
| Drugs | ☐ |
| A Fugitive | ☐ |
| Bankruptcy Fraud | ☐ |
| Computer Fraud/Abuse | ☐ |
| Corruption of Public Officials | ☐ |
| Money Laundering | ☐ |
| Sub Invest Asst by FO (s) | ☐ |

Asst. FO(s) __, __, __, __
A, B, C, D

Task Force

Assisting Agencies ×●
1.
2.

File Number
26A-CE-72261

Stat Agent Soc. Sec. No.

Stat Agent Name

| RA | Squad |
|---|---|
| | 3 |

Assisting Agents Soc. Sec. No. ×
1.      -      -
Name:
2.      -      -
Name:

**Investigative Assistance or Technique Used**

1-Used, but did not help    3 - Helped, substantially   b6
2 -Helped, minimally    4 - Absolutely essential   b7C
For Sub. Invest. Assist. by other FO (s) indicate A,B,C,D for corresponding FO

| Rate | FO | IAT | Rate | FO | IAT | Rate | FO | IAT | Rate | FO | IAT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Fin. Analyst | | | Lab. Div. Exam | | | UCO - Group I | | | Ft. Mon.- NRCSC |
| | | Aircraft Asst. | | | Lab. Field Sup | | | UCO - Group II | | | For. Lang Asst. |
| | | Computer | | | Pen Registers | | | UCO - Nat. Back | | | Non FBI Lab Ex |
| | | Consen Mon. | | | Photo Cover. | | | NCAVC / VI - CAP | | | Vict-Witn Coor |
| | | Elsur / FISC | | | Polygraph | | | Crim/NS Intel Asst | | | |
| | | Elsur / T. III | | | Search Warrant | | | Crisis Neg. - Fed. | | | |
| | | Eng. Field Spt. | | | Show Money | | | Crisis Neg. - Local | | | |
| | | Eng. Tape Ex | | | SOG Asst. | | | ERT Asst. | | | |
| | | Legats Asst. | | | Swat Team | | | Butte - ITC | | | |
| | | Evid Purchase | | | Tech. Ag/Equip. | | | Sav - ITC | | | |
| | | Inf/CW Info | | | Phone Toll Rec | | | Poc - WRCSC | | | |

**A. Complaint / Information / Indictment**
☐ Federal  ☐ Local  ☐ International
Complaint Date: _____
Check if Civil Rico Complaint ☐
Information Date: _____
Indictment Date: _____

**B. Locate/ Arrest**
☐ Federal  ☐ Local  ☐ International
Subject Priority: ☐ A ☐ B ☐ C
Locate Date: _____
Arrest Date: _____
☐ Subject Resisted Arrest
☐ Subject Arrested was Armed

**C. Summons Date:** _____
☐ Federal  ☐ Local

**D. Recovery/Restitution/PELP X**
☐ Federal  ☐ Local  ☐ International
Recovery Date: _____
Code● _____ ✓ Amount $ _____
Code● _____ ✓ Amount $ _____
Restitution Date: _____
☐ Court Ordered
☐ Pretrial Diversion
Code ● _____ Amount $ _____
PELP Date: _____
Code● _____ ✓ Amount $ _____

**E. Hostage(s) Released Date:** _____
Released by: ☐ Terrorist ☐ Other
Number of Hostages: _____
Child Located Date: _____

**F. Conviction**
☐ Federal  ☐ Local  ☐ International
Conviction Date: _____
Subject Description Code: __ __ ● ( ____ )●
For 6F, G, H--Include Agency Code
☐ Felony     or     ☐ Misdemeanor
☐ Plea      or     ☐ Trial
State: _____ Judicial District: _____

**G. U.S. Code Violation**
Required for Sections A, B, F, and J
(Federal only)
| Title | Section | # Counts |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

**H. Sentence Date:** 8/13/02
Sentence Type: CP
In Jail:  Years _____ Months _____
Suspended: Years _____ Months _____
Probation: Years _____ Months _____
Fines: $ _____

**I. Disruption/Dismantlement:**
Disruption Date: _____
Dismantlement Date: _____
Completion of FD-515a Side 2 Mandatory

**J. Civil Rico Matters Date:** _____
Also Complete "Section G"
Other Civil Matters Date: _____
Judgment __ __ __ ●
Judicial Outcome __ __ __ __ ● X
Amount $ _____
Suspension: Years _____ Months _____

**K. Administrative Sanction Date:** _____
Subject Description Code _____●
Type:          Length:
☐ Suspension  ☐ Permanent
☐ Debarment          or
☐ Injunction   Years _____ Months _____

**L. Asset Seizure Date:** _____
Asset Forfeiture Date: _____
CATS # Mandatory _____
Check one of the three:
☐ Asset Forfeiture - Administrative
☐ Asset Forfeiture - Civil Judicial
☐ Asset Forfeiture - Criminal
Do not indicate $ value in Section D

**M. Acquittal / Dismissal / Pretrial Diversion**
Acquittal Date: _____
Dismissal Date: _____
Pretrial Diversion Date: _____

**N. Subject Information** (Required for all Sections excluding Section D (Recovery/PELP), Section E (Hostage), Section I, and Section L.)

| Name | Race ● | Sex | Date of Birth | Social Security No. (if available) |
|---|---|---|---|---|
| Aquilla Marciucci Barnette | B | M | 7/7/73 | 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 |

For Indictments/Convictions only:
☐ Subject related to an LCN, Asian Organized Crime (AOC), Italian Organized Crime (IOC), Russian/Eastern European, Caribbean, or Nigerian Organized Crime Group - Complete FD-515a, Side 1 Blocks A-E mandatory, F-H as appropriate.
☐ Subject related to an OC/Drug Organization, a VCMO Program National Gang Strategy target group, or a VCMO Program National Priority Initiative target group - Complete FD-515a, Side 1 Blocks A-C only.

X Additional Information may be added by attaching another form or a plain sheet of paper for additional entries.
● See codes on reverse side.
✓ Requires that an explanation be attached and loaded into ISRAA for recovery over $1m and PELP over $5m.

Serial No. of FD-515

PC - 006173

DOJ-FOIA 000644
DOJ-FOIA 000644

For Further Instructions See: M● Part II, Sections 3-5 thru 3-5.3.

## PROPERTY CODES

| 01 | Cash |
|----|------|
| 02 | Stocks, Bonds or Negot. Instruments |
| 03 | General Retail Merchandise |
| 04 | Vehicles |
| 05 | Heavy Machinery & Equipment |
| 06 | Aircraft |
| 07 | Jewelry |
| 08 | Vessels |
| 09 | Art, Antiques or Rare Collections |
| 11 | Real Property |
| 20 | All Other |

## SENTENCE TYPES

| CP | Capital Punishment |
|----|-------------------|
| JS | Jail Sentence |
| LS | Life Sentence |
| NS | No Sentence (Subject is a Fugitive, Insane, has Died, or is a Corporation) |
| PB | Probation |
| SJ | Suspension of Jail Sentence |
| YC | Youth Correction Act |

## PELP CODES

| 22 | Counterfeit Stocks/Bonds/Currency/ Negotiable Instruments |
|----|------|
| 23 | Counterfeit/Pirated Sound Recordings or Motion Pictures |
| 24 | Bank Theft Scheme Aborted |
| 25 | Ransom, Extortion or Bribe Demand Aborted |
| 26 | Theft From or Fraud Against Government Scheme Aborted |
| 27 | Commercial or Industrial Theft Scheme Aborted |
| 30 | All Other |

## RACE CODES

| A | Asian/Pacific Islander |
|---|------|
| B | Black |
| I | Indian/American |
| U | Unknown |
| W | White |
| X | Nonindividual |

## AGENCY CODES

| ACIS | Army Criminal Investigative Service |
|------|------|
| BATF | Bureau of Alcohol, Tobacco & Firearms |
| BIA | Bureau of Indian Affairs |
| DCAA | Defense Contract Audit Agency |
| DCIS | Defense Criminal Investigative Service |
| DEA | Drug Enforcement Administration |
| DOC | Department of Corrections |
| DOI | Dept. of Interior |
| EPA | Environmental Protection Agency |
| FAA | Federal Aviation Administration |
| FDA | Food and Drug Administration |
| HHS | Dept. of Health & Human Services |
| HUD | Dept. of Housing & Urban Development |
| INS | Immigration and Naturalization Service |
| IRS | Internal Revenue Service |
| NASA | Nat'l Aeronautics & Space Admin |
| NBIS | Nat'l NARC Border Interdiction |
| NCIS | Naval Criminal Investigative Service |
| RCMP | Royal Canadian Mounted Police |
| SBA | Small Business Administration |
| USBP | U.S. Border Patrol |
| USCG | U.S. Coast Guard |
| USCS | U.S. Customs Service |
| USDS | U.S. Department of State |
| USMS | U.S. Marshals Service |
| USPS | U.S. Postal Service |
| USSS | U.S. Secret Service |
| USTR | U.S. Treasury |
| LOC | Local |
| CITY | City |
| COUN | County |
| ST | State |
| OTHR | Other |

## JUDGMENT CODES

| CJ | Consent Judgment |
|----|------|
| CO | Court Ordered Settlement |
| DF | Default Judgment |
| DI | Dismissal |
| JN | Judgment Notwithstanding |
| MV | Mixed Verdict |
| SJ | Summary Judgment |
| VD | Verdict for Defendant |
| VP | Verdict for Plaintiff |

## JUDICIAL OUTCOME

| AG | Agreement |
|----|------|
| BR | Barred/Removed |
| CC | Civil Contempt |
| DC | Disciplinary Charges |
| FI | Fine |
| PI | Preliminary Injunction |
| PR | Temporary Restraining Order |
| PS | Pre-filing Settlement |
| RN | Restitution |
| SP | Suspension |
| VR | Voluntary Resignation |
| OT | Other |

## SUBJECT PRIORITY

| A | Subject wanted for crimes of violence (i.e., murder, manslaughter, forcible rape) against another individual or convicted of such a crime in the past five years |
|---|------|
| B | Subject wanted for crimes involving loss or destruction of property valued in excess of $25,000 or convicted of such a crime in the past five years. |
| C | All other subjects. |

## SUBJECT DESCRIPTION CODES

### ORGANIZED CRIME SUBJECTS

| 1F | Boss |
|----|------|
| 1G | Underboss |
| 1H | Consigliere |
| 1J | Acting Boss |
| 1K | Capodecina |
| 1L | Soldier |

### KNOWN CRIMINALS

| 2A | Top Ten or I.O. Fugitive |
|----|------|
| 2B | Top Thief |
| 2C | Top Con Man |

### FOREIGN NATIONALS

| 3A | Legal Alien |
|----|------|
| 3B | Illegal Alien |
| 3C | Foreign Official W/out Diplomatic Immunity |
| 3D | U.N. Employee W/out Diplomatic Immunity |
| 3E | Foreign Student |
| 3F | All Others |

### OTHERS

| 8A | All Other Subjects |
|----|------|
| 8B | Company or Corporation |

### TERRORISTS

| 4A | Known Member of a Terrorist Organization |
|----|------|
| 4B | Possible Terrorist Member or Sympathizer |

### UNION MEMBERS

| 5D | President |
|----|------|
| 5E | Vice-President |
| 5F | Treasurer |
| 5G | Secretary/Treasurer |
| 5H | Executive Board Member |
| 5I | Business Agent |
| 5J | Representative |
| 5K | Organizer |
| 5L | Business Manager |
| 5M | Financial Secretary |
| 5N | Recording Secretary |
| 5P | Office Manager |
| 5Q | Clerk |
| 5R | Shop Steward |
| 5S | Member |
| 5T | Trustee |
| 5U | Other |

### GOVERNMENT SUBJECTS
(6F,6G,6H- Include Agency Code)

| 6A | Presidential Appointee |
|----|------|
| 6B | U.S. Senator/Staff |
| 6C | U.S. Representative/Staff |
| 6D | Federal Judge/Magistrate |
| 6E | Federal Prosecutor |
| 6F | Federal Law Enforcement Officer |
| 6G | Federal Employee - GS 13 & Above |
| 6H | Federal Employee - GS 12 & Below |
| 6J | Governor |
| 6K | Lt. Governor |
| 6L | State Legislator |
| 6M | State Judge/Magistrate |
| 6N | State Prosecutor |
| 6P | State Law Enforcement Officer |
| 6Q | State - All Others |
| 6R | Mayor |
| 6S | Local Legislator |
| 6T | Local Judge/Magistrate |
| 6U | Local Prosecutor |
| 6V | Local Law Enforcement Officer |
| 6W | Local - All Others |
| 6X | County Commissioner |
| 6Y | City Councilman |

### BANK,EMPLOYEES

| 7A | Bank Officer |
|----|------|
| 7B | Bank Employee |

PC - 006174

DOJ-FOIA 000645
DOJ-FOIA 000645

(Rev. 08-28-2000)



## FEDERAL BUREAU OF INVESTIGATION

Precedence:  ROUTINE                          **Date:**  10/07/2002

**To:**  Charlotte                                                    b6
                                                                      b7C
**From:**  Charlotte
          Squad 3
          **Contact:**  SA _____

**Approved By:**  _____

**Drafted By:**  _____ dlc

**Case ID #:** 26A-CE-77261    (Closed)

**Title:**  AQUILIA MARCIVICCI BARNETTE;
         DONALD LEE ALLEN - VICTIM (DECEASED);          b6
         CARJACKING-MURDER;                             b7C
         06/21/1996

**Synopsis:**  Return case to closed status.

**Details:**  On February 20, 1998, Barnette was sentenced to death
but subsequently won an appeal and the sentence was overturned.
The sentencing portion of the trial was re-presented to a jury
during July and August of 2002, and on August 13, 2002, Barnette
was once again sentenced to death.

It is requested that this case be returned to closed
status.

♦♦

26ACE-77261-49

b6
b7C

PC-006175

DOJ-FOIA 000646
DOJ-FOIA 000646

FEDERAL BUREAU OF INVESTIGATION
FOIPA
DELETED PAGE INFORMATION SHEET

No Duplication Fees are charged for Deleted Page Information Sheet(s).

Total Deleted Page(s) ~ 13
Page 23 ~ b3, b6, b7C
Page 25 ~ b3
Page 26 ~ b3
Page 27 ~ b3
Page 28 ~ b3
Page 29 ~ b3
Page 30 ~ b3
Page 31 ~ b3
Page 35 ~ Duplicate Duplicate of serial 31
Page 37 ~ Duplicate Duplicate of serial 1A1 enclosure page 2
Page 38 ~ Duplicate Duplicate of serial 1A1 enclosure page 1
Page 39 ~ b6, b7C, b7D
Page 41 ~ Duplicate Duplicate of Serial 34.

PC - 006176

DOJ-FOIA 000647
DOJ-FOIA 000647



## U. S. Department of Justice

Federal Bureau of Prisons

*U.S. Penitentiary*



ORDER SEAL

*601 McDonough Blvd., S.E.*
*Atlanta, GA  30315-4423*

FILED
CHARLOTTE, N.C.

JAN 2 9 1998

U.S. DISTRICT COURT
W. DIST. OF N.C.

January 29, 1998

The Honorable Robert D. Potter
Senior United States District Judge
Western District of North Carolina
195 Charles R. Jonas Federal Building
401 West Trade Street
Charlotte, North Carolina  28202

Dear Judge Potter:

The following is a report regarding the psychological evaluation of Aquilia Barnette (US v. Aquilia Barnette, 3:97CR23-P) as performed by Drs. William Grant and Scott Duncan, pursuant to your court order dated December 22, 1997.  In coming to the conclusions in this report, we have relied on various information as outlined below:

Interview of the defendant on December 29, 1997 (4.5 hours)
Interview of the defendant on January 19, 1998 (2.5 hours)
Offense Reports (43 pages)
Victim Information (one page)
Victim N/O/K Information (one page)
Witness Reports (seven pages)
Investigator Reports (55 pages)
Officer Reports (10 pages)
Crime Scene Reports (18 pages) Lab Requests (22 pages)
Lab Reports (seven pages)
Property Reports (42 pages)
Suspect Information (four pages)
Miranda/Consent Reports (four pages)
Suspect Statements (41 pages)
Warrants (10 pages)

MC-0000421

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 2

Weapons Information (16 pages)
Robin Williams Interview 5/30/96 (10 pages)
Ben Greene Interview 5/1/96 (14 pages)
Barnette Interview 6/25/96 (16 pages)
Arson Report Roanoke City P.D. (26 pages)
Supplemental Reports Homicide - Roanoke (nine pages)
911 Calls and Dispatch on 6/25/96 in Roanoke (20 pages)
Sonji Hill Interview 6/25/96 (six pages)
Buddy Robertson Interview 6/22/96 (six pages)
James Yancey Interview 6/22/96 (four pages)
Earline Thompson Interview 6/25/96 (eight pages)
Calvin Burwell Interview 7/3/96 (four pages)
Patricia Burwell Interview 7/15/96 (four pages)
Bertha Williams Interview 7/19/96 (12 pages)
Roanoke P.D. Evidence Tech. Report (five pages)
Williams Autopsy Report (seven pages)
Donald Allen Autopsy Report (18 pages)
Reports of Assault on Barnette in 1/95 (six pages)
Criminal History of Defendant (11 pages)
NCIC Information 6/28/96 (23 pages)
Missing Person Information (nine pages)
Barnette Residence Information (20 pages)
Witnesses - Roanoke (24 pages)
Prior Acts of Violence (217 pages)
Roanoke Memorial Hospital Information on Barnette (1995) (63
pages)

Cheryl Vasser Interview 1/10/95 (one page)
Ann Seay Interview 1/8/97 (one page)
Ginger Orange Interview 1/1/97 (one page)
State of Georgia v. Barnette (1992 - 93) (eight pages)
Toll Records (80 pages)
Photos:  Allen Homicide Scene, car, items in car, autopsy (281
pages)

Photos: Williams Autopsy (12 pages)
Photos: Arson Scene (24 pages)
Photos: Williams Homicide Scene (80 pages)
Photos: Arson Scene (four pages)
CMPD Lab Reports - Allen Homicide (eight pages)
Roanoke PD Domestic Dispute Reports (three pages)
Arson - Request for Lab Examination (one page)
Arson Photos (five pages)
Exterior Diagram - Th St. & Loudon Ave. (one page)
Interior Diagram 911 Loudon Ave. (one page)
Roanoke PD Arson Reports (four pages)

MC-0000422

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 3

Randy Tate Interview (one page)
UVA Medical Records (117 pages)
Inspection of the Charlotte crime scene by Dr. Duncan (1/17/98)
Inspection of the exterior of defendant's home by Dr. Duncan
(1/17/98 and 1/19/98)

Inspection of the site where car was left in Charlotte by
Dr. Duncan (1/17/98)

Inspection of the general area of the Charlotte crime scene by
Dr. Duncan (1/17/98)

Inspection of the case file from FCI Butner including final
report (180 pages)

Inspection of the psychological raw test data regarding the
defendant's testing at FCI Butner (41 pages)

Attempted telephone interview of Derrick Barnette, defendant's
father, by Dr. Duncan

Review of Dr. Tyson's report
Review of multiple court orders (25 pages)
Rorschach Inkblot Test (Exner Scoring System) performed by
Dr. Duncan

Psychopathy Checklist Revised scored by Dr. Duncan
Attempted telephone interviews of Sonja Cooper, defendant's
mother, by Dr. Duncan

Interview of Tasha Heard by Drs. Grant and Duncan
Telephone contact with the prosecuting and defense attorneys
Interview of Alicia Chambers, ex-girlfriend of defendant by
Dr. Grant on 1/19/98

Telephone interview of Crystal Dennis by Dr. Grant
Telephone interview of Kesha Heard by Dr. Grant

In keeping within the scope of this court ordered evaluation of
Aquilia Barnette, a general psychological and psychiatric
evaluation of the defendant was conducted by Drs. Scott A. Duncan
and William H. Grant. Dr. Duncan is a licensed psychologist and
the Forensic Studies Coordinator at the United States
Penitentiary in Atlanta, Georgia. Dr. Grant is a certified
psychiatrist and Chief Psychiatrist at the United States
Penitentiary in Atlanta, Georgia.

MC-0000423

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 4

PERTINENT PSYCHOLOGICAL ISSUES AFFECTING MITIGATING AND
AGGRAVATING FACTORS PURSUANT TO TITLE 18, U.S.C., 3592: The
possible psychological mitigating factors germane to the federal
death sentence which may be considered by the fact finders in
this case, as seen by Drs. Grant and Duncan, include:

(1)  Impaired capacity - The defendant's capacity to appreciate
the wrongfulness of the defendant's conduct or to conform conduct
to the requirements of the law was significantly impaired,
regardless of whether the capacity was so impaired as to
constitute a defense to the charge.

(2)  Duress - The defendant was under unusual and substantial
duress, regardless of whether the duress was of such a degree as
to constitute a defense to the charge.

(3)  No prior criminal record - The defendant did not have a
significant prior history of other criminal conduct.

(4)  Disturbance - The defendant committed the offense under
severe mental or emotional disturbance.

(5)  Other factors - Other factors in the defendant's background,
record, or character or any other circumstances of the offense
that mitigate against imposition of the death sentence.

The possible psychological aggravating factors pertinent to the
federal death sentence which might be considered by the finders
of fact in this case, as viewed by Drs. Duncan and Grant include:

(1)  Death during the commission of another crime - The death, or
injury resulting in death, occurred during the commission or
attempted commission of, or during the immediate flight from the
commission of, an offense under Section 1118 (kidnaping) and
Section 1116 (hostage taking).

(2)  Substantial planning and premeditation - The defendant
committed the offense after substantial planning and
premeditation to cause the death of a person or commit an act of
terrorism.

(3)  Vulnerability of victim - The victim was particularly
vulnerable due to old age, youth, or infirmity.

MC-0000424

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 5

These evaluators know of no other aggravating factors for which notice has been file in this case that might be affected by a mental health issue.

**BACKGROUND INFORMATION:** The following background information was provided by the defendant. The defendant's statements did not always match with information gleaned elsewhere. Therefore, this information is intended to be a description of historical information as it pertains to the instant offenses from the point of view of the defendant. The veracity of some information can easily be called into question.

The defendant is 24 years of age and was born in Charlotte, North Carolina. He has two brothers by his mother, ages 20 and four-years-old. The defendant reported good relations with both siblings and doing "dad like things" with his four-year-old brother. (This was despite the defendant later admitting that he lied to his brother about borrowing his brother's car for use to commit a crime and also using a fake I.D. which was based on his brother's drivers license that the defendant stole. The defendant reported that he used the information from his brother's license and the defendant's picture to secure a Virginia I.D. card after he had left his own drivers license at the crime scene of the fire bombing on April 30, 1996. Following this, the defendant used the fake I.D. with his brother's name on it to secure the weapon used in the murders of Donald Allen and Robin Williams.)

When the defendant was born, his father was serving in the Air Force. This resulted in family moves and a family separation when the father went to Japan. Mr. Barnette's father left the Air Force when the defendant was about six-years-of-age. Then the defendant's father went to work for the Post Office. The family moved to Charlotte, North Carolina. Although the defendant described his early relationship with his dad as "fatherly", discipline became harsher and more strict following the move to Charlotte, as alleged by the defendant. He described his father as particularly strict about school behavior, homework, chores, feeding the dog, cutting the grass, doing the lawn work, doing the laundry, and washing the dishes. When the defendant did not meet his father's expectations, he allegedly "got a whipping" with a leather strap. The defendant stated that if he got into trouble at school with a teacher or for fighting, "I had to get ready cause I know that when he (his father) got home, I was in for it." He alleged that his father beat him until he had welts and bruises and that he was punched on two

MC-0000425

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 6

occasions by the father. He reported that he has a life-long fear of his father because of the discipline he received when he was younger. However, he also stated that he "loves" his father "to death" because his father did enjoyable things with him as well. When asked how often he was disciplined, the defendant reported, "I always got into trouble in the third grade - you might say every couple of weeks I got beat - not only for school, but the most severe ones were for school. I mean, if I got messing with my little brother, bullying him, or get into trouble for not doing chores, it might have been every couple of weeks, every other week." The worst thing that Mr. Barnette allegedly could do was to bring home bad grades, but the defendant might also have problems with his father for punching other children or getting into trouble with teachers. For instance, talking in school was an example given by the defendant. He reported, "I was just super hyper, but when I got report cards that showed bad grades, I might get beat for an hour."

In addition to the "whippings", Mr. Barnette alleged that he might be told that he could not watch television for a week or could not go outside and play. He also stated, "At some time, I would violate these things anyway - go outside, try and pull one on my Mom, say I could go outside or sneak T.V. . ." Thus, in spite of his alleged fear of his father, he would defy his father's grounding order and play his mother against his father.

According to the defendant, his mother and father treated each other well until the family moved to Charlotte. However, especially after Mr. Barnette was eight-years-old, his parents allegedly argued about money and especially infidelity. The couple eventually divorced when the defendant was eleven. He had mixed feelings about the divorce, but he knew that one of the things it meant was that he did not have to be "afraid" of his father anymore.

Mr. Barnette's mother worked full-time for State Farm Insurance and was a housewife. Although his father drank socially at family functions, his mother allegedly drank more than his father while they were together, during their separation, and after the divorce. Her drinking allegedly increase after the divorce. She reportedly drank to the point of slurred speech and falling down. The defendant recalled that when he was 14 or 15 and visiting a relative's house with his mother, his mother got up to go to the bathroom and fell down on top of a table because she was drunk. The defendant was embarrassed and left. He stated, "I have seen her in all states", and he has "lost count" of the number of

MC-0000426

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 7

times he reportedly saw his mother passed out from drinking. However, Mr. Barnette's mother did make "good money", bought the children what they needed, and provided well for them, according to the defendant.

The defendant reported that he went to preschool in Minot, North Dakota. When the family moved to Charlotte, he attended Beverly Woods, near South Park Mall for grades K through 3. He stated that school work was easy, "it was nothing." It did not hold his attention. He drew frequently in class and always wanted to play.

The defendant was reminded of his remarks that he might get into trouble for punching other children and asked how much of this kind of trouble there was. He backed away from his prior statement saying, "I mean, K through 3, how much work can you do? I wasn't all that interested in that stuff. In fourth grade, I remember sitting in class reading magazines . . . mom remembers that. She says "that is why we took you out of fourth grade . . . the teacher let you do whatever you wanted to do."

The defendant attended fourth grade at Berringer Elementary School. Then, after the fourth grade, he was sent to a private Catholic school, Our Lady of Constellation (probably Our Lady of Consolation). He was about 10-years-old at the time. The Catholic school was "great": small classes, stability of teachers, and an opportunity to get to know the other children in his class. He stated that his peers liked him and that the teachers were good. On Saturdays, he spent time with his friends. However, he was at Our Lady of Constellation for only one year.

That summer, Mr. Barnette's mother and father separated and the defendant, his brother, and mother moved to the Wendover Road Apartments. He went to Cotswald Elementary School in the fifth and sixth grades. This meant more new people and children who were not as friendly as the children in Catholic school. He was on a new side of town in a new house. He started not paying attention to his class work. He reported that it was at this point that his mind wandered.

The defendant attended Randolph Junior High in the seventh and eighth grade then moved to Farm Pond Lane. In 1987, he attended Smith Junior High School for the ninth grade. At Smith Junior High, he admitted having one of his best years in school. For his tenth grade year, the family moved to Georgia.

MC-0000427

Bates No. 14189

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 8

The defendant denied extensive fighting during grammar school.
He stated that he got into perhaps one or two fights in
elementary school (which was contrary to his earlier report that
his father would beat him for fighting in school), no fights in
catholic schools, and none in the fourth grade. In the sixth
grade, he "might" have had two fights (one with the school bully
and one with a boy that he subsequently made friends with) and
was allegedly not involved in serious misconduct. He did say
that in the sixth grade, he tried to forge his mother's
signature on a bad report card - more than once - and was sent to
the principal's office.

When asked what was the worst thing he did in school, he reported
that he was caught in the first grade playing doctor with a
little girl and got paddled.

The defendant also denied significant problems with the police
during grammar school. The only incident that he reported was in
the seventh grade. He stated that he was hanging out around the
school with his friends, the police came, and they ran. After
the family moved to Georgia, he reported having no involvement
with the police as a juvenile.

The defendant was specifically asked about running away from
home. He stated that he ran away from home when he was attending
either Beverly Woods or Berringer Elementary Schools because of a
bad report card from school. He stated that he did not want to
be beaten. He reported having a paper route at the time and
filled his paper route bag with his belongings, walked about
three or four blocks, and knocked on the door of a house where he
did not know anyone. He alleged that he was taken in by a single
father whose daughter was away for the weekend. The individual
allegedly fed the defendant and called the police. The police
turned him over to his father.

The defendant also ran away in the seventh grade because of
problems with his mother's boyfriend. He stayed out overnight,
went to the "Grayson Center" on Wendover Road and "hung out there
for the night."

The defendant reported running away in the ninth grade when he
knew the family was leaving for Atlanta. His mother said that he
did not have to go and that he could stay with his cousin.
However, he did not want to do that either. (It was not clear
then as to the motivation of the defendant to run away when he
was given the choice to either stay in Charlotte or go to Georgia

MC-0000428

Bates No. 14190

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 9

with his family.) He stayed away from home for several days and eventually went to his cousin's house.

The defendant stated that in the tenth grade, he caused his mother so much trouble that she kicked him out of the house on one occasion for "yelling, arguing, fussing, talking-back." By this time, Mr. Barnette had joined the family in Georgia, and he did not want to be there. He allegedly stayed away from home for one night.

While attending the 11th grade in Atlanta, the defendant was seeing a girl named "Tasha" who eventually became the mother of his two children. The couple were never married. He did not go to school and spent the entire day with her. He received considerable criticism from his mother about not coming home on time, or coming in late. His mother would lock the door and not let him in. As a result, he did not go back home for about two months. He left school in the 11th grade, reportedly because Tasha had a child. The relationship lasted about three years, by the defendant's account. Tasha now lives in Georgia with their two children.

Mr. Barnette stated that there were in-law problems. Tasha reportedly had a falling-out with Mr. Barnette's mother and the couple got an apartment after the second child was born. Mr. Barnette reported working two jobs and a temporary job. Tasha allegedly met someone else, at which time "the whole thing blew-up in our face, so we went our separate ways." (This was contrary to the information gleaned from the Kesha Heard interview.)

Mr. Barnette was asked for additional details as to how his relationship with Tasha came to an end. He reported, "She was seeing a guy behind my back. He stopped me one night - he and a bunch of his friends - and tried to start a fight with me. And I wound up shooting him." The defendant reported that he had been avoiding the other person for some weeks, but that this person had been making threats and had a reputation for carrying a gun. Therefore, Mr. Barnette carried a weapon to protect himself. He reported that the man he shot had approach him with eight friends. This man allegedly hit the defendant twice and "I was basically fearing for my life - some of the guys had sticks and stuff, and they were kind of egging me on to do something to me." The defendant spent 48-days in jail for shooting the other man. He reported that when he went to court, he wanted to plead not guilty. Allegedly, the detective on the case thought that he

MC-0000429

could arrange for Mr. Barnette's release if he talked to the judge. The defendant reported that his charges were reduced to three misdemeanor charges: Pointing a Gun at Another Person, Battery, and Discharge of a Firearm Near a Highway. At the time, he was almost 19-years-old.

We asked the defendant if he had supported his children. He stated, "She put me on child support once, and took me off, and put me back on. I always tried to give them Christmas presents and whenever she needed something, I have written a check occasionally. But I have never been able to steadily support them like I wanted to. Never made enough money."

The defendant stated that his next legal problem arose in 1993 out of his relationship with a girl named Crystal. They had been staying together since the summer of 1992. The defendant reported that Crystal has two children who called him "dad". Allegedly, Crystal usually handled the discipline, often with a switch or a belt. While babysitting one night, the defendant stated that he caught the children "playing doctor" - something they had allegedly just gotten into trouble for a week earlier. (However, police reports stated the defendant gave a different reason for the abuse at the time of his arrest.) He decided to handle the situation himself and administered "a whipping" using a make-shift-switch from a coat hanger. The defendant reported that he told Crystal about this when she got home (not supported by the police reports) and said that he knew he had made a mistake. The children went to their grandmother's house a few days later, and their grandmother observed a "welt" on one of the children, according to the defendant. The grandmother reportedly notified the authorities.

The defendant held Crystal responsible for her mother's involvement. He confronted her with the fact that he had advised her as to what he had done, and that he knew that he had made a mistake. Nevertheless, Crystal had permitted her mother to become involved and "jump down my throat and call the police on me. So, her and I got into it and I punched her around pretty bad." Mr. Barnette reported that he turned himself in to the police on charges of Cruelty to Children and found himself arrested for Battery on Crystal. He stated, "So I wound up charged with all three (a misdemeanor Battery charge and two felony counts of Cruelty to Children.)

The defendant reported being in custody for about five weeks, pleaded guilty, and received six years probation on each count of

MC-0000430

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 11

Cruelty to Children. A few days later Crystal bonded him out on the Battery charge. The Battery charge was dropped. He prevailed in getting Crystal to not cooperate with authorities.

Mr. Barnette's next important relationship was with a 16-year-old lady by the name of Alicia Chambers. It was noted by these evaluators that the defendant was vague and misleading about the substance and chronology of events with Alicia Chambers. As a framework, the following chronology, derived from official records, is offered: Mr. Barnette was accused of kicking in (Breaking and Entering) a door and taking Alicia to the defendant's mother's home on November 9, 1993. Three days later, he was charged with Kidnaping and Attempted Assault of Alicia outside her place of employment, a Bojangles restaurant. In late March, 1994, just before the defendant's trial on the charges stemming from the November 9, 1993 incident, Alicia claimed that Mr. Barnette hit her with a baseball bat, causing her to receive 13 stitches to her hand. On March 24, 1994, the night before the trial on the charges from the November 9, 1993 incident, Mr. Barnette was accused and charged with kidnaping and raping Alicia. On March 25, 1994, Mr. Barnette was convicted on charges of Felonious Restraint and Misdemeanor Breaking and Entering for his actions with Alicia on November 9, 1993. All other charges for his alleged behavior after the November 9, 1993 incident were either dropped or dismissed.

According to the defendant, in the fall of 1993, he was arrested for an incident that stemmed out of another relationship with a female. The female's name was Alicia, and she worked at a Bojangles restaurant. The defendant reported that they had had an "ongoing argument. There were some answers I wanted that she wasn't willing to give me. I guess I tried to force her to give me the answers." Specifically, Mr. Barnette alleged that Alicia claimed she was pregnant and the defendant wanted to know whether he fathered the child, or, whether the father was another person. He stated, "It was a big controversy between us over that."

According to the defendant, he accosted Alicia at a bus stop when she was on her way to work and they argued about her pregnancy all the way to her job. Another individual came out of her place of employment and saw them arguing. The defendant then produced a knife. Another person came out of the restaurant and called the police. Before the police could arrive, the defendant and this person started fighting and, when onlookers saw that the defendant had a knife, they assisted in restraining the defendant. A fight ensued and the defendant was subdued by the

MC-0000431

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 12

on-lookers. He was then arrested on three counts of Assault with a Deadly Weapon and Second Degree Kidnaping.

However, there were also warrants out on the defendant because of an incident that took place one week before with Alicia. There were First Degree Burglary and First Degree Kidnaping warrants out on the defendant because he was accused of kicking in the door of "a residence" (Alicia's) and taking her to his house. (Police reports indicate that the defendant had attempted to get Alisa to drop the first warrants, and when she wouldn't, the defendant accosted her with a knife as she got off the bus at work.)

The defendant reported the following outcome: Alicia said she would not go to court on the Second Degree Kidnaping charge. The individual that the defendant attempted to stab showed up at court but the defendant stated that the charges related to the fight were disposed of as misdemeanors and he was given time served. However, he did go to trial for First Degree Kidnaping and First Degree Burglary due to the charges stemming from the preceding week.

Alicia testified on this occasion and the defendant was convicted on charges of Misdemeanor Breaking and Entering. According to the defendant, the jury believed that he did not mean to do anything except get inside the house. They also convicted him on a lesser charge of Felonious Restraint, because, according to the defendant, at one point, he told her that she could not leave his house that same evening. Police reports indicate that the victim (Alicia) did not want to go with him and refused to have sex with him until he forced her into having sex on multiple occasions. He eventually allowed her to call for a taxi to drive her home because his car's breaks didn't work. This was the same car that he drove when he first took her from her mother's house. Alicia was a teenager at the time and the defendant was approximately 20-years-old.

The defendant served 28 days work release and three years probation (he believes). He was ordered to go on 90 days house arrest, but his probation officer did not enforce this, telling him he was doing fine, according to the defendant. The defendant said he was also "to go to counseling" but this did not happen.

The defendant alleged that the relationship with Alicia continued. He stated, "After I got out, we still talked. Next thing you know, I am going to see her. I am not supposed to know

MC-0000432

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 13

where she is. She tells me, why don't I come see her. We were lying there, we made love, she wakes me up and hurries me out the back door. There I am, sitting in a t-shirt and a jacket. It was cold. Alicia's mother looked out the window" and saw Mr. Barnette sitting outside. Alicia told her mother that she did not know how he got there, according to the defendant. The police were called. The defendant told them what had happened, and they went upstairs and retrieved his possessions. He was given his clothes and told to go home. No charges were filed, according to the defendant.

According to Mr. Barnette, the defendant and Alicia continued to see each other against her mother's wishes. On one occasion, her mother observed a meeting at her house and reported it to the police. A few weeks later, the police came to Mr. Barnette's house with a Trespassing warrant and told him that the detective wanted to talk to him about a rape.

The alleged rape related to his action in bringing her to his house for a consensual visit during which there was some friction between them. (According to police reports, the defendant originally stated that Alicia was not at his house.) The defendant refused to take Alicia home. He believes that she made a false report to the police that she had been raped as a result. The defendant was in jail for one week, and the charges were dropped. He had to bond out on the Trespassing charge, which was eventually dismissed.

In 1995, the defendant's grandfather permitted a distance cousin to live on his property. This individual stole the tag off a family friend's car and the defendant confronted him. The distant cousin came to the defendant's house while he was asleep and, during the altercation that followed, shot the defendant in the hand and the leg. No charges were filed against the defendant, but his cousin was charged with Assault with a Deadly Weapon with Intent to Inflict Serious Harm, according to the defendant.

These examiners questioned Mr. Barnette about his relationship with women in general. He stated, "I am a sucker when it comes to women." But when it was suggested to him that there were women who would not attempt to take advantage of him, he reported, "I tried to find them, but I don't find them." Dr. Grant then asked him if, perhaps, he found women who would not stress him as uninteresting. He reported, "With ordinary girls, it is not that I have gotten bored, but nothing ever comes

MC-0000433

of it." "When it comes to women, I am a sucker. I am really sensitive . . . I really take it hard and get hurt . . . I am really emotional about that . . . I've been fucked over a lot . . . I might do something to make her disinterested in me." He went on to state that, at times, he felt that a woman owed him more than she was offering him, but felt that she would cut him off ending, "and it makes me angry."

The defendant was 17-years-old when hired for his first job. He was 22 when he had his last job. In between, there were approximately 12 jobs. His longest job was at a temporary service for two years. Before his current offense, he worked for Camelot Music as an Assistant Manager. There were allegations of sexual harassment. He told the examiners that he engaged in "horseplay" with an employee and touched her in a place where she did not want to be touched. He apologized. The incident allegedly took place in November 1995, but was reported after a dispute between the defendant and the employee in 1996. At that point, his accuser said "she felt threatened for her job because I might try to fire her . . . " Facing termination, he stated, "Actually, I begged her (his second level supervisor) to let me resign." He got a job with Electrolux (apparently on commission; he did not make as much as the other employees) and attempted to organize a talent show for high school students with the possibility of an introduction to a New York record company as an incentive to participate. This venture was not profitable and the defendant was rather vague about the arrangements concerning the venture.

Prior to this, according to the defendant, he met and was dating Robin, one of the alleged victims in his present case. He reported meeting Robin at a club on a trip to Roanoke, Virginia with a friend. Parts of the initial meeting were adversarial, in an appealing/teasing way. When he tried to talk to her at first, he was discouraged by her friend. Later, outside the club when he was singing in the street, Robin and two of her friends called to him and told him not to be so noisy. They talked and exchange phone numbers. The chemistry was good, according to Mr. Barnette. The relationship developed quickly, he felt like he had known her all his life. Within a few days, Robin allegedly told him she loved him. He felt the same way.

This meeting occurred in May 1994. Robin was 21, and the defendant was 20. They continued to talk over the phone, and a long distance relationship, with visits, developed. Mr. Barnette moved to Roanoke in March 1995.

MC-0000434

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 15

The first sign of trouble, according to the defendant, was during his hospitalization after he had been shot by his cousin. The defendant and Robin had a falling-out about Robin's failure to spend enough time with him when she visited him in the hospital. Then, after he moved to Roanoke, he found a hotel receipt for February 15 for two people. This was shortly after he was discharged from the hospital following the shooting. Robin told him that the hotel was really in North Carolina, and she was not with another man, but "that only made it worse". He began to feel that she was not committed to the extent that she said she was. He felt that she had been unfaithful to him when he needed her the most, and that his trust had been misplaced.

As time passed, Robin began to think that Mr. Barnette was seeing someone where he worked. However, in spite of spats and arguments, their relationship appeared to improve. One significant argument took place when Mr. Barnette made a remark that upset Robin. She wanted to leave, and in the course of the shouting that followed, the defendant told her that the situation did not justify her departure. In September, when he was going to Charlotte for his cousin's trial, Robin acted "funny" with him over the phone. He questioned her about what was going on and that provoked her to anger. They argued about whether he ought to come back to Roanoke because Robin was getting suspicious of him having a relationship with another woman.

When Mr. Barnette returned to Roanoke in September (after the trial), he allegedly discovered a phone number in her coat pocket. The phone number was allegedly for one Benny Green. Mr. Green was someone that Robin had been friends with since high school. The defendant asked her about it several times. Each time, Robin became upset. Initially, (according to the defendant) Mr. Barnette did not spend enough time at home to satisfy Robin and there were arguments about that. Then Robin would spend more time away from home, resulting in more arguments. He reported that Robin could not stand to be questioned about her activities, but also required him to justify his absences. The defendant remained suspicious about Benjamin Green, and why he had never met him. He also was concerned that there might be someone else in Robin's life. They might start arguing about something small, but the arguments would frequently turn to Benny Green's phone number.

According to the defendant, Robin questioned the defendant about an individual the defendant had hired at Camelot. She would come to the store and sit on a bench in the front around closing time

MC-0000435

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 16

and ask him "who the new girl was, who the new face was, why were
you and so and so coming out late?"

These examiners then asked the defendant if it might have been
advisable to terminate the relationship at this point.  He
replied, "She is not saying she wants to go anywhere.  I am not
even saying I want to go anywhere.  It's something we need to
work out.  I really want to find out who the other person is.
Tell me so I can go on.  And she is steady claiming no, there is
nobody else . . . so part of me believes her, and part tells me
you been here before man, but the other part wins out."

Allegedly, the defendant bought the victim a purse for her
birthday in October.  Throwing an old purse away, he reportedly
found a condom.  He and the Robin did not use condoms.  Robin
told him that she did not know where the condom came from - it
was just there.  According to the defendant, Robin would
terminate arguments by saying that was the end of the discussion
on the subject, leaving the defendant unsatisfied and continuing
to harbor feelings of uncertainty about the relationship.

The breakup which took place on April 9, 1996 was, according to
the defendant, due to an argument over who Robin was seeing.  The
altercation became physical and he tried to stop her from
leaving.

At other times, the altercations became physical.  The defendant
stated that Robin had struck him with a candle stick holder about
ten times in the course of an argument.  During another, she
lacerated his finger.  The defendant reported taking pills on one
occasion in Roanoke, but did not believe it was a serious suicide
attempt.  He prefaced his statement by stating that he had tried
". . . the whole suicide ploy . . ."

Finally, after their final argument, Robin left the house on foot
and Mr. Barnette left for Charlotte - in her car.  Subsequently,
the defendant, his grandfather, and a cousin came to Roanoke to
pack up his belongings.  During a phone call some ten days later,
Robin wanted to know why he acted that way and said she had been
faithful.

At this point in the original interview, the defendant said, "I
can't talk about the rest of that" on advice from counsel.  He
was asked if he was willing to talk about events during and after
the murders, and he indicated he was willing to do so.

MC-0000436

Bates No. 14198

On the occasion of the first interview, Mr. Barnette told us he was sent newspaper clippings from Virginia that included the fire bombing story. In the newspaper account, he found Benjamin Green's name, concluded that Mr. Green had been sleeping with Robin on the night of the fire bombing and "that did piss me off. I was devastated. First, I was upset about what happened. Then, I have seen this guy's name, right here. I had been back home only a week and several days and it made me think about the times I had been suspicious - I tried to find out who the guy was. I felt guilty that I was a jealous butt, but now, I was right. She was seeing this guy, so it really hurt me. I had been played for a fool again . . . The relationship I had lived with this girl, going through all those pains with - was a lie - and I couldn't believe I had wasted two years of my life, thinking I was going to be happy. And I was really devastated. Didn't know what to do. I thought about really doing myself in. For me, it seemed like the best thing to do. . . I just felt like every time I get into a relationship, I have wound up trapped. So I stayed at home. Got drunk all the time. . . When I didn't get a job at Saturn (a car dealership), I was always drinking - all day. Everyday." The defendant estimated his intake at about four to five beers a day or, alternatively, two beers and several glasses of brandy. The defendant stated, "I couldn't do nothing, couldn't find me a job - all I could think about was everything that happened."

The defendant then thought about obtaining a weapon in order to kill himself. (He later stated that he bought it for self-protection and also told the police that he bought it to kill rats at home.) He bought a pump action shotgun, but alleged the first time he fired it, the slide broke. Therefore, he returned it to the dealer and obtained a semi-automatic shotgun. (A competing explanation is that he could not attach a flashlight effectively to the pump action of the original shotgun.) He stated that he wanted something that would end his life and end it fast. Mr. Barnette went on to state, "The person who did me wrong should pay, just as well as me. I am not going to be around, I am going to be dead, so it wouldn't matter." When the defendant was asked why he taped a flashlight to the bottom of the gun and why he painted the lens of the light red, he stated that he did not know. (A competing explanation is that he wanted to see what he was about to shoot, but painted it red so as not to be as noticeable to passers-by.) When asked why, if he intended to kill himself with the gun, he had fashioned a pistol grip and cut the end off the barrel, he stated that perhaps it was because he could not maneuver the gun into a position to kill

MC-0000437

himself. When he was asked if he had ever tried to position the gun on himself before he sawed it down, he indicated that he had not. Mr. Barnette later stated that he had intended to go to Roanoke and kill himself in front of Robin. When asked if this were the case, why he felt the need to take screw drivers and bolt cutters with him, he stated these items just happened to be in his bag.

Following Robin's death, the defendant reported again attempting to kill himself. On the day of the homicide, he bought a garden hose. That night he allegedly attempted to kill himself with carbon monoxide from the tail pipe of the car he was driving. However, he coughed, gagged, and choked until he jumped out of the car. That evening, he stole a license plate. He reported in an interview that he did this so that he would not get picked up before he had a chance to kill himself. (This seems to be very rational thinking from a person who claims to be seriously thinking about suicide.) On Sunday, he reported going to church in order to pray for Robin and Mr. Allen, the first victim and for forgiveness. The defendant reported that he again attempted to kill himself with carbon monoxide poisoning from the car. He stated that he took sleeping pills first so he would fall asleep and not gag. He reported that another person approach his car, knocked on his door, opened it and turned his engine off. The man spoke to Mr. Barnette about killing himself and left, according to the defendant. The defendant appeared to have regarded this as some kind of a sign, (He stated that it was his belief that the man was an angel) left the area, called his family, and drove to North Carolina.

When reminded that he still had a shotgun in his possession and could have killed himself with it, he reported that he was scared of what a shotgun might do to him, stating, "I seen what the gun did and I wasn't going to do that."

**DEFENDANT'S MOTHER'S REPORT OF RELEVANT HISTORY:** Dr. Duncan contacted Ms. Sonja Cooper by telephone on two occasions. On both occasions, Ms. Cooper stated that it was not a good time for her to talk. On the second occasion, she took Dr. Duncan's work phone and beeper numbers and stated that she would call him. Dr. Duncan gave Ms. Cooper his work hours but never received a call or voice mail message from Ms. Cooper.

**DEFENDANT'S FATHER'S REPORT OF RELEVANT HISTORY:** On January 21, 1998, Dr. Duncan called telephone information in Clinton, Maryland and requested the telephone number of Derrick Barnette.

MC-0000438

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 19

The following telephone number was given: (301) 868-0139. Upon calling this number, an unidentified male answered. Dr. Duncan identified himself and wished to speak with Derrick Barnette. The unidentified male took Dr. Duncan's name and telephone number. Approximately five minutes later, Dr. Duncan received a telephone call from a male identifying himself as Derrick Barnette. Dr. Duncan identified himself, advised Derrick Barnette that he was court ordered to do a psychological evaluation of Aquilia Barnette, and wanted to speak with Derrick concerning his son's childhood while Derrick Barnette was married to the defendant's mother. Derrick Barnette stated that he had "no problem answering any questions" but felt that he should first speak with his son's attorneys in order to get clearance. Dr. Duncan gave Derrick Barnette his office number, beeper number, and schedule for the next 48 hours. On January 22, 1998, the following phone message was retrieved from Dr. Duncan's office voice mail, "Hello, um, this is for Scott Duncan. My name is Derrick Barnette. Uh, you called me earlier today. Um, I really don't feel comfortable about talking to you, so, ah, this is my response to you. Ah, you have a good day. Alright."

**ALICIA CHAMBER'S REPORT OF RELEVANT PSYCHOLOGICAL HISTORY:**
Dr. Grant spoke with four women who knew the defendant well. The first to be interviewed was Alicia. The following is her accounting of her relationship with the defendant:

Alicia and the defendant met in a conventional manner. She was at her cousin's house and the defendant and one of his friends walked by. A conversation started and a relationship developed. At the outset, Mr. Barnett lied about having children. (Alicia told Dr. Grant, "I don't date men with kids"). However, he treated Alicia well and showed her a good time.

As the relationship was becoming established, "jealousy set in. He didn't like what I wore and wanted to have a complete say over the entire relationship."

The first sign of trouble was on a day when Alicia and her cousin were coming back from a shopping center. The defendant saw Alicia from his car and "almost ran into me" with the car. He punched her and threw her purse out of the window of his car because he did not like what she was wearing. After this incident, the defendant became more jealous. There were lots of arguments and "I couldn't have friends or contact with my parents or nothing." When Alicia developed a relationship with someone else and did not want to see the defendant any more, he beat her

MC-0000439

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 20

with a baseball bat, at one point splitting her hand, which required 13 stitches. (This was just prior to his going to court on charges of kidnaping, assaulting, and breaking into Alicia's house on November 9, 1993.) There was "nerve damage, bruises over my body everywhere, I could barely walk." Dr. Grant specifically questioned Alicia about the so called cycle of violence. (In this behavior pattern, spouse beatings are followed by periods of remorse and courtship. The beaten wife agrees to a reconciliation and there is a honeymoon period. Thereafter, criticisms and tensions build, leading to another violent outburst, subsequent remorse, etc.) Alicia stated that the "cycle of violence" accurately characterized their relationship and that she had been significantly abused on ten occasions.

Mr. Barnett kicked in Alicia's door under the following circumstances: The couple had broken up and (on November 9, 1993) Alicia was inside the house talking on the phone. Mr. Barnette arrived. Alicia did not want Mr. Barnett to come in so he kicked down the door and tore the phone off the wall. By this time, she had a knife in her hand. She lunged with it. Mr. Barnett grabbed the knife and held it to her throat. At one point, he had her on his shoulders ready to throw her off the balcony. But, in the end, he carried her down to his car. He told her "You get out of this car and I am going to kill you." They drove to pick up his brother (Alicia reported that it would not have helped her situation to complain about it to Mr. Barnette's brother). Then they went to Mr. Barnette's house. Mr. Barnette's mother was there.

In the meantime, Alicia's mother had called the police and advised them Alicia was probably at Mr. Barnette's house. The police went to the Barnette house, but the defendant left the house through a sliding door. According to police reports, Ms. Cooper originally stated that Alicia was not there. When the police entered the house, Alicia was sitting in plain view inside the door with no shoes on.

Later, Mr. Barnett called Alicia to tell her where he was. She reported his whereabouts to the police and they picked him up. Mr. Barnett was charged with Kidnaping, Assault, and Breaking and Entering. He was convicted of Felonious Restraint and Breaking and Entering in late March 1994.

MC-0000440

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 21

Alicia described the incident at Bojangles (date of offense,
November 12, 1993, three days after she had him arrested on
charges of kidnaping, assaulting, and breaking into her home –
authors) in a manner that differed from the version offered by
Mr. Barnett. She reported that Mr. Barnett had been at her house
hiding in the bushes to see who came and went. When she left the
house, he approached her and told her that he had a knife.
First, he said he would use it on himself. Then he said he would
use it on Alicia. She reported that the motivating factor for
the incident was not, as Mr. Barnett had told these examiners,
her pregnancy. The motivating factor was "Why I wasn't with him
and what I was doing to his life."

Alicia also related another incident: (The night before
Mr. Barnette's trial on the previous charges of kidnaping,
assaulting and breaking into her home on November 9, 1993 –
authors) She was coming home from work, late. She stated, "The
fool was staking out my house. He grabs me, put a hand over my
mouth, and says he'll shoot me if I don't cooperate. We drive
around in his car. We get to his driveway. The switch flipped
(her term for a sudden change from normality to anger). He
wanted to have sex. I didn't but I said okay. Then we went to
his house. He said he would call a cab and let me go home if I
had sex. So I said okay." At home, Alicia's mother called the
police. They found hair, a broken fingernail, and a ripped shirt
in the defendant's car. They also found her bra in the
defendant's bedroom.

Alicia's mother did not approve of their relationship. Alicia
had told her mother that she had cut her hand in the garden (the
defendant did it during the baseball bat assault). She told
police the same thing she had initially told her mother, but the
police found out how she had really been cut. She stated that
the police then wanted her to withdraw her complaint, and she
complied.

Alicia asked if there was anything else that she could add about
the defendant. She reported that his anger "happens in seconds,
like flipping a switch."

**CRYSTAL DENNIS' REPORT OF RELEVANT PSYCHOLOGICAL HISTORY:**
Dr. Grant also interviewed Crystal Dennis about her relationship
with the defendant. The following is an account of her
relationship with the defendant:

MC-0000441

Bates No. 14203

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 22

Crystal described the defendant as "very possessive. I couldn't leave the house and couldn't take a bath or a shower by myself. I couldn't go for groceries or to pay the bills, or to visit my mother or my grandfather." She was asked what she meant when she reported that she was not allowed to take a bath by herself. She replied that if she locked the door, he would push it in. She stated that the defendant believed there was a likelihood that Crystal had been unfaithful and was trying to wash away the evidence.

Crystal told Dr. Grant that her children were not physically abused by the defendant for playing doctor. They were physically abused by him for not eating their dinner. Also, the defendant did not tell Crystal that he had whipped the children with a coat hanger. The children told her themselves.

The defendant did persuade Crystal not to testify against him in court. After his arrest, she described ongoing harassment from the defendant while he was in jail. The jail where the defendant was held was across the street from where Crystal lived, and the defendant said he could see what was going on. Mr. Barnette allegedly would "send me letters from jail and jack off on the tissue", according to Crystal. Mr. Barnette told Crystal he would get out of her life if she did not testify against him. She agreed to the proposal and declined to cooperate with authorities.

**KESHA HEARD'S REPORT OF RELEVANT PSYCHOLOGICAL HISTORY:**
Dr. Grant also talked to Kesha Heard, the sister of Tasha Heard. (Tasha and Mr. Barnette share two children together.) Kesha knew many of the details of the Tasha/Barnette relationship, and was willing to talk about them. The following is a description of Kesha Heard's experiences with the defendant, from her point of view:

Kesha stated that she has known Mr. Barnette since he first met her sister. Tasha was 14-years-old at that time. At first, Kesha didn't know if her sisters attraction to the defendant was just "an adolescent thing." She reported that their mother did not approve of the relationship between Tasha and the defendant. Tasha and Mr. Barnette ran away and lived in empty apartments but stayed away less than one week and eventually came back. Tasha's mother's credit card was stolen and $500 was charged to the card. In the end, Tasha did not have any items to show from the purchases, but the defendant "had a lot of stuff." Eventually, Tasha became pregnant with the defendant's child. Kesha reported

MC-0000442

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 23

that initially, the defendant was "pretty much there for her."
She described Mr. Barnette as a "good daddy" in the beginning.
After Tasha got pregnant with their second child, the defendant
changed. He started seeing another girl. After the birth of the
second child, the defendant started to work. He allegedly told
Tasha that his first pay check had to go back to the company
where it would be held in accordance with company policy. That
was a lie. The defendant allegedly used the money for his own
desires.

Kesha went off to college. She then got an apartment in Newnan,
Georgia, and Tasha and Mr. Barnette had an apartment next door.
She reported that the defendant and Tasha argued and fought a
lot. She reported that they would fight physically, but added
her sister would often defend herself. On several occasions,
Kesha would take-up for her sister. On one occasion, Kesha told
the defendant that if he put his hands on her sister one more
time, she would kill him. The defendant replied that it was his
house, implying that he could do what he wanted. Once when Kesha
walked in on an argument between Tasha and Mr. Barnette, she told
the defendant that she was tired of all the fights between them.
The defendant then pulled a gun on Tasha and Kesha. Kesha then
told Mr. Barnette to leave and find a new place to live. The
defendant allegedly left out the back door but kept returning.
Kesha explained that during the latter part of his relationship
with Tasha, the defendant was also having a relationship with
Crystal Dennis. Since the defendant's name was on the lease,
Mr. Barnette told Tasha that she needed to take the children and
leave. According to Kesha, Tasha's mother received a child
support check for Tasha which Tasha used to pay the rent on the
lease signed by the defendant. When Tasha moved out, Crystal
moved in. Tasha tried to warn Crystal, but to no avail. Kesha
stated, "Next we heard, he (the defendant) was in jail for
beating her (Crystal Dennis') kids with a coat hanger.

Kesha described Mr. Barnette as abusive, but added that her
sister would fight back. She stated that the defendant was
jealous and accused Tasha of doing things "she couldn't have done
with two kids at home." Kesha reported that the defendant has
had no contact with his children until after he was arrested on
present charges. She added that Tasha did not break-up with the
defendant. Instead, he kicked her out with their two children.

MC-0000443

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 24

**TASHA HEARD'S REPORT OF RELEVANT PSYCHOLOGICAL HISTORY:**
Drs. Grant and Duncan interviewed Tasha Heard on January 28,
1998. She confirmed much of the information that her sister
provided Dr. Grant in an earlier interview. She stated, "I was
nervous all the time" when she lived with the defendant. She
stated, "He made me nervous - fighting all the time." She could
not remember many details about what they argued about. She did
remember always being depressed, loosing weight, and her hair
falling out. She reported that she couldn't eat while inside the
apartment that she and the defendant shared. She also stated
that she still sometimes has bouts of nervousness as a result of
her experience with the defendant. She described the defendant
as being "like a cat", always sneaking up on her. Tasha
confirmed the story told by her sister concerning Mr. Barnette
pulling a gun on them. She reported that there were three people
in the apartment (Tasha, Kesha, and a female cousin or friend)
when the defendant pulled a gun on them because he thought Tasha
had other men in the apartment. Tasha reported that her sister,
Kesha, jumped in front of her, stating that the defendant would
have to shoot Kesha first. Kesha then threatened to "kick his
butt" and the defendant left.

Tasha reported that the defendant never paid child support and
confirmed that Mr. Barnette had kicked her out of the apartment
with their two children. She stated that the defendant was
dating Crystal at the time she and he were together. She did not
approve of this, but had two children and no place to go.
Crystal moved in to the apartment after Tasha moved out.

Mr. Barnette told these evaluators that he and Tasha broke up
because she was seeing another man. Tasha denied this
allegation, but added that the defendant had been told she was
seeing Anthony, a man she had never met. She denied to the
defendant that she was ever seeing anybody. He did not believe
her. According to Tasha, Anthony was the same person that the
defendant shot. The defendant allegedly forced Tasha out of the
apartment when he was released from jail for shooting Anthony.

Tasha reported that the defendant has had little contact with his
children since he put them out of the apartment in Newnan,
Georgia. She did state that Ms. Cooper (the defendant's mother)
asked that the children come to visit with her approximately four
years ago. The defendant was also living with his mother at the
time. Both children stayed with their paternal grandmother and
the defendant for approximately two months. She stated that,
neither the defendant nor his mother have had any contact with

MC-0000444

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 25

her or the children since this visit. She denied ever receiving
money or Christmas presents from the defendant or anyone in his
family. The exception to this was when the defendant wrote her a
letter after he was arrested on present charges. Tasha also
reported that she received phone calls and a visit from the
defendant's mother after the defendant was arrested on present
charges. When asked, she speculated that they initiated this
contact in order to look good for the upcoming trial.

**PSYCHOLOGICAL TEST RESULTS:** According to projective personality
test results, the defendant is experiencing a chronic state of
stress which impairs his capacity for controlling his actions and
makes him quite vulnerable to impulsiveness. He uses a basic
thought process to problem solving and decision making in which
he prefers to think things through before initiating any
behavior. His thinking is often marked by flawed logic or faulty
judgment. He is a rather negative, probably angry person. He is
very self-centered and tends to overestimate his worth. This
narcissism usually dominates his perceptions of the world and
often leads to an excessive use of rationalization and denial
when challenges to his integrity occur. His conception of
himself is not well developed and is probably rather distorted.
He is hyper-vigilant and this forms a core element of his
personality. He uses considerable energy to maintain a state of
preparedness. This hyper-alert state has its origins in a very
negative or mistrusting attitude toward people. He is cautious
about interpersonal relations and does not usually anticipate
being close to others. Although he does appear to be reasonably
interested in people, he probably is more aggressive or forceful
than most people in his relations with others, according to his
test results.

**DEFENDANT'S ACCOUNT OF THE CRIME(S):** In the course of the second
interview, following consultation with his attorneys, the
defendant provided the following information: During early to
mid-April, 1996, there was a fight between Robin and the
defendant about her alleged infidelity. According to the
defendant, he took her by the neck, held her down, and demanded
to know who she was seeing. She continued to deny infidelity,
but he was unswayed by her denial. Sometime around or during
this fight, the defendant strongly considered leaving. He felt
that the relationship might be coming to an end, he wanted to see
what Robin's reaction would be if he said he was going, and it
was the first time he had ever been physically violent with her.
He tried to minimize his violent actions when discussing this
altercation by stating, "I just grabbed her by the neck. I never

MC-0000445

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 26

hit her. I never punched her. I just grabbed her by the neck
. . . I never hurt her. . . " He thought in retrospect that if
it were not for the physical violence during this altercation, he
would have stayed away for a while, and then they would have
reconciled. But, because of his prior relationships, he thought
he had crossed over a line. So, he left - in Robin's car. Later
that night, Mr. Barnett telephoned Robin and she told him that he
could not stay any longer. A second call confirmed that she had
not changed her decision.

Subsequently, the defendant returned for his belongings with two
of his relatives. He described Robin as being "at my throat"
while he was there. She cried, yelled, told him to hurry up,
swore, and threw things at him. At one point, the defendant told
Robin to call the police ("we thought somebody should") when they
disagreed about ownership of a VCR that both had paid for,
according to the defendant.

During later phone calls, Robin said she still wanted him and
"maybe we might get back together", according to the defendant.
In the course of one phone call, Robin allegedly said she would
be dating someone over the weekend but that she would call him
Monday. However, she did not call him. Mr. Barnett was also
dating someone in Charlotte but "it didn't last - she wasn't my
type." He did not see a problem with his dating someone else
while continuing to fret about who Robin was dating. He did not
get a job with the Saturn auto company that he had applied for,
went on an "emotional down-swing", and needed a shoulder to lean
on.

The defendant then called Robin who told him that she would be
meeting someone that evening. Mr. Barnette had allegedly been
planning suicide and had purchased sleeping pills for a possible
suicide attempt. He indicated that he told this to Robin. When
he told Robin that he needed a friend, she said there was some
place she had to be. She explained that she had invited an old
friend for drinks. She thought she would be through by 11:30
p.m. The defendant believed that, in his moment of need, "she
was seriously brushing me off. I needed her and a date with some
guy is more important to her. I'd been lied to before. I know
her. I knew who it was and it wasn't who she said it was." (In
a previous interview, Mr. Barnette stated that he did not know
who Mr. Greene was until after the fire bombing on April 30, 1996
when a friend had given him a newspaper clipping.)

MC-0000446

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 27

After hanging up the telephone, the defendant allegedly took
sleeping pills, but could not stop thinking about what happened.
He stated, "I wanted to know whether it was him or not
(presumably Benny Greene). If it wasn't who I thought, she
wouldn't have been putting me off that way for some guy she just
met." He began to think that his relationship had ended because
of this other person (presumably Benny Green) and called again on
the same night, to try and determine who the person was. When he
called, someone was in the apartment with Robin. The defendant
asked if this individual was planning to spend the night with
Robin. Robin allegedly replied, "If he wants to, he will do what
he wants." One of the last things Robin said to him was that her
visitor told her to hang up the phone. The defendant reported
that he also over-heard this man tell her to hang-up the phone.
He stated, "He had no right to do that."

The defendant acknowledged that he dated after leaving Robin but,
"If I had this girl in my apartment and Robin called me with a
problem she was facing, I would have been there for her. I was
telling her I was going to take my life, and she said "I've got a
date." Later that night, after midnight, he left for Roanoke.

The defendant reported that he went from hurt to anger. He drank
alcohol (allegedly about ½ of a fifth) and took pills (all he had
of two different brands of over-the-counter sleeping pills). He
stated, "Even if we weren't together, she could have been there
for me." He "just got so hot and so angry over this."

Prior to leaving for Roanoke, the defendant went to bed, woke up,
and vomited what he had ingested. (He admitted this only after
he was confronted by these evaluators with the improbability of
being able to function with so much alcohol and sleep medication
in his system.) It was about 11:30 p.m. He had been drinking
since 6 p.m. and taking pills since 8 p.m., according to his
self-report. He left for Roanoke between 12:30 a.m. and 1 a.m.
in his brother's car. He stated that he told his brother he was
going to the store. He arrived in Roanoke between 3:15 and 3:30
a.m.

The defendant arrived at Robin's house, and "saw this guy's car
. . . I know this car. It hit me when I saw his car." The
defendant had a baseball bat in the car and had a Penzoil can
that he had filled with gasoline. (He denied having a plan to
burn her apartment. However, when asked why, if this were the
case, he had filled the oil can with gasoline before arriving at
Robin's apartment, he did not know.) He knew that if he began to

MC-0000447

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 28

cause a disturbance someone would call the police. Therefore, he tore out Robin's phone wires. He stated he did not use wire cutters to do so despite police reports to the contrary.

According to Mr. Barnette, he banged on the door and yelled for Benny to come outside - without using his name. He stated, "Part of me knew who it was, but I wasn't really sure. There was some uncertainty." He banged on the door with a bat, making a great deal of noise. He heard footsteps and voices and then heard a sound as if something was sliding back (possibly the slide on a handgun) as if someone was loading the chamber of a gun. He ran to the side of the building. The lights went on and he saw Robin looking out the window. The defendant swung his bat at the window where Robin was looking out (it was about seven feet off the ground). He directed Robin to tell whoever was with her to come outside and heard her tell him to call the police. About this time, the individual in the apartment began shooting, according to the defendant. The defendant "realized the man had shot at me when I was in the right" and felt Robin had told him to shoot. He broke the kitchen window and poured gas on the window, door frame, and the living room window frame. He set the gas on fire. He continued to yell to Robin's companion to come out of the house. Then he went to his car, and poured the remaining fluid over the car before setting it on fire. He denies making the statement "die, bitch, die." He was also unclear why he would stay around the apartment and set it on fire after someone had shot at him. Police reports indicate that Mr. Greene fired his gun after the fire was set.

Mr. Barnett started to strike the other individual's car with the baseball bat. He smashed the windows. At that point, the man started shooting again and the defendant ran into a ditch. Then he ran to his car and returned to Charlotte.

As previously stated, the defendant was asked why he filled the Penzoil can with gas. He responded, "I really don't know what I was going to do with it." We asked him if he planned to torch Robin's house? He reported, "Maybe I wanted to set it on fire, maybe I wanted to set his car on fire. I have no grand answer about what I was going to do. I just saw this empty thing in the car, and here I am putting gas in the car, and I just thought, put some gas in this thing and take it with me . . . all I wanted was to straighten him out for telling her to hang up. It was not his place to tell her that. . . I had a chance to confront the man who had been the other person in our relationship, if it was him."

MC-0000448

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 29

Back in Charlotte, the defendant read about the fire bombing and warrants for his arrest in the newspaper. He learned that Benny Green had been with Robin. He stated, "My gut feeling was right." He projected the blame for Robin's injuries onto Mr. Greene. He read about Robin's injuries and thought "this asshole jumps out the window and leaves Robin inside. It made me mad because he was with her. He didn't care what happened to her, that she got hurt like she did. What was he doing? She had all these cuts, got hurt as much as she did, got rushed to a burn unit. It infuriated me. I wondered what role did he play in the inside of the apartment. She had got all these injuries and he had got none and it upset me on the flip side, because it confirmed this guy was Benny Green."

The defendant was reminded that it was he who threw the gas in the first place, but he held to his position that "if he was man enough, he would have come out of that apartment."

Following his return to Charlotte, the defendant spent most of his time at home. He visited a cousin and told his best friend what had happened. We asked the defendant if he attempted to contact Robin in the hospital. He replied, "I wanted to. I didn't know what to say. I did something I shouldn't have done. I didn't know what to say." He wanted to talk to her and say he was sorry, but claimed he did not know how to do so.

Several weeks went by. He again allegedly had thoughts of suicide. So, he came to a decision that he would shoot himself. However, he did not have a gun and, as a convicted felon, he was barred from owning one. He reported that he bought a shotgun because he would have to fill out forms for a handgun. When he was confronted with the fact that he still filled out forms on which he stated that he had never been convicted on felony charges, he told us that he had made a fake I.D. in Virginia using his brother's drivers license but the defendant's picture. However, the fake drivers license had his brother's date of birth, indicating that the defendant was 18 years old. He stated you need to be 21-years-old to but a handgun. Therefore, his only option was to purchase a long gun.

When asked again to list his reasons for acquiring the shotgun he provided the following: 1) He was having thoughts of suicide; 2) He didn't like living in the house without protection; and 3) If he decided not to kill himself, he would have a gun for shooting rodents, snakes, and squirrels. We questioned the defendant as to the depth of his suicidal ideation in view of his

MC-0000449

priority of protecting himself and the fact that he cited his plan to shoot pests, a relatively minor justification, as motivation for the purchase. He adamantly stated that he was depressed and suicidal. This was the only point in the two-and-a-half hour interview concerning the murders that the defendant showed any real emotions. He became angry, loud, defensive, and started to tear. Even when the defendant was describing the deaths of the two victims, he showed no significant emotion. He did lower his head and talked lower but his mood and affect did not change during these discussions.

In any event, the defendant bought a shotgun and tested it. He reported that it broke. He exchanged it for another. (He denied that he exchanged it for one that allowed him to mount a flashlight on the bottom.) He cut the shotgun down because it was easier to carry around.

According to the defendant, the day before he went to Roanoke, "It had been one of those nights." He was allegedly wondering wether he should kill himself or not. He took his gun and left home. He thought about going to Virginia to show Robin how much pain she had caused him. He thought about "blowing my brains out in front of her to see if that made her happy." He thought if she saw what he was ready to do, she would tell him what she had done. He considered walking and hitchhiking, but then decided to steal a car from someone. He waited by the side of the road at an intersection with his shotgun for approximately one half hour. Then a car arrived at the intersection at a time when there were no other cars present and none coming. He approached the car, instructed the driver at gunpoint to leave the car, and then directed him to go over by the side of the road. Mr. Barnett recalls the victim looking at him and recalls telling the victim to hurry up. Mr. Barnette instructed the victim to go to where he himself had been hiding, and then to turn around (face away). He demanded the victim's wallet and the victim threw it towards him. He picked it up. When these examiners asked Mr. Barnett if the defendant said anything, he reported that Mr. Allen had been saying "don't shoot me" since getting out of his car.

The defendant stated that he started to leave, took two steps, and then turned and started to shoot. At the time, the victim was standing and not facing the defendant. He insisted that he did not drag him further down into the ditch and did not put his hands on him. He denied ever indicating to an F.B.I. agent that he had "drug" the victim further into the brush. He also could not explain the pools and trails of blood from where the victim

MC-0000450

Bates No. 14212

was apparently shot and where Mr. Allen's body was eventually located.

Initially, the defendant denied being able to explain why he shot the victim. However, in the course of further discussion, he told us, "If I don't stop this guy, he's going to stop me from getting to Virginia." Mr. Barnett also reported that there was "Just this feeling of such anger. The actual part is that I felt all this anger." The defendant stated that the crime was not racially motivated. When asked if it would be a fair statement to say that the amount of anger he felt was equal to the amount of hurt he felt, he indicated that it would be fair to say this.

Mr. Barnett arrived in Roanoke at about 5 or 6 a.m. He went to Robin's mother's house. He parked behind the house, left his car, and went to the side of the house where he cut the phone line. Then he sat by the screen door, took the gun out of his bag, and shot at the lock on the door. He ran into the house and down the hallway where he saw Robin's mother holding an infant. He apparently reloaded the gun but denied remembering doing so. Robin had heard the shot and was on the front porch. Robin's mother told her to run. Robin ran. Mr. Barnett ran outside the house and followed Robin as she ran across the street and uphill towards an apartment building. The defendant ran around the other side of the apartment building. Robin ran and the defendant called her to come to him. She fell, got up, ran and fell again. The second time she did not get up. The defendant ran up to her and grabbed her by the hair, telling her to come with him. He pulled her by the hair, questioning her as he pulled her. He asked her why she did it. Robin responded "Do what?" The defendant responded, "You know what . . . why Benny?" Robin replied that she didn't do anything. She then said, in a non-sequitur, "I was trying to get my carpet cleaned." The defendant said, "That didn't make sense to me and I still don't know if that's what she said, but I think that's what she said. When she said that it made me think of other arguments where we argued about that and she would tell me all kinds of crazy stuff. And I hit her, and she stumbled back, and I grabbed her by the arm." The defendant pulled Robin and told her to come with him. She said she was not going anywhere with him. He continued, "If you don't, I am going to have to kill you." At this point, Robin "kind of said no" which lead the defendant to tell her "I've got one for you and one for me." "What?" Robin asked. Mr. Barnette replied, "One bullet." (The defendant recalled that during this

MC-0000451

time, he was pulling her, walking and running down the hill).
The defendant also stated that he wanted Robin to take him to
where Benny lived. She refused.

Robin then said, "No you can't do that" and jerked away from him.
The defendant told her, "Robin, if you don't go with me I am
going to kill you." Robin allegedly responded, "You are not
going to kill me" and grabbed the gun. (This was not supported
by eyewitness statements.) Mr. Barnett pulled away as Robin's
mother ran up. At this point, he lifted the weapon and shot her.
He stated, "When the shot went off, I didn't think I shot her.
Robin took off running in the direction where her mother was
standing." The defendant lifted the gun and shot Robin again.
He reported, "I shot twice. When I saw her get shot, I ran all
the way to where the car was parked and jumped in the car." We
asked the defendant why he did not turn the gun on himself. He
replied, "I'm still trying to find the answer." We continued to
question the defendant, if he was going to kill himself, why take
a tool bag with him. The defendant responded that he simply took
the bag and that the wire cutters were already in there. We
commented that Mr. Barnett seemed to think of suicide all the
time but when the occasion presented itself, he did not do it.
Mr. Barnett could not provide an answer as to why this was so.

**DEFENDANT'S MENTAL STATUS:** Mr. Barnette is alert, attentive, and
highly verbal. He provided many details regarding his
relationships, but was not always completely candid. This was
especially clear when his descriptions of his relationships with
his women was compared with their description of the same
relationships. Also, the defendant would have us believe that he
had no special plan in mind when he filled the Penzoil can with
gasoline. He spoke of being depressed for many years, but was
unable to describe the symptoms of depression in any depth at
all. He reported that things drag, and he does not feel like
doing anything. Much of the depression is related to loneliness,
and "with a woman in my life, nothing bothers me." The only
direct emotion he showed during the interview was when Dr. Grant
suggested that the depth of his depression was not reflected in
some of his behavior. At that point, Mr. Barnette became angry
and accused Dr. Grant of not taking him seriously. Then he
cried. He described good days among the bad, and although he
sometimes thinks of undertaking ambitious projects, like picking
up and moving to California, there was no evidence of these
thoughts being turned into behavior and no manic energy spikes.

MC-0000452

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 33

Thus, there was no persuasive evidence of a Bipolar (manic-depressive) process. There was no evidence of a thought process disorder and no hallucinations.

Mr. Barnette tended to place his behavior in the best of light possible, and to see situations solely from his own point of view. For instance, he decided to kill himself but decided "the person who did the wrong (Robin) should pay, just as well as me. I am not going to be around. I am going to be dead, so it wouidn't matter." Also, he remarked that, after setting fire to Robin's apartment, he "realized that the man was shooting at me when I was in the right." He emphasized Mr. Greene's irresponsibility towards Robin (his belief) during the fire ("This asshole jumps out the window and leaves Robin inside. It made me mad because he was with her. He didn't care that she got hurt like she did."), while ignoring the central issue - that he himself set the fire.

At times, he described his offense behavior as being the result of his own personal distress. At the same time, he paid no heed to the distress or pain he caused other people. He claimed to have been suicidal, but his attempts have, at most, been ambivalent and half-hearted, even while "remorseful" for the deaths of two people, when he had the means of certain death - his shotgun - at hand.

**DIAGNOSIS AND PROGNOSIS:** The following diagnoses are given in accordance with the <u>Diagnostic and Statistical Manual, Forth Edition</u> (DSM-IV) by the American Psychiatric Association unless otherwise indicated:

AXIS    I:    V71.01  Adult Antisocial Behavior

AXIS    II:   301.83  Borderline Personality Disorder with
                       Antisocial and Narcissistic traits

AXIS   III:    No Relevant Diagnosis

AXIS   IV:     Problems Related to/and Interaction
               with the Legal System/Crime

AXIS    V:     GAF: 45 (current, unable to maintain study
                       employment and suicidal ideation)

MC-0000453

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 34

Personality disorders are defined by the DSM-IV as:
". . . enduring patterns of perceiving, relating to, and thinking about the environment and oneself that are exhibited in a wide range of social and personal contexts.  Only when personality traits are inflexible and maladaptive and cause significant functional impairment or subjective distress do they constitute Personality Disorders. . ."

Mr. Barnette's Borderline Personality Disorder features include:

(1)  frantic efforts to avoid real or imagined abandonment

(2)  impulsivity in at least two areas (multiple sexual partners and periodic alcohol abuse)

(3)  recurrent suicidal behavior, gestures, or threats

(4)  affective instability due to a marked reactivity of mood

(5)  inappropriate, intense anger or difficulty controlling anger

(6)  transient, stress-related paranoid thoughts

One needs to meet five (or more) of the nine features in order to meet the diagnostic criteria for Borderline Personality Disorder.

Mr. Barnette's Antisocial Personality traits include:

(1)  failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest

(2)  deceitfulness, as indicated by repeated lying (gleaned from interviews with past girlfriends)

(3)  impulsivity or failure to plan ahead

(4)  irritability and aggressiveness

(5)  reckless disregard for the safety of self or others

(6)  consistent irresponsibility, as indicated by repeated failure to sustain consistent work employment behavior or honor financial obligations

MC-0000454

(7) lack of remorse, as indicated by being indifferent to or
    rationalizing having hurt or mistreated another

The defendant meets all of the criteria (the above listed seven)
for Antisocial Personality Disorder. However, it was not clear
to these evaluators that Mr. Barnette also met an additional
criteria of displaying these symptoms "since the age of 15."
Therefore, a formal diagnosis of Antisocial Personality Disorder
was not made. Instead, antisocial personality traits were added
to the Borderline Personality Disorder diagnosis and a diagnosis
of Adult Antisocial Behavior was also given.

Although not a formal DSM-IV diagnosis, Robert Hare's construct
of psychopathy fits Mr. Barnette very well. When the Hare
Psychopathy Checklist – Revised (PCL-R) was scored, based on over
seven hours of interviews with the defendant, the defendant's
score was conservatively, 32. Dr. Hare's research indicates that
scores above 30 can easily be assessed as meeting his concept of
psychopathy. Mr. Barnette's scores on the PCL-R included a
maximum score of two in 13 of the 20 categories, a score of one
in six of the categories, and a score of 0 on the category of
juvenile delinquency. Significant collateral information was
unable to be gleaned concerning this area of the defendant's life
by these evaluators.

Mr. Barnette's Narcissistic Personality traits include:

(1) requires excessive admiration

(2) has a sense of entitlement

(3) is interpersonally exploitative

(4) lacks empathy

One would have to meet five of the nine criteria given in order
to make a diagnosis of Narcissistic Personality Disorder. The
defendant met four. Therefore, Narcissistic traits were added to
the diagnosis of Borderline Personality Disorder.

Prognosis of recovery from the disorders given is considered
poor. Personality disorders in general area extremely resistant
to change, in part, because the individual does not see that
he/she has a problem. Often they can verbally identify that a
problems exists, and may even say that they "need help."
However, this is almost exclusively after they have found that

MC-0000455

their behavior has placed their own future in peril and that by admitting that they have a problem, they may be able to avoid some, if not all of the responsibility of their past behavior. They also typically continue to blame others for their inappropriate behavior while at the same time, stating they need help. This often gives one the impression of insincerity on the part of the person with the personality disorder. This held true in Mr. Barnette's case. He reported that he never sought mental health treatment, despite the alleged urging of his mother and previous court requirements for him to do so. He stated that he never had the money to seek mental health treatment. When it was pointed out to the defendant that when his family lived on Wendover Road, he lived within walking distance of the Community Mental Health Center where he could have obtained services free of charge, the defendant casually dismissed this as a possibility.

Borderline, Antisocial, and Narcissistic Personality Disorders have traditionally been associated with aggression towards oneself or others. Psychopathy, as defined by Hare's PCL-R, is also a significant indicator of the possibility of future violence. Although specific future violent events are not able to be predicted reliably by mental health professionals, research has shown certain key indicators to be valuable in predicting the increase in likelihood of a person to act in a violent manner in the future. These are discussed below:

(1) Prior arrest for violent crime - Probability of future violence increases with each prior act of violence. It has often been shown in the research that the best predictor of future behavior is past behavior. Mr. Barnette has been arrested many times for his violent behavior. Information gathered from interviews of the defendant's past associates suggest that many of the defendant's acts of violence went unreported.

(2) Current age - The research demonstrates that there is a strong relationship between youth and criminal activity. Mr. Barnette is considered quit youthful at 24-years-of-age.

(3) Age at First Serious Offense - Chronic juvenile offenders are at greater risk of acting violently than those who committed their first serious offense at a later age. Mr. Barnette appears to have been 18 when he first shot a man resulting in misdemeanor charges.

MC-0000456

(4) Sex - Males are at a significantly higher risk than are males to act violently

(5) Race - According to the research, African-Americans are at a higher risk than other races to act violently

(6) Socioeconomic status and employment stability - Based on available information at the time of this writing, Mr. Barnette's SES appears to have been below average when he was growing up. This was especially true from the time his father left the household. The defendant's adult SES at the time of his arrest would be classified as below average. He has had sporadic employment as a young adult. Lower SES and job instability are associated with a higher incidence of crime.

(7) Opiate and alcohol abuse - Abusers are at higher risk than non-abusers to act violently. The defendant clearly reported his abuse of alcohol as a way to cope with stressful situations.

(8) Family environment - A stable, supportive family environment is associated with relatively lower risk. The defendant describes his mother as stable in her employment and loving in her demeanor. He also described her as a dysfunctional alcoholic who was often drunk to the point of stumbling. Mr. Barnette reported that he has little contact with his natural father. Unfortunately, neither of these individuals elected to talk to these evaluators about their experience with the defendant. Therefore, these evaluators would have to conclude, based on the defendant's self-description, that his family environment is less than optimal.

(9) Peer environment - High risk of future violent offenses is associated with "bad company." These evaluators were unable to glean any independent information about the males that the defendant saw as peers. He tended to get involved with under-aged females or females who perhaps did not have a history of a stable male figure in their lives.

(10) Availability of victims - The defendant's victims typically are the females that he has dated. However, he does show a broader range of victims with the children that he "whipped" with a coat hanger, the male that he shot in Georgia, and more significantly, the Charlotte, North Carolina male victim whom he shot at a range of "less than five feet"

MC-0000457

US v. AQUILIA BARNETTE
DOCKET NUMBER: 3:97CR23-P
PAGE 38

because, in the defendant's own words, "If I don't stop this guy, he's going to stop me from getting to Virginia."

(11) Availability of alcohol or weapons - Risk of violence increases with heavy drinking and access to weapons. To the extent that the defendant has available to him either of these items (both are commonly obtained in some fashion in penal environments), his risk of violent acting out will increase.

**DEFENDANT'S IMPAIRED CAPACITY AT OR AROUND THE TIME OF THE OFFENSE:** The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was not significantly impaired at or around the time of the offenses in question.

**DEFENDANT'S LEVEL OF DURESS AT OR AROUND THE TIME OF THE OFFENSE:** The defendant was not under unusual and substantial duress at or around the time of the offenses in question.

**RELEVANT PSYCHOLOGICAL ISSUES CONCERNING THE DEFENDANT'S CRIMINAL HISTORY:** The defendant has a history of criminal acts of violence and control of others, mostly women. He is psychologically manipulative and controlling and will often resort to deceit when he feels that it is to his advantage to do so. However, he also has a history of acting violently toward anyone that he perceives as doing an injustice to him. Additionally, he has acted violently toward innocent individuals if the violence served his own means.

**THE DEFENDANT'S LEVEL OF DISTURBANCE AT OR AROUND THE TIME OF THE OFFENSE:** The defendant did not commit the criminal behavior in question while under the effects of a severe mental or emotional disturbance.

**OTHER MITIGATING PSYCHOLOGICAL FACTORS:** Although the defendant reported that his father was "abusive", his report of being "whipped" did not appear to be consistent with a pattern of severe physical abuse which often occurs for no apparent reason. Mr. Barnette reported that he would be physically punished for getting onto fights at school, getting bad grades, not obeying rules, and the like. Despite stating that he "feared" his father, he also reported defying his father and playing his father against his mother. If one considers Mr. Barnette's early punishments at the hands of his father as abusive, the abuse would certainly not be described as severe or necessarily out of

MC-0000458

the ordinary for many people who grow-up to lead very productive lives. The same can be said about the reported alcohol abuse by the defendant's mother.

**AGGRAVATING FACTORS AFFECTING THE DEATH DURING THE COMMISSION OF ANOTHER CRIME:** Mr. Barnette stated that he desired to have Robin take him to Benny Greene's house so that he could effect revenge on Mr. Greene. In the minds of these evaluators, this would have constituted a hostage situation and kidnaping of Robin Williams.

**PSYCHOLOGICAL FACTORS PERTAINING TO SUBSTANTIAL PLANNING AND PREMEDITATION:** Mr. Barnette displayed substantial ability and state of mind in planning the murder of Robin Williams. Although Mr. Allen was not a specific target, psychologically, his murder was a means to an end for the defendant, as he reported the events to these examiners.

**PSYCHOLOGICAL FACTORS AFFECTING THE VULNERABILITY OF THE VICTIM:** Robin Williams had been previously terrorized prior to her murder by the defendant. Her apartment had been burned and she had been hospitalized, having to undergo skin grafting. There is room for the inference that she was in fear of Mr. Barnette and subject to panic upon observing him armed and chasing her, knowing that he had previously shot his way into her home.

Scott A. Duncan, Psy.D.
Diplomate, American Board of Forensic Examiners
Diplomate, American Board of Forensic Medicine
Forensic Studies Coordinator
United States Penitentiary
Atlanta, Georgia

William H. Grant, M.D.
Certified by the American Board of Psychiatry
Certified by the American Board of Forensic Psychiatry
Certified by the American Board of Psychiatry with Added
Qualifications in Forensic Psychiatry
Chief of Psychiatry
United States Penitentiary
Atlanta, Georgia

MC-0000459

# STATE COURT OF DEKALB COUNTY
## GEORGIA, DEKALB COUNTY

90CU66694

The State
vs.

CRIMINAL ACTION NO. _____ I A

OFFENSE(S) _____ BATTERY

_____ KEITH FURLOW _____

_____ TERM, 19____

☐ PLEA:
- ☐ NEGOTIATED
- ☐ GUILTY ON COUNT(S) _____
- ☐ NOLO CONTENDERE ON COUNT(S) _____

☐ VERDICT:
- ☐ JURY
- ☐ NON-JURY
- ☐ GUILTY ON COUNT(S) _____
- ☐ NOT GUILTY ON COUNT(S) _____

☐ OTHER DISPOSITION
- ☐ NOLLE PROSEQUI ORDER ON COUNT(S) _____
- ☐ DEAD DOCKET ORDER ON COUNT(S) _____

## IT IS CONSIDERED, ORDERED AND ADJUDGED BY THE COURT:

1. That defendant shall pay a fine of $ _____ 300 _____ , and $ _____ 30 _____ as provided by Ga. Law 1983, p. 1094, and $ _____ 30 _____ as provided by Ga. Law 1989, p. 1753, and restitution of $ _____ and shall remain in the custody of the Sheriff of this County until said sums are paid.

2. That the defendant is hereby sentenced to confinement for a period of _____ 12 _____ ( ) hours, ( ) days, ( ) months in the DeKalb County Jail, or in such other place as defendant may be lawfully confined:

## PROVIDED THAT:

( ✓ ) 1. The sentence of confinement shall be suspended upon payment in full of any fine and restitution imposed in this case, on the condition that defendant shall; (A) Not violate the criminal laws of any governmental unit; (B) Avoid injurious and vicious habits-especially alcoholic intoxication and narcotics and other dangerous drugs unless prescribed lawfully; (C) Avoid persons or places of disreputable or harmful character; (D) Report to the Probation Officer as directed and permit each Officer to visit him at home or elsewhere; (E) Work faithfully at suitable employment insofar as may be possible; (F) Not change his (her) present place of abode, move outside the jurisdiction of the Court, or leave the State for any period of time without prior permission of the Probation Supervisor; (G) Support his (her) legal dependants to the best of his (her) ability.

( ✓ ) 2. Payment in full by defendant of the fine and cost of $ _____ 360 _____ , and restitution in the amount of $ _____ shall be a condition precedent to the terms of probation, and further that the defendant shall at all times furnish all information required by the Probation Officer.

( ✓ ) 3. Defendant is to serve _____ ( ) hours, ( ) days, ( ) months in this sentence in confinement and may serve the remaining _____ 12 _____ ( ) hours, ( ) days, ( ✓ ) months on probation.

( ) 4. As an alternative to confinement, the defendant may perform _____ ( ) hours, ( ) days of community service at times and places to be specified by the Probation Office.

( ) 5. Defendant's term of confinement will be served at the ( ) DeKalb County Jail, or _____ other facility

beginning _____ and ending _____ .

( ) 6. Other terms of sentence.

NON-REPORTING PROBATION UPON COMPLETION OF ALL REQUIREMENTS.

_Stay away from Natasha Heard_
_Pay thru phon_

## NOTICE

The defendant is hereby advised that the Court may, at any time, revoke any conditions of this probation and/or discharge the defendant from probation. The probationer shall be subject to arrest for violation of any condition of probation herein granted. If such probation is revoked, the Court may order the execution of the sentence which was originally imposed or any portion thereon in the manner provided by law after deducting the amount of time the defendant has served on probation.

So Ordered this _____ 6 _____ day of _____ August _____ , 19 _____ 90 _____

_Jack B. Smith_
Judge, State Court of DeKalb County

Certificate of Service: I have this day served the defendant with the above sentence _____

_M. Nicholson_
Deputy Clerk

ORIGINAL

PC-005096

IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA

DEFENDANT _Keith Furlow_          CASE NUMBER(S) _90C666694_

RECORD OF DEFENDANT PRIOR TO ENTERING PLEA

The Defendant in this case, being duly sworn, states as follows:

I am not under the influence of alcohol or drugs and I am not suffering from any mental or physical disability.

I have been advised of the nature of the charge against me, the maximum and minimum punishment provided by law and my right to be represented by a private attorney, or by a public defender, if I am eligible.

I understand that by entering a plea of guilty or nolo contendere that I waive:

The right to trial by jury;
The presumption of innocence;
The right to confront witnesses against me;
The right to subpoena witnesses;
The right to testify and to offer other evidence;
The right to assistance of counsel during trial; and
The right not to incriminate myself.

I also understand that by pleading not guilty I will obtain a jury/bench trial. If I choose to remain silent and not enter a plea, a plea of not guilty will be entered on my behalf and I will obtain a jury trial.

I now desire to enter my plea of _Guilty_ to the charge against me. It is free and voluntary. I have not been told what sentence will be imposed. No promises or threats have been made to me by any District Attorney, Solicitor, Lawyer, Policeman or other person to induce me to enter this plea.

I understand that if I am placed on non-reporting or reporting probation, I cannot violate any criminal laws of any governmental unit or any special conditions of probation without being subject to revocation for the balance of the sentence.

I hereby acknowledge/waive receipt of a copy of the accusation in the above-styled case. I swear under penalties of perjury that these statements are true.

X _____     X _____
    DEFENDANT                         DATE


_____           _____
ATTORNEY                               DATE

_Debra J. Blum_
SOLICITOR

I have satisfied myself that this defendant's plea is free and voluntary and that he is in possession of his faculties and is able to understand the nature and consequence of his plea.

This _6_ day of _Aug_ , 19_90_.

_____
JUDGE. STATE COURT OF DEKALB COUNTY

PC - 005097

**STATE OF GEORGIA, DEKALB COUNTY**

**IN THE STATE COURT OF DEKALB COUNTY**

I, RALPH BOWDEN, the undersigned prosecuting attorney for DeKalb County, and the State of Georgia, do hereby charge that ___KEITH FURLOW___ on the ___31st___ day of ___OCTOBER___, 19 89, in DeKalb County, State of Georgia, committed the offense of BATTERY by intentionally causing substantial physical harm to NATASHIA HEARD by GRABBING NATASHIA HEARD, FORCING HER TO THE GROUND AND INJURING HER NOSE AND EYE in violation of O.C.G.A.§16-5-23.1,

contrary to the laws of this State, the good order, peace and dignity thereof.

RALPH BOWDEN
RALPH BOWDEN, Solicitor

DATE: ___JULY 19, 1990___

FILED: ___7-23-90___ _AA_

PC - 005098

STATE COURT OF DEKALB COUNTY

Case Number _____ I A _____ 90C066694

STATE OF GEORGIA

VS.

KEITH FURLOW
Defendant

BATTERY

The Defendant hereby waives formal arraignment and Jury Trial and pleads

guilty.

This 6th day of Aug , 19 90 .

X _____     _____
(Defendant)                      (Defendant's Attorney)

STATE COURT OF DEKALB COUNTY, GEORGIA

RALPH BOWDEN, SOLICITOR

STATE'S WITNESSES

Josephine Heard
6256 Hillandale Drive # 208
Lithonia, Ga. 30058

PC - 005099

IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA

STATE OF GEORGIA                    :
VS.                                 :        ACCUSATION NO.
Keith Furlow                        :        CHARGE(S): Battery

STATE'S RECOMMENDATION ON SENTENCING

Comes now the Solicitor's Office as the duly authorized representative of the people of this State and in particular the citizens of DeKalb County and makes this sentence recommendation:

( ) Pay a reasonable fine. (L) Pay a fine in the amount of 300⁰⁰ .

( ) Serve _____ in custody. ( ) Restitution is _____ .

(L) Serve 12 mos. on reporting probation.

( ) Perform _____ of community service as a condition of probation.

( ) Undergo alcohol/drug/psychiatric treatment as recommended by the Probation Office as a condition of probation.

( ) This case involves domestic violence, and in lieu of jail, the defendant should attend the 16 week counseling program, and pay program costs and fees and avoid violent contact with the victim during the term of probation.

( ) The Defendant having been charged with shoplifting, the following minimum and maximum sentences should be considered:

|  | 1st Offense | 2nd Offense | 3rd Offense |
|---|---|---|---|
| Theft by Shoplifting §16-8-14 | General Misdemeanor | Min. fine $250 | Min. 30 days to serve |

( ) Under authority of Garrett v. State, 175 Ga. App. 400(1985), a restitution hearing should be scheduled.
( ) The defendant has a criminal record which includes convictions for _____
_____
_____

( ) Additional information regarding this case:
_____
_____
_____

WHEREFORE, the State makes this its recommendation as to the sentence this Defendant should receive.

This 6th day of July , 19 90

_____
ASSISTANT SOLICITOR

PC-005100

STATE COURT BOND

# GEORGIA, DeKalb County

KNOW ALL MEN BY THESE PRESENTS:

THAT WE _Keith Furlow_ principal,

and _C & F BONDING CO._

Securities, are held and firmly bound unto His Excellency, _JOE FRANK HARRIS_

Governor of said State and his successors in office in the penal sum of _____

_1150.00_ Dollars, for the true payment whereof we find ourselves, our heirs, executors and administrators, jointly and severally, firmly bound by these presents.

Signed with our hands, sealed with our seals, and dated _January 16_ , 19_90_

THE CONDITIONS OF THE ABOVE OBLIGATIONS ARE SUCH, that if the above bound _____

_Keith Furlow_ shall personally be and appear at the

State Court of Said County to be held on the _2_ day of _April_ , 19_90_

at _9:30_ (a.m - p.m.) then and there and from day to day, from term to term, to answer to an accusation

for the offense of _Battery_ , then the above obligation to be null and void, else to remain in full force and virtue. And the better to secure the payment of this bond, in the event of forfeiture, we each, for ourselves and families, and as the head of our respective families, renounce and waive all right and benefit of the homestead and exemption laws of this State, whether the same be guaranteed by constitutional or legislative provisions providing for homestead and exemptions to the people of Georgia, and each of us assert and say that we have never taken or availed ourselves of any homestead or exemption under the laws of this State, or of the United States or elsewhere.

Approved by:

_____ Sheriff

X _J. Keith Furlow_ (L.S.)

_____ Deputy Sheriff

ADDRESS: _2573 Worth View Ave_

_Decatur GA. 30032_

C & F BONDING CO. _286-1736_

GEORGIA, DEKALB COUNTY

BEFORE ME IN PERSON CAME _____

who being sworn deposes and says, that he is security on the within bond; that he owns in his own right and

name, unincumbered by Mortgage, Lien or Judgment, real estate lying in said County, of the value of _____

_1150.00_ Dollars, the amount of said Bond, over and above the sum of FIVE THOUSAND DOLLARS, which may be claimed as exempt from levy and sale for debts under the Constitution and laws of this State, and all debts and other liabilities.

Sworn to and signed before me this _16_ day of _January_ , 19_90_

_____ (L.S.)

_____ Sheriff

_Diane Chase_ (L.S.)

_____ Deputy Sheriff

ADDRESS: C & F BONDING CO.

_____ GEORGIA _____ ZIP

UPON FAILURE TO APPEAR YOUR BOND WILL BE FORFEITED, AND A BENCH WARRANT WILL BE ISSUED FOR YOUR RE-ARREST.

PC - 005101

Case 3:12-cv-00327-MOC    Document 77-14    Filed 12/22/14    Page 53 of 100

Bates No. 14227

50063571
Furlow Keith L.

Docket No. _____ Page _____

(Security) C & F BONDING CO.

No. _____

# Criminal Bond
# STATE COURT
# OF DeKALB COUNTY

April 2 _____ Term, 19 90

CHARGE

Battery

_____ 1150.00 _____ Dollars

Bond Taken and Approved by _____

_____ Deputy Sheriff

January 16 _____ , 19 90

PC - 005102

STATE OF GEORGIA, DEKALB COUNTY:

Personally appeared the undersigned prosecutor, who being sworn on oath says that to the best of prosecutor's knowledge and belief, the defendant herein, **Keith Furlow**, at **12:30** p.m. on the **31st** day of **October**, 198**9**, in DeKalb County, Georgia, did commit the offense of BATTERY (O.C.G.A. §16-5-23)MISDEMEANOR/FELONY at **6256 Hillandale Dh. #208, Lithonia**, DeKalb County, Georgia, for that defendant did INTENTIONALLY CAUSE 1. substantial physical harm by: **grabbed Natashia Heard, forced her to the floor** or, 2. visible bodily harm, to wit: substantially (blackened eyes,) substantially swollen lips or other facial or body parts, substantial bruises to body parts, or other: **trauma to the eye and injured nose** in violation of O.C.G.A. Sec. **16-5-23.1**, and prosecutor makes this affidavit that a warrant may issue for defendant's arrest.

X **Josephine Heard**
PROSECUTOR

Sworn to and subscribed before me this **3** day of **November**, 198**9**

**Connie White**
Judge, Magistrate Court of DeKalb County
**Deputy Clerk**

DKSO

STATE OF GEORGIA, DEKALB COUNTY
To the Chief of Police of DeKalb County, any Policeman thereof, and to any Sheriff, Deputy Sheriff, Coroner, Constable, Marshall, Law Enforcement Officer of Said State, authorized to execute warrants, GREETING:

For sufficient cause made known to me in the above affidavit, incorporated by reference herein, and other sworn testimony said establishing probable cause for arrest of the accused you are hereby commanded to arrest the defendant named in the foregoing affidavit charged by the prosecutor therein with the offense against the laws of this State named in said affidavit and bring him before me or some other Judicial officer of this State to be dealt with as the law directs. HEREIN FAIL NOT.

This **3** day of **November**, 198**9**.

Judge, Magistrate Court of DeKalb County

---

Date: _____, 198__
Time: ___ a.m. ___ p.m.
Place: Room 132, Magistrate Court
Please Subpoena: _____
_____
_____
_____
_____

Remarks: _____

Defense Counsel: _____
Address: _____
Phone: _____
Appoint Public Defender: Yes ( ) No ( )
Date: _____
Judge: _____
Tape No. _____

---

**No. 299147**

MAGISTRATE COURT
DEKALB COUNTY, GEORGIA

THE STATE
vs.
**Keith Furlow**

| Race | Age | Sex | Ht. | Wt. |
|------|-----|-----|-----|-----|
| B | 19 | M | 6'0" | 130 |

| Hair | DOB | SS# |
|------|-----|-----|
| | | |

Auto _____ Tag _____

Address Home **2573 Northview Ave Decatur, Ga. 30032**

Work _____

Bond: _____
Charge: BATTERY **$1,000**
(Misdemeanor/) Felony
O.C.G.A. Sec. **16-5-23.1**
Prosecutor: **Josephine Heard**
Agent for: _____
Address: **6256 Hillandale Dr #208 Lithonia, Ga 30058**
Phone: **593-8182**
Attorney: _____
Phone: _____

PC - 005103

# WAIVER OF PRELIMINARY HEARING

I have been informed of my right to a hearing before a court of inquiry to examine into probable cause for the accusation against me for the offense(s) of _____

as stated in the affidavit of _____

in state arrest warrant number(s) _____ issued by _____

on the _____ day of _____, 19___ .

I fully understand the purpose of a preliminary hearing and do not desire such hearing and hereby freely and voluntarily waive said hearing. It is my understanding that my signing this waiver in no manner indicates whether I am guilty or not guilty of the offense charged.

This _____ day of _____, 19___ .

_____
**DEFENDANT**

I explained the defendant's rights to a hearing and witnessed him (her) sign this waiver.

This _____ day of _____, 198___

_____
**MAGISTRATE**, DeKalb County, Georgia

---

**GEORGIA, DEKALB COUNTY**

After hearing evidence the warrant is dismissed

_____

_____

This _____ day of _____,

198___ .

_____
Judge, Magistrate Court of DeKalb County

**GEORGIA, DEKALB COUNTY**

After hearing evidence the accused is discharged

_____

_____

This _____ day of _____.

198___ .

_____
Judge, Magistrate Court of DeKalb County

**GEORGIA, DEKALB COUNTY**

After hearing evidence (Upon ~~waiver of hearing by defendant~~), it is ordered that defendant give bond of

$ Same

for defendant's appearance at the Superior/State Court of DeKalb County to answer to the charge(s)

of _____ battery 16-5-23.1

or in default that defendant be committed to the common jail of DeKalb County.

This _____ day of 5/18/90 ,

198___ .

_____
Judge, Magistrate Court of DeKalb County

Tape Number _____

---

Warrant Executed on _____ day of _____ 19___ at _____ m. by

_____
Arresting Officer

PC - 005104

# IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

The State of Georgia

vs.

*Keith Finlaw*
_____
Defendant

Case No. 95C0394/82

Charge: *Simple Battery*

## NOLLE PROSEQUI

Upon the motion of the undersigned assistant solicitor, the above styled case is herby nolle prosequi:

( )   for failure of prosecuting witness to appear at trial after notice to appear.

( )   for insufficient evidence to prove quilt beyond a reasonable doubt.

( )   at the request of the prosecuting witness whose signature is affixed hereto.

_____
Signature

*The defendant agrees not to have any violent contact with the victim Tracy Finlaw. The victim has indicated there have been no further problems with the defendant. As a result, the state will not proceed at this time, but may reactivate the case if violent contact occurs.*

So Moved This 30th day of *August* 19 95

*Lawrence Delan*
Assistant Solicitor

Approved This The 30 day of *AUG* 19__

KENNETH CREEK, CLERK
STATE COURT OF
DEKALB COUNTY, GA.
AUG 30 1995
FILED

nolpros

_____
Judge State Court of DeKalb County

PC - 005087

*my me av may reach your case the week of august 28th then you return on the date below.*

**IN THE STATE COURT OF DEKALB COUNTY**
**STATE OF GEORGIA**

DEFENDANT ___Keith Furlow, Sr.___     CASE NO. ___95C 39482-VB___

OFFENSE(S) ___Simple Battery___

I hereby (acknowledge) (waive) arraignment.

I hereby acknowledge that I have been notified of my constitutional and legal rights, including the right to counsel, and appointed counsel if necessary.

I hereby plead **NOT GUILTY.**

I hereby acknowledge that I have been notified to return to this Court, ready for (NON-JURY) (JURY) Trial

at: ___9:00___ (a.m.) p.m., on the ___15th___ day of ___September___, 19 ___95___.

**REPORT TO ROOM ___305-A___ ON THE ___3rd___ FLOOR OF THE DEKALB COUNTY COURTHOUSE, 556 N. McDONOUGH STREET, DECATUR, GA.**

OR

You are hereby notified to return to the State Court of DeKalb County for a: **HEARING / ARRAIGNMENT** at:

_____ a.m./ p.m., on the _____ day of _____, 19 ____.

**REPORT TO ROOM _____ ON THE _____ FLOOR OF THE DEKALB COUNTY COURTHOUSE, 556 N. McDONOUGH STREET, DECATUR, GA.**

I understand that if I fail to appear at the above time and date, my bond may be forfeited, a bench warrant will be issued for my arrest and I may be charged with the additional offense of BOND JUMPING, which is a misdemeanor.

**NO FURTHER NOTICE WILL BE PROVIDED BY THIS COURT.**

This ___18th___ day of ___August___, 19 ___95___.

___Roderick Keith Furlow___
Defendant

___2099 Hilton Dr___
Address

___Decatur___  ___GA.___  ___30035___
City        State        Zip

___(404) 286-1756 Beeper 245-2685___
Telephone Number

FILED IN THIS OFFICE
THIS ___ DAY OF ___ 19 ___
Clerk, State Court, Dekalb County

_____
Attorney

Witness: _____

_____
Clerk or Solicitor

---

**FOR COURT USE ONLY:** Referred:     Public Defender ___ / APO ___ / Solicitor ___ / Other ___ /

Copy of Accusation given to:     Defendant ___ /     Attorney ___ /

REC-ARR

PC - 005088

# IN THE STATE COURT OF DEKALB COUNTY
## STATE OF GEORGIA

DEFENDANT Keith Furlow          CASE NO. 95 C 39482

OFFENSE(S) Simple BATTERY

I hereby (acknowledge) (waive) arraignment.

I hereby acknowledge that I have been notified of my constitutional and legal rights, including the right to counsel, and appointed counsel if necessary.

I hereby plead **NOT GUILTY.**

I hereby acknowledge that I have been notified to return to this Court, ready for   (NON-JURY) (JURY) Trial

at: 9:00 (a.m.) p.m., on the 18th day of August , 19 95

**REPORT TO ROOM** 305-A **ON THE** 3rd **FLOOR OF THE DEKALB COUNTY COURTHOUSE, 556 N. McDONOUGH STREET, DECATUR, GA.**

OR

You are hereby notified to return to the State Court of DeKalb County for a: **HEARING/ ARRAIGNMENT** at:

_____ a.m./ p.m., on the _____ day of _____ , 19 ____ .

**REPORT TO ROOM** _____ **ON THE** _____ **FLOOR OF THE DEKALB COUNTY COURTHOUSE, 556 N. McDONOUGH STREET, DECATUR, GA**

I understand that if I fail to appear at the above time and date, my bond may be forfeited, a bench warrant will be issued for my arrest and I may be charged with the additional offense of BOND JUMPING, which is a misdemeanor.

### NO FURTHER NOTICE WILL BE PROVIDED BY THIS COURT.

This 6th day of July , 19 95 .

Keith Furlow SR
Defendant

3890 East Ponce de Leon C.6
Address

Clarkton          G.A.     30021
City          State          Zip

(404) 308-8202
Telephone Number

_____
Attorney

Witness:

_____
Clerk or Solicitor

JUL -6 1995

**FOR COURT USE ONLY:** Referred:     Public Defender ___ / APO ___ / Solicitor ___ / Other ___ /

Copy of Accusation given to:          Defendant ___ /     Attorney ___ /

REC-ARR

PC - 005089

Case 3:12-cv-00327-MOC     Document 77-14233 Filed 12/22/14     Page 59 of 100

Bates No. 14233

Case Number _____ VB

STATE OF GEORGIA

vs.

95C039482

KEITH LODERICK FURLOW, SR.
Defendant

SIMPLE BATTERY

The Defendant hereby waives formal arraignment and Jury Trial and pleads

_____.

This _____ day of _____, 19____.


(Defendant)                        (Defendant's Attorney)


STATE COURT OF DEKALB COUNTY, GEORGIA

RALPH BOWDEN, SOLICITOR


STATE'S WITNESSES

95-094202
W.D. HARVEY - DKPD #1239

TRACIE FURLOW - 3890 E PONCE DE LEON AVE, APT C-6, CLARKSTON, GA

PC - 005090

IN THE STATE COURT OF DEKALB COUNTY

I, RALPH BOWDEN, the undersigned prosecuting attorney for DeKalb County, and the State of Georgia, do hereby charge that KEITH LODERICK FURLOW, SR. on the 14TH day of MARCH , 19 95, in DeKalb County, State of Georgia, committed the offense of SIMPLE BATTERY by intentionally making contact of an insulting and provoking nature with TRACY FURLOW by SLAPPING HER _____ in violation of O.C.G.A. §16-5-23,

contrary to the laws of this State, the good order, peace and dignity thereof.

                                    RALPH BOWDEN Bw
                                    RALPH BOWDEN, Solicitor

                                    DATE: JUNE 23, 1995
                                    FILED: 6/23/95 DC

PC - 005091

STATE COURT BOND

# GEORGIA, DeKalb County

KNOW ALL MEN BY THESE PRESENTS:

THAT WE _Roderick Keith Furlow_ principal,

and _____ **ATLANTA DeKALB BONDING CO.**

Securities, are held and firmly bound unto His Excellency, _ZELL MILLER_

Governor of said State and his successors in office in the penal sum of _600⁰⁰_

_____ Dollars, for the true payment whereof we find ourselves, our heirs, executors and administrators, jointly and severally, firmly bound by these presents.

Signed with our hands, sealed with our seals, and dated _3-15_ , 19_95_

THE CONDITIONS OF THE ABOVE OBLIGATIONS ARE SUCH, that if the above bound _Roderick Keith Furlow_ shall personally be and appear at the

State Court of Said County to be held on the _7_ day of _June_ , 19_95_ at _9:00_ (a.m. - p.m.) then and there and from day to day, from term to term, to answer to an accusation

for the offense of _Simple Battery_ , then the above obligation to be null and void, else to remain in full force and virtue. And the better to secure the payment of this bond, in the event of forfeiture, we each, for ourselves and families, and as the head of our respective families, renounce and waive all right and benefit of the homestead and exemption laws of this State, whether the same be guaranteed by constitutional or legislative provisions providing for homestead and exemptions to the people of Georgia, and each of us assert and say that we have never taken or availed ourselves of any homestead or exemption under the laws of this State, or of the United States or elsewhere.

Approved by:

_____ _Robert Patrick Jr._
                            **Sheriff**

_____ _S Ryan_
                            **Deputy Sheriff**

X _Roderick K Furlow_ (L.S.)

ADDRESS: _3890 E Ponce De Leon_

_Clarkston GA 30021 C-6_

GEORGIA, DEKALB COUNTY

**ATLANTA DeKALB BONDING CO.**

BEFORE ME IN PERSON CAME _____

who being sworn deposes and says, that he is security on the within bond; that he owns in his own right and

name, unincumbered by Mortgage, Lien or Judgment, real estate lying in said County, of the value of _____

_600⁰⁰_ Dollars, the amount of said Bond, over and above the sum of FIVE THOUSAND DOLLARS, which may be claimed as exempt from levy and sale for debts under the Constitution and laws of this State, and all debts and other liabilities.

Sworn to and signed before me this _15_ day of _March_ , 19_95_

_Robert Patrick Jam_
_____
                            **Sheriff**

_S Ryan_
_____
                            **Deputy Sheriff**

_____ (L.S.)

_Barbara Martin_ (L.S.)
                            **ATLANTA DeKALB BONDING CO.**
ADDRESS: _____

_____ GEORGIA _____ ZIP

UPON FAILURE TO APPEAR YOUR BOND WILL BE FORFEITED, AND A BENCH WARRANT WILL BE ISSUED FOR YOUR RE-ARREST.

PC - 005092

Bates No. 14236

June 500168700

90C66694

Furlow, Loderick Keith

_____

Docket No. _____ Page _____

_____

(Security) _____ ATLANTA DeKALB BONDING CO. _____

No. _____

# Criminal Bond
# STATE COURT
# OF <u>DeKALB</u> COUNTY

*6 - 7* _____ Term, 19*95*

_____

CHARGE

*Simple Battery*

_____

_____

*600⁰⁰* _____ Dollars

Bond Taken and Approved by _____

*SRyan* _____ Deputy Sheriff

*3 - 15* _____ , 19 *95*

_____

PC - 005093

## AFFIDAVIT FOR ISSUANCE OF CRIMINAL WARRANT

IN THE STATE OF GEORGIA, COUNTY OF DEKALB, personally appeared the undersigned Prosecutor, who, being sworn under oath or, who, under affirmation, says that, to the best of Prosecutor's knowledge and belief, Defendant **Loderick K. Furlow, Sr.** at **8:00 p** M./hours on the **14** day of **March**, 1995, at **3890 E. Ponce de Leon Ave C-6**, DeKalb County, Ga., did commit the criminal offense of SIMPLE BATTERY, for that Defendant intentionally ☒ caused physical harm to **Tracie S. Furlow** by **hitting in face, dragging across floor**; ☐ made physical contact of an insulting or provoking nature with the person of another, to wit., _____ by _____, in violation of OCGA 16-5-23, and Prosecutor makes this Affidavit in order that a criminal warrant may issue for Defendant's arrest.

Sworn to and subscribed to before me
this **14** day of **March**, 1995

**Tracie S. Furlow**
PROSECUTOR

OFC. NAME & PH. NO. **DK 80**

**95-094202**

~~Judge~~ or Clerk, Magistrate Court of DeKalb County

## CRIMINAL WARRANT FOR ARREST

STATE OF GEORGIA, COUNTY OF DEKALB: To the Chief of Police and Sheriff of DeKalb County, any law enforcement officer thereof and to any Sheriff, Deputy Sheriff, Coroner, Constable, Marshal or law enforcement officer of the State of Georgia authorized to execute warrants, GREETINGS: For sufficient cause made known to me in the above Affidavit, incorporated by reference herein, and other sworn or affirmed testimony establishing probable cause for the arrest of the Defendant named in the foregoing Affidavit, you are hereby commanded to arrest said Defendant charged by the Prosecutor therein with the offense against the laws of this State named in said Affidavit and bring him or her before me or some other judicial officer of this State to be dealt with as the law directs. HEREIN FAIL NOT.

THIS **14** day of **March**, 1995

**AR Claxton**
JUDGE, Magistrate Court of DeKalb County

MAGISTRATE COURT OF DEKALB COUNTY

Criminal Warrant No. **95W20062**

THE STATE v. **Loderick Keith Furlow, Sr.**

CHARGE: SIMPLE BATTERY  [16-5-23] [M]

Race: **BLK** Age: **24** Sex: **M** Ht: **180**

Hair: **BLK** D/O/B: **8/11/70** Wt: **6'2"**

SocSec: **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**

Home: **3890 E. Ponce de Leon Ave. Apt. C-6 Clarkston, GA 30021**

Work: _____

BOND $ _____  BRING FOR BOND

Spec cond: _____

►► ___ see attached S/C form ■ JDG: _____

*ARRESTED* (stamp)

Prosecutor: **Tracie S. Furlow**

Agent for: **self**

Address: **3890 E. Ponce de Leon Ave. Apt C-6 Clarkston, GA 30021**

Phone: **508-8202**

10/93 SB

DVC

PC - 005094

# MAGISTRATE COURT OF DEKALB COUNTY

## DEFENDANT'S WAIVER

I hereby waive and relinquish my right to a committal hearing in this criminal matter pending against me. I have been advised of the charges and allegations, of the warrant issuing date and number.

I have been neither threatened nor promised reward in exchange for this waiver. I am not under the influence of alcohol or drugs. I understand the rights I am giving up and the rights I am preserving.

_____     _____
Date                                Defendant

☐ I am satisfied that Defendant's Waiver was given freely and voluntarily and bind over this case at the same bond [or see bond below] on the charge(s) as stated on the reverse side of this page.

New bond: $ _____ ; ►► _____ See attached S/C Form

Special Condition: _____

_____

THIS _____ day of _____, 1995

_____
Judge, Magistrate Court of DeKalb County

PC

SUBPOENA: ☐ PROSECUTOR  ☐ OFC. _____

## COMMITTAL HEARING DISPOSITION

☐ This case is bound over at the same bond on the stated charge upon Defendant's waiver by

_____ Failure to appear

_____ Attorney: _____

☐ This case is dismissed.

☐ Upon presentation of evidence, this case is bound over at the same bond [or see bond below]

_____ on the stated charge

_____ on the felony charge of _____

_____ [OCGA _____]

_____ on the misdemeanor charge of _____

_____ [OCGA _____]

New bond: $ _____ ; ►► _____ See attached S/ C form

Special Condition: _____

_____

THIS _____ day of _____, 1995

_____
Judge, Magistrate Court of DeKalb County

Tape Number[s] _____     PC - 005095

Case 3:12-cv-00327-MOC     Document 77-14     Filed 12/22/14     Page 65 of 100

Bates No. 14239

# SEYMOUR L. HALLECK, M.D.
## 500 Laurel Hill Road
## Chapel Hill, NC 27514

Forensic Psychiatry          Phone: (919) 967-7999
                             Fax: (919) 929-0709

December 30, 1997

*Via Fax (704-372-0181) and US Mail*

Mr. Paul J. Williams
Attorney at Law
Suite 801
Cameron Brown Building
801 S. McDowell Street
Charlotte, NC  26024

Re:  Aquilia Marcivicci Barnette

Dear Mr. Williams:

        This is a summary of my findings concerning Aquilia Marcivicci Barnette.  As you know, he is a 25 year old Black male who is facing two charges of capital murder.  My report is based upon four visits with him on July 28, 1997,   September 16, 1997, November 24, 1997 and December 18, 1997.  My total interview time with Mr. Barnette was approximately 13 hours.  In addition, I reviewed Mr. Barnette's medical records, school records, employment records, material prepared by your mitigation expert, autobiographical material prepared by Mr. Barnette, and the reports of two previous psychological examinations performed by Drs. Tyson and Warren.

**Relevent Past History**

        At the time of his birth,  on July 7, 1973, the subject's mother was 14 years old and the man who was assumed to be his father was 16 years old.  His mother and father saw each other frequently when Mr. Barnette was an infant, but they did not get married until he was approximately 2½ years old.  Some of the subject's rearing was left to the grandparents, but, unfortunately, Mr. Barnette's maternal grandmother was killed by her boyfriend when Mr. Barnette was 14 months old.  When he was approximately four years old his paternal grandmother died suddenly and there was suspicion that she had been poisoned.

        In his pre-school years, Mr. Barnette's rearing was left to his mother, his mother's older sibling, to a slight extent his grandparents, to his mother's aunts and to a slight extent to his father.  There were many moves to different residences during his early

MC-0000282

development. For a time Mr. Barnette's mother lived with an older sister in South Carolina. After her marriage to Mr. Barnette, who had by this time enlisted in the military, the family also lived for a time in South Dakota. There were also several moves to different residences in Charlotte where Mr. Barnette spent the bulk of his pre-adolescent days. Mr. Barnette went through the exercise of trying to figure out how many residences he had lived in by age 13, and he was able to count eleven different places. This was before his mother took him to live in Atlanta when he was approximately 14 years old.

Mr. Barnette recalls his early family life as abusive as well as chaotic. The abuse was primarily inflicted by his father who he believes singled him out for severe punishment for the slightest wrong doing. He feels his father never punished his four years younger brother the same way. The punishment consisted of long beatings with a belt or coat hanger. He states that his father would tell him that he was going to beat him until he couldn't lift his arm any longer. He states that some of the beatings went on for over an hour. He sustained many bruises as a result of these beatings and claims that on one occasion he convinced somebody to call the Division of Social Services, but that no action was taken. He lived in constant dread of these beatings from about the time he was 4 years old until he was approximately 10. He is particularly angry with his mother for not having intervened in the father's excessive punishment and for never responding to his cries for help. He also reports that on one occasion his father tried to choke him. He recalls one childhood effort to run away from home but he did not get very far.

In describing his childhood, Mr. Barnette has a powerful recollection that much of the time his parents did not want him around. He was often told to go outside to play and feared he would be beaten if he went into the house before his parents invited him back. He often assumed that they were either having sex or fighting while he was out of the house.

He reports that by the time he was 7 or 8 years old his parents were fighting with each other frequently, both accusing the other of various infidelities. Sometimes they had fist fights and sometimes these took place in public. He has a vivid memory of his parents fighting in front of his school mates as he was boarding a school bus. The process of the couple becoming separated and divorced began when Mr. Barnette was 11 years old.

While he was somewhat relieved to know that the separation diminished the probability of punishment by his father, he also notes that his mother's conduct deteriorated at this time. She became involved with another man (who was later killed) and spent very little time taking care of Mr. Barnette or his younger brother. She spent whatever money she earned on her new lover, usually extravagantly, and there was very little left for the children. Mr. Barnette also believes that at about this time his mother began using drugs, particularly cocaine, in an excessive manner.

During the years from about 11 to 16, Mr. Barnette had a very stormy relationship with his mother who he did not trust to take care of him or his brother. When Mr. Barnette was approximately 15, his father informed him that a paternity test had been done

MC-0000283

Bates No. 14241

in the process of reaching a monetary settlement with the mother and these tests indicated that neither Mr. Barnette nor his younger brother were the children of his alleged father. He recalls this as an extremely disturbing moment in his life. He has no idea who his real father might be and he continues to think of the man who married his mother as the only father he has ever had.

With all of the changes in residences there were, not surprisingly, a number of school changes as well. Mr. Barnette recalls attending seven different schools before the age of 15. His performance was erratic. At times he seemed to do quite well and other times did quite poorly. His best year was in 5th grade when he attended a Catholic school and responded extremely well to the discipline and intellectual stimulation. Unfortunately, funds were not available to continue his education at this school for more than one year. There is no evidence that Mr. Barnette had difficulty relating to peers in school. He did not have any serious physical illnesses during these years. While he was smaller than most of his peers, he was a good athlete. This, together with an outgoing personality, gave him some status with other students.

Mr. Barnette began having intimate sexual relationships with a two years older female cousin when he was 7 years old. While these relationships did not at the time culminate in sexual intercourse, there was considerable genital stimulation involved. He also reports two other sexual experiences with girls in school before the age of 10. He began having sexual relationships on a regular basis when he was 13 years old and has had many partners in the ensuing years. He sees himself as always having been obsessed with sex and interested in having sex on a daily basis and sometimes several times a day. He describes himself as always having been attractive to women and insists he has no problem with finding women to have sex with. He denies any interest in homosexual activities and denies that such experiences have occurred. As he reached adolescence, he began to become more infatuated with certain women with whom he tried to sustain a long-term relationship. He was unsuccessful in maintaining any of these relationships for more than a year. He did father two children by one of these women during his adolescent years. The burdens of trying to be involved with the mother of his children and making some effort to care for his children eventually led to his dropping out of high school.

Mr. Barnette acknowledges that he tends to get deeply with women who always turn out to be unfaithful to him. He also admits that he usually has been unfaithful to them as well. He also admits that there has been some element of violence involved in all of the close relationships he has with women. Sometimes these women were violent towards him as well.

After the birth of his first child, Mr. Barnette became somewhat closer to his mother. They have had a close relationship for the past eight or nine years but apparently there has been some violence involved. Mr. Barnette acknowledges that shortly before the murders for which he was charged, he was involved in a fist fight with his mother.

MC-0000284

Another pervasive theme in Mr. Barnette's life is a preoccupation with suicide. Thoughts of self-harm seem to come and go and they are rarely sustained. They seem to be effected by his moods, which he and those around him have noted, change rapidly. He believes that his rapid mood changes are also characteristic of some his mother's behavior. At any rate, since about the age of 8 he has had many thoughts of killing himself either by over dosing on pills, jumping off a bridge, or shooting himself. He recalls taking an over dose of Tylenol at age 8 because he was worried about bad grades. He made similar over dose attempts in 10th grade related to disappointing relationships with girls. In May, 1996, while in the process of brooding over the separation from the eventual murder victim, he would sometimes put a pistol in his mouth and think about shooting himself. On one occasion early in May of that year, he took a large number of "sleeping pills" (probably over-the-counter medication) and drank a lot of vodka. At that time he was depressed, not only over the loss of his girlfriend but also at his failure to have received a job as an automobile salesman. He believes that he would have died at this time if he had not vomited up the pills. Mr. Barnette also reports two attempts to asphyxiate himself by running a hose from the exhaust pipe to the car trunk immediately following the murders. One attempt was mechanically unsuccessful and the other was interrupted by a passerby. He was also suicidal in the early weeks following his incarceration, was on suicide watch, and was treated briefly with anti-anxiety and anti-depressant drugs.

Mr. Barnette's experimentation with alcohol and marijuana began when he was approximately 11 or 12 years old. He has been an occasional user of marijuana but a rather frequent and heavy user of alcohol. He has experienced hang-overs, tremors and blackouts.

Mr. Barnette has had several jobs since adolescence and is generally described as a good worker. He has been particularly successful in jobs which involve interacting with the public and sales. Because of his many moves and different involvements, there have been a variety of job changes but he was able to hold at least one fairly responsible job for over one year. He was fired from one job while living in Roanoke, Va., allegedly for sexual harassment. He acknowledges that he did pat a female coworker "on the rear end."

## Psychological Issues Related to the Crime

Mr. Barnette has had some difficulties with the law prior to these current charges, but none resulted in more than two months of incarceration. One of the charges was cruelty to the children of a woman he was living with . He apparently beat them with a coat hanger. He claims he did this when he found them experimenting with each other sexually. His other problems with the law have apparently related to his problems with women and problems with men who were interested in these women.

In 1992, in an altercation with a young man who was interested in one of his girlfriends, Mr. Barnette was arrested for shooting that individual. The case was disposed of when he was convicted of pointing a gun or pistol at another and punished by time served (25 days). When involved in an extremely contentious relationship with a minor woman in late 1993, he was charged with kidnapping, rape and assault with a deadly

MC-0000285

weapon against this woman.    These charges were later modified and he received probation.

Mr. Barnette has also been involved in another violent relationship with a male cousin over family matters. In this incident it was Mr. Barnette who was shot in the leg and hand. He underwent surgical treatment following this shooting and he was still somewhat disabled at the time he was involved with eventual female victim.

Mr. Barnette began his relationship with the female victim about the same time that he was trying to extricate himself from a relationship with the minor female with whom he had gotten into trouble for charges of kidnapping and assault. The couple immediately fell in love and sustained a relationship for almost two years. He moved to Roanoke to be with her and the couple was planning to get married. He felt that his relationship was different than any he had ever had before. He does think that they fully revealed themselves to one another and trusted one another. | In spite of his view of the relationship as idyllic, there were apparently some problems as early as the end of the first year of the relationship, following physical violence between the two of them. She either cut or bit his finger in May, 1995, which was a severe enough injury to require going to the hospital where he had surgery performed.

In the last year of the relationship, there was increasing suspicion on his part that she was interested in other men, particularly an old boyfriend, many accusations of her infidelity on his part and some physical violence. She always denied that she was involved with anyone else and told him that she loved him. In April, 1996 the relationship was clearly falling apart and she asked him to leave the apartment. He went back to Charlotte, brooded, and in May of that year attempted to harm the man whom he believed was her lover. He went to Roanoke and fire bombed the victim's apartment resulting in her receiving serious burns. During the ensuing one and one-half months he found himself unable to work, drank heavily on an almost daily basis and brooded about her disloyalty.

During this period he had difficulty sleeping and concentrating. His energy level diminished, he felt anxious and worthless. He thought about suicide frequently. His self-esteem dropped. There were periods of time during which he was able to talk himself into simply dropping the relationship, but he regularly returned to brooding about it. Eventually, he worked himself up into a rage and he could think only about hurting her and her lover. During the weeks preceding the two crimes for which he has been charged, Mr. Barnette was abusing alcohol, was experiencing rapid mood swings, periods of severe depression punctuated by powerful feelings of anger. Homicidal thoughts alternated regularly with suicidal impulses.

**Mental Status Examination**

Mr. Barnette is a small, wiry, pleasant looking young man who interacts easily with the examiner. He is fully oriented as to time, place and person. He was animated and energetic throughout the interviews, often punctuating some point he is making with his

wave of his arm or some exclamation. During the second interview he spent great deal of the time pacing up and back around the small room as he talked continuously. Mr. Barnette obviously likes to talk and will do for long periods of time if not interrupted. He tends to describe his past and current life in an extremely detailed way, sometimes reporting details which are irrelevant and sometimes going off on tangents before he reaches his goal idea.

He is quite explicit in reporting a history of moodiness, suicidiality and also acknowledges there have been times in his life where he has had little need for sleep, has been hyper-active, expansive, irritable and has had unlimited energy. All of this seems to born out by much of his behavior and mood during the interviews. He cried several times during the first two interviews, but he also showed an unusual amount of hyperactivity, volubility and energy. In short, his appearance during some of the examinations was reminiscent of individuals who are experiencing hypomanic episodes.

On formal testing of psychological functions Mr. Barnette shows good recent and remote memory. There is currently no evidence of delusions or hallucinations. He currently has good insight into the irrationality of his previous behavior. He is stunned by the realization that he has been able to act so irrationally and violently. He is truly saddened by the loss of his girlfriend Robin and exhibits great anguish with regard to the death of both victims.

Mr. Barnette has apparently adjusted well to incarceration after the first few weeks of suicidality. This good adjustment has been sustained both at the Mecklenburg County Jail and at the Federal Correctional Institution in Butner. He has the apparent ability to get along well other inmates without being either a target or an aggressor. In our early interviews, he indicated that he would prefer the death penalty to life imprisonment but this view has been changing as he becomes accustomed to incarceration.

Diagnostic Impressions

Mr. Barnette does not fit smoothly into any of the DSM IV categories. He has periodic short depressions throughout his life alternating with periods of hyperactivity and possible hypomanic behavior. I believe that in the weeks between the middle of April and the middle of June, 1996 he met the DSM IV criteria for major depressive episode. He also meets criteria for substance abuse disorder, at least for the past two years. With the evidence of his periodic depressions, at least one major depressive episode, and some history of hypomanic behavior, the diagnosis of Bipolar Disorder II might also be considered.

Respectfully submitted,

*Seymour Halleck, M.D.*
*by permission*

Seymour L. Halleck, M.D.

MC-0000287

# "UNDER SEAL"

Forensic Evaluation

COPY

FILED
CHARLOTTE, N.C.

JAN 8 1998

U.S. DISTRICT COURT
W. DIST. OF N.C.

NAME: Aquilia Marcivicci Barnette
REGISTER NUMBER: 12599-058
DOCKET NUMBER: 397-CR-23-P
DATE OF BIRTH: 07/07/73
DATE OF REPORT: 12/29/97

IDENTIFYING INFORMATION: Mr. Aquilia Marcivicci Barnette is a 24-year-old, Black male most recently from Charlotte, North Carolina, who was admitted to the Health Services Division of the Federal Correctional Institution, in Butner, North Carolina, on 11/17/97, to undergo psychiatric evaluation. In a Court Order dated 11/05/97, the Honorable Robert D. Potter, Senior, United States District Judge, for the Western District of North Carolina, Charlotte Division, issued an Order requesting that Mr. Barnette be committed to the custody of the Attorney General for the purpose of a psychiatric or psychological examination pursuant to Title 18, United States Code, Section 4241(b) and 4242(a). This Order followed examination of the record and motions in this case by the Court in a finding that there was reasonable cause to believe that the Defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. The record further indicated that the Defendant had filed a Notice of his intention to rely upon a defense of Insanity as provided by Rule 12.2 of the Federal Rules of Criminal Procedure and that the Government was entitled to have an examination of the Defendant conducted as provided by Title 18, United States Code, Section 4242. The Court Order indicated that the time period for the examination would be calculated upon the Defendant's arrival at the Institution. It further ordered that the report of the results of the examination be filed with the Court and copies be provided to the Defense Counsel and United States Attorney as required by Title 18, United States Code, Section 4247(c).

Mr. Barnette is charged in an eleven-count indictment with criminal acts occurring between 04/30/96 and 06/22/96. Charges include the following: on or about 04/30/96, travelling across state lines with intent to injure, harass, and intimidate an intimate partner (Robin Williams), and in the course, intentionally committing a crime of violence (firebombing an occupied apartment and automobile in the driveway) causing bodily injury to her, in violation of Title 18, United States Code, Section 2261(a)(1) and 2261(b); on or about 04/30/96, using and carrying a bottle filled with flammable liquid in an act of interstate domestic violence, during, and in relationship to, a crime of violence, and the carrying of the destructive device, in and of itself, in violation of Title 18, United States Code, Section 924(c)(1) and 844(h)(1); on or about 05/21/96, providing false information in connection with false acquisition of a firearm, in violation of Title 18, United States Code, Section 922(a)(6) and 924; between 05/21/96 and 06/22/96, sawing off part of the barrel of the gun, in violation of Title 26, United States Code, Section 5821, 5822, 5861(f) and 5871; on or about 06/22/96, having been convicted of a felony, possessing a firearm in violation of Title 18, United States Code, Section 922(g)(1) and 924; on or about 06/22/96, shooting to death and taking from the person of Donald Lee Allen, a motor vehicle (1994 Honda Prelude), in violation of Title 18, United States Code, Section 2119(3); on or about 06/22/96, using and carrying a firearm during and in relation to a crime of violence (carjacking) and causing the death of Donald Lee Allen (that is murder by shooting him with a firearm), willfully, deliberately, maliciously, and with premeditation in violation of Title 18, United States Code, Section 924(c)(1) and (i)(2)(1); on or about 06/22/96, transporting a motor vehicle from North Carolina to

1.

FS-000475

Virginia, in violation of Title 18, United States Code, Section 2312; on or about 06/22/96, shooting and killing Robin Williams, in violation of Title 18, United States Code, Section 2261(a)(1) and 2261(d); and on or about 06/22/96, using a firearm and in the ourse of the violation, causing the death of Robin Williams (murder), killing with malice aforethought by shooting with a firearm, willfully, deliberately, maliciously, and with premeditation in violation of Title 18, United States Code, Section 924(c)(1) and (i)(2)(1). These charges occurred in the Mecklinberg County in North Carolina and the Roanoke area of Virginia. There are no codefendants. Mr. Barnette is represented by George E. Laughrun, II, and Paul J. Williams. The Assistant United States Attorney assigned to the case is Robert Conrad.

Early in the evaluation period, the Defense Attorneys contested the examination and a number of motions were filed by the defense and prosecution in the case. On 12/03/97, an Order was issued by Judge Potter ruling on several issues. Conclusions of the Order were that the evaluation could proceed; that the Order would be amended for psychiatric examination in compliance with *U.S. vs. Beckford*; that the Defendant would deliver the report of Dr. Tyson completed in 1994, under seal to the Clerk of Court, no later than 12/08/97, at noon, and that the Clerk would immediately forward that report under seal to this evaluator (Dr. Sally Johnson) by way of overnight mail service; and that the government's request for examination of the Defendant by another health professional in addition to the examination in Butner, would be granted.

During this evaluation period, Mr. Barnette was evaluated by Sally Johnson, M.D., Chief Psychiatrist and Associate Warden of Health Services at the Federal Correctional Institution in Butner, North Carolina. Under her supervision, Charles Vance, M.D., Forensic Fellow, conducted several interviews with Mr. Barnette. Psychological testing was completed by Michael Schaefer, Ph.D., and the results of that testing will be included in this report. Other members of the Health Services Division staff had the opportunity to interview and interact with Mr. Barnette during the evaluation period and their observations and assessments were considered prior to the completion of this report. Mr. Barnette did undergo review of his medical history, physical examination, nursing assessment, and social assessment during the evaluation. Defense-retained psychiatrist Seymour Halleck, M.D., had the opportunity to interview Mr. Barnette on site during the evaluation period on two occasions. Arrangements were also made for defense-retained psychologist Mark Cunningham, Ph.D., to evaluate the patient, but he cancelled his session on the day for which it was scheduled. Mr. Barnette had the opportunity to speak with his attorneys by phone and in person during the evaluation period.

Extensive collateral information was made available for review during the evaluation period. Requests for information were made both to the prosecution and defense attorneys. Collateral information that was available included a letter dated 11/06/97 from Assistant United States Attorney Robert Conrad, and a packet of information including: the Bill of Indictment; a Notice Specifying the Defendant as an Armed Career Criminal; a Notice of Intent to Seek the Death Penalty; and a copy of a Brief in Opposition to the Defendant's Motion to Suppress the Statements of the Defendant. The prosecution also forwarded four volumes of material from the Government's discovery for review. In summary, the discovery materials included numerous reports, interviews, forms, notifications, examination reports, transcripts of interviews, narrative summaries and records. Attachment A is a copy of the list of materials provided. A packet of information was also received from Defense Attorney George E. Laughrun, II. It included a letter dated 12/09/97 and a copy of the Complaint, Indictment, and a description of possible punishment facing the Defendant. A letter was received from Paul J. Williams, dated November 20, 1997, verifying that Seymour Halleck, M.D., was being retained as the Defense psychiatrist. A copy of the report written in 1994 by William M. Tyson, M.D., and brief records from the Blue Ridge Behavior Systems, were also received. Included with the above listed material was a

2.

FS-000476

copy of a 07/17/96 letter from Dr. Tyson to Susan J. Weigand, Assistant Public Defender, in Charlotte, North Carolina; a letter from Susan J. Weigand to Dr. Tyson dated 07/12/96; and a copy of the release of information form signed by Mr. Barnette dated 07/12/96. The letter is addressed to Mr. VonKallist who was the attorney assigned to represent Mr. Barnette in the earlier criminal action. The packet also included a page of hand-written notes from February of 1994 to March of 1994 and an unsigned letter to Dr. Tyson from Paul J. Williams, dated 06/17/97, concerning sending raw test data scores and material to Faye E. Sultan, Ph.D. Records were requested from the Mecklinberg County Jail where Mr. Barnette had been housed since 06/25/96, but no records were received. Through phone conversation, we were able to obtain some information regarding his stay at that facility and this will be addressed in the body of the report. Dr. Johnson did have the opportunity to speak by phone, briefly, to Defense Attorney Paul J. Williams and to Prosecuting Attorney Robert Conrad. She also spoke with Sonia Barnette, Mr. Barnette's mother.

DATES OF CONTACT/PROCEDURES ADMINISTERED:  During the evaluation period, Mr. Barnette was interviewed individually and jointly by other members of the Health Services Division Team. He was generally cooperative with the evaluation, although he indicated that his attorneys had instructed him not to discuss detailed information about the offense. Nonetheless, he spoke quite openly and freely about his behavior around the time in question. He was viewed as being a generally reliable historian, in that, for the most part, the accounts of his behavior and history coincided with that obtained through collateral sources. Interviews with the Defendant were conducted from the point of his arrival on 11/17/97 until he was returned to Court by the United States Marshal Service on 12/19/97. The following procedures were administered during this evaluation:

Clinical Interviews (ongoing)
Physical Examination (11/17/97)
Minnesota Multiphasic Personality Inventory-2 (MMPI-2) (11/26/97)
Wechsler Adult Intelligence Scale - Revised (WAIS-R) (12/10/97)
Wechsler Memory Scale - Revised (WMS-R) (12/11/97)
Personality Assessment Inventory (PAI) (12/11/97)

At the outset of evaluation period, and repeatedly throughout the evaluation, the limits of the confidentiality of the information provided, as well as the purpose of the evaluation, was discussed with Mr. Barnette. He expressed a full and detailed understanding of the evaluation process and the nature of the report that would be prepared. He clearly understood questions that were being raised by the Courts and how the evaluation had come about.

BACKGROUND INFORMATION: Mr. Barnette was born 07/07/73 in Charlotte, North Carolina, to the union of Sonia Cooper Barnette and Derrick Barnette. He is the oldest child of two born to that union having a younger brother, Mario, who is currently approximately 20 years of age. Mr. Barnette's parents remained married until he was approximately 12 years of age, when they separated and subsequently divorced. Approximately three years later, his father remarried to Marcela Sifford and Mr. Barnette has two step brothers as a result of that union: Marcus who is 21, and Allen who is 25. Although his mother has not remarried she has been involved in a long term relationship resulting in the birth of a younger, half brother John, who is currently approximately four years of age. Mr. Barnette describes his early life in relatively positive terms, although he describes verbal bantering between his parents, some of what he viewed as excessive physical discipline on the part of his father towards himself, and some excessive alcohol use by his mother. Both parents were employed and remain employed. His father works as a computer analyst for the Postal Division and currently lives in Maryland. His mother works in the human resource area and is currently employed with a

3.

FS-000477

temporary job agency placing people into work situations. Mr. Barnette did indicate that as a child he and his brother spent some time alone after school, but this seldom exceeded an hour or so. As a child, Mr. Barnette, went by the nickname as Vicci or Vicc. At his own insistence, people eventually began calling him Marc.

Mr. Barnette denies any family history of criminal involvement, significant psychiatric problems, significant medical problems, or significant drug abuse history. The alcohol use of his mother has already been noted.

Mr. Barnette attended school from Kindergarten through tenth grade and discontinued his educational involvement in the eleventh grade. He began his education in Charlotte, by attending Beverly Woods Elementary School from Kindergarten through third grade. In the fourth grade, he attended Barrenger Elementary School. In the fifth grade, he was enrolled for one year in a Catholic School, Our Lady of Consolation, which was the same school his father had attended as a child. He indicated that during that year both his grades and conduct improved. He could not continue there due to the separation of his parents and subsequent lack of financial resources. In the sixth grade, he attended Cotswald Elementary School. Seventh and eighth grade were completed at Randolph Middle School, and the ninth grade was completed at Smith Junior High, all in Charlotte, North Carolina. At that point in time, his mother with whom he was living, moved to the Atlanta, Georgia area, and he began his high school education at Lasonia High School. During the tenth grade, he started "hanging out with friends," skipping school, and failed to complete sufficient credits to continue with his grade level. He left school on several occasions and to date has not succeeded in completing either his GED or receiving a high school diploma. During the same time period of early high school, he met Natasha Heard, with whom he developed a sexual relationship and fathered two children, Angelica and Aquila, who are currently seven and five years of age respectively. They remain in the custody of their mother and Mr. Barnette has had no contact with them over the last few years.

Mr. Barnette has never been involved in military service. He has been employed in a variety of occupations and work settings and on occasion has been assisted by his mother in obtaining placement in various jobs. His employment settings have included short stints of employment with Brickhouse Pizza, A-1 Service Personnel (a temporary job agency), Arby's, Blockbuster Video, Pizza Hut, TempWorld, Harper's Restaurant, Bojangles, Taco Bell, Hot & Now, Courtyard by Mariott, Best Western Hotel, Camelot Music, and Electrolux. He has spent as little as one week on a job and many employment situations were part time and not continued for more than a few months. He denies ever being on unemployment or receiving any type of disability. At the time of the alleged offenses, he was attempting to obtain employment in automobile fields, but had been unsuccessful in his initial efforts in the Charlotte area. Mr. Barnette does indicate that financial problems resulting from his lack of consistent employment played a role in the breakup of his most recent significant relationship which was with one of the victims, Robin Williams.

Mr. Barnette described a series of significant relationships with females since that described above with Natasha Heard, but has no other children. Following the development of problems in his relationship with Natasha, he began a relationship with Crystal Dennis. She had two children from other relationships, and they moved in with Mr. Barnette for a period of time. After a brief period, he began a relationship with Kwanna Dozier. The relationship was of relatively short duration and he subsequently began a relationship with Alicia Chambers in approximately 1993. This relationship also dissolved and it was followed shortly thereafter by his involvement with one of the current victims, Robin Williams. He moved in with Robin Williams in 1995, but broke up with her in April of 1996 shortly before the first charged offense of April 30th. He is currently not involved in any type of

4.

FS-000478

romantic relationship. As outlined below, his relationship history is intertwined with his criminal history. Mr. Barnette describes himself as heterosexual and denies any type of sexual dysfunction.

Mr. Barnette denies any history of significant drug use or abuse, although he admits to the use of alcohol. He does indicate that in his early teens he did try marijuana, but did not continue the use of this drug. He denies ever trying any other forms of illegal substances.

Mr. Barnette gives a relatively detailed account of his alcohol use beginning at age 12 when he first drank some beer in a group setting. He describes drinking to the point of intoxication on that occasion. He continued his alcohol use (primarily beer) up until the present. He denies any withdrawal symptoms. He did not normally drink to the point of intoxication, but occasionally did so. He describes doing that, for the most part, at home, and not being involved in driving while intoxicated. He does admit to drinking other types of alcohol and in addition to beer, but describes beer as his preferred drink. He was drinking on the day prior to the alleged offenses, but in his words, "I was not sloppy drunk." He does indicate that he had drunk as much as a six pack of beer during the course of the day.

Mr. Barnette has no significant psychiatric treatment history. He did undergo a psychiatric evaluation prior to the alleged offenses in 1994. That evaluation, conducted by William Tyson, Ph.D., was done as a result of his legal situation, which involved significant problems in his relationship with Ms. Chambers. He does claim that while still in high school, he became upset over a relationship and took an overdose of some type of over the counter medication. This did not require hospitalization and he did not receive any specific treatment. He also claims one suicide attempt in response to his current charges. He claims that he purchased a section of garden hose and attempted to asphyxiate himself by carbon monoxide poisoning on 06/22/97. He describes being unsuccessful as a result of a construction worker finding him in the car and interfering with his plan. He has not undergone any alcohol use counselling or treatment, and prior to the alleged offense took no psychotropic medication. After his arrest and incarceration in Mecklinberg County Jail, he experienced anxiety and problems sleeping. He was seen by the psychiatrist there (Dr. Short, first name unknown) who felt he was experiencing an Adjustment Disorder. He was treated with antidepressant and antianxiety medications (Desyrel and Ativan). He describes that his sleep did improve with the medication, but he found himself quite drowsy during the day. On his own, he began to cut back on the medication. He voluntarily discontinued the medication around August of 1997, and has not experienced further problems with sleep or depression. Though he contemplated suicide in close proximity to arrest, he denies any suicidal ideation for months and expresses his motivation to live.

Review of collateral information received from William Tyson, Ph.D., indicates that Dr. Tyson saw Mr. Barnette at Mr. VonKallist's request in regard to legal charges that were pending at the time. Dr. Tyson administered a battery of psychological tests including the Minnesota Multiphasic Personality Inventory-2, Incomplete Sentence Blanks, Adult Survivor of Dysfunctional Family Checklist, Wechsler Adult Intelligence Scale-Revised, Bender Gestalt Test of Visual Motor Performance, and the Rorschach Ink Blot Technique to Mr. Barnette in February of 1994. Dr. Tyson opined that Mr. Barnette was both competent and responsible. He did make vague references to the existence of psychological and behavioral problems, but did not believe these interfered either with his competence or responsibility. Further details were not available.

Mr. Barnette has remained in relatively good physical health throughout his life. He does indicate one traumatic injury which occurred in 1995 and did result in some disability to his right hand and pain in his right leg. He indicates that a distant cousin, Ladin Barber, shot him while he was in his home,

5.

FS-000479

Bates No. 14250

causing an injury to his right hand and leg. Mr. Barnette underwent medical evaluation and treatment, and Mr. Barber subsequently was tried in regard to the charges. Mr. Barnette did serve as a witness during that trial. Mr. Barnette claimed that as a result of the shooting he suffered some emotional upset and that memories of the event bothered him for a period of time. He did not describe any specific mental health treatment as a result of that injury.

Mr. Barnette denies any specific juvenile criminal history. As noted, he did have some episodes of being truant from school and was involved in underage drinking. His adult criminal record, as noted above, is intertwined with his relationship history. Available information indicates that in May of 1992, he was arrested in Newnan, Georgia, and charged with Discharging a Firearm near a Public Highway, Reckless Conduct, Pointing a Gun at Another, and Battery. He was convicted on three of the four accounts with the count of Reckless Conduct being dismissed. He was given time served. The charges stemmed from an incident with an acquaintance of his, wherein he claims he was confronted by the victim and several other individuals while he was walking home. This resulted from some relationship problems he was having, involving the sister of this individual and his girlfriend, Natasha. He claims he had found a weapon prior to the event and had it on his person at the time he was confronted by the victim and his friends. Fearing assault, he discharged the weapon and shot the victim, Anthony Britt. He claims the other individuals fled. Despite the fact he was arrested and charged for the behavior, he viewed the Court as being understanding of his position in the case, and claims that is why he was given a minimal sentence. In November of 1992, he was charged by Natasha Heard with Criminal Trespassing, but the charge was dismissed. In January of 1993, he was arrested on two counts of Cruelty to Children and Simple Battery. He was subsequently convicted on the Cruelty to Children charges in March of 1993, and was given a period of probation and a fine of less than $500. This episode allegedly involved him beating his girlfriend's (Crystal Dennis) children with a wire coat hanger, to the point that the children's grandmother identified the injuries and reported him to Social Services.

In March of 1994, he was initially charged with Rape and Kidnapping in regard to Alicia Chambers. The victim had been involved with Mr. Barnette since some time in 1993. Eventually these charges were pled down to Breaking and Entering and Felonious Restraint. Mr. Barnette received again a period of probation. It was during the time of the resolution of these charges that Mr. Barnette became involved with Robin Williams, one of the victims of the current charged offenses.

Mr. Barnette relates that he met Robin Williams in the fall of 1994. As was noted, this was during the time of resolution of the charges stemming from the relationship with Alicia Chamber.' He indicates that he was feeling down about his legal situation and a friend came by and took him to Virginia on an errand. As a result of that trip, he met Ms. Williams. They immediately "clicked" and during the next few days he fell in love with her. They saw each other off and on for the next several months and then around March of 1995 he moved in with her in Roanoke. She was employed at the local hospital as a secretary. Mr. Barnette alternates between describing the relationship in somewhat ideal terms and talking at length about the problems that developed. Apparently by the fall of 1995, Ms. Williams suspected that he was seeing someone else. He admitted that he was involved in an affair, but discounts the significance of that. He states that by September he began to suspect her of seeing someone else. He describes intermittent arguments where fidelity was the focus. During the same time period, he experienced some difficulty in maintaining a job, after he lost his job with Camelot Music as a result of accusations of sexual harassment. He did admit to involvement with a female employee there. Financial problems developed in that he and Ms. Williams had accumulated a significant amount of debt and were not always able to pay the bills. Although he had entered the relationship with the agreement that the expenses would be split in half, by the spring of 1996, he was unable to contribute his half of

6.

FS-000480

the expenses. Following a day or two of arguing in April, they parted and he returned to Charlotte to his mother's home despite his lack of interest in moving back to that area. He claims that he spoke with her by phone on a few occasions after returning to Charlotte. Although he denies any specific plans of reuniting in the near future, he claims he maintained some thought that at some point down the road, in six months or a year, they would get back together. He does indicate that he returned to Roanoke shortly after he left to retrieve some of his property. He claims that during that visit, Ms. Williams put him down in front of his family and her family, and made it appear that he had been sponging off of her by staying with her in Roanoke.

Mr. Barnette gives somewhat conflicting accounts of his mood state during the early weeks after the breakup. Initially he indicated that he threw himself into efforts to obtain a job and reestablish his life. He describes that an uncle assisted him in trying to get a job at a Saturn car dealership. Mr. Barnette describes that the job fell through and left him "in a funk." He describes himself as sinking to a "low ground zero." In other discussions, Mr. Barnette describes his continued suspicions that Ms. Williams was involved in another relationship. He indicates that during a call to her, after the breakup, it was evident to him that a male was at the apartment. Although Ms. Williams alleges that it was an old friend from school, he knew that, in reality, the individual was a man by the name of Benjamin Green. Mr. Barnette indicates that Ms. Williams had maintained a friendship with Mr. Green for an extended period of time but never let Mr. Barnette meet Mr. Green or know any of the details of their relationship.

Mr. Barnette is charged with firebombing Ms. Williams' apartment in Roanoke, Virginia, on or about April 30, 1996. Initially Mr. Barnette vaguely disclaimed any involvement in that activity. He indicated that someone sent him an article describing the firebombing from a Roanoke paper and it was in that article that he read about a male friend, Benjamin Green, spending the night with Ms. Williams. He claims that information contributed to his mounting anger about his situation and the anger directed toward Ms. Williams. Later, Mr. Barnette did not deny involvement in the firebombing, but claimed his intent at that time was not to kill Ms. Williams.

Collateral information available in regard to that episode was obtained from an interview with Robin Williams that took place on May 30, 1996. She indicated that on April 30, 1996, she was in her residence. Around 3:30 in the morning, she heard several loud bangs on the front door. She raised the blinds and saw Mr. Barnette, who made a series of derogatory statements directed toward her. Apparently, Mr. Barnette took a bat and hit the window. He shot at a pane of glass, cut the phone lines, and smashed Mr. Green's car windows (his car was in the driveway). He then threw some type of incendiary device under the door. He indicated that he was yelling "die, bitch, die." As a result of the firebombing, Ms. Williams suffered burns on her arm and required hospitalization. Mr. Barnette's drivers license was left at the scene, as were the wire cutters that were used to cut the phone lines, and a lighter.

Apparently, following the firebombing incident, Mr. Barnette returned to Charlotte. Despite Ms. Williams identifying him as the suspected perpetrator of the firebombing incident, and warrants for his arrest being issued, it appears confusion between the states of Virginia and North Carolina resulted in him not being arrested and taken into custody on the alleged offenses.

Mr. Barnette describes that he was surprised that no one came to arrest him and that he spent the next several weeks at his mother's home in Charlotte feeling frightened, depressed, and brooding over the loss of the relationship. He was angered that Mr. Green was not injured during the incident at Ms. Williams' apartment. He describes being focussed on feeling as if Ms. Williams had been dishonest

7.

FS-000481

with him. He felt angry that he had shared himself "body and soul" with her and that the relationship had not continued. Mr. Barnette indicated that his rate of alcohol consumption increased in the weeks prior to the current alleged offenses. He continued to drink mostly beer and would drink intermittently throughout the day. He does describe interacting with his brothers, his mother's boyfriend, and his mother during that period of time. Activities included watching television and playing video games. His mother described him as less interactive and states he spent more time in his room.

In regard to the weapons involved in the alleged offenses, Mr. Barnette claims he bought the gun in May, but claims he bought it for his own protection. He indicated that he had numerous difficulties as a result of his relationship problems in the Charlotte area and felt that he might be in some danger. He describes himself as needing to protect himself and two brothers, both from other people and from the snakes that frequented the property where they lived. He admits altering the gun, but states he did this so he could keep it hidden in his room. He described the activity as being "like a kid." He indicated he did not want "a big grandpop shotgun." He liked the product obtained and described it as "neat." He did indicated that altering the gun allowed him to keep it hidden from his younger half brother. He denies that he bought the weapon with the intent of harming Ms. Williams.

Mr. Barnette does describe weapons experience since he was a child. He indicates that at the age of eight or nine his father taught him weapon safety and instructed him that guns were for family protection and were not toys. He indicated that his father had a couple of guns in the house and that he remembers early outings including family camping and target practice. As a youth, he also had an air rifle. He was approximately age ten when he first shot his father's gun. He indicated that his father's guns were all legal, with his father having the appropriate permits and licenses. In 1990, he found a gun on his way to a prenatal appointment with his girlfriend, Natasha Heard. He indicates it was a .22 calibre handgun. He cleaned it up and kept it in the house, again for family protection. It was that gun that was used in shooting Anthony Britt in 1992. After the shooting episode, he tossed the weapon away. Since 1993, he has continued to have access to guns in his mother's house. These guns belonged to his grandfather and included an antique shotgun that was not working and another shotgun that was. Mr. Barnette admitted to using the guns to shoot snakes or rats on the property.

In regard to the time period immediately around the alleged murder, 06/21/96 through 06/25/96, Mr. Barnette provided the following information. On the evening of 06/21/96, he felt his anger building up. There was nothing special about the evening. He spent his time playing video games with his brothers, drinking beer, and watching a game on television. He then went back to his room to do his "nightly thinking about Robin." Mr. Barnette indicates "I just broke. I had had enough." He got dressed and "just split," leaving by the side door with his gun. He indicated he couldn't take it any more. He felt like a failure in the relationship and in his inability to get a job. He describes himself as fuming. In his words, he indicates that "I felt evil come over me. I had never been that angry," and states his anger scared him. He believes that while hanging around the house that day he had drunk five to six beers beginning earlier in the evening. He did not perceive himself as drunk, although he thinks drinking does lower his inhibitions. In his own assessment, had he not been drinking, and the thought of heading to Roanoke crossed his mind, he may not have done it. He describes that he has very clear memories of the evenings, but his attorneys have instructed him not to talk about the details of the crime. He claims that he has talked in detail with his attorney about the events of that evening.

Mr. Barnette describes leaving the house, because he "wanted answers." During various interviews, he described himself as being more upset than he had been in the preceding weeks. He admitted that at times in the preceding weeks, he had thought of killing Robin and that the thought had frightened him. He had talked to his mother about his degree of upset and his mother suggested he seek some

8.

FS-000482

help, but he did not. He was not specific as to what he had told his mother. On the evening preceding the crimes, he felt that he wanted to get back for "everything that had ever hurt me." He describes himself as being "on the end of my road I was going to get her (Robin). I was going to make my point. I was not going to be laughed at any more."

Mr. Barnette shared little about the first victim, Donald Lee Allen. Periodically he indicated he could empathize with Mr. Allen's family and that there was nothing he could say or do which would ameliorate their loss. He did indicate that before he encountered Donald Lee Allen, his rage could have been directed at anybody. He did not know the victim and his encounter with him was one of chance and part of his larger intention of finding transportation to Roanoke. Collateral information indicates that Donald Lee Allen had left his family home in South Carolina, on the evening 06/21/96. At some point after midnight on 06/22/96, Mr. Barnette confronted Mr. Lee Allen who was driving his car and was stopped at an intersection in Charlotte. He approached Mr. Lee Allen with the sawed off shotgun. He took his wallet and ordered him across the street. He told him to turn around and subsequently shot him three times. Mr. Allen was left near a drainage ditch. He then took Mr. Allen's car and drove to Roanoke, Virginia.

Mr. Barnette indicates that he went to the house where Robin was staying with her mother. He chased her when she ran from him. When he caught up with her, he felt his anger was gone and asked her, "where is he....why did you let him shoot at me." He indicated he wanted Robin to come with him and show him where Benjamin Green lived. He states she tried to grab the gun and he threatened to kill her if she didn't come with him. He indicated she looked into his eyes and stated, "you're not going to kill me" and grabbed at the gun. He felt like she knew him too well and she perceived him as a weakling, and his anger escalated. He felt she was defying him, in the middle of the street, with him holding a sawed off shotgun. "That is when it happened". He shot her as she was running towards her mother.

Collateral information including information provided directly by Mr. Barnette around the time of his arrest indicated that he drove to Roanoke in the stolen car and arrived there around 5:30 on the morning of 06/22/96. He waited in the car outside of the home until about 7:00 when he saw his girlfriend walk the dog. At that point, he drove around back, parked the car, and came through a gate in the fence. He pulled the phone connections loose and shot his way in through the back door. Ms. Williams' mother encountered him and yelled for Robin Williams to run. He went out the back door, around the house, and began chasing her. He caught up with her and subsequently shot her in the back as she was trying to run towards her mother. He then ran back to the car and left the area.

Mr. Barnette indicates that upon leaving Roanoke he drove to Tennessee with the intent of killing himself. He subsequently bought a garden hose and some tape, pulled off an exit and attempted to asphyxiate himself through carbon monoxide poisoning. This was unsuccessful. He also took several over the counter Nodoze. During the next few days he contacted a cousin of his and his mother. He returned to his mother's home. His mother apprised him that the law enforcement authorities were looking for him. He told her to go ahead to call them. He indicates he was allowed a few hours to spend with his family and did not resist arrest when the authorities arrived. He was subsequently taken into custody.

Collateral information indicates that Mr. Barnette confessed to the crimes of the charged offenses. He provided details to the police and actually took them to recover the body of the first victim Donald Lee Allen. He was subsequently housed in the Mecklinberg County Jail, and remained there until admitted to this Institution for evaluation.

9.

FS-000483

Mr. Barnette describes coming to grips with what he had done shortly after the crimes were committed. He indicated that he fully intended to kill himself as he believed his life was over. He also describes feeling overwhelmed with the magnitude of his behavior. He describes problems with anxiety and insomnia during the first several weeks in jail. He was referred to the psychiatrist servicing the jail and was started on an antidepressant, Desyrel, and an antianxiety medication, Ativan. These improved his sleep and he eventually discontinued them on his own due to daytime drowsiness. He does indicate that he no longer wished to kill himself after his failing with the carbon monoxide poisoning. Although he has contemplated suicide as a resolution to his current problems, he does not currently have thoughts of harming himself.

COURSE IN INSTITUTION:   Upon admission to the Health Services Division of the Federal Correctional Institution in Butner, North Carolina, Mr. Barnette underwent review of his medical history and physical examination. Formal review of medical history, indicated that Mr. Barnette smoked approximately one and a half packs of cigarettes a day since incarceration (approximately fifteen months). He had both chicken pox and measles as a child. He had been treated for tinea versicola (a benign skin problem) and had experienced some muscle pain secondary to the gunshot wound in 1995. He also experienced some arthritis in his right hand and hip secondary to those injuries. He claimed a possible allergy to heparin.

Physical examination, conducted on 11/17/97, showed him to be 5'5" tall and to weigh 145 lbs. Vital signs were within normal limits. Limited range of motion and some numbness were noted on the right second and third fingers secondary to the gunshot wound injury. Scars were noted on his right hip and hand. There were no significant medical problems noted.

Mr. Barnette underwent routine laboratory evaluations. Laboratory studies included a complete blood count and routine blood chemistries including thyroid function studies. All of the results were within normal limits or showed only slight variations that were not viewed as clinically significant at this time. Screening of syphilis, HIV, and Tuberculosis were all negative. Urinalysis was normal. There was no indication to do a chest x-ray or electrocardiogram.

Mr. Barnette remained in good physical health during the evaluation period. He did have minor symptomatic complaints which were treated with symptomatic interventions. These included complaints of low back pain which appeared to be related to the mattress (treated with Motrin) and a single complaint of indigestion which was treated with antacids successfully. He was also seen for a rash and treated for tinea with a trial of selenium sulfide. Later in the evaluation, as he approached returning to court, he experienced some tension headaches. He was treated with Tylenol and Motrin as needed, with good relief.

Nursing evaluation was done upon intake and forensic social assessment was completed during the early part of the evaluation. Information provided was consistent with that obtained in other interviews.

Mr. Barnette was admitted through the Seclusion/Admission Unit which is the routine procedure for new admissions. He was kept in that unit until it was determined that he was suitable to function in the open health services population. He was released to the population in early December and continued in that status until his discharge on 12/19/97.

Mental status evaluation remained consistent throughout the evaluation, with the exception of some mild increase in anxiety toward the end of the evaluation period. Examination showed Mr. Barnette to be a small build, Black male who paid close attention to his hygiene and appearance. He was oriented to

10.

FS-000484

person, time, place and situation and made good eye contact with the interviewers throughout the evaluation. Speech was of normal rate and tone. Vocabulary was indicative of at least average intelligence. He followed questions well. Memory was intact for immediate recall, recent and remote events. Concentration was good upon examination, although in the latter part of the evaluation, he describes some trouble concentrating while reading due to anxiety about his legal situation. No looseness of associations was evident in conversation. There was no reported or observed evidence of hallucinations or delusional thinking. He denied any current suicidal ideation or homicidal ideation. His behavior was consistent with his report. There was no evidence of overt depression or anxiety for the most part. He reported sleep as good and appetite as undisturbed. Mr. Barnette did describe how he managed his anxiety about the situation by only selectively reviewing the events that had occurred. Through conversation he expressed considerable insight into his situation. His judgement on a day to day basis was good. Historically, he demonstrated poor judgement in regard to his behavior on numerous occasions. General information was viewed to be within the average range. He showed good understanding of written and verbal information. He also demonstrated a good ability to integrate himself into the population and quickly learned the rules and regulations of this facility. He received no disciplinary actions or incident reports during the evaluation period.

After receiving funds to place in his commissary and phone accounts, Mr. Barnette maintained phone contact with his family. As noted he maintained contact with his attorneys intermittently throughout the evaluation period. He reported promptly to appointments and was cooperative with interviewing and psychological testing. Mr. Barnette did develop short term friendships with several other inmates in the population, recognizing some from the Charlotte area and some from his time at the Mecklinberg County Jail. He did not express fear for this well being on the compound. He was able to discuss the awareness of his need to remain free from infractions while incarcerated so as not to demonstrate recent episodes of aggressive or problematic behavior.

In regard to the issue to competency to stand trial, Mr. Barnette was able to describe in detail his previous experiences with the legal system. He had a good first hand understanding of the plea bargaining and trial processes. He described his own role as a witness in the past and as a defendant in trial situations. Mr. Barnette had a detailed understanding of the charges against him and the possible penalties associated with each charge. He had a good memory for having reviewed this material with his attorneys and was aware that if he had questions or need for additional details, that information would be available through discussion with his legal counsel. Mr. Barnette talked openly about the severity of the charges against him and his awareness that the death penalty was being sought on several counts, including the two counts of Murder. He expressed a good understanding of the trail process in a death penalty case and the sentencing phase should he be found guilty. Mr. Barnette expressed an awareness of the role of the judge, the jury, prosecutor, and the defense attorneys. He had a detailed understanding of his rights to testify or not testify, and spent considerable time thinking through that decision. He expressed that he had been involved with his attorneys in framing questions for the jury selection process. He also indicated that he had a sense that his attorneys were involving him fully in the decisions being made in his case. He expressed respect and trust in his attorneys, although at times he became frustrated with the infrequency of contact with them during the evaluation. His frustration appeared to be resolved after he received a visit from one attorney near the end of the evaluation period. He felt he had ample time to discuss the status of his case.

In discussing with Mr. Barnette his mental state around the time of the alleged offenses, he disclaimed the presence of any mental illness. As noted, he talked at length about the frustration he felt over the breakup of his relationship with Ms. Williams and the anger at feeling displaced by Benjamin Green (or so he perceived). It was his own opinion that he was both competent to stand trial and responsible

11.

FS-000485

at the time of the offenses, and repeatedly indicated that he was not trying to skirt responsibility for his behavior. At the same time, he expressed hope that his life would be spared. As noted, he retained a full memory for his behavior during the period of time in question. Although he described some alcohol ingestion, he denies that it was to the point of intoxication. He did describes a short sense of getting revenge in regard to the murder, but stated that those feelings vanished quickly with full realization of what had occurred. He was able to express remorse for his behavior and to express sympathy for the victim's families.

During the evaluation period, Mr. Barnette had some contact with the Art Therapy Program. He described that he enjoyed drawing. There was no evidence of loss of reality contact in his work.

Mr. Barnette was cooperative with psychological testing. The results of that testing are outlined below. In summary, they showed him to be of average intelligence and not to be suffering from a major affective or thought disorder.

COGNITIVE ASSESSMENT: Mr. Barnette was administered the Wechsler Adult Intelligence Scale - Revised (WAIS-R) on 12/10/97. He was cooperative with the testing procedures and appeared to concentrate on test items. He appeared concerned to perform well and seemed to give full effort. Mr. Barnette achieved a Verbal I.Q. of 103, a Performance I.Q. of 108, and a Full Scale I.Q. of 105 which places him in the Average range of intellectual functioning across the domains. There was no significant difference between his performance on verbal as compared to non-verbal tasks with him demonstrating well developed skills in both areas. Mr. Barnette did not demonstrate any relative weaknesses on any of the subtests. His relative strengths were in his social judgment & common sense, and his visual-motor organizational abilities. The results of testing are consistent with observations of his level of adaptive functioning and his level of education. The testing provides no evidence of significant cognitive impairment.

Due to Mr. Barnette's reported vague complaints of memory impairment and difficulty in concentrating, the Wechsler Memory Scale- Revised was administered on 12/11/97. The Wechsler Memory Scale measures a subject's memory across a variety of domains including verbal memory, visual memory, general memory, attention/concentration, and delayed recall. Mr. Barnette achieved a Verbal Memory of 106, which places him in the Average range of functioning in this mode of memory. He achieved a Visual Memory of 120, which places him in Superior range of functioning in this mode of memory. His General Memory was 112 which places him in the High Average range of functioning in his overall memory. His Attention/Concentration was assessed to be Average and his Delayed Recall was assessed to be High Average. The overall results of this testing demonstrate Mr. Barnette has no memory impairment in any of the tested domains. His memory is at the average to superior levels. Although his level of attention/concentration is slightly lower than his abilities in other domains, it still falls in the average range when compared to other adults and suggests he should have no major impairments in his concentration/attention.

PERSONALITY ASSESSMENT: Mr. Barnette was administered the Minnesota Multiphasic Personality Inventory - Second Edition (MMPI-2) on 11/26/97. The personality profile produced by Mr. Barnette proved to be of questionable validity. There was some indication he responded inconsistently to test items; endorsing the symptom on one presentation, but not endorsing the same symptom when questioned in an alternative manner. There was also some indication Mr. Barnette may have been over endorsing symptoms as evidenced by his tendency to endorse most of the obvious symptoms of mental illness, but not endorse the more subtle symptoms of the disorders and the fact he elevated eight of the ten clinical scales. The profile, therefore, was interpreted with caution.

12.

FS-000486

Individuals with this profile often experience significant psychological distress despite their attempts to deny or repress their problems. They frequently complain of problems with concentration and having difficulty organizing their thoughts. Their ideas are frequently viewed by others as being unconventional and idiosyncratic. They often feel tense, depressed, anxious, indecisive, hopeless and have a poor self-concept. They are often viewed by others as being angry, rebellious, hostile towards authority figures, and resentful of demands placed on them by others. They are also likely to be immature, unreliable, and egocentric. They frequently develop physical complaints in response to stress, but are unable to see the connection between their stress and their physical ailments. Interpersonally, these individuals have strong needs for attention and affection, but feel conflicted by their fear of dependency. They are very demanding of attention and support and may engage in manipulative behaviors to get their needs met. Although they generally make a good first impression, their long term relationships tend to be very superficial, immature, and based on dependency. They frequently are hypersensitive to the reactions of others and have difficulty maintaining long term relationships.

In order to clarify Mr. Barnette's personality, he was administered the Personality Assessment Inventory (PAI) on 12/11/97. The personality profile produced by Mr. Barnette proved to be valid and interpretable. His pattern of responses suggested he is unhappy, emotional labile, and quite angry. Currently he is experiencing feelings of depression, worthlessness, and anxiety. Person's with similar profiles are typically in a state of crisis characterized by agitation and depression. These feelings may be due to difficulties or rejection in interpersonal relationships. Persons with similar profiles are quite sensitive to actual or perceived rejection by others and often feel abandoned or betrayed by those close to them. Mr. Barnette's responses suggested this might be a more ingrained pattern of anxious ambivalence in intimate relationships. He feels resentment and anger toward the person with whom he is in a relationship, but on the other hand feels dependent and anxious about being rejected. He endorsed feeling confused, indecisive, and distracted, however, there was no indication of active psychotic symptoms. His responses also suggested he has a history of antisocial behavior, and that his alcohol use has negatively impacted upon his life. The results of the PAI are consistent with those of the MMPI-2.

IMPRESSIONS: Diagnostically, according to the <u>Diagnostic and Statistical Manual of the American Psychiatric Association, Fourth Edition</u> (DSM-IV), we view Mr. Barnette as follows:

Axis I:     No Diagnosis or Condition, V71.09

Axis II:    Personality Disorder Not Otherwise Specified, with Antisocial and Narcissistic Features 301.90.

Axis III:   Status Post Gunshot Wound to the Right Hand and Right Hip;
            Tinea Versicola, Currently Being Treated;
            Tension Headaches, Responsive to Ibuprophen and Tylenol;
            Low Back Pain

As noted above, there is no evidence at this time to support that Mr. Barnette has in the past, or is currently suffering, from a severe mental disease or defect. His personality functioning can be described as consistent with a Personality Disorder Not Otherwise Specified with Antisocial and Narcissistic Features. A Personality Disorder Not Otherwise Specified is a classification given to disorders of personality functioning that do not meet criteria for any specific personality disorder, but instead show features of more than one specific personality disorder. These features, together, do cause

13.

FS-000487

clinically significant distress or impairment in one or more important areas of functioning. According to the DSM-IV, the essential feature of a personality disorder is an enduring pattern of inner experience and behavior that deviates from the expectations of the individual's culture and is manifested in at least two of the following areas: cognition, affectivity, interpersonal functioning, or impulse control. The pattern is inflexible and pervasive across a broad range of personal and social situations and leads to clinical significant distress or impairment in an important area of functioning. The pattern is stable and of long duration and its onset can usually be traced back to adolescence or early adulthood. The pattern is not better accounted for as the manifestation or consequence of other mental disorders, and is not due to the physiological affects of substance abuse or medication or other medical condition. Mr. Barnette's areas of personality dysfunction has been evident since late adolescence. The pattern of his dysfunction has been apparent across several different relationships and over a period of more than five years. Mr. Barnette's personality disorder fails to meet the full criteria for either a diagnosis of Antisocial Personality Disorder or of Narcissistic Personality Disorder, but embodies characteristics of both. In regard to the Antisocial Features, Mr. Barnette demonstrates failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest; irritability and aggressiveness as indicated by repeated physical assaults; and irresponsibility as indicated by repeated failure to sustain consistent work behavior or honor financial obligations. Mr. Barnette does not have clear evidence of a conduct disorder with onset before the age of 15. Thus, he does not meet the full criteria required to carry an Antisocial Personality Disorder. It is not atypical for an individual suffering from these personality features to demonstrate an inflated and arrogant self appraisal, and to present as somewhat cocky. As is also evidenced by Mr. Barnette, these individuals are often verbally facile and present with a superficial type of charm.

In regard to the Narcissistic Personality Disorder Features, Mr. Barnette again falls short of meeting the full criteria necessary to have this stand as an independent diagnosis. He does demonstrate a grandiose sense of self importance and tends to exaggerate his achievements and talents. There is some evidence to support that he has been preoccupied with thoughts of ideal love. He also exhibits a sense of entitlement and demonstrates unreasonable expectations in regard to his relationships with other individuals.

Although Mr. Barnette's Personality Disorder diagnosis is descriptive of his functioning currently and over the last several years, it does not reach the degree of severity to interfere with his decision making. There is no evidence that he has suffered from any episodes of psychosis. What is apparent, however, is that his presentation of symptoms may cover a relatively fragile self esteem. He presents as very sensitive to injury from criticism, feeling humiliated and degraded in response to any perceived attack on his self esteem. It is not uncommon for individuals with this type of personality structure to react with rage at perceived losses or the break up of significant relationships. This seems to be consistent with Mr. Barnette's behavior during the alleged offenses. Consistent with the antisocial features of his personality disfunction, is his disregard for the safety of others encountered in an effort to strike out at those he perceives as slighting him or humiliating him.

The type of personality disorder demonstrated by Mr. Barnette is not easily amenable to treatment. No psychopharmacologic interventions are indicated. Individual and group psychotherapy approaches, as well as behavior interventions have had some degree of success in modifying the behavior associated with personality disorders, but the prognosis is somewhat guarded and treatment must often take place in a structured place over an extensive period of time.

It appears that shortly after his arrest, Mr. Barnette may have experienced some symptoms of an Adjustment Disorder with Depressed Mood. These were successfully treated with antidepressant and

14.

FS-000488

Bates No. 14259

antianxiety medications. Although he does not currently demonstrate any overt symptoms or excessive anxiety, given the reality of his situation and the stresses he will face in the upcoming months, it is possible that he could again demonstrate symptoms of depression or anxiety. These should be treated symptomatically should they occur. Also, given the severity of his situation, he should be monitored for the onset of suicidal ideation, although there is no current evidence that he is considering this as a viable option.

In regard to Mr. Barnette's current competency to stand trial, it is our opinion that he currently has both a rational and a factual understanding of the charges against him and is able to work with his attorneys with a reasonable degree of rational understanding. It is our opinion that he is currently competent to stand trial. As noted, Mr. Barnette has a detailed understanding of his current legal situation and the workings of the court. He has had previous experience with the trail process. He demonstrates sufficient intellectual functioning to fully allow him to participate in resolution of his legal situation. As noted above, he is not currently suffering from a severe mental disease or defect that should impair his ability to stand trial.

In regard to the issue of criminal responsibility at the time of the alleged offenses, which ranged from 04/30/96, through 06/22/96, it is our opinion that Mr. Barnette was not, during that time, suffering from a severe mental disease or defect which impaired his ability to appreciate the nature, quality or wrongfulness of his conduct. As noted above, it is our impression that Mr. Barnette does suffer from a Personality Disorder, but the dysfunction associated with this disorder does not rise to the degree to impair his understanding of his behavior or to interfere with his ability to understand his actions and make decisions about his behavior. As described in the body of this report, Mr. Barnette has a pattern of problems developing in his relationships with women. During the process of the breakup of his relationship with Robin Williams, he felt belittled and humiliated. He also developed anger and jealousy as to what he perceived as her involvement in a new relationship with Benjamin Green. The early destructive behavior alleged to have occurred around 04/30/96 appeared to be most directly in response to these perceived insults. His realization of the likely consequences of that behavior, in conjunction with access to a weapon and alcohol ingestion, may have contributed to the progression of his anger and wish for revenge. Mr. Barnette admits that during his brooding over the situation, he considered killing Ms. Williams, but denies that was his intent on 04/30/96. This account is contradicted, to some degree, by the account provided by the victim in regard to the firebombing before her death. Mr. Barnette admits to falsely procuring a firearm and to altering it although he denies this with the intent of using it for the commission of the alleged offenses. Collateral information, including his own statements, at the time of arrest, indicate his plan to carjack a vehicle to provide transportation for himself to Roanoke, Virginia, to confront Ms. Williams. During this evaluation period, Mr. Barnette did not clearly identify a motivation for killing Mr. Donald Lee Allen. He does describe himself as being very "scared" at the time he confronted Mr. Lee Allen and again the availability of a weapon appeared to be a factor. Mr. Barnette did describe himself as being on the road to his end on 06/22/97, and indicated that he considered killing both Ms. Williams and himself. His descriptions of his intent in regard to the murder of Ms. Williams are somewhat conflicting and he implies that he may have actually been focussed on Mr. Green more than Ms. Williams. It is unclear how much his conflicting accounts regarding his behavior are indicative of his ambivalence around the time of the actual offenses or are the product of his relating and thinking about the events repeatedly during the last 15 months. Mr. Barnette clearly expresses his feeling that he had been wronged by Ms. Williams, but at the same time does not believe that his behavior was justified in response. He expresses his own opinion that he was responsible at the time of his actions, although he finds it hard to understand how he came to carry them out to completion. Mr. Barnette's behavior prior to and following the murder of Mr. Allen was deliberate and consistent with his plan to travel to Roanoke. The fact that he cut the

15.

FS-000489

phone lines to prevent calls for help from the household is consistent with his understanding of his behavior at that time. The fact that he left the scene after the killing is also consistent with the belief that he was known by other individuals who had observed the situation and that he would be taken into custody if he remained at the scene. It appears that post the murders, Mr. Barnette did attempt to commit suicide. It is also consistent with him understanding the severity of his actions at that point in time and realizing the consequences of his behavior. As noted, Mr. Barnette eventually returned to his family, cooperated with them in notifying the authorities, and did not resist arrest.

Mr. Barnette was returned to the Mecklinberg County area by the Marshal Service on 12/19/97. He was on no psychotropic medication at the time of his discharge from the facility. He is aware of the psychiatric and psychological services available in the Mecklinberg County Jail and how to access to mental health intervention if needed. As noted, he should be observed for deterioration of his mental status including the presentation of depressive symptomatology and suicidal ideation throughout resolution of his legal situation.


Sally C. Johnson, M.D.
Associate Warden Health Services
Chief Psychiatrist
Mental Health Division
FCI Butner, North Carolina

Michael Schaefer, Ph.D.
Staff Psychologist

SCJ/hh

16.

FS-000490

# TIN, FULTON, WALKER & OWEN

ATTORNEYS AT LAW
301 EAST PARK AVENUE
CHARLOTTE, NORTH CAROLINA 28203

NOELL P. TIN
SHIRLEY L. FULTON
NANCY E. WALKER
C. MELISSA OWEN
JOHN W. GRESHAM
S. LUKE LARGESS
JACOB H. SUSSMAN
MATTHEW G. PRUDEN
W. ROB HEROY

TELEPHONE (704) 338-1220
TELECOPIER (704) 338-1312
www.tinfulton.com

## AUTHORIZATION TO RELEASE PROTECTED HEALTH CARE INFORMATION

Pursuant to the Health Insurance Portability and Accountability Act (HIPAA) Privacy Regulations, 45 CFR § 164.508, **SALLY C. JOHNSON, M.D., and FCI-BUTNER**, is/are hereby authorized to release to the law office of TIN FULTON WALKER & OWEN PLLC or any of its representatives, all medical, mental health, psychological, and/or psychiatric records, meaning every page in my record, including but not limited to: testing data, evaluation notes, reports, and records, office notes, face sheets, discharge summaries, history and physical, consultation notes, intra-operative records, anesthesia records, operative reports, recovery room, pathology reports, medication administration records, EKG reports, EKG strips, EEG reports, EEG strips, therapy notes, orders, progress notes, laboratory results, nurses notes, vital sign sheets, intake/output records, reports of all x-rays, mammograms, CT scans, MRIs or PET scans, respiratory therapy records, nutrition records, social worker records, transfusion records, code sheets, consent forms, autopsy report, labor flow sheets, labor and delivery summary, delivery summary/report/note, fetal monitor strips, nursery records, emergency room records, transfer records, discharge instructions, personal property list, in-patient records, clinic records, correspondence, photographs, videotapes, telephone messages, computer generated information, medical bills, pharmacy and drug records, health insurance, insurance claim forms, insurance payment forms, Medicaid or Medicare records, concerning any medical treatment that Aquilia Marcivicci Barnette has received from you, at your institution, or which you keep in the regular course of business.

I hereby authorize release of all records regarding mental health, psychiatric, chemical dependency, AIDS or AIDS related condition, HIV infection, or genetic testing. A photostatic copy of this authorization shall be as valid as the original.

The purpose of this authorization and request is to obtain ALL medical information pertaining to Aquilia Marcivicci Barnette and the patient's physical condition, which may be relevant as it pertains to certain personal injury claims or litigation. This authorization expires three (3) years from the date of the signature. The aforementioned expiration date has not passed, as this matter is ongoing.

I hereby authorize attorneys of the law firm of TIN FULTON WALKER & OWEN PLLC to speak to my healthcare professionals privately or to take testimony at deposition or trial as may be requested.

Aquilia Marcivicci Barnette has the right to revoke this authorization in writing by providing a signed, written notice of revocation to the entity to whom this Authorization is directed or to the law firm of TIN FULTON WALKER & OWEN PLLC

Medical providers may not condition treatment or payment on whether the above-listed patient executes this authorization. I have been informed and understand that information disclosed pursuant to this Authorization may be subject to redisclosure by a recipient of such information. It is possible that once disclosed, the privacy of the information may no longer be protected under federal medical privacy law.

_____
Aquilia Marcivicci Barnette

Date of Signature: 6/20/12

SSN ███████████

FMC B-000001

# TIN, FULTON, WALKER & OWEN
### ATTORNEYS AT LAW
### 301 EAST PARK AVENUE
### CHARLOTTE, NORTH CAROLINA 28203

NOELL P. TIN
SHIRLEY L. FULTON
NANCY E. WALKER
C. MELISSA OWEN
JOHN W. GRESHAM
S. LUKE LARGESS
JACOB H. SUSSMAN
MATTHEW G. PRUDEN

TELEPHONE (704) 338-1220
TELECOPIER (704) 338-1312
www.tinfulton.com

## AUTHORIZATION FOR RELEASE OF INFORMATION

The undersigned does hereby authorize and direct you to release any and all records, including but not limited to: medical records (including daily progress notes, emergency room records, medication lists, tests and x-rays, visitor lists and discharge summaries), information relating to HIV testing, AIDS, and any AIDS-related syndromes, social service agency records (including welfare, food stamps, social security, and social security disability insurance), educational, school, or training records (including, but not limited to, grade and/or score reports, psychological testing results, Intelligence Quotient results, admissions documentation and disciplinary records), employment, personnel, or work history records, psychological and psychiatric records (including any psychologist/psychiatric notes, progress notes, medication lists and discharge summaries), substance abuse treatment center records (including any references to diagnoses, treatment and/or referral regarding drug and/or alcohol abuse), juvenile court records or any records incidental thereto, (including medical and psychological records), prison/probation/parole records (including pre-sentence reports, and any testing data), immigration, military records, *and any records whatsoever*, to Jacob H. Sussman, Tin, Fulton, Walker, & Owen, PLLC, 301 E Park Ave, Charlotte, North Carolina 28203, or anyone designated to be their agent.

This authority includes, but is not limited to inspection, copying and receipt of documents, photographs, and all other written or recorded information and the receipt of oral information.

This authorization releases the recipient of this form from any and all liability from damages of whatever kind as a result of compliance with this authorization and request for information or any attempt to comply with it.

A copy of this signed authorization shall be as effective and valid as the original. This authorization will remain valid and in effect until revoked in writing by the undersigned.

_____
Aquilia Marcivicci Barnette

6|20|12
_____
Date

_____
Date of Birth

_____
Social Security Number

FMC B-000002

Bates No. 14263

U.S Department of Justice **Certification of Identity**



FORM APPROVED OMB NO. 1103-0016
EXPIRES 10/01/13

Privacy Act Statement. In accordance with 28 CFR Section 16.41(d) personal data sufficient to identify the individuals submitting requests by mail under the Privacy Act of 1974, 5 U.S.C. Section 552a, is required. The purpose of this solicitation is to ensure that the records of individuals who are the subject of U.S. Department of Justice systems of records are not wrongfully disclosed by the Department. Requests will not be processed if this information is not furnished. False information on this form may subject the requester to criminal penalties under 18 U.S.C. Section 1001 and/or 5 U.S.C. Section 552a(i)(3).

Public reporting burden for this collection of information is estimated to average 0.50 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Suggestions for reducing this burden may be submitted to the Office of Information and Regulatory Affairs, Office of Management and Budget, Public Use Reports Project (1103-0016), Washington, DC 20503.

Full Name of Requester [1] AQUILIA MARCIVICCI BARNETTE

Citizenship Status [2] United States _____ Social Security Number [3] ███████

Current Address Reg. No. 12599-058, USP Terre Haute, P.O. Box 33, Terre Haute, IN 47808

Date of Birth ███████ Place of Birth Charlotte, North Carolina

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am the person named above, and I understand that any falsification of this statement is punishable under the provisions of 18 U.S.C. Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5 U.S.C. 552a(i)(3) by a fine of not more than $5,000.

Signature [4] _____ Date 6/20/12

---

**OPTIONAL: Authorization to Release Information to Another Person**

This form is also to be completed by a requester who is authorizing information relating to himself or herself to be released to another person.

Further, pursuant to 5 U.S.C. Section 552a(b). I authorize the U.S. Department of Justice to release any and all information relating to me to:

Jacob H. Sussman, Tin Fulton Walker + Owen PLLC, 301 E Park Ave, Charlotte NC 28203

**Print or Type Name**

[1] Name of individual who is the subject of the record(s) sought.

[2] Individual submitting a request under the Privacy Act of 1974 must be either "a citizen of the United States or an alien lawfully admitted for permanent residence," pursuant to 5 U.S.C. Section 552a(a)(2). Requests will be processed as Freedom of Information Act requests pursuant to 5 U.S.C. Section 552, rather than Privacy Act requests, for individuals who are not United States citizens or aliens lawfully admitted for permanent residence.

[3] Providing your social security number is voluntary. You are asked to provide your social security number only to facilitate the identification of records relating to you. Without your social security number, the Department may be unable to locate any or all records pertaining to you.

[4] Signature of individual who is the subject of the record sought.

FORM DOJ-361

FMC B-000003

BP-A0621
JUN 10
AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**

| Inmate Name AQUILIA MARCIVICCI BARNETTE | Register Number 12599-058 | Date 6/20/12 |
|---|---|---|
| | Date of Birth ▓▓▓▓ | Social Security Number ▓▓▓▓ |

I hereby authorize and request the Federal Bureau of Prisons to:

☑ release information to, or   ☐ obtain information from

**PLEASE CONTACT IF PAYMENT IS REQUIRED PRIOR TO FILLING REQUEST**

Name/Facility: Jacob H. Sussman/Tin Fulton Walker & Owen PLLC

Address: 301 East Park Avenue

City, State, Zip: Charlotte, NC 28203

I understand the information is to be used for (specific reason for release of information):

☐ Continuation of care, or   ☑ Other 2255 litigation

Information to be Released/Obtained: Copy of and/or information from my medical file pertaining to my evaluation and treatment received from 02/04/1997 to present

This is to include:
☑ Complete Record   ☑ Discharge Summary   ☑ History & Physical
☑ Operative Reports   ☑ Consultations   ☑ Progress Notes   ☑ X-ray Reports
☑ Laboratory Reports   ☑ Pathology Reports   ☑ Actual Films*#   ☑ Actual Slides*
☑ Other: any and all documents, records, reports, notes, etc., pertaining to Aquilia M. Barnette

*will be returned
#duplicates accepted

I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization. I need not sign this form in order to assure treatment. I understand that information used or disclosed pursuant to this authorization could be subject to redisclosure by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality. I understand that I may revoke this consent at any time by sending a written notice to the Supervisor of Medical Records. I understand that any release which has been made prior to my revocation and which was made in reliance upon this authorization shall not constitute a breach of my rights to confidentiality. This authorization will automatically expire three months from the date of the signature.

| Signature of Patient *(signed)* FAX SIGNATURE VALID ORIGINAL | Date (Month, Day, Year) 6/20/12 | Staff Witness *(signed)* |
|---|---|---|

SPECIFIC AUTHORIZATION FOR RELEASE OF INFORMATION PROTECTED BY STATE OR FEDERAL LAW. Must sign below, to Release Protected Information.

I specifically authorize the release of data and information relating to:
☑ 1. Substance Abuse   ☑ 2. Mental Health   ☑ 3. HIV

*(signed)* Signature   Date 6/20/12

Deliver Records To: (Institution Address & Fax number)

POF   Prescribed by P6090   This form replaces BP-S621 Old AUG 96

FMC B-000004

Medical Form 9501F
Revised 10-1-55

IN-PATIENT MEDICAL RECORD
COVER SHEET

Name Barnette, Aquilia    No. 12599-058

Date of Adm 11-17-97  Date of Discharge 12-19-97 Days in Hospital 32
  DOB:7-7-73

| DIAGNOSES LISTED IN ORDER OF THEIR IMPORTANCE | CODE NUMBER |
|---|---|
| Axis I:  Adjustment Disorder with Disturbance of Conduct, Acute | 309.3 |
| Axis II:  Personality Disorder, Not Otherwise Specified with Antisocial and Narcissistic Features | 301.9 |
| Axis III: No current significant medical problems S/P Gunshot wounds to hand and leg | |

| OPERATIONS AND OTHER THERAPEUTIC PROCEDURES | CODE NUMBER |
|---|---|
| On no psychotropic medication | |
| Patient should be observed for onset of depressive symptoms including thoughts of self harm. | |

Disposition:
41+42 Study Completed/ W/D of NC

FCI BUTNER,NC
MENTAL HEALTH DIVISION

Physician's Signature: *Sally Johnson MD*

Physician's Stamp: *SALLY JOHNSON MD*

FMC B-000005

PATIENT NAME: Barnette, Aquilia REGISTER #: 12599-058

Date of Initial Contact/Admission to MHD: 11/17/97 Date of Birth: 7/7/73

Race/Ethnic Origin: Black  Marital Status: Married (Single) Divorced (circle one)

Legal Status: Study 4241, 4242, 4247

Patient's Home Address/Telephone Number:

3513 West Blvd., Charlotte, NC 28208

704-399-5479

Name/Address/Phone Number of Next of Kin: Sonia Barnette (mother)

same as above

Level of Education: 11th

Type/Place of Employment: Electrolux salesman

Any Other Significant Identifying Information:

surgical scar approx. 5½" on (R) hip

Date Information was Gathered: 11/17/97

Signature of Staff Gathering Information: Nadine R. Wilson RN

Printed Name of Staff: Nadine Wilson RN

(File in Section I of the Medical Record).

Barnette, Aquilia Marcivic
Reg# 12599-058
DOB: 07-07-1973
I Butner MHD    FMC B-000006

**WORKING DIAGNOSES-CATEGORY #800 (Personality Disorders)**

DSM IV DIAGNOSIS: _____ PD NOS _____ CODE: 301.9 _____

_Personality Disorder_

| | STAFF INITIALS+DATE | |
|---|---|---|
| | THERAPIST | HSS |
| I. Admission Criteria:<br>1. Potential danger to self, others, or property<br>2. Need for comprehensive diagnostic assessment<br>3. Referral for long term assessment or treatment<br>4. Need for continuous skilled observation or therapeutic milieu<br>5. Impaired social, familial, occupational, or institutional functioning<br>6. Unable to be managed in general prison population<br>7. Legally mandated admission<br>8. Other (specify): _____ | 11/18/97<br>CRV | 11/18/97<br>OmD |
| II. Suggested Diagnostic and Therapeutic Services:<br>1. Treatment plan to include problem formulation, treatment goals and therapeutic modalities<br>2. No more than three psychotropic medications at any given time<br>3. No change of psychotropic medication more than twice in a 7-day period<br>4. Psychological Testing<br>5. Other (specify): _____ | 11/18/97<br>CRV | |
| III. Discharge Criteria:<br>1. Achievement of inpatient treatment goals as outlined in the treatment plan<br>2. Resolution of reason for admission<br>3. Specific follow-up treatment plan established<br>4. Other (specify): _____ | 11/18/97<br>CRV | |
| IV. Suggested Length of Stay is 60 days:<br>Other (specify): _____ 4241 + 4242 _____ | | |
| V. Reason(s) for Extending Length of Stay:<br>1. Continued danger to self, others, or property<br>2. Existence/development of medical complications<br>3. Medication reaction<br>4. Continued need for specific type of inpatient service, therapeutic milieu, or skilled observation<br>5. Legally mandated<br>6. Custody or security issues<br>7. Other (specify): _____ | | |

NAME: _Bernette Aguila_ REGISTER NUMBER: _12599-05f_

DATE: _11/18/97_

FMC B-000007

| DATE AND TIME | | | | | |
|---|---|---|---|---|---|
| RT | STOP | RX | DRUG ORDERS | DOCTOR'S SIGNATURE | NURSE'S SIGNATURE |

**\*\*MENTAL HEALTH ADMISSION ORDERS CHECK APPROPRIATE ORDERS\*\*\***

1. Admit to Mental Admission/Seclusion Unit ( ✓ )    noted 11/17/97 1815 *Nadine Wilson cal* *Nadine Wilson cal*

2. Reason for Referral(specify):

3. Vital Signs On Admission: ✓

4. Special Diet Needs: ( ✓ ) None ( )Yes(specify):

5. Chest x-ray: Routine/Lateral ( )

6. Urinalysis ( ✓ )

7. EKG if over 50 or clinically indicated ( ) N/A ✓

8. Laboratory Mental Health Panel ( ✓ )
Other-specify:

9. PPD ( ✓ ) Tetanus( ) Not indicated-explain:
*in 1995 by Hx*

10. Allergies: *Heforin ?*

11. Add to Chronic Care Clinic. specify:
not indicated( ✓ )

12. Prior Health Record Reviewed: ( )Yes ( )No ( ✓ )N/A

13. Special Precautions: ( ✓ )None ( )Yes-explain:

14. Additional Orders: continue on next page:

Date   Time    *SSjelickipt*    *Vance mo PhD*
11/17/97 1500   Physician's Assistant Signature & Stamp

Date   Time: Physician's Signature/Stamp *(on reverse side)*

CHARLES VANCE, MD, PhD.
Psychiatric Fellow

PATIENT'S IDENTIFICATION (For typed or written entries give: Name - last, first, middle; grade; rank; rate; hospital or medical facility)    | REGISTER NO | WARD NO |

Barnette, Aquilia Marcivic
Reg# 12599-058
DOB: 07-07-1973
FCI Butner MHD

**DOCTOR'S ORDERS**

STANDARD FORM 509 (Rev. 10-75)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45-505
509-112

FMC B-000008

| | | | DOCTOR'S ORDERS | | |
|---|---|---|---|---|---|
| MEDICAL RECORD | | | *(Sign all orders)* | | |

<table>
<tr><th colspan="2">DATE AND TIME</th><th rowspan="2">RX</th><th rowspan="2">DRUG ORDERS</th><th rowspan="2">DOCTOR'S SIGNATURE</th><th rowspan="2">NURSE'S SIGNATURE</th></tr>
<tr><th>ST</th><th>STOP</th></tr>
<tr><td>11/17/97</td><td>1800</td><td></td><td>T.V.O Dr. Owens / Nadine Wilson RN</td><td></td><td></td></tr>
<tr><td></td><td></td><td></td><td>Admit to seclusion x 24°.</td><td></td><td></td></tr>
<tr><td></td><td></td><td></td><td>No special precautions.</td><td></td><td></td></tr>
<tr><td></td><td></td><td></td><td>noted 11/17/97 1800<br>Nadine Wilson RN<br>Nadine Wilson RN</td><td>Vance MD, PhD</td><td></td></tr>
<tr><td>11/18/97</td><td></td><td></td><td>Seclusion x 24° per V.O. Dr. Herbal / Athef</td><td></td><td>CHARLES VANCE, MD, PhD.<br>Psychiatric Fellow</td></tr>
<tr><td></td><td>1000</td><td></td><td></td><td>Amy Tharington RN</td><td>Vance MD, PhD</td></tr>
<tr><td>11/19/97</td><td></td><td>①</td><td>Seclusion x 24° c̄ 8w — error GRV</td><td></td><td>11- ___ @ ___<br>CHARLES VANCE, MD, PhD<br>V. RN Lawrinen<br>Psychiatric Fellow<br>RN Lawrinen</td></tr>
<tr><td>10.02 am</td><td></td><td>①</td><td>Seclusion x 24°</td><td>Vance MD, PhD</td><td></td></tr>
<tr><td>11/20/97</td><td></td><td></td><td>(cont Seclusion) x 24/hrs.</td><td></td><td>CHARLES VANCE, MD, PhD.<br>Psychiatric Fellow</td></tr>
<tr><td>10/5</td><td></td><td></td><td>Noted 11/20/97<br>© 1035 Amy L</td><td>S. Johnson MD<br>S. JOHNSON M.D.<br>AWHS.</td><td></td></tr>
<tr><td></td><td></td><td></td><td>Amy Tharington RN</td><td></td><td></td></tr>
<tr><td>11/21/97</td><td></td><td>①</td><td>Seclusion x 24°</td><td></td><td></td></tr>
<tr><td>10.00 am</td><td></td><td></td><td>Noted Beth Hiers RN 11/21/97<br>Beth Heese 1020</td><td>Vance MD, PhD</td><td>CHARLES VANCE, MD, PhD.<br>Psychiatric Fellow<br>Vance MD, PhD</td></tr>
<tr><td>11/22/97</td><td></td><td></td><td>VO Dr Vance</td><td></td><td></td></tr>
<tr><td></td><td>1000</td><td></td><td>Seclusion x 24°</td><td>re: J. Tifflong N.C.</td><td>CHARLES VANCE, MD<br>Psychiatric Fellow</td></tr>
<tr><td>11/23/97</td><td>1055</td><td></td><td>Seclusion x 24°<br>V.O. Dr. Vance / Sheez RN</td><td></td><td>Vance MD, PhD<br>CHARLES VANCE, MD,<br>Psychiatric Fellow</td></tr>
</table>

*(Continue on reverse side)*

PATIENT'S IDENTIFICATION (For typed or written entries give: Name – last, first, middle; grade; rank; rate; hospital or medical facility)

REGISTER NO

WARD N

Barnette, Aquilia Marcivic
Reg# 12599-058
DOB: 07-07-1973
FCI Butner MHD

DOCTOR'S ORDERS

STANDARD FORM 508 (Rev. 10-75)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45-505
508-1 FCI Butner
Mental Health Division

FMC B-000009

# MEDICAL RECORD

## DOCTOR'S ORDERS
(Sign all orders)

| DATE AND TIME | | RX | DRUG ORDERS | DOCTOR'S SIGNATURE | NURSE'S SIGNATURE |
|---|---|---|---|---|---|
| RT | STOP | | | | |
| 11/24/97 | | | Continue Seclusion x 24 hrs. | | |
| 1/10 | | | noted Heidi Hersen 11/24/97 /28 | S. Johnson MD | S. Johnson MD |
| 11-25-97 | 1020 | ① | V/0 Dr. Vance / Seclusion x 24° Ray Pitcai RN | Ray Pitcairn, RN Nursing Supervisor | CHARLES VANCE, MD, PhD. Psychiatric Fellow |
| | | | Vance MD, PhD | | |
| 11/24/97 | | ① | Seclusion x 24° | Vance MD PhD | |
| 9:00a | | | | CHARLES VANCE, MD, PhD. Psychiatric Fellow | |
| | | | noted 11/26/97 1330 Nadine Wilson RN/Nad RN | | |
| 11/27/97 | | ① | Seclusion x 24° | Vance MD PhD | 11/27/97 1155 |
| 10:30a | | | | CHARLES VANCE, MD, PhD. Psychiatric Fellow | |
| 11/26/97 | | ① | Seclusion x 24° | Vance MD PhD | |
| 9:50a | | | noted Heidi Hersen RN 11/28/97 1001 | CHARLES VANCE, MD, PhD. Psychiatric Fellow | |
| 11/25/97 | | ① | Seclusion x 24° | Vance MD PhD | |
| 12:00p | | | Jeff Derry NC 11/29/97 | CHARLES VANCE, MD, PhD. Psychiatric Fellow | |
| 11/30/97 | 1200 | | Seclusion x 24 hrs. | | |
| | | | V.O. Dr. Vance / V. McLaurin RN / V McLaurin RN. | | |
| | | | | Verbal Order Signature: Vance MD, PhD Date : 11/30/97 | |

(Continue on reverse side)

PATIENT'S IDENTIFICATION (For typed or written entries give: Name – last, first, middle; grade; rank; rate; hospital or medical facility)

RE HEOR NO

Bamette, Aquilia Marcivic
Reg# 12599-058
DOB: 07-07-1973
FCI Butner MHD

DOCTOR'S ORDERS CHARLES VANCE, MD, PhD.
Psychiatric Fellow
STANDARD FORM 508 (Rev. 10-75)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45-505
508-1 FCI Butner
Mental Health Division B-000010

| DATE AND TIME | | RX | DRUG ORDERS | DOCTOR'S SIGNATURE | NURSE'S SIGNATURE |
|---|---|---|---|---|---|
| 9T | STOP | | | | |
| 12/1/97 10.35 am | | ① | Relear from Seclusion to my switch unit pending SIS clearance | | |
| | | ② | Pending release maintain Seclusion x 24° | | |
| | | | Noted Heidi Hiersen 12/01/97 Heidi Hiersen 1100 | Vance mo PhD | CHARLES VANCE, MD, PhD. Psychiatric Fellow |
| 12/1/97 4.00 p | | ① | Cancel pending release from Seclusion | | |
| | | ② | Supervised Rec Passes changed by V.O. | Dr Vance / M. ORSINI | |
| | | ③ | Motrin 600 400 mg po t.d prn back pain | | /M V.O. mo PhD |
| | | | Noted 12/1/97 @ 0325 | Vance mo PhD | |
| | | | Beasley W/ C. Beasley, RN | | CHARLES VANCE, MD, PhD. Psychiatric Fellow |
| 12/2/97 8.55 am | | ① | Seclusion x 24° | Vance mo PhD | |
| | | | Noted Ray Pitcairn RN 12-2-97 1010 | Ray Pitcairn, RN Nursing Supervisor | CHARLES VANCE, MD, PhD. Psychiatric Fellow |
| 12/2/97 2150 | | | T.O. P.A Sielidai / M. ORSINI Antacid Tablets II P.O. now x I dose. | | |
| | | | noted M.O ORSINI RN 12-2-97 2150 | KH √ 12/3/97 @ 0035 Beasley Beasley W/C | CHARLES VANCE, MD, PhD. Psychiatric Fellow |

PATIENT'S IDENTIFICATION (For typed or written entries give: Name – last, first, middle; grade; rank; rate; hospital or medical facility)

REGISTER NO

WARD NO

Barnette, Aquilia Marcivic
Reg# 12599-058
DOB: 07-07-1973
FCI Butner MHD

DOCTOR'S ORDERS

STANDARD FORM 508 (Rev. 10-75)
Prescribed by GSA and ICMR
FIRMR (41) CFR) 201-45-505
508-1 FCI Butner
Mental Health Division-000011

Case 3:12-cv-00327-MOC    Document 77-14    Filed 12/22/14    Page 98 of 100
Bates No. 142272

| DATE AND TIME | | RX | DRUG ORDERS | DOCTOR'S SIGNATURE | NURSE'S SIGNATURE |
| --- | --- | --- | --- | --- | --- |
| RT | STOP | | | | |
| 12/3/97 0630 | | | Motrin 800 mg 1 PO TID x 30 c food PRN | Stacy Narlett Stacy Parlette | |
| | 12/4/97 1200 | | Noted: M. Eddinger RN/M.EDD RN 0 0 | Vance mo pho | |
| | 12/4/97 1200 | | NV Chesley RN/ C.Beasley RN | | |
| 12/3/97 9.50a | | 0 | Seclusion x 24° | Vance mo pho | |
| | | | Noted 12/3/97 @ 1000 | | |
| | | | /Amy Tharrington RN | CHARLES VANCE, MD, PhD. Psychiatric Fellow | 12/4/97 1220pm Nadine Wilson RN Nadine Wilson RN |
| 12/4/97 9.00a | | 0 | Seclusion x 24° | | |
| | | 0 | Full Day Passes | Vance MD pho | |
| 12/5/97 1130 | | | Release to Any Unit | CHARLES VANCE, MD, PhD. Psychiatric Fellow JEFF DERZY | 12/5/97 CHARLES VANCE, MD, PHD. Psychiatric Fellow |
| 12-15-97 | 1-14-98 | 1) | Selinium Sulfide, ut pict | CLINT FULLWOOD Physician's Assistant P. Libero RN | noted 12/15/97 1750 Nadine Wilson RN Nadine Wilson RN |
| 12/15/97 | 1735 | | V.O. P.A. Ward / Nadine Wilson RN Clarification on above order, Apply nightly and remove in A.M. X 10 days. Selenium Sulfide. — transcribed 12/15/97 1750p Nadine Wilson RN Nadine Wilson RN | | 12/16/97 0330 Chesley RN C Beasley RN Vance mo pho |
| 12/16/97 | 0330 | | M. Eddinger RN/M.EDDINGER | Nadine Wilson RN | CHARLES VANCE, MD, PhD. Psychiatric Fellow |

(Continue on reverse side)

PATIENT'S IDENTIFICATION (For typed or written entries give: Name – last, first, middle; grade; rank; rate; hospital or medical facility)

REGISTER NO

DOCTOR'S ORDERS

Barnette, Aquilia Marcivic
Reg# 12599-058
DOB: 07-07-1973
FCI Butner MHD

STANDARD FORM 508 (Rev. 10-75)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45-505
508-1 FCI Butner
Mental Health Division

RMG B-000012

| MEDICAL RECORD | | | DOCTOR'S ORDERS (Sign all orders.) | | |
|---|---|---|---|---|---|

| DATE AND TIME | | RX | DRUG ORDERS | DOCTOR'S SIGNATURE | NURSE'S SIGNATURE |
|---|---|---|---|---|---|
| RT | STOP | | | | |
| 12/16/97 | 8.00 | ① | Motrin 800 mg po tid pn c food x 30 dy | 30 dy | 12-16-97 @ 1045 Transcribed V. McLaurin RN V.McLaurin RN |
| | | ② | Vistaril 25 mg po qid pn anxiety/stress x 30 dy | | |
| | | ③ | Tylenol 650 mg po qid pn x 30 dys | | |
| | | | 1st √ 12/17/97 0002 S.Brown SHARON BROWN RN | Vance MD Phr | |
| | | | 2nd √ 12/17/97 @ 0115 C.Beasley (C Beasley) | CHARLES VANCE, MD, PHD. Psychiatric Fellow | |
| 12/17/97 | 0815 | | Chart Reviewed: Medical Axis III - PPD ∅mm 11/20/97 ② Past allergy to Heparin No meds - May release/transfer. PV Libero MD PV Libero MD | | |
| 12/18/97 | 8.30 | ① ② | D/C to Courts on 12/19/97 B No ψ meds | Vance MD Phr | |
| 12/18/97 | 1430 | ① ② ③ | To DC on 12/19/97. No meds. Observe for onset of depressive symptoms including self destructive ideation. (Continue on reverse side) | CHARLES VANCE, MD, PHD. Psychiatric Fellow | |

PATIENT'S IDENTIFICATION (For typed or written entries give: Name - last, first, middle; grade; rank; rate; hospital or medical facility)

REGISTER NO.  S JOHNSON MD   WARD NO

DOCTOR'S ORDERS

Barnette, Aquilia Marcivic
Reg# 12599-058
DOB: 07-07-1973
FCI Butner MHD

STANDARD FORM 508 (Rev. 10-75)
Prescribed by GSA and ICMR
FIRMR (41 CFR) 201-45-505
508-1 FCI Butner
Mental Health Division   FMC B-000013