## PROGRESS NOTES

responses to extreme stress. Educated ~ aspects of stress management including exercise which pt says he enjoys. Will write for Tylenol ~ Motrin to help handle HA ~ Vistaril prn to help c anxiety. Pt indicated he would be interested in talking c the chaplain. Word passed on to Chaplain Morton who said he would be glad to talk to pt today.

Vance MD, PhD

**CHARLES VANCE, MD, PhD.**
**Psychiatric Fellow**

FMC B-000114

Case 3:12-cv-00327-MOC     Document 77-16     Filed 12/22/14     Page 1 of 42
Bates No. 14375

| DATE | |
|---|---|
| 12/15/97 1340. | S: Seen individually. Feeling the stress. Having H/A's - like band around head. Dr. Vance ordered Tylenol & motrin. Off + on all day — Had series of stress H/A's in Va. before moved home. Talked about Psychologist (Defense) cancelling visit. George Lauren (attorney) visited Saturday. Was good visit (1st to Visiting Rm.) Is in Rm 141 - with Theophylos Williams. He feels sorry for him - roomate stays in bed all day - won't clean up room or help with anything. Roomate was masturbating in room. He went to counselor re: issue. Some humor but some stress too. Got money on account Tues. Has talked to Mom 3 or 4 X's. Seems OK. Still reading a lot. Going to bed 8:30 or 9 PM - up a little earlier. Started smoking again. Started smoking at age 22 → until point of arrest (~ 1 yr). Still prefers compound to seclusion. Finds himself thinking about each day + details of Court — "what will 1st day be like — jury selection? witnesses" etc. |

*(Continue on reverse side)*

| PATIENT'S IDENTIFICATION (For typed or written entries give; Name—last, first, middle grade; rank; rate; hospital or medical facility) | REGISTER NO. | WARD NO. |
|---|---|---|
| Barnette, A. M. | | |

**PROGRESS NOTES**
STANDARD FORM 509 (Rev. 11-77)
Prescribed by GSA/ICMR
FIRMR (41 CFR) 201-45.505
509-111

FMC B-000115

Case 3:12-cv-00327-MOC    Document 77-16    Filed 12/22/14    Page 2 of 42
Bates No. 14576

DATE

Attorney filled him in on developments in case. Feels frightened — but pushes it down. Finds self jumping from issue to issue — all important — "time to get serious." Doesn't perceive a plea bargain will be option. Was willing to plea for life sentence. Has pleaded "not guilty." Attorney filed motion (2/97.) about mental issues. Has talked to attorney about NGRI. Does feel something happened at TOC. Realizes that if he's not insane "period" then it's less likely that one would be found NGRI. Alcohol may have been factor in his case. Talked about being under duress — depressed, drinking. That crime — didn't want to be here any more after that Sat. night — I just knew I'd be dead. Thought I would have been dead earlier — after Robin died or was shot — I wanted to die. Has asked himself why he didn't do it. As day passed + that night he would do it — couldn't believe what had happened. Before he left home — had thought about suicide. Had thought about it in weeks prior to crime.

Between 4/96 + 6/96 mental state got worse. Didn't know about other guy at first —

RMC B-000116

| DATE | |
| --- | --- |
| 12/15/9 (cont'd) | he stayed by himself — the worse it got. Kept pictures of her (?) cards. In April was in better mind set — was hopeful he could turn things around. Part not getting job at car dealership — felt like failure. Admits firebombing (?) was serious — objective was not to kill her — he knows objective but won't say. Was upset she was hurt. Things had gone too far — thought "they'll come get me." Played a waiting game — the longer it took the more he had to think about — was surprised no one came to arrest him. Was "terrorized of myself" — "I was not myself." Did think he could fight the case — didn't want to go to jail — thinking life was over was broader concept. As time passed got more more angry about everything that had happened. Bitter + feelings grew — thought of turning himself in. (No current suicidal ideation). "I'm not ready to die — but I have not one oz. of wish to skirt my responsibility." I'm not |

(Continue on reverse side)

PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle grade; rank; rate; hospital or medical facility)

REGISTER NO.    WARD NO.

FCI BUTNER
BUTNER

PROGRESS NOTES
STANDARD FORM 509 (Rev. 11-77)
Prescribed by GSA/ICMR
FIRMR (41 CFR) 201-45.505
509-111

FMC B-000117

## PROGRESS NOTES

**DATE**

Really interested in some of the stuff my lawyer are trying to do. I had nothing to do with

6/22/96.

A. Patient accepting responsibility for behavior - Good understanding of legal procedures. Cooperative with evaluation -

P. Continue Interviews.

S. Johnson M.D.

FMC B-000118

S. Government Printing Office: 1989-261-175/90001

Case 3:12-cv-00327-MOC    Document 77-16    Filed 12/22/14    Page 5 of 42
Bates No. 14379

12/16/97. S/ Seen individually in office. Headache less
1015 O/ since roommate secluded. Talked about
interactions on unit/compound. Has 3 or 4 friends
on hill. Saw some folks in GP he knows from
Charlotte + from jail. —one an old friend
Has had no concerns re. safety. Talked more
about CTST. Has gone through "pre jury questionaire",
has tracked motion dates re: picking jury,
Reviewed role of jury - (weighing evidence,
guilt/innocence). Also understands 2nd
phase of death penalty trial — is concentrating
on that phase. Knows Judge is Judge Potter.
Judge sets the pace, keeps everybody in
bounds. Looked at possible penalties. Then
looked at his role. The decision to take the
stand lies with him. — he's leaning toward
testifying. He wants to clear up things about his
past record. Has some concern about questions
about current case. Wants to get jury to
understand situation he was in Understand his
feelings.
/ Really didn't want to go back to Charlotte —
fearful of being here — much history of trouble.

(Continue on reverse side)

PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle
grade; rank; rate; hospital or medical facility)

REGISTER NO.                    WARD NO.

Barnette, A. M.

FCI BUTNER
BUTNER, N

**PROGRESS NOTES**
STANDARD FORM 509 (Rev. 11-77)
Prescribed by GSA/ICMR,
FIRMR (41 CFR) 201-45.505
509-111

FMC B-000119

Bought gun in May for his own protection. Felt betrayed by Robin in being forced back home — he resented her for that — took different room in house. Viewed himself as protecting Mom + 2 brothers + killing (with) knife or gun of snakes.

Altering gun — was to keep it hidden in room — like a kid — didn't want a big old Grandpop shot gun — I liked it — it was kind of neat. His ~ 7 acres property — mostly wooded. Didn't have car when returned to Charlotte — had plan to try to work something out with Mom to get car —

That night — anger built up — nothing special about it — was playing video games, drinking beer — game on TV with brothers. Though nightly thing — thinking about Robin — "I just broke" — I had enough — got dressed + just split — left side door with gun. — Couldn't take it any more — Failures — relationships, job.

Was so angry, fuming, felt evil come over me" — had never been that angry — scared him — Brothers dad was there, Uncle was there, That anger fluctuated but only up from baseline.

Just hanging in house T-shirt, shorts. Drank 5 to 6 four beers in early evening

FMC B-000120

**DATE**

**12/10/97 (Cont'd.)** Either had 32oz beers. Wasn't sloppy drunk — when he drinks — does just lower inhibitions. When thought crossed his mind, maybe if hadn't drunk anything — it wouldn't have come about. Has not lost memories for evening. Attorneys have told him not to talk about details of crime. Wanted answers. Has detailed "A-Z" memory of time in question — a few blurry spots — but most is there — "like reliving a nightmare." It's like 2 stories — what happened & why it happened.

Anger diminished as got to Tennessee — the bitterness stayed with him until he got home — a feeling that things shouldn't have happened as did — but it did — and rest was to unfold. Hated himself — but didn't want to die. Was angry at himself for what had happened.

Brief sense of revenge — replaced quickly with feeling of what have I done.

Conflict w. Mom. on Sunday — Mom crying — Told him Robin was dead — Things hit him so much worse.

Talked about being w/o a relationship.

(Continue on reverse side)

PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle grade, rank; rate; hospital or medical facility)

REGISTER NO.

WARD NO.

FCI BUTNER
BUTNER, NC

PROGRESS NOTES
STANDARD FORM 509 (Rev. 11-77)
Prescribed by GSA/ICMR.
FIRMR (41 CFR) 201-45.505
509-111

FMC B-000121

## PROGRESS NOTES

DATE

wished he would have gotten out sooner.
Reviewed sexual history. Role of his concern
over Robin having new (old) relationship —
"To think (he) was so committed to one person +
she could have been having an affair behind
his back." - hurt a lot. Main part was he
had given himself to her "body + soul". She was
faking during the relationship - she deceived me."
No beep with Robin in April - was with
her friend. Had he been there in June -
all the better -
Words exchanged between the two of them
that Am - Contributed - I just wanted answers.
When caught up with her - angry, gone -
asked where in her - why did she let him shoot
at him. He wanted her to come with him to
show him where he lives lived. She tried to
grab the gun. Threatened to kill her if she didn't
come with him - she looked in his eyes - "you're
not going to kill me" - grabbed a gun + here
she goes again - I'm a weakling + there it goes
again - gun went back up. She defied me -
in middle of street with sawed off shot gun -
"If I hadn't sat at home all that time -
She was right - she knew me too well - angered
me even more - That's when it happened."

S. Johnson m.D. AWHS

RTW D without continues to cooperate with evaluation. Continue John—

S. Government Printing Office: 1985—461—275/90001

STANDARD FORM 509 BACK (Rev. 11-77)

FMC D-000122

Bates No. 714383

DATE

12/17/97 S/ Seen individually. Patient has finished
1,00 A.M. psychological testing with Dr. Schaefer.
Had some testing by Dr. Tyson in past.
Patient plans to see Dr. Schaefer for review
of results.

· Talked about brief tenure with new
roomate. Believes roomate stole his
pack of Newport cigarettes. Then roomate
was moved. No headache yet today.
Talked about reaction to conversation
yesterday. Has continued to think about
upcoming trial.

· Talked about relationships again —
once attached — deeply attached + break ups
come hard for me. Maintains feelings
even post break up. During last 5 yr.
including Tasha, — at Breakups —
line blurred. — love seemed greater than
it was (Crystal, Alicia, Robin) —
— just let my feelings run.

· As relationship was developing
problems — he had brief affair (out of spite)
with girl from (continued on reverse side) music —

PATIENT'S IDENTIFICATION *(For typed or written entries give: Name—last, first, middle; grade; rank; rate; hospital or medical facility)* | REGISTER NO. | WARD-NO

*Barnette,*

FMC B-000123

## PROGRESS NOTES

**DATE**

it hilighted he preferred relationship with Robin. In latter part - lots of situation, less trust of her. All started chipping away at relationship. He accused her, she got fed up & ended conversation. Physical fight day of breakup. - Robin has thing about him putting his finger in her face. On at least 2 other occasions - she hit him with candelabras & in car. Had done some physical things in previous relationships, Max with Robin was pushing & shoving. Night before breakup was argument over her mother. Day of breakup - took day off - to Pier 1 - spent 60$ on China - cooked dinner picked her up from work - he in better mood and she still grumpy. That night continued with argument & said he was leaving. "You're not going nowhere." Later that night into altercation over "who this guy is." "Benny" - he connected phone # / calls / "mysterious disappearances from work - not there when he's out of town." He went through old purse found condom - just added it to the evidence pile. He felt this guy was changing their relationship. He believes he was right about his suspicions. Wed. after he left he talked to her - she went out with him Friday - he staying over Monday.

.S. GPO : 1987 O - 173-489
STANDARD FORM 509 BACK (Rev. 11-77)

FMC B-000124

Case 3:12-cv-00327-MOC    Document 77-16    Filed 12/22/14    Page 11 of 42

Bates No. 14985

DATE

12/17/97 He knew he was there—because, he called her—he was there—heard him. He had hopes they'd get together maybe 3, 6 or 12 mo. down the road.

As of Monday—he crying, upset, job fell through,—she couldn't take the time—She had a hot date—"kicked me to the side"—She tells me it's Tim—old friend from college"— I knew it was lie." Spent time most of night trying to get feelings across— all feelings came back I felt it was Benny. He called her multiple times one night— "I was in need—whoever the chump is—you can have a date another night." "Turned to what the hell is she doing"

I wanted to confront the guy—partially blamed him for dissolution of relationship. It was to end in marriage or he wouldn't go there—"she let me down". Called it the "perfect relationship."

Money problems—Robin had to pay April rent—his income was inconsistent after lost job with Camelot. $ was major) stress. Were behind on bills.

(Continue on reverse side)

PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle; grade; rank; rate; hospital or medical facility)

REGISTER NO.

WARD NO

PROGRESS NOTES

STANDARD FORM 509 (Rev. 11-77)
Prescribed by GSA/ICMR.
FIRMR (41 CFR) 201-45.505
509-11FMC B-000125

Case 3:12-cv-00327-MOC    Document 77-16    Filed 12/22/14    Page 12 of 42
Bates No. 14386

## PROGRESS NOTES

DATE

A/P Am. tying up data review. Patient tolerating stress relatively well. No overt Suicidal ideation. Will close out interviews this week. Have reviewed testing-

S. Johnson M.D.
S. JOHNSON M.D.
AW+S

**Discharge Note.**

12/18/97
1040

Seen individually in my office. Alert, oriented, slept well. No headache. Informed him defense retained psychiatrist Seymour Halleck MD would be out to see him this afternoon. Instructed him to be in unit by 1245.

Reviewed time spent in jail at Mecklenberg County. Initially he was anxious, couldn't sleep. Saw nurses. Referred to doctor (name not remembered.) Treated with ativan and desyrel for sleep. Took until ? August or Sept. 1997 — weaned himself off gradually — Meds slowed him down — made him groggy during day. Did solve sleep problem. Sleeps. remained fine off meds. Though requested, no medical records have been received from jail.

Described behavior/adjustment in jail. Watched himself carefully due to potential negative impact on case if didn't. Spent time in cell — reading. Experienced no particular problems.

Looked at religious history. He did go talk to chaplain. Thinking of pursuing Catholicism. F is Catholic. Went to Catholic school in 5th Grade, Raised Baptist. Has attended Methodist church

PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle grade; rank; rate; hospital or medical facility)     REGISTER NO.     WARD NO.

FCI BUT
BUTNER

PROGRESS NOTES
STANDARD FORM 509 (Rev. 11-77)
Prescribed by GSA/ICMR.
FIRMR (41 CFR) 201-45.505
509-111     FMC B-000127

most recently. (prior to arrest).

Reviewed alcohol use again. Rarely drank to point of intoxication. No DT's, blackouts. Occasionally late 2° to drinking. Occasional driving when had drunk EtOH but as often didn't drive, stayed home etc. Did not miss work 2° to EtOH use. Still, he did drink regularly as previously described. History of use falls short of abuse diagnosis.

Reviewed issue of CST. Patient retains detailed understanding of legal situation. Perceives himself as CST. Reviewed diagnostic impressions and issue of criminal responsibility. Also discussed stress of awaiting trial, awaiting verdict and hypothetical post verdict) stressors. Patient discussed worries re. his ability to get his message across to Jury. Again, showed insight into feelings of victims' families.

A/: Anticipate patient will return to Charlotte via Marshals on Friday 12/19/97. On no psychotropic meds. Will complete report by 12/30/97.

S. Johnson MD

EMCB-000128

| MEDICAL RECORD | | PROGRESS NOTES |
|---|---|---|

**DATE**

DEC 18 1997 *medically cleared for return to Court.*

1435

JOHN BAUMAN, MD
MEDICAL OFFICER

*(Continue on reverse side)*

PATIENT'S IDENTIFICATION *(For typed or written entries give: Name—last, first, middle; grade; rank; rate; hospital or medical facility)*

REGISTER NO.

WARD NO.

FCI BUTNE/
BUTNER, N

**PROGRESS NOTES**
STANDARD FORM 509 (Rev. 11-77)
Prescribed by GSA/ICMR
FIRMR (41 CFR) 201-45.505
509-111

FMC B-000129

# PROGRESS NOTES

| DATE | |
|------|--|
| | |

FMC B-000130

S. Government Printing Office: 1989-241-175/90001

STANDARD FORM 509 BACK (Rev. 11-77)

Case 3:12-cv-00327-MOC    Document 77-16    Filed 12/22/14    Page 17 of 42

Bates No. 14591

**U.S. Department of Justice**
Federal Bureau of Prisons
*Federal Correctional Institution*
*Mental Health Division*
P.O. Box 1000
*Butner, North Carolina 27509-1000*

### CONSENT FOR RELEASE OF INFORMATION

Patient Name: _Barnette Aguilis_    SS#: ▓▓▓▓▓▓▓▓
Federal Register Number: _12599-056_    Race: _B_

TO:    Name/Address of Healthcare Facility/Provider
     _Dr. Tyson_

DATES OF ADMISSION/DISCHARGE/TREATMENT: _late 1993_
I request and authorize the _Dr. Tyson_ to release the information specified below
to the organization, agency, or individual named on this request. I understand that the information to be
released included information regarding the following:

| | | |
|---|---|---|
| ✓ | Complete Psychiatric Record | ____ Hospital Summary/Discharge Summary |
| ___ | Complete Medical Record | ____ Substance Abuse Treatment Records |
| ___ | Medical Evaluations-Specify:_____ | |
| ✓ | Other - Specified: _forensic report_ | |

PURPOSE FOR WHICH THE INFORMATION IS TO BE USED: _aid in forensic_

_examination_

**\*\*IF A FEE FOR RECORDS IS REQUIRED, CONTACT US _PRIOR_ TO GRANTING THIS REQUEST!!**

*The above records are to be sent to:*    *Federal Correctional Institution*
*PHONE: 919-575-4541 x3665*    *Attn: Mental Health Medical Records/Maryland Unit*
*FAX: 919-575-2017*    *P.O. Box 1000*
     *Butner, North Carolina 27509-1000*

*AUTHORIZATION: I certify that this request has been made freely, voluntarily and without coercion, and that
the information given above is accurate to the best of my knowledge. I understand that I may revoke this
authorization at any time, except to the extent that action has already been taken to comply with it. Redisclosure
of my medical records by those receiving the above authorized information will only be done in accordance with
Federal law. Without my express revocation, this consent will automatically expire within 90 days from the date
of this Consent; or (2) under the following conditions: (if none, so state)*

DATE: _11/21/97_ SIGNATURE OF PATIENT _____

DATE: _11/21/97_ WITNESS' SIGNATURE _____ (Vance)

cc: Inmate's Medical Record        **CHARLES VANCE, MD, PhD.**
                                  Psychiatric Fellow

FMC B-000131

U.S. Department of Justice
Federal Bureau of Prisons
*Federal Correctional Institution*
*Mental Health Division*
*P.O. Box 1000*
*Butner, North Carolina 27509-1000*

## *CONSENT FOR RELEASE OF INFORMATION*

Patient Name: ___Barnette Aguila___   SS#: ███████████

Federal Register Number: ___12599-058___   Race: ___B___

TO:   Name/Address of Healthcare Facility/Provider
___Sonia Barnette___
___704-399-5479___
_____
_____

DATES OF ADMISSION/DISCHARGE/TREATMENT: ___N/A___

I request and authorize the ___Sonia Barnette___ to release the information specified below to the organization, agency, or individual named on this request. I understand that the information to be released included information regarding the following:

| | | |
|---|---|---|
| ___ Complete Psychiatric Record | ____ Hospital Summary/Discharge Summary |
| ___ Complete Medical Record | ____ Substance Abuse Treatment Records |
| ___ Medical Evaluations-Specify:_____ |
| ✓ Other - Specified: ___background information___ |

PURPOSE FOR WHICH THE INFORMATION IS TO BE USED: ___aid in forensic___

___examination___

**\*\*IF A FEE FOR RECORDS IS REQUIRED, CONTACT US _PRIOR_ TO GRANTING THIS REQUEST!!**

*The above records are to be sent to:*   *Federal Correctional Institution*
*PHONE: 919-575-4541 x3665*   *Attn: Mental Health Medical Records/Maryland Unit*
*FAX:  919-575-2017*   *P.O. Box 1000*
   *Butner, North Carolina 27509-1000*

*AUTHORIZATION: I certify that this request has been made freely, voluntarily and without coercion, and that the information given above is accurate to the best of my knowledge. I understand that I may revoke this authorization at any time, except to the extent that action has already been taken to comply with it. Redisclosure of my medical records by those receiving the above authorized information will only be done in accordance with Federal law. Without my express revocation, this consent will automatically expire within 90 days from the date of this Consent; or (2) under the following conditions: (if none, so state)*

DATE: ___11/21/97___   SIGNATURE OF PATIENT _____

DATE: ___11/21/97___   WITNESS' SIGNATURE _____ (Vance)

cc: Inmate's Medical Record   CHARLES VANCE, MD, PhD.
   Psychiatric Fellow

FMC B-000132

U.S. Department of Justice

Federal Bureau of Prisons

*Federal Correctional Institution*

*Mental Health Division*

*P.O. Box 1000*

*Butner, North Carolina 27509-1000*

## *CONSENT FOR RELEASE OF INFORMATION*

Patient Name: _Barnette Aguila_     SS#: ██ ██ ████

Federal Register Number: _12599-058_     Race: _B_

TO:    Name/Address of Healthcare Facility/Provider

_Mecklenberg County Jail_

_(704) 336-2453 (voice)_

DATES OF ADMISSION/DISCHARGE/TREATMENT: _( June 96 - Nov 97 )_

I request and authorize the _Mecklenberg County Jail_ to release the information specified below to the organization, agency, or individual named on this request. I understand that the information to be released included information regarding the following:

_all medical records_

| | |
|---|---|
| ✓ | Complete Psychiatric Record |
| ✓ | Complete Medical Record |
| ✓ | Medical Evaluations-Specify: _____ |
| ___ | Other - Specified: _____ |

___ Hospital Summary/Discharge Summary

___ Substance Abuse Treatment Records

PURPOSE FOR WHICH THE INFORMATION IS TO BE USED: _aid in forensic_

_examination_

**\*\*IF A FEE FOR RECORDS IS REQUIRED, CONTACT US _PRIOR_ TO GRANTING THIS REQUEST!!**

*The above records are to be sent to:*    *Federal Correctional Institution*

*PHONE: 919-575-4541 x3665*    *Attn: Mental Health Medical Records/Maryland Unit*

*FAX: 919-575-2017*    *P.O. Box 1000*

*Butner, North Carolina 27509-1000*

*AUTHORIZATION: I certify that this request has been made freely, voluntarily and without coercion, and that the information given above is accurate to the best of my knowledge. I understand that I may revoke this authorization at any time, except to the extent that action has already been taken to comply with it. Redisclosure of my medical records by those receiving the above authorized information will only be done in accordance with Federal law. Without my express revocation, this consent will automatically expire within 90 days from the date of this Consent; or (2) under the following conditions: (if none, so state)*

DATE: _11/21/97_   SIGNATURE OF PATIENT _____

DATE: _11/21/97_   WITNESS' SIGNATURE _____ _(Vance)_

cc: Inmate's Medical Record

**CHARLES VANCE, MD, PhD.**

Psychiatric Fellow

FMC B-000133

**U.S. Department of Justice**
Federal Bureau of Prisons
*Federal Correctional Institution*
**Mental Health Division**
*P.O. Box 1000*
*Butner, North Carolina 27509-1000*

### CONSENT FOR RELEASE OF INFORMATION

Patient Name: _Barnette Aguila_  ▮▮▮▮▮▮ ▮ ▮▮▮▮
Federal Register Number: _12579-058_  Race: _B_

TO:  Name/Address of Healthcare Facility/Provider
_Steve Austin_
_304-568-1234_

DATES OF ADMISSION/DISCHARGE/TREATMENT: ____N/A____

I request and authorize the _Steve Austin_ to release the information specified below to the organization, agency, or individual named on this request. I understand that the information to be released included information regarding the following:

__ Complete Psychiatric Record     ____ Hospital Summary/Discharge Summary
__ Complete Medical Record         ____ Substance Abuse Treatment Records
__ Medical Evaluations-Specify:_____
✓ Other - Specified: _background information_

PURPOSE FOR WHICH THE INFORMATION IS TO BE USED: _aid in forensic_

_examination_

**IF A FEE FOR RECORDS IS REQUIRED, CONTACT US PRIOR TO GRANTING THIS REQUEST!!**

*The above records are to be sent to:*     *Federal Correctional Institution*
**PHONE: 919-575-4541 x3665**           *Attn: Mental Health Medical Records/Maryland Unit*
**FAX:  919-575-2017**                  *P.O. Box 1000*
                                         *Butner, North Carolina  27509-1000*

**AUTHORIZATION:** *I certify that this request has been made freely, voluntarily and without coercion, and that the information given above is accurate to the best of my knowledge. I understand that I may revoke this authorization at any time, except to the extent that action has already been taken to comply with it. Redisclosure of my medical records by those receiving the above authorized information will only be done in accordance with Federal law. Without my express revocation, this consent will automatically expire within 90 days from the date of this Consent; or (2) under the following conditions: (if none, so state)*

DATE: _11/21/97_ SIGNATURE OF PATIENT _____

DATE: _11/21/97_ WITNESS' SIGNATURE _____ (Vance)

cc: Inmate's Medical Record

**CHARLES VANCE, MD, PhD.**
Psychiatric Fellow

FMC B-000134



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Institution*

January 8, 1998

*P.O. Box 1000*
*Butner, North Carolina 27509-1000*

The Honorable Robert D. Potter
United Stated District Court
Western District of North Carolina
Charles R. Jonas Building, Room 250
401 West Trade Street
Charlotte, North Carolina 28202

RE:    Barnette, Aquilia Marcivicci
       Register Number: 12599-058
       Docket Number: 3:97CR23-P

Dear Senior Judge Potter:

This is in response to your *Ex Parte Order (Re: Motion for Butner Records)*, dated December 30, 1997. It is noted that you are requesting "records for the Defendant Barnette to counsel for Defendant to determine how the Defendant adjusted to incarceration for use at the sentencing phase of the trial."

After telephone discussion on January 7, 1998, to clarify the specific needs of the Court regarding this Order, the following information is being provided. Mr. Barnette was admitted to the Health Services Division of FCI Butner on November 17, 1997 for evaluation. He was initially housed in our Admission/Seclusion Unit pending medical, psychiatric, and case management clearances. On December 5, 1997, he was released to the open population of the Health Services Division, where he remained until his return to your District on December 19, 1997. Review of Mr. Barnette's record revealed that he did not receive any incident reports for rule infractions. He reported promptly to all appointments and was cooperative with the evaluation process. He was noted to interact appropriately with other patients.

Should the Court require additional information, please contact me.

Respectfully,

Sally C. Johnson, M.D.
Associate Warden Health Services

dd

FMC B-000135

Dr. Johnson
med recrd
Ism
cc file
ducta

# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

### 3:97CR23-P

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| vs. ) | **EX PARTE ORDER** |
| ) | (Re: Motion for Butner Records) |
| AQUILIA MARCIVICCI BARNETTE ) | |
| ———————————————) | |

**THIS MATTER** is before the Court on Defendant's *Ex Parte* Motion for Butner Records (document # 237).

The Defendant has filed an *ex parte* motion that F.C.I. Butner produce inmate records for the Defendant Barnette to counsel for Defendant to determine how the Defendant adjusted to incarceration for use at the sentencing phase of the trial.

For good cause shown, the Defendant's Motion will be granted.

**NOW, THEREFORE, IT IS ORDERED** that Mitchell Sprinkle, Case Manager, Correctional Treatment Specialist, Mental Health Division, Federal Correctional Institution, P.O. Box 1000, Butner, North Carolina 27509-1000, surrender to defense counsel copies of any and all records of the Defendant's incarceration at F.C.I. Butner, **except those records which may be privileged** under the Government's psychological examination.

The records should be addressed to George V. Laughrun, II and Paul J. Williams, Suite 602 Cameron Brown Building, 301 South McDowell Street, Charlotte, North Carolina 28204.

FMC B-000136

244

IT IS FURTHER ORDERED that the Clerk shall SEAL the Motion and this Order.

The Clerk is directed to certify copies of this Order to defense counsel only.

This the _30th_ day of December, 1997.

ROBERT D. POTTER
SENIOR UNITED STATES DISTRICT JUDGE

2

FMC B-000137



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Institution*

---

December 31, 1997

P.O. Box 1000
Butner, North Carolina 27509-1000

Jeanie Koechley
Clerk of Court
Western District of North Carolina
Charles R. Jonas Federal Building
401 West Trade Street
Room 204
Charlotte, North Carolina 28202

RE:     BARNETTE, Aquilia Marcivicci
         REGISTER NUMBER:  12599-058
         DOCKET NUMBER:  397-CR-23-P

Dear Ms. Koechley:

Enclosed you will find a copy of the report on Aquilia Marcivicci Barnette.  Per phone direction of The Honorable Robert D. Potter on December 30, 1997, this is to be placed under seal.  The only other distribution of this report was sent via fax to Judge Potter.

Should you have any other questions, please call me at (919) 575-4541, X3650.

Sincerely,

Sally C. Johnson, M.D.
Associate Warden Health Services
Mental Health Division

Enclosures

SCJ/hh

FMC B-000138

*P.O. Box 1000*
*Butner, North Carolina 27509-1000*

December 31, 1997

The Honorable Robert D. Potter
United States District Court
Western District of North Carolina
Charles R. Jonas Federal Building
401 West Trade Street
Room 250
Charlotte, North Carolina 28202

RE:     BARNETTE, Aquilia Marcivicci
        REGISTER NUMBER: 12599-058
        DOCKET NUMBER: 397-CR-23-P

Dear Judge Potter:

In accordance with your Court Order dated November 5, 1997, a psychiatric evaluation on Mr. Barnette has been completed.

It is our opinion that Mr. Barnette is not suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings filed against him, or properly assist an attorney in his own defense. At the time of the alleged offense, he was not suffering from a severe mental disease or defect that interfered with his ability to appreciate the nature, quality, or wrongfulness of his actions. I have enclosed the report prepared by our staff reflecting these opinions.

If we can be of further assistance to the Court in this or other matters, please do not hesitate to so request.

Respectfully,

Harley G. Lappin
Warden

Enclosures

HGL:SCJ/hh

FMC B-000139

Forensic Evaluation

| | |
|---|---|
| NAME: | Aquilia Marcivicci Barnette |
| REGISTER NUMBER: | 12599-058 |
| DOCKET NUMBER: | 397-CR-23-P |
| DATE OF BIRTH: | 07/07/73 |
| DATE OF REPORT: | 12/29/97 |

IDENTIFYING INFORMATION: Mr. Aquilia Marcivicci Barnette is a 24-year-old, Black male most recently from Charlotte, North Carolina, who was admitted to the Health Services Division of the Federal Correctional Institution, in Butner, North Carolina, on 11/17/97, to undergo psychiatric evaluation. In a Court Order dated 11/05/97, the Honorable Robert D. Potter, Senior, United States District Judge, for the Western District of North Carolina, Charlotte Division, issued an Order requesting that Mr. Barnette be committed to the custody of the Attorney General for the purpose of a psychiatric or psychological examination pursuant to Title 18, United States Code, Section 4241(b) and 4242(a). This Order followed examination of the record and motions in this case by the Court in a finding that there was reasonable cause to believe that the Defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. The record further indicated that the Defendant had filed a Notice of his intention to rely upon a defense of Insanity as provided by Rule 12.2 of the Federal Rules of Criminal Procedure and that the Government was entitled to have an examination of the Defendant conducted as provided by Title 18, United States Code, Section 4242. The Court Order indicated that the time period for the examination would be calculated upon the Defendant's arrival at the Institution. It further ordered that the report of the results of the examination be filed with the Court and copies be provided to the Defense Counsel and United States Attorney as required by Title 18, United States Code, Section 4247(c).

Mr. Barnette is charged in an eleven-count indictment with criminal acts occurring between 04/30/96 and 06/22/96. Charges include the following: on or about 04/30/96, travelling across state lines with intent to injure, harass, and intimidate an intimate partner (Robin Williams), and in the course, intentionally committing a crime of violence (firebombing an occupied apartment and automobile in the driveway) causing bodily injury to her, in violation of Title 18, United States Code, Section 2261(a)(1) and 2261(b); on or about 04/30/96, using and carrying a bottle filled with flammable liquid in an act of interstate domestic violence, during, and in relationship to, a crime of violence, and the carrying of the destructive device, in and of itself, in violation of Title 18, United States Code, Section 924(c)(1) and 844(h)(1); on or about 05/21/96, providing false information in connection with false acquisition of a firearm, in violation of Title 18, United States Code, Section 922(a)(6) and 924; between 05/21/96 and 06/22/96, sawing off part of the barrel of the gun, in violation of Title 26, United States Code, Section 5821, 5822, 5861(f) and 5871; on or about 06/22/96, having been convicted of a felony, possessing a firearm in violation of Title 18, United States Code, Section 922(g)(1) and 924; on or about 06/22/96, shooting to death and taking from the person of Donald Lee Allen, a motor vehicle (1994 Honda Prelude), in violation of Title 18, United States Code, Section 2119(3); on or about 06/22/96, using and carrying a firearm during and in relation to a crime of violence (carjacking) and causing the death of Donald Lee Allen (that is murder by shooting him with a firearm), willfully, deliberately, maliciously, and with premeditation in violation of Title 18, United States Code, Section 924(c)(1) and (i)(2)(1); on or about 06/22/96, transporting a motor vehicle from North Carolina to

1.

FMC B-000140

Virginia, in violation of Title 18, United States Code, Section 2312; on or about 06/22/96, shooting and killing Robin Williams, in violation of Title 18, United States Code, Section 2261(a)(1) and 2261(d); and on or about 06/22/96, using a firearm and in the ourse of the violation, causing the death of Robin Williams (murder), killing with malice aforethought by shooting with a firearm, willfully, deliberately, maliciously, and with premeditation in violation of Title 18, United States Code, Section 924(c)(1) and (i)(2)(1). These charges occurred in the Mecklinberg County in North Carolina and the Roanoke area of Virginia. There are no codefendants. Mr. Barnette is represented by George E. Laughrun, II, and Paul J. Williams. The Assistant United States Attorney assigned to the case is Robert Conrad.

Early in the evaluation period, the Defense Attorneys contested the examination and a number of motions were filed by the defense and prosecution in the case. On 12/03/97, an Order was issued by Judge Potter ruling on several issues. Conclusions of the Order were that the evaluation could proceed; that the Order would be amended for psychiatric examination in compliance with *U.S. vs. Beckford*; that the Defendant would deliver the report of Dr. Tyson completed in 1994, under seal to the Clerk of Court, no later than 12/08/97, at noon, and that the Clerk would immediately forward that report under seal to this evaluator (Dr. Sally Johnson) by way of overnight mail service; and that the government's request for examination of the Defendant by another health professional in addition to the examination in Butner, would be granted.

During this evaluation period, Mr. Barnette was evaluated by Sally Johnson, M.D., Chief Psychiatrist and Associate Warden of Health Services at the Federal Correctional Institution in Butner, North Carolina. Under her supervision, Charles Vance, M.D., Forensic Fellow, conducted several interviews with Mr. Barnette. Psychological testing was completed by Michael Schaefer, Ph.D., and the results of that testing will be included in this report. Other members of the Health Services Division staff had the opportunity to interview and interact with Mr. Barnette during the evaluation period and their observations and assessments were considered prior to the completion of this report. Mr. Barnette did undergo review of his medical history, physical examination, nursing assessment, and social assessment during the evaluation. Defense-retained psychiatrist Seymour Halleck, M.D., had the opportunity to interview Mr. Barnette on site during the evaluation period on two occasions. Arrangements were also made for defense-retained psychologist Mark Cunningham, Ph.D., to evaluate the patient, but he cancelled his session on the day for which it was scheduled. Mr. Barnette had the opportunity to speak with his attorneys by phone and in person during the evaluation period.

Extensive collateral information was made available for review during the evaluation period. Requests for information were made both to the prosecution and defense attorneys. Collateral information that was available included a letter dated 11/06/97 from Assistant United States Attorney Robert Conrad, and a packet of information including: the Bill of Indictment; a Notice Specifying the Defendant as an Armed Career Criminal; a Notice of Intent to Seek the Death Penalty; and a copy of a Brief in Opposition to the Defendant's Motion to Suppress the Statements of the Defendant. The prosecution also forwarded four volumes of material from the Government's discovery for review. In summary, the discovery materials included numerous reports, interviews, forms, notifications, examination reports, transcripts of interviews, narrative summaries and records. Attachment A is a copy of the list of materials provided. A packet of information was also received from Defense Attorney George E. Laughrun, II. It included a letter dated 12/09/97 and a copy of the Complaint, Indictment, and a description of possible punishment facing the Defendant. A letter was received from Paul J. Williams, dated November 20, 1997, verifying that Seymour Halleck, M.D., was being retained as the Defense psychiatrist. A copy of the report written in 1994 by William M. Tyson, M.D., and brief records from the Blue Ridge Behavior Systems, were also received. Included with the above listed material was a

2.

FMC B-000141

copy of a 07/17/96 letter from Dr. Tyson to Susan J. Weigand, Assistant Public Defender, in Charlotte, North Carolina; a letter from Susan J. Weigand to Dr. Tyson dated 07/12/96; and a copy of the release of information form signed by Mr. Barnette dated 07/12/96. The letter is addressed to Mr. VonKallist who was the attorney assigned to represent Mr. Barnette in the earlier criminal action. The packet also included a page of hand-written notes from February of 1994 to March of 1994 and an unsigned letter to Dr. Tyson from Paul J. Williams, dated 06/17/97, concerning sending raw test data scores and material to Faye E. Sultan, Ph.D. Records were requested from the Mecklinberg County Jail where Mr. Barnette had been housed since 06/25/96, but no records were received. Through phone conversation, we were able to obtain some information regarding his stay at that facility and this will be addressed in the body of the report. Dr. Johnson did have the opportunity to speak by phone, briefly, to Defense Attorney Paul J. Williams and to Prosecuting Attorney Robert Conrad. She also spoke with Sonia Barnette, Mr. Barnette's mother.

DATES OF CONTACT/PROCEDURES ADMINISTERED:    During the evaluation period, Mr. Barnette was interviewed individually and jointly by other members of the Health Services Division Team. He was generally cooperative with the evaluation, although he indicated that his attorneys had instructed him not to discuss detailed information about the offense. Nonetheless, he spoke quite openly and freely about his behavior around the time in question. He was viewed as being a generally reliable historian, in that, for the most part, the accounts of his behavior and history coincided with that obtained through collateral sources. Interviews with the Defendant were conducted from the point of his arrival on 11/17/97 until he was returned to Court by the United States Marshal Service on 12/19/97. The following procedures were administered during this evaluation:

Clinical Interviews (ongoing)
Physical Examination (11/17/97)
Minnesota Multiphasic Personality Inventory-2 (MMPI-2) (11/26/97)
Wechsler Adult Intelligence Scale - Revised (WAIS-R) (12/10/97)
Wechsler Memory Scale - Revised (WMS-R) (12/11/97)
Personality Assessment Inventory (PAI) (12/11/97)

At the outset of evaluation period, and repeatedly throughout the evaluation, the limits of the confidentiality of the information provided, as well as the purpose of the evaluation, was discussed with Mr. Barnette. He expressed a full and detailed understanding of the evaluation process and the nature of the report that would be prepared. He clearly understood questions that were being raised by the Courts and how the evaluation had come about.

BACKGROUND INFORMATION: Mr. Barnette was born 07/07/73 in Charlotte, North Carolina, to the union of Sonia Cooper Barnette and Derrick Barnette. He is the oldest child of two born to that union having a younger brother, Mario, who is currently approximately 20 years of age. Mr. Barnette's parents remained married until he was approximately 12 years of age, when they separated and subsequently divorced. Approximately three years later, his father remarried to Marcela Sifford and Mr. Barnette has two step brothers as a result of that union: Marcus who is 21, and Allen who is 25. Although his mother has not remarried she has been involved in a long term relationship resulting in the birth of a younger, half brother John, who is currently approximately four years of age. Mr. Barnette describes his early life in relatively positive terms, although he describes verbal bantering between his parents, some of what he viewed as excessive physical discipline on the part of his father towards himself, and some excessive alcohol use by his mother. Both parents were employed and remain employed. His father works as a computer analyst for the Postal Division and currently lives in Maryland. His mother works in the human resource area and is currently employed with a

3.

FMC B-000142

temporary job agency placing people into work situations. Mr. Barnette did indicate that as a child he and his brother spent some time alone after school, but this seldom exceeded an hour or so. As a child, Mr. Barnette, went by the nickname as Vicci or Vicc. At his own insistence, people eventually began calling him Marc.

Mr. Barnette denies any family history of criminal involvement, significant psychiatric problems, significant medical problems, or significant drug abuse history. The alcohol use of his mother has already been noted.

Mr. Barnette attended school from Kindergarten through tenth grade and discontinued his educational involvement in the eleventh grade. He began his education in Charlotte, by attending Beverly Woods Elementary School from Kindergarten through third grade. In the fourth grade, he attended Barrenger Elementary School. In the fifth grade, he was enrolled for one year in a Catholic School, Our Lady of Consolation, which was the same school his father had attended as a child. He indicated that during that year both his grades and conduct improved. He could not continue there due to the separation of his parents and subsequent lack of financial resources. In the sixth grade, he attended Cotswald Elementary School. Seventh and eighth grade were completed at Randolph Middle School, and the ninth grade was completed at Smith Junior High, all in Charlotte, North Carolina. At that point in time, his mother with whom he was living, moved to the Atlanta, Georgia area, and he began his high school education at Lasonia High School. During the tenth grade, he started "hanging out with friends," skipping school, and failed to complete sufficient credits to continue with his grade level. He left school on several occasions and to date has not succeeded in completing either his GED or receiving a high school diploma. During the same time period of early high school, he met Natasha Heard, with whom he developed a sexual relationship and fathered two children, Angelica and Aquila, who are currently seven and five years of age respectively. They remain in the custody of their mother and Mr. Barnette has had no contact with them over the last few years.

Mr. Barnette has never been involved in military service. He has been employed in a variety of occupations and work settings and on occasion has been assisted by his mother in obtaining placement in various jobs. His employment settings have included short stints of employment with Brickhouse Pizza, A-1 Service Personnel (a temporary job agency), Arby's, Blockbuster Video, Pizza Hut, TempWorld, Harper's Restaurant, Bojangles, Taco Bell, Hot & Now, Courtyard by Mariott, Best Western Hotel, Camelot Music, and Electrolux. He has spent as little as one week on a job and many employment situations were part time and not continued for more than a few months. He denies ever being on unemployment or receiving any type of disability. At the time of the alleged offenses, he was attempting to obtain employment in automobile fields, but had been unsuccessful in his initial efforts in the Charlotte area. Mr. Barnette does indicate that financial problems resulting from his lack of consistent employment played a role in the breakup of his most recent significant relationship which was with one of the victims, Robin Williams.

Mr. Barnette described a series of significant relationships with females since that described above with Natasha Heard, but has no other children. Following the development of problems in his relationship with Natasha, he began a relationship with Crystal Dennis. She had two children from other relationships, and they moved in with Mr. Barnette for a period of time. After a brief period, he began a relationship with Kwanna Dozier. The relationship was of relatively short duration and he subsequently began a relationship with Alicia Chambers in approximately 1993. This relationship also dissolved and it was followed shortly thereafter by his involvement with one of the current victims, Robin Williams. He moved in with Robin Williams in 1995, but broke up with her in April of 1996 shortly before the first charged offense of April 30th. He is currently not involved in any type of

4.

FMC B-000143

romantic relationship. As outlined below, his relationship history is intertwined with his criminal history. Mr. Barnette describes himself as heterosexual and denies any type of sexual dysfunction.

Mr. Barnette denies any history of significant drug use or abuse, although he admits to the use of alcohol. He does indicate that in his early teens he did try marijuana, but did not continue the use of this drug. He denies ever trying any other forms of illegal substances.

Mr. Barnette gives a relatively detailed account of his alcohol use beginning at age 12 when he first drank some beer in a group setting. He describes drinking to the point of intoxication on that occasion. He continued his alcohol use (primarily beer) up until the present. He denies any withdrawal symptoms. He did not normally drink to the point of intoxication, but occasionally did so. He describes doing that, for the most part, at home, and not being involved in driving while intoxicated. He does admit to drinking other types of alcohol and in addition to beer, but describes beer as his preferred drink. He was drinking on the day prior to the alleged offenses, but in his words, "I was not sloppy drunk." He does indicate that he had drunk as much as a six pack of beer during the course of the day.

Mr. Barnette has no significant psychiatric treatment history. He did undergo a psychiatric evaluation prior to the alleged offenses in 1994. That evaluation, conducted by William Tyson, Ph.D., was done as a result of his legal situation, which involved significant problems in his relationship with Ms. Chambers. He does claim that while still in high school, he became upset over a relationship and took an overdose of some type of over the counter medication. This did not require hospitalization and he did not receive any specific treatment. He also claims one suicide attempt in response to his current charges. He claims that he purchased a section of garden hose and attempted to asphyxiate himself by carbon monoxide poisoning on 06/22/97. He describes being unsuccessful as a result of a construction worker finding him in the car and interfering with his plan. He has not undergone any alcohol use counselling or treatment, and prior to the alleged offense took no psychotropic medication. After his arrest and incarceration in Mecklinberg County Jail, he experienced anxiety and problems sleeping. He was seen by the psychiatrist there (Dr. Short, first name unknown) who felt he was experiencing an Adjustment Disorder. He was treated with antidepressant and antianxiety medications (Desyrel and Ativan). He describes that his sleep did improve with the medication, but he found himself quite drowsy during the day. On his own, he began to cut back on the medication. He voluntarily discontinued the medication around August of 1997, and has not experienced further problems with sleep or depression. Though he contemplated suicide in close proximity to arrest, he denies any suicidal ideation for months and expresses his motivation to live.

Review of collateral information received from William Tyson, Ph.D., indicates that Dr. Tyson saw Mr. Barnette at Mr. VonKallist's request in regard to legal charges that were pending at the time. Dr. Tyson administered a battery of psychological tests including the Minnesota Multiphasic Personality Inventory-2, Incomplete Sentence Blanks, Adult Survivor of Dysfunctional Family Checklist, Wechsler Adult Intelligence Scale-Revised, Bender Gestalt Test of Visual Motor Performance, and the Rorschach Ink Blot Technique to Mr. Barnette in February of 1994. Dr. Tyson opined that Mr. Barnette was both competent and responsible. He did make vague references to the existence of psychological and behavioral problems, but did not believe these interfered either with his competence or responsibility. Further details were not available.

Mr. Barnette has remained in relatively good physical health throughout his life. He does indicate one traumatic injury which occurred in 1995 and did result in some disability to his right hand and pain in his right leg. He indicates that a distant cousin, Ladin Barber, shot him while he was in his home,

5.

FMC B-000144

causing an injury to his right hand and leg. Mr. Barnette underwent medical evaluation and treatment, and Mr. Barber subsequently was tried in regard to the charges. Mr. Barnette did serve as a witness during that trial. Mr. Barnette claimed that as a result of the shooting he suffered some emotional upset and that memories of the event bothered him for a period of time. He did not describe any specific mental health treatment as a result of that injury.

Mr. Barnette denies any specific juvenile criminal history. As noted, he did have some episodes of being truant from school and was involved in underage drinking. His adult criminal record, as noted above, is intertwined with his relationship history. Available information indicates that in May of 1992, he was arrested in Newnan, Georgia, and charged with Discharging a Firearm near a Public Highway, Reckless Conduct, Pointing a Gun at Another, and Battery. He was convicted on three of the four accounts with the count of Reckless Conduct being dismissed. He was given time served. The charges stemmed from an incident with an acquaintance of his, wherein he claims he was confronted by the victim and several other individuals while he was walking home. This resulted from some relationship problems he was having, involving the sister of this individual and his girlfriend, Natasha. He claims he had found a weapon prior to the event and had it on his person at the time he was confronted by the victim and his friends. Fearing assault, he discharged the weapon and shot the victim, Anthony Britt. He claims the other individuals fled. Despite the fact he was arrested and charged for the behavior, he viewed the Court as being understanding of his position in the case, and claims that is why he was given a minimal sentence. In November of 1992, he was charged by Natasha Heard with Criminal Trespassing, but the charge was dismissed. In January of 1993, he was arrested on two counts of Cruelty to Children and Simple Battery. He was subsequently convicted on the Cruelty to Children charges in March of 1993, and was given a period of probation and a fine of less than $500. This episode allegedly involved him beating his girlfriend's (Crystal Dennis) children with a wire coat hanger, to the point that the children's grandmother identified the injuries and reported him to Social Services.

In March of 1994, he was initially charged with Rape and Kidnapping in regard to Alicia Chambers. The victim had been involved with Mr. Barnette since some time in 1993. Eventually these charges were pled down to Breaking and Entering and Felonious Restraint. Mr. Barnette received again a period of probation. It was during the time of the resolution of these charges that Mr. Barnette became involved with Robin Williams, one of the victims of the current charged offenses.

Mr. Barnette relates that he met Robin Williams in the fall of 1994. As was noted, this was during the time of resolution of the charges stemming from the relationship with Alicia Chamber. He indicates that he was feeling down about his legal situation and a friend came by and took him to Virginia on an errand. As a result of that trip, he met Ms. Williams. They immediately "clicked" and during the next few days he fell in love with her. They saw each other off and on for the next several months and then around March of 1995 he moved in with her in Roanoke. She was employed at the local hospital as a secretary. Mr. Barnette alternates between describing the relationship in somewhat ideal terms and talking at length about the problems that developed. Apparently by the fall of 1995, Ms. Williams suspected that he was seeing someone else. He admitted that he was involved in an affair, but discounts the significance of that. He states that by September he began to suspect her of seeing someone else. He describes intermittent arguments where fidelity was the focus. During the same time period, he experienced some difficulty in maintaining a job, after he lost his job with Camelot Music as a result of accusations of sexual harassment. He did admit to involvement with a female employee there. Financial problems developed in that he and Ms. Williams had accumulated a significant amount of debt and were not always able to pay the bills. Although he had entered the relationship with the agreement that the expenses would be split in half, by the spring of 1996, he was unable to contribute his half of

6.

FMC B-000145

the expenses. Following a day or two of arguing in April, they parted and he returned to Charlotte to his mother's home despite his lack of interest in moving back to that area. He claims that he spoke with her by phone on a few occasions after returning to Charlotte. Although he denies any specific plans of reuniting in the near future, he claims he maintained some thought that at some point down the road, in six months or a year, they would get back together. He does indicate that he returned to Roanoke shortly after he left to retrieve some of his property. He claims that during that visit, Ms. Williams put him down in front of his family and her family, and made it appear that he had been sponging off of her by staying with her in Roanoke.

Mr. Barnette gives somewhat conflicting accounts of his mood state during the early weeks after the breakup. Initially he indicated that he threw himself into efforts to obtain a job and reestablish his life. He describes that an uncle assisted him in trying to get a job at a Saturn car dealership. Mr. Barnette describes that the job fell through and left him "in a funk." He describes himself as sinking to a "low ground zero." In other discussions, Mr. Barnette describes his continued suspicions that Ms. Williams was involved in another relationship. He indicates that during a call to her, after the breakup, it was evident to him that a male was at the apartment. Although Ms. Williams alleges that it was an old friend from school, he knew that, in reality, the individual was a man by the name of Benjamin Green. Mr. Barnette indicates that Ms. Williams had maintained a friendship with Mr. Green for an extended period of time but never let Mr. Barnette meet Mr. Green or know any of the details of their relationship.

Mr. Barnette is charged with firebombing Ms. Williams' apartment in Roanoke, Virginia, on or about April 30, 1996. Initially Mr. Barnette vaguely disclaimed any involvement in that activity. He indicated that someone sent him an article describing the firebombing from a Roanoke paper and it was in that article that he read about a male friend, Benjamin Green, spending the night with Ms. Williams. He claims that information contributed to his mounting anger about his situation and the anger directed toward Ms. Williams. Later, Mr. Barnette did not deny involvement in the firebombing, but claimed his intent at that time was not to kill Ms. Williams.

Collateral information available in regard to that episode was obtained from an interview with Robin Williams that took place on May 30, 1996. She indicated that on April 30, 1996, she was in her residence. Around 3:30 in the morning, she heard several loud bangs on the front door. She raised the blinds and saw Mr. Barnette, who made a series of derogatory statements directed toward her. Apparently, Mr. Barnette took a bat and hit the window. He shot at a pane of glass, cut the phone lines, and smashed Mr. Green's car windows (his car was in the driveway). He then threw some type of incendiary device under the door. He indicated that he was yelling "die, bitch, die." As a result of the firebombing, Ms. Williams suffered burns on her arm and required hospitalization. Mr. Barnette's drivers license was left at the scene, as were the wire cutters that were used to cut the phone lines, and a lighter.

Apparently, following the firebombing incident, Mr. Barnette returned to Charlotte. Despite Ms. Williams identifying him as the suspected perpetrator of the firebombing incident, and warrants for his arrest being issued, it appears confusion between the states of Virginia and North Carolina resulted in him not being arrested and taken into custody on the alleged offenses.

Mr. Barnette describes that he was surprised that no one came to arrest him and that he spent the next several weeks at his mother's home in Charlotte feeling frightened, depressed, and brooding over the loss of the relationship. He was angered that Mr. Green was not injured during the incident at Ms. Williams' apartment. He describes being focussed on feeling as if Ms. Williams had been dishonest

7.

FMC B-000146

Bates No. 144607

with him. He felt angry that he had shared himself "body and soul" with her and that the relationship had not continued. Mr. Barnette indicated that his rate of alcohol consumption increased in the weeks prior to the current alleged offenses. He continued to drink mostly beer and would drink intermittently throughout the day. He does describe interacting with his brothers, his mother's boyfriend, and his mother during that period of time. Activities included watching television and playing video games. His mother described him as less interactive and states he spent more time in his room.

In regard to the weapons involved in the alleged offenses, Mr. Barnette claims he bought the gun in May, but claims he bought it for his own protection. He indicated that he had numerous difficulties as a result of his relationship problems in the Charlotte area and felt that he might be in some danger. He describes himself as needing to protect himself and two brothers, both from other people and from the snakes that frequented the property where they lived. He admits altering the gun, but states he did this so he could keep it hidden in his room. He described the activity as being "like a kid." He indicated he did not want "a big grandpop shotgun." He liked the product obtained and described it as "neat." He did indicated that altering the gun allowed him to keep it hidden from his younger half brother. He denies that he bought the weapon with the intent of harming Ms. Williams.

Mr. Barnette does describe weapons experience since he was a child. He indicates that at the age of eight or nine his father taught him weapon safety and instructed him that guns were for family protection and were not toys. He indicated that his father had a couple of guns in the house and that he remembers early outings including family camping and target practice. As a youth, he also had an air rifle. He was approximately age ten when he first shot his father's gun. He indicated that his father's guns were all legal, with his father having the appropriate permits and licenses. In 1990, he found a gun on his way to a prenatal appointment with his girlfriend, Natasha Heard. He indicates it was a .22 calibre handgun. He cleaned it up and kept it in the house, again for family protection. It was that gun that was used in shooting Anthony Britt in 1992. After the shooting episode, he tossed the weapon away. Since 1993, he has continued to have access to guns in his mother's house. These guns belonged to his grandfather and included an antique shotgun that was not working and another shotgun that was. Mr. Barnette admitted to using the guns to shoot snakes or rats on the property.

In regard to the time period immediately around the alleged murder, 06/21/96 through 06/25/96, Mr. Barnette provided the following information. On the evening of 06/21/96, he felt his anger building up. There was nothing special about the evening. He spent his time playing video games with his brothers, drinking beer, and watching a game on television. He then went back to his room to do his "nightly thinking about Robin." Mr. Barnette indicates "I just broke. I had had enough." He got dressed and "just split," leaving by the side door with his gun. He indicated he couldn't take it any more. He felt like a failure in the relationship and in his inability to get a job. He describes himself as fuming. In his words, he indicates that "I felt evil come over me. I had never been that angry," and states his anger scared him. He believes that while hanging around the house that day he had drunk five to six beers beginning earlier in the evening. He did not perceive himself as drunk, although he thinks drinking does lower his inhibitions. In his own assessment, had he not been drinking, and the thought of heading to Roanoke crossed his mind, he may not have done it. He describes that he has very clear memories of the evenings, but his attorneys have instructed him not to talk about the details of the crime. He claims that he has talked in detail with his attorney about the events of that evening.

Mr. Barnette describes leaving the house, because he "wanted answers." During various interviews, he described himself as being more upset than he had been in the preceding weeks. He admitted that at times in the preceding weeks, he had thought of killing Robin and that the thought had frightened him. He had talked to his mother about his degree of upset and his mother suggested he seek some

8.

FMC B-000147

help, but he did not. He was not specific as to what he had told his mother. On the evening preceding the crimes, he felt that he wanted to get back for "everything that had ever hurt me." He describes himself as being "on the end of my road I was going to get her (Robin). I was going to make my point. I was not going to be laughed at any more."

Mr. Barnette shared little about the first victim, Donald Lee Allen. Periodically he indicated he could empathize with Mr. Allen's family and that there was nothing he could say or do which would ameliorate their loss. He did indicate that before he encountered Donald Lee Allen, his rage could have been directed at anybody. He did not know the victim and his encounter with him was one of chance and part of his larger intention of finding transportation to Roanoke. Collateral information indicates that Donald Lee Allen had left his family home in South Carolina, on the evening 06/21/96. At some point after midnight on 06/22/96, Mr. Barnette confronted Mr. Lee Allen who was driving his car and was stopped at an intersection in Charlotte. He approached Mr. Lee Allen with the sawed off shotgun. He took his wallet and ordered him across the street. He told him to turn around and subsequently shot him three times. Mr. Allen was left near a drainage ditch. He then took Mr. Allen's car and drove to Roanoke, Virginia.

Mr. Barnette indicates that he went to the house where Robin was staying with her mother. He chased her when she ran from him. When he caught up with her, he felt his anger was gone and asked her, "where is he....why did you let him shoot at me." He indicated he wanted Robin to come with him and show him where Benjamin Green lived. He states she tried to grab the gun and he threatened to kill her if she didn't come with him. He indicated she looked into his eyes and stated, "you're not going to kill me" and grabbed at the gun. He felt like she knew him too well and she perceived him as a weakling, and his anger escalated. He felt she was defying him, in the middle of the street, with him holding a sawed off shotgun. "That is when it happened". He shot her as she was running towards her mother.

Collateral information including information provided directly by Mr. Barnette around the time of his arrest indicated that he drove to Roanoke in the stolen car and arrived there around 5:30 on the morning of 06/22/96. He waited in the car outside of the home until about 7:00 when he saw his girlfriend walk the dog. At that point, he drove around back, parked the car, and came through a gate in the fence. He pulled the phone connections loose and shot his way in through the back door. Ms. Williams' mother encountered him and yelled for Robin Williams to run. He went out the back door, around the house, and began chasing her. He caught up with her and subsequently shot her in the back as she was trying to run towards her mother. He then ran back to the car and left the area.

Mr. Barnette indicates that upon leaving Roanoke he drove to Tennessee with the intent of killing himself. He subsequently bought a garden hose and some tape, pulled off an exit and attempted to asphyxiate himself through carbon monoxide poisoning. This was unsuccessful. He also took several over the counter Nodoze. During the next few days he contacted a cousin of his and his mother. He returned to his mother's home. His mother apprised him that the law enforcement authorities were looking for him. He told her to go ahead to call them. He indicates he was allowed a few hours to spend with his family and did not resist arrest when the authorities arrived. He was subsequently taken into custody.

Collateral information indicates that Mr. Barnette confessed to the crimes of the charged offenses. He provided details to the police and actually took them to recover the body of the first victim Donald Lee Allen. He was subsequently housed in the Mecklinberg County Jail, and remained there until admitted to this Institution for evaluation.

9.

FMC B-000148

Mr. Barnette describes coming to grips with what he had done shortly after the crimes were committed. He indicated that he fully intended to kill himself as he believed his life was over. He also describes feeling overwhelmed with the magnitude of his behavior. He describes problems with anxiety and insomnia during the first several weeks in jail. He was referred to the psychiatrist servicing the jail and was started on an antidepressant, Desyrel, and an antianxiety medication, Ativan. These improved his sleep and he eventually discontinued them on his own due to daytime drowsiness. He does indicate that he no longer wished to kill himself after his failing with the carbon monoxide poisoning. Although he has contemplated suicide as a resolution to his current problems, he does not currently have thoughts of harming himself.

COURSE IN INSTITUTION: Upon admission to the Health Services Division of the Federal Correctional Institution in Butner, North Carolina, Mr. Barnette underwent review of his medical history and physical examination. Formal review of medical history, indicated that Mr. Barnette smoked approximately one and a half packs of cigarettes a day since incarceration (approximately fifteen months). He had both chicken pox and measles as a child. He had been treated for tinea versicola (a benign skin problem) and had experienced some muscle pain secondary to the gunshot wound in 1995. He also experienced some arthritis in his right hand and hip secondary to those injuries. He claimed a possible allergy to heparin.

Physical examination, conducted on 11/17/97, showed him to be 5'5" tall and to weigh 145 lbs. Vital signs were within normal limits. Limited range of motion and some numbness were noted on the right second and third fingers secondary to the gunshot wound injury. Scars were noted on his right hip and hand. There were no significant medical problems noted.

Mr. Barnette underwent routine laboratory evaluations. Laboratory studies included a complete blood count and routine blood chemistries including thyroid function studies. All of the results were within normal limits or showed only slight variations that were not viewed as clinically significant at this time. Screening of syphilis, HIV, and Tuberculosis were all negative. Urinalysis was normal. There was no indication to do a chest x-ray or electrocardiogram.

Mr. Barnette remained in good physical health during the evaluation period. He did have minor symptomatic complaints which were treated with symptomatic interventions. These included complaints of low back pain which appeared to be related to the mattress (treated with Motrin) and a single complaint of indigestion which was treated with antacids successfully. He was also seen for a rash and treated for tinea with a trial of selenium sulfide. Later in the evaluation, as he approached returning to court, he experienced some tension headaches. He was treated with Tylenol and Motrin as needed, with good relief.

Nursing evaluation was done upon intake and forensic social assessment was completed during the early part of the evaluation. Information provided was consistent with that obtained in other interviews.

Mr. Barnette was admitted through the Seclusion/Admission Unit which is the routine procedure for new admissions. He was kept in that unit until it was determined that he was suitable to function in the open health services population. He was released to the population in early December and continued in that status until his discharge on 12/19/97.

Mental status evaluation remained consistent throughout the evaluation, with the exception of some mild increase in anxiety toward the end of the evaluation period. Examination showed Mr. Barnette to be a small build, Black male who paid close attention to his hygiene and appearance. He was oriented to

10.

FMC B-000149

person, time, place and situation and made good eye contact with the interviewers throughout the evaluation. Speech was of normal rate and tone. Vocabulary was indicative of at least average intelligence. He followed questions well. Memory was intact for immediate recall, recent and remote events. Concentration was good upon examination, although in the latter part of the evaluation, he describes some trouble concentrating while reading due to anxiety about his legal situation. No looseness of associations was evident in conversation. There was no reported or observed evidence of hallucinations or delusional thinking. He denied any current suicidal ideation or homicidal ideation. His behavior was consistent with his report. There was no evidence of overt depression or anxiety for the most part. He reported sleep as good and appetite as undisturbed. Mr. Barnette did describe how he managed his anxiety about the situation by only selectively reviewing the events that had occurred. Through conversation he expressed considerable insight into his situation. His judgement on a day to day basis was good. Historically, he demonstrated poor judgement in regard to his behavior on numerous occasions. General information was viewed to be within the average range. He showed good understanding of written and verbal information. He also demonstrated a good ability to integrate himself into the population and quickly learned the rules and regulations of this facility. He received no disciplinary actions or incident reports during the evaluation period.

After receiving funds to place in his commissary and phone accounts, Mr. Barnette maintained phone contact with his family. As noted he maintained contact with his attorneys intermittently throughout the evaluation period. He reported promptly to appointments and was cooperative with interviewing and psychological testing. Mr. Barnette did develop short term friendships with several other inmates in the population, recognizing some from the Charlotte area and some from his time at the Mecklinberg County Jail. He did not express fear for this well being on the compound. He was able to discuss the awareness of his need to remain free from infractions while incarcerated so as not to demonstrate recent episodes of aggressive or problematic behavior.

In regard to the issue to competency to stand trial, Mr. Barnette was able to describe in detail his previous experiences with the legal system. He had a good first hand understanding of the plea bargaining and trial processes. He described his own role as a witness in the past and as a defendant in trial situations. Mr. Barnette had a detailed understanding of the charges against him and the possible penalties associated with each charge. He had a good memory for having reviewed this material with his attorneys and was aware that if he had questions or need for additional details, that information would be available through discussion with his legal counsel. Mr. Barnette talked openly about the severity of the charges against him and his awareness that the death penalty was being sought on several counts, including the two counts of Murder. He expressed a good understanding of the trail process in a death penalty case and the sentencing phase should he be found guilty. Mr. Barnette expressed an awareness of the role of the judge, the jury, prosecutor, and the defense attorneys. He had a detailed understanding of his rights to testify or not testify, and spent considerable time thinking through that decision. He expressed that he had been involved with his attorneys in framing questions for the jury selection process. He also indicated that he had a sense that his attorneys were involving him fully in the decisions being made in his case. He expressed respect and trust in his attorneys, although at times he became frustrated with the infrequency of contact with them during the evaluation. His frustration appeared to be resolved after he received a visit from one attorney near the end of the evaluation period. He felt he had ample time to discuss the status of his case.

In discussing with Mr. Barnette his mental state around the time of the alleged offenses, he disclaimed the presence of any mental illness. As noted, he talked at length about the frustration he felt over the breakup of his relationship with Ms. Williams and the anger at feeling displaced by Benjamin Green (or so he perceived). It was his own opinion that he was both competent to stand trial and responsible

11.

FMC B-000150

at the time of the offenses, and repeatedly indicated that he was not trying to skirt responsibility for his behavior. At the same time, he expressed hope that his life would be spared. As noted, he retained a full memory for his behavior during the period of time in question. Although he described some alcohol ingestion, he denies that it was to the point of intoxication. He did describes a short sense of getting revenge in regard to the murder, but stated that those feelings vanished quickly with full realization of what had occurred. He was able to express remorse for his behavior and to express sympathy for the victim's families.

During the evaluation period, Mr. Barnette had some contact with the Art Therapy Program. He described that he enjoyed drawing. There was no evidence of loss of reality contact in his work.

Mr. Barnette was cooperative with psychological testing. The results of that testing are outlined below. In summary, they showed him to be of average intelligence and not to be suffering from a major affective or thought disorder.

COGNITIVE ASSESSMENT: Mr. Barnette was administered the Wechsler Adult Intelligence Scale - Revised (WAIS-R) on 12/10/97. He was cooperative with the testing procedures and appeared to concentrate on test items. He appeared concerned to perform well and seemed to give full effort. Mr. Barnette achieved a Verbal I.Q. of 103, a Performance I.Q. of 108, and a Full Scale I.Q. of 105 which places him in the Average range of intellectual functioning across the domains. There was no significant difference between his performance on verbal as compared to non-verbal tasks with him demonstrating well developed skills in both areas. Mr. Barnette did not demonstrate any relative weaknesses on any of the subtests. His relative strengths were in his social judgment & common sense, and his visual-motor organizational abilities. The results of testing are consistent with observations of his level of adaptive functioning and his level of education. The testing provides no evidence of significant cognitive impairment.

Due to Mr. Barnette's reported vague complaints of memory impairment and difficulty in concentrating, the Wechsler Memory Scale- Revised was administered on 12/11/97. The Wechsler Memory Scale measures a subject's memory across a variety of domains including verbal memory, visual memory, general memory, attention/concentration, and delayed recall. Mr. Barnette achieved a Verbal Memory of 106, which places him in the Average range of functioning in this mode of memory. He achieved a Visual Memory of 120, which places him in Superior range of functioning in this mode of memory. His General Memory was 112 which places him in the High Average range of functioning in his overall memory. His Attention/Concentration was assessed to be Average and his Delayed Recall was assessed to be High Average. The overall results of this testing demonstrate Mr. Barnette has no memory impairment in any of the tested domains. His memory is at the average to superior levels. Although his level of attention/concentration is slightly lower than his abilities in other domains, it still falls in the average range when compared to other adults and suggests he should have no major impairments in his concentration/attention.

PERSONALITY ASSESSMENT: Mr. Barnette was administered the Minnesota Multiphasic Personality Inventory - Second Edition (MMPI-2) on 11/26/97. The personality profile produced by Mr. Barnette proved to be of questionable validity. There was some indication he responded inconsistently to test items; endorsing the symptom on one presentation, but not endorsing the same symptom when questioned in an alternative manner. There was also some indication Mr. Barnette may have been over endorsing symptoms as evidenced by his tendency to endorse most of the obvious symptoms of mental illness, but not endorse the more subtle symptoms of the disorders and the fact he elevated eight of the ten clinical scales. The profile, therefore, was interpreted with caution.

12.

FMC B-000151

Individuals with this profile often experience significant psychological distress despite their attempts to deny or repress their problems. They frequently complain of problems with concentration and having difficulty organizing their thoughts. Their ideas are frequently viewed by others as being unconventional and idiosyncratic. They often feel tense, depressed, anxious, indecisive, hopeless and have a poor self-concept. They are often viewed by others as being angry, rebellious, hostile towards authority figures, and resentful of demands placed on them by others. They are also likely to be immature, unreliable, and egocentric. They frequently develop physical complaints in response to stress, but are unable to see the connection between their stress and their physical ailments. Interpersonally, these individuals have strong needs for attention and affection, but feel conflicted by their fear of dependency. They are very demanding of attention and support and may engage in manipulative behaviors to get their needs met. Although they generally make a good first impression, their long term relationships tend to be very superficial, immature, and based on dependency. They frequently are hypersensitive to the reactions of others and have difficulty maintaining long term relationships.

In order to clarify Mr. Barnette's personality, he was administered the Personality Assessment Inventory (PAI) on 12/11/97. The personality profile produced by Mr. Barnette proved to be valid and interpretable. His pattern of responses suggested he is unhappy, emotional labile, and quite angry. Currently he is experiencing feelings of depression, worthlessness, and anxiety. Person's with similar profiles are typically in a state of crisis characterized by agitation and depression. These feelings may be due to difficulties or rejection in interpersonal relationships. Persons with similar profiles are quite sensitive to actual or perceived rejection by others and often feel abandoned or betrayed by those close to them. Mr. Barnette's responses suggested this might be a more ingrained pattern of anxious ambivalence in intimate relationships. He feels resentment and anger toward the person with whom he is in a relationship, but on the other hand feels dependent and anxious about being rejected. He endorsed feeling confused, indecisive, and distracted, however, there was no indication of active psychotic symptoms. His responses also suggested he has a history of antisocial behavior, and that his alcohol use has negatively impacted upon his life. The results of the PAI are consistent with those of the MMPI-2.

IMPRESSIONS: Diagnostically, according to the Diagnostic and Statistical Manual of the American Psychiatric Association, Fourth Edition (DSM-IV), we view Mr. Barnette as follows:

Axis I:     No Diagnosis or Condition, V71.09

Axis II:    Personality Disorder Not Otherwise Specified, with Antisocial and Narcissistic Features 301.90.

Axis III:   Status Post Gunshot Wound to the Right Hand and Right Hip;
            Tinea Versicola, Currently Being Treated;
            Tension Headaches, Responsive to Ibuprophen and Tylenol;
            Low Back Pain

As noted above, there is no evidence at this time to support that Mr. Barnette has in the past, or is currently suffering, from a severe mental disease or defect. His personality functioning can be described as consistent with a Personality Disorder Not Otherwise Specified with Antisocial and Narcissistic Features. A Personality Disorder Not Otherwise Specified is a classification given to disorders of personality functioning that do not meet criteria for any specific personality disorder, but instead show features of more than one specific personality disorder. These features, together, do cause

FMC B-000152

clinically significant distress or impairment in one or more important areas of functioning. According to the DSM-IV, the essential feature of a personality disorder is an enduring pattern of inner experience and behavior that deviates from the expectations of the individual's culture and is manifested in at least two of the following areas: cognition, affectivity, interpersonal functioning, or impulse control. The pattern is inflexible and pervasive across a broad range of personal and social situations and leads to clinical significant distress or impairment in an important area of functioning. The pattern is stable and of long duration and its onset can usually be traced back to adolescence or early adulthood. The pattern is not better accounted for as the manifestation or consequence of other mental disorders, and is not due to the physiological affects of substance abuse or medication or other medical condition. Mr. Barnette's areas of personality dysfunction has been evident since late adolescence. The pattern of his dysfunction has been apparent across several different relationships and over a period of more than five years. Mr. Barnette's personality disorder fails to meet the full criteria for either a diagnosis of Antisocial Personality Disorder or of Narcissistic Personality Disorder, but embodies characteristics of both. In regard to the Antisocial Features, Mr. Barnette demonstrates failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest; irritability and aggressiveness as indicated by repeated physical assaults; and irresponsibility as indicated by repeated failure to sustain consistent work behavior or honor financial obligations. Mr. Barnette does not have clear evidence of a conduct disorder with onset before the age of 15. Thus, he does not meet the full criteria required to carry an Antisocial Personality Disorder. It is not atypical for an individual suffering from these personality features to demonstrate an inflated and arrogant self appraisal, and to present as somewhat cocky. As is also evidenced by Mr. Barnette, these individuals are often verbally facile and present with a superficial type of charm.

In regard to the Narcissistic Personality Disorder Features, Mr. Barnette again falls short of meeting the full criteria necessary to have this stand as an independent diagnosis. He does demonstrate a grandiose sense of self importance and tends to exaggerate his achievements and talents. There is some evidence to support that he has been preoccupied with thoughts of ideal love. He also exhibits a sense of entitlement and demonstrates unreasonable expectations in regard to his relationships with other individuals.

Although Mr. Barnette's Personality Disorder diagnosis is descriptive of his functioning currently and over the last several years, it does not reach the degree of severity to interfere with his decision making. There is no evidence that he has suffered from any episodes of psychosis. What is apparent, however, is that his presentation of symptoms may cover a relatively fragile self esteem. He presents as very sensitive to injury from criticism, feeling humiliated and degraded in response to any perceived attack on his self esteem. It is not uncommon for individuals with this type of personality structure to react with rage at perceived losses or the break up of significant relationships. This seems to be consistent with Mr. Barnette's behavior during the alleged offenses. Consistent with the antisocial features of his personality disfunction, is his disregard for the safety of others encountered in an effort to strike out at those he perceives as slighting him or humiliating him.

The type of personality disorder demonstrated by Mr. Barnette is not easily amenable to treatment. No psychopharmacologic interventions are indicated. Individual and group psychotherapy approaches, as well as behavior interventions have had some degree of success in modifying the behavior associated with personality disorders, but the prognosis is somewhat guarded and treatment must often take place in a structured place over an extensive period of time.

It appears that shortly after his arrest, Mr. Barnette may have experienced some symptoms of an Adjustment Disorder with Depressed Mood. These were successfully treated with antidepressant and

14.

FMC B-000153

antianxiety medications. Although he does not currently demonstrate any overt symptoms or excessive anxiety, given the reality of his situation and the stresses he will face in the upcoming months, it is possible that he could again demonstrate symptoms of depression or anxiety. These should be treated symptomatically should they occur. Also, given the severity of his situation, he should be monitored for the onset of suicidal ideation, although there is no current evidence that he is considering this as a viable option.

In regard to Mr. Barnette's current competency to stand trial, it is our opinion that he currently has both a rational and a factual understanding of the charges against him and is able to work with his attorneys with a reasonable degree of rational understanding. It is our opinion that he is currently competent to stand trial. As noted, Mr. Barnette has a detailed understanding of his current legal situation and the workings of the court. He has had previous experience with the trail process. He demonstrates sufficient intellectual functioning to fully allow him to participate in resolution of his legal situation. As noted above, he is not currently suffering from a severe mental disease or defect that should impair his ability to stand trial.

In regard to the issue of criminal responsibility at the time of the alleged offenses, which ranged from 04/30/96, through 06/22/96, it is our opinion that Mr. Barnette was not, during that time, suffering from a severe mental disease or defect which impaired his ability to appreciate the nature, quality or wrongfulness of his conduct. As noted above, it is our impression that Mr. Barnette does suffer from a Personality Disorder, but the dysfunction associated with this disorder does not rise to the degree to impair his understanding of his behavior or to interfere with his ability to understand his actions and make decisions about his behavior. As described in the body of this report, Mr. Barnette has a pattern of problems developing in his relationships with women. During the process of the breakup of his relationship with Robin Williams, he felt belittled and humiliated. He also developed anger and jealousy as to what he perceived as her involvement in a new relationship with Benjamin Green. The early destructive behavior alleged to have occurred around 04/30/96 appeared to be most directly in response to these perceived insults. His realization of the likely consequences of that behavior, in conjunction with access to a weapon and alcohol ingestion, may have contributed to the progression of his anger and wish for revenge. Mr. Barnette admits that during his brooding over the situation, he considered killing Ms. Williams, but denies that was his intent on 04/30/96. This account is contradicted, to some degree, by the account provided by the victim in regard to the firebombing before her death. Mr. Barnette admits to falsely procuring a firearm and to altering it although he denies this with the intent of using it for the commission of the alleged offenses. Collateral information, including his own statements, at the time of arrest, indicate his plan to carjack a vehicle to provide transportation for himself to Roanoke, Virginia, to confront Ms. Williams. During this evaluation period, Mr. Barnette did not clearly identify a motivation for killing Mr. Donald Lee Allen. He does describe himself as being very "scared" at the time he confronted Mr. Lee Allen and again the availability of a weapon appeared to be a factor. Mr. Barnette did describe himself as being on the road to his end on 06/22/97, and indicated that he considered killing both Ms. Williams and himself. His descriptions of his intent in regard to the murder of Ms. Williams are somewhat conflicting and he implies that he may have actually been focussed on Mr. Green more than Ms. Williams. It is unclear how much his conflicting accounts regarding his behavior are indicative of his ambivalence around the time of the actual offenses or are the product of his relating and thinking about the events repeatedly during the last 15 months. Mr. Barnette clearly expresses his feeling that he had been wronged by Ms. Williams, but at the same time does not believe that his behavior was justified in response. He expresses his own opinion that he was responsible at the time of his actions, although he finds it hard to understand how he came to carry them out to completion. Mr. Barnette's behavior prior to and following the murder of Mr. Allen was deliberate and consistent with his plan to travel to Roanoke. The fact that he cut the

15.

FMC B-000154

phone lines to prevent calls for help from the household is consistent with his understanding of his behavior at that time. The fact that he left the scene after the killing is also consistent with the belief that he was known by other individuals who had observed the situation and that he would be taken into custody if he remained at the scene. It appears that post the murders, Mr. Barnette did attempt to commit suicide. It is also consistent with him understanding the severity of his actions at that point in time and realizing the consequences of his behavior. As noted, Mr. Barnette eventually returned to his family, cooperated with them in notifying the authorities, and did not resist arrest.

Mr. Barnette was returned to the Mecklinberg County area by the Marshal Service on 12/19/97. He was on no psychotropic medication at the time of his discharge from the facility. He is aware of the psychiatric and psychological services available in the Mecklinberg County Jail and how to access to mental health intervention if needed. As noted, he should be observed for deterioration of his mental status including the presentation of depressive symptomatology and suicidal ideation throughout resolution of his legal situation.


Sally C. Johnson, M.D.
Associate Warden Health Services
Chief Psychiatrist
Mental Health Division
FCI Butner, North Carolina

Michael Schaefer, Ph.D.
Staff Psychologist


SCJ/hh

FMC B-000155