IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:12CV327-RLV

AQUILIA MARCIVICCI BARNETTE )
                                 )
           Petitioner, )
                                 )
   vs. )
                                 )
UNITED STATES OF AMERICA, )
                                 )
          Respondent. )
_____ )

**RESPONSE OF THE UNITED STATES TO
BARNETTE'S MOTION UNDER 28 U.S.C. § 2255
AND MOTION FOR AN EVIDENTIARY HEARING**

Aquilia Marcivicci Barnette has moved under 28 U.S.C. § 2255 to vacate
the death sentence that he received in 2002, upon the recommendation of a
unanimous jury, for the 1996 murders of Robin Williams and Donald Allen.
Petitioner's Initial Motion for Relief, June 19, 2013 (Dkt. No. 48, 3:12-CV-327)
(hereinafter "Mot.") at 1. Barnette contends that this sentence was obtained in
violation of his "rights to effective assistance of counsel, due process of law, and to
be free of cruel and unusual punishment." *Id.* at 11. Barnette does not challenge
his criminal convictions or contend that he is entitled to a sentence short of life
imprisonment. Mot. 1; Petitioner's Brief in Support of Motion for Evidentiary
Hearing, Dec. 22, 2014 (Dkt. No. 74, 3:12-CV-327) (hereinafter "Barnette Br.") at
1.

Barnette's motion and the files and records of the case, including the materials identified by Barnette's brief in support of his motion for an evidentiary hearing, conclusively show that Barnette is entitled to no relief. Accordingly, the United States respectfully requests that this Court deny Barnette's motion under Section 2255 without an evidentiary hearing.

## BACKGROUND

**A.    Barnette firebombs the home of Robin Williams after she ends their relationship.  Months later, he returns and kills her after killing Donald Allen to steal his car.**

1.    <u>Barnette firebombs Robin Williams's apartment</u>.

In 1994, Robin Williams met and began dating Barnette.  At the time, Barnette lived in Charlotte, North Carolina, and Robin lived at her mother's house in Roanoke, Virginia.  After maintaining a long-distance dating relationship for approximately one year, Robin moved from her mother's house into an apartment with Barnette at 1616 Keswick Avenue in Roanoke in March of 1995.  Exhibit 1 ("Ex."), at 1036.[1]  Robin's relationship with Barnette was rocky from the outset.  Ex. at 1037–38.  Robin confided to friends that Barnette had become physically and mentally abusive.  Ex. at 457–58.  Barnette often beat Robin and became increasingly obsessed with a theory that Robin was seeing other men.  Ex. at 407, 419, 458, 1042–46, 1052, 1054.

In April of 1996, Robin ended her relationship with Barnette.  Ex. at 1059.

---

[1] Exhibit 1 consists of the Joint Appendix filed by Barnette in the Court of Appeals for the Fourth Circuit in his appeal from the sentence he received in 2002.  Dkt. No. 60, No. 02-20 (4th Cir. June 12, 2003).  The Joint Appendix contains relevant portions of the record.

2

Robin informed Barnette that he was no longer welcome at the apartment. Ex. at 1059. On the day he left, Barnette choked Robin after confronting her about alleged infidelity. Ex. at 1089. Barnette poured bleach over Robin's clothes and took items owned by Robin when moving his belongings from the apartment. Ex. at 1064.

Barnette moved to his mother's house in Charlotte and became increasingly angry with Robin for ending their relationship. Ex. at 1064, 1072. Barnette did not want to believe that Robin simply did not wish to be with him and assumed that Robin was seeing someone else. Ex. at 1070–71. Barnette attempted to restart his relationship with Robin by harassing her by telephone to the point where Robin threatened to have her phone number changed. Ex. at 1069.

To ease Robin's fears of staying in her apartment alone, Robin's long-time friend, Benjamin Greene, went to the apartment to stay with her on April 29, 1996. Ex. at 406–07. That night, Barnette repeatedly called Robin by telephone and questioned her about why she broke up with him. Ex. at 409, 1069, 1072. Barnette became angry after learning that Greene was in the apartment with Robin. Ex. at 1072–73.

That same night, Barnette borrowed his brother's car, filled two plastic containers with gasoline, and drove several hours to Roanoke. Ex. at 1074–75. In Roanoke, Barnette stopped at a Wal-Mart and purchased a baseball bat. Ex. at 1076. Barnette stopped at a dead-end street near Robin's apartment, retrieved

3

a pair of pliers and the baseball bat, and approached the apartment.  Ex. at 1076–77.  Barnette cut the telephone lines to the apartments in Robin's building to prevent anyone from calling the police.  Ex. at 1077.

At 4:00 a.m. on April 30, 1996, Robin awoke to a disturbance outside of her apartment and said to Greene, "he's here."  Ex. at 409.  Robin tried to call the police for assistance, but the phone line was dead.  Ex. at 410.  Greene looked out of the window of the apartment and saw Barnette smashing the windows of Greene's car with a baseball bat.  Ex. at 410.  Robin screamed out the window, "Why [are] you doing this?"  Ex. at 411.  Barnette replied, "[Y]ou're going to die tonight.  I'm going to kill you."  Ex. at 411.

Barnette threw a fire bomb into the living room through a gap that he had kicked in the front door, yelling "Die, bitch, die."  Ex. at 413, 484, 1078.  Barnette had doused the door and window sills with gasoline, and the firebomb ignited the curtains and quickly engulfed the front portion of the apartment in flames.  Ex. at 413–14, 1078.  Barnette then used one of the containers of gasoline he had brought with him to set fire to Greene's car, which was parked outside of the apartment.  Ex. at 413, 1079.  Barnette then fled in the car that he had borrowed from his brother.  Ex. at 416, 1080.

The entire front of the apartment was engulfed in flames, preventing Robin and Greene from escaping through the only door to the outside.  Ex. at 414, 534.  Greene and Robin ran to Robin's bedroom on the second floor.  Ex. at 414 They knocked the blinds down, and they jumped.  Ex. at 414.

4

Robin sustained in the fire painful and disfiguring second- and third-degree burns, which required extensive hospitalization and skin grafting.  Ex. at 417, 439–440, 498.  Robin identified Barnette as the perpetrator, and Roanoke police obtained a warrant for Barnette's arrest on charges of arson and attempted murder.  Ex. at 424, 427, 489.

>        2.        <u>Barnette prepares to return to Roanoke to kill Robin</u>.

After firebombing Robin's apartment, Barnette drove back to Charlotte.  Ex. at 1081.  Barnette saw his picture on television news programs that identified him as wanted by the police for the firebombing.  Ex. at 1082.  He recognized that he "had time to sit and think about what he had done," and he expected that he "was about to go to prison for about thirty years."  Ex. at 1086.  Although he was aware that he was wanted by the police, Barnette did not turn himself in.  Ex. at 1084.  Instead, Barnette went out with friends, visited clubs, met girls, and drank.  Ex. at 536–37.

On May 20, 1996, Barnette purchased a 12-gauge Stevens shotgun from a pawn shop in Charlotte.  Ex. at 544–45.  When making the purchase, Barnette produced a Virginia driver's license in his brother's name, Mario Vonkeith Barnette.  Ex. at 547.  Barnette presented the false identification because he was on probation in Charlotte and was "hiding out," to avoid being arrested and extradited.  Ex. at 1089.  Barnette completed a federal firearms-transaction form and falsely indicated that he was neither a convicted felon nor a fugitive against whom charges were pending.  Ex. at 549.

5

The following day, Barnette exchanged the Stevens shotgun for a 12-gauge semi-automatic Winchester shotgun, asserting that the Stevens shotgun malfunctioned. Ex. at 551–52. Barnette again used his brother's name and completed another federal firearms-transaction form. Ex. at 552–53. Barnette again falsely stated that he was neither a convicted felon nor a fugitive against whom charges were pending. Ex. at 552–53.

Barnette hid the Winchester shotgun under his bed for approximately one week before sawing off both the stock and barrel ends of the gun. Ex. at 1091–92. Barnette "thought about going to Roanoke and killing Robin." Ex. at 1091. He also thought about killing himself at the same time. Ex. at 1091. He "felt like, well, if [I] was going to go, [I] wasn't going to walk down the middle of the street with some huge gun." Ex. at 1093. So Barnette sawed the ends of the firearm down and wrapped hockey-tape around it to "make it easier to conceal." Ex. at 1093. Barnette then test fired the firearm in its sawed-off condition. Ex. at 1093.

Over a period of weeks, Barnette began "collecting stuff thinking about what [he] actually would do" if he got to Roanoke to kill Robin. Ex. at 1091, 1093. Barnette considered what would happen, how he would get to Robin, and what he would need. Ex. at 1093. And he placed the items that he would need in "the bag that [Barnette] would always pack when [he] would go to see Robin." Ex. at 1093. The items that Barnette collected in the bag included shotgun shells, a crowbar, bolt cutters, and a flashlight. Ex. at 1093. On June 20, 1996, Barnette coated the lens of the flashlight with a red color and taped it to his shotgun as

6

part of his violent plan.  Ex. at 1093–94.  The next day, Barnette thought to himself that this was the day that Robin was going to die.  Ex. at 1094–95.

3.  Barnette carjacks and murders Donald Allen in Charlotte.

Shortly before midnight on June 21, 1996, Barnette walked from his mother's house to the intersection of Billy Graham Parkway and Morris Field Road in Charlotte, toting the gym bag that he had packed and his sawed-off semi-automatic shotgun.  Ex. at 1096.  Another intersection adjacent to Barnette's mother's house was illuminated with a "lot of lights."  Ex. at 1097.  Barnette instead walked to the Morris Field intersection, which was "almost completely black when the light's not green."  Ex. at 1098.

Barnette crouched by the bushes near the intersection and prepared "to carjack somebody."  Ex. at 1098.  Barnette threw his bag into the bushes by the side of the road, opened it, and loaded his gun.  Ex. at 1098.  Barnette recognized that a car occupied by only one person would be easier to carjack and waited until a vehicle arrived at a time when there was no other traffic.  Ex. at 1099.

Barnette ran to a dark blue Honda Prelude driven by 22-year-old Donald Allen, pointed his shotgun into the open window, and opened the door of the car, commanding Donald to "get out."  Ex. at 559, 694, 723, 1100.  Barnette pointed Donald to where his bag was stashed and ordered Donald to give Barnette his wallet.  Ex. at 1100.  Donald complied, throwing his wallet near where the bag was stashed.  Ex. at 1100.  Barnette then directed Donald where to go, marching him down to a ditch.  Ex. at 1101, 1274.  Barnette directed Donald to turn

7

around.  Ex. at 1101.  Donald pleaded, "Don't shoot" and "Don't hurt me."  Ex. at 1101.

After Donald did everything Barnette told him to do and begged for his life, Barnette shot Donald multiple times.  Ex. at 610–11, 1100, 1102.  Barnette retrieved his bag and Donald's wallet, got into Donald's car, and drove off toward Roanoke, where Robin was.  Ex. at 1102–03, 1274–78.  Donald died a short time later.  Ex. at 619–20.

     3.      <u>Barnette drives to Roanoke and murders Robin Williams</u>.

On his way to Roanoke in the Honda Prelude that he stole from Donald, Barnette stopped to purchase gasoline with money from Donald's stolen wallet.  Ex. at 1104.  Barnette arrived in Roanoke when it was still dark.  Ex. at 1110.  Barnette parked the car within sight of the house where Robin lived with her mother, Bertha Williams, while Robin recuperated from the burns that she had sustained from Barnette's firebombing of her apartment.  Ex. at 515, 1110.  Barnette sat in the car and waited for morning.  Ex. at 1110.

Early in the morning, Barnette moved Donald's car to the alley behind the house.  Ex. at 1112.  Before moving the car, Barnette saw Robin open the door and let her dog out.  Ex. at 1110–11.  Barnette also observed a car stop at the house and drop off Bertha Williams's eight-month-old grandchild.  Ex. at 1111.

Barnette entered the yard of the house where Robin was living with her mother through a rear gate and cut the telephone wires with pliers to prevent a call for assistance.  Ex. at 1113.  Barnette then proceeded to the other side of the

8

house and attempted to open the door to the kitchen, where Bertha Williams had been baking brownies for a church bake sale. Ex. at 988. By this time, Bertha had moved to the living room with her grandchild. Ex. at 988.

Barnette "emptied the gun," at the door, firing three shots that caused a spray of pellets to hit walls and furniture inside the home, and kicked the door open. Ex. at 670, 1113–14. Bertha took her granddaughter into her arms and looked out the front door, but did not see anyone. Ex. at 988. Robin ran to her mother. Ex. at 989. Fearing that Barnette had fired into the house, Bertha told Robin to "just run." Ex. at 989.

Robin followed her mother's advice and ran out the front door. Ex. at 989. Bertha Williams turned around and saw Barnette standing in the kitchen with his gun in his hand, demanding to know where Robin was. Ex. at 989. Bertha Williams said, "[S]he's running. Leave her alone." Ex. at 989. Barnette reloaded the shotgun. Ex. at 1114.

Barnette pursued Robin, who fell several times as Barnette chased her. Ex. at 1117. "He was very calm." Ex. at 626. Barnette caught Robin a short distance from her mother's house, grabbed her arm, and ordered her to come with him. Ex. at 1118. When Robin resisted and said no, Barnette grabbed Robin by the hair and began dragging her back toward her mother's house. Ex. at 647, 1118. Barnette told Robin he was going to kill her. Ex. at 1118.

Unable to call the police because Barnette had cut the telephone lines, Bertha Williams went outside and yelled for help. Ex. at 645, 989. A neighbor,

9

Sonji Hill, called 911.  Ex. at 643.  Hill hung up the phone when Barnette, who was approximately 50 feet away, pointed his shotgun at Hill and threatened to shoot her if she did not hang up.  Ex. at 646.

Bertha Williams pleaded with Barnette to leave Robin alone, reminding him that he had "already disfigured her for life."  Ex. at 990.  Robin managed to get away from Barnette.  Ex. at 990.  Her mother took Robin by the arm and began to lead her back to the house.  Ex. at 990.

As Robin and her mother turned away from Barnette, Barnette shot Robin twice.  Ex. at 990.  Robin fell to the ground at her mother's feet.  Ex. at 990.  Robin died of the wounds that Barnette inflicted upon her a short time later.  Ex. at 990.

4.    <u>Barnette flees, is arrested, and confesses</u>.

Barnette fled in the Honda Prelude that he had stolen from Donald, travelling first to Knoxville, Tennessee and then to Charlotte, where he abandoned the stolen vehicle at a shopping center on June 24, 1996.  Ex. at 1122, 1138.  Law-enforcement officers discovered the abandoned vehicle the same night.  Ex. at 692–94.  From a nearby dumpster, officers recovered a gym bag containing, among other items, the loaded shotgun with a flashlight affixed to the barrel that Barnette had used to murder Donald and Robin.  Ex. at 696, 706.

Barnette was arrested at his mother's house in Charlotte on June 25, 1996, and, after receiving the warning required by *Miranda v. Arizona*, 384 U.S. 436 (1966), gave detailed statements to law-enforcement officers recounting the

10

murders and carjacking.  Ex. at 715, 719–37, 1140.  Among other things, Barnette told law-enforcement officers that Donald's body could be found in a drainage ditch at the corner of Billy Graham Parkway and Morris Field Road.  Ex. at 715, 719–20.  When the officers were unable to locate the body, they took Barnette to the location, where he pointed out Donald's body in the woods at the end of the drainage ditch hidden by foliage.  Ex. at 722.  Barnette also identified the blue Honda Prelude as the vehicle he had stolen from Donald and driven to Roanoke.  Ex. at 723.

### B. Barnette is indicted, tried, convicted, and sentenced to death.

Barnette was charged by a grand jury in the Western District of North Carolina on February 4, 1997, with eleven offenses against the United States related to the murders of Donald Allen and Robin Williams.  Ex. at 69–74.  Three of the eleven counts were capital offenses, including one count of intentional killing in the course of a carjacking, 18 U.S.C. § 2119(3), and two counts of using and carrying a firearm during and in relation to the commission of a crime of violence that resulted in the death of a person under circumstances constituting murder, 18 U.S.C. §§ 924(c), 924(i)(1), (2).  Ex. at 72–73.  After a three-week trial in January 1998, the jury found Barnette guilty of all counts.  Ex. at 75.  "No witness at trial disputed the facts of the crimes."  *United States v. Barnette*, 211 F.3d 803, 808 (4th Cir. 2000) ("*Barnette I*").

After Barnette was found guilty, the trial moved to the sentencing phase.

11

The United States sought to prove two statutory aggravating factors supporting the death sentence for each murder. For Allen's murder, the United States presented the statutory aggravating factors of (1) committing an offense in the expectation of receiving something of pecuniary value, and (2) using substantial planning and premeditation in the offense. *Id.* at 810 n.2. For Robin's murder, the United States presented the statutory aggravating factors of (1) the creation of a grave risk of death to one or more persons in addition to the victim and (2) the use of substantial planning and premeditation in the commission of the crime. *Id.* at 810 n.3. The United States also sought to prove three non-statutory aggravating factors, which were the same for each victim: (1) the harm caused to the family of the victim as a result of the killing; (2) the risk that Barnette would likely be a danger in the future; and (3) the existence of multiple victims in the crime. *Id.* at 810 n.3; Ex. at 119.

At the conclusion of the evidence, the jury unanimously found the existence of all of the statutory and non-statutory aggravating factors on each of the three capital counts of conviction. Ex. at 119. The jury also concluded that the aggravating factors outweighed the 29 mitigating factors that at least one juror found on each of those counts. *Barnette I*, 211 F.3d at 811. The jury sentenced Barnette to death on the three capital counts on which he was charged. *Id.*

### C. A second jury again sentences Barnette to death.

The Court of Appeals for the Fourth Circuit affirmed Barnette's conviction

12

"in all respects" but reversed Barnette's sentence of death on the three capital offenses. *Barnette I*, 211 F.3d at 826. The Fourth Circuit held that the district court had erroneously excluded a defense expert that Barnette had sought to call as a surrebuttal witness during the sentencing proceeding and remanded for resentencing. *Id.* On remand, the United States presented the same statutory and non-statutory aggravating factors that it had presented to the jury that had previously returned a sentence of death. Ex. at 111–16.

During the resentencing proceeding, Barnette sought to establish two statutory mitigating factors with respect to each capital count. Ex. at 1974–75, 1985–86, 1998. He sought to establish that Barnette's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired. Ex. at 1975, 1985–86, 1998. And he sought to establish that other factors in his childhood, background, or character mitigated against imposition of the death penalty. Ex. at 1975, 1985–86, 1998.

Barnette also sought to establish sixteen nonstatutory mitigating factors with respect to each count. Those factors included that (1) Barnette accepted full responsibility for his actions; (2) Barnette had remorse; (3) Barnette was abused by his father; (4) Barnette was affected by growing up in a family environment of violence, drugs, and alcohol abuse; (5) Barnette had repeated exposure to violence in his home; (6) Barnette attempted to protect his brother from the damaging effects of parental violence and neglect; (7) Barnette had untreated emotional problems; (8) at the time of his crimes, Barnette was experiencing a depressive

13

episode; (9) Barnette does well in a structured environment; (10) Barnette cooperated with police; (11) Barnette could serve a useful purpose to others in a prison environment; (12) at the time of his offenses, Barnette was experiencing irrational and obsessive thoughts; (13) Barnette's brother and children would be harmed by his execution; (14) Barnette was neglected by his mother; (15) Barnette turned himself into police; and (16) Barnette had been a model prisoner. Ex. at 1975–76, 1986–87, 1998–99.

    1.    <u>The United States's case for the death penalty</u>.

Over the course of four days, the United States presented its case that the death penalty was an appropriate sentence for Barnette's offenses. Ex. at 62–63, 959. The United States presented evidence of Barnette's crimes, the substantial danger that he presented to others, and the harm that Barnette's murders inflicted upon the families of Robin Williams and Donald Allen. It also presented evidence of Barnette's history of violent conduct to show that Barnette presented a risk of future dangerousness.

Benjamin Greene described the details of the night that Barnette firebombed Robin's apartment. Ex. at 402–20. The first responders who arrived at Robin's apartment that night also testified. Ex. at 422, 437. The jury heard from Robin's neighbors who witnessed the fire, including Maude Hubbard who lived next to Robin and to whom Robin ran for help immediately after she escaped. Ex. at 454–62. Hubbard explained how she attempted to call Robin's mother but could not because her telephone line had been cut. Ex. at 460.

14

Another neighbor, John Grubb, testified that he was able to call 911 because he had previously secured his telephone line. Ex. at 448–49. Sergeant R.S. Kahl of the Roanoke City police department testified about his investigation, including the destruction the firebombing caused to Robin's apartment. Ex. at 471–85.

Sarah Aldridge, a nurse at the burn-wound center at which Robin was treated for approximately 12 days, testified about the severe injuries Robin suffered at the hands of Barnette. Ex. at 491–505. Aldridge testified that Robin was "in a great deal of pain" for several days after she was admitted. Ex. at 498. Robin suffered from circumferential burns that required skin grafting and injuries that required multiple surgical procedures to repair. Ex. at 497–501. Robin and members of her family were trained about how to manage dressing Robin's wounds after she was discharged and began her recovery at home. Ex. at 503.

Sydney Williams, Robin's brother, testified that approximately one to two weeks after the firebombing, a number of cards were left on Robin's car that contained handwriting and were signed, "Marc." Ex. at 505, 515–522. One of those cards said, "Robin, you don't have to . . . lie about Benny, if you love him so much you should have never . . . faked your love for me." Ex. at 519. Others said, "Why did you lie," "You let him come between us," "You lied to me," "Why wasn't I good enough for you," "If you loved him so much, why did you even bother with me," and "You never really loved me." Ex. at 519–22. Sydney Williams also described growing up with Robin and how Robin would take care of Sydney's

15

little daughter even better than Sydney had.  Ex. at 505–09.  He explained how Robin's death left a void in his life.  Ex. at 525.

Barnette's friend, Steve Austin, described Barnette's meeting Robin at a social gathering about a year before they moved in together, and he described Barnette's conduct after the firebombing.  Ex. at 528–37.  Austin explained that he saw Barnette approximately a week after the firebombing, when police were looking for him.  Ex. at 530.  Barnette described the firebombing to Austin, explaining that he had put gas in a container and "went on up there."  Ex. at 532–34.

Austin explained that a few weeks after the firebombing, he and Barnette "went out clubbing," "picked up girls, and stuff like that."  Ex. at 536–37.  Austin described an occasion between the firebombing and the murders where he and Barnette met some girls at a club.  Ex. at 536–37.  He and Barnette "went over to their house and played cards and had some drinks, just laughing and joking basically."  Ex. at 536–37.

Jacob Freshour, a manager of the pawn shop from which Barnette procured his semi-automatic shotgun, testified about Barnette's use of his brother's identification to purchase the firearm.  He explained that the purchaser identified himself as Mario Barnette both during the initial purchase and the exchange.  Ex. at 543–55.  And he explained that the purchaser represented that he had not been convicted of a crime punishable by more than one year of imprisonment and that he was not a fugitive.  Ex. at 547–55.  The purchaser

16

walked out of the store with the shotgun.  Ex. at 555.

The jury heard evidence about Donald Allen's murder.  Elaine Edwards, who had met Donald shortly before Barnette murdered him, testified that she called police when she saw a flier that had identified Donald as missing.  Ex. at 555–60.  Officer Robert Holl of the Charlotte-Mecklenburg Police Department described Donald's body when it was found.  Ex. at 560–85.  Todd Nordhoff, an expert in firearm and tool-mark identification with the Charlotte-Mecklenburg Police Department, and Dr. James Sullivan, the medical examiner who conducted an autopsy on Donald's body, testified that Donald was shot three times from less than five feet away and died from his shotgun wounds.  Ex. at  590–621.  The jury also heard the testimony of Officer J.L. Krall of the Charlotte-Mecklenburg Police Department, who discovered Donald's car at a shopping center in Charlotte, and the testimony of Ben Kennedy, an Allen family friend who identified the vehicle and discovered Barnette's gym bag in a dumpster nearby. Ex. at 688–710.  That bag contained, among other things, a sawed-off shotgun with a flashlight taped to the magazine, clothes, bolt cutters, and a crowbar.  Ex. at 696–97, 706.

The jury heard from several eyewitnesses, first responders, and investigators who described the details of Barnette's murder of Robin in front of her mother.  Robin's neighbors, Sonji Hill and Earlene Thompson, described seeing Robin run from her mother's house, followed by Barnette, who calmly chased, dragged, shot, and killed Robin as she moved toward her mother.  Ex. at

621–652.  Thompson testified that Barnette pointed his gun directly at her as she stood on her porch.  Ex. at 628–29.  Hill described how Barnette also pointed his gun at her when she tried to call 911 and told her to "hang up the motherfucking phone."  Ex. at 646.  The jury heard from Officer Daniel C. Dean, the first police officer to arrive on the scene after the murder, Ex. at 652–59, and from Officer Chad Scara, an evidence technician who described, among other things, the extensive damage that Barnette caused by shooting into the Williams home.  Ex. at 659–74.  Dr. Gregory Wanger, an Assistant Chief Medical Examiner in Roanoke, described the results of Robin's autopsy and concluded that she died from the shotgun wounds she received to the back and chest.  Ex. at 675–85.

The jury also heard Barnette's detailed confessions.  Officer James Sanders of the Charlotte-Mecklenburg Police Department, who arrested Barnette after the murders, testified that Barnette described the location of, and directed police to, Donald's body.  Ex. at 710–723.  Sanders, Detective Tony Rice, and Officer Holl, of the Charlotte-Mecklenburg Police Department, testified about the detailed statements Barnette gave describing his murder of Donald and Robin.  Ex. at 723–89.  The jury also heard recordings of Barnette's statements to the officers.  Ex. at 723–89.

In addition to evidence about Barnette's murder of Robin and Donald and the danger his conduct presented to those around him, the United States introduced evidence of the violence that Barnette had inflicted upon others, including Barnette's former girlfriends and their children.  Crystal Dennis

18

described how Barnette hit and kicked her during her relationship with him. Ex. at 789–95. She also testified that Barnette whipped her children with a coat hanger, cutting them open. Ex. at 795–98. James Yarborough, of the Sherriff's Office in Noonan, Georgia, explained that Barnette pleaded guilty to charges of cruelty to children arising out of those beatings. Ex. at 806–12. Rodney Riggs, another law-enforcement officer in Noonan, Georgia, testified that Barnette confessed to shooting Crystal Dennis's brother, Anthony Britt, with a .22 caliber revolver. Ex. at 817–22. Barnette pleaded guilty to several offenses arising from that shooting. Ex. at 825–26.

Natasha Tolbert, the mother of Barnette's two children, testified about how Barnette beat her. Ex. at 827–35. She explained that, among other things, Barnette hit her "everywhere," including when she was pregnant. Ex. at 830. On one occasion, when Tolbert was pregnant with his daughter, Barnette slammed Tolbert against concrete. Ex. at 831. Tolbert also testified that Barnette had no contact with his children—no Thanksgiving visits or Christmas visits, presents, or cards—for five or six years prior to his trial for the murders of Robin and Donald. Ex. at 832–34. Barnette wrote to Tolbert a month prior to his second sentencing hearing and, for the first time in many years, asked to visit his children. Ex. at 833. Tolbert took them up from Georgia to visit their father. Ex. at 834.

Alesha Houston, who had begun dating Barnette when she was 15 and he was approximately 19 or 20, testified about serious injuries that Barnette

19

inflicted upon her.  Ex. at 849–872.  Houston described how Barnette "punched [her] in the side of her face, bruised her che[e]k, [and] chipped [her] front tooth."  Ex. at  859.  She also explained that she still had a bald spot on her head where Barnette had pulled her hair out.  Ex. at 856.  Houston described another occasion when Barnette appeared at her door and beat her with a baseball bat.  Ex. at 878–80.  Her injuries required between 12 and 15 stitches.  Ex. at 880.

Houston described how Barnette abducted her after she had broken up with him.  She described how Barnette kicked down the door of her uncle's house, yanked the phone out of the wall when she tried to call 911, shoved a towel down her throat to keep her from screaming, and cut her fingers with a knife.  Ex. at 858–60, 864.  Barnette physically picked Houston up and threatened to throw her off the balcony before placing her in his Jeep and taking her to his house against her will.  Ex. at 867–69.  Barnette fled his house when the police eventually arrived.  Ex. at 867.  Barnette cried when speaking to Houston on the telephone to gain sympathy and convince her not to press charges against him, because he did not want to be in trouble with the police.  Ex. at 871.

Houston also testified how Barnette threatened her life with a knife.  Ex. at 872–87.  Barnette confronted Houston on her way to work at Bojangles fast-food restaurant shortly after the abduction, asking if Houston was going to press charges.  Ex. at 872–73.  Barnette placed a large butcher knife in Houston's back and attempted to get her to go with him.  Ex. at 873. When Houston's manager at Bojangles approached, Barnette placed the knife to Houston's throat and

20

threatened to kill her. Ex. at 874–75. Other employees from Bojangles and another nearby restaurant disarmed Barnette, and he was arrested. Ex. at 874–76.

Houston also described an occasion on which Barnette threatened to shoot her with a gun if she did not accompany him, drove her to the woods against her will, and then raped her. Ex. at 881–85. Barnette took her to an area of the woods near his mother's house, ripped Houston's shirt off, and proceeded to strangle her with it. Ex. at 882. Houston explained that she tried to fight him off, but Barnette raped her in the back seat of the vehicle while she cried. Ex. at 882.

Afterward, Barnette took Houston back to his mother's house and sought to make sure that he did not press charges against her. Ex. at 882–84. He asked how her hand was doing in the light of the 12 to 15 stitches she received after Barnette had beat her with a baseball bat. Ex. at 880, 882. And he called her a taxi cab, waited with her, and tried to make her feel good about what had happened so she would not call the police when she got home. Ex. at 884. Houston did, however, call the police. Ex. at 885–86.

The jury heard testimony from police who investigated Barnette's rape of Houston and a number of other witnesses who corroborated the events that Houston described. Detective Terry Brandon of the Charlotte-Mecklenburg Police Department testified about his investigation after Houston reported Barnette's sexual assault and the charges brought against Barnette. Ex. at 896–

21

907.  Brent Burgess, who waited tables at a restaurant next to the Bojangles at which Houston worked, observed Barnette's placing the knife to Houston's throat. Ex. at 912–17.  Officer Donna Burgess of the Charlotte-Mecklenburg Police Department, who responded to that incident, testified that she recovered the knife from the scene and charged Barnette with several offenses.  Ex. at 918–24. Debra Adamo, formerly an officer with the Charlotte-Mecklenburg Police Department, testified about Houston's kidnapping by Barnette.  Ex. at 926–35.

The jury also heard from Thad Johnson, the probation officer who supervised Barnette during the probation terms he served following convictions for felonious restraint and breaking and entering.  Ex. at 939–42.  Johnson explained that Barnette often failed to appear for office visits as required.  Ex. at 949.  Johnson also explained that Barnette's probation terms required him to refrain from committing criminal offenses, required him to live in North Carolina, prohibited him from carrying a firearm, and required him to stay away from Houston.  Ex. at 943–44.  Johnson explained that Barnette did not tell him that he was living in Roanoke, Virginia.  Ex. at 949.  Johnson also explained that Barnette told him that he was employed by the Courtyard Marriott in Charlotte and did not tell him that he was working at Camelot Music in Roanoke.  Ex. at 950–55.

Members of Robin's family testified, describing the deep loss that Barnette's conduct had caused them.  Robin's brother, Kenneth Williams, testified that Robin was the one who held his family together.  Ex. at 966.

22

Robin's mother, Bertha Williams, testified as an eyewitness to Robin's relationship with Barnette, Robin's recovery from the severe burns that he inflicted on her, and Robin's death at Barnette's hands. Ex. at 963–94. Bertha Williams testified about an occasion that she had picked Robin up after Barnette had hit her, and that Robin broke up with Barnette after Barnette tried to choke her in the middle of the night, stole her car, and locked her out of her apartment. Ex. at 984–85. Bertha Williams testified that when Robin was recovering at the burn center after Barnette firebombed Robin's house, she almost "[n]ever left her side." Ex. at 986. And Bertha Williams described the day that she lost her daughter, holding Robin's arm as Barnette shot and killed her. Ex. at 988–89. Bertha Williams explained that when Barnette murdered her daughter, he took away the joy of her life. Ex. at 992.

Members of Donald Allen's family also testified, describing the loss they experienced at Barnette's hands. Shirley Allen, Donald's mother, explained that Donald, the youngest of five children, had been a "miracle" baby, born premature with only a 25% chance to live. Ex. at 994–96. Shirley Allen told the jury that Donald had purchased the Honda Prelude for which Barnette had killed him in blue because blue was her favorite color. Ex. at 1000. And she explained that she had not slept a full night in six years, waking up every morning at 2 AM, the time that Donald died. Ex. at 1006. Donald's sister, Denise Allen Hogue, and Donald' father, Bobby Gene Allen, testified about their loss, and their search for Donald when he went missing. Ex. at 1009–24. They had placed missing-person

23

fliers around the area and rode around in vain, looking for him. Ex. at 1009–24. Bobby Allen explained that he filled up two thermos bottles with water and carried them with him while searching for Donald, in case Donald had been tied to a tree and was thirsty. Ex. at 1021. Donald had not attended church with the family on Sunday, as he usually had, and that concerned the family particularly. Ex. at 1020. Bobby Allen explained that he knew Donald had been killed when he learned on television that a body had been discovered. Ex. at 1022.

    2.     <u>Barnette's case in mitigation</u>.

Over the course of four days, Barnette's attorneys presented his case in mitigation, which included testimony from thirteen different witnesses. Defense counsel focused extensively on Barnette's background and that of his family, with emphasis on the domestic violence and alcohol and drug abuse to which he was exposed and the neglect and abuse that he endured from his parents. Barnette's attorneys also focused on Barnette's mental health, with emphasis on the symptoms of depression that he manifested, the borderline-personality disorder with which experts diagnosed him, and signs of other mental-health issues that went unremedied. Expert witnesses called by Barnette's attorneys focused on how Barnette's background placed limits on the choices Barnette had and made them difficult. And Barnette's defense focused extensively on the theory that Barnette's violent conduct was confined to the context of domestic relationships of the kind that he was unlikely to encounter again if he received a sentence of life imprisonment.

24

Barnette's attorneys began by calling Barnette, who testified on his own behalf, apologizing and taking responsibility for the murders. Barnette described his relationship with Robin, admitting that he mistreated her when they lived together and that he was "in the wrong." Ex. at 1035–1068, 1062. He explained that things started off good with Robin but he felt that she was "betraying" him after becoming suspicious that Robin had been unfaithful to him with Benjamin Greene. Ex. at 1035–1068. He explained that he was devastated after breaking up with Robin and moving out of her house. Ex. at 1068.

Barnette described his firebombing of Robin's house and explained that he "was doing something [he] had no business doing." Ex. at 1071–80. He explained that he had taken sleeping pills and alcohol and became angry after calling Robin on the telephone and learning that she had company. Ex. at 1070–72. He testified Benjamin Greene shot at him from the house after he had set it ablaze, and he believed that Robin was telling Greene to shoot him. Ex. at 1079–80. He testified that he traveled back to Charlotte feeling angry and scared. Ex. at 1080–83.

Barnette testified that he learned he was wanted and told his friend that he was "not going to run." Ex. at 1083. He "stayed home the majority of the time" waiting for the authorities "to show up," "wondering why it was taking them so long." Ex. at 1084. He explained Robin was "all that was on [his] mind" when his friend took him out to clubs to meet girls. Ex. at 1085–86. And he testified that when he obtained the shotgun and assembled materials to return to

25

Roanoke he "thought about going to Roanoke and killing Robin and killing [him]self." Ex. at 1091–93.

Barnette described his murder of Donald Allen. Ex. at 1095–1103. He testified that he waited on the side of the road "to carjack somebody." Ex. at 1098. He explained that he needed a car to get to Roanoke. Ex. at 1096–98. And he needed to get to Roanoke to "get to Robin." Ex. at 1096–98. Barnette told the jury, "I'm sorry," and said, "I shouldn't never been there." Ex. at 1099.

Barnette also described his murder of Robin. Ex. at 1108–1122. He testified that he told Robin, "I got one for you and I got one for me" before he shot her. Ex. at 1118–21. He explained that he did not shoot himself after shooting Robin because he panicked after seeing what the gun did to Robin. Ex. at 1128. He testified that he later procured a hose and tried unsuccessfully to kill himself on several occasions by using it to pipe exhaust into the car. Ex. at 1123–30, 1133–36. He further explained that he went to church shortly after the killings to pray for the souls of Robin and Donald. Ex. at 1130–33.

From the stand, Barnette told Robin's family, "I hate myself for what I did to you." Ex. at 1121. He stated he wished he "could give her back" because he knew they missed her. Ex. at 1121. And he said, "I'm so sorry." Ex. at 1121.

Defense counsel presented evidence of Barnette's childhood through lay witnesses including Barnette; his stepfather, Derrick Barnette; his brother, Mario Barnette; and his cousin, Ahmad Cooper. Among other things, Barnette's attorneys focused on the abuse that Barnette suffered at the hands of his father;

26

the violence that he witnessed growing up, particularly between Derrick and his mother, Sonia Barnette; and the neglect he suffered as a result of his mother's irresponsible behavior, inattention, and drug and alcohol abuse.

Defense witnesses told the jury that Barnette was born when his mother, Sonia, was fourteen years old and Derrick was 16 years old. Ex. at 1297, 1316. Derrick and Sonia had dated previously, but they were not together when Barnette was born. Ex. at 1297. Derrick joined the air force and later married Sonia. Ex. at 1299–1302. Barnette's brother Mario Barnette was born when Derrick was stationed overseas. Ex. at 1299–1302.

Barnette's attorneys presented evidence that Barnette's stepfather, Derrick Barnette, beat Barnette when he was a child. Barnette explained that his father would scold him, yell at him, "smack [him] upside the head" and punch him. Ex. at 1151. Derrick Barnette would then tell Barnette to "take off all of [his] clothes" and beat him until Derrick "got tired." Ex. at 1152. Barnette testified that Derrick hit him on his "face, mouth, back, scrotum, penis," and legs. Ex. at 1157. He described an occasion in first grade when school officials hit him with a "huge plexiglass paddle" after he was caught "playing doctor" with a girl. Ex. at 1151. After Barnette got home, he received "one of the worst" beatings from his father. Ex. at 1151.

Defense counsel also presented evidence of the violence to which Barnette was exposed in his home. The jury heard that Barnette regularly witnessed Derrick beating his mother, Sonia. Derrick explained that Sonia "always liked to

27

dance and go out," and routinely did so without Derrick. Ex. at 1302. Sonia went out with increasing frequency, and Derrick observed her getting out of cars belonging to other people to come home at 2 or 3 in the morning. Ex. at 1303. Derrick began accusing Sonia of infidelity and interrogating her about it in front of Barnette and Barnette's brother, Mario. Ex. at 1303. In the context of those arguments, Derrick became physically violent against Sonia. Ex. at 1303.

Defense counsel presented evidence that Barnette saw Derrick and Sonia routinely get into fights over "who was cheating on who," which could not have gotten "more physical." Ex. at 1152. Barnette described an occasion when Derrick was punching his mother in the middle of the street in full view of Barnette and his classmates on a school bus. Ex. at 1156. Barnette also described an occasion when Derrick hit Sonia with a hammer while Barnette yelled at them to stop fighting. Ex. at 1153. Barnette explained that his mother was bleeding, and Derrick told her she was not. Ex. at 1153. Mario Barnette testified that Barnette routinely shielded Mario from those fights, asking him to go to another room when they would escalate. Ex. at 1338–39.

Barnette's attorneys introduced evidence that Derrick and Sonia separated shortly after Barnette completed fifth grade and later got divorced. Ex. at 1158–59. Sonia began going out at night with her girlfriends more often, leaving Barnette and his brother, Mario, at home alone. Ex. at 1159–60. During warmer months, Sonia would leave and not return until the next morning, or in some cases, until two to three days later. Ex. at 1160. Barnette described an occasion

28

when Mario was hit by a car when his mother was away.  Ex. at 1160.  Barnette called his aunt Tessie and was unable to locate his mother.  Ex. at 1160–61.

Barnette's attorneys introduced evidence about the men that Barnette's mother dated.  Ex. at 1161.  Sonia dated a man named "A1" from Richmond who took Sonia "out clubbing" and helped her develop a drug habit that included cocaine.  Ex. at 1161.  Barnette explained how he stumbled across a plate with white residue and a cut straw, which he knew was used for cocaine from the film Scarface.  Ex. at 1163.  Mario recalled a string of men whom he described as shifty eyed and "barely outside of con men."  Ex. at 1348.  Barnette explained that he looked up to another one of his mother's boyfriends, Marc Regan, who "was the biggest drug dealer in the city of Charlotte at the time."  Ex. at 1164.  Regan was killed in a dispute over drugs and money, and Barnette's mother "went into a . . . tailspin, and she didn't recover for some time after that."   Ex. at 1165.

Barnette's attorneys introduced evidence that Sonia's "responsibleness disappeared" after she got divorced.  Ex. at 1162.  The jury heard that Sonia traded in her "very sensible car" for a "lipstick red 1984 Chevy Corvette," which had only two seats to accommodate the three people in their family at the time.  Ex. at 1162.  Later, "all of the money seemed to disappear," Sonia "couldn't keep food in the refrigerator," and she was evicted from the apartment in which she was staying with Barnette and his brother because she "couldn't pay the rent."  Ex. at 1162–63.  The family moved to live with Barnette's aunt Tessie, and then

into another apartment.  Ex. at 1164–65.

Defense counsel introduced evidence that Sonia lost her job and moved the family to live with Barnette's aunt Sheila and cousin Ahmad at their home in Georgia.  Ex. at 1168–70.  Barnette described how the move prevented him from attending Providence High School for tenth grade.  Ex. at 1168–70.   He described how "devastating it was to be taken out of everything [he] knew and loved."  Ex. at 1168–70.

Barnette's attorneys called Barnette's cousin, Ahmad Cooper, who testified about the conditions at their home in Georgia.  Ex. at 1407–15.  Ahmad testified that Barnette had no bed at the house, and that they were frequently unsupervised.  Ex. at 1409–1410.  Ahmad explained that it was Barnette who would make sure that he and Mario were fed and that they did their homework.  Ex. at 1410.  Barnette's mother and aunt would arrive at the home for 30 minutes to an hour to change into their best outfits before leaving again until the next morning or later.  Ex. at 1410.  Ahmad also explained that he observed "a lot" of alcohol consumption and suspected drug use, although he "never saw any firsthand."  Ex. at 1411.

Defense counsel also introduced evidence of the circumstances surrounding Barnette's discovery that Derrick Barnette was not his biological father.  Ex. at 1166–67.  Derrick had previously questioned whether Barnette and his brother were Derrick's biological children, but he did not confirm that he was not their biological father until he took a paternity test at the time that he and Sonia

30

separated. Ex. at 1310. Barnette explained that he felt "gloom" after Derrick told him he was not his biological father. Ex. at 1166–67. Barnette further explained that "after that" he "really did not trust or care about [his] mother as much." Ex. at 1167. Barnette testified that, as of the day that he testified during his 2002 penalty trial, he did not know who his biological father was. Ex. at 1167.

The jury also heard about an occasion on which Barnette's cousin, LaDon Barber, kicked in the door of his family's house and shot Barnette in the leg. Ex. at 1040–41. The injury required surgery. Ex. at 1041. And Barnette had a rod in his leg as a result of the injury. Ex. at 1041.

Barnette's defense also focused on the background of Barnette's parents and grandparents. The jury heard about this family background from Barnette himself, his stepfather, and his brother.

The defense focused in detail on the background of Barnette's maternal grandfather, Jesse Cooper. Ex. at 1293–95. Although Jesse Cooper and Barnette's maternal grandmother, Pearl Cooper, had divorced by the time Derrick Barnette began dating Sonia, Derrick explained that he had known Jesse Cooper since before the ninth grade because Jesse Cooper worked as a janitor at Derrick's school. Ex. at 1293–97. Jesse Cooper was an educated man who had experienced problems since his military service during the Korean War. Ex. at 1294–94. The jury heard that he was hit with mortar fire during that war and was believed dead. Ex. at 1042. His family was notified, he was read last rights,

31

and he was covered up before he moved an arm and revealed that he was still alive. Ex. at 1042. That incident left him totally disabled. Ex. at 1042.

Defense witnesses explained that that Jesse Cooper drank "every day." Ex. at 1295. Derrick would take Jesse to the store for Pabst Blue Ribbon. Ex. at 1295. He explained that Jesse "would stay at home and he would drink his beer." Ex. at 1295.

Defense counsel presented testimony that that Jesse Cooper had taught Barnette and his brother how to shoot firearms. Ex. at 1336–37. Mario Barnette also explained that Jesse Cooper told many war stories and talked in a way influenced by his military experience. Ex. at 1335–36. Mario described Jesse's routine dress as "army coat, looks like he basically just stepped off the boat, shades on, the eye patch, fully clothed, just kind of his own person." Ex. at 1336.

Defense counsel also presented testimony that Barnette's maternal step-grandfather, Leroy Brown, shot and killed Barnette's maternal grandmother, Pearl Cooper, when Barnette was an infant. Ex. at 1297–98. The jury heard that the murder occurred in the house while Barnette's mother, Sonia, and his aunt, Sheila, were present. Ex. at 1299. Sheila was the first to find Pearl Cooper after she was shot, and told Sonia, who called Derrick. Ex. at 1297, 1299. Derrick explained that, after receiving that phone call, he initially got in bed with his mother for comfort before going to be with Sonia. Ex. at 1297–98. The jury heard that Brown served five years in jail for the murder, and that Sonia moved in with her oldest sister and brother-in-law in South Carolina after staying with

32

her father for a short time.  Ex. at 1298–99.

Defense counsel also introduced testimony about the background of Derrick Barnette's parents and aunts.  Derrick explained that his mother and father separated when Derrick was five years old.  Ex. at 1300.  Derrick's father was an alcoholic for a time, until he "just abruptly stopped drinking and had a good job."  Ex. at 1300.  Derrick testified that his father was not there for him physically as a child, but that "he was there emotionally," and Derrick had a close relationship with his father until his father died.  Ex. at 1300.  Mario Barnette explained that he had never known Derrick's mother, because she had been poisoned.  Ex. at 1346.  Barnette and his brother as children regularly stayed with two of Derrick's great aunts Hattie and Mabel, who fed them and supplied them with care packages.  Ex. at 1345–46.

Defense counsel also focused extensively on Barnette's exemplary behavior in prison.  The jury heard from several correctional officers who testified about Barnette's good behavior in prison.  Ex. at 1432–63.  Olandas Truesdale and Tony Harrison, who knew Barnette during his stay at the Mecklenburg County Jail, both described Barnette as a "model inmate."  Ex. at 1432–34.  Bruce Ryherd of the United States Penitentiary in Terre Haute testified that Barnette had moved from "phase one" of his special confinement unit to "phase two," which affords more recreation and more liberal activity time, because of his good behavior.  Ex. at 1435–39. Vicki Boyer, of the same institution, testified that Barnette was "no disciplinary problem" and that Barnette had demonstrated talent as an artist.

33

Ex. at 1443–46.

The jury also heard from Walter W. Buer, a correctional consultant, and Pastor Bobby West, one of Barnette's spiritual advisors. Ex. at 1448, 1369. Buer opined that Barnette would likely remain in a high-security United States Penitentiary. Ex. at 1448, 1449–61. And West testified that he prayed with Barnette, read the Bible with him, and believed that Barnette was remorseful for what he did. Ex. at 1369–71.

Barnette's defense directly addressed Barnette's relationships with women other than Robin, beginning with Barnette's own testimony. Barnette described his relationships with women, including the nonviolent relationship Barnette had with a girl he met in high school in Georgia named Sheila Sullivan. And he described and took responsibility for the violent relationships with the witnesses called by the government. Expert witnesses called by Barnette's attorneys followed up on Barnette's testimony, describing the connections between Barnette's background and domestic violence and explaining that his violent conduct was limited to the context of domestic relationships of the kind unlikely to arise while Barnette remains in prison.

Defense counsel's focus included the romantic relationship Barnette had in high school with Sheila Sullivan, which ended with what Barnette felt was a betrayal. Ex. at 1172. Barnette testified that he "spent probably 95 percent of [his] time with her," that he believed that "she loved [him]," and that she was his "best friend." Ex. at 1173. He explained that two other boys beat him up after

34

making a move on Sullivan.  Ex. at 1172.  Toward the end of the school year, Barnette learned that Sheila had been unfaithful with him and had engaged in sexual relations with another boy named David and David's cousin.  Ex. at 1173–74.  Barnette described that he felt "a serious betrayal."  Ex. at 1174.  He explained that he felt "horrible," and that although it "vaguely felt like some[thing] that happened when [he] was a child," it was the first time he felt like he had suffered a "serious betrayal, with a lot of hurt and a lot of pain."  Ex. at 1174.

Barnette described how he tried to get rid of the pain he felt from Sullivan's betrayal by committing suicide.  Ex. at 1174.  He took pills that made him "violently sick" and called Sullivan on the phone to tell her what she had done.  Ex. at 1175.  He told Sullivan, "I can't take this, you were everything," and five minutes later the paramedics arrived.  Ex. at 1175.

Defense counsel also focused in detail on the relationships Barnette had with the witnesses who had testified against him, Natasha Tolbert, Alesha Houston, and Crystal Dennis.  Ex. at 1176–1228.  Barnette admitted to the mistreatment that his former girlfriends had described.  Ex. at 1176–1228.  He explained how happy he was about his children and that he had bought a newspaper to commemorate the day that his daughter was born.  Ex. at 1182–83.  And he explained that he had recently reestablished relationships with his children in the months prior to the resentencing hearing.  Ex. at 1241–42.

After presenting the jury with details about Barnette's crimes, his

background, his relationships with women, and his positive institutional adjustment, defense counsel introduced the testimony of Dr. Ann Burgess, an "expert in domestic violence." Ex. at 1464–68. Dr. Burgess described domestic violence as an "intentional aggressive act that injures somebody" where "there is a connection through family." Ex. at 1470–71. Dr. Burgess offered several opinions about domestic violence, including that "multi-generational violence" exists and that neglect is a "critical factor" in domestic abuse. Ex. at 1474–75.

Dr. Burgess testified that she believed that Barnette's criminal conduct between April 30 and June 26, 1996, was part of a domestic "crime spree" that was focused on "his obsession to get to his ex-girlfriend to reunite with her." Ex. at 1478. She opined that Barnette's behavior was rooted in the way Barnette was raised. Ex. at 1480. She described the significance of various events in Barnette's past, including the death of Barnette's grandmother, Pearl Cooper; the fact that Derrick Barnette was "in and out" of Barnette's childhood as a caretaker; the behavior of Barnette's mother and aunt in getting dressed up and "going out"; episodes where Barnette sat in a closet crying; and the domestic violence between his parents where they were "challenging each other about issues of fidelity." Ex. at 1480–83, 1489.

Dr. Burgess focused heavily on Barnette's relationships with women, including Robin and Barnette's earlier girlfriends who testified during the case by the United States. Dr. Burgess testified that Barnette's abuse of women and his attacks on Robin were part of a "cycle" that "never gets resolved." Ex. at

36

1479. Barnette "gets into a good relationship, everything seems to be going well, and then gets into this thinking that there's infidelity, thinking that there's jealousy. All of those negative feelings come forward and then he starts to try to control the relationship, and that's where the physical abuse can come in." Ex. at 1479.

Dr. Burgess described Barnette's misconduct as limited to the context of domestic relationships when he is in the community, as distinguished from the structured setting of a prison. Ex. at 1496–97. Dr. Burgess evaluated Barnette's violent conduct, including his murder of Donald and his shooting of Anthony Britt, and concluded that what drove Barnette's misconduct from April through June of 1996 was "obsessional thinking" that focuses only on the "one area" of domestic, boyfriend-girlfriend relationships. Ex. at 1495–96, 1534–36. Dr. Burgess opined that Barnette "gets into difficulty when it's in the context of . . . some kind of boy/girlfriend type of relationship" but "not in the context of . . . doing daily routine and things like that." Ex. at 1496. She explained that Barnette "[d]oes what he's supposed to do when he's in a structured setting." Ex. at 1496–97.

Barnette's attorneys also called as a witness Dr. Mark Cunningham, a clinical and forensic psychologist who testified over the course of two days about Barnette's mental health and the effect that his background had on his conduct. Ex. at 1539–1698. Dr. Cunningham concluded that "Barnette's development was damaged by a number of fundamental factors, and that damage placed him at

37

substantially greater risk for disturbed romantic relationships, for criminal activity, and for criminal violence in the community." Ex. at 1551. Dr. Cunningham also concluded that there was "no indication that Barnette was psychotic at the time of these offenses or that he was so mentally retarded or deficient that he did not know what he was doing." Ex. at 1551. But he opined that although Barnette had a choice about his conduct, he did not have the same choice as everybody else; he had the choice that "you get after you get done with his development." Ex. at 1552.

Dr. Cunningham explained that the Department of Justice had conducted research and identified "risk factors that increase the likelihood of delinquency and violence" and "protective factors" that serve as a buffer against those behaviors. Ex. at 1555. Dr. Cunningham opined that many of those risk factors and others were present in Barnette's history. Ex. at 1555–62, 1569–97. And he offered a number of opinions about the existence or absence of protective factors. Ex. at 1562–69.

Dr. Cunningham identified several risk factors present during Barnette's early childhood. Ex. at 1556–59. Those risk factors included, for example, a family history of criminal behavior and substance abuse; family management problems based on Barnette's moving from place to place, receiving care from different adults, and receiving erratic or abusive discipline; family conflict, which included conflict between Derrick and Sonia and Barnette's mixed feelings about his mother; and parental attitudes, which included Sonia's implicitly condoning

38

criminal behavior by dating drug dealers. Ex. at 1556–59.

Dr. Cunningham identified additional risk factors present from age six. Ex. at 1560. Those factors included, for example, risks associated with "transition and mobility," based on the instability caused by frequent moves during Barnette's early childhood and after his mother's divorce from Derrick; availability of firearms; exposure to immediate portrayals of violence; risks associated with family-management, family conflict, and attitudes favorable toward crime and substance abuse. Ex. at 1561–62. Dr. Cunningham noted that the large group of risk factors present in Barnette's life were "family factors," which he opined had "some relationship to why his violence has substantially been in a family setting." Ex. at 1570.

Dr. Cunningham also identified numerous "protective factors" that tend to serve as a buffer against criminal behavior but were absent in whole or in part from Barnette's life. Ex. at 1562. Dr. Cunningham noted that Barnette was not a female, and girls are less likely to respond to a bad childhood with violence. Ex. at 1563. He also noted that Barnette's intelligence was below the range that typically qualified intelligence as a protective factor. Ex. at 1563. Dr. Cunningham explained that Barnette did not fully benefit from "[s]ocial bonding to a positive role model" because his father did not stay actively involved in his life. Ex. at 1565.

Dr. Cunningham further explained that Barnette required "early interventions" that he did not receive. Ex. at 1567. Dr. Cunningham opined that

39

Sonia's becoming a mother at age 14 when her father had been "psychiatrically and physically disabled, as Jessie [Cooper] was," and her mom had been murdered, presented "a case for a social work agency." Ex. at 1567. He explained that his parents required "marital counseling" and "anger management classes" in the light of their domestic conflicts, in addition to "parenting instruction." Ex. at 1568. Dr. Cunningham also opined that Barnette required therapy after Derrick informed him that he was not his biological father, and that he required the long-term assistance of a mental health professional in the light of his practice of "sitting in a closet naked crying." Ex. at 1569.

Dr. Cunningham summarized Barnette's troubled history and explained that part of the way he tried to address it was by making "premature commitments," which influenced his behavior toward Robin. Ex. at 1616. Although most boys break up with the girls they date at age 16, Barnette became prematurely attached in his teenage relationships and considered those breakups to be a "tremendous injury." Ex. at 1616–17. According to Dr. Cunningham, by the time Barnette began his relationship with Robin he was "carrying this sense that he has been betrayed and abused by these women all along." Ex. at 1617. "Then when it happens with her, she catches the rage and the distrust and the anger not only for these relationships, but for what happened with his mom and dad as well." Ex. at 1617.

Dr. Cunningham concluded that Barnette's crimes were appropriately considered part of a "catathymic homicide," where there is an "emotional bond or

40

attachment" between victim and perpetrator and they "are in a relationship with each other." Ex. at 1620–21. He explained that a catathymic homicide is ordinarily likely to be carried out by a "man with a disturbed attachment history," and explained that Barnette's behavior was consistent with that kind of perpetrator. Ex. at 1620–21.

Dr. Cunningham offered several other detailed insights into Barnette's behavior and mental health. Dr. Cunningham described research that connected Barnette's developmental experience with the kinds of offenses he carried out. Ex. at 1618–26, 1655–66. He explained that Barnette's conduct could be driven by emotional turmoil and still carried out with considerable planning and premeditation. Ex. at 1625. He also described a number of "depressive symptoms" that he ascribed to Barnette during the weeks of the firebombing to the murders. Ex. at 1625–29.

Barnette's counsel also introduced testimony from Dr. Seymour Halleck, an expert in forensic psychiatry, who focused in detail on Barnette's mental health and offered several specific diagnoses. Ex. at 1372, 1376–82. Among other things, Dr. Halleck concluded that between April and June of 1996, Barnette suffered from "a major depressive disorder"; "withdrawal"; and "a substance abuse disorder" because he "sometimes drank too much." Ex. at 1378–81. Dr. Halleck described seeing "a few indications" of "attention deficit hyperactivity disorder," but not enough to make a diagnosis. Ex. at 1380. And Dr. Halleck described several characteristics of Barnette, including "periodic

41

preoccupation with suicidality," "impulsivity" with regard to sex and drugs, "transient episodes of being paranoid," and a "great deal of anger and rage." Ex. at 1382.

Dr. Halleck concluded that Barnette "had a very serious personality disorder" known as "borderline personality disorder." Ex. at 1381. Dr. Halleck explained that Barnette's disorder was characterized "by an enormous fear of abandonment." Ex. at 1381. Dr. Halleck also explained that Barnette "showed rapid fluctuations in mood, and amazingly so even as a child." Ex. at 1381. He explained that Barnette "would switch his mood in just a second, like turning on a light switch. He could be feeling happy and all of the sudden he would be extremely sad." Ex. at 1381.

Dr. Halleck also concluded that Barnette had "the qualities of an antisocial personality disorder and some of the qualities of a narcissistic personality disorder." Ex. at 1382. He concluded that these qualities were less prominent than Barnette's borderline-personality-disorder diagnosis. Ex. at 1382.

Dr. Halleck also offered opinions about how events in Barnette's childhood affected him. Ex. at 1382–85. Dr. Halleck explained that the frequent moves Barnette's family made; the death of his grandmother, Pearl Cooper; abuse by Derrick; Derrick's absence; the fact that Derrick was not Barnette's biological father; and the violence Barnette witnessed between Derrick and Sonia had an effect on Barnette. Ex. at 1382–86. He testified that the way his parents raised him, "coupled with the many other bad things" that happened to him, "ultimately

42

made him more susceptible to depression, substance abuse, and borderline personality disorder and eventual violent behavior." Ex. at 1383.

Dr. Halleck also described his opinion about the limited choices available to Barnette. Ex. at 1388. He explained that Barnette did have a choice about whether "to walk away from the situation and go on with his life or kill these people." Ex. at 1386. But Dr. Halleck explained that he believed that Barnette "was in a position where the choices available to him were extremely hard and difficult to make." Ex. at 1388. Dr. Halleck opined that Barnette saw irrational and exaggerated benefits in completing the murders and "that he was impaired in his ability to evaluate the risks of the situation" in the light of the influence of substances, his status as a "severely disturbed person with a borderline personality disorder, and also all of the role modeling he had experienced." Ex. at 1389–90.

3.    The rebuttal case by the United States.

The United States presented a rebuttal case in the light of testimony presented during Barnette's defense. The rebuttal case included testimony from witnesses who had worked with Barnette and observed his interactions with Robin. It also included testimony from expert witnesses who responded to the expert opinions introduced by defense counsel.

Barnette had testified that he was fired from Camelot Music in Roanoke Virginia for sexual harassment after behaving as "a clown" and "joking around,"

43

Ex. at 1056–57, and the United States called as witnesses two individuals who had worked with Barnette at Camelot.  Ex. at 1706–08, 1717–18.  Joanna Coleman testified that Barnette sexually harassed her at work.  Ex. at 1706, 1710–13.  She testified that Barnette told her that she "needed sex," "needed his big dick in [her]," and that "he'd tie [her] up."  Ex. at 1710.  She explained that Barnette was not joking.  Ex. at 1711, 1715.  Shirley Williams Parker, who had also worked at Camelot, testified that Barnette took her to the apartment in Roanoke he shared with Robin and had sex with her on several occasions.  Ex. at 1717–20.

The United States also called Angela Rosser, who grew up with Robin and testified about an event that Barnette had described during his direct examination.  Ex. at 1719–20.  Barnette had testified about a time when he became angry with Robin when, while driving, he had observed Robin in another car with Rosser when he had expected Robin to be attending the funeral of Rosser's niece.  Ex. at 1043–47.  Barnette explained that he had been driving because he wanted to "be there for her" at the funeral.  Ex. at 1045.  Rosser testified that when Barnette discovered her and Robin out driving to the store, he began crying and hollering, and asking "why did she leave him?"  Ex. at 1722. Robin got into the car that Barnette was driving.  Ex. at 1723.  Rosser followed the car and observed Robin jump from the moving vehicle and begin rolling.  Ex. at 1723–24.  Rosser brought Robin home.  Ex. at 1724.  Rosser testified that, based on what she observed, Barnette had not been trying to find Robin to

44

comfort her on the day of the funeral.  Ex. at 1724.

The United States called Dr. Peter Carlson, an expert in Bureau of Prisons classifications, who testified about the amenities available to inmates sentenced to life imprisonment.  Ex. at 1739–47.  Dr. Carlson explained that inmates could have a variety of different jobs and a "full spectrum" of recreation was ordinarily available, including "ball fields, soccer, baseball," aerobic activities, board games, watching television, and playing cards.  Ex. at 1744.  He also described opportunities to obtain a high school degree, a GED, or to take correspondence courses from a college.  Ex. at 1744.  Dr. Carlson further described the opportunities inmates have to visit with family, which can include monthly visits for each visitor and more if the visiting room is not overcrowded.  Ex. at 1745–46.

Finally, the United States called Dr. Park Dietz, an expert in forensic psychiatry.  Ex. at 1763.  Dr. Dietz agreed with Dr. Halleck about the symptoms that Barnette experienced during the time of his crimes but did not conclude that a diagnosis of major depression was appropriate.  He explained that "it could be major depression, but it could also be excessive drinking over that period of time."  Ex. at 1766–67.  Dr. Dietz agreed with Dr. Halleck's diagnosis of "borderline personality disorder" and concluded that Barnette also had "narcissistic personality disorder" and that he had shown a "great deal of antisocial behavior."  Ex. at 1768–69.  Dr. Dietz also concluded that Barnette's homicides had a robbery component, because Barnette took Donald's car and wallet.  Ex. at 1770.  And he concluded that Barnette had traveled to Roanoke to kill Robin and Benjamin

45

Greene.  Ex. at 1770–71.

Dr. Dietz offered opinions that contradicted the defense theme that Barnette's violent conduct was confined to domestic relationships.  He addressed Dr. Burgess's opinion that "the defendant's motive for violence was domestic in nature," identifying "very different motives" in the two homicides that Barnette committed.  Ex. at 1776–77.  He described "[t]he Robin Williams homicide [as] a domestic homicide with anger and jealousy and revenge being all present, and anger being the dominant one."  Ex. at 1777.  "But," he opined, "the Donald Allen homicide is a homicide of opportunity, of expediency."  Ex. at 1777.  Barnette was able to obtain Donald's car without killing him, but Barnette killed Donald "because he didn't want Donald Allen to call the police, and that is not the same as a domestic homicide."  Ex. at 1777.  Dr. Dietz further opined that the murder of Donald Allen was not a "catathymic homicide," which Dr. Cunningham had described.  Ex. at 1774.

4.  Barnette's death sentence.

The jury returned a verdict of death after deliberating for just over 7.5 hours.  Ex. at 2018–24.  For each of the three capital counts against Barnette, the jury found beyond a reasonable doubt each of the five aggravating factors that the United States sought to prove, except the factor related to future dangerousness.  Ex. at 2044–46, 2062–65, 2080–82.  Unlike the jury that had sentenced Barnette in 1998, the 2002 jury did not find that Barnette was "likely to commit criminal acts of violence in the future which would be a continuing and

46

serious threat to society." Ex. at 2046, 2065, 2082. At least one juror found that Barnette proved fifteen mitigating factors by a preponderance of the evidence. Ex. at 2048–50, 2067–69, 2085–86.

The jury unanimously found that Barnette proved eight mitigating factors. Ex. at 2048–50, 2067–69, 2085–86. Twelve jurors found that Barnette was affected by growing up in a family environment of violence, drugs, and alcohol abuse; that Barnette had repeated exposure to violence in the home; that Barnette attempted to protect his brother from the damaging effects of parental violence and neglect; that Barnette cooperated with police; that Barnette can serve a useful purpose to others in a prison environment; that Barnette was neglected by his mother; that Barnette turned himself in to police; and that Barnette had been a model prisoner. Ex. at 2048–50, 2067–69, 2085–86.

At least half of the jurors found that Barnette proved three additional mitigating factors. Ex. at 2048–50, 2067–69, 2085–86. Eleven jurors found that "other factors in the defendant's childhood, background or character mitigate against imposition of the death sentence." Ex. at 2048–50, 2067–69, 2085–86. Nine jurors found that "Barnette had a history of untreated emotional problems." Ex. at 2048–50, 2067–69, 2085–86. And six jurors found that, at the time of his offenses, "Barnette was experiencing irrational and obsessive thoughts." Ex. at 2048–50, 2067–69, 2085–86.

At least one juror found that Barnette proved four additional mitigating factors. Two jurors found that "Barnette does well in a structured environment."

47

Ex. at 2048–50, 2067–69, 2085–86. One juror found that Barnette had remorse, that he accepted full responsibility for his actions, and that he was abused by his father. Ex. at 2048–50, 2067–69, 2085–86.

The jury considered whether the aggravating factors found to exist sufficiently outweighed any mitigating factors found to exist and unanimously recommended a sentence of death for Barnette on each of the three capital counts of which he had previously been convicted. Ex. at 2054, 2072, 2090. In the light of the jury's verdict, this Court sentenced Barnette to death on each of those three counts. Ex. at 2092.

The Court of Appeals for the Fourth Circuit affirmed Barnette's death sentence. The Court affirmed originally in 2004. *Barnette II*, 390 F.3d 775, 812 (4th Cir. 2004) ("*Barnette II*"). The United States Supreme Court vacated that decision and remanded in the light of its 2005 decision, *Miller-El v. Drekte*, 545 U.S. 231 (2005), which held that a proper analysis of a claim of discrimination in juror selection requires a court to engage in comparative juror analysis. *United States v. Barnette*, 644 F.3d 192, 196, 205 (4th Cir. 2011) ("*Barnette III*"). This Court held an evidentiary hearing and concluded that Barnette had not proved any purposeful discrimination in the selection of his jury. *Id.* at 196. The Fourth Circuit affirmed this Court's decision. *Id.* at 217.

### Discussion

Barnette's motion under 28 U.S.C. § 2255 seeks relief from his death sentence on eight grounds, each of which he contends requires an evidentiary

48

hearing.  First, Barnette contends that he was denied the effective assistance of counsel.  Mot. 11; Barnette Br. 4.  Second, he attempts to reassert the contention rejected by this Court and affirmed by the Fourth Circuit that the selection of his resentencing jury was tainted by racial discrimination.  Mot. 88; Barnette Br. 4, 102.  Third, Barnette seeks to preserve arguments rejected by this Court when it denied an earlier motion for leave to conduct juror interviews.  Mot. 92–95; Barnette Br. 5, 103–04.  Fourth, Barnette contends that the decision to prosecute him in federal court violated his constitutional rights.  Mot. 95–98; Barnette Br. 5, 104.  Fifth, Barnette contends that he did not receive discovery to which the Constitution entitled him.  Mot. 98–100; Barnette Br. 5, 104.  Sixth, Barnette contends that the death penalty is unconstitutional because it is sought on the basis of race and geography.  Mot. 100–101; Barnette Br. 5, 104.  Seventh, Barnette contends that the manner that the Bureau of Prisons would carry out his sentence would violate the Eighth Amendment.  Mot. 101–02; Barnette Br. 5, 104.  Finally, Barnette contends that the cumulative effect of errors referred to in his motion under Section 2255 entitles him to relief.  Barnette Br. 5, 106.

This Court should deny Barnette's motion without an evidentiary hearing. Barnette's "motion and the files and records of the case conclusively show" that Barnette "is entitled to no relief."  28 U.S.C. § 2255(b).  Although he has obtained a host of affidavits and records that he contends support his motion, Barnette is not entitled to a hearing.  He would not be entitled to relief even if the evidence that is not "contradicted by the record, inherently incredible, or [a conclusion]

49

rather than [a] statement[] of fact," *Jackson v. United* States, 638 F. Supp. 2d 514, 528 (W.D.N.C. 2009), "was believed," *United States v. Terry*, 336 F.3d 312, 314–15 (4th Cir. 2004). Accordingly, "an evidentiary hearing is unnecessary." *Id*; *Jackson*, 638 F. Supp. at 617 (denying a motion to vacate a federal death sentence without an evidentiary hearing).

A.  **Barnette cannot establish that the performance of the attorneys who represented him in 2001 and 2002 was constitutionally deficient.**

Barnette first contends that the performance of the attorneys who represented him during his 2002 penalty trial was constitutionally deficient. To establish ineffective assistance of counsel, Barnette has the burden to prove that the performance of his attorneys fell below an objective standard of reasonableness, judged "from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). He must also establish prejudice in the form of "a reasonable probability" that, "but for the deficient performance, he would not have been sentenced to death." *Buckner v. Polk*, 453 F.3d 195, 201 (4th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694).

The *Strickland* standard that Barnette must meet to demonstrate constitutionally deficient performance by his attorneys is well established. Barnette has obtained an opinion from an expert, Russell Stetler, who reviewed affidavits from some of the members of Barnette's defense team, about the extent to which the performance of Barnette's attorneys comported with prevailing norms. Stetler Aff. ¶¶ 47, 90. But "[e]xpert testimony is not necessary to

50

determine claims of ineffective assistance of counsel." This Court is amply "qualified to understand the legal analysis required by *Strickland*." *Earp v. Cullen*, 623 F.3d 1065, 1075 (9th Cir. 2010); *Gates v. Davis*, No. C 88-2779 WHA, 2014 WL 8186134, at \*9–10 (N.D. Cal. Mar. 9, 2014) (declining to consider an affidavit from Stetler about "prevailing professional norms" and "whether or not the actions of petitioner's trial counsel were adequate"). Three attributes of the standard are particularly relevant to the theories advanced by Barnette.

First, the Supreme Court has explained that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Counsel has a duty to "make reasonable investigations" or "make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. But the "heavy measure of deference" that *Strickland* dictates applies "to counsel's judgments" about whether and to what extent to investigate. *Id.* at 691. "There are countless ways to provide effective assistance in any given case." *Id.* The burden rests with Barnette to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Second, an attorney is not unreasonable for declining to introduce evidence that operates as a "doubled edged sword," with potential both to help and hurt the defense case. *Truesdale v. Moore*, 142 F.3d 749, 754 (4th Cir. 1998). "Failure to present particular mitigating evidence often leads to claims that counsel

51

should have introduced such evidence or investigated further." *Id.* "On the other hand, the introduction of evidence that the jury does not credit or that the state turns to its advantage leads to ineffectiveness claims also." *Id.* Accordingly, the Fourth Circuit instructs that the best course for a court reviewing a theory that counsel failed to introduce additional mitigating evidence "is to credit plausible strategic judgments," *id.*, which *Strickland* instructs attorneys are presumed to have made, 466 U.S. at 690.

Finally, although a capital defendant has the right to ask a jury to consider "any aspect" of his "character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), "more is not always better." *Chandler v. United States*, 218 F.3d 1305, 1318 (11th Cir. 2000). Counsel is not required to "present all mitigation evidence." *Id.* To the contrary, "[g]ood advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." *Id.*; *see also United States v. Terry*, 366 F.3d 312, 318 (4th Cir. 2004). Similarly, an attorney is not required to investigate or seek out every piece of evidence that he is allowed to present in mitigation. "[T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distracts from more important duties." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009).

Under various headings, Barnette advances five theories in support of his claim that the performance of the attorneys who represented him at his 2002

52

penalty trial was constitutionally deficient.  First, Barnette contends that his attorneys were constitutionally deficient for failing adequately to investigate and present to the jury evidence in mitigation.  Barnette Br. 11–85, 89–97.  Second, Barnette contends that the advice of his attorneys related to his own testimony at the 2002 penalty hearing was constitutionally deficient.  *Id.* at 85–89.  Third, Barnette contends that evidence of the behind-the-scenes conduct of his defense team demonstrates that the performance of his attorneys was constitutionally deficient.  *Id.* at 97–100.  Fourth, Barnette contends that the inability of his attorneys to locate all records from the 2002 penalty proceeding after it concluded demonstrates a violation of his constitutional rights.  *Id.* at 100–01.  Finally, Barnette refers to a list of conclusions in his motion and contends, without elaboration, that that his attorneys rendered constitutionally deficient performance by failing to protect his constitutional rights.  *Id.* at 102.

Barnette's theories fail as a matter of law.  The discussion that follows addresses each theory in turn and explains why Barnette cannot establish that the performance of his attorneys fell below the objective standard of reasonableness established by the Constitution.  It then explains why Barnette cannot meet his burden to show prejudice.

> 1. <u>Barnette cannot establish that the attorneys who represented him during the 2002 resentencing hearing were constitutionally deficient for failing adequately to investigate and present evidence</u>.

Barnette has obtained a variety of records and affidavits from a host of witnesses and contends that his attorneys failed to conduct an adequate

investigation and unreasonably failed to present evidence reasonably likely to persuade his 2002 jury to recommend a different sentence.  Throughout his brief and motion under various headings, Barnette makes six contentions.  He contends that his attorneys were deficient to the extent that (1) they did not develop or present additional evidence about the background of Barnette or his family; (2) they did not develop or present additional evidence about relationships Barnette had with women other than Robin Williams; (3) they did not develop or present additional evidence that Barnette was depressed; (4) they did not pursue a different strategy with respect to expert witnesses; (5) they did not introduce additional evidence about Barnette's positive institutional adjustment after his arrest; and (6) they did not introduce additional evidence about Barnette's continuing interpersonal relationships.

Even if this Court were to consider as true the competent evidence identified by Barnette, Barnette would be unable to show that the performance of his attorneys was deficient.  Most of what he contends his attorneys ought to have investigated, developed, or introduced was, in fact, introduced by his attorneys, or it is cumulative.  Other evidence is a double-edged sword or of little to no mitigating value.  To the extent that Barnette's attorneys did not further pursue any of the evidence or information that Barnette now identifies, they acted well within the board boundaries of reasonable discretion.

54

a. Barnette cannot establish that his attorneys were deficient to the extent they did not develop or present additional evidence about Barnette's background or that of his family.

Barnette's attorneys presented a detailed history of Barnette and his family that spanned four generations, extending from Barnette's grandfather's experience in the Korean War to his son's prowess on the football field. As the verdict form reflects, Barnette successfully convinced the entire jury that Barnette grew up in a family environment of violence, drugs, and alcohol abuse; that Barnette was repeatedly exposed to violence; that he attempted to protect his brother from the violence and neglect of his parents; and that he was neglected by his mother. To the extent they declined to develop and introduce even more evidence about this history, Barnette has failed to identify competent evidence which, if believed, would overcome the presumption that his attorneys acted reasonably.

Barnette's attorneys did not perform unreasonably to the extent they declined to develop and present additional evidence about the background of Barnette's maternal grandfather, Jesse Cooper. *Cf.* Mot. 42–43; Barnette Br. 27–32. Barnette's attorneys presented substantial evidence about Jesse Cooper, his experience during the Korean War, the way he acted and the role he played in the lives of Barnette and his brother, and what they perceived about him through the testimony of Barnette, Derrick Barnette, and Mario Barnette. Because the jury heard about Jesse Cooper in detail from those witnesses, counsel was not deficient for declining to introduce additional testimony from other witnesses

55

such as Sonia Barnette or her cousins, Jean Nduly and Robert Cooper, about Jesse Cooper's conduct and demeanor. *Cf.* Barnette Br. 28–30. *See Rhode v. Hall*, 582 F.3d 1273, 1287 (11th Cir. 2009) ("Counsel is not required to present cumulative evidence . . . .").

Barnette's attorneys were not deficient to the extent that they did not subject Jesse Cooper to psychiatric tests or investigate records of Jesse Cooper's military service during the Korean War, which ended nearly twenty years before Barnette was born. *Cf.* Mot. 42–43; Barnette Br. 27–28, 30. Counsel is not required to "present all mitigation evidence," and "[c]onsidering the realities of the courtroom, more is not always better." *Chandler*, 218 F.3d at 1318 (11th Cir. 2000). Barnette testified about his own relationship with Jesse Cooper, and his attorneys could reasonably have concluded that evidence that did not bear on that relationship or affect Barnette directly had little mitigating value. Evidence about Jesse Cooper's military record and psychiatric evaluations accordingly risked diverting attention from Barnette's own background and mental health, and Barnette has identified nothing that suggests the extent to which his attorneys declined to pursue more information about Jesse Cooper was unreasonable.

Nor did Barnette's attorneys perform unreasonably to the extent they did not develop and present additional evidence about Barnette's maternal grandmother, Pearl Cooper, and the effect on Barnette's mother of Pearl's murder when Barnette was an infant. *Cf.* Mot. 43–44; Barnette Br. 25, 26–27, 30–31, 93.

Barnette's attorneys presented evidence about Pearl Cooper's murder at the hands of his step grandfather from Derrick Barnette. Barnette's expert witnesses also described Sonia's relationship with Pearl and her stepfather and the effect the murder had on Barnette's mother, and in turn, on Barnette. Ex. at 1383 (testimony of Dr. Halleck); Ex. at 1592, 1684 (testimony of Dr. Cunningham). Barnette's attorneys were not unreasonable for declining to introduce the testimony of six additional witnesses, including Pearl's friend, Do'Lores Guy; Sonia Barnette; Sonia's cousin, Jean Nduly; Sonia's sisters, Tessie Nero, and Sheila Cooper; and a neighbor who "heard about it" when Pearl was killed, Sandra Smith. *Cf.* Barnette Br. 31–37.

Indeed, in addition to being cumulative, increased focus on the effect of Pearl Cooper's murder on other members of her family would have been a double-edged sword. The United States sought to prove that the harm Barnette caused the Williams family and the Allen family when he murdered Robin and Donald was an aggravating factor. Accordingly, the jury might well have considered the ill effects of a murder in the family against Barnette. Additional testimony suggesting that Barnette was affected by Pearl Cooper's murder when he was an infant risked reminding the jury about the experience of Bertha Williams's eight-month old granddaughter, who had been in the kitchen with her mother just before Barnette shot through the door with his shotgun and proceeded outside to murder Robin.

The record establishes that Barnette's counsel reasonably sought to focus

57

on Barnette's own background and his experiences during his own troubled childhood. Counsel was not unreasonable for focusing on Pearl's murder to the extent that it affected Barnette and declining to spend more of the jury's attention on additional, largely cumulative testimony about the way the murder affected Sonia and her sisters.

The performance of Barnette's attorneys was not deficient to the extent that they did not introduce additional evidence about Barnette's relationship with his parents. The jury heard ample evidence Barnette was abused by his father, that Barnette's parents fought violently when they were together, that after Barnette's parents separated Barnette's mother dated criminals and used cocaine, and that Barnette moved from home to home as a child. The testimony about these events by the additional witnesses identified by Barnette, Barnette Br. 37–44, 47–50, would have been cumulative and risked diverting the limited attention of the jury from the evidence that Barnette's attorneys did present. Barnette cannot overcome the presumption that his attorneys were reasonable to the extent they declined to pursue and introduce this evidence. *Van Hook*, 558 U.S. at 11 ("[T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties.").

Contrary to what Barnette suggests, Barnette Br. 43, his attorneys were not constitutionally deficient for declining to seek a draft separation agreement prepared in 1982 that was never implemented. This plan was "scrapped,"

58

according to Barnette, and according to his father, Barnette's parents did not separate until 1984. Derrick Barnette Aff. ¶ 43. Barnette has identified nothing to suggest that he was ever aware of the draft agreement or that it has any relevance to any mitigating factor beyond what the jury already heard about the separation. "An attorney need not pursue an investigation that would be fruitless," *Harrington v. Richter*, 562 U.S. 86, 108 (2011), and Barnette's attorneys were not deficient to the extent they did not investigate this draft agreement.

Barnette's contention that his attorneys were deficient to the extent they did not develop or introduce additional evidence about Barnette's paternity or the circumstances surrounding Derrick Barnette's paternity test is meritless. The jury heard that a paternity test established that Derrick was not Barnette's biological father. They heard about how Barnette learned that fact. And they heard directly from Barnette how that knowledge affected him and his relationship with both his mother and father.

Barnette's contention that his mother, Sonia, was adamant that Derrick was Barnette's father and in denial about the paternity results was "totally missed by resentencing counsel" is contradicted by the record. Barnette Br. 46. Barnette's expert witness Dr. Cunningham testified that Sonia held out Derrick as Barnette's father as a "pretense," Ex. at 1606, and specifically noted that "Sonia insists that the paternity tests were rigged." Ex. at 1610. Indeed, Barnette's attorney during the 2002 resentencing hearing asked Dr. Cunningham

59

several questions in an attempt to elicit testimony about Sonia's denial of the results of the paternity test. Ex. at 1610–11. The court sustained objections to the line of questions. Ex. at 1610.

Barnette's assertion that another expert who testified in 2002, Dr. Burgess, "was not made aware of this issue prior to the 2002 resentencing," Barnette Br. 47, says nothing about the effectiveness of Barnette's attorneys. Like Dr. Cunningham, Ex. at 1549, Dr. Burgess interviewed Sonia Barnette, Ex. at 1477, the source that Barnette today cites for information about her denial, Barnette Br. 46 (quoting Sonia Barnette Aff. ¶ 47). Dr. Burgess could have used her interview to obtain that evidence if it were significant to her analysis. Any failure to do so does not establish ineffective assistance of counsel. *See McHone v. Polk*, 392 F.3d 691, 705 (4th Cir. 2004) (holding that ineffectiveness attributable to a defendant's expert cannot support a claim of ineffective assistance of counsel).

Nor was the decision by Barnette's attorneys to call Derrick Barnette as a witness constitutionally deficient. *Cf.* Mot. 12. Derrick Barnette testified extensively about events in the lives of Barnette and his family members that his resentencing counsel contends were critical. For example, Derrick Barnette described Jesse Cooper's history and daily behavior, the circumstances surrounding the murder of Pearl Cooper, the environment in which Barnette was born to teenage parents, and the results of the paternity test he took revealing that Derrick was not Barnette's biological father. He also described Sonia

60

Barnette's behavior going out dancing, and he described the physical violence that occurred in the house, including the time that he hit Sonia "in the head with a hammer." Ex. at 1304.

Barnette's contention that Derrick "flatly contradicted" Barnette's testimony that he suffered abuse at Derrick's hands is not supported by the record. Derrick confirmed that he beat Barnette with a belt, including while Barnette was naked, and with a switch. Ex. at 1319, 1321, 1325–26. He testified that his purpose was "intimidation." Ex. at 1326. And he testified that he hit Barnette on the penis and scrotum. Ex. at 1328. He also explained that Sonia did not like it when he beat Barnette, but did nothing to stop him. Ex. at 1307. On cross examination, Derrick testified that he never "intentionally hit him above his legs" and that the reason he had beat Barnette was to punish him for "transgress[ing] the family rules." Ex. at 1328. But he did not testify that any of Barnette's statements describing the abuse that he received were false. Moreover, Derrick had told the experts who interviewed him that he did not consider the beatings he administered to have been "all of that excessive," Ex. at 1384 (testimony of Dr. Halleck). Accordingly, his attorneys could reasonably have concluded that the jury would have heard Derrick's take on his conduct toward Barnette in any event. The decision to call Derrick Barnette as a witness was not unreasonable.

In the same motion in which he challenges the decision to call his father as a witness, Barnette suggests that his attorneys were deficient for *not* calling his

61

mother, Sonia Barnette, even though the jury unanimously found her to have neglected him.  Mot. 56.  Barnette's defense blamed Sonia Barnette for much of Barnette's troubled background, and introduced evidence that throughout Barnette's life she struggled to keep a job, drank, did drugs, made poor decisions about how to care for her family, failed to care for her children for days at a time, and exposed Barnette to drug dealers and criminals through the men that she dated.  Indeed, Barnette today contends that his attorneys ought to have introduced *even more* evidence about Sonia's misconduct and poor judgment.  Barnette Br. 48–53, 56, 67–68.  Like the expert testimony that the jury heard at trial describing Sonia as creating a "pretense," Ex. at 1606, Barnette's brief also raises serious questions about Sonia Barnette's credibility.  *See* Barnette Br. 46 (describing Sonia as in "denial," "then and now.").

The record amply establishes that the decision not to call Sonia Barnette as a witness was a reasonable strategic decision.  His attorneys interviewed her, as did his mitigation specialist and his experts.  Alfonso Aff. ¶ 8; Burgess Aff. ¶ 7; Lawson Aff. ¶ 35; Ex. at 1378 (testimony of Dr. Halleck); Ex. at 1477 (testimony of Dr. Burgess); Ex. at 1549 (testimony of Dr. Cunningham).  And his attorneys explained to the jury that Sonia Barnette was in the courtroom "every day," specifically referring to their decision not to call her as a witness.  Ex. at 1939.  Sonia Barnette's testimony presented obvious risks that she would attempt to minimize the misconduct that was a primary focus of the defense case or lack credibility.  Their strategic decision not to call her as a witness was entirely

62

reasonable.

Barnette's contention that the resentencing jury did not hear that Barnette's mother struggled to keep a job, dated "sleazy" boyfriends, did drugs, and disrupted Barnette's life by moving the family to Georgia, drank, and generally contributed to an atmosphere of "chaos," Barnette Br. 48–53, 56, 67–68, is contradicted by the record. The jury heard detailed evidence that Sonia Barnette struggled to keep food in the refrigerator, dated sleazy men including drug dealers, got evicted from the apartment in which she was living with her sons, and lost her job and moved the family to Georgia at a time that deprived Barnette of an opportunity to attend the school that he wanted to attend. The jury found that Barnette's mother neglected him after Barnette himself described the conditions under which he lived with his mother. His attorneys were not constitutionally deficient for declining to present additional evidence of the same conditions.

Barnette's attorneys were not constitutionally deficient to the extent they did not introduce testimony from Mario Barnette about the real father of his cousin. Cf. Barnette Br. 47. That cousin himself testified that he had been estranged from his biological father but found him later in life. Ex. at 1414. He testified about his relationship with his father and what it meant to him. Ex. at 1414. Additional testimony about the subject from Mario would have been cumulative and potentially distracting from other more salient issues.

63

b. Barnette cannot establish that his attorneys were deficient to the extent they did not develop or present additional evidence about relationships Barnette had with women other than Robin Williams.

Barnette's contention that his attorneys were deficient to the extent they did not present additional evidence about Barnette's relationships with women other than Robin Williams, Mot. 41, 69; Barnette Br. 54–67, is misplaced. Barnette's defense focused extensively on Barnette's relationships with women, contending that his violent conduct was confined to the context of domestic relationships. His attorneys were not constitutionally deficient for declining to select a different strategy or to introduce evidence that would have been cumulative, distracting, or potentially harmful.

Barnette's contention that "the resentencing jury knew nothing about," Barnette's relationship with Sheila Sullivan, Barnette Br. 53–56, is contradicted by the record. Barnette himself described in detail his romantic relationship in Georgia with Sheila Sullivan and the betrayal he felt when it ended. He also described the fight that he endured over her. His attorneys were not constitutionally deficient for declining to introduce cumulative evidence about that fight from Barnette's assailants or additional testimony about the relationship that Barnette described.

The record also contradicts Barnette suggestion that his expert, Dr. Burgess, was unaware of the details of Barnette's relationship with Sullivan due to deficiencies by Barnette's attorneys, Barnette Br. 54–55. Dr. Burgess spent two days interviewing Barnette, Ex. at 1476. Any failure to elicit more

64

information about that relationship that was significant to her analysis does not establish a constitutional deficiency by his attorneys. *See McHone*, 392 F.3d at 705.

Barnette's attorneys were not constitutionally deficient to the extent that they did not develop or introduce additional evidence about Barnette's relationship with Natasha Tolbert. *Cf.* Barnette Br. 56–62. Tolbert testified at trial, and the jury heard evidence directly from her about what Barnette's brief contends to have been important. Tolbert testified that Barnette treated her well at the beginning of the relationship. Ex. at 830, 839. *Cf.* Barnette Br. 56. She testified about finding Barnette crying in the closet while naked. Ex. at 837–38. *Cf.* Barnette Br. 57. She testified that Barnette came from an abusive home, Ex. at 838. *Cf.* Barnette Br. 57. And she testified that Barnette was happy when his children were born, identifying photos of Barnette and his children when they were little, Ex. at 840–43. *Cf.* Barnette Br. 59–60. The jury also heard Barnette describe his own excitement about becoming a parent. Ex. at 1182–83.

To the extent that Barnette's attorneys did not introduce evidence that Barnette called the police after Tolbert's sister's boyfriend hit both Tolbert and Barnette, Barnette Br. 58, their representation was not constitutionally deficient. Barnette's attorneys presented ample evidence about Barnette's relationship with Tolbert. Nothing about that incident suggests that it was unreasonable for his attorneys not to pursue it further. *See Chandler*, 218 F.3d at 1318.

Nor were Barnette's attorneys constitutionally deficient for not developing

65

or introducing additional evidence that "when arguments and fights occurred" between Tolbert and Barnette, "both parties were responsible." Barnette Br. 61–62. The jury already heard that when Barnette hit Tolbert, Tolbert "hit him back." Ex. at 830. And the jury heard about at least one occasion when Tolbert hit Barnette and Barnette did not hit back. Ex. at 838–39. But the United States also presented evidence that Barnette slammed Tolbert on the concrete while she was pregnant. Ex. at 831. And defense evidence tending to shift blame for problems in the relationship away from Barnette risked undermining several of the mitigating factors that his defense sought to prove, including that he had remorse and that he accepted "full responsibility" for his actions. Ex. at 1975. *See Moody v. Polk*, 408 F.3d 141, 151 (4th Cir. 2005) (holding that a failure to introduce evidence that could be a "double-edged sword" is not constitutionally unreasonable).

Barnette's attorneys were not constitutionally deficient to the extent that they did not develop or introduce additional evidence about Barnette's relationship with Crystal Dennis. *Cf.* Barnette Br. 62–64. The jury already heard about the events that Barnette identifies in his brief, including that Natasha Tolbert was Barnette's fiancée when Crystal Dennis's brother, Anthony Britt, told Crystal about Barnette. *Cf.* Barnette Br. 62, 63–64. The jury also heard that Britt had been talking to Tolbert, Ex. at 821, which led to a fight during which Barnette shot Britt. *Cf.* Barnette Br. 62–63. The jury already heard Dennis explain that "everything was good" at the beginning of their

66

relationship, and that Barnette did "everything. Cooked. Cleaned. Worked," Ex. at 792. *Cf.* Barnette Br. 63–64. Barnette identifies nothing that demonstrates his attorneys were deficient to the extent they did not elicit additional testimony from Dennis or introduce additional evidence about their relationship.

Barnette's attorneys were also not constitutionally deficient for declining to introduce more details about the fight during which Barnette shot Dennis's brother, which Barnette characterizes as a "serious altercation." Barnette Br. 63. The jury heard details about that fight, including that Britt started it by pushing and threatening Barnette and that Barnette fired three gunshots, hitting Britt with one of them. Ex. at 821–22. To the extent Barnette's attorneys did not develop or introduce testimony from "Britt's best friend" or show that the fight was the product of a "dynamic that Britt" created, Barnette Br. 63, his attorneys were not constitutionally deficient. That evidence risked focusing even more of the jury's attention on Barnette's violent conduct. And placing emphasis on Britt's responsibility for the fight would again have risked undermining defense arguments that Barnette took "full responsibility" for his actions. Ex. at 1975. *See Polk*, 408 F.3d at 151.

Nor was Barnette's counsel constitutionally deficient to the extent they did not develop and introduce evidence about relationships Barnette had with four women in which Barnette contends he was not violent, possessive, aggressive, or jealous. Barnette Br. 65–66. At best, this evidence would have shown merely that that Barnette did not severely injure, burn, rape, or kill every woman with

67

whom he was involved. But this evidence was also a double-edged sword that presented a significant risk of undermining other more powerful mitigating evidence that Barnette did present.

Emphasis by the defense on these other, "healthy" relationships, Barnette Br. 66, risked undermining the opinions of defense experts Drs. Halleck and Cunningham that the choices available to Barnette were more limited than those available to many because of Barnette's background. Ex. at 1386–87, 1551–52. Dr. Halleck, for example, testified that Barnette's choice in the situation he faced with Robin Williams "was either to walk away from the situation and go on with his life or kill these people." Ex. at 1386–89. He opined that for Barnette, the choice was "extremely difficult and hard to make." Ex. at 1386–89. Evidence that Barnette had participated in numerous healthy relationships would have risked suggesting that Barnette could have maintained a similarly healthy relationship with Robin Williams instead of burning and killing her.

Emphasis on these other relationships also risked undermining Dr. Burgess's opinion that Barnette's conduct was part of a pattern of domestic violence that confined his violent conduct to boy/girl relationships. Dr. Burgess herself explains that information about Barnette's healthy relationships "dramatically undercuts" the notion that Barnette's "relationships always followed the same pattern." Barnette Br. 66 (quoting Burgess Aff. ¶¶ 16–18). The evidence accordingly risked weakening Barnette's compelling and ultimately successful argument against future dangerousness — that his violent conduct

68

followed a pattern confined to the context of domestic relationships.  Barnette has not demonstrated that his attorneys were constitutionally deficient to the extent they did not develop and present this evidence.  *See Moody* 408 F.3d at 151 (holding that a failure to introduce evidence that could be a "double-edged sword" is not constitutionally unreasonable).

      c.      Barnette cannot establish that his attorneys were constitutionally deficient to the extent they did not develop or present additional evidence that Barnette was depressed.

Barnette's attorneys were not constitutionally deficient to the extent they did not introduce additional evidence that Barnette was depressed after he broke up with Robin.  Mot. 43–44; Barnette Br. 68–70.  Barnette himself explained how he felt that his breakup with Robin was "devastating," and that he felt he "was back to square not even one, zero."  Ex. at 1068–73.  He told the jury that he drank a "big cup of vodka straight" and began taking three boxes of sleeping pills.  Ex. at 1071.  His brother also described how he observed Barnette's "withdrawal from the family" during the months between the firebombing and murders.  Ex. at 1362–63.  And Barnette's expert witnesses opined that Barnette was depressed, Ex. at 1389 (testimony of Dr. Halleck); 1488 (testimony of Dr. Burgess); 1619 (testimony of Dr. Cunningham), specifically discussed how "the deterioration" of Barnette's "relationship with Robin Williams" contributed to the murders, and explained how the period of time between the firebombing and murders represented an opportunity for intervention that went unmet.  Ex. at 1490–91, 1608.  Testimony from additional witnesses who observed Barnette's

69

depressed behavior would have been cumulative, and declining to pursue or introduce it was well within the reasonable discretion of Barnette's trial counsel.

> d. Barnette cannot establish that his attorneys were constitutionally deficient to the extent they did not pursue a different strategy with respect to expert witnesses.

At trial, the United States sought to prove the aggravating factor of future dangerousness with Barnette's "long history of violence," Ex. at 1030, and his defense sought to rebut that factor by contending that Barnette's violent tendencies were limited to the context of romantic relationships with women of the kind unlikely to arise in prison. Ex. at 1288–89. Dr. Burgess opined that Barnette "gets into difficulty when it's in the context of some . . . kind of boy/girlfriend type of relationship" but not "in the context of doing . . . daily routine and things like that." Ex. at 1496. She described Barnette's romantic relationships as following a "pattern," where the relationship starts off well, Barnette becomes suspicious about infidelity, and Barnette then becomes aggressive. Ex. at 1479–82. And she explained that this pattern had "roots very much in the way [Barnette] was raised and developed." Ex. at 1480.

Dr. Burgess specifically described all of Barnette's violent conduct as confined to the context of domestic violence. She explained that she viewed Barnette's confrontation with Britt, a male, as "within the context of a relationship," and his killing of Donald Allen as part of a "domestic" crime spree in which his ex-girlfriend, Robin, was the target. Ex. at 1495, 1536–37. Dr. Cunningham reinforced this conclusion, describing Barnette's crimes as

70

catathymic homicides and opining that "all of the violence that is identified with Marc Barnette has a family connection to it, or a domestic connection to it." Ex. at 1573. Dr. Burgess contrasted the context of the romantic relationships that gave rise to Barnette's prior violence with that of a "structured setting," where she opined that Barnette "does what he is supposed to do." Ex. at 1496.

This defense strategy was effective. The jury in 2002 — unlike the jury that heard the case against Barnette in 1998 — rejected future dangerousness as an aggravating factor. Ex. at 2046, 2064, 2082. It declined to find that Barnette "was likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society." Ex. at 2046, 2064, 2082.

Barnette nevertheless now contends that his attorneys were deficient in five respects related to the expert testimony that the jury heard. Barnette Br. 11, 20–26, 66–67, 71, 78–85; Mot. 17–18, 62–75. First, Barnette contends that Dr. Burgess's affidavit, in which she offers an opinion different from her 2002 testimony, demonstrates that his attorneys were constitutionally deficient. Barnette Br. 11, 23–24, 66–67, 71; Mot. 67–69. Second, with no affidavits or other evidence from Drs. Halleck and Cunningham, Barnette contends that his attorneys were deficient for declining to provide those experts with additional information. Third, Barnette contends that his attorneys were deficient for declining to call as a witness Dr. Sally Johnson, who had found him competent to stand trial in 1998, Ex. at 1231. Fourth, Barnette contends that his attorneys performed deficiently to the extent that they did not impeach one of the rebuttal

71

experts called by the United States, Dr. Dietz. Finally, Barnette has obtained an opinion from a new expert that Barnette suffered from borderline personality disorder and a major mood disorder. He contends that this opinion supports his theory that the performance of his attorneys was constitutionally deficient. Each of these contentions fails.

First, Barnette's contention that his attorneys were constitutionally deficient because Dr. Burgess now says she would have testified differently, Barnette Br. 11, 23–24, 66–67, 71; Mot. 67–69, is meritless. Dr. Burgess now states that Barnette's "criminal conduct could not simply be explained by [his] upbringing." Barnette Br. 24 (quoting Burgess Aff. ¶ 8). Instead, she now opines that "Barnette's criminal conduct was attributable to a psychotic episode and mental health crisis that he was experiencing." *Id.* She further opines that Barnette "suffered from a mood disorder that was significantly affecting his thinking and behavior." *Id.* Dr. Burgess's new opinions do not establish that Barnette's attorneys were constitutionally deficient.

Dr. Burgess's new opinion is, at best, a double-edged sword that would have risked undermining Barnette's defense against the future-dangerousness aggravating factor. An opinion that Barnette's killing was due to a psychotic episode and mood disorder risked hindering the defense theory that Barnette's violent conduct was limited to a specific pattern that echoed his experience as a child, confined to domestic relationships that he would not face in prison. Burgess's new opinion would have potentially opened the door to an argument

72

that he remained a serious threat to society, whether or not he ever had another girlfriend, because he might experience a psychotic episode or mood disorder in prison. *See Jones v. Catoe*, 9 F. App'x 245, 254 (4th Cir. 2001) (describing evidence in a penalty trial that the defendant was psychotic as a double-edged sword).

Moreover, Dr. Burgess's change of position says nothing about the effectiveness of Barnette's attorneys. The trial record reflects that Dr. Burgess did her own work to develop her opinions. Among other things, she conducted her own interviews of Barnette and his family members, reviewed extensive records, and visited the scene of one of Barnette's murders. Ex. at 1477. She explained her "purpose . . . in talking to Marc Barnette, reviewing these records, and interviewing these other sources." Ex. at 1478. That purpose was not to comply with a request by counsel; Dr. Burgess explained that *her* purpose "was to try to understand what had happened, to try to explain what had happened, how this had come to this point." Ex. at 1478. And the information that she had was sufficient to allow her to testify that she had formed an "opinion with a reasonable degree of scientific certainty." Ex. at 1478. Nothing in Dr. Burgess's affidavit or elsewhere demonstrates that any failure by Dr. Burgess to obtain the information she needed to provide accurate opinions was the product of a constitutional deficiency by Barnette's counsel, nor does Barnette identify any evidence that defense counsel placed any limits on the scope of Dr. Burgess's investigation. *See McHone*, 392 F.3d at 705.

73

Barnette's contention that Dr. Burgess was "[i]nexplicably" not provided with the "mitigation investigation developed by Ms. Alfonso," Barnette Br. 15, is misplaced. Barnette's attorney, Jean Lawson, explains that Alfonso's report was completed a week after Burgess's report. Lawson Aff. ¶ 27. Burgess had spoken to Alfonso on the telephone, Alfonso Aff. ¶ 17, and was able to form opinions to a "reasonable degree of scientific certainty" without Alfonso's report, ex. at 1478. Dr. Burgess did not seek additional information from Alfonso, Alfonso Aff. ¶ 17, and Dr. Burgess does not state that she ever gave Barnette's counsel any indication that she lacked what she needed to give accurate opinions. As explained above, Dr. Burgess's opinions provided a powerful, and ultimately effective, rebuttal of the United States's theory of future dangerousness. Barnette's attorneys were not unreasonable to the extent they did not ask Dr. Burgess to revise her opinions in the light of Alfonso's report.

Furthermore, Dr. Burgess's new opinion directly contradicts that of another defense expert. Dr. Cunningham, a "clinical and forensic psychologist," interviewed Barnette on four occasions, interviewed a host of other individuals familiar with Barnette, reviewed a host of records, and testified unequivocally that there was "no indication that Marc Barnette was psychotic at the time of these offenses." Ex. at 1549–51. Dr. Burgess was not tendered as an expert in psychology; she was tendered as "an expert in domestic violence." Ex. at 1468. Her new opinion, contradicted by that of a forensic psychologist, would have undermined her credibility as an expert in her field. It would have risked

74

undermining Dr. Cunningham's credibility.  And it would have risked confusing the jury about one of the most powerful components of the defense case — the theory that Barnette's violent conduct was confined to domestic boy/girl relationships that he would not face in prison.

Second, Barnette is similarly unable to demonstrate that his attorneys were constitutionally deficient to the extent that they did not provide Drs. Halleck and Cunningham with more information.  *Cf.* Barnette Br. 81–82; Mot. 69–71.  Barnette's premise that these experts relied on "*precisely the same information*" for their testimony in both 1998 and 2002, Barnette Br. 81 (emphasis in original), is contradicted by the record.  Of course both witnesses had the benefit of their own work and other materials from the 2002 proceedings, Ex. at 1377–78, but Dr.  Halleck testified that he also interviewed Barnette four times in 2002 alone.  Ex. at 1377–78.  And in June, the month before the 2002 resentencing, Dr. Halleck interviewed Natasha Tolbert, Sonia Barnette, and Derrick Barnette.  Ex. at 1378.  Dr. Cunningham testified that he conducted more than 18 hours' worth of interviews of Barnette.  Ex. at 1549–50.  He also interviewed Sonia Barnette; Derrick Barnette; Mario Barnette; Aquilia Barnette's friend Steve Austin; Aquilia Barnette's former supervisor, Brian Ard; Shonda Nero; Tony Harrison; Elizabeth Joy; and Dr. Sally Johnson, the psychiatrist who evaluated Barnette at the Federal Correctional Institution at Butner, North Carolina.  Ex. at 1549–50.  *See also* Mecklenburg County Jail Visitation List (Dkt. No. 76–1, 3:12-cv-327, at Bates No. 2309) (identifying

75

Cunningham as a visitor to Barnette in 2002).

Barnette has not identified anything that demonstrates that Dr. Halleck or Dr. Cunningham did not have everything they needed to provide the jury with full and accurate opinions. Barnette has not identified anything that suggests that either expert requested additional materials from Barnette's attorneys or that any failure by the experts to obtain information they needed from the materials they reviewed or the extensive interviews that they conducted was the fault of Barnette's attorneys. And Barnette has not obtained affidavits from Dr. Cunningham or Dr. Halleck or any other evidence showing that their testimony would have been different if Barnette's attorneys had provided them with additional information.

Third, Barnette cannot establish that his attorneys were constitutionally deficient to the extent that they did not introduce testimony from Dr. Sally Johnson, the psychiatrist at the Federal Correctional Institution at Butner, North Carolina, who evaluated Barnette in advance of his 1998 trial. *Cf.* Barnette Br. 25; Mot. 73–75. Barnette contends that Dr. Johnson could have testified about how Barnette's background affected him and how he adjusted well to and behaved well in prison, Barnette Br. 25, 91–92. But the jury that sentenced Barnette already heard days' worth of testimony on those subjects from experts and correctional officers. Barnette has not established that Johnson would have offered an expert opinion that the jury did not already hear. And expert witnesses that Barnette did call reviewed Johnson's work with Barnette,

76

interviewed Johnson, and presented opinions to the jury based on information in Dr. Johnson's report.  Ex. at 1392, 1515, 1520–21, 1550, 1628–29, 1638–39, 1730. Moreover, Dr. Halleck concluded that "differences" existed between what Barnette told Dr. Johnson and what other sources described and that Barnette was not "as open" when speaking with Dr. Johnson as he later became.  Ex. at 1392.  Those differences presented an obvious risk that Dr. Johnson's testimony on cross examination would reflect poorly on Barnette.  Barnette's attorneys were not unreasonable for declining to call Dr. Johnson.

Fourth, the failure of Barnette's attorneys to cross examine the United States's rebuttal expert witness, Park Dietz, about his false testimony during the guilt phase of the March 2002 trial of Andrea Yates in Texas, *Cf.* Barnette Br. 82–85; Mot. 71–73, was not constitutionally deficient.  The State of Texas called Dr. Dietz as an expert witness in their case against Yates for drowning her own children in a bathtub.  *Yates v. Texas*, 171 S.W.3d 215, 218 (Tex. Ct. App. 2005). "On cross examination, [defense] counsel asked Dr. Dietz about his consulting work with the television show, 'Law & Order,' which [the defendant] was known to watch." *Id.*

Dietz testified in the *Yates* case that he was a consultant on two episodes of Law & Order, one depicting "a woman with postpartum depression who drowned her children in the bathtub and was found insane" that he said aired shortly before the occurrence of Yates's crime.  *Id.* 218–19.  After the jury returned a verdict of guilty, however, the producer of Law & Order informed Yates's

77

attorney that "there was no show with a plot as outlined by Dr. Dietz." *Id.* at 220. "Dietz acknowledged that he had made an error in his testimony." *Id.* The Texas trial court denied a defense motion for a mistrial, but allowed the jury considering Yates's punishment to hear a joint stipulation stating that Dietz "would testify that he was in error and that no episode" of Law & Order as described in his testimony "was ever produced." *Id.* at 219–20.

In 2005, the Texas Court of Appeals reversed Yates's convictions. *Id.* at 222. It held that the trial court erred by denying Yates's motion for a mistrial based on Dr. Dietz's false testimony. *Id.*

Although the *Yates* trial occurred within the months before Barnette's resentencing in 2002, nothing suggests that either the United States or Barnette's attorneys were aware that Dietz had given false testimony during that trial. Indeed, both Jan Barefoot and Jean Lawson state in their affidavits that they investigated Dietz's background. Barefoot Aff. ¶ 6; Lawson Aff. ¶ 30. Neither of them suggests that they or anyone else on the defense team was aware of his false statements in the *Yates* case. Dietz's false statements, although relevant to his credibility, were unusual and not about a matter upon which he had focused his opinions in Barnette's case. His attorneys accordingly had no reason to believe that they had overlooked helpful impeachment evidence. *See Pepe v. Walsh*, 31 F. Supp. 3d 441, 493 (N.D.N.Y. 2012) (holding that an attorney is not ineffective for failing to "investigate and discover" an issue unknown to him unless he "had some reason to conduct that investigation").

78

Moreover, Barnette cannot establish that he suffered prejudice from his attorneys' failure to discover Dietz's false testimony and use it to impeach Dietz. Much of Dr. Dietz's testimony echoed that of defense witnesses. Dr. Dietz agreed with Dr. Halleck's diagnosis of borderline personality disorder. And his diagnoses of narcissistic personality disorder and antisocial behavior echoed Dr. Halleck's assessment that Barnette had attributes of both conditions. Dr. Dietz also agreed with the depression-related symptoms that Dr. Halleck attributed to Barnette; he even explained that Dr. Halleck's conclusion that they were the result of "major depression" could be correct. Ex. at 1766–67. Dietz concluded that it was inappropriate to make that diagnosis because the symptoms were ambiguous: "[I]t could be major depression, but it could also be excessive drinking over that period of time." Ex. at 1766–67.

Dr. Dietz's primary disagreement with defense experts focused on the extent to which Barnette's violent behavior was confined to domestic relationships. Unlike Drs. Burgess and Cunningham, Dr. Dietz concluded that Barnette's killing of Donald was not part of a domestic violence crime spree or a catathymic homicide. Dr. Dietz testified that Barnette's killing of Donald was motivated by expediency and to prevent Donald from calling the police after Barnette had obtained his car.

Notwithstanding Dr. Dietz's testimony, the defense convinced the jury that the United States failed to prove that Barnette remained a future danger. Barnette contended that he posed no danger while serving a life sentence in

prison because his violent conduct was confined to the context of a domestic relationship, and he "had no girlfriend in prison." Ex. at 1288. And the jury rejected future dangerousness as an aggravating factor.

Barnette cannot establish a reasonable probability that the outcome of his trial would have been different had Dr. Dietz's been impeached with his testimony from the Andrea Yates trial. Barnette won on the point on which Dr. Dietz's testimony primarily focused. The jury heard largely the same testimony on other issues from Dr. Cunningham. And many of the other opinions presented by Dr. Dietz were minor or intuitive. For example, the jury did not need Dr. Dietz to be credible to understand that there was a robbery component to Barnette's killing of Donald Allen or that his killing was motivated by a desire to avoid the police. The government's evidence and Barnette's own testimony amply established that Barnette took Donald's car and wallet and that Barnette killed Donald after Donald had voluntarily surrendered them. Ex. at 1100. Accordingly, Barnette cannot establish that any failure to impeach Dr. Dietz deprived him of his constitutional right to the effective assistance of counsel.

Finally, Barnette's contention that his attorneys unreasonably failed to develop and introduce evidence of "major mental illness" described by a new expert hired by postconviction counsel, Barnette Br. 20–23; Mot. 14–18, is meritless. Barnette quotes at length from a report prepared in November 2014 by Dr. Richard G. Dudley, a psychiatrist retained by Barnette's postconviction attorneys. Barnette Br. 20–23; Dudley Report, at 1. Dudley concludes that

80

Barnette meets the diagnostic criteria for "Borderline Personality Disorder" and that he "suffers from a major mood disorder, characterized by rapidly changing, extreme mood states." Barnette Br. 21. Nothing about Dr. Dudley's report or anything else identified by Barnette demonstrates that the performance of Barnette's attorneys was constitutionally deficient.

Contrary to what Barnette now contends, the attorneys who represented him in 2002 *did* present evidence of the mental illness described in Barnette's postconviction brief and the postconviction psychiatric expert report. Dr. Halleck, the expert in forensic psychiatry that Barnette called during his resentencing hearing, testified that Barnette had "borderline personality disorder," which he described as a "very serious personality disorder." Ex. at 1381. As explained previously, this diagnosis was even shared by the United States's expert, Dr. Dietz. Ex. at 1768. Dr. Halleck also described the mood characteristics emphasized by Dudley, explaining during the resentencing hearing that Barnette "showed rapid fluctuations in mood, and amazingly so even as a child." Ex. at 1381. He described learning that Barnette would "switch his mood in just a second, like turning on a light switch. He could be feeling happy and all of the sudden he would be extremely sad." Ex. at 1386.

Barnette's new expert concludes that his opinions are "better supported" and "much more complex" than the opinions rendered at the time of his trial, Barnette Br. 22, but even if these conclusions were true they would not establish deficient performance by Barnette's attorneys. Dr. Halleck conducted four

81

interviews with Barnette; he conducted interviews with Natasha Tolbert, Sonia Barnette, and Derrick Barnette; and he reviewed extensive records related to Barnette's case. Ex. at 1378. Barnette has not established that Dr. Halleck did not have everything he needed to fully support his opinion or that any deficiency was the fault of Barnette's attorneys instead of the expert. *See Gilliam v. Sec'y for Dep't Corr.*, 480 F.3d 1027, 1035 (11th Cir. 2007) ("That other experts may have been more persuasive does not mean that counsel's failure to retain those other experts was unreasonable."). And Barnette's attorneys were not constitutionally deficient for declining to present to the jury opinion testimony that was "more complex." Barnette Br. 22. Contrary to Barnette's postconviction more-is-always-better narrative, a reasonable attorney could certainly conclude that additional complexity would not be a virtue, particularly in a proceeding in which defense counsel was already asking the jury to listen to expert testimony over the course of several days. Ex. at 1372–1698. *Chandler*, 218 F.3d at 1318.

> e.  Barnette cannot establish that his attorneys were constitutionally deficient to the extent they did not introduce additional evidence about Barnette's institutional adjustment after his arrest.

Barnette's attorneys were not constitutionally deficient to the extent they did not introduce additional evidence about Barnette's institutional adjustment while in prison. *Cf.* Mot. 77–79; Barnette Br. 89–94. Barnette's attorneys called a number of witnesses from correctional institutions who testified that Barnette was a model prisoner. Ex. at 1432–63. Indeed, they established Barnette's status as a model prisoner as a matter of law and convinced all twelve jurors that

82

Barnette can serve a useful purpose to others in a prison environment, Ex. at 2048–51, 2067–69, 2085–87.

The record undermines Barnette's contention that his attorneys failed "to provide the jury with any evidence about why" Barnette had adjusted to prison so well. Barnette Br. 90; Mot. 45. Barnette presented a substantial amount of evidence that, in the light of his background and mental health, he only "gets into difficulty when it's in the context of some type of relationship, some kind of boy/girlfriend kind of relationship." Ex. at 1496. And he didn't "have a girlfriend in prison." Ex. at 1288. Contrary to his contention that his attorneys failed to present expert testimony on this subject, Barnette Br. 90, this subject was a key theme of the testimony of Dr. Burgess, who explained that he "does what he's supposed to do in a structured setting" such as prison because the context is different from that of a "boy/girlfriend type of relationship" in the community. Ex. at 1496–97.

Additionally, evidence of positive institutional adjustment in prison is potentially mitigating because it can show that "the defendant would not pose a danger if spared (but incarcerated)," *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986), and Barnette and his attorneys succeeded in convincing the jury to reject the contention that Barnette posed a risk of future dangerousness. Ex. at 2046, 2064, 2082. It was entirely reasonable for Barnette's attorneys to take the approach they did to institutional-adjustment evidence. Barnette cannot establish a reasonable probability that a different approach would have resulted

83

in a different, more favorable, outcome.

      f.    Barnette cannot establish that his attorneys were constitutionally deficient to the extent they did not introduce additional evidence about Barnette's continuing interpersonal relationships.

Barnette's contention that his attorneys failed to present evidence that "Barnette had ongoing and significant interpersonal relationships" at the time of his 2002 trial, Mot. 79–80; Barnette Br. 94, is not supported by the record. Barnette testified that he had reestablished a relationship with his children in the months prior to his 2002 penalty trial. Ex. at 1241–43. He explained that he had recently spoken to his son and learned that he had "just made football first year out." Ex. at 1242. He explained that his daughter was mad at him because she had written him a letter a week earlier and he had not yet replied. Ex. at 1242. Derrick Barnette testified that he visited Barnette in jail, along with Barnette's daughter and Natasha Tolbert. Ex. at 1334. And Mario Barnette testified that he had visited his brother in jail, explaining that he felt that Barnette had given him "everything that he could." Ex. at 1361–62.

Like much of the additional evidence Barnette contends his attorneys ought to have introduced, additional evidence of Barnette's continuing personal relationships would have cut both ways. The United States sought to prove the harm caused to the families of Donald Allen and Robin Williams as a result of Barnette's crimes as an aggravating factor. Any evidence about Barnette's continuing relationships risked reminding the jury that Robin Williams and Donald Allen would not have opportunity to have children or watch them grow

84

up.  And it risked reminding the jury that the Williams family and the Allen family would never have the opportunity to visit their loved ones again.  Indeed, the United States introduced additional evidence of the opportunities for visitation available in prison as part of its rebuttal case.  Ex. at 1745–46.  Barnette's attorneys were not constitutionally deficient to the extent they did not develop or present more evidence about Barnette's continuing interpersonal relationships.

2. <u>Barnette cannot establish that his attorneys were deficient to the extent they advised him to testify</u>.

Barnette's attorneys were not constitutionally deficient to the extent that they advised Barnette to testify.  *Cf.* Barnette Br. 85–89; Mot. 75–77.  Barnette confessed to his crimes, he took police to the scene of Donald's murder and helped them locate the body, and he had a track record as a model inmate.  And, as Barnette's motion and brief note, Barnette grew up in unfortunate circumstances.  Accordingly, Barnette had an opportunity to persuade the jury that Barnette accepted responsibility for his actions, that he showed remorse, and that his background had a particularly negative effect on him.  At the same time, his attorneys faced a difficult task.  Barnette's crimes were extraordinarily violent and committed with extensive premeditation.  Barnette was aware that he was wanted by police after firebombing Robin's home.  Instead of turning himself in to police at that time, he played cards, went out clubbing, and assembled weapons and tools to return to Roanoke to kill Robin.

85

Barnette's attorneys were not deficient for recognizing that Barnette's own testimony offered him the best chance of convincing a jury that his background mitigated his conduct, proving that he took responsibility, and proving that he expressed remorse. And they were not deficient to the extent they advised him to testify.

Barnette's contention that the advice of Barnette's attorneys was deficient in the light of the risk that Barnette's testimony might offend jurors, Barnette Br. 86–89, is misplaced. The United States introduced strong evidence, including Barnette's confession, that Barnette firebombed Robin, plotted for months to return to kill her, shot her in front of her mother after killing an innocent bystander for his car and threatening several others in the process. The jury also heard — directly from Barnette's victims — that Barnette had raped, beat, cut, threatened, and kidnapped other women. Barnette's attorneys could reasonably have predicted that the jury would have been "offend[ed]," "alienat[ed]," "anger[ed]," and unable "to relate" to Barnette, Barnette Br. 87–88, if he had not testified, so the risks associated with his testimony gave him little to lose. Barnette's testimony also provided an opportunity, as mentioned above, for Barnette to explain how events in his background affected him and to personally take responsibility and express remorse.

Indeed, Barnette succeeded in persuading the jury to find a host of mitigating factors to which Barnette's testimony spoke. Twelve jurors found that Barnette was affected by growing up in a family environment of violence, drugs,

86

and alcohol abuse.  Twelve jurors found that Barnette had repeated exposure to violence in the home.  Twelve jurors found that Barnette attempted to protect his brother from the damaging effects of parental violence and neglect.  One or more jurors found that other factors in Barnette's background or character were mitigating, that Barnette accepted full responsibility for his actions, and that Barnette expressed remorse. The conclusion by his attorneys that the benefits of Barnette's testimony outweighed the risks was not unreasonable.

3. <u>Barnette cannot establish that the behind-the-scenes conduct of his defense team reveals constitutionally deficient performance</u>.

Evidence gathered by Barnette's postconviction attorneys of the behind-the-scenes conduct of Barnette's 2001–02 defense team does not establish that the performance of the attorneys who represented him at that time was constitutionally deficient.  *Cf.* Mot. 46–63.  Barnette has collected affidavits and materials from some members of that team, including attorneys Claire Rauscher and Jean Lawson, mitigation specialist Cessy Alfonso, private investigator Jan Barefoot, and expert witness Dr. Burgess.  Barnette Br. 12–19, 72–76.  These materials do not include an affidavit from his attorney Harold Bender, who died in March of 2013.  Barnette Br. 100 n.10.  Nor do they include affidavits from the other expert witnesses that Barnette worked with in 2002.

The affidavits that Barnette describes do not purport to identify or describe all of the steps that Barnette's trial team took to prepare for his trial. And although they identify a handful of things that Barnette's attorneys decided

87

not to do — such as not calling Sonia Barnette as a witness, Lawson Aff ¶ 21 — they do not state that these decisions were the product of anything other than fully considered strategic choices.

Although they do not purport to be complete, the materials Barnette has gathered reveal that Barnette's defense team in 2001 and 2002 conducted a thorough investigation and made reasonable choices about what to present to the jury. Barnette's defense team conducted a review of materials from Barnette's first trial, Lawson Aff. ¶ 6, which included "18 boxes of files from prior counsel, 15 volumes of transcripts . . . and one box of discovery" received in March 2001, Rauscher Aff. ¶ 5. Their review included the testimony of 22 defense witnesses, including, among others, Natasha Tolbert, Crystal Dennis, Alesha Chambers Houston, John Thomas Barnette, Ayanna Brewer Beasley, E.A. Joye, Jean Nduly, Jessie Cooper, Shonda Nero, Tessie Nero, Sheila Cooper, Mario Barnette, Tina Davis, Anthony Belton, Dr. Sally Johnson, Nadine Wilson, Tony Harrison, Ricky Paylor, Faye E. Sultan, Dr. Halleck, Dr. Cunningham, and Cynthia Maxwell. Ex. at 34–36.

In the light of the insight afforded by records of Barnette's earlier trial, Barnette's resentencing trial team made decisions about what to do differently from Barnette's first trial team. They hired a new mitigation specialist to perform a "[b]iopsychosocial investigation." Alfonso Report 1 (July 8, 2002) (Defense Bates No. 424). And they hired a private investigator to "locate various witnesses for Ms. Alfonso to review." Lawson Aff. ¶ 11. In the end, Barnette's

88

resentencing team assembled "40 to 50 boxes of trial files."  Barnette Br. 100 n.10.

The defense mitigation specialist, Cessy Alfonso, conducted a detailed investigation and put together an analysis of "psychosocial factors" and a "chronology of Barnette's life events."  Alfonso Report 1.  Alfonso interviewed twelve witnesses:  Barnette; his mother, Sonia; his stepfather, Derrick; his aunts, Sheila Cooper and Tessie Nero; his brother, Mario; his stepfather's great aunt, Mable Johnson; Barnette's grandfather, Jesse Cooper; Barnette's cousin, Armaud Cooper; Barnette's mother's former boyfriend, Larry Wright; Larry Wright's sister, Dorothy Harper; and the mother of Barnette's children, Natasha Tolbert.  Alfonso Report 1–2.  Additionally, Alfonso reviewed eighteen categories of records.  *Id.* at 2.  Several of those categories included materials developed for or records of Barnette's earlier trial.  Other categories included family criminal histories, records surrounding Pearl Cooper's death, employment records of Barnette and Sonia; credit records for Sonia and Sheila Cooper; medical records associated with a gunshot wound received by Barnette, in addition to several others.  *Id.* at 2.

Barnette's contention that his defense team "ignored" the information obtained by their mitigation specialist, Cessy Alfonso, Barnette Br. 18–19, 72–73; Mot. 46–47, 54–59, ignores the words of the affidavits Barnette obtained and turns the presumption of reasonableness that applies to counsel's conduct on its head.  None of the affidavits obtained by postconviction counsel of people with

89

personal knowledge, such Jean Lawson, Cessy Alfonso, or Claire Rauscher, state that Barnette's attorneys did not fully consider the information obtained by Alfonso and make strategic decisions about what evidence to develop and use at trial. Alfonso provided Barnette's attorneys with a detailed report, and much of what Alfonso described was presented to the jury through expert witnesses, Barnette, or family members. Alfonso Report 1–28. Barnette places emphasis on the fact that Alfonso did not provide her report to counsel until shortly before the 2002 trial began. But Alfonso was in contact with counsel and provided them with written correspondence and reports of interviews before the full report was finished. Lawson Aff. ¶21; Alfonso Aff. ¶¶ 4, 15. Barnette has identified nothing that suggests that anything in Alfonso's report was a surprise, that his attorneys "ignored" it, or that his attorneys did not make reasonable decisions about what steps to take in the light of the information Alfonso obtained.

That Barnette's counsel did not present at trial all of the information gathered in Alfonso's report, such as all of the details Alfonso gathered related to Sonia Barnette's upbringing, Jesse Cooper's history, or Barnette's paternity, *cf.* Barnette Br. 72–74, does not establish that his attorneys ignored critical information or made unreasonable decisions. Indeed, his attorneys presented evidence about each of those components of Barnette's background. The decision not to focus in greater detail on Sonia or Jesse's background, when Barnette's own background was troubled and far more relevant to the mitigating factors that his defense sought to establish, was not unreasonable. And although

90

Alfonso raised, without confirming, the possibility that Larry Wright might be Barnette's biological father, Barnette Br. 74, Alfonso Report 4–5, Barnette testified that he did not know who his biological father was. Barnette has identified nothing to suggest that Larry Wright had any influence on him or any testimony to offer that would have assisted his mitigation case. Barnette's attorneys were not unreasonable for declining to pursue evidence about Larry Wright or Barnette's paternity further than they did.

Barnette's private investigator, Jan Barefoot, also did exactly what Barnette's attorneys quite reasonably hired her to do, assist Alfonso with locating witnesses. Barefoot Aff. ¶ 6. She also performed a number of other tasks. *Id.* ¶ 6. Among other things, she was asked to interview witnesses, including Candy Epps, Ann Austin, Darrell Austin, Shovanda Davis, Bob West, Janet Brewer, Eric Cooper, and Greg Austin. Barefoot Aff ¶ 14. She passed the information she received from these witnesses to Harold Bender or Jean Lawson, Barefoot Aff. ¶ 14, and Barnette has identified nothing that shows that Barnette's attorneys did not make reasonable use of Barefoot's services.

Barnette's defense team made a strategic decision to address Barnette's prior relationships with women "head on." Lawson Aff. ¶ 7. The team hired Dr. Burgess, an expert in the field of "domestic violence," not to determine whether Barnette was psychotic, *cf.* Barnette Br. 24, but instead to explain to a jury "the dynamics of Marc Barnette's relationships with other women, as well as the impact that Sonia and Derrick Barnette's volatile relationship had on him."

91

Lawson Aff. ¶ 25–26. Dr. Burgess gave a compelling opinion that helped spare him from the aggravating factor of future dangerousness notwithstanding the overwhelming evidence the United States presented of Barnette's violent conduct against men, women, and children.

Barnette's defense attorneys also met with Dr. Cunningham and Dr. Halleck, who had testified during Barnette's earlier trial. Lawson Aff. ¶32–33. The team decided to have Dr. Cunningham testify not only about Barnette's future dangerousness, but also about Barnette's psychological makeup and mental health issues. Lawson Aff. ¶ 32. This testimony reinforced Dr. Burgess's opinion and presented a detailed explanation of how Barnette suffered from serious mental illnesses and how his unfortunate upbringing affected the choices he faced when he committed his crimes.

Barnette's defense team considered Barnette's prior penalty trial to have been "disjointed," Lawson Aff. ¶ 8, and accordingly employed a different strategy in 2002. The jury in Barnette's 2002 resentencing heard a detailed history of Barnette's background and that of his family from Barnette, Mario Barnette, Derrick Barnette, and Ahmad Cooper, instead of the eleven members of Barnette's family who testified at his first trial, Barnette Br. 19 n.4. The decision to limit the number of witnesses and focus the jury's attention on some issues to the exclusion of others is not deficient representation; it is an essential component of "[g]ood advocacy." *Chandler*, 218 F.3d at 1318.

Barnette's contention that his attorneys were constitutionally deficient to

92

the extent that they did not interview more witnesses, Barnette Br. 77–79; Mot. 47–54, is meritless. Barnette identifies 19 witnesses that he contends his trial counsel failed to interview. Barnette Br. 77. The record demonstrates that Barnette's attorneys were familiar with the substance of the testimony that many of these witnesses had to offer. Other witnesses who appeared at trial spoke to the events observed by the witnesses that Barnette alleges went uninterviewed. Or, as in the case of Eric Cooper, Crystal Dennis, Jean Nduly, Shonda Nero, and Brian Ard, the witnesses had testified at Barnette's earlier trial or were interviewed by Jan Barefoot, who relayed what she learned to defense counsel. Ex. at 34–36; Barefoot Aff. ¶ 14; *see Decastro v. Branker*, 642 F.3d 442, 452 (4th Cir. 2011) ("The Sixth Amendment does not always compel counsel to undertake interviews and meetings with potential witnesses where counsel is familiar with the substance of their testimony." (ellipses omitted) (quoting *Huffington v. Nuth*, 140 F.3d 572, 580 (4th Cir. 1998))). And, with respect to all 19 witnesses, Barnette has failed to demonstrate that his attorneys had reason to believe that the witnesses might reveal valuable, non-cumulative, mitigating evidence. *See Bobby v. Van Hook*, 558 U.S. 4 (2009) ("[G]iven all the evidence they unearthed from those closest to [the defendant's] upbringing and the experts who reviewed his history, it was not unreasonable for [defense] counsel not to identify and interview every other living family member or every therapist who once treated his parents.").

Barnette's attorneys were not unreasonable to the extent they declined to

93

interview more people about the childhood fights that Barnette described at trial. His attorneys reasonably declined to spend their limited resources interviewing Melvin Bryant, who was involved in the 10th-grade fight Barnette described at trial or Kenny Bailey, who was Barnette's friend at the time of that beating. Barnette provided counsel with the details of that fight, and counsel was able to introduce evidence about the fight through Barnette. His attorneys also reasonably declined to interview Victor Montgomery, a friend of the boy that Barnette shot, Anthony Britt, who describes the fight between Barnette and Britt. Barnette Br. 63. Montgomery corroborated the shooting, *id.*, and his attorneys had no reason to believe that his information or testimony would be helpful to Barnette's defense.

Nor were Barnette's attorneys unreasonable to the extent that they declined to interview some of Barnette's former girlfriends and the friends and relatives of those girlfriends. Barnette's attorneys were aware of the substance of Crystal Dennis's testimony from Barnette's trial, and as explained previously, her testimony in 2002 already included the elements that Barnette contends would have been helpful to his mitigation case. As also explained previously, it was entirely reasonable for Barnette's attorneys not to focus on non-violent relationships Barnette had with women, and it was accordingly reasonable for his attorneys not to devote investigative resources to interviewing former girlfriends Kowana Dozier, Temeka Hunter, Sheila Sullivan, or former platonic friend Danielle Mathis. Ex. at 64–66. Nor was Barnette's defense counsel deficient for

94

declining to interview Eric Cooper a second time after Jan Barefoot about the fact that he never "saw any problems" between Barnette and ex-girlfriend Ayana Brewer. Barnette Br. 66. Similarly, the defense team was familiar with Barnette's relationship with Natasha Tolbert from interviews with Tolbert, Barnette Br. 77–78, records from the prior trial, Ex. at 34–36, and Barnette's own statements. It was entirely reasonable for his attorneys not to spend time interviewing Tolbert's friend, Anitria Lyles, or Tolbert's sister, Kesha Heard, about that same relationship. *Cf.* Barnette Br. 61–62.

Barnette's attorneys performed reasonably to the extent they declined to spend additional time interviewing distant family members, neighbors, and landlords from Barnette's childhood. The defense team presented testimony about Jesse Cooper, ample evidence of fighting between Derrick and Sonia Barnette, and ample evidence about the revelation that Derrick Barnette was not Barnette's biological father. Declining to interview Do'Lores Guy, the family's one-time landlord; Sonia's cousin Jean Nduly and Barnette's cousin Shonda Nero, who testified at Barnette's first trial; and neighbors Sandra Smith and Weona Sharpe, for additional information about these matters was not unreasonable.

Finally, Barnette has failed to establish that his attorneys were deficient to the extent they declined to interview John West, Sonia Barnette's current boyfriend, West Aff. ¶ 3, or Brian Ard, the manager of the Camelot Music store where Barnette worked who received sexual-harassment complaints about Barnette, Ex. at 1712–13. Barnette Br. 77. Ard was interviewed by Dr.

95

Cunningham, Ex. at 1549–50, and Sindy Maxwell, Mot. 51. He was also a witness called by the United States during Barnette's 1998 trial. Mot. 51. Barnette offers nothing but his own allegations about what Brian Ard might have had to say. *See* Mot. 51. Even if these allegations are true, they would not establish that Barnette's defense team was unreasonable for declining to interview Ard again. And Barnette has identified nothing that would have given his attorneys any reason to interview West.

Barnette has not established that any of the witnesses he contends his attorneys ought to have interviewed had evidence that was critical to his case, and, to the extent his attorneys declined to interview them, their performance was reasonable. The Fourth Circuit has explained that "the failure to investigate everyone whose name happens to be mentioned by the defendant does not suggest ineffective assistance." *Huffington v. Nuth*, 140 F.3d 572, 580 (4th Cir. 1998) (quoting *Gray v. Lucas*, 677 F.2d 1086, 1093 n.5 (5th Cir. 1982)). And where, as here, the witnesses are not "alibi witnesses or eyewitnesses critical to the determination of guilt," the presumption of reasonableness that attaches to an attorney's decision not to interview witnesses is particularly salient. *Id*; *see also United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004) (explaining that the court must afford "enormous deference" to the "decision whether to call a defense witness"). Barnette has identified no evidence to overcome that presumption.

Barnette's contention that his attorneys were constitutionally deficient for declining to request a continuance, Mot. 81–83; Barnette Br. 97–100, is also

96

misplaced.  Barnette was represented by two experienced attorneys.  He has identified nothing that demonstrates that his attorneys were unprepared to proceed without a continuance.  Moreover, Barnette does not explain how the outcome of his resentencing trial would have been different if it had occurred later.  He has not demonstrated that his attorneys were unable or otherwise failed to present any evidence that they intended to present because of the timing of the 2002 trial.

The record from the 2002 trial and the affidavits and materials gathered by postconviction counsel reveal that Barnette's experienced and skilled death-penalty qualified resentencing attorneys gathered a wealth of information about Barnette, including about his background and mental health, and made reasonable strategic choices about what information to present to the jury.  They consulted with Federal Death Penalty Resource Counsel David Bruck.  Lawson Aff. ¶ 17.  They presented a detailed history of Barnette's family spanning four generations.  They detailed directly and through expert witnesses the unfortunate childhood that Barnette suffered, and how what he observed growing up shaped his relationships with women.  They presented testimony from highly qualified experts about the borderline-personality disorder and other mental-health issues that Barnette suffered.  They presented detailed expert testimony about how Barnette's upbringing and experience limited the choices Barnette had available to him.  They gave the jury the opportunity to hear Barnette explain how his background affected him, express remorse, and take responsibility for his

97

actions directly. They proved that Barnette was a model inmate during the six years he had been incarcerated. And they effectively placed Barnette's ample history of violence against men, women, and children in a context limited to romantic relationships with women, defeating the strong case the United States had presented for the aggravating factor of future dangerousness.

Barnette's attorneys in 2001 and 2002 faced an enormous challenge, and the evidence identified by Barnette fails to demonstrate that they did anything other than rise to that challenge. The United States presented a strong and compelling case that Barnette should receive the death penalty for exceptionally heinous crimes that he committed with extraordinary premeditation and deliberation, which followed a history of violent conduct and risked the lives of others. Barnette's attorneys represented Barnette vigorously and effectively. "There are countless ways to provide effective assistance in any given case," *Strickland*, 466 U.S. at 689, and Barnette has identified several alternative choices that his attorneys could have made. Most of those alternatives involved the presentation of cumulative evidence or evidence capable of hurting Barnette's defense as much as helping. But, in any event, Barnette has not demonstrated that the choices that his attorneys made in 2001 and 2002 were objectively unreasonable.

4. <u>Barnette cannot establish his attorneys were constitutionally deficient to the extent they have failed to locate records after the 2002 penalty trial was completed</u>.

Barnette's contention that the present-day inability of the attorneys who

98

represented him during his 2002 trial to locate records from that trial entitles him to relief from his death sentence on a theory of ineffective assistance of counsel, Mot. 83–84; Barnette Br. 100–01, is meritless.  Barnette identifies no authority that the Sixth Amendment compels attorneys to maintain all of their records for more than 10 years, in case their clients elect to accuse them of ineffective assistance of counsel.  In any event, a posttrial failure to preserve all records would not entitle Barnette to relief from his death sentence.  Barnette cannot establish the kind of prejudice required for relief; he cannot establish that alleged post-sentencing deficient performance affected the sentence he received.  *See Buckner v. Polk*, 453 F.3d 195, 201 (4th Cir. 2006).  Nor can Barnette establish any other kind of prejudice.  Barnette has gathered an enormous amount of evidence, including from the living members of Barnette's trial team, the witnesses who testified at trial, and individuals with whom the defense team spoke.  He has identified nothing that shows that any of the records that his attorneys have been unable locate contain evidence that would support a viable claim cognizable under 28 U.S.C. § 2255.

> 5.     Barnette cannot establish that his attorneys failed to protect Barnette's constitutional rights.

Barnette alleges generally that his attorneys failed to protect his constitutional rights.  Mot. 85–87.  This allegation consists of a numbered list of thirty-one conclusory allegations, each of which begins with "counsel failed . . . ." Mot. 85–87.  None of these allegations identify any specific facts about what his

99

attorneys purportedly failed to do.  Mot. 85–87.  Nor are any of the allegations accompanied by an explanation of why Barnette believes the performance of his attorneys was unreasonable or prejudicial.  Mot. 85–87.  In neither his motion under Section 2255 nor his brief in support of his motion for an evidentiary hearing does Barnette purport to identify any evidence to support his allegations.  To the contrary, his brief does no more than "reference[]" the list in his motion without elaboration and conclude that an "evidentiary hearing and relief is justified."  Barnette Br. 102.

Barnette's allegations are insufficient as a matter of law.  Conclusory assertions unsupported by specific facts are facially inadequate to entitle a movant under Section 2255 to relief or an evidentiary hearing.  *See United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004); *Jackson*, 638 F. Supp. 2d 514, 581 (W.D.N.C. 2009) (rejecting "bald assertions and conclusory allegations" as facially insufficient to support a claim on a motion under Section 2255).  And Barnette's failure to identify any evidence confirms that he is not entitled to an evidentiary hearing.  He has not identified evidence in support of his claims that, if true, would establish that the performance of his attorneys fell below an objective standard of reasonableness or that deficient conduct by his attorneys resulted in prejudice.

6.  <u>Barnette cannot establish a reasonable probability that, but for allegedly deficient conduct by his attorneys, he would not have been sentenced to death.</u>

Barnette is not entitled to relief from his death sentence on a theory of

100

ineffective assistance of counsel because he cannot meet his burden to show that "a reasonable probability exists that, but for the deficient performance, he would not have been sentenced to death." *Buckner v. Polk*, 453 F.3d 195, 201 (4th Cir. 2006). With respect to evidence that Barnette contends the jury ought to have heard, "that showing requires [Barnette] to establish a 'reasonable probability that a competent attorney, aware of the available mitigating evidence, would have introduced it at sentencing,' and 'that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.'" *Wong v. Belmontes*, 558 U.S. 15, 20–21 (brackets and ellipses omitted) (quoting *Wiggins v. Smith*, 539 U.S. 510, 535–36 (2003)). In the light of Barnette's burden, this Court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Id.* Barnette cannot prevail unless this Court concludes that a reasonable probability exists that, absent counsel's errors, "the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Decastro v. Branker*, 642 F.3d 442, 450 (4th Cir. 2011) (ellipses omitted) (quoting *Williams v. Ozmint*, 494 F.3d 478, 484 (4th Cir. 2007)).

No reasonable probability exists that the jury would not have sentenced Barnette to death if his attorneys in 2001 and 2002 had done what his postconviction attorneys contend they should have done. The vast majority of attorney conduct Barnette challenges was not prejudicial for the same reasons that it was not unreasonable. A large portion of the evidence that Barnette

contends his attorneys ought to have investigated, developed, or presented —for example, testimony about Barnette's family history, the violence and neglect Barnette witnessed and suffered while growing up, the behavior of his parents, Barnette's borderline personality disorder and rapid changes in mood, and his relationships with women other than Robin — would have been cumulative. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1409 (2011) (finding no reasonable probability that evidence that "largely duplicated the mitigation evidence at trial" would have changed the jury's verdict); *Buckner v. Polk*, 453 F.3d 195, 206 (4th Cir. 2006) (no prejudice from failure to introduce additional evidence that was "largely cumulative."). And much of it — for example, Dr. Burgess's opinion that Barnette was experiencing a psychotic episode and mood disorder, additional evidence that Barnette had nonviolent relationships with women, and evidence of his continuing interpersonal relationships while in prison — is "a double-edged sword" that "a jury could well find to be aggravating rather than mitigating." *Johnson v. Moore*, Nos. 97–33, 97–7801, No. 1998 WL 708691, at * 13 (4th Cir. Sept. 24, 1998); *Ponticelli v. Sec'y, Fla. Dep't of Corrs.*, 690 F.3d 1271, 1296 (11th Cir. 2012) (explaining that courts have rejected arguments of prejudice "where mitigation evidence was a two-edged sword or would have opened the door to damaging evidence"). Other evidence — for example, evidence of the draft separation agreement that Derrick Barnette prepared and scrapped or the assault Barnette and Natasha Tolbert endured at the hands of her sister's boyfriend — is "of questionable mitigating value," *Cullen,* 131 S. Ct. at 1410, with

no reasonable probability of affecting the outcome.

Much of the conduct by his resentencing attorneys that Barnette now challenges was directed at mitigating factors that the jury found unanimously or the aggravating factor that the jury rejected. Barnette cannot establish prejudice as a result of the approach his attorneys took to presenting evidence that he grew up in a family environment of violence, drugs, and alcohol abuse; that Barnette had repeated exposure to violence in the home; that Barnette attempted to protect his brother from the damaging effects of parental violence and neglect; and that Barnette was neglected by his mother. The jury not only heard evidence about all of those facts; it found those facts to be true and still sentenced Barnette to death. Similarly, Barnette cannot establish a reasonable probability that a different approach to evidence about his institutional adjustment would have resulted in a different sentence. Barnette's attorneys successfully proved that Barnette was a model prisoner and that he could serve a useful purpose to others in prison, and again, the jury still sentenced him to death. Finally, Barnette cannot establish prejudice from the approach his attorneys took to addressing Barnette's relationships with women. His defense convinced the jury to reject the United States's theory of future dangerousness after contending that Barnette's violent conduct was confined to the context of domestic relationships of the kind he would not face in prison. But the jury still sentenced Barnette to death.

Most importantly, Barnette has failed to identify any evidence that, in the

103

light of the overwhelmingly strong case for the death penalty presented by the United States, establishes a reasonable probability that a different approach by counsel would have convinced the jury that the "balance of aggravating and mitigating circumstances did not warrant death." *Decastro v. Branker*, 642 F.3d 442, 450 (4th Cir. 2011). The jury heard that Barnette drove to Roanoke, cut the telephone lines of Robin's house, and firebombed the only exit while she and Benjamin Greene were inside. The jury heard that Barnette yelled to Robin, "[D]ie, bitch, die," and "you're going to die tonight. I'm going to kill you." Ex. at 411, 413, 484. The jury heard that Robin escaped with severe burns, and while she attempted to recover, Barnette went out with friends, visited clubs, met girls, and drank. They also heard that Barnette purchased a shotgun, sawed off the barrel, and assembled materials, planning and preparing to return to Roanoke to kill. The jury heard that Barnette lied in wait for Donald Allen's blue Honda Prelude, and that even after he gave the car and his wallet up willingly, Barnette shot him multiple times. The jury heard that Barnette followed his plan to drive to Roanoke with the shotgun and fired it into the door of the kitchen where Barnette's mother had just been standing with her eight-month-old grandchild, baking brownies for a church bake sale. And the jury heard that Barnette calmly chased, dragged, shot, and killed Robin Williams right in front of Robin's mother, threatening multiple neighbors along the way.

In addition to the firebombing and murders that Barnette carried out with extensive premeditation, the jury heard testimony about an extraordinary

104

amount of violence that Barnette carried out against other women and those around them. The jury heard that Barnette beat the mother of his children, Natasha Tolbert, while she was pregnant, slamming her against the concrete. The jury heard that Barnette beat the children of Crystal Dennis, cutting them open, and shot Dennis's brother. And the jury heard that Barnette threatened Alesha Chambers at knifepoint, beat her with a baseball bat, cut her, kidnapped her, and raped her. The jury would have heard all of this evidence regardless of the approach taken by his resentencing attorneys.

No reasonable probability exists that the jury would not have sentenced Barnette to death if his attorneys had taken any of the approaches that he today contends they ought to have taken. Additional evidence about matters such as Barnette's childhood and background, what happened to his parents and grandparents, nonviolent relationships he had with other women, and ongoing interpersonal relationships; knowledge that Dr. Deitz had falsely claimed to have consulted on an episode of Law & Order during a different case; hearing Barnette's confession but not his testimony; "more complex" opinions about Barnette's mental health; and more evidence that Barnette was depressed is not reasonably likely to have weighed against the powerful aggravating factors heard by the jury in a way that would have achieved a different result. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). And Barnette has failed to identify competent evidence which, if believed, establishes a reasonable probability that, but for

105

alleged deficiencies of his attorneys, he would not have received a sentence of death.

### B. Barnette cannot establish that the selection of the jury for his 2002 penalty trial was tainted by racial discrimination.

The Fourth Circuit rejected Barnette's contention that his 2002 jury was selected in a racially discriminatory way, *Barnette III*, 644 F.3d at 217, and he cannot resurrect that contention by asserting it under 28 U.S.C. § 2255. *Cf.* Mot. 88–92. Barnette's claim under *Batson v. Kentucky*, 476 U.S. 79 (1986), was litigated at all three levels of the courts of the United States. *Barnette III*, 644 F.3d at 196–97. In 2010, with guidance from the Supreme Court and the Fourth Circuit, this Court held a hearing and rejected Barnette's *Batson* claim, finding that "Barnette had not met his burden of proving that the prosecution engaged in purposeful discrimination when it exercised peremptory strikes against five African-American members of the jury venire during jury selection for the sentencing phase in 2002." *Id.* at 196. The Fourth Circuit affirmed, explicitly rejecting "Barnette's contentions that the district court committed prejudicial error in the manner in which it conducted the proceedings below or in its findings of fact and legal conclusions on the merits of Barnette's *Batson* claim." *Id.* Barnette cannot pursue his *Batson* theory again on collateral review. *See United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993); *Boeckenhaupt v. United States*, 547 F.2d 1182, 1183 (4th Cir. 1976); *Clinton v. United States*, No. 3:10-CR-208-RJC-DSC, 2015 WL 5155372, at *6 (W.D.N.C. Sept. 2, 2015).

106

**C.    Barnette cannot establish misconduct related to the jury.**

Barnette cannot establish that he was denied his "constitutional right to a fair trial and impartial jury." *Cf.* Mot. 92.  Barnette makes a host of conclusory allegations about the jury, including that they considered matters extraneous to the trial, harbored "improper racial attitudes," and gave false or misleading responses on voir dire.  Mot. 95.  Barnette does not identify anything that suggests he raised this issue previously before this Court or on direct appeal.  His procedural default forfeited any challenge to his sentence on this ground.  *See Jackson v. United States*, 638 F. Supp. 2d 514, 600 (W.D.N.C. 2009).  Although procedural default can be overcome by a showing of either cause and prejudice or actual innocence, Barnette does not purport to make either showing.  *Id.* at 612.

Barnette's juror-misconduct theory is not only foreclosed by Barnette's procedural default; it is also meritless.  "Before proceeding down the path of impeaching a jury verdict, a § 2255 movant must make a threshold showing of improper outside influence."  *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004).  As Barnette recognizes, Barnette Br. 103–04, this Court already determined that Barnette failed to make that threshold showing when it denied Barnette's motion to conduct juror interviews.  Order, at 4, No. 3:12-CV-327 (July 13, 2013) (Dkt. No. 50).  Accordingly, Barnette cannot establish juror misconduct.

**D.    The decision to prosecute Barnette in federal court did not violate Barnette's constitutional rights.**

Barnette cannot establish that the decision to prosecute him in federal

107

court violated his constitutional rights. Barnette committed multiple murders in multiple states, killing Donald Allen in North Carolina, taking his car, and driving to Virginia to kill Robin Williams. Barnette's preparation, relevant conduct, and flight occurred across state lines. And Barnette committed no fewer than eleven offenses against the United States, including, among others, use and carriage of fire and explosive materials to commit an act of interstate violence, 18 U.S.C. § 844(h)(1), 924(c)(1); use of a firearm that results in death while violating the Interstate Domestic Violence Act, 18 U.S.C. § 924(c), (i); commission of a carjacking that results in death, 18 U.S.C. § 2119(3); and use of a firearm in a carjacking that results in death, 18 U.S.C. § 924(c), (j). Ex. at 69–71.

Although the United States was uniquely positioned to present evidence of Barnette's criminal conduct, which occurred across state lines, while representing the interests of the communities that he harmed in multiple states, Barnette contends that he was selected for prosecution in federal court "because of apparent discriminatory purpose." Mot. 95. Barnette has identified nothing to suggest that he ever raised this selective-prosecution theory previously before this Court or on direct appeal. Barnette's procedural default forfeited this challenge. *Jackson*, 638 F. Supp. 2d at 615. And again, Barnette does not purport to show cause and prejudice or actual innocence. *Id.* at 612.

Like several of Barnette's other theories, his challenge to the decision to prosecute him in federal court is not only foreclosed by his procedural default; it is also meritless. "The Attorney General and United States Attorneys retain

108

'broad discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). "As a result, 'the presumption of regularity supports' their prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" *Id.* (alterations omitted) (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15 (1926)).

Barnette's citation to year 2000 census data and his allegation that the "racial demographics" of the counties from which Barnette's federal jury pools were drawn were different from "state court demographics," Mot. 97, are not capable of meeting Barnette' burden to prove that "the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Armstrong*, 517 U.S. at 466. "To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Id.* The United States Supreme Court has explained that "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*." *United States v. Bass*, 536 U.S. 862, 864 (2002) (emphasis in original). Raw census statistics say equally little about charges brought against similarly situated defendants. And they are insufficient for Barnette to "prove that the decisionmakers in *his* case acted with discriminatory purpose," as he must to prove a constitutional violation. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). Accordingly, Barnette cannot establish that the decision to prosecute him in federal court violated his

109

constitutional rights.  *Armstrong*, 517 U.S. at 466.

**E.  Barnette cannot establish that he was denied any constitutional right to discovery or that the United States knowingly presented false or misleading testimony.**

Barnette cannot establish that he was denied any constitutional right to discovery or that the United States knowingly elicited false or misleading testimony.  *Cf.* Mot. 98–100.  Barnette makes a number of conclusory allegations about the conduct of the United States before and during his trial.  Mot. 98–99. His allegations do not describe any specific facts, and he identifies absolutely no evidence in support of any of his allegations.

Barnette's allegations fail for two reasons.  First, Barnette again does not identify anything that suggests he raised this issue previously before this Court or on direct appeal.  His theory is accordingly forfeited by his procedural default, which he does not purport to overcome by a showing of cause and prejudice or actual innocence.  *See Jackson*, 638 F. Supp. 2d at 600.  Second, his allegations are, like several others in his motion, insufficient on their face because they are conclusory and unsupported by evidence or even specific allegations of fact.  *See id.* at 581 (rejecting "bald assertions and conclusory allegations" as facially insufficient to support a claim on a motion under Section 2255).

**F.  The death penalty is constitutional.**

Barnette contends that his "death sentence should be set aside" in the light of a 2000 study by the Department of Justice that he contends suggests that the "federal death penalty had been disproportionately sought against persons of

color and irrationally sought on a regional basis." Mot. 100–01. Barnette has identified nothing to suggest that he ever raised this issue previously before this court or on direct appeal. Barnette's procedural default accordingly forfeited this theory, as it forfeited several others that Barnette purports to raise, because Barnette does not purport to demonstrate cause and prejudice or actual innocence. *Jackson*, 638 F. Supp. 2d at 612, 615.

Like the other arguments foreclosed by Barnette's procedural default, Barnette's challenge to the death penalty based on the 2000 statistics also fails on the merits. Bare statistical discrepancies, including any revealed by the 2000 Department of Justice study described by Barnette, are insufficient to establish a violation of Barnette's constitutional rights. *United States v. Bass*, 536 U.S. 862, 863 (2002); *United States v. Sampson*, 487 F.3d 13, 26 (1st Cir. 2007). The United States Supreme Court has considered these same statistics and explained that they "say nothing about charges brought against *similarly situated defendants*." *Bass*, 536 U.S. at 864 (emphasis in original). Accordingly, they do not establish a constitutional violation. *Id.* And Barnette has "presented no specific evidence of purposeful discrimination either against himself or against those southern and minority defendants upon whom he purports to base his claim." *Sampson*, 487 F.3d at 26; *accord United States v. Lawrence*, 735 F.3d 385, 439 (6th Cir. 2013).

111

**G.    Barnette's challenge to the manner that his death sentence would be carried out is misplaced.**

Barnette's contention that "the manner of carrying out his execution would violate the Eighth Amendment" is misplaced.  Mot. 101–02; Barnette Br. 105–06.  Barnette concedes that this contention is not ripe.  Mot. 102; *see also  Jackson*, 638 F. Supp. 2d at 615.  And, in any event, as Barnette acknowledges, Mot. 102, "[a] motion pursuant to § 2255 is not the appropriate procedural mechanism for placing this issue before a court."  *Jackson*, 638 F. Supp. 2d at 615.

**H.    Barnette is not entitled to relief based on the "cumulative effect of errors."**

Barnette's contention that he is entitled to relief from his death sentence due to "cumulative error or prejudice," Mot. 102–03, is meritless.  Barnette has failed to establish any "instance in which [his] rights have been violated. 'It necessarily follows that the cumulative error doctrine finds no foothold in this case.'"  *Jackson*, 638 F. Supp. 2d at 617 (quoting *United States v. Sampson*, 486 F.3d 13, 51 (1st Cir. 2007)).

**CONCLUSION**

Barnette's motion and the files and records of the case conclusively show that Barnette is entitled to no relief.  Accordingly, the United States respectfully requests that this Court deny Barnette's motion without an evidentiary hearing.

112

RESPECTFULLY SUBMITTED, this 23rd day of September, 2015.

JILL WESTMORELAND ROSE
ACTING UNITED STATES ATTORNEY

/s/Anthony J. Enright
Assistant United States Attorney
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
(704) 344-6222 (phone)
(704) 344-6629 (fax)
anthony.enright@usdoj.gov

113

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of September, 2015, I caused to be served a copy of the foregoing response to be served on counsel for Barnette via electronic case filing.

s/ANTHONY J. ENRIGHT
Assistant United States Attorney

114