the questions that any of us ask you this morning, none of us are trying to challenge your opinions about anything. We just simply want to find out what they are in the context of this sentencing hearing that we're about to begin. So all we want is your honest answers and we're not trying to debate you or anything like that or make you change your mind about anything.

A.    Okay.

Q.    As a starting point in this case, this jury that would hear the sentencing must be able to accept without reservation verdicts of a prior jury as to the defendant's guilt. You won't hear any evidence about guilt, or at least we won't have a burden of proof as to guilt. Would you be able to do that, accept the prior jury's verdict without reservation?

A.    Yes.

Q.    Okay. Now, do you understand that after a person is found guilty of crimes for which the death penalty or life imprisonment are both possible punishments, that nothing automatic happens. That there's a sentencing hearing, which is what we're doing here. Do you understand that?

A.    Yes.

Q.    You don't automatically get life; you don't automatically get death. And our burden of proof in this case is proof of aggravating factors that we contend exist and that we contend call for the imposition of the death penalty. Do you

understand that's our burden of proof in this case?

A.    Uh-huh, yes.

Q.    And did you understand the defense, if they chose to put on evidence, their burden of proof as to mitigating factors that they will contend call for the imposition of life imprisonment without the possibility of release. Do you understand they have a lesser burden of proof?

A.    (Affirmative nod.)

Q.    We have a burden of proof of proof beyond a reasonable doubt, and unanimously. Their burden of proof is by a preponderance of the evidence, and any one or more jurors can find a mitigating factor in order for that juror to consider it. Okay?

A.    Yes.

Q.    Do you understand that?

A.    Yes.

Q.    All right. Based on -- after that, I'm sure you remember from the judge's instructions, that there's a weighing process that the jury would go through which would help the jury to decide on the sentence in the case. Either a death penalty or life without the possibility of release. Is that a process that you believe that you can take part in?

A.    Yes.

Q.    Okay. And not having heard any evidence yet as to aggravating or mitigating factors, would you say that at this

point you have an open mind about both of those as possible punishments?

A.    Yeah, I have an open mind, yeah.

Q.    Okay.  Now, in your questionnaire, you left some of it blank.  How long have you lived in Charlotte?

A.    Since '82.

Q.    Since '82.  And what do you do?

A.    I work for Continental.  Continental Tire.

Q.    Continental Tire.  What do you do for them?

A.    I'm a trucker.  I bring the material to the tire builders.

Q.    Are you a long distance or a short distance?

A.    No, it's not outside the plant.  It's a trucker inside the plant.

Q.    Okay.  That's a job inside the plant?

A.    Yes.

Q.    What do you do?

A.    Bring materials to the tire builders.

Q.    So although it sounds like you drive a truck, you --

A.    It's like a forklift.  We just drive a truck.

Q.    All right.  Now, does your work know that you've been called for jury service?

A.    No.

Q.    So where did you tell them you were today?

A.    Oh, I got to go -- I work at night.

Q. All right. Would you think that you would continue working at night during this trial or would you tell them that you had jury service and that you were basically working all day?

A. It depends how I feel.

Q. Do you have a Monday through Friday schedule?

A. No. I work 12 hours off -- you know, work two days, off three; work three days, off two.

Q. Okay. Given that, and that you would have to come in here during what we would call regular work hours or approximately nine to five --

A. Uh-huh.

Q. -- every day, would you be able to come in here and pay attention while you were in here and listen to all the evidence and not be thinking about the job or tired from working overnight?

A. I'd try my best.

Q. Okay. So that's not going to be -- job is not an issue, then, for you, I take it.

A. No.

Q. I'm going to go through your questionnaire a little bit. See what pops up as to questions I want to ask you. Do you know anybody that's ever been to court for any kind of domestic violence?

A. No.

Q.    Or anybody who's been the victim of domestic violence?

A.    No.

Q.    Have you heard anything about this case?

A.    No.

Q.    Now, you put that there was a question here in the questionnaire about our burden of proof, proof beyond a reasonable doubt.  And you've noted that you thought that was -- that made it too hard on the prosecution.

Would you be able to follow the law that proof beyond a reasonable doubt is the burden of proof that we have and follow the law as the court would give it to you about holding us to that burden of proof?

A.    Yeah.

Q.    Okay.  And you don't think that's too hard on us or --

A.    No.

Q.    -- you wouldn't make it any easier on us than it is. It's a high burden of proof, proof beyond a reasonable doubt. But you'd be able to follow the law as to that?

A.    Yeah.

Q.    Now, just since this is a case in which both life imprisonment and the death penalty are possible punishments, tell us what your philosophy is about the death penalty in general.

A.    I got to hear all the facts.

Q.    Okay.  And obviously, I'm not asking you to preview what

you would do in this particular case. You haven't heard any evidence yet. But just in terms of your life philosophy or how you feel about it in general, not specifically to the facts of this case, but what is your opinion about the death penalty?

A. I really don't know.

Q. Okay. I mean, it's hard.

A. Yeah.

Q. You know, you come in here and sit and we're all staring at you and, you know, throwing questions at you. Is it something that you hadn't really thought a whole lot about until you started filling out the questionnaire?

A. Yeah, I haven't really thought about it.

Q. Yeah. Not -- now that you know that's going to be part of your consideration here, are you open to the possibility that either the death penalty or life imprisonment without release are possible punishments that you can consider within your life philosophy?

A. Yes.

Q. Okay. Have you followed cases in your life that -- where the death penalty was a possible punishment?

A. Not really.

Q. Okay. Just something that until we've put you on the spot about it, you --

A. Yeah.

Q. -- started thinking about it.

You filled out the questionnaire and it asked what is your personal view of the death penalty, and you said not very strong. Have you given some additional thoughts since filling this questionnaire out knowing that you were going to be coming back in to talk to us?

A. Yeah.

Q. What kinds of thoughts have you had since that time?

A. Somebody life on the line.

Q. Uh-huh.

A. That's all. You know. Life in prison or death.

Q. Pardon me?

A. Life in prison or death.

Q. Right. And again, just to -- because those are -- the certainty here is that one of those two forms of punishment will be handed down in this case. And so I think all we need to know from this -- at this moment is that your personal beliefs about either one don't prevent you or substantially impair you in your ability to consider both forms of punishment.

So it sounds like you are not prevented based on your philosophy about the death penalty from considering it.

A. Yeah.

Q. Now, would you be able to -- in the questionnaire you said you didn't feel -- did not have strong feelings or you

didn't support it very strongly at all. What's that based on?

A. What is that based on?

Q. What made you check that mark on the questionnaire?

A. I don't know.

Q. Okay. Did that just come from you don't have strong feelings one way or the other?

A. Yes.

Q. Okay. And so your uncertainty is not really based on thinking pro and con; it's just based on the fact that you hadn't really been confronted with this issue yet.

A. Yes.

Q. Okay. You did note that -- there was a question that said if you oppose the death penalty, would you say that you could not support it in any case or you might sometimes support it in the most horrible case. Does that sum up your point of view?

A. Yes, sometime, yeah.

Q. Okay. It's obviously an important issue for both sides, but at the end of this case, after we've presented all of our evidence, we're going to stand up in front of this jury and ask this jury to impose the death penalty. So it's important to us that all the jurors can at least consider it as a possible form of punishment. So would you put yourself in that category?

A.    Yes.

Q.    Okay.  Even though it's not a strongly held or a long held belief.  Is that fair to say?

A.    Yes.

Q.    Now, based on the facts as the court has -- the court gave you a factual overview of the basis for the guilty verdicts.

A.    Uh-huh.

Q.    Have you made up your mind one way or the other at this point having not heard any of the evidence as to aggravating and mitigating factors?  Would you say that you have not made up your mind at this point?

A.    I haven't.

Q.    Okay.  Because you haven't heard any evidence in the case.

A.    Yes.

Q.    Now, have you ever been -- you've never been on a jury before, correct?

A.    No.

Q.    How do you feel about group decision making?  Is that something that you're comfortable with?

A.    Yeah.

Q.    Have you ever had any experience at work or otherwise where --

A.    Have to vote on something?

Q. Right.

A. Yeah.

Q. Okay. Would you consider yourself to be the kind of guy who can have your opinion and talk to others about their opinions about things and listen openly to others and have others listen to you?

A. I'm kind of quiet.

Q. Yeah.

A. You know, well, I listen.

Q. Okay. You're a good listener. And so I take it you would be able to listen to other people's opinions.

A. Yes.

Q. Do you feel comfortable expressing your opinion in a group?

A. Yeah.

Q. Okay. From TV and otherwise, you know what a jury process is like --

A. Uh-huh.

Q. -- in general. Do you think that you would be comfortable in a group setting like that? This is a -- this is the most serious kinds of -- kind of decision that a person can make. Is that something that you think you can do?

A. Maybe, yeah.

Q. Do you feel a little bit uncomfortable about that?

A. Yeah.

193 A

Q. Why is that?

A. Because I don't want, you know, to sentence nobody to death, really.

Q. Why is that?

A. I don't want to, you know, sentence nobody to death.

Q. You don't want to do that.

A. Not really.

Q. Now, if the government proves beyond a reasonable doubt what its burden of proof is and -- and the defense, if it chose to put on evidence, put on evidence of mitigating factors, would your belief system allow you, if the facts and the law led you to a death penalty, would your belief system allow you to vote for death?

MR. BENDER: Objection, Your Honor.

THE COURT: Overruled.

A. Yeah.

Q. It's just the seriousness of it --

A. Yes.

Q. -- causes you some concern.

A. Uh-huh.

Q. But you would not be prevented from doing that.

A. No.

Q. All right. So it sounds like you're understanding the serious nature of what we're doing here.

A. Uh-huh.

193 B

Q. And that's what's causing you concern more than not being able to do it. It's really simply not wanting to do it.

A. Yes.

Q. But if the law takes you there, the facts take you there, would you be able to?

A. Yes.

Q. And you're hesitating. Tell me why you're hesitating in answering that.

A. I've never done it before.

Q. Right. Okay. And I know we're putting you on the spot, but -- so your belief system would allow you to participate in this process; is that right?

A. Yes.

MS. TOMPKINS: All right. Thank you. I appreciate your answers to my questions.

MR. BENDER: Thank you, Your Honor.

VOIR DIRE EXAMINATION

BY MR. BENDER:

Q. Good morning, Mr. Blakeney.

A. How you doing?

Q. All right. Mr. Blakeney, were you born and raised in Charlotte?

A. I was born in Charlotte; was raised in Maryland.

Q. In Maryland? And then you came back to Charlotte when?

A. In '82 after I graduated.

Q. After you graduated high school?

A. Yeah.

Q. Up in Maryland.

A. Yes.

Q. Tell me a little bit about your family situation in Maryland.

A. My father had his own business and he got tired of it and moved back south. Too fast, you know.

Q. What kind of business did he have up in Maryland?

A. He had his own trash service.

Q. Trash service?

A. Yeah, trash company.

Q. And as you were growing up, did you help him in that business?

A. Yes.

Q. After school and on weekends, that sort of stuff?

A. Weekends, yes.

Q. And how many brothers and sisters do you have?

A. I have two sisters and a half brother.

Q. What -- did your mom work outside the home, your mother work outside the home?

A. Yes.

Q. What kind of work did she do?

A. Beautician and a nurse.

Q. And your sisters and your -- the half brother you told

me?

A.    Uh-huh.

Q.    Anyway, what do they do?

A.    My sister work for the United States Department in D.C. My sister work for -- other sister work for Family Dollar Warehouse.  And my brother drive a truck for Yellow Freight.

Q.    Okay.  Now, other than the one that lives in D.C., are all of them back here now?

A.    Yes, except the one in DC, yeah.

Q.    And is your father still alive?

A.    No.

Q.    And when did he pass away?

A.    '89.

Q.    Natural causes?

A.    He was shot back in D.C.  They have a -- he only had one lung and he died of pneumonia.

Q.    And that was as a result of being shot?

A.    Yes.

Q.    So he was back here, and was it some sort of robbery?

A.    No, he was in D.C. when he got shot.

Q.    Okay.  Tell me the circumstances about that as you know them to be.

A.    I really don't know what happened.  I was young.

Q.    Okay.

A.    Because I was here at my grandparents' house.

Q.   You were living here with your grandparents?

A.   For the summer.

Q.   Anybody ever caught and prosecuted for the shooting?

A.   I really don't know.

Q.   Okay.  And was your mother down here at that time?

A.   No, she was there.

Q.   She was up there --

A.   Yeah.

Q.   -- in D.C. --

A.   Yes.

Q.   -- as well.

     Did you continue to live down here with your grandparents?

A.   No.  We went back up there.

Q.   But in 199 -- 82 -- '82 or '92 that you came back here?

A.   '82.

Q.   '82.  And you lived -- were you married at that time?

A.   No.

Q.   Okay.  Who did you live with when you came back in '82?

A.   My father and mother moved back.

Q.   So your father was just visiting in D.C. when he got killed, when he got shot?

A.   No.  He was living there.  We was living in D.C.

Q.   All right.  I'm sorry, I'm confused and I'm confusing you and I don't mean to.  Okay.  Tell me what your -- you

indicated, I believe, that your wife worked outside the home.

A. Yes.

Q. What type of job does she do?

A. She secretary for a dentist.

Q. And how long has she had that job?

A. Two years. Something like that.

Q. Tell me a little bit about being a trucker with Continental Tire. What do you do? You say it's a forklift?

A. Bring the material to the tire builders.

Q. Is that the raw rubber?

A. Rubber. Bring like the metal in the tires, stuff like that.

Q. Okay. And you work twelve hours on for two days and then three days off?

A. Yes.

Q. What's that schedule?

A. Twelve hours -- work two days, then I be off for two days; then I go back work for three days, be off three days.

Q. How long has General -- excuse me, Continental been back at work? Y'all were off for --

A. Yeah, we were on strike for a year. We been back for what, about three years.

Q. Okay. Have you been able to make up all the time lost in terms of financially?

A. Yes.

Q. Okay. Anything going on at Continental Tire with regard to the union contract that's going to happen in the next little bit that concerns you or not?

A. No.

Q. What do you do with your time off?

A. Take my kids, you know, football practice, work out, walk the dog.

Q. Play a little sports?

A. Yes. Play basketball.

Q. What's your time? When do you go in -- when do you go in to work?

A. Seven to seven.

Q. Seven to seven?

A. Yes.

Q. And you don't think that's going to create any hardship or problem?

A. Sometime I might be sleepy, but I can stay awake.

Q. Okay. Mr. Blakeney, are you any kin to a Charlotte police officer named Larry Blakeney?

A. I'm not sure.

Q. If you are, you don't --

A. I'm not...

Q. It's not somebody you spend any time with --

A. Huh-uh.

Q. -- talk with about his job.

Now, you indicated on here, it might just be the nature of the question. The question said, in general law enforcement officers are very much more likely than other people to tell the truth when testifying in trial if they're called as a witness in a trial. And you said you agree with that, and that is that a police officer by virtue of who they are and their position are more likely to tell the truth than any other witness.

A. Yeah.

Q. Okay. Is there some reason why you agree with that?

A. They should tell the truth, you know, law officers.

Q. The judge, I think, Mr. Blakeney, will explain to you during the jury selection process that every witness who comes in here, okay, is supposed to tell the truth.

A. Yeah.

Q. And that you take your belief system, whatever it might be, and apply it and tell whether somebody is telling you the truth or not. Okay?

A. Uh-huh.

Q. Do you think you can do that?

A. Yeah.

Q. Okay. I mean, if some witness comes in here who is not a police officer and tells you one thing and you say, yeah, I believe that. That sounds -- sounds like everything else.

A. Can use -- I guess use your own judgment.

Q. You've got to use your own judgment.

A. Yes.

Q. That's a good way to put it. Exactly. And in doing that, you can't give more weight or more believability automatically --

A. Uh-huh.

Q. -- to somebody simply because they're a police officer or whatever. Okay?

A. Uh-huh.

Q. And if you don't believe a police officer, you have every right as a juror to discard his testimony. Okay?

A. Right.

Q. You don't automatically have to accept it as being true simply because he's a police officer.

A. Yeah.

Q. Could you do that?

A. Yes.

Q. And you have -- as a juror, you come in here with all sorts of background. Okay. Your education, the way you were raised, your religion, whatever it is. You are an individual juror. You've walked in your own shoes --

A. Yes.

Q. -- for all these years. And you don't leave that outside the door. What you do is you use all of that, along with the other members of the jury, to come up with a decision,

whatever that might be. Do you understand that?

A. Uh-huh.

Q. Now, you have the right to be -- to have your decision honored by other members of the jury.

A. Yeah.

Q. Right?

A. Uh-huh.

Q. And by the same token, you need to honor the other people's decisions. All right?

A. Uh-huh.

Q. Okay. So they have to honor and respect your opinion and belief --

A. Uh-huh.

Q. -- because you are who you are. And you have to honor and respect their --

A. Yeah.

Q. -- beliefs and opinions.

A. Yes.

Q. Do you think you would be able to do that process, go through that --

A. Yes.

Q. -- with other jurors?

A. Uh-huh.

Q. Okay. And you have to be satisfied beyond a reasonable doubt. That's a very high burden --

A. Yeah.

Q. -- under the law.

And if you're not so satisfied beyond a reasonable doubt of any aggravating circumstance, then the appropriate punishment will be life imprisonment without the possibility of release. Okay?

A. Yeah.

Q. And if that's your belief, you have every right to stick to it. Okay?

A. Right.

Q. Would you be able to do that?

A. Yes.

Q. And you have not -- I don't believe you've ever served on a jury before.

A. No.

Q. Okay. One of the indications here, and maybe you've already answered it, was that you think the burden beyond a reasonable doubt is a little too high, too hard on the prosecutors. Maybe you didn't understand that question when you answered it.

A. Yeah.

Q. The law is they must satisfy --

A. Yeah.

Q. -- you beyond a reasonable doubt. Okay?

A. Yes.

Q. And if they don't, then they haven't met their burden or their requirements.

A. Uh-huh.

Q. All right. So we can't have jurors who have their own views of that. We have to have people who will make sure that the prosecution meets that burden. And if they don't, then they have to say life imprisonment without the possibility of release. Could you do that?

A. Yes.

Q. Would you make sure inside yourself that the prosecution has to meet this high burden; I'm not going to be satisfied with anything less?

A. Yeah.

Q. Is it -- you indicated here, I am uncertain how I feel about the death penalty on the questionnaire.

A. Uh-huh.

Q. Is that the way you are right now as you sit here?

A. Yes.

MR. BENDER: Mr. Blakeney, we appreciate your honest answers and your help in this process. Thank you very much.

THE COURT: Mr. Blakeney, the clerk will have a sheet of paper for you. It gives you a number to call. So we would appreciate it if you would follow the instructions on that notice.

PROSPECTIVE JUROR: Okay.

THE COURT: 121.

(Carla Bryson enters the courtroom.)

THE COURT: Good afternoon.

PROSPECTIVE JUROR: Good afternoon.

THE COURT: I believe you are Ms. Bryson.

PROSPECTIVE JUROR: Yes, I am.

THE COURT: Looking over your questionnaire I had something I wanted to ask you about, and that would be you are a teacher, I believe.

PROSPECTIVE JUROR: I am.

THE COURT: And would you tell us a little bit about that?

PROSPECTIVE JUROR: Yes. The upcoming year will be my fourth year teaching. I teach seventh grade language arts in middle school in Gaston County.

THE COURT: I take it your school year starts sometime in August.

PROSPECTIVE JUROR: That's correct.

THE COURT: You would be expected to report earlier for teacher work days.

PROSPECTIVE JUROR: Yes. I am to begin -- I am to report, I believe, July 30th.

THE COURT: July 30th. That's a pretty short fuse, isn't okay it?

PROSPECTIVE JUROR: It is.

THE COURT: I happen to be from Gaston County but I didn't realize that their school year started that early.

PROSPECTIVE JUROR: Teachers begin on the 30th, and school itself, the students won't return until August 12th.

THE COURT: Okay. Okay. Now, you didn't specifically request to be excused on the grounds of a hardship but we do want to evaluate with you what kind of concerns you might have if you were serving on this jury from, say, Monday week, which would be the 29th of July, on into the third week in August. What kind of concerns would you have for the welfare of the students and that sort of thing?

PROSPECTIVE JUROR: I wouldn't really be concerned. What I would do, I would have to, of course, do is compose lesson plans for them. But I feel confident that when I get there that we will be ready to begin the curriculum. The first three weeks -- in the teaching profession we call it the honeymoon phase where you're getting to know the students and students are getting to know you, so it's not that they are really missing much of the curriculum.

THE COURT: Okay. Very well. The government may inquire.

CARLA BRYSON

VOIR DIRE EXAMINATION

BY MS. ROSE

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 24 of 192

**206**

Q    Thank you for your willingness to serve, for the time you have been waiting and for filling out this questionnaire. It's been really helpful.

As the judge has told you, another jury found the defendant guilty. I noted from your questionnaire that you felt that it would be difficult to accept the prior jury's verdict of guilt without your having heard anything?

A    I'm sorry, please repeat that. Or could you read the question verbatim. I may have marked incorrectly.

Q    And there were a lot of questions here, and in that you teach language arts, you probably will reprimand us on some of our wording that was poor.

This says, "Knowing that another jury has returned verdicts of guilty in this case, can you accept those guilty verdicts without reservation?" And you checked no. It may have been inadvertent, that your opinion may have changed since you heard what the Court said. Tell us your thoughts.

A    When I filled that question out I believe my -- what I was under the impression is that they have found him guilty, and that I guess I'm assuming I was going to be on the jury which would decide whether or not he was guilty or innocent. So I think when I answered that question what I was thinking was they had found him guilty, would you have a problem or I mean, would you automatically assume that he's guilty because they found him guilty. I think that's the way I

understood that question, not knowing that I would be considered only for the sentencing phase.

Q    And part of your job as a sentencing juror would be to accept that he is guilty.

A    Right.

Q    Without reservation and without requiring the government to put on any evidence concerning his guilt.

A    Okay.

Q    That's kind of the position where you are now.  What are your thoughts about that?

A    No, I have no problems with accepting the guilty verdict.

Q    Very good.  You haven't heard anything about this case at all, as I understand it?

A    No, I haven't.

Q    Your father was in law enforcement?

A    And still is.

Q    Is he in Gaston County?

A    Yes, he is.  He's in Gaston County.

Q    What is his particular position?

A    He is a deputy sheriff part-time.  He works at the courthouse.  I really don't know the specifics.  I have been there once or twice and seen him at the door checking purses.

THE COURT:  Is his name Bryson?

PROSPECTIVE JUROR: No, it's not.

THE COURT: Tell us his name.

PROSPECTIVE JUROR: He's Willie Jeeter (ph).

THE COURT: Okay. Thank you.

BY MS. ROSE

Q    Anything about your father being in law enforcement that would affect your ability to fairly evaluate all the witnesses' testimony, whether they are a civilian or a law enforcement officer?

A    No.

Q    I understand -- we had a question on there that said would you agree that in general law enforcement officers are more likely than others to tell the truth and you said, "I somewhat agree."

A    I do. I somewhat agree that law enforcement officials are more inclined -- are more predisposed to be honest. It's because of my dealings with my father and I feel like he's an honest individual, therefore, I assume that other people may be honest as well.

Q    If the Court were to instruct you that as a member of the jury, that you should take the testimony that you hear from any witness, whether they are an expert witness, a lay witness or a law enforcement witness, and to evaluate that based upon whether it's their credentials, their training, their experience, and evaluate it within -- when weighed

against the other evidence, their demeanor, to determine their credibility. Could you do that?

A    Yes.

Q    Did your father ever work in a investigative capacity?

A    Yes, he did.

Q    You said he's part-time. Has he kind of semi-retired and is now taking a lighter duty?

A    He retired from the county police where he did serve as a detective, and not really ready to retire and still somewhat young, he decided he would go back into law enforcement as part-time. He's still retired but he does have a little part-time job that doesn't mess with his retirement.

Q    Back when he was working kind of in a more reactive role, did he talk to you about the cases or investigations in which he was involved?

A    No.

Q    What kind of detective was he? I don't know how it works in Gastonia.

A    I think -- like I didn't really ask him this question -- I think he was a criminal detective, in that as much as I know, he worked things like break-ins and -- that's pretty much all I can remember. Maybe something about a break-in or something.

Q    Describe for us your personal view of the death

penalty. And I know what you wrote here, I'm not ignoring your questionnaire. But you have had some time to reflect upon the questionnaire and some of the issues that were raised by it, and so if you would, talk to us about that a little bit, please?

A    I can't really say. And my points I guess hasn't really changed. I can't say I'm really for the death penalty or totally against it. I really haven't formed any serious hard core judgment on that.

Q    And, of course, this -- you said you don't have any religious, moral, social or political beliefs that would help you form, I guess, your nonopinion basically --

A    Right.

Q    -- where you are now. But is there anything about your background, whether it's your -- you know, the way you were brought up, personal experiences, whether you were taught religious teachings that affected where you fall out on this whole issue?

A    No, I can't say my background has had anything to do with it. I guess for the most part I fell like I've kind of been a straggler. Sometimes I'm for; sometimes I'm against. It's really nothing I've ever considered, you know, am I for it or am I against it.

Q    Now, the way it works here in a sentencing hearing is this: The government would put on evidence of aggravating

factors. And an aggravating factor is a factor that would tend to support the imposition of the death penalty. The defense does not have to put on evidence, but if they choose to put open evidence, they can put on evidence of a mitigating factor or a factor which intends to support the imposition of life imprisonment without release. The judge would give you the law. And it would be your job to evaluate that evidence, evaluate the aggravating and mitigating, and to weigh them and to work through that process until you were able to render a verdict.

Knowing that little bit about the process, as you sit here today, could you render either of those verdicts?

A   Yes, I can.

Q   I'm not being critical when I say your nonopinion. As you said you don't go either way, you almost don't have an opinion on the death penalty. Would it be fair to say that you would approach it based upon the facts, the evidence and the law?

A   That would be the only way I could approach it. Like I said, I have no opinion one way or the other. The only way I could come to a conclusion or some type of -- yeah, the only way I could come to a conclusion would be based on the evidence and instructions.

Q   Is there anything that would prevent you from rendering either of those verdicts? That would prohibit you from

being able to go either way?

A    No.

Q    I guess the important thing is the Court will instruct you to wait until you have heard all the evidence before you made up your mind, of course, with the evidence and the law, and that together with the other jurors to work through that process, and would you feel comfortable doing that?

A    Yes.

Q    You know at some point after hearing all of the evidence and hearing the law you are going to have to make a decision and you're going to have to be certain about where you fall out.  Are you going to be able to get there?

A    I feel so, yes.

MS. ROSE:  Thank you.

PROSPECTIVE JUROR:  You're welcome.

MR. BENDER:  Thank you, Your Honor.

VOIR DIRE EXAMINATION

BY MR. BENDER

Q    Good afternoon.  Jean Lawson and I represent Marc. We're assisted by Debra Miller.  You've heard this before.

Ms. Bryson, I appreciate all your help in filling this out, listening to your comments here.  There are no right or wrong answers.  Any answer you give us that's heartfelt is the right answer and that's all we're looking for.  Nobody is going to get upset with you about your opinions.  We're

not going to try to change it, we just want to know who you are.

Tell me a little bit about your sister and her work with mentally disabled people.

A    My sister is employed at Pathways.  I don't know if it's the same in Mecklenburg County as it is in Gaston County.

I don't really know much about what she does.  What I do know is that I don't think that she works with anyone that is profound.  I think what she does is she assists them in being integrated into the community.  I know that she also takes them to doctors' appointments, makes sure they receive their medicines on time, things of that nature.

Q    Have you ever visited with her while -- at her work?

A    Yes, I have.

Q    And I'm not familiar with that orientation.  Are there psychiatrists or psychologists there at that facility?

A    I have no idea.

Q    And I notice that your mother was a teacher.

A    Uh-huh.

Q    Is she retired now?

A    No, she's not.

Q    Do you all happen to teach at the same school?

A    No, we do not.  She teaches elementary and I do middle school.

Q    Why did you decide to be a teacher?  What was it about that profession?

A    I will be totally honest, when I went to school I went into school under the intention that I really wanted to become a lawyer.  I really did.  And I went to a large university.

The first class I took that I thought was going to propel me into the law field was political science.  There were probably 300 students and I flunked political science. And I said that's probably not the way for me.  (Laughter) So I changed my major to English and I graduated with a degree in English.  Had absolutely nothing to do with it. Nowhere to do.  My mama said, "Well, you're sitting there with a degree that I've paid all this money for.  Why don't you do something with it?"  I said, "Well, okay, perhaps." I just decided that I'd go back and I got my certification in teaching.  And I've enjoyed it since I've done it.  It's just that I didn't go off to college with that intent.

Q    You're probably glad you're teaching English rather than being a lawyer.

A    I think so.

Q    When you say a large university, I notice that you spent sometime in Charleston.

A    Uh-huh.

Q    Was it Charleston Southern or --

A     Yes.  When my husband graduated from college and we married, we moved to Charleston.  He had a job working for the federal government.  And I decided -- that's when I began my work towards certification and a master's program there.

Q     And where was the large university?

A     UNC Chapel Hill.

Q     I think most of us would congratulate you on that choice.

You mentioned your husband working with the federal government.  Is he still working with the federal government?

A     No, he's not.

Q     What was he doing at that point?

A     He was an electrical engineer for the Department of Defense.

Q     You have two brothers.  What do they do?

A     My older brother works for Lowe's Home Improvement, and my youngest brother owns a skating rink.

Q     Everybody is still living in Gaston County?

A     Yes.

Q     Ms. Bryson, I guess this is your only time for jury service?

A     It is.

Q     When you come in to jury service like this you bring

with you, and you don't leave outside the door -- but you bring with you all your life experiences, life experience attitudes, whether it's based on religion, your family upbringing, your education, your job experience, whatever it may be. And as such it's sometimes been described as you walk in your own shoes. You're your own person. And you make weighing decisions and decisions based on all of that. Do you understand that?

A    Uh-huh.

Q    Okay. And as a juror you have the right with other jurors to honor your decisions and the way in which you arrive at those. Will you insist on that with other jurors?

A    Will I insist that they honor my decision?

Q    Right. And the way in which you arrive at your decision.

A    Absolutely. It's a respect then. I have to respect how they have arrived at their decisions. They must, in turn, respect the way I've arrived at mine.

Q    Okay. And I was going to turn that around but you turned it around for me. That everybody has to respect each other in the way in which they arrive at their decision because everybody is different. If we weren't, we'd only need one juror and this process would have ended a long time ago.

So if you have a -- one of the things that you're going

to have to decide is whether you have been satisfied beyond a reasonable doubt, the highest in the law, of certain aggravating circumstances. Aggravating circumstances are things that make this offense in this case more deserving of the death penalty. And you have to decide beyond a reasonable doubt whether that's been proven. If it has not, then the appropriate burden is life in prison without the possibility of release. So if you have that doubt, if you're not convinced beyond a reasonable doubt, will you stick with that decision?

A    When you say that decision, which decision?

Q    If that decision -- and I'm not trying to put words in your mouth or make you decide one way or the, that's not proper -- but I'm giving you an example, if you're not satisfied beyond a reasonable doubt that any aggravating circumstance has been proven beyond a reasonable doubt, the decision should be -- the appropriate decision is life without the possibility of release. In other words, don't just -- don't agree to get along.

A    Right.

Q    You stick by your own decision in the decision-making process.

A    (Nods head)

Q    While we're talking about decisions and decision-making process, can you think of anything in your life experience

where you had to make a particularly difficult decision? You don't have to tell me what it is, but if you can, if you have one, sort of focus on it.

A    Okay.

Q    Okay. Whatever that decision was you resolved it, you decided one way or another.

A    Uh-huh.

Q    How did you come to make that decision in that very difficult circumstance?

A    The decision in particular -- well, not in particular -- that I am thinking of, the way that I came to the decision that I did is I kind of had to weigh options; I had to weigh the pros. I had to weigh the cons.

     In this particular situation, when the pros far outweigh the cons, then that was the decision I made based on the outcome.

Q    Okay. Okay. And how did you feel afterwards?

A    It was a good decision.

Q    Yeah.

A    I'm satisfied with it.

Q    No regrets about it?

A    No, none.

Q    One of your brothers had some problem with the law involving worthless checks and that sort of stuff.

A    Uh-huh.

Q    How did your father deal with that?

A    My father was very upset, to say the least. And my father is at the point now where he's helping him to work through it and to get everything cleared up so he's back on the right track.

Q    Other than it being a financial situation, was there anything else you think that led your brother to sort of stray a little bit off the straight and narrow?

A    No. Strictly financial. Okay.

Q    Have you ever had any experience familywise, friend or maybe in your college or university experience with domestic abuse?

A    No.

Q    Any of your children that you teach, your students, ever come to you and said, "Ms. Bryson, the reason I don't have my homework is because my parents were arguing last night."

A    No.

Q    Anything along that --

A    No.

Q    The reason we ask is you may hear some testimony about domestic abuse and its affects on children. You didn't study any of that when you were at Chapel Hill?

A    Not that I recall, no.

Q    Your feeling about the death penalty is sort of, "I'm

really unsure."

A    That's because I am too.

Q    No, I'm trying to ask you, you are unsure, right?

A    That's correct.

Q    All right.  These are two very severe punishments, life imprisonment without the possibility of release which means that Marc dies in prison.  You have to think about this every day of your life.  And death you obviously know is a very severe punishment.

Anything about either one of those that will prevent you from considering, as you sit here right now, either one of those possible options?

A    I kind of got lost in the question there but your question, I think, was is there anything that would prevent me from --

Q    From being on a level playing field.

A    No.

Q    Let's just put it that way.  You're not leaning one way or the other?

A    No.

Q    Do you have an opinion or belief about someone in a prison having an useful life or value their life, spending a life in prison without the possibility of release?

A    I'm sorry, could you rephrase that?

Q    You have a belief or an opinion that someone who is

incarcerated for the rest of his life can have some useful life in that environment?

A   Yes.

Q   Okay.  Have you ever known anybody who has started out on the wrong path but yet has been able to change their life and come back to the right path?

A   I can't say I have known anyone personally.  I do attend church and I have been in church where I have heard of people who have done that but I don't know them personally.

MR. BENDER:  May I have a moment?

THE COURT:  Yes.

MR. BENDER:  Ms. Bryson, thank you for your honest answers and all your help in helping us with this decision. Thank you.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  Thank you, Ms. Bryson.  The clerk will have a notice for you that is a piece of paper that gives you a phone number we'd like to you call and tells you about when you can call so we can get back in touch with you.

PROSPECTIVE JUROR:  Okay.

(Ms. Bryson exits the courtroom.)

(Recess taken.)

THE COURT:  We need 119, please.

(Gary Silverstein enters the courtroom.)

THE COURT: Is your name Gary Silverstein.

PROSPECTIVE JUROR: Yes.

THE COURT: The parties will have some questions for you. The government may inquire.

MS. TOMPKINS: Thank you, Your Honor.

GARY SILVERSTEIN

VOIR DIRE EXAMINATION

BY MS. TOMPKINS

Q    Mr. Silverstein, I'm Anne Tompkins, this is Jill Rose and we represent the United States in this case.

We're going to ask you some questions now based on the answers you gave in your questionnaire and focused towards the context of this sentencing hearing. As you know, ad nauseam by now, this is a case that involves the death penalty and life without the possibility of release that are the two possible punishments. The questions I'm going to ask you are not meant to embarrass you or put you on the spot or challenge your opinions about anything. They are just simply to find out information that's relevant for us as we search for a jury in this case.

As a starting point for this hearing, you and the rest of the jury would have to accept without reservation the verdicts rendered by a prior jury in the guilt phase of this case. Would you be able to do that?

A    Yes.

about a two-hour period but I --

THE COURT: Could it be Judge Mullen who also has white hair?

PROSPECTIVE JUROR: Unfortunately, I can't remember.

THE COURT: Okay. In any event, is there anything about that involvement, even though it be in this court, that in your opinion now would affect your ability to be fair and impartial in dealing with the case that would be before you?

PROSPECTIVE JUROR: I wouldn't think so.

THE COURT: Okay. Well, the attorneys may want to ask you some more about that in a minute.

You indicate, if I'm not wrong about it, that you supported the death penalty but would never vote to impose it. I'm not sure if I have that right, but in any event, do you have any hard and fast view about the death penalty?

PROSPECTIVE JUROR: I don't think that's the right interpretation, at least if I was answering questions the way I intended.

THE COURT: Right. And the questions are confusing, I think that's fair to say. So we'll let the government inquire and go on from that.

MS. TOMPKINS: Thank you, Your Honor.

JAMES DONALDSON

## VOIR DIRE EXAMINATION

BY MS. TOMPKINS

Q    Mr. Donaldson, I'm Anne Tompkins.  This is Jill Rose. We represent the United States in this case.  I'm going to ask you some questions that come from your questionnaire that we appreciate you filling out.

It's obviously in the context of this sentencing hearing in which there are two possible punishments, life without release and the death penalty.  So a lot of my questions are going to focus on those issues since that is really the context of this hearing.

None of questions I ask or anybody asks are meant to challenge you or change your opinion about anything.  Just trying to figure out who you are in the context of this sentencing hearing.

A    Okay.

Q    And there were some confusing questions, and I think I'm clear about where you stand, but I'll work through those as we get to them.  Tell me what you do as Core Properties?

A    I'm the CFO, chief financial officer.

Q    What kind of company is Core Properties?

A    They are a real state company.  Brokerage and development.

Q    Were you or are you part of the litigation?

A    Yeah, I'm involved in that.

Q    As a witness or how?

A    No.  Just through --

Q    The financial?

A    My responsibility as a CFO.

Q    The financial impact it may have?

A    Right.

Q    Again, if during the trial you were selected and you come to realize that Judge Voorhees is the judge on that, would you be able to set aside that -- if any thoughts came to mind and listen to this case and the facts, apply the law as he gives it to you irrespective of that?

A    I believe so.  At this point, we're very early on in that, and there's really -- we haven't gotten far enough where I have an opinion one way or the other.

Q    This obviously doesn't have anything to do with that.

    And in terms of your work, do they know you have been called for jury service?

A    Yes.

Q    And would you consider it to be an extreme hardship for you to be here or are they ready for you to satisfy your jury duty?

A    I think it will be extremely difficult but we can get through.

Q    So you have worked out with them the possibility that you may be called for this jury?

A    Yes.

Q    And your wife is at home with the kids?

A    Right.

Q    That would not be an issue.

Let me go through this, bear with me just a second.

No prior jury service?

A    No.  I was called once in New York but never actually sat for a jury.

Q    And you're aware, I'm sure, of the deliberative process that a jury goes through?

A    Right.

Q    Anything about that kind of decision-making process that you don't like or can't do or would not be willing to be part of?

A    No.

Q    You would be willing to listen to other people express their opinions, express your opinions, and try to come to a consensus, if possible?

A    Yes.

Q    And it looks like that you, in assessing law enforcement witnesses, you would be able to assess law enforcement witnesses in the same way you assess any kind of witness, just based on their testimony and how it fits in with other evidence and be instructed by the Judge about assessing credibility?

A    I think so.

Q    The Judge went through -- you would, in fact, as a starting point in this case, be able to accept a prior jury verdict; is that correct?

A    Yeah, I believe so.

Q    Okay.  You had answered no at the time you filled out the questionnaire that you would not be able to do that. Obviously you've probably come to know a little bit more about this process.

A    Right.

Q    Based on what you heard about the process, would you require the government to reprove the defendant's guilt which would otherwise not be a burden of proof of ours?

A    No, I don't think so as long as I didn't hear anything that had been contradicted what had been decided in the past.

Q    This jury, as a starting point, like I said, must accept that prior jury's verdict and move forward from there and assess the government's presentation of evidence, which would be evidence that goes toward aggravating factors which we contend exist and call for the imposition of the death penalty, and same way if the defense wanted to put on evidence of mitigating factors which we contend call for the imposition of life imprisonment without the possibility of release.  That's going to be the structure of the evidence

that you're going to hear. Any problem with that?

A No.

Q And the government has the burden of proof, proof beyond a reasonable doubt and unanimous in the presentation of our aggravating factors, and you understand that the defense has a different burden of proof, preponderance of the evidence, and only one juror can find a mitigating factor in order for it to be considered by that juror. Are you okay with all of that?

A Yes.

Q Do you understand the weighing process that the jury would go through in order to make its determination?

A Yes, I do.

Q And I think the Court asked you little bit -- we had a series of "always" and "never" questions on the questionnaire that were somewhat difficult to understand, although you've noted you would never vote to impose the death penalty, I would take that to be a mistake?

A The way I interpreted the question was whether or not you would always vote to impose it.

Q Okay. And what are your thoughts about that?

A And no, I would not always vote. I think it's too tough to put an absolute on. But it was the general saying I do support it.

Q When the questions are asked your view about your

feelings about the death penalty, they are outside the context of this case but philosophical. We're not asking you what are you going to do in this case. You haven't heard any evidence in this case. So when I'm asking you questions, it's just really more your philosophy about the death penalty.

A    Right.

Q    In this case you haven't -- you've heard facts from the court that will give you a factual background but you haven't heard any evidence of aggravating or mitigating factors at this point. Would you say that at this point in this case you have an open mind about either the death penalty or life imprisonment without release as possible punishments?

A    Probably not a hundred percent. Just based on the comments of the Judge and the fact we're here today.

Q    Now, it would be important for you to set aside any opinions that you may have formed based that factual basis and to come into this proceeding with an open mind. And we all come into the courtroom with life experiences and opinions, and we don't ask you not to have any when you come in, but we ask you, if possible, to set aside opinions that you may have formed and wait to make your decision in the case based on the evidence you will hear in the courtroom. Would you be able to do that?

A     I think so.

Q     And as I sometimes say, the defense and the government want folks to come in here on an even keel, even playing field, not to come in with predetermined viewpoints about things and it would be important for you to be able to do that.  Are you saying that you can do that?

A     I think I can.

Q     Do you understand there's nothing automatic after a finding of guilt on a charge for which the death penalty and life imprisonment without release are possible punishments?

A     Right.

Q     There's no automatic sentence.  The jury decides after hearing certain kinds of evidence as will be presented in this case.

Now, in this case what you do know is that the defendant has been found guilty of first degree murder, two first degree murders, and a carjacking resulting in death that was a premeditated, deliberate murder.  Both of them.  Would you -- you understand, again, there's no automatic sentence after that?

A     Right.

Q     The government has a burden of proof that goes beyond presentation of premeditated deliberate murder.  Do you understand that?

A     Okay.

Q    And that our aggravating factors will be presented in the context of this courtroom, but that after premeditated deliberate murder there's not an automatic death sentence and there's not an automatic life sentence. You understand that?

A    Yes.

Q    And based on that, would you be able to follow the Court's instructions about waiting to hear all the evidence, waiting to hear the law and entering into that deliberative process with your fellow jurors?

A    Yes.

Q    And other than the factual background that the Court gave you, you don't know anything about this case?

A    No.

MS. TOMPKINS:   All right.   Thank you.   I appreciate you answering my questions.

VOIR DIRE EXAMINATION

BY MS. LAWSON

Q    Mr. Donaldson, hi, how are you?

A    I'm fine.   Thank you.

Q    Harold Bender and I represent Marc Barnette who is seated here, and you now know what he did.   You heard it from Ms. Tompkins; you heard it from Judge Voorhees.

When you come into this courtroom there are no right or wrong answers.   There are only your truthful, honest

answers. Those are the right ones, the ones that you really feel, you are really thinking, and nobody is going to try to change your mind about that. And I hope you understand where my question comes from, and that is, I heard you say something -- that suggested to me after you heard the facts you had a feeling about what ought to happen in this case. Is that basically what you were conveying?

A    I think that's fair to say.

Q    Could you talk a little bit about that, what made you get the feeling?

MS. TOMPKINS:  Objection.  That's not the standard.

THE COURT:  Overruled.

Q    You can answer that.

A    I just think based on the description the Judge gave of the incidents I think that gives you some level of feelings as to where it goes.  But that's not to say I wouldn't have tried to put that aside and then make an impartial decision after hearing all the evidence.

Q    Thank you for your candor.  That's important.

In some other places in the questionnaire had some interest in your candid answers.  One was about -- there was a statement in there about police officers tend to tell the truth more often than other people and you marked you disagree with that.  Can you tell us a little bit about why you disagree with that?

A    I interpret that to mean that they would -- that the question is referring to police officers versus any average person. And I don't think they are less likely to tell the truth, but I'm not sure that they get a greater weight than anybody else here.

Q    So if Judge Voorhees instructed you consistently with that, you would be able to weigh the testimony just the way you expressed it?

A    Yes. I think it depends on the situation and the people you were hearing.

Q    What do you think of the sentence of life imprisonment without the possibility of release as a punishment for two first degree murders?

        MS. TOMPKINS: Objection.

        THE COURT: Overruled.

Q    Go ahead.

A    I'm not sure if I've got a real opinion on it. You mean in contrast to the other possibility? Again supporting the death penalty, I'm not sure that it's an adequate punishment.

Q    That's fair enough. You mentioned that your approval, you're belief in the death penalty, your support for it is based on social issues. Could you elaborate on that, please?

A    I guess it's -- I view it as less a punishment for a

past crime and more as an important deterrent for future ones.

Q    So the social impact of deterrents would be something that someone else would look at say, "I don't think I'll commit that crime."

A    Exactly.

Q    Are there any other factors that feed into your position?

A    No.  I think that's largely it.

Q    Cost of incarceration?

A    No.

MS. LAWSON:  Your Honor, I make a motion.

THE COURT:  Would you have other questions?

MS. TOMPKINS:  Yes, Your Honor.

### VOIR DIRE EXAMINATION

BY MS. TOMPKINS

Q    Mr. Donaldson, you do know some of the facts about the case, the underlying facts of the guilty verdicts.  But you haven't heard any evidence on aggravating or mitigating factors.

Based on that, do you have an open mind about what possible punishments, either life imprisonment without release or the death penalty, that those are both open options for you as a juror?

A    Yes, I understand they are both there.

Q    Are you able to consider at this point having heard none of the evidence both of those options?

A    I certainly would make every effort to put any preconceived notions I got today aside to do that.

Q    And today you wouldn't automatically vote one way or the other?

A    No.

MS. TOMPKINS:  That's all.

THE COURT:  You may ask other questions.  Motion be denied.

MS. LAWSON:  Thank you.

VOIR DIRE EXAMINATION

BY MS. LAWSON

Q    You also mentioned in your questionnaire that the punishment should be enforced more promptly.  Would you tell us a little bit about that?

A    I just think in situations where the penalty is imposed that it should actually be imposed.

Q    Have you read or heard about appeals and things of that nature?  And if you have, can you tell us how that ties into your perspective on the speed with which it should be carried out?

A    I can't think of specific cases where I had read about the appeals.  There seems to be a number in Texas.  But it does seem that there's a very long period of time between

sentencing and the actual carrying out of the sentence.

Q  What impact does that have on your feelings about the death penalty in general?

A  I don't think that has any effect on my feelings in general.

Q  You have told Ms. Tompkins several times that you would try your best to set aside your feeling that you developed once you heard the fact situation in this case and only you know whether you can do that.  None of us can tell you.  And if you had any concerns or any reservations about your ability to consider both punishments on these facts, this is the time, consistent with your oath as a juror, to tell us that.  Do you?

A  No, I don't have any specific concerns.  I've never been in this exact situation before, so it's difficult.  I can't say with 100 percent certainty.  I'd like to think I could put that aside.

Q  And I hope you understand I'm not trying to belabor the point, but there's still some equivocation there.  And that's very difficult for us of going into this process selecting a jury with someone who has some reservation, if that's what it is.  I'm not sure that's what you're expressing.

A  I wouldn't call it reservation.  I believe -- I think I can do it.

Q    I'm sure in your work you do a lot of decision making in your own mind as well as in groups.  Would you take a second and think about an important decision you have had to make in your life experience, you don't have to tell us what it is, but once you have it fixed in your mind just let me know.

A    Okay.

Q    How did you come to get to whatever decision you made on that?

A    Just basically by taking available information, weighing the pros and cons and making the best decision I thought was available at the time.

Q    Did you ask for any input from other people?

A    Yes.

Q    Did you feel the input helped you make the decision?

A    Yes.

Q    Were you satisfied with the decision after you made it?

A    Yes.

Q    Have you ever had a time when you went dissatisfied with the decision you made, the important decision?

A    I wouldn't say dissatisfied.  There's been moments that have looked better than others but overall satisfied.

        MS. LAWSON:  May we have and moment, Your Honor?

        THE COURT:  Yes.

Q    Just a couple more questions, Mr. Donaldson.

Briefly what we're going to be looking at here is starting with the knowledge that Marc Barnette murdered Donald Allen, murdered Robin Williams --

MS. TOMPKINS: Objection.

THE COURT: I haven't heard the whole question yet.

Q That's where we start in this process. And from there the government has to establish aggravating circumstances.

THE COURT: I think you need to take into account the fact that one of the --

MS. LAWSON: I understand.

THE COURT: -- alleged aggravating factors is --

MS. LAWSON: Yeah, I understand --

THE COURT: -- in the predicate of your question. Okay. Go ahead.

BY MS. LAWSON

Q And it may be that in the fact of the convictions there's an aggravating circumstance, okay, but when we start, it's the government's duty to go forward and present evidence of aggravating circumstances. Do you follow me?

A Yes.

Q The burden of proof on the government is beyond a reasonable doubt, so whatever aggravating circumstance they would advance, you, individually, and all 12 jurors would have to determine that that's been proven beyond a reasonable doubt. And, you know, the common sense meaning

of that, it's the highest burden in our law. Internally you know what beyond a reasonable doubt means, right?

A     Right.

Q     If the government doesn't prove the existence of any aggravating circumstance, the punishment would be -- it's like a default, it would be life imprisonment without the possibility of release. Do you follow me?

A     Yes.

Q     Okay. If they do prove aggravating circumstances --

MS. TOMPKINS: Objection.

THE COURT: Overruled.

Q     -- the next thing the jury would have to do -- and this is called guided decision making, that's what the Supreme Court calls in this context -- the jury would have to consider whether there are any mitigating circumstances. And a mitigating circumstance is a circumstance about Marc or about the offenses or anything else that a juror may need to have mitigating value about in a situation that calls for imposition of a sentence of life imprisonment without the possibility of release, okay?

Now, for the mitigating circumstances, those don't need to be proven beyond a reasonable doubt, but just by a preponderance of the evidence, the 51 percent. And it doesn't have to be unanimous. One juror can find a mitigating circumstance and it can be considered by that

juror and any other juror who wants to find mitigation, okay?

A    Uh-huh.

Q    Does it seem unfair to you that the government has such a high burden in a situation like this?

A    No.

Q    It's possible even that you don't find any mitigating circumstances, but the jury could move on to the next step, which is a weighing step, and that is to weigh the mitigating circumstances, if there are any, against the aggravating circumstances. And they don't need to be -- it's not mathematical. It can be one mitigating circumstance outweighs five aggravating circumstances or the reverse, okay. Each individual juror has to decide what weight to give the circumstances.

And irrespective of how those come out in your weighing process -- well, if you all find -- that is the 12 of you -- that the aggravating circumstances don't outweigh the mitigating circumstances, you go to the default punishment of life imprisonment without the possibility of release. Did I explain that? You look like you're following me.

A    I'm with you.

Q    Yeah. But even if you find that of the aggravating circumstances outweigh the mitigating circumstances, it would be your duty to go to a last step, which is to --

MS. TOMPKINS: Objection.

THE COURT: Overruled.

Q  -- make the decision whether the imposition of a sentence of death is more appropriate, the only appropriate sentence when considered with the alternative punishment of life imprisonment without the possibility of release. That's the process.

A  Okay.

Q  Knowing what you know and feeling the way you feel, do you think you are able to engage in that process and give meaningful consideration to a sentence of life imprisonment without possibility of release?

A  Yes, I think so.

Q  Do you have any reservations about your ability to do that?

A  No, I don't have any reservations.

Q  Now, when you go to deliberate, each of the jurors come from different backgrounds, different educational levels, different religious perspectives, and that's part and parcel of who they are and what you and the others bring into the deliberations. If we didn't need 12 different people, we'd just need one juror to impose punishment. Do you follow me?

A  Uh-huh.

Q  So I guess my question is are you prepared to insist that the other jurors honor and respect your opinion and

your decision you make?

A    Yes.

Q    By the same token, even if you disagree with another juror's position, are you willing to listen to respectfully and able to honor it?

A    Yes.

Q    I guess the last question I would ask you is -- and I asked it different ways -- if you think -- well, if you know you can be fair in this case?

A    Yes, I think I can be fair.

MS. LAWSON:  Thank you very much.

THE COURT:  Thank you, sir.  The clerk will give you a piece of paper that has a telephone number on it and we would appreciate if you would call the number given as instructed on the notice.

Now, it appears that we have seven more and that we're going to have to lay some of these over until tomorrow.  Do I hear a number?

MS. TOMPKINS:  120 has a vacation, July and August.

THE COURT:  Okay.  Do you want to take -- okay. Let's say we'll take that one up for sure.  Anyone else?

MS. TOMPKINS:  102 has a vacation planned August 5th through the 9th.

THE COURT:  Is that Womble?

MS. TOMPKINS:  Yes.

No. 97 is a school bus driver. I'm not sure how that may play out.

THE COURT: I have about five notes on No. 97, so maybe we ought to bring that person in.

MR. BENDER: Judge, since you invited us to speak on that subject --

THE COURT: I did. As a matter of fact, I don't even have to do that to think that counsel might rise to the occasion. (Laughter)

MR. BENDER: Maybe we ought to take those three and see how they go and let the other three come back tomorrow -- or the other four.

THE COURT: Four. Agreeable.

MS. TOMPKINS: That's agreeable.

THE COURT: All right. Let's call for 100, 95, 123 and 118. This 123 says he knows a lot about this case, follows state and local trials and he checks virtually every media there is as far as where he got his information on this case. I think we might want to keep him in the group today. Now, as a matter of fact, No. 95 says he has a hardship and would lose business and put five people out of work. As a taxpayer he doesn't like long-term sentences and that sort of thing. So let's keep -- I think we'll keep working on those, now, see if there are any that are more or less in the ballpark. No. 100 says he would never vote to

PROSPECTIVE JUROR: Destin, Florida.

THE COURT: Where is that?

PROSPECTIVE JUROR: Destin, Florida. Panhandle.

THE COURT: Are you going to fly, drive?

PROSPECTIVE JUROR: Drive.

THE COURT: Right. And you have your hotel booked?

PROSPECTIVE JUROR: Saturday to Saturday.

THE COURT: Right. Any questions?

MS. ROSE: No, sir.

THE COURT: Thank you very much for participating in this part of this process and you'll be excused.

PROSPECTIVE JUROR: Thank you.

(Mr. Gregory exits the courtroom.)

THE COURT: 127.

(Betty Campbell enters the courtroom.)

THE COURT: Good afternoon.

PROSPECTIVE JUROR: Good afternoon.

THE COURT: I believe you are Ms. Campbell.

PROSPECTIVE JUROR: Yes, I am, sir.

THE COURT: We have a couple of questions for you, and one of them would be having to do with the issue that you heard about as we -- as the Court gave you these preliminary instructions or orientation instructions, and -- which had to do with the fact that in this facet of the case we're here only for sentencing, and the only business of the

jury would be to render a decision concerning whether either the death penalty on one hand or the life sentence without the possibility of release on the other would be the sentence as justified. And there's a lot of law that could be explained along those lines, but I think we gave you capsule of it earlier.

And in your questionnaire that you filled out the other day I believe you said you disagreed with capital punishment. Is that a fair statement?

PROSPECTIVE JUROR: I wouldn't say it's a totally 100 percent disagree, but I do lean in that direction quite a bit, maybe more than 50 percent, but not necessarily a hundred percent, if that makes sense.

THE COURT: Right. Well, the whole idea, questions at this stage of a proceeding is to determine if the jurors are leaning one way or another before they've even really considered any evidence and that sort of thing. Because each of the parties have a right to have jurors that come into the process neutral or as much as possible. And tell us a little bit about your views on the death penalty, if you would.

PROSPECTIVE JUROR: I guess I have some concern with the statement "sure beyond a reasonable doubt," that clause.

THE COURT: Right. Right. Of course, that's the

burden that the government has to prove aggravating factors. That is factors that the government says should cause a juror to consider the death penalty. On the other hand, the defendant has the possibility, if they wish to do so, to put up evidence about mitigating factors, or factors that would argue the other way. And the question is whether you could consider both types of evidence and render a decision within the context of the law.

PROSPECTIVE JUROR: Oh, yes. Yes. I don't have no problem with that.

THE COURT: The government may inquire.

BETTY CAMPBELL

VOIR DIRE EXAMINATION

BY MS. ROSE

Q    And to follow up on the Judge's question, and in rendering a decision within the context of the law may involve deciding with other people to impose the death penalty. Could you do that?

A    Siding with them?

MS. LAWSON: Objection, Your Honor. I didn't understand your statement, I'm sorry. I misunderstood.

BY MS. ROSE

Q    The Judge said within the context of the law could you make a decision on this case and you said yes. And one of the potential penalties here is the death penalty.

A    Right.    I understand that.    Uh-huh.

Q    So given some of your personal difficulties with the death penalty, realizing that may be kind of a philosophical decision but now you're here.

A    Right.

Q    A lot of folks say, "I may believe in it," or -- but when it's right there in their face or when it becomes a personal decision that makes it more difficult.  So -- and we understand that.  So if that's your hesitancy or you have some uncertainty about it personally, and your ability to personally perhaps impose that penalty, then we need to know that.  What are your thoughts?

A    Well, you know, in this situation then I would be open to facts on both sides.  I mean, that's what I would be here for, is to look at both sides and make an informed decision based on what I have been given or what has been presented to me.

Q    Right.  And could that informed position involve you voting the death penalty?

A    Yes.  Yes, it could.

Q    And you may recall my name is Jill Rose and this is Anne Tompkins and we're representing the government here.

A    I'm sorry?

Q    To back up and start at the beginning -- but I wanted to follow up with your discussion with the Judge before we

moved on.

I see that you work. And I take it you have made some arrangements with your work to be away, if necessary, for two or three weeks?

A    It wouldn't be a problem. I haven't really discussed it with them but it wouldn't be a problem.

Q    But you know they will work with you on that?

A    Yes.

Q    As the Judge said, a jury found the defendant guilty of the murder of two people, carjacking resulting in death. Do you have any difficulty accepting that jury's verdict?

A    No.

Q    And understand, particularly having some more discussions with us, that this job here is just a sentencing?

A    Yes.

Q    Making a decision as to one of those two possible verdicts?

A    Yes, I do understand that.

Q    You've never served as a juror before?

A    No, I have not.

Q    Okay. Tell us a little bit about what forms your opinions or your beliefs or your philosophy on the death penalty, where does that come from?

A    I guess pretty much the one statement I made. Beyond a

reasonable doubt, relating that -- you know, there's 12 jurors and they must come to one decision. But within that 12, every one is sure beyond a reasonable doubt. I guess that has always kind of, you know, like stuck in my mind.

Q Right. And, you know, that burden of proof is the burden of proof that is used throughout this country in every criminal proceeding, whether it's at the state or federal level, that's the burden of proof that the government always carries. Do you think that burden of proof is too heavy or requires too much of the government?

A Well, maybe on an individual personal basis, it's a possibility, but as a whole, as a juror, when you're in after your ideas, your pros and cons, a person might tend to maybe feel more comfortable with the decision when they all come to one agreement.

Q You know, beyond a reasonable doubt just means applying your reason and common sense.

A Right.

Q It doesn't mean without any doubt. It does not mean beyond the shadow of a doubt. It's just reasonable. A reason and commonsense standard. You understand that?

A Yes.

Q Now, in your questionnaire -- and I know we talked about this -- your answer to the question, "What is your personal view of the death penalty?" You said "I disagree

with capital punishment."

A    Which is, I guess, my answer to what we just previously discussed.  It's all just....

Q    You were concerned about the burden of proof?

A    Yes.

Q    But knowing that it's a reasonable doubt standard, you understand how all of that works?

A    Yes.  A standard of the court system.

Q    Have you changed your mind?  Probably when you came in and filled out your questionnaire you never thought about these issues so seriously.  And you had some time to think about it between the time this was completed, and, of course, coming in today.

Has your -- what have your thoughts been?  You probably drew the conclusion that this might have something to do with a capital case.  Have you changed your mind or what were your thoughts during that intervening time period?

A    Believe it or not that's the one -- that is the one statement from that questionnaire that did kind of come back to visit me.  And -- I guess -- somewhat still have mixed feelings about it.  But I think I could make an informed decision or have a open mind when we're weighing the two sentences, one against the other.

Q    But certainly given the fact you don't believe in capital punishment, that's a tough decision.

MS. LAWSON: Objection. That's not what she said.

PROSPECTIVE JUROR: I'm not saying 100 percent. I felt like in the past, or even maybe now, in my mind it leans, I'll just say percentagewise, maybe 55 or 60 percent; I don't 40 percent, I do -- that sort of thing. But not a 100 percent. But I know there's always exceptions in any situation or, you know, given different forms of evidence. Well, in this case we're just deciding the sentence anyway. But, you know, there could be a number of factors that could pull the pendulum back the other way.

Q    It sounds like you're saying you just have to hear the evidence and the law?

A    Yes.

Q    Why would you favor abolishing the death penalty?

A    Preponderance of the evidence again.  Just kind of goes back.

Q    And explain what you mean there by preponderance of the evidence.

A    Unclear, undefined evidence.  Maybe understated, overstated.  Just different factors.

Q    Have you ever had any experience, your friends or family or acquaintances, with domestic violence?

A    No.

Q    I'm just looking to see -- your only experience with the court system has been the lawsuit over the car accident.

A    A lawsuit -- a car accident.

Q    There was a question here that said that, "Have you known -- you or anyone you know sued anyone?" Yes. Car accident. "Have you or anyone you know ever been sued?" Yes, car accident.

A    Yes.

Q    And I didn't know if that experience was the one that kind of led you to question or to explore the burden of proof issue that you talked about?

A    Well, it could -- the fact that I had some legal classes, I'll say, maybe that has something to do with it too. You know, during some of my schooling, I've taken some courses of -- that might have something to do with it.

Q    Would you be able to listen to the law?

A    Oh, sure.

Q    And follow it?

A    Yes.

Q    Not with what you might believe the notion of the law would be or your understanding of the law but what the Court says the law is?

A    Yes.

Q    All right. Thank you very much.

THE COURT: Ms. Campbell, I was a little bit unclear about your degree of concern about the death penalty. I think a couple of times you indicated that it

was something like 55, 45. In other words, you leaned against imposing the death penalty something like 55 percent to 45 percent. Something along those lines?

PROSPECTIVE JUROR: Yes.

THE COURT: So that's kind of where you start. There's going to be a little bit of a difference in which of the two penalties you could even consider before you heard any evidence; is that right?

PROSPECTIVE JUROR: Right.

THE COURT: Okay. Would there be any other questions?

MS. LAWSON: On that issue or in general?

THE COURT: Beg your pardon?

MS. LAWSON: On that issue?

THE COURT: On that issue.

MS. LAWSON: Yes, sir.

### VOIR DIRE EXAMINATION

BY MS. LAWSON

Q   Ms. Campbell, you took your law class, and I assume you learned, I'm sure you did, that you apply the law as it's written, or in this case as Judge Voorhees will give it to you.

A   Yes.

Q   And when you were talking about 55 to 45 percent, were you attempting to give a sort of a general feeling about

your personal view on a societal issue?

A    I think that's more what I was talking about.  It was just a personal thing, never having been summoned for jury duty, just my own personal belief and thinking just in a everyday general conversation.

Q    And we appreciate your candor because everybody comes in with certain ideas and notions.  You know, you're not a blank slate.  You have lived your life and you can look out and make decisions about things.

I guess the question is, are you willing to sit back and equally consider the evidence and the potential punishments before you go back and deliberate and make a decision?

A    Oh, most definitely.

Q    So even though in your -- you know, in the past as you're looking at it you may not be aggressively for capital punishment, you're still willing to let the government put on its evidence and you're still willing to listen to it, right?

A    Most definitely.  This is like the real world.  That was just a personal view before.  You know, but when you come into real life situations, then, you know -- that you put personal beliefs aside and listen to the facts at hand.

Q    Thank you.  I appreciate your clarifying that.

THE COURT:  You may inquire.

BY MS. LAWSON

Q    Ms. Campbell, we have already been introduced, all of us, and just have a few questions to ask you.  And I guess you picked up on it by now, that although the potential outcome of this case is going to resolve the issue of what we do about Marc Barnette.

A    Yes.

Q    We start from the fact that he confessed to two murders and he's guilty of them beyond a reasonable doubt.

A    Yes.

Q    And you understand that and you accept the fact that that's beyond a reasonable doubt?

A    Yes, I do.

Q    Okay.  So where we start is the fact that 12 jurors are going to have to listen to the evidence and make a decision.

A    Okay.

Q    And you understand you come in here and you walk in your own shoes, bring your own experiences, your own education, your own background with you.

A    Yes.

Q    And you're not required to leave that, take that out of your equation.  You are who you are.

A    Okay.

Q    I guess what I want to make sure of is that when you, knowing who you are, if you can make up your own mind and expect other people in the jury to respect your decision --

A    Yes.

Q    -- and your wishes in this regard?

A    I understand.

Q    But by the same token, would you expect or would you accord the other jurors that same right to have an opinion even if it's different from yours?

A    Oh, most definitely, yes.  No problem with that.  To me that's understandable.

Q    Okay.  So as I understand it, you would require the government to take you to a point beyond a reasonable doubt that death is the appropriate punishment when compared to the only alternative, which is life imprisonment without the possibility of release?

A    Yes.

Q    Before you would vote for that?

A    Yes, I could.

Q    I just have a couple of quick questions.  In looking at your work, do you work for Bank of America or the temporary service or both?

A    With Bank of America through the temporary service.

Q    Okay.  And how long have you done this job that you have been doing?

A    Oh, about nine months now.  It's been almost a year.

Q    In terms of the -- is it an awful lot of accounting or --

A    Yes, somewhat.  Yes, it is.  Not accounting in the general sense.  It is not -- it is not a part of the accounting department, but because we are responsible for all the armor, on-ground, inbound transportation for the company, a lot of the reports, statistical data that we produce, it's similar to accounting but we are not a part of the accounting department.

Q    Sort of independent accounting then?

A    It's a -- I'm so relatively new there, that's pretty much the best I can do with that.

Q    It sounds interesting.  Do you enjoy it?

A    Yes, I do.  Yes, I do.

Q    Are you active at St. Paul's?

A    No, I'm not.

Q    Does your faith play any kind of role in who you are and how you conduct your life?

A    Yes, it does.

Q    Ms. Rose asked you a little bit about domestic violence.  There's going to be evidence of domestic violence in this case.  Are you familiar -- have you either seen or read about the effect the of domestic violence on children who grow up in that environment?

A    I've heard of issues, you know, through the TV.  Maybe read magazines or newspapers from time to time.

Q    Do you have an impression in your own mind about what

effect domestic violence has on children?

A     Yes.  I -- I have my ideas.

Q     Can you share them with us?

A     Well, personalitywise, in their own personal lives, I think it would have the impact of maybe even communicating with people, getting along with people.  Maybe being somewhat of an introvert, you know, playing a impact on their overall personality and lifestyle.

Q     I'm grateful for your answers.  Thank you for taking the time to talk to us.

A     Thank you.

          MS. ROSE:  I make a motion, Your Honor.

          THE COURT:  Okay.  You may be excused.

          PROSPECTIVE JUROR:  Thank you.

          THE COURT:  Thank you very much for your attention to this matter.

          MS. LAWSON:  Your Honor, may I be heard, please before --

          THE COURT:  No.

               (Ms. Campbell exits the courtroom.)

          THE COURT:  Okay.  Now you may be heard.

          MS. LAWSON:  Your Honor, a person doesn't have to be entirely neutral before they can it on a jury of this kind.

               She was maneuvered into giving a quantifiable

response. And you can be 55 percent toward or have a 55 percent preference to life as long as you can set that aside and she said she could.

THE COURT: Don't you think her answers were consistent with her answers on the preliminary jury questionnaire?

MS. LAWSON: No. I think her -- well --

THE COURT: I mean she said she disagreed with capital punishment.

MS. LAWSON: It's what is your personal view of the death penalty. That is as open a question as can be. It doesn't say well, compared to the life imprisonment without the possibility of release. She can disagree with it but still follow the law. She can have problems with how it's applied and still follow the law and that's the standard.

THE COURT: Well, wait just a minute.

Okay. Her answer was your personal view of the death penalty. Disagree with capital punishment. The only reason I mention that is because you said she was maneuvered into making a statement about these percentages. Now I think that her questionnaire answers indicate that that was where she started from, not the point to which she was maneuvered.

MS. LAWSON: Okay. But then if you go to the next page, she gives the straight up, four in a row, "no"

answers, which means she's saying she would never -- I mean, they are as confusing to me as they are to the jurors -- she says no, she wouldn't never vote to impose the death penalty, which means she can vote to impose it.  She also said that she wouldn't always, in No. 116, vote to impose the penalty of life.  So she's demonstrated, as have many, many other jurors who came through here, a willingness to consider it and an indication that she's not totally bound by her statement "I disagree with it."  Most of the jurors who have been passed on many of them have said, "I favor.  I strongly favor it."  And yet they have -- they have been able to articulate exactly what she did, which is consider all the circumstances and follow the law.

THE COURT:  Her ability to consider death is not substantially impaired to the point that she should be stricken from the jury panel.

THE COURT:  I think one has to make a judgment about the overall presentation of the juror.  And in that case one is left with the firm conviction that she would not give, as you all have been indicating, a level playing field.  And that being the case, she was properly stricken.

I understand what you're saying and I think there are some nuances that the Court has to pay strict attention to.

There were several jurors early in the process who

were stricken, not because they didn't give correct literal answers, if there is such a thing, but because the Court was convinced they could not give the defendant a fair trial.

In the case of this last juror, I believe that juror would not do likewise as to the government.

MS. LAWSON: Your Honor, can I ask if that was based solely on her answers or on her demeanor or ....

THE COURT: It was a combination. She twice came back to the well that in terms of her decision-making faculties, she would tilt in favor of not imposing one of the two options of sentences.

And it's not calculus, as we have been saying, either in terms of what the jurors do or what the Court has to do in terms of evaluating the essential fairness of the juror.

MS. LAWSON: Yes, sir. Obviously for the record we object.

THE COURT: Certainly. Exception.

No. 130, please.

(Sheila Sherrill enters the courtroom.)

SHEILA SHERRILL

VOIR DIRE EXAMINATION

THE COURT: Good afternoon. And you are Ms. Sherrill.

PROSPECTIVE JUROR: Yes, sir.

THE COURT: There are a couple of questions I'd like to inquire about, that is to say the answers that you gave on your questionnaire.

Do you recall being with us a couple of weeks ago and doing that questionnaire?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: And you indicated that -- I think that you would always vote for the death penalty --

PROSPECTIVE JUROR: Yes, sir.

THE COURT: -- in a case of murder.

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Would that pretty much be the case irrespective of the particulars of the individual murder?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Okay. Would there be any questions?

MS. TOMPKINS: No, sir.

THE COURT: We want to thank you very much for participating with us. You'll be excused.

(Mr. Sherrill exits the courtroom.)

THE COURT: No. 136.

(Susan Cohen enters the courtroom.)

THE COURT: Good afternoon. I believe you are Ms. Cohen.

PROSPECTIVE JUROR: That's right.

THE COURT: All right. I think the attorneys will

THE COURT: Yes, sir. All right. We appreciate very much your participating with us, and we hope you can serve on another case with us another time.

(Mr. Aaron exits the courtroom.)

THE COURT: No. 181, please.

(Debra Moore enters the courtroom.)

THE COURT: Good afternoon, Ms. Whitney, pardon me while I fumble through some papers.

PROSPECTIVE JUROR: It's Moore.

THE COURT: I'm sorry, you are Ms. Moore.

PROSPECTIVE JUROR: Uh-huh.

THE COURT: You indicated that your uncle had been assaulted and murdered in New York City.

PROSPECTIVE JUROR: That's correct.

THE COURT: That's a very sad thing, no doubt. Could you tell us when that happened?

PROSPECTIVE JUROR: 1981.

THE COURT: Okay. And is that something that was a major event in your family's life at that time.

PROSPECTIVE JUROR: Yes.

THE COURT: Could you tell us a little bit about what happened, if it's not too hard for you to do that?

PROSPECTIVE JUROR: As I remember it, he had gone out on a Sunday morning to get his newspaper and this person followed him back into the house and robbed him and stabbed

him several times with knife.

THE COURT: All right. Now, the question for us today, I think, would be whehter that experience in your family's life would influence you in your ability to consider the evidence in a case of this type?

PROSPECTIVE JUROR: No.

THE COURT: That's something that in your mind wouldn't impair you at all in your ability to consider evidence in this case and be fair to both parties?

PROSPECTIVE JUROR: I don't think it would impair my ability to look at the evidence or whatever.

THE COURT: Okay. The government may inquiry.

DEBRA MOORE

VOIR DIRE EXAMINATION

BY MS. ROSE

Q    Hi, Ms. Moore. My name is Jill Rose, this is Anne Tompkins and we represent the United States in this case.

Thank you for your patience back here this afternoon. We appreciate your time as well that you took to fill out the questionnaire. It's been very helpful.

I see you work in a law firm. Do they do any criminal law?

A    No.

Q    How long have you been with this firm?

A    Three years with this firm.

Q    And right before that you worked for legal service?

A    Legal Services of Southern Piedmont.

Q    Now, legal services represent indigent criminal defendants?

A    No criminal.  Civil.

Q    Just civil.  So in looking back, you haven't really been involved in any criminal aspects --

A    No.

Q    -- of the paralegal field.

I see now it's more patient-hospital issues.

A    Right.

Q    You have made arrangements, I see, with your work such that if you're here for three weeks it's not a tremendous -- obviously it's an inconvenience, we wouldn't say that --

A    It will be an inconvenience.

Q    -- but it's not a hardship?

A    Not a hardship.

Q    We appreciate you doing that, taking care of that.

Looking at your questionnaire, let's see, your daughter was a witness in court.

A    Yes.

Q    How long ago was that?

A    Seven years probably.

Q    That was not in her current job with the Postal Service?

A    No.  No.

Q    What -- it was an armed robbery?

A    She was at a -- going to pay her rent at a building and apparently someone tried to rob somebody in the building and she was in her car preparing to leave.  And apparently they thought she saw him run out or whatever, and she was questioned with other people who were there.

Q    So that didn't rise to the level of her going and testifying in court?

A    No.  I believe she just spoke with some detectives or whatever and they told her that they may call her but they didn't.

Q    And you've never been called -- maybe you have been called to jury duty but hadn't had a chance to serve?

A    I have been called to civil jury duty but I was not chosen.

Q    You also have not been -- have any close friends family or otherwise who have been victims of domestic violence?

A    No.  Just worked with women who work with them.

Q    Tell us about that.

A    As a paralegal at legal services, we interviewed and represented women who needed to file domestic violence claims.  Abuse.

Q    Helping them with protective orders?

A    Got protective orders.  We did weekly -- I guess you'd

call them just open -- time for people to come in and ask questions about how they go about getting a protective order.

Q    And did you assist them in filling out that paperwork?

A    Assisted them in the paperwork and assisted them in preparing them for court.

Q    Did you actually go to court with them?

A    I couldn't represent them in court but as a paralegal I assisted the attorney in preparing the documentation.

Q    Okay.  So you heard a lot of information about domestic violence situations from them?

A    Uh-huh.

Q    Did any of them come back for other like -- did you all do divorces as well?

A    No.  We mostly did custody work and domestic violence protective orders.

Q    Dealing with the custody issues and the domestic violence, did you hear of children in those homes with domestic violence?

A    Yes.

Q    Was that a concern that was expressed?

A    Uh-huh.

Q    Did you ever follow up with those folks to see how the children were doing or how --

A    No, that really wasn't a part of what we did.

Q    Did you form any opinions about the effects of domestic violence on children?

A    Yeah, I guess.  I formed -- I think that -- after you do something like that for so long you have to form an opinion.

Q    What kind of conclusions did you come to?

A    About the children?

Q    Yes, ma'am.

A    I felt that they were in bad situations sometimes and it was sad.

Q    But that despite that, they were often -- not situations which they could never come off of?

A    No, I wouldn't think they couldn't.  But like I said, I never really knew about what happened after we assisted them.

Q    You heard what the Judge said by way of his introduction about the jury finding the defendant guilty, and that as a starting point this jury must accept the finding of those guilty verdicts.  And on your questionnaire you said you weren't sure you understood that question, and you probably didn't because you didn't know where it was coming from.  Now that you have heard more from the Court, you do feel comfortable with that?

A    Yeah.

Q    So your sister works with children and teenagers.  Has

she talked with you about her work? Does she do family counseling?

A She does family counseling. She lives in New York and we only see each other about twice a year and when we talk, we're not talking about work.

Q I bet you're not. Tell us about your opinion about the death penalty.

A My opinion of the death penalty. I don't know. I -- I -- I think I believe that that was -- I don't have an opinion about it.

Q When you filled out this questionnaire --

A Uh-huh.

Q -- you probably got some idea of where this case was going?

A Uh-huh.

Q And you have had several weeks to reflect maybe on your answers, maybe planted some seeds in your mind. What have you been thinking since you filled out this questionnaire about the death penalty? Have you considered it?

A I think since -- thinking about it, I at the time thought that we were going to have to listen to the case and make a decision about whether a person was guilty or not. So those were my thoughts. Knowing now that that's already been done and we just have to decide whether he's going to get the death penalty or life, I -- I -- I think it just

depends on what the evidence is.

I'm willing to look at it and make a decision based on what I hear. I don't have a view one way or the other about the death penalty.

Q You -- it's kind of hard to qualify it as maybe a nonopinion or a -- but what's helped you -- what brings you to that point?

I see you're active in your church. Do your religious beliefs have any bearing on that? Anything about your upbringing? Tell us what's helped to get you to that position or no position.

A I think that if -- my religion basically says that those things are -- it's -- we don't determine those things. That it's God's will to say. That's what my religion would say.

Q Would you be able to then go against your religion?

A I would be willing to listen to the facts, whatever is presented, and make a decision based on that.

Q What --

A I -- I don't know.

Q What if the facts went a way that went against your religion?

A I'm sorry, what did you say?

Q What if the facts were in opposition given your position, given your religion, what then?

A     I don't think my religion would have any bearing on that. I said that's what we -- that's what overall we believe, but I -- I -- I don't feel strongly one way or the other. I -- I -- again, I would just have to make that decision based on what's before me. I can't sit here and say one way or the other.

Q     Do you at this point feel that the government, who is going to stand up before this jury and say you need to return a verdict of death, are we on an equal playing field with you in your ability to consider that?

A     Yes.

Q     You hesitated. I mean -- I know these are tough questions because we're just -- it seems all philosophical. But it's more than philosophical because it's the here and now.

It's not whether you, in reading an article in the newspaper or hearing about some facts or maybe even reading a book, say, "Yeah, I understand that death penalty thing and I'm not for it or against it." But now you're in the position of someone who has to be ultimately fair to both sides. And that's what everybody is entitled to. That's what makes the cogs of the justice system roll. And if you're not in that position, don't feel like you have to be one thing or another but who you are --

A     I understand.

Q    -- but don't feel you have to serve on a case that you may not be well served?

A    I understand.

Q    We're not saying you wouldn't be a good juror, but this may not be the case for you.

A    Right.  I understand.

Q    We're just asking for honesty, please.

A    I don't have a view one way or the other.  I would look at the facts, whatever is before me, and make that decision at that time.  I don't know what my opinion would be.  I can't say what it would be at this point.  I'm -- that's just it.

Q    What about not necessarily -- can you fairly consider both potential penalties here?

A    I think I can.

Q    And that's all we can ask.  Thank you.

THE COURT:  Now, Ms. Moore, let me ask you a question.

As you've heard before, we're just looking at your straight-up answers as honestly you can make them.  And assume that you know absolutely nothing about this case.  In other words, the facts of the case you know nothing about but you are aware of your duty to weigh whatever facts the government wants to put in as to whether it could prove to you beyond a reasonable doubt certain aggravating factors.

And the defense would endeavor to prove to you, if it saw fit, certain mitigating factors. And you would be asked to consider those if they are proved beyond -- by a preponderance of the evidence, then you may consider those. So that would be your duty.

Looking at facts under the scheme of proof where the government has a larger burden to prove facts and the defendant then may offer evidence, if he sees fit, but in the end it's the jurors' decision whether the death penalty is justified or whether a life sentence is the appropriate sentence. And the question for you would be whether you personally, given your personal beliefs, could render a decision one way or the other in that framework, or whether you would simply already be predisposed in that regard?

PROSPECTIVE JUROR: I would not already be predisposed.

THE COURT: Okay. Thank you very much.

MS. ROSE: Thank you, Judge. I don't have any other questions.

VOIR DIRE EXAMINATION

BY MR. BENDER

Q    Good afternoon, Ms. Moore.

A    Good afternoon.

Q    I guess you remember that I'm Harold Bender and Ms. Jean Lawson and we represent Marc and we're assisted by

David Ball in this matter. We appreciate your honest answers and candor in this matter so far. We'll just take a minute of your time.

As juror you come in here with whatever your life experience has been. That's made up of your religion, your education, your work experience, your upbringing with your sister and I guess four other brothers?

A    Four --

Q    Four brothers?

A    Four sisters, one brother.

Q    Well, okay. I apologize for getting that wrong.

A    Okay.

Q    Anyway, you come in here with all of that. You're your own person. You walk in your own shoes. Do you understand that?

A    Uh-huh.

Q    Do you agree with that?

A    I agree with that.

Q    And as such you are entitled or actually have the right to your values, your opinions, your beliefs to be honored and respected by other jurors, whatever they may be. Do you understand that?

A    Uh-huh.

Q    Do you agree with that?

A    I agree with that.

Q    Will you insist on it if you're a juror?

A    I will.

Q    And by the same token, each and every juror that you serve with has the same right to have their beliefs and opinions honored in this process.  Would you be able to do that, honor their opinion and beliefs, even if they may be different than yours?

A    Yes.

Q    Because they have the same right.

A    Right.

Q    And if you have a strongly held belief that you just simply can't set aside, you have the right to maintain that throughout.  Do you understand that?

A    I understand that.

Q    You're not just going to go along to get along sort of in this very serious matter.

A    Uh-huh.

Q    That's not inferring in any way that you're not supposed to have dialogue with other members of the jury and try to come to an appropriate decision in this matter.  Do you understand that?

A    Uh-huh.

Q    That's sort of the jury process.  Okay.

I think most of the questions about domestic violence have been answered but I do want to ask one question.

When people would come in in an abusive situation and needed a protective order or whatever else the legal services did, would you have occasion to meet the children? Did they sometimes bring their children in with them?

A    Uh-huh.  They would bring them to the office.

Q    Have you had occasion to interact with them?

A    Not necessarily.  Normally we put them in a place where they can play.

Q    Okay.

A    Because we -- that wasn't our responsibility.

Q    Right.  How long were you with legal services?

A    About 15 years.  15, 16 years.

Q    Okay.  And was that when you decided you wanted to be a paralegal or continued to work in the legal field?

A    Right. I guess.  I just got a job as a legal secretary, in fact, and I guess the longer I enjoyed the work and just -- that's what I did.

Q    Tell us a little bit about what you do -- let me get the name here of the law firm -- Turner, Enochs and Lloyd?

A    Uh-huh.

Q    Tell us a little bit about what you do with that law firm.

A    I work in the health law section of the firm and the firm has a contract with a major hospital and -- to help people in the hospital who do not have a means of making

payments, so they don't have insurance or whatever.

Q    Right.

A    So our firm provides legal experts to the financial counselors at the hospital to advise them about other sources of payment.  And my major field is Medicaid and Medicare.

Q    And I notice something about administrative hearings. Are there administrative hearings in the Medicaid, Medicare field?

A    Yes.  If we decide that the patient should apply for Medicaid, and if they are denied, we go to administrative hearings with the Department of Social Services.

Q    Are they normally held before an administrative law judge?

A    Initial hearings are held before Medicaid supervisors and the state appeal hearings are heard before state hearing officers and they don't really call them administrative law judges because I think that's the Social Security side of it.

Q    And you don't get involved in Social Security disability or anything like that, do you?

A    We do.  We have to be familiar with the Social Security rules regarding disability because that's a piece of Medicaid.  People apply if they are disabled so you have to apply the Social Security rules to that.

Q   Okay.  You have -- you've told us about one sister in New York.  Where are your other sisters?

A   I have another sister there who is retired.  She was a principal of a school in the Bronx and she retired about three years ago.  I have a brother who is a school teacher, a sister who is a nurse, and another sister who is a minister and works for a collection agency.

Q   And are all of them located in and around New York City?

A   No.  Just the two sisters.  My two older sisters live in New York and the rest of us are here.

Q   Okay.  Do you attend your sister's church?

A   My sister -- we go to church together.

Q   You indicate she was a minister?

A   She is a -- she doesn't have a church.  She's an associate minister at our church and is on the ministerial staff there.

Q   You never have been engaged in criminal law?

A   No.

Q   Ms. Moore, thank you very much for your honest answers and your help in helping us in this process.  Thank you, ma'am.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  The clerk will give you a sheet of paper, Ms. Moore, that gives you a number to call.  We

appreciate it.

(Ms. Moore exits the courtroom.)

THE COURT: 204.

(Marybeth Whitney entersthe courtroom.)

THE COURT: Good afternoon.

PROSPECTIVE JUROR: Hello.

THE COURT: I believe you are Ms. Whitney.

PROSPECTIVE JUROR: Right.

THE COURT: And the attorneys will have some questions to you.

PROSPECTIVE JUROR: Okay.

THE COURT: The government may inquire.

MS. TOMPKINS: Thank you, Your Honor.

MARYBETH WHITNEY

VOIR DIRE EXAMINATION

BY MS. TOMPKINS

Q    Good afternoon.  Again, I'm Anne Tompkins, this is Jill Rose.  We represent the United States in this case.

I'm going to ask you some questions that come from your answers on the questionnaire.

A    Okay.

Q    Since this is a sentencing hearing in which there are two possible punishments, life imprisonment without release and the death penalty, a lot of my questions are going to focus on your philosophy about the death penalty given this

that.

PROSPECTIVE JUROR: It would be. I'm a single parent, so if that were the case -- I just started working a second job so that would definitely be a hardship.

THE COURT: Any questions further.

MS. TOMPKINS: No, sir.

THE COURT: Thank you very much for bringing that to our attention.

MS. TOMPKINS: Thank you, Your Honor.

(Ms. Falls exits the courtroom.)

THE COURT: 222, please.

(Deana Stanford enters the courtroom.)

THE COURT: Good afternoon.

PROSPECTIVE JUROR: Good afternoon. I believe you are Ms. Standfield.

PROSPECTIVE JUROR: Stanford.

THE COURT: I'm sorry. Stanford.

As you well know, the jury will be asked certain questions, the government may have some and then the defense may have some.

MS. ROSE: Thank you, Your Honor.

DEANA STANFORD

VOIR DIRE EXAMINATION

BY MS. ROSE

Q    Good afternoon. My name is Jill Rose. This is Anne

Tompkins again.

Thank you, Ms. Stanford, for being with us this afternoon and for taking the time to fill out this questionnaire previously. It was very helpful.

As the Judge told you earlier, this is just a sentencing hearing, verdicts of guilty having already been returned on the charges.

Can you accept the verdict of the previous jury?

A    Yes.

Q    You wouldn't require the government to come back in and reprove that guilt to you?

A    No.

Q    This is a whole separate phase.

Now, in a case -- you heard a little bit about the circumstances that supported the finding of guilt in this case. Obviously you wouldn't be here if the sentence were automatic. Even in cases where there is a first degree murder, it's not automatic death penalty, it's not automatic life imprisonment without the possibility of release. That's the purpose of the hearing.

Knowing now a little bit more about what this is about, is there anything personally, religiously, philosophically, morally that would prevent you from sitting on this case as a fair and impartial juror giving both sides equal consideration?

A    No.

Q    In looking at your questionnaire, one of the questions was your feeling on the death penalty and you did not respond to that.  Would you please tell us your opinions on the death penalty?

A    I think in certain circumstances that it's probably warranted.

Q    However, you did note you don't feel strongly at all about it.  Would you tell us what has helped to formulate your opinions on the death penalty?

A    I'm not quite sure I understand what you're asking.

Q    Well, religion, upbringing, reading, friends?  It's the law of the land.  It's a legal penalty.

A    Right.

Q    But what has helped you form your determination that it's okay in certain circumstances but you don't feel strongly about it --

A    I think what I meant is I don't feel a definite one way.  I think it would depend on the case.

Q    You said -- you did check here, "I am uncertain how I feel about the death penalty."

A    I think I was responding to uncertain whether I'm a solid -- I'm not solid one way or the other.

Q    Can you keep -- equally and fairly can you keep both punishments or penalties in your consideration?

A    Yeah.  Oh, yeah.

Q    The way this hearing works, as the Judge explained a little bit, is that the government would present aggravating factors, evidence of aggravating factors, an aggravating factor being a factor or circumstances that would tend to support the death penalty.

A    Uh-huh.

Q    Legally.  The defense doesn't have to put on any evidence.  If they do, it will be in the form of mitigating factors, which is evidence or circumstances which would tend to support their position of life imprisonment without release.

A    Uh-huh.

Q    And then it becomes the job and duty within the legal framework given by the Judge, the job and the duty of the jury to weigh the aggravating against the mitigating and determine then based upon that weighing process which one is the true verdict.

A    Okay.

Q    That's kind of the procedure here.

A    Okay.

Q    As we sit here today, are either of those options open to you equally?

A    Yes.

Q    You don't lean either way?

A    No. No. It would depend on the situation.

Q    You want to hear the evidence?

A    Yeah. I mean yes, honestly.

Q    And then once you've heard the evidence and the law then you can consider both of them?

A    Yeah.

Q    Thanks for answering that for us.

Now, let's see, you did note earlier -- double-check -- that you had heard something about that case.

A    Yes.

Q    Where?

A    I can recall reading an article in "The Observer".

Q    Recently?

A    No. It's been when the incident originally occurred.

Q    Do you recall any of the specifics any differently than what you heard?

A    Not any differently than he reminded -- the name did not ring a bell at all until he started giving information about it and then I recalled that.

Q    Anything about hearing that that where you automatically formed an opinion as to the result of what should happen?

A    No.

Q    Once again, that's not evidence. You've got to wait and hear the evidence as it comes from that witness stand

and you said you could do that?

A    Yeah.

Q    You're a nurse and have you let them know you may be out of pocket for a couple, three weeks?

A    Yes.

Q    Thank you for doing that.

Anything about -- anything about your chosen profession, your career, that falls into that balancing of the death penalty given you've taken that oath about saving a life, do you feel those two come together, are you looking at one as job related and the other as law of the land. Talk to us a a little bit about that.

A    I see them as differently.

Q    We may have some medical testimony during the course of the trial, and the Judge will tell you that whether it's medical or law enforcement or psychological or just an everyday lay witness that it's the job of the jurors to consider that evidence and determine the believability or the credibility of witnesses. And can you do that for all of those folks, equally and fairly?

A    Yes.

Q    Flipping through here let me see. You have a cousin who is with CMPD?

A    Correct.

Q    Do you talk with them about their work?

A    When I see him I do.  He's a parole officer now.

Q    What's his name?

A    Mat Thompson.  Used to be with robbery.

Q    Have you ever seen him in the hospital?  You don't work in emergency, do you?

A    No.  No.  And no, it's just family things I see him at actually.

Q    Do you deal with any domestic violence in your work, victims of domestic violence?

A    Rarely.  I mean it does happen but I don't sit there --

Q    Do you deal with -- other than perhaps your medical training, psychologists, psychiatrists?

A    No.

Q    You said the two most important things you can teach your children, things you learned from your parents, common sense.  That's really what we need here in the courtroom. We don't ask you to leave that at the door.  When you come in you use your reason and common sense as you evaluate the testimony and the evidence.  I don't know if you can teach common sense but it's a good thing to have.

A    I hope it's in their gene pool.

Q    Your mother served as a juror in murder trial.  Did she talk to you about that at the time?

A    It's a number of years ago.  20 years ago.  Just that it was a murder thing.  Afterwards I think she told us a

little bit more, but we were young enough that we didn't need detail. She felt like we didn't need details on anything. I have no idea what it was about.

Q    In that you have a cousin who is a police officer, and I touched on this briefly, but there was a question in here in general do you think law enforcement is more likely to tell the truth than anybody else. You said "I somewhat agree." Is that based on what?

A    They are human.

Q    Will you weigh their testimony like you would anybody else's?

A    Probably.

Q    Just because they are wearing a badge doesn't mean that --

A    I mean I think everybody tries to tell the truth but everybody has their own perception, also, of how things occur.

Q    And that's the job of the jury to take what you hear from the witness stand, all the witnesses, and evaluate the credibility, believability by their demeanor, by how it fits in with the other evidence and talk about that together with other jurors.

A    Right.

Q    The Judge will instruct you as to that. All right. Thank you very much.

VOIR DIRE EXAMINATION

BY MS. LAWSON

Q    And you thought it was almost over?

A    I know.

Q    Ms. Stanford, I'm Jean Lawson.  Harold Bender and I represent Marc Barnette.  We're assisted by David Ball.

I'm not going to ask a whole lot of questions, but we have been reading your questionnaire and listening to you.

Just a couple, though.  Did you -- what made you become a nurse?  Was it your mother's example?

A    Probably that was the most -- the largest factor.  I kind of always knew that's what I wanted to do.  Just -- people need to feel better and that was my make-them-feel-better-kind of thing.

Q    Was she also in labor and delivery?

A    She actually was when I was a very young child.  But most of her working years were not in that.  Not in a hospital.

Q    Did she move into doctor's office?

A    Both doctor's office and occupational health.

Q    Did you do any other kind of nursing duty before -- nurses, I think -- what you've got is really one of the happier jobs in a hospital.  What did you have to do to work your way through to get there?

A    Actually I did not.  When I was in school, though, I

did work in the operating room so that's the only other experience I have had.

Q    Do you find when you're assisting in the labor aspect that you get to know your patients?

A    Oh, very much so.

Q    There will be some evidence in this case of very young girls giving birth to children.  Have you experience assisting those children having children?

A    A few, yeah.

Q    Is there anything special that you take away from that, anything special that affects how you look at children and that kind of early maternity, those issues, and how it affects them and the children later in life?

A    Probably.  I think it's probably very individual.  The person -- you know, you can't say across the board every 16-year-old is going to be a terrible mother when they are 30, if that's what you mean.

Q    Yeah.

A    I think everybody -- I mean everybody can be so different.  There's a lot that really do well.  But in the very beginning of it, I can't see that far forward -- you know, you can't predict that far forward.

Q    Plus you're not seeing them in the most normal of circumstances?

A    Right.

Q    Your husband's job as a fire fighter, has he ever delivered a baby?

A    Actually he has, yeah.

Q    How long ago was that and how did that affect you?

A    It was prior to us ever meeting.  I think it was in a car in a gas station because they stopped there and called the medics or EMTs.

Q    So it's a family thing?

A    It's become that way.

Q    There's a certain amount of evidence the jury is going to hear in this case about domestic violence.  And having been in a hospital setting, do you have any experience outside of what you see in the hospital in terms of research, reading studies or perhaps even knowing people who are involved in domestic violence situations?

A    Not very much at all.

Q    So I take it that whatever you hear you'll be able to listen to, won't be so distressed by the subject matter that you would close an ear to it?

A    No.

Q    In this jury service you bring everything that makes you you into the courtroom.  All your background, your experiences, the things that you hold important, talking about family values in the questionnaire.  You don't leave those outside the courtroom door.  That is part of who you

are and it's you as an individual, everything you are as a juror. And you have a right to have the other jurors listen to you and respect your decisions and your opinions and honor them. Do you agree with that?

A    Yes.

Q    And by the same token the other jurors have that same right to have you listen to them but also to be allowed to have their opinions and decisions respected?

A    Uh-huh.

Q    Do you have any difficulty with that proposition?

A    No.

Q    Okay. And if during the course of your deliberations, after listening to the other jurors, if you remain persuaded of a particular decision or opinion, are you able to hold on to that opinion?

A    I would think so, yes.

Q    So you wouldn't kind of go along to get along? You wouldn't give up a strongly held position that you had simply because it was easier than holding on to it?

A    No.

Q    I know you said that your mother's experience on a murder trial, you didn't get the details. Did you pick up anything from her about her jury experience in general, for instance, did she ever say, "I'll never go back on a jury again"?

A    Actually what I picked up from her was that's something we all need to do, that's something we all need to experience.  So I didn't have a problem coming.  Initially I didn't put any request to be let out of this because that's something we all need to do as citizens.  And I think that started from possibly -- well, from upbringing too, but her having done that, I guess I saw, well, she did her part.  I ought to also.

Q    Where did you get your nursing from?

A    UNC Charlotte.

MS. LAWSON:  Thank you very much.  We appreciate you answering questions.  I'm the last one.

THE COURT:  The Court has a notice for you.  It has a phone number on it and if you'd call that as indicated we'd appreciate it.

PROSPECTIVE JUROR:  Okay.

(Ms. Stanford exits the courtroom.)

THE COURT:  212 please.

(Stephen Maskol enters the courtroom.)

STEPHEN MASKOL

VOIR DIRE EXAMINATION

THE COURT:  Good afternoon, sir.

PROSPECTIVE JUROR:  Hello.

THE COURT:  Your name is Mr. Maskol.

PROSPECTIVE JUROR:  That's right.

F L E D
IN COURT
CHARLOTTE. N. C.

JUL 2 9 2002

U. S. DISTRICT COURT
W. DIST. OF N. C.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:97-cr-23-V |
| | ) | |
| vs. | ) | |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE, | ) | VOLUME 11 |
| | ) | |
| Defendant. | ) | |

JURY SELECTION
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
JULY 27, 2002

APPEARANCES:

On Behalf of the Government:

    ANNE M. TOMPKINS, ESQ.
    JILL WESTMORELAND ROSE, ESQ.
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    JEAN B. LAWSON, ESQ.
    P.O. Box 472106
    Charlotte, North Carolina

    HAROLD J. BENDER, ESQ.
    200 North McDowell Street
    Charlotte, North Carolina

           Cheryl A. Nuccio, RMR-CRR
           Official Court Reporter
         United States District Court
          Charlotte, North Carolina

SATURDAY MORNING, JULY 27, 2002

THE COURT: Good morning. Doesn't feel unbearably hot in here, just yet anyway.

MR. BENDER: Judge, may I bring something to the court's attention before we begin?

THE COURT: Yes.

MR. BENDER: Last night as I was reviewing the transcripts of the jury selection, there was a gentleman by the name of Kraig, spelled with a K, Allen who appears as the last potential juror on July the 25th. He was the -- just to refresh Your Honor's recollection, he was the man who worked for Joe Gibbs Racing. Was a janitor.

THE COURT: I recall him.

MR. BENDER: Yeah. I asked him about the 18 and the 20 car and questions along those lines.

THE COURT: Yes, sir.

MR. BENDER: I had your law clerk check the times that you had for us. The government took thirteen minutes. I took sixteen minutes. And in ten pages of transcript for the government and four pages of transcript for me, there's nothing in there about the 18 or the 20 car. There's nothing in there about the walk in your own shoes thing, which I have been consistent in ad nauseum and -- I'm not concerned about this juror. We have sufficient notes to make a reasoned decision on him. What concerns me is if we're not getting a

full, complete, accurate transcript, we need to know that and we need to do something about it, so...

THE COURT: Well, you're quite right. We will inquire of Ms. Kelly and ask her to review her notes again and the -- her computer program as recorded on disk and her -- and the backup tape, if necessary, to determine what happened. And we'll have to ask her, then, if that could be happening in other instances.

MR. BENDER: Right.

THE COURT: In other words, why it happened and what might be the cause.

MR. BENDER: It's a concern and I'm sure it's a concern shared by the government.

THE COURT: I'm quite sure.

MR. BENDER: I have one other --

THE COURT: You didn't come across other instances of that as of so far?

MR. BENDER: So far --

THE COURT: Okay.

MR. BENDER: -- I did not.

THE COURT: Okay.

MR. BENDER: I have one other matter. Judge, we will be -- as you call a number, we may be asking to renew a cause challenge for various reasons. And I don't know whether you want to call all twelve, let me address any that might be

in the twelve, or, as one is called, if I think I have a renewed cause challenge. I just don't know how you want us to do that.

THE COURT: That might be the efficient way to do it.

MR. BENDER: Okay.

THE COURT: Because as to certain ones it might be moot and save a little time.

MR. BENDER: Right.

THE COURT: So what we'll do is -- I have Ms. Calkins' list and it's a random ordering of the 65 jurors who in the end were qualified.

And the first juror in the box is number 132. That is Martens, M-a-r-t-e-n-s.

And the second one is juror 15. That is Mills, M-i-l-l-s.

The third is 243. That is Patterson.

Fourth is Bryson, number 121.

Fifth is 70, Sanders.

Sixth is 100, Lyles, L-y-l-e-s.

And seven is Anderson, number 26.

And eight is 186, Robinson.

And nine is 266, Reinhardt, R-e-i-n-h-a-r-d-t.

Ten is Matteson, M-a-t-t-e-s-o-n, number 133.

MR. BENDER: Your Honor, with regard to that one, we

would renew our cause challenge.

THE COURT: All right. Number 141 is eleven. That is Greenwood.

And twelve is number 82, Johnson.

Inasmuch as there may be more than one juror with the same name, I will -- although you have the number to identify, I will put the first name with these.

Going from one to twelve, it's Ann Martens.

And two is Kimberly Mills.

And three is Carol Patterson.

And four is Carla Bryson.

And five is Regina Sanders.

Six is Lee Lyles.

And seven is Steward Anderson.

And eight is Rita Robinson.

And nine is Joseph Reinhardt.

And ten is Randall Matteson.

Eleven is Joanna Greenwood.

And twelve is Sheila Johnson.

Do you have it there when we talked to Mr. Reinhardt?

MR. BENDER: I believe it was yesterday afternoon -- yesterday. I believe he was yesterday afternoon.

THE COURT: I believe you're right.

THE COURT REPORTER: You wouldn't have that one

yet. Joy is not here.

THE COURT: Do you want to add anything to what you already argued?

MR. BENDER: Judge, it's Matteson that I was renewing my objection.

THE COURT: Oh, Randall Matteson.

MR. BENDER: Yes.

THE COURT: Okay.

MR. BENDER: I'm sorry.

THE COURT: That was 7/24. Did you want to be heard about him?

MR. BENDER: Yes, sir, Your Honor.

The cause challenge made at the time was concerning his agreement that police officers tend to tell the truth. And on page 15 -- well, beginning on page 1561, at the bottom of the page about page -- line 17, on down through 1562, I make a motion at line 7.

Then there's a follow-up voir dire by Ms. Tompkins. And his answer during rehabilitation was, as Ms. Tompkins tried to rehabilitate him, he said, I wouldn't say I wouldn't absolutely believe them, but I tend to believe them more.

Question: Right. Because they're a sworn officer.

Right.

And based on --

THE COURT: Now, what line are you on?

FORM FED  ® PENGAD · 1-800-631-6989

MR. BENDER: I am on -- I go down through line 7 is where I made my motion.

THE COURT: I don't -- I've got page 1561, but line 7 --

MR. BENDER: 1562, Judge, I'm sorry. It starts at the bottom of page 1561 and goes to the top of page 1562.

THE COURT: Well, tell me what page you're on. That helps.

MR. BENDER: I'm on page 1561 at the bottom beginning at line 17.

THE COURT: Okay.

MR. BENDER: Through the end of that page, through the top of page 1562 down through line 7 where I make my motion.

THE COURT: All right, sir.

MR. BENDER: Okay. Rehabilitation. And then line -- through line 12 -- 12 through 19 is where the juror says -- actually, on line 16 it says, I wouldn't say I wouldn't absolutely believe them, but I tend to believe them more.

Right. Because they're a sworn officer.

Right.

Based on that Eighth Circuit case that I tendered to the court, I ask that our cause for challenge -- our renewed cause for challenge be granted.

The Fourth Circuit case that we looked up when this

issue first arose, in my opinion, doesn't answer this question. The Fourth Circuit case simply says it's not pro se error -- per se error for the -- for the court not to ask about the law enforcement questions during a --

THE COURT: All right. Taking all of his answers together, including that there are corrupt police all over the news nowadays, the court denies the motion.

MR. BENDER: Okay.

THE COURT: Okay. So we have twelve in the box. Is the government prepared to tell us which ones it will strike?

MS. TOMPKINS: Yes, sir. Government will strike number 15, which is juror number 2 -- how are you going to do that? By juror number?

THE COURT: Well, tell us where they are in the box.

MS. TOMPKINS: Okay. Juror number 2, juror number 4, juror number 5, juror number 7, and juror number 8.

MR. BENDER: Your Honor, as to juror number 4, we make a Batson challenge. As to juror number 5, we make a Batson challenge.

THE COURT: All right. Now, your -- what is your prima facie case?

MR. BENDER: Judge, of the jurors called --

THE COURT: Jurors what?

MR. BENDER: Of the jurors called, the twelve here.

THE COURT: Yes.

MR. BENDER: Okay. These are the only two black females in the -- in the twelve. There is a black male, Mr. -- juror number 6.

The questioning, as I recall, of these jurors was that we have -- that -- their answers were no different than anyone else, any white female or any white male or --

THE COURT: Well, aren't you anticipating the government's -- whatever statement they might make about that?

MR. BENDER: Well --

THE COURT: I'm glad to hear anything else you want to say about it.

MR. BENDER: Well, of course, our client is African-American and these are two African-American females who said they could be fair in this matter. There are seven black females in the pool and the government is eliminating two of them, and we believe it's based on race and the exercise of peremptory challenge should not be allowed for these blacks.

THE COURT: Okay. You're saying as of the twelve that are in the box, there are three African-Americans.

MR. BENDER: Yes, sir.

THE COURT: Is that right?

MR. BENDER: Yes, sir.

THE COURT: Okay.

MR. BENDER: And two of those are black females and they are eliminating -- asking to be allowed to eliminate two of them. They answered just like everybody else.

As to Ms. Bryson, she is a graduate of --

THE COURT: Wait just a minute, if you will.

MR. BENDER: Yeah.

(Pause.)

THE COURT: Okay. What -- are you through, Mr. Bender?

MR. BENDER: Well, Judge, this young lady's father was in law enforcement. He was a detective with the Gaston County Police Department. He is now with the sheriff's department. She is a college graduate.

She says that -- in her -- on her death penalty questions, I can't say I'm really for the death penalty or totally against it. I haven't formed any serious, hard core judgment on that. And she says, Sometimes I'm for it; sometimes I'm against it. So I think that's the kind of juror we want.

THE COURT: Okay. What does the government say by way of explanation?

MS. TOMPKINS: Just for the record also, we just want to note that there's a black female victim in the case so that factually there's not an obvious racial bias. There's a

black victim and a white victim.

In this particular juror's case, on the questionnaire she noted that her personal view of the death penalty waivers; and that she was not sure whether she favored abolishing the death penalty; and marked on the questionnaire that she was uncertain about how she felt on the death penalty.

In questioning, she called herself, quote, a straddler. And again, said that she was uncertain about how she felt about the death penalty.

And for those reasons, the government is exercising a peremptory strike on her.

THE COURT: All right. Now, let's go to number 50, Regina Sanders.

MR. BENDER: No 70, Judge.

THE COURT: Excuse me, her number is 70.

(Pause.)

MS. TOMPKINS: I'm sorry, Your Honor. Ms. Sanders --

THE COURT: Wait just a minute.

MS. TOMPKINS: I'm sorry.

THE COURT: I think we need to hear from Mr. Bender as to his prima facie case, or Ms. Lawson.

MS. LAWSON: Yes, Your Honor. Ms. Sanders is an African-American female. Mr. Barnette is an African-American

male.

Ms. Sanders is -- her statements to the court were July 19th in the afternoon starting at page 888. She is an entrepreneur. Operates a part-time mailing business from her home. She has started a master's level program in sociology. She is as well educated if not more educated than a number of members in the jury. She indicated that she understood the law. Would accept the law as stated by the court. That she had no hesitation in accepting the guilty verdict.

What she did, though, Your Honor, is she expressed the opinion that some socioeconomic groups may have been selected for capital punishment, and I think that that may be why the government is striking her. I think I'd refer you to the bottom of page 891 of the transcript. The problem is that she says the truth. She recognizes something that she recognizes out of her experience is a matter of race. And that's critical because that's exactly what Batson addresses is the recognition by African-Americans that some cases are singled out for capital punishment. I don't think that there's any clearer indication of why Batson exists and that is that some people of the African-American race believe that some people are singled out for capital punishment. That's, you know, a perception that people of that race may well hold. And that's a distinction. It's a distinction that we don't see in other jurors, the white jurors, and that's why

she's being taken off the jury, because she expressed a view that some people are singled out, some socioeconomic groups.

THE COURT: That's the basis -- I mean, <u>Batson</u> has a basis but we're not arguing the basis of it.

MS. LAWSON: Right.

THE COURT: You would -- would you say that her concern that certain groups have been unfairly selected for punishment, would you think that would go -- that would indicate an extraneous influence on her decision making process apart from the facts of this case?

MS. LAWSON: What I'm saying is that they wouldn't. She said they wouldn't. But that she recognizes that there is a socioeconomic issue there that is of some concern.

Other jurors expressed discrete concerns. For instance, some jurors said that they would only approve of the death penalty as punishment if the victim was a police officer or if the victim was a legislative official. What she's saying is some valid expression of concern about how it's applied in general, how cases are selected for capital prosecution. And I think that that expression of opinion is -- you know, indicates a valid, well-educated concern, but she said that she could follow the law.

THE COURT: All right. Is that all?

MS. LAWSON: Yes, sir.

THE COURT: I'll hear from the government.

MS. TOMPKINS: Your Honor, Ms. Sanders said that she had strong feelings about the fairness of the death penalty and actually the unfairness of its application against socioeconomic, race and age factors which she thought made the application of the death penalty unfair. And she stated that because of this, it is applied unfairly and she was not sure she could be fair. And for that reason we are exercising a peremptory strike.

And also, just for the record, and each time I'll reiterate that there is an African-American female victim in the case.

THE COURT: Okay.

MS. LAWSON: I would just point out, Your Honor, that at page 893, she confirmed that she would take part in the deliberations with a fair and open mind. Said, I would keep an open mind. And, you know, the balance of her colloquy makes it clear that she'll do exactly what the other jurors said they would do fairly and impartially.

THE COURT: The court finds that in both of these cases the government has made a race neutral explanation. Consequently, the burden falls on the defendant to make an overall showing concerning a purpose of discrimination.

Is there anything further that the defense would like to say to that?

MR. BENDER: No, Your Honor.

THE COURT: Okay. Those challenges are disallowed. So numbers -- jury box numbers 2, 4, 5, 7, and 8 are stricken at the request of the government.

I'll ask the clerk to replace those jurors and that is to be done by going down the list. And the juror number 13 is -- goes into box 2 and that is Timothy Rock.

And 4, juror number 14, goes into box 4, and that is Scott Dockery.

MR. BENDER: Judge, do you also have their juror numbers?

THE COURT: Yes, sir, I'm sorry. Mr. Dockery is 160.

MR. BENDER: Okay.

THE COURT: And Mr. Rock is 263.

MR. BENDER: Thank you.

THE COURT: Okay. And then in number 5, seat 5 is number 98, James Donaldson.

MR. BENDER: Renew a challenge.

THE COURT: Okay.

MR. BENDER: Are you ready to hear from me at this time?

THE COURT: Not quite.

MR. BENDER: Okay.

THE COURT: Just a second.

MR. BENDER: Okay.

THE COURT: And then number 7, going down our list, number 16 goes to seat -- let's see, seat 7 is juror number 29, David Kelly.

And finally, seat 8 is juror number 17 on the random list, number 181 originally, Debra Moore.

(Pause.)

THE COURT: Okay. Juror number 98, I think you said you wanted to renew your challenge for cause.

MR. BENDER: Yes, sir, Your Honor. And there are three comments that he made I'd like to bring to the court's attention.

The first is on page 1295 of the transcript.

THE COURT: Okay. If you'll wait just a second, I'll get hold of that.

MR. BENDER: Okay.

(The transcript was tendered to the court.)

THE COURT: Okay. Thank you.

MR. BENDER: On 1295 when the government was questioning him, beginning on page -- line 8 through line 16.

THE COURT: Okay. Is that all?

MR. BENDER: No, sir. On that page -- in that colloquy he says, about an open mind about either death or life without the possibility of release, he said probably not a hundred percent did he have an open mind.

Then again, on page 1299, beginning at line 11, 11

through 20 on that page.

THE COURT: Okay.

MR. BENDER: Okay. In that one he was asked, What do you think about life imprisonment without the possibility of release as a punishment for first degree -- two first degree murders?

He said, I'm not sure if I've got a real opinion on it. You mean in contrast to the other possibility? Again, supporting the death penalty. I'm not sure that it's an adequate punishment, referring to life without the possibility of release.

And then later on on page 1302, beginning on line 6 through line 17.

(Pause.)

THE COURT: Do you want -- I mean, are you -- I don't know when you -- a long pause, I don't know if you're done or...

MR. BENDER: I don't know whether -- no.

THE COURT: I want you to make your case --

MR. BENDER: Okay.

THE COURT: -- for why we should renew our consideration of that challenge.

MR. BENDER: I was giving the court time enough to read it, so...

THE COURT: Okay.

MR. BENDER: Anyway. But in that --

THE COURT: I am following, by the way.

MR. BENDER: Okay. In that there -- concerns or reservations about consideration of both punishments, and his answer was no, I don't have any specific concerns. Never been in this exact situation, so it's difficult. I can't say with a hundred percent certainty. I'd like to think I could put that aside.

So those are three instances, Judge, where we believe he was properly challenged for cause. We make -- we renew that cause challenge. Ms. Campbell was released for cause over our objection because she said something about 45 -- 55 and 45 percent. And so here's a man who's saying I can't -- you know, I can't do it a hundred percent. I can't tell you I have an open mind. I can't tell you I can put that aside. I support the death penalty to the extent that I don't believe life without the possibility of release is an adequate punishment.

So all of that, we say, should grant us this cause for challenge.

THE COURT: Would the government wish to reply?

MS. ROSE: That was not our general sense. I remember long questioning of that juror. And on the law enforcement questions he was very open. On the death penalty he was very open. He wasn't -- he didn't have a long

explanation. Just said I support it. I understand -- understand it. Didn't get any sense that he couldn't be anything other than a fair and impartial juror.

The totality of his questioning, he came across as someone who would consider both options and attempt to be fair and impartial. We ask that you deny that motion.

THE COURT: Okay. The renewed challenge will be denied based on the context of what he said as he said it and his overall demeanor and presentation.

So we have -- now have those new five in the box, and the question is whether the government will offer any challenges to them?

MS. ROSE: Yes, we would, Your Honor. Juror number 8 -- or not number 8, seat number 8, juror number 181.

MR. BENDER: Your Honor, we'd challenge that on the same basis.

THE COURT: Okay. Is that a <u>Batson</u> challenge --

MR. BENDER: Yes.

THE COURT: -- to number 8?

MR. BENDER: Yes.

THE COURT: That is, seat number 8 which is Debra Moore.

MR. BENDER: Yes.

THE COURT: Number 181. So is that the only challenge the government is offering?

MS. ROSE: Yes, Your Honor.

MR. BENDER: Judge, again, of the six strikes that have been used by the government, three of them have been used as to black females. For the record, Marc Barnette is an African-American. We acknowledge that Robin Williams was also an African-American, but that Donald Allen was a white male.

There are only seven black females in the pool. The government has essentially eliminated almost half of them by their challenges. I can get her transcript. I don't have it right before me, but -- our notes would indicate that she was a perfectly good juror. If you'll give me a moment, I'll try to find that transcript.

MS. HANKINS: The afternoon of the 25th.

THE COURT: Page 1914.

MR. BENDER: Okay, the 25th.

MS. HANKINS: Afternoon.

MR. BENDER: Afternoon.

THE COURT: July 24th.

MS. HANKINS: 25th.

THE COURT: I'm not sure it's afternoon. It may be in the morning.

MS. HANKINS: I think she was called on the morning, but we must not have gotten to her until the afternoon because the red transcript is the afternoon.

THE COURT: Okay.

MR. BENDER: Judge, in her answers, she said that she really didn't have an opinion about the death penalty. She's willing to look at it, make a decision, from what I hear. Don't have a view one way or the other. She also says, I don't feel strongly one way or the other. I just have to make a decision based on what's before me. I can't sit here and say one way or the other. And really, very short questioning by the government on this matter. I don't have a view one way or the other. Look at the facts, whatever is before me, make that decision at that time. Don't know what my opinion would be.

All of that is an indication that -- to us that based on the limited amount of questioning by the government, that this challenge is solely based on race considerations.

THE COURT: Okay. The court grants the prima facie case.

Would there be a reply by the government?

MS. ROSE: Yes, Your Honor. Note that -- one thing the record is not going to reflect is her long hesitation in responding to a number of questions. One of those that I made particular notes about was when we asked are we on the equal playing field question, there was a very long hesitation before she could tell me whether the government was on an equal playing field.

Another thing that is of great concern is that we

talked about her religious beliefs in the context of the death penalty. And my quote made there is she said, We don't do those things, when I asked her what her re -- how her religious beliefs factored into her views of the death penalty, and she said we don't do those things. My follow-up question was something along the line of are you willing to go against your religion, and she said I don't know.

THE COURT: And I believe she said in her questionnaire, It's God's will to say.

MS. ROSE: Right. And based upon those, along with the very long hesitancy, particularly to that question of are we equal here as we sit before you, the government offers those reasons to support the strike.

THE COURT: Okay. Would there be anything further from the defense on this matter?

MR. BENDER: No, Your Honor.

THE COURT: Okay. The government finds that to be a race neutral explanation and -- and does not find their overall -- that there's a purpose of discrimination on the part of the government here. And that is based primarily on her having religious bent against the death penalty or throwing in the question whether she could apply it in view of those beliefs and her overall demeanor.

THE COURT REPORTER: You said the government finds, did you mean the court?

THE COURT: The court finds.

Okay. So the next replacement, then, for seat number 8 is number 18 on the random list, original number 31, Lisa McIntire.

Will there be any strike offered of that juror?

MS. TOMPKINS: No, Your Honor. The government is satisfied with this panel.

THE COURT: All right. The matter of strikes, then, goes to the defendant as to those presently in the box.

MR. BENDER: May we have just a moment, Your Honor?

THE COURT: Yes, sir.

(Counsel conferred.)

MR. BENDER: Okay.

THE COURT: All right, sir.

MR. BENDER: Your Honor, we would exercise peremptory strikes as to seat number 2, Mr. Rock, number 263.

THE COURT: Okay. Let's see now. Hold that up right there for a second.

(Pause.)

THE COURT: All right, sir. 13.

MR. BENDER: The next strike would be as to seat number 3, Ms. Patterson, number 243.

THE COURT: All right, sir.

MR. BENDER: Number 4, Mr. Donaldson, number 98.

MS. HANKINS: That's number 5.

MR. BENDER: 5. Okay, 5, I'm sorry.

THE COURT: 5.

MR. BENDER: I'll start looking at Ms. Lawson so I can keep straight.

Seat number 6, Mr. Lyles, number 100.

Seat number 7, Mr. Kelly, number 29.

Seat number 8, Ms. McIntire, number 31.

Seat number 10, Mr. Matteson, number 133.

And seat number 12, Ms. Johnson, number 82.

We're satisfied with the remainder.

THE COURT: All right. That would appear to be eight strikes.

MR. BENDER: Yes, sir.

(Pause.)

THE COURT: All right. Any challenges to those?

MS. TOMPKINS: No, sir.

THE COURT: Okay. The court will then replace those as follows:

Random number 19, juror number 136 goes into seat 2. That's Susan Cohen.

And random 20, seat number 45, is Peggy McManus going into seat 3.

And number 226, then, goes into seat 5. And she -- he is John Fowler.

And seat 6 is filled with number 85, John

Youngblood.

And seat 7 filled by number 223, Kristal Roseboro.

Seat number 8 is number 5, Barbara Iosue, I-o-s-u-e.

And seat 10 is 108, Karen Sanders.

And 12 -- excuse me -- yeah, seat 12, number 36, Bryan Williams.

And we'll hear from the defendant when you're ready about strikes for those seats.

MR. BENDER: Sort of like the NBA draft. Are we on the clock?

THE COURT: Actually, the only clock is governed by the fact that this room is getting hotter and the judge has the warmest clothing on of all.

(Counsel conferred.)

MR. BENDER: I believe we're ready, Judge.

THE COURT: All right, sir.

MR. BENDER: We would use a strike against seat number 6, Mr. Youngblood, number 85.

We would use a strike --

THE COURT: Let's see. Can you also --

MR. BENDER: Excuse me.

THE COURT: -- use seat numbers.

MR. BENDER: Yeah, that's --

THE COURT: All right. Seat 6 is number 85,

Youngblood.

MR. BENDER: Right. Seat 8, number 5, Iosue.

THE COURT: Thank you.

MR. BENDER: And that would be our strikes.

THE COURT: All right, sir.

Okay. Now, number 6, replacement for 85, Youngblood, will be number 83, George Fitzsimmons.

And replacement for seat 8, Iosue, is random 28, initial number 125, and that is Sean Mather.

MR. BENDER: May I inquire of the court if we have heard anything from him about his situation involving his new baby or his wife or anything?

THE COURT: No.

MR. BENDER: Okay.

(Counsel conferred.)

MR. BENDER: Judge.

THE COURT: Yes, sir.

MR. BENDER: In seat number 6, Mr. Fitzsimmons, number 83, we would use a strike.

Seat number 8, Mr. Mather, number 125, we would use a strike.

THE COURT: Okay. So that would be twelve regular strikes.

MR. BENDER: Yes, sir.

THE COURT: And in place of seat 6, Fitzsimmons,

will go number 38, David Miller.

And in place of number 8, Mather, goes number 43, Luther Ray, Jr.

(Counsel conferred.)

MR. BENDER: Judge.

THE COURT: Yes, sir.

MR. BENDER: In seat number 8, Luther Ray, number 43, we would strike.

THE COURT: Okay. Just that one?

MR. BENDER: Yes, sir.

THE COURT: Okay. And in his place will go random number 31, juror number 118, Jacob Santinelli.

(Counsel conferred.)

MR. BENDER: Judge, we're satisfied.

THE COURT: All right, sir. Let's hear from the government, then, as to those seats where the defendant replaced anybody, and that would be 2, 3, 5, 6, 7, 8, 10, and 12.

MS. TOMPKINS: Of the new panel, Your Honor, the government would strike seat number 2.

THE COURT: Okay. Wait one second.

MS. TOMPKINS: Okay.

(Pause.)

THE COURT: Okay. The government --

MS. TOMPKINS: That's juror number -- original

number 136, Susan Cohen. We will strike --

THE COURT: Okay. As to seat number 6, you are striking --

MS. HANKINS: Seat number 2, Judge.

THE COURT: Excuse me, number 2.

MS. TOMPKINS: Number 2.

THE COURT: Thank you. You're striking Ms. Cohen.

MS. TOMPKINS: Yes.

THE COURT: All right.

MS. TOMPKINS: We will strike seat number 6, David Miller.

THE COURT: That would be number 38.

MS. TOMPKINS: Yes.

THE COURT: Okay.

MS. TOMPKINS: And seat number 10, Karen Sanders.

THE COURT: 108.

MS. TOMPKINS: Yes. And we're satisfied with the rest.

THE COURT: Okay. So that's three strikes on top of your six.

MR. BENDER: Judge, may we have just a moment --

THE COURT: Yes.

MR. BENDER: -- concerning Batson?

THE COURT: You may.

MR. BENDER: We may or may not challenge. We need

to get our notes together.

THE COURT: Yes.

(Pause.)

MS. TOMPKINS: That is --

MS. HANKINS: That was three in addition to their six, and I show they have five.

MS. TOMPKINS: Six on the first round.

THE COURT: One, two, three, four, five. You had challenged 2, 4, 5, 7, and 8, and then you replaced 8. That made six.

MS. HANKINS: Okay.

MS. TOMPKINS: Yes. That's my --

THE COURT: And then you've got three more, and that makes nine.

MS. TOMPKINS: That's my tally.

MS. HANKINS: I didn't count Moore. Okay.

MR. BENDER: There will be a <u>Batson</u> challenge, Judge.

THE COURT: All right. Can you tell me which one?

MR. BENDER: The transcript or the juror?

THE COURT: No, which juror are you about to look at so I can look at my own notes.

MR. BENDER: Right. It's Ms. Sanders, 108, which is seat --

MS. ROSE: 10.

MR. BENDER: -- 10.

THE COURT: Okay.

MR. BENDER: With regard -- excuse me, Judge.

THE COURT: Okay. Let me -- I'm trying to find her. I think I can do that.

MR. BENDER: It was on the Saturday transcript, July 20.

THE COURT: Yes.

(Pause.)

THE COURT: All right, sir. Go ahead, please.

MR. BENDER: Ms. Sanders is employed full-time and was asked about her job. She said there would be no problem.

This was the lady who had put down on her -- on her questionnaire concerning knowing somebody who was murdered. She put private. Your Honor said if you want to -- if you want to have a side-bar, we can. She said no, that's fine. It was my best friend's mother. Visited in the home with them. They're still friends.

With regard to the death penalty, she said, Without hearing more detail, I'm kind of torn between the death penalty. It just kind of depends, I guess, really on the case and just hearing the details, more information about it. Don't have a strong yes for the death penalty. Don't have a strong no for the death penalty. Depends on the situation. Can she consider the death penalty? Yes, that's something I

can consider.

Judge, this is -- Marc is African-American. Robin Williams, one of the victims, is African-American. Donald Allen is white. This juror is African-American. This is the, I guess the third -- well, it's four out of seven African-American females that have been excused by the government.

THE COURT: Now, you were saying earlier that there were at the outset four African-American females?

MR. BENDER: African-American females in the pool, there were seven.

THE COURT: There were seven in the entire pool.

MR. BENDER: Right.

THE COURT: And how many males, black African-American males?

MR. BENDER: We've got it written down here somewhere. We had it all broken down by race.

There were five African-American males.

THE COURT: All right.

MR. BENDER: And very -- very short amount of questioning also in this matter. Religious training has nothing to do with her position on the death penalty.

The cumulative effect of the government's strikes is to -- out of -- out of nine strikes, they have exercised four against African-Americans. And I think the cumulative effect

is that the strikes are race based and discriminatory in nature. And there's nothing in her transcript or her questioning that would indicate in any way that she is not a qualified juror to sit on this case.

THE COURT: Let me hear from the government.

MS. TOMPKINS: Your Honor, as to Ms. Sanders, on her -- first of all, I will say this. Of the nine strikes the government has exercised at this point, we've exercised three strikes against white females, four on black females, including Ms. Sanders, one black male, and one white male. We have passed black males to the defense which have been, some of whom have been struck by the defendant, so --

THE COURT: I'm sorry, I didn't hear that last.

MS. TOMPKINS: We've passed black males to the defense, some of whom have been struck by the defense.

Specifically as to Ms. Sanders, on her jury questionnaire, on the question, What is your personal view of the death penalty, she answered not sure. On the question, What is -- what of the following describes your attitude towards the death penalty, she noted she was uncertain about how she felt about the death penalty. And on the jury questionnaire question of which it says, If you favor the death penalty, would you say you favored it, and then the range was very strongly, somewhat strongly, not very strongly at all, and she noted other. So on her questionnaire she

noted hesitancy about her ability to consider the death penalty.

In the questioning overall, there was a feeling that she was hesitant in her answers. She was somewhat noncommunicative with the government. We noted long hesitations before answering the question on her opinion on the death penalty. And she did answer that she was kind of torn. Again, when asked, Can you consider the death penalty, she gave a very hesitant answer. She hesitated a long time before she answered.

So based on her noncommunicative answers, her hesitant answers, her uncertainty about her ability to consider the death penalty, both in the questionnaire and in questioning, we are exercising a strike on her.

MR. BENDER: Judge.

THE COURT: Yes, sir.

MR. BENDER: Judge, perhaps the record does reflect -- I said there were four out of nine were used against African-Americans. It now appears there were five out of nine.

MS. TOMPKINS: I've got four including Ms. Sanders.

MR. BENDER: I thought you said four against African-American females and one against --

MS. TOMPKINS: Yes.

MR. BENDER: -- a black male.

MS. TOMPKINS: Yes.

MR. BENDER: So five out of nine have been exercised against the African-American race, male or female.

MS. TOMPKINS: But the government has also passed both black female and black males to the defense, so just for the record.

THE COURT: Well, the court finds that the explanation is race neutral, and in the overall context of her answers and her demeanor, that -- considering the arguments of both parties, that the government's purpose is not a discriminatory purpose. So that's the rationale.

Now, as to those three seats, the replacement jurors for seat 2 will be number -- random number 32, juror number 231. And that is Jennifer Joles.

And as to number 6, seat 6, the replacement is number 222, Deana Stanford.

And finally, as to seat 10, the replacement is number 138, Gary Moore.

MS. TOMPKINS: The government is satisfied.

THE COURT: All right. The defendant would then exercise strikes against -- if any, against seats 2, 6, and 10.

(Counsel conferred.)

MR. BENDER: Your Honor, we're ready.

THE COURT: All right, sir.

MR. BENDER: We will excuse in seat number 2 Ms. Joles, number 231.

THE COURT: Okay.

MR. BENDER: That would be the only strike we'll use.

THE COURT: Let's see. Seat number 6 was -- had juror Stanford in it.

MR. BENDER: Yes.

THE COURT: So Ms. Joles, I think, was in seat 2.

MR. BENDER: Yes. I thought that's what I said.

THE COURT: Okay. If that's what you said, that's fine. Seat 2, Ms. Joles.

That's 14 strikes of regular jurors.

Ms. Joles is replaced by random 35, juror number 84, Mark Blakeney.

(Counsel conferred.)

MR. BENDER: Your Honor, we are satisfied with the panel.

THE COURT: All right, sir.

So the government may consider a strike against seat number 2, if it sees fit.

MS. ROSE: And the government would do so, Your Honor.

THE COURT: You would strike number 84, Blakeney?

MS. ROSE: Yes, sir.

MR. BENDER: Judge, this would be a <u>Batson</u> challenge. We have a transcript here somewhere.

THE COURT: All right, sir. We'll hear you when you're ready, Ms. Lawson.

MS. LAWSON: Yes, sir. Just one moment, if you don't mind.

(Pause.)

MS. LAWSON: Okay. Your Honor, of course, we'd make a challenge pursuant to <u>Batson</u>. Mr. Barnette is African-American, so is this potential juror.

I made a special note of this juror's questioning, Your Honor, at the time it went on. Mr. Blakeney is a truck driver. He drives inside the plant. And this was the first time the government ever asked this question that's on page 1146, line 21.

Question: All right. Now, does your work know that you've been called for jury service?

Answer: No.

So where did you tell them you were today?

Well, I got to go -- I work at night.

It struck me as being -- it simply struck me as being an attempt to remove a black juror right off the bat in terms of the questioning by starting with his work without really finding out too much about him and what he does. And it was striking that they did that. The questioning of him

starts on page 1143, and this line of questioning starts at 1146. I think also the government realized that they had done that because after that, they asked most of the jurors does your work know where you are? Have you talked to them? Have you told them where you are? It started with the questioning of this African-American juror.

He indicated that he was able to follow the law. He says I've got to hear all the facts. He acknowledged that it's hard to impose the death penalty, but that he would do it. And in fact, the government says at page 1150, line 21, So it sounds like you are not prevented based on your philosophy about the death penalty from considering it. He says, Yes. Meaning, you know, the response was consistent with the question.

Again, did that just come from you not having a strong feeling one way or the other? Yes.

There was no reason, nothing about him that would suggest that he would be anything but a juror who could perform his duties satisfactorily.

And again, I think in the context of how the government started the approach to him, it was evident that they didn't talk to him. They wanted to see if they could find a way to get rid of him right off the bat.

That's also, Your Honor, six out of ten African-American jurors that have been struck by the

government.

THE COURT: Let's hear the government's response.

MS. ROSE: In looking back at the notes, I noted that there was once again a great hesitancy in responding to questions. I think the quote, though, that most sticks out and that most concerned the government here was the fact that he said, I don't want to sentence anyone to death.

He was not -- I did notice here that he was very quiet. In fact, I don't remember whether it was us or the defense that questioned him about the fact that he wasn't very chatty with anyone, and he indicated that yes, he was a quiet person.

His views of the death penalty were not very strong. He was -- he indicated on his questionnaire he was uncertain about how he felt about the death penalty, and that combined with the quote, I don't want to sentence anyone to death.

THE COURT: Okay. First of all, the court puts no stock in the timing about the question on work conflict in that the court was encouraging the lawyers to get to any potential conflict that would possibly resolve the question of that juror's readiness to be a juror as quickly as possible.

But moving on to the substantive arguments about it, the court finds that a race neutral explanation has been presented. And that considering the arguments of both

parties, that the -- there has been no showing of a purposeful discrimination in regard to the striking peremptorily of this particular juror. So that -- even when one considers the overall pattern of strikes of the government. So that strike is recognized.

And number -- seat number 2, then, is filled by random number 36, juror number 208, Allen Kraig -- excuse me, Kraig Allen.

MR. BENDER: Your Honor, we would exercise a peremptory strike as to 208, Mr. Allen.

THE COURT: All right. Wasn't it the government's --

MR. BENDER: Oops.

MS. TOMPKINS: Thank you for that.

Before that, we were satisfied.

THE COURT: So the government having been satisfied as to Mr. Allen, it goes back to defendant and the defendant strikes number 2, seat 2, number 208, Kraig Allen.

MR. BENDER: Judge, may I just -- the state of the record being what it is, I can't recall whether -- whether I made a challenge for cause on him or not.

THE COURT: Let's see.

No, you made one to Matteson and Donaldson.

MR. BENDER: Yeah, I don't remember, and the record --

THE COURT: But you -- yeah.

MR. BENDER: And the record certainly doesn't reflect.

THE COURT: You wouldn't have made one, I don't think, until he was put in the box.

MR. BENDER: Right.

THE COURT: Now, this is the one, I think, you were saying there might be some absence of information --

MR. BENDER: Right.

THE COURT: -- in the transcript.

MR. BENDER: In the transcript, that's right. And that's kind of where I'm coming from. I don't remember whether I challenged him for cause or not and the transcript just simply doesn't reflect.

THE COURT: Well, I don't have any notes in the affirmative on that, but it may be that you did.

Are we in a position to contact Ms. Kelly?

THE COURT REPORTER: I think we could probably give her a call.

THE COURT: Let's try to do that.

THE COURT REPORTER: It appears to me that there are just pages missing off the end.

THE COURT: Let's try to call her and we'll take a break.

(Brief recess at 11:17 a.m.)

Okay. The issue has to do with Mr. Kraig Kelly as to the transcript in his case.

MR. BENDER: Kraig Allen.

THE COURT: I'm sorry, Kraig Allen, thank you. Now, page 2028 was missing out of the transcript the court has and the -- and Ms. Nuccio has made a rendition of page 2028 based on a telephone discussion with Ms. Kelly, Joy Kelly. And it appears to fit in in such a way that it would be 2028. Comes right up to adjournment on that particular day.

So the question I have for you, Mr. Bender, first of all, have you seen that page 2028?

MR. BENDER: Yes, sir, we had that one in our transcript.

THE COURT: Okay.

MR. BENDER: That's one of the four pages we referred to.

THE COURT: Right. And you have contemplated the fact that there was another person in the race -- the NASCAR racing business and you asked her questions about cars.

MR. BENDER: Right, yeah.

THE COURT: Right.

MR. BENDER: Yeah.

THE COURT: And is it your firm opinion that

something else may have been asked of Mr. Allen that is not in the transcript?

MR. BENDER: Absolutely.

THE COURT: All right. Well, then, it seems to me we'll have to bring the court reporter in and ask her to go over the backup tape. And if this one is already certified, recertify it to the court that based on that, that it is in fact the official transcript.

MR. BENDER: And based on what we have here and what, I think, most of us believe, and certainly I do, this is not the complete transcript. And based on that, I would ask that Mr. Kraig Allen be excused for cause because no reviewing court would ever be able to know exactly what went on because if I talked for sixteen minutes, they talked for thirteen minutes, it's virtually impossible for them to have ten pages, we have four. And I think everybody here in the courtroom -- well, I'm not going to assume anything, but I did ask about the 18 and the 20 car. The others were -- and I can tell you exactly what car numbers they were when I was talking to the other person. But that was definitely asked because I remember getting a smile from some people about that. And in his shoes colloquy, I just -- I was pretty good about that.

MS. TOMPKINS: If I may respond?

THE COURT: Beg your pardon?

MS. TOMPKINS: May I respond to that?

THE COURT: Yes.

MS. TOMPKINS: As to Mr. Allen, earlier Mr. Bender said that he had enough information on his notes to be able to make a decision about whether or not they would or wouldn't select him as a juror.

And in terms of the appellate record or the complete record, I'm not sure that there are any appellate issues that relate to Mr. Allen. There's not going to be a Batson motion on him. There are no foreseeable appellate issues that relate to him as a juror. The government doesn't have a record to make its decisions on jury selection, and that's beside the point. The real point being -- obviously, the issue is are we getting a complete recordation as we --

THE COURT: That's the issue.

MS. TOMPKINS: Right.

THE COURT: And we have to examine that.

MS. TOMPKINS: And I want to examine that, but that's a separate issue from whether or not Mr. Allen should be just stricken for cause for that reason alone.

THE COURT: Well, striking Mr. Allen for cause might moot the issue about his transcript, but it doesn't solve the problem of whether the transcript is accurate in respect to his statements; and if it's not, we certainly want to investigate that in terms of the accuracy of the overall transcript in such dimension as it might -- as the facts might

suggest.

So we'll take a lunch break until 1 o'clock and ask Ms. Kelly to come in and bring her transcript and backup tape-recording and we'll have a factual hearing on the state of the transcript and then proceed from there with the balance of jury selection.

(Lunch recess at 11:50 a.m.)

SATURDAY AFTERNOON, JULY 27, 2002

THE COURT: Okay. The record will show that the parties are here by their attorneys and the defendant is here.

Ms. Kelly.

MS. KELLY: Yes, sir.

THE COURT: A question arose as to the completeness of the transcript concerning the testimony -- the statements, questions and answers during voir dire of Mr. Kraig Allen.

MS. KELLY: Yes, sir.

THE COURT: And have you looked into that?

MS. KELLY: Yes, sir.

THE COURT: What can you tell us about that?

MS. KELLY: I have checked the tape with my transcript and it is complete. I have printed out the page that was missing from the court file. And that is where I'm at.

THE COURT: So if --

MS. KELLY: There's nothing missing from the whole -- I mean, as far as my transcript and matching it with the tape, there is nothing missing.

THE COURT: Okay. What -- how was the quality of the backup tape?

MS. KELLY: Okay. Just okay. I was having problems with interference with some of the stuff. Some of it's good; some of it's not. My recorder is one of those kind of things that, I don't know, something is wrong with it. But it does -- it's okay if you want to listen to it.

THE COURT: Okay. Now, the -- when you're operating your backup recorder --

MS. KELLY: Yes, sir.

THE COURT: -- what mike -- from what microphones does it pick up?

MS. KELLY: My own personal one connected to the recorder.

THE COURT: All right. And where is that located when you're working?

MS. KELLY: It is located on the table here that I work at.

THE COURT: Okay. It's not one of these mikes at the counsel table?

MS. KELLY: No, sir.

THE COURT: The mikes at counsel table serve what

function? Can anyone answer that?

Ms. Hankins, can you answer that?

MS. TOMPKINS: They amplify.

THE COURT: You're tapping that and it amplifies your voice.

MS. TOMPKINS: Yes.

THE COURT: And of course, there is a microphone in the ceiling which, as I understand it, also picks up voices and amplifies them through the speakers that are located in the jury box and there is one here at the bench. And I guess that -- those are the only speakers.

But I have a concern about the fact that defense counsel has moved its mikes below the table and out of sight. And I take it that's because you're concerned there might be a -- in talking at counsel table, it might be picked up -- that is, confidential talk at counsel table might be picked up.

MR. BENDER: That's correct, Your Honor.

THE COURT: And I don't know that that would be a problem unless it turns out the jurors aren't hearing you well. In which case, you might need to add additional amplification.

MR. BENDER: And of course, if they do -- we have some that are hard of hearing and all of them have said, you know, I'll raise my hand if I can't hear. So I've got to assume they'll do that.

THE COURT: Well, I think they will.

MR. BENDER: Yeah. Can I just inquire?

THE COURT: You may, but before -- while I'm talking about the mikes, are you aware of any function of the mikes at counsel table with reference to the -- to your, Ms. Nuccio, reporting?

THE COURT REPORTER: I've had a hard time hearing.

I can't take me and talk at the same time.

But I -- we sit down below everybody. Ms. Hankins' computer makes a humming noise that we hear above everything else. It's like a vacuum cleaner running. And as you're running it, you can't hear anything beyond it; but everybody else who stepped away from the vacuum cleaner can hear fine. So we have that to deal with as well. And it is very difficult to hear -- as jurors have been sitting next to me here, at times I haven't been able to hear and I've asked them to repeat. It's just -- we're in a very difficult spot here. That's all I'd say.

THE COURT: Well, you all are the first counsel that have ever expressed any concern about it. Is this a continuing concern based on the mike -- the -- the people at the marshal's office downstairs overhearing anything?

MR. BENDER: Yes, sir.

THE COURT: Is that the problem?

MR. BENDER: Yeah, or just anybody overhearing. And

I know that it's piped in downstairs, you know. They've said they turned the volume down.

THE COURT: Well...

MR. BENDER: We'll do what the court wants.

THE COURT: I'd appreciate it if you would go downstairs with the marshals at some point, the next day or so, and let it be on and let somebody be up here talking and you can hear what, if anything, you can make out.

MR. BENDER: Okay.

THE COURT: I mean, there -- the purpose of having it down there, if there's a commotion in the courtroom. There's no need for it to be at a level of any individual words. And I've been assured that they not only don't hear individual words from counsel table, but that if they did, they understand that it would be a violation of federal law for them to disclose it to anybody.

So that would be -- that concern has to do with the job of the court reporter being made as easy as we can within reason.

Yes. Inquire, please.

MR. BENDER: Ms. Kelly, everything that you transcribed and certified is contained in these four pages --

MS. KELLY: Yes, sir.

MR. BENDER: -- within the transcript.

MS. KELLY: Yes, sir. I've checked that, yes, sir.

MR. BENDER: Okay.

MS. KELLY: I've checked it. I've checked the tape against the transcript.

MR. BENDER: Okay.

MS. KELLY: To be sure that -- I understood there was concern that you felt like there was several pages missing and there was nothing -- there was a page missing, I understand, from the original which didn't print out for some reason, but that's the only thing I could find.

MR. BENDER: Well, my concern really is --

MS. KELLY: Uh-huh.

MR. BENDER: -- that the government went questioning for thirteen minutes and there are ten pages of transcript. I questioned for sixteen minutes and there are four pages of transcript. I also questioned that juror about the 18 car and the 20 car by number.

MS. KELLY: Uh-huh.

MR. BENDER: And it's not in here. I also questioned that juror about, you know, you walk in your own shoes. It's not in here. That's my concern.

MS. KELLY: Well, according to the tape, your -- the tape contains the beginning and the ending of your examination. None of what you expressed is on there.

THE COURT REPORTER: None of which what, Joy?

MS. KELLY: Expressed -- none of what you just said

could I find on the tape. You know, walking in your own shoes. I mean, if you want to listen to the tape, I brought it here for it to be listened to.

THE COURT: Beg your pardon?

MS. ROSE: May I ask a question as well?

THE COURT: Yes.

MS. ROSE: The times that are recorded, do you note the times on your record or are those just someone's notes, and how closely are those notes being kept? Do we really have an accurate time of the specifics of when everyone's questioning began and when it ended? Was there some -- there's no official record of that and nothing -- like no stopwatch is being kept officially, anything of that nature. It was just kind of glancing at our watches type of thing.

THE COURT: I can respond to that.

Okay. The only record of time that I know of, the court kept time for purposes of the 20 minute limit on each attorney. And Ms. Rose questioned from 5:36 to 5:49. That was thirteen minutes. And the defendant started at 5:49, but I don't have a record of when he finished because it was within the 20 minutes. So we don't have anything printed definitive about how long Mr. Bender questioned that juror. It was the last juror of the day. However, I have no reason to question his recollection about it except to look at the transcript and listen to the tape. I do recall him

questioning about the car numbers, but I don't recall if it was this witness or another witness or both, personally.

So I would -- I think we're in a position where we -- if you want to listen to the tape, then we should listen to it.

MS. KELLY: Yes.

THE COURT: Can you go ahead and begin it where Mr. Bender began his questioning.

MS. KELLY: Yes.

MS. TOMPKINS: Put it on this table maybe.

MS. ROSE: Or sit it by the mike.

THE COURT: Put it right in front of the microphone.

(Ms. Kelly complied.)

THE COURT: Start it over.

Where is the transcript? Is this it?

MS. KELLY: That is the page that was missing.

THE COURT: Beg your pardon?

MS. KELLY: That's the page that was missing. That didn't get printed.

MS. TOMPKINS: Do it a little bit back so we'll be sure we get the absolute beginning.

MS. KELLY: Certainly.

THE COURT: All right. What page is this?

THE COURT REPORTER: 2024.

MS. LAWSON: 2024.

THE COURT: Mr. Bender begins on what page?

MR. BENDER: 2024.

THE COURT: Okay. 2014?

MR. BENDER: 2024.

(The tape was played.)

THE COURT: Okay. I timed that at seven minutes, you know, roughly. Same way I timed all the presentations.

Now, Ms. Kelly, can you tell us what -- what is going on with the clicking when you hear a clicking sound in the recording?

MS. KELLY: No, I can't. I don't know what that is. It happened -- it's been going on periodically. It's like some kind of interference maybe from the lights or something. I'm not sure what that is. So I have decided not to use that recorder and have been using another recorder.

THE COURT: All right. I was about to say that that would be indicated here --

MS. KELLY: Yeah.

THE COURT: -- to attempt to eliminate that problem.

Ms. Nuccio, have you had difficulty of a similar noise that might have been caused by an electrical interference?

THE COURT REPORTER: (Negative nod.)

THE COURT: The answer there is no.

THE COURT REPORTER: I use a different machine.

THE COURT: Beg your pardon?

THE COURT REPORTER: I use a different recorder.

THE COURT: Right.

Well, Mr. Bender, it appears to be connected. That is to say, the questioning that you did goes from a beginning point to an ending point with apparently even flow and it would appear that you were talking about the racing matters as a preface, so to speak, or simply a colloquy between you and the juror at the beginning of the conversation, and there was some clicking in that area.

Could you play that area over again.

MS. KELLY: Sure.

THE COURT: At the very beginning.

(Ms. Kelly complied.)

THE COURT: Would you back up some.

MS. KELLY: Yeah.

(The tape was played.)

MS. KELLY: I think I'm a little too far for you, right? That was Ms. Rose.

THE COURT: Yeah, we want to go forward past Ms. Rose.

(Ms. Kelly complied.)

THE COURT: All right. That's enough.

Now, is your -- when you take notes, you use a machine. What do you call that machine?

MS. KELLY: Stenograph.

THE COURT: And your Stenograph notes, did they show connected conversation between counsel and this juror according to what you related here in the transcript?

MS. KELLY: Yes, sir, that's how it works. It's connected with the notes. The translation of the English is attached to the word.

THE COURT: Right.

MS. KELLY: To the steno stroke.

THE COURT: All right. Well, I find that the transcript is accurate with the exception that line 17, page 2026, he said, The things that my dad had done for black people not to black people. That was borne out on the tape.

MS. KELLY: Okay.

THE COURT: Other than that, it appears to be accurate.

So the motion to excuse this juror for cause will be denied unless -- I mean, to the extent it's grounded in an inaccurate or incomplete transcript. Did you want to make a -- either a new or renewed -- I didn't hear any challenge to him on there. I didn't reflect one in my notes or recall one, so I guess at this point if you wanted to challenge him for cause, it would have to be a new motion.

MR. BENDER: Okay. Your Honor, for the record, I would show that Ms. Susan Sikes, juror number 131, who appeared on July the 23rd in the morning session, is in public relations and advertising and does some NASCAR work.

She was asked, So you deal with the 24, the 28, and the 20.

To which she responded, Oh, we have a fan, do we?

And I responded, You can see a little red on my neck.

That was the individual that I -- that is clearly in here that I talked about car numbers with. I talked about car numbers with Mr. Allen as well, the 18 and the 20. Those are the two cars that Joe Gibbs Racing has. It doesn't appear on there.

I would also note for the record that with regard to one of the jurors -- if I can just have a minute. It's been denominated that Ms. Lawson did the questioning and, in fact, as we go through, you will see that the court is referring to Mr. Bender.

THE COURT: Could you direct me where you're looking?

MR. BENDER: Well, I'm trying to find it. Ms. Lawson and I saw it.

(Pause.)

MR. BENDER: Your Honor, this would be the

transcript of July 24th, the afternoon session. Voir dire examination.

THE COURT: Okay. July 24.

MR. BENDER: Page -- page 162 -- excuse me, 1671.

THE COURT: And what is going on at that point?

MR. BENDER: Well, it just denominates Ms. Lawson as being the person doing the questioning when, in fact, it was Mr. Bender who was doing the questioning.

MS. KELLY: Yes, I see that.

THE COURT: Beg your pardon?

MS. KELLY: That's my mistake.

THE COURT: All right. You'll correct that.

MS. KELLY: Yes, sir.

MR. BENDER: Okay. Your Honor, based on all of that, I ask that since the record is not complete, that Mr. Kraig Allen be excused for cause.

THE COURT: All right. Now, your recollection about the numbers is based on the fact that you follow NASCAR.

MR. BENDER: Yes, sir.

THE COURT: And people who follow NASCAR know the car numbers just as they would proper names.

MR. BENDER: That's kind of the way we -- we do that. Matter of fact --

THE COURT: Everybody knows about the 3 car, for example.

MR. BENDER: Yes, sir.

THE COURT: Even with mild acquaintance with NASCAR. And those who know NASCAR know which numbers go with which racing team.

MR. BENDER: Yes, sir.

THE COURT: So based on that and your comments about it, the court will grant that motion for excusing Mr. Allen for cause.

MS. TOMPKINS: Your Honor, may the government just be heard briefly on that?

THE COURT: You may.

MS. TOMPKINS: I had this playing right in front of me. The garbled point right at the beginning was when Mr. Bender was talking about those two cars and the -- Mr. Allen said, Yes, both of them, which to me was his answer to whatever the two car numbers are which was --

THE COURT: Wait just a second. You were looking where?

MS. TOMPKINS: I'm not looking at the record. I was listening, just listening as we were just playing it. Harold begins his questioning of Mr. Allen and there is a point where there is static. What you can hear from Mr. Allen is, Yes, both of them, which --

THE COURT: Wait, I'm sorry. I just want to get that back in front of me.

MS. TOMPKINS: And I'm not speaking from the printed record; I'm speaking from just my listening.

THE COURT: I understand, but it stands to reason that what you are saying about what happened would be grounded in the record.

MS. TOMPKINS: Right. And it was in that garbled section which ended with everyone's laughter.

THE COURT: Everybody, as I recall, laughed because the question was, What's Coach Gibbs going to say to you when you say I can't be there for three weeks? And the answer was, He better get used to cleaning his own bathrooms, and everybody laughed at that.

MS. TOMPKINS: And that's correct. And what I'm saying is that Mr. Bender is making a big deal about the fact that the car numbers don't appear in the record when clearly his reference to the car numbers was during that static moment in the tape that preceded, What is Coach Gibbs going to say when you're not there? It is clear --

THE COURT: Oh, I see. Where it says both of them.

MS. TOMPKINS: Both of them.

THE COURT: That's in the record. And that's where the clicking was going on.

MS. TOMPKINS: And that was his reference to those two car numbers. So -- and my point is is that Mr. Bender is making a big deal about the fact that the record is terribly

incomplete because there is no reference to the two car numbers when his response clearly indicates, and my notes from that conversation reflect, and my memory of that conversation also bolsters that that was his response to Mr. Bender talking about those two car numbers and then the conversation naturally proceeds to racing and Coach Gibbs, laughter.

THE COURT: I believe that's correct.

MS. TOMPKINS: And then on to substantive issues.

THE COURT: And the question was, That involves cleaning, and then there's a hyphen or a dash. Now, wouldn't the court reporter ordinarily where something is inaudible put inaudible in parenthesis at that point?

MS. KELLY: Yes, sir.

THE COURT: And opposed to the double...

MS. KELLY: That's my natural instinct when I'm writing, that's correct. I would put -- or I would ask. I would certainly ask. That means like --

THE COURT: I think you would.

MS. KELLY: Excuse me. That indicates to me that there was some interruption or something else going on.

THE COURT: Right.

MS. KELLY: I mean, talking at the same time, that kind of thing.

THE COURT: You certainly would want to put, I believe, inaudible in there rather than just a double hyphen.

MS. KELLY: Would you like me to change that?

THE COURT: Yes.

MS. KELLY: Okay.

THE COURT: But I would -- I think that a finding is in order that it is a very minimal ellipsis in the record, but it's an ellipsis; and based on that, the court's ruling will stand. So Mr. Allen will be stricken for cause.

(Pause.)

THE COURT: Just for clarification to the record to the extent it might need it, the court's finding in that regard is that where the double hyphen appears on line 2, page 2025, there was an inaudible statement by Mr. Bender about two numbered racing cars and the answer to that which involves one sentence, or not more than two, I would think, and that the answer to that particular statement came as follows: Both of them, and goes on to accurately reflect from there.

So the next juror in line to fill seat number 2 is number 32, and that is Edward Brunck, B-r-u-n-c-k.

So the question, then, would be, Mr. Bender or Ms. Lawson, would you seek to challenge that juror?

MR. BENDER: Point of clarification, Judge. The -- Mr. Allen was put in as a -- well, I guess passed by the -- passed by the government and a cause challenge was granted, so do we go back to the government for the government to be -- as to Mr. Brunck or us? I don't know.

MS. TOMPKINS: Well, I would say we passed him. They made a challenge for cause.

THE COURT: Yeah, he -- the government had passed on him.

MR. BENDER: Okay.

THE COURT: So -- as you say, you made a challenge for cause. So if you -- I have no problem in throwing it back to the government because your pass, in effect, was mooted because he was as good as not there. So in his place you have Mr. Brunck. At the defense request, the court will ask the government if it wants to excuse Mr. Brunck?

MS. TOMPKINS: Yes, we will exercise a peremptory strike on him.

THE COURT: So in place of Mr. Brunck -- and that makes nine challenges by -- let's see. Six, seven, eight, ten challenges by the government.

MR. BENDER: Your Honor, we have eleven.

THE COURT: Okay. Mr. Blakeney makes eleven.

MS. HANKINS: (Affirmative nod.)

THE COURT: The clerk agrees and both parties agree.

So in his place the next juror is number 172, Larry Young.

MS. LAWSON: I'm sorry, Your Honor, who?

THE COURT: 172.

MS. LAWSON: Thank you.

THE COURT: The court inquires whether he will be passed by the government or not?

MS. TOMPKINS: If I may have one moment.

(Counsel conferred.)

MS. TOMPKINS: The government is satisfied.

THE COURT: All right. The defense, then, has the opportunity to challenge or not Mr. Young.

MR. BENDER: We'll use a peremptory challenge on number 172, Mr. Young.

THE COURT: Okay. And that being the case, we have next in line 104, Diane Edwards.

(Counsel conferred.)

MR. BENDER: Your Honor, we're satisfied with the jury.

THE COURT: All right. Comes back to the government, then, concerning seat 2 and whether it will exercise a challenge concerning Ms. Edwards.

MS. TOMPKINS: Your Honor, we're satisfied.

THE COURT: All right. So Ms. Edwards, then, becomes juror number 2.

Okay. Now, then, as indicated we proceed to the matter of alternates. And the next juror in line would be number 40 in the random order and number 6, Corey Phifer, is alternate number 1.

2347

Case 3:12-cv-00327-MOC    Document 100    Filed 09/23/15    Page 173 of 192
355

And number 2 is number 126, Ralph Holder.

MR. BENDER: Your Honor, we would challenge for cause on Mr. Holder.

THE COURT: All right. We'll hear you in just a minute about that.

Number 3 is number 233, Elizabeth Pendergrass.

All right. Number 4, then, alternate number 4 is number 8, Wanda Butler.

Okay. The government will have the first opportunity to strike.

MR. BENDER: Could I just be heard?

THE COURT: You're right. Go ahead.

MR. BENDER: With regard to Mr. Holder, he appeared in the afternoon session of July the 22nd.

Does the judge have it? Do you have it, Your Honor? Okay.

THE COURT: We're almost ready to hear you about that.

MR. BENDER: Thank you.

(Pause.)

THE COURT: Okay.

MR. BENDER: On page 1276.

THE COURT: Yes, sir.

MR. BENDER: Beginning on line 2, What's your personal view of the death penalty?

If convicted beyond a reasonable doubt, it should be carried out.

Is that the way you feel?

He says, I think that's the way I feel. Then he says, Well, I don't think, that is the way I feel.

THE COURT REPORTER: I don't think that is the way I feel?

MR. BENDER: Well, I don't think, comma, that is the way I feel.

And then further down, beginning on line 14, it -- through line 25, and then over to line 1 of the next page, 1277, he replies, I have an opinion that if you've been convicted, you have been tried and convicted, death penalty is involved, I think 22 years is too long to drag something out. I think that it should be administered and I have no problem with that.

Based on those responses, I ask the court to reconsider our challenge for cause.

THE COURT: Okay. What's the government say to that?

MS. TOMPKINS: Your Honor, I don't have a copy of his -- I don't have a transcript so --

MR. BENDER: Here.

MS. TOMPKINS: -- I can't view it in its totality.

THE COURT: Go ahead and look at it. You have a

copy, do you not?

MS. TOMPKINS: Pardon me?

THE COURT: Somewhere.

MS. TOMPKINS: I'm sorry?

THE COURT: Are you not receiving the daily copy?

MS. TOMPKINS: Well, we're not -- we've chosen not to pay for them.

THE COURT: All right.

MS. TOMPKINS: So I mean, we could for $125 a day.

If you don't mind that I'm looking. Off the top of my head, Your Honor -- I'll let Ms. Rose look at that. From my notes which I took, he did say that he had no opinion about the verdict. That he could wait. He understands that this jury would sentence him only. A lot of the defense questioning was about another juror who may possibly -- another person called for jury service. But -- and apparently -- I don't know that he was challenged for cause at the time, but the court denied that at a time directly after this man's questioning, and nothing has changed since then.

So again, we're reviewing the specifics.

(Pause.)

MS. TOMPKINS: Question by the government, As you sit here today, do you have any predisposed notions about what the ultimate penalty should be in this case?

He said, I've really searched my mind. I haven't

heard the evidence. And to do what you're supposed to do as a juror in this case, this particular case, no, I don't.

Question: As you sit here today, could you wait until you've heard all the evidence?

Yes, ma'am.

And keep an open mind?

Yes.

So on the totality of this juror's answers, I'd ask you to deny that motion for cause.

And he says several times during this, we went back and asked him several times had he formed an opinion, could he be fair, could he wait until he heard all the evidence and the law, and he responded yes, he could do that. Ending on page 1269. And the other quotes that I read were from 1266.

(Pause.)

THE COURT: Okay. The court will grant the motion to excuse for cause on reconsideration. And Mr. Holder, then, is stricken for cause.

MR. BENDER: Judge, does that mean everybody else moves up one?

THE COURT: It does. I should think it would.

MR. BENDER: Okay. So that 2 becomes 233, Pendergrass, and 3 becomes Wanda Butler, number 8.

THE COURT: And the number 4 becomes number 22, George Evans.

MS. HANKINS: Huh-uh, missed one.

THE COURT: Beg your pardon? Oh, wait a minute. Excuse me, number 193, Andrea Bryant, is next in order.

Thank you, Madam Clerk.

So is the government considering its position on these four?

MS. ROSE: Yes. The government would move to excuse alternate number 2, number 233, and alternate number 4, number 193.

THE COURT: Any challenge to those two?

MS. LAWSON: Yes, Your Honor. To Pendergrass, Your Honor, number 233.

THE COURT: Is that a <u>Batson</u> challenge?

MS. LAWSON: Yes, Your Honor. If I may have just a moment, Your Honor, I'll be prepared to proceed expeditiously.

(Pause.)

THE COURT: Okay. You may be heard.

MS. LAWSON: Your Honor, thank you. By way of prima facie showing, Mr. Barnette is African-American. Potential juror Elizabeth Pendergrass is African-American.

Ms. Pendergrass, the challenge to her would be the seventh challenge by the government of -- out of their thirteen. Almost half of the jurors that they have exercised peremptory challenges to have been African-American which is

grossly disproportionate to the -- their representation in the pool.

Ms. Pendergrass was forthright. No delays in her answers. Well-educated. A foster mother, as you may recall. Cub Scout leader. Involved with children. Told the court that although she had put on her form that she would not impose the death penalty, I think that she also made it clear that that was in the abstract, and that she had never been called on to do such a thing. But when the government talked to her, she said that she would consider both choices.

On page 2053, line 8, Ms. Rose is saying, So the death penalty is one of your two choices here. So you would have to be fully willing to consider it.

And Your Honor said, Do you have a question?

And Ms. Rose says, Would you?

And her answer is, I would be willing to consider it.

Question: And would you consider it the same way that you would consider life imprisonment?

I would.

It's perfectly clear that she is fully capable of making an appropriate decision in this case. And I think that there is no way that the juror would be ill suited to sit on this case. And given the number of challenges that the government has exercised against African-American jurors, we

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 179 of 192

361

would ask you to sustain our <u>Batson</u> challenge.

THE COURT: Okay.

MS. ROSE: Are you ready for me?

THE COURT: I'm ready.

MS. ROSE: On her questionnaire, her personal view of the death penalty is I believe in life imprisonment. She has mixed feelings about lethal injection. She goes on to say, If you favor the death penalty, would you favor it, and she marks other and says, Imprisonment strongly. She says on her questionnaire --

THE COURT: Where did that last come from?

MS. ROSE: Her questionnaire.

THE COURT: Right.

MS. ROSE: And then I'll address her court statements.

She also, in response to question 123 on the questionnaire, says, If you oppose the death penalty, would you say that you, and it asks for a commentary portion. And she said, I would strongly support the death penalty if it meant life imprisonment.

Now, she further went on to say during her questioning whenever I asked her about the death penalty, she said, I don't really have a view. I believe in life imprisonment. That she favored imprisonment strongly.

THE COURT: Now, are you talking about her verbal

responses here?

MS. ROSE: Yes.

THE COURT: What page?

MS. ROSE: I don't have the transcript. Those are quotes from the notes. As I was questioning her, Ms. Tompkins was making notes.

MS. LAWSON: Your Honor, I just ask you please to review her statements in the transcript that you have. It's --

THE COURT: That's what I intend to do.

MS. LAWSON: It's July 26, the morning. It's volume 10.

THE COURT: I have it in front of me.

MS. ROSE: And we can take a look at those or the court can review those as well.

The other thing I would add, Your Honor, that this doesn't reflect, and even Ms. Lawson and Mr. Bender commented to me at the break on that day at how hostile she was toward me in my questioning. That she was very -- we weren't really joking about it, but it was very clear that she was not cooperating with the government and was clearly being openly -- she openly disliked me; and certainly I think the government has the right, if they have the challenges, to strike someone from the jury who is openly hostile to them.

The quote to which I referred Your Honor is on 2052,

line 15 and 16.

THE COURT: Okay. Given the drift of this juror toward life imprisonment, the court finds that the explanation of the government for a nonpretextual reason is sustained. The court will therefore overrule the Batson objection, considering the arguments of both sides.

So the government's first strike was to number 2, Pendergrass.

And the next one on the list is George Evans, number 22.

MS. HANKINS: Judge, do the other ones slide down again?

THE COURT: No.

MS. HANKINS: Just fill that in, okay.

THE COURT: And the next strike was to number 4 which is Andrea Bryant. And the one to replace her would be number 123, Gary Bowman.

Now, will there be any further challenges by the government of peremptories?

MS. ROSE: No, Your Honor.

THE COURT: Do you accept the jury?

MS. ROSE: Yes.

THE COURT: The alternates --

MS. ROSE: Yes, sir.

THE COURT: -- as presented?

All right. It goes, then, to the defendant.

MR. BENDER: Just a moment, Your Honor.

THE COURT: The government has used its two challenges.

(Counsel conferred.)

MR. BENDER: Your Honor, are you ready?

THE COURT: Yes, sir.

MR. BENDER: We will excuse as an alternate juror, I guess she's in alternate seat number 2, Ms. Butler, number 8.

THE COURT: No, let's see. I have number two as George Evans.

MR. BENDER: I thought we were moving.

THE COURT: No. When we did the one for cause, it was -- I consider that --

MR. BENDER: Okay.

THE COURT: -- as if that person no longer was in the mix so the other ones moved up.

MR. BENDER: Okay.

THE COURT: But now we're just looking at particular slots and the slots that came open by way of peremptories were 2 and 4, so the next one on the list went to seat 2 and that was Evans.

MR. BENDER: Okay.

THE COURT: And the one after that went to seat 4

and that was Bowman.

MR. BENDER: Okay. All right. That's fine. We still exercise that strike.

THE COURT: All right. Against Mr. Bowman.

MR. BENDER: No, Butler.

THE COURT: Against --

MR. BENDER: Wanda Butler.

THE COURT: Oh, I get you. Number 8. Very good.

MR. BENDER: Right. We're satisfied with the others.

THE COURT: All right, sir.

Now, the next one on the list is Larry Shattuck, number 153.

(Counsel conferred.)

MR. BENDER: Your Honor, I think we have our jury and our alternates.

THE COURT: All right, sir. Thank you.

So reviewing, the defendant has one alternate strike left and the government used its alternate strikes. The government used eleven regular strikes, leaving nine. Defendant used fifteen strikes, leaving five.

So the jury, then, will be seat one, number 132, Ann Martens.

Seat number 2 -- okay. The clerk has given me a clean sheet of paper. Diane Edwards, 104.

Number 3, 45, Peggy McManus.

4, Scott Dockery, number 14.

And 5 is John Fowler, number 226.

6 is Deana Stanford, number 222.

Number 7 is Kristal Roseboro, number 223.

Number 8, Jacob Santinelli, number 118.

Number 9, Joseph Reinhardt, number 266.

Number 10, 138, Gary Moore.

Number 11, 141, Joanna Greenwood.

Number 12 is Bryan Williams, 36.

And alternate 1 is Corey Phifer, number 6.

Number 2, George Evans, number 22.

Number 3 alternate is Mr. Larry Shattuck, 153.

And 143, Gary Bowman, is number 4.

Okay. Scott Dockery is number 16 -- I mean 160, sorry. I misspoke and said something about him being number 14, but that's incorrect.

Okay. For the information of the parties, the court proposes to have the jurors starting from the front row to the left 1 through 6, leaving two seats. And on the back row, starting from the left, 7 through 12, leaving two seats. Then as to this cluster of four seats, on the far right, number 1 would be on the left front seat. Number 2 is the left -- the right front seat. And number 3 is the left rear seat. And number 4, it actually has a 4 on it, that's the number 4 rear

seat.

MR. BENDER: That's the only person who could find their seat.

THE COURT: That's right. And if they're milling around, we'll understand.

Is there anything else relative to jury selection?

MR. BENDER: No, Your Honor.

THE COURT: I would hear the parties as to how many we think we might want to bring in just as a reserve against what we were talking about the other day, the possibility that once faced with the reality of jury service, somebody might come up with a panicky type excuse or otherwise come up with something that suffice for cause or simply didn't show and somebody who couldn't get into court on Monday.

MR. BENDER: Your Honor, we would suggest four, which would be the same number as the alternates.

THE COURT: Well --

MS. TOMPKINS: That sounds fine.

THE COURT: -- five for good measure?

MR. BENDER: Sounds good.

MS. TOMPKINS: Five would be fine.

THE COURT: All right. I hate to inconvenience anybody, but we'll work from five. And I would advise the clerk which five those are, and that would be the next five on the list.

Now, this list, I have asked the clerk to take a copy of the random list that we've been using and file it as Court Jury Selection Exhibit Number 1. And she won't file it, however, until Monday, until we make sure we don't need anybody else, so that we retain the random and unpredictable slate of jurors who might be coming in next.

Now, the order of business would be, I take it Monday we would hear the parties. First of all, does anybody anticipate any motions at this point?

(Counsel conferred.)

MR. BENDER: As I recall, Your Honor has ruled on motions in limine sort of on a case-by-case basis.

THE COURT: That is my recollection.

MR. BENDER: That's the only thing we would have.

THE COURT: Yes, sir.

MR. BENDER: We don't anticipate filing any more.

THE COURT: All right, sir. So we'll bring the jury in, have them seated. I will ask them that question about whether anything new has come up to affect their ability to be fair and impartial. And then assuming we have no shake up of jurors at that point, we will proceed with opening statement -- well, the court would give that preliminary instruction reminding the jurors of the essential framework of law within which the facts will be found and the preliminary jury instructions that are contained in the bench book that I went

over with you, and you can look at a copy of it if you wish. But in any event, it's the innocuous stuff that we take up at the beginning of every trial, particularly about juror conduct. Then I will take -- the parties will be offered the opportunity to make opening statements.

Would there be any view about the time you might want for an opening statement?

MS. ROSE: 30 minutes.

MS. LAWSON: I don't think we'll take longer than that, Your Honor.

THE COURT: All right. That's certainly not -- we'll look at that as a contemplated outer limit, keeping in mind that these aren't arguments; they're statements of how counsel might forecast the evidence to proceed. And then we would go into evidence.

I thank all of you for your professionalism and your very capable approach to these matters.

MR. BENDER: Thank you. Have a good weekend.

THE COURT: Yes, sir. Wait one second.

(The court and Ms. Dannelly conferred.)

THE COURT: Oh. Let me ask the government to depart. Not that we've gotten tired of you or anything, but we have certain budgetary matters to take up --

MS. TOMPKINS: Do what?

THE COURT: -- that are ex parte in nature.

MS. TOMPKINS: Oh, no problem.

THE COURT: We just need you to be out of the room for the time being.

MS. TOMPKINS: Okay. We'll just leave and then we'll come back. We didn't know if it was going to be lengthy.

THE COURT: I definitely think it won't be lengthy.

(Ex parte hearing.)

(Evening recess at 2:35 p.m.)



RECEIVED
JUN 1 6 2003
US ATTORNEY'S
OFFICE
CHARLOTTE, NC