## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

---

### UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

### AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

---

### JOINT APPENDIX - VOLUME II OF V
### (Pages 372 - 844)

---

HAROLD J. BENDER
LAW OFFICE OF HAROLD J. BENDER
200 North McDowell Street
Charlotte, NC 28204
(704) 333-2169

ROBERT J. CONRAD, JR.
UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6629

MARK E. OLIVE
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
(850) 224-0004

ANNE M. TOMPKINS
ASST. UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6222

*Counsel for Appellant*

*Counsel for Appellee*

**Additional Counsel Listed on Back of Cover**

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

JILL WESTMORELAND ROSE
ASSISTANT UNITED STATES ATTORNEY
WESTERN DISTRICT OF NORTH CAROLINA
100 Otis Street, Room 233
U.S. Courthouse Building
Asheville, North Carolina 28801
(828) 271-4661

# TABLE OF CONTENTS

Federal District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Indictment filed February 4, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Guilty Verdict returned January 27, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Defendant's Motion in Limine Regarding the Victim
       Impact Statements, filed June 4, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Motion for Allocution by the Defendant, filed
       June 4, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Government's Response in Opposition to
       Defense Motion in Limine to Prohibit
       and/or Limit Victim Impact Evidence,
       filed June 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Government's Response to Motion for Allocution
       by the Defendant, filed June 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Order Denying Defendant's Motion for Allocution,
       entered June 18, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Order Denying Defendant's Motion in Limine
       regarding the Victim Impact Statements,
       entered June 21, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Motion for Relief Pursuant to *Ring v. Arizona*
       filed July 2, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

    Attachments:

    Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

1

Government's Notice of Intent to Seek
the Death Penalty, filed August 7, 1997 ........................... 110

Government's Reaffirmation of Intention
to Seek the Death Penalty, filed July 30, 2001 ..................... 118

Defendant's Memorandum in Support of Motion
Regarding *Ring*, filed July 12, 2002 ........................... 121

Government's Response to Defendant's Motion for
Relief Pursuant to *Ring v. Arizona*,
filed July 12, 2002 ........................................... 128

Voir Dire:

Prospective Juror Regina Sanders (888) ........................... 133

Prospective Juror Edwards (1014) ............................... 148

Prospective Juror Karen Sanders (1071) .......................... 169

Prospective Juror Blakeney (1143) ............................... 184

Prospective Juror Bryson (1239) ................................ 205

Prospective Juror Donaldson (1289) ............................. 224

Prospective Juror Campbell (1477) .............................. 245

Prospective Juror Moore (1913) ................................. 264

Prospective Juror Deana Stanford (1960) ......................... 281

Parties' exercise of peremptory challenges to the
prospective jurors, July 27, 2002 ............................... 294

2

## Volume II

Resentencing Volume 12, July 29, 2002, (Morning) . . . . . . . . . . . . . . . . . . . . . . 372

Resentencing Volume 12, July 29, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 469

Resentencing Volume 13, July 30, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . . 587

Resentencing Volume 13, July 30, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 687

Resentencing Volume 14, July 31, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . . 773

## Volume III

Resentencing Volume 14, July 31, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 845

Resentencing Volume 15, August 1, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 959

Resentencing Volume 16, August 5, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 1029

Resentencing Volume 16, August 5, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1107

Resentencing Volume 17, August 6, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 1202

## Volume IV

Resentencing Volume 17, August 6, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1312

Resentencing Volume 18, August 7, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 1424

Resentencing Volume 18, August 7, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1533

Resentencing Volume 19, August 8, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 1634

Resentencing Volume 19, August 8, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1726

## Volume V

Resentencing Volume 20, August 9, 2002 (Morning) .................... 1799

Resentencing Volume 20, August 9, 2002 (Afternoon) .................. 1822

Resentencing Proceedings, August 12, 2002 ......................... 1870

Resentencing Proceedings, August 13, 2002 ......................... 2017

Defendant Motion for Mistrial regarding victim
impact testimony, filed August 5, 2002 ........................ 2034

Written questions from the jurors filed August 13, 2002 ................ 2037

District Court Judge's answer to jurors' written question
filed August 13, 2002 ................................... 2038

Jury verdict form with reference to count 7, filed
August 13, 2002 ...................................... 2039

Jury verdict form with reference to count 8, filed
August 13, 2002 ...................................... 2057

Jury verdict form with reference to count 11, filed
August 13, 2002 ...................................... 2075

Judgment and Order imposing sentence, entered
August 20, 2002 ...................................... 2092

Defendant's Motion for New Trial, Arrest of Judgment
and Other Relief, filed August 20, 2002 ...................... 2097

Order Denying Defendant's Motion for New Trial,
Arrest of Judgment and Other Relief
entered September 9, 2002 ............................... 2149

4



UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA ) DOCKET NO. 3:97-cr-23-V
)
vs. )
)
AQUILIA MARCIVICCI BARNETTE, ) VOLUME 12
) MORNING
Defendant. )
_____)

TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
JULY 29, 2002

APPEARANCES:

On Behalf of the Government:

    ANNE M. TOMPKINS, ESQ.
    JILL WESTMORELAND ROSE, ESQ.
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    JEAN B. LAWSON, ESQ.
    P.O. Box 472106
    Charlotte, North Carolina

    HAROLD J. BENDER, ESQ.
    200 North McDowell Street
    Charlotte, North Carolina

              Cheryl A. Nuccio, RMR-CRR
               Official Court Reporter
            United States District Court
             Charlotte, North Carolina

MONDAY MORNING, JULY 29, 2002

(Jury not present.)

THE COURT: Good morning. The defense has made two motions in limine, one concerning the firebombing and one concerning medical examiner testimony and exhibits. Does the government wish to be heard?

MS. ROSE: Yes, Your Honor. As to both medical examiner's testimony and exhibits and the motion in limine concerning the evidence of the April 1996 firebombing, the government requests that you deny the motion.

Each of those incidents and evidence of each -- from each of those go to the government's aggravating factors, future dangerousness, as well as substantial planning and premeditation. As well, in determining punishment all relevant evidence, whether it's harmful or helpful, should be considered provided it's otherwise admissible according to United States law. In order to enable the resentencing jury to fulfill its responsibility -- or the sentencing jury to fulfill its responsibility, the government is authorized to offer evidence for the purpose of putting this jury in the very same position of having at least as much knowledge as the previous jury.

And on those grounds we would ask that you deny the motions.

THE COURT: Okay. The court will deny the motions.

(The court and Ms. Hankins conferred.)

THE COURT: Okay. Are the parties ready to bring the jury in to make a final inquiry of them?

MR. BENDER: Yes, sir.

MS. TOMPKINS: Yes, Your Honor.

MS. LAWSON: Yes, sir.

THE COURT: All right. After which time we will go forward with the -- some -- an overview of the instructions, as I said, conduct of jurors, that sort of thing.

I would propose to read the counts of the indictment, Seven, Eight, and Eleven, since this jury will not have heard that heretofore and perhaps give them a little clarity on exactly what it is -- what is being referred to when we talk about the counts of the indictment.

Okay. If there's nothing further, we'll ask the jury to come in, please.

(Jury entered the courtroom.)

THE COURT: Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: Before we begin, I'd like to ask you this one question; and if you have an affirmative answer to this, please just raise your hand at this point. Since you answered the written questionnaire and participated in jury selection over the last couple of weeks, has anything happened or has anything come to your mind which you believe may

prevent you from being fair and impartial as to both parties in this case?

(No response.)

THE COURT: Okay. Thank you very much.

Excuse me just a second.

(The court and Ms. Hankins conferred.)

THE COURT: Okay. I'll ask the clerk to impanel the jury, please.

(All sixteen jurors were duly impaneled.)

THE COURT: Thank you, Madam Clerk.

Members of the jury, I'll go over some instructions with you by way of a preliminary statement.

It will be your duty, members of the jury, to find from the evidence what the facts are. You and you alone will be the judges of the facts. You will then apply to those facts the law as the court will give it to you. You must follow that law whether you agree with it or not.

Nothing the court may say or do during the course of this trial -- that means the presiding judge. Nothing the court may say or do during the course of the trial is intended to indicate or should be taken by you as indicating what your verdict should be. The evidence from which you will find the facts will consist of the testimony of the witnesses, documents and other things received into the record as exhibits, and any facts that the lawyers may agree to or

stipulate to.

Now, certain things are not evidence and must not be considered by you. And I'll list these for you now.

First of all, the statements, the arguments, and the questions by the lawyers are not evidence. So you have to make a distinction in your mind between what is said by the lawyers out here and what is said from the witness stand, because only what is said from the witness stand as sworn testimony is the evidence.

Objections to questions are not evidence. The lawyers have an obligation to their respective clients to make objections when they believe evidence being offered may be improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

You should not -- now, then, if you are -- you are instructed that if some item of evidence is received for a limited purpose only, you must follow that instruction.

Testimony that the court has excluded or told you to disregard is not evidence and must not be considered.

Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in the courtroom.

Now, there are two kinds of evidence, direct and circumstantial. Direct evidence is direct proof of a fact,

such as testimony of an eye witness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist. I'll give you other instructions on this and other matters toward the end of the case, but keep in mind you may consider both types of evidence.

Now, in making all the determinations you're required to make in the sentencing phase, you may consider only the evidence that will be presented at this sentencing phase of the trial. You may not consider as evidence anything that the court or the attorneys said during the orientation and jury selection process.

Now, in deciding what the facts are, you may have to decide what testimony to believe and what testimony not to believe. You may believe all that a witness says or only part of it or none of it. In deciding what testimony of any witness to believe, consider the witness's intelligence, the opportunity the witness had to have seen or heard the things testified about, the witness's memory, any motives the witness may have for testifying a certain way, the manner of the witness while testifying, whether that witness said something different at an earlier time, the general reasonableness of the testimony, and the extent to which the testimony is consistent with other evidence that you believe.

You will hear testimony from certain law enforcement officers. The fact that a witness may be employed by a

governmental unit as a law enforcement official does not mean that his or her testimony is deserving of more or less consideration or greater or lesser weight than that of an ordinary witness. It is for you to decide after weighing all the evidence in light of the instructions I give to you about the factors relevant to determining the credibility of any witness whether you accept the testimony of a law enforcement witness and what weight, if any, it deserves.

So today we begin the sentencing phase of this matter. Before the trial -- excuse me, before the parties begin with their presentations, I wish to give you a brief summary of the applicable law. I'll give you a full instruction on the law at the conclusion of this hearing.

Now, the defendant has been found guilty of the offenses contained in Counts Seven, Eight, and Eleven of the bill of indictment. Now, I'll read those to you right now to give you some background in that.

An indictment is not evidence. It is only an accusation. With that in mind, I'll simply read the -- these Seven, Eight, and Eleven counts.

The court would mention the fact that during the jury selection process, you heard perhaps certain references to the charges of conviction as being carjacking resulting in death and perhaps first degree murder by use of a firearm. As you'll hear from the way these counts are worded, there's a --

FORM FED ® PENGAD · 1-800-631-6989

this will be the full legal statement of what the charges were.

In Count Seven, the government alleged that on or about June 22, 1996, in Mecklenburg County, within the Western District of North Carolina, the defendant, Aquilia Marcivicci Barnette, with intent to cause death or serious bodily harm, did knowingly, willfully and unlawfully take by force, violence and intimidation, that is, he shot to death and took from the person of Donald Lee Allen, a motor vehicle which had been shipped, transported and received in interstate or foreign commerce, that is, a 1994 Honda Prelude with the vehicle identification number given in that count. In violation of Title 18, U.S. Code, Section 2119(3).

Count Eight alleges that on or about the 22nd day of June, 1996, in Mecklenburg County, in the Western District of North Carolina, the defendant, Aquilia Marcivicci Barnette, knowingly used and carried a firearm, that is, a sawed-off Winchester semi-automatic shotgun, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, the carjacking set forth in Count Seven above, and in the course of this violation, caused the death of Donald Lee Allen through the use of a firearm, which killing is a murder as defined in Title 18, U.S. Code, Section 1111, in that the defendant, with malice aforethought, did unlawfully kill Donald Lee Allen by shooting him with the

firearm willfully, deliberately, maliciously, and with premeditation. In violation of Title 18, U.S. Code, Section 924(c)(1) and (i)(2)(1).

And then in Count Eleven, the government alleged that on or about the 22nd day of June, 1996, in Mecklenburg County, in the Western District of North Carolina and in the Western District of Virginia, the defendant, Aquilia Marcivicci Barnette, knowingly used and carried a firearm, that is, a sawed-off Winchester semi-automatic shotgun, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, the act of interstate domestic violence set forth in Count Ten, and in the course of this violation, caused the death of Robin Williams through the use of a firearm, which killing is a murder as defined in Title 18, U.S. Code, Section 1111, in that the defendant, with malice aforethought, did unlawfully kill Robin Williams by shooting her with a firearm willfully, deliberately, maliciously, and with premeditation. In violation of Title 18, U.S. Code, Sections 924(c)(1) and (i)(2)(1).

Now, you must consider whether imposition of a sentence of death is justified as to any one, two or three of those counts, or whether the defendant should be sentenced to life imprisonment without the possibility of release. You must make this decision separately for each count. You are

not required to make the same decision on each count and your deliberations must be separate as to each count. The law leaves this decision exclusively to you, the jury, to determine. And if you determine that the defendant should be sentenced to death or to life imprisonment without possibility of release, the court is required to follow and impose that sentence.

I will now instruct you as to the process you must follow separately in making your verdict. Now, this process must be followed as to each of Counts Seven, Eight, and Eleven separately.

Two terms you have already heard and will hear throughout this phase of the case are aggravating factors and mitigating factors. These factors have to do with the circumstances of the crime or the personal traits, character or background of the defendant, and perhaps victims.

The word aggravate means to make worse or more offensive or to intensify.

The word mitigate means to extenuate or to make less severe or to make -- or to moderate.

An aggravating factor is a fact or circumstance which would tend to support imposition of the death penalty.

A mitigating factor is any aspect of the defendant's character or background, any circumstance of the offense, or any other relevant fact or circumstance which might indicate

that the defendant should not be sentenced to death.

Now, in the death penalty statute, aggravating factors are listed. These are called statutory aggravating factors. As I instructed you -- or you may have heard earlier, before you may consider imposition of the death penalty for any one, two or all three of Counts Seven, Eight or Eleven, you must find that the government proved at least one of these aggravating factors specifically listed in the death penalty statute and your finding must be unanimous and beyond a reasonable doubt.

There also may be nonstatutory aggravating factors which are those not specifically set out in the death penalty statute. Again, your finding that any nonstatutory aggravating factors exist must be unanimous and beyond a reasonable doubt if, in fact, you make such a finding.

Now, you must determine the existence of the aggravating factors separately for each of Counts Seven, Eight, and Eleven. You are not allowed to take an aggravating factor from one count and apply it to another count.

The defendant has the burden of proving any mitigating factors; however, there is a different standard of proof as to mitigating factors. You need not be convinced beyond a reasonable doubt about the existence of a mitigating factor. You need only be convinced that it is more likely true than not in order to find that it exists.

A unanimous finding is not required. Any one of you may find the existence of a particular mitigating factor.

Now, if you have found that at least one statutory aggravating factor exists, you then must weigh the aggravating factors you found to exist against any mitigating factors you found to exist to determine the appropriate sentence.

You must also make a finding concerning the intent or the mental state of the defendant as to each offense. And that would be -- the burden is on the government there again to prove that beyond a reasonable doubt to all the jurors.

Now, I'll give you detailed instructions regarding the weighing of aggravating and mitigating factors before you begin your deliberations; however, I instruct you now that you must not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater. You must consider the weight and value of each factor. And if there are no mitigating factors found by the jury, you must still weigh the evidence and consider whether a penalty of death would be justified given your other findings and your overall assessment of the case.

Now, then, I instruct you that during the trial, you're not to discuss the case with anyone or permit anyone to discuss it with you or in your presence. And that includes your fellow jurors. So until you retire to the jury room at the end of the case to deliberate on your verdict, you're

simply not to talk about it. If someone at home or elsewhere asks you about it, you must tell them the court has told you not to talk about it until it's over, at which time you may talk about it if you wish.

Second, do not read or listen to anything touching on this case in any way. And if anyone should try to talk to you about it notwithstanding the court's instructions, you must bring that to the court's attention promptly.

And third, do not try to do any research or make any investigation about the case on your own.

And lastly, do not form any opinion until all the evidence is in and you have heard the arguments of counsel and the instructions of the court as to the law.

So, you keep an open mind until you start your deliberations at the end of the case. Only at that point have you heard everything you need to hear to make any -- form any opinions or make any conclusions, and you do that in deliberation with your fellow jurors.

Now, if you wish, you may take notes; but if you do, you must leave them in the jury room when you leave at night. And remember, they are for your own personal use. Sometimes it is distracting to take notes and you want to be sure if you do that, that you are paying attention to what is being said by way of testimony.

Now, the order of business here will be as follows:

First, the government will have an opportunity to make an opening statement which is simply an outline to help you understand the evidence as it comes in. Next, the defense attorneys may, if they wish, make an opening statement at this time. Opening statements are neither evidence nor arguments.

Now, the government would then present its witnesses and counsel for the defendant may cross examine them.

Following the government's case, the defendant may, if he wishes, present witnesses who the government may cross examine.

After all the evidence is in, the attorneys will present their closing arguments to summarize and interpret the evidence for you, and the court will instruct you on the law. After that, you retire to deliberate on your verdict.

Now, as you have heard, some of you -- if you -- something is said from the witness stand or perhaps by counsel or the court that you don't understand or if it's mumbled or indistinct, just raise your hand and we'll have it repeated for you. It's important that all of you decide the case based on the same evidence so it's important that all of you hear what is being said. So don't hesitate to do that.

Now, occasionally the court needs to speak with the attorneys about some matter of law or something administrative or logistical and sometimes we may save time by taking that over here at the side-bar with the court reporter. And we do

that to save the time it would take to send the jury out. But there will be other times when we would ask you to step into the jury room so we can accomplish whatever it is that we need to talk about outside the presence of the jury. But if we do take a side-bar over here, you may stand and stretch and be at ease and you may chat with one another, but not about the case.

Thank you very much for your attention to these instructions.

Will the government have its opening statement at this time?

MS. ROSE: Yes, we will, Your Honor.

May it please the court: June 21st is the summer solstice and that's the longest day of the year. On June 21st, 1996, the defendant used those long hours to put the finishing touches on his deadly plans.

The evidence will show that throughout the course of that day he gathered together tools that he would use for death and destruction. He packed a bag with a crowbar, handcuffs, wire cutters, shotgun shells, and a Winchester .12 gauge semi-automatic shotgun.

The evidence will show that the defendant had sawed off the stock and the barrel himself. Had taped a small flashlight to the top of the barrel, and had taken the time to color the lens red so that he could see in the darkness yet

avoid detection.

And toward the end of that very long day, the defendant began to implement his deadly plans. He dressed in black head to toe: black pants, black shirt, black hat. He gathered his bag that he had so carefully packed, left his home on West Boulevard, walked about a mile down the dark roadside of Billy Graham Parkway to the intersection of Morris Field Road. That intersection was dark and lightly traveled.

As he arrived there close to midnight, the defendant had his bag and he was ready. Soon, very soon, two people would die.

And on that very same summer day, 22-year-old Donnie Allen of McConnell, South Carolina, worked his job at the Jacobson Division of Textron. At the end of the day he went home to his family. Ate dinner, took a shower, and visited with his parents. None of them knew it would be their last. How could they?

About 7:30 Donnie said he was going to go out, meet some friends, play some pool. And he drove up to Coyote Joe's on Wilkinson Boulevard and he did just that. He met some friends and played some pool. At about midnight he left. Went out on Wilkinson Boulevard, down Morris Field Road to the intersection of Billy Graham Parkway.

And on that hot summer evening, Donnie had his window down. And as he sat there waiting for the light to

change, the evidence will show the defendant put a shotgun in his face and ordered him out of the car. Donnie complied. The defendant wanted his wallet. Donnie gave it to him. You'll hear from the evidence that the defendant ordered Donnie across the road, down a small incline into a ditch to a concrete culvert. The evidence will also show that Donnie Allen's last words were, Please don't shoot. Don't hurt me.

The defendant ordered him to turn around, shot him three times, twice in the back. He then picked up his bag, got in Donnie's car and headed for Roanoke. Donnie Allen died in the ditch, in the dark, in the weeds alone and could only be identified by his dental records when he was found several days later.

The defendant took Donnie's car and drove to Roanoke. He took Donnie's money and bought gas. And somewhere along the way he changed out of his black clothing. The defendant was going to Roanoke for one reason: one down, one to go.

Robin Williams, the former girlfriend of the defendant, lived in Roanoke. She had broken up with him in April. And on April 30th he had gone to her apartment, firebombed it such that she had to jump from a second story window to save herself. She suffered severe burns. She spent a number of days at the University of Virginia Burn Center, and she was home recuperating at her mother's on Lowden Avenue

in Roanoke. Robin Williams was disfigured, but she was alive and the defendant was coming to finish what he started.

He got to the Williams' home a little before daybreak. As he sat there, he watched the morning come to life. Robin's brother dropped off his baby for Mrs. Williams to keep. Robin let her dog out.

And as Mrs. Williams was in the kitchen playing with her grandbaby, baking brownies for a church luncheon, the defendant slipped from Donnie's car, grabbed his sawed-off shotgun and some spare shells, his wire cutters and cut the phone lines to the Williams' home. He blasted his way in the back door with three shots, kicked the door in. And as Mrs. Williams stood there holding her grandbaby, he calmly reloaded his gun. All Mrs. Williams could do was scream run, Robin, run. Run, Robin, run. Robin did just that.

The evidence will show she ran out the front door chased by the defendant. She ran through the neighborhood. He finally caught her, dragging her, sometimes by the hair, across her neighbor's lawn screaming at her; she begging for her life. Her mother came to try to save her. Robin broke away from the defendant, ran toward her mother, and he shot her in the back. She fell at her mother's feet and died. There was nothing her mother could do to save her.

The defendant got in Donnie's car. He didn't come back to Charlotte. He drove across the state of Virginia into

Tennessee to Knoxville where he went to a hotel, stole a license plate to avoid detection. He then later came back to Charlotte, abandoned Donnie's car behind a shopping center on Independence Boulevard.

Several days later he arranged to be arrested by law enforcement at his mother's home. When they got there, the defendant was dressed in slacks, a button down and suspenders. Not the black clothes he had on when Donnie was murdered. And the evidence will show he was clutching a shotgun when he shot Donnie and Robin in the back, not a Bible as he was clutching when law enforcement got there. He did later confess to both killings.

You're going to hear evidence that this was not the first time the defendant had been violent. That he's had a history of violence. Criminal arrests, felony convictions, and turbulent relationships with women.

Now, members of the jury, that's a summary of the evidence we expect you to hear during the government's case. And the purpose of that evidence is to prove each of the aggravating factors beyond a reasonable doubt to each of you.

Now, there are going to be aggravating factors related to each of the two murders.

First, as to the murder of Donnie Allen, that the defendant committed the murder for pecuniary gain; that is, that he wanted something of value: Donnie's car, the money

that was in Donnie's wallet.

Secondly, that the defendant committed Donnie's murder after substantial planning and premeditation.

The third aggravating factor is that the defendant has committed a pattern of violence throughout his life such that if he is allowed to live, he will be a serious and continuing threat.

Fourth, is the harmful scope and effect of Donnie's murder on the Allen family.

And fifth, that the defendant killed two people.

Now, there are also going to be aggravating factors related to Robin's murder.

First, that during the commission of Robin's murder, the defendant created a grave risk of harm to others; that being her mother and a neighbor, Sonji Hill.

Secondly, that the defendant murdered Robin after substantial planning and premeditation.

Third, that the defendant has committed a pattern of violence such that once again, if he is allowed to live, he will be a serious and continuing threat.

Fourth, the horrible scope and effect of Robin's murder on her family.

And fifth, that the defendant murdered two people.

In proving each of these aggravating factors to you beyond a reasonable doubt, the government will have shown that

there is but one true verdict in this case and that is a verdict of death for the murders of Robin Williams and of Donnie Allen.

In murdering Donnie and Robin, the defendant brought together two people who were strangers. Two people who under any other circumstances would never have been joined together in any way. But he joined them together in a very gruesome way. He joined them together in death.

The defendant murdered Donnie and Robin. The evidence will show he shot them in the back. The evidence will show they begged for their lives. The evidence will show he showed them no mercy and they are gone, but we're here. The Williams family, the Allen family, and the United States of America is here and we are here for justice.

THE COURT: May the defense have an opening statement at this point?

MS. LAWSON: Yes, Your Honor. Thank you.

THE COURT: Yes, ma'am.

MS. LAWSON: We're all here to decide what to do about Marc Barnette, and what you heard from the government is what brings us here. It's what caused him to be convicted of these crimes. But that's just the starting point.

And in the two years that Harold Bender and I have represented Marc, we've been trying to figure out the same thing that you're undoubtedly thinking. How, in the name of

heaven did this happen? And over this period of time, we've talked to a lot of people. We've researched. We've talked to experts, people who know more about these things than we do. And we think we found some information for you that you need to consider. And that's all we can do, is give you information to allow you to make a good decision.

Now, in giving you this information, we're going to talk about abuse. We're going to talk about violence. We're going to talk about neglect. And none of those excuse what Marc Barnette did and we're not offering it for that purpose. We're offering it for information for you to use when you make your decision.

Now, the information that we've been able to get goes back to before the Korean War. It's the story of Marc Barnette and his family and what shaped him into a young man with terrible emotional problems, behavioral problems that are the product of how he was raised. Some uncertain heredity, his physiology.

See, Marc's family were the Coopers, Jesse and Pearl Cooper. Before the Korean War, Jesse and Pearl were married and had a daughter. Her name is Tessie. Jesse went off to the Korean War and fought for us and was horribly injured. He spent a long time in a VA hospital recuperating, and then came back to his family home, to Pearl and to Tessie.

Now, Jesse, by all accounts of his conduct, came

home shell shocked. He started drinking a lot. He didn't take care of his family terribly well. He did all sorts of odd things that you'll hear about. He and Pearl stayed together for a while and had two more daughters, Sonia and Sheila. Sonia is Marc's mother. Pearl stayed for a while longer, but Jesse's behavior got to be too much for her and she left him. They divorced. She took the girls with her. Tessie had grown and moved from the home.

Eventually, Pearl married a man by the name of Leroy Brown who lived with Tessie -- I mean, with Sonia and Sheila in a house here in Charlotte. And one night when Sonia went to a junior prom, Pearl and Leroy were fighting about the cost of Sonia's dress. That night Leroy Brown shot and killed Pearl, his wife, Sonia's mother. Before we get to that, though, we talk about Marc.

Marc was born in July of 1973. When the nurse put Marc in his mother's arms, she was fourteen years old. A child herself. And Pearl was helping Sonia raise this child until the day she was murdered. That day Marc was ten months old. So the girls went back and lived with Jesse for a while and Jesse behaved the way he always had, and Tessie came back and took her sisters in. She was a very young woman herself. She raised them, and Sonia still had Marc with her. And eventually Sonia married Marc -- married the man who was supposed to be Marc's father. His name is Rick Barnette.

Now, Sonia and Rick did not have a good marriage. It was characterized by reciprocal domestic violence. He hit her in the head with a hammer. She stood over him with a frying pan in her hand. There was crying; there was infidelity; there were accusations of infidelity, all in the presence of Marc.

Rick was in the service and the family moved to North Dakota. The fighting continued. Sometimes it was worse than others. Rick got reassigned to Okinawa, so he sent Sonia and the children -- the child back to Charlotte.

And with Rick gone, Sonia started running around. She started acting the way a damaged young woman would act. You'd expect that behavior from somebody who had been through young motherhood, the murder of her mother, being raised by a slightly older sister. Sonia ran around. She drank. Did drugs. Didn't take care for Marc very well. Neglected him.

Eventually, Marc was joined by a little brother. His name is Mario. And while Sonia was running around, Marc took care of his little brother.

Eventually, Rick came back from the service, from Okinawa and the fighting continued and the violence continued. And he was a very strong disciplinarian, but most of the violence in the household was the two parents accusing each other, hurting each other. And that's what Marc saw as he grew up.

Eventually, Marc and Sonia separated and the boys stayed with Sonia.  She continued to neglect the children.  A good example is she lost her car in an accident and used the insurance proceeds to buy a new car, a red Corvette.  She couldn't have driven her sons to school if she wanted to.  Mario on one occasion was hit by a car.  Sonia couldn't be found.  Stayed out all night, leaving the boys alone.

Rick didn't like what was going on, didn't like paying child support for these children, and eventually began to do some math and realized or began to suspect that he was in Okinawa at the time that Mario was conceived.  So he forced paternity testing and learned that he was not the father of Mario nor the father of Marc.  And to this day nobody knows who Marc's father is.  Well, one person does.  It's Sonia.  But she either can't or won't tell anyone.

Now, what Marc is is the product of his heredity that's somewhat cloudy, his physiology and how he was raised, and the people he knew and the examples he learned how to follow.  And during the course of this evidence, you'll see that he grew up to be a terribly damaged young man.  And one of the prime ways in which he was damaged is evidenced by the relationships that the government is going to talk to you about.

At a very young age, a young teenager, he had a girlfriend by the name of Sheila.  When she broke up with him,

he took a batch of pills. It wasn't a very sophisticated suicide attempt, but it showed the level of his distress.

Not too long after that, he met a girl named Tasha. Tasha would become the mother of his two children, Angelica and little Marc. Tasha, when she gave birth to Angelica, was fourteen years old. Their relationship was characterized by fighting, by violence, by accusations of infidelity, the same things that had plagued his parents' marriage. It was not a pretty marriage or relationship. In fact, they never did marry.

Eventually, Marc left Tasha and lived with Crystal. Again, fighting, accusations of infidelity, jealousy, assaults. Crystal had two small children and Marc had occasion to discipline them once and hit them with a hanger. He himself had been hit with objects as opposed to hands. He was charged with cruelty to children and pled guilty. He was told to get counseling, and he didn't. Instead, he came back to Charlotte.

And in Charlotte he met a girl by the name of Alecia. Now, with Alecia you begin to see how pathological Marc's behavior was. He loved her. And it was a very, very difficult relationship. Again, a lot of fighting. A lot of breakups. A lot of reunions. And in the course of his relationship with Alicia, you see that he became obsessed with her. He did terrible things in broad daylight in front of

people.

One time he kicked in a door and ran into a room to get to her, never even seeing the people who were in the room.

Another time he grabbed her off a bus as she went to work and held her trying to talk to her. And when people came to rescue her, he used a knife to hold them at bay.

Eventually he was charged with some of the incidents relating to Alecia and pled guilty and was put on probation. But he didn't report for probation because he was already involved with Robin Williams and he moved to Roanoke to be with Robin. And he loved her the way he had never loved anybody else. To the point that he was insanely jealous of her. Totally wrapped up in her. And she completed him. And eventually he began to think that she was seeing somebody else. He found evidence, telephone numbers, other things, and they fought even more. And they broke up early in 1996. And Marc came back to Charlotte to live in the same place with his mother that he always lived.

In coming back to Charlotte, Marc left behind the thing that was most important to him, the person who completed him, and that was Robin Williams. And although nobody diagnosed him then, it was clear to any person that he was sliding into a major depression. He couldn't sleep. He watched all sorts of bizarre television shows. He couldn't

get a job, although he tried on one occasion and just couldn't pull it together. He began wandering around and acting strange and nobody in the household did anything, got him any help.

And of course, his thinking by then was pretty disordered. He kept calling Robin on the telephone, and family members will tell you that he would weep on the phone begging her to take him back. He cried a lot. But he had been crying even when he was with Tasha. He would crawl in a closet and cry. So you can see the depth of the feelings that he had throughout his life.

In any event, one night he thought when he called Robin that there was a man with her, and he got angry because he was obsessed with Robin. And that's the night that he went up to Roanoke. The purpose was to call this man out into the parking lot. To find out why he was with his Robin. Not very logical, but that's what happened. When nobody came out, he started bashing the car's windows in that he figured belonged to this man who eventually turns out to be Benny Greene. Eventually, he threw a firebomb into the apartment and it burned.

He returned to Charlotte and the next day found out that, in fact, Robin had been injured and that Benny Greene had been in the apartment. He didn't get calmer; he got angrier. He waited for the police to come. He was aware that

there was a warrant for him. Sometimes he'd sit down at the bottom of the driveway waiting for the police to come. His family and his friends knew that the police were looking for him. And they saw him get sadder and more depressed and more withdrawn walking around the house or the yard, watching shows like Tales from the Crypt, not eating. In fact, on one occasion he shaved his head and told his mother he had done it because he was having trouble thinking.

Now, this disordered kind of thinking persisted until he became so obsessed with getting to Robin, to find out why she had broken up with him, why she was with this other man, that he began to put together things that he thought he'd need to get Robin to talk to him. And when he went up to Roanoke, his plan, his idea was something so murky, so confused, so the product of a disordered mind that all he wanted was to get to Robin. He couldn't get to her without getting a car, and there was no car at his house that was operational. The only thing he needed to do, that he wanted to do was to get to Robin. And that's why he left his home and got a car. No excuse. But his thinking was that disordered that he would kill a man for his car.

And he drove to Roanoke and he waited for Robin. And it's clear that he didn't know what he was going to do once he saw Robin. The thoughts swirling in his mind. You know, take her someplace and talk to her. Scare her into

resuming the relationship. Kill her, kill himself. Kill both of them. These thoughts, these obsessional thoughts whirling around in his mind.

And when he finally got to Robin, he still didn't know what he was going to do, but eventually he killed her. At the same time he shot her, though, he wanted to try to catch her. His conflicted thinking, his irrational thinking persisted.

He ran away. He tried to kill himself when he was in Tennessee but failed. And so he came home to his family. Dressed respectfully, held the Bible that he used to read with his grandfather Jesse, called the police and confessed. Told them where to find Donnie Allen's body.

Now, that's how he got to the point where he was convicted. The second part of all this is who has he been since? You'll hear evidence that in the six years that he's been in custody because of these offenses, he has been a model prisoner. Not the first infraction. He's an example to other people in the jail and he's been an example to other people in the prison. He's been so orderly that they've allowed him to be a trustee in one of the institutions in which he's been housed. So the man who sits here now is a very different man. He's changed over the last six years. And you'll hear evidence about why that happened.

You'll hear a lot of evidence about Marc coming from

the government witnesses. And again, all we can ask is that you listen to it because all we're trying to do is give you information that will help you make your decision. Thank you.

THE COURT: You may call your first witness.

MS. ROSE: Government will call Benny Greene.

BENJAMIN SPENCER GREENE,

being first duly sworn, was examined and testified as follows:

THE COURT: You may proceed.

MS. ROSE: Thank you.

DIRECT EXAMINATION

BY MS. ROSE:

Q. Good morning, sir. Would you state your name for the members of the jury, please.

A. Yes. Benjamin Spencer Greene.

Q. And how old are you, Mr. Greene?

A. I'm thirty.

Q. Do you live here in Charlotte?

A. Yes, I do.

Q. Where do you work?

A. I work for Nabisco.

Q. What's your position at Nabisco?

A. Truck driver.

Q. How long have you been an employee of Nabisco Corporation?

A.    I've been there eight years.

Q.    And you might need to speak up a little bit, Mr. Greene. I don't know if everyone can hear you.  Thank you.

Prior to moving to Charlotte, where did you live?

A.    I lived in Roanoke, Virginia.

Q.    How long had you been in Roanoke?

A.    Been in Roanoke for twenty-seven years.

Q.    Is that your place of birth?

A.    Yes, it is.

Q.    Did you attend school in Roanoke?

A.    Yes, I did.

Q.    While you were in high school, did you meet Robin Williams?

A.    Yes, I did.

Q.    How long had you known Robin?

A.    Since tenth grade.  Sixteen years old.

Q.    Did you two become friends?

A.    Yes, we did.

Q.    Did you ever have a romantic relationship with Robin?

A.    No.

Q.    How would you describe the relationship that you did have?

A.    With Robin, it was basically a going out to eat, going to the movies type of relationship.  It was never romantic. Anything like that.

Q. And did you also hang out with a group of girls who were her closest girlfriends?

A. Yes.

Q. After you graduated from high school, did you two continue to keep in touch?

A. Yes, we did.

Q. During the course of your friendship over those years, did you get to know the Williams family?

A. Yes, I did.

Q. Did you visit in their home?

A. Yes, I did.

Q. Would you just describe for the members of the jury the kind of person that Robin was.

A. She was a very caring, down to earth, good hearted woman.

Q. Was she a lighthearted person?

A. Yes. Just real humorous and, I mean, she was a good friend.

Q. I'm going to show you what has been marked as Government's Exhibit 67W. I'd ask you to take a look at that exhibit. Tell us who that is.

A. That's Robin.

Q. She had a bright smile, didn't she?

A. Yes, she did.

Q. And was that characteristic of Robin?

A.    Yes, it was.

MS. ROSE:  Your Honor, I would move to admit Government 67W.

THE COURT:  Okay.  It may be admitted.

(Government's Exhibit Number 67W was received into evidence.)

Q.    Do you recall when Robin began her relationship with the defendant?

THE COURT:  Wait just a minute.  Was the jury able to see that?

THE JURY:  (Negative nods.)

THE COURT:  Can you see it now?

THE JURY:  (Affirmative nods.)

MS. ROSE:  It may just now be receiving its signal.

BY MS. ROSE:

Q.    Do you recall when the defendant and Robin began their relationship or did she talk to you about it?

A.    No.  She never talked and I never asked.

Q.    Did you know that she was seeing someone?

A.    Yes, I knew she was involved.

Q.    How did you know that?

A.    Through her mother.

Q.    During Robin's involvement with the defendant, did you see her very often?

A.    No.

Q. Did your contacts with her drop off?

A. Yes, it did.

Q. When the defendant and Robin broke up, how did you learn about it?

A. That's a good question. I don't know if it was either through her mother or Robin herself. I don't know.

Q. At some point, though, in that April, did you see Robin?

A. Yes, I did.

Q. What did she tell you at that time?

A. She told me she would -- she had just got out of an abusive relationship and that she was afraid to stay at her place, her apartment.

Q. And as a result of that, what did you offer to do?

A. I offered to stay over there a couple nights of the week.

Q. And why was that?

A. Well, my job was around the corner from it for one thing. It wasn't no big problem for me to go to work. And second of all, I told her if she -- she was paying rent, she shouldn't be afraid to stay in her apartment.

Q. And at that point did Robin tell you much about the relationship with the defendant? Did she describe some of the things that occurred during the course of that relationship?

A. She -- she never really told me and I never did really ask. There's only on one occasion I asked because her -- in

her bedroom her closet doors was broke and I asked her what happened, and that was the only really -- before the incident that we actually talked about it. We never really talked about it.

Q. Did she tell you why her closet doors were broken?

A. Yes.

Q. What did she tell you?

A. She told me he slammed her into -- into the closet doors.

Q. On April the 29th of 1996, did you, in fact, go with Robin the first night back at her apartment?

A. Yes, I did.

Q. And did you stay with her that evening?

A. Yes, I did.

Q. If you can recall, when did you arrive at the Keswick Apartments on that particular evening?

A. I arrived first. It was around 7:00, 7:30. It was just getting dawn -- dusk, I believe it was, that night.

Q. Was Robin home from work yet?

A. No, she wasn't.

Q. While you were waiting on her to arrive, what did you do?

A. I sat in my car. I think one of her neighbors came out and asked me -- told me she wasn't there and I said, yes, I knew she -- I was waiting on her. And I think the neighbor --

she had called the neighbor and told the neighbor that she was on the way -- to tell me that she was on the way.

Q. Would you describe a little bit the layout of the apartment. It's a two-bedroom apartment.

A. Yes. When you walk in the door, the living room is right there. To your left is the kitchen. And then you go down the hallway, then the second -- the bedroom was on the left-hand side and then Robin's room was on the right-hand side.

Q. What did you carry with you on that particular evening?

A. (No response.)

Q. Go ahead, I'm sorry.

A. I carried my gun with me.

Q. Why did you do that?

A. I always -- I always carried it because I go to work early in the morning. I always carried it.

Q. Now, the area where you worked, which is close to the Keswick Apartments, was that one of the nicer areas of Roanoke?

A. No, it's not.

Q. Now, I'm going to show you Government's Exhibit 7F, already admitted. Can you describe for the members of the jury what Government's Exhibit 7F is.

A. Yes. That's -- that's the back of the apartment.

Q. And can you just -- which apartment, if that's shown there, was the one that Robin had?

Q. Now, after you got to the apartment that evening, what did you and Robin do?

A. Well, we had rented some movies. I had brought my VCR and we hooked it up and we just watched movies. That's what we did that evening.

Q. Now, during the course of the evening, did she receive a number of phone calls?

A. Yes, she did.

Q. Tell the jury about that.

A. Yes. The phone kept ringing and sometimes she would answer it and sometimes she wouldn't. And she kept on repeatedly hanging up.

Q. At some point did you go to bed?

A. Yes, I did.

Q. Did you go to bed before Robin?

A. Yes, I did.

Q. What's the next thing that you recall happening on that evening?

A. I recall Robin waking me up screaming and crying and saying that he was here.

Q. Did you know who she meant when she said he's here?

A. No, I didn't.

Q. About what time was this when you were awakened?

A. I can't recall what time it was.

Q. Was it after midnight but before morning?

A. Yes.

Q. What did you do when Robin woke you up?

A. I told her to call the police.

Q. Was she able to do that?

A. No.

Q. Why not?

A. The phone line was dead.

Q. What's the next thing that happened?

A. We went to the window, the kitchen window there.

Q. Was that on the front, the side or the back of the home?

A. The front -- the front of the home.

Q. You might need to back up a little bit. Go ahead.

A. We went -- we went to the kitchen window in the front of the apartment.

Q. What did you see?

A. I seen a man out there bashing my car in with a bat.

Q. With a baseball bat?

A. Yes, with a baseball bat.

Q. What did you do?

A. Well, at first I guess it kind of shocked me. I didn't -- I didn't do anything at first. She was -- she was conversating with him. She was asking him why was he -- why were you doing this.

Q. How was she communicating at that point?

A. She was screaming.

Q.   Was the window open?

A.   It was a hole in the window.

Q.   Had that already been broken in?

A.   Before I got there, no.

Q.   So --

A.   It was broken in.

Q.   During the course of that evening --

A.   Yeah.

Q.   -- that window was broken?

A.   That window had a hole in it, yes.

Q.   And Robin is speaking out the window.  What's being said?

A.   She was -- she was saying, Why were you doing this?  And she kept on screaming, Why were you doing this?

Q.   What was the defendant saying?

A.   He was saying that you're going to die tonight.  I'm going to kill you.

Q.   What did he actually say?

A.   He said, I'm going to kill you.

Q.   What did you and Robin do at that point?

A.   At that point?  We -- we was still at the window at that point.  He was still kicking the front door in.  He was trying to kick the front door in.

Q.   Had he left your car at that point?

A.   Yes, he had.

Q.   Okay.  I'm going to show you a couple exhibits already marked and previously admitted.  First, Government's Exhibit 1C.  What is that exhibit?

A.   That's my car.

Q.   Exhibit 1D?

A.   Side of my car.

Q.   Now, that's not what your car looked like when you pulled up at Robin's that night or before you went to bed.

A.   No.

Q.   And Government's Exhibit 1E?

A.   That's my car.

Q.   Was that taken later on in the early morning hours --

A.   Yes, it --

Q.   -- of April 30th?

A.   After it happened, yes.

Q.   You said the defendant was at the front door.  What was happening?

A.   He was trying to kick the door in.

Q.   Which window (sic)?

A.   The front door.

Q.   Was the door locked?

A.   Yes, it was.

Q.   Do you recall how many locks were on that door?

A.   She had quite a bit of locks on the door.  I'm going to say at least three.

Q.   Was the defendant able to get in?

A.   No.

Q.   What happened?

A.   What happened?  After he -- my car got bashed in, he threw a substance in the door.

Q.   So the door was knocked at least somewhat open.

A.   Yeah, it was cracked.  It was just a little bit, just enough, about that far right there apart (indicating).

Q.   Was there a chain on the door?

A.   I can't recall if it was a chain on the door or not.

Q.   Do you recall if the door frame or the door itself was broken?

A.   Yes.

Q.   Had about a six inch, is that an accurate description --

A.   Yes.

Q.   -- of what you've just shown us, about six inches?

You said a substance was thrown in.  Describe that.

A.   Yes.  It was -- it was a lit bottle and it had a rag hanging out of it.  It was lit.

Q.   A lit bottle?

A.   Yes.

Q.   Who threw the bottle through the door?

A.   The same guy that was bashing my car in.

Q.   Where did it go when it came through the front door?

A.   It hit the living room curtains and it caught the corner

of the bottom of the living room curtains. It caught fire right there.

Q. Did it catch fire rather quickly?

A. Yes, it did.

Q. What happened next?

A. After it caught the curtain, Robin tried to put it out.

Q. How did she try to put it out?

A. I think she had a towel or something. She tried to put it out. I can't remember if she tried to put it out with a towel or her hands. I can't remember that. I think she tried to put it out with a towel.

Q. Were you all able to get out the front door?

A. No.

Q. Where was the defendant as things were catching fire?

A. At that point I didn't -- I didn't look. When the house was -- caught on fire, I didn't -- I didn't look where he was at right there.

Q. What did you two do?

A. Well, we ran -- we ran to her bedroom and we knocked the shade -- we knocked the blinds and everything down. We jumped from the second story window.

Q. I'm going to show you Government's Exhibit 2A previously admitted. Describe that exhibit, if you would, please, Mr. Greene.

A. Yes. That's the front of the apartment.

FORM FED ® PENGAD · 1-800-631-6989

Q.   And the window that's broken, is that the kitchen window you were describing earlier?

A.   Yes, it is.

Q.   Show you what's been marked and admitted as Government's Exhibit 2C.   What is Government's Exhibit 2C?

A.   That's the back of the apartment, the second story window we jumped out of.

Q.   And am I accurately pointing to the window which was Robin's bedroom window?

A.   Yes.

Q.   And Government's Exhibit 2H.

A.   Yes, that's the window.

Q.   Robin's bedroom.

A.   Yes, it is.

Q.   Looks like there are some scrape marks there on the brick.   Do you know what those are from?

A.   Yes.   That's -- that's from our knees, I believe.   Our knees and arms.

Q.   Were you wearing shoes when you all left or were you barefooted?

A.   We was barefooted.

        THE COURT:   Mr. Greene.

Q.   Did you have on your night clothes --

        THE COURT:   Excuse me just a second.   That microphone spits back to you when you're too close to it, so

stay back a little bit and then just try to keep your voice up. I think that will work out. Thank you.

MS. ROSE: Thank you.

BY MS. ROSE:

Q. Did you have on your night clothes or did you all have a chance to change into other clothing?

A. We had what clothes on we went to bed in.

Q. Now, before you and Robin jumped from the window, did you see where the defendant went?

A. Yes. Yes, I did.

Q. Where?

A. Right -- right before the -- after the curtains caught on fire, Robin was -- I was still at -- she was trying to put the fire out. I was still at the window. Yes, I seen a car come down the hill with its lights off. He ran and jumped in the passenger side and then the lights came on and the car drove off.

Q. Now, did you get your gun out?

A. I had my gun -- I had my gun out before then, yes.

Q. What did you do?

A. I just -- I shot it.

Q. Did you shoot at the defendant?

A. No. I shot over his head.

Q. And what was your purpose of shooting over his head?

A. To scare him off.

Q.    Now, once you got outside, had you gotten any injuries from the fire?

A.    No.  I had a scrape from jumping out of the window. That's probably -- that's probably about it.

Q.    What about Robin?

A.    She got burnt trying to put the fire out.

Q.    What was Robin doing -- once you were able to get out of the apartment, you're on the ground, what's Robin doing?

A.    She's knocking -- knocking on doors of her neighbors trying to get them out, telling them the house was on fire.

Q.    Were you able to see any visible injuries to her at that time?

A.    Yes, I was.

Q.    Describe for the jury what you saw.

A.    Yes.  Her skin was hanging off her forearm.

Q.    Did a neighbor or someone give her a towel or something to wrap her arm in?

A.    Yes.  Yes, they did.

Q.    How quickly thereafter did the police or paramedics arrive?

A.    They was there pretty fast.  I say within a couple minutes.  Five minutes at least.

Q.    Did you receive any medical attention?

A.    No.

Q.    And did you see Robin getting medical attention?

A.   Yes.   They -- they split us up pretty fast when they came.   They stuck me in one ambulance and her in another so I didn't really -- after that -- after they came they split us up, so I didn't really see her after that.

Q.   I'm going to show you Government's Exhibit 2D previously admitted.   Which room in the apartment is Government's Exhibit 2D, can you tell?

A.   No, I can't tell.   Looks like the living room.

Q.   Okay.   Now, when's the next time that you saw Robin?

A.   The next time I saw Robin, UVA hospital.   That was the last time.

Q.   University of Virginia Medical Center up in Charlottesville?

A.   Yes.

Q.   Did you go visit her while she was receiving treatment there?

A.   Yes, I did.

Q.   How was she doing emotionally when you saw her?

A.   She was -- she was more apologetic about my VCR being burnt up more than anything.

Q.   She apologized to you.

A.   Yes, she did.   And I told her I can replace that.   That's no big problem.

Q.   Did you then see her after she returned home from the hospital?

A.    Yes, I did.

Q.    Where did you see her then?

A.    I seen her at -- at her mom -- mother's house and she came to my parents' house, also.

Q.    So you all began visiting with one another again as old friends.

A.    Yes.

Q.    Did she begin then to talk to you a little bit about her relationship with the defendant?

A.    Actually, she -- yes.  She talked more about it after the incident, yes.

Q.    What did she tell you?

A.    She only told me a couple things.  And like she would come home and he would smell her panties to make sure that she hadn't been sleeping with anybody.  Things like that.  And I told her why didn't she tell her brothers.  And she was afraid that her brother would kill the guy, basically.

Q.    Did she tell you that she wasn't sharing what had been occurring with her family members or friends?

A.    No.

Q.    Did she talk about emotionally how she was doing at that point?  She's in recovery for the burns, but how is she doing emotionally?  What did she tell you?

A.    I think emotionally, I mean, to me she was still pretty much the same person towards me.  Emotionally wise, I didn't

FORM FED ● PENGAD · 1-800-631-6989

-- I wasn't around her that long to, you know, to get the emotional part from her.

Q. When did you hear that Robin had been murdered?

A. That morning.

Q. What morning?

A. I can't remember the date.

Q. The morning --

A. Yeah, the morning.

Q. The morning that she was killed?

A. Yes, that morning.

Q. How did you hear?

A. Detective Kahl came by the house. He was calling my parents' house and he told me to stay there. And when I finally got in touch with him, he told me the news.

Q. Did Robin tell you whether she felt safe in her mother's home?

A. She told me she felt safe at her mother's house.

Q. Did the apartment, was it fully burned?

A. Yes, it was.

Q. Were you able to recover anything out of there that belonged to you?

A. Only thing was in there was my work uniforms that I was going to work the next day and my VCR. That was the only thing in there that I lost.

MR. ROSE: Mr. Greene, thank you.

CROSS EXAMINATION

BY MR. BENDER:

Q.   Mr. Greene, approximately how many times had you stayed with Robin after she and Marc Barnette had split up?

A.   That was the first time.

Q.   That was the first time that night?

A.   Yes, sir.

Q.   You had heard from Robin that she was afraid to stay there by herself because of this jealous person that she had been involved with, didn't you?

A.   Yes.

Q.   And before you went to bed that night, the phone would ring fairly constantly, wouldn't it?

A.   Yes, it would.

Q.   Sometimes Robin would just ignore it, wouldn't pick it up, right?

A.   Right.

Q.   Other times she might pick it up and then hang it up; is that right?

A.   That's correct.

Q.   And at other times she might pick it up and speak into it, didn't she?

A.   That's correct.

Q.   And this all happened before you went to bed.

A.   This happened before I went to bed.

THE COURT: Okay. The jury is seated. You may call your witness.

MS. TOMPKINS: Government calls K.O. Hubbard.

K.O. HUBBARD,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please.

A. Investigator Hubbard.

Q. Can you spell your name to the court reporter.

A. H-u-b-b-a-r-d.

Q. And how are you employed?

A. Police officer with the City of Roanoke Police Department in Virginia.

Q. All right. And if you can keep your voice up --

A. Okay.

Q. -- so we can all hear you. Thank you.

How long have you been a police officer?

A. Be twelve years in October.

Q. Pardon me?

A. Twelve years in October.

Q. Were you employed and on duty as an officer during the early morning hours of April 30th, 1996?

A. Yes, I was.

Q. Did you respond to a call for service at an apartment

located at 1616 Keswick Avenue in Roanoke, Virginia?

A.    Yes, I did.

Q.    About what time did you receive that call service?

A.    About four a.m.

Q.    And when you responded, what did you see when you arrived?

A.    When I got there I could tell the apartment was fully involved in flames.  Also, a vehicle on the side of the street...

THE COURT REPORTER:  I'm sorry, the apartment was --

THE WITNESS:  Fully involved in flames.

THE COURT REPORTER:  And then something about a vehicle?

THE WITNESS:  Yes.  Also there was a vehicle in front of the apartment, also.

BY MS. TOMPKINS:

Q.    And what kind of vehicle was that?

A.    It was a red Honda.

Q.    And what did you notice about the Honda, if anything?

A.    The hood of the Honda was on fire at that time.

Q.    And when you say fully involved, describe what that looks like.

A.    Flames coming out all of the windows of the apartment.

Q.    Was the police -- or the fire department on the scene yet?

A.   No, they got there probably a minute after I did.

Q.   The red Honda, where was that parked in relation to the apartment building?

A.   It was directly in front of the apartment.

Q.   Directly in front of 1616?

A.   Yes, ma'am.

Q.   What did you do next?

A.   I located Williams and Greene.

Q.   Where were they?

A.   They were toward the rear of the apartment building.

Q.   Did you see anybody else outside?

A.   It was several people outside.

Q.   All right.  What did you notice about Robin Williams?

A.   She had a towel wrapped around one of her arms.  She was real nervous and jittery, and she talked real nervous and fast.

Q.   What did she tell you?

A.   She told me, I told you he was crazy.  Asked her who? She said her ex-boyfriend, Aquilia Barnette.  At that point I think they transferred her to the hospital by ambulance and I finished talking to her at the scene.

Q.   Okay.  Did you -- at the scene did you speak to Benjamin Greene?

A.   Yes, I did.

Q.   What did he tell you?

A.   He told me he heard some knocking outside.  Looked outside.  He noticed Williams' ex-boyfriend Aquilia Barnette beating his vehicle with a baseball bat.  At that point he put the bat down, started lighting Molotov cocktails and throwing them at the apartment.  One went through the window.  I believe the second one he said bounced off.  Barnette picked it up again and threw it inside the apartment.

Q.   And was that -- did you later learn that the person who did that's name was Barnette?

A.   Yes.

Q.   And what is -- and was it your term or Mr. Greene's term, Molotov cocktail?

A.   I can't recall.

Q.   Okay.

Q.   What is a Molotov cocktail?

A.   It's a bottle has some type of flammable fluid in it. Has cloth on the top of it, basically like a cloth.  And throw it.  When it breaks, the fire from the flame -- from the cloth inside the bottle spread from the fluid and usually a pretty good sized fire results from it.

Q.   All right.  So it's sort of a homemade --

A.   It's kind of a homemade bomb --

Q.   -- instrument?

A.   -- I guess you could say.

Q.   All right.  What did Benny Greene tell you he did in

response?

A. He said he fired some shots out the window at Barnette to scare him.

Q. And what did you do with Mr. Greene's gun, if anything?

A. I secured it. He gave it to me voluntarily. I secured it at the police department.

Q. And he gave it to you freely?

A. Yes.

Q. All right. And you mentioned that you later went to the hospital to talk to Robin; is that correct?

A. Yes, I did.

Q. How long after she left in the ambulance did you follow?

A. It was a few minutes. I don't know exactly.

Q. Which hospital did you go to?

A. Roanoke Memorial Hospital.

Q. All right. And did you see her at the hospital?

A. Yes, I did.

Q. Where was she?

A. She was in the emergency room.

Q. And did you -- were you able to interview her in the emergency room?

A. Yes, I did.

Q. And how was her condition different if at all from how she was at the scene?

A. She was a lot calmer. She was a lot calmer at the

emergency room.

Q. And what, if anything, did you notice about any injuries that she had?

A. They had started working on her and they took the towel off her arm and the skin on her arm had -- some had bubbled up and other parts of it was peeling off.

Q. All right. Now, what information did she give you at the hospital?

A. Name, date of birth, address here in Charlotte.

Q. Whose name, date of birth?

A. Aquilia Barnette.

Q. And had she given you his name at the scene?

A. No.

Q. And did you ask her if she knew who was responsible?

A. Yes.

Q. Okay. And that's when she gave you his name?

A. Yes.

Q. Okay. So she knew his name, his date of birth. What else?

A. Address.

Q. And that address was where?

A. I believe it was 3413 West Boulevard, Charlotte, Virginia -- I mean, Charlotte, North Carolina, excuse me.

Q. All right. And what did you do -- what else -- information did you get from Robin Williams?

A. I believe...

Q. If any.

A. Vehicle. Vehicle description. She gave me was an older, I believe a B210 Nissan, blue with primer spots, if I remember correctly.

Q. And what was -- what vehicle -- how did that relate to the incident?

A. That was the vehicle he left in.

Q. That Mr. Barnette left in?

A. Yes.

Q. Okay. And what did you do with that information?

A. Put a lookout for our state police and North Carolina State police in Charlotte.

Q. I'm going to show you some photographs that have previously been admitted. Government's Exhibit 1A, do you recognize that?

A. Yes, I do.

Q. What is that?

A. That's 1616 Keswick after the fire had been put out.

Q. I'm going to show you Government's Exhibit 1B. Do you recognize what that is?

A. The same building.

Q. Okay. And when you said fully involved, was -- did you see flames coming out of those windows?

A. Yes, ma'am.

Q.   I'm going to show you what's been marked and admitted as Government's Exhibit 1C.   Is that the red Honda that you spoke of?

A.   Yes, ma'am.

Q.   And that was the condition that it was in when you saw it?

A.   Yes.

Q.   That's Government's Exhibit 1D previously admitted.

A.   It's the same vehicle, yes, ma'am.

Q.   And Government's Exhibit 1E?

A.   Yes.

Q.   And that's the damage that you saw --

A.   Yes, ma'am.

Q.   -- that night?

     Now, before April 30th, 1996, had you ever been to 1616 Keswick Avenue?

A.   Yes, ma'am, on two occasions.

Q.   And tell the jury about those two other occasions that you had been to that apartment.

A.   The first one was June of '95.   I responded to an attempted suicide.   Got there, learned that Ms. Williams and Mr. Barnette got into an argument.

Q.   Do you remember what time of day or night it was when you responded?

A.   I'm not sure.   It had to be -- I worked midnight shift

then, so it had to be early morning hours.

Q. And when you got there in June of '95, who did you meet?

A. Ms. Williams and Ms. Barnette -- Mr. Barnette.

Q. Did you speak to Mr. Barnette?

A. Yes, I did.

Q. Okay. What did he tell you?

A. They had got in an argument and Ms. Williams had threatened to break up with him. I asked him -- of course, the call was suicide from taking pain pills --

THE COURT REPORTER: You asked him what, I'm sorry?

THE WITNESS: Ma'am?

THE COURT REPORTER: You asked him what? I had a hard time understanding you.

THE WITNESS: Oh. He was taking pain pills for an injury he had at work. Apparently, he told Ms. Williams he was taking a bunch of them to commit suicide.

BY MS. TOMPKINS:

Q. What was the type of call for service?

A. It was an attempted suicide.

Q. Okay. And did you ask Mr. Barnette whether he had in fact attempted suicide?

A. I asked him. He said no, he just said it just because she had threatened to break up with him and he was mad. Also, rescue was called and his vital signs was normal.

Q. You said that -- I'm sorry, I didn't hear that.

A. Rescue responded.

Q. Okay.

A. And they found his vital signs was normal.

Q. Okay. So he had said that he had not, in fact; that he was mad at her. Is that what you said?

A. Yes.

Q. And that he had just said that he was attempting suicide.

A. Yes.

Q. Now, what was the other incident that you had responded to 1616 Keswick?

A. It was -- I can't remember the exact date.

Q. Okay. Was it, well, close in time to the arson?

A. It was before the arson. Again, Mr. Barnette and Ms. Williams had got into an argument. He had left with her car and keys and apparently she had locked herself out of her apartment.

Q. Well, had she locked herself out or had -- what did she tell you happened?

A. I can't remember exactly. Sometime during the argument that she got locked out of her apartment.

Q. Okay.

A. She went to a neighbor's house and called and she said her mom was on her way with an extra key to let her in. And since it was cold outside, I let her sit in my vehicle until

her mom arrived.

Q. All right. So she had called 9-1-1 from a neighbor's house?

A. Yes, ma'am.

Q. And when you responded, where was she?

A. I believe she met me out -- she was in the neighbor's house and when she saw me pull up, I believe she came outside. She was at the neighbor's house.

Q. Okay.

A. When she saw me pull up, she came outside.

Q. And do you remember what type of call that was?

A. No, I don't.

Q. Just a general call for service?

A. Yeah.

Q. And did you file a report?

A. I can't remember.

MS. TOMPKINS: Thank you. That's all the questions I have.

CROSS EXAMINATION

BY MR. BENDER:

Q. Mr. Hubbard, on the 30th or the 29th of April when you arrived at the apartment, it was engulfed in flames, was it not?

A. You said it was?

Q. Yeah.

A.   Yes, it was.

Q.   And there -- fire department there was trying to put it out.

A.   Well, they got there after I did.

Q.   Okay.  And was the medic personnel already on the scene?

A.   No, sir.

Q.   Okay.  And where was Robin Williams when you talked to her first?

A.   She was toward the rear of the apartment building.  She was toward the rear of the apartment building.

Q.   Okay.  And she made a comment to you like, I told you he was crazy, or made that comment to somebody.

A.   Yes.

Q.   Okay.  Do you know who she was directing that to?

A.   Barnette.

Q.   Barnette?

A.   Yes, sir.

Q.   Well, he wasn't there.

A.   No.

Q.   But her comment, I told you he was crazy, was she telling you that she had told you that he was crazy or was she telling Benny Greene?

A.   She was telling me.

Q.   Telling you.

A.   Yes, sir.

Q. Okay. And since you had been there before, you -- you were aware that this was sort of a tumultuous relationship. Sort of -- not a very good relationship that she was involved in.

A. No, sir.

Q. You had been there on two occasions, hadn't you?

A. Yes, sir.

Q. Prior to this. Both were prompted by some sort of argument.

A. Yes.

Q. According to what you -- according to what you were told.

A. Yes.

Q. And the second time the argument -- that was in early April before the firebombing incident, wasn't it?

A. Yes.

Q. And that was when Marc Barnette had taken her car, some argument had ensued and he had taken her car.

A. Yes, sir.

Q. Left her at the apartment by herself.

A. Yes, sir.

Q. And the first -- the first incident was when -- back in June of '95. Sometime in June of '95.

A. Yes.

Q. The attempted suicide. Robin had called 9-1-1 regarding

the attempted suicide, hadn't she?

A. Yes.

Q. And when you -- when you got there, you talked to Marc Barnette, didn't you?

A. Yes.

Q. Okay. And he was very distraught over this relationship, wasn't he?

A. Yes, somewhat.

Q. He told you he was.

A. Yes.

Q. He was upset about it. Told you that, too, didn't he?

A. Yes.

Q. And in fact, he said he didn't -- he really didn't try to commit suicide. He simply told her that he had tried to commit suicide for her to have some sort of sympathy on him or that sort of thing, didn't he?

A. Yes, sir.

MR. BENDER: Thank you, sir. Appreciate it.

MS. TOMPKINS: No further questions.

THE COURT: You may step down.

THE WITNESS: Thank you.

(Witness stepped down.)

MS. TOMPKINS: Next witness is Kent McIlhany.

KENT MCILHANEY,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please, and spell it for the court reporter.

A. Kent McIlhany. K-e-n-t. M-c-I-l-h-a-n-y.

Q. How are you employed?

A. How?

Q. How are you employed?

A. I'm a first lieutenant paramedic/fire fighter for Roanoke City Fire Department.

Q. How long have you been in that position?

A. Ten years.

Q. And back in April of 1996, what was your position with the fire department?

A. I was a cardiac technician/fire fighter at that time.

Q. Is that like an EMT?

A. It's a step -- a couple steps above EMT. It's just one step below paramedic.

Q. And do you have any special training to become a cardiac technician?

A. Yes, ma'am.

Q. What is that?

A. Through classes. Approximately around 400 hours worth of training.

Q. What are the duties of a cardiac technician/fire fighter?

A. We respond to any EMS or fire related calls that come in through the 9-1-1 system. And we handle medical emergencies, fire emergencies, wrecks, anything involving any kind of injury or illness.

Q. All right. Do you travel in a fire truck or in an ambulance?

A. At this time both. At that time I was on an ambulance --

Q. Okay.

A. -- only.

Q. Now, back in -- on April 30th, 1996, were you on duty in the early morning hours?

A. Yes, ma'am.

Q. Did you respond to a call for service that morning?

A. Yes, ma'am.

Q. What type of call was it?

A. It was a call for a structure fire.

Q. And what did you do in response to that?

A. We got on the ambulance, me and my partner that I was with, and responded to the address that was given to us.

Q. Was that 1616 Keswick Avenue in Roanoke?

A. Yes, ma'am.

Q. And what did you see when you got there?

A. When we arrived the fire department was already there. We parked on a side street to stay out of the way of the fire trucks and exited the vehicle. There was a house/duplex type

apartment building that had obviously had some fire damage in it. And we proceeded to walk towards that scene.

Q. When you say we, did you have your partner with you?

A. Yes, I did.

Q. Did you see Robin Williams?

A. She was walking towards me from the direction of the residence.

Q. And is that the person that you later came to know as Robin Williams?

A. Yes, ma'am.

Q. Describe what happened next.

A. She was walking towards me so I naturally met her, and obviously she was injured in some way. She had a towel wrapped around her -- around her arm. And I began -- made contact with her to find out what her injuries were.

Q. What was her demeanor at that time?

A. She was in shock. Appeared to be scared and upset.

Q. All right. What did you do next?

A. I took her to the ambulance and put her inside where -- it was a little bit cool that evening. I took her inside, put her in the ambulance where it was warm and began to see what kind of injuries she had and what treatment I might have to render at that time.

Q. And what observations did you make?

A. She had second degree burns on her right arm

approximately about halfway down her arm; and second and third degree burns on the left arm, again, about halfway down; also, on the wrist and hand on the left side. These burns were more severe than on the right and --

Q. Let me ask you to describe to the jury the classification of burns.

A. There are basically three classifications of burns. There's first degree which is kind of like a moderate or mild sunburn that you would get.

Second degree is a really severe sunburn. You get blisters.

And then third degree is where you actually have -- the tissue is destroyed all the way down to the fatty tissue. All your skin tissue is destroyed and sometimes even beyond that. And you actually get kind of a blanched look to the skin and that skin sometimes will even come off of the area that's affected.

Q. Okay. Now, on Robin's arms, relate those to the injuries on her arms.

A. She had blisters and a reddening appearance on the right arm from about halfway down to around her wrist. The left arm, as I said before, was more severe. She had the blisters and reddening and then she also had blanched appearances in places on her -- around her wrist and hand. On the left side it was actually completely around the entire arm and hand,

FORM FED   PENGAD · 1-800-631-6989

what we call circumferential burns, and those are extremely severe burns.

Q. What does the phrase full thickness burn mean?

A. That, again, is like a third degree burn. It burns completely through all the tissue into the fatty layer of tissue and is complete tissue death.

Q. And what kind of treatment does a third degree burn require?

A. Usually it requires extensive care at a burn center. It's long recovery. A lot of times they have to do skin grafts and things of that nature to remedy it.

Q. Did -- I'm sorry.

A. That's okay.

Q. Did you notice any other injuries on Robin Williams?

A. She had some abrasions on her knees and an abrasion kind of in the lower right part of her chest/abdomen area.

Q. All right. Did you have a conversation with her, ask her any questions?

A. Yes. Basically asked her standard -- we ask exactly what happened so we have an understanding of how they got injured and what other kind of injuries might be occurring. And I asked her, you know, basically what happened to her. And she said that she had been awoken by some noise, some yelling and screaming, and then had went to see what that was. And then heard a louder noise near the front of the residence. And

FORM FED ® PENGAD · 1-800-631-6989

when she arrived at that part of the house, there was fire at the front door. And she said she hollered at her friend who was staying with her. At that point the house was on fire; they needed to get out. They tried to exit the front of the residence and that's when she received her burns. At that point they went to a window at the rear of the residence and climbed out, which is a second story window. It's approximately 15 feet or so off the ground. Both of them climbed out and jumped out on to the ground from there.

Q. What other comments did she make about what had happened to her that night?

A. She told me that her ex-boyfriend had been bothering her, calling her and harassing her, and that she recognized his voice that night screaming and yelling at her prior to jumping out the window and that she knew that it was him, and she was obviously really scared of that situation.

Q. All right. Now, did you question her about her pain level?

A. Yes. As we transported her to the hospital, her pain level seemed to increase. Initially in injuries you have a lot of adrenaline so the pain may not be there as much. But as she started to calm down a little bit and realized she was, I guess, in a safer environment and that her injuries weren't as life threatening as she might have thought at first, she -- her pain level increased. So I recognized that in talking to

her. So we have, basically, a question that we ask to rate your pain on a scale of one to ten. Ten is usually the highest; one is the lowest. And she rated hers at a seven, which is fairly high.

Q. Did she give you any information about how she burned her arms, at what point she burned her arms?

A. She told me that as she tried to exit the front of the residence to get out, that's when she received the burns.

Q. And what treatment did you provide her at that time?

A. Put her on oxygen which is, again, standard that we do in case she inhaled any smoke or heated air; put her on the heart monitor to monitor her heart function; and start an IV line for fluid replacement. Burns typically require a lot of fluid replacement. And transported her from there.

Q. Okay. Transported her to the hospital.

A. Correct.

Q. Were you back in the back of the ambulance with her during the ride to the hospital?

A. Yes, ma'am.

Q. Did she make any other comments on the way to the hospital?

A. She told me that, again, she was very scared of what had happened. She couldn't believe that her ex-boyfriend had done this. And she was very concerned about whether he was -- whether they had caught him or not, whether he was still out.

She was scared that he might still have a way of getting to her. And she was also very concerned about her medical condition and what was going to happen with her in the future.

Q. What did you tell her?

A. I told her that basically her injuries were pretty severe. They didn't -- they weren't life threatening, but they were pretty severe. She was going to require a lot of therapy and treatment. It was going to take quite some time to recover from this. And there was a good chance that she would lose a lot of function or some function, particularly in the left hand, due to the nature of the burns.

Q. Was she crying?

A. Yes. Yes.

Q. Now, did you do a written report after you finished?

A. Yes, we did.

Q. Okay. And what level of detail do you put in that?

A. Relatively -- since it is a medical report, we tend to detail the -- what we found with the patient, the injuries involved, our treatment, and a brief medical history if it's pertinent, and just a basic description of what happened with the patient.

Q. Would you have necessarily put in all of the things that Robin said to you on the way to the hospital in your medical report?

A.   At that time, no, I wouldn't have.

Q.   And where did you complete your report?

A.   At the hospital.

Q.   Did you check up on Robin after you dropped her off?

A.   Yes.  I stayed at the hospital that evening probably for total time of about an hour or so.

Q.   Was that typical?

A.   Not completely typical.  You kind of get interested in certain cases with certain people and this particular one was interesting just due to the fact that the nature of the incident, and we seemed to kind of make a little bit of a connection even though it was a short period of time.  She felt safe and trusted me a little bit, so I just felt obligated to kind of stick by her for a little while.

Q.   Okay.  I'm going to show you some photographs that have been previously admitted into evidence.  That is Government's Exhibit 23J.  Is that consistent with the burns that you noted that night?

A.   Yes.

Q.   And this is Government's Exhibit 23K.  Again, is that consistent with the burns you noted that night?

A.   Yes, it is.

Q.   And finally, Government's Exhibit 23I.  Are those consistent with the circumferential burns that you had mentioned before?

**444**

A.    Yes, ma'am.

MS. TOMPKINS:  Thank you.  That's all the questions I have.

MR. BENDER:  I have no questions.  Thank you.

THE COURT:  You may step down.

(Witness stepped down.)

MS. TOMPKINS:  Government calls John Grubb.

JOHN GRUBB,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q.    State your name, please, and spell it for the court reporter.

A.    John Grubb.  Last name is G-r-u-b-b.

Q.    And where do you live?

A.    I live in Salem, Virginia.

Q.    Where were you living back in April of 1996?

A.    In Roanoke, Virginia.

Q.    And April of 1996, how long had you lived in Roanoke?

A.    I think about five years.

Q.    Where were you living?

A.    At 1618 Keswick Avenue.

Q.    Was that in the Keswick Apartments?

A.    Yes.

Q.    Who lived there with you?

A.    My three children.

Q.    You and your three children?

A.    Yes.

Q.    How old were your kids at that time?

A.    I think they were eight, thirteen, and fifteen.

Q.    I'm going to show you a photograph that's been marked and introduced as Government's Exhibit 7G.  Is this the apartment building where you were living?

A.    Yes, ma'am.

Q.    Okay.  And which -- can you see the front door to your apartment from this picture?

A.    No, it's on the back side.

Q.    On the back side.  Was it back on the back side over here (indicating)?

A.    Yes, ma'am.

Q.    Okay.  So describe for the jury how this apartment building is configured.  How many apartments are in that building?

A.    There's four.  There's two on the back side, so those two are like the basement apartments.

Q.    So there's an entry way here and an entry way here (indicating)?

A.    Correct.

Q.    Front door?

A.    Correct.

Q.    Is there one way in and out of each one of those apartments?

A.    That's correct.

Q.    Just the front door?

A.    Right.

Q.    And then there's an apartment on the front or back, as the case may be?

A.    Correct.

Q.    And then another apartment.

A.    Yes, ma'am.

Q.    And you were back here (indicating)?

A.    Yes, ma'am.

Q.    And was this where Robin Williams lived?

A.    Correct.

Q.    Okay.  Now, did you know your other neighbors?

A.    I knew the lady that lived upstairs.  My kids referred to her as Granny.

Q.    And was that Robin's next door neighbor?

A.    Correct.

Q.    Okay.  Did you know who lived beside you?

A.    I knew his name.  His name was Tony.  I don't know his last name.  And I don't recall her name either.

Q.    Did you know Robin Williams and Marc Barnette when they lived there?

A.    Just seeing them around.  Didn't know them personally.

Q. I'm going to take you back to April 30th, 1996. What happened in your apartment at approximately 4 o'clock in the morning?

A. I was awakened by what I first thought was gunfire, like hitting glass, shattering glass. And I immediately, of course, hit the floor. And then I could also hear screaming.

Q. What did you hear?

A. It was to the effect of, Oh, my god. Oh, my god. I don't believe he's done this.

Q. What did you do next?

A. Proceeded to call 9-1-1.

Q. What -- can you describe the screaming noises. How did that sound to you?

A. Oh, it was very loud, curdling. Somebody was in dire need of help.

Q. Did you recognize the voice?

A. I thought it was coming from Robin Williams' apartment.

Q. So you called 9-1-1.

A. Correct.

Q. And your phone was working?

A. Yes.

Q. What, if anything, when you moved into that apartment building, did you do in relation to the telephones?

A. I had secured my phone line because the telephone lines were right there at my apartment and they were quite a mess,

so I had secured mine so -- because I work in the security industry. I secured mine so nobody could tamper with it.

Q. So you -- I'm going to show you what's been marked and admitted as Government's Exhibit 6C. Is that the phone box at your apartment at Keswick?

A. Yes, ma'am.

Q. So when you first moved in, what was the state of those wires?

A. Pretty bad.

Q. Okay. They were jumbled up.

A. Yeah.

Q. And that's your line of work; is that right?

A. Correct.

Q. So you wanted -- when you say secure your phone, what do you mean by that?

A. So it can't be tampered with or cut.

Q. Okay. And you did that for your phone line alone.

A. Yes.

Q. Okay. So you called 9-1-1. What did you do next?

A. When I was talking to the lady on 9-1-1, I was telling her what was occurring. And while I was on the phone with 9-1-1, somebody started banging on my door and yelling, Help me, help me, and it was a female voice.

Q. In a female voice?

A. Uh-huh.

Q. Did you open the door?

A. No. The 9-1-1 operator, I believe she told me not to.

Q. Okay. And I didn't know exactly what was going on out there, so I didn't.

Q. Did you eventually go outside?

A. Yes.

Q. And what did you observe?

A. There was nobody there at the door. So I proceeded to go around the apartments. And when I got to the side of the apartment, there was flames shooting out the side of the apartment.

Q. And was that Robin's apartment?

A. Correct.

Q. What did you do next?

A. I proceeded back into my apartment to get my kids out of the apartment.

Q. What did you do with your kids?

A. Put them in my car.

Q. At some point did you see Robin Williams?

A. Yes, ma'am.

Q. Where did you see her?

A. On the side of the apartments.

Q. What was she doing?

A. She was sitting in the grass crying and she had towels wrapped around her arms.

Q.    What did you do next?

A.    My main concern was with my children, so I basically stayed around the car with my children.

Q.    Were other neighbors out?

A.    Yes.

Q.    Other neighbors had been awakened; is that right?

A.    Yes.

Q.    Did emergency personnel arrive on the scene?

A.    Yes.

Q.    And describe what happened next.

A.    They proceeded to put out the fire and give medical attention to Robin Williams, but I was basically trying to keep my kids away from everything.

Q.    Okay.  Did you have to go to work that morning?

A.    I went later in the evening.  I didn't go directly first thing in the morning.

Q.    Okay.  So later -- later on you went to work?

A.    Uh-huh.

Q.    What happened when you got to work?

A.    Well, I proceeded to work, but then I got a telephone call from my son.

Q.    What did he tell you?

A.    That he had found a driver's license and pliers around the side of the house.

Q.    And what did you tell him to do?

A.   I told him not to touch anything around the apartment and keep the driver's license inside the apartment.

Q.   And what did you do next?

A.   Then I went home to take a look at it.

Q.   You went home, I'm sorry?

A.   I proceeded to go home because I thought it was important.

Q.   Looking at Government's Exhibit 7G, do you know on which side of the apartment building your son found it?  Was it on this side of the apartment building (indicating)?

A.   Correct.

Q.   Okay.  What was there around the area where you found the driver's license and the pliers?

A.   Talking about the landscape or...

Q.   Was there any -- what's over on that side of the apartment building?

A.   There's a window right there.  It goes to my children's apartment at that time.  It's like a -- they call it a window well.

Q.   Right.

A.   Where it goes down inside the ground.

Q.   Okay.  And is that where he found the driver's license?

A.   Correct.

Q.   Had your son picked up the driver's license?

A.   Yes, ma'am.

Q. Okay. What did you do when you got home?

A. I looked at it and decided to call the police department.

Q. Okay.

A. Felt it was...

Q. Did the police come out?

A. Yes.

Q. Okay. And is this the driver's license that your son picked up?

A. Yes, ma'am.

Q. And that has been previously marked and admitted as Government's Exhibit 7B. And you handed that to the police officer who responded to the scene?

A. Correct.

Q. Was that Officer Kahl?

A. I don't recall the name.

Q. Okay. And you did not touch the pliers; is that correct?

A. No, ma'am.

Q. I'm going to show you what's been marked and admitted as Government's Exhibit 6A. And located there, is that the pair of pliers that your son located at the scene?

A. Yes, ma'am.

Q. Did you point those out to Officer Kahl?

A. Correct.

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. All right. Ma'am, would you introduce yourself to the jurors, please.

A. My name is Maude G. Hubbard.

Q. And your last name is H-u-b-b-a-r --

A. b-b-a-r-d.

Q. All right. Now, where do you live, Ms. Hubbard?

A. Roanoke, Virginia.

Q. How long have you lived in Roanoke?

A. Just about all my life.

Q. You don't want to tell us how long that is, though, do you?

A. No. I'd say thirty, forty years, whatever. I won't tell you my age.

Q. Now, living in Roanoke, did you get to know Bertha Williams and her family?

A. I did.

Q. How do you know the Williams family?

A. Well, we all go to church together. We all church -- the same church together.

Q. What church is that?

A. Mt. Olive.

Q. And did you see the Williams children grow up?

A. Yes, I did.

Q. And did you know Robin Williams pretty well?

A. I did. Very well.

Q. At some point did she move in to an apartment near yours at Keswick Avenue?

A. Right.

Q. Now, Ms. Hubbard, I'm going to show you what's been previously admitted as Government's Exhibit 7G. And did you live next door to Robin at the Keswick Apartments?

A. I did.

Q. I'm going to point, there's a white car pointed there, was this your apartment?

A. (No response.)

Q. That's not your car, but is that the apartment that you lived in back then?

A. Right.

Q. Now, how long had you been living at that address when Robin moved in?

A. I'd been there approximately about five years, I think. I'm not for sure.

Q. Now, did the folks who lived in that complex and Robin and the other Williams children as well, did they have a nickname for you?

A. Yes. Everyone called me Granny.

Q. In late 1995, do you recall Robin moving in to the

apartment next to yours?

A. Yes, I do.

Q. And did you see her as she was making preparations to move in?

A. Yes, ma'am, I did.

Q. Tell us about that.

A. Well, she was moving in new furniture and one thing like that. And, you know, me and her talk occasionally right often.

Q. Did you two have that kind of relationship where --

A. Yes, we did. We had a very good relationship.

Q. If you would, describe for us what Robin was like as a person.

A. She was just a beautiful, wonderful person. She'd always come to me because like I was her mother because, see, I have children also and I could -- me and her could, you know, talk with one another. And she would come and talk with me often about so many different things. And she would tell me things. She would say, Don't tell my brothers. You know, she didn't want her brothers to know that she was going through it, but me and her would talk.

She would always say, Granny, fry some potatoes. She loved potatoes and onions. And she would always come and she would say, Granny, I can smell that good food in there. And sometimes I would go in there and cook it and me and her, she

would eat, you know. She would say, Get up, Granny, get up, because I was a late sleeper. And she would always come by and holler at me wondering how I was doing and all. She was just a beautiful and wonderful person.

Q. Now, did she work every day?

A. Yes, she did.

Q. And she would often come and get you up before she went to work?

A. No, no, no, no, no. No, ma'am. Not -- all the time I would just sometimes know that she was going to work and she would holler when she'd be coming in.

Q. Okay.

A. And we would sit out there and talk. So many things she would tell me, but -- she'd tell me don't tell my brothers and don't tell my mother, and I made her that promise and I didn't call Sister Bertha and ask -- tell her until things got so -- because she would come there to my phone and call her mother and, you know, I just -- it's just -- it's a hard thing for me because I love Robin. Robin was a beautiful person and she reminded me so much of my children. See, I'm a mother of six children myself. I got grown children and grown grandchildren. And so, you know, therefore, I know the feeling. I know the feeling.

Q. Yes, ma'am. And Robin was very close to her family, wasn't she?

A.   Oh, Lord, yes.  And her mother.  Her and her mother, they just loved one another.  And her brothers, they loved their sister.  They loved their sister.  And their sister loved them brothers.  They were just a close-knit family period.

Q.   Now, since you lived next door to Robin's apartment, was there a common wall between your apartments?

A.   Well, there was a wall -- you know how those duplex, two down and two up.  On the side because my bedroom was next to her bedroom.  You know, like off like that, you know.

Q.   And because you shared that wall between your bedrooms, were you often able to hear what was happening?

A.   Oh, yes, definitely.  Definitely I did, yes.

Q.   And what did you hear?

A.   I heard her crying and begging him don't hit me no more.  Don't fight me.  Don't do this to me.  Don't do this.  Don't do that.  And sometimes she would -- she'd -- I imagine she would be wrestling with him to get out of there because he knew that if Robin got out of there, Robin was going to call -- was going to come to my apartment and I was going to call her mother.  He knew that.

Q.   Did you, after these incidents would occur, did you discuss them with Robin?

A.   What did you say?

Q.   When something would happen or when you would hear noises or crying or something from next door, did you talk to Robin

Q.   You might not remember the date, but do you remember her moving back in and her friend Benny Greene being there?

A.   Yeah, I seen Benny Greene there.  But she told me that she -- her girlfriend was going to move in with her.  She said a girlfriend is going to move in with her.  She said but in the meantime he just going to stay there until the girl -- something happened why the girl had never -- didn't move in with her.  But Benny Greene did not -- no, he wasn't moving in with Robin, huh-uh.

Q.   Well, they were friends.

A.   They were just friends, absolutely.

Q.   During the middle of the night or early in the morning hours of April 30th of 1996, what did you hear?

A.   Well, the fact of it I didn't hear it.  They had to come and wake me up, see, because I'm a diabetic.  And see, when I went to sleep, well, you know, you get in them sleeps, people that been diabetic, they know -- I didn't hear -- Mr. Grubbs downstairs is the one, his little son came up, J.R., and was hollering, Granny, Granny, Granny, Granny.  And you know, by me staying by myself, I didn't get up.  You know, I don't open up no door when I'm there by myself.

     And anyway, when they said that, I come to the door.  They said, Come on, come on out and get out of here.  Said, come on, they done throwed a thing through the -- through the window.

And I seen her, I said, Lord have mercy, what's done happened? What's done happened?

And they said that boy done throwed that -- come in throwed that thing through the apartment.

And I said, Oh, Lord have mercy.

And about that time, Robin and a lady up the street, Joyce Coleman, came down, but as she -- I heard this person hollering, I don't deserve this. I don't deserve this. Oh, Mama, Mama, Mama, I don't deserve this. Why, why me? But I couldn't catch her voice. And she went on up there and come back. This is when she called, Granny, Granny, open the door. Granny, open the door for me. Open the door.

When I opened the door, they had a towel wrapped around her arm.

Q. You talking about Robin?

A. Robin.

Q. And I said, Oh, Lord have mercy, you know.

And she said, Call my mama. Call my mama. Call Mama, Granny. Call her.

And that time I went to pick up the phone, my phone was dead. The wires had been cut. So I couldn't -- so at that time the police, or whatever, came, they carried her right on. I said, Well, when she come, I'll tell Sister Bertha when she come that they done take her -- take her on to the emergency center. We got to get away, we got to get this girl

away from here. And I had no way of getting in touch with her because the phone line was -- and I didn't know it until the next morning, Mr. Grubbs came up and he's the one took and, you know, put the phone -- fixed it. But the wires was cut.

And in the meantime, in the evening I didn't know what was going on. I'd be sitting there, we didn't have no screen doors, just had the doors cracked open, you know, get air. And he had a video, but I seen -- but I didn't know what he was doing.

Q. He --

A. He had a video, yes. He was sitting there on that porch and he videoed how far from here to here, how I guess the -- from the time what he was going to do.

Q. Who was videoing?

A. Marc.

Q. Oh, okay.

A. Marcus.

Q. All right. Now, after the -- after the fire, did you have a chance to talk to Robin that evening?

A. No, they shipped -- took her right on. I didn't get to say any more to her. I didn't see Robin anymore.

Q. When she got back from the hospital, did you see her at church or at her mother's home?

A. I saw her at church, and that's when she had that black glove on her arm.

Q. How was she doing at that time?

A. Well, she was doing fairly well, but she was still upset condition that she was in. Her hands, they had a black glove because it burnt all up in here. And she was, you know, kind of furious and she was just, you know, she just wasn't herself. She wasn't the same Robin because I could tell this, you know. She was going through something or another. I, you know, imagine that anybody like that, I would guess you'd have to be. You can't be the same person that you were when all other time you was, you was outspoken and out laughing and had a beautiful smile at all times. Just -- she was just a beautiful person. As I said, you know, whatever, you know, the Lord do's is up to the good Lord; it's not up to me, but I just say, you know, what goes around comes around. You don't -- you can't take something that you can't give back. Take a life.

Q. Now, Ms. Hubbard, did you -- other than at church, did you ever see Robin, did you visit in their home or visit with her after the fire?

A. What did you say now?

Q. Did you visit with Robin in her mother's home after the fire?

A. No, I did not. No, I did not.

MS. ROSE: Thank you very much. Wait just a minute. They may have some questions for you, ma'am.

CROSS EXAMINATION

BY MR. BENDER:

Q.    Ms. Hubbard...

A.    Yes.

Q.    Just a few questions.

A.    Yes.

Q.    The first time you ever met Marc Barnette was at church with Robin, wasn't it?

A.    No, I don't think so.

Q.    Didn't he sometimes go to church with Robin before they moved in the apartment?

A.    Well, I seen him there about once, I think.  About once.

Q.    And when Robin first moved in, she was very happy, wasn't she?

A.    Yeah, she seemed like a happy person.

Q.    She was very much in love with Marc and he was very much in love with her at first.

A.    I -- well, I guess.

Q.    Okay.  Seemed like they were.

A.    Yes.

Q.    Seemed like they got along pretty well at first.

A.    At first, right.

Q.    Yeah.  And then that began to change.

A.    Right.

Q.    And she would confide in you that she couldn't get him to

move out.

A. That's right.

Q. And they had been there for about a year and a half, hadn't they?

A. Somewhere like that.

Q. And she was -- she was bothered by him because he was so jealous and so possessive of her.

A. That's right.

Q. She told you that.

A. Right.

Q. Okay. And the day that the U-Haul was there, there was some other people there --

A. Yeah, there was some other people, but I didn't know them.

Q. You didn't know who it was.

A. No, I did not.

Q. Okay. Any argument going on that you heard that day?

A. Not that day because Robin wasn't there.

Q. Okay.

MR. BENDER: All right. I appreciate it, Ms. Hubbard. Thank you.

THE WITNESS: Thank you.

MS. ROSE: Thank you, ma'am.

THE WITNESS: Uh-huh.

(Witness stepped down.)

MS. ROSE: May we approach, Your Honor, on a scheduling matter?

THE COURT: Excuse us, members of the jury. We'll take a side-bar and you all may be at ease.

(Side-bar conference as follows:)

MS. ROSE: We've moved pretty quickly this morning and we've got to hook up some equipment to play a tape and wondered if we could go ahead and take our lunch break at this time.

THE COURT: Does it take that long?

MS. ROSE: Well, we -- or if you want to take a quick break. I mean, do you think we can get the computer over here?

MS. TOMPKINS: I need to speak with Jan Chapman and see whether or not they have it over here. I think we were expecting it to be after lunch.

THE COURT: For your next witness?

MS. ROSE: Yes.

THE COURT: What kind of a tape?

MS. TOMPKINS: A statement that Robin made to the arson investigator.

MS. ROSE: It's a pretty lengthy witness.

THE COURT: What's that?

MS. ROSE: It's a pretty lengthy witness.

THE COURT: Yeah. All right. We'll take a break.

MS. ROSE: May we approach, Your Honor, on a scheduling matter?

THE COURT: Excuse us, members of the jury. We'll take a side-bar and you all may be at ease.

(Side-bar conference as follows:)

MS. ROSE: We've moved pretty quickly this morning and we've got to hook up some equipment to play a tape and wondered if we could go ahead and take our lunch break at this time.

THE COURT: Does it take that long?

MS. ROSE: Well, we -- or if you want to take a quick break. I mean, do you think we can get the computer over here?

MS. TOMPKINS: I need to speak with Jan Chapman and see whether or not they have it over here. I think we were expecting it to be after lunch.

THE COURT: For your next witness?

MS. ROSE: Yes.

THE COURT: What kind of a tape?

MS. TOMPKINS: A statement that Robin made to the arson investigator.

MS. ROSE: It's a pretty lengthy witness.

THE COURT: What's that?

MS. ROSE: It's a pretty lengthy witness.

THE COURT: Yeah. All right. We'll take a break.

MR. BENDER: For an hour and a half like you've promised us?

THE COURT: He's been working me this entire trial. I do think we'll start at 9:30 until we see that we're getting behind or something.

MS. LAWSWON: Your Honor, we need to make a record on the record.

THE COURT: We'll do that as soon as the jury is out.

(End of side-bar conference.)

THE COURT: Okay. Members of the jury, we'll go ahead and take our lunch break. Let's see, hour and a half, so that would be twenty after one. So that's how long we will have.

Please remember the usual instructions. Keep an open mind about the case. And we'll see you at twenty minutes after one.

(Jury exited the courtroom.)

THE COURT: The record will show that at the last side-bar conference, the government made the request that the -- we take an early lunch so that the next witness who has a recording to play can be ready. That is to say, they have to set up equipment for the recording. So the court allowed that, and also spoke about the fact that we would be starting at 9:30 hereafter unless we get into a bind about time.

And keep in mind, please, that in the future we will try not to have to do this because the court reporters are set up one in the morning, one in the afternoon. We can't always make arrangements for the afternoon court reporter on the spur of the moment, so be sure and have your morning's work ready to go and enough to do that. Thank you.

(Lunch recess at 11:50 a.m.)

 

FORM FED ⊛ PENGAD • 1-800-631-6989

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2468

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA )

 ) CASE NO. 3:97CR23-V

 v. ) July 29th, 2002

 ) Afternoon Session

AQUILIA MARCIVICCI BARNETTE, )

 Defendant. )

TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE RICHARD L. VOORHEES

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

 ANNE M. TOMPKINS, Esq.

 JILL WESTMORELAND ROSE, Esq.

 Assistant United States Attorney

 227 West Trade Street

 Suite 1700

 Charlotte, North Carolina 28202

FOR THE DEFENDANT:

 JEAN B. LAWSON, Esq.

 P.O. Box 4275

 Charlotte, North Carolina 28226

 HAROLD J. BENDER, Esq.

 200 North McDowell Street

 Charlotte, North Carolina 28204

Reported by: Scott A. Huseby,

 Registered Professional Reporter,

 Certified Court Reporter,

FILED
IN COURT
CHARLOTTE, N. C.

JUL 30 2002

U. S. DISTRICT COURT
W. DIST. OF N. C.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2469

P R O C E E D I N G S

(Lunch recess.)

THE COURT: For the information of the parties, it appears we will be continuing court through Friday unless something else appears.

Now, then, let me speak about the exhibits. There is a little box up here with red lights on it which I haven't had occasion to use before. I take it you are monitoring from down there when these exhibits begin to appear on the jury screen.

MS. TOMPKINS: But for one exhibit, all exhibits we have shown this morning were previously admitted in the guilt phase. And unless they have been, we will monitor and not show them to the jury until they have been admitted by the Court.

THE COURT: All right, but I'm holding you all responsible for not showing them something that hasn't been preadmitted. Thank you. May we have the jury, please.

(The jury returned to the courtroom.)

THE COURT: Members of the jury, I'm sorry we were not able to get back to you sooner than we did. We had some equipment to set up and that sort of thing. Anyway, we'll move along. You may call your witness.

MS. TOMPKINS: Next witness is Sergeant

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2470

Rick Kahl.

                    RICK HALL,

being first duly sworn, was examined and testified as

follows:

                    DIRECT EXAMINATION

              BY MS. TOMPKINS:

     Q.    State your name, please, and spell your name

for the court reporter.

     A.    I'm Sergeant R.S. Kahl, that's K-A-H-L, Roanoke

city police department, Roanoke, Virginia.

     Q.    And how long have you been with the Roanoke

city police department?

     A.    20 years.

     Q.    What were your duties in April of 1996?

     A.    I was assigned fire investigations.  I was in

CIV or criminal investigations bureau.

     Q.    And when did you get promoted to sergeant?

     A.    December 2000.

     Q.    I'm going to take you back to April of 1996.

Did you conduct an investigation of a fire, an

intentionally set fire to the apartment at 1616 Keswick

and the vehicle outside that apartment?

     A.    Yes, I did.

     Q.    And from whom did you receive information about

that fire?

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-459
Case 3:12-cv-00327-MOC     Document 101-1     Filed 09/23/15     Page 110 of 200
471

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2471

A. From fire investigator David Deck who works for the fire department.

Q. When did you first receive that information?

A. I received it the morning I arrived into work which was a little after 9:00 o'clock.

Q. Was that on April 30th?

A. Correct.

Q. 1996?

A. Correct.

Q. What did fire marshal Deck tell you?

A. He advised that he responded to a call or a fire call at 1616 Keswick which is a quadriplex in the city of Roanoke, an intentionally set fire. There was a lot of damage to the apartment. The victim that had resided there was transported to the UVA burn center.

Q. Did you go out to the scene at Keswick Avenue?

A. I went out there a little bit later in the morning to meet him and talk to some people up there.

Q. Okay. And en route to the apartment complex, what happened?

A. I was contacted by the dispatcher to advise that I needed to speak with a young boy there about 8 years old, his name was Jacob Grubb, who resided in one of the apartments. And what they had told me is that he found some potential evidence from the fire there.

Reported By:
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 101    Filed 09/23/15    Page 111 of 200
472

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2472

Q. Now, describe to the jury what you observed when got out to the Keswick apartments.

A. Well, what I observed is there is four apartments in this building. There is two in the front, which would be I guess the south side, and there is two in the back.

Q. I'm going to show you previously marked and introduced Exhibit 7G. There is a pointer up there which you can use to describe your testimony as you describe what you found when you went out there.

A. Okay, this right here is 1616, that apartment right there. That was where Robin Williams resided. And this one would be 1614 and that's where Maude Hubbard resided. And the two in the back, on the bottom, right there would be where Grubbs resided, which was 1618. And right here would be where Tony St. Clair and Wanda Coopman resided.

Q. Who did you speak to when you went out there?

A. I spoke with Ms. Maude Hubbard that day extensively.

Q. What did she tell you?

A. Well, she told me a little bit about Robin and the fact that there had been some problems over there, ongoing domestic problems at 1616 Keswick.

Q. And if you touch with that pen, if you touch

Reported By:
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 101    Filed 09/23/15    Page 112 of 200
473

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2473

the corner of the screen, it will clear that on the black part.

A. Which part? Oh --

MS. TOMPKINS: May I approach, Your Honor?

THE COURT: Yes.

BY MS. TOMPKINS:

Q. Did you make contact with Jacob Grubb?

A. Yes.

Q. Was his father there at that time?

A. Not at that time. I spoke with him later, but Jacob was there when I arrived.

Q. What did you learn from him?

A. Well, what he showed me, it would be on this side of the lower level (indicating), there is some phone wires to the apartment, all four apartments and the line next to the set of phone wires was a pair of pliers. And he had in his hand an operator's license that belonged to Aquilia Marcivicci Barnette, which he -- when I asked him where he found it, he pointed in the direction next to the pliers.

Q. And that was over on that side of the building where you've made that mark?

A. Right, exactly.

Q. If you clear that screen, I'm going to show you what has been marked and admitted as Government's

Case 3:12-cv-00327-MOC    Document 101    Filed 09/23/15    Page 113 of 200
474

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2474

Exhibit 6A. When you got there, were the pliers still in place?

A. Correct.

Q. Could you just make a mark on there to show the jury where those pliers are?

A. Right there (indicating).

Q. Did you collect the pliers?

A. Yes.

Q. Did you also notice the phone lines?

A. Yes.

Q. And I'm going to show you what has been previously marked and introduced as Government's Exhibit 6C. Are those the phone lines by the side of the building?

A. Correct.

Q. How close in proximity are those phone lines to the pliers?

A. Just a few feet.

Q. And when you got out there, had the phone lines been repaired by John Grubb?

A. Correct.

Q. I'm growing to now show you what has been previously marked and introduced Government's Exhibit 7B. Is that the driver's license that Jacob Grubb gave you?

Reported By:
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 101    Filed 09/23/15    Page 114 of 200

475

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2475

A.    Correct.

Q.    And whose driver's license is that?

A.    Aquilia Barnette.

Q.    And what address does that show?

A.    1616 Keswick Avenue Northeast, Roanoke, Virginia.

Q.    All right.  Did Mr. Grubb come home while you were out there or did you speak to him later?

A.    Spoke to him over the phone.

Q.    And what did he tell you?

A.    Well, he just verified that he repaired the phone lines and he also told me about his son, what he had found and what he had told him and he called the police on behalf of his son.

Q.    What else did you find out there at the scene?

A.    On Maude Hubbard's driveway, I found what appeared to be a Bic blue lighter.

Q.    I'm going to show you what has been previously marked and introduced as Government's Exhibit 6B, and is that the Bic lighter that you found?

A.    Correct.

Q.    And is that where you found it?

A.    Correct.

Q.    And where is Maude Hubbard's apartment in relation to Robin Williams?

Case 3:12-cv-00327-MOC    Document 101    Filed 09/23/15    Page 115 of 200
476

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2476

A.    Right next-door.

Q.    Okay.  Did you go up inside the burned apartment?

A.    Yes.

Q.    And describe for the jury what you saw.

A.    Well, immediately when you walked in, there was only one way into the apartment through the front door, its only access, entry and exit.  And when I walked in, the entire living room which is the first room you walk into was damaged.

Q.    I'm going to show you what has been previously marked and introduced as Government's Exhibit 2G.  Is that what the living room of the apartment looked like when you saw it?

A.    Correct.

Q.    What about other areas of the apartment?

A.    Well, the other areas had some smoke damage and they would be to the back, toward the back.  It wasn't a very big apartment.

Q.    I'm going to show you what has been previously marked and introduced as Government's Exhibit 2F.

A.    That looks to be the same room.  It's just another view of that side window.

Q.    How would you describe -- was the apartment inhabitable at all?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2477

A.   Not at that time, no.

Q.   Okay.  Now, did you have occasion to interview Benny Greene?

A.   Yes.

Q.   When was that?

A.   On the 1st of May.

Q.   That was the next day?

A.   Correct.

Q.   What did he indicate to you as his relationship to Robin Williams?

A.   He was a good friend of hers, nothing more than that.  They met and were good friends from high school, and she asked to him to stay with her during a time of need and she was afraid of Mr. Barnette.

Q.   Now, what else did you do, if anything, about the investigation at that time?

A.   Well, at -- I summoned an evidence technician to collect the evidence which he had done on the 1st when I was out there, and I made contact with the Williams family.  I spoke with Ray Williams on the 1st of May.

Q.   Do you know what relationship Ray Williams was to Robin Williams?

A.   I believe he is the uncle.

Q.   Okay.  You spoke to him on May 1st, 1996?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2478

A.    Correct.

Q.    And what did he tell you?

A.    He told me that Robin was in the hospital, would be in there for some time. I explained to him that when she came back, I needed to talk to her concerning the incident at Keswick. He was made aware at the time that there were warrants outstanding for the suspect which was Aquilia Barnette and that we were looking for him.

Q.    And did you check to make sure that warrants had been issued?

A.    Yes.

Q.    And what else did you verify at that time?

A.    Well, I verified that we had warrants and made sure that the surrounding districts or areas were aware just that we were looking for him.

Q.    Okay. When you first checked about warrants, how -- what was the -- how far were the warrants sent basically or to be on the lookout?

A.    Well, initially they were -- first teletype that was sent out was just in the Virginia area, but we expanded that to North Carolina area as well, including Charlotte.

Q.    Okay. And as you received more information and better information, did you make sure that got into the

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2479

computer system?

A. Correct.

Q. Now, during the course of your investigation, did you receive a phone call from any member of or a phone message from any member of the Williams family?

A. Yes.

Q. And when was that?

A. 7th of May.

Q. May 7th?

A. May 7th.

Q. What was that message?

A. It was a message from Kenneth Williams. He had a -- he had a phone number that he passed on, that was given to me of a possible number that we needed to look into.

Q. Pardon me?

A. A possible phone number.

Q. Okay, that the --

A. That the suspect may have been calling from or had some knowledge of.

Q. What was that phone number?

A. That number was 704-568-9286.

Q. So that was the telephone call that had been placed to the Williams home?

A. I don't know the details behind it. It was

Reported By:
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC Document 101 Filed 09/23/15 Page 119 of 200

480

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2480

just a phone message given to me of a possible number.

Q. Okay. Did you have the opportunity to talk with Robin Williams?

A. Yes.

Q. When was that?

A. Well, initially when I talked to Ray Williams at first, he told me she was going to be in the hospital for some time. I explained that I need for her to call me or someone to call me when she had come back home. And she called me either the 13th or 14th of May to let me know that she was home. At that time I was going out of town for a couple of weeks. We set up a time on the 30th of May to meet at her residence at 911 Louden Avenue which was in Roanoke.

Q. Did you meet with Robin Williams on May 30th, 1996?

A. Yes.

Q. Where was that meeting?

A. It was in her living room of her home.

Q. Was that at her mother's house at 911 Louden Avenue?

A. Correct.

Q. Did you -- what did you notice about Robin's condition physically?

A. Well, obviously there was -- she had extensive

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2481

burn marks or burns to her right and left arm and hand. I believe it was one of her hands were burned and she had some cloth stockings on both arms as well. And during my interview she did show me, you know, the damage and what, you know, what the doctor instructed her to do to try to help herself out.

Q. She showed you her burns?

A. Yes.

Q. And what did she tell you about the therapy that she was --

A. Well, she said she was going through some extensive rehabilitation for what had happened, and so she was trying to get through all of that.

Q. What was her demeanor on the day that you took that interview?

A. She -- surprisingly, she was very upbeat, cordial, very friendly to me and the fact that she wanted to move on with her life and get this behind her.

Q. Now, when you interviewed her at her home, did she give you some additional information about the defendant, Marc Barnette?

A. Yes. One of the things that we were trying to find is where he might be staying and she gave me an address of 3413 West Boulevard, which was apparently in Charlotte, North Carolina.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2482

Q.    Okay.

A.    She had never been to that residence before, so she wasn't sure whether it existed or not.  But she gave me that address, verified it through the other information I had along with some phone numbers that she gave me.  She gave me four phone numbers.

Q.    And what phone numbers were those?  What was the purpose of her giving you those phone numbers?

A.    Trying to locate Barnette.

Q.    Okay.  And were those -- without going through what the phone numbers were, were those phone numbers of places where she thought he might be?

A.    Yeah, possibly.

Q.    Okay.  And do you know what -- whose phone numbers those were?

A.    A couple of them, one was unknown, actually two were unknown and two that we had an idea.

Q.    And what were those phone numbers?

A.    Well, we were unsure of the one, 399-5479, we were unsure if that was his or not.  It was a possibility that it was his.  But there's one that was to a hotel and one to a Sandra Nero, N-E-R-O, and an unknown number.

Q.    Was the number to Ms. Nero, was that the same number that Kenneth Williams had given you earlier?

Case 3:12-cv-00327-MOC    Document 101    Filed 09/23/15    Page 122 of 200
483

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2483

A.    Correct.

Q.    Now, when you interviewed Robin on April 30th, 1996, was she able to clearly remember the events?

A.    Yes, she was.

Q.    On, I'm sorry, on May 30th, she was able to clearly remember the events of April 30th?

A.    Yes.

Q.    Did she tell you who she saw throw the fire bomb at her apartment?

A.    Yes, it was Aquilia Barnette.

Q.    Did she tell you anything about what he said when he did that?

A.    He was yelling die, bitch, die.

Q.    Did you record your interview with Robin on that day?

A.    Yes.

MS. TOMPKINS:  At this time, Your Honor, we would like to play that taped interview.

THE COURT:  You may.

MS. TOMPKINS:  They were admitted in trial as trial exhibits 10A and 10B, tape and transcript.

(Tape played for the jury; transcript displayed to the jury.)

BY MS. TOMPKINS:

Q.    Sergeant Kahl, was that your last contact with

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2484

Robin Williams?

A.   I believe so, yes.

Q.   When did you find out that she had been murdered?

A.   The day it happened.

Q.   What did you do?

A.   At that time I contacted the FBI, got them involved.

Q.   Did you contact Benny Greene?

A.   That day?

Q.   Yes.

A.   No.

Q.   Did you ever contact Benny Greene about that?

A.   I don't know if it was me or someone else, I don't recall.

MS. TOMPKINS:  Thank you, that's all the questions I have.

CROSS-EXAMINATION

BY MR. BENDER:

Q.   Sergeant Kahl, the statement that she gave to you was on May 30th --

A.   Correct.

Q.   -- 1996?  And she had been out of the hospital, that is Ms. Williams had been out of the hospital for about 2 weeks prior, prior to that?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2485

A.    Correct.

Q.    And I believe you were on vacation for a couple of weeks?

A.    Correct.

Q.    And that's why this didn't take place when Ms. Williams was immediately released from the hospital?

A.    Correct.  It was -- when I talked to her at the time, she was resting well and it was agreed upon by us to set that date when I come back.

Q.    But your investigation had been ongoing even though you had not had access to Ms. Williams?

A.    Correct.

Q.    You talked to some neighbors out there and they described a domestic disorder concerning Ms. Williams and her boyfriend?

A.    Correct.

Q.    And did you ever talk to other police officers who had responded to domestic calls at that address?

A.    Well, my understanding that the disorders that I was made aware of, none were reported to the police. My recollection is that very few, if any, were reported to the police.

Q.    You didn't talk to K.O. Hubbard about two instances where he had to go out there for domestic abuse matters?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2486

A.    I may have, yes.  I don't remember.

Q.    Okay.  And he made reports about those?

A.    Correct.

Q.    So does that sort of refresh your recollection that they had been --

A.    I do remember talking to Hubbard, but I don't -- I know he had some dealings with the family, I don't -- I'm sure if he went out there on a domestic, he would have made reports of it.

Q.    Now, you also in the course of your investigation talked to members of Ms. Williams' family, didn't you?

A.    Correct.

Q.    And one of them was a Ray Williams?

A.    Correct.

Q.    And he verified that Ms. Williams had broken off a relationship with Mr. Barnette and this appeared to be what motivated him to do this offense, didn't it?

A.    Right.

Q.    And then in her interview, Ms. Williams told you essentially the same thing about this relationship that they had?

A.    Correct.

Q.    That it was broken off abruptly and that she was trying to get him to understand why she broke off

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2487

this relationship, is that right?

A.   Correct.

Q.   And he was calling over and over again to the point where she even threatened to have her number changed?

A.   Correct.

Q.   And he just wouldn't accept the fact that she wanted to break up with him?

A.   That's according to Robin, yes.

Q.   And on the night of this fire bombing incident, she told you that she had been to her mother's house and that she got a call or perhaps several calls from Marc Barnette?

A.   Correct.

Q.   And that she told Marc she was going out that night?

A.   Correct.

Q.   And Marc sort of begged her and said, according to her, no, stay and talk to me, talk to me, stay, stay on the phone and talk to me?

A.   Correct.

Q.   That's what she told him.  And she described somebody who was very, very jealous?

A.   Correct.

Q.   And he knew, according to her, that she had a

Case 3:12-cv-00327-MOC     Document 101     Filed 09/23/15     Page 127 of 200
488

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2488

friend staying with her?

A.    Yes.

Q.    And he was very angry about that, according to her?

A.    Correct.

Q.    Now, let me talk to you a little bit about the warrants that were issued.  How many felony warrants were issued for Marc's arrest and when were they issued?

A.    They were issued that night that the fire occurred.

Q.    And what were they?

A.    I believe there were two attempted murder, two fire bomb arson offense warrants.  I believe there was four total felony warrants.

Q.    And that was April 30th, 1996?

A.    Correct.

Q.    As of May 2nd, 1996, the Charlotte police department had received a telex or some information from your department about Marc Barnette being wanted for those offenses, didn't they?

A.    As of the 2nd, yes.

Q.    And as of the 2nd, they were notified of the address of 3413 West Boulevard in Charlotte?

A.    Correct.

Q.    And that was 6 weeks, 7 weeks before the murder

Reported By:
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889
800-333-2082                                                                        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 101    Filed 09/23/15    Page 128 of 200
489

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2489

of Robin Williams?

A. Correct.

Q. And was he arrested for these outstanding offenses?

A. Not until after the murder.

Q. So during the 7 weeks that the Charlotte police department knew he was wanted for serious charges, wouldn't you classify them as serious charges?

A. Correct.

Q. So for 7 weeks, the Charlotte department knew where he was located?

A. Well, the information was given to them and there was a teletype response that I received back saying that the address was not valid.

Q. Well, tell us the address where he was arrested.

A. My understanding is --

MS. TOMPKINS: Objection.

THE COURT: Overruled.

THE WITNESS: My understanding was the 3413 West Boulevard.

BY MR. BENDER:

Q. And that was the exact same address that you had sent in the teletype to the Charlotte police department?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2490

A.    Correct.

MR. BENDER:   Thank you, Sergeant Kahl.

MS. TOMPKINS:   No further questions.

(Witness excused.)

MS. ROSE:   Government would call Sarah Aldridge.

SARAH ALDRIDGE, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.    Would you state your name, please, ma'am?

A.    Sarah Powell Aldridge.

Q.    Would you spell your last name?

A.    A-L-D-R-I-D-G-E.

Q.    Where do you live, Ms. Aldridge, what area?

A.    I live in the Charlottesville area.

Q.    Charlottesville, Virginia?

A.    Yes, ma'am.

Q.    Where do you work?

A.    University of Virginia Health Systems.

Q.    How long have you been employed with the UVA Health Systems?

A.    Since July of '95.

Q.    And what is your position there?

Reported By:
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 101-1    Filed 09/23/15    Page 130 of 200

491

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2491

A.    I am currently a staff nurse in a clinic.

Q.    Is there a particular area of practice for you at this time?

A.    Yes, ma'am, medicine clinic.

Q.    Are you working with just -- I mean, is that an emergency room?

A.    No, it is an outpatient clinic.

Q.    Back in 1995, 1996, where within the UVA Health System were you working?

A.    I was in the Decamp Burn Wound Center.

Q.    And had you -- was part of your training in burn treatment?

A.    Yes.

Q.    And officially, you are a registered nurse?

A.    Yes, ma'am.

Q.    Whenever you were hired by the UVA medical center, did you have to undergo any additional training before you could work in the burn unit?

A.    Prior to beginning the burn unit, I was working in wound care in another facility, in a long-term care facility, so I came with some basic knowledge. From the time I began in July of '95 until I left in '99, I was undergoing continuous training as were all of the nurses expectations at that time in critical care. I had become a level one trauma provider at an intensive care

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2492

unit.

Q. So what does that mean?

A. That means that I was qualified to care for a trauma patient from the time they entered the intensive care unit until the time we discharged them.

Q. Now, the burn unit there, is that classified, is that entire unit classified as an intensive care unit?

A. The burn unit at the University of Virginia is unique in that it provided care from the most critical patients through to their release as an acute care patient, so we had varying levels of care that we provided.

Q. Is it a large unit?

A. At that time, it was 16 beds.

Q. So the maximum amount of patients who could receive care there would have been 16?

A. Yes, ma'am.

Q. Were there any folks that were coming in at the -- kind of on an outpatient basis, those who were receiving a different level of care than the intensive patients?

A. I'm not sure I understand the question.

Q. Did you have -- were there patients who came in daily who had been discharged but who lived in the area

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2493

who would come in daily to receive treatments?

A. Rarely.

Q. If you would for the members of the jury just describe a little bit about your work there in the burn unit, what does a burn patient, what kind of care do they typically receive?

A. On admission, a burn patient is taken to what we call our tank room or our procedure room. There they undergo debridement of their wounds which means we remove any nonviable tissue. They are examined. They are photographed. The initial care is provided. Initial dressings are provided. Over the next 2 to 3 days, the wounds finally declare themselves whether they are going to be partial or full thickness wounds. During that time, they are taken each day back to the procedure room and again undergo further debridement of their wounds until finally grafting is accomplished and they are ready to leave the hospital several days after that.

Q. A couple of medical terms you used there, debridement, what does that mean, is that cleansing?

A. Not exactly. It involves cleansing, yes. They are bathed in a sure cleanse we call it. It's a preparation that treats the wound. It cleanses it. It also removes any bacteria that may be growing in it, and

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2494

then it's a process of removing nonviable skin or in essence dead skin that will not regenerate and will not heal.

Q. You talked about some thickness burns. What does that entail?

A. A first degree burn or a partial thickness burn would be much like your sunburn. A second degree or full partial or deep partial would be your burns much like you receive on a stove if you touch the unit and get a blister that will heal on their own, very painful but would heal. A third degree burn or a full thickness is a burn that you would receive that is going to require surgical intervention to heal.

Q. And that surgical intervention is typically in the form of what?

A. Typically in the form of going to the operating room, removing that skin, that nonviable skin and replacing it with a donor. Usually if the patient is not extensively burned or the burns do not cover more of their body than not, the donor site can come from typically a thigh and then it's placed in the affected area.

Q. So the thigh would be the first harvest or donor area for the skin grafts?

A. Usually, depending on where the burn is.

Reported By:
800-333-2082    Huseby, Inc., an Affiliate of Spherion  (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 101    Filed 09/23/15    Page 134 of 200
495

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2495

Q. What -- someone with the third degree burns that you talked about, the full thickness burns, what is the pain level of an injury like that?

A. It's a little misleading. A third degree burn initially is not painful because the nerve endings have been so damaged that they don't -- feeling is not generated in that area. The partial thickness and the second degree are the most painful initially. However, the third degree burn, once it's treated and once that layer of skin has been removed and the grafting has been accomplished, throughout that process it becomes more and more painful.

Q. And how long typically is it a painful wound or a painful injury?

A. Again, it varies. The acute phase will be until after the graft has adhered, and then that patient is going to experience pain over the region upwards of a year longer.

Q. Now, you talked about the graft adhering. During that -- about how lengthy is that process?

A. Generally a patient stays in the hospital 3 to 5 days after the surgery that places the graft. At the end of the third day, the dressing is taken off, removed, the graft is evaluated for the adherence. If any spots need to be redone, they are done at the end of

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2496

that time. If it looks like the skin is going to take, then it's redressed. And they will stay in the hospital another couple of days to make sure infection is not going to set in.

Q. And I don't want you to go into too much detail because I know it is a surgical procedure, but just real briefly, how do you take skin from one part of your body and make it stay in another place?

A. A technique that is roughly equated to shaving the skin off of the arm or the leg is used to remove it. It's called a diatom, and it's much like a cheese slicer and it just layers the skin up. That's removed and then it's laid, if I was go going to use this arm as the donor, and then lay it over on the hand. Then it's stapled into place and mashed very tightly.

Q. Do you recall meeting Robin Williams there in the burn unit?

A. Yes, ma'am.

Q. Do you remember specifically what day you first met her?

A. I think it was the day after she was admitted.

Q. Early in May?

A. Yes, ma'am.

Q. If you would, just describe her condition at the time that you saw Robin.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2497

A. She was very withdrawn the first several days. She was in a great deal of pain. She had entered our unit and on her admission eval, she had had to have what we call escharotomies, which increased the pain level. It simply -- because her burns were circumferential meaning they went all the way around her arm, she had to be opened so that the swelling that occurs in a burn wouldn't impede the venous return or the blood flow in that arm causing further damage. And so this increased her pain level in particular.

She was given pain medication routinely. She required a significant amount of pain medication initially. As a young person and a very healthy person coming in, she did progress well and did heal well.

Q. As she began to heal, did you get to know her a little bit or speak with her on some frequency?

A. Yes, ma'am.

Q. Tell the jury about that.

A. Robin came in and was very quiet with us initially. There was concern that she would need some counseling and that kind of thing. I had her the day before she was discharged, and by that time she had begun to open up a bit about her injuries and she discussed with me what her plans for discharge were and where she was planning to go.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2498

Q.    What did she tell you?

A.    She told me that she was planning to return to the southwest Virginia area with her mother, that she had hoped to live a normal life, although she didn't feel that it was possible.

Q.    Did she describe in particular any fears or concerns?

A.    Yes.  She told me that she felt like there was nothing she could do to hide from her attacker, that she felt like that she would probably not survive her relationship.

Q.    While Robin was there at the hospital, did she -- was she surrounded by friends or family, did you see folks coming there to offer her support?

A.    Yes, ma'am.  Her mother was with her virtually continually.  The burn unit is a closed unit and when we have a patient that has been the victim of attack, we keep the security at a higher level.  So we had a lot of phone calls and a lot of people that wanted admittance, but the number of visitors was kept very low for her security at this time and also for her ability to heal and rest properly.

Q.    And as you recall, how long was she there?

A.    About 12 days, 12 to 13 days.

Q.    Is that an average length of stay for the type

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2499

of burns that she had?

A.   For the type of burns she had, that was about average.

Q.   I'm going to show you some exhibits which have been previously marked and received into evidence, Government's Exhibit 23I, would you take a look at that exhibit and describe that photograph?

A.   This is her left forearm and hand.  It appears to be pretty badly scarred.  It's a bit dark photo, but it looks like a post burn.

Q.   And is that what her injuries, the condition of her injuries or the healing process when she left the medical center?

A.   Yes.

Q.   I will also show you what has been previously identified and received as Government's Exhibit 23K.

A.   That appears to be her right arm.  Her right arm injuries were not as deep as her left arm injuries, and that looks like it would be about what they were when she left.

Q.   And 23J?

A.   Again, her left arm showing significant scarring, looks to be some contractures in her left fingers beginning.

Q.   What does that mean?

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 101    Filed 09/23/15    Page 139 of 200
500

United States of America vs. Aquilia Marcivicci Barnette

7/29/200

Page 2500

A.   As the scarring develops, it becomes taught and shrinks.  It is very difficult to keep the hands as supple and as flexible as they were.  It takes a lot of exercise, a lot of therapy on them to keep -- to keep movement in the joints.  And as they tighten frequently, they have to be redone, the scars have to be revised, openings have to be made so that you can't have movement again.

Q.   What is the process for that?

A.   Again, it's surgical.

Q.   I show you what has been marked and received as Government's Exhibit 23F.

A.   That appears to be a donor site that is well healed.

Q.   So that would be part of the skin grafting removal area?

A.   Yes, ma'am.

MS. ROSE:  If I may approach the witness, Your Honor.

THE COURT:  Yes.

BY MS. ROSE:

Q.   I'm going to hand you what I have marked as Government's Exhibit 63D.  Take a look at that.  Are you able to identify that exhibit?

A.   Yes, ma'am.

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-459.

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 140 of 200

501

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2501

Q. And 63D 1?

A. Yes, ma'am.

Q. What are each of those exhibits?

A. These are compression garments. They are used to minimize scarring to help increase circulation and to help increase mobility and decrease the contractures.

MS. ROSE: Your Honor, I would move at this time admission of Government's Exhibits 63D and 63D 1.

THE COURT: Let them be admitted.

BY MS. ROSE:

Q. And an individual like Robin who was having her hand or arm treated, what -- you said that these were used to assist in recovery or --

A. Yes, ma'am. Once the graft is in place, it's kept down through a compression garment. Those would be her long-term garments. Initially we do it through Ace wraps. And then as she progresses on an outpatient basis, she would wear these compression garments for at least a year.

Q. And the longer one of course for her forearm, is that correct?

A. That was probably for her forearm, yes, ma'am.

Q. And these have to be worn how many hours a day?

A. Most of the time, patients are asked to wear

Case 3.12-cv-00327-MOC    Document 101    Filed 09/23/15    Page 141 of 200
502

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2502

them 20 to 24 hours.

Q. When Robin left the unit, had you all, you or anyone else from the floor advised her of precautions she should take not only in recovery but protection as well?

A. Yes, ma'am. We spoke with her. I spoke with her about her discharge plan. I had advised her that she needed to seek counseling, that it would be wise to leave the area and not return to her home at that time, perhaps go to somewhere else. We of course gave her her medical discharge information including follow-up appointments, how to take care of her skin, how to do her wound care at home. She still had significant wounds on her right arm that she would need to dress frequently, as well as had to care for her donor sites that would take several weeks to heal completely, and how to care for her new graft.

Q. Now, was she given particular orders as far as a local Roanoke doctor to see or her local hospital or did you all train her in ways to care for herself, is that something that requires specific medical attention?

A. It requires specific medical attention in that she and her family would have been trained to do the dressings. I don't recall exactly who was going to perform her treatments, whether she was going to have

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2503

home care for a while or if she was -- some of her family were going to do it.  Typically it's the kind of thing that a family could do with close follow-up back in our clinics.  And I know that her follow-up clinics, she seen by the plastic surgery department and through some therapy at the university.

Q.  So she was planning for her future with her recovery?

A.  Yes, ma'am.

Q.  Did you notice a change in Robin's demeanor?  You indicated the first couple of days she was very quiet, withdrawn, of course heavily medicated.  How was her demeanor as she left?

A.  She was more open.  She was still hesitant to trust and she appeared hesitant to trust us.  She did open up more on the last couple of days and spoke of her personal situation.

MS. ROSE:  Thank you.  I have no other questions of this witness, Your Honor.

CROSS-EXAMINATION

BY MS. LAWSON:

Q.  Ms. Aldridge, just a couple questions.  You and the other professionals at the hospital were concerned about Robin Williams' safety, weren't you?

A.  Yes, ma'am.

Case 3:12-cv-00327-MOC    Document 101    Filed 09/23/15    Page 143 of 200

504

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2504

Q. And that's because you know that by the time a spouse or former boyfriend or girlfriend starts doing things like this, it may not stop, is that right?

A. Yes, ma'am.

Q. And in fact it may get worse?

A. Yes, ma'am.

MS. LAWSON: Thank you, no further questions.

THE COURT: You may step down.

MS. TOMPKINS: Government calls Sydney Williams.

SYDNEY WILLIAMS, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. Can you state your name, please?

A. Sydney Williams.

Q. And I know it's hard, but can you keep your voice up?

A. Yes, I'm fine.

Q. Spell your name for the court reporter.

A. S-Y-D-N-E-Y, W-I-L-L-I-A-M-S.

Q. And are you Robin's brother?

A. Yes.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2505

Q. Do you have any other brothers?

A. Yes, one.

Q. And who is that?

A. Kenneth Williams, right there (indicating).

Q. Okay. If you could pull the mike a little bit closer to you and just make sure you keep your voice up so we can hear you.

A. All right.

Q. Now, are you the oldest?

A. Yes.

Q. How old were you when Robin was born?

A. I would say I was about 9.

Q. And how old was Kenny?

A. About 5.

Q. What do you remember about Robin as a child?

A. About her as a child?

Q. Uh-huh.

A. Well, she was my little sweetheart. I used to do a lot of work around the house and everything, and my mom used to give me money and I'd go to flea markets and yard sales and buy her dresses and things like that.

Q. What kind of little girl was she?

A. I tried to keep her with me all the time. I tried to make her a tomboy, but she was all woman.

Q. And you said that you -- make sure you keep

Reported By:
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 101    Filed 09/23/15    Page 145 of 200
506

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2506

your voice up so these people over here can hear you.

A. Okay.

Q. That you bought her dresses. How did you do that?

A. Well, you know, I might help my mom out cleaning up or I might wash a car, maybe cut a yard or something and might get 5 or 6 dollars and go to a yard sale or flea market or anything just to buy her something.

Q. Did you help get her ready for school?

A. Yes, I did.

Q. What did you do?

A. Well, I used to do her hair, I get her dressed, just anything I could do for her.

Q. Now, did there come time when you moved out of the house?

A. Yes.

Q. When was that?

A. I was about 15 then. I would say she was about 8.

Q. Where did you go?

A. That's when I met my girlfriend that's still there.

Q. Okay. And are you still with her?

A. Yes.

Reported By:
800-333-2082        Huseby, Inc., an Affiliate of Spherion (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 101    Filed 09/23/15    Page 146 of 200
507

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2507

Q. And how old were you when you moved out?

A. About 15, 16, somewhere around there.

Q. Now, when you moved out, how did your relationship with Robin change?

A. Well, it dropped off for a while, but, you know, I still went to see her and she'd come to see me. And I used to work at the hospital and she did, too. And like, you know, like me going in the evening or something like that and she would come in at night and we'd talk to each other before like I'm getting off and she's coming in, you know, things like that. Then she would come by my office and get me, take me to the house and we'd all sit around and have a good time.

Q. And what was Robin's relationship with her mother like growing up?

A. Even when she was grown, she was still sleeping in the bed with mom.

Q. And what was she like when y'all were all in the house together with your mom?

A. Still a baby.

Q. What kind of woman did your little sister become?

A. More of a mother figure, because like at the time I had just had my first little baby and she used to want to keep the baby with her more than I did.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2508

Q. So although you were the oldest, she sort of mothered you?

A. Well, I could talk to her about anything. I felt more comfortable to talk with her than anybody else.

Q. Now, even after you moved out, did you and Robin and the family still stay close?

A. Yes. I mean, you know, we always have family outings and dinners and we'd go to each other's house and have dinners.

Q. All right. After you moved out, did the family still go to church together?

A. Yes.

Q. Now, do you know the defendant, Marc Barnette?

A. Yes.

Q. And how do you know him?

A. Only through my sister.

Q. Do you remember when Robin started seeing Marc?

A. Yes.

Q. Where was she living when they first started seeing each other?

A. With my mom.

Q. Had she always lived at home?

A. Yes.

Q. Did you ever see Marc come over to your mom's

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2509

house to visit Robin?

A. Well, I seen -- he came up one or two -- well, no, I used to get off of work at night and like I say, she was off at work, I used to see them sitting there like right down the street from my house is a water tank and a bike trail, I used to see them out there sitting, talking, you know, just at night. And I said what you doing, and she said this is Marc, he is my friend and we're just talking. And I said, well, be safe and you know if you need me, I'm right down the street. I used to see them there frequently or they would come and sit in front of my house like that and talk.

Q. Did you live nearby?

A. Yes, I only stayed about maybe two or three blocks down the street.

Q. Okay. So you were always nearby?

A. Yes.

Q. Now, did there come a time when Robin moved into an apartment with Marc?

A. Yes.

Q. Did you ever go over to that apartment?

A. Yes.

Q. Prior to the fire bombing incident, did you ever see any signs that Robin might be in danger?

A. I didn't. I didn't.

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 149 of 200
510

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2510

Q. Now, I'm going to take you back to April of 1996. Where were you working at that time?

A. I was working at a place, a golf company, golf course.

Q. At a golf course at Roanoke?

A. Yes.

Q. What did you do there?

A. I used to cut the greens and the roughs and all of that and like rake sand traps, just everything that have to do with a golf course.

Q. How close was the golf course to Robin and your mom's house?

A. I would say maybe a 7 or 8-minute drive.

Q. Now, did you live close enough to the golf course to come home for lunch?

A. Yes.

Q. Do you remember April 30th, 1996 when the fire bombing happened?

A. Yes, I was awokened by a phone call.

Q. Who called you?

A. My brother's wife, Sharon.

Q. What did she tell you?

A. She just said to come down to Robin's apartment because her apartment was on fire.

Q. Did you go over to Robin's apartment then?

Case 3:12-cv-00327-MOC     Document 101     Filed 09/23/15     Page 150 of 200
511

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2511

A.    Yeah, I went straight there.

Q.    You went straight there?  What did you see when you got there?

A.    Well, fire trucks was there, and the house was just a mess.  And I went in, and she was already gone to the hospital.

Q.    What did you do next?

A.    Well, I stayed there until the police -- I mean, until the fire department had secured the apartment and everything and I went to the hospital to get my mom.

Q.    Where was your mother?

A.    I think she was at already at home or at the hospital, I'm not really sure right now, but I went to the hospital.  Then she was all right, so I think I went home and picked my mom up and my mom was packing something to go to Charlottesville.

Q.    When you got to the Roanoke hospital, was Robin still there or had she been transported?

A.    She was already gone.

Q.    Okay.  Do you know where she had been transported?

A.    To the University of Virginia.

Q.    Did you and your mom drive to the University of Virginia just right then?

Reported By:
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 101    Filed 09/23/15    Page 151 of 200
512

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2512

A.    Yes.

Q.    About how long did it take to drive there?

A.    I would say about an hour and a half.

Q.    And you and your mom went?

A.    Uh-huh.

Q.    Did you see her when you got there?

A.    Yes.

Q.    How was she?

A.    My sister?

Q.    Uh-huh.

A.    She was in the bed and like had a lot of medications in her, I guess.  But as soon as I walked in and seen her, I got sick so I had to run to the rest room myself.

Q.    Why was that?

A.    I think it was just my nerves.

Q.    Now, were you able to talk to her while she was at the hospital at UVA?

A.    Yes, I talked to her.

Q.    And what did she tell you about what happened?

A.    Well, she just kept saying -- well, the first time I seen her, I just couldn't believe that she was in the condition that she was in, like burnt and things like that.  And I said, well, baby, just get yourself together and we are going to take care of you, like

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2513

that. And so whenever she needed some other things like that, well, they already had a list of things that she needed. So I already knew that I had to drive right back to Roanoke and get them things and come back.

Q. Okay. So she had a list of things that she needed from home?

A. Yes.

Q. Did you drive back and forth between Roanoke and Charlottesville?

A. Well, depends on what she needed. Maybe I would go -- sometimes I went twice a day, sometimes I went once a day, sometimes every other day.

Q. Did she tell you who was responsible?

A. Yes.

Q. And what did she tell you about that?

A. It was Aquilia Barnette. She said she looked him straight in the face.

Q. Now, did you do anything to try and find Marc while she was in the hospital?

A. Yeah. Well, see, in our community, we got like Roanoke, Salem and Vinton is all close together, Roanoke, Salem and Vinton, and I know I burned up $200, $300 worth of gas just riding and looking.

Q. And that was in the days or weeks that followed the fire?

Case 3:12-cv-00327-MOC     Document 101     Filed 09/23/15     Page 153 of 200

514

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2514

A.  Yes.

Q.  Now, when you went to see Robin in those weeks after the fire, what was her state of mind?

A.  Well, she didn't know how her life was going to turn out.  She kept saying she didn't know if she was ever going to get married because she had never had a child yet or anything like that, and she didn't know if anybody would really want her in life or anything.  And I said, well, baby we all want you in life.

Q.  Was that because of her burns?

A.  Yes.

Q.  Now, when she got out of the UVA burn center, where did she go?

A.  She went to my mom's house.

Q.  Did you go see her there?

A.  Yes.

Q.  How often?

A.  Every day.  I mean, it might be after work or maybe on my lunch break or whatever, something like that.

Q.  And how was she?

A.  She was in decent spirits, but she was still scared to come outside or do anything like that.

Q.  Now, while Robin was in the hospital and after she got home, where was her car parked?

Reported By:
800-333-2082      Huseby, Inc., an Affiliate of Sullivan (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/16   Page 154 of 200
515

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2515

A. Oh, well, see, I took her car to my home and put it in the yard and blocked it in with my truck and my other car.

Q. And that was a couple of blocks away from Louden Avenue?

A. No -- well, yeah. See, that's about maybe like 3 miles, maybe 4 miles away.

Q. When she first got back from UVA, was her car still parked at your place?

A. Yes, because she couldn't drive it. It was gears and she couldn't use her hands unless it was straight.

Q. Now, after Robin got home, was there an occasion that you came home for lunch?

A. Yes.

Q. And when you left that morning, was there anything on Robin's car?

A. No, it wasn't.

Q. And when you got home for lunch, what, if anything, did you notice?

A. Okay. I went in the house and so when I walked by the car, I just didn't look back, I just walked by it. And when I came back out, I made a couple sandwiches and I came back out and I seen a bunch of like cards on the windshield. So I picked them up, and

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2516

they was, you know, I guess it was correspondence from Barnette and my sister. And so what I did, it made me really, really nervous, so I just --

Q. Why were you nervous?

A. Because she had just been burned and I couldn't find him and I didn't know where he was at, so I got in the car and went straight down to my mom's. And I went in the house and I said, how you doing, and she said, I'm going okay, what you doing? I said, well, I'm just on lunch break, just coming to check on you. I didn't tell her nothing.

Q. Why didn't you tell her anything?

A. Because I didn't want to upset her.

Q. Would she have been upset?

A. Yeah, I'm quite sure she would have. So I said, I'm going back to work right now. So what I did, I just left the house and I went straight over to my aunt's house because my Uncle Ray was there. And I said, Uncle Ray, I think you need to come on and just go to mom's with her and just stay there with her because I found these cards here.

Q. You showed the cards to Uncle Ray?

A. Yeah, you know, I showed them to him and just to like as far as him to go on and go with me.

Q. What did you do with the cards?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2517

A. What did I do with them at that time?

Q. Yes.

A. I just kept them in my car.

Q. Did you ever turn them over to police?

A. Oh, yes, I did that. I'm talking about that day that I found them and I went to get my uncle, when I carried him to my mom's house I just kept the cards in my possession.

Q. Did you look at the cards?

A. Yes.

Q. Could you tell by the writing on the cards who they were to and from?

A. Yes.

Q. And who were they to and from?

A. The cards was like snap to, I don't know to who or from, but then it had like just scribbling on them and everything.

Q. All right. I'm going to show you a series of those cards, and I will begin with what has been previously marked and admitted as Government's Exhibit 50A. Does that appear to be a birthday card?

A. Yes.

Q. I'm going to open it up and show the inside. Can you read that?

A. Uh-huh.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2518

Q. Is that a happy 21st birthday card?

A. Yes.

Q. Does it say -- is it signed by Pooh?

A. Yes.

Q. Do you know if that was the nickname for Robin?

A. I don't know, because she used to use the word Pooh a lot.

Q. All right. Now, on the back of that card, did there appear to be writing on that?

A. Yes.

Q. And what does that say?

A. Robin, you don't have to laugh about -- to lie about Benny, if you love him so much, you should have never fucked -- fucked --

Q. Faked your love for me?

A. Yeah, faked your love for me.

Q. And what about in the box, what does that handwriting there say?

A. I can't see the second, these, what --

Q. Does that say these are just a sample of your lies?

A. Yeah, that's what it is.

Q. And that was one of the cards you found on her --

A. Yes, it was about three or four, maybe five

Reported By:
800-333-2082     Huseby, Inc., an Affiliate of Spherion  (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 158 of 200
519

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2519

cards.

Q. All right. I'm going to show you another card that has been previously marked and introduced as Government's Exhibit 50B. Is that one of the other cards that you found?

A. Yes.

Q. All right. And is there handwriting on that?

A. Yes.

Q. And what does that say?

A. Why did you lie.

Q. I'm going to show you another card that's been previously marked and admitted as Government's Exhibit 50C.

A. Uh-huh.

Q. And what does the handwriting on that card say?

A. Okay. You let him come between us.

Q. Okay. And before that, was that a love card before that, just by looking at the message in the card, I love the heck out of you?

A. Yes.

Q. I'm going to show you an item that's been previously marked and admitted as Government's Exhibit 50D. What does the handwriting on the front of that card say?

A. You lied to me.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2520

Q. Okay. Is there a, looks like a little signature on there, a little Marc?

A. Yes.

Q. Is that the same Marc that you'd seen on other cards?

A. Yes.

Q. Now I'm going to show you what has been previously marked and admitted as Government's Exhibit 50E. Can you read the handwriting on that card?

A. Why wasn't I good enough for you.

Q. Is that the same Marc on it?

A. Yes .

Q. I'm going to show you what has been previously marked and admitted as Government's Exhibit 50F. Can you read the handwriting on that card?

A. If you loved him so much, why did you even bother with me, and it's still got the little sign.

Q. All right. And I'm going to show you what has been marked as Government's Exhibit 50G. Can you read the handwriting on that?

A. You never really loved me.

Q. Okay. Now, when you looked at those cards, were those cards that had all been signed by Robin?

A. Had they been signed by Robin or are you talking about --

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2521

Q. Had they been -- were they cards that Robin had sent to Marc Barnette?

A. I don't really know which way the cards were sent to.

Q. Okay. The cards that went between them?

A. Yes.

Q. What did you do with those cards eventually?

A. Turn them to the police.

Q. Did you ever tell Robin about those cards?

A. I know I told my uncle and my mom and I don't know if she found out through them or not. I didn't never tell her.

Q. About how long after the fire bombing at her apartment did you find those cards on her car?

A. I would say it was after about maybe a week, maybe 2 weeks.

Q. Okay. After she got back from the hospital?

A. No, she was still in the -- no, it was after she had came from the hospital.

Q. And you said you drove around looking for Marc. Did you find him?

A. No.

Q. Did you tell Kenny, your other brother?

A. Yes.

Q. Did he help you look for Marc?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2522

A.   Well, I'm quite sure he did his own looking whether he was out in his car.

Q.   Okay.  Now, how did you come to learn about your sister's murder?

A.   While I was at work.

Q.   Was that a Saturday morning?

A.   Yes.  I work seven days a week.

Q.   And was that at the golf course?

A.   Yes.

Q.   Tell the jury what happened that morning.

A.   Okay.  Well, we used to go to work and like stay for like -- like we used to go Saturdays and Sundays and we work like four hours and get paid for like six.  So we have to rake sand traps and everything like that.  So I had maybe like maybe four to seven sand traps to do.  It usually would take like 2 and a half to 3 hours to do.  You know, I was finished in about 45 minutes.  I don't know what it was, I was just -- I don't know what it was, I was just finished them in 45 minutes, maybe an hour.

Q.   And what happened next?

A.   Okay.  And then my supervisor rode up on me and told me I had to go home.  So I turned around, I was going to talk to my friend for like two more minutes and he said, Sydney, I need to go home now, so I knew

Reported By:
800-333-2082   Huseby, Inc., an Affiliate of Spherion  (704) 333-9889   Fax (704) 372-4593
523

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2523

something was wrong.  So I got in the golf cart and went to my car, and I had just gotten to my mom's house and I seen my pastor and four or five, maybe ten church members and my mom sitting on the porch and police and everything, so I knew something was wrong.  So I went to the porch and said, mom, what is wrong?  She said, well, my baby's been shot.  And I said, who, Robin?  And she said, yes.  I said, well, is she all right?  And she said, well, I don't know.  I guess she just didn't want to tell me.  And I said, well, where Kenny at?  She said, well, he gone to the hospital.  I said, well, I seen my pastor and everybody there around my mom, so I went to the hospital.  And I got there and my brother was there, and she was gone, you know.  And I said, well, Kenny all we can do is --

Q.   What did Kenny tell you when you got there?

A.   He said she's dead, man.  He said, would you like to go see her?  And I said, Kenny, I mean, I can't handle it right now, you know.  I said, our priority is to take care of mom now because she okay, and I think he left his car and he got in my car.  And I been living in Roanoke all of my life and I got lost five to six times trying to get home.

Q.   How far is it from the hospital to home?

A.   Oh, maybe 10 to 12 miles, something like that.

Case 3:12-cv-00327-MOC  Document 101  Filed 09/23/15  Page 163 of 200

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2524

Q. And did you and Kenny go home?

A. Yes, we went to mom's house.

Q. And what was the scene like there?

A. Well, I was distraught and Kenneth went up on the porch. I believe mama already knew, but when we came back that morning, she really knew. And Kenny went up there and I was standing back there and everybody was around mom and he went ahead and told her, and it just got hot all of a sudden all day.

Q. Now, Sydney, tell us how has Robin's death affected your life?

A. Well, it affected me in so many ways that I got a void in my life that I can't fill, and I done tried all kind of ways, but all I can do is put it in the Lord's hands. I know that she used to take care of my little daughter even though she was just a baby even better than I did and now sometimes I need a little help with her, you know. I wish she was here to help me. I just wish she was here because it will take a whole lot of void out of my life.

Q. What do you miss most about Robin?

A. Just sitting and talking and going to the movies. You know, seems like I go to the hospital and just sit down and she will come out and we will talk. I miss talking and just being with her. I miss it all.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2525

MS. TOMPKINS: Thank you, Sydney, no further questions.

MR. BENDER: No questions, Your Honor.

THE COURT: Members of the jury, we will take our afternoon break at this time and we will call for you in about 15 minutes.

(The jury left the courtroom.)

(Brief recess.)

THE COURT: Are the parties ready to resume?

MS. TOMPKINS: Yes, sir.

THE COURT: May I have the jury, please.

(The jury returned to the courtroom.)

THE COURT: You may call your next witness.

MS. ROSE: Steve Austin.

STEVE AUSTIN, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Would you introduce yourself to the jury, sir?

A. Steve Austin.

Q. You can pull that mike a little closer to you. Mr. Austin, where do you live?

Reported By:
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889

800-333-2082                                        Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2526

A.    11405 Wood Fire Road in Charlotte.

Q.    That's here in Charlotte?

A.    Yes.

Q.    How long have you lived in Charlotte?

A.    All of my life.

Q.    Do you work, sir?

A.    Yes.

Q.    Where do you work?

A.    Philip Morris.

Q.    How long you been employed at Philip Morris?

A.    Seven years.

Q.    Now, are you a friend of the defendant Marc Barnette?

A.    Yes.

Q.    How long have you two been friends?

A.    All of our lives.

Q.    Where did you meet him?

A.    He used to live right across the street from me.

Q.    Did you grow up together?

A.    Yes.

Q.    What do you call him?  Do you have a name that you refer to him as?

A.    Vichi.

Q.    Vichi?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2527

A.    Yes.

Q.    Have you stayed in contact with the defendant over the last several years?

A.    Yes.

Q.    Now, who is Greg Austin?

A.    My brother.

Q.    Where does Greg Austin live?

A.    He now lives in Ohio.

Q.    Prior to moving to Ohio, where did he live?

A.    In Roanoke, Virginia.

Q.    How long had he been living in Roanoke in 1996?

A.    I would say about two or three years.

Q.    Did you and the defendant visit your brother in Roanoke?

A.    Yes.

Q.    About how frequently would you two do that?

A.    I would do it all the time; I don't know how many times me and Vichi went up there.

Q.    When you and the defendant would go up to visit your brother, did you go out to the night spots and socialize?

A.    Yes.

Q.    And on one of those occasions were you with the defendant when he met a lady named Robin Williams?

A.    Yes.

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/13   Page 167 of 200

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2528

Q. And did they thereafter begin a relationship?

A. Yes.

Q. And did the defendant initially maintain that relationship long distance from Charlotte?

A. Yes.

Q. About a year or so after they met did he move up to live with her in Roanoke?

A. Yes.

Q. While they were living in Roanoke, did you visit with them at their apartment on Keswick?

A. I would stay with my brother, but Vichi would come and pick me up and we would go back over to their apartment.

Q. Whose car did he drive when he came to pick you up?

A. Robin's.

Q. I'll show you previously identified and admitted Government Exhibit 7G. Is this the apartment that you visited --

A. Yes.

Q. -- on occasion? How many times would you say you went there with the defendant?

A. Numerous.

Q. Pardon?

A. Several times.

800-333-2082   Reported By:   Huseby, Inc., an Affiliated Spherion (704) 333-9889   Fax (704) 372-4593

529

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2529

Q.    Would Robin be there on those occasions?

A.    Sometimes, yes.

Q.    She worked during the day, didn't she?

A.    Yes.

Q.    At some point do you recall the defendant and Robin breaking up and him coming back to Charlotte?

A.    Yes.

Q.    Shortly after he moved back to Charlotte did you hear about the fire bombing up in Roanoke at Robin's apartment?

A.    Yes.

Q.    How did you hear about that?

A.    Well, I have another brother, he had a girlfriend that lived in Virginia, and one particular morning she called asking had we seen Vichi, and I was like, no, why, and she told me that the house had been fire bombed and the police were looking for Vichi.

Q.    What did you do when you heard that?

A.    I told her I hadn't seen him or heard from him, and I called his mom to see if she had heard from him and she was like --

Q.    And had his mother heard from him at that point?

A.    No.

Q.    How long prior to the fire bombing had it been

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2530

before you had seen him?

A.    Before the fire bombing?  I don't know.

Q.    More or less than a week?

A.    I can't remember.

Q.    All right.  Why did you call his mother's home?

A.    To see if she had heard from him or seen him.

Q.    Did he normally stay there?

A.    Yes.

Q.    When did you finally hear from the defendant?

A.    It was almost a week later, four or five days later.

Q.    And during that time period had you been calling or looking for him in his regular places?

A.    Yeah.  I mean, I called his mom every now and then; that's about it.

Q.    When you finally did hear from the defendant, what did he tell you?

A.    He called me and told me to come and pick him up, that he needed to talk to me.

Q.    Did you, in fact, go pick him up?

A.    Yes.

Q.    And where did you pick the defendant up?

A.    He was somewhere off of Independence Boulevard in a McDonald's parking lot.

Q.    Now, where was that Independence related to his

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2531

mother's -- or where was that in relation to his mother's home on West Boulevard?

A. It is like across town.

Q. Was he there with a car?

A. No.

Q. Did he indicate to you how he had gotten to that McDonald's on Independence?

A. No.

Q. Where did you go when you picked him up?

A. We went over to my mom's house.

Q. Where does your mother live?

A. She lives in Clanton Park.

Q. And was there anybody with you at the time other than the defendant?

A. Yeah, I had a friend girl with me.

Q. Did you take her to your mother's home in Clanton Park as well?

A. Yes.

Q. What did you do when you got to your mother's house?

A. I told my mom to entertain my company while I talked to Vichi out on the back, and me and Vichi went out on the back and we started talking.

Q. What did he tell you?

A. He told me about the fire bombing. He was

800-333-2082    Reported By:
Huseby, Inc., an Affiliate of Spherion (704) 333-9889    Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2532

saying that he had been trying to get back together with Robin after they had broken up and -- you know, through phone contact and one particular night he, day or night, I'm not sure, but he called her and, you know, they were talking and he heard a guy's voice in the background and it was like the guy kept messing with her, tickling her, whatever, playing with her while they were on the phone and you know he really wasn't concerned about that, is what he told me, that he was just desperately trying to get Robin back and one minute she would say, yeah, we can get back together and the another minute she would say, no, we can't get together, just kind of messing with him.

So eventually they got off of the phone, and I don't know if he had drinks or what, but some kind of way he got in his brother's car and he went up there. And he say he stopped at a gas station and got some gas and he had a baseball bat and a little container and he said he put some gas in the little container and went on up there and got -- finally got to the apartment, and he said that he was telling the guy to come outside, because the guy's car was there at the apartment, so he is telling the guy to come outside and the guy would never come outside so he took the bat and just started beating up the guy's car and this guy had a gun, he

800-333-2082              Huseby, Inc., an Affiliate of Spherion  (704) 333-9889              Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2533

stuck his arm out the door just shooting around but he never would come outside. And so Vichi say he took the little container of gas and threw it through the kitchen window.

Q. Did he say whether he saw Robin get out of the apartment?

A. He said she had came out the back window. He said that the guy pushed her out the back window. When he threw the gas thing in there he heard the screams or whatever, and I guess he went back and got in the car. He said the guy ran out the front door and Robin was out the back window.

Q. During the conversation did the defendant tell you whether he and Robin had ever talked about what they would do if the apartment caught on fire?

A. He told me that she would -- she said that she would jump out the back window.

Q. And in your visits to that apartment, there was only one way in and one way out through the door?

A. Right, front door.

Q. Did the defendant tell you that he had abused Robin before?

A. (Shakes head.)

Q. You will have to speak. You can't just nod because we are recording.

Reported By:
800-333-2082   Huseby, Inc., an Affiliate of Spherion (704) 333-9889   Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2534

A. No.

Q. Did he tell you on that night that he yelled, die, bitch, die?

A. No.

Q. Did he tell you about going up to Roanoke and putting the cards on her car windshield?

A. No.

Q. Did he tell you about calling her mother's home after the fire?

A. No.

Q. He didn't tell you that part? After the defendant told you basically what had happened up in Roanoke, what did you two then do?

A. I took him back where I got him from.

Q. Back to the McDonald's parking lot?

A. Yeah.

Q. Did he indicate to you whether he had a ride or where he would be going from there?

A. No.

Q. After that about how long was it before you saw the defendant again?

A. A couple of weeks, three weeks or so. It wasn't long, I know that.

Q. For a couple of weeks you didn't see him at his mother's?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2535

A.    Yeah.

Q.    You didn't see him at your house?

A.    Say it again.

Q.    You didn't see him during that two weeks, you didn't know where he was?

A.    No, I didn't know where he was, but I know pretty soon after that we had just got back together.

Q.    And what did you two do on the next occasion that you got together?

A.    Went out clubbing, stuff like that.

Q.    What do you mean when you say you went clubbing?

A.    Went to a club, picked up girls and stuff like that --

Q.    And, in fact --

A.    -- just hanging out.

Q.    I'm sorry, I didn't mean to interrupt you, sir.

A.    I said just hanging out basically.

Q.    Clubbing and meeting girls.  Did he actually meet a girl that you two later got together with?

A.    Yes.

Q.    What did you do on that occasion?

A.    We met these girls at a club and, you know, exchanged numbers and stuff, and like that weekend we went over to their house and played cards and had some

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2536

drinks, just laughing and joking basically.

Q. Now, that all happened before -- after he burned Robin but before he killed her, that was in the inbetween time?

A. Right.

MS. ROSE: All right, sir, thank you very much.

CROSS-EXAMINATION

BY MR. BENDER:

Q. Mr. Austin?

A. Yes.

Q. When did you and Marc, you know him as Vichi, some other people call him Marc, but when did you and Marc first meet each other?

A. Like I said, we grew up together. I have known him all of my life.

Q. Tell us a little bit about what Marc was like growing up.

A. A clown.

Q. What do you mean by that?

A. He was a really good guy, talented, adventurous, just an all-around good guy, kind of quiet.

Q. When you say talented, did he have any particular talents?

A. Yeah. He had a lot of talents. He could work

Reported By:
800-333-2082    Huseby, Inc., an Affiliate of Spherion    (704) 333-9889    Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2537

on cars, build model airplanes, draw, and -- he just -- he could do a lot of stuff. He was good with his hands, I'll put it like that.

Q. And y'all grew up together across the street from each other. It wasn't on West Boulevard, was it?

A. No.

Q. Where was it?

A. It was in Clanton Park.

Q. And that was when he was living with his mother, Sonia, and Rick Barnette?

A. Right.

Q. And I believe was that Rick Barnette's house that they lived in?

A. Yes.

Q. Did y'all ever go to school together?

A. No.

Q. Did you see each other, how often as you grew up?

A. We saw each other all the time until he moved to Atlanta.

Q. When he moved to Atlanta?

A. Until he moved to Atlanta.

Q. And I believe that was because his mother had moved down there --

A. Right.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2538

Q. -- and took the boys with her?

A. Right.

Q. It wasn't his choice to go down there, was it?

A. No.

Q. Now, when did y'all get reacquainted after he moved to Atlanta? Did he come back?

A. Yes, they came back. And, I mean, they would visit quite often and we would get together sometimes; but when he came and moved back, we would get together a lot.

Q. Where was he living at that time, when he came back?

A. That's when they were living off of West Boulevard.

Q. 3413 West Boulevard?

A. Right.

Q. Describe that place, that house, if you would.

A. It was a house that they were basically remodeling. It was up off of the street, away from the street, kind of secluded in the woods.

Q. It had the house number on the mailbox?

A. Yeah. The mailbox was on the street.

Q. Okay. Did Marc ever tell you that after this fire bombing that he sat out by the street and waited for the police to come?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2539

A. Yeah. That's before we had started hanging out again, he would tell me that, you know, nobody came and got him yet. That's basically why we just started hanging out again, they never came and got him.

Q. You met Robin the same night that Marc met Robin, didn't you?

A. Right.

Q. Tell us how that happened.

A. We were at a club in Virginia and -- it was me, Vichi, and my brother, my oldest brother, and Robin was there with a few of her friends, and we just started dancing and talking. After the club was over, we all walked outside together and he was talking to Robin.

Q. And did you ever go back with him when he went back to see Robin before they moved in together?

A. Probably. We probably rode up there together, because I would go see my brother all the time and he may have been along for the ride just to go see Robin.

Q. Describe in the first few months or years of their relationship, describe what you saw between Robin and Marc.

A. They was like just crazy in love with each other. You know, I have never seen him so happy, I will just put it like that. I have never seen anybody in love the way that they displayed it, you know.

Reported By:
800-333-2082  Huseby, Inc. an Affiliate of Spherion  (704)333-9889  Fax (704)372-4593
Case 3:12-cv-00327-MOC  Document 10-1  Filed 09/23/13  Page 179 of 200
540

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2540

Q. And about when was the last time you saw he and Robin together?

A. I don't know.

Q. When he came back to Charlotte, you didn't -- after he moved back and before the incident, the fire bombing incident, had y'all talked on the phone about him being back in Charlotte?

A. Yeah.

Q. And did you -- had you tried to take him out to clubs during that time, before the fire bombing?

A. Yeah, I had -- well, I was trying to take him out not to just clubs but anywhere, trying to keep his mind off of Robin, and I would introduce him to some of my lady friends and whatever. I just do anything to try to keep his mind off of it.

Q. And was that what happened in the time between the fire bombing and the murder, trying to keep his mind off of Robin?

A. That was before the fire bombing and after the fire bombing.

Q. Describe what Marc was like after he came back from Roanoke after he and Robin broke up.

A. He was really just down and out, you know, but he would always keep it to himself. He never really went into the depth about it, but you could tell that

Case 3:12-cv-00327-MOC  Document 101  Filed 09/03/15

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2541

she was on his mind, and, you know, he just felt bad

about the whole break

up situation.

Q.    Do you know whether anybody, his family or
anybody tried to get him help, counseling, anything like
that?

A.    No, I don't know.

Q.    What does your mother do?

A.    She does taxes.

Q.    And that's Ann Austin?

A.    Yeah.

Q.    And did your mother do Marc's taxes for him?

A.    Yes.

Q.    So Marc worked regularly?

A.    Yeah, he always had a job.

Q.    Mr. Austin, the government subpoenaed you to be
here, didn't they?

A.    Yes.

Q.    Tell us how you were served with that subpoena
by the government.

A.    How what?

Q.    How did the government come and serve you with
that subpoena?

A.    They came to my job.

Q.    How many folks?

Case 3:12-cv-00327-MOC Document 101 Filed 09/23/15 Page 181 of 200

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2542

A. I only saw one.

Q. Okay. And what did they do to serve you?

A. They pulled me off of my job, took me away in the back entrance and set me in a room and gave me a subpoena.

Q. Okay. Now, the day that your friend Marc said that he needed to talk to you and you picked him up from there and you brought him home, did he also talk to your mother the same day?

A. Yes.

Q. And do you know that he has a cousin, Shawn Denero, who lives in Tanglewood Apartments right behind that McDonald's that you are talking about?

A. I didn't know that at the time.

Q. Do you know that now?

A. Yes.

MR. BENDER: Thank you that's all.

MS. ROSE: Thank you, Mr. Austin. No other questions.

THE COURT: You may step down.

Call your next witness.

MS. TOMPKINS: The government calls Jacob Freshour.

JACOB FRESHOUR,

being first duly sworn, was examined and testified as

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 182 of 200

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2543

follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please, and spell your last name for the court reporter.

A. Jacob Freshour, F-R-E-S-H-O-U-R.

Q. How are you currently employed?

A. E-commerce manager with PCA International. We have the portrait studios in Wal-Mart.

Q. How were you employed in May of 1996?

A. I was the manager of Quick Pawnshop on Freedom Drive.

Q. For how many years did you work for Quick Pawn?

A. And seven altogether.

Q. And what was your position at Quick Pawn?

A. After the first year I was always in management.

Q. And you were at the Freedom Drive store, is that right?

A. Yes, ma'am.

Q. Now, on May 20th, 1996, did you sell a 12-gauge shotgun to an individual at your pawnshop on Freedom Drive?

A. Yes, ma'am.

Q. What kind of firearm is that?

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 183 of 200
544

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2544

A.    A pump shotgun, it is a shotgun that you have to pull it back, pump it back, per se, to bring the shell up into the chamber.

Q.    Was that a Stevens 12-guage shotgun?

A.    A Stevens 12-guage shotgun, yes, ma'am.

Q.    Is that a long barrel?

A.    That would be a long barreled shotgun.

Q.    Describe that pump action.

A.    You would pull the pump back this way (indicating) and it would put the shell up in the chamber to fire.

Q.    Okay.  Now, tell the jury what you remember about that sale.

A.    The first thing that I remember was it was right after we opened, probably between 9:00 and 9:30. The customer came in.  There wasn't much conversation during the transaction, and I guess the reason I remember that is that's pretty unusual when I deal with somebody.  I usually do a good job of drawing them out, trying to build your customer base, being assured they are purchasing the item that they want to purchase. There wasn't a lot of conversation.  It was a fairly quick transaction.  We looked at a few long guns, a few shotguns, and that was the gun that the individual selected.

Reported By:
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 184 of 200
800-333-2082   Huseby, Inc., an Affiliate of Spherion  (704) 333-9889   Fax (704) 372-4593
2545

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2545

Q. Okay. Now, in 1996 when an individual purchased a firearm, what kind of paperwork needed to be filled out?

A. ATF required you to fill out a yellow form to transfer ownership of the gun to the individual from the shop.

Q. Was it actually yellow?

A. Yes, ma'am.

Q. I'm going to show you what has been previously marked and introduced as Government's Exhibit 18A. Do you see that?

A. Yes, ma'am.

Q. And do you recognize it?

A. Yes. That's an ATF form to transfer ownership of a gun.

Q. And that was the paperwork that was required in 1996 for any firearm sale?

A. Yes.

Q. Who requires that to be filled out?

A. That's a federal law, the Alcohol, Tobacco, and Firearms.

Q. Do you know what the purpose of that is?

A. To identify the buyer and to transfer ownership of the gun.

Q. All right. What was the name of the person

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2546

that was given to you who was purchasing that firearm?

A.    Mario Von Keith Barnette.

Q.    And do you require identification from people who are purchasing firearms?

A.    Either a picture state issued ID or state issued driver's license.

Q.    What form of ID does this form show was given to you on that day?

A.    A Virginia ID.

Q.    Is that shown right here at the bottom?

A.    Yes, ma'am.

Q.    Now, in 1996 could a person from a different state come to North Carolina and buy a firearm?

A.    As long as it was a long gun, a shotgun.

Q.    Not a handgun, is that fair?

A.    Not a handgun.

Q.    Now, how was this form filled out in 1996, who filled out the top and who filled out the bottom of this form?

A.    The top form is filled out by the customer.

Q.    This section here (indicating), for example, the customer fills out the name, height, weight, race --

A.    Exactly.

Q.    -- residence, date of birth, and place of birth, is that correct?

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 101    Filed 09/23/15    Page 186 of 200
547

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2547

A.    Yes, ma'am.

Q.    Now, what about the next section, the series of questions under certification of transferree, who fills that out?

A.    That's filled out by the customer.

Q.    So the customer reads those questions and fills them out themselves, is that right?

A.    Yes.

Q.    Is there any way that at that time you at the pawnshop could verify the answers given?

A.    No.

Q.    Now, what is the purpose of those questions?

A.    To determine if you are a felon, fugitive from justice, illegal alien, that type of thing.

Q.    And, for example, Question A, can you read that?  Is that close enough to you?

A.    Yes.

Q.    What does it ask?

A.    Are you under indictment or information in any court for a crime punishable by imprisonment for a term exceeding one year --

Q.    Go ahead.

A.    -- or formal acquisition of a crime made by a prosecuting attorney as distinguished from an indictment presented by a Grand Jury.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2548

Q.   And what was the answer to that?

A.   No.

Q.   Now, what was the question in Section B?

A.   Have you been convicted in any court of a crime punishable by improvements for a term exceeding one year?  Note, the yes answer is necessary if the Judge could have given a sentence of more than one year.  The yes answer is not required if you have been pardoned for a crime or the conviction has been expunged or set aside, if you have had your civil rights restored and under the law where the conviction occurred you are not prohibited from receiving or possessing any firearm.

Q.   And what was the answer given to whether or not this person had been convicted of a crime punishable by a term exceeding one year?

A.   No.

Q.   And over on C, what was the question asked?

A.   Are you a fugitive from justice.

Q.   And what was the answer given?

A.   No.

Q.   Okay.  Other questions were, are you -- under D, what was that question?

A.   Are you an unlawful user of or addicted to marijuana or any depressant, stimulant, or narcotic drug or any other controlled substance.

Case 3:12-cv-00327-MOC   Document Reported Filed 09/23/15   Page 188 of 200
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
549

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2549

Q. And what was that answer?

A. No.

Q. And E, F, G, and H, are those questions about whether or not they have been committed to a mental institution, have been dishonorably discharged from the Armed Forces, whether they are an illegal alien and whether they are a citizen?

A. Yes.

Q. And all of those questions were answered no?

A. All of those questions were answered no.

Q. And down below that there is a certification. What does it tell a person that, what happens if they would answer yes to any of the questions above?

A. If they answer yes to any of the above questions, they are prohibited from purchasing or possessing a firearm except as otherwise provided by federal law.

Q. And that's right there on that form, and at that point there was no way for you all to verify any of that information?

A. No.

Q. Okay. And did the person purchasing the firearm sign that?

A. Yes.

Q. And the signature says what name?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2550

A.    Mario Barnette.

Q.    Okay.  And down at the bottom of the form does that show the type of the firearm purchased?

A.    Yes, ma'am.

Q.    Okay.  And that was what kind of firearm again?

A.    Model 77B shotgun, Stevens 12-guage.

Q.    And is that your signature down here?

A.    Yes, ma'am.

Q.    And does that automatically transfer ownership?

A.    That transfers ownership legally, yes.

Q.    No waiting period or anything like that?

A.    No waiting period.

Q.    So on that morning the person calling himself Mario Barnette walked out of Quick Pawn with that 12-guage shotgun?

A.    Yes, ma'am.

Q.    What happened the next day?

A.    The next day about the same time, between 9:00 and 9:30, the same individual came back and said that the gun did not work properly, and we warrantied our guns for a year, so we looked at some more guns, exchanged it for another gun, filled out another ATF form transferring ownership of the second gun, and the first gun reverted back to us.

Q.    Did you verify one way or the other whether

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2551

that shotgun you sold him the day before was, in fact, working or not?

A.   No.  We didn't have any way to verify that on premises.

Q.   So did you just -- you took his word for it that the gun was defective in some way?

A.   Yes, ma'am.

Q.   And that was a policy at Quick Pawn, is that right?

A.   That was the policy at Quick Pawn.

Q.   Now, what time of day did that person come back in?

A.   It was the same time, early in the morning just after opening, 9:00 or 9:30.

Q.   And what type of firearm was exchanged?

A.   We exchanged it for a semiautomatic shotgun.

Q.   Okay.  I'm going to show you now what has been previously marked and introduced as Government's Exhibit 18B.  Is that the form that you filled out on May 21st, 1996?

A.   Yes, ma'am.

Q.   Okay.  And again on the top of that form, that again was filled out by the purchaser, the person calling himself Mario Von Keith Barnette, is that correct?

Reported By:
800-333-2082     Huseby, Inc., an Affiliate of Spherion  (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 101     Filed 09/23/15     Page 191 of 200
552

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2552

A. Yes, ma'am.

Q. Now, there is a difference in this one, it notes Virginia driver's license. Did the person give you a different form of ID on the 21st?

A. No, ma'am. It was the same ID. The driver's license or ID notation was for our records. On the yellow form itself what we are concerned about is the state and the number on the identification, and we just notated it to have our -- just for our own use, basically.

Q. Okay. Do you know -- do you remember from day one, from the 20th to the 21st, was it the same kind of identification?

A. Yes, ma'am.

Q. Okay. So one of those days it was incorrect?

A. Clerical error.

Q. Okay, clerical error. Otherwise, the information is exactly the same as the day before, is that correct?

A. Yes, the same number on the identification and the same number on the rest of form.

Q. Okay. And all of the answers to the questions asked prohibiting transfer of firearm were answered no?

A. Yes, ma'am.

Q. And down at the bottom, what kind of firearm

Case 3:12-cv-00327-MOC Document 101 Filed 09/23/15 Page 192 of 200
800-333-2082 (704) 333-9889 Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2553

was that that was purchased?

A. It was a Winchester 12-guage shotgun.

Q. All right. Is that a long barreled gun?

A. Long barreled gun, yes.

Q. Okay. And is that a pump action or semiautomatic?

A. Semiautomatic.

Q. What is the difference, if you know?

A. On a semiautomatic you don't have to do the pump action; once you load the gun, it will feed the shells itself up into the chamber.

Q. Okay. So there is no movement on the barrel?

A. No movement on the barrel.

Q. Okay. Then it goes to the second page of Government's Exhibit 18B. Do you recognize that?

A. Yes, ma'am.

Q. What is that?

A. That would be the sales receipt for the second shotgun.

Q. And how much was paid for that Winchester semiautomatic?

A. With tax, $211.99.

Q. And does that show the method of payment?

A. Let's see. Yeah, the method of payment would have been cash.

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2554

Q.   All right.   And, again, that person calling themselves Mario Von Keith Barnette walked out of the Quick Pawn with that shotgun?

A.   Yes, ma'am.

MS. TOMPKINS:   Thank you.   That's all the questions I have.

MS. LAWSON:   No questions.

THE COURT:   You may step down.

MS. ROSE:   The government would call Elaine Edwards.

ELAINE EDWARDS,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.   Would you please introduce yourself to the members of the jury?

A.   Elaine Ann Reincke Edwards.

Q.   Will you spell everything but Elaine and Ann?

A.   Yes, Reincke is R-E-I-N-C-K-E.

Q.   And Edwards?

A.   With an S, E-D-W-A-R-D-S.

Q.   Where do you live, what state?

A.   Currently?

Q.   Yes.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2555

A.    San Antonio, Texas.

Q.    How long have you lived out in Texas?

A.    A little over a year.

Q.    What took you there?

A.    Personal reasons.

Q.    Now, do you work?

A.    Yes.

Q.    What is your line of work?

A.    I work at a cemetery and funeral home.

Q.    Before moving to Texas where did you live?

A.    In Mt. Holly, North Carolina.

Q.    Did you grow up in Mt. Holly?

A.    No.  I grew up in Charlotte and South Carolina.

Q.    Where in South Carolina?

A.    York.

Q.    I want to turn your attention back some time to June 21st of 1996 and particularly the evening of that date.  Do you recall what you did on that evening?

A.    My girlfriends and I went out to Coyote Joe's over on Wilkinson Boulevard.

Q.    And is that a place where you frequently went to listen to music, dance, and play pool?

A.    Correct.

Q.    Do you recall about what time you got there on the evening of June 21st, 1996?

Reported By:
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2556

A. It think it was about 10:30.

Q. And on that occasion did you see someone you knew as Donnie Allen?

A. Yes.

Q. How did you know Donnie?

A. Well, I had just met him that night but he looked familiar and my girlfriends and I needed a partner to play pool, and so when I looked at him, I said, hi, you look familiar, and I asked him if he went to the same school I did and he said yes. So I said, we are about to play pool, do you want to, and he said yes and so then I asked him about some friends that I knew, he knew, and then we just exchanged names and everything of who we knew.

Q. What school had you two gone to together?

A. York Comprehensive High School.

Q. You talked about people that you knew in common?

A. Yes, uh-huh.

Q. What was Donnie's demeanor on that particular evening?

A. He was a really nice guy. He was real timid. He didn't speak much. We just played pool and that was it. He is real quiet. He was a real nice guy.

Q. After you played that one game of pool did you

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 196 of 200

**557**

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2557

see him anymore that evening?

A. No, I did not.

Q. A few days later did you see something that reminded you about him and seeing him that Friday night?

A. Yes.

Q. What was it?

A. Over in York they had flyers over in Eckerd's and Food Lion of him, and so I asked the person in Eckerd's and they didn't know much about it, and then in Food Lion I asked about it again and they said that they are looking for him. And they said if you have any information, just give them a call.

Q. Was that -- did you see that flier on that Sunday?

A. Yes.

Q. I'll show you what has been previously identified and admitted as Government's Exhibit 26A. Take a look at that exhibit. Are you able to recognize it?

A. Yes.

Q. What is that?

A. That's the flier from the -- that they had on the doors, and they had one over at the pharmacy where you pick up your medications over in Eckerd's.

Q. Did you see it both at Eckerd's and another

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2558

store?

A. In Food Lion, yes.

Q. Would you read the flier to us, please, ma'am?

A. Missing, Donnie Allen since 6-29 -- 6-21-96, Friday night, last seen in McConnell, South Carolina around 6:30 to 7:00, in his dark blue Honda Prelude car, has been found in the Charlotte, North Carolina area. 22 years old, 6 foot 1, 150 to 155 pounds. Reward if information leads to finding him. Please call -- do you want me to read out the numbers?

Q. And it listed numbers to include the York County Police or to the Charlotte-Mecklenburg Police Department?

A. Yes.

Q. It had information on there about his mustache being darker and his hairs, and a difference in his hair, and then it says in quotes, please call?

A. Uh-huh.

Q. And that was Sunday or Monday, best of your recollection, that you saw that?

A. I'm going to say it was Sunday. It's just been so long, but I do believe it was Sunday, because Monday, you know, everyone has to work, so I wouldn't be out there.

Q. After having seen the flier that day, what did

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2559

you then do?

A.    I went to my mom and dad's, because I lived in Gastonia and they lived in South Carolina, and so I went over there and I told my mom and dad and they told me definitely call and find out what was going on, so I did.

Q.    Who did you call?

A.    I called the York County PD.

Q.    What information did you provide to York County?

A.    Pretty much the same thing that I just previously just talked about, that I had just met the man, and, you know -- that was it, that I did see him at Coyote Joe's that night.

MS. ROSE:  Thank you.  No further questions.

MS. LAWSON:  No questions.

THE COURT:  Call your witness.

MS. TOMPKINS:  The government calls Bob Hall.

ROBERT A. HOLL, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 199 of 200
560

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2560

Q. Would you state your name, please.

A. Robert A. Holl.

Q. And could you spell your last name for the court reporter.

A. H-O-L-L.

MS. TOMPKINS: Before I begin with him, Your Honor, at this point the government is calling Officer Holl for the limited purpose of the crime scene at Billy Graham and Morrisfield, subject to re-call later on the confession.

THE COURT: All right.

MS. TOMPKINS: Thank you.

BY MS. TOMPKINS:

Q. How are you employed?

A. City of Charlotte, Charlotte-Mecklenburg Police Department.

Q. How long have you been a police officer?

A. Since 1983.

Q. And what is your current employment?

A. I'm assigned to the HITS Unit, Highway Interdiction Traffic Safety, I'm a detective, I investigate traffic fatalities.

Q. In June of 1996 what was your assignment with the Charlotte-Mecklenburg Police?

A. Felony investigations, homicide.