United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2561

Q. And as of June of 1996, how long had you been a homicide detective?

A. Eight years.

Q. By June of 1996, approximately how many homicides had you participated in the investigation of?

A. At least 200.

Q. On Tuesday morning, June 25th, 1996, did you become involved in the investigation of the murder of Donald Lee Allen?

A. Yes, ma'am.

Q. What role were you assigned?

A. I was initially assigned to the processing of the victim's vehicle that had been located earlier that morning.

Q. And actually when you were first assigned, was it a missing persons case?

A. Yes, ma'am.

Q. What did you do first?

A. I met with a detective from the missing persons section of the department. He briefed me as to his involvement. I then made contact with the crime scene technician that was actually processing the car. Shortly after that, which would be approximately 7:30 in the morning, my immediate supervisor was notified by me. He came to the location of the department where the car

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 1 of 286
562

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2562

was assigned, and I was assigned to the case to process the vehicle.

Q. And do you know where the car had been found?

A. Behind Independence Shopping Center, which is approximately the 4000, 5000 block of East Independence Boulevard in Charlotte.

Q. And at the time you were first assigned, where was the vehicle located?

A. At the garage area of the law enforcement center. It was brought in due to inclement weather.

Q. And for what purpose was it brought in?

A. To fingerprint, process the vehicle for any type of evidence that may be inside the car, at that point in time in order to try to find out where the owner of the vehicle was.

Q. What did you do next?

A. Once I learned what had been done with the vehicle and then once I had been assigned to the vehicle itself, I advised the crime scene technician as to what would be collected in the car at that particular time, which included any paper items that were in the vehicle, fingerprinting the car, photographing the car, any blood that could be found in the car, anything that would help lead us to find the missing person.

Q. Okay. Did the crime scene search technician

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2563

advise you about what had been found inside the car?

A. She advised me as to what had been found inside the car and around the car where the car was located at the Independence Shopping Center, which it was located to the rear of the building.

Q. And what else was found in the vicinity of the car at the Independence Shopping Center?

A. Inside a dumpster, a gym bag, a Winchester semiautomatic 12-guage shotgun, bolt cutters, crowbar. Inside the vehicle, when I saw it, along with the papers, a pair of handcuffs hanging from the inside rearview mirror.

MS. TOMPKINS: May I approach the witness, Your Honor?

THE COURT: Yes.

BY MS. TOMPKINS:

Q. I'm going to show you what has been previously marked and admitted as Government's Exhibit 31E1 and ask you if you recognize that?

A. Yes, I do.

Q. What is that?

A. The 12-guage shotgun that was located at the scene of where the vehicle was located.

Q. And is that a full length shotgun, or what had been done to modify it?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2564

A. It had been cut down to an overall length now, whether I measured it originally, 23 inches.

Q. Okay. So the barrel has been sawed off?

A. The barrel has been sawed off, along with a MAG flashlight attached with electrical tape to the end at the time that I observed it, which was mid morning of that day, the 25th, red chips of what appeared to be paint attached to the electrical tape, to the rear of the vehicle in the back, what you would call the trunk area, where the hatch would come up, there were red chips of paint that were located there. There was also a second MAG light that I located up in the passenger compartment of the vehicle.

MS. TOMPKINS: Your Honor, may the witness step off of the witness stand and display that.

THE COURT: He may.

BY MS. TOMPKINS:

Q. Officer Holl, show the jury, as you go past the jury, show them the taped items. Had the stock of that -- I'm not sure what -- the handle of that firearm, has that been cut down as well?

A. Yes. The barrel has been cut, the MAG light, the tip of the lens has been colored red.

Q. Now, when that was first recovered, was that -- the lens of that MAG light intact?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2565

A. Yes, it was.

Q. And since that time has it broken?

A. Correct.

Q. What was your next step in your investigation?

A. Once the processing of the vehicle was completed, I ended up meeting with two of my supervisors, along with the missing persons section. I then contacted ATF, Alcohol, Tobacco, and Firearms, to start a trace on the weapon. By around 9:30 that morning, missing persons investigators were assigned to -- made contact with authorities in Tennessee, because there was a tag on the car, a license plate that was a Tennessee tag that came back stolen. The VIN number for the car did not come back stolen but came back to the now -- the decedent.

I then received a telephone call approximately 10:15 in the morning from an FBI Agent Womble; reference, a case in Roanoke, Virginia where a woman was killed by a shotgun and the vehicle in question that the defendant was driving was a Honda Civic with gold pinstripes. I was also told that the FBI was looking for an individual by the name of Aquilia Barnette.

Q. Is there a way that officers and agents from different law enforcement agencies have access to information, for example, about a stolen car?

Reported By:
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 5 of 286

566

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2566

A. Yes, there is.

Q. Okay. And what is that?

A. NCIC, National Crime Information Center.

Q. And what -- was that one of the ways that Agent Womble knew about the Honda Prelude?

A. Agent Womble was assigned to a task force which our officers were also assigned to, which he had gained information through the task force of our unit working and had heard that we had come in contact with a Honda. The particular car that I was processing was a Honda Prelude with gold lettering on the front and the back of the H for Honda and on the back trunk the word Prelude.

Q. And if officers in Roanoke, Virginia had put information -- could they also put information into that same system that could be accessed by officers anywhere?

A. Anywhere in the nation, yes.

Q. And it was from there that Agent Womble knew that folks in Roanoke were looking for a blue Accord, or a blue Honda, that is?

A. I know that Agent Womble came to me already stating that he was looking for a Honda Civic, and he already had warrants on Aquilia Barnette for the death that occurred in Virginia.

Q. Okay. So the FBI was already looking particularly for the defendant, Aquilia Barnette?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2567

A. Yes, ma'am.

Q. And they knew where he lived, police had the address?

A. Correct.

Q. Okay. Had you been by that address?

A. I went -- during the investigation I went by that address in order to speak to the defendant's mother, and also prior to testifying I took counsel out to that particular address. Even though I had been there, I missed the driveway by a half a block, I had to turn around and go back up to the driveway where the defendant lived at that period of time.

Q. And do you know in 1996 whether or not house numbers were on the mailbox at West Boulevard?

A. When I went out there, there was a mailbox with a post; I didn't see any house numbers on it. The house sits back in the woods.

Q. So can you see the house from the road?

A. No, ma'am.

Q. Do you -- can you tell that there is a house back behind where the mailboxes are?

A. Not during the summer I couldn't.

Q. Now, what did you tell Special Agent Womble when you talked to him about your investigation?

A. At 10:15 I told him everything that I knew at

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 7 of 286
568

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2568

the time, and shortly after 11:00 that morning he arrived at the law enforcement center. I took him down to a secured area where the car was and once again briefed him on what I had at that point in time, and he readvised me that he was looking for the defendant in question.

Q. And was there -- did Agent Womble tell you anything about the type of weapon that was used in the Roanoke murder?

A. Originally on the telephone conversation he told me that it was a 12-guage shotgun that was used and I had told him at that point in time that the 12-guage Winchester had been recovered where the car was located.

Q. Later that day did you learn that Aquilia Barnette had been arrested?

A. I learned that he had been arrested on my way back from McConnell, South Carolina, because I went down to the victim's residence.

Q. For what purpose did you go to McConnell, South Carolina?

A. At that point in time, having a missing person's case and the possibility that foul play was involved, went down in order to process the victim's room, went down to his residence, gained access with his parents, he lived with his parents, had the York County

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Sheriff's Department and Lieutenant Thompson to meet me there along with their crime seen units in order to methanol his bedroom.

Q. What does that mean?

A. It's special tape that is used to lift up any type of hair that may be on dressers, floors, pillowcase, also any combs in order to get any head hair, and also fingerprint the bedroom in order to obtain fingerprints if the time comes that we do find the victim and we can start processing through DNA as to who this individual is.

Q. So it was after you were on your way back from McConnell that you learned that the defendant had been arrested?

A. Correct.

Q. What did you do next?

A. I was instructed to stand by the law enforcement center, that the defendant, along with the FBI agent and one of our officers assigned to the task force were en route out to the possible crime scene of where Donald Allen was located with the cooperation of the defendant.

Q. What did you learn -- when you said en route to the crime scene, where was that?

A. The scene of possibly where Donald Allen was

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2570

located at the intersection of Morrisfield and Billy Graham. And subsequently it was established that the victim was located there. I was directed to get one of our vehicles to go out to the scene, and at 17:40, 20 minutes of 6:00 in the evening, I arrived out there and processed the crime scene.

Q. This is all happening on the same day that you initially were assigned a missing person?

A. Correct.

Q. Now, you all went to Billy Graham and Morrisfield Drive. Who provided the information for you to go out there?

A. Aquilia Barnette.

Q. So he had made a statement to colleagues of yours at the Charlotte-Mecklenburg Police Department?

A. Made statements and took them out to where the victim was located.

Q. Now, did you go out to Billy Graham and Morrisfield Drive?

A. Yes, ma'am.

Q. Where is that intersection located in Charlotte? Pick a point of interest that we would all be somewhat aware of.

A. A half a block away from the entrance/exit to Josh Birmingham Road, which takes you out to Charlotte

Reported By:
800-333-2082  Huseby, Inc., an Affiliate of Spherion  (704) 333-9889  Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 132   Filed 09/23/15   Page 10 of 286
571

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2571

Douglas International Airport.

Q. So out towards the airport?

A. Correct.

Q. How far is that intersection, the intersection of Morrisfield and Billy Graham, from the intersection of Billy Graham and West Boulevard?

A. Eight-tenths of a mile.

Q. And how far is the defendant's mother's home from the intersection of West Boulevard and Billy Graham?

A. One block.

Q. Pardon me?

A. One block.

Q. Now, describe what the intersection of Morrisfield and Billy Graham looked like in June of 1996.

A. West Boulevard is -- or, correction, Morrisfield is two lanes of travel, including the turn lanes, going southbound with one northbound lane, multiple lanes of traffic on Billy Graham, no overhead street lighting, and there is one business that is located directly across the street from where the victim was located about a half a block further north of the intersection, so it's isolated right at the intersection itself.

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 11 of 286
572

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2572

Q. So in 1996 were there any street lights at that intersection?

A. No, ma'am.

Q. And since that time have they put street lights in?

A. I believe six.

Q. I'm going to show you what has been previously marked and admitted as Government Exhibit 34A. Do you recognize what that is?

A. Yes, I do.

Q. What is that?

A. Aerial photograph of the intersection of Morrisfield and Billy Graham where the victim, Donald Allen, was located.

Q. Okay. And is that a photograph that was taken on the day that Donald Allen's body was found at that location?

A. Yes, it was.

Q. And, again, do you note whether or not there are any lights at any of those intersections?

A. The only lights there are the traffic lights. Other than that, there are no street lights.

Q. Now, in contrast to the intersection at West Boulevard and Billy Graham, how did that intersection look in June of 1996?

Reported By:
800-333-2082    Huseby, Inc., an Affiliate of Spherion  (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 162   Filed 09/23/15   Page 12 of 286
573

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2573

A. At the intersection of West Boulevard, on the same side of the street is where you see the vehicles on this particular photograph, eight-tenths of a mile back, so in other words, this direction at the top of the photograph --

Q. Back in this direction (indicating) heading that way?

A. Correct. The intersection has a low income housing project right on the intersection itself.

Q. Is that called Boulevard Homes?

A. Yes, it is. Across the street from that there are numerous single family dwellings, including the defendant's mother's residence that sits back in the woods, and it's heavily lighted with street lights on West Boulevard.

Q. Are there any residences or apartment complexes or businesses close to this intersection?

A. The only business that is here is approximately half a block back up in that direction (indicating).

Q. All right. Now, when you got to that location, what did you do?

A. I was advised by my immediate supervisor where the victim was located. I went over to where the victim was located, which was down a drain runoff culvert on a rock bed. The crime scene technician had not arrived

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2574

yet.

Q. Who was there when you got there?

A. Sergeant Nathy, who was my immediate supervisor, and two homicide investigators.

Q. All right. And so before crime scene search technicians got there, where did you go?

A. I just went over to visually look at it. The scene had already been roped off with yellow banner tape. And once the crime scene technician arrived, I advised her what was going on, and the first thing we did was go in and photograph.

Q. Was the defendant at the scene when you were there?

A. No.

Q. All right. I'm going to show you what's been previously marked and admitted as Government's Exhibit 34B. Describe for the jury what that is.

A. Over at this particular location is where Morrisfield is located. This is the street sign for Billy Graham, so Billy Graham would run in that particular direction. The culvert runs parallel with Morrisfield, cement and structure, it's approximately 100 to 135 feet in length, which it ends down in this general location into a rock bed.

Q. Now, how far -- there is a vehicle that's

Reported By:
800-333-2082  Huseby, Inc., an Affiliate of Spherion  (704) 333-9889  Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 175  Filed 09/23/15  Page 14 of 286
575

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

parked at the side of that photograph.  How far is the roadway from this little culvert?

A.    There is approximately 10 feet of grass and then there is a rock shoulder the width of the vehicle, and then there is one lane of travel.

Q.    And where is the stoplight in relation to this photograph?

A.    Well, the intersection itself would approximately be another 15 feet in that direction.

Q.    I'm going to put back up Government's Exhibit 34A.  Does that show where the -- a car would stop at that red light, at that intersection?

A.    Yes, a car would stop right there.

Q.    And can you see that culvert area from this photograph?

A.    I'm sorry?

Q.    Can you see the culvert?

A.    The culvert starts over in this location, curves down into the trees, and the victim was located right in there (indicating).

Q.    I'm going to show you what has been marked as Government's Exhibit 34C and ask you if you can recognize what that is?

A.    It's the culvert that starts the curve and goes down into where the rock bed is located at the end.

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 15 of 286

576

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2576

Q. About how many feet further down is that from the previous photograph?

A. Approximately 40 feet. You can see at the -- down in this particular location a stain on the culvert, which is blood. The first trail of blood was located approximately 20 feet further up from where the victim was located.

Q. All right. I'm going to show you a photograph that's been marked and introduced as Government's Exhibit 34D. And does that depict -- what does that depict?

A. It depicts the culvert. Morrisfield would be over here, Billy Graham, the 65 feet further south from where the victim was located, and this area right in here is where the trail of blood goes down and --

Q. All right. I'm going to show you another photograph which may help you. What else did you want to comment about that photograph, if anything?

A. My screen went dark.

MS. TOMPKINS: Can we just take a moment and do a little technical something?

THE COURT: Yes.

THE WITNESS: Right there is where the victim was located (indicating).

BY MS. TOMPKINS:

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2577

Q. I'm going to show you now a photograph that's been previously marked and introduced as Government's Exhibit 34E. And what does that depict?

A. Once again, it depicts the same culvert. All of the dark area is blood. There is a large pool of blood that was located in here, a second pool of blood that was located here. All of the blood ran down to this general location. A shotgun shell spent, in other words, had been fired, located at number one, number two, and there was a third one found right in that general area, number three.

Q. All right. I'm going to show you what has been marked and introduced as Government's Exhibit 34F. Does that show a closer view of the two previously identified shotgun shells spent?

A. Yes, ma'am.

Q. And the dark areas, is that blood stains?

A. Correct.

Q. Did you have a crime scene search technician collect those items?

A. Different areas of the blood were swabbed, collected, spent shot shells were collected. There is a shot cup wadding that was located down where the victim was eventually located that was collected, along with a pair of pants that were located to the right of the

Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 17 of 286

578

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2578

culvert as we have been looking at the particular photograph.

Q. Officer Holl, looking at Government's Exhibit 34E one more time, standing there could you see the body of Donald Allen?

A. No.

Q. Okay. Now, I'm going to show you what has been previously marked and admitted as Government's Exhibit 34H, and on that rock in the middle, can you tell what that is?

A. That's part of the shotgun.

Q. Right there?

A. Part of the shotgun shell that was located.

Q. Is that the wadding from the shotgun shell?

A. Yes, it is.

Q. What is wadding?

A. Wadding is part of what keeps the -- your ammunition inside the red portion. You have the brass portion that the hammer will strike against and then the other end is where your ammunition will come out of, and the wadding and the cup end up holding everything intact.

Q. Now, I'm going to show you a photograph that has been previously marked and introduced as Government's Exhibit 34Q. Are those markings made by

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2579

crime scene search?

A.    Yes, they are.

Q.    Okay.  And Numbers 2, 3, and 5, are those the shotgun shells found?

A.    Correct.

Q.    The three spent shotgun shells?

A.    Yes, ma'am.

Q.    So that third shell casing was found further down in the culvert?

A.    By a couple of feet from Item Number 3.

Q.    Now, at the bottom of that culvert, what did it look like, what did it end into?

A.    It ends into a large rock bed.  The culvert itself is a steep pitch going downhill, and at the bottom it turns into rock, for example, to slow down the water runoff into the natural area.  There is approximately another 15 to 20 feet of rock bedding.

Q.    All right.  Now, at the bottom of the rock culvert, what did you see?

A.    The victim, Donald Allen.

Q.    And describe the positioning of his body.

A.    The victim was located on the rock bed itself just off the culvert.  His feet were towards the rock culvert, his head was down into the wooded area.  The victim was located on his back, his left leg was

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 19 of 286

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2580

straight, out to a 45-degree angle. His right leg was bent slightly at the knee, but the kneecap was still semistraight in front of him. His left arm was bent at the elbow with a forearm pointing up in a direction like this bent out to the side. The right arm was slightly bent at the elbow with his hand resting on his right thigh. His head was tilted, canted slightly to the left.

Q. All right. I'm going to show you what has been previously marked and admitted as Government's Exhibit 34I and ask you if you recognize what is depicted in that photograph?

A. The victim, Donald Allen, on his back.

Q. And where in that photograph would the concrete culvert have ended?

A. It's not in there.

Q. Okay. It's not in this photograph, it's further back?

A. It's further -- the culvert is in that direction.

Q. Okay. And the rocks that you mentioned, are those the rocks that we see in the bottom of that photograph?

A. Yes, ma'am.

Q. I'm going to show you what has been previously

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2581

marked and introduced as Government's Exhibit 34J and ask you to describe what that is?

A. Once again, it's the victim, Donald Allen, laying on his back in a thick wooded area, laying on top of the rock.

Q. All right. I'm going to show you what has been previously marked and introduced as Government's Exhibit 34K. And what is depicted in that photograph?

A. The victim, Donald Allen. He was wearing what I would call a golf shirt, pullover shirt with a small collar on it, three buttons at the top. The top button was not buttoned, the other two were, blue jeans, brown belt, the shirt was tucked in. The color of the shirt I could not depict because of the decomposition of the body. Dark purple and white Nike Air Pegasus sneakers, with -- the right shoe was untied, left shoe was tied, watch on the left wrist, gold facing with a brown strap, and a gold necklace around the neck that was tucked inside the shirt.

Q. How many days had it been since Donald Allen was missing?

A. From the 22nd just past midnight, which was a Saturday, and located the late afternoon, early evening of the 25th. Weather temperatures, or weather at the time, clear, same temperature that it is outside today.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2582

Q.   I'm going to show you what has been previously marked and introduced as Government's Exhibit 34L.  From what angle, if you know, was that photograph taken?  Where would Billy Graham and Morrisfield be from there?

A.   Billy Graham Parkway would be this line right here (indicating), 65 feet back from where the victim was located, myself and another investigator actually measured that ourselves because of the thickness of the trees and the brush, so we could get in there and do it.

Q.   All right.  I'm going to show you now a photograph marked and introduced as Government's Exhibit 34M, and, again, if you could orient that photograph to Billy Graham and Morrisfield, please.

A.   This is part of the rock bed.  This is going up a steep embankment to Billy Graham.  Morrisfield would be over in that direction.

MS. TOMPKINS:  And could you clear that just a second.

BY MS. TOMPKINS:

Can you point out for the members of the jury the body of Donald Lee Allen in that photograph.

A.   (Indicating).

Q.   I'm going to show you a photograph previously marked and introduced as Government's Exhibit 34N and ask you again to orient that photograph to the roadway.

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2583

A. Billy Graham Parkway is up in there and we are standing out towards Morrisfield shooting down into the trees.

Q. All right. And can you tell in that photograph where Donnie Allen's body is?

A. No, you cannot.

Q. Pardon me?

A. No, ma'am.

Q. All right. What did you do next after crime scene search took photographs and collected evidence?

A. Went back -- I went to --

Q. Let me ask you this: How were you dressed out there on the scene that day?

A. Coat and tie; and working the crime scene itself, went into a biohazard outfit because of the decomposition of the victim.

Q. Did you take measurements?

A. Yes.

Q. Okay. And what was the distance between the first blood spot and Donald Allen's body?

A. 20 feet.

Q. And what about the second large blood spot and Donald Allen's body?

A. Approximately 10 feet.

Q. And the shell casings were arrayed down the

Reported By:
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889
800-333-2082                                          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 23 of 286
584

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2584

culvert, is that right?

A.   Yes, ma'am.

Q.   And did you later continue your investigation back at the law enforcement center?

A.   Yes, ma'am.

MS. TOMPKINS:  That's all the questions I have for Investigator Holl at this time, subject to re-call, Your Honor.

MR. BENDER:  I have no questions of Mr. Holl at this time.

THE COURT:  All right, sir, you may step down.

Members of the jury, we will take our evening break at this time.  Let me remind you to keep an open mind about the case.  Do not discuss it.  Remember the other instructions that I have given you.  Avoid any news accounts of it.  Remember the other instructions I have given you.  Thank you very much for your attention to the case today, and we will see you in the morning. It will be 9:30 instead of 9:00 tomorrow.  Thank you very much.

(The jury left the courtroom.).

THE COURT:  The record will reflect that Mr. Huseby has been good enough to come in this afternoon to do the court reporting.  Ms. Kelly won't be

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/13   Page 24 of 286

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2585

with us for this case any longer.  Ms. Nuccio was here this morning and yesterday morning.

Anything before we recess for the evening?

MS. TOMPKINS: No, Your Honor.

MR. BENDER:  No, Your Honor.

THE COURT:  Thank you.


I, Scott A. Huseby, do hereby certify that the foregoing transcript is a true and correct transcript from the record of proceedings in the above-entitled matter.

_7-30-02_

SCOTT A. HUSEBY, RPR, CSR                    DATE

Notary Public

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA      )      DOCKET NO. 3:97-cr-23-V
                              )
      vs.                     )
                              )
AQUILIA MARCIVICCI BARNETTE,  )      VOLUME 13
                              )      MORNING
            Defendant.        )
_____)

TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
JULY 30, 2002

<u>APPEARANCES</u>:

On Behalf of the Government:

      ANNE M. TOMPKINS, ESQ.
      JILL WESTMORELAND ROSE, ESQ.
      227 West Trade Street, Suite 1700
      Charlotte, North Carolina

On Behalf of the Defendant:

      JEAN B. LAWSON, ESQ.
      P.O. Box 472106
      Charlotte, North Carolina

      HAROLD J. BENDER, ESQ.
      200 North McDowell Street
      Charlotte, North Carolina

                  Cheryl A. Nuccio, RMR-CRR
                   Official Court Reporter
                 United States District Court
                  Charlotte, North Carolina

FORM FED ⊕ PENGAD • 1-800-631-6989

JUL 3 1 2002

TUESDAY MORNING, JULY 30, 2002

(Jury not present.)

THE COURT: The parties ready to begin?

MS. TOMPKINS: Yes, Your Honor. I do have a couple of matters.

THE COURT: All right.

MS. TOMPKINS: Officer Krall, K-r-a-l-l, who testified in the guilt phase of the trial and was scheduled to testify today, had emergency abdominal surgery. I talked to her this morning and she's bedridden and she's unable to come in and testify. Her testimony was finding Donnie Allen's vehicle, and it's -- there's really no substitute person to testify to that.

And what the government proposes is that we read her trial testimony into evidence; that I would ask the questions and Ms. Rose would answer the questions verbatim as they came in in the guilt phase, both direct and cross, in lieu of her testimony. And that we show her -- the photographs and the evidence that came in through her in the trial.

And we did talk to defense counsel about that. They don't have any problem with us doing that.

THE COURT: All right. Very well. Would that be your next witness?

MS. TOMPKINS: No. It will be either late this morning or early this afternoon.

THE COURT: Okay.

MS. TOMPKINS: The only other thing is when Dr. Sullivan testifies, I've put this podium out here in the middle of the room and I'm going to at the appropriate time in his testimony bring it here in front of the jury box and put a portable x-ray reader in front of the jury box so that -- put it up high so that they can see the x-ray as he talks about it, and then we'll take that podium out of the courtroom.

THE COURT: All right.

MS. TOMPKINS: Also, just for point of clarification, when Ms. Rose and I do Officer Krall's testimony, would you like us to remain seated at the table or have Ms. Rose take the witness stand?

THE COURT: I think that's what you might do.

MS. TOMPKINS: Have Ms. Rose take --

THE COURT: If there is no objection.

MR. BENDER: No.

THE COURT: All right.

MS. ROSE: The witness stand?

THE COURT: Yes.

MS. ROSE: Okay.

MS. TOMPKINS: Thank you, Your Honor.

THE COURT: Now, the doctor, is that one of those who was objected to in the motion in limine?

MS. LAWSON: Yes, Your Honor.

MS. TOMPKINS: Yes.

THE COURT: Right. Well, again, the court having done the balancing test, prejudicial effect against probative value, finds that it's more probative than prejudicial.

MS. LAWSON: May it please the court, just one clarification. The photographs were not admitted, the photographs taken during the autopsy.

MS. TOMPKINS: Right.

MS. ROSE: We're not using those.

MS. LAWSON: You don't endeavor to do that again.

THE COURT: I beg your pardon?

MS. TOMPKINS: In Dr. Sullivan's testimony, there was a motion in the guilt phase of the trial in which autopsy photos of Donald Allen's autopsy were disallowed, and the government is not going to be attempting to get those into evidence here in the sentencing phase.

THE COURT: All right.

Okay. May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: You may call your next witness.

MS. TOMPKINS: The government calls Todd Nordhoff.

TODD NORDHOFF,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q.   State your name, please, and spell your last name for the court reporter.

A.   My name is Todd Nordhoff, N-o-r-d-h-o-f-f.

Q.   And what do you do for a living?

A.   I'm a firearm and tool mark examiner with the Charlotte-Mecklenburg Crime Laboratory.

Q.   How long have you been in that position?

A.   For sixteen years.

Q.   Tell the jury what education and training you've had in the field of firearm and tool mark identification.

A.   I have a bachelor of science degree in psychology from the University of Michigan.  I completed master's course work in forensic science at Michigan State University.  I have done internships with the Michigan State Police Laboratory in East Lansing, Michigan, in firearm and tool mark identification, and with the Charlotte Crime Laboratory here in Charlotte in the firearm and tool mark identification.

I have attended the FBI academy in firearm and tool mark related training.  I have attended numerous training seminars put on by the Association of Firearm and Tool Mark Examiners. And I did approximately two and a half years of on-the-job training.

Q.   Do you have continuing education requirements that you --

to stay certified?

A.    I am not certified.

Q.    Is there any certification in your field?

A.    There is.  They just started it within the last two or three years and I have not gone through the certification program yet.

Q.    Have you kept your education up during the course of your sixteen years?

A.    Yes.  I attend training seminars whenever I'm allowed.

Q.    Okay.  And during your sixteen years at the Charlotte-Mecklenburg Crime Lab, approximately how many firearms have you examined?

A.    I have no way of knowing exactly.  Several thousand.

Q.    And how many times have you testified in court as an expert -- as a firearm and tool mark identification expert?

A.    Approximately a hundred thirty-five.

Q.    Now, have you also given opinions in your expert testimony about the distance from the muzzle of the firearm to the object fired at?

A.    Yes, I have.

        MS. TOMPKINS:  Your Honor, at this time we would tender Todd Nordhoff as an expert in firearm and tool mark identification.

        THE COURT:  All right.  He will be so declared.

        Now, members of the jury, the witness here has been

described as an expert in tool mark and firearms examination. The court will instruct you that such a witness is permitted to testify even though he did not actually witness any of the events involved in this trial. A person's training and experience may make him an expert in a technical field. The degree of expertise is a relative thing, however, and it's for you to evaluate. In other words, the law allows such a person to state an opinion here about matters within that particular field.

Merely because the witness expresses an opinion does not mean, however, that you must accept this opinion at all events. The same as with any other witness, it's up to you to decide whether to believe the testimony and whether you choose to rely upon it. Part of that decision will depend on your judgment about whether his background of training and experience is sufficient for him to give the expert opinion that you hear. You must also decide whether his opinions are based on sound reasons, judgment, common sense, and information. Thank you.

BY MS. TOMPKINS:

Q.   Now, Mr. Nordhoff, did you conduct analysis of evidence gathered by crime scene search and other investigators in the case of Aquilia Marcivicci Barnette?

A.   Yes, I did.

Q.   Did that analysis include the analysis of a firearm,

spent shotgun shells, live ammunition, and a man's shirt?

A.    Yes, it did.

Q.    Did that also include wadding, shotgun pellets, and shot cups?

A.    Yes.

Q.    Did you prepare a report of your findings?

A.    I prepared, I believe, three different reports.

Q.    Okay.  I'm going to show you Government's Exhibit 40 which has been previously admitted into evidence.  Is that the report that you -- or at least page 1 of a crime lab report that you did on your findings in the case of Aquilia Barnette?  Can you see it on your screen?

A.    Yes, I can.  I'm just --

Q.    Okay.

A.    Yes, that's the first page of one of the reports.

        MS. TOMPKINS:  Can you zoom out so we can see the whole thing.

Q.    Is that your signature at the bottom of that page?

A.    Yes, it is.

Q.    Now, did you analyze a firearm?

A.    Yes, I did.

        MS. TOMPKINS:  May I approach the witness, Your Honor?

        THE COURT:  Yes.

Q.    Let me show you what's been previously marked and

admitted as Government's Exhibit 31E1. Is that the firearm that you analyzed?

A. Yes, it is.

Q. Okay. I think the tape has gotten old --

A. Yes.

Q. -- on that and it's not taped on anymore.

What types of analysis did you perform on that firearm?

A. I examined it to determine what it is; that it was safe for me to test fire it, and I test fired it.

Q. Okay. And was it operable?

A. Yes, it was.

Q. Now, did you measure the length of the barrel?

A. Yes, I did.

Q. And for what purpose?

A. To determine how long it was, whether it met legal statute.

Q. All right. And what was the barrel length?

A. Fourteen inches.

Q. And was that the legal or illegal length?

A. That's illegal.

Q. What else did you do on your analysis of the firearm?

A. As I said, I test fired it and obtained discharged shot shells for later comparison to evidence shot shells.

Q. Okay. Did you also receive spent shotgun shells from crime scenes both in Charlotte and in Roanoke, Virginia?

A.    Yes, I did.

Q.    And the purpose of your discharging shotgun shells was for that comparison?

A.    Yes.    Other than the pure operability of the firearm, that's correct.

Q.    Describe for the jury the process that you go by and what happens after you've shot a shotgun shell for comparison purposes.

A.    Okay.    I guess, starting from the beginning, you would load the shotgun shell in the magazine.    This particular shotgun holds two in the magazine and one in the chamber.    I generally shoot two at a time so that I can compare my tests together.

So what I do is load two into this magazine and then pull the bolt back.    It's kind of hard to deal with the ties here, but pull the bolt back.    One of the live shot shells pops up; and when I let go of the bolt, it slides it into the chamber. At that point pull the trigger.    The pellets go out the end of the bore.    The discharged shot shell is extracted from the chamber by a little hook here, and it strikes another piece of metal and throws it out the side of the shotgun.    At that point another live shot shell comes out of the magazine; and when the bolt slides back closed, it chambers it making it ready to fire again.

Do you want me to explain the comparison then or --

Q. Yes. Tell the jury after you've shot, how do you -- how do you retrieve the shell or the spent -- the casing and by what process do you make that comparison?

A. Okay. We would pick up the shot shell that would fall on the floor in our shoot room. We shoot into a large rubber trap -- we call it a trap -- that safely captures the pellet. After we shoot, the shot shells are discharged from the side of the firearm. We just pick those up off the floor.

And what I look at on those is I compare the two shot shells under a comparison microscope to look at marks that are left by different parts of the shotgun. When the shotgun is fired, the -- as I said, the pellets all come out the muzzle. The shot shell pushes back against this part here which is the bolt.

When that bolt was manufactured, it was milled in a process where it was ground and the milling of that leaves little tiny scratch marks on it. Those scratch marks are unique to every gun. No two milling processes are the same because it's a grinding type stone or harder metal, or whatever they use to do the milling. And it's a random process of the stone or the grinder against the metal here in the bolt and the surface is unique to this gun.

And what happens, when that shot shell pushes back against it, it leaves impressions in the primer of the shot shell and sometimes also on the outer portion of the case

head.

What I do is compare those marks under a comparison microscope which is basically two microscopes side by side and we put one under each side and look at the tiny little marks that are impressed in the shot shells. And if I can get those to agree from one to the other on my test, then I know that the shotgun is making reproducible marks from shell to shell to shell.

So what I do then is compare one that I've fired from the gun to one that was sent to me as evidence to determine whether or not it was fired in the gun by looking for those -- that same set of marks.

Q. All right. Now, what type of shotgun is that?

A. It's a Winchester Model 140 .12 gauge semi-automatic shotgun.

Q. Okay. Now, let me take you to page 2. And did you receive from police -- go ahead and zoom in a little bit on that, Jan -- discharged .12 gauge shotgun shells?

A. Yes, I did.

Q. And did you go through that process in order to determine whether those shotgun shells had been fired from that shotgun?

A. Yes, I did.

Q. And what was your -- what were those findings?

A. That the shot shells were discharged in this shotgun.

Q.   And did you receive those shotgun shells from both the crime scene at Morris Field and Billy Graham Parkway and in Roanoke, Virginia?

A.   Yes, over a period of time.

Q.   Okay.  Now, what is wadding?

A.   Wadding is a part of the shot shell that sits between where the powder is in the bottom -- I don't have one.  If you can imagine a canister, a large size.  You have the primer that I was speaking of at the bottom and then there's powder and then there's the wadding.  It's a, in this case, plastic buffer, and then on top of the wadding sits a shot cup that protects the barrel when it kind of -- when it goes out from the chamber through the barrel, it protects the barrel from the leading that would be produced with the pellets which are inside the shot cup.  So the shot cup and the pellets all get pushed out and the wadding is the cushion between the powder and the shot cup.

Q.   And does that project out as well?

A.   Yes, it does.

Q.   And so the result after a shotgun is fired is that the shell casing is present and the wadding separates those pellets?

A.   That's correct.  The shot shell in this case, since it ejects from the gun, would be present.  Not all shotguns do.  Double barrel shotgun, you have to break it open manually and

take the shells out. Or a single shot top break, something like that. But in this case it's a semi-automatic so that it ejects the shells automatically.

Q. Are you able to determine where the wadding comes from in a particular shot shell?

A. A particular shot shell? No.

Q. And what analysis can you do with wadding?

A. Generally with wadding, I would look at it to determine who the manufacturer was and what caliber it was. That's generally all we can do. However, sometimes if the barrel has been sawed off and it's real rough at the muzzle, it will leave marks that I could match back to that muzzle, but that's rare.

Q. Okay. Now, you mentioned about this barrel being sawed off. What is the effect of sawing off a barrel from a shotgun?

A. One of the major effects in terms of ballistics is that the pellets, when they leave the barrel, they spread out more quickly. The longer the barrel -- they spread out in a cone shape as they leave the barrel. And the longer the barrel is, the more narrow that cone is. So it would -- the pellets would tend to scatter more quickly with a shorter barrel.

Q. So the spray pattern is wider?

A. That's correct, yes.

Q. Okay. And would the distance between the muzzle and the

thing or person shot, would you be able to look at that spray pattern to make a determination of distance?

A. Based on test firing the weapon with similar ammunition, yes.

Q. Now --

MS. TOMPKINS: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. I'm going to show you what's been previously marked and introduced as Government's Exhibit 31J and ask you if you recognize that? The control number is on the back.

A. Yes. This is an envelope which I received pursuant to this case previously. It's identified as containing a live Federal shot shell from the center console.

Q. Okay. Is that from -- who collected that?

A. It's A.C. Ray is --

Q. Crime scene search technician?

A. -- the crime scene search technician, yes.

Q. And did you note that on page 1 of your -- of the report that you received that?

A. (No response.)

Q. At number 18.

A. Yes, that's number 18. That's the first item.

Q. And is that consistent with the kind of shot shell that would be fired from that shotgun?

A. Yes, it is.

Q. And I'm going to show you now what's been marked as Government's Exhibit 31L. Do you recognize that?

A. Yes. This is an envelope also which I received.

Q. And where did -- and what does it contain?

A. It's identified as containing two live Federal shot shells from the shotgun magazine.

Q. Okay. And did those shot shells come from the magazine of that firearm?

A. They were identified to me as having come from that, yes.

Q. Okay. And are they consistent with the type of shells shot from that firearm?

A. Yes, they are.

Q. All right. And the shell casings that you got from crime scene, those were all consistent as being shot from that firearm; is that right?

A. They were -- they were all the correct caliber and they were indeed fired from this.

Q. Okay. Based on --

A. Within the shotgun.

Q. Based on your comparison microscope analysis?

A. Yes.

Q. Okay. Did you also conduct an analysis of a garment worn by Donald Allen?

A. Yes, I did.

Q. Okay. For what purpose?

A. For the determination of primarily muzzle to target distance or garment distance.

Q. And show the jury how that is done.

A. Okay. What I do with that is I examine the -- in this case with the shotgun, the pattern or the hole in the garment and get the general size and the characteristics, whether it's a single hole or a lot of little tiny holes from a lot of pellets.

And then what I will do is take the suspected firearm and ammunition that's similar to what was used in the shooting case and I will do test fires at different distances starting -- depending on the size of the pattern that I have in the evidence, from contact and go out until a point at which the pattern is larger and I can say certainly that it had to have been closer than that spot or that distance. I would, depending on how many live shells I have and factors like that and how much of the material I have to shoot into, I shoot sometimes, you know, three or four, sometimes five or six different shots at different distances trying to bracket the distance where the hole or holes in the evidence have to be within the close and the -- the fire range of that bracket.

Q. Did you use similar ammunition?

A. Yes, I did.

Q.   Okay.  You didn't use the live ammunition that was recovered; is that correct?

A.   No, I don't generally like to use the evidence ammunition unless it's absolutely necessary.  If I can go out and buy a box similar of the same type, the same loading, then I would use that preferably because we don't like to destroy evidence if we don't have to.

Q.   And in your test firings, what distances did you do test firings against cloth for your comparison purposes?

A.   In this case I shot at one, two, three, four, five, and six feet.

Q.   Okay.  I'm going to show you a photograph that's been previously marked and admitted as Government's Exhibit 39A. Did you analyze the garment worn by Donnie Allen?

A.   I examined the shirt represented by this photograph --

Q.   Okay.

A.   -- that was identified as being worn by Donnie Allen.

Q.   And describe for the jury how you conducted your analysis using the test firings that you'd done in comparison with this garment.

A.   Okay.  As I said before, I looked at the holes in the garment.  And primarily here we have single holes, single large holes with small satellite holes around them.  And so what I did was when I -- I test fired my tests into cloth.  It was a similar type cloth to what the shirt was made of.  And

at the different distances. And then I compared the holes in the cloth that I shot versus the holes in the shirt here.

Q. All right. And take each of these one at a time and describe for the jury the results of your analysis.

A. Okay. Well, the results are pretty much the same for -- are the same for all three shots --

Q. Well, let me stop you. One of the holes, this hole is elongated. Why is that?

A. That would be consistent with the shot not coming straight into the garment. It would be consistent with the shot coming in at an angle; and because of that the -- more of the material is taken out as the pellets go through. But you notice it's about the same width as the other two so that tells me that that's what happened as opposed to it being further away where the hole would be larger all the way around, it's the same width, and it's just a glancing type shot as opposed to a direct entry type shot.

Q. All right. And the other two holes here and here, the fact that they're round, what does that tell you?

A. That they are more or less straight into the garment as opposed to an angle entry.

Q. All right. And based on that, there were three shots; is that correct?

A. That's correct.

Q. Now, tell the jury what the results of your analysis were

in terms of your opinion as to the distance from the muzzle to this shirt.

A. Okay. Based on my testing with the shotgun and like ammunition, I determined that the distance was greater than contact but less than five feet.

Q. And how is that?

A. As I said -- well, contact -- a contact shot tends to just rip all the fabric and just really shreds it up. I've seen a lot of contact shots and I know it's not a contact shot based on that. And from one, two, three, four, five, at five feet I started getting significant pellet -- lots of holes around the main hole. Not just one or two holes, but lots of holes around the main hole. And at six feet it was even greater.

So I can say with certainty in my -- to my training and experience that these holes were made from a distance of less than five feet but greater than contact.

Q. All right. And let me just show you, I'm going to show you a close-up of this hole right now. That's Government's Exhibit 39D. And is there any spray pattern or pellet holes outside of the main hole?

A. No. There is -- you can see it's kind of shredded around the outside, but there are no holes, small satellite holes around that hole.

Q. Okay.

A.    The large hole.

Q.    And based on your test firings, that shows you less than five feet; is that correct?

A.    That's correct.

Q.    Okay.  And I'm going to show you what's been previously marked and admitted as Government's Exhibit 39E, the second hole.  Now, there are two smaller holes.  Are those pellets necessarily?

A.    No.  They -- actually, they're elongated -- or the one is elongated on the lower left there.  That may have been caused by the wadding or the shot cup as it was striking the garment.

Q.    Okay.  So that hole is consistent with the other hole in terms of the distance.

A.    Yes.

Q.    Okay.  And that distance of greater than a contact wound and less than five feet, is that consistent for all three?

A.    Yes, that's correct.

        MS. TOMPKINS:  Thank you.  That's all the questions I have.

                    CROSS EXAMINATION

BY MR. BENDER:

Q.    Mr. Nordhoff, when the shotgun shell is ejected, is it ejected to the right and slightly backward?

A.    Not necessarily backward.  It can be backward, forward or

just straight out. It varies from gun to gun and from shot to shot sometimes.

Q. When you test fired it, which way did the shotgun shells eject?

A. To the right, but I couldn't tell you, I don't remember whether it was forward or backward.

Q. And depending on what it may strike on the surface, on the ground, depends on where it ultimately locates, right?

A. Yes, that's correct. What the surface of the ground is, whether it bounces, whether it rolls; or if it's a soft surface, it may just stay right where it lands.

Q. Okay. And did you receive these shotgun shells, the spent shells, from latent print examination?

A. Some of them I did. I'd have to check exactly which ones in my notes.

Q. If you could.

A. Okay.

Actually, I received the live shot shells from latent prints. The discharged shot shells I did not -- did not go to fingerprints that I know of.

Q. Okay. You didn't send them there after your examination?

A. No, I didn't. After I examined them, I would have handled them and probably the only fingerprints they would have found would have been mine.

MR. BENDER: Okay. Thank you.

MS. TOMPKINS: I just have one follow-up, Your Honor.

REDIRECT EXAMINATION

BY MS. TOMPKINS:

Q. The location of the spent shells, does that have any -- is that of any help to you in determining the distance between muzzle and point of contact?

A. No.

MS. TOMPKINS: Thank you.

MR. BENDER: Nothing further.

THE COURT: You may step down.

THE WITNESS: Thank you.

(Witness stepped down.)

MS. TOMPKINS: Government calls Dr. James Sullivan.

JAMES MICHAEL SULLIVAN,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. Can you state your name, please.

A. Dr. James Michael Sullivan.

Q. And where do you work and what's your position there?

A. I'm a forensic pathologist employed as medical examiner for Mecklenburg County.

Q. All right. Are you licensed to practice medicine in

Q. All right. Did you conduct an autopsy on a person that was identified as Donald Lee Allen?

A. Yes.

Q. And when was that?

A. June 26, 1996.

Q. And was the identification of Donald Lee Allen later confirmed by the use of dental records?

A. Yes.

Q. Did you prepare an autopsy report to detail your findings?

A. Yes.

Q. I'm going to show you what's been marked as Government's Exhibit 43A. Is that the autopsy and the report that you conducted on Donald Lee Allen?

A. This is part of it. This is actually that part called Report of Investigation by Medical Examiner, but it's part of the overall report.

Q. Okay. Now, describe for the jury what you observed about the body of Donald Lee Allen.

A. The examination showed the body of a young adult white male in a state of marked decomposition with three gunshot wounds to the body. All of the wounds were to -- directed to the right side of the body.

FORM FED ® PENGAD • 1-800-631-6989

Q. Keep your voice up, please.

A. Yes. Three shotgun wounds to the body. All three wounds were directed to the right side of the body. They included a shotgun wound to the right shoulder, a shotgun wound to the right upper arm, and a shotgun wound to the right back, the right chest. All of the wounds appeared to be of close range.

Q. All right. Did you prepare a diagram of your findings?

A. Yes, I did.

Q. I'm going to put that diagram on the screen. Can you see that?

A. Yes.

Q. Can you clear that screen. There's a mark on it.

(Witness complied.)

Q. Thank you.

Now, you mentioned that there were three shotgun wounds to Donald Allen's body. Is there any way for you to make a determination about the order of those shotgun wounds?

A. No, there's no way to do that.

Q. And did you label those wounds arbitrarily?

A. Yes.

Q. Now, you had mentioned that the shotgun wounds were close range. When you say close range, how do you make that determination and what do you mean by close range?

A. In this case my estimate was that all of the wounds --

the distance from the barrel to the skin surface was under three feet. The estimate of the range is made based on usually the configuration of the wound on the skin, the entrance wound site, the size of the wound, and the shape of the wound.

Additionally, in this case I did remove the shirt from Mr. Allen and looked at the shirt briefly to help ascertain an estimate of the range since two of the wounds had some deformation due to decomposition. The shirt was helpful in establishing that all three of the wounds seemed to be of the same range.

Q. All right. Now, did you observe the presence of wadding in any of the wounds?

A. Yes. I recovered plastic wadding material from what was labeled shotgun wound number 1 and what was --

Q. Let me just stop you quickly --

A. Yes.

Q. -- and ask you if that was any help in making a determination about the range of the shot?

A. Yes, that also can aid. Wadding is usually not found in wounds if the distance from the barrel to the skin is greater than five feet. The wadding will follow the pellet charge into the wound if the distance is closer than five feet in most circumstances.

Q. All right. And would it be fair to say that the smaller

the hole for a shotgun wound, the closer the range?

A.    Yes.

Q.    And did you make those observations when you did your autopsy?

A.    Yes.

Q.    Now, did you have -- what problems, if any, did you have in making your -- in your examination in making the determination of range?

A.    Well, again, because of the decomposition present and what is destruction of tissue by insects after death which routinely occurs with decomposition, two of the entrance wound sites were altered from their original configuration, basically enlarged.  That would have been what was labeled shotgun entrance wound site number 2 and number 3.  The shotgun wound entrance site that was labeled number 1 retained fairly clear rounded and tight --

Q.    Show on the diagram where shotgun wound number 1 is.

A.    Be on the back outer aspect of the right shoulder and that was a round, smooth margin wound of a fairly small diameter (indicating).

Q.    The wound was of a small diameter?

A.    Yes.

Q.    And was the entry wound on the front or the back of this person?

A.    Toward the back of the right shoulder.

Q. All right. Now, what other observations did you make about shotgun wound number 1 on Donald Allen?

A. This wound was directed primarily to the left and slightly forward and slightly upward. It caused fracturing of the top end of the right upper arm bone, the humeral head.

Q. Tell the jury what the humeral head is.

A. The humerus is the upper arm bone, and the top part of it is a rounded bone that's essentially the ball of a ball and socket joint, and that is called the humeral head. That was fractured and dislocated from the rest of the shaft.

The pellet charge continued, as I said, primarily to the left and caused injury around the outer aspect of the right collarbone in soft tissues there, which is where I recovered the wadding we referred to, as well as a sample of pellets from that wound.

Q. All right. Now, in your autopsy, what observations did you make about the range for this particular wound?

A. Well, again, that characteristic of that size diameter of a wound that's fairly smooth margined essentially does not show any evidence of a spread out of pellets --

Q. Okay.

A. -- causing satellite pellet wounds. In terms of forensic pathology, that's a close range wound and generally with most shotguns, under three feet. May be some variance, obviously, with different weapons and ammunition, but an estimate would

be for that sort of wound, under three feet.

Q.    Okay.   Could you clear that screen and then go to shotgun wound number 2 on the body of Donald Allen and describe your findings.

A.    Shotgun wound number 2 was to the right arm with the arm in what we call anatomic position, which would be as it's displayed here in this diagram with the palm facing forward, which is usually not how most people are carrying their arm, but we describe the wound in anatomic position.

The wound is directed from the back forward.  And the entrance site, again, is enlarged due to the state of decomposition of the body.  Again, looking at the shirt, I could tell that the entrance wound site on the shirt was exactly the same in terms of the width or diameter as shotgun wound number 1.  So even though the wound has been enlarged due to decomposition, I give the same estimate of range of a close range wound.

This wound, as I mentioned, the pellet charge was directed essentially forward.  With the arm in the usual carrying position turned in, it would be more likely directed to the left.  And this pellet charge caused fracture and dislocation of the shaft of the humerus, that is, the upper arm bone and injuring --

Q.    When you say fracture and dislocation, was that -- the upper arm bone was broken?

A.    Yes, completely broken.

Q.    And separated?

A.    And separated.  An injury to the soft tissue in that area.  There was a partial exit site on the front of the arm through which at least some of the pellet charge exited.  I did recover a sample of pellets in the soft tissues of the right upper arm.  And I did not see any evidence of plastic wadding in that wound.  It may have exited.

Q.    Okay.  Was that a through and through wound?

A.    Well, again, this is a partial exit.  There are still --

Q.    Okay.

A.    There's still a good bit of the pellet charge in the arm, but a portion of the pellet charge had exited.

Q.    Now, clear that screen, if you would, and go to shotgun entrance site number 3.

A.    Shotgun wound number 3 was to the chest.  The entrance site was on the far right side of the upper back.  This wound also, the entrance site was enlarged due to the factors of decomposition.  And again, I made my estimate of the range based on looking at the entrance site in the shirt, which, again, seemed to be exactly the same diameter and width as shotgun wound number 1.

This wound was directed primarily to the left, slightly forward and slightly upward.  It caused fracture of several ribs on the right back and the posterior chest.  And then

pellet charge continued with pellet injury to the right lung and to the liver. The liver will extend up into the -- what you would think of as the chest cavity. The top of the liver will extend upward into that chest cavity. And the top part of that had sustained pellet injuries.

And I recovered a sample of pellets and, again, plastic wadding material from that wound.

Q. Did you -- of the pellets and wadding, did you collect that and submit it to the police department?

A. Yes.

Q. Let me first show you what has been previously marked and admitted as Government's Exhibit 34K. You had talked about decomposition. What in this picture will show you the cause of that decomposition?

A. Well, the picture of the body shows the effects of decomposition. One is a dark discoloration to the skin. During decomposition -- that is, tissue and fluids in the blood break down. Included in that is hemoglobin in the blood and will often cause a discoloration, dark brown or green or dark red discoloration. At the same time there is bacterial proliferation and it produces gas and will cause distension of the tissues of the body. The body beings to appear puffy.

And additionally, in this photograph, the -- some of the white material seen on the upper chest near the armpit area, that is maggot activity.

A.    That's correct.  It should be just one shaft.  It's fractured in the middle and separated.

Q.    All right.

A.    Then this cluster of pellets here is that associated with what was described as shotgun wound number 3.  It has caused fracturing of ribs toward the right side of the back and is directed to the left, slightly upward and slightly forward.  It caused pellet injury to the lung and to the liver.  In this area it's a little bit difficult to explain three dimensionally, but the lung will come down approximately this far in the body and the dome of the liver is curved and sits up underneath the diaphragm into what you would think of as the chest cavity.  So in this area the liver and the lung, so to speak, overlap two dimensionally and the pellet charges caused injury to both (indicating).

Q.    Now, with each wound do you have an opinion about the blood loss from each of those wounds?

A.    Well, there would be fairly rapid blood loss, exsanguination, predominantly, I believe, due to the injury in this area to be the brachial and humeral vasculature which would be injured and there would be fairly rapid blood loss from that.  There would be a lesser degree of blood loss in this area from the injury to the lung and to the solid organ or liver --

Q.    Okay.  So shotgun wound number 1, which was the wound to

the arm which fractured the upper arm bone, that was the -- that would be the wound that would cause the most blood loss?

A. No, I think it actually would be shotgun wound number 2.

Q. Number 2?

A. The mid shaft.

Q. Okay. In the mid shaft, right.

And shotgun wound number 1 and number 3 that went into the chest, less blood loss; is that correct?

A. That's correct.

Q. Okay. All right. You can take your seat.

(Witness resumed the witness stand.)

Q. Now, do you have an opinion to a reasonable medical certainty about whether Donnie Allen died immediately from those wounds inflicted?

A. Yes, I'd have an opinion. No, he did not die immediately from these wounds.

Q. Okay. And do you have an opinion to a reasonable medical certainty about how long Donnie Allen would have been conscious?

A. Not specifically to the second or minute, but I could give a range of what I think would be a maximum time.

Q. Okay. Explain --

A. Which would be --

Q. Explain what your answer is and how you came to that conclusion.

A. Basically would be in terms of -- again, not immediately and not in seconds. I think it would be in terms of minutes, probably a few minutes. I would -- and again, this is just a rough estimate, put a maximum time -- I don't believe anyone would retain consciousness longer than five minutes, but it could be much sooner than that.

Q. So a matter of minutes, up to five minutes that he could have remained conscious.

A. Roughly.

Q. Okay. Now, do you have an opinion about the painfulness of each of the shotgun wounds inflicted upon Donnie Allen?

A. Well, certainly there's substantial pain with a shotgun wound; and with these three wounds, yes, there would be substantial pain.

Q. And finally, based on the autopsy, do you have an opinion satisfactory to yourself and to a reasonable medical certainty about the cause of death?

A. Yes. The cause of death is multiple shotgun wounds.

MS. TOMPKINS: Thank you, Dr. Sullivan. No further questions.

MS. LAWSON: No questions. Thank you, Dr. Sullivan.

THE COURT: You may step down.

(Witness stepped down.)

MS. TOMPKINS: Can we take a break and take that

down?

THE COURT: (Negative nod.)

MS. TOMPKINS: No?

MS. ROSE: The government will call Earlene Thompson.

EARLENE THOMPSON,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Good morning. State your name, please, ma'am.

A. Earlene Thompson.

Q. Where do you live, Ms. Thompson?

A. As of right now? 215 Cherry Avenue.

Q. In what city?

A. Roanoke, Virginia.

Q. And we'll need you to pull that microphone closer so that the members of the jury are able to hear your testimony. Be sure you speak up.

Do you work there in Roanoke?

A. Yes, I do.

Q. What kind of work do you do?

A. I'm a secretary.

Q. Where?

A. At Lewis Gail Hospital.

Q. How long have you worked there?

A. Almost two years.

Q. Now, in June of 1996, did you live at 904 Loudon Avenue Northwest, Apartment A?

A. Yes, I did.

Q. How long in June had you been living at that apartment?

A. About a month.

Q. Had you been there long enough to get to know some of the neighbors?

A. Basically speaking. Speaking to the neighbors. That was about it.

Q. Who lived there with you?

A. My two daughters.

Q. How old were they at the time or how old are they now?

A. Now they're thirteen and sixteen.

Q. Now, describe, if you would, for the members of the jury, the layout of that apartment. Was it a single home or --

A. It was a duplex.

Q. Did you know who lived on the other side?

A. Yes, I did.

Q. Who was that?

A. Sonji Hill.

Q. Had you lived at that address long enough to get to know the Williams family who lived across and down the street?

A. I did live at the address eventually to get to know them. At the beginning I spoke and waved to everybody. As

far as like talking, conversations, stuff like that, no, there wasn't much of that.

Q.   Now, in the early morning hours of Saturday, June the 22nd, of 1996, describe what you heard or what woke you up that morning.

A.   At first it sounded like fireworks, firecrackers going off at first.

Q.   What did you do?

A.   I got up immediately.  I had the phone in my hand.  I went to the door.  Actually looked outside, and I saw a man standing at the Williams' house on the side of their house.

Q.   Now, I'm going to show you what has been marked as Government's Exhibit 21-O previously admitted.  Do you recognize what's depicted within that exhibit?

A.   Yes.

Q.   Would you point to your residence.

A.   I lived here on the side (indicating).

Q.   And is the Williams' home in that photograph?

A.   Yes, it is.

Q.   Would you just put an "X" on the Williams' home.

     (Witness complied.)

Q.   Now, when you said you walked outside, did you walk out on the back side of the house, the part that we see here?

A.   No.  I lived on the front side where I placed the "X" at.

Q.   All right.   I'm going to show you what's been marked as Government's Exhibit 21R.   If you'll clear that screen, please.

(No response.)

Q.   Okay.   Would you mind clearing that in the corner where it says clear last mark.

A.   Where am I doing it at?

Q.   Let me come help you.

Right here.

A.   Oh, okay.

Q.   Remove last mark.   And you can use that to mark.

A.   Okay.

Q.   All right.   Can you identify that photograph?

A.   Yes.

Q.   What --

A.   That's my apartment, the duplex.

Q.   Mark which side of the duplex that you lived on.

(Witness complied.)

Q.   When you -- you said you picked up the phone and went outside.   What did you see?

A.   I saw a guy at the Williams' house on the side going up the steps.

Q.   Point to the side where you saw someone at the Williams' home.

(Witness complied.)

Q. What else did you see?

A. I saw Ms. Williams holding a child.

Q. Where was Ms. Williams when you saw her holding the child?

A. She was at the side door at the time.

Q. The individual that you had seen at the side door, had that male gone inside or was he still outside?

A. No, he was still outside.

Q. What happened then?

A. That's when I seen Robin actually run out the front door.

Q. If you would clear that mark, please, up there in the upper corner, and show where Robin came out.

(Witness complied.)

Q. The front door of the Williams' home?

A. Yes.

Q. Were you at that point able to see the male who had gone in her side door?

A. I seen him. He didn't actually go into the side door because when she ran out the front door, he actually came back out. He actually came back like coming towards the street.

Q. So he went in the side door and came back out the side door?

A. He didn't actually go in the side door at all.

Q. Well, did you -- when you saw Robin at the front door,

were you able to hear anything?

A. I heard Ms. Williams say, Robin, run.

Q. If you'll clear those marks, please.

(Witness complied.)

A. And show the members of the jury the direction in which Robin ran.

(Witness complied.)

Q. Now, you're standing on your front porch still at this time?

A. Yes.

Q. You said you had the phone. What were you doing?

A. Calling 9-1-1.

Q. When you saw Robin come out and run that way, if you'd clear those marks and indicate to the members of the jury where you saw the defendant go.

(Witness complied.)

A. He actually was coming out towards the street when I actually made contact with him.

Q. Describe how the defendant was moving.

A. He wasn't running. He was actually -- it was like a trot -- it was like a space. He was trotting like. He was very calm. When I actually looked at him, he looked like he was actually there. He looked like he was set out to do a deed, and he did it.

Q. Well, did you see anything in his hand?

A.    A gun.

Q.    Can you describe the gun?

A.    It looked like a shotgun.

Q.    How was the defendant holding the gun?

A.    He was holding it like this (demonstrating).

Q.    Stand up and show us.

A.    He was actually holding the gun like this (demonstrating).  And he pointed the gun.

Q.    Where did he point the gun?

A.    Towards me.

Q.    Now, at this point are you still standing on your front porch?

A.    Yes.

Q.    Had you gone down the steps or were you on the porch itself?

A.    No, I was actually on the porch itself.  And I went back into my house when I saw the gun like point towards me.

Q.    Did -- as the defendant pointed the gun at you, did you actually get a look at him?

A.    Yes.

Q.    When -- did you make eye contact?

A.    We made eye contact.  And I just turned and went back into my house.

Q.    Okay.  You may sit down.  Thank you.

       (Witness complied.)

police. I was basically in shock that I was seeing all this.

Q. If you would clear those markings.

(Witness complied.)

Q. And indicate when you came out of your home, by that -- after you'd gone back in and come right back out, where was Robin?

A. He was dragging her back down this street right here (indicating).

Q. Describe what you mean by dragging.

A. He was like pulling -- looked like he was pulling her by her hair, actually pulling her back down the street.

Q. Could you hear anything at this time?

A. I could hear commotions. I couldn't really hear from where I was at on my steps. Ms. Williams was actually -- you know, she was hollering help her baby.

Q. By that point is she outside?

A. Ms. Williams? Yes, Ms. Williams is right there with her.

Q. If you'll clear that mark, please.

(Witness complied.)

Q. I'm going to show you what's identified as Government's Exhibit 21Q. Indicate on that exhibit where you next saw the defendant and Robin come back in to your view when you came back out on your porch.

A. Right here (indicating).

Q. Let me also show you -- if you'll clear that, please, ma'am.

(Witness complied.)

Q. Government's Exhibit 21R previously admitted. Orient us there to where you're standing.

A. I was right here in the middle (indicating).

Q. And where was the defendant and Robin?

(Witness indicated.)

Q. Where was Mrs. Williams?

(Witness indicated.)

Q. What could you hear at that time?

A. I can basically just hear. At the time I was focused. I heard Ms. Williams say, Help my baby. She was hollering. She was crying.

Q. What was the defendant doing?

A. I could hear certain like -- I couldn't really hear the conversation. I could just hear -- you know, I knew they were saying something to each other. I just don't know what.

Q. So the defendant was speaking.

A. Yes.

Q. And Robin was speaking as well.

A. Yes.

Q. Was Ms. Williams saying anything at that point that you could understand?

A. No. That I could understand, no.

Q.    While you're out there on your porch, is your neighbor Sonji still on her porch --

A.    Yes.

Q.    -- with the phone?

A.    She is.

Q.    Now, at this point are you still talking to the 9-1-1 --

A.    No.

Q.    -- communicator?

A.    No.

Q.    What happened -- if you'll go ahead and clear those marks.

(Witness complied.)

Q.    And describe what happened next.

A.    He actually -- he had shot one time.  The first time he had shot looked like Robin had just like threw up her hands.  And then he shot -- she had turned to run up to the yard.

Q.    All right.  She was running that way (indicating)?

A.    Yeah, she was running up, and that's when he shot her again and she fell right in here (indicating).

Q.    Where -- describe -- back up a little bit.  You said that the defendant had her by her hair, by her arm as they're having conversation.  Describe how Robin got away or what happened such that she could get away.

A.    Looked like she just actually snatched, just jerked herself away out of his grip.

left.

A.    He went across the street to here.  It's like a little alley that's right behind here that's leading up into Ms. Williams -- that, you know, you can go behind Ms. Williams and all the yards (indicating).

Q.    Okay.  21P.  If you'll clear those.

      (Witness complied.)

Q.    Once again, show -- where was Robin's body in Government's Exhibit 21P?

A.    Right here in the yard (indicating).

Q.    And where -- let me come up and change this color for you.

      MS. ROSE:  If I may approach, Your Honor?

      THE COURT:  Yes.

Q.    Now, mark the direction of the defendant's travel.

      (Witness complied.)

Q.    Is that where you lost sight --

A.    Yes.

Q.    -- of the defendant where you stopped marking?

A.    Uh-huh.

Q.    Now, you can see to the right of those final markings that there -- it looks like a street back there.  Does that street continue on to the left side of the photograph behind the houses and trees?  Are you -- referring --

A.    I'm not really familiar with that.  I know it's an

alley.

Q. When you saw the defendant go to the alleyway, describe what happened next.

A. To me he calmly backed out and just left.

Q. Fast, slow, squealing of tires? Describe how he left.

A. It was no squealing of tires. It wasn't like he was speeding off. It was really -- it was slow. It was just he just backed out normally and just drove off.

Q. Now, where is Ms. Williams at this point?

A. At this point she's running back and forth. She's screaming. She's hysterical. She's -- she's up on the porch -- she's up on the steps for a second. She's running back and forth to Robin, Help my baby. Help my baby.

Q. Were you able to offer any assistance at that point?

A. No, because I was -- I was in shock. I couldn't offer anybody any -- do anything for anybody at the time, but call 9-1-1.

Q. After the defendant left, how long was it before either an ambulance or law enforcement got there?

A. To me it seemed like it took forever for them to get there.

Q. Time was just on a different way for you at that point.

A. Yes.

Q. Did you talk to law enforcement on that occasion?

A. I did.

Q. Did you tell them -- you gave an interview at some point later.

A. I did.

Q. Now, also at some time later, did you get an opportunity to hear a transcript of -- or hear a recording of your 9-1-1 call?

A. Yes.

Q. And did you also review a transcript of that call --

A. Yes.

Q. -- for its accuracy?

MS. ROSE: Your Honor, at this time the government would like to publish previously marked and admitted Exhibits 20A and 20C. They're synched.

THE COURT: Beg your pardon?

MS. ROSE: They're synchronized.

THE COURT: All right.

MS. ROSE: Would you clear the screen, please.

(Witness complied.)

(Government's Exhibits Numbers 20A and 20C were published to the jury.)

Q. Do you recall that conversation with 9-1-1?

A. Yes, I do.

Q. Now, do you still live on Loudon Avenue?

A. No, I don't.

MS. ROSE: All right. Thank you. I don't have any

other questions of this witness.

CROSS EXAMINATION

BY MR. BENDER:

Q.   Yeah, Ms. Thompson, do you remember testifying in the guilt/innocence phase of this trial some time ago?

A.   I'm sorry?

Q.   Do you remember testifying under oath in the guilt/innocence phase of this trial some time ago?

A.   Yes, I do.

Q.   Okay.  And at that time you indicated that Ms. Williams was right here about the distance from this juror to you, didn't you?  At the time the shots were fired.

A.   I can really vaguely remember.  I mean, I can remember every detail what happened.  At that time I was basically -- I was upset.  As far as distance, I just did an estimate.  I just said a distance.

Q.   Right.  And that was -- that was the distance back at that time was from that juror.

A.   At that time they was close.  They was really close to each other at that time.  You just said give a distance and I just gave one.

Q.   And that was the distance at that time, right?

A.   No, it wasn't.

Q.   Do you remember being asked:  When you said how far was Ms. Williams from Robin when the shot was fired, I believe you

referred to someone on the jury in a white shirt. You're referring to the second juror from the end on the front row.

A. I don't remember where they were at, but I did remember stating a guy sitting in the jury that was sitting in white.

Q. Your response was, Yes I'm referring to somewhere in that distance.

A. Yes.

Q. Okay. And that was your testimony at that time, right?

A. I mean, it's still my testimony. Far as distance and stuff like that, as I explained then. I mean, if you're telling me to give you an estimate, I'm not really good as far as giving estimates, stuff like that. I can give you distance and at the time, yeah, I did say that.

Q. Okay. And that was your best recollection.

A. Yes.

Q. And Ms. Hill was on the phone on the porch calling 9-1-1.

A. Also, yes.

Q. Right. And what you saw was a young man with a shaved head. Do you remember?

A. I don't remember, no.

Q. Do you remember he didn't have any hair on his head?

A. No, I don't.

Q. Okay. And do you remember telling the police that the man you saw didn't have any hair on his head?

A.    No.  I mean, what I'm saying is then I can't remember, it's so far along, what he had on or what colors.

Q.    Okay.

A.    Actually, if his head was shaved or not.

Q.    Okay.

A.    Only thing I can remember is looking into his eyes and...

Q.    And he was yelling and screaming and out of control, wasn't he?

A.    Who?

Q.    Huh?  The man.

A.    I'm sorry, who was?

Q.    The man was yelling.

A.    No, the man was not yelling.  He was not screaming.  He was not out of control.

Q.    Okay.

A.    It was her mother basically was screaming.

Q.    Okay.

A.    And very upset.

Q.    Okay.  And was Robin -- was Robin arguing with him, screaming at him?

A.    Like I told -- like I said the first -- you know, when I stood up and said I basically couldn't hear the conversation. I know there was some words.  That was it.

        MR. BENDER:  Okay.  All right.  Thank you.  That's all.

REDIRECT EXAMINATION

BY MS. ROSE:

Q.   I do have a question, Ms. Thompson.  When you said you were referring -- if I may approach the witness -- to the second person on the end, that could have been this person, could have been this person (indicating).

A.   Yes.

Q.   Do you remember which one it was?

A.   I seen so many people they saying white that day, so I mean, only thing I can say is they was so close I was just trying to basically give an angle.  Ms. Williams and Robin was close.  They was close.  And I would say -- and I think if I honestly can remember, if I was referring to someone up at this end closest to me.

MS. ROSE:  All right.  Thank you.  I don't have any other questions.

MR. BENDER:  I don't have any questions.

THE COURT:  Okay.  You may step down.

(Witness stepped down.)

THE COURT:  Okay.  Members of the jury, we'll take our morning break at this time.  Please remember the usual instructions.  We'll call for you in about fifteen minutes.

(Brief recess at 11 o'clock a.m.)

(Jury not present.)

THE COURT:  Mr. Bender.

MR. BENDER: Yes, sir, Judge. We have noticed on our screen here, I guess it's the ELMO system is what they call it. Ours is very out of focus and we can hardly read anything. We showed it to the prosecutors and I think they agree at lunch, they say they're going to have a technical person over here to straighten that out. Just want to let the court know.

THE COURT: Okay. In the meantime, I wonder if the one at the government table could be put at an angle so that it's visible from defense table.

MS. TOMPKINS: I'll do that.

THE COURT: Do it.

MR. BENDER: Y'all won't be able to see it.

MS. TOMPKINS: We know what (inaudible).

MR. BENDER: Okay.

THE COURT: All right.

MR. BENDER: Appreciate that. With my eyes I may have to get a little closer.

MS. TOMPKINS: That's okay.

THE COURT: Well, feel free to move around as you see fit.

MR. BENDER: All right. Thank you.

THE COURT: May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: All right. The jury is with us.

MS. ROSE: The government will call Sonji Hill.

SONJI HILL,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Would you state your name, please, ma'am.

A. Sonji Hill.

Q. And spell your first name.

A. S-o-n-j-i.

Q. Where do you live, Ms. Hill?

A. I live at 150 Laconia Avenue.

Q. In Roanoke, Virginia?

A. Yes, Roanoke, Virginia.

Q. Do you work up there in Roanoke?

A. Yes, I do.

Q. What kind of work do you do?

A. I work at Allstate Insurance Company. I'm a trainer.

THE COURT REPORTER: Austin?

THE WITNESS: Allstate.

Q. How long have you been employed with Allstate Insurance?

A. Thirteen years.

Q. Now, in June of 1996, did you live at 904 Loudon Avenue, Apartment B?

A. Yes, I did.

Q. Is that a duplex?

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 78 of 286

A.   Yes, it is.

Q.   And was Earlene Thompson your next door neighbor, the person who shared the other side of that duplex with you?

A.   Yes, she is.

Q.   Who lived in the apartment with you?

A.   My three children.

Q.   Now, on -- in June of 1996, how long had you been living in that apartment?

A.   I had been there since '92.

Q.   Had you gotten to know the neighbors?

A.   Yes.

Q.   Did you know the Williams family?

A.   Yes.

Q.   Do you recall the early morning hours of June the 22nd of 1996?

A.   Yes.

Q.   Would you describe for the jury that morning.   What happened that morning?

A.   From the beginning?

Q.   Yes, ma'am.

A.   I was unfortunately talking on the phone.

Q.   About what time?

A.   It was early morning.   Six.   To my coworker.   She actually lived in Rocky Mount.   We did that quite frequently.

Q.   So this was a coworker with Allstate Insurance?

A.    Yes.

Q.    And you're talking about Rocky Mount, North Carolina?

A.    Rocky Mount, Virginia.

Q.    Rocky Mount, Virginia.

A.    Yes.

Q.    Okay.    This is early in the morning, you're talking on the phone.    What happened?

A.    I heard a loud boom and I went to -- my bedroom is actually beyond the living room, and I went to the front door to see what it was.

Q.    Show you what's been marked and previously admitted as Government's Exhibit 21R.    Do you recognize that dwelling in the photograph?

A.    Yes, I do.

Q.    What is it?

A.    That is my apartment.    My old apartment.

Q.    If you would, you can pick up that little pen there and mark which side of the apartment that you lived on.

A.    I lived on this side (indicating).

Q.    And you said you came and looked out a window.    Which window?

A.    I actually came to the door.

Q.    Can you see the door in that picture or is it --

A.    No, you can't see it.    It's behind the pole.

Q.    Behind the telephone pole?

A. Yes. You can see this part of it. I'm sorry, I'm coloring. I'm sorry.

Q. Do you know how to remove that mark? Do you see that? You have to tap it several times.

A. I'm sorry, I thought you just wanted me to remove that.

(Witness complied.)

Q. All right. Thank you. So you went to your front door. What did you see?

A. I saw Robin come out of the front door.

Q. Show you an exhibit that's been marked as 21P. If you would indicate on Government's Exhibit 21P where it was that you saw Robin Williams.

A. She came out this door (indicating).

Q. Could you see anything else going on at the house at that moment?

A. No.

Q. Any other people around the front of the house --

A. No.

Q. -- beside the house at that time?

A. No.

Q. When you saw Robin come out -- let me ask you this first. Did you know Robin?

A. Yes.

Q. How long had you known her?

A. I knew her in -- as long as I've been there. They lived

Q.   Did you have your phone with you at that time or not?

A.   Yes, I did.

Q.   What were you doing?

A.   I was -- I had hung up with my girlfriend and then I was -- saw the commotion and I hung up the phone.

Q.   Did you make any other phone calls?

A.   Yes.  I called --

Q.   Who did --

A.   -- 9-1-1.

Q.   Are you talking to 9-1-1 at this point?

A.   I didn't talk to 9-1-1 until actually they came out of the house.  Both of them were out of the house and up the hill.

Q.   Describe, then, if you will, just mark on Government's Exhibit 21P the direction where Robin -- when she came out of the front door, where did she go?

A.   She came this way and it's a hill (indicating).

Q.   So you can't see it in that picture, but there's an incline going up toward the back of your home; is that accurate?

A.   Yes.

Q.   Did you -- when she came around to the side of the house, did you stay there on the porch?

A.   She actually went around the back and came back down the other side.  Yes, I stayed on the porch.

Q. My point is did you lose sight of her --

A. Yes.

Q. -- at some point?

A. Yes.

Q. Did you then pick up sight of Robin again?

A. Yes, I did.

Q. Where was that?

A. I picked her up on this side of the house (indicating).

Q. All this time you're still on your front porch?

A. Yes.

Q. If you'll clear those markings.

(Witness complied.)

Q. Show us the direction that the defendant went.

A. He took the same path she took.

Q. During this time, tell us what's happening with you. What are you doing?

A. I am talking to 9-1-1 and the defendant -- Ms. Williams came out and told me to call -- to -- they were asking who it was.

Q. Well, let me ask you this first. How far behind Robin and the defendant was Ms. Williams? How long did it take her to come out of the house?

A. They were out of sight by the time she came out of the house.

Q. So they had already gone to the side or the back of your

duplex --

A.    Right.

Q.    -- by the time she came out?

A.    Yes.

Q.    Did you see which door she came out of, the side door or the front door?

A.    I don't know.

Q.    Did she have the baby with her at that time?

A.    No.

Q.    Are you talking to 9-1-1?

A.    Yes.

Q.    While you're talking to 9-1-1, what was the defendant doing?

A.    They were -- when I got -- when they came back to me or meanwhile?

Q.    At some point they come back around the side.  Are you hearing anything at that point?

A.    I'm hearing Ms. Williams.  While I'm on the phone, the police are asking who is it, who is it, and I have to -- I'm asking her who it is.

Q.    Now, she's doing what?  What's Ms. Williams doing?

A.    She's hollering.

Q.    What's she saying?  Can you hear what --

A.    She was hollering to me, Call 9-1-1.  Call 9-1-1.  I called 9-1-1.

Q. While you're talking to 9-1-1, what did the defendant do to you?

A. The defendant -- to me? He pointed the gun at me and told me to hang up the motherfucking phone.

Q. Is that a quote?

A. Yes, that's a quote.

Q. Did you make eye contact with the defendant?

A. Yes.

Q. Show the jurors what the defendant did with the gun when he looked at you and told you to hang the motherfucking phone up.

A. He pointed at me.

Q. What did you do?

A. I hung the phone up.

Q. Did you stay outside or --

A. No, I went back in the house.

Q. When you got in the house, what did you do?

A. When I got in the house, 9-1-1 called me back and --

Q. They called you back.

A. They called me back.

Q. When he points the gun at you, did you think he -- what did you think he was going to do?

A. Thought he was going to shoot me.

Q. At this point where is Robin? The defendant points a gun at you; where is Robin?

A.   She is in front of him.

Q.   Is she still moving?

A.   Yes.

Q.   Describe for the jury how the defendant was moving.  When he came out of the house and as he's coming across the street and up the hill, how is he moving?

A.   He was -- he was trotting.  Not necessarily running fast.  He was trotting.

Q.   When they come back around to the side, what happens?

A.   When they get to where I can see them?

Q.   Yes.

A.   After he points the gun at me?

Q.   Yes.

A.   He concentrates back on her and -- well, he drug her from the hill down by her hair.

Q.   On this -- are you able to -- let me show you another photograph, Government's Exhibit 21R.  If you would mark on there where you saw the defendant dragging Robin by the hair.

A.   He was dragging her this way (indicating).

Q.   Did they stop at about that point?

A.   Yes.

Q.   What happened then?

A.   Then he let her hair go and she walked away.

Q.   Did she walk away, pull away?  Describe actually what happened.

A.    She just sort of casually walked away.

Q.    Where was Mrs. Williams?

A.    She was over -- this is the front door.  She was here.  Below the steps, I'm sorry.  Not on the steps, below the steps (indicating).

Q.    At some point did she move towards Robin?

A.    Yes.

Q.    If you would, just make an "X" where Robin was.

      (Witness complied.)

Q.    Where was the defendant?

A.    The defendant was here and Robin was here (indicating).

Q.    And by the time Mrs. Williams got over to Robin, where was -- where was Mrs. Williams?

A.    She was about here (indicating).

Q.    Then what happens when Robin gets away?

A.    He pulled the trigger the first time and it didn't -- the gun didn't go off.  But then he pulled the second time and it went off.

Q.    Now, how many shots do you recall hearing at that time?

A.    One.

Q.    Okay.  Now, are you still on the phone with 9-1-1?

A.    Yes.

Q.    When Robin was shot, was she moving toward her mother?

A.    Yes.

Q.    Did they get close to each other?

A.   When she fell she didn't fall forward, she fell backwards, so Ms. Williams had to come to her.

Q.   Were they far apart?

A.   No.

Q.   What did -- as this is happening, what is Mrs. Williams doing?  What is she saying?

A.   She's crying out, Jesus, Jesus.  He shot my baby.

Q.   Where are you standing?

A.   I am actually in the house.  This window right here has mini blinds and I was pulling the mini blinds down and I could see everything.

Q.   Are you on the phone with 9-1-1 at that point?

A.   Yes, I am.

Q.   After Robin was shot and fell to the ground, her mother is there, what does the defendant do?

A.   He just walks away.

Q.   Walks?

A.   He started walking, then he trotted to the car.  The car is actually in -- behind Ms. Williams' house is an alley and the car was parked in the alley.

Q.   Show you Government's Exhibit 21P.  Show us where the defendant -- if you'll clear those.  You'll have to tap it several times to clear those markings.

        (Witness complied.)

Q.   Show where the defendant went.

A.  Here (indicating).

Q.  Did you see where the car was parked?

A.  I didn't see it until he backed out.

Q.  Did he back out or pull out forward?

A.  He backed out.

Q.  And where did he go when he backed out?

A.  He went this way (indicating).

Q.  Now, at this point is anybody there other -- out there at the corner other than Mrs. Williams and Robin?

A.  Earlene, my next door neighbor, and her --

Q.  While you're talking to 9-1-1, did you see Earlene as well?

A.  No.

Q.  Show you government -- you never made eye contact with her.

A.  I could hear her, but I couldn't see her because I was concentrating on him.

Q.  Okay.  But you knew she was out there on the porch.

A.  Yes.

Q.  Government's Exhibit 21Q, can you see the road -- or the alleyway where the defendant's car was parked or where he pulled out?

A.  Here (indicating).

Q.  And where was -- where did Robin, if you can see in this photograph, where did Robin eventually fall and die?

A.    She would have been over here (indicating).

Q.    Were you -- during the course of this, you said you had hung up the phone with 9-1-1.  They called back.

A.    Yes.

Q.    While you were speaking with them, were they asking you some questions about the identity --

A.    Yes.

Q.    -- of the person that was there?

Tell the jury about that.

A.    They were asking what his name was.  What did he have on.

Q.    Did you ask someone what's his name?

A.    Yes.  I asked Ms. Williams what his name was.

Q.    And what did Mrs. Williams do?

A.    She gave me his name.  She said Marc.

Q.    You gave them his name.

A.    Uh-huh.

Q.    And describe the way he had gone.  Have you since had a chance to listen to the recording of your 9-1-1 calls?

A.    At the previous case, but since then I have not.

Q.    And did you also see the transcript --

A.    Yes.

Q.    -- of your conversation?

MS. ROSE:  Your Honor, those were previously marked and admitted.  I would ask to publish them to the jury at this

time. It would be 20A and 20B.

THE COURT: Okay. Let them be admitted.

(Government's Exhibits Numbers 20A and 20B were published to the jury.)

Q. Is that where the defendant pointed the gun at you?

A. Uh-huh.

Q. You'll need to speak up.

A. Yes.

Q. Whose voice was screaming Jesus in the background?

A. Ms. Williams.

MS. ROSE: I don't have any other questions.

MR. BENDER: I have no questions.

THE COURT: You may step down.

(Witness stepped down.)

MS. ROSE: The government will call Daniel Dean.

DANIEL C. DEAN,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Good morning, sir. Would you please introduce yourself to the jury.

A. Daniel C. Dean. Police officer, City of Roanoke, Virginia.

Q. Thank you. And you might want to pull that mike a little bit closer to you just so we can be sure we can hear you.

Are you a patrol officer with the Roanoke Police Department?

A.    Yes, I am.

Q.    How long have you been working at that department?

A.    Eleven years.

Q.    And were you also working patrol back in the early morning hours of June the 22nd of 1996?

A.    Yes, I was.

Q.    At that time did the Roanoke Police Department have area assignments for the different officers who were on patrol?

A.    Yes, they do.

Q.    Were you assigned to the area that included Loudon Avenue?

A.    No, I was not at that -- on that particular day.

Q.    Okay.  Describe for the jury what those circumstances were that morning.

A.    I was assigned to work the downtown area of the city which is in the south side of the Roanoke city area.  The city is divided into four quadrants.  The Loudon Avenue area is the northwest section of the city.

That morning, it was a little after seven a.m., I was sitting in the parking lot of the YMCA which is located at Fifth and Church Street Southwest in Roanoke.  At that time we received a radio dispatch call from the dispatchers of an incident that was occurring in the 900 block of Loudon Avenue

Northwest.

Q. And that was about 7:10 or a little after seven, something like that?

A. Yes.

Q. Or do you have a particular note of the specific time?

A. I believe it was 7:10. In that area.

Q. Now, how far -- at the YMCA where you're located, how far was that from the 900 block of Loudon?

A. It's less than a mile.

Q. Did you actually respond to that call?

A. Yes, I did. As the dispatcher was relaying the call, the dispatcher relayed that there was a man -- a subject brandishing a weapon. I sat there. I still didn't respond because that wasn't my section of the city. Once the call dispatcher escalated into there were subjects fighting at the 900 block of Loudon, then she relayed that there was a -- shots fired and a person was down in the 900 block of Loudon. At that point I did respond to the call. I activated my blue lights and my siren on my patrol vehicle and headed to that location.

Q. So you initially thought whoever was assigned to that quadrant of the city is going to be heading there first; but as things escalated, you described them, you headed that way as well.

A. Yes, I did.

Q.   In fact, were you the first officer to get there?

A.   Yes, I was.

Q.   What did you see when you arrived at the 900 block?

A.   When I arrived, I positioned my vehicle in the 800 block of Loudon Avenue and I observed several people in the 900 block of Loudon Avenue, and particularly at the intersection of Ninth and Loudon.  There was a person on the ground with a subject standing beside them.

Q.   Government's Exhibit 21P, if you would take a look at that, Officer.  And let me assist you, if I may approach, Your Honor?

THE COURT:  You may.

Q.   If you would mark where you parked your patrol car.

A.   I believe I was in this area here is where I parked the patrol car (indicating).

Q.   And where did you see the female lying on the ground?

A.   Here (indicating).

Q.   You can clear these marks by touching like that.

All right.  At this point was there an ambulance there or any other assistance?

A.   No, ma'am, there wasn't.  The ambulance hadn't arrived yet.

Q.   What did you do?

A.   I exited my vehicle and I approached the two subjects that were at the intersection where one was laying on the

ground.

Q.   Who was the second person that was there?

A.   Standing?

Q.   Yes.

A.   She was later identified to me as Bertha Williams.

Q.   Robin's mother.

A.   Yes.

Q.   Show you Government's Exhibit 21R.  If you would, please, sir, mark where Robin's body was lying.

A.   It was here.  This mark would be her feet and her head was at this point here.  Her body was in that position (indicating).

Q.   And where was Mrs. Williams?

A.   She was standing directly beside her.

Q.   Right beside her.  If you'll clear those, please, sir.

(Witness complied.)

Q.   Did you see anybody at that moment out on their porch on the house in the photograph?

A.   I don't recall seeing anyone.  There were people in the roadway walking around, several people, but I don't recall seeing people on the porch.

Q.   Did you go up --

A.   Yes.

Q.   -- to Mrs. Williams?

A.   I approached them.  As I was approaching, I noticed that

there was a shotgun shell laying in the roadway near the intersection. I went by that to Ms. Williams on the corner. I noticed -- I bent over to get -- down to a lower level with the person that was on the ground. I noticed that she had a large wound to her upper chest area.

Q. Was she on her back or on her stomach?

A. She was on her back.

Q. Was she still alive?

A. She -- there -- she was -- she made two breaths. There wasn't -- didn't appear to be any inhaling. There was a short exhale, a stop, and then a longer exhale, and then that was the last breathing motions that I witnessed. Her body went completely limp and there was no other motion.

Q. Was her mother there with her?

A. Yes, she was.

Q. At that point what did you do?

A. I -- I ensured that rescue was en route. I was trying to tell Ms. Bertha Williams that there was an ambulance on the way. She was very, very hysterical. She was crying. She was telling me not to let her baby die. She said this several times. Repeated it over and over. Please don't let my baby die. I ensured her that there was an ambulance on the way and they were going to take care of her.

Q. Is Ms. Williams, while she's, you know, begging you to save her daughter, is she standing up, is she on the ground?

A.   She's standing.

Q.   Are you trying to offer her assistance?

A.   At that -- not at that point.  I was trying to just console her at that -- you know, to keep her from being so hysterical.  Then I did -- once -- I tried -- this wasn't working, so I decided that I was just going to escort her away from this area to see if that would help her some.  And I -- she took my elbow and I escorted her across the street to her residence, which I later learned was 911 Loudon.

Q.   Did she point out to you which of those homes was hers?

A.   Yes.

Q.   At this point you say other people are coming out.

A.   Yes.  There were people out in the street and on the sidewalks in the area.

Q.   Once you got her settled at her home, by that point had paramedics or other law enforcement officers arrived?

A.   Yes, other officers had arrived in the area.  An ambulance and paramedics had arrived.  They were actually attending to her daughter.  As we sat on the porch, we could see them attending to her from the porch.

Q.   Did you actually sit down with Ms. Williams there?

A.   She sat down in a chair and I knelt beside her and she asked me to pray with her and we said a prayer together on the porch.

Q.   What did you pray?

A.    I don't recall exactly what was said.  She still after that was still very hysterical.

MS. ROSE:  All right, sir.  Thank you.  I don't have any other questions.

MR. BENDER:  I have no questions.

THE COURT:  You may step down.

(Witness stepped down.)

MS. TOMPKINS:  Next witness will be Officer C.R. Sacra.

<u>CHAD RHYNE SACRA</u>,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q.    State your name, please, and tell us how you're employed.

A.    I'm Officer Chad Rhyne Sacra.  I'm employed by the Roanoke City Police Department, Roanoke, Virginia.

Q.    How long have you been with the Roanoke City Police Department?

A.    Been with the department for fourteen years.

Q.    What are your current duties?

A.    I'm an evidence technician for the city of Roanoke.

Q.    How long have you been an evidence technician?

A.    Currently I've been an evidence technician for approximately eight years.

Q.    Since about 198 -- 1994?

A.    Yes.

Q.    Describe for the jury the duties and responsibilities of an evidence technician.

A.    Evidence technician is responsible to arrive at major crime scenes. And once you've arrived, you maintain security of the crime scene. You search the crime scene for evidence related to the case. You document, take notes, measurements for diagrams, photography, collect the evidence, and preserve it for later submissions.

Q.    Are you -- you're a sworn officer; is that correct?

A.    Yes, I am.

Q.    All right. So you use evidence as an investigative technique.

A.    We do.

Q.    Okay. Do you attempt to use the physical evidence that you find on a scene along with interviews and other investigators' interviews to try to piece together what has happened?

A.    Certainly.

Q.    Did you do that in this case?

A.    As far as my part of the case, I generally work with the physical evidence itself. I look at the evidence and what it suggests. And then I collaborate with detectives who have gone out and obtained witness statements and such to

determine.

Q. And you did that function in this case; is that correct?

A. Yes, I did.

Q. Let me take you back to June of 1996. Were you on duty in the early morning hours of June 22nd, 1996?

A. I was.

Q. And did you become aware of a call for service for a shooting at the 900 block of Loudon Avenue?

A. I did.

Q. Do you remember what time that was?

A. The call that I received came in approximately 7:20 in the morning.

Q. What did you do next?

A. At that time I went to our evidence unit and then responded directly to that scene.

Q. What did you see when you got there?

A. When I arrived, patrol units had already started establishing a cordoned off area or an area boundaried by crime scene tape. There was a Roanoke Emergency Medical Services unit that was in the process of rolling away from the intersection when I arrived.

I parked outside the roped-off area and I went directly to the sergeant who was on the scene at the intersection of Ninth and Loudon.

Q. Did you speak to the sergeant?

A.    I did.

Q.    And what did you learn?

A.    Sergeant had indicated that the person in the back of the emergency medical unit had been located laying beside the street in a grassy area across the street from where we were speaking.  She also indicated that there appeared to be some evidence there in the middle of the street.  She indicated to me a residence at 911 Loudon Avenue where the situation was supposed to have been started.

We walked down there and I started noticing officers posted in different places there at that residence.  And after I had established that security was well maintained, then I started my evidence collection duties.

Q.    I'm going to show you a series of photographs.  Now, you mentioned that the sergeant indicated to you that there was evidence located there in the street.

A.    Yes.

Q.    What was that?

A.    There was a .12 gauge Federal number 8 shot shotgun casing laying in the street.

Q.    I'm going to show you what's been previously marked and introduced as Government's Exhibit 21Q.  Does that photograph depict approximately where the shotgun shell was?  Can you tell from that photograph?

A.    My recollection, the -- where the police unit is in that

shot --

Q. Is where the shotgun shell was?

A. The shotgun shell casing would have been to its rear trunk area just off the passenger side.

Q. All right. I'm going to show you a photograph marked and introduced as Government's Exhibit 21-O. Does that -- would you be able to point out where that shotgun shell was on that photograph? There's a stylus up there. Let me show you how to use that. You can use that to make a mark and then clear it by hitting that up there.

A. Okay. I would estimate the shotgun shell casing to have been (indicating).

Q. Okay.

A. A little --

Q. Did you collect that shotgun shell?

A. Yes, I did.

Q. Okay. And let me show you what has been marked and introduced as Government's Exhibit 21JJ. Did you photograph the shotgun shell as it lay in the street?

A. I did.

Q. And is that that shotgun shell?

A. Yes, ma'am.

Q. Now, did the sergeant in charge indicate that that corner of Ninth and Loudon was one of the crime scenes that you were to be collecting evidence from?

A.   Yes.   When I arrived and she indicated there was evidence located there.

Q.   Okay.

A.   That's...

Q.   What else did you notice at that location?

A.   There was a reddish area adjacent to the street in the grass which I attributed to blood.   The sergeant indicated that the victim had been laying there prior to being transported by the rescue unit.

Q.   All right.   And again, I'm going to show you Government's Exhibit 21Q.   Can you point out on there where the blood was.

A.   I don't see it clearly, but I --

Q.   Okay.   I tell you what I'll do is I'm going to take that down and show you Government's Exhibit 21EE.

A.   Okay.

Q.   And is that a photograph that you took of the blood left on that corner?

A.   It is.

Q.   Okay.   And that is -- is that the roadway at the top of that photo?

A.   Yes, ma'am.

Q.   Okay.   And there is a white -- is that a piece of paper?

A.   Probably left behind by rescue personnel.

Q.   Okay.   And that was directly there at the corner?

A.   It was off the corner approximately 15 feet.

Q.    Okay.

Q.    What did you do next?

A.    After collecting the photograph and then collecting, measuring the shotgun shell, I also took samples of that red stain for comparison.

After having cleared that area and searching that area for any additional evidence, I then moved to the residence at 911 Loudon Avenue.

Q.    When you approached 911 Loudon, did you go to the front door or around the back?

A.    When I went to the residence, I first went to where the -- I saw an officer standing on the east side of the residence.  I needed to find out what type of evidence he was there to protect.  When I arrived there, I saw what he was protecting, and then moved to the backyard to overview a fence and a gate that was open in the back.

Q.    All right.  And what was that officer standing to protect?

A.    There were several pieces of evidence at that location.  Three shotgun shells which had been fired.  There was some blood on the interior side of the storm door.  The metal entry door on that side into the kitchen area had three holes in it.  The door was open.

Q.    All right.  I'm going to slow you down just a little bit.  As you went around to the back of the house, is there an

alleyway back there?

A. Yes, there is.

Q. Okay. I'm going to show you what's been marked and introduced previously as Government's Exhibit 21LL. Is that a photograph of the alleyway in the back of that house?

A. Yes, it is.

Q. All right. And is depicted in that photograph the back of 911 Loudon, can you tell?

A. I'm not able...

Q. Okay. But that's a photograph of the alleyway --

A. Yes.

Q. -- back behind the house?

Now, what did you observe, if anything, in the alleyway?

A. I searched the alleyway from Ninth Street all the way until it dead ends. That alleyway proceeds up past the residences and dead ends before it ever reaches Tenth Street. At the end of that alleyway I found what appeared to be two tire tracks in the grass at the dead end of that area. It appeared to have acceleration marks in the grass where the grass was churned up and the dirt was churned up. However, at that time I couldn't establish how long it had been there or who may have caused that damage.

Q. I'm showing you what's been marked as Government's Exhibit 21P. Can you mark on there where the alleyway begins and ends, if you can.

A.     This would be Ninth Street.  The alleyway works its way in that direction and follows behind the houses and dead ends up in this area (indicating).

Q.     Okay.

Q.     That's not a through alleyway; is that correct?

A.     No.

Q.     I'm going to show you what's been previously marked and introduced as Government's Exhibit 21MM.  Describe what that is.

A.     That's a photograph of the acceleration mark in that grass.

Q.     Okay.  Did that appear to be fresh to you?

A.     Relatively.  But as I stated, I was unable to say with certainty the amount of time it had been there.

Q.     Did you prepare a diagram of the outside crime scene?

A.     Yes, I did.

Q.     And before you prepared that diagram, did you make measurements to make an accurate diagram?

A.     I did.

Q.     I'm going to show you now what's been marked and previously admitted as Government's Exhibit 21L.  Is that your diagram?

A.     It is.

Q.     Take the jury through this diagram, if you would, showing them the -- what you've noted in the legend and where those

things are located.

A. Okay. When I arrived on the scene, I arrived in this location. I met with Sergeant Martin. We spoke from this location (indicating).

The "A" indicated there indicates a .12 gauge spent shotgun shell, Federal number 8 shot.

"B" adjacent to the street indicates the blood in the grass at the street's edge.

Q. Now, take the jury back to "D", the gate and the fence, and describe what you saw about the gate and the fence at the rear of Loudon Avenue.

A. The gate was about one-third partially open. The fence line around the residence is continuous without breaks and that gate at the rear of the residence leading into the alley was about a third open.

Q. Okay. Can you clear those marks and indicate where the....

(Witness complied.)

Q. There you go.

A. This is the gate (indicating).

Q. Thanks. All right. Did you proceed into the back of that house?

A. I proceeded to search up to the house.

Q. All right.

A. At which time I found "F" which is actually attached to

the rear of the house. It's a telephone box where the wires come into the residence. And in looking at those wires, they appeared to have been cut, and I did substantiate there was no telephone service into the house.

Q. All right. And using that diagram, what did you see at "E" on your diagram?

A. "E" was an east side kitchen door located here. At that location were three .12 gauge spent shotgun shells, Federal brand, number 8 shot.

Q. All right. I'm going to -- if you could clear by tapping the corner of that screen.

(Witness complied.)

Q. Thank you.

I'm going to show you what's been marked and introduced as Government's Exhibit 21S. Do you recognize that?

A. I do. That's the phone box attached to the rear of the residence.

Q. All right. And did you -- show you now what's marked as Government's Exhibit 21T. Is that a close-up?

A. Yes, it is.

Q. And does that show the cut phone wires?

A. It's difficult to see, but, yes, it does.

Q. Is that too light?

A. You can see in this location a clear shot of one of the lines.

what that depicts.

A. There's three spent shotgun casings: one here, one here, and one here (indicating).

Q. And that's --

A. Number --

Q. Go ahead.

A. They were all Federal brand number 8 shot.

Q. All right. Going back to 21W. What observations did you make about that back door?

A. In regards to seeing the shotgun shell casings laying there beneath and beside the door and looking at the damage to the door, it appeared that a shotgun had been used at very close range to fire into the dead bolt of the door to probably access the residence.

Q. Did you notice any smudges or marks on that door?

A. I did.

Q. What was that?

A. Towards the bottom you could see down in the lower portion of that door, there were smudge marks. There was no clear shoe wear impression there; however, it appeared as if somebody had kicked that door.

Q. And when you went inside of the house, was there confirmation that that door had, in fact, been kicked?

A. Yes. The -- once I entered the residence, I found that the door jam itself for which the dead bolt would slide into

and lock the door, that was broken. The dead bolt came out of the lock mechanism and fell on to the floor. So the frame itself was splintered from some other force other than a shotgun shell.

Q. I'm going to show you now what's been marked and introduced as Government's Exhibit 21V. Tell the jury what that is.

A. That is a photograph of the three cylindrical holes next to the dead bolt lock.

Q. And based on your training and experience, what can you tell the jury about those three shots?

A. Based on the size of the shot that would be encased in those shotgun cases that I recovered, the number 8's would indicate a smaller size shot. For that small of a shot to have caused this type of damage, the shotgun would have been very close to the door, if not almost contacting the door because that shot would tend to spread once it leaves the barrel beyond three to five feet.

Q. Is that shot known sometimes as bird shot?

A. Yes, ma'am.

Q. I'm going to now show you what's been marked and introduced as Government's Exhibit 21Y. Describe for the jury what that depicts.

A. You can see in this shot the interior side of that door, how it's splintered in. You can see this door frame here is

A.   What you see in several different locations are wood shavings throughout the kitchen area.  There is a wall right here which was directly in the doorway's path.  And on the opposite side of that wall is where the calendar was hanging. The kitchen is off to this area.  And as you move towards where the picture was taken from, that is the dining room area (indicating).

Q.   Did you notice damage on this footstool?

A.   Yes, I did.

Q.   And what was that?

A.   There were several strike marks from what appeared to be the bird shot that came through the home.

Q.   Did you notice damage on any other dining room table, dining room chairs?

A.   As far as shot damage, I noticed shot damage to the side of this stove, to the opposite side of this wall, the one adjacent to the door.  I located shot damage on the ottoman, also on the leg of this table, and then on the west wall behind this table as well as the south wall (indicating).

Q.   I'm going to show you now Government's Exhibit 21Z.  Is that the shot damage on the side of the stove?

A.   It appears to be.

Q.   Show you Government's Exhibit 21DD.  Is that shot damage on the dining room table leg?

A.   Yes, ma'am.

Q.   And dining room chair leg?

A.   Yes, ma'am.

Q.   And on the floor, is that wood chips from that?

A.   Yes, ma'am.

Q.   I'm going to show you what's been marked as Government's Exhibit 21AA.  Is that shot damage on the -- on a wall?

A.   Yes, it is.

Q.   And is that indicative of bird shot?

A.   It's about the same size as what I would expect to find.

Q.   All right.  And Government's Exhibit 21CC, is that also shot damage on the wall?

A.   Yes, ma'am.

Q.   So in your opinion, when those -- when the three shots were fired into that dead bolt, what happened to the spray from those shots?

A.   The -- the bird shot itself continued in several -- in three distinctive paths.

One struck the side of the stove, glanced off that and then continued into the wall right behind the door.

A second shot went across the dining room striking the ottoman, striking the dining room table and continuing to the west wall.

A third shot went through the door and ended up in the south wall.

Q.   Did you prepare a diagram?

A.    I did.

Q.    And is Government's Exhibit 21K previously marked and introduced, is that the diagram that you prepared?

A.    Yes, it is.

Q.    Now, on the legend "A" is sunglasses.  Where did you find a pair of sunglasses?

A.    It was adjacent to the wall that we discussed with the calendar.

Q.    Okay.  And show the jury where the entry doorway that we've been speaking of is on that diagram.

A.    It is located here (indicating).

Q.    All right.  Now, on your legend, do you note that "B" is shot damage?  Circle all the areas in that home where there was shot damage, if you would.

A.    There was shot damage on the side of the stove, on this wall, on the ottoman, dining room table leg, west wall, and south wall (indicating).

Q.    All right.  Now, where was it that you found blood?

A.    There was a small area of red stain on the interior surface of that storm door (indicating).

Q.    All right.  And note for the jury where on this diagram you located the spent Federal shotgun shell, .12 gauge.

A.    Three shotgun shell cases located on the exterior:  one here, one here, and one here (indicating).

Q.    Officer Sacra, you mentioned before that in your position

specialty is forensic pathology.

Q. Where are you employed?

A. I'm employed by the Office of the Chief Medical Examiner. That's in the Health Department in Roanoke, Virginia. We cover thirty-six counties and sixteen cities.

Q. How -- what's your position there with the medical examiner's office?

A. My title is Assistant Chief Medical Examiner.

Q. And how long have you been affiliated with the medical examiner's office there in Roanoke?

A. In Roanoke I started in 1999.

Q. Prior to that time, where did you work?

A. For eleven years I was a state medical examiner in Alabama. Prior to that I was employed as an assistant chief medical examiner in Virginia in the Tide Water and Northern Districts. I was also a medical legal fellow early on in my training in Richmond, Virginia.

Q. Tell the members of the jury about your education, your training, and your experience.

A. I received my medical degree from Ohio State University in Columbus, Ohio. I completed my anatomic, clinical training there in the hospital in 1983. Following that, from 1983 to 1984, I was a medical legal fellow with the Medical College of Virginia in Richmond, Virginia. During that time I was also a Richmond metropolitan medical examiner. After I completed

that, I was employed as assistant chief medical examiner, first in the Northern District and then later in the Tide Water District before going to Alabama.

I'm board certified by the American Board of Pathology in anatomic, clinical, and forensic pathology. I'm licensed to practice medicine in Alabama and Virginia. I'm a member of the National Association of Medical Examiners where I've served two terms as a member of the board of directors.

MS. ROSE: Your Honor, at this time I would tender Dr. Wanger as an expert in forensic pathology.

THE COURT: He will be so declared as an expert in that field.

And members of the jury, you will remember my earlier instruction about how to deal with the testimony of an expert witness. Thank you.

BY MS. ROSE:

Q. The jury has heard from another forensic pathologist, but if you would, just give a quick definition of what a forensic pathologist is.

A. Well, pathology deals with injury and illness in man. And forensic pathology deals with the determination of the cause and manner of death of those persons that die a suspicious or violent death. The tool we use for that is called the autopsy.

Q. And under what circumstances does the office of the chief

medical examiner receive a body for autopsy? Are there certain requirements before you all will review?

A. Yes, ma'am. Most of the requirements in the statute are concerning suspicious or violent deaths. We also have some public health and infant responsibilities as well. But usually it's a suspicious or violent death.

Q. And what areas did you say you covered there within Western Virginia?

A. I cover the Western District. We cover thirty-six counties and fourteen -- thirty-six counties and fourteen cities.

Q. If you would, just give an overview of the autopsy procedure in general.

A. The autopsy starts with an external examination. The external examination looks for surfaces that have been injured or may have evidence of disease. That's followed by an internal examination through a series of incisions. There's a Y-shaped incision on the chest and abdomen. There's an incision made in the head. The internal organs are removed and examined for evidence of injury or illness.

Q. Now, in your work at the medical examiner's office in Roanoke, do you work with a Dr. Oxley?

A. No, Dr. Oxley is retired. I essentially took his position.

Q. And in taking his position, did you have an opportunity

FORM FED ⊕ PENGAD · 1-800-631-6989

to review the records, notes, photographs, and the report of investigation prepared by Dr. Oxley when he performed the autopsy of Robin Williams?

A.   Yes, ma'am, I did.

Q.   Show you what's been previously marked as Government's Exhibit 24A.  Do you recognize that document, Dr. Wanger?

A.   Yes, ma'am.

Q.   What is it?

A.   It's a copy of the autopsy report of Ms. Williams.

Q.   And you have reviewed that document?

A.   Yes, ma'am, I have.

Q.   What were the initial observations of the body of Robin Williams?

A.   Well, on the external examination, Ms. Williams had a number of old injuries and some new injuries.

The new injuries consisted of shotgun wounds.  There was a shotgun wound underneath the left arm and there was a shotgun wound entrance in the left back.  There was also a tear on the knee; the skin had split.

And there were older injuries consisting of what appeared to be burns that had been grafted.  There were skin donor sites on the thighs and skin had been grafted on to the left forearm.  There was also a burned area on the right forearm.

Q.   I placed upon the screen an attachment to the report of autopsy that's been previously marked and identified as the

body diagram portion. If you would, Dr. Wanger, describe for us what's recorded on the body diagram area.

A. Okay. There's a front and back to the diagram. The front is on the left side of the diagram, your left, and the right, obviously, the back.

On the left underarm area, which I'm circling here, is an area where there's a shotgun wound entrance. Most of the pellets have gone in as a single group. They're starting to spread a little bit creating some small scalloping or semicircular marks on the edge of the wound. As pellets go out of a weapon, they go in as a group. As you get further and further away, they start to spread. Essentially, you'll start losing the big hole and get little holes; and eventually you get far enough away you get nothing but little holes. So if you're fairly close to the weapon, it still is a central group. All of the pellets are going in. And this is an entrance wound here (indicating).

On the back is another entrance wound here. That one is a bit more round, so it's probably a little closer (indicating).

There are diagrams that Dr. Oxley made showing the areas where there are old burn injuries on this arm (indicating).

He also described, although it's not on the diagram, some older smaller areas of burn injury on the right arm.

In order to have these burns heal, it's sometimes

necessary to put a graft on there and the best grafts are obviously your own skin. And so down here on the thighs, there's these rectangular areas where skin has been taken and put on the burn areas. These are grafts to help it heal (indicating).

Also on the diagram there's an area here where there's a laceration or tear on the knees as well as some abrasion. That's obviously, there's been some force to the knee that caused it to do that (indicating).

He described some older areas of injury as well in the area of the ankle which were old abrasions or skin scrapes (indicating).

Q. If you'll clear those.

(Witness complied.)

Q. Thank you. I'll show you what has been previously marked and identified as Government's Exhibit 23A. If you would, Dr. Wanger, describe Government's Exhibit 23A.

A. Okay. This is a photograph depicting the face of Ms. Williams. It does have our autopsy number on the ruler, although it's upside down in the photograph. "W" refers to our district. We're the Western District. And it's the 329th autopsy in 1996. That's what the numbers stand for there.

You can see the face clearly and then at the bottom of the photograph up towards the right, your right, her left -- here we go -- we have the wound here. Right here. And you

can see the edge through here is a little irregular scallop (indicating).

Q. And what's the significance of that?

A. If it's not completely round, it may indicate that the pellets are starting to spread a little bit and you're seeing some pellets are starting to creep out towards the margin of the solid pellet column and they'll create little semicircular defects in the skin at the edge.

Q. And the area where you've marked the scalloping, would that be an entrance or an exit wound?

A. This is an entrance in the left chest and armpit area. Pellets have gone through and disrupted the tissue underneath the arm and that side of the chest.

Q. And the direction of travel of that would have been what?

A. It would have been front to back and somewhat to the left.

Q. Show you Government's Exhibit 23B previously marked --

A. Okay. This --

Q. -- identified and admitted.

A. This is a depiction of the arm as it's raised. It may be a little hard to orient. But if you look at me and just imagine that you're getting a picture here and catching a little bit of my face. That's what you're looking at here.

What we saw earlier is a little bit covered by the ruler,

these edges along here. The wound has gone through here, the pellets have gone through here and disrupted the soft tissues in here (indicating).

There's a lot of important structures under your arm. There's a large bundle of nerves and there's a major artery that goes to your arm. Your artery is about the size of your finger so it's a good diameter vessel, and that causes a lot of bleeding when it's been lacerated or torn.

Q. Show you Government's Exhibit 23C.

A. Okay. Again, we're -- we're seeing a little more detail here on the entrance area. And you can see how there's some scalloping here and here where the pellets -- it's not a completely round circle there (indicating).

Q. Previously marked, identified Government's Exhibit 23D.

A. Okay. This picture depicts the left back area. Ms. Williams has been rolled somewhat on her right side for this photograph. Her head is towards the top of your screen; her feet are towards the bottom of the screen. More or less in the center or lower half here of the photograph is a round circular defect. That's a shotgun wound entrance. That's what it looks like when the pellets all go in as a group. They go in sort of as a column and they make a large single hole. And that's a very characteristic appearance for an entrance wound of a shotgun that's fairly close.

Q. Lighten this up for you. 23G previously marked and

admitted.

A.   On the diagram I circled a knee for you.  This is a picture of that knee where the skin is somewhat abraided here and then there's a tear in the skin.  The tear medically is called a laceration.

Q.   And does that appear to be a fresh laceration?

A.   Yes, ma'am.

Q.   We had heard some evidence of her falling.  Would that be consistent with a fall?

A.   Yes, ma'am.  If she struck her knee on the way down, it it could do that.

Q.   Government's Exhibit 23F.

A.   Okay.  This is a picture showing the thigh area, one of those rectangular shaped areas I circled for you on the diagram.  This is where the skin is taken to put on the burns.  There's one on this thigh and the other thigh (indicating).

Q.   And that procedure would be called skin grafting?

A.   Yes, ma'am.

Q.   And that would be -- what would be known as a harvest point?

A.   Yes, ma'am.

Q.   A donor area.

Government's Exhibit 23I.

A.   Okay.  What you're seeing on this photograph is the left

arm and it's showing an area where it's darkened here and roughened. That's where there's been a graft here. And that's where all the burn injury had been and the graft had been put on there. It's a darker, rougher looking scar (indicating).

Q. What kind of burn would create an area like that?

A. Well, in order to require graft to heal, usually it's a full thickness burn. In other words, it's gone through all the layers of the skin so there isn't anything to grow back. If you have a lesser burn, there may be little islands of skin left that will fill in and eventually scar and cover the defect. But if you burn down through all the layers of the skin, there isn't anything left there to come back so you have to graft it. And so this was a fairly thick burn.

Q. Previously marked, identified, admitted Government's Exhibit 23J.

A. This is the other surface of the left forearm. Again, we have this area of grafting an old burn here, extends out onto the back of the hands. You can see the difference between the normal skin up here and the more scarred and retracted graft tissue down there (indicating).

Q. Once again, some of that skin that's harvested from the leg is placed here to assist in the healing?

A. Yes, ma'am.

Q. Previously marked, identified, admitted Government's

Exhibit 23K.

A. Okay. This is a -- this is a right arm with an area of some burning, too, and probable graft. It looks like a graft was put in there as well (indicating).

Q. Dr. Wanger, based upon the examination of Robin Williams' body, do you have an opinion formed to a medical certainty as to her cause of death?

A. Yes, ma'am.

Q. And what is that opinion?

A. She died from shotgun wounds to the chest and back.

Q. And given those wounds, how long could an individual live?

A. Well, as I told you, a major artery was injured underneath the arm. In addition to that injury, the one that went in the back injured the liver, the heart, and the lungs. Both of these would have bled profusely. In a matter of minutes she probably would have been unconscious.

MS. ROSE: I have no other questions of Dr. Wanger, Your Honor.

MR. BENDER: No questions, Your Honor.

THE COURT: You may step down.

THE WITNESS: Am I excused, Your Honor?

THE COURT: Yes, sir, you may be excused.

THE WITNESS: Thank you.

THE COURT: No objection?

MR. BENDER: No objection.

(Witness was excused.)

THE COURT: Members of the jury, we'll take our break at this time and ask you to be back with us at five minutes after two. Thank you for your attention to the case today and please remember all the instructions. Thank you.

(Lunch recess at 12:35 p.m.)

* * *

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2699

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA          )

                                  )   CASE NO. 3:97CR23-V

     v.                           )   July 30th, 2002

                                  )   Afternoon Session

AQUILIA MARCIVICCI BARNETTE,      )

          Defendant.              )

          TRANSCRIPT OF SENTENCING HEARING

     BEFORE THE HONORABLE RICHARD L. VOORHEES

          UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

     ANNE M. TOMPKINS, Esq.

     JILL WESTMORELAND ROSE, Esq.

     Assistant United States Attorney

     227 West Trade Street

     Suite 1700

     Charlotte, North Carolina   28202


FOR THE DEFENDANT:

     JEAN B. LAWSON, Esq.

     P.O. Box 4275

     Charlotte, North Carolina   28226

     HAROLD J. BENDER, Esq.

     200 North McDowell Street

     Charlotte, North Carolina   28204

Reported by:   Scott A. Huseby,

               Registered Professional Reporter,

               Certified Court Reporter,

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 126 of 286

687

Page 2700

P R O C E E D I N G S

(Lunch recess.)

THE COURT: Anything for the Court before we resume?

MS. LAWSON: No, Your Honor.

THE COURT: All right. May we have the jury, please?

MS. ROSE: The first witness will be my reading of the testimony.

THE COURT: All right.

(The jury returned to the courtroom.)

THE COURT: Good afternoon, members of the jury. I believe the government proposes to put into evidence prior testimony, is that correct?

MS. TOMPKINS: That's correct, Your Honor. It will be the testimony of Officer J.L. Krall who is unavailable to testify today.

THE COURT: All right. Members of the jury, when a witness such as this has previously testified as a sworn witness and is examined by the government and also counsel for the defendant, then the jury is to consider such testimony and consider that it is entitled to the same consideration and is to be judged as to credibility and weight and otherwise considered by the jury insofar as possible in the same

Case 3:12-cv-00327-MOC     Document 102     Filed 09/23/15     Page 127 of 286
688

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2701

way as if the witness had been present and had testified from the witness stand here. Because of this, you may consider the statements as if they were made at this trial and rely on them as much or as little as you think proper. Thank you.

MS. TOMPKINS: The government would call Officer J.L. Krall, and Ms. Rose will read her testimony.

THE COURT: All right.

MS. TOMPKINS: Just for the record, Your Honor, I'm going to be reading this verbatim and Ms. Rose's answers will be verbatim.

THE COURT: Right. And your questions will be those that were tendered by government counsel and Ms. Rose will answer in the same words as the witness, Officer Krall, is that correct?

MS. TOMPKINS: That's correct, and I have the cross-examination which I will also read.

THE COURT: All right.

MS. TOMPKINS: And her answers will be verbatim, answers to the cross-examination questions.

THE COURT: All right, thank you.

BY MS. TOMPKINS:

Q. Officer, would you state your full name, please?

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 128 of 286
689

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2702

A.   Officer J.L. Krall.

Q.   And Officer J.L. Krall, you work for the Charlotte-Mecklenburg police department, is that correct?

A.   Yes, I do.

Q.   And what do you do for the Charlotte-Mecklenburg police department?

A.   Patrol officer.

Q.   How long have you been a police officer?

A.   Five years.

Q.   I want to turn your attention back to June 24th of 1996.  On that particular day, were you working as a Charlotte police officer and on duty?

A.   Yes, I was.

Q.   Were you assigned back in June, and particularly on June 24th of 1996, were you assigned to a particular area of the city limits of Charlotte in which you were supposed to patrol?

A.   Sure, the Baker Three district.

Q.   I'm sorry, would you repeat that?

A.   Baker Three district.

Q.   And if you would keep your voice up like that so all of the members of the jury can hear what you say, tell the members of the jury what in general the Baker Three district covers here in the city of Charlotte.

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 129 of 286
690

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2703

A.    It's Independence, Sharon Amity, all the way out to the county line.

Q.    And as a patrol officer, what is your general primary responsibility and duty within that particular district of Charlotte?

A.    I patrol Independence, Sharon Amity, all the way down to Independence, Village Lake, patrol and answering calls.

Q.    Back on that particular date at around 9:00 o'clock at night, were you on duty and in your patrol car?

A.    Yes, sir, I was.

Q.    Did you happen to be patrolling the parking lot behind the 5600 block of Independence Avenue in Charlotte?

A.    Yes, I was.

Q.    What businesses are located at that address?

A.    It's Harris-Teeter, TJ Maxx, Sports Authority, whole bunch of little strip mall stores.

Q.    Those strip mall stores and the parking lots which adjoin those stores, is that an area that you had patrolled before that particular date?

A.    Yes, it is.

Q.    How often would you patrol those particular parking lots both in front of and behind those

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 130 of 286
691

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                 7/30/2002

Page 2704

businesses?

A.    That's my assigned area every day that I work.

Q.    So it would be fair to say that on a daily basis, you would patrol that area?

A.    Yes, I do.

Q.    When you were -- did you patrol that area on June 24th at about 9:00 o'clock at night?

A.    Yes, I did.

Q.    Did you see a vehicle parked behind one of the businesses there at that location?

A.    Yes, I did.

Q.    What about the vehicle got your attention, if you would relay that to the members of the jury?

A.    It was a dark blue Honda.  I easily know the cars that always park behind the building.  It's 9:00 o'clock at night, the shops are closing, and I've never seen that vehicle back there before.

Q.    And was that in a lot behind 5610 East Independence Boulevard?

A.    Yes, sir.

Q.    What did you do when you noticed that vehicle that got your attention?

A.    Pulled in behind it and ran the tag through our terminal.

Q.    Tell the members of the jury what you mean by

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 102     Filed 09/23/15     Page 131 of 286
692

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2705

running the tag, if you would.

A. We have a computer in our car where we can run vehicle information, check to see if the car is stolen or who the owner of the car is.

Q. What tag was on to Honda Prelude when you ran the tag?

A. It was a Tennessee tag, 031 RBT.

MS. TOMPKINS: May I approach the witness, Your Honor?

THE COURT: Yes.

BY MS. TOMPKINS:

Q. I'm going to show you, Officer, Government's Exhibit 28B. Is that the tag you saw on the back of the Honda Prelude that you saw in the parking lot?

A. Yes, it is.

Q. When you ran that particular tag, that being the Tennessee tag 031 RBT, what if anything did you learn?

A. I learned that it was stolen from a David Nelson in Tennessee.

Q. And when you say it was stolen, you are referring to the tag being stolen?

A. Yes.

Q. Once you learned that information, what did you do?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2706

A. The tag wasn't coming back to that particular car, so I checked the VIN number on the Honda.

Q. And when you say VIN number, you are referring to the vehicle identification number?

A. Yes, sir.

Q. Is that number a unique number to each individual car?

A. Yes, it is.

Q. And what was the vehicle identification number on the Honda Prelude that you inspected?

A. It was JHMBA8142RC004261.

Q. When you ran -- well, did you run that VIN number?

A. Yes, I did.

Q. When you ran the VIN number through your computer, did you learn who that car belonged to?

A. Yes, I did. It belonged to a Donald Allen of 2075 McConnells Road, South Carolina.

Q. Once you learned that that Honda Prelude belonged to Donald Allen from McConnells, South Carolina, what did you do next?

A. Asked my dispatcher to send a message down to the sheriff's department in South Carolina to see if they could locate the owner of the vehicle.

Q. See if they could find Mr. Allen?

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affiliate of Spherion  (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 133 of 286
694

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2707

A. Yes, sir.

Q. Did you -- once you made that request of dispatch, what happened next?

A. She came back and she told me that they were unable to locate Mr. Allen, so I contacted my sergeant and he told me to leave the vehicle where it was.

Q. Did you then leave the scene?

A. Yes, I did.

Q. At some point after you left the scene, did you get another -- did you get a call concerning Mr. Allen's Honda Prelude?

A. Yes, I did. The communications supervisor contacted me and advised me that Mr. Allen was now being reported as a missing person.

Q. When you were first at the location with the Honda Prelude, did you know at that point that Mr. Donald Allen had been reported missing?

A. I did not.

Q. When you learned of that information from the dispatcher over your radio, what did you do?

A. I went back to the Honda.

Q. After you were there with the Honda the second time, did any other officer arrive there on the scene?

A. Yes, sir, Officer T.C. Lontz.

Q. Shortly after Officer Lontz arrived, did

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 134 of 286
695

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2708

anyone -- anybody else arrive there on the scene?

A.    Yes, sir, Mr. Allen's brother-in-law, Kenny Hogue, and a friend, Ben Kennedy, arrived.

Q.    What, if anything, happened between you and Mr. Kennedy and Mr. Hogue?

A.    I was talking to Mr. Hogue and he advised me that Mr. Allen came up to Coyote Joe's to meet a girl.

Q.    And was missing since then?

A.    Yes, sir.

Q.    At some point did Ben Kennedy, the gentleman that was with Mr. Hogue, did he do something there near the Prelude that got your attention?

A.    Yes, he did.  He yelled to us that he had found a gun.

Q.    Did you turn towards him when he yelled that?

A.    Yes, sir. I turned towards him and he standing behind us beside a blue dumpster.

Q.    Did you go over to where he was standing?

A.    Yes, I did.

Q.    And did you look inside the dumpster?

A.    Yes, I did.

Q.    What, if anything, did you see?

A.    There was a gym bag and inside the gym bag there was a sawed-off shotgun with pistol tape grip and a magazine flashlight taped to the magazine of the

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 102     Filed 09/23/15     Page 135 of 286
696

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2709

shotgun.

Q.   Did you see anything else in the bag?

A.   There was some black pants, black baseball cap, white towel, garden hose, bolt cutters, crowbar.

Q.   After you noticed those items in the dumpster, what did you and Officer Lontz do at that point?

A.   We called for another officer and we taped the area off.

Q.   When you stay taped the area off, are you referring to, you secured the area?

A.   Yes, sir.

Q.   Did you keep anyone, the people that were there, from going near those items once you saw them?

A.   Yes we did.

Q.   And did that also include the Honda Prelude?

A.   Yes, I did.

Q.   At some point, did Officer Fred Allen arrive there on the scene?

A.   Yes, he did.

Q.   What, if anything, did you see Officer Allen do?

A.   He helped place the crime scene tape up around.

Q.   Okay.  Did you ever attempt to get inside the Honda Prelude?

A.   Yes, I did.  It was locked.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 136 of 286
697

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2710

Q. Were you able -- were you ever able or any other officer ever able to obtain a key to get inside the vehicle?

A. Yes, sir. Mr. Allen's brother gave me the key which I gave to my sergeant and he opened up the trunk of the car.

Q. Were you with your sergeant when he opened up the trunk?

A. Yes.

Q. When he opened up the trunk of Donnie Allen's Prelude, what, if anything, did you see in the trunk of the car?

A. There was a South Carolina tag -- it says tab -- FBE 685 along with some dirt in the trunk.

Q. Now, that South Carolina tag that you observed in the trunk, FBE 685, did you do any investigation to determine if that was the legal tag for Donnie Allen's Honda Prelude?

A. Yes, sir. I checked the tag and it was the legal tag.

Q. So that was the tag that was supposed to be on there instead of the Tennessee tag?

A. Yes, sir.

Q. Did you eventually see crime scene technicians respond to that scene?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 137 of 286
698

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2711

A.    Yes, I did.

                MS. TOMPKINS:   May I approach the witness, Your Honor?

                THE COURT:   Yes.

                MS. TOMPKINS:   This is outside of the context of the transcript, but rather than approach I'm going to show the photographs on the system that we have here today.

                THE COURT:   All right, you may.

                MS. TOMPKINS:   And then I will resume.

                BY MS. TOMPKINS:

Q.    Officer, I'm going to show you Government's Exhibits 30A, 30B, 30C, 30E and 30F, if you would take a look at each of those items and tell me what those are, please.

A.    This is from Mr. Allen's vehicle.

Q.    Which one is this, 29?

                MS. TOMPKINS:   Your Honor, she is referring to Government's Exhibit 30A.

                BY MS. TOMPKINS:

Q.    That's a photograph of the front of the Honda Prelude, is that correct?

A.    Yes, it is.   This --

Q.    I'm now showing you Government's Exhibit 30B.

A.    This is rear shot of his vehicle and our patrol

Reported By: Scott A. Huseby, RPR
800-333-2082            Huseby, Inc., an Affiliate of Spherion  (704) 333-9889            Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 138 of 286
699

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2712

vehicles.

Q. And you are referring to 30B?

A. Yes, sir.

Q. Looking now at 30C, is that a photograph of the tag as you saw it when you opened the trunk of Donnie's car?

A. Yes, it is.

Q. Okay, 30E, would that be part of the items that you noticed when you looked into the dumpster?

A. Yes, sir, it is.

Q. And lastly, looking at 30F, what is shown in that photograph?

A. It's a gym bag, and there is a pistol grip shotgun covered up by some black pants.

Q. Do all of those items fairly and accurately illustrate the items that you saw in the dumpster in Donnie Allen's car the night that you located it in that location?

A. Yes, it is.

MS. TOMPKINS: Your Honor, the Court then admitted those photographs into evidence.

BY MS. TOMPKINS:

Q. Did you notice anything about the inspection sticker that was on the Honda Prelude?

A. Yes, sir. There is little parts of a green

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2713

sticker in the bottom left-hand corner of the windshield.

Q.   And what did that indicate to you when you made that observation?

A.   I knew that South Carolina had green inspection stickers.

MS. TOMPKINS:  No further questions, Your Honor.  Okay, now on cross-examination.

BY MS. TOMPKINS:

Q.   Officer Krall, when you were at the scene and examined the contents of the dumpster, did you find or see a church bulletin and make a note of that in your report?

A.   Yes, sir, there was a church bulletin.

Q.   And was there an address on the church bulletin?

A.   I don't recall.

Q.   Do you know if there was a reference in the church bulletin to the state of Tennessee?

A.   I don't recall.

Q.   Did you also find two letters to a person named Vici, or Vicci, excuse me, from a person named Pooh?

A.   Yes, I did.

Q.   Did you make a note of that in your report?

A.   Yes, I did.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2714

Q.   Did you also find some hose, like a garden hose with some tape taped around the end of the hose?

A.   Yes, I did.

Q.   Did you make a note of that in your report?

A.   Yes, I did.

MS. TOMPKINS:  He asked to approach the witness.

BY MS. TOMPKINS:

Q.   Let me first show you a photograph marked for purposes of identification as Defendant's Exhibit Number 13, and ask you if you recognize it and if so, what it shows?

MS. TOMPKINS:  And we do not have Defendant's Exhibit 13.

THE WITNESS:  It appears to be an envelope, a church bulletin and part of a garden hose wrapped with duct tape.

BY MS. TOMPKINS:

Q.   And do you recall whether you saw those items at the scene as you have previously testified to?

A.   Yes, sir, I did.

Q.   And I will hand you a photograph marked for the purpose of identification as Defendant's Exhibit Number 14 and ask you if you can identify the photograph?

A.   Yes, sir.  It's a garden hose and a Sears bag.

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 141 of 286
702

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2715

Q. And is that the garden hose or part of the garden hose that you observed at the scene as you have previously testified to and noted in your report?

A. Yes, sir.

Q. Finally I hand you Defendant's Exhibit Number marked Defendant's Exhibit 15 and ask you if, before I show you the photograph, you observed any box of Compoz sleeping pills?

A. I don't remember seeing any.

Q. You don't remember seeing that?

A. No, sir.

MS. TOMPKINS: No further questions.

MS. ROSE: Your Honor, at this time the government would call Ben Kennedy.

BEN KENNEDY,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Would you state your name, please, sir.

A. Ben Kennedy.

Q. Where do you live, Mr. Kennedy?

A. Currently here in Charlotte, Running Brook Road.

Q. How long have you lived in Charlotte?

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affiliate of Spherion  (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 142 of 286
703

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2716

A.    Approximately 9 years.

Q.    Do you work?

A.    Yes, ma'am.

Q.    Where do you work?

A.    U.S. Airways.

Q.    And what is your position with U.S. Airways?

A.    Customer service and health and safety inspector.

Q.    Are you a neighbor of Kenneth Hogue?

A.    I was for 2 years.

Q.    And what is Kenneth Hogue's relationship to the Allen family, to Donnie Allen's family?

A.    Brother-in-law.

Q.    Do you recall back in June of 1996 when Donnie Allen was missing?

A.    Yes, ma'am.

Q.    And did your neighbor Kenny Hogue kind of keep you apprised of what was going on with his search?

A.    Yes, ma'am.

Q.    On June 25th of 1996 after Kenny Hogue got a call from Bob Allen, Donnie's father, did he call you?

A.    Yes, ma'am.

Q.    Tell the members of the jury about that phone call.

A.    He told me that he'd received a call and they

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 143 of 286
704

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2717

think they had located Donnie's car and asked if I would drive over to see the car and help him identify the car, if that was Donnie's.

Q. And about what time in the evening was that?

A. It was about 9:30.

Q. And did you in fact accompany Kenny Hogue over at Independence?

A. Yes, ma'am.

Q. When you got there, what did you see?

A. We saw Donnie's car and I think there were two officers there at time, and Kenny stepped out and identified Donnie's car as well as I. And --

Q. Had you met Donnie?

A. Yes, ma'am.

Q. Did he come and visit his sister and Kenny with some frequency?

A. Yes, ma'am.

Q. And during that 2 years, did you get to know Donnie Allen?

A. Yes, ma'am.

Q. Would you describe for the jury the shopping center where the car was located?

A. On Independence, it's a Harris-Teeter and Carolina Sports Authority and some small shops in between.

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 144 of 286
705

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
7/30/2002

Page 2718

Q. Was it in the front of the shopping center or in the back?

A. In the back.

Q. While Kenny was talking with some officers, what did you do?

A. Just out of curiosity -- they said there was nothing in the car, and so just out of curiosity I walked over and looked in the dumpsters behind the shopping center.

Q. Were there a number of dumpsters there?

A. There was probably four or five, all seemed to be full but one.

Q. And when you saw that all were full but one, what did you then do?

A. I went and opened the lid on the one dumpster which seemed to be empty.

Q. When you looked inside, what did you see?

A. I saw some black clothes, a bag, a sawed-off shotgun, garden hose, wire cutters and a flat crowbar.

MS. ROSE: If I may approach, Your Honor.

BY MS. ROSE:

Q. I'm going to show you a couple of exhibits, Mr. Kennedy. I'm going to show you Government's Exhibit 31E-1 and ask you to take a look at that exhibit, if you would, please, sir, and tell me if you are able to

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 145 of 286
706

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2719

identify it or if you've seen it before?

A.    Yes, ma'am.

Q.    Where did you see Exhibit 31E-1?

A.    That's the shotgun that was in the dumpster.

Q.    Also going to show you what has been marked as Government's Exhibit 31A-1.  What is 31A-1?

A.    That's the handbag that was in the dumpster.

Q.    And within that, Government's Exhibit 31A-3?

A.    The flat crowbar that was laying on the bag.

Q.    And 31A-2?

A.    The wire cutters that were in the dumpster.

MS. ROSE:  All of these exhibits, Your Honor, having been previously identified and admitted.

BY MS. ROSE:

Q.    When you first saw the bag, was it zipped or open or describe the condition?

A.    It looked like someone had just thrown it into the dumpster and the items had fallen out.  The bag was laying on its side and the items were laying in the bottom of the dumpster.

Q.    I'm going to show you Government's Exhibit 30D. What is 30D?

A.    A dumpster.

Q.    Is that the dumpster that was there behind the parking lot where these items were located?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 146 of 286
707

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2720

A.   To the best that I can tell, yes, ma'am.

Q.   Government's Exhibit 32A, are you able to see that now, Mr. Kennedy?

A.   Yes, ma'am, those are the items in the bottom of the dumpster.

Q.   Is that how they were located when you first glanced into the dumpster?

A.   Yes, ma'am.

Q.   Government's Exhibit 32B?

A.   It's the garden hose and the ball cap that were in the dumpster.

Q.   Does there appear to be a church bulletin there as well?

A.   Yes, ma'am.

Q.   Government's Exhibit 32C?

A.   I believe it's the shirt and pants that were in the dumpster.

Q.   Now, all of these --

A.   Or excuse me, maybe a towel.  I can't really tell from the picture.

Q.   And all of these photographs, sir, were they taken outside the dumpster there in the parking lot?

A.   Yes, ma'am.  After the officers got there, they took them out and marked each item individually.

Q.   Government's Exhibit 32D?

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 147 of 286
708

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2721

A.     Pants and the dumpster and the handbag.

Q.     Government's Exhibit 32E?

A.     The handbag, tools and pants that were in the dumpster.

Q.     32F?

A.     Sawed-off shotgun which was in the dumpster.

Q.     Are those all of the items that you saw when you looked in the dumpster on that particular evening?

A.     Other than a few cans or bottles, yes, ma'am.

Q.     I show you one other photograph, sir.  This would be Government's Exhibit 30F.  Can you describe that exhibit?

A.     That's the inside of the dumpster.  You can see the handbag, pants laying across it, and the handle of the shotgun.

Q.     And is that exactly how those items were located when you first saw them?

A.     Yes, ma'am.

Q.     While you were there, did the officer then take these items which have been depicted in the photographs as well as the ones that you identified, were they then taken into custody?

A.     Yes, ma'am.

MS. ROSE:  I don't have any other questions of Mr. Kennedy, Your Honor.

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 148 of 286

709

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2722

MS. LAWSON:  Just one.

CROSS-EXAMINATION

BY MS. LAWSON:

Q.   Mr. Kennedy, on that hose that you saw in the dumpster, it had duct tape wrapped around one end, did it not?

A.   Yes, ma'am.

MS. LAWSON:  Thank you very much.

THE COURT:  You may step down.

THE WITNESS:  Thank you.

MS. ROSE:  Government would call officer Mike Sanders.

JAMES MICHAEL SANDERS,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.   Would you introduce yourself to the jury, please, sir?

A.   I am James Michael Sanders.

Q.   Where do you work?

A.   Charlotte-Mecklenburg police department.

Q.   How long have you been an officer there?

A.   Approximately 21, 22 years, going on 22.

Q.   Currently, what is your position?

Case 3:12-cv-00327-MOC     Document 102     Filed 09/23/15     Page 149 of 286
710

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2723

A.    I'm a detective with the felony bureau, but I'm assigned to the FBI's violent crime fugitive task force.

Q.    And was that the position which you held in June of 1996?

A.    That's correct.

Q.    What does the violent crimes fugitive task force do?

A.    It's set up to pretty much go after the most violent offenders.  We open preliminary investigations and follow them through.  Our main objective is to do what they call a UFAP which is unlawful flight to avoid prosecution.  It's people that commit serious crimes here, take off to another state, we go after them.

Q.    Now, do you recall Tuesday, the 25th of June of 1996?

A.    Yes, I do.

Q.    And what do you recall as it relates to this case about that date?

A.    On that particular date, I was contacted by Special Agent Phil King, advised to report to the FBI office and to make contact with Special Agent Womble, that we would be involved in an apprehension.

Q.    In the apprehension of what?

A.    The person we would be apprehending would be Mr. Barnette.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 150 of 286
711

Page 2724

Q.   Now, at some point did you meet with FBI Agent Womble?

A.   Yes, I did.  We met at the FBI office.

Q.   And once you met with Agent Womble, did you then learn who it was that you would be arresting?

A.   I did.  At that time, they explained it would be Mr. Barnette and explained where we were going and what it was in reference to.

Q.   Did you know at that time what charges the defendant was being arrested on?

A.   I did.  He had a UFAP as well as it was murder charges out of Roanoke, Virginia.

Q.   The UFAP being the unlawful flight to avoid prosecution from another district?

A.   That's correct.

Q.   Upon getting that initial information, what did you and the FBI agents then do?

A.   It was determined that Special Agent Womble and myself would go in one vehicle to 3413 West Boulevard which is the residence of Mr. Barnette -- I think it's 3413, let me make sure -- right, 3413 West Boulevard, and D.C. Laney and Rick Walton would ride in the second vehicle.

Q.   Are they Charlotte-Mecklenburg officers or part of the task force that you are on?

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 151 of 286

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2725

A.    They are part of the task force.

Q.    Now, were you able to find 3413 West Boulevard?

A.    We were.  It's pretty hard to find the way it sits up off the road into the back.  It's a driveway that looks in pretty terrible shape at the time.

Q.    Describe how you found that residence.

A.    We drove in and at first, it looked like we were not going to find the residence.  We just continued on going up into a, kind of a wooded area, and the residence is on back up off the road.

Q.    When you pull in, does it go directly to a home, was there another residence there?

A.    There is another -- it may be even abandoned, I don't recall for sure, but there is another place to the right as you are going in I believe it was.

Q.    Now, how far is it from West Boulevard, that location on West Boulevard down to the intersection of Billy Graham Parkway and Morris Field Road?

A.    You can go down to the Billy Graham Freeway and you can just make a right and it's the next intersection down.

Q.    Have you ever checked the distance on it?

A.    I have not personally.

Q.    When you got to the defendant's home, was he there?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 152 of 286
713

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          7/30/2002

Page 2726

A.    Yes, he was.

Q.    Were there other folks there?

A.    There were other family members, his mother and I believe his grandfather and I believe there were some younger children.

Q.    Describe how the defendant was dressed on that occasion.

A.    He had dress slacks, white shirt, I believe they were green dress slacks, suspenders, a white shirt, dark socks and dress shoes.

Q.    And was he holding anything in particular at that time?

A.    He was holding a Bible.

Q.    Did his family appear to be supportive and loving?

A.    Very much so.  His mother was very interested in him at that point in time.

Q.    About what time of day was this when the defendant was arrested?

A.    We actually placed him under arrest at 3:12 p.m.

Q.    Now, do you know what had taken place prior to you meeting with the FBI agents over at the FBI office in order to meet the defendant, had there been some phone calls exchanged and an arrangement made to go by

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 102     Filed 09/23/15     Page 153 of 286
714

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2727

and pick him up?

A. It was my understanding that arrangements had been made with agents and Mr. Barnette's mother.

Q. Through his mother?

A. Correct.

Q. When you arrested the defendant, was he advised of the charges?

A. He was, not at first. We walked him out to Agent Womble's car, placed him in the right rear seat, and at that time his hands were handcuffed in front of him and he was verbally advised by Special Agent Womble.

Q. Why didn't you handcuff him whenever you went to the house?

A. Pretty much family was very distraught. The family seemed so loving, and it was just -- it was a decision we had made, to walk him out.

Q. You said there were also perhaps some children there?

A. Smaller children.

Q. When you arrested him, handcuffed him and got him in the car, was he also advised of his Miranda rights?

A. Yes, he was, verbally.

Q. Now, would you describe to the members of the jury whenever a defendant is advised of their Miranda

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 102     Filed 09/23/15     Page 154 of 286
715

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2728

rights, is there a particular form that is used?

A. There is -- normally there is a form used, but at this particular time we had not used it, he was just verbally advised.

Q. Now, after the defendant was arrested, where did you then go, what happened next?

A. I got into the left rear side beside Mr. Barnette, Special Agent Womble was the driver of the first vehicle, D.C. Laney and Rick Walton got in the second vehicle and we transported him to the FBI office.

Q. When you got there, what happened?

A. We placed Mr. Barnette in the interviewing area. It's a booking area room at the FBI office.

Q. And what's the purpose of that, the booking area or the booking procedure?

A. That's where we take everyone that we are going through, we take them down for the purpose of filling out forms, getting a criminal history, things as far as their identification and fingerprint them before taking them to the jail.

Q. And as part of that arrest process, is the defendant asked questions about injuries, prior medical information, employment, whether they have drug or alcohol addictions, things of that nature?

A. That's correct.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2729

Q.    Did the defendant answer positively to any of those?

A.    The defendant stated that he did not have an alcohol or drug problem.  He did inform me that he had a prior injury or informed us that he had a prior injury, I believe it was his right leg, said he had an entry exit wound on his right leg and he now had a pin in that same location.

Q.    Did he tell you the nature of that injury?

A.    Yeah, he said he had been shot in the past.

Q.    Following those preliminary questions, what happened next in the process?

A.    Special Agent Womble advised Mr. Barnette that the case in Roanoke, Virginia was a murder trial, and he informed Mr. Barnette that he believed that there was more than enough evidence to place Mr. Barnette at the scene of the murder trial in Roanoke.  And Mr. Barnette stated at that point in time, I'm sure there is, I'm sure that's right.  At this point, Special Agent Womble advised Mr. Barnette that we were involved or he was involved in a missing person case that had occurred here in Charlotte, and Special Agent Womble advised Mr. Barnette that we believe the vehicle that Mr. Barnette had driven to Roanoke, Virginia to commit that murder was the same vehicle that belonged to the

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 156 of 286
717

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2730

missing person here in Charlotte.

Q. Now, prior to you or Agent Womble bringing up the missing person, had the defendant said anything about Donnie Allen?

A. No, he had not.

Q. Whenever you all told him that you felt like he was involved in that, what did the defendant do?

A. Didn't state anything at first. When Special Agent Womble explained to him -- as I stated earlier, Special Agent Womble asked him if there was something that we needed to know about a person, if he needed medical attention we needed to know about it, and if he didn't need medical attention, if he was just bound in any way and needed assistance, that we needed to know about it.

Q. After going through that scenario, kind of laying out as the situation may be with Mr. Allen, what did Mr. Barnette do?

A. At that time, Mr. Barnette requested a pencil and paper, still didn't say anything. Special Agent Womble supplied Mr. Barnette with a piece of paper out of the notebook that he was writing or using for the interview and I supplied Mr. Barnette with an ink pen.

Q. Then what happened?

A. Mr. Barnette wrote on this piece of paper. He

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 157 of 286
718

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2731

gave the location of Donald Allen's body. He wrote on the paper, corner off Billy Graham and Morris Field Road, period, left side drain ditch.

Q. So the quote is, corner off Billy Graham and Morris Field Road, period, left side drain ditch?

A. That's correct.

Q. And I see you referring to some notes there. Are you referring -- let me show you what has been previously marked, admitted as Government's Exhibit 36, ask you to take a look at that exhibit and tell the jury what it is.

A. This would be my supplement made from beginning into the whole investigation.

Q. And that's your report of what occurred?

A. That's my report, correct.

Q. And are you referring to a copy of that?

A. I am.

Q. Government's 36. Now, do you during the course of an interview or investigation take very clear notes, try to be specific?

A. Yes, ma'am. As a general rule, they are to assist in your later supplement.

Q. Once the defendant gave you the piece of paper with that identifying information, what did you all do?

A. At that point I stepped out of the interview

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 158 of 286
719

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2732

room, telephoned the Charlotte-Mecklenburg police dispatch and requested a homicide supervisor. Shortly I was contacted by homicide supervisor Sergeant Sanders, requested that I telephone him at his office. I called him at his office and I explained to him what had taken place up to this point. At this time, Sergeant Sanders advised me he would be en route to the FBI office.

Q. And once Sergeant Sanders got to the FBI office, did all of you then leave that building?

A. Yes, we did. Sergeant Sanders requested that I go in and ask Mr. Barnette if he would take us to the location he had written on the paper which was the corner of Billy Graham and Morris Field, the left side drain ditch.

Q. Did you know at that time why Sergeant Sanders was requesting that the defendant be brought to that intersection?

A. At the time, just to make sure that we were going to the exact location and it wasn't the wrong street or anything, just to clarify.

Q. And once again, did you and the other officers take the defendant, put him in the car and head for that direction?

A. We did. We took two vehicles once again, placed Mr. Barnette in the right rear seat, hands still

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 159 of 286
720

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2733

handcuffed in front of him. I got into the left rear seat. Special Agent Womble was the driver of vehicle one. Sergeant Sanders and at that time D.C. Laney were in vehicle number two. We proceeded to go from the FBI office toward the location he had given us.

Q. About what time of day was that?

A. That would have been 4:57 p.m.

Q. And as you started getting closer to that intersection or to Morris Field Road, who was giving directions?

A. Mr. Barnette was giving directions the whole time. He had explained to us -- as we were pulling out of the FBI office, he explained to us that we would be getting onto Wilkinson Boulevard and we would be going outbound on Wilkinson Boulevard.

Q. If you would, describe the defendant's demeanor during this trip.

A. He was very calm at that point, giving good directions, very -- no problems at all at that point.

Q. And had he been calm and collected from the time that you arrested him that day?

A. He had. Up until that point, he was doing real well.

Q. Now, once you reached Morris Field and Billy Graham, what happened?

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 160 of 286
721

Page 2734

A.    When we reached Morris Field and Billy Graham, just prior to getting to the intersection of Billy Graham, the defendant advised Special Agent Womble to pull over to the right side of the road on Morris Field. And then at that point, the defendant pointed across the street and said the drain ditch directly across Morris Field.

Q.    Did you or one of the other officers go down into the drainage ditch to see if the body of Donnie could be located?

A.    That's correct.  I advised Sergeant Sanders and D.C. Laney what Mr. Barnette had stated and the two of them went down, walked across.

Q.    And did in fact one of them come back and ask another question?

A.    Yes, they did.  They had a little bit of a problem locating him because he was further down into it, and Mr. Barnette advised me to tell them to go further down.

Q.    Do you recall his specific words?

A.    I'm not sure if I -- I don't recall the exact words.  I don't have them on here.

Q.    Once the sergeant was told that the body was further into the woods or down the ditch, what happened?

A.    The body was located.

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 161 of 286
722

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2735

Q.   Now, were there any more statements made at that time by the defendant?

A.   Not at that particular time, no.

Q.   After -- did you then leave that area with the defendant?

A.   We did.  Special Agent Womble was the driver. D.C. Laney got into the right front passenger seat. Mr. Barnette remained in the right rear and I remained in the left, and we started toward the law enforcement center.

Q.   When you got to the law enforcement center, before getting out of the car, did you do anything there?

A.   We did.  Just prior to getting to the law enforcement center, we discussed Mr. Allen's vehicle.  I asked Mr. Barnette if he could remember anything about the vehicle to identify it from another vehicle. Mr. Barnette advised that it was a blue Honda Prelude. Just prior to pulling underneath, Special Agent Womble asked Mr. Barnette if he wanted to see the vehicle and he was sure he could identify it, Mr. Barnette stated he was sure.  We pulled up under the police station.  The vehicle was parked in a parking space under the old police station near other vehicles.  Mr. Barnette was able to point at it and say that's the blue Honda.

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 162 of 286
723

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          7/30/2002

Page 2736

Q.    Now, I take it that when the car was located at the shopping center behind Independence that it had been moved to the police department for what purpose?

A.    Just secure it.

Q.    Was there also evidence collection or processing of that car being done?

A.    Yes, there was.

Q.    After you drove past the parking area, where is the next place you went with the defendant?

A.    I carried Mr. Barnette up in the crime against persons section, it's the felony section, to place him in an interview room.

Q.    And at that point, were you the only individual who was interviewing the defendant or what was the setup?

A.    At that particular time, D.C. Laney and myself, we hadn't started an interview at all.  Prior to placing him in, I asked Mr. Barnette if he needed to go to the rest room or if he wanted something to eat or drink.  He declined on anything to eat or drink but did say he had to go to the rest room, so we walked him down the hall to a rest room on the vice section on that floor.

Q.    Once he had used the rest room, did you then take him back to the interview room?

A.    He was placed back in the interview room,

Case 3:12-cv-00327-MOC     Document 102     Filed 09/23/15     Page 163 of 286
724

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2737

correct.

Q. And prior to talking any further with him, was he once again advised of his Miranda rights?

A. He was. At that time, Special Agent Womble entered, took the handcuffs off from him. Special Agent Womble exited the interview room and Sergeant Sanders and myself remained in the interview room. Sergeant Sanders informed Mr. Barnette that his rights still carried over as was explained to him earlier.

Q. About what time in the evening was it then?

A. 6:15 p.m.

Q. Who went into the interview room with you at 6:15?

A. Sergeant Sanders and myself entered the interview room.

Q. Whenever you advised the defendant that his Miranda rights still applied as they were explained to him earlier at the FBI office, what did he say?

A. He acknowledged he understood his rights.

Q. Did you then begin to ask the defendant some questions about Donnie Allen's murder?

A. Sergeant Sanders pretty much started the interview. He asked him where he had met the person that owned the vehicle, I believe.

Q. I believe if you look at -- it would be the

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 164 of 286
725

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2738

third, fourth page of your report beginning at 6:15, if you would just tell the members of the jury what you recall the defendant saying that particular evening.

A.    Okay.  Upon asking him if he remembered where he met the subject that owned the car which was later determined to be Donald Allen, he stated that he had been doing some drinking at his residence, been thinking about a lot of things, thinking about his girlfriend. He stated he had taken a shotgun, placed it inside a bag with some shells and then he proceeded to tell how he had started over to Billy Graham and Morris Field.

Q.    Did he tell you about what time it was when he got to Morris Field and Billy Graham?

A.    He felt like it was around 2:00 a.m. and that was actually early Friday morning, or Saturday morning, I'm sorry, Friday might, Saturday morning.

Q.    Did the defendant tell you what about this intersection was the reason that he had gone there?

A.    Yes, he did.  He stated he had prior knowledge of that particular intersection.  I believe he said he went to church somewhere in that area, so he knew that intersection was dark.  And his purpose was to go there and to car-jack somebody for their car to get a way to Roanoke.

Q.    And did he describe for you what happened when

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 165 of 286

726

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2739

he saw the blue Honda Prelude come up to the light?

A. He did. He stated as the Honda stopped for the red light, the window was down and he walked directly up to him and pointed a shotgun and ordered him out of his vehicle.

Q. Did he tell you whether the driver of the car did what he asked him to do?

A. He did. He took it a step further. He stated that when he ordered him out of the vehicle, he stepped out of the vehicle. He stated he didn't have any money at the time, so he ordered the defendant to give him his wallet and the defendant did give him his wallet.

Q. You mean the victim?

A. I'm sorry, the victim did give him his wallet. Then he stated that he told the victim to walk across the street, across Morris Field and the victim walked immediately across, still pointing the shotgun at him the whole time. He stated he told the victim to turn around, the victim was facing him, and he told him to turn around and he shot him.

Q. Did he say when the driver turned around, the defendant said that he shot him multiple times?

A. Yes, he did.

Q. After that, did he tell you what he did with Donnie Allen's car?

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an Affiliate of Spherion (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 166 of 286
727

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2740

A.   He stated he got into the car and he drove back down Morris Field Road.  He believes he went towards Wilkinson Boulevard and he ended up on 77 headed toward Roanoke.

Q.   Did he tell you about stopping somewhere to get gas and how he was able to purchase that gas?

A.   He did.  He stated he couldn't recall where the gas station was, but he did stop to get gas and he paid cash for the gas.

Q.   Did he then tell you that he headed for Roanoke and got to his girlfriend's mother's house?

A.   He did.

Q.   What did he say?

A.   He stated he drove to Roanoke and he parked across the street from his girlfriend's mother's residence and just started watching the house.  He stated that this was around 5:30 a.m. Saturday morning.

Q.   What was the defendant doing at this time, what is his demeanor at this point?

A.   He said he was talking to himself pretty much discussing the way his girlfriend went out with another guy, taking his life away from him.  He said there was times that he thought about he just wanted to talk to . her and there was times he knew he just wanted to kill her, back and forth.

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 167 of 286

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2741

Q.    Did he tell you what happened about 7:00 o'clock that morning?

A.    Yes, he did.  He said he observed Robin come out with her dog.

Q.    What did he then do?

A.    When she went back into the house, he stated that he pulled his car around behind the house or pulled the blue Honda Prelude behind the house, took the shotgun, he exited his vehicle, went down behind the house, said he went through a gate.  There's a fenced-in area with a gate.  He opened it up.  He said he knew that they might try to call the police, so he pulled the wires out of the phone.  Then at that point he walked up to the -- he stated the right rear side door, so apparently the rear door is pretty much to the rear but on the side as well of the residence.  He tried to get in the back door.  He couldn't.  He stated he took the shotgun and shot at the lock on the door a couple of times, he wasn't sure if it was one or two, and he still had to forcefully push his way into the door.

Q.    What did he say he saw when he stepped inside the door?

A.    He stated upon stepping inside the door, he saw Robin and her mother.  They appeared to be looking out the front door trying to figure out where the noise was

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion, (704) 333-9889          Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 168 of 286

729

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2742

coming from. And in his opinion, he stated that they must not have known it was him trying to come into their house because they were looking as if it was taking place somewhere else.

Q. What did he say he heard Robin's mother say?

A. He stated when Robin's mother turned around and observed him, she hollered run, Robin, run.

Q. And what did the defendant do?

A. At that point, the defendant said he observed Robin run out the front door and across. He ran back out the rear door that he had just came into, ran around the house, and then he ran through the same way Robin had ran to get away and started chasing Robin.

Q. Did he tell her why he was able to catch, or did he tell you, I'm sorry, how he was able to catch Robin?

A. Yes, he did. He stated that he was able to catch her because she had fallen twice which allowed him to catch up with her, and he was able to grab her with his left hand.

Q. Now, at that point did he indicate that he was kind of unclear on what had happened from that point on?

A. He pretty much -- well, he stated to me that she tried to pull away a couple of times and he grabbed her by the arm, and when she got away once he grabbed

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 169 of 286

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2743

her by hair. And then he made a statement to her, don't worry, I've got one for me and one for you, something along those lines.

Q. Did he tell you that he shot her as she was running toward her mother, he did remember that?

A. Yes, he did. He said as she broke away, he could see her running at her mother and he shot her, couldn't remember how many times he shot her, but he knew he put the shotgun up and shot her.

Q. After that, what did he tell you he did?

A. He said he ran back to the Honda Prelude and drove away. But he did look over and see her laying on the ground, so he knew he had shot her and he drove away.

Q. Did he tell you where he went?

A. Yes, he did. He said he drove to Knoxville, Tennessee.

Q. Did you ask him what he had done with Donnie Allen's billfold?

A. We did ask him, and I don't believe he could tell us. I think he wasn't sure what had happened to it at that point.

Q. What did you ask him next after you asked about the billfold?

A. When we asked him about the billfold, pretty

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 170 of 286
731

United States of America vs. Aquilia Marcivicci Barnette        3:97CR23-V
Proceedings Before Judge Richard L. Voorhees        7/30/2002

Page 2744

much what brought the billfold up was that was the way he knew who Donnie Allen was.  We had asked him.  He stated that he had seen Donnie Allen's identification in the billfold.

Q.   Did he tell you what he did when he got into Tennessee?

A.   Yes, he did.  He stated that was where he went to the First Calvary Baptist Church in Knoxville.

Q.   Did he talk about anything else he did?

A.   He said he had purchased a garden hose and some tape, he had intended to commit suicide.

Q.   Did he also indicate that he removed the tag off of the car, put it in the trunk and replaced it with another tag he had gotten at a motel?

A.   Yes, he did.  He was asked this a couple of different times.  He stated that he knew that the police, just law enforcement in general would be out looking for him and that particular car, so he wanted to remove the South Carolina tag and put another tag on it.

Q.   When asked about what kind of gun he had, what did he tell you?

A.   He said it was a Winchester shotgun.

Q.   Did he describe how he had gotten that gun?

A.   He told me earlier that he couldn't remember exactly when, but he said earlier he had purchased the

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 171 of 286
732

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2745

shotgun at a pawnshop on Freedom Drive.  He didn't know the name of the pawnshop, but he stated he had purchased it in his brother's name, he used his brother's ID.

Q.   What was his brother's name?

A.   Mario Barnette.

Q.   Did you ask him if there was anything else specific that he could recall about this gun?

A.   Yes, I did.  He was able to describe the gun really well.  He stated that he had altered the shotgun by cutting the barrel off, he had cut the stock off, stated that he had taken a flashlight and taped it to the barrel.  When asked why he did this, he stated he used hockey type tape to tape it to it because he used the gun to hunt snakes and varmits around the house.

Q.   Did he tell you a little bit about what he did in Knoxville, Tennessee, did he go back to that situation?

A.   Yes, he did.  He stated at one point in time, he had taken the hose and put it in the exhaust and taped it to the exhaust and attempted suicide, but he said this was at a Sears, I believe, and a security guard had approached him and stopped him.

Q.   Did he also tell you that he'd tried to commit suicide with some sleeping pills?

A.   Yes, he did.  He stated he had -- couldn't

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 172 of 286
733

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/30/2002

Page 2746

remember where he'd gotten them, said that he had obtained some sleeping spills and had taken some of those, attempted it a second time, and he said a white construction worker which he didn't know had stopped him again at that point.

Q.   Now, at that point, did you know or did either of you say anything to him about the fact that he had a loaded shotgun in the car when he was doing these other attempted suicides?

A.   He stated that he still had the shotgun with him in the trunk of the car, I believe it was.

Q.   Did he talk to you about coming back to Charlotte?

A.   Yes, he did.  He stated he stopped at a gas station, I believe it was on 40 East, and I believe at that point he had made a phone call to some of his relatives and he had to ask for directions at the gas station to get back towards Charlotte.

Q.   In fact, did he say he called his mother on Sunday and told her he was sorry for what he had done and told her what he had done?

A.   He stated that he had talked to her, yes, correct, he had telephoned his mother and told her about the incident in Roanoke.

Q.   When he got back to Charlotte, what did he do?

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affiliate of Spherion  (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 173 of 286
734

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2747

A. When he got back to Charlotte, he said he parked his vehicle near his cousin's house near the Sports Authority, said that he got out of the vehicle, got a beige bag, which was the same beige bag that he had used prior to going to the intersection, said he put the garden hose and shotgun inside the beige bag and put them inside a dumpster which was near the rear of the car.

Q. Did he indicate that that location where he'd abandoned the car was near a relative's home, do you recall that?

A. Yes, he sure did. It was a Shonda -- said it was a cousin.

Q. Shonda Nero?

A. That's correct.

Q. And that then she picked him up, did he say that specifically?

A. I don't remember if he said she picked him up or not. I know that he went to her location.

Q. Did you -- did there come to be some discussion about Donnie Allen's golf clubs which were in his car?

A. Yes, there was. He brought -- when we asked him about any other things that he could tell us about the car, that was when Mr. Barnette stated that at one time he had observed golf clubs in the car but he didn't

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 174 of 286
735

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2748

know what had happened to them, they were no longer in there.

Q. And those clubs were never recovered?

A. Not to my knowledge.

Q. Did the defendant talk about the gun, how it was configured as far as the shells that it would hold?

A. Yes, he did. On a couple of difficult occasions, he explained that the shotgun would hold three rounds, that he could put two in the tube and one in the chamber.

Q. Did he also indicate whether he had extra shells with him?

A. He did. He stated when he first left his residence on Friday night or early Saturday morning, that he had placed extra shells in the beige bag that he carried with him.

Q. When he talked about Donnie Allen, did you or Sergeant Sanders ask if the man had tried to run or resist?

A. I asked him at one time if the man had resisted and he stated no, that when he told him to get out of the car, he did. When he told him to give him his wallet, he gave him his wallet. When he told him to walk across the street, he did. When he told him to turn around, he stated he did, and at that point he

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2749

started shooting him.

Q. At that point then, did the defendant ask to call some family members?

A. Yes, he did. He requested to talk to his mother.

Q. And did he talk about then, begin to talk about his state of mind?

A. He started mentioning he had in the past been feeling depressed. He had seen a commercial, I think it was a Charter Pines commercial about depression. He even talked about at one time a cousin had found some sleeping pill boxes or something and called to check on him, said that it had really bothered him, her leaving him.

Q. Did he tell you why he was at Billy Graham and Morris Field specifically?

A. He stated the reason that he picked that intersection specifically is the only light there is the red light itself, red, yellow and green light, it's really dark, no one can see. And he knew that whoever stopped at the red light with a car, he was going to approach and take the car from them, even went to tell us that we really needed to have some lights put up at that intersection in the future.

Q. At about 7:21 that evening, was that interview

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an Affiliate of Spherion  (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 102     Filed 09/23/15     Page 176 of 286
737

Page 2750

concluded?

A.   It was.

Q.   Did the defendant take a break at that point?

A.   He was offered an opportunity to eat and drink and he declined.

Q.   Did he make any phone calls at that time, did he call his mother?

A.   Not quite at that time.  Let me -- no, not at that time, he did not.

MS. ROSE:  I don't have any further questions at this time.

CROSS-EXAMINATION

BY MR. BENDER:

Q.   Mr. Sanders, you were assigned to the Charlotte violent crimes fugitive task force at that time?

A.   That's correct.

Q.   Are you still assigned there?

A.   Yes, sir, I am.

Q.   How long prior to June of 1996 were you assigned there?

A.   I'm not sure when I had actually came onto the task force.  I'm not even sure.

Q.   Was there an unlawful flight to avoid prosecution warrant out for Marc Barnette as a result of the violence that occurred in Roanoke against Robin

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 177 of 286
738

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2751

Williams on August -- excuse me, April 30th, 1996?

A.    That was my understanding.

Q.    So from April 30th, '96 through 25th or 26th, somebody with the FBI or law enforcement knew there was an unlawful flight to avoid prosecution warrant outstanding for him for the fire bombing?

A.    Yes, sir, I would think so, yes.

Q.    When you drove in that driveway, there was a mailbox with 3413 West Boulevard out there, wasn't it?

A.    I don't recall seeing the mailbox.  I'm not saying it wasn't there, I just don't recall seeing it.

MR. BENDER:  Your Honor, since it's not our turn to introduce evidence, I do need to have him identify this.

THE COURT:  You may.

MR. BENDER:  I'm not well versed in this, so I need somebody to focus it down for me.

BY MR. BENDER:

Q.    Can you see that mailbox?

A.    Yes, sir, I do.

Q.    Is that the photograph of West Boulevard?

A.    Yes, sir.

Q.    Headed towards Billy Graham?

A.    That's correct.

Q.    And do you see the house number of 3413 on the

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 178 of 286

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2752

mailbox there?

A.    I see it on this mailbox, correct.

Q.    Okay.  You have no reason to doubt that it was there?

A.    I couldn't say whether it was or wasn't.  I never seen it -- I don't recall ever seeing it.  It very well could have been, but I wouldn't want to stake anything on it.

Q.    Okay.  What attempts were made by the violent -- Charlotte violent crimes fugitive task force to locate Marc Barnette on the fugitive warrant from April 30th through June 26th?

A.    I couldn't tell you.  The only thing that I knew about this started on the date of this incident.  June 25th was my first of being informed of any of it.

Q.    Okay.  So you don't know if any attempts were made, do you?

A.    Not by me personally, no.  I had no knowledge of it before June 25th.

Q.    Have you looked through the files and tried to determine that?

A.    I have not, no.

Q.    This is a fairly comprehensive report that you did concerning the events of June 25th, 1996, wasn't it?

A.    Yes, sir.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2753

Q. And it was done on June 26th, that is, it was written by you and put in the computer by you on June 26th, 1996, wasn't it?

A. Right, my notes were done that day. I'm not so sure of the exact date it was put in the computer, but I believe it would have been the 26th.

Q. Fairly fresh in your mind as to what happened?

A. Yes, sir.

Q. And you or at least Special Agent Womble knew where to go, went out there, turned in the driveway and went to the residence?

A. Yes, sir.

Q. And you were in the car?

A. Right.

Q. And at that time, you found Marc Barnette either in the house or out of the house, which one?

A. Inside the house.

Q. Inside, okay. He was not permitted to take his Bible with him, was he?

A. I don't believe so. I don't think they'd let him have it at the jail.

Q. Gave you no problem?

A. No, he did not.

Q. Cooperated with you?

A. Well, there was no alternative. At that point,

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 180 of 286
741

Page 2754

he knew why we were there.

Q.    Right.  He turned himself in basically?

A.    Correct.

Q.    And he didn't give you any trouble when you went back to the FBI office?

A.    No, he did not.

Q.    And at first, he was being asked about this unlawful flight to avoid prosecution warrant for the murder in Roanoke, wasn't he?

A.    Correct.

Q.    That was what he was initially asked about was the Roanoke murder?

A.    He was not asked about the Roanoke initially, no, he was just informed that that was another case.  He was actually asked about the missing person case.

Q.    He told you he had been employed up in Roanoke with Electrolux from February through April of 1996, is that --

A.    That's correct.

Q.    And he told you that he had returned home in about April of 1996 due to a break-up with his girlfriend, Robin Williams?

A.    That's correct.

Q.    And he gave you his address where he had been staying as 3413 West Boulevard?

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 181 of 286
742

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2755

A.    Correct.

Q.    Gave you his telephone number there?

A.    Yes, he did.

Q.    And that was 704-399-5479?

A.    That's correct.

Q.    And that was one of the numbers that the violent crimes fugitive task force had as of April 30th, 1996 on how the locate Mr. Barnette, wasn't it?

A.    I can only tell you what happened on the 25th. I know what happened on that date.

Q.    When Agent Womble said that he believes that more than enough evidence to arrest him for the murder in Roanoke, he said, I'm sure there is, I'm sure that's right?

A.    That's correct.

Q.    He didn't deny anything about that, did he?

A.    He did not.

Q.    And then when Agent Womble said we have got a missing persons situation we are trying to look into too, we think the car that you were driving had something to do with that, he said let me see a piece of paper and a pen?

A.    That's correct.

Q.    And at that time, he actually -- did he write out or did he draw a diagram of the intersection?

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/30/2002

Page 2756

A.   I don't have that with me.  I know he had written it out, but I think there was a diagram on there.  Seems I do remember a diagram.

Q.   And he did that voluntarily?

A.   Yes, he did.

Q.   And then I believe your brother is Rick Sanders?

A.   That's correct.

Q.   And at that time, Rick was a homicide supervisor?

A.   He was.

Q.   And when you made the call for any supervisor about the diagram and the information you just received, it just happened to be Rick who called back?

A.   Right, he was on duty.

Q.   And he said something like ask him if he will go with us?

A.   Right, upon arrival.

Q.   So you went back in the room, talked to Marc, asked him if he would go with you and he said he would?

A.   That's correct.

Q.   Now, at this time, you had no idea what had happened to Donald Allen, had you?

A.   No, sir, did not.

Q.   So Marc Barnett actually took you to where the

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 183 of 286
744

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2757

body was, gave you directions and rode with you?

A.   Yes, sir.

Q.   And when you got to that location and Special Agent Womble pulled over to the right side of the road, Marc Barnette pointed in the direction across Morris Field?

A.   That's correct.

Q.   And started crying?

A.   That's correct.

Q.   He started crying right then?

A.   Yes, sir.

Q.   And said there is a drain that runs on the other side of the ditch down the hill kind of in the curb?

A.   That's correct.

Q.   And that's where his body was located?

A.   It was.

Q.   You didn't go down there, though, did you?

A.   No, sir, I remained with Mr. Barnette.

Q.   And so there were some news vans out there that day, weren't there?

A.   I believe I recall some coming later.

Q.   Well, y'all were only there for less than 30 minutes, that is, with Marc at the scene, but some news vans came before y'all left at 5:36, didn't they?

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889
800-333-2082                                                                                    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 184 of 286
745

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2758

A.   Yes.   Before we left, there was a news van, correct.

Q.   Do you know how some news organization got word about this crime scene?

A.   Well, I wouldn't know about this one, but it's not uncommon for them to monitor channels.   If anyone slips and uses what we call a private line, you are taught as a rookie it's not really private.   It's a bad saying for it because they do monitor.

Q.   So somebody may have made a mistake?

A.   It could have been that someone called requesting anything and they got wind of it and they will come out.

Q.   And after y'all left, Mr. Barnette was still crying as you left?

A.   He got himself composed as we were leaving. There was no problem upon leaving.

Q.   And you asked him if he could identify the vehicle and he said he knew it was a blue Prelude?

A.   That's correct.

Q.   Thought about it.   Took him down and rode him around and he said, that's it?

A.   That's correct.

Q.   Still very cooperative with you?

A.   He was.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889
800-333-2082
Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2759

Q.    Now, at that point you put him in a room.    I guess after you took him to the rest room, you put him in another room?

A.    In an interview room.

Q.    Interview room?

A.    That's correct.

MR. BENDER:  Your Honor, we have marked Defendant's Exhibit 1 and 1A.  Since we are not permitted to introduce evidence, I would like to just show it to him.

BY MR. BENDER:

Q.    They say you can identify it without seeing it. Can you?

A.    Well, I can tell you that it states Marc Barnette, 6/25/96.

Q.    I thought that's what you would do.  I need you to take a look at it and see if you are familiar with it and can identify it.

THE COURT:  Let's take a break and maybe you can do it that way.

MR. BENDER:  Yes, that will be good, Judge.

THE COURT:  Members of the jury, we will take a break and we'll call for you in about 15 minutes. Keep an open mind about the case, don't discuss it, and

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 186 of 286
747

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2760

remember the other instructions. Thank you.

(The jury left the courtroom.)

THE COURT: What is that a tape of?

MR. BENDER: It's a tape -- it's a video of the 6:15, starts at 6:15 on the 25th of Mr. Barnette being interviewed by I think Mike Sanders and Rick Sanders during that time.

THE COURT: So you want this witness to review that while the break is underway?

MR. BENDER: Yeah, and then we will come back and introduce it before the jury. And what we have done, Judge, is this is the one we got from -- it's the entire one that we have from the government. We have taken 15 minutes of that and put it on another tape, that's 1A, so we need to introduce the full one in case they want to play the whole thing under the rules of evidence.

THE COURT: Well, Defendant's Exhibit 1 is which one?

MR. BENDER: That is the entire interview of -- that began at 6:15 that day.

THE COURT: And 1A?

MR. BENDER: 1A is an excerpt from that, 15-minute excerpt.

THE COURT: Now, do you propose to play

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889
800-338-2082                                                    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 187 of 286
748

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2761

that at this time for the jury?

MR. BENDER: No, Your Honor, we were going to play it in our evidence, but we have to have him identify it.

THE COURT: You can let him identify it when we come back from the break.

MR. BENDER: All right.

THE COURT: And he may -- presumably he will need to look at at least some of it during the break.

MR. BENDER: Sure.

(Brief recess.)

THE COURT: Did you take care of that business?

MR. BENDER: We did, Your Honor.

THE COURT: May we have the jury, please.

(The jury returned to the courtroom.)

MR. BENDER: May I, Your Honor?

THE COURT: Yes, sir.

BY MR. BENDER:

Q. Let me just back up a minute before I ask you what we were talking about before the break. After Marc came back from the rest room and you put him in the interview room, that is an interview room with video and audio capabilities, is it not?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2762

A.    That is correct.

Q.    Okay.  And so far as you knew, the video and the audio were operational at that time?

A.    When we first placed him in, but later we found out it was not.

Q.    All right.  And you later found out that the video was fine, the audio was low and there was some words that were unintelligible, is that correct?

A.    That's correct.

Q.    But as far as the video was concerned --

A.    Yes, sir.

Q.    -- it was fine?

A.    Yes, sir, the video worked fine.

Q.    And with regard to Defendant's Number 1, during the break you and I have had an opportunity to review that, is that a video of that interview that was conducted by you and Rick Sanders at approximately 6:15 p.m. on June the 25th, 1996?

A.    That's correct.

Q.    And as to Defendant's Exhibit 1A, is that about a 15-minute excerpt of that video from 6:15 p.m. on June the 25th, 1996?

A.    That's correct.

Q.    Okay.  And you've had an opportunity to review as much of it as you needed to to verify that?

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889
800-333-2082                                                           Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 189 of 286
750

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2763

A.    Right.

Q.    Now, the video recorder, the camera itself, is not visible, is it?

A.    No, sir.

Q.    It's sort of a hidden camera in there?

A.    Right.

Q.    And the audio, or the microphone for the audio is also not visible, is that right?

A.    Right.  Well, they are not where you would readily identify them.  They are visible, but not --

Q.    Okay.  It's not like a tape recorder where people know that they are being recorded?

A.    No, sir.

Q.    That did happen later, did it not --

A.    Yes, sir, it did.

Q.    -- at some point?  Did you participate in that audio recording with an actual tape recorder?

A.    Yes, sir, I did.

Q.    Now, during this time that you were, you and Rick Sanders were with Marc in that interview room, he told you that he was so mad at her, meaning Robin, for taking his life away --

A.    Yes, sir --

Q.    -- and that --

A.    -- he did.

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an Affiliate of Spherion  (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 190 of 286
751

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2764

Q. He also said, I hated her for that, but I also loved her?

A. Yes, sir, I believe so.

Q. Okay. Do you need to refresh your memory with looking at your notes?

A. I do recall that, yes. Yes, sir.

Q. And he was crying at that time, was he not?

A. I don't remember right off if he was crying at that particular time, but I believe that was one of the emotional times that he had that he was crying.

Q. Okay. All right. You put that in your report, didn't you?

A. That's correct. That was when he got down to the point where I couldn't -- he wasn't audible.

Q. All right. And then Rick Sanders asked him what happened next and he said he just didn't know what he wanted to do, he thought about her, thought at times that he just wanted to talk to her and at other times he wanted to kill her?

A. That's correct.

Q. And when he was asked again what happened, he said, when she cheated on me, I didn't know about it, is that correct?

A. That's correct.

Q. Okay. And he said, she was willing to marry

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 102     Filed 09/23/15     Page 191 of 286
752

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2765

me, she's the only one that was willing to marry me. Do you remember him saying that?

A. That's correct.

Q. He also said that when he got to Roanoke in the early morning hours, saw Robin's car, he just sat there and was continuously talking to himself?

A. That is correct.

Q. And he said that at one point something told him to kill her and to then kill himself?

A. That's correct.

Q. He said he just didn't have shit to live for?

A. That is correct.

Q. He said he didn't really know whether he had shot Robin once or twice, but he did know that he had shot her in the back?

A. That is correct.

Q. Now, he went on to tell you about going to Tennessee and changing the license plates and that sort of thing, didn't he?

A. Yes, sir.

Q. And he told you about going to church?

A. He did.

Q. Okay. And he went to church to pray for Donald Allen, didn't he?

A. That's what he stated, yes.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affiliate of Spherion, (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 192 of 286

753

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2766

Q. And then he talked about buying a garden hose, some duct tape, taping up the garden hose, putting it in his car and trying to commit suicide?

A. That's correct.

Q. And you know from your investigation of this that there was actually a garden hose, some duct tape, found in the car, part of the garden hose had been cut?

A. That's correct.

Q. Okay. And even on the exhaust pipe of the Honda Prelude there was some tape residue, some sticky residue around the exhaust pipe?

A. I have no knowledge of that.

Q. You didn't know that?

A. No, sir.

Q. Okay. And that -- when he told you about the gun, what he told you later turned out to be true, about where he bought it, sort of when he bought it, he sawed it off on both ends, taped it up, that sort of thing?

A. That is correct.

Q. And at the time you talked to him, you yourself did not know where he bought it and that he himself had cut it off and that sort of thing, did you?

A. I did not.

Q. Until he told you?

A. Right.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889
800-333-2082                                                                Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 193 of 286
754

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2767

Q. He told you about getting some sleeping pills and another suicide attempt with the garden hose?

A. That is correct.

Q. And he was interrupted by some construction worker?

A. Correct.

Q. That told him something like, no matter how bad it is, you don't need to do that, or words to that effect?

A. Right.

Q. He told you that he remembered crying a lot and going into the church and praying while he was crying, didn't he?

A. That's correct.

Q. And he was praying for Donald Allen?

A. That's what he stated, correct.

Q. And he had also indicated to you that he came to realize at some point, maybe through the Charter Pines commercials, that he was in a state of depression and might have needed some help?

A. Stated that he had seen them in the past, correct.

Q. All right. And that some family member had taken -- had called him because they were worried about him trying to commit suicide, words to that effect?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2768

A.   With the sleeping pills, correct.

Q.   Right.  Okay.  Now, at some point during all of this you allowed Marc to go call his mother, Sonia?

A.   That is correct.

Q.   You took him out to the telephone?

A.   Right.

Q.   He wanted to talk to her and wanted to tell her everything, particularly about Donald Allen?

A.   That's correct.

Q.   Okay.  And you overheard him saying a statement to her, I just had to get to Roanoke?

A.   That's correct.

MR. BENDER:  Thank you, sir.  That's all.

REDIRECT EXAMINATION

BY MS. ROSE:

Q.   Officer Sanders, was the UFAP, the unlawful flight to avoid prosecution, was that not issued after the murders in Roanoke?

A.   That was for the murder in Roanoke, correct.

Q.   That wasn't issued for the arsons?

A.   No.

Q.   It would have been issued after June 22nd?

A.   Correct.

Q.   Now, do you know whether when you went out there with Agent Womble of the FBI -- you knew that the

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an Affiliate of Spherion  (704) 333-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 195 of 286
756

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2769

defendant had made arrangements to be picked up?

A. That is correct.

Q. And that his mother had given directions .so that you all could locate his residence?

A. That was my understanding, that we had directions to go to the house.

Q. And the photograph that you looked at, you don't know when that picture was taken?

A. I have no knowledge, no.

MS. ROSE: I don't have any other questions.

RECROSS-EXAMINATION

BY MR. BENDER:

Q. So are you now telling us that even though the Roanoke Police Department had issued some information to the SBI and the Charlotte Police Department on April the 30th, 1996 that they had outstanding warrants for two attempted murders and one felonious arson, that the FBI, the violent crimes fugitive unit, had no knowledge?

A. I personally had no knowledge of it, no, sir. I was not informed of anything until the 25th, myself.

Q. Okay. So y'all had -- the fugitive unit had no knowledge of this?

A. Once again, I did not personally, no.

MR. BENDER: All right. Thank you.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affiliate of Spherion  (704) 333-9889  Page 196  Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 196 of 286
757

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2770

THE COURT: You may step down.

MS. TOMPKINS: The government calls Tony Rice.

TONY RICE,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please, and how you are employed.

A. Tony Rice, R-I-C-E. I'm a detective with the Charlotte-Mecklenburg Police Department.

Q. How long have you been with the Charlotte-Mecklenburg Police Department?

A. A little over 20 years.

Q. And for how long have you been an investigator or detective?

A. Probably about 14 of those 20.

Q. What are your current duties?

A. Currently I'm assigned to the criminal intelligence unit where we provide dignitary protection and threat assessments for events coming to Charlotte.

Q. In June of 1996 what were your duties?

A. I was an investigator assigned to the homicide section.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889
800-333-2082 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 102 Filed 09/23/15 Page 197 of 286
758

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2771

Q. How long were you a homicide detective?

A. Approximately five years.

Q. Were you involved in the investigation of Aquilia Marcivicci Barnette back in June of 1996?

A. Yes, ma'am, I was.

Q. And what was your part of that investigation?

A. I responded to a crime scene and I had taken a statement from Mr. Barnette.

Q. So you conducted an interview with the defendant, is that correct?

A. Yes, ma'am.

Q. And on what date did you conduct that interview?

A. June 25th, 1996.

Q. Is that the date that he was arrested?

A. It is.

Q. Where did that interview take place?

A. It took place at the law enforcement center.

Q. Approximately what time was that?

A. Of the interview?

Q. Yes.

A. Approximately 7:40, 7:45 at night.

Q. Do you know whether an interview had already been conducted prior to your interview of the defendant?

A. Yes, ma'am.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2772

Q. Tell the jury about that interview.

A. Detective Sanders and Sergeant Sanders had conducted an interview with Mr. Barnette prior to my interview.

Q. And was that in a room that has an audio and video equipment built in?

A. Yes, ma'am, it is.

Q. And that was in the old law enforcement center --

A. Correct.

Q. -- that's no longer?

A. It was demolished.

Q. After that interview was completed, was the videotape reviewed?

A. Yes, myself and Detective Sanders reviewed the tape.

Q. And what determination was made after reviewing that videotape?

A. The audio itself of the tape was of poor quality in certain parts, you just -- you couldn't understand it.

Q. And that was the interview that was conducted by Sergeant Sanders and Detective Mike Sanders?

A. That's correct.

Q. Did you then do an additional interview?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 199 of 286
760

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2773

A.   Yes.

Q.   Okay.  And what was the purpose of your interview?

A.   The purpose of my interview was to obtain a statement pertaining only to an incident that occurred outside of Charlotte.

Q.   Why was it that you wanted to get a -- was that the Roanoke incident?

A.   The Roanoke incident, yes, ma'am.

Q.   Why was it that you wanted to get a statement only for the Roanoke incident?

A.   We figured at some point in time that that jurisdiction would want a statement from Mr. Barnette and we would go ahead and get that for them.

Q.   Okay.  Now, because of the poor quality of the audio portion of the videotape from the prior interview what did you do?

A.   When we conducted this interview we added a desktop type tape recorder, cassette recorder, inside the interview room.

Q.   Who was in the interview room with you?

A.   Myself and Detective Sanders.

Q.   Okay.  And approximately how long after the interview with Detective Sanders and Sergeant Sanders did your interview take place?

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an Affiliate of Spherion  (704) 333-9889  Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 200 of 286

761

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2774

A.    I would say approximately 15, 20 minutes.

Q.    And did you, with your auxiliary cassette recorder did you make an audiotape of that interview?

A.    Yes, ma'am, we did.

Q.    Did you stop the recorder at any points in time during that interview?

A.    Yes, the recorder was stopped twice during our interview.

Q.    And for what purposes did you stop the recorder?

A.    Clarification on questions that I had asked of Mr. Barnette.

Q.    Was a transcript of that interview prepared?

A.    Yes, ma'am.

Q.    And a cassette tape?

A.    A transcript of the cassette tape, yes, was prepared.

MS. TOMPKINS:   If I could have a moment, Your Honor.

THE COURT:   Yes.

MS. TOMPKINS:   At this point the government would request to publish to the jury previously admitted Government's Exhibits 37A and 37B, the cassette taped interview and the transcript.

THE COURT:   You may.

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 201 of 286
762

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2775

(Audio played for the jury.  Transcript displayed to the jury.)

MS. TOMPKINS:  What happened at the time you stopped the recorder now?

THE WITNESS:  Clarification, I believe.

(Audio played for the jury.  Transcript displayed to the jury.)

THE COURT:  Now, members of the jury, you have heard the tape recording, the audio portion, and you also viewed a transcript that was presented on your screens simultaneously with the audiotape, and that transcript also undertakes to identify the speakers engaged in the conversation.

You are permitted to view the transcript as you did for the limited purpose of helping you follow the conversation as you listen to the tape recording and also to help you keep track of the speakers.  The transcript, however, is not evidence.  The tape recording itself is the primary evidence of its own contents.

You are specifically instructed that whether the transcript correctly or incorrectly reflects the conversation or the identity of the speakers is entirely for you to decide based on what you have heard about the preparation of the transcript and upon your own

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 202 of 286
763

Page 2776

examination of it in relation to what you heard on the tape recorder. If you decide that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent. Differences in meaning between what you hear in the recording and read in the transcript may be caused by such things as the inflection in a speaker's voice. You should, therefore, rely on what you hear rather than what you heard- rather than what you read, when there is a difference. Thank you.

MS. TOMPKINS: That's all the questions I have, Your Honor.

CROSS-EXAMINATION

BY MS. LAWSON:

Q. Good afternoon, Investigator Rice. How are you?

A. Fine. How are you?

Q. Fine, thank you. Let me ask you first to clarify something that may be very confusing. Your interview with Marc Barnette would have been the third police interview of that day, is that correct?

A. I'm aware of one prior to mine, but I'm not aware of a third.

Q. Okay. You are aware that when Marc Barnette turned himself in Special Agent Womble and Investigator

Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 203 of 286
764

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2777

Sanders went out to his mother's house and he told them what happened and took them to Billy Graham Parkway, are you aware of that?

A.    Portions.  I'm aware that Agent Womble and Investigator Sanders had some interaction with him; but to the extent, I don't know.

Q.    Okay.  Were you aware that he was interviewed at the FBI office after he turned himself in?

A.    No, ma'am, not that I recall.

Q.    Okay.  So your involvement came after that --

A.    Yes.

Q.    -- when he was at the law enforcement center?

A.    That's correct.

Q.    And are -- is it your testimony that Investigator Sanders and Sergeant Sanders, the two brothers, attempted to interview Marc Barnette and, in fact, interviewed him in the room with the concealed camera and he talked to them about Donald Allen's murder and Robin Williams' murder, do you recall that?

A.    Yes.

Q.    And it was Investigator Mike Sanders who testified just before you came in?

A.    I believe so, yes.

Q.    And you all reviewed that interview about both murders and determined that the audiotape, the sound was

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an Affiliate of Spherion  (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 204 of 286
765

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2778

inadequate?

A. Correct.

Q. And you then decided that you needed the interview purely for the Roanoke case?

A. Yes, ma'am.

Q. And that was the interview we just saw?

A. Yes, ma'am.

Q. And you and Sergeant Sanders conducted that one?

A. Investigator Sanders and myself did.

Q. Okay. Now, it's correct, isn't it, that you told Marc Barnette that you wanted to talk exclusively about the Roanoke case in that interview so that those investigators would have that information?

A. Correct.

Q. And when you testified that you stopped the tape a couple of times for clarification, do you remember what you had clarified?

A. Not specifically. I believe it was related somehow to that previous question that we were speaking of, how that might relate back to Charlotte.

Q. Okay. Let me ask you if the other time that the tape was stopped he wasn't crying heavily?

A. I don't understand your question, I'm sorry.

Q. The other -- well, have you testified that both

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
7/30/2002

Page 2779

times the tape was stopped it was so that he could clarify something?

A. Correct.

Q. Do you recall previously testifying that the recorder was cut off for the first time for Mr. Barnette to compose himself, he hung his head, cried, and we started back?

A. That may well be true, yes.

Q. So if you testified to that at an earlier occasion, that would have been closer to when you actually made your notes?

A. Yes.

Q. Before you started the interview you went into the interview room and noticed that he had been crying heavily even before you started taping?

A. Yes.

Q. And you knew that he had just gone through the entire story with Sergeant Sanders in the tape that had no good audio?

A. Correct.

Q. And he told you that he knew that Donald Allen was the man that he had shot because he had seen his name on his billfold, on his license?

A. He did not tell me that, no.

Q. So you -- but you observed the tape recorded

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 102     Filed 09/23/15     Page 206 of 286
767

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2780

interview, the videotaped interview with the two Sanders investigators?

A. Yes.

Q. Okay. And you recall him saying that?

A. Yes. He told Detective Sanders and Sergeant Sanders that.

Q. Okay. And you wrote it down in a supplement?

A. Yes, ma'am.

Q. Okay. And that's what you used to testify here today?

A. Correct.

Q. Okay. And you also know that he told Sergeant Sanders and Investigator Sanders that he had gone to church to pray for the man --

A. Yes, ma'am.

Q. -- he had killed? Now, he did tell you before he started the interview that he was confused on some issues, that he didn't remember everything?

A. Yes.

Q. But did he appear to be trying to be truthful and as clear as he possibly could?

A. In my opinion, yes.

Q. Did you notice anything about his demeanor other than the crying that was of significance to you?

A. No, ma'am.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 207 of 286
768

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2781

Q.   And then at some point he was offered the opportunity to call his mother?

A.   I believe so, yes.

Q.   And do you recall noting in your supplement that he said he wanted a few moments to compose himself before he talked to his mother?

A.   Yes, I do.

Q.   So even after the interview that's just been played, he was -- well, describe how he was that he needed to compose himself.

A.   I'm sorry, I didn't understand the question.

Q.   How was he acting that he needed some time to compose himself?

A.   It's my recollection that that statement made by Mr. Barnette was between the -- it was at the end of the first interview prior to my interview taking place.

Q.   Okay.  The rights that you heard referred to by Sergeant Sanders in that tape recording, what rights were those?

A.   His Miranda.

Q.   Do you know what you all had told him in terms of his Miranda rights?

A.   Those rights were given to him by Agent Womble and I think witnessed by Investigator Sanders.

Q.   So you were aware that Agent Womble had talked

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2782

to him after giving him his Miranda rights?

A. To what conversation they had, no. I was under the understanding, they told me, that, in fact, he had been given his Miranda and waived.

Q. Okay. And do you know the Miranda rights that Investigator, or Special Agent Womble gave him?

A. Do I know them?

Q. Yeah. Every police officer memorizes them, right?

A. Yes.

Q. Okay. Would you tell the jury what Special Agent Womble would have told Marc Barnette when he gave him his Miranda rights?

A. It was done, to the best of my knowledge, on a preprinted form that the FBI uses, which is separate from ours, and verbatim I cannot tell you what that form says.

Q. What are the -- would you just recite the Miranda rights that you've referred to?

A. The person has the right to remain silent, anything they say can and will be used against them in a court of law; they have the right to an attorney; if they cannot afford an attorney, one will be presented to them free of charge before any questioning; if they decide to answer questions now, they have still have the

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an Affiliate of Spherion  (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/23/15    Page 209 of 286
770

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2783

right to stop answering questions until they have spoken to an attorney.

MS. LAWSON: No further questions, thank you.

MS. TOMPKINS: No questions.

THE COURT: You may step down.

MS. ROSE: Your Honor, may we approach?

THE COURT: Yes. Excuse us, members of the jury. You may be at ease.

(Beginning of bench conference.)

MS. TOMPKINS: The next witness is Agent Officer Bob Holl. We will not finish it. He is about we have a tape to play and the tape lasts for an hour, so we can either start and break in the middle or break for the day and start in fresh tomorrow.

THE COURT: Do you have a preference?

MR. BENDER: Yes, sir, I think you know what it is.

MS. TOMPKINS: I think it would be cleaner if we could start fresh in the morning.

THE COURT: You don't have something you could go over?

MS. TOMPKINS: Same kind of thing as the other witnesses.

THE COURT: Members of the jury, we have

Reported By: Scott A. Huseby, RPR
800-333-2082       Huseby, Inc., an Affiliate of Spherion  (704) 333-9889       Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 210 of 286

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2784

reached a good stopping point -- now that we have a court reporter, we have reached a good stopping point, and so we will ask you to remember the usual instructions and take care about those things and we will see you in the morning at 9:30. Thank you for your attention to the case today.

(The jury left the courtroom.)

THE COURT: Anything for the Court before we recess for the day?

MS. LAWSON: Your Honor, can we reconstruct the side-bar in the presence of the defendant?

THE WITNESS: Yes. Thank you for reminding me. The side-bar had to do strictly with whether we wanted to go forward with the next witness, it being approximately 20 minutes until 5:00 and the witness is expected to play a tape that takes about an hour, so rather than break it in the middle at 5:00, we decided to go forward in the morning, so that was the gist of it.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:97-cr-23-V |
| | ) | |
| vs. | ) | |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE, | ) | VOLUME 14 |
| | ) | MORNING |
| Defendant. | ) | |

TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
JULY 31, 2002

APPEARANCES:

On Behalf of the Government:

    ANNE M. TOMPKINS, ESQ.
    JILL WESTMORELAND ROSE, ESQ.
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    JEAN B. LAWSON, ESQ.
    P.O. Box 472106
    Charlotte, North Carolina

    HAROLD J. BENDER, ESQ.
    200 North McDowell Street
    Charlotte, North Carolina

           Cheryl A. Nuccio, RMR-CRR
           Official Court Reporter
         United States District Court
          Charlotte, North Carolina

WEDNESDAY MORNING, JULY 31, 2002

(Chambers conference. Defendant not present.)

THE COURT: Counsel have joined the court in chambers for a scheduling conference.

MR. BENDER: Yes, sir. This is concerning scheduling. The government's case, I think originally we thought it would take a week and it's moved, I think, a little more rapidly than anybody thought. As a result, we're having witness problems. And we have a certain sequence in which we want to present our evidence which we think would be the most effective way. And as a result of that and our witness problems, we want to ask the court to allow -- regardless of when they end, to allow us to start on Monday, Monday morning.

THE COURT: Would your problem necessarily preclude Friday, say?

MS. LAWSON: We've spent the better part of last night and this morning trying to figure out how to patchwork it together and finally realized this morning that we were compromising our client's presentation of the case by trying to fit people in on Friday in a patchwork fashion. We certainly considered trying to alter our presentation to accommodate the problems and also to, you know, keep the case going, but finally concluded that we're not going to be able to do the job we had planned to do and we set to do if we have

to take people out of order, basically.

THE COURT: What is your best estimate of the defense case time?

MR. BENDER: We believe we will be through sometime on Wednesday, maybe even Tuesday.

THE COURT: Of next week?

MR. BENDER: Of next week, yeah. But definitely Wednesday.

THE COURT: And I know the government has at least one rebuttal witness.

MS. ROSE: We have probably a day of rebuttal evidence.

MS. ROSE: We anticipate concluding by lunch tomorrow.

THE COURT: Okay. Okay. I think we can handle that. So in deference to the defense sequence and scheduling problems, we'll contemplate concluding government evidence this week, beginning defense evidence next week.

MR. BENDER: Okay.

MS. LAWSON: Thank you very much.

MR. BENDER: Thank you, Judge.

THE COURT: Very well.

MS. ROSE: Thank you.

THE COURT: Thank you all very much.

(End of chambers conference.)

THE COURT: May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: We took up some scheduling matters while you were waiting and we appreciate you being here on time, however, even though we weren't able to get to you right away.

You may call your first witness.

MS. TOMPKINS: Government calls Investigator R.A. Holl.

ROBERT A. HOLL,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please.

A. Robert A. Holl.

Q. And remind the jury of who you are.

A. I was the investigator that worked the case of the victim Donald Lee Allen.

Q. And you testified previously about processing the crime scene at Morris Field and Billy Graham; is that correct?

A. That's correct.

Q. In June of 1996, tell the jury what position you held.

A. Homicide investigator, felony investigations, Charlotte

FORM FED ® PENGAD · 1-800-631-6989

Police Department.

Q. Now, on the date that the defendant, Aquilia Barnette, was arrested, where were you while he was being interviewed by your colleagues?

A. Morris Field and Billy Graham at the crime scene where the victim was located.

Q. And you did not participate in any of those interviews at that date; is that right?

A. That's correct.

Q. Now, was a federal detainer put on him on that date?

A. Yes, there was.

Q. And what was the -- what is that?

A. He was in -- basically, in the custody of the federal authorities, from what I was told by an FBI agent, for the murder in Virginia. Once he's placed in the Mecklenburg County Jail, a local law enforcement agent cannot get that individual out of the Mecklenburg County Jail system.

Q. So after his interviews with Charlotte-Mecklenburg Police Officers Sanders and Rice, after that time a federal detainer was put on him; is that right?

A. My understanding a detainer was on him at the time he was actually arrested.

Q. Okay. And Federal Agent Womble, who was part of his arrest process.

A. Correct.

Q. Now, when was that detainer lifted?

A. Around noontime Friday, the 28th of June.

Q. And what was the effect of that?

A. It automatically put him in state custody. The murder warrants for Mecklenburg County, then, were served on him that afternoon.

Q. And that federal detainer was not related to the murder necessarily, but was it related to the unlawful flight to avoid prosecution?

A. From Virginia, yes, ma'am.

Q. Okay. Now, June 28th, 1996, the defendant was in state custody; is that correct?

A. That afternoon.

Q. And what did you do on that afternoon?

A. After being instructed by one of my immediate supervisors, myself and one investigator went over to the Mecklenburg County Jail. The defendant was in front of the state magistrate being served with a warrant. I then took custody of that individual and brought him over to the Law Enforcement Center for the purpose of interviewing him.

Q. Now, did you advise him of his right to counsel?

A. When I got back to the station. When I first arrived, I asked him if he needed to utilize the restroom. He stated no. Asked him if he wanted anything to eat. He said yes, because he missed both meals being transported between the

jail system within Mecklenburg County. I had an investigator go out and get the food that he requested.

Then I sat down with him, put him in an interview room and advised him of his constitutional rights according to Miranda.

Q. How do you do that? Describe for the jury that process.

A. The form I used was the same form that was utilized on a prior interview with him with Investigator Sanders, and basically goes over the -- you have the right to remain silent. You have the right to have an attorney present during questioning. Had the blanks on it where his name, date of birth and everything completed.

My standard of what I do, one portion of the waiver I had the defendant actually read. That way I know he can comprehend what's going on. Also, that I know for a fact that he can read what he's looking at.

Q. All right. Did he appear to understand the rights as you advised him?

A. He understood the section that he read out loud. I then had him initial it at the end of that sentence. Once he stated that he understood his rights, I asked him if he would sign the form, which he did.

Q. And he did waive his right to silence and to an attorney; is that correct?

A. Yes, ma'am.

Q. Describe for the jury the process that you used to conduct an interview.

A. When I first sat down with him, in order to establish a rapport with him, knowing that eventually I wanted to start a taped interview with him. A tape recorder can be an inhibitor. You put a tape recorder in front of somebody, they may get nervous; they may not. Not knowing the individual, I sat down and just spoke to him. Got his general information -- name, address, date of birth -- in order to get a flow of communication going between the two of us. He actually spoke to me first. Answered a couple questions that he had, and then went into an interview of the defendant of asking him, Marc, what happened?

Q. Okay. Now, did you note in your report that initial interview that you did before you started the recorder?

A. Yes, I did.

Q. Now, what was his demeanor when you spoke to him on June 28th, 1996?

A. Calm and cooperative.

Q. Did he give you a statement?

A. Yes, he did.

Q. Did you tape record that statement?

A. Yes, I did.

Q. And did you have a transcript of that statement prepared?

A.    I did.

MS. TOMPKINS:  Your Honor, at this time we would like to publish to the jury what has been previously marked and introduced as Government's Exhibits 38A and 38B.

THE COURT:  Okay.  Let them be admitted.  Now, one is the tape and one is the transcript; is that right?

MS. TOMPKINS:  That's correct.  38A is the tape. 38B is the transcript.

THE COURT:  Okay.  Members of the jury, you'll recall my instruction earlier about use of a transcript and the instruction I gave you about that.  Essentially, that it's the tape that's the evidence, not the transcript.  So if there is any difference, you'd be guided by what you hear, not what you see on the paper.  Thank you.

(Government's Exhibits Numbers 38A and 38B were published to the jury.)

BY MS. TOMPKINS:

Q.    Investigator Holl, I've got some follow-up questions for you.

Do you know, based on your training and experience, what the effect of coloring the lens of a flashlight red is?

A.    Yes, I do.

Q.    What is that?

A.    It dulls the light.  Through prior military experience, it allows the individual with the light to see a small

distance in front of them but not to let others looking at them see the direct light.

Q. And you mentioned that -- was there a second flashlight found in the vehicle?

A. Yes, there was.

Q. And describe that to the jury.

A. It's the same as what was on the shotgun. Small mag light with a red lens on the cover.

Q. And were there handcuffs found in the vehicle?

A. On the interior rear view mirror.

Q. And did the defendant tell you that those were his?

A. Yes, he did.

Q. Now, in the interview, what color did the defendant say the Prelude was?

A. Black.

Q. Now, at that point were you aware that he had been interviewed previously by Investigator Rice?

A. No, I did not.

Q. You weren't aware that he had previously identified that as a blue Prelude?

A. No, I did not.

Q. How many days did the defendant drive that vehicle?

A. From the morning of the 22nd until late the 25th.

Q. And -- so he had driven the car three days, correct?

A. Correct.

Q.   And he had scraped off the inspection sticker; is that right?

A.   Yes, ma'am.

Q.   And did he talk to you about changing the license tag?

A.   Yes, he did.

Q.   And he had talked to you about two times where he had attached a hose to the tail pipe; is that correct?

A.   With duct tape.

Q.   Now, based on the -- what you learned from investigators, what did you do in terms of the tail pipes on the Honda Prelude?

A.   From what I learned from the interview that Investigator Sanders conducted, I went back down to the Prelude which I kept in custody underneath the Law Enforcement Center and had the tail pipes cut off the car.

Q.   Why is that?

A.   Because I recalled from the initial viewing of the car back when I processed the vehicle to the time of what I was told that the defendant had put a hose in the tail pipe and connected it with duct tape, that I didn't see any residue of the tape to establish that.

Q.   I'm going to show you what's been marked as Government's Exhibit 71 which is a box and ask you to examine that box and tell me if you recognize it.

A.   Yes, ma'am.

Q.    What is that?

A.    It's a box that states that it contains the exhaust pipes from a Honda Prelude.

Q.    All right.  And did you ask for those to be cut off?

A.    I did.

Q.    Okay.  Could you open that box.

(Witness complied.)

Q.    What does that contain?

A.    The rear exhaust system from the Honda Prelude.

MS. TOMPKINS:  And may I approach, Your Honor?

THE COURT:  Yes.

Q.    And let me show you -- are they packaged up?

A.    Yes, they are.

Q.    Are they in substantially similar condition or the same condition they were when you had them cut off the Honda Prelude?

A.    Yes, ma'am.

Q.    And I'm going to show you what's been marked as Government's Exhibit 71A and 71B.  Are both of those in substantially the same condition as when you had them cut off?

A.    Yes, they are.

MS. TOMPKINS:  Your Honor, at this time I would move admission of Government's 71, 71A, and 71B.

THE COURT:  Let them be admitted.

(Government's Exhibits Numbers 71, 71A, and 71B were received into evidence.)

Q.   Now, take those out of the bags, Investigator Holl.

(Witness complied.)

Q.   As a homicide investigator, did you ever have the occasion to go to the scene of a suicide by carbon monoxide poisoning?

A.   Yes, ma'am, I have.

Q.   Approximately how many times?

A.   Approximately a dozen.

Q.   And were those carbon monoxide poisonings by the same -- by the mechanism of using a hose attached into the vehicle?

A.   It was either by attaching a hose inside to the vehicle from the exhaust system or a car was inside a closed garage with the door closed, the windows open on the car, the victim inside the motor vehicle with the engine running.

Q.   Now, on the occasions wherein the person committed suicide by use of a hose and a tail pipe, on those occasions did you have the opportunity to view the tail pipes in the suicides that you investigated?

A.   Yes.

Q.   Okay.  And when you looked at the tail pipes from Donnie Allen's Prelude, was that consistent with what you had previously seen in carbon monoxide suicides?

A.   No, it's not.

Q. In what way?

A. There's no tape residue that I have noticed on the tail pipes that I did not notice on the day that I had these cut off.

Q. And were the tail pipes then and are they now consistent with the defendant's story of having twice taped a hose to those tail pipes in order to attempt suicide?

A. No. When duct tape is attached, being that duct tape is so sticky, when duct tape connects to itself, you cannot peel it apart. When duct tape gets on something that's hot, the glue actually transfers over to the item that it's attached to. It doesn't come off. You can take the tape off, but the glue doesn't come off.

Q. And in Mr. Barnette's statement to you, the second suicide attempt he said he went unconscious; is that correct?

A. That's correct.

Q. And how hot does the tail pipe get when the car is running?

A. I don't know temperature wise. I know that if you touch it, you're going to get burned.

Q. And again, did you notice at the time that you had those tail pipes cut off the Prelude tape residue?

A. No, ma'am.

Q. Did you see any melted tape on the end of the hose?

A. The hose I'd have to say I didn't look at.

Q. Okay. Was there any melted duct tape in the trunk of the vehicle?

A. No, there was not.

MS. TOMPKINS: Thank you. That's all the questions I have.

CROSS EXAMINATION

BY MR. BENDER:

Q. Mr. Holl, you found some -- a garden hose that had been cut, did you not?

A. I'm sorry, sir?

Q. You found a garden hose that had been cut.

A. That was located by a different investigator and the crime scene technician out at the scene where the car was located.

Q. But you found it. Somebody did.

A. Correct.

Q. You found some Compoz, some No Doz, some sort of over-the-counter sleeping product?

A. A sleeping product box of Compoz that contained twelve -- originally unopened would contain twelve; there were six left, which is consistent with what the defendant said he took.

Q. Okay. And you found a receipt from a Sears in Knoxville for the hose.

A. Yes, I did.

Q. Okay. And a church bulletin.

A.   Yes.

Q.   Along with all the other stuff in the bag that you've described.

A.   Yes, sir.

Q.   And this was the fourth interview that had been conducted?

A.   When I conducted my interview, I only knew of one prior to that.

Q.   Okay.

A.   And that was the one from Investigator Mike Sanders.

Q.   Okay.  You didn't know about Tony Rice's --

A.   No.

Q.   -- interview?

A.   No, I did not.

Q.   Or the interview by Agent Womble at the FBI office?

A.   No, I did not.

Q.   But you were the chief investigator.  You were the lead investigator in this matter.

A.   I was the investigator that was assigned to the case involving Mr. Allen.  There were two supervisors, two sergeants that were, per se, calling the shots as to what would be done and what would not be done on the case.

          MR. BENDER:  Okay.  I think that's all.  Thank you.

          THE WITNESS:  Yes, sir.

          THE COURT:  You may step down.

(Witness stepped down.)

THE COURT: Members of the jury, we'll take our morning break at this time. Please recall the usual instructions. We'll call for you in about fifteen minutes.

(Brief recess at 10:57 a.m.)

THE COURT: May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: Government would call Crystal Dennis.

CRYSTAL DENNIS,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Would you state your name, please, ma'am.

A. Crystal Dennis.

Q. You'll need to speak up so that the members of the jury can hear you.

Ms. Dennis, where do you live?

A. Noonan, Georgia.

Q. Pull that mike towards you, please, or move up. I know you're pregnant. It's hard.

(Witness complied.)

Q. You live in Noonan, Georgia?

A. Yes, ma'am.

Q. How long have you lived in Noonan, Georgia?

A. All my life.

Q. Do you have family there?

A. Yes.

Q. Do you work?

A. Yes.

Q. Where do you work?

A. I'm getting my apprenticeship cosmetology.

Q. Do you know the defendant in this case, Marc Barnette?

A. Yes, I do.

Q. How did you meet the defendant?

A. I met him through my half brother, Anthony Britt.

Q. And what was his relationship with Anthony?

A. I guess at the time, I guess they was friends or buddies, or whatever.

Q. When you met the defendant, was he involved in a relationship with someone else?

A. Yes, he was.

Q. Who was that?

A. Natasha Heard.

Q. Heard, H-e-a-r-d?

A. Uh-huh.

Q. And was Anthony Britt Natasha's brother?

A. No, he was my brother.

Q. I'm sorry. What did you call the defendant?

A. Marc.

Q. Did -- when you first met, what were your initial

impressions?

A. I thought he was cute and he was sweet.

Q. How frequently did you see him?

A. Every day.

Q. Was that generally because he was with your brother or did he come -- at some point come see you specifically?

A. He would come over to my mom house where I was staying to see me.

Q. And eventually, did you two get involved in a relationship?

A. Yes, we did.

Q. And at some point, then, did the two of you actually move in together?

A. Yes, we did.

Q. Did -- was it your apartment or his apartment?

A. His apartment.

Q. And what was the name of that apartment complex?

A. Chestnut Lane Apartments.

Q. And that was in Noonan?

A. Yes, it was.

Q. When you and the defendant moved in together, did you have children from another relationship?

A. Yes.

Q. How many?

A. Two.

Q.  How old were your children?

A.  I think at that time they was probably one or two.

Q.  When you first moved in together, describe the relationship.

A.  Everything was good.  I mean, he was sweet.  I mean, did everything.  Cooked, cleaned, worked.

Q.  Did your children like him?

A.  Yes.

Q.  Did he seem to act like he liked the children?

A.  Yes.

Q.  In fact, at that time what shift were you working?

A.  Well, when we first met I wasn't working.  Well, I was working -- yes, I was.  I was working at Burger King when we first met.

Q.  Did you eventually quit your Burger King job?

A.  Yes, I eventually quit.

Q.  Why?

A.  Just like at the time going through things with him.  He didn't want me working.

Q.  Now, did he have any relatives in the area?

A.  No, not at that time.

Q.  Eventually did he have some family there?

A.  The only person I know that was there was just him and Natasha.  His mom lived in Atlanta.

Q.  Okay.  And how far is that from Noonan?

A. All depends. Usually about 40, 45 minutes to an hour.

Q. Did you meet his mother?

A. Yes.

Q. Did she come to visit you all frequently?

A. She came on occasion she came down, yes, and we went to visit her.

Q. During your relationship did the defendant talk to you about his mother or his childhood?

A. No.

Q. Did he ever indicate that he had a sad, vicious or violent childhood?

A. No.

Q. Did he seem to have a close relationship with his mother?

A. Yes.

Q. After a while did the nature of your relationship change?

A. Yes, it did.

Q. In what way?

A. Marc had got to the point where he didn't want me leaving the house without him. I couldn't go anywhere, couldn't go visit my friends or do anything unless he was with me.

Q. What else did he do?

A. He was jealous, abusive.

Q. Abusive in what way?

A.    He would hit me, jump on me, fight.

Q.    How frequently did that happen?

A.    It's hard to remember it was so many times.  It was over any little thing.  Probably maybe once or twice out of the week we would go without fighting.

Q.    Now, did -- during this time, had you gotten another job?

A.    Yeah.  I went back to Burger King.  Well, I went to Dan River and I wasn't there long because of transportation wise, but eventually I wound up going back to Burger King because I moved out with him and got my own apartment.

Q.    But before you moved out from the defendant, where were you working?

A.    At that time no where.

Q.    Well, didn't you have a second shift job such that he would care for your children?

A.    That was the time I was at Dan River when I had the second shift job.

Q.    And what was Dan River?

A.    We did pillowcases and sheets.

Q.    And what time was second shift at that particular plant?

A.    I think I was working from three till eleven.

Q.    And what were the child care arrangements?

A.    Well, he was off at night and I worked.  Well, he was off during the morning and I work at night so he would keep the

kids while I was at work.

Q. On January the 23rd, 1993, if you'll turn your attention to that date. What happened?

A. I recall I think Marc had got up and left. I don't remember if he went to the store or -- he went somewhere, and my son came into the room and he told me -- he was showing me the marks. He told me to look what Marc did.

And I was like, Well, how did he do this?

He was like, He hit us. He whipped us with a clothes hanger.

And I was like, Why did he whip you with a clothes hanger?

He was like, Because we didn't eat all our food.

Q. And what was your son's name?

A. Mario.

Q. And was the defendant around when Mario told you this?

A. No, he wasn't.

Q. How long after it had happened did Mario tell you what the defendant had done?

A. I'm thinking it was the same night because the marks, the cuts and everything was open. That next morning he got up and told me about it because they was in bed asleep when I got home.

Q. Your son at that point was old enough to be very communicative?

A.   Yes, uh-huh.

Q.   When they told you the defendant had beaten them with a coat hanger, what did you do?

A.   I was upset and when he got home I confronted him about it and we got to fighting.  And the next day I had to go to work, I took them to my mom's house.

Q.   Now, you say you got in a fight.  Describe what the defendant did to you when you confronted him about --

THE COURT:  Excuse me just a minute.  The microphone isn't cooperating with us.  If you stay back from the microphone but keep your voice up, it will work fine.

But don't tell her to move closer to the mike.  It's just a matter of keeping their voice up, okay.  Thank you.

Q.   All right.  Now, --

THE COURT:  I'm sorry, we were hearing extraneous noises and the machine wasn't working well.  Go ahead.

Q.   When you confronted the defendant, what did he do?

A.   We got to arguing and then we started fighting.  You know, he started punching me and hitting me and I tried to fight back.

Q.   Where did he hit you?

A.   In my face.  He kicked me.  Wherever he could hit me, he hit me.

Q.   Did he leave after that argument or stay there?

A.   He left after that argument and then he come back.

them, I sent my kids there.

Q. Did the defendant eventually leave and go to his mother's?

A. Yes, he left. He took my car and went to Atlanta where his mom was.

Q. Did he have a car?

A. He had a car, but his brakes was locked up on it. He couldn't move it.

Q. Had you given him permission to take your car?

A. No.

Q. When he went to his mother's in Atlanta, how long did he stay?

A. If I'm not mistaken, I think it was one day because the detectives, when they came to my mom house, somehow they wired the phone and got me to sweet talk him to come back down because that was the only way I could get my car back.

Q. And were you able to talk him into coming back?

A. Yes.

Q. Did you recover your car?

A. Yes. They arrested him that day.

Q. And -- all right. I'm going to show you what's been previously admitted, marked, and identified as Government's Exhibit 52E and 52F. Actually, let me approach the witness. Tell me if you can identify these.

A. Yes. This is my son Mario and this is where he had --

the marks on his back where he had beaten him with the clothes hanger.

Q. Are those the photographs that were taken by the Noonan Police Department?

A. Yes.

Q. And do they fairly and accurately represent the injuries your son had suffered at that time?

A. Yes.

MS. ROSE: Your Honor, at this time I would move to admit previously marked Government's Exhibit 52E and 52F.

THE COURT: Let them be admitted.

(Government's Exhibits Numbers 52E and 52F were received into evidence.)

Q. Government's Exhibit 52E, can you tell us what that is.

A. That is where he's pointing to the marks in his back where he was beaten with a clothes hanger. Where he got the cuts.

Q. Government's Exhibit 52F.

A. That's the lowest part -- the lower part of his back where he also had the cuts on his back from the clothes hanger.

Q. Did you also at this time speak with individuals from the Child Protective Service about what had happened to your children?

A.    No, huh-uh.

Q.    Show you Government's Exhibit 52C. Take a look at that exhibit, please, ma'am. Are you able to identify it?

A.    Yes. This is another cut from the clothes hanger on the lower part of his side.

Q.    On the other side?

A.    On the other side.

Q.    Was that taken at the same time as the other photographs?

A.    Yes.

Q.    And does that photograph fairly and accurately represent Mario's injuries?

A.    Yes.

          MS. ROSE:  At this time, Your Honor, I would move to admit 52C.

          THE COURT:  Let it be admitted.

          (Government's Exhibit Number 52C was received into evidence.)

Q.    And what is the hand pointing to there?

A.    That hand pointing is showing to one of the cuts that was made from the clothes hanger.

Q.    Also, Mario's arm?

A.    His arm. I can't really tell because I knew he had chicken pox. I think some of the spots from his arm are from the chicken pox that he had.

Q. Okay. After you met with detectives, did they initiate charges against the defendant?

A. Yes.

Q. And was he eventually convicted of those charges?

A. Yes.

Q. Did the two of you ever reconcile?

A. No.

Q. And did you move from the apartment that you two had shared at that time?

A. Yes.

Q. How old are your children now?

A. They're thirteen and fourteen.

Q. How are they doing?

A. They're doing fine.

Q. Had any lasting effects?

A. No.

MS. ROSE: Thank you. I have no other questions at this time.

CROSS EXAMINATION

BY MS. LAWSON:

Q. Good morning, Ms. Dennis. How are you?

A. Fine.

Q. Good. Let me just back up to the beginning of your relationship with Marc Barnette. When you first met him, you said your half brother, Anthony Britt, introduced you to him.

A.   Yes.

Q.   And is it correct that Anthony wanted him to spend time with you so that he could begin dating Tasha, Tasha Heard?

A.   Eventually later that's what I found out, yes.  That's how it all went down.

Q.   Okay.  So before you met Marc, he was with Natasha Heard who was called Tasha, right?

A.   Yes.

Q.   And that was in Noonan, Georgia?

A.   Yes.

Q.   And that's Coweta County?

A.   Yes.

Q.   So Anthony got you together with Tasha -- I mean, you together with Marc so he could spend time with Tasha, and there was -- there was some trouble about that between Marc and Anthony, wasn't there?

A.   Yes, there was.

Q.   And do you recall a time when Marc was over at your house and Anthony came over to the house and they had some words?

A.   They wasn't at my house.  What had happened was when Marc was leaving my house heading home, they got into it at the railroad tracks where he was heading home.

Q.   Marc was on his way home from your house?

A.   Yes.

Q.   And so your understanding -- okay.  What happened -- who

was with Anthony Britt when they met at the railroad tracks?

A. If I'm not mistaken, I think it was my brother Anthony, I think Felton James, and I think Victor -- Victor Montgomery.

Q. And as a result of what happened at the railroad tracks, Marc shot Anthony, didn't he?

A. He shot at him, yes.

Q. And Anthony was charged with some kind of fighting charge and Marc was charged with a misdemeanor arising from that; is that right?

A. Yes.

Q. And it was sometime after that that you and Marc began dating and moved in together; is that right?

A. Yes.

Q. Now, I believe you testified that in the beginning Marc cooked, cleaned, worked a job. The children liked him; he liked them. And he took care of them.

A. Yes.

Q. Now, your mother lived in Noonan; is that right?

A. Yes.

Q. But you didn't take them over to her.

A. No.

Q. Now, you also testified that he was -- well, he was controlling.

A. Yes.

Q. Possessive.

A.    Yes.

Q.    Insanely jealous.

A.    Yes.

Q.    And was he that way through your whole relationship or did that just start after a while?

A.    It just started after a while.

Q.    For the first, what, three to six months everything --

A.    Yes, from the first three to six months.

Q.    He followed you sometimes.

A.    Yes.

Q.    If you left the house, he wanted to know where you were going.

A.    He came looking for me, yes.

Q.    And during the arguments that you had, occasionally you'd hit him back, right?

A.    Yes.

Q.    He accused you of dating other men.

A.    Yes.

Q.    Seeing other men.

A.    Yes.

Q.    Being unfaithful to him.

A.    Yes.

Q.    Now, when he -- when you reported -- or was it your mother who reported the incident with your children?

A.    Yes.

Q. And if Captain Yarbrough recorded their ages as three and five, would that refresh your recollection about how old they were when it happened?

A. Probably was, yeah.

Q. Okay. Now, he left before the police got there; is that right?

A. Yes.

Q. And you -- what did you say to him to get him to come back?

A. Well, the only thing that they told me to do was talk him into coming back. That was the only way I could get my car back, you know. That we would work things out, whatever.

Q. Okay. And he came back.

A. Yes, he came back.

Q. Okay. And that's when he was arrested and put in the Coweta County Jail.

A. Yes.

Q. Now, after he got out of the Coweta County Jail -- strike that.

While he was in the Coweta County Jail, you visited him, didn't you?

A. Yes. I visited on behalf because he kept calling my mom house, and the only way I would get him to stop was to go see what he wanted because my mom had got tired of him ringing her phone.

Q.   Okay.   Were you there at her house?

A.   Yes, because I didn't have a phone at the time.

Q.   Okay.   So he kept calling to try to reach you and talk to you?

A.   Yes.

Q.   How many times would you say he called?

A.   It's been so long, I can't recall how many time he called a day.

Q.   Numerous times each day?

A.   Yes.

Q.   What did he say to you when you went to see him at Coweta County Jail about this?

A.   He was just -- just talk and see if I could talk to the D.A. to get them to drop charges, or whatever.

Q.   Did he tell you he still had feelings for you?

A.   Probably did.   I can't recall.

Q.   Do you recall that he moved back in with you for about a week after he got out of jail?

A.   It wasn't a week he moved in with me, he moved back in with me.   He only was there to call to get somebody to come and get him because his car was messed up.   And I think at that time he was seeing some girl on a job that he was working with.   I don't know how he got back up there.   But no, he didn't move back in with me.

          MS. LAWSON:   No further questions.

MS. ROSE: I have no other questions.

THE COURT: You may step down.

(Witness stepped down.)

MS. ROSE: James Yarbrough.

JAMES YARBOUGH,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Would you state your name and spell your last name, please, sir.

A. My name is James Yarbrough. It's Y-a-r-b-r-o-u-g-h.

Q. Where do you work?

A. Coweta County Sheriff's Office.

Q. Is that in Georgia?

A. Yes. It's in Noonan, Georgia.

Q. How long have you been employed with the sheriff's department?

A. I've been with the sheriff's department since 1994. I've been in law enforcement for twenty-five years.

Q. Back in 1993, what was your position in law enforcement?

A. I was a detective with the Noonan Police Department. I was a sergeant.

Q. And in January of 1993, did you meet a Ms. Crystal Dennis and make a report concerning assault on she and her children?

A. Yes, I did.

Q.   Do you recall where you met with her?

A.   At her mother's home.

Q.   And who was there besides Ms. Dennis?

A.   Ms. Dennis, her mother, her children, and we had a Department of Family and Resource worker there, also.

Q.   What did she tell you had occurred?

A.   She advised me that a couple nights before, that her boyfriend was watching her children while she worked a second shift job.  During that time he whipped the children using a metal coat hanger.  He caused excessive pain to the children.  He left scars and marks and welts on the children.  They were a three-year-old and a five-year-old.

Q.   A boy and a girl?

A.   That is correct.

Q.   Did you, on the occasion that you spoke with Ms. Dennis, look at the children?

A.   Yes, I did.  And I also photographed the injuries made to the children.

Q.   Describe the injuries that you saw on that occasion.

A.   The injuries were not on the backside of the child, they were more up on the chest and the back side area of the children, on the backs of the children.  The -- some of the marks on the children were -- you know how the curved hook is on the metal coat hanger, you could see that mark on the children.  And it had started -- it had scabbed up, some of

them, and you could still see where the hook, the imprint was made on them.

Q. Were you able to communicate with the children and talk to them about what had happened?

A. Yes.

Q. I'm going to show you what have been marked and identified as Government's Exhibit 52E, 52F, 52C. First 52C. Can you identify that photograph?

A. Yes. That's the mark on the little three-year-old, Mario Weaver. That's one of the marks from the coat hanger on his side.

Q. 52E?

A. Some more of the marks on his back.

Q. And 52F?

A. On his arm. The marks.

Q. And are those photographs that you took?

A. Yes, it is.

Q. All right, sir. After you photographed the children and -- did you also speak to Ms. Dennis about any injuries that she had?

A. Yes. She told me that when she confronted her boyfriend, the defendant, about this, that he became argumentative. That he struck her and tried to choke her.

Q. And did you check her to see if there were any wounds or injuries?

A.    Yes.    The side of her face was swollen where she had been struck.

Q.    Now, did you make an incident report --

A.    Yes, I did.

Q.    -- of your contact with her?

      Show you what I have marked as Government's Exhibit 53A. If you would take a glance at 53A.    Are you able to identify those documents?

A.    Yes, I am.    This is my incident report from that date.

Q.    All right.

      MS. ROSE:    Your Honor, I would move to admit Exhibit 53A.

      THE COURT:    Let it be admitted.

      (Government's Exhibit Number 53A was received into evidence.)

Q.    Once you completed your incident report and documented what you learned, what did you then do?

A.    Went to our local magistrate and had warrants issued on the defendant for cruelty to children and for simple battery to his girlfriend.

Q.    And was the defendant arrested on those charges?

A.    Yes, he was.

Q.    Describe the circumstances under which he was arrested.

A.    He was not at the scene where the incident -- where we interviewed the children and Ms. Dennis.    But a few days later

he came back to Coweta County. He was arrested at that time at her apartment when he arrived.

Q. And was that the Pinewood Villas?

A. Yes. 1C Pinewood Villa.

Q. When he was arrested, was the defendant interviewed?

A. Yes, he was.

Q. Who interviewed him?

A. I did.

Q. Do you recall the date and time of that interview?

A. The date was the 28th day of January, 1993. The time exactly I do not recall.

Q. Show you what I've marked as Government's Exhibit 53B. If you would take a look at 53B. What is it?

A. That is the statement given by the defendant about the incident about the cruelty to children and striking Crystal Dennis.

Q. And when was -- does it have a date on there as to when --

A. Yes, it does.

Q. -- that was taken?

A. The 28th day of January, 1993.

MS. ROSE: I'd move to admit Government's Exhibit 53B, Your Honor.

THE COURT: Let it be admitted.

(Government's Exhibit Number 53B was received into

evidence.)

Q.   What did the defendant tell you had happened?

A.   He advised me that he was baby-sitting the children while Crystal was at work.  That the three-year-old had removed the laces from his shoes and that's why he spanked him with a metal hanger.  He did not recall why he struck the five-year-old little girl, Jessica.

Also, he said when they argued, sometimes he did strike Crystal.  He said not that often, but he did at times strike her.

Q.   Did he indicate that he and Crystal had had problems before over the discipline of the children?

A.   Yes, he did.  He did mention that they had problems and he thought it was due to her mother's interference.

Q.   Did -- did he indicate any other reason other than the shoelaces?  Did he say anything about them playing doctor or doing something that he felt to be inappropriate?

A.   No, he did not.

Q.   Did he offer any other explanation saying why he thought hitting children with a coat hanger would be appropriate?

A.   Not that I recall.

Q.   Did he talk to you about anything in his background?

A.   No, ma'am.

Q.   Did you follow up with those charges which ended in a resolution of that case?

A.   Yes, I did.

Q.   What was that?

A.   In our March term of that same year, 1993, of our grand jury, he was indicted on charges of cruelty to children.  He later pled guilty to those charges and he received six years on each count to run concurrent.  Period of time on probation for those charges.

Q.   And concurrently, is that kind of court talk for they run together?

A.   That is correct.

Q.   You said he received probation.

A.   Yes, he did.

Q.   Show you what I've marked as Government's Exhibit 53D.  What is that exhibit?

A.   This is his Superior Court in Coweta County final disposition sheet that states the outcome of the court case itself.

          MS. ROSE:  I'd move to admit 53D, Your Honor.

          THE COURT:  Let it be admitted.

          (Government's Exhibit Number 53D was received into evidence.)

Q.   As a part of the term or condition of his probation, was the defendant ordered to undergo any counseling or treatment?

A.   Yes, he was.

Q.   And was that a usual judgment in a case of this nature?

A. Yes, it is.

Q. Were these convictions misdemeanors or felonies?

A. Felonies.

MS. ROSE: I have no other questions.

CROSS EXAMINATION

BY MS. LAWSON:

Q. Good morning, Captain Yarbrough. How are you?

A. Just fine.

Q. Good. In connection with your investigation, Marc Barnette admitted that he had struck the children with the hanger.

A. Yes, ma'am.

Q. Were you aware that Mario Dennis said to his mother that he was hit for not eating his food?

A. No, I'm not familiar with that.

Q. Okay. This is the first time you heard that when you were in court here?

A. That's the first I've heard of it.

Q. Do you recall filing a police report that said that when you talked to Marc Barnette, he said that after Crystal complained to him about striking her children, that he quit doing it?

A. I believe that's in his statement.

Q. Okay. Now, pursuant to subpoena, did you provide us with a copy of all the records of the Coweta County Jail concerning

Marc Barnette's stay there during the time he was charged with these offenses?

A. Yes, ma'am, I believe they were faxed to you.

Q. Okay. And the subpoena was for all records, including any disciplinary records; is that correct?

A. It was for all jail records, I believe.

MS. LAWSON: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. Let me show you Defendant's Exhibit Number 2, Captain Yarbrough. And ask you to take a look at it and see if you recognize those?

A. Yes, I do.

Q. What are they?

A. The first is the warrant application on the cruelty to children on the first child and the second child. Deposition form, final deposition. Then the booking report when he was booked in on charges.

Q. These charges that you've just talked about?

A. No, this charge here is an older case.

Q. Oh, that's the shooting of Anthony Britt?

A. I do not know.

Q. Okay.

A. Bonding procedure. Questions that are asked of an inmate when he comes in. Anything that's issued to him, whether it

be clothing, toothbrush. All the general questions. Visitors' log: who he would like to visit him. Medical questions. Waiver of first appearance form before the judge. Property receipts. She declared what he was charged with. Another warrant I did not take. Bond slip where he made bond on a charge previously. And another bond slip when he made bond on another charge. And another one.

Q. There are no disciplinary records or reports of any misconduct or infractions during any stay in the Coweta County Jail, is there?

A. No, ma'am.

Q. And it would have been in that file.

A. It should have been in the file, yes, ma'am.

Q. If it existed.

A. If it existed at that time.

Q. Okay. Thank you.

Captain Yarbrough, is Investigator Rodney Riggs here with you today?

A. Yes, Lieutenant Riggs is here.

MS. LAWSON: Okay. Thank you very much. No further questions.

MS. ROSE: If I might have just a moment, please, Your Honor.

(Pause.)

REDIRECT EXAMINATION

BY MS. ROSE:

Q.    I'm going to approach and show you Defendant's Exhibit 2, an attached page.  What is this page of Exhibit 2?

A.    This is his medical questionnaire.  All the questions he was asked when he first came in.  If he had any problems with trauma, bleeding, anything going on, hepatitis, tuberculosis, any diseases.  Are you under a doctor's care at this time?

Q.    Just for jail purposes or whether it's liability or so that you can make sure that you were providing adequate care --

A.    That's correct.

Q.    -- while in custody.

      As to when the defendant was asked if he had mental or emotional upset, what was the response?

A.    No.

Q.    Attempted suicides?

A.    No.

            MS. ROSE:  All right.  Thank you, sir.  I don't have any other questions.

            MS. LAWSON:  No questions, thank you.

            THE COURT:  You may step down.

            THE WITNESS:  Thank you, sir.

            (Witness stepped down.)

            MS. TOMPKINS:  Next witness will be Rodney Riggs.

                        RODNEY RIGGS,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q.    Will you state your name, please.

A.    Rodney Riggs.

Q.    And what is your occupation?

A.    I'm a detective with the Noonan Police Department in Noonan, Georgia.

Q.    How long have you been with the police department in Noonan, Georgia?

A.    Twenty-seven years.

Q.    In May of 1992, what was your assignment with the police department?

A.    I was a detective sergeant in criminal investigations.

Q.    And you conducted investigations of what kinds of cases?

A.    Assaults, thefts, crimes against persons.  Whatever type of criminal case arose.

Q.    All right.  Now, on or about May 7th, 1992, did you become involved in an investigation that involved Aquilia Barnette?

A.    Yes, ma'am, I did.

Q.    What was the nature of that investigation?

A.    On May the 2nd the Noonan Police Department had received a call about a shooting that occurred on Augusta Drive at the railroad tracks.  The uniformed division responded and found

that an Anthony Britt had been shot in an altercation there, and Britt identified the person that shot him as a person he knew as Marc. I took over the investigation and identified that person as Marc Barnette, and later arrested Barnette for various charges because of that altercation.

Q. Was Anthony Britt also charged for his role in that altercation?

A. Yes, he was.

Q. And what was Anthony Britt charged with?

A. He was charged with disorderly conduct.

Q. And what was Barnette charged with?

A. Battery, reckless conduct, pointing a gun at another, and discharging a firearm.

Q. And are those -- those are misdemeanor charges?

A. Yes, they are.

Q. And how is it -- now, Anthony Britt was shot; is that correct?

A. Yes.

Q. Were you able to determine what kind of firearm was used?

A. Yes, ma'am.

Q. And how was that?

A. Through the bullet that was removed from Britt.

Q. Okay. And how can a person be shot and have that be a misdemeanor charge?

A.    Because of the circumstances arising about the altercation and the fact that the wound was not life threatening.

Q.    Okay.  So you -- were you able to arrest Barnette on those charges?

A.    Yes, ma'am.

Q.    Okay.  And did you take a statement from him?

A.    Yes, I did.

        MS. TOMPKINS:  May I approach, Your Honor?

        THE COURT:  Uh-huh.

Q.    I'm going to show you two exhibits.  First, Government's Exhibit 54A, and ask you if you recognize what that is?

A.    Yes, ma'am.  This is the Noonan Police Department report about the assault of Barnette on Britt.  It happened in May of 1992.

Q.    And make sure that you speak into that microphone for me.

A.    All right.

Q.    And I'm going to show you now Government's Exhibit 54B and ask if you recognize that?

A.    Yes, I do.  This is a waiver of counsel form that I read to Marc Barnette before I interviewed him on May the 7th, 1992.

Q.    All right.

        MS. TOMPKINS:  Your Honor, move admission of

Government's Exhibit 54A and 54B.

THE COURT: Let them be admitted.

(Government's Exhibits Numbers 54A and 54B were received into evidence.)

MS. TOMPKINS: Do you have copies of these with you at the stand?

A.   Yes, ma'am, I have the originals.

Q.   Okay.  I have copies with me.

Now, describe for the jury just briefly how you advised the defendant of his rights.

A.   The Noonan Police Department has a standard form that's called Waiver of Counsel.  It has a blank on it to write the person's name of who you're interviewing.  It has the rights commonly known as Miranda warnings on there.  And then it has a place for the date and time and for the signature of the person who you're interviewing.

Q.   And did the defendant appear to understand his rights?

A.   Yes, ma'am, he did.

Q.   And did he waive those rights?

A.   He did.

Q.   And did he make a statement to you?

A.   Yes, ma'am, he did.

Q.   And is that statement attached to the waiver of rights form?

A.   Yes, ma'am, it is.

Q. On Government's Exhibit 54B; is that correct?

A. Yes, ma'am.

Q. Okay. Read that statement to the jury, please.

A. This is Marc Barnette's statement.

Q. And if you would, just keep your voice up. You've got a very low voice.

A. Okay. My fiancee, Natasha Heard, and I have been having some trouble lately. Anthony Britt has been talking to her and that has been making things worse. I have also been talking to Anthony's sister, Crystal Dennis, and Anthony has been telling her things about me.

On Friday, May the 1st, I got off work. I went by Crystal's apartment on Hannah Street. While I was there Anthony came over. Several times that evening Anthony asked me to come outside with him. I never did because I had nothing to say to him.

I finally left Crystal's apartment about 1:30 a.m. and was walking home. When I got on Augusta Drive near the railroad tracks, Anthony came on the street and hollered at me. I turned around and saw there was several other people with him. Anthony came running up to me and started arguing with me. He was telling me what he was going to do to me and said that I had been talking about his son. I told Anthony I didn't want any trouble and I kept walking. Anthony followed me and kept talking to me about my fiancee and what he was

going to do to me. He finally got in front of me and I tried to go around and he pushed me. I tried going around him a second time and he pushed me again. I had my pistol with me and when he pushed me the second time, I pulled my pistol and I shot once and hit Anthony. I shot two more times, but I didn't hit anybody.

I was afraid at that time because of the crowd that was with Anthony. When I shot, the crowd took off running and I ran toward my apartment. When I got near my apartment, I threw the gun into the woods. The gun is a .22 caliber revolver.

And the statement is signed by Marc Barnette.

Q. All right. And is that also signed by you?

A. Yes, ma'am, it is.

Q. And in that statement, did the defendant say he already had that .22 caliber gun with him that evening?

A. Yes, ma'am.

Q. Okay. Did you ascertain whether or not Anthony Britt or any of the people with him had firearms that night?

A. There was no indication that no one else had a firearm that night.

MS. TOMPKINS: Thank you. That's all the questions I have.

CROSS EXAMINATION

BY MS. LAWSON:

Q. Detective Riggs, how are you?

A. Fine, thank you.

Q. Good. You, being a veteran police officer when this occurred, conducted a thorough investigation of the case, did you not?

A. Yes, ma'am.

Q. And as a result of that investigation, you charged Marc Barnette with nothing but misdemeanors.

A. That's correct.

Q. And misdemeanors are less serious charges than felonies.

A. That's correct.

Q. And in fact, shooting somebody can be a felony in the state of Georgia, can't it?

A. Yes, ma'am.

Q. All right. So your election to charge him with misdemeanors was based on your investigation of the case.

A. Yes, ma'am. The totality of the facts around the circumstance.

Q. Okay. And as of late 1997, 1998, you were aware that Mr. Britt had himself -- well, had been killed in a gun battle; is that right?

A. That's right.

Q. And that gun battle was concerning an altercation with another man over a woman.

A. That's correct.

Q. And that the man was trying to leave the apartment complex. Mr. Britt approached him. An argument ensued and gunfire took place and Britt was killed.

A. That is correct.

Q. That's what you report.

A. Yes, ma'am.

Q. Okay. So this situation in which Mr. Britt was killed was somewhat similar to what you've just testified about when Marc Barnette was charged.

A. Yes, ma'am, somewhat similar.

Q. So basically, that charge -- that fight between Britt and Mr. Barnette was over women.

A. Yes.

MS. LAWSON: No further questions. Thank you.

MS. TOMPKINS: I do have a couple redirect.

REDIRECT EXAMINATION

BY MS. TOMPKINS:

Q. Now, did you follow up with the -- what happened with the charges to Mr. Barnette?

A. He was convicted of, I think, three of the four charges.

Q. Was -- well, let me show you what's been marked as Government's Exhibit 70. Do you recognize that?

A. Yes, ma'am.

Q. What is that?

A. This is a certified copy of a docket book of the Noonan

Municipal Court.

Q. And does that show the results of these criminal charges?

A. Yes, ma'am, it does.

MS. TOMPKINS: We'd move the admission of Government's Exhibit 70, Your Honor.

THE COURT: Let it be admitted.

(Government's Exhibit Number 70 was received into evidence.)

Q. And does it also have Anthony Britt's charge on there?

A. Yes, ma'am, it does.

Q. Tell the jury what happened with all the charges stemming from this incident.

A. On Anthony Britt's charge of disorderly quarreling, he pled guilty and received a fine of $33.

On Barnette's charge of discharging a firearm in the city, he pled guilty and spent time in jail, and the letters T-W-O are there for the sentence. That stands for time worked out. So he spent time in jail for that.

Q. The time he spent in jail, was that the time he had spent in jail from the time of his arrest until the time that the case was resolved?

A. Yes, ma'am.

Q. Do you know how many days that was?

A. From May the 7th, 1992, to June the 8th, 1992.

Q.    So about 30 days?

A.    Yes, ma'am.

Q.    Okay.

A.    On the charge of battery, he pled guilty to that and the sentence was also time worked out.  The charge of reckless conduct was dismissed.  And the charge of pointing a gun at another, again, he pled guilty and time worked out on that.

Q.    All right.  Now, Anthony Britt, as you testified, was later murdered; is that correct?

A.    Yes.

Q.    And it was characterized as a gun battle?

A.    Yes.

Q.    Now, on the night of the incident with Barnette and Anthony Britt, that wasn't a gun battle, was it?

A.    It was not a gun battle on that night, no.

Q.    Okay.  Only one person brought their gun to that battle; is that right?

A.    Yes, ma'am.

            MS. TOMPKINS:  Thank you.  That's all.

            THE COURT:  You may step down.

            (Witness stepped down.)

            MS. ROSE:  Natasha Heard.

            (Pause.)

            MS. ROSE:  She's on her way, Your Honor.  She had stepped out of the witness room.

(Pause.)

## NATASHA TOLBERT,

being first duly sworn, was examined and testified as follows:

### DIRECT EXAMINATION

BY MS. ROSE:

Q.   State your name, please, ma'am.

A.   Natasha Tolbert.

Q.   Spell your last name, please.

A.   T-o-l-b-e-r-t.

Q.   And prior to being married, were you Natasha Heard?

A.   Uh-huh.

Q.   H-e-a-r-d?

A.   Yes.

Q.   Where do you live?

A.   In Noonan.

Q.   Noonan, Georgia?

A.   Uh-huh.

Q.   How long have you been a resident there?

A.   Ten years.

Q.   Do you know the defendant --

A.   Yes, I do.

Q.   -- in this case?

How do you know the defendant?

A.   I'm his children's mother.

Q.   When did you meet him?

A. I don't recall the year.

Q. Well, how old are your children?

A. Eleven and ten.

Q. Is the eleven-year-old male or a female?

A. Female.

Q. What's her name?

A. Angelica Heard.

Q. And the ten-year-old?

A. Aquilia Heard.

Q. He's a male, right?

A. Yes.

Q. Now, how did you meet the defendant?

A. At a pool in Lathonia.

Q. In?

A. Lathonia.

Q. Laconia?

A. Lathonia.

Q. Lathonia.

A. Uh-huh.

Q. I take it that's in Georgia.

A. Yes.

Q. Where is that in relationship to Noonan?

A. Approximately maybe 25 miles north.

Q. How old were you at that time?

A. Fourteen.

A.   Yes.

Q.   Whose apartment was that?

A.   Marc's.

Q.   Did he move out of his home with his mother to live with you?

A.   Yes.

Q.   For you two to move in together?

A.   Uh-huh.

Q.   With whom were you living at that time?

A.   My mother.

Q.   And did you also have a grandmother living in the area?

A.   Yes, I did.

Q.   Did you stay with her some?

A.   Yes, I did.

Q.   Where did the two of you live?

A.   In Noonan off of Berry Avenue.

Q.   Did you continue with your schooling?

A.   No.

Q.   Did he?

A.   No.

Q.   What was he doing at that time?

A.   At the time of when?

Q.   When you moved in together.  When he quit school, did he have a job?

A.   Yes, he did.

Q. Where was he working, if you recall?

A. Arby's.

Q. And did you have a job?

A. No.

Q. When you first started the relationship, describe for the jury how you two got along.

A. Great.

Q. How did you two get along at the beginning?

A. We did. We got along real good.

Q. How did he treat you?

A. He treated me well. Real good. Well.

Q. At some point did that change?

A. Yes.

Q. Tell us about that.

A. I'm nervous, so I don't know how to explain it.

Q. Well, just tell us what happened. What you recall.

A. Well, sometimes he just would get mad and stuff and we would get to -- get to fighting physically.

Q. Did he hit you?

A. Yes.

Q. Where?

A. I don't know. Just everywhere, I guess.

Q. And what would you do under those circumstances?

A. Hit him back.

Q. Now, while you were pregnant, did this occur?

A.    Uh-huh.

Q.    Tell the members of the jury what happened as you were getting off the bus and had a disagreement with the defendant.

A.    I don't quite remember it all that well, but I know that me and him did get into a tussle and I do remember him slamming me on the concrete.

Q.    And how far along were you in your pregnancy at that time?

A.    I don't know.

Q.    Do you remember which child you were pregnant with?

A.    Uh-huh.

Q.    Which one?

A.    Angelica.

Q.    After that incident, did you see the defendant later that night?

A.    Yes.

Q.    What happened when he came over to your house on that evening?

A.    I think I told him about it.

Q.    And what did he do?

A.    I don't remember.

Q.    At some point did you and the defendant break up?

A.    Yes.

Q.    Or end your relationship?

A.   Uh-huh.

Q.   Do you remember what year that was?

A.   No.

Q.   How old were the children?

A.   I want to say maybe Marc was about a month and maybe Angelica was maybe two or one.  Something like that.

Q.   Where did the defendant go when that relationship ended?

A.   I don't know.

Q.   Do you recall whether he went to live with his mother?

A.   No, I don't.

Q.   Did he go to Charlotte or Atlanta?

A.   I don't know.

Q.   You don't know because you didn't have any contact with him, did you?

A.   No.

Q.   In fact, he didn't contact you or the children for five or six years; is that correct?

A.   I remember one letter.

Q.   During a six-year period.  No Thanksgiving?

A.   No.

Q.   No Christmas?

A.   (Negative nod.)

Q.   Didn't send the children Christmas presents?

A.   (Negative nod.)

Q.   Send them a Christmas card?

A. (Negative nod.)

Q. You need to answer out loud. The court reporter is taking --

A. Oh, no.

Q. Phone calls to the children maybe on their birthday?

A. No.

Q. You went a long time without hearing from him or seeing him or having contact with him in any way. Is that fair to say?

A. That's true.

Q. Until about a month ago.

A. Yes.

Q. Tell us about that.

A. What do you want to know?

Q. How it was that the defendant made contact with you about a month ago.

A. I don't remember really. I just know that we came up. And I think he wrote me a letter and asked could he visit, have a visit with the kids.

Q. Okay. About a month ago you got that letter?

A. Uh-huh.

Q. The first in many years.

A. Yes.

Q. And how did -- did you come up here to visit him?

A. Yes.

Q. And how did you get up here?

A. I drove.

Q. How were you able to afford that trip up?

A. I work. Me and my husband.

Q. And you visited with the defendant.

A. Uh-huh.

Q. And you took the children to see him.

A. Yes.

Q. That was the first time the children had seen him since he left them at a month and two years old or so; is that correct?

A. That's correct. Well, no, I don't -- that's not right. Because before then he did come and got them and I think they stayed in Charlotte for about three months.

Q. Three months.

A. Three months.

Q. Now, you testified in this case previously, didn't you?

A. Yes.

Q. At that time do you recall saying that you had not seen the defendant in five years?

A. That's correct.

Q. And nor had your children.

A. That's correct.

Q. And earlier today you told me that you had not seen him or heard from him but one time in all those years.

A. That's right.

MS. ROSE: Thank you. I don't have any other questions.

CROSS EXAMINATION

BY MR. BENDER:

Q. Good morning, Ms. Tolbert.

A. Good morning.

Q. You're now married, are you not?

A. Yes, I am.

Q. Okay. Tell us to whom you are married.

A. Lovey Tolbert.

Q. And what does he do? What sort of work?

A. He's a correctional officer.

Q. And that's in the state of Georgia?

A. Yes, it is.

Q. Now, Ms. Tolbert, when you and Marc first met, you were living in Lathonia?

A. Yes.

Q. And both of you were living in an apartment complex --

A. Yes.

Q. -- that had a swimming pool.

A. Yes.

Q. And I believe y'all met at the swimming pool.

A. Uh-huh, that's correct.

Q. He seen you walk by and he followed you over there,

something like that.

A. Something like that.

Q. Okay. All right. And as a result of that, y'all started talking and dating.

A. Yes.

Q. Okay. And was he living with his mother at that time?

A. Yes.

Q. Okay. Not much food in that apartment, was there?

A. No.

Q. What else was in that apartment that his mother had?

A. Alcohol.

Q. Lot of alcohol?

A. I don't know about a lot, but I've seen it.

Q. Okay. Some wine?

A. Uh-huh.

Q. Some maybe hard liquor, that sort of stuff?

A. (Affirmative nod.)

Q. Maybe even some beer?

A. I don't know.

Q. Okay. Not much furniture in that apartment.

A. Well, I think they had a living room set, but I know that they didn't have beds.

Q. Didn't have any beds?

A. Huh-uh.

Q. Okay. And Marc and his brother Mario lived there with

his mother.

A. Yes.

Q. And so when you and Marc began dating and became intimate, that is, sexually intimate, would he -- would he usually come to your apartment?

A. Yes.

Q. Okay. Describe that apartment for us.

A. My apartment?

Q. Yeah. With your mother or with whomever you were living at that time.

A. She had her room, and on this side of the apartment were my room, my sister's room.

Q. Uh-huh. Y'all had furniture.

A. Oh, yeah.

Q. Had beds.

A. Yes.

Q. And during the periods of time you were there in Lathonia, do you remember Marc ever going in the closet?

A. Yes, I do.

Q. Tell us about that.

A. I don't know why he did it, but sometimes I would find him in there. Sometimes he wouldn't have no clothes on. He'd be in there crying.

Q. Okay. Be in the closet naked crying.

A. Uh-huh.

Q.   Did he ever tell you why he was that emotional or what it was about?

A.   No.

Q.   Now, I think both of you came from an abusive home, didn't you?

A.   Yes.

Q.   Tell us about your home life.

A.   My dad, he beat me, my mom, my sister, you know.

Q.   Okay.  And when this incident occurred that you told us about, you were living in Noonan at that time.

A.   Yes.

Q.   And you had moved there and then Marc came some time later?

A.   No.

Q.   Did y'all move there together?

A.   Yes.

Q.   And that's where your grandmother lived.

A.   Yes.

Q.   And Marc was working at Arby's?

A.   Yes.

Q.   And I think you had been to -- had you been to Underground Atlanta --

A.   Yes, we had.

Q.   -- that day?  And Marc had -- Marc had been talking to some girl that you didn't know there and I believe you slapped

him.

A.    Yes, I did.

Q.    Okay.  And he didn't slap you back there.

A.    No.

Q.    Or react in any way, did he?

And on the way -- and on the bus ride back, you were talking to some young man that you knew but he didn't know.

A.    That's correct.

Q.    And you got off the bus, that's when he got mad at you --

A.    Yes.

Q.    -- didn't he?

And although this relationship started out, I think you used the word great, he was very kind, caring, took care of you, did all the things that you wanted a man to do for you, didn't he?

A.    Yes.

Q.    But then it began to go -- get a little rough.

A.    Yes, it did.

Q.    Is that right?

A.    Yes.

Q.    And he became possessive, jealous.  Didn't want you wearing any makeup; is that right?

A.    That's right.

Q.    And was that after Angelica was born?

A.    I don't remember.

Q.   Okay.  What -- what was Marc's attitude when he found out that you were pregnant with Angelica?

A.   He was happy.  He was happy.

Q.   Would he go with you to your prenatal care?

A.   Yes.

Q.   Y'all would sometimes have to ride the bus.

A.   Yes.

Q.   And then, I guess, walk the rest of the way.

A.   Yes.

Q.   And Marc would be with you.

A.   Yes.

Q.   And how old were you at that time?

A.   Fourteen.

Q.   Tell us what Marc did on the day that Angelica was born.

A.   He bought a newspaper.

Q.   Why did he buy a newspaper that day?

A.   Because he wanted to -- wanted her to see what was going on the day she was born.

Q.   It's been marked previously and introduced as Defendant's Exhibit 40.

     Ms. Tolbert, Defendant's Exhibit 40, is that the newspaper he bought on the day that she was born?

A.   Yes, it is.

Q.   Okay.  And he wanted Angelica to have something --

A.   Yes, sir.

Q.    -- on the day she was born.

Do you remember any photographs that might have been taken the two of y'all took and kept in a scrapbook?

A.    Yes, I do.

Q.    And the scrapbook, how long have you made this scrapbook or kept it?

A.    It's been a while.

Q.    Okay.  While they're looking at those, how old is Angelica now?

A.    She's eleven.

Q.    And how old is little Marc?

A.    He's ten.

Q.    What is little Marc doing today?

A.    He's playing.  He's trying out for football.

Q.    Down in Noonan?

A.    Yes.

Q.    And Angelica came with you up here?

A.    Yes, sir.

Q.    When you were up here previously, did the children want to see their dad?

A.    Yes, they did.

Q.    Were they excited about seeing their dad?

A.    Very much.

Q.    Have the children been wanting to write him --

A.    Yes.

Q. -- for some period of time?

A. Yes.

MR. BENDER: May I approach, Your Honor?

THE COURT: Yes.

Q. Defendant's Exhibit Number 3, can you identify that for us?

A. Uh-huh.

Q. What is Defendant's Exhibit Number 3?

A. That's Marc and Angelica during Christmas time.

Q. Okay. And is there a Christmas tree in the background?

A. Yes, it is.

Q. And Defendant's Exhibit Number 4, what is that a picture of?

A. That's a picture of Marc holding up a picture of him and his family.

Q. Okay. And is he standing in front of the partially decorated Christmas tree?

A. Yes, he is.

Q. Defendant's Exhibit Number 5, could you tell us what that is.

A. That's a picture of Angelica and Marc when they was little.

Q. Okay. And Defendant's Exhibit Number 6?

A. That's another picture of brother and sister graduating from kindergarten.

Q. And Defendant's Exhibit Number 7?

A. Is what I made for them brothers and sisters.

Q. Okay. So it shows both of them.

A. Uh-huh.

Q. The photograph with the Christmas tree, that's a picture of this Marc Barnette, right?

A. That's right.

Q. Okay. When y'all were living together down in Noonan.

A. I think we were in Lathonia then.

Q. Okay. But Angelica had been born because he's holding her in one of those pictures.

A. That's right.

Q. Now, have you, through the years, been able to show your children that photo album so that they knew who their father was?

A. Yes, I have.

Q. And how do they feel about their father?

A. They love him.

           MR. BENDER: Thank you. That's all.

                    REDIRECT EXAMINATION

BY MS. TOMPKINS:

Q. All but -- let's see. There's a picture of the defendant with Angelica when she was little --

A. Uh-huh.

Q. -- right?

Q.    Uh-huh.

A.    Well, I graduated a year ago for dental assistant and I've been doing that for a while, and now I've left that to make sure my youngest child, you know, go to school and I'm throwing papers part-time now.

Q.    So you went ahead and finished your education and got your dental assistant degree.

A.    Yes, I have.

MS. ROSE:  Very good.  All right.  Thank you very much.

THE COURT:  You may step down.

(Witness stepped down.)

THE COURT:  We'll take our lunch break at this time, members of the jury.  Ask you to be back with us at 2 o'clock.  Thank you very much for your attention to the case. Remember the instructions.

(Lunch recess at 12:31 p.m.)

✻        ✻        ✻



RECEIVED

JUN 1 6 2003

US ATTORNEY'S
OFFICE
CHARLOTTE, NC