## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

**JOINT APPENDIX - VOLUME III OF V
(Pages 845 - 1311)**

HAROLD J. BENDER
LAW OFFICE OF HAROLD J. BENDER
200 North McDowell Street
Charlotte, NC 28204
(704) 333-2169

ROBERT J. CONRAD, JR.
UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6629

MARK E. OLIVE
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
(850) 224-0004

ANNE M. TOMPKINS
ASST. UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6222

*Counsel for Appellant*

*Counsel for Appellee*

**Additional Counsel Listed on Back of Cover**

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

JILL WESTMORELAND ROSE
ASSISTANT UNITED STATES ATTORNEY
WESTERN DISTRICT OF NORTH CAROLINA
100 Otis Street, Room 233
U.S. Courthouse Building
Asheville, North Carolina 28801
(828) 271-4661

# TABLE OF CONTENTS

Federal District Court Docket Sheet ................................... 1

Indictment filed February 4, 1997 ................................. 69

Guilty Verdict returned January 27, 1998 ......................... 75

Defendant's Motion in Limine Regarding the Victim
Impact Statements, filed June 4, 2002 ........................... 76

Motion for Allocution by the Defendant, filed
June 4, 2002 ................................................. 78

Government's Response in Opposition to
Defense Motion in Limine to Prohibit
and/or Limit Victim Impact Evidence,
filed June 12, 2002 ........................................... 80

Government's Response to Motion for Allocution
by the Defendant, filed June 12, 2002 .......................... 89

Order Denying Defendant's Motion for Allocution,
entered June 18, 2002 ....................................... 93

Order Denying Defendant's Motion in Limine
regarding the Victim Impact Statements,
entered June 21, 2002 ....................................... 97

Motion for Relief Pursuant to *Ring v. Arizona*
filed July 2, 2002 ........................................... 100

Attachments:

Indictment ................................................. 103

1

Government's Notice of Intent to Seek
the Death Penalty, filed August 7, 1997 .......................... 110

Government's Reaffirmation of Intention
to Seek the Death Penalty, filed July 30, 2001 ..................... 118

Defendant's Memorandum in Support of Motion
Regarding *Ring*, filed July 12, 2002 ........................... 121

Government's Response to Defendant's Motion for
Relief Pursuant to *Ring v. Arizona*,
filed July 12, 2002 ........................................ 128

Voir Dire:

Prospective Juror Regina Sanders (888) ........................ 133

Prospective Juror Edwards (1014) ............................ 148

Prospective Juror Karen Sanders (1071) ....................... 169

Prospective Juror Blakeney (1143) ............................ 184

Prospective Juror Bryson (1239) ............................. 205

Prospective Juror Donaldson (1289) .......................... 224

Prospective Juror Campbell (1477) ........................... 245

Prospective Juror Moore (1913) ............................. 264

Prospective Juror Deana Stanford (1960) ...................... 281

Parties' exercise of peremptory challenges to the
prospective jurors, July 27, 2002 ............................ 294

Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 5 of 200

## Volume II

Resentencing Volume 12, July 29, 2002, (Morning) . . . . . . . . . . . . . . . . . . . . . . 372

Resentencing Volume 12, July 29, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . . 469

Resentencing Volume 13, July 30, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . . 587

Resentencing Volume 13, July 30, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 687

Resentencing Volume 14, July 31, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . . 773

## Volume III

Resentencing Volume 14, July 31, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 845

Resentencing Volume 15, August 1, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 959

Resentencing Volume 16, August 5, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1029

Resentencing Volume 16, August 5, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1107

Resentencing Volume 17, August 6, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1202

## Volume IV

Resentencing Volume 17, August 6, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1312

Resentencing Volume 18, August 7, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1424

Resentencing Volume 18, August 7, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1533

Resentencing Volume 19, August 8, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1634

Resentencing Volume 19, August 8, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1726

Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 7 of 200

## *Volume V*

Resentencing Volume 20, August 9, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 1799

Resentencing Volume 20, August 9, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1822

Resentencing Proceedings, August 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . 1870

Resentencing Proceedings, August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . 2017

Defendant Motion for Mistrial regarding victim
    impact testimony, filed August 5, 2002 . . . . . . . . . . . . . . . . . . . . . . . . 2034

Written questions from the jurors filed August 13, 2002 . . . . . . . . . . . . . . . . 2037

District Court Judge's answer to jurors' written question
    filed August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2038

Jury verdict form with reference to count 7, filed
    August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2039

Jury verdict form with reference to count 8, filed
    August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2057

Jury verdict form with reference to count 11, filed
    August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2075

Judgment and Order imposing sentence, entered
    August 20, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2092

Defendant's Motion for New Trial, Arrest of Judgment
    and Other Relief, filed August 20, 2002 . . . . . . . . . . . . . . . . . . . . . . . 2097

Order Denying Defendant's Motion for New Trial,
    Arrest of Judgment and Other Relief
    entered September 9, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2149

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/31/2002

Page 2863

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA            )

                                    )    CASE NO. 3:97CR23-V

   v.                               )    July 31st, 2002

                                    )    Afternoon Session

AQUILIA MARCIVICCI BARNETTE,        )

        Defendant.                  )

        TRANSCRIPT OF SENTENCING HEARING

    BEFORE THE HONORABLE RICHARD L. VOORHEES

        UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

    ANNE M. TOMPKINS, Esq.

    JILL WESTMORELAND ROSE, Esq.

    Assistant United States Attorney

    227 West Trade Street

    Suite 1700

    Charlotte, North Carolina  28202

FOR THE DEFENDANT:

    JEAN B. LAWSON, Esq.

    P.O. Box 4275

    Charlotte, North Carolina  28226

    HAROLD J. BENDER, Esq.

    200 North McDowell Street

    Charlotte, North Carolina  28204

Reported by:  Scott A. Huseby,

              Registered Professional Reporter,

              Certified Court Reporter,

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2864

P R O C E E D I N G S

THE COURT: Ms. Hankins had contact with a juror and I asked her to put that on the record, please. You don't have to mention the nature of the medical.

THE CLERK: One of the jurors brought it to my attention that he was having a medical problem and might need a couple of hours to see a doctor. And I told him was the problem something that he felt that he needed to be excused or he didn't feel like he could sit here, and he said no, that honestly the problem had been going on since last Friday and he's been dealing with it fine and he really doesn't want to miss anything.

And so I told him that there was a good possibility that we may not work on Friday, would that give him a chance to get an appointment with a doctor and he said yes, that would work fine and he is going to try to do that. And then I told him if that did not work out or if he could not get an appointment or if he felt that -- if he had any further pain and he wished to be excused, just come back and we would go from there, just to let me know and we would go from there.

THE COURT: Which is the juror number?

THE CLERK: Number 118, Mr. Sentinelli. But he advised me that on the break, he is going to get the phone number and go ahead and make his doctor's

800-333-2082   Huseby, Inc., a   846   Huseby, RPR   Repor   merion   (704) 333-9889   Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2865

appointment for Friday and everything should be okay.

THE COURT: All right. Anything further about that?

MS. LAWSON: Your Honor, just to make inquiry, if Mr. Sentinelli, because of whatever this problem is, has been able to concentrate on the evidence or if he has been impaired any way in doing that.

THE COURT: What did he say about that, Ms. Hankins?

THE CLERK: He said -- when I asked him, I said, you know, is it something painful that you really need to and he said, oh, no, no, I'm fine, I've been here all week, and he said no. So I don't think it was something that would be to the level that it would impair his concentration.

THE COURT: Well, I think that's adequate. She told him if he has any problem, let us know if it's disturbing your ability to be a juror.

Now, would there be any objection to the Court telling all of the jurors that we won't be working Friday?

MS. TOMPKINS: No objection.

MR. BENDER: No objection.

THE COURT: I'm sure they would appreciate knowing that. May we have the jury, please.

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc. an Affiliate of Spherion (704) 333-9889        Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2866

(The jury returned to the courtroom.)

THE COURT: Members of the jury, I wanted to tell you that we will not have court on Friday, and so you can have that day for your own personal purposes or business purposes as the case may be.

One other thing I would bring up at this point, there's been some testimony about certain statements said to have been made by the defendant to investigating authorities concerning certain matters. When you consider this testimony, you should ask yourselves these questions: first, did the defendant say the things the witness told you the defendant said. To answer this question, you must decide if the witness was honest, had a good memory, and whether he or she actively understood the defendant.

Second, if the defendant did make a statement, was it correct. Here you must consider all of the circumstances under which the statement was made, including the defendant's personal characteristics, and ask yourselves whether a statement made under these circumstances is one you can rely on.

After you've answered these questions, you may rely on the testimony about the statement as much or as little as you think proper.

You may call your next witness.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2867

MS. TOMPKINS: Government calls Alesha Chambers Houston.

ALESHA CHAMBERS HOUSTON, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. Could you state your name, please?

A. Alesha Chambers Houston.

Q. And throughout your testimony, I just ask you to keep your voice up as best you can so that it will carry all the way back.

A. Okay.

Q. How old are you?

A. 25.

Q. And what business are you in?

A. I work with Bank of America in security.

Q. In April of 1993, how old were you?

A. 15.

Q. And what school did you go to?

A. Myers Park.

Q. And in the 1992, '93 school year, what grade were you in?

A. Tenth.

Q. Did you have a part-time job?

Report                    Huseby, RPR
800-333-2082   Huseby, Inc., a                    herion (704)-333-9889
849
Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 15 of 200 Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2868

A.   Yes.

Q.   And where was that?

A.   At Bojangles.

Q.   And was that here in Charlotte?

A.   Uh-huh.

Q.   Which Bojangles was that?

A.   On Woodlawn.

Q.   About that time, did you meet the defendant, Marc Barnette?

A.   Yes.

Q.   What did you call him?

A.   Marc.

Q.   How did you meet him?

A.   I was at my cousin's and we were out sitting on her porch, and him and a friend walked by.

Q.   Then what happened?

A.   He came over and talked to us.  We exchanged numbers that day, and I called him later and it went from there.

Q.   How old was he at the time?

A.   19, 20, I'm not sure.

Q.   Did y'all begin dating?

A.   Yes.

Q.   How long did that dating relationship last?

A.   Maybe about 3 months.

Reported ~ ~ ~ ~ ~useby, RPR
800-333-2082   Huseby, Inc., an A      Filed 09/23/15  (704) 333-9889   Page 16 of 200 (704) 372-4593

850

Case 3:12-cv-00327-MOC   Document 103

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                     7/31/2002

Page 2869

Q.   Describe for the jury how that relationship was at the beginning.

A.   It was very nice in the beginning, probably an ideal relationship.

Q.   In what ways was it ideal?

A.   I mean, you know, he was real caring, thoughtful, did a lot of good, fun things together, things like that.

Q.   And where was he living when y'all first started seeing each other?

A.   With his mother.

Q.   Where did she live?

A.   On West Boulevard.

Q.   Do you know who else lived in that house?

A.   I think an aunt of his named Tina, his brother Mario and his grandfather.

Q.   What is his grandfather's name?

A.   Jessie.

Q.   Do you know what the age difference between Marc and Mario is?

A.   Mario was my age, so about 4 years.

Q.   Four years younger?

A.   Yes.

Q.   Now, when the relationship began to turn at some point during your relationship, what began to

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2870

happen, what did he do?

A. At first he became very possessive. You know, he always questioned where I went, who I talked to, what I wore, who I kept company with, things like that.

Q. What kind of issues did he have with what you wore?

A. He didn't like for me to be revealing with my clothing, cover as much as possible, I suppose.

Q. And you said that he was controlling. In what ways was he controlling?

A. Basically he wanted me with him all the time, and if I was not with him, he wanted tight tabs or where I was.

Q. And as long as you did that, how was the relationship?

A. Everything was fine, uh-huh.

Q. And what if you didn't go along with how he wanted it to be?

A. We would get into an argument, argument followed with violence.

Q. Now, did Marc drink much when you were with him?

A. No.

Q. Did you ever know Marc to take drugs?

A. No.

Case 3:12-cv-00327-MOC     Document 103     Filed 09/23/15     Page 18 of 200
852

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2871

Q.    Now, do you recall a specific incident when y'all were dating when he reacted violently to what you were wearing?

A.    Yes.  My cousin and I had gone to a strip mall close by our house and we were walking back.  He interceded us on the way back and he was in a vehicle and he veered the car so that he was like trying to run into us, I suppose, and he just started yelling where you been and what you doing with that on, you know you are not supposed to wear that shit.  And he told me to get in the car, and I got in the car because I was embarrassed and I didn't know what would follow if I didn't.

So I got in the car and we drove down some highway on the way to his house, and he was cursing and fussing.  And he took his fist and punched me in the side of my face, bruised my check, chipped my front tooth.  And I was telling him at first I didn't want to go with him anyway because I had a meeting to go to that evening at work and I kept telling him, you know, I have to go to a meeting, take me back to my aunt's house, and he wouldn't.  When he hit me in any face and chipped my front tooth, I grabbed my purse and took out a compact to check, you know, what damage he done to my face, and he smashed my purse and threw it on the side of the

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR2?
7/31/2(

Page 2872

highway and proceeded to his mother's house.

Q.    Where were you living at the time?

A.    At that time, I was living at home with my mom.

Q.    And were there times when you lived with other family members?

A.    Yes.

Q.    Who else did you live with?

A.    I lived with my aunt for a short period of time and I also lived with an uncle later on in that year.

Q.    And were you having some turmoil at home?

A.    Yeah.

Q.    Was your father part of your family?

A.    My stepfather, yeah.

Q.    Was there turmoil between your mother and your stepfather?

A.    No, it was more or less between her and I, between -- yeah, between her and I about him basically.

Q.    And how old were you at that time, when the chipped tooth incident happened?

A.    I was still 15.

Q.    And what did he say -- did you say anything to him about the damage that he had done to your face and your teeth?

A.    Yes, I asked him, why would he hit me like that and he made a comment to say that he didn't want me to

Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 20 of 200

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2873

be pretty to anyone else.

Q. How long had y'all been together when that happened?

A. Maybe a month.

Q. Now, did there come a time when you and Marc lived for a while in a hotel in Charlotte?

A. Uh-huh.

Q. Where was that?

A. It was off of North Tryon, I can't remember the name of it.

Q. Was that in the summer of 1993?

A. Yes.

Q. Was it a Motel 6?

A. No.

Q. Now, during the time that you and Marc were staying at the hotel, were there any incidents of violence?

A. Yes, there was. I can't --

Q. Was there a time when he found a number of someone in your purse?

A. That wasn't while we were staying there, that was an entirely -

Q. Okay.

A. We had -- the incident you are talking about, we were at a Motel 6 and --

Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 21 of 200
855

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2874

Q. Tell the jury about that incident.

A. Like you were saying, we were at a Motel 6 and we were about to leave, I believe. I was on my way to a hair appointment and I had a book bag with me, and he went through my book bag while I was in the bathroom, I believe, and he found a phone number of a person. He was just a friend. Actually he found an address of the person's college that he was going to. And when I come out of the bathroom, he just attacked me. Well, first he asked me, you know, whose is this, and I explained to him he was just a friend of mine that I wanted to correspond with, and he attacked me. He punched me with his fist. He pulled a big clump of my hair out. To this day, I'm still bald in that spot where he pulled my hair out. That's basically it.

Q. And was that -- when in the relationship did that incident happen? How long had you known him?

A. Maybe about 4 or 5 months.

Q. Did you have an on again, off again relationship?

A. Yeah, yeah.

Q. Now, was your conflict with your mother in part because of things like living with Marc at the hotel?

A. Yeah, of course, she didn't want me to be with him. She knew off the top when she first saw him what

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2875

kind of person that he was, but of course I didn't listen, me being young and native.

Q. Did there come a time when you tried to break up with Marc?

A. Uh-huh, several different occasions I tried to.

Q. Several times?

A. Uh-huh.

Q. And how did that go when you would try to break up with him?

A. Oh, no, you do not break up with Marc Barnette. You're going to be with him until he decides when the end comes. And most of our fights, our physical fights were about me trying to leave the relationship.

Q. Now, what did you do when -- what would he do when you wanted to break up, what was his reaction to you? You said that he wouldn't let it happen. What would he do?

A. First he'd sit down and we'd ask and he'd ask why I wouldn't want to be with him. Many times I told him I'm not going to be with a violent person, I don't enjoy being beat. I don't understand why he didn't understand my reasoning, but of course that led to violence.

Q. And what would you do in response to that, would you stay with him?

Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 23 of 200
857

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2876

A.   I don't know if you really understand what I'm about to say, but you have to kind of play the game with him.  You have to appease him, make him think whatever it is he wants to think until you can make a move to get on with your life.  It's just a mind game with him, you have to -- I can't explain it any better than that.

Q.   Did you go through those episodes sort of a cycle like that with him?

A.   Yes, repeatedly.

Q.   Now, I'm going to talk to you about an incident that happened on November 9th, 1993, and in November of 1993 were you living with your uncle?

A.   Yes.

Q.   Where was that?

A.   He lived off of West Boulevard on Watson Drive.

Q.   How far was that from Marc's mother's house on West Boulevard?

A.   It's about maybe 4 miles.

Q.   Was there an incident that took place on November 9th in which the police were called to your uncle's house?

A.   Yes.  I had just gotten in from work, and I had taken a shower, put on some -- it was November, but I was inside so I had on shorts, a T-shirt, some socks. And at the time, before everything occurred I was

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A1          (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 24 of 200

858

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2877

folding clothes, and at one point or another the phone rang and it was my mom. I talked to her shortly. When I hung up from her, he came knocking at the door and I told him that I wouldn't let him in, you know, what did he want. He said he just wanted to talk, just wanted to talk.

Q. Let he stop you. What was the status of your relationship at that time, were you trying to break up with him?

A. Yeah, yeah, we were not together. The phone rang again while he was still out there banging and I was talking to one of my uncle's girlfriends, and he got quiet for a second so I thought maybe he left. Next thing I know or heard, a booming sound. I knew it was him entering the premises. I ran, hung up from her, got a knife, came back to the phone, and I proceeded to call 911. By the time all that transpired, he was inside the house. I missed my phone call. He yanked the phone out of the wall, threw it. I still had the knife and we wrestled with it for awhile. He finally got it out of my hand and he cut several of my fingers doing that.

Q. How had he gotten in the door?

A. Can you give me one second?

Q. Okay, I'm sorry.

A. He apparently kicked the door in to get inside.

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an A     rion   (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 25 of 200
859

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2878

Like I say, after we struggled with the knife and whatever and he kept telling me to come with him, I was not going with him. Somehow or another, he threw me over his shoulder. And my uncle had a balcony right off of his apartment and he would say if I wasn't going with him out the front door, then I would leave over the balcony. I was screaming at the top of my lungs trying to get someone to hear me, you know, to help me or call the police or something. And luckily someone drove by the bottom and he took me back inside because we still was at the front door. And on my way, I'm trying to grab things to get him to, you know, to stop him from taking me.

Anyways, we went to a vehicle he had waiting, put me in it, and we drove to Checkers on Wilkinson to pick up his brother Mario from work.

Q. Now, let me just slow you down. Did he actually physically pick you up at the balcony?

A. Of course, I was much smaller than I am now, but oh, yeah, he did.

Q. How much did you weigh at that time?

A. 110.

Q. And did he threaten to throw you off of the balcony?

A. Uh-huh.

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 7/31/2002

Page 2879

Q. What did he say?

A. I can't remember his exact words right now, but I do know that he said that he would throw me off of the fucking balcony if I didn't go where he wanted me to go.

Q. All right. And so did he carry you down the stairs?

A. Uh-huh.

Q. And how did y'all leave the premises?

A. In, it's like a Jeep-like vehicle that he had.

Q. So he was driving a Jeep?

A. Uh-huh.

Q. Did he place you in the Jeep?

A. Uh-huh.

Q. What were you thinking and feeling at that time?

A. I couldn't believe it. I mean, things like that happened to me before, but at that time, that was one of the most extreme things that he had done. I was trying my best to calm myself down so I could think and focus on what I was going to do in order to get away from him.

Q. I'm going to show you a series of photographs.

MS. TOMPKINS: If I may approach the witness, Your Honor?

THE COURT: Yes.

Case 3:12-cv-00327-MOC     Document 103     Filed 09/23/15     Page 27 of 200
861

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2880

BY MS. TOMPKINS:

Q. I'm showing you what has been marked as Government's Exhibits 58A through 58F, if you would just mind scrolling through those and tell me if you recognize what those are?

A. Uh-huh. The first picture is a picture of my uncle's door, the one that he kicked in.

Q. That's 58A?

A. Yes, with the lock kicked out. The second is just a better view of the picture. Third, same thing. The fourth picture, 58D, is a picture of the actual dead bolt lock with wood lying on the floor. 58E is a picture of how we left the house, the phone that was on the wall, my work hat. The towel that he stuffed down my throat to make me quiet is on the table, another shot of the house with the towel and the phone.

MS. TOMPKINS: Your Honor, we'd move the admission of Government's Exhibits 58A through 58F.

THE COURT: Let them be admitted.

BY MS. TOMPKINS:

Q. I'm going to show these to you now, for the jury, if you don't mind going through and describing with the photo what Government's Exhibit 58A is.

A. That's the picture of the door closed with the lock.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2881

Q.    And over on this side, is that the broken lock on the door?

A.    Uh-huh.

Q.    And I'm showing you Government's Exhibit 58B. Is that the inside of the door?

A.    Uh-huh, from the inside with the lock lying on the floor.

Q.    Is that the lock on the floor right there?

A.    Yes.

Q.    And that was a dead bolt?

A.    Uh-huh.

Q.    And 58C?

A.    Again, inside picture of the door.

Q.    And that's a close-up of the dead bolt having been knocked out?

A.    Uh-huh.

Q.    58D?

A.    Shows the dead bolt lock lying on the floor.

Q.    So the door had been locked when he was banging on the door?

A.    Uh-huh.

Q.    I'm going to show you Government's Exhibit 58E, and tell the jury what is in that photograph.

A.    That's the picture of the living room like I said earlier with the phone that was torn off of the

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2882

wall lying on the floor, my work hat. The towel that he used to stuff down my mouth to keep my quiet is on the table.

Q. Now, when you came in -- when he came into the house, were you on the telephone with 911?

A. Yes.

Q. And how did he get the phone out of your hands?

A. He just smashed it out of the wall, out of my hand, everything.

Q. Out of the wall and out of your hand?

A. Uh-huh.

Q. Now, you mentioned that there is a towel. Is that the towel right here?

A. Actually it's up on the table.

Q. Right here (indicating)?

A. Yeah.

Q. Tell the jury what happened with the towel.

A. Because I kept screaming, of course he wanted me to be quiet, and he stuffed the towel down my throat.

Q. And then when you quieted down, did he take the towel out?

A. Actually I took it out. I smashed it out myself.

Q. And that was when y'all were wrestling around?

A. After he got the knife out of my hand, uh-huh.

Page 2883

Q.   And now I'm showing you Government's Exhibit
58F.

A.   Uh-huh.

Q.   And that's the living room?

A.   Yeah, mostly the same thing.  It's the phone,
the towel.

Q.   Is that the couch where y'all wrestled with the
knife?

A.   Yes.

Q.   And you said that he was able to get the knife
out of your hand?

A.   Uh-huh.

Q.   But that you got cut?

A.   Yeah.

Q.   Now, what were you wearing that night?

A.   I had on a T-shirt, some shorts and socks.

Q.   And this was November?

A.   Uh-huh.

Q.   About what time was it?

A.   Maybe 11:00'ish.

Q.   Okay.  So it was November 8th going into
November 9th?

A.   Yeah.

Q.   What happened when you got into the vehicle,
when he placed you in the vehicle?

Reporte        Huseby, RPR
800-333-2082    Huseby, Inc., an        erronle (704) 33-1889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 103    Filed 09/23/15    Page 31 of 200
865

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2884

A.   When he got into the driver's side, he told me where we're going, we're going to pick up his brother and that when he got in, you know, I better be quiet as to what was going on.  We drove to his brother's job in complete silence.  I don't remember -- I know I definitely didn't say anything.  He may have said something, but I don't remember at the time.

Q.   Did you feel like you could get out of the car any time you wanted to?

A.   Huh-uh.

Q.   How were you feeling?

A.   I was just scared.

Q.   Did you do as you were told?

A.   Uh-huh.

Q.   After you picked up Mario, what happened?

A.   He acted as if everything was fine.  You know, he talked to Mario about his night at work and, you know, we drove back -- we drove to his mother's house.

Q.   And what happened when you got to his mother's house?

A.   I don't remember whose room it was, but I know we sat in a room and talked for a while.

Q.   You and he talked?

A.   Uh-huh.

Q.   Again, what was your feeling, what were you

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2885

feeling at that time?

    A.    Still scared.

    Q.    Had you gone to his house willingly?

    A.    Oh, no, huh-uh.

    Q.    You'd gone against your will?

    A.    Uh-huh, I was forced to go, uh-huh.

    Q.    What happened next?

    A.    Once we were inside the house?

    Q.    Uh-huh.

    A.    After a while of talking, I heard some
commotion out front and apparently it was the police.
They had come -- I later found out that they were called
by my mother.  She knew where I was, of course.  His
mother answered the door.  She said that she didn't know
her son was there, but I wasn't there.  And first of
all, she didn't greet us, but she saw us walking into
the house when we first got there.  And when I heard her
say that I wasn't there, Marc flew out the back door and
I came out of the room shortly after to let them know
that yes, I was there.  And when I came out, she was
like what is that girl doing in here, you know, she is
not supposed to be there, like she didn't know that I
was there earlier.

    Q.    You heard Marc's mother talking to the police?

    A.    Uh-huh.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A          ion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 33 of 200
867

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2886

Q.   Now, when you came out of the room, had Marc already left out the back?

A.   He had already gone, uh-huh, he left out the patio door, uh-huh.

Q.   Had he heard the police coming to the door?

A.   Yeah, uh-huh.

Q.   Now, when y'all were sitting in there talking, what were y'all talking about?

A.   You know, why I didn't want to be with him, why did I make him do what he did, things like that.

Q.   So you walked out, and was there a police officer there?

A.   Yes.

Q.   Was that a male or a female officer?

A.   Actually there were two.  I think it was a male and a female officer there.

Q.   And what happened next?

A.   She asked me who I was and I told her my name, Alesha Chambers.  And she said -- I know eventually she asked me, you know, did I want -- you know, was I there willingly and I told her no.  And she wanted to talk and I told her that I didn't feel comfortable talking in the house, if I could go outside and talk to her.  And she said yes and she took me outside and we talked in the driveway.

Case 3:12-cv-00327-MOC   Document 103   Filed 09/03/13   Page 34 of 200

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2887

Q.   Did you make a statement to her that night?

A.   Yes, I told her everything that happened earlier that evening.

Q.   And did you sign that statement?

A.   Uh-huh.

Q.   What happened next?

A.   She was radioed and told that they had him on the phone at my uncle's house.  Apparently he had gone to where he was and he had called back looking for me. So once we got back there, you know, they told me if I could get his location on the phone so they could go pick him up, if I would go ahead.  And I talked to him. When I first got on the phone, he was --

Q.   Let me slow you down one second.

A.   Okay.

Q.   First of all, I want to show you, if I may approach, I want to show you what's been marked as Government's Exhibit 55A and ask you to turn to the last page of that.  Is that your signature?

A.   Yes.

Q.   Glance over that, and is that the statement that you gave to Officer Adamo that evening?

A.   Uh-huh.

Q.   You don't have to read the whole thing, but --

A.   Yeah.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A      rion  (704) 333-9889
800-333-2082      Case 3:12-cv-00327-MOC., Document 103   Filed 09/23/15   Page 35 of 200  Fax (704) 372-4593
869

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2888

MS. TOMPKINS: Your Honor, move admission of Government's Exhibit 55A.

THE COURT: Let it be admitted.

BY MS. TOMPKINS:

Q. So Officer Adamo drove you back to Watson Drive?

A. Uh-huh.

Q. Who was there?

A. My uncle, my mother, a lot of police officers. I can't remember who else.

Q. Okay. And was the phone ringing when you got there?

A. He was already on the line when I got there.

Q. And who was he talking to, do you know?

A. A police officer.

Q. Did the police ask you to talk to him?

A. Yes, to try to find out his location.

Q. And tell us about that phone call.

A. I got on the phone.

Q. Were the police listening on another line?

A. Yes, on another extension, uh-huh. I got on the phone and he was crying hysterically. I could barely understand what he was saying. At one point --

Q. What was he saying?

A. Basically, you know, same thing he said when I

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 36 of 200
870

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2889

was at his mother's house, you know, why, why, why, why didn't I want to be with him, why did I cause all this trouble for him, things like that. At one point in the conversation, he asked me to meet with him and I told him okay. And when I said okay, he became very calm. The tears stopped, the babbling stopped. He was talking to me like I'm talking to you in just one split second. And he was able to tell me where he was, and the police all hung up and they went to go pick him up.

Q. Is that the first time that you ever heard Marc cry?

A. Yeah, I think so.

Q. Were there other times in the relationship where Marc cried?

A. After that, yeah, uh-huh.

Q. After that?

A. Uh-huh.

Q. And what kinds of instances would Marc cry?

A. When the police became involved, you know, he really did not want to be in trouble with the police and he would cry, I guess sympathy cry or whatever, trying to make me not press charges against him, but that was the only time.

Q. Now, was Marc arrested that night as far as you know?

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A1 ion (704) 333-9889 Fax (704) 372-4593
800-333-2082 (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 37 of 200
871

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2890

A.     Yes.

Q.     And was there a trial?

A.     Yes.

Q.     Was Marc convicted of felonious restraint and breaking and entering?

A.     Yes.

Q.     And did you testify in that trial?

A.     Uh-huh.

Q.     Now, do you know whether he got jail time or probation?

A.     I'm not sure, to be honest.

Q.     Now, I'm going to take you to another incident that happened a few days later, it was actually 3 days later on November 12th, 1993.

A.     Okay.

Q.     Were you working at Bojangles at that time?

A.     Still, uh-huh.

Q.     Now, on November 12th, 1993, did you work that day or go to work that day?

A.     Uh-huh.

Q.     What happened on that day?

A.     I caught the city bus to work, and the bus lets me off at like the intersection of Woodlawn and South Boulevard.  Aunt after I crossed South Boulevard to walk to work, I saw him.  And basically he wanted to know why

800-333-2082 Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/15  Page 38 of 200  Hon (704) 333-9889  Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2891

I got him in trouble, if we could work out what happened. He wanted to know if I was going to press charges and testify at the trial, things like that.

Q. And this was just after he had been arrested?

A. Yes.

Q. Now, when you first saw him that day, was it at your house or was it after you got off the bus?

A. After I got off the bus.

Q. And where was he when you got off the bus?

A. He was standing in a parking lot, but I forget which business was in that parking lot.

Q. So you spoke to him?

A. Uh-huh.

Q. And were you walking to Bojangles?

A. Uh-huh, yeah.

Q. What kinds of things was he saying to you?

A. I can't remember exactly what I said to him, but I did let him know, you know, please get away from me, leave me alone, I'm on my way to work, whatever. And by me telling him that I wasn't going to go with him, he put a knife in my back to try to get me to go with him.

Q. What kind of knife was it, did you see it?

A. Yeah, the knife had a big blade on it. It was a big knife.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2892

Q.   Was it a knife that you would use to cut your food or was it a big kitchen knife?

A.   Yeah, it was like a butcher's type knife.

Q.   And you were in the parking lot, is that right?

A.   Uh-huh.

Q.   And he put that knife in your back?

A.   Uh-huh.

Q.   What happened next?

A.   By that time, we were in the back of the place where I worked.  And I don't know how, but people from my restaurant and the one next-door, TK Tripps, they all came out.  And he was like, you know, he was telling me to act like nothing was wrong, don't let them know what is going on.

Q.   And where was the knife at this point?

A.   Still in my back -- no -- yeah, still in my back.  And my manager ran up to me -- well, he approached us, and he took the back of the knife and put it at my throat.

Q.   Marc did?

A.   Yeah, uh-huh.

Q.   When your manager ran up?

A.   Yeah.  When the manager saw this, him and the guy from TK Tripps, both ran toward us.  Marc pushed me off him.  I don't know who, but somebody grabbed me and

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/13   Page 40 of 200

874

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2893

they beat him with some stick. They beat him with a stick.

Q. Now, when Marc had the knife to you, what did he tell you he was going to do?

A. He was going to kill me.

Q. Did he say that?

A. Uh-huh.

Q. What else did he say, he was going to kill you and --

A. He was going to kill me and then he was going to kill himself.

Q. So the folks from TK Tripps and Bojangles rushed him, is that right?

A. Uh-huh.

Q. Now, as they rushed him, did Marc say anything to you?

A. You know, just to act as if nothing was wrong.

Q. And those guys beat him with a stick, is that correct?

A. Uh-huh, yeah.

Q. And did the police come?

A. Yeah, the police -- yeah, they came, and he was arrested at that time also.

Q. When the guys came up and beat him, what did you do?

Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 41 of 200
875

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2894

A.    Somebody, I don't know -- like I said, I don't know who, but some guy, I was just in his arms.  I was just so -- just shaking and scared and glad for it to be over, crying.

MS. TOMPKINS:  If I may approach, Your Honor.

BY MS. TOMPKINS:

Q.    I will show you what has been marked as Government's Exhibit 55B, and ask you if you recognize what that is?

A.    Yeah, that's the statement from that day.

Q.    Is that your signature at the bottom of that statement?

A.    Uh-huh.

MS. TOMPKINS:  Move admission of Government's 55B, Your Honor.

THE COURT:  Let it be admitted.

BY MS. TOMPKINS:

Q.    And did you basically tell the police in this statement what you told us today?

A.    Yes.

Q.    And was Barnette arrested?

A.    Yes.

Q.    Now, before the court date, did he contact you?

A.    Yeah, he contacted me by phone.

Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/13    Page 42 of 200

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     7/31/2002

Page 2895

Q.    And what did he say to you?

A.    Basically he was asking me not to appear because he knew that if I didn't appear, that the charges would probably be dropped, still trying to work out the relationship, things like that.

Q.    Still wanted to work things out?

A.    (Nods head.)

Q.    Did you go through a period of time after those two incidents in November where you didn't see him?

A.    Yes.

Q.    Did you begin to see somebody else?

A.    Well, not seeing this person in a relationship type, but he was a friend of mine, yes.

Q.    And describe him to the jury and why you began hanging out with him.

A.    The person I'm speaking of, he was a body builder, very, very big guy, and I knew that not too much would happen to me with this guy around.  So it was sort of like I was seeking protection from Marc with this guy.

Q.    So it wasn't as much a romantic kind of thing?

A.    No.

Q.    All right.  Now, I'm going to take you to an incident in March of 1994.  Do you remember seeing Marc Barnette at your mother's house?

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A...      ...ion  (704) 333-9889
800-333-2082      Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 43 of 200      Fax (704) 372-4593
877

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2896

A.   Yes.   I was at home waiting for this guy to pick me up and take me to work and someone knocked at the door, and I assumed that it was this guy because like I say, I was waiting on him.  So I didn't ask who it was or look in the peephole, I just opened the door and it was Barnette standing at the door.  And I asked him, you know, what are you doing here, what do you want.  And he entered in the house, same thing, trying to work it out, stuff like that.  At that time, I told him that I was waiting on company to come, if he would please leave.  And when he heard that I was waiting on someone to come, he got angry.  Behind our door was a baseball bat my mom kept for protection.  He took it and he beat me with the baseball bat.

Q.   Were you injured?

A.   Oh, yeah.  He cut my hand open with the bat, I had to get stitches for it, black and blue all over.

Q.   Now, how long of a beating was that?

A.   Probably took minutes, but it seemed like it took forever.

Q.   And how did he leave you?

A.   He left me on the floor crying.  It was like he collected him himself and realized what he was doing, and he just dropped the bat and ran out the door.

Q.   And what did you do?

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 7/31/2002

Page 2897

A.   Called my mom, because I knew I had to go to the emergency room and she had insurance for me, so I was calling her to let her know to give them whatever information they needed for me.  And I got on the bus and went to the emergency room.

Q.   Now, did you call the police?

A.   At some point in time, I did.  I don't remember exactly when.

Q.   Did you end up ever reporting this incident to the police?

A.   No, you are right.

Q.   Let me strike that.  Did you tell your mom what had happened?

A.   Yes, I told my mom what happened, yes.

Q.   Did you tell her that it was Marc -- did you tell her that Marc Barnette had beaten you with a bat?

A.   No.  Of course, she did not like him like I said earlier, and I did not want her to know that he was there.  Not protecting him, but I just didn't feel like getting into an argument with her about him.  I told her that I got cut on some glass that I was picking up in the front yard.

Q.   And that's when you called her to get her insurance information?

A.   Uh-huh.

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 45 of 200
879

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2898

Q.    Because you did not want her to know that he had come over?

A.    Yeah.

Q.    Were you in fact seeing him?

A.    No.

Q.    So you got on the bus and took yourself to the hospital?

A.    Yes.

Q.    How many stitches did you get?

A.    Between 12 and 15, I can't remember how many.

Q.    All right.  I'm going to take you to an incident that happened then 10 days after that, on March 25th, 1994.  Do you remember that date?

A.    I'm trying to recall.  Yes, I do.

Q.    Did you have stitches in your hand?

A.    Yes, I had sutures actually.  The stitches had dissolved, I had sutures left.

Q.    And had you been dropped off from work?

A.    Uh-huh.  Again, my manager dropped me off.

Q.    What happened next?

A.    Sorry?  He left before I got to the door.  I think I had my key in the door, I'm not sure, but Marc stepped from around the side of the house.  And I was startled because I didn't expect for anybody to be there, let alone him.  Of course, we conversated.  I

Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 46 of 200
880

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/31/2002

Page 2899

can't remember exactly what was said.  I do know that he wanted me to go with him again.  I told him no.  He said he had a gun, that if I didn't go with him, he was going to shoot me.  So we got into his vehicle, drove --

Q.    Did you ever see a gun?

A.    No.

Q.    Did he ever make a display of any sort?

A.    What he did, he had his hand in his pocket.  I supposed that his gun was in his pocket with his hand.  And he like had his jacket at my side.

Q.    Were you compelled to do what he asked because of that threat?

A.    Uh-huh, uh-huh.

Q.    What were you thinking at that time?

A.    No, not again, what is it that he wants, you know.  I was going to do whatever it took to come out of the situation alive, but still I didn't want to be with him.

Q.    What did he say to you or what happened next?

A.    Once we got in the vehicle --

Q.    What kind of car was it?

A.    It was a care he was trying to fix up, like a Buick Regal or something.

Q.    So you got in the car with him?

A.    Uh-huh.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A          ·ion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 47 of 200
881

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2900

Q.   And where did y'all go?

A.   To his mother's house.

Q.   That's the house over on West Boulevard?

A.   Uh-huh.

Q.   What did he say to you that he wanted?

A.   He more or less wanted to make sure that I didn't press charges against him again.  He wanted to see how my hand was doing, again talking about the relationship, things like that.

Q.   Now, did he make any moves on you physically?

A.   Uh-huh.  We were both in the back seat of the car sitting in the wooded area near his mom's house, and he tried to have -- well, he wanted to have sex with me and, of course, no.  I still had on my work uniform.  He ripped -- first he put his hand on my shirt and ripped my bra off, and then once he got the bra off he ripped my shirt off and he proceeded to strangle me with my shirt.  And at that time, I was losing breath and I told him, you know, do whatever you are going to do, just get it over with, and he did.  He raped me in the back seat, and I was crying, you know, telling him, this wasn't right and he just stopped.

Q.   Did you try to fight him off?

A.   Uh-huh.  Oh, yeah.  When he ripped my shirt, we scuffled for a while.  I broke my pinkie nail during the

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     7/31/2002

Page 2901

fight.  I was trying to get him off of me.

Q.   You said that you wanted to do whatever just to get it over with and get out alive?

A.   Yes.

Q.   Was that what was in your mind at the time?

A.   Yeah.

Q.   What happened next?

A.   After that incident took place, we went inside his house.  I think it was to his bedroom, I'm not exactly sure.  Once inside the bedroom, we talked for a little while.  He wanted to have sex again.  And at that time, this is going to be rude or however you take it, but I was thinking to myself that let me go ahead and have sex with him, if he satisfies himself, he will go to sleep and I can leave, and that's what took place. We had sex.  He was falling -- I saw he was getting tired and I said, can I go home, I wanted to go home. And because his mother was there and he didn't want me to be found there by her, he was willing to call me a cab so that I could leave, and that's what he did.  He called a cab.  By the time we got outside, we saw the cab coming down the street.  So he took a little flashlight to try and get the cab to come and get me.

Q.   So he waited down by the road to help the cab find your house?

Page 2902

A.    Yeah.

Q.    Now, was that Marc Barnette being nice to you?

A.    No, that's Marc Barnette doing damage control. He didn't want his mom to find out that I was in the house, and I guess he was trying to make me feel good about what happened and not call the police once I got home.

Q.    Now, what happened when you got home?

A.    I told mom what happened and we called the police.

Q.    Did you want her to call the police?

A.    Oh, yeah, uh-huh.

Q.    What was your emotional state at that time?

A.    I remember telling my mom I wanted to kill him and I did tell her I wanted to kill him, because I was just so tired of the cycle going through it with him. And I felt dirty about what happened.  I went and took a shower trying to get as clean as possible.  The police got there, told them what happened, and they took me down for a rape kit.

Q.    And without getting too graphic, tell the jury what you have to go through to have a rape kit done.

A.    Oh, it's not fun at all.  They take hair samples.  They take samples from under your nails.  They take pubic hair samples.  They slough off some of your

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 50 of 200
884

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/31/2002

Page 2903

skin.  They get samples of that.

Q.    So you went and had a pelvic exam and had hair samples taken?

A.    Yes, a pelvic exam as well, yes.

Q.    Now, when you gave your statement to the police, did you give a complete statement to the police initially?

A.    No.

Q.    Why not?

A.    Not because I was lying about what happened, it's just that part of the events I wanted to not come out due to my mom finding out more or less.

Q.    What didn't you want your mother to know about?

A.    I think a few days before this incident, Barnette and I had been together, we were together sexually, and I didn't want her to know about that entire incident, so I just didn't say anything about it.

Q.    You told them about what happened that night only?

A.    Uh-huh.

Q.    Did the police later, after they had spoken to Marc Barnette, did they come and confront you with that?

A.    Yes.

Q.    And did you then tell them that in fact was what happened?

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 51 of 200
885

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2904

A.    Uh-huh.

Q.    Did that have an impact on the charges that were filed?

A.    Yes, I think so.

MS. TOMPKINS:  May I approach the witness, Your Honor?

THE COURT:  Yes.

BY MS. TOMPKINS:

Q.    I'm going to show you what has been marked as Government's Exhibit 55C and ask you to look at Page 3 of that.  Just glance over it, if you would.

A.    Okay.

Q.    Is that the statement that you gave to investigator -- a rape investigator from the police department?

A.    Yes.

Q.    And is that your signature at the back of that?

A.    Uh-huh.

MS. TOMPKINS:  Move admission of Government's Exhibit 55C, please.

THE COURT:  Let it be admitted.

BY MS. TOMPKINS:

Q.    Now, did you see the defendant any after that point?

A.    No.

800-333-2082                    (704) 333-9889                    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 52 of 200

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2905

Q.    Moved on with your life?

A.    As best I could, yeah, yeah.

MS. TOMPKINS:  Thank you, Alesha, that's all the questions I have.

CROSS-EXAMINATION

BY MS. LAWSON:

Q.    Hello, how are you, Ms. Houston?

A.    I'm fine, how are you doing?

Q.    I just have a few questions to ask you, I hope you don't mind.

A.    Okay.

Q.    First of all, going to the last incident where you made a statement to Investigator Graue where Marc had you in the car and ripped off your shirt and your bra, you did -- you lied to the police basically and they found out about it?

A.    No, I didn't lie, I just omitted information.

Q.    You omitted the fact that you and he had consensual sex earlier?

A.    Yeah.

Q.    And as a result of that, they didn't charge Marc Barnette with rape?

A.    Yeah.

Q.    But you testified that in the beginning of your relationship, everything was very nice, very happy, you

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 53 of 200
887

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2906

were very much in love, is that right?

A.   Yes.

Q.   He treated you well?

A.   In the beginning, yes.

Q.   And then at what point did he start to change?

A.   A couple of months, maybe like I said about 3 months after.

Q.   Was that then in the summertime when you spent 3 months living with him in that motel?

A.   It wasn't that long.

Q.   Two months?

A.   Maybe.

Q.   And so it was while you were at the motel that you think it started?

A.   It started before then, but I just didn't know any better at that time.

Q.   And it spiraled, didn't it, it got worse and worse with the passage of time?

A.   Yeah.

Q.   And he was accusing you of being unfaithful to him?

A.   Uh-huh.

Q.   And that piece of paper that he found in your book bag, was he searching your book bag?

A.   Uh-huh, yes.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2907

Q.   And he found a piece of paper, and was it apparent from the piece of paper that it was a man, the college student?

A.   Yes.

Q.   So it had some kind of man's name on it?

A.   Yes.

Q.   And he accused you of being unfaithful?

A.   Yes.

Q.   And you hadn't been unfaithful, had you?

A.   No.

Q.   And the hitting was generally about you not doing what he wanted you to do?

A.   Yes.

Q.   And he objected to your dressing in a more revealing way because he felt that other men would start looking at you?

A.   Yes.

Q.   And he followed you or wanted to know where you were because he was concerned that you might be seeing other men?

A.   Yes.

Q.   And that was really the central issue between the two of you is that if you did anything that made him think you were being unfaithful, even though you weren't, he would get angry and start hitting, is that

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Al         ion. (704) 333-9889         Fax (704) 372-4593
800-333-2082

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 55 of 200
889

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2908

basically it?

A. No, because some incidents occurred because we had pending court cases and he, like I said, didn't want me to testify in those court cases.

Q. Well, let's get to that, but when you had periods -- the periods that your mother disapproved of, when he was hurting you it was because he thought, wrongfully, but he thought you were being unfaithful or you were dressing in a way that other men would look at you, things of that nature?

A. Sometimes, yeah.

Q. And then as you started taking out charges, you started telling the police what was happening, he not only asked you to drop the charges, but he kept talking to you about resuming the relationship, is that right?

A. Uh-huh, yes.

Q. And in fact what you went to the Motel 6 -- well, no, the hotel on Clanton Road, and when was that, that you went to the one on Clanton Road?

A. I'm not exactly sure if you're asking me for a date.

Q. No, I mean before or after November?

A. Before, before.

Q. Before November. And even then, you said that he was trying to work things out with you?

Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 56 of 200

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2909

A.    Yeah.

Q.    And the night that he kicked your uncle's door in, is it your testimony that he walked 4 miles to get to you that night?

A.    No.  At first I thought he did, but I later found out that he drove.

Q.    So he had a car?

A.    Uh-huh.

Q.    Now, he is not much bigger than you are, is he, about 5 foot 4?

A.    Yeah, not now he is not much bigger than me, no.

Q.    What was different about him back then, heavier?

A.    I was smaller and at that time, he was.  He was taller than me and he was bigger than I was.

Q.    Okay.  And again, I'm not contesting that, but he was about 5 foot 4, and he managed to swing you up over his shoulder after kicking in the door?

A.    (Nods head.)

Q.    And you told the police all of this?

A.    Yes.

Q.    And you told them that he threatened to kill you?

A.    Yes.

Case 3:12-cv-00327-MOC     Document 103     Filed 09/23/15     Page 57 of 200
891

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2910

Q.   You told your mother?

A.   Yeah.

Q.   You told your Uncle Jasper?

A.   Yes.

Q.   And it was pretty obvious that he would do almost anything to get to you, is that right?

A.   Yes.

Q.   And in fact before, several weeks before he kicked down the door at your Uncle Jasper's, he did the same thing, he kicked it in once before then?

A.   Yes.

Q.   And he ran right into the room where you were and there were other people there and he snatched some kind of scarf off of your head, right?

A.   Yes.

Q.   And said what, what did he say?

A.   I don't remember.

Q.   Did it have something to do with why are you doing this to me?

A.   Probably.

Q.   And by doing this to me, he was referring to breaking up?

A.   Yes.

Q.   And that was part of the escalation of events that led to, for instance, him holding you at knife

Case 3:12-cv-00327-MOC Document 103 Filed 09/23/13 Page 58 of 200

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2911

point outside of the restaurant on November 12th?

A. I think that was more or less of us going to court, yeah.

Q. And on November 9th when he called your mother's house and was talking to you and crying uncontrollably, is that the night that that was happening?

A. Yes.

Q. He was talking to you both about not going to court but also getting back together again?

A. Yes.

Q. And the minute you said something about getting back together again, it was like a switch flipped?

A. Uh-huh.

Q. Now, you told the police when they came out to his mother's house and got you that night that she knew you were in there?

A. Uh-huh.

Q. That you were scared of his mother?

A. Yes.

Q. And you didn't want to talk to her?

A. Yes.

Q. Why were you scared?

A. She carries on with this facade. I'm not exactly sure 00 it's not because she is trying to

Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 59 of 200
893

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2912

protect Marc, I think, but I think it's more or less of her trying to protect this image that she carries on. And I don't want her -- I don't appreciate her talking to me any kind of way trying to protect this image of her that she has, so --

Q.   Is it image of herself?

A.   Image of herself and her family, yeah.

Q.   Okay.  What did she do that makes you feel this way about her, can you tell the jury a little bit about that?

A.   She is just -- the only word that comes to mind that you may understand is she is just fake.  She is real fake.

Q.   I'm sorry, I couldn't hear you.

A.   She is fake.

Q.   Fake, F-A-K-E?

A.   F-A-K-E, yes.  She just -- to me, she is just so, so busy trying to live this -- live up to this image of hers that she's created.

Q.   What image is it that's she created?

A.   That her family is nice, that they have money and she is nice and stuff like this, just -- and that her family is all together.

Q.   And what is the truth?

A.   That it's not.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2913

Q.    Tell the jury about that.

A.    With the exception of Mario and the grandfather, they have a lot of problems.

Q.    Like?

A.    At that time, she was abusing drugs, her and the aunt that lived there, just a lot of things going on in that house.

Q.    In fact, at times when you and Marc were close, he talked to you about the fact that his mother was pregnant and using drugs, didn't he?

A.    Yes.

Q.    And he told you that he was really worried about whether the baby would be born drug addicted, didn't he?

A.    Yes.

Q.    And those were the times when you kind of liked Marc because he was sensitive about that?

A.    Yeah.

Q.    And he talked to you about an incident in his childhood when he was near his mother and his father hit his mother in the head with a hammer and blood flew all over?

A.    Yeah.

Q.    And that was when you and Marc were getting along?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2914

A.    Yeah.

Q.    Did he tell you how that affected him?

A.    He didn't really say how it affected him, but I could tell by the way he was telling the story that it really, really bothered him to see that.

Q.    He also told you how relieved he was when his mother's baby was born not addicted to drugs, didn't he?

A.    Yeah, he did.

MS. LAWSON:  No further questions, thank you.

MS. TOMPKINS:  Nothing further.

THE COURT:  You may step down.

MS. ROSE:  W.T. Brandon.

W.T. BRANDON,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.    Would you introduce yourself, please, sir?

A.    Terry Brandon.

Q.    And you are an officer?

A.    Yes, a detective in the sexual assault unit.

Q.    In the Charlotte-Mecklenburg police department?

A.    That's correct, yes.

Q.    How long have you been with that department?

Reporter Roy Scott A. Huseby, RPR
800-303-2082   Case 3:12-cv-00327-MOC   Huseby, Inc.   Document 103   Filed 09/28/15   305-988   Page 62 of 200   Fax (704) 372-4593

896

United States of America vs. Aquilia Marcivicci Barnette   3:97CR23-V
Proceedings Before Judge Richard L. Voorhees   7/31/2002

Page 2915

A.   Been with the department since March of '87, and I've been with the sexual assault unit since August of '93.

Q.   March of 1994, you were actively involved as an investigator within the sexual assault unit there?

A.   Yes, I was.

Q.   And did you in relation to that position begin an investigation into the defendant Barnette?

A.   Yes.

Q.   What were the circumstances?

A.   On March 25th of 1994 at approximately 7:17 a.m., I received a call from patrol which they stated they were in the preliminary investigation of a rape case and requested our assistance.

Q.   And did you become involved then?

A.   Yes, myself and Investigator Graue responded to 3413 West Boulevard, where officers were on the scene at that time.

Q.   Now, had you been to that residence before?

A.   No, I had not.

Q.   Will you describe kind of the location?

A.   The location is off of West Boulevard down near the intersection of Billy Graham, and it's actually before you get to Billy Graham off of West Boulevard. And as you are driving down, it's pretty easy to drive

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 63 of 200
897

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2916

by the driveway that you would actually turn up in because it's real heavy wooded area. It looks like a driveway, just kind of goes up and it ends. But actually as we were driving out, I asked the officers exactly where were they and they kind of guided me to that location, and there is a house back up off of the roadway you can't actually see.

Q. When you got there, there were some patrol officers already staking care of initially things?

A. Yes, they had more or less secured the scene and secured the suspect vehicle, and also Barnette was sitting in the back seat of the vehicle at that time. He had been arrested on an unrelated trespassing charge.

Q. So those were other outstanding warrants not related to any sexual assault?

A. Right, this was unrelated to what we were investigating at that time.

Q. When you got there, did you talk with the defendant?

A. Yes, we did.

Q. Did you tell him why you were there and what charges you were investigating?

A. Yes, I told him that we were investigating an allegation made against him that he was the suspect in a rape and kidnapping.

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/13   Page 64 of 200
898

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/31/2002

Page 2917

Q.    Now, at that point did you already have some preliminary information so that you knew where to begin your investigation or any particulars?

A.    Yes.  Like I said, at about 7:17 we received a call and the patrol officers had given us the preliminary investigation, the information that they knew at that time, according to what the victim had been saying had happened to her and the items that she had missing.

Q.    Based upon that information, did you ask the defendant if you could search his car which was parked there outside the house?

A.    Yes, we did ask him that and did obtain consent from Barnette about searching his vehicle, and I also asked him could we search the residence, too, his room, and he gave us consent to search that also.

Q.    Could you describe the car that you searched?

A.    It was a '79 model purple Buick Regal.  As I approached the vehicle, I could see in the passenger front seat there was a fingernail and also sort of a lavender purplish shirt that was in the front seat area. There was no back seat in the car and it had some oil cans and things of that in the back seat area.

Q.    As part of your evidence collection, did you in fact collect the broken fingernail and the shirt?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2918

A.    Yeah.  What I did was at that point went ahead and called for crime scene to respond to our location. Before any of the evidence was collected, it was photographed and then that evidence was collected by our crime scene technicians.

Q.    Now, was that, the recovery of a broken fingernail, consistent with what you had learned from Ms. Chambers?

A.    Yes.  At one point I did go to the hospital, and I did observe on her right small end finger a broken fingernail or what appeared to be a fingernail broken off, and it appeared to be that fingernail that we saw in the vehicle.

Q.    You said you'd also gotten permission to search in the home.  Describe what you found there or where, particularly within the house you did search.

A.    We conducted our search and focused mainly on the defendant's bedroom.  As you walked in, the floor was plywood, there was no carpeting on the floor.  There was a box spring mattress set up along the wall area. There was -- the seat, the back seat from the vehicle, it was in that room also with clothes items thrown about on top of it.  There were other clothes items on the floor.  And there was a lady's black bra on the floor also in the room.

800-333-2082          Huseby, Inc. an A4          ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 66 of 200
900

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2919

Q.    Did you collect evidence there?

A.    Yes, it was also photographed and collected by our crime scene technicians.

Q.    Were there other people present at the defendant's home?

A.    Yes, his grandfather and -- Mr. Cooper and his mother and an aunt.

Q.    At that time, did you interview anyone?

A.    I interviewed the grandfather.  Detective Graue, she interviewed or talked to the mother and the aunt.  But I did interview the grandfather.

Q.    I'm going to show you what has been marked as Government's Exhibits 56A and 56B.  If you would, please, take a look at those exhibits.  Are you able to identify them?

A.    Yes.

Q.    What is 56A?

A.    A is the subpoena witness and also property disposition form and adult waiver of rights which I read to Barnette on that day and he signed it, and also a statement from Mr. Cooper, the grandfather.  This is the arrest affidavit that I filled out when we charged Barnette with first degree kidnapping and first degree rape, two counts.  And I can't make out what this other right here is.

Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 67 of 200
901

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2920

Q.   That's second degree rape looks like, but is that part of your internal paperwork for the department?

A.   Yes, it is, sure is.

Q.   All right.  Now, 56B, what is that?

A.   This is the statement that I obtained from Barnette on that day when I talked to him and he gave a statement.  It consists of about seven pages.  And I took his statement and then part of the way through, he wanted to add something and I gave it to him, and that's why there is a change in handwriting styles.  Part of that is what he wrote himself.

Q.   So you wrote part based upon what he was telling you?

A.   Yes.

Q.   And then he took over and completed that?

A.   Yes.

MS. ROSE:  Your Honor, at this time I'd move to admit Government's Exhibits 56A and 56B.

THE COURT:  Let them be admitted.

BY MS. ROSE:

Q.   Do you have copies of these?

A.   Yes, I do.

Q.   Where was the defendant interviewed?

A.   At the law enforcement center, which was the old police department located at 825 East Fourth Street.

Reported By: Scott A. Huseby, RPR
800-323-2082          Huseby, Inc., an Af          ent          (704) 333-9889          Fax (704) 372-4593

Page 2921

Q.   And about what time that day did you speak with him?

A.   I read him his rights at 10:19 a.m., and looks like we finished up obtaining his statement at 2:49 p.m.

Q.   Now, had you already, or had you spent any time with Ms. Chambers at that point?

A.   Yes, I had, yes.

Q.   Had you already completed your investigation related to her and taken her statement?

A.   What we did was had patrol take a preliminary statement from her.  It's customary in the sexual assault unit we will go back and reinterview the victim a day or two later because it's so hectic when all that is going on.  And usually the statement is taken at the hospital, so we usually go back for a second statement.  But to answer your question, I did have the patrol officer obtain a statement from her, and that was the information that we were using.

Q.   So you knew the scenario of the events that had taken place before you spoke with the defendant?

A.   That's correct.

Q.   And that assisted in asking the proper questions or knowing --

A.   Yes.

Case 3:12-cv-00327-MOC     Document 103     Filed 09/23/15     Page 69 of 200
903

United States of America vs. Aquilia Marcivicci Barnette                3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                7/31/2002

Page 2922

Q.    -- what you needed to ask.  Was she still at the hospital having the rape kit done or receiving medical treatment?

A.    Yes, when we went to -- when we went to his residents, yes, she was at the hospital.

Q.    You Mirandized the defendant before you spoke with him on this occasion?

A.    Yes.

Q.    Where you said that was part of the package that you identified as Government's Exhibit 56A.  What did the defendant tell you had taken place on this occasion?

THE COURT:  Wait just a minute.  Members of the jury, I will instruct you a little further about statements made to investigating authorities.  Whether this statement was voluntarily given, and if so, what weight to give it is entirely up to you.  In other words, these are questions of fact which are up to a jury to decide.  In determining whether a statement was voluntary and what weight to give it, if any, you should consider what we call the totality of the circumstances.  You may consider, for example, whether the statement was induced by any promise or threat.  You may also consider any other factor which your common sense tells you is relevant to the issue of voluntariness.  Thank you.

Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/13  Page 70 of 200
904

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2923

BY MS. ROSE:

Q.    What did he tell you had occurred?

A.    He said that on that Wednesday prior to this day here, which would have been Friday morning, that he and Alesha, the victim, had stayed in a motel that day and had consensual sex, had left the motel and she was going to get her hair done.  The next morning, he called her early.  Apparently he had the hotel room still in his name, called her real early that morning to try and get in touch with her.  She was -- she did not answer the phone the first time about 6:49.

The second time he called was shortly after that, and he spoke with her.  She stated then she could not get away to meet him, that -- let me see here, I'm kind of summarizing some of this.  That he then worked on his vehicle throughout the day, made a few trips to a parts house where he purchased parts for the car that he was working on which was that purple Buick.  He was having a steering, power steering problem and it was leaking fluid.

He finished work on the car about 10:00 p.m. that night, went in, checked his mail, voice mail, saw that he had a call, he was hoping that it was her, the victim, saw that it was somebody else.  He then called her work where he spoke with her, she answered

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 71 of 200
905

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2924

the phone. She said she was going to have to stay until closing. Then he found out what time she closed. He stated that he stayed home and didn't go anywhere after that, that he was home the rest of the night until his aunt came and woke him up and said some people are looking at your car and it was the police that was down there looking at his car.

Q. And he went on to say that his aunt knew he was home all night long, he didn't go anywhere, and said he didn't move his car after he came in around midnight?

A. That's correct, yes.

Q. And he also said that Alesha that had made all of this up?

A. Yes.

Q. Did he also tell that you that his car could be easily broken into and that he thought somebody had framed him by putting evidence in the car?

A. Yes, he made that statement and it was -- added it to his statement that day.

Q. In fact, that's part of what he wrote?

A. Right.

Q. Did he go on to say that he and Alesha did have a relationship, that they had some rocky points but that they were involved in this relationship together?

A. Yes, and also that he felt like her moths was

800-333-2082  Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/15  704-335-9889  Page 72 of 200  Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2925

making her stay away from him, but he did mention in his statement that he knew that she parked -- she knew that he parked his car there and was easy to get into, and that she did put those items in his car.

THE REPORTER:  That she did put those items in his car?

THE WITNESS:  That she did put the items in his car, planted them.

BY MS. TOMPKINS:

Q.   After the interview was completed, what happened next?

A.   After that was completed, we would have finished up our investigation with collecting hair standards and then would have completed the arrest processing and sent him to jail.

Q.   Do you know what eventually happened with those charges which you lodged against the defendant?

A.   I think they were actually dropped by the DA's office.

Q.   Was he not convicted of felonious restraint or were they dropped totally?

A.   I can't remember.  I don't remember.

MS. ROSE:  All right, thank you very much.

CROSS-EXAMINATION

BY MS. LAWSON:

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2926

Q. Investigator Brandon, how are you?

A. Doing fine.

Q. Would it refresh your recollection that he was -- the DA's office would not prosecute this particular case that you investigated and that the felonious restraint had to do with him taking her out of the Jasper Chambers apartment in November?

A. I don't remember the disposition of this case.

MS. LAWSON: May we have a moment, Your Honor? I need to find a document.

THE COURT: Yes, you may.

MS. LAWSON: May I approach the witness, Your Honor?

THE COURT: Yes.

BY MS. LAWSON:

Q. Investigator Brandon, perhaps it would help you to start somewhere around here. Read this and see if it refreshes your recollection about the disposition of the case that you have been testifying about, just read it to yourself.

A. Okay.

Q. Does that help you?

A. Yes.

Q. What do you now recall about what happened with the charge that you investigated?

Page 2927

A.    That according to that statement there, that the case was rejected for prosecution.

Q.    Now, in part was that because of the follow-up interview that police officer Graue took with Alesha Chambers where she indicated that she had been intimate with Marc Barnette on several occasions between the day that they broke up in early March and this occasion?

A.    I would probably think that the DA's office would have to review the entire -- I don't know if I could just say that the DA's office would reject the case based on one statement versus another. But just in looking at the entire case, and the likelihood that it would get a conviction is what they have to try and determine, you know.

Q.    Did you feel that you had a strong case?

A.    I felt like there was probable cause to arrest Mr. Barnette for what had happened, and, yeah, I felt like there was probable cause.

MS. LAWSON:   May I approach the witness, Your Honor?

THE COURT:   Yes.

BY MS. LAWSON:

Q.    Investigator Brandon, let me ask you if you would take a look at Exhibit 10 and see if that is not the follow-up interview conducted by Officer Graue of

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 75 of 200
909

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2928

Alesha Chambers.

A.    Yes, it is.

Q.    And the DA's office had a copy of that when they considered whether to prosecute this as a rape case?

A.    Oh, yes, they would have had it.

Q.    And this is an official document of the police department and you have yourself reviewed it?

A.    Yes.

Q.    And the problem with the prosecution was that Alesha Chambers said that she had been sneaking around with him and her brother had seen them together and that's why they broke up?

A.    Yes.

Q.    And that's the day that he hit her with the baseball bat?

A.    Yes.

Q.    And that would according to this be March 15th, 10 days before the March 25th incident that you've been talking about?

A.    That's correct, yes.

Q.    And she told Investigator Graue on the 25th that she told him she didn't want to be with him anymore, she was trying to push him away and he was trying to hug her, he lost it, is that what she told

Reported By: Scott A. Huseby, RPR
800-333-2082                Huseby, Inc., an A—       —ion (704) 333-9889    Page 76 of 200   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 76 of 200
910

United States of America vs. Aquilia Marcivicci Barnette      3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                  7/31/2002

Page 2929

Investigator Graue?

A.   Yes.

Q.   Basically, Investigator Brandon, you felt that Alesha Chambers was hurt in some way by Marc Barnette and you were unable to get the DA's office to prosecute the case, is that right?

A.   That's correct.

Q.   Were you aware of the other incidents in November, on November 9th and November 12th, during the course of your investigation?

A.   You are speaking of November of '93?

Q.   Right.

A.   I knew there was a prior kidnapping.

Q.   Did you sense that Marc Barnette's family took any of this seriously?

A.   No.

MS. LAWSON:  No further questions, thank you.

REDIRECT EXAMINATION

BY MS. ROSE:

Q.   In fact, when you interviewed his grandfather, he made a statement saying that Marc had been home all night?

A.   That's correct, yes, he did.

Q.   And the family tended to close around him in a

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2930

protective way?

A.   Yes.   The mother, her comment was that he's been dating her, you know, I don't think he did that.

MS. ROSE:   Okay, thank you.

THE COURT:   Members of the jury, we will take our afternoon break at this time.

(The jury left the courtroom.)

(Brief recess.)

THE COURT:   May we have the jury, please.

(The jury returned to the courtroom.)

THE COURT:   The jury is with us.

MS. ROSE:   Brent Burgess.

BRENT M. BURGESS,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.   Hi.   Would you introduce yourself to the jury, please, ma'am.

A.   I'm Brent McQuickerd Burgess.

Q.   And where do you live?

A.   I live in Mebane, North Carolina.

Q.   Do you work there?

A.   No.   Currently I'm a stay-at-home mother.

Q.   Because you have a new baby, right?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2931

A.   Yes.

Q.   Prior to that time, though, where were you working?

A.   I worked at the Chapel Hill Police Department from '94 to '98, and then from '98 to 2000 I worked at IBM in RTP.

Q.   Now, did you formerly live in Charlotte?

A.   Yes.  I went to school at UNC Charlotte.

Q.   And while attending UNC Charlotte did you have a job?

A.   Yes.

Q.   Where did you work?

A.   I worked at TK Tripps waiting tables.

Q.   And where is that located?

A.   Woodlawn, I believe.  I don't remember the street.

Q.   Woodlawn.  Is there a Bojangles next to that TK Tripps --

A.   Yes.

Q.   -- or was there at the time?

A.   To the left.

Q.   Back in November of 1993 were you, in fact, waiting tables at TK Tripps?

A.   Yes.

Q.   On that date, November the 12th of '93, will

800-333-2082   Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 79 of 200   Fax (704) 372-4593

913

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2932

you tell the members of the jury what happened as you were getting into work that day?

A. I was in the back of the kitchen and we were preparing for dinner and our assistant manager came in from the back parking lot of the rear door and said, Brent, I need you to call 911, and he said it so casually I thought he was kidding, and I said for what for and he said, no, I'm serious, there is a guy beck here in the back parking lot that has a knife to a girl's throat, call 911. And as he was saying this, he was unscrewing like an industrial size bedroom handle from the broom and he headed out the back door. And our hostess heard it, so she went ahead and called, and I followed him out the back door.

Q. When you got outside, when did you see?

A. Behind our parking lot there is like a little residential street and a residential area behind it, and there was a black male holding a black female on that street and he had a knife to her throat.

Q. How was she dressed? Was she in a particular uniform?

A. I don't -- I can't remember.

Q. You don't recall whether it was a Bojangles uniform or other --

A. I mean, it may have been, because I know she

800-335-2082 Huseby, Inc., all From (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 80 of 200

914

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2933

worked there.

Q. Now, what was happening at the point that he had the knife to her throat, was there any conversation going on or words being exchanged?

A. From what I remember, he was walking backwards and he had her kind of up over her shoulder and there were several employees from Bojangles and a couple of our employees that were approaching him and, you know, everybody was kind of yelling back and forth. I don't remember anything specific said.

Q. Can you describe the knife?

A. It was a large kitchen knife, sort of like a butcher knife. It was visible -- I was 30 or 40 feet away; I could see it plainly.

Q. What was he doing it with the knife?

A. He had it, from what I remember, he had it to her throat and he, I guess he became distracted from all of the people approaching him, and I think that's what allowed her to get away.

Q. And was your manager out there with this big bedroom handle?

A. Yes. He --

Q. Describe what happened.

A. He was the closest to him because he had a, you know, sort of a weapon with him. And so when she got

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 81 of 200
915

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2934

away, she ran to someone. And he started going towards Kevin Daly, our assistant manager, swinging the knife in his direction and Kevin was kind of walking backwards and with the bedroom handle trying to hit him with it, and he hit him several times. And this industrial size broom, mop handle broke over his arm or some part of his body before he actually dropped the knife, and they wrestled him to the ground and held him there until the police arrived.

Q. And when the police arrived, did you, in fact, make a statement?

A. Yes. I sat next to the police officer in his car and told him what I saw and he wrote the police report.

MS. ROSE: If I may approach, Your Honor.

BY MS. ROSE:

Q. I'm going to hand you what I've marked as Government Exhibit 60. If you would, Ms. Burgess, take a look at that exhibit. Are you able to identify it?

A. Yes, and that's my signature, uh-huh.

Q. Is that the statement that you gave the Charlotte officer on that particular evening?

A. Uh-huh, yep.

Q. And did you basically tell the officer what you've told the jury here today?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af          on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 82 of 200
916

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2935

A.   Yes.

        MS. ROSE:   I would move for admission of Government's Exhibit 60, Your Honor.

        THE COURT:   It will be admitted.

        MS. ROSE:   And I have no other questions at this time.

                    CROSS-EXAMINATION

        BY MS. LAWSON:

Q.   Good afternoon.   How are you?

A.   Good.

Q.   Good.   Your manager -- well, do you know Jeffery Jordan?

A.   Jeffery Jordan?

Q.   Right.

A.   No.

Q.   Is he a coworker -- would it refresh your recollection to know he was a coworker of yours at the Bojangles.

A.   I worked at TK Tripps --

Q.   I'm sorry.

A.   -- not at Bojangles.

Q.   I see.   One of the witnesses to this event said that when he was hit with the stick two or three times it didn't seem to do anything because he was acting crazy.   Would you agree with that assessment?

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an A        ion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 83 of 200
917

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2936

A.    It was a chaotic situation.  I mean, I guess I would agree with that, yeah, I mean, because, yeah, he had to hit him several times before he dropped the knife.  That's why it broke over him.

MS. LAWSON:  No further questions.  Thank you.

MS. ROSE:  I have no other questions.  Thank you.

THE COURT:  You may step down.

MS. TOMPKINS:  The government calls Officer Donna Burgess.

DONNA BURGESS,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q.    State your name, please.

A.    Donna Burgess.

Q.    And how are you employed?

A.    Charlotte-Mecklenburg Police Department.

Q.    How long have you been with the police department?

A.    15 years in February.

Q.    And what are your current duties?

A.    I'm assigned to the patrol division in Adam 1.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2937

Q.   What were your duties back in November of 1993?

A.   At that time I worked in the Adam 2 district in patrol.

Q.   And does the Adam 2 district include Independence Boulevard?

A.   No.  Adam 2 would basically be --

Q.   I'm sorry, Woodlawn?

A.   Yeah, Woodlawn.

Q.   Tell the jury where Adam 2 was back in those days.

A.   It would be South Tryon Street, West Boulevard, Clanton Road, Remount, basically kind of like the southwest.

Q.   Okay.  Now, were you employed and on duty as patrol officer on November 12th, 1993?

A.   I was.

Q.   And did you respond to a call for service on that day to Exmore Drive?

A.   I did.

Q.   Where is that?

A.   Exmore is located basically off of Woodlawn Road and you would turn on Nations Crossing.  It's a little back street that would back up to Nations Crossing, and Old Pineville, actually.

Q.   Is there a Bojangles there?

Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 85 of 200
919

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2938

A.    There is.

Q.    And a TK Tripps?

A.    There is.

Q.    What did you see when you responded to that location?

A.    There were several people standing at the back of the business on Exmore, several males and females.

Q.    All right.  And what did you do next?

A.    We -- actually, we responded to a call.  We got there, were told that a male had come up and tried to kidnap a female.  Several people, from what I can remember, responded to her and helped her.

Q.    So they had already done that?

A.    Well, when we got there, the suspect was sitting down on the street, several people were standing there with the victim.

Q.    Okay.  Did another or other officers respond to that call?

A.    Actually, I think several of us responded to that, it came out as an E call, which means an emergency call.

Q.    And was the defendant -- had the defendant been subdued by civilians?

A.    He had.

Q.    Okay.  And when you got there did another

Case 3:12-cv-00327-MOC  Document 103   Filed 09/28/15  Page 86 of 200

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2939

officer take him into custody?

A.    I think I actually took him into custody.  He was placed in a patrol car and we talked to all of the witnesses, of course, talked to the victim about what had occurred and he was placed under arrest.

Q.    Okay.  And by the time you were able to place him under arrest, was the situation calm?

A.    I wouldn't say it was calm.

Q.    How would you describe it?

A.    Just a lot of people, you know -- any time we get to a scene like that, it's rather hectic until we can find out, you know, what is going on, make sure everybody is okay.  I think we had medic respond to the scene.  So any time we respond like that, it's a little -- it's a little hectic until we can figure out what is going on here and we get everybody secured and make sure everybody is okay.

Q.    But my point being when you got there, was the defendant subdued?

A.    He was.

Q.    Let me show you what's been marked as Government's Exhibit 59 and ask you if you recognize it?

A.    I do.  This is a case report that I filled out that described what took place on this date and time.

                    MS. TOMPKINS:  Move admission of

Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/15  Page 87 of 200

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2940

Government's Exhibit 59, please.

THE COURT: Let it be admitted.

BY MS. TOMPKINS:

Q. Who did you talk to on the scene?

A. We would have talked to the victim, of course, and we would have talked to all of the witnesses.

Q. Who was the victim?

A. It would have been Alicia Chambers.

Q. Did you speak to her?

A. I did.

Q. What did she tell you?

A. She stated that someone she knew had come in and had taken her by knife point out the back of the business, where she was -- I think she was on the way to work and that he had come up to her and had a large knife and had basically kidnapped her at the back of the business.

Q. All right. Did you find a knife there at the scene?

A. I did.

Q. Did you collect it?

A. I did.

Q. How would you describe that knife?

A. I put down that it was a large knife, so I'm thinking that would have been a butcher knife.

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          7/31/2002

Page 2941

Q.   Did she tell you the man's name who had kidnapped her, basically, with the knife?

A.   She did.

Q.   Who was that?

A.   That would have been Marc Barnette, Aquilia Barnette.

Q.   Okay.  And you are referring to what in your supplement?

A.   This would have been a suspect witness that we fill out, we put down all of the information, who would be listed as a suspect, and then at the bottom of it would be listed who would be the witness and the report.

Q.   And what did you learn from witnesses at the scene?

A.   Just what happened.  Several people stated that they observed what took place.  There were several witnesses, and we took statements from all of those folks out there.

Q.   Okay.  And just tell us what you learned from those folks.

A.   Several of the witnesses stated that they had observed the male come up and take the female, had a knife to her throat and had basically taken her up to the back where we ended up, you know, finding him, up on Exmore.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af          ion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 103     Filed 09/23/15     Page 89 of 200
923

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2942

Q.   What was your initial charging decision?

A.   Initially I charged him with, of course, first degree kidnapping, and I think he had several charges because there were other victims in this case report, assault with a deadly weapon, being the knife.

Q.   Now, do you have as a police officer get to make the ultimate charging decision?

A.   No.  What happens in this, when we get a case report, we go ahead and make the arrest, we have to paper the case and take it to the district attorney's office.  Some of the cases we do that before we arrest a person, we will take it -- if we have a felony case, we will talk to the district attorney about it and determine what kind of charges.  In this case, you know, we did the arrest and then I papered it and took it to the district attorney, and they will ultimately make the decision on what the person will be charged with.

Q.   Now, at the scene you spoke with Alicia Chambers?

A.   I did.

Q.   What was her demeanor at the scene?

A.   Very upset, crying, very -- you know, very upset about what had taken place.

Q.   Do you know if she was injured in any way?

A.   I don't recall that she was injured in any way.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2943

MS. TOMPKINS: If I could have a minute. Thank you, Officer Burgess, that's all the question I have for you.

THE WITNESS: Thank you.

CROSS-EXAMINATION

BY MS. LAWSON:

Q. Officer Burgess, you mentioned that you took out some assault charges. Did that involve Marc Barnette swinging the knife at other people other than Alicia Chambers out there?

A. I believe it did.

Q. And are you familiar with Officer TE Russell, who took a statement from one of the people out there?

A. Yes, ma'am.

Q. Officer Russell wrote down that Marc Barnette was, according to witness Jeffery Jordan, trying to carry her away and that he thinks he hit him two or three times with a stick but he was acting crazy, do you recall anything about that being said?

A. All I could say, there were several victims out there that we took case reports on.

Q. Were you familiar with one of the people who said that Marc had kicked his car on a prior occasion when he was running him off from Bojangles?

A. No, ma'am, I'm not.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A         ion  (704) 333-9889

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2944

Q. Can you tell the jury how Marc Barnette was acting when you put him in the patrol car?

A. I don't think -- I don't recall that we at that point had any problems with him. He was, I think, not -- I don't recall having any problems with him at that point.

Q. And can you tell from your police report what time this occurred, what time of day?

A. Yes, ma'am. That would have occurred at 4:00 in the afternoon, actually 4:18.

MS. LAWSON: Thank you very much.

THE WITNESS: Thank you.

MS. TOMPKINS: The government calls Special Agent Debra Adamo.

DEBRA ADAMO, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please, and spell your last name for the court reporter.

A. Debra Adamo, A-D-A-M-O.

Q. How are you currently employed?

A. I'm a special agent with the Federal Bureau of Investigation.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A         ion, (704) 333-9889         Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 103    Filed 09/23/15  Page 92 of 200

926

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2945

Q.   Where are you located?

A.   Phoenix, Arizona.

Q.   And what is your position with the FBI now?

A.   Currently I work financial institution fraud.

Q.   How long have you been an FBI agent?

A.   A little over six years.

Q.   Before you were an FBI agent, what did you do?

A.   I was a police officer with the Charlotte-Mecklenburg Police Department.

Q.   And for how long were you with Charlotte-Mecklenburg Police?

A.   About six years.

Q.   And what were your duties for those six years?

A.   For about the first four years I was in patrol, worked as a patrol officer, for the last two years I was a detective in property crimes working burglaries, house break-in's, and strong-armed robberies.

Q.   In November of 1993 were you a patrol officer?

A.   Yes, I was.

Q.   Now, in preparation for your testimony today, did you review police reports from November 9th, 1993?

A.   Yes, I did.

Q.   Did you respond to a call for service on that date?

A.   Yes.

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 93 of 200
927

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2946

Q.   What kind of call was that?

A.   I was dispatched out to assist another officer who was on a call for service which was a 911 hang-up call.

Q.   And do the police respond when there is a hang up to 911?

A.   Yes.

Q.   Why is that?

A.   Obviously they don't know what the situation is, someone could be having an emergency and need police but they just can't say what they need, so they will send a unit out to check on the residence.

Q.   Who was the officer that you got a call to respond and help?

A.   Officer Lizi Joye.

Q.   And did she or were you directed to a particular place?

A.   Yes.  She asked me to go to an address off of West Boulevard to look for a Mr. Barnette and girlfriend Alicia Chambers.

Q.   Where was Officer Joye?

A.   She was at Ms. Chambers' residence on, I believe Watson Drive.

Q.   What did -- what happened when you got to the location at West Boulevard?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A        rion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 94 of 200
928

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/31/2002

Page 2947

A.    I went to the home, knocked on the door, a female answered that I assumed was Mr. Barnette's mother, spoke to her asking her if Ms. Alicia Chambers was there at that address, she allowed me to come into the house, and I did locate Ms. Chambers in the home.

Q.    When you first came in and spoke with Marc Barnette's mother, what did she tell you about whether or not Marc Barnette or Alicia Chambers were there?

A.    She said that they were not there.

Q.    And did you later or -- moments later see Alicia Chambers?

A.    Yes, I did.

Q.    And where did she come from?

A.    Actually, as the mother backed into a larger room away from the door, she looked to the side of the room and made the comment, what are you doing here, and I walked into the room and looked in the direction in which she was looking at and saw Ms. Chambers sitting in a chair up against a wall.

Q.    What happened next?

A.    The mother continually was yelling what are you doing here. I asked Ms. Chambers if she wanted to come with me. She nodded yes. I allowed her to come with me outside. She had no shoes on, it was very cold and muddy and wet outside, so I had to carry her to my

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A    ion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 95 of 200
929

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2948

patrol car. Because the mother was very agitated at her presence there, I decided I needed to take her on away from the residence.

Q. And what was Alicia Chambers' demeanor inside the house?

A. Very quiet. She didn't say a word. She looked very confused, very frightened.

Q. And you are small woman, but you were able to carry Alicia to your car?

A. Yes.

Q. Did she have any shoes on?

A. No shoes.

Q. She had socks on only?

A. Yeah. I recall just, you know, very small little white socks or slip-ons, you know, just over her feet.

Q. And this was in November, is that right?

A. Yes.

Q. When you got Alicia out to your car, what happened?

A. She had told me that she was taken there against her will and that she was afraid of the mother, that's why she didn't say anything in the house. So I took her away from the house. I didn't take her directly back to her home, because I knew there was

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2949

probably family members there and they would probably all want to console her, see if she was okay, and I wanted to get a good and accurate statement from her as to what happened before they spoke with her.

Q.   Did you take a statement from her?

A.   Yes, I did.  I stopped in a parking lot of a business that was closed and took her statement.

Q.   Did you also complete a supplement detailing the events of that night?

A.   Yes, I did.

Q.   I'm going to show you now what has been marked as Government's Exhibit 57 and ask you if you recognize what that is?

A.   Yes, I do.

Q.   What is that?

A.   This is a statement that I wrote, actually I believe it's two statements, one, mine as to the events that occurred and secondly a statement that I had wrote on behalf of Ms. Chambers.

Q.   So as Ms. Chambers told you what had happened that night, did you write it down?

A.   Yes, I did.

Q.   And did she sign that statement?

A.   Yes, she did.

Q.   After you -- well, tell the jury what Ms.

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 97 of 200
931

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2950

Chambers told you had happened.

A. She told me that she was in her home, her ex-boyfriend, Mr. Barnette, had called her, she was trying to break up with him, he was angry about this and she didn't want to speak with him on the phone, he told her that, well, then I'm coming over there, she told him not to, the -- she hung up with him, she later spoke with her mom, or aunt actually, I can't recall, but she was on the phone with someone else and she heard him banging on the door, later -- she did not answer the door but later she heard him banging harder on the door, believing that he was trying to break into the residence, so she hung up the phone, she said she went to get a knife to try to protect herself in case he did enter the residence and then she called 911, at which time he did enter the home and grab the phone out of her hands, yanking it out of the wall.

Q. And did she tell you then that he had carried her out to his vehicle?

A. Yes. She said that she was screaming trying to get the attention of the neighbors, he took a towel and put it in her mouth to muffle her screams, took her out, put her in his car, told her that he would kill her if she didn't come with him. I believe they went to pick up his brother from work. She said she just sat there

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2951

in the car quietly because she was scared and then he took her back to his home.

Q. Okay. And what did she tell you happened once they got to his home?

A. I believe she -- I don't recall exactly what she said happened at the home but that she was afraid of the mother --

Q. All right?

A. -- and the family that lived at the residence, his family.

Q. Was Marc Barnette there at the home when you got there, at West Boulevard?

A. She said that he was, that whenever I came to the door he fled out the back door.

Q. What did you do after you took a statement from Alicia Chambers?

A. I took her back to her residence.

Q. Was that at Watson Drive?

A. Yes.

Q. I'm going to show you what's been previously marked and admitted as Government's Exhibit 58D. Do you recognize that as part of the door that was broken off?

A. Yes, I believe that is. It's been several years, but yes.

Q. And let me show you what has been previously

Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 99 of 200
933

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2952

marked and admitted as Government's Exhibit 58E.  Is that the telephone cord?

A.    Yes.  Yeah, I definitely remember the type of telephone that it was that was yanked.

Q.    Now, were you all able to put that telephone back together?

A.    Yes.  I picked it up and put it back in the wall, because I was told that he was calling the house --

Q.    Okay.

A.    -- and I wanted to listen in on the conversation if she -- if he called back again.

Q.    So there was another phone in the house that was ringing?

A.    Yes.

Q.    Now, were you able to listen in on a phone call that Alicia Chambers had with Marc Barnette?

A.    Yes, I did.

Q.    And tell the jury about that.

A.    Whenever he first began to speak with her, he was crying, very emotional, just saying how much he loved her, that he just wanted to be with her, so forth. She asked him, well, can you meet me somewhere and we will talk about it.  She did this at the direction of myself, because we wanted to get him into custody that

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          7/31/2002

Page 2953

night.  He didn't -- did not come to meet with her, but he immediately switched from crying and being emotional to being very unemotional.  He spoke very clearly and deliberately, it was as if he had just turned his tears off completely, and began to say things like, you know, why are you going to charge me, are you going to charge me, why are you talking to the police, you know I'm going to pay for that door, so forth.

Q.    What happened next?

A.    Officer Joye then took the telephone conversation over and told Marc, you know, that he needed to come in and see us.  Obviously, he did not. We were unable to get him into custody that evening.

MS. TOMPKINS:  Thank you.  That's all the questions I have.

CROSS-EXAMINATION

BY MR. BENDER:

Q.    Special Agent Adamo, you received a call from Elizabeth Joy to go to 3413 West Boulevard?

A.    Yes.  She requested assistance, not specifically just me, but officers in the area to respond there to look.

Q.    And you did?

A.    Yes.

Q.    And when you got there, you knocked on the door

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 101 of 200
935

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2954

and were allowed to come in?

A. Yes.

Q. And you met someone who you believed to be Marc's mother?

A. Yes. The woman at the door was -- appeared to me to be in charge of the household. She was the one that answered the door, and she was very boisterous as far as what are you doing here whenever she was addressing Ms. Chambers and stating, you are not invited here, get out of here. So, yes, I believed her to be the mother.

Q. She was almost combative with Ms. Chambers, wasn't she?

A. Yes, she was.

Q. Okay. Yelling at her?

A. Yes.

Q. And telling you to get her out, don't ever let her come back, words to that effect?

A. Yes.

Q. And later that night after you took Ms. Chambers' statement and took her back to her residence -- it was really her uncle's residence, wasn't it?

A. Yes. I believe she was living there with an aunt or uncle; I'm not certain.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2955

Q. Okay. And y'all took a statement from Jasper Chambers, who owned that house, do you remember?

A. I don't know if I took a statement from him, perhaps another officer. I would have to look back to be certain.

Q. And do you remember whether you or Elizabeth Joy in your presence in talking to Jasper Chambers were told that about five weeks prior to this --

MS. TOMPKINS: Well, objection, she said she didn't know.

THE COURT: Overruled.

BY MR. BENDER:

Q. About five weeks prior to this night he had kicked the door in and ran past family members to Alicia Chambers as if the family members were not even in the room?

A. I don't recall that statement. Perhaps the other officer took that statement.

Q. Okay. And when you were on the phone with him, you were on one extension and Ms. Chambers was talking with him?

A. Yes. I merely listened in.

Q. And did Elizabeth Joy listen in as well?

A. I believe she was standing with me listening on the same extension.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2956

Q.   And Marc was crying and was very upset, or at least seemingly so?

A.   Yes.  Initially, yes.

Q.   And he was saying things like, I didn't mean it, you know I wouldn't hurt you, I just want to be with you, I love you, right?

A.   That sounds correct, yes.

Q.   And all you had to do was open the door?

A.   Correct.

Q.   And then when she said could we meet somewhere, trying to get him where y'all could arrest him, like flipping a switch, he just quit?

A.   Correct.

Q.   And do you remember him saying that everyone and everything were always interfering with their relationship?

A.   I don't specifically recall that.

Q.   And that he thought he could make everything right if he could just talk to her?

A.   I don't recall that.

Q.   Okay.  One other thing, Ms. Chambers said that she -- that she didn't want to talk to you in the house because the mother was -- did drugs in that house?

A.   She said that they did drugs in the house.  To me that possibly meant any family member.  She didn't

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2957

specify the mother.

Q. Okay. All right. And she was also afraid of the mother and that's why she --

A. She did say that she was frightened of the mother.

Q. Okay.

MR. BENDER: Thank you, ma'am.

MS. TOMPKINS: Thank you. Nothing further.

THE COURT: You may step down.

THE WITNESS: Thank you.

MS. TOMPKINS: The government calls Thad Johnson.

THAD JOHNSON, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please.

A. Thad Johnson.

Q. How are you currently employed?

A. I'm currently employed in the private sector --

Q. Okay.

A. -- with Wachovia Bank here in Charlotte.

Q. If you didn't want to say --

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Af        ion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 105 of 200
939

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2958

A.    I apologize.

Q.    Did you used to be a state probation officer?

A.    I did, yes, ma'am.

Q.    And is that with the North Carolina State Probation and Parole?

A.    That's correct, yes, ma'am.

Q.    For how many years did you do that?

A.    About nine and a half years.

Q.    What was your job title?

A.    Adult probation/parole officer.

Q.    Now, back in September of 1994 were you a state probation officer?

A.    Yes, ma'am.

Q.    What does an adult probation officer do?

A.    Okay.  Basically, we supervise a probation case.  When an individual is placed on probation in the State of North Carolina, we just help enforce their court contract or conditions of probation judgment and supervise the client for the suspended sentence.

Q.    All right.  And when you say a court contract, is that the probationary judgment that defendants sometimes get?

A.    Yes, that's correct.

Q.    And are there conditions of probation that people on probation must adhere to?

Case 3:12-cv-00327-MOC  Document 103   Filed 09/23/13   Page 106 of 200
940

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2959

A.    Yes, ma'am.

Q.    Did you supervise Aquilia Marcivicci Barnette on probation?

A.    Yes, ma'am.

Q.    I'm going to show you what has been marked as Government's Exhibit 72 and ask you if you recognize what that is?

A.    Yes, ma'am, I do recognize what it is.

Q.    What is that?

A.    It's the probation file for Mr. Barnette.

Q.    All right.  Is that his original probation file?

A.    Yes, ma'am.

Q.    Now, are there two documents in the front of that file that constitute two cases of probation?

A.    Yes, ma'am.

Q.    Tell the jury, taking each one one at a time, what those probationary cases were.

A.    Sure.  The first case, it's for felonious restraint.  Should I read the case number or just --

Q.    When was the date of conviction on that?

A.    The date of conviction was --

Q.    Or if you know the date of offense.

A.    Yeah, the conviction date was September 20th of '94.

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 107 of 200
941

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2960

Q.   Okay.

A.   And the offense date was November 8th of 1993.

Q.   Okay.  And that was a conviction for felonious restraint?

A.   Yes, ma'am.

Q.   And is that Case 1 probation?

A.   That is correct, that is Case 1.

Q.   And what does the other document say?

A.   It's Case 2 of probation, which is for breaking and entering.

Q.   And what is the offense date on that?

A.   The offense date, it's the same date, 11-8-93.

Q.   All right.  What is Case 1 and Case 2 of probation?  What does that mean?

A.   When someone is placed on probation, they can have more than one supervised case if they commit another crime, it could be on the same day or it could actually be a subsequent offense that occurred actually while they were on probation, so a person could have more than one probation case.

Q.   What was the defendant's sentence for his convictions of felonious restraint and breaking and entering?

A.   It was a one-year sentence suspended for three years.

Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 108 of 200
942

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2961

Q. Okay. So that meant that he got sentenced to one year active, that active portion of his sentence was suspended, is that correct?

A. Yes, ma'am.

Q. And that you would supervises him for three years?

A. Correct.

Q. Was there a condition that he be placed on electronic house arrest?

A. Excuse me, I apologize. It was a special condition of one of the cases, I'm not sure which one, but, yes, it was a special condition.

Q. All right. Now, are there regular conditions of probation and special conditions?

A. Yes, ma'am.

Q. Okay. What is regular condition of probation number one?

A. Okay. Regular condition number one -- can I refer to the judgment?

Q. Sure, absolutely.

A. Let's see here, commit no criminal offense in any jurisdiction.

Q. All right. And is it also a regular condition of probation that a probationer remain in the State of North Carolina --

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2962

A.   Yes, ma'am.

Q.   -- unless given permission to leave?

A.   Absolutely, yes, ma'am.

Q.   Is it a condition of probation that a probationer live in the state of North Carolina --

A.   Yes, ma'am.

Q.   -- unless given permission to leave?

A.   Exactly.

Q.   Is there a condition of probation that the defendant not possess a firearm?

A.   That is correct.

Q.   Were there specific or special conditions of probation that Barnette stay away from Alicia Chambers?

A.   Yes, absolute  -- yes, it was a special condition, yes, ma'am.

Q.   All right.  Now, when a person is placed on probation, how is it that you monitor that person?

A.   Okay.  Well, there are several ways that we initiate contact.  We initiate contact by mail, through letters, also through telephone, and through home visits.  So those are the general ways that we would contact the probationer.

Q.   Now, when Mr. Barnette was first placed on probation, was that September 22nd, 1994 or approximately at that time?

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 110 of 200
944

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2963

A.   Yes, ma'am.

Q.   And did he give information about what his address and his employment was at that time?

A.   Yes, ma'am.

Q.   And what was that?

A.   The address was listed as 3413 West Boulevard in Charlotte, North Carolina.

Q.   And what was his employment?

A.   Courtyard Marriott in Charlotte, North Carolina.

Q.   Did the defendant have to, based on the records that you have before you, spend some time in jail as part of his condition of his probation, if you will refer to 9-22-94?

A.   Yes.  He had a 20-day -- it was part of the special probation that he serve 20 days active, and then he began the probation.

Q.   All right.  Now, periodically during the course of Mr. Barnette's probation, did you try to verify the information that he had given you?

A.   Yes, ma'am.

Q.   And how would you do that?

A.   The first time I went to the residence I was unable to verify.  I actually had to go to the residence three times to verify the address because there was no

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an AJ          ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 103     Filed 09/23/15     Page 111 of 200
945

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2964

clear address marking on West Boulevard here in Charlotte for the actual house number, so I did go and verify the residence. A lady who identified herself as his mom stated that he lived there off and on but she would get a message -- I gave her an appointment for him to come in.

Q. Okay. Now, you said it took you three times to find that residence?

A. Yes, ma'am.

Q. Did you actually go and leave and --

A. I did, yes.

Q. So that would be an event for a date that you tried to find the residence and went home unsuccessful?

A. Exactly.

Q. And you did that three times?

A. Yes, ma'am. The third time I found the residence.

Q. All right. Did you have an office visit with the defendant?

A. Yes, ma'am.

Q. And referring to your notes, when was that, or did you have --

A. The first contact.

Q. The first contact you had with him.

A. The first contact I had with him was, in the

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 112 of 200
946

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/31/2002

Page 2965

office, was on September -- I'm sorry, July 24th of 1995.

Q. Okay. And before that date had another probation officer done some supervision?

A. Yes, ma'am, that's correct.

Q. And based on the notes in that file, were letters sent to the defendant?

A. Yes, ma'am.

Q. And before the time that you took over supervision, had the defendant failed to appear for office visits?

A. Yes, ma'am.

Q. Did he fail to appear for office visits in January, February, and March?

A. Yes, ma'am.

Q. Now, in March of 1995 do the notes of his probation report indicate that the probation officer had called the Courtyard Marriott and that the defendant was not employed there?

A. That's correct.

Q. Was that on March 20th, 1995?

A. Yes, ma'am.

Q. Was that you?

A. Yes, ma'am.

Q. And it was after that date that you attempted

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Al      ion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 113 of 200
947

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

to find the residence unsuccessfully, is that correct?

A.   That's correct, yes, ma'am.

Q.   In July, this was some months after he was placed on probation, you had a contact with him, is that correct?

A.   Yes, ma'am.

Q.   What do your notes of July 17th, 1995 reflect?

A.   He reported on that day as scheduled.  He stated to me at the time he was recovering from a gunshot wound, that he was shot in the leg and his femur was shattered, he didn't contact the office because of getting shot and he was recover from that, was his comment.

Q.   All right.  Let me actually get you to flip the page before.  You are looking at July 24th?

A.   I apologize, yes, I am.

Q.   And let me get you to look at July 17th.

A.   July 17th?

Q.   1995.

A.   Excuse me one moment.  I do apologize, yes, he did report on July 19th.

Q.   Okay.  Just read at the top of that page that begins, I rode.

A.   Okay.  Actually he didn't report on that day, but I made contact that day, or tried to make contact.

800-333-2082        Huseby, Inc., an Al...         (704) 333-9889        Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2967

That was July 17th of '95. I rode up and down West Boulevard Drive, finally found residence, I talked to defendant's mom, defendant is not living there but does come in from time to time, she did not have his address, the other address he was living at at the time but said she will give him a message to report on July 19th of '95 at 4:30.

Q. Okay. So on July 17th, 1995 you had contact with the defendant's mother?

A. Yes, ma'am.

Q. And did she tell you on that date that he was living in Roanoke, Virginia?

A. No, ma'am.

Q. Okay. Did she say that she knew what his telephone number was in Roanoke, Virginia?

A. No, ma'am.

Q. Okay. But she said that he did come in from time to time?

A. Yes.

Q. And that she would relay that message?

A. Yes.

Q. And on July 19th did the defendant, in fact, call you?

A. Yes, he did.

Q. And where did he tell you he was working at

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2968

that time?

A.    He called and told me that he was working for a temporary agency called Temp World.

Q.    Is that here in Charlotte?

A.    Yes, yes, in Charlotte.

Q.    All right.  And it was on that date that he told you that he had been shot in the leg and was recovering?

A.    Yes, ma'am, yes.

Q.    Now, on July 19th, 1995 what notation did you have about the defendant's mother?

A.    His mom called and confirmed that he would be in on July 24th, is when we had rescheduled the appointment.

Q.    All right.  On that date did you call Temp World to confirm his employment?

A.    I did.  I called Temp World here in Charlotte, and the phone numbers indicated an address on Park Road in Charlotte, and they indicated that he was not employed.

Q.    Okay.  So did you know at that time that he was employed at Camelot Music in Roanoke, Virginia?

A.    No, ma'am, absolutely not.

Q.    On July 24th, 1995 did you have an office visit?

A.    visit?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2969

A.   Yes.  Yes, ma'am.

Q.   Okay.  Did the defendant actually show up in your office in Charlotte?

A.   Yes.

Q.   And what did he tell you on that date?

A.   That's when the comment I had made a few moments ago, that he had been recovering from a gunshot wound, he had been shot in the leg and that his femur was shattered  and that he had not been reporting because he was recovering from his gunshot wound.  At that point I took a photo, which is standard on the first contact that each officer makes.  I took a photo. He indicated at the time to me that he was employed at the Courtyard Marriott, Arrowood Road, Charlotte, North Carolina, and that Sheila Cooper was his supervisor and that he was working as security night audit from 11:00 to 7:00.

Q.   Now, this was about ten months after he was placed on probation, is that right?

A.   That's correct.

Q.   And just so the jury knows, what, in those days, what was your case load?

A.   Case load was, as I remember, was around 230, 240, somewhere in that range.

Q.   230 or 240 people?

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an A1 ...   ion  (704) 333-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 117 of 200
951

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2970

A.    Exactly, at one time.  And I was actually the second probation officer that had supervised the case at that point.

Q.    And so ten months into his probation you had your first face to face with him, is that correct?

A.    That's correct.

Q.    And he told you on July 24th, 1995 that he worked at the Courtyard Marriott?

A.    Yes, ma'am.

Q.    And that his supervisor was Sheila Cooper?

A.    Yes, ma'am.

Q.    He gave you a schedule?

A.    He did.  He indicated that at that -- for that particular time he was working 11:00 to 7:00 but the schedule could vary so he could not give an exact schedule every week but that particular week he was working 11:00 to 7:00.

Q.    And what kind of problem did that present in terms of his probation?

A.    Well, as far as house arrest, it created -- initially we didn't have equipment because we had limited number of units and with so many people on probation we didn't have enough devices to cover, and part of the EHA, or electronic house arrest program, you had to be on a set schedule all the time.  I mean, your

Case 3:12-cv-00327-MOC, Inc. Document 103    Filed 04/23/15 889 Page 118 of 200 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2971

work schedule couldn't fluctuate at all.

Q. And that -- did you know who Shelia Cooper was at the time?

A. I did not. I mean, he indicated that she was his supervisor at Courtyard Marriott.

Q. Did you know that Sheila Cooper was living at his mother's residence on West Boulevard?

A. No, ma'am.

Q. Did you know that Shelia Cooper was his aunt?

A. At the time I did not know that.

Q. And did you know that he was, again, living and working in Roanoke, Virginia?

A. No, ma'am, I did not.

Q. Now, did you continue to attempt to verify his employment?

A. Yes, ma'am.

Q. And was his employment actually verified by the Courtyard Marriott, Sheila Cooper?

A. It was.

Q. Did you actually call and speak to Sheila Cooper?

A. I did.

Q. And let me just refer to you to 11-14-95. Are you there?

A. Yes.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an /         rion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 119 of 200
953

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Q.    And what does that say?

A.    I called Marriott, defendant's place of employment, verified still there, left message for defendant to call ASAP.

Q.    And in the meantime between July and November, had the defendant no-showed for office visits?

A.    That's correct.

Q.    Okay.  And did he call and -- sometimes no-show and sometimes call with an excuse?

A.    He did.

Q.    Now, did there come a point where you considered his probation to be violated?

A.    Yes, ma'am.

Q.    And when was that?

A.    The probation violation report, I just need to refer to my notes, if I may.

Q.    Feel free.

A.    They should be attached.  The violation report is dated 12-19-95.

Q.    Okay.  And -- 12-19-95?

A.    Yes, ma'am.

Q.    Okay.  And what happens when a violation report is issued?

A.    A probation warrant is issued.

Q.    A warrant for his arrest?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af          ion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 120 of 200
954

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2973

A. A warrant for his arrest is issued.

Q. And you had his address as the address on West Boulevard, is that correct?

A. That is correct.

Q. Now, would the defendant have been allowed to move from West Boulevard to Roanoke, Virginia with your permission?

A. We do have where another state could supervise for us as a courtesy, but they would have to be in compliance with the probation judgment before that could take place, but that is allowed as long as they are in compliance.

Q. Right. So he could have said to you, I'm moving to Roanoke, Virginia?

A. He could have, and possibly it could have been worked out.

Q. Did you ever know that he had moved and was living out of state?

A. No, ma'am, not at all.

Q. And did you ever know until after the case that he hadn't worked for Courtyard Marriott during the entire course of his probation?

A. No, I didn't know that.

MS. TOMPKINS: Thank you. That's all the questions I have.

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an A... ...ion (704) 333-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 121 of 200

955

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2974

THE WITNESS: Thank you.

CROSS-EXAMINATION

BY MS. LAWSON:

Q.   Mr. Johnson, do your notes reflect that a young woman by the name of Robin Williams accompanied him to one of the probation appointments that you had scheduled with him?

A.   Yes, ma'am.  I believe on the very first appointment -- yes, she did come with him, yes.

Q.   And can you just summarize -- well, your statement about the electronic house arrest appears to be that you didn't put him on electronic house arrest when he was first placed on probation because you didn't have enough equipment, is that essentially what you said?

A.   That is correct, yes, ma'am.

Q.   And do I also understand you to say that one of the reasons you had trouble keeping up with looking for him and calling people about him was because you had a case load of 230?

A.   No.  I -- it could explain the difference as far as timing, but, yeah, we had a very -- huge case load, 230 people, 240 people.  I actually specialized in domestic violence, so my case load was 230, 240 domestic violence cases that were somewhat related to domestic

Page 2975

violence here in Mecklenburg County.

MS. LAWSON: No further questions.

THE WITNESS: Thank you.

MS. TOMPKINS: Thank you. Your Honor, can we have a side-bar?

THE COURT: Excuse us, members of the jury. You may be at ease.

(Beginning of bench conference.)

MS. TOMPKINS: I'm requesting to the Court that -- at this time the next witnesses are the victim impact witnesses, I think it would be bad to start that and go for 10 minutes and --

THE COURT: How long do you anticipate?

MS. TOMPKINS: In total I would say two hours, two or three hours.

THE COURT: All right. Why don't we adjourn until tomorrow.

(Conclusion of bench conference.)

THE COURT: Members of the jury, we have reached a good stopping point, so we will do that and ask you to be with us again at 9:30 in the morning. Please keep an open mind about the case and remember all of the instructions. Thank you .

(The jury left the courtroom.)

THE COURT: How long does the defense say

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Afl          on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 123 of 200
957

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2976

the defense evidence might take at least by way of some supposition at this point?

MR. BENDER: Two and a half to three days.

THE COURT: Starting next Monday?

MR. BENDER: Yes.

THE COURT: All right. That last side-bar had to do strictly with scheduling, by the way, whether to go until 5:00 or break at this time, and -- at ten minutes until 5:00, the next witness being longer than ten minutes. Thank you very much.

I, Scott A. Huseby, do hereby certify that the foregoing transcript is a true and correct transcript.

SCOTT A. HUSEBY

8-1-02

DATE

Case 3:12-cv-00327-MOC Document 103 Filed 09/28/15 Page 124 of 200

2977



COPY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA   )   DOCKET NO. 3:97-cr-23-V
                           )
        vs.                )
                           )
AQUILIA MARCIVICCI BARNETTE, )   VOLUME 15
                           )   MORNING
        Defendant.         )
_____)


TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
AUGUST 1, 2002


APPEARANCES:

On Behalf of the Government:

    ANNE M. TOMPKINS, ESQ.
    JILL WESTMORELAND ROSE, ESQ.
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    JEAN B. LAWSON, ESQ.
    P.O. Box 472106
    Charlotte, North Carolina

    HAROLD J. BENDER, ESQ.
    200 North McDowell Street
    Charlotte, North Carolina


            Cheryl A. Nuccio, RMR-CRR
            Official Court Reporter
           United States District Court
            Charlotte, North Carolina

FORM FED ® PENGAD • 1-800-631-6989

THURSDAY MORNING, AUGUST 1, 2002

THE COURT: May we have the jury.

MS. LAWSON: Your Honor...

THE COURT: Wait just a second.

MS. TOMPKINS: Your Honor, in the -- the next witnesses are the victim impact witnesses. We've got a series of photographs that we'd like to show. I'm speaking specifically of photographs of Robin Williams that I'd like to show to her mother, Bertha Williams. There are approximately twenty-three photographs of Robin throughout her life. I showed them to defense counsel beforehand seeking a stipulation as to their admissibility so that we wouldn't have to go through that. And I believe they're stipulating to their admissibility, but were objecting to the number of photographs. So at this point, then, I'd like to hand them up to the court --

THE COURT: All right.

MS. TOMPKINS: -- for the court's --

MS. ROSE: And I'll have the same, Your Honor. I have, I think, thirteen photographs related to Donnie Allen for the court to review as well.

THE COURT: All right.

(Photographs were tendered to the court.)

MS. TOMPKINS: Here, these are actually three more through Kenny Williams.

(Photographs were tendered to the court.)

MR. BENDER: May I be heard?

THE COURT: Yes, sir.

MR. BENDER: The Fourth Circuit opinion in this case refers to pain and says, in effect, that this victim impact evidence went beyond the quick glimpse of the life that was permitted by pain; however, on the whole, it did not contaminate the proceedings. And they went to do an analysis of -- and actually broke it down by percentage of how much of the overall testimony went to the victim impact evidence.

The government has now had the opportunity to try to refine their victim impact evidence because of error that they urged upon the court at the time. I just don't think that's fair. I think there comes a point where it's too much. How much is too much? I don't know. But I think that's what the Fourth Circuit was telling us is in the context of the prior proceeding, this was okay. But, you know, another straw might be the one that breaks the camel's back.

As I read Ms. Bertha Williams' testimony, there was no photograph introduced through her testimony. She introduced a poem, I think something called More About Robin that she read to the jury, and a hospital gown. But there was no photograph that was introduced and now they want to introduce twenty-some photographs. Is that too much? We urge upon the court that it is. I think you have to make the

decision where that line is and are they going to be crossing that line. This is a little more than a quick glimpse of life that pain provides. So -- and also with regard to Allen. Some of them may be proper. A limited number of them, but I think all of these may be crossing that line because the Fourth Circuit has pretty well set forth what they -- in the context of the prior proceeding, what they thought was appropriate. And I think they said it was only about 22 percent. That's why it's okay to do that.

THE COURT: Okay. In terms of the probative value of the photographs, they're all appropriate. The government may offer them to show the phases of the victim's life. It does seem there may be some duplication in there that's unnecessary, so I think the government should be cognizant of that. But in terms of the numbers, a great many of them simply show the same thing and are therefore unnecessary. But they're also for that reason not inflammatory or otherwise prejudicial to the defendant. So the court will allow the photographs.

May we have the jury, please.

MS. TOMPKINS: Your Honor, quickly, I'm sorry. Just for the record, I just wanted the -- it to reflect that Ms. Williams' testimony will be both factual, that is, testimony that was received previously in the guilt phase that she will be testifying about facts about the arson and the murder, as

well as victim impact. So just for the record, the weight of her testimony or the length of it will be reflective that the government is calling her one time rather than twice for humanitarian reasons and that her testimony will be -- could have been cut up into two segments, one that was related to the facts and one as related to victim impact, and so the record reflects that.

MS. ROSE: And the same for the Allen family who can testify factually about Donnie's missing person's reports that were filed and their search for him as well as their victim impacts.

THE COURT: All right. That's efficient. May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: You may call your next witness.

MS. TOMPKINS: The government calls Kenneth Williams.

KENNETH WILLIAMS,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please.

A. Kenneth Williams.

Q. Can I get you to pull that mike a little bit closer. It works, just speak up. I know it's difficult.

A. My name is -- my name is Kenneth Williams.

Q. Do you go by Kenny?

A. Yes, ma'am.

Q. Are you married?

A. Yes, ma'am.

Q. And who is your wife?

A. Sharon Williams.

Q. What do you do for a living, Kenny?

A. I'm a locomotive engineer.

Q. Okay. How long have you been doing that?

A. Thirteen years.

Q. Are you Robin's brother?

A. Yes, ma'am.

Q. Older brother?

A. Younger brother.

Q. Younger brother. What's the age difference between you two?

A. About five years.

Q. Okay. And Robin was younger than you, correct?

A. Yes, ma'am.

Q. She's -- she was about five years younger?

A. Yes, ma'am.

Q. How old are you now?

A.   Thirty-five.

Q.   I'm going to show you what's been stipulated to admissibility Government's Exhibit 67Z.  Is that Robin?

A.   Yes, ma'am.

Q.   About how old was she when that picture was taken?

A.   Probably out of, you know, high school probably.  Last year of high school.  Probably about the twelfth, maybe.

Q.   Tell the jury about your relationship with Robin.

A.   It was a real happy relationship.  Fun.  We laughed a lot.  Played a lot.  Shared a lot of things together.  It's kind of hard for me because we was like a whole lot alike.

Q.   In what ways were you all alike?

A.   Well, you know, she was the type person that would protect other people's feelings to hide her own.  What I'm saying is is that she would rather see a smile on -- on you -- have you happy, but yet she was all right.  You know what I mean?  And that's the way I am, you know.  I like to see other people happy.

Q.   And Robin was the same way?

A.   (Affirmative nod.)

Q.   What was -- what was it like growing up with Robin?  What was she like as a young woman?

A.   Happy.  Fun.  You know, kind, soft-hearted.  You know, just an average kid that had, you know, say, full of life, you know.  Just like that.  Fun.

Q. Now, did there come a time where you moved out of the home?

A. Yes, ma'am.

Q. Okay. And was Robin still living at the home?

A. Yes, ma'am.

Q. And did your relationship with Robin change at all?

A. No, it didn't change. But I, you know, I moved out and I came back and forth. But we was basically -- our family is real close knitted, you know.

Q. And how did Robin fit into that?

A. She was really the piece that hold it together. You know, she was the one that instigated a lot of stuff. Laughter, and you know. She was really the one that held us all, you know, together and stuff.

Q. Kenny, I'm going to show you a picture that's marked as Government's Exhibit 67AA. Tell the jury about this picture.

A. What you want to know?

Q. When was that?

A. Probably back in '89, '90 maybe. Somewhere around in there.

Q. Was Robin -- how old was Robin about?

A. I don't know. I believe it was after she had graduated. What it is, see, I had the motorcycle in the yard because she wouldn't dare ride up and down the street with it.

Q. She wouldn't ride with you on the street?

A. No, she said, I ain't riding this thing.

Q. But she wanted to get her picture taken on it.

A. Yeah.

Q. I'm going to show you, Kenny, what's been marked as Government's Exhibit 67X. And if you don't mind holding that up to the jury. And tell the jury who each one of those people are.

A. It was me, that's my brother, that's my little sister, and that's my mother.

Q. And about when was that?

A. I don't know. I believe that was in about the sixth grade. Sixth or seventh grade, maybe.

Q. What was your role in the family when you all were growing up?

A. Well, me and my brother -- my mama worked in the morning time so we kind of made sure she got dressed, her hair was done. And I was kind of like the one that really, you know what I'm saying, protected her, you know. You know, I was always the one to know where she went. And if she was where she wasn't supposed to be, I go get her, you know. But, you know, we really -- we looked after each other. All of us, basically, are alike in a lot of ways. And I miss her.

Q. Now, Kenny, after the firebombing, did you go visit Robin in the hospital?

A. Yes, ma'am.

Q. Where were you when you learned of that?

A. I was out of town in West Virginia.

Q. Driving the train?

A. Yes, ma'am. The type job I have, I travel a lot. I take trains up the road and back down the road.

Q. Did you get back to Charlottesville to see Robin?

A. Yes, I did.

Q. And when she got back home, did you see her?

A. Yes, ma'am.

Q. And how was she?

A. She was all right, I guess. Like I could tell that she was upset, but, you know, she was kind of like -- she liked to reassure you that, you know, she was all right, you know what I mean, but yet she wasn't, you know, but I knew, you know, because all of us have this type bond. We could feel each other, you know. And --

Q. Now, Kenny, I'm going to -- on the day that Robin died, how did you learn of her death?

A. I was asleep and -- me and my wife was asleep and got a phone call and I -- and I hurried up and got in the car and drove -- drove down the street through stop signs and red lights, but I didn't know she was -- had died or nothing. I was just going to try to protect her. And when I got there, she was inside the ambulance and my mama told me to follow the ambulance to the hospital. And when I went there, they came

and told me.

Q.     What did you do?

A.     Whew.  I -- well, by then my -- my brother had came.  And I left out of the emergency room and walked across the street to like a little park to get myself together, I guess.  Then we got back in his car and went to the house.  I don't recall how we made it to the house, how we got to the house, but we got to the house.

And my mother was sitting on the porch with people and she said, Kenny, how is Robin?  How is my baby?

I said, Mama, she gone.  It's just like, you know, yesterday it happened to me.

Q.     What do you miss most about Robin, Kenny?

A.     I miss her smile.  She always had the same smile like that.  I miss her smile.  I miss her conversation.  I miss her laughter, you know.  I miss playing with her and hugging her.  Everything.

MS. TOMPKINS:  Thank you, Kenny.  I appreciate it.

MR. BENDER:  No questions.

THE COURT:  You may step down.

(Witness stepped down.)

MS. TOMPKINS:  The government calls Bertha Williams.

BERTHA WILLIAMS,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please.

A. Bertha Williams.

Q. Are you Robin's mother?

A. I am.

Q. How old was Robin when she died?

A. She was twenty-three.

Q. When's her birthday?

A. Her birthday?

Q. (Affirmative nod.)

A. June -- October 13th, 1972.

Q. So Robin would be thirty this year?

A. Yes.

Q. How old was Robin when she died?  Twenty-three?

A. Twenty-three.

Q. Now, you also have two sons, Kenny and Sidney; is that right?

A. Yes.

Q. How old were they when Robin was born?

A. I think Sidney was eight.  Kenny had just turned six.

Q. Do you have any grandchildren?

A. I've got one -- I got three, I think.

Q. Okay.  And what are their names?

A. Destiny is six and Tonya is fourteen, and I've got a

button. I've got one coming.

Q. Tell the jury what Robin was like when she was a little girl.

A. She was always an upbeat little girl. She was a great talker. She talked, turned cartwheels and run. That's what she would do all the time. She'd talk, turn cartwheels and run. Shy was always happy. Always upbeat. And everybody she met was her cousin. Everybody was her cousin. If you were an older person, you were -- they were her Granny. But all the young people were her cousin. Didn't matter who it was. I met some more cousins today, that's what she said.

Q. I'm going to show you, Ms. Williams, a picture marked Government's Exhibit 67A. Is that Robin's baby picture?

A. That's her. One of her baby pictures, yes, ma'am.

Q. I'm going to show you now Government's Exhibit 67B.

A. Those were some of her cousins. Those were some of her cousins. And she fed them. They would all run into the house to eat two or three times a day.

Q. All right. And I'm going to show you Government's Exhibit 67C. About how old was Robin in that picture?

A. She was about five.

Q. Now, I'm going to show you now Government's Exhibit 67Y. What was that a graduation from?

A. Her kindergarten picture.

Q. Was she a proud kindergarten student?

A.   Oh, yes, she was a proud kindergarten.  She was the hool-a-hoop champion.  At graduation she did all the hool-a-hoop things.  She took the hoop through her arms and up her legs and everywhere.  She was the center of attraction that day.

Q.   Show you what's been marked as Government's Exhibit 67F.  Is that a school picture of Robin?

A.   I think she was about eight.

Q.   Okay.

A.   Seven or eight then.

Q.   Now, as Robin grew up, what kind of little girl did she grow up to be?

A.   Well, she was a prissy little girl.  She turned cartwheels and did all kinds of things.  But when she went to kindergarten, she never would wear any pants.  She always wanted to wear a dress.  Never -- I never could get her in a pair of pants.  All the time it was a dress.  She never liked tennis shoes.  I'd buy her tennis shoes and she would take them outside and throw them away.  I'd go to try to find them and they were gone.  She was a great talker and she just loved people.  And she loved to scream and sing and dance.  And she just -- was just an upbeat child.

Q.   Did she -- show you what's been marked as Government's Exhibit 67V.

A.   That was the first haircut she ever had.

Q. And tell the jury about that haircut.

A. She was about thirteen and she had her hair cut and she had a stiff neck for a week.

Q. Why is that?

A. Because she didn't want her hair to be out of place. She walked like this (demonstrating) for a week. I said, What are you doing?

And she said, Look, at my hair, Mommy. Look at my hair. She just loved it.

All of her teachers talked about how she came in the classroom with her head up just so they would notice that she cut her hair. She had a stiff neck about a week.

Q. Now, tell the jury about your relationship with Robin.

A. Robin and I were inseparable. Wherever I went, she went. Whatever I did, she did. If I wouldn't eat it, she wouldn't eat it. If she thought I liked it, she liked it. She was my bed partner. She had her own bed. She'd start out in her bed, but she'd wake up in the morning in mine. Every time.

Q. And how --

A. All the time.

Q. How would you know she was in bed with you?

A. Because she'd put her cold feet on me and we'd fuss about get your feet off of me. Well, Mommy, Mommy. And she'd snuggle up. And she put some socks on her feet just to keep

me warm.

Q. Did you all --

A. She didn't like the cold.

Q. She didn't like the cold.

Did y'all have a Saturday morning standing date?

A. Saturday morning -- Saturday mornings was our time together. Whatever I wanted to do on Saturday mornings, she did. She didn't spend time with her friends at the mall until in the evening. But Saturdays was our day. She wouldn't have anything to do with her friends until after we were together.

Q. What did she call you?

A. She called me Mommy.

Q. All her life?

A. All her life. She'd run in the house and she'd grab me and dance me around in the floor and I'd say, Stop, stop, Robin, stop. And she'd grab me in a bear hug, hold me real tight, and then she'd rock me from side to side, and then she'd say, Ah, you all right, Mommy, and then she'd go on about her business. I miss her.

Q. Now, did Robin -- after Robin graduated from high school, what did she do?

A. She went to ECPI. She got a computer degree from ECPI.

Q. I'm going to show you Government's Exhibit 67M.

A. That's her. That's when she graduated from ECPI.

Q. What kind of degree did she get?

A. A computer specialist degree.

Q. And did she get a job in that field?

A. Yes, she got a job at the hospital.

Q. What did she do at the hospital?

A. She was a secretary there.

Q. Was she still living at home?

A. Yeah, she lived at home.

Q. What shift did she work?

A. She worked straight three to eleven.

Q. And how did she let you know everything was all right?

A. Well, every day at 2:30, any time between 2:20 and 2:30, because I worked days, the phone would ring in the department where I worked. And everybody -- there was 27 workers. Everybody knew at 2:30 when that phone rang it was Robin to tell me that she was going to work. I'm leaving now, Mommy, and I'll talk to you later. Nobody answered the phone because they knew it was her and they would yell at me, if I was in another room, they'd say, Bertie, that's your call, and it would be. It would always be her.

Q. She'd call you at work?

A. She'd call me to let me know she's leaving home.

Q. And what about at night?

A. She'd call me every night -- when she left home, she called me every night at 11:30 to tell me good night and tell me that she loved me. I'm going to bed now, Mommy. Good

night and I love you. Every night. Every night. I don't care what was going on, she'd call to let me know.

Q. Now, I'm going to show you a picture that's labeled Government's Exhibit 67Q. Do you know when that was taken?

A. It was taken on her job. I think that's her friend Ginger.

Q. That was her job at the hospital?

A. At the hospital. I think that's her friend Ginger.

Q. I'm going to show you a photograph that's labeled Government's Exhibit 67P.

A. That's holding my grandbaby, Sidney's child. That's Destiny. That's the baby that I had in my arms on that fateful morning.

Q. Now, Robin had a purple shirt on there. Tell the jury about the color purple.

A. That's her favorite color. She loved purple.

Q. Now, Ms. Williams, do you remember when Robin met Marc Barnette?

A. I remember.

Q. How was that -- how was that relationship? How did that go for you?

A. Well, when she met him, she told me she went out to a club one night and she told me that -- I got up on Sunday morning, went to church and I came home. She didn't go. And she said, Mama, I met somebody last night. And I said, You

did? And she went on to talk about him. She said, He seems like he's real nice, Mommy. He's okay. She said, He's going to call me later and I'm going to go get him. And I went on to church. And apparently he called her and she did go get him and brought him to the house, but I didn't meet him then.

Q. Did you meet him as they began dating?

A. As they began dating and she kept talking to him on the phone. He eventually came up and he went to church with her one Sunday and that's when I met him when he came up and went to church with her.

Q. And over the next year, did they date long distance?

A. They did.

Q. And did Marc come up and visit with your family?

A. Marc came up. He come up sometime on weekends.

Q. And how did y'all accept Marc?

A. We accepted him because Robin wanted him. We accepted him. We didn't -- we didn't know anything about him. But she liked him, so if she liked him, we liked him. We treated him like family. We never mistreated him.

Q. Did he come to Thanksgiving and Christmas and other family events?

A. Yeah, he was there. When he stayed with her, he was at Thanksgiving and Christmas. Whatever we had. Cookout, family outings. He was always included.

Q. How did Robin tell you that she and Marc were going to

move in together?

A.   Well, we were -- we were at lunch one day and she said, Mama, she said, Marc and I are going to move in together.

And I told her no.  I said, You don't know that much about this boy.  I said, Why you want to do that?

She said, Mommy, she said, I can't stay home forever.

And I just looked at her and I thought, well, she's right.  She's twenty-one years old.  She had her own job.  She had her own car.  She had her own savings account.  She worked -- made her own money.  She was a level-headed girl.  Very responsible.  Independent.  So I didn't have any other choice but to tell her, well, you're right.

The only drawback from that was he wanted her to come to North Carolina to live, and she said they had been looking at things in North Carolina.  But her brother Sidney told her no.  Said, If he's a man, he'll come here.  And so I guess she told him because he came to Roanoke.

Q.   All right.  And Robin moved out; is that right?

A.   She did.

Q.   Did Robin have a dog?

A.   She had a dog, Marcie.  She had it since she was about twelve years old.  Since she was about twelve.

Q.   I'm going to show you Government's Exhibit 67S.  Is that Robin's dog Marcie?

A.   That's Marcie.

Q.    And is that Destiny?

A.    That's Destiny.

Q.    Now, when Robin moved out, did she take the dog with her?

A.    He wouldn't let her have it.  She told -- he told her that he didn't like dogs.  Dogs make too much mess and shed too much and she couldn't have it.  But when he came up, he brought a cat.  He wouldn't let her have her dog, but he brought a cat.

Q.    Did she come back over to the house to visit her dog?

A.    Oh, yeah.  That was her dog.  She carried him around like he was a baby.

Q.    Now, after Marc moved up, did Robin ever give you any indication that things were not going well?

A.    Everything seemed to go okay for two or three months and about, must have been about June she told me, she said, Mommy, I'm not happy.

      And I said, Well, if you're not happy, send him home.

Q.    Is that June of '95?

A.    Yes, ma'am.  I said, If you're not happy, I said, tell him to go home.

      She said, Well, I'm going to see if we can work it out.

      But it continued and continued and continued and she couldn't ever, ever get rid of him.  She wanted to and she was unhappy.  Then she'd have some good days and she had some bad

days, I believe. Sometimes she'd come, she'd be real happy. She'd be just like herself. And some days she'd come home, she'd be down in the dumps. She'd be smiling, but you can tell by her facade that she wasn't -- she was upset.

Q. Did you direct her down to the Roanoke city offices to help her out?

A. I told her to go -- I said, Well, go downtown and tell them to come and send him out because it was her apartment; it was not his. They told her downtown that there was nothing that she could do. That if he was there and he was helping pay bills and things, that it was a money thing and that he had a right to be there. But they told her to write him a 30-day notice. And this didn't happen up until January. And so she wrote him a notice and she was scared to give it to him so she put it where he could find it.

Q. Did she know whether he found it?

A. Apparently he did because she never did see it anymore. She called me, she said, Mama, Marc has got -- he found the notice, Mama.

I said, What did he say?

She said, He hasn't said anything.

Q. Now, Ms. Williams, did you know that in June of 1995 the police had responded out to their apartment on Keswick Avenue?

A. No, I didn't know it until the last trial I heard it.

FORM FED ® PENGAD · 1-800-631-6989

She never told me.

Q. For the attempted suicide call.

A. They never told me that.

Q. Were there times when Robin would come home and spend nights with you while she was living with Marc?

A. Whenever -- whenever whatever happened, she would come home. I would always know when something bad really happened because she would come home and she stayed two or three days. And she'd come home and she'd come home and get in the bed with me and snuggle up. She never ever would tell me anything.

I said, What's the matter, Robin?

She said, Oh, Mama, I don't know what's wrong with Marc. And that was the only thing she would ever say. I don't know what's wrong with Marc.

And she'd stay for two or three days and then she'd come home or she'd call me from work and she'd say, Mommy, I'm going home tonight.

I'd say, What? I said, You're going home? I said, How do you ever expect to teach him a lesson if you're not -- if you're going to come home stay a while and then go back?

She said, I don't know, I'm going back.

Well, he would have called her and he would have called her and sweet talked her and she'd take him back.

Q. Did Robin want to help Marc?

A. Oh, yeah. She said, Oh, Mommy, he'll be all right. Oh, Mama, it will be all right. And she was always trying to protect him. I'd go to fussing, He'll be all right, Mama. He just needs some help. He'll be all right, Mama.

Q. Ms. Williams, do you remember a time when you went out to Robin's apartment on Keswick Avenue to bring her home?

A. I went out there one time to bring -- I went home one night -- went one night to bring her home. Wasn't the last time, but he had been in North Carolina for a week for some reason and she told me that he didn't -- she didn't want to go back to get him. She said, I don't want to go get him, Mama.

I said, Well, if you don't want to go get him, I said, leave him. She had made up her mind that she wasn't coming to get him.

And I was at work and some time he had called her and she called me and she said, Mommy -- she was down in the dumps, but she said, Mommy, I'm going to get Marc.

I said, What? I said, I don't believe that.

She said, Well, he called me. And I guess he had called and played on the -- crying or whatever he did on occasions and, you know, he just -- she just went -- sweet talked her.

Q. Did you ever --

A. And about three days after that, they called -- she called me and told me to come down and I went down there because he had hit her.

Q.   What happened when you got there?

A.   I walked in the house and he was just a ranting and raving and going on.  And I walked over to him and I said, Why are you hitting her?  And I hit him.  I said, You do not hit her.  Leave her alone.

And he said, Don't hit me.  Don't hit me.  I give you the utmost respect.

I said, I know you do and you need to give it to Robin.

I took Robin.  I said, Come on, Robin, let's go.

Robin and I left the house.  And he told Robin if she left, he was going to kill hisself.

And I said, Come on, Robin.  He's not going to kill hisself.

Robin got in her car.  I got in my car and we pulled off.  We got around the back of the house and we looked up and he was standing up in the bathroom window like this (demonstrating).  And she stopped the car.  And I stopped my car and I said, Why are you stopping?

Oh, Mama, he's going to kill hisself.

I said, He's not.  He's not going to kill hisself.  You come on.  And I made her come on home.  And I said, By morning, I said, he'll be all right.  He's not going to kill hisself.

And sure enough, 7 o'clock in the morning he called the house to talk to her.

Q. Now, Ms. Williams, when they broke up, Robin and Marc, did you go over to the apartment with Robin?

A. She had called me the night before and told me -- well, she -- think about it. She had called me the night before and told me to come and get her and I went to get her. And she was outside. She didn't have on any shoes. She didn't have on anything but a gown. She couldn't get in. He had taken her car. She -- Granny wasn't at home so she had to walk to the houses on the far side to call me to come and get her. And I went and got her and I took her in the car and we came on home.

Q. Was that the night that she was locked out and called the police?

A. She was locked out.

Q. Now, after --

A. Outside in the cold. Well, she told me, she said, Mama, she said she had worked twelve hours that day from seven in the morning to seven at night. She'd come home. And she said she took a shower and she had taken a shower and she laid on the sofa and something told her to unlock the front door. Apparently -- apparently, he had been arguing with her or something and she said she didn't want to go to sleep. She was afraid to go to sleep. But she drifted off to sleep anyway. And when she woke up, he was choking her in her sleep. He was choking her and she had to fight.

Apparently, he -- apparently, he went out there and got in her car and took off with her car because she didn't have a key. I didn't have a key because they had two keys so he had both the keys. Apparently, she run out to get to her car and she couldn't get back in.

Q. Now --

A. And that was the last straw for her.

Q. Okay. After that, they broke up?

A. She called North Carolina. She told his mama that he wasn't welcome back in her house anymore.

Q. After they broke up, did you go back over -- and Marc moved his things out, what did you and Robin discover in the apartment?

A. We went back -- we went back the night after he had come up and moved his stuff out. She went back to get her clothes and her clothes were covered with bleach. He had bleached all her clothes. She had clean clothes in the basket in the closet that she had washed. All her clothes had bleach all over them. Bleach all over everything. Bleach all down in her (inaudible) and everything. She didn't have any clothes.

She had been telling me before this, she would always come home, she said, Mama, I don't have any clothes.

And I said, Well, why? Because she -- she had a clothes fettish. She would always buy new clothes. She loved to dress. She had everything imagine. She was a dresser. And I

couldn't understand why she didn't have any clothes and I just thought maybe she didn't have any clothes because she didn't want to wear what she had. So we'd go out and we'd buy her more clothes. And she later told me that anything that he thought that she looked nice in, he got rid of. She wore it one day, wore it twice and she'd go back to get it and it was gone.

Q. Ms. Williams --

A. She had never told me.

Q. -- I'm going to talk to you a little bit about Robin's recovery after the firebombing. The jury has heard about the firebombing incident.

Did you stay with her at UVA Burn Center?

A. Yes, ma'am. I stayed the whole time except maybe about five hours I had to come home, but I never left her. Never left her side.

Q. And how did she do during her recovery at UVA?

A. She did really well, but she would scream out at nighttime. They would have to give her heavy medication because she would scream out at night that she would be so afraid and she would scream at night. And I'd have to go to her and take care of her.

Q. Ms. Williams, I'm going to show you what's been previously marked and introduced as Government's Exhibit 63D1 and 63D. Are those the compression garments that Robin wore?

A.   Yes, ma'am.  She had to wear them because of the burns on her arm.

Q.   Now, when Robin got back to Roanoke, did y'all order more of those?

A.   She ordered one for every outfit -- of every color.

Q.   And why is that?

A.   Because she liked to dress and she wanted everything to match.  So she ordered one of every color.

Q.   I'm going to show you what is marked as Government's Exhibit 63C.  Show that to the jury if you will.

          (Witness complied.)

Q.   What is that first?

A.   This is a gown that was sent to the University of Virginia from the hospital, the group of people that she worked with.  This was signed by all the nurses and the doctors and everybody that knew her.  They sent this to her for her to wear while she was there.

          MS. TOMPKINS:  Move admission of Government's Exhibit 63D (sic), Your Honor.

          THE COURT:  Let it be admitted.

          (Government's Exhibit Number 63C was received into evidence.)

Q.   And those were from her colleagues at Memorial where she worked?  Community?

A.   Where she worked at Memorial.

Q.    And that came to the burn center?

A.    Yeah, they sent it down.  They made it and sent it to her.

Q.    Now, Ms. Williams, I'm going to talk to you about the events of the morning of June 22nd, 1996.  Tell the jury what happened that day.

A.    Well, I got up around 6 o'clock because I was expecting my grandbaby to come so I could baby-sit her while her mother went to work.  I got up and went and sat out on the front porch and read the paper waiting on her to come.  She's supposed to been there by 6:30 and she was just a few minutes late.  So when she did come, I got the baby and I went in the house and sat her in the floor in the den and cut on the TV so she could watch the cartoons and I went in the kitchen to make brownies because we were having a bake sale at church.  And as soon as I got the brownies made and got them in the stove, I went back in the den where she was.  It was about 7 o'clock.  And I sit down in the chair.

      And all at once I heard this big boom.  I said, What is that?  And I got up and I looked around the door to look.  I said, My stove must be blowing up.  I was a nervous person so I wouldn't go.  I wouldn't go look.  I just sit back down.  Then I heard it again.  I said, What in the world is that?  So I got up and I went and looked out the front door and looked around the back of the house, but I couldn't see my back door

because the way my house is made, and I stepped back in the house and I heard it again.

And by that time Robin had run down the steps and she said, Mama, what is that?

And I said, I don't know. I said, I don't know, Robin. I said, It must be Marc.

And she started turning around and around and around in the floor. She said, Oh, Mama, what must I do? What must I do? What must I do?

I said, I don't know, Baby. I said, I don't know, Baby. I said, Just run. Just run.

And I had the baby in my arms and she run out the front door and I was standing looking at her running up the upgrade by the apartment house. And I turned around and when I turned around, Marc was standing looking at me. And he brought his gun down and throwed it on me. And I said, Marc, don't shoot my grandbaby.

He said, Where is she at? Where is she at?

I said, She's running. Leave her alone. Out the door he went and up the upgrade. And I said -- I run back in the house and I picked up the telephone and there was no dial tone. And I went out on the porch and I started screaming. By that time my brother was down. Had come from the back of the house down the steps. And I said -- I started screaming for anybody, Help. Help. Call 9-1-1. I said, This boy is

going to kill my baby. Call 9-1-1. Call 9-1-1.

Then I run across the street and I could hear them coming over the hill and she kept telling him, No, I'm not going. No, I'm not going. By the time I got around, they were down middle ways to here.

I walked across -- started across and Robin started away -- I said, Leave him -- leave her alone, Marc. I said, You have already disfigured her for life. Leave her alone. I said, Come on, Robin. And she started walking away and I caught her by the arm and we started back. And by the time she stepped up on the knobbed upgrade of the -- the yard, he shot and she threw up her hands. And I looked back at him. He brought that gun down and shot again and she fell. And she fell.

I said, Oh, she fell. Oh. And I got down to assess her body and I said, Oh, he shot her in the side. And I grabbed her and I said, Robin, hold on, Robin. And she went huh, huh (demonstrating). That's when she -- she was just gasping for her breath. And I said, Oh, Robin, wait a minute. Hold on, Robin, hold on.

And I run -- I ran to Sonji's and I said, Give me the phone. Give me the phone.

And she said, I don't have a phone that come down the steps. I said, I need the phone. I need the phone. So I ran up to her porch and I called my pastor and I said, Pray.

Pray. I said, This boy has shot Robin. Please pray. Pray.

And I run back down. I ran back down and I ran back to her body and after I got to her body and then the policeman came. I said, Please don't let my baby die. I said, Please, please don't let my baby die. And then -- then the ambulance and everything came. And I said, Is she dead? Is she dead? Is she dead? Is she dead?

And they said, I don't know, ma'am. Then somebody told me, Well, I got a little pulse.

And I thought, Oh, no, no, and I knew she was dead. She just died. She just died. He just shot her and she just fell at my feet.

She was petrified. She couldn't say anything. And I said, Come on, Robin. Come on, Robin. And she just looked at me and just walked away. She couldn't say a word. She was so afraid.

Q. Ms. Williams, did Kenny and Sidney come over later that morning?

A. Somebody called -- somebody called him. I don't know who called him, but Kenny came. And I sent Kenny to the hospital. Somebody went to Sidney's job and told Sidney and Sidney came and they went to the hospital.

Then they came home and I said, Kenny, is she -- is my baby dead?

And he said, Mama, she's gone. She's gone.

I didn't get to tell her good-bye. She was the joy of my life. Marc knew she was the joy of my life. The only little girl I had. The only little girl I had.

You knew that, Marc. You took her life. Took away her future. You know how much she meant to me.

Q. Ms. Williams... Ms. Williams, that morning, do you remember praying?

A. How could you do that, Marc?

MS. TOMPKINS: May I approach?

A. How can you kill my baby? Why you kill my baby, Marc? She loved you, you know that. She never mistreated you, Marc.

I'm sorry. I'm sorry. I'm sorry. I apologize. I apologize.

Q. Ms. Williams, every year do you all remember Robin by putting a memorial in the newspaper?

A. Yes, ma'am.

Q. Show you Government's Exhibit 68.

A. We put one on her birthday every year.

Q. And y'all have done that every year?

A. Yes, every year. I don't want her to be forgotten. She was such a good person.

Q. Ms. Williams, I'm going to show you what's been marked as Government's Exhibit 63E. If you can, did you -- did you write a poem after Robin died?

A.   I did, yes, ma'am.

Q.   And is that a copy of the poem?

A.   Yes, ma'am.

MS. TOMPKINS:   Move admission of Government's Exhibit 63E.

THE COURT:   Let it be admitted.

(Government's Exhibit Number 63E was received into evidence.)

Q.   If I could get you to take a deep breath.  Could you read that poem to the jury.

A.   The name of my poem I wrote for her is Stuck at 23!

There should have been a college degree.

There should have been wedding bells and the patter of little feet.

There should have been more laughter, hugs and kisses for me, (Mommy).

But now you're stuck at 23!

How can I forget how much you loved me, and how many times we always agreed.

How you knew my wants, my needs, and the way we cared -- and the way you cared for me.

But now you're stuck at 23!

I love you, my daughter.  You meant the world to me.

So soar like the angel that I know you to be.

Now you are free, free, indeed, although you're stuck at

23!

MS. TOMPKINS: Thank you, Ms. Williams. I don't have any further questions.

MS. LAWSON: No questions.

THE COURT: You may step down, Ms. Williams.

THE WITNESS: Thank you.

(Witness stepped down.)

MS. ROSE: Government will call Shirley Allen.

SHIRLEY ALLEN,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Good morning. Would you introduce yourself to the jury, please, ma'am.

A. Shirley Allen.

Q. And Ms. Allen, where do you live?

A. In McConnells, South Carolina.

Q. And you're married to Mr. Allen?

A. Yes.

Q. Bob Allen. How many children do you have?

A. We have five.

Q. What are their names and ages?

A. David is the oldest. He's forty-five. And Dennis is the next. He's forty-three. And Denise is, I think, forty-one. And Dean is thirty-nine. And there's eleven years between

Dean and Donnie. Donnie, if he was living, he'd be twenty-eight.

Q. He would be twenty-eight.

A. Yes.

Q. Now, Donnie came last and later in life for you.

A. Yes, he did.

Q. Would you tell the members of the jury about that. You found out you were going to have another baby eleven years after your last.

A. Well, I mean, you know, we really wanted another child. And, of course, the older children, they was real shocked and surprised, you know, that we was going to have another child. And -- but we all was very excited about it and, you know, we looked forward to him coming and all.

Q. Did he come a little sooner than expected?

A. Yes. He came three months early. He was born in March and he wasn't supposed to be born until June.

Q. What was Donnie's birthday?

A. March the 30th, 1974.

Q. And how much did he weigh when he was born?

A. He weighed 2 pounds 14 ounces.

Q. I'm going to show you Government's Exhibit 66A. Stipulated admission. Was that taken how long after his birth, his premature birth?

A. Probably -- he was probably about two days old.

Q. How long was he in the hospital?

A. He had to stay 48 days.

Q. And back in 1974, premature birth, particularly 2 pounds, was significant.

A. Yes. Because he -- he lost down some of his weight. I think he lost down about 2.9 and it took 48 days for them to get him back up to around 4 pounds when we brought him home from the hospital.

Q. He spent quite a bit of time there. It was a little bit of a miracle for him to live?

A. It sure was because they only gave him a 25 percent chance to live when he was born.

Q. And as he grew up, describe his relationship with his siblings.

A. Well, by him having older -- two older brothers and an older sister and, of course, Dean was eleven years older than him, he was just a joy to everybody. They all shared. And he had to be fed every three hours and it would take an hour to feed him and we would take turns, you know, taking care of him. They all helped me. We all shared in his care. And Denise especially. She was, you know, she's just like another mother to him. She was thirteen. And they just -- I was lucky to even spend time with him because they was all fighting over who was going to take him riding or who was going to take care of him and he was just a joy to every one

of us.

Q. Now, as -- what kind of young man did he begin to grow into?

A. He was just happy-go-lucky. He, you know, he was just -- we just showed him all the love and everything and he just loved everybody he met. You know, anybody that ever met him, they'd always remember him because it didn't matter what age, the little kids, our younger grandchildren, he would just take and play with them. And if we had a church thing, he would take the little babies and hold them and he'd go around, he'd hug all the older ladies, the widow ladies in the church. When he come in on Sunday morning, it didn't matter who it was, he went around hugged everybody.

Q. Now, he was younger. Did he and his father have a --

A. They were very close, yes. And he always -- our other children call my husband Dad and Donnie called him Poppa.

Q. As he got a little older, he got involved in sports.

A. Yeah, he was a good baseball player. He loved sports.

Q. When he got into high school, he grew to be a tall young man, didn't he?

A. Yeah. He was a little over 6 foot. Maybe something -- maybe 6'1".

Q. And what kind of hobbies did he engage in during high school?

A. Well, he -- he was on the golf team. He won, I think,

his team won the top honors, I think, the year before he graduated in '92. I think it was '91. And he was an excellent golfer and he practiced all the time. He would go and hit golf balls at driving ranges. He'd get out in the backyard and hit golf balls. Matter of fact, my husband, we still find golf balls where he'd hit them way back in the back of our property.

And I know our grandson Josh, our oldest grandson Josh, he has kind of taken up golf. Donnie told him, said, Josh, if you're going to be good at it, you've got to get out and you got to work at it. You got to practice, you know. And he always tried to advise the younger grandchildren what, you know, to get out and give it your all, in other words, you know, if you're going to go after something.

Q. Did -- in fact, did he get a scholarship --

A. Yes, he won a --

Q. -- to further his education?

A. He got a golf scholarship and he went to York Tech and --

Q. What did he study there?

A. Auto mechanics, I think. And I don't know, several different things.

Q. And where was he eventually employed after he finished his education?

A. Well, he worked at Spring Lake Country Club, you know, all during his high school. And he went from there, he had a

friend that he would go see and he kind of taught him how to work on these big greens mowers and things. And so this man knew some of the people that worked at Jacobson Textron and they told them about Donnie and he helped Donnie to go put -- you know, told Donnie about it. He went over and put his application in and he was working at Jacobson Textron as a technician. He worked on those big mowers all the time.

Q. Now, at some point -- did he have some other hobbies other than just golf?

A. He loved to hunt. Our oldest son David, he got Donnie interested in hunting. Or he just -- well, he had a best friend, Brian Jones. He and Brian would go hunting together. They would go any kind of hunting. He loved to deer hunt and he -- David -- he had just bought him a bow and some arrows and he was trying to learn to shoot the bow, you know. He would go out in the yard with a target and a bale of hay and practice shooting and he was -- he was always -- he would always just hit it dead center. I'd watch him. He was real good at it, you know.

Q. Did there come a time when he had worked and earned some money and wanted to purchase a new car?

A. Yes. Well, first he got -- he had a little show truck and he would take it. He would work -- he would go to all different places and take it and show it. And it was real low to the ground. It wasn't a real practical vehicle. And he

said he wanted to go buy him a car that he could drive, you know, go and -- it would be better, you know, he could get around in it better and he didn't want to mess his little show truck up. So he took his show truck, which he took it and traded it in on his Honda. And, of course, they give him way far less. He wouldn't let his dad go with him or didn't ask his dad to go with him and he wanted to do it on his own. Dean went with him and they went and --

Q. And did he get the -- his blue Honda Prelude?

A. Well, yes. He told me he was going to get a red one when he left. He said, Mama, I want a red one.

I said, You get whatever color you want, you know.

So he came back and he had a blue one, the dark blue. And I said, Well, why did you -- he blowed the horn and we went -- I went out and looked at it. And I said, Well, Son, why did you get a blue one?

He said, Well, Mama it had everything on it that I wanted on it. And he said, And I know your favorite color is blue so that's why I got blue.

Q. Government's Exhibit 66L. Is that the car --

A. Yes, it is.

Q. -- that Donnie owned?

A. Yes, it is.

Q. Would you tell the members of the jury about Friday evening, July 21st, 1996 (sic).

A. Well, we had all worked that day, Dean, Bob, Donnie and I. And I was real tired. We was all real tired. Donnie was, matter of fact, was the last one to come in that evening. They had grilled steaks out and had a big meal at work. They'd always on their breaks, they'd go out and play horseshoes and do things, you know, or they would all bring food and they would share a meal together. And I had picked up some pizzas for dinner that night because I was too tired to cook. And I asked him -- he came in and I asked him, I said, Would you like to have some pizza.

He said, No, mom, I ate a big meal and I don't want anything right now.

So we was all just resting and I had one of my legs, I had -- it was hurting real bad and I just went in the bedroom and just stretched out across the bed and put a pillow under my leg and we -- you know, Dean was out -- we was all doing our own thing, so to speak. And Bob was outside doing something.

And when I got up, I asked Bob, I said, Where is Donnie? He said, Well, he just walked by me. He was in the laundry room washing his hands and he said, Donnie walked by me and I asked him, I said, Donnie, where are you going? And he said, Well, I'm just going out for a while, Dad -- or Poppa. He always called him Poppa. And he said, I won't be gone long.

And we -- we trusted him. I mean, you know, he would go

out. He was twenty-two years old. But he would always call in if he was late or, Mama, you know, I'm over here hanging out. I'll be home after while, or whatever. And you know, we don't -- we didn't ask him exactly where he was going. You know, and what he was going to do because, you know, we knew he would be okay.

So my husband told me he had gone out. And we -- it was midnight or after and my husband went to bed. And Dean, I told Dean, I said, This is not like Donnie. He just don't stay out at night. He just don't do it. At least he would call. And I sat up all night that night, but we never did get a call.

So on Saturday we had to go to a wedding in Mt. Holly, North Carolina, and Donnie was going to go with us. And I kept telling my husband, I said -- and he was supposed to go to his hunt club that morning for a meeting real early in the morning. I said, I can't understand because Donnie would have been here because he was going to go to his hunt club meeting and then go to the wedding with us in Mt. Holly.

And so we got up and I was -- I could -- I knew something was wrong but, you know, you just think, well, I'm going to go ahead and do this. So we went on to the wedding and Denise was at the wedding and I told her, I said, Denise, Donnie didn't come in last night. She said, Mama, this is just not like Donnie. And I said, No, it's not. So we went on and

went to the wedding.

We come home that afternoon. I told my husband, I said, We got to go out and hunt him. Something is wrong. And I think -- and I said, well -- my husband said, Maybe he'll call. Maybe he's just spending the night with somebody.

And so he didn't call and so we went on -- we went out hunting. He had previously been going with this girl. He was engaged to her from '95 -- August -- in August, he got engaged in 1995, and they broke up in January 1996, and I thought maybe he had went to see her, you know. And we didn't know exactly where she lived. And we -- she lived in a trailer park and we hunted and hunted. We couldn't find his car or, you know, and so we went on. I said we're going to have to do something. So we went to Moss Justice Center in York.

Q. And what day is this again?

A. This was on a Sunday, I think. Sunday morning.

Q. Did you go to church that day?

A. Yes.

Q. Did you go to the sheriff's department before or after church?

A. After church. And we went up there and we put out a missing persons bulletin on him.

Q. Gave them the information about his car?

A. Yes.

Q. When he was last seen?

A. Gave them everything, uh-huh.

Q. Did you make it to church that night?

A. No.

Q. Was that rare for you and your husband?

A. Yes, it was. And we called all the other children and told them, you know, Donnie was missing. And Dennis, he packed -- he just come on down there. And Denise took her children to her mother-in-law's. And they just moved in. They was there. And David. All the other children just came. And all of our friends. The whole house was just full of church friends and family.

Q. By -- by Monday evening or Tuesday, what's happening at your house?

A. Well, it was Monday evening, Dennis was answering the phone, I think, and David or some of the children in the bedroom. And they said -- they come in there and asked me, said they -- or told us that they found Donnie's car and it was locked and they wanted to know, they said the policeman wanted to know if we had a key. And I said, Yes, in there on Donnie's desk in his bedroom is a key.

And so Dennis, I think one of the other children went in there and got it and it was about three or four carloads of Donnie's friends, our family that went over. They told them where to come and they went over there. And of course, our son-in-law Kenny from Mt. Holly, he got there before all the

rest of them got there, and Kenny and his friend found the gun in the dumpster in the back and Donnie's car was sitting there. And they knew something was wrong because Donnie always kept his car immaculate. I mean, it was clean all the time. There was dirt and stuff all in the inside of the car. You know, they could look in it.

Q. Now, when did you -- when did -- how did you learn of your son's death?

A. Well, it was -- let me think. Tuesday we was all still in shock, like I said, and everybody -- we just had friends that just took over. They brought food in. And we was all around and it was in the afternoon. Bob and the children knew it before I did because they had called and told them that they found a body on Morris Field Road and they was pretty sure it was Donnie's. And they wanted to know -- which I didn't know at the time. They was asking about Donnie's necklace with a cross and his watch. And so they was pretty sure and all about it.

And Dennis came in and asked me who Donnie's orthodontist was and I told him. And see, I didn't know they was going to get the dental records, of course. I couldn't put it together because I was still in such shock. I just, you know, walking around like I didn't know what was going on.

So finally, they knew it was Donnie's body and my husband came in and told me that they had found him. And then I

walked by the TV and it showed them bringing Donnie's body out and it was -- I just can't tell you how bad it was.

Q. How -- I don't know if you can put in words the loss of your child, but how has Donnie's murder affected your family, affected you?

A. Oh, it's -- our lives is -- will never be the same. It just -- he was such a joy and he just -- I mean, like I haven't slept a full night in six years. I sleep like two hours at a time. And I wake up 2 o'clock every morning and I couldn't figure out why. I kept telling Denise and my children, I said, you know, I can't figure out why, but every morning at 2 o'clock I'd wake up. Then I found out that was when Donnie died.

Q. Did you -- show you Government's Exhibit 67K. When was this picture of Donnie made?

A. That was his senior school -- well, that was at his senior prom picture.

Q. And did, after Donnie's death, someone in the family find a poem that was meaningful to you that has brought some comfort to you?

A. Yes. Denise, our daughter, she seen this in a -- a poem in a book and she ordered all of us a copy of it and had Donnie's picture put to one side and had it framed and his birth date on there and the date of his death on there.

Q. And that's this photograph --

A.   Yes, that's --

Q.   -- that's contained with the poem?

Did you bring a copy of that to share since it's brought a lot of comfort to you?

A.   Yes.  I don't know whether I'll be able to read it.  I'll try.  Let me see.  I think this is the wrong paper because it doesn't have the poem on it.

Q.   That's okay.

A.   Okay.

Q.   It's at line 5.

A.   Pardon?

Q.   At line 5 on your piece of paper.

A.   Line 5?  Oh, I'm sorry.  Excuse me.  I was looking up above.

It said, I'm free.  Don't grieve for me for now I'm free.  I'm following the path God laid, you see.  I took his hand when I heard him call.  I turned my back and left it all.  I could not stay another day to laugh, to love, to work or play.  Tasks left undone must stay that way.  I found that peace at the close of the day.  If my parting has left a void, then fill it with remembered joys.  A friendship shared, a laugh, a kiss, oh, yes, these things I too will miss.  Be not burdened with times of sorrow.  I wish you the sunshine of tomorrow.  My life -- my life's been full.  I savored much, good friends, good times, a loved one's touch.  Perhaps my

1007

time seemed all too brief. Don't lengthen it now with undue grief. Lift up your hearts and peace to thee. God wanted me now. He set me free.

Q. And were those sentiments the kind that you would expect from Donnie?

A. Yes, it was.

Q. From his personality and his feelings?

A. Yes.

MS. ROSE: Thank you for sharing. I have no more questions.

MR. BENDER: No questions.

(Witness stepped down.)

MS. ROSE: Denise Allen, if you would come around, please.

THE COURT: We'll be taking our morning break.

MS. ROSE: Okay.

THE COURT: We'll take our morning break, members of the jury. We'll call for you.

(Brief recess at 11 o'clock a.m.)

THE COURT: Are the parties ready to resume?

(No response.)

THE COURT: May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: All right. You may --

MS. ROSE: Denise Allen, come around, please.

DENISE ALLEN HOGUE,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.    Would you introduce yourself to the jury, please, ma'am.

A.    Yes.  My name is Denise Allen Hogue.

Q.    And you live here in Mecklenburg County?

A.    Yes, I do.  I live in Mt. Holly.  No, I live in Gaston County.

Q.    And you are Donnie's only sister.

A.    Yes.

Q.    Whenever you learned of Donnie's disappearance, did you help your family as you all were looking for him or trying to find what might have happened to him?

A.    Yes.  I found out on Sunday that he still wasn't home and so I went to my mom's.  I had to wait till the next morning to go down there because I had to take my children to my mother-in-law's house, and I went straight down there.  We were sitting at the house and just waiting and hoping for some word and I just said I can't just sit here.  I've got to do something.  So I got in my car and rode up and down the road near their house and just looked.  Just called his name and looked in ditches and everything.  Just hunting him.

Q.    How long did you do that that day?

A.    I don't know.  Hours.  I really don't know how long.  The

preacher stopped and would check on me because I was by myself, but I just couldn't stop. And while I was looking, I just had a real overwhelming feeling come over me that he's not with his car. At one time I thought maybe, you know, we thought maybe a bad wreck. But I just thought, no, he's not with his car. And I went from praying, Lord, just let us -- let him be okay to just, Lord, let us find him.

Q. At that point did you go home and help your parents put together a flyer?

A. Yes, ma'am. Yeah, I went home and -- well, and then I went back out to look some more and I was showing his picture and this lady asked me in the hardware if I had thought to make up flyers, and I said, oh. And of course, I hadn't. I was just addled. So I made these flyers up and then just started distributing them around.

Q. Okay. Where did you distribute them?

A. Down around the York area where Mom and Dad live and then I had gone to Rock Hill and was getting hundreds of them made. And we were on our way, we were getting ready to go to the Charlotte area because we thought possibly he may have gone over there that evening, and that's when something told me to call home. And I called home to check on things and my brother Dennis answered the phone and he told me to get home, to get back there.

Q. You got back to your parents, what did you find?

A.    Well, I was with some friends at that time.    They were going to help me put out the flyers and they wouldn't let me drive back to my mom and dad's.    They drove me back there. And we got there and Dennis, my brother, met me out in Mom and Dad's garage and he told me at that time that they had found a body on Billy Graham and Morris Field Drive and that they thought it was Donnie, possibly Donnie.    And he said, Sis, if you don't think you can go in there, we haven't told Mom yet, and if you think you're going to get too upset, don't go in there.    And I said -- Dennis just looked at me.    I couldn't cry or anything.    You know, I didn't want to believe it.    I didn't want to accept it.    So I just went on in the house and stayed in the living room and we just kept quiet because we wanted to know for sure before we told Mom anything.

Q.    Your dad knew at that point that they had found the body.

A.    Yes.

Q.    And you all had given some family member information about Donnie's orthodontist --

A.    Right.

Q.    -- for dental records?

A.    Dennis came into the kitchen and asked mom about -- he started out telling my mother that Caleb's teeth were protruding and he was going to have to have braces and just went about it like that in a nonchalant way, and my mom

started telling him, oh, yeah, you know, who Donnie's orthodontist was. And I was sitting beside my cousin in the couch in the living room and I knew as soon as I heard that, oh, my Lord, they're going for the dental records. And I think that's when I really knew, you know. But then they came out shortly after that, Dad told Mom they had found Donnie.

Q. Now, after Donnie's burial, did you learn of a special request he had made to one of your children?

A. Yes, I did. My oldest son is 19 years old. He's handicapped, in a wheelchair. And he looks almost identical to Donnie. He really looks a lot like Donnie.

Q. Is he, in fact, here at the courthouse?

A. Yes, he is here today.

Q. What is his condition?

A. Well, for insurance purposes they put cerebral palsy, but he really doesn't exactly have cerebral palsy. He was premature like Donnie was and they had to do an emergency section and take him. He just didn't get the oxygen he needed at some point in time right before he was born or right after possibly, too, and has brain damage.

Q. And he's wheelchair bound?

A. Exactly. Total care.

Q. Can he communicate?

A. No.

Q. And you say he looks a lot like Donnie?

A. Yes, ma'am, he does. And Donnie had -- the way I found out about it is Mom called me -- I can't really remember if it was Mom or Donnie that actually called me and asked me for my social security number. And because of Brandon, my son, Donnie wanted to put me on his life insurance policy because of Brandon. He told my mother if anything ever happened to him, he wanted Brandon to be taken care of.

Q. And after his burial, did you learn that he had, in fact, made you and Brandon the beneficiary of his work benefits?

A. Yes, I did.

Q. Did you at a later time put together just some quips from family video footage of particularly Christmases and things with Donnie?

A. Yes, ma'am.

Q. Tell us about that.

A. Well, like I say, it was get-togethers. We always get together every Christmas, Thanksgiving, and all of our birthdays. At one time we got together for everybody's birthday, but the family is so large we kind of cut it down to just the grandkids. But a lot of the pictures are from all our get-togethers and Donnie's on there a lot going around hugging everybody. He was always giving everybody hugs, thanking them for presents and smiling real big like he always did.

Q. And the -- does it have footage of his last Christmas

with the family?

A.   Yes, it does.

MS. ROSE:  Your Honor, that has been marked as Government's Exhibit 62 and I move for its admission and permission to play a portion of that at this time.

THE COURT:  It will be admitted.

(Government's Exhibit Number 62 was published to the jury.)

A.   That Christmas they gave him a truck, a little car truck.

There he was saying, I got to give out hugs.

Q.   How old was he here?

A.   That was right after he had his braces off.  That's when I was telling him to show me his pearly whites, and I'm really not exactly sure how old he was.

Q.   Did Donnie's car have some special significance for him, the blue Prelude that he had bought?

A.   Yes.  He was real proud of his car.  It was his pride and joy.  He always kept it shined up and cleaned.  And like Mom said, he knew Mom's favorite color was blue and that's one reason he got a blue car.

And we were going to try to sell it afterwards, but I cleaned it up and I told my husband, I said, You know, it's kind of hard to put that for sale sign in the window.

And he said, If you don't want to sell it, don't sell

it. You know, you can't change your mind later.

So I went straight out there, took the sign out of the window and kept his car.

Q. Just a part of Donnie.

A. Yes. Just couldn't let go of it.

MS. ROSE: All right. Thank you.

MR. BENDER: No questions.

THE COURT: You may step down.

(Witness stepped down.)

MS. ROSE: Bob Allen, would you come up, please.

BOBBY GENE ALLEN,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Would you tell us your name, please, sir.

A. My full name is Bobby Gene Allen. I go by Bob.

Q. All right. Mr. Allen, you live in McConnells, South Carolina?

A. That's correct.

Q. We've met some of the other members of your family. How long have you and Ms. Allen been married?

A. Forty-eight years.

Q. Did you grow up in South Carolina?

A. Down near Grover. In the edge of South Carolina.

Q. Just briefly describe your upbringing.

A.   Well, we were a poor family.  My dad was a sharecropper. We moved from one place to another.  Then when we got out of school, then, we would pick cotton and look after the farm work.  Then we went to public work.  Then Shirley and I got married and moved to Mt. Holly, raised our children.  We lived in Mt. Holly for thirty-two and a half years.

Q.   Now, did you and Donnie, with him being your youngest, have a special relationship?

A.   Yes, we did.

Q.   Tell us about that.

A.   Well, we were close.  Donnie was special to the whole family.  By being born prematurely and we didn't get to take him anywhere for two years because they wouldn't let us take him out of the house because he was so young and they was afraid he would get some germ.  We couldn't give him his polio shots until after two years of age.

And then he grew up and we would play games together.  We would -- I took him hunting.  Built a tree stand in a cedar tree and I took him with me and I climbed up in that tree and pulled my rifle up on a rope.  I told Donnie, I said, take the loop in that rope and put it over your head and under your arms.  And I said, Climb up here with Poppa.  He always called me Poppa.  I said, You won't fall, because he was afraid to climb.  And he did that and we spent the better part of that day in that tree looking for deer.  We didn't get anything,

but we enjoyed the day in that tree together.

Q. Did you and Donnie enjoy many days together just the two of you?

A. Yes, we did.

Q. What other hobbies did he have or activities did the two of you enjoy together?

A. Well, he was a good golfer. He won the club championship, junior club championship in York in 1992. He and I would go to Cowens Ford Country Club up on Lake Norman. We were members up there. And we would play in the father/son tournament, and very seldom we would come in over third place. He was an excellent golfer.

Q. And that, of course, helped him with getting a golf scholarship for his education.

A. That's correct.

Q. And after that he began work at Textron.

A. That's correct.

Q. Did you have an opportunity to talk with some of his coworkers and supervisors about his work performance?

A. Yes, I did. His supervisor called me one day and talked with me about him. He told me that -- he said, Mr. Allen, I'm not telling you this because he's your son, but he says, we're very fortunate to have Donnie as an employee. He said, He is the most mature twenty-year-old I have ever seen.

Donnie had gone to Madison, Wisconsin, and gone through

school out there and he would -- would have gotten a raise the week after he was killed.

Q.   Now, Donnie lived at home with you and Mrs. Allen.

A.   That's correct.

Q.   If you would, just describe the last time you saw your son.

A.   Well, I had been in the garden tying some tomato plants up.  I was in the laundry room washing my hands.  Donnie had come in from work and he had laid down and rested a little while.  And he came by me in the laundry room and he said, Poppa, I'm going out a while.  I'll be back after while.  And I didn't realize that would be the last time I'd ever see him.

Q.   Did you know that he liked to go to Coyote Joe's to play pool?

A.   Well, we didn't know at that time where he had gone.  We talked to Dean.  My wife and myself had gone to Pidgeon Forge for the weekend prior to that and Dean told us that Donnie had gone to Coyote Joe's and had met a girl over there.  So that's where we began our search was at Coyote Joe's.

Q.   Was pool one of his hobbies?

A.   Yes, it was.  He and I purchased a pool table together. He asked me if I would go in with him and buy one, and it's in our garage now.  And he played pool regularly.

Q.   When Donnie didn't come home that evening, was that

unusual?

A.    Yes, it was.  Donnie always called if he was going to be late.  He would go by his friend's house, Stanley Chambers, and he would find out what they had for supper and he'd call home and see what we had, and he would decide whether he wanted to eat with Stanley and his wife or come home and eat with us.  So he always kept in contact with us.

Q.    Saturday morning rolls around, what do you and Mrs. Allen do?

A.    Well, he didn't come in and we were concerned about it.  But being a twenty-two-year-old and going out and meeting a young lady, we figured maybe, well, we'd give him the benefit of the doubt and he'd come in later that day.  So we did not -- was not too concerned about it at that time.

Q.    As the day progressed, what happened?

A.    Well, we were more concerned because he was supposed to have come in and gone with us to a wedding that afternoon.  And then later we found out that he was supposed to have gone with Stanley to their hunt club and done some work at their hunt club.  So we were real concerned about it then.

Q.    Did you go on to church as usual on Sunday morning?

A.    Yes, we did.  We went to church services and we had a covered dish dinner after the service and my wife and myself was on the hospitality committee and we were looking after everything there at the dinner.  And some of our friends came

up to us and told us, says, You just don't seem like yourself today. And we didn't tell them what the problem was, but -- that we were concerned about Donnie not coming home.

So later that day, Shirley and I went out and we begin to ride around and see if we could find the girl that he used to be engaged with. And we met a highway patrolman and they -- there were two gentlemen in the car and they pulled into York Seafood, and I pulled in behind them, got out and talked with them and told them what the problem was. And they told us to go down to Moss Justice Center and file a missing person's report. So --

Q. And Moss Justice Center, is that part of the York County Sheriff's Office?

A. Yes, it is.

Q. Now, did Donnie regularly go to church with you and Mrs. Allen?

A. Yes, he did. Donnie went to church with us Sunday mornings, Sunday nights and Wednesday nights. He was a regular church goer.

Q. So when he didn't meet you at church Sunday, you were particularly concerned.

A. Yes, we were.

Q. After you filed the missing person's report, what did you then do?

A. Well, we just went home. And on Monday we got a call

that they had located his car. The South Carolina Highway Patrol out of Chester called us and told us. And we went to East Independence Boulevard to where his car was and took the key. And our son-in-law was over there and they had found the shotgun. I gave them the key and they opened the trunk of the car. And of course, they took pictures and everything. They sent us on home. We left from there with the --

Q. Even though they found Donnie's car, were you still making efforts to find him?

A. Yes. We went out Tuesday. I told my wife and my daughter, I said, I'm going out and hunt our buddy. I said, He may need some water. I filled two thermos bottles with water and carried them with me.

Q. And what was your purpose in carrying some water at that point?

A. I thought maybe that he may have been tied to a tree or something somewhere and that we might be able to find him. That's the reason I did that. And we went out and that's when we went to Coyote Joe's and searched the parking lot and the wooded area around there, Stanley Chambers and Rick Eldridge and myself. And we left there and we went back up Wilkinson Boulevard and turned to the right on Morris Field Road and rode down to Billy Graham Parkway and turned to the left, and we didn't know at that time that Donnie's body was laying in the ditch to the left of us just a few feet from us.

Q. Did you see something on the TV that night?

A. Yes, we did. We went on back home and we -- we were sitting in our bedroom. The detectives were there. And they called us and they questioned us about a cross that Donnie had on, a necklace with a cross on it. And I told them that he did. And they questioned us then about his dental report, wanted to know where he had had his dental work done. So Dennis talked to my wife and found out where he had had that done. And about that time, there was a piece that came on the TV and it was an overhead view of the Morris Field Road and Billy Graham Parkway there and the reporter said there is a body in there. And at that time I knew it had to be Donnie. I went in and told my wife. I said, They found Donnie's body. She broke down and cried.

Q. Following the discovery of Donnie's body, did your church family and your friends help you all through that time?

A. Yes, they did. Our church family and friends came in. They took over all the housework and everything that was to be done around there. And they just put their arms around us and loved us and took care of us.

Q. Did -- because of the significance of your church to Donnie and the way your church had helped you through your loss, what did you do as a memorial for him?

A. Well, there was so many gifts that came in from all of our friends. There was over $1,600 that came in as a memorial

to Donnie. And we took that money and purchased three crosses and put it in the front of our church in memory of Donnie.

Q. Do you see those when you attend weekly?

A. Those church -- those crosses are there. The center one is lit up every Sunday morning.

Q. Did you also do some things at your home?

A. I didn't understand that.

Q. Did you do some things at your home as a memorial to Donnie?

A. Yes.

Q. Would you tell us what they are.

A. Well, my mind is not right clear right now, so...

Q. Did you and Donnie play horseshoes together a lot?

A. Yes, we did. We played -- as he would come in from work, he'd come in and rest a while. And he'd come by me and he'd say, Old Man, you want to get beat in a game of horseshoes?

And I asked him, I said, Son, do you really think you can whip your dad?

He says, Well, I can try.

So we'd go out and we'd pitch maybe a half a dozen games of horseshoes and he might beat me one game out of the six, so -- but since that time I haven't pitched any horseshoes in those pits. And I planted a sequoia tree which is a giant redwood in one of those pits, and it's about 2 foot high right now, in memory of Donnie.

Q. What's -- can you describe for us the impact of your loss.

A. Describe what?

Q. The impact of your loss.

A. Oh, it's something that we'll never get over. It's like the sunshine has been taken out of our lives for the rest of our lives.

Q. What's the first thing you do when you open your eyes in the morning?

A. I sit up in the bed and I reach over and I get my Bible, and I have a bookmarker in there with Donnie's picture on it. And I say, Good morning, my buddy up in heaven. And I read my daily Bible readings.

MS. ROSE: Thank you, sir.

MS. LAWSON: No questions.

(Witness stepped down.)

MS. ROSE: Your Honor, at this time the government would move for admission of Government's Exhibit 65A, 65B, and 65C pursuant to 18 U.S.C. 3593(c). These are the transcripts of the trial of this matter.

THE COURT: Let them be admitted.

(Government's Exhibits Numbers 65A, 65B, and 65C were received into evidence.)

MS. ROSE: And with that the government would rest, Your Honor.

THE COURT: Members of the jury, we'll take a short break. Please remember the usual instructions. Thank you.

(Jury exited the courtroom.)

THE COURT: Now, I understand that you have concluded your direct case and it's the intention of defense to open its case on Monday.

MS. LAWSON: Yes, Your Honor.

THE COURT: All right. Anything to be done at this time before I dismiss the jury for the day?

MS. LAWSON: Just one issue and that has to do with the admission of the transcript of the prior trial.

THE COURT: Yes.

MS. LAWSON: Of course, we object to that. It's discretionary.

The problem is that that trial -- that prior trial contains evidence that was not presented to this jury. It would be improper for them to consider anything other than the fact of the conviction. The government was allowed to present evidence of the underlying crimes during this case, so it duplicates what they would find in the trial transcript. The trial transcript also includes motions hearings, issues that were not properly before the jury that heard the guilt/innocence phase to even consider.

And so in total, it would prejudice Mr. Barnette in a number of ways. One is by disclosing information that's not

subject to disclosure to the sentencing jury. Second, it duplicates the testimony already taken. If they want to introduce or give the jury access to the evidence on which they base this sentencing decision, they can certainly introduce the transcripts of what happened here, what was said here. But we're not able to confront testimony in a prior transcript or address whatever impact it may have on the jury that does this sentencing.

So we (A) object and (B), if you're going to admit it, request that it not be published to the jury under any circumstance.

THE COURT: Well, let me ask the government what purpose it may have in introducing that document?

MS. ROSE: Just one of the things that 3593(c) says is that at the sentencing hearing, information may be presented as to any matter relevant to the sentence, including the mitigating, aggravating. Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial.

It's not something we're looking to publish to the jury, Your Honor. We're just completing the record.

THE COURT: Well, that -- if you're not going to publish it to the jury, then it's really a moot point but -- whether it's admitted or not. The court will admit it into the record, but not as an exhibit and not for the jury's

attention unless the government makes a particularized showing.

MS. ROSE: All right. Thank you.

THE COURT: Does that take care of your motion?

MS. LAWSON: Yes, sir.

THE COURT: All right. Thank you all very much.

Let's bring the jury back and we'll send them on for the week until Monday.

(Jury entered the courtroom.)

THE COURT: Okay. Members of the jury, we've concluded our business for the week. I think we told you that we wouldn't be working on Friday. The government now having rested its case, we'll move along with the case on Monday. And I can't give you a good estimate about how long the trial will take, but it's possible that the case will wind up toward the end of next week or I would think certainly the beginning of the following week. But we'll, of course, move it along as well as we can for the sake of all concerned.

So I'll remind you about some instructions that are particularly important.

I instruct you not to discuss the case with anyone until you actually begin your deliberations, whether members of your family, people involved in the trial or anyone else, and that includes your fellow jurors. If someone should approach you and try to discuss the trial with you

notwithstanding the court's instruction, please let me know about that.

Also, you must not read or listen to any news reports of the trial. Remember, you must not talk about anything with any person who is involved in the trial even about something that has nothing to do with the trial.

And if you need to speak to the court about anything, please give a note to the marshal and he'll hand it to me, or she will.

I may not repeat these things for you at every break, but you've heard most of this before.

I remind you not to do any research or investigation on your own.

Keep an open mind about the case.

Don't form any opinions about it until you've heard all the evidence as it's important that you have all the story before you make any conclusions about it.

Thank you again for your attention to these matters and the evidence today. We'll see you on Monday morning at 9:30.

(Recess at 11:50 a.m.)



UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA   )   DOCKET NO. 3:97-cr-23-V
)
    vs.             )
)
AQUILIA MARCIVICCI BARNETTE, )   VOLUME 16
)   MORNING
      Defendant.    )
_____)

TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
AUGUST 5, 2002

F I L E D
COURT
CHARLOTTE, N. C.

AUG 6 2002

U. S. DISTRICT COURT
W. DIST. OF N. C.

APPEARANCES:

On Behalf of the Government:

    ANNE M. TOMPKINS, ESQ.
    JILL WESTMORELAND ROSE, ESQ.
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    JEAN B. LAWSON, ESQ.
    P.O. Box 472106
    Charlotte, North Carolina

    HAROLD J. BENDER, ESQ.
    200 North McDowell Street
    Charlotte, North Carolina

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

MONDAY MORNING, AUGUST 5, 2002

(Jury not present.)

THE COURT: Okay. The court will deny the motion for mistrial.

MS. LAWSON: Thank you, Your Honor.

THE COURT: The mike is not on.

MS. HANKINS: I'm sorry, Judge.

THE COURT: Thank you.

MS. LAWSON: Your Honor, we have one other motion.

THE COURT: All right.

MS. LAWSON: Pursuant to Rule 29, we move to dismiss the count and the notice relating to future dangerousness of the defendant on the ground that the government has produced no evidence whatsoever that Mr. Barnette would be dangerous in the future.

THE COURT: Anything from the government?

MS. TOMPKINS: Your Honor, the government produced witnesses of the defendant's history of violence and the government will be asking the jury to use his long history of violence as a predictive measure of a future of violence.

THE COURT: All right. The motion will be denied.

The parties ready to resume with evidence at this time from the defense side?

MR. BENDER: We are, Your Honor.

THE COURT: All right. May we have the jury,

please.

(Jury entered the courtroom.)

THE COURT: Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: The defense may call its first witness.

MR. BENDER: Your Honor, our first witness will be Marc Barnette.

AQUILIA MARCIVICCI BARNETTE,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BENDER:

Q.   State your name for the jury, please.

A.   Aquilia Marcivicci Barnette.

Q.   Marc, some of the jurors may have noticed the shackles around your leg. Are you currently serving an active sentence for being convicted of eight separate counts in an indictment in addition to the three that we are here for sentencing purposes?

A.   Yes, I am.

Q.   And did they all arise out of the very same incident that we've been talking about that occurred in June of 1996?

A.   Yes, sir.

Q.   Were they violence against women acts, two counts?

A.   Yes, sir.

Q.   Use and carry of a firearm during a crime of violence?

A.   Yes.

Q.   Arson in commission of a felony?

A.   Yes.

Q.   Providing false information to acquire a firearm?

A.   Yes.

Q.   Making a firearm?

A.   Yes.

Q.   Felon in possession of a firearm?

A.   Yes.

Q.   Use and carry a firearm and carjacking resulting in death?

A.   Yes.

Q.   And interstate transportation of a stolen motor vehicle?

A.   Yes, sir.

Q.   Marc, when did you first meet Robin?

A.   I met Robin, it was May 7th, 1994, in Roanoke, Virginia, at a nightclub after hours party.

Q.   Tell us the circumstances of you going to Roanoke, Virginia.

A.   I had just not too long ago ended for good the relationship with Alecia Chambers and because of the legal issues that I had with her and different things that were going on, my best buddy Steve was trying to get me -- get my head up because I was down in the dumps and I didn't know what to do, so he just came up with this great idea that I could go

with him to see his brother in Virginia.

Q. And is his brother Greg Austin?

A. Greg Austin, his oldest brother.

Q. And did you and Steve go there?

A. Yeah. I wanted to get out of Charlotte.

Q. And do you remember what nightclub you went to in Roanoke?

A. I don't recall the name of the club. It was just a place they had downtown. One of the few spots in Roanoke. We hung out all day, me, Steve, Greg. His other brother Darrell was there. We got bored and they suggested we go out there, so we went out there.

Q. And sometime after you got there, did you -- did you meet Robin? Did you see her?

A. Yes.

Q. Talk to her?

A. I saw her.

Q. Okay. And did you talk to her that evening?

A. We talked that night. Had a few words, but nothing clicked. We danced and -- but nothing really clicked.

Q. Okay. Before you left the club that night, did y'all exchange phone numbers?

A. As we left the club, we saw each other kind of in the parking lot where we parked our cars and we talked some more and talked to her friends. Steve talked to one of her

friends. And we just -- it clicked then for some reason and we exchanged phone numbers and addresses.

Q. Okay. Sometime later that evening or the next morning, did you actually call Robin or did she call you?

A. We talked that night after we got home and we agreed that we would go out the next day. I called her at around 9:30 and she said she'd be there about ten, and she was there at 9:59.

Q. And did you actually meet the very next day?

A. That was the next day at 9:59 the next morning. It was a -- it was a Sunday. It was Mother's Day.

Q. And did you meet her mother on that day?

A. I didn't get a chance to meet Bertha that day.

Q. And what did you -- how did you spend that Sunday, Mother's Day?

A. She took me around Roanoke. She showed me all the places to go, the sights. It's a valley area so it has a lot of mountains. It's absolutely beautiful. It was her -- like her nephew or godson's birthday so I got to help, you know, do the birthday party thing. Go to the grocery store. And we just -- we went to the mall. We just hung out. Just hung out and had a great time.

Q. And about what time did you leave that day?

A. Steve and I, we did not leave Roanoke until maybe 1:30 in the morning because we didn't want to leave.

Q. Stayed there all -- all day into the early morning hours