of Monday?

A.   All day.  Well, all day and all night.  She came over to where I was staying.  We were having a cookout as well, so it just -- I mean, we spent all day together.

Q.   After you got back to Charlotte, did you stay in contact with Robin?

A.   Yes.  I -- we stayed in touch through the phone, writing letters, sending cards.  All that stuff.

Q.   Did you go back to see her the next weekend?

A.   That next weekend I caught the Greyhound bus and spent probably Friday, Saturday, and some of Sunday with her.

Q.   Okay.  Did you have occasion to meet any of her family at that time?

A.   I believe that was the first weekend I met her family.

Q.   Did you have occasion after that to meet her family?

A.   Yes.  I spent a lot of time with them.

Q.   Describe your relationship with her family prior to April of 1996.

A.   Robin's family basically became my family.  They accepted me with open arms.  I would have -- I loved being in Roanoke. I loved being around them.  They fed me.  They housed me.  I became a part of them.

Q.   At that time were you working in Charlotte?

A.   At that time I was -- I had just actually accepted a new job and that was at Courtyard Marriott on Arrowwood Road.

Q. Okay. Tell us how the relationship between you and Robin developed, if it did.

A. We actually told each other we loved each other the first day we met when we spent that day together. I had never had a day like that. I had never met anyone like that. We just continued to fall deeper and deeper in love.

Q. Now, did there come a time when some discussion arose between the two of you as to whether you would move in together either here in Charlotte or in Roanoke?

A. It was fall, I believe, of '94 and I had to fly back to Charlotte. I had to be at work and I didn't know it. We could not stand separating. And it kind of tore -- tore us apart. We were at the airport waiting in the concourse and she said, Vicci, she said, this is just getting too hard. And she said, What do you think about us moving in together?

Q. Okay. And did you discuss moving to Charlotte?

A. Yes, we did.

Q. Whose idea was it to move to Roanoke?

A. She told me what her brother Sidney had said about moving up there. She did not want to leave her mother. She did not want to leave her family. And I respected that. I just wanted to be with her so there was no problem.

Q. And when did you actually move in together?

A. We moved in, I believe it was mid March of 1995.

Q. And was that over on Keswick Avenue?

A.    Yes.

Q.    Describe that apartment for us, if you will.

A.    Keswick is a duplex, I think if you've seen it.  It has stairs to the apartment.  It has a gravel driveway.  It's up on a hill.  It's -- when you walk in, you've got this fuchsia colored carpet.  The living room is right there.  Kitchen is to the left.  The bathroom is straight ahead.  The back den, other extra bedroom is to the back left.  And our bedroom was to the back right.

Q.    Did you get a job in Roanoke at that time?

A.    I actually -- I got two jobs.  I worked for Best Western.  I was still doing night audit.  And I also got a part-time job at Camelot music store in the mall.

Q.    Describe the relationship that you and Robin had right after y'all moved in together in March of '95.

A.    After we moved in together, it was amazing.  I had never experienced anything quite like it.  We were -- it was just the absolute best.

Q.    Did there come a time when y'all began to argue over a receipt that you had found?

A.    A few weeks after I'd been there, I was going to wash the car and I was cleaning out all her junkie papers out of her glove compartment and I stumbled across a Super 8 motel receipt for two people.

Q.    And as a result of finding that, did you confront Robin

about it?

A.    I called her on her job and I was highly upset because I had no prior knowledge of it and it -- it hit me as something highly suspicious.

Q.    And what explanation did Robin give you?

A.    She told me that after I had been shot earlier in the year, she needed to get away.  Some of her friends took her to Greensboro and they went shopping and that's where it came from.

Q.    And did you accept that explanation?

A.    As hard as it was, I knew my past as far as feelings of jealousy and here I had this amazing thing starting out, so I swallowed it.

Q.    Do you remember a night that you were working at Best Western when this issue arose again?

A.    I had talked to her on the phone while I was at work since I worked at night and she did not like staying at home at night while I worked.  And it came up on the phone and we got into an argument.

Q.    What, if anything, did you do as a result of that argument over the motel receipt?

A.    I made her very upset because I had brought it up again after I promised not to.  She said she had enough of that, and she didn't know if it was going to work out with me making those kinds of accusations.  So the more we argued, the more I

got upset and wondered why she would bring it -- bring that point up that she wanted -- didn't know if it would work out. So I called a cab and I caught the cab home and left my job unattended.

Q. You were the only one at the motel that night?

A. I was the only one at the front desk and I left.

Q. And where did you go?

A. I told him to go straight to my house.

Q. And when you got to your house, what did you find?

A. Robin was there with her friend Angela Rosier, and that made me suspicious as to was Angela putting words in her head. I wasn't ready to take responsibility that my jealousy, my accusations was what was leading to that. So we just furthered to argue that night.

Q. Did you actually lock yourself in the bathroom?

A. Yes, I did.

Q. Okay. What, if anything, did you tell Robin that you were going to do in the bathroom?

A. I had been taking Tylenol 3 with codeine for my leg and I told her I would take every last one of them.

Q. Did she or Angela ever call EMT's or anybody?

A. Yes, they did.

Q. Okay. And was that the incident we heard about where you had threatened suicide?

A. That's the first incident with her.

Q. Okay. Did you and Robin sort of make things -- patch things back up after that?

A. After the EMT left, Angela left, we sat there and talked. She really felt for me. She drove me back to work.

Q. Now, you mentioned a couple of times being shot and taking medication for pain. Was this back in January of 1995?

A. January 25.

Q. Okay. You were -- you had not moved to Roanoke at that time?

A. Not at that time.

Q. Tell us the circumstances surrounding you getting shot in January of 1995.

A. I have a cousin named LaDon Barber and he and my grandfather have a very bad relationship or had a very bad relationship. He was very strung out on drugs and stuff. He would always get my grandfather give him money. When my family returned to Charlotte in 1993, we put a stop to that. But after him getting out of prison, he came back in '94 for some reason. So we caught him doing it again, but we ran him off. Later we found out that he had destroyed the top of our well because we were on well water. So we put out a warrant for him for trespassing.

Later on we saw him, my brother and I, trespassing on our property. So we followed him across the street into the

Boulevard Home projects and we watched him to where he went; and when the police came, we pointed him out and had him arrested. Well, he -- he, of course, didn't like that, but it happened again. We caught him trespassing again and called the police on him again.

This day that this happened, I was about to leave that afternoon for Roanoke. I had my resumes in order, had my suits in order. I heard a loud crash at my front door and I heard my grandfather kind of yell. He had kicked in the door and knocked my grandfather on the ground. As soon as I got up out of my bed, I ran to my bedroom door and he ran into me and he shot me in my leg and in my hand.

Q. As a result of that, did you have any type of surgery?

A. I had to have emergency surgery that afternoon and they had to try to save my leg.

Q. I believe you have a rod in your leg right now.

A. I have a rod from my hip down to my knee with two screws and a bolt.

Q. And your grandfather is Jesse Cooper.

A. Yes.

Q. What was his condition at that time?

A. He was elderly. Very frail. He was trying to get over an infection because he had been bitten by a spider. He was frail.

Q. Had he -- had he had some problems during the Korean

War?

A. The record shows that for all intents and purposes, my grandfather was killed during the Korean War. They were shelled and he got hit by mortar fire. They pronounced him dead, read him his rights, called the family, and covered him up. But for some reason he was able to move an arm and they re-examined him and they found that he wasn't dead. He was still alive.

Q. And he was totally disabled from that point on?

A. From that point on. It took them several years for them to reconstruct him and for him to try to get his life back.

Q. Now, getting back to you and Robin. After the incident where you left the Best Western unattended, later made up, she took you back, did this issue ever arise again?

A. The issue about the receipt only came back up in conjunction with some other things that started to happen.

Q. Okay. In July of '95 did you and Robin have another argument about her seeing other people or perhaps you seeing other people?

A. We -- she has several friends. Some of them were guy friends. When Robin and I first met, we basically laid everything on the table. There were going to be no secrets. Friends, guy friends, it didn't matter, you could have them. I could have friend girls. It didn't matter. We had both been scarred by previous relationships. But there was one

person that she was -- seemed to be very secretive about and his name -- she told me his name. His name was Benjamin Greene. She went to high school with him. He was friends with her family, friends with her friends. But for some reason I never got to meet him like I met some of her other friends.

Q. Did there come a time when you and Robin had a fairly big argument and she had a knife after you?

A. In the end of July we got into an argument about that, my jealousy making me crazy. I took her car keys. I went in the bedroom and I sat on the bed and watched TV. And when we got into the argument, Robin wanted to leave and I didn't want her to. She kept asking me, telling me, Vicci, give me my keys, and I played dumb. I don't know where your keys are. The next thing I know, she came in to the bedroom and she had our long butcher knife.

Q. And what ensued after that with regard to the knife?

A. I told her I didn't have her keys. She said I'm not playing with you. She said, I want my fucking keys. She went and sat in the living room and I laughed because I did not think she was serious. But the more I thought about it, the more upset I became and I just got -- I got angry. So I went into the living room and I threw her keys on the couch and I asked her what was she doing, why would she pull a knife on me. So that's when I tried to take the knife from her, and I

got what I deserved. My finger was almost totally cut in half.

Q. And after you had your finger cut, did Robin take you to the emergency room?

A. She -- I started bleeding everywhere. She worked at Community Hospital. She got me a towel. Got me to the car. She took me to the emergency room.

Q. And about how many stitches did you have to have?

A. The stitches were just to close it up. I had to have surgery to reconnect all my ligaments and tendons.

Q. And when did you have that surgery?

A. I believe I had it sometime in early August.

Q. Did there come a time when Robin was going to a funeral by herself and made you very suspicious?

A. Robin's -- one of her friend's daughter had drowned and she was -- she was a beautiful little girl. I went to the wake with her, but Robin was going to go to the funeral. And I was still wrapped up in my bandages and stuff and I needed to take my medication, so she told me just to stay at home. She got me something to eat. And she told me I could have -- you know, have the car even though I wasn't supposed to drive. She wanted me to drop her off at her friend's.

Q. And did you do that?

A. I took her over to her friend's and dropped her off. I had wanted to go, but because it was time for me to take my

medication, I needed to, you know, go home. And she said she would come home later.

After I left -- dropped her off, because of the argument that led to what happened to my finger, things just really weren't going well between us, to say the least.

Q. And you didn't go home and stay, obviously.

A. I kept driving around. I knew it was time for me to take my medication, but I just -- I wanted to be with her and I wanted to be there for her as she was being there for her friend. So I kept driving around and I didn't go back home. Eventually I saw one of the cars at the house that had been parked there. The car started to follow me and I -- I couldn't understand. I kept looking in the rear view mirror wondering is that the same car. I was sure it was. And I thought I saw her in the back. I pulled over and let the car go by and got behind it. The car pulled into a subdivision and stopped, and that's when Robin got out.

Q. And what was her attitude with you after she got out of that car?

A. She got out of that car and got into her car in the passenger side with me and she was -- she was trembling. She had a very shaky voice. And she was very apologetic.

Q. Okay. Did you accept her apology?

A. I didn't know how to at that time because of the suspicions that were rising in my mind. I didn't understand

why if I took her to her friend's to be there for them, why she was out riding around, and I didn't take her explanation.

Q.   What happened after that?

A.   I sped off and left her friends behind because I told her I wanted to talk to her alone without Angela or whoever the other girl was getting involved.  And I ran a stop sign and stopped pretty quickly.

Q.   Did you accuse her of being unfaithful to you at that time?

A.   At that time as well as others.  I accused her of having them take her somewhere to meet someone.

Q.   Did she actually try to jump out of the car while you were driving?

A.   She tried to get out of the car after I ran the stop sign.  She asked me what was I doing.  She tried to get out of the car and she dangled from the car, and that's when I stopped her -- or stopped the car.

Q.   Did you eventually get back to the apartment that day?

A.   We left after Angie and her friend caught up to us and they asked us what was going on, was she all right.  She said everything is fine.  Everything is fine.  She said, I'm going to take him back home.  We went back home that evening.

Q.   And how were things at that time when you got back home?

A.   We just weren't talking to each other.  She was -- she was highly upset, as is understandable.  I started to have a

lot of pain in my hand because I had done this while my hand was in a semi cast. So she had to take me to the hospital again.

Q. And I believe as a result of all that, you -- your fingers to this day aren't right.

A. No. I still can't bend my hand.

Q. Now, you told us about LaDon Barber shooting you. When did you have to go to court and testify against him?

A. I had to go to court, I believe it was September of '95 to -- not too many months after we had made up just from that incident I just described.

Q. Did Robin come to Charlotte with you?

A. She was -- things still weren't really well and she didn't want to come. She didn't want to take the time off from her job.

Q. Had Robin been to Charlotte to visit before?

A. Robin had been to Charlotte several times.

Q. Had she stayed at your house?

A. She stayed at my house as well as my job because I got discounts and stuff.

Q. And that was the Courtyard?

A. That was Courtyard Marriott.

Q. And all of this was prior to you moving up there.

A. Yes.

Q. Okay. After you moved to Virginia, did you and Robin

have occasion to come back to Charlotte to visit --

A.    Yes.

Q.    -- your family?

A.    Yes.  We come back all the time.

Q.    Were you involved in a church?

A.    Very much.  That's one of the things that I believe that led me to meet Robin.

Q.    And who would you go to church with?

A.    I was, as my grandfather called it, I was his wing man. I was what he says is the only grandchild that would go with him.

Q.    And I believe you went to church with Robin and her family in Roanoke.

A.    When we first met I had occasion to go with Bertha on a few occasions.

Q.    Did you -- while you were here testifying against LaDon Barber, did you have occasion to speak to Robin on the telephone?

A.    I talked to her mostly every night.  Some of those nights I stayed with my best friend Steve; some of those nights I stayed at home, so I did get a chance to talk to her.

Q.    Okay.  What was the result of the trial involving LaDon Barber?

A.    He -- there was a hung jury by one juror.  So instead of him wanting to be retried, he agreed to take a lesser sentence

and he was convicted and sentenced to that time.

Q. Have you ever had any more problem out of LaDon Barber?

A. We didn't see each other that much before then and, no, you know, we weren't going to see each other after that.

Q. Was there anything you did that precipitated LaDon Barber's assault on you?

A. No. Just having him locked up and having him arrested.

Q. After the -- after the trial, did you return to Roanoke?

A. I did return.

Q. And were you still working at Best Western at that time?

A. At that time I had been promoted at Camelot so I had -- I had quit my job at Best Western.

Q. Working full-time at Camelot?

A. I was at -- started management training.

Q. And where was Robin working at this time?

A. Robin is still working at Community Hospital.

Q. Were both of you now working the same shift, sort of a day shift?

A. Yes. One of the big main reasons I did decide to leave Best Western is Robin continually expressing how she didn't like to stay there. The promotion came right in time so now our schedules kind of meshed.

Q. After you got back from Charlotte after the LaDon Barber trial and you're working full-time at Camelot, did an incident occur while you all were making love one night?

A.   We were making love.  This is probably a day or two after I'm home.  And she called me somebody else's name.

Q.   What name did she call you?

A.   She called me Derrick, her ex-boyfriend.

Q.   How did that make you feel?

A.   I was hurt.

Q.   What did you do?

A.   I got up and went in the bathroom and took a shower.  Got an extra comforter, blanket and went and slept on the couch.

Q.   What, if anything, did she do?

A.   I can't -- I can't recall what she did.

Q.   Did she ever apologize to you?

A.   She -- she tried to say, Baby, I'm sorry.  Baby, I'm sorry.  Tried to get into the bathroom.  Tried to get me to come back to bed, but I didn't want to hear it.

Q.   Sometime after that, how were things getting along with you and Robin?

A.   Things were generally good.  If I wasn't bringing up issues of infidelity, things were fine.  That was the only issue we argued about.  Not bills.  Not -- I mean, the thing we did get into disagreement about was if we didn't have enough time together.  But infidelity was the key issue we argued about.

Q.   Now, she was working at the hospital and you were working at Camelot and you only had one car.  How did you work that

out?

A.   Oh.   She -- Robin -- you have to understand Robin.   She loved her job.   And she loved to be there on time.   We would wake up at 5 o'clock every morning if she worked the morning shift.   And because I did not have to be at the store maybe until nine or work nights, I always kept her car.   And that's the way she preferred it because I could drop her off, I could go to work, and then I could pick her up, you know, and switch and she could drop me back off.

Q.   So you would normally pick her up in the evening?

A.   I'd pick her up.   Sometimes we'd switch at lunch.   If I worked at night and closed the store, she would take me.

Q.   Okay.   An incident occurred where you were going to pick her up and she needed a coat from the apartment.   Tell us about that.

A.   It was probably fall '95.   I was at home that day.   I don't think I worked.   So we talk on the phone lovey-dovey. Where do you want to go eat?   What do you want?   You know, she felt like pizza.   So it was one of those times, I think it might have been September where it's warmer during the day than it is at night.   So Robin had this beautiful leather coat so I went to get it.   But if you know Robin, she keeps all her trash in her pockets.   So I was pulling out trash, pulling out cigarette packs, empty packs, tissue, and I come across a telephone number of Benjamin Greene.

Q.   And how did that make you feel?

A.   Because we had got into it about him on other occasions and my suspicions were what they were, it made me feel extremely hurt.

Q.   Did you go pick up Robin?

A.   I went and picked her up.  We stopped at a pizza place on the way back.  Got our pizza.  We came home.

Q.   And you couldn't take it any longer, could you?

A.   No.  I sat there and I tried just to not bring it up. Number one, I didn't want her to know that I had found it. But I just -- I couldn't hold it.

Q.   What happened?

A.   I started berating her, screaming, cursing at her. Asking her why she had his number if he was just a friend? How come I had met other guy friends, even other ex-boyfriends but not him?  Why did she have this number?  Did he come over when I was out of town?  I asked her how long she had had the number.  Did she see him while I was gone?  You name it, I said it.  I called the number several times.  It was a pager number.  I asked her what was the code.  I berated her.  Asked her was the code 69.  Everything you could imagine I said, I said.

Q.   And what was Robin's attitude as you were saying all of this?

A.   She got real quiet.  She didn't really explain it.  She

said, I don't know where it came from.

Q. Did that make -- cause you more rage?

A. The fact that she did not give me a satisfactory explanation made things worse. I felt like if she would have just told me some kind of good story, made something good up: I ran into him at the mall, he gave me the number. I saw him the other day. But her explanation was I don't know how it got there. I don't know where it came from.

Q. Now, your -- was your relationship with Robin beginning to get better or worse during this period of time?

A. It was -- it was wavering. There were the great times and then there were the not so great times.

Q. When is Robin's birthday?

A. October 13th, 1972.

Q. October 1995, did you get Robin a birthday present?

A. I was -- I was excited because the year before I wasn't -- I got her a gift, but it was your usual first birthday, first new relationship type gift. This time I knew Robin. I knew her better. I knew how she was. Very practical. If you got her something that she could not use, it would sit. So I was excited and I spent the whole day trying to find her something. I found -- I replaced her tennis shoes. She had the raggediest pair of tennis shoes that you ever could imagine, so I bought her these beautiful pair of tennis shoes. And then I went and I found her a new black purse.

Q. And had you been in her closet looking through her clothes prior to buying that?

A. Yes. I wanted to know what kind of purse she might like. So the only way to do that was to look at some of her old purses. And all of them were mostly all black, but that's what she liked, so I wanted to get it right because I didn't want it to sit.

Q. While you were going through her old purses, tell us what you found.

A. This was a purse that she had broke within the past couple of months. She had one when we first met and it was there also. But this purse, I looked inside and it had an empty condom wrapper.

Q. How did that make you feel?

A. Because I thought about it. I said, No, no, this can't be right. I said, This is not happening. I said, Well, this purse is the purse she just broke so this is the last purse that she used. And it just all started to fall into place with what I considered the lame explanations about the hotel receipt, the phone number, what she said to me that night. It just all started to pile up.

Q. Did you ever confront her about it?

A. We got into it that night.

Q. When you say got into it, were you physical with her?

A. Yes.

Q. How many times were you physical with Robin?

A. I never beat up on Robin. She wasn't the type of girl who would put up with that. What I -- things that happened with Robin is I would push her and put my finger in her face. Putting your finger in Robin's face was just as much as slapping her, and that was a lot for her to take.

Q. Did Robin give you any explanation for the empty condom package?

A. She once again said she didn't know how it got there.

Q. And how did that make you feel?

A. It made me feel like she was betraying me. She was lying to me. She was playing on my intelligence. That -- I told her, I said, Robin, I said, even I can come up with a better lie than that. And it hurt me a great deal.

Q. Were you ever able to push these incidents into the background?

A. We would get into arguments and she might leave and go stay with her mom and I would get upset, rant and rave for an evening or -- the next day we'd cool off a little bit. But if I wanted to keep Robin, I had to let it go. I had to push it to the back of my mind. So I had to do that on a couple of occasions.

Q. Did you still love Robin?

A. Excuse me?

Q. Did you still love Robin?

A.  Did I still love her then?

Q.  Yeah.

A.  Absolutely.

Q.  Was she your soul mate?

A.  Yes, she was.

Q.  When you were working at Camelot music during this period of time, did there come a time when you got fired from Camelot music?

A.  After I had taken the full-time job, I got promoted to assistant manager of the store; but on January 25, 1996, my employment was terminated.

Q.  Tell us why you got terminated from Camelot music.

A.  The man who hired me, me and him were like buddy-buddy. We both lived in Atlanta. We just clicked. He promoted me over several people. And one of the last people that got hired by the previous assistant manager, we never clicked and she didn't really care for me. I didn't really care for her. Well, in November of '95 during the holiday rush, we were trying to blow off some steam, have a good time. And if you heard what Steve said, I'm a clown.

Well, we were playing a game of, I guess you'd say smack ass. We were smacking people on the butt as hard as we could running around the store during close. Well, this girl Renee, she's an older woman actually, she wasn't in on the fun and I didn't know it. So I came in the office and I smacked her

right in the butt, and she yelled and she said, Don't do that again. I thought she was playing. She was on the floor doing some stock. I snuck up on her, I did it again and I laughed. And she got very cross and she told me, I'm serious. Don't do that again. I said, Okay. I'm sorry. Didn't think anything else about it.

Q. Were you sometime later confronted by your manager and charged with sexual harassment?

A. In January of '96, two months later, I had asked Renee to do something. She disagreed with me. I came into work maybe the next day and Brian said he needed to talk to me. And that's when he confronted me with that and said that I had sexually harassed her.

Q. Had there been another occasion where you had made a fairly inappropriate sexual remark to another female employee?

A. We had an employee that worked there before I got promoted and I really liked her. She was real sweet. Real pretty. We were joking around one day and I made a sexual comment to her that was very inappropriate when I look back on it. At the time I was just goofing off and I wasn't serious, but she took it as such.

Q. Tell us what you told her.

A. We were talking about sex and guys and stuff and I joke -- I told her, I said, You need this big black dick. And I

was just playing, but she took it seriously.

Q. Was that another one of the reasons why you were terminated?

A. He brought that up and said that that had been told to him.

Q. After you were terminated from Camelot for the reasons you've told us, did you get another job?

A. I told Robin I didn't know what I was going to do. I took the two -- next two weeks off to try to make a decision whether -- because of the -- how the relationship was going, whether I wanted to move back to Charlotte or whether I was going to stay in Roanoke. She let on that she wanted me to stay, so I found a job at Electrolux Corporation doing what you call hard core sales door to door. That's what I did next.

Q. And how long -- how long did that last?

A. That lasted until the day we broke up.

Q. Was there any time that Robin talked about trying to get a restraining order against you?

A. Prior to me losing my job at Camelot, we had some more blowups and she had stated that she wanted me to leave. But I always thought I could save the relationship and did not want to leave.

Q. Initially did you -- when this relationship started and you moved in together, was there any talk of marriage?

A. Because of the type of relationships that Robin and I had been in, when we first met and would go out, get a pitcher of beer, pull out my cigars, pull out our cigarettes and we would talk three hours. Just talk, talk, talk about all of our relationships and everything that had happened in the past. We both said that the next relationship has to lead to marriage because we were sick and tired of the bad relationships. So we discussed -- discussed it and I told her, I said, I'm not moving to Roanoke just to live with some girl. I love you too much for that. I said, If there is not marriage in the future, I don't want to come. So we did discuss it.

Q. Did Robin love you?

A. I believe she did.

Q. April 1996, had things deteriorated to the point that you moved out?

A. We got into the biggest fight in April '96. I had just -- I thought things were deteriorating and they weren't going to get better. So before I left and moved back to Charlotte, I was going to force her to admit to me the truth about Benjamin Greene. And the way that I went about that is I tried to choke her.

Q. Tried to do what?

A. I tried to choke her.

Q. And what was her reaction to being choked?

A. She fought. I pushed Robin. I've thrown food at Robin. I threw a glass of brandy at Robin. But I had never tried to choke her. When I did that, we fought and we fought and she ran out the house.

Q. What did you do?

A. I said, Forget about it. I got my jacket, got my set of keys. I said, I'm leaving. That's it. Because I knew I crossed that line. That was the last straw for her. So I locked the door and I left.

Q. And where did you go?

A. First I went to the grocery store pay phone, called her. She was upset. Asked where was her car. I told her I had her car. She wanted me to bring it back. I said, No, I'm not coming back until you -- until we talk the thing out.

Her brother got on the phone, told me I had better bring the car back or he was going to kill me.

And now she got back on the phone, I told her, I said, Well, I know I'm not bringing the car back, I said, if he's going to threaten me like that. But you know, I was in the wrong. And so eventually I didn't know what to do. I just -- I drove back to Charlotte because that's the only place I had to go.

Q. You took her car and came back to Charlotte.

A. Yes, sir.

Q. Now, how soon after that did you go back to Roanoke to

get your belongings out of her apartment?

A. I forget what day it was, but that night, because I got there like maybe 5 o'clock in the morning. I called Robin that afternoon. I told her I talked to my mom. I told her I was sorry. I told her I knew that was it, that was my last chance. I told her I was getting a -- going to get some money together and I will be up there, I think it might have been a Thursday, that afternoon we would meet -- either meet at the apartment that Friday, the next morning, or I would pick her up and I would get a truck and move all my stuff out.

Q. Had you quit your job at Electrolux at that time?

A. No, I hadn't. I had to call my boss to come out to the apartment while I was in the middle of moving all of my belongings to pack up two cleaners because things were just totally a mess that afternoon and I could not pack my stuff up, move out and pack his cleaners up and deliver them to him.

Q. You rented a U-Haul and went back up there. You took her car.

A. Well, I took her car. I got my cousin to go with me and my grandfather went with me because he didn't want anything to happen with me after I told him that her brothers were pretty much -- pretty upset with me. I got a room at the Marriott. We stayed at the Marriott that night. The next morning I went -- we got a truck. I went in Robin's car, picked her up. Her

uncle was with her. Drove back to the -- Penske. It was the Penske place. Gave her all my keys. Gave her all the extra keys. She went to the apartment and we got in the truck and followed.

Q. Okay. Now, that night when you stayed at the Marriott, did you ever go back over to Keswick?

A. Yes, I did.

Q. Did your grandfather and your cousin go back over there with you?

A. No. They didn't know I had left.

Q. So you left the hotel, the Marriott.

A. Yes.

Q. And what did you do going back over to Keswick?

A. I went to the apartment, and I knew that it was my fault that it was over, but I was pretty upset because I didn't want it to end, so I went into the apartment and I destroyed a lot of her clothes.

Q. How did you do that?

A. I poured bleach all over them.

Q. Did you take anything else out of the apartment?

A. We had -- she had bought a VCR and a TV from Circuit City and I paid half for it. She paid the other half. She put it on her credit card and I gave her the cash. So I got mad and said, you know, I didn't pay all this money for this and I'm not leaving anything, so I took the VCR.

Q.   And that was the night before you actually went back over there with your grandfather and your cousin to pack up that truck?

A.   I had told him I was going to the store, but I didn't.  I went to the apartment.

Q.   So the next morning you come back over there with the Penske or the U-Haul, whatever truck it was.

A.   Yes, sir.

Q.   And her uncle is over there and Robin is over there.

A.   Robin was there.  Her uncle.  He had been in the car when I picked them up.  Her brother and his wife, Kenny and Sharon, arrived shortly after we got there.

Q.   And describe that scene as you were getting your stuff out.

A.   It was a mess.  Lot of tears.  Lot of yelling.  Lot of accusations.  I knew I wouldn't be coming back and I wanted the truth.  And I accused her of stuff; she accused me of stuff.  She berated me.  She yelled at me.  My cousin, he -- he was trying to help me pack and my grandfather was trying to help me pack all my stuff.  But her brother, he threatened me, as I would if that was my sister.  I don't blame him for anything.  But it was a -- Robin, she cried and she cried. And it was the end.  I mean, this was the absolute end.  There was not going to be no more making up.  It was -- this was it so it was very emotional.

Q. Did you and your grandfather and your cousin come back to Charlotte?

A. So -- yeah, we came back to Charlotte. We packed up the truck and I drove away.

Q. Where did you live when you came back to Charlotte?

A. I crawled back home to my mom.

Q. And did you put your stuff in the house at 3413 West Boulevard?

A. I moved back to -- I didn't take my old bedroom. I believe that was going to my little baby brother. I moved into the loft studio which is on the top of the house and I moved in there.

Q. Describe that house on 3413 West Boulevard, if you would.

A. Our house is a Jim Walters home. If you're familiar with Jim Walters, you can get it up to a certain percentage complete and then you complete the rest. And since I'm like a shade tree mechanic, handyman, amongst other things, that was something we were comfortable doing.

So when you walk in the front door, you have the living room or you can go straight and you have a partition. And you get to the back area, you have the den. Over to the left you have a bathroom with my brother's room and my old room which is a smaller room. If you come out of my brother's room and go straight, you can go straight to the kitchen after you

cross the den. It's a square house pattern. My mother's room sits to the front with her own bathroom. The kitchen has its own door. When you walk in the kitchen door, the stairway goes right to the loft.

Q. Okay. And when you moved back in April of 1996, who all was living at that house?

A. Oh. I believe you had my baby brother John Mack, my brother Mario, my mother, my grandfather, and me.

Q. Were you working at that time? Were you able to get a job?

A. I made several plans and this was like going to be a new beginning. I had let some of my old tendencies come up with Robin and I knew that some kind of way I had to shake that, but the first thing I had to do was show that I could be responsible and that I wanted to get a better job. My boss in Roanoke at Electrolux wanted me to come back; but if I couldn't live with her, I had no plans to go back.

So I talked to my uncle who's been in car sales for probably 30 years, 25 maybe, about finding a job at a dealership.

Q. Okay. And did you actually make application?

A. I made two. I told him I didn't want to do hard core sales anymore. I didn't want to work -- he worked at Sam Johnson for years. I don't like that kind of stuff. I told him I would like to try to get on at Saturn because it's more

retail oriented. So he set up an interview, but he said he promised nothing. He just told the guy to give me an interview.

Q. Now, you've said that you felt like it was over between you and Robin when you moved out on April the 10th, or whenever it was.

A. Yes.

Q. Did you ever call her again?

A. I felt like -- as I have a tendency to do, I knew it was over, but I had to try. I knew she still loved me. I still very much loved her. So I had to try to at least get a base -- beginning with her. Friends. Something. I offered -- I said, you know, can we maybe go back to having a long distance relationship because all she ever kept saying was we just can't live together anymore. And I took that as saying that, well, even though we can't live together, maybe there could be something else.

Q. And how often would you talk on the phone?

A. When I first came home, we talked every two days, every other day, maybe.

Q. And what was her attitude towards you at that time?

A. In the beginning she was -- she was like, Vicci, you know, I don't know why you keep thinking that I would cheat on you. She never would say no, she didn't love me. She would always say yes. But she would never say no, we couldn't get

back together. She would always say she didn't know.

Q. Did that give you some hope?

A. That gave me just a little -- enough hope that I kept trying.

MR. BENDER: Your Honor, this may be a good time for a short recess.

THE COURT: Okay. Members of the jury, we'll take a break at this time and we'll call for you in about fifteen minutes. Please remember the usual instructions. Thank you.

(Brief recess at 10:40 a.m.)

THE COURT: The jury is with us.

MR. BENDER: Thank you, Your Honor.

### AQUILIA MARCIVICCI BARNETTE

DIRECT EXAMINATION (Cont'd.)

BY MR. BENDER:

Q. Marc, you had told us about your various conversations with Robin after you came back to Charlotte. Did you ever go back to Roanoke between the time you moved in to Jesse Cooper's house and the end of April 1996?

A. No, I don't think so.

Q. Okay. So the communications you had with Robin were all by telephone.

A. Oh, yes. Yes.

Q. What was your mental or emotional condition at that time after you came back to Charlotte?

A.    It goes back to the things that Robin and I discussed when we started our relationship.  It wasn't about the getting to something that was going to be temporary.  I had fallen on my face enough and she had been displeased with past relationships enough that when this ended, devastating is just to say the least.  That doesn't, you know, enclose the whole feeling that I had because I now felt I was back to square, not even one, zero.  I had lost my baby.  I didn't have a job.  I was back home with Mom.  I was twenty-two.  I had gone through this too many times before and it was -- had happened all over again.  So I was desperate for something positive, anything positive to happen.

Q.    Were you drinking alcohol at that time?

A.    When I first got back, Steve was, Man, you're back in town.  We went out, went to the club.  He introduced me to a couple girls, or whatever.  But you know, I started to try to live a little bit, but Robin was just still on my mind.  I would go out with him.  We'd go over to some of the girls' house who he helped me meet and I'd sit there and stare into space.  And he'd say, Vicci, Vicci.  Say, I know you're still not thinking about that, but I was.  So I didn't see him for a while.  And I went home feeling sorry for myself.  The day that the manager called from Saturn and said he hired somebody else, and he couldn't have picked a worse day.

Q.    And had you consumed some alcohol from the time you got

back?

A. After I got the call around eleven a.m., Robin wasn't really -- I had kind of called her too much. She had threatened to have her phone changed. So I felt like if I got that job, I could do things. I could produce. I could show her that I could maybe change my ways. I could do some better things. I didn't get the job that day so that afternoon I went to the ABC store and I bought maybe a half a gallon of Absolut Vodka.

Q. And did you begin to drink?

A. Yes, I did.

Q. Later that afternoon or early evening, did you try to call Robin?

A. I tried to call her, it was around evening time. Called to the apartment. And I know Robin. We were like hand and glove. She does not like being by herself -- at home by herself at night. When I left, I took my bed, all the bedroom furniture, the thing that had the TV in it, a lot of dishes, and I took the VCR, so she had to replace all that. She had been staying at her mom's. So I knew that if she wasn't there, she hadn't replaced the stuff yet so she had to be at her mom's. So I called her at her mom's.

Q. And did you talk to her?

A. The first time no, I talked to her uncle Ray. He said she was in the shower and -- which I had no right to, I felt

suspicious.

Q. And did you call back later?

A. I called her back. I gave her maybe half an hour to 40 minutes. Called back. I needed to talk to somebody and there at that time in my life was no one who could calm my nerve, who could make me feel better other than her. So I called her back and I talked to her, but she told me she was having a -- somewhat of a date.

Q. How did that make you feel?

A. I was very needy right then. Nothing ever seemed to work. I just was constantly thinking of all the good times that I screwed up, I threw away. And I really needed her right then. She told me that she was going out, I was hurt.

Q. Did you continually call?

A. I called maybe one additional time to the house. She said, Vicci, hold on. She clicked the phone. She said -- she clicked back, she said -- she said, Well, I got to go. She said, My friend is at the apartment.

I said, Well, how the hell did he know where her apartment was? I said, Who is this guy?

She said, His name is Tim. And she gave me this story about they went to school together. She ran into him at the mall. They were going to have drinks at the apartment. So I started questioning her about how he knew where the apartment was. I never knew a Tim. I never seen a Tim. I've met other

FORM FED ● PENGAD · 1-800-631-6989

guys, but not him.

Q. And did you later call back to the apartment?

A. After she said she had to leave, I left. My grandfather was going to the store so I went with him. And I thought that at that point that she told me that, hey, I'm going back to the apartment, me and a guy friend, going to have some drinks, I'll talk to you later. That just kind of -- it made matters worse in my mind. If she loved me, if she cared about me, this was my time in need. No matter what I had done, we will always be there for each other. When she said that, it made me feel like she truly no longer cared about me. So when my grandfather went to the store, I tagged along and I bought maybe three boxes of sleeping pills.

Q. And when your grandfather came back from the store, what did you do?

A. I went back up to my loft room, fixed me a big cup of Vodka straight, proceeded to start taking sleeping pills.

Q. What, if anything, happened?

A. I called Robin and -- at the apartment, talked to her on the phone. She said, Vicci, she said, I've got company. She said, I don't want to talk to you right now.

Q. How did that make you feel?

A. I really felt like -- I felt like garbage. I felt like trash. I felt like, you know, this is it. Screw it. I'm not going to threaten this time. I'm going to take every last one

of these pills. You know, I'm going to tell her, I said, Hey, you never loved me. You never cared about me. I said, Ain't been but nine, ten days, you've already got somebody over there. I said, you know, Steve tried to get me to go out with these girls, I didn't pay them any attention. I kept thinking about you.

She said, Well, Vicci -- this is one of Robin's sayings -- you should have thought about that.

Q. Did any of this make sense to you while it was going on?

A. No. I -- I mean, I knew I had messed up. And I knew we had for at times was the perfect relationship. But I always felt like I could make it better. I always felt like I could fix it. And I knew how much she loved me. I hadn't felt that for a long time. But in my mind committing suicide was at that time a huge cry for help, but I was serious. And I had to figure some way to get her to know I was serious. I was tired of starting over. I was tired of the breakups and the feelings of not being loved and she was key to everything around me and I felt like if I could just talk to her and get her to understand my true feelings, that she would tell this guy to hit the road and Vicci come on back.

Q. That didn't happen, did it?

A. No. I started to get just more and more angry. She would hang up on me. I'd call back, curse her out and hang up on her. Eventually, it started getting later, later. It was

probably getting close to 1 o'clock. And she had told me that he had left. He had went to the store to get some more beer or get some beer because she had wine. And she said, Vicci -- I said, But Robin, I said, don't you love me?

And she said, I do.

I said, Well, don't you want me there?

She said, Yes, but I just can't put up with that anymore.

So I got real nasty. Started saying some real nasty stuff to her about the guy that was there and what they were going to do. Were they going to fuck? And it just -- I became more and more belligerent.

And finally, he had come back and she said that -- she said, It's time for me to go. She said, He told me it's rude to talk on the phone while you have company. And she hung up.

Q. Was the alcohol and the sleeping pills having any effect on you at all?

A. It was just making me real leery. I was staggering a lot, but because I was becoming so upset, temperature was really rising and especially from the alcohol. If my cousin was here, she could tell you, I can't handle alcohol too well. So I threw up all over my bedroom floor.

Q. Was your brother Mario home at that time?

A. He came home maybe fifteen minutes later. I heard the

door shut, his car keys, and I heard his bedroom door shut.

Q. What did you do at that point?

A. I felt like she was serious. She really didn't care. So I thought about going to, I think the place was still open 24 hours, drugstore to get some more sleeping pills. So I went -- I put my money in my pocket. I still had on the suspenders, the shirt that I had from earlier in the day looking for jobs. I went to my brother's room. I said, Mario, I said, I need your keys. I need to go to the store.

He said, No.

I said, Mario, I said, I'm just going around the corner. I'm just going to the store.

He said, Oh, man. He said, I got to go somewhere.

I said, Mario, just give me the keys.

He said, On my dresser.

So I took the keys and I ran to the car. And I -- when I pulled out of -- on to West Boulevard right at the intersection of Billy Graham, I was in the lane to go to Woodlawn, and I just kept thinking, thinking, and thinking. And I said, I'm not going to let this guy, I'm not going to let it happen. I'm not going to let it happen. So I backed up. I got in the right-hand lane and I turned and went up Billy Graham, got on 85, got on 77, and I headed for Roanoke.

Q. Did you have anything with you like the gas can or anything?

A.    What I was saying earlier, I'm like a shade tree mechanic.  One of my cars, projects that I was working on needed transmission fluid, so I had two like plastic, almost like oil that you go to Pep Boys and get, but they were transmission fluid.  All my tools were in the car -- in his car because I had been working on his car doing body work, priming, sanding, bondo.  All that stuff I kept in his car. So that was in the car.

Q.    How old was Mario at this time?

A.    I was twenty-two so he had to be eighteen at the time.

Q.    And what kind of car was it that you were in?

A.    It was my father's car.  My father had a couple of old cars.  It was a 280Z.  Probably a '74 model, maybe.  Black. It had a lot of primer spots because we were -- I was filling some rust holes for him, trying to anyway.  So that's what it was.

Q.    Now, as you drive up 77 headed towards Roanoke, did you ever stop anywhere?

A.    I stopped at a gas station and was getting some gas. That's when I thought about the transmission fluid things.  I was going to go get that guy and I was going to do something to him.  I pulled the bag out and as I was putting gas in his car, I poured the transmission fluid out, stuck the gas filler into the thing and filled two plastic containers up with gas.

Q. And when you got to Roanoke, did you go to a Wal-Mart?

A. By where I used to work at Valley View mall they have a -- one of those Wal-Marts, Super Wal-Mart, stays open all night. I hadn't had a gun since the incident with Ant Britt in '92. I didn't know what I was going to do, but I didn't think I could kick the door in because it was a steel door, plus my leg. So I was going to do something to get him out of the apartment and I didn't know if this guy was 6'7", 6'6", three hundred pounds, I didn't care. But I needed an equalizer, and I was going to also fix his car for him when I got there. So I stopped at the Wal-Mart and I bought an Easton -- Eaton aluminum baseball bat.

Q. What made you think you had the right to get back at this guy?

A. I didn't. At that time I was so out of control, so jealous, I was doing something I had no business doing. I had no business there. I was twenty-two and I was -- I was an idiot. I'm still somewhat of an idiot, but I should have hung up the phone, let her go on with her life and went on with mine. But at that time so much stuff had piled up on top of me emotional wise that I wasn't in control of my emotions and I let them -- I let them run the show.

Q. After you got the baseball bat and the two quart jugs of gasoline, where did you go?

A. I drove to the apartment. I parked at the dead end way

up the hill. I came down the hill -- well, first I went in the bag and I pulled out some pliers. Pulled out the bat. Put two of the things in my jacket. I went down the hill. I went to Robin's car. I said, well, I'm not going to touch her car. I put the things on the ground, put the bat on the ground. I went to the phone box. Pulled out the pliers. Pulled the wire off. I said somebody might call the police, I said, but not them. I got the bat. I got the containers. I opened the containers. I took out my lighter. I went to the door and I tried to kick the door in, and I started screaming and screaming. I don't remember everything I said, but I said some pretty nasty stuff.

Q.    Did anybody ever come to the door?

A.    I heard -- I saw the light go on because as you walk up the steps, you have the door, the kitchen window, and the living room window. I heard the blinds go and I heard her say, That's him. I didn't hear a male voice. I was listening. I listened, I didn't hear anything. So I jumped off the steps. I left the containers on the steps. I ran around to the window. I saw Robin pull the blind up and she looked. And I started screaming at her. I jumped up and I broke the window with the baseball bat.

Q.    What were some of the things you were yelling at Robin?

A.    I said, Die, bitch, die. I told her, I said, Tell that punk ass motherfucker to come outside. Fight me like a man.

I said, I'm not going to let him do this. I can't remember everything I said because I was overly hysterical.

Q. What did you do to the car that you saw there that was not Robin's?

A. I couldn't figure out, they weren't coming -- why he wouldn't come outside. I had kicked the door in and it jammed, but I didn't know that until a lot later. I thought he was -- just maybe the police would come, I would go away. So I said, Oh, so you don't want to come outside. So I started smashing his car.

Q. Did you ever see anybody other than Robin?

A. I never saw Benny. I saw Robin one time, maybe twice, but I never saw Benny.

Q. So you never saw him and he never came out.

A. No. No. The door had jammed. I jumped back up on the porch and I had the open containers there. The first thing I did, I put the bat to the side. I started pouring gas on the bottom of the door because it was a little crack there. I poured gas on the window sill of the living room. I poured gas on the kitchen window sill. I set fire to it and I jumped off the steps after grabbing the bag.

Q. Why did you -- why did you set fire to the apartment, Marc?

A. Look back on this, I was out of control. I was -- in my mind at that time, which it makes no logical sense to me now,

you think about you get into an argument, you get emotional, and you overly react. I wanted him outside. I wanted to face him. I wanted to see -- I had my heart -- I knew it was Benny. I told her on the phone that's not some guy named Tim. I said, I know who that is. At the time I blamed him for breaking up my relationship. I wasn't as yet ready to accept the fact that it was me. And I felt like this guy came between us. This guy broke us up. It was his fault. It was her fault because she was supposed to have loved me.

But when you look back on it, it was the most juvenile of things, and I just -- I still don't -- I'm trying to understand a lot of the things I've done in my past and this is -- this is one of them.

Q. Did you ever get shot at?

A. After I jumped off -- I had broken the kitchen window somewhere in there. I had jumped off the porch step. I went to his car. I had one of the other containers. I started pouring gas all over his car, on the hood, tried to pour some inside, and I set fire to it and it caught my arm on fire. Next thing I know, I hear this what sounded like a bumble bee going at supersonic speed and it zipped past my ear. At the same time I heard a loud bang like a shot. I started ducking and started running. I ran and I dropped the bat. I dove into this ditch across the street and I kept saying to myself, He's shooting at me. He's shooting at me. And then if you

understand what I was trying to say, the sense that it made then which it makes no sense now, I said to myself, She told him to shoot at me. Looking back on it, I mean, that makes no sense to me now, but that's what flashed in my mind when I dove into the ditch.

Q. After that did you get in Mario's car?

A. After that I ran up the side of the road trying to make sure I didn't get hit if he kept shooting. Mario's car, if you remember the map, the street goes up, it was a dead end. I got in the car, drove down, jumped out, went and got the baseball bat. At that time the living room was -- it was flaming. It was flaming. And I just -- I thought -- I was scared they would come out. I did not really -- you know, if you're thinking, you don't do something like this to begin with. But the way I wasn't thinking, I'm thinking, well, he'll come outside. The whole apartment was on fire. I said, Shit. I jumped in the car, took off.

Q. Where did you go?

A. Actually, I didn't leave. I went up the street, I turned around, I went back. I thought -- I thought I had heard some yelling, screaming echoing off the back of the apartment. So I said, Well, sounds like she got out. I got back in the car. I'm at the top of the street. A different way. I drove off. Went through Vinton because I think we actually -- we live right on the Vinton/Roanoke line. I went, I drove to

another gas station. Looked at my jacket. I had burned my jacket. Had glass all over my jacket and my skin. I put gas in the car and I headed back to Charlotte.

Q. How did you feel on the way back to Charlotte?

A. I was scared because I didn't really know what had happened to her. I was angry because Benny never came out and in my heart I knew it was him but I never proved it to myself, you know. I felt like she had let him come between us and he was in there, but I never got to confront him. At the same time I had this conflicting emotion that was Robin okay and I did not know.

Q. You got back to Charlotte sometime in the early morning hours?

A. It started to like rain real bad on the way back so I had to stop in, I think Pulaski, Virginia. It's up on the mountain because you got to go over a mountain, come down a mountain to get to this area if you go straight up 81. I stopped and just -- I was shaking. Just shaking. And I was -- I started to -- it started to dawn on me that I had got myself into something huge. So I didn't get back until -- I tried to hustle because I knew that my brother had to be at work and I had told him I was going to the store. So I didn't even go home. I drove to his job on Billy Graham. I think he was working at U.S.Air -- I think he was working at Wendy's at the time. I pulled up and thought he might be there, but he

wasn't. It wasn't until maybe ten minutes later that my mom pulled up with him in my grandfather's car.

Q. When you got back to Charlotte, did you know that they were looking for you to try to arrest you?

A. When I got back that day, I parked my brother's car at his job. I got in the car with my mom after they pulled up and she -- she let me have it. She was cursing me, yelling at me. And I didn't say anything. When we got home, I said, you know, I'm not staying here. I got on the bus to my cousin's house. She lives all the way on east Charlotte -- on Monroe Road. So I went over there and I told her, I said, I just had to get away. I can't think. I got to think. We were sitting around smoking and my picture came on the news. That was that night.

Q. So the night after the firebombing, your picture was on the local news.

A. It was the same day.

Q. Your picture was on the news that you were wanted for a firebombing in Roanoke, Virginia.

A. It was on Channel 9.

Q. Did you think you were going to get arrested?

A. At that point I was scared, but I started listening to the reports and at that point I didn't know what I was going to do. But they said something that -- about Robin getting hurt. That -- that scared me more than anything because I

think, as you previous heard, we joked about us having one door in that apartment and who would jump first. And I always said that I would jump first or you could jump. She said, No, I wouldn't jump. I said, Well, I would jump and break your fall. I heard that she had got hurt and she had got burned and I started to get scared. I started to get worried that I had done more than I thought I had done. And I started to get angry because I said, Well, if she left me for this guy, I said, if he cared anything about her, wouldn't he have made sure she was okay? How did she get hurt, but the news said nothing about him getting hurt. So I had those conflicting emotions starting to happen again.

Q. Did you get arrested?

A. No, I didn't get arrested.

Q. Did you ever go sit and wait to get arrested?

A. There were certain times where after I -- I attempted to call her from Shawn's. I went -- I attempted to call her from Steve's. I attempted to call her from my house. But when I was at home, I told my mom, I said, Did any of my cousins ask me, Steve ask me, I said, I'm not going to run. I said, When they show up, I said, that's it.

I said, Steve, man, I said, one week we were celebrating I just come home. I said, Now you're getting ready to see me off, probably going to get thirty years or more. But I stayed at home a good deal. I visited with my cousin. I visited

with him. But I stayed home the majority of the time waiting for them to show up.

Q. You didn't turn yourself in?

A. The thing about that is they've been to my house multiple times. Sitting at home in my living room, they show up, I'm there. I wasn't as yet willing to just go to the police station because I knew it was the same thing as them showing up. They had never had any problem finding my apartment before. I was wondering why it was taking them so long.

Q. Now, after this incident were you relieved that you had gotten revenge on Robin and Benny?

A. No. Steve -- a couple of maybe -- I don't know if it was a week later, days later, his brother faxed him a newspaper report of the -- what happened and then I actually had it in print before my eyes what had happened to Robin. It made me sick. It made me sick to my stomach because I just couldn't picture that I had caused her burns. That I had hurt her like that. It was the difference between being out of control emotionally and when I had time to sit and think about what I had done. There was never any I got my revenge. It was a lot of fear, lot of anguish, but never any relief.

Q. Did you know -- or when did you know for the first time that your thoughts about who she was with were true that she was with Benny Greene?

A. I don't know if you know what it's like to think

something and really believe something yourself until someone can convince you otherwise. But that night I really believed it was him because Robin wouldn't just go and meet some new guy, some strange guy and bring him home. She wouldn't do that. It would have to be somebody she knew. And that made me just think that I knew it was him in my heart. My mind, well, a little sketchy. When I read that article and I saw the name Benjamin Greene, it was all new. It was fresh. It kind of made me angry. But when I kept reading and found out she was hurt, that's where I get the conflicting emotions.

Q. Now, Steve Austin has testified in here about trying to take you out to some clubs after that. Did you go to one club or several clubs, or tell us what was going on with Steve and you at that time.

A. Steve tried. Just say that. We went to this club on Freedom Drive called Champs, I believe. Maybe not Champs. The Arena is what it was when I first came home. That's where we met some ladies. The next thing he tried to get me to go out to the clubs. You know, we got dressed. We went out. We rode to this one that was right near uptown, the convention center, but I wouldn't get out the car. So I said, I just -- I said, Steve, I don't know. We went to his house and so we decided just to chill at his house. Drink some beer. That was the first and last time I got to drink like Killians Red and we talked, and he called some girls over and everything.

But, you know, I knew I was about to go to prison for about thirty years.

He said, I'm going to miss you, man.

I said, Well, I don't know. I did it to myself.

But the girls, I mean, he tried. You know, I love Robin.

Q. Is that what was on your mind, Robin?

A. That's all that was on my mind.

Q. Now, when you -- after Steve had attempted to take you to a club, introduce you to somebody else, what were you feeling during the day and what was your day like after that?

A. I started to -- the thought of going to prison started to really weigh on me. At first I was like, man, you know, I'm going to go to prison about thirty years. Arsonist. Attempted murder. But as time started to go by, I would see cousins, cousins would come over and try to say, You okay? You know, Are you going to go down and turn yourself in?

I said, Well, the police should have been here. I started to get, I guess it's depression because I've learned lately over the past couple years about what that stuff is. At this time I just didn't know. It was just a feeling. And I just started to be more and more down in the dumps. I might -- I would walk to my driveway. We have a split, like a Y and I would sit there and I'd go -- I'd look up and I'd just go where are they? Please come and get me because I don't

know what's starting to happen to me.

Q. And you're not working.

A. No.

Q. Are you out looking for work?

A. No. No.

Q. What was -- what was your major concern during that period of time?

A. I just needed to talk to somebody.

Q. Did you ever try to talk to Robin after the firebombing?

A. I called her, but her uncle Ray answered the phone.

Q. And what were you told?

A. I think at the time she might have still been in the hospital.

Q. Did you ever try to contact her at the hospital?

A. No.

Q. Did there come a time when you were able to talk to Robin at all during this period of time?

A. No.

Q. How often did you try?

A. I tried. Got my cousin to call. I called from Steve's. Maybe two to three times.

Q. Never were able to talk to her?

A. No.

Q. Sometime in May of 1996, you -- you went over to, I guess it's Freedom Drive to the pawnshop.

A.    Yes.

Q.    And you bought a shotgun.

A.    Yes.

Q.    Was that shotgun for snakes and varmints and that sort of stuff around your house?

A.    There was -- there was a lot of confliction in my mind. I started to have -- I started to have thoughts of suicide. But I was angry at myself because I knew I had tried before and not completed it. This time I was -- I had made up my mind that I was serious. I had hoped that by trying and thinking about this seriously, that God would listen and the police would show up and I would -- they would take me away. I said, well, if that happens, I can't lose, you know. We've always had maybe one, two guns in the house. So I could leave it there for that. But that wasn't the real, real reason, you know. That might have been something I told Holl, but I didn't really understand what he was saying. My overwhelming feeling was of I can't go to prison. I can't do real time. I'd rather die.

Q.    You went down there and you got a pump action the first time.

A.    Yes.

Q.    You used a false driver's license or identification card in Mario's name.

A.    Yes, sir.

Q. Why did you ever have that false document to begin with?

A. That goes back to when I moved to Roanoke. My probation officer hadn't yet, as you heard, put me on house arrest. We signed a lease in March of '95. My cousin had got out on bond, I believe, and I was still healing up, so I left. We did go to some of our -- I say our because Robin always went with me to appointments to my probation officer. But he never -- we had it planned that if he put me on house arrest, I would go home. I would go to work at Courtyard. Get my job back. And we would live apart for the six months or so. When he stopped calling, I missed a visit. I got worried and I think that was around the time we made a visit home one time. I snuck away my brother's -- some paperwork; and when I got back to Roanoke, I went -- I went to DMV and got a fake ID under his name because I said if I was in Robin's car or ever got carded, I did not want them to arrest me and extradite me for skipping on my probation. So I was kind of hiding out, I guess you could say.

Q. So it was to -- if the -- if there was such a warrant out for you for absconding or probation violation, that sort of stuff, and you got caught, you would be Mario Barnette as opposed to Marc Barnette.

A. Exactly because that was around the time when things were really difficult with our relationship. If I was just to leave, maybe take some time to get that situated, I feel like

that would have been the end. So I didn't want to leave and the best thing I thought at the time was to hide out a little bit longer.

Q. And so you get this pump action, you take it home. You took it back the next day.

A. Yeah. I had to wait for my mom to leave, then I -- because I was no longer allowed to touch my brother's car after what I did, as you can imagine. So I would tell my grandfather I needed to go to the store. So I went and I bought that gun and I believe I fired it once and it broke. The slide broke. So I got him to, you know, let me, you know, Poppa, I need to go to Lakeview store, or whatever. And I snuck back and told them it was broke.

Q. And they exchanged it for you?

A. He said, Well, we can't give you your money back. He said, That's our policy. And I felt like I was -- something hit me to say don't buy another gun. Buy a stereo or something. But I said no. I said, Well, let me see what you got. And that's when he pulled out the other gun.

Q. And that was the semi-automatic that you had?

A. That was the semi-automatic. That was the first time I had ever seen a semi-automatic shotgun.

Q. Okay. Took it back home.

A. Yes, sir.

Q. When did you saw the barrel off of it?

A.    I can't really recall the time.  It was maybe a week, maybe days later.  I hid the gun in my room in a fabric box which is a long, tall box that was under my bed.  So I hid it in there.  It was sometime, maybe a week and a half maybe at the maximum that went by, but I cannot recall how long it took before I decided to saw the gun.

Q.    Why did you hide it?

A.    Why did I hide the gun?

Q.    Yes.

A.    Because I didn't want anybody at my house to know I had that gun.

Q.    During this period of time, Marc, tell us as best you can what's going on in your mind mentally or emotionally.

A.    It's like a -- just a swirl of lots of different fantasies and ideas and weird thoughts.  At one point I'm saying to myself before I even got the gun, I thought I was going to hang myself.  After I got the gun, I thought I would just shoot myself.  And I thought about going to Roanoke and killing Robin and killing myself.  But those thoughts were also juxtaposed with any minute, any day the police are going to show up.  But I just had so many conflicting fantasies and thoughts and emotions that it was -- it was hurting me.  And the only way I felt like I could relieve that hurt, I started to drink more and more and more.

Q.    How much would you consume on a daily basis during this

period of time?

A.    I started drinking first thing in the morning.  I still had some Vodka left over.  I -- my grandfather, he'd go to the store.  He'd get, you know, get beer.  I'd tell him to get me -- get me whatever he wanted.  He'd pay for it.  I'd stay in my room.  And I'd just try to keep these thoughts away, these morbid fantasies about death and the final out, you know.  It felt almost like they were attacking me.  Like something was coming over me.

Q.    Why didn't you just pick up the phone, call the police?

A.    I wish I did.

Q.    Any reason why you didn't do that?

A.    I don't know.  I was fighting my own emotions.

Q.    Sawed the gun off.

A.    Yes, sir.

Q.    And both ends.

A.    Yes, sir.

Q.    What did you put around the stock end?

A.    As I started to -- started to think, things started to become clearer as far as knowing what a murder/suicide is.  Started to almost relate to stories I had heard of a guy doing that.  So now I felt like, well, if I was going to go, I wasn't going to walk down the middle of the street with some huge gun.  I started thinking about making it small.  Something like you see on TV.  Conceal it.  Make it easier to

conceal. So I sawed the ends down, wrapped hockey tape around it. At that point I hadn't put the flashlight on it yet.

Q. Had you test fired the gun in the sawed-off condition?

A. Yes, I had.

Q. Where had you done that?

A. Excuse me?

Q. Where had you done that?

A. Way in the back of the woods. We've got maybe eleven acres total, maybe seven. I'd taken it way in the back of the woods by a creek.

Q. Now, you had a gym bag or some sort of bag that you kept in your room there.

A. The significance of that bag is that was the bag that I would always pack when I would go see Robin.

Q. What had you been putting in that bag during the days or weeks leading up to all this?

A. I had shells, shotgun shells, crowbar, bolt cutters, little pen flashlight. Started collecting stuff thinking about what I actually would do if I got there; and if I got there, what would unfold. And it wasn't so much as a plan, it was so much just thinking what was going to happen. What would I need? How would I get to her? And I started to put those things in my bag.

Q. Do you remember when you taped the flashlight to the shotgun approximately?

A. It might have been the day before I left.

Q. And why the red lens?

A. I don't know if you heard about all the men in my family, but I was the first one to not join the service. Every male since -- well, before me has. And we'd sit around and listen to all the war stories from Nam to World War II to Korea. So I know a little bit about what some of my uncle talked about, lot of things he didn't talk about in Nam. I even had one of those flashlights, the army ranger type that has several different lenses.

Q. Okay. But you actually coated the lens yourself?

A. Yes, I coated that one.

Q. And was that part of the murder/suicide that was going through your head and how you were going to do it?

A. Yes.

Q. Play it out in your head?

A. Yes, it was.

Q. Friday, I guess Friday morning, the 21st or 22nd of June, you woke up, got this gym bag in your room with shells and things in it. How do you feel that morning when you wake up?

A. I had -- I had been drinking all day the day before. And when I rolled over, the first thing I did was took a drink of what was left. And I just felt -- it was -- it was -- I felt like it was 90 degrees. It was probably about noon. And I -- I just couldn't take it anymore.

Q.   Did you think this was the day?

A.   Yes.   Something -- something just said today is the day I die.

Q.   Was this the day Robin was going to die?

A.   Yeah.

Q.   Tell us about that day up until the evening.   What was going on with you?

A.   Absolutely nothing.   I just stayed in my room.   Listened to music that just seemed to exacerbate the situation.   Just made me keep thinking about the hurt, pain I felt.   I just -- I wanted out.   I was through dealing.

Q.   The late afternoon, early evening, it gets to be dark. You're in your room.   You're in the house.   What's going on in the other parts of the house?

A.   My uncle, he -- my uncle shows up for some reason.   And him and my mom's fiance, they were watching TV and I could hear them downstairs.   And I'm walking around my room and I'm just -- I'm ready to go.   And I go to my brother's room and it gets pretty late.   I'm talking to him.   Start playing video games with him.   And we just talked.   So I got up and I left and I stopped.   My uncle wanted to talk to me and I didn't know why he wanted to talk to me, but I didn't want to talk. I went to my mom's room and she was getting ready for work. She worked in the Westin downtown.   So I talked to her.   I said, I love you.

Q. What time did she go to work?

A. I don't -- I don't recall. It was later.

Q. Sometime in the evening, ten, eleven o'clock?

A. Yeah.

Q. How were you dressed?

A. I had on a -- Robin had bought me a -- maybe a Guess shirt or something. It was beige denim, some blue jeans that she bought, and shoes she bought.

Q. What did you do about midnight, 1 o'clock?

A. I just -- I think I went down, went got some more beer. Kept waiting for Jeff and John to leave. My mom was already gone. Grandfather was gone. I don't know if Mario was there. I think he might be gone. Jeff and John, they were going to go somewhere and they wanted me to go. I was waiting for them to leave.

Q. After they left, what did you do?

A. I threw some pants or something in a bag, shirts, got my gun, put it in the bag. I dumped the box with the rest of the shells in the bag. I went outside and looked around. There was nobody in sight. I started walking.

Q. Where were you going?

A. I didn't know really, but I was going to get to Roanoke.

Q. Didn't have a car, did you?

A. No.

Q. Was there any car around there that you could have used

that night?

A.   No.

Q.   You walked down to the intersection of West Boulevard and Billy Graham.  Describe that intersection for us.

A.   It's real wide.  It's four lanes.  Lot of lights.

Q.   That's the -- at that intersection is where your property -- your grandfather's property is, isn't it, right there in that intersection?

A.   Yes.

Q.   Which way do you walk after you get to that intersection?

A.   I used to -- I used to go to church on Morris Field, Morris Sanctuary.  I -- you know, I know that whole area, airport, Billy Graham, like the back of my hand.  It was really the only way to go.  There was just nothing down that way.  So I walked that way.

Q.   About a mile?

A.   About a mile.

Q.   Somewhere like that.

A.   About a block.

Q.   You walked up there.  What do you have with you?

A.   Got my bag had clothes in it.  Had my gun, shells.  All kinds of -- I don't know what all I put in that bag.  Just all kinds of stuff.

Q.   Marc, where did you ever get the idea that you had to

have a car that night?

A. When I left my driveway, everybody had left and I didn't know what I was going to do. I was going to get to Roanoke some way.

Q. Tell us again why you had to get to Roanoke that night.

A. I needed to get to Robin.

Q. Got up to the intersection of Morris Field and Billy Graham. When you got up there, where did you go?

A. When I got there, as I kept walking, it just seemed to get darker and darker and I was, you know, I was a little -- I was woozy, but I was -- I was set on doing something. As I got to the intersection, it was just nothing there. It was red lights and green lights. So I went and I knew that's where you turn into Morris Field and that's how I used to go to church. So I threw my bag over in the weeds, bushes right by the side of the road, opened my bag. I loaded my gun. And I crouched.

Q. What were you waiting for?

A. I was going to carjack somebody.

Q. Were you waiting for somebody to stop on Morris Field or Billy Graham or did it make any difference to you?

A. It couldn't -- if you've driven on Billy Graham, you know it's basically a freeway. Morris Field is two lanes, small. It's almost completely black when the light's not green. I kept watching cars come down Morris Field. One come down.

Another. That's when I said I was going to get a car.

Q. Were you waiting for a car with only one person?

A. I didn't know what to do. I just -- if it was one person, that would make it easier. I didn't really have a formulation plan, just to get a car. It was very base because the more I started to think, the more I started to waver. So I just -- however it was going to present itself. Whatever opportunity was going to present itself, I was going to take advantage of.

Q. Now, 1:00, 1:30 in the morning, you're there crouched down in the dark with a gun. What do you see coming down Morris Field?

A. It was like a black -- black car. I couldn't -- I couldn't make it out at that time. But he didn't pull -- he didn't pull all the way to the light. He didn't pull all the way to the intersection. Music was just blasting. And I couldn't really see in there. But at that time everything just seemed stopped. No traffic came on Billy Graham. No traffic came behind him. It just seemed like an eternity.

I'm sorry. I'm sorry. I know you don't believe me. I'm sorry. I'm sorry. I shouldn't never been there.

MS. ROSE: Well, objection, Your Honor.

THE COURT: Please answer the questions.

Q. Marc...

(Pause.)

Q. Marc, would you tell us whether the window on the car was up or down?

A. It was down.

Q. What did you do at that time?

A. I ran -- I ran to the car. I put -- I put the gun in the window and I opened the door. I told him to get out. I said, Get out.

Q. Did he get out?

A. Yes, he did.

Q. What, if anything, did you do at that time?

A. I told -- I -- I told him to go that way. Go that way to where my bag was.

Q. Did you even know this person's name?

A. He was an innocent man. Never seen him before in my life.

Q. Did he follow your instructions?

A. Yes, he did.

Q. Where did you go? Where did you make him go?

A. I pointed him to where my bag was stashed. And it was by a culvert or something. I pointed him down that way. And before we got there, I told him, I said, Give me your wallet. He reached in his pocket, he pulled it out and threw it on the part of the culvert. I told him, I said, Go that way.

Q. Did he do what you told him to do?

A. Yes, he did.

Q. What was going through your head? What were you thinking?

A. I wasn't thinking, man. If I was thinking, I wouldn't been there.

Q. What were your next instructions or directions?

A. I told him to turn around.

Q. Did he say anything to you at that time, Marc?

A. He said, Don't shoot. He said, Don't hurt me.

Q. Back where y'all were standing in the culvert when he said, Don't shoot me --

A. I couldn't see anything. It was pitch black.

Q. Did you tell him to keep moving?

A. No. We were already so far in the woods, on the concrete, on a slope. He was somewhere in front of me. I kept looking back and looking back.

Q. Marc, did -- Marc, did you turn on your flashlight while you were in there?

A. No. Nothing. Nothing happened like you would think something is going to happen. It didn't happen like that. I couldn't even see him. I didn't even fumble for it. I had both of my hands on the gun. I didn't know if he was going to attack me or reach out. I didn't know if he was going to run. I just -- I was panicking.

Q. Marc, why not just tie this young man to a tree? You've got all the tools you need in the bag.

A.   I just -- I wasn't thinking.  It doesn't make sense.
This is not some planned hit.  I wasn't in it just -- I just
wanted a car.  And I just overreacted.  I just thought he's
going to stop me.  He's going to stop me.  I wasn't cold about
it.  I wasn't meticulous.  I was just being a damn idiot.  And
I shot him for no damn reason.  Innocent man.  He didn't do
nothing to me.  Nothing.  Not a damn thing to me.  And I know
his family seated here, they don't have a son no more because
of me.  I shot him for no reason.  Out of fear and stupidity.

Q.   Marc, how many times did you shoot the man?

A.   I didn't even remember until they told me.  I just pulled
the trigger and pulled the trigger and pulled the trigger.  I
didn't even know if I hit him.  If I did hit him, did I kill
him?  Did he live?  I was just -- everything was swirling
around.  I just ran.  I ran.  I ran.

Q.   Where did you go?

A.   I grabbed -- I grabbed the bag.  I grabbed his wallet.  I
got in the car and I fled.  I just -- I turned around and I
drove.  I drove.

Q.   Did you turn onto Billy Graham to go out to 85 and then
to 77?

A.   No.  When I got to the car, I just -- I looked back.  I
think about this.  The light must have changed because all of
a sudden it started to lighten up and I couldn't figure out
why back then.  It was because traffic had started moving on

Billy Graham. So I turned around and I went back down the road, Morris Field.

Q.   Went back down Morris Field?

A.   Yes.

Q.   Is that the way the car had come when you -- when it stopped there?

A.   Yes.

Q.   Now, when you got -- when you got down on Morris Field, did it intersect with Wilkinson?

A.   Yes.

Q.   Do you remember what you did when you got to that intersection?

A.   I had the gun in the front seat. I had his wallet in the front seat. I looked at it. I took out the license and I looked at it and I read it.

Q.   Is that the first time you knew the name of the man you had killed?

A.   Yes.

Q.   Now, as you got on Wilkinson, where were you heading?

A.   All I could -- I was going to Roanoke.

Q.   Pardon?

A.   I was going to Roanoke.

Q.   And that's where Robin was?

A.   Yes.

Q.   As you headed up -- or out Wilkinson, did you get on 77

north?

A. Yes.

Q. Did you ever stop as you were going up 77 north or 81, or however you went to Roanoke, to get some gas?

A. I think so.

Q. Do you remember -- do you remember whether you did stop, not stop, use the money from the wallet to get some gas?

A. I did.

Q. Do you remember where that was?

A. No.

Q. It's -- did you even know what time it was?

A. No.

Q. About how long would it normally take you to drive to Roanoke?

A. Three hours plus.

Q. Do you know how long it took you to get to Roanoke that day?

A. A lot less.

Q. And why was that?

A. Just the way I was -- it's just the way I was driving.

Q. Weren't you afraid to get caught for speeding?

A. I've never been able to -- six years later I've still not been able to pinpoint all my feelings. I think at some point I took my time and didn't, sometime I did, but a lot of that is still just not real clear. Still trying to work through

FORM FED ● PENGAD · 1-800-631-6989

some of the smaller details because it's not really the thing that's mostly on my mind about what happened that night -- or that morning.

MR. BENDER: Your Honor, this may be a good stopping point.

THE COURT: I had that in mind myself.

Members of the jury, we'll take a lunch break. Please remember the usual instructions. Keep an open mind about the case. We'll ask you to be back with us at quarter of two. That will give you almost an hour and a half. Thank you very much.

(Jury exited the courtroom.)

THE COURT: Mr. Bender.

MR. BENDER: Your Honor, Marc Barnette has every right as he's testifying and subjecting himself to cross examination to express remorse because that is a mitigating factor. That's one of the things about his character that this jury is entitled to receive and view it any way they want to. He has every right to do that. And that's what he was doing when the objection came.

THE COURT: I think that objection was directed at the fact that he had stopped answering questions as such.

MR. BENDER: Well, the --

THE COURT: And that's why it was appropriate for you to ask another question.

MR. BENDER: Well, I think -- and I submit that in this matter it's appropriate for him to express remorse if he chooses to do so.

THE COURT: I think he's done that at length.

MR. BENDER: The other matter I wanted to address the court about is if -- I assume that Ms. Rose will be cross examining him since she was the one who objected in this matter. That normally in federal court, the person who objects is the one who is either doing the examination or the cross examination. So I assume that Ms. Rose will be doing that in this matter?

THE COURT: Well, we'll see what the government proposes to do.

MR. BENDER: Okay.

THE COURT: All right.

(Lunch recess at 12:22 p.m.)

 

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3129

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA          )

                                  )   CASE NO. 3:97CR23-V

     v.                           )   August 5, 2002

                                  )   Afternoon Session

AQUILIA MARCIVICCI BARNETTE,      )

          Defendant.              )

          TRANSCRIPT OF SENTENCING HEARING

     BEFORE THE HONORABLE RICHARD L. VOORHEES

          UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

     ANNE M. TOMPKINS, Esq.

     JILL WESTMORELAND ROSE, Esq.

     Assistant United States Attorney

     227 West Trade Street

     Suite 1700

     Charlotte, North Carolina  28202


FOR THE DEFENDANT:

     JEAN B. LAWSON, Esq.

     P.O. Box 4275

     Charlotte, North Carolina  28226

     HAROLD J. BENDER, Esq.

     200 North McDowell Street

     Charlotte, North Carolina  28204

Reported by:  Scott A. Huseby,

              Registered Professional Reporter,

              Certified Court Reporter,

Case 3:12-cv-00327-MOC    Document 194    Filed 09/23/15    Page 73 of 280
1107

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3130

P R O C E E D I N G S

THE COURT: Are the parties ready to resume?

MR. BENDER: Yes, Your Honor.

THE COURT: Just for information of the attorneys, the Court invokes a rule about attorneys where there are more than one counsel restricting objections to one or the other that is the one who is doing the questioning, but the Court only invokes such a rule when it becomes bothersome that you have -- when the Court can't really tell who is functioning as the attorney on a particular witness. That hasn't happened yet in this trial on either side, so this is the first time it's come up. But I will continue to -- I will instruct counsel about that again if it becomes troublesome. May we have the jury, please.

(The jury returned to the courtroom.)

THE COURT: All right, you may resume.

MR. BENDER: Thank you, Your Honor.

BY MR. BENDER:

Q. Marc, tell us how you were dressed when you carjacked Donnie Allen's car.

A. I had on jeans and a tan shirt.

Q. And did you at any time change clothes?

A. No. They were in the bag, but I never wore

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3131

them.

Q. Okay. And were those the jeans and the tan shirt that Robin had given you?

A. Yes.

Q. There's been some testimony about you having a bald head or a shaved head --

A. Yes.

Q. -- when you were in Roanoke. Do you remember when you shaved your head?

A. I shaved it maybe a day or two before I left before that night.

Q. Okay. Tell us why you shaved your head.

A. As things kept getting worse and I was continually fighting the thought to do what I set out to do, I couldn't think straight. And I just kept looking at my hair. I had this long hair on my head and I just could not think, and the only thing I could think to do was to shave it off. So I shaved it and I took a razor and I shaved it off.

Q. Did you think that would help you think more clearly?

A. It sounds pretty stupid, but at the time that's exactly what I thought.

Q. Now, when you got to Roanoke after you'd stopped and gotten gas, had any idea of what time of the

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A          ion  (704) 333-9889
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 75 of 280

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                      8/5/2002

Page 3132

morning it was?

A.    I had lost track of time.

Q.    Where did you go first when you got to Roanoke?

A.    I went straight to Robin's mom's house.

Q.    And was that over on Louden Avenue?

A.    Yes.

Q.    And where did you park when you first got there?

A.    When I first got there, I parked across the street behind the duplex that you saw in the pictures earlier.

Q.    You parked on the side street?

A.    No, I remember going to the duplex.

Q.    Okay.  And how long did you stay parked there on Louden or right nearby?

A.    Until after I had saw Robin and saw Robin's mom.  It wasn't until I welled up something inside of me to go to the house that I moved the car.

Q.    When you say you saw Robin, did you have any idea what time it was, whether it was dark, light?

A.    It was still twilight, kind of dark.  The sun was not yet come up.

Q.    And when you saw Robin the first time, where did you see her?

A.    I saw her open the front door and let Marcie

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an AI          on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 76 of 280
1110

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3133

out.

Q.   That's the dog that we know about?

A.   Yes, that's Robin's pet.

Q.   And that's a fenced in yard all the way around?

A.   Yes.

Q.   Okay.  Did you see her later get Marcie back in the house?

A.   I might have, I really don't recall.

Q.   Okay.  And you saw her mother, Bertha Williams?

A.   Yes, I did.

Q.   When did you see Bertha and what were the circumstances under you seeing her?

A.   After I saw Robin, I got real antsy and I started to doubt everything that I was there for.  It was almost seemed like just. I was starting to get confused.  After a while, I sat there for a long time, I saw a brownish car pull up and I saw Bertha come out.  I think she had been on the porch already for a few minutes, sitting there.  And the car pulled up, and in my mind at the time, the only thing I felt was it was Bennie.  But she came off the porch and she went to the car.  It was Destiny, her grandbaby.  And she took her back in the house and she shut the door.

Q.   Okay.  And at that time was when you moved the car?

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 77 of 280

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3134

A.   That's when I backed up, moved the car to the alleyway behind her house.

Q.   Is that someplace that you had parked before or knew it was back there?

A.   I knew it was back there, but I had never parked back there.

Q.   Why did you move your car to park it in that little alleyway behind the house?

A.   It was -- by that time, it was daybreak.  I had sobered up pretty well, and the distance I was from the house was pretty far.  I moved the car to get closer to the house.

Q.   And when you parked back there, what did you do next?

A.   I got out of the car.  I pulled the gun out of the bag.  I proceeded to just go in the back gate and move towards the house.

Q.   Okay.  You opened the back gate at the very rear of the property?

A.   Yes.

Q.   The chain link fence and walked in, and where did you go when you walked into the yard?

A.   I went and stood at the back corner where there is a kitchen window at the very back of the house, and I started to look around.  I started thinking about phone

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 78 of 280
1112

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3135

lines then. I didn't want anyone to stop me. I found the phone lines, I reached in my pocket, I pulled out some wire cutters and I cut the phone lines.

Q. And then did you approach the kitchen door?

A. I moved around towards the other side of the house to where the kitchen door was, and I sat there on the step for seemed like forever.

Q. What were you thinking?

A. Just my mind was a mess. My heart was just in my head banging and I just had the feeling like this is it, this is going to be the end. And I didn't know if I could do it, and I didn't know what to expect. I didn't know what was going to happen. I just felt like if I got in that door, I don't know what was going to happen.

Q. Did you try the kitchen door, try to open it?

A. I tried to open it.

Q. Did you try to kick it in?

A. No, I don't think. I might have pushed against it, but I just didn't put any force on it.

Q. Okay. Then what did you do?

A. I held the screen door back, placed the gun up to the door and I leaned against the screen door and grabbed the gun with both hands, I placed it near where the dead bolt was and just took some real deep breaths, and I started shooting inside the door.

Case 3:12-cv-00327-MOC    Document 194    Filed 09/23/15    Page 79 of 280
1113

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3136

Q.    Do you remember how many times you shot at the door?

A.    I think I just squeezed the trigger and emptied the gun.  It's only three shots, I believe.

Q.    And after you shot three times, did you have to kick the door or somehow force it open even after that?

A.    I did, but I just -- you know, it was -- everything was kind of just disjointed, kicked on the door.  I got in the door.  I just remember getting in, remember how.

Q.    Had you reloaded your gun at that time?

A.    Once I entered the home, I looked towards the kitchen area where I was facing.  I heard all of this commotion to my left, and I heard Robin say, I think it came from down the street.  And I looked outside and she was on the front porch holding the screen door open.  She was just about to come back inside, and I saw Robin's mom standing there.  That's when I started to reload.

Q.    And did you ever catch Robin's eye at that point?

A.    I looked kind of through her.  She was standing in the middle of the foyer area by the den entry, and I kind of looked over her shoulder.  And I saw Robin and she got a glimpse of me, and that's when Bertha had

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an        union (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 80 of 280
1114

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3137

turned, looked at me and she told Robin to run.

Q. Now, did you point that gun at Bertha and the baby?

A. I don't remember. I was reloading and I thought about it because I heard her say that, and I think it was unintentional, because when she told Robin to run, I ran out the back.

Q. Which way did you run?

A. The back. I ran back out the way. I wasn't going to go through Bertha. I wasn't going to hurt Bertha.

Q. And is there another gate on that chain link fence somewhere near the front?

A. The front sidewalk runs right to the steps of the house, and you go through the gate from the street to get to the house.

Q. Had Robin run through that gate?

A. I heard the gate swing, bang. I did not see her when I ran out the back. So, I mean, I used to -- I slept at that house, spent a lot of time there. I know the house like my own house, so I knew she ran out the front gate.

Q. And did you run out that front gate also?

A. Yes.

Q. When was the next time you saw Robin after she

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 81 of 280
1115

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3138

ran out of the house?

A. When I finally got around the gate, I ran between her car and her mother's car. I looked up and I couldn't see, so I slowed down and I was looking around. I wasn't quite sure where she had run. I ran to the left around the duplex towards the intersection. As I ran through the grass, started to come up the hill, that's when I saw her come around the back of the duplex.

Q. And what did you do at that point?

A. I told her to come here. I started chasing her.

Q. Was she saying anything to you as you were chasing her?

A. No, she -- when she saw me, she bolted. And she slipped and she fell, and I was moving towards her at a very slow rate. She got up, she ran some more and she ran over the back of this hill on the street we were on. By the time she got over the hill, she slipped and fell into this person's yard.

Q. And how close were you to her at that point when she fell the second time?

A. I was probably about four, five people distance, person distance from her, maybe good 7, 8 feet because I was closing on her.

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 82 of 280
1116

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3139

Q.   Marc, as you were running after Robin chasing her with that sawed-off shotgun, what were you thinking?

A.   I just -- I don't really -- I don't really understand the difference between then and now, the structure of the thought is just not the same.  I mean, I had emotions and feelings of getting to her.  I had fantasies of taking her with me, having her tell me it would be okay, taking me to find Bennie.  I had so much stuff running through my mind, there is -- it's just never one thing to pinpoint.  And it's just so much different from now, and it's not really -- I can't really explain it.  It's hard for me to explain what I was thinking, because once again, if I was, I don't think those situations would have occurred.

Q.   Now, Marc, after she fell the second time, when you were closing on her, did you ever grab her, were you ever able to get close enough to grab her?

A.   Yes, I did.

Q.   How did you grab her?  You've got the shotgun in both hands.

A.   She fell and she was in the grass.  I grabbed her by her right hand, I believe, and I pulled her.  I told her to get up.  I had the shotgun in my right hand.  I was pulling her back across the hill with my right hand -- with my left hand with my -- the shotgun in my

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 83 of 280
1117

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3140

right hand.

Q. And then you -- where in relationship to that intersection at Louden and whatever street that is, how far up that hill had she gotten before you grabbed her?

A. She was -- had nearly run to the adjoining street. On the back of that duplex, it's a house with a driveway behind it. This house was sideways to the house where she had run and fell in the grass.

Q. Were you talking to Robin, was she talking to you, were you yelling at each other, what was going on as you grabbed her?

A. I remember grabbing her, pulling her. She was pulling, resisting. I kept telling her to come on. I said, you are going with me. She said, I'm not going with you. I said, you are coming with me, and she said no. And by this time, I could start to hear Bertha calling. We started to trek down the street, still in the middle of the street. I was trying to get her to go to the car with me. We were arguing. I told her I was going to kill her.

Q. And what did she respond when you said that you were going to kill her?

A. She said, you are not going to kill me.

Q. Then what happened?

A. I said that's okay, I said, because I got one

800-333-2082   Huseby, Inc.   (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 84 of 280
1118

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3141

for you and I got one for me.

Q. Marc, what happened after you said, I got one for you and I got one for me?

A. She snatched away from me and she tried to reach for the gun. Just when she reached for it, she almost got it, and I pulled back and that's when I shot her.

Q. Do you know where you shot her?

A. No.

Q. At that time?

A. No.

Q. What if anything did Robin say to you when you shot her at that time?

A. She didn't really say anything. She -- we were kind of parallel with where Bertha was coming in the street area. She turned, she lifted her arm up and I didn't think I shot her, and she started to run towards her mom.

Q. Then what happened?

A. I shot her in the back.

Q. Did Robin say anything as you shot her the second time?

A. She just fell.

Q. Where was her mother Bertha when you shot her in the back?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an          rion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 85 of 280
1119

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3142

A. She was coming towards us.

Q. Could you hear her screaming or yelling at you?

A. Not until after Robin was laying there.

Q. Did you see somebody on the porch with a telephone, the porch of the duplex?

A. At that time, I had forgotten that there was somebody up there. They told me, but I didn't remember. I had to think, really think about it because at that time, the whole time I was grabbing Robin and she was fighting me and I had her by the hair one time and then by the arm again, my focus was on her. I couldn't see or sense too much going on around me. Everything else outside of her -- the view of her was -- it was skewed, so I didn't remember that there was somebody up there on that porch.

Q. Marc, at the time you shot and killed Robin, were you in love with Robin?

A. I was very much in love with her.

Q. What did you do after you shot her in the back?

A. I panicked. I saw Robin, I saw her get hit when I shot her and I saw blood. It was just like everything was in slow motion. I wanted to catch her. It seemed like I was just moving away and I was running.

Q. Where were you running?

A. I don't know, I was just running away.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3143

Q.   How many shots did you have in that shotgun?

A.   I don't recall.

Q.   Why didn't you put the shotgun in your mouth, under your chin, up to your head and do what you had planned to do when you went up to Roanoke that day?

A.   Because I panicked.  I saw what that gun did, I saw it when it hit her and everything just froze, and I don't know why.

Q.   Marc, is there anything you want to say to Robin's family at this point?

A.   I don't understand how I got to this point because I know how much y'all loved Robin and I know how much she meant to you, and I hate myself for what I did to you.  I just wish I could give her back because I know you miss her, and I'm so sorry.  I'm very sorry.

Q.   Marc, after you shot Robin in the back and you ran away, where did you go?

A.   I just drove.  I didn't know where I was going.

Q.   Did you run in that little alleyway and get in the car?

A.   Yes.

Q.   And when you left Roanoke, do you even remember what route you took as you left Louden Avenue?

A.   No.

Q.   Did you get on the interstate?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., ar          ierion  (704) 333-9889
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 87 of 280
1121

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3144

A. Yes.

Q. And that's Interstate 81?

A. Yes.

Q. Which way did you head at that point, do you remember?

A. At the time, I just -- I got on the highway and I just kept driving. I didn't have a clue what was going to happen next.

Q. Did you continue to drive on the interstate?

A. Yes, I did.

Q. And did you have any idea where you were going, did you have any plan or purpose as to where you were going to end up?

A. No. I did not realize where I was until I reached I think Bristol, Tennessee.

Q. And did you continue to drive until you got to Knoxville?

A. Yes, I did.

Q. Any reason why you stopped in Knoxville, you got family there, friends, relatives?

A. No.

Q. What is going through your mind, Marc, as you are driving up 81, finally end up in Knoxville? You just murdered two people.

A. I just -- I did not know what to do, confusion,

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 88 of 280
1122

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3145

I mean, hurt. I mean, I had so much going on, fear, I mean, worry. It was just -- I just didn't know what to do, what to do next. And then it just -- it dawned on me that I had panicked. I didn't shoot myself. I started to think about what I needed to do.

Q. What did you decide to do?

A. I decided that I was going to kill myself one way or the other.

Q. What is the first place you remember stopping after you got to Knoxville?

A. I had never been around there, but I got to this hardware store and I went in there and I said, okay, I'm going to find a way to do this, because I wasn't going to touch that gun again, not after I saw what happened to Robin. I just chickened out and didn't blow my brains out, which most days I wish I had.

Q. What were you looking for at the hardware store?

A. I just thought about carbon monoxide poisoning. I don't know where I got the idea or how it came to me, but that's why I went to the store, to buy a hose or whatever else and I was going to park that car and just that was going to be it.

Q. Were you able to find the hose at that hardware store?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3146

A.   No.

Q.   What did you do after you couldn't find the hose at the hardware store?

A.   I left.  I think I got on a highway.  I had saw a mall when I came into the town, so I went there.  I drove around.  I was absolutely lost.  I was just running on fumes.  I pulled into a Sears, ran in, went to garden, whatever section, bought hose, went back out to the car.

Q.   Did you have some duct tape with you in the car?

A.   No, there was none in the car, I don't think.

Q.   Was that the only thing you got at the Sears was garden hose?

A.   You will have to refresh my memory.  I mean, some of the stuff like that, it's not as clear.  I did a lot of things and I don't always remember everything.  Some stuff gets left out.  I talked to a lot of people about this and sometimes I leave stuff out.  Sometimes, something else is added, but it's only because I didn't think about it.  So I got some duct tape.  I cannot remember at this time right now where.  I do remember getting the hose, but I did get some duct tape at some time.

Q.   Okay.  Did you also go to a pharmacy, a drug

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 90 of 280
1124

United States of America vs. Aquilia Marcivicci Barnette

Proceedings Before Judge Richard L. Voorhees

3:97CR23-V

8/5/2002

Page 3147

store to buy some over-the-counter pills?

A. That did not happen that day or that night.

Q. Okay.

A. That happened on Sunday evening. This was Saturday afternoon.

Q. Where did you go with the hose and the duct tape?

A. I stayed in the mall parking lot for quite some time. I just sat there. Things were starting to seep in, started reliving what had happened, the night with Donnie, seeing Robin. I just sat there, and I didn't know where to go or what I was going to do. I started cutting up hose and just looking around. It's broad daylight, middle of the afternoon. I'm thinking to myself, okay, where I'm going to do this.

Q. What sort of plan did you have, if any?

A. Just to park somewhere, put the hose in the pipe and go to sleep.

Q. About what time, if you remember, what time did you leave that Sears parking lot?

A. I had been sitting there thinking that nobody would come up to me. Some security guard comes up and he bangs on the window. Well, I didn't have the hose on the car, everything was inside, so I left and I left that area. I knew I needed to find somewhere where this

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3148

could happen, but I was very paranoid because of what had happened that morning. I wanted it to get dark so there would be no chance of somebody finding me. So I think at that time I went to a movie theater parking lot where it was crowded, and I parked and I said I'm just going to sit here until it got dark.

Q. And did you do that?

A. Yes.

Q. After it got dark there in the movie theater parking lot, did you have any plan or idea as to where you might go next?

A. No. It got dark. I left that area because it was still the mall area, but it was somewhat adjacent. I left, got on the highway again. I got off on this exit. I just -- you know, I didn't know where I was. I drove. It was this two-lane road. I just took it, pulled into a subdivision. It was only maybe six houses total in the whole subdivision. I pulled all the way to the back of the subdivision, and there was just some brick, dirt. It was just like it was nothing there, like it was abandoned or it was either new.

Q. And then what did you do when you found this fairly deserted area?

A. I just thought about what I did, kept thinking about it, kept thinking about it, and I just said I got

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 92 of 280
1126

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3149

to go.  So I put the hose inside the pipe, cranked the car up, rolled the windows up and I tried to go to sleep.

Q.    Were you able to go to sleep?

A.    No.  That first time, Saturday night, it was -- I don't know if it was the adrenaline or what it was or the thoughts continuously over in my head what had happened earlier that morning, but it just seemed like it was choking me, and I was fidgeting and I just -- I couldn't go to sleep.

Q.    Did you use the duct tape on the tail pipe that night?

A.    No.  The hose that I bought was a garden hose. You didn't tape the pipe, all you had to do was slide it down into the pipe.  It stopped any exhaust from coming out.  All exhaust that came out goes through the hose.

Q.    You couldn't go to sleep?

A.    No.

Q.    Was the carbon monoxide coming into the interior of the car?

A.    Yes, it was -- it was fogging up the glass.  It was this putrid smell.  It's not what you smell if you stand at the back of a car.  It's different when it's in that tight space and it was getting in my nose, was choking me, my eyes were burning and it was fogging the

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 93 of 280
1127

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3150

glass. I stayed in that car I know for more than half an hour.

Q. Did the carbon monoxide make you sleepy at all?

A. It didn't make me sleepy that night, no. Like I said, the thoughts of what happened just seemed to keep me agitated. I kept feeling this -- these feelings. Finally I got out of the car, I was coughing, just -- I said what is it, what is it, why is it that this is not working? You hear about this all the time, it works, people put a pipe in and they go to sleep, but it did not happen.

Q. Where did you go after you got out of the car, cleared your head, where did you go?

A. At that time, I was trying to figure out why this wasn't working. You see it on TV. It works all the time. I felt -- I was feeling this -- these feelings of just overwhelming pain. Because of what I had done earlier that day, I felt like Robin and Donald's soul was just -- were attacking me and mad at me and they were not resting, and it just felt like I had to pray for them. It was just this overwhelming feeling of needing to pray for them.

Q. When did you take the South Carolina license tag off of Donald Allen's car and put the Tennessee tag on it?

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 94 of 280
1128

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3151

A.    After I pulled the hose out of the pipe, I left.  And it's Saturday night, you know, I'm not thinking I can go find a church.  I'm thinking that I need to call home, I need to say good-bye, I need to go pray.  I just kept hearing Robin's voice saying you commit suicide, you are going to hell.  I kept thinking about what I had done to her and I might be going anyway, so I left.  And as I left that road, I'm just -- it's hard for me to explain the feelings because they were conflicting, but I knew I needed to be around for the next night.  And that's when I saw, I think it was a hotel, some hotel up on a hill and I pulled into that parking lot.  And that's when I switched -- well, took the tag off the car, because I needed to move around. These are the things that kind of just start coming to me and I started to do.

Q.    And you stole somebody's tag off of their car, a Tennessee tag?

A.    Yes, I did.

Q.    Put it on Donald Allen's car?

A.    Yes, I did.

Q.    And left his -- what did you do with his tag, did you leave it in the car or throw it away?

A.    I put it in the trunk.

Q.    When did you decide that the inspection sticker

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 95 of 280
1129

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3152

needed to be removed because nobody in Tennessee had inspection stickers?

A. I didn't notice the inspection sticker until the next day, late in the afternoon.

Q. Where did you sleep the night -- Saturday night, what was left of that Saturday night, where did you sleep?

A. I didn't sleep, I stayed in the car.

Q. Do you remember where you parked the car while you stayed in it?

A. I kept moving around. I felt -- the felling of paranoia was just everywhere. I didn't know -- I knew they were looking for me, they, you know, law enforcement, so I just kept moving around. I would go from one hotel parking lot, I stay, I leave there, I go to another hotel parking lot and kept moving around.

Q. Sunday morning arrives, you are still in the car?

A. Yes.

Q. You still have this need to go pray for the souls of Robin and Donnie?

A. You have to understand that that was the only thing driving me. I didn't feel right, as you shouldn't, doing what I did, and that was the one thing that I was driven to do at that time. I went from

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A̶ ̶ ̶ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 96 of 280
1130

United States of America vs. Aquilia Marcivicci Barnette

3:97CR23-V

Proceedings Before Judge Richard L. Voorhees

8/5/2002

Page 3153

conflicting emotions to that one single thought, and that's just something at that point that I just had to do.

Q. And with that thought in mind, what did you do?

A. I don't know where I was. I had moved around, drove down some of these roads. Like I say, I don't know Knoxville. It's Sunday morning. I was raised in church. I saw two elderly black people in a car. Sunday morning, there is only one place you can be going. And I just, as corny as it sounds, whether you believe it or you don't, I felt like God was watching me and for some reason, I stumbled into these people. I knew to follow them. I followed them. They went right to the church.

Q. Did you go inside the church?

A. Yes, I did.

Q. Were you still dressed the same way?

A. Yes, I was.

Q. Did you have any blood on you, Robin's blood or anybody else's blood?

A. I had blood on my jeans from cutting my finger when I had tried to get in her back door. I didn't have -- at no point did I have anyone else's blood on me except for my own.

Q. Do you remember the name of the church that you

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3154

went to?

A.    I only remember because of the flyer I had that somebody handed me when I came in.    I think it's Calvary.

Q.    Where did you sit in the church?

A.    In the very, very back corner because of the way I was dressed, because of the guilt of everybody staring at me knowing exactly what I did.    If you do something like that to somebody, everyone you look at seems to know exactly what you did even if they've never seen me before.

Q.    What's the first thing you did when you got in the church and sat on the back row, Marc?

A.    I just started praying.    They were in the midst of the choir singing.    It was very, very emotional.    I just asked God to pray for Donnie, pray for Robin.    I didn't care what happened to me anymore, it just -- it didn't make it all right, it's just something was pulling at me, maybe it background or my past from growing up in church that this is something that I needed to do, I need to make amends some kind of way before I left this world.

Q.    After the service was over, what did you do?

A.    I left.    I didn't stay for the whole service. I left maybe midservice.    I left, found a gas station

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 98 of 280
1132

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3155

not too far from there, and that's when I called home.

Q. Who did you call?

A. I called my mother.

Q. Tell us what you told your mother and how she responded to you.

A. She was -- she was very emotional. She was crying. She told me what the FBI agents had told her. I told her how sorry I was, told her how sorry I was.

Q. Did your mother say anything to you that the FBI were looking for you in connection with Donnie Allen's death or carjacking or did she simply mention Robin's murder?

A. She just mentioned Robin's.

Q. After you talked to your mother, what idea or plan did you have after that?

A. I told her I loved her and good-bye. It reverted back to what I had told myself I had to do. She was near hysterical, but I hung up. At the time, I just didn't know how I could face up to something like that, so I was going to go back to that same spot and this time, it was going to be over.

Q. Was this the day that you went to the drug store or the pharmacy?

A. On the way back to that place, you just have to get on the highway, by that time I had a little more

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 99 of 280
1133

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3156

familiarity with the highway and how it ran and that particular exit. There was a drug store or something. I stopped. I bought I think a box of sleeping pills and I said, my idiot logic that I was using at the time was, well, hey, you know, I just couldn't go to sleep, so sleeping pills will fix that and carbon monoxide will take care of the rest. So I bought something to drink to take the pills with and I made it back to that spot.

Q. What did you do when you got back to the same spot?

A. It was daytime this time. Because I had been there the night before, it was pretty much abandoned and this was almost a dead end at this -- since it was daylight, I could see that they were new houses because it wasn't dark anymore. And I grew up in some subdivisions at sometime in my life, so I know how new subdivisions go up and how they are. So it was daylight, I parked, and since I didn't really have a fear that somebody would come back there because now I could see where this area was.

Q. What did you do with the hose?

A. I put the hose -- slid it back inside the pipe, I put some tape on the hose part to keep it from coming out, got in the car, it had got dark, I took half of a box of sleeping pills, I rolled up the windows, and I

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A            rion  (704) 333-9889
Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 100 of 280
1134

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3157

drifted off.

Q.   Something happened after that, Marc.   Tell us what it was that kept you from doing what you set out to do.

A.   I have told people this and, you know, I can understand the skepticism.  I had the gun, but I didn't use it because I was fearful of it, seeing what had happened to Robin.  I was a coward by not using it.  But when I did this Sunday night, I was damn sure that this was it.  I drifted off.  And, you know, I care about what people believe, but in this instance, this is something that was very weird.  I felt my body tingle, I saw white light, whether you -- you know, whoever believes it, that's fine.  This -- that's what happened.  The next thing I know, there is some guy, it's morning and he is banging, banging on the passenger side door.  And he just opens the door, and he starts yelling at me, yelling at me up and down, and he goes back to the back of the car.  And, I mean, I'm sitting there and I have come to and I'm going, this is not happening.  I get out to see where he goes.  He is at the back of the car and he pulls the hose out of the pipe, and he lifts the trunk lid and throws it in there.  And he is telling me all of this stuff about you can't do this, you can't kill yourself.  And I'm thinking, what is going on?  No

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 101 of 280
1135

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3158

sooner than he says, you know, stand here, get some rest, it is the most weird -- one of the most weird things that happened, he just walks off, and that was the last I ever saw of him.

Q. And you got back in the car after that?

A. Yeah, I got out of there.

Q. Where did you go next after that?

A. I got -- you know, he disappeared somewhere through the bushes or something, and I still don't know where he came from, but I got out of there because I don't know who he was or where he came from. I got on the highway and was just driving, but I did not recognize this highway as the same place I came from so I got off again.

Q. Did you make a phone call?

A. Yeah. I -- I was -- you know, taking the totality of everything that happened in these past couple of days, I feel like I'm just losing. So I call -- and I can't call my mom back. She is -- you know, the police are there. FBI is there. I'm not going to call her. I call my cousin, and I just called her to try to help me.

Q. Was this Shonda?

A. That's Shonda Nero.

Q. What did Shonda tell you in that phone call?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3159

A.   She was happy to hear from me, but she was very frantic and she was -- asked me, where are you, what are you doing?  I said -- you know, I started to cry and talk about what happened with Robin and Donnie.  And she said, just shut up.  She said, where are you?  And I said, I'm in Tennessee.  I said, I don't have any gas.  And she said, I need you to come home.  I said, I don't have any gas.  And she said, I don't care.  She said, just drive.  She said, when you get wherever you are, you know, I will come meet you, or something she said about coming to meet me halfway or whatever.  And she said, just don't hurt yourself.  So I got in the car.  I started to get the gun and say no, can't go back, but I got in the car and I started to drive.

Q.   You headed to Charlotte?

A.   Yes, I did.

Q.   Did you know how to get back from Charlotte -- to Charlotte from where you were?

A.   No, because the highway I was on now, it was different than 81 when I came into Roanoke -- I mean, Knoxville.  All that happened is I started driving, I started seeing signs to Charlotte and I found out it was 40, but I still don't know how I got on 40.

Q.   Were you able to get back to Charlotte with the amount of gas you had in Donnie's car?

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 103 of 280
1137

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3160

A.    Yes.  I don't know how, but yes.

Q.    When you got back to Charlotte, where did you go, what is the first thing you did?

A.    I went to her apartment.  I parked in the back of her apartment complex area which is off Monroe Road and Independence.

Q.    What did you do when you parked back there?  And I think the jury has probably seen the photographs of where you parked.

A.    I parked the car.  At this point, I'm thinking, you know, I got to turn myself in.  I don't know what is going to happen, but I need to be accountable for the things I did.  So I didn't want to leave anything in the car that somebody might take.  There was a dumpster behind it, made sure there was some stuff in the dumpster that kind of resembled whatever was in the car, put it in the dumpster, closed the dumpster.  I believe I locked the key in the car but I can't really remember, but I remember locking the car.  And then I headed towards my house.

Q.    And did you go see Shonda or did you just start walking?

A.    No.  Because I had talked to her on the phone, I felt like I kind of pulled her into this.  And I felt like if I went to her apartment, that she would be

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A        rion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 104 of 280
1138

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3161

involved. So I started to walk and started to walk and think.

Q. Did you walk all the way back to 3413 West Boulevard?

A. Yes, I did.

Q. Did you spend the night anywhere?

A. No.

Q. When you got back to Jessie Cooper's house at 3413 West Boulevard, what if anything -- well, first of all, who did you see when you got there?

A. Well, I had walked some time, stopped, sat, walked a little bit. I had to get my thoughts in order. I did not go to my house until probably the next day since I had came into Charlotte around the evening time, so it was midafternoon by the time I got to my house. I went in through a couple of neighbor's back driveways, because I didn't know if the agents would be sitting in my driveway or police would be in my driveway or watching the driveway. So I went, and I think I went to the side or the back door. I saw my mom for the first time since Friday night.

Q. Who else was there?

A. I believe my brother Mario was there. Mom's fiance was there. I cannot recall if my grandfather was there or not.

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an          erion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 105 of 280
1139

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3162

Q.    Did you tell your mother everything that you had done on that Friday night and Saturday relating to Donnie Allen and Robin Williams?

A.    No, she was still hysterical about what happened in Virginia, and I did not know how to tell her exactly everything I had done.  So she was just fretting over me.  I told her -- she told me she had been in contact.  Of course, I knew she had been in contact from the day before.  I said, I'm ready to turn myself in, I need to do what is right.  And from then on, I just prepared myself to meet the FBI agents when they came to the house after she called them.

Q.    Now, Marc, there was some testimony that when you -- when the agents and the police officers came out there to arrest you, you had a Bible in your hand?

A.    (Nods head.)

Q.    Was that for show or exactly why did you have that Bible in your hand?

A.    Nothing that occurred those horrible 3 days was for show.  I had a Bible in my hand because I was just praying for help.  I dressed, cleaned myself up because that was the last time my family was ever going to see me a free man.  I knew that this would be the last time I would be able to touch my mom, hug my mom, and I didn't want them to see me with blood on my jeans.  And

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 106 of 280
1140

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3163

I just prepared myself to accept and face my responsibility.

Q. Now, Marc, the agents came out that day, put you in the back of the car, handcuffed you, took you to the FBI office first, didn't they?

A. Yes, sir.

Q. Told you of your rights, all of the things that police officers do and FBI agents do. Did you confess to them that you had killed Robin Williams?

A. Yes, I did.

Q. At that time, did they ask you about a missing person named Donnie Allen?

A. Yes, he did.

Q. Tell us what you told them when they first mentioned Donnie Allen.

A. I told them that I had the information but that I wanted my attorney to tell them and I would tell my attorney.

Q. But you didn't have an attorney at that time?

A. They told me I would not get an attorney until later, maybe a day or two after I had been processed and that they really needed to know now in case he was hurt, in case he was bound somewhere.

Q. And what did you do?

A. I did not understand my rights on that issue

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 107 of 280
1141

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3164

because I was -- I wanted to tell them where he was, but I didn't know how to tell them. So I said, if you give me a piece of paper, I will show you, thinking -- I don't know what I was thinking, thinking that it made a difference.

Q. Did you either draw them a map or write out in your own handwriting where the location of Donnie Allen's body was?

A. I did both.

Q. And at that time, did someone ask you if you would take them to where Donnie Allen's body was?

A. Yes, he did.

Q. And tell us what happened with regard to them taking you out there to Morrisfield and Billy Graham.

A. They placed me in the back of the car that we had arrived in. And, I mean, these guys, 20 years, 15 years on the force, they know Charlotte like the back of their hands, but I was so nervous and confused that I was giving them directions every step of the way on how to get there, where to turn, where to go and what light, what light down is it. And it just didn't dawn on me that I was doing that, but they knew where I was referring to.

Q. When you got out there and you are in the back of either the agent's car or the police car, they

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3165

stopped. What was your emotional condition at that point?

A. I was shaking, but I was very -- I just didn't know what to expect was going to happen. I looked over to my left and I saw at least maybe three or four unmarked cars, maybe two marked police cars. I can't really remember. I think one of the guys got out, went across the street, talked to a guy in a suit, came back. He asked me would I point -- I could not look over there for an extended period of time, but when I looked up and I pointed, I just -- I lost it. I started -- you know, became very emotional. I just kept picturing what happened that night, but I pointed over there.

Q. Did anybody ever come back to the car and tell you that they had found Donald Allen's body?

A. To the best of my knowledge, yes.

Q. After you sat out there for a while in the back of the car, did they take you back to the law enforcement center?

A. I was trying to calm myself. I wanted to stick my chin up and say I take full responsibility, I did something very horrible, but I was having a hard time calming myself down. So we left the area. People started to come. Cars started to pull up. I saw a helicopter. News van started to pull up. They said,

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A......... .............rion (704) 333-9889          Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 134    Filed 09/23/15    Page 109 of 280
1143

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3166

let's get him out of here. So they pulled off and they went and got on Billy Graham, but I can't recall which way we went. Eventually we came back down to the old law enforcement center. And he said, Marc, he said, do you think you can identify the car? And I'm, you know, I had nothing to hide. I want them to know everything, every detail, so to me it was nothing. I said yes. He drove me to a parking garage and said is that it, and before I became upset, I said yes.

Q. Now, they took you from there into an interview room, do you remember that?

A. Yes.

Q. And at first, I believe you just sat there for a few minutes and then somebody came in to talk to you?

A. They closed the door, then they would open it. You had all of these guys walking around, looking in on me. I was sitting there, I was shaking like a leaf and he asked me, do you want something to drink and eat? Like, no. So many guys talked to me that day, I can only tell you maybe I remember one guy, but there were three, at the max three people in and out of that room. I can't remember everybody I talked to but maybe one guy.

MR. BENDER: Your Honor, at this time, I would like to play for the jury part of that videotaped

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 110 of 280

1144

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3167

interview.  This was identified by Mike Sanders.

THE COURT:  Yes, sir.

MR. BENDER:  The original is Defendant's Exhibit 1 in its entirety.  The portion that we have is Defendant's Exhibit 1A, if we could play that at this time.

THE COURT:  You may.

MR. BENDER:  Your Honor, if this won't work, there is a TV with a video back in the back room, if I can just -- might be a good time to take a break and let me get it out and set it up so that --

THE COURT:  All right, we will take our break at this time.  Members of the jury, please remember the usual instructions.  Thank you.

(The jury left the courtroom.)

THE COURT:  I will ask counsel to report to me when you are ready as far as the technical preparation.

MR. BENDER:  Yes, sir.

THE COURT:  Thank you.

(Brief recess.)

THE COURT:  Have the parties worked out the technical glitches?

MR. BENDER:  I believe we have, Your Honor.

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 111 of 280
1145

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3168

THE COURT: All right. May we have the jury, please.

THE COURT: All right.

MR. BENDER: For everybody's benefit, 1A is a 15-minute segment, but we are not even going to play all of that. We will just play a few minutes of it, if we could.

THE COURT: All right.

BY MR. BENDER:

Q. Marc, can you tell us what this is?

A. It looks like the interrogation room.

Q. Okay. And is that you sitting there with your hand over your face?

A. I believe so.

Q. Okay. Are these the two police officers that interviewed you that day?

A. The only one I remember is the one right there in the blue shirt.

(Tape played for the jury.)

MR. BENDER: Turn it off there.

BY MR. BENDER:

Q. Marc, is that you in the interview room during the first confession you made to the police that night?

A. I believe that was the first full confession, the second interview.

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 112 of 280
1146

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3169

Q. First interview occurred at the FBI office?

A. Yeah.

Q. Now, Marc, how old are you?

A. 29.

Q. When were you born?

A. July 7th, 1973.

Q. Who is your mother?

A. Sonia Barnette.

Q. And were you born here in Charlotte?

A. Yes, I was.

Q. Who is Derrick Barnette?

A. He's what in the past, probably since the ninth grade I've come to find out is my stepfather. I thought he was my real father, but he is not.

Q. And you have one brother, Mario?

A. I have two, John McAllister as well as Mario.

Q. John is the son of Sonia and John West?

A. Yes.

Q. Okay. Was -- when you were born, was Derrick in the military?

A. I believe actually when I was born he was in high school, but he enlisted in the military shortly after that.

Q. And was that the Air Force?

A. Yes, it was.

Case 3:12-cv-00327-MOC    Document 194    Filed 09/23/15    Page 113 of 280
1147

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3170

Q.   Do you remember living in Columbia, South Carolina with your Aunt Tessie and her husband?

A.   Yes, I do.

Q.   Was that at Fort Jackson?

A.   Fort Jackson, South Carolina.

Q.   Do you know where Derrick, your father, was at that time?

A.   At that time he was serving a tour in Okinawa, Japan.

Q.   So you and your mother, Sonia, were in Fort Jackson?

A.   Yes.

Q.   After your father, Derrick, came back to the states from his tour of duty in Okinawa, did you move back to Charlotte as a family?

A.   Yes, we did.

Q.   And where did you live at that time?

A.   At that time I lived at 1137 Comstock Drive in Clanton Park.

Q.   And was that Derrick's house, a house that Derrick had inherited from his mother?

A.   Yes.

Q.   And was that where you met your best friend, Steve Austin?

A.   Yes.

Case 3:12-cv-00327-MOC     Document 104     Filed 09/23/15     Page 114 of 280
1148

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3171

Q.   And you and Steve became friends as a result of playing in the neighborhood together?

A.   Yes.

Q.   Did there come a time when Derrick was assigned or transferred to Minot, North Dakota?

A.   Yes, he was.

Q.   Did you and Sonia go with him?

A.   Yeah, I think we -- all of us went together.

Q.   Did that include Mario at that time?

A.   My recollection, I don't know, but he was there.  When he came, I'm not sure, if he was brought later.

Q.   Okay.  How long did you and the family stay at Minot, North Dakota?

A.   I'm thinking maybe a year, maybe more.  I'm not quite sure how long.  It seemed like --

Q.   Other than being very cold, do you have any memories of Minot, North Dakota?

A.   Other than there's only maybe two months of sun, it was just -- I kind of liked it.  Outside of the things that went on within the family, as far as turmoil, it wasn't all bad.

Q.   Did the turmoil begin in Minot, North Dakota, or was that your first memory of the turmoil?

A.   My first memories of Minot.

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 115 of 280
1149

Page 3172

Q. After the year that Derrick was assigned to the Air Force in Minot, did you come back to Charlotte?

A. Yes.

Q. And did you and Steve ever go to school together although you were neighbors?

A. Steve is two years older than me, so I always seemed to -- we seemed to just miss going to school with each other.

Q. What school did you go to after you came back to Charlotte?

A. I think I went to preschool in Minot, so when I came back, I went to Beverly Woods for kindergarten through third grade.

Q. Okay. And was there a time when you and some young girl got in trouble at Beverly Woods?

A. Yes, there was.

Q. What were y'all doing to get in trouble?

A. Oh, it was in the first grade. We had been playing around in class, so we did not get to go to the concert or whatever was going on in the gymnasium, the teacher made us stay in the classroom, so you leave a girl and a boy in a classroom in first grade age, we decided to explore birds and bees, to my teacher's surprise when she opened the door after the class came back.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3173

Q. You were basically playing doctor?

A. That's correct.

Q. Now, had you had any experience with sex or been exposed to anything like that through magazines or anything?

A. At that point it was only sneaking in my father's closet sneaking and looking at his Playboy magazines.

Q. Were you punished at school?

A. I was sent to the principal's office, as was the girl. The principal, Mr. Pangle, he pulls out this huge plexiglas paddle and I got a couple of licks.

Q. What happened when you got home?

A. He called my father right there in the office, which is the worst thing he could have done.

Q. What happened?

A. My father, he didn't give whippings, I got beatings, and that was one of the worst.

Q. What sort of beating would your father administer to you how would he beat you?

A. He used to come home from work. First he would scold me, yell at me, might smack me upside the head, he might punch me. Then he would tell me to go in my room, take off all of my clothes; and if I didn't, that pretty much made things doubly worse, so I would go in my room,

Reported By: Scott A. Huseby, RPR
800-333-2082 Huseby, Inc., an ... rion (704) 333-9889
Case 3:12-cv-00327-MOC Document 104 Filed 09/23/15 Page 117 of 280
1151

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3174

take off all of my clothes. He had this leather belt almost like a shaving strap, is what it looked like to me, being that age and that small, and he is about 6'1", and he used to have this thing where he said, I'm going to beat you until I get tired, and that's exactly what he used to do.

Q. Now, what was going on with Derrick and your mother, Sonia, at that time?

A. Between the -- probably my second grade and fourth grade years was some of the worst fighting that I can remember. You name it, they fought over it, but it seemed that the recurrent thing that they always fought over was who was cheating on who, and that just -- I mean, it was some pretty bad fights.

Q. And were they physical fights as well as arguments over infidelity?

A. First, you know, you get the arguing, but it seemed to start from the time he get home, because I believe at that time she got home before he did, into the night, or it would maybe just start in the middle of the evening, even into the night. And, I mean, I don't think you could have got more physical unless they would have killed each other.

Q. What would you do with Mario when these fights started?

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 118 of 280
1152

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3175

A. I would lock him in the bedroom.

Q. How much older are you than Mario?

A. Four years.

Q. Do you ever remember a time when Derrick hit your mother, Sonia, in the head with a hammer?

A. Yes.

Q. Okay. Where were you when she got hit in the head with a hammer?

A. I think I was in the kitchen and they were fighting over by the dining room table and I was screaming at them to stop fighting.

Q. Did you ever see any blood on your mother?

A. Yes. She was bleeding, and he berated her and said, you know, you ain't bleeding, that's just lipstick, or something crazy.

Q. Where did you go to the fourth grade?

A. Beverly Woods ends at three, so I went to a school that was very close by, within walking distance. Back then it was Barringer Elementary, I think it's an academy now.

Q. Okay. How was the home situation when you went to the fourth grade?

A. Fourth grade was the worst. It just got worse and worse. You had periods of my mother trying to leave, my father not wanting her to leave. He would

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 119 of 280
1153

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3176

take her keys.  He would do stuff to her car tires.
They fought all the time.  My -- abuse towards me seemed
to triple.  I got more and more beatings.  I started to
get punched, choked.  He messed my face up one time so
bad that I couldn't go to school for a week.  One time
he was beating me so bad that I ran out of house in my
underwear and I had nowhere to run so I hid under a
school bus, but he dragged me out and dragged me back in
the house.

Q.    Now, when you say your mother was wanting to
leave or threatening to leave, was that to go out and
party or leave for good?

A.    She threatened to leave for good, but there
were times when she just wanted to leave the house just
to get away from him.  But there were a lot of times
where she had got pretty much fed up to the point where
she wanted to start having a life outside of the life
with him or us.

Q.    And was there a time when you actually saw your
mother getting in a car with another man?

A.    Yes.  I -- if they started arguing, I --
sometimes if Mario wasn't there, if it was in the
afternoon, I kind of got tired of it, so I would run out
the back, and I had my favorite tree, which is, I guess
it's a eucalyptus or elm tree, and I would climb as high

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an          ion (704) 333-9889  Page 120 of 280  (704) 372-4593
Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 120 of 280
1154

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3177

as I could, and you could hear them arguing and I could see the driveway. She left out of the driveway and walked down the street, and I could hear him yelling at her and it just -- it was a mess. I saw her go all the way down Comstock to where there is a street, I think called Darrell Lane, and I saw her get in the car with another man.

Q. Would there be nights when your mother would leave and not come home?

A. Yeah. It would be just me, Mario, my dad. We would just fix Sloppy Joe's and Kool Aid, and he would just sulk and we would sulk with him.

Q. Would there be times when Derrick would beg and cry for Sonia not to leave, not to go out with other men?

A. I remember this one instance, me and my brother were supposed to be sleeping, but we were woke up and it was just -- something was wrong. They were in the bedroom right across from ours, and I could hear my father crying and crying and crying and begging, and Mario was like, what are they doing, what are they doing. And I said, get back in the bed. So I shut the door and I snuck to the den and I watched him sit there and beg for her not to leave.

Q. Did she leave?

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 121 of 280
1155

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3178

A.    I can't recall.

Q.    Was there a time when you were on the school bus and you saw your mother and father stopped in the middle of the road fighting?

A.    One day -- you know, everybody in the neighborhood, I was the butt of the jokes, because my parents used to go at it, my dad used to beat my mom, so -- and I used to try to hide that, get mad at kids and stuff when they would talk about my family, so one day, you know, we were on the school bus, we were waiting, you know, get another stop, and my mother and father had -- were just leaving and they rounded at the corner, so just as my bus rounded the corner, we got on, I think Seaman Drive, and go down a hill, and my father had a very unique car, he had BMW 2002, bright orange, it was stopped in middle the street.  The school bus pulls up, and they were -- he was just punching her.  They were arguing and screaming, and the school bus driver had to go around, and all of the kids on the bus, since they know it's my car, they knew it was my parents, and they just looked at it, and it was just highly embarrassing.

Q.    If you brought home a report card that wasn't what Derrick thought you were capable of doing, what would happen?

A.    It was like I had done I don't know what to

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3179

him, but he didn't just say, well, I'm going to punish you, put you on punishment, I got the same treatment that I got if I had done something horrible, and then he would put me in punishment on top of that. But the beatings for that were no different than if I had done something else.

Q. You were still beat with the belt?

A. He would beat me until -- I mean, he hit me in my face, mouth, back, scrotum, penis, I mean, legs. I had the biggest, reddest welts and cuts on me. I mean, he beat me until I was nothing but a crying mass of child, you know, I couldn't move, until he got tired.

Q. Where did you go in the fifth grade?

A. I think -- I went to Our Lady of Constellation.

Q. A Catholic school?

A. Yeah. You know, for some strange reason I was having trouble at school, so they thought it was my teachers, so they said, well, we will put him in private school and maybe he will straighten up.

Q. How was Catholic school?

A. It was the best.

Q. How did you get along with the strict discipline in Catholic school?

A. I mean, my father was a disciplinarian. It seemed to me that if I did anything outside of the

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3180

lines, I knew what was coming, so I tried not to step out of them, I did, so I got what he gave out. So when I went to school, since this was the school that he graduated from and they were very strict, they had the nuns running the class, some teachers, you got called to the nun's, mother superior's office for the smallest infraction. It was very good for me.

Q. The summer after your fifth grade, was that when Derrick and your mother, Sonia, separated?

A. Yeah. Things at home that year seemed to kind of cool off. It was almost like an ultimatum had been set somewhere, so there wasn't a lot of things going on at home. Somewhere towards the end of that year they announced to my brother and I that they were separating.

Q. And where did you go live?

A. I think he helped my mother get an apartment in Wendover Place Apartments, and that's where we relocated to.

Q. And who moved into the apartments over at Wendover?

A. It was just me, my brother, and my mom.

Q. Now, after you moved over to Wendover and your mother and father are separated, what was Sonia's conduct like?

A. I think they had been married for maybe nine

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 124 of 280
1158

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3181

years, probably since she was in her teens, now she had her own place, she had her two kids, and my mom at first kept doing some of the responsible things that she had done while married to my father, she tried to furnish the home, make sure we got to school. She had a good job with State Farm. At first things were pretty okay.

Q. Okay. And then did there come time when things began to change insofar as your home life was concerned?

A. One day I just kind of noticed my mom, something was not right, and I asked her, curiously, were her and my father divorced, because they had told us they were just separated, and she broke down crying and said yes. From that point on she just spent a lot of time in her room until some of her girlfriends started to come over. After that she started to go out a lot and started to hang out with her girlfriends a lot more.

Q. And when she would go out at night, did y'all have a baby-sitter come in and stay with you?

A. No.

Q. What would happen?

A. I stayed home and watched Mario.

Q. About how old were you at that time?

A. 12.

Q. Would there be times when your mother would go

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 125 of 280
1159

United States of America vs. Aquilia Marcivicci Barnette
3:97CR23-V
Proceedings Before Judge Richard L. Voorhees
8/5/2002

Page 3182

out and not come back?

A.    Yes.

Q.    How often would that happen?

A.    Every -- it was during the warmer months that she would go out, and sometimes she wouldn't come back until the next morning, sometimes it would be two days, one time it was maybe four days.

Q.    Do you know if there was ever any time that Derrick came over there and -- when your mother had left you for a day or two and he took you?

A.    I mean, there were so many times that I can't remember -- the instance that sticks out in my mind about that is one time my mom was gone out maybe that Friday evening, well, now it's Sunday afternoon, still no mom.  My brother was playing with his friend named Drew down the block in the complex.  I had saw them and told him, hey, that it's dark, you need to come home. Well, I'm sitting there -- excuse me, I'm sorry -- and the door, somebody is knocking at the door and I opened the door and it was Drew, and I said, Drew, where is Mario?  He said, Mario, Mario got hit by a car.  And I said, what?  And he said, Mario got hit by a car.  So I jumped in my jeans and ran out the door as fast as I could, ran maybe a mile, and -- because he told me where it was.  And I got there, he was on the stretcher in the

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 126 of 280
1160

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3183

ambulance, everybody was there. I rode with him to what I think is now CMC. And I still couldn't find my mom.

Q. Couldn't find your mother?

A. Nope.

Q. Were you able to get in touch with your aunt and have her come?

A. I had to get in touch with my aunt, my Aunt Tessie, to come out there; and if my memory serves me, I don't even think it might have been a Sunday, this might have been a Monday, because I think I called her at work.

Q. That is your Aunt Tessie?

A. That's my Aunt T. I still couldn't find my mother.

Q. You still couldn't find your mother at work?

A. No.

Q. During that period of time was your mother dating somebody named Al?

A. Yeah. She met this guy. This was probably her first boyfriend after my father, after the divorce, and she met some guy from Richmond, Virginia named Al, I can't remember his last time, but he was just no good.

Q. Did Al make your mother trade her car?

A. He used to take her out, take her out clubbing, this is when she kind of stopped hanging out with her

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3184

girlfriends and started hanging with him a lot more. Her behavior just got real weird. Her responsibleness disappeared. They would go off and hang out and be gone for two days. She had a very good job and a very sensible car. We had school clothes and everything. Once Al came, I think one of the first things he did was they were gone for two days, all of a sudden they showed back up, and it's maybe 8:00, 9:00 o'clock at night. You know, I don't know what to say, I'm mad, but she tells me, go look outside, go look outside. I go look outside, and she said, you see that, and I look and it's not the Chrysler New Yorker that she had been driving, she has got now a bright red, lipstick red 1984 Chevy Corvette.

Q. How many seats did that Chevy Corvette have?

A. Two.

Q. And how many people were in your family at that time?

A. Three.

Q. Did there come a time when you actually got evicted from your apartments on Wendover?

A. Yeah. Al, he disappeared. I stumbled across a whole bunch of checks, I don't know if they were bad checks or not, a bag of fake gold chains, I don't know what they were doing, but suddenly all of the money

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 128 of 280
1162

Page 3185

seemed to disappear.  My mom couldn't pay the rent.  She couldn't keep food in the refrigerator, so we had to move in the middle of the school year, of my eighth grade school year, and we had to find a place to stay. The only place we could stay was my Aunt Tessie's.

Q.   Prior to being evicted and after Al left, was your mother into alcohol and drugs?

A.   Yes.  Before we got evicted out of Wendover, her habits had got real bad.  And, you know, I was in denial about it and looking at it a certain way, trying not to see my mom in a certain light, but she wasn't just partying, she had picked up some bad habits, I think from Al, and the money wasn't going to just pay for the car, I think Al helped her develop a drug habit, and the drug at the time was just cocaine.

Q.   Did you actually see evidence of that in the house?

A.   Yeah.  I would stumble across a plate with this white residue, cut straw, and, you know, I think everybody has seen Scar Face, you pretty much figure it out.

Q.   So after you moved in with Aunt Tessie and Uncle Jeff, about how long was it -- how long did you live there?

A.   Oh, we stayed there from springtime, I think

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 129 of 280
1163

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3186

this is 19, don't quote me, might be '85. By the end of the summertime, I had made my aunt and uncle pretty sick of me, and they were pretty fed up with some of the stuff I was doing.

Q. So where did you go?

A. My mom found a house to rent on the -- some side of down I had never remembered being in, rented a house from a friend and we moved over there, which was Windsong Trails on Arrowood Road.

Q. Was your mother, did she begin another relationship about that time?

A. Prior to that, before we even left Wendover, she hooked up with this guy named Marc Regan. I thought the world of him because he just seemed to have all of this money and all of these cars and stuff; but before we even moved out of my aunt's house, he was killed, so she hooked up with some guy named Tyrone who, I don't know if he had a job, he didn't have a car, but he did have a big drug habit.

Q. Did you at any time learn that Marc Regan was one of the biggest drug dealers in the city of Charlotte?

A. I think he was the biggest drug dealer in the city of Charlotte at that time.

Q. What was your mother's reaction after Marc

Case 3:12-cv-00327-MOC     Document 104     Filed 09/23/15     Page 130 of 280
1164

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/5/2002

Page 3187

Regan was killed?

A. Because he came on to me as a real good guy, I really liked him, I envied him, I looked up to him; but when they told me that morning that he had been shot and killed in a money drug dispute, when my mom finally came home, because she didn't come home for a couple of days when the information came about, she called home to let me know, my cousin let me know, but she went into a spiral, a tailspin, and she didn't recover for some time after that.

Q. Were you going to Smith Junior High at that time?

A. When he was killed, it was summer time. I started at Smith. After she moved and got us a house, I started at Smith Junior High School for my ninth grade year.

Q. Any sports that you enjoyed, anything --

A. At that time I had ran track at Randolph, for the eighth grade year. So to keep myself busy, I went out for it at Smith Junior High, too.

Q. Sometime I guess around your 13th birthday, sometime around then, Derrick came and picked you up, you and Mario, took you to Steak and Ale for dinner?

A. Yes. This is before my 15th birthday. I'm 14 at this point.

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an     erion (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 131 of 280
1165

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3188

Q.   Okay.

A.   I was at school and I had a track meet, and I am walking to the field, I don't think anything, it's just another day. I get to the field and I look and I see my father standing in the infield, his nice suit. He came all the way from Jersey, I guess. I don't know what's the occasion. At this point I don't have a clue about what he wants to talk to me about. I thought he was just here in town.

Well, you know, I had to try to show off, so I had to try to run at fast as I ever ran. So that night, you know, I went home on the bus. He said, I will be by to pick you and your brother up later. So this is February. I believe it's 1988.

Well, he came and picked us up and took us out. We went to Steak and Ale. I'm not really thinking about what he is here for. It's just a night out. But he said, you know, guys, I've got something I've got to tell you, and I just remember going to the salad bar, you know, ordering stuffed flounder, you know, details like that. I don't remember to this day him actually telling me that he was not my father. That's what he wanted to tells us, that DNA results said that he was not our father.

Q.   And were the results true as to Mario as well?

Reported By: Scott A. Huseby, RPR

800-333-2082          Huseby, Inc., an ...rion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 132 of 280
1166

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3189

A.    Yes.

Q.    What was your feeling after you learned who you thought was your father was not your father?

A.    You know, I had a great day up to that point, but everything after that was all downhill, gloom.  I remember going home, we had just come out of a big snow in Charlotte at that time.  I remember all of the lights being dark in the house, pulling back up everything seemed to be so slow, so dark, and after that I just -- something inside of me, I just really did not trust or care about my mother as much at that point.

Q.    Marc, do you know who your father is to this day?

A.    No.

Q.    Have you ever questioned your mother about it, asked her who your father is?

A.    I don't know how.

Q.    Did your mother ever tell you anything about the DNA or paternity test that Derrick had gotten?

A.    We took the test when I was maybe 11 or 12, around the time of the separation.  I think this is one of the things that prompted me to ask her were they divorced when I was around 12.  I remember going to this place way out nowhere and I remember my brother screaming, screaming when they put the needle in him,

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 133 of 280
1167

United States of America vs. Aquilia Marcivicci Barnette  3:97CR23-V
Proceedings Before Judge Richard L. Voorhees  8/5/2002

Page 3190

because he is scared of needles, and I just remember being so angry at my father, because all my mother kept saying was, he is just doing this for Marcella, his is just doing this because of Marcella, I don't know why he is doing this, but it's got to be because of that woman.

Q.  Who was Marcella?

A.  That was the woman that my father had started dating and became engaged to.  They are still married to this day, they have a son.  He has been married probably since '86, '87 maybe.

Q.  He was not living in Charlotte at that time?

A.  At the time of the paternity test he was.  At the time of the results, when he took us out that night, he was living in New Jersey.

Q.  After your ninth grade at Smith Junior High School, where were you going to go in the tenth grade?

A.  I was supposed to go to Olympic and I had my records set, my classes picked.  I was going to study horticulture.  They told us at the end of the year that people where I live were going to go to Providence. Providence was brand new, and I was going to be in the first class at Providence.  So I had to switch some of my classes, but everybody in my neighborhood was like, yes, you know, we were going to Providence.

Q.  Were you excited about that?

Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 134 of 280
1168

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/5/2002

Page 3191

A.    I cannot tell you how excited I was, because I didn't want to go to Olympic.

Q.    Did you ever go to Providence?

A.    Nope.

Q.    Why didn't you go to Providence?

A.    Well, apparently my mom lost her job and she didn't know what to do, same friends coming around, same old habits, same bad things, so she owed the woman we were renting from, even though we were family friends, a lot of money, we were maybe two months behind on rent. She no longer had the Vette, that got repo'd. She had a boyfriend who was doing nothing. Her sister said, hey, look, there is nothing happening for you in Charlotte, you need to come to Atlanta, you need to start fresh, make a change, so she came up with this great plan that, you know -- I didn't think she was serious until her sister sent her want ads in the mail. When I saw that, I didn't even want to give it to her, but I was -- she made the decision to move to Atlanta.

Q.    And when you moved to Atlanta, describe the living conditions when you first got down there.

A.    Before we left I went to stay with my Aunt Tessie then, see some old friends, didn't want to leave. She went down and got a job, got the U-Haul, moved our stuff, and then came back and got us. We got there, and

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A⁻⁻⁻    ⁻⁻ ⁻  ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 135 of 280
1169

United States of America vs. Aquilia Marcivicci Barnette                    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                          8/5/2002

Page 3192

my aunt stayed in, it was a decent apartment, I think it was Pleasantdale, or something of that nature. It was a two bedroom, living room, dinette, kitchen, and that was it.

Q. Now, this isn't Aunt T, Aunt Tessie, you are living with, this is Shelia?

A. No. I stayed with Tessie before my mother came and got us. We had our big good-bye. Shelia is the baby sister of the three, and she was the one that lived in Atlanta. So we moved in with her while she was having a house built.

Q. Okay. And how many children did Sheila after have at that time?

A. Shelia was about to have her second child, Mikayla. She only had one previous child, which was my cousin, Ahmad. The only positive thing I got out of when we moved was I would spend more time with him, but it was, I can't tell you how devastating it was to be taken out of everything I knew and loved. Atlanta was completely alien to me, to say the least.

Q. Did there come a time fairly soon after that when Shelia's house was ready and y'all moved to Lithonia?

A. Yeah. We were staying in Norcross, Dunwoody, at first. They registered me in school not knowing if I

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A          rion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 1170     Filed 09/23/15     Page 136 of 280

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3193

would go or not, but somewhere in, I think it's -- I think Mikayla was born in August, school starts, I think on the 9th, Mikayla was born, I think on the 12th, or 17th, I believe, so we moved to the house in Lithonia, which was further out in the suburbs from Norcross.

Q.    And did you attend Lithonia High School?

A.    I went there late because school had already started, but that was the first school that I actually attended.

Q.    How did you fit in at that new high school?

A.    Atlanta is completely different from Charlotte, to say the least.  It's like somebody threw me in a fast moving river and I had to try to catch my breath.

Q.    Did you feel out of place?

A.    I was out of place.  I talked with somewhat of a country accent; but compared to them I talk like I'm from New York.  They asked me where I was from.  I didn't know how to dress.  It was just alien.

Q.    Did you have a relationship with a young lady at the high school?

A.    Yeah.  The first person that I met that I kind of talked to that I liked was a guy, but he was a, you know, he was a jock and everything and he wanted to play football, he was new there.  We went and hung out.  We met this girl.  She went to my school.  I didn't really

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 137 of 280
1171

click with him.  I liked him, but he couldn't take Steve's place, so I kind of grasped onto a romantic relationship with this girl named Sheila Sullivan, and I spent probably 95 percent of my time with her.

Q.   Did there come a time that as a result of your relationship with Shelia Sullivan that you had to defend yourself with some other boys?

A.   Yes.  Towards the end of the school year I had this guy that had been chasing me throughout the school wanting to fight all the time, and I couldn't figure out why.  I questioned Shelia and she said she didn't know but he was trying to move in on her, she would tell him to leave her alone, but eventually he caught up to me. I kept ducking him.  He was the school bully, not one of them, but the school bully.  Eventually he caught up to me.

Q.   And did he beat you up?

A.   Not just him, but it was him and his cousin, Melvin, and they jumped me on my way home and they beat me up pretty bad.

Q.   Did you have to go to the hospital?

A.   I had to go to the hospital, got x-rays.  I didn't have to have surgery, but I had to stay out of school for probably maybe a week, week and a half.

Q.   And what happened with your relationship with

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 138 of 280
1172

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3195

Shelia after that?

A.    She kind of started showing not much interest in me, and I felt like it was just because I lost a fight.  I couldn't fight three guys, but she never explained how he wanted to fight me.

The next thing I know, we were drifting apart, and I didn't really understand that it was because of David, but somebody told me that she had actually been running around with David.  I refused to believe that, thinking that, no, you know, she loved me, you know. She was my best friend, my buddy.  I spent all of my time with her.  She was my anchor in Atlanta, trying to get my feet.  So at this time one day I look out of my math class first period and I see Sheila and she is leaving the school yard, leaving the campus.  The next day I found out why.

Q.    Did she actually leave with David that day?

A.    She left and went to David's cousin's house, who lived around the corner, and David was there with him.

Q.    Okay.  And did you later find that Sheila had been unfaithful to you and had had sex with David that day?

A.    Not only did I find out that she had had sex with David, but she had sex with David and his cousin

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 139 of 280
1173

United States of America vs. Aquilia Marcivicci Barnette            3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                          8/5/2002

Page 3196

that day.  I found out that the next day when she didn't come to school.

Q.   How did you feel about this relationship and what had happened in it?

A.   That was the first time I had ever felt that. It made me feel horrible.  It hurt real bad, but it was the first time I had ever felt that, a serious betrayal. It kind of vaguely felt like somebody that happened when I was a child, but I couldn't connect it.  It was just a serious back stabbing, serious betrayal, with a lot of hurt and a lot of pain.

Q.   How did you try to get rid of that pain?

A.   I tried to kill myself.

Q.   How did you try to do that?

A.   Pills.

Q.   Sleeping pills again, or for the first time?

A.   I couldn't hear you.

Q.   Was it sleeping pills?

A.   I had some pills when I first moved to Atlanta, I don't know if it was the water or whatever, but I just broke out.  My aunt took me to the dermatologist and I had some pills, but they all made me sick, and I mean, they made me violently sick.  So I took every last one of them, knowing that whatever happened to my body I wouldn't be able to handle it and something would

Case 3:12-cv-00327-MOC     Document 104     Filed 09/23/15     Page 140 of 280
1174

United States of America vs. Aquilia Marcivicci Barnette   3:97CR23-V
Proceedings Before Judge Richard L. Voorhees   8/5/2002

Page 3197

happen.

Q. Did the EMT or the emergency people come and take care of you?

A. I had got Shelia on the phone, told her what I had done, asking her how could she do this. I knew what happened that day in that apartment. David's cousin told me everything that happened. And she tried to deny it. She said, what are you doing? I said, no, I can't take this, I can't take this, you were everything. So she just said, hold on, and she clicked over and she came back and she kept talking to me. No more than five minutes later EMT or paramedics walked around my house over to where I was sitting.

Q. After that episode and after that school year, did Sonia, your mother, actually get her own apartment and moved out of the house with Sheila?

A. At the end of the school year we got an apartment in a place called The Crossings.

Q. When you were living in the house in Lithonia, what was going on with Shelia and Sonia during that period of time?

A. After that house was built and Mikayla was born, this is '88, things were fine up until probably after Christmas. After Christmas, New Year's '99, there was a lot of going out, a lot of hiding in the bathroom

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 141 of 280
1175

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3198

in Sheila's bedroom, and at the time I couldn't figure out what was going on, they were just acting weird. And that's all I kind of remember. It was starting to be -- funds were starting to be low. It seemed to be something that I had seen before, but I couldn't put my finger on it because I spent so much of my time with Mikayla, my brother, and my little cousin Ahmad.

Q. Same sort of thing, going out at night, not coming back?

A. There was some of that where they would go out, maybe come back early the next day, but it was just more of a -- they were kind of whooping it up. And they tried to hide it, but I kept the kids kind of behind me in the whole scheme of things, but I was witnessing what was going on.

Q. Were there times when there might not be food in the house?

A. Yes. Little kids growing up, Ahmad, Mario, go outside and play and come back in and nothing to eat. There was nothing I could do about it. That's some of the things that happened.

Q. In that apartment complex that you were talking about where your mother and you and Mario moved, was there any furniture in that apartment?

A. We had a living room set that we had since she

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 142 of 280
1176

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                        8/5/2002

Page 3199

split up from my father, an old water bed that didn't work, and that was it.

Q.   Did you have a bed?

A.   No.

Q.   Did Mario have a bed?

A.   No.

Q.   One day you saw somebody walking through the parking lot headed toward the swimming pool of that apartment.  Did you find out who that was?  Did you follow her over there?

A.   Yeah.  I followed her over to the swimming pool and we met and we talked.  She later became the mother of my children, that was Tosha Herd at that time.

Q.   Did you and Tosha fall in love?

A.   At first it was a -- it was more lust, but we just instantly clicked.  It was so deep the first night and we found out that we had so much in common.  We had a lot in common as far as backgrounds and things like that.  It was amazing.

Q.   Did you share with her what had gone on in your life with your mother and your father and the abuse?

A.   That was the first time I had opened up and found somebody that I could talk to.  I didn't realize the things that I was carrying, but she just absorbed it and listened to it because she had gone through so much

Case 3:12-cv-00327-MOC     Document 104     Filed 09/23/15     Page 143 of 280
1177

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3200

of the similar stuff, so she listened to me.

Q. That summer after you met Tosha, did you go visit Rick and his family, or Derrick and his family in New Jersey?

A. I met with Tosha. A lot of the things of bonding that happened with Tosha and I didn't happen until school started. I met Tosha like two or three days before I went to Jersey, and I stayed in Jersey, Philly, Charlotte, and just had this big summer break paid for like some by my mom, dad, grandfather. It wasn't until after I came back that Tosha and I really bonded and started hanging together a lot.

Q. What grade were you in at that time?

A. That was supposed to be my tenth grade year; but because of the things that happened with Shelia, I didn't go to school a lot at the end of my tenth grade year, so they had me in 11th grade, but I still had tenth grade English, which that's just the way the school system worked, so as soon as I finished tenth grade English, I could make up my 1th grade English, the next year I could go to 12th grade.

Q. And what grade was Tosha in?

A. Tosha was a subfreshman. She was supposed to be in the ninth grade, but she was in her eighth grade year.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Snherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 144 of 280
1178

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3201

Q. And you say y'all began to bond?

A. Yes.

Q. What did that mean in terms of going to school, seeing each other, that sort of thing?

A. That meant we stopped going to school for the most part. We went for a long time, but I carried over this sudden bad habit I had of skipping school, but it didn't seem bad, because with Tosha, we hung out, we would go down to Underground, we would ride the MARTA. We would just hang out all day long, and it seemed like nothing mattered but us two.

Q. When you say bond, what does that mean to you?

A. It's just something that you can't pull apart.

Q. Did you ever see Tosha with another man?

A. When we first started dating, I thought that I saw her with another guy.

Q. Where did you think you saw her?

A. I thought I saw him come out of her apartment when I had come home from school early in the afternoon, me and my best friend Kenny at that time.

Q. Did you confront her with it?

A. I went back to the house and Kenny said he was leaving, I called Tosha to the house, and that's the first time I ever hit a girl.

Q. Did she fight back?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A⎯⎯ ⎯⎯⎯ ·ion  (704) 333-9889          Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 145 of 280
1179

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3202

A.    Yes, yes, Tosha did fight back.

Q.    Now, when did you learn that Tosha was pregnant with your child?

A.    I think it might have been March of 1990.

Q.    What sort of discussions did y'all have that centered around her pregnancy?

A.    We talked about -- at first we were scared, as anybody who is 16, 14, who gets pregnant. We discussed about having an abortion, because it didn't seem like we were going to get any help because of the kind of parents that we felt we had. My mother didn't seem to care until I brought that up, and her whole personna seemed to change and she was like, oh, no, that's not an option. So as we knew things would be better, our families would be supportive, I continued to good to school, Tosha kept going for a little bit, but then we both dropped out. We just talked about what was not going to happen to our children, which was the things that had happened to us growing up.

Q.    How old was Tosha at that time?

A.    When I met Tosha, she was 13, turning her 14th birthday. At this time she was still 14 when she got pregnant.

Q.    Did you actually go with her to the prenatal care?

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 146 of 280
1180

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3203

A.    I never missed prenatal, hospital tour, Lamaze class.  If I had to leave school, so what?  This was my baby girl coming into the world.  I had all of the ultrasounds.  I didn't miss anything.

Q.    Sometimes you actually would have to ride the bus?

A.    We rode the bus.  I mean, we lived in Lithonia.  If you have ever been to Atlanta, you know that it's a suburban city.  You catch the 86 Lithonia to Atlanta, that takes 30 minutes; then you catch the MARTA train to God knows where we had to go, that takes another 30 minutes, and then you walk.  Everything is too spread out.

Q.    And your mother, Sonia, is the one that insisted that there not be an abortion?

A.    Yes.  We were getting desperate; but when I brought it to my mother's attention one day, she said, that's not an option.

Q.    Did you actually do something to get ready for the baby?

A.    I had to make a decision.  I had screwed up that school year so bad in 1990 that I had to figure out what I was going to do.  So I went and got a job, wanted to start saving money, I knew I needed income to take care of her, because I wasn't going to depend on people

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 147 of 280
1181

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3204

who I didn't know if I could depend on in that situation. So I went and -- started going to Home Depot, started buying paint, started shopping for a crib, stroller, car seat, you name it. I went to take care of my business.

Q. When was your daughter born?

A. September 29th, 1990.

Q. Were you actually in the delivery room?

A. I helped calm Tosha down when she got the epidural. I was there -- I never left. They made me leave actually for a few hours, but I went in the waiting room, I slept, I would not leave her side. I fed her ice chips, everything. I think she was in labor for maybe 17 hours. When it was actually time for the birth, I helped with the birth, helped her breathe, helped her push.

Q. What was your feeling at that time?

A. Excitement, fear, trepidation.

Q. We have heard about a newspaper that you bought that day. This is Defendant's Exhibit 40. Can you identify that?

A. When Angelica was born, I was bouncing through the roof. I ran out, and I think one of my mom's friends had came by and brought me something to eat. And I looked and saw this Atlanta Journal and

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an      rion (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 148 of 280
1182

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3205

Constitution newsstand, and I just thought, you know, that would be great, if she would know what was going on in the world the day she was born, so I bought this newspaper for her.

Q. Is that newspaper for her?

A. That's Angelica's newspaper.

Q. After Angelica was born, did you and Tosha live together?

A. No. She still stayed in her apartment with her mother. I still stayed in between apartment and my aunt's house until my mom got her new apartment.

Q. Sometime after that did Tosha and Angelica move to Newnan, Georgia?

A. After Tosha got pregnant with little Marc.

Q. And how many years between Angelica and little Marc?

A. Oh, maybe only 15 months, maybe.

Q. And when she moved to Newnan, did you move down there with her?

A. Actually, no. She was pregnant for awhile, and Tosha's mother and I, we never got along. Her mother was a Jehovah's Witness and Tosha was possessed, as her mother would say, and she blamed a lot of it on me. So when she found out she was pregnant again, she said, that's it, you've got to find somewhere to go, I don't

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 149 of 280
1183

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3206

care where. The only place Tosha could go was Newnan, Georgia. I at the time stayed with my aunt while Tosha was pregnant with little Marc, but she moved to Newnan while she was pregnant with him.

Q. Was it during the pregnancy of Angelica or the pregnancy of Marc that y'all had problems and you pushed her down on the sidewalk?

A. That was during her first trimester with Angelica.

Q. And was that as a result of you seeing her talk to some man or young man on the bus?

A. Yes.

Q. Okay. What sort of feelings did you have when you saw that that would cause you to push your pregnant wife down on the concrete?

A. We had been to Underground that day and had just a wonderful day, but this guy had went to school with us and he would always try to talk to Tosha and I hated him. When she saw me talk to this girl at the Five Points MARTA station, she slapped me. I didn't know what to do. But when we got on the bus and she started talking to him, she wouldn't talk to me, she ignored me, she paid me no attention, and it made me feel such a slight, I didn't know how to take it. It was embarrassing. I felt hurt. I didn't know -- I

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 150 of 280

1184

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3207

don't really know how to explain it.

Q. But you did push her down while she was pregnant?

A. Yes, I did.

Q. When did the two of you move in together in Newnan, Georgia?

A. Little Marc was born on New Year's Eve 1991. I was working for my mom at the time. The pressure was tremendous. She had moved back to Atlanta and was staying with her mother. Her mother was fine with it, as far as I know, but me and her couldn't get along. I knew that this was my responsibility. I was only working to find us a place to stay. I believe this is -- I'm 17 or 18 years old at the time, and I know that I have to find a place. So in March of '91, when Marc was approximately three months old at the time, I signed a lease in Newnan, Georgia, because it was the only place I could afford at the time, working on minimum wage and temp jobs.

Q. Okay. That was probably March of '92 if Angelica was born in September of '91?

A. Angelica was born in September of '90; Marc was born in December of '91, so he was about three months old at the time we moved in.

Q. So that was in March of '92 that y'all moved

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an Affiliate of Snherion (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 151 of 280
1185

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3208

in?

A.    It was March of '92 when we moved in.

Q.    Were you working at that time?

A.    I was still working for my mom at a temp service in Midtown Atlanta.  If they had a job, no matter where it was, hey, I will go get it.  But I didn't know what I was going to find.  I'm a high school dropout, got two kids.  Under Georgia law what we are married, common law, so my wife was unemployed, she was getting WIC, food stamps.  She wasn't getting a welfare check yet, so the only thing I could do, I wanted to be able to find a place close to the apartment, so I got a job at a fast food restaurant.  That's all I could find.

Q.    And was that Arby's?

A.    That was Arby's of Newnan.

Q.    Was that within walking distance of the apartment?

A.    6 minutes walking distance.

Q.    How long did y'all live under that arrangement?

A.    Not long, maybe another three months.

Q.    What happened that caused that relationship to go bad?

A.    I met a guy named Anthony Britt, and Tosha and I, we started having a lot of problems, bills.  You name it, we argued over it.  It got so much to the point

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Suberion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 152 of 280
1186

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3209

where when I would go to work, I would stay maybe an hour later than I had to, hang in the parking lot with some friends before I would go home just to make sure she was asleep because I didn't want to argue.

The only person that would wait up would be Jelly Bean, my daughter. She would wait and wait and wait. She wouldn't go to sleep until I got home. But it just kept going on, and I met a guy named Anthony, he was best friends with the guy next door, and we started hanging out and he introduced me to his half sister, which you met, who is pregnant now, Crystal Dennis.

Q. Were you also physically abusive to Tosha during these times?

A. I would come home at night. If she was awake, we would argue and I would smack her and we would fist fight, and sometimes the kids would see it, sometimes they would be asleep but they would wake up.

Q. Did you, shortly after that, begin seeing or going over to the apartment or the house of Crystal Dennis?

A. Yeah. I started to go and hang out there at night because I didn't want to fight in front of the kids, I didn't want to fight Tosha, I wanted things to work, but I started spending most of my late nights going over to Crystal's house playing cards and hanging

Case 3:12-cv-00327-MOC     Document 104     Filed 09/23/15     Page 153 of 280
1187

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3210

out with her family and I would come home at 2:00 in the morning just so I could avoid arguing or jumping on Tosha.

Q. And what was the Anthony Britt's role in all of this at this time?

A. I thought he introduced me to Crystal, just so -- you know, guys do that sort of thing, he didn't have respect for the family unit, and at that point neither did I. But I found out later that why I was over at Crystal's or I would call home from Arby's, Anthony would be at my apartment, and I started to put two and two together that the only reason he introduced me to her was so I wouldn't be there when he wanted to mess with Tosha.

MR. BENDER: Your Honor, I'm beginning to go into another relationship and I didn't know whether you wanted to stop at this point.

THE COURT: No, sir. I think we will move along just a few more minutes.

MR. BENDER: Okay.

BY MR. BENDER:

Q. Now, did you begin spending more and more time with Crystal Dennis than you did with Tosha?

A. Yes. I would spend almost every night, whether I worked or not, sometimes during the daytime. I would

Page 3211

take her son and daughter out and ride around with me.
I started pretty much ignoring Tosha because I felt no
matter where I turned there would be Anthony, he would
be coming around.

Q.    Did you actually move out with Tosha or have
Tosha move out?

A.    After I got out of jail, the day I got out of
jail from pleading guilty to the charges about the
shooting with the aunt, I came straight home, I brought
Crystal with me, and I told Tosha she had to leave
because of the things that I had been hearing.

Q.    You mentioned being in jail because of the
shooting of Anthony Britt.  The jury has heard testimony
from, I think Detective Rigs about that involvement.
Was it pretty much the way he told it?

A.    Yeah.  I mean, the only detail is that the
rumor at the time was Tosha had sent Anthony to jump on
me and he was playing both of them, telling Crystal
things that I was about to tell her that I wanted to
work it out with Tosha and I didn't have any interest in
her past friendship.  He threatened to kill me that
night; and if you knew Anthony, he sold dope, he was one
of the bad boys, and I thought he was serious.  That's
the only reason I shot him, is because him and the guys
he was with were serious, the guys were telling him to

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 155 of 280
1189

United States of America vs. Aquilia Marcivicci Barnette

3:97CR23-V

Proceedings Before Judge Richard L. Voorhees

8/5/2002

Page 3212

slap me and he said he was going to kill me, and I had tried to avoid him up to that point because I knew his reputation. That's the only thing different than that.

Q. How long did you spend in jail as a result of that shooting?

A. 28 days, until I pled guilty.

Q. Did Crystal ever come visit you while you were in jail?

A. I tried to get Tosha to come visit me, but she wouldn't. Crystal came up every weekend, she wrote me letters, she gave me money, took care of me. Every time I would call the house, I would get lip from Tosha. They would tell me that Anthony had been staying over there, he had basically moved into my apartment. She had brought her friend from Atlanta and she was dating Ant's friend and they were having a big ball. She let the phone get cut off, let the rent lapse, the light bill lapse. That's a lot of the reason that when I came home, I told her she had to leave, because she had let him move into my apartment.

Q. And did she move out at that time, that is, Tosha?

A. Yes, she did.

Q. Did she take your two children with her?

A. I thought that she was moving to her sister's

Page 3213

apartment behind mine where I could see my kids, but she

didn't stay over there long, maybe a couple of weeks.

Then she moved and took the kids from that area and

moved to her grandmother's house where she had

previously stayed.

Q.    And shortly after that did Crystal Dennis move

in with you?

A.    About a week later she moved in.

Q.    And I believe Crystal Dennis had two children

by a prior relationship?

A.    Yes, she did.

Q.    And did they live with you, too?

A.    Yes, they did.

Q.    Tell us what the relationship was between you

and her children.

A.    It was -- I treated her children no different

than I treated mine, I took them to the park, I did

everything I could for them.  They had two different

fathers and they didn't get to see him that much.  They

were kind of like of aunt's elk, that's where they hung

out, those are the kinds of things they did.  She had

lived with one of them previously and he had beaten her

up pretty bad, and I knew that and I wanted to take care

of them, so at that time I just was -- it was great.

You know -- but the thing that happened was Tosha

Case 3:12-cv-00327-MOC     Document 104     Filed 09/23/15     Page 157 of 280
1191

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3214

started to spread a rumor that I loved Crystal's kids more than my own, which wasn't true. That's how good I treated them.

Q. Did you go back to work at Arby's, or were you not working at that time?

A. My manager was real cool. I explained to him what happened that night. He gave me my job back. I worked that job for a good couple of more months, until the summer months. Then I got another part-time job, so now I had three jobs, basically.

Q. What kind of bonding did you and Crystal have at that time?

A. There wasn't much bonding with Crystal. Crystal filled a need. I tried to bond with her kids more than her. I didn't want it to be over between Tosha and I. It was very devastating to how that ended. So Crystal and I, it was the physical thing. It was more important at that time with her. I needed somebody to be there for me, and that's what all it was.

Q. More of a sexual thing --

A. Basically.

Q. -- than love and the bonding?

A. Basically. I still loved Tosha at the time. It was physical.

Q. Was Crystal working also at that time?

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 158 of 280

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
8/5/2002

Page 3215

A.   At that time, no, she wasn't.  She had -- she was about to get ready to go back to school, but because she changed addresses, she couldn't go to Newnan High anymore, they told her she had to go way out to East Coweta High School.  I wasn't too much out of school, so I told her -- you know, she got WIC, she got food stamps.  There was no reason for her to go to work if she didn't want to.  I had two jobs that I alternated between, Arby's and I got another job, and I told her that I needed to go back to school, so we started going to East Coweta together.

Q.   Did you have a car?

A.   I still had my all time favorite car, yes.

Q.   Volkswagon Beetle?

A.   Volkswagon Bug.

Q.   And was that the way y'all had transportation back and forth to school?

A.   Yes.

Q.   How long did you and Crystal Dennis stay in school?

A.   Maybe two weeks.

Q.   Then what happened?

A.   I couldn't pay my bills, make enough money.  I needed to work day and nights, I couldn't just work night shift, so I told her I had to, quit and she

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 159 of 280
1193

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3216

decided that she would quit, too, and get a job.

Q.    Did she get a job?

A.    Yes, she did.

Q.    Where did she work?

A.    She went to a temp service first, they placed her in a textile plant, and she stayed there for a good while.

Q.    What shift was she working?

A.    She alternated between day shift and evening shift.

Q.    And what shift or shifts were you working?

A.    Oh, I worked -- at that time I started working morning shift.  I was working some night shifts at Blockbuster, so I was just basically work those two jobs, night and days.

Q.    One day you were baby-siting her children, she was at work?

A.    That didn't occur until after she moved out of the apartment.  I helped her find her own apartment, because at that point, with me working and taking care of her kids, I wasn't taking care of mine, so she got an apartment in the complex adjacent to mine and she still worked at the same textile plant.  And the night you are referring to by the child abuse occurred on a night where she worked the evening shift and got off at night.

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 160 of 280
1194

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                    8/5/2002

Page 3217

Q.    Tell us what happened while you were there with her children.

A.    I had been going through the mix with going to see Tosha, and I had another girlfriend at the time, and me and Crystal would argue about my other girlfriend, people would tell her a lot of stuff.  So I was off that day, or I had worked early day shift and Crystal went to work that night.  I had the kids with me and I was baby-sitting them.  Cortez wouldn't finish his food and Nicki didn't really do anything at that point, so I sent them upstairs.  If you know Crystal's kids at that time, they were very rambunctious, so it got real quiet upstairs.  I go upstairs to see what is all the hush, and that's when I saw them together playing doctor, if you will.

Q.    And when you found them playing doctor, what did you do?

A.    I flew into a rage.  Something inside of me clicked or snapped, however you say it.  All the things that had been going on between Crystal and I, I had a lot of pressure; but when I saw that, I felt like they were -- it was aimed at me.  I don't know how to explain it, but that's just the way I felt.  So I grabbed a coat hanger out of the closet, a metal coat hanger, and I took Mario downstairs, told him to go downstairs, and I

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 161 of 280
1195

United States of America vs. Aquilia Marcivicci Barnette

3:97CR23-V

Proceedings Before Judge Richard L. Voorhees

8/5/2002

Page 3218

went behind him, and I started to just whip him and whip him. I went back upstairs and I whipped Nicki just a little bit. And I told them, I said, you two can't do that, you two are brother and sister. I said, and I think you two have been told about that before, when Crystal's mother had disciplined them for it. I said, I'm going to tell your mother when she gets home, and that's what happened.

Q. Did you go pick up Crystal?

A. Yeah. They -- I kept Mario downstairs with me, Nicki was upstairs. By the time it was time to pick up Crystal, we got in the car I had bought Crystal, because the bug wasn't running, so we drove out to her job, picked her up, and they were real quiet. And she said, hey, guys, what is going on? And I said, they got in trouble. She said, what did y'all do? I said, I will tell you when we get home. So we drove home. And I told her that they would tell her what happened.

Q. And did you?

A. They told her what had happened. I did not tell her about the coat hanger, because after I had done it, I realized what I had done. But I wanted to tell her at a later time and explain it to her how I got to that point. So I think maybe it was the next day, she -- it was a Friday, she sent them to stay with her

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3219

mother and we just went about our workday and nothing happened that Friday.

Q. When did something happen with regard to her children?

A. The next day her mother Sylvia shows up with her aunt and her cousin and they -- it was right when we pulled up from picking her up from work again. They came in and said they were going to call the police on me, they had seen what I did to Mario and Nicki, how could I do that, why did she let me do that, and they said, we are going to send you to jail for child abuse.

Q. And you took her car and left?

A. I took the Toyota Corolla and I left. I said, I am not staying here. I said, you are going to let her take to me that way. I said, you didn't explain to her what happened. At the time I didn't -- I understood what I did; but when she came and she was accusing me of child abuse, I thought that if I could apologize, it would be okay, because I didn't fully understand that I was doing some of the same stuff that happened in my past, and I was not ready to hear it from somebody else. So I left and went to Sandy Springs in north Atlanta.

Q. And did you ever call back or get back in touch with Crystal?

A. That was the first day I called, talked to her,

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an          erion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC          Document 104          Filed 09/23/15          Page 163 of 280
1197

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3220

asked her why she had let her mom and her aunt accuse me of child abuse. I said, we need to talk. So I borrowed the keys to my aunt's truck and I went back to Newnan, and this is the next day, which I think is on a Sunday. Crystal's mom wasn't at home, so I picked her up from her mother's house and I took her to her apartment, and that's when we got into it and I attacked her about the child abuse and why she had let them call the police on me. I felt like she was doing something to me, even though it was me who was at fault.

Q. You said you attacked her. What did you do?

A. I punched her and I beat her up.

Q. When were you arrested on that charge?

A. I left her apartment, drove back, picked up the Toyota, stayed there for awhile, talked to her on the phone. She wanted her car. I didn't want to bring it back because I knew they would arrest me, but I said okay. As soon as I pulled into the projects where her mother stayed, I was arrested.

Q. And you were charged with felony child abuse at that time?

A. Yes.

Q. Did you go back to jail?

A. Yes.

Q. How long did you spend in jail this time?

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 164 of 280
1198

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3221

A.    I can't recall.  It was January when this happened.  I think I was pled guilty and received probation in maybe March.

Q.    While you were in jail did Crystal come visit you?

A.    Yes, she did.

Q.    Did she bring her kids with her?

A.    Yes, she did.

Q.    Was there ever a time when you got to see your children --

A.    No.  Tosha and I had been falling out, if you will, back and forth.  Since now I had had Crystal live with me, we weren't on speaking terms.  She told me that I would never see the kids again.  She had me arrested for trespassing at one time for trying to come see Angelica, so Tosha and I were on absolutely nonspeaking terms.

Q.    After you got out jail and were placed on probation, could you move -- could you go back with Crystal in her apartment?

A.    They gave me probation, but I still couldn't get out because of the simple assault to her.  She gave some money to a mutual friend of ours to come bond me out, it was a $50 bond.  I went straight -- if you know where the jail is to where she lives, it's a three- to

Case 3:12-cv-00327-MOC    Document 104    Filed 09/23/15    Page 165 of 280
1199

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3222

five-minute walk.  You can see the jail from the apartment.  So I went straight back to the apartment, and her and Cortez, Mario, were there when I got there.

Q.  But you couldn't stay there, could you?

A.  No.  I was there for maybe a good week.  DSS had said that if I was allowed to come back, that they would take the kids.  Her mother had told them that she was going to let me come back and say.  She told me that her uncle was looking for me, her cousin was looking for me, and Mario's father was looking for me, and Jessica's father was looking for me.  On top of that Anthony was ready to try to get me back, so he was looking for me also.

Q.  While you were in jail, did you call Crystal repeatedly?

A.  Yes.  I called her until the phone got cut off because she didn't have any help paying her bills since I was locked up, so I called her at her mother's, and I talked to her sister sometime, her sister would tell me where she was.

Q.  You said you couldn't stay at Crystal's house. Where did you go?

A.  I got -- my girlfriend I had on the side, she got me a place to stay for the night, but I had nowhere to go.  The only people in Newnan were my two kids and

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an /          rion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104    Filed 09/23/15  Page 166 of 280
1200

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/5/2002

Page 3223

Tosha, and she had a boyfriend. And like I said, we had a big falling out. The only place I could go was back to Charlotte.

Q. How did you get back to Charlotte?

A. My family wired me some money through Western Union. The friend girl I had was angry and she tried to get me to stay, but she didn't have any place for me to stay for any more than one night, so I told her, I said, I've got to go, I've got my bags, I bought a bus ticket and I caught a bus back to Charlotte. That was March '93.

MR. BENDER: Your Honor --

THE COURT: It's 5:00, members of the jury. We will take our break at this time. Please keep an open mind about the case. Remember the other instructions, avoid any discussions about it with anyone and avoid any publicity, if there is any, and that sort of thing. Thank you very much. It will be 9:30 in the morning, as before.

(The jury left the courtroom.)

THE COURT: Anything for the Court before we adjourn for the evening?

MR. BENDER: No.

THE COURT: Thank you.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A          ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 104     Filed 09/23/15     Page 167 of 280
1201

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA ) DOCKET NO. 3:97-cr-23-V
)
vs. )
)
AQUILIA MARCIVICCI BARNETTE, ) VOLUME 17
) MORNING
Defendant. )
_____ )

TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
AUGUST 6, 2002

APPEARANCES:

On Behalf of the Government:

    ANNE M. TOMPKINS, ESQ.
    JILL WESTMORELAND ROSE, ESQ.
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    JEAN B. LAWSON, ESQ.
    P.O. Box 472106
    Charlotte, North Carolina

    HAROLD J. BENDER, ESQ.
    200 North McDowell Street
    Charlotte, North Carolina

            Cheryl A. Nuccio, RMR-CRR
            Official Court Reporter
            United States District Court
            Charlotte, North Carolina

TUESDAY MORNING, AUGUST 6, 2002

THE COURT: May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: All right, sir. The jury is with us.

MR. BENDER: Thank you, Your Honor.

AQUILIA MARCIVICCI BARNETTE,

DIRECT EXAMINATION (Cont'd.)

BY MR. BENDER:

Q.    Marc, yesterday when we ended, you had told us about getting some money from your mother to get on the bus from Noonan, Georgia, to come back to Charlotte. And did you do that?

A.    Yes, sir. That's exactly what I did.

Q.    And approximately when was that?

A.    That was March of 1993.

Q.    1993 or -- and when you got back here, with whom did you live?

A.    I stayed at the 3413 address on West Boulevard.

Q.    Okay. Where was your mother and Mario at that time?

A.    They were at the address along with my grandfather.

Q.    Okay.

A.    My mother -- my mother was a couple months pregnant at the time.

Q.    Okay. And was her fiance John West living there at that time?

A.    He hadn't come back from Atlanta yet.

Q.    Were you able to find employment once you got back here?

A.    I went to work for Temp World when I first got back.

Q.    And how long did you work for Temp World?

A.    I didn't stay on the books long.  I went and found a waiting tables job, so I liked that money better.

Q.    And where was that?

A.    That was at Pizza Hut.

Q.    Now, your relationship with Tasha and the children had ended.  Your relationship with Crystal Dennis had ended.  Were you involved in any sort of relationship in Charlotte when you first got back?

A.    No.  No.

Q.    Did you later become involved in a relationship with someone here in Charlotte?

A.    Oh, yes.

Q.    And first of all, who was that and about when was that?

A.    That was Alesha Chambers.  That started spring break which is in April.  That was in 1993.

Q.    And how did you come to meet Alesha Chambers?

A.    I was hanging out with Steve.  We were, you know, partying.  Glad to be back home.  I went for a walk with his brother Darrell in his apartment complex over on South Boulevard.  There were a couple of girls on the stoop -- on the steps and we talked to them for a minute.  We left.  We

came back on the way back. That's when I talked to her again. That's when we formally introduced ourselves. That's when I met Alesha.

Q. Did you exchange phone numbers or some way to get in touch with each other?

A. We exchanged phone numbers. Talked that night.

Q. And tell us how that relationship developed through the first few months.

A. Alesha was staying with her aunt for a while. When I met her, that's where I met her. She was at her aunt's house. So for the first couple months, I would go and see her because I would visit my best friend. Then she told me she really didn't stay there, she stayed somewhere else. I went to that address. We began dating, if you will. She was in high school with my brother. Thought she was kind of young, but she -- her mother didn't seem to care that she knew my age. Her mother seemed to like me at first. I thought it was because of my personality, but I found out it was something else.

Her mother fell on hard times because of that other issue that I -- you know, it was drugs. They had to leave because they were evicted out of their apartment. So Alesha had to move in with her -- one of her uncles. At the time her and her mother were having these big arguments about her stepfather who had just come home from prison. So Alesha ran

away, and that was the first day of trouble. And she wanted to come stay with me, but she couldn't stay at my house. I put her up in a hotel.

That was the first big sign of trouble because we were at my house that afternoon after we had checked out and the police showed up. Alesha's mother had sent the police to look for her and blamed me for taking her away. But all I had tried to do was tried to find a place for her to stay until she could get her mind together.

After that she pretty much ran away for good and she just told me she didn't want to go back to her mother because her mother continued to let her stepfather come back into their lives. She didn't want that. So I put her up in a hotel on the side of town where I was working at the time. I was still on the books at Temp World and they had me at a job for Electron, or whatever, and so I made enough money to be able to do that. So we stayed together for several weeks.

Q. Living in the motel?

A. Yes. I didn't want -- yeah, living in a motel. I didn't want to drive from west Charlotte to north Charlotte. I worked twelve-hour shifts. She didn't want to go back home and I didn't have anywhere else for her to stay so I got a hotel.

Q. And how was the relationship during that period of time?

A. At first it was okay. But then, you know, things started

happening.

Q. Now, when you say things started happening, tell us what started happening.

A. She wanted to get a job and so she got a second -- another job at this Bojangles place. I would take her to work sometimes. Sometimes she would just drive my car to work after I got off. I started to get suspicious about some of the things that I felt she was doing. I thought she might have been getting other guys' phone numbers and things like that. One day I found a phone number in her bag.

Q. And was that like in her purse when you say her bag?

A. She had a book bag at the time. She didn't have many clothes.

Q. So you were actually searching through her bag to find evidence of what you felt was infidelity on her part?

A. That's exactly what happened.

Q. And once you found what you believed to be evidence of her infidelity, what, if anything, did you do to Alesha?

A. I slapped her around. Pushed her around. Jumped on her.

Q. And did she acknowledge that she had been with other men during this relationship?

A. At that period of time she denied it.

Q. And did the relationship continue to deteriorate after that time?

A. At that time something happened to my car so Alesha went to stay with a friend, this lady who let her pay room and board. School was about to start. I was no longer with Temp World. I went and decided that I would try to find a little in-between job. Alesha suggested that I come and work at Bojangles with her so we could spend some more time together while she was living with this lady.

Her mother eventually found out where she was staying and thought that I had put her up to it to not go back to where her mother was staying. Eventually, she went and stayed back with her mom and that's when I worked with her at Bojangles and that's when things really started to get pretty bad.

Q. So both of you were working at Bojangles together?

A. Yes.

Q. And when you say get really bad, did the abuse and violence continue and did it escalate?

A. Off and on. The things that increased it were she would openly flirt with the guys that we worked with there. And I asked her, I said, You asked me to work here to be with you, but you're, you know, not really hiding the fact that you like this guy or that guy likes you. So my jealousy really increased and I only stayed there for a week before I couldn't take it any more, and the violence towards her did increase.

Q. What sort of things would you do for her -- or to her?

A. I would hit on her. I would hit on her.

Q. Would you ever allow Alesha to wear any sort of tight or revealing clothing?

A. No, I didn't like that. I felt like she wore her tightest jeans to work and flirt with those guys and that just -- it made me extremely jealous and I would tell her not to do it. Tell her not to wear makeup. Things like that.

Q. And how did she respond to all this, Marc?

A. She didn't really understand why I was saying that.

Q. And would that make you -- would it enrage you even more, make you even more jealous?

A. Yes, it would.

Q. Did there come a time when you actually physically took her from her -- her uncle's house or wherever she was staying at that time?

A. They had moved into another uncle's house. I remember talking to her on the phone trying to get the relationship back because as far as the dating relationship was concerned, it had ended after I left Bojangles. I hit on her too many times. I remember trying to get the dating girlfriend/ boyfriend relationship back and talking to her on the phone, and I felt like she was slighting me on the phone at night.

Q. What made you feel like, you know, she was slighting you?

A. She just really did not want to talk to me.

Q. Okay. You said you wanted the dating relationship back.

It had really gone away. Had y'all maintained a sexual relationship throughout even though there was no, quote, dating relationship?

A. The sexual relationship actually never ended until a few weeks before the trial for those charges in '94.

Q. And going back to when she really didn't want to talk to you on the phone, sort of snubbed you in a way, what did you do at that time?

A. I was supposed to be going to pick up my brother from work and on the way to picking him up from work, I went to the apartment where she was.

Q. What did you do when you got to the apartment?

A. I got out, parked the car behind the apartment. Went to the apartment. I banged on the door. Told her to come to the door. And I heard her in there laughing and giggling.

And she said, What do you want?

And I said, Open the door.

She wouldn't open the door. And I kept banging on the door and she just pretty much stopped talking to me through the door and she just kept talking on the phone.

Q. And how did that make you feel?

A. It just made me -- I couldn't understand -- at that time I couldn't understand how I had taken care of her, put her up, been there for her, tried to protect her from her mom. I felt like she was just totally disrespecting me and not giving me

the kind of answers at the time I felt like I had deserved and I felt like she was -- she was hurting my feelings at the time and I didn't really understand why. But that's the kind of emotions that was starting to swell up inside of me.

Q. As a result of those emotions, what did you do?

A. I lost it. I started kicking on the door and I kicked it hard enough to where I kicked it in.

Q. And did you break the bolt dead off the door at that time?

A. The dead bolt stuck. The part around the door broke and then the dead bolt fell out.

Q. Once you got in the apartment, what did you do to Alesha?

A. I grabbed her. We started wrestling. She had a knife. I took the knife from her. Tried to choke her. Slapped her. She slapped me. We fought. I picked her up and told her if she wouldn't come with me, I would throw her off the balcony. Picked her up, took her to the balcony. She said, Okay. Okay. I dropped her back down. I grabbed her. She grabbed her coat and we ran out the apartment.

Q. Did you ever stuff anything in her mouth to keep her from screaming and yelling?

A. I don't recall. Could have happened, but I don't recall right now.

Q. Once you got her outside, did you put her in the car that

you were driving?

A. I told her to stand by the door. I went around to the driver's side and got in and popped the lock. Told her to get in.

Q. Did you have any weapon at that time?

A. No.

Q. Okay. Once she got in the car, did you abuse her physically?

A. No.

Q. In the car?

A. No.

Q. Were you still yelling at her?

A. No.

Q. Arguing with her?

A. No.

Q. Was she arguing with you, anything like that?

A. She was asking me why was I doing what I was doing, but we weren't arguing.

Q. What did you want from Alesha when you broke in there and took her out?

A. I wanted her to explain to me why all of a sudden I was no longer good enough. That's the only thing that kept repeating in my mind. I wanted her to talk to me and explain to me why she didn't want to date but she wanted to see me sometimes but she didn't want to be my girlfriend.

FORM FED ® PENGAD • 1-800-631-6989

Q.   And were you able to find out the answers to those questions?

A.   Yes, I was.

Q.   Where did you take her?

A.   I took her -- I went to pick my brother up, which I was supposed to had been doing.  I picked him up.  Then I drove to my house.

Q.   Your brother Mario was working at that time?

A.   Yes, he was.

Q.   And where did you pick him up?

A.   On Wilkinson at the Checkers restaurant.

Q.   Did she say anything to your brother Mario about what had happened or did you explain to Mario what had happened?

A.   No.  We were -- we were kind of quietly talking at that point before we picked him up.  We sat there and she was just asking me why had I done what I had done.  And I kept questioning her as to why she was doing what she was doing. It didn't make sense to me that what I had just done.  Mario came.  He got in the car.  He had to get in the passenger side and kind of squeeze behind her and sat in the back seat, and at that point she stopped talking.

Q.   Once you got to your grandfather's house at 3413 West Boulevard, what did you do with Alesha?

A.   It was muddy, real muddy.  This is an SUV I was driving. I had got her to slide over to the driver's side of the seat

and I carried her to the kitchen doorsteps.

Q.    Okay.  Did y'all go in the house?

A.    Yeah, we went in the house at that time.

Q.    What room did you go in in the house?

A.    The kitchen doorsteps -- steps to the kitchen door, that's where it leads to.

Q.    How long did you have Alesha in your house that day?

A.    I can't really put a number on it.  More than fifteen minutes.

Q.    Okay.  Was it as long as an hour?

A.    I can't say.  Could have been.

Q.    Okay.

A.    But I can't say.

Q.    And what were y'all doing in the house during that fifteen minutes to an hour?

A.    My brother had went to take a shower and get ready for bed.  Alesha and I were sitting in the corner of his room and I was trying to get her to explain to me why she had -- you know, at that time it doesn't make sense what she had done to me.

Q.    You -- you had your own room upstairs, the loft.

A.    Actually, at that time I did not have a room.  I think the loft had stuff in it or somebody might have -- my mother's friend might have been staying there.  And the side back room, I wasn't staying in that room at the time.  So at that point I

didn't have a room.

Q. Okay. So you were sitting in Mario's room talking.

A. Yes.

Q. What occurred while y'all were sitting there talking?

A. I heard banging on the door. I got up, went to see who it was. I could see my -- my aunt going to the door. I saw the police and I left out of the back patio.

Q. Had you assaulted Alesha while you were in Marc's room?

A. Mario's room? No, I hadn't.

Q. Mario's room, I'm sorry.

A. No.

Q. So y'all were just in there talking at that time.

A. I was trying to get the explanation to kind of ease my conscience. I didn't understand what was going on between us. I knew she had started liking other guys. But I hadn't accepted that it was my physical violence towards her that had made her do so. So I was looking for answers. We just -- I was just talking to her.

Q. You went out the sliding glass door. Do you know what Alesha did?

A. No, I do not. I do not know what Alesha did.

Q. Where did you go?

A. Across the street.

Q. To Boulevard Homes?

A. Actually, Little Rock. Same area.

Q. Later that same evening, did you call Alesha?

A. Yes, I did.

Q. Where was she at that time?

A. I believe I called Jasper's apartment. I think she was back there at the time.

Q. Jasper was the uncle with whom she was staying at that time?

A. Yes.

Q. And what kind of conversation did you have with Alesha when you called her back?

A. Well, I figured pretty much that the police would be there. When she got on the phone, I was kind of suspicious, so I wanted to kind of see what was going on because Alesha, she's -- she's pretty smart, but I wanted to know what exactly was going on because I wanted to see if she would let on that the police were there or if she was -- might have been there by herself.

Q. Were you crying on the phone?

A. No, I was pretending to cry at that time.

Q. Okay. Now, did you -- after you talked to Alesha for a few minutes, did you talk to some police officer?

A. When Alesha said let's meet, I kind of threw up a facade. She let her -- she let her guard slip. That let me know they were there. So that's when I pretty much let her know that I knew that they had been there the whole time.

Common sense says if I kicked in a door, it was a crime scene, police would be there. But Alesha thought she could bait me in to turning myself in. I had wanted to talk to her alone; but since I knew they were there, I wasn't going for it. At that point I think Officer Joy might have got on the phone.

Q. What did you actually do after you talked to Officer Joy?

A. I stayed -- I stayed out. I did not go back home. I can't remember what happened that night, but I did not go back home.

Q. Why did you want to talk to Alesha alone?

A. Because I had just done something completely stupid and I wanted to apologize. I wanted to get her to understand I didn't want to hurt her. I only want to know why the -- she didn't want to be my girlfriend anymore after I felt like I had done so much for her and I had begun to really care about her a great deal. And I just wanted those -- I wanted an explanation.

Q. Okay. Sometime later were you arrested?

A. I wasn't arrested on those charges until the next incident.

Q. Okay. That was the one that occurred on September the 12th -- excuse me, November the 12th?

A. November the 12th, correct.

Q. Right. And Alesha Chambers has testified and told this

jury that when she got off the bus at South Boulevard to walk to the Bojangles on Woodlawn, that you were waiting for her.

A. Yes.

Q. Were you?

A. Yes.

Q. Okay. Now, on this occasion you did have a weapon, didn't you?

A. Yes.

Q. Describe what kind of weapon you had.

A. I took a knife out of my kitchen cabinet -- kitchen drawer.

Q. When she got off the bus, what did you do as she walked towards her work at Bojangles?

A. I grabbed her, grabbed her by the arm. Kept badgering her, trying to get her to talk to me. She kept asking me what was I doing there. What did I want. I kept telling her I wanted her to tell me why this was happening. By the time we got to the back of Bojangles, same one I had worked at, I saw one of her managers, I think it was Jeff or Dave, come out of the back door. He saw us. And that's when I grabbed her.

Q. And what did you do with the knife?

A. I placed it in her back area and grabbed her and placed her in front of me and started to walk down the street with her.

Q. Did you threaten to kill her?

A.   Yes.

Q.   And what was Alesha saying to you as you had the knife in her back and was threatening to kill her?

A.   She was just telling me to let her go.

Q.   And I guess, as Alesha testified to, some people came out of both of the TKTripps and the Bojangles at that time.

A.   At that time Jeff was already on the street.  Dave was following behind him.  Then the people from TKTripps came and that's when they surrounded me and I let her go.

Q.   Did you ever have the knife to her throat during this time?

A.   I honestly do not remember putting the knife to her throat.  I've been told that, but I really do not remember that.

Q.   And were you -- when you were surrounded, were you threatening those employees of TKTripps and Bojangles with the knife?

A.   I remember threatening Jeff because Jeff was one of the guys that I had been accusing Alesha of sleeping with.  I did not remember threatening anyone else but him because he was standing directly in front of me with a broomstick.

Q.   Pretty important to you at that time to be able to talk to Alesha and get some answers from her, wasn't it?

A.   Yes.  That's why I was there.

Q.   The police came on that occasion --

A.    Yes, they did.

Q.    -- did they not?

And were you arrested at that time?

A.    I was arrested at that time when they got there.

Q.    And were you served with a warrant for the prior incident?

A.    Yes.  I was charged with all charges.

Q.    On that one occasion.

A.    On that one day.

Q.    Okay.  So this didn't have anything to do with whether you were going to drop the charges from the prior -- whether she was going to drop the charges from the prior incident, was it?

A.    No.  This was just a continuance of what had happened the previous couple days.

Q.    Were you incarcerated as a result of the charges?

A.    Yes, I was.

Q.    And how long did you stay in jail?

A.    My family was able to make bond for me the day before Thanksgiving.

Q.    So what was that, about two weeks, ten days?

A.    About two weeks or ten days.

Q.    And once you got out, what was your relationship with Alesha like?

A.    You have to understand that through all this, the things

that I was trying to get out of Alesha was why she didn't want to continue the boyfriend/girlfriend relationship. The sexual relationship never stopped. I talked to Alesha while I was locked up. She told me that she and her mother had moved to north Charlotte and that she wasn't supposed to tell me where it was and the phone number, but she gave me the phone number anyway. The day I got out, I think that afternoon, that night I called her at work and she asked me to meet her uptown and so we continued on.

Q.    You met her uptown.

A.    Met her uptown that night I got out.

Q.    Did y'all have sex that night?

A.    Had sex that night uptown.

Q.    And did the relationship, at least the sexual part of the relationship, did it continue after that?

A.    Continued after that, yes.

Q.    What about the dating or the boyfriend/girlfriend relationship?

A.    She would not get into the dating boyfriend/girlfriend relationship. She had told me while I was in jail she had a boyfriend and that was why she didn't want to get back together. But with Alesha, you know, sex was fine, but she had a guy now. I saw him on a couple of occasions uptown. She described him to me. She went as far as to describe sex with him, not leaving out one detail. She, you know, just

described that we could not have that kind of relationship anymore, but anything else was fine as long as her mother and her brother didn't find out.

Q. How did that make you feel?

A. Cheap is the word that constantly comes to my mind. Worthless, because I thought at one time she had cared about me. She liked me enough that she wanted to have sex with me every other day, but now she had somebody else in her life as far as her boyfriend. I'm not the type of person where that's satisfying for me. I need a relationship setting, and with Alesha that's what I had needed. She just wasn't willing anymore.

Q. March of 1994, you and Alesha got into it again.

A. I can't recall. This is March of '94?

Q. I think it was March the 25th, 1994.

A. We had -- I had been -- okay. Yeah. I had been sneaking back and forth over to her mother's house and seeing her. I knew she was -- had a boyfriend. He lived -- she told me where he lived and she spent time with him. Sometimes she spent the nights. I was still trying to get the relationship back and get her to break up with him because it seemed to me like she spent all her time with me. So we got into it about that. And I mean, we had just finished having sex. And I just didn't feel like I should be -- I felt like I should have been her boyfriend. She was going to go see him that day and

FORM FED ● PENGAD • 1-800-631-6989

1222

I didn't like that. I didn't like it at all.

And I reached behind the back of the door and I pulled out a baseball bat and I just started swinging and I hit her in the hand and cut her hand open. Once I saw that, I dropped the bat and fell on the floor. And I was so torn up inside, I just -- I started balling and I couldn't stop. She -- she told me I had lost it. That's what happened that day.

Q. Did you assault her in any other way other than the bat? Did you hit her with your fist?

A. No.

Q. Or choke her or anything?

A. No. No. No. When I hit her in the hand, I wasn't trying to beat her. I was trying to scare her. When I hit her in the hand, it cut her hand. I dropped the bat after that. I didn't run. I just fell on the floor and started crying.

Q. Was there another time that you kicked in the door at Jasper Chambers'?

A. That was previous to that first time. What happened was the door was unlocked. I kicked up against it and turned the door, but it was already -- it wasn't locked or anything. I didn't break it down. It was open. That was when we had first had the breakup and she went back to stay with her mom at Jasper's and that's when I would call her and she would not talk and I thought in my mind at the time that they were

keeping her from talking to me. That's why I went down there that day. That was prior to the evening when she was home alone.

Q. Was there another time when you took Alesha against her will, put her into a car and had forced sex on her?

A. Yes.

Q. Tell us about that.

A. After what happened with the baseball bat, a couple weeks had went by. I believe the baseball bat happened early in March. So she was pretty much angry at me, but she still talked to me. So that gave me this kind of rare hope that maybe she would be forgiving and try to understand me.

I had been working on my car all day and talked to her at work. She said she was going -- getting off pretty late, at eleven. So I told her I would call her. But actually, I drove over there after working on this parts car, this junk car. I drove over there and was there when Jeff dropped her off. I went and stood on the steps with her. She told me to get off the steps because her brother would see. So we stood in the driveway. She was asking me how I got there. I told her I had been working on my car all day and I told her to come on. So we got in the car. I didn't force her. I didn't threaten her, tell her I had a gun. We sat in the car. She didn't think I wanted to take her with me. She thought I just wanted to talk.

So I told her that I wanted to go to the store and she said, Well, I can't go, she said, because my mom will be home pretty soon. And that's one thing that she couldn't allow was to let her mom find out that she had been seeing me.

So I said, No, I'm, you know, hey, just going to the store. I'll bring you right back, but I was lying to her.

I drove to the store a long ways away, and the further away we got from her house, she kept asking me to take her back. And I said no. I said, Why? You don't want your boyfriend to find out that you're with me?

And she said, No, it's not that. She said, I don't want my mom to find out.

So I said, Well, I have to go check my voice mail. I need to go home. I made some kind of excuse. And I drove all the way to my house and parked in the driveway.

Q. And while you were parked there in the driveway, what happened?

A. I started talking about the night before when we were at the Motel 6 and how I enjoyed it. And she said she -- she was pretty angry because I had taken her from the house and she didn't want to leave. So we started arguing about that and the fact that the only reason I accuse her -- the only reason she didn't want to be there was because she didn't want her boyfriend to find out that she had been with me the night before. So I got cross with her and tried to have sex with

her. She rebuffed me. Said she wanted to go home. I said, Well, you just had sex with me last night. What's the difference about today? Why am I not good enough for you today?

So I grabbed her shirt and I ripped her shirt, strangled her with it. And she said, Okay. Okay. I'll have sex with you. And we had sex in the car.

Q. Not willingly.

A. No.

Q. Marc, you've talked to a lot of people through the years about this, police officers, psychologists, psychiatrists. You've never admitted that you had forced sex or raped Alesha, have you?

A. This is the first time I have -- I've been struggling with this for a long time because me and Alesha had sex almost every other day. And to me at that time by hearing her say yes, okay, I was -- I've been in constant denial that I forced her to have sex with me. But we even had sex two additional times that night and a week later, so that made it easier for me to deny that I had done that.

But I've been struggling with this. Last night I didn't sleep. I said to myself that there's no way that I can go before my jury and continue to deny something that happened and I've been fighting with myself. I've been bitter about it because some of the things I felt she done before and after

that night because it seemed to make it easier to make an excuse for her, but I made up my mind I could no longer make up an excuse about it. I could no longer deny what happened. That time, that instance I forced sex on her.

Q. Marc, after that you had voluntary sex a couple of other times that night. Did you finally call a cab and send her home?

A. No. I admitted to her why I had taken her. I wanted her to get caught. I wanted her mother to bust her. I wanted her boyfriend to find out that she had been seeing me and been having sex with me all these times because I felt like then she would have no choice but to come back. So I told her I still wasn't going to take her home. We had sex. She woke me up. Started kissing me. We had sex again. I went to sleep. By this time it was almost 6:30 in the morning. And she thought I would still take her home. I said no. I said, There's a phone book. I said, I'll get it for you. I said, You can call a cab, I said, because I want you to get caught. I said, I want him to know.

Q. And did you walk her down to the end of the driveway and put her in the cab?

A. Yeah. The damage control thing. I put her -- the cab actually could not find my driveway because it's completely dark. It's even worse to find at night. So I -- he passed by. I flagged him down with my -- that marble flashlight. He

pulled up. I gave her a hug, kissed her. Told her good luck because I knew her mother would be waiting for her when she got there, and I didn't think anything else about it.

Q. During the time that you had this relationship with Alesha, did you ever confide in her about what had happened in your home life as you were growing up and the beatings that you've suffered?

A. Earlier in the relationship when we stayed together, we spent so much time together. There were nights when I would just try to open up and talk to her to try to get her to understand that -- like the first instance where I hit her and chipped her tooth. I was trying to get her to understand that I was having issues about, you know, the way those things kind of happened to me growing up.

Q. And was she very supportive and comforting to you when you described those things?

A. At times she was. She seemed like she could understand because she -- her real father wasn't around and she was very quiet about that and she never really fully explained why, but there was something about that. So she seemed to understand.

Q. Okay. You went to trial on those earlier charges, didn't you?

A. Yes.

Q. And that was a jury trial.

A. Yes.

Q.   And were you convicted of felonious restraint and a lesser included offense of kidnapping?

A.   Yes.

Q.   Okay.  What was your sentence for that?

A.   Probation.

Q.   Who attended some or all of the days of that trial with you?

A.   My mother was there for the most part.  Robin came for the last two days.

Q.   Robin Williams?

A.   Robin Williams.

Q.   So you had been -- by the time the trial had come around, you had gotten in this relationship with Robin Williams.

A.   I met Robin in May.  I was still seeing Alesha some.  I wanted to keep her happy because I didn't know at the time what she would do when trial came.  But at that time I was wholly into Robin and...

Q.   She cared enough about you to come down for two days.

A.   Yes.

Q.   And be with you in that trial.

A.   You know, going back and forth to Roanoke, I -- after that last incident, I didn't have sex for a while before I met Robin.  And I told her, you know, when we met and we would get our pitcher, we would go out and have these talk sessions and talk all night, I told her about my past and told her about

all the things I went through, the things that were happening to me, the things I had done to these other girls, and I wanted her to understand and I started to tell her about my childhood. Robin was the greatest listener I had ever been with. She was there for me and she handled that.

Q. Marc, after you confessed in June of -- June the 25th, 1996, took the police to find Donnie Allen's body, you were placed in the Mecklenburg County Jail, were you not?

A. Yes.

Q. And you have been incarcerated from that day throughout.

A. Since June 25, 1996.

Q. Okay. Never been released on bond.

A. No.

Q. Continuously incarcerated.

A. Yes.

Q. We had somebody from the Coweta County Sheriff's Office come here and testify that according to their records, you had no disciplinary incidents while you were incarcerated in Coweta County on two separate occasions. Have you had any instance, disciplinary instance in the Mecklenburg County Jail during the period of time that you have been incarcerated?

A. Not one.

Q. At some point prior to the guilt/innocence phase of the trial, you were sent by the court to Butner, the federal facility at Butner, that is, the federal prison facility at

Butner for a psychiatric evaluation to determine your competence to stand trial.  Do you remember that?

A.    Yes, I do.

Q.    And Dr. Sally Johnson was the person who evaluated you and found that you were competent to stand trial.

A.    Yes.

Q.    Do you remember about how long you were in the federal prison at Butner?

A.    I think thirty days is the limit.  I think I was there a little short of the time than that.

Q.    You started out in seclusion there.

A.    Yes.

Q.    Were you able to, within that thirty days, move into general population?

A.    Yes.

Q.    General population means -- well, tell us what it means.

A.    Again, in general population you are housed in a dorm style.  You have rooms.  Steel bunks.  You're allowed to walk to the cafeteria to eat.  You're allowed to walk a track, play basketball, visit the library, attend school.  But you have to be in your unit at a certain time and you cannot move between units or between facilities.  Only in certain periods of time can you do that.  Have what they call controlled movement.

Q.    And during that thirty days, did you have any infractions or disciplinary violations at all?

A.    No.

Q.    At some point you were sent, pending federal designation, you were sent to a prison in Virginia.  Do you remember that?

A.    Yes.  I was sent there waiting transfer to a federal facility.

Q.    Okay.  And about how long were you in a prison in Virginia?

A.    The first one that was changing over, they had us housed there from April to July of 1998.

Q.    During that period of time, did you have any violations or disciplinary infractions whatsoever?

A.    None.

Q.    And were you moved to another facility in Virginia or were you transferred to a federal prison?

A.    They were opening a new facility and they wanted federal inmates waiting for transfer housed there, called Sussex One State Prison.  It's kind of what they call a super max.  So I was housed there waiting to be transferred to a federal facility.

Q.    And while you were there, did you have any violations or disciplinary infractions whatsoever?

A.    None.

Q.    You were ultimately designated to the federal penitentiary in Terra Haute, Indiana.

A.    Yes.

Q. Were you not?

A. Yes, I was.

Q. And while you were at the federal facility in Terra Haute, Indiana, did you have any disciplinary infractions or any violations of rules whatsoever?

A. No, sir.

Q. When you first arrived at Terra Haute, describe -- and this was a special housing unit, describe the cell that you were in.

A. It's a six by eleven cell, steel bunks, concrete bottom bunk, toilet facility, steel chair, steel desk, window with bars and a screen mesh, and -- it's an old -- it was built in 1920. It's very old. It's very secure.

Q. And when you arrived there, this had a steel door as opposed to bars?

A. Yes. There's no bar door. This is a solid, very thick, two, three inches thick steel door. Small glass panes, wires.

Q. During the time or right after you arrived there, were you ever permitted out of your cell?

A. You get two showers a week and you can get an hour out of your cell a day to go to the metal cages to exercise if you choose to.

Q. Okay. So you were in that cell twenty-three hours a day?

A. Some days twenty-four.

Q. And that lasted about a year?

A. I was there from -- in the -- you mean locked down?

Q. Yeah.

A. Yeah, that lasted for a year.

Q. And at the end of that year, were you -- did you go into what the Bureau of Prisons calls phase two for that special housing unit?

A. For that type of unit they have three phases. I was in phase one for a year and I was allowed to graduate, so to speak, to phase two.

Q. And is that because of your good conduct and the way in which you conducted yourself in the prison?

A. That's what I was told is it allows you to move to phase two.

Q. And during that time you were in phase two, describe for us what that meant. Were you able to be out of your cell more than one hour a day?

A. They give you -- on the -- they switch it from an hour a day to three to four hours every other day. And they let you commingle with a maximum of three other inmates. So that's the only advantage. You can shower on those days so your shower increases from two days a week to maybe four out of seven days.

Q. Did you also become some sort of orderly for that special housing unit?

FORM FED ● PENGAD • 1-800-631-6989

A.    They only had -- they wanted to offer us an employment position, but they didn't know what they were going to do.  So they had three positions available for somebody to clean the pod, paint, do laundry, make coffee for the inmates, sweep the back, shovel snow.  Whatever around that unit was allowed.  They called it orderly, and I was one chosen.

Q.    And was that also because of the conduct you had exhibited there in that special housing unit?

A.    Yes.  They -- as an orderly, you are supervised by two corrections officers at a time and so they don't want what they call a trouble inmate.  Someone who is going to do whatever they say do.  So they picked me for that job.

Q.    Do you have any special talents or hobbies that you enjoy?

A.    The things that I used to enjoy, I used to do at home.  It wasn't until being in that facility that year constant lock down where I had a lot of things on my mind, things that I had done to Robin's mom, her family and the Allen family, and I had a lot of time to think about that.  So to help me to be able to put things in order and to sort my mind out, I wanted to try to do something that I hadn't done since high school, since before Tasha and I had met.  So I started to sketch and draw to see if I still had it, and it helped -- it helps me think.  When other guys are playing cards, smoking and talking junk and watching TV, I like to find a quiet spot and try to

FORM FED ● PENGAD · 1-800-631-6989

let my mind think. So I started to draw.

They saw that I could draw so they said that they would try to get us some paint. So I started painting. It's the first time I painted since high school.

Q. What's been marked as Defendant's Exhibit Number 8. Can you identify Defendant's Exhibit Number 8?

A. This is a test, what you call a test for maybe a bigger canvas in the future. It's a Ferrari Testarossa, an old model. They used to race in the El Megilia (phonetic). It's one of the first Ferraris I ever painted.

Q. And did you have something to go by?

A. I had a -- I had some reference material from some of the magazines that a couple of guys get, so I used that as a reference.

Q. Okay.

MR. BENDER: Your Honor, at this time I would move for the introduction of Defendant's 8. Ask that it be passed to the jury.

THE COURT: Let it be admitted. You may pass it.

(Defendant's Exhibit Number 8 was received into evidence and published to the jury.)

Q. Defendant's Exhibit Number 9. Can you identify that?

A. This is another test. It's on cardboard, not canvas. It was to -- I was -- I had never worked with acrylic. I wanted to see what it did and how it applied itself to the material.

So it's just a test with acrylic on cardboard.

Q. Okay. And this is also -- is this an open wheel race car?

A. It's a -- actually, that's -- since I used to follow racing, it's McLaren Williams' Formula 1 race car.

MR. BENDER: Your Honor, I would move the admission of Defendant's Exhibit Number 9 and ask that it be passed to the jury.

THE COURT: Let it be admitted.

(Defendant's Exhibit Number 9 was received into evidence and published to the jury.)

Q. Defendant's Exhibit Number 10. Can you identify that?

A. This is --

MS. HANKINS: You already have a Number 10.

MR. BENDER: Okay. Let's make this 11.

A. This was my last acrylic on canvas. It's an Aston Martin Vanquish set to debut, I think, this year. Just something I was trying to -- different -- trying to manipulate light.

Q. Okay.

MR. BENDER: Your Honor, move the introduction of Defendant's Exhibit Number 11 and ask that it be passed to the jury.

THE COURT: You may.

(Defendant's Exhibit Number 11 was received into evidence and published to the jury.)

Q. And Defendant's Exhibit Number 12. Can you identify Number 12?

A. This was the absolute first time I tried to paint. I found some reference material. And a guy that had done something similar, he kind of inspired me to do something positive instead of -- I was kind of feeling depressed. So I had heard he did acrylic on canvas and I tried it, and that's what came out after several months on lock down.

Q. Okay.

MR. BENDER: Your Honor, move the introduction of Defendant's Number 11 and ask that it be passed to the jury.

THE COURT: You may.

(Defendant's Exhibit Number 11 was received into evidence and published to the jury.)

MR. BENDER: May I approach again, Your Honor?

THE COURT: Yes, sir.

Q. Defendant's --

MR. BENDER: May I while they're looking, Your Honor?

A. Yes, sir.

Q. Okay. Defendant's Numbers 3, 5, 7, 4, and 6 -- I guess 3 through 7 -- are from a scrapbook that Tasha Tolbert identified as coming from her scrapbook. Number 3, can you identify that?

A. That's me holding Angelica at her -- that would have been

her first Christmas.

That's my cousin Michaela and that's my aunt Sheila.

Q. Okay. All right.

MR. BENDER: Your Honor, I'd move the introduction of Defendant's Number 3 and ask that it be passed to the jury.

THE COURT: Let it be admitted.

(Defendant's Exhibit Number 3 was received into evidence and published to the jury.)

Q. Take them in order here. Defendant's Number 4. Can you identify that from her scrapbook?

A. That's me holding a picture. That's a picture that she took of my mother, my brother, all of us trying to sit on Santa Claus's lap. That was -- that's still Angelica's first Christmas.

MR. BENDER: Your Honor, move the introduction of Defendant's Number 4 and ask that it be passed to the jury.

THE COURT: Let it be admitted.

(Defendant's Exhibit Number 4 was received into evidence and published to the jury.)

Q. Defendant's Number 5. Can you identify that from her scrapbook?

A. It's Angelica and her little brother.

Q. Is that little Marc?

A. That's Aquilia Marcivicci.

MR. BENDER: Move introduction of Defendant's Number 5 and ask that it be passed to the jury.

THE COURT: Let it be admitted.

(Defendant's Exhibit Number 5 was received into evidence and published to the jury.)

Q.    Defendant's Number 6.  Can you identify that?

A.    That's my son and my daughter.  Jelly Bean and Marc.

Q.    That's a -- that's a little later picture than the one we just passed.

A.    This is -- this is around the time, I believe, that Marc is maybe three or four.  I was -- me and Robin were dating at this time when they were this age.

MR. BENDER: Move the introduction of Defendant's Number 6 and ask that it be passed to the jury.

THE COURT: Let it be admitted.

(Defendant's Exhibit Number 6 was received into evidence and published to the jury.)

Q.    Defendant's Exhibit Number 7.  Can you identify that from her scrapbook?

A.    The top picture is more recent years.  The middle picture is a picture I think I just saw.  The side picture is something similar to what I just saw.  The bottom picture is around the time that I lived at -- moved back to Charlotte, as well as the bottom two pictures.

Q.    Okay.

MR. BENDER: Your Honor, move the introduction of Defendant's Number 7. Ask that it be passed to the jury.

THE COURT: Let it be admitted.

MR. BENDER: Thank you.

(Defendant's Exhibit Number 7 was received into evidence and published to the jury.)

Q. Marc, have you been able to establish some sort of relationship with your children in the past few months?

A. In the past few months I have. There was a time when I didn't think that it would ever again be possible because of the things that I had done to Tasha and the animosity we shared. She had dated a guy who she told me she was going to marry and she told me I would never see my kids again, and I believed her. And I set out and I thought I would just have to start all over again. And Robin was the first person who -- she was similar to Tasha. She listened to me and I thought we could maybe have a family. I thought Tasha hated my guts. But since we've been talking lately, talked to her last night, saw her last Thursday night, we found out that we didn't hate each other. That she's always kept me in the kids' lives and that she thought I had stopped loving her and the kids when Crystal moved in and that she actually thought that I loved Crystal and her kids. We had all this time all these years been listening to other people. But she made a promise to me years ago that no matter whatever happened to

either one of us, we would keep each other in the kids' lives and she's done that and now I talk to my kids.

My daughter is mad because she hasn't gotten a letter from me. She wrote me last week and I haven't written back fast enough. So she was upset with me last night.

My son, he just made football his first year out. He made running back. He's going to start. Talked to him last night about practice and hitting and pads.

And her husband, he's a great guy. She did marry him. They've been together for quite some time.

But my children -- I just don't know how to describe it. It's really -- it really hits me to know that I denied other people their children and I know what it feels like to not be able to hug your child, not be able to be there for ballet and football. And I just think about what I did to these other people and I don't know what I would do if somebody ever did it to my daughter and my son.

Q. Marc, when you wake up every morning, look at that steel door, the steel bars, what do you think about?

A. I think about what I did to Robin's mom, what I did to Mr. Allen, what I did to the Allen family, what I did that night. Every day. It's why I'm -- I've been put away. It's why I've been put on ice. I hurt those people. I took something very precious from them. And I don't -- I just struggle every day to try to think about why I did that.

MR. BENDER:  Thank you, Marc.  No further questions.

THE COURT:  Okay.  Members of the jury, we'll take our morning break at this time.  Please remember the usual instructions.  We'll call for you in about fifteen minutes.  Thank you.

(Brief recess at 10:38 a.m.)

THE COURT:  May we have the jury, please.

(The jury entered the courtroom.)

THE COURT:  The jury is with us.

MS. ROSE:  Thank you, Your Honor.

<u>AQUILIA MARCIVICCI BARNETTE</u>

CROSS-EXAMINATION

BY MS. ROSE:

Q.   Mr. Barnette, last Wednesday Tasha Tolbert testified that you left them when your son was one month old and you never really looked back.  Isn't that true?

A.   No, ma'am.

Q.   You didn't send any child support.

A.   Yes, ma'am, I did.

Q.   When did you send child support?

A.   My child support checks were garnished from Arby's, from Blockbuster and from Courtyard Marriott.  It was deducted through my checks.

Q.   So that wasn't a voluntary payment; they were taken from

your checks by the state.

A.    I wrote voluntary checks from my checking account on maybe only two occasions because they were taking the rest from my work checks.

Q.    She testified she never heard from you at Christmas. Never heard from you at Thanksgiving.  Never heard from you for the children's birthdays.  You were gone.

A.    After we split up, yes.

Q.    But you really didn't establish a relationship, if you want to call it that, until about a month or so ago; is that true?

A.    Yes, ma'am.

Q.    I noticed that as you looked through some of the pictures of the defense exhibits -- if I may approach.  I'm going to show you Defense Exhibit Number 6.  I think you identified that earlier as just a picture of the kids, right?

A.    That's my babies.

Q.    You didn't know that this was a picture from the graduation because you weren't there, were you?

A.    Unfortunately, I was not.

Q.    Now, you've had an opportunity over several years to talk a lot about your childhood to various people, haven't you?

A.    Yes, ma'am.

Q.    And the version that you told the jury about yesterday is quite different from some of the other versions you've told

about your childhood. Wouldn't you say that's a fair statement?

A.    No, ma'am.

Q.    Well, you told -- do you recall being interviewed by Dr. Johnson at Butner?

A.    Yes, ma'am.

Q.    And that was back in November and December of 1997; is that correct?

A.    Yes, ma'am.

Q.    And Dr. Johnson gathered your background information to put it together for a report to this court, and you told her a whole lot of information beginning with your background, lot of history and some testing and things were done. Do you recall all of that?

A.    Yes. The interview with Dr. Johnson took several weeks; whereas, I only had one day with the jury so there's no way I could explain everything to them.

Q.    Well, you -- so -- well, it appears that your testimony yesterday was a lot more detailed than that which you provided to Dr. Johnson. In fact, you told her during her interviews of you that your childhood -- or this is how she described it based upon what you said.

Mr. Barnette describes his early life in relatively positive terms, although he describes verbal bantering between his parents and some excessive alcohol use by his mother.

That's not what you told the jury yesterday.

A. I think I elaborated a little.

Q. Well, it was important for you to tell Dr. Johnson everything because you were being evaluated for the court, weren't you?

A. Dr. Johnson, I believe, was one of the first psychiatrists I had ever opened up to so it was new for me. It's been several years since and I've been able to go into my mind and bring out sort of the demons of my childhood and explore them more.

Q. And you have been able, as you've talked to more and more psychiatrists, to go into your mind knowing you were going to be facing these twelve and really tell your story. You've been able to develop it over the course of time, haven't you?

A. Develop it as in?

Q. Fleshing it out.

A. It's -- my childhood is very difficult for me to talk about and at first I didn't want to talk about it because I didn't understand what it had to do with my later behavior. But as the time has passed, I've been able to be able to talk about it a little bit more.

Q. And you also spoke to -- later on you were interviewed by Dr. William Grant and Dr. Scott Duncan. Do you recall that as well?

A. That was more like an interrogation, yes.

Q. And you described to them that your father was strict about school behavior and that it was whenever you didn't meet his expectations that you got whippings.

A. Those were some of the things I got whippings for, yes.

Q. You said on a couple of occasions you had some welts and bruises and that he had punched you.

A. Yes.

Q. Do you remember telling them that?

But you never talked about being beaten while you were naked, did you?

A. No, ma'am.

Q. You never talked about him kicking you in the penis and the scrotum, did you?

A. I didn't say he kicked me. I said when he hit me with the belt, that's some of the area that I was hit in.

Q. You also didn't even mention excessive spanking until you were of school age because as it related to this interview, it was more toward your school performance and when you failed to do your chores at home.

A. Is that the question?

Q. Yes.

A. Could you repeat the question?

Q. You didn't tell them about getting spanked back in North Dakota. You described it as beginning at your school age.

A. I cannot recall everything I told Dr. Duncan. All I know

that he worked for the government, so I didn't have a really good trust, especially since he was a psychiatrist. I thought he was there to hurt me.

Q. Well, Dr. Johnson works at Butner. She's a psychiatrist.

A. Yes, but she doesn't work for the prosecution.

Q. They both work for Bureau of Prisons.

A. But it's not the prosecution. It's a different -- this is the court. You're the prosecution.

Q. Now -- well, you never did tell your psychiatrist, Dr. Howlitt, about being beaten naked or hit in the scrotum and the penis, did you?

A. But you have to realize that these are things that I've been trying to overcome as the time has gone by. It's not been easy to just tell the first person you meet, yeah, this is what happened. It took some time to build trust with some people.

Q. Now, do you recall your father testifying during the trial?

A. Which trial?

Q. The trial -- your case.

A. The guilt phase?

Q. Yes.

A. Okay. I remember him testifying.

Q. And do you recall him testifying that he did spank you,

but he never hit you in your face or intentionally anything above the legs. Do you recall your father's testimony to that effect?

A. I think I do.

Q. He never testified under questioning from your lawyers that he beat you until he was exhausted, that he beat you naked, and that's very different from the story that you told the jury yesterday, isn't it?

A. Yes, it is. Can I explain why I think that's different?

THE COURT: You may.

A. May I? The same thing occurred to me when I beat Crystal's children. I didn't at the time think it -- anything was wrong until later. And I have not yet been able to talk to my father about anything that happened between us in our childhood. It's still something that's very difficult. And I respected what he said because from his point of view, he didn't think he had done something. And I've never been able to tell him my side of it, what it was like to be beat like that.

Q. Your mother also testified during your trial as well. Do you recall that?

A. Yes, I do remember that. Some of it.

Q. And she testified that the problems with your father or that their relationship did not become abusive until you moved back to Charlotte.

A. From where?

Q. From North Dakota.

A. I was a child. Like I said yesterday, I think and I don't always recall.

Q. And she indicated that your father's physical abuse really didn't begin until you were older, until you were about eight or nine years of age. That's your mother's recollection.

A. That would be her recollection. Mine was different.

Q. In fact, do you recall telling Dr. Dietz when you talked to him that when your parents separated, you really considered living with your father?

A. I did.

Q. But that you decided to live with your mother because she was less strict.

A. I think I also told Dr. Dietz because I was fearful of my father because of the type of punishments he meted out.

Q. You said, So when they separated, although I loved my father, I wanted him to stay, but I also wanted to go with my father. But I knew that going with my father would have been a very, very strict upbringing. So when he asked us, he gave us the choices to my brother and myself, I chose to go with my mother. There would be a little more freedom because my mother wasn't as stern a parent as my father was.

A. That's what I meant.

Q. Now, you say that now you've had a chance to reflect on things, to talk to a number of psychiatrists. You had opportunities both when you were convicted of beating the children in Georgia and then again of your assaults on Alesha to get counseling. In fact, the court ordered it on both those occasions and you didn't go, did you?

A. I recall them ordering it on the first occasion. But I didn't understand what it would be about, why did I need counseling, so I didn't go on that first occasion. I thought it was just, say, me disciplining children. That was 1993.

I don't recall being issued on the second time when I was given probation. As I recall, I was given intensive probation, supposedly supposed to be house arrest, and that was it.

Q. And also part of that was counseling because of the assaultive behavior. But you don't remember that?

A. Thad Johnson never once told me I had to have counseling.

Q. Well, you -- that's because you didn't go to your probation visits. You absconded probation; isn't that correct?

A. I believe I attended maybe four or five visits, two or three with Robin Williams. So I absconded towards the end of my probationary period, not towards the beginning.

Q. Now, one of the things that you talked about yesterday

about your relationship with Robin was infidelity. You said that was the biggest issue between you two.

A. Yes, it was.

Q. Other than that, that your relationship was a very good one.

A. Yes.

Q. That you felt it was healthy.

A. Yes.

Q. Loving.

A. Very much.

Q. But because of your distrust of her, you were very, very controlling.

A. Yes.

Q. You limited the amount of time she spent with her friends.

A. No.

Q. You allowed her freely to visit with her friends?

A. I actually used to get into it with Robin when we first moved in together. She would want to stay at home, rent a movie and just cuddle and snuggle. I would say you need to go out some, because when Steve would come down she'd tell me to go out. So that was one of the things we talked about in the beginning of our relationship that I used to do and I wasn't going to try to do it with her because I wanted it to last.

Q. So it would be your testimony that you gave Robin a

tremendous amount of freedom to be with her friends, to be with her family, to be with her coworkers. Is that your testimony?

A. That is correct.

Q. You detailed an occasion, however, yesterday where she went to a funeral with a group of friends and you couldn't stand it. You ended up following her, tracking her down and getting her out of the car at an intersection.

A. Yes.

Q. But that's not consistent with the freedoms that you're telling this jury you gave her.

A. You would be juxtaposing that one incident with the relationship as a whole?

Q. That's an example.

A. Oh, well, that would be only one instance that ever happened.

Q. And that I believe you testified yesterday that no matter what explanation she gave you for these supposed infidelities, you just couldn't accept them.

A. I don't know why, but I could not.

Q. And it didn't matter what she said, you were going to get angry, you were going to get abusive, and there was nothing she could do.

A. Actually, there was something she could do. As far as the incident that kept recurring was with Benjamin Johnson --

Benjamin Greene and I just had the feeling that -- well, I told her, I said, Robin, if you just tell me what is the deal with this guy. I felt like my emotions would have been satiated and we could have moved on.

Q. Didn't she tell you he was an old high school friend?

A. But I've met several of Robin's old high school friends, old boyfriends, even old lovers. He was the one guy she seemed to keep secret and that just seemed to eat at me and drive me crazy. Even one of her old boyfriends even worked for me one night. So he -- it kept being a thorn in the side of the relationship.

Q. To this day do you still think she was having a relationship with him?

A. I don't know. I feel more or less of a loss to what I did to Robin. I think that kind of falls by the wayside as to what happened. And it doesn't matter because I shouldn't have done what I did. That's where my feelings are.

Q. Did you hear Robin's own voice here in this courtroom as that tape was played where she described Benjamin Greene as her best friend?

A. Yes, I did. I have --

Q. You didn't believe it then either, did you?

A. Well, the thing about that is when me and Robin talked when we first met, we had gone down the litany of our so-called friends. So, you know, it rung that -- that's

something that rang back to the beginning part of our relationship when I described some of my quote, unquote, friends and she described some of her quote, unquote, friends. I just wish that I had listened then so none of this would have happened. That seems to be all that matters to me.

Q. But as as you became more and more possessive and more and more controlling, I mean it's almost torturous what you did to her; isn't that true?

A. I would agree to that.

Q. You were verbally abusive, weren't you?

A. That was the bulk of the relationship. I was very verbally abusive to her. Very emotional. Tried to make her cry. On a few occasions I would push her.

Q. You were mentally abusive because of those -- the constant inquisitions.

A. Yes, I was.

Q. You burned her.

A. Yes, I did.

Q. You disfigured her.

A. Yes, I did.

Q. For that time that she lived after you burned her, she's looking over her shoulder waiting for you to come back. That was torturing her, wasn't it?

A. Yes, I imagine it was.

Q. And then you took her and dragged her by her hair through

the street.   That tortured her.

A.   Yes, ma'am.

Q.   Then you made her look down the barrel of your sawed-off shotgun.   That tortured her.

A.   Yes, ma'am.

Q.   You made her beg for her life.

A.   Yes, ma'am.

Q.   As much as she loved her mother, you shot her right in front of her mother.

A.   Yes, ma'am.

Q.   You tortured that poor girl, didn't you?

A.   Yes, ma'am.

Q.   But you constantly said she was the one at fault.

A.   The thinking back then doesn't make sense to me when I look at it.

Q.   Well, that's your thinking now.

A.   No.

Q.   You still believe she was being unfaithful to you no matter what she said, no matter the words you heard here in this courtroom.

A.   No.   My thinking now is about what I did.   I don't go back and think about whether or not she was with Benny.   When you bring it to me now, yeah, it's fresh, but I don't dwell on that.   I dwell on what happened and what I did to Bertha and what I did to Kenny and Sidney.

Q. You were -- while you were accusing Robin of being unfaithful, you were engaged in a sexual relationship, weren't you?

A. Yes. When I thought Robin had been cheating on me and she would never come clean, I thought that, well, what's good for the goose is good for the gander and I thought that would be the way to get back at her and so I cheated on her.

Q. And you brought Shirley Williams, a Camelot employee, over to your apartment, Robin's apartment and had sexual relations with her there, did you not?

A. Yes, we did.

Q. On the -- you talked a lot about suicide yesterday and you specifically said that on the day that you firebombed Robin and burned her, that you had tried to commit suicide earlier that day; is that correct?

A. Yes, ma'am.

Q. And I believe you said that it started with drinking some Vodka.

A. And sleeping pills.

Q. How much Vodka did you have?

A. I can't tell you. I couldn't even remember.

Q. Well, was it a little?

A. It was more than a little -- it was more than a lot.

Q. Did you finish the bottle?

A. I can't even remember.

Q.   How many pills did you take?

A.   I -- I had three boxes; but out of the three boxes, I can't recall how many pills I actually took.  I vomited sometime before -- in the midst of arguing back and forth and harassing Robin on the phone.  So -- but I cannot tell you how many I took.

Q.   But you tried to commit suicide supposedly with pills before.

A.   Yes, ma'am.

Q.   And you knew -- you knew, I mean, obviously, it wasn't working.

A.   The previous time I had tried, the EMT gave me some liquid that you drink and then you drink hot water after it.  And because they were there, they said you have a choice:  You can take this or you can go to the emergency room and we'll pump your stomach.  So I started taking the liquid, drank the water, and I vomited.  That's the previous time I had actually taken pills.

Q.   And so on this occasion, you said you did throw up.  About what time did that occur on that particular day or evening?

A.   I cannot give you an exact time.  It was late.  Maybe early hours.  But I'm not sure.

Q.   But despite all the -- the lack of clarity that you have at this time, you were able to hear your brother come in.  I

believe yesterday you described pretty particularly you heard the door open, the keys jingle, your brother slam the door, and you knew then you had a way to go to Robin.

A. Yes.

Q. You recall those particular details.

A. I can recall that, but that's not a specific time as to 12:30, 1:30. That's just something that happened in the house. I was the only one at home previous to him coming home.

Q. So you get in the car and you head for Roanoke.

A. Yes, ma'am.

Q. You're okay to do that. You're able to carry out that function. Get there safely.

A. I wouldn't say I was okay. I got there.

Q. And I think you described that trip to Roanoke. It's about a three and a half hour journey, isn't it?

A. Three plus.

Q. It's kind of an up and down the mountain trip.

A. Traveled it, drove it several times.

Q. The road is windy. It's not exactly an easy trip, is it?

A. I wouldn't say that. What do you mean by easy? It's Interstate Highway 81 is no different than 77 and it's wide. Takes you -- cuts through the mountains. It's just a highway.

Q. And then you have to take some back roads down into the area towards Keswick.

A. No. Keswick sits off of Orange which is something like Independence. It's kind of wide. Four lanes, two on each side. Once you turn off of there, you cut through a residential neighborhood and the apartments sit right there.

Q. You got there fine, in the middle of the night, but not before making your stop at Wal-Mart.

A. Yes, ma'am, that's right.

Q. Now, yesterday was the first time we had heard about the purchase of the ball bat from Wal-Mart. You have not told anybody, none of the investigators, none of the psychiatrists anything about taking the time to stop and purchase that ball bat.

A. Yes. As I stated before yesterday, there's a lot of things that I had not thought about. There are certain issues that are constantly on my mind. Ask what happened. A lot of other details I had not previously remembered. So I have been trying to remember every detail so I could be as much forthright with you as possible.

Q. So you stop, you get the ball bat and you got your gas. You formulated your plan. Despite all the substances in your system, you formulate your plan. You go over there and carry it out.

A. Well, this is three, maybe four hours later. I wasn't

FORM FED ® PENGAD · 1-800-631-6989

that inebriated at the time. I wouldn't say much as a plan as I was hurting, angry, and I was prepared to act out. The only plan was to get him and her outside of the apartment.

Q. Well, you got the items together that you needed. The jugs, the rags, the gas, the bat.

A. I discovered the transmission -- I think as I stated yesterday, fluid containers were already in the car when I stopped for gas when I noticed them. The only thing that I went to go get specifically for the act was the baseball bat.

Q. Well, you had to fill up the gas containers.

A. Mario didn't have much gas in the car. That's inconsequential.

Q. So you had all those things together. Were you able to -- you had your lighter. You had your clippers, your wire clippers. You had what you needed.

A. Well, like I stated yesterday, I had been working on Mario's car so he had all my tools, bunch of stuff in the back seat. The only thing I did go get for that act was the baseball bat.

Q. You get there, you get out, you clip the wires because you didn't want anybody to be able to call the police.

A. That's correct.

Q. And then you began your attack. You knew Robin was afraid of a fire in that apartment because you all had talked about it.

A. We had talked about it. We had joked about it. And we talked about it, about what would happen.

Q. Yesterday you described your activities on that evening as out of control.

A. I was overreacting emotionally, yes.

Q. But you were able to carry through with what you set out to do. You did burn. You did cut the wires.

A. I did burn? Is that -- I never said I set out to burn Robin. I never said that.

Q. Well, what did you think was going to happen when you lit fuel and threw it through the windows?

A. I didn't know because I wasn't thinking. I was acting out. That's why I said I was out of control. I think someone in control doesn't set fire to an apartment with one door and knowing that there's one way to get out. So I wasn't -- I wasn't thinking.

Q. So because you're not thinking, you're not responsible for what happened?

A. I have never said I was not responsible for anything I've done.

Q. But it's just that it wasn't premeditated and deliberated.

A. That instance, no.

Q. Poured the gas on the window sill as you described yesterday.

A. Yes.

Q. Didn't mean that to happen?

A. No, I did pour it on there. I never said I didn't mean to pour it on there. But I did not mean to set Robin on fire. I wanted Benny Greene to see there was a fire and to come outside so I could beat him up. That's why I was there.

Q. You destroyed the door so badly they couldn't get out.

A. I saw that in pictures later.

Q. Don't remember that, though, or that evening.

A. When I got there and I started kicking on the door, the door jammed. I did not know until I read the newspaper accounts that that's why they didn't come out. That night I didn't understand why they weren't coming out. I thought he -- when he shot at me that he shot from the door, but the door was jammed. That's why they had to go out the back way. I didn't find it out until later.

Q. So when -- so it's your testimony today that when you went there and started the fire, it was aimed at Benny.

A. It was aimed at Benny and Robin. I cannot say that she was not full partner what was happening that night. I was very upset with her as well as him and I screamed a lot of things that night at her as well, yes.

Q. And screaming die, bitch, die doesn't have anything to do with Benny Greene, does it?

A. As far as her being with Benny Greene, I think it has a

lot to do with it.

Q. You left there and went directly to your brother's employment.

A. I stopped at a gas station because I ran out of gas or something. Drove back to Charlotte.

Q. And you made it to your brother's work and eventually met your mother there.

A. I went to his job because I thought he would already been there. But he hadn't pulled up yet. They pulled up maybe five minutes after I had arrived.

Q. And when was it that you knew the police would be looking for you?

A. I felt they were going to be looking for me right then, but I wasn't absolutely positive until that night when I saw my face on Channel 9.

Q. And at that point is when you went down and turned yourself in.

A. No, ma'am, I did not.

Q. That thought was just beyond you as well. Were you out of control at that point as well? Just couldn't...

A. No, ma'am, I was not. I had calmed down a great deal and was now contemplating several issues.

Q. You testified that during that time you thought about Robin and that you were full of fear and anguish and sick to your stomach as you pictured her burns.

A. I think I was referring to after the news accounts, they were referring to her being burned. And after I had read the newspaper Steve had got faxed from his brother, I had a lot more emotions than that, but that's the best that I can describe. It's hard for me to describe.

Q. And out of that anguish and sickness to your stomach for what she was going through, you took a bunch of letters that she had written you, wrote horrible things on them and drove them up there and left them on her car.

A. No, ma'am. That -- the letters she was referring to, the first time I heard -- saw those letters was the last guilt phase trial. I had not seen those letters since the last fight -- well, the last -- the middle fight with -- about Benny when we still lived together.

Q. So you're saying you didn't take these letters and write on them and put them on her car?

A. I wrote that stuff on those letters back in 1995. I'm not saying they didn't get on that car. But I wasn't the one who put them there.

Q. Oh. So whenever her brother goes to work, they're not on the car; comes back, they're on the car. You're saying somebody else did that?

A. The last person who had those letters was Robin, and I don't know who put those on the car. It couldn't have been her, but I don't know who did it.

Q. These were letters to you from her. Why would she have had letters she sent to you?

A. That happened when I moved out. We had so much stuff, I left some stuff behind. Those were some of the missing items. Because if you look at what I wrote, that happened when we got into the fight about the Benny Greene phone number and she went to stay with her mother for a couple days. I wrote that stuff out; but the last time I saw those letters, they were in my upper drawer in my dresser.

Q. And they miraculously survived the fire you set and made it to her car. Is that your testimony?

A. I'm not saying they were left in that apartment. She could have taken them to her mother's house when she moved back in with her mother after our breakup. I don't know what happened to the letters. I was surprised to see them.

Q. So you didn't make a trip back to Roanoke. That's your testimony.

A. Oh, I did not.

Q. You, however, spent time at your cousin's.

A. I was at Shawn's and had her call, check on Robin. I spent time with Steve. Tried to get me out of the funk I was in. I was contemplating what was going to happen next thirty years after they picked me up.

Q. And during that time you were blaming Benny a lot for Robin's burns because...

A. I began to after reading the article. I still wasn't blaming myself. I was still saying to myself if he cared about her, if she picked him, how did she get hurt and he didn't get hurt? He didn't get a scrape. Robin got cut. Robin got scraped. Robin got burned. How did he get out of the apartment and not get hurt? So in the beginning, yes, I did.

Q. Now, it was during this time that you began to get more and more depressed, I believe you described yesterday.

A. There were periods of that, yes.

Q. So there were moments you were depressed and then you had moments of feeling normal.

A. It's hard to describe. I probably let the doctors say because I don't understand it fully.

Q. And you said that during that time that you began to drink and drink more.

A. Yes.

Q. But that was only on the bad days.

A. There were more of those than good ones.

Q. You would admit that it's not unusual for anybody to be upset after a breakup. That wasn't unique to you.

A. But the thing about my breakups, they seemed -- I seemed to be more sensitive to them. I seem to take them much, much harder. And this one was the -- one of the most devastating of all and I take my breakups hard for some reason. I don't

understand it, but I do.

Q. So your bad days, you began to drink more and more. And up to that time you had not been much of a drinker; is that a fair statement?

A. Social. Steve and I would get together, he has a keg refrigerator and we can get -- we could get wired up. Robin and I would go out to a place, our little place called McAdo's, share a pitcher. So social. But this started to turn into something else.

Q. And you testified that during this period of depression, you really weren't thinking about much of anything.

A. I was having the -- you know, it just seemed like anything because some thoughts come in, some thoughts wouldn't. It was just a depressive state.

Q. Now, as it came closer to June, you began to think more and more seriously about what you wanted to do to Robin.

A. Yes.

Q. That's when you got the bag that was significant to Robin, that being the one that you packed when you went to visit her.

A. Yes.

Q. And you began gathering things and putting them in the bag.

A. Yes.

Q. Because I believe, as you testified yesterday, you didn't

Q. know what would happen once you got to Roanoke.

A. Yes.

Q. And you also testified that you didn't know what you would need when you got there.

A. Yes.

Q. So you were formulating your plan.

A. Yes.

Q. You said that on the morning of June 21st, 1996, the very first thing you did that morning was take a drink.

A. Yes.

Q. What were you drinking on that occasion?

A. I can't remember. It might have been beer. I don't think I had any more liquor at the time, but I'm not quite sure.

Q. Didn't take any pills at that time.

A. No, ma'am.

Q. Did you stay in your room most of the day?

A. Some most of the day, yes.

Q. At some point there was a lot of family around.

A. I recall my mother -- are you referring to the evening hours?

Q. Yes.

A. The evening hours I recall my mother being -- preparing for work. Mario was in his room. My mother's fiance and my uncle were right below me in the den area. Those are the only

FORM FED ⑬ PENGAD · 1-800-631-6989

family members I remember at that time.

Q. And you were living with your mother, your brother, and your grandfather at that time.

A. Yes. As well as my mother's fiance had now come home to help raise his son.

Q. And then the young boy was there as well.

A. Yes.

Q. Didn't talk to them about it?

A. I absolutely hid my feelings from my family at that time for several weeks.

Q. Did you continue to drink throughout the day?

A. Off and on, yes.

Q. At the end of the day, were you drunk?

A. I really can't express how I felt. I don't know if I was totally inebriated or was I just what you call buzzing, but at that time the drinking was just drinking. It wasn't pleasurable. It wasn't enjoyable. It didn't leave a whole lot of drunk feelings. I had just been drinking.

Q. I believe in one of your statements you said that throughout the course of that day that you'd had about a six pack. Is that a fair statement?

A. From morning all the way till before I left. Throughout the day.

Q. But you testified yesterday that when you left your home, you had no particular destination in mind.

A.    Roanoke, I believe is what I stated.

Q.    I believe you testified yesterday you had no destination in mind.  You didn't know where you were going.  Didn't know how you were going to get there.  You just left and started walking.

A.    In the scheme of things, I think it's known that I was going to Roanoke.

Q.    You had your -- by that time your bag of tools with your shells, the handcuffs, the crowbar, the wire cutters.

A.    Yes, ma'am, I did.

Q.    Now -- and of course, your shotgun.  How did you know how to saw off that shotgun and fashion it the way that you've done?

A.    Shotgun barrel is only a metal pipe.  Any plumber shaves a metal pipe.  I think if you've watched any movie, I think you've seen a sawed-off shotgun.  That's it.

Q.    What about the stock and the way that you fashioned it and the taping?

A.    I only sawed it off the same way I sawed off the front and put tape around it.

Q.    And of course, taped on the flashlight.

A.    Yes, ma'am.

Q.    As you began walking on that particular evening, how did you decide which way to go?

A.    As I stated yesterday, I went to church on Morris Field

Road. I know that area like the back of my hand. I know that intersection.

Q. And you knew it was dark.

A. It's dark when you come back home in the middle away from Bible study. It was dark that night.

Q. And your testimony yesterday was that when you reached the intersection of Billy Graham and Morris Field Road, that you were woozy and intent on doing something.

A. Yes, ma'am.

Q. What did you mean by woozy?

A. That's just like I tried to explain now the feeling. It's not like you're totally drunk. Maybe you're buzzing, but you have the emotional impact that's going on. So it's just a strange feeling. It's not something like where if I'm at the pub and I'm drinking, you have good feelings. This was mixed with very bad feelings.

Q. And your intent at that point was to kill somebody and get a car.

A. The intent right there was to carjack someone.

Q. You had your gun.

A. Yes, ma'am.

Q. And you dropped your bag off in the weeds, I believe is how you described it, and you began to crouch in the darkness.

A. Yes, ma'am.

Q. And wait. And despite this wooziness that you testified about, you were able to wait in a way with your gun effectively because nobody saw you, did they?

A. No, ma'am.

Q. You said you were wearing a white shirt as you sat there by the side of the road.

A. Cream colored shirt.

Q. Other cars had come by before Donnie, had they not?

A. Only a few.

Q. And as he pulled up, the window was down, wasn't it?

A. Yes, ma'am.

Q. How long did you have to wait for just the right car?

A. I cannot really honestly say how much time passed.

Q. I believe you told some of the investigators it was about thirty minutes. Does that seem accurate?

A. They wanted me to give them a number. That's the number I gave them. But still to this day I'm not comfortable with that number.

Q. Yesterday you testified, however, despite all this planning, despite your getting there, despite getting the gun, despite the waiting, that this was not a planned hit. Those were your words yesterday.

A. Yes, ma'am.

Q. You had your bag.

A. Yes, ma'am.

Q. You prepared the gun, prepared it well for nighttime.

A. Yes, ma'am.

Q. Had the flashlight on it.

A. Yes, ma'am.

Q. The gun was loaded.

A. Yes, ma'am.

Q. Had your spare shells.

A. Yes, ma'am.

Q. You were at a dark intersection.

A. Yes, ma'am.

Q. You're waiting in the dark.

A. Yes, ma'am.

Q. Crouching in the dark.

A. Yes, ma'am.

Q. Took Donnie from the car.

A. That was what I was there for and that's what was planned, to rob him for the car.

Q. You marched him down in that ditch.

A. Yes, ma'am.

Q. He did everything you told him.

A. Yes, ma'am, he did.

Q. Begged for his life.

A. Yes, ma'am.

Q. Now, you asked him for his wallet. You said he threw it on the ground.

A. Yes, ma'am.

Q. Yesterday when you were asked about shooting him, you said, I didn't know I'd hit him. It was too dark to see. Do you remember that?

A. Yes, ma'am. That's -- I was relating the feelings of what had happened that night.

Q. But it wasn't too dark to find his wallet on the ground, was it?

A. Donnie did not throw his wallet to where we were standing. He threw it as we were entering the culvert. That area was illuminated by the traffic on Billy Graham. Where Donnie and I went was further down in the culvert.

Q. You didn't have any problem finding his wallet despite your wooziness, despite the darkness. You got what you needed.

A. Yes, ma'am.

Q. Did Donnie cry out when you shot him?

A. He did not necessarily cry out. It seemed like he exhaled breath.

Q. Well, you heard Dr. Sullivan testify that the wounds that he received would have been very painful. Shattering his arm, the bone in his arm, basically dislocating it from his body. It would have been a very painful injury. And you say he didn't cry out?

A. He did not. He -- it was almost like a moan. But I did

not know where I had hit him because where we were standing, it was complete pitch black.

Q.    And --

A.    That's why I didn't know if I hit him or not because when I got shot, I cried out and that was with only a .32 hollow point. I had a shotgun and he did not cry out.

Q.    Did you hear his body hit the ground?

A.    No, ma'am. I was running at that point.

Q.    Did you see him moving?

A.    I could not see Donald Allen. If you look at the picture, the culvert, it's surrounded by high brush trees. That area is absolutely no light. Completely dark.

Q.    You had your flashlight?

A.    I didn't have it on.

Q.    You had taken the time to put it on there, but you didn't have it on.

A.    Reacting to what I was doing. The plan, as you call it, it didn't go as you say it was planned. I didn't cut on the light. I didn't use it for a certain purpose.

Q.    Did you drag his body?

A.    Absolutely not.

Q.    You saw those pictures of the different places of the bloodstains. How did that happen? Did you leave him there alive enough to drag himself?

A.    I don't know that. I left as soon as I shot him.

Q. You were able to find the bag that you dropped off, pick it up, get your spare shells and your tools, the things you needed. Found that, didn't you?

A. Yes, ma'am.

Q. And at this point are you still woozy and out of control?

A. At this point it's -- I just feel my heart beating a tremendous deal. It's a lot of nervousness. They say something like adrenaline, and that may have been what it was. The wooziness was still there, but not as sharp as the adrenaline when I ran back to the car.

Q. And you headed for Roanoke at that point.

A. Yes, ma'am.

Q. You took the money from Donnie's wallet.

A. Yes, ma'am.

Q. At some point you stopped and bought gas.

A. Yes, ma'am.

Q. Where was that?

A. I could not recall. I still to this day try to remember where it was and I cannot.

Q. Didn't pick up the phone, call 9-1-1 from an anonymous pay phone and say there's a man in the ditch down there, might be alive who's injured. Didn't think about Donnie Allen at that point, did you?

A. I wasn't thinking at all.

Q. No. You were thinking -- you were thinking about getting to Robin, weren't you? That was the next part of your plan.

A. That was the emotional situation I was going through from the git-go was get to Robin.

Q. What happened to the golf clubs that were in Donnie's car? Did you forget that detail?

A. No. At the time when I did my first interview, I told them, I still don't remember what I did with them.

Q. Did you pawn those in Knoxville to get yourself some more money?

A. No.

Q. Did you bring them home and pawn them?

A. No.

Q. Well, what happened to them?

A. I don't know. There would be a record if you pawned something. I've pawned stuff before. There -- I have never pawned Donnie's anything. When I came home and parked the car, everything that I had left was in the car. I turned myself in that day. I don't understand what you mean why I would pawn something after I killed a man. That's callous.

Q. You got something to drink when you stopped and got gas in Roanoke.

A. I don't remember that.

Q. You went directly to Ms. Williams' home.

A. Yes.

1278

Q. You testified that as you sat there outside her home, you weren't thinking straight.

A. No.

Q. But yet you did, once you got there, you did exactly what you'd planned to do.

A. No.

Q. Oh, that's right. You didn't kill yourself.

A. That's true, also.

Q. You cut the phone wires so nobody could call for help.

A. Yes, ma'am.

Q. You rendered them helpless.

A. Yes, ma'am.

Q. You took away the only defense that that family was going to have whenever you blasted in the back door.

A. Yes, ma'am.

Q. Do you say that's not a plan?

A. You said what I had planned that -- it did not happen the way I had thought things were going to happen that day.

Q. Because you didn't kill yourself.

A. That is in addition to what else I had thought was going to happen that day.

Q. You -- you pulled the phone wires out before the fire, right?

A. Yes.

Q. It was the same thing: To render them defenseless.

A.    Yes.

Q.    You pulled the phone wires on Alesha Chambers at her house, we saw the photos of that, so she couldn't call law enforcement.

A.    Yes.

Q.    Do you remember that?

A.    Yes.

Q.    So pulling the phone wires on the Williams home was just part of the whole predatory plan that you had set up.

A.    Yes.

Q.    And isn't that just the reason you killed Donnie, so he couldn't call for help?

A.    I'm still struggling to find out why I pulled the trigger.  He give me everything I asked for.

Q.    It was so he couldn't call the police and say my car had been stolen, so he couldn't call for help.

      (No response.)

Q.    Isn't that why you did it?

A.    I'm still struggling with that.

Q.    You said yesterday that you began to doubt what you were there for.

A.    Yes.

Q.    But you didn't turn back.

A.    I almost did.

Q.    But you didn't.

A. But I did not.

Q. Moved the car in a better position. Right?

A. Yes, ma'am, I did.

Q. You grabbed your gun.

A. Yes, ma'am, I did.

Q. You grabbed your spare shells.

A. Yes, ma'am.

Q. By the way, at what point did you reload the gun after killing Donnie?

A. I don't think that happened until I was at Bertha's back door.

Q. You said you sat on the steps at that point and thought about ending your life.

A. I had several thoughts, that being one.

Q. And I guess as you were thinking about that is when you reloaded the gun?

A. That might be possible. I cannot say yes.

Q. This suicide attempt was no different than any of the ones before and any that would follow. You always lived.

A. The thing about that is I was serious this time.

Q. So you loaded the gun instead of turning it on yourself. You blasted your way in their back door.

A. Yes, ma'am.

Q. Right?

And after you blasted your way in the back door shooting

all three shells that were in the gun, what's the next thing you did?

A.    I heard Robin's mother.  I heard Robin's voice.  I turned to the left.

MS. ROSE:  If I may approach the witness?

THE COURT:  You may.

Q.    I'm going to hand you Government's Exhibit Number 31E1. If you would take this, please.  It belongs to you.

A.    No, ma'am.

Q.    If you would, I want you to show the jury something, please, sir.

A.    I vowed never to touch that gun again and I will not.

Q.    Well, tell us about how you reloaded this gun.  You crafted it.  This is your work.  You need to take it and show the jury how you made it work.

A.    That gun I used to kill people and I will not touch that gun again.

Q.    Well, show us how you reloaded it while you're standing in Bertha Williams' kitchen, the brownies are cooling on the stove, she's screaming for her daughter to run for her life. Tell us how you reloaded it.

A.    The shells go in the side and that's how I did it.  I put the shells --

Q.    Do you have to pull that back?

A.    I don't remember.

Q. Do you have to pull this back and load them in one at a time?

A. I don't remember how you put them in. I think you might put them in through the bottom.

Q. Do you have to pull this back each time?

A. I don't know.

Q. Pardon?

A. I don't know. I think you put the shells in the bottom and then --

Q. Then what happens to them?

A. Then you pull the trigger.

Q. Okay. So you load them up from the bottom and nothing has to move to load them into the chamber. I mean, how does it work?

A. I don't recall. Simply because after I got to Tennessee, I put that gun in the trunk. Next time I put it in the dumpster. I did not want to see it again.

Q. Where did you have your spare shells that you used to reload in the kitchen?

A. I think when I left the car, I stuffed shells in my pockets.

Q. After you killed Robin, you went back to your car and you left town. Do you remember which way you left?

A. No, ma'am. I remember getting on 81. I think I might have hit Orange, but I got on 81.

Q. Yesterday you told the jury that all you could think about at that point was suicide.

A. I had a lot of thoughts, suicide being the main one.

Q. Got this gun, some spare shells right there in the car with you. But you weren't going to kill yourself with that gun, were you?

A. Not after I saw Robin bleed all over herself.

Q. I mean, you'd seen what a sawed-off shotgun can do to somebody.

A. That was the first time I had seen it.

Q. You'd seen the fear in Robin's face as she looked down the barrel back at you the first time you shot her.

A. No, ma'am.

Q. You know how frightening it was.

A. I knew how frightening it was, but actually seeing that after I shot her, she turned away from me and started to go towards her mother, so I did not see her when I cowardly shot her in the back.

Q. And you didn't want to do that to yourself.

A. It frightened me terribly and I panicked. I wish I hadn't. I wish also I hadn't done any of this.

Q. So instead of using the gun that you knew worked because you didn't want to look down the barrel end of it the way you had done to Robin, you for about the twenty-fourth time go and take some sleeping pills to kill yourself.

A. Yes, ma'am.

Q. That doesn't work as good as a gun, did it?

A. No, ma'am.

Q. So then you decided you were going to gas yourself for the first time.

A. I gassed myself first. I took sleeping pills and gas the second time.

Q. But you weren't going to do that until you had a chance, as you said, to go offer prayers on behalf of those you had murdered.

A. That happened after the first suicide attempt.

Q. You took the time to call home and ask for forgiveness from your mother.

A. That was before the last suicide attempt.

Q. You didn't want to die without being able to tell her that you were sorry, did you?

A. I wanted her to know that I love her and I wanted to say good-bye.

Q. You wanted to tell your mother good-bye, didn't you? And you wanted to tell her you loved her, didn't you?

A. Yes, ma'am.

Q. Donnie and Robin didn't get that chance, did they?

A. No, ma'am.

Q. But you made sure that you had it.

A. Yes, ma'am.

Q. Despite all the adventures that you detailed, that you had over there in Knoxville, you made it back to Charlotte and got near your cousin's apartment and that's where you abandoned Donnie's car, correct?

A. The reason I parked his car where it was parked, there's not a lot of traffic back there. I know the patrols back there. I've spent time at my cousin's house. I knew they would find the car. That's why I parked it in that spot.

Q. Why didn't you just call the police?

A. I don't know. I wish I had. But like I said, I wish this never would have happened, either.

Q. And because you wanted to preserve the evidence of your crimes, you put them in a dumpster.

A. Yes.

Q. Instead of leaving them in a locked car.

A. Yeah. I felt somebody might steal the car, so I put them in the dumpster behind the car. I left shells in the car that matched shells in the bag. I didn't know what would happen to me at that point, if I would make it home, but I had to try.

Q. Now, did you contact your cousin or your mother first?

A. I contacted my mother first. That was on Sunday early. I contacted my cousin on Monday, Monday -- mid Monday, I believe.

Q. At that point you did not tell them anything about Donnie Allen.

A.    They had -- I called them for help.  They told me that they knew about Robin.  I did not have at that time the opportunity to tell them.  I wanted to fully explain it to them.

Q.    And the officers in fact are the ones that brought up Donnie Allen.

A.    No.

Q.    The officers said to you we have a car.

A.    You're referring to me?  I thought you were referring to my mother.

Q.    No.

A.    If you're referring to me.  In the process of the first interview when Womble was talking to me and I'm telling him about Robin, his next question to me was, Marc, we want you to help with a missing person.  He never gave me the opportunity to blurt it out.  I was simply answering everything they asked me.  That's why it came out like that.

Q.    You were getting ready to tell them; they just beat you to it.

A.    I was just following his instruction and his question at that time.

Q.    At that point you knew they had the car.  You knew they had your fingerprints in it.

A.    No, at that time I did not know they had the car.  He told me about the car after I took them to Donnie Allen's --

where he was.

Q. They showed you the car after that, but they told you that they had a missing persons report and that the car seen in Roanoke matched the description of the missing persons car. Isn't that how it happened?

A. Oh, yes, yes. Now I remember. Yes. But that doesn't say that they had the car. It says that it was identified as the same car.

Q. And I believe you described yesterday that you didn't really confess anything at that point. You just wrote corner of Billy Graham and Morris Field and slid it on a piece of paper across to them.

A. I was talking to Agent Womble and I didn't really know what to do about that, so I wrote it down. I drew a map. I did not think that they would allow me to go out there with them or ask me to take them out there with them. He didn't do that until afterwards.

Q. You told the jury that while -- despite all the violent acts of your life, beating up women for many years, children, shooting at people, that you've been a model prisoner while awaiting this sentencing.

A. There -- I don't have a girlfriend in prison. I don't have a relationship. I don't have that kind of surrounding, that relationship setting. It's just like when I was at home, if I wasn't involved in a relationship or relationship was

FORM FED ● PENGAD · 1-800-631-6989

fine, never done anything to anybody.

Q. That's not what I asked you. I asked you about your behavior while awaiting this sentencing. You've been very good, haven't you?

A. You're talking about incarceration. That's what I'm referring to.

Q. And you're saying you've been good because you haven't been -- had a chance to be around women?

A. That's correct. In a relationship setting. We have female guards. I talk to them same way I talk to the male guards. They're all guards to me. But I don't have that romantic connection with anyone.

Q. And really, it's not a setting in which you could get into any kind of trouble, is it? It's pretty controlled in some ways.

A. Oh, no. You know, like I said, in phase two, when you go down to the day room and you've got four guys together, playing cards, you know, I've seen guys get into fights. If you're in the county jail where I've been -- there's one place where I was, it's called 5100. It's a unit. At one time we were having fights every day, and I just -- I don't get into that sort of thing, you know. That's not how I do my time.

Q. No, you just beat up girls.

A. I have a problem with abusing women.

Q. Now, the special confinement unit that you described

prior to your coming for your sentencing, that's not general prison population life.

A. Only the phase two aspect is similar to general population. And where I'm housed now, it's general population.

Q. And general population life, I mean, allows you to do your artwork that the jury has seen. In fact, they were nice enough to go and get you different mediums to use. You said you tried the acrylics. So you're able to follow through, do some of your artwork.

A. That's not general population. That was the maximum security lock down. That's just one of the few things I had to be able to do.

Q. In the general population, though, you get to do a whole lot more than that. Like you said, when you were at Butner, that was kind of more a realistic setting. You got to play basketball, right?

A. I don't play basketball. I said you could go to the gym. I can't play basketball.

Q. Or attend school.

A. I am currently trying to get my G.E.D. where I was housed at.

Q. And you can go to the library. You talked about that a little bit.

A. They have a law library where I went and studied some

law, where a lot of guys study law on their cases.

Q.   And of course, they have magazines and cable TV and other ways to entertain yourself throughout the day.

A.   I'm not a big TV person.  I like to read.

Q.   And of course --

THE COURT REPORTER:  I'm sorry?

THE WITNESS:  I said I'm not a big TV person.  I like to read.

Q.   And of course, you get your regular phone calls.

A.   Well, in general population they can have that.  Not where a lot of places I've been housed.  You have to have permission to get the call.  You're only allowed two calls a month.

Q.   Well, that was in the special confinement unit.

A.   Also at Butner before I was out in GP.

Q.   And then -- but you do get to call and talk to your family or, like you said, you're trying to build a relationship with your children now in the last month.

A.   Yes.  Where I'm housed at now in the county jail, you're allowed to use the phone when the pod hours are open.  I think we're open a total of six hours a day.

Q.   And of course, you can get a job while there in prison and make some money.

A.   If you stay out of trouble, you're allowed to work, make a little bit of income.  I think we make 50 cents an hour or

something like that. You work maybe four hours a day.

Q. And that money, then, can go into a canteen so you can buy things you like. Whatever, candy bars or drinks or things that --

Q. Well, there again, you have to understand me. I don't eat junk food. What I've been trying to do before I left was find some kind of way I could save up some money to be able to maybe, if I had been lucky enough to get contact with Tasha, wanted to be able to try to help the kids out.

Q. Can you, when you're there, also get visitors?

A. I haven't touched any of my family, just as I didn't allow Donnie and Robin to. In the past six years every visit is behind glass and steel. Since -- when I'm away from Charlotte, I was only lucky enough to see -- my father came to see me in Virginia. Only since waiting and going through trial do I receive some visits. My children recently and sometimes my mother.

Q. But you can in general prison population have visitors. You can have a list of folks that can come see you and you can talk with them. May not be a contact visit, but it's an opportunity to visit and see them; is that correct?

A. Yeah, because I've been told I will never again have a contact visit.

MS. ROSE: Thank you. I don't have any other questions.

MR. BENDER: Nothing further, Your Honor.

THE COURT: You may step down.

THE DEFENDANT: Thank you.

(Defendant stepped down.)

THE COURT: Do we have another witness?

MS. LAWSON: Yes, Your Honor. Derrick Barnette.

DERRICK BARNETTE,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q. Good morning, Mr. Barnette. Would you please introduce yourself to the jury.

A. My name is Derrick Barnette.

Q. And how are you connected to Marc Barnette?

A. That's my son.

Q. Now, where do you live and work now, Mr. Barnette?

A. I live in Clinton, Maryland. I'm a postal worker.

Q. Are you married?

A. Yes, ma'am.

Q. Do you have any children or stepchildren?

A. I have two stepchildren and one biological child.

Q. Tell the jury first of all if you know Jesse Cooper?

A. Yes. That's Sonia's father. That's my first wife's father.

Q. And your first wife is Sonia Cooper, Marc's mother?

A.    Right.  That's correct.

Q.    How did you meet Jesse Cooper?

A.    He was the janitor at our -- at my high school.

Q.    Which high school was that?

A.    Harry P. Harding here in Charlotte.

Q.    Do you know where Jesse Cooper is now?

A.    He's in the hospital.

Q.    How long has he been in there?

A.    A couple of months, I believe.

Q.    From what is he suffering, do you know?

A.    I think he has cancer.

Q.    Tell us about Jesse Cooper.

A.    When I first met Jesse, I didn't know he was Sonia's father.  I met Sonia when I was in the ninth grade.  And when I went to high school, she would always say I have somebody watching you.  And I met Jesse and I had already known him.  But he was a nice guy and we talked in the hall between classes.

Q.    What kind of person was he besides nice as you got to know him?

A.    He was unique.  Little eccentric.  He had been -- in his conversation, he was kind of hard to understand unless you really got to know him because he would speak in a code.  It was more or less a military code.  He would talk about coming to -- in his camp and stilettos and just various conversations

like that. However, I did learn that he had a degree from North Carolina A&T State University where I had gone for a semester and he was a very educated man, but had been in the military and was experiencing some problems.

Q. Did you know whether or not he drank?

A. Yes. Every day. He liked his -- he used to call it PBR, Pabst Blue Ribbon. And I would take him to the store and bring him back and he would stay at home and he would drink his beer.

Q. At some point did you meet Sonia Cooper and start dating her?

A. Yes. I met her when I was in the ninth grade prior to going to high school.

Q. And where -- what grade was she in when you met?

A. She was in the seventh grade. I was in the ninth.

Q. Tell the jury about the Sonia Cooper you met when she was in the seventh grade.

A. Sonia was a real nice girl. She was cute. She was fairly smart. We could, you know, have conversations, you know, that even in the ninth grade about school. You know, what we had learned. Those types of conversations.

Q. Did you and she date when she was in the seventh grade?

A. Yes.

Q. Did you ever know her mother, Pearl Cooper?

A. Yes, I knew her mother. She was a nurse. She was much

like my mother. Concerned about the well-being of her children. Single mother. Just seemed to be a real good person. She had a good heart. She was a good person.

Q. Had she and Jesse divorced by the time you first started going with Sonia?

A. Yes.

Q. At some point did you and Sonia become sexually intimate?

A. Yes.

Q. How old was she or in what grade was she?

A. Probably about the eighth or the ninth grade. I was in high school.

Q. What was your relationship like other than being sexually intimate when you were first dating?

A. We could talk. We got along. We were a normal teenage couple, I guess. She felt more like a friend more so. We had been together for a while and, you know, we kind of understood each other.

Q. Are you saying that she felt like you were a friend or you felt like she was a friend?

A. I thought we were both friends, somebody I could communicate with.

Q. And that's in addition to your sexual relationship with her?

A. Yes.

Q. At some point did Sonia become pregnant?

A. Yes.

Q. Were you told by anyone who the father of the baby was?

A. When she was pregnant and I think up until she had the baby, we had separated. We weren't together. And then -- well, maybe -- when she was pregnant we were spending some time together; but after she had the baby, we weren't together. And I was told that the baby looked like me, so I went over and looked at it and it was a cute baby, so...

Q. That was Marc?

A. That was Marc.

Q. Were you there when Marc was born? At the hospital.

A. No.

Q. And Marc was born when Sonia was fourteen.

A. Right.

Q. Where did Sonia and Marc go to live after they left the hospital?

A. They lived with her mother in Arrowwood and her stepfather. I believe they had gotten married.

Q. That would be Leroy?

A. Right. Brown.

Q. And at some point did -- what happened to -- between Leroy and Pearl Cooper?

A. One morning I got a phone call. It was Sonia. She had told me that Leroy Brown had shot her mother and that she

asked me to come down there. I got up and got in the bed with my mother and had a conversation with her. Just, you know, how did this happen? How could this happen? Why? And she, you know, comforted me. And I got another phone call from Sonia and I immediately got up and drove down there to her.

Q. Why did you get in bed with your mother and talk to her at that point?

A. I was young. I needed that support.

Q. So you were --

A. I just -- I just needed to be with her for that moment. And I think the phone call rang early and she asked me what it was about. So in the conversation with her, I just got in the bed with her and had that conversation.

Q. Did she give you consolation and support and help you figure out what to do for Sonia?

A. Yeah. She told me to go. But, you know, my questions were how could somebody do this and, you know, just go through the whole question thing.

Q. Do you know whether Leroy Brown was prosecuted for the murder of Pearl Cooper?

A. Yes, he was. I think he spent about five years in jail.

Q. Did Pearl die?

A. Yes, she did.

Q. And do you know how she died?

A. From shotgun wounds, I think one to the head and another

one maybe to the chest area. I'm not sure.

Q. Do you know if Sonia ever saw her mother's body there at the house?

A. I know her sister Sheila was the first one to find her and went in and got Sonia. And I'm not sure if she actually saw her or not, but it wasn't a good time.

Q. The murder occurred in the house while Sonia and Sheila were there?

A. Right. And they were surprised that they didn't even hear the gun shots. They were in the house when it occurred.

Q. Did Sonia change after that?

A. She didn't change outwardly, but you couldn't make any references to her mother. She would just break down at that point.

Q. Where did she go to live first after her mother's death?

A. I think she stayed with her father for a while and then she moved in with her oldest sister and brother-in-law.

Q. And they moved down to Ft. Jackson, South Carolina?

A. South Carolina. Yeah, he was in the military. He was in the army.

Q. Did you -- I'm sorry. Did you continue your relationship with Sonia?

A. Yes.

Q. And at some point did you enlist in the military?

A. Yes. I joined the air force.

Q.  Was that before or after you married Sonia?

A.  That was before.

Q.  What made you ask Sonia to marry you?

A.  I cared about her.  I liked the family atmosphere.  At a young age my mother and father separated when I was five years old.  He wasn't there, but -- I mean, he wasn't physically there, but he was emotionally there and he would come by.  And he lived in Philadelphia.  He had some issues.  He was an alcoholic for a while and then he just abruptly stopped drinking and had a good job.  And we had a close relationship until the time he died.

Q.  So you married Sonia because you wanted to have a family?

A.  Yes.  I've always wanted to have a family.

Q.  At some point did you have another child?

A.  Yes.  Mario.

Q.  How old was Marc when Mario was born?

A.  I think they're about four years apart.

Q.  Where were you living when Mario was born?

A.  I was in Okinawa.

Q.  Had you been on a tour of duty overseas for a substantial period of time?

A.  I had left in August and I returned six months later. In, I think, February.  Yeah, February.

Q.  Tell the jury, please, what your relationship was like

FORM FED ® PENGAD • 1-800-631-6989

with Sonia as the children were growing up.

A. We had a nice relationship. I left Omaha, Nebraska. We got married -- well, I was in Omaha and I was stationed there and then I asked Sonia to marry me. She said she would. So I came back to Charlotte. And as soon as I returned alone, I found out that I had orders to go to Okinawa. Well, that was about six months later. So I had promised her that I would come and get her and Vicci and we would, you know, be together for that period of time because the tour in Okinawa, I think, was eighteen months.

So we packed up the little bit of stuff we had. We didn't have any furniture. I got a TV and a cot from some friends of mine on base and I had a sleeping bag for Vicci. We had some pots and pans. And we would go out every pay day, buy food, you know, for the month. And it was a pretty fun time. I enjoyed it even though we didn't have anything. It was a pretty nice time.

Q. Did you beat her then?

A. Beg your pardon?

Q. Did you beat her then?

A. No. No.

Q. When did that start?

A. After we returned to Charlotte after I got out of the military. I'm -- I can't dance so I don't care to go out to clubs and clubs to me, you can't talk to people, so, you know,

if you can't dance, no need in going. And I'm not a real big drinker. When I was in the military, I drank enough. And it wasn't a problem but it was going to be a problem, so I stopped before I left.

Q. You started to tell the jury about you don't dance. What significance is that?

A. Well, when we got back, Sonia liked to go out and she's always liked to dance and go out. So, you know, being the kind of person I wanted to be, I said, well, you know, you go ahead. I can, you know, stay at home and keep the kids. I don't have a problem with that. You know, she's entitled to things that she liked to do.

Q. And how old was Marc when this was going on?

A. Maybe seven, eight.

Q. How often was she going out a week?

A. Every weekend or maybe every other weekend.

Q. How did that make you feel?

A. Well, at first it was okay. I didn't have a problem.

Q. What happened later?

A. She started to go more often with more, I guess, intensity of having the need to go versus, you know, I'm going out with some friends having a good time.

Q. How did that make you feel?

A. Not very good.

Q. How did you --

A.   I had a friend of mine I would call and talk to late at night.  You know, it got to the point where I could watch the cars go up the street and she would probably get out of one of them and then, you know, walk back to the house 2 or 3 o'clock in the morning.  It wasn't a good feeling.

Q.   What did you think was going on?

A.   Well, she was probably seeing somebody else.

Q.   Did you accuse her of that?

A.   Of course.

Q.   Did you interrogate her about it?

A.   Yes.

Q.   Were the children -- did you do this at home?

A.   Yes.

Q.   Were the children there?

A.   Yes.

Q.   Is that when physical violence began in your household?

A.   More or less, yes.

Q.   What kind of things did you do to Sonia and why did you do them?

A.   I would ask her about what she was doing.  Who she was doing it with.  And, you know, the arguments pursued.  You know, some ugly things were said.  The children were there. Just questioned her about, you know, number one, why you got to go?  Where you going?  Who you going with?  She said a couple times she was going with a neighbor and I would call

the neighbor's house and the neighbor said, Well, I haven't seen her. So, you know, that just intensified the situation.

Q. Did you know whether she was doing -- using alcohol or taking drugs at that point?

A. I knew she was drinking, you know, when she would go out to the club, but I never saw any other drug abuse.

Q. Were there times when you would beg her to stay home?

A. Yes.

Q. How would you do that?

A. I would ask her, you know. You know, we'd get right up out the bed and, you know, she started dressing. I said, Where you going? And I said, you know, why you can't stay at home? You know, you got a family here.

And I even made mention to the neighbor, which I went to school with was a friend of mine, I said, you know, if Tina had a friend, she wouldn't be hanging out with you, you know. She would be with her participating in, you know, their relationship. So it would just go on and on and on.

Q. Did you ever follow her?

A. No. I wanted to have somebody to follow her, but it never happened.

Q. What's the worst thing you ever did to Sonia?

A. Probably hit her in the head with a hammer.

Q. With a hammer?

A. Yes.

FORM FED ® PENGAD · 1-800-631-6989

Q.    When did that happen?

A.    It was during one of the arguments we were having.

Q.    During the arguments, would she push back or yell back or --

A.    Oh, yeah.  It was a two-way confrontational experience.

Q.    Pushing?

A.    Yeah.

Q.    Slapping?

A.    On occasion.

Q.    Did she ever brandish a weapon against you?

A.    I woke up one time, she had a frying pan over my head. Turned into sort of a joke.  You know, I was just laying on the sofa.  Hadn't done anything that time.

      And I just asked her what -- I woke up and she's standing there with the frying pan.  I says, What you going to do?

      She said, I'm going to hit you with it.

      Why?  I mean, you know, so...

Q.    Did you do anything to make her jealous?

A.    Well, she accused me -- well, that was an understatement.  We were riding in the car together and we had just bought a Saab and we were -- I pulled into the car wash and these two girls pulled up in front of me.  Now, I had my family and her in the car.  I didn't know them.  And she got real upset with me, you know, just over that.  So she was fairly jealous.

Q.   So did she accuse you of infidelity?

A.   Yes.

Q.   And at some point did it get to be too much for you all to be living together?

A.   Yes, it did.

Q.   How old was Marc when that happened?

A.   Maybe ten.  Let's see.  I got out of the military in '79.  We were together until about '84.  So he was about ten to twelve.

Q.   And so Mario would have been?

A.   Eight.

Q.   Eight.

A.   Or seven.  Somewhere in there.

Q.   Did the level of argument and violence in your household increase over time?

A.   Yes.  It steadily increased.

Q.   Now, during the times that you were in the household before you separated from Sonia, did you hit anybody else?

A.   I spanked the children, or Vicci.

Q.   By Vicci, you mean Marc?

A.   Yes.  I know him by Vicci.

Q.   He testified that you beat him with a belt.  Is that true?

A.   That's true.

Q.   He testified that his mother would go hide in the

bathroom when you were hitting him. Is that true?

A. Sometimes she was present. Sometimes she wouldn't be in the room. She didn't like it.

Q. She didn't like it when you beat him?

A. No.

Q. What did she do to stop you?

A. Nothing. She -- nothing. That I can remember.

Q. Did you have a couple of principles that you felt were really important to get Vicci to accept and follow?

A. Yeah. I'm real strong on education and not lying to me. Those two things I just don't tolerate.

Q. And did you talk to him about that?

A. Yes.

Q. Repeatedly?

A. Yes.

Q. And did you talk to Sonia about lying?

A. Yes, ma'am.

Q. Accused her of lying to you when she went out, stepped out on you?

A. Yes.

Q. If she denied being unfaithful to you, did you believe her?

A. No.

Q. Do you recall a time when Marc got caught playing doctor at school?

A. No, ma'am.

Q. When you and Sonia were together, did you hit Marc more or less or the same amount as Mario?

A. Less. I only spanked Mario one time.

Q. Why?

A. Because he was a different child. He did basically what he was told and he obeyed fairly much.

Q. After you separated, did you pay child support to Sonia for the children?

A. Yes.

Q. How much, do you recall?

A. I think it was $400 a month.

Q. And did she --

A. No, $400 every two weeks, I believe. I'm sorry.

Q. What kind of money were you making then?

A. Maybe $17 an hour.

Q. And what kind of money was she making then?

A. I'm not sure. She worked for State Farm.

Q. Was it your impression that she needed the child support that you were paying?

A. It got to that point. I wasn't late with the child support; and what I mean by late, I wasn't several weeks behind. And, you know, if the child support wasn't there on that day, I would get a phone call. I had moved to Philadelphia for my job and I didn't see if the money was

going toward the children and the household, but it was always there before the next payment was due.

Q. Did you begin to suspect that the money wasn't going to the children?

A. Yes.

Q. What made you suspect that?

A. The intensity of the phone calls. They became frequent within that week. You know, you say you was going to send it today. I don't have it by two days later, where is it? When you going to send it? And it was almost like she was using it to pay bills with versus using it to take care of the children.

Q. Did there come a time when you began to question whether Mario was your biological child?

A. Yes, ma'am.

Q. What brought that on?

A. We had separated. Some of these phone calls. I had did the math earlier. I had contacted some attorneys. None of them were willing to handle the case, I guess. But I did find one during the separation and divorce.

Q. Nobody was willing to handle a case where you would potentially determine that the children born into your marriage were not yours?

A. Right.

Q. Did they tell you why?

A.    Well, I had one family attorney and he didn't want to get in between us.   He was a friend of mine and a friend of Sonia and a friend of the family.   So out of respect for that relationship, he didn't want to, you know, choose sides, I guess.   So I respected that.

Q.    As a result of whatever you filed in court, were Sonia and the children and you required to give blood for a paternity test?

A.    Yes.

Q.    And eventually, you learned that neither Mario nor Marc were your children; is that right?

A.    That's correct.

Q.    What did you do when you found that out?

A.    I took Vicci and Mario out to dinner and I kind of explained to them before what had happened about the blood test and maybe some possibilities of what it could be and what it would mean.   And during -- well, after dinner I told them that I was not their biological father, but I would always be their father because they didn't have any choice in this and this was not between me and them, it was between me and their mother.

Q.    What specifically did you tell them about why you had the paternity test?

A.    Like again, I said this is between me and your mother. This has nothing to do with you.   But Vicci asked more

questions at that point because when I told him I wasn't his biological father, he reacted and it was subtle, but I got questions from him more than I got from Mario. And I told them, you know, me and your mother had to separate because we weren't getting along and it wasn't fair to you to be in this type of relationship.

And once the tests came back, I also mentioned that, you know, how would you feel if you were having a relationship and she was having children by, you know, somebody else. So I tried to explain it as well as I could at that time.

Q. How old was Marc when you told that to him?

A. Somewhere between nine and twelve.

Q. Now, you, as a result of --

THE COURT: Would this be just as good a time to break for lunch?

MS. LAWSON: Yes, sir. Yes, sir.

THE COURT: All right. Members of the jury, we'll do that. Please remember the usual instructions. Ask you to be back with us at 2 o'clock. Thank you.

(Lunch recess at 12:30 p.m.)





RECEIVED
JUN 1 6 2003
US ATTORNEY'S
OFFICE
CHARLOTTE, NC