## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

### UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

### AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF NORTH CAROLINA

## JOINT APPENDIX - VOLUME IV OF V
### (Pages 1312 - 1798)

HAROLD J. BENDER
LAW OFFICE OF HAROLD J. BENDER
200 North McDowell Street
Charlotte, NC 28204
(704) 333-2169

ROBERT J. CONRAD, JR.
UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6629

MARK E. OLIVE
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
(850) 224-0004

ANNE M. TOMPKINS
ASST. UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6222

*Counsel for Appellant*

*Counsel for Appellee*

**Additional Counsel Listed on Back of Cover**

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477
A Division of Lantagne Duplicating Services

JILL WESTMORELAND ROSE
ASSISTANT UNITED STATES ATTORNEY
WESTERN DISTRICT OF NORTH CAROLINA
100 Otis Street, Room 233
U.S. Courthouse Building
Asheville, North Carolina 28801
(828) 271-4661

# TABLE OF CONTENTS

Federal District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Indictment filed February 4, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Guilty Verdict returned January 27, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Defendant's Motion in Limine Regarding the Victim
Impact Statements, filed June 4, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Motion for Allocution by the Defendant, filed
June 4, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Government's Response in Opposition to
Defense Motion in Limine to Prohibit
and/or Limit Victim Impact Evidence,
filed June 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Government's Response to Motion for Allocution
by the Defendant, filed June 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Order Denying Defendant's Motion for Allocution,
entered June 18, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Order Denying Defendant's Motion in Limine
regarding the Victim Impact Statements,
entered June 21, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Motion for Relief Pursuant to *Ring v. Arizona*
filed July 2, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Attachments:

Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

1

Government's Notice of Intent to Seek
the Death Penalty, filed August 7, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Government's Reaffirmation of Intention
to Seek the Death Penalty, filed July 30, 2001 . . . . . . . . . . . . . . . . . . . . . 118

Defendant's Memorandum in Support of Motion
Regarding *Ring*, filed July 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Government's Response to Defendant's Motion for
Relief Pursuant to *Ring v. Arizona*,
filed July 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

Voir Dire:

Prospective Juror Regina Sanders (888) . . . . . . . . . . . . . . . . . . . . . . . . . 133

Prospective Juror Edwards (1014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

Prospective Juror Karen Sanders (1071) . . . . . . . . . . . . . . . . . . . . . . . . . 169

Prospective Juror Blakeney (1143) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Prospective Juror Bryson (1239) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Prospective Juror Donaldson (1289) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Prospective Juror Campbell (1477) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

Prospective Juror Moore (1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

Prospective Juror Deana Stanford (1960) . . . . . . . . . . . . . . . . . . . . . . . . . 281

Parties' exercise of peremptory challenges to the
prospective jurors, July 27, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

### *Volume II*

Resentencing Volume 12, July 29, 2002, (Morning) . . . . . . . . . . . . . . . . . . . . . . 372

Resentencing Volume 12, July 29, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 469

Resentencing Volume 13, July 30, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . 587

Resentencing Volume 13, July 30, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 687

Resentencing Volume 14, July 31, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . 773

### *Volume III*

Resentencing Volume 14, July 31, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . 845

Resentencing Volume 15, August 1, 2002 (Morning) . . . . . . . . . . . . . . . . . . 959

Resentencing Volume 16, August 5, 2002 (Morning) . . . . . . . . . . . . . . . . . 1029

Resentencing Volume 16, August 5, 2002 (Afternoon) . . . . . . . . . . . . . . . . 1107

Resentencing Volume 17, August 6, 2002 (Morning) . . . . . . . . . . . . . . . . . 1202

### *Volume IV*

Resentencing Volume 17, August 6, 2002 (Afternoon) . . . . . . . . . . . . . . . . 1312

Resentencing Volume 18, August 7, 2002 (Morning) . . . . . . . . . . . . . . . . . 1424

Resentencing Volume 18, August 7, 2002 (Afternoon) . . . . . . . . . . . . . . . . 1533

Resentencing Volume 19, August 8, 2002 (Morning) . . . . . . . . . . . . . . . . . 1634

Resentencing Volume 19, August 8, 2002 (Afternoon) . . . . . . . . . . . . . . . . 1726

## Volume V

Resentencing Volume 20, August 9, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . 1799

Resentencing Volume 20, August 9, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1822

Resentencing Proceedings, August 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . 1870

Resentencing Proceedings, August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . 2017

Defendant Motion for Mistrial regarding victim
impact testimony, filed August 5, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . 2034

Written questions from the jurors filed August 13, 2002 . . . . . . . . . . . . . . . . 2037

District Court Judge's answer to jurors' written question
filed August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2038

Jury verdict form with reference to count 7, filed
August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2039

Jury verdict form with reference to count 8, filed
August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2057

Jury verdict form with reference to count 11, filed
August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2075

Judgment and Order imposing sentence, entered
August 20, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2092

Defendant's Motion for New Trial, Arrest of Judgment
and Other Relief, filed August 20, 2002 . . . . . . . . . . . . . . . . . . . . . . . . 2097

Order Denying Defendant's Motion for New Trial,
Arrest of Judgment and Other Relief
entered September 9, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2149

Page 3337

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA            )

                                 )   CASE NO. 3:97CR23-V

      v.                           )   August 6, 2002

                                 )   Afternoon Session

AQUILIA MARCIVICCI BARNETTE,        )

           Defendant.               )

TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE RICHARD L. VOORHEES

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

      ANNE M. TOMPKINS, Esq.

      JILL WESTMORELAND ROSE, Esq.

      Assistant United States Attorney

      227 West Trade Street

      Suite 1700

      Charlotte, North Carolina  28202

FOR THE DEFENDANT:

      JEAN B. LAWSON, Esq.

      P.O. Box 4275

      Charlotte, North Carolina  28226

      HAROLD J. BENDER, Esq.

      200 North McDowell Street

      Charlotte, North Carolina  28204

Reported by:  Scott A. Huseby,

              Registered Professional Reporter,

              Certified Court Reporter,

Case 3:12-cv-00327-MOC     Document 105     Filed 09/23/15     Page 11 of 250
1312

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3338

PROCEEDINGS

THE COURT:  May I have the jury, please.

MS. TOMPKINS:  Your Honor?

THE COURT:  Yes, excuse me.

MS. TOMPKINS:  I just wanted to state for the record that just a minute or two ago I received from defense counsel, it's not really a report, but it is what purports to be a report from Dr. Mark Cunningham, a witness for the defense, who will be testifying as an expert, I think -- I don't have the Court's order in front of me, but the Court had put out a schedule for reports to be generated and given to oppositional counsel which was clearly scheduled for well before the trial begins rather than on the day or day before the expert is going to be testifying.  Just for the record, I just wanted to let you know I just got it.

THE COURT:  What is the explanation for that?

MR. BENDER:  Your Honor, last Friday, I believe it was, maybe Thursday afternoon after court, Ms. Tompkins called me and said that she could not locate Dr. Cunningham's report and did I have a copy of it and she would come by and pick it up.  I gave her a copy at that time with some exhibits that, or slides, photocopies of slides we had used the last time.

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 12 of 250
1313

Page 3339

We received these I think this morning from Dr. Cunningham. We don't know how many of them we are going to use. She has his report, had his report some time ago. These are simply slides that he will use to illustrate his testimony.

I would also like to state for the record that we have requested but not received a formal report from the expert that the government is going to use, Dr. Dietz. The only thing we have seen has been a draft report. So we have -- as soon as we got them, we gave them to them. We don't know how many we are going to use out of that. We are still making that decision at this time.

THE COURT: Well, we need to try to break the logjam here. You say you don't have the report until today.

MS. TOMPKINS: Well, to clarify what Mr. Bender said, last Friday what I had from Dr. Cunningham was a page and a half letter to the Court that Dr. Cunningham had generated in the trial, which was not a report, rather a letter to the Court saying, I have expertise to testify, and copies of slides that he had used in a presentation.

I, in fact, had them, and have had them for as long as I have needed them. I thought that he had actually generated a report per se, these are my

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 13 of 250
1314

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3340

findings, this is the conversation that I had with the defendant.

What Mr. Bender gave me was, in fact -- I thought there was something different. What Mr. Bender gave me was something that I already had, so I made my preparations based on that. Moments ago I got handed, I don't know, 50 pieces of paper which is wholly different, wholly different than the document that I have had in my possession for a year.

THE COURT: It's not slides, I take it.

MS. TOMPKINS: It is -- well, when he says slides, I think he means from a Power Point presentation. That's all there is. There is no actual report. It is copies of a Power Point presentation.

THE COURT: All right. We will reserve some attention for that for the future.

May we have the jury, please.

(The jury returned to the courtroom.)

THE COURT: The jury is with you. You may continue.

MS. LAWSON: Thank you, Your Honor.

DERRICK BARNETTE,
being previously duly sworn, was examined and testified as follows:

EXAMINATION

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3341

BY MS. LAWSON:

Q. Mr. Barnette, you became a father for the first time when you were 16 years old, is that right?

A. That's correct.

Q. Did you try to be a good father?

A. Yes, ma'am.

Q. Tell the jury what you did to be a good father.

A. Being raised in a single family home, I also had a family structure, I had a grandfather and grandmother, and a mother. And like I said, my father was absentee, but he was present when I needed him to be. He also communicated with my mother.

In that structure I had mother, grandmother, grandfather, and a good background. As I tried to be a father, I tried to pass some of those same things on to me -- I mean, to my children. I mean, we had food in the house, we had transportation, car, lights, all of that good stuff. It was the basics.

When I got out of the military, I had a job for a little while, then I started to school and generated some income from military payments that they would pay for going to school.

Q. Were you aware that Marc had seen either yours or your brother-in-law, Jeff Nero's, Playboy magazines when he was very young?

Case 3:12-cv-00327-MOC   Document 131-5   Filed 09/23/15   Page 15 of 250

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3342

A.    No, I wasn't aware of that.

Q.    Tell the jury a little bit about how Sonia Barnette took care of the boys after you were separated and you were no longer living with her.  What do you know about that?

A.    After she left, I didn't know if we were going to get back together or not.  I kind of had a year where, you know, we would have a trial, I didn't tell her this, this was something that I kept to myself, and we would try to work it out.  I would call her; and if she said, I will call you back, that means I wouldn't get a phone call.

Q.    You would or would not?

A.    I would not.  You know, if she said, I will call you back, you know, I wouldn't see her anymore.  One day I called her, one Saturday morning, it must have been about 8:00, 9:00 o'clock, and the children answered the phone.  I said, where is your mother?  And they said, she is not here.  I said okay.  So I called back about 11:00.  I had suspected that she was leaving them there alone, but I never questioned them about it.  I never felt that you should question children about adult's practices, so I told them to get dressed, I would be there in a minute.  So I went and picked them up, and we went home and we cooked and we played.  And I

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3343

guess about 8:00, 9:00 o'clock I got a call from Sonia. It a general conversation, hey, how are you doing? I said, fine, okay, see you later, and hung up.

About an hour or two later I get another phone call and she is frantic because she hasn't seen the kids. And I said, when is the last time you saw them? And I got a vague answer about them going out to play and they didn't come in. And I tried to ask her some other questions to try to narrow it down to, you know -- but she never did. And I think she heard the kids in the background, and she says, they are over there with you? I said no, that was the TV. This went on for about another 30 minutes and then I told her I had them, and either she picked them up or I took them home.

Q. To the best of your knowledge, did she leave them alone at home on other occasions?

A. I felt like she did, but I never knew that for a fact.

Q. During the time that you were still living together when you were having some confrontations, do you recall ever fighting with her, arguing with her out in the street?

A. No, I don't recall arguing with her in the street. Maybe in the yard, if that, but mostly I believe they were contained to the house.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Aff               on (704) 333-9889
800-333-2082                                              Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 17 of 250
1318

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3344

Q.   Do you recall kicking in the front door?

A.   Yes.

Q.   What precipitated that?

A.   We were having our usual argument for the day, and for some reason I walked outside; and when I came back to get in, the door was locked and I had left my keys in the door.  And when I kicked the door, it was a thin wooden door, I think it was more like a closet door, or it seemed to be, so it wasn't a real thick hard door, and I kicked it and my foot went right through it.

Q.   When Marc was a child, did you ever hit him when he was naked, hit him with a belt?

A.   Yes.

Q.   When you talked to the boys about the results of the paternity test, what did you tell them they should do in terms of finding out who their father or fathers were?

A.   I told them they should talk to their mother.

Q.   Do you know if she ever admitted to them who their fathers were?

A.   No.

Q.   When you stopped paying child support, and that was by court order, right --

A.   Right.

Q.   -- that you were relieved of that obligation?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3345

A.   Right.

Q.   Did it occur to you that Sonia would have trouble maintaining herself and the two boys without that additional income?

A.   Yes.

Q.   Was it shortly after that that Sonia started dating unsavory men?

A.   I don't know.  I don't know who she dated.  I tried not to get involved in -- after she left I was relieved that she had gone; I tried not to get involved in what she was doing outside.

Q.   Did you know anything about what was going on with Marc down in Georgia and with Alicia Chambers?

A.   No.  I got a phone call one time from him when he was incarcerated when he had spanked the children with the coat hanger and --

Q.   If you would, tell the jury whether you knew anything about Marc getting arrested here and going to trial for what went on between him and Alicia Chambers.

A.   No, I don't know anything about that.

Q.   Now, how has all of this affected Mario Barnette?

A.   It's really hard to say how it really affects him, but he is deeply hurt.  This information -- once I told them that I was not their biological father, I

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Afl
800-333-2082
on (704) 333-9889
Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 19 of 250
1320

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3346

never mentioned it again. I always treated them the same. I never brought it up again. And I think just from listening to all of this information, it's not a good feeling. I think he is emotionally hurt.

Q. Did Mario and Marc always consider you to be their father?

A. Yes.

Q. What happened after Mario heard this in court today?

A. He cried. He broke down. I had to talk to him.

MS. LAWSON: No further questions. Thank you.

THE WITNESS: I beg your pardon?

MS. LAWSON: No further questions. Wait. May I ask another question?

MS. TOMPKINS: Yes.

BY MS. LAWSON:

Q. Did you ever hit Marc with a coat hanger?

A. No. I used a belt. I think when he was small I used a switch, but I wouldn't hit him with a coat hanger or extension cord.

MS. LAWSON: No further questions.

CROSS-EXAMINATION

BY MS. TOMPKINS:

Case 3:12-cv-00327-MOC, Document 105    Filed 09/23/15    Page 20 of 250

1321

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/6/2002

Page 3347

Q.   Mr. Barnette, education is important to you, is that right?

A.   Yes, ma'am.

Q.   And your mother was a teacher?

A.   Yes, ma'am.

Q.   And did she instill that in you?

A.   It was important to her.  You know, it was -- as all children, or some of my children have come up, they wanted to drop out of scoop, and she says, that's not an option.

Q.   And that was -- that's something that you wanted to pass on to Marc and Mario?

A.   Yeah.  I think that's very important for a black family, to have a good education.

Q.   And you went to college, correct?

A.   I'm going to college now.  I graduate in December.

Q.   Congratulations.

A.   Thank you.

Q.   Now, and you have had good jobs, correct?

A.   I have had this job since I separated from Sonia.

Q.   What is that?

A.   I work for the Postal Service.

Q.   What do you do for the Postal Service?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af          or (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 21 of 250
1322

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3348

A. I'm a project manager.

Q. And you have been with them how many years?

A. Since '82.

Q. And before that it was the military?

A. Yes.

Q. How many years did you spend in the Air Force?

A. Four years.

Q. And you did your training in Texas, is that right?

A. That's correct.

Q. And then went to Nebraska?

A. Nebraska, Offit -- Omaha, Nebraska.

Q. And that was an 18-month deployment?

A. Right.

Q. And at that point you and Sonia were married, correct?

A. During that period we got married, just before I went to Okinawa, like six months before I went to Okinawa.

Q. And Sonia and Marc went to Nebraska with you?

A. Yes.

Q. And then your -- that was for 18 months?

A. That was for six months. They lived with me for six months.

Q. And then you next went to North Dakota?

Case 3:12-cv-00327-MOC Document 105 Filed 09/23/15 Page 22 of 250

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3349

A.    After Okinawa, yes.

Q.    That was after Okinawa?

A.    Yes.

Q.    So that was Marc, Mario, Sonia, and you?

A.    Right.

Q.    How long was that deployment?

A.    One year -- wait a minute.  One year.

Q.    Okay.  And after that you came back to Charlotte?

A.    That's correct.

Q.    And your mother had died and left you her home?

A.    That's correct.

Q.    And you all moved into that home?

A.    Yes.

Q.    At this point you had testified things were good in the family, things were good with Sonia?

A.    Yeah, they were pretty good when we first moved back.  You know, we were happy.

Q.    Marc was, what, about three or four at that point?

A.    No.  I think he was more like seven or eight or nine.

Q.    So he was seven or eight by the time you came back to Charlotte?

A.    Uh-huh.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Af        on  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 23 of 250
1324

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3350

Q. And up to that point, like you said, life was pretty good?

A. It was pretty good, yes.

Q. Family is very important to you, isn't that correct?

A. Yes.

Q. And you testified that you tried to be a good father?

A. (Nods head.)

Q. You took your family with you except for Okinawa?

A. That's correct.

Q. And so at -- when did things begin going bad with you and Sonia?

A. After we had been back for awhile, she was working, I was going to school, could have been peer pressure, you know. I heard things likes --

Q. When was that?

A. Right after we got back from North Dakota.

Q. Okay. Is that when you got your job with the Postal Service?

A. Well, I had some other jobs before that, but yes.

Q. Now, you just mentioned that you had, in disciplining Marc you had spanked him naked?

Reported By: Scott A. Huseby, RPR
800-333-2082  Huseby, Inc., an A        ion (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/13   Page 24 of 250
1325

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3351

A.    Yes.

Q.    Now, you have never testified to that before, is that correct?

A.    That's correct.

Q.    At what age was Marc when you did that?

A.    Probably about seven to eight, somewhere in that area.

Q.    Was that a further punishment that you -- to humiliate him?

A.    It was intimidation.  The first punishment, and it's a stage, not that it's a planned stage, but I tried to get him to understand a couple of things, and this was another way of saying, if you don't do it, the punishment gets worse.

Q.    As he got older, did you continue doing that?

A.    No.

Q.    Now, when you testified in the trial, you used the term spanked.  Would you say that you spanked him?

A.    Yes.

Q.    Now, defense counsel asked you and framed the question in terms of did you beat him.  Would you characterize it as a spanking?

A.    I think all of those are interchangeable.

Q.    Okay.

A.    It just depends on your frame of reference.

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Aff        n (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 605    Filed 09/23/15    Page 25 of 250
1326

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3352

Q.    So when you testified previously that you spanked him using a belt or a switch, would that be accurate?

A.    That's true.

Q.    Okay.  You had also previously testified that you had never hit him in the face or intentionally hit him above his legs, only on his butt.  Would that be accurate?

A.    That would be accurate.

Q.    Now, you were asked previously and you testified previously that it was not a constant thing, you were not constantly disciplining Marc.  Is that fair to say?

A.    He was disciplined more than the other children.

Q.    Would it be fair to say that Mario was a quieter child?

A.    Yes.

Q.    Would it be fair to say that Marc was disciplined when Marc transgressed the family rules?

A.    Yes.

Q.    And those family rules would be don't lie, do well in school?

A.    That's true.

Q.    Would you ever consider that you had spanked

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3353

Marc without him transgressing a little?

A. No.

Q. Now, Marc testified about having been hit in the penis and scrotum. Do you have any recollection of that?

A. I have a vague recollection that I did it accidentally, not intentionally. Normally --

Q. Would that have been an isolated incident, if it happened?

A. When I spanked him, sometimes he would jump around in a circle, and it was more action just going around, but it's possible, and I do remember an incident where I did.

Q. All right. So that might have been an isolated incident?

A. It could have happened, yeah.

Q. Would you say that Mario -- you testified on direct that Mario pretty much did as he was told, is that right?

A. Pretty much.

Q. Now, when you and Sonia broke up, you didn't abandon Marc and Mario, did you?

A. It depends on what you mean by that.

Q. You have remained in their lives, isn't that correct?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3354

A.    I have, but probably not as much as I should have.

Q.    You did not walk away from them and said, you are not my biological children, isn't that correct?

A.    You are correct.

Q.    And when you did tell them that there was a court proceeding about that, you took them to a nice restaurant, Steak and Ale?

A.    Uh-huh.

Q.    Would it be fair to say that you were trying to be sensitive to the way that you broke them this news?

A.    Yes.

Q.    In fact, you haven't dwelled on it with them, have you?

A.    It hasn't been an issue with me.

Q.    Is that because you have remained their father?

A.    That's correct.

Q.    Okay.  Now, with Sonia, you and Sonia had physical disputes, correct?

A.    That's correct.

Q.    But you don't remember having a fight out in the street?

A.    Not in the street.  Maybe in the yard.  I don't recollect that particular fight, but it's possible.  We had some pretty bad fights.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Aff.

800-333-2082

Case 3:12-cv-00327-MOC  Document 105    Filed 09/23/13    Page 28 of 250

Fax (704) 372-4593

1329

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3355

Q. And were many of those loud, verbal fights?

A. Absolutely.

Q. And as you have testified at times, you hit Sonia?

A. That's correct.

Q. And was that towards the end of your marriage?

A. Yes, during the middle, toward the end.

Q. And Marc was about in fifth grade when you all separated?

A. It was '84, I believe.

Q. And that year you all put Marc in private school, is that right?

A. I don't know exactly when he was in private school.

Q. Towards the end of your relationship with Sonia, Marc was taken out of public school and put in private school?

A. I think it was the other way around, but I don't remember. I think he started out in private school and then went to public school.

Q. If there had been testimony that he went to Catholic school in the fifth grade, would that be accurate?

A. I don't remember. I just don't remember, I'm sorry.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3356

Q. And that was because you and Sonia were dissatisfied with the public schools for Marc?

A. I had went to private school. I think you get a good foundation from a private school.

Q. And so y'all pulled Marc out of the public school and put him in private school?

A. I don't remember.

Q. But Marc went to private school?

A. He did go to private school, I do know that, I can't remember when.

Q. And, again, education is important to you?

A. Absolutely.

Q. And after you and Sonia separated, didn't you continue to go and see the boys?

A. Not as often as I should.

Q. Okay. But you did?

A. I left the door open for them because I didn't know what she was going to tell them after the test came back, and I wanted to leave that door open for whatever would happen.

Q. Well, you told them that you would always be there for them?

A. Absolutely.

Q. And you, in fact, are?

A. Yes.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3357

Q. You moved to Maryland?

A. Yes.

Q. Did you spend some time in Philadelphia?

A. Yes.

Q. Did Marc come and spend a summer with you in Philadelphia, or some time one summer?

A. I remember him being there, yes.

Q. And you've mentioned that when Marc moved to Georgia -- you obviously knew he moved to Georgia, isn't that right?

A. No. I knew he had gone, yes.

Q. Do you remember -- you have just testified that he had called you from the jail, so you knew that he was in some amount of trouble, correct?

A. Yes.

Q. Do you remember Marc contacting you about wanting a car?

A. Yes.

Q. And that you had offered to pay for half the car if he would go back to school, do you remember that?

A. Absolutely.

Q. And that was because that you wanted that to be incentive for Marc to get back in school?

A. That's correct.

Q. So even though he was in Georgia, he was in

800-333-2082    Huseby, Inc., an A...    or (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 31 of 250
1332

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3358

touch with you?

A. Somewhat.

Q. And saw you as a person that he could go to when he needed something like a car?

A. Not really.

Q. Well, he did come to you and say, dad, I need a car?

A. Yes. He came to me then, but there are stipulations to when I will help you. If you are helping yourself, you get from me; but if you are just begging, I can't help you.

Q. So you, in an effort to try to teach Marc, you said quid pro quo, I will do something for you if you do something for me?

A. Right.

Q. And that's you being a parent?

A. Right.

Q. Now, when Marc called you from jail in Georgia, what did he call you about, do you remember?

A. He called and he was talking to me about the situation he was in, and I gave him some advice.

MS. TOMPKINS: Thank you, Mr. Barnette. I don't have any further questions.

MS. LAWSON: If I may, Your Honor.

REDIRECT EXAMINATION

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 32 of 250
1333

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3359

BY MS. LAWSON:

Q.   Mr. Barnette, did you go with Tosha and Marc's daughter, Angelica, to visit Marc in jail last Thursday?

A.   I did.

Q.   Was that before or after she testified in court?

A.   That was after.

MS. LAWSON:   No further questions.   Thank you.

THE COURT:   You may step down.

MS. LAWSON:   We would call Mario Barnette, Your Honor.

MARIO V. BARNETTE,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q.   Good afternoon.   Would you tell the jury your name, please.

A.   Mario Von Keith Barnette.

Q.   Are you related to Marc Barnette?

A.   Yes.

Q.   Do you call him Marc or Vicci?

A.   Marc.

Q.   How old are you, Mario?

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an AI   on (704) 333-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 33 of 250
1334

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3360

A.    I'm 25 years old.

Q.    Where do you work?

A.    I work at Citel Corporation, an extension of On-Star, basically you push the button to get directions, reservations, things like that.

Q.    How long have you worked there?

A.    About one month from a year now.

Q.    And where do you live?

A.    At 3513 West Boulevard, Charlotte, North Carolina.

Q.    Is that with your mother, Sonia Barnette?

A.    Yes.

Q.    Who else lives in that house now?

A.    Presently it's me; my mother; her fiancee, John West; John Mack, which is her son; Pearl McKenzie, youngest daughter; and my grandfather, but he is actually in the hospital right now trying to recover from pancreatic cancer.

Q.    How long has your grandfather been in the hospital?

A.    Oh, wow.  I would say about six months roughly.

Q.    Has it mostly been at the VA Hospital in Salisbury?

A.    Yes.

Q.    Are you familiar with your grandfather, Jessie,

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3361

telling a lot of war stories and talking in funny ways?

A. Yes. Me and my cousin basically grew up visiting my grandfather. We call him Papa. And the land that we live on presently is basically where the entire Cooper family was raised. One house would get built, the sister, brother, whatever, would live there, the next one would come up. So when we went to visit him, he was living in what was I believe previously his mother's house, but it was pretty run down. He had had a cousin come down and put a screen on the front of it, and that's basically where he lived with his, as he put it, his carrasyn (phonetic) hill. And he did have kind of a strange way of talking at first. He calls his middle daughter, which is my mother, Sonar, which, you know, her name is Sonia, but that was kind of a word play for him. Scotia was Tessie. You know, he just had his own way of speaking. His general dress would be, you know, army coat, looks like he basically just stepped off the boat, shades on, the eye patch, fully clothed, just kind of his own person, you know.

Q. And did he teach you and Marc and your cousin how to shoot?

A. Yes. Coming from the military background with 7 acres of land out there, basically we discussed it with local police; and as far as I can remember, they

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          ᵒn (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 35 of 250
1336

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3362

said as long as we were a certain distance away from the road that it was considered private property. And ever since, wow, ever since I can first remember visiting my grandfather, we have always went out into the back. At first it started with hunting deer, we would go with cousins hunting squirrel, just hunting in general, and then it was basically practice shooting from there, had a scarecrow way back in the back that used to sit up about a good 50 yards away. And I actually learned to shoot a shotgun. That was my first gun I learned to shoot with.

But that has always been the norm to us. You know, my cousin learned. Basically anybody in the Cooper family that came up there, you know, just -- you would have family members and friends come out there with their guns to practice shooting there.

Steve has a 9 millimeter gun, and he has been out there several times, you know, brand new gun, wants to test it out, goes out in the back, shoots the gun. It was not a thing to us.

Q. Do you remember living together in the house where both parents were there with Barnette and your mother, Sonia?

A. Yes. That was in Comstock.

Q. What do you remember about any fighting between

Case 3:12-cv-00327-MOC    Document 105-7    Filed 09/23/15    Page 36 of 250

1337

Page 3363

your parents?

A. I never visually saw any fighting. There was always a wall between us, and that was mainly because of my older brother, Marc. Any time any kind of inclination to a fight, maybe started with the bickering, or whatever the situation was, I was immediately rushed to the room. You know, it was in a calm manner, it wasn't like emergency vehicles or anything, but I was taken to the room, basically kept in a separate environment while on the other side of the wall I could hear the yelling escalating, sometimes thumping, not really knowing what it is, not seeing it for myself, but it would be me in the bedroom allowed to play with a toy of his that I always wanted to while he was on the other side with the parents doing I have no idea what.

Q. And it was Marc who would put you in that safe place?

A. Yes.

Q. How often would he have to put you in that safe place, do you remember?

A. As for frequency, I couldn't give a day by day or week by week basis. It almost became routine to the point where when it did escalate, sometimes I would go ahead and start walking to the room, knowing that's

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3364

where he wanted me to go. And, I mean, there were times where the parents were telling me to go to the room, you know, in certain situation. But if they weren't, if they were already in the middle of it, it was definitely him rushing me into the room and shutting the door and telling me to stay in there until things calmed down.

Q. How did you feel when those fights were going on?

A. At first I used to get real worried that possibly my parents were -- I mean, if you could hear it, sometimes it sounds like they were going neck to neck with each other, you know, and it worried me a lot. You know, and knowing that my brother was there, I don't know why, but it kind of gave me a sense of security knowing that he was the mediator. It's strange when you think of it now, but at that time he was my big brother, so my big brother can take care of anything. And to see him putting me in that room and go out there with them was like everything is going to be okay because he is just a little kid but he is going to work something out and I will be allowed back out of the room.

Q. Did you know whether or not Marc got hit, beaten, slapped by your father?

A. Yeah. I knew he got some whippings. Usually it was due to schooling, maybe some kind of deviation,

800-333-2082 (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3365

you know, not respecting others, something along the general rules of the house, but he definitely was getting, you know, whippings for discipline.

Q.    Did you know whether or not there was any kind of instrument used on him or bare hands or belts, switches?

A.    I barely even remember simply because that -- what you are referring to just brings up a point about a belt.  This belt was used like the one time that I received discipline from my father, that I can remember, and I'm not meaning to go off into a tangent, but basically I was at home, he had went to the store or something like that.  Since I was by myself, he told me, do not answer the door for anyone, period, I don't care if you recognize them or what.  And the door knocks and the female on the outside says, it's Pat, and I'm thinking I've heard that name before and I let her in. Well, you know, my dad comes home, because he was only gone like a couple of minutes.  When he comes home, Pat was sitting in the living room and he was like, after the conversation and everything he comes in the room and he said, I told you not to open the door, you know, and he pulls out this belt, it's a black belt.  You know how your regular belt width is about like this (indicating) this is like double wide.  And instead of single holes,

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Af        on (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 39 of 250
1340

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3366

it has double holes on it, black with these little like metal holes where the belt, you know, clamps into it. And I received a beating for opening the door when I wasn't supposed to. And I can remember that being, quote, unquote, the belt, and I was fearful after one beating with it, so I definitely didn't want to go through it again.

Q. Did one or both of your parents ever use any other kind of disciplinary techniques on you?

A. Whippings for being bad, punishment for not getting good grades. For me it was basically not being able to go outside and play. But like I said, other than that one beating, for me, it was basically concentrate on the education; and if I didn't do as well as they knew I could, then it was basically no playing for that couple of days.

Q. Tell the jury, if you would, how your parents tried to get you to stop sucking your thumb.

A. Well, I don't know how I processed this, but to me it comes off as the only thing I can do is laugh about it; but when I tell other people, they seem to get this kind of crazy look on their face. I'm not sure how old I was, maybe five or six years old, and I had a bad habit of sucking my thumb. They used to tell me, no, don't, scold me, whatever the situation was. I just

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3367

kept sucking my thumb. So one night I'm laying in the bed asleep, and it had to be about maybe midnight or 1:00, I don't know what time, I'm just asleep sucking my thumb. All of the sudden the door busts open, it's my mom and dad, and they were like kind of giggling, but they grabbed me, they put a blindfold on me and they bring me to the kitchen. So I'm blindfolded, I'm like, what is going on, what is going on. They turn on the kitchen lights, apparently, and pulled up the blindfold just a little bit and they have a chopper's block on the kitchen counter and they let me see this big butcher knife, and I was like oh, my God. I'm like I don't know if they are about to do this or not. But apparently they wanted me to see my thumb and the butcher knife. The would blindfold me and they bring the knife down on the chopping block. I'm screaming. I'm like, oh, I can't believe this. And they wrap my thumb up, put hot sauce all over it, wrapped it up and sent me back to bed, so I'm basically crying and sniffling and thinking they just cut my thumb off because I didn't stop sucking it. And eventually I came to my senses and I started wiggling my thumb, and I'm like, wait a minute. So I take it off and I'm like, hey, I've still got my thumb. And I suck my thumb and it has hot sauce on it. So I looked at it -- at the time that it happened, I looked

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Af      on (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 41 of 250
1342

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

at it like these people ain't playing, basically, you know, if you do something wrong, you missing fingers; but when I look back at it in retrospect, all I can do is really laugh, because, you know, it just -- when you look at that situation, you're just thinking, man, that was kind of drastic for just thumb sucking, but in actuality I just look at it and kind of take it in and keep going. That's what I've been doing basically my whole life.

Q. Mario, do you remember when your parents separated and you moved out of the home that you all had shared as a family?

A. Vaguely. During that whole situation from Comstock up until almost present day it has just been a rush of different situations happening back to back, but I do remember, I think we moved to Wendover Apartments after living in Comstock.

Q. Tell the jury about how you all were living after your dad and mom separated, in terms of your care and food and things of that, supervision, things of that nature.

A. Well, basically it started off with everything being okay. We were told that our parents were simply separated, and, you know, I'm thinking girlfriend, boyfriend break-up, after a while they will get back

Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15   Page 42 of 250

Page 3369

together, but the separation never -- I was expecting it to get back. You know, I was still getting frequent calls from my father checking up on us and stuff. The condition at the time was decent. I mean, we had food in the house, nice clothes, we were going to school on a regular basis. It was just the family without the father at the time, so it was okay.

Q.   Did things change?

A.   Eventually. Even I started to recognize the changes that my brother tried to protect me from seeing. He would go downstairs and the living room would be full of smoke and strangers. We don't know who these people are or why they are laughing so hard. You just kind of felt out of place in your own house, you know, that your mother and brother lived; and then when you go to the refrigerator and open it up, there is not much there. It started to get less and less. My mother at first, she did grocery shop, she did keep up things in the house, nice furniture, things like that. The furniture stayed nice. The beds stayed nice. The little airplane liquor bottles -- she had this little glass cart with four wheels on it that you could push, it was basically a mobile wet bar, that was nice. But as for the refrigerator, it went downhill. It went from being able to ask mom to buy you the special peanut butter and

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 43 of 250
1344

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3370

jelly swirled up in the jar to almost hoping and praying when you opened the refrigerator that there is something halfway decent to eat.

Q. What was Marc doing, if anything, to help you through this period?

A. Marc was trying to, I guess trying to keep me satisfied as a kid, not really worried about things in the house. He would give me the change out of his pocket to go walking up to the 7-11 store to get some junk food.

There was another supplement to us, and that was my, what I have always known as my grandmother, and my Aunt Mabel, these two people were my grandmother and my great aunt, just no questions asked. And we more and more frequently began to visit them. First it was on the weekends, then it started sometimes those weekends would roll over onto weekdays. But we would stay with my grandmother and my great aunt Mabel, and they would feed us. They knew I loved chicken. Any time it was time to go home, we basically had a care package, and that sometimes was meant to last until the next time we visited them, maybe as early as that next weekend. So that combined with my brother, didn't seem like much difference to me personally.

Q. The grandmother that you are referring to, is

800-383-2082      Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/13   Page 44 of 250      Fax (704) 372-4593
(704) 333-9889

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3371

that Derrick Barnette's mother?

A. Yes.

Q. At some point she died?

A. No, no, not Derrick Barnette's mother, because I never knew her. This was Hattie Adams, which I believe was my dad's great aunt. They were both great aunts, but I called one grandma and the other one Aunt Mabel.

Q. Were you ever told anything about how Derrick Barnette's mother died?

A. I have been told that she was poisoned, I'm not sure with what, that one day they came in the house or she had left my grandfather, something to that extent, the next thing you know she is dead from poisoning.

Q. Who told you that?

A. I believe my mother did, if I'm not mistaken.

Q. Now, did there come a time when you got hit by a car?

A. Yeah. One of the times when we were living in Wendover, I think I was about, I think I was about 10 -- no, I had to be about seven or eight, me and my friend Drew, one of my friends from the Wendover neighborhood, we had a thing about walking to the 7-11, as I just described. On the way there there was a big oak tree standing there like this (indicating) and the road

Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 45 of 250
1346

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3372

continues past it. You know, we looked past the oak tree, nothing's going on, looked the other way, nothing's going on, crossed the road, and I believe it was a tan Regal, hits me as I crossed the road. They say I spun around the driver's side of the car, knocking off the mirror, I think I broke the glass and dented up the door before I hit the ground.

Shortly after that, I don't remember much other than the paramedic stabilizing me, putting me on the wooden board and my brother showing up. Apparently he had ran, because he was huffing and puffing. And I can remember all of these questions being asked to me before he came there, where do you live, I live at apartment such and such in Wendover Apartments. You know, what is your mother's name, what is your father's name, you know, things like that. So my brother came up and he took over the questioners until we get to the hospital.

When I got there, my Aunt T had met us there. And I had talked to the doctor. I think a couple of times they were telling me, man, I really messed that car up, but I didn't have anything wrong with me before my brother came in, and then they just kind of all left and went outside and started discussing whatever. I believe my Aunt T took me home that night and shortly after my mom showed up.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3373

Q. Had she been gone all day?

A. I believe all weekend. It was Martin Luther King's birthday, which is always a Monday and you are always out of school, and I don't think I had seen her the day before that, if I'm not mistaken.

Q. Do you remember your mom getting a red Corvette?

A. Oh, yeah. I loved that car. I think it was an '84 or '86 red Corvette, nice. I got to ride in it one time. Since it was only a two seater I had to sit in the hatch part, but she was definitely the talk of the town with that vehicle. It was nice.

Q. Before that did you have a family style car where you could all ride together?

A. Chrysler New Yorker, I believe, short, square looking sedan. I think it was that.

Q. Do you remember anything about the men that your mother was associating with when you all were living away from Mr. Barnette?

A. No other word than slim can come to mind when you think about the guys. They were just barely outside of con men, just any -- you just had a bad vibe about them. Even at the age I was, you would see these guys come in and their eyeballs would be yellowy, kind of shifty, never really spoke much to me, kind of just went

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3374

straight to the back. After awhile they come back and flopped on the couch. I remember one had this thing about bringing merchandise in, always had some kind of bag or case with him. I don't know, it was just kind of -- I never really paid attention to those guys because they never really paid attention to me. They would come in, be there a couple of weeks, maybe a couple of months, then they would disappear. That's all I really knew about them.

Q. Did you and Marc ever talk about these men?

A. I can remember talking about how I don't like them. One of them tried to win me over by giving me a fake gold chain that I actually wore during a class picture, but I just didn't like them. I didn't pay them any attention. My dad was not these people and they really didn't want anything to do with me as far as I was concerned.

Q. Do you recall the trip to the restaurant where Derrick Barnette told you and Marc that he wasn't your father?

A. To a certain extent. What I mean by that is I have only recently began to examine my memories of my family in specific, of course.

In this instance, I remember my dad picking us up, taking us to Steak and Ale on Woodlawn, sitting

Page 3375

down.  I even remember the bread, great bread, the sweet bread with the butter on it.  I don't remember what I had for dinner, but I remember afterwards, as the guys, as we called ourselves, the guys were sitting there kind of getting done, he dropped a pretty heavy load on us, he told us that he wasn't our biological father.

That's the first time I had ever heard the word biological used in that context the begin with, and after that it just kind of went blank.  I remember him saying that he was going to be there, but it was almost as if I had paused for that second and then hit play afterwards, because as soon as he said he wasn't our biological father, he went into some kind of explanation.  I was just sitting there numb, I mean, just astounded and just -- after he tried to explain it, like I said, it just went through and everything just stopped for a second, and it didn't really come back until he said, I'm still your father and I'm still going to be here for you, and I thought everything would be okay after that.

Q.  After that happened did you and your family, your mother and brother, wind up moving to Georgia?

A.  First we stayed a short stint with my Aunt Tessie and Aunt Conley, then I think we moved to Windsong Trails, I believe, and then we moved to Georgia

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 49 of 250
1350

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3376

after that.

Q. Do you know why you moved to Georgia?

A. Job opportunity was all I was ever told about that.

Q. Who did you move in with?

A. I'm sorry?

Q. Did you live with anybody when you first got to Georgia?

A. When we first moved to Georgia we lived with my Aunt Shelia, that was the youngest of the three sisters, Aunt Shelia and my little cousin, Ahmad.

Q. And was there anyone living in the household at that time?

A. Uncle Michael. But like I said, my Aunt Shelia and my Cousin Ahmad.

Q. Was Uncle Michael married to your Aunt Shelia?

A. I have never been sure of that even to this day if they were married or not.

Q. How were things in that household?

A. Once again, it looked great from the outside. I believe it was a two-bedroom household, and Ahmad was living in his own bedroom, so we had no space, because there was none. Basically me, Ahmad, and Marc stayed in one room and Aunt Shelia and Uncle Michael were in the master bedroom. It was better but worse. What I mean

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3377

by that, it was better because my cousin was there, so now there is another person, somebody else closer to my age to play with.

Q. How are the ages of you and Ahmad and Marc?

A. We are all four years apart. Marc is oldest, he is four years older than me, and I'm four years older than Ahmad.

Q. Go ahead, I'm sorry.

A. No problem. We played hee man, watched it on TV, all of that good stuff. Sometimes we would step out of the room and Marc would be in the living room. Sometimes we would step out and wouldn't nobody be out there. Sometimes we would step out and, you know, everybody was there. But basically that was the worst part, was because my mother almost became nonexistent. I don't know what she was thinking at the time, maybe because we were living with our aunt she can be the head of household now, I'm not sure, but it was still my brother basically guarding and providing for us, but now it was my cousin included with that.

Q. What were the adults doing when you said sometimes you would go out in the living room and there was no one there?

A. I never knew. I never knew, number one, where they are, when they were coming back, any of that. At

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3378

first when we were living in, I believe it was in Windsong Trail, it really got to me, and it was kind of -- it's a really fucked up feeling to feel like nobody in the world cares for you. When we lived in Windsong, there were several days where I could come out of my room and that house would be completely empty, I mean, nobody, you know. And it was bad at first because you would scream and you would pitch fits and you would throw your stuff against the wall and when you got quiet, it was quiet again, nobody came asking you what is wrong, nobody came, you know, saying stop that or even disciplining you. It was nothing. You know, it was pretty bad.

But after then something in me just said, you know, if they are not -- if they are not going to be there all the time, you have to be there for yourself, and through that came a lot of patience, and I guess self-reliance, without over exaggerating on that. I couldn't go to the grocery store and spend $100 on groceries like I needed, but emotionally, I just went numb to everything after that.

Q. What was -- when you did see the adults in the household, your mother, your Aunt Shelia, Michael, what did they do in the evenings?

A. Go out. Just as they came back around the

800-383-3983    3:12-cv-00327-MOC, Document 105    Filed 09/23/15    Page 52 of 250    704) 372-4593
1353

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3379

afternoon, when the nighttime came, they were getting prepared to go out again. That bed was always made up because it seemed like nobody ever slept it in. Me and Ahmad could come in, jump on the bed, and literally you could come back at midnight and still see the footprints on there.

These people just had a social life beyond belief, I guess, I'm not sure, but I know that you would see them sometimes in the afternoon and then you wouldn't see them until sometimes the next afternoon, and it just went like that.

Q. Did they dress in any particular way when they went out?

A. Oh, yeah. They had the leather skirts, the shoulder pads, because, you know, in '80's that was the thing, was the shoulder pads. In the '90's of course you had the bright contrasting colors and the stilettos to go with it. And, you know, I guess they had to get a couple of drinks before they went out to get tipsy or whatever the situation was, get yourself in that mood, the hair was always done. They looked great going out, all of them did.

Q. What was the food situation in the house?

A. You lucked out if you opened the freezer and saw some TV dinners. Me and my cousin -- my cousin

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3380

Ahmad was like the main foundation for a lot of stuff. We helped each other through this just as much as my brother helped us through it. We had all of these ongoing jokes like, gee, I wonder what is for dinner and would kind of start laughing at each other, because a lot of times there wasn't anything for dinner, or very minimal. If it was, it was Salisbury steaks. I mean, I don't know if y'all ever had those TV dinner Salisbury steaks, but once a week is okay. When you start getting to it like every other day, you start mooing when you wake up in the morning. If it wasn't Salisbury steak, it was chicken. And that was just in between. Sometimes nothing, sometimes this, sometimes that.

Q. Did you and Marc and Ahmad have a little game that you played with the adults in the household when they were going out?

A. This is one of our other jokes that we had going between me and him. You come around the corner, and Aunt Shelia and mom would have their best outfits on and they would be about a couple of steps from headed out the door after saying bye kind of off in the distance, yelling bye. You kind of run around the corner and be like, where you going and look at each other and look back at you and say, the store. And at first we were real naive about it and used to say, oh,

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 54 of 250

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3381

you going to the store, here is 25 cents, get me one of those Little Debbie cakes, I liked the Oatmeal cookies, Ahmad like the ziggy cakes, so we would go digging in our pockets or the piggybanks or whatever, here is a quarter, get me a Debbie cake. It hurt at first because they would come back the next day and there would be no Debbie cakes. And, you know, it was kind of painful at first again because you know that you could ride your bike to the store and get back in less than a day and it took them forever to get back and they always forgot your cakes. So as a form of protection between ourselves, when they said they were going to, quote, unquote, the store, you know, bring me back a Debbie cake and just kind of left it at that.

Q. How did Marc protect you and Ahmad through that period of time?

A. Well, this is after the apartment. Aunt Shelia had gotten out of the apartment, and I believe she had a house built or moved into a house in Lithonia, Georgia. That's when stuff started getting bad again. At the apartment he was simply taking care of us. I don't remember any major altercations there. In Lithonia it started getting worse again because -- well, I'm not sure why, I'm just not sure why. But altercations between him and Uncle Michael started to arise; and

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 55 of 250
1356

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3382

because of the fights between him and Uncle Michael, Aunt Shelia and my mom got belligerent to him, too, and there was one major circumstance where it was late at night, the next thing I know the door just whips open, it was almost like he had kicked it open or something. It was Uncle Michael. And everybody is accusing Marc of stealing money. Nobody knows. I mean, we are waking up out of our sleep. Marc was sleeping on the floor, me and Ahmad were sleeping on the bed. He gets up; and before anything, he looked back and recognizes we are up and he pushes kind of everything out of the door and shuts the door behind it and you hear just like royal rumble on the other side of that door, and I believe my cousin even went for a second of kind of opened the door to see what was going on. Marc pushed the door shut again. After then I can remember Marc basically being kicked out of the house just like that, he was gone, and then on it was basically me and Ahmad.

Q. Prior to that night were you aware of whether there was any drug use going on among the adults in that house?

A. I had a suspicion. But once again, I'm all of 12, 13. You know, you could put a mound of cocaine in front of me and I would think it was powdered sugar. So as for what was going on, I'm not sure, but there were a

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 56 of 250
1357

Page 3383

lot of changes in the household, attitudes towards each other, secrecies. There was a sudden thing about my mom and Aunt Shelia and whoever was over at the time. Almost as soon as they came in the door they went in the bathroom and shut the door, and there was like a whole other world in there. I'm not sure what they were doing, so I can't say specifically. But I just don't know.

Q. After Marc was tossed out of the house -- prior to that you said he was sleeping on the floor. How long had that been going on?

A. Ever since we moved to the house. I mean, we alternated from the couch, but the couch had plastic on it, brand new furniture, it was like ivory white, so it had the plastic zipper covers on it. So if you didn't sleep on the couch, you basically slept on the floor. It was carpeted, though.

Q. Was there new furniture at the same time that you were eating Salisbury steak?

A. The new furniture was my Aunt Shelia's's furniture when we first moved in with her, so I'm not sure when she purchased that.

Q. After Marc left, do you know whether that's when he started going with Tosha?

A. I'm pretty sure. We heard about it. The

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Aff    n (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 57 of 250
1358

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/6/2002

Page 3384

apartment complex that me and my mother moved into was the same one where he was basically staying with Tosha at, so the frequency of seeing my brother came to arise a little more, but you could definitely tell that most of his attention was directed at his girlfriend. I think that was across in the apartments in Lithonia; I'm not sure.

Q. Did Marc ever help you when you were choking?

A. Yes.

Q. Tell us about that.

A. That was in Windsong Trails. I remember going to the refrigerator after setting up some rock candy on the window. That's basically where you take the sugar water, add a little dye to it, stick a string in it. I learned that from school. But after doing that, it kind of made me thirsty, so I went and grabbed some water and some ice. And after I got done with the water, I was chewing on ice. And smart enough, I was kind of walking around the house at the same time and doing whatever, and it got lodged in my throat about halfway. And luckily -- I was already in another room, I think I was coming from my bedroom. The way the house is set up, you had to zigzag from the bedroom to the hall to the den to the living room. And my brother was sitting in the living room watching TV, and I came up to him,

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3385

couldn't speak.  I don't know what color I was at the time, if I was changing colors or not, but he looked at me, he asked me to say something, I couldn't speak, so he got behind me and did the heimlich maneuver and the ice cube came out.  And, I mean, you know, people want to speculate, oh, but if you would have laid down and gave yourself the heimlich or waited until the ice melt, there is no telling.  All I know is I thank him for saving my life in that minute.

Q.   Did you know or did you ever meet Robin?

A.   Robin Williams, yes.

Q.   How did your brother feel about Robin, if you know?

A.   From looking at him in other relationships, he definitely had a thing about devoting everything --

Q.   I'm sorry, I'm having difficulty hearing you.

A.   I'm sorry.  I was saying from looking at him in other relationships, the outside view, he definitely had a thing about giving it all.  And with Robin it seemed a lot easier for both of them.  There was never, as far as what I saw when she visited, there were never any fights between them.  I think she came down either during -- it was definitely during the Christmas season in which he had purchased her, I believe it was a full length leather coat, I'm not sure if he purchased her that then

Case 3:12-cv-00327-MOC     Document 105     Filed 09/23/15     Page 59 of 250
1360

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3386

or not, but he was proud of the relationship with her. It had been a long time since I had seen him happy, and he seemed to be making her happy as well.

Q.    When you say he gave his relationships his all, what do you mean by that?

A.    Ever since Tosha, my brother would basically fall off the face of the earth when it came to a girlfriend. I mean, it was just like this is where my focus is, and I could see how he would do that. But it happened from his first girlfriend to his last girlfriend, he gave everything that he could, and only in retrospect can I say maybe he gave too much, you know, but I'm not going to judge that.

Q.    Do you visit Marc in the jail when he has been here?

A.    Infrequently.

Q.    Why is that?

A.    I mean, there can be a million excuses for it, but what it really boils down to is I feel like this man has given me all he could, and he didn't have to, he was just my brother, not my father. I don't even know who my father is, you know. But he has given me everything that he could, and some of the simplest things I could do for him I failed him at, and I feel like I disappointed him so consistently. He can call me. He

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Af    on (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 60 of 250
1361

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/6/2002

Page 3387

has called me and asked me for magazine subscriptions, cut out pictures so he could use them as reference material when he was sketching or painting, the simplest tasks, and I never have the time for it, I never get around to it. I feel ashamed by that, that I just -- I just feel like I have disappointed him on a major level.

Q. Did you observe anything about Marc in the six or seven weeks before he killed Donald Allen and Robin Williams?

A. I observed Marc's withdrawal from the family. That's something that he would not do. The upstairs loft is another separation from the rest of the family. You can look down and see everybody but there was only one way up in which he had literally blocked off and put a sign up that said something to the extent of do not disturb, I need privacy.

You could hear him up there sometimes on the phone; but seeing him downstairs in the living room watching TV with everybody else, that kind of faded in the wind there.

He -- at first he tried. I believe he gave everything that he had to try to get back up, and the only reason I know that is because there is a car that my father gave me, a '78 Datsun 280Z, and that was my first car, I used it to go to work. And when he first

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 61 of 250
1362

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3388

got back, he would borrow that car almost on a daily basis because he was excited about this job interview that he was so close to getting. They had given him multiple interviews. And he would take my car, go out there, bring it back in time to pick me up from work, go up there again, whatever the situation is.

After that job went down, and I believe he said the girl got it because she had a high school education or a college degree or something like that, it was almost like you didn't see him again until that night, and that was kind of strange.

He started doing things I hadn't seen him do. He was adamant about telling me not to smoke or deal drugs, marijuana, anything, you know. He used to tell me, what are you going to do, years in prison for a couple of $10 sales, that doesn't make sense, you know.

Q. Is that what he told you?

A. That's what he told me.

Q. As a way to teach you not to do that?

A. To tell me basically don't do drugs, don't sell drugs. And then to see him smoking was strange. I had never seen my brother smoke. I don't know if he did it at clubs or whatever, but I had never seen him smoke. And he started borrowing cigarettes from my mom, and I was like -- the first time it happened I was kind of

Reported By: Scott A. Huseby, RPR
800-333-2082, Huseby, Inc., an Af... on (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 62 of 250
1363

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/6/2002

Page 3389

like, what is that, what are you doing? I smoke, but for him to smoke, it was just strange. And I know what my mom drinks, I know what John drinks, but there was other beers sometimes located in the refrigerator, and I didn't drink beer at the time so I wasn't worried about it, but just little strange things that you never really catch onto until it all came together.

And the night that happened breaks my heart, because he was there. I blame myself because he was sitting right there in front of us; and if we would have known anything, I would have protected him like he protected me throughout my whole life and I would have had to hold him down, beat him senseless, lock him in the closet, you know, whatever the situation is to make sure that he doesn't go through with anything that he might feel in his heart was something that he had to do. And we didn't, the family didn't. Everybody was there, but nobody knew. And he went up there -- my grandfather said he even saw him on West Boulevard when he was pulling in the driveway. Anybody, we all had a chance to do something, and I feel like we all let him down as well as him letting himself down and every life that he has affected.

Q. Do you know how he feels about what he did?

MS. TOMPKINS: Objection.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Aff          n (704) 333-9889
800-333-2082                                              Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 63 of 250
1364

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3390

THE COURT: Sustained.

BY MS. LAWSON:

Q. Has he talked to you about how he feels about what he did?

MS. TOMPKINS: Objection.

THE COURT: Overruled.

THE WITNESS: He doesn't go into detail with me. Even the visitations, the few visitations that I have had with him, I will ask him about his well-being, you know, how are you doing. He will refer to something else. He doesn't -- you know, it's that buffer, that barrier again that says you don't need to know this. But, you know, you ask him, how are you holding up, you know, and he will say, how is your car doing? That's his kind of response to things to let you know that he is not going to let you.

Q. How do you feel about your brother?

A. I love him. I mean, he is -- at points in my life he was all that I had, so I just love him.

MS. LAWSON: Thank you. Answer any questions the government has.

CROSS-EXAMINATION

BY MS. ROSE:

Q. Mr. Barnette, I was looking through the transcript of your testimony from the trial here, and

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 64 of 250

1365

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
8/6/2002

Page 3391

you told us a lot of new information that you didn't testify about the first time. Is that fair to say?

A. That's correct.

Q. You didn't talk about the thumb sucking discipline episode before, did you?

A. No.

Q. Or about the yellow shifty eyed men, that's new information as well?

A. Yes.

Q. As well as the descriptions of parties and the dressing up, you didn't talk about that before, did you?

A. No. I wasn't asked those questions.

Q. And this was the first time we heard about the life saving story with the ice cube, that's new information, isn't it?

A. Actually, I discussed that with the previous attorneys. For whatever reason they felt the need not to discuss that in court.

Q. You mean your attorney?

A. My brother's attorneys from the previous trial, yes.

Q. Now, you did, however, testify that in the early years it was a family atmosphere, there were good times, like holidays, we celebrated all of the holidays and went out together?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3392

A.    Yes.

Q.    At home you said that your parents argued but you were in your room, you described it mostly in happy terms at that time, do you recall that?

A.    From what I have seen, and that is exactly right.  From what I have known and from what I was able to see, it was happy times.  There was a time where my mother and father were tickling each other and we were all allowed to jump in and help tickle her feet.  There were happy times.

Q.    You described a very different time in Georgia. In fact, you testified previously, you described your brother during this time of Lithonia High School as being a track star?

A.    That's true.

Q.    And that it wasn't until he and your mother started arguing that he left the house and began to spend more time with Tosha?

A.    That situation in which he and my mother were arguing was mainly because of Uncle Michael accusing him of stealing the $500, as I said previously.  It was him, Aunt Shelia, and my mother all three basically on him.

Q.    But you didn't say that last time, you described it as between he and his mother?

A.    It was breezed over last time.  That's correct.

800-303-2082   Huseby, Inc.   704/333-9889   (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 66 of 250
1367

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3393

Q.   Now, you said that from everything that you experienced that you have become a more patient and self-reliant person?

A.   Yes.

Q.   I think that's a good thing.  Are you going to school now or just working?

A.   I graduated high school.  Like I said, I'm working at Citel Corporation.

Q.   Very good.  You haven't been in any kind of trouble, you don't have any criminal history, do you?

A.   I have traffic incidents, yes.

Q.   Speed tickets, things like that?

A.   Exactly.

MS. ROSE:  All right, sir.  Thank you very much.

THE WITNESS:  Is that it?

THE COURT:  You may step down.  Members of the jury, we will take our afternoon break at this time.

(The jury left the courtroom.)

THE COURT:  Counsel should avoid using the term trial and should refer to an earlier proceeding or a guilt phase.  Do you understand?

MS. ROSE:  Yes, sir.

THE COURT:  Thank you.

(Brief recess.)

Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 67 of 250
1368

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3394

THE COURT:  May we have the jury, please.

(The jury returned to the courtroom.)

THE COURT:  All right.  The jury is with us.

MR. BENDER:  I call Bob West.

BOBBY H. WEST,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

Q.  State your name, please.

A.  Bobby H. West.

Q.  And, Mr. West, where do you live?

A.  I live at 6849 Woodhaven Road, Roanoke, Virginia, 24019.

Q.  What is your occupation or profession?

A.  I have a couple.  I manage a couple of cemeteries in the Roanoke Valley.  I'm also pastor of a church in Salem, and my wife and I have been involved in prison ministry since 1971.

Q.  As a result of your and your wife's involvement in the prison ministry, did you come to know Marc Barnette?

A.  Yes, I did.

Q.  And this is Marc seated here?

A.  Yes.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3395

Q.   How did you come to know Marc Barnette?

A.   Well, I probably spoke to him when he was imprisoned here in Virginia, but we had private conversations when he was moved to the U.S. penitentiary in Terre Haute, Indiana.

Q.   Approximately how many times did you visit him when he was incarcerated in Virginia on his way to Terre Haute?

A.   Well, several times, in waving and speaking to him as I walked past his housing unit.  Our conversations were at length after he moved to Terre Haute.

Q.   And did you and/or your wife actually travel to Terre Haute to continue in your prison ministry?

A.   Yes, we do.

Q.   In the special housing unit in Terre Haute, Indiana, were you able to visit with him and counsel with him?

A.   We were.

Q.   Describe the area in which you were able to visit or counsel with him.

A.   Well, it's a cubical with a glass in between. He would be on one side of the cubical, and either my wife or I would be on the other side of the cubical.  We would speak by phone.

Reported By: Scott A. Huseby, RPR

800-333-2082    Huseby, Inc., an A...    ion. (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 69 of 250
1370

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3396

Q. No actual contact?

A. It was a noncontact visit.

Q. Do you still consider that you are one of Marc spiritual advisors?

A. Yes, I do.

Q. Were you able to pray with him and read the Bible with him and those sorts of things?

A. Yes, sir.

Q. Do you believe that Marc is remorseful for what he did?

MS. TOMPKINS: Objection.

THE COURT: Overruled.

BY MR. BENDER:

Q. Go ahead, you can answer.

A. Yes, I do.

Q. And do you know whether or not Marc has ever been able to forgive himself for what he did?

A. He has had a terrible time doing that. We have talked at length about that, not only whether God would forgive him or not. He talked about ever being forgiven by the families of the victims, and he had a hard time, and he may still be working through forgiving himself.

MR. BENDER: Thank you, sir. I have nothing further.

MS. TOMPKINS: No questions.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc. an Aff          n (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/13   Page 70 of 250
1371

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3397

THE COURT: You may step down.

MR. BENDER: Your Honor, may Mr. West and his family be excused to go back to Virginia?

THE COURT: They may.

THE WITNESS: Thank you, Your Honor.

MR. BENDER: Your Honor, our next witness will be Dr. Seymour Halleck.

SEYMOUR L. HALLECK, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BENDER:

Q. State your name and spell your last name for us.

A. Seymour Leon Halleck. The last name is spelled H-A-L-L-E-C-K.

Q. Where do you live, Dr. Halleck?

A. I live in Chapel Hill, North Carolina, 500 Laurel Hill Road.

Q. And what is your profession?

A. I'm a psychiatrist.

Q. And how long have you been a psychiatrist?

A. I have been practicing psychiatry since 1953.

Q. And if you would, give us your educational background and any work that you have done in the past.

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 71 of 250
1372

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3398

A.    Beginning with college I entered at the University of Chicago in 1945, received my bachelor of philosophy from that institution in 1948.  At that time I entered medical school at the University of Chicago, and in 1950, in the middle of my medical school training, I received a bachelor of science degree in anatomy.  I received my M.D. from the University of Chicago in 1952.

Following that I entered the United States Public Health Service, where for the first year I was an intern in San Francisco.  During that time I had a little bit of contact with prison work, because I spent a little time delivering medical care at Alcatraz.

Following that I was assigned to the Federal Bureau of Prisons for two years of service with the Public Health Service, and that was at Springfield, Missouri, the medical center for federal prisoners.  I held many different jobs, including running the acute unit and chronic unit and taking care of people who at that time were called psychopathic deviants.

Upon leaving Springfield I entered psychiatric residency training at the Menninger School of Psychiatry, where I studied between 1955 and 1958.

In 1958 I took a job at the University of Wisconsin as an assistant professor, and held that job

800-333-2082                                   (704) 333-9889                   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/13   Page 72 of 250

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3399

almost continuously for 14 years, with the exception of about a year and a half in 1959 where I served as medical director for the State Division of Corrections and ran a state sex crimes program.

In 1972 I left the University of Wisconsin and came to the University of North Carolina as a professor, and I have had many different jobs there. I have been running an inpatient unit, I've been running crisis units, I ran the outreach program, I was assistant chairman, I was acting chairman, I was associate chairman at various points in my career there.

I resigned from my position there in September of 1995 and began a small practice of forensic psychiatry after that, which I have been doing almost exclusively since then.

Q. Would you tell the jury something about your past clinical experience?

A. Until I resigned from the university, I maintained an active clinical practice, so I was either running inpatient units and caring for very, very sick patients or seeing a whole lot of outpatients in psychotherapy, or very often doing both.

Q. Okay. And when you describe your clinical practice, that's actually meeting with patients in therapy or counseling?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff°°°°°°°°°n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 73 of 250
1374

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3400

A.    Until 1995 I was very active in treating patients, meeting them in therapy and counseling.

Q.    Okay.  And what sort of teaching experiences have you had?

A.    I have taught at -- continually since 1958, and I also did some teaching as a resident at the University of Kansas for awhile.  But I have always had medical school classes continuously during that time.  And I have taught at two law schools.  I taught at the University of Wisconsin, really beginning in about 1958, until I left in 1972, and I taught at the law school at the University of North Carolina from 1972 until I retired in 1995.

Q.    What sort of experience have you had in the correctional area?

A.    I had the two years at Springfield, I had the years when I ran the Wisconsin correctional program, and I have had a lot of experience consulting to various correctional facilities.

Q.    Have you had any experience in any civil court proceedings?

A.    I have done a lot of civil work in the last five years, yes.

Q.    And have you had any experience in criminal cases?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3401

A.    Yes, I have.

Q.    Could you tell us about that?

A.    I have done a large number of death penalty cases in the last seven or eight years.

Q.    How about any honors or awards that you may have received?

A.    In 1980 I received the Isaac Ray award for forensic psychiatry from the American Psychiatric Association.  Earlier than that I had received the Sutherland award from the American Society of Criminology for contributions to theoretical criminology.  I received a marshal award from the Menninger School of Psychiatry as a distinguished alumnus.  And I just recently received an award from the American Academy of Psychiatry and Law called the Golden Apple Award, and I guess that's for being a good guy, but I was a founder of the Apple organization.

Q.    Have you been published?  Are you the author of any works?

A.    I have published over 100 articles.  I have written six books by myself and I have edited six other books.

MR. BENDER:  Your Honor, at this time I would tender Dr. Halleck as an expert in the field or forensic psychiatry.

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/13   Page 75 of 250

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3402

THE COURT: Okay. Members of the jury, the witness will be declared an expert. You will recall my instruction earlier. In short, I told you that when knowledge of a technical subject matter might be held for a jury, that is, a person having special training or experience within that technical field is permitted to state his or her opinion about matters within that field. Merely because such a witness expresses such an opinion, however, does not mean that you must accept that opinion. The same as with any other witness, it's up to you to decide whether to rely upon it.

BY MR. BENDER:

Q. Dr. Halleck, have you had occasion to interview Marc Barnette?

A. Yes.

Q. How many times have you interviewed Marc Barnette?

A. I interviewed him four times in 1997. I interviewed him in July, September, November, and December of 1997. I interviewed him on really four different occasions in 2002. I interviewed him on April 9th and April 10th, and I interviewed him again on June 13th and June 14th.

Q. And have you also been able to talk with members of his family or other persons?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3403

A. Yes. On June 14th I talked with Tosha Herd on the telephone for about 45 minutes, on June 14th I also talked with Sonia Barnette for about an hour in person, and on July 17th I spoke by telephone with Mr. Derrick Barnette.

Q. Have you been able to review any other materials related to Marc Barnette?

A. I reviewed a great deal of material. Do you want me to read all of the material I reviewed? Most of it relates to a previous proceeding and many psychiatric reports of the experts who have seen Mr. Barnette. Do you want me to read that?

Q. Not necessary. But it would be fair to say that you have reviewed much documentation related to Marc Barnette and his present situation?

A. I think I have reviewed most of the available documentation on this case.

Q. Based on that do you have an opinion or a diagnosis as to Marc's condition?

A. I believe he has several diagnoses, which I will list now.

Q. Okay.

A. I believe that between the beginning, or the first week in April of 1996 until about June 21st, and shortly thereafter as well, he suffered from a major

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A          ion. (704) 333-9889          Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 77 of 250
1378

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3404

depression. By that I mean he had symptoms in which we felt bad, sad, despondent, was tearful, for large parts of a day, for days at a time without interruption.

Secondly, he suffered from a withdrawal at that point. He lost interest in anything pleasurable, he lost interest in staying with friends or doing things that made him feel better. Even though he tried those things, they made no favorable impact on him. He lost appetite. He lost sleep. His energy diminished. He found it difficult to concentrate. He found himself increasingly restless and agitated. His sense of self-esteem was markedly diminished, and he became very down on himself, and he periodically had suicidal thoughts and suicidal impulses. So my major diagnosis which is most relevant to the crime was that he was suffering from a major depressive disorder, which is fairly common but a serious disorder.

The other diagnosis I made was a substance abuse disorder. There are two ways of describing substance difficulties in our diagnostic and statistical manual. One is substance dependence, and the other is substance abuse. Substance dependence means that you need more and more of the same element to keep your habit going, it's called tolerance, and substance dependence requires that you have both tolerance and withdrawal symptoms

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 78 of 250
1379

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/6/2002

Page 3405

when you stop.  Now, I believe that Marc was probably a heavier drinker than he indicated this morning, but I do not believe that he had substance dependence.  I believe he had substance abuse, by which I mean that he sometimes drank too much and when we drank too much he would sometimes get in trouble and behave iridically.

In previously thinking about Marc, I wondered at times if he could have had what is called a bipolar disorder, which would be depression plus some kind of manicy behavior.  I looked again in 2002, and I could find no evidence that that disease really was developing or had been there.

I also looked at the possibility that as a child he may have had attention deficit hyperactivity disorder, that's something his son does have, and there were a few indications of it.  I could find no consistent reporting of the symptoms of that disorder by Marc, his mother, or his father, and by that I mean Marc would report one or two symptoms and his mother would report different symptoms, and his father would report different symptoms.  I think everybody agreed that he was somewhat hyperactive, but I did not feel like I could make a diagnosis of attention deficit hyperactivity disorder.

Now, in our diagnostic manual we have what we

Case 3:12-cv-00327-MOC     Document 105     Filed 09/23/15     Page 79 of 250
1380

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

call axes. The main diagnosis are put on axis one and personality disorders and developmental disorders are put on axis two. I felt that Marc had a very serious personality disorder, which is borderline personality disorder, and that was characterized by an enormous fear of abandonment. He was always fearful that people would leave him and try to keep people from abandoning him. He was very mixed up about people. At times he would over-idealize them and then he would put them down. He would assign something to be ideal for awhile and then he thought it was the worst thing in the world. And that is a phenomenon that that is common in borderline personality disorder, and it's called splitting.

He also showed rapid fluctuations in mood, and amazingly so even as a child. Both Tosha reports and his mother reports, and others have reported, that he would switch his mood in just a second, like turning on a light switch. He could be feeling happy and all of the sudden he would be extremely sad.

Marc also showed periodic preoccupation with suicidality. He showed impulsivity in a couple of areas, both with regard to sex and with regard to drugs. And he showed transient episodes of being paranoid, which is also a characteristic of people with borderline personality disorder.

800-833-2082 Case 3:12-cv-00327-MOC Huseby, Inc. an A Document 105 Filed 09/23/15 Page 80 of 250 (704) 372-4593

1381

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3407

And finally he showed a seventh characteristic, which is demonstrating a great deal of anger and rage.

Marc also had some characteristics of other personality disorders. He had some of the qualities of an antisocial personality disorder and some of the qualities of a narcissistic personality disorder, but for various reasons I did not feel those were as prominent as the borderline personality disorder diagnosis which I gave to Marc.

Although personality disorders are not usually viewed as being as severe as what we call axis one disorders, borderline personality disorder is an exception. People with borderline disorder function deeply. They often get severe depression. And since they get severe depression very often, it is in some ways worse than other people who get major depressive disorders. They often do not respond as well to medications. And there is a lot of recent research which indicates that borderline personality disorder people have a very serious and painful illness.

That essentially is my diagnosis.

Q. Okay. Dr. Halleck, do you have an opinion as to how Marc, the early parenting of his parents might have affected Marc as he was growing up?

A. I think it affected him in a variety of ways.

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an A1   ion (704) 333-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 81 of 250
1382

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3408

I think it made it very difficult for him to feel loved, it made him frightened, it made him insecure, it made him untrusting. Later on it gave him identity problems, and coupled with the many other bad things that happened the Marc, ultimately made him more susceptible to depression, substance abuse, and borderline personality disorder and eventual violent behavior.

Q. Do you have an opinion as to whether or not the frequent moves the family made or his mother, Sonia, made may have affected him?

A. All of these things are cumulative. I think the moves in particular made it harder for him to make permanent acquaintances, made it harder for him to build relationships with people, diminished his self worth and made his life harder.

Q. How about an opinion as to whether the death of his grandmother, that is, Pearl, that Derrick described this morning, whether or not that had any effect on him?

A. I think that had a major effect on him. We have to remember that his mother was only 14 at the time, and she was really a child raising a child and the grandmother was having a significant role, apparently, in raising Marc. So with the grandmother's death, Marc not only lost one of the people that was parenting him, but Sonia had a profound reaction to her mother's death

Reported By: Scott A. Huseby, RPR
Huseby, Inc.
800-333-2082

Case 3:12-cv-00327-MOC Document 105 Filed 09/23/13 Page 82 of 250

(704) 372-4593

1383

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3409

and she became less effective as a parent.

Q. How about any effect that his father's abuse, that is Derrick Barnette's, abuse may have had on him?

A. I think that had a powerful effect on him, too, because you have to react to that with anger, you have to react to that with bad feelings about yourself, with a negative self concept, with feeling unloved, and there is ample evidence that child abuse, physical or sexual, leads to great difficulties in later life, both personality difficulties, more antisocial behavior, more susceptibility to depression.

I would like to say that in my interviews with both Mr. and Mrs. Barnette that I received rather powerful confirmation that these beatings had taken place. Sonia told me that when these things happened she felt so overwhelmed that she would usually run in the bathroom and she felt that the beatings were extremely excessive.

I talked to Mr. Barnette about it, and he did not feel that they were all of that excessive, but at the end of our interview on the telephone he did say that he had changed his mind over the years, that he was very young back then, that he now felt more mature and that he would do it differently now, and also expressed a great deal of regret that he had not brought Marc into

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 83 of 250
1384

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3410

his own home more.

Q. How about Derrick Barnette's absence, that is, him leaving the family after the separation and subsequent paternity test?

A. I think Marc had mixed feelings about that. Number one, I don't think he felt he would be beaten as much, but also I think he missed his father, and I think that he was quite devastated when he learned that the man that he loved in spite of all of the things that were going on was not his real father.

Q. The fact that Marc does not even today know who his father is, his mother won't even acknowledge to him, would that have any effect on him?

A. I think that continues to bother him a lot. As a matter of fact, Marc said one of the things that he wants from his mother right now is to simply acknowledge that somebody else was his father.

Q. And the violence that he saw, not only the violence that he suffered, but the violence he saw between Sonia and Derrick, would that have had any effect on him?

A. Again, in terms of making him feel angry or unloved or insecure, but I think also as simply a role model. He saw a lot of people hurting each other, he got hurt himself, it began to seem to him as if this was

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3412

stress when you have a rod put in your hip and somebody

shoots you and you have major surgery and your hand is

somewhat disabled by it, too, so I think that was

contributing to his demoralization at the time he got

depressed.

Q. Did Marc Barnette have choices in this matter?

A. I viewed his choice at the time of his crime, and I would like to put all of the crimes together. I think the killing of Mr. Allen, the fire bombing, and the killing of Robin Williams are all kind of a part of the same turmoil he was going through, and I think his choice in that situation was either to walk away from the situation and go on with his life or kill these people.

Q. So he did have a choice?

A. He had a choice.

Q. Could you explain that a little bit more?

A. He had a choice, but I believe he had a hard choice. Of course, he knew what he was doing. I think he knew that he was committing a crime, he was motivated to commit the crime, he committed the crime in a somewhat rational way. What was irrational about it was that he made very little effort to avoid detection, which is unusual for a criminal. He made very little effort to get anything out of it. There was no robbery,

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A}                    ion. (704) 333-9889
800-333-2082                                                      Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 85 of 250
1386

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3413

there was no sexual gratification in any of this, and basically he acted out a plan rationally based on irrational motivations. I felt that his motivations in doing this did not make sense to him, nor did they make sense to anyone else.

Q. When you say they were hard choices, can you give us an example of how Marc's choices were perhaps more difficult for him than --

A. I used an example in an article that I wrote about this, looking at choice in terms of availability of choice in terms of there being hard choices and easy choices.

And I tried to postulate a situation in which a number of people were asked to compete in a one mile race and looked at people with various kinds of handicaps to see how that might have influenced or compromised their choice. And if you look at a person who, let's say, just has a feeling of being anticompetitive or is phobic about running races, that person, the choice might be a little bit harder for them, but that's not very significant. On the other hand, if you look at a person who has an asthma problem and might have an asthmatic attack if he ran a race, running that race would be a fairly hard choice. If you look at a person who is running a high fever and has

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/6/2002

Page 3414

infectious mononucleosis, for example, it would be a very hard choice. If he had a broken ankle or sprained ankle, he might be able to do it, but it would be a very hard choice. Finally, there is no choice. If you were a paraplegic, you could not do it. To put it in a more workday kind of situation, if I'm running a high fever and feel just awful but feel I have to go to work that day, I can go to work that day, but it's a hard choice. And I remember a personal event about 25 years year ago where I had a speaking engagement in Chicago and felt awful, headaches, fever. I finally went to the doctor, was diagnosed with infectious mononucleosis. And I said, what do I do about Chicago, I have to give a speech there? And the doctor said, if you think you can get there, go ahead. And I think he was wrong. I think I could have gotten there, but it would have been a very hard choice and very stupid choice, so I didn't go.

I think it's the same way with Marc, I think all of these things that have buttressed him, not buttressed him but bombarded him over the years, all of the stressful things that we have talked about it, have put him in a situation where he simply did not have the kind of the normal thinking to weigh the various choices and he was in a position where the choices available to him were extremely hard and difficult to make.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Af                    on  (704) 333-9889            Fax (704) 372-4593
800-333-2082                                                                                  Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 87 of 250
1388

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3415

Most of us, if we felt betrayed by a loved one, we would be angry, we would get upset, and might go through a lot of rumination, as he did, but I think most of us would find it relatively easy and sane and sensible to walk away from the situation.

Marc did not have the strength to do that, because he was depressed, because he was really heavily influenced by substances at the time, and because of his personality, a severely disturbed person with a borderline personality disorder, and also all of the role modeling he had experienced.

Now, another way I try to conceptualize what happens to somebody who does this sort of thing is to try to look at it in terms of their going through benefit/risk evaluations of should I do it or shouldn't I do it, and I think Marc came up with really irrational benefits. And then in addition to that he exaggerated the benefit of the irrational benefit. Most of the things that he thought of were benefits were that people then know that I'm a real person, that I'm a real man, I have to get even with all of the people who betrayed me over the years, including his parents, I have to show the world that I'm somebody, that I'm not just a wimp. These are not rational motivations for killing somebody, but Marc began to see them more and

800-333-2082        Huseby, Inc., an A...        ...889        (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/13   Page 88 of 250
1389

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3416

more as being rational.

In addition to that, he was impaired in his ability to evaluate the risks of the situation. And if you think about the risks, what are they? One risk obviously is you are going to kill somebody you love, and that's a terrible risk. Another risk is that your conscience is going to bother you because you know you are going to kill innocent people, and that too is a terrible risk. Another risk is that you are going to get arrested and that you are going to go to prison at the very least and that you are probably going to be executed. Another risk is that you really have broken faith with your religion and your God. And if you are religious, and I think Marc was, that there are consequences to that.

Now, what Marc did with those risks is he essentially put them aside, denied them, refused to face them, and diminished their power to deter him from what he did.

Q. Does Marc Barnette have a conscience?

A. I think he has a strong conscience. I think that has been very well evidenced yesterday, and certainly has been evidenced in all of the interactions I have had with him over the years. And I think his conscience is torturing him, and that's one of the risks

Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 89 of 250
1390

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3417

I think most people would have anticipated. It's not just what you think of yourself. I think another risk which he underestimated was the risk of disgrace that he would have to get up like he did today and yesterday and talk about all of the terrible things that he did, and that disgrace would be known not only to himself, but to family and friends and other loved ones and to the whole world, and he just didn't factor that in.

Q. In your expert opinion, do you think this was a crime that was deterable by the death penalty?

MS. TOMPKINS: Objection.

THE COURT: Sustained.

BY MR. BENDER:

Q. Do you have an opinion as to whether this was the type of crime that was impulsive, planned?

A. I thought the crime had qualities of both impulsiveness and planning, but I thought it was irrational.

MR. BENDER: Okay. Thank you, Dr. Halleck.

CROSS-EXAMINATION

BY MS. ROSE:

Q. Good afternoon, Dr. Halleck. A lot of what you based your diagnosis on was the information that you received from the sources that you described but with

Case 3:12-cv-00327-MOC Document 105 Filed 09/23/15 Page 90 of 250
1391

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3418

these very detailed interviews with the defendant, his rendition of his life and his history, is that true?

A. I have read all of that, I've read all of the negative things that he has done as well, and I'm quite familiar with all of those.

Q. And did you use all of those things to base your diagnosis?

A. Yes.

Q. But a lot of it really did rely upon what the defendant told you?

A. A lot of it did, but there is sufficient collateral evidence that he was behaving in a seriously depressed way. Even as a child -- there are some things that I didn't get into that both Tosha and his mother report, that even as a young adolescent he would have frequent crying spells and he would get in the closet naked and cry. His mother certainly confirms most of the depressive symptomology that I have described, and I thought I heard Mario confirming the same thing here just a little while ago.

Q. You also reviewed Dr. Johnson's report, I believe?

A. Yes, I did.

Q. And, of course, what the defendant told her about his childhood was different than some of the other

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A    ion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 91 of 250
1392

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3419

sources?

A. There were some differences I thought, I didn't think they are greatly different, and I -- he was just getting his first introduction to revealing himself to somebody he perceived might be a hostile examiner, and he had been warned by his attorneys not to say too much to Dr. Johnson, so I think that it came out a little less, a little less darker than it actually was.

Q. But you know Dr. Johnson professionally and you certainly respect her professionally --

A. Oh, of course.

Q. -- and know that she is quite adept at interviewing defendants and making diagnoses, you are not casting aspersions on her abilities at all?

A. Not at all. I don't think Marc was being as open. I think Marc has become increasingly open as time passes. He also has a tendency sometimes to deny bad things. I think he denies the extent to which he drinks, and there are times that he wants to deny how bad things were with his family.

Q. Other than hearing his brother, Mario, today did you interview him prior to forming your diagnoses?

A. No.

Q. Did you interview Shonda Nero, his cousin with whom he was very close growing up?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3420

A.   No, I did not.

Q.   Did you interview Tessie Nero, Shonda's aunt?

A.   No.

Q.   What about Sheila Cooper?

A.   No, I did not.

Q.   Did you speak with Crystal Dennis?

A.   No, I did not.

Q.   Or Alicia Chambers?

A.   I did not.

Q.   Did you visit either of the crime scenes?

A.   Yes.

Q.   The one in Charlotte?

A.   The one in Charlotte.

Q.   Clearly your diagnosis is going to be based upon the information that you received, isn't that true?

A.   Well, 99 percent of diagnosis is based on your interview with the patient, but it always helps to have collateral information, and it's there in this case.

Q.   Now, there was some evidence, based upon his records, that he was a pretty good student, bright student, and did pretty well in school?

A.   I don't think he was a good student at all.  I think he is very bright, but I don't think he was a very good student.

Q.   That he was involved in athletics and tended to

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 93 of 250
1394

Page 3421

excel at times in athletics even when he moved to Georgia?

A.   He ran track.

Q.   That he had hobbies?

A.   Yes.

Q.   And that his mother supplied him with art supplies and things that he needed to further his painting hobby, are you aware of that?

A.   Yes.

Q.   And that despite some of the difficulties that he has had with his mother, that she has always been there, that's where he always lived and he has always gone to his mother, isn't that true?

A.   Yes.  He loves his mother.

Q.   She helped him find jobs, she helped him write resumes for him, she's been there for him all the way through all of this?

A.   I don't believe she's been there for him all the way through.  I think he loves his mother but he also feels very betrayed by her.

Q.   Would you say that an individual in the defendant's position has motivation to distort the facts?

A.   That happens with anybody who is charged with a crime.  That happens.

800-333-2082    Huseby, Inc.    (704) 333-9889    Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3422

Q. And whenever someone is facing a severe penalty, a defendant is going to have an enhanced desire to shade the truth in their favor?

A. That's usually true.

Q. Haven't you in some of your writings described that when you are conducting an examination like the one that you have conducted on the defendant, that you must approach it with a lot of cynicism and look for the possibility that the defendant is lying, exaggerating, avoiding being defensive, or even malingering?

A. Of course, that's always true.

Q. You talked about the excessive alcohol on the night of the murders as the defendant reported to you.

A. Yes.

Q. Of course, that's something that could not be corroborated?

A. It couldn't be corroborated unless we got together all of the people who were with him during that time and they all counted how many beers he had.

Q. So you had to take his word for that?

A. Pretty much so.

Q. And you did not go up to Roanoke, did you?

A. No, I did not.

Q. You haven't experienced that drive from here to Roanoke at nighttime?

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 95 of 250

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3423

A.   No, I have not.

Q.   The defendant testified that he had some good days and some bad days, and is that indicative of this major depressive disorder that you have diagnosed?

A.   Well, you are supposed to have two solid weeks of bad days to diagnose major depressive disorder.  I thought when I went over it with him in the past that sometimes it lasted for over two weeks without a good day.  I think other people got different answers from Marc.

Q.   And that's one of those things, really, that you couldn't corroborate, you had to take his word for that, that it was a two-week span, you had no way of determining that that, in fact, was accurate?

A.   Well, it also may be a trivial point, because the details of DSM IV are not written in stone and somebody can be very severely depressed and have a good day every now and then.

Q.   Were you here for the testimony of his friend, Steve Austin?

A.   No.

Q.   Where he talked about him getting out some, meeting girls, playing cards, going to some clubs?

A.   No.  But I heard Marc say that they tried to go out together and his heart just wasn't in it.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3424

Q. Isn't it true, though, that a considerable number of defendants experience symptoms of depression before they commit a crime?

A. I think a lot of defendants are depressed when they commit a crime, yes.

Q. And that most become depressed in the course being arrested, indicted, put in jail?

A. I think there is a depression that follows the arrest as well.

Q. It's not uncommon amongst criminals to see this depression centering around the events?

A. Well, there are two ways of looking at that. I think the depression sometimes plays a major role in the event happening, sometimes depression interferes with the person's ability to think clearly and logically and enhances the possibility of the crime taking place, and then there is always depression once you realize you are facing prison and/or death.

Q. Do you feel like the defendant's depression affected his rational thought here?

A. I think it led him to develop irrational motivation. In terms of carrying out a plan, it didn't affect him in that way. People can be very depressed and still work. People can be delusional and have false beliefs and still carry out criminal acts in a pretty

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af          on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 97 of 250
1398

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3425

rational way.

Q. So certainly the defendant's state of mind did not affect his ability to premeditate and deliberate these murders?

A. I don't think it did, no.

Q. You described that the defendant had biological defects in handling emotions that he was simply born with. Would you describe that?

A. I described that back at a previous hearing. And I thought these were probable, there was no definitive evidence that that existed.

Q. But you testified to that, I mean, what did you mean at the time?

A. I testified that generally people who develop borderline personality disorder and major depression do have some biological defects. That's a current belief.

Q. You said that depressive disorders are fairly common. About how common are they?

A. About 10 percent of the population at some time.

Q. And a breakup, that's a depressive event for anybody --

A. Usually.

Q. -- would that be fair to say?

A. It depends. There's various degrees of

800-333-2082  Case 3:12-cv-00327-MOC-DCK  Document 105  Filed 09/23/13  Page 98 of 250  (704) 372-4593
1399

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3426

distress over it. Sometimes it only lasts a day or two and you wouldn't call it depression.

Q. Somebody who goes through a breakup of a meaningful relationship, that hurts longer than a day or two, wouldn't you say?

A. Well, it could hurt a lot, too, and there still may not be depression. There is the pain of losing somebody that you love, which is not the same as depression, which carries with it certain specific symptoms.

Q. You think about people who break up, they are going to lose sleep, they are going to lose their appetite, they are going to withdraw from their friends and family, those are things that we saw here with the defendant?

A. Again it depends on the degree for how long it lasts and what the severity of the symptoms are. Everybody will have a great deal of sadness when they are losing somebody they care about, but there have to be very specific things happening before you call it major depression.

Q. Depression would, however, be something very predictable, it would be a very predictable reaction to the fire bombing and knowing that the police are looking for you?

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A
800-333-2082
3:12-cv-00327-MOC Document 105 Filed 09/23/15 Page 99 of 250
1400
(704) 333-9889
Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3427

A.    I think that would be predictable, yes.

Q.    And I guess you said 10 percent of the population experiences depression --

A.    That may be higher, I think, but it's at least 10 percent.

Q.    So that's a pretty common malady?

A.    Yes.

Q.    And depression doesn't necessarily lead to violent behavior?

A.    It usually doesn't.

Q.    You mentioned that the DSM-4 is, of course, a diagnostic manual that you use to determine the defendant's diagnosis.  One diagnosis you did not discuss was conduct disorder, and in looking at the DSM-3, it basically defines conduct disorder as repetitive or persistent pattern of behavior in which the basic rights of others are violated, isn't that a fair summary?

A.    Are we talking about three or four?

Q.    Four.

A.    I think you are right.

Q.    And according to that manual, you have to find three or more of certain criteria within a 12-month period, and let me tell you what those criteria are, you need to find three.  One is bullies, threatens, or

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 100 of 250
1401

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3428

intimidates others. Does that sound correct?

A. I can look at my manual, if you give me a second.

Q. I copied it, just tell me if this sounds correct. Number two, often initiates physical fights. Number three, has used a weapon that can cause serious bodily harm to others. That would include, on their list, a bat and a gun. Number four, has been physically cruel to people, has stolen while confronting a person. There are others on the list, but one of them listed is deliberately setting a fire with the intention of causing serious damage. Now that's five of the three that are required, but you did not diagnose that.

A. The conduct disorder is generally for children, and none of those things were present before age 15. You are talking about adult behavior. Those things might qualify him for antisocial personality disorder, but even antisocial personality disorder needs a diagnosis of conduct disorder, too, and that's a diagnosis of childhood.

Q. Now, there are a lot of people walking around on the face of this earth today who have had some significantly rough backgrounds, isn't that true?

A. Of course.

Q. And many people who have suffered physical

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 101 of 250
1402

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3429

abuse --

A.    Yes.

Q.    -- out there in the world?  Many people who have been exposed to drugs and alcohol use within their home, correct?

A.    Sure.

Q.    And they are now out committing any crimes. And there is a significant part of the population that has had something horrible happen to them that are not committing crimes?

A.    True.  But again, it is the cumulative nature of the many insults he experienced growing up as a child that makes him more likely to commit a crime.

Q.    There are people who, once again, who have been subjected to all of these things, alcohol, drug abuse, child abuse, who do not become violent?

A.    Oh, that's true.

Q.    And who do not commit not one but two murders?

A.    Certainly true.  But again, the issue is of the difficulty of his choice.  Some people facing difficult choices make the right choice.  He faced an extremely difficult choice and made the wrong choice.

Q.    Isn't it true that a history of past violence increases the probability that future violence will occur?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3430

A.    Yes.

Q.    Can a psychiatrist's personal opinions affect the diagnosis?

A.    I think that happens to a slight extent, yes.

Q.    Do you think that personal opinions can affect your ability to find the offender responsible?

A.    They may affect your ability to come up with a statement about responsibility.  Your own personal opinions, however, should not influence the diagnosis you find.  Let me say that another way.  Two people might come up with the same diagnosis, but one person may say he is not responsible or insane and the other person may say that he is sane.  I think that's a moot issue in this case, though, because nobody is saying that he is not responsible.  I think he is responsible.

Q.    But wouldn't that affect the way that you evaluate what you have learned?

A.    I think you always have to be careful about what your prejudices are when you are evaluating any patient, and you do the very best you can to neutralize any biases you may have.

Q.    And you are against the death penalty personally?

A.    Yes.

Q.    And you know this defendant is facing that

Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 103 of 250

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3431

punishment?

A.    Yes.

Q.    Do you recall an article that you wrote for the -- it's called A Critique of Current Psychiatric Roles in the Legal Process?  Do you recall writing that article?

A.    Vaguely, yes.

Q.    Page 397 of that article, Footnote 34, and in light, the system of justice would have to do away with the death penalty.  As long as we continue to execute people, psychiatrists and others will be tempted to purger themselves for humanitarian purposes.  Do you remember writing that, sir?

A.    I said that, yes.

        MS. ROSE:  I have no other questions.

                REDIRECT EXAMINATION

        BY MR. BENDER:

Q.    Dr. Halleck, on what grounds do you oppose the death penalty?

A.    The major grounds on which I oppose it has to do with my career.  I'm a physician, and I feel my job in the world is to try to help save lives, and I would find it very hard to assist in sending somebody to death.

        The other major reason I oppose it is because I

800-833-2083  Huseby, Inc.  fax (704) 333-9889  (704) 372-4593
Case 3:12-cv-00327-MOC  Document 105    Filed 09/23/15  Page 104 of 250
**1405**

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3432

do not believe it deters.  There is lots of evidence that states that don't have the death penalty have lower death rates than states that do.

At any rate, there is no definitive evidence that the death penalty deters anything.  I think it's obvious in the case of Marc Barnette that the death penalty would not and could not have deterred him.  People with the same kind of illness as Marc are not deterable, and executing Marc would not deter people like him.

MR. BENDER:  Okay.  Thank you, Dr. Halleck.

THE COURT:  You may step down.

MR. BENDER:  Your Honor, may we excuse Dr. Halleck to go back to Chapel Hill?

THE COURT:  With no objection, you may be excused.

THE WITNESS:  Thank you.

MS. LAWSON:  Your Honor, we call Ahmad Cooper, please.

AHMAD COOPER,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q.    Good afternoon.  Would you tell the jury your

Reported By: Scott A. Huseby, RPR

800-333-2082    Huseby, Inc., an A    ion  (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 105 of 250
1406

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3432

do not believe it deters. There is lots of evidence that states that don't have the death penalty have lower death rates than states that do.

At any rate, there is no definitive evidence that the death penalty deters anything. I think it's obvious in the case of Marc Barnette that the death penalty would not and could not have deterred him. People with the same kind of illness as Marc are not deterable, and executing Marc would not deter people like him.

MR. BENDER: Okay. Thank you, Dr. Halleck.

THE COURT: You may step down.

MR. BENDER: Your Honor, may we excuse Dr. Halleck to go back to Chapel Hill?

THE COURT: With no objection, you may be excused.

THE WITNESS: Thank you.

MS. LAWSON: Your Honor, we call Ahmad Cooper, please.

AHMAD COOPER,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q. Good afternoon. Would you tell the jury your

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3433

name, please.

A.    Ahmad Colinday Marc Cooper.

Q.    Where do you live, Mr. Cooper?

A.    I currently reside in Austell, Georgia, at Anderson Mill Road.

Q.    Do you know Marc Barnette?

A.    Yes, I do.  He is my older cousin.

Q.    How are you connected to him?  Who is your mother?

A.    My mother is Shelia Cooper, the youngest of the three sisters.

Q.    Did you know Marc Barnette before he moved into your mother's house down in Georgia?

A.    I did know him from when I used to visit, and I used to come up to Charlotte and visit when I was younger.

Q.    Is that when he was living with Jessie Cooper?

A.    I'm sorry, maybe I misunderstood the question.

Q.    Was he living with your grandfather, Jessie, or did you just visit him over there?

A.    Well, when I was younger, I visited him while he was still living with his mother and father.

Q.    When Marc and his family moved from Charlotte to Atlanta, did they move in with you?

A.    Yes, they did.

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 107 of 250
1408

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3434

Q.   Tell the jury what living in that household was like.

A.   I guess in the beginning, I was personally very ecstatic, because like I always looked up to Mario and Marc, and it was just good to have them around for the first time, so I would have to say in the beginning it was good.  When they first came, I was happy.

Q.   Did Marc have a bed at that house?

A.   No, he did not.

Q.   Tell the jury how life in that household progressed over time.

A.   Well, as I stated, when we all first started living together, I think I was very happy, and I think that was the mutual feeling in the household.  And then I guess slowly you began to see how things started to deteriorate between the family.

Q.   What kind of things made you think that there was deterioration?

A.   I mean, first of all, there was a definite lack of communication between the adults and children in the house.

Q.   Can you give us some examples?

A.   Well, for an example, as things progressed in that house, a routine day -- on a routine day there would be a very slim chance that we would see our

800-233-2082                                                                    (704) 333-8889                    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 108 of 250
1409

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3435

parents.

Q. Who were the adults living in the house at that time?

A. The adults in the house were my mom, Shelia Cooper; and my aunt, Sonia Barnette; and my stepfather, Michael O'Neill.

Q. Tell the jury about some of the incidents that you recall while you were growing up about your mother and your stepfather going out.

A. Well, as I stated, it was always -- as time progressed they would just be there very infrequently, and I could recall waking up in the morning and they would be off to work and I could recall coming home from school and I would go outside and play and I would come home and Marc and Mario, we would all be there, Marc would make sure that we were fed and homework was done, and it was like my aunt and my mom and Mike would come in, and they may be there for 30 minutes to an hour, they would put on their best outfits and they were right back out the door and probably wouldn't see them until the next morning, if I did at all.

Q. How long was the longest period of time that you all were unsupervised?

A. I couldn't give one instance to say how long we were unsupervised; it happened with frequency.

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 109 of 250
1410

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3436

Q.    How about food in the house?

A.    Food in the house deteriorated with the family.

Q.    Did you hear Mario testify about the Salisbury steaks?

A.    Yeah.  Definitely it went from being food in the fridge to TV dinners, and that's basically what it would consist of.  I guess they gave it to us because they were there so infrequently that the food they did buy they wanted to make sure we could make ourselves.  There wasn't much of that to go around.  They maybe bought six at a time.

Q.    Did you notice any alcohol or drug consumption?

A.    I noticed definite alcohol consumption.  There was a lot of that.  There was suspicions about drug consumption, but I never saw any firsthand, but I had suspicions even as a child.

Q.    How much older is Marc than you?

A.    He is eight years older.

Q.    At some point you had a little sister.  What is her name?

A.    Her name is Mikayla O'Neill.

Q.    Did Marc take care of you, Mario, and Mikayla?

A.    Yes, he did.  She was born shortly after we moved into the house in Lithonia, Georgia, and he was very frequently the baby-sitter.

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/6/2002

Page 3437

Q.    And in connection with that, did he change her diapers and take care of her?

A.    Naturally he did.

Q.    Did you all have a game about giving money to your parents to buy you cakes?

A.    Oh, I mean, when my mom and Aunt Sonia would go out, we would probably be in the back, Marc would be in the back talking on the phone, and me and Mario would probably be watching TV and playing the video game and we would run up into the front of the house because our room was the very last room in the house, and we would run up there and we would ask them where they are going and they would be very immaculently dressed and we would ask them if they would go get us a Star Crunch or an oatmeal pie, just a snack, candy.  You know, we liked a lot of junk food back then.

Q.    Did you get the candy or whatever it was that you asked for?

A.    I cannot ever recall ever for all the times we asked receiving it.  After awhile we pretty much assumed that they were pretty much not going to the store.

Q.    Did you and Marc and Mario ever talk about what was going on with the adults in your household?

A.    Me and Mario had conversations from time to time, but Marc did a pretty good job of making sure that

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an AI          ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 111 of 250
1412

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3438

a lot of stuff went unseen in terms of what we saw.

Q.    How do you know that?

A.    There were just certain instances where there would be a lot of things going on in the house and Marc would make it a point to make sure that we never saw it.

Q.    Now, you graduated from high school?

A.    Yes, ma'am.

Q.    What are you doing now?

A.    I'm currently working at Dave and Buster's, cocktailing full-time, and I also go to school full-time at Chattahoochee Technical College.

Q.    What are you studying?

A.    Criminal justice.

Q.    Tell this jury what Marc has meant to you in your lifetime.

A.    Well, Marc has always been like my father figure.  He's someone that I have always looked up to, because I never knew my father until two years ago.  And my stepfather was very much an alcoholic and a drug addict, and he was never really around that much.  So Marc was definitely the person that I always looked up to, and he always gave my advice and helped me out, and he even does so to this day, because we write each other very frequently.  And it just really hurts to see him in this position, and I love him dearly.  It's just hard to

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 112 of 250
1413

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3439

express in words how much I love him. It's just a very hard time.

Q. Ahmad, you mentioned your real father. So Michael O'Neill was not your father?

A. No, he is not.

Q. How did you find out about your father?

A. How did I find out about my father?

Q. Yes.

A. I always knew that I had another father, but I had been estranged from him for some time due to extenuating circumstances between my mother and he.

Q. So he found you or you found him?

A. I found him.

Q. What has your relationship with your father meant to you?

A. I guess it kind of brings a sense of completion to you. You feel like you know one side of yourself for so long; so when you meet your other side, you kind of feel complete for the first time, I guess I would say. A lot of things I never understood, I can look at him and talk to him, and my older brothers that I have now, and I can see where that kind of makes sense.

MS. LAWSON: Thank you. No further questions.

MS. TOMPKINS: I've got a few questions

Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 113 of 250
1414

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3440

for you.

                         CROSS-EXAMINATION

                    BY MS. TOMPKINS:

Q.   How old are you now?

A.   20 years old.

Q.   So how old were you when Marc moved down to Atlanta?

A.   When they first moved to Atlanta, I believe I was six years old, going on seven.

Q.   How old was Marc?

A.   I believe he was 13 or 14 at the time.

Q.   And he went to high school down there, correct?

A.   Yes, ma'am.

Q.   Your mom, Sheila, she went down to Atlanta on a college scholarship, is that right?

A.   Initially, yes.

Q.   And what was she doing for a living?

A.   She worked when I was younger.  She worked part-time at a package -- at a liquor store, and she also worked at Georgia Power for some time.

Q.   Had she finished school by the time you were born?

A.   She never finished.

Q.   She went to college for some period of time?

A.   She went for maybe a year and a half, maybe

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3441

two, but she got pregnant with me.

Q. And you all were living in an apartment, is that right, when they all moved down?

A. Yes, ma'am.

Q. Didn't you and Mario and Marc share a bedroom?

A. Yes, ma'am.

Q. And you were excited about having those guys around, correct?

A. I was excited about having them around initially.

Q. And you looked up to Marc?

A. Yes, ma'am.

Q. Things were good in the apartment at first?

A. As I said, initially.

Q. Okay. And did there come a time when Marc moved out of the apartment to be with his girlfriend?

A. There was an incident that came up where they requested that Marc leave, but I don't think he ever really left on his own accord.

Q. But Marc moved out?

A. Yes, ma'am.

Q. Did you know Natasha?

A. Yes, ma'am.

Q. Marc was 15 when Angelica was born, is that right?

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 115 of 250
1416

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3442

A.    If I'm not mistaken, I believe so.

Q.    So that was a year or two after he got down there?

A.    I believe it was about two years after he had gotten down.

Q.    And he and Natasha got a place of their own, correct?

A.    Eventually.

Q.    And Marc continued to go to high school, isn't that right?

A.    Well, he dropped out after awhile, but he did continue for a couple of years, I believe.

Q.    He got through the 11th grade, do you remember that?

A.    I'm not quite sure if he got finished with the 11th grade or not.

Q.    And when he went to high school, he was on the track team?

A.    Yeah.  He was a track star.

Q.    Now, so you were around and aware, I'm supposing, when Marc's second child was born?

A.    Yes, ma'am.

Q.    And by that time he had moved out, sometime before that?

A.    Yes, ma'am.

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 116 of 250
1417

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3443

Q.    So he was there in the apartment for about two years, is that what you are saying?

A.    Well, we didn't actually stay in that apartment.  When they first moved down, we stayed in the apartment, and shortly thereafter we moved into a house in Lithonia, Georgia.

Q.    In fact, your mom was building a house when they came down, isn't that right?

A.    I'm not sure if the house was built, but plans were being made to move into a house.

Q.    And y'all moved into the house together?

A.    Yes, ma'am.

Q.    And do you remember when -- were you around when Marc got together with Crystal Dennis?

A.    I remember a time, meeting her a few times when I was in the city of Charlotte.

Q.    You all had moved back to Charlotte?

A.    Yes, ma'am, we had moved back to Charlotte in 1993.

Q.    How old were you then?

A.    I believe I was 13 or 14 years old at the time, maybe a little younger.

Q.    So that incident that you are speaking of in Charlotte, was that Alicia Chambers, 1993?

A.    Oh, yeah, Alicia Chambers, I'm sorry.

Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 117 of 250
1418

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3444

Q. Were you aware that Marc went and spent some time in jail down in Georgia?

A. Yes, ma'am.

Q. Were you proud of him then?

A. Was I proud of him then?

Q. Yes.

A. No. I was worried about him.

Q. Were you worried about Crystal?

A. I don't ever recall meeting Crystal.

Q. Were you worried about Natasha?

A. Yes, I was very much worried about Natasha.

Q. Now, you mentioned that you all moved back up to Charlotte. Did the whole family unit move back up to Charlotte?

A. Aunt Sonia and Mario moved back up, Marc moved up shortly thereafter, and we moved back, by we I mean my mom, my sister, and my brother, later that year.

Q. And y'all moved into the house on West Boulevard?

A. Yes, ma'am, my grandfather's house.

Q. How long did you live there?

A. I believe we moved out around 1996, '97.

Q. All right. Marc talked about an Aunt Patty and Aunt Mabel. Do you know who those folks are?

A. Yes, ma'am.

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 118 of 250
1419

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                      8/6/2002

Page 3445

Q.   Were those also women that you knew?

A.   I had visited them a couple of times.

Q.   Okay.  Would it be fair to say that the family was pretty tight?

A.   No, it would not.

Q.   Okay.  So Marc's mom moving down to Atlanta to move in with her sister was not because she loved her sister?

A.   As it was explained to us, it was a job opportunity.

Q.   But she did move in with her sister?

A.   Yes, ma'am.

Q.   And then y'all moved up and moved in with Sonia and Shelia's father?

A.   Yes, ma'am.

Q.   So to that extent, the family unit stayed together?

A.   No.  Just because a family lives together doesn't mean that the family is together.

Q.   The family lived together?

A.   Yes, ma'am.

Q.   And Marc talked about having a loving relationship with Hattie and Mabel.  Do you remember those times?

A.   Yes.  Marc and Mario loved them very much.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A          ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 105     Filed 09/23/15     Page 119 of 250
1420

United States of America vs. Aquilia Marcivicci Barnette   3:97CR23-V
Proceedings Before Judge Richard L. Voorhees   8/6/2002

Page 3446

Q.   Did Jessie -- were you part of the group that he took out hunting?

A.   I don't really recall that situation, but I do recall the first time I ever learned how to shoot a gun was on my grandfather's land.

Q.   And that was the land on West Boulevard?

A.   Yes, ma'am.

Q.   And your grandfather taught you how to shoot?

A.   Actually, my Aunt Sonia was the one who actually taught me to shoot.

Q.   So you were not part of that group that Jessie Cooper taught to shoot?

A.   Not that I can recall.

Q.   Did y'all have Christmases, Thanksgiving, family get-togethers?

A.   Christmas and Thanksgiving, usually.

Q.   And how long did you live over there on West Boulevard?

A.   From about '93 to '96, I believe.

Q.   And what did you do when you left there?

A.   We moved over off of Beatties Ford Road, right down the street from where I went to high school.

Q.   When you say we, who was that?

A.   We is my mother, Shelia Cooper; and my younger sister, Mikayla O'Neill; and my younger brother, Michael

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an Af          on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105-1   Filed 09/23/15   Page 120 of 250
1421

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3447

O'Neill, Jr.

Q. How old were you then?

A. I was just -- when we first moved there, I was on the verge of starting high school, so I may have been 14, about to turn 15.

Q. Now, when y'all were down in Atlanta and you talked about there being some -- no food in the fridge, that sort of thing, how old were you then?

A. As I stated, when all of this started going on with the food missing in the fridge, I was about seven or eight years old.

Q. And for how long did that go on?

A. For quite some time, but I couldn't give you a specific time frame, but it carried on for quite some time.

Q. For five years?

A. We didn't stay there for five years, but basically from the point it started until the point we moved, yes.

Q. How many years was that?

A. It was maybe three years.

Q. Was your mom working then?

A. To the best of my knowledge, yes.

Q. And you graduated from high school here in Charlotte, is that right?

Case 3:12-cv-00327-MOC     Document 105     Filed 09/23/15     Page 121 of 250
1422

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3448

A.    Yes, ma'am.

Q.    And you're working full-time and going to school full-time?

A.    Yes, ma'am.

Q.    Where are you going to school?

A.    Chattahoochee Technical College.

Q.    And what are you studying?

A.    Criminal justice.

MS. TOMPKINS:  Thank you.  I have no further questions.

MS. LAWSON:  No questions.

THE COURT:  You may step down.  Members of the jury, we will take our evening recess.  Please remember the usual instructions.  We will see you in the morning at 9:30.  Thank you for your attention to the case.

(The jury left the courtroom.)

(Adjourned.)

I, Scott A. Huseby, do hereby certify that the foregoing transcript is a true and correct transcript.

SCOTT A. HUSEBY                                    DATE

Reported By: Scott A. Huseby, RPR
800-333-2082       Huseby, Inc. an Af       (004) 333-9889       Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/13   Page 122 of 250

1423

3449

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA    )    DOCKET NO. 3:97-cr-23-V
                            )
      vs.                   )
                            )
AQUILIA MARCIVICCI BARNETTE, )    VOLUME 18
                            )    MORNING
           Defendant.       )
_____)

TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
AUGUST 7, 2002

APPEARANCES:

On Behalf of the Government:

    ANNE M. TOMPKINS, ESQ.
    JILL WESTMORELAND ROSE, ESQ.
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    JEAN B. LAWSON, ESQ.
    P.O. Box 472106
    Charlotte, North Carolina

    HAROLD J. BENDER, ESQ.
    200 North McDowell Street
    Charlotte, North Carolina

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

FORM FED ● PENGAD • 1-800-631-6989

WEDNESDAY MORNING, AUGUST 7, 2002

(Jury not present.)

THE COURT: Ms. Lawson.

MS. LAWSON: Thank you, Your Honor.

We just wanted to inform you that I think we're going to get to a point where there's going to be some dispute about admissibility of evidence, and I'm not sure whether you characterize it that way. It would be as to Dr. Cunningham. And we just wanted to alert you to that. We may need to hear that outside the presence of the jury so that you can determine when you'd like to hear it. We have other witnesses we can present and move forward. Dr. Cunningham would be our last witness.

THE COURT: Okay. What would you anticipate might be the nature of the dispute?

MS. TOMPKINS: I had informed the court yesterday at the afternoon break that I had received the report of Dr. Cunningham as the basis of his testimony in what I would contend to be a violation of the court's order under Beckford, that all reports generated by expert witnesses be provided to opposing party by June 25th. So I wanted to bring to the court's attention -- and, in fact, in the court's order it says, Failure of either party to provide the reports of his mental health examination in a timely manner as ordered by this court will result in forfeiture of the right to present

mental health testimony at trial.

Also, in a response filed by the defense -- well, to back it all up, in February of this year the government filed a motion asking for the defense to give notice whether or not they were going to file -- whether or not they were going to use mental health testimony. The court gave until April 15th to do so, and on April 15th they filed their response saying that Seymour Halleck, Dr. Mark Cunningham, Dr. Faye Sultan, and Dr. Sally Johnson are the intended expert witnesses. Their evaluations, opinions and reports are in possession of the government.

The report that the government has had in its possession is a report done by Dr. Mark Cunningham. And as late as last Friday when I went by Mr. Bender's office to get a copy of a report, it was -- the thing that I got from Mr. Bender was the same slide presentation that I've had in my possession for a long time. I had thought that Dr. Cunningham had done some kind of a traditional report. So I've had that. So as late as last Friday I was given a set of -- a power point presentation.

Yesterday I was given a package of sixty-two power point slides that, as I told the court yesterday, are 100 percent different than the report that I've had in my possession for a year. The purpose --

THE COURT: So there never was a traditional

report.

MS. TOMPKINS: There -- well, that is his report. His testimony has been that is -- that is his report, his power point presentation. He does not do a traditional report as other psychiatrists and psychologists do. And what the government has been led to believe and what their preparation for cross examination and our preparation for rebuttal has been based on the presentation that we've had in our possession.

So the government simply wants to say that yesterday the package of information given to us about what Dr. Cunningham's testimony will be is completely different. It's a completely different topic. Our preparation and our expert rebuttal preparation has been a waste. And that -- it's the government's position that it's flaunting the court's order.

THE COURT: Well, when did the defense come into possession of these sixty pages of different power point presentation?

MS. LAWSON: Basically Monday, Your Honor. And if I can clarify this a little bit.

Dr. Cunningham at the first trial tendered a letter basically outlining the nature of his findings. In addition, he testified at the first proceeding.

The government, in our opinion, failed to present any evidence of future dangerousness during its case in

chief. We contend, therefore, that they're not entitled to rebut any kind of future dangerousness testimony unless we present it. Because the government failed to present that evidence, we don't intend to open that door and allow them to put on rebuttal evidence to rebut something we don't present.

The slides are illustrative. They're not -- they're exhibits. They're not his report. His testimony will be and is contained within the material provided by the defense in response to your order.

Your Honor, we made up two bound volumes of mental health expert testimony and reports and gave it to the government. In our response we said to them that the testimony would be consistent with what they said either in their testimony or in their reports. So they've had, you know, possession of that all this time. If they prepared for future dangerousness, that's -- that's their problem. What we intend to present doesn't relate to future dangerousness but as to the other aspects of Dr. Cunningham's written report and his testimony at the first trial.

THE COURT: It strikes me as somewhat arbitrary at this point to rely on an absence of future dangerousness testimony as an issue since Dr. Halleck talked about that issue.

MS. LAWSON: Only when elicited on cross examination by the government. He didn't talk about it at all in his

direct. And the government can't back door its way into rebutting testimony that hasn't been offered by the defense simply by trying to elicit it on cross examination.

THE COURT: I think that's a doubtful proposition. Even though his testimony may have been in response to cross, it's nevertheless testimony presented during the defense case which the government has an obligation as well as an opportunity to rebut. I think that's arbitrary to say that, well, just because it came in on cross, it's something the government can't respond to. The government, in other words, is bound by the answer.

MS. LAWSON: Well, the government -- I think the government elicited it for the purpose of curing the fact that they didn't present evidence of future dangerousness in their case.

THE COURT: Well, another factor is that the government's notice talked about future dangerousness as an aggravating factor. So there's no surprise to the defense in that respect.

MS. LAWSON: Well, that's true. But if they don't prove it in their case in chief, they have no right to rebut it.

MS. TOMPKINS: If I may respond, Your Honor. We've already been through that. They made a motion and the court denied it. Our future dangerousness testimony came in through

witnesses.

THE COURT: Right. I think one of the -- one of the things we will ask Dr. Cunningham to go into is -- in voir dire is when he had his sixty pages because, you know, the government -- that is, the defense has a right to attempt to hold back its case as long as possible, but not when you have -- but not in regard to psychological reports that had been ordered by the court to be disclosed.

MS. LAWSON: Your Honor, these sixty pages are not -- they're illustrative exhibits. His testimony would come in even without them, we contend.

THE COURT: But they do disclose what his line of opinion is and evidently there's been an effort here to sandbag the government on expert opinions, on an expert's professional opinions which is exactly what the reports are supposed to disclose. And it doesn't do to rely on semantics as to whether it's a pinpoint presentation or slide presentation or a traditional report or otherwise. The substance of it is what counts.

MS. LAWSON: Well, and the substance of it, I'm respectfully advising the court, was disclosed in Dr. Cunningham's report tendered to the government --

THE COURT: Well, I may have to examine that because you say that; the government says it's a whole different idea. I don't know right now. I just know that you two

disagree about it.

MS. LAWSON: Yes, sir.

THE COURT: All right. We'll go on with other testimony at this point.

(Jury entered the courtroom.)

THE COURT: Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: You may call your witness.

MS. LAWSON: Thank you, Your Honor.

Call Terry Dorsey to the stand, please.

TERRY MICHAEL DORSEY,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q.   Good morning, Mr. Dorsey.  How are you?

A.   Good morning.

Q.   Would you introduce yourself to the jury, please, and tell them what you do.

A.   My name is Terry Michael Dorsey.  I am a detention officer for the Mecklenburg County Jail.

Q.   How long have you worked there?

A.   Five years.

Q.   Do you know Marc Barnette, the person seated right here?

A.   Yes, I do.

Q.   Could you tell the jury what kind of an inmate he's

been.

A.    Perfect.  I mean, no problems, no hassles.  Respectful, intelligent, and quiet.

MS. LAWSON:  Thank you very much.  Please answer any questions they have for you.

CROSS EXAMINATION

BY MS. ROSE:

Q.    And you knew that he was brought to the Mecklenburg County Jail awaiting this sentencing hearing.

A.    I didn't know at the time, no.

Q.    That's why he's here.

A.    Right now, yes.  Yes.

MS. ROSE:  Thank you.

MS. LAWSON:  May Mr. Dorsey be released?

THE COURT:  Yeah, he may be released.

MS. LAWSON:  Thank you.

(Witness was excused.)

MS. LAWSON:  Your Honor, we'd call Olandas Truesdale.

OLANDAS TRUESDALE,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q.    Good morning, Mr. Truesdale.

A.    Good morning.

Q. Would you please introduce yourself to the jury and tell them how you're employed.

A. I'm Olandas Truesdale, and I'm a detention officer at Mecklenburg County Jail Central.

Q. And how long have you worked there?

A. Four years.

Q. Do you know Marc Barnette?

A. Yes, I do.

Q. Would you tell the jury what kind of an inmate he has been.

A. I would describe him as a mod -- a good model inmate.

Q. Thank you very much. Were you about to say something?

A. No, ma'am.

MS. LAWSON: Thank you. Answer any questions they have, please.

MS. ROSE: No questions. Thank you, sir.

THE COURT: You may step down. You may be excused.

(Witness was excused.)

MS. LAWSON: Your Honor, we'd call Tony Harrison, please.

TONY HARRISON,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q. Good morning.

A. Good morning.

Q. Would you please introduce yourself to the jury and tell them what you do.

A. Yes. My name is Tony Harrison. I'm a correctional officer, Mecklenburg County Sheriff's Department.

Q. How long have you worked in that capacity?

A. Six years.

Q. Do you know Marc Barnette?

A. Yes, I do.

Q. How do you know him? Through the jail?

A. Yes, through the jail.

Q. Would you tell the jury what kind of an inmate he has been.

A. Since I've known Mr. Barnette, he's been a role model inmate. He's followed all the orders and directives that are given at the Mecklenburg County Sheriff's Department.

MS. LAWSON: Thank you very much. Please answer any questions they have.

MS. ROSE: I have none, sir. Thank you very much.

MS. LAWSON: May he be released, Your Honor?

THE COURT: He may.

MS. LAWSON: Thank you.

(Witness was excused.)

MR. BENDER: Your Honor, our next witness is Bruce Ryherd, and I will get him out of the back room.

THE COURT: All right, sir.

BRUCE RYHERD,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BENDER:

Q.   State your name and spell your last name, please, sir.

A.   My name is Bruce Ryherd, R-y-h-e-r-d.

Q.   And where do you live, Mr. Ryherd?

A.   Terre Haute, Indiana.

Q.   And what's your occupation or profession?

A.   I'm a correctional counselor with the Federal Bureau of Prisons.

Q.   And are you assigned to the United States Penitentiary at Terre Haute?

A.   Yes, I am.

Q.   How long have you been there?

A.   I have been at Terre Haute, Indiana, for fourteen years and eleven months.

Q.   Mr. Ryherd, do you know Marc Barnette?

A.   Yes, I do.

Q.   Is this Marc seated here?

A.   Yes, it is.

Q.   I believe Marc came to the special confinement unit at Terre Haute in July of 1999.

A.   That is correct.

Q. Okay. And tell us what phase one of that special confinement unit means.

A. The way the unit was set up, phase one inmates are those inmates that are recently received. They stay in phase one until they're -- they meet the criteria for phase two. They have to be in the unit for a minimum of twelve months. They have to maintain clear conduct while they're there. And they have to participate in recommended programs by the unit team.

Q. Okay. And in phase one, are all the people there locked down for twenty-three hours a day?

A. Yes.

Q. And so there's one hour a day that they are permitted recreational activity.

A. That's correct.

Q. And is that recreational activity alone or is it with other inmates?

A. They are afforded an opportunity to recreate with other inmates, but it's in segregated rec areas. In other words, there's more than one individual out, but they are maintained in separate recreation areas. They don't have any physical contact with each other.

Q. Okay. And during the one year that Marc was in phase one, how was his conduct?

A. He was not a management problem to us while he was housed in phase one. He was recommended for phase two upon which

time he met the criteria.

Q. Okay. The criteria, again, for moving to phase two was what?

A. He had to maintain at least twelve months clear conduct. He had to be in the unit for a period of twelve months, and participate in recommended programs.

Q. Okay. And so he met all those criteria.

A. Yes, he did.

Q. Was recommended for phase two.

A. Yes.

Q. And not all inmates in the special housing unit or special confinement unit are recommended for phase two, are they?

A. No.

Q. Now, although he was recommended, did he actually achieve phase two?

A. Yes, he did.

Q. Tell us a little bit about what phase two means.

A. Phase two allows those inmates that are progressed to that phase to recreate with other inmates that are in the phase. They're afforded a little bit more liberal activity time. There's an adjusted schedule to where they're afforded more recreation out of their cell. They're afforded an opportunity to rec with others.

Usually we -- what we did at the time that Marc was

there, two or three inmates were allowed to rec together in the recreation cage or recreation area that was established inside the unit. There was a period of leisure time in the evening that was established for the guys in phase two. A leisure activity center was established inside the unit in the larger rec area. And they were afforded an opportunity in the evening to come out, participate in board games, card games, and watch TV.

Q. Okay. And during the time that they're in phase two, they're also being watched or monitored by staff.

A. Correct.

Q. Okay.

A. At no time when any inmate is out within the confines of the unit or outside of his cell, they are constantly monitored by staff. There is a hundred percent staff supervision. So the unit is a controlled environment.

Q. Okay. And if an inmate were to violate some rule or have any infraction --

A. Right.

Q. -- would he go back to phase one?

A. If a staff member became aware that an inmate had committed a prohibited act in accordance with bureau prison policy, an incident report would be written. Then it would be followed up by an investigation by a member of the correctional services staff, usually a lieutenant or --

depending on the nature of the offense. Then what would happen is it would be referred to the UDC or the unit team, which is the Unit Disciplinary Committee. Then what they would do is based on the severity of the incident report, it could either go to our disciplinary hearing officer or the UDC could handle the report.

Once an inmate was found to have committed a prohibited act, he would be referred back to phase one and then his criteria for placement in phase two would start all over.

Q. Okay. What type of infraction or violation of the rules would cause this sort of report?

A. Well, it could be anything from assaulting a staff, attempting to introduce contraband into the institution by mail, by telephone, abuse of telephone privileges, being unsanitary, refusing an order, being insolent to a staff member. Just various things that they could be found to have done.

Q. Any type of back talk or refusing to obey an order would result in that?

A. Most definitely.

Q. And until Marc was brought back here for the purpose of this sentencing hearing, did he maintain clear conduct and was he in phase two throughout --

A. Yes, he was.

Q. -- the time he was there?

FORM FED ® PENGAD · 1-800-631-6989

MR. BENDER: Okay. Thank you, Mr. Ryherd.

THE WITNESS: Okay.

CROSS EXAMINATION

BY MS. TOMPKINS:

Q. Good morning.

A. Good morning.

Q. How many inmates are at the federal penitentiary at Terre Haute?

A. How many total inmates?

Q. Correct.

A. Approximately fifteen hundred.

Q. Fifteen hundred. And how many are in the special confinement unit?

A. Currently there is twenty-four inmates in the special confinement unit at Terre Haute.

Q. And while the defendant was in the special confinement unit, he was awaiting his sentencing hearing; is that correct?

A. Yes.

Q. Now, in what ways does the special confinement unit differ from the general population where the fifteen hundred are?

A. In the fact that it is a totally controlled lock down unit. Any time an inmate is removed from his cell, he's under constant staff supervision. Depending upon the nature of the

-- of what is considered his custody level, he can be a two-man cover or three-man cover, i.e., meaning --

Q. What does that mean?

A. Well, meaning that two or three staff members must walk or escort the inmate wherever he goes: To the shower, to the recreation area, to a call out, and that type of thing.

Q. Okay. So in the special confinement unit, the folks that are there are closely monitored, correct?

A. Yes.

Q. And if there is any movement of a person in the special confinement unit, they are always monitored by or covered by at least two staff members.

A. Yes.

Q. They have minimal contact with other inmates, correct?

A. That is correct.

Q. So what is the spectrum of behavior on the special confinement unit?

A. As far as...

Q. From -- of your observations from bad behavior to good behavior. What are the possibilities for bad behavior?

A. That's only up to the individual, but for the most part the individuals that we've housed at the unit since I've been there have been very little of a discipline problem.

Q. And would that be because of the level of control on the special confinement unit?

A.    I believe so.

Q.    Is good behavior on the special confinement unit unusual?

A.    No.

Q.    It is the norm?

A.    Yes.

Q.    Now, the move to phase two, when inmates are given the opportunity, inmates move to phase two, correct?

A.    Uh-huh.

Q.    Are there inmates who decline to move to phase two?

A.    Yes.

Q.    Okay.

A.    There have been.

Q.    There have been.  Do most inmates move to phase two when eligible?

A.    If they meet the criteria and it's ultimately up to the unit team to make the recommendation based on the criteria and then it's ultimately up to the warden of the institution to decide whether that placement is appropriate.  But yes, for the most part they do progress.

Q.    And in your personal experience have most inmates moved from phase one to phase two if they so desired?

A.    Yes.

Q.    And earned it?

A.    Yes.

Q. So it's the norm to move to phase two.

A. Yes.

MS. TOMPKINS: Thank you. That's all the questions I have.

MR. BENDER: I have nothing further. Thank you, Mr. Ryherd.

THE COURT: You may step down and you may be excused.

(Witness was excused.)

MR. BENDER: Call Vicki Boyer.

VICKI BOYER,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BENDER:

Q. State your name, please.

A. Vicki Boyer.

Q. Spell your last name for the court reporter.

A. B-o-y-e-r.

Q. Okay. Ms. Boyer, where do you live?

A. I live in Marshal, Illinois.

Q. Okay. What -- you are, I believe, employed at the United States Penitentiary in Terre Haute, Indiana?

A. I am.

Q. How long have you been there?

A. Sixteen years.

Q.    And what is your current position?

A.    I'm a case manager.

Q.    Tell us what a case manager means.

A.    A case manager is responsible for when they receive an inmate on their case load, recommending programs for them as far as substance abuse programs, financial responsibility, making recommendations to them. We're also responsible for doing any type of correspondence. Say an attorney or a Congressman or a family member writes in on that respective person, then we are responsible to answer correspondence for the warden's signature.

Q.    And as such, are you familiar with Marc Barnette?

A.    Yes, I am.

Q.    And this is Marc right here.

A.    It is.

Q.    And were you his case manager?

A.    Yes, I was.

Q.    Now, Marc, I think, came to the special confinement unit in about July of 1999.

A.    That's correct.

Q.    During that period of time, what kind of inmate was he?

A.    He was no disciplinary problem. He followed the recommendations of the unit team.

Q.    And actually got to phase two --

A.    He did.

Q. -- we've heard about.

And how did he do in phase two?

A. He was no problem in phase two.

Q. And I believe you helped him get some art supplies.

A. The recreation department was actually in charge of the art supplies, but the unit team worked with the recreation department in order to get that, yes.

Q. Okay. And somehow you found out that Marc enjoyed drawing art.

A. Yes, we did.

Q. And that was one of the recreational activities that he did?

A. That was one of the first recreational -- other than their physical recreation, that was one of the first activities we started in the unit.

Q. The jury has already seen these, but are these some of the paintings that Marc did while he was --

A. Yes, they are.

Q. -- in Terre Haute?

Q. I believe you described him as being quite talented.

A. He was very talented.

Q. Ms. Boyer, you are familiar as case manager with all of the Bureau of Prisons records pertaining to Marc when he was sent to USP, the penitentiary at Butner for evaluation.

A. That's correct.

Q. Didn't find any indication of any infraction, minor or otherwise while he was there.

A. No, there were no disciplinary infractions in his file.

Q. And also, as you look through the records, Ted Moretz was a staff psychologist, was he not?

A. Yes, he was.

Q. And his assessments --

MS. TOMPKINS: Objection to someone else's assessment.

THE COURT: Overruled.

MR. BENDER: Part of the records.

Q. His assessment of threat to others, the current potential for harm to others is judged to be low. You're familiar with that, aren't you?

A. I know there are documents in the file from Mr. Moretz. I know he made weekly rounds and talked to Mr. Barnette. But I -- I mean, without looking at it.

Q. Okay. I'll ask you to look at this and see if that doesn't refresh your recollection.

A. Those are the reports done by the psychology department, yes.

Q. Okay. And doesn't it say threat to others, potential is low?

A. Is judged to be low, yes.

Q. Thank you.

MR. BENDER: That's all. Thank you, ma'am.

CROSS EXAMINATION

BY MS. TOMPKINS:

Q. Ms. Boyer, the special confinement unit currently houses twenty-four inmates; is that right?

A. That's correct.

Q. And there are approximately fifteen hundred inmates in the general population?

A. That's correct.

Q. Okay. And the special confinement unit is not the general population, correct?

A. No, it's not.

Q. How many women work at the Terre Haute facility?

A. I'm going to guess and say around fifty.

Q. Okay. And those women have access to inmates clearly.

A. Yes, they do.

Q. Just like you had access to them.

A. Yes, they do.

MS. TOMPKINS: That's all the questions I have.

REDIRECT EXAMINATION

BY MR. BENDER:

Q. Have you ever felt threatened by Marc Barnette?

A. No, I have not.

MR. BENDER: Thank you.

THE COURT: You may step down and you may be

excused.

(Witness was excused.)

MR. BENDER: Your Honor, we now call Wally Buer.

WALTER W. BUER, JR.,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BENDER:

Q. State your name, please, sir.

A. Walter W. Buer, Jr.

Q. And Mr. Buer, where do you live?

A. I live in Brighton, Missouri.

Q. Okay. I believe you're retired at this time, are you not?

A. From the Bureau of Prisons, that is correct.

Q. How long were you at the Bureau of Prisons?

A. Twenty-one years and nine months.

Q. And I believe your occupation or profession right now is a correctional consultant.

A. That is correct.

Q. And how long have you been doing that?

A. Approximately nine years.

Q. As such, do you keep current on the policies and manuals of the Bureau of Prisons?

A. Yes, sir, the ones that are released.

Q. Okay. At my request, did you do an estimate of the

custody classification for Marc Barnette?

A.    I did.

MS. TOMPKINS:    Well, objection as to expert testimony.

THE COURT:    Overruled.

Q.    Well, let me just go back.    What were your duties at the Bureau of Prisons while you were employed there?

A.    In 1968 I signed on as a case manager at Ashland, Kentucky.    And two years later transferred over to the federal medical center in Springfield, Missouri, as a case manager. Part of the time there later on in my time at that place, I worked as a case management coordinator, and which essentially means reviewing the work of other case managers.    And transferred after that as a staff instructor at Dallas for eighteen months.    That was '74 to '76.    Then after that time I transferred to the penitentiary at Terre Haute as case management coordinator and spent approximately eight years there.    And later on at that time I was a camp administrator after that.    Went out as associate warden to Tallahassee. After that I transferred to the regional office in Atlanta, Georgia.    And after that I worked at the federal medical center in Springfield, Missouri, for a second tour.

Q.    Okay.    Now, at my request, did you prepare an estimate of his -- Marc's classification?

A.    I did.

Q.   And were you sent various materials of his jail and prison records, the offense report, and such items to do that?

A.   Yes.

MR. BENDER:   How do I do this so it doesn't come up in the jury box?

MS. TOMPKINS:   Do you have a copy of that so I can look at it?

MR. BENDER:   Yes.

(The document was tendered to Ms. Tompkins.)

MS. TOMPKINS:   Your Honor, I'd like to be heard.

THE COURT:   Okay.  Members of the jury, we'll ask you to step out while we take up a legal matter.  Thank you.

(Jury exited the courtroom.)

MS. TOMPKINS:   Your Honor, this witness is about to, without the question being asked in opinion form, give an opinion as to the defendant's classification in prison based on his training and experience.  This is, without them calling it expert testimony, expert testimony and this man is about to give his opinion.  Never seen this.  Never heard of this fella.  And there's been no notice of this expert testimony.

THE COURT:   Let me hear the question.

VOIR DIRE EXAMINATION

BY MR. BENDER:

Q.   Well, what is inmate classification, Mr. Buer?

A. Well, the classification that you asked me to report on has to do with both the security level and the custody assignment on a given inmate. And that is derived from a manual by the Bureau of Prisons that specifies the criteria utilized in determining those classifications.

Q. Okay. And it's a form and you circle various matters such as type of detainer. Give it however many points.

A. Well, it's a worksheet. When it's all -- when it's completed by the Bureau of Prisons, then it is printed out in a computer and it's in the electronic database that the Bureau of Prisons holds on each and every inmate.

THE COURT: Well, so what you want him to state would be his opinion of what the classification of the defendant would be?

MR. BENDER: No. That he went through the worksheet used by the department -- Bureau of Prisons; and based upon the matters that were sent to him, he scored this out.

THE COURT: All right.

MR. BENDER: According to the score.

THE COURT: Why would you not have access to the actual classification as opposed to this witness's estimate of what it would be?

MR. BENDER: Well, we asked for the Bureau of Prisons records, Judge. You remember that hassle. We subpoenaed all of their records. In looking through those

records, we can't find the classification. This worksheet that was scored are the computer printout. If the government has it, I'd like to see it and we can excuse Mr. Buer.

MS. TOMPKINS: We have the same records that we got from the Bureau of Prisons that the defense has. They're right here. We have -- we have the exact same thing. So whatever we got from BOP, they got from BOP. This -- we filed a notice of expert opinion, Dr. Peter Carlsen, who is an expert in Bureau of Prisons classification in anticipation of the witnesses from Bureau of Prisons who have previously testified. So they are on notice as the court orders us to put them that we are -- that we have a potential rebuttal witness about the defense -- about the defendant's prison classification. This is yet another sandbagging attempt by the defense to put an expert witness on and to put evidence in front of the jury with no notice, no voir dire, and asking those questions in innocuous forms.

But this is clearly, based on his training and experience and thirty years with the Bureau of Prisons, his opinion about the defendant's future classification.

THE COURT: All right. You're correct about that. However, the witness will be allowed to testify.

May we have the witness -- I mean, the jury back, please.

(Jury entered the courtroom.)

DIRECT EXAMINATION (Cont'd.)

BY MR. BENDER:

Q. Mr. Buer, tell the jury what classification means in the Bureau of Prisons.

A. Classification is basically a level of assignment in institutional levels. There are approximately -- well, there's minimum, low, medium, and high security facilities, not to mention administrative. And then there are levels of custody, community in -- or out, in, and maximum. Both of those are computed by way of a program statement that gives specific instructions to the Bureau of Prisons for determining both of those assignments.

Q. Okay. And did you make such a worksheet for classification for Marc Barnette?

A. Yes, sir, I did.

Q. Is this -- is this that document?

A. Yes.

Q. Okay. I believe it has across the top My Estimate.

A. That is correct.

Q. Okay.

MR. BENDER: Your Honor, we would mark this as Defendant's Exhibit Number 13.

THE COURT: You may.

MR. BENDER: And ask that it be admitted and shown to the jury.

THE COURT: You may do so.

(Defendant's Exhibit Number 13 was received into evidence and published to the jury.)

Q. Mr. Buer, would you go through the A portion at the top, identifying data, and tell us what that means.

A. Well, when these things are made up, the unit assignment and the date that the form is made is included. The individual's name, register number, and criminal history points.

Q. Okay. And no points are assessed for A, are they?

A. No.

Q. But the points begin at B, called the base scoring.

A. That is correct.

Q. Okay. And tell us what B1 is.

A. B1 is type of detainer. And in reviewing the materials I had available, I saw no pending charges from any other jurisdictions indicating there was a potential for further legal action.

Q. Okay. And so you scored a zero for that.

A. That is correct.

Q. Okay. And then severity of current offense. Based on the information you were provided, what score did Mr. Barnette receive?

A. Seven points. That would be greatest severity level. And there is a guideline in the appendix of the manual showing

that this case would be satisfied by the greatest severity.

Q. Okay. I believe 3 -- B4, if you would.

A. 4, type of prior commitment. He had serious, three points. That is determined not by the length of time he might have served, but by the seriousness of what is termed offense behavior; and the offense behavior in this instance, I believe, was assault of some form where by definition someone could be in fear of serious bodily harm or death. So that would qualify. Even though the term itself is relatively short, it would qualify as serious.

Q. Okay. Even though he received basically credit for time served, twenty-two days, I think, on one offense and --

A. Yes.

Q. -- some days on another, it's still a serious offense based on the type of offense that it was.

A. In this classification instruction, that is correct.

Q. Okay. Then B5, would you tell us about that.

A. History of escapes or attempts. In my review of the files, I found nothing that would suggest escape behavior.

Q. Okay. And then B6.

A. History of violence. And I don't remember the specific dates, but the way it -- in doing the evaluation, it was over five years ago since the most serious violence had occurred and I gave that a number six because it ranged in that, between the five and ten years. That does not count current

offense.

Q. B7.

A. Precommitment status, which indicates whether the person was allowed on their own recognizance or voluntary surrender, so that was not applicable.

Q. Okay. And the voluntary surrender means that after receiving some term of imprisonment, they voluntarily surrendered to the prison.

A. That is correct.

Q. Okay. Had nothing to do with the -- turning themselves in or confessing. That sort of thing.

A. No.

Q. And then B8, you simply add up those numbers.

A. That is correct.

Q. Okay. So your estimate was a base score of sixteen.

A. Yes.

Q. Okay. And then custody scoring. What does that mean?

A. Custody scoring are those factors subsequent to confinement that are measured by policy and they relate mostly to conduct while in the institution, although the drug issue does not. And this is part of the determining information that is used in balance with the base score later on in the form.

Q. Okay. Now C1, percentage of time served, did you take into account that Mr. Barnette through this sentencing hearing

will either be sentenced to die or will receive life without the possibility of release?

A.   When I did this, I did this with the life without the possibility of release as I indicated in my report.

Q.   Right.

A.   It just presumed that classification -- or that sentence.

Q.   Okay.   And life without the possibility of release in federal prison means exactly that, does it not?

A.   That is correct.

Q.   Okay.   And C2, you gave a score of four.

A.   Yes.   In reviewing the documents, as near as I could find, there was no drug abuse history that was documented.

Q.   And C3, mental or psychological stability.

A.   The forms that I read indicated that he was getting along satisfactorily and so that was -- I just put that down as favorable.

Q.   Okay.   And type and number of most serious incident, what does that refer to?

A.   Incident reports are reports for misconduct of some variety in which a person is found guilty, and there were none.

Q.   Okay.   Frequency of disciplinary reports.

A.   It follows there were none.   There is no frequency.

Q.   Okay.   C6 responsibility demonstrated.   What's that

mean?

A. That basically relates to rapport with staff and fellow inmates as well as participation in the Inmate Financial Responsibility Program. And I found that he was, according to reports, he had participated in all of that as he was supposed to. So four or good based on the reports that I saw seemed appropriate.

Q. Okay. And C7, family or community ties.

A. I found no information about that specifically, but I did find another form within the context of the reports that indicated that the staff saw him as average or good in this area.

Q. Okay. And so you add those up and you come up -- you add B and C.

A. No.

Q. Okay.

A. No. The score for the custody total is one score and the other score is a different one.

Q. Okay. And then how do you -- how do you apply that on this document here?

A. Okay. This is called a matrix and in the matrix you go down -- this is -- anyway, his base score, which is seen on the left-hand side of the form, you find the range in which he would fall, which would be fourteen to twenty-two. Go over to -- I hit some kind of a button here. Go over to

twenty-seven, and in this form it came to a minus two. However, that is -- because of the way this printed up, that is an error on my part. It would be a minus one.

Q. Okay.

A. So anyway, that's where it would be is a minus one. Which the minus scoring is a recommendation by the form to decrease a custody level. There needs to be something here for clarification.

Q. Yes, sir.

A. In this matter of scoring, however, because up -- if you bring the top of the form back down because there is a governing issue up here when it relates to the two things. The greatest severity offense is a public safety factor, as well as sentence length. And the greatest severity offense level as it is viewed by the Bureau of Prisons would keep an individual basically out of a camp without further review by the regional office after it had been referred by the institution.

However, on sentence length regarding this issue, on life sentences it restricts the placement of an inmate to a high security facility which is otherwise a U.S. penitentiary. And that is critical because when you get down to the bottom of the form again and look at where I said security total, because of that arithmetic error that came to a fourteen, that would be a medium security scoring, arithmetic scoring.

However, in taking the scored security level with that public safety factor, it then overrides the arithmetic scoring and remains at the high level because that's how it is in the policy. That's what would be restricted. The only way that that would be changed is not something that could be done within the institution or by the warden, but there would have to be an agreement by the team and the warden that they would refer that to the regional office for some waiver. That is the provision and policy that a waiver can be -- can be done. But otherwise, this constraint in that kind of sentence is always there unless this has very high management level agreement that some waiver should be placed.

Q. And a high security classification is a United States penitentiary?

A. United States penitentiary, yes, sir.

Q. Okay. At any time would Marc Barnette ever be in a situation where there were not dual fencing and gun towers?

A. No, sir, I do not anticipate that at all.

MR. BENDER: Okay. Thank you. That's all I have.

CROSS EXAMINATION

BY MS. ROSE:

Q. You don't anticipate that, but you indicated that there are provisions by this waiver policy for that to happen.

A. Uh-huh. I mean -- are you asking a question?

Q. Yes, sir.

A.   Okay.   And what is it?

Q.   You said it's not likely for him to be outside of a penitentiary setting; however, there are provisions within the Bureau of Prisons guidelines for this waiver procedure.

A.   Okay.   Based on my experience in the system and based on what I've observed as a consultant with how the agency still works, the primary value here is public safety with the staff and the executives of the -- of this bureau.   There would have to be -- I don't even know what the compelling factors would be from my experience to move this kind of case to a low type of security facility.   I can't imagine it.   I mean, just based on what I know about how that would not happen.   This is not something that is going to go on by accident or without very high executive review.   And so with that, I have reasonable certainty that this would not happen.

Q.   And the reason is because given this classification, this arithmetic, the defendant is seen as a dangerous person.

A.   Well, he's got a -- yeah, he's got behavior here that they would not see as permissible to put him in a less secure setting.

Q.   And that's because prior violence, prior bad acts are the things that predict future behavior, right?   I mean, that's what this is based on.

A.   Well, you know, I guess if you want to go that way, yes. But that's what all of this classification is and it will --

it will tell you in the preamble of this that they have done the research so they predict this kind of thing. Therefore, when they are kept in a secure environment, the free world, if you want to put it that way, is safe from this individual. He's not going to be out there.

Q. And the environment in which -- in a high security penitentiary within the confines of that fence is not a twenty-four hour a day lock down.

A. No, ma'am.

Q. Tell us about --

A. Generally not.

Q. Tell us about the things that are available to those within the setting.

A. Okay. In a penitentiary setting, the movements are going to be controlled, meaning where they go from their units to their jobs or to food service for dining and all of that sort of thing. So there would be controlled movements within the context of this institution. There is a higher staff ratio to inmate in a high security facility.

What is available to them? Schools are available. Recreation is available. You know, eating in chow line is available to them. Those are some instances.

Q. Whatever magazine subscriptions as long as it's not obscene, they can get whatever magazines they want.

A. Well, I can't really address specifically to what

magazines they can get, but they can get mail, yes.

Q. They can send mail?

A. They can make phone calls -- supervised phone calls that are monitored, yes. The mail is shaken down before it is delivered to an inmate, so --

Q. And they have visitors?

A. Pardon?

Q. They have visitors?

A. Yes, ma'am.

Q. They can watch TV, play cards, play board games?

A. Yes, ma'am.

Q. And within that facility are socialized with other inmates.

A. That is correct. In the general population facility, you are right.

Q. And these are general population facilities.

A. The one as I believe he would be eligible for based on the classification as I see it, yes.

MS. ROSE: All right. Thank you, sir.

MR. BENDER: I have nothing further.

THE COURT: You may step down.

MR. BENDER: May he be excused?

THE COURT: You may be excused.

(Witness was excused.)

THE COURT: Call your next witness.

MS. LAWSON: Thank you, Your Honor. Call Dr. Ann Burgess.

ANN WOLBERT BURGESS,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q.    Good morning. Would you please tell the jury your name.

A.    Yes. It's Ann Wolbert Burgess.

Q.    And where do you live?

A.    I live in West Newton, Massachusetts.

Q.    And how are you employed?

A.    I'm employed at the Boston College School of Nursing which is in Chestnut Hill, Massachusetts, as a professor of psychiatric nursing.

Q.    Would you tell the jury, please, your education.

A.    Yes. I have a bachelor of science degree in nursing from Boston University. I have a master of science degree in psychiatric nursing from the University of Maryland. And I have a doctor of nursing science degree in psychiatric nursing from Boston University, and that was in 1966.

Q.    In addition to your education, would you tell them, please, your professional experience.

A.    Yes. I have had professional experience both as a staff nurse and then I have -- currently have a clinical practice, but much of my time has been in academe, both at Boston

1464

College, Boston University, and the University of Pennsylvania. Those are the three major universities I've been with.

I also have been a research supervisor on a metabolic depression unit at the Massachusetts Mental Health Center.

I have had administrative positions. I've been chair of the departments in which I've been. I've been interim dean of the School of Nursing at Boston University. I've been research -- director of nursing research at Boston University. And at University of Pennsylvania I was in psychiatric nursing what they call the van Ameringen chair.

THE COURT REPORTER: The van what?

THE WITNESS: Ameringen, A-m-e-r-i-n-g-e-n.

Q. Do you currently hold any positions or appointments other than the ones you've talked about?

A. My current positions are at Boston College as well as University of Pennsylvania. Those are the two positions I hold. I also have a private practice so that I do see patients.

Q. Do you treat patients?

A. I do treat patients, yes.

Q. And what is your background in terms of clinical treatment of people and your credentials for doing that?

A. In nursing we have a comparable position where you can be certified, and I am certified by the American Nurses

Association as a clinical specialist in psychiatric mental health nursing. I've been that since 1980.

In the state of Massachusetts, I also have what's called prescriptive authority, which means I can also prescribe medication for any clients, patients that I'm seeing.

So those are the clinical positions and duties that I have now.

Q. Tell the jury a little bit, please, about your work through your career in terms of domestic violence.

A. When I first went to Boston College, I joined with a sociologist, Linda Holmstrom, to begin to understand and to study the problems that women have as a result of being raped. So we had one of the first studies, it was a hospital based study, of women coming into the emergency room with a complaint that they had been raped.

Following that -- and that was back in the '70s when this was an issue that was just beginning to be addressed. The second major part, if you will, of my career had to do with presenting this material, teaching this material to law enforcement because there was a mandate out that law enforcement, especially at the FBI, needed to train their agents in the whole area of rape victimology.

Following this, the whole issue of domestic violence became an issue in the '80s. And so I became involved in that not only in terms of the research I was doing, but also had

the opportunity to be on a commission, the U.S. Attorney General William French Smith commissioned a task force to look at this problem of family violence throughout the country, and so we did that. The commission of twelve of us looked at that and we came up with recommendations for the U.S. Department of Justice of what they could do to try to teach and educate and research this problem more. So that was in the -- in -- about in the mid '80s that our publication came out.

And there was a second important part of my work in the domestic violence field and in 1996 there was a -- what's called the VAWA Act was passed, and that's Violence Against Women Act. And that called for more attention to the problem, but it also called for a survey of the research that had been done in the area. And the National Academy of Sciences was commissioned to do the report and I was fortunate enough to be asked to chair that committee so that we were able to look at all of the literature that is in the area of domestic violence and to come up with recommendations about where gaps were in the area of causes, consequences, prevention, and treatment.

Q. In addition to reviewing the literature, Dr. Burgess, have you contributed to the literature?

A. Yes. Specifically in the area of domestic violence I have been in the last, probably the last five or six years, been focused specifically on trying to understand the -- the domestic abuser. And so I've had two publications in the area

of looking at programs that are available if indeed somebody is charged and arrested for a domestic violence offense, that they would then go into a special program where there would be assessment so we could begin to understand that more. So I've had that opportunity and published in that.

And also have a contract with the Veterans Administration in Philadelphia to look at how their treatment teams are trying to understand whether there are any abusers within their population. So we're designing some survey tools to survey not only staff, but also the patients, the men that come in to the VA just for routine mental health consultation.

Q. In addition to research and publishing, do you also engage in treatment or counseling either for abusers or for victims of abuse?

A. Yes, for victims of abuse. My clinical practice has always been with victims. I have studied offenders. I certainly have evaluated offenders, but I have not treated offenders.

Q. Have you been qualified, Dr. Burgess, as an expert in domestic violence?

A. Yes, I have.

MS. LAWSON: Your Honor, at this point I would tender Dr. Burgess as an expert in domestic violence.

THE COURT: She'll be declared an expert in that

area. Members of the jury, you will remember the earlier instruction I gave you about how to treat the testimony of a person who is described as an expert.

Q. Dr. Burgess, let me also ask you what your contacts have been with the Federal Bureau of Investigation.

A. Yes. In the -- about the mid '70s after some of our publications came out on the rape victim, I was invited to the Behavioral Science Unit at Quantico, the FBI academy in Quantico, to begin to train in the area of rape victimology with not only the special agents themselves, but also with the national academy of -- they have a group that comes in as well as their agents.

In the capacity of doing that, had an opportunity to talk with them about some of the research and the possibility of doing research and really developed a colleague relationship with the behavioral science unit to study serial offenders. At that time that was their mandate: To understand serial sexual offenders. So we studied serial killers. We studied serial -- and that was led by John Douglas and Bob Ressler. Ken Lanning was looking at serial offenders in the child area, child molestors, child abductors, that area.

So those were the two major areas that I worked with probably over about a ten-year period, culminating in one of the projects that we felt was a major contribution to law enforcement was what we call the Crime Classification Manual

which is a way for law enforcement and researchers to talk about various crimes, much as the DSM in the psychiatric field, Diagnostic and Statistical Manual, so it is really a model after that to help law enforcement with talking about various crimes.

Q. Dr. Burgess, the government in this case has retained a psychiatrist by the name of Park Dietz. Do you know him?

A. Yes.

Q. He's here in the courtroom?

A. Yes, I know Park Dietz.

Q. How is your connection with Dr. Dietz through the FBI established?

A. Well, one of the things I did with the FBI, they were -- would periodically ask for recommendations, for names for people who might be helpful to them in their work in a variety of ways. And at the time I did know Dr. Dietz's work. I respected his work. And I recommended him as someone for them to consider.

Q. Dr. Burgess, can you explain to the jury basically what domestic violence is.

A. Okay. Domestic violence -- let's start with violence because violence is something, we can define that. Violence is the intentional aggressive act that injures somebody. So that in itself is just defining violence.

Within violence you have a number of types of violence.

You can have physical violence where there's actual physical injury.

You can have psychological violence which very much is going to be verbal. The kinds of things that are said to people that are injurious. May not be certainly physically injurious, but certainly has a psychological impact.

And then you have sexual violence, sexual abuse is another type of abuse.

Those are the main in talking about violence.

Then when you move to the domestic, what does domestic piece mean? You can have stranger violence, and we're familiar with that where there's no relationship. A person commits a crime and there's no relationship.

But you also can have acquaintance violence where there is some kind of relationship.

And then you can have domestic violence where there is a relationship that is generally based on some type of -- it can be legal, as in a marriage. You can have partner violence or you can have common law violence, domestic. You can also have siblings. You can have sibling on sibling. Some way there is a connection through family is generally what is meant by domestic. Again, it's been expanded so it isn't just a legal relationship, but it can move into the common law or the cohabitating is sometimes what they call it. And sometimes people rather than domestic violence will call it relationship

violence. So there's been a variation, if you will, over the years of how it's described.

Q. Other than the character, you know, the identities of the people who perpetrate stranger violence and domestic violence, what defines domestic violence in terms of its origin, the conduct, things like that?

A. Well, first of all, I wish we knew more about the origins. But we do basically have research that's going on in three major areas connected with domestic violence. One is the biological area; second is sociological area; and third would be psychological area.

As far as the biological area, there's been a lot of activity and a lot of interest in this area. Nothing definitive, so I can't -- we can't say, well, you know, this causes this. But just some of the interesting research, some have said, well, maybe it's related to hormones. Maybe testosterone is a factor here because so many males seem to be more violent than females. But again, that hasn't been proven but it's being looked into.

Sometimes I think it's maybe in the nerve transmitters, the way information in our brain travels back and forth and carries, you know, certain information. So serotonin has been one nerve transmitter that there's been a lot of interest around.

And then you can have such things as maybe a blood

abnormality. There's been some looking at what's called hypoglycemia as a way when the body -- there's a lowering of that, does that in some way activate?

There also is -- don't forget biology is not just genetic. That is a factor. They do not have any gene that is necessarily responsible yet. But other factors in biology could be head injury. There's been a lot of interest as -- you know, could a lot of head injuries be a possible correlating factor? So that there has been that attempt in the biological area.

Sociologically there's been a lot of research and that is where they look at numbers. They will take surveys and they'll take statistics and they've looked at things like age. They've looked at things like gender. Males, age. They've looked at race as a factor. They've looked at poverty as a factor. They've looked at environmental features and periodically come out with various things. But again, nothing really definitive.

One of the major sociological factors that is described in the literature is called the cycle of violence; that there seems to be this, in domestic violence, a cycle that seems to carry on from generation to generation.

Then the third area that there is a lot of interest in is the psychological area and there's been a great deal of research that has looked at could possibly traumatic factors,

FORM FED ® PENGAD · 1-800-631-6989

could abuse be a factor? Is there something that goes on in the development of infants and children and adolescents that may be a factor? So trauma and psychological abuse has been probably one of the more interesting areas. And that's been in the literature for quite a long time, dating way back to the 18 -- probably 1880s when it was noted that there's something about trauma. When the, what they call the stimulus barrier is broken, that there's something about trauma that keeps repeating itself. Again, that gets into the cycle of violence which does cross over into the sociological field.

So there have been a number of interesting areas to look at. They have not come up with a cause, so to speak, but there is a lot of interest and energy being put into studying the problem.

Q. In terms of the multi-generational violence, do you have an opinion to a degree of scientific certainty about whether multi-generational violence, spousal abuse, exists?

A. Yes.

Q. And what is that opinion?

A. Yes. It is my opinion that this does exist. This has, as I said, has a tradition and a history in the literature as well as certainly clinically that there -- the repetition, if you will, of certain patterns of behavior certainly are there. And that can be both individually case by case and that certainly is showing up empirically.

Q. Do you have an opinion to a reasonable degree of scientific certainty as to whether neglect contributes to domestic abuse in some cases?

A. Yes.

Q. And what is that opinion, please?

A. Neglect is really reaching the forefront of troubling areas. The neglect of a child, the neglect in various ways, doesn't have to be, you know, again, that -- there is a wide type. But neglect is looming as a major factor, and I -- my opinion is this is a critical factor.

Q. Now, you're not saying that everybody who's neglected becomes a perpetrator of domestic violence, are you?

A. No, I'm not at all.

Q. Okay.

A. Nor am I saying -- that's where one of the research areas is is that certainly you can even within the same family children that seem -- they seem to get what we call protective factors, that there is something that seems to protect and compensate for that or they're not targeted in a certain way. That there seems to be something in the dynamics.

And that's one other factor of when you have domestic violence, you have what we call dynamics. There are certain things within the relationship, that there can be tension and so forth, and that is very critical in looking at how it may be shown throughout the family to the children.

FORM FED ● PENGAD • 1-800-631-6989

Q. Dr. Burgess, do you know Marc Barnette?

A. Yes, I do.

Q. And did you hear a portion of his testimony and the testimony that followed that?

A. I did.

Q. You've been here yesterday and today.

A. That's correct.

Q. How much contact have you had with Marc Barnette? Could you tell the jury about that.

A. I had two days that I spent with Marc Barnette. I spent July 14th and the 26th. I came down twice and interviewed him here in Charlotte.

Q. Did you mean June 14th and --

A. Did I say June? Yes, June. June 14th.

Q. And June the 26th.

A. Yes.

Q. Okay. And where did you meet with him?

A. I met with him in the jail.

Q. In addition to talking to Marc, did you review records pertaining to Marc?

A. Yes. I reviewed --

Q. Let me interrupt you just a second, if I could.

A. Okay.

Q. The -- do you have a list of the records?

A. I do.

Q.   Starting with item number 2, would you list those records, please.

A.   Yes.  I have Mr. -- I reviewed Mr. Barnette's school records, his employment records, his medical records, and I reviewed all the material that had been prepared by Paul Williams and Cindy Maxwell.  Just keep reading?

Q.   Yes.

A.   I reviewed volume one and two of mental health expert reports and trial testimony, prison medical records, transcribed interview of Robin Williams dated 5/30/96, transcribed interview of Benjamin Spencer Greene dated 5/1/96.  I reviewed transcribed interviews by the Mecklenburg Police Department dated 6/25/96 and 6/28/96.  I also looked at videotaped and audiotaped copies of police interview.  I looked at all of the discovery materials, police reports and statements regarding the 11/12/93 incident at Bojangles.  And I also reviewed the police report on the 1974 homicide of Pearl Henderson Brown.

Q.   In addition, did you talk to any people other than Marc Barnette?

A.   I did.  I talked with his mother, Sonia Barnette, and I talked with his -- by telephone with his father, Derrick, and with his brother, Mario.

Q.   Did you also view the scene of the murder of Donald Allen?

A.    I did, yes.  I saw that, yes.

Q.    As well as the -- the Barnette home at the corner of Billy Graham Parkway?

A.    That's correct, I did that, yes.

Q.    Tell us what your purpose was in talking to Marc Barnette, reviewing these records, and interviewing these other sources.

A.    My purpose in interviewing both Marc Barnette as well as reviewing all the materials was to try to understand what had happened, to try to explain what had happened, how this had come to this point.  So that it gave me both official versions because I had official versions.  I also had the interview with Marc.  I had collateral information from how his father and his mother and his brother had known Marc growing up.  So that I try to get as complete a picture as possible with the intent to explain how this happened, why this happened in the best possible way I could.

Q.    Do you have an opinion to a reasonable degree of scientific certainty as to whether or not these murders were part of a domestic homicide?

A.    I do.

Q.    Would you tell the jury your opinion.

A.    My opinion is that it -- this is what is called a crime spree that lasted over an extended time period from April 30th through to June 26th, I think it was, of 1996 in which it

escalated over time, but it was all part of his attempt to reengage with his ex-girlfriend Robin Williams, and that all of the activities and the criminal activities that we see within that time frame is focused on his obsession to get to his ex-girlfriend to reunite with her.

Q. Did you see any similarity in the events of -- between the firebombing and the murders in other conduct of Marc Barnette?

A. Yes, I did.

Q. Would you explain that, please.

A. I really saw a clear pattern of this kind of -- not certainly to the degree, but this kind of obsessional need to reunite the relationship with prior girlfriends and his thinking. I think what's important here is his thinking and the way that he presents his thinking and the way that he talks to the young women is very, very similar. That he gets into this pattern of he gets into a good relationship, everything seems to be going well, and then gets into this thinking that there's infidelity, thinking that there's jealousy. All of those negative feelings come forward and then he starts to try to control the relationship, and that's where the physical abuse can come in. That's where the verbal abuse can come in. And it's always the cycle and it never gets resolved. It just goes from young woman to young woman, from girlfriend to girlfriend. Because what happens is the

girlfriend pulls away; and the more she pulls away, the more he tries to re-establish the relationship and it just doesn't work.

Q. To what extent does that behavior have its roots in the way Marc was raised and developed?

A. Well, I think it has its roots very much in the way he was raised and developed. And when we go and look at child development, one of the most important things that they say about children, infants and children, is to attach, is to bond, is to develop a good relationship with a caretaker. Usually that's going to be a mother or a father, or both. Other people, of course, can be important.

But what happened, when you look at his history, is that there are a number of serious failures in that. First of all, a major caretaker dies, the grandmother. Even though he's very young, it still for the child is going to be -- can be registered in memory at a nonverbal level because we know that children certainly do react. Don't necessarily be able to tell you about it, certainly can't tell you about it years later. But at any rate, the experience happened. There are multiple caretakers. Even as we've heard with the father in and out of the situation because of his military commitment and, you know, natural kinds of things that happen.

But that failure to bond, to attach is very much what is in the literature to explain why some people are unable to

take rejection, to separate without having enormous anger, which really is covering up feelings of sadness, of feeling unworthy, whatever the painful feelings are. It's the anger and the rage that you see.

And so I do think that the roots of this are in his early childhood development where attachment was real anxious attachment, if you will. The anxiety of who is going to be there for him; as well as being overly attached, if you will, because he wants so much to have and the need to have the girlfriend as an adult, of course, not as a child. The child's need for the mother is always important and that seems to have some serious deficits.

Q. You mean in Marc's case.

A. Correct, in Marc's case. His -- the attachment with his mother.

Q. To what extent has his need for attachment influenced Marc's behavior with his specific girlfriends and his reaction to that?

A. What he seems to do with each successive girlfriend is the pattern of things go well, but then he begins to get suspicious. He really -- the suspicion and the infidelity has been there from the, as we heard yesterday, the domestic violence where things are said, parents are challenging each other about issues of fidelity. So that becomes a theme.

He really becomes programmed. We all get programmed, if

FORM FED · PENGAD · 1-800-631-6989

you will, in our own families, but for Marc it's very clear that it's suspicion, it's paranoia, and it's this domestic violence as a theme.

And so with each successive girlfriend, when there is -- he gets close to her, it's almost like he has to start distrusting her because he can't tolerate the closeness. So even though he wants to love her, he really can't trust her. And that starts into maybe, you know, you're unfaithful, all the paranoia, all of those things. He finds little things in the relationship, and clearly this is not going to work in our adult -- or even in adolescent relationships. So the -- the only thing he knows to do is to become aggressive and physical to try to regain and re-establish that relationship.

Q.    There's been testimony in this case from Crystal Dennis and Alesha Chambers that Marc didn't want them to wear makeup or dress in clothes that might make them attractive to other women (sic). How does that fit into this situation?

A.    Well, that fits in very well with his need to control. Domestic violence, there is a coercive control in the relationship which, of course, is not a mutually receptive relationship. So he does these things that he thinks is going to make her not be attractive to other men. So it's still based on suspicion. The clothing, the makeup, that in no way make yourself attractive, is his thinking, so that any other man will be interested. So he thinks he can control that.

Which, of course, is faulty logic. But that's the way he tries to control her. And that's not unusual in the -- certainly the studies that I've done on batterers. That's a very common kind of position.

Q. Did you hear the testimony of Mario Barnette yesterday about the life that they led in Georgia with his mother and his aunt getting dressed up and going out?

A. I did.

Q. What significance is that to you in terms of evaluating Marc's behavior and personality structure?

A. Well, two things are important there. One is they're getting dressed up and going out and having -- obviously, looking like they're going to have a good time. So that says, well, you go outside, you don't stay inside to have a good time with us. So that's from a -- from a -- from a parent's standpoint.

I think the other second thing that was important is that they would not say where they were going. They might say they were going out to the store or something like that. So that could very much mislead a child. And they quickly, as we heard, caught on that that was not where they were going. But it really leaves the child with the emptiness, the sadness, those kinds of feelings. We're not -- you know, we're not as worthy and they were -- that clearly can be seen as emotional neglect.

Q.  You talked about his need to attach.  Is that what you call an attachment injury or relationship injury?

A.  Yes.  In the literature that is exactly what it's being called.  In other words, Donald Dutton is one of the foremost writers on that and Reid Meloy that talk about the pathology of attachment; that there is a definite failure in the ability.  Either they become overly or anxious in the attachment and so they're need to continue to re-establish a failed relationship is tried.

Q.  Do you have an opinion to a reasonable degree of scientific certainty whether the -- Marc's violence increased over time in terms of his domestic partners?

A.  Yes.

Q.  What is that?

A.  Yes, it did.  And again, this is not necessarily uncommon to see.  That the more something goes on, the more desperate somebody becomes, the more they're going to try their only way of handling it and by -- for Marc, this is to use physical aggression and to use other kinds of things to -- in a desperate attempt to try to regain the control.  So that definitely it did in my opinion escalate.  Especially when it isn't curtailed.  That's one of the important things that there are no limits set on it.  That's the purpose of either some kind of intervention, treatment, whatever, is to stop it, prevent it.  That didn't happen.

Q.    You are -- well, there's been some testimony about an incident involving Alesha Chambers and her Uncle Jasper where Marc kicked in the door and ran into the room to get to Alesha and didn't seem to notice there was anybody else in the room. Are you familiar with that?

A.    I am.

Q.    Did you review the records?

A.    I have.

Q.    What -- of what significance is that to you in formulating your opinions about Marc and his condition?

A.    Well, it is a -- it's an example of how obsessed he was, how, if you will, mission driven he was to get to the girlfriend, the ex-girlfriend. So that anybody that was in the way is just going to be pushed out, whether it's a door, whether it was a person, or whatever, because that's all he could think about in his, what I call his faulty logic of thinking that this is going to work because it never does, but he doesn't understand that. That's really his irrational thinking that by doing this, he's still going to somehow reclaim the relationship.

Q.    Do you have an opinion, then, as to what Marc's purpose has been consistently in terms of going after his girlfriends?

A.    Yes. His purpose has been -- and he says it quite clearly. Every time there is a breakup, he says, I just need

to go and talk with her. I just need to hear from her and explain. And I need her to tell me what happened. And again, he doesn't understand his behavior in the matrix of the relationship and he -- as I said, he says it quite clearly with each successive girlfriend.

So it's a repetitive, repetition kind of -- there's even a jargon term in psychiatry that calls it repetition compulsion. He just is compelled to do it over and over, the same thing.

Q. Now, you've mentioned treatment. What kind of treatment is appropriate for somebody who's exhibiting these kinds of symptoms or behaviors?

A. Oh, there is -- again, this is important. You try to get treatment the very minute there is any type of infraction. But it's difficult with young males. We find it even difficult with men that are arrested for battering. They have to be ordered into counseling because it is seen as such a nonmanly thing, or whatever you want.

But we clearly believe that there are such programs as anger management. Prime -- would have been a prime thing for Marc to have anger management. His impulsivity. His inability to put time between having a thought and acting because he just seems to act. That would be one. Certainly, the -- the counseling in terms of his early childhood would be important.

He has many things that I think he has suffered with that should have been addressed. One, certainly, a delayed grief reaction is something that I felt that he had. He really lost his father at a very critical age when he was a young adolescent and nobody really worked with him to help him understand all of that. So part of the acting out, if you will, is a cover over of the sadness and the grief. And in many ways lost his mother emotionally in that move to Florida -- to, I'm sorry, to Georgia.

So from a counseling standpoint, there were multiple times that you try to reach young people even at the school level. Sometimes they will try to identify a child that's in trouble when he had moved to that new school. That would be another opportunity.

Q. Now, the evidence is that Marc was ordered to go to something like an anger management program when he hit Crystal Dennis and her children. And he -- well, he didn't go.

A. Right.

Q. What is your perspective on that?

A. Well, my perspective is they have to go. That they have to be -- that it has to be mandated. It has to be followed up. You just can't say to somebody, well, you have to go into counseling. That rarely works. We have found that out in many, many areas. That isn't just with young teenagers. But he -- there should have been provisions to enforce this. We

know so much more now than we did about domestic violence and that's critical to catch it early and to intervene and to stop it.

Q. How aware are domestic abusers of the fact that they've got a problem?

A. They're not aware. They use what we call very primitive defenses. They deny that there's a problem. It's not me; it's always somebody else. They project out. It's always her; that she did something or, you know -- I mean, they'll get into that kind of thing. So it's very hard. You have to work through the denial before you can actually get to any of the important issues.

Q. Do you have an opinion to a reasonable degree of scientific certainty as to whether at various points during his childhood Marc suffered from depression?

A. Yes. I do --

Q. What is that?

A. -- believe he suffered from depression. We have some indication in the record that he made some attempt, even though they seem very minor, but the point is it was -- there was an attempt and nobody talked with him. I think he was quite young, at about age eight. He certainly was older as a teenager when he makes some more attempts. And it's always critical to pay careful attention to that even though it seems like it really wasn't a big thing, like maybe he just took

some pills or so forth. It's very -- very critical to find out what is going on in a young child that even would make them think to do it even if it's a very weak attempt. So that we saw on the record at least two or three times when he's not even a teenager and then as a young teenager.

Q. Are you familiar with the episodes of going into Tasha Heard's closet and crying?

A. Yes. I -- yes, that -- he would come there and he would cry. I think the other important observation that is threaded throughout everybody's report is the crying. And that is unusual. It would be an important behavior to pick up and find out why was he crying? Why would this young boy be crying? And again, that example. There are others where when he is trying -- extracting from a relationship, that there would be periods of crying and then kind of pulling himself together.

So again, all of those -- there was also one other very important observation by a detective that had put in a very clear description of how troubled he saw Marc at -- one time and I guess it was with Alesha.

Q. Mario Barnette was raised in the same family and has no history of domestic violence. Can you address that?

A. Well, Mario was, don't forget, four years younger so we're looking at a critical time period of Marc in those, say, the first four years. Then Mario comes into the picture when

there starts to be some stability because the father's assignments, or whatever, the family starts moving because of the military. So that the father is in the home. The father does -- is strict. He certainly is a strict disciplinarian. And for Mario, that -- who also has the older brother, as Marc is an older brother, who also does play a protective role.

Yeah, he experiences things quite differently. That's not to say that he still doesn't have a lot of feelings and thoughts about it, but he doesn't act them out as we see later on for Marc.

So I would say the early years, those critical first four or five years were critical for -- for Marc that Mario did not share.

Q. Do you -- have you found any evidence whatsoever from the records or in your conversations with Marc and collateral sources, that anybody attempted to get any mental health assistance for Marc when he was growing up?

A. No, I don't see any active outreach for that and that's what you really look for, active outreach, which is what you generally have to have. I didn't see that.

Q. Okay. In reference to Marc's relationship with Robin Williams, how did the deterioration of that contribute to these tragedies?

A. The relationship started, as I understand it, quite -- quite fast. It was a very fast engagement, so to speak. But

then as the relationship developed, a major source of concern for Marc came up with this, what he -- what she described, what Robin Williams described as an old -- I guess old high school friend. Of course, given Marc's paranoia and his suspicion, he immediately thought that this was an old boyfriend, so that makes a slight difference. And then when he finds certain items of hers, it just flares up. The jealousy, the rage, the -- you're lying, you're not telling the truth. And that's when it starts into the final phase, if you will. First of all, they split up because he's becoming more and more, as we've seen with other relationships, more and more possessive and controlling and that isn't the way she wants a relationship.

So it culminates when they have separated with this new person being introduced. This is, I think, the first -- certainly a person that he can identify. He doesn't know it's this man. He asks her. Evidently doesn't give her the name and so then he says -- that's his, aha, you have lied to me. And that's what sets him into motion to go and talk with her and tries to do it in a very failed way, of course, with the firebombing. Again, his logic and how he puts it all together is very flawed.

And then when he's not caught in that next six weeks when he fully is expecting to be picked up, it doesn't happen. And he's just brooding and obsessing over this, has to find out.

And so he sets out on this course to find out and to ask her about it.

And of course, when we hear what he tells the police after he is apprehended is I just wanted to talk to her. I wanted her to tell me about it. I even wanted her to -- we'd go and see this Benny Greene. Again, it's that same scenario that we've heard over and over. But this time it was very intense. This time it had escalated and obviously what ended up in a double tragedy.

Q. What was the quality of Marc's thinking, his logic, his reasoning in that period of time after he broke up -- Robin broke up with him?

A. Well, his thinking, in my opinion, his logic is always flawed. This is not logical thinking. It's not rational thinking. It's really based on much of the way he's learned through the family of this infidelity, the suspicion, this paranoia. So he filters everything through that. He's never had a chance to really have anyone challenge him and say, you know, this doesn't make any sense. What is wrong? So that's what -- what occurs.

Q. Did his mother tell you anything about his hair and his thinking?

A. Yes. In this period of time when he is at home waiting, assuming that the police are going to pick him up because they knew where he lived, he shaved his hair. He shaved his head.

But the reason being he needed -- he couldn't think as clearly with the hair on his head. Now, again, that's a very illogical type of reason for shaving one's head; but to him, he had to do it. So it's almost that he just had to do it. It gives you an idea, I think, of the way he was thinking, how disturbed his thinking was at that point.

THE COURT: Okay. We'll need to take our break. Members of the jury, remember the usual instructions. Thank you.

(Brief recess at 11:20 a.m.)

THE COURT: Anything for the court before we begin?

MS. LAWSON: No, sir.

THE COURT: May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: All right. The jury is with us.

ANN WOLBERT BURGESS

DIRECT EXAMINATION (Cont'd.)

BY MS. LAWSON:

Q. Dr. Burgess, in your experience and clinical judgment, does a person who abuses other people in a domestic violence situation enjoy perpetrating the abuse?

A. No. It's not been my experience that they enjoy perpetrating the abuse because they are doing it for different reasons. They are doing it to keep control of the individual and it's in that service that they're doing it. That's not

been in any -- certainly any of the studies we've done, that's never been alluded to.

There is a biological piece to the battering, if you will, so that there is a release of tension after they have inflicted this aggression and that is one of the explanations for the cycle of violence where they have the honeymoon phase and they go into the aggression, and then after that it goes back again to a more peaceful kind of plateau. But I can't think of any literature that suggests that they enjoy it.

Q. Now, there has been some testimony about Marc hitting Crystal Dennis's children with a coat hanger. You're familiar with that from your review of the records?

A. I am.

Q. Could you tell the jury what part that plays in all of this.

A. Well, the -- that plays -- again, that shows his programmed learning is -- when I asked him about it, he said, well, his father had disciplined him and so he was just disciplining these children. What he fails to take into consideration, again, the flawed logic, is these are small children, three and five, and the amount of injury, whatever there was there. But in his mind, his -- this was sanctioned. This was okay to do in his family.

Q. Would you have considered that an act other than within the domestic context?

A.   No.  I see this within the context because it is family. It's a caretaking type of role.  It's not necessarily that he's related to these children, but he is being put into the caretaker role.  So in that -- it's a domestic -- in my opinion a domestic situation.

Q.   There's also been testimony about Anthony -- about Marc shooting a fellow by the name of Anthony Britt during a confrontation at some railroad tracks.  Can you define that in terms of Marc's overall history of violence.

A.   Right.  My understanding is that's still within the context of a relationship.  It's not like it's a stranger kind of thing.  So again, it falls into that -- it certainly is not a direct relationship, but it has that need to defend and need to protect and that kind of context.

Q.   So would you consider both the assault on Crystal's children and the shooting of Anthony Britt to be domestic type crimes?

A.   I would, yes.

Q.   What -- what drove Marc from the period before the firebombing through the end of this period, through the end of June?

A.   Well, Marc has what we call clearly obsessional thinking.  In other words, he gets very focused.  Obsession, definition of that is it's a repetitive, intrusive thought that just keeps coming into the mind without the ability to

kind of put it out of the mind and it's persistent. And this is what happens. This is what gets into his mind and he doesn't have the ability to put it out of his mind or to substitute anything else. So the more he broods about it, the bigger it can become and the more intricate it becomes. So it's -- if you will, it's a very self-contained kind of thinking pattern that drives him to the tragedies that occurred.

Q. And is that obsessional thinking related to everything that he thinks about or to just a specific area?

A. No, he's just focused on this one area. This is the one driving thought in his head. I mean, we have had testimony that he really didn't do much of anything else when he's in this time period. He isolates himself. He isn't eating or sleeping. So he's just focused in on that.

Q. Now, there have been some questions about the fact that there are women in some prisons. Can you address that in terms of how it relates to Marc and his future?

A. Well, the issue of women is Marc gets into difficulty when it's in the context of some type of relationship, some kind of boy/girlfriend type of relationship. It's not in the context of doing -- you know, doing daily routine and things like that. So I don't see that there -- you can make any connection between the two. He does, as we've heard, follow orders well. Does what he's supposed to do when he's in a

structured setting. So we've been talking about how his thinking becomes when he's in an unstructured setting, when he's in the community. So I would say there's no connection.

MS. LAWSON: Thank you very much.

CROSS EXAMINATION

BY MS. TOMPKINS:

Q. Dr. Burgess, you talked a little bit at the beginning of your testimony about your various areas of expertise, correct?

A. Yes.

Q. And you have a great deal of expertise in rape trauma; is that right?

A. Correct.

Q. And in domestic violence.

A. Correct.

Q. Tell the jury about the trauma involved in being the victim of domestic violence.

A. Well, the trauma involved in being a victim, what we've seen in looking at, if you will, battered women is the difficulty that they have in extricating themselves from a relationship. And they certainly suffer in terms of the physical abuse, the psychological abuse, all of that. But again, because you've got this context of this relationship, it's just very, very hard -- one of the biggest difficulties we have when we're working with women is to help them

extricate -- remove themselves from the relationship to be able to get help for themselves and for their children. So that's -- I mean, it's certainly traumatic.

Q. And tell the jury about your expert opinion about the trauma involved with being a rape victim.

A. Well, the rape victim, again, you have to look at who is the assailant.

If it's a stranger, it's one type of issue that has to be worked through. Someone that didn't even know me, you know, does this to me.

When it's within a domestic situation, then you have the added problem of somebody who knows me and cares about me can do this to me.

So you have different what we call levels of trauma, but it's a tremendously, just in general, it's -- all the literature agrees certainly on my work that it's a devastating experience for a woman regardless of her age. It's very traumatic.

Q. Would you agree that family violence is a widespread problem?

A. I absolutely would and probably underestimated how widespread it is.

Q. Now, in your report that you prepared, you reviewed previous reports of other psychologists and psychiatrists, correct?

A.    Yes, I did.

Q.    You, though, however -- you're not a psychologist or a psychiatrist.

A.    No, I'm a psychiatric nurse.

Q.    You reviewed police reports.  You reviewed prior testimony of witnesses; is that correct?

A.    That's correct.

Q.    Now, in your report you give a factual rendition of the events that happened in this case, correct?

A.    Yes.

Q.    And is that based on both your review of the record and your interview with the defendant?

A.    Well, it's all of the materials, yes.

Q.    Okay.  So that's a yes?

A.    Yes.

Q.    Would you agree that when you're doing a forensic diagnosis, that having the facts correct would be important?

A.    Yes.

Q.    Would you also agree that inconsistencies in stories you resolved in favor of the defendant?

A.    Not necessarily.

Q.    Well --

A.    I guess it would depend on the inconsistency.

Q.    Okay.  In your report, you use the phrase that the defendant, quote, traveled to Knoxville, Tennessee, went to

church and twice attempted to take his own life.

A. Correct.

Q. Wouldn't it also be fair to say that he fled to Tennessee to evade the police and avoid detection?

A. I guess you could say that.

Q. Okay.

A. Fled, yes.

Q. Now, you didn't put in your rendition of the facts, did you, that the defendant while in Tennessee stole a Tennessee license plate and put it on his car to further avoid detection?

A. No, I did not, that's correct. I did not.

Q. Now, were you aware that the physical evidence related to the tail pipes did not -- was not corroborated, the physical evidence did not corroborate the defendant's story of having twice attempted suicide?

A. I understand that now, yes.

Q. Now, in your report you said that, quote, Barnette told police that he killed Robin Williams and he had killed Donnie Allen.

A. Yes.

Q. Now, are you aware that Barnette didn't tell the police about Donnie Allen until they told him that he was a suspect?

A. Well, as I understand his testimony yesterday, it came out in the context of the interview, that's correct.

Q. Okay. So after he was presented with evidence that he was a suspect in that case.

A. No. I believe it came out that they were investigating a missing person case and could he -- could he help them, is the way I remember the testimony.

Q. Correct. Right. They told him.

A. Well, they said they were investigating a missing person and could he help them, so I think he did help them.

Q. Okay. Now, you had mentioned in your report, quote, items recovered from the Honda included a June 23rd church bulletin, duct tape taken from the tail pipe, garden hose, and love letters.

A. Yes.

Q. Okay. You do realize that there was no duct tape taken from the tail pipes.

A. All right.

Q. Okay. And would you agree that you failed to mention that the other items that were recovered from that scene -- or from the car, actually, was a flashlight with a red colored lens matching the one on the shotgun and handcuffs?

A. Yes. That was in his bag, as I recall.

Q. Okay. From the car.

A. Oh, from the car.

Q. Do you understand or do you realize that from the vehicle shotgun shells, a second flashlight with the red colored lens

and handcuffs?

A.    Right.  Yes, I knew that was --

Q.    You didn't mention that in your report.

A.    Well, I had it that he took a bag and I didn't list all the items, that's correct.

Q.    Okay.  In fact, in your report you failed to mention at all that found in the dumpster was the sawed-off Winchester shotgun with the taped on flashlight, dark clothing, bolt cutter, and crowbar.

A.    No, I do have in the report where I call it a disorganized crime scene that the items that he discarded were found in the dumpster.  What I didn't do is itemize them all. I just lumped them together as items in the dumpster.

Q.    Let's talk about the disorganized crime scene.  That's a -- does that come from your crime classification manual?

A.    It's a term that the FBI use in looking -- going to a crime scene and looking at whether it's organized or disorganized.

Q.    And whether a crime scene is organized or disorganized sheds some light on the defendant's mental status at the time of the crime; is that right?

A.    It may or may not.  Depends on how it's going to be used.  But usually they're looking at it in terms of finding a suspect.

Q.    Okay.  But can it be used to recreate the defendant's

mental status in looking at how organized or disorganized the crime scene is?

A.    Yes, they can.

Q.    Now, wouldn't you agree that when -- if the defendant purchased a firearm using a fake ID a month before the murders took place -- in fact, did that twice -- that that would be a sign of organization?

A.    Yes.  And I have that as he has elements of structural organization to all of this.  Yes, I did cover that.

Q.    Now, would you agree that in the days before the crime, the defendant sawing off the barrel of a shotgun and sawing off the stock of the shotgun, attaching a flashlight and basically preparing a murder weapon would be an element of organization?

A.    Yes.

Q.    Now, would you agree that packing a bag in the days preceding the crime to put in potential tools that he may need as he formulated his plan to travel to Roanoke and murder Robin Williams, that would be evidence of organization?

A.    No, I wouldn't add the murder of Robin Williams.  I think that he clearly did pack a bag with all the items that we've just said and he intended to travel to Robin to see Robin Williams, yes.

Q.    Well, would you agree that traveling to Roanoke to see Robin Williams, having murdered someone for their car, armed

with a shotgun and blasting his way into the home and chasing her would show some amount of intent to kill?

A.   Well, it certainly shows mission.  It certainly shows obsession.  It certainly shows that he's intent to get to her.  Yes, I agree it shows all of that.  But we do have the report that he gives to the police afterwards that he still intended to confront her to find out why she was doing this to him so that there was built in to his statement another piece of time that never got played out because, of course, of what happened.

Q.   Well, isn't it true that it never got played out because the defendant's approach to the Williams household was one of violence?

A.   Well, one of the things that you do get into with domestic violence situations -- it's not only in our report, but in all kinds of literature -- is that there is this dynamic, that there is -- the amount of tension, of emotion that is contained in the confrontation plays a part in all of this, and that's what I was trying to say.  That there is not necessarily this point A to point B with intent.  It doesn't -- I don't see any evidence that it came through that way.

Q.   Okay.

A.   But rather, there was other thoughts in his mind that he wanted -- he wanted an explanation.  He even wanted to go see this Benny Greene.

1504

Q. Now, would you agree, back to the organization versus disorganization, that walking eight-tenths of a mile to a dark intersection to lay in wait for a vehicle to carjack would be evidence of organization?

A. Yeah, we've already said that. I'm talking about the crime scene.

Q. Okay. So am I.

A. I mean, back to that crime scene. Yes, that certainly does.

Q. All right. Now -- and I'm talking about the Donnie Allen crime scene.

A. I understand, yes.

Q. Would you agree that waiting thirty minutes, up to thirty minutes for a vehicle to come by was organization -- an organized thought process?

A. Well, he's waiting.

Q. Yes.

A. We don't really have what's in his thoughts at that point, but he's waiting. So, yes, he's waiting.

Q. Now, would you agree that marching Donnie Allen from his vehicle into the woods and shooting him three times was a purposeful organized act?

A. Well, the way that that tragedy occurred is that there was an obstacle perceived by Marc and there was an opportunity. Unfortunately, the opportunity the obstacle

overcame. And we did see some of his thinking about why he did that and --

Q. So are you --

A. -- overcame that.

Q. -- saying that Donnie Allen was collateral damage?

A. No, I didn't say that. I'm saying that he needed a car. That's the opportunity. That Donald Allen is part of that. Then gets us into the second part of the obstacle.

Q. Okay.

A. And that's -- that's where the tragedy occurred, yes.

Q. Now -- I'm sorry. Are you done?

A. I'm done.

Q. Would you agree that when Marc Barnette got to Roanoke after driving three and a half hours?

A. Yes.

Q. And that he waited at a place where he could see the Williams house but couldn't be seen, that that's evidence of organized thought?

A. Well, it's his mission. He's intent. He's got to get access to her. So in that context, yes. There certainly is some structural organization to it. But then when you get to the actual crime at that location is where it becomes very disorganized.

Q. Wouldn't you agree that cutting phone lines so that they couldn't call 9-1-1 is again an organized logical process?

A. Yes. Yes. He had done that before. That's right.

Q. And do you understand or would you agree that Mr. Barnette had to reload that shotgun several times in order to continue on his mission?

A. Yes. We heard that yesterday.

Q. And that that was -- that's evidence of organization, organized thought. I have fired all of my shotgun shells and now I need to reload.

A. Well, it's -- yes, it certainly is putting him into his mission position, yes, that's true.

Q. Wouldn't it be an organized thought process when he blasted his way into the house and confronted Bertha Williams, that he leveled the shotgun at her and threatened to kill her to get to Robin?

A. Right. He is going to get anyone in -- his mission is to get Robin so anybody in the path is in a very dangerous position. Yes, I agree. And that's moving him towards his confrontation with Robin, yes.

Q. Exactly. A thought process, an organized thought process --

A. No.

Q. -- I am trying to get to a person; get out of my way.

A. It's an irrational thought process the way he's doing it, but, yes, it is -- he's mission oriented. He's obsessed with getting there, that's correct, yes.

Q. And when the defendant saw Sonji Hill calling the police and pointed the shotgun at her to tell her to get off the phone, that was -- that was an organized thought in order to continue his mission.

A. True.

Q. Now -- and again, we've gone through, would you agree that fleeing the scene to another state, hiding the ownership of the vehicle outwardly by taking a license plate off, taking the inspection sticker off, would be evidence of an organized thought process to evade detection?

A. Well, he certainly is trying to get away from the scene. It does not show clear -- he doesn't get away with it. I mean, I think the important thing is when you're looking at disorganized versus organized, he very easily is caught. Everybody has seen him. He's in plain view. So he really doesn't even have to do any of that because there's not going to be any problem in getting him, and they essentially do. He certainly does some things to try to avoid detection, that's correct.

Q. Wouldn't you agree that --

A. But --

Q. I'm sorry, go ahead.

A. I was just going to say, in a disorganized crime scene, it's usually the police have a lot of difficulty in determining who's done it. Organized is where it's very

difficult for them. And this is a case where everybody knows who did it and they quickly do find his weapons.

Q. Wouldn't you agree that the people who witnessed, including Ms. Williams witnessed her daughter being murdered, they knew, and the 9-1-1 tape says Marc Barnette on it?

A. Correct.

Q. Would you agree with that?

A. Right.

Q. Now, nobody knew, wouldn't you agree, who killed Donnie Allen?

A. That's correct.

Q. And that Mr. Barnette's attempts to evade detection were specifically directed toward his association with Donnie Allen.

A. Yes.

Q. Okay. And that's why it's an organized thought process, is it not, that he was attempting to disassociate Marc Barnette with the Donnie Allen murder?

A. No. See, I wouldn't agree with that because it's so easily -- he completely cooperates the minute they say we're looking for this missing person. He does try some attempts to get himself -- he has to get back to Charlotte, so he does go through as you've just described.

Q. Well, he wasn't arrested in Tennessee, was he?

A. No. He was arrested in Charlotte.

Q. So he successfully evaded detection in Tennessee as he wished.

A. That's true.

Q. And when he drove back to Charlotte, he successfully evaded detection for a time.

A. Well, not a very long time.

Q. For twenty-four to thirty-six hours.

A. But they certainly knew where to locate him.

Q. But he wasn't arrested in Charlotte -- isn't it true, that he didn't, in fact, go to his home on West Boulevard when he got to Charlotte?

A. Not immediately, correct.

Q. In fact, he went to another place and dumped that car and hid the weapon.

A. Correct.

Q. So wouldn't you agree that's an organized crime scene?

A. No, I wouldn't agree it's an organized crime scene. A crime scene means -- it's a little different than what I think what you're --

Q. Okay. We'll agree to disagree on that.

A. Okay.

MS. LAWSON: She interrupted. Objection, Your Honor. She should finish her answer.

THE COURT: Well, just ask questions.

MS. TOMPKINS: Thank you, Your Honor.

Q.   Now, you reviewed, I'm sure, Robin's statement to police that she gave after the arson.

A.   I did.

Q.   Now, your report mentions Benny Greene several times. And in your report you refer to Benny Greene as Robin Williams' ex-boyfriend.

A.   Yes.

Q.   Would you agree that no where in any of the police reports or interviews is Benny Greene referred to as Robin Williams' ex-boyfriend?

A.   Right.   It's unclear ex -- well, friend, right.

Q.   So it's not unclear, is it?

A.   Well, in his mind.   In his mind it's a boyfriend.   In Marc's mind.

Q.   Okay.   So -- so that's one of the times where you took the defendant's word for it rather than the evidence in the case.

A.   Well, my point being, this was at the crux of the whole -- what gets played out is this Benny Greene.   So in his mind it's very important.   So, yes, I put it because it wouldn't make sense to just say this is just a -- why would he -- why else would he be so intent on getting that relationship clarified if he wasn't concerned that this was a boyfriend -- ex-boyfriend -- or current boyfriend?

Q.   So it makes sense for your report that he be typed as an

ex-boyfriend.

A.    Because -- right, because I'm trying to explain what happened.  You know, why he went on this crime spree.

Q.    Right.  But you agree that, in fact, Benny Greene was a nonromantic friend.

A.    That's my understanding from his testimony, correct, yes.

Q.    All right.  Now, in your factual rendition of the arson, you say that, quote, two small containers of gas had been poured on the window sills.

A.    Yes.

Q.    Now, you failed to mention, but are you aware that the defendant yelled, Die, bitch, die, as he threw Molotov cocktail like containers at the apartment?

A.    I understand that's what he said.  He's not quite clear what all he said, is my remembering of his testimony.  He said he could have even -- he didn't have clear memory of all the things, but I do remember that, correct, yes.

Q.    Okay.  And were you here for his testimony when he testified that he had, in fact, yelled, Die, bitch, die?

A.    Yes, I was.  I'm not sure I was here for the first day.

Q.    In your report you mentioned that, quote, after confessing to his mother and best friend, he waited at his mother's home for the police to arrest him, end quote.

A.    Yes.

Q. Okay. Now, did you review Steve Austin's testimony about Barnette's conduct in between the arson and the murder?

A. I think you need to refresh my memory.

Q. Well, let me just strike that. This is the -- this is in reference to after the arson and before the murder, you said in your report, quote, after confessing to his mother and best friend, he waited at his mother's home for the police to arrest him.

A. Yes.

Q. Okay. Now, are you aware that Steve Austin, the defendant's best friend, testified that in that period of time, they went out and partied and met girls and went to clubs?

A. I didn't hear that testimony, but I -- okay. Yes.

Q. And did you know that Steve Austin also testified that when he went out with Mr. Barnette, he didn't pick him up at the West Boulevard home; he, in fact, picked him up out on Independence Boulevard near Monroe Road and, in fact, dropped him off there. Are you aware of that?

A. I don't remember that detail.

Q. So it's possible, then, that in between the arson and the murder, that the defendant was, in fact, hiding out at his cousin's apartment rather than waiting at home to be arrested.

A. Well, obviously, he did other things over that six-week

period. I don't think that that was in the service of hiding out, I really don't. I really think that had the police come, they would have been able -- people knew where he was. So that -- I wouldn't agree that he was hiding out. He certainly was there.

Q. Okay. But it's certainly a possibility.

A. I don't know that it's a possibility. He fully expected to be apprehended.

Q. Now, isn't it true that a person who wants to turn themselves in can dial 9-1-1?

A. That's true.

Q. Are you also aware that in that period of time between the arson and the murders, that the defendant -- well, that cards written from Robin Williams to the defendant were found on Robin Williams' car at her brother's house?

A. Right. I heard that testimony yesterday.

Q. Okay. And you didn't --

A. So it's not clear how they get there, is my memory.

Q. Isn't it possible that the defendant took a trip to Roanoke and put those cards where he had scrawled derogatory sayings on them and put them on Robin's car? Is that a possibility?

A. Well, anything is possible, but that would have required him getting a car, going through the whole thing. How possible it is compared to how probable it is, I'm not sure.

Q. Now, as to Robin Williams' murder, your report says that when asked by police why he shot Robin, that Barnette tearfully told the police that he didn't know.

A. That was in the -- right, in one of the very early interviews, if I recall, yes.

Q. Now, are you aware that Barnette also told Officer Holl that after brooding about Robin, quote, my anger took over?

A. Yes. Oh, yes.

Q. And are you aware that Barnette told Dr. Sally Johnson that on the evening of June 21st, quote, I had never been that angry.

A. Yes. Yes. The anger is certainly surfacing, absolutely. That's what brooding is all about. And all of the content that's going on in his head and the irrational thinking, it's just brewing.

Q. All right. And are you aware that Barnette told Dr. Park Dietz that before he left his house that night that Donnie Allen was murdered and Robin Williams was murdered, he said, quote, I became more angry and more angry and more angry as the day went by. Then all I thought about why should I go after Benny Greene when Robin was the one who caused me all this pain. She lied to me. She betrayed me. She stabbed me in the back.

A. Yes, that is -- that's classic for his thinking of the suspiciousness, the paranoia, the domestic violence. That is

his thinking pattern, yes.

Q. And anger is part --

A. Yes, because anger covers over. Anger is a good psychological defense against sadness, against disappointment, against loss, yes.

Q. Okay. Now, are you aware that the defendant told Dr. Dietz that on the night of the murder, he wanted revenge and that's what he set out to do?

A. That's what he told Dr. Dietz, yes. He told him that.

Q. Now, you called in your report, your opinion section of your report, the criminal acts you called, quote, a symbolic reenactment of family and childhood patterns?

A. Yes.

Q. What part of the defendant's childhood patterns involved carjacking and murdering a man for his car?

A. Those are the acts. Don't forget thoughts precede actions. And so what I am speaking about is the thinking process that goes on that drives behavior. So the thinking patterns would be the suspiciousness, the paranoia, the domestic violence which has within it the sanction of acting violently when one is upset or one wants to correct a situation. So that would be the thinking that then drives the subsequent behavior that we all have talked about.

Q. All right. What part of the defendant's childhood patterns involve the use of Molotov cocktails to try to burn

down an apartment?

A.   Well, again, that's a thinking of how to do something harmful.  I don't know enough about his experience with that to be able to comment on that.  But he certainly wanted to injure.  He certainly wanted to hurt.

Q.   All right.  Now, you reference -- you reference in your report and testified about events that happened before the defendant was born, correct?

A.   Yes.

Q.   Is it fair to say that the defendant's actions in this case were not reenactments of things that happened before he was born?

A.   Well, there were -- there was the murder of the mother -- of the grandmother.

Q.   Okay.  In fact, that was after he was born.

A.   Right.

Q.   Okay.

A.   Before he was born we have the generational aspect of the -- of the grandparents.  Oh, before he was born.  Well, we're looking at the patterns.

Q.   Okay.  My question is, is it fair to say that the defendant's actions in this case were not reenactments of things that happened before he was born?

A.   Oh, before he was born.  Well, I was really going for the one generation back.

Q.   All right.

A.   So...

Q.   Now, you mentioned just now the grandmother who died when the defendant was ten months old.

A.   Yes.

Q.   Now, you mentioned on your direct testimony that the grandmother's death, the quote was:  Can be registered in memory at a nonverbal level.  Is that right?

A.   I don't think I meant about the murder.  What I was referring to was how memory is laid down in childhood before one develops the ability to verbalize and to remember.  That there is what we call implicit memory and there is explicit memory.  We all operate on explicit memory.  But implicit memory is what's there before there's no verbalization.  And it's very clear that there are reactions that people have and you can actually learn.  You can do condition learning through this.  And this is where the literature and the understanding of why early childhood experiences can impart on a child because of this implicit memory.  So that's what I was referring to.  Not the concept.  He learns the concept later on when he's older.  I mean, he knows now that his grandmother was murdered.  But at the time what registers is all of the upset in the caretaking arrangement because she was the primary caretaker.  All of a sudden she's gone.  You now have a fifteen or sixteen year old mother who now has to find a new

place to live, so you know that that has affected her. And all of that can get transmitted to the child in a nonverbal way.

Q. What tests were performed on the defendant to make the determination that an event that happened when he was ten months old has -- had an impact on him?

A. Well, I'm just giving you the literature on memory implicit and explicit. And the literature that shows the implicit, we use a lot of -- it's actually how we deal with people who can't speak. In nursing we have to deal with stroke patients where there's been impairment to the memory and so we know that there are ways that you can reach people through the implicit memory. It has no language. It's one of our most primitive levels of memory.

Q. So no tests were performed on the defendant to make a determination about the impact of that event that happened when he was ten months old.

A. Well, we have all of the material on his inability, his attachment dysfunction. We have that. We don't have any tests. We just have his behavior.

Q. Okay. Now, isn't it important that in a person's childhood they are taught to tell the truth, to do their chores, to get a good education?

A. Yes. That's -- yes.

Q. All right. And that that should be encouraged rather

than discouraged.

A.    Yes.

Q.    Now, your report references that Derrick Barnette's discipline of the defendant as, quote, slapped, spanked or beat for any infraction, for example, poor grades or not filling the dog's water bowl, end quote, and that, quote, lying was not tolerated, correct?

A.    Correct.

Q.    Would you agree -- well, were you here for Derrick Barnette's testimony?

A.    Yes.

Q.    Okay.  And do you recall that Mr. Barnette testified on cross examination that the spankings that he had given the defendant as a child were always directly related to transgressions of family rules?

A.    Yes.

Q.    Now, defendant -- the defendant in this case has reported inconsistently about his childhood exposure to violence, wouldn't you agree?

A.    No, I don't think it's inconsistent.  He did it way back in the very beginning in his first interview in the prison as I understand it.  He talked about physical --

Q.    Did you --

A.    -- abuse.

Q.    -- review the report of Dr. Sally Johnson which was

conducted in December of 1997?

A. Yes.

Q. And so you are aware that she reported that, quote, Mr. Barnette describes his early life in relatively positive terms.

A. Well, I think that's true. I think up until -- he did have a presence of some family life. And a lot depends on how the question is asked and how the -- as we've already talked about, how the person writing the report is going to view it. And when his father and mother were in the home and up until he's about eleven, ten or eleven, I don't think that's a misrepresentation from him at the time he's being interviewed in the prison. But I do believe he did say he -- there was some physical abuse and I'm not sure it's in Dr. Johnson's report.

Q. Right. All right. Now, you testified -- or actually, in your report you said that when the family moved to Georgia,, quote, the home life was unstable.

A. Yes.

Q. Did you talk to Sheila Cooper, the defendant's aunt or -- yeah, defendant's aunt about life in Georgia?

A. No, I didn't get an opportunity.

Q. Did you review her testimony?

A. I'm not sure I did.

Q. Well, would you be surprised to know that she reported

that Marc was happy in Georgia. That he ran track on the school track team. That he danced a lot. That he liked art and drew a lot, and helped her baby-sit her children?

A. I would agree with that. I wouldn't disagree whatsoever. I think that that is the way that Marc would present himself and how others would see him, yes.

Q. Now, you also put in your report that when Marc -- when they moved down to Atlanta, that the defendant moved into, quote, big brother role of supervising Mario.

A. Yes.

Q. What other role would you have suspected a big brother would play?

A. Well, he moved into that role because, as we heard yesterday, the -- there was inconsistency with the mother being in the home. So he really assumed a major role, not just big brother. He really assumed -- I think that he minimizes the role of protector and father figure that he served not only for Mario but for his cousin. So I think he underestimates how important he was to those two young boys.

Q. Now, you talked in your report about Marc Barnette's relationships; is that right?

A. Yes.

Q. Now, where did you get the indication that the defendant had, quote, a wish to have a monogamous relationship?

A. I heard that from -- I'm not sure if I can point chapter and verse, but he certainly told -- that was the intent is to have a -- certainly with Tasha, to have a monogamous relationship. And that's what gets him into so much difficulty because he begins to get suspicious. I mean, that's just his programmed learning of being able to trust the young women that he establishes a relationship with.

Q. Well --

A. He has said that.

Q. -- did you review -- well, did you talk to Crystal Dennis or Natasha Heard or Alesha Chambers?

A. No, I did not talk with him.

Q. Well, are you aware that he himself was never monogamous in any of his relationships?

A. Well, he does talk about that. And one of the ways he rationalizes that is to -- he does to them what he believes is going on with them. Again, that's very faulty thinking and logic. But he does, I agree, yes.

Q. Now, about Crystal Dennis. In your report you adopted the defendant's story that he beat those children with a coat hanger because he caught them playing doctor.

A. Well, that was -- right. That's one version, yes.

Q. Okay.

A. And that's in my report, you're correct.

Q. And clearly you're aware, then, that when interviewed by

police just after the crime happened, that he said that he had beaten the older boy because he wouldn't keep his shoelaces tied and couldn't remember why he had beaten the little girl.

A.   Yes.  I'm certainly aware that there are multiple versions of that by multiple people.  So, yes, I'm aware of that.

Q.   Well, aren't the multiple versions of that from the defendant?

A.   Yes.

Q.   Okay.

A.   And I'm not sure Crystal is --

Q.   Well, did you review the police reports?

A.   Yes.  Yes.

Q.   And you understand --

A.   So I saw --

Q.   -- Crystal Dennis was not a witness to that crime.

A.   Correct.

Q.   So there is no version from Crystal Dennis.

A.   Correct.

Q.   And you're aware that the only versions of events of that crime came from the defendant.

A.   Well, it's also what the children say.

Q.   Well, are you aware --

A.   My understanding was --

Q.   -- that one of the children was two years old?

A. Right. But there was an older -- my understanding is they were a little bit older. That there is some discrepancy in the age. I thought the children were a little bit older.

Q. Are you aware that there are no statements from the children?

A. To Crystal, to their mother? They made no statements to their mother.

Q. Correct.

A. Oh, okay. I thought there were.

Q. But you didn't account for in your report that there are different versions of that event coming from the defendant himself.

A. No, I didn't put in all the various versions. The point was he did abuse the children. That's in the report.

Q. Right.

A. And the -- and the motive for that is in there.

Q. But isn't a theme of your report that the defendant is reenacting childhood trauma?

A. What my explanation of that was is what he said, is that when children don't play by the rules, whatever, that -- because he was disciplined, he disciplined them. So it was a clear translation of what happened to him. That's not at all unusual.

Q. Well, are you aware that the defendant said -- has claimed that since he was beaten with a coat hanger by his

father, that's why he did that to those children?

A. Yeah. Oh, well, that's what he said, yes. Marc said that.

Q. And are you aware that Derrick Barnette has not corroborated that he ever beat the defendant with a coat hanger?

A. Yes. I remember he said he didn't remember ever doing that, so that's correct, yes.

Q. And so there -- while the defendant wants that -- and maybe you do, too -- to be a reenactment of a childhood trauma, that childhood trauma never happened; isn't that right?

A. I'm not saying that's a reenactment of a childhood trauma. What I'm saying is that's a reenactment of what happened to him. So that you -- you discipline children as you've been disciplined. That's not unusual. That's his thinking. What differs is the level and the item used.

Q. In your report you detail the defendant's relationships with various women in his life before Robin.

A. Yes.

Q. And you talked about Crystal Dennis a little bit. And with Alesha Chambers, are you aware that the defendant admitted on the stand on Monday that he had, in fact, raped Alesha Chambers?

A. I heard that.

Q.   And you've got that in your report that police learned that Marc and Alesha had consensual sex and dropped the rape charge.

A.   That's my understanding and that's -- yes, that that was a decision made by the police or prosecutor.

Q.   Do you know that's factually inconsistent both with the police reports and the defendant's own testimony on Monday?

A.   Well, his testimony Monday, I mean, we heard that, yes. And his explanation was that similar -- and this is again a very common characteristic in batterers or people who abuse in domestic situations is they do not see it as.  And that the denial is very strong.

Q.   All right.  Now, in your report you note that the defendant had told you that he had -- that as of May of 1996, the defendant said he had jeopardized everything for nothing. He had abandoned his children.  Skipped on probation.  Used his brother's ID.  But he had to talk to Robin.

A.   Yes.

Q.   Those are your words.

A.   Well, I don't know if they're my words.  Yes, I mean, that's in my report.

Q.   Okay.  Now, isn't it true that the defendant had abandoned his children five years earlier when he left Natasha Heard?

A.   I think he's using abandonment in a very different sense

there. Yes, he certainly is not involved with his children, but the use of the word there is -- as he's making his decision or as he's moving towards this intent, this obsession to contact Robin Williams.

Q. Now, you had mentioned in your direct testimony about the defendant never getting any mental health treatment, correct?

A. I'm not aware of any, that's right.

Q. Now, you are aware, though, that when he was placed on probation after the felony child abuse conviction, that mental health treatment was ordered.

A. Yes.

Q. Okay. And that after his conviction for felonious restraint and breaking and entering in one of the incidents with Alesha Chambers, that mental health counseling was ordered.

A. It was ordered but not mandated and nobody comes out and does outreach to it. But I'm absolutely aware of that, yes, that he -- it was recommended. He never followed through. It was never any outreach, yes.

Q. All right.

A. I'm aware of that.

Q. But you're not suggesting that it's someone else's fault that the defendant didn't get counseling, are you?

A. I'm not suggesting that at all. I'm just suggesting that when you have juveniles, that there has to be in place a more

structured outreach, just as with batterers. We've learned that it's -- you have to -- they will not go to counseling on their own. That there has to be some other mechanism to get them to counseling. So, no, I'm not blaming anybody. I'm just saying this is a fact of how we have to set up programs to be able to intervene and to prevent family violence.

Q. Now, you also were aware that the defendant was not a juvenile when he committed his crimes against either Crystal Dennis's children or Alesha Chambers, correct? Those were both adult court convictions. Are you aware of that?

A. Right. I don't know what age. Right, yes.

Q. Well, he was twenty --

A. Okay.

Q. -- when he assaulted Alesha Chambers.

A. Right. Well, I will amend my statement to say there should be programs in place that go up the ladder in age similar as we have with batterers because many batterers are in their thirties and forties.

Q. Wouldn't you agree that probation that orders counseling would be one of those processes put in place to help someone?

A. Well, we have found that's not -- that's inadequate. That's not successful. That you have to do much more in outreach to get them into the programs to -- the denial is quite great. So I'm just saying that programs, this is one of the things that we found is a very difficult area.

Q.   Are you aware that the defendant absconded supervision as soon as he was placed on probation; therefore, not allowing for anyone to follow up with him about his court-ordered counseling?

A.   I think they knew where he lived.  I'm not sure that that's -- I mean, there are other ways to put programs in place.  But there have been successful ways of doing it.

Q.   Well, are you --

A.   That's all I'm suggesting.  But, yes, I know that --

Q.   Are you aware that the defendant actually moved to Roanoke, Virginia, not telling his probation officer that he, in fact, wasn't even living in the state anymore?

A.   Right, yes.  I'm aware of that.

Q.   Now, in your report you use the phrase, quote, repetition compulsion?

A.   Yes.  That's a jargon term that's used in psychiatry.

Q.   Now, are you suggesting that the defendant wasn't able to control his actions?

A.   What I'm saying is the programming that he had in his head and his need to carry out this mission was what was driving the behavior.  And in a psychological way, you can see this as repetition compulsion.  That's what I was stating.

Q.   All right.

A.   And there is a psychological body of knowledge that does adhere to that.

Q. And that's a psychiatric jargon term?

A. Yeah. I mean, it's used in the field to explain a phenomenon that's very hard to explain without using those terms.

Q. Okay. Now, you also used the word programmed quite a few times in your narrative.

A. Yes.

Q. Are you suggesting that someone else was controlling the defendant's behavior?

A. No. I'm just saying that we all get programmed in various ways in the way we grow up in our families and we learn certain beliefs and certain ways of doing things, and that's what Marc learned in his family. So it's just, again, a term to describe how -- how we learn growing up and then play it out as adolescents and adults.

Q. In your report you state that, quote, he had the emotional and thinking capacity he had when he was eleven.

A. Yes.

Q. What psychological or psychiatric instrument did you use to test and measure the defendant in order to make that statement?

A. I made that statement because in severe trauma and in certain other kinds of cases we see a phenomenon that's called the clock stopped. And a lot of times people just don't move beyond -- psychologically. Obviously, they, you know, develop

otherwise. But it's the clock stopping. And I really feel that was such a major point in his life when the father and the mother and losing both and then the move and everything that happens after that is a traumatic change, and that was the reason that I used that. I didn't use any tests. This is --

Q.    Okay.

A.    -- strictly an interpretation that I made of his -- to try to explain what happened. Why he did what he did.

Q.    You're aware, aren't you, that there is, in fact, no psychological or psychiatric tests that can be used to measure that?

A.    We -- in psychological terms we look at behavior and then we have to go backwards in terms of trying to explain why people behave the way they do. What is their motive. I mean, that's really what psychology is all about. So it's just one explanation.

Q.    All right. Now, are you --

        THE COURT:  Appears to be about time for lunch.

        MS. TOMPKINS:  Okay.

        THE COURT:  Members of the jury, we'll take our lunch break. Please recall the usual instructions as always. We'll see you at 2 o'clock.

        (Lunch recess at 12:33 p.m.)

                    *        *        *



United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/7/2002

Page 3560

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA )

) CASE NO. 3:97CR23-V

v. ) August 7, 2002

) Afternoon Session

AQUILIA MARCIVICCI BARNETTE, )

Defendant. )

TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE RICHARD L. VOORHEES

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

    ANNE M. TOMPKINS, Esq.

    JILL WESTMORELAND ROSE, Esq.

    Assistant United States Attorney

    227 West Trade Street

    Suite 1700

    Charlotte, North Carolina  28202

FOR THE DEFENDANT:

    JEAN B. LAWSON, Esq.

    P.O. Box 4275

    Charlotte, North Carolina  28226

    HAROLD J. BENDER, Esq.

    200 North McDowell Street

    Charlotte, North Carolina  28204

Reported by:  Scott A. Huseby,

        Registered Professional Reporter,

        Certified Court Reporter,

Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 232 of 250
1533

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3561

P R O C E E D I N G S

MS. LAWSON:  Just for your information, Dr. Burgess will be our last witness before Dr. Cunningham, so whatever --

THE COURT:  Dr. Cunningham will be allowed to testify.  I will take up the issue of the violation of the rules at some appropriate point.

MS. LAWSON:  He will not be allowed to testify?

THE COURT:  He will be.

MS. LAWSON:  Thank you, Your Honor.

THE COURT:  I trust the jurors had a good lunch.

(Jurors nod heads.)

THE COURT:  Okay.  I believe you had a witness on the stand, continuation of Burgess on the stand.

BY MS. TOMPKINS:

Q.   Dr. Burgess, I want to talk to you a few minutes about Donnie Allen.  Are you aware that in your report, the only reference in your 12-page report about Donnie Allen is on Page 3 of your report, where you note that, quote, the fatal contact with Donald Allen was a result of Barnette's flawed logic, that Allen was both an opportunity and an obstacle to his reunion with

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Aff        n (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 233 of 250
1534

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/7/2002

Page 3562

Williams?

A. Yes. That's under the heading killings of Robin Williams and Donnie Allen. It is a full heading.

Q. All right. Now, and that is your only reference to Donald Allen in your full-page report?

A. I don't believe that's the only reference. The -- there is reference in terms of the dynamics and some of the conclusions, if you want me to read those to you?

Q. Well, in that heading of your report it says, killings of Robin Williams and Donald Allen. Your first sentence on that is, this is a domestic homicide, correct?

A. That's correct.

Q. Now, you are aware that there were two murders here?

A. That's correct.

Q. Okay. So are you saying that these are two domestic homicide?

A. No. I'm saying this is a domestic crime spree. This is a crime spree of which it is a domestic homicide, but the target is Robin Williams, the victim was Donald Allen. And the way the literature reads and the way it's written up in both the workplace violence literature as well as the domestic violence literature

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3563

is that, as it says later in the report, that you can have both victims and a target and you are to identify the target as well as the victims, they are not to be used interchangeably.

Q.   Clearly there are two homicides here?

A.   That's correct.

Q.   All right.  And Robin Williams was a homicide victim, correct?

A.   Yes.  She was the target of Marc Barnette.

Q.   And Donald Allen was a homicide victim, is that correct?

A.   That's correct.  He was a victim of Marc Barnette.

Q.   So when said this is a domestic homicide, did you mean that these are two domestic homicides?

A.   No.  I meant that it's a crime spree involving domestic homicide of which there is a target and there is a victim.

Q.   Well, about the crime spree, you are speaking of the time frame from the fire bombing to the murders?

A.   Right, that's correct, April 30th to the 22nd of June.

Q.   Are you aware that while the defendant was in this crime spree he applied for a job as a car salesman at Saturn?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3564

A. Yes, he had applied, I'm not sure it was within that -- he had applied for that, not received it, I think. I don't have a time frame, but, yes, he had applied for a -- to be a car salesman at the Saturn dealership.

Q. Are you aware that that was, in fact, during the duration of what you are terming the crime spree?

A. Yes. I don't have the precise date of his application to know whether it's within that, but I know that he was -- he had applied.

Q. Okay. And are you aware that during the time frame in which you are calling a crime spree that he went out with his friend Steve Austin and met girls at clubs?

A. Yes.

Q. And, in fact, he had met a particular girl from whom he had gotten a telephone number?

A. Yes. I believe I read that, yes.

Q. All right. Now, back to Donald Allen for a moment, are you aware that in your report, in your headings entitled, which form the bases for your opinion, that under family and childhood patterns, family stresses, that Marc Barnette's relationships, there is no point in your report in which you attempt to explain what impact any of those things had on Marc

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3565

Barnette's actions when he marched Donnie Allen into the wood and shot him three times?

A.    Well, what I'm speaking to is the pattern behavior, his targeting, and that whole domestic scene. I don't specifically speak to that except in the last sentence on that section.  Let me read it.  It has, where it's very dangerous in these domestic situations for anybody that's in the vicinity.  Again, it's a very similar situation to workplace violence, where you can have the abuser coming into the workplace and -- after a specific partner, ex-partner, and multiple people are in the vicinity and become victims, so that's my similarity there.

Q.    So because Donald Allen had the misfortune of being in Marc Barnette's vicinity, he became a victim?

A.    Well, the reason Donald Allen comes into this is he needed a car, so it was an opportunity to get the car, but it also became an obstacle to the way he was thinking at that particular point in time, from what his testimony says, in terms of being able to worry that he will be identified and stopped and all of that.

Q.    So Donald Allen's murder was a means to an end, that end being Robin Williams' murder?

A.    In the crime spree, yes.

MS. TOMPKINS:  Thank you.  No further

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3566

questions.

REDIRECT EXAMINATION

BY MS. LAWSON:

Q.    Dr. Burgess, the questions you've been asked by Ms. Tompkins and your answers to them, do they in any way change the opinions or the testimony that you have given in this courtroom?

A.    No, they do not.

Q.    How long has the Federal Bureau of Investigation been requesting and using your services, the behavioral sciences unit?

A.    Since the mid 1970's; 1975, I think.

Q.    When was the most recent time?

A.    I did a training on the advanced training group in April of this year.

MS. LAWSON:  Thank you.  No further questions.

THE COURT:  You may step down.  Call your next witness.

MS. LAWSON:  Your Honor, we call Dr. Mark Cunningham.  It will take him about five minutes to set up his equipment.  Could we have that long to accomplish that, please.

THE COURT:  All right.  Members of the jury, if you will step out for about five minutes,

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3567

please. Thank you.

(The jury left the courtroom.).

THE COURT: Mr. Bender, why couldn't you have done this during lunch?

MR. BENDER: We didn't know how long they were going to take, Judge.

THE COURT: Is this -- we couldn't have finished that last witness with these preparations already having been made?

MR. BENDER: Perhaps we could have, but we didn't know how long the government was going to take.

THE COURT: All right. Let's take a five-minute recess.

(Brief recess.)

THE COURT: Are the parties ready?

MS. LAWSON: Yes, sir.

THE COURT: Bring the jury.

(The jury returned to the courtroom.)

MS. LAWSON: We would call Dr. Mark Cunningham.

MARK D. CUNNINGHAM, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3568

Q. Would you please tell the jury your name.

A. Mark Douglas Cunningham.

Q. What is your occupation?

A. I'm a clinical and forensic psychologist in private practice.

Q. How long have you been a psychologist?

A. About 24 years now.

Q. You mentioned that you have a clinical and forensic practice.

A. Yes, ma'am.

Q. Would you explain that?

A. Yes, ma'am. Clinical psychology is the evaluation and treatment of psychological disorders. Forensic psychology is the application of psychological research and techniques to legal issues, all the way from evaluating parental capabilities in child custody situations, psychological injuries in civil cases; in criminal court, things like competency to stand trial or mental state at time of offense, or sentencing determinations, such as are being considered today, any way that psychology as a science can help inform some issue that is before the Court.

Q. Where are you licensed to practice as a clinical psychologist?

A. I'm licensed as a psychiatrist in Texas,

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3569

Louisiana, Arkansas, Tennessee, South Carolina, Indiana, Illinois, Colorado, Idaho, Oregon, New Mexico. There are 11 states. I may have left one out.

Q. Is your forensic practice national in scope?

A. Yes, ma'am, it is.

Q. And how long have you been licensed?

A. I was first licensed in Connecticut, I think in 1979 or 1980, so about 22 years.

Q. And where do you maintain your office?

A. My offices are in the Dallas area, in Lewisville.

Q. Now, have you -- you mentioned that you have had occasion to testify nationally. Is that in, among other things, capital sentencing proceedings?

A. Yes, ma'am, in federal and state cases.

Q. And how often have you testified over the past five years?

A. Over the last approximately five years I have testified in about 20 or 22 federal capital cases and about 50 or a little more state capital cases in various jurisdictions around the country.

Q. Could you give us some educational background, tell us how you were educated and where?

A. Yes, ma'am. I got my undergraduate degree from Abilene Christian College, that's now Abilene Christian

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 241 of 250
1542

Page 3570

University, with majors in mass communications and psychology. I graduated from there in 1973 with high honors.

I then attended graduate school at Oklahoma State University and a doctoral training program in clinical psychology that is accredited by the American Psychological Association as the clinical psychology doctoral training site and got both my masters and doctorate degrees in clinical psychology there.

I did a one-year clinical psychology internship at the National Naval Medical Center in Washington D.C., actually in Bethesda, Maryland, which is in suburban Washington, D.C., and was an active duty naval officer and psychology intern for that year and then was assigned as a staff clinical psychologist at the Naval Submarine Medical Center in Groton New London, Connecticut. At that time that was the primary Atlantic seaboard submarine base for the Navy, and was a psychologist there at that medical center for about three and a half years.

I did a couple of years of part-time post-doctoral training at Yale University while I was there in Connecticut.

I then took an academic position for a couple of years and have participated very actively in continuing

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Af...    ...on (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 242 of 250
1543

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3571

education across my career, and across the last, about the last 10 years have been very intensively involved in forensic psychology, continuing education.

Q. In terms of the forensic -- you are here in terms of your forensic practice, is that right?

A. Yes, ma'am. It's hard to get away from the training as a clinical psychologist and the years of primary practice that I did counseling people about their problems and evaluating their problems, and so that always illuminates how I look at things, in terms of how development ends up affecting people as adults and how disturbances in their psychological makeup end up coming out in behaviors that are destructive to them and other people. It's all kind of the same -- the forensic psychology is the application of that knowledge.

Q. Have you ever been published in the area of forensic psychology?

A. Yes, ma'am, I have.

Q. Tell us about that, please.

A. Across the last four or five years I have had eight peer reviewed publications that I have been first author of or have coauthored, including one that's in press currently, that means it's past peer review but hasn't physically come out in the journal yet. It's due

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 243 of 250
1544

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3572

out in about a month.

I am the first author of a book chapter that is also in press in the comprehensive handbook of psychology. It's a 12-volume series that is intended to represent psychology as it exists, kind of the state-of-the-art of the science at this point in time. Two of my reports that have been sanitized for identifying information have been published in a case book that just came out this last year as models or examples of forensic reports, one involving capital sentencing and another involving competency to be executed. And then there are some teaching points that have also been included in that volume that I authored. And then I have also written some invited papers at a -- of a scholarly nature but not of a peer reviewed stature.

Q. Are you licensed in any particular field in terms of psychology? Do you have a license?

A. I'm licensed as a psychologist in these states.

Q. And you have board certification?

A. Yes, ma'am. I'm board certified in forensic psychology by the American Board of Professional Psychology. That's the board certification organization that is recognized by the American Psychological Association, and that diplomate or board certification

Case 3:12-cv-00327-MOC Document 105 Filed 09/23/13 Page 244 of 250
1545

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3573

status is with examination and a lot of ordeal. You can be boarded in clinical or counseling or school, industrial, neurophysch, family, a number of different specialty areas, including forensic psychology.

Q. How many board certified forensic psychologists are there in the United States?

A. In forensic psychology, fewer than 200.

Q. Do you teach any kind of continuing education for other psychologists to further their training and maintain their currency in training?

A. Yes, ma'am, I do. As a board certified forensic psychologist, I'm a fellow of the American Academy of Forensic Psychology, and one of the primary goals of the Academy is to elevate the standard of practice as it comes into the courtroom. That doesn't mean teaching psychologists how to be more persuasive or to be slicker, but it instead involves trying to equip them with the best perspective and knowledge available about what issue they are evaluating, and also helping them become aware of the best available research that can be brought to bear on those issues.

And on three or four occasions over the last several years I have given full day workshops under the auspices of the Academy on capital sentencing evaluation, teaching psychologists how to engage and

Reported By: Scott A. Huseby, RPR
Huseby, Inc. an A          ien (704) 333-9889          Fax (704) 372-4593
800-330-3082          Case 3:12-cv-00327-MOC Document 105          Filed 09/23/15          Page 245 of 250
1546

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3574

conduct and what resources and research to bring to bear in those evaluations.

Q. In addition to teaching do you also continue to take courses and advance your own knowledge in the area?

A. Oh, yes, ma'am.

Q. How do you do that?

A. I do it by going to continuing education myself, and I'm a very active student and enjoy continuing to learn, and so I go to lots of workshops.

Q. To what professional organizations do you belong that are relevant to your testimony here?

A. As I said, I'm a fellow of the American Academy of Forensic Psychology; I'm a member of national, state, and local psychological associations; I'm listed in the national register of health service providers, which is sort of a review of clinical capabilities; I am also listed in what is called a CPQ, which is intended to ease psychologists moving between different licensing jurisdictions by serving as a clearinghouse for their credentials, that somebody has reviewed those and found them to be bona fide and so then can make that report to the various licensing agencies.

Q. Now, Dr. Cunningham, you testify around the country in cases such as this. Do you normally testify more for the defense or for the government?

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/7/2002

Page 3575

A.   In capital cases I have only been asked to perform evaluations or to come to testify by the defense.  I have never been asked by the government in a capital case.

Q.   Would you perform such an evaluation and testify if the government had you participate in an evaluation and asked you to testify?

A.   Oh, yes, ma'am.  I don't have a personal agenda or opinion about the death penalty and would be glad to consult with the government.

Q.   Have you ever conducted an evaluation that did not prevent the execution of a person?

A.   Oh, yes, ma'am.

Q.   Would you tell the jury about that?

MS. TOMPKINS:  Objection.

THE COURT:  Sustained.

BY MS. LAWSON:

Q.   Do you feel that you have been biased in performance of your duties in any way?

A.   No, ma'am.

MS. TOMPKINS:  Objection.

THE COURT:  Sustained.  Members of the jury, do not consider that last answer.

BY MS. LAWSON:

Q.   Dr. Cunningham, have we asked you to conduct an

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3576

evaluation of Marc Barnette?

A.   Yes, ma'am.

MS. LAWSON:  Your Honor, at this point we would ask that he be qualified as an expert in clinical and forensic psychology.

THE COURT:  He will be so declared, and the jury will remember the usual instructions that I have given in the case of each expert.  Thank you.

BY MS. LAWSON:

Q.   In the course of your evaluation did you prepare a report, a written two-page report of the issues that you felt were important?

A.   Yes, ma'am.

Q.   And would it be fair to say that you are addicted to Power Point presentations?

A.   Yes, ma'am, that's a fair characterization.

Q.   Let's get started with the number of visits you have had with Marc Barnette and the documents that you reviewed in connection with your testimony.

A.   Yes, ma'am.  I interviewed Marc Barnette on four different occasions, for a total of just over 18 hours of interview time.

I also interviewed his mother, Sonia; his father, Derrick; his brother, Mario; his aunt, Shelia; Steve Austin, his good friend; a Brian Ard, who was his

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3577

supervisor at Camelot Music; Chanda Nero; Tony Harrison, who was at the Mecklenburg County Jail.

I interviewed police officer Elizabeth Joy, who had had contact with him associated with a couple of his arrests. I also interviewed, and some of these were by telephone because of the distances involved, I also had a telephone interview with Sally Johnson, who was the psychiatrist who was in charge of his evaluation at Butner, the federal medical facility, when he was evaluated there.

There were also some individuals that I attempted to contact that I made telephone calls to that either their numbers had been disconnected or I left messages with the answering machine and didn't hear back from, and that included Tina Davis, who was a family friend; Alicia Chambers; Crystal Dennis; Natasha Herd; and also Gene Barbour. And then there was a jailer, Greg Griffith, who I also attempted to contact. And then there was another jailer, Captain Allen Cobb, who I spoke to briefly and he was going to retrieve some records and get back with me and we didn't end up making contact. But those are the individuals who I interviewed directly.

In terms of records that I reviewed, I reviewed offense reports, transcripts of this and prior

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Aff        n (704) 333-9889
800-333-2082                                          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 249 of 250
1550

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3578

proceedings, past mental health records and evaluations, including the Butner records as well as past testimony of experts, medical records, correctional records, school records, a suitcase full of records.

Q. In addition to all of that, have you been here in court since Monday?

A. Yes, ma'am.

Q. What conclusions have you drawn, just generally, before we get started, about Marc Barnette and his functioning, his development?

A. Marc Barnette's development was damaged by a number of fundamental factors, and that damage placed him at substantially greater risk for disturbed romantic relationships, for criminal activity, and for criminal violence in the community.

Q. Beginning with your Power Points, can you talk about what relationships -- before we do that, did Marc Barnette have a choice in what he did?

A. Oh, yes, ma'am.

Q. Could you explain that, please?

A. There is no indication that Marc Barnette was psychotic at the time of these offenses or that he was so mentally retarded or deficient that he did not know what he was doing. He recognized the wrongfulness of his behavior. He exercised volition or choice. If he

800-333-2082   Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/13   Page 250 of 250   Fax (704) 372-4593
1551