United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/7/2002

Page 3579

was not able to do those things, then we wouldn't be here, then he would be not guilty by reason of insanity. And so this is not really about did he have a choice, did he know right from wrong, but rather what shaped the choice, what shaped his value system, a concept not of criminal responsibility but rather moral culpability. And in that sense the critical issue is that we don't all have the same choice. He had a choice, not the same choice I would have, but the choice that you get after you get done with his development.

Q. You have a series of slides in your machine that will help illustrate that, or at least illustrate your testimony today?

A. Yes, ma'am. A critical issue in psychology associated with choice, here is the person and here are what we would consider to be the bad outcomes, psychological disorder, drug dependency and criminal activity, and the issue is how does this person get over here and how does choice operate in this person getting to these bad outcomes.

Well, if when you are growing up there is no family history of alcohol or drug dependence and there is no family history of psychological disorder and there is no developmental abandonment or instability, that's the foundation that your life is on, and typically here

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 1 of 249
1552

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3580

is what is a part of that, you have an intact family where there is acceptance and affirmation, and a good deal of stability and predictability and structure, where there is consistency and your parents are doing the right thing, they are modeling positive values, not only in what they tell you, but in how they behave, and then you have sustained relationships with other stable peers and your choices then rest on top of this whole structure.

Now, if this is what your life looks like, you can still get to the bad outcomes, but it's quite a leap to get there, it's not easy to get to those bad outcomes.

If, though, you have a family history of substance dependence or psychological disorder, it's as if you've ramped this thing up just a little bit. And if there is model substance abuse, if folks in the home are drinking and drugging in front of you, that ramps it up some more; and if you have developmental trauma, abandonment, or instability, it ramps it up even more. Now, if somebody who is in this position begins to drink and drug themselves, it's almost as if you've put this things on rollers.

Of course, the problem is, if this is how you have grown up, then typically none of these are present

800-333-2082        Ph: (704) 333-9889        Fax: (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 2 of 249
1553

Page 3581

in your life and instead you look more like this.  Now, this person has a choice, not the same choice that I would have growing up like Leave It to Beaver.  It's a choice that sits on this kind of ramp.

Now, the height of that ramp, the angle of it, is what we are looking at when we look at moral culpability, what kind of angle was the choice sitting on, because depending on what that slope is, those two people don't have the same life, they have a -- the same choices, and so that's a critical issue in terms of why we look at family background or how somebody was damaged.

Q.    Isn't this sort of excusing behavior by blaming abuse?

A.    Kind of an abuse excuse?

Q.    Yes.

A.    Not according to the United States Department of Justice, it's not.

Q.    And you brought a slide about that?

A.    Yes, ma'am.  The U.S. Department of Justice is looking at this same kind of model as they try to prevent criminal violence in our society.

The Department of Justice has an agenda of reducing criminal violence in this country.  One way to do that is to lock people up after the fact, after the

Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 3 of 249
1554

Page 3582

crime, only then you already have a victim. Much better if you can prevent that violence from happening in the first place.

And so the increasingly the Justice Department is trying to identify how that violence can be prevented. Now, they are looking at in these approaches processes that are going to interrupt what causes the problem behavior, and that is the language of the Justice Department, they are seeking to interrupt processes that cause this serious violent chronic early offending in the community.

And as they do that they identify -- the research talks about risk factors that increase the likelihood of delinquency and violence, and also protective factors that would buffer somebody from that occurring. Now, that's critically important, because we look around and recognize that everybody that grows up and is physically abused or is neglected in some way or their parents divorce, clearly those people don't all go on to commit acts of criminal violence.

And so the question becomes how do we account for some people going on to criminal violence and others not. And as the Justice Department looks at that, they are seeing this in terms of risk and protective factors and the relative balance of those, and the strongest

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3583

prevention, then, is to decrease the risk factors and increase the protective ones.

Q. What are some examples of things that our society, at least our government, are implementing in order to reduce risk factors? Can you think of some, like Head Start or --

A. Yes, ma'am. Head Start, boys and girls clubs, youth sports grants to try to get kids involved in positive activities, family strengthening, interventions for single moms, public housing even, as you are trying to provide an economic floor for families so that they can have some stability, but increasingly things that are targeted toward kids at school with their recreation and supports for family systems.

Q. We have heard a lot of testimony about Marc in his early years, Dr. Burgess talked about the first couple of years.

A. Yes, ma'am.

Q. Do you have a slide about the risk factors in early childhood during those periods that you consider relevant to Marc?

A. Yes, ma'am. These are the factors that were identified by the Justice Department that are present. These increase the risk if they are present between conception and age 6, and I have listed all of the ones

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A...                rio...(704) 333-9889
800-333-2082                         Page Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 5 of 249
1556

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3584

that were identified in this 1995 Department of Justice study, and then I've put red check marks beside the risk factors that were present in Marc's background.

Q.   Starting with the first one that you have a red check mark by, what information do you have that led you to conclusions in your report about family history of criminal behavior and substance abuse, as it relates particularly to Marc?

A.   The substance abuse is the alcohol abuse of his mom, as well as descriptions that Marc, Mario, and Ahmad had, things that sure looked like drug abuse, adults going into the bathroom together and staying in there for a long time, coming down and the room being full of a funny smelling smoke, the descriptions of his mom's pattern of drinking across his development, but particularly in his early adolescent years when it seemed to increase.

Q.   What about family management problems, what does that mean in this context?

A.   Family management problems involve a number of things.  It means that the -- if you have a little child that you don't have continuing predictable structure, if you are moving from place to place, if the care of the child is rotating between adults on an inconsistent fashion, if the discipline in the home is erratic or

800-363-2083   Case 3:12-cv-00327-MOC   Huseby, Inc.   Document 106   Filed 09/23/13   Page 6 of 249   Fax (704) 372-4593
(704) 333-9889

1557

United States of America vs. Aquilia Marcivicci Barnette
3:97CR23-V

Proceedings Before Judge Richard L. Voorhees
8/7/2002

Page 3585

abusive, so that, for example, Marc' father was overdisciplining him or responding to him in an abusive fashion while his mother might not be present at all at times to supervise him or keep up with what he was doing, and so you have highly unstable management of the family. The financial management was erratic as well.

Q. Family conflict, what things did you take into consideration when you marked that with a red mark?

A. That involves the degree of conflict that was present between Derrick and Sonia, their chronic martial problems, also conflicts that were present parent to child in terms of Marc's really mixed feelings about his mama, as he loves her on one hand and yet she is going out and leaving him and there is not food in the refrigerator but yet she has money for a new dress to go out in, those kinds of things that represent a continuing climate of conflicting emotions and feelings and attitudes.

Q. Let me ask you this: What you are testifying about, do you give tests to determine this information to get to these risks factors, or how do you get to those?

A. These are not psychological diagnoses or psychological processes. These are simply descriptions of what the environment is, and that's based on what

Page 3586

descriptions are present for multiple individuals about what this was like.  And so as I get reports from Mario and Ahmad, and Marc as well, and then mom and dad on some of it, they tend to minimize it, but they own some of this as well, then there are a number of people who are all confirming the historical accuracy of these.

Q.    The last one, parental attitudes, tell us about that.  What information have you learned about that?

A.    A couple of pieces here.  One of them involves mom's involvement in drug and alcohol abuse.  As mom then is dating a guy that is described as a leading drug dealer.  That conveys a condoning of criminal behavior as a lifestyle.  If that's who you're dating, if that's who your boyfriend is in front of your children, that's an endorsement of that kind of attitude.  So there is both direct modeling of substance abuse and also behavior by association that endorses it.

Q.    Are you blaming Marc's mother for what he did?

A.    No, ma'am.  This is not a function of blame. It's a matter of trying to -- it's a matter of trying to account for how we ended up with the tragic loss of life of these two human beings, of Donnie and Robin, who did not deserve to die.

Now, typically somebody doesn't get to that all by themselves.  I mean, they didn't grow up usually like

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3587

Leave It to Beaver and one day just then go out and commit a double homicide. So when we try to account for how we got there, we're likely to encounter that there were a number of the critical people in this person's life who failed them along the way. Now, ultimately the choice they made was their own, but it wasn't a choice that they made in a vacuum.

Q. I imagine that your next slide is age 6 to someplace.

A. Yes, ma'am, it is.

Q. You have more red marks. Tell us about that slide.

A. Transition and mobility, particularly across Marc's first four years of life. He was bouncing from pillar to post with his mom, and I will talk about that in a few minutes. But he is there with his grandma in that household, then he goes to his dad's household, then back with grandma, then grandma is murdered herself, then they go back to dad's, then to sister Tessie, I think back to Charlotte. They are bouncing all over the place. And then when Sonia and Derrick get married, there are more moves that happen, so very unstable geographic situation across the early years of his life. That instability occurs again after his parents divorce when he is 11 and there is a shifting of

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Af          on  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 9 of 249
1560

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3588

residences and schools.

Q. Well, a lot of people move, and they don't all wind up doing what Marc did.

A. Yes, ma'am. But two parts of that. First, if that's the only thing that is going on, is the moves, then it may not have a negative effect on you. If you are in the military, you've got two parents that love each other, it's a stable family, the military environment is familiar to you as well and you move once a year, that may not do anything but let you see lots of different parts of the country and help you learn to relate to people quickly.

If you are someone, though, who is socially vulnerable and it's not easy for you to make friends or if, in fact, your parents don't stay together and there's a lot of chaos at home and things are not very stable there and you have some other vulnerabilities, then that factor, along with many others, may, in fact, put you in harm's way.

Q. What is the next one you have checked?

A. Availability of firearms, which is a pretty widespread social vulnerability in this country, as is immediate portrayals of violence.

Others that we picked up on before, the family management problems, family conflict, criminal attitudes

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A...ian (704) 333-9889
800-333-2082 (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 10 of 249
1561

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3589

favorable toward crime and substance abuse.  Ultimately
he ends up failing in school and being truant and
dropping out of school and having favorable attitudes
toward delinquent, or at least violent behaviors himself
in terms particularly of relationships in a domestic
context.

Q.   Now, there are some up there that you haven't
checked.  Are those -- is the risk factors, that thing
that you have under Department of Justice model, is that
everything that they list?

A.   Yes, ma'am, I've listed all of the factors that
this study identified, and then I've put red check marks
by the ones that are present in his background, and he
doesn't have all of the risk factors, he has a good many
of them.

Q.   Your next slide is what, adolescence to
adulthood?

A.   Well, that's this one.  This is as far as we
go, because we are just looking at what is formative up
to adulthood.

The next slide looks at protective factors that
were identified in this study, and those include -- they
are grouped into different types.

For example, under individual characteristics, if
you were female, that's an incredibly powerful

Case 3:12-cv-00327-MOC   Document 56-26   Filed 09/23/15   Page 11 of 249

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3590

protective factor to keep you from going on into violent behavior yourself.  It's not that girls are unaffected by being damaged when they're growing up; it's just that the damage ends up coming out in other ways.  They become sexually active early, very early, end up dysfunctional relationships or are depressed or anxious or abuse drugs.  They don't pick up a gun and hurt somebody in most instances.

If you are intelligent, and typically what we mean here is college bound intelligence, really bright and capable, then when you get to school, it's a place of great success for you and you get a lot of attention from your teachers and even if things are out of control at home, at school you really do well.  Now, I have got a check mark beside this in Marc's life, but it maybe should be kind of a check minus.  His IQ score as it's been measured is in the mid 90's range, between 92 and 98 in a full scale IQ score, and so he is just a little bit below or kind of right in the average range, and typically to view this as a protective factor we want to see somebody in the high average range, 115, 120, that kind of thing.  But in fairness, he did have some intellectual capabilities, and so I identified that as a partial protective factor.

Positive social orientation means that you show

800-333-2082    Huseby, Inc. an Af    (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106   Filed 09/23/15  Page 12 of 249
1563

United States of America vs. Aquilia Marcivicci Barnette        3:97CR23-V
Proceedings Before Judge Richard L. Voorhees        8/7/2002

Page 3591

some inclination to be constructive and do the right thing. For example, when Marc is a little kid up through kind of early adolescence, he sort of assumes a parent role in the family and is looking after his little brother and is looking after Ahmad then, a little bit later, and he is putting them in the back room and being protective of them, tried to keep up with them, get them in for their meals, look after them. He is not just hitting the streets himself. It's not like when he is 12 years old he is a junior drug dealer. He is still at home trying to do the right thing.

Marc consistently seeks employment, again, not out robbing and selling drugs, but is trying to be gainfully employed and mostly brings the money home to support whatever household that he is a part of. He even keeps seeking long-term relationships. Technically, they are not monogamous. He still goes out on these women, but he keeps seeking a long-term love ideal relationship even if he cannot be entirely faithful there himself, so there is some indication of positive social orientation.

Resilient temperament is the notion that for whatever reason some people just bounce back really well. If you have more than one child, you probably noticed that those kids were different from the moment

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3592

they were born in terms of kind of how they could handle disruptions in their schedule or stresses or other things, and so that resilient temperament varies from person to person.

Social bonding to a positive role model, if you have a really powerful positive anchor, that can be so valuable for you. Had Marc's father stayed actively involved in his life, had they been in the same town and his dad was getting with him a couple of times a week across his adolescence, that might have been enough to have been the anchor that let him hold on in spite of some of these adversities.

Q. Excuse me, Dr. Cunningham, is that the case even though Marc perceived his father to be engaging in excessive or abusive discipline?

A. That excessive discipline history reduces the extent to which his dad can be this constructive person. He needed somebody in his life who was consistently there in a responsible, adult, caring, assertive, good citizen that loved him and was anchored to him. That's what they're talking about. If you have somebody like that, that can be a powerful protective factor. They can't be a thousand miles away and say, call me if you need me. They have got to be at hand to deliver something to you.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3593

Q.    What about the things that were going on in the family between mother and father and his reactions to that that has some relevance to the family members and his father's role in his life?

A.    Well, the models that Marc had in his family of origin were not healthy in many ways.  His parents were continuously suspicious of the other one being unfaithful and very actively accused each other of that infidelity on a chronic, ongoing basis.  There was some reason for that.  There is some evidence that, in fact, both of them were being unfaithful to the other one at least from time to time.  Those accusations then rose to them being violent with each other, mutually violent, and ultimately his dad being more aggressive about that than his mom.  So you didn't have folks present with him that we would consider to be, gee, I would like to send my kid to that house because there are some real positive models there.

Q.    And you have two check marks there for positive -- are those protective kinds of functions --

A.    To a very limited degree.  I'm assuming, since he ran track, that there were likely some coaches that took some interest in him there, and he had a really good friend, Steve Austin, that has been a continuing lifelong friend, so there was a little bit of protection

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/13   Page 15 of 249
1566

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3594

from those. There were not healthy beliefs and clear standards of behavior that promoted nonviolence and abstinence from drugs. In fact, it was just the opposite. And there were not effective early interventions.

Q. Why did Marc need early interventions based on your review of the history and as you pointed out in your report?

A. Very early when Sonia is a mother at 14 years old, that's a pretty obvious disaster waiting to happen, 14-year-olds just don't make very good mamas. That's a time for some pretty intensive social intervention without a report to child welfare that somebody is being neglected -- when she is in the hospital and she is having a baby at 14, that's a need for an ongoing case worker to be assigned to this girl and this family to help her find some stability and some nurturance there. They needed to stay in one place and not get bounced all over the place.

I mean, it's tough when your father is psychiatrically and physically disabled, as Jessie was, and your mom has been murdered and you're 14, 15 years old and you have a baby. We are already in harm's way. I mean, it's a case for a social work agency. There is lots of intervention and support that is needed there.

800-333-2082 Case 3:12-cv-00327-MOC, Inc. Document 106 Filed 709/233319889 Page 16 of 249 (704) 372-4593
1567

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3595

Q.   Are there any other interventions that you, in terms of his childhood, that you think would have been appropriate?

A.   Oh, yes, ma'am.  As there are domestic conflicts that are occurring, there was clearly a need for both of his parents to be in marital counseling and to be in anger management classes themselves.

I think they needed some parenting instruction. Marc needed to be involved in positive youth activities, in scouting, in athletics, in a boys and girls club.

There needed to be some interventions to keep Derrick plugged in after the divorce so that he was present emotionally in a more ongoing sort of way. Sonia essentially stopped being a parent in many ways when she went down to Atlanta and starts going out with Shelia much of the time.

So there are interventions and social supports that were needed for the parents, and then counseling assistance for Marc.

When his father told him that he was not his biological father, if there was ever a kid that needs to go to therapy at that point, it was Marc.  When you are growing up in a family where the parents are beating each other up, gee, that's a kid that needs somebody to talk to.  He is going to need some counseling

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3596

assistance.

Q. What about when Tosha would find him sitting in a closet naked crying? I guess if you had seen that going on, what recommendation would you have made at that point for intervention?

A. He needed to see a mental health professional on an ongoing and long-term basis, particularly with the history that would have been taken from him about what had happened to him up to that time. It appears that he was significantly depressed on a somewhat fluctuating basis, whether there was some medication support that could have been helpful, certainly he needed some counseling support, needed lots of advising and intervention about the way he went about his relationships.

Q. What do you have next that illustrates and backs up and explains your report?

A. Well, this next slide is about a follow-up study that was done by the Department of Justice, this one much more extensive in reviewing all of the existing research virtually that had been done up to this time, and this time identifying individual -- breaking it up not by ages but instead by types of risk factors.

And so we identify individual factors. Again, I have listed all of them and put check marks beside the

Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/13    Page 18 of 249

1569

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees       8/7/2002

Page 3597

ones that were present in Marc's history. You will notice this after these, some of them, there is a parentheses like here, X2-5. Some of the studies reported odds ratios. In other words, if the child were hyperactive, there is a two to five times greater likelihood of ending up in serious delinquency or violence by early adulthood just from that factor alone, regardless of what other factors are present.

And then very importantly, this Justice Department study identifies that the risks are cumulative, that it's not just one risk and another risk, but it's A plus B plus C; and as you add on risk factors, you are steadily increasing the likelihood of a criminally violent outcome.

The large group of factors, risk factors, that were present in Marc's life are these family factors, and I think that that has some relationship to why his violence has substantially been in a family setting.

Q. Before we go there you have some check marks under individual factors. Let's not skip anything here.

A. Yes, ma'am. The aggressiveness doesn't become apparent until Marc is a teenager and he begins to get involved in romantic relationships, and so I think the first thing that happens is the abuse of Tosha and some confrontations with males in the context of a

Case 3:12-cv-00327-MOC   Document 57-06   Filed 09/23/15   Page 19 of 249
1570

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/7/2002

Page 3598

relationship with a woman, early initiation of violent behavior. That refers to these, the beatings of Tosha, the violence that he had with his female partners. And he had beliefs that were -- that allowed that, that were consistent with it. Now, they are not beliefs that just hatched out of nowhere. These are beliefs that are a pretty natural product of growing up in a family system where the parents are mutually accusatory and are fighting and yelling and cussing and hitting each other. But he ends up being a product of that kind of belief system.

Q. Now, on aggressiveness, would that include the shooting of Anthony Britt? You are familiar with that?

A. Oh, yes, ma'am.

Q. Marc testified that it was essentially he felt threatened. Was that an act of aggressiveness that you are talking about, or some qualification?

A. First it's a problem that he was carrying a gun. The fact that he got in a fight with Anthony Britt is -- that I think would not be considered an act of early aggressiveness. That would just be a fight. That he is carrying a fun, that elevates it in aggressiveness.

Now, there is perhaps some reason why he is feeling vulnerable. He is of small stature, Anthony

800-733-2082 Case 3:12-cv-00327-MOC, Inc. Document 106 Filed (704) 233-1889 Page 20 of 249 (704) 372-4593
1571

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3599

Britt apparently has some reputation, and Anthony Britt even brings along a couple of friends in this intention. So I sympathize with the feeling threatened; but when he is this age and he is carrying a handgun, that is -- I think he is off this early aggressive indicator.

Q.   Is there anything -- well, anything about the aggressiveness, at least when you are talking about youth violence, that is outside the scope of sort of family oriented domestic stuff?

A.   In his life?

Q.   Yes.

A.   No, ma'am.  I believe that all of the violence that is identified with Marc Barnette has a family connection to it, or a domestic connection.  Much of it involves violence toward female partners.  We have the shooting of Anthony Britt, which is about a domestic conflict.  It's about their competition over Tosha.

There is an instance where he gets in a fight with a guy at school who was involved with, I think may have been involved with Tosha or one of the other girls that he was involved with.

The abuse of Crystal's children occurred again in a family context where he is operating essentially as a father figure, except he is there as a stepparent and doesn't have the same degree of legitimacy that you

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 157-26     Filed 09/23/15     Page 21 of 249

Page 3600

might otherwise have, and that also has a family context.

So his life history of violence I see as being connected to these primary relationships, dysfunctional relationships with women and his behaviors within a family setting.

Q. Let's talk about the family factors now --

A. Yes, ma'am.

Q. -- the ones that you've checked. Tell us about those and how they apply to Marc and to your findings in your report.

A. Well, there are two types of child maltreatment that are present. There is actual abuse. Those are things like his father whipping him so that he leaves welts on him, or punching him. There is also one of mom's boyfriends, Al, who on occasion also punches Marc.

Another type of child maltreatment is neglect. As Sheila is leaving these children overnight while she goes out to clubs, even for a couple of days at a time disappearing, that is very obvious neglect.

Q. Did you mean Sheila or Sonia?

A. I'm sorry, Sonia. As Sonia is going out and leaving Marc, taking care of Mario overnight, you know, on one occasion where Derrick discovers that that's the case and goes over and picks up the kids, but it is

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/7/2002

Page 3601

happening much more routinely after that, as they're down in Atlanta, as Mario testified to. So you have both abuse and neglect, and some of the neglect is earlier in his background.

The third type of child maltreatment involves this domestic violence that's happening in front of the child. That also is kind of a corruptive and vicarious violence experience.

Poor family management practices we have talked about. That's the lack of structure in the home, the lack of consistent discipline, low levels of parental involvement. This includes Sonia going out while dad and the kids are at home, which is not a good sign for a mom to do on a repeated, multi time a week basis. And then as she is -- when she and Sheila are going out together and they are leaving their children unattended overnight, or they just come in from work, change clothes, the kids go to the refrigerator and look for TV dinners and try to scavenge some food, that injures the child not only because the parent is not there, it's what it says about what kind of feeling does mom have for these kids. If you are a mama and you can go out and leave your kids like that, what does that say about the glue that is supposed to be there between you and this child. So that part is even more damaging than the

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3602

fact that the kids are having to scavenge.

Q. In your report you talk about primary attachment instability. Is that sort of the same thing that you are talking about here?

A. Yes, ma'am. At the point that -- by the time he is 11 years old and Sheila and Sonia are going out together, that is really past the zone of primary attachment that we are talking about. The years of primary attachment that I'm mostly concerned about are zero to five.

The point is, though, when you've got a mama who is 14 years old, you are already concerned about her ability to attach in a positive way. Then later, when mama is going out and leaving these kids like this unattended and not taking care of them, it makes you -- it gives you some inference about the poor quality of care. If this how she is behaving when she is 26, what was the quality of care when she was 14 and 15?

Q. What is the next one?

A. Poor family bonding and family conflict. That's related to this attachment issue, the bonding is, dad ends up being absent across the first four years of his life, with the military and with being out of town as Sonia and Marc leave the community after the grandma is killed, the ongoing family conflicts that exist

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3603

between Derrick and Sonia.

Residential mobility I talked about, that was very extensive during the first four years of life and then picks up again after age 11. That has a plus, minus after it because some of the studies show that residential mobility is a risk factor, and other studies don't show that, and so it seems not to be just mobility alone but mobility in the presence of other risk factors.

Q. The next one is parental attitudes?

A. Yes, ma'am. And the next one is parent child separation, which have from his father repeatedly across the first four years of his life. Then his father is substantially separated from his life after age 11 and then kind of -- his mother is physically present but emotionally absent, functionally absent, across the adolescent years as well.

Q. If these are family factors, how do you explain Mario, his development, and how he is now?

A. And that's a real good question, since they grow up in the same family setting. There are a number of differences that I would point out that I think may help account for why Mario's outcome has been better than Marc's.

Number one, Mario may have a different father.

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 25 of 249
1576

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3604

We only know that Derrick is not their father. We don't know that they share the same father, and they were conceived four years apart from each other. So they may share a different genetic heritage in terms of their dad.

During Marc's first four years of life, he's got a 14-year-old mama who is moving from pillar to post repeatedly and his dad is largely absent from his life. First Sonia goes to live with her dad, then she goes out of state and lives with Tessie. During that period of time, Derrick is only seeing Marc maybe three or four times a year, relatively brief visits. Then Derrick goes off to the military and they don't see much at all during the time that he is in basic. During the year or so that he is in Omaha, they are with him for six months of that, then his is gone again for a year, year and a half overseas to Okinawa. So his dad is effectively absent during this early time of his life. When Marc is born, though, dad is getting out of the military and he is present. So Marc's first four years of life, he has his mom and dad there. The relationship between them is going about as well as it does, and he has an 18-year-old mom, not a 14-year-old mom.

When he gets older, Mario has somebody who is bigger than he is helping run interference for him, who

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 26 of 249
1577

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3605

is taking him away from the domestic violence, who is

helping him get his dinner, who is calling him in from

the street. So he has some experience of security that

there is somebody bigger than he is who is looking after

him, as opposed to Marc who doesn't have that.

Let me add one other thing about that. Mario has

not escaped clean from this, either. I asked Mario

about whether he has been violent with his partners --

MS. TOMPKINS: Objection.

THE COURT: Sustained.

BY MS. LAWSON:

Q. Okay. What other factors are significant

besides the two that you've got here?

A. This Justice Department study also identified

school factors, peer related factors, and community

neighborhood factors. Really the only ones that I saw

that applied to Marc were these school related factors,

and those in many ways are kind of a by-product of the

chaotic family setting.

Q. You have a slide that talks about balancing --

A. Yes, ma'am.

Q. -- risk and stuff. Would you use that to

illustrate your testimony about the risk factors and the

factors that protect children?

A. Yes, ma'am. As we look at this Justice

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3606

Department research about the nature of cumulative risk factors, our cumulative protective factors, if you have lots of risk factors and not many protective factors, then your likelihood of violence in the community is becoming increasingly great. It's a cumulative weight effect.

Alternatively, if you have lots of protective factors and not many risk factors, then your likelihood of violence is not very great. And as we try to identify this notion of who is going to be violent in the community, it is substantially a function of balancing how much risk factor, how much protected factor by this Justice Department analysis.

Q. Now, you talked about these factors in general --

A. Yes, ma'am.

Q. -- but how do -- do they apply directly to Marc and show us that slide.

A. Yes, ma'am.

Q. In what way? Do you want to go back a second? You had a point to make with that, didn't you?

A. Yes, ma'am.

Q. Tell us why you brought that slide in.

A. This is a function of, as we look again at this question of choice and what the Justice Department does

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 28 of 249
1579

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3607

with choice in this analysis of risk, the bottom line is they don't address choice at all in their analysis of the risk and protective factors for serious violence by young adulthood.

The reason that they don't focus on choice I think is this: If you have lots of protective factors and not many risk factors, you mostly make good choices. And if you have lots of risk factors and not many protective factors, you are really at risk for bad choices.

Now, prevention doesn't do much good just to try to get somebody to tell them they need to make a better choice. Prevention involves rebalancing the scales so that folks make better choices, because you have reduced the risk factors and added on protective factors.

Q. You made a slide that illustrates the elements, the features in Marc's life that are specific to what you just talked about generally.

A. Yes, ma'am.

Q. That's next. Tell us about that.

A. As I looked at specific emotionally damaging factors beyond those that are kind of in conjunction with those that were described by the Department of Justice, those include a family legacy of dysfunction and domestic violence and domestic homicide, a teenage

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 29 of 249
1580

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3608

mother, chronic domestic conflict and observed violence, physical abuse, paternity disillusionment and abandonment by his father, his mother's neglect, substance abuse and corruptive attitude, emotional abuse, sexually traumatic exposures, disrupted peer relationships, and personal victimization.

Q. Are those the things that you saw in Marc's background?

A. Yes, ma'am.

Q. Explain the emotional abuse.

A. Emotional abuse is leaving the children unattended. It's telling them that you are going to the store when, in fact, you are going out for the evening. It's the fighting and violence in front of them. It's not scarring their body, and they may still be getting enough to eat, it's not like they are starved to death, but you are scarring this kid's soul by the way that you treat him.

Q. What evidence is there in Marc's history of sexually traumatic exposures?

A. There are a number of parts of that, and I'm not talking about him being molested. You can be injured in this sexual channel without somebody directly molesting you or fondling you.

The things that happened to him that were

Case 3:12-cv-00327-MOC Huseby, Inc. Document 106 Filed 09/23/15 359-9889 Page 30 of 249 (704) 372-4593

1581

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3609

damaging to him on this circuit I think involved at the age of five, six, seven, finding his uncle's pornography that is quite explicit and the depicting genital sexual acts between adults. In addition, the access to his father's Playboys.

Whether it's out of some of that exposure or out of the chronic accusations of infidelity that are happening between his parents, or an absence of supervision, he ends up sexually experimenting, kind of becoming sexually aware very early so that he is engaged in sex play with an older female cousin by the age of seven and first has penetration at about age 10, then is sexually active with peer females by the time he is 13 or so.

MS. TOMPKINS: Objection. There's been no evidence of that.

THE COURT: Members of the jury, don't consider that last remark.

BY MS. LAWSON:

Q. Personal victimization, Dr. Cunningham, why does that apply and in what way to Marc?

A. Well, that involves the instance where he was beaten up by several peers when he was a kid, and his mom described his attitude being different about that, including having less interest in school and greater

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., in A...    ion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC... Document 106   Filed 09/23/15   Page 31 of 249
1582

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3610

withdrawal.

The other primary victimization was when he was shot by his cousin, with going through his hand, shattering his femur, resulting in there being a rod in his leg. That's a very significant event when you think about being a young adult, late adolescent, young adult male who defines himself in terms of his physical body, and here Marc has been a track star and now it hurts for you to walk and you limp and you are self conscious, and then there is this reality that in your own home you can be shot by a relative. That changes your experience of yourself and the world around you.

Q. Now, being real candid about all of this, Marc inflicted a certain amount of those elements of on his girlfriends?

A. Yes, ma'am, he did.

Q. And not everybody who has these things happen to them wind up killing people?

A. That's correct. It's a -- part of it is a function of risk factors and protective factors. It's not unlike trying to explain why some kids get cancer and some kids don't. Sometimes the neighborhood will be built on top of the toxic waste dump. The way they figure it out is some kids start to get cancer. They don't all get cancer, maybe only one kid in ten does;

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 32 of 249

1583

Page 3611

but the rate of cancer in the surrounding community is 1 in 500. That's why we know something toxic is coming out of the soil. That doesn't have to get to everybody in order for to us know that that is a significant risk factor. So these are things that placed him more at risk, that helped initiate this trajectory that ended so tragically.

Q. Were you here yesterday when Mario testified about being told that his other grandmother had been poisoned?

A. Yes, ma'am.

Q. Have you received that report from other people who you interviewed in connection with this evaluation?

A. Yes, ma'am.

Q. Who has told you that and do have some more information on this legacy?

A. Yes, ma'am. Do you want me to describe the specifics or talk about --

Q. Sure, and then relate it to.

A. Let me skip over this. In terms of the depth of his paternal grandmother -- I describe stepgrandmother because this is Derrick's mother and Derrick is technically not Marc's father, biological father, and so I have her identified as the stepgrandmother. She died when Derrick was in the Air

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affi    n (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 33 of 249
1584

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3612

Force, late in his tenure in the Air Force. She died of a cerebral hemorrhage, apparently, at least that's what was believe, but the family believes and talked among each other that they thought, in fact, that she was poisoned by her boyfriend at that time.

Derrick described that being a concern that he had had. Other family members described their belief in that as well, so that this is part of the -- it's part of the family belief system. Whether she was poisoned or not, these kids are growing up with some thought in their mind that their dad's father was poisoned by their boyfriend. They also have knowledge that their mom's mother was shot and killed by her boyfriend. And so that's part of the legacy of who my family is, is that grandmas have been killed on both sides.

His maternal grandfather, Jesse Cooper, was a Korean war veteran who was physically and psychiatrically disabled and also alcoholic. His maternal grandmother, Pearl Cooper, had chronic conflicts with Jesse in their marriage, they divorced in 1971 when Tonia was 13, and she then she is murdered by gunshot by her second husband in 1974 when Marc is about 10 months old.

Derrick's father, Tom Barnette, was described as an alcoholic. Derrick's parents divorced when he was

Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 34 of 249

1585

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/7/2002

Page 3613

five. His mom ends up dying suddenly or being poisoned. Then Derrick is only 16 himself when Marc is born, so he has a 16-year-old father and a 14-year-old mother. He and Sonia have chronic conflicts about her fidelity, and there are physical fights with her, including hitting her with a hammer on occasion. Sonia's 14 when Marc is born, she is engaged in loud fights and physical exchanges with Derrick. One of her boyfriends, Marc Regan, ends up being a homicide victim himself, and then she is abusing alcohol and drugs herself.

Q. I have got to skip over a couple of slides. Can you -- do they illustrate your testimony relative to your opinions about Marc Barnette?

A. Yes, ma'am.

Q. Can you back them up?

A. Let me go forward one and then back one, if I could. As we look at this family legacy, one aspect of the importance of this legacy is that a child is predisposed through heredity to substance and alcohol abuse, to psychological disorders, to personality disorders. Many ways just like with heart disease and high blood pressure, there are a lot of predispositions that have a genetic component to them. And in Marc's background, there is a genetic predisposition to substance dependence by history in his family members,

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 35 of 249
1586

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/7/2002

Page 3614

and also to psychological or personality disorders.

Family history also makes a difference, because family behavior patterns and effects are multigenerational. That means that you can see the same pattern from generation to generation in many instances. Now, some of that is from what we call scripts. Those are kind of the ideas of how my life is supposed to go that I never even much stopped to think about. Like it just never occurred to me that I would get married before I was in my early 20's, because my parents didn't and no one else in the family did. I never really thought about going to college or not, because that was always part of the script in the family.

Now, in Marc's family the scripts involved relationship instability that goes back to his grandparents. It involved distrust and infidelity. He has got -- the man who killed Sonia's mom was pathologically jealous and domestically violent himself.

There is a script of premature parenting. Sonia was 14 when Marc was born, and her mother, Pearl, was 15 or 16 when Tessie, her first child, was born, and they think that her mother was also a teenager, but we couldn't get the records identified to anchor that, but you at least have grandma to mama, and then Marc becomes a parent in his mid teens as well, so you have this same

Case 3:12-cv-00327-MOC  Document 106-7  Filed 09/23/15  Page 36 of 249
1587

Page 3615

pattern one generation after another of premature

parenting, as well as parental neglect and abandonment

that goes back generations.

There is also modeling, which means that part of

how you learn to be who are and how you relate to other

people is by imitating what is going on in your family,

by imitating your parents, and it's the sense of

catching yourself and realizing that you are doing

something exactly the way that your dad would do it or

your mom would do it even without thinking about it.

The modeling that he had was for domestic violence and

for substance abuse and dependence, and for parental

irresponsibility in many respects.

There is also what is called sequential damage,

and that's the idea that if grandma wasn't there by

death or by neglect and didn't do a very good job with

mama, then when mama comes to adulthood or adolescence,

she is damaged herself, and as good a job as she might

like to do as a parent, she has been damaged, so she

doesn't end up doing a very good job, she damages the

next generation, she doesn't parent them effectively, so

you see how this can go from generation to generation to

generation as they sequentially damage one another.  The

sequential damage in this family system includes the

substance dependence of parents and abandonment by

Case 3:12-cv-00327-MOC ·· Document 106    Filed 09/23/15    Page 37 of 249
1588

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3616

parents and also the death of a parent.

Q. Does this illustrate the points in your report about corruptive modeling, is that what you are talking about?

A. Yes, ma'am. Corruptive modeling is in this area here, and also with these scripts, as generationally the adults in the family have interacted in an unstable way with this infidelity and distrust and violence and having babies at 15, 16 and neglect, all of that is having a corruptive influence on the value system and the personalities of the kids that are growing up in that system.

Q. Now, Mario had some of the same scripts and modeling. Let's talk again about Mario and how he did not do what Marc did.

MS. TOMPKINS: Objection to what Mario did.

THE COURT: Sustained.

BY MS. LAWSON:

Q. Mario didn't kill two people --

MS. TOMPKINS: Objection to what Mario did.

THE COURT: Sustained. You will have to rephrase your question.

BY MS. LAWSON:

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/7/2002

Page 3617

Q.   Did you hear -- I will just go forward.  Please show us your next slide and tell us how it relates to your report and your conclusions about Marc.

A.   Yes, ma'am.  This arena of -- the factor of primary disruptive attachments is I think this most important thing that helps understand Marc Barnette and accounts for his domestic violence and ultimately for his participation in this offense, and that's the idea that in those first four years of life he did not have a solid anchor to a parent figure who was present and nuturing in his life.

Now, that's just fundamentally important to the development of personality, and that's the foundation that everything else rests on.  We intuitively know that.  Even though you can't remember things that happen to you before the age of four, we are so terribly careful about our kids at that age and spend so much time loving them and holding them and interacting with them and trying to keep them on a regular schedule, and that's not just so that they won't be cranky, that's what is helping make them solid as people.  That's what is equipping them to care about and be able to love somebody else some day and have a stable personality themselves.  And so as that is fractured and disrupted in Marc' development, then in adolescence and early

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an A...     ion: (704) 333-9889     Page 39 of 249     Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/13   Page 39 of 249
1590

Page 3618

adulthood, when he tries to relate to other people and be close to them, he does it in a destructive way.

Now, the power of primary disruptive attachments here is something that psychology -- nobody in psychology really disagrees that family relationships and the quality of those early attachments are fundamental to how a child is going to value other members of society as an adult. That's the conclusion, even of the FBI's behavioral science unit as they studied a particular type of homicide, at the core of that, they found that these guys, that these perpetrators --

MS. TOMPKINS: Objection, no foundation.

THE COURT: Overruled.

THE WITNESS: They found in this research that at the core of the cause, the core ideology of this homicide was that they had faulty attachments, the family relationships were disturbed and the glue didn't stick between the members of the family the way it was supposed to.

THE COURT: You may ask another question.

BY MS. LAWSON:

Q. Do you have any other examples of disruptive primary attachments in Marc's life?

A. Yes, ma'am. We have talked about Sonia being

800-733-2083 Case 3:12-cv-00327-MOC, Huseby, Inc. Document 106 Filed (704) 833-8889 09/23/15 Page 40 of 249 Fax (704) 372-4593
1591

Page 3619

14 and Derrick being 16.  That was birth.  Then from birth to age 10 months, Marc's care is shared by Sonia and Shelia and Pearl and also a baby-sitter that they had, and this is with Sonia being 14, 15 years old and going back to school.  Marc's care is with a baby-sitter during the day.  Sonia covers him for a few hours when she comes home from school, and then it looks like Pearl picks up in the evening hours.

Then at 10 months Pearl was murdered with Marc in the next room when this happens, not that he can remember Pearl being murdered, but that's now part of -- that's part of what you know about yourself and your family, that when you were 10 months old, your grandma was murdered in the next room.

Now, to the extent that Pearl was potentially his primary mama at that point -- if she was engaged in parenting like most moms would be of a 14- or 15-year-old, there is a good likelihood that she in an emotional way was Marc's mama.  Now she is suddenly absent at a pretty critical juncture.  At the very least we know that Sonia as a 14-, 15-year-old has lost her mama, and that's going to have an effect on what she can bring to bear in trying to take care of Marc.

Q.    What is the next slide that you have that helps describe and demonstrate your findings in your report?

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 41 of 249
1592

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3620

A.   Well, when we look at what effect does that have on Sonia and her ability to be a mama or potentially on Marc if, in fact, he is losing his emotional mama at this age -- when a parent dies, it's not just one event, but it changes almost everything about the child's life, about Sonia's life.  It pervades most aspects of the child's life.  It reaches to the core of the way that he makes sense of the world around him.  And it's a potential long-term increased risk for all kinds of things, from psychological disorders to coping problems to depression, alcoholism, suicide, intimacy and autonomy, marital difficulties, criminal activity.  To have a parent taken from you in your developmental years before the age of 18 is a catastrophic blow.  And depending on what other risk factors you have present at that time is kind of going to determine just how much effect does it have.

Q.   Is this your construct in terms of this is your personal opinion of what happens when you have a potential increased risks?

A.   No, ma'am.  A lot of the slides have this little writing down at the bottom, and that represents the peer reviewed study or journal article or Justice Department source that these findings were taken from, so this is -- these are the findings of an article by

Case 3:12-cv-00327-MOC-DCK   Document 106   Filed 09/23/15   Page 42 of 249
1593

United States of America vs. Aquilia Marcivicci Barnette      3:97CR23-V
Proceedings Before Judge Richard L. Voorhees      8/7/2002

Page 3621

Finkelstein that was published in 1988 that is a review of the literature on what long-term effects -- they are reviewing the scientific studies that have been done up to this time regarding the long-term effects of a parent dying on you during your childhood.

Q.    What do you have next that illustrates your opinions expressed in your report?

A.    From age one to two, Sonia, Shelia, and Marc live with Jesse, that's her father, and Sonia goes back to high school.

Then from two to three Sonia, Sheila, and Marc live with her older sister, Tessie, and Sonia's brother-in-law, Jeff Nero, and Sonia goes back to high school.

Age three, Sonia and Marc join Derrick in base housing in Omaha for about six months.  Then Sonia and Marc come back to Jeff and Tessie's house while Derrick is overseas for a year, is gone again.

Then from age three to four Sonia and Marc are moving back and forth between Charlotte and Columbia.

At age four Derrick returns from Japan, and Sonia, Marc, and Mario join him in North Dakota.  That's the disruption that is happening across these formative first four years of life.

Q.    Now, where did you get the information that you

Case 3:12-cv-00327-MOC  `Docun159406   Filed 09/23/15   Page 43 of 249
1594

Page 3622

have given us here?

A.    This came from interviews of Sonia and Sheila and Marc and Mario and Derrick, and I'm piecing together a chronology of what was happening at different ages.

Q.    Okay.  Tell us -- show us the next slide.

A.    This is not the end of his attachment story. You can say okay, that's what happened from age four, but, gee, when he's four his dad joins the family and things are all different.  And, in fact, there was much more stability in many ways than this early period of time represented.  At least the same adults are physically present from day to day.

There were continued injuries, though, in this attachment process.  Between the ages of four and eleven Sonia didn't intervene during Derrick's extended beatings of Marc.  When I interviewed Sonia four years ago, she described that the beatings would sometimes last 15 or 20 minutes and she would go to the bathroom because it was so disturbing to her.  Now, usually you think about a spanking lasting 15 or 20 seconds, and she is talking about physical blows that are occurring across 15 or 20 minutes of time.

From age four to eleven Sonia, not initially, but with time, she starts going out by herself without Derrick to clubs once a week or every other week, and

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3623

that gradually increases to several nights weekly. And then after they separate and when Marc and Sonia and Mario move down to Atlanta, then she repeatedly chooses clubbing and boyfriends and her own preferences in needs over the welfare of the kids, both in terms of leaving them unsupervised and also spending money on going out and outfits as opposed to groceries.

And then also an element in this disruptive attachment are what I describe as Sonia's pretense and Derrick's abandonment.

Q. Now, Derrick's abandonment, are you referring to his divorce or separation from Sonia or other factors that you think might have had some effect on primary attachments?

A. Well, the abusive discipline -- Derrick is kind of a mixed figure in Marc's life during the years before the divorce. On one hand there is this physical violence that is abusive in nature that's leaving bruises and welts. At the same time he is also doing things with Marc and is going places with him and is engaging him in fatherly kinds of activities, so you have got these two things that are happening at the same time. So there is some attach, although it's disturbed by the violence that's occurring between Derrick and mom and Derrick to Marc.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3624

The abandonment that I'm speaking of primarily, though, involves what happens after the divorce. Derrick has long thought that these children might not be his, particularly Mario, because he did the math and he was overseas when he is thinking that Sonia should have gotten pregnant with Mario. And so he has the paternity testing done and it identifies that neither of these children are his.

This creates a dilemma about what you are going to do. Do you tell these boys that? Do you tell them that you are not their biological father or not?

Now, the fact that he takes them to a nice restaurant to tell them about this in no way diminishes the enormous impact that that is for your dad to tell you that he is not really your dad.

Now, he tells them at that point that he still loves them, that nothing has changed, that he is still their father and he is going to be there for them, but the reality is that his participation in their life is fundamentally different after that. He doesn't pay child support. Now, after all, these are not his biological children.

MS. TOMPKINS: Objection to the narrative, nonresponsive to the question.

THE COURT: Members of the jury, we will

800-333-2082 Case 3:12-cv-00327-MOC, Inc. Document 106  Filed 709/23/13 889  Page 46 of 249 fax (704) 372-4593
1597

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3625

take our break at this time, afternoon break.

(The jury left the courtroom.)

(Brief recess.)

THE COURT: One administrative matter. Doctor, when did you come up with your latest 60 or so page Power Point presentation?

THE WITNESS: Monday -- Tuesday morning I think is when I finally cut it down to the ones I was using. I came with the body of them Sunday night, and I cut them -- I did some more work on them on Monday and had the final set I think Tuesday morning.

THE COURT: So you are saying that they were in preparation over what period of time?

THE WITNESS: Over the past -- some of these I created but didn't use in 1998, and others of them I have been working on over the past, I think I did some several months ago and then some over the past couple of weeks, much of it in the last seven days.

THE COURT: Any questions on that?

BY MS. TOMPKINS:

Q. Dr. Cunningham, you've known that you were going to testify in this case for some time, correct?

A. Yes, ma'am.

Q. Two years or so?

A. You know, I can't remember when I was

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 47 of 249
1598

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3626

recontacted. By this defense team I was kind of informally retained I think in about March, but I was contacted by someone else earlier and had some sense that I might be back in this case.

Q. But you understand that the defense had notified the Court on April 15th of this year that you would, in fact, be an expert witness in this case?

A. Yes.

Q. Were you aware of a court order that required experts to produce their reports by June 25th, 2002?

A. No, ma'am.

Q. Defense counsel didn't tell you that there was a deadline for your report?

A. Not that I recall.

Q. And part of this presentation that you have been giving us today was prepared by that point, a portion of it?

A. Yes, ma'am. Some of these slides were already prepared prior to June 25th.

Q. And defense counsel clearly had spoken to you beforehand about the nature of your testimony today?

A. Yes and no. The anticipation had been that my testimony would largely be risk assessment, or at least that was the greater likelihood, but then advised me, I think when I came back out this last time in June that

Case 3:12-cv-00327-MOC Document 106 Filed 09/23/13 Page 48 of 249
1599

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3627

they definitely wanted me to work up -- I remember when I came out in July, July 8th, that there was a discussion about going ahead and working up mitigation for sure at that time, but I had been working on it to some extent before that time and had prepared some things back in 1998.

Q.   So part of it was done in 1998, you were refining the content of your presentation into June and early July?

A.   Yes, ma'am, even as late as this last weekend.

Q.   But you were never told by defense counsel that there was a pretrial deadline for your report?

A.   No, ma'am.

MS. TOMPKINS:  Okay.

THE COURT:  Any questions?

MS. LAWSON:  Yes, sir.

BY MS. LAWSON:

Q.   Dr. Cunningham, is this your report, this presentation?

A.   No, ma'am.

Q.   When did you write your report?

A.   I provided a report in January 1998, I think, January 14th.  I can look.

MS. TOMPKINS:  Do you have a copy of it there?  I'm sorry.

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 49 of 249
1600

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3628

THE WITNESS: Yes, I do.

THE COURT: You may look at it.

MS. TOMPKINS: Can I mark it?

THE COURT: You may.

MS. TOMPKINS: Just for the purposes of this.

THE WITNESS: Watch your step.

BY MS. TOMPKINS:

Q. I will call it Government's Exhibit 100 for lack of a better word. And this is what you are purporting to be your report, is that correct?

A. Yes, ma'am.

Q. And that was completed in January of 1998?

A. That's correct.

MS. TOMPKINS: I'm not going to admit that again, but I will hand it up for the Court' perusal.

THE COURT: What we ought to do is make a copy of it so the doctor can have his copy.

MS. TOMPKINS: Would you give that to the clerk for the moment. Do you need a copy?

THE WITNESS: Only if I'm asked about it.

THE COURT: Any other questions?

MS. LAWSON: Yes, Your Honor.

BY MS. LAWSON:

Q. In that report, Dr. Cunningham, do you set out

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 50 of 249
1601

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3629

everything that you are testifying today in terms of your conclusions?

A.     In a general and summary fashion.  This is only a single paragraph, and it describes that there are multiple mitigating issues are present which are likely to be relevant to a jury in sentencing.  These include primary attachment instability and insecurity, childhood geographic instability, multigenerational domestic violence scripts, observed domestic jealousy and violence, paternal abandonment, corruptive modeling, vulnerability to alcohol abuse, depressive and posttraumatic symptoms, poor parental supervision and instruction, and other developmental factors.  These mitigating factors form a nexus to the instant offense.

So this describes in a very general fashion, certainly the presentation today is much more specific in elucidating these factors and includes some additional damaging developmental factors besides those that, I guess I'm referring to them here as other developmental factors.  There are some others that I have identified here that are specifically named that are not present in the report.

Q.     Is there any other report that you have made in connection with this case?

A.     There are affidavits that were filed in this

Case 3:12-cv-00327-MOC   Document 196   Filed 09/23/15   Page 51 of 249
1602

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3630

case. There is my testimony at the prior proceedings that I think mentions catathymic, chronic catathymic process, or homicide, but I don't recall another report.

Q. Now, you have -- some of these slides that you have got are static in that you use them almost every time you testify, is that right?

A. Yes, ma'am.

Q. For instance, the things from the Department of Justice where you talk about general development and risk factors?

A. Yes, ma'am. The slides about the factors that have been identified by the United States Department of Justice, I have used those in testimony in state and federal capital cases where I have talked about mitigation for over a year. They have different check marks on them. The scales I have used for some time. And as I talk about what the impact is of various damaging developmental factors, many of those also represent research studies that I have used in other state cases and other federal cases.

Q. And to your knowledge, do prosecutors have these actual slides, or the ones that you talked about that are static?

A. Yes, ma'am. My testimony is extraordinarily well-known to the office of the U.S. Attorney, because I

Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 52 of 249

1603

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3631

so routinely participate in federal capital cases. And I also have reason to believe that there is some pooling of information about what I'm testifying about between state and federal cases, because what happens in a federal case on cross will very quickly occur in the next state case that I'm in somewhere, so I get a sense that there may be some pooled information about my testimony in capital cases.

Q. You have no direct knowledge about whether this particular U.S. Attorney's office has that information?

A. No, ma'am, only that my routine experience is that there are many volumes of my testimony that are behind the U.S. Attorneys, assistant U.S. Attorneys that are questioning me or they refer to my testimony in other cases in ways that are quite consistent from one case to another.

THE COURT: We better not take any further time with it at this point. May we have the jury, please.

(The jury returned to the courtroom.)

THE COURT: The jury is with us.

MS. LAWSON: Thank you, Your Honor.

BY MS. LAWSON:

Q. Dr. Cunningham, when we broke off you were talking about Derrick's abandonment, and I think you

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an Al            on  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 53 of 249
1604

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3632

were discussing child support.

A.    Yes, ma'am.   In the aftermath of the discussion at Steak and Ale where Marc and Mario are told by Derrick that he is not their biological father, he tells them that he is still going to be their emotional father and will still be there for them, but the relationship markedly changes after that.

One of things that happens is that he stops paying child support.  Now, while he is not legally obligated to continue paying that, he's announced to them that he is still their father.  And if you are somebody's father, then you are still involved in providing for their basic support.  Now, that isn't that you provide for their basic support when they are kind of quid pro quo, when they are doing what you want them to, then you provide some support.  As a father, you support your children's basic needs, and the part that you do the withholding on is the extra, do they get a TV in their room, what kind of access to a car do they get, what kind of spending money do they get, but you are making sure that they are supervised and educated and guided and there is some help with the rent and that kind of thing.

Now, Sonia, after this, is a single parent, and perhaps she doesn't very wisely disburse the money that

Page 3633

she has and her priorities perhaps are not what they should be, but there is simply not enough money to go around. And that translates for your sons, they don't have groceries in the house. And they don't have appropriate supervision and they don't have a consistent place to live that isn't a mixed family setting wherever all of the relatives have piled in together and you may have 10 people living in the house. So that withdrawal of financial support, on one hand you say, I'm still your father, but by the way, I'm not providing any substantial economic investment in your support from this day forward.

THE COURT: Wait for another question.

BY MS. LAWSON:

Q. You also talk about Sonia's pretense. Did you 'make up a slide to illustrate your testimony and your report concerning that?

A. Yes, ma'am. Sonia's social presentation to the family is of being a committed wife and mother. That's the external appearance of things. Now, the reality is that there is false paternity, who she is represented to Derrick and the children is their biological father is not correct, that's a pretense. There is, in fact, infidelity as demonstrated by this false paternity, at the very least, as well as the clubbing and things.

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 55 of 249
1606

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3634

There is open domestic conflict and fighting in front of Marc and Mario all the time while representing that this is a happy family, going out to clubs by herself without her husband, leaving the boys unattended when they get to Atlanta particularly. The supervision is inadequate. She is gone to clubs and is absent, and nobody is really looking after the kids and what they do. She is spending money on her lifestyle rather than on the bills, so that now they end up being evicted from their apartments and there is not a -- there isn't food in the refrigerator. That then causes recurrent household moves and puts them into a really chaotic household setting of moving from place to place or moving in with Shelia and having them changing partners that are in the house that include very marginal boyfriends. There is Al, who is described as a thug and a thief; and Mark Regan, who related in a nice way to the kids but was a major drug dealer.

Then as Marc is coming apart and is becoming involved in violent or delinquent behavior himself and the domestic violence, Sonia is covering for him. The police officer comes to the door, Officer Joy comes to the door, is asking whether or not Alicia is in the household, and Sonia says, no, that she is not, when, in fact, Alicia is sitting in a chair against the wall

Case 3:12-cv-00327-MOC  Reproduced Document 106    Filed 03/23/15    Page 56 of 249
800-333-2082                Huseby, Inc., an Aff   1607    n (704) 333-9889           Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3635

inside the room. And so rather than seeing that this is a kid who is significantly at risk and needs some consequences brought to bear on him and also needs some treatment, she is covering for him.

The same thing happens when he is home after the fire bombing for six weeks. You would think at that point that you would call the police on your child before they ended up being caught in some kind of a sudden apprehension where there might be more violence or that you would be trying to bring some resources to bear instead of letting him not only sit and wait for the police himself, but become increasingly depressed in front of your eyes while you know that he has recently participated in a fire bombing. It's just baffling that there is this degree of inertia from people that would represent themselves as being --

MS. TOMPKINS: Objection unless he is expressing a professional opinion.

THE COURT: Sustained.

BY MS. LAWSON:

Q. What about neglect of interventions, is that essentially the same thing you were discussing?

A. Well, the interventions include getting him some counseling when Derrick tells Marc and Mario that he is not their dad or getting them involved in a boys

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3636

and girls club program, getting counseling for him when he is participating in these domestically violent relationships.

Q. If Alicia Chambers Houston had come into the courtroom and testified that Sonia was a fake, is that consistent with what you are talking about here?

A. Yes, ma'am. I think that captures this falseness that puts Marc later at such risk, because then what he is presented with a female that he is vulnerable to who may, in fact, be loyal or caring about him, he has enormous distrust that what she is telling him he can't depend on. Well, it's understandable how you might learn that if what your dad has told you about loving you and being there for you you can't depend on and if mom has represented herself in this way while she has been somebody fundamentally different. How is it that he would learn to trust the woman that is in front of him?

Q. Your next slide has to do with maltreated children. Would you have -- can you just briefly tell us about this and what it shows?

A. Yes, ma'am. These are a couple of studies that are sponsored by the U.S. Department of Justice, and essentially what they show is that if you come from a background of maltreatment, of abuse and neglect, you

Reported By: Scott A. Huseby, RPR
800-333-2082 Huseby, Inc., an A toll (704)333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 58 of 249
1609

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3637

are 20 to 25 percent more likely to end up being involved in criminal behavior or criminally violent behavior. It doesn't make you 100 percent likely. It increases your risk, though, significantly, about 20 or 25 percent.

Q. What is your next slide? Have we pretty well covered abandonment by father in your other slide?

A. Yes, ma'am. The only thing I might add is that as Sonia insists that the paternity tests were rigged, she leaves Marc and Mario to deal with this issue by themselves and then there is no shared reality of, okay, this is what happened, let me help you understand this. By denying it, Marc --

MS. TOMPKINS: Objection. There is no evidence of this.

THE COURT: Sustained. Members of the jury, don't consider that last comment.

BY MS. LAWSON:

Q. Do you know whether Sonia has ever affirmed the results of the paternity test?

A. Yes, ma'am.

Q. From whom did you get that information?

A. As I recall from Sonia. She described that the tests were rigged.

MS. TOMPKINS: Objection.

Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 59 of 249
1610

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3638

THE COURT: Sustained. Don't consider the last remark.

BY MS. LAWSON:

Q. Okay. Dr. Cunningham, you have another slide that discusses the literature about parental structure and what happens if it's insufficient?

A. Yes, ma'am, I do. There are two critical periods of time -- I guess three, when there is insufficient structure and supervision and discipline present in Marc's life.

Across the first four years of life, there is inconsistency in one person who is there on a caring, involved basis, and also there is not the degree of just environmental structure, you know, where you try to have your kids go sleep in the same bed at the same time with the same bed time ritual, with the same things that you do each day. That structure and routine is incredibly important to the formation of a healthy child.

And here is what happens: Children don't have much ability to structure themselves. They don't have good -- their brakes don't work so good, so you surround them with a lot of structure, a lot of predictability in their daily routine and very clear limits and discipline, and also the adults in their life behave in a very predictable fashion, that mom and dad act the

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3639

same way in an even routine, consistent sort of way, all of this structure around you, and what happens is over time that structure moves from the outside to the inside. And now you don't have to have mom at your elbow anymore, because mom is in your head.

The same sort of thing happens to you while you are in the military. That's why judges used to sentence delinquent kids to the Marines rather than prison. The idea was if you are in a highly structured context, that over a period of several years some of that structure will move from the outside to the inside and you will be able to control and direct your life more effectively.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3640

Now, most of the time after somebody has been in the military you see some evidence of that. You can detect this is somebody who has been in the military. There is something about their bearing, some of that structure they never entirely shake.

Well, Marc doesn't have that kind of structure across the first four years of his life. Then when the routine is more consistent, you have got mom and dad in this chronic infidelity fight that they are in that is keeping their behavior all erratic.

Then in a very critical phase of early adolescence you don't have a male figure in the home to help set limits and mom bails out as a parent in terms of supervising. So now you don't have effective discipline during that phase.

Now, here's what happens when you don't have that structure around you that's there to move into the inside: There is grave risk to psychological health and positive socialization, self-control does not develop, and aggression can unfold. Children whose families fail to provide adequate supervision are more likely to exhibit delinquent behavior, and here's the bottom line, quite simply, lack of parental discipline and structure and consistency contributes to aggressiveness and predisposes to violence in the community. The notion

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3641

that psychologists are opposed to discipline is entirely false, but it's very important that it's consistent and appropriate and with conventional even behavior and regular routines.

Q. Dr. Cunningham, in your written report you include among your findings attachment instability, poor parental supervision, or something to that effect, domestic violence as things that are pertinent to Marc Barnette?

A. Yes, ma'am, because we are trying to understand why doesn't he exert greater self-control, why does aggression erupt out of this person, where are the brakes. Then the background of structure and discipline becomes very, very important to that consideration.

Q. Does your next slide illustrate your contents of your report about that?

A. Yes, ma'am. This is a -- Marc Barnette behaves in an injurious way in the relationships, the close relationships of his life repeatedly, with Crystal, with Tosha, with Alicia, with Robin, so it becomes fundamentally important to identify where does this come from, this relationship disturbance that he has.

Now, the ability to relate to other people in a positive, caring way, in a healthy way, is not so much something that you see or that you learn about, it is

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3642

more like something that you catch, that you absorb through your skin by living in that.

The way you learn how to be healthy in relationships is to be in healthy relationships as a kid; and when you don't catch it, when what you catch is violent and unstable and insecure, then that's how you behave on the other side. So this is kind of a description of, or a summary of the nature of relationship injuries to kind of recapitulate this, all the way from the youthfulness of his parents, which was a dramatic risk factor as he was starting out, to the shifts in care, in Sonia's mother's murder and the changes in residences, his dad's absence, mom's drinking and partying, he's physically abused by his father, Sonia and Derrick are fighting frequently with public fist fights and chronic accusations of infidelity. Then they divorce and there is the paternity testing. Then Derrick is inconsistently involved with the boys. Sonia starts partying extensively and spends little time caring for her kids, and then Sonia is involved with abusive, marginal men, including one that physically abuses the boys; Marc and Mario were also left with their great aunt Hattie and family friends so that Sonia was free to travel with a boyfriend; he is prematurely sexualized; the move with the kids down to Atlanta, so,

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/13   Page 64 of 249
1615

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3643

again, a very vulnerable age; at the beginning of high school he is separated from the network of friends that he has had across his middle childhood. That is something that all of us try to keep from happening to our kids, because we are concerned about drugs and dropouts, and we would sure like for them to go into high school anchored to the healthy peers that they've had from earlier. So soon after he has lost his dad and his paternity, now he loses his friends and his mom substantially bails out in terms of being present.

Now, part of way he tries to address that is to make these premature commitments. He is getting involved in relationships that are -- that involve adult sexual activity of intercourse that he believes should be committed the way adults are committed to each other, and now as a kid he has children himself. Now that not only means that -- I mean, by definition the girl that you date when you are 16 you are going to break up with. It's supposed to be that way. She has got to date you and some other people to figure out who she is.

MS. TOMPKINS: Objection.

THE COURT: Sustained.

BY MS. LAWSON:

Q. To what extent do the premature commitments that you indicated exist apply to the offense for which

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3644

this jury is considering sentencing of Marc Barnette?

A. I think it has a very significant connection. These premature commitments that he seems to have little sense of, that he is dealing with a 15 year old, when those fall apart, he regards those as some sort of terrible injury and betrayal of him when they are just simple developmental things that happen to all of us. Everybody gets dumped by the girlfriend they had when they were 16 and she finds somebody else. But because he has gotten prematurely attached and thinks that this is the love of his life and the mama of his children, then when that very predictable thing happens, he takes that as a tremendous injury. When he gets to Robin and is now getting old enough to make that kind of commitment, he is carrying this sense that he has been betrayed and abused by these women all along. Then when it happens with her, she catches the rage and the distrust and the anger not only for these relationships, but for what happened with his mom and dad as well.

Q. In your written report you say that these factors that you have discussed form a nexus to the instant offenses?

A. Yes, ma'am.

Q. Can you explain that?

A. Well, it forms a nexus in, really in three

United States of America vs. Aquilia Marcivicci Barnette  3:97CR23-V
Proceedings Before Judge Richard L. Voorhees  8/7/2002

Page 3645

ways.  These are things that would put somebody at greater risk for criminal activity and violence of all sorts.  They are broad risk factors.  They also are the sort of background that we would anticipate seeing in someone who is domestically violent, where there is a history then of attachment damage and they have grown up with modeling of domestic violence.  And it also relates to a particular type of homicide process called catathymic homicide.  So we've really got several aspects that this connects to, and several different types of offenses, the murder of a spouse, the murder/suicide that may occur in couples, and a catathymic homicide.

Q.  Now, you are talking about the research that underlies your opinions and your testimony?

A.  Yes, ma'am.  There is some research about these that helps connect Marc Barnette's developmental experience with the sort of offense that gets carried out here.

Q.  I imagine you have another slide that discusses this further?

A.  Yes, ma'am.  I try never to be without a slide. But to get a sense of the extent of this, 16 percent of murders occur within the family.  Of those, four out of ten involve a spouse killing the other spouse.  29

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3646

percent of female homicide victims in 1993 were killed by a current or former husband or boyfriend. So when a woman is killed, there is a one in three chance that she has been killed by a current or former intimate, this from the FBI's uniform crime report in 1993.

Q. Does your next slide deal with risk factors for homicide?

A. Risk factors for murder/suicide. And this is from an article from the American Journal of Psychiatry, the role of depression in couples involved in murder/suicide and homicide. These are the risk factors for a murder/suicide, and I have red check marks by the one --

MS. TOMPKINS: Objection to murder/suicide.

THE COURT: Overruled.

THE WITNESS: I have red check marks by the factors that I think were present in Marc Barnette and in his relationship with Robin.

There was evidence of depression in the six weeks, couple of months prior to this offense. There is a male who carries it out, who is living with a woman in a long-term relationship, that relationship is characterized by discord, physical abuse, frequent separations and reunions. There is the abuse of alcohol

Reported By: Scott A. Huseby, RPR
800-333-2082  Huseby, Inc., an All  Document 106  Filed 09/23/15  or (704) 333-9889  Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Page 68 of 249
1619

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3647

or previous depressive episodes and personality disorder, and there is premorbid jealousy. Those are risk factors for murder/suicide, and we see these same factors in Marc Barnette and in this relationship with Robin.

BY MS. LAWSON:

Q. Now, you mentioned catathymic homicide.

A. Yes, ma'am.

Q. Is that what label is applied to what happened here?

A. I think it's a label that applies. Catathymic homicide is a concept that first appears in the psychiatric literature in 1912 by a guy named Mayor. This isn't something knew, it's been around for 90 years. And it's not a diagnosis. It's a description of a particular type of process, of a particular type of homicide and how it unfolds. And these are the elements that are a part of this, as described by Revitch, who is one of the writers in this area, and also by Reid Meloy, who has written extensively about violent attachments and attachment -- criminal violence that has attachment disorder origins to it.

Now, when we look at a catathymic homicide, it's most likely to be carried out by a perpetrator, by a man with a disturbed attachment history. That's why this

800-333-2082    Huseby, Inc., et Al    (704) 333-9889    Fax (704) 372-4593

Case 3:12-cv-00327-MOC-DCK    Document 106    Filed 09/23/15    Page 69 of 249
1620

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3648

early bonding issue is so important. There is then an emotional bond or attachment that exists between the victim and the perpetrator. They are in a relationship with each other. There is then what is called an incubation stage that lasts anywhere from several days to a year or longer, and here is what is going on during the incubation stage. The future perpetrator's thoughts are obsessively preoccupied with the future victim. Their emotions are of depression, frustration, helplessness, and attention buildup. Their behavior may become kind of bizarre. So, for example, Marc Barnette is described as shaving his head, going out in the woods with a shotgun at night and almost playing a war games kind of thing, not coming down and socializing with the family, displaying behaviors that are unusual. Their thoughts become more disorganized and tangential. That thought content is pervaded by fantasies of murder and suicide.

Now, when the homicide wish occurs to them, they find it disturbing and uncomfortable, and so they try to put it out of their mind, to suppress it, but it keeps coming back. Their family or friends may be warned in some way, or there may be a cry for help. Marc Barnette certainly seems to be sending out calls for help all the way from this fire bombing and then going back home

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3649

where his family knows about it as well as his pretty

disturbed behavior across that six weeks that would

alert most family members that they have somebody who is

in trouble.  And then following the homicide there is a

release of tension and a subsiding of the crisis.

Q.    Now, you have prepared a slide that deals with
the personality structure that contributes to this?

A.    Yes, ma'am.  This is the from the research of
Reid Meloy, and he talked about the personality
structure of the person who commits a catathymic
homicide, that there is a history of damaged
attachments, that they lack an integrated identity.
That means a solid sense of who you are, separate from
whoever you are attached to.  That's part of what lets
you weather a breakup without becoming homicidal or
suicidal, that even though it hurts that this other
person is not there, mostly I still feel okay.  But when
you don't have an integrated identity, when that other
person leaves, it feels like they have taken your arm
and leg with them, and so you are feeling actively
maimed almost by them.

Now, in their personality structure, then, they
are dependent, which is what you see Marc doing, that he
attaches very suddenly to a new relationship or new
acquaintance, he very quickly falls in love, but he also

Reported By: Scott A Huseby, RPR
Huseby, Inc., an A        ion (704) 333-9889        Fax (704) 372-4593
800-333-2082   Case 3:12-cv-00327-MOC     Document 106   Filed 09/23/15   Page 71 of 249
1622

Page 3650

feels pretty entitled about how they are supposed to treat him and what respect they're supposed to give him and not wearing makeup and accounting for their behavior and all kinds of things. There are alternating feelings of grandiosity, that means feeling like I'm somebody pretty special, and sensitivity to humiliation, that merely anything in that relationship context feels like I'm being put down or uncared for. There is a desire for be admired and taken care of but sensitivity to slight criticism or to slight threat, and that's this jealousy proneness.

Q. Dr. Cunningham, when you talked about that middle one, dependent and entitled, did you also mention narcissistic?

A. I'm sorry, the narcissistic is the entitled, kind of to be treated as if I'm somebody special and to feel really injured if somebody rejects me. It's not that I really do feel that great about myself. If I did, it wouldn't bother me so much if somebody leaves, so it's a false sense. I'm kind of like a blowfish, I'm expanded like I'm somebody special, but really inside I feel terribly vulnerable, and that's that sensitivity to criticism and rejection.

Q. You talk about the incubation period in a catathymic homicide.

Reported ~ ~ ~ ~ ~ iseby, RPR
Huseby, Inc., an ~ ~ ~ ion (704) 333-9889
800-333-2082    Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 72 of 249   Fax (704) 372-4593
1623

Page 3651

A.    Yes, ma'am.

Q.    Is that a part and parcel of it?

A.    Yes, ma'am.

Q.    Did you find in your review of the evidence in this case and your evaluations evidence of incubation?

A.    Yes, ma'am, I did.

Q.    Would you share that with the jury?  Did you make a slide?

A.    Well, this is about what incubation involves, again from Reid Meloy, and here's the stages of it, and then I want to talk about Marc Barnette and the way that you see these same stages and what is happening to him across the period of time, particularly between the fire bombing and these tragic murders.

There is a devaluation of what once was and an idealization of what might have been, so there is a sense of, gee, this was the love of my life and then this sense of how can they treat me this way, what sort of person is this.  The victim is perceived as abandoning and, therefore, controlling the perpetrator. It's the idea that with their leaving they are actively humiliating me, they are making me somebody who is not worth very much, it feels like an active assault when all this person is doing is walking away.  The victim is perceived as a threat to their psyche, to their

Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 73 of 249
1624

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/7/2002

Page 3652

well-being, and in extreme cases a predator, who in a magnified and crazy sense is doing irreparable harm to the perpetrator. In a minute I will describe some of Marc Barnette's thought processes that he reported to me and to the medical staff at Butner that reflect this kind of thinking.

Options such as leaving the relationship are never consciously weighed. There is anxiety and depression that, mixed with homicidal/suicidal thoughts concerning this person. There is a homicide/suicide wish, either she must die or I must die, something has to give.

The violence then is considered to be affective. In other words, it's driven by all of this emotional turmoil. Now, that doesn't mean that there may not be considerable planning and premeditation. The act itself may be carried out in a very premeditated, organized way. What is driving it, though, is this surging, kind of crazy affect and thought process.

Q. You prepared another slide dealing with that?

A. Yes, ma'am. In terms of symptoms that I found to be present in Marc Barnette, to varying degrees across the several to six weeks between the fire bombing and the murders, there are a number of depressive symptoms, depressed mood, brooding rumination, sleep

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3653

disturbance, appetite disturbance, reduced libido, not absent libido, Steve Austin did take him out, but there is not the degree of sexual drivenness that was present before, loss of initiative, concentration deficits, reduced self-esteem, diminished interests, social withdrawal, suicidal thoughts, all of those being symptomatic of depression, which is part of this incubation stage in many cases.

MS. LAWSON: May I approach the witness, Your Honor?

THE COURT: Yes.

BY MS. LAWSON:

Q. Let's proceed first, if that's all right. Do you have another slide on this issue?

A. Yes, ma'am. This simply describes the specific -- it's a description of symptoms that go along with the -- before I just listed them, and this is a description of some of what was happening within each of these categories.

Q. Can you give just a brief summary of what those are as applied to Marc's situation?

A. You know, for example, brooding rumination, which I will talk some more about. He is in his room reviewing cards, letters, pictures, mementos, he cries, at night he turns on a red light, he stares, he drinks,

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/13   Page 75 of 249

1626

United States of America vs. Aquilia Marcivicci Barnette

3:97CR23-V

Proceedings Before Judge Richard L. Voorhees

8/7/2002

Page 3654

he points a gun at himself in the mirror, puts it under his chin, walks into the woods pretending to be on --

MS. TOMPKINS:  Objection, not in evidence.

THE COURT:  Overruled.  Members of the jury, you will have to remember the evidence in this regard, whether you recall it or otherwise.

THE WITNESS:  These symptoms that I'm describing are principally based a detailed history that I took of him of depressive symptoms that he said -- I would talk to him about these different areas and said, what was going on with you.  I have then taken that and organized it into different symptom components.

Social withdrawal, he did go out a couple of times with Steve Austin, but spent much of the time, his family described this as well, in his room, even putting a sign up for nobody to come upstairs to the loft, would come down to get his food, might eat there, might take it back up to his room, a much diminished interest in usual activities or socializing.  Energy varied quite a bit, appetite reduced, having trouble sleeping.  Those are all features that seem to have been a part of this.

BY MS. LAWSON:

Q.   In connection with your opinions expressed, what have you got next for us to review?

A.   I am describing here some of the irrational

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 76 of 249
1627

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3655

brooding that was going on as I talked to him about, what was going through your mind.

Now, the parts of this that are in black are what I obtained from my interviews with him, the parts that are in blue are what were obtained by Dr. Sally Johnson from Butner federal medical center, as well as others that were treating, where they are capturing some of his language or perceptions.

Marc described, she is the only person I really explained myself to, how I felt deeply, everything. She really knew how I had been treated in my past relationships. I had put so much trust in one person. She threw it all back in my face and didn't give a damn about anything I had told her. This is kind of -- you see this way of sort of twisting what happened. She berated me in front of her family, my family, made me seem like a squatter. In the end she treated me like a dog when she kicked me out. To think I was so committed to one person and she could have been having an affair behind my back, had given himself to her body and soul. She was faking during the relationship, she deceived me, how did I let her play me like she did, she had lived a lie for two years and suckered me into another hopeless relationship that I thought was so meaningful, it turned out to just be a lie, we planned to marry, she had cut

800-333-2082    Huseby, Inc.    Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/7/2002

Page 3656

me open, I wasn't going to be laughed at anymore, how dare she take my life like that, she killed me, everything I had, the life I was leading, the place we stayed together, how comfortable I was, she destroyed all of that because she wasn't true to the relationship we had, everything was gone, she didn't deserve to be happy after she totally wiped her feet all over me, why do I have to die by myself.

That's this crazy rumination that is going on across this period of time, and it fits with the stages that we talked about and that Reid Meloy identified as being part of the thought processes of this catathymic incubation.

Q. Dr. Cunningham, I'll show you Defendant's Exhibits 21 and 22 and ask you if those are duplicates of slides that you have just shown?

A. Yes, ma'am, they are.

Q. You had those made from those actual slides you have just shown?

A. Yes, ma'am, I did.

MS. TOMPKINS: Objection to the quotes from the defendant outside the context of the Butner record. These are just --

THE COURT: Members of the jury, we will take our evening recess at this time. I'll ask you to

Case 3:12-cv-00327-MOC  Document 106   Filed 09/23/15  Page 78 of 249
1629

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/7/2002

Page 3657

be with us tomorrow morning at 9:30. Please remember the usual instructions. Thank you.

(The jury left the courtroom.)

THE COURT: Let me see the slides. Do you have more representations of what has been on the screen?

MS. LAWSON: Just the last three or four, Your Honor.

THE COURT: What is the purpose, what do you intend to do with them?

MS. LAWSON: I intend to introduce them into evidence.

THE COURT: What is the objection?

MS. TOMPKINS: The objection is that it's apparently, although there is no quotation marks, there is a series of quotations from an interview that I don't believe is in evidence at this point. If it says Butner records, there is no Butner records in evidence, and these are apparently quotations from the defendant, who has already testified. And I don't know what the purpose of them are in the context of his testimony or his opinion. It's simply an opportunity for the defense to put on self-serving statements of the defendant. It seems to be outside of the context of the diagnosis or an expert opinion. It's more of a narrative.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A...ion (704) 333-9889
800-333-2082     Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 79 of 249
1630

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/7/2002

Page 3658

MS. LAWSON: Your Honor, he testified that he reviewed the Butner records. There's been other testimony about the fact of -- elicited by the government about the fact that he was up at Butner on cross-examination, was he evaluated by Dr. Sally Johnson who was at Butner. He testified very clearly so that the jury would understand it that the material in blue was excerpted from the Butner records. And what these are are examples of what he has testified to in terms of evidence of this catathymic thought process. You know, clearly it's a basis for his opinion that this is a catathymic homicide.

MS. TOMPKINS: And he is demonstrating that, if the Court is going to let that in -- the things in black, clearly there doesn't appear to be any transcript or summary of the -- this witness's conversations with the defendant, but it's being portrayed to the jury, and I would just object to the cumulative nature of the defense putting that in in addition to having it in five-by-five quality here in front of them and putting it up yet again in a different format.

THE COURT: Well, I think he has established -- he has testified that the statements, I believe the ones in black are the ones that he took from

Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 80 of 249

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3659

the defendant.  Is that correct?

THE WITNESS:  That's correct, sir.

THE COURT:  And the ones in blue, you say came from Dr. Johnson?

THE WITNESS:  Yes, sir.  They are excerpted from the Butner records.  Most of those notes are from her.  It's possible there may be another -- that there are other folks writing in the chart who also quoted, things about his thought processes at the time.

THE COURT:  Well, do you want to put those in as substantive evidence?

MS. LAWSON:  As illustrative, Your Honor.

THE COURT:  Well, I will think about that.

MS. LAWSON:  We have a couple of the slides that are going to follow this.  I will be glad the tender them to the Court for review or a paper slide.

THE COURT:  You want to go over those? Let's see them.

MS. LAWSON:  These are slides that were already given to the government yesterday.

THE WITNESS:  Your Honor, can I put that up on the screen?

THE COURT:  Yes.

THE WITNESS:  I think you have one of

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3660

these. Ms. Lawson, I believe you have this one about the inner struggle that he is making regarding the pull to act on these thoughts and the attempt not to, and I believe there are two slides that describe that, again apart from Butner, apart from my interview with him, and then a second slide also about that inner struggle that he is engaged in. There is then a chart, actually this one, that describes how all of these things tie together all the way from the recurrent damaged attachment to the family legacy of domestic homicide through the processes of relationship that he engages in to this catathymic crisis zone, ultimately coming out in homicidal thoughts and, in this case, ultimately actions toward his female partner and toward Donnie as well.

THE COURT: So you want to put those in? And of course it -- I will hear from the parties in the morning if you have anything further to say about that.

(Adjourned.)

I, Scott A. Huseby, do hereby certify that the foregoing transcript is a true and correct transcript.

SCOTT A. HUSEBY                                    DATE

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA      )      DOCKET NO. 3:97-cr-23-V
                             )
        vs.                   )
                             )
AQUILIA MARCIVICCI BARNETTE,  )      VOLUME 19
                             )      MORNING
        Defendant.            )
_____)

TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
AUGUST 8, 2002

APPEARANCES:

On Behalf of the Government:

        ANNE M. TOMPKINS, ESQ.
        JILL WESTMORELAND ROSE, ESQ.
        227 West Trade Street, Suite 1700
        Charlotte, North Carolina

On Behalf of the Defendant:

        JEAN B. LAWSON, ESQ.
        P.O. Box 472106
        Charlotte, North Carolina

        HAROLD J. BENDER, ESQ.
        200 North McDowell Street
        Charlotte, North Carolina


                Cheryl A. Nuccio, RMR-CRR
                  Official Court Reporter
               United States District Court
                 Charlotte, North Carolina

THURSDAY MORNING, AUGUST 8, 2002

THE COURT: Ms. Lawson.

MS. LAWSON: Yes, sir. We will shortly be concluding our evidence at the end of Dr. Cunningham's cross examination, and I wanted to move that the government not be permitted to elicit any future dangerousness testimony from Dr. Cunningham on the basis that we have not introduced that in our case in chief. We discussed that in connection with our Rule 29 motion.

THE COURT: Well, the court would -- the court, of course, denied the Rule 29 motion.

MS. LAWSON: Yes, sir.

THE COURT: Because the defendant's record and other evidence in the case taken as a whole indicated that the issue of future dangerousness remained in the case. The court would allow the motion in the sense that -- well, I'll hear from the government about it, but it may be that the remedy is to grant your request unless the government wants to call this witness as its own witness later.

Do you want to be heard on that?

MS. TOMPKINS: I do not wish to be heard, Your Honor.

THE COURT: That's what the court will do.

MS. LAWSON: Also, Your Honor, the government's questions of our witnesses have suggested that Marc Barnette

behaved himself well in custody because he was awaiting the sentencing hearing. But facts are that for a substantial period of time when he was in custody on death row, he had no hope or expectation of a new sentencing hearing. To allow the government to continue to make that implication to the jury would force us to illicit testimony to the effect that he had no hope because he was under a sentence of death, which, of course, would be problematic for us and improper. So I would ask that you instruct the government not to ask questions that make that suggestion.

THE COURT: Well, I'll ask the government to attempt to limit its questions in that regard so as not to put the defendant to a Hobson's choice.

MS. TOMPKINS: And we will do that. And would say to the court that the defense were the -- is the side that called those individuals to the stand to open that door.

THE COURT: Well, you're right about that. I think the -- I guess what you would do is attempt to limit your questions to the recent period.

MS. TOMPKINS: Yes, sir.

THE COURT: Without attempting -- getting into why.

Incidentally -- now, let's put on the record exactly what exhibits you wanted to put in evidence.

MS. LAWSON: Your Honor, they would be Exhibits 20, 21, 22, 23, 24, 25 which are the blowups of the slides that

you saw yesterday. Do you want me to hand them up so you can examine them? They're a little bit cumbersome.

THE COURT: No, just bring them forward so I can see them a little bit better. Hold them up one at a time.

MS. LAWSON: Here's 20. Your Honor, this is the one on incubation.

THE COURT: That one will be admitted.

MS. LAWSON: Thank you.

MS. HANKINS: Is that 20?

THE COURT: But state the sub number as well.

MS. LAWSON: In terms of Exhibit 20, the --

THE COURT: Oh, they're all 20?

MS. LAWSON: No, Exhibit 20 is this one sheet.

THE COURT: Okay. 20 can come in.

MS. LAWSON: Thank you.

MR. BENDER: This is 21.

THE COURT: 21 can come in. Let me look at that.

MR. BENDER: Yes, sir.

THE COURT: No, that's a quotation or an alleged quotation from the defendant. It won't be allowed.

MR. BENDER: Okay.

THE COURT: 20 seemed to be a statement of some sort of factors.

MR. BENDER: 22 is --

THE COURT: That's additional alleged statements --

MR. BENDER: Yeah.

THE COURT: -- which will not be admitted.

MR. BENDER: Okay.

MS. LAWSON: 23 is similar, Your Honor.

THE COURT: That will not be admitted.

MS. LAWSON: 24 also are statements of the defendant.

THE COURT: Right. That will not be admitted.

MS. LAWSON: And let's see. 25 is a chart illustrating Dr. Cunningham's prospective testimony about --

THE COURT: That's a flow chart. That can be admitted.

MS. LAWSON: Thank you, Your Honor.

THE COURT: As to the ones that have alleged statements by the defendant, that would merely be confusing or misleading to the jury inasmuch as the defendant testified about his ruminations concerning the crimes and the other subject matters on those boards.

MR. BENDER: Your Honor, may I put on the record the ones that are not going to be admitted?

THE COURT: Yes.

MR. BENDER: Just so we'll all be sure.

THE COURT: Right.

MR. BENDER: That would be 21, 22, 23, and 24.

THE COURT: Right. This witness was allowed to

testify about those alleged statements as a basis for his opinion, but to admit them as freestanding evidence would put an improper focus on statements about which the defendant could have been examined and cross examined, but was not.

MS. LAWSON: Thank you, Your Honor.

THE COURT: Now, we have a jury matter. Ms. Calkins was approached by a juror, I believe, as relayed to my law clerk, Ms. Dannelly.

Would you tell us, Ms. Calkins, what happened.

MS. CALKINS: A juror approached me this morning and said -- asked if they could be readvised of keeping an open mind policy and not forming opinions. And I asked him if they've been discussing the case and he would not say. He just said that opinions are being formed.

THE COURT: Okay. Now, what's the pleasure of the parties about dealing with that? Can you tell us what juror that is?

MS. CALKINS: He's an alternate, I believe. George Evans.

THE COURT: Number 22?

MS. HANKINS: (Affirmative nod.)

THE COURT: He would be in the right front.

MS. LAWSON: What I'm not sure of, Your Honor, is if he's saying that he's forming an opinion or if other jurors are expressing opinions or if other jurors are saying they've

formed opinions. So it's not clear, and I don't know whether it's any clearer from what Ms. Calkins said, but I don't think that we have any choice but to -- for you to make some inquiry.

THE COURT: Let's bring Mr. Evans in, then.

DR. CUNNINGHAM: May I step down, Your Honor?

THE COURT: Yes, sir, please do.

CSO YELTON: Evans?

THE COURT: Evans. George Evans, number 22.

(Mr. Evans entered the courtroom.)

THE COURT: Just right there is fine in the jury box. That's fine. You can take a seat if you wish.

MR. EVANS: Okay.

THE COURT: You had some conversation, I believe, briefly with Ms. Calkins earlier this morning.

MR. EVANS: Yes.

THE COURT: The jury clerk out there.

MR. EVANS: Yes.

THE COURT: Could you tell us what the nature of your concern is.

MR. EVANS: It seems that we may be forming opinions early. You were saying to have an open mind.

THE COURT: Yes, sir.

MR. EVANS: And I was just concerned that maybe the open minds are closing, I don't know. It just seems like it.

Case 3:12-cv-00327-MOC   Document 16-106   Filed 09/23/15   Page 89 of 249

THE COURT: All right. Well, now, is this indicated by things you hear in the jury room?

MR. EVANS: Yes.

THE COURT: And is it your --

MR. EVANS: Nothing -- it's nothing concrete. It's just as we leave here and go in there, it's just observations about the presentation. It's like, something like, I hope we can hurry up and get this over with. Something --

THE COURT: Something --

MR. EVANS: Someone was saying, I think we can do this in ten minutes.

THE COURT: Okay. Would it reach the level of debate or discussion, perhaps, in violation of the court's instructions not to discuss the case even with your fellow jurors?

MR. EVANS: Well, we haven't talked about it, but I didn't know -- I wouldn't think that -- it's not -- as far as I can tell, it's as if the minds are made up here. We go in there and the mind is made up or it seems like it is. As far as I can tell, no discussion in there, though, indicates that, yeah, I think that's right. It ought to go this way. It's like --

THE COURT: Well, would you say there's been discussion of evidence as -- like in particulars?

MR. EVANS: I don't know of anything in particular.

I haven't heard anything like that.

THE COURT: Okay. Will there be any questions from counsel?

MS. ROSE: No.

MR. BENDER: Yes. Yes, Your Honor, if I may.

Mr. Evans, just like in jury selection, just your honest feelings. And obviously, you have some because you brought it to our attention.

MS. TOMPKINS: Well, let me object.

THE COURT: Yeah. I don't want preambles. I just want questions.

MR. BENDER: Okay.

MS. TOMPKINS: And if the court could instruct that the questions not be leading so as to suggest an answer.

THE COURT: Exactly.

MR. BENDER: Okay. Who has been discussing the case or talking about it?

MS. TOMPKINS: Well, objection. He said no one had been discussing the case.

THE COURT: That is a leading question.

MR. BENDER: Judge, this is a serious issue and somehow we got to get to the bottom of it. I don't know how to do it other than --

THE COURT: All right. I'll ask the questions.

MR. BENDER: -- ask him.

THE COURT: Is there anything you can add as far as telling the court the nature of what -- first of all, is this something that has -- that just came up yesterday or the day before or...

MR. EVANS: It was after the -- I think it was in the third break of the day before the end of the day and one of them said something -- I don't remember which one it was now. He said something to the effect that -- that led me to think he had -- may have made up his mind and -- in a negative point of view. Something here he had seen. He just didn't agree with the testimony of the witness for the defense. That he felt like the guy was -- well, he just didn't believe the witness and so he was -- he was ready to make a determination now.

THE COURT: This is one juror.

MR. EVANS: As far as I could tell. That was just one. I was hoping that something like a -- read the juror's creed and be more thoughtful about what you're hearing and keep an open mind. I was hoping that would do it, but I don't know.

THE COURT: Well, so are you saying that that's essentially the only incident that causes you to come before the court in terms of --

MR. EVANS: Yes.

THE COURT: -- whether the court's instructions

might have been violated?

MR. EVANS: Yes.

THE COURT: All right, sir. Thank you very much.

MR. BENDER: Your Honor, may I?

THE COURT: Yes. Wait just one second.

MR. BENDER: May I approach or write out a question for you to ask?

THE COURT: Yes, sir, you may.

(The question was tendered to the court.)

THE COURT: Okay. This comment that you mentioned that another juror said, did he say that in the presence of other jurors other than you?

MR. EVANS: I don't think anybody else heard it.

THE COURT: Okay. And if so, was there any response to it, whoever may have heard it?

MR. EVANS: I don't remember saying anything. I was just kind of shocked that -- at the -- it seemed a little bit more heavier with -- he was ready to get on with the show, so to speak.

THE COURT: Get the case over with.

MR. EVANS: Yes.

THE COURT: That sort of thing. All right. Now, are you able to give us an idea who it was just so that we might perhaps speak with that individual?

MR. EVANS: I don't know him by name or number.

THE COURT: Do you know which seat he's in?

MR. EVANS: No.

THE COURT: What we need to do is to find out who that is. You need to be able to identify -- you can identify the person by appearance, I guess.

MR. EVANS: Well, there are two of them here that look similar.

THE COURT: Yeah.

MR. EVANS: They have distinctions, but they do look similar. I guess if he was to say something else, I may be able to relate -- you know, connect it better. But right now I'm kind of confused as to which one it was now.

THE COURT: All right. So you're not sure which of the two it might be.

MR. EVANS: Not for sure.

THE COURT: Do you think you could give us both names or both -- somehow identify both of them?

MR. EVANS: Yes.

THE COURT: Okay.

MR. EVANS: But I'm not sure as to which one it is.

THE COURT: I understand that. But -- I wonder if you could step into the jury room with the marshal there and just decide, if you can, which two you're talking about. And then I'll let the marshal ask people for their juror numbers.

MR. EVANS: Okay.

THE COURT: So we would have a way to identify them. Can you do that?

MR. EVANS: I could try, yes.

MS. TOMPKINS: Your Honor, can we be heard before we single anybody out?

THE COURT: Yes.

MS. TOMPKINS: Outside the presence of the juror?

THE COURT: Yeah. Why don't you step into the anteroom there just momentarily and we'll get right back to you.

MS. ROSE: We have witnesses in there, Your Honor.

THE COURT: Okay. We could use that room.

And you understand we're just trying to deal with things that come up and see what would be appropriate in a given instance, but we very much appreciate your communicating with the court.

Okay. That room is available, then. Thank you, Mr. Evans.

(Mr. Evans exited the courtroom.)

THE COURT: You may be heard.

MS. TOMPKINS: Before we decide to bring in and single out particular jurors, what I would offer is that based on what Mr. Evans has reported to the court, there's been no deliberation. That the comments made by that juror have been predominantly about fatigue and he apparently made a comment

about this witness.

Jurors are allowed to think about the case. They're not allowed to deliberate about the case. There's nothing that says a juror can't formulate opinions as the case goes on. They are to keep an open mind and listen to the court's instructions at the end and then deliberate with their fellow jurors. They're not to be a blank slate and have zero thought process during the course of the trial.

THE COURT: Well, the concern is the court has asked them not to discuss the case --

MS. TOMPKINS: Yes.

THE COURT: -- even with fellow jurors.

MS. TOMPKINS: And it appears from Mr. Evans that there was no discussion. That a juror made a comment that was not responded to and it was a comment made out loud and heard by Mr. Evans only, apparently, and that there has been no deliberation, and I think that's the key. Are they discussing the case and deliberating? And Mr. Evans said no, they are not discussing the case. That juror made a comment about the witness that was left unresponded to.

I'm concerned about singling out jurors and that -- that the point can be made to all jurors in the case to keep an open mind and not deliberate, not talk amongst yourselves about the case until you've heard all the evidence and the court's instructions.

THE COURT: Okay. What say the defense counsel?

MS. LAWSON: Your Honor, Mr. Evans felt that whatever he heard was significant enough to bring it to Ms. Calkins' attention. And what he said was we may be forming opinions and open minds, in the plural, are closing. And that room is pretty small and Mr. Evans may not have noticed whether anyone else heard or repeated what this particular -- what this juror said. The phrase was hope we can get this over with, which indicates not only the formation of an opinion, but an intentional disregard of the evidence. And you've got to have an open mind to listen to the evidence and that's what you've told them to do.

I agree with Ms. Tompkins that it is a very difficult task to find out which jurors have violated your order. It may well be that it's worthwhile asking some of the female jurors if they've heard anything because that doesn't single anybody in particular out. I don't know how -- what to propose, but I think that we need to inquire into it further in order to assure a fair trial. But also that it be done in a way that not alarm the jurors or make them think that they're in some kind of trouble to the extent that they're not candid with Your Honor.

THE COURT: Well, I think you read into his comments a little more than is there. It does seem that one juror may have violated the court's instruction by way of stating

something that could be interpreted as a statement that he had made up his mind. So I thought if we could single out that juror, the defense would have an option to strike that juror at this point in favor of the alternate.

MS. TOMPKINS: And if I may, Your Honor --

THE COURT: And then -- yes.

MS. TOMPKINS: On striking that juror, I believe that's a -- what Mr. Evans has brought forward is jury fatigue and -- rather than I've made up my mind. Mr. Evans said that he wishes -- that juror wishes the case could be over, but that it's still possible for all jurors to have an open mind and listen to the evidence. Just because he has made his mind up or whatever he has done or formed opinions about the evidence as it comes in or a particular witness as it comes in, there's no prohibition to that. The only harm might be that he has said something in front of other jurors in an effort to begin the deliberation process.

I just think it's -- we're making -- you know, it's a little draconian to try to find out a juror who made a comment that could be interpreted many ways which apparently, at least from the government's point of view, is more about fatigue than it is about deliberation; that we've singled that person out and start picking people off the jury not knowing -- I don't know what -- how Mr. Evans has now been affected by that, so if we start taking people off the jury, then Mr.

Evans has now been involved in that same colloquy, so now we essentially lose Mr. Evans as a juror. And I think a curative instruction to the entire panel is an appropriate response.

MS. LAWSON: May I say one thing, Your Honor? In the notes I was taking when Mr. Evans was talking, he said this juror said, I think we can get this over with in ten minutes. That means he's ten minutes away from his decision and that's what is really alarming. He's ready to deliberate. He's ready to make a decision. And he may have already made that decision. It's not fatigue. It's I know what I'm going to do. And it's similar to comments in other cases where people make jokes going down the hall about this is dead man walking or -- it's of great concern.

And I don't think that Mr. Evans has been implicated in anything improper. In fact, he's gone above and beyond what a juror might think they have to do because he's reported it to you. So I don't think that disqualifies him in any way. He's done his duty. He's followed your instructions.

MS. TOMPKINS: Just so the record is clear, it's also possible that the interpretation of the ten minutes was this juror -- this witness could be taken care of in ten minutes. It's -- Mr. Evans doesn't know --

THE COURT: I think -- I think -- that's why I said she's reading too much into that.

Let's put this other juror, that is, Mr. Evans, back

FORM FED · PENGAD · 1-800-631-6989

in the jury room and call all of them back in here. I'll ask them if any of them are aware of any violations of the court's instructions and then I'll reinstruct them.

MR. BENDER: Excuse me. Your Honor, because of the serious nature of this matter and Mr. Evans' concerns, we would ask that you have him identify the two people and give us the opportunity to use strikes against one or both of those people.

THE COURT: All right. I'll do that.

MS. TOMPKINS: And I object. That would be unnecessary and that Mr. Evans is himself implicated.

MS. ROSE: Why don't we ask the panel. Bring them in, instruct them, and ask them has anybody made up their mind? Do not make -- do not make improper comments. If you have made up your mind, let us know. He's telling us his perceptions. I mean, he's speaking for thirteen or fourteen other people, fifteen other people. I mean, I think it's -- that's a draconian measure whenever we're not even sure that he perceived the right thing. You're taking one man's word for it. I think it's better to leave this panel together at this point, give them an instruction. Ask them, Your Honor. Ask them about it.

THE COURT: Okay. We'll follow through on the court's request that you bring in Mr. Evans to place him with the other jurors and we'll bring all the jurors back into the

courtroom.

MR. BENDER: Just so I'm -- just so I'm sure, we're not going to have -- now we're not going to have him identify --

THE COURT: No, sir. I think that's the worst course of the two we've looked at.

MR. BENDER: Well, let me just state for the record, group dynamics being what it is, you ask that question, nobody is going to raise their hand. Nobody is going to rat themselves out and say yeah.

THE COURT: Well, Judge Sessions and others in the past have asked this question every time the jury comes back into the courtroom and it seems to be something that can be effective.

MR. BENDER: I think it's probably being asked in the context of during the recess. Here we have a juror who is so concerned he brings this to the court's attention, and I think it needs to be -- something needs to be done about it.

THE COURT: Well, the brunt of what he said was that the -- his request to Ms. Calkins was that he thought it would be well to reinstruct the jury to keep an open mind, and that evidently is based on the one comment made to him by another juror. That does not appear to rise to the level of having tainted the jury.

Follow through, please.

MR. BENDER: One more request, Your Honor. Would you leave the door open for Mr. Evans or anyone else to bring to the court's attention any concerns they have? Obviously, Mr. Evans has done that. I'm afraid that now if we close that door, he won't feel comfortable coming back in and saying, oh, by the way, I heard another comment. So I don't know how you want to do that, but I think you ought to leave that door open for everybody or anybody to bring it to the court's attention.

THE COURT: All right. May we have the jury.

(Jury entered the courtroom.)

THE COURT: Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: We have a long case and the progress here and at some point during the -- such a trial, the court -- that is, in this case, the sentencing phase, the court goes back to some of the things it said earlier to you. You've been instructed at some length about this, that and the other thing. And I thought I would ask you at this point if -- has any juror violated the court's instructions even inadvertently? If you would have an affirmative answer to that, just raise your hand and we'll deal with that at some appropriate time. Would there be anyone who would answer that question affirmatively?

(No response.)

THE COURT: And the second one would follow up with that one would be has anything happened to impair your ability to be a fair and impartial juror? Would anybody have an affirmative answer on that?

(No response.)

THE COURT: All right. Now, of course, if you needed to communicate with the court about anything, you can always send the court a note to let the court know about it.

And I'll go back over some of the things we've gone over before. That is to say, until the trial is completed, then, and you are deliberating, you are not to discuss this case with anyone, whether members of your family, people involved in the trial, or anyone else, and that includes your fellow jurors. If anyone approaches you and tries to discuss the trial or this phase of it with you, please let me know about that immediately.

And you must not read or listen to any news reports of the trial.

And finally, remember that any -- that you must not talk about anything with any person who is involved in the trial, even about something that has nothing to do with the trial.

Thank you very much for your attention to these instructions. That's just a little update for you.

I think you had a witness on the stand yesterday.

MS. LAWSON: Yes, Your Honor. Dr. Cunningham, please.

<u>MARK CUNNINGHAM</u>

DIRECT EXAMINATION (Cont'd.)

BY MS. LAWSON:

Q. Dr. Cunningham, yesterday afternoon when we left off you were talking about the incubation of a catathymic homicide.

THE COURT REPORTER: Of a what, I'm sorry? I didn't hear you.

MS. LAWSON: The incubation of a catathymic homicide.

THE COURT REPORTER: Catathymic?

MS. LAWSON: Uh-huh.

Q. Would you light up your screen and let's finish discussing this, please.

A. Yes, ma'am.

Q. Tell us about the incubation and what the process is according to the studies that you --

A. When we stopped yesterday, I was describing the sort of irrational brooding that was occurring with Marc across the weeks prior to these homicides.

You may recall that in discussing the aspects of that incubation stage, as Dr. Reid Meloy has described this catathymic homicide, and this was present in Marc's brooding ruminations. This idealization; devaluation of what once was;

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 104 of 249

idealization of what might have been. Robin was perceived as abandoning and controlling him. She was perceived as a threat, as if somehow she was being destructive to his psychological well-being, and almost like she was the one who was being assaultive in some emotional way toward him and doing great harm to him. With him constructing that in such a way as to make simply exiting that relationship difficult to weigh or even to bring to mind.

And also, last time I talked about -- or last night I talked about the depressive symptoms that were intermixed with this homicidal/suicidal thought. This kind of either she must die or I must die or both of us must die.

And also, the aspect of this that the violence is driven by this emotional turmoil, by this irrational brooding process. And while that's the driving force behind it, the way in which it's carried out may reflect a lot of planning and premeditation and organization in the way that that offense is carried out.

Q.   What does affective, that a-f-f-e-c-t-i-v-e mean in --

A.   That's a --

Q.   -- (inaudible) terms?

A.   That's a derivative of affect which means emotions.  If someone goes in to rob a liquor store, that may be done in a relatively cool, calculated sort of way and it's instrumentally designed to get them money.  They aren't going

in there because they're enraged or because they have some issue with the owner of the liquor store. It's just a vehicle to accomplish that criminal end. And so it's not affectively driven. It's just monetarily motivated.

Affective means that the driving force behind it is emotional in nature. Not profit oriented, but emotion oriented. And in this case this angry, paranoid, brooding, irrational process is what's fueling the action.

Now, when it's actually carried out, though, it isn't that the person just suddenly flies off on somebody. In this case they may be thinking about it, had been thinking about it for some time in advance and begins to make preparations or plans.

In that sense, I would disagree with Dr. Burgess who described these crime scenes as being of an unorganized type. As I look at these crime scenes and at these offenses, it has substantial organized presentation.

If we look at the first crime scene involving Donnie Allen, the -- the weapon is brought to the crime scene. Marc then waits for a period of time for a victim of vulnerability in terms of somebody who is in a car by themselves when other cars are not coming. The victim is approached in a way that maximizes the likelihood of surprising them and getting them out of the car. And Donnie is then taken away from the immediate place that he's encountered into a zone where he is

less visible and where there is less likely to be observation, either of the offense or of his body being found. And there is then a flight from that scene.

And all of those things go with an offense that -- and a crime scene that is relatively organized in nature.

Now, again, that doesn't -- that doesn't detract from the affective purpose of this which is to get a vehicle to act out in an irrational way toward Robin Williams. But that crime scene does have a lot of organized qualities to it.

When we get to the Robin Williams' crime scene, it also has many organized qualities to it, although it's somewhat mixed.

On the organized side, he observes the situation for a period of time before he enters into it and watches the house. The car is moved to a position behind the house, as I recall, in kind of an alley and is left running. Again, a weapon is brought to the scene. Entrance -- the phone lines are cut. The door is blasted open with the shotgun. And he then encounters -- attempts to encounter Robin Williams.

Now, the part of this that is less tightly organized is that while there is one agenda that has been carrying him toward killing her when he encounters her, if that's the sole purpose, then the easiest thing to do is to shoot her right there in that room or as he is chasing her to shoot her as she runs.

There seems to be another agenda that is present at the same time which involves trying to get her to talk to him, to leave with him so he can get answers. Much the same as he was seeking from Alesha some years before is he was trying to figure out how can you treat me this way? Don't you love me? Where is our relationship going? That sort of thing. So you have this sort of mixed agenda that occurs.

He is not taking steps toward disguising his identity and so ultimately his capture is almost certain, and that part, perhaps, is less organized in nature.

When he flees that scene, that also has some mixed elements to it. Obviously, he is trying to do some things that delay his capture. Things like leaving the scene; changing a license plate; scraping off the inspection sticker. I don't think they represent an attempt to permanently escape capture or else you don't go back to Charlotte and turn yourself in. But it is an attempt, it looks like, to delay his apprehension while he tries to figure out what he's going to do next, whether he's going to kill himself, sort of what to -- sort of what to do now.

But I think the larger weight of this is that these -- these crime scenes and much of his activity across this period of time is organized in nature.

The alcohol I think contributes, as it often does, in these -- across this incubation stage. It contributes to some

FORM FED ⊗ PENGAD · 1-800-631-6989

disorganization of thought and maybe reduces inhibitions to some degree. But he has not had so much to drink that day as to be intoxicated and does operate a motor vehicle and do some other things so that he is certainly not staggeringly intoxicated in any sense. There may be some disinhibition that this -- to help put this thing in motion, particularly at the point that he is encountering Donnie Allen. By the time gets to Robin several hours later, alcohol I think would be a minimal presence, if at all, in explaining this.

So I would disagree with Dr. Burgess in that sense. I think perhaps what she was alluding to is this -- this issue that the offense as -- the totality of the offenses from the firebombing through encountering Donnie Allen, taking his car and killing him and going to Robin's, that the totality of those is an affectively driven phenomena that is kind of irrational in its motivation. The way in which it's carried out, though, is relatively organized.

Q. Did you make a slide showing the symptoms or the things that were present in Marc that are related to this incubation?

A. To this -- yes. There's another part of the incubation stage that the literature talks about and that's the idea that the person struggles within themselves about this homicidal/suicidal impulse that's occurred to them. And again, these are extracted from my interviews with Marc as

well as from the Butner records from the time that he spent in the federal medical center there and was evaluated psychologically, psychiatrically.

The notes from Butner described: Terrorized with myself. I was not myself. Thought of turning myself in.

I was at war with myself. I felt like I was going over the edge. I was fighting with myself. This is from my own notes.

You know you can't do that. You know that's wrong and terrible.

Another part was saying, Look what she did to you. Look what Alicia did, what Crystal did, what Tasha did. That's that notion I was talking about last time of taking what are pretty typical adolescent relationship breakups and instability and making them profound betrayals of the -- what otherwise would have been the love of your life.

Look what people have done to me from birth on. I let people treat me bad all my life. You can't let people -- you can't keep letting people hurt you like this. They're laughing at you. Probably Robin is saying look how weak he is. Look what I did to him.

I couldn't take any more. I had to do something to prove to everybody that I'm not going to be pushed around anymore.

The next morning I would think: What happened last night? It was scary. And this is regarding those thoughts of

the preceding night. In the morning I wouldn't want to do anything to her. I was just angry with her, but not with the emotional intensity of the night before.

From the Butner notes: The thought of killing Robin scared him. Talked to mom. That he was losing it. She offered hospitalization or therapist. Didn't know if he could deal with it. Grew up in church. Knew Ten Commandments. Thought -- when thought crossed his mind, passing through, scary.

Something takes over your body, stuffs you in a corner, fights it. Then stronger force just takes over. Told myself you know better. Now feel -- now feeling feels to alien to me. It's like looking at a tape.

Night of offense: Stopped at the end of the driveway. Struggle within self about whether it was the right thing to do. You can turn back now but that part was getting weaker.

I just broke. I couldn't take any more. Felt evil come over me. Had never been that angry. Scared him.

So you see the struggle that again is talked about in the literature about this incubation stage, this phenomena of having these thoughts and fantasies and impulses that are disturbing and that the person tries to push away but that grow in strength over time.

THE COURT: Do you have another question, counsel?

MS. LAWSON: Yes, sir.

Q. What further things did you find in the literature about the catathymic homicide that are important?

A. I think this -- I think this captures -- let me see if there was another one that describes this. No, that captures the issues about both the irrational brooding that he was doing and the inner struggle and the depressive symptoms during that incubation stage.

Q. Can you use your highlighter to describe the process as shown on this illustration of your testimony?

A. Yes, ma'am. This is a flow chart that I developed to try to tie together the different elements of what had happened in his history and the tragic outcome in this case.

The -- there is this background that we've talked about in terms of recurrent damaged attachment. The instability and emotional absence of his mother; the death of his grandmother; the absence of his father; and the continued instability of attachments across his middle childhood.

And the expectation of that kind of recurrent damaged attachment would be both feelings of hurt and anger, and also a significant degree of kind of damaged personality, damaged emotional security, damaged sense of self that would make somebody very needy, to have somebody else to attach to, to -- in an attempt to make them whole.

Now, the other thing that's happening historically is this -- there's a family legacy of domestic homicide as a

script, a script of modeled domestic violence, the past relationship failures that he's carrying as evidence of folks that have abused him, and then his own past victimization of being beaten up when he was dating Sheila who preceded Tasha, as I recall, and also being shot by his cousin the year before this -- these capital offenses. And this -- these play out at a number of different levels in terms of what happens next.

Because he's needy as he goes into adolescence, he repeatedly becomes dependent on a female partner. That's where he goes to try to get some sense of well-being. As he's so dependent on that, though, on that girl, he feels enormously emotionally vulnerable. And sometimes that may be contributed to by behavior of the partner, and certainly that vulnerability is added to by his past experience with relationships in his family and with past romantic relationships.

His response to that emotional vulnerability is to shift into all these obsessive, jealous, controlling, violent behaviors. He becomes obsessively possessive. Wants to know where the girl is all the time. Doesn't want her wearing makeup. Is incredibly jealous and sensitive to any cue that she's being unfaithful. Begins to behave in a very controlling and demanding fashion. And that then is accompanied by physical abuse.

Now, the behavior of his partner may aggravate that

some. They're young as well and may be interested in somebody else, may even see somebody else, and that is not unusual at this stage of development with relationships.

Understandably, when he acts like that, the relationship simply can't continue and so it breaks down. When that happens, he then feels this enormous abandonment, anxiety and rejection. And really, at this point is when we start to enter this kind of catathymic zone. That out of his abandonment, anxiety and rejection, he then shifts to this obsessive preoccupation, depression, desperate futility, and rage that we saw acted out in some of the behaviors that he had toward Alesha as he kicks in her door, abducts her, holds her at knife point. You see the cycle in this zone.

And this is then accompanied by or results in suicidal impulses as an exit point out of this cycle and out of some contribution to depression as well, or towards some sort of homicidal, assaultive ideation, thoughts, impulses, fantasies toward a female partner.

Now, this is fuel by alcohol abuse in this zone.

Now, sometimes what happened is he would cycle through this. Sometimes what would happen in the past is that there would be some resolution of it. He might reconcile with this girl and start all over again. Or he might quickly find another partner to attach to and the cycle would start again.

In this case and in this instance, the tragic outcome as

we got to this point was the killing of Donnie Allen on the way to act out this homicidal fantasy, seek some reunion alternatively with Robin Williams.

Q.   Let me show you, Dr. Cunningham, what we have marked as Defendant's Exhibit 25.   Is 25 a replication of that slide you just showed us?

A.   Yes, ma'am, it is.

Q.   Okay.   And Number 22 (sic), is that a replication of the slide that you also showed us yesterday --

A.   Yes, ma'am.

Q.   Dealing --

A.   That describes symptoms of depression that he exhibited during this incubation stage.

Q.   Thank you.

        MS. LAWSON:   Your Honor, move admission of these two.

        THE COURT:   They will be admitted.

        MS. LAWSON:   Thank you.

        (Defendant's Exhibits Numbers 20 and 25 were received into evidence.)

Q.   Dr. Cunningham, there has been some talk about inconsistent reports from Marc about his family history, abuse, things of that nature.   Have you experienced, reviewing records and documents and -- in connection with Marc or with other people, that would give us some information about why

there are inconsistent responses?

A. Yes, ma'am.

Q. Okay. Could you tell us about that, please.

A. Let me deal with inconsistencies in Marc's descriptions initially and then describe some explanations or some hypotheses to consider in how to account for those.

As Marc is making reports to --

MS. TOMPKINS: Objection to -- unless it's an expert opinion about whether or not defendant should be believed.

THE COURT: Sustained.

Q. How many times to your knowledge has Marc been evaluated?

A. At least seven or eight times.

Q. And have you reviewed all those evaluations?

A. Yes, ma'am.

Q. Have you reviewed the different statements that Marc has made, for instance, about the amount of abuse that he suffered?

A. Yes, ma'am, I have.

Q. Do those statements differ over and throughout those records?

A. Yes and no. They -- they all describe, by my best recollection, excessive discipline, abusive discipline from his father. They vary in the details that are provided regarding that, and to some degree in the extent or the

frequency with which some of the behaviors are described.

So the answer is that he has pretty consistently described being treated abusively by his dad. The details of that and the extent of it vary depending on which report.

Q. Would they also vary depending on how much the examiner kept in their mind as opposed to what they wrote down?

A. Potentially.

MS. TOMPKINS: Objection.

THE COURT: Overruled.

A. Yes, ma'am. That's a factor that whatever is said is taken through the person who's hearing it.

Q. Dr. Cunningham, do you advertise your services?

A. No, ma'am.

MS. LAWSON: Thank you. No further questions.

CROSS EXAMINATION

BY MS. TOMPKINS:

Q. Dr. Cunningham, I'd like to conduct my cross examination of you in a question/answer format. Is that all right?

A. Yes, ma'am.

Q. Now, you stated on direct that in the past you've testified, I think, in twenty-two federal capital cases and fifty state capital cases.

A. Approximately. It's about twenty-two and just over fifty state cases.

Q. And all of those have been since 1994 when you testified

in the first capital case?

A.    I believe I testified in my first capital case in 1995.
I consulted on a case in 1994.

Q.    All right.  How many cases are you currently providing
services for which the case has not gone to trial yet?

A.    I don't know.

Q.    Capital cases.  Approximately?

A.    I really don't have any sense of it.  It is -- I know
there's more than ten, but beyond that I really don't know.

Q.    More than ten less than thirty?

A.    I have no idea.

Q.    Maybe more than thirty?

A.    I'm not -- I'm not trying to hedge.  I simply don't
know.  Sometimes I may get a call on a case and then never get
another call about it or it may even be resolved without my
being aware of it, and so I simply don't know how many there
are.

Q.    All right.  How many capital cases did you testify in
last year?

A.    Again, it would be an estimate.  I think about -- about
twelve or so.  But I don't -- I apologize, I didn't bring a
list of that testimony with me.  But I've testified about
seventy times in the past -- in capital cases in the past five
years, and I think it runs in the average of twelve or
fourteen a year.

Q.   So you think the year before that you did twelve to fourteen?

A.   That's my best recollection.  Again, I -- it's kind of speculative because I don't have that list in front of me.

Q.   Now, you've been involved in this case since when?

A.   Since 1997.

Q.   And you interviewed the defendant for how many hours?

A.   Just over eighteen.

Q.   Some of those a few years ago and some of them more recently?

A.   That's correct.

Q.   And in your eighteen hours of interviews with the defendant, did you record those?

A.   No, ma'am.  I took very detailed notes.  I did not record it.

Q.   All right.  Did you prepare some kind of a transcript of those eighteen hours of interviews with the defendant?

A.   Not beyond my detailed notes.

Q.   Did you write out a summary of the defendant's statements?

A.   Not beyond the detailed notes.

Q.   And those detailed notes are for your personal use, correct?

A.   Yes, ma'am.

Q.   And they're not part of your report that you generated,

correct?

A.   The report is very brief.  The notes are very extensive.
There is -- there's probably eighty or a hundred pages of
notes.

Q.   Okay.  Those are your personal notes, correct?

A.   They're my notes of the interviews of him and anyone else
that I talk to.

Q.   Okay.  And those are available to you in preparing for
your testimony, correct?

A.   Yes, ma'am.

Q.   And they're not part of your public report as much as
this is public.

A.   I'm not sure how to respond.  I guess depending on how
discovery works, then the notes are with me here on the stand
so -- and they were in 1998.  They're not hidden.

Q.   So if I wanted to go up there now and begin reading your
eighty pages of notes about your eighteen hours of interviews
with the defendant, I could sit here and do that now.

A.   Yes, ma'am.

Q.   Okay.  Rather than having prepared a summary or a
transcript as part of your report to the court.

A.   Yes, ma'am.  The transcript -- summary was not requested
of me.

Q.   So when you tell us what the defendant said, we would
have to take your word for that rather than know the context

of those quotes from the defendant.

A.   In terms of the notes that I took, what was in black you would take my word for.  What's in blue is from the Butner records.

Q.   Okay.  And I'm talking about from your report.

A.   Yes, ma'am.

Q.   We wouldn't know what other things the defendant said or you haven't told us in the other eighty pages of your personal notes about the defendant's statements to you over eighteen hours.

A.   Not verbatim, no, ma'am.

Q.   Okay.  So you're telling us what you want us to know about what the defendant told you.

A.   I'm not sure that that accurately characterizes it.  I've tried to illustrate -- the only thing that I've used directly are quotes that illustrate his inner struggle and the kind of irrational brooding that was occurring because his words seem to best capture the quality of that better than me summarizing it.  As I've described other history from him and other individuals, I've treated most of that in a summary fashion rather than the person's precise words because that seemed to be the most efficient way of presenting a comprehensive picture.

Q.   Okay.  So in the -- so that we could be efficient, we don't know actually what the defendant said in those portions

where it says dot, dot, dot.

A. That's correct.

Q. Okay. Nor do we know what other things he might have said about anything.

A. That's correct.

Q. Okay. Now, you have a slide presentation, correct?

A. Yes, ma'am, to accompany my testimony.

Q. And you -- some of those slides or many of those slides, actually, you use in other cases that you testify in.

A. Yes, ma'am, some of those I have used before.

Q. Okay. And those are the cases, the twelve to fourteen cases per year that you testify in.

A. Yes, ma'am. I may not use those in every case, but for example, the risk factors identified by the Department of Justice, I have used those pretty routinely across the last year because they simply represent the best research currently on the connection between development and criminal violent outcome.

Q. Okay. Now, the first slide -- I'm not asking you to put it up. In fact, could you go ahead and take that down.

A. Oh, yes, ma'am.

Q. At the top of the chart it said choices.

A. The ramp.

Q. Right.

A. The top block of all those had choice resting on that

whole structure, yes, ma'am.

Q. Okay. And on direct you were asked did Marc Barnette have a choice, and your answer was, oh, yes, ma'am.

A. Yes, he did.

Q. Okay. Now, isn't it true that the defendant chose to use his brother's identification to buy two firearms?

A. Yes, ma'am.

Q. Isn't it true that he chose to saw off the barrel and the butt and tape a flashlight to the bottom of that shotgun?

A. Yes, ma'am.

Q. Okay. Isn't it true that he chose a dark intersection in which to lay in wait for an unsuspecting driver to arrive at that intersection to be carjacked?

A. Yes, ma'am.

Q. Isn't it true that he chose to walk Donnie Allen into the dark woods, turn him around and shoot him three times in the back?

A. Yes, ma'am.

Q. And isn't it true after he shot Donnie Allen he chose to lean down and pick up his wallet?

A. Yes, ma'am.

Q. And he chose to drive Donnie Allen's car to Roanoke, Virginia.

A. Yes, ma'am.

Q. And at which point he chose to lay in wait for Robin

Williams to wake up in the morning and shotgun his way into that home.

A. Yes, he did.

Q. And he chose to cut the phone lines so that Ms. Williams could not call 9-1-1 to assist her daughter who was being chased by Mr. Barnette with a shotgun.

A. Yes, ma'am.

Q. Okay. And he chose to threaten the neighbor, Sonji Hill, when she was calling 9-1-1.

A. That's correct.

Q. All right. And he chose to drag Robin through her -- by her hair and her arm through that neighborhood.

A. Yes, he did.

Q. And he chose to shoot Robin Williams twice in front of her mother, killing her.

A. Yes, ma'am, he made all those choices.

Q. All right. Now, in the Department of Justice study that you -- much of your presentation is -- relies on, that study uses -- or identifies risk factors.

A. Well, you've asked -- you've asked a compound question. I find that to be a very important study, but my presentation also relies on many other pieces of scientific research. And so that's an important one and I did discuss it.

Q. Okay. Let's talk about the DOJ study right now.

A. Yes, ma'am.

Q.  The Department of Justice study identifies risk factors.

A.  Yes, it does.

Q.  And that's part of your presentation.

A.  Yes, ma'am.

Q.  And that was a study of, quote, Serious, violent, and chronic juvenile offenders.

A.  Yes, ma'am.

Q.  And that that study identified risk factors associated with serious, violent, and chronic juvenile offenders.

A.  Yes, ma'am.

Q.  And in your presentation you've attempted to provide this jury with an accurate description of the environment in which the defendant grew up.

A.  Yes, ma'am.

Q.  Okay.  And associate those risk factors with the defendant's environment.

A.  That's correct.

Q.  All right.  Now, weren't those risk factors developed to determine who might become a juvenile offender?

A.  Yes, ma'am.

Q.  Okay.

A.  By late juvenile, early adulthood, that's correct.

Q.  Okay.  Well, it's from the Department of Juvenile Justice, correct?

A.  Yes, ma'am.

Q. All right. Well, isn't it true that Marc Barnette has no juvenile criminal history?

A. I believe that's correct.

Q. Okay. So those factors didn't end up being very predictive, did they?

A. I think that they are. The context of these studies is to identify risk of serious violence in late adolescence or early adulthood.

Q. Okay. Even --

A. And that's --

Q. I'm sorry.

A. That's the tracking that the longitudinal studies take. And as you look at the continued follow-up, the interviews in the community and Widham study and others, they're tracking these folks on up into early adulthood. Often -- often the evidence of this is beginning in the teenage years --

Q. Okay. Let me --

A. -- and that's certainly the case with Marc.

Q. Let me stop you --

A. Yes, ma'am.

Q. -- just so that you can answer my questions specifically.

A. Yes, ma'am. I apologize.

Q. That study was entitled, The guide for implementing the comprehensive strategy for serious, violent, and chronic

juvenile offenders put out by the Juvenile Justice Bulletin, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

A.    That's correct.

Q.    That was who put out the study, yes?

A.    Yes, it is, but it's not targeted to folks that are --

Q.    Dr. Cunningham --

A.    -- less than fourteen years old.

Q.    I'm asking you who put out the study.

        MS. LAWSON:  Can he explain his answer.

        THE COURT:  Let him answer the question.

Q.    Okay.  Did the --

A.    That's the title of the study, but it's intended to identify individuals who are at risk in the late adolescent, early adult period.  You're looking at a trajectory that often begins in teenage years and continues and is evident by early adulthood.

Q.    Okay.  Thanks.  Now, you had a slide that talked about -- well, noting the study we've been talking about, Prevention approaches seek to interrupt the processes that cause behave -- problem behavior.

A.    That's correct.

Q.    All right.  So is it your testimony that these risk factors cause violence?

A.    That's the words of the Department of Justice:  That

these risk factors are the processes that cause the problem behavior. Now, they don't cause it one hundred percent of the time, but they do have a significant -- a significant presence in increasing that risk and in that sense have a causative component.

Q.    All right.  Now, is it your testimony, then, that risk factors cause behavior?

A.    They increase -- in many instances those are formative in nature.  I guess it's like saying does cigarette smoking cause cancer?  Well, it's a risk factor for it.  That doesn't make it happen in every case and so it must not be the only variable that we can use to account for it.  And yet to say that it has no causative contribution, that would be in error as well.

Q.    Well --

A.    And so this is -- when we talk about risk factors, you're talking about things that have a portion of the causative element.

Q.    Okay.  Well, would it be also accurate to say that the risk factors are associated with violence?

A.    Yes, ma'am.

Q.    Don't they start with looking at people who are already criminals, making a determination about their lives in order to try predict?

A.    In some instances.  In other instances they are tracking

these individuals as they go along and have some that have not been maltreated and some that have and track both groups over time.

Q. All right. So being male is a risk factor, correct?

A. Oh, yes, ma'am. That's the majority of criminal violence is perpetrated by males.

Q. All right. Now, does being male cause you to be violent or is it associated with being violent?

A. It's associated. It increases your risk.

Q. Okay. And family conflict is a risk factor.

A. Yes, ma'am.

Q. Okay. Does family conflict cause violence or is it associated with violence?

A. The two are potentially -- the two can be synonymous. As the risk increases, as the association increases, there is a causative element. So that if you have three types of family violence, family conflict, there's about 78 percent of those kids were violent in the community. If there was no family conflict, it was about 40 something.

Q. Right, so there's an association.

A. Yes, ma'am. It has a causative element to it.

Q. All right. But you're not saying, of course, that anybody who is male and has family conflict is going to murder two people, are you?

A. No, ma'am. They're at greater risk, but they're by no

means even likely to out of that background.

Q. All right. Now, it is true, though, however, isn't it, that every single one of the thousands of individuals incarcerated have risk factors?

A. Yes, ma'am. That's often how they got to prison.

Q. Now, in individualizing the defendant's life history to those risk factors, you gathered information from multiple sources.

A. Yes, ma'am.

Q. And it's important that the information that you use to prepare your report be accurate.

A. Yes, ma'am.

Q. And one of the slides that you talked about, it was risk factors in the community, conception to age six.

A. Yes, ma'am.

Q. And there was a list of things and you checked off a few of them.

A. Yes, ma'am.

Q. Now, one of the things that you checked off was family history of criminal behavior and substance abuse.

A. Yes, ma'am.

Q. Okay. And the -- in your testimony yesterday, you noted that -- you checked that off because of alcohol abuse by the mother, Sonia Barnette, that she was going out dressed up, going out with her sister and leaving the children.

A. She was doing that. She was also drinking to excess and was observed to be intoxicated, and evidence of drug abuse as well.

Q. And you actually gave the example of Mario Barnette's testimony about observing his mother leaving with the aunt and going out drinking.

A. Yes, ma'am.

Q. Now, you realize, don't you, that that example that you have given this jury was -- as reported by Mario Barnette and yourself occurred when the family was living in Atlanta and Marc was fourteen or fifteen years old.

A. Yes, ma'am, in that instance. Sonia was going out during the time that she was still married to Derrick across his childhood.

Q. Right.

A. And that is also described by Armad. Derrick Barnette described Sonia going out as well. So her alcohol abuse doesn't seem to be in serious question.

Q. My point is that you told this jury that that's a risk factor Marc Barnette had from conception to age six, and the examples that you're giving the jury to back up the fact that you're giving this risk factor to him happened well after the defendant -- in fact, the defendant was a teenager. Armad wasn't born yet.

A. I think that's a good point, and that may have been my

oversight. There is -- there are indications of Sonia going out to the clubs and abusing alcohol relatively early on. It becomes worse over time. And whether or not that aspect is included in the conception to age six or whether it simply shows up at six to adolescence, I think that's an arguable point.

Q. All right. So in that same conception to age six, you checked off family conflict.

A. Yes, ma'am.

Q. All right. Did you listen to Derrick Barnette's testimony that he and Sonia did not begin having conflict until Marc was about eight years old and they had moved back to Charlotte?

A. Yes, ma'am, I heard that.

Q. Okay. And that is -- but you've nevertheless given Mr. Barnette a family conflict risk factor from conception to six, notwithstanding the testimony of Derrick Barnette.

A. It's not a function of notwithstanding. There are a couple of elements that I would point to associated with that family conflict. One of them is that Derrick's discipline toward Marc was abusive in nature over an extended period of time, going back to his early childhood, and I think that has a family conflict component to it.

Derrick didn't suddenly do the math about Mario and his parenting -- whether he was the father of Mario at the time

that he leaves Sonia. That's something that was obvious at the time -- as he's deployed overseas and he's looking at the dates and when Mario was born. So that's something that's been present as an issue in this marriage from very early on.

Q. And I'm not quibbling -- well, I am quibbling, but my point to you is that you've given, haven't you, Mr. Barnette credit, if you will, for risk factors based on things you have determined to be present in his life at some point regardless of whether they're actually conception to six?

A. Well, let me continue the answer if I could. At age ten months --

Q. Well, I'll ask if you'll answer that question --

A. Well, I'm trying to.

Q. -- and then you can --

A. At age ten months his grandmother is murdered in a domestic violence incident in the home that he's living in. I think that also qualifies as family conflict.

Now, this guy was also abusive of her. You have his mother moving out of the house because she's unhappy about Pearl living with -- marrying and living with this guy. Now, that also qualifies as a context of family conflict prior to the age of six.

Q. All right.

A. She's then bouncing from pillar to post because she isn't entirely happy with where she's living. That qualifies as

family conflict.

Q. What my questions to you are is the examples that you've given the jury are not accurate in terms of other known evidence about Mr. Barnette's life. That's the point --

A. The examples that I gave --

Q. -- that I'm making with you, if you understand that.

A. The examples that I gave were intended to be illustrative and not comprehensive. Now, if I identified at conception to age six an example of conflict between the parents that in fact occurred after he was age six, then that's a fair criticism. I apologize for that. There is ample evidence of family conflict conception to age six in addition to whether or not what the degree of tension and conflict was between his parents at that age.

Q. Well, there are important differences, though, however, Dr. Cunningham, if I may take you to your next slide which was age six through adolescence where you give Mr. Barnette a check mark for transitions and mobility.

A. Yes, ma'am.

Q. Okay. And again, your example was the first four years of Mr. Barnette's life the family moved. Of course, which the first four years of his life are not age six to adolescence; isn't that correct?

A. Yes, ma'am. I don't think that was my complete answer in response to that item. I think I described that there was a

good deal of transition, mobility early on and then there was another -- then there was a period of stability up to about age eleven. Then there is another period of significant mobility in the aftermath of the divorce.

Q. And isn't it true that transitions and mobility is not a risk factor zero to six because young, young children aren't affected by moves as much as children who are older?

A. No, ma'am, that's not correct.

Q. Well, it's not on the DOJ risk factors zero to six --

A. If you look --

Q. -- is it?

A. If you look at family management practices --

Q. Well --

A. -- as that --

Q. -- is it on the list from DOJ --

A. Yes, ma'am. I believe it fits under family management practices. The issue at a younger age is not simply geography, it's the loss of structure as this child is continually in a different family mix, in a different location, and in a different home. And as -- as you have significant instability at that age, it's not so much the mobility as the instability in family management.

Q. Now, you had given Marc Barnette a check mark for parental attitudes favorable toward and parental involvement in crime and substance abuse.

A.   Yes, ma'am.

Q.   Again, did you hear Derrick Barnette's testimony that the two most important things he wanted to teach his young children were honesty and the importance of education?

A.   I heard that testimony.

Q.   Okay.  Would you -- well, strike that.

You also testified that Derrick Barnette left welts and bruises on the defendant.

A.   That's my understanding.

Q.   Okay.  Now, are you aware that he had previously testified under oath that when asked, Mr. Barnette, was your -- when you disciplined your son, Marc Barnette, did you leave welts and bruises, and his answer was no.

A.   That's correct.  Mr. Barnette's description of that is discrepant from other observers.

Q.   All right.  And in spite of evidence to the contrary, you still associated these risk factors with the defendant.

A.   Yes, ma'am.  I might turn to my interview with Derrick to see whether or not he identified to me that in fact he left welts and bruises as well.

Q.   What I'm talking about, Dr. Cunningham, is a statement made under oath, not an interview with you, and a statement he's made under oath in this courtroom.  So I'm not asking you to verify.  I'm asking you were you aware of statements that he's made under oath?

A.    I was here in the courtroom.  I don't recall whether he said that there were no welts and bruises that were left from the beatings that -- the whippings that Marc got.  I don't recall his testimony precisely in that regard.  The information that I obtained from other individuals in the family, and my recollection is perhaps him as well, is that it did leave welts and bruises.

Q.    All right.  But I'm reading to you from -- would you like to see it?

A.    Is this his testimony of yesterday?

Q.    This is his testimony from a prior hearing.

A.    I wasn't in attendance then so I would need to see that.  But the recollection that I have of it yesterday is unclear to what extent he acknowledged that there may have been welts and bruises.

Q.    Okay.  Now, have you accounted for Mr. Barnette's different stories?

A.    If you'll let --

Q.    As well as accounted for the defendant's different version of events?

A.    I have some explanation of both, yes.

Q.    Have you accounted for it in your findings?

A.    Yes, ma'am, I've tried to take that into consideration.

Q.    And in favor -- in the favor of Mr. Barnette.

A.    No, ma'am.  I would not at all dispute that Derrick's

description or characterization of his parenting is potentially at odds with the way other people might have observed that and perhaps at odds with how it would be -- how that would be evaluated from an external perspective.

Derrick says that he was there for Marc. When he's not paying child support, when he leaves it in the kids' hands to contact him, when a couple of years go by without contact, when Marc calls him from jail and there's no follow-up call --

Q. Dr. Cunningham --

A. -- that's not being there for your child as a father. So his perceptions of his own conduct may not be -- may not be particularly objective.

Q. Were you here for his testimony wherein he discussed Mr. Barnette calling him from Georgia when he was in jail and...

A. Yes, ma'am. I had a follow-up conversation with him then about what happened after that. Did you go to Georgia? Did you call him on the phone? Did you follow up with him to see if he got treatment?

Q. Well --

A. And the answer was --

Q. -- is it true that Derrick Barnette has remained a part of Marc Barnette's life?

A. In a peripheral sort of way. If he were a biological parent, his rights could have been terminated based on the degree of contact that he's had.

MS. TOMPKINS: Well, objection.

THE COURT: Sustained. Members of the jury, don't consider the last statement.

Q. All right. Let's move on. Isn't it possible that where -- you seem to be saying that Derrick Barnette may be minimizing his conduct. Is that -- I think you testified to that yesterday.

A. Yes, ma'am.

Q. Wouldn't it be fair to say that the defendant might have a tendency to maximize?

A. That potential is there. There's some of this that Derrick acknowledges himself that is an objective reality about how often there is contact or what degree of involvement he has in Marc's life.

Q. All right. Let's see, family legacy. You went through some amount of testimony about the family legacy.

A. Yes, ma'am.

Q. You called Jesse Cooper, quote, psychiatrically disabled.

A. Yes, ma'am.

Q. Okay. Now, what psychiatric tests did you perform on Jesse Cooper to make that determination?

A. I was advised of that by Sheila, his daughter --

Q. My question is what psychiatric tests did you perform on Jesse Cooper to make that determination?

A.   I did not test Jesse Cooper.

Q.   Okay.  Thank you.  You have a slide in that same family legacy slide that calls Tom Barnette, who is Derrick Barnette's father, Marc Barnette's grandfather, an alcoholic playboy.

A.   That's correct.

Q.   Now, did you review prior testimony in this case?

A.   A great deal of it.  I don't recall all of it, but I did review a great deal of prior testimony.

Q.   Now, Tom Barnette is from Philadelphia, correct?

A.   I don't recall.

Q.   Well, would it surprise you that in prior testimony when he was asked, Did you ever see Marc Barnette at Christmas time, that his answer was, Yes, I did.  I spent quite a bit of time going there those ages.  I've forgotten now what age he flew over there on the plane, but he came over several times.

     Okay.  Would it surprise you to know that when asked, Did you know Marc when he was around the age of fourteen, that Tom Barnette stated, I believe at that time -- I don't know when they went to Atlanta, but it was after the divorce.  But I can tell you this.  He was interested in historical things and I took a week off to take him to the zoo, different places so he'd be able to explain to his classmates what he saw there and I was hoping that would stick because I thought he was very intelligent at that age and he wanted to do something in

life.

A.    Yes, ma'am.  I was not describing what role he had in Marc's life as a grandfather.  I was describing what his presence was in Derrick's life early on in the early divorce of his family.

Q.    And you just made the announcement to the jury that he's, quote, an alcoholic playboy.

A.    That was my understanding from the interviews that had been done, the investigation.

Q.    And I'm guessing those are your words.

A.    No, ma'am.  Those are words that were part of the psychosocial history investigation that was done four or five years ago.

Q.    Okay.  So they're the words of some other sort of psychologist, sociologist?

A.    No.  My perception was, and I need to look and see if they're in quotes, was that that was how he was characterized by members of that family, but I don't recall with certainty.

Q.    So you -- we don't know who those people are or where that characterization came from --

A.    Not specifically --

Q.    -- correct?

A.    -- no.

Q.    Okay.

A.    Or if it's -- they are -- I don't recall.  It may be

specifically attributed, but I don't recall.

Q. Now, you've also testified several times about the grandmother who was allegedly poisoned, correct?

A. Potentially poisoned.

Q. Okay. But there are no police reports or corroborative information about whether or not that did or didn't happen.

A. No, ma'am. The critical issue is not whether it happened, but, rather, the presence of this as part of the history of this family. That people in the family believe it and the children have heard this.

Q. All right. Now, you testified yesterday one of your slides was about the relevance of a family's history or legacy over generations.

A. Yes, ma'am.

Q. And the first bullet point was the child is predisposed through heredity.

A. That's correct.

Q. Now, are you suggesting that Marc is a natural born killer?

A. No, ma'am. That's a mischaracterization. I think that he was at risk in a number of ways. I think he was at some risk for alcohol abuse. I think he was at risk for personality disorder, and for some affective instability, some borderline personality traits that are present in other members of the family. I think there are a number of

biological predispositions that are operating here.

Q. All right. Well, based on his heredity is there always a risk that he can kill someone?

A. It's not so simple as a hereditary risk of killing somebody. It's the -- the hereditary risks are four factors that put him on a trajectory that took him here. The borderline personality traits that he has, I think, have a genetic -- a hereditary component. When you take that kind of genetic personality predisposition and you mix it with early abandonment and attachment problems and other things that happened along the way, that helps take you to somebody who is domestically violent and who has a much more difficult time with relationships and is more likely to behave erratically and potentially violently in that relationship context.

Q. You talked about parental death. And am I correct that that relates to the defendant's grandmother who was killed when the defendant was ten months old?

A. That's correct.

Q. So are you telling this jury that the defendant's presence in the house when his grandmother was killed when he was ten months old was a contributing risk factor for the defendant killing Robin Williams and Donnie Allen?

A. It's part of the family legacy of domestic homicide that your grandmother was killed. I think another part of that is the knowledge that when that happened, you were just in the

next room. I mean, there's a sense that this wasn't something that happened a long time ago far, far away, but this happened pretty close to you.

Now, the part that is tied in addition to that knowledge is that a primary caretaker in his life was amputated at the age of ten months, and that is a potential substantial damage to a child's attachment development, particularly when the substitute or additional parent who is there is only fifteen years old.

Q. So little Destiny Williams who was in Ms. Bertha Williams' arms when the defendant shotgunned his way into the house and who Robin helped to take care of, is she now -- does she have a risk factor in her life because the defendant killed Robin Williams in her -- while she was in the house?

A. I think she is at greater risk for emotional or psychological problems in part from, again, the murder of a close family member. Now, depending on the extent of which -- and this now being part of what's traumatized this whole family system, and I would expect that that -- that does have the potential to reverberate through her life. Now, because she's female it's unlikely to be acted out in criminal violence, but this has not been a vitamin in her life. This is a -- that has been a destructive event.

Q. Murder/suicide. You realize this is a murder/murder, not a murder/suicide?

A.   Yes, ma'am.  I characterized this or talked about the research on murder/suicide because that seems to have been a part of the thought pattern and the fantasy that was being carried out, and his own reports of attempting suicide in the aftermath.

Q.   All right.  Now, in your slide on murder/suicide, you put case characteristic and had some check marks.

A.   Yes, ma'am.

Q.   And one of them was married or long-term relationship.

A.   Yes, ma'am.

Q.   Now, defendant didn't have a long-term relationship with Donnie Allen, did he?

A.   Oh, no, ma'am.

Q.   There was no physical abuse in the -- or history of physical abuse between Marc Barnette and Donnie Allen, was there?

A.   No.  That offense was in the service of the subsequent offense with Robin Williams that had some potential for murder/suicide.

Q.   All right.  So Donnie Allen had done nothing to provoke Marc Barnette into shooting him, correct?

A.   Oh, no.  And I wouldn't characterize that Robin Williams had provoked him into shooting.  There's not something that -- I wouldn't ascribe this to them.  But there was no relationship that Donnie Allen had as Robin did.

Q. So Donnie Allen's murder doesn't fit into the family legacy of domestic violence or modeled domestic violence or past relationship failure; is that right?

A. As I described yesterday, the risk factors that I've talked about are risk factors for violence in the community in general. They are specifically related in this case to a domestic homicide progression that Donnie Allen is caught up in.

Q. All right. Now, it's your goal, I guess, your purpose --

MS. LAWSON: Objection, Your Honor.

THE COURT: Rephrase your question.

MS. TOMPKINS: I'll start over again.

Q. Your testimony is in an effort to try to explain why Marc Barnette murdered Robin Williams and Donnie Allen; is that correct?

A. Yes, ma'am, it is intended to be explanatory.

Q. And isn't it true, Dr. Cunningham, that this is about Marc Barnette's choices?

A. Yes, ma'am, it is about his choices. Not the same choices that you or I would have, but the choices that he got after a lifetime of things that he didn't get a choice about. Then, yeah, at the offense then he's making lots of choices. This is about -- this is about the choices and about the slope of the ramp that those choices are made on.

Q. But you agree, as we started out by agreeing, that Marc

Barnette made choices; isn't that correct?

A. Oh, yes, ma'am. My ramp model has choices sitting on it. It's just a function of what structure do those choices rest on.

Q. And Marc Barnette made choices in this case.

A. Yes, he did.

MS. TOMPKINS: That's all the questions I have.

MS. LAWSON: No further questions.

THE COURT: You may step down.

THE WITNESS: Thank you, sir.

(Witness stepped down.)

THE COURT: Members of the jury, we'll take our morning break at this time. Remember the usual instructions. Thank you.

(Jury exited the courtroom.)

THE COURT: The clerk had a question about the exhibits that were admitted or not admitted, so I'd ask you to try to straighten that out with her during the break.

Do I understand the defense evidence is concluded here?

MR. BENDER: Yes.

I think the question was Defendant's Exhibit Number 1 which was the entire interview.

MS. HANKINS: No, 22 and 25. First thing this morning we said 20 and 25 were in. 22 was not allowed because

it was additional statements. And then the last two charts Ms. Lawson showed, she called them 22 and 25 and then Judge allowed 22. So --

MS. LAWSON: I think the problem is that the ink smeared on the exhibit number.

MR. BENDER: I think it's 20 and 25.

MS. LAWSON: Yes.

MS. HANKINS: Okay. Good.

MS. LAWSON: I'm sorry.

MS. HANKINS: That's correct.

THE COURT: Those are the nontestimony charts.

MS. LAWSON: That's right. It's just that the 20 smeared and it looked like a 22.

THE COURT: All right. So there are no more defense witnesses.

MR. BENDER: No more defense witnesses. If we could have a minute to make sure we've got all our exhibits entered in.

THE COURT: All right. You may do that during the break.

And will the government be offering rebuttal witnesses?

MS. ROSE: Yes, Your Honor. And we'll be prepared to go on with the evidence.

(Brief recess at 11:15 a.m.)

(Jury not present.)

THE COURT: Yes, sir.

MR. BENDER: Your Honor, I have given to the government, and I think I've tendered to your law clerk, the case of United States versus Stitt, S-t-i-t-t, which was a Fourth Circuit case decided in May of 2001. The citation is 250 F.3d 838.

The -- in the Stitt case, the Fourth Circuit pretty well defined what is rebuttal evidence and what is not. In that case they found victim impact was not rebuttal evidence because it didn't rebut anything pertaining to the life -- the good deeds of that defendant.

And I bring that to the court's attention because the posture we are in today is as a result of the government's rebuttal evidence as well as lack of surrebuttal evidence. So I am asking the court in an abundance of caution to proceed -- to have a voir dire as to the rebuttal witnesses that the government intends to call so that we can see -- and the court can make a determination.

THE COURT: Do you have any idea right now that the government intends to offer any victim impact evidence?

MS. LAWSON: Well, I don't know whether it's victim impact evidence. I understand Brian Ard is here who was the manager of Camelot. What does that rebut? What issue, mitigating circumstance or aggravating circumstance is that

going to rebut? We don't know.

THE COURT: Well, we'll hear from the government.

MS. ROSE: Well, I don't think we're going to be calling Brian Ard. Any rebuttal evidence we have relates to -- four of our five rebuttal witnesses relate to inconsistencies within the defendant's testimony that the government will be rebutting.

One from Camelot because the defendant described his tenure at Camelot and his leaving Camelot as being all based on a joking nature and the way he characterized his conduct there. We would rebut that characterization.

He also very clearly within his testimony indicated that he did not, through his controlling behavior, try to alienate Robin from her friends or take her away from folks or that she was not changed in her demeanor with her friends. We're not talking about -- talking about her good points. We're talking about her relationship with others as a result of her relationship with him.

THE COURT: Now, what witness are you talking about there?

MS. ROSE: That would be Angela Rosser.

THE COURT: Angela?

MS. ROSE: Rosser, R-o-s-s-e-r.

THE COURT: Now, what situation did she have with reference to the facts of the case?

MS. ROSE: Two things. The defendant testified -- gave a very specific circumstance during his direct testimony about a funeral that Robin went to of a friend's child and described his behavior related to taking Robin from either a reception after that funeral or something. It's the government's -- and he went on to say both then and particularly in my cross examination -- I think my question was, Is it your testimony that you did not remove her from her friends or would not allow her to spend time with her friends, and he said absolutely not. So she would be testifying as to the alienation of friends and the fear that Robin experienced whenever she spent more time with her friends than she was supposed to, and the particular incident that the defendant detailed about the funeral.

Shirley Williams is a very brief witness with whom the defendant had a sexual relationship during his time with Robin that he presented some testimony about. We would be rebutting that.

And then our two expert witnesses on BOP classification and Dr. Dietz.

That would be the government's rebuttal. Three civilians --

THE COURT: BOP classification and what else?

MS. ROSE: Dr. Dietz. The rebuttal evidence as to psychological testimony which was presented by their three

psychologists.

MR. BENDER: Judge, what -- what mitigating circumstance or aggravating circumstance is any of that except for the experts? What does it rebut?

In the -- Mr. Barnette during his testimony said that he had other relationships while he was with Robin. That simply goes to making him look bad and it doesn't rebut anything. There's not any mitigating circumstance to which that rebuts.

THE COURT: Well, I think it -- most of those fact witnesses go to the point of whether the defendant was under a great compulsion to be attached to Ms. Williams. And his behavior while an employee of Camelot is directly responsive to that.

MS. LAWSON: Your Honor, in terms of the behavior at Camelot Music, if I understand, the government intends to rebut Mr. Barnette's testimony about what led to his dismissal. That he basically testified that it was just horsing around as opposed to legitimate sexual harassment. Is that the objective of this witness's testimony?

MS. ROSE: That it goes to the attachment as to Robin. It also goes to the believability and credibility of a witness. I mean, the government can rebut -- or can show to the jury whether they should believe a witness based upon the evidence that they've heard and -- I mean, just as in this

case as in any other case. If the government has --

THE COURT: Well, you can't -- there's very specific rules about putting on witnesses to attack the credibility of other witnesses. I take it what you would be trying to do is to attack his version of the facts.

MS. ROSE: Exactly.

THE COURT: And that's legitimate.

MS. ROSE: Yes.

MS. LAWSON: May I just point out to the court that that is fairly prejudicial information. And at the last trial Mr. Ard testified on cross about the woman who had made the allegations of inappropriate sexual contact. You'll recall that Mr. Barnette said that they were horsing around. That it was not -- you know, he felt that it was not particularly offensive.

Mr. Ard was shown a picture. Question: The first picture is you and Joanna; is that right?

Answer: Correct.

Question: Kind of horsing around; is that correct?

Answer: Uh-huh.

Now, that corroborates Marc Barnette's testimony at least as to his perception and Mr. Ard's perception. Allowing the government to bring this man in to purportedly contradict Marc when basically he's saying the same thing, I think it's improper.

MS. ROSE: We're not calling Brian Ard.

MS. LAWSON: Who from Camelot Music, I'm sorry?

MS. ROSE: Joanna Baldwin who is the victim.

MS. LAWSON: Okay. Yet he's already testified to that and we already know that another witness who was there describes it as horsing around.

THE COURT: Well, the government is entitled to respond to that.

MS. LAWSON: Okay.

THE COURT: That's direct rebuttal and for an issue that the defendant thought appropriate on the defense case. So the court finds the purposes which have been tendered by the government are appropriate for rebuttal witnesses as indicated.

Let's have the jury, please.

MS. LAWSON: May we rest before the jury?

THE COURT: Yes, if you wish.

MS. LAWSON: And of course, we make our Rule 29 motion.

THE COURT: Yes. Thank you. Renewed and denied.

(Jury entered the courtroom.)

THE COURT: All right. The jury is with us.

Will there be any further evidence from the defense?

MR. BENDER: No, Your Honor. The defense rests.

THE COURT: All right, sir. Thank you.

Will there be rebuttal evidence from the government?

MS. ROSE: There will be rebuttal evidence. At this time the government will call Joanna Coleman.

JOANNA BALDWIN COLEMAN,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Hi. Would you introduce yourself to the jury, please, ma'am.

A. Joanna Baldwin Coleman.

Q. And where do you live?

A. Roanoke, Virginia.

Q. Did you attend college in Roanoke?

A. Yes, Roanoke College.

Q. Have you since graduated?

A. Yes. In 1998.

Q. Are you working?

A. Yes. I work for Ferrum College.

Q. What's your position there?

A. I'm the director of the annual fund.

Q. Now, while you were going through college, did you work to pay for your education?

A. Yes.

Q.    Where did you work?

A.    Camelot Music store.

Q.    There in Roanoke?

A.    Uh-huh.  And I worked full-time hours.

Q.    While full-time attending school as well?

A.    Yes.

Q.    Did -- while working at Camelot Music, did you meet the defendant, Marc Barnette?

A.    Yes.  He was the assistant manager.

Q.    When you were hired, was he the assistant manager?

A.    No.  He was a key holder, which is a level of management.

Q.    What does that mean?

A.    He had management responsibilities such as opening the store and taking care of the money, that type thing.  You would call in to Marc if you couldn't make it to work.  But at that point I think maybe -- I started late summer.  By the fall he was assistant manager.

Q.    You're going to have to speak up so the jurors can hear you.

A.    Okay.

Q.    You might need to lean.  Don't pull the microphone toward you.

A.    Okay.

Q.    You just might need to lean.

When did you -- what year did you begin -- what month and year did you begin work?

A.    July 1995.

Q.    Was the defendant already employed there when you were hired?

A.    Yes.

Q.    And it was later on that fall, then, that he became the key holder or assistant manager?

A.    Yes.

Q.    Did you see the defendant frequently at work?

A.    I worked with Marc a lot because I mostly worked night shift because of college and he, for the most part, was there nights.

Q.    Did he -- while working in management and prior to that time, was he involved in sales or helping customers?

A.    Yes.  Marc was excellent with customer service.  He knew all types of music and he was very personable.  People would come in, you know, just to see -- just ask Marc about different musicians, whatnot.  So yes, he was very out in the store to be seen.

Q.    He interacted well with those folks?

A.    Extremely well.  We had repeat customers that would come in and ask specifically for Marc.  Marc brought in go-go music to the store which is something we had not carried before.  Independent type music.  He was always working with

customers. Trying to stay, you know, current.

Q. During the time that you worked with the defendant, describe how he treated you.

A. Marc was extremely friendly at first. He has a flirtatious nature. Is it okay to get into the whole --

MS. LAWSON: Objection, Your Honor.

THE COURT: You may pose a new question, counsel.

Q. During the time that you were working with the defendant, did he do some things that made you feel uncomfortable?

MS. LAWSON: Objection.

THE COURT: Overruled.

A. Yes. Marc was extremely friendly. So at first, within my first two weeks of working there, he would come to me and say, you know, why don't you meet me at Applebee's after work for a drink. I was nineteen at the time. At that point in the summer I had not started school yet and I lived an hour away. So as a condition of getting the job, I had to, you know, on my summer breaks, whatnot, or Christmas drive back and forth from Martinsville to work there. So I would say, well, you know, I'm heading home. And I really thought he was just being friendly at the time.

As the months progressed, he would make very sexual and lewd comments and -- like I said, started off pretty innocent with just meet me for drinks. By the end of it --

MS. LAWSON: Objection.

A.    -- it was very vulgar.

MS. LAWSON:  Objection.

THE COURT:  Overruled.

Q.    Describe for the jurors as it progressed over the months specifically what happened.

A.    Marc harassed me.  I'll just say it like that.  Again, it started off with, you know, meet me for drinks.  And then it moved into, you know, you look sexy today.  You know, look at your rear in this outfit.  There's so many things.  I was too thin.  I needed sex.

By the very end, you know, there was a progression by Christmas.  He would say things like I needed his big dick in me.

MS. LAWSON:  Objection.

THE COURT:  Overruled.

Q.    Go ahead.

A.    I needed to be -- he'd tie me up.  At that point -- at first, you know, I would talk about my boyfriend, things to kind of throw him off when he would talk about the drinks when I was still trying to figure out is he just being nice, is he harassing me.  By the end, you know, I would barely speak to Marc.  And Marc would come in and he would say, What the hell is wrong with you?  We had a very hostile work relationship by the end.  You know, I would come to work and just work my shift and go home and just try to speak with him as little as

possible. At that point I had a management position so I didn't really have to call on Marc for a lot. I could go in, do my job, and get out of there. And --

Q. Well, now, as he started saying more specifically sexual things to you, was it only a one-time occasion?

A. No. It was all the time. You know, it got to the point that pretty much every shift I worked. And it's hard for me looking back now to say why did I stay at a 5.20 an hour job, but, you know, I was going to a private school. My mom was a single parent secretary. I needed the money. And in my head -- you know, I didn't know Roanoke that well. I just thought this is the only place, you know, I can get a job as a college student. So I kept thinking if I ignore him --

MS. LAWSON: Objection.

A. -- talk about my boyfriend --

THE COURT: Overruled.

A. -- he'll leave me alone and eventually he'll get the hint and just go on and we'll just talk about work and, you know, this would be it.

Q. Did you see the statements that the defendant was making to you as joking?

A. No. No. No. I don't know how you can joke about, you know, by the end -- he was more funny at first. By the end, you know, we had a hostile -- tense, maybe hostile is not the right word, tense working relationship. So when he got into

the I needed a dick in me, or whatnot, you know, I think that was more -- you know, he wouldn't walk by and just say, you know, you need -- laughing and say something like that. It was more he had a stern voice then. It was more of a -- I won't say it was a threatening environment, but it was getting close to it. You know, it wasn't at all some fun and games type thing, you know.

Q. Did he ever bring Robin Williams into the store?

A. Yes. Robin came in a few times. She would come up to the counter. She never really said much. I remember her being a very pleasant person. Seemed very friendly. Shy, though. You know, she wasn't someone that would just come in and start talking to us.

Q. Did you eventually report what was happening?

A. Brian had called me --

Q. Who is Brian?

A. Brian Ard was the manager of the store, I'm sorry. He had called me over Christmas of that year -- that would be Christmas of '95 -- because some of the men in the store had noticed that there was some tension between Marc and me.

MS. LAWSON: Objection. Move to strike.

THE COURT: Overruled.

A. They had noticed there was some tension between the two of us. And Mark Tuck in particular had asked Brian Ard to come into the store unannounced to see if he could see some of

what was going on.

So Brian Ard called me. Again, I was on my Christmas break and had been driving back and forth. And said, you know, people are saying there's some tension with you and Marc and is there harassment? And I told him that, you know, Marc had bothered me at first. I still just wanted it to go away. I didn't want all this conflict. Again, I'm going to school full-time. I'm working full-time. I just wanted to make my money and go home. So I said I really felt like, you know, again, Marc had bothered me at first, but that it was going to blow over. It had blown over.

And it was in January that it really came out that it -- it just got worse. And so in January when Marc was fired.

Q. Was that based solely on what you had said?

A. No. Her name was Renee Worther, I believe --

MS. LAWSON: Objection.

THE COURT: Overruled.

A. -- had actually brought it to Brian's attention. Marc had slapped her on the rear and she had walked out that night. Thought about it, because I remember she said she was vacuuming. Marc had told her to vacuum. She had walked out that night. Thought about it. And she knew I was being harassed. And she told Brian again, Joanna is being harassed. She just will not say she's being harassed. And that next day Brian started calling everyone in the store in

and we let it -- we started talking about it. But again, I just wanted to avoid it. There were times -- I had a friend from high school come visit me during that Christmas break. He was just coming through the mall. And I could tell it bothered Marc that this guy --

MS. LAWSON: Objection. Nonresponsive.

THE COURT: Sustained. Ask a new question, please.

Q. Did you continue after -- after the defendant was fired, did you continue to work at Camelot?

A. Yes.

Q. Until you graduated?

A. Yes.

MS. ROSE: Thank you very much. I don't have any other questions.

THE WITNESS: Okay.

CROSS EXAMINATION

BY MS. LAWSON:

Q. Ms. Coleman, you're aware this is not a sex harassment case, is it?

A. Yes, I'm aware.

Q. And I believe you mentioned that at first it was friendly and playful.

A. I would say it was friendly. Playful is not -- it was friendly. We didn't joke back and forth. I would say it was friendly.

Q. He never laid his hands on you --

A. He touched my rear.

Q. -- in a sexual way.

Oh, okay. All right. You testified to that.

Let me ask you this. If Marc Barnette had taken the stand in this case --

A. Uh-huh.

Q. -- and testified voluntarily that he -- he said to an employee at Camelot Music that he needed -- or she needed to have his big black dick in me (sic), that that was the truth. Is that the truth?

A. That's absolutely the truth.

MS. LAWSON: Thank you. No further questions.

REDIRECT EXAMINATION

BY MS. ROSE:

Q. If he said he was joking, was that the truth?

A. He was not joking. I mean, he had me chopping up boxes in the back room when my friend came in. I mean, it was a tense environment. He didn't want even to have men in there talking to me. I chopped up boxes for probably six hours during Christmas when all these people are in the store because he was mad that another male talked to me. You know, we're not joking at this point. I mean, there was no -- no ifs, ands or buts. I was making Marc upset by talking to another male. He was going to punish me by making me chop

boxes all afternoon. You know, there was no joking. I was not -- you don't joke about things like that. You know, I'm sorry. I just -- it bothers me to even hear we could have been joking about such things. It was such a hard thing at the time. You know, I cried a lot. Even though I didn't come forward and say that he was harassing me at first, that doesn't mean that I went home and forgot about it. You know, every friend I had knew. I just didn't want to cause that kind of conflict at work. I just wanted to pay for my student loans and be able to stay in school. You know, that was my number one priority. So that's...

MS. ROSE: Thank you.

THE WITNESS: Thank you.

MS. LAWSON: No further questions.

THE COURT: You may step down.

THE WITNESS: Thank you.

(Witness stepped down.)

MS. ROSE: Government will call Shirley Williams

SHIRLEY PARKER,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Would you state your name, please, ma'am.

A. Shirley Parker.

THE COURT REPORTER: Shirley what?

THE WITNESS: Shirley Parker.

Q. Shirley Williams Parker?

A. Yes.

Q. Do you know the defendant seated over here, Marc Barnette?

A. Yes, I do.

Q. Where did you meet the defendant?

A. At the Camelot Music store at Valley View Mall in Roanoke, Virginia.

Q. When was that, if you remember?

A. I don't quite remember the year. But I -- I was sixteen at the time.

Q. How old are you now?

A. Twenty-three.

Q. Were you living in Roanoke at the time?

A. Yes, I was.

Q. And you said you met him at Camelot. Were you employed at Camelot when you met the defendant?

A. No, I wasn't.

Q. How did you meet him?

A. I went in looking for a tape or a CD and he came over to help me. And our conversation was based around the gospel music area. That's where I was looking for my tape or my CD. And I ended up asking for an application for a job.

Q. And did you, in fact, apply and get a job there at

Camelot?

A. Yes, I did.

Q. Was the defendant in management at the time?

A. I do believe he was.

Q. And how long did you work at Camelot?

A. For about a month. Just throughout the Christmas season.

Q. It was a temporary position?

A. Yes.

Q. During that time, describe how the defendant treated you.

A. We were on a business level at work. But then we had a friendship outside of work.

Q. And as a result of that friendship, did he take you on several occasions to Keswick Apartments?

A. Yes, he did.

Q. And while at Keswick Apartments, was anyone else there when he took you there?

A. No.

Q. While there, what happened?

A. We had sex. I can't remember how many times. Maybe once or twice on the two times that he did take me there.

MS. ROSE: All right. I don't have any other questions.

MR. BENDER: I don't have any questions.

THE COURT: You may step down.

(Witness stepped down.)

MS. TOMPKINS: The government calls Angela Rosser.

ANGELA ROSSER,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please, for the jury.

A. I'm sorry?

Q. State your name for the jury.

A. Angela Rosser.

Q. How old are you, Angela?

A. Twenty-nine.

Q. Where did you grow up?

A. Roanoke, Virginia.

Q. Did you grow up with Robin Williams?

A. Yes.

Q. Did you all ever work together?

A. No.

Q. You worked at one hospital; she worked at another?

A. Yes.

Q. Now, growing up in Roanoke around Robin, were you aware of a Saturday morning ritual that Robin had with her mother?

A. Yes.

Q. What was that?

MR. BENDER: Objection, Your Honor.

THE COURT: Overruled.

MR. BENDER: Victim impact.

MS. TOMPKINS: Well -- let me just ask my next question.

THE COURT: You may.

Q. After Robin began dating the defendant, was Robin -- do you know whether Robin adhered to that Saturday morning ritual she had with her mother?

A. Are you asking me did it change?

Q. Yes.

A. Yes.

Q. What was that change?

A. Well, they used to go out every Saturday morning and they done whatever it is that they done. We would get together in the evening time. Well, when that started -- when she stopped hanging with us in the evening, then I knew something had changed. Just her whole -- everything changed.

Q. Okay. When she began dating Marc Barnette, did -- do you know whether or not she stopped going out with her mom on Saturday morning?

A. I didn't know if she had stopped going with her mom, but I knew she had stopped going with us.

Q. Okay. And describe for the jury the change in your relationship with Robin when she started dating Marc

Barnette.

A.    Well, we used to go out every weekend when she didn't have to work.  That changed.  We used to talk just about every day.  That changed.  We communicated at work because she worked three to eleven and I was on the night shift.  That changed.  We just -- everything just stopped.  Immediately.

Q.    So you and Robin -- had you all had lots of contact before that?

A.    Uh-huh.

Q.    Do you know whether or not Marc Barnette encouraged Robin to maintain her relationships with her friends?

        MR. BENDER:  Objection.

        THE COURT:  Overruled.

A.    No, I don't know.  I just know that she said that he was --

        MR. BENDER:  Objection.

        THE COURT:  Overruled.

        (Pause.)

        THE COURT:  Go ahead.

Q.    Go ahead.

A.    He was not -- he didn't know a lot of people so that's why she spent a lot of time with him trying to get him to know people in Roanoke, but he didn't want to get to know us.

Q.    During the time that Robin and Marc Barnette dated, how much of Robin did you see, actually?

A. I saw Robin very seldom. The last time that we really got together is when my niece had died.

Q. Okay.

A. And she came to the funeral.

Q. Did the defendant come to the funeral?

A. No.

Q. Okay. Do you remember an incident after the funeral in which you had an encounter with the defendant, Mr. Barnette?

A. Yes.

Q. Describe that for the jury.

A. Me and Robin and my cousin was going to the store and we had came to a stop sign. And Marc was in front of us and she had ducked down in the seat. And I asked her what's wrong, and she said she didn't want -- want -- she didn't want him to see her. And she said, Just let him go.

Well, evidently, he had saw her when she ducked down because when he took a right, we kept straight. He ended up right back behind us. He had turned -- made another turn.

Q. And this was after your niece's funeral?

A. Uh-huh.

Q. Where were y'all going?

A. We was just going to the store.

Q. Okay.

A. And --

Q. Do you know what car Mr. Barnette was in?

A.    Robin's car.

Q.    Okay.  And what happened next?

A.    She finally told us to pull over, and we did.  And he -- he got out the car and he was screaming and crying and hollering, asking her why is she doing that to him?  Why did she leave him?

She was telling him that we were just going to the store.

And he said, No, you weren't.  You lied to me.  You said that you wasn't going to go anywhere.  And he was -- he just kept crying and hollering and crying.

And she got in the car -- she said, well -- he said, Let's go home.  And she got in the car with him.

And I told her, you know, if he's going to act like that, don't go with him.

She said, No, it's all right.  I'm going to go ahead and go home.

And when he -- when she got in the car, he took off doing every bit of 50.  And I told my cousin to try to keep up with them.  Well, by this time he ran a stop sign.  Robin jumped out of the car while it was moving.  She was rolling.  And I pulled up behind her.

Then me and him got into it because I didn't understand why she was so scared and why did she jump out of the car.  I knew he was going fast, but I felt like she was really scared

of him and that's why she done that. So me and him was arguing back and forth and he was telling me leave him alone. I mean, he was crying and he was jumping up and down telling me I don't understand; that I don't like him and that he didn't know anybody here.

And so I told Robin that she wasn't going to get back in the car with him.

And she was -- she said, No, it's okay.

She said -- I said, No, if you're going to go, I'm going to go with you because you're not going to get back in the car with him.

So we got -- I got in the car with them and we went back to her apartment. And they --

Q. Why did you do that?

A. Because I didn't want her to go by herself because she jumped out of a moving car. I felt like if she was scared, then I was going to be there for her.

So when we got back to her apartment, we waited in the living room and they were in the bedroom and he just -- you could just hear him crying from the other room.

Q. All right. Now, in your opinion, based on your observations on that date, did Marc Barnette try to find Robin in order to give her comfort on that day of your niece's funeral?

A. No.

MR. BENDER: Objection.

THE COURT: Overruled.

Q. You can answer that.

A. No.

MS. TOMPKINS: Thank you. That's all the questions I have.

MR. BENDER: I have no questions.

THE COURT: You may step down.

(Witness stepped down.)

MS. ROSE: Government will call Dr. Peter Carlson.

THE COURT: We'll take our lunch break at this time, members of the jury.

MS. ROSE: Okay.

THE COURT: And we'll ask you to be back with us, members of the jury, at 1:45. Give you an hour and a half.

Please keep an open mind about the case. Remember the other instructions. Thank you.

(Jury exited the courtroom.)

MR. BENDER: Excuse me.

THE COURT: Yes.

MR. BENDER: Before Dr. Carlson testifies, may I have his report?

MS. ROSE: He's not going to do any opinions.

MR. BENDER: Okay.

THE COURT: All right.

 

Page 3755

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA )

) CASE NO. 3:97CR23-V

v. ) August 8, 2002

) Afternoon Session

AQUILIA MARCIVICCI BARNETTE, )

Defendant. )

TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE RICHARD L. VOORHEES

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

ANNE M. TOMPKINS, Esq.

JILL WESTMORELAND ROSE, Esq.

Assistant United States Attorney

227 West Trade Street

Suite 1700

Charlotte, North Carolina 28202

FOR THE DEFENDANT:

JEAN B. LAWSON, Esq.

P.O. Box 4275

Charlotte, North Carolina 28226

HAROLD J. BENDER, Esq.

200 North McDowell Street

Charlotte, North Carolina 28204

Reported by: Scott A. Huseby,

Registered Professional Reporter,

Certified Court Reporter,

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 175 of 249
1726

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3756

P R O C E E D I N G S.

THE COURT: Ms. Lawson?

MS. LAWSON: Yes, sir. We have reviewed the report. I understand the next and last witness for the government on rebuttal is Dr. Dietz.

MS. ROSE: He is not the next witness, but he will be a witness.

MS. LAWSON: Okay. And we've agreed to address this now so as to not create scheduling problems.

We contend that the information in his report, his proposed testimony, is not proper rebuttal. We have gone through the report, having heard all of the mental health testimony and the factual testimony and really cannot find any evidence that it differs in any material way or rebuts the testimony that's been heard in court.

The only purpose to present this would be to reiterate testimony about bad acts and things of that nature in front of the jury, which is improper rebuttal, particularly under the Stitt case.

What I would like to do, if it's all right with you, is give you a copy of the report so that you can look at it and allow me to go through it to demonstrate why what is in there is not rebuttal.

THE COURT: All right. Please hand it up.

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/13   Page 176 of 249

1727

Page 3757

MS. LAWSON: Thank you.

THE COURT: Thank you.

MS. LAWSON: Do you want to read it first or go through it paragraph by paragraph?

THE COURT: I will go through it.

MS. TOMPKINS: I may be able to shortcut, Your Honor, that Dr. Dietz's testimony will be rebuttal in nature and it will be based on opinions that he has that will rebut opinions that have been put forth by defense experts, and the basis for those opinions is in part his interview with the defendant and his review of other documents, all of which is detailed in that report.

(Reviewing report)

THE COURT: Okay. Do you want to add anything to what you have said, Ms. Lawson?

MS. LAWSON: Well --

THE COURT: I have the report. It appears to contain opinions that tend to rebut those of the previous experts presented by the defendant; and to the extent that it's necessary for him to go into aspects of the record that tend to support these opinions, he is entitled do that.

MS. LAWSON: His opinion is that Mr. Barnette was not psychotic at the time of the offense;

Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 177 of 249
1728

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3758

there is no testimony that he was.

THE COURT: I heard testimony earlier that he was not psychotic.

MS. LAWSON: And --

THE COURT: And while that is not -- it doesn't mean that the government has to contradict an opponent witness at every turn to be rebuttal.

MS. LAWSON: Well, if I may point out, Your Honor, Pages 7, 8, 9, 10, and part of Page 11 are nothing more than recitations of information that's already in evidence and acknowledged by the defense witnesses.

THE COURT: Would that not have been an objection to your expert's testimony when he went through the aspects of Mr. Barnette's past and character at vast lengths in supporting his opinions, wouldn't that be the exact same thing that you offered your witness for the purpose of doing?

MS. LAWSON: Absolutely, but that means that it's not rebuttal.

THE COURT: No. It means it's a form of expert -- presentation of expert testimony that you evidently approved.

MS. LAWSON: Well, in terms of laying out and reciting stuff that's already in evidence from the

Page 3759

other nonexpert witnesses.

THE COURT:  And your witness not only put in things that were in evidence, but he based his opinions on many things that were not in evidence but were based on his own interviews --

MS. LAWSON:  But --

THE COURT:  -- and evidence from Ms. Johnson's interviews, which were not in evidence.

MS. LAWSON:  But this material --

THE COURT:  I don't mean to say these things by way of argument with you, but just to elicit that which you see as fundamental to your objection.

MS. LAWSON:  Fundamental to our objection is that this provides the government with an opportunity to leave the last thing in the jury's mind those incidents that have already been testified to and acknowledged, and that purpose is not proper for rebuttal.

THE COURT:  All right.  The Court takes a view that that is not the purpose of these things.  If the witness went to excessive lengths in that regard, I would certainly be cognizant of objections.

MS. LAWSON:  There is just one other -- well, I don't have anything more on that.  Thank you, Your Honor.

Case 3:12-cv-00327-MOC     Document 106     Filed 09/23/15     Page 179 of 249
1730

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3760

THE COURT: Thank you.

MR. BENDER: Excuse me, Judge.

THE COURT: Yes, sir.

MR. BENDER: I don't know whether they are intending to introduce the report or not. I don't think it's proper for them to introduce it. I think he can testify from it, but not to introduce it. I think it bolsters his credibility if they do.

But of concern to us is rebuttal is rebuttal. It is not the time to introduce new evidence, and there are things in here that have not been testified about that the government had every right to cross-examine whoever they wanted about these things; but to allow new evidence to come in through a rebuttal witness, I think is highly improper.

THE COURT: That would be correct, except to the extent that it involves the opinion, professional opinion of a witness and an appropriate basis for such an opinion.

MR. BENDER: Well, for instance, on Page 12, dates unknown, there's been no evidence of that --

THE COURT: Where are you?

MR. BENDER: Dates unknown on Page 12. Okay?

THE COURT: Well, of course, we don't know

Page 3761

at this point what the government intends to do.  First of all, does the government intend to attempt to offer this entire report?

MS. TOMPKINS:  I was, yes, going to offer the entire report.  As to the specific dates unknown, Dr. Dietz references where that information came from, and that was prior testimony of Sonia Barnette, and the other one was Dr. Seymour Halleck's report.  So it's referenced.  I'm not going to ask him specifically about that.

So in general, let me say, that Dr. Dietz should be allowed to testify about how his opinion differs from defense experts, if it does, and what that opinion is so that the new evidence that defense counsel doesn't want -- doesn't think should be allowed in rebuttal is simply this doctor's different opinion.

If there is a -- if there is something factual there that is not in evidence, I will be happy to redact a line that contains something not in evidence out of the abundance of caution.  But I do also agree with the Court that many, many things have -- were placed into evidence by Dr. Cunningham for which there has been no evidence placed in.  But if you have specific instances, I would -- then let's talk about those individually.

MR. BENDER:  I do, and that being one.  In

Case 3:12-cv-00327-MOC    Document 172-6    Filed 09/23/15    Page 181 of 249
1732

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3762

the next paragraph --

THE COURT: What is your objection, to the dates unknown statement?

MR. BENDER: Yeah, that whole thing. There has been no testimony about that. They could have asked Dr. Halleck when he was on the stand, they could have asked Marc Barnette when he was on the stand, but this is new evidence that's coming in, and I don't think it's going to alter his opinion to remove these things that are highly prejudicial and are new, not rebuttal information. If Marc Barnette said, no, I didn't do that, then --

THE COURT: As a factual matter, they are not rebuttal, and the Court will view that as an appropriate redaction, although it's still true that that may be the kind of thing that that witness would base his opinions upon.

MS. TOMPKINS: And that is correct. I mean, his opinion is going to be based on all of the things that he reviewed, including prior testimony, just like Dr. Cunningham's opinions were all of the things that he reviewed, which were numerous interviews with people who didn't testify, so their words got to be put into evidence through Dr. Cunningham without numerous objections by the government. In fact, I don't believe

Case 3:12-cv-00327-MOC     Document 106     Filed 09/23/15     Page 182 of 249
1733

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3763

we objected at all.

THE COURT: Let's hear what other specifics Mr. Bender has in mind.

MR. BENDER: Okay. In the very next paragraph, 1989 through 1992, I think it's the third sentence, Ms. Herd told Drs. Grant and Duncan that Mr. Barnette pulled a gun, okay, and that --

MS. TOMPKINS: Well, again, I have to say, Your Honor, that all of the experts testified based on their review of reports. The government would be happy to put in the reports of Grant and Duncan and prior testimony of other witnesses upon which the witness relied.

If the objection is it's not in evidence, we can easily place that into evidence. These are documents that Dr. Dietz reviewed. I don't think I'm grasping the harm done, especially in light of Dr. Cunningham's lengthy testimony about conversations that he had with people who didn't testify.

THE COURT: Okay. That paragraph does not rise to the level of being supercilious and prejudicial to the defendant insofar as it provides a basis for a witness's opinion.

MR. BENDER: I'm not talking about the whole paragraph. I'm just talking about that one

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff˙˙ ˙ ˙ ˙ ˙ ˙on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 106     Filed 09/23/15     Page 183 of 249
1734

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3764

sentence in there. The rest of the paragraph can stay, because there's been evidence of that. But, I mean, Natasha Herd came in here and was not questioned about this. And if she had said, yeah, you know, he shot at my sister, then -- but I don't think that changes Dr. Dietz's opinion, just to leave that thing out because there is no evidence of that.

MS. TOMPKINS: Well, I'm completely flabbergasted at defense counsel's insistence, in light of Dr. Cunningham's testimony, much of which was uncorroborated.

THE COURT: Well, you are right in that assertion that it's somewhat surprising.

MR. BENDER: Well, Judge, the --

THE COURT: On the other hand, he is making an objection and the Court will deal with the objection on its merits.

You object to the notion that Ms. Grant told two doctors that the defendant pulled a gun on her sister and her?

MR. BENDER: Right.

THE COURT: I would ask the government not to inquire into that --

MR. BENDER: Okay.

MS. TOMPKINS: I'm sorry.

Reported By: Scott A. Huseby, RPR
800-323-2082          Huseby, Inc., an Aff...          ...n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 184 of 249
1735

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3765

THE COURT: -- out of deference to, or indulgence to the defendant, in terms of prejudice versus probative value.

MR. BENDER: On Page 13, July 28, 1992, that whole --

THE COURT: Where are you on 13?

MR. BENDER: 13, the top paragraph, July 28, 1992. I mean, that's -- the reference to that is a criminal history chart prepared by the United States Attorney's Office, which I assume they are going to use in closing. There's been no evidence of that.

MS. TOMPKINS: You know --

THE COURT: Wait a minute. I'm looking at the paragraph entitled May 2.

MR. BENDER: No. July 28th, 1992 on Page 13.

THE COURT: Oh, okay. What is your objection to that?

MR. BENDER: There is no evidence of that at all, nothing. Ms. Herd was not asked about that, nobody was asked about it.

THE COURT: Apparently it came from the chart prepared by the U.S. Attorney's Office.

MR. BENDER: Right.

MS. TOMPKINS: And, again, Your Honor, the

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affi··  ·· ~· ·  n (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 185 of 249
1736

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3766

man's opinions are based on documents that he reviewed. His opinions are not based solely on evidence, clearly, just like Dr. Cunningham --

THE COURT: All we are doing is cherry picking a few pieces of evidence that the defendant thinks are unduly prejudicial, and I'm being somewhat deferential to him in that respect.

MS. TOMPKINS: Okay.

THE COURT: So there is no point in bringing that up. First of all, I'm not sure what the -- where this criminal history chart referred to here came from or what its origins are, what its basis is as prepared by the U.S. Attorney's Office, so there is no point in bringing that one out.

MR. BENDER: Just two more, Judge. On Page 15.

THE COURT: All right.

MR. BENDER: December 15, 1993.

THE COURT: Same ruling.

MR. BENDER: And the last one, on Page 16, January 1995.

MS. TOMPKINS: I believe that's in evidence through the defendant.

MR. BENDER: I beg to differ. The defendant was asked did you do anything that would have

800-383-2082    Huseby, Inc. an Affiliate    (704) 333-9889    Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/13   Page 186 of 249

1737

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3767

caused you to be shot by Ladon Barbour. He said, only report him to the police, that's all I did. He could have been cross-examined about that, he could have been asked, didn't you shoot into Ladon Barbour's car.

THE COURT: I'd ask the government not to go into that one.

MR. BENDER: Okay. Believe it or not, Judge, that's it.

MS. TOMPKINS: Now, in terms of being able to mark and introduce, I'll probably need some time to make redactions.

THE COURT: I beg your pardon?

MS. TOMPKINS: I will need to make redactions. Those are actually present in his -- you have a copy of his report and those are in, so --

THE COURT: Well, we will take up the admissibility of the report as redacted after the jury is dismissed.

MS. TOMPKINS: All right.

THE COURT: You can identify it at this point.

MS. TOMPKINS: May I have just a minute to speak with my expert to see whether or not what the Court's --

THE COURT: Right, you can do that,

Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 187 of 249
1738

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3768

because obviously the effort would be to minimize any

extraneous prejudicial effect to the defendant, at the

same time your witness is entitled to state his opinions

and the basis for them.  And, of course, defense counsel

has asserted that it wouldn't change the witness's

opinion, but you can inquire of your witness whether

that's the case.

MS. TOMPKINS:  Thank you.  If I could have

two minutes.

THE COURT:  Yes.

(Brief recess.)

MS. TOMPKINS:  Thank you.

THE COURT:  Are the parties ready to

proceed?

MS. TOMPKINS:  Yes.

MS. LAWSON:  Yes.

THE COURT:  May we have the jury.

(The jury returned to the courtroom.)

THE COURT:  Welcome back, members of the

jury.  I believe the government would be offering a

witness.

MS. ROSE:  Yes.  Dr. Peter Carlson, come

on up, please, sir.

PETER M. CARLSON,

being first duly sworn, was examined and testified as

Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 188 of 249
1739

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3769

follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Dr. Carlson, would you please state your name?

A. Peter M. Carlson.

Q. And you are retired from the Bureau of Prisons, is that correct?

A. Yes. I retired in December, on December 31st of 1999 from the Federal Bureau of Prisons.

Q. And how many years did you spend with the Federal Bureau of Prisons?

A. 30 years with the BOP.

Q. If you would, just tell the members of the jury what your work history was there within the BOP.

A. I served with the federal prison system from 1970 through 1999, began with the Bureau of Prisons as a case manager at the United States penitentiary at McNeal Island, Washington.

From there I served in positions in the central office of Washington and Dublin, California and Miami, Florida and in Atlanta, Georgia. I became associate warden at the United States penitentiary in Atlanta. I was there until 1983, and then I was transferred as warden to the federal prison in Duluth, Minnesota, served as warden at Duluth, subsequently served as

Case 3:12-cv-00327-MOC     Document 174     Filed 09/23/15     Page 189 of 249

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
8/8/2002

Page 3770

warden at Phoenix, Arizona, and at the federal medical center then in Rochester, Minnesota.

In 1993 I became the assistant director of the Federal Bureau of Prisons and served in that capacity and as regional director for the western region of the country until my retirement.

MS. ROSE: Given those qualifications, Your Honor, the government would tender Dr. Carlson as an expert in Bureau of Prisons classifications.

THE COURT: Okay. He will be declared an expert in that field, and members of the jury, you will recall the instruction I've given you earlier about dealing with expert witness testimony. Thank you.

BY MS. ROSE:

Q. Basically, if you would, tell us, what is the kind of mission of the Bureau of Prisons?

A. Well, officially the Federal Bureau of Prisons has a mission of protecting the public through the confinement of offenders, a mission of safe and secure housing of federal inmates in the federal facilities, and finally a mission of preparing individuals who are confined for the possibility of eventual release to their home communities.

Q. How is an inmate's classification determined?

A. An inmate is classified based on his

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 190 of 249
1741

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3771

characteristics, his personal history and on the characteristics of the offense that he has been involved in. The entire classification system revolves around the individual inmate's personal background and then the matches made to the characteristics of the various institutions around the country, the federal facilities.

Q. In doing so, how do you determine where an inmate will be placed? I mean, isn't that the purpose of the classification system?

A. Yes. The purpose is to measure the individual offender's background, his security needs, and to try to match that to a correctional facility that offers the appropriate amount of security and to place the inmate generally as close to home as we can into an institution to which he is appropriately classified.

Q. And that is something that you consider for any inmate, the closest to their home, because why?

A. The agency tries to keep an inmate as close to home as feasible, as it's believed that facilitates the release process and successful return to one's home community.

Q. But let me ask you this: For someone who has received a life sentence, where could they be placed within the Bureau of Prisons?

A. Inmates serving life terms within the BOP are

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A⁻⁻⁻    ⁻ ⁻ ⁻ ·ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 74-26     Filed 09/23/15     Page 191 of 249

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3772

generally confined at high security penitentiaries.

Regardless of how they score, regardless of their

background, they would have a public safety factor that

would override the scoring of the individual's

classification. In this case a life sentence would

mandate that the individual be confined in a high

security institution.

Q. Are there any exceptions for that, or waivers?

A. Exceptions are made for that, but there is an

established procedure that ensures that it is reviewed

at the highest level of the agency.

The institution classification personnel, the

case manager and the unit team, would begin that

recommendation for valid reasons, they would make that

recommendation through the local institution to the

warden, and the warden would eventually, if he or she

agreed, make that recommendation to the regional office.

Q. And when you were in the regional office, did

that ever occur?

A. Yes. As regional director I approved a number

of transfers to less secure institutions for high

security offenders.

Q. Now, when one receives a life sentence, do they

go into a general population?

A. Certainly. A life sentence does not preclude

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A━━     ━ ━ ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 106     Filed 09/23/15     Page 192 of 249
1743

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/8/2002

Page 3773

placement in an open population of the penitentiary.

Q. Would you describe the daily life of an inmate who is in the general population, having received a life sentence?

A. A typical day of an inmate in a penitentiary setting, that is, a high security setting, would be they would be housed in appropriate cells of the institution. They would be locked in their cell for the duration of the evening hours. That would be from approximately 10:00 p.m. until 6:30 the following morning. 6:30 of every day inmates are permitted to move to the dining room for their morning meal, after which there would be a work call in the institution. Every inmate is expected to work during their confinement and would be assigned an institution job. The inmates would then be required to work until the noon break, the noon meal. They would be allowed to gather in the dining room to eat and then return to their work assignment for the afternoon.

All inmates in every institution are then returned to their cell for a 4:00 p.m. count and then allowed to proceed to the dining room for their evening meal.

After the evening meal they have leisure time either in a cell house or in the recreation area, a

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an Aff...     ...on (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 193 of 249
1744

Page 3774

recreation yard of the prison, or in the school of the institution until the institution is re-called in the evening, approximately 9:00 p.m., but that varies by facility, and they remain in their housing unit until the housing unit is locked down, usually at 10:00 p.m.

Q.   Now, what kind of jobs are offered within BOP?

A.   A wide variety of jobs are available to inmates within the correctional setting, ranging from work as a unit orderly, or a cleaner; work out on the recreation field, mowing grass; could be work in the dining room, preparing, serving, or cleaning in the dining room; and a percentage of inmates are allowed, selected to work in federal prison industries in the factories.

Q.   Now, there are recreation areas available?

A.   Yes, ma'am.

Q.   What kind of recreation areas?

A.   Recreation in a typical prison setting would be the full spectrum of recreation that you would see in any institutional setting, prison or otherwise, but it could be the ball fields, soccer, baseball.  There is always a track for aerobic activity.  Activities could be indoor, in terms of board games or watching television or playing cards, and activities include therapeutic programmatic activities.  Educational programs could also include going to school in the

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/8/2002

Page 3775

evening, taking classes, that sort of thing.

Q. You can get a high school degree, college degree, all kinds of degrees?

A. Well, you can get a high school degree, an equivalent of a high school degree, through the GED program, and some institutions offer correspondence courses or occasional college classes if the inmate is willing to pay for those classes.

Q. And there are libraries as well with access to those materials?

A. Libraries are typical in every correctional facility I have worked, yes.

Q. In the daily movements, those individuals are not shackled or handcuffed or anything like that?

A. No. In the daily routine of any correctional facility, inmates are not shackled, unless they are placed in a special housing unit of one sort or another.

Q. They interact freely with one another?

A. They do.

Q. Build relationships with each other?

A. They do, yes.

Q. Now, one of the things that you talked about was placement near family. Are they allowed to visit with family members?

A. Yes. Every correctional facility operated by

800-333-2082 Case 3:12-cv-00327-MOC, an Document 106 Huseby, Inc. Filed 09/23/15 Page 195 of 249 Fax (704) 374-4593

1744 B

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3776

the Federal Bureau of Prisons has a visiting program where friends and loved ones are allowed to come into the facility on a fairly regular basis for visiting purposes.

Q.   Are those contact visits?

A.   They are contact visits in nearly all settings except for the very, very high secure settings, such as you would find at the administrative maximum facility in Florence, Colorado, in the special operations at Terra Haute for death row, and in a few unique controlled units, special units that we operate in specific institutions around the country.

Q.   But the general population --

          MR. BENDER:   I would like to be heard, Your Honor.

          THE COURT:   Overruled.

          BY MS. ROSE:

Q.   But the general population, as you've described, of any general lifer is going to get contact visits with family?

A.   Yes, that's correct.

Q.   With what frequency, generally?

A.   Visiting is limited by various institutions depending on their specific circumstance, frankly, how crowded the visiting room becomes, but it's fairly

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3777

typical for an inmate to be allowed one visit from each visitor over a period of a month.

Q. Did you earlier describe that visitors could come as much as possible if there is opportunity, like you say, if there is not overcrowded in the visiting room, if somebody wanted to come every day, that would be a possibility?

A. That would be possible, yes.

Q. Whenever visitors are not there, are there telephone facilities or other contact facilities for inmates?

A. Telephones are available to inmates in all correctional settings, with a couple of exceptions. All telephone calls are to an approved list of individuals that the staff has approved, all of these calls are recorded.

Q. Once again, for the general population, those are with whatever frequency is available?

A. That's correct, depending on what is available time-wise in that specific institution. And since I have retired, the agency has put in a timed parameter over the course of every month for telephone calls, but it's still a fairly open telephone system.

Q. They can, of course, send mail and receive name?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3778

A.     Inmates certainly have access to mail privileges.

MS. ROSE:  Nothing further.  Thank you.

CROSS-EXAMINATION

BY MR. BENDER:

Q.   Mr. Carlson, we are talking about life without the possibility of release, not just life in prison, do you understand that?

A.     Yes, sir.

Q.     Okay.  And if this jury decides that Marc Barnette is to be sentenced to life without the possibility of release, there are three separate charges for which he will receive life without the possibility of release.  Do you understand that?

A.     I do, sir.

Q.     Now, based on that, he would be placed in the highest security that the Bureau of Prisons has, wouldn't he?

A.     Let me define those terms, sir.  The highest security the Bureau of Prisons offers would be at the administrative maximum facility at Florence, Colorado. He would not be placed in that facility.  He would be placed in a high security facility, a United States penitentiary.

Q.     Which would be Marion, Illinois, for instance?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3779

A. Actually, Marion and Florence penitentiaries are unique in the Bureau's classification system, and transferred to Marion or the administrative maximum at Florence are reserved for inmates who are extreme management problems within the agency. There are a few inmates that have been directly placed into one of those institutions. Mr. Barnette's case would not come close to the parameters of those cases.

Q. But it would be a United States penitentiary?

A. Yes.

Q. Okay. There would be a guard tower, walls --

A. Every --

Q. -- confratina wire?

A. Every United States penitentiary has towers around the facility, not every USP has guard towers. Excuse me, has walls. A number of the newer facilities have been constructed with the double fence lines.

Q. Now, you have been sort of acting like maybe you are a little of soft on crime. The Bureau of Prisons is not soft on crime or people who commit crimes, are they?

A. No, sir, they surely are not.

Q. And the purpose for these programs, whether it be recreation, taking college courses, is to try to allow the inmate to get a little value out of their

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A1    ion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 199 of 249
1748

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3780

life, improve their situation somewhat, isn't it?

A.   That's correct, sir.

Q.   Okay.  And so these are offered for people who want to take advantage of it?

A.   They are.

Q.   And the better off your conduct is, perhaps the more opportunity you have to engage in the programs sponsored by the Bureau of Prisons?

A.   That's absolutely correct.

Q.   And that's what you want in the Bureau of Prisons, isn't it?

A.   That's correct.

Q.   You want model inmates?

A.   We do.

Q.   Somebody who is not going to create problems, right?

A.   Yes.

Q.   And if somebody is at a United States penitentiary and they have a violation or create some problem, the Bureau of Prisons can move them to Marion or super max in Colorado, can't they?

A.   They can and they do.  What is a little different about those two institutions is that they represent less than 1 percent of the prison population. An individual has to work very, very hard to earn his

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af...      ...on  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 200 of 249
1749

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3781

way to one of those institutions.

Q. Right. But the Bureau of Prisons has in place policies that mandate or dictate that for certain inmates, if they create some type of problem, that they go to a higher security level, don't they?

A. That's correct. If I could add to that, as assistant director of the agency, I sat on the panel that approved transfers. It was myself and another individual that approved transfers into Marion and into the administrative maximum facilities' control units, and those inmates had either seriously assaulted another inmate, killed another inmate, or seriously assaulted or killed a staff member. The other possibility was the individual could have presented an extreme escape risk. But those basically are the parameters for that small percentage of inmates placed there.

Q. But you also have other means of disciplining a prisoner rather than perhaps sending them to Marion or super max, don't you?

A. Yes, sir, we sure do.

Q. You can lock them up 23 hours a day --

A. Correct.

Q. -- in the penitentiary?

A. True.

Q. But what you are hoping for is the model inmate

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          m (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 106     Filed 09/23/15     Page 201 of 249
1750

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3782

who takes advantage of whatever programs there might be and is no discipline problem whatsoever, that's what you hope for?

A.    Yes, sir.

Q.    Even in this case, when Marc Barnette will never ever be released, that's what you are hoping for?

A.    That's correct.

Q.    And the Bureau of Prisons will never release Marc Barnette, will they?

A.    Depending --

MS. ROSE:  Objection.

THE COURT:  Overruled.

BY MR. BENDER:

Q.    I mean, that's the law?

A.    If, in fact, he has a nonreleasable sentence, the Bureau of Prisons will not knowingly release Mr. Barnette.

Q.    And the only two sentences that this jury is considering is death or life without the possibility of parole?

A.    Yes, sir.

Q.    By law, he can't be released?

A.    That's correct.

Q.    The Bureau of Prisons isn't going to override the law or violate the law, are they?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3783

A.    No, sir.

Q.    And when you consider model inmates, the people you are hoping will take advantage of these programs, not only are they a model inmate to the staff, courteous to the staff, do what is told, but they are also model inmates as they relate to other prisoners or inmates, isn't it?

A.    One would hope so, yes, sir.

Q.    Okay.  Now, you talked about mail.  Every piece of mail that is sent to an inmate is opened, is it not -- well, except for legal mail?

A.    That's correct.

Q.    So when an inmate gets mail, it's already been opened and somebody has already searched it?

A.    That's correct.

Q.    And when they talk on phones, the phones are monitored, that is, they are recorded, are they not?

A.    I would differentiate between recorded and monitored.  All telephone -- all outgoing telephone calls are recorded, not all are necessarily monitored, unless the individual inmate is on a hot list.

Q.    Right.  So every telephone call that is made from a Bureau of Prisons facility is recorded?

A.    That is correct, with the exception of legal calls that have been approved to one's counsel.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff⋯          ⋯n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 106     Filed 09/23/15     Page 203 of 249
1752

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3784

Q.   Now, you talked about the public safety factor. The public safety factor is found in the policy and procedures manual, isn't it?

A.   Yes.

Q.   Okay.  And the security designation and classification manual, which is program statement 5100.07, determines the classification of an inmate, doesn't it?

A.   That's correct.

Q.   And you have already told us that someone with a life sentence without the possibility of release would be a high security?

A.   Yes.

Q.   And would always be a high security unless someone, the team managers, the unit managers, were to somehow recommend that that public safety factor be waived?

A.   That's correct.

Q.   Right?

A.   Yes.

Q.   Then if it were ever going to be waived, it would have to go to the associate warden and then the warden?

A.   Yes.

Q.   And then it would have to go to the regional

Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 204 of 249

1753

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/8/2002

Page 3785

office?

A.    Correct.

Q.    How many people have to sign off on a waiver of public safety factor?

A.    In the processing as it wins its way out of the institution or how many signatures are required for that waiver?

Q.    For that waiver.

A.    One signature, that of the regional director or his or her designee.

Q.    But that doesn't happen without the signatures and the approval or recommendation of some other people?

A.    Well, the staff members that recommend it and the staff members that process it.  They all have a sign-off process, yes.

Q.    Getting back to phone calls one minute, you can't receive phone calls as an inmate unless they are pre-planned and approved by some staff member?

A.    That's correct.

MR. BENDER:  Thank you.  That's all.

MS. ROSE:  Thank you.

THE COURT:  You may step down.

THE WITNESS:  Thank you, Your Honor.

MS. TOMPKINS:  The government calls Dr. Park Dietz.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Al    ion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 175-6    Filed 09/23/15    Page 205 of 249
1754

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3786

PARK DIETZ, Ph.D.,

being first duly sworn, was examined and testified as

follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q.   Please state your name and spell it for the
court reporter.

A.   I'm Dr. Park Dietz, D-I-E-T-Z.

Q.   What is your profession?

A.   I'm a physician.  I specialize in psychiatry,
and my practice has been limited for many, many years to
forensic psychiatry.

Q.   What is a forensic psychiatrist?

A.   A forensic psychiatrist is a psychiatrist who
specializes in the application of the principles and
practice of psychiatry to matters that are in dispute,
typically legal questions.

Q.   All right.  What is your educational
background?

A.   I went to college at Cornell University in
upstate New York and graduated with honors in psychology
and a dual major in biology and psychology, and then I
entered medical school and in 1975 received the M.D.
degree from Johns Hopkins University School of Medicine
in Baltimore, and the same year I also received a

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff⋯ ⋯ ⋯ ⋯ ⋯n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 206 of 249
1755

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/8/2002

Page 3787

masters degree in public health from Johns Hopkins and by then had I think completed all of the course work toward a Ph.D. in sociology, and years later I wrote a dissertation and was awarded the Ph.D. also from Johns Hopkins.

Q.    Have you received any training in a medical specialty?

A.    Yes.  At that time the route into psychiatry was that after medical school one did a three-year residency, and I did my first two years as assistant resident in psychiatry at the Johns Hopkins Hospital, and then I spent my third year as the resident and chief fellow in forensic psychiatry at the hospital of the University of Pennsylvania in Philadelphia, and that made me eligible to sit for the board examinations in psychiatry and become board certified.

Q.    What positions have you held since completing your training?

A.    Well, my first job after training starting in 1978 was as an assistant professor of psychiatry at the Harvard Medical School, and my first assignment there, though I was employed by one of the Harvard hospitals, McClain, which is a nice private hospital, my job was to go to a miserable maximum security forensic hospital about an hour away and to run the forensic program there

Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 207 of 249
1756

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
8/8/2002

Page 3788

and try to make it a Harvard teaching hospital. We didn't do too well at making it a Harvard teaching hospital, but we did our best. I spent two years in that capacity.

Then I was fortunate enough to get out of that bad experience by being asked by the United States Attorney'S Office in Washington to be in charge of the evaluation of John Hinkley in connection with the charges arising against him for his attempt to assassinate President Regan and the others that he shot that day. And I spent about a year commuting between Washington and Boston working on that case and then returned to my teaching position and spent most of my fourth year at Harvard doing research on the relationship between mental disorder on the one hand and violent crime on the other.

At that point I received some job offers from other institutions and eventually selected one at the University of Virginia and moved to Charlottesville, Virginia to become an associate professor of law in the school of law and an associate professor of behavioral medicine and psychiatry in the school of medicine, and over the next six years I stayed there and was promoted to professor in both schools. And my responsibilities there were to train the fellows in forensic psychiatry,

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3789

who were people who had applied to learn the subspecialty of forensic psychiatry. I was medical director of the university's institute of law psychiatry and public policy, which drafted legislation for the Commonwealth of Virginia and conducted research, and we operated a clinic there, a forensic psychiatry clinic that did evaluations of criminal defendants in a few civil cases, largely for the defense bar in Virginia, occasionally for prosecutors or out of state.

And during that time I received a grant from the National Institute of Justice to conduct what was the first research on what later became known as stalking, and we studied a very large number of cases and devised techniques of predicting which people are in contact with strangers, because we were looking mostly at stranger cases that would approach their target victims. And that was a major task for many years.

I also had a course load in law school and the normal assignments in medical school, and in law school I taught or co-taught courses in crimes of violence, psychiatry and law, psychiatry and criminal law, psychiatry and civil law, law and public health, law and medicine, and related areas.

Q. What -- did you have a teaching position at UCLA?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3790

A.   Yes.  Then I decided that I wanted to change the focus of what I was doing.  I had been an academic for 10 years since my training and a long time before that, and I decided that I wanted to spend more of my time consulting on cases, and I moved to southern California and I received an appointment at UCLA as clinical professor of psychiatry and bio behavioral sciences, and I have maintained that since that time.

And what I have done since then is to operate two consulting firms, both of which I began and lead.  One is called Threat Assessment Group, which I founded in 1987, and we provide workplace violence prevention services to employers, mostly large corporations, to some extent government agencies and celebrities and individuals, but primarily to large employers.

And the other firm is called Park Dietz and Associates, and it is today a group of 28 experts who consult to attorneys and courts in civil and criminal matters, and they are based all over the U.S. and Canada.  That's how I spend my time, between those two organizations.

Q.   Without going through an exhaustive list, have you conducted research and been published?

A.   Yes.  Well, I was very actively involved in research earlier in my career, and it's all been about

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3791

protecting people from being harmed, that is, injury prevention of one kind or another, or about criminal violence or about destructive sexual behaviors. And I have published about a hundred items in the professional literature and very little for the general public, but a hundred some for the professionals.

Q. And briefly describe for the jury your professional experience with domestic violence and homicide.

A. Well, with respect to domestic violence, long ago when I treated patients I had occasion to treat some victims and a few offenders. Of course, I saw lots of offenders when evaluating a large number of people for the courts, and over the years have done countless evaluations of people charged with a domestic homicide, but the major ongoing activity I have is really preventing domestic violence when employers bring to us cases in which someone is being threatened or stalked by an intimate, my firm advises the employer on what to do to safely manage the case and to make sure that no one is injured. And we do that quite routinely. There is probably not a week that goes by that we are not handling a case that is very serious and making sure that no one gets hurt.

Q. Have you testified in court as an expert

Case 3:12-cv-00327-MOC    Document 17606    Filed 09/23/15    Page 211 of 249
1760

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3792

witness?

A.    Yes, I have.

Q.    How many times?

A.    I didn't answer the second part of your question about homicide experience.

Q.    All right.

A.    With respect to homicide, my initial experience had to do with another field altogether, forensic pathology.  When I was still a medical student, I had a lab at the medical examiner's office in Baltimore and I used to go to hot crime scenes with the ME's people while it was still a fresh scene and try to observe what the police did, what the forensic people did.  I spent about a year around the medical examiner's office involved in autopsies, and what they did -- since then my work has been psychiatric and I have evaluated a very large number of people who have been charged with every manner of homicide imaginable, and I consider it a major focus of my work.

Q.    How many times have you testified as an expert witness?

A.    More than a thousand, but many of those were early, very simple civil commitment proceedings, nothing quite as complex as this.

Q.    In cases such as this, about how many times

Case 3:12-cv-00327-MOC     Document 106     Filed 09/23/15     Page 212 of 249

1761

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3793

have you testified?

A.    I'm not sure.  I know that in the years that I have been functioning primarily as a private consultant it is on the order of six or a dozen times a year that I'm in court, so I would guess maybe 100, 200 cases.

Q.    Were you retained as an expert in the case of Jeffery Dahmer?

A.    Yes, I was.

Q.    Were you retained as an expert in the case of Robert Bardo?

A.    Yes.

Q.    What, briefly, did Robert Bardo do?

A.    He stalked several different entertainers and eventually killed a television actress named Rebecca Schaffer.

Q.    For whom did you testify in that case?

A.    For the defense.

Q.    Did you work on the Susan Smith case, the woman who drowned her children in her car?

A.    Yes.

Q.    Did you work on the Ted Kaczynski case, the Unibomber?

A.    Yes, I did.

Q.    And were you an expert in the case of Andrea Yates, the woman who drowned her children in the

Case 3:12-cv-00327-MOC     Document 762     Filed 09/23/15     Page 213 of 249
1762

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3794

bathtub?

A.    Yes.

MS. TOMPKINS:  Your Honor, at this time we would tender Dr. Dietz as an expert in forensic psychiatry.

THE COURT:  He will be so declared. Members of the jury, you will remember the expert witness instruction.  Thank you.

BY MS. TOMPKINS:

Q.    Dr. Dietz, what were you hired by the government to do?

A.    Well, to evaluate the available evidence by examining the defendant and by reviewing the records and the reports by other experts in order to determine why the defendant had done these offenses and to be able to evaluate the evidence that the defense would put on during this phase.

Q.    Did you review the opinions and reports of defense experts?

A.    I did.

Q.    Did you interview the defendant?

A.    Yes.

Q.    For how many hours?

A.    For the better part of two days, as I recall.

Q.    Did you audiotape that interview?

Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 214 of 249
1763

United States of America vs. Aquilia Marcivicci Barnette      3:97CR23-V
Proceedings Before Judge Richard L. Voorhees      8/8/2002

Page 3795

A.   Yes, I did.

Q.   Was there a transcript made of that interview?

A.   Yes, and provided to both sides.

Q.   Did you prepare a written report?

A.   Yes, I did.

          MS. TOMPKINS:   May I approach?

          THE COURT:   Yes.

          BY MS. TOMPKINS:

Q.   I'm going to show you what has been marked as Government's Exhibit 75 and ask you if you recognize that?

A.   This is a copy of my report in this case.

Q.   All right.   And is that a summary of both the -- your findings and the sources of information on which you based your findings?

A.   Yes, and my opinions.

Q.   And your opinions.

          MS. TOMPKINS:   Your Honor, we would move to admit Government's Exhibit 75.

          MR. BENDER:   Objection.

          THE COURT:   It's been identified. Overruled.

          MS. TOMPKINS:   Thank you.

          BY MS. TOMPKINS:

Q.   Now, in terms of the sources of information,

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 215 of 249
1764

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3796

did you review police reports related to both these two homicides and the defendant's prior criminal history?

A. Yes, I did.

Q. Did you review police reports and photographs related to the fire bombing?

A. Yes.

Q. Did you review the interviews of Robin Williams and Bennie Green about the fire bombing?

A. I did.

Q. Crime scene photographs from both crime scenes?

A. Yes.

Q. Interviews with the defendant and law enforcement?

A. Yes.

Q. And mental health evaluations done by other psychologists and psychiatrists, including Dr. Halleck, Dr. Cunningham, Dr. Duncan, Dr. Burgess?

A. I did not have Dr. Cunningham's report; but as to the others, yes.

Q. As to Dr. Halleck, based on your review of the documents that we have just discussed and your interview with the defendant, did you form diagnostic opinions about the defendant that differ from Dr. Halleck's?

A. To some extent, yes.

Q. Would you describe those for the jury?

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 216 of 249

**1765**

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3797

A.    Well, I think there are two areas where I think my opinions differ somewhat from Dr. Halleck's.  The first has to do with his opinion regarding depression.

I was here during the testimony of all of the defense witnesses in this phase and heard Dr. Halleck's testimony, and I understood him to say that the defendant had a major depression for period in April -- I'm sorry, yes, from April to June that included the time of these crimes.  And I agree with Dr. Halleck about what symptoms the defendant was experiencing, but there is an issue that makes me uncertain as to whether it's correct to call this a major depression, and that has to do with the defendant's drinking during that time.

In clinical practice one is cautioned not to make a diagnosis of depression while someone is still drinking heavily, because the effects of alcohol can't be distinguished from the effects of the illness that we call depression.  So that's why on admission to a hospital people first have to dry out and detox before they can be properly diagnosed as depressed.

And during the entire period when Mr. Barnette had the symptoms that could be depression or alcohol, he was drinking heavily.  He told me that drinking made him feel more depressed and more despondent.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3798

He had obvious reasons to be sad and depressed and to hang out in his room during that time, and that included having been dumped by Robin after he struck her, having been turned down for the job at the Saturn dealership, being sought by the police after he did the fire bombing, and it's not surprising that somebody would be nervous and upset and depressed when they had those events happen in their lives.

And he was drinking so heavily that I think it's very hard to tell whether it was a depressive illness or whether it's the drinking that made him feel the way he did and have the symptoms that he had.

And the other clue that it might be the drinking is that the symptoms resolved rather quickly with very little treatment once he was incarcerated and no longer had access to alcohol. So it could be a major depression, but it could also be excessive drinking over that period of time.

Q. And that was based on the defendant's own report about his consumption of alcohol, is that correct?

A. Yes.

Q. Were there any other parts of Dr. Halleck's testimony in which your expert opinion differed from his?

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Aff⠐⠂⠂⠂ ⠂⠂⠂ ⠂⠂ ⠂n (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 218 of 249
1767

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                 8/8/2002

Page 3799

A.    I think the second diagnostic issue has to do with the description of Mr. Barnette's personality. While I don't disagree with Dr. Halleck in finding him borderline personality disorder, because that's a diagnosis I, too, made, I also found elements of two other disturbances of personality. One has been alluded to, but I don't think anybody diagnosed narcissistic personality disorder. In my report I said that the defendant did have that particular condition.

And many of the signs and symptoms of it have been described here already. They include a grandiose sense of self importance, that is, feeling that he is special; a lack of empathy for other people, not being sensitive to what it does to people when you beat them and what it does to people when you hit them with a coat hanger and what it does to people when you behave as he has toward people; fantasies of unlimited success and ideal love. I think he had a notion of what love and a long-term relationship would be like that wasn't entirely realistic. A sense of entitlement. I think Dr. Cunningham already addressed the defendant having that. I found Mr. Barnette in my interview to be haughty and arrogant with me, and I think that others have observed some of the same kind of behavior in their exams of him. And that's a feature of this condition.

Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 219 of 249
1768

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3800

And a tendency to exploit other people in his relationships with them is another feature of that condition. It doesn't take that many to make the diagnosis. He has more than enough for me to say that he has also got a narcissistic personality disorder as well as borderline.

And then the last personality set that I don't think has been described by the experts preceding me in much detail is that in his adult life Mr. Barnette has shown a great deal of antisocial behavior, a familiar pattern of antisocial conduct. And I would describe these as antisocial personality traits, and among the ones that he has had as an adult are deceitfulness, including lying and concealing his criminal conduct, and at least once feigning a suicide attempt. His failing to conform to social norms with respect to lawful behavior, such as taking women's cars without their permission, breaking and entering and other crimes; his consistent irresponsibility, such as not having consistently paid child support; his erratic work history; his being terminated for sexual harassment; his infidelity to each of his sexual partners; his impulsivity and failure to plan ahead; his reckless disregard for the safety of others, such as driving under the influence or setting fire to an occupied

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 220 of 249
1769

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                    8/8/2002

Page 3801

apartment building; and his irritability and aggressiveness, with a very long history of violence, extending back to early adulthood.

Q.   Now, Dr. Dietz, Dr. Halleck expressed an opinion regarding whether or not there was a robbery component to these homicides.  What is your opinion about that?

A.   Of course there was a robbery involved in the Donnie Allen homicide, he robbed him of his car and he robbed him of his wallet, so --

Q.   Does that differ from Dr. Halleck's opinion?

A.   Yes.  He said there was no robbery.

Q.   Let me talk to you a minute about -- did you see Dr. Ann Burgess's testimony?

A.   I did.

Q.   Now, Dr. Burgess testified that in her opinion the defendant proceeded to Roanoke because he just wanted to talk to Robin.  Based on your review of documents and the testimony and your interview of the defendant, did you form an opinion different from Dr. Burgess as to the defendant's motivation for traveling to Roanoke?

A.   Yes, I did.

Q.   And what is that?

A.   Well, the most important difference with that

Case 3:12-cv-00327-MOC     Document 106     Filed 09/23/15     Page 221 of 249
1770

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3802

opinion is that I think that he traveled to Roanoke to kill Benjamin Green and Robin Williams. And the idea that he wanted to talk to Robin isn't totally wrong. It's the most common thing that domestic offenders, including ones that kill their victims, say when they are arrested, they say, I just wanted to talk to her. But that's not true.

They want to do many things. Talking is one of them. Getting her back is another. In this case what he wanted to do and what he acknowledges having thought about doing was to kidnap her and make her take him to Benjamin Green, and he had already thought of killing Robin, he had thought of killing Benjamin. He had handcuffs with him. He tried to get her to go with him. He held her at gunpoint and ordered her to go with him, but she wouldn't do it. And he didn't have an opportunity to confront Benjamin Green or kill him. He settled for killing Robin.

Q. All right. Now, as to Dr. Cunningham, let's go to him for a minute, Dr. Cunningham showed a graphic at the end of his testimony, which has been marked and admitted as Government's Exhibit 25.

Now, Dr. Dietz, do you remember this graphic put on by Dr. Cunningham?

A. Yes, I do.

Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 222 of 249
1771

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3803

Q. Now, using Defendant's Exhibit 25, would you agree that that accurately portrays the significant factors operating at the time of these homicides?

A. Well, I think a great deal of what is on here is -- has truth to it. I think there are many different ways one could phrase it, many different ways one could graph it out, and so it's not set in stone that it's done exactly this way, but the principal issue about what you have displayed here is that alcohol abuse is shown on the outside as worsening the things on the inside of that egg shaped diagram, but it's quite possible that it's equally accurate to say that after he was rejected by Robin Williams he began drinking and while drinking heavily worked himself up into a state of anger while he was experiencing the symptoms that anyone gets when they drink that much and then being that angry set on a course of action.

So I don't think that it's incorrect to characterize him as ruminating or being preoccupied or thinking constantly about the various things that he might do, but it's not necessarily accurate to call it obsessive preoccupation.

I suppose rage is extreme anger, I wouldn't quarrel with that. I think he was depressed; but whether that was secondary to the alcohol, I don't know.

Reported By: Scott A. Huseby, RPR
800-333-2082       Huseby, Inc., an Af‾ ‾ ‾ ion (704) 333-9889       Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 172    Filed 09/23/15    Page 223 of 249

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                8/8/2002

Page 3804

Q.    What changes would you make to that document to in your opinion reflect factors on the defendant at the time of the homicides?

A.    I think really the important things, since there is no question he was upset and angry and suffering from what looks like depression during that time, I don't argue with that, what I think is important to add here, however, is at the bottom of the diagram. The defendant told me and others that he was thinking of suicide.  He told me and others that he was thinking of killing Robin Williams, which is the homicide, the ideation toward a female partner, but he also told me that he was thinking of -- I don't draw too well, I'm sorry; I'm drawing even worse -- he was thinking of killing Benjamin Green.  I can't do it right.

Q.    Okay, we will call that a G.  There you go.

A.    And he also told me that he was thinking of getting into a shoot-out with the police.

So he had a number of different things on his mind, and he would vacillate among them, should I kill Robin Williams, should I kill Benjamin Green, should I kill both of them, should I kill Robin and then myself, should I get into a shoot-out with the police and cause them to kill me.  Those were all considerations that he had during this period of weeks that he was upset and

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af          on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 224 of 249
1773

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3805

drinking heavily.

Now --

Q. Now -- I'm sorry, go ahead. How does Donnie Allen fit into that?

A. He doesn't. Donnie Allen is not one of the people that he had been thinking about killing. He wasn't on that particular list.

On the night in question, however, he needed a car. And rather than wait to get hold of Mario's car or find another way to obtain transportation, he set in motion a plan to do a carjacking. And as Dr. Cunningham said, he did that in an organized way and had succeeded in obtaining control of the vehicle, had succeeded in obtaining the cash he would need for gasoline and incidentals, but then did something else, he committed an unnecessary additional crime, the homicide of Donnie Allen. And that doesn't fit into the rest of this.

Q. All right. Dr. Cunningham testified about catathymic homicide. Do you have an opinion about whether Donnie Allen's murder is a catathymic homicide?

A. I don't think that it's reasonable to refer to the murder of Donnie Allen as a catathymic homicide, because there was no relationship between them and because there is no period of brooding or incubation period about Donnie Allen.

Case 3:12-cv-00327-MOC    Document 146    Filed 09/23/15    Page 225 of 249
1774

Page 3806

Donnie Allen's homicide is done for expediency and not for any of those emotional reasons that relate to the Robin Williams homicide.

Q.   Do you have an opinion about whether or not Donnie Allen's homicide fits in with Dr. Cunningham's testimony?

A.   I see it as a separate criminal act that isn't accounted for by the emotional state that explains why the defendant would have such anger and rage and jealousy and vengefulness towards Robin Williams.

Q.   And would it be fair to say that Dr. Cunningham sees it as one motive?

A.   I understood his testimony to be that that was something that he did on the way to Robin Williams.

Q.   Let me get you to go back to Dr. Burgess for a minute.  Dr. Burgess used the term programmed to describe how Marc Barnette's upbringing affected his behavior.  Do you have an opinion on that statement based on your review of the record and your interview with the defendant?

A.   Well, I think there is a sense in which it's not unreasonable to use the analogy that computers to talk about people acquiring some kinds of information, but it's a mistake to draw that analogy very far, because we are not computers.  People differ from

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 226 of 249
1775

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3807

computers in their ability to think independently, to do things differently from what their surroundings may have taught them or even attempted to program them to do.

And so while it's true that Mr. Barnette's early life taught him some bad lessons, it's not the case that he didn't have alternatives available to him. His experiences of the world were not limited to those within his immediate family. He read. He watched TV. He knew other people. He had the opportunity to see that there are other ways of behaving besides the ones that he had observed, and I think that to call it programming is to attempt to portray human behavior as determined by heredity and environment and to deny the role of freewill in human action. And that, of course, is an old philosophical debate, is behavior determined or do people act freely, and there are elements of both in the way people really behave.

Q. Dr. Burgess also stated that the defendant's motive for violence was domestic in nature. Do you have any opinion about the defendant's motives for violence?

A. Well, I think a great deal of Mr. Barnette's motivation in his lifelong pattern of violence, I don't mean to say that he was violent his whole life, but during the years in which he was, in his adulthood, that he directed a great deal of it within domestic settings.

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an Af     on (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 126   Filed 09/23/15   Page 227 of 249
1776

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3808

But there was a variety of motives toward that violence. Some of his violence was through anger. That's the single most common theme for his violence. Some of it was jealousy. Some of it was revenge when he thought people had hurt him. Some of it was fear, such as when he shot the man who had pushed him and threatened him. Some of it was because children wouldn't do what he wanted. And some of it was to intimidate a witness, because he didn't want Alicia to testify against him about the rape. Those are a number of different motives prior to these homicides.

And even in these homicides we see two very different motives. The Robin Williams homicide is a domestic homicide with anger and jealousy and revenge being all present, and anger being the dominant one. But the Donnie Allen homicide is a homicide of opportunity, of expediency. It was not necessary in order to get his transportation. He killed Donnie Allen in the course of a robbery and carjacking because he didn't want Donnie Allen to call the police, and that is not the same as a domestic homicide.

Q. All right. Now, in your opinion, Dr. Burgess had made the statement that this is a domestic homicide. In your opinion, was this one crime or two?

A. I believe that this was two crimes, the murder

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 228 of 249
1777

Page 3809

of Donnie Allen and the murder of Robin Williams.

Q. And why is that important?

A. Well, one reason it's important is that this jury is being asked to sentence the defendant for each of those crimes. Another reason it's important is that two different lives were taken that night for two different reasons.

Q. And in your opinion, did these two murders have the same motive?

A. No. I believe that these two murders have different motives.

MS. TOMPKINS: Thank you, Dr. Dietz. That's all the questions I have.

THE COURT: Members of the jury, we will take our afternoon break at this time. You will remember the usual instructions. Thank you.

(The jury left the courtroom.)

(Brief recess.)

THE COURT: Mr. Bender?

MR. BENDER: Yes, Your Honor. At this time we would move for a mistrial on the basis that Dr. Peter Carlson, when he was testifying on direct, if memory serves me correctly, said, in response to a question by Ms. Rose, something to the effect of the special operations unit death row in Terre Haute,

Case 3:12-cv-00327-MOC     Document 106     Filed 09/23/15     Page 229 of 249
1778

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3810

Indiana, and we have been very, very careful, even the witnesses that came in from Terre Haute, to call it the special housing unit and special confinement unit, have never let anybody know that that was death row, and now it's out there. And I asked to be heard and Your Honor said no, and I would have made a motion for mistrial at that time. It's trying to unring a bell. We have been very careful about that matter.

THE COURT: The Court will deny the motion. He brought that up in response to a question having to do with the various facilities that were present in the various different places and it wasn't in a context that indicated the defendant had been on death row, so the motion will be denied.

The Court will deny the government's request to admit the expert's opinion as such in that its probative value is not outweighed by the prejudicial effect.

MS. TOMPKINS: Are you speaking of his report?

THE COURT: I'm talking about the report in toto. Okay. May we have the jury, please. The witness may retake the stand.

(The jury returned to the courtroom.)

THE COURT: Your witness. The witness and the jury is here.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3811

MR. BENDER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BENDER:

Q. Good afternoon, Dr. Dietz.

A. Good afternoon.

Q. Dr. Dietz, you testified that you spent a couple of -- the better part of two days interviewing Marc?

A. Yes. I think that's how long it was.

Q. Okay. You've reviewed a vast amount of documents in this matter?

A. Pretty big.

Q. And have you interviewed anyone else personally associated with this matter?

A. No, I haven't.

Q. None of Marc's family members or any of the victims?

A. That's right.

Q. Okay. And I believe you can agree that reasonable minds may disagree on certain matters?

A. Yes, certainly.

Q. And I think you said that you and Dr. Halleck disagree in some respects but not in all respects?

A. That's right, and not very much.

Q. Right. What you found as you went through this

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3812

was there was some evidence that Marc had made some prior threats to people, and particularly Robin, die, bitch, die, during the fire bombing --

A.    That would be an example, yes.

Q.    And also as you looked at this you found that there was some erratic behavior on Marc's part, didn't you?  Let me give you an example, okay?

A.    Sure.

Q.    You heard testimony about him shaving his head because his thinking wasn't clear and he thought maybe he could think clearly if he shaved his head?

A.    I heard that testimony.

Q.    Okay.  That's fairly erratic behavior, wouldn't you think?

A.    Well, I wouldn't call it erratic behavior.  If he shaved his head because he thought he couldn't think clearly, that would be significant and would show some distortion in his thinking.  If he shaved his head for the reason that other killers I have examined have shaved their head, then it wouldn't be an example of that, it would be part of his plan to get a mission haircut.

Q.    But you have no evidence of that?

A.    Correct.

Q.    And he was suffering from some depression, and

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff" · ·  ·´ ` · · )n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 232 of 249
1781

Page 3813

the difference is how much.  Was it major depression or something less than that?

A.    Well, actually, it's not so much how much, because I agree about the symptoms that Dr. Halleck said.  The difference would be the cause.  Crying and lack of appetite and social withdrawal and so on, I believe he had, though I'm not sure he had them uninterrupted for two weeks or more.

The question is is that caused by an underlying depressive illness inherent in him as in 10 percent of the population or was that caused because he was drinking a lot for those weeks, and I don't think there is any way to tell which it was.  Though the evidence I cited tends to favor it being the drinking, you can't be sure.

Q.    Right.  But there was some depression?

A.    Either way he was having symptoms that look just like depression.

Q.    Guns have been involved in or at least were used in these two homicides, right?

A.    Yes.

Q.    And there was some testimony about maybe shooting guns in the 7 acres out on the home place?

A.    There was testimony about his learning to shoot from family, yes.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi¨      ¨¨    ¨  n  (704) 333-9889              Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 17825    Filed 09/23/15    Page 233 of 249

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3814

Q. All right. Some bit of paranoia?

A. I'm sorry?

Q. Was there some bit of paranoia, like afraid he was going to get caught if he walked up the road?

A. There was definitely more of a jealousy at various points in his life, which I think is an example of paranoia. It could be suspicious of your partner's infidelity and accusatory of her. That's a kind of paranoia. And the night of the crime, I think he was taking steps to avoid being prematurely stopped and so that's why he didn't walk up the side of the road, but I wouldn't call that paranoia to be careful where you walk with a bag with an unlawful firearm in it.

Q. But there was some aspect of paranoia present in his behavior?

A. I don't see it in his behavior, but in his account of what he thought, for him to believe that Robin had been lying to him and having an affair with Bennie Green and for him to think that about the other women in the past, I would call that an example of paranoia.

Q. And the jealousy, the rage, and I think Dr. Cunningham called it something obsessive, I forget what it was.

A. Preoccupation.

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 234 of 249

1783

Page 3815

Q.   Right, right, obsessive preoccupation, fixation, got to get to Robin, whether it's to kill she and Bennie Green or to talk to her, there was some sort of a fixation on her for what he perceived she had done to him?

A.   Well, I don't think it would be correct to say that there is a fixation, since he is thinking about many different things he might do during that period of time.  He isn't fixed on exactly what he is going to do. He keeps making decisions and changing his mind.  And even up to the time that he has got Robin at gunpoint, there is still several ways this could go, depending on how everything plays out.  So it's not a fixed purpose necessarily.  But it is true that during that time he is repetitively thinking about her and one of his thoughts is of killing her, killing Benjamin Green.

Q.   Right, his repetitive thought pattern was Robin, she is what is causing this problem I have --

A.   That's one of his thoughts.  And at other times he doesn't think that.  For example, when he wakes up and he hasn't been drinking and his blood alcohol level is down.  In one of Dr. Cunningham's examples he said to me, gee, why was I thinking that last night, I'm not as angry toward her now.

Q.   Okay.  Dr. Dietz, you have two consulting

Case 3:12-cv-00327-MOC     Document 106     Filed 09/23/15     Page 235 of 249
1784

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
8/8/2002

Page 3816

firms.  One is the Park Dietz and Associates?

A.  Yes.

Q.  And are you the sole owner of the Park Dietz and Associates?

A.  I suppose my wife is an owner, too; but other than that, yes.

Q.  All right, okay.  And anybody else is either an independent contractor or an employee like a staff person or that sort of thing?

A.  Correct.

Q.  And you actually solicit and advertise, do you not?

A.  Well, I don't know what counts as advertising, but we do send out brochures to mailing lists of attorneys.  We have done that two or three times.  And we speak at a great many meetings of various kinds of attorneys and will sometimes have brochures there.  And we have a web site.  We have never paid for an ad.

Q.  Okay.  As a matter of fact, you sent me one of your letters and brochures, didn't you?

A.  If you belong to the National Association of Criminal Defense Lawyers, or whatever the group is called, then we did, we sent it to our mailing list.

Q.  You are not very picky, are you?

That's Defendant's Exhibit 26.  Can you identify

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affi... ...n (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 236 of 249
1785

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3817

that?

A.   This is a cover letter from December 3rd of 2001, sent to that mailing list of defense lawyers.

Q.   So that's what you call a solicitation, whatever it is, that's what you send out, sort of a mass mailing?

A.   Yes.  You should have answered it.

(Laughter.)

Q.   Thank you.  You also have a group called the Death Threat Assessment Group, do you not?

A.   Yes.

Q.   And you are president, vice president, secretary and treasurer and sole shareholder in that?

A.   Yes.

Q.   Tell us again what that does.

A.   It provides services to primarily employers on workplace violence prevention.  There is some other things we do, but that's the major activity.

Q.   And Defendant's Exhibit 27, can you identify that?

A.   This is an old version of what we used to call the big brochure that sets forth generally what services were offered at the time.

Q.   Okay.  All right.  And you send that out, rather than to attorneys, to Fortune 500 companies,

Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 237 of 249
1786

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3818

large corporations, that sort of thing?

A. We never had a mass mailing of this; but the nicer, newer one, we did.

Q. Okay. So I don't have the nicer, newer one.

MR. BENDER: Your Honor, at this time I would move to introduce Defendant's Exhibits 26 and 27.

THE COURT: Let them be admitted.

BY MR. BENDER:

Q. In connection with the Threat Assessment Group, and it's reflected in that old brochure, there is something called murder 9:00 to 5:00 HBO that you and, was it your wife, was she the producer of that?

A. No.

Q. Okay.

A. Neither my wife at the time nor I were producers of it.

Q. Okay. You are familiar with it, an HBO production?

A. Yes, sure.

Q. And you refer to it in there as one of the things that you were seen by, I think you said 20 million people, and it's about workplace violence?

A. Yes, it is.

MR. BENDER: Your Honor, I would like to have this marked as Defendant's Exhibit 28.

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 238 of 249
1787

Page 3819

MS. TOMPKINS: Your Honor, we have an objection to the relevance.

THE COURT: Members of the jury, we will ask you to step out for a moment while we take up a legal matter.

(The jury left the courtroom.)

THE COURT: Please describe the exhibit.

MR. BENDER: Yes, Your Honor. It is Dr. Dietz's HBO called Murder 9:00 to 5:00, and it is a video of workplace violence and Dr. Dietz talks about that, and the questions I asked, which seemed innocuous -- well, let me ask Dr. Dietz to leave, if I could, while we argue this motion.

MS. TOMPKINS: Objection.

MR. BENDER: Could we have him sequestered while I make this motion?

THE COURT: I have no objection.

(Dr. Dietz leaves the courtroom.)

MR. BENDER: Your Honor, he describes the exact same things he described about Marc Barnette, threats, paranoia, fixation, jealousy, guns, all of which his group says they can prevent or that you ought to be aware of and that you ought -- and it ought to be able to prevent and you need to hire us to do that. Now, the relevance is, one, it's cross-examination; two

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A          :ion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 239 of 249
1788

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3820

is it's going to show that --

THE COURT: On cross-examination you can ask him about it -- but go on to your second point.

MR. BENDER: Okay. And at the very end he says, and we are talking about multiple homicides in the workplace, and at the very end when Dr. Dietz comes on and describes these things, he says, as he goes back through it, he says, these people are not evil, these people need help, they need to be treated with dignity and respect. Marc Barnette is not evil. He needs to be treated with respect and helped, and that's the whole purpose of this.

THE COURT: You are entitled to ask the witness about that.

MR. BENDER: Can I show it to him?

THE COURT: No. You can show it to him on voir dire. How long is the tape?

MR. BENDER: It's about 40 minutes.

THE COURT: Entirely out of order. Needless consumption of time, confusion of the jury, and misleading the jury, plus it's got a serious problem of relevance.

MR. BENDER: Your Honor, when he says these are the things I found about Marc, the same things that I find when I'm being paid by corporations.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3821

THE COURT: You can put -- I will let you put on his conclusion and let him explain it.

MR. BENDER: Well, it has -- without --

THE COURT: Whatever he says about it. But we are not going to spend the afternoon hearing a 40-minute tape about something that is not specifically domestic violence or another type of violence that's been identified here.

MR. BENDER: Well, Ann Burgess said this was very similar to workplace violence in her testimony.

THE COURT: You can ask Dr. Dietz about that.

THE COURT: What is the government's position on this?

MS. TOMPKINS: Your Honor, we would contend that it's not relevant, that it is a needless waste of time. If defense counsel wants to ask him about -- I don't know even know what this thing is about, but ask him questions rather than watching a video, but I would also contend that asking him or trying to correlate workplace violence to this, the crimes here in this sentencing hearing, is completely irrelevant and do not match up and he should not be allowed to ask him about his opinions on workplace violence related to the defendant. This is not a case

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3822

of workplace violence.

THE COURT:  He can ask that question on cross-examination.

MR. BENDER:  On direct examination Dr. Dietz said, with respect to this TAG group, Threat Assessment Group, he does it in preventing domestic violence in the workplace and he does it routinely. Those were his words.

THE COURT:  Right.  And you can go into any length you deem necessary within reason to cross-examine him about that.

MR. BENDER:  Well, can I cue it up to the last like five minutes?

THE COURT:  Yes, sir.

MS. TOMPKINS:  I object to playing a portion out of context.

THE COURT:  Well, all we are going to do right now is look at it for purposes of voir dire.

MR. BENDER:  The whole thing or just the last five --

THE COURT:  The last five minutes.

MS. TOMPKINS:  Should Dr. Dietz be present for this?

THE COURT:  Yes, bring Dr. Dietz in.

MR. BENDER:  Judge, I don't know how we

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affi¨ ˉˉ ˙ ˙n (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 242 of 249
1791

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3823

are going to fast forward it to that point.  Is there some way I can see a screen and tell when it --

THE COURT:  For purposes of voir dire, Dr. Dietz, and out of the presence of the jury we will be showing the last five minutes or so of a tape that you heard Mr. Bender identify.

(Videotape is being played outside of the presence of the jury for purposes of voir dire of the witness.)

MS. TOMPKINS:  Can you turn it down a little bit more so that the jury can't hear it?

Your Honor, while he is cueing that up, if I could comment, if the purpose is to show some sort of bias, it's not relevant.  If Dr. Dietz has a bias, then the defense is allowed to expose that, and I'm not quite sure what kind of bias against the defendant that they are trying to expose.

THE COURT:  I don't think they are trying to show bias.  They are trying to show that he thought something different at a different time, I would assume, but we will ask Mr. Bender about that.

MR. BENDER:  We've got it cued up.  Would you like to see it now?

THE COURT:  Yes.  The witness may observe it also.

MR. BENDER:  Sure.

Page 3824

(Video played for the Court.)

MR. BENDER:  That's it.

THE COURT:  Counsel may cross-examine the witness appropriately with regard to that.

MR. BENDER:  Can I also show it?

THE COURT:  No, sir.  The record will show that the tape began as shown here in court for voir dire purposes with a screen that showed the name of Dr. Dietz.

May we have the jury, please.

MR. BENDER:  Your Honor, I would introduce that tape for the record.

THE COURT:  It will be introduced for purposes of completing the record but not as an exhibit for this trial.

MR. BENDER:  Right.

THE COURT:  Thank you.

(The jury returned to the courtroom.)

THE COURT:  All right, sir.  The jury is with us.

BY MR. BENDER:

Q.  Dr. Dietz, on direct examination you mentioned that this TAG group, Threat Assessment Group, is involved in preventing domestic violence in the workplace and that's what you routinely do, is that

Case 3:12-cv-00327-MOC     Document 106-3  Filed 09/23/15     Page 244 of 249
1793

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3825

correct?

A. We -- almost right. We don't do primary prevention of domestic violence. What we do is to help employers deal with domestic violence in ways that protect their employees, and most typically that is that the employee is a victim who makes it known that she has obtained a restraining order against her abuser or that she feels frightened that her abuser will come to her workplace, and that's how we tend to learn of it, and then we manage it from there.

Q. And the Murder 9:00 to 5:00 video that you did for HBO, you showed four individuals who had committed domestic violence in the workplace, didn't you?

A. No. We did four cases of workplace violence. None of them was domestic violence, but all four were serious violence. One was a woman who shot her supervisor. One was a man who stalked a woman who had no relationship with him and then did a mass murder in which he shot her and killed others. One was a postal worker who did a mass murder at his workplace, no domestic element. And the fourth one was a man who was trying to go to his workplace to do a mass murder but locked himself out of his car on the way and killed a couple of people at a fast food restaurant and committed suicide; again, no domestic element.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi¨ ~~ ~ ~ ˙n (704) 333-9889          Fax (704) 372-4593
1794
Case 3:12-cv-00327-MOC     Document 106     Filed 09/23/15     Page 245 of 249

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3826

Q.   But you also indicated that things for an employer to look for were threats, erratic behavior, firearms, fixation on coworker, depression, and paranoia, didn't you?

A.   The video does indicate that, and I support that.  The way that came to be is that I gave HBO a list of the 12 features that we had found associated with workplace mass murder, and they wanted to make it a list that was simpler, and we whittled it down to six.  We had debates about how much the public should be told about warning signs and how to contextualize that and eventually we resolved there would be a sensitive way to mention these six things for the public.

Q.   And at the end you showed little snippets of each one of these people who had killed strangers to get to -- to try to get to their primary object, which is their boss, their supervisor, and you said, this is not about evil, this is about getting people help and treating them with the dignity and respect that they deserve, each one of those people, didn't you?

A.   I said these cases are not about evil, they are about troubled people and so on.

MR. BENDER:  Thank you.  That's all.

MS. TOMPKINS:  No further questions.

THE COURT:  You may step down.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an ... rion (704) 333-9889          Fax (704) 372-4593
800-333-2082
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 246 of 249
1795

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3827

MS. TOMPKINS: That's the evidence for the government, Your Honor.

THE COURT: Will there be any surrebuttal from the defense?

MR. BENDER: Your Honor, may we have a moment --

THE COURT: Yes, sir, you may.

MR. BENDER: -- to talk about that?

THE COURT: Yes, you may. The jury may be at ease.

MR. BENDER: Your Honor, we will not put on any other evidence. Thank you.

THE COURT: Members of the jury, the Court told you earlier the order of business would include hearing the evidence and then we would have the arguments of the attorneys and also the charge of the Court, that is a set of instructions that would give you the law in the case. We propose to do that beginning Monday morning, so you will have tomorrow off and you will be free to go today.

Let me remind you of the instructions to keep an open mind about all of the issues in the case. Don't discuss it with anyone or comment on it or let anyone discuss it in your presence, including your fellow jurors. Don't do any research or visit any locations,

Case 3:12-cv-00327-MOC     Document 9-06     Filed 09/23/15     Page 247 of 249

United States of America vs. Aquilia Marcivicci Barnette                3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                8/8/2002

Page 3828

and all of the other instructions I have given you.

Thank you very much for your attention to those.  We

appreciate your attention to the evidence throughout

this fairly long trial, and we will see you on Monday

morning at 9:30.  Thank you.

(The jury left the courtroom.)

THE COURT:  Will there be suggestions for

the Court as to the holding of the charge conference

tomorrow from any of the attorneys?

MR. BENDER:  Judge, I've been elected.  We

would like to have some time this evening and maybe

tomorrow morning to put together a list of mitigating

circumstances.  We've got it pretty much finished, but

probably need to put some finishing touches on it.

Could I suggest that maybe we start at 10:30 in the

morning?

THE COURT:  10:30 will be fine.  And at

that time the Court will likely have a proposed set of

jury instructions and verdict sheet with everything but

the mitigating factors, although it may have the

mitigating factors from the previous proceeding --

MR. BENDER:  Right.

THE COURT:  -- simply as a starting place.

MR. BENDER:  Yes, sir.

THE COURT:  That will be in court, with

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an Aff          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 248 of 249
1797

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3829

the defendant present, and we will take up instructions. It's very possible that we will have another one tomorrow afternoon, if we need a follow-up, the object being to put a final draft in place.  Thank you.

I, Scott A. Huseby, do hereby certify that the foregoing transcript is a true and correct transcript.


SCOTT A. HUSEBY                                    DATE

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi            n (704) 333-9889          Fax (704) 372-4593