# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

---

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

## AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

---

## JOINT APPENDIX - VOLUME V OF V
### (Pages 1799 - 2151)

---

HAROLD J. BENDER
LAW OFFICE OF HAROLD J. BENDER
200 North McDowell Street
Charlotte, NC 28204
(704) 333-2169

ROBERT J. CONRAD, JR.
UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6629

MARK E. OLIVE
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
(850) 224-0004

ANNE M. TOMPKINS
ASST. UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6222

*Counsel for Appellant*

*Counsel for Appellee*

**Additional Counsel Listed on Back of Cover**

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 1 of 200

JILL WESTMORELAND ROSE
ASSISTANT UNITED STATES ATTORNEY
WESTERN DISTRICT OF NORTH CAROLINA
100 Otis Street, Room 233
U.S. Courthouse Building
Asheville, North Carolina 28801
(828) 271-4661

# TABLE OF CONTENTS

Federal District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Indictment filed February 4, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Guilty Verdict returned January 27, 1998 . . . . . . . . . . . . . . . . . . . . . . . . 75

Defendant's Motion in Limine Regarding the Victim
    Impact Statements, filed June 4, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . 76

Motion for Allocution by the Defendant, filed
    June 4, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Government's Response in Opposition to
    Defense Motion in Limine to Prohibit
    and/or Limit Victim Impact Evidence,
    filed June 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Government's Response to Motion for Allocution
    by the Defendant, filed June 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . 89

Order Denying Defendant's Motion for Allocution,
    entered June 18, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Order Denying Defendant's Motion in Limine
    regarding the Victim Impact Statements,
    entered June 21, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Motion for Relief Pursuant to *Ring v. Arizona*
    filed July 2, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

    Attachments:

    Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

1

Government's Notice of Intent to Seek
the Death Penalty, filed August 7, 1997 .......................... 110

Government's Reaffirmation of Intention
to Seek the Death Penalty, filed July 30, 2001 ..................... 118

Defendant's Memorandum in Support of Motion
Regarding *Ring*, filed July 12, 2002 ........................... 121

Government's Response to Defendant's Motion for
Relief Pursuant to *Ring v. Arizona*,
filed July 12, 2002 ........................................ 128

Voir Dire:

Prospective Juror Regina Sanders (888) .......................... 133

Prospective Juror Edwards (1014) .............................. 148

Prospective Juror Karen Sanders (1071) ......................... 169

Prospective Juror Blakeney (1143) .............................. 184

Prospective Juror Bryson (1239) ............................... 205

Prospective Juror Donaldson (1289) ............................ 224

Prospective Juror Campbell (1477) ............................. 245

Prospective Juror Moore (1913) ................................ 264

Prospective Juror Deana Stanford (1960) ........................ 281

Parties' exercise of peremptory challenges to the
prospective jurors, July 27, 2002 ............................. 294

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 5 of 200

### Volume II

Resentencing Volume 12, July 29, 2002, (Morning) . . . . . . . . . . . . . . . . . . . . . 372

Resentencing Volume 12, July 29, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . 469

Resentencing Volume 13, July 30, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . 587

Resentencing Volume 13, July 30, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . 687

Resentencing Volume 14, July 31, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . 773

### Volume III

Resentencing Volume 14, July 31, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . 845

Resentencing Volume 15, August 1, 2002 (Morning) . . . . . . . . . . . . . . . . . . 959

Resentencing Volume 16, August 5, 2002 (Morning) . . . . . . . . . . . . . . . . . 1029

Resentencing Volume 16, August 5, 2002 (Afternoon) . . . . . . . . . . . . . . . . 1107

Resentencing Volume 17, August 6, 2002 (Morning) . . . . . . . . . . . . . . . . . 1202

### Volume IV

Resentencing Volume 17, August 6, 2002 (Afternoon) . . . . . . . . . . . . . . . . 1312

Resentencing Volume 18, August 7, 2002 (Morning) . . . . . . . . . . . . . . . . . 1424

Resentencing Volume 18, August 7, 2002 (Afternoon) . . . . . . . . . . . . . . . . 1533

Resentencing Volume 19, August 8, 2002 (Morning) . . . . . . . . . . . . . . . . . 1634

Resentencing Volume 19, August 8, 2002 (Afternoon) . . . . . . . . . . . . . . . . 1726

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 7 of 200

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 8 of 200

## *Volume V*

Resentencing Volume 20, August 9, 2002 (Morning) .................... 1799

Resentencing Volume 20, August 9, 2002 (Afternoon) .................. 1822

Resentencing Proceedings, August 12, 2002 ......................... 1870

Resentencing Proceedings, August 13, 2002 ......................... 2017

Defendant Motion for Mistrial regarding victim
    impact testimony, filed August 5, 2002 ........................ 2034

Written questions from the jurors filed August 13, 2002 ................ 2037

District Court Judge's answer to jurors' written question
    filed August 13, 2002 ...................................... 2038

Jury verdict form with reference to count 7, filed
    August 13, 2002 .......................................... 2039

Jury verdict form with reference to count 8, filed
    August 13, 2002 .......................................... 2057

Jury verdict form with reference to count 11, filed
    August 13, 2002 .......................................... 2075

Judgment and Order imposing sentence, entered
    August 20, 2002 .......................................... 2092

Defendant's Motion for New Trial, Arrest of Judgment
    and Other Relief, filed August 20, 2002 ...................... 2097

Order Denying Defendant's Motion for New Trial,
    Arrest of Judgment and Other Relief
    entered September 9, 2002 ................................. 2149

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA ) DOCKET NO. 3:97-cr-23-V
 )
 vs. )
 )
AQUILIA MARCIVICCI BARNETTE, ) VOLUME 20
 ) MORNING
 Defendant. )
_____)

CHARGE CONFERENCE
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
AUGUST 9, 2002

APPEARANCES:

On Behalf of the Government:

 ANNE M. TOMPKINS, ESQ.
 JILL WESTMORELAND ROSE, ESQ.
 227 West Trade Street, Suite 1700
 Charlotte, North Carolina

On Behalf of the Defendant:

 JEAN B. LAWSON, ESQ.
 P.O. Box 472106
 Charlotte, North Carolina

 HAROLD J. BENDER, ESQ.
 200 North McDowell Street
 Charlotte, North Carolina

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

FRIDAY MORNING, AUGUST 9, 2002

(Jury not present.)

THE COURT: The court's in session for the purpose of discussing proposed jury instructions. The court has a set which is proposed. Because of printing problems, the automation specialist is printing those out at the present time.

Now, you've already been given a copy of proposed verdict sheets. Would there be any comments on those at this time?

MS. TOMPKINS: Do you want to go first?

MS. LAWSON: You go first.

MS. TOMPKINS: Okay. The government will jump to Unable to Reach a Unanimous Verdict.

THE COURT: Okay.

MS. TOMPKINS: And would cite the court --

THE COURT: Now, what page are you on?

MS. TOMPKINS: That is page 17 of...

THE COURT: Right.

MS. TOMPKINS: Okay. You have it?

THE COURT: I do.

MS. TOMPKINS: Citing Jones versus the United States, 527 U.S. 373, 1999 Supreme Court case.

In that case a similar jury instruction was argued for by the defendant and denied, and the Supreme Court

approved the denial of this jury instruction saying, quote, It concerned a procedural matter and was not one which should have been the subject of an instruction.

The court reasoned in that case that the jury was not misled about its role in the sentencing process. That the jury should be encouraged to fulfill its role to reach a unanimous verdict and that by -- the court said, and this is a quote, We have long been of the view that the very object of the jury system is to secure unanimity by comparison of views and by arguments among the jurors themselves. And that -- in fact, the _Allen_ charge, which is commonly used when a jury is unable to be unanimous, speaks to the importance of a unanimous verdict.

And that the court also concluded that, quote, The government has a strong interest in having the jury express the conscience of the community on the ultimate question of life or death, and a charge to the jury of the sort proposed by petitioner might have the effect of undermining this strong governmental issue -- interest, that is.

THE COURT: All right. Is there any objection by the defendant to just remove that page?

MR. BENDER: Yes, Your Honor, because we believe that's a correct statement of the law. In the event that they are unable to reach a verdict, a sentence of life without the possibility of release will be -- will be entered by the

court, and that's what --

THE COURT: Well, I think she's not saying it isn't correct. She's saying that it isn't necessary.

MR. BENDER: We believe it is necessary to give them all the options that are provided for by the law.

THE COURT: Well, wouldn't you think Jones makes it at least optional?

MR. BENDER: If Jones does make it -- I'm not familiar with Jones. Well, I think it's a carjacking case, but I haven't read it in a while. But if Jones makes it optional, then we would implore the court to leave it in.

MS. TOMPKINS: And the government would again argue that Jones says, in fact, it undermines the core purpose of juries and that is to be unanimous.

Also, the Federal Death Penalty Act does not require a deadlock instruction, so -- they have put in a specific instruction that the jury not base its sentence on race, color, religious beliefs, natural origin or sex of the defendant or any victims. So they've specifically put in additional instructions that they think are important to the federal death penalty and they have left out purposefully, I would argue, a lack of unanimity instruction.

And I do believe that Jones specifically says, and the majority of the Supreme Court argued that this is an improper jury instruction. And that's -- well...

MR. BENDER: Your Honor, we believe that's a burden shifting. There are two ways in which a life sentence can and should be imposed. One is if it's unanimous life. And two is if it's not unanimous; in other words, if they fail to reach a unanimous decision, then a life without possibility of release sentence will be imposed. By eliminating this, we think it's improperly burden shifting to make us prove a higher standard than we need to.

THE COURT: Well, the court will have another look at the Jones case and consider that before we meet this afternoon.

MS. TOMPKINS: Can I ask just to cite another case for you to look at in your determination?

THE COURT: Let me -- I think there's more than one Jones case. Give me that earlier cite.

MS. TOMPKINS: It's 527 United States 373. It's a 1999 case under the Federal Death Penalty Act.

THE COURT: All right. And you have another cite?

MS. TOMPKINS: Yes. If you would look at 462 S.E.2d 25. It's a North Carolina Supreme Court case; cert. denied by the United States Supreme Court, which also has the same issue.

And a Fourth Circuit case, if you would, which is Green versus French, cited at 143 F.3d 865.

THE COURT: All right. Now, apparently the parties

are both agreeable to leaving out any option to the jury about the defendant being sentenced as otherwise provided by law, as Judge Potter did.

MS. TOMPKINS: Yes. Although, I will say this. And this is also in the Jones case. That is a lawful instruction, but -- and in the Jones case the court said even if it's factually impossible, it's still in the statute and lawful. However, the government understanding that it's not a true possibility in the effort to tell this jury exactly what the actual facts are, we will concede and take that out.

THE COURT: All right. So that's -- that will be observed throughout the instructions, that that's -- that's not an option and won't be suggested as an option.

MS. TOMPKINS: And I just point out that the lawfulness of that instruction, because I think it mentions what the government's request to take out the lack of unanimity argument. Just leave it at that.

THE COURT: I'm sorry, say that again.

MS. TOMPKINS: I think -- the government's argument about taking out the instruction about a lack of unanimity dovetails with our effort to leave the decision with the jury and to tell the jury exactly, you know, what the facts are and what the law is and that both of those issues are talked about in the Jones case and I think they dovetail a little bit.

THE COURT: And evidently, you say that's the case

even though the only unanimity requirement discussed in the statute -- well, take that back. The statute talks about unanimity in imposing the death penalty. It also talks about unanimity in imposing a life sentence. And the effect of those two recommendations by the jury is that the court is bound by them.

MS. TOMPKINS: Yes.

THE COURT: The statute also talks about this third option of sentencing according to law which is also a unanimous type of decision, but that's not going to be in play here. But the jury is told that unless they are unanimous in their recommendation for death, then there won't be a death sentence. In other words, the mitigation instructions, of course, discuss lack of unanimity there. In any event, we'll look at that issue further.

MR. BENDER: Your Honor, may I address --

THE COURT: Okay. Before we leave that earlier point, you'll be given a copy of proposed instructions from the court, and page 69, section 8.02 will have to be changed as a result of some of these discussions. So you can contemplate that there will be some editing, at least of that page, which is entitled Consequences of Deliberations.

Okay. Mr. Bender.

MS. LAWSON: Yes. Two other suggestions. I think they appear on each one of the three. On page 5...

THE COURT: Yes, sir.

MR. BENDER: And it may just be a spacing problem, if we can get "yes" and "no" on the same page.

THE COURT: You're right. We will handle that.

MR. BENDER: Okay. And also, as I count the lines, there are ten lines as opposed to twelve lines for the...

THE COURT: Oh. Well, I accept your math. Is that in the case of each of these options where they have to sign twelve times?

MR. BENDER: I believe it is, Judge.

THE COURT: All right. We'll see to that.

MR. BENDER: That's all I have for that.

THE COURT: Okay.

MS. TOMPKINS: Nothing further from the government.

THE COURT: All right. Then, of course, the defendant's revised mitigating factors will be inserted. The copies that you now have have the -- I believe the original trial mitigators.

MR. BENDER: Right. Judge, for the record, we would move to dismiss the aggravating factor of future dangerousness as we had previously done.

THE COURT: All right. Thank you. That motion will be denied.

Now, I propose to take up some of the defendant's proposed instructions. Has the defendant -- I mean, the

government looked at those?

MS. ROSE: Yes, Your Honor.

THE COURT: And do you -- the first one talks about the government's burden of proof. Now, as to that, the court proposes to use its standard instruction on reasonable doubt, which says it's a doubt based upon reason and common sense and that its meaning is no doubt clear to the jury, and I won't define it otherwise.

The government have any objection to that?

MS. TOMPKINS: No, sir.

THE COURT: And I assume the defendant does because the defendant proposed a more elaborate reasonable doubt instruction, but the court --

MR. BENDER: That's correct, Your Honor.

THE COURT: Okay. But the court will decline to give that one.

Now, Mitigating Factors Defined, does the government have any objection to that?

MS. TOMPKINS: If we could just have a moment.

(Pause.)

MS. TOMPKINS: I'm just taking a look at the court's version of that quickly.

(Pause.)

MS. TOMPKINS: We would ask the court to use 6.01 as proposed by the instructions handed out by the court rather

than the defendant's.

THE COURT: Okay. I'll give that consideration. Is there anything in particular that you would like to -- that you say is incorrect about the defendant's proposal?

MS. TOMPKINS: The line, Indeed, if a homicide was justified or excusable, a defendant would not be guilty or punishable for it, I think is misleading and confusing. Really, this is about what is a mitigating factor and not about a justifiable or excusable homicide, and I think it takes the jury away from the point of the instruction which is to tell them what is a mitigating factor. And that particular line, I think, takes it far afield.

THE COURT: All right. I'll consider that.

Now, then, Mitigating Factors to Consider. Of course, that will be taken off defendant's new list of -- list for this trial.

Any objection to the rest of that page?

MR. BENDER: Your Honor, I would only say that the last sentence where it says Part 4, I'm not sure what that is in the verdict sheet, but --

THE COURT: You're right. We'll certainly look at that to make sure. Thank you.

MS. TOMPKINS: Well, the government would object to the defense Mitigating Factors to Consider and ask the court to keep the instructions as the court has proposed. I think

it's, again, somewhat misleading and asks the jury to consider things that they're at this point -- it's not important for them. For example, This was a choice expressly made by Congress in enacting the capital punishment statute. It goes very far afield from the strict instructions for the process by which they are to make their decision. This isn't a philosophy of why we have mitigating factors and what Congress intended.

So I would ask the court to deny the defense version of Mitigating Factors to Consider and stay with the patterned instructions as being more directly to the point.

THE COURT: When you say patterned --

MS. TOMPKINS: When I say patterned, I think I'm talking about the ones that have been handed out by the court.

THE COURT: Right.

MS. TOMPKINS: And they may or may not be pattern.

THE COURT: We've been searching for something that is called patterned instructions --

MS. TOMPKINS: Which I'm now calling patterned instructions.

THE COURT: -- and aren't sure whether such a thing exists at the present time.

Okay. And then the next one, Death Penalty Must be Unanimous Beyond a Reasonable Doubt. Any objection from the

government?

MS. TOMPKINS: If I can have just one minute.

(Pause.)

MS. TOMPKINS: This is a -- an issue that we have gone through somewhat during jury selection and the court remembers I made numerous objections during jury selection. I think this is the one. What the defense wants to argue is that there is, as I've argued before, an extra step that even if you're persuaded that the aggravating factors, you must still be unanimously convinced beyond a reasonable doubt that they're serious to mandate a sentence of death.

And the sentence that I would object to is, Even if one juror -- if even one juror concludes that justice can be served by a sentence less than death, the jury cannot return a decision in favor of capital punishment.

What I would ask the court to do, and I'll have to look at the court's instructions, but that they not again lead the jury down the path of nonunanimity, but that what this -- the jury should be instructed that, obviously, and they will be instructed that their decision should be unanimous beyond a reasonable doubt as to aggravating factors. I again think that this points them down the path of what happens if there's a nonunanimous verdict. There's a straight forward way to say this to the jury and this isn't it.

THE COURT: Well, in terms of reasonable doubt as

referenced in that -- in the middle sentence -- actually, it's the first sentence, the statute talks about the government proving its aggravating factors by -- beyond a reasonable doubt. It doesn't expressly talk about the government proving its overall case beyond a reasonable doubt. And it doesn't expressly talk about mandating a sentence of death beyond a reasonable doubt.

What does the government say to that?

MS. TOMPKINS: Well, I think that there -- I'm not sure whether the court has it, but I think there's an instruction that will say they are never required to find -- to give the defendant the sentence of death. I think that covers that issue. Any verdict of the jury must be unanimous. This leads the jury to believe that only a death sentence needs to be unanimous. We would again be saying to the jury -- they are going to be charged with making a unanimous decision. And we are -- well, and of course, the government is arguing that they not be told or instructed as to the consequences of a nonunanimous verdict since that argues against the whole purpose of the jury system. And I think this shades into that issue that's covered in the Jones case.

I don't know what case they cite or whether this has ever been given in a death case. It wasn't in the last Barnette case, anyway.

MR. BENDER: Well, Judge, it was submitted in the death case of <u>United States versus John Claud Oscar</u> in the Eastern District of Virginia, Norfolk Division. I do not know whether it was given in that case, but it was tendered and that's where it came from. I wish I had more to give you than that.

THE COURT: What was the defendant's name?

MR. BENDER: Oscar, O-s-c-a-r. The case number was 2:93-cr-131, from the Norfolk --

THE COURT: All right.

MR. BENDER: From the Norfolk Division of the Eastern District of Virginia.

THE COURT: Okay. I'll consider that request.

Then we have Life Option, No Requirement of Death Penalty.

MS. TOMPKINS: And on this the government would -- I think this was what I was citing, that the law allows for them to be instructed, I believe, that they're never required to impose a death sentence. I don't have any problem with that. It's the sentence that follows or the sentences that follow, the for examples, which the government would object to. But no objection to the first sentence.

THE COURT: You object to the examples.

MS. TOMPKINS: Yes.

THE COURT: And you have no objection to the closing

four lines, five lines.

MS. TOMPKINS: Pardon me?

THE COURT: The last four lines go on after the examples are given.

MS. TOMPKINS: I would -- what the government would propose is that this be a one-sentence instruction and that the rest of it doesn't add to that instruction. So for example all the way to the end we would object to.

MR. BENDER: Judge, that was an instruction also tendered in that very same case.

THE COURT: All right. Now, where -- in the last sentence it talks about I'm specifically required by law to advise you that you have this broad discretion. Are you able to say what law is referred to there?

MR. BENDER: Well, I think the statute gives them the -- as I think we probably argued about the first day is: Or even in the absence of mitigating, whether the aggravating factor or factors alone are sufficient to justify a sentence of death. They have the discretion to decide that.

THE COURT: That is correct. So the only --

MR. BENDER: Right.

THE COURT: -- issue here is how to express that. And that's what you are saying is the required by law reference.

MR. BENDER: Right. That even though you go through

all that, it's really your decision.

THE COURT: All right. I'll consider that.

MS. TOMPKINS: If I may, Your Honor, on that point, I think that's the point that I was starting to argue before. If I can find it in the statute.

The defense has argued since the beginning of this case that that is an "and" rather than an "or" in the statute. The jury -- in the -- it says, Or, in the absence of mitigating factors, whether the aggravating factors alone are substantial enough to call for the imposition of the death penalty. It's not "and." It's not a -- that's not a two-part process. This is in 3593(e), I believe. Where it explains to the jury they're to consider whether all the aggravating factor or factors found to exist sufficiently outweigh the mitigating factors, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death.

And defense counsel has been arguing that that's an "and." That they do that weighing process and then they have another step to say and you have to decide that the aggravating factors alone are enough. And the government argues that that's an "or" and that's in the event that the jury finds no mitigating factors to exist, they have to do some sort of weighing process with the aggravating factors alone. That that's only in the event that no mitigating

factors are found.

THE COURT: All right. I'll consider that argument as well.

Okay. Then we have the Unanimity Required Only for Death Sentence or Life Without Possibility of Release. Any objection to that?

MS. TOMPKINS: I think it's -- the language doesn't fit our actual circumstances of our case.

THE COURT: Well, I can fix that.

MS. TOMPKINS: And again, this goes back to the instructions on unanimity. I believe the Jones case would argue that this is not required and, in fact, might then cause to confuse the jury. And I would harkin back to my argument about, citing Jones, that -- and the Federal Death Penalty Act which does not require for there to be further instructions about unanimity or lack thereof. And this is what that does.

THE COURT: All right. Then there's the Weighing of the Aggravating and Mitigating Factors.

MR. BENDER: Judge, obviously, there's a second page that we just didn't -- didn't get copied, if you read the last sentence on that page.

THE COURT: Where it says what is called for in --

MR. BENDER: Yeah.

THE COURT: -- something. Yeah, that's true. I don't see that.

MR. BENDER: Yeah. I can fax it to everybody during the lunch recess.

THE COURT: Okay. If you'll do that.

MR. BENDER: Yeah.

MS. TOMPKINS: And if I could take a minute to look at the court's proposal of the court's 8.01.

(Pause.)

MS. TOMPKINS: And we would ask the court to use the court's proposal of 8.01, Weighing Aggravation and Mitigation, as being instructive to the jury about the law rather than -- rather than a -- the jury argument which the defense is open to argue to the jury in their closing argument. But as an instruction from the court, I think it's out of place and would ask the court to use the court's 8.01 for Weighing Aggravation and Mitigation.

THE COURT: All right. I'll consider your request there. And we'll look at Mr. Bender's second page when it comes in.

Okay. Then Life Option, No Requirement of Death Penalty. Any objection to that?

MS. TOMPKINS: That has already been addressed and I think they've already been instructed and there would be no necessity to reinstruct them on that.

THE COURT: Okay. Now, then, the government made certain proposed instructions. I just want to ask the defense

if you would like to highlight any of those to which you have an objection at this point?

MR. BENDER: Would you like for us to go through it?

THE COURT: Yes, I would, if you would care to.

MR. BENDER: Okay. On page 1.

THE COURT: Page 1.

MR. BENDER: In the second paragraph.

THE COURT: Okay.

MR. BENDER: Says, And sentencing phases.

THE COURT: Second paragraph, which begins During these proceedings?

MR. BENDER: Right.

THE COURT: Okay.

MR. BENDER: The last --

THE COURT: What line of that paragraph?

MR. BENDER: It's the very -- it's the line next to the last half sentence there.

THE COURT: Okay.

MR. BENDER: Original jury in the innocence and sentencing phases.

THE COURT REPORTER: I'm sorry, Mr. Bender, I didn't hear what you said.

MR. BENDER: I said, and sentencing phases, talking about the original jury. I think that needs to be...

THE COURT: Certainly that comes out.

MS. TOMPKINS: In fact, Your Honor, what we would propose is -- what I'd like to do, rather than spend a lot of time going through the government's proposal, is to look at the court's proposal which I think might ultimately -- I'm not abandoning our --

THE COURT: Right.

MS. TOMPKINS: -- instructions, but I think it might be not a good use of time to go through --

THE COURT: I think you may be right about that.

All right. Now, let me ask this. What about -- how much time do the parties say they would like for argument?

MR. BENDER: Do we have to be restricted?

THE COURT: I think it's -- I think it's advisable to put a time on it.

MR. BENDER: And --

THE COURT: Now, we don't cut people off in midsentence or midparagraph, but there should be some focus on how much time is going to be taken.

MR. BENDER: I just remark that in state court it's unlimited in this thing. But we believe that our side together should have three hours for us to split any way we choose.

THE COURT: That's a breathtaking request in a case where the facts have been rehearsed at great length by

numerous witnesses. It's not a long, technical case where a lot of the evidence needs to be marshalled. I mean, you should have plenty of time, but surely this -- a concern on your part that you'd wear the jury out trying to talk that long about it.

MR. BENDER: Oh, absolutely. Absolutely. We're cognizant of that. We're also cognizant of our responsibility where a man's -- where we hold a man's life in our hands. It's very -- it's a serious matter that we just can't give short script to. We may be able to do it in less time. I would hope that we would for everybody's sake, including the jury.

THE COURT: Of course, you're entitled to use your time as you see fit in terms of co-counsel participating.

MR. BENDER: Right.

THE COURT: What's the government say?

MS. TOMPKINS: We believe that we can do both of our arguments in two hours or less as an outside, and don't expect to take that much time.

THE COURT: I think the same statement can be made that the jury has heard, as I say, lengthy accounts of the crime, the two crimes and the two focuses of the crimes, North Carolina and Virginia, lengthy accounts about defendant's family history, lengthy accounts of the prior domestic events in the defendant's life. And I believe I'll give you both two

hours, but I think that is likely to wear thin on the patience of the jury, but that's my unsolicited advice about how long it should take to argue this case.

And as I say, if the defendant's counsel reach the two-hour point and ask for additional time, the court will give that consideration because I wouldn't want to cut off some important point that you feel should be made. But I also think that, as I've said before, there's an exhaustian factor that should be taken into account.

Anything else that occurs to you all that you want to take up right now before we adjourn?

And what I would propose to do is this afternoon at 2:30 give you a more complete proposal from the court, and that hopefully will be available to you before 2:30. Could even be e-mailed to your offices, I would think.

MS. TOMPKINS: Okay.

MR. BENDER: I will fax to the court and to you all the second page of what was omitted.

THE COURT: All right, sir.

MS. HANKINS: We'll need an original --

MR. BENDER: Oh, yeah.

MS. HANKINS: -- for the file.

MR. BENDER: But for their purposes I think a faxed copy will be okay for right now.

THE COURT: All right. Thank you.

(Lunch recess.)

\* \* \* \* \*

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

<u>CERTIFICATE OF REPORTER</u>

I certify that the foregoing transcript is a true and correct transcript from the record of proceedings in the above-entitled matter.

Dated this 9th day of August, 2002.

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter

Page 3853

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA    )

)    CASE NO. 3:97CR23-V

v.    )    August 9, 2002

)    Afternoon Session

AQUILIA MARCIVICCI BARNETTE,    )

    Defendant.    )

TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE RICHARD L. VOORHEES

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

ANNE M. TOMPKINS, Esq.

JILL WESTMORELAND ROSE, Esq.

Assistant United States Attorney

227 West Trade Street

Suite 1700

Charlotte, North Carolina  28202

FOR THE DEFENDANT:

JEAN B. LAWSON, Esq.

P.O. Box 4275

Charlotte, North Carolina  28226

HAROLD J. BENDER, Esq.

200 North McDowell Street

Charlotte, North Carolina  28204

Reported by:  Scott A. Huseby,

    Registered Professional Reporter,

    Certified Court Reporter,

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 34 of 200
1822

Page 3854

P R O C E E D I N G S

(Charge Conference 2:30 p.m.)

(Charge conference held outside of the presence of the

jury.

THE COURT:  I have signed the order

directing parties to maintain all exhibits, as we always

do these days.

Have both of the parties gotten the email?

MR. BENDER:  Yes, Your Honor.

THE COURT:  Okay.  And, of course, the

part of the email that had to do with substantive

offenses, offense instructions remains the same as what

you were given this morning.

And I received Mr. Bender's email about the

weighing of aggravating and mitigating factors.

Let me ask first whether the government has any

objection to the Court's proposal.

MS. TOMPKINS:  From the email?

THE COURT:  Yes.

MS. TOMPKINS:  Which we're actually now --

we don't have possession of it at the moment.  I don't

have it.

THE COURT:  You didn't print it out?

THE CLERK:  It's what I just handed you.

MS. TOMPKINS:  Okay.  That's what she was

Case 3:12-cv-00327-MOC   Document 207   Filed 09/23/15   Page 35 of 200
1823

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/9/2002

Page 3855

going back to get.

MS. LAWSON: And that's what you gave us this morning?

THE CLERK: No. What was in your chair when you came back from the break and what I just handed Anne was the same thing that was the email. It's the newest version.

MS. LAWSON: We are straight.

MS. TOMPKINS: What I would propose to do, as bad as this sounds, is to go through it page by page.

THE COURT: Well, that's okay. If you have any -- but do you have any comments? I mean, that's --

MS. TOMPKINS: Yes, we have comments, just on a -- just in general as we -- I think if we go through it page by page there will be many pages in which there will be no problems. We will probably come to pages where there may be grammatical issues, typographical issues, and then substantive issues.

THE COURT: Right. I have already caught a few typos and that sort of thing, and some duplication. But anyway, let's take the first six pages, starting with introductory remarks and going through direct and circumstantial evidence and credibility of witnesses.

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/9/2002

Page 3856

MS. LAWSON:  We are fine there, we have no comment.

MS. TOMPKINS:  No objection.

THE COURT:  And seven is exclusion of statements from the witness stand.  Eight talks about definitions.  Nine talks about videotape and audiotaped evidence.

MS. LAWSON:  There is something we would like bring to your attention on Page 10, Your Honor.

THE COURT:  Okay.

MS. LAWSON:  As you know, Paragraph Number 2 is intelligibly, audibly, and visually.  Of course, we showed that snippet of tape of Mr. Barnette in the interview room and it is probably not audible, so if you could take that out.

THE COURT:  Any problem from the government on that?

MS. TOMPKINS:  No.

THE COURT:  All right.  We will take 2 out.

MS. LAWSON:  Also Number 5, has the tape been edited or altered, obviously we introduced two versions of the tape, the actual tape and then the edited version, so we could take that out.

THE COURT:  Objection from the government?

Reported By: Scott A. Huseby, RPR
800-333-2082       Huseby, Inc., an Affiliate of Spherion  (704) 333-9889       Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
8/9/2002

Page 3857

MS. TOMPKINS: No objection.

THE COURT: Okay, that comes out.

MS. LAWSON: Thank you.

THE COURT: 11 is impeachment by non-sworn prior statements. And 12, I thought I would change that first sentence. 12 is prior inconsistent statements under oath, and I thought it should say, the first sentence, you will also recall that it was brought out that before this trial some of the witnesses, I'm going to say before this hearing, some of the witnesses made statements in a judicial proceeding, that is, under oath related to the subject matter of this sentencing hearing, and then it goes on from there as shown. Any concern about that?

MS. LAWSON: No, sir.

MS. TOMPKINS: No.

THE COURT: All right. And in statement or conduct of the defendant, Page 13, I took out confession in each place where it appears, so it just says statement or admission. Does that seem reasonable to all parties?

MS. LAWSON: Yes.

MS. TOMPKINS: Could I just have one moment on that?

THE COURT: All right. The only issue

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3858

that I had on that one was, second, if the defendant did make the statement, was it correct, and I haven't seen that before in a jury instruction and I wasn't sure where that came from and --

THE COURT: That comes from the Federal Judicial Center Pattern Jury Instructions, June 1982, Page 39.

MS. TOMPKINS: Okay then. No objection.

THE COURT: Who's going to take the FJC to task?

MS. TOMPKINS: Who am I to quibble.

THE COURT: 15 is defendant's testimony, impeachment by a prior conviction; and then 16, credibility of defendant as a witness.

MS. TOMPKINS: I have Pages 13 and 14. 13 is defendant's statements and then 14 is statement or conduct of defendant.

THE COURT: Right. I wanted to reverse those pages, so 13 is 14 and 14 is 13. In other words, take up voluntariness first and then correctness second.

MS. LAWSON: I'm still trying to find that page, because I'm working off of what we got this morning, but we don't contest the voluntariness of the statement.

THE COURT: I would be delighted to just

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3859

take that one out.

MS. TOMPKINS: I would agree, I think it is a little bit confusing.

THE COURT: It is. But that's one of those I threw out to the sharks to see if they'd bite.

MS. TOMPKINS: So 13 is out.

MR. BENDER: And they did.

THE COURT: And they did. All right. The old 14 is out, which is statement or conduct of defendant, so old 13 remains, defendant's statements. Thank you.

And then 15, impeachment by prior conviction; 16 credibility of defendant as a witness.

MS. TOMPKINS: Can we go back to 15 real quickly?

THE COURT: Yes. By the way, I don't intend to read any of the titles. They're just in there to get a handle on it.

MS. TOMPKINS: It says he's pleaded guilty to certain charges brought against him prior to 1996, and, in fact, in some of those he was found guilty. It's a small point, but he hasn't actually pleaded guilty to everything for which he has a prior criminal conviction, so if we could put in the defendant has been convicted of certain criminal charges.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3860

THE COURT: Is that agreeable to the government?

MS. TOMPKINS: To the defense.

MR. BENDER: How about both?

THE COURT: Has pleaded guilty or been convicted?

MR. BENDER: Right.

MS. TOMPKINS: That's fine.

THE COURT: All right. Now, the government -- I thought at this point this is where we would take up the arguments. In other words, I would like to say at least what I have already given there before the arguments just to get it out of the way, boilerplate type stuff, and then have jury arguments.

MS. TOMPKINS: Okay.

THE COURT: And then do the rest of the instructions starting with government's burden of proof. Now, do you have Page 17?

MR. BENDER: Yes.

MS. LAWSON: Is that --

THE COURT: Yeah, that tells the burden of proof. It says, the government has the burden of proving to you its contentions and any aggravating factors beyond a reasonable doubt, and I thought I would add, you will be instructed about this in more detail in

Case 3:12-cv-00327-MOC      Document 82907      Filed 09/23/15      Page 41 of 200
1829

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/9/2002

Page 3861

just a few minutes. That's just to introduce the definition of reasonable doubt, which comes next.

Page 19 begins the introduction, and I thought I would, in each of these counts I would remind the jury that an indictment is not evidence. And, for example, on Count 7 say, for ease of reference, Count 7 may be said to allege a crime of car jacking resulting in death, it alleges, and then read it, do that on each case, in each count.

MS. TOMPKINS: Now, the only contention the government would have on that is it's no longer an allegation, so it doesn't really -- it does allege, but he has actually been convicted of.

THE COURT: I realize that, and they are told that, but it just seems to me that it would be helpful to the jury to understand what was alleged, and they can also understand that there was a conviction.

MS. TOMPKINS: Okay.

MS. LAWSON: If Your Honor please, probably on Page 20, I have written all over the earlier version, but where you say you must now consider whether imposition of a sentence of death is justified, the third line down, it discusses the options to death or life imprisonment without the possibility of release, and then it's got, or a sentence as provided by law for

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 42 of 200
1830

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3862

the commission of these crimes.

THE COURT: Right. I caught that, too. The words or a sentence provided by law come out.

MS. LAWSON: And then the next paragraph the same thing, the defendant be sentenced to a sentence as provided by law --

THE COURT: Right. That whole sentence comes out.

MS. LAWSON: And the bottom of the paragraph after that, aggravating factors and mitigating factors, these factors have to do with the circumstances of the crime.

THE COURT: Right. I thought we might just take that sentence out, you know, starting with these factors.

MS. TOMPKINS: Yeah.

MS. LAWSON: That makes it make sense.

THE COURT: Right, because that next sentence sort of mixes mitigators and aggravators, perhaps, so we will just take that sentence out.

MS. ROSE: The sentence beginning these factors?

THE COURT: Yes, beginning these factors and ending up and/or victims comes out.

Now, then on the top of Page 21, I thought it

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 43 of 200

1831

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3863

better track the statute, if it says a mitigating factor

is any aspect of the defendant's character, record, or

background, any circumstances of the offense or any

other, etcetera, just add the word record in there

mainly, since that's what the statute says.

MS. TOMPKINS:  In the paragraph that

begins, the defendant has the burden of proving any

mitigating factors, that paragraph talks about the

preponderance of the evidence standard but doesn't use

the preponderance of the evidence language.  The

language in that paragraph says, you need only to be

convinced that it's more likely true than not true in

order to find that it exists, and we don't you use that

ever again, and I would suggest putting in the

preponderance of the evidence language.

MR. BENDER:  Is that defined somewhere

else?

MS. TOMPKINS:  It is defined somewhere

else.  My concern is that that's the only time we ever

say more likely true than not true, just so that the

jury understands that the standard in that is the

preponderance of the evidence.

THE COURT:  Suppose it says, you need only

be convinced by the preponderance of the evidence or its

greater weight that it is more likely true than not true

800-333-2082          (704) 331-9889          (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/13   Page 44 of 200
1832

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3864

in order to find that it exists, does that sound all right?

MS. TOMPKINS: Okay.

MR. BENDER: Okay.

THE COURT: That ties it into the later discussion about preponderance. Then Page 22, two paragraphs, I thought I would take the second one out because I will have already defined, talked about credibility.

MS. TOMPKINS: In the 3.01 introduction, the second paragraph, are you ahead of me on that?

THE COURT: I'm with you.

MS. TOMPKINS: Some of the legal principles that you must apply in the sentencing decision duplicate those you've --

THE COURT: That should just come out, should it not?

MS. TOMPKINS: Yes. I guess we could take out those first two sentences and begin with, the instructions I'm giving you now are a complete set of instructions on the law.

THE COURT: Right, okay. Anything about 24?

MS. TOMPKINS: No, sir.

THE COURT: 25?

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082

Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3865

MR. BENDER: Judge, can we go back to 24 for a minute?

THE COURT: Yes, sir.

MR. BENDER: Before you may consider the imposition of the death penalty, I think it should read, the government must prove unanimously and beyond a reasonable doubt.

THE COURT: Well, that would be confusing, because the statute doesn't define an objective which the government must prove beyond a reasonable doubt except for aggravating factors. I could say, the burden of proof -- as far as age is concerned, I wouldn't see any difficulty in telling the jurors that they have to agree to that unanimously and beyond a reasonable doubt.

MS. TOMPKINS: That's just what it says --

THE COURT: It does say that.

MR. BENDER: But it has to be proven --

THE COURT: All right. I will say that --

MR. BENDER: -- by the government.

THE COURT: I will say that the government must prove to you unanimously and beyond a reasonable doubt that the defendant was 18, etcetera. Does that fix it?

MR. BENDER: Yes, sir.

THE COURT: 25.

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 46 of 200
1834

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3866

MS. TOMPKINS: 25 at 1B, the defendant intentionally inflicted serious bodily injury that resulted in the death of Donald Lee Allen, the instructions had, previous instructions used in the case had in parenthesis, describe predicate facts; and since they are not in there, it is sort of a nonsensical sentence as written. But I think you could insert in there, as consistently done the later, I think it says by shooting or by being shot to describe the serious bodily injury to Donald Lee Allen which resulted in his death, so if we would insert the phrase by being shot, something to that effect, to make that sentence make sense.

MR. BENDER: 1B or 1D?

THE COURT: B as in boy.

MR. BENDER: Right.

MS. LAWSON: And can I add to that? In 1A the government must prove that the defendant killed the victim, it should be proved beyond a reasonable doubt and unanimously.

THE COURT: Okay.

MS. LAWSON: Same the thing in 1B, the government must prove beyond a reasonable doubt. And if we have already put by shooting him, to save time and energy it would seem to be prudent to just delete the

Case 3:12-cv-00327-MOC    Document 35-7    Filed 09/23/15    Page 47 of 200
1835

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3867

definition of serious bodily injury because it's already established, so the rest --

MS. TOMPKINS: Well, this is the statutory way that -- I don't know what you -- I don't want to delete anything from that paragraph. I want to add to the paragraph. One of the ways that they can find the requisite mental intent is in this manner, and I would ask that they be allowed to consider this, rather than taking it away.

MS. LAWSON: The other concern I have is it is not an aggravating factor alleged by the government that this murder was especially heinous or atrocious and cruel. I mean, it's not even a nonstatutory aggravating factor. And to go on with that sentence where you describe a consciousness of extreme physical pain improperly injects that into this case, and it's not an aggravating factor. We all know that he died of a gunshot wound. That's really not a condition.

MS. TOMPKINS: It's not an aggravating factor because it's under the finding of requisite mental intent, and there are for ways in which the jury can find requisite mental intent, 1B being one of those four ways. We are not alleging it to be an aggravating factor. We are alleging it to be proof of their finding of requisite mental intent.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate Jof Spherion (704) 333-9889          Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 48 of 200
1836

United States of America vs. Aquilia Marcivicci Barnette                    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                               8/9/2002

Page 3868

MS. LAWSON: Well, substantial risk of death is sufficient, and I think that adding that other language is going to confuse the jury and may inflame them to the point that they return a verdict based on an unalleged aggravator.

MS. TOMPKINS: And this was, of course, in the original case and Dr. Sullivan testified as to this for this reason. This is one of the ways in which they can find the defendant had the requisite mental intent, so we are not putting it in there as an aggravating factor. It's in there for the purposes that the statute --

THE COURT: Well, now, you are not saying that it's in the statute, are you? 3591A, 2B just says, intentionally inflicted serious bodily injury that resulted in the death of the victim.

MS. TOMPKINS: That's correct, and that's what is in 1B.

THE COURT: 1 boy?

MS. TOMPKINS: Yes.

THE COURT: Right. But it goes on to define serious bodily injury. Suppose we stop that definition as follows, say serious bodily injury means a significant or considerable amount of injury which involves a substantial risk of death.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3869

MS. LAWSON: That's fine.

THE WITNESS: Because really we are not talking about anything less than death. There is not evidence --

MS. TOMPKINS: Well, I will just object and move along. I mean, that's what the definition of a serious bodily injury is if that completes the sentence.

THE COURT: Well, if you take out -- just take out extreme physical pain, doesn't that accomplish your goal? Because there is evidence of disfigurement and loss or impairment of a body member, organ, or mental faculty.

MS. LAWSON: As Mr. Bender points out, he is dead.

THE COURT: I recognize, but I think the government would be entitled -- in other words, if -- this is really not going to be an issue, I wouldn't think, but we will just take out that extreme physical pain.

MR. BENDER: Judge, am I correct in understanding that they have to be unanimous as to any one of these?

THE COURT: Yes.

MR. BENDER: In other words, six can't find 1A and 6 can't find 1B and then come back and say,

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 50 of 200
**1838**

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3870

we are unanimous?

THE COURT: No, right.

MR. BENDER: Okay. And I don't know whether that's covered; it may be.

MS. TOMPKINS: It is.

MS. LAWSON: Well, of course, on the second page of that in 1C it says, the government, in the fifth line, the government must prove unanimously and beyond a reasonable doubt.

THE COURT: All right.

MS. LAWSON: And the same thing with 1D, and I couldn't exactly figure out how to put that, because there is not the word proved, so I just thought we could add on at the end of that 1D, this must be proven to you unanimously and beyond a reasonable doubt.

MS. TOMPKINS: Just to avoid the umpteenth time of saying that, the jury is instructed that the government's burden of proof is and remains unanimous and beyond a reasonable doubt, so it's a little bit unnecessary, I think, every time you say the word proof, when it has to do with the government, that you reiterate that each and every time. They know that's our burden of proof for anything that we are alleging.

THE COURT: Well, go back to 25, we introduced those four subparagraphs by saying the

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 51 of 200
1839

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3871

government alleges.  I think right there I might say the government must prove unanimously and beyond a reasonable doubt any one of the following --

MS. TOMPKINS:  That's perfect.

THE COURT:  -- propositions as to a particular count under consideration.  But in this case we are talking about Count 7, so --

MR. BENDER:  Judge, I understand what the statute says with regard to 1D, but in the death of Donnie Allen, is that even applicable?

THE COURT:  You are talking about one bravo?

MR. BENDER:  No.  One dog.

MS. TOMPKINS:  That would be, in our terminology, reckless disregard for human life.  I know where you are going with that, but it's actually --

MR. BENDER:  Creates grave risk of death to a person other than one of the participants.

MS. TOMPKINS:  That's not that.  It's the next part of it which is the important part, which is that his acts constituted a reckless disregard for human life.  It's not grave risk of harm to more than one person.

THE COURT:  Yeah, that looks innocuous and tracks the language of the statute, so that will be

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3872

unchanged. We will move on to Page 27 then.

MS. TOMPKINS: At the top of 27 and, in fact, each time that we talk about statutory aggravating factors, rather than the first sentence, which says, if you unanimously fined beyond a reasonable doubt the existence of at least one or more of the requisite mental states, the old instructions last time actually said, if you unanimously find beyond a reasonable doubt that the defendant intentionally committed the murder of or intentionally committed acts resulting in the death of Donnie Allen in any of the manners described in the instruction number whatever, you must then proceed to determine whether the government has proven beyond a reasonable doubt, etcetera, rather than -- I think that's -- the use of the phrase requisite mental states, I think is terminology that they may not be understanding; and so rather than using that terminology, what the government would request is that we actually use the words.

THE COURT: I will consider that.

MR. BENDER: We object to that, Your Honor.

THE COURT: And that would be because?

MR. BENDER: Well, obviously you are going to explain to them they have to follow the law with

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3873

regard to the mental state.

THE COURT: Right.

MR. BENDER: And then lead into it by saying, if you found the existence of one or more of the requisite mental states as found, that explains it to them.

THE COURT: Okay.

MS. LAWSON: Just below that, Your Honor, this particular one I think we need to insert unanimously in Line 3, proven unanimously and beyond a reasonable doubt. I don't think that it's possible to disregard that where there is not something in that same stretch that allows for, you know --

THE COURT: All right. I will consider your argument about that, Mr. Bender. That's a small matter, but we will think about it.

Anything else on 27? I wish y'all could figure out a way for me not to have to go through each count separately, but I don't -- I have seen other instructions that tried to group the intent as to several counts and group the age and group things, and I just don't think they are very clear and they are confusing.

All right. Anything on 28?

MS. LAWSON: Can we add unanimously and

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 54 of 200
1842

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3874

beyond a reasonable doubt on that one?

THE COURT: Somewhere on Page 28?

MS. LAWSON: Yes. Where I did it is at the end, this must be proven to you unanimously and beyond a reasonable doubt.

THE COURT: Yes. That would be in the second line, in the second paragraph?

MS. LAWSON: Yes.

MS. TOMPKINS: Now, in this, and in each of the times in which we are talking about statutory aggravating factors, the terminology, the first aggravating factor contended for by the government, and that's awkward language, I believe, in the last jury instructions it said, one, the defendant committed the offense in Count 7 in the expectation of the receipt of anything of pecuniary value, so it just goes directly into it rather than saying the first contended for by the government. I think that language is just -- the whole terminology -- rather I would ask that it say, one, the defendant committed the offense in Count 7 in the expectation of the receipt of anything of pecuniary value and then go into, to wit, Honda automobile, Donald Allen's wallet and money and then go on to the second paragraph.

MS. LAWSON: I think the problem with that

Case 3:12-cv-00327-MOC    Document 197    Filed 09/23/15    Page 55 of 200
1843

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3875

suggestion is that it takes out the fact that it's a contention of a party to the litigation. It contended to -- I mean, it could be advanced by the government or proposed by the government.

MS. TOMPKINS: It's different terminology than the instructions used for the, quote, unquote, contentions of the defense. It doesn't use that same -- when you get to the mitigating factors of the defendant it doesn't say the first mitigating factor contended for by the defense. That's why I just thought it would be cleaner to just go straight into it.

THE COURT: All right. I will think about that.

MS. TOMPKINS: And also, when we are referencing Donald Allen or Robin Williams, rather than say Allen, we would request that it say Donald Lee Allen consistently throughout the instructions.

THE COURT: All right.

MS. TOMPKINS: And each time -- I don't want to make the same argument again; but on the second aggravating factor, we would request that that be, two, the defendant committed the offense of car jacking; and if the Court can reference the jury instructions in the previous sentencing hearing, that's the format that we would wish to use, because I don't want to get up each

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3876

time and make the same argument over and over again.

THE COURT: All right. So you make -- you are contending for the same language --

MS. TOMPKINS: To introduce each of the aggravating factors.

THE COURT: -- essentially that Judge Potter used in each of these aggravating factors?

MS. TOMPKINS: Yes, sir.

THE COURT: Okay. All right, 29, 30, 31.

MS. LAWSON: On 31, Your Honor, Paragraph Number 2, there is a footnote note at the end of --

THE COURT: Okay. Let's kill that.

MS. LAWSON: And then there is a line at the bottom.

THE COURT: And we will kill that. Thank you.

MS. LAWSON: On the second page, Your Honor, the second paragraph, second line from the bottom of that paragraph, I propose that instead of saying existence of a statutory mitigating factor, it's the existence of any statutory mitigating factor.

THE COURT: Which paragraph?

MR. BENDER: 32, Page 32.

THE COURT: Oh, I see a little footnote, too. That comes out, too. Page 32?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3877

MR. BENDER: Yes, sir.

THE COURT: Second paragraph.

MS. LAWSON: Yeah, second line from the bottom of that paragraph, the existence of a statutory mitigating factor, just replace A with any.

THE COURT: Any?

MS. LAWSON: Yes.

THE COURT: All right. Okay, 33.

MR. BENDER: These are not the ones that we submitted this morning.

THE COURT: No. We will have to do that.

MR. BENDER: Right.

THE COURT: We will just use them verbatim, I guess.

MR. BENDER: As were submitted this morning?

THE COURT: Yes.

MR. BENDER: At the end of this, Judge, we would like to ask for a preemptory instruction on some of those.

THE COURT: All right. Do you want to go over those?

MR. BENDER: Under statutory --

THE COURT: Let's see. Okay.

MR. BENDER: Statutory, Number 1, we would

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion (704) 333-9889          Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 58 of 200
1846

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3878

ask for a preemptory instruction.

THE COURT:  Any objection --

MS. TOMPKINS:  Objection.

THE COURT:  -- from the government?

MS. TOMPKINS:  Yes, objection.

THE COURT:  Okay, I think there is evidence both ways on that.

MR. BENDER:  Nonstatutory, Number 1.

MS. TOMPKINS:  Objection.

THE COURT:  Okay.

MR. BENDER:  Number 2.

MS. TOMPKINS:  Objection.

THE COURT:  I think those are for the jury.

MR. BENDER:  Number 3.

MS. TOMPKINS:  Objection.

MR. BENDER:  I think even Dr. Dietz concluded that he had been abused by his father.

THE COURT:  I think the evidence is conflicting.  I mean, I agree the trend of the evidence -- for example, I believe Dr. Dietz did seem to concede that -- we have used the term excessive discipline, but that's not the same as abuse, necessarily.

MR. BENDER:  There is no -- I don't know

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889

800-333-2082

Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3879

of any evidence that he was not abused by his father.

THE COURT: Well, the jury heard Mr. Barnette, that is, the father, testify.

MR. BENDER: Right.

THE COURT: And he testified about what he did and didn't do, and I believe the jury is entitled to make up its mind as to his credibility. That's the best -- not necessarily the best evidence, but at least it's evidence. That could go either way, so I would leave that for the jury's determination.

MR. BENDER: Number 4.

MS. TOMPKINS: Objection.

THE COURT: I think that's a preemptory.

MS. TOMPKINS: Your Honor, I don't want to real argue it, but I don't think at all -- Mrs. Barnette didn't testify at all. There is room for the jury to make a consideration about whether hearing from that witness might have been good evidence of neglect, and I think that's, again, another consideration. It's a matter of degree.

THE COURT: It's essentially uncontradicted, though.

MS. TOMPKINS: Well, we would contend that defendant's own statements early to psychologists painted a picture of a childhood less than having been a

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3880

neglected child.

THE COURT: I think I will leave that one as a preemptory. I mean, some judges I have seen use of directed verdict or something, but I don't think that's appropriate. I could just direct the jury to find that but in the way of a preemptory instruction.

MR. BENDER: Number 7.

MS. TOMPKINS: Objection. Again, I think it's an issue for the jury.

THE COURT: I believe that's for the jury.

MR. BENDER: Number 8.

MS. TOMPKINS: Objection.

THE COURT: That's for the jury.

MR. BENDER: Number 9.

MS. TOMPKINS: Well, objection just on the --

THE COURT: That's for the jury.

MR. BENDER: Even Judge (sic) Dietz said he was experiencing a depressive episode.

THE COURT: But that's different from depression caused by alcohol, so that's why there's conflicting possibilities.

MR. BENDER: It's still depression. It was a depressive episode. The question was, was it caused by alcohol or was it caused by some sort of a

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 61 of 200

1849

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3881

psychotic --

THE COURT: I make a distinction between a depressive episode, which implies that it came on the defendant, as contrasted from an alcohol-induced depression, so that's --

MR. BENDER: Number 10.

MS. TOMPKINS: I think 10 and 13 are similar; again, I think these are up to the jury to decide.

MR. BENDER: Is there any evidence to the contrary?

MS. TOMPKINS: Well, it's the language. Marc Barnette has had no infractions, behavioral infractions, while incarcerated, that's uncontested; but whether he does well in a structured environment is a wholly different proposition for a jury to consider. It's -- one of those is factual and the other one is subjective.

MR. BENDER: The testimony was uncontroverted that when he was in Catholic school, in a structured environment, he did very well, when he was incarcerated in a structured environment. There is no evidence to the contrary.

THE COURT: Well, I think the government is correct in saying that there's uncontradicted

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 62 of 200
1850

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3882

evidence that he has done well in an incarcerated environment, but a structured environment is something that the jury could disagree about.

MR. BENDER: Number 11.

THE COURT: That would appear to be a preemptory.

MR. BENDER: Number 12.

MS. TOMPKINS: I would object to that.

THE COURT: That could be viewed either way, so I will deny that one.

MR. BENDER: Number 13.

MS. TOMPKINS: Again, I would object to that on the same grounds as 10.

THE COURT: All of the evidence is that he is a model prisoner.

MS. TOMPKINS: Model prisoner being a subjective -- what is uncontradicted is that he has had no behavioral infractions. Model prisoner is a subjective term on top of a fact that is subjective.

MR. BENDER: There was testimony using those exact words which was uncontroverted.

THE COURT: That's a preemptory. How about Marc Barnette has been a model prisoner?

MR. BENDER: That's fine.

MS. TOMPKINS: That's good.

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 63 of 200
1851

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3883

THE COURT: Did you say that's fine?

MR. BENDER: Yes, sir.

THE COURT: All right. We will change that accordingly and give a preemptory on it.

MR. BENDER: Okay. Those would be the only ones that we would ask for a preemptory on.

THE COURT: All right, sir. Thank you. Let's see, we are back to --

MR. BENDER: 33.

THE COURT: -- 33 and 34, which will conform to the new submission by defendant.

MS. TOMPKINS: Those are the mitigators?

THE COURT: Then we go to 36.

MS. TOMPKINS: Yes.

MS. LAWSON: I have some requests, Your Honor.

THE COURT: All right.

MS. LAWSON: On 36, the last long paragraph that starts, if you unanimously conclude, what this misinstructs the jury on is their final determination, the last three lines, the aggravating factor or factors are themselves sufficient to justify a sentence of death. It mandates that you shall record your determination that death is justified on the special verdict form. You know, you go to that last

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3884

process to determine whether in light of all of this you are going to sentence him to death. It skips that final decision. And the other thing is the next, the jury, we would like changed to a juror.

THE COURT: Say that last.

MS. LAWSON: It says the jury. We would like to change it to a juror. It's never required --

MS. TOMPKINS: And I would object to that. That's --

THE COURT: I think it's accurate to say a juror.

MS. TOMPKINS: That arguably is asking for a hung jury to say that a juror should do anything individually. The jury instructions speak to the jury as a group, not as individuals. All references to the jury are to the jury, and to say that is a suggestion that a juror should -- it sort of argues against the process of deliberation.

MS. LAWSON: But the statute requires that final determination, and that's got to be individual. That's why it says that.

MS. TOMPKINS: Well, this is a main point of contention that we have never gotten to the bottom of. Ms. Lawson believes that the law requires for that final deliberation; and if it was, then the statute

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 65 of 200
1853

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3885

would say, and rather than or, and the government contends that it says or if you find no mitigating factors or in the absence of a mitigating factor whether the aggravating factor or factors alone are sufficient. That is not an and. If they find mitigating factors, they conduct a weighing process.

If -- what Ms. Lawson wants to happen, it would say and after doing that make one final determination on the aggravating factors alone, but it doesn't say that. It says find them both, if you find them both, then weigh them; or in the absence of mitigating factors, you can only look at the aggravating factors. There is nothing to weigh them against. You must make your determination about whether the aggravating factors themselves are sufficient to call for the imposition of death. It's not and do this final step. It's or. If you haven't found mitigating factors, you must do something with the aggravating factors that you found, and the thing that you do is determine if whether they alone, since there are not mitigating factors to weigh them against, are they themselves alone substantial enough to call for the imposition of the death penalty.

MS. LAWSON: But that ignores the balance of the section of the statute. Ones you get to where Ms. Tompkins is talking about, then it says, based upon

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3886

this consideration, the jury by unanimous vote, or if there is no jury, shall recommend whether the defendant should be sentenced to death, to life imprisonment without the possibility of release. I mean, you weigh and you give the consideration, but you still have the option. That's 3593 E3 down at the bottom.

THE COURT: Did you say E3?

MS. LAWSON: Yes, sir.

THE COURT: Well, you are referring to the last sentence in E3.

MS. LAWSON: Yes, Your Honor, that starts, based upon this consideration.

THE COURT: And what is your argument about that?

MS. LAWSON: Well, that after you get to the point of whether the aggravating factors are sufficient to justify a sentence of death, the jury, by unanimous vote, shall recommend whether the defendant should be sentenced to death or life imprisonment. There is still a determination of whether, having gotten to that point, whether death is the appropriate punishment. And, you know, this is what we talked about the first day of jury selection, and I believe this is what you instructed the potential jurors.

THE COURT: Well, how about if we say the

Case 3:12-cv-00327-MOC    Document 1857    Filed 09/23/15    Page 67 of 200
1855

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3887

members of the jury are never required to vote for a sentence of death?

MS. LAWSON: That's fine. But, again, the lines above it, it seems to direct them to determine death simply because they found that the aggravating factors outweigh the mitigating factors, and it ignores that last sentence of the statute, that there is still discretion, it's a directed verdict or death.

MS. TOMPKINS: If that was the case, the special verdict form would have another question, which it does not, and the Fourth Circuit would have required that in United States versus Barnette, but the special verdict form does not say now that you have done your weighing process, take one further step.

THE COURT: Well, I think the statute ties the decision of the jury to the weighing process, because it says, based upon this consideration, referring to the weighing process, but to me the members of the jury are never to required to vote for a sentence of death conveys the thought that in doing the calculus of factors, aggravating and mitigating, if any, there is no required result.

MS. TOMPKINS: That's satisfactory to the government.

MS. LAWSON: I guess the thought we have,

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 68 of 200
1856

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
8/9/2002

Page 3888

Your Honor, on the members of the jury is that it again implies that unanimity is required, and in point of fact, a single juror -- each individual juror has to make that decision.

THE COURT: Well, I think that's clearly included within the unanimity requirement.

MS. LAWSON: Right. But the unanimity requirement seems to eradicate the individual juror's discretion.

THE COURT: Well, I contemplate that we will have a -- I will contemplate the arguments of the parties. What I would propose to do, by the way, is to put these into as much of a final form as we can sometime over the weekend and email them to you so that you will have the Court's final, or mostly final, proposal, subject to any last minute revelations by the parties.

MS. LAWSON: Your Honor, Page 37, are you there yet?

THE COURT: We are still on 37.

MS. LAWSON: The second line, if the jury determines that death is not justified, you shall proceed to determine whether the appropriate punishment is life without the possibility of release. You don't determine that. If you don't come back with death, it's

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Suberion (704) 333-9889
800-333-2082
Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 69 of 200
1857

Page 3889

automatically life.  What I recommend doing is you shall record your recommendation of life imprisonment without the possibility of release.

MS. TOMPKINS:  And I would object to that. They actually have a duty to unanimously decide one way or the other.

THE COURT:  Yeah, I agree with the government on that.  The statute does not talk about unanimity on the death penalty in lieu of which there is an automatic default sentence.  It specifically says, this is again where we were looking before, E3, the last sentence, shall recommend whether he should be sentenced to death, to life imprisonment without possibility of release, or some other lesser sentence.  Now, we are leaving off or some other lesser sentence by consent of the parties.  But it still says that the unanimous recommendation is submitted, either to death or to life imprisonment, and the default would be the failure to agree altogether, in other words, the failure to deliver a verdict, which, in fact, under the law would result in not a mistrial but a decision by the Court, but I think you all wanted to avoid telling the jury that -- well, you didn't -- both of you didn't say that, but --

MS. LAWSON:  I was going to say.

THE COURT:  That's an issue that appears

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 70 of 200
1858

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/9/2002

Page 3890

to be foreclosed by the -- not necessarily foreclosed, but answered by the Jones decision the Government cited this morning.

MR. BENDER: Judge, may I just interject right now?

THE COURT: Yes.

MR. BENDER: One of the issues on appeal in this matter was the failure of the Court to instruct on a non-unanimous decision, and that issue was not decided by the Fourth Circuit, although that was an issue that was presented. And the decision in Barnette was post Jones. Had the Fourth Circuit chosen to decide that issue post Jones, I think they would have said something about it. So I think that's an issue that is still ripe for consideration, and what -- the only thing that they finally got down to was in the event that -- the jury unanimously concludes that a sentence should be either death or life without the possibility of release but cannot agree on which one of these should be imposed the Court will sentence the defendant to life imprisonment without the possibility of release. And I think that issue is still open, and I think the Court may act in peril by foreclosing there, simply because the Jones decision was available to the Fourth Circuit, that was an issue that was before them; but because they

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3891

reversed it on other grounds, they didn't reach that.

THE COURT: Well, Jones goes a little farther than simply saying it's discretionary. It seems to say that it's contrary to the theory and practice of the jury system to instruct about a failure to agree. So my view is -- I will look at the Barnette case again to see if I can glean any instructiveness from it on this issue. But in the absence of a positive result there, the Court will submit the request for a unanimous verdict on death and a unanimous verdict on life --

MS. LAWSON: Your Honor --

THE COURT: -- and not advise the jury about what would happen in the event of a deadlock.

MS. LAWSON: Down on Page 37, Your Honor, it does talk about punishment as provided by law.

THE COURT: Right. That reference will be removed. It appears that that page should end about six lines up from the bottom where it says, shall record that determination on a special verdict form.

And if there is nothing further there, we will go on to 38.

MS. TOMPKINS: No issues on 38.

THE COURT: I beg your pardon?

MS. TOMPKINS: No issues on 38.

THE COURT: I think we would make the same

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate Jof Spherion  (704) 333-9889          Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 72 of 200
1860

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3892

adjustments that we did on the earlier when we talked about serious bodily injury.

MS. LAWSON: Also insertion of beyond a reasonable doubt, I see three places, and unanimity.

THE COURT: I will fix it the same way I intended to fix it earlier.

MS. TOMPKINS: And I guess we can assume that for each time so we don't have to keep on doing it.

THE COURT: That's correct, as to each count.

MS. TOMPKINS: On 39 I wasn't sure at bottom of that page you had an instruction down there about intent --

THE COURT: Right.

MS. TOMPKINS: -- and I didn't know whether there was going to be a section where you were going to define terms, it's fine there. I just wasn't sure whether there was a time when you were going to be defining terms, but I don't have any problem with its placement.

THE COURT: If the parties would prefer the Court to give the usual instruction about knowledge and intent, I will be glad to do that. There are a couple of places where knowledge and intent is referred to in the same manner as you see on the bottom of Page

Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 73 of 200
1861

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3893

39.

MS. TOMPKINS: Yes.

MR. BENDER: Judge, perhaps you could insert that in your original comments to them before our argument.

THE COURT: Okay, I will be glad to do that. I will add that mental elements instruction. Thank you. Okay, 40.

MS. TOMPKINS: 40 is that same thing of the use of terminology of requisite mental states, rather than just jumping right in to --

THE COURT: I will use the same analysis that I have come up with on the other one where you raised that question earlier.

MS. TOMPKINS: Yes, sir.

THE COURT: Okay. 41.

MS. LAWSON: Is that the commission of the offense for pecuniary gain?

THE COURT: Yes.

MS. LAWSON: I thought I would mention it needs to be unanimously and beyond a reasonable doubt since we didn't have that in the first set of changes. It's the second line of the second paragraph, the government must prove.

THE COURT: Okay.

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate Jof Spherion  (704) 333-9889        Fax (704) 372-4593

Page 3894

MS. TOMPKINS: And just the use of Donald Lee Allen rather than just Allen.

THE COURT: Right, we will try to do that throughout.

42 -- well, we are off into 8. Anything about 8 that you want to throw in that's different from the way we dealt with it in 7?

MR. BENDER: I think it would be same, Judge.

THE COURT: I believe it would. I mean, you have victim impact, you have future violence, two people killed. Okay? And then as to Count 11.

MS. LAWSON: We have nothing until we get to 4.03E.

THE COURT: That's Page 54.

MR. BENDER: Judge, we are assuming that all of the changes in 7 would apply to 8 and 11.

THE COURT: Yes, unless there is some analytical reason not to, but I don't anticipate any.

MS. LAWSON: That's Page 54, Your Honor. Again, this is one of those ones that's different from the first one, and the first line of the second paragraph, government must prove and you insert unanimously and beyond a reasonable doubt.

THE COURT: Okay.

Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 75 of 200

1863

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3895

MS. TOMPKINS: And in the first line of the instruction, the government would request that after the last word of that line, victim, that we put in, that is, Bertha Williams and Sonji Hill.

MS. LAWSON: That's fine.

THE COURT: S-O-N-J-I, right?

MS. TOMPKINS: S-O-N-J-I, yes.

THE COURT: H-I-L-L?

MS. TOMPKINS: Yes.

THE COURT: Okay. Then after we get through with the substantive counts, you have a duty to deliberate instruction on Page 69. Now, this consequences of deliberations on 68 needs work to be consistent with what I have already ruled.

MS. TOMPKINS: Can we talk about the expert witnesses? It comes before that on Page 64.

THE COURT: Well, let me back up here for clarity's sake. I have weighing aggravation and mitigation up to Page 62 and 63. Then we go into the other instructions. Experts belongs in the early part that I'm going to dispose of before you all argue, and the same with instruction regarding law enforcement witnesses. Now, the instruction regarding statements defendant made to investigating authorities, we have already taken that out earlier.

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 76 of 200
1864

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3896

MS. LAWSON: And you took out where it starts into the rules of evidence, down in the last two paragraphs.

MR. BENDER: That whole thing is gone.

THE COURT: That whole instruction is gone. Do you want to make any comment on expert witnesses?

MS. TOMPKINS: In the first paragraph, the last line, it says, some of these witnesses were permitted to testify even though they did not actually witness any of the events. In fact, none of experts were witnesses to events, so I'm not sure that's an instructive line.

THE COURT: Why don't we just take that line out?

MS. LAWSON: Your Honor, the listing of expert witnesses, I'm sure it was just the names of them, perhaps an attempt to do it alphabetically, but it puts undue emphasis on the government's rebuttal witnesses, Carlson and Dietz, and I would suggest that it's obviously alphabetical or that they're listed there in order of appearance in trial.

THE COURT: We will do it in order of appearance.

MS. LAWSON: That would be, I believe, Dr.

Case 3:12-cv-00327-MOC   Document 86-7   Filed 09/23/15   Page 77 of 200
1865

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3897

Halleck, Dr. Burgess, Dr. Cunningham, and then Dr. Carlson and Dr. Dietz.

THE COURT: All right, those five. Okay. Anything else about experts? Law enforcement witnesses? Then we come to consequences of deliberations. As I said, that needs to be reworking to be consistent with earlier rules. What I would suggest there is the first four lines, that's the first paragraph, remain the same and leave in the last line, which says, the jury is never required to impose a sentence of death, although that may be changed a little bit.

MR. BENDER: As it was earlier?

THE COURT: Yes.

MR. BENDER: Whatever that's going to be --

THE COURT: Right.

MR. BENDER: Thank you.

THE COURT: And the balance of that second paragraph comes out. Okay. Anything on duty to deliberate?

MS. TOMPKINS: The government would ask for the duty the deliberate instruction that Judge Potter gave in the first trial, his number 8.03, which is -- he has got in parenthesis under Allen charge to be given when the jury is hanging, but it's longer and it

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 78 of 200
1866

United States of America vs. Aquilia Marcivicci Barnette                3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                            8/9/2002

Page 3898

would be our preference to have that, if you don't mind me --

THE COURT: Do you have a preference? Your Honor, we prefer this one.

THE COURT: Okay. I will consider those arguments. I will consider those arguments. 70, justice without discrimination. Special verdict, Page 71. We will check those section numbers. Then there is one called defendant's previous trial, and that should say -- well, that isn't, of course, read to jury.

MS. TOMPKINS: You want to call it defendant's trial?

THE COURT: I mean, the caption isn't read to the jury.

MS. TOMPKINS: Oh, that's true. The government in this one, the last line of that says, you should not consider any of the statements you have heard regarding the previous proceeding in any way when you make your sentencing determination now except that you must accept the guilty verdicts reached in that guilt phase, and it is possible is that prior inconsistent statements were --

THE COURT: You are right, it should say except as to credibility determination or something.

MS. TOMPKINS: Yes.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3899

THE COURT: I could leave that out or make that change. Does defense have any preference?

MR. BENDER: I would take out the whole thing.

MS. TOMPKINS: As long as -- I guess the point of this is that they have to accept the guilty verdict, so that part of the last sentence may be reworked.

MR. BENDER: If they don't know that now --

THE COURT: Yes. It says that in the second sentence, so we will take the last sentence out. Then I have a concluding instruction. Any comments about that?

MR. BENDER: Typo, first line of the sixth paragraph, they are for your own personal use.

THE COURT: Right, thank you. Anything further?

MR. BENDER: Judge, we would object to the Court's failure to use any of our proposed jury instructions.

THE COURT: Yes, sir, the record will so reflect.

MR. BENDER: Thank you. Judge, are we going to do anything with regard to the juror George

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 80 of 200
1868

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3900

Evans and his statements, or is that an issue already --

THE COURT: I believe that was resolved by the Court's renewed instruction.

MR. BENDER: Okay.

THE COURT: If there is nothing further, we will be emailing these things to you as soon as we get them worked up.

MR. BENDER: Will that also include the special verdict forms as well?

THE COURT: Yes, sir. Thank you.

I, Scott A. Huseby, do hereby certify that the foregoing transcript is a true and correct transcript.

SCOTT A. HUSEBY                              DATE

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889
800-333-2082                                    Fax (704) 372-4593

Page 3901

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA          )

                                  )   CASE NO. 3:97CR23-V

          v.                      )   August 12, 2002

                                  )

AQUILIA MARCIVICCI BARNETTE,      )

               Defendant.         )

               TRANSCRIPT OF SENTENCING HEARING
          BEFORE THE HONORABLE RICHARD L. VOORHEES
               UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE government:

          ANNE M. TOMPKINS, Esq.
          JILL WESTMORELAND ROSE, Esq.
          Assistant United States Attorney
          227 West Trade Street
          Suite 1700
          Charlotte, North Carolina  28202

FOR THE DEFENDANT:

          JEAN B. LAWSON, Esq.
          P.O. Box 4275
          Charlotte, North Carolina  28226
          HAROLD J. BENDER, Esq.
          200 North McDowell Street
          Charlotte, North Carolina  28204

Reported by:  Steve S. Huseby,
                    Registered Professional Reporter,
                    Certified Court Reporter,

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 82 of 200
1870

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3902

P R O C E E D I N G S

(9:40 a.m.)

THE COURT:  Good morning ladies and gentlemen. Have the attorneys had an opportunity to look at the technical changes the Clerk -- anything further about those jury instructions?

MR. BENDER:  Your Honor, nothing about the jury instructions, but I did notice on the special verdict form --

THE COURT:  Yes, sir.

MR. BENDER:  -- it may not make any difference, I'm just concerned about some confusion.  On page 13 of one of them, the directed verdict, number three, four, five, I don't know why they are numbered three, four and five as opposed to one, two, and three, because they are three, four and five on the other one.  I wanted to bring that to the Court's attention.

THE COURT:  Perhaps 14, 15 and 16.

MR. BENDER:  Or another one, two, three.

THE COURT:  Either way.

MR. BENDER:  Yeah.

THE COURT:  One, two, and three okay with the government?

MS. TOMPKINS:  Yes, sir.

MS. LAWSON:  There is one other issue I

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3903

thought we ought to resolve beforehand. We have two charts

and showed them to Ms. TOMPKINS and Ms. Rose and they object

to one of them, and I thought if you could rule on that now.

THE COURT: Yes, it's a good idea to rule on

anything that needs attention.

MS. LAWSON: May I approach?

THE COURT: This is one of your charts?

MS. LAWSON: Yes, basically sets out the

hierarchy of burdens of proof.

THE COURT: What would the government say to

that?

MS. TOMPKINS: Your Honor, the hierarchy of

burden of proof is proof beyond a reasonable doubt or more

probable than not. There is no burden of proof that's almost

certain or quite probable, likely possible or best guess.

There also are not burdens of proof within the law, and I

think that's a confusing, misleading chart to show the jury.

The Court will instruct them about the burdens of proof, the

one that the government has and the one that the defendant

has, and that's misleading.

MS. LAWSON: I will just point out that where

it says more likely than not is equivalent language to

preponderance of the evidence.

MS. TOMPKINS: I don't have any problem with

this or this, it's the almost certain, quite probable, likely

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 84 of 200
1872

Page 3904

possible and best guess that are not --

THE COURT: I think as long as counsel doesn't imply that anything other than reasonable doubt or more likely than not, it gives a legally recognized standard. In other words, the terms of your argument, it's time to talk about how probabilities aren't enough and that sort of thing, so you can do that, you can use your chart, but just don't imply that that's -- there are somehow legal recognitions to anything but the top one and the one that's recognized as a preponderance of the evidence.

MS. LAWSON: Thank you, Your Honor.

THE COURT: Okay. One other thing since we're on that subject, having to do with arguments, typically of course there's broad leeway given to argument. Sometimes attorneys inadvertently say something like I think or I believe, and of course personal belief is not appropriate for arguments, so try to avoid that.

Also, of course, you would want to avoid anything that would suggest a basis for decision other than what's in the facts and the law, and you've got plenty of leeway based on the law to argue the various things that you may want to argue. So that's no doubt recognized by all the attorneys.

Anything further before we bring the jury in for the first 20 pages of the instruction? And then we will go right into argument by the government and we will see how far

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 85 of 200
1873

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/12/2002

Page 3905

we get as far as breaks go.  Thank you.

May we have the jury, please.

(Jury in at 9:34 a.m.)

THE COURT:  Good morning, members of the jury. As I indicated to you the other day, the final items of business we have before deliberations would be the arguments of counsel and the instructions of the Court as to the law.

Now, what I would propose to do is give you some of the jury instructions at this time so that they won't all have to come at you at one time.  And then we will have the arguments of counsel and then the Court will give you the final portion of the jury instructions.

So, members of the jury, now that you have heard the evidence and will shortly hear the arguments of counsel, I'll instruct you as to some of the law that applies to this case.  First, I'll instruct you on some rules for jury consideration of cases of this type, including how to assess certain types of evidence and the credibility of witness, and then after the arguments I shall discuss the law of sentencing for this case, and following with the directions to guide your deliberations.  Can all of you hear me okay?

Now, it's your duty and your responsibility in this hearing to find the facts.  You may find those facts only from the evidence which has been presented during this sentencing hearing.  The evidence consist only of the

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Suberion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 86 of 200
1874

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3906

testimony of the various witnesses who have been called and sworn and testified in your presence, and the exhibits which have been admitted into evidence by the Court.

In reaching your decision as to the facts, it's your sworn duty to follow the law as the Court instruct you. You will apply the law as given you by the Court to the facts that you find from the evidence and reach your verdict accordingly. Counsel may quite properly refer to some of the governing rules of law in their arguments. If, however, any difference appears to you in the law as stated by counsel and that stated by the Court in these instructions, you are of course to be governed by these instructions. You're not to single out one instruction alone as stating the law but must consider all of the instructions as a whole. Also, you may not substitute or follow any personal or private notion or opinion as to what the law is or ought to be. You are required to perform these duties without bias, prejudice or sympathy for or against any party. The law does not permit jurors to decide cases on the basis of bias, prejudice, sympathy or any perceived public opinion, or on any basis other than solely upon the basis of the law and the facts that apply in this particular case.

Now, there are two types of evidence which a jury may properly assess in determining whether a party has met it's burden of proof. One is direct evidence such as the

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affili-+- -f C-b---- (704) 333-9889

800-333-2082                                                                Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3907

testimony of an eyewitness. The other is circumstantial evidence, the proof of a chain of circumstances leading to a conclusion sought to be established. Circumstantial evidence is evidence of facts or circumstances from which the existence or nonexistence of other facts in controversy may be inferred. As a general rule, the law makes no distinction between direct and circumstantial evidence. It simply requires that the jury reach its conclusions based upon all the evidence in the case within the framework of the law as the Court instruct you.

Excuse me a second. Now, then, where there is a question as to what took place at the various times and places, you must determine the credibility of the witnesses. The Court instructs you that you are the sole judges of the credibility of the witnesses and the weight that their testimony deserves. And while there is no absolute or arbitrary guide or measure by which you determine the truthfulness or untruthfulness of a witness, the Court will point out to you certain general principles which you should consider as you pass upon this phase of the case.

Among the things you may properly consider in determining the credibility of the witnesses are first, whether the witness had any motive or reason for being truthful or untruthful; secondly, the witness's interest if any in the outcome of the case; third, whether there has

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 88 of 200
1876

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3908

appeared from the witness's attitude or conduct any bias, prejudice, or feeling which may cause that person's testimony to be influenced; next, whether the testimony bears the earmarks of truthfulness; next, to what extent if any it's corroborated or confirmed by other testimony which is not questioned, and to what extent if any it's corroborated or confirmed by known or admitted facts. You may also consider the intelligence and the mental capacity of the witness and the witness's opportunity to have accurate knowledge of the matters to which the person testifies.

I instruct you that you may believe all that a witness says or none, or believe part and disbelieve part. You may consider the interest which the witness may have in your verdict, the demeanor of the witness on the stand, the reasons for his or her testimony, and the means which the witness may have to know the things to which he or she has testified.

If you find a witness who's interested in your verdict, it's your duty to scrutinize that testimony closely, but after you have done so and if you find that he or she is telling the truth in whole or in part, then you would give that testimony the same weight you would that of a disinterested witness. It's your duty, members of the jury, to find the truth of this matter.

Now, during the trial I instructed you to exclude

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 89 of 200

1877

Page 3909

from consideration certain statements made from the witness

stand.  I remind you that it's your duty to follow that

instruction and consider only the evidence which was duly

allowed from the witnesses presented to you.

Now, from time to time in these instructions I will

define certain terms that I use in the instructions.  You are

to apply these definitions as you consider the evidence, and

if I do not define certain words you would assign to them

their ordinary, everyday meaning.

Now, you've heard audiotape recorded evidence

during the course of this trial.  You've also seen

typewritten transcripts of the tape-recordings which I

believe were presented on a screen for you.  Those

transcripts undertook to identify the speakers engaged in the

conversations.  You were permitted to consider the

transcripts for the limited purpose of helping you follow the

conversation as you listened to the tape-recording and also

to help you keep track of the speakers.

The transcript, however, is not evidence.  The tape

recording itself is the primary evidence of its own contents.

You are specifically instructed that whether the transcripts

correctly or incorrectly reflected the conversation or the

identity of the speakers is entirely for you to decide based

upon what you have heard here about the preparation of the

transcripts and upon your own examination of the transcript

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi¨ ¨ ¨ ¨ ¨ ¨ ¨ ı (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107-8    Filed 09/23/15    Page 90 of 200
1878

Page 3910

in relation to what you heard on the tape recording.

If you decide that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent. Differences in meaning between what you heard in the recording and read in the transcript may be caused by such things as the inflexion in a speaker's voice. You should, therefore, rely only upon what you heard rather than what you read when there's a deference. You've also seen video tape recorded evidence during the course of this trial. It is not illegal to make the audio and videotape shown to you during the trial. The videotape, therefore, is a proper form of evidence as is an audiotape and may be considered by you just as any other evidence.

Now, in considering a videotape offered into evidence and shown to you, however, you should consider the following questions. First, does the tape fairly and accurately depict or illustrate the events and locations purportedly shown in light of the testimony you heard concerning these events and the circumstances surrounding the filming of the tape. Next, is it helpful to an understanding of any fact at issue in the case. And third, is the tape misleading or confusing in light of the circumstances surrounding its preparation. And lastly, have the speakers on the tape been adequately identified by believable evidence.

Reported By: Steve S. Huseby, RPR
800-333-2082        Huseby, Inc., an Af        )n (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 91 of 200
1879

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/12/2002

Page 3911

So after you have considered these questions, you may rely on the videotape as much or as little as you deem proper. Now, during the trial you heard the testimony of a number of people who were described to us as experts in various fields. These expert witnesses were Dr. Seymour Halleck, who is an expert in the area of forensic psychiatry; Dr. Ann Burgess, who is an expert in the area of domestic violence; Dr. Mark Cunningham, who is an expert in the area of forensic and clinical psychology; Dr. Peter Carlson, who is an expert in the area of Bureau of Prison classification, and Dr. Park Dietz, who is an expert in the area of forensic psychiatry.

Now, the degree of expertise is relative and is for you to evaluate. In other words, a person's training and experience may make him or her an expert in a technical field. The law allows that person to state an opinion here about matters within that field. Merely because that witness expresses an opinion, however, does not mean that you must accept the opinion at all events. The same as with all other witnesses, it's up to you to decide whether you believe the testimony and choose to rely upon it. Part of that decision will depend upon your judgment about whether his or her background of training and experience is sufficient to give the expert opinion that you heard. You must also decide whether his or her opinions were based on sound reasons,

Page 3912

judgment, common sense, and information.

Now, you heard testimony from various law enforcement personnel.  The fact that a witness may be employed by the government as a unit -- excuse me, as a law enforcement official does not mean that his or her testimony is deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.  It's up to you to decide after weighing all of the evidence, in light of these instructions about the factors relevant to determining credibility, whether you accept the testimony of a law enforcement witness and what weight if any it deserves.

The testimony of a witness may be discredited or impeached by showing that he or she previously made statements which are inconsistent with his or her present testimony.  The earlier contradictory statements if any are admissible only to impeach the credibility of the witness and not to establish the truth of these earlier statements.  It's the province of the jury to decide the credibility if any to be given the testimony of a witness who has been impeached.

Now, if a witness is showing knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness's testimony and other particulars, and you may reject all the testimony of that witness or give it such credibility as you may think it deserves.

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 93 of 200
1881

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3913

You will also recall that it was brought out that before this hearing some of the witnesses made statements in a judicial proceeding, that is, under oath. Now, even though these statements were not made in this courtroom, they were made under oath at an earlier proceeding, and because of this you may consider these statements as if they were made at this trial and rely on them as much or as little as you think proper.

Now, you heard testimony that the defendant made statements to the police concerning the crimes for which you are to determine the appropriate sentence. When you consider this testimony, you should ask yourself these questions. First, did the defendant say the things the witness told you the defendant said. To answer this question you must decide if the witness is honest, has a good memory, and whether he or she accurately understood the defendant. Second, if the defendant did make the statement, was it correct. Here, you must consider all of the circumstances under which the statement was made, including the defendant's personal characteristics, and ask yourself whether a statement made under these circumstances is one you can rely upon. After you have answered these questions, you may rely upon the testimony about the statement as much or as little as you think proper.

You have heard evidence to the effect that the

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Snherion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 94 of 200
1882

Page 3914

defendant pleaded guilty to or has been convicted of certain charges brought against him prior to 1996. Prior conviction of a crime that is a felony is one of the circumstances which you may consider in determining the credibility of a witness. The fact that the defendant was convicted of or pleaded guilty to certain earlier offenses, however, does not mean that he should receive any particular sentence in this case and must not be used as guilt of any prior crime as proof of any aggravating factor in this case. You should judge the testimony of the defendant, Aquilia Marcivicci Barnette, in the same manner as you judge the testimony of any other witness.

Now, the word knowingly as used in these instructions -- this is a definition -- as used in these instructions to describe the alleged mental state or state of mind of the defendant at any time means that he was conscious and aware of his action, realized what he was doing or what was happening around him and did not act because of ignorance, mistake, accident or other innocent reason. Knowledge may be proven by a defendant's conduct and by all the facts and circumstances surrounding the case.

Now, the term willfully as used in these instructions to describe the alleged state of mind of the defendant means that he knowingly performed an act or failed to act deliberately and intentionally or on purpose as

Page 3915

contrasted with accidentally, carelessly or unintentionally.

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there's no way of directly scrutinizing the workings of the human mind. In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts done or omitted by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

You may infer but are certainly not required to infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. It's entirely up to you, however, to decide what facts to find from the evidence received during this trial.

Thank you very much for your attention to these instructions. Now, as I say, I'll give you the rest of them later on after the arguments.

Under our rules, the government has the first opportunity to state its arguments to you, and then the defendant will have the opportunity to make its arguments and respond to Government's arguments; and finally, the government will have an opportunity to respond to the defense arguments.

Is the government ready to proceed?

Reported By: Steve S. Huseby, RPR
800-333-2082                Huseby, Inc., an Aff··      ·· ·   ·)n (704) 333-9889          Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 96 of 200
1884

Page 3916

MS. TOMPKINS: Yes, sir.

THE COURT: You may do so.

MS. TOMPKINS: There's a lot that I could say about this case but I'm not going to say lot. How could I possibly manage to do justice to the task of summarizing the lives and the deaths of Donnie Allen and Robin Williams. I don't know. I'm humbled by this responsibility. But I do know that you can do this. I know that you can do justice in this case. And I stand before you right now and ask for justice on behalf of Donnie Allen and Robin Williams. You know this case, and I'm not going to spend a lot of time repeating the facts. Let me talk to you just a minute about Donnie Allen.

Donnie Allen lived at home with his parents McConnell, South Carolina. He went to work every day, and in his spare time, he liked to spend time with his father. They played golf together, they liked pitching horseshoes, and they liked to go hunting. He loved shooting pool and he loved his car. He was his father's best friend and he was his mother's miracle baby, and he was mature enough and thoughtful enough and caring enough to leave his life insurance to his sister Denise for the care of her handicapped son. He had his whole life in front of him. Donnie Allen lived to be 22.

Let me talk to you a little bit about Robin

Case 3:12-cv-00327-MOC     Document 197     Filed 09/23/15     Page 97 of 200
1885

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3917

Williams. Robin lived at home with her mother. She worked at the local hospital, went to work every day. She went time with her lifelong friends in her hometown of Roanoke, Virginia. She loved spaghetti and she had lots of cousins. Robin had a smile that lit up a room. And even as the younger sister, she was a source of strength to her older brothers. She was her mother's best friend and she had her whole life in front of her. Robin Williams lived to be 23.

Now, they are not here today but we are, and we're here today because the defendant Marc Barnette made choices. Those were his choices made by a man, made as an adult. These choices were not programmed by his childhood and they were not destined to happen. These murders were not destined to happen. We're here because Aquilia Marcivicci Barnette chose to kill Donnie Allen and he chose to kill Robin Williams.

There are three charges and three separate sentencing decisions that you all will make in this case, and two of those charges relate to the murder of Donnie Allen. Those are Count 7 and Count 8. Count 7 is car-jacking resulting in death and Count 8 is the use of a firearm during that car-jacking that resulted in Donnie's death. And Count 11 relates to Robin Williams' murder, and that is the use of a firearm while violating the Interstate Domestic Violence Act that resulted in her death.

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi··  ˉˉ ˙  ˙ ˑ n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 98 of 200
1886

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3918

I'm going to talk to you about the deliberation process because it's vitally important that you understand the deliberation process that you all will be called to go through during this extraordinarily important decision. The law doesn't send you back into that room to make a decision in a vacuum. The law doesn't send you back in that room to sit in silence and submit a secret ballot. There is a structure that the Court will inform you about that you will go through in your deliberation process and I trust that you will follow that process in your deliberations.

You will be given a special verdict form and that you will use that special verdict form to guide your decision making process in order to come back into this room with the unanimous decision. There are two questions that the special verdict form will ask you to answer before you get to the process of deciding on aggravating and mitigating factors, and I contend to you ladies and gentlemen that you will be able to answer those questions quickly.

The first is was the defendant 18 years old at the time of these crimes. And I contend to you ladies and gentlemen that's not a fact in contention in this case. The defendant's driver's license that he left on the scene at the arson shows his birthday to be 7-7-73. He was 22 at the time of these incidences and that's not a point of contention, so I ask you to answer that question yes.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3919

The second set of questions that you will answer are called requisite mental intent. Those are indications that the defendant intended to kill both Robin and Donnie. The government will present you on the special verdict form four different ways that you can find that requisite mental intent. The first, and I contend although you only need to find one of those unanimously and beyond a reasonable doubt, all four of them have been proven to you. The first is that the defendant intentionally killed Donald Allen and Robin Williams. Intentionally means knowingly, deliberately, willfully and on purpose. There is uncontroverted evidence in this case that these were intentional murders.

The second way that you can find that requisite mental intent is that the defendant intentionally inflicted serious bodily injury to both Donnie Allen and Robin Williams; again, uncontroverted evidence here and I would ask you to answer that question yes. The third way is that the defendant use lethal force in killing Donnie and Robin; the fact that Donnie Allen was shot at close range is an indication that lethal force was used, I would ask you to answer that question yes. And finally, the fourth way that you will find this requisite mental intent is that the defendant's conduct constituted a reckless disregard for human life.

And I will ask you to find all four of those

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 100 of 200
1888

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
8/12/2002

Page 3920

unanimously and beyond a reasonable doubt, and at that point you will move on to the consideration of the aggravating factors that have been presented by the government and the mitigating factors. You will consider aggravating factors that we have put forth in this case and that we contend call for the imposition of the death penalty. The defense has presented evidence of mitigating factors that any one or more of you could find by a preponderance of the evidence.

It is at this point that you will conduct that weighing process that we talked about during jury selection. The judge is not going to instruct you on how to do this weighing process. He's going to tell you that you shouldn't simply count the numbers, it's not mathematical; but I contend you to, ladies and gentlemen, that you should assess the quality of the evidence you heard in this courtroom in making your weighing decision. I point this out because I want you to compare the quality of the Government's evidence to the quality of the defendant's evidence. We didn't simply bring an investigator in here to just tell you what happened, that you would have to take his word for it. We had multiple witnesses come in to testify to you so that you could make the determination of what happened.

We brought you Benjamin Greene and Maude Hubbard in here to describe that arson to you, in addition to the police and fire personnel that responded to the scene. We brought

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3921

you the defendant's best friend, Steve Austin, to tell you what he did in between the fire bottoming and the murders. We brought Earlene Thompson and Sonji Hill to describe that awful morning in June as well as the officers who responded.

We brought you Natasha Herd, Crystal Dennis, and Alicia Chambers to tell you the defendant's life-long history of violent behavior. But we didn't make you simply take their word for it, we brought you the police officers who told you about the police reports and eyewitnesses who came in here and told you, yes, that's, in fact, what happened.

So I ask you when you make your decision as to the weight you're going to give the aggravating and mitigating factors, consider the quality and type of evidence presented to you and contrast that with the defense. How many people did you hear about from the defense versus how many people heard from? Consider that as you're making your weighing decision.

Now, I'm now going to talk to you about the aggravating factors that relate to Donnie Allen. They relate to Counts 7 and 8, as I told you, the commission of a car-jacking that results in death and the use of a firearm in a car-jacking that results in death. And the first of those statutory factors that I want you to consider, that we're asking you to consider, is that this crime was committed with the expectation of receiving something of pecuniary value.

Reported By: Steve S. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Snherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 102 of 200
1890

Page 3922

And what that means is Donnie Allen was killed for his car, Donnie Allen was killed for the money in his wallet. Remember the defendant's own testimony, he told you when he left that house that night, that he was, I was going to car-jack somebody, that's what he said. He went out and he crouched in the tall grass and he waited for someone to car-jack, he needed a car and he needed money. There's no other explanation for Donnie Allen's murder, the defendant wanted what Donnie Allen had. So I ask you to find that unanimously and beyond a reasonable doubt.

The second aggravating factor I want you to consider is the use of substantial planning and premeditation. Marc Barnette didn't kill Donnie Allen on the spur of the moment. There was much, much thought and much, much planning that went into this crime. Marc Barnette planned where, when, and how this crime was going to take place. The defendant's own testimony showed you the amount of time that he spent planning and the choices he made in carrying this out. And in spite of Donnie Allen's pleas of please don't shoot me, please don't shoot me, the defendant shot him down in the dark woods and left him there conscious for up to five minutes waiting for his last breath to come.

Consider the choices that the defendant made in the weeks before this murder. He used his brother's name and a fraudulent Virginia ID to purchase the shotgun. He purchased

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 103 of 200

1891

United States of America vs. Aquilia Marcivicci Barnette                    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                                     8/12/2002

Page 3923

that shotgun well before these murders. He took the first shotgun back, he fixed that flashlight to the pump action shotgun. He sawed off the barrel and sawed off the stock, and he told you he did it to make it easier to conceal. He chose the items he needed for his murder kit, handcuffs, screwdrivers, bolt cutters, an additional flashlight, and extra ammunition. He chose that dark intersection for that planned car-jacking where no one could see him. He crouched in the tall grass and he approached Donnie Allen's vehicle when no one else was around. And he chose to force Donnie Allen to walk that long walk down the culvert and into the dark woods where he shot him three times. This murder was well planned and brutally executed.

While the statutes define some aggravating factors that we have presented, there are other factors that we contend exist in this case and that call for the imposition of the death penalty, and they are the same for both Donnie and Robin.

The first is that there is the risk that the defendant would likely be a danger in the future. As our evidence has shown to you, ladies and gentlemen, the defendant has a proven track record of solving his problems through violence. He has had a violent history and a proven history. Use your common sense when you make your consideration here. What is the best predictor of future

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3924

behavior? Past behavior. Marc Barnette solves problems through violence. Marc Barnette will continue to solve problems through violence. Even the defense's own witness said he had a hereditary predisposition for violence. Marc Barnette will be a danger in the future.

Another aggravating factor that we want you to consider is that there were multiple victims in this crime. Not only did Donnie Allen die, but hours later Robin Williams was murdered, and the existence of multiple victims is an aggravating factor that calls for the imposition of the death penalty.

And finally as to Donnie Allen, we want you to consider the aggravating factor of the harm that's caused to the Allen family as a result of Donnie's death. Remember back to the testimony of the Allen family as they expressed the pain and the hurt that will just never go away. Remember Bob Allen, Donnie's father, who told you that the first thing that he does every morning is say good morning to his buddy Donnie and that the last thing he does every night is tell him good night and I love you. That is a pain that will never go away, even six years later. Every family gathering that the Allen family has, every holiday, and every happy moment that they have is affected by the pain of Donnie's absence. I ask you to find each and every one of these aggravating factors unanimously and beyond a reasonable

Reported By: Steve S. Huseby, RPR
800-333-2082    Huseby, Inc., an Affiliate of Spherion, (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 97   Filed 09/23/15   Page 105 of 200
1893

Page 3925

doubt.

I want to talk to you about Robin Williams' murder contained in Count 11. The first aggravating factor the government contends we have proven to you unanimously and beyond a reasonable doubt is the creation of a grave risk of death to one or more persons in addition to Robin. Consider the other people that Marc Barnette put in harm's way when he got to Roanoke. Marc Barnette shotgunned his way into Ms. Williams' house and held the shotgun on her as she held her ten-month-old child, Destiny, grandchild, Destiny. At that moment Bertha Williams was in the zone of danger. The judge is going to describe the zone of danger. Certainly being -- facing the barrel of a shotgun puts you into the zone of danger.

Now, Marc Barnette then ran out after Robin out the front door; and if you remember the testimony of Sonji Hill, she was the lady who stood on her front porch calling 911, and you remember the 911 call that was abruptly cut short, and that was when the defendant pointed the shotgun at Sonji Hill and told her to hang up the motherfucking phone. And Sonji Hill told you that at that moment she thought she was going to be killed and she hung up that phone. Sonji Hill was in the zone of danger.

Moments later, when the defendant caught up with Robin as she struggled to get away from his grip and run

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889
800-933-2082                                                                  Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 08/23/15   Page 106 of 200
1894

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/12/2002

Page 3926

towards her mother, Marc Barnette shotgunned Robin Williams twice in her back as she ran towards her mother and Robin Williams fell at her mother's feet. And again at that moment Bertha Williams was in the zone of danger, and I'd ask you to find that aggravating factor unanimously and beyond a reasonable doubt.

The second statutory aggravating factor is substantial planning of premeditation. I contend to you, ladies and gentlemen, there has rarely been a more planned out murder than the murder of Robin Williams. This murder began on April 30, 1996, when Marc Barnette threw a malatal cocktail through her apartment window and yelled, die, bitch, die. That's when this murder started.

You're well aware of the overwhelming evidence through the Government's witnesses and threw the defendant's own words of the plan that he put in place and carried out, and again, the advanced purchase of the shotgun, the fire bombing being the first attempted murder, Marc Barnette even told you that he thought about Robin, thought about killing Robin in the weeks before he did, he brooded and got angrier and angrier until the night of June 21st and June 22nd. He stalked her in between the fire bombing and the murder. We showed you the cards that were placed on her car that was at her brother Sydney's house. He disavowed that, but ladies and gentlemen of the jury, who would know, who else would

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3927

know where Robin's car was and where Sydney lived?  Marc Barnette was in Roanoke in between the fire bombing and the murder to stalk her and taunt her and put those cards on her car.  He took the wire cutters up there and cut the phone lines so that Bertha Williams couldn't even call for help as she watched her daughter's murderer track her down and drag her around the neighborhood.  He chased Robin Williams through the neighborhood, dragging her and shooting her so that she could not get loose.  Again, ladies and gentlemen, there's never been a more planned and premeditated murder than Marc Barnette's killing of Robin Williams, and I ask you to find that unanimously and beyond a reasonable doubt.

The other factors that we want you to consider and ask you to consider for the imposition of the death penalty are the same factors that I talked to you about in relation to Donnie Allen, and I contend you should also find these as they relate to Robin Williams:  One, that the defendant will likely be a danger in the future.  Again, his history of violence is a good predictor and a common sense predictor of his future behavior.  The existence of multiple victims, that not only that day was Robin killed, but Donnie was killed earlier, and lastly, the harm caused to the Williams family as a result of the loss of Robin.

Remember back to the tearful testimony of her brothers, Sydney and Kenny.  They talked about how Robin was

Reported By: Steve S. Huseby, RPR
800-333-2082    Huseby, Inc., an Aff.    n (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 108 of 200
1896

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3928

the glue that held that family together and how much they miss her. Who could forget Bertha Williams' testimony about the joy of knowing Robin and the pain of living without her and losing her, of having her only little girl to be stuck at 23. Think about Bertha Williams who waits for the phone to ring at night at 11:00 when Robin used to call her when she got to work to let her know that she was okay. Think about how Bertha Williams must feel every day when she goes into her kitchen and sees those shotgun blasts in the walls of her kitchen reminding her of that awful day. Think of the weight that she carries on her shoulders when she walks out of her front porch and looks across the street to the spot where her child was gunned down before her very eyes. Consider the weight that rests on the shoulders of the Allen family and Ms. Williams when you consider the weight that you will give that aggravating factor. And I contend to you, ladies and gentlemen, that that will outweigh the mitigating factors.

Now, the defense put on evidence of mitigating factors, and I talked to you earlier about who you heard from and who you didn't hear from. You did hear from the defendant, and he gave you an exhaustive life history, told you about his childhood, his teenage years and his adult years with his girlfriends, including Robin, and I contend to you, ladies and gentlemen, that the defendant's testimony is so filled with misinformation that you simply can't believe

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi          a (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 37     Filed 09/23/15     Page 109 of 200
1897

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/12/2002

Page 3929

it.  I contend to you, ladies and gentlemen, that those hours that Marc Barnette was on the witness stand is just where he likes to be, the center of attention.

He got to weave you a tale in which he was either the victim or the hero.  And I contend to you, ladies and gentlemen, that watching him testify gave you a good look at why a good woman like Robin Williams would have ever been with him.  Marc Barnette talks a good game.  I contend to you, ladies and gentlemen, that his testimony was slick and rehearsed and that Marc Barnette is a good artist.  He is a spin artist.

He presented him in different ways during his testimony.  The first of those ways that I'm going to talk to you about is Marc Barnette is a minimizer.  Marc Barnette minimized his own behavior.  Take, for example, the way he described being fired from Camelot Music for sexual harassment.  He told you it was a misunderstanding after a game of slap ass.  The defense didn't call any of the Camelot people to bolster that or corroborate that statement.  We brought you Joanna Coleman, who told you that was no game, that was not a joke.  It was a constant, unwanted harassment, it was aggressive and it was not fun.  The defendant spun the story the way he wanted you to hear it and hoped that you would accept that without explanation.

You heard plenty of evidence about the defendant's

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Af          on (704) 333-9889
800-333-2082                              Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 110 of 200
1898

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3930

so-called suicide attempts, especially his alleged suicide attempts after he killed Donnie and Robin. The defendant wants you to believe that as a sign of his remorse. I contend, ladies and gentlemen, that it never happened. The physical evidence showed you that it never happened. Remember Officer Hohl who showed you that after the murders he took -- he cut off the tail pipes from Donnie Allen's car, after Mr. Barnette told him about these suicide attempts, and he did that because the physical evidence did not back up Marc Barnette's own contention that he had attempted suicide not once but twice. It never happened. He made that story up to make himself look better, to make you feel sorry for him, and to show you that that was some sign of remorse. With a loaded shotgun in the car, Marc Barnette could have easily killed himself if he had really intended to. And with his history of suicide gestures that never happened, don't find it, don't find that he was remorseful.

He told you that he went to church. How do we know? He has church bulletin in the car; but after what you've heard from him, how do you know if he went to church, and if he did, why? He wants you to believe he went to pray for the souls of the people he just murdered. And I contend to you, ladies and gentlemen, that his spin of his story began immediately.

The defendant told you that he didn't even know if

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff       )n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 111 of 200
1899

Page 3931

he shot Donnie Allen.  He wants to minimize his responsibility.  Two witnesses told you that scientific evidence showed that Donnie Allen, the shots that killed Donnie Allen were fired from close range.  Todd Nordolf, the firearms expert, said those shots were fired from five feet or closer.  Dr. Sullivan, the medical examiner, told you that those shots were fired from three feet or closer.  That is a close range shot.  The defendant wants you to believe that he didn't know, because he doesn't want to hold himself responsible and he doesn't want you to hold him responsible. I contend to you, ladies and gentlemen, that his contention that he didn't know that he even shot Donnie is a pathetic attempt to hold himself less responsible, and don't believe it.

Dr. Sullivan talked about the painfulness of those injuries.  One shot broke Donnie Allen's upper arm bone.  One shot broke the ball and socket joint.  One shot went through his lungs.  That is a painful injury.  And don't you know, ladies and gentlemen, that Donnie Allen would have cried out. Marc Barnette knew exactly what he had done, but he wants you to believe that he doesn't.

In other parts of his testimony Marc Barnette portrayed himself as a victim.  He came in here and said that his father beat him until his arm was tired, that his father would beat him for no reason.  The truth is, ladies and

Case 3:12-cv-00327-MOC          Document 107          Filed 09/23/15          Page 112 of 200
1900

Page 3932

gentlemen, when the defendant started telling his story to psychologists in 1997, he described a relatively happy childhood. He consistently reported that he felt overdisciplined by his father but as time went on he got more and more savvy with the way he should tell his story to psychologists, and his story got better and better. Pretty soon that became justification for his felony child abuse conviction that he had done in Georgia, so pretty soon it became that Marc Barnette's father had beat him with a coat hanger. He got better and better, his story spun and spun.

You did get to hear from Derrick Barnette, and I contend to you, ladies and gentlemen, that he did not back up the defendant's story. The discipline that he said that he gave the defendant was based on transgression of the family rules, do well in school and don't lie, and it was always related to that and it was never with a coat hanger. But Marc Barnette wants you to see him as a victim.

Marc Barnette told you that his parents neglected him. Did Marc Barnette have an ideal childhood? No, but he had two parents who worked and he had two parents who cared enough about him that when he was not doing well in school, they pulled him out of the public school system and put him in private school. Ask yourself, ladies and gentlemen, where the neglect comes in.

Marc Barnette also portrayed himself at times

Case 3:12-cv-00327-MOC    Document 190-107    Filed 09/23/15    Page 113 of 200

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/12/2002

Page 3933

during his testimony as a hero. The defendant portrayed himself, when he described his relationship with his prior girlfriends, as rescuing them from their terrible lives. He minimized his own testimony. He minimized the fact that a life with Marc Barnette is a life of pain, physical pain and mental pain, physical pain because you're going to get hit, kicked, hit with a baseball bat, have a knife put to your neck, kidnapped, raped, and fire bombed. That's what life was like with Marc Barnette. And he casually admitted to you during his testimony that he had done these crimes, but every single time that he had made that admission he couched it in terms and shaded it in terms that they had all done something to bring that on.

Marc Barnette blames Bennie Greene for Robin's burns. You remember Investigator Tony Rice who was in here who told you that during that confession he said how could Bennie have let this happen? He minimizes the consequences of his own actions and blames Bennie Greene for the fact that Robin had to jump out of the window, never seeing, of course, his own personal responsibility.

Marc Barnette told you that he encouraged Robin to spend time with her friends and family. Bertha Williams told you that when Marc came into Robin's life she stopped seeing her, they had a Saturday morning ritual where they went shopping and that stopped.

Case 3:12-cv-00327-MOC Document 107 Filed 09/23/15 Page 114 of 200
1902

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/12/2002

Page 3934

Angela Rosser came in here and told you that she was best friends with Robin through life, that as soon as Marc got with her she never saw her again. And when she did, she said Marc was difficult to be around. Marc told the story of when Angela's niece died, that he was looking for Robin so that he could comfort her in her time of need. Angela Rosser came in here, ladies and gentlemen, and I contend to you that Angela Rosser told you what happened that day, that Marc Barnette was tracking Robin down and trying to find her, frightened her so much that Robin jumped out of a moving car and Angela Rosser had to follow them home to protect Robin. I contend to you, ladies and gentlemen, that the defendant spun his story in the hopes that you would believe what he had to say.

One of the most important ways that the defendant wants you to believe he is a hero relates to his brother, Mario. And why is it important that that terrible home life described in detail by the defendant and by Dr. Mark Cunningham, why is it important that they bolster that? I contend to you, ladies and gentlemen, if that home environment that was detailed by those two witnesses was so terrible, so terrible that it created Marc Barnette the cold blooded killer, why didn't it create Mario Barnette the cold blooded killer, so Marc had to tell stories of shielding his brother from his parents' fights, Marc Barnette the

Case 3:12-cv-00327-MOC Document 97 Filed 09/23/15 Page 115 of 200
1903

Page 3935

superhero. And to make that theory fit, I contend to you, ladies and gentlemen, that the defense bends over backwards to create an atmosphere that was so bad that created Marc but Marc was such a hero that he shielded that from Mario. They cannot have it both ways, they cannot have it both ways.

But even if you take their word for it without looking very closely at the facts, as bad as they portrayed it to be, the defendant was strong enough, thoughtful enough, and resourceful enough to protect his brother and his cousin from this harm. So how can he be that resourceful and thoughtful and at the same time be the creation of this environment that made him into a killer? The simple truth is Marc Barnette made choices as an adult.

I contend to you, ladies and gentlemen, that Marc Barnette has recreated his life story with the help of expert witnesses to try to create a psychological justification now for things that he did and choices that he made. I contend to you, ladies and gentlemen, that the clearest explanation of Marc came from Dr. Dietz, Marc Barnette is narcissistic, he sees himself as the center of the universe and all things revolve around him and his needs; if anything gets out of whack, he reacts violently.

You heard from defense expert witnesses. I contend to you, ladies and gentlemen, that was carefully orchestrated testimony, it was designed to have you not look too closely

Reported By: Steve S. Huseby, RPR
800-333-2082            Huseby, Inc., an A          ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 116 of 200
1904

Page 3936

at the facts that they contend support their opinions. You got quick snapshots, you got uncorroborated information, and yet it always showed that Marc was not responsible for his choices.

Ask yourself when you consider their testimony, what do I know about the quality of information that they used to form their opinions? Dr. Mark Cunningham came in here and testified to an exhaustive family history. He made granted pronouncements about prior generations of relatives that he wants you to hold accountable for Marc's actions now that he made as an adult. He wants to accept at face value information that he bases his opinion on.

You only got to hear a couple of members of the Barnette family. You got to hear Derrick Barnette, and as I've told you before, I contend to you that Derrick Barnette does not fit into the profile that the defense experts wanted you to believe. I contend he came across as an intelligent and successful person whose discipline within the family was based, while it might have been overboard, it was still based on transgression of the rules and it was not as the defense wants you to believe. Dr. Cunningham conceded on cross-examination that the defendant may be the one with the tendency to maximize his childhood in order to make an excuse for his behavior.

You got to see Mario Barnette. They grew up in the

Case 3:12-cv-00327-MOC     Document 190507     Filed 09/23/15     Page 117 of 200

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3937

exact same environment, and Mario Barnette is a successful young man working and going to college. Do you know why? I contend to you, ladies and gentlemen, that Mario Barnette simply made different choices than Marc Barnette made. Ask yourself when you look at the defense expert witnesses what opportunity do you have to judge the credibility of those facts, who did you hear about that you didn't hear from. You heard a lot about Sonia Barnette. And according to the defense, she's the one to blame for Marc Barnette's actions. Ask yourself why didn't you hear from her, because they hope that you're going to simply take their word for who she is and how she is. You heard about her, but you didn't hear from her.

You heard about Tom Barnette, Derrick Barnette's father and Marc Barnette's grandfather. Dr. Cunningham called him, quote, an alcoholic playboy. Prior testimony on cross-examination revealed that -- had him coming up to Philadelphia, had the defendant coming to Philadelphia to visit Tom Barnette, who said that he had been taken to the zoo and taken around to historical sites because he wanted Marc to know the history of the city. You heard about him, but you didn't hear from him.

You heard about Jesse Cooper, the defendant's grandfather. This is a man who has apparently taken care of his extended family over the course of the years.

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affili--- -- ------- (704) 333-9889
800-333-2082
Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 118 of 200
1906

Page 3938

Dr. Cunningham labeled him as psychiatrically disabled. What psychiatric tests had been conducted on Jesse Cooper? None. They simply want you to believe at face value the formula that they contend excuses Marc Barnette's behavior.

Marc Barnette made choices. The defense didn't give you the tools to find their mitigating factors. Dr. Cunningham came in here with these so-called facts. He had interviewed the defendant for 18 hours. There's no tape. There's no transcript. There's no way for us to know what the defendant said during those 18 hours, but he gave you ten or so quotes from the defendant and said, this is what he told me over 18 hours, but there was simply no way to know what was really said.

Ask yourself about the expert witnesses. How helpful were their opinions? The defense wants you to believe that the defendant is not responsible for the -- or couldn't appreciate the wrongfulness of his conduct. That's their first mitigating factor. And I urge you not to find that mitigating factor. There has simple been no evidence that he did not appreciate the wrongfulness of his conduct.

I submit to you that you have heard nothing that the defendant did anything but make choices, deadly choices, choices for which he should now be held accountable.

The defense wants you to believe that his only choice was to strap a mag light onto a sawed off shotgun and

Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 119 of 200

United States of America vs. Aquilia Marcivicci Barnette  3:97CR23-V
Proceedings Before Judge Richard L. Voorhees  8/12/2002

Page 3939

crouch in the woods and wait for someone to car-jack, that his only choice was to march Donnie Allen into the woods and pump three shotgun blasts into his back, that his only choice was to drive to Roanoke, shotgun his way into that house and chase Robin down until he found her and kill her with two shotgun blasts.  That was his only choice?  Give me a break.

Contrast that, ladies and gentlemen, with the Government's expert, Dr. Park Dietz.  Dr. Dietz looked you in the eye and said, Marc Barnette was not psychotic at the time of these crimes, Marc Barnette's choices were not predetermined by he childhood, childhood risk factors do not causes adult behavior, Marc Barnette's behavior was not programmed.  He told you this was two crimes with two distinct motives, this was not a domestic homicide, and he told you that Marc Barnette has told so many stories in the past that it's not possible to know what happened.  Plain language, plain opinions.

The defense is going to get up here and ask you to find various mitigating factors, and I ask you as you considering those to think carefully and thoughtfully first, has this been proven to me by a preponderance of the evidence.  And I contend to you that there are mitigating factors that you simply should not find based upon that standard.

And secondly as you consider those, consider

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3940

carefully whether those mitigating factors have mitigating value. The Court is going to instruct you that you should find some of those mitigating factors to be true, but your primary role when you're in that deliberation room is to decide the weight, and I ask you to be very careful in doing so.

Ladies and gentlemen, in this case, with the help of law enforcement, with the help of the defendant's living victims, with the help of eyewitnesses, and with the help of the Allen family and the Williams family, Ms. Rose and I have done our job, and now we're asking you to do yours. We've all spoken for Robin and we've all spoken for Donnie, and now we're asking you to do the same. You are now their voice. Speak for Donnie and speak for Robin. Speak for the Williams family and speak for the Allen family. Speak with a strong, united voice to everyone who is listening, and speak to Marc Barnette and tell him that he is ultimately accountable, put your 12 voices together and speak the words of justice and sentence the defendant to death.

MS. LAWSON: Good morning. When we first came in here, Harold Bender and I told you that we, like you, were shocked and surprised and curious and wondering at these terrible crimes. We told you that what we wanted to do is what we could do to help you make a decision. We went and we looked and we talked to people and we talked to people who

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affi" ˙ ˙ ˙ ˙ a (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 121 of 200

1909

Page 3941

had more expertise in this area than we did and we thought that we had some explanation for you, not excuses, no excuses for Marc Barnette's crimes, but to help you understand what happened here so that you could make a just decision.

And you remember that when we were in jury selection, all of you said that you could consider a sentence of life imprisonment without the possibility of release for a man who had killed two people, Robin Williams, Donald Allen, planned murder, no self defense and no insanity, and that's where we are. He's guilty of that as described, but that's not the end of it. All of you knew that you would have to choose between two punishments, you'd have to choose between life in prison without the possibility of release or death. And what we set out to do is give you some tools that would help you understand. And I think we've just been called slick, but that's not our purpose. Our purpose is to help you understand and give you information.

What you need to understand first of all is Marc Barnette is sick, has been his entire life. All he wanted his entire life was love, and at the same time he repelled love. That's because, as Dr. Halleck told you, he has a borderline personality disorder. You see, who of us would want to be Marc Barnette? Think of it that way. Who among us would choose to be that way? When he was placed in the arms of his 14-year-old mother, she was of the same age that

Case 3:12-cv-00327-MOC          Document 107          Filed 09/23/15          Page 122 of 200
1910

Page 3942

middle school students are out carrying around bags of flour to see that they don't want to become parents. She was troubled, undoubtedly troubled, as you've heard, unable to take care of a child and relying on her mother to provide the things that a child needs in order to love, in order to grow, in order to be intact. And those things didn't happen for him, and you know they didn't happen.

Who chose to raise him like that? Who chose to leave him in a position where he would get a borderline personality disorder? There's nobody who has disagreed that Marc Barnette had that borderline personality disorder. Dr. Halleck told you that it is a very serious and painful illness. And he grew up with that. He didn't choose it.

And Dr. Halleck, how can he be ridiculed when he has been practicing medicine and healing people since before most of the people in this room were born, since 1953. And he's seen Marc Barnette since 1997, and he came in here and he told you that Marc Barnette has for his whole life suffered from a serious disorder.

And what are the hallmarks of that disorder? Those are the things that you saw described not only by the doctors, all of them, including the Government's doctor, Dr. Dietz, but they also are proven to have existed throughout Marc Barnette's entire childhood.

I made some notes, but remember the evidence as you

Page 3943

heard it, don't accept it from me, but you may remember some of these things. Dr. Halleck says that the borderline personality disorder is characterized by fear of abandonment, very mixed up about people, rapid fluctuations in mood, paranoia, difficult to feel loved, insecure, untrusting, identity problems, and susceptible to depression. Now, that's the definition of what Marc Barnette suffers from. Dr. Halleck told you that, Dr. Cunningham told you that, Dr. Dietz told you that.

Now, who else told you about that? Tasha Herd, he was insecure, he was jealous, he tried to be controlling. That's the Government's witness, and they want you to believe that we are just overreaching and making stuff up.

But you know there are good qualities to Marc Barnette notwithstanding what happened to him and the disorder that he suffered from. And you saw that again from the Government's witnesses. Tasha Herd, when they got together, he was good and loving and they cared about each other. And after a few months into this relationship when they were both so young, things went bad. He was jealous, he was controlling, he was insecure, he was paranoid about where she was, he feared abandonment. She saw that when she was 14 years old, and Dr. Halleck, in his 70's, told you that's Marc Barnette, not just now, but when he was a teenager. He didn't choose to be that way.

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Snherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 124 of 200
1912

Page 3944

Dr. Halleck told you, and Dr. Cunningham told you, and Dr. Dietz told you that Marc Barnette was depressed, seriously depressed at the time of these crimes. Now, you can't think that Marc Barnette thought that up as an excuse, because Tasha Herd told you, the Government's witness, told you that when he was a teenager and they were together, he would sit in the closet naked and crying. Is that normal? Is that the way you would want your children to be? There's plenty wrong with that young man, and he can be called narcissistic or whatever bad you want to say about him, but it's not right. And he didn't choose the suffering that must have led him to sit in a closet crying, he didn't choose not to be treated, and everything he did to Tasha Herd shows you how sick he was.

You don't choose to be like that, you don't choose to sit in a closet, you don't choose to have borderline personality disorder that is a very serious and painful disorder, according to Dr. Halleck. And Dr. Dietz agrees that he's got borderline personality disorder. It's not like there is controversy or conflict about that.

He goes to be with Crystal, and she told you, and these were her words, as I recall them, that things were great in the beginning, he cooked, he cleaned, he worked. Here's a young man who is trying to be right, he is trying to do good things. He's trying to be what every parent wants

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi⸱⸱ ⸱⸱ ⸱⸱ ⸱ ı (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 125 of 200
1913

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3945

their child to be. He's trying to be a good partner to the women in his life. And then things start happening that are not good. His personality starts surfacing, notwithstanding his best efforts not to have that happen. He didn't choose to have this borderline personality disorder. What he chose, what he tried to choose was to be a good boyfriend, a good parent to Crystal's children, at least in the beginning, and then the paranoia and the jealousy that Dr. Halleck and Dr. Cunningham and Dr. Dietz tells you is a part of who he is, surfaces. And he and Crystal have problems, he doesn't want her dressing up, he doesn't want her wearing make-up, he doesn't want her going out.

Now, where in the name of heaven did he learn what happens when women get dressed up and put on make-up and go out? Does it harken back to when mom said, I'm going out to the store and the feelings that he had because of that? Of course it does. You know that. You've got common sense. You rely on your reason and common sense in addition to the expert witnesses. How can that not affect a child? How can that not not shape who we are? Of course it does. You don't even need psychiatrists and psychologists to know that. But it's there and they agree it's there.

And he hit Crystal's children with a coat hanger, he freely admitted that to you from the stand. And you know what? That was wrong. You know what else? It's a good

Reported By: Steve S. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 126 of 200
1914

Page 3946

thing he didn't use the weapon of choice in the house he grew up in, because it would have been a hammer or a frying pan. It's wrong, but you can see where that comes from.

So he's got this disorder and he moves on. He comes to Charlotte and he hooks up with Alicia Chambers. And he wants to be loved. They hook up, they are happy, things are going well. And because he has this inner whatever that tries to make himself be loved, he also pushes people away. You saw that with Crystal, with Tasha. He was such a proud father with Tasha. When Angelica was born, he went out and got the newspaper showing the date of her birth, he painted the nursery, he went to all the neonatal appointments. That's a young man who is trying to be normal. That's a young man who is trying to do right. And yet in each relationship, he falls apart, he loses it. His underlying personality disorder overwhelms what he is trying to do to do right. That's a tremendous conflict and has to be tremendously painful.

When he gets to Charlotte, he gets involved with Alicia. And by then the repercussions of everything he is doing really spiral out of control. Again, in the beginning, things are good, Alicia told you that, we don't need a psychiatrist to tell you that. He was trying.

Now, I don't know at what point things got bad between Marc and Alicia, but he hit her, which is what he had

Case 3:12-cv-00327-MOC     Document 101-17     Filed 09/23/15     Page 127 of 200
1915

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3947

learned to do, what he had done in the past. The painful thing about that is that they kept getting back together, and I think it's pretty clear in Alicia's case, you may or may not agree, but in Alicia's case there was a certain amount of getting back together and mixed signals between Marc and Alicia. But the bottom line is that you could tell Marc was getting sicker and sicker. He continued to cry. He told you that. We didn't tell you that. Marc -- it was no surprise coming to you from Marc, because you already heard it from the Government's witnesses. He would become incoherent. He would become babbling when he was upset about this relationship issue. He continued to be jealous and possessive, and that's the borderline personality disorder. That's the product of how he is. And he didn't choose that.

What he wanted to choose was to do the right thing, to be a good mate, to be loved, and to love back. But it never ever happened. And when Alicia rejected him, as you might expect, given the way he was treating her, he didn't handle that at all well, did he? By Alicia's testimony, by Investigator Adama's testimony, he would do everything he could to get to Alicia, crying, begging on the telephone, please let's make up, please let me love you, please let's get together. A healthy person would have walked away, but not Marc Barnette, because in every relationship, the begging -- Crystal came in here and told you that while he

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff            n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 128 of 200
1916

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3948

was sitting in jail down in Georgia for hitting her kids, he was calling her mother's house all the time, several times a day, let's get back together, what's wrong. That's pathetic. And that's the product of an illness that he didn't choose.

And you can see how devastating that illness is. And as Dr. Halleck told you, that illness leads to a high susceptibility to depression, depression that sends you spiralling out of control, that sends him spiralling out of control.

Now, what happens with Alicia that lets you know how sick he is? In addition to the crying, the weeping, the incredible attempts to get back together when the rest of us know there's no chance of that, there is the business of November the 9th. November the 9th, when he rushes into her apartment, or where she is staying with her uncle, he carries her out of an apartment, knowing that she was on the phone. That's terrible behavior and it's out of control. He carries her to her mother's houses -- to his mother's house. And, of course, there nobody does anything about it. The police come, they charge him with felonious restraint, kidnapping, for taking her out, and three days later he's back. He wants to talk to Alicia, and it doesn't matter who is there, where he is, he needs to talk to Alicia. He goes to a Bojangle's, 4:00 o'clock in the afternoon with a knife and in broad daylight, in view of everyone, attempts to take her away to

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff'          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 177     Filed 09/23/15     Page 129 of 200

Page 3949

talk to her. He didn't stab her right there, although he behaved in a very frightening manner. That's the borderline personality disorder that he didn't choose. That's really crazy behavior.

And you heard Brent McCrickard come in here and tell you how he was swinging the knife at people who were trying to come to Alicia's aid. That's not rational conduct, and you know that. And you don't need a doctor to tell you that, but Dr. Cunningham told you how Marc Barnette can cycle because of his mood swings in and out of desperation, in and out of trying to figure out what to do, in and out of trying to be a good man while he can't, or has tremendous difficulty doing it.

Come March of the next year, you know from the police reports, from Alicia Chambers, and, in fact, from Marc Barnette, who has admitted all of this to you, he entered the home of Jasper Chambers, Alicia's uncle, and ran past several people to get to Alicia and he acted like he didn't even know they were there, totally oblivious to what else was around him, just like he was out at the Bojangles. When he gets like that, he sees nothing and thinks of nothing but his destination. He doesn't choose that. Dr. Halleck told you how painful that is to be like that.

When he is convicted of felonious restraint, Marc is put on probation, but by then Marc had found the thing

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Snherion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 130 of 200
1918

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3950

that would solve all his problems, solve all his pain.  Her

name was Robin Williams.  And he loved her, and he preferred

to be with her than to stick around and be on probation.  And

that's wrong, but he found, once again, what he needed, which

was love, to love and be loved, to be part of a family.  And

so instead of staying on probation here, he went to Roanoke.

Now, you heard people talk about how Robin changed

when Marc went to Roanoke, and they blame it on him, and

that's understandable, because he has done these terrible

things.  But for him, Robin moved out of her mother's home to

be with him.  And you might want to suppose that maybe she

loved him enough to be with him all the time and she loved

him enough to spend time away from her friends to be with

him, and he loved her back and you know that.  You know that.

Now, Marc would get upset.  You heard Ms. Williams

talk about Marc being upset.  And you heard Angela Rosser

talk about how out of control Marc could get.  She came and

told you about Marc weeping in the street trying to get to

Robin, weeping in the street, something he has been doing

since he was a teenager.

He's got a very serious borderline personality

disorder that he did not choose.  And at times it got so bad

that the depression kicked in and he would be weeping in the

closet, on the telephone, and in the street.  And every bit

of that was related to his domestic partners, because you

Page 3951

know he worked. Steve Austin told you that he consistently kept a job. Everybody who talked about that talked about him working at Camelot Music, at Bojangles, at other places. He tried to do the right thing, and some of us succeed and some of us fail.

When Robin breaks up with him in early April of 1996, he comes home, and he is depressed, he is crying, he's not working, he's not succeeding in finding a job. Those things don't pull you out of depression. They make it worse. And he's medicating his depression with alcohol, not something he's done before. You will recall Crystal told you, no drugs, no drinking. Mario told you that he began to notice he was drinking. Marc told you he was drinking a lot. And Dr. Cunningham told you that alcohol is a disinhibitor, it makes you less in control of your faculties, your decision making, and anybody who has seen anybody drinking heavily knows that, you don't need the doctors, but that's what they told you.

Marc goes through the same thing he's gone through with Tasha, with Crystal, with Alicia, when he is thinking about Robin. He's up on the phone, they tell you, crying, trying to talk to her, weeping.

Now, you may not think that his weeping is real, but it's still a part of his personality. That's the way he reacts to this kind of pain. He's distressed. He's upset.

Reported By: Steve S. Huseby, RPR
800-333-2082     Huseby, Inc., an Affiliate of Spherion (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 132 of 200
1920

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3952

And as Dr. Halleck and Dr. Cunningham and Dr. Dietz told you, he was experiencing irrational, obsessive thoughts of Robin. Even Dr. Dietz, who says that he is narcissistic, also agrees with Dr. Halleck that he was experiencing major depression.

Now, Dr. Dietz didn't talk to Tasha or the Barnette family. He just read records. And he told you that although he and Dr. Halleck might disagree on the origin of the major depression, he was still suffering from those symptoms. He agreed that there was obsessional thought, repeated thinking about Robin and then thinking about what he would do because of the way he felt during this major depression. And he talked about how his thoughts keep changing, his plans keep changing, and that ties into a phrase that Marc used to use when he was on the stand. He said, my heart was beating in my head. Now, that's a sign of emotion that is out of control. It's a sign of emotion that goes from the heart into the brain. My heart is beating inside my head. And Dr. Dietz, Dr. Halleck, and Dr. Cunningham talk about the obsession, the intrusive thoughts, the constant thoughts. Dr. Dietz, the Government's expert, said, kept making decisions, kept changing his mind, ruminating, preoccupied, his thinking changing all of the time. He shaved his head so he could think better, remove the hair and somehow my mind will clear. He's not thinking better. He continues to think irrational thoughts.

Page 3953

Now, he does have a lack of insight, he always has. You know from his relationships with Alicia and Tasha that he doesn't understand why people don't want to be around him. That's part of the narcissism, but that's a feature of his borderline personality disorder. The government's expert told you that, Dr. Dietz, and Dr. Dietz also said that he was a little bit haughty during their interview, but that's consistent with being a narcissistic personality, too. He didn't choose to have that. That's a feature of borderline personality disorder.

Now, Dr. Cunningham talked to you about a catathymic homicide. Marc is the perfect candidate to commit something like that. Catathymic homicide has been recognized as a process since the early 1900's, and it's where you have a family history of violence towards women, you have a need to attach, a desperation to stay attached, and you're not complete unless you are attached. And when you're not attached, the borderline personality disorder is extremely painful.

And in the past with Alicia and Crystal and Tasha, Marc Barnette got out of that cycle with nothing more than violence toward these women. And I'm not minimizing that, but that's what happened.

But with Robin he told you, I felt more complete than I had in my entire life. When Robin and he separated,

Case 3:12-cv-00327-MOC     Document 107-22     Filed 09/23/15     Page 134 of 200
1922

Page 3954

honestly his own fault, he was devastated. He went into that major depression in early April and he went out of control and he was unable to pull himself out of that catathymic phase, that A, that Dr. Dietz told you was basically correct. He was obsessed to get to Robin, and he didn't know why. And he didn't have a plan. He was either going to kill her or kill himself and her. He was going to get the police to kill him. He was going to take her to get Bennie Greene to come out so that he could talk to him or kill him. And these are all the thoughts that are swirling in that man's mind. And his thoughts were irrational. Dr. Dietz says, it's a significant distortion in thinking, out of control.

And as you heard from the Government's own witness, the man who has seen Jeffrey Dahlmer and the Unabomber and he's from California and he's a celebrity, Marc Barnette was out of control. And what he told you is that different doctors in good faith can disagree about what a person's mental state is. But you know from the facts that Marc Barnette believed that he had to get to Robin. That's depression and personality disorder and some disinhibition from alcohol. And he wasn't so drunk that he couldn't drive to Roanoke, but his thinking was looser, his controls were looser. And you remember Dr. Cunningham told you about that incubation period where he's literally at war with himself. I can't do this, I have to do it, I need to do it, doing it

United States of America vs. Aquilia Marcivicci Barnette      3:97CR23-V
Proceedings Before Judge Richard L. Voorhees      8/12/2002

Page 3955

is wrong. He's got a conscience. You have seen it. You have heard Dr. Halleck talk about it, about how tortured he is, I can't do it, I have to do it, please don't make me do it. That is a sick man.

All his violence through his life has been in the context of a domestic situation. He wants to love, he wants to be loved, and that didn't happen for him. And he didn't choose to be the person he is. He made choices for which you are going to punish him. But remember that part of that is something that he didn't choose. He chose his actions, there's no excuse, he's responsible and you're going to punish him. But there is mitigation in this because he didn't choose all of it.

And those are the things that you think about when you decide what punishment you're going to impose.

THE COURT: Ms. Lawson, would this be as good a time as any for a morning break?

MS. LAWSON: Sure.

THE COURT: All right. Members of the jury, please hold what you've got, keep an open mind about the case, please don't discuss it, and we will call for you in about 15 minutes. Thank you.

(Jury out at 11:05 a.m.)

(Brief recess.)

(Jury in at 11:29 a.m.)

Reported By: Steve S. Huseby, RPR
800-333-2082      Huseby, Inc., an Affiliate of Snherion (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 136 of 200
1924

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3956

THE COURT: Ms. Lawson.

MS. LAWSON: We were talking -- well, I was talking about Marc as these crimes unfolded. We know he was depressed, by every expert, major depression. We know he was having irrational thoughts. We know his mind was cycling, changing his mind, having irrational thoughts, plans. And by the time he committed the fire bombing, it's obvious that he had lost control.

He loved Robin, and he was so angry that she was with a man and he couldn't understand why she didn't want to be with him and he wanted to know and he wanted that man to come out. He was lost, totally absorbed in his irrational thoughts. When he came home from that and found out that the police were looking for him, not unexpectedly, and he didn't turn himself in.

By then Marc Barnette belonged either in a jail or a hospital. He shouldn't have been out on the street. He was living with his family and they didn't put him in a hospital. He was dangerous to himself and to other people at that point. He should have been committed. Instead, he was left to ruminate in his room.

The only person who really recognized what was going on with him and tried to do something about it was Steve Austin, his friend. Now, Steve may have been young enough at that point that he didn't know how bad off Marc

Case 3:12-cv-00327-MOC    Document 19257    Filed 09/23/15    Page 137 of 200

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3957

was, but he knew he was bad enough off that he tried to take him out to clubs, tried to cheer him up, tried to introduce him to other girls. And as Marc told you, that just didn't interest him and he went back home. He was in the throws of what every doctor who came in here told you was a major depression.

Now, Ms. Tompkins talked about Marc lying to you. Somehow, I took his testimony to be among the most truthful, candid imaginable. He told you about things that he hadn't even admitted to other people.

Didn't that strike you as truthful? Did he strike you as perverse? You have to make up your own mind about that, because you're the judges of the credibility of the witnesses. But he told you, after hearing the testimony in this courtroom about Robin Williams' family finding cards that you have seen on the windshield of her car, after he's admitted to everything else, that he didn't do that. Now, why would he not admit that? It wasn't a crime to leave those on the windshield. I submit to you he was so sick by then that if he did it, he doesn't even remember it. Why would he not tell you that that happened? It's his handwriting. They found other cards in the car.

He was totally depressed and totally out of his mind in terms of being focused on Robin. And it was getting worse. And he went home and he should have been in the

Page 3958

hospital, for his own protection and for the protection of others.  But nobody either cared or noticed or did anything about it.  And he was left ruminating, obsessing, and thinking.

Now, Dr. Burgess, Dr. Halleck, Dr. Cunningham, and Dr. Dietz all told you the same thing, he was focused on getting to Robin.  And what he did -- and this is the only point where Dr. Dietz disagrees, and reasonable men can disagree, he says, reasonable professionals, men and women, is he wanted to get to Robin so badly that he used any means necessary to get to her, and Donald Allen, as Dr. Burgess told you, was an obstacle and an opportunity to get to Robin. An you can decide for yourselves whether Marc decided to go out and kill Donnie Allen or whether what he wanted, what he needed, because of his disordered thinking, was a car.

Now, Marc himself referred to the murder of Donnie Allen as senseless.  While he was weeping on the stand about it and apologizing, he recognized that, as we all do, as senseless.  But, you know, I was thinking about the word senseless, because we don't look at it too well, but it means without sense, and that's exactly where Marc Barnette was, he was operating on auto pilot and it was without sense.  And as upsetting as that is, it fully describes Marc Barnette's mental state at that time.

Dr. Dietz told you that he's done a lot of

Case 3:12-cv-00327-MOC     Document 9-7     Filed 09/23/15     Page 139 of 200
1927

Page 3959

workplace violence studies, he's an expert in it, and he told you about cases in which he's done a review of people who went barging into a workplace with a target, a person in mind, and on the way killed other people who were not involved at all, killed strangers to get to their target. Do you remember that testimony? And that's exactly what happened here. As tragic as it is, Marc Barnette had to get to Robin Williams. And the same thing that happened to Donnie Allen as has happened in other cases in which Dr. Dietz has been on review or involved.

You know what, you don't measure the value of a person's life by what you do to the person who took it. You measure it in terms of the memories and the joy that they brought other people and the quality of their life. That's how you measure it. You don't measure life by punishment.

Now, where we are here is making a decision about what to do with Marc Barnette. And the burden, as you heard, is on the government to prove to you beyond a reasonable doubt what they want you to do, which is to have him executed.

Now, Marc is guilty of this crime beyond a reasonable doubt, but that doesn't have anything to do with the decision you make here. What you have to decide here is whether the government has persuaded you beyond a reasonable doubt that Marc should be put to death.

Reported By: Steve S. Huseby, RPR
800-333-2082        Huseby, Inc., an Aff------- -f ------- (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 140 of 200
1928

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/12/2002

Page 3960

And, you know, there are different ways of defining reasonable doubt, but this is one of them, you talk about the different kinds of thinking, decisions, issues that you think about when you're talking about reasonable doubt. You know, you may have all doubt, you may not know what to think. Reasonable doubt is the highest level of conviction that a person could have, and the Government's burden is to prove the things it has to prove, including the punishment that they are suggesting to you, beyond a reasonable doubt, more than the top of this chart, higher than the top of this chart. What they have to do is prove to each and every one of you beyond a reasonable doubt that death is the only appropriate punishment for Marc Barnette, particularly when considered with the alternate punishment of life without the possibility of release.

Now, we talk about Marc's violent behavior throughout his lifetime. In talking about it realistically, you know that every bit of that happened in the context of a domestic relationship. Well, he will never have another domestic relationship. He will never become involved with a woman to the point where he gets so attached and feels the needs that he's got to the extent that he becomes violent or hurts somebody. He's in a place where there's so much structure that doesn't happen. And you know that that's what his violence was tied to because you know that for the past

Page 3961

six years he not only hasn't hurt anybody, he hasn't stepped out of line. You know where his violence has been directed, Dr. Burgess talked to you about that, it comes from the domestic situation, and that won't exist ever again.

Now, when you talk about the process that you're going through, think of it as a line. You have to think about whether the government has proved to you aggravating circumstances or factors. Those are the things that they told you about, that Ms. Tompkins told you about in her opening argument.

And you have to just think about them, deliberate about them and decide whether the government has proven the existence of one or more of those to you beyond a reasonable doubt, up here, okay?

Then you consider mitigating circumstances. Now, those don't have to be proven to you beyond a reasonable doubt. They have to be proven by the preponderance of the evidence, more likely than not. So all of you can think about the mitigating circumstances, and you can not only decide whether they have been established to you more likely than not, but you don't have to be unanimous. So whereas for aggravating circumstances you have to be unanimous in finding them beyond a reasonable doubt, for the mitigating circumstances that will be advanced to you, you only have to find them by the preponderance of the evidence. Not only

Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 142 of 200
1930

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3962

that, you don't have to be unanimous. If one of you finds a mitigating circumstance, you can consider that in your weighing process in your deliberations. And you give all these things weight and you make a decision, because here's the bottom line question here, and that is, what's the punishment going to be, what are you going to decide on? And this is where you weigh mitigating and aggravating.

And the burden is on the government here to prove to all of you and beyond a reasonable doubt that death is the only appropriate punishment when considered with life without the possibility of release, and that is a huge burden because they have got to prove it unanimously and beyond a reasonable doubt to get to death. And if they haven't satisfied you beyond a reasonable doubt and unanimously that death is the only appropriate punishment for this man, then you will impose a sentence of life imprisonment.

Now, do you see any reason why you need to go to death? Marc Barnette is not violent in a prison environment. His actions are the product of a debilitating, devastating mental illness, an underlying personality disorder coupled with major depression.

And Harold Bender will talk to you some more about some other mitigating factors, but mitigation is so important that you can make up your own mitigating factors. If from the evidence you think of something that hasn't even been

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3963

suggested to you, there are blanks on the form to write it in. We may not have thought of what you may consider to be mitigating, but it's your decision and you develop your own mitigation from your thoughts and your ideas and what you believe about Marc.

But the bottom line is, you never ever have to vote for death. And in never doing that, if that's what you choose, you know that Marc Barnette will be sentenced to life imprisonment without the possibility of release in a federal penitentiary.

In a pretty short period of time, Judge Voorhees is going to read voluminous instructions to you. And I see some of you squinting. These instructions will tell you the law. They will tell you about the weighing mitigating and aggravating. They will tell you that the government must prove that this crime is so aggravated that it calls for imposition of the sentence of death. If they can't prove that, then the sentence will be life imprisonment without the possibility of release. But Judge Voorhees will tell you that it's your duty as jurors to consult with one another and to deliberate in an effort to reach agreement, if you can, without violence to individual judgment.

Each of you must decide the case for yourself but only after an impartial consideration of the evidence of the case with your fellow jurors. In the course of your

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 144 of 200
1932

Page 3964

deliberations, do not hesitate to reexamine your own views and change your opinion if you're convinced it's erroneous, but do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of reaching a verdict. You will hear that once during these instructions. You listen for it, because it's important, but also it signals that we're near the end of the instructions.

And three times during these instructions Judge Voorhees will tell you this, the members of the jury are never required to vote for a sentence of death. In other ways, in other words, when weighing mitigating and aggravating factors, if any, there is no required result.

The Government's burden is to convince, each and every one of you, to the certainty of beyond a reasonable doubt that death is the only punishment for Marc Barnette when considered with life without the possibility of release. If you are not satisfied of that unanimously, then his sentence will be life imprisonment without the possibility of release.

Each and every one of you need to make this decision for yourselves, without doing violence to your individual judgment. And it takes 12 people to sentence somebody to death. You have to be unanimous. And if you're not, don't let expediency or the desire to reach a verdict or

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3965

unreasonable concession to the other jurors against your own will cause you to vote for anything but life imprisonment without the possibility of release.

Thank you for your attention.

THE COURT: Members of the jury, we will take our lunch break at this time, and ask you to be back with us at half past the hour of 1:00, make that a quarter past. That will give you an hour and a half. Thank you for your attention to the case. Remember all of your usual instructions. Thank you.

(Jury out at 11:46 a.m.)

(Lunch recess).

THE COURT: Ready for the jury.

(Jury in at 1:26 p.m.)

THE COURT: The jury is with us.

MR. BENDER: Thank you, Your Honor. May it please the Court, ladies and gentlemen of the jury, what we have gone through and what you have done since the very first day you came in here and were oriented and heard the facts, the brief overview of this case, what you heard about was a senseless, irrational crime for which there is no legal justification. If there were a legal justification, we wouldn't be here, because the jury that got us to this point may have found self-defense or legal insanity or some legal justification that would not have caused us to be here, so

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi¨ ´´ ´ ´ ı (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 146 of 200
1934

Page 3966

there is no legal justification for this senseless irrational crime committed by Marc Barnette that resulted in tragic consequences as you have heard, and heard from the very first day you came in here.

But we believe that we can rely on reasonable men and women in this process, and we believe that you are the reasonable, responsible people you told us you were when we questioned each of you, that you can take the irrational, senseless, and emotional aspects of this case and look at it reasonably. And I'm going to try in the few minutes I have to help you do that as best I can.

First I want to look at all -- have you look at all the times in which there was no intervention in this matter. As Ms. Lawson told you, he was a sick man. He was irrational. In some ways he was out of control. You've heard all the descriptions of Marc. His family made no intervention in this matter. Steve Austin tried his best in his immature mind he could to take him out and get his mind off of it. His church made no intervention in this matter. There was no guidance counselor to intervene in this matter. And you know what? Most regrettably, there was no intervention by the Charlotte-Mecklenburg Police Department.

Now, we have been accused of being slick, not bringing in Jesse Cooper, who at this very moment, as you know, as you have heard, is lying on his death bed in a VA

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3967

hospital dying of pancreatic cancer. We didn't have any psychological testimony by Jesse Cooper, because you know what, Jesse Cooper gave part of his body and most of his mind in the service of this country, and you heard about that. So it's not fair and it's not just to accuse us of not bringing in Jesse Cooper in this matter.

This is not an issue of who is to blame. We know who is to blame. Everybody in this courtroom knows who's to blame. Marc Barnette is to blame. He is responsible for these crimes. And make no doubt about it, although he has accepted that responsibility, he is looking at, at best-case scenario, life without the possibility of release, a severe punishment. Some people think that is more severe than the death penalty.

Now, the government put up Dr. Peter Carlson to tell you about the classification, high severity classification, he's always going to be there, but they tried to minimize it. And I think I asked Dr. Carlson, you're not trying to imply or say to this jury that the Bureau of Prisons is soft on crime? Of course not was his response, of course not.

But let me just give you a way to think about life imprisonment without the possibility of release. Think for a moment about the nicest hotel you've ever stayed in, it could be a vacation spot, it could be a spa, it could be a Super 8.

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 148 of 200
1936

Page 3968

I don't know what it is. But you think for a moment of the nicest hotel you've ever stayed in. Now think about that door to your room is locked. You've got plush surroundings, a big bed, but that door is locked. Well, 7:00 in the morning somebody comes by and unlocks the door for you. And you look out the window, there are no bars on your window because it's a nice hotel, but you look out the window and you see people walking back and forth, going on their daily work, going to work, maybe even on their little cell phones talking. You can never walk that street. You will never be able to walk that street. Oh, you can walk the halls, because everybody else's door is unlocked, and you can walk the halls and you can chat to the other folks on that floor, but you can never go in the elevator, you can't go to the lobby. Oh, you've got room service, but you don't pick up the phone and call. The same man that unlocks your door in the morning brings you your tray of food, it's what he wants to bring you, not what you want. But you're in this really plush surrounding. But you're going to stay there for the rest of your life, every day for the rest of your life. And when night falls, somebody locks your door, puts you in that room.

Now, think a moment, while you're in that room locked up, of something bad you have done to somebody. It may just be an unkind word, something you did to a loved one

Reported By: Steve S. Huseby, RPR
800-333-2082     Huseby, Inc., an Affi------ -f ------- (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 149 of 200
1937

Page 3969

that hurt them, not physically, but perhaps emotionally or mentally. You said something that you regretted to say to them. Now, when you wake up in the morning and you open your eyes in that very nice room, you've got to remember that hurt that you caused to that loved one, and that's going to stay with you every day for the rest of your life.

That is far better, that scenario is far better than anything Marc Barnette would ever know. His door is steel bars, he sleeps on a cot, a metal bunk, and he will do that for the rest of his life. And as he told you, when he wakes up every morning, and has for the last six years, and will do so for however long he lives, his first thought is what he did to Robin and her family and what he did to Donnie Allen and his family. And that is life without the possibility of release for Marc Barnette, and that is a severe, severe punishment.

Now, the judge, I believe, will tell you that when we're talking about mitigating circumstances, and that's this area right here with the preponderance of the evidence more likely than not on the chart, Ms. Lawson went through that and I don't need to go back through it, he will instruct you that three of the mitigating circumstances have been determined by the Court by the preponderance of the evidence.

If you all can't see that, just raise your hand. I assume everybody can see that. These are mitigating factors

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi··· ˉˉ ˙ ˙ n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 150 of 200
**1938**

Page 3970

that reasonable minds cannot disagree about. The Court has found that and has said all of the evidence indicates that this is found by the preponderance of the evidence, reasonable minds can't disagree about it, so you should mark your verdict form accordingly.

Number 1, Marc Barnette was neglected by his mother. There's absolutely no doubt about that. That's probably been proven up here, certainly by a preponderance of the evidence. Think about the lack of furniture, no bed, no food, all the other things that you can think about that you've heard about, the neglect that went on in that household, staying out days at a time, partying, doing whatever it is that she did. Think about the cherry red Corvette, that some man in her life, not Rick Barnette, not Derrick Barnette, but some other man in her life, convinced her that she had to get rid of the Chrysler New Yorker and get a cherry red Corvette. If Sonia ever wanted to take the kids to school, which she didn't, she couldn't have, she didn't have enough seats for them.

We've been accused of not putting up Ms. Barnette. She's here in the courtroom. She's sat here every day and she has listened to all this. She has listened to every word of it, and every word of it is true unfortunately, unfortunately.

Think about that in conjunction with the abuse that

Reported By: Steve S. Huseby, RPR
800-333-2082     Huseby, Inc., an Affi........ .. .......n (704) 333-9889     Fax (704) 372-4593

Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 151 of 200
1939

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3971

was -- that he suffered at the hands of Derrick Barnette. All of us are fathers, all of us are mothers. God, I don't want to come into court and I don't want to say the things that I have got to say, but Derrick Barnette came up here and said, yeah, I did hit him with my fist, I slapped him. And you know what? For whatever reason, I took that belt with the studs in it, or the holes in it, the metal, that Mario described, and I whipped him. And not only did I whip him, he was naked and he was jumping around, and, yeah, I hit him on his penis and his scrotum because he was jumping around.

Now, think about that. That's one of the things you're going to have to decide. The Court hasn't decided that, but that's one of them, was that he was abused by his father. And he was. And he was.

And think about the story that Mario told you about his thumb. It happened to Mario, but it just goes to show you what was going on in his family as Marc was growing up and as Marc was trying his best in that environment to protect Mario from this. Mario said, the abuse I experienced, the violence I experienced in that home was behind the wall, it's on the other side of the wall. It's on the other side of the wall because Marc Barnette took him and put him in his room and let him play with his favorite toys so that he didn't have to grow up in this same kind of environment.

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 152 of 200
1940

Page 3972

There was repeated violence, repeated violence. You know, think about, if you would, a young man, or any of you, as a young man, getting on the school bus with your friends, going off to class, the bus turns the corner and there in the middle of the street blocking the school bus are your mother and dad in that orange BMW that he described fighting each other. How embarrassing. How embarrassing to have that happen to you.

The other -- one of the other things that the judge will tell you has been found by a preponderance of the evidence, and you should so find, Marc Barnette turned himself in to the police.

Now, again, you've heard all of the testimony about that, he did, he came back, turned himself in, had his mother call and say, to the FBI, they came out there, knew where to go, apparently, came out there and he turned himself in. He accepted responsibility for what he had done. When he was initially questioned, he accepted responsibility.

They asked him about the missing person, Donnie Allen, and what does he do? He writes out on a piece of paper the diagram and the location. What else does he do? After he has given them the confession to what he did to Robin, they say, take us to show us where Donnie Allen's body is, and he does. He does. They drive him out there. He cooperated with the police. He turned himself in. He helped

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi··    ·· ·   · n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Docume 1941 7     Filed 09/23/15     Page 153 of 200

Page 3973

them locate Donnie Allen's body.  And he confessed to them.

He confessed to them.  He told them exactly what happened.

The other thing that the judge will instruct you about in this regard is that reasonable minds cannot disagree that Marc Barnette was a model prisoner.  Every piece of evidence that you've heard in this courtroom was that he has been.  The people from Mecklenburg County jail, the three correctional officers that came in here, all told you and I think used the word model prisoner when they were talking to you, and there's never been any question about that.  For six years, six long years, he has never, ever had even as much as a write-up.  Think about that for a minute.  Think about that.

In your Holiday Inn or Western or Four Seasons or Super 8 that you're in, think about how difficult it would be to live every day with people in that hallway that you have access to and never ever say a cross word to them.  Can you do that at your work?  Have you done that for the last six years at your work, at your home, at your church, went for six years with not even a cross word?  Not only to the correction officer but to the inmates as well, the people you're sharing the hallway with.  He functions in a structured environment, structured environment, functions well.

Now, think about the Catholic school.  He went to

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/12/2002

Page 3974

the Catholic school one year, I believe it was the fifth grade. His response to that was, the best year I ever had, the best year I ever had. Why? Because of the discipline, the structure. He adapts well. He never had any write-ups in the Catholic school, never got a whipping when he came home because he had acted out in school, because the structure and the discipline is what he was craving, it's what he has been all along.

In the Mecklenburg County jail, he's in the general population parts of the time. You've heard he's been locked down 23 hours a day and out one, and that was for 12 months, one hour. Can't get in much trouble there. But in the Mecklenburg County jail, when you're in the general population, I think he even said there were fights that went on in general population, and he stayed away, never got in any trouble, never had a single write-up. So he functions in a structured environment. He has been and will continue to be a model prisoner.

And I think Dr. Carlson may have said it best when he said that what we hope and what we want are inmates who are model inmates, we appreciate that, and we give them a little more, we reward them just a little bit, you know, it may be with allowing them to be an orderly, clean toilets, sweep up the hall, but what we have found is that these people have value in their lives. Even incarcerated for the

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 155 of 200
1943

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3975

rest of his life without the possibility of release, he has usefulness, he has value, will continue to have value.

You know, he did get to that phase two that we talked about, and while in phase two, this may not be your cup of tea, you may not like car pictures, but the young man has talent, the young man has usefulness, the young man has value. That's important. That is important because he will never be in society again. Marc Barnette has forfeited the right, his right to be in a free society, but he has not forfeited his right to be incarcerated for the rest of his life in whatever society that may be and whatever structure that may be.

He is a different man. He has demonstrated that. He is not the same man he was in the spring and summer of 1996. He is a different man. And he will continue to be that different man throughout what the rest of his life may be. He has shown remorse. He has shown remorse.

You know, I think it was Mike Sanders, one of the police officers, who came in and said when they took him out there to Morrisfield Drive and he pointed to where Donnie Allen's body was, he cried. He cried. Mike Sanders said he cried. We showed you the little snippet of the taped confession, wasn't very audible, but you could sure see Marc Barnette crying.

Of course, you know, they are going to get up here

Reported By: Steve S. Huseby, RPR
800-333-2082         Huseby, Inc., an Afl         m (704) 333-9889         Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 156 of 200
1944

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/12/2002

Page 3976

and say, well, he cried because he got caught, he turned himself in, and of course part of that is for his own situation, of course it is, but part of that, and the major part of that, is remorse for what he did to Donnie Allen and Robin Williams and their family. And you saw it, and you heard it. You heard it and saw it right there. And he took responsibility and he said, I'm sorry, I am sorry. They didn't do anything to me, but I took them away from you, and for that I am deeply and truly sorry.

Bob West, oh, that all of us would have a spiritual advisor like Bob West. It would probably be a better place if all of us had the Bob Wests of the world in our spiritual body. Bob West goes to see him, drives from Roanoke, Virginia to Terre Haute to see him and help him, and Bob West says he has shown genuine remorse; he is struggling with forgiveness, he may never get that; but in his spirituality, he has shown remorse and he is struggling with forgiveness.

You saw him when Ms. Rose got up there, take this gun, show me how you load this gun. The last time I touched that gun, I killed two people. I've vowed never to touch that gun again. That's genuine remorse.

One of the other mitigating circumstances that you're going to be asked to consider is what impact, harmful impact, is this execution going to have on Mario and Angelica and little Marc, if you are permitted to consider that. You

heard Mario up here, and sure he's interested, he's his brother, but he loves him. He appreciates everything he did for him. He doesn't want to see him executed. He wants him to continue to be his big brother for whatever advice he may give him from that hell hole where he's going to be living. He wants it. He needs it. And you can ridicule all you want to the fact that Marc Barnette, when he took up with Crystal Dennis and all those other women and they were garnishing part of his wages when he was working, but he might have sent a check here or there or whatever, but he didn't support those kids, you know that, you've heard that. Maybe he thought he didn't deserve to, I don't know. But you know, you can ridicule the last month or six weeks where those children, Angelica, Marc, have tried to establish some kind of relationship with them. God bless Tasha Tollman, what a wonderful mother, what a wonderful person. She has kept these photographs, and you have seen them, to show her kids, this is who your daddy is. And, yeah, he doesn't send money, he doesn't attend the kindergarten graduation, he wasn't there when these pictures were made, he's your father, he's your father. And, you know, some of us, some folks, I should say, may have had absent fathers in their lives. And suddenly, as Ahamd Cooper, finds out, this is my father, and I'm a grown man, I'm 20 something years old, but you know what, I want to establish a relationship with that person,

Page 3978

Ahmad's words were it makes me complete, it makes me complete. That's what Marc and Angelica deserve. They want to have that relationship with their father, wherever he may be. They want to be able to correspond to him. They want to know him in whatever way, and it will be harmful to them if he's executed.

You know, the worst people, the Ted Kaczynski, the Susan Smiths, the Jeffrey Dahlmers, don't show remorse, they don't turn themselves in, they don't confess, they don't change their lives and the way in which they lead their lives, but Marc did all those things. He is not the worst of the worst.

Now, when you get back there, I hope I've touched all of the mitigating circumstances, I think I have in one way or the other, probably not by number, but you can take a look at them, but when you get back there and you start this weighing process and you think about how I feel inside about these mitigating circumstances and what it means to be a model prisoner, to be remorseful, to do the things I have tried to outline for you here and you feel because of all of those things, or any one of those things, that Marc should not suffer the ultimate punishment of death because I haven't been proven beyond a reasonable doubt that the only, only punishment appropriate in this case is death, that that other severe punishment is better and it's what I feel, then you

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3979

walk in your own shoes, as we talked to you about, and you let the others, respect them enough to walk in their shoes, and don't do it solely because of the opinion for the mere purpose of returning a verdict. Walk in your shoes, as you promised us that you would do, and allow the others to do the same.

The judge will tell you, and Ms. Lawson said three times, in his instructions, members of the jury are never required to vote for a sentence of death, never. And if anybody gets up here and says, it is your duty to sentence him to death, it is not. It is your duty to make the weighing process, to make the system work. It is never your duty to return one verdict or the other. So don't let anybody tell you that it is, because you're never required to vote for a sentence of death. It is your individual, personal decision in this matter.

Now, before I sit down, I've got to tell you about Park Dietz. You all remember Dr. Park Dietz, the celebrity psychologist, examined, evaluates all these people, he told you who they were, but he also has got this TAG Group, Threat Assessment Group, and the Murder 9:00 to 5:00, and the murder 9:00 to 5:00, as he said on the stand, is basically about domestic violence in the workplace. There are four people. These people are mass murderers. One of them is a postal worker, killed a couple of people, I think, innocent people.

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 160 of 200
1948

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/12/2002

Page 3980

One of them killed seven people, injured four on his way through the building to get to the person that he wanted to get to, that he was fixated on, that he was paranoid about, that he was depressed about, that he had threatened, and then I think one of them had shot three people and one of them shot two and then committed suicide.

But anyway, in his Murder 9:00 to 5:00, all of that, the person who killed seven innocent people on his way to get to the domestic partner that he wanted, that person, according to Parker Dietz, is not evil. None of these people are evil. These people -- it's all about being in trouble, these are troubled people.

Marc Barnette is not an evil person. He was a very troubled young man who has changed his life for the better, because he has taken full responsibility, because he is remorseful, has changed his life and can be a better person than he is today in that structured environment. Because of all of those things, life is the just and appropriate punishment, and I'd ask you to so find and return your sentencing recommendation as life without the possibility of release.

I thank you for your time.

MS. ROSE: May it please the Court, members of the jury, the defendant has asked you to show him mercy; but when Donnie and Robin begged for mercy, he showed them none.

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff·· ···· ·· ·n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC          Document 40-7          Filed 09/23/15          Page 161 of 200
1949

Page 3981

He has asked you to consider his life, but he showed their lives no consideration. The defendant has said consider the fact that my life has value, but the value of life was not on his mind when he left his home on June 21st. He didn't leave his home thinking about life. He left his home with one thing on his mind, and that was to kill.

Now, the first aggravating factor you're going to consider is substantial planning and premeditation, and the substantial planning and premeditation for these murders began back in April. Back in April, he had made up his mind that if I can't have Robin, nobody will. So this is what he did. This is what he did to show Robin, if I can't have you, nobody will. He burned her home. And what was the effect of that? This was the effect of that. She was alive. She was disfigured, but she was alive. And that wasn't enough. He wanted her dead, because if he couldn't have her, nobody would. She lived.

And so he left Roanoke. He heard she lived. Her suffering wasn't enough. He began to formulate a plan to make sure that if he couldn't have her, nobody would. Thus begins the premeditation and deliberation. And you heard about it, how he got the gun, how he packed the bag with the tools he would need and how he went to the corner of Morrisfield and Billy Graham and waited to kill. He sat there crouching in the weeds, waiting for the right moment,

Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 162 of 200

1950

**United States of America vs. Aquilia Marcivicci Barnette**  3:97CR23-V
Proceedings Before Judge Richard L. Voorhees  8/12/2002

Page 3982

the right car, to kill.  He had a plan, and he followed it.

It was ruthless, it was calculated, and it was blood thirsty, but it was a plan and he followed it.

And when he was done with Donnie Allen, when he left Donnie in the ditch to rot, you know what he did then?  He drove to Roanoke.  And when he got to Roanoke, the scene at the Williams' home was like a commando attack on an enemy fort, only here it was the women and children he targeted, only here it was the women and children that would fall within his plan, and from the moment he stepped from Donnie's car, when he cut the phone wires and until the moment he got into the car and left, he was following his plan.

And it was that plan that brings us here, members of the jury, and that is why that aggravating factor of substantial planning and premeditation is so important.  That's why it deserves a significant amount of weight, because it is the reason we're here.  And that long time planning, the ruthless calculated, blood thirsty way that he carried out these murders shows you that he had the ability to plan, and that weighs mightily, mightily in favor of death.

You're also going to consider the aggravating factors specifically related to Donnie's murder of pecuniary gain.  Pecuniary gain is killing a man because he has something that you want.  Donnie Allen had something the

Page 3983

defendant wanted. How chilling is it to think about pulling up to a red light in your city and a blood thirsty killer is crouched in the weeds with a gun waiting to kill you because you have something that they want. He wants your car and he wants your money. It's frightening. It's frightening to think that you would be killed for those reasons, and that's why pecuniary gain is a significant aggravating factor. It shows a reckless disregard for life.

But the defense says to you, he did not have the ability to appreciate the wrongfulness of his conduct. His capacity to appreciate the wrongness of his conduct was impaired. That's why they are mitigating factors.

But you've heard about free will. And if he was so sick, if he was so very sick that he couldn't think, that he couldn't plan, as they told you, we wouldn't be here. And as you heard from Dr. Halleck, the prisons are full of these borderline personality people. You know why? Because they are mean, ruthless killers. It doesn't mean you're crazy. What it says is that I have a choice. We heard that from everybody. It's about a choice.

And don't you forget about a human's free will. There's nobody that made the defendant do anything. It's free will. It's responsibility. And you've heard that you should consider the mitigating factor that the defendant has a history of untreated emotional problems.

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3984

Now, we do know that he has a history of violent conduct, and we do know that because of his violent conduct he came into the court system twice. He was convicted of felonies twice. Twice the judge looked at him and said, society will not tolerate your violence. Twice the Court said to him, you must have counseling. He was ordered by the court to get counseling. And if he was in such pain, if he was in such suffering, why didn't he do what his probation officers asked him to on those occasions? If he was suffering as we have heard, why does he not get help when he was ordered to get it? No. It's free will. It's a conscious decision, and it's a choice.

And they say, well, you know, he's not going to have any women in prison. Donnie Allen was not involved in a relationship with the defendant. Anthony Britt was not involved in a relationship with the defendant. Sonji Hill was not involved in a relationship with the defendant. Those children were not involved in a domestic relationship with the defendant. That doesn't fly.

They also tell you about their mitigator of remorse. You heard the defendant testify, and I asked him, did you think, did you really think that Robin had something going on with Bennie? Do you still believe that? Yes. You heard Robin's sweet voice on that tape saying, Bennie is just a friend. I asked him, I said, you heard her, you heard her

Reported By: Steve S. Huseby, RPR
800-333-2082    Huseby, Inc., an Affi           ı (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 165 of 200
1953

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/12/2002

Page 3985

say he's just a friend, don't you believe it?  No.  If he were remorseful, he would let go, but no, he couldn't have her, and nobody will.  And that's why these people are dead.

You're going to hear about an aggravating factor related specifically to Robin's murder, and that's that other people were put within the harmful scope.  Ms. TOMPKINS talked a little bit about that.  But once again, it shows the abilities -- the defendant's ability to appreciate what was happening at that time, that whoever got in his way was in the harmful scope.

Fortunately for Bertha Williams he was distracted by the front door as Robin ran out.  Sonji Hill obeyed his command when he pointed the gun at her and gave her an order.  She went in the house.  She told you, I went in the house because I thought he was going to shoot me.  Those kinds of thoughts, those kind of actions, that kind of reckless disregard for life, members of the jury, are why these aggravating factors are so weighing.

The aggravating factor that we contend, submit to you, weighs more than all their mitigating factors together is that of victim impact, and that is the loss, the continuing loss and the effect on the living.

They say to you, what about his brother and his children, should he receive the death penalty?  Members of the jury, he is a guilty man.  He has been convicted of

Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 166 of 200
1954

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                    8/12/2002

Page 3986

three, three crimes which carry the death penalty. He is a guilty man. Two innocent people were murdered, two innocent people were terrorized, two innocent people never got the chance that he got to tell their story. There is no comparison, and that deserves no weight.

Robin died, having survived his first attempt. She lived after the fire. And she spent the last six weeks of her life looking over her shoulder. And on June 22nd she fought her last battle with the defendant. How must it have felt to run from your home in terror? What must she have thought as she was chased by a killer? What was Robin thinking when she tripped and she fell and she was pulled to her feet by a killer? What was she thinking when she looked at her mother, the woman with whom she shared a bond and a special relationship, saw terror and helplessness in her mother's eyes, the girl who would have never hurt her mother, in her last living moments had to look at terror and haplessness in her mother's eyes? Consider that in your weighing process.

What was Robin thinking as she was shot through the back, through her heart, and as she fell dying at her mother's feet? Let's recall those moments.

(Whereupon, an audiotape played in open court).

MS. ROSE: Do you think Robin heard her mother call the name of Jesus? Do you think Robin heard the wail of

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3987

a mother who has just witnessed her child's murder?  We will never know.  We can't know that.  But what we do know is that Bertha Williams will never be the same.  To lose a child is inexplicably dreadful, but to lose a child to a murder, to witness that murder is something I can't articulate, I can't imagine that loss, and none of you probably want to.  What is the impact on the living?  There is not one mitigator, nor do all their mitigators, outweigh that loss.

What is the impact on the Allen family as they sat by the phone waiting for a call, as they sat at home hoping that this wonderful young man would come home?  Imagine those moments, those days, those hours of wondering, where is my baby.  How can you measure that?  How can you measure that?

And even after his car was found, you heard Bob Allen tell you, we thought he might be still alive.  This was hope against all hope, the kind of hope that only a parent can hold out for.  And Bob Allen, knowing it had been hot, the very last thing he did on that Tuesday morning after Donnie's car was found on Monday night, was to get two jugs of cold water, because he thought Donnie might be tied up somewhere and be thirsty.  And he didn't know that he had driven by Donnie's body as it was in the ditch.

And what of the impact on the Allen family of the condition of their child's body?  Once they were finally able to say good-bye, the hot sun and the insects had destroyed

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affili~*~ ~f ~~h~~i~~ (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 168 of 200
1956

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3988

their son's body such that it could only be identified by dental records. Imagine that. Can you? Will you? And how do you weigh that whenever you go back to consider victim impact and the aggravating factors? How do you weigh that?

Life in prison. It's not life as we know it, but it's life. While the defendant is pursuing his hobby of painting his pictures, Donnie and Robin are in a dark and silent grave. When the defendant steps out into the recreation yard and feels sunshine on his face and breathes fresh air in his lungs, Donnie and Robin are in a dark and silent grave.

When the defendant's family and his minister come to visit him, to hug him, to show him love, Donnie and Robin are in dark and silent grave, and their families will never get that chance. Is that justice? Is that justice, members of the jury? Is that befitting of this crime? Is that punishment befitting of this crime?

And the defendant says, I will be thinking of them each and every moment. No, he won't. He'll be making plans, building relationships, seeing his family, friends, working, painting, living life, and Donnie and Robin are in a dark and silent grave. Why does he deserve more than they have? Is that justice? Why is he more deserving of fresh air and sunshine than Donnie and Robin who are in a dark and silent grave? Why is his life more valuable than those two precious

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3989

lives that he took? Ask yourself if that is justice.

And when you go back there and you begin to weigh those aggravating and those mitigating factors, ask yourself this question, how much does a teardrop of a grieving parent weigh? How much grief and sorrow is in a single teardrop? Because there have been a lot shed for these two wonderful people, two innocent people. Put that on your scales when you ask yourself what should we do.

And the judge is going to give you the law, and that law is going to guide you in your deliberations. And you heard much about this weighing process and it is not a numbers factor. It's weight. It's impact. It's the substantialness of those factors.

Now, I want you to think back to the day that you were selected as a juror. Each of you was asked, can you render a verdict of death? And each of you said yes. The time has come. The facts say that is the appropriate punishment. The law says it is a justified punishment. The defendant has been convicted of three, three offenses, and there's only a few within the law of the land that says, the death penalty is appropriate, and he's been convicted of three of them.

The death penalty is appropriate. It's justified. And the law of the land says it is applicable. The defendant is deserving of no less. The facts deserve no less. Why?

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affili... of Srborion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 170 of 200
1958

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3990

Why, members of the jury, would he deserve more than Donnie and Robin?

Anything less than the death penalty will be giving him a victory, a victory for what he has done, because he doesn't want the death penalty, and you will be giving him a victory in saying your life means more to us than these two.

Your verdict of death will bring justice to this community. Your verdict of death is going to bring peace to these families, and your verdict of death is final. It's finally going to put Donnie and Robin to rest. Do that.

THE COURT: Members of the jury, now that the arguments are concluded, I'll go ahead and ask you to take a break, and then we'll be able to get through all the instructions when you get back. So please continue to hold what you've got, keep an open mind about the case, and don't discuss it, and we will begin in approximately 10 to 15 minutes when you come back. Thank you very much.

(Jury out at 2:26 p.m.)

(Brief recess.)

THE COURT: Are the parties ready to resume and go forward with the instructions?

MR. BENDER: Yes.

THE COURT: The record will show that each juror will have a copy of the instructions to follow along as the Court reads them.

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 171 of 200
1959

Page 3991

May we have the jury, please.

(Jury in at 2:51 p.m.)

THE COURT:  Members of the jury, there are currently 12 sets of those instructions in the jury box, and we're going to have four more here in just a minute.  I would like to ask you to look on, in other words, pass them down enough so that several of you can use them two at a time and everybody will be able to follow.  And as I say, shortly we'll have a copy for each of you.

Let's turn to Page 21.  That's where we left off.  And if any of you finds that a page is missing or something, please look on with your neighbor, but hopefully they are all in the proper order and present and accounted for.  And I'll continue the instructions I was giving you earlier this morning on Page 21 here.  Is everybody with me?

Okay.  The government has the burden of proving to you its contentions and any aggravating factors beyond a reasonable doubt.  You will be instructed about this in more detail in just a few minutes.

Now, the term reasonable doubt means just what it says, it's a doubt based upon reason and common sense.  Its meaning is no doubt self-evident and understood by you, and the Court will not attempt to define the term further.

By the way, members of the jury, if you would rather just listen, you're free to do that, because you will

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Snherinn  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 172 of 200
1960

Page 3992

have a copy of the instructions in the jury room with you with an index if you decided later during deliberations that you wanted to refer to something. But in any event, you have the option of reading or listening, whichever suits you best.

Now, then, members of the jury, the defendant has been found guilty of the offenses alleged in Count 7, 8, and 11 of the indictment. An indictment is not evidence. Now, those counts are as follows: Now, for ease of reference, Count 7 may be said to have alleged the crime of car-jacking resulting in death. Count 7 alleges as follows: On or about June 22, 1996, in Mecklenburg County, within the Western District of North Carolina, the defendant, Aquilia Marcivicci Barnette, with attempt to cause death or serious bodily harm, did knowingly, willfully, and unlawfully take by force, violence, and intimidation, that is, he shot to death and took from the person of Donald Lee Allen a motor vehicle which had been shipped, transported, and received in interstate foreign commerce, that is, a 1994 Honda Prelude, vehicle identification number as shown there on the page, in violation of Title 18, U.S. Code, Section 21193.

Like Count 7, Count 8 involves the death of Donald Lee Allen, but a different offense is charged, and the defendant was found guilty of both charges. Count 8 may be said to allege the crime of use of a firearm in a crime of violence, namely, car-jacking, resulting in death.

Case 3:12-cv-00327-MOC     Document 16-17     Filed 09/23/15     Page 173 of 200
1961

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3993

Count 8 alleges as follows: On or about June -- the 22nd day of June, 1996, in Mecklenburg County, in the Western District of North Carolina, the defendant, Aquilia Marcivicci Barnette, knowingly used and carried a firearm, that is, a sawed off, Winchester semiautomatic shotgun during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, the car-jacking set forth in Count 7 above, and in the course of this violation caused the death of Donald Lee Allen through the use of a firearm, which killing is a murder as defined in Title 18, U.S. Code, Section 11-11, in that the defendant, with malice aforethought, did unlawfully kill Donald Lee Allen by shooting him with a firearm, willfully, deliberately, maliciously, and with premeditation, in violation of Title 18, U.S. Code, Section 924C1 and I21.

Count 11 may be said to allege the crime of use of a firearm in a crime of violence, namely, interstate domestic violence, resulting in death. Count 11 alleges as follows, on or about the 22nd day of June, 1996, in Mecklenburg County, in the Western District of North Carolina, and in the Western District of Virginia, the defendant, Aquilia Marcivicci Barnette, knowingly used and carried a firearm, that is, a sawed off Winchester semiautomatic shotgun during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, the act

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi'···· ·f ····'· ···'·· (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 174 of 200
1962

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3994

of interstate domestic violence set forth in Count 10, and in the course of this violation caused the death of Robin Williams through the use of a firearm, which killing is a murder as defined in Title 18, U.S. Code, Section 11-11, in that the defendant, with malice aforethought, did unlawfully kill Robin Williams by shooting her with a firearm willfully, deliberately, maliciously, and with premeditation in violation of Title 18, U.S. Code, Section 924c1 and I21.

You must now consider whether imposition of a sentence of death is justified as to any one, two, or all three of those counts, or whether the defendant should be sentenced to life imprisonment without the possibility of release for commission of these crimes.

You must make this decision separately for each count. You are not required to make the same decision on each count, and your deliberations must be separate as to each count. The law leaves this decision exclusively to you, the jury. If you determine that the defendant should be sentenced to death or to life imprisonment without the possibility of release, the Court is required to impose that sentence.

I will now instruct you as to the process you must follow separately in making your verdict. This process must be followed as to each of Counts 7, 8, and 11 separately.

Now, two terms that you've already heard and will

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affil̃˙·˙· ˙f ˙·˙·˙·˙·˙·˙· (704) 333-9889          Fax (704) 372-4593

Case 3:12-cv-00327-MOC     Document 197     Filed 09/23/15     Page 175 of 200
1963

Page 3995

hear throughout this phase of the case are aggravating factors and mitigating factors. The word aggravate means to make worse or to make more offensive or to intensify. The word mitigate means to make less severe or to moderate.

An aggravating factor is a fact or circumstance which would tend to support imposition of the death penalty. A mitigating factor is any aspect of the defendant's character, record, or background, any circumstance of the offense, or any other relevant fact or circumstance which might indicate that the defendant should not be sentenced to death.

In the death penalty statute, aggravating factors are listed. These are called statutory aggravating factors. As I instructed you earlier, before you may consider imposition of the death penalty for any one, two, or all three of Counts 7, 8, or 11, you must find that the government proved at least one of these aggravating factors specifically listed in the death penalty statute, and your finding must be unanimous and beyond a reasonable doubt.

There also may be nonstatutory aggravating factors, which are those specifically not set out in the death penalty statute. Again, your finding that any nonstatutory aggravating factor exists must be unanimous and beyond a reasonable doubt.

You must determine the existence or nonexistence of

Reported By: Steve S. Huseby, RPR
800-333-2082        Huseby, Inc., an Aff        n (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 176 of 200
1964

Page 3996

the aggravating factors separately for each of Counts 7, 8, and 11. You are not allowed to take an aggravating factor from one count and apply it to another count. You may not substitute or add any other factor in aggravation but must consider only those alleged by the government.

The defendant has the burden of proving any mitigating factors. However, there's a different standard of proof as to mitigating factors. You need not be convinced beyond a reasonable doubt about the existence of a mitigating factor. You need only be convinced by the preponderance of the evidence or its greater weight that it is more likely true than not true in order to find that it exists.

A unanimous finding is not required, and any one of you may find the existence of a mitigating factor. Now, if you have found that at least one statutory aggravating factor exists, you then must weigh the aggravating factor or factors you found to exist against any mitigating factors you found to exist to determine the appropriate sentence.

I will give you detailed instructions regarding the weighing of aggravating and mitigating factors before you begin your deliberations. However, I instruct you now that you must not simply count the number of aggravating and mitigating factors and reach a decision based upon which number is greater. You must consider the weight and the value of each factor.

Page 3997

In making all of the determinations you are required to make in the sentencing phase, you may consider any evidence that was presented during the sentencing hearing in which you just participated over the last several weeks.

Now, regardless of any opinion you may have as to what the law may be or should be, it would be a violation of your oaths as jurors to base your verdict upon any view of the law other than that given to you in these instructions. The instructions I am giving you now are a complete set of instructions on the law applicable to the sentencing decision. I have prepared them to ensure that you are clear in your duties at this extremely serious stage of the case.

I have also prepared special verdict forms, one as to each count, that you must complete. Now, the forms detail special findings you must make in this case and will help you perform your duties properly. Now, one comment that's not on your page there, I will be going through the instructions for each of the three counts separately. You will recognize a pattern as I go through these counts, but it will avoid confusion for me to go through them separately.

Now back on Page 28, before you may consider the imposition of the death penalty, the government must prove to you unanimously and beyond a reasonable doubt that the defendant was 18 years of age or older at the time of each of the offenses. If you unanimously make that finding, you

Page 3998

should so indicate on the appropriate pages of the special

verdict forms and continue in your deliberations.  If you do

not unanimously make that finding, you should so indicate on

the appropriate pages of the special verdict forms and no

further deliberations will be necessary as to any count or

counts where that applies.

I will now instruct you as to the process you must

follow with respect to your deliberations for each of Counts

7, 8, and 11.  Before you may consider the imposition of the

death penalty for the commission of Count 7, you must also

unanimously find beyond a reasonable doubt that the defendant

intentionally killed or committed acts resulting in the death

of Donald Lee Allen in one or more of the manners described

below.

If you unanimously make at least one of these

findings as to the murder of Donald Lee Allen in Count 7, you

should so indicate on the appropriate page of the verdict

sheet form and continue your deliberations.  If you do not

unanimously make at least one of these findings as to the

murder of Donald Lee Allen in Count 7, you should so indicate

on the appropriate page of the special verdict form and no

further deliberations will be necessary as to Count 7.

The government must prove unanimously and beyond a

reasonable doubt any one of the following contentions as to

the murder of Donald Lee Allen in Count 7:  1A, the defendant

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3999

intentionally killed Donald Lee Allen. To establish that the defendant intentionally killed the victim, the government must show that the defendant killed the victim with a conscious desire to cause the victim's death. And 1B, the defendant intentionally inflicted serious bodily injury that resulted in the death of Donald Lee Allen. Here, the government must prove that the defendant deliberately caused serious injury to the victim's body which in turn caused the victim's death. Serious bodily injury means a significant or considerable amount of injury which involves a substantial risk of death, unconsciousness, protracted and obvious disfigurement, or protracted loss or impairment of a body member or mental faculty.

And the next one, the third one, the defendant intentionally participated in an act contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person other than one of the participants in the offense and the victim, Donald Lee Allen, died as a result.

The government must prove that the defendant deliberately shot Donald Lee Allen with a conscious desire that the victim be killed or that lethal force be employed against the victim. The phrase lethal force means an act or acts of violence capable of causing death.

And the fourth one is that the defendant

Case 3:12-cv-00327-MOC    Document 107-8  Filed 09/23/15    Page 180 of 200
1968

Page 4000

intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Donald Lee Allen died as a direct result of the act by shooting.

Now, intent or knowledge may be proved like anything else. You may consider any statements made and acts done by the defendant and all the facts and circumstances in evidence which may aid in a determination of defendant's knowledge or intent. You may but are not required to infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. You will recall the Court's earlier instruction on knowledge and intent which was a little bit longer than the one I gave you right there.

Now, if you unanimously find beyond a reasonable doubt the existence of at least one or more of the requisite mental states as discussed in the previous section, you must then proceed to determine whether the government has proven unanimously and beyond a reasonable doubt the existence of any of the following alleged statutory aggravation -- excuse me, aggravating factors with respect to the same murder in Count 7.

Now, in this case the government has alleged as statutory aggravating factors as to Count 7 first that the

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affi_____ __ _____ (704) 333-9889          Fax (704) 372-4593
800-333-2082

Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 181 of 200

1969

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4001

defendant committed the offense in Count 7 in the expectation of the receipt of something of pecuniary value; second, that the defendant committed the offense after substantial planning and premeditation to cause the death of Donald Lee Allen. The law permits you to consider and discuss at this point only statutory aggravating factors specifically claimed by the government which the government alleges exist as to Count 7.

Now, the first aggravating factor contended for by the government is the defendant committed the offense in Count 7 in the expectation of the receipt of anything of pecuniary value, namely, a Honda automobile and Donald Lee Allen's wallet and money.

To establish that a defendant committed an offense in the expectation of the receipt of anything of pecuniary value, the government must prove unanimously and beyond a reasonable doubt in essence that the defendant committed the offense in the expectation of anything in the form of money, property, or anything else having some economic value, benefit, or advantage.

There's no requirement that the government prove that something of pecuniary value actually changed hands. The words receipt or expectation of receipt should be given their ordinary, everyday meaning, which includes obtaining or expecting to obtain something. In this case, the government

Page 4002

alleges that the pecuniary gain is the expectation of taking Donald Lee Allen's motor vehicle and the victim Donald Lee Allen's wallet and money.

Now, the second aggravating factor the government contends for is that the defendant committed the offense of car-jacking resulting in death as charged in Count 7 after substantial planning and premeditation to cause the death of Donald Lee Allen.

Planning means mentally formulating a method for doing something or achieving some end. Premeditation means thinking or deliberating about something and deciding whether to do it beforehand. Substantial planning and premeditation means a considerable or significant amount of planning, and premeditation above and beyond the minimum required for the commission of the offense alleged in Count 7.

If the government does not satisfy each of you beyond a reasonable doubt that at least one of these statutory aggravating factors exists for Count 7 in the murder of Donald Lee Allen, you should enter a finding to that effect as to that particular count of the special verdict form, and no further deliberations as to that particular count will be necessary.

In the event that you unanimously find that the government has proven beyond a reasonable doubt the existence of at least one of the statutory aggravating factors with

Reported By: Steve S. Huseby, RPR
800-333-2082    Huseby, Inc., an Affil          ı (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 183 of 200
1971

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4003

respect to the murder of Donald Lee Allen in Count 7, please enter that finding on the appropriate page of the special verdict form and continue your deliberations.

It would be necessary for you to make that unanimous finding as to the same allegation of aggravating factor. It wouldn't do for you to -- in other words, a unanimous verdict as to one aggravating factor means 12 voting with respect to that factor.

Now, then, you must then consider whether the government has proven the existence of any nonstatutory or miscellaneous aggravating factors as to Count 7 in the murder of Donald Lee Allen.

As in the case for statutory aggravating factors, you must unanimously agree that the government has proven beyond a reasonable doubt the existence of any of the alleged and nonstatutory aggravating factors before you may consider such factors in your deliberations on the appropriate punishment for the defendant in this case.

The law permits you to consider and discuss only those aggravating factors specifically claimed by the government with respect to Count 7 and listed below. You are not free to consider any other facts in aggravation which you conceive of on your own.

The nonstatutory aggravating factors that the government has alleged in this case as to Count 7 are, first,

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi            n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 184 of 200
1972

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4004

the defendant caused harm to the family of Donald Lee Allen as a result of the impact of the killing on the family of Donald Lee Allen; and second, the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society; third, the defendant intentionally killed two people in that in addition to killing Donald Lee Allen, the defendant also killed Robin Williams.

In the event that you unanimously find that the government has proved beyond a reasonable doubt the existence of any of these nonstatutory aggravations with respect to Count 7, please enter that finding on the appropriate page of the special verdict form and continue in your deliberations. Even if you do not find the existence of any nonstatutory aggravating factors, you should continue your deliberations as to Count 7.

Now, before you may consider the appropriate punishment for the commission of Count 7, you must consider whether the defendant has established the existence of mitigating factors. A mitigating factor is any fact about the defendant's life, background, record, or character, or about the circumstances surrounding the intentional killing of Donald Lee Allen, or any other relevant fact which would suggest, in fairness, that a sentence of death is not justified.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4005

Now, unlike aggravating factors, which you must unanimously find proved beyond a reasonable doubt in order for you to consider them in your deliberation, the law does not require unanimity with regard to mitigating factors. Any juror may find the existence of a mitigating factor and then must consider it in this case. Also, unlike aggravating factors, you do not need to find the existence of any statutory mitigating factor before you can proceed to determine the existence of any nonstatutory mitigating factor.

It is the defendant's burden to establish any mitigating factors, but only by a preponderance of the evidence. This is a lesser standard of proof under the law than proof beyond a reasonable doubt. The factor is established by a preponderance of the evidence if its existence is shown to be more likely so than not so. In other words, a preponderance of the evidence means such evidence as when considered and compared with that opposed to it produces in your mind the belief that what is sought to be established is more likely than not true.

In a special verdict form relating to mitigating factors, you are asked to report the total number of jurors that find a particular mitigating factor established by a preponderance of the evidence.

The statutory mitigating factors which the

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affil········· ···n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 186 of 200
**1974**

Page 4006

defendant asserts he has proven by a preponderance of the evidence are as follows; one, the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired regardless of whether the capacity was so impaired as to constitute a defense to the charge; and second, the other factors in the defendant's childhood, background or character mitigate against imposition of the death sentence.

The nonstatutory mitigating factors which the defendant asserts he has proved by a preponderance of the evidence are as follows: One, Marc Barnette has accepted full responsibility for his actions; two, Marc Barnette has remorse; three, Marc Barnette was abused by his father; four, Marc Barnette was affected by growing up in a family environment of violence, drugs and alcohol abuse; five, Marc Barnette had repeated exposure to violence in the home; six, Marc Barnette attempted to protect his brother, Marion, from the damaging effects of parental violence and neglect; seven, untreated emotional problems; eight, at the time of these crimes Marc Barnette was experiencing a depressive episode; nine, Marc Barnette does well in a structured environment; ten, Marc Barnette cooperated with police; eleven, Marc Barnette can serve a useful purpose to others in a prison environment; twelve, at the time of these offenses, Marc Barnette was experiencing irrational and obsessive thoughts;

Reported By: Steve S. Huseby, RPR
800-333-2082 Huseby, Inc., an Affi¨ ˙ ˙˙ ˙ ı (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 10-7 Filed 09/23/15 Page 187 of 200
1975

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 4007

and thirteen, Marc Barnette's brother and children will be harmed by his execution.

On the special verdict form you are asked to identify any mitigating factors, nonstatutory or statutory, that any of you finds has been proved by a preponderance of the evidence. That would be factors in addition to the ones that are listed in 1 through 13 there and that any of you finds has been proved as indicated by the preponderance of the evidence.

Now, in addition there are three nonstatutory mitigating factors which the Court instructs you to find; one, Marc Barnette was neglected by his mother; two, Marc Barnette turned himself into police; and three, Marc Barnette has been a model prisoner. The Court instructs you that these three mitigating factors have been established by a preponderance of the evidence and you should so indicate on the verdict form.

Excuse me just a second. With respect to Count 7, if you have found at least one of the four requisite mental states and the existence of at least one statutory aggravating factor and the existence or absence of any statutory and nonstatutory mitigating factors, you will then engage in a weighing process of the statutory and nonstatutory aggravating factors and any statutory and nonstatutory mitigating factors as to Count 7.

Page 4008

In determining the appropriate sentence, all of you must weigh the aggravating factor or factors that you unanimously found to exist as to Count 7, whether statutory or nonstatutory, and each of you must weigh any statutory and nonstatutory mitigating factors that you individually found to exist as to Count 7.

In engaging in the weighing process, you must avoid any influence of passion, prejudice, or undue sympathy. Your deliberations should be based upon the evidence you have seen and heard and the law on which I have instructed you.

The process of weighing aggravating and mitigating factors against each other, or weighing aggravating factors alone, if there are no mitigating factors, in order to determine the proper punishment is not a mechanical or mathematical process. In other words, you should not simply count the number of aggravating and mitigating factors and each -- and reach a decision based on which number is greater, you should consider the weight and value of each factor.

The law contemplates that different factors may be given different weights or values by different jurors, thus you may find that one mitigating factor outweighs all aggravating factors combined or that the aggravating factor or factors proven do not standing alone justify imposition of a sentence of death. Each individual juror is to decide what

Page 4009

weight or value is to be given to a particular factor in your decision making process.

The members of the jury are never required to vote for a sentence of death. In other words, in the process of weighing aggravating factors and mitigating factors, if any, there is no required result. If you unanimously conclude that the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist such that a sentence of death is justified as to Count 7, or in the absence of any mitigating factors that the aggravating factor or factors are in themselves sufficient to justify a sentence of death, you shall record your determination that death is justified on the special verdict form.

On the other hand, if you do not so conclude, then you would answer no to this issue on the special verdict form and then go on to the next issue, which asks if based on this weighing process you have unanimously determined that a sentence of life imprisonment without a possibility of release should be imposed as to Count 7.

I will now instruct you as to the process you must follow with respect to your deliberations for Count 8. And you'll recognize some familiarity as I go through this with what I already instructed you concerning Count 7.

Before you may consider the imposition of the death

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 190 of 200
1978

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4010

penalty for the commission of Count 8, you must also unanimously find as to that specific count beyond a reasonable doubt that the defendant intentionally killed or committed acts resulting in the death of Donald Lee Allen in one or more of the manners described below.

If you unanimously make at least one of these findings as to the murder of Donald Lee Allen in Count 8, you should so indicate on the appropriate page of the special verdict form and continue your deliberations. If you do not unanimously make at least one of these findings as to the murder of Donald Lee Allen in Count 8, you should so indicate on the appropriate page of the special verdict form and no further deliberations will be necessary as to Count 8.

The government must prove unanimously and beyond a reasonable doubt that any of the following contentions as to the murder of Donald Lee Allen. In Count 8, you must find any of these four, and the first one the government alleges is the defendants intentionally killed Donald Lee Allen. To establish that the defendant intentionally killed the victim, the government must prove that the defendant killed the victim with a conscious desire to cause the victim's death; secondly, the government (sic) intentionally inflicted serious bodily injury that resulted in the death of Donald Lee Allen. The government must prove that the defendant deliberately caused serious injury to the victim's body which

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff￣ ￣ ￣ n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 207     Filed 09/23/15     Page 191 of 200
1979

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/12/2002

Page 4011

in turn caused the victim's death.

Serious bodily injury means a significant or considerable amount of injury which involved a substantial risk of death, unconsciousness, protracted, and obvious disfigurement or protractive loss or impairment of a body member, organ, or mental faculty.

And 1C, the defendant intentionally participated in an act contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person other than one of the participants in the offense and the victim, Donald Lee Allen, died as a result.

The government must prove that the defendant deliberately shot Donald Lee Allen with a conscious desire that the victim be killed or that lethal force be employed against the victim. The phrase lethal force means an act or acts of violence capable of causing death.

And fourth, the defendant intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a person other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Donald Lee Allen died as a direct result of the act by shooting. And you will recall the Court's earlier instructions on knowledge and intent.

Now, if you unanimously find beyond a reasonable

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4012

doubt the existence of at least one of the requisite mental states as discussed in the previous section, you must then determine and proceed to determine whether the government has proven unanimously and beyond a reasonable doubt the existence of any of the following alleged statutory aggravating factors with respect to the same murder in Count 8.

In this case the government has alleged as statutory aggravating factors as to Count 8, first, that defendant committed the offense in Count 8 in expectation of the receipt of something of pecuniary value; and second, the defendant committed the offense in Count 8 after substantial planning and premeditation to cause the death of Donald Lee Allen.

The Court permits you to consider and discuss at this point only statutory aggravating factors. That would mean these two specifically claimed by the government, which the government alleges exist as to Count 8.

The first aggravating factor contended for by the government is the defendant committed the offense in Count 8 in the expectation of the receipt of anything of pecuniary value, namely a Honda automobile and Donald Lee Allen's wallet and money. You will recall the Court's earlier instruction as to what pecuniary value means, because what is there at the second paragraph of Page 44 is identical to what

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affil_____ __ _____ (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 107    Filed 09/23/15    Page 193 of 200

1981

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4013

I read to you earlier with respect to Count 7.

So moving on to Page 45, the second aggravating factor that the government contends is that the defendant committed the offense of use of a firearm in a crime of violence, namely, car-jacking resulting in death as charged in Count 8 after substantial planning and premeditation to cause the death of Donald Lee Allen.

Planning means mentally formulating a method for doing something or achieving some end. Premeditation means thinking or deliberating about something and deciding whether to do it beforehand. Substantial planning and premeditation means a considerable or significant amount of planning and premeditation above and beyond the minimum required for the commission of the offense described in Count 8.

Now, if the government does not satisfy each of you beyond a reasonable doubt that at least one of these statutory aggravating factors exists for Count 8, you should enter a finding to that effect as to that count, that is, Count 8, on the special verdict form and no further deliberations as to that count will be necessary.

In the event that you unanimously find that the government has proven beyond a reasonable doubt the existence of at least one of the statutory aggravating factors with respect to the murder of Donald Lee Allen in Count 8, please enter that finding on the special verdict form and continue

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4014

your deliberations.

You must then consider whether the government has proved the existence of any nonstatutory or miscellaneous aggravating factors as to Count 8. As in the case for statutory aggravating factors, you must unanimously agree that the government has proved beyond a reasonable doubt the existence of any of the alleged nonstatutory aggravating factors before you may consider such factors in your deliberations on the appropriate punishment for the defendant as to this count.

The law permits you to consider and discuss only those aggravating factors specifically claimed by the government with respect to Count 8 and listed below. You are not free to consider any other facts in aggravation which you conceive of on your own.

The nonstatutory aggravating factors that the government has alleged in this case as to Count 8 are that, one, the defendant caused harm to the family of Donald Lee Allen as a result of the impact of the killing on the family of Donald Lee Allen; second, the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society; and third, that the defendant intentionally killed two people in that in addition to killing Donald Lee Allen, the defendant also killed Robin Williams.

Page 4015

In the event that you unanimously find that the government has proved beyond a reasonable doubt the existence of any of these nonstatutory aggravating factors with respect to Count 8, please enter that finding on the appropriate page of the special verdict form and continue your deliberations.

Even if you do not find the existence of any nonstatutory aggravating factors, you should continue your deliberations as to Count 8.

Before you may consider the appropriate punishment for the commission of Count 8, you must consider whether the defendant has established the existence of any mitigating factors. A mitigating factor -- you'll recall, you heard earlier, the Court has instructed you to find three mitigating factors, so, of course, at least three of them have been established.

Going on then, a mitigating factor is any fact about the defendant's life, background, record, or character, or about the circumstances surrounding the intentional killing of Donald Lee Allen, or any other relevant fact that would suggest in fairness that a sentence of death is not justified.

Now, unlike aggravating factors which you must unanimously find proved beyond a reasonable doubt, in order for you to consider them in your deliberations, the law does not require unanimity with regard to mitigating factors. And

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4016

any juror may find the existence of a mitigating factor and then must consider it in this case. Also, unlike aggravating factors, you do not need to find the existence of any statutory mitigating factor before you can proceed to determine the existence of any nonstatutory mitigating factor.

It is the defendant's burden to establish any mitigating factors, but only by a preponderance of the evidence. This is a lesser standard of proof under the law than proof beyond a reasonable doubt.

A factor is established by a preponderance of the evidence if its existence is shown to be more likely so than not so. In other words, a preponderance of the evidence means such evidence as when considered and compared with that opposed to it produces in your mind a belief that what is sought to be established is more likely than not true.

In the special verdict form relating to mitigating factors, you are asked to report the total number of jurors that find a particular mitigating factor established by a preponderance of the evidence.

The statutory mitigating factors which the defendant asserts he has proved by a preponderance of the evidence are, first, the defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly impaired,

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4017

regardless of whether the capacity was so impaired as to constitute a defense to the charge.

Secondly, the other factors in the defendant's childhood, background or character, mitigate against imposition of the death penalty, excuse me, the death sentence. The nonstatutory mitigating factors which the defendant asserts he has proved by a preponderance of the evidence are as follows: One, Marc Barnette has accepted full responsibility for his actions; two, he has remorse; three, he was abused by his father; and four, he was affected by growing up in a family environment of violence, drugs and alcohol abuse; and fifth, he had repeated exposure to violence in the home; sixth, he attempted to protect his brother, Mario, from the damaging effects of parental violence and neglect; seven, he had a history of untreated emotional problems. At the time of these crimes, Marc Barnette was experiencing a depressive episode. Marc Barnette does well in a structured environment. Marc Barnette cooperated with police. Marc Barnette can serve a useful purpose to others in a prison environment. At the time of these offense, Marc Barnette was experiencing irrational and obsessive thoughts; and thirteen, his brother and children will be harmed by his execution.

Now, on the special verdict form you are asked to identify any mitigating factors, statutory or nonstatutory,

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 198 of 200
1986

Page 4018

that any of you finds has been proved by a preponderance of the evidence. And there's also a space there to put in mitigating factors that any of you finds has been proved by a preponderance of the evidence, whether the defendant listed it or not.

In addition, there are three nonstatutory mitigating factors which the Court instructs you to find; one, Marc Barnette was neglected by his mother; two, he turned himself in to police; and three, he has been a model prisoner. The Court instructs you that these three mitigating factors have been proven by a preponderance of the evidence, and you should so indicate on the form.

Now, with respect to Count 8, if you have found at least one of the four requisite mental states and the existence of at least one statutory aggravating factor and then gone on to determine the existence or absence of any statutory or nonstatutory mitigating factor, you will then engage in a weighing process of the statutory and nonstatutory aggravating factors and any statutory and nonstatutory mitigating factors as to Count 8.

In determining the appropriate sentence, all of you must weigh the aggravating factor or factors that you unanimously found to exist as to Count 8, whether statutory or nonstatutory, and each of you must weigh any statutory and nonstatutory mitigating factors that you individually found

Case 3:12-cv-00327-MOC     Document 107     Filed 09/23/15     Page 199 of 200

1987

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4019

to exist as to Count 8.

In engaging in the weighing process, you must avoid any influence of passion, prejudice, or undue sympathy. Your deliberations should be based upon the evidence you have seen and heard and the law on which I have instructed you.

The process of weighing aggravating and mitigating factors against each other or weighing aggravating factors alone, if there are no mitigating factors, in order to determine the proper punishment is not a mechanical or mathematical process. In other words, you should not simply count the number of aggravating and mitigating factors and reach a decision based upon which number is greater. You should consider the weight and value of each factor.

The law contemplates that different factors may be given different weights or values by different jurors, thus you may find that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factor or factors proven do not, standing alone, justify an imposition of a sentence of death.

Each individual juror is to decide what weight or value is to be given to a particular factor in your decision making process. The members of the jury are never required to vote for a sentence of death. In other words, in the process of weighing aggravating factors and mitigating factors, if any, there is no required result.