United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/12/2002

Page 4020

If you unanimously conclude that the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist such that a sentence of death is justified as to Count 8, or in the absence of any mitigating factors that the aggravating factor or factors are in themselves sufficient to justify a sentence of death, you shall record your determination that death is justified on the special verdict form.

On the other hand, if you do not so conclude, then you would answer no to this issue on the special verdict form and then go on to the next issue, which asks if, based on this weighing process, you have unanimously determined that a sentence of life in prison without the possibility of release should be imposed as to Count 8.

Excuse me just a moment.

MR. BENDER: May we be heard just one moment?

THE COURT: Yes. Members of the jury, don't go on looking at the instructions, although you can look back over some of them. But just be at ease for a moment and I'll speak to counsel at the side-bar. Excuse us.

(Side bar outside the presence of the jury as follows:)

MR. BENDER: As to Counts 8 and 11, you have omitted the first element, which is the age, you do it as to Count 7; and since the special verdict form in each one of them first element has age, I think I you need to go back.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4021

THE COURT: I'll remind the jury that the age has to be found as to each count.

MR. BENDER: Okay. That's the only thing I saw.

THE COURT: Right, thank you.

(Side bar concluded).

THE COURT: Thank you, members of the jury. Okay. For those of you following along, we're on Page 53. I'll now instruct you as to the process you must follow with respect to your deliberations for Count 11.

And by the way, you'll recall, of course, that before you go on with any of these counts, 7, 8, or 11, you would have to make the finding as to the defendant's age being at least 18, that is, 18 or more, before you would go on. But if you have found that, and the jury form, that is, the special verdict form, goes through that process for you, in a sequence as to each count, before you may consider the imposition of the death penalty for the commission of Count 11, after you consider age, you must also unanimously, as to that specific count, find beyond a reasonable doubt that the defendant intentionally killed or committed acts resulting in the death of Robin Williams in one or more of the manners described below.

If you unanimously make at least one of these findings as to the murder of Robin Williams in Count 11, you

Reported By: Steve S. Huseby, RPR
800-333-2082     Huseby, Inc., an Affi          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 108     Filed 09/23/15     Page 2 of 166
1990

Page 4022

should so indicate on the appropriate page of the special verdict form and continue your deliberations. If you do not unanimously make at least one of the findings as to the murder of Robin Williams in Count 11, you should so indicate on the appropriate page of the special verdict form and no further deliberations will be necessary as to Count 11.

Now, the government must prove unanimously and beyond a reasonable doubt any one of the following contentions as to the murder of Robin Williams in Count 11, and all the jurors would have to make that unanimous finding as to -- finding as to any one of these mental states that you must find before it can be considered established.

First, the defendant intentionally killed Robin Williams. To establish that the defendant intentionally killed this victim, the government must prove that the defendant killed the victim with a conscious desire to cause the victim's death; secondly, the defendant intentionally inflicted serious bodily injury that resulted in the death of Robin Williams by shooting. The government must prove that the defendant deliberately caused serious injury to the victim's body which in turn caused the victim's death. Serious bodily injury means a significant or considerable amount of injury which involves a substantial risk of death, unconsciousness, protracted and obvious disfigurement, or protracted loss or impairment of a body member, organ, or

Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 3 of 166
1991

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4023

mental faculty; and third, the defendant intentionally participated in an act contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person other than one of the participants in the events and the victim, Robin Williams, died as a result.

The government must prove that the defendant deliberately shot Robin Williams with a conscious desire that the victim be killed or that lethal force be employed against the victim. The phrase lethal force means an act or acts of violence capable of causing death.

And the fourth one alleged is as follows, the defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person other than one of the participants in the events such that participation in the act constituted a reckless disregard for human life, and Robin Williams died as a direct result of the act by shooting. You will recall this Court's earlier instruction about knowledge and intent.

If you unanimously find beyond a reasonable doubt the existence of at least one of the requisite mental states as found and discussed in the previous section, you must then proceed to determine whether the government has proven beyond a reasonable doubt unanimously the existence of any of the following alleged statutory aggravating factors with respect

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi'·-·- -· °-·--·-n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 4 of 166
1992

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4024

to the murder in Count 11: In this case the government has alleged as statutory aggravating factors as to Count 11 that in the commission of the offense in Count 11 the defendant knowingly created a grave risk of death to one or more persons in addition to the intended victim; and second, the defendant committed the offense in Count 11 after substantial planning and premeditation to cause the death of Robin Williams. The law permits you to consider and discuss at this point only statutory aggravating factors specifically claimed by the government which the government alleges exist as to Count 11.

The first aggravating factor contended for by the government is in the commission of the offense in Count 11 the defendant knowingly created a grave risk of death to one or more persons in addition to the intended victim, namely Bertha Williams and Sonji Hill.

To establish the existence of this factor, the government must prove unanimously and beyond a reasonable doubt that the defendant knowingly created a grave risk of death to one or more persons in addition to the victim of the offense in committing the offense. Persons in addition to the victims includes innocent bystanders in the zone of danger created by the defendant's acts, but does not include other participants in the offense, if any.

Grave risk of death means a significant and

Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 5 of 166
1993

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4025

considerable possibility that another person might be killed.

Knowingly creating such a risk means that the defendant was

conscious and aware that his conduct in the course of

committing the offense might have this result. In other

words, the defendant had reckless disregard or extreme

indifference for human life. You will recall the Court's

earlier instruction as to knowledge and intent.

Now, the second aggravating factor for which the

government contends is that the defendant committed the

offense of use of a firearm in a crime of violence, namely,

interstate domestic violence resulting in death as charged in

Count 11 after substantial planning and premeditation to

cause the death of Robin Williams.

Planning means mentally formulating a method for

doing something or achieving some end. Premeditation means

thinking or deliberating about something and deciding whether

to do it beforehand. Substantial planning and premeditation

means a considerable or significant amount of planning and

premeditation above and beyond the minimum required for the

commission of the offense described in Count 11.

If the government does not satisfy each of you

beyond a reasonable doubt that at least one of these

statutory aggravating factors exists for Count 11, you should

enter a finding to that effect as to that particular count,

that is, Count 11, on the special verdict form, and no

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff            n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 6 of 166
1994

Page 4026

further deliberation as to that count will be necessary.

In the event that you unanimously find that the government has proven beyond a reasonable doubt the existence of at least one of the statutory aggravating factors with respect to the murder of Robin Williams in Count 11, please enter that finding on the special verdict form and continue your deliberations.

You must then consider whether the government has proven the existence of any nonstatutory or miscellaneous aggravating factors as to Count 11. As in the case for statutory aggravating factors, you must unanimously agree that the government has proven beyond a reasonable doubt the existence of any of the alleged nonstatutory aggravating factors before you may consider such factors in your deliberations on the appropriate punishment for defendant in this case as to Count 11.

The Court permits you to consider and discuss only those aggravating factors specifically claimed by the government with respect to Count 11 and listed below. You are not free to consider any other facts in aggravation which you conceive of on your own.

The nonstatutory aggravating factors that the government has alleged in this case as to Count 11 are that, one, the defendant caused harm to the family of Robin Williams as a result of the impact of the killing on the

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi                    ι (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 195-8     Filed 09/23/15     Page 7 of 166
1995

Page 4027

family of Robin Williams; second, the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society; and third, the defendant intentionally killed two people in that in addition to killing Robin Williams, the defendant also killed Donald Lee Allen.

In the event that you unanimously find that the government has proved beyond a reasonable doubt the existence of any of these nonstatutory aggravating factors with respect to Count 11, please enter that finding on the appropriate page of the special verdict form and continue your deliberations. Even if you do not find the existence of any nonstatutory aggravating factors, you should continue your deliberations as to Count 11.

Before you may consider the appropriate punishment for the commission of Count 11, you must consider whether the defendant has established the existence of any mitigating factors. A mitigating factor is any fact about the defendant's life, background, record, or character, or about the circumstances surrounding the intentional killing of Robin Williams or any other relevant fact that would suggest in fairness that a sentence of death is justified or that a lesser sentence is the appropriate -- let me see if that reads correctly -- that's a typo there, which we'll have to fix for you, because it should say is not justified. So let

Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 8 of 166
1996

Page 4028

me read that sentence over correctly.

A mitigating factor is any fact about the defendant's life, background, record, or character, or about the circumstances surrounding the intentional killing of Robin Williams or any other relevant fact that would suggest in fairness that a sentence of death is not justified, and that's where we will stop that sentence.

Now, then, unlike aggravating factors, which you must unanimously find proved beyond a reasonable doubt, in order for you to consider them in your deliberations, the law does not require unanimity with regard to mitigating factors. Any juror may find the existence of a mitigating factor and must consider it in this case. Also, unlike aggravating factors, you do not need to find the existence of any statutory mitigating factor before you can proceed to determine the existence of any nonstatutory mitigating factor.

It is the defendant's burden to establish any mitigating factors, but only by a preponderance of the evidence. This is a lesser standard of proof under the law than proof beyond a reasonable doubt. A factor is established by a preponderance of the evidence if its existence is shown to be more likely so than not so. In other words, a preponderance of the evidence means such evidence as when considered and compared with that opposed to

Case 3:12-cv-00327-MOC    Document 99-08    Filed 09/23/15    Page 9 of 166
1997

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                8/12/2002

Page 4029

it produces in your mind the belief that what is sought to be established is more likely than not true. In Part 5 of the special verdict form relating to mitigating factors, you are asked to report the total number of jurors that find a particular mitigating factor established by a preponderance of the evidence.

Excuse me just a minute, please.

Page 61, the statutory mitigating factors which the defendant asserts he has proved by a preponderance of the evidence are, first, the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of the law was significantly impaired regardless of whether the capacity was so impaired as to constitute a defense to the charge; second, the other factors in the defendant's childhood, background, or character mitigate against imposition of the death sentence.

The nonstatutory mitigating factors which the defendant asserts he has proved by a preponderance of the evidence are as follows: First, Marc Barnette has accepted full responsibility for his actions; second, he has remorse; third, he was abused by his father; fourth, he was affected by growing up in a family environment of violence, drugs and alcohol abuse; fifth, he has repeated exposure to violence in the home; sixth, he attempted to protect his brother, Mario, from the damaging effects of parental violence and neglect;

Page 4030

and seven, he had a history of untreated emotional problems;

eight, at the time of these crimes, Marc Barnette was

experiencing a depressive episode; nine, Marc Barnette does

well in a structured environment; ten, he cooperated with

police; eleven, Marc Barnette can serve a useful purpose to

others in a prison environment; twelve, at the time of these

offenses, he was experiencing irrational and excessive

thoughts; and thirteen, Marc Barnette's brother and children

would be harmed by his execution.

Now, on the special verdict form, you are asked to

identify any mitigating factors, statutory or nonstatutory,

that any of you find has been proved by a preponderance of

the evidence. You also will have a place to enter any

mitigating factors which you find have been proved by a

preponderance of the evidence and which occurred to you but

are not listed in the list of the defendant's contentions.

In addition, there are three nonstatutory

mitigating factors which the Court instructs you to find;

first, Marc Barnette was neglected by his mother; second, he

turned himself in to police; third, he has been a model

prisoner. And the Court instructs you that these three

mitigating factors have been proven by a preponderance of the

evidence and you should so indicate on the verdict form.

Now, with respect to Count 11, if you have found at

least one of the four requisite mental states, and, of

Case 3:12-cv-00327-MOC     Document 108     Filed 09/23/15     Page 11 of 166
1999

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 4031

course, the requisite age that I spoke about earlier, and the existence of at least one statutory aggravating factor and the existence or absence of any statutory and nonstatutory mitigating factor, you will then engage in a weighing process of the statutory and nonstatutory aggravating factors, and any statutory and nonstatutory mitigating factors as to Count 11.

In determining the appropriate sentence, all of you must weigh the aggravating factor or factors that you unanimously found to exist as to Count 11, whether statutory or nonstatutory, and each of you must weigh any statutory and nonstatutory mitigating factors that you individually found to exist as to Count 11.

In engaging in the weighing process, you must avoid any influence of passion, prejudice, or undue sympathy. Your deliberations should be based upon the evidence you have seen and heard and the law on which I have instructed you.

The process of weighing aggravating and mitigating factors against each other, or weighing aggravating factors alone, if there are no mitigating factors, in order to determine the proper punishment is not a mechanical or mathematical process. In other words, you should not simply count the number of aggravating and mitigating factors and reach a decision based upon which number is greater. You should consider the weight and value of each factor.

Reported By: Steve S. Huseby, RPR
800-333-2082    Huseby, Inc., an Affi      ı (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 12 of 166
2000

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4032

The law contemplates that different factors may be given different weights or values by different jurors, thus you may find that one mitigating factor outweighs all aggravating factors combined or that the aggravating factor or factors proven do not standing alone justify imposition of a sentence of death. Each individual juror is to decide what weight or value is to be given to a particular factor in your decision making process.

The members of the jury are never required to vote for a sentence of death. In other words, in the process of weighing aggravating factors and mitigating factors, if any, there is no required result.

If you unanimously conclude that the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist such that a sentence of death is justified as to Count 11, or in the absence of any mitigating factors that the aggravating factor or factors are in themselves sufficient to justify a sentence of death, you shall record your determination that death is justified on the special verdict form.

On the other hand, if you do not so conclude, then you would and no to that issue on the special verdict form and then go on to the next issue, which asks if based upon this weighing process you have unanimously determined that a sentence of life in prison without the possibility of release

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4033

should be imposed as to Count 11.

Now, at the end of your deliberations, if you unanimously recommend that the defendant be sentenced to death or to life imprisonment without the possibility of release, or any or all of Count 7, 8, or 11, the Court is required to impose that sentence accordingly. The recommendation does not have to be consistent with each count. As I said earlier, the members of the jury are never required to vote for a sentence of death. In other words, in the process of weighing aggravating factors and mitigating factors, if any, there is no required result.

Now, Section 6 on each verdict form provides space to record your verdict as to the appropriate and justified sentence for the defendant. Any verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. In other words, your voting must be unanimous before it can be said that a verdict has been reached and the questions posed to you in Count 6 -- that is, in Section 6 of the verdict form.

Now, it is your duty as jurors to consult with one another and to deliberate in an effort to reach agreement if you can do so without violence to individual judgment.

Each of you must decide the case for yourself, but only after an impartial consideration of the evidence in the

Reported By: Steve S. Huseby, RPR
800-333-2082     Huseby, Inc., an Aff     n (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 108     Filed 09/23/15     Page 14 of 166
2002

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4034

case with your fellow jurors.

In the course of your deliberations do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times you are not partisans, you are judges, judges of the facts. Your sole interest is to seek the truth from the evidence in the case and within the framework of the law as I have given it to you.

Now, in your consideration of whether the death sentence is justified for the commission of Count 7, 8, and 11, you shall not consider the race, color, religious beliefs, national origin, or sex of either the defendant or the victims. You are not to recommend a sentence of death unless you have concluded that you would recommend a sentence of death for the crime in question no matter what the race, color, religious belief, national origin, or sex of either the defendant or any victims might have been.

To emphasize the importance of this consideration, section Roman numeral seven of the special verdict form contains a certification statement. Each juror should carefully read the statement and sign in the appropriate place if the statement accurately reflects the manner in

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Soborion  (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 15 of 166

2003

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4035

which each of you reached your decision.

Excuse me just a second.

Thank you, members of the jury. I have prepared three forms, each entitled special verdict form, to assist you during your deliberations. You are required to record your determinations on these forms. You will see that there is a special verdict form for each of Counts 7, 8, and 11. Remember, your deliberations must be separate as to the possible punishment for each of Counts 7, 8, and 11.

Section 1 of the special verdict forms contains space to record your written findings on defendant's age, and it also has instructions as to whether to go forward or not depending on how you find, and those instructions are throughout the verdict form. Section 2 on each form contains space to record your written findings on the requisite mental state. Section 3 on each form contains space to record your written findings on statutory aggravating factors. And Section 4 on each form contains space to record your written findings on nonstatutory aggravating factors. Section 5 on each special verdict form contains space to record your written findings on mitigating factors. Section 6 provides space to record your verdict. And Section 7 is your certificate concerning justice without discrimination.

You or the foreperson are each required to sign each decision form in accordance with the instructions on the

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 16 of 166
2004

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4036

form. And the instructions on the form, of course, are mandatory and you are required to follow that process according to how you find and in accordance with the instructions.

Now, during the course of this sentencing hearing, you have heard that the defendant was tried earlier in the guilt phase. Specifically, you heard that during the guilt phase of this case, the defendant was found guilty of Count 7, 8, and 11, in addition to numerous other counts. That is true. As a result of the guilty verdicts for Counts 7, 8, and 11, you are here to determine the appropriate sentence for the defendant. The defendant and the government are entitled, however, to have you decide this case solely on the evidence that has come before you in this sentencing phase.

Now, if you should desire to communicate with me at any time during your deliberations, please write down your message or question and pass the note to the marshal, who will bring it to my attention. I shall not -- excuse me, I shall respond as promptly as possible either in writing or by having you return to the courtroom so that I can address you orally. I caution you, however, that any message or question you might send, you should not, in that message you should not tell me any details of your deliberations or how any jury member is leaning in his or her decision.

It is proper, again, to have a final caution,

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 17 of 166
2005

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4037

nothing that I as the presiding judge has said in these instructions or nothing that I have said or done during this trial has been said or done to suggest to you what I think your decision should be. What your decision should be is your exclusive duty and responsibility.

Now, members of the jury, you've heard the evidence and the arguments of counsel for both sides. It's your duty to remember the evidence, whether it was called to your attention or not; and if your recollection of the evidence differs from that of the attorneys, you are to rely solely upon your recollection of the evidence in your deliberations. If you made notes during the trial, remember they are for your own personal use. If you did not take notes, remember it's your responsibility to recall the evidence. You cannot give the responsibility to recall evidence to someone who took notes.

We depend upon the judgment of all members of the jury. You must all remember the evidence in this case. The Court instructs that as soon as you reach the jury room, before beginning deliberation, I suggest this, that you select one of your members to serve as the foreperson. This individual has the same vote as the rest of the jurors but simply serves to preside over the discussions. As soon as you have reached a verdict on all three counts, you will return to the courtroom and your foreperson will, on request,

Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 18 of 166
2006

Page 4038

hand the verdict sheet to the clerk.

Now, during the trial several items were received into evidence as exhibits. You will not be taking the exhibits into the jury room with you at the start, because I'm not sure that you will need them. If after you have begun your discussions of the case you think it would be helpful to have any of the exhibits with you in the jury room, have the foreperson send me a note asking for them. And if you want to hear or see any tapes, we would bring you back into the courtroom to use the equipment located here.

Would there be any request for a side-bar at this time?

MR. BENDER: Yes, Your Honor.

THE COURT: Members of the jury, if you'll excuse us for a moment, and once again you may be at ease. Thank you.

(Side bar out of the presence of the jury.)

MR. BENDER: First of all, with regard to Page 60, the typographical error, is that going to be fixed before the instructions?

THE COURT: Yes. What we're going to do is collect all 16 sets and then -- right now, and then slip-sheet them and then send 12 back into the jury room. And she's already got the -- Ashlyn already has the --

MR. BENDER: On our --

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/12/2002

Page 4039

THE COURT:  There's the way it looks now (indicating).

MR. BENDER:  On our Count 11, the statutory aggravating factor I think is incorrect.

MS. TOMPKINS:  It's supposed to be grave risk of death, more than one person for pecuniary gain.

THE COURT:  You're quite right.  So we'll have to fix that before they begin.

MR. BENDER:  Before they begin deliberating.

THE COURT:  We'll tell them that.

MR. BENDER:  Why don't we just take a short break while we do that.

THE COURT:  Yeah, we can do that.

MS. ROSE:  They can select their foreperson when we send them back.

THE COURT:  What's that?

MS. ROSE:  We could let them go, send it back after they return to the room or something.

THE CLERK:  It won't take but a second.

MR. BENDER:  I suggest we take a short recess but not let them deliberate or anything, bring them out when we all are sure that that's what needs to be done.

THE COURT:  Anything further?

MR. BENDER:  Did you intend to review the actual verdict sheet?  I don't believe that's necessary.

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affil⸱⸱⸱ ⸱f ⸱⸱⸱⸱⸱⸱⸱⸱ (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 20 of 166
2008

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4040

THE COURT:  I don't think so.  I think it's self-explanatory.

THE CLERK:  Will you tell me again?  I didn't hear what you said.

MS. TOMPKINS:  It's supposed to be grave risk of death.

THE COURT:  We want to do that.  And, of course, we'll show it to you before we -- what I thought I would do is after the break send them out with their instructions and have a verdict sheet as corrected and send the alternates into -- I thought we would send the alternates home with the usual instructions not to talk about it, everything that we usually tell them, and tell them we'll call them if we need to, and then I would tell the regular jurors to go back and start deliberations at least to the point of selecting a foreman and/or foreperson, and then at that time decide whether or not they want to break for the evening and start fresh in the morning or continue on until they advise us they are ready for an evening break.  Okay.

(Side bar concluded.)

THE COURT:  Members of the jury, we will have one more short break before you begin your deliberations.  It will be less than 10 minutes.  We will invite you to leave your jury instructions there on the chair and we will fix that one page that had the error in it, and then we will

Page 4041

bring you back out in less than 10 minutes and we'll have you

deliberating after that.

So go ahead and take a break, don't talk about the

case, continue to remember all the other instructions.

(Jury out at 4:10 p.m.)

THE COURT: Court is now back in session. I

believe we have corrected the error on Page 60 of the

instructions and corrected Pages 6 and 7 of the verdict

sheet.

Anything further before we bring the jury back to

move on?

MR. BENDER: No, Your Honor.

MS. ROSE: No.

THE COURT: We are waiting for the

instructions.

Okay. May we have the jury, please.

(Jury in at 4:26 p.m.)

THE COURT: Okay. Members of the jury, I

believe each of you now has a -- there are 12 sets of

instructions there, I believe. What I would ask you to do

now is take the case and see how you will find. Except given

the hour, let me make a suggestion, that is, that you might

want to go back to the jury room, the 12 of you, and pick

your foreperson and then advise the Court that you would like

to start in the morning fresh. That would seem to be an

Reported By: Steve S. Huseby, RPR
800-333-2082    Huseby, Inc., an Affiliate of Spherion  (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 22 of 166
2010

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4042

appropriate decision, if that's the pleasure of the jury, otherwise, you would deliberate and let me know later on in the evening when you are ready to take a break until tomorrow.

Is that clear enough? Thank you very much. And the alternates will stay with us here for just a minute and I'll speak to you separately. If you all would just kind of come around to the front of the jury box so everyone else can go out. Thank you.

(Jury out at 4:28 p.m.)

THE COURT: Let me speak to you gentlemen then. As you know, it's a very important function for alternates to serve as members of a jury, as you have done up until now, and we're going to continue to need your services between now and the time that the jury actually returns a verdict. The importance of that, as you can understand, is that if for some reason one of the jurors became ill or had a family emergency or was unable for any reason, if up to four jurors might have a situation like that, then you would be available and ready to step in and continue the deliberations of the jury. In that event we would, of course, tell the jury to begin its deliberations all over so that the alternates could participate from the beginning.

So, again, thank you very much for your attention to the case, for your readiness and willingness to serve

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4043

should you be called upon to do so, and for your attention to the evidence throughout. But we are going to let you go on home at this point, with the same instructions we sent you home with overnight each day during this trial, and that would be that until the trial is completed, then you are not to -- and we will call and advise you if, in fact, it does get completed, or, of course, if we need you to step into the jury, then we will advise you of that by telephone also.

So you are not to discuss this case with anyone, with members of your family, people involved in the trial or anyone else, including your fellow jurors. If anyone approaches you about the case and tries to discuss it notwithstanding the Court's instructions, you should let me know about that immediately.

Also you must not read or listen to any news reports of the trial. That's especially important as trials come to a close, so just don't turn -- I would suggest that you not even turn on the radio in your car or not watch any TV overnight, and also -- yeah, you can go ahead and tell them we will be with them in just a moment.

Okay. And I would suggest that you not read any newspapers until you know what your situation is with respect to this trial, avoid looking at any headlines, if there are any, that sort of thing, should there be any newspapers out on the street.

Reported By: Steve S. Huseby, RPR
800-333-2082     Huseby, Inc., an Affi'···· -f C-·····-1 (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 108     Filed 09/23/15     Page 24 of 166
2012

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4044

And finally remember, don't do any research about the case or do any investigation, and keep an open mind about it, because until you go in to deliberations, it would not be appropriate to make your mind up about any particular issue in the case.

Do all of you understand, or do you have any questions for the Court?

JUROR: So we're to call back?

THE COURT: No, sir. We'll call you. Feel free to call back at any time and speak to the clerk, if you want to know the status of the case, but otherwise we'll let you know when we may need you. We'll call you in any event should there be a decision by the jurors. Thank you again. You're free to go at this time.

JUROR: I have things in the jury room.

THE COURT: Why don't you let these jurors come back in, and then you all can go back to the jury room and pick out your personal items and go on out that way.

(Jury in at 4:32 p.m.)

THE COURT: Okay. Members of the jury, I take it you would like to start fresh in the morning, is that correct?

JUROR: Yes.

THE COURT: Who will be speaking for the jury?

JUROR: (Indicating).

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 108     Filed 09/23/15     Page 25 of 166
2015

Page 4045

THE COURT:  Thank you again for your attention to the case, the evidence, the instructions, the arguments. Let me remind you again about the overnight instructions. Until the deliberations are completed, you're not to discuss the case with anyone, whether members of your family, people involved in the trial, or anyone else, including your fellow jurors, so just don't comment on it or discuss it and tell people that might ask about it that you would -- you're free to talk about it after it's over but not before.

Also, please avoid any news accounts of the case, should there be any.  As the case comes to a close, you have to be particularly careful.  I would suggest that you just not play the radio in your car, not watch any TV, and avoid any newspapers between now and the time the deliberations are complete.

And keep an open mind about the case, of course, overnight until you get back with your jurors and begin deliberating and making up your minds as instructed.

Thanks again for your attention to all of these things.  Remember all of the instructions I've given you, and we'll see you tomorrow morning at 9:30.  What you will do tomorrow at 9:30, come in and we will assemble here as we always do and then we will just send you right out.  Thank you.

MR. BENDER:  Excuse me.

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 26 of 166
2014

Page 4046

THE COURT:  Yes, sir.

MR. BENDER:  Are they going to be taking home anything with them or leaving it here?

THE COURT:  Yeah, the clerk is going to collect the instructions and the verdict sheet.  Thank you.

(Jury out at 4:34 p.m.)

THE COURT:  Anything for the Court before we recess for the evening?

MR. BENDER:  Just in the presence of Marc Barnette, we had two side-bar conferences, one was with regard to the age element and the Court needed to reinstruct or further instruct the jury about that.  That's all that happened at that one.  The second one was with regard to the typographical error on Page 60 and also with regard to statutory -- pardon me, statutory aggravating circumstances on Count 11, there was a problem with that, it didn't --

THE COURT:  Right, the draft of the instructions that we were proposing to give to the jury had a pecuniary object aggravator when it should have been the -- now I've forgotten.

MR. BENDER:  Risk of harm to more than one person.  That's all that happened.

THE COURT:  Yeah, that's correct, and the record will also reflect there were no additional objections at the end of the Court's instructions aside from what's of

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees       8/12/2002

Page 4047

record earlier in the matter.  Thank you very much.

MR. BENDER:  In the event that I need to re-object to failing to instruct on my proposed --

THE COURT:  Yes, sir, we consider those objections to be established in the record but to the -- if they are renewed, then they are also denied.  Thank you very much.

MR. BENDER:  Thank you.

(Court adjourned, 4:37 p.m.)

I, STEVEN S. HUSEBY, do hereby certify that the foregoing transcript is a true and correct transcript.

STEVEN S. HUSEBY                                    DATE

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4048

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA            )

                                    )   CASE NO. 3:97CR23-V

            v.                      )   August 13, 2002

                                    )

AQUILIA MARCIVICCI BARNETTE,        )

            Defendant.              )

            TRANSCRIPT OF SENTENCING HEARING

        BEFORE THE HONORABLE RICHARD L. VOORHEES

            UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

        ANNE M. TOMPKINS, Esq.
        JILL WESTMORELAND ROSE, Esq.
        Assistant United States Attorney
        227 West Trade Street
        Suite 1700
        Charlotte, North Carolina   28202

FOR THE DEFENDANT:

        JEAN B. LAWSON, Esq.
        P.O. Box 4275
        Charlotte, North Carolina   28226
        HAROLD J. BENDER, Esq.
        200 North McDowell Street
        Charlotte, North Carolina   28204

Reported by:  Steve S. Huseby,
                Registered Professional Reporter,
                Certified Court Reporter,

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4049

PROCEEDINGS

(9:34 a.m.)                                                     09:33:32

                                                               09:33:32

THE COURT:  Are all the jurors here?                           09:33:36

MR. BENDER:  Your Honor, before we bring the                   09:33:40
jury in, at this time I would move for a motion for a          09:33:41
mistrial based upon improper argument of Ms. Rose yesterday;   09:33:44
one, it did not rebut our argument; two, it went well beyond   09:33:49
the plain, brief glimpse of life.  It was basically an         09:33:55
argument on victim impact, and so we ask at this time that     09:34:02
you grant us a mistrial.                                       09:34:10

THE COURT:  All right, the motion will be                      09:34:14
denied.  May we have the jury, please.                         09:34:16

(Jury in at 9:35 a.m.)                                         09:34:43

THE COURT:  Good morning, members of the jury.                 09:34:59
You now have your jury instructions, the Clerk will hand you   09:35:03
your verdict sheet on the way out and you're ready to          09:35:06
deliberate.  Thank you very much, you may proceed to do that   09:35:10
at this time.                                                  09:35:14

(Jury out at 9:36 a.m.)                                        09:35:19

THE COURT:  When the jury comes back with its                  09:35:46
findings, I presume it would be in order to dismiss the jury,  09:35:51
assuming the verdict is in order, and proceed to sentencing.   09:35:57
The Court will examine the verdict sheet before anything else  09:36:03
happens when the jury comes out and make sure it's in proper   09:36:07

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4050

form.

Anyone have any different ideas about how to proceed in that manner?

MR. BENDER: No, Your Honor.

MS. TOMPKINS: No, sir.

THE COURT: I do want to thank counsel for the hard work you've put into this case, your commitment to a high level of professional standards. All right.

THE CLERK: All rise.

(Court recessed at 9:36 a.m.)

(Court resumed at 11:36 a.m.)

THE COURT: Ms. Dannelly will hand you a proposed answer to the jury's question.

Any objection?

MR. BENDER: Yes.

THE COURT: Say it, please.

MR. BENDER: I think Your Honor needs to include the instructions on page 31, the law permits you to consider and discuss at this point only statutory aggravating factors specifically claimed by the Government which the Government alleges as to Count 7. My recollection is that the note was that it included the to cause the death and I think your response should be simply that the only thing that you can consider is that it was to cause the death.

THE COURT: All right. That objection will be

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082
Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4051

overruled.                                                    11:38:36

MS. TOMKINS:  Just for the record, there's no    11:38:43

objection by the Government to the Court's --                 11:38:45

THE COURT:  Thank you.  Now, Mr. Bender, did     11:38:50

you have some item you wanted to bring up about the jury      11:38:53

taking breaks?                                                11:38:57

MR. BENDER:  No, I simply suggested that         11:39:00

during the point that this question was under consideration,  11:39:08

that perhaps the Court should respond in some way like, you   11:39:12

know, we are considering your -- I'm meeting with the         11:39:19

attorneys and considering your question, why don't you take   11:39:20

your mid-morning break, and just as a response to them, let   11:39:24

them know that we are considering their question.  That was   11:39:30

the only thing --                                             11:39:33

THE COURT:  Have they asked about a break yet?   11:39:34

THE BAILIFF:  No, sir.                           11:39:38

THE COURT:  We'll let them continue but we'll    11:39:39

keep in mind your question should we have further contact     11:39:41

with the jury.                                                11:39:44

MR. BENDER:  Thank you.                          11:39:45

(Court in recess at 11:48 a.m.)                  12:30:23

(Court resumed at 12:31 p.m.)                    12:30:24

THE COURT:  Are the parties ready the send the   12:30:32

jury on to lunch?                                             12:30:33

MR. BENDER:  Yes, Your Honor.                    12:30:35

Reported By: Steve S. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate Jof Spherion  (704) 333-9889        Fax (704) 372-4593

Page 4052

THE COURT:  All right, let me have the jury.    12:30:36

(Jury in at 12:32 p.m.)    12:31:06

THE COURT:  Members of the jury, I guess you    12:31:19
got my note about lunch; is that satisfactory?    12:31:20

THE JURORS:  Yes, sir.    12:31:26

THE COURT:  We'll send you on then, and please    12:31:26
suspend your deliberations until we get you back into court    12:31:29
after lunch and then we'll send you to deliberate, so hold    12:31:32
what you got and keep an open mind between now and then.    12:31:36
Think about an hour would be appropriate?  We'll contemplate    12:31:40
you being back with us then at 1:30, thank you.    12:31:44

(Jury out at 12:32 p.m.)    12:31:52

(Lunch recess).    12:31:52

THE COURT:  Can we have the jury.    13:35:37

THE BAILIFF:  Yes, sir.    13:35:43

(Jury in at 1:37 p.m.)    13:36:19

THE COURT:  I see all the members of the jury    13:36:21
are accounted for; did you all have a good lunch?    13:36:22

THE JURORS:  Yes, sir, thank you.    13:36:26

THE COURT:  It may seem like a formality, but    13:36:28
it's necessary, and we will just send you back in and say    13:36:31
move along.  Thank you.    13:36:33

(Jury out at 12:37 p.m.)    13:36:42

THE COURT:  Anything for the Court at this    13:37:09
point?    13:37:11

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889
800-333-2082                                      Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 33 of 166
2021

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4053

MR. BENDER: Judge, just one thing. These 13:37:13 paintings that were introduced into evidence, could we go and 13:37:16 take those to Kinko's and get a color copy made and 13:37:20 substitute that for the original? 13:37:24

THE COURT: Any objection by the Government? 13:37:28

MS. ROSE: None. 13:37:30

THE COURT: Okay. 13:37:31

(Court in recess, 1:38 p.m.) 13:37:41

(Court back in session, 5:12 p.m.) 15:30:21

THE COURT: Are the parties ready to receive 17:12:01 the verdict? 17:12:03

MR. BENDER: Yes, sir. 17:12:07

MS. TOMPKINS: Yes, sir. 17:12:07

THE COURT: May we have the jury, please. 17:12:11

(Jury in at 5:13 p.m.) 17:12:31

THE COURT: Okay, Juror Number 2, I believe 17:12:47 you are the foreperson. 17:12:49

JUROR: Yes, sir. 17:12:52

THE COURT: Has this jury reached the verdict? 17:12:52

JUROR: Yes, sir. 17:12:55

THE COURT: Was it unanimous with the 17:12:55 decisions put to the jury's attention? 17:12:56

JUROR: Yes, sir. 17:12:59

THE COURT: And did you enter the verdict on 17:12:59 the verdict form? 17:13:00

Reported By: Steve S. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion (704) 333-9889        Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 34 of 166
2022

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4054

JUROR:  Yes, sir.                                      17:13:01

THE COURT:  And have all the jurors signed as          17:13:01
indicated by the instructions?                         17:13:04

JUROR:  Yes, sir.                                      17:13:05

THE COURT:  Thank you.  Let me ask the Clerk,          17:13:06
if you will receive the verdict form.                  17:13:08

Excuse me, members of the jury, while I go over         17:13:26
this form.  You may be at ease.                        17:13:29

(Brief pause.)                                          17:13:29

THE COURT:  Members of the jury, if you'll             17:20:37
excuse us for a minute, I'll ask you counsel to step to the   17:20:38
side bar and I'll talk to them in a minute and be right back.  17:20:42
Thank you.                                             17:20:46

(Side bar outside the jury's presence as follows:)     17:23:59

THE COURT:  We're on the record in the                 17:23:59
anteroom next to the courtroom.  The only thing that I notice  17:23:59
in the verdict sheet, they answered it in regular form.  They  17:23:59
did answer yes to the death sentence question on all three     17:23:59
cases, and there were various mitigating factors found.  The   17:23:59
age was 18 in each case and all four mental states were found  17:23:59
in each case.  The majority of the aggravating factors were    17:23:59
found and both statutory aggravating factors in each case.     17:23:59

One of the aggravating factors, future violence        17:23:59
danger, they answered no, though, to that one, and the other   17:23:59
ones were all yes.  But as to -- for example, here's number    17:23:59

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4055

seven and you can see they answered section A for the death sentence. In all three cases, they did not do anything with section B, and it would appear to me that that would not be a matter that we would need to send them back for.

MS. ROSE: No.

MR. BENDER: I don't think so.

THE COURT: They correctly perceived that they have done their job because they have answered it.

MR. BENDER: Yeah.

THE COURT: That being the case, now, would there be a request to pole the jury?

MS. LAWSON: Yes.

MR. BENDER: And if we may just suggest that you just go to page 16 or 17, whatever the death is, and say unanimous recommendation was death and then pole them as to that instead of going through all of the pages.

MS. ROSE: Yes.

THE COURT: Is that agreeable to all parties?

MR. BENDER: Yes.

MS. ROSE: Yes.

MR. BENDER: We're going to make a recommendation that he be expedited to Terra Haute.

THE COURT: Right, I will enter that on the record at the conclusion of the other matters, so if I forget, remind me.

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate Jof Spherion (704) 333-9889

800-333-2082

Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4056

MR. BENDER:  That thank you.  17:23:59

MS. TOMPKINS:  Thank you.  17:23:59

(Side bar concluded).  17:23:59

THE COURT:  Now, members of the jury, the Court having received your verdict forms, it's our usual procedure to pole the jury, and we will do that at this time.  17:24:24

Juror Number 1, the verdict as to -- well, let me do it this way, I'll read this verdict from section 6, or I believe 7, sub A, based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factor or whether the aggravating factors are of themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of death shall be imposed for the killing of Donnie Lee Allen as to count 7.  17:25:01

So Juror Number One, is that your verdict and is it still your verdict?  17:25:08

MS. LAWSON:  Yes, sir.  17:25:09

THE COURT:  Juror Number Two, is that your verdict and still your verdict?  17:25:12

MS. LAWSON:  Yes, sir.  17:25:14

THE COURT:  An Juror Number Three, is that your verdict and still your verdict?  17:25:17

JUROR:  Yes, sir.  17:25:19

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889
800-333-2082
Fax (704) 372-4593

Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 37 of 166
2025

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4057

THE COURT: And Juror Number Four, is that your verdict and still your verdict?     17:25:20 17:25:21

JUROR: Yes, sir.     17:25:23

THE COURT: And Juror Number Five, is that your verdict and still your verdict?     17:25:23 17:25:24

JUROR: Yes, sir.     17:25:27

THE COURT: And Juror Number Six, is that verdict and still your verdict?     17:25:27 17:25:28

JUROR: Yes, sir.     17:25:30

THE COURT: And Juror Number Seven, is that your verdict and still your verdict?     17:25:31 17:25:32

JUROR: Yes, sir.     17:25:33

THE COURT: Juror Number Eight, is that your verdict and still your verdict?     17:25:34 17:25:35

JUROR: Yes, sir.     17:25:37

THE COURT: Juror Number Nine, is that your verdict and still your verdict?     17:25:37 17:25:39

JUROR: Yes, sir.     17:25:40

THE COURT: Juror Number Ten, is that your verdict and still your verdict?     17:25:41 17:25:42

JUROR: Yes, sir.     17:25:43

THE COURT: Juror Number 11, is that your verdict and still your verdict?     17:25:44 17:25:46

JUROR: Yes, sir.     17:25:47

THE COURT: Juror Number 12, is that your     17:25:48

Case 3:12-cv-00327-MOC     Document 108     Filed 09/23/15     Page 38 of 166
2026

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4058

verdict and still your verdict? 17:25:50

JUROR: Yes, sir. 17:25:51

THE COURT: All right, sir. Now, members of 17:25:53
the jury, with reference to the verdict in Count 8, based 17:25:58
upon consideration of whether the aggravating factor or 17:26:07
factors sufficiently outweigh any mitigating factor or 17:26:11
factors found to justify a sentence of death, or in the 17:26:15
absence of any mitigating factors whether the aggravating 17:26:19
factors in themselves are sufficient to justify a sentence of 17:26:21
death, we recommend by unanimous vote that a sentence of 17:26:24
death shall be imposed for the killing of Donnie Lee Allen as 17:26:27
to Count 8, and you answered that issue yes. 17:26:31

And of course, you have all signed that, but I'll 17:26:36
also poll you about it. I'll ask you then, Juror Number One, 17:26:40
is that your verdict and is it still your verdict? 17:26:43

JUROR: Yes, sir. 17:26:46

THE COURT: Juror Number Two, is that your 17:26:47
verdict and still your verdict? 17:26:48

JUROR: Yes, sir. 17:26:49

THE COURT: Juror Number Three, is that your 17:26:49
verdict and still your verdict? 17:26:51

JUROR: Yes, sir. 17:26:52

THE COURT: Juror Number Four, is that your 17:26:53
verdict and still your verdict? 17:26:58

JUROR: Yes, sir. 17:26:58

Case 3:12-cv-00327-MOC   Document 198   Filed 09/23/15   Page 39 of 166
2027

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4059

THE COURT: Juror Number Five, is that your    17:26:58
verdict and still your verdict.    17:26:58

JUROR: Yes, sir.    17:27:01

THE COURT: Juror Number Six, is that your    17:27:01
verdict and still your verdict?    17:27:02

JUROR: Yes, sir.    17:27:03

THE COURT: Juror Number Seven, is that your    17:27:03
verdict and still your verdict?    17:27:05

JUROR: Yes, sir.    17:27:06

THE COURT: Juror Number Eight, is that your    17:27:07
verdict and still your verdict?    17:27:08

JUROR: Yes, sir.    17:27:10

THE COURT: Juror Number Nine, is that your    17:27:10
verdict and still your verdict?    17:27:12

JUROR: Yes, sir.    17:27:13

THE COURT: Juror Number Ten, is that your    17:27:14
verdict and still your verdict?    17:27:14

JUROR: Yes, sir.    17:27:16

THE COURT: Juror Number 11, is that your    17:27:17
verdict and still your verdict?    17:27:18

JUROR: Yes, sir.    17:27:20

THE COURT: Juror Number 12, is that your    17:27:21
verdict and still your verdict?    17:27:23

JUROR: Yes, sir.    17:27:23

THE COURT: All right. Now, members of the    17:27:26

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 40 of 166
2028

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4060

jury, with reference to Count 11, the answer posed -- I mean the question posed was based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors whether the aggravating factors are in themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of death shall be imposed for the killing of Robin Williams as to Count 11, and you answered that issue yes.

And I'll ask you by way of polling, likewise, Juror Number one is that your verdict and is it still your verdict?

JUROR: Yes, sir.

THE COURT: Juror Number Two, is that your verdict and still your verdict?

JUROR: Yes, sir.

THE COURT: Juror Number Three, is that your verdict and still your verdict?

JUROR: Yes, sir.

THE COURT: Juror Number Four, is that your verdict and still your verdict?

JUROR: Yes, sir.

THE COURT: Juror Number Five, is that your verdict and still your verdict?

JUROR: Yes, sir.

Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 41 of 166
2029

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4061

THE COURT: Juror Number Six, is that your verdict and still your verdict? 17:28:34 17:28:35

JUROR: Yes, sir. 17:28:36

THE COURT: Juror Number Seven, is that your verdict and still your verdict? 17:28:37 17:28:40

JUROR: Yes, sir. 17:28:41

THE COURT: And Juror Number Eight, is that your verdict and still your verdict? 17:28:41 17:28:43

JUROR: Yes, sir. 17:28:45

THE COURT: Juror Number Nine, is that your verdict and still your verdict? 17:28:46 17:28:47

JUROR: Yes, sir. 17:28:48

THE COURT: Juror Number Ten, is that your verdict and still your verdict? 17:28:49 17:28:50

JUROR: Yes, sir. 17:28:52

THE COURT: Juror Number 11, is that your verdict and still your verdict? 17:28:52 17:28:54

JUROR: Yes, sir. 17:28:55

THE COURT: Juror Number 12, is that your verdict and still your verdict? 17:28:56 17:28:58

JUROR: Yes, sir. 17:28:59

THE COURT: Will there be anything further before the jury is discharged? 17:29:10 17:29:11

MR. BENDER: No, Your Honor. 17:29:16

THE COURT: Members of the jury, I want to 17:29:17

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082                                   Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4062

thank you profusely and sincerely for the hard work you put   17:29:19

into this case.  It's been two weeks plus of trial and   17:29:23

evidence and other time that you have spent with us doing   17:29:25

questionnaires and answering questions in jury selection; we   17:29:28

very much appreciate your service as citizens who came   17:29:32

forward from your places of work and your homes to do the   17:29:36

work of the courts.   17:29:40

You are discharged from this case, and we have no   17:29:42

further cases for your attention in this term.  Now, I asked   17:29:43

you in the past not to talk about the case, but as I   17:29:47

indicated once the case is over, it's your option now if   17:29:50

someone wants to talk about the case, you're free to answer   17:29:54

any questions or talk about it as you see fit, but you're   17:29:56

under no obligation to do so.  It's entirely up to you.   17:30:00

So again, thank you very much.  If you have any   17:30:02

questions about the jury service, feel free to call the   17:30:05

telephone number you've been given and speak to the Clerk   17:30:07

about it, and we will ask that the marshal escort the jurors   17:30:10

as appropriate.   17:30:21

(Jury out at 5:31 p.m.)   17:30:34

THE COURT:  I've asked the Clerk to go back   17:31:00

and collect any forms or instructions that may be in the jury   17:31:02

room.  The Clerk will be handling the verdict, they will be   17:31:05

filed with the Court.   17:31:54

I will now ask if the defendant wants to say   17:31:55

Case 3:12-cv-00327-MOC     Document 31-08     Filed 09/23/15     Page 43 of 166
2031

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4063

anything to the Court.

THE WITNESS: I would just like to thank my counsel, I think they did a terrific job, I'm very pleased. I'd like to thank my mother for being here every day without fail to support me, and that's it.

THE COURT: All right, sir. Thank you. Anything further then before the Court imposes a sentence?

MS. TOMPKINS: No, sir.

MS. ROSE: No, sir.

THE COURT: In Case Number 3:97CR23-V, the Court will impose a sentence of death as to Count 7, 8 and 11.

Anything further before we adjourn?

MR. BENDER: Yes, sir.

THE COURT: I remember what you had asked. I will ask the marshal service to make every effort to expedite the defendant's return to Terra Haute as opposed to any extended layover here in the Mecklenburg County jail. Does that take care of it then?

MR. BENDER: Your Honor, we would respectfully give notice of appeal.

THE COURT: Yes, sir, notice of appeal will be recorded, and I'm sure you'll follow through with written notice in due time.

MR. BENDER: Thank you.

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082                                                                    Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4064

THE COURT:  All right.                                17:33:04

(Proceedings adjourned, 5:34 p.m.)                    17:33:18


I, Steve S. Huseby, do hereby certify that the foregoing transcript is a true and correct transcript.


STEVE S. HUSEBY                          DATE

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889
800-333-2082                                        Fax (704) 372-4593

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Docket No. 3:97CR-23

F  L E D
IN COURT
CHARLOTTE, N. C.

AUG  5 2002

U. S. DISTRICT COURT
W. DIST. OF N. C.

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                        ) | **MOTION FOR MISTRIAL** |
| ) | |
| AQUILIA MARCIVICCI BARNETTE, ) | |
| Defendant.            ) | |
| _____ ) | |

NOW COMES the Defendant, by and through his attorneys, and moves the Court that an Order for Mistrial be entered in this trial for the following reasons:

1. During the victim impact evidence, previously objected to by the Defendant, the prosecution was permitted to put on Bertha Williams, the mother of the victim, Robin Williams.

2. Bertha Williams, during her testimony became understandably emotional when discussing her daughter's life. However, during her emotional testimony, she turned to the Defendant and asked repeatedly, "why did you have to kill Robin? Why did you have to kill my baby"?, or words to that effect.

3. The rationale articulated in *Payne v. Tennessee*, 501 U.S. 808 (1991) is to allow a "brief glimpse" in the life of the victim to show the victim's "uniqueness as an individual human being." Id. 828

4. The emotional display and the question to the Defendant, goes well beyond the brief glimpse permitted by *Payne*. "To the extent that a

death sentence is based upon emotion, it is, of course,

unconstitutional", *Gardener v. Florida* 430 U.S. 349, 357 (1977).

Based on the foregoing, the Defendant moves the Court that a mistrial be

ordered in this matter to insure that the Defendant's sentence is not based upon

emotion.

This the _5_ day of August, 2002.



Harold J. Bender
200 N. McDowell Street
Charlotte, NC 28204
(704) 333-2169

Jean B. Lawson
PO Box 472106
Charlotte, NC 28247
(704) 341-1865

Attorneys for BARNETTE

2035

# CERTIFICATE OF SERVICE

I, Harold J. Bender, do hereby certify that I have served a copy of the foregoing **Motion for Mistrial** upon the following by hand delivering to:

Ms. Anne Tompkins
Assistant United States Attorney
United States Attorney's Office
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202

This the 5 day of August, 2002.

HAROLD J. BENDER
Bender & Barnett
200 North McDowell Street
Charlotte, North Carolina 28204
Telephone: 704/333-2169

p.6

III. Statutory Agg. Factors
Wording of #2

"to" cause the death - does this
mean he planned the carjacking
to cause the death

or are we considering wether
he planned the carjacking
"which" caused the death

F I L E D
IN COURT
U. S.

AUG 1 3 2002

U. S. DISTRICT COURT
W. DIST. OF N. OF

8-13-02    Case : 3:97CR23-V

(To the foreperson: please read this aloud to all the jurors.)

Members of the jury: Your question asks as follows:

"P. 6   III. Statutory Agg. Factors
Wording of #2"

'To' cause the death - does this mean he planned the carjacking to cause the death

or are we considering whether he planned the carjacking 'which' caused the death?"

As I understand it, you are asking for an interpretation of the language in #2, page 6,which reads: "Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Seven after substantial planning and premeditation to cause the death of Donald Lee Allen?"

It appears that this question might arise as to this alleged aggravating factor as to all three counts, because the government has alleged the planning and premeditation factor as to each count. For purposes of this answer, however, I shall assume we are talking about Count Seven.

To answer the question in your note, I would suggest that you read the language of #2, page 6, carefully and give the words their ordinary, everyday meanings. The focus here is whether the offense happened after, or in consequence of, substantial planning and premeditation. Note that #2 refers to "the offense in Count Seven". It might be helpful to re-read the language of Count Seven of the indictment as shown toward the top of page 23 of your jury instructions. Also, re-read the instruction which pertains to #2 as shown on page 33 of the jury instructions.

I would make the same suggestion as to this particular aggravating factor for all three counts in which it is alleged.

Please let me know if there are further questions. Thank you.

Judge Voorhees

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Case Number: 3:97CR-23-V

UNITED STATES OF AMERICA )
)
v. )
)
)
)
AQUILIA MARCIVICCI BARNETTE, )
Defendant )
)

AUG 13 2002

U. S.

## SPECIAL VERDICT FORM REGARDING THE PUNISHMENT TO BE IMPOSED UPON THE DEFENDANT FOR THE KILLING OF DONALD LEE ALLEN WITH REFERENCE TO COUNT SEVEN

### I.  AGE OF DEFENDANT

Instructions: Answer "YES" or "NO".

1. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant was eighteen years of age or older at the time of the offense in Count Seven?

YES _____

NO _____

*Diane R. Edwards*
FOREPERSON

Instructions: If you answered "NO" with respect to the determination in Section I, then stop your deliberations, cross out Sections II, III, IV, V and VI of this form, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the

1

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 51 of 166

appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you answered "YES" with respect to the determination in Section I, then proceed to Section II which follows.

2

## II. REQUISITE MENTAL STATE

Instructions: For each of the following, answer "YES" or "NO".

1. As to the charge in Count Seven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed Donald Lee Allen?

YES _✓_

NO _____

*Diane R Edwards*
FOREPERSON

2. As to the charge in Count Seven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally inflicted serious bodily injury which resulted in the death of Donald Lee Allen?

YES _✓_

NO _____

*Diane R Edwards*
FOREPERSON

3

3. As to the charge in Count Seven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct intending that Donald Lee Allen be killed and/or that lethal force be employed against Donald Lee Allen which resulted in the death of Donald Lee Allen?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

4. As to the charge in Count Seven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and resulted in the death of Donald Lee Allen?

YES ✓

NO _____

_Diane R. Edwards_
FOREPERSON

Instructions: If you answered "NO" with respect to all of the determinations in this section, then stop your deliberations, cross out Sections III, IV, V and VI of this form, and proceed to Section VII. Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you answered "YES" with respect to any one or more of the determinations in Section

4

II, then proceed to Section III which follows.

5

2043

## III. STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO",

1. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Seven in the expectation of the receipt of something of pecuniary value?

YES _✓_

NO _____

_Diane R Edwards_
FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Seven after substantial planning and premeditation to cause the death of Donald Lee Allen?

YES _✓_

NO _____

_Diane R Edwards_
FOREPERSON

Instructions: If you answered "NO" with respect to both of the statutory aggravating factors in this Section III, then stop your deliberations, cross out Sections IV, V and VI of this form, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you found the requisite age in Section I, the requisite mental state in Section II and

6

2044

answered "YES" with respect to one or both of the statutory aggravating factors in this Section III, then proceed to Section IV which follows.

7

2045

## IV. NON-STATUTORY AGGRAVATING FACTORS – COUNT SEVEN

Instructions: For each of the following, answer "YES" or "NO".

1. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant caused harm to the family of Donald Lee Allen as a result of the impact of the killing on the family of Donald Lee Allen?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society?

YES _____

NO ✓

_Diane R Edwards_
FOREPERSON

3. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed two people in that in addition to killing Donald Lee Allen, the defendant also killed Robin Williams?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

8

Instructions: Regardless of whether you answered "YES" or "NO" with respect to the three non-statutory aggravating factors in this Section IV, then proceed to Section V, which follows.

9

2047

## V. MITIGATING FACTORS

Instructions: For each of the following mitigating factors, in the space provided, indicate the number of jurors who have found the existence of that mitigating factor to be proven by the preponderance of the evidence as to Count Seven.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such [a] factor[s] established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

The statutory mitigating factors which the defendant contends have been proved by a preponderance of the evidence are:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

Number of jurors who so find __*0*__.

2. The other factors in the defendant's childhood, background or character mitigate against imposition of the death sentence.

Number of jurors who so find __*11*__.

The non-statutory factor[s] in the defendant's background or character, the circumstances of the crime[s], or other relevant facts or circumstances as mitigation which the defendant

10

contends have been proven by the preponderance of the evidence are as follows:

    1. Marc Barnette has accepted full responsibility for his actions.

Number of jurors who so find ___1___.

    2. Marc Barnette has remorse.

Number of jurors who so find ___1___.

    3. Marc Barnette was abused by his father.

Number of jurors who so find ___1___.

    4. Marc Barnette was affected by growing up in a family environment of violence, drugs and alcohol abuse.

Number of jurors who so find ___12___.

    5. Marc Barnette had repeated exposure to violence in the home.

Number of jurors who so find ___12___.

    6. Marc Barnette attempted to protect his brother, Mario, from the damaging effects of parental violence and neglect.

Number of jurors who so find ___12___.

11

2049

7. Marc Barnette had a history of untreated emotional problems.

Number of jurors who so find ___9___.

8. At the time of these crimes, Marc Barnette was experiencing a depressive episode.

Number of jurors who so find ___0___.

9. Marc Barnette does well in a structured environment.

Number of jurors who so find ___2___.

10. Marc Barnette cooperated with police.

Number of jurors who so find ___12___.

11. Marc Barnette can serve a useful purpose to others in a prison environment.

Number of jurors who so find ___12___.

12. At the time of these offenses, Marc Barnette was experiencing irrational and obsessive thoughts.

Number of jurors who so find ___6___.

13. Marc Barnette's brother and children will be harmed by his execution.

Number of jurors who so find ___0___.

12

2050

In addition, there are three non-statutory mitigating factors which the Court instructs you to find. The Court instructs you that these three mitigating factors have been proven by the preponderance of the evidence and you should so indicate on this verdict form:

1.   Marc Barnette was neglected by his mother.

Number of jurors who so find ___12___.

2.   Marc Barnette turned himself in to police.

Number of jurors who so find ___12___.

3.   Marc Barnette has been a model prisoner.

Number of jurors who so find ___12___.

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "NONE" and line out the extra spaces with a large "X". If more space is needed, write "CONTINUED" and use the reverse side of this page.

___. ___None_____

_____

Number of jurors who so find _____.

13



Number of jurors who so find _____.

Number of jurors who so find _____.

Number of jurors who so find _____.

Instructions: Regardless of whether or not you chose to write in additional mitigating factors and findings in Section V above, proceed to Section VI and Section VII which follow.

14

Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 64 of 166

**2052**

## VI. DETERMINATION

Based upon consideration of whether the aggravating factor or factors found to exist as to Count Seven sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor or factors as to Count Seven are in themselves sufficient to justify a sentence of death, indicate your recommendation using either the following form A or B.

15

2055

## A.    Death Sentence

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor(s) are in themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of death shall be imposed for the killing of Donald Lee Allen as to Count Seven.

<div align="right">

YES ___12___

NO _____

</div>

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer "NO", the foreperson alone should sign, and you should proceed to Section VI (B):

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____
                                        FOREPERSON

Date: ___August___ _13_, 2002

16

**B. <u>Sentence of Life in Prison Without Possibility of Release</u>**

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor or factors are in themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of life in prison without possibility of release shall be imposed for the killing of Donald Lee Allen in Count Seven.

<div align="right">

YES     _____

NO     _____

</div>

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer "NO", the foreperson alone should sign, and you should proceed to Section VII:

_____       _____

_____       _____

_____       _____

_____       _____

_____       _____

_____       _____

                                                 FOREPERSON

Date: _____ _____, 2002

17

## VII CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin or sex of the defendant or the victim might have been.

*[juror signatures]*

FOREPERSON

Date: August 13, 2002

WHEN THE JURY HAS COMPLETED ITS WORK AS TO EACH COUNT AND FILLED OUT THE VERDICT SHEETS ACCORDINGLY, THE JURY WILL RETURN TO THE COURTROOM.

18

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 68 of 166

2056

UNITED STATES OF AMERICA )
)
v. )
)
)
AQUILIA MARCIVICCI BARNETTE, )
Defendant )
)

## SPECIAL VERDICT FORM REGARDING THE PUNISHMENT TO BE IMPOSED UPON THE DEFENDANT FOR THE KILLING OF DONALD LEE ALLEN WITH REFERENCE TO COUNT EIGHT

### I. AGE OF DEFENDANT

Instructions: Answer "YES" or "NO".

1. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant was eighteen years of age or older at the time of the offense in Count Eight?

YES _✓_

NO _____

_Vant R Edwards_
FOREPERSON

Instructions: If you answered "NO" with respect to the determination in Section I, then stop your deliberations, cross out Sections II, III, IV, V and VI of this form, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the

1

appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you answered "YES" with respect to the determination in Section I, then proceed to Section II which follows.

2

## II. REQUISITE MENTAL STATE

Instructions: For each of the following, answer "YES" or "NO".

1. As to the charge in Count Eight, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed Donald Lee Allen?

YES ✓

NO _____

_____
FOREPERSON

2. As to the charge in Count Eight, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally inflicted serious bodily injury which resulted in the death of Donald Lee Allen?

YES ✓

NO _____

_____
FOREPERSON

3

2059

3. As to the charge in Count Eight, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct intending that Donald Lee Allen be killed and/or that lethal force be employed against Donald Lee Allen which resulted in the death of Donald Lee Allen?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

4. As to the charge in Count Eight, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and resulted in the death of Donald Lee Allen?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

Instructions: If you answered "NO" with respect to all of the determinations in this section, then stop your deliberations, cross out Sections III, IV, V and VI of this form, and proceed to Section VII. Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

4

If you answered "YES" with respect to any one or more of the determinations in Section II, then proceed to Section III which follows.

5

2061

### III. STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO",

1. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Eight in the expectation of the receipt of something of pecuniary value?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Eight after substantial planning and premeditation to cause the death of Donald Lee Allen?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

Instructions: If you answered "NO" with respect to both of the statutory aggravating factors in this Section III, then stop your deliberations, cross out Sections IV, V and VI of this form, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you found the requisite age in Section I, the requisite mental state in Section II and

6

Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 74 of 166

**2062**

answered "YES" with respect to one or both of the statutory aggravating factors in this Section III, then proceed to Section IV which follows.

7

## IV. NON-STATUTORY AGGRAVATING FACTORS – COUNT EIGHT

Instructions: For each of the following, answer "YES" or "NO".

1. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant caused harm to the family of Donald Lee Allen as a result of the impact of the killing on the family of Donald Lee Allen?

YES ✓

NO _____


FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society?

YES _____

NO ✓

FOREPERSON

3. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed two people in that in addition to killing Donald Lee Allen, the defendant also killed Robin Williams?

YES ✓

NO _____

FOREPERSON

8

Instructions: Regardless of whether you answered "YES" or "NO" with respect to the three non-statutory aggravating factors in this Section IV, then proceed to Section V, which follows.

9

2065

## V. **MITIGATING FACTORS**

Instructions: For each of the following mitigating factors, in the space provided, indicate the number of jurors who have found the existence of that mitigating factor to be proven by the preponderance of the evidence as to Count Eight.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such [a] factor[s] established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

The statutory mitigating factors which the defendant contends have been proved by a preponderance of the evidence are:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

Number of jurors who so find ___0___.

2. The other factors in the defendant's childhood, background or character mitigate against imposition of the death sentence.

Number of jurors who so find ___11___.

The non-statutory factor[s] in the defendant's background or character, the circumstances of the crime[s], or other relevant facts or circumstances as mitigation which the defendant

10

contends have been proven by the preponderance of the evidence are as follows:

1. Marc Barnette has accepted full responsibility for his actions.

Number of jurors who so find ___1___.

2. Marc Barnette has remorse.

Number of jurors who so find ___1___.

3. Marc Barnette was abused by his father.

Number of jurors who so find ___1___.

4. Marc Barnette was affected by growing up in a family environment of violence, drugs
and alcohol abuse.

Number of jurors who so find ___12___.

5. Marc Barnette had repeated exposure to violence in the home.

Number of jurors who so find ___12___.

6. Marc Barnette attempted to protect his brother, Mario, from the damaging effects of
parental violence and neglect.

Number of jurors who so find ___12___.

11

7. Marc Barnette had a history of untreated emotional problems.

Number of jurors who so find __9__.

8. At the time of these crimes, Marc Barnette was experiencing a depressive episode.

Number of jurors who so find __0__.

9. Marc Barnette does well in a structured environment.

Number of jurors who so find __2__.

10. Marc Barnette cooperated with police.

Number of jurors who so find __12__.

11. Marc Barnette can serve a useful purpose to others in a prison environment.

Number of jurors who so find __12__.

12. At the time of these offenses, Marc Barnette was experiencing irrational and obsessive thoughts.

Number of jurors who so find __0__.

13. Marc Barnette's brother and children will be harmed by his execution.

Number of jurors who so find __0__.

12

In addition, there are three non-statutory mitigating factors which the Court instructs you to find. The Court instructs you that these three mitigating factors have been proven by the preponderance of the evidence and you should so indicate on this verdict form:

1.    Marc Barnette was neglected by his mother.

Number of jurors who so find __12__.

2.    Marc Barnette turned himself in to police.

Number of jurors who so find __12__.

3.    Marc Barnette has been a model prisoner.

Number of jurors who so find __12__.

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "NONE" and line out the extra spaces with a large "X". If more space is needed, write "CONTINUED" and use the reverse side of this page.

__. __None_____

_____

Number of jurors who so find _____.

13



Number of jurors who so find _____.

Number of jurors who so find _____.

Number of jurors who so find _____.

Instructions: Regardless of whether or not you chose to write in additional mitigating factors and findings in Section V above, proceed to Section VI and Section VII which follow.

14

**2070**

## VI.  <u>DETERMINATION</u>

Based upon consideration of whether the aggravating factor or factors found to exist as to Count Eight sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor or factors as to Count Eight are in themselves sufficient to justify a sentence of death, indicate your recommendation using either the following form A or B.

15

2071

## A. Death Sentence

Based upon consideration of whether the aggravating factor or factors found to exist

sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death,

or in the absence of any mitigating factors, whether the aggravating factor(s) are in themselves

sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of

death shall be imposed for the killing of Donald Lee Allen as to Count Eight.

YES    _1_____

NO    _____

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer

"NO", the foreperson alone should sign, and you should proceed to Section VI (B):

FOREPERSON

Date: _August_ _13_, 2002

16

**B.**   **<u>Sentence of Life in Prison Without Possibility of Release</u>**

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor or factors are in themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of life in prison without possibility of release shall be imposed for the killing of Donald Lee Allen in Count Eight.

<div align="right">

YES   _____

NO   _____

</div>

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer "NO", the foreperson alone should sign, and you should proceed to Section VII:

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

                                     FOREPERSON

Date: _____     _____, 2002

17

2073

## VII CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin or sex of the defendant or the victim might have been.

FOREPERSON

Date: _August_ _13_, 2002

WHEN THE JURY HAS COMPLETED ITS WORK AS TO EACH COUNT AND FILLED OUT THE VERDICT SHEETS ACCORDINGLY, THE JURY WILL RETURN TO THE COURTROOM.

18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Case Number: 3:97CR-23-V

UNITED STATES OF AMERICA )
)
v. )
)
)
AQUILIA MARCIVICCI BARNETTE, )
Defendant )
_____ )

AUG 1 3 2002

## SPECIAL VERDICT FORM REGARDING THE PUNISHMENT TO BE IMPOSED UPON THE DEFENDANT FOR THE KILLING OF ROBIN WILLIAMS WITH REFERENCE TO COUNT ELEVEN

**I.  AGE OF DEFENDANT**

Instructions: Answer "YES" or "NO".

1. As to the charge in Count Eleven, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant was eighteen years of age or older at the time of the offense?

YES ✔

NO _____

*Diane R Edwards*
FOREPERSON

Instructions: If you answered "NO" with respect to the determination in Section I, then stop your deliberations, cross out Sections II, III, IV, V and VI of this form, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the

1

appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you answered "YES" with respect to the determination in Section I, then proceed to Section II which follows.

2

**2076**

## II.  REQUISITE MENTAL STATE

Instructions: For each of the following, answer "YES" or "NO".

1. As to the charge in Count Eleven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed Robin Williams?

YES ✓

NO ____

_Diane R Edwards_
FOREPERSON

2. As to the charge in Count Eleven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally inflicted serious bodily injury which resulted in the death of Robin Williams?

YES ✓

NO ____

_Diane R Edwards_
FOREPERSON

3

3. As to the charge in Count Eleven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct intending that Robin Williams be killed <u>and/or</u> that lethal force be employed against Robin Williams which resulted in the death of Robin Williams?

YES ✓

NO _____

*Diane R Edwards*
FOREPERSON

4. As to the charge in Count Eleven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and resulted in the death of Robin Williams?

YES ✓

NO _____

*Diane R Edwards*
FOREPERSON

<u>Instructions</u>: If you answered "NO" with respect to all of the determinations in this section, then stop your deliberations, cross out Sections III, IV, V and VI of this form, and proceed to Section VII. Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

4

If you answered "YES" with respect to any one or more of the determinations in Section II, then proceed to Section III which follows.

5

2079

## III. STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO",

1. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Eleven while knowingly creating a grave risk of death to one or more persons in addition to the intended victim, namely, Bertha Williams and Sonji Hill?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Eleven after substantial planning and premeditation to cause the death of Robin Williams?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

Instructions: If you answered "NO" with respect to both of the statutory aggravating factors in this Section III, then stop your deliberations, cross out Sections IV, V and VI of this form, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

6

Case 3:12-cv-00327-MOC     Document 108     Filed 09/23/15     Page 92 of 166
**2080**

If you found the requisite age in Section I, the requisite mental state in Section II and answered "YES" with respect to one or both of the statutory aggravating factors in this Section III, then proceed to Section IV which follows.

7

2081

## IV.  NON-STATUTORY AGGRAVATING FACTORS – COUNT ELEVEN

Instructions: For each of the following, answer "YES" or "NO".

1. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant caused harm to the family of Robin Williams as a result of the impact of the killing on the family of Robin Williams?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society?

YES _____

NO ✓

_Diane R Edwards_
FOREPERSON

3. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed two people in that in addition to killing Robin Williams, the defendant also killed Donald Lee Allen?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

8

Instructions: Regardless of whether you answered "YES" or "NO" with respect to the three non-statutory aggravating factors in this Section IV, then proceed to Section V, which follows.

9

## V.   MITIGATING FACTORS

Instructions: For each of the following mitigating factors, in the space provided, indicate the number of jurors who have found the existence of that mitigating factor to be proven by the preponderance of the evidence as to Count Eleven.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such [a] factor[s] established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

The statutory mitigating factors which the defendant contends have been proved by a preponderance of the evidence are:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

Number of jurors who so find ___0___.

2. The other factors in the defendant's childhood, background or character mitigate against imposition of the death sentence.

Number of jurors who so find ___11___.

The non-statutory factor[s] in the defendant's background or character, the circumstances of the crime[s], or other relevant facts or circumstances as mitigation which the defendant

10

**2084**

contends have been proven by the preponderance of the evidence are as follows:

1. Marc Barnette has accepted full responsibility for his actions.

Number of jurors who so find ____1____.

2. Marc Barnette has remorse.

Number of jurors who so find ____1____.

3. Marc Barnette was abused by his father.

Number of jurors who so find ____1____.

4. Marc Barnette was affected by growing up in a family environment of violence, drugs and alcohol abuse.

Number of jurors who so find ____12____.

5. Marc Barnette had repeated exposure to violence in the home.

Number of jurors who so find ____12____.

6. Marc Barnette attempted to protect his brother, Mario, from the damaging effects of parental violence and neglect.

Number of jurors who so find ____12____.

11

7. Marc Barnette had a history of untreated emotional problems.

Number of jurors who so find ___9___.


8. At the time of these crimes, Marc Barnette was experiencing a depressive episode.

Number of jurors who so find ___0___.


9. Marc Barnette does well in a structured environment.

Number of jurors who so find ___2___.


10. Marc Barnette cooperated with police.

Number of jurors who so find ___12___.


11. Marc Barnette can serve a useful purpose to others in a prison environment.

Number of jurors who so find ___12___.


12. At the time of these offenses, Marc Barnette was experiencing irrational and obsessive thoughts.

Number of jurors who so find ___6___.


13. Marc Barnette's brother and children will be harmed by his execution.

Number of jurors who so find ___0___.


12

In addition, there are three non-statutory mitigating factors which the Court instructs you to find. The Court instructs you that these three mitigating factors have been proven by the preponderance of the evidence and you should so indicate on this verdict form:

1.    Marc Barnette was neglected by his mother.

Number of jurors who so find ___12___.

2.    Marc Barnette turned himself in to police.

Number of jurors who so find ___12___.

3.    Marc Barnette has been a model prisoner.

Number of jurors who so find ___12___.

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "NONE" and line out the extra spaces with a large "X". If more space is needed, write "CONTINUED" and use the reverse side of this page.

___. None _____

Number of jurors who so find _____.

13



Number of jurors who so find _____.

Number of jurors who so find _____.

Number of jurors who so find _____.

Instructions: Regardless of whether or not you chose to write in additional mitigating factors and findings in Section V above, proceed to Section VI and Section VII which follow.

14

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 100 of 166

**2088**

## VI.  DETERMINATION

Based upon consideration of whether the aggravating factor or factors found to exist as to Count Eleven sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor or factors as to Count Eleven are in themselves sufficient to justify a sentence of death, indicate your recommendation using either the following form A or B.

15

## A.    <u>Death Sentence</u>

Based upon consideration of whether the aggravating factor or factors found to exist

sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death,

or in the absence of any mitigating factors, whether the aggravating factor(s) are in themselves

sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of

death shall be imposed for the killing of Robin Williams as to Count Eleven.

YES    ✓

NO    _____

If you answer "YES", sign your names here, and then proceed to Section VII.  If you answer

"NO", the foreperson alone should sign, and you should proceed to Section VI (B):

FOREPERSON

Date: _August_ _13_, 2002

16

**B.** <u>Sentence of Life in Prison Without Possibility of Release</u>

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor or factors are in themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of life in prison without possibility of release shall be imposed for the killing of Robin Williams as to Count Eleven.

YES   _____

NO   _____

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer "NO", the foreperson alone should sign, and you should proceed to Section VII:

_____      _____

_____      _____

_____      _____

_____      _____

_____      _____

FOREPERSON

Date: _____   \_\_\_\_\_, 2002

17

FILED
CHARLOTTE, N. C.

AUG 2 0 2002

U. S. DISTRICT COURT
W. DIST. OF N. C.

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| ) | **JUDGMENT AND ORDER** |
| ) | |
| AQUILIA MARCIVICCI BARNETTE, ) | |
| Defendant ) | |
| _____ ) | |

Pursuant to the jury verdict, returned on January 27, 1998, finding the Defendant guilty

on all eleven counts of the Indictment; and pursuant to the jury verdict, returned on August 13,

2002, recommending the imposition of the death penalty on Counts Seven, Eight and Eleven of

the Indictment, the Court will now impose sentence on said counts, which are more particularly

described as follows:

**Count Seven**: Carjacking in violation of 18 U.S.C. § 2119(3), offense concluded June 22,

1996.

**Count Eight**: First Degree Murder by Use of a Firearm in violation of 18 U.S.C. §§

924(c)(1) & (i)2(1), offense concluded June 22, 1996.

**Count Eleven**: First Degree Murder by Use of a Firearm in violation of 18 U.S.C. §§

924(c)(1) & (i)2(1), offense concluded June 22, 1996.

Pursuant to the Federal Death Penalty Act of 1994, Title 18 U.S.C. §§ 3591-3595 and the

Special Findings of the jury, returned on August 13, 2002, and the jury's unanimous vote

recommending that the Defendant shall be sentenced to death, it is the Judgment of the Court that

the Defendant Aquilia Marcivicci Barnette is sentenced to death on each of Counts 7, 8 and 11 of

the Indictment.

/5

Pursuant to the provisions of 18 U.S.C. § 3596, IT IS ORDERED that the Defendant is committed to the custody of the Attorney General of the United States until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence.

When the sentence is to be implemented, the Attorney General shall release the Defendant to the custody of the United States Marshal, who shall supervise the implementation of the sentence in the manner prescribed by law of the State of North Carolina.

In the event the Defendant is released from prison, a five year term of supervised release is ordered. Within 72 hours of release from custody of the Bureau of Prisons, the Defendant shall report in person to the probation office in the district to which the Defendant is released.

This the 20th day of August, 2002.

RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

CRIMINAL ACTION NO. 3:97CR23-P

FILED
CHARLOTTE, N.C.

FEB 2 0 1998

U.S. DISTRICT COURT
W. DIST. OF N.C.

UNITED STATES OF AMERICA

v.                                                    JUDGMENT AND ORDER

AQUILIA MARCIVICCI BARNETTE

Pursuant to the jury verdict, returned on January 27, 1998, finding the Defendant guilty on all eleven counts of the Indictment, the Defendant is adjudged guilty of each of the following offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number |
|---|---|---|---|
| 18 U.S.C. §§ 2261(a)(1) & 2261(b) | Interstate Domestic Violence | April 30, 1996 | 1 |
| 18 U.S.C. § 924(c)(1) | Use & Carry a Firearm During Crime of Violence | April 30, 1996 | 2 |
| 18 U.S.C. § 844(h)(1) | Arson in Commission of a Felony | April 30, 1996 | 3 |
| 18 U.S.C. §§ 922(a)(6) & 924 | Providing False Information To Acquire a Firearm | May 21, 1998 | 4 |
| 26 U.S.C. §§ 5861(f) & 5871 | Making a Firearm | June 22, 1996 | 5 |
| 18 U.S.C. §§ 922(g)(1) & 924 | Felon in Possession of A Firearm | June 22, 1996 | 6 |
| 18 U.S.C. § 2119(3) | Carjacking | June 22, 1996 | 7 |

Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 106 of 166

2094

| | | | |
|---|---|---|---|
| 18 U.S.C. §§ 924(c)(1) & (i)2(1) | First Degree Murder by Use of a Firearm | June 22, 1996 | 8 |
| 18 U.S.C. § 2312 | Interstate Transportation Of Stolen Vehicle | June 22, 1996 | 9 |
| 18 U.S.C. §§ 2261(a)(1) & 2261(b)(1) | Interstate Domestic Violence | June 22, 1996 | 10 |
| 18 U.S.C. §§ 924(c)(1) & (i)2(1) | First Degree Murder by Use of a Firearm | June 22, 1996 | 11 |

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the Defendant, Aquilia Marcivicci Barnette is hereby committed to the custody of the Bureau of Prisons to be imprisoned as follows:

Count 6: LIFE;

Count 10: LIFE to be served concurrently with Count 6;

Count 1: 240 Months to be served concurrently with Count 6;

Counts 4, 5, & 9: 120 Months each count to run concurrently with each other and with Count 1;

Count 2: 360 Months to run consecutively to all other Counts; and

Count 3: 180 Months to run consecutively to all other Counts, resulting in a total sentence of Life Imprisonment, plus 540 Months consecutive.

As to Counts 7, 8, and 11, the Court has previously sentenced the Defendant to death on each Count in accordance with the recommendation of the jury.

2

Pursuant to the Federal Death Penalty Act of 1994, Title 18 U.S.C. §§ 3591-3595 and the Special Findings of the jury, returned on February 10, 1998, and the jury's unanimous vote recommending that the Defendant shall be sentenced to death, it is the Judgment of the Court that the Defendant Aquilia Marcivicci Barnette is sentenced to death on each of Counts 7, 8, and 11 of the Indictment.

Pursuant to the provisions of 18 U.S.C. § 3596, IT IS ORDERED that the Defendant is committed to the custody of the Attorney General of the United States until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence.

When the sentence is to be implemented, the Attorney General shall release the Defendant to the custody of the United States Marshal, who shall supervise the implementation of the sentence in the manner prescribed by law of the State of North Carolina.

As required by 18 U.S.C. § 3013, IT IS ORDERED that the Defendant shall pay a Special Assessment of $100.00 for each Count for a total of $800.00 which shall be due and payable immediately.

In the event the Defendant is released from prison, a five year term of supervised release is ordered. Within 72 hours of release from custody of the Bureau of Prisons, the Defendant shall report in person to the probation office in the district to which the Defendant is released.

Dated this _____ day of February, 1998.

BY THE COURT:

ROBERT D. POTTER, SENIOR JUDGE

3

Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 108 of 166

2096

FILED
CHARLOTTE  N C

U.S. DISTRICT COURT
W. DIST. OF N C.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA   02 AUG 20  AM 10: 23
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Docket No. 3:97CR-23 |
| v. | ) | |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE, | ) | |
| Defendant | ) | |
| | ) | |

## MOTION FOR NEW TRIAL, ARREST OF JUDGMENT AND OTHER RELIEF

NOW COMES the defendant, by and through counsel, and pursuant to Rules 33

and 34 of the Federal Rules of Criminal Procedure, respectfully moves that the Court

grant the defendant a new trial, or vacate the sentences of death imposed herein on

August 13, 2002 and impose sentences of Life Imprisonment without Possibility of

Release. In support of this Motion, the undersigned advance the following:

1. On July 2, 2002, the defendant filed his Motion for Relief pursuant to Ring v.

Arizona, ____ U.S.____, 122 S.Ct. 2428 (June 24, 2002) and Apprendi v. New Jersey,

530 U.S. 466, 120 S.Ct.2348, 147 L.Ed.2d 435 (2000). This Motion was filed thirteen

(13) days before the defendant's sentencing hearing was scheduled to start. A copy of the

Motion is attached as Exhibit 1 and incorporated herein by reference.

2. In the Motion, the defendant sought the following:

(a) that the Court strike the government's Notice of Intent to Seek the
Death Penalty;

(b) that the Court impose non-aggravated sentences due to the
constitutional insufficiency of the government's attempt to secure aggravated sentences;

(c) that the Court deem the Death Notice to be not properly pled and void
due to lack of inclusion in the Indictment;



(d) that the Court prohibit the government from introducing aggravating circumstances to the jury; and

(e) for such other relief as is justified and appropriate.

3. On July 12, 2002, the government filed a "Response to Defendant's Motion for Relief Pursuant to Ring v. Arizona." A copy of the government's Response is attached as Exhibit 2. The defense contends that the government's pleading is unresponsive to the issues raised by the defendant's Motion.

4. After July 15, 2002, during jury selection proceedings in this case, this Court issued an oral order denying the relief sought by the defendant.

5. On July 22, 2002, the United States government filed a pleading in the case of United States of America v. Zacarias Moussaoui, Criminal No. 01-455-A (ED VA) which substantially adopted the position taken by the defendant here respecting the constitutional necessity of grand jury indictment on any aggravating factors required by law to authorize imposition of the death penalty, See United States of America v. Zacarias Moussaoui, supra, "Government's Opposition to Standby Counsel's Supplemental Memorandum in Support of Motion to Dismiss Government's Notice of Intent to Seek a Sentence of Death" in the case. In this very significant case, in which pleadings are likely approved at high levels in the United States Department of Justice, the government argues persuasively that Ring v. Arizona does apply to capital sentencing, and asserts that it secured re-indictment of Mr. Moussaoui so as to comply

with Ring. A copy of the Government's Memorandum is attached as Exhibit 3, and may be found at http://notablecases.vaed.uscourts.gov/1:01-cr-00455/docs/66899/0.pdf.[1]

6. On August 13, 2002, the jury concluded the sentencing hearing by recommending that the defendant be sentenced to death on all three counts submitted to it by the Court. Pursuant to 18 USC Section 3594, the Court imposed three death sentences upon the defendant.

7. In light of the government's apparent reassessment of the applicability of Ring to federal capital sentencing proceedings through the Indictment Clause of the Fifth Amendment, the undersigned request that the Court reconsider its denial of the defendant's Motion for Relief under Ring, and grant the relief sought. In the alternative, and consistent with the mandate of Ring, the undersigned request that the Court issue an order, pursuant to Rule 34 of the Federal Rules of Criminal Procedure, arresting the sentences of death because the indictment fails to allege essential elements of the offense of capital or death-eligible murder (the alleged statutory aggravating factors), and/or

---

[1]The Government's Moussaoui submission states that "the Court's ruling [in Ring] that aggravating factors are viewed as elements of the offense, which require jury determination, suggests that the Court is likely to find that the Indictment Clause mandates submission of aggravating factors to the grand jury. See Ring, 122 S. Ct. at 2439 ("If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt."); id. at 2443 ("Because Arizona's enumerated aggravating factors operate as the 'functional equivalent of an element of a greater offense,' . . . the Sixth Amendment requires that they be found by a jury."); see also United States v. Cotton, 122 S. Ct. 1781, 1783 (May 20, 2002) (in federal prosecutions, any fact increasing the maximum punishment "must also be charged in the indictment.")."

because the Court lacked jurisdiction to hold a capital sentencing hearing before a jury in the absence of a constitutionally-sufficient allegation of statutory aggravating circumstances in the indictment.

In making this request, the defendant does not concede that the Federal Death Penalty Act may be rendered constitutional under Ring by means of the remedy selected by the government in Moussaoui--namely, the securing of a superseding indictment in which statutory aggravating factors are re-designated as "elements" of capital murder. On the contrary, he submits that the designation by Congress of such allegations as mere sentencing factors can only be corrected by Congress, and the FDPA is therefore facially unconstitutional under Ring and the Indictment Clause of the Fifth Amendment. The issue is academic here, however, since (unlike in Moussaoui) no such superceding indictment has been sought or obtained in this case. Instead, over his timely objection, cf. United States v. Cotton, 122 S. Ct. 1781 (2002), the defendant has clearly received a sentence--death--which exceeds the maximum sentence of life imprisonment allowable under the offenses actually made out by the indictment.

FOR ANY OR ALL OF THE REASONS SET FORTH HEREIN, the defendant requests that the Court reconsider its ruling on the Defendant's Motion for Relief Pursuant to Ring v. Arizona, and rule that the defendant's sentencing hearing—and the death sentences produced by it -- are invalid under the Indictment Clause of the Fifth Amendment. The defendant further requests that the Court impose a sentence of Life Imprisonment Without the Possibility of Release on each of the three counts submitted to the jury, inasmuch as that is the only punishment possible under indictments that fail to allege any capital aggravating circumstances.

Respectfully submitted on this the _20_ th day of August, 2002.

_Jean B. Lawson_
Jean B. Lawson
PO Box 472106
Charlotte, NC 28247
(704) 341-1865

_Harold J. Bender_ JBL
Harold J. Bender
200 N. McDowell Street
Charlotte, NC 28204
(704) 333-2169

ATTORNEYS FOR AQUILIA MARCIVICCI BARNETTE

# NOTE:

# THIS IS A PARTIALLY SCANNED DOCUMENT.

# PLEASE SEE THE CASE FILE FOR ATTACHMENTS, EXHIBITS, AFFIDAVITS OR OTHER MATERIAL WHICH HAS NOT BEEN SCANNED.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:97CR-23-1-V

FILED
CHARLOTTE, N.C.

02 JUL 17 PM 4: 24

U.S. ...
W. DIST ... C.

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v. )<br>)<br>AQUILIA MARCIVICCI BARNETTE, )<br>Defendant. )<br>_____ ) | **SUPPLEMENT TO DEFENDANT'S<br>MEMORANDUM IN SUPPORT<br>OF MOTION REGARDING *RING*** |

**NOW COMES** the Defendant, by and through counsel, and tenders this supplementary information to the Court in support of the defense contention that the Defendant's constitutional rights are violated by this sentencing hearing wherein the government seeks to place alleged "aggravating factors" before the jury in the absence of a grand jury indictment charging those circumstances.

The government recognizes the constitutional requirement that aggravating circumstances be alleged in an indictment by a grand jury. As evidence of this acknowledgment, the defense tenders the superceding indictments in *United States v. Moussaoui* (01-455-A; EDVA) and *United States v. Fell* (2:01CR12-01; DVt) (Exhibits 1 and 2) wherein the government specifically sought and obtained superceding grand jury true bills containing allegations of aggravating factors charged for sentencing purposes

Respectfully submitted, this the __17__ day of July, 2002.

_____
Harold J. Bender
200 N. McDowell Street
Charlotte, NC 28204
(704) 333-2169

_____
Jean B. Lawson
PO Box 472106
Charlotte, NC 28247
(704) 341-1865

ATTORNEYS FOR AQUILIA MARCIVICCI BARNETTE

2103

# CERTIFICATE OF SERVICE

I, Harold J. Bender, do hereby certify that I have served a copy of the foregoing

Supplement to Defendant's Memorandum in Support of Motion Regarding *Ring* upon

the following by depositing a copy of the same in the United States Mail, postage prepaid, and

addressed to:

Ms. Anne Tompkins
Assistant United States Attorney
United States Attorney's Office
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202

This the 7 day of July, 2002.

Harold J. Bender
Bender, Barnett & Falls
200 North McDowell Street
Charlotte, North Carolina 28204
704-333-2169
Attorney for Defendant BARNETTE

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 01-455-A |
| | ) | |
| | ) | Conspiracy to Commit Acts of Terrorism |
| -v- | ) | Transcending National Boundaries |
| | ) | (18 U.S.C. §§ 2332b(a)(2) & (c)) |
| | ) | (Count One) |
| | ) | |
| ZACARIAS MOUSSAOUI, | ) | |
|     a/k/a "Shaqil," | ) | Conspiracy to Commit Aircraft Piracy |
|     a/k/a "Abu Khalid al Sahrawi," | ) | (49 U.S.C. §§ 46502(a)(1)(A) and (a)(2)(B)) |
| | ) | (Count Two) |
| Defendant. | ) | |
| | ) | Conspiracy to Destroy Aircraft |
| | ) | (18 U.S.C. §§ 32(a)(7) & 34) |
| | ) | (Count Three) |
| | ) | |
| | ) | Conspiracy to Use Weapons of Mass |
| | ) | Destruction |
| | ) | (18 U.S.C. § 2332a(a)) |
| | ) | (Count Four) |
| | ) | |
| | ) | Conspiracy to Murder United States |
| | ) | Employees |
| | ) | (18 U.S.C. §§ 1114 & 1117) |
| | ) | (Count Five) |
| | ) | |
| | ) | Conspiracy to Destroy Property |
| | ) | (18 U.S.C. §§ 844(f), (i), (n)) |
| | ) | (Count Six) |

### JULY 2002 TERM - AT ALEXANDRIA

### SUPERSEDING INDICTMENT

### THE GRAND JURY CHARGES THAT:

<u>COUNT ONE</u>

(Conspiracy to Commit Acts of Terrorism Transcending National Boundaries)

<u>Background: al Qaeda</u>

1.     At all relevant times from in or about 1989 until the date of the filing of this Indictment, an international terrorist group existed which was dedicated to opposing non-Islamic governments with force and violence. This organization grew out of the "mekhtab al khidemat" (the "Services Office") organization which had maintained offices in various parts of the world, including Afghanistan, Pakistan (particularly in Peshawar), and the United States. The group was founded by Usama Bin Laden and Muhammad Atef, a/k/a "Abu Hafs al Masry," together with "Abu Ubaidah al Banshiri," and others. From in or about 1989 until the present, the group called itself "al Qaeda" ("the Base"). From 1989 until in or about 1991, the group (hereafter referred to as "al Qaeda") was headquartered in Afghanistan and Peshawar, Pakistan. In or about 1991, the leadership of al Qaeda, including its "<u>emir</u>" (or prince) Usama Bin Laden, relocated to the Sudan. Al Qaeda was headquartered in the Sudan from approximately 1991 until approximately 1996 but still maintained offices in various parts of the world. In 1996, Usama Bin Laden and other members of al Qaeda relocated to Afghanistan. At all relevant times, al Qaeda was led by its <u>emir</u>, Usama Bin Laden. Members of al Qaeda pledged an oath of allegiance (called a "<u>bayat</u>") to Usama Bin Laden and al Qaeda. Those who were suspected of collaborating against al Qaeda were to be identified and killed.

2.     Bin Laden and al Qaeda violently opposed the United States for several reasons. First, the United States was regarded as an "infidel" because it was not governed in a manner consistent with the group's extremist interpretation of Islam. Second, the United States was

2

viewed as providing essential support for other "infidel" governments and institutions, particularly the governments of Saudi Arabia and Egypt, the nation of Israel, and the United Nations organization, which were regarded as enemies of the group. Third, al Qaeda opposed the involvement of the United States armed forces in the Gulf War in 1991 and in Operation Restore Hope in Somalia in 1992 and 1993. In particular, al Qaeda opposed the continued presence of American military forces in Saudi Arabia (and elsewhere on the Saudi Arabian peninsula) following the Gulf War. Fourth, al Qaeda opposed the United States Government because of the arrest, conviction and imprisonment of persons belonging to al Qaeda or its affiliated terrorist groups or those with whom it worked. For these and other reasons, Bin Laden declared a jihad, or holy war, against the United States, which he has carried out through al Qaeda and its affiliated organizations.

3. One of the principal goals of al Qaeda was to drive the United States armed forces out of Saudi Arabia (and elsewhere on the Saudi Arabian peninsula) and Somalia by violence. Members of al Qaeda issued fatwahs (rulings on Islamic law) indicating that such attacks were both proper and necessary.

4. Al Qaeda functioned both on its own and through some of the terrorist organizations that operated under its umbrella, including: Egyptian Islamic Jihad, which was led by Ayman al-Zawahiri, and at times, the Islamic Group (also known as "el Gamaa Islamia" or simply "Gamaa't"), and a number of jihad groups in other countries, including the Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the Philippines, Tajikistan, Azerbaijan, Malaysia, Singapore, Indonesia, and the Kashmiri region of India and the Chechnyan region of Russia. Al Qaeda also

3

maintained cells and personnel in a number of countries to facilitate its activities, including in Kenya, Tanzania, the United Kingdom, Germany, Canada, Malaysia, and the United States.

5. Al Qaeda had a command and control structure which included a <u>majlis al shura</u> (or consultation council) which discussed and approved major undertakings, including terrorist operations. Al Qaeda also had a "military committee" which considered and approved "military" matters.

6. Usama Bin Laden and al Qaeda also forged alliances with the National Islamic Front in the Sudan and with representatives of the government of Iran, and its associated terrorist group Hizballah, for the purpose of working together against their perceived common enemies in the West, particularly the United States.

7. Since at least 1989, until the filing of this Indictment, Usama Bin Laden and the terrorist group al Qaeda sponsored, managed, and/or financially supported training camps in Afghanistan, which camps were used to instruct members and associates of al Qaeda and its affiliated terrorist groups in the use of firearms, explosives, chemical weapons, and other weapons of mass destruction. In addition to providing training in the use of various weapons, these camps were used to conduct operational planning against United States targets around the world and experiments in the use of chemical and biological weapons. These camps were also used to train others in security and counterintelligence methods, such as the use of codes and passwords, and to teach members and associates of al Qaeda about traveling to perform operations. For example, al Qaeda instructed its members and associates to dress in "Western" attire and to use other methods to avoid detection by security officials. The group also taught its

4

**2108**

members and associates to monitor media reporting of its operations to determine the effectiveness of their terrorist activities.

8. Since in or about 1996, Usama Bin Laden and others operated al Qaeda from their headquarters in Afghanistan. During this time, Bin Laden and others forged close relations with the Taliban in Afghanistan. To that end, Bin Laden informed other al Qaeda members and associates outside Afghanistan of their support of, and alliance with, the Taliban. Bin Laden also endorsed a declaration of jihad (holy war) issued by the "Ulema Union of Afghanistan."

### The September 11 Hijackers

9. On September 11, 2001, co-conspirators Mohamed Atta, Abdul Aziz Alomari, Wail al-Shehri, Waleed al-Shehri, and Satam al-Suqami hijacked American Airlines Flight 11, bound from Boston to Los Angeles, and crashed it into the North Tower of the World Trade Center in New York. (In this Indictment, each hijacker will be identified with the flight number of the plane he hijacked.)

10. On September 11, 2001, co-conspirators Marwan al-Shehhi, Fayez Ahmed, a/k/a "Fayez Banihammad," Ahmed al-Ghamdi, Hamza al-Ghamdi, and Mohand al-Shehri hijacked United Airlines Flight 175, bound from Boston to Los Angeles, and crashed it into the South Tower of the World Trade Center in New York.

11. On September 11, 2001, co-conspirators Khalid al-Midhar, Nawaf al-Hazmi, Hani Hanjour, Salem al-Hazmi, and Majed Moqed hijacked American Airlines Flight 77, bound from Virginia to Los Angeles, and crashed it into the Pentagon.

5

12. On September 11, 2001, co-conspirators Ziad Jarrah, Ahmed al-Haznawi, Saeed al-Ghamdi, and Ahmed al-Nami hijacked United Airlines Flight 93, bound from Newark to San Francisco, and crashed it in Pennsylvania.

### The Defendant

13. ZACARIAS MOUSSAOUI, a/k/a "Shaqil," a/k/a "Abu Khalid al Sahrawi," was born in France of Moroccan descent on May 30, 1968. Before 2001 he was a resident of the United Kingdom. MOUSSAOUI held a masters degree from Southbank University in the United Kingdom and traveled widely.

### MOUSSAOUI's Supporting Conspirators

14. Ramzi Bin al-Shibh, a/k/a "Ahad Sabet," a/k/a "Ramzi Mohamed Abdellah Omar," was born in Yemen on May 1, 1972. He entered Germany in or about 1995 and afterwards lived in Hamburg, where he shared an apartment with hijacker Mohammed Atta (#11) in 1998 and 1999. Bin al-Shibh also was employed with Atta as a warehouse worker at a computer company in Hamburg.

15. Mustafa Ahmed al-Hawsawi, a/k/a "Mustafa Ahmed," was born in Jeddah, Saudi Arabia on August 5, 1968.

### The Charge

16. From in or about 1989 until the date of the filing of this Indictment, in the Eastern District of Virginia, the Southern District of New York, and elsewhere, the defendant, ZACARIAS MOUSSAOUI, a/k/a "Shaqil," a/k/a "Abu Khalid al Sahrawi," with other members and associates of al Qaeda and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to kill and maim persons

6

within the United States, and to create a substantial risk of serious bodily injury to other persons by destroying and damaging structures, conveyances, and other real and personal property within the United States, in violation of the laws of States and the United States, in circumstances involving conduct transcending national boundaries, and in which facilities of interstate and foreign commerce were used in furtherance of the offense, the offense obstructed, delayed, and affected interstate and foreign commerce, the victim was the United States Government, members of the uniformed services, and officials, officers, employees, and agents of the governmental branches, departments, and agencies of the United States, and the structures, conveyances, and other real and personal property were, in whole or in part, owned, possessed, and leased to the United States and its departments and agencies, resulting in the deaths of thousands of persons on September 11, 2001.

## Overt Acts

In furtherance of the conspiracy, and to effect its objects, the defendant, and others known and unknown to the Grand Jury, committed the following overt acts:

## The Provision of Guesthouses and Training Camps

1. At various times from at least as early as 1989, Usama Bin Laden, and others known and unknown, provided and supported training camps and guesthouses in Afghanistan, including camps known as al Farooq, Khalden, Derunta, Khost, Siddiq, and Jihad Wal, for the use of al Qaeda and its affiliated groups.

## The Training

2. At various times from at least as early as 1990, unindicted co-conspirators, known and unknown, provided military and intelligence training in various areas, including

7

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 123 of 166
2111

Afghanistan, Pakistan, and the Sudan, for the use of al Qaeda and its affiliated groups, including the Egyptian Islamic Jihad.

### Financial and Business Dealings

3. At various times from at least as early as 1989 until the date of the filing of this Indictment, Usama Bin Laden, and others known and unknown, engaged in financial and business transactions on behalf of al Qaeda, including, but not limited to: purchasing land for training camps; purchasing warehouses for storage of items, including explosives; purchasing communications and electronics equipment; transferring funds between corporate accounts; and transporting currency and weapons to members of al Qaeda and its associated terrorist organizations in various countries throughout the world.

### The Efforts to Obtain Nuclear Weapons and Their Components

4. At various times from at least as early as 1992, Usama Bin Laden, and others known and unknown, made efforts to obtain the components of nuclear weapons.

### The Fatwahs Against American Troops in Saudi Arabia and Yemen

5. At various times from in or about 1992 until the date of the filing of this Indictment, Usama Bin Laden, working together with members of the _fatwah_ committee of al Qaeda, disseminated _fatwahs_ to other members and associates of al Qaeda that the United States forces stationed on the Saudi Arabian peninsula, including both Saudi Arabia and Yemen, should be attacked.

### The Fatwah Against American Troops in Somalia

6. At various times from in or about 1992 until in or about 1993, Usama Bin Laden, working together with members of the _fatwah_ committee of al Qaeda, disseminated _fatwahs_ to

8

other members and associates of al Qaeda that the United States forces stationed in the Horn of Africa, including Somalia, should be attacked.

<u>The Fatwah Regarding Deaths of Nonbelievers</u>

7.      On various occasions, an unindicted co-conspirator advised other members of al Qaeda that it was Islamically proper to engage in violent actions against "infidels" (nonbelievers), even if others might be killed by such actions, because if the others were "innocent," they would go to paradise, and if they were not "innocent," then they deserved to die.

<u>The August 1996 Declaration of War</u>

8.      On or about August 23, 1996, a Declaration of Jihad indicating that it was from the Hindu Kush mountains in Afghanistan entitled, "Message from Usamah Bin-Muhammad Bin-Laden to His Muslim Brothers in the Whole World and Especially in the Arabian Peninsula: Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Mosques; Expel the Heretics from the Arabian Peninsula" was disseminated.

<u>The February 1998 Fatwah Against American Civilians</u>

9.      In February 1998, Usama Bin Laden endorsed a <u>fatwah</u> under the banner of the "International Islamic Front for Jihad on the Jews and Crusaders." This <u>fatwah</u>, published in the publication <u>Al-Quds al-'Arabi</u> on February 23, 1998, stated that Muslims should kill Americans - including civilians - anywhere in the world where they can be found.

<u>Bin Laden Endorses the Nuclear Bomb of Islam</u>

10.     On or about May 29, 1998, Usama Bin Laden issued a statement entitled "The Nuclear Bomb of Islam," under the banner of the "International Islamic Front for Fighting the

9

Jews and the Crusaders," in which he stated that "it is the duty of the Muslims to prepare as much force as possible to terrorize the enemies of God."

### Usama Bin Laden Issues Further Threats in June 1999

11. In or about June 1999, in an interview with an Arabic-language television station, Usama Bin Laden issued a further threat indicating that all American males should be killed.

### Usama Bin Laden Calls for "Jihad" to Free Imprisoned Terrorists

12. In or about September 2000, in an interview with an Arabic-language television station, Usama Bin Laden called for a "jihad" to release the "brothers" in jail "everywhere."

### MOUSSAOUI Trains at Al Qaeda Training Camp

13. In or about April 1998, ZACARIAS MOUSSAOUI was present at the al Qaeda-affiliated Khalden Camp in Afghanistan.

### The German Cell

14. Beginning in and about 1998, Ramzi Bin al-Shibh, Mohammed Atta (#11), Marwan al-Shehhi (#175), and Ziad Jarrah (#93), and others, formed and maintained an al Qaeda terrorist cell in Germany.

### Hijackers Travel to the United States

15. On or about January 15, 2000, Khalid al-Midhar (#77) and Nawaf al-Hazmi (#77) traveled from Bangkok, Thailand, to Los Angeles, California.

### Hijackers Receive Flight Training

16. On or about June 3, 2000, Mohammed Atta (#11) traveled to the United States from Prague, Czech Republic.

10

17. In or about early July 2000, Mohammed Atta (#11) and Marwan al-Shehhi (#175) visited the Airman Flight School in Norman, Oklahoma.

18. Between in or about July 2000 and in or about December 2000, Mohammed Atta (#11) and Marwan al-Shehhi (#175) attended flight training classes at Huffman Aviation in Venice, Florida.

### Money is Moved to the Hijackers

19. On or about June 29, 2000, $5,000 was wired from the United Arab Emirates ("UAE") to Marwan al-Shehhi (#175) in Manhattan.

20. On or about July 18, 2000, $10,000 was wired from UAE into a Florida SunTrust bank account in the names of Mohammed Atta (#11) and Marwan al-Shehhi (#175).

21. On or about July 26, 2000, in Germany, Ramzi Bin al-Shibh wired money to Marwan al-Shehhi (#175) in Florida.

22. On or about August 7, 2000, $9,500 was wired from UAE into a Florida SunTrust bank account in the names of Mohammed Atta (#11) and Marwan al-Shehhi (#175).

23. On or about August 29, 2000, $20,000 was wired from UAE into a Florida SunTrust bank account in the names of Mohammed Atta (#11) and Marwan al-Shehhi (#175).

24. On or about September 17, 2000, $70,000 was wired from UAE into a Florida SunTrust bank account in the names of Mohammed Atta (#11) and Marwan al-Shehhi (#175).

### Jarrah (#93) Attempts to Enroll Bin al-Shibh in Flight Training Courses

25. On or about May 17, 2000, in Germany, Ramzi Bin al-Shibh applied for a visa to travel to the United States, listing a German telephone number ("German Telephone #1".) This visa application was denied.

11

26. On or about June 15, 2000, in Germany, Ramzi Bin al-Shibh applied for a visa to travel to the United States. This visa application was denied.

27. In or about August 2000, Ziad Jarrah (#93) attempted to enroll Ramzi Bin al-Shibh in a flight school in Florida.

28. On or about August 14, 2000, Ramzi Bin al-Shibh arranged to wire money from his account in Germany to the account of a flight training school in Florida.

29. On or about September 15, 2000, in Yemen, Ramzi Bin al-Shibh applied for a visa to travel to the United States, listing a residence in Hamburg, Germany. This visa application was denied in September 2000.

30. On or about October 25, 2000, in Germany, Ramzi Bin al-Shibh applied for a visa to travel to the United States. This visa application was denied.

<u>Bin al-Shibh Sends Money to al-Shehhi (#175)</u>

31. On or about September 25, 2000, in Hamburg, Germany, Ramzi Bin al-Shibh sent money via wire transfer to Marwan al-Shehhi (#175) in Florida.

<u>MOUSSAOUI Inquires About Flight Training</u>

32. On or about September 29, 2000, ZACARIAS MOUSSAOUI contacted Airman Flight School in Norman, Oklahoma using an e-mail account he set up on September 6 with an internet service provider in Malaysia.

33. In or about October 2000, ZACARIAS MOUSSAOUI received letters from Infocus Tech, a Malaysian company, stating that MOUSSAOUI was appointed Infocus Tech's marketing consultant in the United States, the United Kingdom, and Europe, and that he would receive, among other things, an allowance of $2500 per month.

12

<u>Atta (#11) Purchases Flight Training Equipment</u>

34.    On or about November 5, 2000, Mohammed Atta (#11) purchased flight deck

videos for the Boeing 747 Model 200, Boeing 757 Model 200, and other items from a pilot store

in Ohio ("Ohio Pilot Store").

<u>Bin al-Shibh Travels to London</u>

35.    Between on or about December 2 and December 9, 2000, Ramzi Bin al-Shibh

traveled from Hamburg, Germany, to London, England.

<u>MOUSSAOUI Travels from London to Pakistan</u>

36.    On or about December 9, 2000, ZACARIAS MOUSSAOUI flew from London,

England, to Pakistan.

<u>Atta (#11) Purchases More Flight Training Equipment</u>

37.    On or about December 11, 2000, Mohammed Atta (#11) purchased flight deck

videos for the Boeing 767 Model 300ER and the Airbus A320 Model 200 from the Ohio Pilot

Store.

<u>Flight Training and Exercise</u>

38.    Between in or about January 2001 and March 2001, Hani Hanjour (#77) attended

pilot training courses in Phoenix, Arizona, including at Pan Am International Flight Academy.

39.    Between on or about February 1, 2001, and on or about February 15, 2001,

Mohammed Atta (#11) and Marwan al-Shehhi (#175) took a flight check ride around Decatur,

Georgia.

40.    In or about February 2001, Mohammed Atta (#11) and Marwan al-Shehhi (#175)

attended a health club in Decatur, Georgia.

13

## MOUSSAOUI Comes to the United States

41. On or about February 7, 2001, ZACARIAS MOUSSAOUI flew from Pakistan to London, England.

42. On or about February 23, 2001, ZACARIAS MOUSSAOUI flew from London, England, to Chicago, Illinois, declaring at least $35,000 cash to U.S. Customs, and then from Chicago to Oklahoma City, Oklahoma.

43. On or about February 26, 2001, ZACARIAS MOUSSAOUI opened a bank account in Norman, Oklahoma, depositing approximately $32,000 cash.

44. Between on or about February 26, 2001, and on or about May 29, 2001, ZACARIAS MOUSSAOUI attended the Airman Flight School in Norman, Oklahoma, ending his classes early.

## Nawaf al-Hazmi (#77) Purchases Flight Training Equipment

45. On or about March 19, 2001, Nawaf al-Hazmi (#77) purchased flight deck videos for the Boeing 747 Model 400, the Boeing 747 Model 200 and the Boeing 777 Model 200, and another video from the Ohio Pilot Store.

## MOUSSAOUI Joins a Gym

46. In or about March 2001, ZACARIAS MOUSSAOUI joined a gym in Norman, Oklahoma.

## Hijackers Travel to and Within the United States

47. On or about April 1, 2001, Nawaf al-Hazmi (#77) was in Oklahoma.

48. Between on or about April 23, 2001, and on or about July 19, 2001, Satam al-Suqami (#11), Waleed al-Shehri (#11), Ahmed al-Ghamdi (#175), Majed Moqed (#77), Marwan

14

al-Shehhi (#175), Mohammed Atta (#11), Ahmed al-Nami (#93), Hamza al-Ghamdi (#175), Mohald al-Shehri (#175), Wail al-Shehri (#11), Ahmed al-Haznawi (#93), Fayez Ahmed (#175), and Salem al-Hazmi (#77) traveled from various points in the world to the United States.

### MOUSSAOUI Contacts a Commercial Flight School

49. On or about May 23, 2001, ZACARIAS MOUSSAOUI contacted an office of the Pan Am International Flight Academy in Miami, Florida, via e-mail.

### Hijackers Open Bank Accounts

50. In Summer 2001, Fayez Ahmed (#175), Saeed al-Ghamdi (#93), Hamza al-Ghamdi (#175), Waleed al-Shehri (#11), Ziad Jarrah (#93), Satam al-Suqami (#11), Mohand al-Shehri (#175), Ahmed al-Nami (# 93), and Ahmed al-Haznawi (#93) each opened a Florida SunTrust bank account with a cash deposit.

### Other Hijackers Attend Gym Training

51. Between in or about May and in or about July 2001, in Florida, Ziad Jarrah (#93) joined a gym and took martial arts lessons, which included instruction in kickboxing and knife fighting.

52. In or about June 2001, in Florida, Waleed al-Shehri (#11), Marwan al-Shehhi (#175) and Satam al-Suqami (#11) joined a gym.

### MOUSSAOUI Purchases Flight Training Equipment

53. On or about June 20, 2001, ZACARIAS MOUSSAOUI purchased flight deck videos for the Boeing 747 Model 400 and the Boeing 747 Model 200 from the Ohio Pilot Store.

15

2119

<u>Al-Hawsawi and Fayez Ahmed (#175) Open UAE Bank Accounts</u>

54. On or about June 23, 2001, Mustafa Ahmed al-Hawsawi used a cash deposit to open a checking account at a Standard Chartered Bank branch in Sharjah, UAE, and an ATM account in connection with the checking account.

55. On or about June 25, 2001, at the same Standard Chartered Bank branch in Sharjah, UAE, Fayez Ahmed (#175) used a cash deposit to open a checking account and also opened a savings account. Fayez Ahmed also opened an ATM and a VISA card account in connection with the checking account.

56. On or about June 25, 2001, Mustafa Ahmed al-Hawsawi opened a savings account at the Standard Chartered Bank and a VISA card account on the same account.

<u>Atta (#11) Purchases a Knife</u>

57. On or about July 8, 2001, Mohammed Atta (#11) purchased a knife in Zurich, Switzerland.

<u>MOUSSAOUI Pays for Flight Lessons</u>

58. On or about July 10 and July 11, 2001, ZACARIAS MOUSSAOUI made credit card payments to the Pan Am International Flight Academy for a simulator course in commercial flight training.

<u>Fayez Ahmed (#175) Gives Al-Hawsawi Control Over UAE Account</u>

59. On or about July 18, 2001, Fayez Ahmed (#175) gave power of attorney to Mustafa Ahmed al-Hawsawi for Fayez Ahmed's Standard Chartered Bank accounts in UAE.

60. On or about July 18, 2001, using his power of attorney, Al-Hawsawi picked up Fayez Ahmed's VISA and ATM cards in UAE.

16

61. Between on or about July 18 and on or about August 1, 2001, Mustafa Ahmed al-Hawsawi caused Fayez Ahmed's VISA card to be shipped from UAE to Fayez Ahmed in Florida. (The VISA card was then used for the first time on August 1, 2001, in Florida.)

### Jarrah (#93) Travels to Germany

62. On or about July 25, 2001, Ziad Jarrah (#93) traveled from the United States to Germany.

### Bin al-Shibh Moves Money to MOUSSAOUI from UAE

63. Between on or about July 29 and August 4, 2001, in Norman, Oklahoma, ZACARIAS MOUSSAOUI made several telephone calls from public telephones to a number in Duesseldorf, Germany ("German Telephone # 2").

64. On or about July 30 and 31, 2001, in Hamburg, Germany, Ramzi Bin al-Shibh, using the name "Ahad Sabet," received two wire transfers, totaling approximately $15,000, from "Hashim Abdulrahman" in UAE.

65. On or about August 1 and 3, 2001, Ramzi Bin al-Shibh, using the name "Ahad Sabet," wired approximately $14,000 to ZACARIAS MOUSSAOUI in Oklahoma from train stations in Duesseldorf and Hamburg, Germany.

### MOUSSAOUI Purchases Knives

66. On or about August 3, 2001, ZACARIAS MOUSSAOUI purchased two knives in Oklahoma City, Oklahoma.

### Jarrah (#93) Returns to the United States from Germany

67. On or about August 4, 2001, Ziad Jarrah (#93) traveled from Germany to the United States.

17

<u>MOUSSAOUI Travels from Oklahoma to Minnesota</u>

68. On or about August 10 and August 11, 2001, ZACARIAS MOUSSAOUI was driven from Oklahoma to Minnesota.

<u>MOUSSAOUI Takes Commercial Flying Lessons in Minnesota</u>

69. On or about August 13, 2001, in Minneapolis, Minnesota, ZACARIAS MOUSSAOUI paid approximately $6,800 in cash to the Pan Am International Flight Academy.

70. Between on or about August 13 and on or about August 15, 2001, ZACARIAS MOUSSAOUI attended the Pan Am International Flight Academy in Minneapolis, Minnesota, for simulator training on the Boeing 747 Model 400.

<u>MOUSSAOUI Possesses Knives and Other Items</u>

71. On or about August 16, 2001, ZACARIAS MOUSSAOUI possessed, among other things:

- two knives;

- a pair of binoculars;

- flight manuals for the Boeing 747 Model 400;

- a flight simulator computer program;

- fighting gloves and shin guards;

- a piece of paper referring to a handheld Global Positioning System receiver and a camcorder;

- software that could be used to review pilot procedures for the Boeing 747 Model 400;

18

- a notebook listing German Telephone #1, German Telephone #2, and the name "Ahad Sabet;"

- letters indicating that MOUSSAOUI is a marketing consultant in the United States for Infocus Tech; and

- a hand-held aviation radio.

### MOUSSAOUI Lies to Federal Agents

72. On or about August 17, 2001, ZACARIAS MOUSSAOUI, while being interviewed by federal agents in Minneapolis, attempted to explain his presence in the United States by falsely stating that he was simply interested in learning to fly.

### Jarrah (#93) Undertakes "Check Ride" At Flight School

73. On or about August 17, 2001, Ziad Jarrah (#93) undertook a "check ride" at a flight school in Fort Lauderdale, Florida.

### A Co-Conspirator Calls Fayez Ahmed From Germany

74. On or about August 18, 2001, a co-conspirator made a telephone call from Germany to Fayez Ahmed (#175) in Florida.

### Final Preparations for the Coordinated Air Attack

75. On or about August 22, 2001, Fayez Ahmed (#175) used his VISA card in Florida to obtain approximately $4,900 cash, which had been previously deposited into his Standard Chartered Bank account in UAE.

76. On or about August 22, 2001, in Miami, Florida, Ziad Jarrah (#93) purchased a Global Positioning System ("GPS"), other GPS related equipment, and schematics for 757

19

Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 135 of 166

2123

cockpit instrument diagrams. (GPS allows an individual to navigate to a position using coordinates pre-programmed into the GPS unit.)

77. On or about August 25, 2001, Khalid al-Midhar and Majed Moqed purchased with cash tickets for American Airlines Flight 77, from Virginia to Los Angeles, California, scheduled for September 11, 2001.

78. On or about August 26, 2001, Waleed al-Shehri and Wail al-Shehri made reservations on American Airlines Flight 11, from Boston, Massachusetts, to Los Angeles, California, scheduled for September 11, 2001, listing a telephone number in Florida ("Florida Telephone #1") as a contact number.

79. On or about August 27, 2001, reservations for electronic, one-way tickets were made for Fayez Ahmed and Mohand al-Shehri, for United Airlines Flight 175, from Boston, Massachusetts, to Los Angeles, California, scheduled for September 11, 2001, listing Florida Telephone Number #1 as a contact number.

80. On or about August 27, 2001, Nawaf al-Hazmi and Salem al-Hazmi booked flights on American Airlines Flight 77.

81. On or about August 28, 2001, Satam al-Suqami purchased a ticket with cash for American Airlines Flight 11.

82. On or about August 28, 2001, Mohammed Atta and Abdulaziz Alomari reserved two seats on American Airlines Flight 11, listing Florida Telephone #1 as a contact number.

83. On or about August 29, 2001, Ahmed al-Ghamdi and Hamza al-Ghamdi reserved electronic, one-way tickets for United Airlines Flight 175.

20

84. On or about August 29, 2001, Ahmed al-Haznawi purchased a ticket on United Airlines Flight 93 from Newark, New Jersey, to San Francisco, California, scheduled for September 11, 2001.

85. On or about September 3, 2001, in Hamburg, Germany, Ramzi Bin al-Shibh, using the name "Ahad Sabet," received approximately $1500 by wire transfer from "Hashim Ahmed" in UAE.

86. On or about September 5, 2001, Ramzi Bin al-Shibh traveled from Dusseldorf, Germany, to Madrid, Spain, and did not return to Germany.

87. On or about September 6, 2001, Satam al-Suqami (#11) and Abdulaziz Alomari (#11) flew from Florida to Boston.

<u>The Hijackers Return Excess Money to Al-Hawsawi in UAE</u>

88. On or about September 4, 2001, Mohammed Atta (#11) sent a FedEx package from Florida to UAE.

89. On or about September 5, 2001, Fayez Ahmed (#175) wired approximately $8,000 from his Florida SunTrust account to the Standard Chartered Bank account over which Al-Hawsawi had power of attorney.

90. On or about September 8, 2001, an Arab male retrieved the package from Mohammed Atta (#11) at FedEx in Dubai, UAE.

91. On September 8, 2001, Mohammed Atta (#11) wired $2,860 to "Mustafa Ahmed" in UAE.

92. On September 8, 2001, Mohammed Atta (#11) wired $5,000 to "Mustafa Ahmed" in UAE.

21

93. On September 9, 2001, Waleed M. al-Shehri (#11) wired $5,000 to "Ahamad Mustafa" in UAE.

94. On September 10, 2001, Marwan al-Shehhi (#175) wired $5,400 to "Mustafa Ahmad" in UAE.

95. On September 11, 2001, in UAE, approximately $16,348 was deposited into Al-Hawsawi's Standard Chartered Bank account.

96. On September 11, 2001, in UAE, at about 9:22 a.m. local time (the early morning hours of Eastern Daylight Time), Mustafa Ahmed al-Hawsawi moved approximately $6,534 from the $8,000 in Fayez Ahmed's (#175) Standard Chartered Bank account into his own account, using a check dated September 10, 2001, and signed by Fayez Ahmed; Al-Hawsawi then withdrew approximately $1,361, nearly all the remaining balance in Ahmed's account, by ATM cash withdrawal.

97. On September 11, 2001, in UAE, approximately $40,871 was prepaid to a VISA card connected to Al-Hawsawi's Standard Chartered Bank account.

<u>The September 11, 2001 Terrorist Attacks</u>

98. On September 11, 2001, the hijackers possessed a handwritten set of final instructions for a martyrdom operation on an airplane using knives.

99. On September 11, 2001, Mohammed Atta (#11) and Abdulaziz Alomari (#11) flew from Portland, Maine, to Boston, Massachusetts.

100. On September 11, 2001, Mohammed Atta (#11) possessed operating manuals for the Boeing 757 and 767, pepper spray, knives, and German travel visas.

22

101.    On September 11, 2001, Ziad Jarrah (#93) possessed flight manuals for Boeing 757 and 767 aircraft.

102.    On September 11, 2001, Mohammed Atta, Abdul Aziz Alomari, Satam al-Suqami, Waleed al-Shehri, and Wail al-Shehri hijacked American Airlines Flight 11, a Boeing 767, which had departed Boston at approximately 7:55 a.m. They flew Flight 11 into the North Tower of the World Trade Center in Manhattan at approximately 8:45 a.m., causing the collapse of the tower and the deaths of thousands of persons.

103.    On September 11, 2001, Hamza al-Ghamdi, Fayez Ahmed, Mohand al-Shehri, Ahmed al-Ghamdi, and Marwan al-Shehhi hijacked United Airlines Flight 175, a Boeing 767, which had departed from Boston at approximately 8:15 a.m. They flew Flight 175 into the South Tower of the World Trade Center in Manhattan at approximately 9:05 a.m., causing the collapse of the tower and the deaths of thousands of persons.

104.    On September 11, 2001, Khalid al-Midhar, Majed Moqed, Nawaf al-Hazmi, Salem al-Hazmi, and Hani Hanjour hijacked American Airlines Flight 77, a Boeing 757, which had departed from Virginia bound for Los Angeles, at approximately 8:10 a.m. They flew Flight 77 into the Pentagon in Virginia at approximately 9:40 a.m., causing the deaths of 189 persons.

105.    On September 11, 2001, Saeed al-Ghamdi, Ahmed al-Nami, Ahmed al-Haznawi, and Ziad Jarrah hijacked United Airlines Flight 93, a Boeing 757, which had departed from Newark, New Jersey bound for San Francisco at approximately 8:00 a.m. After resistance by the passengers, Flight 93 crashed in Somerset County, Pennsylvania at approximately 10:03 a.m., killing all on board.

23

## Al-Hawsawi Flees the U.A.E. for Pakistan

106. On or about September 11, 2001, Mustafa Ahmed al-Hawsawi left the U.A.E. for Pakistan.

107. On or about September 13, 2001, the supplemental VISA card connected to Al-Hawsawi's account was used to make six ATM withdrawals in Karachi, Pakistan.

## A Co-Conspirator Calls On Muslims To Fight The United States

108. On or about October 7, 2001, in Afghanistan, Ayman al-Zawahiri called on Muslims to join the battle against the United States.

## Bin Laden Praises The September 11 Attack And Threatens More Attacks

109. On or about October 7, 2001, in Afghanistan, Usama Bin Laden praised the September 11 attack, and vowed that the United States would not "enjoy security" before "infidel armies leave" the Saudi Gulf.

## A Co-Conspirator Solicits Violence Against United States Nationals

110. On or about October 10, 2001, Sulieman Abu Ghaith announced, on behalf of al Qaeda, that all Muslims had a duty to attack United States targets around the world.

(In violation of Title 18, United States Code, Sections 2332b(a)(2) and 2332b(c).)

24

**2128**

<u>COUNT TWO</u>
(Conspiracy to Commit Aircraft Piracy)

1.      The allegations contained in Count One are repeated.

2.      From in or about 1989 until the date of the filing of this Indictment, in the Eastern District of Virginia, the Southern District of New York, and elsewhere, the defendant, ZACARIAS MOUSSAOUI, a/k/a "Shaqil," a/k/a "Abu Khalid al Sahrawi," and other members and associates of al Qaeda and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to commit aircraft piracy, by seizing and exercising control of aircraft in the special aircraft jurisdiction of the United States by force, violence, threat of force and violence, and intimidation, and with wrongful intent, with the result that thousands of people died on September 11, 2001.

<u>Overt Acts</u>

3.      In furtherance of the conspiracy, and to effect its illegal objects, the defendant, and others known and unknown to the Grand Jury, committed the overt acts set forth in Count One of this Indictment, which are fully incorporated by reference.

(In violation of Title 49, United States Code, Sections 46502(a)(1)(A) and (a)(2)(B).)

25

## COUNT THREE
### (Conspiracy to Destroy Aircraft)

1. The allegations contained in Count One are repeated.

2. From in or about 1989 until the date of the filing of this Indictment, in the Eastern District of Virginia, the Southern District of New York, and elsewhere, the defendant, ZACARIAS MOUSSAOUI, a/k/a "Shaqil," a/k/a "Abu Khalid al Sahrawi," and other members and associates of al Qaeda and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to willfully destroy and wreck aircraft in

acts of violen ...inst and incap: ...ate individuals on such ai...aft, so as likely to e...aanger .. safety of such aircr: ... ...g .. ..... ...ousands of persons on September 11, 2001.

### Acts

3. In furtherance of the conspiracy, and to effect its illegal ...jects, the defendant, and others known and unknown to the ...a... Jury, comm... ted the overt acts set forth in Count One of this I...... whic...... fully incorporated by reference.

(In violation of Title 18, .... .. ... ...

26

<u>COUNT FOUR</u>
(Conspiracy to Use Weapons of Mass Destruction)

1.     The allegations contained in Count One are repeated.

2.     From in or about 1989 until the date of the filing of this Indictment, in the Eastern District of Virginia, the Southern District of New York, and elsewhere, the defendant, ZACARIAS MOUSSAOUI, a/k/a "Shaqil," a/k/a "Abu Khalid al Sahrawi," and other members and associates of al Qaeda and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to use weapons of mass destruction, namely, airplanes intended for use as missiles, bombs, and similar devices, and other weapons of mass destruction, without lawful authority against persons within the United States, with the results of such use affecting interstate and foreign commerce, and against property that was owned, leased and used by the United States and by departments and agencies of the United States, with the result that thousands of people died on September 11, 2001.

<u>Overt Acts</u>

3.     In furtherance of the conspiracy, and to effect its illegal objects, the defendant, and others known and unknown to the Grand Jury, committed the overt acts set forth in Count One of this Indictment, which are fully incorporated by reference.

(In violation of Title 18, United States Code, Section 2332a(a).)

27

## COUNT FIVE
### (Conspiracy to Murder United States Employees)

1. The allegations contained in Count One are repeated.

2. From in or about 1989 until the date of the filing of this Indictment, in the Eastern District of Virginia, the Southern District of New York, and elsewhere, the defendant, ZACARIAS MOUSSAOUI, a/k/a "Shaqil," a/k/a "Abu Khalid al Sahrawi," and other members and associates of al Qaeda and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to kill officers and employees of the United States and agencies and branches thereof, while such officers and employees were engaged in, and on account of, the performance of their official duties, and persons assisting such employees in the performance of their duties, in violation of Section 1114 of Title 18, United States Code, including members of the Department of Defense stationed at the Pentagon.

## Overt Acts

3. In furtherance of the conspiracy, and to effect its illegal objects, the defendant, and others known and unknown to the Grand Jury, committed the overt acts set forth in Count One of this Indictment, which are fully incorporated by reference.

(In violation of Title 18, United States Code, Sections 1114 and 1117.)

28

Case 3:12-cv-00327-MOC    Document 108    Filed 09/23/15    Page 144 of 166

**2132**

## COUNT SIX
### (Conspiracy to Destroy Property of the United States)

1.     The allegations contained in Count One are repeated.

2.     From in or about 1989 until the date of the filing of this Indictment, in the Eastern District of Virginia, the Southern District of New York, and elsewhere, the defendant, ZACARIAS MOUSSAOUI, a/k/a "Shaqil," a/k/a "Abu Khalid al Sahrawi," and other members and associates of al Qaeda and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to maliciously damage and destroy, by means of fire and explosives, buildings, vehicles, and other real and personal property used in interstate and foreign commerce and in activities affecting interstate and foreign commerce, and buildings, vehicles, and other personal and real property in whole and in part owned and possessed by, and leased to, the United States and its departments and agencies, and as a result of such conduct directly and proximately caused the deaths of thousands of persons on September 11, 2001, including hundreds of public safety officers performing duties as a direct and proximate result of the said damage and destruction.

### Overt Acts

3.     In furtherance of the conspiracy, and to effect its illegal objects, the defendant, and others known and unknown to the Grand Jury, committed the overt acts set forth in Count One of this Indictment, which are fully incorporated by reference.

(In violation of Title 18, United States Code, Sections 844(f), (i), and (n).)

29

Case 3:12-cv-00327-MOC     Document 108     Filed 09/23/15     Page 145 of 166
2133

<u>Notice of Special Findings</u>

a. The allegations of Counts One, Two, Three, and Four of this Indictment are hereby realleged as if fully set forth herein and incorporated by reference.

b. As to Counts One, Two, Three, and Four of this Indictment, the defendant ZACARIAS MOUSSAOUI:

(1) was more than 18 years of age at the time of the offense. (Title 18, United States Code, Section 3591(a));

(2) participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victims died as a direct result of the act. (Title 18, United States Code, Section 3591(a)(2)(C));

(3) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victims died as a direct result of the act. (Title 18, United States Code, Section 3591(a)(2)(D));

(4) in committing the offenses described in Counts One, Two, Three, and Four, knowingly created a grave risk of death to one or more persons in addition to the victims of the offense. (Title 18, United States Code, Section 3592(c)(5));

(5) committed the offenses described in Counts One, Two, Three, and Four in an especially heinous, cruel, and depraved manner in that they involved torture and

30

serious physical abuse to the victims. (Title 18, United States Code, Section 3592(c)(6)); and,

(6) committed the offenses described in Counts One, Two, Three, and Four after substantial planning and premeditation to cause the death of a person and commit an act of terrorism. (Title 18, United States Code, Section 3592(c)(9)).

(Pursuant to Title 18, United States Code, Sections 3591 and 3592).

_____
FOREPERSON

/s/_____
MICHAEL CHERTOFF
ASSISTANT ATTORNEY GENERAL

/s/_____
PAUL J. McNULTY
UNITED STATES ATTORNEY
ROBERT A. SPENCER
DAVID J. NOVAK
ASSISTANT UNITED STATES ATTORNEYS
EASTERN DISTRICT OF VIRGINIA

/s/_____
JAMES B. COMEY
UNITED STATES ATTORNEY
KENNETH M. KARAS
ASSISTANT UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF NEW YORK

31

TJNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | *DE~ThTY* r~~j( |
| V. | ) | Crim. No. 2:01CR12-01 |
| | ) | |
| | | (18 U.S.C. §~ 2, 922(g); |
| DONALD FELL | ) | 924(c); 1201(a) & 2119) |

### SUPERSEDING INDICTMENT

The grand jury charges:

1. On or about November 27, 2000, inside the residence of Debra Fell in Rutland, Vermont, the defendant DONALD FELL and Robert Lee killed Debra Fell and Charles Conway by stabbing them with knives and slashing their throats.

2. After the killings, FELL and Lee decided to flee from Rutland and left the residence to search for a vehicle. They were armed with a Mossberg 12-gauge shotgun.

3. In the pre-dawn hours of November 27, FELL and Lee accosted Teresca King, who had driven a 1996 Plymouth Neon automobile from her home in North Clarendon, Vermont to her job at the Price Chopper supermarket in downtown Rutland. FELL and Lee commandeered King's vehicle at shotgun-point and abducted Mrs. King.

4. Thereafter, FELL and Lee drove Mrs. King from Vermont to New York

State. A few hours after the carjacking and kidnapping, in Dutchess County, New York, FELL and Lee intentionally killed Mrs. King by punching and kicking her in

the head and by smashing her head with rocks. They abandoned her body at the murder scene.

5. After killing Mrs. King, FELL and Lee drove in her automobile to Wilkes-Barre, Pennsylvania and then on to Clarksville, Arkansas where, on November 30, 2000, they were stopped by law enforcement authorities and arrested.

6. Mrs. King's 1996 Plymouth Neon automobile was manufactured outside the state of Vermont.

2

7. The grand jury repeats and realleges paragraphs 1-6 of this indictment.

8. On or about November 27, 2000, in the District of Vermont, the defendant DONALD FELL, with intent to cause death and serious bodily harm, took by force and violence and by intimidation from the person and presence of Teresca King a 1996 Plymouth Neon automobile, a motor vehicle that had been transported, shipped and received in interstate and foreign commerce, and the death of Teresca King resulted from such taking of the automobile.

(18 U.S.C. §§ 2119(3) & 2)

3

COUNT 2

9.  The grand jury repeats and realleges paragraphs 1-6 of this indictment.

10.  On or about November 27, 2000, in the District of Vermont and elsewhere, the defendant DONALD FELL unlawfully seized, kidnapped, abducted and carried away Teresca King and held her for ransom, reward and otherwise, and willfully transported h~r, while she was alive, in interstate commerce from the State of Vermont to the State of New York, resulting in the death of Teresca King.

(18 U.S.C. §~ 1201 (a) (1) & 2)

4

**2140**

COUNT 3

11. The grand jury repeats and realleges paragraphs 1-6 of this indictment.

12. On or about November 27, 2000, in the District of Vermont and elsewhere, the defendant DONALD FELL knowingly possessed and brandished a firearm, specifically a Mossberg 12-gauge shotgun, in furtherance of crimes of violence for which they may be prosecuted in a court of the United States, namely, carjacking and kidnapping in violation of 18 U.S.C. §§ 2119 and 1201.

(18 U.S.C. 8§ 924(c) (1) (A) (ii) & 2)

5

13.   The grand jury repeats and realleges paragraphs 1-6 of this indictment.

14.   On or about and between November 27, 2000 and November 30, 2000, in the District of Vermont and elsewhere, the defendant DONALD FELL, who was a fugitive from justice, transported a firearm, to wit, a Mossberg 12-gauge shotgun, in interstate commerce between th~ State of Vermont and the State of Arkansas.

(18 U.S.C. ~§ 922(g) (2) & 2)

6

15. The grand jury repeats and realleges the accusations of Counts 1 and 2 of this indictment.

16. As to Counts 1 and 2, the defendant DONALD FELL was 18 years of age or older at the time of the offenses.

a. was 18 years of age or older at the time of the offenses.

b. intentionally killed Teresca King (18 U.S.C. ~ 3591 (a) (2) (A))

c. intentionally inflicted serious bodily injury that resulted in the death of Teresca King (18 U.S.C. §. 3591 (a) (2) (B)).

d. intentionally participated in one or more acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and Teresca King died as a direct result of such act or acts (18 U.S.C. § 3591 (a) (2)(C))

e. intentionally and specifically engaged in one or more acts of violence, knowing that the act or acts created a grave risk of death to a person, other than one of the participants in the offense, such that participation in such act or acts constituted a reckless disregard for human life, and Teresca King died as a direct result of such act or acts (18 U.S.C. § 3591(a) (2) (D)).

f. caused the death of Teresca King during the commission

6

of a violation of 18 U.S.C. § 1201 (kidnapping) (18 U.S.C. §

3592(c) (1)).

g. committed the offense in an especially heinous, cruel,

or depraved manner in that it involved serious

physical abuse to Teresca King (18 U.S.C. §

3592(c) (6))

h. intentionally killed or attempted to kill more than one person in a

single criminal episode (18 U.S.C. § 3592 (c) (16))

A TRUE BILL

~a~~eZ≤V
FOREPERSON

<?& 4 ~~?1~(
PETER W. HALL (GLW & WBD)
United States Attorney

Rutland, Vermont
July 8, 2002

6

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA

v.                                    )Crim. No. 2:01CR12-01


DONALD FELL

**SUPPLEMENTAL NOTICE OF INTENT TO SEEK DEATH PENALTY**

The United States of America, by and through its attorney, Peter W. Hall, United States Attorney for the District of Vermont, notifies the defendant Donald Fell, the Court and defendant's counsel that, in the event the defendant is convicted under Counts 1 and/or 2 of the Superseding Indictment, relating to the death of Teresca King, the United States will seek the sentence of death.

The Government believes that the circumstances are such that if the defendant is convicted of either of those offenses, a sentence of death is justified. At a death penalty hearing, the Government will prove the threshold culpability factors and statutory aggravating factors as set forth in the Superseding Indictment. In addition, the Government will prove the following aggravating factors identified under 18 U.S.C. § 3593 (a)

1.  Donald Fell participated in the abduction of Teresca King to facilitate his escape from the area in which he and an accomplice had committed a double murder. This factor applies to both Counts 1 and 2.

2.   Donald Fell participated in the murder of Teresca King to prevent

2

her from reporting the kidnapping and carjacking to authorities. This factor applies to both Counts 1 and 2.

3. Donald Fell participated in the murder of Teresca King after substantia premeditation to commit the crime of carjacking. This factor applies to both Counts 1 and 2.

4. As reflected by the victim's personal characteristics as an individual human being and the impact of the offense on the victim and the victim's family, the defendant caused loss, injury and harm to the victim and the victim's family, see Payne v. Tennessee, 501 U.S. 808, 825-27 (1991), including but not limited to the following:

(a) Infliction of distress on the victim. During the four-hour interval between her kidnapping and murder, Teresca King suffered extreme anxiety and emotional suffering.

(b) Impact of the offense on the family of the victim. The kidnapping and murder of Teresca King have caused the King family extreme emotional suffering, and the victim's family has suffered severe and irreparable harm.

This factor, non-statutory aggravating factor number 4, applies to both Counts 1 and 2.

2

Dated at Burlington, in the District of Vermont, this 8th. day of July, 2002.

Respectfully submitted,

UNITED STATES OF AMERICA

PETER W. HALL
United States Attorney

3

# CERTIFICATE OF SERVICE

I, JeanineM. W. Blais, Secretary to the U.S. Attorney and the Criminal Chief for the United

States Attorney's Office for the District of Vermont, do hereby certify that I have served a copy

of the foregoing <u>SUPPLEMENTAL NOTICE OF INTENT TO SEEK DEATH</u>

<u>PENALTY</u> on the Defendant by mailing a copy thereof to Alexander Bunin, Federal Public

Defender and Gene V. Primomo, Assistant Federal Public Defender at 39 North Pearl Street, 5th

Floor, Albany, New York 12207 and Paul S. Volk, P.O. Box 8, Burlington, VT *05402-0465;* counsel for the

defendant, this 8th day of July, 2002.

JEANNE M.W. BLAIS
Secy. to USA & Criminal Chief
U.S. Attorney's Office
P.O. Box 570
Burlington, VI' 05402

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Case Number: 3:97CR-23-V

UNITED STATES OF AMERICA )
)
)
)    ORDER
)
AQUILIA MARCIVICCI BARNETTE, )
     Defendant )
_____ )

**FILED**
CHARLOTTE, N. C.

SEP 0 9 2002

U. S. DISTRICT COURT
W. DIST. OF N. C.

This matter is before the Court upon Defendant's Motion that the Court grant Defendant a new trial or vacate the three death sentences imposed on August 13, 2002 and impose sentences of Life Imprisonment without Possibility of Release. Defendant makes his Motion pursuant to Rules 33 and 34 of the Federal Rules of Criminal Procedure. In this Motion, Defendant reiterates the arguments he presented in support of his July 2, 2002 Motion for Relief pursuant to *Ring v. Arizona*, ___ U.S. ___, 122 S.Ct. 2428 (June 24, 2002). That Motion for Relief was denied by oral order of this Court on July 29, 2002.

Defendant argues that *Ring* applies to federal capital sentencing proceedings, and therefore the Federal Death Penalty Act is facially unconstitutional under *Ring* and the Fifth Amendment's Indictment Clause. Thus, Defendant argues that because the indictment in this case fails to allege essential elements of the offense of capital or death-eligible murder (the alleged statutory aggravating factors were set forth in the Government's Notice of Intent to Seek the Death Penalty), and/or because the Court lacked jurisdiction to hold a capital sentencing hearing before a jury without a constitutionally-sufficient allegation of statutory aggravating circumstances in the indictment, this Court should reconsider its denial of Defendant's earlier Motion for Relief under *Ring*.

In support, Defendant cites the government's decision in *United States v. Zacarias Moussaoui*, Criminal No. 01-455-1 (E.D. VA) to secure a re-indictment of Mr. Moussaoui subsequent to the *Ring* decision. That case is non-binding on this Court. Furthermore, this Court considered the government's use of a superceding indictment in the *Moussaoui* case when, on July 29, 2002, it denied Defendant's Motion for Relief under *Ring*. The *Ring* decision declared Arizona's death penalty statutory scheme unconstitutional because the trial judge and not the jury makes factual findings during sentencing as to the presence or absence of aggravating factors. However, "Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him ... Ring does not contend that his indictment was constitutionally defective." *Ring* at 2437, FN4. It is the position of this Court that the *Ring* decision in itself does not find the Federal Death Penalty Act facially unconstitutional. The *Ring* decision is a narrow one and does not reach the issue of whether, under the Federal Death Penalty Act, the aggravating factors must be alleged in the indictment. Under the Federal statutory scheme, the jury makes the ultimate factual findings as to the presence or absence of both statutory and non-statutory aggravating factors, which complies with the Supreme Court's decision in *Ring*.

Pursuant to F.R.CR.P. 33, this Court may grant Defendant's motion for a new trial "if the interests of justice so require". Pursuant to F.R.CR.P. 34, this Court "shall arrest judgment if the indictment ... does not charge an offense or if the court was without jurisdiction of the offense charged." This Court finds that the interests of justice do not require granting a new trial pursuant to the Rule 33. In addition, this Court finds that the indictment in this case sufficiently alleged the elements of the offenses charged. This Court clearly had jurisdiction over the re-sentencing hearing in accordance with the Federal Death Penalty Act and the Constitution, and

will not arrest judgment in this case.

It is THEREFORE ORDERED that Defendant's Motion New Trial, Arrest of Judgment and Other Relief is hereby DENIED.

This the 5th day of September, 2002.

RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE



RECEIVED
JUN 1 6 2003
US ATTORNEY'S
OFFICE
CHARLOTTE, NC