| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **vs.** | **<u>DEATH</u> <u>PENALTY</u> <u>§ 2255</u>** |
| **AQUILIA MARCIVICCI BARNETTE** | |

### <u>PETITIONER AQUILIA MARCIVICCI BARNETTE'S REPLY</u>

Aquilia Marcivicci "Marc" Barnette, through undersigned counsel, files this reply to the government's response [Doc. 98] (hereinafter "Govt. Brief") to Mr. Barnette's Initial Motion for Relief Pursuant to 28 U.S.C. § 2255 [Doc. 48] and Motion for Evidentiary Hearing [Doc. 73]. Mr. Barnette reiterates his request for an evidentiary hearing on all disputed issues of fact. He further reserves the right to amend his § 2255 motion and related pleadings in support of a hearing.

## I. THE GOVERNMENT'S RESPONSE FAILS TO ADEQUATELY REBUT MR. BARNETTE'S CLAIMS THAT HIS SENTENCING HEARING WAS UNCONSTITUTIONAL.

Mr. Barnette's § 2255 motion and pleadings in support of an evidentiary hearing explain how and why trial counsel's performance prior to and during his resentencing in 2002 was constitutionally deficient and further details how competent counsel would have uncovered and used compelling mitigating evidence that probably would have persuaded one or more fully-informed jurors to spare Mr. Barnette's life. *See* Claims I and VIII. The § 2255 motion and pleadings in support of an evidentiary hearing also set forth additional constitutional violations that require relief from his sentences of death. *See* Claims II-VIII. Mr. Barnette's claims and request for a hearing is supported by numerous affidavits and declarations of former members of

1

Mr. Barnette's defense team, experts, family, and friends, as well as records that were never collected or reviewed by trial counsel. This wealth of information describes, among other things, Mr. Barnette's excruciatingly troubling and complicated background and family history, the true depth of the physical and emotional abuse he suffered as a child, his positive character traits that were often masked by substantial psychiatric impairments, and the extent of his positive adjustment to incarceration. The government fails to sufficiently contest or rebut this information, that competent trial counsel should have developed and used it to avoid a death sentence, and the reasonable probability of a different result with effective counsel. As a result of these errors, Mr. Barnette's sentencing jury was misinformed, misled, and without sufficient information to properly weigh the mitigating circumstances of Mr. Barnette's life.

## II.     THE SCOPE OF REPLY OF THIS REPLY.

Much of the government's response simply reflects its disagreement with the factual and/or legal basis of Mr. Barnette's § 2255 motion and request for an evidentiary hearing. It is not counsels' intention here to repeat each and every claim presented in the original motion or request for a hearing. Instead, counsel will focus on particular areas of legal and/or factual dispute that, in counsels' judgment, require specific attention by way of a reply.

## III.     AN EVIDENTIARY HEARING IS REQUIRED.

When, as here, a petitioner files a motion to vacate or set aside under § 2255, an evidentiary hearing *must* be granted "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. Based on the § 2255 petition and subsequent pleadings and exhibits filed in this case, it is clear that Mr. Barnette has presented a number of colorable constitutional claims showing disputed facts. *See United States v. Magini*, 973 F.2d 261, 264 (4th Cir. 1992) ("A federal court in a habeas

proceeding *must* hold an evidentiary hearing when the petitioner alleges facts which, if true, would entitle her to relief.") (emphasis added). Conclusive negation is a high bar. *See, e.g., United States v. Auten*, 632 F.2d 478, 482 (5th Cir. 1980) (documents suggesting, but not proving, that Government had failed to disclose all impeachment information about its witness were sufficient to trigger a hearing). If the petitioner's "specific and detailed factual assertions … cannot be said to be incredible," and, if true, would entitle him to relief, the function of 28 U.S.C. § 2255 can be served only by affording a hearing. *See Machibroda v. United States*, 368 U.S. 487, 495-496 (1962). When district courts have failed to hold evidentiary hearings to resolve factual disputes cases in § 2255 actions, the Fourth Circuit has reversed. *See, e.g., United States v. Diaz*, No. 13-6952, 547 F. App'x 303, 304, 2013 WL 6246774 (4th Cir. Dec. 4, 2013) (holding that district court "abused its discretion in concluding, without an evidentiary hearing, that Diaz did not direct counsel to file a notice of appeal"); *United States v. Mitchell*, No. 11-6711, 484 F. App'x 744, 745, 2012 WL 2365895 (4th Cir. Jun. 22, 2012) (holding that district court abused its discretion by failing to hold an evidentiary hearing as was required to make the factual findings necessary for resolving petitioner's § 2255 motion); *United States v. O'Quinn*, No. 05-6412, 166 F. App'x 697, 698, 2006 WL 372430 (4th Cir. Feb. 16, 2006) (vacating and remanding because factual dispute existed that required evidentiary hearing on claim of ineffective assistance of counsel).

An evidentiary hearing is mandatory here because almost all of Mr. Barnette's claims concern events that took place outside the Court's presence and that do not appear in the trial record. In such circumstances, only an evidentiary hearing can ensure a fair and reliable determination of the underlying facts. *See Machibroda,* 368 U.S. at 494-95 (hearing necessary where movant's allegations primarily concern "occurrences outside the courtroom and upon

which the record [can], therefore, cast no real light"); *United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004) (same); *Armienti v. United States*, 234 F.3d 820, 825 (2nd Cir. 2000) (a hearing is ordinarily required where the movant's claims depend on "actions taken by counsel outside the [trial judge's] presence"). Because ineffective assistance of counsel claims "involve[] off-the-record interactions" involving trial counsel and other members of the defense team, they typically "cannot be determined by examining the motion, files, and records" alone. *Chang v. United States*, 250 F.3d 79, 85 (2nd Cir. 2001) (citation omitted). This is particularly true where, as here, the Government alleges that defense counsel acted according to a "strategy." *See United States v. Hayes*, 532 F.3d 349, 355 (5th Cir. 2008) (absent a hearing, there is "no way to analyze [counsel's] potential strategy"); *United States v. Culverhouse*, 507 F.3d 888, 898 (5th Cir. 2007) (remanding for hearing, because without a hearing, court could only make "hindsight guesses" regarding counsel's strategy).

In its response, the government repeatedly denies—without submitting any evidence—that Mr. Barnette's trial counsel performed deficiently. By contrast, Mr. Barnette submitted sworn affidavits and declarations. The conflict between Mr. Barnette's detailed allegations, supported by sworn evidence, and the Government's unsupported denials cannot be resolved against Mr. Barnette without a hearing. *See Peavy v. United States,* 31 F.3d 1341, 1346 (6th Cir. 1994) (where affidavit supported the movant's claims, and Government offered no "evidence in support of its position," Government's "unverified responses … were plainly inadequate" to justify denying relief without a hearing). As the Supreme Court has held, the purpose of § 2255 is to ensure that petitioners with legitimate claims are not barred from relief. *See Barefoot v. Estelle,* 463 U.S. 880, 888 (1983) (courts "need not, and should not … fail to give non-frivolous claims of constitutional error the careful attention that they deserve");

*Blackledge v. Allison,* 431 U.S. 63, 72 (1977) ("[A]rrayed against the interest in finality is the very purpose of the writ of habeas corpus to safeguard a person's freedom from detention in violation of constitutional guarantees.").

The Fourth Circuit has made clear, repeatedly, that under these circumstances an evidentiary hearing is required. *See, e.g., United States v. White,* 366 F.3d 291, 300 (4th Cir. 2004) (remanding for an evidentiary hearing in case where government never offered any sworn denial of petitioner's allegation; "an attorney's unsworn argument does not constitute evidence, and the Government has offered no affidavit, deposition, sworn statement, or other direct evidence" to rebut the petitioner's claims); *United States v. Witherspoon,* 211 F.3d 923, 927 (4th Cir. 2000) (remanding for an evidentiary hearing because "it is not clear from counsel's affidavit whether counsel disputes the facts alleged by [the movant]"); *United States v. Young,* 644 F.2d 1008, 1113 (4th Cir. 1981) (remanding for an evidentiary hearing because "[t]he record does not disclose the necessary facts to answer [the] question" that would otherwise justify relief).

IV. **THE GOVERNMENT'S BRIEF MISSTATES THE TRIAL RECORD, MISCONSTRUES THE BREADTH OF MITIGATING EVIDENCE, AND INCORRECTLY SUGGESTS DEFERRING TO TRIAL COUNSEL'S DECISIONS THAT WERE UNINFORMED AND UNREASONABLE.**

A. **The Government's Brief's References to the Trial Record Do Not Support Its Claims.**

The government's brief repeatedly, but incorrectly, claims that "[m]ost of what [Mr. Barnette] contends his attorneys ought to have investigated, developed, or introduced was, in fact, introduced by his attorneys, or it is cumulative." [Govt. Brief at 54] These arguments are simply unsupported by the record.

### 1. The jury did not hear readily available information about the abuse Barnette suffered at the hands of his father.

For example, the government's brief misstates the record by claiming that "[t]he jury heard ample evidence Barnette was abused by his father." [Govt. Brief at 58] Yet during the trial the government made precisely the opposite argument when it objected to a peremptory finding that the evidence established that Mr. Barnette had been abused by his father. [Govt. Ex. 1 at 1847] This Court agreed that the evidence was at best "conflicting" and perhaps did not rise to the level of showing "abuse":

> I think the evidence is conflicting. I mean, I agree the trend of the evidence – for example, I believe Dr. Dietz did seem to concede that – we have used the term excessive discipline, but that's not the same as abuse, necessarily.

[Govt. Ex. 1 at 1298] When trial counsel pressed the point, the Court further noted:

> And [Derrick Barnette] testified about what he did and didn't do, I believe the jury is entitled to make up its mind as to his credibility. *That's the best – not necessarily the best evidence, but at least it's evidence. That could go either way*, so I would leave that for the jury's determination.

[Govt. Ex. 1 at 1848 (emphasis added)] Evidence that "could go either way" is not the equivalent of "ample evidence" that Mr. Barnette was abused by his father." Indeed, the jury all but fully rejected (11 jurors out of 12) that Mr. Barnette had been abused by his father. [Stetler Declaration ¶ 87, Bates No. 61]

### 2. The jury did not hear readily available information about Jesse Cooper, a significant caretaker in Barnette's life.

The government's brief similarly misstates the record by claiming that "Barnette's attorneys presented substantial evidence about Jesse Cooper, his experience during the Korean War, the way he acted and the role he played in the lives of Barnette and his brother, and what they perceived about him through the testimony of [Marc] Barnette, Derrick Barnette, and Mario Barnette." [Govt. Brief at 55] The record upon which the government relies does not support this

argument. For example, the government's brief suggests that Derrick Barnette explained to the jury "Jessie Cooper's history and daily behavior." [Govt. Brief at 60] Yet Derrick Barnette's actual testimony—which barely spanned one-and-a-half pages of transcript—provided scant information about Jesse Cooper. Instead, Derrick Barnette merely told the jury that Jesse Cooper "was unique" and a "[l]ittle eccentric," that he "would speak in a code [that] was more or less a military code," and that he drank Pabst Blue Ribbon. These descriptors of Jesse Cooper went completely unexplained and unexplored by trial counsel, leaving the jury with nothing useful or informative. [Govt. Ex. 1 at 1294-95]

Similarly, trial counsel did not present "substantial" information about Jesse Cooper through Marc Barnette or Mario Barnette. Marc Barnette testified for less than one page about his grandfather. From him the jury learned that Jesse was "elderly," "frail," had been "pronounced … dead" during the Korean War, and was disabled thereafter. [Govt. Ex. 1 at 1040-41]  Mario Barnette shared that Jesse Cooper lived in a "pretty run down" house, called family members by nicknames, and dressed in an army coat and wore an eye patch. Without follow-up or further explanation, Mario Barnette shared that Jesse Cooper was "just kind of his own person." [Govt. Ex. 1 at 1336]

As expert Russell Stetler explains, "There was no hint of psychiatric or physical disability [concerning Jesse Cooper] from [the testimony of] either Derrick or Mario." [Stetler Declaration ¶ 82, Bates No. 194] Completely omitted from what the jury heard about this important person in Marc Barnette's life was the fact that Jesse Cooper "had been traumatized during the war; upon his return home, he exhibited symptoms consistent with Posttraumatic Stress Disorder (PTSD); he then became an alcoholic, apparently at least in part in an attempt to self-medicate those symptoms." As Dr. Richard Dudley reports, according to Marc Barnette's mother, Sonia, "her

7

father 'lived in that war for the rest of his life.'" [Dudley Report ¶ 9, Bates No. 210] The jury heard none of this important information about a key figure in Mr. Barnette's upbringing. [Rowles Mitigation Report, Bates Nos. 232-259; Jesse Cooper: Military Records, Bates Nos. 5156-5253]

Trial counsel's failures were unreasonable. It was clear that trial counsel were aware that Jesse Cooper had a traumatic experience in the Korean War and that it disabled him. Yet they failed to conduct a reasonably thorough investigation in order to actually understand what had occurred and why it was significant. They failed to obtain Jesse Cooper's military and medical background, and failed to investigate how that background, and its impact on him, manifested and affected others, including Mr. Barnette.

Moreover, what defense counsel seemingly sought to introduce about Jesse Cooper was sharply undercut by their own failures to conduct a proper investigation and provide their experts with readily available information. Dr. Mark Cunningham, who testified during Mr. Barnette's resentencing 2002, explains:

> My review of the materials from post-conviction counsel makes clear that there were important pieces of information trial counsel had never shared with or provided to me. This information includes, but is not limited to, Cessie Alfonso's expert report; Jesse Cooper's medical and military records; and access to many social history witnesses (who apparently were readily available in 2002) and the important mitigating and mental health information they had to share. Because I did not have this information in 2002, the expert opinion I provided to Mr. Barnette's sentencing jury was unknowingly incomplete and rendered me vulnerable to damaging impeachment by the government. For example, because trial counsel did not provide me with this available information, my testimony in 2002 about … the scope and significance of Jesse Cooper's combat trauma (Korea) and post-traumatic stress symptoms … was incomplete.

[Affidavit of Cunningham ¶ 11, Bates No. 14846]

*3. The jury did not hear readily available information about the murder of Pearl Cooper and its affect on Barnette's mother and his own upbringing.*

The government's brief similarly misstates what the jury learned about the murder of Marc Barnette's maternal grandmother, Pearl Cooper. [Govt. Brief at 56] Any comparison between what trial counsel presented concerning Pearl Cooper with what a reasonable investigation would have produced lays bare just how insufficient trial counsel's efforts were. Mr. Barnette's jury knew nothing about Pearl's status in the family, her break-up with Jesse Cooper, the impact of the divorce on the family, family suspicions long-held of Lloyd Brown (who would eventually kill her), the disturbing details of how she was killed and her body discovered, and how the murder shook Sonia and the family. [Brief in Support at 31-37]

Rather than receive a full and informed accounting of this seminal event, Mr. Barnette's jury was simply told the following:

| Trial Counsel: | And at some point – what happened to – between Leroy [sic] and Pearl Cooper? |
|---|---|
| Derrick Barnette: | One morning I got a phone call. It was Sonia. She had told me that Leroy Brown [sic] had shot her mother and that she asked me to come down there. I got up and got in the bed with my mother and had a conversation with her. Just, you know, how did this happen? How could this happen? Why? And she, you know, comforted me. And I got another phone call from Sonia and I immediately got up and drove down there to her. |

[Govt. Ex. 1 at 1297-98]

In terms of the significance of Pearl's murder, trial counsel elicited only the following from Derrick Barnette:

| Trial Counsel: | Did Sonia change after [the murder]? |
|---|---|

9

| Derrick Barnette: | She didn't change outwardly, but you couldn't make any references to her mother. She would just break down at that point. |
|---|---|

[Govt. Ex. 1 at 1343]

With regard to the defense experts, trial counsel's efforts to educate the jury about this seminal event was similarly unavailing—a direct consequence of their unreasonably insufficient investigation.

| Trial Counsel: | How about an opinion as to whether the death of his grandmother, that Derrick described this morning, whether or not that had any effect on [Marc Barnette]? |
|---|---|
| Dr. Halleck: | I think that had a major effect on him. We have to remember that his mother was only 14 at the time, and she was really a child raising a child and the grandmother was having a significant role, apparently, in raising Marc. So with the grandmother's death, Marc not only lost one of the people that was parenting him, but Sonia had a profound reaction to her mother's death and she became less effective as a parent. |

[Govt. Ex. 1 at 1383-84]

| Dr. Cunningham: | Then at 10 months Pearl was murdered with Marc in the next room when this happens, not that he can remember Pearl being murdered, but that's now part of – that's part of what you know about yourself and your family, that when you were 10 months old, your grandma was murdered in the next room. |
|---|---|

[Govt. Ex. 1 at 1592]

It is insufficient the jury to have heard that "Sonia had a profound reaction to her mother's death and she became less effective as a parent" but not be provided with *any* information to support that claim—especially when such evidence was readily available. The evidence provided in post-conviction demonstrates clearly how and why this trauma was unmistakably significant. [Brief in Support at 31-37] Moreover, it cannot be claimed that this

decision *not* to provide the jury with this information was reasonable and informed strategy. [Lawson Affidavit, Bates No. 14861; Alfonso Affidavit ¶ 9, Bates No. 2]

> 4. *The jury did not hear readily available information about Sonia Cooper's claims that Derrick Barnette "rigged" paternity tests and how that affected Barnette.*

The government's brief is also incorrect when it asserts that Sonia Cooper's claims "that Derrick was Barnette's father and in denial about the paternity results" were put before the jury. [Govt. Brief at 59] Notably, the government previously argued that trial counsel put forward "no evidence of this." During resentencing, Dr. Cunningham tried to testify about Sonia's insistence that the paternity tests were rigged, and how that left Mr. Barnette and his brother "to deal with this issue by themselves," resulting in "no shared reality of, okay, this is what happened, let me help you understand this." Because trial counsel had not adequately developed or presented this information, the prosecution successfully objected to this testimony because "[t]here is *no evidence of this*." [Govt. Ex. 1 at 1610-11 (emphasis added)] Mr. Barnette's post-conviction filings make clear there was powerful information about the paternity issue that trial counsel knew or should have known, but they failed to adequately develop this information.[1] As Dr. Cunningham explains:

> My review of the materials from post-conviction counsel makes clear that there were important pieces of information trial counsel had never shared with or provided to me. … Because I did not have this information in 2002, the expert opinion I provided to Mr. Barnette's sentencing jury was unknowingly incomplete and rendered me vulnerable to damaging impeachment by the government. For example, because trial counsel did not provide me with this available information, my testimony in 2002 about Sonia Cooper's denial of Derrick's paternity test results and the impact that had on Marc Barnette … was incomplete.

[Affidavit of Cunningham ¶ 11, Bates No. 14846]

---

[1] *See*, *e.g.*, Alfonso Affidavit ¶ 12-14, Bates No. 3; Burgess Affidavit ¶ 19, Bates Nos. 54-55; Johnson Affidavit ¶¶ 20, 22, Bates No. 92.

> 5. *The jury did not hear readily available information about the abuse and neglect Barnette suffered during his childhood.*

The government's brief further misstates the trial record with respect to Sonia Barnette and what the jury heard about her parenting. Indeed, at resentencing, the prosecution challenged the sufficiency of the defense evidence concerning the neglect suffered by Mr. Barnette during his childhood, stressing in particular the failure of the defense to call his mother to testify. As the prosecution argued:

> Mrs. Barnette didn't testify at all. There is room for the jury to make a consideration about whether hearing from that witness might have been good evidence of neglect, and I think that's, again, another consideration. It's a matter of degree … [W]e would contend that defendant's own statements early to psychologists painted a picture of a childhood less than having been a neglected child.

[Govt. Ex. 1 at 1848-49] As noted above, the jury all but completely rejected the mitigating factor that Mr. Barnette had been abused by his father. [Stetler Declaration ¶ 87, Bates No. 61]

> 6. *The government has no response to the fact that trial counsel knowingly provided Barnette's experts with faulty and incomplete information—and never informed the experts that they were doing so.*

The government's brief also failed to provide a credible response to Mr. Barnette's undisputed assertions that the experts in his case relied on faulty information. Trial counsel themselves told this Court that the mitigation investigation done at the first trial was "superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation," and that it contained "misinformation." [2002 Resentencing: Ex Parte Filings, Bates No. 366] *Despite this knowledge, trial counsel unreasonably had their experts rely on that very same information at Mr. Barnette's resentencing.* The government's brief overlooks this fact—and the fact that trial counsel unreasonably withheld the work produced by their replacement mitigation specialist from their experts. [Doc. 74 at 80-81; Cunningham Affidavit ¶ 10, Bates No. 14846]

The government also offers faulty logic in an effort to gloss over the fundamental problem that trial counsel failed in their duties to properly investigate, develop, follow-up on, and present readily available mitigating evidence. For example, the government suggests that it is unimportant that trial counsel failed to contact Dr. Sally Johnson and provide her with accurate information about Mr. Barnette's background prior to the 2002 resentencing because "the expert witnesses that Barnette did call reviewed Johnson's work with Barnette, interviewed Johnson, and presented opinions to the jury based on information in Dr. Johnson's report." [Govt. Brief at 76-77]

This circular reasoning endorses nothing more than a classic case of "garbage in, garbage out," and fails to grasp the problem with experts relying on faulty, incomplete, and inaccurate information. *See United States v. Esquivel-Rios*, 725 F.3d 1231, 1237 (10th Cir. 2013) ("What goes into the database will much affect the reasonableness of a search relying on it: garbage in, garbage out (GIGO)."). For example, Dr. Halleck was cross-examined by the government about the fact that Dr. Johnson had previously reported that Mr. Barnette described his childhood "in relatively positive terms." [Govt. Ex. 1 at 1521] The government's brief fails to address the fact that Dr. Johnson now agrees that her information about Mr. Barnette's background was "sparse and less comprehensive than seen in many capital cases[.]" Thus, Dr. Halleck was put in a position where his opinion and credibility were undermined because trial counsel plied him with inaccurate and incomplete information. To be sure, the information that was available—but not developed or shared by trial counsel—was significant. Had this information been made available to Dr. Johnson, not only would have Dr. Halleck's opinion been more credible, but Dr. Johnson could have and would have testified favorably. [Johnson Affidavit ¶¶ 11, 17, 20-22, 25 Bates Nos. 90-93]

**B.  The Government Incorrectly Argues for Limitless Deference to Trial Counsel's Decisions.**

The government seeks to brush aside Mr. Barnette's evidence of trial counsel's deficient performance by repeatedly arguing that seemingly limitless deference is due to trial counsel's strategic decision-making. Deference to the reasonable and informed decision-making of trial counsel extends only that far—to the point that the decisions were *reasonable* and *informed*—and not, as here, where trial counsel concedes that choices made were not, in fact, reasonably informed or strategic. *See Winston v. Pearson*, 683 F.3d 489, 504 (4th Cir. 2012) ("Yet deference to the decisions of counsel is not limitless. Attorneys have a duty to investigate their client's case so as to enable them to make professional decisions that merit distinction as 'informed legal choices.'") (quoting *Elmore v. Ozmint,* 661 F.3d 783, 858 (4th Cir. 2011)). Indeed, the "usual deference to tactical decisions is not relevant" when the decisions are based on "information that was faulty because of … ineffective investigatory steps." *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987).

The government does not—and indeed they cannot—contest the following un-informed acts and omissions by Mr. Barnette's trial counsel. For example:

- Ms. Lawson "never considered" and did not recall ever discussing with co-counsel, Harold Bender, whether to have any mental health expert assess or evaluate Mr. Barnette's trial testimony. This was despite the fact that she was aware that an expert could "opine to the jury about a defendant's confession or demeanor." [Lawson Affidavit ¶ 23, Bates No. 97]

- Ms. Lawson did not coordinate or suggest conversations or meetings between a key defense expert, Ann Burgess, and any other social history witnesses, despite knowing that such access would have been important to Dr. Burgess' expert opinion. This failure to provide Dr. Burgess with such access resulted in the expert having unduly incomplete and inaccurate information. As Ms. Lawson explains, "Some of the social history information … provided to Dr. Burgess, including information about Mr. Barnette's prior relationships, came from Sindy Maxwell's work on the first trial – the same work [trial counsel] had previously concluded and told the court was poorly done and deficient." Trial counsel further failed to coordinate any information sharing

14

between Dr. Burgess—whose opinion relied upon an accurate and fulsome understanding of Mr. Barnette's background—and Cessie Alfonso, who provided trial counsel with a mitigation report (one week after Dr. Burgess submitted her report). [Lawson Affidavit ¶¶ 26-27, Bates No. 98]

- Trial counsel never provided Dr. Mark Cunningham or Dr. Seymour Halleck with Cessie Alfonso's mitigation report or informed either expert that Sindy Maxwell's social history investigation (upon which they both relied) was, in trial counsel's view, incomplete and inaccurate. Consequently, both experts relied on the incomplete and inaccurate background information compiled by Ms. Maxwell from Mr. Barnette's first trial. [Lawson Affidavit ¶¶ 32-33, Bates Nos. 99-100; Cunningham Affidavit ¶ 10, Bates Nos. 14846]

- Although they had good reason to believe it was significant and important, trial counsel never collected Jessie Cooper's medical or military records or other information about his combat injuries or commendations. [Lawson Affidavit ¶ 34, Bates No. 100]

- Although they themselves told the Court that Mr. Barnette's prior relationships with other women was critically important to understand, trial counsel did not interview, and did not direct their investigators or experts to interview, a number of key witnesses (such as Sheila Sullivan, Tameka Hunter, and Kowana Dozier). [Lawson Affidavit ¶ 29, Bates No. 99]

- Trial counsel was aware that focusing on Sonia Barnette's "own grief, trauma, and abuse, and how that impacted her, could have been powerful mitigating evidence," yet they failed to develop or present any of that information to the jury, and failed to ask any of the experts to focus on those issues. [Lawson Affidavit ¶¶ 21, 35 Bates No. 97, 100]

- After trial counsel told this Court that the first investigation (from the 1998 trial) had been "superficial and non-sufficiently in depth to enable the formation of a cohesive theory of mitigation," trial counsel knew—but did nothing about the fact—that their new mitigation specialist interviewed only 12 people (including Mr. Barnette) and failed to interview a slew of witnesses who had previously testified or been identified as "potential mitigation witnesses" (such as Sheila Sullivan, Tameka Hunter, and Kowana Dozier). [Lawson Affidavit ¶¶ 8, 37 Bates No. 95, 100-01]

The failure of Mr. Barnette's trial counsel to perform the aforementioned duties and develop readily available information for presentation to the jury was unreasonable and deserves no deference. These issues and investigative avenues that were abandoned, or not pursued, were not particularly complicated or complex. Take, for example, the failure to obtain Jesse Cooper's

15

military records. As the Fourth Circuit has made clear, "Counsel were obligated 'to be familiar with readily available documents necessary to an understanding of [Barnette's] case[.]'" *Winston*, 683 F.3d at 505 (quoting *Hyman v. Aiken,* 824 F.2d 1405, 1416 (4th Cir.1987)). By neglecting to review Cooper's military records and present them to the jury, and instead unreasonably rely on Mr. Barnette—the defendant—to inform the jury about his grandfather's military service and psychological condition, trial counsel wholly abdicated their responsibility to present a full and accurate profile of Mr. Barnette's life.

These failures are all the more pronounced given the outcome of the first trial in 1998. As noted by expert Russell Stetler, a number of important "red flags" were evidenced from the 1998 penalty proceeding upon which trial counsel should have revisited.

> The 1998 sentencing proceeding in Mr. Barnette's case was itself full of "red flags": the trauma experienced by Mr. Barnette's teenager mother when her mother was shot and killed by her step-father; the combat trauma experienced by Mr. Barnette's maternal grandfather, Jessie Cooper, in the Korean War and its impact on his civilian life; the beatings Derrick inflicted on young Marc for bad grades in school; the impact of the divorce of Derrick and Sonia; Mr. Barnette's hospitalization in Georgia after a brutal beating; the track coach who recognized Mr. Barnette's potential and may have had an outsider's insights into his situation at home; the shooting of Mr. Barnette by his cousin when he returned to North Carolina; Mr. Barnette's suicide attempt as a teenager; and his chronic crying spells, from the time he was with Natasha Heard (sobbing in the closet) until the period after the break-up with Robin Williams (when his mother and Aunt Sheila observed him crying on the telephone). Events that were superficially described needed to be explored in depth. What was the impact of her mother's murder on Sonia? How did her mother's death affect Sonia's ability to care for her son? After the grandmother died, who looked after ten-month-old Marc while Sonia attended school? What did the military and Veterans Administration records document about Jessie Cooper's wounds and post-war functioning? How did Mr. Barnette do in school? What did teachers and coaches know about his home situation? Did he come to school hungry or with visible bruises? Who could confirm the physical maltreatment by his father? What did police reports and medical records say about the incidents when Mr. Barnette was victimized as a teenager? The 1998 proceedings provided a roadmap for follow-up investigation.

[Stetler Declaration ¶ 54, Bates No. 175] Despite the "roadmap for follow-up investigation,"

trial counsel for Mr. Barnette at resentencing inexplicably failed to reasonably explore these issues.

The existence of "red flags" and the need for the follow-up investigation was not lost on trial counsel. Indeed, the August 28, 2001 *ex parte* filing by Ms. Lawson and Ms. Rauscher establishes this fact. As Mr. Lawson explained:

> Based on our work in the case up to that point, which constituted a review of the first trial transcript, Mr. Barnette's criminal record, and discovery, we wrote that "an approach different from that used in his first sentencing hearing [was] warranted." We believed that the first defense team tried to minimize the features of Marc Barnette's relationships with other women, and, in some instances, sought to blame the women for any difficulties that existed. It was our belief that we would need to address those prior relationships head on, and have a far better understanding of them than what the first defense team had or presented to the jury.
>
> Based on our review of the case materials as of August 28, 2001, it was also apparent that the first defense team presented a "disjointed" sentencing case. As we explained in the *ex parte* Statement of Defense Contentions: "[W]itnesses were unprepared for cross-examination. The investigation was superficial and not sufficiently in depth to enable the formation of a cohesive theory of mitigation."

[Lawson Affidavit ¶¶ 7-8, Bates Nos. 94-101]

The Supreme Court has consistently stressed the importance of reasonably pursuing leads. In *Wiggins v. Smith*, nothing that trial counsel had uncovered suggested that mitigation would be fruitless: "To the contrary, the many red flags … would have prompted a reasonable attorney to conduct additional investigation." 539 U.S. 510, 525 (2003). Similarly, in *Rompilla v. Beard*, the Supreme Court noted that counsel "could not have reasonably ignored mitigation evidence or red flags because they were unexpected." 545 U.S. 374, 391 (2005). Here, trial counsel was clearly on notice about "red flags" and fruitful leads, but inexplicably failed to reasonably pursue them.

The government's brief naively suggests that trial counsel was not unreasonable in how it handled Mr. Barnette's own testimony since "the risks associated with his testimony gave him little to lose." [Govt. Brief at 86] As the post-conviction evidence makes clear, trial counsel failed miserably to reasonably consider the effect of Mr. Barnette's putative testimony. [Doc. 74 at 85-88] Despite the fact that trial counsel should have been aware that a prior expert had reported that Mr. Barnette "rigidly adheres to thinking patterns that center around justification of his actions," which consequently "does not allow him to accept that his actions will be seen as problematic," [Tyson Report, Bates Nos. 14773-14774] trial counsel failed to take any reasonable steps to deal with that evident problem. Trial counsel should have also been aware that a separate expert had previously reported that Mr. Barnette had "developed significant perceptual and cognitive distortions," and that "[t]hese perceptual inaccuracies … bred behavior grossly inappropriate to social situations." [Sultan Report, Bates Nos. 14770-14772] Despite this obvious "red flag," trial counsel failed to consult with a single expert about the risks of having Mr. Barnette testify. [Lawson Affidavit ¶¶ 22-23, Bates Nos. 94-101; Alfonso Affidavit ¶ 23, Bates Nos. 1-5, Burgess Affidavit ¶ 22, Bates Nos. 51-55] This failure is patently unreasonable. As Dr. Cunningham explains:

> I was aware that Mr. Barnette testified on his own behalf at his resentencing trial. Trial counsel never sought my advice or insights in 2002 about putting Mr. Barnette on the stand as a witness. Had trial counsel asked my opinion, I would have told them that although Mr. Barnette expressed genuine remorse for what he had done, he had tremendously limited insight into his own behaviors and was likely to be unable to properly display his remorse when confronted with the stress of examination and cross examination. Indeed, I would have told trial counsel that I would anticipate that Mr. Barnette's testimony would likely come across to a jury as self-serving and unsympathetic.

[Cunningham Affidavit ¶ 14, Bates No. 14847]

The government, which now seeks to defend trial counsel's unthinking decision, took full advantage of the situation at trial. Indeed, prosecutors asserted, without challenge or rebuttal, that "[Mr. Barnette's] testimony [was] so filled with misinformation that you simply can't believe it. I contend to you, ladies and gentlemen, that those hours that Marc Barnette was on the witness stand is just where he likes to be, the center of attention." He was nothing more than a "spin artist." [Govt. Ex. 1 at 1897-98]

Unsurprisingly, the jury all but fully rejected any notion that Mr. Barnette was conveying acceptance of responsibility and remorse. [Stetler Declaration ¶ 87, Bates No. 61; 2002 Resentencing: Bates No. 318, 336, 354]

**C.     The Government's Assertion That Investigative Paths Not Taken Were Based On Strategic Avoidance of "Double-Edged" Evidence Has No Basis.**

When forced to concede that information was not investigated, developed, or introduced, the government's brief pivots and argues that such information would have been "a double-edged sword or of little to no mitigating value." [Govt. Brief at 54] These arguments include the following:

- Evidence concerning the impact of Pearl Cooper's murder on other family members was "a double-edged sword" because it would risk reminding the jury of the experiences of the victims' families. [Govt. Brief at 57]

- Evidence that revealed an accurate and complete picture of Mr. Barnette's relationship with Netoisha Tolbert was a "double-edged sword" because it would undercut his assertion that he had remorse and had accepted "full responsibility" for his actions. [Govt. Brief at 66]

- Evidence of Barnette's continuing relationships with his family while in prison "would have cut both ways" because it would risk reminding the jury that the two victims would not have the opportunity to have children or watch them grow up. [Govt. Brief at 84-85]

- Evidence that revealed an accurate and complete picture of Mr. Barnette's relatively healthy female relationships "was also a double-edged sword [in] that [it] presented a significant risk of undermining other more powerful mitigating evidence," might have

"risked suggesting that Barnette could have maintained a similarly healthy relationship with Robin Williams," and could have risked weakening his argument against future dangerousness. [Govt. Brief at 68]

- Dr. Ann Burgess' expert opinion that Mr. Barnette's criminal conduct was attributable to a psychotic episode and a mental health crisis was "double-edged" because it would have "risked undermining Barnette's defense against the future-dangerousness aggravating factor." [Govt. Brief at 72-73]

These arguments have no merit. Deference to trial counsel's decisions cannot be afforded when counsel has not undertaken a reasonable investigation or made a reasonable decision about what evidence to pursue and present. The Sixth Amendment "imposes upon counsel a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Gray v. Branker*, 529 F.3d 220, 229 (4th Cir. 2008). Absent this reasonableness, no deference is due.

Trial counsel confirms that any failure to investigate and present evidence about Pearl Cooper's death and the affect it had on family members was not because of any concern about "a double-edged sword." [Lawson Affidavit, Bates No. 14861] This evidence, with which experts were never provided and about which Mr. Barnette's jury never learned, would have provided the jury with needed insight and a connection between the horror of Pearl Cooper's murder and Sonia's resulting difficulties.

Trial counsel also confirms that any failure to investigate and present an accurate and complete picture of Mr. Barnette's relationship with Netoisha Tolbert was not because of any concern about "a double-edged sword." [Lawson Affidavit, Bates No. 14861] This evidence, with which experts were never provided and about which Mr. Barnette's jury never learned, would have made clear that Mr. Barnette was not, contrary to trial counsel's own misguided and misinformed arguments, a batterer.

20

Trial counsel confirms that any failure to develop and present evidence of Mr. Barnette's continuing relationships with his family while in prison was not because of any concern about "a double-edged sword." [Lawson Affidavit, Bates No. 14861] This evidence, with which experts were never provided and about which Mr. Barnette's jury never learned, would have given the jury evidence to support the argument that Mr. Barnette's execution would adversely affect those he continued to relate with while in prison. In the absence of this and other information, *none* of the jurors found that Mr. Barnette's brother and children would be "harmed by his execution." [2002 Resentencing: Bates No. 319, 337, 355] This wholesale rejection is particularly noteworthy in light of the fact that at least nine jurors at Mr. Barnette's first trial in 1998 found that his mother, brother, and children would be "harmed by the emotional trauma of his execution." [2002 Resentencing: Bates. Nos. 286, 302]

There was no reasonable and informed strategic basis for trial counsel's failure to develop and present evidence of Mr. Barnette's continuing relationships with his family while in prison. Indeed, Dr. Cunningham had initially been retained by trial counsel to provide testimony that would address Mr. Barnette's adjustment in prison. Yet inexplicably trial counsel failed to elicit any such testimony from Dr. Cunningham, who explains that he was "willing and able to testify at Mr. Barnette's resentencing trial in 2002 about his positive adjustment to prison and his lack of disciplinary issues, and how it was consistent with [Dr. Cunningham's] expectations for his future adjustment." [Cunningham Affidavit ¶¶ 8, 12, Bates Nos. 14845-14846]

Trial counsel also confirms that any failure to develop and present evidence of Mr. Barnette's relatively healthy relationships with other females was not because of any concern about "a double-edged sword." [Lawson Affidavit, Bates No. 14861] This evidence, with which experts were never provided and about which Mr. Barnette's jury never learned, would have

revealed an accurate and complete picture of Mr. Barnette's relatively healthy relationships. Further, as noted above, it would have fundamentally changed the damaging—and inaccurate—picture presented by the defense expert, Ann Burgess.

Trial counsel also confirms that any failure to develop and present evidence that Mr. Barnette's criminal conduct was attributable to a psychotic episode and a mental health crisis was not because of any concern about "a double-edged sword." [Lawson Affidavit, Bates No. 14861] This evidence, with which experts were never provided and about which Mr. Barnette's jury never learned, would have also provided an expert explanation for his behavior and apparent inability to control and modulate his reactions.[2] This powerful mental health evidence would have also provided direct support for multiple mitigating factors. Given the significance of such evidence, there is a reasonable probability that a competent lawyer would have introduced it at sentencing. On this particular record, it would have revealed no additional negative factors to the jury and would have had virtually no downside for defense strategy. *See Wiggins v. Smith,* 539 U.S. 510, 535 (2003); *see also Gray v. Branker*, 529 F.3d 220, 236, 2008 WL 2502144 (4th Cir. 2008) ("[E]vidence of Gray's mental impairment would not have conflicted with the mitigation strategy pursued by the defense, which was essentially that Gray was a good father, son, and community member. The mental health evidence would surely have provided a significant boost to Gray's mitigation case." (internal citation omitted)).

---

[2] In the absence of this and other information about his mental health, none of the jurors found that Mr. Barnette's mental health, and his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge," [2002 Resentencing: Bates. Nos. 317, 335, 353] only two jurors found that he did well in a structured environment, and only six jurors found that, at the time of the offenses, Mr. Barnette was "experiencing irrational and obsessive thoughts." [2002 Resentencing: Bates No. 319, 337, 355]

22

Thus, it is inescapable that in each of the instances listed above, trial counsel failed to undertake a reasonable investigation before deciding *not* to explore or present the information. Ms. Lawson makes this point clear:

> Any shortcomings or deficiencies in our investigation on behalf of Marc Barnette had nothing to do with any concern that the information we would learn or present might be "double-edged" or more aggravating than mitigating. We could not determine what could possibly be a "double-edged sword" until we knew what the information was in the first place.
>
> Any failure to provide our experts with any information was not done in an effort to shield our experts from information that we thought might possibly be detrimental to our case or their opinions.
>
> If any of our experts had suggested to us that Marc had been suffering from a significant mental health crisis at or around the time of the crimes—including, but not limited to, that he may have been psychotic or suffering from a mood disorder—I would not have been concerned that such information would have been a "double-edged sword" or of little to no mitigating value. Instead, I would have considered such information to be valuable and mitigating.

[Lawson Affidavit ¶¶ 4-6, Bates No. 14861]

The government strains mightily to "credit plausible strategic judgments" to trial counsel where there exists no rational or reasonable basis to do so. By taking this approach, the government is repeating a course of action that has been previously rejected by the Supreme Court. In *Wiggins v. Corcoran*, 288 F.3d 629, 642 (4th Cir. 2002) *rev'd sub nom. Wiggins v. Smith*, 539 U.S. 510 (2003), the Fourth Circuit took the position the government is taking here: that available social history evidence that trial counsel failed to investigate, develop, and present was not necessarily mitigating. *Id.* In so doing, the Fourth Circuit noted that "[t]he best course for a federal habeas court is to credit plausible strategic judgments in the trial of a [capital] case." *Id.* at 642-43 (citing *Bunch v. Thompson,* 949 F.2d 1354, 1364 (4th Cir.1991)).

The Supreme Court reversed the Fourth Circuit in *Wiggins* because of its unduly parsimonious assessment of the value of the mitigating evidence trial counsel failed to investigate, develop, and introduce. 539 U.S. 510 (2003). In doing so, the Supreme Court roundly rejected the position being taken in this action by the government:

> Given both the nature and the extent of the abuse petitioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form. While it may well have been strategically defensible upon a reasonably thorough investigation to focus on Wiggins' direct responsibility for the murder, the two sentencing strategies are not necessarily mutually exclusive. Moreover, given the strength of the available evidence, a reasonable attorney might well have chosen to prioritize the mitigation case over the direct responsibility challenge, particularly given that Wiggins' history contained little of the double edge we have found to justify limited investigations in other cases.

539 U.S. at 535 (citing *Burger v. Kemp,* 483 U.S. 776 (1987); *Darden v. Wainwright,* 477 U.S. 168 (1986)).

Here, the post-conviction record makes clear that trial counsel never undertook and/or completed a "reasonably thorough investigation" based upon which they could have made a "strategically defensible" decision.

**D.      The Government's Brief Incorrectly Casts Blame at the Feet of Defense Experts.**

The government's brief repeatedly casts blame for identified shortcomings in the defense investigation and presentation on the defense experts who testified during Mr. Barnette's resentencing. For example, the government's brief argues that Dr. Ann Burgess "did her own work to develop her opinions," and both Dr. Mark Cunningham and Dr. Seymour Halleck "had the benefit of their own work and other materials from the 2002 proceedings." [Govt. Brief at 73, 74]

This argument completely misses the point and misapprehends the responsibilities of trial counsel in a capital proceeding. None of the experts in question were aware that trial counsel had roundly criticized and rejected the work of Sindy Maxwell—and that, nevertheless, trial counsel provided that same information to them and asked them to rely upon it. [Doc. 48 at 64-71]

As Dr. Cunningham explains:

During the first trial [in 1998], I was provided family and background information that had been compiled by Sindy Maxwell. I was never told by Ms. Lawson, Mr. Bender, or anyone else from Mr. Barnette's defense team that his new lawyers believed and had told the Court ahead of trial-that the work produced by Ms. Maxwell was "superficial and not-sufficiently in depth." Because the defense lawyers never suggested to me that I should question the accuracy or completeness of the information I had previously been given about Mr. Barnette's background, I did not have any reason to question it.

[Cunningham Affidavit ¶ 10, Bates Nos. 14846]

And Dr. Burgess, having now been provided with information developed during post-conviction, attests that her "earlier findings, opinions, and testimony were badly marred by inaccurate and incomplete information with which trial counsel provided me," and which she never had reason to question. [Burgess Affidavit ¶ 9, Bates Nos. 52]

While post-conviction counsel has confirmed that Dr. Cunningham and Dr. Burgess were similarly situated in this regard—they were both provided with inaccurate and incomplete information and never told by trial counsel to question the quality of the information—the same would appear to hold true for Dr. Seymour Halleck. Although efforts to speak with Dr. Halleck have been unsuccessful,[3] all available evidence makes clear that Dr. Halleck was provided the same information and same instructions as the other trial experts. [Doc. 74 at 79-82] In the face of this evidence the government's brief fails to explain how these experts could have divined trial counsel's failures. *See Gray v. Branker*, 529 F.3d 220, 239 (4th Cir. 2008).

---

[3] *See* Diamond Affidavit, Bates No. 14862; Rowles Affidavit, Bates No. 14863-14864.

**V.    MR. BARNETTE WAS PREJUDICED BY TRIAL COUNSEL'S DEFICIENT PERFORMANCE.**

In the penalty phase of a capital case, the prejudice inquiry is not a rote cataloging exercise where a court merely ensures that counsel presented some testimony on each potential area of mitigation. Instead, the Court must evaluate the totality of the available mitigation evidence—both that presented at trial and at the collateral proceedings. *See Williams v. Taylor,* 529 U.S. 362, 397–98 (2000). If "the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [the defendant's] moral culpability," then prejudice has been shown. *Wiggins,* 539 U.S. at 538; *see also Cone v. Bell,* 556 U.S. 449, 475 (2009) (noting that prejudice can occur if the evidence, "viewed cumulatively," may have led to a different decision). This Court must consider that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Strickland,* at 695-696.

Further, in making that determination, the Supreme Court has directed habeas courts to look at not only the evidence trial counsel failed to uncover, but also what further effort by reasonable attorneys in their role as advocates would have produced with the evidence. *See Rompilla,* 545 U.S. at 391–92 (describing chain of evidence a defense lawyer at the time could have developed following reasonable investigation); *see also Kyles v. Whitley,* 514 U.S. 419, 438, 441 (1995) ("reasonable probability" standard looks at cumulative effect of "disclosure of suppressed evidence to competent counsel").

The government's brief's position as to prejudice is overly simplistic and fundamentally flawed. Indeed, the government suggests that so long as one trial witness testified about one historical event or fact, no habeas relief is possible despite the fact that post-conviction counsel later establishes that the historical event or fact as reported to the jury was materially inaccurate

or incomplete. This argument, which endorses the notion that it is acceptable for "the defense team [to] exist[] on paper, but not in reality," is unsupportable. [Stetler Declaration ¶ 61, Bates No. 180]

The evidence that Mr. Barnette's trial counsel unreasonably ignored and failed to investigate would have painted a vastly different evidentiary picture for the jury. *See Wiggins,* 539 U.S. at 538 (asking whether "the available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal"). Accordingly, a sufficient showing of prejudice has been made.

## **CONCLUSION**

For the foregoing reasons, and those asserted in Mr. Barnette's § 2255 motion, pleadings filed in support of an evidentiary hearing, exhibits filed thereto, Mr. Barnette, through counsel, respectfully prays this Court to:

1. Grant Petitioner's Initial Motion for Relief Pursuant to 28 U.S.C. § 2255 [Doc. 48] and vacate his sentence of death;

2. Authorize Petitioner to conduct discovery of facts, witnesses, documents, and evidence that will support the allegations of this petition;

3. Grant Petitioner's Motion for Evidentiary Hearing [Doc. 73] and conduct a hearing on the allegations of his petition; and

4. Enter such other order as this Court deems just and equitable.

Dated: April 4, 2016

/s/ Mark E. Olive
N.C. State Bar No. 10615
LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com

/s/ Jacob H. Sussman
N.C. Bar No. 31821
TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, NC 28203
704-338-1220 (tel)
704-338-1312 (fax)
jsussman@tinfulton.com

/s/ Ross Richardson
Ross Richardson
FEDERAL DEFENDERS OF WESTERN
 NORTH CAROLINA, INC.
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720 (tel)
704-374-0722 (fax)
ross_richardson@fd.org

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has served the foregoing motion with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Anthony J. Enright
anthony.enright@usdoj.gov

Dated: April 4, 2016

/s/ Jacob H. Sussman
Counsel for Mr. Barnette

29