IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:12-cv-327
(3:97-cr-23)

| | | |
|---|---|---|
| AQUILIA MARCIVICCI BARNETTE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court upon Petitioner Aquilia Marcivicci Barnette's motion to vacate sentence filed pursuant to 28 U.S.C. § 2255 on June 19, 2013 (Doc. 48), motion for evidentiary hearing filed on December 22, 2014 (Doc. 73), and motion to supplement the motion to vacate, filed on June 24, 2016. (Doc. 119). For the reasons set forth below, the motions are denied.

I.    **PROCEDURAL HISTORY**

This Court sentenced Petitioner to death following his conviction for various crimes relating to the murder of his ex-girlfriend, Robin Williams, in Roanoke, Virginia, and the carjacking and murder of Donald Lee Allen in Charlotte, North Carolina. United States v. Barnette, Case No. 3:97-cr-23. Petitioner first attempted to kill Williams by firebombing her apartment in Roanoke in April 1996, causing her to suffer second and third-degree burns. Following his return to Charlotte, Petitioner later purchased a shotgun which he used to carjack and murder Allen shortly before midnight on June 21, 1996, before driving on to Roanoke. After arriving at the home of Williams' mother, Petitioner entered the home and fired shots, chased Williams out of the home, and ultimately shot and killed Williams in front of her mother.

1

Petitioner was convicted of the following 11 counts: (1) interstate domestic violence in violation of 18 U.S.C. § 2261(a) & (b); (2) use of a destructive device (firebomb), during a crime of violence in violation of 18 U.S.C. § 924(c)(1); (3) using and carrying fire and explosive materials during commission of felony, in violation of 18 U.S.C. § 844(h)(1); (4) making a false statement during the purchase of a firearm, in violation of 18 U.S.C. § 922(a)(6) & 924; (5) making a firearm by sawing off shotgun without complying with National Firearms Act, in violation of 26 § 5821, 5822, 5861(f), 5871; (6) possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) & 924; (7) commission of carjacking resulting in death, in violation of 18 U.S.C. § 2119(3); (8) using and carrying firearm during crime of violence (carjacking) resulting in death, in violation of 18 U.S.C. § 924(c)(1) & (i)2(1); (9) transporting stolen vehicle in interstate commerce, in violation of 18 U.S.C. § 2312; (10) interstate domestic violence, in violation of 18 U.S.C. § 2261(a)(1) & (b)(1); and (11) using and carrying a firearm during crime of violence (interstate domestic violence) resulting in death, in violation of 18 U.S.C. § 924(c)(1) & (i)2(1). No witnesses disputed the facts at trial and Petitioner was found guilty of all 11 counts. Following a separate penalty phase trial, the jury recommended a death sentence on Counts 7, 8, and 11, with an aggregate term of life imprisonment on the remaining non-capital counts.

The Fourth Circuit Court of Appeals affirmed Petitioner's convictions but vacated the death sentence and remanded for resentencing due to the Court's refusing to allow expert surrebuttal testimony during the penalty phase. United States v. Barnette, 211 F.3d 803, 825-826 (4th Cir. 2000). Following a second penalty phase trial in 2002, Petitioner was again sentenced to death on Counts 7, 8, and 11, which the appellate court affirmed. United States v. Barnette, 390 F.3d 775 (4th Cir. 2004). Upon certiorari review, the Supreme Court vacated Petitioner's death

sentence and remanded the matter for further consideration in light of <u>Miller-El v. Dretke</u>,[1] 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). <u>Barnette v. United States</u>, 546 U.S. 803, 126 S.Ct. 92, 163 L.Ed.2d 32 (2005). Following a limited hearing and in camera review of jury questionnaires and notes, this Court reaffirmed its ruling that the prosecution's peremptory strikes did not constitute any <u>Batson</u> violation. The Fourth Circuit affirmed the decision, <u>United States v. Barnette</u>, 644 F.3d 192 (4th Cir. 2011), and the U.S. Supreme Court denied certiorari review. <u>Barnette v. United States</u>, 565 U.S. 1263, 132 S.Ct. 1740, 182 L.Ed.2d 534 (2012).

On June 19, 2013, Petitioner filed his motion to vacate sentence pursuant to 28 U.S.C. § 2255, raising the following claims: 1) ineffective assistance of counsel; 2) improperly conducted <u>Batson</u> proceeding; 3) misconduct related to the jury; 4) constitutional violation resulting from decision to federally prosecute; 5) prosecutorial violations; 6) unconstitutionality of federal death penalty; 7) unconstitutionality of manner of federal execution; and 8) cumulative error. (Doc. 48). Petitioner seeks an evidentiary hearing on his motion. (Doc. 73). On June 24, 2016, Petitioner moved to supplement his motion with additional claims challenging his convictions in Counts 1, 2, 3, 8, 10, and 11. (Doc. 119).

These matters have been fully briefed and are now ripe for disposition.

## II.    STANDARD OF REVIEW

A prisoner convicted of a federal offense may collaterally attack a conviction or sentence under the following four grounds: 1) the sentence was imposed in violation of the Constitution or laws of the United States; 2) the court was without jurisdiction to impose the sentence; 3) the sentence was in excess of the maximum authorized by law; or 4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). Section § 2255 is designed to correct fundamental errors

---

[1] The Supreme Court clarified the procedure for evaluation of claims of purposeful discrimination during jury selection under <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

which would "inherently result[ ] in a complete miscarriage of justice." United States v. Addonizio, 442 U.S. 178, 185, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979)(quoting Hill v. United States, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962)).  In a § 2255 proceeding, the petitioner bears the burden of proving his claims by a preponderance of the evidence.  Miller v. United States, 261 F.2d 546, 547 (4th Cir. 1958).

## III.    DISCUSSION

### A.    Necessity for Evidentiary Hearing

The court need not hold an evidentiary hearing on a § 2255 motion if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).  The determination of whether to hold an evidentiary hearing is ordinarily left to the sound discretion of the court.  Raines v. United States, 423 F.2d 526, 530 (4th Cir. 1970). "Evidentiary hearings on § 2255 petitions are the exception, not the norm, and there is a heavy burden on the petitioner to demonstrate an evidentiary hearing is warranted."  Moreno-Morales v. United States, 334 F.3d 140, 145 (1st Cir. 2003).  Upon review of Petitioner's § 2255 claims and the record, the Court concludes that an evidentiary hearing is not required. Accordingly, Petitioner's motion for an evidentiary hearing (Doc. 73) is denied.

### B.    Initial § 2255 Claims

#### 1.    Ineffective Assistance of Counsel

Petitioner's ineffective assistance claims are directed at his trial counsel for the 2002 resentencing penalty phase trial.

##### a.    Legal Standard

The right to counsel guaranteed by the Sixth Amendment includes the "right to the effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80

4

L.Ed.2d 674 (1984)(quoting McMann v. Richardson, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449, n. 14, 25 L.Ed.2d 763 (1970)). To successfully challenge a conviction under § 2255 based on ineffective assistance of counsel, a petitioner must satisfy the two-prong test set forth in Strickland, which requires the petitioner show that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) counsel's deficient performance prejudiced the defense. Strickland, 466 U.S. at 688, 692.

The first prong requires that petitioner show that counsel's performance was deficient by articulating specific acts or omissions that fell "outside the wide range of professionally competent assistance." Id. at 690. However, when reviewing these alleged acts or omissions, courts must give substantial deference to counsel's strategic judgments. Id. at 691. This requires the presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Burt v. Titlow, 571 U.S. 12, 22, 134 S.Ct. 10, 187 L.Ed. 348 (2013)(quoting Strickland, 466 U.S. at 690). The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Harrington v. Richter, 562 U.S. 86, 104, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)(quoting Strickland, 466 U.S. at 687)).

To establish prejudice under the second prong, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, at 694. The petitioner must show that counsel's error worked to his "actual and substantial disadvantage," not merely that it created a "possibility of prejudice." Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir.1997)(quoting Murray v. Carrier, 477 U.S. 478, 494, 106 S.Ct. 2639, 2648 (1986)).

5

The court need not analyze both prongs if petitioner makes "an insufficient showing on one." Debreus v. United States, 2012 WL 3686250, *3 (D.S.C. Aug. 24, 2012)(citing Strickland, 466 U.S. at 697)). Failure to satisfy either prong is fatal to a petitioner's claim. Fields v. Attorney Gen. of Maryland, 956 F.2d 1290, 1297 (4th Cir. 1992)).

### b. Failure to Conduct Adequate Investigation

Petitioner alleges that trial counsel failed to adequately investigate and pursue readily available and important mitigating information about Petitioner's background.

### (i). Misuse of Investigative Resources

Petitioner states that a serious reinvestigation into his background was warranted after counsel informed the Court in an *ex parte* filing that the social history presented at the 1998 trial was "superficial and not-sufficiently in depth." (Doc. 48, p. 63, Doc. 364, p.5, sealed). In the filing, counsel informed the Court of the defense's need to obtain a new mitigation specialist due to the first mitigation specialist's failure to develop rapport with Petitioner's family and friends and critical omissions in her background investigation. Id. However, despite having obtained a new mitigation specialist and private investigator in preparation for the resentencing trial, Petitioner now accuses trial counsel of making the same mistakes by failing to investigate and present adequate mitigation evidence.

Petitioner argues that trial counsel failed to use and supervise their new mitigation specialist, Cessie Alfonso. Petitioner alleges that counsel failed to ask Alfonso to speak with Petitioner's former girlfriends, failed to present sufficient evidence of Petitioner's prior relationships, ignored Alfonso's suggestions about powerful areas of mitigation, did not receive Alfonso's psycho-social report until one week before jury selection, and failed to provide defense experts with a copy of Alfonso's report. Petitioner claims this resulted in a significant amount of

6

mitigating evidence not being shared with defense experts or presented to the jury.

Failure to conduct an "adequate investigation in preparing for the sentencing phase of a capital trial" may constitute ineffective assistance. Emmett v. Kelly, 474 F.3d 154, 161 (4th Cir. 2007)(citing Rompilla v. Beard, 545 U.S. 374, 380, 125 S.Ct 2456, 162 L.Ed. 2d 360 (2005)). However, "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." Id. (citing Wiggins v. Smith, 539 U.S. 510, 533, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). Nor does Strickland "impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client." Id. (citing Tucker v. Ozmint, 350 F.3d 433, 442 (4th Cir. 2003)).

The record reflects that Petitioner presented a significant amount of mitigating evidence at trial. The defense concentrated their efforts on Petitioner's family background and upbringing, as well as his exposure to domestic violence, substance abuse, and neglect. In total, Petitioner presented thirteen witnesses. During his own testimony, Petitioner admitted responsibility for the murders of Williams and Allen, described the crimes in detail, and expressed remorse. (Transcript, p. 1095-1122, 1242).[2] Petitioner and other witnesses described his past relationships, including his relationship with Williams prior to and leading up to the firebombing of her apartment and murder. (Transcript, p. 1032-1074, 1171-1230, 1360-1364, 1479-1497, 1570-1573, 1616-1617, 1628-29).

---

[2] Citations to the trial transcript are taken from the Joint Appendix (Volume I-V) filed in the appeal from Petitioner's 2002 sentence, United States v. Barnette, Record No. 02-20, docketed in Case 3:97-cr-00023, Doc. 639-643, and identified by Bates number.

7

Family members who testified for the defense included Petitioner's younger brother Mario Barnette, cousin Ahmad Cooper, and stepfather Derrick Barnette. Mario described Petitioner's childhood, witnessing violent fights between their parents, and Petitioner shielding Mario from the abuse. He also discussed the impact of their parents' separation and their mother's substance abuse, partying, and neglect. (Transcript, p. 1334-1365). Witnesses described the lack of care given to Petitioner and his brother, how they were left unsupervised, and how the boys slept on the floor and were often without food. (Transcript, p. 1159-1165, 1176-1177, 1409-1413, 1422, 1574-1575, 1595-1596, 1606-1607). The jury heard testimony regarding Derrick Barnette's abuse of Petitioner and Petitioner's mother, as well as Petitioner and his brother learning that Derrick Barnette was not their biological father and the detrimental effect of this news. (Transcript, p. 1151-1158, 1166-1168, 1304-1310, 1319-1321, 1338-1341, 1349-1350, 1384-1385, 1568, 1573, 1595, 1597, 1605). Also included in Petitioner's mitigation testimony were descriptions of his maternal grandparents, Jesse and Pearl Cooper. Jesse Cooper sustained combat injuries in the Korean War, leading to psychological issues and alcohol dependency. Following their divorce, Pearl Cooper was later murdered by her second husband. Testimony included the devastating effects of this murder on Petitioner's mother Sonia, and her sister. (Transcript, p. 1041-1042, 1293-99, 1336-1337, 1383-84, 1567, 1585, 1592-93).

Petitioner called three expert witnesses—Dr. Ann Burgess (domestic violence expert), Dr. Mark Cunningham (clinical and forensic psychologist), and Dr. Seymour Halleck (forensic psychiatry expert). These experts testified about Petitioner's background and mental health and explained how Petitioner's violent behaviors were associated with his domestic relationships. (Transcript, p. 1496-1497, 1572-1573). This testimony also explained Petitioner's diagnosis of borderline personality disorder as being characterized by fear of abandonment and fluctuations in

8

mood, in addition to depression, withdrawal, substance abuse disorder, and signs of antisocial and narcissistic personality disorders. (Transcript, p 1381-1385, 1479-1497, 1551-1573, 1619-1623). Finally, the defense's mitigation presentation also included testimony concerning Petitioner's positive adjustment to prison and lack of disciplinary problems, and the rekindling of his relationships with his family and children. (Transcript, p. 1231-1242, 1432-1463, 1496-1497).

Upon review of the mitigation evidence presented by trial counsel, the Court concludes that the record contradicts Petitioner's assertions that counsel failed to investigate and present adequate mitigation evidence to the jury. To follow-up on the mitigation investigation that was performed for the first trial, counsel obtained a new mitigation specialist and investigator, and presented a significant amount of mitigating testimony as described above. This presentation included a thorough social history of Petitioner, as well as testimony from Petitioner himself, other witnesses, and experts regarding his past relationships. Petitioner cannot support his claim that trial counsel committed any errors by failing to task the mitigation specialist with speaking with Petitioner's former girlfriends. As discussed in subsection (e) below, the defense experts conducted their own interviews and review of records. Petitioner cannot establish that the defense experts did not review sufficient materials on which to base their opinions.

Considering the mitigation evidence presented at trial, Petitioner cannot show that counsel's actions fell below an objective standard of reasonableness. Petitioner is also unable to establish that he suffered prejudice as he cannot point to any omitted evidence that would have likely changed the outcome of trial had counsel introduced it. Therefore, this claim is denied.

### (ii). Failure to Re-interview 1998 Trial Witnesses

Petitioner claims counsel was ineffective for failing to re-interview certain witnesses who were either previously interviewed and/or previously testified at the 1998 trial.

Petitioner alleges his childhood friend Steve Austin (witness for the Government at both the 1998 and 2002 trials) could have testified: 1) that Petitioner would retreat to Austin's home to sleep in order to avoid the chaos in his own home; 2) that Petitioner looked after Austin who suffered from sickle-cell anemia; 3) about circumstances leading up to Petitioner's move to Georgia after his parents' separation; 4) about Austin's visit with Petitioner in jail prior to the 2002 trial; and 5) the depth of their friendship.

Petitioner alleges these family members could have offered the following testimony: 1) Jean Nduly (cousin), as to the effect of Pearl Cooper's murder on Petitioner and his mother, the chaos of Petitioner's childhood home, her care of Petitioner when he was an infant, the aftermath of fights between Sonia and Derrick Barnette, and her interactions with Petitioner; 2) Jeff Nero (uncle), as to the abuse and neglect in Petitioner's childhood home, Petitioner and his mother moving in with his family after the murder of Pearl Cooper, the effect of Pearl Cooper's murder on Petitioner's mother, and his interactions with Petitioner; and 3) Shonda Nero (cousin), as to the chaos and violence experienced by Petitioner growing up and his past relationships with women. Petitioner also includes stepfather John West in this list but does not state what testimony West could have provided.

Petitioner claims that counsel should have re-interviewed Brian Ard, Petitioner's former boss at Camelot Records in Roanoke, Virginia, who fired Petitioner following sexual harassment allegations in 1996. Petitioner claims that Ard could have testified as to his observations of Petitioner and Robin Williams, Petitioner's promotion to Assistant Manager, how Petitioner maintained a good relationship with Ard following his termination and provided job references, and how Ard kept a picture of Petitioner's children on his office wall.

Petitioner alleges counsel failed to re-interview former girlfriend Crystal Dennis, who testified for the Government at both the 1998 and 2002 trials. Dennis testified about an altercation between Petitioner and her half-brother Anthony Britt in May 1992, after Britt started dating Natasha Tolbert, the mother of Petitioner's children. Petitioner states that counsel could have elicited testimony that 1) Dennis' relationship with Petitioner was platonic until he was released from jail; 2) Petitioner believed Tolbert's had intensified her romantic relationship with Britt during the time Petitioner was in jail; 3) Petitioner's mood swings were inexplicable; 4) Petitioner made an effort to return to high school; and 5) the fathers of Dennis' children threatened Petitioner.

Whether to call witnesses is a decision by counsel "which the courts do not second-guess." Williams v. Carter, 76 F.3d 199, 200 (8th Cir.1996)(citing Sherrill v. Wyrick, 524 F.2d 186, 188, 190 (8th Cir.1975)). Courts should afford great deference to this strategic decision. United States v. Terry, 366 F.3d 312, 317 (4th Cir. 2004). "[C]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir.1978). "[T]he failure to investigate everyone whose name happens to be mentioned by the defendant does not suggest ineffective assistance." Huffington v. Nuth, 140 F.3d 572, 580 (4th Cir. 1998)(quoting Gray v. Lucas, 677 F.2d 1086, 1093 n.5 (5th Cir. 1982)).

Petitioner cannot show counsel was ineffective for failing to re-interview and elicit testimony from the above listed witnesses. Significant testimony concerning Petitioner's childhood and background was provided by Petitioner, his stepfather Derrick Barnette, brother Mario, cousin Ahmad Cooper, as well as Petitioner's expert witnesses. Their testimony included the murder of Petitioner's grandmother and its effect on Petitioner's mother, as well as Petitioner's

domestic relationships, including his relationship with Williams. (Transcript, p. 1032-1074, 1171-1230, 1293-99, 1335-1367, 1383-1384, 1479-1497, 1570-1573, 1592-93, 1628-29, 1684). Petitioner's own testimony included a description of his relationship with Crystal Dennis and the altercation with Anthony Britt. (Transcript, p. 1186-1201). Petitioner's expert witnesses testified at length regarding Petitioner's upbringing and its effect on him, as well as his mood swings and mental health. (Transcript, p. 1372-1391, 1464-1497, 1541-1633, 1655-1668). Petitioner, corrections employees, and experts also testified about Petitioner's positive adjustment to prison. (Transcript, p. 1231-1235, 1432-1463, 1496-1497).

Petitioner's assertions about what these witnesses might have testified to is speculative, not to mention that most of this additional testimony would have been cumulative. See Hedrick v. True, 443 F.3d 342, 353 (4th Cir.2006)(counsel not ineffective for failing to call additional mitigation witnesses where testimony would have been duplicative). Petitioner cannot establish that it was unreasonable for counsel not to re-interview these witnesses or that had counsel done so, it would have resulted in a different outcome at trial. Therefore, this claim is denied.

### c. Failure to Use Information Developed by Mitigation Specialist

Petitioner argues that counsel received important information from the interviews conducted by mitigation specialist Cessie Alfonso but did not follow up on Alfonso's work or share information with defense experts or the jury. Based upon Alfonso's interviews, Petitioner claims that counsel could have elicited the following testimony from Natasha Tolbert, mother of Petitioner's children: 1) her recollections of first meeting Petitioner; 2) her belief that Petitioner was very troubled; 3) neglect by Petitioner's mother and her dismissiveness of Tolbert's concerns; and 4) Petitioner's turbulent mood swings.

12

Petitioner alleges that Alfonso advised that the background of Petitioner's mother, Sonia Barnette, was critically important. Petitioner contends that counsel should have presented evidence of the aftermath of Sonia's parents' divorce, subsequent murder of her mother and the effect of those events on her and her sister, Jesse Cooper's Korean War experience and trauma, becoming a young mother, her abusive marriage to Derrick Barnette, her neglect of Petitioner and his brother, and her issues with drugs and alcohol. Petitioner also complains that counsel failed to introduce evidence about Petitioner learning Derrick Barnette was not the biological father of he and his brother, his mother's denial, and how it was well-known that Larry Wright was likely Petitioner's father. Petitioner claims counsel could have called Larry Wright to testify that it was a significant possibility that he might be Petitioner's father.

Petitioner cannot show that counsel was deficient in failing to present every detail revealed in Alfonso's investigation. As previously discussed, Petitioner presented a wealth of mitigating evidence, including testimony from witnesses, experts, and Petitioner himself concerning his life history and background. Counsel cross-examined Natasha Tolbert about meeting Petitioner, her observations of the neglect of Petitioner and his brother, and Petitioner's mental health. (Transcript, p. 835-844). Numerous witnesses testified about Petitioner's mother and her parents Jesse and Pearl Cooper, as well as the issue of Petitioner's unknown paternity. Petitioner cannot demonstrate counsel was ineffective for not calling Larry Wright to testify when it was pure speculation as to whether Wright is Petitioner's biological father. There is no evidence to indicate that counsel ignored or omitted any critical information. Petitioner cannot show that counsel was deficient with regard to the information gathered by Alfonso, nor can Petitioner show that he suffered prejudice. Therefore, this claim is denied.

13

#### d.      Failure to Interview Additional Mitigation Witnesses

Petitioner claims that counsel was ineffective for failing to interview numerous additional witnesses that counsel knew or should have known possessed mitigating evidence.  Petitioner states that counsel failed to interview former girlfriends Sheila Sullivan, Temeka Hunter, Kowana Dozier, Beth Durant, and Ayanna Brewer-Beasley, who could have testified that their relationships with Petitioner were non-violent.  Petitioner states that additional testimony could have been introduced that Sullivan was unfaithful to Petitioner, that Petitioner was assaulted by a fellow teenager with whom Sullivan later cheated, and that Petitioner attempted suicide following their relationship.  Petitioner also states that counsel failed to interview childhood neighbors Wendy Sharpe, Regena Nero, and Delores Hart, who could have testified about Petitioner's chaotic childhood, the fighting between Petitioner's parents, the neglect of Petitioner and his brother, and Petitioner's grandparents, Jesse and Pearl Cooper.

As set forth above, there was substantial mitigation testimony presented at trial and Petitioner cannot show that these additional witnesses would have provided critical testimony that would have affected the outcome of trial.  Petitioner's assertions as to the subject of their potential testimony is speculative.  The jury heard extensive testimony regarding Petitioner's past relationships—including Petitioner's own description of his relationship with Sheila Sullivan and his suicide attempt following their break-up.  Substantial testimony was also presented to the jury concerning Petitioner's background and childhood, the abuse and neglect he suffered at the hands of Sonia and Derrick Barnette, and the murder of his grandmother Pearl Cooper and its effects on the family.  Additional testimony from these witnesses would have been cumulative.  Counsel was not deficient for declining to interview these additional witnesses and Petitioner cannot show he suffered any prejudice.  Petitioner cannot satisfy Strickland and therefore, this claim is denied.

14

### e.     Ineffectiveness as to Defense and Government Experts

Petitioner claims trial counsel failed to provide defense experts with important mitigation and mental health information by having them rely on the investigative work from the mitigation specialist employed for the 1998 trial. Petitioner also alleges that trial counsel was ineffective for failing to impeach the Government's expert witness, Dr. Park Dietz, and for failing to call Dr. Sally Johnson to testify.

### (i).     Dr. Seymour Halleck & Dr. Mark Cunningham

Petitioner alleges that due to counsel's failure to provide readily available information, forensic psychiatrist Dr. Seymour Halleck abandoned an earlier suspicion from his 1997 report that Petitioner might also suffer from a mood disorder in addition to his diagnosis of Borderline Personality Disorder. Petitioner states that his former girlfriend, Natasha Tolbert, informed mitigation specialist Cessie Alfonso that she tried to tell Petitioner's mother that something was wrong with him and that Petitioner's mood swings were so dramatic she did not feel she could leave his side. However, Petitioner states that this information was not provided to the defense experts.

Petitioner submits a report from Dr. Richard Dudley, a psychiatrist retained by postconviction counsel, who Petitioner claims could now testify at an evidentiary hearing that Petitioner also suffered from a serious and independent mood disorder. (Doc. 74-6, p.1-15, ¶69). Petitioner states that Dudley's testimony shows that Petitioner's behavior was not simply "reactive" but was "powerfully and uncontrollably driven by a genetic etiology." (Doc. 48, p. 66).

As to forensic psychologist Dr. Mark Cunningham, Petitioner argues that counsel's failure to provide information from the mitigation specialist exposed him to impeachment. Petitioner states that the mitigation specialist urged counsel to consider the impact of Jesse Cooper's combat

injuries and mental health issues and that counsel's failure to introduce Cooper's military and medical records left the defense vulnerable to attacks. Petitioner cites to an instance where the Government attacked Cunningham's credibility for relying on an assessment by Jesse Cooper's daughter that Cooper was "psychiatrically disabled." (Transcript, p. 1690-1691). Petitioner cites another where the Court sustained a lack of evidence objection to Dr. Cunningham's testimony that Petitioner's mother "insists that the paternity tests were rigged." (Transcript, p. 1610).

Petitioner cannot establish that counsel was ineffective for failing to provide Dr. Halleck with the information from Natasha Tolbert contained in Alfonso's report regarding Tolbert's observations and concerns about Petitioner's mood swings. Petitioner's assertions are speculative, and he provides no affidavit or evidence from Dr. Halleck to state that this information would have altered his opinion. The record reflects that Dr. Halleck conducted his own interviews of Petitioner—four in 1997 and four in 2002, as well as interviewed Natasha Tolbert, Derrick Barnette and Sonia Barnette prior to the 2002 trial, in addition to reviewing a wealth of records. (Transcript, p. 1377-1378). Dr. Halleck testified as to Petitioner's fluctuations in mood as well as Petitioner's family background, including abuse by his stepfather, the murder of his grandmother and its effect on his mother, his exposure to violence, and Petitioner's discovery that Derrick Barnette was not his biological father. (Transcript, p. 1381-1385).

Petitioner's assertion that a new expert, Richard Dudley, could now testify that Petitioner suffered from an independent mood disorder is of no consequence. "A postconviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial." Waldrop v. State, 987 So.2d 1186, 1193 (Ala. Crim. App. 2007)(citing State v. Combs, 652 N.E. 2d 205, 213 (1994)). "It will nearly always be possible in cases involving the basic human emotions to find one expert witness who disagrees with another

and to procure an affidavit to that effect from the second prospective witness." <u>Waye v. Murray</u>, 884 F.2d 765, 766-67 (4th Cir. 1989). Petitioner can show no ineffectiveness on part of counsel for failing to provide information to Dr. Halleck or that he suffered any prejudice.

Petitioner also cannot establish that counsel was ineffective for failing to introduce the medical and mental health records of Jesse Cooper or for Dr. Cunningham receiving a sustained lack of evidence objection for his statement about Sonia Barnette's paternity test suspicions. Dr. Cunningham testified that he interviewed Petitioner several times for more than 18 hours, as well as interviewed Sonia Barnette, Derrick Barnette, Mario Barnette, Sheila Cooper, Steve Austin, Brian Ard, Shanda Nero, Tony Harrison, police officer Elizabeth Joy, and Dr. Sally Johnson. (Transcript, p. 1549-1550). Dr. Cunningham conducted an extensive records review, including medical and mental health records, school records, trial transcripts—what he termed "a suitcase full of records." (Transcript, p. 1550-1551).

Petitioner submits a post-conviction affidavit from Dr. Cunningham, stating that trial counsel did not share Cessie Alfonso's mitigation report, Jesse Cooper's medical or military records, or provide access to other social history witnesses.[3] (Doc. 118-2, p. 2, ¶11). Dr. Cunningham states that because he did not have this information, his expert opinion was unknowingly incomplete and rendered him vulnerable to impeachment. <u>Id.</u> However, Dr. Cunningham does not state how his opinion would have changed had he been provided with additional information from trial counsel. Dr. Cunningham also acknowledges that Dr. Dudley makes a strong case in his post-conviction report that Petitioner was suffering from a longstanding mood disorder but stops short of changing his opinion or diagnosis. (Doc. 118-2, p. 2, ¶13).

---

[3] Dr. Cunningham's post-conviction affidavit is submitted upon his review of trial testimony, as well as post-conviction materials including reports of Dr. Richard Dudley and Zachary Rowles, mitigation report of Cessie Alfonso, and pleadings and affidavits filed in this post-conviction proceeding. (Doc. 118-2, p. 2, ¶9).

17

Petitioner cannot establish counsel was ineffective for not providing the defense experts with more information, nor can Petitioner demonstrate that a different outcome would have resulted had counsel done so. As such, Petitioner fails to establish any ineffective assistance on part of counsel and therefore, this claim is denied.

### (ii).    Dr. Ann Burgess

Petitioner claims that counsel's failure to provide experts with readily available information resulted in a highly aggravating and inaccurate diagnosis by Dr. Ann Burgess, Petitioner's domestic violence expert. Petitioner states that Dr. Burgess was not provided with Cessie Alfonso's mitigation report or interview summaries, which prevented her from having a complete picture of Petitioner's family history. Petitioner states that Dr. Burgess was unaware of the trauma caused to Sonia Barnette following her parents' divorce and her mother's subsequent murder, the extent of Jesse Cooper's combat trauma and alcoholism, the manner in which Petitioner's paternity was handled, the fact that Petitioner would run away to neighbors' homes as a child, and the complete picture of Petitioner's relationships, including that they did not fit the "pattern" of violence she described at trial. Dr. Burgess testified that Petitioner was involved in a "crime spree" that extended from the firebombing of Robin Williams' residence to the murders of Williams and Donald Allen, reflecting a pattern with his relationships and a cycle of violence which was rooted in the way he was raised and developed. (Transcript, p. 1478-1482). However, Petitioner alleges that had she been supplied with the report, it would have materially affected her expert opinion.

Dr. Burgess states that she would now testify differently after having reviewed Alfonso's mitigation report, along with the post-conviction report from Dr. Richard Dudley and post-conviction mitigation report from Zachary Rowles. (Doc. 74-3, p. 1-5). She says her prior

emphasis on multi-generational violence was misplaced and that she would now opine that Petitioner was experiencing a "psychotic episode" and "mental health crisis," as well as suffered from a mood disorder. (Doc. 74-3, p. 1-5, ¶11). [4]

Petitioner cannot demonstrate that trial counsel was ineffective for failing to provide Dr. Burgess with Cessie Alfonso's report. Trial counsel Jean Lawson states in her post-conviction affidavit that Alfonso did not provide her mitigation report to defense counsel until one week after Dr. Burgess submitted her report. (Doc. 74-3, p. 48, ¶27). Dr. Burgess conducted her own extensive investigation, including review of Petitioner's school, employment, medical and other records, mental health reports, testimony from the 1998 trial, prison records, interviews, trial transcripts, and police reports. (Transcript, p. 1477). She also interviewed Petitioner twice in 2002, as well as interviewed Sonia Barnette, Derrick Barnette, and Mario Barnette. (Transcript, p. 1476-1477). Dr. Burgess also spoke with Alfonso on one occasion. (Doc. 74-2, p. 3, ¶17). Petitioner cannot establish that counsel's poor performance caused any omissions in her investigation. Additionally, Dr. Burgess' new opinion that Petitioner suffered a "psychotic episode" would contradict forensic psychologist expert Dr. Mark Cunningham, who testified that there was no indication Petitioner was psychotic at the time of his crimes. (Transcript, p. 1551-1552).

Based on the foregoing, Petitioner cannot establish that counsel was constitutionally deficient for not ensuring Dr. Burgess was provided with Alfonso's report, nor can he demonstrate that he suffered prejudice. Therefore, this claim is denied.

---

[4] Dr. Burgess bases her new opinion not only on Alfonso's report, but also the post-conviction reports of Zachary Rowles and Dr. Richard Dudley, which were previously unavailable. (Doc. 74-3, p. 1-5, ¶8).

### (iii).    Dr. Park Dietz

The Government called as a rebuttal expert forensic psychiatrist Dr. Park Dietz, who disagreed with the defense experts' opinions that Petitioner's violent activities were confined to domestic relationships or motivated by domestic violence.  (Transcript, p. 1776-1778).

Petitioner accuses counsel of ineffective assistance for failing to impeach Dr. Dietz concerning false testimony he provided a few months prior in the high-profile case against Andrea Yates, a Texas mother who drowned her children in the bathtub and claimed insanity as a defense to the crimes.  Petitioner states that Dr. Dietz testified that he was a consultant for the television program "Law & Order" and that Yates "got the idea to drown her children from an episode of "Law & Order" in which a mother was acquitted on an insanity defense after drowning her children in a bathtub." (Doc. 48, p. 72).[5]  However, it was later revealed that Dr. Dietz had provided false testimony, as no such episode of "Law & Order" ever produced.  The prosecution abandoned its death penalty request and Yates was found guilty in March 2002.  However, Yates' murder convictions were overturned in 2005 and she was found not guilty by reason of insanity.

Petitioner argues that due to the timing of the disclosure in the Yates case, trial counsel should have been able to discover Dietz's false testimony and use it for impeachment.  In the alternative, Petitioner argues that this should also be a Brady/Giglio claim against the Government due to the Government's failure to disclose this information to trial counsel.

Petitioner cannot establish that counsel was ineffective for failing to impeach Dr. Dietz with respect to his testimony in the Yates trial.  "Defense counsel constantly must decide what questions to ask and how much time to spend on a particular witness.  These are precisely the types

---

[5] In its decision reversing Yates' convictions, the First District Court of Appeals of Texas noted that while "Dr. Dietz did not suggest in his testimony that Yates used the plot of the show to plan killing her children," the prosecution did so by suggesting in its closing argument that Yates patterned her actions after the "Law & Order" episode. Yates v. State, 171 S.W.3d 215, 218-222 (Tex. App. 2005).

of tactical decisions a court is not supposed to second guess." Higgs v. United States, 711 F.Supp.2d 479, 515 (D. Md. 2010)(citing Byram v. Ozmint, 339 F.3d 203, 209 (4th Cir. 2003)).

Petitioner presents no evidence to show that any members of the defense team had knowledge of Dr. Dietz's false testimony in the Yates trial or that they acted unreasonably by failing to discover this line of impeachment. Both trial counsel Jean Lawson and investigator Jan Barefoot stated in their post-conviction affidavits that they investigated Dr. Dietz's background, with Attorney Lawson noting that she spent a great deal of time reviewing testimony from prior cases in which he testified. (Doc. 74-2, p. 15, ¶6; Doc. 74-3, p. 49, ¶30). Petitioner cannot demonstrate he suffered prejudice because he cannot show that had trial counsel impeached Dr. Dietz regarding his false testimony, that it would have resulted in a different outcome at trial. As such, Petitioner cannot satisfy either prong of Strickland.

Additionally, Petitioner presents nothing to suggest that the Government was aware of Dietz's false testimony, and therefore cannot establish any Brady/Giglio claim. Based on the foregoing, this claim is denied.

### (iv). Dr. Sally Johnson

Petitioner asserts that counsel was ineffective for failing to consult with and call as a witness Dr. Sally Johnson, a forensic psychiatrist employed at the Federal Correctional Institution at Butner, North Carolina, who was previously appointed to evaluate Petitioner and testified in the 1998 trial as to Petitioner's competency. Petitioner argues that had counsel called Dr. Johnson as a witness, she would have been able to testify to a number of mitigating issues featured in her 1998 testimony, including Petitioner's positive institutional adjustment, expressions of remorse, and mental illness.

21

Petitioner cannot establish that counsel was ineffective for failing to call Dr. Sally Johnson as a witness. The decision to call witnesses is a classic tactical decision, not to be second-guessed. Sampson v. United States, 2001 WL 34563140, *5 (W.D.N.C. July 25, 2001)(citing Strickland, 466 U.S. at 689). The record reflects that the jury heard substantial testimony concerning Petitioner's institutional adjustment, mental health issues, and remorse from Petitioner himself and from other witnesses, including correctional employees and experts.

Dr. Johnson testified at the first trial and counsel was therefore aware of the substance of her testimony. See Alexander v. United States, 2009 WL 1542550, *4 (D.Md. May 28, 2009)(counsel not ineffective for choosing not to call witness in second trial that previously testified in first trial, as counsel was aware of substance of testimony and strategic decision not to call witness should be upheld). The experts called by the defense also reviewed Dr. Johnson's report as part of their investigations. (Transcript, p. 1392, 1515, 1520-1521, 1628). As such, Petitioner cannot establish that counsel was ineffective for failing to call Dr. Johnson as a witness, nor can Petitioner establish that he suffered prejudice because of counsel's decision not to call Dr. Johnson. Therefore, this claim is denied.

### f.     Failure to Advise Petitioner Not to Testify

Petitioner claims that trial counsel was ineffective for failing to advise him not to testify, failing to properly prepare him to testify, and failing to frame his testimony in the context of his mental health issues. Petitioner argues that in testifying about his role in the charged crimes, prior relationships, and his upbringing, he essentially served as his own mitigation specialist. Petitioner states that due to his mental health issues, portions of his testimony were inaccurate and highly aggravating, leading the Government to characterize him as a "spin artist."

An ineffective assistance of counsel claim regarding counsel's failure to inform a defendant of his right to testify (or not testify) must satisfy the two-prong test set forth in Strickland. Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998). However, the Fourth Circuit has cautioned that counsel's advice on whether a client should testify "is a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance." Carter v. Lee, 283 F.3d 240, 249 (4th Cir. 2002)(quoting Hutchins v. Garrison, 724 F.2d 1425, 1436 (4th Cir. 1983)).

As discussed at length above, significant mitigation evidence was presented to the jury on behalf of the defense, including numerous mitigation witnesses. The jury heard lengthy testimony regarding Petitioner's mental health issues and background, so Petitioner cannot contend that he served as his own mitigation specialist. The presentation of mitigation evidence and witnesses, along with Petitioner's own testimony, was undoubtedly part of the defense team's strategy and efforts to persuade the jury not to impose a death sentence. In light of the overwhelming evidence against Petitioner, it was not unreasonable for the defense to decide the jury should hear from Petitioner himself. As indicated by the jury verdict, the jury did find in Petitioner's favor as to several of the mitigating factors. (Case 3:97-cr-00023; Docs. 596-598).

Petitioner provides nothing more than conclusory allegations that counsel was ineffective for failing to advise him not to testify. Petitioner has put forth nothing to support his claims that counsel's conduct fell outside the range of professional standards. See United States v. Terry, 366 F.3d 312, 316 (4th Cir. 2004)("[C]onclusory allegations are insufficient to establish the requisite prejudice under Strickland). Petitioner cannot establish counsel's performance fell below an objective standard of reasonableness or that if he had not testified, it would have changed the outcome of trial. Therefore, this claim is denied.

g.     **Failure to Investigate and Present Evidence Regarding Institutional Adjustment/Meaningful Relationships**

Petitioner alleges that counsel was ineffective for failing to investigate and present additional evidence regarding his positive adjustment to prison. Petitioner states that counsel made a gaping omission by failing to explain to the jury that Petitioner's mental health issues and mood disorders were better controlled and managed in prison, and that counsel should have presented expert testimony as to Petitioner's positive response to structure. Petitioner also states that counsel failed to present evidence showing he maintained and developed meaningful relationships with family and friends since his imprisonment. Petitioner argues these witnesses could have testified about his connectedness with his half siblings, how he would send family members artwork, and his interest in maintaining his relationship with Natasha Tolbert and their two children.

Petitioner cannot establish that counsel was ineffective for failing to present additional evidence regarding his positive adjustment to prison. The record reflects that there was ample testimony regarding Petitioner's adjustment to prison. Petitioner himself testified about his positive adjustment and good behavior, as well as how he became employed as a prison orderly. (Transcript, p. 1231-1235). Numerous corrections employees were called by the defense and testified as to Petitioner's lack of disciplinary problems, and there was expert testimony explaining that his positive adjustment was due to the fact that his difficulties and violence arose in the context of domestic relationships. (Transcript, p. 1432-1463, 1496-1497, 1572). Dr. Burgess explained that Petitioner's misconduct was limited to the context of domestic relationships, stating that he "[d]oes what he's supposed to do when he's in a structured setting." (Transcript, p. 1496-1497).

Petitioner also fails to demonstrate that counsel was ineffective for failing to present additional testimony regarding his personal relationships after imprisonment. Natasha Tolbert testified that Petitioner corresponded with her after he went to prison and that she had taken their

kids to visit him. (Transcript, p. 833-834, 841-842). Petitioner testified to reestablishing his relationship with his children and his recent correspondence with them. (Transcript, p. 1241-1242). Petitioner's stepfather Derrick Barnette testified that he had recently accompanied Natasha Tolbert and Petitioner's daughter to visit him a week before trial, and Petitioner's brother testified he had also visited his brother. (Transcript, p. 1334, 1361).

Based on the foregoing, Petitioner cannot establish that counsel was ineffective for failing to call additional witnesses to testify as to Petitioner's prison adjustment and maintaining his personal relationships. There was sufficient testimony on these issues and counsel cannot be deemed ineffective for failing to call witnesses to give cumulative testimony. See United States v. Dehlinger, 740 F.3d 315, 324-325 (4th Cir. 2014). Therefore, this claim is denied.

### h.     Failure to Request Continuance

Petitioner argues that trial counsel were ineffective for failing to move to continue the penalty phase trial despite being unprepared and needing additional time. Petitioner claims they were scrambling on the eve of and during trial to uncover information that should have been investigated and developed well in advance. Petitioner cites to jail visitation records and states that in the six and a half months before trial, Attorney Jean Lawson met with Petitioner three times for a total of five hours and forty-five minutes, and that there were no visits between Petitioner and Attorney Claire Rauscher (who later withdrew and was replaced by Attorney Harold Bender), investigators, or experts. Petitioner also alleges that counsel delayed in requesting expert and investigative funding, in conferring with those involved in the 1998 trial, and in preparing for trial due to other cases and responsibilities.

Petitioner cites to a February 26, 2002 *ex parte* hearing regarding the defense's budgetary needs, wherein Attorney Bender informed the Court that the defense team had been "burning the

midnight oil" in preparation for trial, stating "[w]e don't want this case continued."  (Case 3:97-cr-00023; Doc. 688, p. 2-3, sealed).  Petitioner states that Attorney Bender had no basis for making this promise, as the defense's mitigation investigation was barely underway, experts had not yet been engaged, and counsel was failing to adequately supervise the defense's mitigation specialist.  Petitioner alleges that the defense's preparation fell short and resulted in disorganization and an absence of coherent strategy.

Petitioner's opinion regarding counsel's performance cannot support an ineffective assistance claim.  "[T]he trial lawyers, in every case could have done something more or something different.  So, omissions are inevitable.  But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled'." Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000)(quoting Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)).  See also United States v. Mayo, 646 F.2d 369, 375 (9th Cir. 1981)(difference of opinion as to trial tactics does not constitute deficient performance).

As discussed above, defense counsel gathered and presented a wealth of mitigation evidence on Petitioner's behalf concerning his background and mental health.  This presentation clearly involved strategic decision-making regarding what information to present to the jury.  Attorney Bender's statement to the Court that the defense did not wish to seek a continuance indicates the defense felt they were adequately preparing for and able to try the case.  The entirety of Attorney Bender's statement to the Court was as follows:

> "...The trial date is scheduled for July 15th, 2002.  And in order for us to get ready for that, we have literally been burning the midnight oil.  We don't want this case continued.  We're not going to ask for this case to be continued.  I don't think Your Honor wants it continued -- in any way.  And I don't think the client wants it to be continued.  And I'm sure the government doesn't.  So in order to get ready and adequately prepare, we have got to spend an inordinate amount of time.  We have already spent a great deal of time.  Every Saturday and Sunday since I've been appointed I've done something in this case, whether it's reading the transcript or

reviewing discovery, you know, reading testimony of witnesses, trying to determine which witnesses we're going to call, meeting with experts and the family. We've done that on several Saturdays. So in order to prepare adequately, we're just going to have to spend the time necessary to get it ready, and that -- that is one of the reasons for the case budget..."

(Case 3:97-cr-00023; Doc. 688, p. 2-3, sealed). There is nothing in the record that indicates defense counsel were unprepared during trial or struggling to proceed. Attorneys Lawson and Rauscher were appointed on February 13, 2001, and Attorney Bender was appointed to replace Rauscher on January 14, 2002. Jury selection began on July 15, 2002 and counsel had many months in which to prepare. Given that this was a re-trial of the sentencing phase, counsel already had a previous record available from which to work. The defense team's review of materials included "18 boxes of files from prior counsel, 15 volumes of transcripts from the first trial, and one box of discovery." (Doc. 74-4, p. 29, ¶ 5). Defense counsel also hired a second mitigation specialist and an investigator for assistance with their preparations. (Doc. 74-3, p. 45, ¶10).

Petitioner's claims are conclusory and speculative and lack factual support to establish ineffectiveness on part of trial counsel. Petitioner does not explain how counsel's actions resulted in disorganization or an absence of strategy. Petitioner provides no facts showing how counsel was unprepared and fails to demonstrate that counsel's actions or inactions affected the outcome of Petitioner's trial. Petitioner is unable to establish he suffered prejudice as he cannot show that his trial would have resulted in a different outcome had counsel requested a continuance. As such, he cannot satisfy Strickland and this claim is therefore denied.

### i. Failure to Maintain and Preserve Files

Petitioner argues that trial counsel's failure to maintain and preserve files gives rise to a constitutional violation. During a September 17, 2012 *ex parte* hearing, former trial counsel Harold Bender, who was semi-retired at the time, acknowledged on the record that he was the last among Petitioner's counsel to possess trial files and that he had been unable to locate them. (Doc.

17, p. 1). Petitioner states that while Attorney Bender produced approximately 300 pages prior to his March 2013 death, Petitioner claims approximately 40 to 50 boxes of files have not yet been located. (Doc. 48, p. 4, n. 1).

Following the hearing, this Court ordered the Government to provide to Petitioner's habeas counsel all discovery previously disclosed to Petitioner's 1998 and 2002 trial counsel, including witness statements, statements and documents produced pursuant to the Federal Rules of Criminal Procedure or the Federal Rules of Evidence, all <u>Brady</u> material, and correspondence between the prosecution and defense. (Doc. 17). The Government provided a diskette to Petitioner with over 3,000 pages of materials in November 2012, followed by nineteen additional diskettes of materials in March 2013. (Doc. 64). Petitioner filed a motion seeking additional discovery from the Government, which the Court denied for lack of good cause. (Docs. 51, 62).

In light of the efforts made to provide Petitioner with complete records, Petitioner cannot articulate how he has been prejudiced by failing to receive Attorney Bender's trial files, nor can he describe how he has been unable to pursue his § 2255 claims. Petitioner has filed a lengthy § 2255 motion with numerous grounds, as well as a motion seeking to add additional claims.

A § 2255 proceeding enables the petitioner to collaterally attack his or her sentence. Here, Petitioner attacks an act of trial counsel that occurred well after the trial and sentencing. Petitioner cannot establish that trial counsel's failure to preserve and maintain files had any effect on the outcome of his trial and sentencing, and therefore, this claim is not appropriate under <u>Strickland</u> or § 2255. <u>See</u> <u>Johnson v. United States</u>, 2010 WL 1252674, *6 (W.D.N.C. Mar. 23, 2010)(counsel's failure to produce files to petitioner for habeas purposes cannot support ineffective assistance claim, as there is no right to counsel in post-conviction proceedings).

28

Petitioner's claim that trial counsel was ineffective for failing to preserve or maintain files is without merit and therefore, this claim is denied.

### j.    Additional Ineffective Assistance Grounds

On pages 85-87 of his motion, Petitioner sets forth a laundry list of thirty-one additional claims of ineffective assistance against trial counsel. However, Petitioner provides insufficient allegations of fact in support of these claims. These vague and unsupported allegations amount to nothing more than general assertions and warrant no relief. See United States v. Dyess, 730 F.3d 354, 359 (4th Cir. 2013)(vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the court). Therefore, these claims are denied.

Petitioner further alleges that trial counsel's ineffective performance caused him prejudice because the totality of the mitigating evidence presented created "a reasonable probability that at least one juror would have struck a different balance." However, as set forth above, Petitioner has failed to demonstrate any ineffective performance on part of trial counsel. Therefore, this claim is also denied.

### 2.    *Batson* Proceeding

Following Petitioner's appeal from the second penalty phase trial, the Supreme Court vacated his death sentence and remanded the matter for a Batson hearing. Barnette v. United States, 546 U.S. 803, 126 S.Ct. 92, 163 L.Ed.2d 32 (2005). This Court conducted a limited hearing and in camera review of jury questionnaires and found no Batson violation. That decision was affirmed on appeal, United States v. Barnette, 644 F.3d 192 (4th Cir. 2011), and the U.S. Supreme Court denied certiorari review. Barnette v. United States, 565 U.S. 1263, 132 S.Ct. 1740, 182 L.Ed.2d 534 (2012).

Petitioner now complains that the Court denied his request at the <u>Batson</u> hearing for the jury questionnaires and the Government's annotated copies. In reviewing the issues, the Court ordered the Government to submit unredacted copies of its questionnaires for in camera review. (3:97-cr-23, Docs. 645, Doc. 649). Petitioner argues this prevented him from accessing the most important sources of evidence to support his <u>Batson</u> claim on appeal and that trial counsel should have insisted that the questionnaires be included in the appellate record.

This Court previously denied Petitioner's request for discovery on this claim, noting that it failed as a matter of law, as the <u>Batson</u> proceeding had been upheld on appeal. (Doc. 62, p. 7-8). <u>United States v. Barnette</u>, 644 F.3d 192, 196 (4th Cir. 2011).[6] The Supreme Court denied certiorari review. <u>Barnette v. United States</u>, 565 U.S. 1263, 132 S.Ct. 1740, 182 L.Ed.2d 534 (2012).

A petitioner "will not be allowed to recast, under the guise of collateral attack, questions fully considered [on direct appeal]." <u>Boeckenhaupt v. United States</u>, 537 F.2d 1182, 1183 (4th Cir. 1976). The <u>Batson</u> hearing was reviewed on direct appeal, with the appellate court finding no error. Petitioner cannot support this ineffective assistance claim and he is foreclosed from attempting to re-litigate this issue. Therefore, this claim is denied.

### 3. <u>Misconduct Related to Jury</u>

Petitioner argues that his constitutional rights were violated due to misconduct related to the jury. Petitioner asserts that during the 2002 penalty phase trial, a juror raised a concern that other jurors were forming, or had formed, opinions about whether Petitioner should receive the death penalty prior to the Court's final instructions. Petitioner also states that the misconduct included: 1) improper consideration of matters extraneous to the trial, 2) improper racial attitudes which infected the deliberations of the jury, 3) false or misleading responses by jurors, 4) improper

---

[6] Although the Fourth Circuit did find that the Court erred in denying Petitioner clean copies of the original juror questionnaires, it found the error harmless. <u>United States v. Barnette</u>, 644 F.3d 192, 212-213 (4th Cir. 2011).

biases of jurors which infected their deliberations, 5) improper exposure to the prejudicial opinions of third parties, 6) improper communications with third parties, 7) improper communications with U.S. Marshals, 8) improper *ex parte* communications, and 9) improperly prejudging the guilt and penalty phases of trial. Petitioner elaborates no further and states this claim requires additional discovery.

This Court previously denied Petitioner's motion seeking to interview the jurors on this issue. (Doc. 50). The Court reviewed the record and the inquiry conducted at trial and found that the pre-deliberation remarks made by one juror and overheard by another juror did not fall into the category of "extraneous, prejudicial information or outside influence" necessary to justify juror interviews. (Doc. 50, p. 3). The juror's remarks came seven days into the sentencing trial and appeared to have been in reaction to testimony which immediately preceded it. There was no evidence the juror had any prior bias against Petitioner or acquired any extrinsic information prejudicial to Petitioner. Id. at 3-4.

The remainder of Petitioner's allegations are conclusory and he sets forth no facts to support his claims of misconduct related to the jury. Therefore, this claim is denied.

**4.    Decision to Prosecute in Federal Court**

Petitioner claims that the Government's decision to federally prosecute him violated his constitutional rights because it resulted in a significant reduction in the number of African Americans in the jury pool. Petitioner states that the decision to prosecute in federal court resulted in 4% fewer African Americans in the jury pool because federal jurors are pulled only from voter registration lists, while state jurors are pulled from both voter and driver's license lists. Therefore, Petitioner maintains that a state court prosecution would have unlikely resulted in a death sentence.

31

The Government has broad prosecutorial discretion, so long as it "has probable cause to believe that the accused committed an offense defined by statute" and the decision is not "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." Rowsey v. Lee, 327 F.3d 335, 342-343 (4th Cir. 2003)(quoting Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978)). "Absent clear evidence that a prosecutor's choice in forum was motivated by an unjustifiable standard, prosecutorial discretion stands." Moore v. United States, 2012 WL 3078932, *4 (E.D. Pa., July 30, 2012)(citing United States v. Armstrong, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)).

To establish a prima facie case that violation of the fair-cross-section requirement occurred, one must show that "(1) a group qualifying as 'distinctive' (2) is not fairly and reasonably represented in jury venires, and (3) 'systematic exclusion' in the jury-selection process accounts for the underrepresentation." Berghuis v. Smith, 559 U.S. 314, 327, 130 S.Ct. 1382, 176 L.Ed.2d 249 (2010)(citing Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)). "[T]he selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial." Taylor v. Louisiana, 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). However, "the Constitution does not require that the juror selection process be a statistical mirror of the community; it is sufficient that the selection be 'in terms of a fair cross-section' gathered without active discrimination." United States v. Cecil, 836 F.2d 1431, 1445 (4th Cir.1988).

Petitioner fails to show that the Government's decision to federally prosecute him was racially motivated. Petitioner previously sought discovery on this claim, which this Court denied on grounds that Petitioner failed to make a prima facie showing that the decision to federally prosecute him violated his constitutional rights. (Doc. 62, p. 9-11). The Court held that Petitioner

would need to show that the source from which the Western District of North Carolina drew eligible jurors in 2002 systematically excluded African Americans and was not representative of the community. (Doc. 62, p. 9-10). The Court explained that "[j]uries in all four divisions of the Western District of North Carolina are selected according to the District Jury Selection Plan in which potential jurors are randomly selected from the voter registration lists ("VRLs") of the division where the trial is held." Id. The Court noted that "Congress has expressly sanctioned the use of VRLs as the source for jury selection in federal courts." Id. (citing Cecil, 836 F.2d at 1445; 28 U.S.C. § 1863(b)(2). See also United States v. McGrady, 173 F.3d 426, *2–3 (4th Cir.1999)(unpublished table decision)(finding no fair cross-section violation in use of VRLs by the Western District of North Carolina as source for jury selection).

The Court also held that Petitioner failed to provide information regarding the percentage of African Americans registered to vote in Charlotte where he was tried, the percentage of those eligible to vote but who had not registered, or any factual support for his claim that African Americans were unfairly represented. (Doc. 62, p. 10). Petitioner did not allege that North Carolina "systemically" or "intentionally" excluded African Americans by its voter registration procedures, nor that the Court purposefully misapplied or violated the rules or procedures of its own District Jury Selection Plan in order to exclude eligible African Americans from jury pools in this District or the Charlotte Division. Id.

Based on the foregoing, Petitioner's claim is denied.

### 5. Unconstitutionality of Death Penalty

Petitioner challenges the death penalty as unconstitutional on grounds that it is sought in a discriminatory manner based upon race and geography. Petitioner cites two Department of Justice studies from 1988 through 2001, which he claims show that the federal death penalty has been

disproportionately sought against persons of color and residents of the South.

This Court previously addressed this claim in its review of Petitioner's motion for discovery. (Doc. 62, p. 13-14). Petitioner acknowledged at that time that he had not provided sufficient evidence to prove a constitutional violation and sought discovery related to this claim. (Doc. 51, p. 14-15). However, the Court concluded that Petitioner made no showing that as a death-eligible defendant he was treated differently from persons of other races who engaged in similar conduct and that statistical studies cited by Petitioner did not constitute sufficient evidence to support his discrimination claims. (Doc. 62, p. 13-14). The Court also noted that Petitioner failed to make a credible showing that "the decisionmakers in *his* case acted with discriminatory purpose." Id. at 13 (citing McClesky v. Kemp, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)(emphasis original)). In McClesky, the Supreme Court held that reliance on statistical data alone cannot prove discriminatory intent in support of an equal protection claim brought by a capital defendant. Id.

Because Petitioner provides nothing more than statistical studies, he has not demonstrated that the decisionmakers in his case acted with discriminatory purpose. Therefore, this claim is denied.

### 6.     Federal Execution and Eighth Amendment

Petitioner claims that the manner in which the Bureau of Prisons will carry out his execution violates the Eighth Amendment. However, Petitioner briefs this argument no further, noting that his challenge is not yet ripe as it may appropriately be raised in a 42 U.S.C. §1983 action. The Government agrees. Therefore, this claim warrants no relief and is denied.

34

### 7. <u>**Cumulative Effect of Errors**</u>

Petitioner asserts that he is entitled to relief due to the cumulative effect of the errors raised in his motion to vacate. However, as set forth above, Petitioner's claims of error are without merit. Generally, if none of a defendant's claims warrants relief individually, a court will decline to reverse for cumulative error. <u>United States v. Basham</u>, 561 F.3d 302, 330 (4th Cir. 2009). Therefore, this claim is denied.

### C. **Petitioner's Motion to Supplement**

On June 24, 2016, more than three years after the filing of his § 2255 Motion to Vacate, Petitioner moved to supplement his motion with additional claims challenging his convictions in counts 1, 2, 3, 8, 10, and 11, in light of recent U.S. Supreme Court decisions in <u>Johnson v. United States</u>, 576 U.S. 591, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015) and <u>Welch v. United States</u>, 136 S.Ct. 1257, 194 L.Ed.2d 387 (2016). (Doc. 119).

Federal Rule of Civil Procedure 15 governs the amendments of § 2255 motions and provides that a party may amend their pleading once as a matter of course at any time before a responsive pleading is served or they must otherwise seek leave of court or obtain written consent from the adverse party. Fed. R. Civ. P. 15(a). Leave to amend "shall be freely given when justice so requires." <u>United States v. Pittman</u>, 209 F.3d 314, 317 (4th Cir. 2000). However, courts may deny leave to amend when the amendment would be prejudicial to the opposing party, there has been bad faith on part of the moving party, or the amendment would be futile. <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 242 (4th Cir. 1999)(citing <u>Johnson v. Oroweat Foods Co</u>., 785 F.2d 503, 509 (4th Cir. 1986)).

### 1. __Crime of Violence Case Law__

In <u>Johnson</u>, the Supreme Court declared the residual clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), to be unconstitutionally vague and held that the imposition of an enhanced sentence under ACCA's residual clause violated due process. <u>Johnson v. United States</u>, 576 U.S. 591, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015). Shortly thereafter, the Supreme Court held in <u>Welch</u> that the rule set forth in <u>Johnson</u> was substantive and applied retroactively to cases on collateral review. <u>Welch v. United States</u>, 136 S.Ct. 1257, 194 L.Ed.2d 387 (2016).

Petitioner's convictions for counts 2, 8, and 11 fall under 18 U.S.C. § 924(c). Section § 924(c) defines the term "crime of violence" using two clauses, the "elements" or "force" clause and the "residual" clause. The force clause includes any felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). Similar to § 924(e), the residual clause includes any felony "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B).

Petitioner's convictions in counts 1 and 10 under 18 U.S.C. § 2261 incorporate the definition of "crime of violence" found in 18 U.S.C. § 16(b), which is identical to the definition in § 924(c). The counts under which Petitioner was convicted under 18 U.S.C. § 2261 and 18 U.S.C. § 924(c) impose an enhanced sentence due to the commission of offense acts during a "a crime of violence" and require determinations that he committed a "crime of violence" as one of the elements necessary to prove the violation.

Both the Government and Petitioner moved for a stay pending decisions by the Fourth Circuit in <u>United States v. Ali</u>, No. 15-4433 and <u>United States v. Simms</u>, No. 15-4640 regarding the constitutionality of § 924(c)'s definition of "crime of violence." (Docs. 121, 122). Shortly

thereafter, the U.S. Supreme Court granted certiorari review in <u>Lynch v. Dimaya</u>, No. 15-1498 to address whether the residual clause of 18 U.S.C. § 16(b) was also unconstitutionally vague, and the Fourth Circuit issued a stay in <u>Ali</u> pending the <u>Dimaya</u> decision.  On December 8, 2016, this Court granted a stay pending Supreme Court decisions in <u>Dimaya</u> and/or <u>Simms</u>, noting that at least six of Petitioner's convictions depend upon the definition of "crime of violence" under 18 U.S.C. § 16(b) or § 924(c).  (Doc. 123).

On April 17, 2018, the Supreme Court issued its decision in <u>Sessions v. Dimaya</u>, 138 S.Ct. 1204, 200 L.Ed.2d 549 (2018), extending its ruling in <u>Johnson</u> and holding that the residual clause of the definition of "crime of violence" in 18 U.S.C. § 16(b) is unconstitutionally vague. Subsequently, on June 24, 2019, the Supreme Court held in <u>United States v. Davis</u>, 139 S.Ct. 2319, 204 L.Ed.2d 757 (2019) that the residual clause of 18 U.S.C. § 924(c)(3)(B) is also unconstitutionally vague.

Following <u>Davis</u>, the Government filed its Response to Petitioner's motion to supplement on November 21, 2019. (Doc. 132).  Petitioner filed his Reply on February 20, 2020. (Doc. 136).

## 2. **Timeliness**

The Government asserts that Petitioner's supplemental claims are untimely because he was required to bring his claims within one year of the judgment becoming final as provided by 28 U.S.C. § 2255(f)(1).  Petitioner contends that his motion to supplement is timely under § 2255(f)(3) because it asserts rights initially recognized in <u>Johnson</u> and retroactive under <u>Welch</u>.  Section § 2255(f)(3) allows the statute of limitations to start running from "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review."  28 U.S.C. § 2255(f)(3).

37

Petitioner's supplemental motion initially sought to challenge the residual clauses of § 924(c) and § 16(b), which were subsequently addressed by the Supreme Court in <u>Davis</u> and <u>Dimaya</u> several years after the filing of the supplemental motion. The pending court decisions on this issue and connection to <u>Johnson</u> is what prompted both Petitioner and the Government to move for a stay, which this Court granted. (Docs. 121-123).

Petitioner's motion to supplement also challenges his § 924(c) and § 2261 convictions for failing to constitute crimes of violence under the force clause, and he contends these claims are timely under <u>Dimaya</u> and <u>Davis</u>. These claims were included with the other grounds in his supplemental motion and within one year of the <u>Johnson</u> decision. As such, this Court will not dismiss Petitioner's motion to supplement as untimely filed.

### 3. Procedural Default

The Government argues that Petitioner's challenges to his convictions in counts 1 and 10 are barred by procedural default because Petitioner's argument that the language in the indictment fails to conform to the categorical approach should have been raised during his criminal case. Because Petitioner's challenges to counts 2, 3, and 11 rely upon the same rationale, the Government argues they too are barred by procedural default.

A § 2255 motion "may not do service for an appeal" and claims that should have been raised at trial or on appeal are procedurally defaulted unless an exception applies. <u>United States v. Frady</u>, 456 U.S. 152, 165, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). To overcome a procedural default, a petitioner must show either (1) "cause" and "actual prejudice" resulting from the errors complained of, or (2) that a "miscarriage of justice" would result from refusal to entertain the collateral attack. <u>United States v. Mikalajunas</u>, 186 F.3d 490, 492-93 (4th Cir. 1999)(citing <u>United States v. Frady</u>, 456 U.S. 152, 167-68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). "Cause" for procedural default exists "where a constitutional claim [was] so novel that its legal basis [was] not

38

reasonably available to counsel." Reed v. Ross, 468 U.S. 1, 16, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984). "Actual prejudice" is shown by demonstrating that the error worked to petitioner's "actual and substantial disadvantage," rather than just creating a "possibility of prejudice." Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1997)(quoting Murray v. Carrier, 477 U.S. 478, 494, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). To show that a "miscarriage of justice" would result from the court's failure to entertain the collateral attack, the movant must show "actual innocence by clear and convincing evidence." United States v. Mikalajunas, 186 F.3d at 493.

Petitioner's supplemental motion challenges the residual clauses of § 924(c) and § 16(b) following the Supreme Court decisions in Johnson and Welch, and later addressed by Dimaya and Davis. The supplemental motion also challenges his § 924(c) and § 2261 convictions for failing to constitute crimes of violence under the force clause. Petitioner argues that his supplemental claims are not procedurally defaulted because he has raised a jurisdictional defect as well as timely and straightforward challenges under Davis and Dimaya.

It is arguable that Petitioner's challenges were not previously available in light of the Johnson and Welch decisions, and later decisions in Dimaya and Davis. Even if Petitioner has demonstrated cause, he cannot show the necessary prejudice or actual innocence required to excuse any procedural default. Petitioner's § 924(c) and § 16(b) convictions are valid under the force clause and his challenges fail as a matter of law. See section 4, *infra*. Petitioner cannot show any likelihood that his convictions would have been different absent the alleged error, nor can he establish actual innocence in light of the overwhelming evidence presented at trial. Petitioner's supplemental claims seeking to challenge his convictions in counts 1, 2, 3, 10 and 11 under the force clause are therefore procedurally defaulted from collateral view.

39

### 4. Petitioner's Challenges to his Convictions Fail on the Merits

Assuming *arguendo* that Petitioner's supplemental claims are not procedurally defaulted, his challenges to his convictions fail as a matter of law on the merits.

Petitioner's supplemental motion challenges the residual clauses of § 924(c) and § 16(b). However, the holdings in Davis and Dimaya make clear that convictions under § 924(c) or § 16(b) may now stand only if the underlying offense qualifies as a crime of violence under the "force" or "elements" clause. Bost v. United States, 2020 WL 2041340, *2 (W.D.N.C. Apr. 28, 2020). This requires a determination of whether the predicate crime had, as an element, "the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). The "physical force" must be "capable of causing physical pain or injury to another person" and must be "intentional." Johnson, 559 U.S. at 140; United States v. Dixon, 805 F.3d 1193, 1197 (9th Cir. 2015).

To determine whether a predicate offense underlying a § 924(c) conviction falls within the force clause, the court looks to the elements of the "ordinary case" of such offense. In re Irby, 858 F.3d 231, 234 (4th Cir. 2017). Whether an offense qualifies as a crime of violence requires application of the categorical approach or the modified categorial approach depending on nature of the offense. Davis, 139 S.Ct. at 2325-26.

The categorical approach applies to statutes that set out a "single (or 'indivisible') set of elements" and "focuses on the elements of the prior offense rather than the conduct underlying the conviction." United States v. Mathis, 932 F.3d 242, 264 (4th Cir. 2019)(quoting United States v. Cabrera-Umanzor, 728 F.3d 347, 350 (4th Cir. 2013)). "In short, [courts] look to the statutory definition of the offense in question, as opposed to the particular facts underlying the conviction." United States v. Davila-Felix, 667 F.3d 47, 56 (1st Cir. 2011). A predicate crime can

only qualify as a "crime of violence" if all of the criminal conduct covered by a statute, including the least culpable conduct, matches or is narrower than the "crime of violence" definition. United States v. Torres-Miguel, 701 F.3d 165, 167 (4th Cir. 2012).

On the other hand, the modified categorical approach applies to a narrow range of cases involving statutes with "alternative elements" as they are 'divisible' and "compris[e] multiple, alternative versions of the crime." Descamps v. United States, 570 U.S. 254, 261-262, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013)(citing Taylor v. United States, 495 U.S. 575, 602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990)); Castillo v. United States, 2020 WL 1490727, *5 (W.D.N.C Mar. 24, 2020). Under the modified categorical approach, the court may look to a limited set of documents such as the indictment, jury instructions, or plea colloquy to determine what crime and with what elements a defendant was convicted. Id.

Petitioner argues that none of the predicate crimes of which he was convicted categorically qualify as "crimes of violence" under the force or elements clause. However, the Court finds that Petitioner's claims are without merit and fail as a matter of law. Therefore, allowing Petitioner leave to supplement his claims would be futile.

### a.      Counts 1 and 10

Petitioner first challenges counts 1 and 10, which charged him with interstate domestic violence under § 2261 as follows:

Count 1 charged that on or about April 30, 1996, Petitioner

> did travel across a state line, that is, did transport himself from Charlotte, North Carolina to Roanoke Virginia with the intent to injure, harass, and intimidate an intimate partner, Robin Williams, and in the course and as a result of such travel intentionally committed a crime of violence, that is, did firebomb Robin Williams' occupied apartment and an automobile parked in her driveway causing bodily injury to her. In violation of Title 18, United States Code, Sections 2261(a)(1) and 2261(b).

Count 10 charged that on or about June 22, 1996, Petitioner

41

did travel across a state line, that is, did transport himself from Charlotte, North Carolina to Roanoke, Virginia with the intent to injure, harass, and intimidate an intimate partner, Robin Williams, and in the course and as a result of such travel intentionally committed a crime of violence, that is, shot and killed Robin Williams causing bodily injury and death to her. In violation of Title 18, United States Code, Sections 2261(a)(1) and 2261(b).

Petitioner argues that in both counts, the Government failed to indicate what crime it was alleging as the predicate "crime of violence," and instead, alleged only specific facts (i.e. that the crime of violence in count 1 was the "firebomb[ing] of Robin Williams' occupied apartment and an automobile..." and in count 10, that the crime of violence was that Petitioner "shot and killed Robin Williams..."). Petitioner states that this "recitation of facts without an alleged crime leaves this Court unable to apply a categorical approach to the elements of the predicate crime." (Doc. 119, p. 18). Petitioner adds that because "[c]ounts 1 and 10 fails to allege *any* statutory crime that the government contended was violated, this Court cannot presume that a crime *might* have been alleged that would have satisfied the force clause." Id. (emphasis original).

Petitioner challenges the indictment because it fails to include a specific code provision. However, this argument is without merit and is not supported by the Dimaya or Davis decisions. The crimes described in count 1 (firebombing Williams' residence causing injury to her) and count 10 (shooting and killing Williams) satisfy the force clause in requiring the intentional use of force capable of causing physical pain or injury sufficient to uphold Petitioner's convictions. A plain reading of the subsequent counts 2 and 11 make clear the statutory code provisions referenced in counts 1 and 10. Petitioner's complaint that the code provisions are not listed is not characteristic of the "force clause" challenges as contemplated by recent case law. Petitioner cites no on-point authority in support of his argument. Instead, Petitioner is challenging the language of the

indictment, which, as discussed in Section 3, *supra*, should have been raised in his criminal proceeding. Therefore, this claim fails as a matter of law.

### b.    Counts 2 and 11

Petitioner argues that counts 2 and 11 are also invalid because they presuppose convictions under counts 1 and 10. Counts 2 and 11 charged Petitioner with knowingly using and carrying a firearm during and in relation to a "crime of violence," with the acts of interstate domestic violence in counts 1 and 10 to be the predicate "crimes of violence."

Count 2 charged that on or about April 30, 1996, Petitioner

> knowingly used and carried a firearm, that is a destructive device, consisting of a bottle filled with flammable liquid, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, an act of interstate domestic violence in violation of Title 18, United States Code, Section 2261 as set forth in Count One. In violation of Title 18, United States Code, Section 924(c)(1).

Count 11 charged that on or about June 22, 1996, Petitioner

> knowingly used and carried a firearm, that is a sawed-off Winchester semi-automatic shotgun, during and in relation to a crime of violence, for which he may be prosecuted in a court of the United States, that is the act of interstate domestic violence set forth in Count Ten above, and in the course of this violation caused the death of Robin Williams, through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111, in that the defendant, with malice aforethought, did unlawfully kill Robin Williams by shooting her with the firearm willfully, deliberately, maliciously, and with premeditation. In violation of Title 18, United States Code, Sections 924(c)(1) and (i)(2)(1).

Petitioner contends that because counts 1 and 10 should be vacated as argued above, counts 2 and 11 fail. Petitioner also alleges that aside from the "crime of violence" element in § 2261, none of the remaining elements satisfies the force clause. Petitioner points out that § 2261(a) requires the defendant travel "with the intent to kill, injure, harass or intimidate," which Petitioner asserts does not qualify as a "crime of violence" under the force clause. Petitioner claims that intending to "intimidate" attempts to criminalize conduct that does not require an intentional threat

of violent physical force. In support, Petitioner argues that the federal bank robbery statute, 18 U.S.C. § 2113(a), has a similar intimidation element.

Petitioner's argument that counts 2 and 11 automatically fail because counts 1 and 10 should be vacated is insufficient. As discussed above, Petitioner's challenge to counts 1 and 10 are without merit. Petitioner's claim that his convictions fail because § 2261 criminalizes conduct that does not require an intentional threat of physical force also is without merit. The statute under which Petitioner was convicted, 18 U.S.C. § 2261(a)(1), states:

> A person who travels across a State line. . . with the intent to injure, harass, or intimidate that person's spouse or intimate partner, and who, in the course of or as a result of such travel, intentionally commits a crime of violence and thereby causes bodily injury to such spouse or intimate partner, shall be punished as provided in subsection (b).

The statute imposes its own requirement that the defendant cause bodily injury. See United States v. Jacobs, 2020 WL 3421765, *11 (E.D. Ky. June 22, 2020)(the "bodily injury requirement [of § 2261] at a minimum connotes the use of physical force" thereby sufficient to constitute a crime of violence under § 924(c)(3)'s force clause). Petitioner's reliance on the federal bank robbery statute is misplaced, as the Fourth Circuit has held in United States v. McNeal that bank robbery under 18 U.S.C. § 2113(a) is a "crime of violence" within the meaning of the force clause of 18 U.S.C. § 924(c)(3), as "intimidation entails a threat to use violent physical force, and not merely a threat to cause bodily injury." United States v. McNeal, 818 F.3d 141, 156-157 (4th Cir. 2016).

Based on the foregoing, § 2261(a) qualifies as a crime of violence and satisfies the force clause requirement. Therefore, Petitioner's claim is without merit and fails as a matter of law.

### c. Count 3

Petitioner alleges that because Count 1 must be vacated as argued earlier, his conviction in Count 3 for § 844(h)(1) cannot be sustained.

44

Count 3 charged that on or about the 30th day of April, 1996, Petitioner

> knowingly used and carried fire and explosive materials, to commit an act of interstate domestic violence in violation of Title 18, United States Code, Section 2261, a felony prosecutable in a court of the United States. In violation of Title 18, United States Code, Section 844(h)(1).

However, for the reasons discussed above, Petitioner's arguments with regard to Count 1 are without merit. Therefore, this claim fails as a matter of law.

### d.     Count 8

Count 8 charged that on or about June 22, 1996, Petitioner

> knowingly used and carried a firearm, that is a sawed-off Winchester semi-automatic shotgun, during and in relation to a crime of violence, for which he may be prosecuted in a court of the United States, that is, the carjacking set forth in Count Seven above, and in the course of this violation caused the death of Donald Lee Allen, through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111, in that the defendant, with malice aforethought, did unlawfully kill Donald Lee Allen by shooting him with the firearm, willfully, deliberately, maliciously, and with premeditation. In violation of Title 18, United States Code, Sections 924(c)(1) and (i)2(1).

Petitioner argues that the predicate offense of carjacking under 18 U.S.C. § 2119 cannot qualify as a "crime of violence" under § 924(c) because it can be violated by intimidation and without the intentional use, attempted use, or threatened use of violent force. However, the Fourth Circuit has held that carjacking under 18 U.S.C. § 2119 qualifies as a "crime of violence" under the force clause of 18 U.S.C. § 924(c). United States v. Evans, 848 F.3d 242, 247-248 (4th Cir. 2017). Evans held that the term "intimidation" as used in the statute "means a threat of violent force" and includes a threat of violent force to satisfy the force clause requirement. Id. Therefore, this claim fails as a matter of law.

### e. Count 7

Petitioner was convicted in count 7 of carjacking resulting in death in violation of 18 U.S.C. § 2119(3). Petitioner argues that because the claims raised in his motion to supplement require the vacation of his convictions in counts 1, 2, 3, 8, 10, and 11, then his conviction and death sentence for count 7 must also be vacated. Petitioner asserts that there is a reasonable likelihood that the inclusion of unconstitutional counts influenced the jury's decision to sentence him to death. However, because the Court has concluded Petitioner's challenges to counts 1, 2, 3, 8, 10, and 11 fail as a matter of law as discussed above, Petitioner's challenge to count 7 is without merit. Therefore, this claim also fails as a matter of law.

### 5. Concurrent Sentence Doctrine/Harmless Error

The Government contends that this Court should decline to consider Petitioner's motion to supplement because it is futile under the concurrent sentence doctrine and harmless error rule. Where a defendant is serving concurrent sentences and one is shown to be valid, the court may decline to pass upon the validity of the other conviction with a showing the defendant will suffer no harm letting both the valid conviction and unreviewed conviction stand. United States v. Hill, 859 F.2d 325, 326 (4th Cir. 1988). The Government states that because Petitioner does not challenge the validity of his conviction and death sentence in count 7, that conviction would still stand, and any error would be harmless even if his other counts were invalidated.

Regardless of the potential applicability of the concurrent sentence doctrine, this Court has reviewed Petitioner's motion to supplement and determined that his proposed supplemental claims fail as a matter of law and that leave to amend should be denied. See Section 4, *supra*. As such, the Court need not address the Government's request to apply the concurrent sentence doctrine/harmless error rule.

46

## IV.    CONCLUSION

For the reasons set forth above, the Court denies Petitioner's motion to supplement (Doc. 119), motion for evidentiary hearing (Doc. 73), and motion to vacate sentence filed pursuant to 28 U.S.C. § 2255 (Doc. 48).

The Court further finds that Petitioner has not made a substantial showing of a denial of a constitutional right as required for issuance of a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2). Miller-El v. Cockrell, 537 U.S. 322, 336-38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)(in order to satisfy §2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)(holding that when relief is denied on procedural grounds, a petitioner must establish both that the correctness of the dispositive procedural ruling is debatable, and that the petition state a debatably valid claim of the denial of a constitutional right).

**IT IS, THEREFORE, ORDERED** that:

1.   Petitioner's Motion to Vacate Sentence under 28 U.S.C. § 2255 (Doc. 48) is DENIED.

2.   Petitioner's Motion to Supplement (Doc. 119) is DENIED.

3.   Petitioner's Motion for Evidentiary Hearing (Doc. 73) is DENIED.

4.   This Court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**

Signed: March 12, 2021

Max O. Cogburn Jr.
United States District Judge

47